**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:13-cv-08564 |
| v. | ) ) ) | |
| SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff Property Casualty Insurers Association of America alleges as follows:

## NATURE OF THE ACTION

1.       This is an action under the Administrative Procedure Act ("APA"), which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be [among other things] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706.  Review is based on the administrative record, *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009), and the agency action must stand or fall based on the explanation and rationale actually given by the agency in its notice or decision, *see SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

2.     The agency action at issue here is the United States Department of Housing and Urban Development's ("HUD's") promulgation of a regulation purporting to "formalize" HUD's belief "that liability under the Fair Housing Act ["FHA"] may arise from a facially neutral practice that has a discriminatory effect" on a group of persons defined by race, color, religion, sex, handicap, familial status, or national origin—"regardless of whether there was an intent to discriminate." *See* 78 Fed. Reg. 11460, 11460 (Feb. 15, 2013) (the "Disparate Impact Rule" or the "Rule") (attached as Exhibit 1); *see id.* at 1463 (listing protected classes). This lawsuit challenges HUD's application of this regulation to the provision of homeowners insurance and property and hazard insurance ("homeowners insurance"), the underwriting and pricing of which has historically been regulated by the States. HUD's inclusion of homeowners insurance in the Disparate Impact Rule was arbitrary and capricious and contrary to law.

3.     Application of disparate impact liability to homeowners insurance cannot be reconciled with the McCarran-Ferguson Act. The McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, preserves the historic role of the States in regulating the business of insurance. It prohibits the application of federal laws that would "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance" unless the federal law "specifically relates to the business of insurance." 15 U.S.C. § 1012(b). The provision of homeowners insurance is extensively regulated by the States to ensure that insurance rates and practices are fair and reasonable.

4.     State laws permit and often require insurers to engage in risk-based underwriting and pricing—a practice that is fundamental to the business of insurance. As a matter of state law, property and casualty insurers are required to charge rates that are not excessive, inadequate, or unfairly discriminatory. A rate is not unfairly discriminatory, however, if it is

based on actuarial data reflecting past losses that reveals differences in the risks posed by different insureds. Insurers are thus permitted as a matter of state law to use actuarially significant risk factors. Indeed, many states mandate that insurers use these actuarial risk factors.

5. The Disparate Impact Rule would impair the ability of insurers to price and underwrite insurance based upon risk. Rather than allow insurance decisions to be guided by objective actuarial data regarding risk—as contemplated by state law—the Disparate Impact Rule would require insurers to attempt to determine whether their underwriting and pricing decisions have a disparate impact on customers falling within a protected class. The Rule would thus fundamentally change the business and regulation of insurance.

6. Because the Disparate Impact Rule would impair state laws regulating the business of insurance, and because the FHA does not specifically relate to the business of insurance, the application of the Disparate Impact Rule to insurance exceeds HUD's statutory authority under the FHA.

7. HUD's decision to apply disparate impact liability to homeowners insurance is not only contrary to the McCarran-Ferguson Act, and thus not in accordance with law, but also arbitrary and capricious. HUD failed altogether to address the application of the McCarran-Ferguson Act to the Disparate Impact Rule. Rather than determine whether the Rule would invalidate, impair, or supersede state law, HUD simply asserted—with no support—that only the courts are required to apply the Act. *See* 78 Fed. Reg. at 11475. The McCarran-Ferguson Act, however, contains no exception for federal regulatory action. It categorically declares that "[n]o Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). HUD failed

to consider this statutory requirement when it promulgated the Disparate Impact Rule and concluded that it applies to homeowners insurance.

8. HUD also failed to consider how application of a disparate impact standard would affect the business of insurance, which is dependent on effective risk segmentation. It provided no reasoned explanation for its decision not to create a safe harbor or exception for risk-based insurance generally or for particular commonly used risk factors. Rather than address these issues, as it was required to do under the APA, *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), HUD once again sought to shift to the courts the agency's obligation to consider the ramifications of applying its Rule to homeowners insurance. HUD merely stated that "insurance practices with a legally sufficient justification will not violate the Act." 78 Fed. Reg. at 11475. HUD's refusal to grapple with this important issue was arbitrary and capricious.

9. HUD also failed to address how the Disparate Impact Rule can be reconciled with the law of those States that require insurers to file and obtain regulatory approval for the rates they offer for homeowners insurance. The "filed rate" doctrine precludes claims premised on rates that have been approved by a state regulator. Although HUD acknowledged comments expressing the view that the Rule contravened the "filed rate" doctrine, HUD simply declined to address that basic issue.

10. The burden-shifting provisions of the Disparate Impact Rule are also contrary to settled law, particularly as applied to the insurance industry, which operates by classifying risks based on a broad range of actuarial data. In numerous respects, HUD's proposed framework deviates from the procedures required under settled precedent and the APA, including by impermissibly shifting the burden of proof to the respondent or defendant. In doing so, HUD

has deprived insurers of a viable opportunity to demonstrate in case-by-case adjudications that risk-based underwriting and pricing is justified by legitimate, non-discriminatory business purposes. HUD's proposed framework, when combined with HUD's failure to recognize a safe harbor for actuarially sound risk-based pricing and underwriting, calls this fundamental premise of homeowners insurance into question.

11. For the reasons set forth herein, the Court should declare that insofar as the Disparate Impact Rule purports to apply to the business of insurance, it is preempted by the McCarran-Ferguson Act and was promulgated in contravention of the APA.

## PARTIES

12. Property Casualty Insurers Association of America ("PCI") is an Illinois not-for-profit corporation with its headquarters in Chicago, Illinois. It is a trade association of property and casualty insurers representing more than 1,000 member companies. In 2012, PCI's members wrote over $190 billion in annual premiums and constituted 32% of the U.S. homeowners insurance market. PCI's members sell homeowners insurance, subject to state insurance regulations, in every state of the United States. PCI's mission is to promote and protect the viability of a competitive private insurance market for the benefit of consumers and insurers. In bringing this lawsuit, PCI seeks to vindicate both its own interests and the interests of its members.

13. Defendant Department of Housing and Urban Development ("HUD") is an executive agency of the United States Government, 5 U.S.C. §§ 101, 105, established by the Department of Housing and Urban Development Act of 1965, 42 U.S.C. § 3531 *et seq.*, Pub. L. No. 89–117, 79 Stat. 451. HUD is headquartered at 451 Seventh Street SW, Washington, DC 20410.

14.     Defendant Shaun Donovan is the Secretary of the Department of Housing and Urban Development and is being sued in his official capacity.  Secretary Donovan is charged with implementing the Fair Housing Act and is responsible for the Department's promulgation of the challenged regulations.  His official address is 451 Seventh Street SW, Washington, DC 20410.

## JURISDICTION AND VENUE

15.     This action arises under the APA and the McCarran-Ferguson Act.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and is authorized to grant relief under 5 U.S.C. §§ 702, 705, 706.

16.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff PCI resides in this district and no real property is involved in this action.

17.     This Court can grant declaratory and injunctive relief pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201, 2202.

## ALLEGATIONS

## I.     THE PROVISION AND PRICING OF INSURANCE

18.     Insurance is a means for transferring the risk of loss from one party, the insured, to another, the insurer.  In exchange for accepting the insured's risk, the insurer charges a rate. The rate is set based on numerous factors, including the probability and amount of potential loss, policy limits, deductibles, and the insurer's cost of doing business.  *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* § 1:6 (3d rev. ed. 2010).  The probability and amount of potential loss is also central to underwriting decisions—*e.g.*, decisions about whether to insure a particular risk or class of risk.  *Id.* at § 1:2.

19.     Determinations about the probability and amount of potential losses are made by actuaries, who are credentialed professionals trained and skilled in the analysis, evaluation, and

management of the financial implications of future contingent events primarily with respect to general insurance.  In setting property and casualty insurance rates, actuaries adhere to the Casualty Actuarial Society's Statement of Principles Regarding Property and Casualty Insurance Ratemaking: Adopted by the Board of Directors of the Casualty Actuarial Society, May 1988, *available at* http://www.casact.org/professionalism/standards/princip/sppcrate.pdf.  These principles "provide the foundation for the development of actuarial procedures and standards of practice" and, as such, provide essential guidance for insurers.  *Id.*

20.     When forecasting the probability and amount of potential loss, insurers consider a host of actuarial factors that correlate with losses.  *See* Michael J. Miller*, Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009).  For homeowners insurance, these factors might include, among many others, exposure to certain perils such as wind or hail, the types of construction materials used to build a house, house size, history of previous losses, geographic location, and proximity to fire hydrants.  In applying these factors, insurers thus consider risk, not race.  As the United States Court of Appeals for the Seventh Circuit has explained, "[r]isk discrimination is not race discrimination." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) (Easterbrook, J.); *see also id.* at 298 ("[C]lassification of risks is important to insurance, and assigning higher rates to greater risks differs from assigning rates by race.").

21.     Reliance on neutral, actuarially justified factors to calculate the probability and amount of potential losses is fundamental to the ability of the insurance industry to correlate risks to rates.  The insurance market operates most efficiently and fairly when each consumer pays a rate that accurately reflects the cost of providing insurance to that consumer and other similarly situated consumers.  If insurers could not set rates based on neutral, actuarially justified

factors and risk calculations, the insurance industry could not function.  *See, e.g.,* Robert Detlefsen, *"Disparate Impact" Theory Provides No Support for Banning Credit Scoring in Insurance*, Legal Backgrounder, Apr. 8, 2005, at 1, *available at* http://www.wlf.org/upload/040805LBDetlefsen.pdf.  If risk is not considered in setting prices, lower-risk customers are overcharged for insurance relative to the risk of loss that they pose.  If this were to occur (notwithstanding state law discussed below), many lower-risk customers would choose not to purchase insurance rather than pay too much for it.  This problem of adverse selection would cause prices to rise.  *See* Miller*, Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L. J. 29, 44 (2012).  Those consumers who are required to maintain a minimum level of insurance to meet mortgage requirements and those who ultimately sustain uninsured losses, among others, would suffer the consequences of this process.  *See* Alejandro Lazo, *Nearly one-third of U.S. homeowners have no mortgage*, L.A. Times, Jan. 10, 2013, *available at* http://articles.latimes.com/2013/jan/10/business/la-fi-free-and-clear-20130110.

22.     The Court of Appeals for the Seventh Circuit has noted this very phenomenon:

> Insurance works best when the risks in the pool have similar
> characteristics.  For example, term life insurance costs
> substantially more per dollar of death benefit for someone 65 years
> old than for one 25 years old, although the expected return per
> dollar of premium is the same to both groups because the older
> person, who pays more, also has a higher probability of dying
> during the term.  Auto insurance is more expensive in a city than in
> the countryside, because congestion in cities means more
> collisions.  Putting young and old, or city and country, into the
> same pool would lead to adverse selection: people knowing that
> the risks they face are less than the average of the pool would drop
> out.  A single price for term life insurance would dissuade younger
> persons from insuring, because the price would be too steep for the
> coverage offered; the remaining older persons would pay a price

> appropriate to their age, but younger persons would lose the
> benefits of insurance altogether. To curtail adverse selection,
> insurers seek to differentiate risk classes with many variables.

*Am. Family Mut. Ins. Co.*, 978 F.2d at 290 (noting the difference between disparate treatment

claims and disparate impact claims in addressing the application of the McCarran-Ferguson Act).

23. Additionally, if insurers were somehow forced to disregard the actual risk posed

by insureds (again, notwithstanding state law to the contrary), there would be severe disruption

in the market for insurance. Insurers who on balance provide coverage for riskier insureds would

have to set their overall prices higher than their competitors to cover expected losses. But such

an imbalance could not be sustained in a competitive market.

24. The inability to set rates based on neutral, actuarially justified factors would also

create an artificial subsidy for the purchase of hazard-prone or poorly constructed houses. For

example, insurance rates on houses made of easily flammable materials would be similar to rates

on houses built of safer materials. This would remove an incentive for the construction of safer

houses and the maintenance of existing homes. *See, e.g.*, Avraham, *The Economics of Insurance

Law—A Primer*, 19 Conn. Ins. L. J. at 66-67.

## II.     STATE REGULATION OF INSURANCE

25. Homeowners insurance is subject to extensive State regulation. State regulatory

regimes affirmatively permit—and often mandate—the use of risk-based pricing based on

actuarially significant risk factors.

26. State law generally prohibits insurers from charging excessive, inadequate, or

unfairly discriminatory insurance rates. For purposes of insurance law, rates are "unfairly

discriminatory" if "premium differences . . . do not correspond to expected losses and average

expenses or if there are expected average cost differences that are not reflected in the premium

differences." Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty

Actuarial Society E-Forum at 283 (internal quotation marks omitted). As further explained in

Principle 4 of Casualty Actuarial Society Statement of Ratemaking Principles, "[a] rate is

reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound

estimate of the expected value of all future costs associated with an individual risk transfer."

Statement of Principles Regarding Property and Casualty Insurance Ratemaking: Adopted by the

Board of Directors of the Casualty Actuarial Society, May 1988, *available at*

http://www.casact.org/professionalism/standards/princip/sppcrate.pdf.

27.     This issue has also been addressed by the National Association of Insurance

Commissioners ("NAIC"), a standard-setting and regulatory support organization created and

governed by state chief insurance regulators that establishes standards and best practices,

conducts peer review, and coordinates regulatory oversight. NAIC's model code makes clear

that an insurer is guilty of unfair discrimination when it makes underwriting and rating

distinctions "between individuals or risks of the same class and of essentially the same hazard"

or when underwriting and rating decisions are not supported by "the application of sound

underwriting and actuarial principles related to actual or reasonably anticipated loss experience."

Unfair Trade Practices Act § 4(G)(3) (Model Regulation Service, July 2008).

28.     As a result, insurers are affirmatively permitted, and often required, to take into

account actuarially significant risk factors in making underwriting decisions and setting rates.

These principles are consistently applied across the states.

## A.     State Laws Permitting Consideration Of Actuarial Factors

29.     State laws make clear that insurers are permitted to consider actuarially

significant risk factors. For example, Illinois law prohibits "any unfair discrimination *between*

*individuals or risks of the same class or of essentially the same hazard and expense element*

because of the race, color, religion, or national origin of such insurance risks or applicants."
215 Ill. Comp. Stat. 5/424(3) (emphasis added). Rates may differ on the basis of sex, sexual
preference, or marital status if "such classification or differentiation is based upon expected
claim costs and expenses *derived by applying sound actuarial principles* to relevant and
reasonably current company or intercompany studies, claim costs and expense experience."
Ill. Admin. Code tit. 50, § 2603.40(a) (emphasis added).

30.  Similarly, Wisconsin law states: "One rate is unfairly discriminatory in relation
to another in the same class if it clearly fails to reflect equitably the differences in expected
losses and expenses. Rates are not unfairly discriminatory because different premiums result for
policyholders with like loss exposures but different expense factors, or like expense factors but
different loss exposures, so long as the rates reflect the differences with reasonable accuracy."
Wis. Stat. Ann. § 625.11(4).

31.  West Virginia law specifies that risk-classification standards "may measure any
differences among risks that can be demonstrated to have a probable effect upon losses or
expenses." W. Va. Code § 33-20-3. Virginia law provides that "[n]o rate shall be unfairly
discriminatory if a different rate is charged for the same coverage and the rate differential (i) is
based on sound actuarial principles or (ii) is related to actual or reasonably anticipated
experience." Va. Code Ann. § 38.2-1904(A)(3). Maine law states that "[n]o risk classification
may be based upon race, creed, national origin or the religion of the insured," Me. Rev. Stat. tit.
24-A, § 2303(1)(G), but a risk classification "based upon size, expense, management, individual
experience, purpose of insurance, location or dispersion of hazard, or any other reasonable
considerations" is not unreasonable or unfairly discriminatory "provided such classifications and
modifications apply to all risks under the same or substantially similar circumstances or

conditions," *id.* § 2303(2). *See also* Tenn. Code § 56-5-303(d) ("A rate is not unfairly discriminatory because different premiums result for policyholders with like loss exposures with different expenses, or like expenses but different loss exposures, so long as the rate reflects the differences with reasonable accuracy.").

32. Many other states' laws are to similar effect. *See* Alaska Stat. § 21.39.030; Colo. Rev. Stat. § 10-4-403(1)(a); Del. Code Ann. tit. 18, § 2503(b); Mich. Comp. Laws § 500.2109(1)(C); *Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) ("Alaska has other statutes that specifically protect insurance customers from discrimination. These statutes forbid "'unfair discrimination between insureds or property having like insuring or risk characteristics in any ... of the terms and conditions of the insurance.'"); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("SDCL 58-33-26 states in pertinent part: No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Ins. Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. § 241. … Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assur. Soc. of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

**B.      State Laws Mandating Consideration Of Actuarial Factors**

33.      Many states not only permit, but expressly require insurance companies to

consider past loss and other actuarially relevant factors in developing insurance rates.  For

example, Ind. Code Ann. § 27-1-22-3(a)(1) provides that "[d]ue consideration shall be given to

the past and prospective loss experience within and outside this state … [and] to all other

relevant factors, including trend factors, within and outside this state …."). Wisconsin law

similarly provides:

> Due consideration shall be given to all of the following that apply:
>
> (a) Past and prospective loss and expense experience within and outside of this state.
>
> (b) Catastrophe hazards and contingencies.
>
> (c) Trends within and outside of this state.
>
> (d) Loadings for leveling premium rates over time or for dividends or savings to be allowed or returned by insurers to their policyholders, members or subscribers.
>
> (e) Subject to s. 632.365, all other relevant factors, including the judgment of technical personnel.

Wis. Stat. Ann. § 625.12(1).

34.      Numerous other states have similar laws.  *See e.g.*, Ala. Code § 27-13-27

(requiring insurers to "[g]ive consideration to past experience within the state and without the

state when necessary…[and to] all factors reasonably related to the kind of insurance involved");

Ariz. Rev. Stat. § 20-356(2) ("Due consideration shall be given to past and prospective loss

experience within and outside this state, to catastrophe hazards, if any, to a reasonable margin for

underwriting profit and contingencies, to dividends, savings or unabsorbed premium deposits

allowed or returned by insurers to their policyholders, members or subscribers, to past and

prospective expenses within and outside this state and to all other relevant factors within and

outside this state."); Ark. Code Ann. § 23-67-209(a) ("Due consideration must be given to past and prospective loss and expense experience within and outside this state .…"); Colo. Rev. Stat. § 10-4-403(1)(c) ("[U]nfair discrimination exists if, after allowing for practical limitations, price differentials fail to reflect equitably the differences in expected losses and expenses.); Del. Code Ann. tit. 18, § 2503(a) ("Due consideration shall be given to past and prospective loss and expense experience within and outside the State"); Ga. Code Ann. § 33-9-4 ("Consideration shall be given to the extent applicable to past and prospective loss experience … and to all other factors, including judgment factors, deemed relevant within and outside this state"); Idaho Code Ann. § 41-1437(1) ("due consideration shall be given to past and prospective loss experience … and to all other relevant factors"); La. Rev. Stat. Ann. § 22:1454(B) ("Due consideration shall be given to past and prospective loss and expense experience within and outside the state"); Me. Rev. Stat. Ann. tit. 24-A, § 2303 ("Due consideration must be given … to past and prospective loss experience … [and] to all other relevant factors within and outside this State"); Md. Code, Ins. § 11-205(c) (requiring insurers to consider "past and prospective loss experience" and "all … relevant factors within and outside the state"); Mich. Comp. Laws § 500.2110 ("In developing and evaluating rates … due consideration shall be given to past and prospective loss experience … to underwriting practice and judgment; and to all other relevant factors within and outside this state."); Minn. Stat. Ann. § 70A.05 ("Due consideration shall be given to past and prospective loss and expense experience within and outside this state, to a reasonable provision for catastrophe hazards and contingencies, to clearly discernible trends within and outside this state, ... and to all other relevant factors, including the judgment of underwriters and raters."); Miss. Code. Ann. § 83-2-3 ("Due consideration shall be given to past and prospective loss and expense experience … and to all other relevant factors, including the judgment of the filer."); Mo. Rev.

Stat. § 379.318(1) (requiring insurers to consider "past and prospective loss experience," "conflagration and catastrophe hazards," "past and prospective expenses," "a reasonable margin for underwriting profit and contingencies," and "all other relevant factors, including trend factors"); Ohio Rev. Code § 3935.03 ("Consideration shall be given to: (1) Past and prospective loss experience within and outside this state; … (6) All other relevant factors within and outside this state"); Or. Rev. Stat. § 737.310 ("(3) Rates for each classification of coverage shall be based on the claims experience of insurers within Oregon on that classification of coverage unless that experience provides an insufficient base for actuarially sound rates .…"). *See also* Mont. Code Ann. § 33-16-201(2)(a); Neb. Rev. St. § 44-7502; Nev. Rev. Stat. § 686B.060; N.H. Rev. Stat. § 412:15(II)(a); N.J. Stat. § 17:29A-4(c), 11; N.M. Stat. § 59A-17-7; N.Y. Ins. Law § 2304(a); N.C. Gen. Stat. § 58-40-25(1); N.D. Cent. Code § 26.1-25-03(1); Okla. Stat. Ann. tit. 36, § 985; R.I. Gen. Laws § 27-44-5(e)(1); S.D. Codified Laws § 58-24-6.1; Tenn. Code § 56-5-304; Tex. Ins. Code § 2251.052; Utah Code § 31A-19a-201; Wash. Rev. Code § 48.19.030.

## C. State Filed Rate Requirements

35. In many states, proposed rates must be filed with state regulators for review and approval. *See*, *e.g.*, Ala. Code § 27-13-30; Alaska Stat. § 21.39.040(a), (c); Ark. Code Ann. § 23-67-211(a); Colo. Rev. Stat. §§ 10-4-404 , 10-4-406; Del. Code Ann. tit. 18, § 2504; Haw. Rev. Stat. § 431:14-104(a); Ky. Rev. Stat. § 304.13-051; La. Rev. Stat. Ann. § 22:1451(B); Neb. Rev. St. § 44-7508; N.J.S.A. § 17:29A-6, -7; N.D. Cent. Code § 26.1-25-04; Ohio Rev. Code § 3935.04; Wash. Rev. Code § 48.19.060.

**D.      State Administrative Mechanisms For Reviewing Rates**

36.      In addition, many state regulatory regimes provide systems of administrative

redress to review allegedly improper rates.  For example, Indiana law provides for rate review by

the insurance commissioner:

> (a) Upon the commissioner's motion, or upon written request by
> any insured affected thereby or by any licensed insurance producer
> or broker, if such request is made in good faith and states
> reasonable grounds, the commissioner, if the commissioner shall
> have reason to believe that any filing is not in compliance with the
> applicable provisions of section 3 of this chapter, or in the case of
> an alleged violation of section 6 of the chapter if the commissioner
> finds on the basis of the information on file with the department
> that there has been a prima facie showing of a violation of that
> section, shall hold a hearing upon not less than ten (10) days
> written notice to the rating organization or insurer which made the
> filing in issue, specifying the items and matters to be considered
> and stating in what manner and to what extent noncompliance is
> alleged to exist.
>
> *      *      *
>
> (b) If, after such hearing, the commissioner finds, based upon a
> preponderance of the evidence adduced at such hearing and made a
> part of the record thereof, that such filing is not in compliance with
> the provisions of section 3 of this chapter, the commissioner shall
> immediately issue a written order to the parties specifying in detail
> in what respects and upon what evidence such noncompliance
> exists and stating when, within a reasonable period thereafter, such
> filing shall be deemed no longer effective.

Ind. Code Ann. § 27-1-22-5(a).

37.      Other states similarly permit review of insurance rates.  *See* Ala. Code § 27-13-30

("Whenever the commissioner shall find that rating systems theretofore approved by him, or

which pursuant to Section 27-13-37 are effective without approval, provide for, result in or

produce rates which are unreasonable or inadequate or which discriminate unfairly between risks

in this state involving essentially the same hazards, he shall issue an order … directing that such

rating systems be altered or revised …."); Alaska Stat. § 21.39.050(c); Ariz. Rev. Stat. § 20-358

(includes a provision allowing "any person or organization aggrieved with respect to any filing or rating system which is in effect" to "make written application to the director" which may, after a hearing, result in disapproval of the rate); Del. Code Ann. tit. 18, § 2520 (permitting an appeal of filings by any aggrieved person or organization); Fla. Stat. § 627.0645(7); Ga. Code Ann. § 33-9-26; Haw. Rev. Stat. § 431:14-106(c), (e); Idaho Code Ann. § 41-1427; 215 Ill. Comp. Stat. 5/132.3; Iowa Code § 507.2; Md. Code, Ins. § 11-208(d)-(e); Me. Rev. Stat. Ann. tit. 24-A, § 2306; Mich. Comp. Laws § 500.2416 (within thirty days); Minn. Stat. Ann. § 70A.11; Miss. Code. Ann. § 83-2-11; Mo. Ann. Stat. § 379.348; Mont. Code Ann. § 33-16-204; Neb. Rev. Stat. § 44-7508(13-15); N.H. Rev. Stat. §§ 412:38, 412:19; N.M. Stat. Ann. §§ 59A-17-13(B), 59A-17-30, 59A-17-33; N.Y. Ins. Law §§ 2319, 2320; N.C. Gen. Stat. § 58-40-100; N.D. Cent. Code § 26.1-25-09; Ohio Rev. Code § 3937.04; Okla. Stat. Ann. tit. 36, §§ 989(B), 990; Or. Rev. Stat. §§ 737.215, 737.225(3), 737.235, 737.340; R.I. Gen. Laws § 27-44-14; S.C. Code § 38-73-1030; S.D. Codified Laws § 58-24-29; Tenn. Code §§ 56-5-309, 56-5-315; Tex. Ins. Code §§ 2251.105, 2251.1031, 2252.052; Utah Code §§ 31A-19a-217, 31A-19a-218; Va. Code Ann. § 38.2-1909 ("The Commission may investigate and determine, … whether rates in this Commonwealth for the classes of insurance to which this chapter applies are excessive, inadequate or unfairly discriminatory or whether loss experience and other factors within the Commonwealth are being properly used to determine the rates."); Vt. Stat. tit. 8, §§ 4700, 4704; Wash. Rev. Code § 48.19.310; W. Va. Code § 33-20-9; Wyo. Stat. § 26-14-106(d)-(g).

## III.    THE MCCARRAN-FERGUSON ACT

38.    Historically, insurance was largely immune from federal regulation because the business of insurance was not considered "commerce" that could be regulated by Congress. *See Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1868).  As a result, the States enjoyed a virtually

exclusive domain over the insurance industry, which is today one of the most heavily regulated businesses in the country.  In 1944, the Supreme Court determined in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of insurance across state lines was interstate commerce that Congress could regulate.  Congress responded in 1945 by enacting the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, which ensured that the Supreme Court's decision in *South-Eastern Underwriters* did not undermine state regulation of insurance. The extensive state regulation of the business of insurance discussed above is a result of this long history of exclusive state control of this area.

39.    Section 1 of the McCarran-Ferguson Act, 15 U.S.C. § 1011, provides: "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."

40.    Subsection 2(b) of the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance."  The Supreme Court has recognized that the McCarran-Ferguson Act "is, in effect, a clear-statement rule."  *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 507 (1993).  Federal law cannot invalidate, impair, or supersede state regulation of insurance unless Congress states its intention to do so clearly and expressly.

41.    Under the McCarran-Ferguson Act, federal law is reverse-preempted if it "directly conflict[s] with state regulation" or when "application of the federal law would . . .

frustrate any declared state policy or interfere with a State's administrative regime." *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999); *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 563 (7th Cir. 1999) ("Direct conflict with state law is not required to trigger this prohibition; it is enough if the interpretation would 'interfere with a State's administrative regime.'").

42.     The Act applies where federal law would impose liability for conduct permitted by state law. *See, e.g., Ojo v. Farmers Group, Inc.*, 356 S.W.3d 421, 434-35 (Tex. 2011) (disparate impact challenge to use of credit scores reverse-preempted under McCarran-Ferguson because Texas's insurance law permits the use of credit scoring, despite any disparate impact that the use of credit scoring will produce, so long as the factors used in credit scoring are not themselves based on race); *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 968 (8th Cir. 2008) (disparate impact claims under the Fair Housing Act impaired state law, which did not permit private cause of action for alleged discrimination by an insurer); *Riverview Health Inst. LLC v. Medical Mutual of Ohio*, 601 F.3d 505, 519 (6th Cir. 2010) ("We conclude that application of federal RICO in this case would impair Ohio's insurance regulatory scheme. The conduct at the heart of Plaintiff's' complaint implicates Ohio's law regarding payment of claims and the Ohio Department of Insurance is charged with administering the applicable state law. In this case, Plaintiffs have no common law remedy or private right of action. The state RICO statute is inapplicable and the damages available pursuant to federal RICO would far exceed the damages contemplated by the Ohio legislature when enacting its insurance regulatory scheme.").

43.     The Seventh Circuit concluded in *NAACP v. American Family Insurance Co.* that the McCarran-Ferguson Act applies to the Fair Housing Act. *See* 978 F.2d at 293-95. Although the Court concluded that the McCarran-Ferguson Act does not reverse-preempt disparate *treatment* claims under the Fair Housing Act, the Court's analysis suggested that the outcome

would be different for disparate *impact* claims given "the nature of insurance" and its reliance on

risk differentiation. *See id.* at 290 (describing problem of "adverse selection"), *id.* ("assum[ing]

that the plaintiffs can establish disparate treatment and not just disparate impact of decisions

made on actuarial grounds"); *id.* at 291 ("All we decide is whether the complaint states claims on

which the plaintiffs may prevail if they establish that the insurer has drawn lines according to

race rather than actuarial calculations."); *id.* at 298 (noting difficulty applying "disparate impact

paradigm" to insurance).

## IV.    THE FAIR HOUSING ACT

44.    Enacted as Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.*,

the Fair Housing Act ("FHA"), as amended, makes it unlawful, among other things, "[t]o

discriminate against any person in the terms, conditions, or privileges of sale or rental of a

dwelling, or in the provision of services or facilities in connection therewith, because of race,

color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b); *see also id.*

§ 3604(f)(2) (prohibiting discrimination because of "handicap").

45.    The FHA does not reference homeowners insurance in any context.  Congress

was silent on the subject of homeowners insurance in the FHA.  The FHA, therefore, is not

specifically related to the business of insurance*. Am. Family Ins. Co.,* 978 F.2d  at 295 ("The

Fair Housing Act is an 'Act of Congress' that does not 'specifically relate [] to the business of

insurance.").

## V.    THE DISPARATE IMPACT RULE

### A.    HUD's Proposed Rule

46.    On November 16, 2011, HUD issued a proposed rule entitled "Implementation of

the Fair Housing Act's Discriminatory Effect's Standard."  *See* 76 Fed. Reg. 70921 (Nov. 16,

2011).  In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate."  *Id.* at 70921.  HUD asserted that the purpose of the proposed rule was "to establish uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act."  *Id.*

47.    In the notice of proposed rulemaking, HUD cited "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." 76 Fed. Reg. at 70924.  The notice of proposed rulemaking did not reference the McCarran-Ferguson Act, much less discuss how application of disparate impact liability could possibly be reconciled with the historic consideration of actuarially significant risk-based factors in the pricing and underwriting of insurance.

## B.    Comments From The Insurance Industry

48.    In response to HUD's unsupported assertion that its new disparate impact rule would apply to the provision of homeowners insurance, the insurance industry submitted detailed comments explaining why doing so would be unlawful and ill advised, including comments from the PCI and two other insurance trade associations, the National Association of Mutual Insurance Companies ("NAMIC"), and the American Insurance Association ("AIA").  *See* Comments of the Property Casualty Insurers Ass'n of America, Docket No. FR-5508-P-01 (Jan. 17, 2012) ("PCI Comments"); Comments of the National Association of Mutual Insurance Companies, Docket No. FR-5508-P-01 (Jan. 17, 2012) ("NAMIC Comments"); Comments of the American Insurance Association, Docket No. FR-5508-P-01 (Jan. 17, 2011) ("AIA Comments").

49.     The insurance industry comments explained that the application of disparate impact liability to homeowners insurance is fundamentally inconsistent with consideration of actuarially sound risk-based factors and would violate the McCarran-Ferguson Act.  For example, PCI's Comments noted that "[e]very state has extensive laws and regulations governing insurance underwriting practices and those laws naturally recognize the need for insurers to distinguish between different types and degrees of risk.  Indeed, risk discrimination is the foundation of insurance underwriting and every state has considered at length the appropriate regulatory balance to prohibit unfair discrimination."  PCI Comments at 2.  Thus, imposing liability on insurers for their core practice of risk discrimination would be inappropriate and would impair state regulation of the insurance industry.  *See id.*

50.     The NAMIC Comments similarly explained:  "The foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk.  Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly.  Race or other protected class characteristics are not part of the risk assessment process."  NAMIC Comments at 5.  They further noted (at p. 5):

> To actuarially determine rates that most accurately measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly.  This practice is the very essence of risk-based pricing.  Common homeowners insurance factors include claim history of applicant, construction material(s), distance from a fire station, dog/breed of dog owned, fire suppression devices, home-based business presence and type, lead paint potential (constructed pre-1978), loss history of property, roofing material, trampoline use, slab versus basement and the presence of an operational security system.

51. Comments further explained that the use of factors to calculate risk would be limited by the application of disparate impact liability because any factor could affect protected groups differently:

> Under HUD's proposed rule, . . . common underwriting factors could be jeopardized, even though they do not intentionally discriminate, if they were found to have the "effect" of making unavailable or denying a dwelling to a certain percentage of a particular racial or ethnic group if that percentage is greater than the percentage of other groups that is similarly affected. To achieve a condition in which no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process. In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk. This calls into question conclusions drawn simply from statistical samplings and underscores why the business of risk classification defies a disparate impact analysis.

NAMIC Comments at 5-6.

52. The comments submitted to HUD further explained that eliminating risk-based pricing would have significant negative consequences: "adverse selection will increase, and coverage availability will suffer. Perversely, application of the proposed rule could in fact harm all insurance consumers, including the very groups it purports to protect." NAMIC Comments at 7.

53. The insurance industry comments also explained that because state laws expressly contemplate consideration of actuarially significant risk factors, the application of disparate impact liability would violate the McCarran-Ferguson Act. The comments noted that "[c]lassifying people and property by the risks they present and treating similar risk profiles in a similar manner is a form of reasonable and fair discrimination that is at the very heart of the business of insurance." NAMIC Comments at 6; *see also* PCI Comments at 2. As a matter of state insurance law, the term "[u]nfair discrimination" has a "specific meaning": "a rate is

reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer [in the insurance context]." *Id.* (quoting Principal 4 of Casualty Actuarial Society's Statement of Ratemaking Principles). The comments noted that courts have already held that the application of disparate impact liability to insurers under the FHA would conflict with the laws of states such as Texas, Missouri, Nebraska, and Mississippi. *Id.* at 8-9.

54.     Comments also pointed out that pricing for homeowners insurance falls within states' common law "filed rate" doctrine. The "filed rate" doctrine bars private claims based on insurance rates filed with state regulatory entities. Applying disparate impact liability to insurance rates would undermine state regulators' approval of insurance rates. *See* NAMIC Comments at 7.

55.     In light of the inherent conflict between disparate impact liability and consideration of actuarial risk factors, the insurance comments requested that HUD exempt insurance underwriting and pricing from the Disparate Impact Rule. *See* PCI Comments at 3; NAMIC Comments at 9. In the alternative, commenters requested that HUD provide regulatory safe harbors for long-recognized actuarial risk factors, such as age and condition of a property or distance from a fire station. *See* NAMIC Comments at 9. Comments also requested that HUD exempt Fair Access to Insurance Requirements (FAIR) plans, which provide insurance to high-risk individuals who might otherwise be denied coverage. *See id.*

56.     Finally, the insurance comments explained that HUD's "three-step burden-shifting" approach for resolving disparate impact claims conflicted with the Supreme Court's decision in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), in numerous respects relevant to the insurance industry. At the first step of the process, HUD improperly omitted the

requirement that any disparate impact be "significant." At the second step, HUD improperly

shifted the burden of proof to the defendant and required a defendant to show that the challenged

practice is "necessary" to serve a legitimate interest. And at the third step, HUD erred by

omitting the requirement that any proffered alternative practice be "equally as effective" as the

challenged practice at serving the defendant's legitimate business interests. *See* NAMIC

Comments at 10-11; AIA Comments at 4.

###    C.    HUD's Final Rule

57.    On February 15, 2013, HUD promulgated its final Disparate Impact Rule, which

purports to "formalize[]" HUD's view that the FHA's prohibition on discrimination may be

violated by practices that have a discriminatory effect in the absence of a discriminatory intent.

78 Fed. Reg. at 11460.

58.    The Disparate Impact Rule provides that "[a] practice has a discriminatory effect

where it actually or predictably results in a disparate impact on a group of persons or creates,

increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion,

sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a). It further provides

that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a

legally sufficient justification," *id.* § 100.500, meaning that: (1) the challenged housing practice

"[i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the

respondent" and (2) "[t]hose interests could not be served by another practice that has a less

discriminatory effect," *id.* § 100.500(b).

59.    Under the Rule, the plaintiff or charging party has the initial "burden of proving

that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R.

§ 100.500(c)(1). If the plaintiff or charging party meets that burden, "the respondent or

defendant has the burden of proving that the challenged practice is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). If the defendant or respondent meets its burden, the plaintiff or charging party "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3). HUD rejected a "significance requirement" for disparate impact liability. 78 Fed. Reg. at 11468. HUD also declined to require that an alternative "practice that has a less discriminatory effect" be "equally effective" at serving the defendant's substantial, legitimate, nondiscriminatory interest. *Id.* at 11473. Accordingly, disparate impact defendants may be liable under the HUD Rule for failing to adopt an alternative practice even when that practice is not as effective at serving their substantial, legitimate, nondiscriminatory interests. Such a rule is irreconcilable with actuarially-based pricing and underwriting in the insurance industry, where risk factors are identified and applied based on their relative predicative quality.

60. HUD did not meaningfully address whether extension of disparate impact liability to insurance practices would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act. Rather than grapple with this key issue, HUD merely asserted that the McCarran-Ferguson Act applies only to courts, not federal agencies construing statutes during the rulemaking process. Specifically, HUD took the position that: "McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs *courts* on how to construe federal statutes, including the Act." 78 Fed. Reg. at 11475 (emphasis added). HUD thus did not consider whether the Disparate Impact Rule conflicts with state laws and policies permitting the use of risk-based pricing and underwriting.

61.     There is no support for HUD's novel contention that a federal agency need not consider whether an action it is taking is consistent with federal law.  To the contrary, it is well established that "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  An agency must identify "a source of authority in either the express language or the purpose and operation of [a statute] to justify" its regulations.  *Wabash Valley Power Ass'n v. Rural Electrification Admin.*, 988 F.2d 1480, 1491 (7th Cir. 1993); *see also California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 398 (D.C. Cir. 2004) ("It is therefore incumbent upon [an agency] to demonstrate that some statute confers upon it the power it purport[s] to exercise ….").  An agency has an obligation to examine its statutory authority to act.  *See, e.g.*, 5 U.S.C. § 553(b)(2) ("The notice [of proposed rulemaking] shall include ... reference to the legal authority under which the rule is proposed....."); *Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013) ("It is certainly true that agencies are required to ensure that they have authority to issue a regulation.").  As a result, failure to consider a statutory limitation is "necessarily arbitrary and capricious." *Owner-Operator Indep. Drivers Ass'n v. Federal Motor Carrier Safety Admin.*, 656 F.3d 580, 587-88 (7th Cir. 2011); *United Mine Workers of Am., Int'l. Union v. Dole*, 870 F.2d 662, 667 (D.C. Cir. 1989) ("[A]gency failure to explicitly consider statutory limits on authority in [its] statement of basis and purpose renders [a] rulemaking defective.").

62.     HUD thus had an obligation to determine whether the Disparate Impact Rule it was proposing was consistent with federal law.  McCarran-Ferguson limits the reach of federal statutes like the FHA that are not specific to insurance.  To consider its statutory authority under the FHA and whether the Disparate Impact Rule was consistent with federal law, HUD

necessarily had to consider McCarran-Ferguson. HUD was not permitted simply to take action and leave it to the courts to sort out whether it had authority to do what it did. HUD's refusal to even consider the application of McCarran-Ferguson was arbitrary and capricious.

63. HUD also failed to meaningfully address insurance industry comments explaining that the application of disparate impact liability is flatly inconsistent with established risk-based insurance practices authorized by state law. HUD did not dispute that application of disparate impact liability is incompatible with actuarial risk-based pricing and underwriting or that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk." 78 Fed. Reg. at 11475. To the contrary, HUD seemed to accept that insurers will have to try to justify the disparate impact caused by risk-based pricing and underwriting. Its sole response on these points was that an insurance company "has a full opportunity to defend the business justifications for its policies." *Id.*; *see also id.* ("Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification.").

64. Despite acknowledging the possibility that the use of risk-based pricing and underwriting could be a sufficient business justification for any resulting disparate impact, HUD refused to create a safe harbor for the use of risk-based pricing and underwriting. In response to the insurance associations' requests for an exemption for insurance or safe harbors for certain risk factors or for FAIR plans, HUD stated that "[c]reating exemptions or safe harbors related to insurance is unnecessary because, as discussed above, insurance practices with a legally sufficient justification will not violate the Act." 78 Fed. Reg. at 11475. Citing *Graoch Associates # 33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n*, 508 F.3d 366 (6th Cir. 2007), HUD also asserted that "creating exemptions beyond those found in the Act would run contrary to Congressional intent." 78 Fed. Reg. at 11475 & n.141. The *Graoch*

decision, however, actually supports granting an exemption here. It makes clear "that if *no* disparate-impact challenge to a particular practice ever could succeed under the burden-shifting framework, then a court categorically may bar *all* disparate impact challenges to that practice." 508 F.3d at 375 (emphasis in original). Indeed, *Groach* found that "categorical bars are justified" when there is "no reason to require courts to engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success." *Id.* at 376. Thus, the only case HUD cites for the proposition that it does not have the power to create exemptions actually permits exemptions in the precise circumstances present here. Even more fundamentally, HUD apparently failed to consider that even if it did need a statutory basis to create an exemption, that basis is supplied by the McCarran-Ferguson Act.

65.     HUD acknowledged that "[s]ome commenters stated that application of the disparate impact standard would interfere with state regulation of insurance in violation of … the common law 'filed rate doctrine.'" 78 Fed Reg. at 11474. The "filed rate" doctrine bars claims against insurance companies based on rates that have been submitted and approved by state regulatory agencies. *See, e.g.*, *Schermer v. State Farm Fire and Cas. Co.*, 721 N.W.2d 307 (Minn. 2006); *Stevens v. Union Planters Corp.*, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000). Despite acknowledging this legitimate issue, HUD altogether failed to address it. That alone is a basis to set aside the rulemaking. It is well established that a "regulation will be deemed arbitrary and capricious, if the issuing agency failed to address significant comments raised during the rulemaking." *Association of Private Sector Colleges and Univ. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012) (citation omitted); *see also PPL Wallingford Energy LLC v. F.E.R.C.*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) ("An agency's 'failure to respond meaningfully' to objections raised by a party renders its decision arbitrary and capricious." (citation omitted));

*Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992) ("EPA is required to give reasoned responses to all significant comments in a rulemaking proceeding." (internal citations omitted)). Indeed, courts have "stressed that [u]nless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned." *Wallingford Energy*, 419 F.3d at 1198 (internal quotation marks omitted).

66. Nor did HUD offer any meaningful response to comments noting that the proposed burden-shifting rules are at odds with settled law. Most notably, HUD never explained how the burden-shifting standards set for the Disparate Impact Rule can be reconciled with the Supreme Court's decision in *Wards Cove Packaging Co. v. Antonio*, 490 U.S. 642 (1989), or can sensibly be applied to the business of insurance. HUD's failure to apply settled law on the burden of proof and the process for adjudicating a disparate impact claim deprives insurers of a viable opportunity to demonstrate even on case-by-case basis that risk-based underwriting and pricing is justified by legitimate, non-discriminatory business purposes.

## VI. PLAINTIFF AND ITS MEMBERS ARE INJURED BY THE DISPARATE IMPACT RULE

67. The Disparate Impact Rule has caused and will cause injuries to PCI and its member companies.

68. The Rule purports directly to regulate PCI's member companies and to rewrite the rules of risk-based pricing and underwriting. It has generated substantial uncertainty in the industry and has required PCI's member companies to expend substantial resources assessing how the Rule could possibly apply to the business of insurance. Moreover, to even attempt to comply with the Rule, PCI member companies would be required to expend enormous amounts of money and time (and possibly subject themselves to liability) (a) retrospectively and prospectively collecting data that they do not currently obtain about whether their customers fall

within a protected class, (b) analyzing their pricing and underwriting criteria in light of the newly collected data to try to identify factors that could have a disparate impact, and (c) adopting entirely new underwriting and pricing practices. If PCI members are forced to disregard actuarial risk data in favor of protected class data, they will be unable to price insurance as accurately and competitively as they currently do, resulting in lost business, decreased availability of insurance, and potential insolvency.

69.     Application of the Rule to risk-based pricing and underwriting by PCI members would also place those members in an impossible position of either complying with state law regarding the pricing and underwriting of insurance or complying with the Rule. It is not possible, for example, to comply with state laws that require that insurers take into consideration past loss and other actuarially relevant factors in developing insurance rates while simultaneously disregarding any risk factor that happens to correlate with any of the classifications covered by the Rule. This compliance exposure would injure PCI members.

70.     The Disparate Impact Rule also has caused and will cause injuries to PCI. Since the final Disparate Impact Rule was promulgated, PCI has been required to devote a significant amount of time and resources—separate from time spent relating to this lawsuit—responding to the Rule for the benefit of its members and educating members about possible impacts of the Rule.

## COUNT I

### (Extension of Disparate Impact Liability To Insurance Is In Excess Of Statutory Jurisdiction, Authority, Or Limitations Or Is Not In Accordance With Law Because It Would Violate The McCarran-Ferguson Act)

71.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

72.     The Disparate Impact Rule constitutes final agency action.

73.     The McCarran-Ferguson Act provides as follows:

      A.    "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."  15 U.S.C. § 1011.

      B.    "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).

74.    The Fair Housing Act does not specifically relate to the business of insurance.

75.    The Disparate Impact Rule construes the Fair Housing Act to subject the provision and pricing of homeowners insurance to disparate impact liability.

76.    Subjecting the provision and pricing of homeowners insurance to disparate impact liability would invalidate, impair, or supersede state laws, regulations, and policy determinations regulating the business of insurance and impose a barrier to the regulation of the business of insurance by the several States.

77.    Among other things, subjecting the provision and pricing of homeowners insurance to disparate impact liability would:

      A.    Invalidate, impair, or supersede state laws, regulations, and policy determinations expressly contemplating, and often requiring, the use of risk-based pricing and underwriting of homeowners insurance;

      B.    Invalidate, impair, or supersede state laws, regulations, and policy determinations providing for the review and approval of insurance pricing and underwriting decisions by state regulators; and

C.       Invalidate, impair, or supersede state laws, regulations, and policy determinations establishing state administrative forums for the resolution of disputes relating to insurance rates and other insurance practices.

78.     The Disparate Impact Rule thus violates the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), and is in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT II

**(The Disparate Impact Rule Is Arbitrary, Capricious, Or An Abuse of Discretion, Because Defendants Did Not Adequately Address The Conflict Between The Rule And The McCarran-Ferguson Act)**

79.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

80.     The Disparate Impact Rule constitutes final agency action.

81.     Comments submitted to HUD explained that extension of disparate impact liability to insurance practices would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act.

82.     HUD failed to address this issue in the Disparate Impact Rule.  It did not consider whether its Rule would invalidate, impair, or supersede state laws regulating the business of insurance.  HUD instead asserted that the McCarran-Ferguson Act applies only to courts, not federal agencies.  78 Fed. Reg. at 11475.  There is no support for this assertion, and HUD cited none.  HUD was bound to comply with the McCarran-Ferguson Act and was required to consider statutory limits on its authority when issuing the Disparate Impact Rule.

83.     HUD's failure to address whether the Disparate Impact Rule violates the McCarran-Ferguson Act was arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

## COUNT III

**(The Disparate Impact Rule Is Arbitrary, Capricious, Or An Abuse Of Discretion Because Defendants Did Not Adequately Consider The Rule's Impact On Insurers And The Business of Insurance)**

84. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

85. The Disparate Impact Rule constitutes final agency action.

86. Comments submitted to HUD explained that the use of actuarial risk factors is critical to pricing and underwriting of homeowners insurance. Comments further explained that applying disparate impact liability to the pricing and underwriting of homeowners insurance would limit insurers' ability to engage in risk-based pricing and underwriting.

87. HUD failed to address these concerns in the Disparate Impact Rule. HUD did not dispute that risk-based pricing and underwriting is of critical importance or that imposition of disparate impact liability would prevent use of risk-based pricing and underwriting absent further justification. It stated only that insurers could attempt in case-by-case litigation to show that they have a legitimate business justification for their practices.

88. HUD's failure to address the impact of the Disparate Impact Rule on the business of insurance was arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

## COUNT IV

**(The Disparate Impact Rule Is Arbitrary, Capricious, Or An Abuse of Discretion Because Defendants Failed To Justify The Decision To Reject Safe Harbors For Insurance)**

89. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

90. The Disparate Impact Rule constitutes final agency action.

91. Comments submitted to HUD sought exemptions from the Disparate Impact Rule for risk-based pricing and underwriting of homeowners insurance and safe harbors for the use of

legitimate risk factors and FAIR plans.  In the Disparate Impact Rule, HUD rejected these requests.

92.     HUD failed to provide a reasoned explanation for its denial of these requests. HUD noted that insurers could defend against disparate impact claims if they could carry their burden to show that the use of an actuarial factor and/or set of factors was necessary to achieve a substantial, legitimate, nondiscriminatory interest.  But HUD provided no justification for requiring insurers to bear the costs of litigating this issue on a case-by-case basis.  HUD also indicated that it believed it lacked authority under the FHA to recognize exemptions or safe harbors.  But the authority on which HUD relied actually would permit the recognition of exemptions or safe harbors.

93.     HUD's failure to provide a reasoned explanation for its denial of the requested exemptions and safe harbors was arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

## COUNT V

### (The Disparate Impact Rule is Arbitrary, Capricious, Or An Abuse of Discretion Because Defendants Failed To Address The "Filed Rate" Doctrine)

94.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

95.     The Disparate Impact Rule constitutes final agency action.

96.     Comments submitted to HUD explained that application of the Disparate Impact Rule to homeowners insurance would violate the "filed rate" doctrine.

97.     HUD acknowledged these comments but failed to address whether application of the rule would violate the "filed rate" doctrine.

98.     HUD's failure to address these comments was arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

## COUNT VI

**(The Burden-Shifting Framework in the Disparate Impact Rule is Arbitrary and Capricious, an Abuse of Discretion, and Not in Accordance with Law)**

99.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

100.    The Disparate Impact Rule constitutes final agency action.

101.    In the absence of statutory direction to the contrary, the Supreme Court has held that disparate impact liability must be premised on exacting standards in order to avoid unjustified, expensive, and time-consuming litigation.  Under those standards, a plaintiff must make a prima facie showing that a specific practice of the defendant causes a "significantly disparate impact" on a protected class.  *See Wards Cove Packaging Co.* v. *Antonio*, 490 U.S. 642, 658 (1989).  If a plaintiff makes this prima facie showing, the defendant need only present evidence that the challenged practice serves its legitimate goals.  *See id.* at 659.  The burden of persuasion remains on the plaintiff.  *See id*.  When a defendant produces such evidence, the plaintiff may prevail only if he or she can prove that the defendant refused to adopt an alternative practice that would have served its goals equally effectively without causing the disparate impact.  *See id.* at 660-61.

102.    Similarly, under the Administrative Procedure Act, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof."  5 U.S.C. § 556(d); *see also Steadman v. SEC*, 450 U.S. 91 (1981).   Because a charge brought by HUD under the FHA may be heard in either an administrative or judicial proceeding, the burden-shifting standards established in the Disparate Impact Rule must satisfy the Administrative Procedure Act requirement that the proponent of a proposed "order"—here, a proposed finding of a violation of the FHA—bear the burden of proof.

103.    In violation of the Administrative Procedure Act and the Supreme Court's direction regarding burden-shifting in disparate impact cases, the Disparate Impact Rule purports to shift the "burden of proof" to the respondent or defendant once the complainant has met its prima facie burden of showing a disparate impact.  This would unfairly impose on insurers the burden of proving that their particular risk-based underwriting and pricing practices serve legitimate business goals, particularly where the conduct is authorized by governing state law. That burden should properly rest on the party seeking fundamentally to alter the business of insurance by imposing disparate impact liability.

104.    The Disparate Impact Rule also disregards other limitations recognized by the Supreme Court.  The Disparate Impact Rule provides that a plaintiff need only show that the challenged practice "caused or predictably will cause" a disparate impact.  In contrast, the Supreme Court has held that a "significant[]" disparate impact is required to establish a prima facie case.  *Wards Cove*, 490 U.S. at 658.  This difference could be important in cases challenging insurance practices, where almost any risk-based underwriting and pricing decision will likely impact at least some groups differently.  Similarly, once a prima facie case is established, the Rule requires that the defendant or respondent show that "the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."  In contrast, the Supreme Court has expressly rejected reading a necessity requirement into a disparate impact framework, concluding that such a requirement would impose a degree of scrutiny impossible to meet.  *Id.* at 659 ("[T]here is no requirement that the challenged practice be "essential" or "indispensable" to the employer's business for it to pass muster: this degree of scrutiny would be almost impossible for most employers to meet[.]").  Insurers should not be required to show that each underwriting and pricing decision they make is by itself strictly

"necessary," particularly where the use of risk-based underwriting and pricing as a whole is so plainly justified and where risk factors are identified and employed based on their relative, predicative qualities. Moreover, although the Supreme Court has held that any "alternative practices" that a plaintiff might offer in lieu of allegedly an offending practice must be "equally effective," *see id.* at 661, HUD omitted that requirement from the Rule. For insurers, however, any deviation from risk-based pricing and underwriting threatens to undermine the entire manner in which insurance is provided.

105. By impermissibly shifting the burden of persuasion to the defendant or respondent and failing to include the limitations required by settled law, the Disparate Impact Rule is arbitrary, capricious, and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT VII

### (The Burden-Shifting Framework In The Disparate Impact Rule Is Arbitrary And Capricious Because Defendants Did Not Adequately Address Relevant Limitations)

106. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

107. Comments submitted to HUD explained that HUD's proposed burden-shifting rules were contrary to law. Although HUD responded to many of these comments, it failed to offer any reasoned explanation for why it was not bound by the Supreme Court's decision in *Wards Cove Packaging Co.* v. *Antonio*, 490 U.S. 642 (1989), and other law. For the reasons explained above, HUD's failure to apply the proper burden-shifting framework under the Disparate Impact Rule will unfairly penalize insurers forced to defend their authorized underwriting and pricing practices.

108. HUD's failure to address whether and how the Disparate Impact Rule can be reconciled with *Wards Cove* and other law was arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

1.        Declare invalid the application of the Disparate Impact Rule to the pricing and provision of homeowners insurance and property and hazard insurance.

2.        Enjoin HUD and its officers from applying the Disparate Impact Rule to pricing and underwriting of homeowners insurance and property and hazard insurance;

3.        Award Plaintiff its costs and reasonable attorneys' fees as appropriate; and

4.        Grant any such other relief that this Court deems just and appropriate.

Dated: November 27, 2013                    Respectfully submitted,

                                            PROPERTY CASUALTY INSURERS
                                            ASSOCIATION OF AMERICA

                                            By:    s/ Rowe W. Snider
                                                   One of Its Attorneys

Seth P. Waxman (*pro hac vice application forthcoming*)
Randolph D. Moss (*pro hac vice application forthcoming*)
Brian M. Boynton (*pro hac vice application forthcoming*)
Matthew J. Tokson (*pro hac vice application forthcoming*)
Lynn Eisenberg (*pro hac vice application forthcoming*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C.  20006
Tel.:    (202) 663-6000
Fax:    (202) 663-6363
Email: seth.waxman@wilmerhale.com
        randolph.moss@wilmerhale.com
        brian.boynton@wilmerhale.com
        matthew.tokson@wilmerhale.com
        lynn.eisenberg@wilmerhale.com

Of Counsel:

Rowe W. Snider (# 03125194)
Ashlee M. Knuckey (# 6300237)
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606

Tel.:   (312) 443-0700
Fax:    (312) 896-0336
Email: rsnider@lockelord.com
        aknuckey@lockelord.com