Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 4

      8.     <u>In promulgating any rule, it cannot apply retroactively</u>.  There is no basis for retroactive application of the Proposed Rule, and such an approach would violate due process.

      9.     <u>In promulgating any rule, the Department should assure that it complies with applicable requirements for determining the impact of the rule on small businesses</u>.  The Department's Regulatory Flexibility Act findings fail to explain how the Proposed Rule would not overburden small businesses.

For these reasons, the Trade Associations recommend that HUD postpone its rulemaking until after the Supreme Court decides *Magner* to take advantage of the Court's guidance in promulgating any rule.  If HUD does not do so, the Trade Associations urge HUD to revise the Proposed Rule to make clear that the Fair Housing Act's anti-discrimination provisions address disparate treatment only.  At the very least, the Department should revise the rule so that the burden and standard of proof comport with *Wards Cove* and to create an exemption for businesses which are otherwise complying with government and government-sponsored programs or policies intended to rehabilitate the residential housing market.

**II.**    <u>**Discussion**</u>

    **A.**    **HUD Should Postpone its Rulemaking Process until the Supreme Court Decides *Magner v. Gallagher***

The issues addressed by the Proposed Rule – namely, whether the Fair Housing Act recognizes disparate-impact claims and if so, what standard applies to such claims – are the same issues that the Supreme Court is currently reviewing in *Magner v. Gallagher*, No. 10-1032 (U.S.).  The Court granted the petition for a writ of certiorari in *Magner* on November 7, 2011, and has set the matter for disposition this term.  On November 16, 2011, the Department issued the Proposed Rule.  Implementation of Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70,921 (Nov. 16, 2011).

The Department signed the United States' *amicus* brief submitted to the Court in connection with *Magner*.  Through that brief, the Department expressed its position to the Court on the questions presented in *Magner*.  Accordingly, there is no need for HUD to rush to finalize the Proposed Rule in advance of the Court's decision.  On the contrary, a short continuance in the rulemaking process will allow HUD to make use of the Court's guidance as to how the Fair Housing Act is to be interpreted and will not materially delay the promulgation of any rule.  If the Court rules that the Fair Housing Act does not recognize disparate-impact claims, the continuance would spare HUD the burden of amending a final rule that was recently

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 5

issued and save businesses from the unnecessary expense of attempting to understand the broad scope of a rule only to find that it is inapplicable. If the Court finds that the Fair Housing Act does allow for disparate-impact claims, the Court is likely to provide guidance on the proper burden and standard of proof for such claims. Finalizing a rule that comports with such guidance, again, would be more efficient for HUD and save businesses from the unnecessary expense of attempting to understand the undefined scope of the rule.

Finally, and importantly, by waiting until the Court rules in *Magner*, the Department will demonstrate proper deference to the Court, which is constitutionally charged with ruling on interpretations of federal law, such as the Fair Housing Act. *See* U.S. Const., Art. III, § 2 ("[t]he judicial power shall extend to all cases, in law and equity, arising under … the laws of the United States").

For these reasons, the Department should postpone its rulemaking on the "discriminatory effects standard" under the Fair Housing Act until after the Supreme Court renders its decision in *Magner* so that the Department can take full advantage of the Court's guidance in the rule promulgation process.

### B.    The Fair Housing Act Does Not Encompass a Disparate-Impact Theory

Even if the Department were to promulgate a rule before the Supreme Court renders its decision in *Magner*, the Trade Associations believe that the Department must revise the Proposed Rule because the Fair Housing Act does not encompass disparate-impact liability.

> *1.    The Plain Language of the Fair Housing Act Does Not Support Disparate-Impact Claims*

When Congress intends to prohibit neutral practices that have disparate impact, it employs language expressly concerning the "effects" of such practices. By contrast, Congress's use of language prohibiting discriminatory practices "because of" certain traits or characteristics, such as the language found in the Fair Housing Act, only extends to disparate treatment.

The plain language of the Fair Housing Act requires proof of intentional discrimination and does not envision a violation founded on disparate impact. Sections 804(a) and 805 of the Act prohibit certain practices in the provision of housing and residential lending, respectively, "because of" certain factors. 42 U.S.C. §§ 3604(a), 3605. The Supreme Court has held that language prohibiting discrimination "because of" certain factors reflects a congressional intent to address intentional discrimination only. *See generally Ricci v. DeStefano*, 129 S. Ct. 2658 (2009); *Smith v. City of Jackson, Miss.*, 544 U.S. 228 (2005).

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 6

In *Smith*, the Court was unanimous in the conclusion that the "because of" language in section 4(a)(1) of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a)(1), "does not encompass disparate impact liability," but rather contemplates only intentional discrimination. *Compare Smith*, 544 U.S. at 236 n.6 (plurality op.) (section (a)(1) of ADEA makes it unlawful for an employer "to fail or refuse to hire … any individual … *because of* such individual's age," and "[t]he focus of the paragraph is on the employer's actions with respect to the targeted individual") (emphasis added); *with id.* at 246 (Scalia, J., concurring) ("the only provision of the ADEA that could conceivably be interpreted to effect [a disparate-impact] prohibition is § 4(a)(2)"); *and with id.* at 249 (O'Connor, J., dissenting) ("[n]either petitioners nor the plurality contend that the first paragraph, § 4(a)(1), authorizes disparate impact claims, and I think it obvious that it does not. That provision plainly requires discriminatory intent").

In *Ricci*, the Court reached a similar conclusion with regard to the "because of" language contained in section 703(a)(1) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1). 129 S. Ct. at 2672-73. The Court reasoned:

> As enacted in 1964, Title VII's principal nondiscrimination provision held employers liable only for disparate treatment. That section retains its original wording today. It makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin."

*Id.* at 2672 (citing 42 U.S.C. § 2000e-2(a)(1)) (emphasis added).

By contrast, the Court has held that disparate-impact claims are cognizable under certain other provisions of the ADEA and Title VII because those statutes contain additional language, *not* found in the Fair Housing Act, directed to the effects of discrimination. *See Smith*, 544 U.S. at 235 (plurality op.); *Ricci*, 129 S. Ct. at 2672-73; *Griggs v. Duke Power Co.*, 401 U.S. 424, 426 n.1, 429-30 (1971). In *Smith*, the Court held that disparate-impact claims are available under the ADEA because, like Title VII, the ADEA prohibits actions by employers that "deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee, because of such individual's age." 544 U.S. at 235 (plurality op.) (emphasis in original) (comparing ADEA, 29 U.S.C. § 623(a)(2), with Title VII, 42 U.S.C. § 2000e-2(a)(2)). Congress intended the phrase "otherwise adversely affect," contained in both the ADEA and section 703(a)(2) of Title VII, to address "the *consequences* of employment practices, not simply the motivation." *Smith*, 544 U.S. at 234-35 (plurality

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 7

op.) (emphasis in original). Only if a statute "focuses on the *effects* of the action on the [protected individual] rather than the motivation for the action of the [defendant]" does the statute prohibit disparate impact. *Id.* at 236 (plurality op.).

The Fair Housing Act proscribes only conduct undertaken "because of" certain factors. 42 U.S.C. §§ 3604(a), 3605. With respect to section 805, governing residential lending practices, the Act provides: "It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, *because of* race, color, religion, sex, handicap, familial status, or national origin." *Id.* § 3605 (emphasis added). In the context of the precedent discussed above, the Court has held that the "because of" language found in sections 804(a) and 805 of the Act addresses only intentional conduct.

Unlike certain employment discrimination statutes, the Act does not contain a provision proscribing lending practices that "otherwise adversely affect" individuals on the basis of the enumerated traits or characteristics.[2] Indeed, the Fair Housing Act does not include any of the words that have been interpreted as giving rise to disparate-impact claims, such as "affect" and "tend to," in any of its provisions prohibiting discrimination. *Compare* 42 U.S.C. §§ 3604 and 3605 *with* 42 U.S.C. § 2000e-2(a)(2); 29 U.S.C. § 623(a)(2); and 42 U.S.C. § 12112(b)(6); *see also Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 96 n.13 (2008) (concluding ADEA section 4(a)(2) incorporates disparate-impact because of its "tend to deprive" language); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) (concluding same regarding section 102(b) of Americans with Disabilities Act of 1990). Congress, therefore, limited recovery under the Act to claims arising out of disparate treatment, not disparate impact. *See Gross v. FBL Fin. Servs.*, 557 U.S. 167, 129 S. Ct. 2343, 2349 (2009) (Congress is presumed to act intentionally where it does not add language to one statute that it has included in another statute); *cf. Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 168 n.16 (1993) ("we may not add terms or provisions where [C]ongress has omitted them").

Furthermore, the executive branch has previously opined that the Fair Housing Act does not recognize a disparate-impact theory. In signing the Fair Housing Amendments Act, the President issued a statement saying that the amended Act "does not represent any

---

[2] For the Department's convenience, the Trade Associations attach hereto at Appendix B a chart comparing the provisions in Title VII and the ADEA, which the Court has identified as giving rise to disparate treatment or disparate impact claims, with the language of the Fair Housing Act.

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 8

congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that Title 8 violations may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent.... Title 8 speaks only to intentional discrimination." "Remarks on Signing the Fair Housing Amendments Act of 1988," Public Papers of President Ronald W. Reagan, Ronald Reagan Presidential Library (Sept. 13, 1988).[3] That same year, the United States Solicitor General submitted an *amicus* brief to the Supreme Court asserting that a plaintiff must prove *intentional* discrimination to establish a violation of the Act, stating that "[n]ot only do the statute's language and legislative history show that a violation of Title VIII [(i.e., the Fair Housing Act)] requires intentional discrimination, substantial practical problems result if this requirement is discarded," such as "the difficulties in placing meaningful limits on the discriminatory effect standard of liability." *See* Brief for United States as *Amicus Curiae, Town of Huntington, N.Y. v. Huntington Branch, NAACP*, 488 U.S. 15 (1988) (No. 87-1961).[4]

Nevertheless, in the United States' *amicus* brief submitted in *Magner*, the Solicitor General now argues that the presence of exemptions in the Fair Housing Act "reinforce[s]" "[t]he existence of disparate-impact liability under" the Act. *See* Brief for United States as *Amicus Curiae*, at 15-16, *Magner v. Gallagher* (Dec. 29, 2011) (No. 10-1032) ("United States' *Magner Amicus* Brief").[5] Besides the inconsistency with the prior position of the government, this argument fails because the exemptions are simply the codification of legitimate, non-discriminatory reasons for taking certain actions. They do not imply any intent on the part of Congress to recognize disparate impact under the Act. Moreover, the mere presence of an exemption cannot give rise to an implied disparate-impact cause of action where Congress might have, but chose not to, create an express cause of action. *See Gross*, 129 S. Ct. at 2349.

Nor is the government's argument persuasive when it asserts that the "otherwise make unavailable or deny" language in section 804(a) of the Fair Housing Act is the equivalent of the "otherwise adversely effect" language in section 703(a)(2) of Title VII. *See* United States' *Magner Amicus* Brief, *supra*, at 11 ("[b]y banning actions that 'make unavailable or deny' housing on one of the specified bases, Section 804(a) [of the Fair Housing Act] focuses

---

[3] *Available at* http://www.reagan.utexas.edu/archives/speeches/1988/091388a.htm.

[4] *Available at* http://www.justice.gov/osg/briefs/1987/sg870004.txt.

[5] *Available at* http://www.americanbar.org/content/dam/aba/publications/ supreme_court_preview/briefs/10-1032_neither_amcu_usa.pdf.

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 9

on the result of challenged actions … rather than on the intent of the actor"). In so arguing, the Solicitor General takes the phrase "make unavailable or deny" out of context and thus, impermissibly distorts the meaning of the phrase. The complete phrase, "*otherwise* make unavailable or deny," 42 U.S.C. § 3604(a) (emphasis added), is a catch-all at the end of a list of actions that the Fair Housing Act prohibits to be performed with discriminatory intent.[6] It is a fundamental precept of statutory interpretation that a general item within a list with more specific items is construed to have a similar meaning as the specific items in the list. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). Because it is contained within a list of items preventing actions based on disparate treatment, the phrase "otherwise make unavailable or deny" must be interpreted similarly and cannot be read to encompass liability for disparate impact. Moreover, neither section 805 of the Act governing residential lending practices nor the other anti-discrimination provisions of section 804 of the Act contain the language "otherwise make unavailable or deny" and thus, could not be interpreted to recognize a disparate-impact theory on that basis. *See, e.g.*, 42 U.S.C. §§ 3604(b)-(e), 3605(a).

       2.     *The Courts of Appeals Have Misapplied the Supreme Court's Title VII Jurisprudence in Construing the Fair Housing Act*

The Courts of Appeals have approved the application of the disparate-impact approach under the Fair Housing Act at least in certain circumstances.[7] Yet, their holdings are often incorrectly premised on the Supreme Court's Title VII jurisprudence, which recognizes the availability of a disparate-impact approach in Title VII based on language *not* found in the Fair Housing Act.[8] In particular, the Courts of Appeals' decisions are wrong to the extent

---

[6] Section 804(a) provides in full: "To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or *otherwise make unavailable or deny*, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a) (emphasis added).

[7] The majority of these decisions address section 804 of the Fair Housing Act governing housing and not section 805 of the Act governing residential real-estate related transactions. Of the ninety-six Courts of Appeals decisions, available through a Westlaw search, addressing disparate impact under either or both sections, ninety-one decisions discuss section 804, whereas only thirteen discuss section 805.

[8] *See, e.g., Graoch Assocs. # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n*, 508 F.3d 366, 372 (6th Cir. 2007) ("[r]elying on the analogy between Title VII and the FHA, several other circuits have applied essentially this approach to disparate-impact

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 10

that they conclude *Griggs* held that the language "because of" reveals a congressional intent to allow a disparate-impact approach. As made clear by the Court's decisions in *Smith* and *Ricci*, this is not the proper lesson of *Griggs*. Rather, *Smith* and *Ricci* each confirm that the language "because of," including the provision in Title VII, does not permit a disparate-impact approach. *Smith*, 544 U.S. at 236 n.6 (plurality op.); *Ricci*, 129 S. Ct. at 2672-73.

Notably, neither in 1968, when it enacted the Fair Housing Act, nor in 1988, when it amended the Act, nor in 1991, when it amended Title VII to better articulate the disparate-impact theory available under that statute, did Congress choose to incorporate language into the Fair Housing Act analogous to that language under Title VII which the Court has interpreted as providing for a disparate-impact cause of action. As the Court has stated, "[w]e cannot ignore Congress' decision to amend Title VII's relevant provisions but not make similar changes to [other anti-discrimination statutes]. When Congress amends one statutory provision but not another, it is presumed to have acted intentionally." *Gross*, 129 S. Ct. at 2349. Moreover, Title VII and the Fair Housing Act are separate laws, passed by different acts of Congress in different years. Title VII is a part of the Civil Rights Act of 1964, while the Fair Housing Act is Title VIII of the Civil Rights Act of 1968. That both laws were designed to eliminate discrimination, one in employment and the other in housing, does not warrant identical construction, particularly in light of the Court's aforementioned observation in *Smith*. 544 U.S. at 236 n.6 (plurality op.).

---

claims under the FHA"); *2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006) (noting that the Fair Housing Act's "language prohibiting discrimination – 'because of ... race ... or national origin' – is identical to Title VII's, and since *Griggs*, every one of the eleven circuits to have considered the issue has held that the FHA similarly prohibits not only intentional housing discrimination, but also housing actions having a disparate impact"); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 51 (1st Cir. 2000) (noting that "[i]n light of *Griggs* and the similarity of the statutes, it is a fair reading of the Fair Housing Act's 'because of race' prohibition to ask that a demonstrated disparate impact in housing be justified by a legitimate and substantial goal of the measure in question"); *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 745 & n.1 (9th Cir. 1996) ("look[ing] for guidance to employment discrimination cases" in finding that the Fair Housing Act provides for disparate impact); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146 (3d Cir. 1977) ("in [Fair Housing Act] cases, by analogy to Title VII cases, unrebutted proof of discriminatory effect alone may justify a federal equitable response"). *But see Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 714 (7th Cir. 1998) (cautioning against the "wholesale transposition" of discrimination theories and standards of proof from the Title VII context to the unique area of "credit discrimination").

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 11

3. *HUD's Reading of the Fair Housing Act Exceeds the Scope of Its Delegation of Authority from Congress*

A federal agency "literally has no power to act … unless and until Congress confers power upon it." *American Library Ass'n v. F.C.C.*, 406 F.3d 689, 698 (D.C. Cir. 2005). If "[t]here is no statutory foundation for" an agency's proposed rule, the agency "act[s] outside the scope of its delegated authority when it adopt[s]" such a rule. *Id.* at 692, 698; *Nagahi v. I.N.S.*, 219 F.3d 1166, 1169 (10th Cir. 2000) ("an agency cannot create regulations … beyond the scope of its delegated authority").

In addition, agency regulations "may not serve to amend a statute, nor add to the statute something which is not there." *California Cosmetology Coal. v. Riley*, 110 F.3d 1454, 1460-61 (9th Cir. 1997) (concluding agency exceeded authority Congress delegated to it) (quotations and citations omitted). "It is a fundamental precept of administrative law that an agency … rule … cannot overcome the plain text enacted by Congress." *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 141 n.9 (5th Cir. 2010). Because an agency may not interpret a statute to "supersede the language chosen by Congress," "a regulation which operates to create a rule out of harmony with the statute, is a mere nullity." *Pacific Gas & Elec. Co. v. United States*, 664 F.2d 1133, 1136 (9th Cir. 1981) (citing *Mohasco Corp. v. Silver*, 447 U.S. 807 (1980)). Furthermore, the Supreme Court has ruled that if Congress has made itself clear through statutory language, any agency interpretation "must give effect to" Congress's intent. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). When an agency rule is contrary to the plain language of a statute, the rule is not entitled to any deference and should be rejected. *See New Jersey v. EPA*, 517 F.3d 574, 582 (D.C. Cir. 2008).

Although Congress has conferred on the Department the authority to "make rules … to carry out" the Fair Housing Act, 42 U.S.C. § 3614a, such authority does not extend to making rules that are contrary to the Act's plain language. As discussed above, the plain language of the Act contains no recognition of disparate-impact liability. The Supreme Court has expressed a belief that an agency acts beyond the scope of its delegated authority in promulgating regulations that encompass disparate impact where the operative statute does not itself encompass disparate impact. *See Alexander v. Sandoval*, 532 U.S. 275, 285-86 & n.6 (2001) ("[w]e cannot help observing … how strange it is to say that disparate-impact regulations are 'inspired by, at the service of, and inseparably intertwined with' § 601 [of Title VI of the Civil Rights Act of 1964], … when § 601 permits the very behavior that the regulations forbid").

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 12

Furthermore, the "creating, perpetuating, or increasing segregated housing patterns" language in proposed section 100.500(a)(2) may extend liability far beyond the type of factual circumstances presented in the lawsuits that the Department cites as support for the provision, as most of those cases raised at least a suggestion of intentional discrimination.[9] *See* 76 Fed. Reg. at 70,925.

The Act requires that lenders make credit decisions without consideration of factors such as race or national origin, and yet the proposed section seems to require that lenders consider these impermissible factors in making credit decisions. For instance, assume that an Asian-American applicant seeks financing for a home purchase in a residential area that is comprised almost exclusively of Asian-American residents. The proposed language of section 100.500(a)(2) raises the question of whether approving the loan would have "the effect of ... perpetuating, or increasing segregated housing patterns on the basis of race ... or national origin." At the same time, denial of the application because of the race or national origin of the applicant would constitute overt discrimination that is prohibited by the Act. The elimination of segregated housing patterns is a desirable social goal, but no law, including the Fair Housing Act, imposes an obligation on lenders, to consider such factors in individual credit decisions. In fact, the law specifically precludes such considerations.

Because it has proposed a rule that is contrary to the plain language of the Fair Housing Act, the Department has exceeded the scope of the authority delegated to it by Congress. Moreover, by attempting to "supersede the language chosen by Congress," the Proposed Rule would be "a mere nullity" and would have no force of law. Nor would the rule be entitled to any deference. Accordingly, the Department should revise the Proposed Rule to make clear that its interpretation of the Fair Housing Act does not extend to disparate impact.

---

[9] Indeed, in each of the cases that HUD cites, the defendant was a government actor, not a private defendant, and had implemented zoning ordinances or regulations that, despite superficial neutrality, were designed to prevent minority penetration into homogeneous housing sectors. *See Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 928-32 (2d Cir. 1988); *United States v. City of Black Jack, Mo.*, 508 F.2d 1179, 1181-83 (8th Cir. 1974); *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*; 749 F. Supp. 2d 486, 491-93 (N.D. Tex. 2010); *Dews v. Town of Sunnyvale, Tex.*, 109 F. Supp. 2d 526, 529 (N.D. Tex. 2000).

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 13

     4.     *HUD Fails to Acknowledge, much less Explain, the Proposed Rule's Departure from HUD's Prior Official Position*

In its original position interpreting the Fair Housing Act, which position the Department issued through the notice-and-comment process, the Department expressed no opinion as to whether the Fair Housing Act extended to disparate-impact claims. Rather, in describing the "Standard for Proving a Violation" under the Act, the Department stated that the "regulations are *not* designed to answer the question of whether intent is or is not required to show a violation." Implementation of Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3232, 3234-35 (Jan. 23, 1989) (emphasis added). The Department left no doubt that it was not taking a position on the issue, stating that it would "maintain a neutral position on the issue of whether discriminatory intent is necessary for advertising to be considered violative of the [Fair Housing Act]." *Id.* at 3275.

Now, for the first time in an official notice-and-comment capacity,[10] the Department posits that the Fair Housing Act provides for disparate-impact claims. The Proposed Rule, however, does not acknowledge that the Department's official regulatory position for the past twenty-two years has been neutral with respect to the question of the availability of disparate impact under the Fair Housing Act, much less explain why HUD proposes to depart from that position. Rather, the Department contends that it "has long interpreted the Act to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate." 76 Fed. Reg. at 70,921. Moreover, the Department states, without citation, that it "has repeatedly determined that the … Act is directed to the *consequences* of housing practices, not simply their purpose." *Id.* at 70,922 (emphasis added). The Department's inability to provide an adequate explanation of the change in its official interpretation of the Fair Housing Act suggests that the Department should revise the Proposed Rule to comport with the plain language of the Act and eliminate disparate impact from any rule.

---

[10] Although HUD joined a 1994 Policy Statement on Discrimination in Lending that suggested that the Act could be violated through disparate impact, *see* 59 Fed. Reg. 18,266, 18,269 (Apr. 15, 1994), that statement was not subject to the official notice-and-comment process.

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 14

    **C.**    **Even if Disparate-Impact Claims Were Viable under the Fair Housing Act, a Standard of Review that Shifts Part of the Burden of Proof to Defendants Is Contrary to Supreme Court Jurisprudence**

        *1.*    *The Burden and Standard the Proposed Rule Articulates Are Contrary to the Burden and Standard the Supreme Court Set Forth in* Wards Cove

If the Fair Housing Act is found to recognize a disparate-impact approach, the Trade Associations believe that the Proposed Rule incorrectly states the burden and standard of proof for that type of claim as articulated by the Supreme Court. Several aspects of the Proposed Rule contravene the Court's jurisprudence, namely (1) the requirement that a defendant articulate a policy which "has a *necessary and manifest* relationship to one or more of the housing provider's legitimate, nondiscriminatory interests," (2) the shifting of the burden of proof to the defendant to prove that relationship, and (3) the requirement that a plaintiff only establish that a less-discriminatory alternative *could* serve the defendant's business interests. 76 Fed. Reg. at 70,925 (emphasis added).

The burden and standard articulated by the Proposed Rule are contrary to the burden and standard set forth by the Supreme Court in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989) (*"Wards Cove"*), which decision would apply to any disparate-impact claim under the Fair Housing Act if that type of claim were viable under the Act. In *Wards Cove*, the Court articulated the necessary elements for stating a prima facie case for disparate impact in the Title VII employment context, namely that a plaintiff must (1) identify a specific policy or practice, (2) demonstrate a disproportionately unfavorable impact on a protected class of which the plaintiff is a member, and (3) establish that the challenged policy or practice *caused* the impact. *See* 490 U.S. at 656 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988)). In doing so, the plaintiff would typically introduce statistical data asserting that a defendant's actions have caused a substantial adverse impact on the protected class. *See Watson*, 487 U.S. at 987. To be valid, the statistical data must reflect the proper comparison. For example, in a hypothetical claim against a lender made pursuant to the Proposed Rule, the proper comparison would be between the recipients of the subject type of loan and applicants from the protected class who were *otherwise qualified for* that type of loan in the market in question. *See Wards Cove*, 490 U.S. at 650-52. In its current form, however, the Proposed Rule does not apply the correct baseline – the composition of "the pool of qualified … applicants" in the relevant market – for the type of prima facie comparison mandated by *Wards Cove*. *Id.* at 651; *cf. Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 (1977) ("a proper comparison was between the racial composition of

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 15

Hazelwood's teaching staff and the *racial composition* of the *qualified* public school teacher *population in the relevant* labor *market*") (emphasis added)).

Under *Wards Cove*, if the plaintiff makes a prima facie showing, the defendant can justify the challenged policy by articulating a legitimate business goal that the policy serves. 490 U.S. at 658-59 ("at the justification stage of ... a disparate-impact case, the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer"). The Court never articulated that the legitimate business interest must be *necessary* as does the Proposed Rule, *see* 76 Fed. Reg. at 70,927, and the Court expressly disclaimed any requirement that the defendant establish that its policy was "essential" or "indispensable."[11] 490 U.S. at 659. Indeed, the government has previously acknowledged as much with respect to regulations promulgated under the ADEA. *See Meacham*, 554 U.S. at 93 n.9.

A simple example illustrates the complicated position in which the standard of the Proposed Rule would place those subject to it. The decision to charge a certain amount of rent might be related to a legitimate business interest, such as maintaining a certain profit margin. Yet, if a plaintiff brings a disparate-impact lawsuit, and establishes that charging a higher rent has had a disproportionate effect on people who share one of the enumerated traits or characteristics, it would be difficult for the defendant to establish maintaining its desired profit margin constitutes a "business necessity."

As another example, the Proposed Rule would interfere with loss-mitigation activities, including activities undertaken in connection with the Home Affordable Modification Program ("HAMP") and Home Affordable Refinance Program ("HARP") of the United

---

[11] The Proposed Rule also cites with approval to *Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251 (D. Mass. 2008), suggesting that for a creditor, creditworthiness may be the only basis for a business justification defense. This position is without basis in law. *Cf.* Policy Statement on Discrimination in Lending, 59 Fed. Reg. 18,266, 18,269 (1994) ("When an Agency finds that a lender's policy or practice has a disparate impact, the next step is to seek to determine whether the policy or practice is justified by 'business necessity.' ... Factors that may be relevant to the justification could include *cost* and *profitability*." (emphasis added)). Accordingly, the Department should clarify that the scope of interests that may support a business justification defense extends to interests beyond just creditworthiness.

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 16

States Department of the Treasury ("Treasury").[12] HAMP is a voluntary program, as are all loss mitigation activities. Thus, if a servicer were sued on the basis that its HAMP practices had a disproportionate impact on people who share one of the enumerated traits or characteristics, it may not be able to defend on the basis that it complied with HAMP standards because participation in that program is not "necessary." The Trade Associations, therefore, propose that the Department revise the Proposed Rule to provide an exemption so that a lender or servicer would not face disparate-impact liability if it is otherwise meeting the requirements or standards established by the federal government, any state government, government-sponsored enterprises, or investors. The exemption proposed by the Trade Associations is discussed in detail below.

In addition, the Proposed Rule contravenes *Wards Cove* by shifting the burden of proof to the defendant. Under *Wards Cove*, "the ultimate burden of proving that discrimination against a protected group has been caused by a specific … practice remains with the plaintiff *at all times.*" 490 U.S. at 659 (emphasis in original). Therefore, the Trade Associations recommend that the Department revise the Proposed Rule to reflect that the plaintiff bears the burden of proof throughout the course of an action brought pursuant to the Fair Housing Act.

Furthermore, having articulated a legitimate business goal, the defendant should prevail unless the plaintiff can prove "that 'other tests or selection devices, without a similarly undesirable racial effect, *would* also serve the … legitimate [business] interest[s]'" in an equally effective manner. *Id.* at 660 (emphasis added) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975)). Under *Wards Cove*, the plaintiff cannot prevail by merely showing that a less discriminatory alternative *could* serve the defendant's business interest. Yet, ignoring *Wards Cove*, the Proposed Rule adopts such a standard. *See* 76 Fed. Reg. at 70,927. Moreover, the standard in the Proposed Rule suggests that the plaintiff can suggest a hypothetical alternative about which a defendant may not have any knowledge or capacity for implementing. This too is contrary to *Wards Cove*. The Court stated that any alternative must not only be "equally effective as" the chosen practice but also must have been known to and rejected by the defendant; it cannot merely be a post-hoc creation of the

---

[12] HAMP and HARP are part of Treasury's Making Home Affordable program and, in conjunction with the Federal Housing Finance Agency for HARP, were implemented under authority granted to Treasury in the Emergency Economic Stabilization Act of 2008. Pub. L. No. 110-343, § 109, 122 Stat. 3765 (Oct. 3, 2008); *see* Departmental Offices, Privacy Act of 1974, as Amended, 74 Fed. Reg. 38,484, 38,484 (Aug. 3, 2009) (discussing HAMP); 2010-2011 Enterprise Affordable Housing Goals; Enterprise Book-Entry Procedures, 75 Fed. Reg. 9034, 9040 (Feb. 26, 2010) (discussing HARP).

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 17

plaintiff. *See* 490 U.S. at 660-61. This is a logical extension of the Court's recognition that "[c]ourts are generally less competent than [businesses] to restructure business practices." *Id.* at 661 (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 (1978)).

In response to *Wards Cove,* Congress altered the standard for future Title VII litigation with the passage of the Civil Rights Act of 1991. Specifically, Congress amended Title VII to allow plaintiffs to challenge a group of employment practices without having to identify a specific practice as being the cause of their alleged harm, as well as to require that the burden of persuasion shift to the defendant to articulate a "business necessity" for the challenged practices. *See* 42 U.S.C. §§ 2000e-2(k)(1)(A)-(B). Congress has never made any such amendments to the Fair Housing Act, and accordingly, if the Act recognizes a disparate-impact theory, the burden and standard of proof articulated in *Wards Cove* would remain applicable to such claims under the Act. The Supreme Court made this clear in *Smith*, in which it stated that "[w]hile the relevant 1991 amendments expanded the coverage of Title VII, they did not amend the ADEA or speak to the subject of age discrimination. Hence, *Wards Cove*'s pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA." 544 U.S. at 240.

Finally, proposed section 100.120(b)(2) suggests that "[p]roviding loans ... in a manner that results in disparities in their cost, rate of denial, or terms or conditions, or that has the effect of denying or discouraging their receipt of the basis of race" violates the Fair Housing Act. 76 Fed. Reg. at 70,926. This proscription could be read as imposing liability for disparities correlated with a prohibited basis without application of the burden or standard of proof mandated by *Wards Cove* or even by proposed section 100.500. Proposed section 100.120(b)(2) may also permit the filing of frivolous lawsuits based on statistical data alone – for example, on the public loan data reported by financial institutions under the federal Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §§ 2801, *et seq.*[13] But such data by

---

[13] HMDA itself is a disclosure law. It establishes neither unlawful lending terms nor a cause of action. HMDA requires most mortgage lenders to report information about their home-lending activities. 12 U.S.C. § 2803. Federal Reserve Board Regulation C implements HMDA and describes the information to be submitted to federal agencies, which subsequently is made public by the Federal Financial Institutions Examination Council ("FFIEC"). See www.ffiec.gov. Information regarding the disposition of all loan applications (that is, whether they were accepted or declined) is reported, but only limited information about loan pricing is reported. For example, Regulation C previously required reporting as to the spread between certain higher-priced mortgage loans' annual percentage rate ("APR") and the yield on comparable Treasury obligations but not the actual APR, much

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 18

itself is not predictive of illegal discrimination. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ----, 131 S. Ct. 2541, 2555-56 (2011) (criticizing reliance on mere statistical disparity between members of two different groups as basis for bringing Title VII claims).

The Proposed Rule seeks to implement an approach adopted by Congress when it amended Title VII through the Civil Rights Act of 1991. Yet, it required an act of Congress to establish such an approach in the Title VII context. Congress has never made a comparable amendment to the Fair Housing Act. Accordingly, the Trade Associations believe that the Department should revise the Proposed Rule to correctly set forth the burden and standard of proof as set forth by the Supreme Court in *Wards Cove*.

> 2. *The Burden and Standard the Proposed Rule Articulates Are Contrary to* Wal-Mart

In *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ----, 131 S. Ct. 2541 (2011) ("*Wal-Mart*"), the Supreme Court narrowed the application of the disparate-impact theory in cases where discretion in decision-making is challenged.[14] In particular, *Wal-Mart* rejected the application of the disparate-impact theory to a company-wide policy of discretion. 131 S. Ct. at 2554-55. Where hundreds or thousands of persons independently exercise discretion in carrying out their job duties, that is "just the opposite of a uniform ... practice" which is normally the subject of a disparate-impact approach – such as the height and weight requirement applied uniformly to all prison guard applicants in *Dothard v. Rawlinson*, 433 U.S. 321, 323-24 (1977). *Wal-Mart*, 131 S. Ct. at 2554. Rather, the Court found the challenged conduct to be "a policy against having uniform employment practices." *Id.* In its reasoning, the Court opined, "[w]ithout some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members'

---

less requiring that such spread be reported for all loans. 12 C.F.R. § 203.4(a)(12) (2008). In addition, borrowers' credit scores, income and assets, and cash reserves, the debt-to-income ratio, and the loan-to-value ratio are not among the currently reported data. 12 C.F.R. § 203.4 (2011).

[14] The Court first recognized disparate-impact challenges to subjective policies, such as discretion in decision-making, in *Watson*, 487 U.S. at 989-91 (applying the disparate-impact approach to subjective decision-making regarding promotions, to address the "functional equivalent" of intentional discrimination). *Wal-Mart*, however, operates to limit the application of *Watson* in certain factual circumstances.

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 19

claims for relief will produce a common answer to the crucial question why was I disfavored." *Id.* at 2552.[15]

The Proposed Rule, however, contravenes *Wal-Mart* where it provides for a disparate-impact cause of action for facially-neutral policies involving the exercise of discretion. *See* 76 Fed. Reg. at 70,924 ("Any facially neutral action … [such as] policies, practices, or procedures, including those that allow for *discretion* …, may result in a discriminatory effect actionable under the Fair Housing Act and this rule." (emphasis added)). Accordingly, at the very least, the Department should remove those aspects of the Proposed Rule that would give rise to disparate-impact liability based on the exercise of discretion.

> 3. *The Burden and Standard the Proposed Rule Articulates Are Contrary to Meyer v. Holley*

Citing with approval to *Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251 (D. Mass. 2008), the Proposed Rule suggests that an entity can be held liable for the neutral practices of a third party. But *Miller* is not entitled to any weight. First, the decision merely denied a motion to dismiss brought at the outset of the case. Second, to the extent that the decision could be read to support liability against a defendant for actions of third parties over which the defendant lacks control, *Miller* is at odds with *Meyer v. Holley*, 537 U.S. 280 (2003), which limits vicarious liability under the Fair Housing Act to traditional agency relationships. 537 U.S. at 286-89. Finally, the *Miller* matter became part of a multi-district litigation proceeding in which a motion to certify a putative disparate-impact class was denied because under *Wal-Mart*, "statistical evidence of average disparities does not suffice" to establish commonality. *In re Countrywide Fin. Mortgage Lending Practices Litig.*, No. 08-MD-1974, 2011 WL 4862174, at *3-4 (W.D. Ky. Oct. 13, 2011), *Fed. R. Civ. P. 23(f) review pending* (No. 11-514, 6th Cir.).

As written, however, the Proposed Rule would create liability for entities complying with contractual obligations set by third parties, including the federal government. For instance, a loan servicer applying loss-mitigation criteria set by the party that owns the loan (very commonly not the servicer) or by Treasury may face liability under the Proposed Rule for purported disparate impact caused by the criteria. In addition, lenders may face liability for credit decisions based on automated underwriting systems that the government-sponsored

---

[15] The Court further reasoned that granting employees discretion "is also a very common and presumptively reasonable way of doing business – one that we have said should itself raise no inference of discriminatory conduct." *Wal-Mart*, 131 S. Ct. at 2554 (quotations omitted).

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 20

enterprises Fannie Mae and Freddie Mac require lenders to use and that contain credit-risk algorithms which lenders have no ability to alter. Accordingly, the Trade Associations believe that the Department should revise the Proposed Rule to correctly set forth the standard the Supreme Court set forth in *Meyer*.

> **D.** **The Trade Associations Are Concerned That Creating a Disparate-Impact Cause of Action May Encourage Lenders to Consider Prophylactic Measures That Would Present Legal Risks and Draw Resources Away from Efforts to Prevent Disparate Treatment**

The disparate-impact approach originally was designed to challenge "practices, adopted without a deliberately discriminatory motive, [that] may in operation be functionally equivalent to intentional discrimination." *Watson*, 487 U.S. at 987. The Proposed Rule's application of the disparate-impact approach to the residential mortgage lending industry could have unintended consequences. The disparate-treatment approach is well suited to rooting out discrimination in lending, but the threat of a disparate-impact challenge inevitably causes lenders to consider prophylactic measures to minimize risk. These measures are themselves undesirable and, perversely, can enhance rather than minimize legal risk to the detriment of lenders, hindering their efforts to serve borrowers.

The threat of disparate-impact liability arises when the end results of a lender's operations have different demographic results, despite the uniform application of sound, neutral financial standards. For instance, notwithstanding a lender's neutral credit assessment policies, applicants belonging to one racial group may be rejected for financing at a greater rate than applicants from another racial group. If the differences in the rejection rates are deemed statistically significant (that is, the results can not be attributed to mere chance), the lender faces the prospect of a disparate-impact lawsuit. The risk can arise regardless of the racial group impacted or whether men or women experience differential results.

In lending, generally-accepted credit assessment standards, which themselves raise no inference of discrimination, may produce differential results that can be correlated with factors such as race or national origin. For instance, it is commonplace and accepted for lenders to consider applicants' credit scores as an important indicator of credit risk, because such a score is highly predictive of risk and costs relatively little to obtain. At the same time, the Federal Reserve Board has found that the "[d]ifferences in credit scores among racial or ethnic groups … are particularly large," with 52.6% of African-Americans in the sample appearing in the lowest two score deciles, as compared to 16.3% of non-Hispanic whites. *See* Board of Governors of Fed. Reserve Sys., *Report to the Congress on Credit Scoring and*

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 21

*Its Effects on the Availability and Affordability of Credit*, at 80 (Aug. 2007) ("FRB Study").[16]
Similarly, the National Community Reinvestment Coalition ("NCRC") has stated that "our
analysis finds that zip codes with concentrations of minorities contain a disproportionate
percentage of consumers with [low] FICO scores between 580 and 620." Nat'l Cmty.
Reinvestment Coal., *Working-Class Families Arbitrarily Blocked from Accessing Credit:
NCRC's Fair Lending Investigation of Credit Score Restrictions by Federal Housing
Administration-Approved Lenders*, Mortgage Lending Disparities Series Paper, at 15 (Dec.
2010).[17]

Down-payment requirements also impact various racial and ethnic groups differently. This
result is reflected in examining census data on household wealth, because wealth (versus
income) is the primary source for a down payment. In 2009, the median wealth of white
households was 20 times that of African-American households and 18 times that of Hispanic
households. *See* Pew Research Center, *Twenty-to-One: Wealth Gaps Rise to Record Highs
Between Whites, Blacks and Hispanics*, at 1 (July 2011)[18] (analyzing 2009 U.S. Census
Bureau data and finding that average African-American and Hispanic households had $5,677
and $6,325 in wealth, respectively, while the average white household had $113,149 in
wealth). Debt-to-income and loan-to-value requirements can also have a differential impact
among various racial and ethnic groups.

These are simple examples of basic elements of assessing credit risk, and yet differences in
their impacts could be expected to trigger at least the initial stages of a legal claim under a
disparate-impact approach. In reality, the issues faced by lenders are far more complex in
that the many elements related to credit risk assessment are usually layered in complex
models or algorithms often developed by third parties. For example, as noted above, the
government-sponsored enterprises Fannie Mae and Freddie Mac require lenders to evaluate
credit risk pursuant to automated underwriting systems containing models proprietary to
those entities. The sum total of the elements in the model might have the same differential
impact as the application of single assessment elements such as credit score and ability to

---

[16] *Available at* http://www.federalreserve.gov/boarddocs/rptcongress/creditscore/
creditscore.pdf.

[17] *Available at* http://www.ncrc.org/images/stories/mediaCenter_reports/
fha%20white%20paper-120810-final.pdf.

[18] *Available at* http://www.pewsocialtrends.org/files/2011/07/SDT-Wealth-Report_7-26-
11_FINAL.pdf.

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 22

make a down payment, yet lenders are not in a position to "justify" each element of the model much less the relationships among all the variables.

And, in making two new types of residential mortgage loans – namely, Qualified Mortgages ("QMs") and Qualified Residential Mortgages ("QRMs") – created pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act") and certain of its proposed implementing regulations, lenders may engage in more conservative underwriting to avoid ability-to-repay liability (in connection with QM loans) or risk-retention requirements (in connection with QRM loans). *See* Dodd-Frank Act §§ 941, 1412. These cautious underwriting practices may restrict the availability of loans to groups with less wealth or income and, correspondingly, to individuals who are members of racial or ethnic minorities.[19] Such differentials may prompt disparate-impact lawsuits.

The Trade Associations recognize that under the Proposed Rule, liability would not attach unless the challenged policy or practice lacked a necessary, non-pretextual business justification. But the primary objective of most lenders, as with most businesses, is to minimize the risk of ever facing such a challenge. A lawsuit alleging lending discrimination is a very serious charge and can occasion an immediate reputational injury and business disruption caused by the need to defend such charges. The allegation of a statistical impact is still newsworthy even if there is no reasonable inference that it is caused by an impermissible differential treatment. Moreover, defending allegations of disparate impact is typically very expensive.

In these circumstances, the possibility exists that businesses may seek to manage their end numbers so as to avoid legal risk. Lenders might manage their end numbers by extending credit to individuals who are members of a racial minority group but who would otherwise not qualify for credit. For example, the threat of liability under the "perpetuating … segregated housing patterns" standard of proposed section 100.500(a)(2), *see* 76 Fed. Reg. at 70,926, may encourage lenders to consider demographics in making credit decisions. The Supreme Court has recognized this result as it has allowed the expansion of the use of a disparate-impact approach in the employment discrimination field. *See Watson*, 487 U.S. at 992-93 (noting that "the inevitable focus on statistics in disparate-impact cases could put undue pressure on employers to adopt inappropriate prophylactic measures"). The Court has

---

[19] *See* charts, attached hereto at Appendix C, reflecting correlation, based on data from federal government sources, between groups with less wealth or income and individuals who are members of racial or ethnic minorities.

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 23

expressed concerns that a lender's efforts to avoid a disparate-impact legal challenge may themselves constitute intentional unlawful discrimination. *See, e.g., Ricci,* 129 S. Ct. at 2664 ("[w]e conclude that race-based action like the City's in this case is impermissible under Title VII unless the employer can demonstrate a strong basis in evidence that, had it not taken the action, it would have been liable under the disparate-impact statute"); *see also City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 499-500 (1989) (rejecting a set-aside program for minority contractors, since "an amorphous claim that there has been past discrimination ... cannot justify the use of an unyielding racial quota"). And the Court has cautioned that "[a]llowing employers to violate the disparate-treatment prohibition based on a mere good-faith fear of disparate-impact liability would encourage race-based action at the slightest hint of disparate impact. ... That would amount to a de facto quota system." *Ricci,* 129 S. Ct. at 2675.

Thus, implementing a rule that recognizes a disparate-impact approach under the Fair Housing Act may place lenders in the predicament of facing suit where they are attempting to comply with law, no matter what they do. The threat of such suits is not merely hypothetical. In the past several years, lenders have faced frequent disparate-impact suits.[20] No matter how frivolous such suits may be, the threat of such suits may cause lenders to manage their end numbers, which creates another kind of risk, and the defense of such lawsuits would inevitability draw resources away from lenders' efforts to ensure the fair treatment of individual loan applicants and from lenders' ability to fund loans.

For these pragmatic reasons, the Trade Associations believe HUD should revise the Proposed Rule to make clear it does not recognize disparate impact as creating liability under the Fair Housing Act.

---

[20] *See, e.g., In re Countrywide Fin. Mortgage Lending Practices Litig.,* No. 08-MD-1974, 2011 WL 4862174, at *3-4 (W.D. Ky. Oct. 13, 2011) (denying motion to certify disparate-impact class; under *Wal-Mart,* "statistical evidence of average disparities does not suffice to" establish commonality); *Rodriguez v. National City Bank,* --- F.R.D. ----, 2011 WL 4018028, at *5-7 (E.D. Pa. Sept. 8, 2011) (declining to certify class for settlement of disparate-impact claims because discretion provided to defendants' various loan officers precluded finding of commonality in light of *Wal-Mart*); *In re Wells Fargo Residential Mortgage Lending Discrimination Litig.,* No. 3:08-md-01930-MMC, slip op. at 5-8 (N.D. Cal. Sept. 6, 2011) (denying class certification on Fair Housing Act claim because, in part, claim relied upon discretion of individual brokers or branches).

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 24

    **E.**    **The Department Should Create an Exemption, or Alternatively, a Safe Harbor, for Lending and Servicing Practices That Are Undertaken in Compliance with Government or Government-Sponsored Policies or Programs**

As discussed above, the Proposed Rule's burden and standard of proof, and in particular, the business-necessity requirement, will likely engender disparate-impact lawsuits based on lending or servicing actions that are paradoxically undertaken in compliance with, or encouraged by, government or government-sponsored policies or programs. To avoid such a divergence in government objectives, the Trade Associations request that any final rule contain an exemption from disparate-impact lawsuits that would otherwise arise as a result of participation in or compliance with government or government-sponsored policies and programs. In the alternative, the Trade Associations request that any final rule contain a safe-harbor provision for actions taken in compliance with or as the result of following the guidance of such policies and programs.[21]

In particular, the Proposed Rule would run counter to two other significant federal policies. First, as discussed above, it would conflict with the ability of lenders, servicers, and investors to continue with foreclosure prevention activities under such programs as HAMP and HARP.

Second, it would conflict with the loan origination reforms Congress enacted with the Dodd-Frank Act. The QRM and QM rules to be promulgated under the Dodd-Frank Act, along with Dodd-Frank Act amendments to the Home Ownership and Equity Protection Act ("HOEPA"),[22] will make compliance with the Proposed Rule difficult.[23] The purpose and design of several Dodd-Frank Act revisions to mortgage lending is to cause fewer loans to be made to borrowers with weaker credit profiles and to increase the cost of those loans if they are made.

---

[21] Another alternative is for the Department to create a presumption of non-discrimination for the conduct of a lender or servicer taken in compliance with HAMP guidelines, the proposed QM and QRM rules, or similar statutes and regulations or government-sponsored requirements.

[22] Enacted as part of the Riegle Community Development and Regulatory Improvement Act of 1994, Pub. L. No. 103-325, §§ 151-158, 108 Stat. 2160 (1994).

[23] As the first of the charts attached hereto at Appendix C reflects, less than a quarter of all loans purchased by government-sponsored entities between 1997 and 2009 would meet QRM requirements.

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 25

Under the Dodd-Frank Act, lenders may permissibly make both QRM loans and non-QRM loans, QM loans and non-QM loans, and loans defined as "high-cost"[24] and loans that are not so defined. Each of these types of loans is defined at least in part by the costs and terms of the loan. There are increased costs for non-QRM loans, such as fees and risk-retention requirements. There are also increased costs for non-QM loans and for high-cost loans imposed by the Truth-in-Lending Act, *see* 15 U.S.C. § 1640, as amended by the Dodd-Frank Act, *see* Dodd-Frank Act §§ 1413, 1416. QRM loans and non-QRM loans are additionally, and expressly, defined by the borrower's credit profile.

QRM loans, non-"high-cost"-loans, and QM loans that are not "high-cost" loans may be available to borrowers with stronger credit profiles and less credit risk. This is true of QRM loans because they are defined as loans to borrowers with only a very strong credit profile.[25] This is also true of non-"high-cost" loans because, by definition, they are less expensive than "high-cost" loans. This is also true of QM loans (that are not "high-cost" loans) because there is a limit on the rate a lender may charge on such loans,[26] and on the points and fees for these loans. *See* Dodd-Frank Act § 1412. Borrowers with stronger credit profiles are more likely to be eligible for these loans because of the lower risk, and thus lower cost, associated with lending to such borrowers. Groups and individuals with less wealth or income, some of whom may be in protected classes, may obtain non-QRM, non-QM, and "high-cost" loans disproportionately more than other groups.

Congress made the policy decision that some borrowers should be able to obtain mortgage credit only at higher cost than other borrowers or not at all. Consequently, in deciding how to meet the new Dodd-Frank Act requirements, lenders will be forced to make decisions about how to make mortgage credit available in a manner that is likely to disparately affect certain groups of borrowers. No matter what a lender does to implement the Dodd-Frank Act mortgage reforms, the lender will face liability under the Proposed Rule. Lenders, servicers,

---

[24] The Dodd-Frank Act expressly defines what constitutes "high-cost" loans. Dodd-Frank Act § 1431(a) (amending 15 U.S.C. § 1602(aa)).

[25] For example, under the proposed QRM rule, a QRM loan would be one on which the loan-to-value ratio is no more than 80 percent in a purchase transaction (and 70 to 75 percent for refinances). Credit Risk Retention, 76 Fed. Reg. 24,090, 24,167 (April 29, 2011) (proposed to be codified at 24 C.F.R. § 267.15(d)(9)).

[26] A QM loan that is not a "high-cost" loan must have a rate under the rate threshold in the definition of "high-cost" loans. *See* Dodd-Frank Act § 1431(a).

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 26

and investors should not be put in the position of having to choose or balance which of competing government policies to implement and which to ignore.

The purpose of the Trade Association's suggested exemption, therefore, would be to make clear that a lender's or servicer's decision to originate or service a loan in accordance with government or government-sponsored programs, incentives, or statutes and regulations would not be subject to liability under disparate impact as articulated by the Proposed Rule. For example, the exemption would shield entities from liability for actions taken in compliance with the Treasury's guidelines under HAMP, the recently proposed QM and QRM loan regulations,[27] and similar federal, state, or government-sponsored policies or programs.

In effect, the exemption would work in tandem with the Proposed Rule's business-necessity exception. Specifically, the exemption would make clear that the business-necessity exception includes, per se, actions taken in compliance with or as a result of following guidance of government or government-sponsored policies or programs which are targeted at credit criteria and conditions. A list of such programs or policies would include, without limitation, HAMP guidelines, government-sponsored enterprise requirements, QM and QRM rules and incentives, FHA/VA lending regulations, and Ginnie Mae requirements.

Regardless of its form, whether an exemption, a safe-harbor provision, or a presumption, the critical element of such a revision to the Proposed Rule is to ensure that the rule does not create a Catch-22 for lenders or servicers who are otherwise complying with or assisting in government efforts to rehabilitate the residential housing market.

---

[27] As noted above, the proposed QM and QRM regulations, issued pursuant to the Dodd-Frank Act, would establish incentives and requirements for the lending industry to employ conservative underwriting standards. *See generally* Regulation Z, Truth in Lending, 76 Fed. Reg. 27,390 (May 11, 2011) (proposing QM rules); Credit Risk Retention, 76 Fed. Reg. 24,090 (Apr. 29, 2011) (proposing QRM rules).

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 27

### F.    The Proposed Rule Should Not Apply Retroactively

The Supreme Court has recognized that "[r]etroactivity is not favored in the law" and, therefore, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("courts should be reluctant to find such authority absent an express statutory grant").

Nothing in Congress's delegation of rulemaking authority under the Fair Housing Act serves as an express authorization to promulgate retroactive rules. The delegation reads, in whole:

> The Secretary may make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out this subchapter. The Secretary shall give public notice and opportunity for comment with respect to all rules made under this section.

42 U.S.C. § 3614a. This general rulemaking authority, like that in *Bowen*, "contain[s] no express authorization of retroactive rulemaking." 488 U.S. at 213 ("where Congress intended to grant the Secretary the authority to act retroactively, it made that intent explicit").

Accordingly, the Department should clarify that any final rule will apply prospectively only.

### G.    The Proposed Rule Would Unnecessarily Burden Small Businesses

When HUD issues a proposed rule, it must "prepare and make available for public comment an initial regulatory flexibility analysis" that "shall describe the impact of the proposed rule on small entities." 5 U.S.C. § 603(a). The regulatory flexibility analysis must describe and, if feasible, estimate how many "small entities to which the proposed rule will apply." *Id.* § 603(b)(3). The analysis "shall also contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities." *Id.* § 603(c). HUD must engage in a similar regulatory flexibility analysis when it finalizes a rule. 5 U.S.C. § 604.

The Department recognized this duty in the Proposed Rule. 76 Fed. Reg. at 70,926 ("[t]he Regulatory Flexibility Act … generally requires an agency to conduct a regulatory flexibility analysis"). Yet, HUD's analysis does not discuss the number of small entities that the Proposed Rule will affect or discuss any alternatives to the proposal. HUD simply concludes

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 28

"that the proposed rule will not have a significant economic impact on a substantial number of small entities" because "HUD's objective in this proposed rule is to achieve consistency and uniformity" in the application of disparate impact under the Fair Housing Act "and therefore reduce burden for all who may be involved in a challenged practice." *Id.*

Contrary to HUD's limited analysis, the Proposed Rule will place an unnecessary burden on small lending businesses. First, businesses may incur substantial costs in performing statistical and legal analysis of whether their neutral policies have a disparate impact. Second, small businesses may face expenses and burdens from the risk-mitigation measures imposed by large industry participants, particularly if the conduct of third parties is considered a "policy" for disparate-impact liability purposes as the Proposed Rule suggests. Third, as discussed above, the Proposed Rule will place lenders in the predicament of facing suit where they are attempting to comply with law, no matter what they do, and the defense of such lawsuits would inevitability draw resources away from lenders' efforts to ensure the fair treatment of individual loan applicants and from lenders' ability to fund loans. Accordingly, the Trade Associations urge the Department to revise the Proposed Rule to include adequate initial and final regulatory flexibility analyses before proceeding with any final rulemaking.

### III.    Conclusion

The Trade Associations and their members strongly support the Fair Housing Act and fair lending. They submit that the Act prevents disparate treatment of individuals but does not recognize a disparate-impact theory. For the reasons set forth above, the Trade Associations urge the Department to revise the Proposed Rule to make clear that the Act does not encompass disparate-impact liability or, at a minimum, wait until the Supreme Court renders a decision in *Magner* before promulgating a final rule. If the Department does not so revise the Rule, in the alternative, the Trade Associations submit that *Wards Cove* establishes the proper burden and standard of proof for that type of claim and that the Department should revise the Proposed Rule to align with controlling Supreme Court jurisprudence. Finally, the Trade Associations request that the Department revise the Proposed Rule to ensure that it does not create liability for their members who are otherwise complying with or assisting in government or government-sponsored efforts to rehabilitate the residential housing market.

The Trade Associations would greatly appreciate the opportunity to meet with the Department to discuss the issues raised in this comment letter, including the scope of Fair Housing Act liability, the burden and standard of proof that should apply if the Act does extend to disparate impact, the full contours of an exemption for government and government-sponsored policies and programs as well as the list of programs and policies to

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 29

which it would apply, and the impact of the Proposed Rule on members of the financial
services industry, including small businesses, and borrowers.

Very truly yours,

*/s/ Paul F. Hancock*

Paul F. Hancock
K&L GATES LLP

Appendices

On behalf of:

American Bankers Association
American Financial Services Association
Consumer Bankers Association
Consumer Mortgage Coalition
Independent Community Bankers of America
Mortgage Bankers Association

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 30

## APPENDIX A

American Bankers Association ("ABA"), headquartered in Washington, D.C., is the principal national trade association of the financial services industry. The ABA's members, located in each of the 50 states, the District of Columbia, and Puerto Rico, include financial institutions of all sizes. ABA members hold a majority of the domestic assets of the banking industry in the United States.

American Financial Services Association ("AFSA") is a national trade association for providers of financial services to consumers, including residential mortgage loans. AFSA seeks to promote responsible, ethical lending to informed borrowers and to improve and protect consumers' access to credit.

Consumer Bankers Association ("CBA") is the only national financial trade group focused exclusively on retail banking and personal financial services – banking services geared toward consumers and small businesses. As the recognized voice on retail banking issues, the CBA provides leadership, education, research, and federal representation on retail banking issues. CBA members include most of the nation's largest bank holding companies, as well as regional and super-community banks that collectively hold two-thirds of the industry's total assets.

Consumer Mortgage Coalition ("CMC") is a trade association comprised of national residential mortgage lenders, servicers, and service providers. CMC was formed in 1995 to pursue reform of the mortgage origination process. CMC members participate in every stage of the home financing process.

Independent Community Bankers of America ("ICBA") is a trade association that represents nearly 5000 community banks of all sizes and charter types nationwide. ICBA member community banks seek to improve cities and towns by using local dollars to help families purchase homes. ICBA member community banks are actively engaged in the business of residential mortgage lending in the communities that they serve.

The Mortgage Bankers Association ("MBA") is the national association representing the real estate finance industry, an industry that employs more than 280,000 people in virtually every community in the country. Headquartered in Washington, D.C., the association works to ensure the continued strength of the nation's residential and commercial real estate markets; to expand homeownership; and to extend access to affordable housing to all Americans. MBA promotes fair and ethical lending practices and fosters professional excellence among real estate finance employees through a wide range of educational programs and a variety of publications. Its membership of over 2200 companies includes all elements of real estate finance: mortgage companies, mortgage brokers, commercial banks, thrifts, Wall Street conduits, life insurance companies, and others in the mortgage lending field. For additional information, visit MBA's website.

Regulations Division
Office of General Counsel
United States Department of Housing and Urban Development
January 17, 2012
Page 31

## APPENDIX B

| | Title VII, Sec. 703(a) | ADEA, Sec. 4(a) | FHA, Sec. 804(a) | FHA, Sec. 805 |
|---|---|---|---|---|
| **Disparate Treatment Proscription** | (a) It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin; | (a) It shall be unlawful for an employer: (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age; | [I]t shall be unlawful – (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person *because of* race, color, religion, sex, familial status, or national origin. | It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, *because of* race, color, religion, sex, handicap, familial status, or national origin. |
| **Disparate Impact Proscription** | (a) It shall be an unlawful employment practice for an employer – … (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities *or otherwise adversely affect* his status as an employee, because of such individual's race, color, religion, sex, or national origin. | (a) It shall be unlawful for an employer: … (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities *or otherwise adversely affect* his status as an employee, because of such individual's age.… | None. | None. |

**APPENDIX C**




## More Than 80 Percent of GSE Business from 1997–2009 Would Not Have Been QRM

Percent of all mortgages that would NOT have met all requirements under the proposed QRM standard, by year of origination

| Year | Percent |
|------|---------|
| 1997 | 79.6% |
| 1998 | 76.7% |
| 1999 | 80.5% |
| 2000 | 83.6% |
| 2001 | 80.6% |
| 2002 | 77.6% |
| 2003 | 75.4% |
| 2004 | 83.0% |
| 2005 | 85.6% |
| 2006 | 88.5% |
| 2007 | 89.3% |
| 2008 | 82.6% |
| 2009 | 69.5% |

*Source:* FHFA.

Chart 1



# High LTV Lending Is Not a Recent Innovation — Heavily Used by Borrowers of Color

**Percent of Homebuyers with LTVs of 90% or Higher**

**Percent of Homebuyers with LTVs of 95% or Higher**

*Source:* MBA Analysis of Census Bureau American Housing Survey Data.

- High LTV loans have been an important component of the home purchase market for decades.
- Borrowers of color have made much greater use of these loans.
- All homebuyers have made more use following the loss of wealth in the recession.

## Chart 2



**Borrowers of Color Use Government Lending to a Greater Extent**

Government[a] Share of Home Purchase Loans by Borrower Characteristic

a. FHA, VA, USDA

*Source:* Federal Reserve Analysis of HMDA data.

- HMDA data show that borrowers of color have already heavily been using government housing programs such as FHA in recent years.

- For example, 81.6 percent of African-American borrowers used a government program to finance the purchase of a home in 2010.

- An overly narrow QRM definition would further increase borrowers of color reliance on these government programs, as they would be the primary source of low-down payment lending.

Chart 3

# Family Net Worth by Selected Characteristics

| Family Characteristic | Median Net Worth | |
|---|---|---|
| | 2007 | 2009 |
| All Families | 125.4 | 96.0 |
| *Percentile of income (2007)* | | |
| Less than 20 | 10.1 | 7.2 |
| 20–39.9 | 39.1 | 32.9 |
| 40–59.9 | 95.4 | 72.6 |
| 60–79.9 | 216.7 | 167.5 |
| 80–89.9 | 373.5 | 302.5 |
| 90–100 | 1,205.1 | 894.5 |
| *Race or ethnicity of respondent (2007)* | | |
| White non-Hispanic | 178.8 | 149.9 |
| Non-white or Hispanic | 32.8 | 23.3 |
| *Housing status (2007)* | | |
| Owner | 244.8 | 192.6 |
| Renter or other | 5.5 | 3.6 |

*Source:* Federal Reserve, 2009 Survey of Consumer Finances

Chart 4

# Trends in Loan-to-Value Ratio by Income and Race / Ethnicity for First-Time Homebuyers, 1989–2005

| Income or Race / Ethnicity LTV Category | 1989–2005 (%) | 1989–1997 (%) | 1997–2005 (%) | Change (%) |
|---|---|---|---|---|
| *Low-income buyers** | | | | |
| 80% or less | 44.4 | 45.9 | 43.1 | -2.8 |
| 80.1 to 90% | 19.3 | 19.5 | 19.1 | -0.4 |
| 90.1 to 95% | 12.1 | 10.2 | 13.5 | 3.3 |
| Above 95% | 24.3 | 24.3 | 24.2 | -0.1 |
| *Moderate-income buyers* | | | | |
| 80% or less | 41.9 | 43.4 | 40.4 | -3.0 |
| 80.1 to 90% | 22.4 | 24.2 | 20.8 | -3.5 |
| 90.1 to 95% | 14.4 | 14.1 | 14.7 | 0.6 |
| Above 95% | 21.3 | 18.3 | 24.1 | 5.9 |
| *High-income buyers* | | | | |
| 80% or less | 45.5 | 44.5 | 46.4 | 1.9 |
| 80.1 to 90% | 26.0 | 28.6 | 23.9 | -4.7 |
| 90.1 to 95% | 13.2 | 14.0 | 12.4 | -1.6 |
| Above 95% | 15.3 | 12.9 | 17.3 | 4.4 |
| *White buyers* | | | | |
| 80% or less | 44.4 | 45.1 | 43.0 | -2.1 |
| 80.1 to 90% | 23.7 | 25.0 | 22.2 | -2.8 |
| 90.1 to 95% | 13.0 | 12.7 | 13.4 | 0.7 |
| Above 95% | 19.0 | 17.2 | 21.4 | 4.2 |
| *African-American buyers* | | | | |
| 80% or less | 37.8 | 36.7 | 37.9 | 1.1 |
| 80.1 to 90% | 19.9 | 20.1 | 20.4 | 0.3 |
| 90.1 to 95% | 15.4 | 16.2 | 15.0 | -1.2 |
| Above 95% | 26.8 | 27.0 | 26.7 | -0.2 |
| *Hispanic buyers* | | | | |
| 80% or less | 40.5 | 42.1 | 41.0 | -1.0 |
| 80.1 to 90% | 20.4 | 23.8 | 18.6 | -5.2 |
| 90.1 to 95% | 14.9 | 11.6 | 15.3 | 3.7 |
| Above 95% | 24.2 | 22.5 | 25.0 | 2.5 |

- The table to the left shows that African-American, Hispanic, low-income and first-time homebuyers have consistently turned to high LTV loans in greater proportions.
- The table shows data from 1989–2005 calculated from the American Housing Survey (AHS) conducted by the Census Bureau.
- AHS data for 2009 shows:

| | All Households | African-American Buyers | Hispanic Buyers |
|---|---|---|---|
| 80% or less | 26% | 14% | 20% |
| 80.1%–90% | 17% | 13% | 17% |
| 90.1%–95% | 14% | 21% | 19% |
| Above 95% | 31% | 51% | 44% |

Source: MBA analysis of AHS data.

LTV = loan-to-value

- Low-income homebuyers are defined as those whose incomes are less than 80 percent of the area median income.

Source: Tabulations from the 1991–2005 American Housing Surveys

Table from Belsky and Herbert, "Initial Housing Choices Made by Low-Income and Minority Homebuyers," Cityscape, 2008.

Chart 5

# Borrowers of Color Use Government Lending Programs to a Greater Extent

## Incidence of Selected Types of Home Purchase Loans by Borrower Characteristic

| Minority status of borrower | 2006 | | | 2007 | | | 2008 | | | 2009 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Govern-ment* | GSE | Other** | Port-folio | Govern-ment* | GSE | Other** | Port-folio | Govern-ment* | GSE | Other** | Port-folio | Govern-ment* | GSE | Other** | Port-folio |
| African-American | 13.9 | 16.9 | 43.2 | 26 | 21.9 | 34.2 | 15.7 | 28.2 | 64 | 19.4 | 5.2 | 11.4 | 81.4 | 9.2 | 2.6 | 6.8 |
| Hispanic | 7 | 18.2 | 46.5 | 28.3 | 12.2 | 37 | 17.2 | 33.6 | 51.5 | 29.5 | 6.1 | 13 | 73.6 | 15.3 | 4.1 | 6.9 |
| Non-Hispanic white | 9.6 | 33.2 | 27.8 | 29.4 | 11.5 | 44 | 16.2 | 28.4 | 35.4 | 36.2 | 9.9 | 18.5 | 52.1 | 28.9 | 7.1 | 11.9 |

* FHA, VA, USDA
** Conventional, non-GSE
Source: Federal Reserve Analysis of HMDA data, Avery et al. 2010.

- HMDA data show that borrowers of color have already been heavily using government housing programs, such as FHA, in recent years.

- For example, 81.4 percent of African-American borrowers in 2009 used a government program to finance the purchase of a home.

- An overly narrow QRM definition would further increase borrowers of color use of these government programs, as they would be the primary source of low down payment lending.

Chart 6



Document Details

SHARE

Comment Submitted by Robert Woody, Property Casualty Insurers Association of America

**Document ID:** HUD-2011-0138-0084  **Document Type:** Public Submission
This is comment on   Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

Please find attached PCI's comments on HUD's proposed rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard

Attachments:

| ▾ Comment Submitted by Robert Woody, Property Casualty Insurers Association o... | View Attachment: PDF |
| --- | --- |
| **Title:** Comment Submitted by Robert Woody, Property Casualty Insurers Association of America (Attachment) | |





**PCI** | Property Casualty Insurers
Association of America

Shaping the Future of American Insurance

Robert Woody
Senior Counsel, Policy

January 17, 2012

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

RE:    <u>Implementation of the Fair Housing Act's Discriminatory Effects Standard
Proposed Rule [Docket No. FR-5508-P-01]</u>

The Property Casualty Insurers Association of America (PCI) appreciates the opportunity
to provide comments in response to Department of Housing and Urban Development's
(HUD) proposed rule on the Fair Housing Act's (FHA) Discriminatory Effects Standard.
PCI is composed of more than 1000 member property casualty insurance companies
representing the broadest cross-section of insurers of any national trade association. PCI
members write over $174 billion in annual premium, representing 38.3 percent of the
nation's property casualty insurance.

The proposed rule seeks to ensconce in HUD's regulations a theory of legal liability
under which a housing practice that is found to have a "disparate impact" on a protected
class can be deemed to violate the FHA's proscription on racial discrimination in housing
practices even though the practice was not adopted for a racially discriminatory purpose.
The preamble to the proposed rule lists as one example of the types of activities that can
have a disparate impact and thus violate the FHA, "the provision and pricing of
homeowner's insurance." In support of that contention, the preamble cites the case of *Ojo
v. Farmers Group, Inc.*, 600 F.3d 1205, 1207-8 (9th Cir. 2010).

*As an initial matter, it is critical for HUD to recognize that homeowners' insurers do not
discriminate on the basis of race and, indeed, it would be illegal in all states for them to
do so.* The issue the rule presents for insurers is whether non-racially motivated and
sound actuarial underwriting principles recognized by state insurance regulators that
permit accurate risk-based pricing for consumers can be prohibited by federal regulators
who find them to have a "disparate impact" and whether such HUD actions would violate
a federal statute reserving the power to regulate insurance to the states.

**<u>The Proposed Rule is Premature</u>**. It is at best premature for HUD to propose this rule
when it raises key issues that are now pending before the U.S. Supreme Court in *Magner*

2600 South River Road, Des Plaines, IL 60018  Telephone 847-297-7800  Facsimile 847-297-5064  www.pciaa.net

© 2010 Property Casualty Insurers Association of America

*3*

*v. Gallagher.*[1] In that case, the Court will decide whether disparate impact claims are cognizable under the FHA and if so, what burden shifting approach should be applied. The proposed rule assumes that disparate impact claims are cognizable under the FHA and adopts its own burden shifting approach. HUD should suspend any further action on this rule at least until the Supreme Court has ruled on these issues.

**FHA Does Not Create Liability Based on Disparate Impact Theory**. The Supreme Court granted certiorari in the *Magner* case in part to resolve a split in the circuits on the question of whether disparate impact claims are cognizable under the FHA. PCI believes that the better view is that they are not. The statutory language of Section 3604 of the FHA prohibits discrimination in housing "*because of* race, color, religion, sex, familial status, or national origin" (emphasis added). Other federal statutes, such as the Civil Rights Act and the Americans with Disabilities Act prohibit conduct that "adversely affects" a protected class, which language has been interpreted as permitting disparate impact claims. Had Congress intended to authorize disparate impact claims in the FHA, it knew how to do so, but chose not to. HUD does not have the authority to substitute its contrary views for the will of the Congress.

**Disparate Impact Theory in Insurance Context**. The application of the proposed disparate impact rule in the insurance context is especially problematic. In 1945, Congress passed the McCarran-Ferguson Act,[2] which among other things, declared that insurance is regulated by the states and not by the federal government. In so doing, McCarran-Ferguson provided that state laws preempt contrary federal laws ("reverse preemption") when: (1) the federal law does not expressly relate to the business of insurance; (2) the state law is enacted for the purpose of regulating insurance; and (3) the application of the federal law might "invalidate, impair or supersede" state laws regulating insurance. Every state has extensive laws and regulations governing insurance underwriting practices and those laws naturally recognize the need for insurers to distinguish between different types and degrees of risk. Indeed, risk discrimination is the foundation of insurance underwriting and every state has considered at length the appropriate regulatory balance to prohibit unfair discrimination. HUD's reference to insurance in the preamble of the proposed rule suggests that it may use its disparate impact rule to become a federal regulator of insurance underwriting practices despite McCarran-Ferguson's explicit reservation of insurance regulatory powers to the states. There can be no question that, should HUD take such a position, it would prompt swift and vigorous legal challenge.

**HUD Misrepresents the Holding in the *Ojo* Case**. HUD's reference to the Ninth Circuit's decision in the *Ojo* case in support of its description of the FHA's application to insurance underwriting practices egregiously misrepresents the ultimate holding in the that case. The *Ojo* case involved an African-American plaintiff in Texas whose homeowners' insurance premiums were increased as a result of his credit scores and who alleged that this violated the FHA by virtue of a disparate impact on him and other racial minorities. Contrary to HUD's statement in the preamble, the Ninth Circuit did *not* opine

---

[1] 619 F.3d 823 (8th Cir. 2010), cert. granted, No 10-1032 (Docket) (U.S. Nov. 7, 2011).
[2] 15 U.S.C. § 1012.

2

on whether "the provision and pricing of homeowners insurance" is among the activities "that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." While the Ninth Circuit did find in *Ojo* that the FHA prohibits racial discrimination in the provision of homeowners' insurance generally (while also noting a split among the Circuits on the question), its ruling did not comment on the legitimacy of the disparate impact theory of liability. Instead, the Court's analysis focused appropriately on whether the McCarran-Ferguson Act's reverse preemption rule operated to prevent any attempted application of a federal disparate impact standard to homeowners insurance.

The Ninth Circuit initially found that the first two prongs of the McCarran reverse preemption test were clearly met, but certified to the Texas Supreme Court the third-prong question of whether the application of the federal disparate impact test invalidated, impaired, or superseded Texas law and was therefore preempted pursuant to the McCarran-Ferguson Act. The Texas Supreme Court found that, while Texas law prohibits the use of credit scores *based on* race, or rates that differ *because of* race, a cause of action based on non-racially motivated actions that produce a disparate impact pursuant to the FHA could invalidate, impair or supersede Texas law. *Ojo v. Farmers Group, Inc.,* 2011 WL 2112778, at *11 (Tex. Sup. Ct. 2011). Therefore, the third prong of the McCarran-Ferguson test was met and, contrary to the impression given in the preamble to the proposed rule, the plaintiff in *Ojo* did <u>not</u> prevail.

HUD's misrepresentation and misuse of the finding in the *Ojo* case raises an alarming specter that the agency may seek to enforce its disparate impact rules to prevent insurers from using racially neutral credit scoring information to price insurance risks. We note that the Texas statute at issue in *Ojo* was based on the Unfair Trade Practices Model Act published by the National Association of Insurance Commissioners (NAIC) and the Model Act Regarding Use of Credit Information in Personal Insurance published by the National Conference of Insurance Legislators (NCOIL). A large majority of states have adopted laws based on those models, so the McCarran analysis employed by the Ninth Circuit in *Ojo* has impact throughout the country.

**<u>Congress Does Not Want Federal Intrusion into Insurance Regulation</u>**.  Finally, we note that the Congress has considered on several occasions whether the federal government should interfere in the states' regulation of insurer underwriting practices with respect to questions of racial discrimination and has decided not to do so.  For example, in 1993 Congress considered, but did not adopt, H.R. 1188, the "Antiredlining in Insurance Disclosure Act," which would have required insurers to report to the Secretary of Commerce certain information about personal insurance broken down by zip code. Had the Congress felt that federal intrusion into the area was warranted, it could have authorized such intrusion. Because it has not, HUD must refrain from doing so as well.

Should HUD finalize its rule over our objections, we urge that the text of the regulation include an express exemption for insurance underwriting practices. At a minimum, HUD

3

should clarify in the final rule the misleading statement in the proposed rule's preamble that incorrectly implies that HUD has regulatory authority over insurers.

Again, PCI appreciates the opportunity to comment and would be pleased to provide any additional information HUD may require as it considers this important issue.

Sincerely,

Robert W. Woody

4







# NATIONAL
# DISABILITY RIGHTS
### NETWORK
Protection & Advocacy for Individuals with Disabilities

January 17, 2012

**Via Electronic Submission**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

> **Re: Docket No. FR-5508-P-01;** *Implementation of the Fair Housing Act's Discriminatory Effects Standard*

Dear Rules Docket Clerk:

The National Disability Rights Network (NDRN) hereby submits these comments to express our strong support for HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard. NDRN is the national membership organization for the federally mandated Protection and Advocacy and Client Assistance Programs, which advocate for people with disabilities to receive appropriate services and achieve maximum freedom in their day-to-day lives. Although NDRN has signed on to the comments being submitted by the Housing Task Force of the Consortium of Citizens with Disabilities (CCD), we write separately to accentuate the strong support for these standards in those comments.

The Protection and Advocacy and Client Assistance programs work every day with clients who face frequent discrimination based on disability. As the examples in the letter from CCD illustrate, people with disabilities have faced a history of persistent discrimination in housing, and have regularly fought against policies that would serve to keep them out of different housing programs. Strong regulations are necessary to implement the ban on policies that have a discriminatory effect on people with disabilities, even when they appear neutral on their face.

NDRN strongly supports the comments being submitted by the CCD Housing Task Force. Please feel free to get in touch with us at (202) 408-9514 if you have any questions.

Sincerely,

Curt Decker
Executive Director

900 SECOND STREET NE, SUITE 211 • WASHINGTON, DC 20002-3560
TEL: 202.408.9514 • FAX: 202.408.9520 • TTY: 202.408.9521
WEBSITE: WWW.NDRN.ORG • E-MAIL: INFO@NDRN.ORG



Document Details

SHARE

Comment Submitted by Attorney General Eric Schneiderman, et al.

**Document ID:** HUD-2011-0138-0086   **Document Type:** Public Submission
This is comment on   Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See attached file(s)

Attachments:

− Comment Submitted by Attorney General Eric Schneiderman, et al. (Attachment...     View Attachment: PDF

**Title:**
Comment Submitted by Attorney General Eric Schneiderman, et al. (Attachment)



Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW, Room 10276
Washington, DC 20410

January 17, 2012

Re:     **Comment from the Attorneys General of New York, Massachusetts, New Mexico, Hawaii, Illinois and West Virginia Regarding the Implementation of the Fair Housing Act's Discriminatory Effects Standard (Docket No. FR-5508-P-01)**

This comment addresses the proposed regulations concerning the implementation of the Fair Housing Act's discriminatory effects standard, published on November 16, 2011.

The Fair Housing Act was passed in 1968 and subsequently amended in 1988 with very strong bipartisan support from Congress. Congress's central objectives in passage of the Act were to eliminate housing discrimination and promote residential integration. Nearly forty-four years following passage of the Act, both discrimination and segregation in housing remain pervasive and intractable problems. The broad remedial goals of the Act are squarely aligned with the interests of our states which have long been committed to combating housing discrimination faced by minority communities and other groups subject to protection under the Act.

The existence of disparate impact liability under the Fair Housing Act has long served as an important and central tool to reach those facially neutral practices that may have a discriminatory effect, even in the absence of evidence of discriminatory purpose. The imposition of disparate impact liability under the Act is consistent with Congress's goal that the Act be directed to the consequences of housing policies and practices. This interpretation also reflects Congress's considered judgment that requiring proof of intentional discrimination may be difficult and could undermine the broad remedial objectives of the statute.

The statutory text and structure of the Fair Housing Act, and the Act's legislative history, make clear that the statute was intended to encompass disparate impact claims. Moreover, every federal appeals court in the country has upheld and validated disparate impact liability under the Act. HUD's proposed three-step burden-shifting approach is consistent with the approach now used by a number of federal courts of appeals, and is both reasonable and workable. The ultimate impact of the regulation will be one that will unify and harmonize the approach to disparate impact claims brought under the Fair Housing Act going forward. In addition, HUD's proposed regulations will provide greater clarity regarding the appropriate test for courts that currently consider balancing factors and other extra considerations that go above and beyond the three-step, burden-shifting approach.

Ongoing housing discrimination and residential segregation remain insidious and pervasive problems today. In addition to limiting housing opportunities and choices for minorities, both housing discrimination and segregation produce significant secondary effects that are felt in the context of education and employment. Our states share the commitment to eliminating racial

*3*

discrimination in housing which animated the initial passage and subsequent amendments to the Act. Despite our own extensive efforts to address the problems, we recognize that disparate impact liability under the Act remains necessary to fully address and remedy ongoing barriers to equal housing opportunities. We commend HUD for seeking to make uniform the standard that applies in the context of disparate impact litigation brought under the Fair Housing Act. Strong and even enforcement of the Fair Housing Act can help significantly combat discrimination and promote residential integration in our states. Indeed, an equal and open housing market is not only good public policy but one that recognizes we live in increasingly diverse and interconnected communities.

     Thank you.


     Sincerely,


Eric Schneiderman
New York Attorney General

Martha Coakley
Massachusetts Attorney General


Gary K. King
New Mexico Attorney General

Lisa Madigan
Illinois Attorney General


David M. Louie
Hawaii Attorney General

Darrell V. McGraw, JR.
West Virginia Attorney General



## Comment Submitted by Bailey de Iongh

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: <u>FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard</u>

For related information, <u>Open Docket Folder</u>

Comment Period Closed
Jan 17 2012, at 11:59 PM E

**ID:** HUD-2011-0138-0087
**Tracking Number:** 80f9915

### Comment

See attached file(s)

### Document Information

**Date Posted:**
Jan 18, 2012

**Show More Details**

### Attachments (1)

Comment Submitted by Bailey de Iongh
(Attachment)

**View Attachment:**  



**King County**

Department of Executive Services

**Office of Civil Rights**
Chinook Building
401 Fifth Avenue, Suite 215
Seattle, WA 98104
206-296-7592    TTY Relay: 711
www.kingcounty.gov/civilrights

January 17, 2012

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The King County Office of Civil Rights (KC OCR), the Washington State Human Rights Commission (WSHRC) and the Seattle Office for Civil Rights (SOCR) thank the Department for its publication of a proposed regulation implementing the discriminatory effect standard under the Fair Housing Act ("FHA"), and submit the following comments and recommendations regarding that regulation.

KC OCR, WSHRC and SOCR are local agencies enforcing local ordinances which have been certified as substantially equivalent to the federal Fair Housing Act. Both agencies have had agreements with HUD through the Fair Housing Assistance Program for many years. In addition to enforcement, KC OCR and SOCR also provide fair housing education and outreach.

We support the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the FHA. Courts have long recognized that the disparate impact analysis applies in housing discrimination cases.

The proposed regulations state that the plaintiff/complainant has the burden of proving that a less discriminatory alternative exists. The placement of the burden of proof can be critical in fair housing cases. We would respectfully urge HUD to place the burden on the defendant/respondent to prove that no less discriminatory alternative exists and not on the plaintiff/complainant.

National Fair Housing Alliance
Comments to Proposed Discriminatory Effect Regulations
Page 2

Placing the burden on the defendant/respondent is appropriate because the defendant/respondent is in the better position to bear the burden of proof on this issue. The defendant/respondent will have the knowledge of alternatives and whether the alternatives will meet its business objectives or pose an undue hardship.

Thank you for the opportunity to comment on the proposed regulation implementing the FHA's discriminatory effect standard. We commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the FHA.

Sincerely,


Bailey de Iongh
Director
King County Office of Civil Rights

Julie Nelson
Director
Seattle Office for Civil Rights

Sharon Ortiz
Executive Director
Washington State Human Rights Commission

☼ SHARE

## Document Details

### Comment Submitted by Garth Rieman, National Council of State Housing Agencies

**Document ID:** HUD-2011-0138-0088   **Document Type:** Public Submission
This is comment on   Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

**Show Details**

The National Council of State Housing Agencies (NCSHA) thanks you for the opportunity to comment on HUD's proposed rule implementing Title VIII of the Civil Rights Act of 1968 (The Act). NCSHA and its member state housing finance agencies (HFA) are committed to providing quality affordable housing opportunities for low and moderate-income individuals and families free from discrimination. Central to our overriding vision of an affordably housed nation is the goal of removing fair housing obstacles that impede anyone from accessing the affordable housing of their choice. We are deeply committed to helping HFAs administer programs and allocate resources in a nondiscriminatory manner to create greater housing choice and opportunity. NCSHA welcomes the opportunity to work with HUD to strengthen its regulations to advance this objective. NCSHA is concerned that the proposed rule's burden-shifting framework could have unintended and serious consequences on HFA and other stakeholders' affordable housing efforts. In addition, we feel publishing this rule at this time is premature because of the imminent Supreme Court case examining the core issues raised in the proposed rule. ... We look forward to working with HUD to advance our mutual fair housing objectives in a way that minimizes the potential negative unintended consequences we fear the proposed rule would generate. Thank you for your consideration of our comments. Please contact me if we can provide additional information. Sincerely, Barbara Thompson Executive Director

## Attachments:

| — Comment Submitted by Garth Rieman, National Council of State Housing Agenci... | View Attachment: |
|---|---|

**Title:**
Comment Submitted by Garth Rieman, National Council of State Housing Agencies (Attachment)





**NCSHA**
National Council *of*
State Housing Agencies

January 17, 2012

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street, SW, Room 10276
Washington, DC 20410

Re:     Proposed Rule: Implementation of the Fair Housing Act's Discriminatory Effects Standard
        <u>Docket No- FR - 5508-P-01</u>

To Whom It May Concern:

The National Council of State Housing Agencies (NCSHA) thanks you for the opportunity to comment on HUD's proposed rule implementing Title VIII of the Civil Rights Act of 1968 (The Act). NCSHA and its member state housing finance agencies (HFA) are committed to providing quality affordable housing opportunities for low and moderate-income individuals and families free from discrimination. Central to our overriding vision of an affordably housed nation is the goal of removing fair housing obstacles that impede anyone from accessing the affordable housing of their choice.

We are deeply committed to helping HFAs administer programs and allocate resources in a nondiscriminatory manner to create greater housing choice and opportunity. NCSHA welcomes the opportunity to work with HUD to strengthen its regulations to advance this objective.

NCSHA is concerned that the proposed rule's burden-shifting framework could have unintended and serious consequences on HFA and other stakeholders' affordable housing efforts. In addition, we feel publishing this rule at this time is premature because of the imminent Supreme Court case examining the core issues raised in the proposed rule.

NCSHA represents HFAs that operate in every state, the District of Columbia, New York City, Puerto Rico, and the U.S. Virgin Islands. They administer the Low Income Housing Tax Credit (Housing Credit) and issue private activity bonds (Housing Bonds) to finance affordable housing for renters and home buyers. HFAs also administer a wide range of other affordable housing and community development programs, including HOME, Section 8, down payment assistance, homebuyer education, loan servicing, homeless assistance programs, and state housing trust funds.

NCSHA is a national nonprofit, nonpartisan Washington, DC-based association that represents the interests of state HFAs before the Administration and the Congress. In addition to its policy and advocacy work, NCSHA provides HFAs education and training and facilitates best practice exchange among them.

3

We believe the burden-shifting framework HUD proposes is overly broad and unnecessarily makes many legitimate affordable housing and community development activities susceptible to unfair criticism and potentially costly litigation. The proposed rule's burden-shifting framework allows plaintiffs to demonstrate that an alternative policy or decision could achieve a program's goals in a less discriminatory manner. However, the proposed rule provides no guidance on how the relative costs and benefits of alternative approaches should be evaluated.

This framework creates great uncertainty. The fundamental test should be whether the challenged practice has a legitimate nondiscriminatory purpose.

We urge HUD to assign the plaintiff the burden of proving that the challenged practice does not have a necessary and manifest relationship to one or more of the defendant's legitimate, nondiscriminatory interests, permitting the defendant to prevail if it can demonstrate the challenged practice serves legitimate program goals, as we understand numerous courts have handled such cases.

One example of the rule's potential unintended consequences arises in the context of rental affordable housing preservation. Due to the scarcity of affordable housing and the lack of resources to develop as much new housing as is needed, many policy-makers and program administrators aspire to preserve as much affordable housing as possible. Preserving existing affordable housing improves the living conditions of low-income households living in those properties and contributes to neighborhood and community development.

Due to previous siting and development decisions, preserving some existing affordable housing in areas of concentrated poverty raises questions about perpetuating segregation or disparate impact. HFAs and others strive to carefully balance these concerns against the value of preservation to the residents of such housing and their communities.

The value of specific preservation developments and the legitimate government interest in pursuing them should be an important consideration in evaluating whether such developments violate the Fair Housing Act. Shifting the burden of proof onto defendants could discourage important and beneficial preservation activities.

Another example of a potentially problematic consequence is the question the proposed rule raises about whether credit scoring overlays may have a disparate impact on protected classes. Credit scoring is widely considered a legitimate and critical component of prudent mortgage underwriting. Depending on the initial standards established for a particular program, overlays may protect homebuyers from obtaining credit they cannot repay. Shifting the burden of proof onto lenders and program administrators could discourage the application of reasonable standards designed to protect the homebuyers themselves. Such standards might also avoid high delinquency and default rates, which could call into question homebuyer assistance programs more broadly.

Based on these concerns and to allow HUD to consider the Supreme Court's guidance on these issues, we urge HUD to postpone any action on the proposed rule until after the Supreme Court has ruled on the pending Magner v. Gallagher case (No. 10-1032). Since various courts have applied different standards on relevant cases, HUD should pursue rulemaking in this area and provide for an additional public comment period only after the Supreme Court acts.

2

We look forward to working with HUD to advance our mutual fair housing objectives in a way that minimizes the potential negative unintended consequences we fear the proposed rule would generate.

Thank you for your consideration of our comments. Please contact me if we can provide additional information.

Sincerely,

Barbara Thompson
Executive Director

3





**UNITED GUARANTY**

January 17, 2012

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
Room 10276
451 7th Street SW.
Washington, DC 20410

**RE: Proposed Rule of the Office of the Assistant Secretary for Fair Housing and Equal Opportunity, 24 CFR Part 100, Docket No. FR–5508–P–01, RIN 2529–AA96, Implementation of the Fair Housing Act's Discriminatory Effects Standard**

Dear Assistant Secretary:

United Guaranty Corporation (United Guaranty) is a holding company for various mortgage guaranty insurers that provide private mortgage insurance (MI) to lenders that originate residential mortgage loans. United Guaranty's insurance products have been protecting lenders of all sizes against mortgage credit losses since 1963, and as of year-end 2011 United Guaranty had $109.2 billion of first-lien insurance in force in the United States. In addition to MI, United Guaranty offers a range of risk management and financial services to help lenders protect their investments. United Guaranty is a subsidiary of American International Group, Inc. (AIG).

United Guaranty has taken the lead in our industry to strengthen the mortgage finance system by promoting responsible risk management practices. These efforts include innovative products and pricing methods based upon a multivariate analysis that takes into account the interaction of several risk variables. This method has consistently proven to be the best predictor of loan performance. United Guaranty is ultimately dedicated to ensuring sustainable home ownership for creditworthy borrowers who lack the funds for a sizeable down payment. Our business model puts private capital at risk under disciplined risk management to promote sustainable home ownership across the country, as well as to place investment quality mortgages into the secondary market.

The Department of Housing and Urban Development (HUD) has proposed amendments to its regulations implementing the Fair Housing Act (FHA)[1] in order to establish clear guidelines regarding imposition of liability for discrimination under a "disparate impact" theory (Proposed Rule).[2] The Proposed Rule will undoubtedly have a significant impact on the mortgage industry, including private mortgage guaranty insurers, and its potential effects should be carefully considered prior to the adoption of a final rule. MI is often an integral part of residential real estate transactions, which are covered by the prohibitions outlined in the FHA. United Guaranty is pleased to submit the following comments and recommendations to assist HUD in finalizing a fair and prudent final rule.

---

[1] 42 U.S.C. 3601 et seq. (Title VIII of the Civil Rights Act of 1968, as amended).
[2] Proposed Rule of the Office of the Assistant Secretary for Fair Housing and Equal Opportunity, 24 CFR Part 100.

United Guaranty Corporation
Law Department
230 North Elm Street | Greensboro, NC 27401
Mailing Address: P.O. Box 20597 | Greensboro, NC 27420-0597

800.334.8966 toll free | 336.217.5590 fax
www.ugcorp.com



Comment on Implementation of the Fair Housing
Act's Discriminatory Effects Standard
United Guaranty Corporation                                   January 17, 2012

## Summary

United Guaranty fully supports the explicit goal of the FHA ". . . to provide, within constitutional limitations, for fair housing throughout the United States."[3] United Guaranty also supports the stated Congressional intent cited by HUD in the Proposed Rule ("the intent of Congress in passing the Fair Housing Act was broad and inclusive, to advance equal opportunity in housing and achieve racial integration for the benefit of all people in the United States."[4]) However, United Guaranty urges HUD to fully consider all the potential effects of formally expanding liability under the FHA based on a showing that a neutral policy either has a disparate impact on a protected group or creates, perpetuates, or increases segregation, even if such a policy was not adopted for a discriminatory purpose. We outline some of the potential adverse consequences of such expansion below.

Even if the adverse consequences of expanding liability under the FHA are found to be acceptable to HUD, it should nevertheless align its approach with past U.S. Supreme Court precedent in regard to the burden of proof in such cases. The Proposed Rule adopts a burden-shifting approach which HUD cites as "analogous to the discriminatory effects standard under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e)." HUD notes that Title VII has often been looked to for guidance in interpreting analogous provisions of the FHA and that the Proposed Rule is consistent with the discriminatory effects standard confirmed by Congress in the 1991 amendments to Title VII. However, the explicit language differences and the legislative history of Title VII make that law an inappropriate benchmark for setting the legal standard of proof in Title VIII FHA cases. The proper standard for non-Title VII cases places the burden of proving discrimination against a protected group with the plaintiff at all times.

## I.   Adverse Effects of Expanding Liability Under the FHA

One of the primary responsibilities of an insurance company is to properly underwrite risk in order to assess insurability. Once a risk is determined to be insurable, the insurer must then determine the appropriate rate to charge for the risk. These core competencies are developed from sound actuarial analysis that takes into account the interaction of various risk variables. There is no question that the actuarial data and variables developed by an insurer must avoid the inclusion of factors that directly impact groups protected under applicable anti-discrimination laws. However, to allow costly discrimination lawsuits to proceed against insurers where proven predictive variables that are completely neutral in their application may possibly have a statistical disparate impact on a protected group would unduly harm competition in the insurance industry and affect the availability of insurance to consumers generally.

Developing actuarially sound rates for mortgage insurance, as well as many other lines of insurance, inherently results in a differential impact to individuals because individuals who pose a higher risk of loss will typically pay higher premiums to obtain the insurance product. It is always possible that such differential impact may be statistically correlated to particular groups of individuals. However, such an outcome is not necessarily illegal or insidious and should not result

---

[3] 42 U.S.C. 3601
[4] Proposed Rule of the Office of the Assistant Secretary for Fair Housing and Equal Opportunity, 24 CFR Part 100.



Comment on Implementation of the Fair Housing
Act's Discriminatory Effects Standard
United Guaranty Corporation

January 17, 2012

in liability to an insurer that is using facially neutral predictive factors in its analysis. Imposing liability under a disparate impact theory as proposed by HUD will force many insurers to track and manage the statistical outcome in order to minimize the risk of costly litigation.[5] Such results have been historically criticized as inappropriate and contrary to Congressional intent.[6]

An example of the negative effects that can result from curbing the use of facially neutral predictive factors was described by the Federal Trade Commission (FTC) in a study of credit-based insurance scores,[7] which have historically been challenged as having a disparate impact on protected groups. The FTC found that banning the use of factors that are known to be correlated with risk could have negative effects on insurance markets due to the inability of insurers to adjust prices based on the risk associated with a characteristic.[8] The FTC concluded that credit-based insurance scores are predictive of risk for automobile policies.[9] Thus, insurance companies' use of such scores enhanced their ability to underwrite and price policies in ways that correspond more closely to individual risk.[10] This accuracy reduced the extent to which lower-risk consumers subsidize higher-risk consumers by charging such consumers an appropriate premium based on the risk.[11] The broader effects of such accuracy were noted to be insurers' willingness to offer policies to a wider range of higher-risk consumers and to lower the overall cost of premiums.[12]

The Federal Reserve Board (Fed) also conducted a study to assess the effects of credit scoring on credit markets generally.[13] The Fed study concluded that credit history was predictive of credit risk for the population as a whole and for all major demographics groups.[14] The Fed study found

[5] See Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 992-993 (1988) ("We agree that the inevitable focus on statistics in disparate impact cases could put undue pressure on employers to adopt inappropriate prophylactic measures . . . Respondent and the United States are thus correct when they argue that extending disparate impact analysis to subjective employment practices has the potential to create a Hobson's choice for employers, and thus to lead in practice to perverse results. If quotas and preferential treatment become the only cost-effective means of avoiding expensive litigation and potentially catastrophic liability, such measures will be widely adopted. The prudent employer will be careful to ensure that its programs are discussed in euphemistic terms, but will be equally careful to ensure that the quotas are met.")
[6] Id. ("Congress has specifically provided that employers are not required to avoid "disparate impact" as such . . . . Preferential treatment and the use of quotas by public employers subject to Title VII can violate the Constitution, see, e.g., Wygant v. Jackson Bd. of Education, 476 U. S. 267 (1986), and it has long been recognized that legal rules leaving any class of employers with "little choice" but to adopt such measures would be "far from the intent of Title VII." Albemarle Paper Co., 422 U.S. at 422 U. S. 449 (BLACKMUN, J., concurring in judgment) . . . Allowing the evolution of disparate impact analysis to lead to this result would be contrary to Congress' clearly expressed intent, and it should not be the effect of our decision today.")
[7] Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance, A Report To Congress by the Federal Trade Commission, July 2007 (FTC Report).
[8] See FTC Report, supra, at pg. 47. The FTC also noted that there could be unnecessary societal costs if insurers are forced to spend more on development of new risk variables to capture some of the same risk prediction benefits of scores. Id. At pg. 49.
[9] Id. At pg. 34.
[10] Id.
[11] Id.
[12] Id. At pg. 46. The FTC noted that credit-based scores would make the process of underwriting and rating quicker and cheaper and that competition among insurers would lead to cost savings from the process improvements to be passed on to consumers in the form of lower premiums. Id.
[13] Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit, Board of Governors of the Federal Reserve System, August 2007.
[14] Id. At Pg. S-1.

Comment on Implementation of the Fair Housing
Act's Discriminatory Effects Standard
United Guaranty Corporation                                    January 17, 2012

that credit scoring is a cost- and time-saving technology that has likely contributed to improved
credit availability and affordability.[15] The basic reason is that credit scoring allows creditors to
quickly and inexpensively evaluate credit risk and to more readily solicit the business of their
competitors' customers regardless of location.[16] Credit scoring also increases the consistency and
objectivity of credit evaluation and thus helps to diminish the possibility that credit decisions will
be influenced by individual characteristics or other factors prohibited by law, including race or
ethnicity.[17] Use of credit scoring also increases the efficiency of consumer credit markets by
helping creditors establish prices that are more consistent with the risks and costs inherent in
extending credit.[18] The Fed concluded that credit scoring is a low-cost, accurate, and standardized
metric of credit risk and that it has both broadened creditors' access to capital markets and
strengthened public and private scrutiny of lending activities.[19]

As these studies have shown, the use of facially neutral factors that are correlated to risk are a
benefit to consumer markets generally, and any expansion of the FHA to allow such factors to be
more easily challenged would be a detriment to the continued development and use of such
factors. The FHA explicitly prohibits the use of factors directly related to protected groups, even if
such factors are predictive. This prohibition has served to advance the goals of the FHA and
achieve the stated intent of Congress in passing the FHA and thus the expansion being sought by
HUD in the Proposed Rule is neither necessary nor prudent.

United Guaranty supports the development and use of innovative pricing methods that measure
the dynamic interaction of risk variables in a changing economic environment. Such methods are
essential to assessing the risk of mortgage loan default. Accurate evaluation of the risk of each
loan requires proper underwriting at the time of origination and the flexibility to adjust
underwriting guidelines. It is well accepted that a substandard loan origination process and lax
underwriting standards contributed to the recent housing market downturn. As recent events
have shown, there is no benefit to allowing a consumer to purchase a home that will eventually
fall into foreclosure. A sustained housing recovery will need to incorporate the flexibility of a
multivariate approach that considers all of the characteristics of a loan. Such a system cannot
develop efficiently if the disparate impact theory of discrimination is allowed to be used as a
litigation weapon in FHA claims. The result could be increased pricing and tighter eligibility
standards that would affect the cost and availability of mortgage loans to financially able and
willing borrowers, thus reducing housing demand at a crucial time in the housing recovery.

## II.  Proper Standard of Proof If Disparate Impact is Allowed Under the FHA

Although allowing discrimination claims under the FHA to proceed under a theory of disparate
impact could result in many of the adverse consequences noted above, United Guaranty
recognizes that certain public policy goals may warrant such expansion of liability in appropriate
circumstances. However, unless Congress has clearly and explicitly acted to define the applicable
standards (as it has done in regard to Title VII employment discrimination cases), HUD should
exercise its authority in a narrowly tailored fashion that complies with the mandates of past U.S.
Supreme Court precedent.

---

[15] Id. At Pg. S-2.
[16] Id. At Pg. S-4.
[17] Id.
[18] Id.
[19] Id.



Comment on Implementation of the Fair Housing
Act's Discriminatory Effects Standard
United Guaranty Corporation

January 17, 2012

The burden-shifting approach adopted in the Proposed Rule is, as HUD states, analogous to the standard under Title VII and consistent with the standard confirmed by Congress in the 1991 amendments to Title VII; however, the language under Title VII was not meant to apply to the FHA. The U.S. Supreme Court has held that Title VII is materially different with respect to the relevant burden of persuasion, and thus decisions construing Title VII do not control the construction of other laws.[20] Textual differences in Title VII also make it clear that even if another law may authorize recovery on a disparate impact theory, the scope of such liability may be narrower than under Title VII.[21]

The 1991 Amendments[22] to Title VII cited by HUD should likewise not apply to Title VIII FHA cases, as it should always be presumed that Congress acts intentionally when it amends one law but not another.[23] The 1991 Amendments were enacted for the specific purpose of establishing a standard different from the standard articulated by the U.S. Supreme Court.[24] Thus, the Court's prior guidance for application of disparate impact remains in place for non-Title VII cases.[25] That guidance dictates that the ultimate burden of proving a discrimination claim remains with the plaintiff at all times.[26] In the Proposed Rule, HUD recognizes that there has been variation in how

---

[20] See Gross v. FBL Fin. Servs. 129 S Ct 2343 ("Because Title VII is materially different with respect to the relevant burden of persuasion, however, these decisions do not control our construction of the ADEA.")

[21] See Smith v. City of Jackson, 544 U.S. 228 ("Two textual differences between the ADEA and Title VII make it clear that even though both statutes authorize recovery on a disparate-impact theory, the scope of disparate-impact liability under ADEA is narrower than under Title VII. The first is the RFOA provision, which we have already identified. The second is the amendment to Title VII contained in the Civil Rights Act of 1991, 105 Stat. 1071.")

[22] See 42 U.S.C. § 2000e-2(k)(1). The amendments clarified that if a plaintiff meets its initial burden, then the burden of persuasion, not just the burden of production, shifts to the defendant to show a business necessity for the practices with disparate impact.

[23] See Gross, supra ("Moreover, Congress neglected to add such a provision to the ADEA when it amended Title VII to add §§2000e—2(m) and 2000e—5(g)(2)(B), even though it contemporaneously amended the ADEA in several ways" . . . "[w]hen Congress amends one statutory provision but not another, it is presumed to have acted intentionally."); citing EEOC v. Arabian American Oil Co., 499 U. S. 244, 256 (1991).

[24] Supreme Court vs. HUD: The Race to Decide "Impact or Intent", Legal Insight, K&L Gates, November 17, 2011.

[25] Id. ("But Congress amended only Title VII, and that amendment has no impact on the Fair Housing Act . . . . Thus, Wards Cove's guidance for application of disparate impact remains in place for non-Title VII litigation, and HUD's proposal violates that standard.") See also Smith, supra, ("One of the purposes of that amendment was to modify the Court's holding in Wards Cove Packing Co. v. Atonio, 490 U. S. 642 (1989), a case in which we narrowly construed the employer's exposure to liability on a disparate-impact theory. See Civil Rights Act of 1991, §2, 105 Stat. 1071. While the relevant 1991 amendments expanded the coverage of Title VII, they did not amend the ADEA or speak to the subject of age discrimination. Hence, Wards Cove's pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA.")

[26] See Ward's Cove Packing v. Antonio, 490 U.S. 642 at 659-660 ("'[T]he ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff at all times.' [Citing] Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 997 (1988). This rule conforms with the usual method for allocating persuasion and production burdens in the federal courts, see Fed.Rule Evid. 301, and more specifically, it conforms to the rule in disparate treatment cases that the plaintiff bears the burden of disproving an employer's assertion that the adverse employment action or practice was based solely on a legitimate neutral consideration. See Texas Dept. of Community Affairs v. Burdine, 450 U. S. 248, 450 U. S. 256-258 (1981). We acknowledge that some of our earlier decisions can be read as suggesting otherwise. See Watson, supra, at 487 U. S. 1006-1008 (BLACKMUN, J., concurring). But to the extent that those cases speak of an employer's "burden of proof" with respect to a legitimate business justification defense, see, e.g., Dothard v. Rawlinson, 433 U. S. 321, 433 U. S. 329 (1977), they should have been understood to mean an employer's production -- but not persuasion -- burden. Cf., e.g., NLRB v. Transportation Management Corp., 462 U. S. 393, 462 U. S. 404, n. 7 (1983).")

000574

Comment on Implementation of the Fair Housing
Act's Discriminatory Effects Standard
United Guaranty Corporation                                    January 17, 2012

HUD and the courts have applied the disparate impact theory.[27] Though HUD has been given
Congressional authority to administer the FHA, it cannot ignore U.S. Supreme Court precedent
that has addressed this issue. Thus any decision to adopt a burden-shifting approach in Title VIII
FHA cases that does not follow the mandate of the U.S. Supreme Court should not be the subject
of a regulatory rule but rather should be decided by the U.S. Supreme Court[28] or by Congress.

## Conclusion

Expansion of liability under the FHA based upon a showing of disparate impact has been an issue
of debate and contention for many years. Though United Guaranty supports efforts to create clear
guidelines and standards in this area of law, such efforts must fully consider all of the economic
consequences that may result. As outlined above, past studies have shown that the use of facially
neutral factors that are correlated to risk are a benefit to consumer markets generally and the use
of such factors in ways that are responsible and actuarially supported should not be curtailed.

United Guaranty also recognizes that expansion of liability under the FHA based upon a showing
of disparate impact may be appropriate to attain certain public policy goals but such expansion
must be carefully adopted in a way that is legally supported. U.S. Supreme Court precedent clearly
dictates that the ultimate burden of proving a discrimination claim remains with the plaintiff at
all times and HUD should follow that mandate in formulating a burden of proof standard that is
legally supported in its final rule.

United Guaranty would be pleased to answer any questions HUD may have or to provide
additional data supporting the information outlined above.


Sincerely,

---

[27] Proposed Rule of the Office of the Assistant Secretary for Fair Housing and Equal Opportunity, 24 CFR
Part 100 ("While the discriminatory effects theory of liability under the Fair Housing Act is well established,
there is minor variation in how HUD and the courts have applied that theory.")
[28] We note that the U.S. Supreme Court decided on November 7, 2011 to hear a case that will resolve whether
the disparate impact theory can be applied in FHA cases (and will also likely rule on the appropriate
standard applicable under such a theory). See Gallagher v. Magner, 619 F.3d 832 (8th Cir. 2010).







# NCLC®

NATIONAL
CONSUMER
L A W
C E N T E R®

Advancing Fairness
in the Marketplace for All

January 17, 2012

**Via Electronic Submission & Mail**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

**Re: Docket No. FR-5508-P-01;** *Implementation of the Fair Housing Act's Discriminatory Effects Standard*

Dear Rules Docket Clerk:

On behalf of the undersigned, we write in support of HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard. The events of the last several years have shown that we must be particularly vigilant in ensuring that members of every community have equal access to safe, affordable home financing.

With one clarification (detailed below), this proposed regulation will formalize HUD's longstanding and consistent position that the anti-discrimination provisions of the Fair Housing Act are directed to the consequences of housing and home financing policies and practices, not simply their purpose. This position comports with the interpretation of the Act by the federal courts of appeals, which have consistently held, for over forty years, that liability under Title VIII may be established based on a showing that a neutral policy or practice has a disparate impact on a protected group.

The disparate impact standard is critical to effective and vigorous fair housing enforcement in a variety of contexts. This is evident from the array of examples listed in the proposed regulation (76 Fed. Reg. 70924-25). However, disparate impact analysis is arguably most important – and likely to have the greatest impact – in cases involving access to credit.

While discriminatory practices by a landlord, realtor or developer will certainly have serious negative consequences, the impact is likely to be limited geographically and numerically. In contrast, the policies or practices of large financial institutions, mortgage insurers, credit bureaus and other participants in the home finance market can affect hundreds of thousands of people across the country; ensuring that those policies or practices do not have a discriminatory effect on the basis of race, gender or other protected characteristics can go far to promote a fair housing market and integrated communities. Furthermore, purchasing a home is the most significant financial transaction most families

**www.NCLC.org**

**Boston Headquarters:**
7 Winthrop Square
Boston, MA 02110-1245
Phone: 617/542-8010
Fax: 617/542-8028

**Washington Office:**
1001 Connecticut Ave. NW
Ste. 510
Washington, DC 20036-5528
Phone: 202/452-6252
Fax: 202/463-9462

ever undertake. Home loans that are overpriced or contain features that increase the likelihood of default and foreclosure negatively impact families' ability to build assets, access educational opportunities or plan for the future, potentially locking in wealth and income disparities for generations.

There is ample evidence of credit discrimination in the U.S. home finance market. For example, a study of 2007 HMDA data showed that African-American applicants were 3.2 times more likely than white applicants to receive a high-cost conventional loan and 2.6 times more likely to be denied a loan. Hispanic applicants faced similar difficulties; they were 2.6 times more likely to receive a high-cost conventional loan and 2.3 times more likely to be denied a loan.[1]

Statistically significant disparities in the mortgage market remain, even after credit risk and other factors are taken into account.[2] Some of the disparity in outcome may be attributable to unequal treatment by individual loan officers,[3] but some portion of it is the result of arguably neutral policies, practices and incentive structures that nevertheless have a discriminatory effect on protected groups.[4] The disparate impact standard, which encourages actors in the housing market to seek the least discriminatory means of meeting their business needs, is ideally suited for identifying and remedying such practices.

*Preserving the "business necessity" standard in the burden-shifting analysis*

---

[1] Robert B. Avery, Kenneth P. Brevoort, & Glenn B. Canner, Div. of Research & Statistics, Fed. Reserve Bd., *The 2007 HMDA Data*, 94 Fed. Reserve Bull. A107 (Dec. 2008)

[2] *See, e.g.*, Office of Pol'y Dev. & Research, United States Dep't of Hous. & Urban Dev., Risk or Race: an assessment of subprime lending patterns in nine metropolitan areas (Aug. 2009) (concluding that "[i]n general, the inclusion of credit score measures did not explain away the troubling finding that even after years of public policy efforts, race and ethnicity remain important determinants of the allocation of mortgage credit in both home purchase and home refinance markets."); Bocian, et al., Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosure* (Nov. 2011).

[3] *See, e.g.*, Office of Pol'y Dev. & Research, United States Dep't of Hous. & Urban Dev., All Other Things Being Equal: A Paired Testing Study of Mortgage Lending Institutions, Final Report (Apr. 2002) (finding that loan officers generally treated paired testers the same, but where there were differences, black and Hispanic applicants were much more likely to receive unfavorable treatment than white Anglo applicants).

[4] *See, e.g.*, Compl. United States v. Countrywide Fin. Corp., No. 11-CV-10540 (C.D. Cal. Dec. 21, 2011) at ¶ 6-7 ("Countrywide's home mortgage lending policies allowed its employees and mortgage brokers both to set the loan prices charged to borrowers and to place borrowers into loan products in ways that were not connected to a borrower's creditworthiness or other objective criteria related to borrower risk. Countrywide's policies created financial incentives for its employees and mortgage brokers by sharing increased revenues with them. Countrywide knew or had reason to know... that its policies... were resulting in discrimination.")

2



We support HUD's choice to create a single regulation to apply to both public and private actors, but suggest that the regulation be revised to make clear that it incorporates the "business necessity" standard articulated in the 1994 *Interagency Policy Statement on Discrimination in Lending*. This policy was signed by ten government agencies, including HUD, and reads:

> When a lender's policy or practice has a disparate impact, the next step is to seek to determine whether the policy or practice is justified by "**business necessity**." The **justification must be manifest** and may not be hypothetical or speculative. 59 Fed. Reg. at 18269 (emphasis added).

The Interagency Policy Statement standard is well-established, especially in fair lending matters, and we would urge including it in the regulation so that there is no confusion over, or dilution of, that standard.

As currently written, the regulation provides that if a plaintiff meets the burden of demonstrating that a housing practice has a discriminatory effect, as defined in proposed §100.500(a), the defendant has the opportunity to prove that the practice "has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests" (proposed §100.500(c)(2)). That language sets the bar too low and is also too vague to provide advance guidance to institutions seeking to comply with fair housing and fair lending requirements.

We propose two changes to the proposed language. First, for all respondents and defendants, the legitimate, nondiscriminatory interest should be "substantial," not merely legitimate. This is a stronger standard than the proposed regulation, but still not the most stringent possible. For example, some court have required proof of a "compelling business necessity."[5]  However, we recognize that when HUD previously argued for this standard, the 10th Circuit rejected it.[6] Requiring that the nondiscriminatory interest be "substantial" is a reasonable approach, recognized by the courts.[7]

Second, the regulation should specify that defendants or respondents engaged in commercial activity must meet the business necessity standard set forth in the 1994 policy statement. While business necessity may not have meaning in all contexts (for example, where a government agency is the defendant), it provides a clearer, more predictable standard for lenders and other financial institutions seeking to meet fair housing requirements than simply "legitimate, nondiscriminatory interests."

---

[5] *See, e.g., Pfaff v. HUD*, 88 F.3d 739, 747 (9th Cir. 1996) ("appropriate standard of rebuttal in disparate impact cases normally requires a compelling business necessity"); *Graoch Associates # 33 v. Louisville/Jefferson County*, 508 F.3d 366, 387) (6th Cir. 2007).

[6] *Mountain Side Mobile Estates v. HUD*, 56 F.3d 1243, 1254 (10th Cir.1995).

[7] *See, e.g., Langlois v. Abington Housing Authority*, 207 F.3d 43, 51 (1st Cir. 2000) ("a demonstrated disparate impact in housing [must] be justified by a legitimate and substantial goal of the measure in question")

3



Provided this clarification is made, HUD's proposal will foster the goals of the Fair Housing Act and benefit our clients. The proposal represents a long-needed confirmation of the propriety of disparate impact claims under the Fair Housing Act and a clarification of the burden of proof under this standard. It provides a national standard for courts, housing providers, municipalities and the financial and insurance industries. These issues are now being considered by the Supreme Court and we urge HUD to issue the final rule as soon as possible to provide the Court definitive agency interpretation concerning these issues.

Very truly yours,

Arielle Cohen
Staff Attorney
National Consumer Law Center
7 Winthrop Square
Boston, MA 02110-1245
(617) 542-8010

Nina F. Simon
Director of Litigation
Center for Responsible Lending
302 West Main Street
Durham, NC 27701
(919) 313-8500

4



## Document Details

**Comment Submitted by Michelle Santantonio, Long Island Housing Services, Inc.**

**Document ID:** HUD-2011-0138-0091   **Document Type:** Public Submission
This is comment on     Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

I am writing to support HUD's efforts to establish standards for determining when a housing practice with a discriminatory effect is in violation of the federal Fair Housing Act. This is a critical issue and I would urge that the Respondent or defendant should bear burden of proof to establish that noless discriminatory alternative existed. Please see Long Island Housing Services' comments which are attached.

Attachments:

← Comment Submitted by Michelle Santantonio, Long Island Housing Services, In...        View Attachment:

Title:
Comment Submitted by Michelle Santantonio, Long Island Housing Services, Inc. (Attachment)





# Long Island Housing Services, Inc.
### 640 Johnson Avenue, Suite 8, Bohemia, New York 11716-2624
### Suffolk: 631-567-5111 ~ Nassau: 516-292-0400 ~ Fax: 631-567-0160
### www.LIFairHousing.org

January 13, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

**Board of Directors**

Berta Cevallos, NS-LIS
**President**
Donna A. E. Boyce
**Secretary**
Alex P. Ames, CPA
**Treasurer**
Carol Germann
Georgette Grier-Key
Cathryn Harris, Esq.
Linda R. Hassberg, Esq.
Lenora W. Long
Beth M. Wickey, Esq.
**President Emeritus**

**Executive Director**

Michelle Santantonio

**Advisory Council**

Frederick K. Brewington, Esq.
Glen R. Cherveny, AIA
Mildred Lewis
Thomas Maligno, Esq.
Robert W. Ralph
Nina J. Stewart, Esq.
Beth M. Wickey, Esq.

**Consultant**

Janet Hanson
Juana Cortes de Torres, Esq.

Re:  Docket No. FR-5508-P-01
Implementation of the Fair Housing Act's Discriminatory Effect Standard
Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom it May Concern:

Long Island Housing Services, Inc. supports the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative.
Please note that we are in full support of the National Fair Housing Alliance's comment letter.

Long Island Housing Services ('LIHS') is a private, not-for-profit corporation organized under the laws of New York State, with its principal place of business at 640 Johnson Avenue, Suite 8, Bohemia New York. Complainant is the principal fair housing advocacy and counseling organization on Long Island and was founded in 1969. Its primary objectives are to promote racial integration and equal housing opportunity throughout Long Island, encourage the development of low-income and affordable housing, and to educate and assist the public regarding housing rights and opportunities in the region. LIHS pursues these goals through counseling clients in such areas as fair housing, landlord/tenant, homelessness prevention, mortgage financing and rental strategies, and government assisted programs. Our activities also include fair housing testing and advocacy, making presentations to the public, and servicing as a clearing house for information.
Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act. Please contact me at 631-567-5111, ext. 316 or by email: Michelle@LIFairHousing.org with any questions.

Sincerely,

*Michelle Santantonio*
Michelle Santantonio
Executive Director



United Way of Long Island



BBB
ACCREDITED CHARITY
newyork.bbb.org

**A 501 (c) (3), not-for-profit, fair housing agency serving Long Islanders since 1969.**

*Our mission is the elimination of unlawful housing discrimination and promotion of decent and affordable housing through advocacy and education.*


Your Voice in Federal Decision-Making

# Comment Submitted by Chancela Al-Mansour, Housing Rights Center

This is a Comment on the **Department of Housing and Urban Development** (HUD) Proposed Rule: **FR–5508–P–01 Implementation of the Fair Housing Acts Discriminatory Effects Standard**

For related information, **Open Docket Folder** 

## Comment

See attached file(s)

## Attachments (2)

### Comment Submitted by Chancela Al-Mansour, Housing Rights Center (Attachment)

**View Attachment:** `PDF`

### Comments on Disparate Impact Rule

**View Attachment:** `PDF`

Comment Period Closed
Jan 17 2012, at 11:59 PM ET

**ID:** HUD-2011-0138-0092
**Tracking Number:** 80f991c7

## Document Information

**Date Posted:**
Jan 18, 2012

**Show More Details** ⎙



**TO BE SUBMITTED ON NFHA LETTERHEAD**

January 17, 2012

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:

The National Fair Housing Alliance ("NFHA"), its members and the other organizations signed below commend the Department for its publication of a proposed regulation implementing the discriminatory effect standard under the Fair Housing Act ("FHA"), and submit the following comments and recommendations regarding that regulation.

Founded in 1988, NFHA is a consortium of more than 220 private, non-profit organizations, state and local civil rights agencies and individuals from throughout the United States.  Headquartered in Washington D.C., NFHA, through comprehensive education, advocacy, and enforcement programs, provides equal access to apartments, houses, mortgage loans and insurance policies for all residents of the nation.

We support the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the FHA.  The proposed rule effectuates the broad remedial effect intended by Congress and furthers the statutory goal of providing, "within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601; *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982) (noting the "broad remedial intent of Congress embodied in the Act").  For many years, we have encouraged the Department to adopt regulations implementing the discriminatory effect standard and request that the Department act promptly to enact the regulations.

In the more than forty years since the FHA was passed, a strong consensus has developed among the courts that the FHA includes a disparate impact standard.  *See, e.g., Mt. Holly Gardens Citizens in Action v. Township of Mount Holly*, 658 F.3d 375, 384 (3d Cir. 2011) ("All of the courts of appeal that have considered the matter . . . have concluded that plaintiffs can show the FHA has been violated through policies that have a disparate impact. . . .").  As federal courts have consistently held, "[i]n disparate impact cases, [e]ffect, not motivation, is the touchstone because a thoughtless housing practice can be as unfair to minority rights as a willful scheme." *Id.* at 385 (quoting *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir. 1976).

National Fair Housing Alliance
Comments to Proposed Discriminatory Effect Regulations
Page 2

      The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70921, 70925 (proposed Nov. 16, 2011) (to be codified 24 C.F.R. § 100.500(c)(3)). Where the burden is apportioned is often a critical issue that has the potential to affect the outcome of fair housing cases and overall enforcement of the FHA and state and local fair housing laws. The dispute in disparate impact cases under the FHA often focuses on the determination of whether a less discriminatory alternative exists. *See, e.g., Mt. Holly*, 658 F.3d at 385 (indicating that this step in the analysis determines "whether a person is being deprived of his lawful rights because of his race").

      We must observe that the proposed rule places the burden of proof upon the plaintiff or complainant to demonstrate a less discriminatory alternative. Proposed § 100.500(c)(3) states that "[i]f the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the complainant or plaintiff may still prevail upon demonstrating that the legitimate, nondiscriminatory interests supporting the challenged practice can be served by another practice that has a less discriminatory effect." Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. at 70927.

      We respectfully suggest that the burden of proof should be assigned to the defendant or respondent to show that there is no less discriminatory alternative. The proposed rule observes that judicial interpretations of the FHA and the burden of proof Congress assigned to disparate impact employment discrimination cases support assigning the burden of proof to plaintiffs or complainants. *Id.* at 70925. In fact, federal courts are split on the issue of which party bears the burden of proof to demonstrate a less discriminatory alternative and reliance on Title VII standards is inappropriate because of the unique nature of less discriminatory alternatives in FHA cases. Furthermore, a defendant/respondent is in a far superior position to bear the burden of proof on this issue.

      First, there is no unanimity among the courts that have addressed the question of which party should have the burden of proof regarding less discriminatory alternatives. Many federal courts have held that the defendant/respondent has the burden of proof to demonstrate that there is no less discriminatory alternative. *See e.g. Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 939 (2d Cir. 1988) (a defendant must show that there are no less discriminatory alternatives available); *Mt. Holly*, 658 F.3d at 385 (holding that defendants have the burden of showing that there is no less discriminatory alternative and that "[o]nly when the defendants make this showing does the burden shift back to the plaintiffs—where it ultimately remains—to provide evidence of such an alternative"); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 50 (1st Cir. 2000) (affirming the district court's decision holding that the defendant failed to show a less discriminatory alternative); *Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs*, 749 F. Supp. 2d 486, 503 (N.D. Tex. 2010); *Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526, 565 (N.D. Tex. 2000).

      Second, courts have rejected the lockstep importation of Title VII principles into the determination of which party bears the burden of establishing a less discriminatory alternative. As the Third Circuit explained in *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 148 (3d Cir.

National Fair Housing Alliance
Comments to Proposed Discriminatory Effect Regulations
Page 3

1977), "[l]ooking to Title VII for the correct standard for rebuttal of a prima facie case, we note that the 'business necessity' test employed in Title VII job discrimination cases, *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), is of somewhat uncertain application in Title VIII cases." *Id.* The Third Circuit explained that less discriminatory alternatives are far easier to identify and quantify in a Title VII case, noting that "the job-related qualities which might legitimately bar a Title VII-protected employee from employment will be much more susceptible to definition and quantification than any attempted justification of discriminatory housing practices under Title VIII." *Id.*; *see also*, *Huntington*, 844 F.2d at 937-38 (stating that "in Title VIII cases there is no single objective like job performance to which the legitimacy of the facially neutral rule may be related" and that a defendant's justifications are "normally based on a variety of circumstances" in zoning cases under the FHA); *Langlois*, 207 F.3d at 51 (noting that "a single criterion-like the relationship of the test to job performance used under Title VII-is hardly possible" under the FHA). Thus, both the qualitative and quantitative nature of less discriminatory alternatives in FHA cases supports assigning the burden of proof to the defendant or respondent.

Finally, the burden of proof to establish a less discriminatory alternative in a FHA case should be assigned to the defendant/respondent for a more practical reason – that party almost always has superior knowledge of the less discriminatory alternatives available and whether the alternatives meet its business objectives. The test to determine a less discriminatory alternative asks whether an alternative imposes "an undue hardship under the circumstances of the specific case" on the defendant or respondent. *Mt. Holly*, 658 F.3d at 386. The test is similar to the rebuttal burden imposed on a defendant or respondent in a reasonable accommodation case. *Id.*

In assessing who should have the burden in FHA cases, courts have permitted shifting the burden to the party for whom the proof was the easiest. *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1291, 1295 n. 16 (7th Cir. 1977) (holding that the burden to identify parcels of land that were appropriate for the development of multi-family housing was on the defendant municipality because "[i]t is far easier for defendant to show that a single parcel of land which is suitable does exist than for plaintiffs to show that no suitable land exists" and that allocating the burdens any other way "would compel plaintiffs to attempt the impossible task of proving a negative"). The defendant/respondent generally has far superior knowledge of the alternative practices available to meet its legitimate objectives and is in a far better position to assess whether an alternative imposes an undue hardship upon it in the particular circumstances of the case and is consistent with its goals.

For example, in cases challenging zoning policies or practices as having a disparate impact on people of color, the municipal defendant will unquestionably have superior knowledge about the existence and feasibility of alternative approaches that might achieve its permissible objectives with less discriminatory impact on protected classes. Plaintiffs will rarely be in a position to conduct such an assessment because they will lack information and be outside the political decision-making process. In such a case, logic would dictate imposing the burden on local government to identify such alternatives and to articulate why they would not achieve its objectives.



National Fair Housing Alliance
Comments to Proposed Discriminatory Effect Regulations
Page 4

In litigation involving insurance or lending—where private companies scrupulously protect proprietary information such as credit scores, actuarial data and risk assessment—there is an even stronger rationale for imposing the burden on the defendant, whose knowledge will be vastly superior to that of a plaintiff and who will uniquely possess information with respect to less discriminatory alternatives.

Beyond the litigation context, the policy embedded in the HUD final rule should incentivize and encourage insurers and lenders who build and use statistical models to look at alternative models and variables to make certain that they adopt the most predictive models that have the least discriminatory impact (and thus avoid litigation altogether). Placing the burden on these private parties will have salutary business and public policy effects as well: By requiring them to actually look at such alternatives, they may find and implement less discriminatory approaches that are equally (or even more) predictive of business risk that they would not otherwise have explored.

For the reasons outlined above, we urge the Department to revise the proposed rule to impose the burden on the defendant/respondent in the final step of the disparate impact analysis.

Thank you for the opportunity to comment on the proposed regulation implementing the FHA's discriminatory effect standard. We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the FHA. Please contact Lisa Rice at 202.898.1661 or lrice@nationalfairhousing.org with any questions.

Sincerely,







# HRC
## HOUSING RIGHTS CENTER
WORKING FOR JUSTICE AND EQUALITY IN HOUSING

January 17, 2011

Regulations Counsel
Office of General Counsel
U.S. Department of Housing and Urban Development
451 Seventh St SW, Room 10276
Washington D.C. 20410

Re:    Docket No. FR-5508-P-01
       Implementation of the Fair Housing Act's Discriminatory Effect Standard
       Submitted through Federal eRulemaking Portal at www.regulations.gov

To Whom It May Concern:



The Southern California Housing Rights Center (dba Housing Rights Center, "HRC") is in receipt of an email dated January 12, 2012 sent on behalf of Secretary Donovan, thanking the Housing Rights Center for our letter of November 22, 2011, regarding the U.S. Department of Housing and Urban Development proposed rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard.*

As was noted, it our letter, HRC commends HUD for publishing the proposed rule and expressed support for the rule's provisions. The rule affirms HUD's longstanding interpretation of the Fair Housing Act to prohibit practices that have a discriminatory effect, and proposes uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act.

With this letter, HRC wishes to reiterate our support of the Department's efforts to establish standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act. The Department has requested comments on the issue of which party bears the burden of proof to establish a less discriminatory alternative. We respectfully suggest that the burden of proof be assigned to the defendant or respondent to show that there is no less discriminatory alternative.

The Housing Rights Center is Southern California's largest non-profit civil rights organization dedicated to securing the right to equal access in housing. The Housing Rights Center's ("HRC") mission is to actively support and promote fair housing through education and advocacy, to the end that all persons have the opportunity to secure the housing they desire and



520 SOUTH VIRGIL AVENUE  |  SUITE 400  |  LOS ANGELES, CA 90020  |  800.477.5977  |  213.387.8400  |  FAX 213.381.8555
REGIONAL OFFICE: 1020 NORTH FAIR OAKS AVENUE  |  PASADENA, CA 91103  |  626.791.0211
WWW.HOUSINGRIGHTSCENTER.ORG
000588



National Fair Housing Alliance
Comments to Proposed Discriminatory Effect Regulations
Page 2

can afford, without discrimination based on their race, color, religion, gender, sexual orientation, national origin, familial status, marital status, disability, ancestry, age, source of income, or other characteristics protected by law.

    We are also in full support of the National Fair Housing Alliance's comment letter.

    Thank you for the opportunity to comment on the proposed regulation implementing the Fair Housing Act's discriminatory effect standard.  We again commend the Department for promulgating the proposed regulations implementing the discriminatory effect standard under the Fair Housing Act.  Please contact Chancela Al-Mansour at (213) 387-8400, ext. 35 or at calmansour@housingrightscenter.org with any questions.

Sincerely,

Chancela Al-Mansour
Executive Director







**Fair Housing Council**
of Riverside County, Inc.

3933 Mission Inn Avenue, Riverside, CA 92501
P.O. Box 1068, Riverside, CA 92502-1068
(951) 682-6581 • (800) 655-1812 • FAX (951) 682-0262
E-mail: fhcrc@fairhousing.net • www.fairhousing.net

Janet Green, President
Board of Trustees Chair
Riverside Community
College District

Dr. Lulamae Clemons,
Vice President
Retired Health Educator

John Start, Vice President
Retired City of Riveside
Police Department

Ellie Uli, Secretary
Retired Public
Administrator

Tony Mize, Treasurer
President, Workforce
Homebuilders, LLC

Steve Brown,
Board Member
Retired City Manager,
City of Coachella

Reginald Arhin,
Board Member
Senior Accountant
County of Riverside
Auditor Controller

Misha Wilkins,
Board Member
Public Affairs Manager
Planned Parenthood of
San Diego and Riverside
Counties

Frank McCloud
Board Member
Retired USAF/
Civil Service

Rose M. Mayes
Executive Director

Palm Springs/
County Office
655 N. Palm Canyon
Palm Springs, CA 92262
(760) 864-1541
(800) 655-1541

Corona Office
650 S. Main Road
Corona, CA 91720
(951) 371-6518

Moreno Valley Office
23890 Alessandro Blvd.
Suite A1
Moreno Valley 92553
(   ) 653-8314

January 17, 2012

**Via Electronic Submission & Mail**

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

**Re:  Docket No. FR-5508-P-01;** *Implementation of the Fair Housing Act's Discriminatory Effects Standard*

Dear Rules Docket Clerk:

As an advocate for equal opportunity in housing, I am writing in strong support of HUD's proposed regulation implementing the Fair Housing Act's discriminatory effects standard. For over 25 years, the Fair Housing Council of Riverside County, Inc. (FHCRC) has provided services to communities throughout Riverside County to address housing disparities and to assist in sustaining housing opportunities.

HUD's proposed regulation is an important and necessary step in ensuring that the nation's housing is available to all, regardless of protected class status. In our work, we have encountered many examples of housing practices that are neutral on the surface, but destructive to the mission of fostering equal opportunity.

FHCRC frequently receives complaints of unreasonable or overly restrictive occupancy standards which impacts families with children. Some of the most recent issues involve families which have to double up and share housing due to the current economic crisis. Housing providers are denying applicants due to potential complaints from the neighbors about the lack of parking, noise and number of children. When such limitations are imposed by housing providers, they may have the effect of excluding families with minor children from housing. This effect, even if not intended by the housing provider, runs counter to the goals of the Fair Housing Act.

HUD's proposed regulation provides clarity to housing providers, housing seekers, municipalities, and courts who may confront such policies in many different ways. The regulation not only clarifies the burden of proof in the context of litigation to the benefit of courts and litigants. It also will help to prevent litigation by providing housing providers, municipalities, and the mortgage and insurance industries with the incentives and tools they need to evaluate all alternatives and make well-considered decisions. This guidance will foster the goals of the Fair Housing Act and benefit the clients of our agency.

We applaud HUD's efforts to provide guidance on the important issue of disparate effects under the Fair Housing Act and urge HUD to issue the final rule as soon as possible.

Very truly yours,

Rose Mayes, Executive Director







January 17, 2012

<u>Via Electronic Submission & Mail</u>

Regulations Division

Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500
www.regulations.gov

**Re: Docket No. FR-5508-P-01; Implementation of the Fair Housing Act's Discriminatory Effects Standard**

Dear Rules Docket Clerk:

On behalf of Silver State Fair Housing Council, I write to urge the prompt adoption of HUD's proposed rule implementing the Fair Housing Act's discriminatory effects standard. Because there is no reason for further delay, and the proposed rule is well grounded in the text, purpose, history and enforcement of the FHA, I ask HUD to issue a final rule as soon as practicable.

### 1. The Final Rule Should Not Be Delayed.

The right time to issue the final rule is now, not after the Supreme Court issues a decision in the *Magner* case. There is no valid reason to delay implementation. HUD acted responsibly and appropriately when it issued the proposed rule in November 2011, and the pending case should not lead HUD to delay finalizing the rule. HUD has the authority and expertise to issue regulations under the FHA, *see* 42 U.S.C. §§ 3612, 3615. Under *Chevron USA Inc. V. NRDC*, 467 U.S. 837 (1984), the Court defers to those regulations. To delay the implementation of a valid agency rule based on a pending, undecided Supreme Court case would turn *Chevron* deference on its head, depriving the Supreme Court of HUD's agency expertise and experience.

### 2. The Proposed Rule is Not a Departure from Existing FHA Interpretations.

HUD's proposed rule does not present a novel or inconsistent interpretation of the FHA. To the contrary, HUD's proposed rule

P.O. Box 3935, Reno, NV 89505

(775) 324-0990 • fax: (775) 324-7507 • toll free: (888) 585-8634 • Relay Nevada 711

email: fairhousing@gbis.com • silverstatefairhousing.org

echoes numerous appellate court decisions, numerous HUD ALJ decisions, HUD's own internal guidelines, and positions taken by the Department of Justice in previous cases. HUD should act now to codify the important and long-standing principles embodied by these decisions.

### 3. The Proposed Rule is Consistent with the Language of the FHA and Congressional Intent.

HUD's proposed rule is a sound interpretation of the FHA, based on established principles of statutory interpretation and legislative intent. The FHA does not by its own terms require proof that a discriminatory housing practice is motivated by specific intent, nor does it forbid the use of disparate effects standards to prove a violation. Indeed, the Act does not delineate or limit the theories of proof that may be employed to establish each discriminatory housing practice. It makes little sense for HUD to import an intent requirement, and to limit theories of proof, where Congress has not expressly done so in the Act. On the contrary, to limit the Act to one particular theory of proof, excluding all others, offends the plain meaning of the Act's terms.

Moreover, there is nothing in the legislative history of the Act to suggest that Congress intended to limit theories of proof or assumed that intentional discrimination was the sole method of proof when it passed the 1968 Act or subsequent amendments. The only attempt to add an explicit provision requiring proof of intent to discriminate was rejected by the Senate before the Act passed in 1968. And the House Report on the Fair Housing Amendments Act of 1988, issued after the disparate impact theory had been adopted by litigants and courts in many fair housing cases, affirmed that "housing discrimination is not limited to blatant, intentional acts of discrimination. Acts that have the effect of causing discrimination can be just as devastating as intentional discrimination." House Report 100711, June 17, 1988, Fair Housing Amendments Act of 1988, p. 25. Congressional intent, therefore, does not appear to require proof of discriminatory intent.

### 4. The Proposed Rule is Consistent with Precedent Interpreting Other Remedial Civil Rights Laws that Express Discrimination in Similar Language.

The proposed rule also is consistent with the Supreme Court precedents regarding standards of proof under Title VII and the ADEA. Attempts to draw distinctions between the language in those laws and the language in the FHA are unavailing. There are no material distinctions between those laws – in which the high court has recognized a disparate effects test – and the FHA.

Moreover, the text of the FHA's prohibited practices, though not identical to other statutes, are written as broadly as possible, and readily encompass the discriminatory impact theory. Use of the terms "otherwise make unavailable" embrace all manner of conduct, whether the result of discriminatory intent or effect. There is nothing inherent in the plain meaning of FHA's use of the terms "because



of" that limit establishment of a discriminatory housing practice to a showing of intentional discrimination only. Since the FHA is to be construed as broadly as possible, consistent with constitutional limitation, there is no justification for adopting a narrow reading of its text that will hobble enforcement and undermined its purposes.

**5. The Proposed Rule Will Not Deprive Housing Providers and Lenders of the Ability to Make Well-Reasoned Decisions.**

Implementing the proposed rule will not deprive housing providers, real estate professionals and mortgage lenders of the power to make reasonable decisions regarding their businesses. The rule will not force housing providers to rent to sexual predators, for example, or force mortgage lenders to disregard valid indicia of poor credit history. Instead, the rule encourages housing providers, lenders, and land use officials to evaluate their own decisions in light of their businesses' needs and the alternatives that may be available. That evaluation will result in more well-reasoned and better decisions.

Finally, HUD's proposed rule takes the correct approach by requiring proof of a facially neutral practice that "actually or predictably results in a discriminatory effect." *See* § 100.500(a). Silver State Fair Housing Council supports the standard that HUD has articulated in the proposed rule. If the rule were to apply only in cases in which actual discriminatory effect had already occurred, then it would be virtually impossible to state a claim of disparate impact in many cases, particularly in cases where the housing at issue has not yet been built. Moreover, HUD's proposed language is consistent with the FHA's definition of an aggrieved person in § 3602 – *i.e.,* one who is injured or *is about to be injured* by a discriminatory housing practice – and lends support to HUD's approach.

For all of these reasons, I urge HUD to issue the final rule as soon as possible.

Very truly yours,

Katherine E. Knister
Executive Director





**Disability
Rights
California**

*California's protection and advocacy system*

**LOS ANGELES REGIONAL OFFICE**
3580 Wilshire Boulevard, Suite 902
Los Angeles, CA 90010
Tel: (213) 427-8747
TTY: (800) 719-5798
Toll Free: (800) 776-5746
Fax: (213) 427-8767
www.disabilityrightsca.org

January 17, 2012

Regulations Division
Office of General Counsel, Room 10276
Department of Housing and Urban Development
451 Seventh Street, SW
Washington, DC 20410-0500

**Re: Disability Rights California Comments to Proposed Changes to 24
CFR Part 100 [Docket No. FR-5508-P-01] (October 4, 2011)**

Submitted Electronically via Federal Rulemaking portal,
www.regulations.gov

To Whom It May Concern:

Disability Rights California is pleased to have the opportunity to comment in
support of the proposed addition by the Department of Housing and Urban
Development (HUD) to 24 CFR Part 100 regarding the implementation of
the Fair Housing Act's discriminatory effects standard.

Disability Rights California is a non-profit agency serving approximately
25,000 Californians with disabilities each year through advocacy, legal
representation, abuse investigations, and public education initiatives.
Disability Rights California is the nation's largest disability rights
organization, and is the agency mandated to provide protection and
advocacy services for those individuals in California who have
developmental, physical, sensory, and/or mental disabilities, pursuant to
the federal Developmental Disabilities Assistance and Bill of Rights Act, 42
U.S.C. §§ 15001, 15041, et seq., as amended, 45 C.F.R. § 1386;
Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. §
10801, et seq.; the Protection and Advocacy for Individual Rights Act, 29

U.S.C. § 794e; the Assistive Technology Act, 29 U.S.C. §§ 3011, 3012; and California Welfare & Institutions Code §§ 4900 et seq. On behalf of these individuals and their families, we write in strong support of HUD's proposed regulation regarding implementation of the Fair Housing Act's discriminatory effects standard.

Fair Housing Act protection against discriminatory effects is crucial for people with disabilities, both because housing is an area of utmost importance for people with disabilities and because housing discrimination is so prevalent against them. The goals of independence and integration – which lie at the core of the disability rights civil rights movement – cannot be achieved until equal access to housing for people with disabilities becomes a reality. A number of barriers affecting a large number of people with disabilities stand in the way, including inaccessibility, unaffordability, and various forms of housing discrimination. See, e.g., *Discrimination against People with Disabilities: Barriers at Every Step*, June 2005 report by the Urban Institute prepared for U.S. Dept. of Housing and Urban Development Office of Policy Development and Research, available at www.huduser.org/publications/pdf/DDS_Barriers.pdf; and *Priced Out: The Housing Crisis for People with Disabilities*, Technical Assistance Collaborative, Inc., June 2010, available at http://www.tacinc.org/downloads/Priced%20Out%202010/PricedOut2010.pdf. Our own experience confirms this, as a significant portion of the requests for legal assistance we receive each year concern access to housing and housing discrimination. While sometimes discrimination against people with disabilities is the result of discriminatory intent, often it is not. The impact upon our clients, however, can be just as severe and present just as much of a barrier.

As a result, the fact that it has long been settled law that housing practices with a discriminatory effect are prohibited under the Fair Housing Act is a critical protection for people with disabilities. See, e.g., *Hurd v. Ramona Land Co.*, 2003 WL 23281593 (N.D. Cal. 2003) (holding that the plaintiff might prove discrimination under the Fair Housing Act by proving a discriminatory effect from the defendant's acts or failure to act where a woman with mobility impairments was locked out of the building's elevator and the housing provider failed to make repairs to the elevator). However, as HUD's notice of proposed rulemaking explains, there has been some variation in the way that HUD and the U.S. courts have applied this. For example, *Keith v. Volpe*, 858 F.2d 467, 484 (9th Cir. 1988), the Ninth



Circuit case holding that a finding of discriminatory effect will support a violation of the Fair Housing Act, explains that the District Court below had used multiple tests to analyze whether the plaintiffs had made their prima facie case due to this variation in application. HUD's proposed regulation would add important clarification and uniformity to the standard of liability for facially neutral housing practices that have a discriminatory effect. We strongly support this proposal and urge HUD to issue its final rule as soon as possible so that all may benefit from a definitive agency interpretation on this matter.

Sincerely,

DISABILITY RIGHTS CALIFORNIA


By Autumn M. Elliott
Associate Managing Attorney

Comment Submitted by Christopher Brancart, Brancart & Brancart, Attorneys at Law          Page 1 of 1





# BRANCART & BRANCART
## ATTORNEYS AT LAW

*Christopher Brancart*
*Elizabeth Brancart*
*Liza Cristol-Deman*

P.O. BOX 686
PESCADERO, CA 94060

*Telephone (650) 879-0141*
*Facsimile (650) 879-1103*
*www.brancart.com*

**Street Address**
8205 Pescadero Road
Loma Mar, California 94021

January 17, 2012

<u>Via Mail</u>

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 Seventh Street, SW, Room 10276
Washington, DC 20410-0500

**Re:** **Docket No. FR-5508-P-01; Implementation of the Fair Housing Act's Discriminatory Effects Standard**

Dear Rules Docket Clerk:

Thank you for providing us with the opportunity to comment on HUD's proposed rule regarding the Fair Housing Act's discriminatory effects standard. Our firm has represented individuals, non-profits, and housing providers in Fair Housing Act cases for more than twenty years. We have served as counsel of record in numerous cases brought under the Fair Housing Act, including *Meyer v. Holley*, 537 U.S. 280 (2003); *Harris v. Itzhaki*, 183 F.3d 1043 (9th Cir. 1999); and *Giebeler v. M& B Associates*, 343 F.3d 1143 (9th Cir. 2003). The attorneys at the firm also provide support and training for other attorneys and advocates who work in the area of fair housing. It is from this background and experience in the Fair Housing Act that we write to express our strong support for HUD's proposed rule on the discriminatory effects standard, and to urge HUD to issue the final rule without delay.

**First, HUD's proposed rule is supported by the plain language of the Fair Housing Act.** Indeed, there is little support for the contrary position that the language of the FHA requires proof of intent.

Most of the discriminatory housing practices set forth in the FHA follow a similar pattern: a covered person or entity who engages in a housing practice or policy "because of" a protected characteristic violates the law. The phrase "because of" in the FHA is broad enough to encompass a discriminatory effects standard. Indeed, the language of the FHA does not contain any definition or substantive provision that limits the ways in which a complainant may prove that a housing provider (or lender or municipality) has acted "because of" a protected characteristic. Nowhere in the FHA

Docket No. FR-5508-P-01
Implementation of the FHA's Discriminatory Effects Standard
January 17, 2012
Page 2

did Congress state that the only possible nexus between the adverse action and the protected characteristic is intentional discrimination. The common definition of "because of" comfortably encompasses more than one method of proof to show a nexus between an adverse action and a protected characteristic, including proof under a disparate impact theory.

If Congress intended to require only one theory of proof, it could have said so, limiting the establishment of discriminatory housing practices to cases in which protected characteristics are a "motivating factor" for the adverse action, or where adverse actions are taken "for the purpose of discriminating" or "with the intent to discriminate" on the basis of protected characteristics. To read those strictures into the FHA's use of "because of" drains the remedial force from the FHA in service of a result contrary to the stated purpose of Congress: "It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. To the extent that the FHA can be read to recognize a disparate impact theory without offending "constitutional limitations," the legislative purpose and plain meaning of the Act are served.

Courts that have evaluated the phrase "because of" within the FHA and other civil rights laws have not found otherwise. Title VII, for example, has a similar construction of discriminatory practices using the phrase "because of." In *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), the Supreme Court held that the "because of" language in Title VII supports a discriminatory effects standard. There is no difference in the language or history of Title VIII that would dictate a different outcome.[1]

The broad "because of" language in the FHA is not the only language that supports a discriminatory effects standard. Sections 804 (a)and (f) of the FHA make it unlawful to "otherwise make unavailable or deny" a covered dwelling to anyone based on a protected characteristic. Such broad, all-encompassing language is at odds with the argument that Congress intended to limit the standards of proving a discriminatory housing practice. On the contrary, by using the phrase "otherwise make unavailable or deny," Congress signified that the FHA prohibits an unlimited range of practices and standards of proof that limit housing opportunities or perpetuate segregation "because of" protected characteristics.

Similarly, the Age Discrimination in Employment Act (ADEA) contains provision

---

[1] It is not accurate to claim that Courts of Appeals have permitted a disparate impact standard under the FHA *despite* the Act's language, as some commenters have suggested. After the remand from the Supreme Court in *Arlington Heights*, for example, the Seventh Circuit acknowledged that some might take a "narrow view" of the FHA's language and argue against a disparate impact theory of proof. But the Seventh Circuit did not endorse or adopt that "narrow view." 558 F.2d at 1290. Had the court adopted the narrow view, it would have contravened the broad, remedial purpose of the FHA and the clear meaning of the words in the Act.

4

Docket No. FR-5508-P-01
Implementation of the FHA's Discriminatory Effects Standard
January 17, 2012
Page 3

that is parallel to the FHA's "otherwise make unavailable or deny" provision. In *Smith v. City of Jackson*, 544 U.S. 228, 235 (2005), the Supreme Court held that the ADEA's parallel provision encompasses a disparate impact standard. Again, there is nothing in the language or history of the FHA that would dictate a different outcome here.

Congress intended for the FHA to reach beyond disparate treatment to "undo the effects of … past State and Federal unconstitutional discriminatory actions." Statements of Senator Mondale during hearings on 1968 FHA at 2699. The broad language used in the FHA is designed to provide flexibility to plaintiffs seeking to enforce the law. An intent requirement would frustrate achievement of the broad remedial goals of the FHA because of the difficulty of proving purposeful discrimination. "As overtly bigoted behavior has become more unfashionable, evidence of intent has become harder to find." *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977) (Arlington Heights II), *cert. denied*, 434 U.S. 1025 (1978).

**Second, the discriminatory effects standard in the proposed rule is not a departure from the standards that have been used by courts and administrative law judges for more than thirty years.** The proposed rule will not undercut the valid decision making authority of housing providers, lenders, or municipal governments. Those stake-holders have been operating under a FHA that has encompassed these standards in nearly every circuit in the nation for many years. Those who profess concern about the effects of the rule, or dismay at the timing of the rule, are surely misguided.

**Third, HUD should issue the final rule without delay.** HUD has the authority and the responsibility to issue rules interpreting the FHA. 42 U.S.C. 3615. The pending *Magner* case does not provide a valid reason for HUD to abdicate that responsibility, depriving the Supreme Court of HUD's recognized agency expertise. *Meyer v. Holley*, 537 U.S. 280 (2003).

**Fourth, HUD's definition of "legally sufficient justification" is appropriate.** Adoption of alternative formulations, such as the one discussed in the 1989 *Wards Cove* decision, 490 U.S. 642, are neither required nor wise for several reasons. First, adoption of the *Wards Cove* standard would turn statutory construction on its head. When Congress adopted the 1988 amendments, the definition of legally sufficient justification articulated by the courts was consistent with that proposed by HUD in the proposed rule. *See, e.g., Betsey*, 736 F. 2d at 988 (calling for "a business necessity that is sufficiently compelling to justify the challenged practice"); *Black Jack*, 508 F.2d at 1188 n. 4 (calling for the defendant "to demonstrate that its conduct was necessary to promote a compelling governmental interest"). Congress is presumed to be aware of these judicial interpretations and adopts them when it reenacts a statute a statute without change. *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). At the same time, Congress had no opportunity to address the standard in *Wards Cove*, a decision issued by the Supreme Court well after the adoption of the 1988 amendments.



5

Docket No. FR-5508-P-01
Implementation of the FHA's Discriminatory Effects Standard
January 17, 2012
Page 4

Second, since issuance of *Wards Cove*, several courts and HUD have followed the standard published in the proposed rule. *Charleston Housing Authority v. U.S. Dept. of Agriculture,* 419 F.3d 729, 741 (8th Cir. 2005); *Interagency Policy Statement on Discrimination in Lending,* 59 Fed. Reg. at 18269 (a lender"s policy or practice has a disparate impact, the next step is to seek to determine whether the policy or practice is justified by "business necessity.")

Third, there are inherent differences between employment and housing cases. The variety of factors that exist in making an employment decisions rarely appear as relevant in the housing context. Thus, a wooden application of the formulation articulated by the Supreme Court in *Wards Cove* would result in greater confusion and fail to address the wide variety housing practices subject to the FHA, such as the perpetuation of segregation.

Fourth, there is nothing in the *Wards Cove* case to suggest that the Supreme Court announced an iron rule that applied in all disparate impact cases under all statutes. On the contrary, the court analysis was carefully tailored to address its unique concerns arising out the application of disparate impact analysis in the employment context. The Court referred to the burden of defendant, where disparate impact is shown, as the "business necessity defense." *Id.*, at 659. It rejected a test that require a defendant to show that a practice was "essential" or "indispensable," *ibid,* two standards that are not present in HUD's proposed rule.

Finally, to avoid misinterpretation, HUD could consider inserting the word "reasonably" to define its use of the necessary standard. Although reasonableness is assumed in construing regulations, that addition would alleviate concern that necessity must be assessed by its reasonable relationship to a defendant's legitimate interests, and that the burden is not so high as to be unreasonable.

**Fifth, the proposed rule set forth a clear but flexible standard that encourages sound business decision without limiting the legitimate business judgment.** There is nothing in the proposed rule that suggestion that it will be applied in a manner to thwart development of affordable housing in minority neighborhoods, unless that development has effect of perpetuating segregation within a community. If segregative effect can be shown, then the rule calls upon the decision makers to justify the decision. That standard may be readily met under most circumstance where the affordable housing program is necessary to address substandard housing conditions without reinforcing existing segregated living patterns. Accordingly, it would be unwise to exclude certain housing programs from coverage under the proposed rule. Those program may be implemented in a manner that perpetuated segregation or not, and the unique facts surrounding implementation of any specific governmental housing program should be assessed under FHA just like any other housing practice.

**Sixth, the proposed rule sets forth a flexible standard that may be applied to a wide variety of housing practices.** Because of the wide variety of housing practices regulated by the FHA, it would be unwise for HUD to attempt to craft an

Docket No. FR-5508-P-01
Implementation of the FHA's Discriminatory Effects Standard
January 17, 2012
Page 5

catchall test for establishing disparate impact.   The proof needed to show disparate impact sufficient to shift the burden to a defendant will vary from case to case and depending on the unique factual circumstance of each case.   No rigid formulation can fits the a variety of practices that exist in a rapidly evolving housing market.  While application of existing disparate impact standard may be helpful, such as the EEOC's 4/5 rule or certain statistical models or tests, none of these tests is sufficiently flexible to applied to every possible practices covered by the FHA.

    Finally, it is unreasonable to assume that the standard for showing disparate impact proposed by HUD will create unwarranted litigation exposure for businesses or governments.  The standard proposed by HUD has been followed by most courts for decades, and there has been only limited use of the disparate impact theory in fair housing litigation.   Moreover, HUD and the courts provided respondents and defendants with a several means of  disposing of meritless cases.  *See e.g.*, 24 C.F.R. 180, Fed. R. Civ. P. 11, 12, & 56.

                    Sincerely yours,


                    /s/ Christopher Brancart

Case: 1:13-cv-08564 Document #: 19-5 Filed: 02/12/14 Page 91 of 129 PageID #:712



**Document Details**

**Comment Submitted by David M. Marquis, National Credit Union Administration**

**Document ID:** HUD-2011-0138-0097    **Document Type:** Public Submission
This is comment on    Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

See Attached

**Attachments:**

| − Comment Submitted by David M. Marquis, National Credit Union Administration... | View Attachment: |
|---|---|
| **Title:** Comment Submitted by David M. Marquis, National Credit Union Administration (Attachment) | |



 National Credit Union Administration

January 13, 2012

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW, Room 10276
Washington, DC 20410

Re:     Proposed Rule – Implementation of the Fair Housing Act's Discriminatory Effects
        Standard [Docket No. FR-5508-P-01]

To Whom It May Concern:

In response to the proposed rule that would implement the Fair Housing Act's
discriminatory effects standard, we offer comments for your consideration.  The National
Credit Union Administration (NCUA) charters, supervises, and insures federal credit
unions.  NCUA also insures a majority of the state-chartered credit unions in the nation.
Federal credit unions are non-profit, cooperative institutions that provide financial
services to members who fall within a defined field of membership.  Under the Federal
Credit Union Act, a federal credit union's field of membership is limited to persons who
share a common bond or are within a well-defined community.  12 U.S.C. 1759.  Many
states define and charter credit unions in a manner substantially similar to the
provisions of the Federal Credit Union Act.

The proposed rule would establish uniform standards for determining when a housing
practice with a discriminatory effect violates the Fair Housing Act.  Under the proposed
rule, a discriminatory effect occurs where a facially neutral housing practice actually or
predictably results in a discriminatory effect on a group of persons or on the community
as a whole.  The proposed rule addresses discrimination in the making of loans and the
provision of other financial assistance.  Specifically, the proposed rule includes failing or
refusing to provide any person information regarding the availability of loans or other
financial assistance in connection with a residential real estate-related transaction or
providing information that is inaccurate or different from the information provided to the
others based on a protected status as a prohibited practice.  It would also prohibit
providing loans or other financial assistance in a manner that results in disparities in
their cost, rate of denial, or terms or conditions, or that has the effect of denying or
discouraging their receipt on the basis of a protected class.

The proposed rule also sets out a burden-shifting framework for discriminatory effect
claims.  This framework appears to establish a strict liability test that does not take into

1775 Duke Street - Alexandria, VA 22314-3428 - 703-518-6300

Regulations Division
January 13, 2012
Page Two

account the statutory limitations on whom credit unions may offer financial services and assistance. While the proposed rule would permit a credit union to show a challenged practice has a necessary and manifest relationship to legitimate, nondiscriminatory interests, it is unfair and burdensome that credit unions might have to defend practices based on legal limitations at all. We suggest revising the proposed definition of "legally sufficient justification" to create a safe haven for institutions that are complying with a statute and unintentionally engage in a practice that results in a discriminatory effect on a protected class.

We appreciate your consideration of our comments. If you have any questions, please contact Consumer Compliance and Outreach Director Tonya Sweat or Consumer Compliance Officer Laura Todor at (703) 518-1140.

Sincerely,

David M. Marquis
Executive Director

cc: NCUA Office of General Counsel
NCUA Office of Consumer Protection



# FEDERAL REGISTER

| Vol. 78 | Friday, |
|---------|---------|
| No. 32  | February 15, 2013 |

Part IV

## Department of Housing and Urban Development

24 CFR Part 100
Implementation of the Fair Housing Act's Discriminatory Effects Standard; Final Rule

**11460** Federal Register / Vol. 78, No. 32 / Friday, February 15, 2013 / Rules and Regulations

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Part 100**

**[Docket No. FR–5508–F–02]**

**RIN 2529–AA96**

## Implementation of the Fair Housing Act's Discriminatory Effects Standard

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Final rule.

**SUMMARY:** Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act or Act), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin.[1] HUD, which is statutorily charged with the authority and responsibility for interpreting and enforcing the Fair Housing Act and with the power to make rules implementing the Act, has long interpreted the Act to prohibit practices with an unjustified discriminatory effect, regardless of whether there was an intent to discriminate. The eleven federal courts of appeals that have ruled on this issue agree with this interpretation. While HUD and every federal appellate court to have ruled on the issue have determined that liability under the Act may be established through proof of discriminatory effects, the statute itself does not specify a standard for proving a discriminatory effects violation. As a result, although HUD and courts are in agreement that practices with discriminatory effects may violate the Fair Housing Act, there has been some minor variation in the application of the discriminatory effects standard.

Through this final rule, HUD formalizes its long-held recognition of discriminatory effects liability under the Act and, for purposes of providing consistency nationwide, formalizes a burden-shifting test for determining whether a given practice has an unjustified discriminatory effect, leading to liability under the Act. This final rule also adds to, and revises, illustrations of discriminatory housing practices found in HUD's Fair Housing Act regulations. This final rule follows a November 16, 2011, proposed rule and takes into consideration comments received on that proposed rule.

**DATES:** *Effective Date:* March 18, 2013.

**FOR FURTHER INFORMATION CONTACT:** Jeanine Worden, Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410–0500, telephone number 202–402–5188. Persons who are deaf, are hard of hearing, or have speech impairments may contact this phone number via TTY by calling the Federal Relay Service at 800–877–8399.

**SUPPLEMENTARY INFORMATION:**

## I. Executive Summary

### A. Purpose of Regulatory Action

*Need for the Regulation.* This regulation is needed to formalize HUD's long-held interpretation of the availability of "discriminatory effects" liability under the Fair Housing Act, 42 U.S.C. 3601 *et seq.,* and to provide nationwide consistency in the application of that form of liability. HUD, through its longstanding interpretation of the Act, and the eleven federal courts of appeals that have addressed the issue agree that liability under the Fair Housing Act may arise from a facially neutral practice that has a discriminatory effect. The twelfth court of appeals has assumed that the Fair Housing Act includes discriminatory effects liability, but has not decided the issue. Through four decades of case-by-case application of the Fair Housing Act's discriminatory effects standard by HUD and the courts, a small degree of variation has developed in the methodology of proving a claim of discriminatory effects liability. This inconsistency threatens to create uncertainty as to how parties' conduct will be evaluated. This rule formally establishes a three-part burden-shifting test currently used by HUD and most federal courts, thereby providing greater clarity and predictability for all parties engaged in housing transactions as to how the discriminatory effects standard applies.

*How the Rule Meets the Need.* This rule serves the need described above by establishing a consistent standard for assessing claims that a facially neutral practice violates the Fair Housing Act and by incorporating that standard in HUD's existing Fair Housing Act regulations at 24 CFR 100.500. By formalizing the three-part burden-shifting test for proving such liability under the Fair Housing Act, the rule provides for consistent and predictable application of the test on a national basis. It also offers clarity to persons seeking housing and persons engaged in housing transactions as to how to assess

potential claims involving discriminatory effects.

*Legal Authority for the Regulation.* The legal authority for the regulation is found in the Fair Housing Act. Specifically, section 808(a) of the Act gives the Secretary of HUD the "authority and responsibility for administering this Act." (42 U.S.C. 3608(a)). In addition, section 815 of the Act provides that "[t]he Secretary may make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out this title. The Secretary shall give public notice and opportunity for comment with respect to all rules made under this section." (42 U.S.C. 3614a.) HUD also has general rulemaking authority, under the Department of Housing and Urban Development Act, to make such rules and regulations as may be necessary to carry out its functions, powers, and duties. (See 42 U.S.C. 3535(d).)

### B. Summary of the Major Provisions

This rule formally establishes the three-part burden-shifting test for determining when a practice with a discriminatory effect violates the Fair Housing Act. Under this test, the charging party or plaintiff first bears the burden of proving its prima facie case that a practice results in, or would predictably result in, a discriminatory effect on the basis of a protected characteristic. If the charging party or plaintiff proves a prima facie case, the burden of proof shifts to the respondent or defendant to prove that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests. If the respondent or defendant satisfies this burden, then the charging party or plaintiff may still establish liability by proving that the substantial, legitimate, nondiscriminatory interest could be served by a practice that has a less discriminatory effect.

This rule also adds and revises illustrations of practices that violate the Act through intentional discrimination or through a discriminatory effect under the standards outlined in § 100.500.

### C. Costs and Benefits

Because the rule does not change decades-old substantive law articulated by HUD and the courts, but rather formalizes a clear, consistent, nationwide standard for litigating discriminatory effects cases under the Fair Housing Act,[2] it adds no additional costs to housing providers and others engaged in housing transactions. Rather,

---

[1] This preamble uses the term "disability" to refer to what the Act and its implementing regulations term a "handicap." Both terms have the same legal meaning. *See Bragdon* v. *Abbott,* 524 U.S. 624, 631 (1998).

[2] *See* nn. 12, 28, *supra,* discussing HUD administrative decisions and federal court rulings.

**Federal Register** / Vol. 78, No. 32 / Friday, February 15, 2013 / Rules and Regulations　　**11461**

the rule will simplify compliance with the Fair Housing Act's discriminatory effects standard and decrease litigation associated with such claims by clearly allocating the burdens of proof and how such burdens are to be met.

## II. Background

The Fair Housing Act was enacted in 1968 (Pub. L. 90–284, codified at 42 U.S.C. 3601–3619, 3631) to combat and prevent segregation and discrimination in housing, including in the sale or rental of housing and the provision of advertising, lending, and brokerage services related to housing. The Fair Housing Act's "Declaration of Policy" specifies that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." [3] Congress considered the realization of this policy "to be of the highest priority." [4] The Fair Housing Act's language prohibiting discrimination in housing is "broad and inclusive;" [5] the purpose of its reach is to replace segregated neighborhoods with "truly integrated and balanced living patterns." [6] In commemorating the 40th anniversary of the Fair Housing Act and the 20th anniversary of the Fair Housing Amendments Act, the House of Representatives reiterated that "the intent of Congress in passing the Fair Housing Act was broad and inclusive, to advance equal opportunity in housing and achieve racial integration for the benefit of all people in the United States." [7] (See the preamble to the November 16, 2011, proposed rule at 76 FR 70922.)

The Fair Housing Act gives HUD the authority and responsibility for administering and enforcing the Act,[8] including the authority to conduct formal adjudications of Fair Housing Act complaints [9] and the power to promulgate rules to interpret and carry out the Act.[10] In keeping with the Act's "broad remedial intent," [11] HUD, as the following discussion reflects, has long interpreted the Act to prohibit practices that have an unjustified discriminatory effect, regardless of intent. (See also the

preamble to the November 16, 2011, proposed rule at 76 FR 70922–23.)

In formal adjudications of charges of discrimination under the Fair Housing Act over the past 20 years, HUD has consistently concluded that the Act is violated by facially neutral practices that have an unjustified discriminatory effect on the basis of a protected characteristic, regardless of intent.[12] In one such formal adjudication, the Secretary of HUD reviewed the initial decision of a HUD administrative law judge and issued a final order stating that practices with an unjustified discriminatory effect violate the Act. In that case, the Secretary found that a mobile home community's occupancy limit of three persons per dwelling had a discriminatory effect on families with children.[13] When the housing provider appealed the Secretary's order to the United States Court of Appeals for the Tenth Circuit, the Secretary of HUD defended his order, arguing that statistics showed that the housing policy, while neutral on its face, had a discriminatory effect on families with children because it served to exclude them at more than four times the rate of families without children.[14] Similarly, on appeal of another final agency decision holding that a housing policy had a disparate impact on families with children,[15] the Secretary of HUD, in his brief defending the decision before the United States Court of Appeals for the Ninth Circuit, discussed in detail the text and legislative history of the Act, as well as prior pronouncements by HUD that proof of a discriminatory intent is not

required to establish liability under the Act.[16]

HUD has interpreted the Act to include discriminatory effects liability not only in formal adjudications, but through various other means as well. In 1980, for example, Senator Charles Mathias read into the Congressional Record a letter that the Senator had received from the HUD Secretary describing discriminatory effects liability under the Act and explaining that such liability is "imperative to the success of civil rights law enforcement." [17] In 1994, HUD joined with the Department of Justice and nine other federal regulatory and enforcement agencies in approving and adopting a policy statement that, among other things, recognized that disparate impact is among the "methods of proof of lending discrimination under the * * * [Fair Housing] Act." [18] In this Policy Statement on Discrimination in Lending (Joint Policy Statement), HUD and the other regulatory and enforcement agencies recognized that "[p]olicies and practices that are neutral on their face and that are applied equally may still, on a prohibited basis, disproportionately and adversely affect a person's access to credit," and provided guidance on how to prove a disparate impact fair lending claim.[19]

Additionally, HUD's interpretation of the Act is further confirmed by regulations implementing the Federal Housing Enterprises Financial Safety and Soundness Act (FHEFSSA), in which HUD prohibited Fannie Mae and Freddie Mac from engaging in mortgage purchase activities that have a discriminatory effect in violation of FHEFSSA.[20] In addressing a concern for how the impact theory might operate under FHEFFSA, HUD explained that "the disparate impact (or discriminatory effect) theory is firmly established by Fair Housing Act case law" and concluded that this Fair Housing Act disparate impact law "is applicable to all segments of the housing marketplace, including the GSEs" (government-sponsored enterprises).[21] In

---

[3] 42 U.S.C. 3601.

[4] *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 211 (1972) (internal citation omitted).

[5] Id. at 209.

[6] Id. at 211.

[7] H. Res. 1095, 110th Cong., 2d Sess., 154 Cong. Rec. H2280–01 (April 15, 2008) (2008 WL 1733432).

[8] *See* 42 U.S.C. 3608(a).

[9] *See* 42 U.S.C. 3610, 3612.

[10] *See* 42 U.S.C. 3614a.

[11] *Havens Realty Corp.* v. *Coleman,* 455 U.S. 363, 380 (1982).

[12] *See, e.g., HUD* v. *Twinbrook Village Apts.,* No. 02–00025600–0256–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) ("A violation of the [Act] may be premised on a theory of disparate impact."); *HUD* v. *Carlson,* No. 08–91–0077–1, 1995 WL 365009 (HUD ALJ June 12, 1995) ("A policy or practice that is neutral on its face may be found to be violative of the Act if the record establishes a prima facie case that the policy or practice has a disparate impact on members of a protected class, and the Respondent cannot prove that the policy is justified by business necessity."); *HUD* v. *Ross,* No. 01–92–0466–18, 1994 WL 326437, at *5 (HUD ALJ July 7, 1994) ("Absent a showing of business necessity, facially neutral policies which have a discriminatory impact on a protected class violate the Act."); *HUD* v. *Carter,* No. 03–90–0058–1, 1992 WL 406520, at *5 (HUD ALJ May 1, 1992) ("The application of the discriminatory effects standard in cases under the Fair Housing Act is well established.").

[13] *HUD* v. *Mountain Side Mobile Estates P'ship,* No. 08–92–0010–1, 1993 WL 307069 (HUD Sec'y July 19, 1993), aff'd in relevant part, 56 F.3d 1243 (10th Cir. 1995).

[14] Brief for HUD Secretary as Respondent, *Mountain Side Mobile Estates P'ship* v. *HUD,* No. 94–9509 (10th Cir. 1994).

[15] *HUD* v. *Pfaff,* No. 10–93–0084–8, 1994 WL 592199, at *17 (HUD ALJ Oct. 27, 1994), rev'd on other grounds, 88 F.3d 739 (9th Cir. 1996).

[16] Brief for HUD Secretary as Respondent, *Pfaff* v. *HUD,* No. 94–70898 (9th Cir. 1996).

[17] 126 Cong. Rec. 31,166–31,167 (1980) (statement of Sen. Mathias reading into the record letter of HUD Secretary).

[18] Policy Statement on Discrimination in Lending, 59 FR 18266, 18269 (Apr. 15, 1994) ("Joint Policy Statement").

[19] *Id.*

[20] *See* 24 CFR 81.42 (2012).

[21] The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), 60 FR 61846, 61867 (Dec. 1, 1995).

promulgating this regulation, HUD also emphasized the importance of the Joint Policy Statement, explaining that ''[a]ll the Federal financial regulatory and enforcement agencies recognize the role that disparate impact analysis plays in scrutiny of mortgage lending'' and have ''jointly recognized the disparate impact standard as a means of proving lending discrimination under the Fair Housing Act.'' [22]

Consistent with its longstanding interpretation of the Act, over the past two decades, HUD has regularly issued guidance to its staff that recognizes the discriminatory effects theory of liability under the Act. For instance, HUD's Assistant Secretary for Fair Housing and Equal Opportunity (FHEO) issued a memorandum in 1993 instructing HUD investigators to be sure to analyze complaints under the disparate impact theory of liability.[23] HUD's 1995 Title VIII Complaint Intake, Investigation and Conciliation Handbook (Enforcement Handbook), which set forth guidelines for investigating and resolving Fair Housing Act complaints, emphasized to HUD's enforcement staff that disparate impact is one of ''the principal theories of discrimination'' under the Fair Housing Act and required HUD investigators to apply it when appropriate.[24] HUD's 1998 version of the Enforcement Handbook, which is currently in effect, also recognizes the discriminatory effects theory of liability and requires HUD investigators to apply it in appropriate cases nationwide.[25]

In 1998, at Congress's direction, HUD published in the **Federal Register** previously-internal guidance from 1991 explaining when occupancy limits may violate the Act's prohibition of discrimination because of familial status, premised on the application of disparate impact liability.[26] More recently, HUD posted on its Web site guidance to its staff and others discussing how facially neutral housing

policies addressing domestic violence can have a disparate impact on women in violation of the Act.[27]

Although several of the HUD administrative decisions, federal court holdings, and HUD and other federal agency public pronouncements on the discriminatory effects standard just noted were discussed in the preamble to HUD's November 16, 2011, proposed rule, HUD has described these events in the preamble to this final rule to underscore that this rule is not establishing new substantive law. Rather, this final rule embodies law that has been in place for almost four decades and that has consistently been applied, with minor variations, by HUD, the Justice Department and nine other federal agencies, and federal courts. In this regard, HUD emphasizes that the title of this rulemaking, ''Implementation of the Fair Housing Act's Discriminatory Effects Standard,'' indicates that HUD is not proposing new law in this area.

As discussed in the preamble to the proposed rule (76 FR 70921, 70923), all federal courts of appeals to have addressed the question agree that liability under the Act may be established based on a showing that a neutral policy or practice has a discriminatory effect even if such a policy or practice was not adopted for a discriminatory purpose.[28] There is minor variation, however, in how evidence has been analyzed pursuant to this theory. For example, in adjudications, HUD has always used a three-step burden-shifting approach,[29]

as do many federal courts of appeals.[30] One federal court of appeals applies a multi-factor balancing test,[31] other courts of appeals apply a hybrid between the two,[32] and one court of appeals applies a different test for public and private defendants.[33]

Another source of variation in existing law is in the application of the burden-shifting test. Under the three-step burden-shifting approach applied by HUD and the courts, the plaintiff (or, in administrative adjudications, the charging party) first must make a prima facie showing of either a disparate impact or a segregative effect. If the discriminatory effect is shown, the burden of proof shifts to the defendant (or respondent) to justify its actions. If the defendant (or respondent) satisfies its burden, the third step comes into play. There has been a difference of approach among the various appellate courts and HUD adjudicators as to which party bears the burden of proof at this third step, which requires proof as to whether or not a less discriminatory alternative to the challenged practice exists. All but one of the federal courts of appeals that use a burden-shifting approach place the ultimate burden of proving that a less discriminatory alternative exists on the plaintiff,[34] with some courts analogizing to the burden-shifting framework established for Title VII of the Civil Rights Act of 1964 (Title VII), which addresses employment discrimination.[35] The remaining court of appeals places the burden on the

---

[22] *Id.*

[23] Memorandum from the HUD Assistant Secretary for Fair Housing & Equal Opportunity, The Applicability of Disparate Impact Analysis to Fair Housing Cases (Dec. 17, 1993).

[24] HUD, No. 8024.1, *Title VIII Complaint Intake, Investigation & Conciliation Handbook* at 7–12 (1995).

[25] HUD, No. 8024.1, *Title VIII Complaint Intake, Investigation & Conciliation Handbook* at 2–27 (1998) (''a respondent may be held liable for violating the Fair Housing Act even if his action against the complainant was not even partly motivated by illegal considerations''); *id.* at 2–27 to 2–45 (HUD guidelines for investigating a disparate impact claim and establishing its elements).

[26] *See* 63 FR 70256 (Dec. 18, 1998) (publishing ''Keating Memo'' regarding reasonable occupancy standards); Quality Housing and Work Responsibility Act of 1998, Public Law 105–276, 112 Stat. 2461, § 589 (Oct. 21, 1998) (requiring publication of Keating Memo).

[27] Memorandum from HUD Office of Fair Housing & Equal Opportunity, Assessing Claims of Housing Discrimination Under the Fair Housing Act & the Violence Against Women Act 5–6 (Feb. 9, 2011). *http://www.hud.gov/offices/fheo/library/11-domestic-violence-memo-with-attachment.pdf.*

[28] *See, e.g., Graoch Assocs. #33, L.P.* v. *Louisville/Jefferson Cnty. Metro Human Relations Comm'n,* 508 F.3d 366, 374–78 (6th Cir. 2007); *Reinhart* v. *Lincoln Cnty.,* 482 F.3d 1225, 1229 (10th Cir. 2007); *Hallmark Developers, Inc.* v. *Fulton County, Ga.,* 466 F.3d 1276, 1286 (11th Cir. 2006); *Charleston Hous. Auth.* v. *U.S. Dep't of Agric.,* 419 F.3d 729, 740–41 (8th Cir. 2005); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 49–50 (1st Cir. 2000); *Simms* v. *First Gibraltar Bank,* 83 F.3d 1546, 1555 (5th Cir. 1996); *Jackson* v. *Okaloosa Cnty., Fla.,* 21 F.3d 1531, 1543 (11th Cir. 1994); *Keith* v. *Volpe,* 858 F.2d 467, 484 (9th Cir. 1988); *Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 937–38 (2d Cir. 1988), aff'd, 488 U.S. 15 (1988) (per curiam); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 148 (3d Cir. 1977); *Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 987–89 & n.3 (4th Cir. 1984); *Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290–91 (7th Cir. 1977); *United States.* v. *City of Black Jack,* 508 F.2d 1179, 1184–86 (8th Cir. 1974).

[29] *See, e.g., HUD* v. *Twinbrook Village Apts.,* No. 02–00025600–0256–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); *HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994) rev'd on other grounds, 88 F.3d 739 (9th Cir. 1996); *HUD* v.

[line continues right column]

*Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993); *HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992); *see also* Joint Policy Statement, 59 FR 18269.

[30] *See, e.g., Charleston,* 419 F.3d at 740–42; *Langlois,* 207 F.3d at 49–50; *Huntington Branch,* 844 F.2d at 939.

[31] *See, e.g., Metro. Hous. Dev. Corp.,* 558 F.2d at 1290 (applying a four-factor balancing test).

[32] *See, e.g., Graoch,* 508 F.3d at 373 (balancing test incorporated as elements of proof after second step of burden-shifting framework); *Mountain Side Mobile Estates* v. *Sec'y HUD,* 56 F.3d 1243, 1252, 1254 (10th Cir. 1995) (incorporating a three-factor balancing test into the burden-shifting framework to weigh defendant's justification);.

[33] The Fourth Circuit has applied a four-factor balancing test to public defendants and a burden-shifting approach to private defendants. *See, e.g., Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 989 n.5 (4th Cir. 1984).

[34] *Compare Mt. Holly Gardens Citizens in Action, Inc.* v. *Twp. of Mount Holly,* 658 F.3d 375, 382 (3d Cir. 2011) (burden of proving less discriminatory alternative ultimately on plaintiff), *and Gallagher* v. *Magner,* 619 F.3d 823, 834 (8th Cir. 2010) (same), *and Graoch,* 508 F.3d at 373–74 (same), *and Mountain Side Mobile Estates,* 56 F.3d at 1254 (same), *with Huntington Branch,* 844 F.2d at 939 (burden of proving no less discriminatory alternative exists on defendant).

[35] *See, e.g., Graoch,* 508 F.3d at 373 (''[C]laims under Title VII and the [Fair Housing Act] generally should receive similar treatment'').

defendant to show that no less discriminatory alternative to the challenged practice exists.[36] HUD's administrative law judges have, at times, placed this burden of proof concerning a less discriminatory alternative on the respondent and, at other times, on the charging party.[37]

Through this rulemaking and interpretative authority under the Act, HUD formalizes its longstanding view that discriminatory effects liability is available under the Act and establishes uniform standards for determining when a practice with a discriminatory effect violates the Fair Housing Act.

## III. The November 16, 2011, Proposed Rule

On November 16, 2011, HUD published a proposed rule in the **Federal Register** (76 FR 70921) addressing the discriminatory effects theory of liability under the Act. Specifically, HUD proposed adding a new subpart G to 24 CFR part 100, which would formalize the longstanding position held by HUD and the federal courts that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, regardless of whether the practice was adopted for a discriminatory purpose, and would establish uniform standards for determining when such a practice violates the Act.

In the proposed rule, HUD defined a housing practice with a "discriminatory effect" as one that "actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin."

A housing practice with a discriminatory effect would still be lawful if supported by a "legally sufficient justification." HUD proposed that a "legally sufficient justification" exists where the challenged housing practice: (1) Has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent or defendant; and (2)

those interests cannot be served by another practice that has a less discriminatory effect.

Consistent with its own past practice and that of many federal courts, HUD proposed a burden-shifting framework for determining whether liability exists under a discriminatory effects theory. Under the proposed burden-shifting approach, the charging party or plaintiff in an adjudication first bears the burden of proving that a challenged practice causes a discriminatory effect. If the charging party or plaintiff meets this burden, the burden of proof shifts to the respondent or defendant to prove that the challenged practice has a necessary and manifest relationship to one or more of its legitimate, nondiscriminatory interests. If the respondent or defendant satisfies this burden, the charging party or plaintiff may still establish liability by demonstrating that the legitimate, nondiscriminatory interest can be served by another practice that has a less discriminatory effect.

In the proposed rule, HUD explained that violations of various provisions of the Act may be established by proof of discriminatory effects, including 42 U.S.C. 3604(a), 3604(b), 3604(f)(1), 3604(f)(2), 3605, and 3606 (see 76 FR 70923 n.20), and that discriminatory effects liability applies to both public and private entities (see 76 FR 70924 n.40).

HUD also proposed to revise 24 CFR part 100 to add examples of practices that may violate the Act under the discriminatory effects theory.

## IV. Changes Made at the Final Rule Stage

In response to public comment, a discussion of which is presented in the following section, and in further consideration of issues addressed at the proposed rule stage, HUD is making the following changes at this final rule stage:

### A. Changes to Subpart G

The final rule makes several minor revisions to subpart G in the proposed rule for clarity. The final rule changes "housing practice" to "practice" throughout proposed subpart G to make clear that the standards set forth in subpart G are not limited to the practices addressed in subpart B, which is titled "Discriminatory Housing Practices." The final rule replaces "under this subpart" with "under the Fair Housing Act" because subpart G outlines evidentiary standards for proving liability under the Fair Housing Act. The final rule also replaces the general phrase "prohibited intent" with

the more specific "discriminatory intent."

The final rule slightly revises the definition of discriminatory effect found in proposed § 100.500(a), without changing its meaning, to condense the definition and make it more consistent with terminology used in case law. Proposed § 100.500(a) provided that "[a] housing practice has a discriminatory effect where it actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin." Final § 100.500(a) provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."

To clarify "legally sufficient justification" and in particular, what HUD meant in the proposed rule by "a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests," HUD is revising the definition found in proposed § 100.500(b) to read as follows: "(1) A legally sufficient justification exists where the challenged practice:

(i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and (ii) Those interests could not be served by another practice that has a less discriminatory effect. (2) A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative * * *." This revision to the definition of "legally sufficient justification" includes changing "cannot be served," the phrasing used in the proposed rule, to "could not be served."

This revised definition of "legally sufficient justification" also appears in § 100.500(c)(2) and, in essentially the same form, in § 100.500(c)(3). The final rule also replaces the word "demonstrating" with "proving" in § 100.500(c)(3) in order to make clear that the burden found in that section is one of proof, not production.

In addition to these changes, the final rule makes several minor corrections to § 100.500. The final rule substitutes "42

---

[36] *Huntington Branch,* 844 F.2d at 939.

[37] *Compare, e.g., HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992) (respondent bears the burden of showing that no less discriminatory alternative exists), *and HUD* v. *Twinbrook Village Apts.,* 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) (same), *with HUD* v. *Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (charging party bears the burden of showing that a less discriminatory alternative exists), *and HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994) (same).

U.S.C. 3610'' with ''42 U.S.C. 3612'' in § 100.500(c)(1) because the procedures for a formal adjudication under the Act are found in 42 U.S.C. 3612. Also in § 100.500(c)(1), the final rule changes ''proving that a challenged practice causes a discriminatory effect'' to ''proving that a challenged practice caused or predictably will cause a discriminatory effect.'' This edit is required for consistency with the Fair Housing Act and § 100.500(a), which prohibit actions that predictably result in discrimination.

The final rule further corrects proposed § 100.500(c)(1) and (2) to replace ''complainant'' with ''charging party'' because in cases tried before HUD administrative law judges, the charging party—and not the complainant—has the same burden of proof as a plaintiff in court. Under the provisions of the Act governing adjudication of administrative complaints, an aggrieved person may file a complaint with the Secretary alleging a discriminatory housing practice, or the Secretary may file such a complaint,[38] but it is the Secretary who issues the charge of discrimination and prosecutes the case before the Administrative Law Judge, on behalf of the aggrieved person.[39] Any aggrieved person may intervene as a party in the proceeding,[40] in which case the intervener would bear the same burden of proof as the charging party or a plaintiff in a judicial action.

### B. Changes to Illustrations

The illustrations added in this rule, as well as the existing illustrations in part 100, represent HUD's interpretation of conduct that is illegal housing discrimination under the Fair Housing Act. Liability can be established for the conduct illustrated in part 100 through evidence of intentional discrimination, or based on discriminatory effects pursuant to the standards set forth in subpart G, depending on the nature of the potential violation.

In order to make clear that the Fair Housing Act violations illustrated in part 100 may be proven through evidence of intentional discrimination or discriminatory effects, as the evidence permits, and that any potential discriminatory effects violation must be assessed pursuant to the standards set forth in § 100.500, the final rule amends paragraph (b) of § 100.5 to add at the end the following sentence: ''The illustrations of unlawful housing discrimination in this part may be

established by a practice's discriminatory effect, even if not motivated by discriminatory intent, consistent with the standards outlined in § 100.500.''

The final rule revises the illustrations of discriminatory housing practices in the proposed rule, rephrasing them in more general terms. The language of the added illustrations, which in the proposed rule included paraphrasing the definition of discriminatory effect from subpart G, is revised to eliminate the paraphrasing, which is unnecessary after the addition to paragraph (b) of § 100.5. This revision is also intended to eliminate any potential negative implication from the proposed rule that the existing illustrations in part 100 could not be proven through an effects theory. In addition to this general streamlining of the illustrations in the proposed rule, the final rule makes the following specific revisions to the illustrations.

In order to avoid redundancy in HUD's Fair Housing Act regulations, this final rule eliminates proposed § 100.65(b)(6). The substance of proposed § 100.65(b)(6), which covers ''Providing different, limited, or no governmental services such as water, sewer, or garbage collection'' is already captured by existing § 100.65(b)(4), which prohibits ''Limiting the use of privileges, services, or facilities associated with a dwelling,'' and existing § 100.70(d)(4), which prohibits ''Refusing to provide municipal services * * * for dwellings or providing such services differently.''

In response to public comment, the final rule adds ''enacting'' and ''ordinance'' to § 100.70(d)(5). These changes confirm that an ordinance is one type of land-use decision that is covered by the Act, under a theory of intentional discrimination or discriminatory effect, and that land-use decisions may discriminate from the moment of enactment. This final rule therefore revises proposed § 100.70(d)(5) to give the following as an illustration of a prohibited practice: ''Enacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.'' The final rule removes ''cost'' and ''terms or conditions'' from proposed § 100.120(b)(2) and adds them to § 100.130. This revision is not intended to make any substantive changes to HUD's interpretation of the Act's coverage, but rather is for organizational purposes only: § 100.120 addresses

discrimination in the making and provision of loans and other financial assistance, while § 100.130 addresses discriminatory terms or conditions. Other minor streamlining changes are made to existing § 100.120(b). Accordingly, this final rule revises § 100.120(b) to read as set forth in the regulatory text of the rule.

The final rule amends existing § 100.130(b)(2) to add ''or conditions'' and the term ''cost'' to the list of potentially discriminatory terms or conditions of loans or other financial assistance. It also adds new § 100.130(b)(3), which, in response to a public comment, illustrates that servicing is a condition of loans or other financial assistance covered by section 805.[41] Because, as noted above, at the final rule stage ''terms and conditions'' is removed from proposed § 100.120(b)(2), new § 100.130(b)(3) also addresses the provision of loans or other financial assistance with terms or conditions that have a discriminatory intent or effect. As a result of these changes, new § 100.130(b)(3) reads as follows: ''Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin.''

### V. The Public Comments

The public comment period for the November 16, 2011, proposed rule closed on January 17, 2012. Ninety-six public comments were received in response to the proposed rule. Comments were submitted by a wide variety of interested entities, including individuals, fair housing and legal aid organizations, state and local fair housing agencies, Attorneys General from several States, state housing finance agencies, public housing agencies, public housing trade associations, insurance companies, mortgage lenders, credit unions, banking trade associations, real estate agents, and law firms.[42] This section of the preamble, which addresses significant issues raised in the public

---

[38] 42 U.S.C. 3610(a)(1)(A).

[39] 42 U.S.C. 3610(g)(2)(A), 3612.

[40] 42 U.S.C. 3612(c).

[41] 42 U.S.C. 3605. Discrimination in residential mortgage servicing may also violate section 804 of the Act, 42 U.S.C. 3604.

[42] All public comments on this rule can be found at *www.regulations.gov*, specifically at *http://www.regulations.gov/#!searchResults;rpp=50;po=0;dktid=HUD-2011-0138.*

comments, organizes the comments by subject category, with a brief description of the issue (or set of related issues) followed by HUD's response.

Many comments were received in support of the rule generally and in support of the proposed discriminatory effects standard in particular. This summary does not provide a response to comments that expressed support for the proposed rule. Supportive comments included statements asserting that the rule: advances the goals of the Fair Housing Act; offers a well-reasoned standard for analyzing discriminatory effects claims; provides a national standard for courts, housing providers, municipalities and the financial and insurance industries; provides clarity to housing providers, housing seekers, and others; will decrease litigation by clarifying the burdens of proof; and will help address a lack of adequate housing for older persons even though age is not a protected characteristic under the Act because older persons may be affected by practices with a discriminatory effect based on disability. Commenters stated that the rule is particularly necessary to maintain protections against discriminatory and abusive practices in the mortgage industry, as the Fair Housing Act covers activities in residential real estate-related transactions that may not be covered by the Equal Credit Opportunity Act (ECOA).[43] A commenter stated that the rule's flexible standard is appropriate, as no rigid formula fits the variety of practices that exist in a rapidly evolving housing market.

Several commenters supported discriminatory effects liability under the Act in general, stating that it is widely agreed that discriminatory effects analysis is critically important to vigorous enforcement of the Fair Housing Act, and that the rule is consistent with HUD's longstanding interpretation and the interpretation of the federal courts of appeals. Commenters in support of the importance of the effects test proffered the following: if the effects approach were no longer available, "the proverbial door to equal housing opportunity will be slammed in the face of many victims"; the effects analysis is particularly important with respect to

the protection of persons with disabilities and in familial status cases; municipal land use decisions are more likely to have a discriminatory effect on minorities when they unreasonably attempt to restrict affordable housing; the effects analysis is important to environmental justice investigations; the discriminatory effects standard encourages housing providers to develop creative ways to achieve their economic objectives while promoting diversity; the effects standard gives HUD and fair housing advocates the tools to reveal the effects of racism, poverty, disability discrimination, and adverse environmental conditions on the health and well-being of individuals protected by the law; the rule provides practical administrative guidance for HUD attorneys and administrative law judges, as well as for the state and local fair housing agencies that share responsibility with HUD for adjudicating fair housing complaints; and the disparate impact standard is important in addressing discrimination in lending and denial of access to credit, which are often the results of neutral policies that have a disparate impact on protected groups.

Some commenters supported the proposed rule's allocation of the burden of proof, stating that the rule is practical and supported by longstanding precedent, and that it provides clear guidance to housing providers and government agencies in adopting rules and policies and an objective method for courts to evaluate discriminatory effect claims. A commenter stated that the perpetuation of segregation theory of effects liability is supported by the legislative history of Title VIII and the obligation to affirmatively further fair housing found in 42 U.S.C. 3608(d).

Following are the remaining issues raised by the public comments and HUD's responses.

### A. Validity of Discriminatory Effects Liability Under the Act

*Issue:* Some commenters opposed the rule because, in their view, the Act's text cannot be interpreted to include liability under a discriminatory effects theory. Commenters stated that the Fair Housing Act does not include an effects standard because it does not use the phrase "adversely affect," as in Title VII, the Age Discrimination in Employment Act (ADEA), or the Americans with Disabilities Act. One of these commenters stated that the Fair Housing Act does not include any of the words in other statutes that have been interpreted as giving rise to disparate impact claims, such as "affect" and "tend to." A commenter found the

"otherwise make unavailable or deny" language in the Fair Housing Act unpersuasive evidence that Congress intended the Act to include an effects test because it is a catchall phrase at the end of a list of prohibited conduct, and it must be read as having a similar meaning as the specific items on the list.

Some commenters stated that the Act's prohibition of certain practices "because of," "on account of," or "based on" a protected classification necessitates a showing of discriminatory intent. A commenter stated that "because of" and "on account of," as used in every provision of the Act, require evidence of intent because the same phrases are used in two provisions of the Act that cannot plausibly be interpreted to employ discriminatory effects liability. In this regard, this commenter pointed to 42 U.S.C. 3631, which uses the phrase "because of" to create criminal liability for specific fair housing violations, and 42 U.S.C. 3617, which uses the phrase "on account of" to ban coercion and intimidation of those exercising fair-housing rights.

Other commenters expressed support for a rule setting out the discriminatory effects theory of liability. Some of these commenters stated that Congress intended that such liability exist and that the text of the Act readily supports this position. Commenters stated that discriminatory effects liability best effectuates Congress's broad, remedial intent in passing the Fair Housing Act and the Act's stated purpose of providing for fair housing, within constitutional limitations, throughout the country. Commenters pointed out, through examples of neutral practices with discriminatory results that they have encountered, that an effects theory of liability continues to be vital in achieving the Act's broad goal. Commenters stated that, consistent with HUD's interpretation of the Act, federal courts have unanimously held that liability may be established by proof of discriminatory effects.

*HUD Response:* As the preamble to the proposed rule and this final rule make clear, both HUD and the federal courts have long interpreted the Fair Housing Act to prohibit actions that have an unjustified discriminatory effect, regardless of whether the action was motivated by a discriminatory intent. Section 804(a) of the Act makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex,

---

[43] ECOA prohibits any creditor from discriminating in credit transactions on the basis of race, color, national origin, religion, age, sex, marital status, or public assistance program participation. *See* 15 U.S.C. 1691(a). By comparison, Section 805 of the Fair Housing Act prohibits any person whose business includes engaging in residential-related transactions from discriminating in such transactions on the basis of race, color, religion, sex, disability, familial status, or national origin. *See* 42 U.S.C. 3605.

familial status, or national origin.'' [44] Similarly, section 804(f)(1) makes it unlawful ''[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap.'' [45] This ''otherwise make unavailable or deny'' formulation in the text of the Act focuses on the effects of a challenged action rather than the motivation of the actor. In this way, the provisions are similar to the ''otherwise adversely affect'' formulation that the Supreme Court found to support disparate impact liability under Title VII and the ADEA.[46] And, indeed, the federal courts have drawn the analogy between Title VII and the Fair Housing Act in interpreting the Act to prohibit actions that have an unjustified discriminatory effect, regardless of intent.[47]

In addition, many of the Fair Housing Act's provisions make it unlawful ''to discriminate'' in certain housing-related transactions based on a protected characteristic.[48] ''Discriminate'' is a term that may encompass actions that have a discriminatory effect but not a discriminatory intent.[49] HUD's extensive experience in administering the Fair Housing Act and in investigating and adjudicating claims arising under the Act, which is

discussed in this preamble and that of the proposed rule,[50] informs its conclusion that not only can the term ''discriminate'' be interpreted to encompass discriminatory effects liability, but it must be so interpreted in order to achieve the Act's stated purpose to provide for fair housing to the extent the Constitution allows.[51] Indeed, as far back as 1980, the HUD Secretary explained to Congress why discriminatory effects liability under the Fair Housing Act is ''imperative to the success of civil rights enforcement.'' [52] Only by eliminating practices with an unnecessary disparate impact or that unnecessarily create, perpetuate, increase, or reinforce segregated housing patterns, can the Act's intended goal to advance equal housing opportunity and achieve integration be realized.[53] In keeping with the broad remedial goals of the Fair Housing Act,[54] HUD interprets the term ''discriminate,'' as well as the language in sections 804(a) and 804(f)(1) of the Act, to encompass liability based on the results of a practice, as well as any intended effect.

The ''because of'' phrase found in sections 804 and 805 of the Act [55] and similar language such as ''on account of'' or ''based on'' does not signal that Congress intended to limit the Act's coverage to intentional discrimination. Both section 703(a)(2) of Title VII [56] and section 4(a)(2) of the ADEA [57] prohibit certain actions ''because of'' a protected characteristic, yet neither provision requires a finding of discriminatory intent.[58] Moreover, the fact that the phrases ''on account of'' and ''because of'' appear in sections 817 and 831 of the Fair Housing Act [59] does not

preclude finding discriminatory effects liability under the Act's other substantive provisions using the same language because, as discussed above, HUD bases its interpretation of those other provisions on other language not found in sections 817 and 831, such as the phrase ''otherwise make unavailable or deny a dwelling'' and the term ''discriminate.''

HUD's interpretation is confirmed by the fact that the Act's text contains three exemptions that presuppose that the Act encompasses an effects theory of liability. For one, section 805(c) of the Act allows ''a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.'' [60] If the Act prohibited only intentional discrimination, it would not be unlawful to ''take into consideration factors other than'' protected characteristics in the first instance, and this exemption would be superfluous. Second, section 807(b)(1) of the Act states that ''[n]othing in this title limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling.'' [61] Since ''the number of occupants permitted to occupy a dwelling'' is not a protected classification under the Act, this provision makes sense only as authorizing occupancy limits that would otherwise violate the Act based on an effects theory.[62] Indeed, in 1991, HUD issued a memorandum to its staff explaining when occupancy limits would violate the Act based on disparate impact liability, and Congress later directed HUD to publish these guidelines in the **Federal Register**.[63] Third, section 807(b)(4) of the Act states that ''[n]othing in this title prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance.'' [64] As with the two exemptions discussed above, this provision would be wholly unnecessary if the Act prohibited only intentional discrimination.

---

[44] 42 U.S.C. 3604(a).

[45] 42 U.S.C. 3604(f)(1).

[46] *See Griggs* v. *Duke Power Co.,* 401 U.S. 424, 431 (1971) (holding that Title VII includes a disparate impact standard); *Smith* v. *City of Jackson, Miss.,* 544 U.S. 228, 235 (2005) (affirming that the holding in *Griggs* represented the best reading of Title VII's text); *id.* at 240 (holding that section 4(a)(2) of the ADEA includes a disparate impact standard); *see also Nat'l Cmty. Reinvestment Coalition* v. *Accredited Home Lenders Holding Co.,* 573 F. Supp. 2d 70, 78 (D.DC 2008) (holding that the Fair Housing Act encompasses disparate impact liability because, among other reasons, language in the Act is analogous to language in the ADEA found by the Supreme Court to include disparate impact).

[47] *See Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 146 (3d Cir. 1977) (''[I]n Title VIII cases, by analogy to Title VII cases, unrebutted proof of discriminatory effect alone may justify a federal equitable response.''); *Graoch,* 508 F.3d at 374 (quoting *Griggs,* 401 U.S. at 431) (''The Supreme Court held that Title VII, which uses similar language [to Title VIII], 'proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.' The same analysis justifies the existence of disparate-impact liability under the FHA.'').

[48] *See* 42 U.S.C. 3604(b), 3604(f)(1), 3604(f)(2), 3605, and 3606.

[49] *See, e.g., Alexander* v. *Choate,* 469 U.S. 287, 299 (1985) (assuming without deciding that section 504 of the Rehabilitation Act of 1973, which prohibits ''subject[ing] to discrimination'' otherwise qualified handicapped individuals, ''reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped''); *Board. of Ed.* v. *Harris,* 444 U.S. 130, 140–41 (1979) (concluding that the term ''discrimination,'' as used in the 1972 Emergency School Aid Act, was ambiguous and proscribed actions that had a disparate impact).

[50] *See supra* nn. 12–27; preamble to the November 16, 2011, proposed rule at 76 FR 70922–23.

[51] In enacting the Fair Housing Act, Congress expressed its desire to provide, within constitutional limitations, for fair housing throughout the United States. *See* 42 U.S.C. 3601.

[52] *See* 126 Cong. Rec. 31,166–31,167 (1980) (statement of Sen. Mathias) (reading into the record letter of HUD Secretary).

[53] *See supra* nn. 3–7; *infra* nn. 65–69.

[54] *See supra* note 11.

[55] 42 U.S.C. 3604 and 3605.

[56] 42 U.S.C. 2000e–2(a)(2).

[57] 29 U.S.C. 623(a)(2).

[58] *See Meacham* v. *Knolls Atomic Power Lab.,* 554 U.S. 84, 96 (2008) (explaining that, ''in the typical disparate-impact case'' under the ADEA, ''the employer's practice is 'without respect to age' and its adverse impact (though 'because of age') is 'attributable to a nonage factor' ''); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 147 (3d Cir. 1977) (''[T]he 'because of race' language is not unique to § 3604(a): that same language appears in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h), yet a prima facie case of Title VII liability is made out when a showing of discriminatory effect (as distinct from intent) is established.'').

[59] 42 U.S.C. 3617 and 3631.

[60] 42 U.S.C. 3605(c).

[61] 42 U.S.C. 3607(b)(1).

[62] *See City of Jackson,* 544 U.S. at 238–39 (explaining that the ADEA's provision that allows an employer ''to take any action otherwise prohibited * * * where the differentiation is based on reasonable factors other than age discrimination'' would be ''simply unnecessary'' if the ADEA prohibited only intentional discrimination).

[63] *See supra* note 26.

[64] 42 U.S.C. 3607(b)(4).

The legislative history of the Act informs HUD's interpretation. The Fair Housing Act was enacted after a report by the National Advisory Commission on Civil Disorders, which President Johnson had convened in response to major riots taking place throughout the country, warned that "[o]ur Nation is moving toward two societies, one black, one white—separate and unequal." [65] The Act's lead sponsor, Senator Walter Mondale, explained in the Senate debates that the broad purpose of the Act was to replace segregated neighborhoods with "truly integrated and balanced living patterns." [66] Senator Mondale recognized that segregation was caused not only by "overt racial discrimination" but also by "[o]ld habits" which became "frozen rules," [67] and he pointed to one such facially neutral practice—the "refusal by suburbs and other communities to accept low-income housing." [68] He further explained some of the ways in which federal, state, and local policies had formerly operated to require segregation and argued that "Congress should now pass a fair housing act to undo the effects of these past" discriminatory actions. [69]

Moreover, in the approximately 20 years between the Act's enactment in 1968 and its amendment in 1988, the nine federal courts of appeals to address the issue held that the Act prohibited actions with a discriminatory effect. [70] Congress was aware of this widespread judicial agreement when it significantly amended the Act in 1988. [71] At that time, the House Committee on the Judiciary specifically rejected an amendment that would have provided that "a zoning decision is not a violation of the Fair Housing Act unless the decision was made with the intent to discriminate." [72] Instead of adding this intent requirement to the Act, Congress chose to maintain the Act's operative text barring discrimination and making unavailable or denying housing, to extend those prohibitions to disability and familial status, and to establish the exemptions discussed above that presuppose the availability of a discriminatory effects theory of liability. [73] The failed attempt in 1988 to impose an intent requirement on the Act followed five other failed attempts, in 1980, [74] 1981, [75] 1983, [76] 1985, [77] and 1987. [78]

*Issue:* Two commenters stated that, when promulgating regulations implementing the Fair Housing Amendments Act of 1988, HUD stated in the preamble that the "regulations are not designed to resolve the question of whether intent is or is not required to show a violation" of the Act. [79] A commenter faulted HUD for failing to explain what the commenter perceived as a change in its official interpretation of the Act, and urged HUD to eliminate disparate impact liability from the rule. Some commenters stated that President Reagan, when signing the Fair Housing Amendments Act of 1988, expressed his opinion that the amendment "does not represent any congressional or executive branch endorsement of the notion, that [Fair Housing Act] violations may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent." [80] Some commenters also stated that, in 1988, the United States Solicitor General submitted an amicus brief to the U.S. Supreme Court in *Huntington Branch, NAACP* v. *Town of Huntington* asserting that a violation of the Fair Housing Act requires a finding of intentional discrimination. [81]

*HUD Response:* While HUD chose not to use the regulations implementing the Fair Housing Amendments Act of 1988 to opine formally on whether a violation under the Act may be established absent discriminatory intent, it has never taken the position that the Act requires a finding of intentional discrimination. On the contrary, through formal adjudications and various other means, including other regulations, interpretive guidance, and statements to Congress, HUD has consistently construed the Act as encompassing discriminatory effects liability. [82] HUD's prior interpretations of the Act regarding the discriminatory effects standard are entitled to judicial deference. [83] Neither President Reagan's signing statement nor the Solicitor General's amicus brief in *Huntington Branch* affects or overrides the longstanding, consistent construction of the Act by HUD, the agency with delegated authority to administer the Act and to promulgate rules interpreting it. Moreover, the Department of Justice both before and after *Huntington Branch* has taken the position that the Fair Housing Act includes discriminatory effects liability. [84]

*B. Definition of Discriminatory Effect, § 100.500(a)*

In order to make it more concise and more consistent with terminology used in case law without changing its substance, this final rule slightly revises the definition of "discriminatory effect."

Proposed § 100.500(a) provided that "A housing practice has a discriminatory effect where it actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin."

Final § 100.500(a) provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of

---

[65] Report of the National Advisory Commission on Civil Disorders 1 (1968).

[66] 90 Cong. Rec. 3422 (1968).

[67] 114 Cong. Rec. 3421 (1968).

[68] *Id.* at 2277.

[69] *Id.* at 2669.

[70] *See, e.g., Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 935–36 (2d Cir.), aff'd, 488 U.S. 15 (1988); *Hanson* v. *Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir. 1986); *Arthur* v. *City of Toledo,* 782 F.2d 565, 574–75 (6th Cir. 1986); *United States* v. *Marengo Cnty. Comm'n,* 731 F.2d 1546, 1559 n.20 (11th Cir. 1984); *Smith* v. *Clarkton,* 682 F.2d 1055, 1065 (4th Cir. 1982); *Halet* v. *Wend Inv. Co.,* 672 F.2d 1305, 1311 (9th Cir. 1982); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 146 (3d Cir. 1977); *Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978); *United States* v. *City of Black Jack,* 508 F.2d 1179, 1184–85 (8th Cir. 1974).

[71] *See, e.g.,* H.R. Rep. No. 100–711, at 2182 (1988) (citing courts of appeals decisions in discussing a policy that could have a "discriminatory effect" on minority households ("[b]ecause minority households tend to be larger"); 134 Cong. Rec. 23711–12 (1988) (Statement of Sen. Kennedy) (noting unanimity of courts of appeals as to the disparate impact test); Fair Housing Amendments Act of 1987: Hearings Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary, 100th Cong., 1st Sess. 529–557 (1987) (testimony of Prof. Robert Schwemm, Univ. of Ky. Law Sch.) (discussing "strong consensus" in federal courts of appeals that the Fair Housing Act prohibited disparate impact discrimination).

[72] *See* H.R. Rep. No. 100–711, at 89–91 (1988) (dissenting views of Rep. Swindall).

[73] *See* Fair Housing Amendments Act of 1988, Pub. L. 100–430, 102 Stat. 1619 (1988).

[74] H.R. Rep. No. 96–865, at 2 (1980) (The Act "effectively proscribed housing practices with the intent or effect of discriminating on account of race, color, national origin, or religion."); 126 Cong. Rec. 31,164 (1980) (explaining that the addition of an intent requirement "would make a radical change in the standard of proof in title VIII cases") (statement of Sen. Bayh).

[75] 127 Cong. Rec. 22,156 (1981).

[76] 129 Cong. Rec. 808 (1983).

[77] S. 139, 99th Cong. § 6(e) (1985).

[78] 133 Cong. Rec. 7180 (1987).

[79] 54 FR 3232, 3235 (Jan. 23, 1989).

[80] Remarks on Signing the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1140, 1141 (Sept. 13, 1988).

[81] *See* Brief for United States as Amicus Curiae, *Town of Huntington* v. *Huntington Branch, NAACP,* 488 U.S. 15 (1988) (No. 97–1961).

[82] *See, e.g.,* nn. 12–27, *supra.*

[83] *See, e.g., United States* v. *Mead Corp.,* 533 U.S. 218, 230 & n.12 (2001) (*Chevron* deference is warranted for formal adjudications).

[84] *See United States.* v. *City of Black Jack,* 508 F.2d 1179, 1184–86 (8th Cir. 1974); *see also* Brief for the United States as Amicus Curiae, *Magner* v. *Gallagher,* 132 S. Ct. 1306 (2012) (No. 10–1032).

**11468** **Federal Register** / Vol. 78, No. 32 / Friday, February 15, 2013 / Rules and Regulations

persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.''

Commenters raised a number of issues with respect to the definition of ''discriminatory effect.''

*Issue:* Two commenters requested that HUD expand the definition of ''housing practice'' to include the language from the preamble to the proposed rule that provided examples of facially neutral actions that may result in a discriminatory effect, ''e.g. laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria,'' to make clear that the Act does not apply only to housing ''practices.''

*HUD Response:* The Act and HUD regulations define ''discriminatory housing practice'' broadly as ''an act that is unlawful under section 804, 805, 806, or 818.''[85] As HUD explained in the preamble to the proposed rule, any facially neutral actions, e.g., laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act. Given the breadth of the definition of ''discriminatory housing practice,'' and the examples provided in the preamble to the proposed rule, HUD does not agree that it is necessary to provide those examples in the text of the regulation. The final rule does, however, replace ''housing practice'' with ''practice'' in order to make clear it applies to the full range of actions that may violate the Fair Housing Act under an effects theory.

*Issue:* A commenter stated that, in light of the Supreme Court's decision in *Wal-Mart Stores, Inc.* v. *Dukes,*[86] HUD should ''remove those aspects of the proposed rule that would give rise to disparate impact liability based on the exercise of discretion.''

*HUD Response:* HUD does not agree that the Supreme Court's decision in *Wal-Mart* means that policies permitting discretion may not give rise to discriminatory effects liability under the Fair Housing Act. The opinion in *Wal-Mart* did not address the substantive standards under the Fair Housing Act but instead addressed the issue of class certification under Title VII. Moreover, even in that context, the opinion in *Wal-Mart* does not shield policies that allow for discretion from liability under Title

VII. On the contrary, the Supreme Court confirmed that an employer who permits his managers to exercise discretion may be liable under Title VII pursuant to a disparate impact theory, ''since an employer's undisciplined system of subjective decision-making can have precisely the same effects as a system pervaded by impermissible intentional discrimination.''[87]

*Issue:* Some commenters asked HUD to remove the word ''predictably'' from the proposed definition. One commenter made this request out of concern that such a definition would make good faith compliance with the Act difficult, and another because claims based on a predictable impact are too speculative. Another commenter expressed support for the inclusion of ''predictably'' in the definition because discrimination cases often involve members of a protected class who predictably would be impacted by the challenged practice. As an example, the commenter stated that a challenge to a zoning or land use ordinance might focus on persons who would be excluded from residency by application of the ordinance.

*HUD Response:* HUD agrees with the latter commenter that the Act is best interpreted as prohibiting actions that predictably result in an unjustified discriminatory effect. HUD's interpretation is supported by the plain language of the Fair Housing Act, which defines ''aggrieved person'' as any person who ''believes that such person will be injured by a discriminatory housing practice that is about to occur,''[88] and which specifically authorizes HUD to take enforcement action and ALJs and courts to order relief with respect to discrimination that ''is about to occur.''[89] Moreover, courts interpreting the Fair Housing Act have agreed that predictable discriminatory effects may violate the Act.[90]

*Issue:* A commenter requested that the preamble or the text of the final rule make clear that reasonable data, such as data from the U.S. Census Bureau, data required by the Home Mortgage Disclosure Act (HMDA), and HUD data

on the occupancy of subsidized housing units, can be used to demonstrate that a practice predictably results in a discriminatory effect.

*HUD Response:* The purpose of the rule, as identified in the November 16, 2011, proposed rule, is to formalize a long-recognized legal interpretation and establish a uniform legal standard, rather than to describe how data and statistics may be used in the application of the standard. The appropriate use of such data is discussed in other federal sources, including the Joint Policy Statement.

*Issue:* Several commenters expressed concern that the proposed rule did not explain the degree to which a practice must disproportionately impact one group over another. A few commenters expressed the opinion that, in order for a practice to violate the Act, the practice must result in a significant or non-trivial discriminatory effect. A commenter wrote that members of a protected class must be impacted in a manner that is ''meaningfully different'' from any impact on other individuals. Another commenter suggested defining a disparate impact as a 20 percent difference between the relevant groups. Another stated that the impact should be ''qualitatively different.'' A commenter wrote that, in the lending context, a disparate impact should not exist where statistics only show that a protected class, on an aggregate basis, has not received as many loans as the general population. Another commenter stated concern that the rule would allow small statistical differences in the pricing of loans to be actionable.

*HUD Response:* As stated in the response to the preceding issue, this rule concerns the formalization of a long-recognized legal interpretation and burden-shifting framework, rather than a codification of how data and statistics may be used in the application of the standard. To establish a prima facie case of discriminatory effects liability under the rule, the charging party or plaintiff must show that members of a protected class are disproportionately burdened by the challenged action, or that the practice has a segregative effect. Whether a particular practice results in a discriminatory effect is a fact-specific inquiry. Given the numerous and varied practices and wide variety of private and governmental entities covered by the Act, it would be impossible to specify in the rule the showing that would be required to demonstrate a discriminatory effect in each of these contexts. HUD's decision not to codify a significance requirement for pleading purposes is consistent with the Joint

---

[85] 42 U.S.C. 3602(f); 24 CFR 100.20.
[86] 131 S. Ct. 2541 (2011).

[87] Id. at 2554 (internal brackets and quotation omitted).
[88] 42 U.S.C. 3602(i).
[89] *See* 42 U.S.C. 3610(g)(2)(A); 3612(g)(3); 3613(c)(1); 3614(d)(1)(A).
[90] *See, e.g., Pfaff* v. *HUD,* 88 F.3d at 745 (''*Discriminatory effect*' describes conduct that actually or predictably resulted in discrimination.''); *United States.* v. *City of Black Jack,* 508 F.2d at 1184 (''To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect.'').

Policy Statement,[91] the statutory codification of the disparate impact standard under Title VII,[92] and the Consumer Financial Protection Bureau's interpretation of the disparate impact standard under ECOA.[93]

*Issue:* Two commenters stated that, in order to establish a prima facie case of discriminatory effect liability, a charging party or plaintiff should have to identify a specific practice and show that the alleged discriminatory effect is caused by that specific practice, with a commenter referring to *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989), in support of this position.

*HUD Response:* HUD addressed this issue at the proposed rule stage, and its analysis is not changed in this final rule. Under this rule, the charging party or plaintiff has the burden of proving that a challenged practice causes a discriminatory effect.[94] In HUD's experience, identifying the specific practice that caused the alleged discriminatory effect will depend on the facts of a particular situation and therefore must be determined on a case-by-case basis. Moreover, as recognized in the employment context under Title VII, the elements of a decision-making process may not be capable of separation for analysis,[95] in which case it may be appropriate to challenge the decision-making process as a whole. For example, in a reverse redlining case, there may be multiple acts or policies which together result in a discriminatory effect.[96]

*Issue:* Commenters expressed concern with the definition of "discriminatory

effect" because it included a practice that has "the effect of creating, perpetuating, or increasing segregated housing patterns" based on protected class. A commenter asked that "segregation" be removed from the proposed definition. Another commenter expressed concern that this portion of the definition would extend liability beyond the factual circumstances of the cases HUD cited as examples in the proposed rule's preamble because, according to the commenter, most of those cases raised at least a suggestion of intentional discrimination. A commenter stated that "perpetuating" should be more clearly defined so that the rule states, for example, whether the term requires an attempt to segregate further, or merely a practice that continues existing patterns of segregation. Another commenter expressed the related opinion that "not explicitly fostering integration" should never form the basis for liability under the Act.

*HUD Response:* As discussed in the preambles to both the proposed rule and this final rule, the elimination of segregation is central to why the Fair Housing Act was enacted.[97] HUD therefore declines to remove from the rule's definition of "discriminatory effects" "creating, perpetuating, or increasing segregated housing patterns."[98] The Fair Housing Act was enacted to replace segregated neighborhoods with "truly integrated and balanced living patterns."[99] It was structured to address discriminatory housing practices that affect "the whole community" as well as particular segments of the community,[100] with the goal of advancing equal opportunity in housing and also to "achieve racial integration for the benefit of all people in the United States."[101] Accordingly, the Act prohibits two kinds of unjustified discriminatory effects: (1) harm to a particular group of persons by a disparate impact; and (2) harm to the community generally by creating, increasing, reinforcing, or perpetuating

segregated housing patterns.[102] Recognizing liability for actions that impermissibly create, increase, reinforce, or perpetuate segregated housing patterns directly addresses the purpose of the Act to replace segregated neighborhoods with "truly integrated and balanced living patterns." For example, the perpetuation of segregation theory of liability has been utilized by private developers and others to challenge practices that frustrated affordable housing development in nearly all-white communities and thus has aided attempts to promote integration.[103]

Moreover, every federal court of appeals to have addressed the issue has agreed with HUD's interpretation that the Act prohibits practices with the unjustified effect of perpetuating segregation.[104] In one such case, for example, the court of appeals held that a zoning ordinance that prevents the construction of multifamily housing in areas that are primarily white may violate the Act by "reinforcing racial

---

[91] *See* Joint Policy Statement, 59 FR 18,266, 18,269 (Apr. 15, 1994) (defining "disparate impact" as "a disproportionate adverse impact" on applicants from a protected group).

[92] *See* 42 U.S.C. 2000e-2(k)(1)(A)(i) (complaining party must demonstrate "that a respondent uses a particular employment practice that causes a disparate impact").

[93] *See* 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)-2 (discriminatory effect may exist when a creditor practice "has a disproportionately negative impact on a prohibited basis").

[94] *See* 24 CFR 100.500(c); *see also* 76 FR 70925.

[95] *See* 42 U.S.C. 2000e–2(k)(1)(B)(i) ("[T]he complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice").

[96] *See, e.g., Hargraves* v. *Capital City Mortg. Corp,* 140 F. Supp. 2d 7, 20–22 (D.D.C. 2000) (finding that "predatory lending" in African American neighborhoods, which included exorbitant interest rates, lending based on the value of the asset rather than a borrower's ability to repay, profiting by acquiring the property through default, repeated foreclosures, and loan servicing procedures with excessive fees, could disparately impact African Americans).

[97] *See* nn. 6–7, 65–69 and accompanying text, *supra;* 76 FR 70922.

[98] As discussed in the "Definition of Discriminatory Effect" section, the final rule amends the definition of "discriminatory effect" to make it more concise and more consistent with terminology used in case law, but its substance is unchanged.

[99] *Trafficante,* 409 U.S. at 211 (citing 114 Cong. Rec. 3422 (Feb. 20, 1968) (statement of Senator Mondale)).

[100] *Trafficante,* 409 U.S. at 211 (citing 114 Cong. Rec. 2706 (1968) (Statement of Senator Javits)).

[101] H.R. Res. 1095, 110th Cong., 154 Cong. Rec. H2280–01 (April 15, 2008).

[102] *See, e.g., Graoch,* 508 F.3d at 378 (there are "two types of discriminatory effects which a facially neutral housing decision can have: The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups."); *Huntington Branch,* 844 F.2d at 937 ("the discriminatory effect of a rule arises in two contexts: adverse impact on a particular minority group and harm to the community generally by the perpetuation of segregation * * * recognizing this second form of effect advances the principal purpose of Title VIII to promote, open, integrated residential housing patterns.") (internal citations and quotation marks omitted); *Metro. Housing Dev. Corp.* v. *Village of Arlington Heights,* 558 F.2d at 1290 ("There are two kinds of racially discriminatory effects which a facially neutral decision about housing can produce. The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.") (internal citations omitted); *Hallmark Developers, Inc.* v. *Fulton County,* 386 F. Supp. 2d 1369, 1383 (N.D. Ga. 2005) ("Of course there are two kinds of racially discriminatory effect which can be produced by a facially neutral decision. If the decision or action perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.") (internal citations omitted).

[103] *See, e.g., Huntington Branch,* 844 F.2d at 937; *Arlington Heights,* 558 F.2d at 1291; *Black Jack,* 508 F.2d at 1184–86; *Summerchase Ltd. Pshp. I, et al.* v. *City of Gonzales, et al.,* 970 F. Supp. 522, 527–28 (M.D. La. 1997); *Dews,* 109 F. Supp. 2d at 567–68.

[104] *See supra* note 28.

**11470** **Federal Register** / Vol. 78, No. 32 / Friday, February 15, 2013 / Rules and Regulations

segregation in housing.'' [105] For consistency with the terminology used in this case law, the final rule adds the term ''reinforces'' to the definition of ''discriminatory effect.''

In response to the comment regarding the facts of the cases HUD cited as examples in the proposed rule's preamble, HUD notes that those cases [106] are not exhaustive and therefore should not be viewed as the only ways that a violation of the Act may be established based on a discriminatory effects theory. Moreover, even if the facts of a particular case suggest intentional discrimination, in many instances both an intent to discriminate and a discriminatory effect may exist, and a charging party or plaintiff may bring a claim alleging either or both intent and effect as alternative theories of liability. Regardless, as explained throughout this preamble, and in case law, discriminatory intent is not required for a violation of the Act under an effects theory.

### C. Legally Sufficient Justification, § 100.500(b)(1)

In response to comments, this final rule slightly revises the first prong of ''legally sufficient justification,'' as provided in the November 16, 2011, proposed rule, which is required to sustain a practice with a discriminatory effect under the Act.

Proposed § 100.500(b)(1) provided: ''A legally sufficient justification exists where the challenged housing practice: (1) Has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent * * * or defendant.''

Final § 100.500(b)(1) provides: ''A legally sufficient justification exists where the challenged practice: (1) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent * * * or defendant * * * A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative.''

Comments were received with respect to proposed § 100.500(b)(1), some agreeing with the standard as stated; some recommending that § 100.500(b)(1) set either a higher or lower standard of proof for defendants and respondents; and some suggesting that HUD provide definitions for certain terms or use slightly different terms to make the regulatory provision easier to understand and apply.

### 1. Substantial, Legitimate, Nondiscriminatory Interests, § 100.500(b)(1)

*Issue:* Although some commenters supported the use of the phrase ''legitimate, nondiscriminatory interest,'' a commenter asked that the final rule provide a definition of the phrase to ensure that the standard is applied uniformly. Commenters stated that the word ''substantial'' or ''clearly'' should modify the phrase ''nondiscriminatory interests,'' reasoning that justifying discrimination with an interest that may be of little or no importance to the defendant or respondent would run contrary to Congress's goal of providing for fair housing within constitutional limitations.

*HUD Response:* HUD agrees that, in order to effectuate the Fair Housing Act's broad, remedial goal, practices with discriminatory effects cannot be justified based on interests of an insubstantial nature. Accordingly, HUD is making clear in this final rule that any interest justifying a practice with a discriminatory effect must be ''substantial.'' A ''substantial'' interest is a core interest of the organization that has a direct relationship to the function of that organization. The requirement that an entity's interest be substantial is analogous to the Title VII requirement that an employer's interest in an employment practice with a disparate impact be job related.[107] HUD uses the more general standard of substantiality because there is no single objective, such as job-relatedness, against which every practice covered by the Fair Housing Act could be measured. The determination of whether goals, objectives, and activities are of substantial interest to a respondent or defendant such that they can justify actions with a discriminatory effect requires a case-specific, fact-based inquiry.

The word ''legitimate,'' used in its ordinary meaning, is intended to ensure that a justification is genuine and not false,[108] while the word ''nondiscriminatory'' is intended to ensure that the justification for a challenged practice does not itself discriminate based on a protected characteristic. HUD and federal courts interpreting the Fair Housing Act have

been applying these concepts without incident.[109]

*Issue:* Commenters requested that ''legitimate, nondiscriminatory interests'' be replaced or equated with ''business necessity.'' This would, in their view, be consistent with judicial interpretations of the Fair Housing Act, with HUD's regulations governing Fannie Mae and Freddie Mac, and with the Joint Policy Statement. Commenters stated that the Joint Policy Statement is well established and provides a clear, predictable standard to covered entities. Several commenters expressed concern that the proposed standard requiring a ''legitimate'' justification was weaker than, and would be interpreted as requiring less than, the ''business necessity'' standard.

*HUD Response:* In its adjudications under the Fair Housing Act, HUD has required respondents to prove that their challenged practices are justified by business necessity.[110] The other federal regulatory and enforcement agencies involved in the investigation of lending discrimination have taken the same approach.[111] The ''substantial, legitimate, nondiscriminatory interest'' standard found in § 100.500(b)(1) is equivalent to the ''business necessity'' standard found in the Joint Policy Statement. The standard set forth in this rule is not to be interpreted as a more lenient standard than ''business necessity.'' HUD chooses not to use the phrase ''business necessity'' in the rule because the phrase may not be easily understood to cover the full scope of practices covered by the Fair Housing Act, which applies to individuals, businesses, nonprofit organizations, and public entities. Using the phrase ''business necessity'' might confuse litigating parties and the courts as to how the term might apply, for example, to a nonprofit organization that provides housing or housing-related services, or to a branch of state or local government carrying out its functions. The standards in § 100.500 apply equally to individuals, public entities, and for-

---

[105] *Huntington Branch,* 844 F.2d at 937–38.
[106] *See* 76 FR 70925.

[107] *See* 42 U.S.C. 2000e-2(k)(1)(A)(i).
[108] *See, e.g.,* Legitimate Definition, Merriam-Webster's Dictionary, *http://www.merriam-webster.com/dictionary/necessary* (last visited Mar. 15, 2012) (defining ''legitimate'' as ''neither spurious nor false'').

[109] *See, e.g., Darst-Webbe Tenant Ass'n Bd.* v. *St. Louis Hous. Auth.,* 417 F.3d 898, 902 (8th Cir. 2005) (defendant must prove that challenged action is necessary to achieve ''legitimate, non-discriminatory policy objectives''); *Charleston Hous. Auth.* v. *U.S. Dept. of Agric.* 419 F.3d 729 (same).
[110] *See, e.g.,* 1998 Enforcement Handbook at 2–30 (instructing HUD investigators that a respondent's policy must be justified by a ''business necessity''); *HUD* v. *Carlson,* 1995 WL 365009, at *14 (HUD ALJ June 12, 1995) (''The Respondent has the burden to overcome the prima facie case by establishing a business necessity for the policy.''); Joint Policy Statement, 59 FR at 18269 (requiring a challenged policy or practice to be ''justified by 'business necessity' '').
[111] *See* Joint Policy Statement, 59 FR at 18269.

profit and nonprofit private entities because, as discussed below, neither the text of the Act nor its legislative history supports drawing a distinction among them. Accordingly, HUD has chosen terminology that, while equivalent to its previous guidance in the Joint Policy Statement, applies readily to all covered entities and all covered activities.

*Issue:* Some commenters expressed concern that the term "legitimate" allows for subjective review of a proffered justification.

*HUD Response:* HUD and courts have reviewed justifications proffered by covered entities for many years. While the review is very fact intensive, it is not subjective. Whether an interest is "legitimate" is judged on the basis of objective facts establishing that the proffered justification is genuine, and not fabricated or pretextual.[112] HUD and courts have engaged in this inquiry for decades without encountering issues related to the subjectivity of the inquiry. HUD therefore believes that concerns about subjective reviews of proffered justifications are not warranted.

*Issue:* A commenter requested that the final rule expressly state that increasing profits, minimizing costs, and increasing market share qualify as legitimate, nondiscriminatory interests. Similarly, another commenter asked that the final rule codify examples of tenant screening criteria such as rental history, credit checks, income verification, and court records that would be presumed to qualify as legally sufficient justifications.

*HUD Response:* HUD is not adopting these suggestions because the Fair Housing Act covers many different types of entities and practices, and a determination of what qualifies as a substantial, legitimate, nondiscriminatory interest for a given entity is fact-specific and must be determined on a case-by-case basis. Accordingly, the final rule does not provide examples of interests that would always qualify as substantial, legitimate, nondiscriminatory interests for every respondent or defendant in any context.

2. Relationship Between Challenged Practice and Asserted Interest, § 100.500(b)(1)

*Issue:* Several commenters expressed concern with HUD's use of the term "manifest" in the proposed requirement that the challenged practice have a "necessary and manifest relationship" to one or more legitimate, nondiscriminatory interests of the respondent or defendant. Commenters

expressed uncertainty about what the term was intended to mean and how it would be interpreted by HUD or by federal courts. Two commenters expressed concern that the term "manifest" may involve a subjective evaluation and others did not understand the evidentiary concept embodied in the term. A commenter urged HUD to make clear in the language of the final rule, in addition to the preamble, that a justification may not be hypothetical or speculative.

*HUD Response:* In the proposed rule, the term "manifest" was used to convey defendants' and respondents' obligation to provide evidence of the actual need for the challenged practices, instead of relying on speculation, hypothesis, generalization, stereotype, or fear. HUD recognizes that some commenters were confused by the term "manifest." In response to these concerns, HUD is replacing the term "manifest" in the final rule with the requirement, added in § 100.500(b)(2), that "a legally sufficient justification must be supported by evidence and may not be hypothetical or speculative." This language is intended to convey that defendants and respondents, relying on a defense under § 100.500(b)(1), must be able to prove with evidence the substantial, legitimate, nondiscriminatory interest supporting the challenged practice and the necessity of the challenged practice to achieve that interest. This language is consistent with HUD's longstanding application of effects liability under the Fair Housing Act, is easy to understand, can be uniformly applied by federal and state courts and administrative agencies, and is unlikely to cause confusion or unnecessary litigation about its meaning. HUD notes that this language is also consistent with the application of the standard by other federal regulatory and enforcement agencies under both the Fair Housing Act and ECOA,[113] with the approach taken under Title VII,[114] and with the approach taken by a number of federal courts interpreting the Fair Housing Act.[115]

*Issue:* A commenter suggested that the phrase "necessary and manifest" should be defined.

*HUD Response:* As discussed above, HUD has removed the word "manifest" in the final rule in order to avoid any potential confusion. Thus, § 100.500(b)(1) is slightly revised at this final rule stage to state that a respondent or defendant seeking to defend a challenged practice with a discriminatory effect must prove that the practice "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" of the respondent or defendant. In the proposed rule, as well as this final rule, HUD uses "necessary" in its ordinary, most commonly used sense.

*Issue:* Some commenters suggested that HUD remove the word "necessary" to make the standard found in § 100.500(b)(1) consistent with the Title VII standard set out in the Supreme Court's opinion in *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989). Commenters suggested various standards without the word "necessary," including requiring that the challenged practice have "a legitimate business purpose," that the challenged practice have "a legitimate nondiscriminatory purpose," or that the challenged practice be "rationally related to a legitimate, nondiscriminatory goal."

*HUD Response:* HUD declines to adopt the commenters' suggestion to remove "necessary" from the rule. HUD's substantial experience in administering the Fair Housing Act confirms that requiring a challenged practice with a discriminatory effect to be necessary best effectuates the broad, remedial goal of the Act. Indeed, in 1994 HUD and ten other federal agencies notified lenders of the requirement to justify the discriminatory effect of a challenged lending practice under the Fair Housing Act and ECOA by showing that the practice is necessary to their business.[116] Moreover, in 1997, HUD

---

[112] *See* note 109, *supra.*

[113] *See* Joint Policy Statement, 59 FR at 18269 ("The justification must be manifest and may not be hypothetical or speculative.")

[114] *See* 42 U.S.C. 2000e–2(k)(1)(A)(i) (the respondent must "*demonstrate* that the challenged practice is job related for the position in question and consistent with business necessity") (emphasis added).

[115] *See, e.g., Charleston Hous. Auth.* v. *U.S. Dep't of Agric.,* 419 F.3d 729, 741 (8th Cir. 2005) (the challenged housing practice must have a "manifest relationship" to the defendant's objectives); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d at 149 ("a justification must serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant") (emphasis added); *Huntington Branch,*

*NAACP* v. *Town of Huntington,* 844 F.2d at 938, aff'd, 488 U.S. 15 (1988) (per curiam) (same).

[116] *See* Joint Policy Statement, 59 FR 18,269 (the second step of a disparate impact analysis under the Fair Housing Act and ECOA is to "determine whether the policy or practice is justified by 'business necessity.' ") *Id.* (giving an example of a policy that may violate the Fair Housing Act and ECOA since "the lender is unlikely to be able to show that the policy is compelled by business necessity"); *see also* Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation, Federal Reserve Board, Office of Thrift Supervision, National Credit Union Administration, The Interagency Fair Lending Examination Procedures app. at 28, August 2009, available at *http://www.ffiec.gov/pdf/fairappx.pdf.*

promulgated a regulation recognizing that section 805 of the Act [117] does not prevent consideration, in the purchasing of loans, of factors that are necessary to a business.[118] In addition, in 1988 the House Committee on the Judiciary, in advancing a bill amending the Fair Housing Act, recognized that liability should not attach when a justification is necessary to the covered entity's business.[119] HUD's view is also consistent with Congress's 1991 enactment of legislation codifying that, in the employment context, a practice that has a disparate impact must be consistent with "business necessity" and must also be "job related." [120] HUD also notes that a similar necessity requirement is found in ECOA, which requires that a challenged practice "meets a legitimate business need." [121] HUD's final rule therefore uses language that is consistent with its longstanding interpretation of the Fair Housing Act, comparable to the protections afforded under Title VII and ECOA, and fairly balances the interests of all parties.

*Issue:* A commenter expressed concern that requiring a "necessary" relationship may interfere with loss mitigation efforts, including those under the Home Affordable Modification Program (HAMP) and Home Affordable Refinance Program (HARP)—federal programs that encourage mortgage servicers to offer modifications of loans or refinances—because such efforts are voluntary and participation in them may not be perceived as "necessary."

*HUD Response:* Since at least the date of issuance of the Joint Policy Statement in 1994, lenders have been on notice that they must prove the necessity of a challenged practice to their business under both the Fair Housing Act and ECOA. This requirement has not prevented lenders or servicers from engaging in effective loss mitigation efforts. The mere fact that a policy is voluntarily adopted does not preclude it from being necessary to achieve a substantial, legitimate, nondiscriminatory interest. By formalizing the process of proving

---

[117] 42 U.S.C. 3605.

[118] *See* 24 CFR 100.125(c); *cf. Darst-Webbe Tenant Ass'n Bd.* v. *St. Louis Hous. Auth.,* 417 F.3d, at 902 (the challenged practice must be "necessary to the attainment of" the defendant's objectives) (internal citation omitted); *see also Affordable Hous. Dev. Corp.* v. *City of Fresno,* 433 F.3d 1182, 1195 (9th Cir. 2006) (describing the Eighth Circuit's approach as "sound").

[119] H.R. Rep. No. 100–711, at 2191 (1988) ("The Committee does not intend that those purchasing mortgage loans be precluded from taking into consideration factors justified by business necessity.").

[120] *See* 42 U.S.C. 2000e–2(k)(1)(A).

[121] 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)(2).

business necessity in a rule that clearly allocates the burdens of proof among the parties, HUD is not changing substantive law, but merely clarifying the contours of an available defense so that lenders may rely upon it with greater clarity as to how it applies.

*Issue:* A commenter expressed the concern that requiring a respondent or defendant to prove necessity would subject the respondent or defendant to unnecessary and possibly frivolous investigations and litigation. Another commenter took the opposite position, stating that the rule would not create excessive litigation exposure for respondents or defendants because numerous procedural mechanisms exist to dispose of meritless cases. A commenter stated that, at the second stage of the burden-shifting analysis, a defendant should have the opportunity to demonstrate not only a legally sufficient justification, but also that the charging party or plaintiff did not satisfy its prima facie case because the challenged practice did not result in a discriminatory effect.

*HUD Response:* Given how the discriminatory effects framework has been applied to date by HUD and by the courts, HUD does not believe that the rule will lead to frivolous investigations or create excessive litigation exposure for respondents or defendants. As discussed above, since at least 1994, when the Joint Policy Statement was issued, lenders have known that they must prove the necessity of a challenged practice to their business. Moreover, HUD believes that promulgation of this rule—with its clear allocation of burdens and clarification of the showings each party must make—has the potential to decrease or simplify this type of litigation. For example, with a clear, uniform standard, covered entities can conduct consistent self-testing and compliance reviews, document their substantial, legitimate nondiscriminatory interests, and resolve potential issues so as to prevent future litigation. A uniform standard is also a benefit to entities operating in multiple jurisdictions. To the extent that the rule results in more plaintiffs being aware of potential effects liability under the Fair Housing Act, it should have the same impact on covered entities, resulting in greater awareness and compliance with the Fair Housing Act. Additionally, as a commenter noted, the Federal Rules of Civil Procedure provide various means to dispose of meritless claims, including Rules 11, 12, and 56. Moreover, a respondent or defendant may avoid liability by rebutting the charging party's or plaintiff's proof of

discriminatory effect.[122] If the fact-finder decides that the charging party or plaintiff has not proven that the challenged practice resulted in a discriminatory effect, liability will not attach.

*Issue:* A commenter expressed concern that, under the proposed rule, a legally sufficient justification under § 100.500(b)(1) may not be hypothetical or speculative but a discriminatory effect under § 100.500(a) may be, creating an imbalance in the burden of proof in favor of the charging party or plaintiff.

*HUD Response:* This comment indicates a misunderstanding of what § 100.500 requires. Requiring the respondent or defendant to introduce evidence (instead of speculation) proving that a challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests in order to benefit from the defense to liability is not different in kind from requiring the charging party or plaintiff to introduce evidence (not speculation) proving that a challenged practice caused or will predictably cause a discriminatory effect. As discussed in this preamble, the language of the Act makes clear that it is intended to address discrimination that has occurred or is about to occur, and not hypothetical or speculative discrimination.

*D. Less Discriminatory Alternative, § 100.500(b)(2)*

Some comments were received with respect to § 100.500(b)(2) of the proposed rule. With that provision, HUD proposed that a practice with a discriminatory effect may be justified only if the respondent's or defendant's interests cannot be served by another practice with a less discriminatory effect. In response to these comments, the final rule makes one slight revision to the proposed provision by substituting "could not be served" for "cannot be served."

*Issue:* A commenter requested that HUD replace "cannot be served" with "would not be served" because, under the Supreme Court's analysis in *Wards Cove,* a plaintiff cannot prevail by showing that a less discriminatory alternative could in theory serve the defendant's business interest. This commenter also stated that, in order for liability to attach, a less discriminatory alternative must have been known to and rejected by the respondent or

---

[122] *See, e.g., Dothard* v. *Rawlinson,* 433 U.S. 321, 331 (1977) (Title VII case explaining that a defendant is "free to adduce countervailing evidence of his own" in order to discredit a plaintiff's evidence of disparate impact).

defendant. Other commenters stated that, in order for liability to attach, the alternative practice must be equally effective as the challenged practice, or at least as effective as the challenged practice, with some of these commenters pointing to *Wards Cove* in support of this position. A number of other commenters, on the other hand, cited to Fair Housing Act case law for the proposition that liability should attach unless the less discriminatory alternative would impose an undue hardship on the respondent or defendant under the circumstances of the particular case.

*HUD Response:* HUD agrees that a less discriminatory alternative must serve the respondent's or defendant's substantial, legitimate nondiscriminatory interests, must be supported by evidence, and may not be hypothetical or speculative. For greater consistency with the terminology used in HUD's (and other federal regulatory agencies') previous guidance in the Joint Policy Statement,[123] the final rule replaces "cannot be served" with "could not be served." A corresponding change of "can" to "could" is also made in § 100.500(c)(3) of the final rule. HUD does not believe the rule's language needs to be further revised to state that the less discriminatory alternative must be "equally effective," or "at least as effective," in serving the respondent's or defendant's interests; the current language already states that the less discriminatory alternative must serve the respondent's or defendant's interests, and the current language is consistent with the Joint Policy Statement, with Congress's codification of the disparate impact standard in the employment context,[124] and with judicial interpretations of the Fair Housing Act.[125] The additional modifier

"equally effective," borrowed from the superseded *Wards Cove* case, is even less appropriate in the housing context than in the employment area in light of the wider range and variety of practices covered by the Act that are not readily quantifiable. For a similar reason, HUD does not adopt the suggestion that the less discriminatory alternative proffered by the charging party or plaintiff must be accepted unless it creates an "undue hardship" on the respondent or defendant. The "undue hardship" standard, which is borrowed from the reasonable accommodation doctrine in disability law, would place too heavy a burden on the respondent or defendant.

In addition, HUD does not agree with the commenter who stated that *Wards Cove* requires the charging party or plaintiff to show that, prior to litigation, a respondent or defendant knew of and rejected a less discriminatory alternative,[126] or that *Wards Cove* even governs Fair Housing Act claims. HUD believes that adopting this requirement in the housing context would be unjustified because it would create an incentive not to consider possible ways to produce a less discriminatory result. Encouraging covered entities not to consider alternatives would be inconsistent with Congress's goal of providing for fair housing throughout the country.

*Issue:* Two commenters expressed concern that, under the proposed rule's language, the discriminatory effect of an alternative would be considered but a lender's concerns such as credit risk would be irrelevant.

*HUD Response:* HUD believes these commenters' concerns will not be realized in practice because a less discriminatory alternative need not be adopted unless it could serve the substantial, legitimate, nondiscriminatory interest at issue. The final rule specifically provides that the interests supporting a challenged practice are relevant to the consideration of whether a less discriminatory alternative exists. As stated in § 100.500(c)(3), the charging party or plaintiff must show that the less discriminatory alternative could serve the "interests supporting the challenged practice." Thus, if the lender's interest in imposing the challenged practice relates to credit risk, the alternative would also need to effectively address the lender's concerns about credit risk.

*E. Allocations of Burdens of Proof in § 100.500(c)*

In the proposed rule, HUD set forth a burden-shifting framework in which the plaintiff or charging party would bear the burden of proving a prima facie case of discriminatory effect, the defendant or respondent would bear the burden of proving a legitimate, nondiscriminatory interest for the challenged practice, and the plaintiff or charging party would bear the burden of proving that a less discriminatory alternative exists.

*Issue:* Some commenters stated that the plaintiff or charging party should bear the burden of proof at all stages of the proceedings, either citing *Wards Cove* in support of this position or reasoning that, in our legal system, the plaintiff normally carries the burden of proving each element of his claim. Other commenters asked HUD to modify § 100.500(c)(3) in order to place the burden of proving no less discriminatory alternative on the defendant or respondent. Those recommending that the burden allocation be modified in this way reasoned that the respondent or defendant is in a better position to bear this burden because of greater knowledge of, and access to, information concerning the respondent's or defendant's interests and whether a less discriminatory alternative could serve them. Several commenters stated that this is particularly true in the context of government decisions, as complainants and plaintiffs will generally be outside the political decision-making process, and in the context of insurance and lending decisions, where proprietary information and formulas used in the decision making process may be vigorously protected.

Commenters stated that complainants and plaintiffs may not have the capacity to evaluate possible less discriminatory alternatives. Some commenters also pointed out that assigning this burden to the respondent or defendant may avoid intrusive and expensive discovery into a respondent's or defendant's decision-making process, and would incentivize entities subject to the Act to consider less discriminatory options when making decisions. Commenters also stated that courts have placed this burden of proof on the defendant, others have placed it on the party for whom proof is easiest, and reliance on Title VII is inappropriate because of the unique nature of less discriminatory alternatives in Fair Housing Act cases.

*HUD Response:* HUD believes that the burden of proof allocation in § 100.500(c) is the fairest and most

---

[123] *See* Joint Policy Statement, 59 FR at 18269 ("Even if a policy or practice that has a disparate impact on a prohibited basis can be justified by business necessity, it still may be found to be discriminatory if an alternative policy or practice could serve the same purpose with less discriminatory effect.")

[124] *See* 42 U.S.C. 2000e–2(k)(1)(A)(i) ("the concept of 'alternative employment practice'" under Title VII "shall be in accordance with the law as it existed on June 4, 1989"); *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405, 425 (1975) ("[I]t remains open to the complaining party to show that other tests or selection devises, without a similarly undesirable racial effect, would also serve the employer's legitimate interest.").

[125] *See, e.g., Darst-Webbe,* 417 F.3d at 906 ("plaintiffs must offer a viable alternative that satisfies the Housing Authority's legitimate policy objectives while reducing the [challenged practice's] discriminatory impact"); *Huntington,* 844 F.2d at 939 (analyzing whether the "[t]own's goal * * * can be achieved by less discriminatory means"); *Rizzo,* 564 F.2d at 159 (it must be analyzed whether an alternative "could be adopted

that would enable [the defendant's] interest to be served with less discriminatory impact.").

[126] *See Wards Cove Packing Co., Inc.* v. *Atonio,* 490 U.S. 642, 660–61 (1989).

**11474** **Federal Register** / Vol. 78, No. 32 / Friday, February 15, 2013 / Rules and Regulations

reasonable approach to resolving the claims. As the proposed rule stated, this framework makes the most sense because it does not require either party to prove a negative. Moreover, this approach will ensure consistency in applying the discriminatory effects standard while creating the least disruption because, as discussed earlier in this preamble, HUD and most courts utilize a burden-shifting framework,[127] and most federal courts using a burden-shifting framework allocate the burdens of proof in this way.[128] In addition, HUD notes that this burden-shifting scheme is consistent with the Title VII discriminatory effects standard codified by Congress in 1991.[129] It is also consistent with the discriminatory effects standard under ECOA,[130] which borrows from Title VII's burden-shifting framework.[131] There is significant overlap in coverage between ECOA, which prohibits discrimination in credit, and the Fair Housing Act, which prohibits discrimination in residential real estate-related transactions.[132] Thus, under the rule's framework, in litigation involving claims brought under both the Fair Housing Act and ECOA, the parties and the court will not face the burden of applying inconsistent methods of proof to factually indistinguishable claims. Having the same allocation of burdens under the Fair Housing Act and ECOA will also provide for less

[127] See supra notes 29–33.

[128] See supra notes 34, 35.

[129] See 42 U.S.C. 2000e–2(k).

[130] ECOA prohibits discrimination in credit on the basis of race and other enumerated criteria. See 15 U.S.C. 1691.

[131] See S. Rep. No. 94–589, at 4–5 (1976) ("[J]udicial constructions of antidiscrimination legislation in the employment field, in cases such as Griggs v. Duke Power Company, 401 U.S. 424 (1971), and Albemarle Paper Co. v. Mood, [422 U.S. 405 (1975)], are intended to serve as guides in the application of [ECOA], especially with respect to the allocations of burdens of proof."); 12 CFR 1002.6(a) ("The legislative history of [ECOA] indicates that the Congress intended an 'effects test' concept, as outlined in the employment field by the Supreme Court in the cases of Griggs v. Duke Power Co., 401 U.S. 424 (1971) and Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness."); 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)–2 ("Effects test. The effects test is a judicial doctrine that was developed in a series of employment cases decided by the Supreme Court under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), and the burdens of proof for such employment cases were codified by Congress in the Civil Rights Act of 1991 (42 U.S.C. 2000e– 2).").

[132] See Joint Policy Statement, 59 FR 18266. Indeed, the Joint Policy Statement analyzed the standard for proving disparate impact discrimination in lending under the Fair Housing Act and under ECOA without any differentiation. See 59 FR 18269.

confusion and more consistent decision making by the fact finder in jury trials.

With respect to expressed concerns about the ability of plaintiffs or complainants to demonstrate a less discriminatory alternative, plaintiffs in litigation in federal courts may rely on Rule 26(b)(1) of the Federal Rules of Civil Procedure for the discovery of information "that is relevant to any party's claim or defense," [133] and parties in an administrative proceeding may rely on Rule 26(b)(1) and a similar provision in HUD's regulations.[134] The application of those standards would plainly provide for the discovery of information regarding the alternatives that exist to achieve an asserted interest, the extent to which such alternatives were considered, the reasons why such alternatives were rejected, and the data that a plaintiff or plaintiff's expert could use to show that the defendant did not select the least discriminatory alternative. An appropriately tailored protective order can be issued by the court to provide access to proprietary information in the context of cases involving confidential business information, such as those involving insurance or lending, while providing to respondents and defendants adequate protection from disclosure of this information. Moreover, as noted above, in administrative adjudications, it is the charging party, not non-intervening complainants, who bear this burden of proof.

### F. Application of Discriminatory Effects Liability

Comments were received with respect to how the discriminatory effects standard would be applied and how it might impact covered entities. These comments expressed varying concerns, including the retroactivity of the rule, its application to the insurance and lending industries, and its impact on developing affordable housing.

*Issue:* A commenter stated that each of the cases listed in the proposed rule as examples of practices with a segregative effect involved a government actor, while another commenter asked HUD to clarify whether liability may attach to private parties.

*HUD Response:* Liability for a practice that has an unjustified discriminatory effect may attach to either public or private parties according to the standards in § 100.500, because there is nothing in the text of the Act or its legislative history to indicate that

[133] Fed. R. Civ. P. 26(b)(1).

[134] See 24 CFR 180.500(b) ("parties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the proceeding").

Congress intended to distinguish the manner in which the Act applies to public versus private entities.[135]

*Issue:* A commenter expressed the opinion that the Fair Housing Act does not grant HUD the power to promulgate retroactive rules, and therefore HUD should make clear that the final rule applies prospectively only.

*HUD Response:* This final rule embodying HUD's and the federal courts' longstanding interpretation of the Act to include a discriminatory effects standard will apply to pending and future cases. HUD has long recognized, as have the courts, that the Act supports an effects theory of liability. This rule is not a change in HUD's position but rather a formal interpretation of the Act that clarifies the appropriate standards for proving a violation under an effects theory. As such, it "is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand." [136]

*Issue:* A commenter stated that the most appropriate remedy for a violation of the Act under an effects theory is declaratory or injunctive relief. This commenter expressed the opinion that the use of penalties or punitive damages generally does not serve the underlying purpose of the Fair Housing Act to remedy housing discrimination.

*HUD Response:* HUD disagrees with the commenter. The Fair Housing Act specifically provides for the award of damages—both actual and punitive—and penalties.[137]

*Issue:* Commenters from the insurance industry expressed a number of concerns about the application of the proposed rule to insurance practices. Some commenters stated that application of the disparate impact standard would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act (15 U.S.C. 1011–1015) or the common law "filed rate doctrine." Some commenters stated that HUD's use of Ojo v. Farmers Group, Inc., 600 F.3d 1205 (9th Cir. 2010), in the preamble of the proposed rule was not appropriate.

[135] See 42 U.S.C. 3602(f) (defining "discriminatory housing practice" as "an act that is unlawful under section 804, 805, 806, or 818," none of which distinguish between public and private entities); see also Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am., 208 F. Supp. 2d 46, 59– 60 & n.7 (D.D.C. 2002) (applying the same impact analysis to a private entity as to public entities, and noting that a "distinction between governmental and non-governmental bodies finds no support in the language of the [Act] or in [its] legislative history").

[136] Pope v. Shalala, 998 F.2d 473, 483 (7th Cir. 1993) (quoting Manhattan General Equip. Co. v. Comm'r, 297 U.S. 129, 135 (1936)).

[137] See 42 U.S.C. 3612–14.

*HUD Response:* HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance,[138] and courts have agreed with HUD, including in *Ojo* v. *Farmers Group.*[139] Moreover, as discussed above, HUD has consistently interpreted the Act to permit violations to be established by proof of discriminatory effect. By formalizing the discriminatory effects standard, the rule will not, as one commenter suggested, "undermine the states' regulation of insurance." The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance * * * unless such Act specifically relates to the business of insurance." McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act. How the Act should be construed in light of McCarran-Ferguson depends on the facts at issue and the language of the relevant State law "relat[ing] to the business of insurance." Because this final rule does not alter the instruction of McCarran-Ferguson or its application as described in *Ojo* v. *Farmers Group,* it will not interfere with any State regulation of the insurance industry.

*Issue:* Some commenters stated that liability for insurance practices based on a disparate impact standard of proof is inappropriate because insurance is risk-based and often based on a multivariate analysis. A commenter wrote that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk," or might be forced to violate state laws that require insurance rates to be actuarially sound estimates of the expected value of all future costs associated with an individual risk transfer.

*HUD Response:* HUD believes that these concerns are misplaced. First, they presume that once a discriminatory effect is shown, the policy at issue is *per se* illegal. This is incorrect. Rather, as § 100.500 makes clear, the respondent or defendant has a full opportunity to defend the business justifications for its policies. This "burden-shifting framework" distinguishes "unnecessary barriers proscribed by the [Act] from valid policies and practices crafted to advance legitimate interests."[140] Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification.

*Issue:* Some commenters asked HUD to exempt insurance pricing from the rule, exempt Fair Access to Insurance Requirements ("FAIR") plans, or establish safe harbors for certain risk-related factors.

*HUD Response:* Creating exemptions or safe harbors related to insurance is unnecessary because, as discussed above, insurance practices with a legally sufficient justification will not violate the Act. Moreover, creating exemptions beyond those found in the Act would run contrary to Congressional intent.[141]

*Issue:* Another commenter stated that the "burden of proof issues" are difficult for insurers because they do not collect data on race and ethnicity and state insurance laws may prohibit the collection of such data.

*HUD Response:* The burden of proof is not more difficult for insurers than for a charging party or plaintiff alleging that an insurance practice creates a discriminatory effect. The charging party or plaintiff must initially show the discriminatory effect of the challenged practice using appropriate evidence that demonstrates the effect. If the charging party or plaintiff makes that showing, the burden shifts to the insurer to show that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests.

*Issue:* A commenter expressed concern that the rule may create strict liability for entities complying with contractual obligations set by third parties, including the federal government.

*HUD Response:* The commenter misconstrues the discriminatory effects standard, which permits a defendant or respondent to defend against a claim of discriminatory effect by establishing a legally sufficient justification, as specified in § 100.500.

*Issue:* Another commenter expressed concern that the citation to *Miller* v. *Countrywide Bank, N.A.,* 571 F. Supp. 2d 251 (D. Mass. 2008), in the preamble to the proposed rule suggested that liability could exist under the Act for the neutral actions of third parties and that such liability would be inconsistent with the Supreme Court's decision in *Meyer* v. *Holley,* 537 U.S. 280 (2003). This commenter requested that HUD revise the proposed rule to articulate the standard set forth in *Meyer.*

*HUD Response:* HUD does not agree with the commenter's suggestion. HUD recognizes that pursuant to *Meyer,* liability under the Act for corporate officers is determined by agency law. The proposed rule cited *Miller* as an example of how a lender's facially neutral policy allowing employees and mortgage brokers the discretion to price loans may be actionable under the Fair Housing Act. The decision in *Miller* is not inconsistent with the Supreme Court's ruling on agency in *Meyer,* and therefore HUD does not believe that the final rule needs to be revised in response to this comment.

*Issue:* Several commenters expressed concern that adoption of the proposed discriminatory effects standard would lead to lawsuits challenging lenders' use of credit scores, other credit assessment standards, or automated underwriting. A commenter stated that a lender's consideration of credit score or other credit assessment standards such as a borrower's debt-to-income ratio may have a disparate impact because of demographic differences. This commenter cited studies which indicate that borrowers who live in zip codes with a higher concentration of minorities are more likely to have lower credit scores and fewer savings. A commenter stated that credit scores are often used as the determining factor in a lender's origination practices and that certain underwriting software and investor securitization standards require a minimum credit score. The commenter further stated that HUD's Federal Housing Administration (FHA) program has recognized the value of credit scores in setting underwriting standards for FHA insured loans. According to the commenter, lenders have little ability or desire to override credit score standards, because manual underwriting is time consuming and staff-intensive. Another commenter expressed concern that, even if a lender was successful in defending its credit risk assessment practices under the burden-shifting approach, the lender would have to defend an expensive lawsuit and suffer harm to its reputation.

---

[138] *See, e.g.,* 24 CFR 100.70(d)(4) (Mar. 15, 1989) (defining "other prohibited sale and rental conduct" to include "refusing to provide * * * property or hazard insurance for dwellings or providing such * * * insurance differently" because of a protected class); 53 FR 44,992, 44,997 (Nov. 7, 1988) (preamble to proposed regulations stating that "discriminatory refusals to provide * * * adequate property or hazard insurance * * * has been interpreted by the Department and by courts to render dwellings unavailable").

[139] *See Ojo* v. *Farmers Group, Inc.,* 600 F.3d at 1208; *NAACP* v. *American Family Mut. Ins. Co.,* 978 F.2d 287, 297–301 (7th Cir. 1993); *Nationwide Mut. Ins. Co.* v. *Cisneros,* 52 F.3d 1351, 1355–1360 (6th Cir. 1995). *But see Mackey* v. *Nationwide Ins. Cos.,* 724 F.2d 419, 423–25 (4th Cir. 1984) (pre-Fair Housing Amendments Act and regulations pursuant thereto holding that Act does not cover insurance).

[140] *Graoch,* 508 F.3d at 374–75.

[141] *See Graoch,* 508 F.3d at 375 ("we cannot create categorical exemptions from [the Act] without a statutory basis" and "[n]othing in the text of the FHA instructs us to create practice-specific exceptions").

**11476** **Federal Register** / Vol. 78, No. 32 / Friday, February 15, 2013 / Rules and Regulations

Commenters from the lending industry also stated that the rule may have a chilling effect on lending in lower income communities. A commenter stated that the rule will create uncertainty in a skittish market, so lenders will be cautious about lending in lower income communities for fear of a legal challenge. Some of these commenters reasoned that underwriting requirements and risk requirements pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act (the Dodd-Frank Act (Pub. L. 111–203, approved July 21, 2010)), such as ability to repay, down payment requirements, and qualified residential mortgages, may result in a disparate impact because of demographic differences. Another commenter explained that the rule would eliminate in-portfolio mortgage loans at community banks, which provide mortgage credit to borrowers who may not qualify for a secondary market transaction.

*HUD Response:* HUD does not believe that the rule will have a chilling effect on lending in lower income communities or that it will encourage lawsuits challenging credit scores, other credit assessment standards, or the requirements of the Dodd-Frank Act. As discussed above, the rule does not change the substantive law; eleven federal courts of appeals have recognized discriminatory effects liability under the Act and over the years courts have evaluated both meritorious and non-meritorious discriminatory effects claims challenging lending practices.[142] As HUD has reiterated, the rule formalizes a substantive legal standard that is well recognized by both courts and participants in the lending industry for assessing claims of discriminatory effects. Indeed, in the lending context, at least since the issuance of the Joint Policy Statement nearly 18 years ago, non-depository lenders, banks, thrifts, and credit unions have been on notice that federal regulatory and enforcement agencies, including HUD and the Department of Justice, may apply a disparate impact analysis in their examinations and investigations under both the Fair Housing Act and ECOA. The regulations and Staff Commentary implementing ECOA also explicitly prohibit unjustified discriminatory effects.[143] Thus, neither a chilling effect nor a wealth of new lawsuits can be expected as a result of this rule. Rather, HUD anticipates that this rule will encourage the many lenders and other entities that already conduct internal discriminatory effects analyses of their policies to review those analyses in light of the now uniform standard for a legally sufficient justification found in § 100.500. Indeed, lender compliance should become somewhat easier due to the rule's clear and nationally uniform allocation of burdens and clarification of the showings each party must make.

*Issue:* Some commenters expressed concern that faced with the threat of disparate impact liability, lenders might extend credit to members of minority groups who do not qualify for the credit.

*HUD Response:* The Fair Housing Act does not require lenders to extend credit to persons not otherwise qualified for a loan. As discussed previously, the final rule formalizes a standard of liability under the Act that has been in effect for decades. HUD is unaware of any lender found liable under the discriminatory effects standard for failing to make a loan to a member of a minority group who did not meet legitimate nondiscriminatory credit qualifications.

*Issue:* Several other commenters expressed a concern that discriminatory effects liability might have a chilling effect on efforts designed to preserve or develop affordable housing, including pursuant to HUD's own programs, because much of the existing affordable housing stock is located in areas of minority concentration. A commenter stated that resources designed to support the development of affordable housing will be "deflect[ed]" away so as to respond to claims of disparate impact discrimination. Another commenter requested that HUD issue guidance to the affordable housing industry as they administer HUD programs.

Other commenters expressed concern about potential liability for administrators of the federal Low Income Housing Tax Credit (LIHTC) program. These commenters reasoned that the concentration of affordable housing stock in low-income areas, combined with federal requirements and incentives which encourage the deployment of tax credits in low-income communities, may result in discriminatory effects liability for agencies administering the LIHTC program. Several commenters asked HUD to specify in the final rule that the mere approval of LIHTC projects in minority areas alone does not establish a prima facie case of disparate impact under the Act or that locating LIHTC projects in low-income areas is a legally sufficient justification to claims of disparate impact discrimination. A commenter requested that HUD provide guidance to such agencies.

*HUD Response:* HUD does not expect the final rule to have a chilling effect on the development and preservation of affordable housing because, as discussed above, the rule does not establish a new form of liability, but instead serves to formalize by regulation a standard that has been applied by HUD and the courts for decades, while providing nationwide uniformity of application. The rule does not mandate that affordable housing be located in neighborhoods with any particular characteristic, but requires, as the Fair Housing Act already does, only that housing development activities not have an unjustified discriminatory effect.

Concerns of a chilling effect on affordable housing activities are belied by the prevalence of cases where the discriminatory effects method of proof has been used by plaintiffs seeking to develop such housing[144] and even by the less frequent instances where

---

[142] *Compare Ramirez* v. *GreenPoint Mortg. Funding, Inc.*, 633 F. Supp. 2d 922, 927–28 (N.D. Cal. 2008) (holding that the Act permits disparate impact claims and finding that plaintiffs adequately pled a specific and actionable policy that had a disparate impact on members of a protected class); *Miller* v. *Countrywide Bank, N.A.*, 571 F. Supp. 2d 251, 258 (D. Mass. 2008) (denying defendants motion to dismiss and finding that plaintiffs adequately pled a specific and actionable policy, a disparate impact, and facts raising a sufficient inference of causation); and *Hoffman* v. *Option One Mortg. Corp.*, 589 F. Supp. 2d 1009, 1011–12 (N.D. Ill. 2008) (holding that the Act permits disparate impact claims and finding that plaintiffs adequately pled a specific and actionable policy, a disparate impact, and facts raising a sufficient inference of causation), *with Ng* v. *HSBC Mortgage Corp.*, No. 07–CV–5434, 2010 WL 889256, *12 (E.D.N.Y. Mar. 10, 2010) (dismissing plaintiff's claim of disparate impact discrimination and finding that the claim was "alleged with little more than buzzwords and conclusory labels").

[143] *See* 12 CFR 1002.6(a); 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)–2 ; *see also* Consumer Financial Protection Bureau Bulletin 2012–04 (Apr. 18, 2012) ("CFPB reaffirms that the legal doctrine of disparate impact remains applicable as the Bureau exercises its supervision and enforcement authority to enforce compliance with the ECOA.").

[144] *See, e.g., Huntington Branch*, 844 F.2d at 926 (reversing district court and finding Fair Housing Act violations based on discriminatory effect of town's refusal to rezone site for affordable housing); *Greater New Orleans Fair Hous. Action Ctr.* v. *St. Bernard Parish*, 648 F. Supp. 2d 805 (E.D. La. 2009) (finding parish's subversion of attempts to develop affordable housing had a discriminatory effect in violation of the Fair Housing Act); *Dews* v. *Town of Sunnyvale*, 109 F. Supp. 2d 526 (N.D. Tex. 2000) (finding that developer established Fair Housing Act violation based on Town's rejection of development application under discriminatory effects method); *Sunrise Dev.* v. *Town of Huntington*, 62 F. Supp. 2d 762 (E.D.N.Y. 1999) (finding the plaintiff had established prima facie case of discriminatory effect and granting preliminary injunction requiring town to consider plaintiff's zoning application); *Summerchase Ltd. Pshp. I* v. *City of Gonzales*, 970 F. Supp. 522 (M.D. La. 1997) (denying defendant's motion for summary judgment on developer's claim that parish's denial of building permits for affordable housing development had a discriminatory effect in violation of the Fair Housing Act).

agencies administering affordable housing programs have been defendants.[145] Rather than indicating a chilling effect, existing case law shows that use of the discriminatory effects framework has promoted the development of affordable housing, while allowing due consideration for substantial, legitimate, nondiscriminatory interests involved in providing such housing. Moreover, recipients of HUD funds already must comply with a variety of civil rights requirements. This includes the obligation under Title VI of the Civil Rights Act of 1964 and its applicable regulations to refrain from discrimination, either by intent or effect, on the basis of race, color, or national origin; the obligation under the Fair Housing Act to affirmatively further fair housing in carrying out HUD programs; and HUD program rules designed to foster compliance with the Fair Housing Act and other civil rights laws. As discussed throughout this preamble, allegations of discriminatory effects discrimination must be analyzed on a case-by-case basis using the standards set out in § 100.500. HUD will issue guidance addressing the application of the discriminatory effects standard with respect to HUD programs.

*Issue:* Like commenters who requested "safe harbors" or exemptions for the insurance and lending industries, some commenters requested that the proposed rule be revised to provide "safe harbors" or exemptions from liability for programs designed to preserve affordable housing or revitalize existing communities. A commenter requested that the final rule provide safe harbors for state and local programs that have legitimate policy and safety goals such as protecting water resources, promoting transit orientated development, and revitalizing communities. Other commenters requested safe harbors or exemptions for entities that are meeting requirements or standards established by federal or state law or regulation, such as the Federal Credit Union Act, the Dodd-Frank Act, HAMP and HARP, or by government-sponsored enterprises or investors.

*HUD Response:* HUD does not believe that the suggested safe harbors or exemptions from discriminatory effects liability are appropriate or necessary. HUD notes that, in seeking these exemptions, the commenters appear to misconstrue the discriminatory effects

standard, which permits practices with discriminatory effects if they are supported by a legally sufficient justification. The standard thus recognizes that a practice may be lawful even if it has a discriminatory effect. HUD notes further that Congress created various exemptions from liability in the text of the Act,[146] and that in light of this and the Act's important remedial purposes, additional exemptions would be contrary to Congressional intent.

*Issue:* Several commenters expressed concern that in complying with new Dodd-Frank Act mortgage reforms, including in determining that consumers have an ability to repay, a lender necessarily "will face liability under the Proposed Rule."

*HUD Response:* HUD reiterates that the lender is free to defend any allegations of illegal discriminatory effects by meeting its burden of proof at § 100.500. Moreover, if instances were to arise in which a lender's efforts to comply with the Dodd-Frank Act were challenged under the Fair Housing Act's discriminatory effects standard of liability, those same activities most likely would be subject to a similar challenge under ECOA and Regulation B, which also prohibit lending practices that have a discriminatory effect based on numerous protected characteristics.[147] The Dodd-Frank Act created the Consumer Financial Protection Bureau to combat both unfair and deceptive practices and discriminatory practices in the consumer financial industry, and it gave the Consumer Financial Protection Bureau authority to enforce ECOA.[148] *See* Dodd-Frank Act sections 1402–1403 (enacting section 129B of the Truth in Lending Act "to assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive," and, as part of that section, requiring the Consumer Financial Protection Bureau to create regulations that prohibit "abusive or unfair lending practices that promote disparities among consumers of equal credit worthiness but of different race, ethnicity, gender, or age"); *see also* Dodd-Frank Act section 1013(c) (establishing the Consumer Financial Protection Bureau's Office of Fair Lending and Equal Opportunity to provide enforcement of fair lending laws, including ECOA, and coordinate

fair lending efforts within the Bureau and with other federal and state agencies); *id.* section 1085 (transferring regulatory authority for ECOA to the Consumer Financial Protection Bureau).

*G. Illustrations of Practices With Discriminatory Effects*

Consistent with HUD's existing Fair Housing Act regulations, which contain illustrations of practices that violate the Act, the proposed rule specified additional illustrations of such practices. The November 16, 2011, rule proposed to add illustrations to 24 CFR 100.65, 100.70 and 100.120. The final rule revises these illustrations in the manner described below.

Because the illustrations in HUD's existing regulations include practices that may violate the Act based on an intent or effects theory, and proposed § 100.65(b)(6) describes conduct that is already prohibited in § 100.65(b)(4)—the provision of housing-related services—and § 100.70(d)(4)—the provision of municipal services—this final rule eliminates proposed § 100.65(b)(6). This will avoid redundancy in HUD's Fair Housing Act regulations, and its elimination from the proposed rule is not intended as a substantive change.

Commenters raised the following issues with respect to the proposed rule's illustrations of discriminatory practices.

*Issue:* A commenter stated that the examples specified by the proposed rule describe the types of actions that the commenter's "clients encounter regularly." Examples of potentially discriminatory laws or ordinances cited by commenters include ordinances in largely white communities that establish local residency requirements, limit the use of vouchers under HUD's Housing Choice Voucher program, or set large-lot density requirements. Commenters suggested that language should be added to proposed § 100.70(d)(5), which provides, as an example, "[i]mplementing land-use rules, policies or procedures that restrict or deny housing opportunities in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns" based on a protected class. Commenters stated that this example should include not just the word "implementing," but also the words "enacting" "maintaining," and/or "applying" because the discriminatory effect of a land-use decision may occur from the moment of enactment. A commenter suggested that the word "ordinances" should be added to the example to make clear that the Act applies to all types of exclusionary land-use actions.

---

[145] *Compare, e.g., In re Adoption of 2003 Low Income Housing Tax Credit Qualified Allocation Plan,* 369 N.J. Super. 2 (N.J. Sup. Ct. App. Div. 2004) *with Inclusive Cmtys. Project, Inc.* v. *Tex. Dep't of Hous. & Cmty. Affairs,* 749 F. Supp. 2d 48 (N.D. Tex. 2010).

[146] *See, e.g.,* 42 U.S.C. 3603(b)(1) (exempting from most of section 804 of the Act an owner's sale or rental of his single-family house if certain conditions are met).

[147] *See* 15 U.S.C. 1691 *et seq;* 12 CFR part 1002.

[148] *See* 12 U.S.C. 5491 *et seq.*

*HUD Response:* HUD reiterates that the illustrations contained in HUD's regulations are merely examples. The scope and variety of practices that may violate the Act make it impossible to list all examples in a rule. Nevertheless, HUD finds it appropriate to revise proposed § 100.70(d)(5) in this final rule in order to confirm that a land-use ordinance may be discriminatory from the moment of enactment. The final rule therefore changes "[i]mplementing land-use rules, policies, or procedures * * * " to "[e]nacting or implementing land-use rules, ordinances, policies, or procedures * * * ." It is not necessary to add "maintaining" or "applying" to § 100.70(d)(5) because the meaning of these words in this context is indistinguishable from the meaning of "implementing."

Because the illustrated conduct may violate the Act under either an intent theory, an effects theory, or both, HUD also finds it appropriate to replace "in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns" because of a protected characteristic with "otherwise make unavailable or deny dwellings because of" a protected characteristic. As discussed in the "Validity of Discriminatory Effects Liability under the Act" section above, the phrase "otherwise make unavailable or deny" encompasses discriminatory effects liability. This revised language, therefore, is broader because it describes land-use decisions that violate the Act because of either a prohibited intent or an unjustified discriminatory effect. The final rule makes a similar revision to each of the illustrations so they may cover violations based on intentional discrimination or discriminatory effects.

*Issue:* A commenter requested that HUD add as an example the practice of prohibiting from housing individuals with records of arrests or convictions. This commenter reasoned that such blanket prohibitions have a discriminatory effect because of the disproportionate numbers of minorities with such records. The commenter stated further that HUD should issue guidance on this topic similar to guidance issued by the Equal Employment Opportunity Commission. Another commenter expressed concern that the rule would restrict housing providers from screening tenants based on criminal arrest and conviction records. This commenter also asked HUD to issue guidance to housing providers on appropriate background screening.

*HUD Response:* Whether any discriminatory effect resulting from a

housing provider's or operator's use of criminal arrest or conviction records to exclude persons from housing is supported by a legally sufficient justification depends on the facts of the situation. HUD believes it may be appropriate to explore the issue more fully and will consider issuing guidance for housing providers and operators.

*Issue:* Several commenters suggested revisions to proposed § 100.120(b)(2), which specifies as an example "[p]roviding loans or other financial assistance in a manner that results in disparities in their cost, rate of denial, or terms or conditions, or that has the effect of denying or discouraging their receipt on the basis of race, color, religion, sex, handicap, familial status, or national origin." These commenters stated that proposed § 100.120(b)(2) does not contain language concerning the second type of discriminatory effect, i.e., creating, perpetuating or increasing segregation. They urged HUD to add language making clear that the provision of loans or other financial assistance may result in either type of discriminatory effect.

In addition, several commenters asked HUD to clarify that mortgage servicing with a discriminatory effect based on a protected characteristic may violate the Act.

*HUD Response:* As discussed above, proposed § 100.120(b)(2) is revised in the final rule to cover both intentional discrimination and discriminatory effects. HUD also agrees that residential mortgage servicing is covered by the Act. It is a term or condition of a loan or other financial assistance, covered by section 805 of the Act.[149] Accordingly, the final rule adds a § 100.130(b)(3), which provides an illustration of discrimination in the terms or conditions for making available loans or financial assistance, in order to show that discriminatory loan servicing (and other discriminatory terms or conditions of loans and other financial assistance) violate the Act's proscription on "discriminat[ing] * * * in the terms or conditions of [a residential real estate-related transaction]."

*Issue:* A commenter expressed concern that the language in proposed § 100.120(b)(2) would allow for lawsuits based only on statistical data produced under HMDA.

*HUD Response:* HUD and courts have recognized that analysis of loan level data identified though HMDA may indicate a disparate impact.[150] Such a

showing, however, does not end the inquiry. The lender would have the opportunity to refute the existence of the alleged impact and establish a substantial, legitimate, nondiscriminatory interest for the challenged practice, and the charging party or plaintiff would have the opportunity to demonstrate that a less discriminatory alternative is available to the lender.

*Issue:* A commenter stated that HUD should not add any of the new examples unless the final rule makes clear that the specified practices are not *per se* violations of the Act, but rather must be assessed pursuant to the standards set forth in § 100.500. According to the commenter, the new examples may be misconstrued because they state only the initial finding described in § 100.500.

*HUD Response:* HUD agrees that, when a practice is challenged under a discriminatory effects theory, the practice must be reviewed under the standards specified in § 100.500. The final rule therefore adds a sentence to the end of § 100.5(b), which makes clear that discriminatory effects claims are assessed pursuant to the standards stated in § 100.500.

### H. Other Issues

*Issue:* A commenter requested that HUD examine the overall compliance burden of the regulation on small businesses, noting that Executive Order 13563 requires a cost-benefit analysis.

*HUD Response:* In examining the compliance burden on small institutions, the governing authority is the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*, which provides, among other things, that the requirements to do an initial and final regulatory flexibility analysis "shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." Thus, the focus is on whether the rule—and not the underlying statute or preexisting administrative practice and case law—will have a significant economic impact. For this rule, the impact primarily arises from the Fair Housing Act itself, not only as interpreted by HUD, but also as interpreted by federal courts. Because this final rule provides a uniform burden-shifting test for determining

---

[149] 42 U.S.C. 3605. Discrimination in residential mortgage servicing may also violate § 804 of the Act. 42 U.S.C. 3604.

[150] *See City of Memphis and Shelby Cnty.* v. *Wells Fargo, N.A.*, No. 09–2857–STA, 2011 U.S. Dist.

LEXIS 48522 at *45 (W.D. Tenn. May 4, 2011); *Mayor and City Council of Baltimore* v. *Wells Fargo Bank, N.A.*, No. JFM–08–62, 2011 U.S. Dist. LEXIS 44013 (D. Md. April 22, 2011); *Steele* v. *GE Money Bank*, No. 08–C–1880, 2009 U.S. Dist. LEXIS 11536 (N.D. Ill. Feb. 17, 2009); *Taylor* v. *Accredited Home Lenders, Inc.*, 580 F. Supp. 2d 1062 (S.D. Cal. 2008).

whether a given action or policy has an unjustified discriminatory effect, the rule serves to reduce regulatory burden for all entities, large or small, by establishing certainty and clarity with respect to how a determination of unjustified discriminatory effect is to be made.

The requirement under the Fair Housing Act not to discriminate in the provision of housing and related services is the law of the nation. We presume that the vast majority of entities both large and small are in compliance with the Fair Housing Act. Furthermore, for the minority of entities that have, in the over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will simply be the costs of compliance with a preexisting statute, administrative practice, and case law. Compliance with the Fair Housing Act has for almost 40 years included the requirement to refrain from undertaking actions that have an unjustified discriminatory effect. The rule does not change that substantive obligation; it merely formalizes it in regulation, along with the applicable burden-shifting framework.

Variations in the well-established discriminatory effects theory of liability under the Fair Housing Act, discussed earlier in the preamble, are minor and making them uniform will not have a significant economic impact. The allocation of the burdens of proof among the parties, described in the rule, are methods of proof that only come into play if a complaint has been filed with HUD, a state or local agency or a federal or state court; that is, once an entity has been charged with discriminating under the Fair Housing Act. The only economic impact discernible from this rule is the cost of the difference, if any, between defense of litigation under the burden-shifting test on the one hand, and defense of litigation under the balancing or hybrid test on the other. In all the tests, the elements of proof are similar. Likewise, the costs to develop and defend such proof under either the burden-shifting or balancing tests are similar. The only difference is at which stage of the test particular evidence must be produced. There would not, however, be a significant economic impact on a substantial number of small entities as a result of this rule.

Executive Order 13563 (Improving Regulations and Regulatory Review) reaffirms Executive Order 12866, which requires that agencies conduct a benefit/cost assessment for rules that "have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments or communities." As stated in Section VII of this preamble below, this rule is not "economically significant" within the meaning in Executive Order 12866, and therefore a full benefit/cost assessment is not required. This final rule does not alter the established law that facially neutral actions that have an unjustified discriminatory effect are violations of the Fair Housing Act. What this rule does is formalize that well-settled interpretation of the Act and provide consistency in how such discriminatory effects claims are to be analyzed.

## VI. This Final Rule

For the reasons presented in this preamble, this final rule formalizes the longstanding interpretation of the Fair Housing Act to include discriminatory effects liability and establishes a uniform standard of liability for facially neutral practices that have a discriminatory effect. Under this rule, liability is determined by a burden-shifting approach. The charging party or plaintiff in an adjudication first must bear the burden of proving its prima facie case of either disparate impact or perpetuation of segregation, after which the burden shifts to the defendant or respondent to prove that the challenged practice is necessary to achieve one or more of the defendant's or respondent's substantial, legitimate, nondiscriminatory interests. If the defendant or respondent satisfies this burden, the charging party or plaintiff may still establish liability by demonstrating that these substantial, legitimate, nondiscriminatory interests could be served by a practice that has a less discriminatory effect.

### A. Discriminatory Effect—Subpart G

#### 1. Scope

This final rule adds a new sentence to the end of paragraph (b) in § 100.5, which states: "The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent, consistent with the standards outlined in § 100.500."

#### 2. Discriminatory Effect Prohibited (§ 100.500)

Consistent with HUD's November 16, 2011, proposed rule, this final rule adds a new subpart G, entitled "Discriminatory Effect," to its Fair Housing Act regulations in 24 CFR part 100. Section 100.500 provides that the Fair Housing Act may be violated by a practice that has a discriminatory effect, as defined in § 100.500(a), regardless of whether the practice was adopted for a discriminatory purpose. The practice may still be lawful if supported by a legally sufficient justification, as defined in § 100.500(b). The respective burdens of proof for establishing or refuting an effects claim are set forth in § 100.500(c). Section 100.500(d) clarifies that a legally sufficient justification may not be used as a defense against a claim of intentional discrimination. It should be noted that it is possible to bring a claim alleging both discriminatory effect and discriminatory intent as alternative theories of liability. In addition, the discriminatory effect of a challenged practice may provide evidence of the discriminatory intent behind the practice. This final rule applies to both public and private entities because the definition of "discriminatory housing practice" under the Act makes no distinction between the two.

#### 3. Discriminatory Effect Defined (§ 100.500(a))

Section 100.500(a) provides that a "discriminatory effect" occurs where a facially neutral practice actually or predictably results in a discriminatory effect on a group of persons protected by the Act (that is, has a disparate impact), or on the community as a whole on the basis of a protected characteristic (perpetuation of segregation). Any facially neutral action, e.g., laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act and this rule. For examples of court decisions regarding policies or practices that may have a discriminatory effect, please see the preamble to the proposed rule at 76 FR 70924–25.

#### 4. Legally Sufficient Justification (§ 100.500(b))

Section 100.500(b), as set forth in the regulatory text of this final rule, provides that a practice or policy found to have a discriminatory effect may still be lawful if it has a "legally sufficient justification."

#### 5. Burden of Proof (§ 100.500(c))

Under § 100.500(c), the charging party or plaintiff first bears the burden of proving its prima facie case: that is, that a practice caused, causes, or predictably will cause a discriminatory effect on a

group of persons or a community on the basis of race, color, religion, sex, disability, familial status, or national origin. Once the charging party or the plaintiff has made its prima facie case, the burden of proof shifts to the respondent or defendant to prove that the practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant. If the respondent or defendant satisfies its burden, the charging party or plaintiff may still establish liability by proving that these substantial, legitimate, nondiscriminatory interests could be served by another practice that has a less discriminatory effect.

*B. Illustrations of Practices With Discriminatory Effects*

This final rule adds or revises the following illustrations of discriminatory housing practices:

The final rule adds to § 100.70 new paragraph (d)(5), which provides as an illustration of other prohibited conduct "[e]nacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings because of race, color, religion, sex, handicap, familial status, or national origin."

Section 100.120, which gives illustrations of discrimination in the making of loans and in the provision of other financial assistance, is streamlined, and paragraph (b)(2) now reads as set forth in the regulatory text of this final rule

In § 100.130, the final rule also amends paragraph (b)(2) and adds new paragraph (b)(3). The words "or conditions" is added after "terms," and "cost" is added to the list of terms or conditions in existing paragraph (b)(2). New paragraph (b)(3) includes servicing as an illustration of terms or conditions of loans or other financial assistance covered by section 805 of the Act: "Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin."

**VII. Findings and Certifications**

*Regulatory Review—Executive Orders 13563 and 12866*

Executive Order 13563 ("Improving Regulation and Regulatory Review")

directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs, emphasizes the importance of quantifying both costs and benefits, of harmonizing rules, of promoting flexibility, and of periodically reviewing existing rules to determine if they can be made more effective or less burdensome in achieving their objectives. Under Executive Order 12866 ("Regulatory Planning and Review"), a determination must be made whether a regulatory action is significant and therefore, subject to review by the Office of Management and Budget (OMB) in accordance with the requirements of the order. This rule was determined to be a "significant regulatory action" as defined in section 3(f) of Executive Order 12866 (although not an economically significant regulatory action, as provided under section 3(f)(1) of the Executive Order).

This rule formalizes the longstanding interpretation of the Fair Housing Act to include discriminatory effects liability, and establishes uniform, clear standards for determining whether a practice that has a discriminatory effect is in violation of the Fair Housing Act, regardless of whether the practice was adopted with intent to discriminate. As stated in the Executive Summary, the need for this rule arises because, although all federal courts of appeals that have considered the issue agree that Fair Housing Act liability may be based solely on discriminatory effects, there is a small degree of variation in the methodology of proof for a claim of effects liability. As has been discussed in the preamble to this rule, in establishing such standards HUD is exercising its rulemaking authority to bring uniformity, clarity, and certainty to an area of the law that has been approached by HUD and federal courts across the nation in generally the same way, but with minor variations in the allocation of the burdens of proof.[151] A uniform rule would simplify compliance with the Fair Housing Act's discriminatory effects standard, and decrease litigation associated with such claims. By providing certainty in this area to housing providers, lenders, municipalities, realtors, individuals engaged in housing transactions, and courts, this rule would reduce the burden associated with litigating discriminatory effect cases under the Fair Housing Act by clearly establishing which party has the burden of proof, and how such burdens are to be met. Additionally, HUD believes the rule

may even help to minimize litigation in this area by establishing uniform standards. With a uniform standard, entities are more likely to conduct self-testing and check that their practices comply with the Fair Housing Act, thus reducing their liability and the risk of litigation. A uniform standard is also a benefit for entities operating in multiple jurisdictions. Also, legal and regulatory clarity generally serves to reduce litigation because it is clearer what each party's rights and responsibilities are, whereas lack of consistency and clarity generally serves to increase litigation. For example, once disputes around the court-defined standards are eliminated by this rule, non-meritorious cases that cannot meet the burden under § 100.500(c)(1) are likely not to be brought in the first place, and a respondent or defendant that cannot meet the burden under § 100.500(c)(2) may be more inclined to settle at the pre-litigation stage.

Accordingly, while this rule is a significant regulatory action under Executive Order 12866 in that it establishes, for the first time in regulation, uniform standards for determining whether a housing action or policy has a discriminatory effect on a protected group, it is not an economically significant regulatory action. The burden reduction that HUD believes will be achieved through uniform standards will not reach an annual impact on the economy of $100 million or more, because HUD's approach is not a significant departure from HUD's interpretation to date or that of the majority of federal courts. Although the burden reduction provided by this rule will not result in economically significant impact on the economy, it nevertheless provides some burden reduction through the uniformity and clarity presented by HUD's standards promulgated through this final rule and is therefore consistent with Executive Order 13563.

The docket file is available for public inspection in the Regulations Division, Office of the General Counsel, Room 10276, 451 7th Street SW., Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at 800–877–8339.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires

---

[151] *See, e.g.,* the extensive discussion of the various options in *Graoch,* 508 F.3d at 371–375.

an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. For the reasons stated earlier in this preamble in response to public comment on the issue of undue burden on small entities, and discussed here, HUD certifies that this rule will not have significant economic impact on a substantial number of small entities.

It has long been the position of HUD, confirmed by federal courts, that practices with discriminatory effects may violate the Fair Housing Act. As noted in the preamble to the proposed rule (76 FR 70921) and this preamble to the final rule, this long-standing interpretation has been supported by HUD policy documents issued over the last decades, is consistent with the position of other Executive Branch agencies, and has been adopted and applied by every federal court of appeals to have reached the question. Given, however, the variation in how the courts and even HUD's own ALJs have applied that standard, this final rule provides for consistency and uniformity in this area, and hence predictability, and will therefore reduce the burden for all seeking to comply with the Fair Housing Act. Furthermore, HUD presumes that given the over 40-year history of the Fair Housing Act, the majority of entities, large or small, currently comply and will remain in compliance with the Fair Housing Act. For the minority of entities that have, in the over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will simply be the costs of compliance with a preexisting statute. The rule does not change that substantive obligation; it merely sets it forth in a regulation. While this rule provides uniformity as to specifics such as burden of proof, HUD's rule does not alter the substantive prohibitions against discrimination in fair housing law, which were established by statute and developed over time by administrative and federal court case law. Any burden on small entities is simply incidental to the pre-existing requirements to comply with this body of law. Accordingly, the undersigned certifies that this final rule will not have a significant economic impact on a substantial number of small entities.

*Environmental Impact*

This final rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled ''Federalism'') prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) Imposes substantial direct compliance costs on state and local governments and is not required by statute, or (ii) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This final rule does not have federalism implications and does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

*Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (UMRA) establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and on the private sector. This final rule does not impose any federal mandates on any state, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

List of Subjects in 24 CFR Part 100

Civil rights, Fair housing, Individuals with disabilities, Mortgages, Reporting and recordkeeping requirements.

For the reasons discussed in the preamble, HUD amends 24 CFR part 100 as follows:

## PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

■ 1. The authority citation for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

### Subpart A—General

■ 2. In § 100.5, add the following sentence at the end of paragraph (b):

#### § 100.5   Scope.

\*      \*      \*      \*      \*

(b) \* \* \* The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent,

consistent with the standards outlined in § 100.500.

\*      \*      \*      \*      \*

### Subpart B—Discriminatory Housing Practices

■ 3. In § 100.70, add new paragraph (d)(5) to read as follows:

#### § 100.70   Other prohibited conduct.

\*      \*      \*      \*      \*

(d) \* \* \*

(5) Enacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

### Subpart C—Discrimination in Residential Real Estate-Related Transactions

■ 4. In § 100.120, revise paragraph (b) to read as follows:

#### § 100.120   Discrimination in the making of loans and in the provision of other financial assistance.

\*      \*      \*      \*      \*

(b) Practices prohibited under this section in connection with a residential real estate-related transaction include, but are not limited to:

(1) Failing or refusing to provide to any person information regarding the availability of loans or other financial assistance, application requirements, procedures or standards for the review and approval of loans or financial assistance, or providing information which is inaccurate or different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Providing, failing to provide, or discouraging the receipt of loans or other financial assistance in a manner that discriminates in their denial rate or otherwise discriminates in their availability because of race, color, religion, sex, handicap, familial status, or national origin.

■ 5. In § 100.130, revise paragraph (b)(2) and add new paragraph (b)(3) to read as follows:

#### § 100.130   Discrimination in the terms and conditions for making available loans or other financial assistance.

\*      \*      \*      \*      \*

(b) \* \* \*

(2) Determining the type of loan or other financial assistance to be provided with respect to a dwelling, or fixing the amount, interest rate, cost, duration or other terms or conditions for a loan or

other financial assistance for a dwelling or which is secured by residential real estate, because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin.

■ 6. In part 100, add a new subpart G to read as follows:

## Subpart G—Discriminatory Effect

### § 100.500  Discriminatory effect prohibited.

Liability may be established under the Fair Housing Act based on a practice's discriminatory effect, as defined in paragraph (a) of this section, even if the practice was not motivated by a discriminatory intent. The practice may still be lawful if supported by a legally sufficient justification, as defined in paragraph (b) of this section. The burdens of proof for establishing a violation under this subpart are set forth in paragraph (c) of this section.

(a) *Discriminatory effect.* A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.

(b) *Legally sufficient justification.* (1) A legally sufficient justification exists where the challenged practice:

(i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and

(ii) Those interests could not be served by another practice that has a less discriminatory effect.

(2) A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative. The burdens of proof for establishing each of the two elements of a legally sufficient justification are set forth in paragraphs (c)(2) and (c)(3) of this section.

(c) *Burdens of proof in discriminatory effects cases.* (1) The charging party, with respect to a claim brought under 42 U.S.C. 3612, or the plaintiff, with respect to a claim brought under 42 U.S.C. 3613 or 3614, has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect.

(2) Once the charging party or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.

(3) If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.

(d) *Relationship to discriminatory intent.* A demonstration that a practice is supported by a legally sufficient justification, as defined in paragraph (b) of this section, may not be used as a defense against a claim of intentional discrimination.

Dated: February 8, 2013.

**John Trasviña,**

*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2013–03375 Filed 2–14–13; 8:45 am]

**BILLING CODE 4210–67–P**

problem of residential segregation and its attendant evils, Congress appears to be oblivious to what has been happening throughout the country. At this moment, 22 States have adopted fair housing laws, five of them during 1967. The laws of four other States, Connecticut, Indiana, Massachusetts, and, I am proud to say, my own State of Minnesota, were amended this past year in order to strengthen them. Minnesota's law is now one of the strongest in the Nation and covers most of the housing market.

In addition to the States, 84 cities, villages, and counties, together with the District of Columbia, have adopted fair housing ordinances. And for those of us who live in the Metropolitan Washington area and believe housing discrimination is a national disgrace, it has been a source of local pride to have Maryland this year become the first border State to adopt a fair housing law and both Montgomery County and Prince Georges County adopt separate ordinances that improve upon the statewide law.

It is some measure of the rate at which such laws are being passed that of the 84 local ordinances, 43 were adopted in 1967, the great majority since midsummer.

And even these figures are becoming outdated almost as I speak. For example, Detroit, Mich., adopted a fair housing law only last week. In Alexandria, Va., just across the Potomac River, the city council is establishing a new department to carry out a voluntary open housing policy. And within the past few days, open housing laws have been enacted in Louisville, Ky., by a newly elected Democratic city council which reversed the decision of the previous Republican-controlled council, and in Milwaukee, Wis., where a white Catholic priest, Father James Groppi, has led more than 100 marches demanding enactment of a strong open housing law.

Perhaps at this point some Members of this body will feel that if progress is being made in open housing, there is no need for Congress to act. I do not believe so. These scattered and local developments, far from absolving us from action, make it even more important than before that Congress enact a national fair housing law that will place all States and all localities upon an equal footing.

The local and State open housing laws being enacted represent a hodgepodge of good and bad. Some are good laws, but most are ineffective at best, and a few are tokenistic frauds. Too many of them have glaring loopholes in coverage and totally inadequate enforcement.

But they all represent progress for their mere adoption is an official recognition by the community that housing discrimination does in fact exist, that it is undesirable, and that laws are needed to eliminate it.

As the Milwaukee Journal noted in an editorial following approval of that city's limited open housing law:

> Local enforcement of the open housing right within the narrow coverage limits of the state law . . . has finally become the official policy of the city of Milwaukee. It is no great thing, but at least the council did move. It is a beginning.

And, Members of the Senate, it is time Congress made its beginning. This is a case where it is manifestly clear that, rather than leading in the fight for open housing throughout this land, the Federal Congress in fact is one of the slowest institutions to respond to what is known concerning the need for this kind of activity.

There is no longer any economic, political, moral, or other justification for segregated housing. On this one issue alone, liberals and conservatives alike can be condemned, and we all know that justice, morality and the national interest demand that the Congress act.

As the chief author of the Federal fair housing bill, I have found nothing more frustrating than trying to make real progress on this issue—which for the first time involves northerners as well as southerners—and call upon this Nation to declare the principle that we are going to live together and not separately.

The charge is made against those of us who have participated in the past civil rights debates in this body that we find it very easy to point the finger at the South, but that we find it difficult to point our finger at the North where racial patterns exist.

I accept the challenge. I think all representatives of the Northern, Western, and Southwestern States of this Union ought to realize that one of the reasons why we resent that charge is that there is some truth to it.

This issue raises the question whether those of us who have northern and western constituencies favor civil rights measures which are manifestly needed when they affect, not just Georgia or Alabama, but Minnesota, Montana, and every State in the Union. Each of us will have to leave this Chamber with a red face if we insist that civil rights measures are only for the South, and not for matters which we know exist just as fully throughout the northern and western communities of this Nation.

The next point is that there is a pent-up demand for more housing among ghetto residents. For example, an HHFA study in 1963, based on 1950 and 1960 censuses, found that in the 21 areas analyzed, the total number of nonwhites earning more than $4,000 a year increased nearly 15 times from 1949 to 1959—from 59,000 to 940,000 persons.

In the Commission on Civil Rights Report for 1967, on page 60, these remarks are found:

> Asked at an open meeting what she would do if she had a better income, Mrs. Charlotte Gordon, a resident of a Gary slum, replied: "The first thing I would do myself is to move out of the neighborhood."
>
> Another resident of the same area, Mrs. Fries, in reply to the identical question, said she would like to move to "someplace where we could have a lawn, you know, and just breathe free air for a change."

To many slum residents, just as to other Americans, moving to a better neighborhood may mean more than obtaining better housing. For one thing, it may give their children the opportunity to grow up in a healthier atmosphere. Mrs. Gordon explained why she wanted to move:

> "I feel this is a slum, and if your children grow up in this kind of thing, never seeing anything else, what are they to know about

it? You tell them about it, but how can you tell them about it?"

The opportunity to move outside the ghetto also may mean the opportunity to send children to better schools. And it may bring one closer to job opportunities; the flight of jobs from central cities would not present a barrier to employment opportunity for Negroes if they were able to live in the areas where the jobs were being relocated.

Negroes who live in slum ghettos, however, have been unable to move to suburban communities and other exclusively white areas.

In part, this inability stems from a refusal by suburbs and other communities to accept low-income housing. Even Negroes who can afford the housing available in these areas, however, have been excluded by the racially discriminatory practices not only of property owners themselves, but also of real estate brokers, builders and the home finance industry. An important factor contributing to exclusion of Negroes from such areas, moreover, has been the policies and practices of agencies of government at all levels.

*Owners and Realtors.* Walter Sowell, a Negro who was Superintendent Engineer with the Cleveland Metropolitan Housing Authority, testified at the Cleveland hearing that he had "looked over the entire Cuyahoga County" for a home and a neighborhood within his means. He was told on the phone that he could not buy a house because he was Negro, "but never face to face . . . there were a lot of excuses given. . . . [T]he second call or third call, usually the house was sold or something happened and it was transferred to another real estate company."

We had several witnesses before our subcommittee who were Negro, who testified that they had the financial ability to buy decent housing in all-white neighborhoods, but despite repeated good-faith attempts, were unable to do so. The pattern of frustration, the pattern of misleading statements, the lies and deceits were found in each of their experiences. Never, or rarely, was race given as a reason, but always it was absolutely obvious that no other good reason could be given.

I cite to the Senate an example which shows this problem in its most extreme and outrageous and indefensible terms, for in this record is the testimony of a Negro naval officer, a lieutenant in the U.S. Navy. At page 193, this testimony of Lt. Carlos Campbell is recited. I was chairing the subcommittee at the time he testified. He is a young, handsome, intelligent, magnificent example of the finest that American youth is contributing to the defense of our Nation. He has served this country for 8 years. He has gone wherever this Nation has asked him to go. He has pledged himself to risk even his life for the defense of this Nation. What have we done in exchange?

In March of 1966 he was ordered to report for duty with the Defense Intelligence Agency at Arlington, Va. The story he told as he tried time and time again to find decent housing, which he was able to pay for, within reasonable distance of the post to which he was assigned by the U.S. Government, is a story of shame, of unconscionable racist abuse that should be a burden on the conscience of every decent American. Lieutenant Campbell went to over 39 separate homes, many of which had been listed with the Department of Defense Housing Office as available on a nonsegregated basis. Time and time again he

cheaper and the inhabitants less able to organize politically to oppose them.[12]

Most significantly of all, law enforcement is least effective in the ghetto, although it is there it is needed the most.[13]

There is an additional basis under the Fourteenth Amendment to support fair housing legislation. Section 5 of the Amendment authorizes Congress to *enforce* the Amendment's provision—one of which is the Equal Protection Clause. Enforcement, in the legal sense, traditionally includes both the prevention of violations and the punishment[14] and correction of the effects[15] of past violations. It follows that if the States in the past denied to persons within their jurisdictions the equal protection of laws, and if the effects of their denials are still present, Congress possesses the power to correct these effects. Similarly, the Fifth Amendment, which has been interpreted as imposing equal protection obligations on the Federal Government, *Bolling v. Sharp,* 347 U.S. 497 (1954) grants Congress the power to correct the enduring effects of past denials of equal protection by the Federal Government.

Such denials, state and Federal, were in fact numerous, and their effects in housing are still present. The States and their local subdivisions enacted zoning laws denying Negroes and other minorities the right to live in white neighborhoods until the Supreme Court put a stop to the practice in 1917. *Buchanan v. Warley,* 245 U.S. 60. Local ordinances with the same effect, although operating more deviously in an attempt to avoid the Court's prohibition, were still being enacted and struck down by the courts as late as 1930. *Harmon v. Tyler,* 273 U.S. 668; *City of Richmond v. Deans,* 281 U.S. 704 (1930). During these years there also came into use privately drawn racially restrictive covenants in deeds, which "ran with the land" and bound successive owners irrespective of their personal inclinations. Such covenants quickly became the major weapon for keeping minorities out of good housing,[16] and they were fully honored by State and lower Federal courts (See 3 A.L.R. 2d 466, 474 77 (1949)) until the Supreme Court ruled in 1948 that they could not constitutionally be enforced. *Shelley v. Kraemer,* 334 U.S. 1; *Hurd v. Hodge,* 334 U.S. 24; *Barrows v. Jackson,* 346 U.S. 249.

And the problem of government-practiced discrimination in housing is not entirely one of the past. The Supreme Court, in affirming the California Supreme Court's decision invalidating "Proposition 14," stated, on May 29, 1967, that the state's constitutional amendment adopted under Proposition 14 "was intended to authorize, and does authorize, racial discrimination in the housing market. The right to discriminate is now one of the basic policies of the State." *Reitman v. Mulkey,* (slip opinion) No. 483, at 11.

This "state action" was struck down by the Court, but it illustrates the point that it is not only state action of long ago that has barred the way to equal opportunity in housing.

Throughout this period and even somewhat after the Supreme Court's historic ruling in *Shelley v. Kraemer,* the Federal Housing Administration actively encouraged the use of racially restrictive covenants, in most cases flatly refusing to grant its mortgage insurance or guarantees unless such covenants were included in the deeds concerned.[17] FHA went so far as to recommend language for a model restrictive covenant to be used in deeds for mortgage property insured by the agency.

At the same time, the Federal and State governments were cooperating to enforce segregation in public housing. Lower federal courts approved such efforts as late as 1941,[18] and although courts more recently have, when they had the opportunity, invalidated them, efforts to keep public housing segregated were continuing in the North until at least 1955 (See *Detroit Housing Commission v. Lewis,* 226 F. 2d 180) and in Kentucky, Missouri and Tennessee until at least 1961.[19]

These efforts to place Negroes in separate neighborhoods were especially successful because they occurred during the period of the greatest Negro migration out of the South into Northern cities. Whereas only 10 per cent of the Nation's Negroes lived outside the South in 1910, 40 per cent did so by 1960.[20]

Throughout these years, the Federal and state governments were also active in promoting segregation in areas other than housing, such as schools and the armed forces. That activity also contributed to housing segregation, because it educated the white public to the myth that any kind of close association with Negroes was debasing and to be avoided.[21]

It thus seems only fair, and is constitutional, that Congress should now pass a fair housing act to undo the effects of these past State and Federal unconstitutionally discriminatory actions.

\*     \*     \*     \*     \*

It is no objection to its validity that a Federal Fair Housing Act would prohibit private acts of discrimination as well as discrimination practiced by government. The supposed objection arises from a false analogy between judicial enforcement and congressional enforcement of the Equal Protection Clause. The power of a court to enforce the Equal Protection Clause arises directly from its language, which speaks only of what States are forbidden to do. Hence, courts enforcing the clause can only forbid action by States or their local subdivisions. But the power of Congress to *enforce* the Clause arises from Section 5 of the Amendment. Section 5 grants a legislative power, and legislative powers are exercisable in accordance with the Necessary and Proper Clause. *Katzenbach v. Morgan,* 384 U.S. 641, 648–51; *United States v. Guest,* 383 U.S. 745, 762, 782–84. Under that Clause (Article I, Section 8 of the Constitution) Congress has the power "To make all Laws which shall be necessary and proper for carrying into Execution . . . all . . . Powers vested by this Constitution in the Government of the United States, . . ."

The scope of the Necessary and Proper Clause has been settled at least since Chief Justice Marshall formulated it in 1819 in *McCulloch v. Maryland:*[22]

"Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional."

The purpose, or "end" of the fair housing law is to remove the walls of discrimination which enclose minority groups in ghettoes, so that they may live wherever their means permit and be better able to secure the equal benefits of government and other rewards of life. Prohibiting private as well as government acts of discrimination in housing is undoubtedly a "means which [is] appropriate" and "plainly adapted to that end."

Mr. MONDALE. Mr. President, I ask unanimous consent to have included following the submission of the pending proposal an additional document entitled "Memorandum of Law on the Constitutionality of Federal Fair Housing Legislation," prepared by the Anti-Defamation League of B'nai B'rith and the National Committee Against Discrimination in Housing, under the chairmanship of one of America's great lawyers, Mr. Sol Rabkin, and a distinguished committee of top lawyers and other experts who have contributed to this remarkable summary of the law surrounding this issue, which study concludes that there is absolutely no doubt of the constitutionality of this proposal.

There being no objection, the memorandum was ordered to be printed in the RECORD, as follows:

MEMORANDUM OF LAW ON THE CONSTITUTIONALITY OF FEDERAL FAIR HOUSING LEGISLATION

This Memorandum discusses the constitutional basis for federal legislation against discrimination in housing. The proposed federal fair housing legislation contains a sweeping ban on discrimination, based on race, religion or national origin, in the sale, rental and financing of all housing. This Memorandum deals with the fundamental question—whether Congress has power, under the Constitution, to adopt any legislation designed to curb bias in the general housing market.

Three points are made in the following pages: (1) Congress has power under the Commerce Clause to prohibit discrimination in housing; (2) Congress has such power also under Section 5 of the Fourteenth Amendment; and (3) Congress is not barred from taking such action by the Due Process Clause of the Fifth Amendment.

INTRODUCTION

This pamphlet is a Memorandum of Law setting forth the constitutional authority of Congress to enact federal fair housing legislation directed against discrimination in private housing. It was originally prepared in 1966 in response to a request by the Subcommittee on Constitutional Rights of the Senate Judiciary Committee which asked for the views of the National Committee Against Discrimination in Housing on the fair housing section of the proposed, now dead, Civil Rights Act of 1966. We are grateful to Sol Rabkin of the Anti-Defamation League of B'nai B'rith, Joseph B. Robison of the American Jewish Congress and Rhonda Goodkin of the American Jewish Committee who prepared it. The Memorandum is presented here, with minor revisions, in the belief that the American public must be fully informed about the constitutionality of federal fair housing legislation if the country is to preserve its democratic heritage and avoid fur-

[12] *Dark Ghetto* by Kenneth B. Clark, Harper and Roe, New York, 1965, pp. 154–182.

[13] *The Challenge of Crime in a Free Society,* Report by the Commission on Law Enforcement and Administration of Justice, U.S. Government Printing Office, Washington, D.C., 1967, pp. 60–63.

*Dark Ghetto* by Kenneth B. Clark, Harper and Roe, New York, 1967, pp. 81–97.

*Manchild in the Promised Land* by Claude Brown, McMillian Co., New York, 1965, pp. 30–32, 160–180.

[14] See e.g., 18 U.S.C. 241–43.

[15] See, e.g., 42 U.S.C. 1980 et seq.

[16] Gunnar Mydal, *An American Dilemma* 349–50, 662–27 (1944).

[17] See *U.S.F.H.A., Underwriting Manual* (1938), paragraphs 980 (3)g, 935, 937 and 951. These provisions stayed in effect until 1947, see *U.S.F.H.A., Underwriting Manual* (1947), Preface, p. VI. Even thereafter FHA continued to deny mortgage insurance or guarantees if the neighborhood was or threatened to become integrated, see Abrams, *Forbidden Neighbors* 233 (1955), and Weaver, *The Negro Ghetto* 71–73 (1948).

[18] See *Favors v. Randall,* 40 F. Supp. 743 (E.D. Pa. 1941).

[19] The United States Commission on Civil Rights, *The Fifty States Report* 173, 329, 591 (1961).

[20] McEntire, *Residence and Race* 9–11 (1960); *Statistical Abstract of the United States, 1966,* Table 26, p. 27.

[21] McEntire, *Residence and Race* 87 (1960).

[22] 4 Wheat. 316 (1819).

Case: 1:13-cv-08564 Document #: 19-5 Filed: 02/12/14 Page 124 of 129 PageID #:745

H.R. 13315. An act to amend section 127 of title 28, United States Code, to define more precisely the territory included in the two judicial districts of Virginia; to the Committee on the Judiciary.

H.R. 14401. An act to grant the masters of certain U.S. vessels a lien on those vessels for their wages; to the Committee on Commerce.

H.R. 14934. An act to reduce from five to four the ratio of career substitute employees to regular employees in the postal field service, and for other purposes; and

H.R. 14935. An act to amend title 39, United States Code, to regulate the mailing of master keys for motor vehicle ignition switches, and for other purposes; to the Committee on Post Office and Civil Service.

H.J. Res. 297. A joint resolution to change the name of Twin Buttes Dam and Twin Buttes Reservoir on the San Angelo project, Texas, to "Bryant Dam" and "Bryant Reservoir"; and

H.J. Res. 358. A joint resolution to change the name of San Angelo Reservoir project, Texas, to "Culberson Deal Reservoir" project, Texas; to the Committee on Interior and Insular Affairs.

---

## COMMITTEE MEETING DURING SENATE SESSION

Mr. MANSFIELD. Mr. President, I ask unanimous consent that the Committee on Foreign Relations be authorized to meet during the session of the Senate today.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

---

## INTERFERENCE WITH CIVIL RIGHTS

The Senate resumed the consideration of the bill (H.R. 2516) to prescribe penalties for certain acts of violence or intimidation, and for other purposes.

Mr. MANSFIELD. Mr. President, I ask unanimous consent that the time between now and 1 o'clock be divided equally between the majority and the minority leaders or whomever they may designate.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

### UNANIMOUS-CONSENT AGREEMENT

Mr. MANSFIELD. Mr. President, I ask unanimous consent that at the conclusion of the vote on the cloture motion, there be a period for the transaction of morning business.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered. Who yields time?

Mr. MANSFIELD. Mr. President, I suggest the absence of a quorum, with the time not to exceed 1 minute, and to be charged equally to both sides.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. HART. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered. Who yields time?

Mr. HART. Mr. President, I yield such time to the Senator from Minnesota [Mr. MONDALE] as he shall desire.

Mr. MONDALE. Mr. President, overt racial discrimination remains in one major sector of American life—that of housing. Congress and the courts have acted to eliminate practices separating Negroes from whites in education, voting, public accommodations and employment, but a Negro is not free to live where he chooses.

During the past few days we have set out the case for fair housing. Let me summarize it.

First, fair housing is one more step toward achieving equality in opportunity and education for the Negro.

Open occupancy will have great practical psychological significance to the Negro who has "tried harder" and yet remains trapped in the ghetto for a lifetime. He can tell his child growing up in the ghetto that he can get out if he wants—if he is willing to study and to work.

Without fair housing legislation, however, it will become increasingly difficult for Negroes to obtain a decent education and to find employment. The Negro will not be able to escape the ghetto, nor will he be able to find jobs or integrated schools within the ghetto. In the first 5 years of this decade, one-half to two-thirds of all new factories and stores in all areas of the country except the South were located outside the central cities and metropolitan areas. This trend is expected to continue.

Jobs can move to the suburbs, but housing discrimination prevents Negroes from following. Eighty percent of the nonwhite population of metropolitan areas in 1967 lived in central cities. These persons, the least able to afford the high cost of transportation from the city to the suburbs, are left without work.

De facto segregation in schools is directly traceable to the existing patterns of racially segregated housing. No responsible American maintains any longer that it is possible to provide quality education—and in ghetto area schools in the Nation's largest cities, any education at all—to minority children as long as they are restricted to living in the old and congested parts of a city. The soundest, long-range way to attack segregated schools is to attack the segregated neighborhood.

Second, the fears of the integration voiced by some white property owners are not based on sound evidence.

Caucasians traditionally have owned the property in the United States, and it is no accident that they have been able to determine that Negroes live in the oldest and least-desirable housing. Old habits have perpetuated themselves into frozen rules to the extent that the opponents of fair housing legislation, by some obscure process of reasoning, can label it "forced" housing. This bill forces no one to sell—it simply removes from an economic transaction an irrelevant test based on color.

I believe, and testimony before the Housing Subcommittee of the Banking and Currency Committee reinforced this belief, that the great majority of real estate brokers, tract developers, and owners and operators of apartment houses feel compelled by business pressure to maintain the existing patterns of race and color in housing, no matter what they may personally believe.

They fear the loss of listings, of buyers or of tenants if they are known to sell or lease to Negroes; otherwise, they would sell to the first buyer who had the money and could meet the seller's terms.

The policy of the largest of the Nation's homebuilders, as stated by William J. Levitt, is to obey the open occupancy law where there is one and to follow local custom elsewhere. Mr. Levitt maintains that—

Integration has certainly not hurt us . . . [but] any homebuilder who chooses to operate on an open occupancy basis, where it is not customary or required by law, runs the grave risk of losing business to his competitor who chooses to discriminate.

By requiring all who engage in housing transactions not to discriminate, the fair housing bill will relieve the pressure on each. When every seller or renter must by law treat his customers equally, there will be no risk of loss for those who do.

The pressure not to sell or rent to Negroes comes not from the occupant who is leaving the house or apartment—he is not forced to do anything—rather, it comes from those who remain in the neighborhood. They fear the appearance of one Negro family means property values plummet, to be followed by a mass immigration of Negroes.

The fear that property values will fall is a myth of the most pernicious sort. What is the truth? The best known study of the effect when nonwhites move into a previously all-white neighborhood shows property values do not decrease, and often increase in 85 percent of the cases.

Closely tied to the property value horror story is another myth—that fair housing legislation means a deluge of Negroes into white neighborhoods, creating new ghettos. Experience under the District of Columbia's fair housing ordinance demonstrates that the number of Negroes in previously all-white areas of the city is regulated strictly by their ability to pay.

Once again, Mr. President, I emphasize that the basic purpose of this legislation is to permit people who have the ability to do so to buy any house offered to the public if they can afford to buy it. It would not overcome the economic problem of those who could not afford to purchase the house of their choice.

Third, the question often arises: Can the Government regulate the disposal of private property? Government has regulated property in a variety of ways since the times of earliest English property law. Even fair housing is not new, I referred to the District of Columbia's fair housing ordinance; the District is not alone. Twenty-two States and 84 cities, villages, and counties have adopted fair housing laws. These measures, and many of them were passed in 1967, indicate an important shift in public understanding and acceptance of the issue.

I am proud to say that my State of Minnesota has one of the strongest, if not the strongest, fair housing statutes in the country. It has worked effectively, practically, and there is now great difficulty in finding anyone who would oppose a fair housing law in the State of Minnesota.

If there are those who fear voting for fair housing for political reasons, I hope they will take another look at the num-

ber of local communities which have recognized the need and desirability of taking a stand on fair housing.

Unfortunately, most of the State and local fair housing laws have serious shortcomings in coverage and enforcement. The act which we are considering remedies this, but it leaves existing State and local fair housing ordinances in effect, and in appropriate cases, the Department of Housing and Urban Development may cede its jurisdiction to State or local agencies, or cooperate with them in joint operations.

A Federal fair housing measure is within the Constitution, supportable under either the equal protection clause of the 14th amendment or the commerce clause. Congress power to enforce the equal protection clause by appropriate legislation includes a law to remove obstacles in the way of persons' securing the equal benefits of Government. Such a law is one preventing racial discrimination in housing because discrimination in housing forces persons to live in segregated areas where the benefits of Government are less available.

Discrimination in housing interferes with interstate commerce in several ways: the confinement of Negroes to older homes restricts the number of new homes built, which in turn reduces the amount of building materials and residential financing moving in interstate commerce; difficulty in finding housing retards the movement of Negroes across State lines in search of employment; and discrimination in housing contributes to violence in the cities which disrupts business and interstate commerce.

Fourth, the enactment of this fair housing amendment is important to the outcome of the struggle for leadership in the Negro community.

Passage of a national fair housing law will not stop those who are committed to violence in our cities this summer—but it will rob them of Negro support. We are really—in waging this fair housing battle—fighting for the minds and hearts of the vast middle ground of responsible Negroes, who have persevered in their commitment to progress through the courts and through the legislative process. The black racists are fighting to make these Negroes believe that white America is basically indecent, that white America never has and never will give full equality to Negroes. On the outcome of this crucial struggle hangs the future of this Nation.

If the racists and extremists win, we face a real possibility of guerrilla warfare in our major cities, lasting not just a few hot summer days, but for years—a Vietnam here at home. The Pentagon's battle plan for the cities—revealed in testimony before the Senate's Armed Services Committee a few days ago—creates special riot forces, trained to quell urban disruptions and equipped with armored cars, searchlights, chemical spray guns and tear gas dispensers.

We might well ask why fair housing comes to be portrayed as the key to preventing such a holocaust. We readily admit that fair housing by itself will not move a single Negro into the suburbs—the laws of economics will determine that. But we as readily must admit that

the psychological importance to the Negro of available decent housing is very great.

It is impossible to gage the degradation and humiliation suffered by a man in the presence of his wife and children—when he is told that despite his university degrees, despite his income level, despite his profession, he is just not good enough to live in a white neighborhood.

In the case of one witness who appeared before our subcommittee, despite the fact that he was an impressive and effective officer in the Navy who served and protected this country for 8 years, he nevertheless was unable to purchase housing of his choice.

This person is forced to admit, in effect, to his family that he cannot provide for them, cannot provide a decent home in a decent neighborhood—and to that extent is less than a man. A white gangster or an American Nazi would have no questions asked other than his ability to pay.

Fifth, segregated housing is the simple rejection of one human being by another without any justification but superior power; we have closed our hearts to our fellow human beings to the extent that we have closed our neighborhoods to them.

The frustration to those of us who support this open occupancy legislation is that much of the housing discrimination is caused by the bigotry of fearful ignorance, and not by the bigotry of racial hatred. In some cases, rumors and fears and horror stories are peddled in white neighborhoods by those who seek to make a profit from this ignorance and fear.

We have learned many times over that in truly integrated neighborhoods people have been able to live in peace and harmony—and both Negroes and whites are the richer for the experience.

Thus, a large part of the job that lies ahead of us—that of overcoming ignorance, and teaching the truths of integration—can be assigned to the role of law as a teacher. The same ignorance and fear was present in the debates over public accommodations in the 1964 civil rights law, the same horror stories with a few changes were circulated then. But the law has, on the whole, operated smoothly and well, and both Negroes and whites have used the law in the spirit in which it was intended.

I believe the same will be true when we pass this measure. There will not be a great influx of all the Negroes in the ghettos into the suburbs—in fact, the laws of supply and demand will take care of who moves into what house in which neighborhood. There will, however, be the knowledge by Negroes that they are free—if they have the money and the desire—to move where they will; and there will be the knowledge by whites that the rapid, block-by-block expansion of the ghetto will be slowed and replaced by truly integrated and balanced living patterns.

The National Advisory Commission on Civil Disorders soon is expected to tell the American people that they are in deep trouble. Most Americans are not aware of the seriousness of our urban problems nor of the poverty and misery in which the urban minority poor must live.

I must say, relevant to that Commission, that two Members of this body served in the preparation of that important study, the most sweeping and fundamental ever undertaken concerning the social problems of this country. One Senator also served as the coauthor of the amendment, the distinguished Senator from Massachusetts [Mr. Brooke]. The other Senator is a sponsor of the measure, the distinguished Senator from Oklahoma [Mr. Harris].

ADDITIONAL COSPONSOR OF CLOTURE MOTION

Mr. President, at this time I ask unanimous consent that the name of the Senator from Oklahoma [Mr. Harris] be added as a signer of the cloture motion filed by the majority leader on February 16.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. MONDALE. Mr. President, we here in the Congress know. We do not have to wait for riot reports, or more riots, to act. We know what is wrong; we know what must be done.

America's goal must be that of an integrated society, a stable society free of the conditions which spawn riots, free of riots themselves. Yet trends of drift and civil disorder make the goals of integration and stability seem ever farther. If America is to escape apartheid we must begin now, and the best way for this Congress to start on the true road to integration is by enacting fair housing legislation.

I know of no single action we could take which would contribute more to understanding, to peace and justice within our country, and to the moral decency of all Americans than the simple matter of Congress declaring that we have had the last of segregation in the sale and rental of living quarters in the United States, and that once and for all we have decided, as a nation, to live together, not separately.

Mr. HART. Mr. President, we reserve the remainder of our time.

The ACTING PRESIDENT pro tempore. Who yields time?

Mr. DIRKSEN. Mr. President, I yield myself 10 minutes.

The ACTING PRESIDENT pro tempore. The Senator from Illinois is recognized for 10 minutes.

Mr. DIRKSEN. Mr. President, I think it should be made clear to the Senate—at least to those Senators who are now in the Chamber—that we are not voting cloture on the open occupancy amendment.

The cloture motion has been filed and directed to the pending bill, the Hart bill, which came from the Judiciary Committee which, of course, embraces everything offered in connection with it.

It should be made abundantly clear that the cloture motion goes to the bill itself.

I think that, only for record purposes, I should point out there was a House bill which, at long last, came to the Senate Judiciary Committee where hearings were held and where the bill was substantially modified. It was reported from the Judiciary Committee by a majority of only one vote. There were significant changes as between the Senate and the House bill.

Westlaw.

S. REP. 94-589, S. Rep. No. 589, 94TH Cong., 2ND Sess. 1976, 1976 U.S.C.C.A.N. 403, 1976 WL 13838 (Leg.Hist.)

**403 P.L. 94-239, EQUAL CREDIT OPPORTUNITY ACT AMENDMENTS OF 1976
House Report (Banking, Currency and Housing Committee) No. 94-210,
May 14, 1975 (To accompany H.R. 6516)
Senate Report (Banking Housing and Urban Affairs Committee) No. 94-589,
Jan. 21, 1976 (To accompany H.R. 6516)
House Conference Report No. 94-873,
Mar. 4, 1976 (To accompany H.R. 6516)
Senate Conference Report No. 94-685,
Mar. 9, 1976 (To accompany H.R. 6516)
Cong. Record Vol. 121 (1975)
Cong. Record Vol. 122 (1976)
DATES OF CONSIDERATION AND PASSAGE
House June 3, 1975; March 9, 1976
Senate February 2, March 9, 1976
The Senate Report and the House Conference Report are set out.

(CONSULT NOTE FOLLOWING TEXT
FOR INFORMATION ABOUT OMITTED MATERIAL. EACH    COMMITTEE REPORT IS
A SEPARATE DOCUMENT ON WESTLAW.)

SENATE REPORT NO. 94-589
Jan. 21, 1976

*1 The Committee on Banking, Housing and Urban Affairs, to which was referred the bill (H.R. 6516) to amend title VII of the Consumer Credit Protection Act to include discrimination on the basis of race, color, religion, national origin, and age, and for other purposes, having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

## HISTORY OF THE LEGISLATION

The Equal Credit Opportunity Act Amendments bill, S. 1927, was introduced by Senators Biden and Proxmire on June 12, 1975. Earlier, Senator Brock had introduced a bill, S. 483, dealing exclusively with age discrimination; and a House-passed bill, H.R. 6516, had been sent to the Senate. All three bills were referred to the Consumer Affairs Subcommittee, which held hearings on them on July 15, 17 and 24, 1975. That Subcommittee met in executive session on September 29, 1975, and recommended a revised version of S. 1927 to the full Committee. In meetings on December 12 and 15 the full Committee met and approved the bill as recommended, with several amendments. The Committee then substituted the text of its bill for that of H.R. 6516, which without objection is herewith reported.

### *2 **404 NATURE AND SCOPE OF THE LEGISLATION

Hearings in the House of Representatives in 1974 produced testimony of discrimination against credit applicants on account of their sex or marital status, and also on account of other characteristics unrelated to creditworthiness. The resulting legislation, the Equal Credit Opportunity Act of 1974 (Title V of Public Law 93-495), enacted at the end of the 93rd Congress, dealt only with discrimination on the grounds of sex or marital status, and this legislation is therefore the natural extension of that Act to encompass other categories of discriminatory practices.

The bill expands the prohibitions against discrimination in credit transactions to include age, race, color, religion, national origin, receipt of public assistance benefits, and exercise of rights under the Consumer Credit Protection Act. At the same time, the bill recognizes the utility and desirability of 'affirmative actions' type credit programs whether offered under governmental auspices or by private credit grantors. The bill also recognizes the genuine need of creditors to know their applicant's age and the source of their income in order to make a determination of creditworthiness.

In one of its most important provisions, the bill establishes for the first time in federal legislation the right of rejected credit applicants to obtain a statement of reasons for the action taken against them.

The remainder of the bill is incidental to its major purpose of extending the federal ban on discriminatory credit practices. The bill creates a new Consumer Advisory Council in the Federal Reserve Board to advise and consult with it concerning its supervisory functions under this Act and the rest of the Consumer Credit Protection Act. In the process this Council will absorb the existing Truth in Lending Advisory Committee. The bill further clarifies the relationship of this Act to existing or future state law dealing with credit discrimination, generally permitting such

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

state law to continue in effect so long as it is not inconsistent with this Act.

The bill substantially strengthens the enforcement mechanisms in the present law. The ceiling for class action recoveries of civil penalties is raised from the present formula of the lesser of $100,000 or 1% of the creditor's net worth, to the lesser of $500,000 or 1%. The U.S. Attorney General is empowered to bring enforcement actions, either on referral from other agencies or on his own initiative where there are patterns or practices in violation of the Act. The Federal Reserve Board and the Attorney General, will be required to submit annual reports on their activities.

The original Equal Credit Opportunity Act, dealing only with discrimination on the grounds of sex or marital status, applied to all credit transactions, not only those involving consumer applicants. The Federal Reserve Board's regulations under that Act have recognized that there are often significant operational differences between consumer and business credit, and this bill permits the Board to exempt classes of business credit transactions where the Act's prohibitions and remedies prove unnecessary.

## *3 **405 Need for the Legislation

Credit has ceased to be a luxury item, either for consumers or for business entrepreneurs. Consumer credit outstanding continues to grow at a phenomenal pace and now stands slightly below $200 billion, not even counting 1-4 family mortgage credit which would add more than $400 billion to that total. Virtually all home purchases are made on credit. About two-thirds of consumer automobile purchases are on an installment basis. Large department stores report that 50% or more of their sales are on revolving or closed-end credit plans. Upwards of 15% of all consumer disposable income is devoted to credit obligations other than home mortgages.

In this circumstance the Committee believes it must be established as clear national policy that no credit applicant shall be denied the credit he or she needs and wants on the basis of characteristics that have nothing to do with his or her creditworthiness. The Committee readily acknowledges that irrational discrimination is not in the creditor's own best interests because it means he is losing a potentially valuable and creditworthy customer. But, despite this logical truth, the hearing record is replete with examples of refusals to extend or to continue credit arrangements for applicants falling within one or more of the categories addressed by this bill.

Discrimination against the elderly was the most often cited abuse, despite the fact that in the experience of many creditors their older customers were their best customers. The Committee finds no justification for any policy of refusing to extend credit to persons merely because they fall within certain age groups, particularly when the only reasons offered for such blanket refusals are the unavailability of credit life insurance, or the mere 'likelihood' of insufficient income

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.