on retirement, or the possibility that the applicant will not survive through the full term of an adequately secured mortgage.

Past instances of discrimination against racial minorities were cited in the record. More recently, studies conducted by federal agencies have indicated the strong probability of race discrimination in mortgage credit. (The pilot studies conducted by the Comptroller of the Currency and the Federal Home Loan Bank Board are contained in the hearing record.) In its testimony, the Department of Justice also noted the emerging problems of credit discrimination as a result of the Arab oil boycott; the Department urged the inclusion of race, color, religion and national origin to parallel other civil rights legislation.

In short, this bill identifies characteristics of applicants which the Committee believes are, and must be, irrelevant to a credit judgment, and prohibits or curtails their use.

At the same time the Committee recognizes and affirms the creditor's right to make a rational decision about an applicant's creditworthiness. Thus the bill allows inquiries about the applicants age and about whether the applicant's income is from public assistance and permits use of those characteristics in scientifically sound credit **\*4** scoring systems. It also permits and encourages 'affirmative action' type credit programs.

**\*\*406** The requirement that creditors give reasons for adverse action is, in the Committee's view, a strong and necessary adjunct to the antidiscrimination purpose of the legislation, for only if creditors know they must explain their decisions will they effectively be discouraged from discriminatory practices. Yet this requirement fulfills a broader need: rejected credit applicants will now be able to learn where and how their credit status is deficient and this information should have a pervasive and valuable educational benefit.Instead of being told only that they do not meet a particular creditor's standards, consumers particularly should benefit from knowing, for example, that the reason for the denial is their short residence in the area, or their recent change of employment, or their already over-extended financial situation. In those cases where the creditor may have acted on misinformation or inadequate information, the statement of reasons gives the applicant a chance to rectify the mistake.

Beyond these substantive needs, and now that the law will be expanded considerably beyond its present sex and marital status scope, the Committee believes it is essential that strong enforcement mechanisms be established, and that the states be left free to develop their own more vigorous anti-discrimination laws. On the former point, the bill increases the ceiling for class action recoveries of punitive damages, and authorizes enforcement actions by the Attorney General as well as by other agencies. State laws on credit discrimination are not displaced unless they are inconsistent with the federal law, and states with substantially similar or stronger laws may be exempted from this Act in favor of their local laws.

In sum, this bill is intended to prevent the kinds of credit discrimination which have occurred

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

in the past, and to anticipate and prevent discriminatory practices in the future. The Committee believes the bill will do this without infringing on the freedom of creditors to make informed credit judgments and avoid unsound practices. This legislation should therefore redound to the benefit of both creditors and applicants, by producing a more informed and competitive market-place, where credit applicants can be assured of evenhanded treatment in their quest for what has become a virtual necessity of life.

## EXPLANATION OF THE LEGISLATION

### Categories of Prohibited Discrimination

The prohibitions against discrimination on the basis of race, color, religion or national origin are unqualified. In the Committee's view, these characteristics are totally unrelated to creditworthiness and cannot be considered by any creditor. In determining the existence of discrimination on these grounds, as well as on the other grounds discussed below, courts or agencies are free to look at the effects of a creditor's practices as well as the creditor's motives or conduct in individual transactions. Thus judicial constructions of anti-discrimination legislation in the employment field, in cases such as Griggs v. Duke Power Company, 401 U.S. 424 (1971), [1] and Albemarle Paper Company v. Moody (U.S. Supreme Court, June 25, 1975), are intended to serve **\*5** as guides in the application of this Act, especially with respect to the allocations of burdens of proof.

**\*\*407** Creditors are obviously free to require that their applicants have reached the age of majority so that they are competent to enter binding contracts. Creditors are precluded from rejecting or 'blackballing' any applicant solely because of his or her age, but creditors may inquire about the applicant's age in order to assess other factors directly related to creditworthiness. Thus a creditor justifiably may inquire how close to retirement an applicant is so that he may judge whether the applicant's income will continue at a sufficient level to support the credit extension. Similarly, the creditor is entitled to ask the applicant's age to gauge the pattern or intensity of his or her credit history. The Federal Reserve Board is given authority to identify other pertinent elements of creditworthiness for which age is a necessary preliminary inquiry. One such element might be the adequacy of any security offered by the applicant. An elderly applicant might not qualify for a 5%-down condominium loan because the duration of the loan exceeds his life expectancy and the condominium itself has a speculative future value. But that same applicant ought to be deemed creditworthy when he seeks a $10,000 home improvement loan secured by a $50,000 homesite.

Similar considerations apply in the case of public assistance recipients, and the Committee in-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

tends this category to be read broadly to include all federal, state or local governmental assistance programs, whether premised on entitlement or need. Blackballing such applicants, or arbitrarily discounting such income, is forbidden, but this provision in the bill should not be read to mandate extensions of credit to individuals on public assistance whose incomes can be expected to be low or marginal. To the extent such income levels, either alone or in conjunction with other income (for example, social security plus pension), would meet the creditor's usual standards, the Committee believes it is intolerable that the recipients of such income should be disadvantaged because of its source. Creditors can still consider the amount and stability of such income, or its accessibility through judicial process, in the same way they would consider the incomes of others. The Committee believes and intends that this provision in the bill will help assure reasonable access to the credit market to those persons who are financially dependent, and, in the case of public assistance to the needy, will help in their quest for financial independence.

The prohibition in subsection 701(a)(3) is intended to bar retaliatory credit denials or terminations against applicants who exercise their rights under any part of the Consumer Credit Protection Act. That would include this title, the Fair Credit Reporting Act, and also the various chapters of the Truth in Lending Act. The 'good faith' qualification recognizes that some applicants may engage in frivolous or nuisance disputes which do reflect on their willingness to honor their obligations.

The essential prohibition in this legislation is directed at discrimination 'against' applicants. Nothing in this section should be read to bar occasional extensions of credit to individuals who would not normally qualify, or to bar experimental or ongoing special programs which **6** prefer applicants in certain categories so long as there is no accompanying restriction of credit available to applicants not in those categories. For example, this Act is not intended to prohibit positive credit programs aimed at 'young adults' or 'golden age' accounts.

## **408** Credit Scoring Systems

The provision in section 701(b) authorizing the inclusion of age and public assistance income in empirically derived credit scoring systems provoked considerable discussion in the Subcommittee and in the Committee. These systems are being used more and more frequently, predominantly by the larger creditors who have the statistical base and the resources to devise workable and reliable scoring techniques. The 'system' usually consists of an allocation of points to characteristics of the applicant, the total number of points depending on how that applicant compares to a statistical sampling of previous applicants with similar credentials.

Creditor witnesses strongly urged that this bill permit the use of age and source of income in such scoring systems. In their experience age tended to be one of the best 'predictors' of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

eight to twelve characteristics typically incorporated into these scoring systems.

The following table indicates, for one large retailer, how the composite scores produced by their scoring system correlate to the actual performance of their credit customers.

CREDIT SCORE RELATED TO ACCOUNT PERFORMANCE-SPRING 1974

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Though some members of the Committee were concerned that these scoring systems were inherently discriminatory in that they saddled each applicant with the statistical characteristics of similar prior applicants, a majority of the Committee believes that, on balance, a carefully constructed scoring system is in fact more fair and less discriminatory than a system which relies in large part on the subjective impressions and judgments of individual credit grantors or their employees. And the testimony before the Subcommittee did not seem to indicate that creditors using scoring systems had been the source of serious complaints.

**\*7** The scoring systems which may include age and public assistance factors under this section are those which are 'demonstrably and statistically sound ' as this phrase may be spelled out in Board regulations. By this the Committee means that any such system must be based on sound statistical methodology, and that its results must be **\*\*409** statistically significant and useful in the context of a particular creditor's operations. Thus the Committee does not sanction the use of age and public assistance benefits in a numeric scoring system which is a mere consensus of the subjective views of a particular creditor's loan officers.

Affirmative Action Programs

Certain credit programs are specifically designed to prefer members of economically disadvantaged classes, and the Committee does not intend to undermine these programs. Rather, subsection 701(c) makes it clear that denials of credit to persons ineligible for those programs does not violate this Act.

Examples of such programs would include government sponsored housing credit subsidies for the aged or the poor. Credit offered to a limited clientele by non-profit organizations-- such as credit unions, or educational loan programs-- would enjoy the same protection.

In addition, subsection 701(c)(3) authorizes the Board to prescribe standards for other special purpose programs offered by profit-making organizations (commerical creditors) which will likewise be immune from a charge that they violate the Act. By its reference to 'special social needs' the Committee expects that the minimum requirement for any such program will be that it

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

is designed to increase access to the credit market by persons previously foreclosed from it.

Reasons for Adverse Action

The Committee believes that the provision entitling rejected applicants to a statement of reasons for adverse action is among the most significant parts of the bill. With few exceptions, creditors have refused to do anything more than notify rejected applicants of the fact of the rejection. Only rarely do creditors give even a cursory explanation of the reasons why. The creditors' apparent rationale has been that since they had no legal obligation to explain their action they would not venture the effort or the potential embarrassment of doing so.

The Committee is convinced that this attitude is not only short-sighted on the creditors' part, but that it deprives rejected credit applicants of necessary and useful information. Further, the Committee believes that the disclosure is essential to achieve the anti-discrimination goals of the legislation, for a creditor who knows he may have to explain his decision is much less likely to rest it on improper grounds. In addition, we believe that knowing the reasons for adverse action will, over time, have a very beneficial educational effect on the credit-consuming public and a beneficial competitive effect on the credit marketplace.

That a refusal to disclose reasons is shortsighted for creditors is borne out by the experience of creditors who have volunteered that information. Often, it appears, disclosure permits the applicant to correct or supplement information in his application, causing the creditor to change his decision and make a profitable loan he otherwise **8** would have rejected. In other cases the disclosure of reasons appears to be valued public relations tool. National BankAmericard, Inc., for example, had recommended to its member banks that they adopt a policy of giving reasons to rejected applicants.

**410** There was much debate in the Subcommittee, and among witnesses, whether to require a written statement of reasons in every case of adverse action against a credit applicant. Testimony from creditors and data from other sources indicates that significant costs would be involved in complying with such a universal requirement, but this testimony and data was questioned by consumer representatives as being an overstatement of the true costs of compliance. It was also argued that automatic written statements of reasons would aid in the enforcement of the antidiscrimination provisions of the Act because thorough documentation of a creditor's practices would be possible.

The Committee's judgment is that a blanket requirement for written reasons in every case is not necessary to achieve the benefits intended. With the wide variety of ways in which credit applications are handled and processed, such a requirement could be overly restrictive and cumbersome, as well as expensive.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

The provision itself is intended to operate in a sensible and flexible way.

Whether the creditor approves or rejects the application, the applicant must be notified of the decision within a reasonable time. Where that decision is adverse, the creditor has options. He may elect to send a written statement of reasons automatically in every case, and this statement could obviously be combined with the denial notification itself.

Alternatively the creditor must give every rejected applicant a written notification of the fact of rejection and of the applicant's right to get a statement of reasons on request. The Committee intends that this notice of rights be clear and conspicuous in whatever instrument is used to convey it. The written notification will probably most often be mailed, but could consist of a simple card handed to the applicant at the time the adverse decision is conveyed face to face. If this notification also explains that the applicant can get an oral statement of reasons confirmed in writing, the creditor may give an oral explanation, either in person or by phone. Absent this latter explanation, any requested statement of reasons must be in writing.

Where a Fair Credit Reporting Act disclosure is also called for, the Committee expects that the notices required under that Act and under this section will be combined for a substantial savings in cost of handling and mailing.

The Committee does not expect or intend that statements of reasons be given in the form of long, detailed personal letters. The bill calls for a 'concise indication' of the applicant's deficiencies, and a short, check-list statement will be sufficient so long as it reasonably indicates the ground for adverse action. The Board's regulations may suggest formats for such statements. Examples of such brief statements were submitted by several witnesses in the hearings on this legislation. Some of these, not necessarily ideal, are as follows:

DATE . . .

DEAR . . . : Thank you for your interest in applying for credit at . . . . We are sorry that we cannot open a credit account **\*9** count with you at this time. Our decision is based on our own policies. The reason for the decline is indicated below:

  -- length of employment

  -- lack of credit references

  -- **\*\*411** credit references too new

  -- time in residence

  -- income for credit limit requested

  -- too many other credit obligations at this time

  -- other

Please feel free to call me at . . . if you have any further questions or if you wish to reapply at a later date.

Sincerely,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

. . . . . . ,
Manager, New Accounts.
APRIL 2, 1974.

Sample sample, Sample sample.

DEAL MR. SAMPLE: We are sorry that we cannot comply with you request for an . . . at this time.

We can assure you that your application has been given every consideration and nothing which would reflect adversely on you has been found in our investigation. Your application is declined because it does not meet our membership requirements with respect to length of residence.

It has been our experience that applicants who do not meet these requirements at one time may qualify later on, after achieving additional residence and employment stability. We cordially invite you to submit a new application at a later date when your circumstances have changed.

The above reference number and date of this letter must be given if communication with us is necessary.

Thank you for your interest in our service.

Sincerely,

. . .
New Accounts Department.
APRIL 2, 1974.

Ref: H-0061395

Sample sample, Sample sample.

DEAR MR. SAMPLE: We are sorry but we cannot comply with your request for an . . . at this time.

We can assure you that your application has been given every consideration and that nothing which would reflect adversely on you has been found in our investigation. It is declined because your individual income does not meet our minimum requirements.

Perhaps you have other income sources that did not appear on your application and that were not readily apparent in our investigation. If you do, please give us this additional information in writing now so we can evaluate it. Or, if you do not have other sources of income just now, we cordially invite you to submit a new application at a later date when your circumstances have changed.

**\*10** The above reference number and date of this letter must be given if communication with us should be necessary.

Thank you for your interest in our service.

. . . . . . ,
New Accounts Department.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Sincerely,

**412** This flexible mechanism for allowing credit applicants to learn why creditors turned them down is triggered by any 'adverse action' taken by the creditor. This term is carefully defined to include denials, revocations, unilateral changes in the terms of a credit plan, or refusals to grant substantially all the credit requested. The Board may set guidelines for what 'substantially the amount or on substantially the terms requested' means in differing contexts.

The Committee does not intend to require the giving of reasons where no such explanation can reasonably be expected by the debtor, and thus the last sentence of section 701(d)(5) makes it clear that there is no 'adverse action ' when, for example, a consumer attempts to use a credit card which has been revoked for non-payment, or when a borrower seeks to refinance a loan which is already in default. Similarly, there is no adverse action taken within the meaning of this section when a credit card issuer refuses to authorize new credit under a revolving credit plan for a customer who seeks such credit in a point-of-sale transaction where that new credit would exceed the established limit for that customer. This would hold true even where a particular creditor would treat an attempted purchase as an implied request for an increased credit line. The formalized statement of reasons called for in this section is appropriate, in the Committee's view, only where there is an equally formalized application for credit, and not for inexplicit requests for increased limits on open end credit plans.

## Business Credit

The present Equal Credit Opportunity Act prohibits discrimination in any type of credit transaction, including all forms of business credit, on the basis of sex or marital status. Final regulations implementing that Act were issued by the Federal Reserve Board on October 16, 1975, and came into effect on October 28, 1975. The regulations make certain 'adjustments and exceptions ' with respect to the treatment of different classes of business credit transactions, as authorized under section 703 of the Act.

The Committee considered an amendment to section 703 authorizing the Board, in prescribing regulations, to exempt from any of the provisions of the Act 'any class of transactions not primarily for personal, family or household purposes.' This language, added onto the authority already provided in existing law, could have been interpreted as mandating a broad exemption of business credit transactions from the coverage of the Act.

In order to clarify the intent, the Committee approved an amended version of the proposed language which authorizes exemptions from 'one or more' of the provisions of the Act, but only 'if the Board makes an express finding that the application of such provision or provision would not contribute substantially to carrying out the **11** purposes of this title.' The purpose of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

amendment is to narrow the scope of the exemption authority granted to the Board and to make it clear that Congress does not intend to deny the antidiscrimination protections of the Act to minorities, women and others who encounter problems of discrimination in obtaining credit to establish businesses or conduct normal business operations.

**413** The Committee recognizes that there are a number of differences between consumer credit and business credit. On the other hand, the Committee has received evidence of discrimination in business credit transactions encountered by the groups covered under present law and under the proposed amendments to the Act. J. Stanley Pottinger, Assistant Attorney General for Civil Rights in the Justice Department, testified on this point and also expressed specific opposition to the proposal to exempt business credit from the Act in a letter to Senator Biden, stating as follows:

In our view, the Act should not be narrowed to apply only to consumer transactions. So limited, the Act would probably not apply to the Arab boycott, referred to in my testimony, or to discrimination in business credit transactions against minority-owned businesses. In addition, the distinction between business and consumer transactions would be difficult to draw in many cases, resulting in needless litigation.

Under the language as amended, the Board would have the authority to exempt classes of business transactions from the coverage of one or more of the provisions of the Act, if it finds that there is no incidence of discrimination in such transactions. In order to grant an exemption, however, the Board would have to make an express finding that there was no evidence or likelihood of discrimination in that class of transactions, nor would the potential for discrimination be greater if the Board were to exempt that class of transactions from compliance with one or more provisions of the Act. In using the language 'one or more' of the provisions, the Committee intends to indicate to the Board that it should not grant broad exemptions but rather should weigh carefully the impact of specific provisions of the Act on the class of transactions in question, with a view to lifting only those requirements which impose administrative burdens while not contributing substantially to carry out the purposes of the Equal Credit Opportunity Act.

For the purposes of this section, the term 'class of transactions' is to be interpreted narrowly to mean types of business credit transactions with common characteristics, and not all business credit in general. In considering any exemptions under this section, the Board should take into account factors which might logically bear on the presence or absence of discrimination, such as the size of the companies or institutions involved, the dollar amount of the transaction under consideration, or the parity of bargaining power between the parties to the transaction.

Consumer Advisory Council

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Early drafts of this bill, and the House bill itself, called for a separate Advisory Committee on the Equal Credit Opportunity Act similar to that for Truth in Lending. At the urging of the Federal Reserve **12** Board, however, the Subcommittee and Committee agreed to establish a broader Advisory Council to advise and consult with the Board concerning separate Truth in Lending Advisory Committee will be abolished.

The Committee believes that combining into one group all the consumer-related advisory functions in the Board will facilitate the operation**414** of that process, and permit a more coordinated approach to the implementation of consumer legislation. This provision also checks the proliferation of this kind of advisory committee and results in some savings of federal funds.

Relation to State Laws

The present Equal Credit Opportunity Act leaves almost totally unclear the status of existing or future state laws dealing with discrimination in credit transactions. The Committee believes that practices of discrimination are so abhorrent that federal law ought not foreclose the states from initiating their own laws unless those laws are incompatible with this legislation. A similar policy has been adopted by the Congress with respect to Truth in Lending and more recently with the Fair Credit Billing Act.

This bill clarifies the relationship of the Equal Credit Opportunity Act to state law in several ways.

First, the amended section 705(e) makes it clear that where both state law and federal law are violated by the same conduct, an aggrieved applicant is entitled to but one recovery of monetary damages. He may choose to sue under the state law or under the federal law, but not both. At the same time, an applicant is free to pursue administrative, injunctive or declaratory relief under either federal or State law without being forced to make an election of remedies. Thus an aggrieved applicant may utilize any conciliation services available under state law without foregoing his or her right to seek monetary damages separately. Or that applicant might seek a declaratory judgment in federal court without losing any available claim to monetary damages under state law. The Committee assumes, however, that in any such bifurcated proceeding the normal rules of res judicata and collateral estoppel will apply.

New subsections (f) and (g) of section 705 track similar language in the Fair Credit Billing Act. State law is displaced by this Act only to the extent of inconsistencies between them, and the Board may determine whether such inconsistencies exist. The Committee appreciates that the limitation set on the Board's authority in this regard-- that the Board cannot find state law inconsistent if it 'gives greater protection to the applicant'-- is somewhat imprecise. Identical language in the Fair Credit Billing Act was found manageable by the Board, however, and the Committee

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

believes that it is better to use a familiar standard in this area than to attempt a separate 'laundry list' of inconsistencies for different parts of the Consumer Credit Protection Act. The Committee intends that those state laws which give greater protection to the applicant, as determined by the Board, shall apply equally to all credit granting institutions doing business in that state.

**\*13** Some states (e.g., Massachusetts) have adopted antidiscrimination legislation quite similar to this Act. Other states may be expected to do so in the future. Subsection 705(g) like comparable provisions in the Truth in Lending and Fair Credit Billing Acts, will permit classes of transactions in such states to be exempted from the substantive requirements and prohibitions of the federal law whenever the local law is substantially the same or stronger than the federal. To resolve an uncertainty under prior legislation, this bill makes clear that where such exemptions are made in favor of state law, the full remedial **\*\*415** and enforcement structure of this Act remains in place. Thus aggrieved applicants retain their access to the federal courts, and the federal enforcement agencies may retain their authority to act against violators. It is expected, however, that these agencies will generally defer to the appropriate state officials.

## Civil Liability

Since discrimination is inherently insidious, almost presumptively intentional, yet often difficult to detect and ferret out, the Committee believes that strong enforcement of this Act is essential to accomplish its purposes. The bill therefore provides enforcement opportunities of three kinds. Under section 704 (which remains unchanged) various federal agencies are given administrative enforcement responsibility. Under the revised section 706, the United States Attorney General is also authorized to bring enforcement actions, either on referral of cases from the administrative agencies, or on the Attorney Generals' own initiative where there are patterns or practices in violation of the Act. The entrusting of enforcement responsibility to the Attorney General is premised on the assumption that that office's experience in the enforcement of other civil rights legislation can be effectively expanded and built on to achieve maximum compliance with the antidiscrimination policies of the Equal Credit Opportunity Act.

The chief enforcement tool, however, will continue to be private actions for actual and punitive damages. Much of the testimony received in the hearings, and much of the debate in Subcommittee and Committee centered on the adequacy of the recovery ceiling for punitive damages in class actions. The present law sets that ceiling at the lesser of $100,000 or 1% of the creditors' net worth. The Subcommittee had recommended that this be changed to the greater of $50,000 or 1%. The Committee eventually agreed upon a level of $500,000 or 1% of the creditor's net worth, whichever is less.

The setting of any ceiling on class action liability is meant to limit the exposure of creditors to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

vast judgments whose size would depend on the number of members who happened to fall within the class. The risk of any ceiling on class action recoveries is that, if it is too low, it acts as a positive disincentive to the bringing of such actions and thus frustrates the enforcement policy for which class actions are recognized.

In the context of this Act, where individual recoveries of punitive damages could be as high as $10,000, a $100,000 ceiling tends to discourage the bringing of a class action whenever there are more than **\*14** 10 members in the class. In a parallel situation under Truth in Lending, where the class action ceiling is also $100,000, several courts have noted the incompatibility of that ceiling with the effective use of the class action device. Boggs v. Alto Trailer Sales, Inc. (No. 74-1605, 5th Cir., April 14, 1975); Weathersby v. Fireside Thrift Co. (No. C-73-0563 AJZ, N.D. Calif., Feb. 25, 1975).

The Committee wishes to avoid any implication that the ceiling on class action recovery is meant to discourage use of the class action device. The recommended $500,000 limit, coupled with the 1% formula, provides, we believe, a workable structure for private enforcement. Small businessmen are protected by the 1% measure, while a **\*\*416** potential half million dollar recovery ought to act as a significant deterrent to even the largest creditor. Creditors are also protected by the list of factors (in section 706(b)) a court should consider in determining any class action award.

The Committee is aware of the many difficulties surrounding the use of class actions for civil penalties or punitive damages. The largest obstacle to class actions may lie in the procedural rules applicable to them-- as, for example, the notification requirements under the case of Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974) [2] -- rather than in any necessarily arbitrary ceiling on recovery. For this reason the Committee, through its Subcommittee on Consumer Affairs, intends to look at alternative private enforcement procedures such as the so-called qui tam or private attorney general action. We are hopeful that there may be workable and effective substitutes for the class action as a consumer enforcement device not only for this Act but also for other similar legislation.

The Committee also recommends a change in the statute of limitations applicable to actions brought under this Act. The present one-year limitation is, we believe, too short a period of time for violations of antidiscrimination legislation. The development and investigation of the necessary facts-- especially in the case of agency or Attorney General action-- may require more than a year. Discriminatory practices, unlike violations of Truth in Lending, are not apparent from the face of particular documents or contracts. The Committee therefore recommends that the statute of limitations be extended to two years. In addition, where an agency or attorney General action has been commenced within two years of a violation, and where it is likely that individual applicants may only learn of potential violations through publicity surrounding the government's ac-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion, we believe the affected applicant should have a reasonable additional time to bring his or her private action. The bill therefore permits private actions to be brought within one year after the commencement of a government action where both involve the same conduct.

Finally, the Committee has added a new subsection 706(j) to make clear that if a creditor's credit granting standards are otherwise subject to discovery in any judicial or administrative proceeding, nothing in this Act clothes those standards with immunity. Such standards may be relevant and necessary in particular actions, and the Committee does not intend to preclude such discovery by any inference in this Act that those standards are beyond reach.

## *15 Effective date

The substantive provisions of this bill would become effective eighteen months after its enactment. This period should give the Federal Reserve Board time to promulgate necessary regulations sufficiently in advance of the effective date to allow creditors to bring their practices into compliance.

The original Equal Credit Opportunity Act allowed only twelve months between enactment and effective date, and as a result the actual content of final regulations was not known until a few days before they became effective. Since the purpose of these regulations is to effectuate compliance and not to trap creditors in unintended violations, the **417 Committee believes it is very important that the Board have sufficient time to draft, and that creditors have adequate time to adjust to, new regulations. The necessity for phasing in new regulations over a period of a year or more should be avoided.

The remainder of this Act-- beyond the substantive requirements and prohibitions-- will take effect on enactment. This would include the provisions on civil liability and enforcement, and on relation to state law.

## COST OF LEGISLATION

In compliance with Sec. 252(a)(1) of the Legislative Reorganization Act of 1970, as amended (2 U.S.C. 190j), the Committee estimates that there will be no measurable cost to the Federal Government in carrying out the provisions of this legislation. Enforcement activities by federal agencies, including the drafting of regulations, can be carried out with present agency resources, or with minimal additions. Since the Consumer Advisory Council created by this legislation would absorb the existing Truth in Lending Advisory Committee, no new expenditures for that Council are anticipated beyond whatever per diem is required for additional Council members.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

\*    \*    \*    \*

## *16 SECTION-BY-SECTION ANALYSIS

Section 1. Short title.-- This section provides that this Act may be cited as the Equal Credit Opportunity Act Amendments of 1975. It also incorporates the short title of Title VII of the Consumer Credit Protection Act ('The Equal Credit Opportunity Act') into a new section 709 of that title.

Section 2. Prohibited discrimination: Statements of Reasons-- This section re-writes section 701 of the present Equal Credit Opportunity Act.

Subsection (a) adds the following new categories of prohibited discrimination: race, color, religion, national origin, age (provided the applicant has the capacity to contract), receipt of public assistance benefits, or exercise of rights under the Consumer Credit Protection Act. These are in addition to the existing prohibitions against discrimination on the grounds of sex or marital status.

Subsection (b) confirms that it is not a violation of this Act for creditors to inquire about marital status in order to ascertain the creditors rights and remedies in a particular transaction; nor is it a violation to inquire of the applicant's age or about public assistance benefits for the purpose of assessing legitimate elements of credit-worthiness. Empirical credit scoring systems which consider age or public assistance benefits may be used so long as they are demonstrably and statistically sound.

Subsection (c) makes it clear that it is not a violation of this Act to refuse credit under three types of specially limited affirmative =action type programs: programs authorized by law for economically disadvantaged persons; programs run by non-profit organizations for their members or for economically disadvantaged persons; or special credit programs offered by profitmaking organizations to meet special social needs approved in Board regulations.

**418 Subsection (d) establishes the right of applicants to be informed of whatever action the creditor takes within a reasonable time. In addition, where that action is adverse to the applicant, the applicant has a right to a statement of reasons why. That statement may be given automatically in writing. Or creditors may give rejected applicants written notice of their right to such a statement of reasons on request. In this case applicants have sixty days from the time the creditor notifies them of adverse action to request the reasons, and the creditor has thirty additional days to supply them. Such statements of reasons must be in writing, unless the creditor has advised the applicant (in the written notification of rights) of his or her right to have any oral statement of reasons confirmed in writing on written request. The subsection further provides that statements of reasons are satisfactory if they contain a concise indication of the applicant's credit deficien-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

cies according to the standards used by the creditor.

**\*17** Subsection (d) also provides that notifications and statements of reasons from third-party creditors may be made directly by the creditor or indirectly through the party requesting that credit be extended to an applicant.

The term 'adverse action,' which triggers the obligation to provide reasons, is defined to mean a denial or revocation of credit, a change in credit terms, or a refusal to grant credit substantially as the applicant requested it. 'Adverse action' does not include refusals to extend additional credit to applicants who are delinquent or in default, or where the new credit would exceed an established credit limit.

Section 3. Exemptions: Advisory Council.-- This section amends section 703 of the Equal Credit Opportunity Act by adding a new sentence and a new subsection (b). The new sentence specifies that Board regulations implementing this Act may exempt classes of credit transactions (other than consumer transactions) from one or more of the provisions of this Act if the Board finds that the application of those provisions would not contribute substantially to achieving the purposes of this legislation.

New subsection 703(b) establishes a Consumer Advisory Council to advise and consult with the Board concerning its functions under the Consumer Credit Protection Act and other consumer matters. The Board shall consist of representatives of consumers and creditors, shall meet at the call of the Board, and its members shall be entitled to compensation up to $100 per day plus expenses. The section of the Truth in Lending Act establishing a separate Advisory Committee for that Act is repealed.

Section 4. Federal Trade Commission enforcement.-- This section amends section 704 of the Equal Credit Opportunity Act to make clear that the enforcement powers of the Federal Trade Commission include the power to enforce any Federal Reserve Board regulation under this title as if the violation were a violation of a Federal Trade Commission trade regulation rule.

Section 5. Relation to State law.-- This section amends section 705 of the Equal Credit Opportunity Act by rewriting one subsection and adding two new ones.

Subsection (e) is rewritten to make clear that where the same conduct violates both state and federal law, an aggrieved person may sue for money damages either under this Act or under state law but not **\*\*419** both. This election is inapplicable to any administrative or court action not seeking money damages.

New subsection (f) provides that state laws dealing with credit discrimination are displaced by this Act only to the extent they are inconsistent with it. The Board can determine whether there are inconsistencies but cannot find state law inconsistent where it gives greater protection to applicants.

New subsection (g) provides that classes of credit transactions within a state are to be exempt-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

ed from the requirements of this Act if the applicable state law is substantially similar to, or gives greater protection than, this Act. But violations of such state law continue to be violations of this title.

Section 6. Civil liability.-- This section rewrites section 706 of the Equal Credit Opportunity Act.

**\*18** Subsection (a) restates the present law to the effect that aggrieved applicants may recover actual damages either in individual or class actions.

Subsection (b) permits recoveries of punitive damages up to $10,000 in individual actions, or up to the lesser of $500,000 or 1% of the creditors net worth in class actions, in addition to any actual damages. In determining the amount of punitive damages the court is instructed to consider relevant factors including the frequency and persistence of violations, the creditor's resources, the number of persons affected and whether the creditor's violation was intentional.

Subsection (c) provides that aggrieved applicants may also seek equitable and declaratory relief in any appropriate court of competent jurisdiction.

Subsection (d) confirms that in any successful action the award shall include reasonable attorney's fees.

Subsection (e) establishes a defense to liability for creditors who act in conformity with any official rule, regulation or interpretation of the Board, even though that regulation, interpretation or rule is later declared invalid by judicial or other authority.

Subsection (g) establishes that any action for violation of this title can be brought in the appropriate federal district court, or in any other court of competent jurisdiction, within two years of the violation. This two-year statute of limitations may be extended an additional year from the commencement of an administrative enforcement action or from the commencement of an action by the Attorney General where such agency or Attorney General action is itself brought within two years of the violation.

Subsections (g) and (h) authorize the Attorney General to bring civil actions against violators either on referral of cases from the responsible agencies or whenever the Attorney General believes there is a pattern or practice of violations.

Subsection (i) provides that a person may recover either under this title or under section 805 of the 1968 Civil Rights Act, where the same transaction violates both.

Subsection (j) confirms that nothing in this title shields a creditor's credit granting standards from discovery in any proceeding where they would otherwise be discoverable.

Section 7. Annual Reports.-- This section adds a new section 707 to the Equal Credit Opportunity Act requiring the Board and the Attorney**\*\*420** General to submit annual reports on their administration of this Act.

Section 8. Effective date.-- This amendment to the effective date provision in the present law

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

provides that the amendments made by this Act take effect on enactment except that the amendments to section 701 take effect eighteen months after enactment.

Section 9. Table of Sections.-- This section amends the table of sections to reflect the additions made by this Act.

### *19 ADDITIONAL VIEWS OF MR. HELMS

The Equal Credit Opportunity Act Amendments have as their purpose the prohibition of discrimination in the granting of credit on the basis of age, race, color, religion, national origin, and the receipt of public assistance benefits. While this is certainly a laudable objective, I am apprehensive that Federal legislation is not the proper instrumentality to achieve these ends and that the proposal if enacted will be counterproductive.

#### Province of State Law

Until the passage of the Consumer Credit Protection Act in 1968, the regulation of consumer credit was the exclusive domain of the states. Historically, the primary source of regulation came through the usury statutes. Other early consumer credit legislation dealt with such matters as disclosure of credit information, credit insurance, debt adjusting wage assignments, and garnishments. To remedy the fragmented approach to consumer credit protection, the National Conference of Commissioners on Uniform State Laws has recommended the enactment by the states of the Uniform Consumer Credit Code. In addition, many states have enacted or are considering enactment of legislation prohibiting unreasonable discrimination in credit granting. Thus, until recently, the regulation of consumer credit and consumer credit contracts has been the sanctuary of the states. I view with serious concern the recent tendency as exemplified by the Real Estate Settlement Procedures Act, the Fair Credit Billing Act, and the Equal Credit Opportunity Act, to encroach upon state efforts to regulate consumer and home mortgage credit. These amendments are just one more nail in the coffin of the right of the individual to have local matters determined by the state legislatures.

The lack of need for Federal legislation in this area was highlighted by the findings of the National Commission on Consumer Credit made public in December of 1972. The Commission did not find sufficient evidence to prove the hypothesis that there is racial discrimination in the granting of consumer credit. However, evidence before the Commission suggested that creditworthy consumers living in poverty areas have severe problems in obtaining credit-- problems largely associated with the difficulties creditors have in collecting debts in certain areas of inner cities. The Commission found that the basic problem of providing credit to the poor is not a cred-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

it problem but an income and employment problem.

On the other hand, while the Commission concluded from anecdotal evidence that there were incidences of discrimination in granting of credit to women, it did not recommend legislation in solving the problem. Rather, it felt that competition among the credit grantors **421 would remedy any shortcomings in the system. In my view, the hearings on this subject before the Subcommittee on Consumer Affairs have not produced any hard evidence which would lead a reasonable person *20 to reach a conclusion contrary to the findings of the National Commission on Consumer Finance that Federal legislation is not needed.

### Legislation will be counterproductive

Not only has the Congress been encroaching on right of the states to legislate on local matters, it has also usurped much of the vital decision-making power formally exercised by business and consumers in a free market. This is vividly illustrated in the consumer credit areas. The first effort was the Truth in Lending Act which had an equally noble purpose. But the implementation of this legislation has burdened industry with great costs, all of which are passed on to the consumer. On top of this, there is no empirical evidence that there have been offsetting economic benefits. Rates have not dropped and there does not seem to be an awareness among most consumers of comparative costs of credit. Last year the real regulatory overkill came with the enactment of the Fair Credit Billing Act, the Equal Credit Opportunity Act, and the Real Estate Settlement Procedures Act. Now, even before we have had an opportunity to see how the Equal Credit Opportunity Act will work. Congress is extending it to cover additional fields of activity.

Although the sponsors of this legislation have decried bureaucratic regulations imposing paper work on industry they have included provisions that would require lenders to give in writing upon request reasons for denial of credit. Yet no survey shows that the consumer is dissatisfied with the present system.

This regulatory overkill can have the result of harming those intended to benefit by either drying up sources of credit or making credit more expensive or both.

Equally devastating is the effect that the regulatory overkill is having on small business. A good example may be seen in the testimony given before the Consumer Affairs Subcommittee by a small independent merchant from Worchester, Massachusetts. The witness states that if the regulatory trend is to continue many independent credit retailers will be forced out of business. The witness reiterated that retail merchants don't refuse business and don't discriminate on account of color, sex, religion, or national origin. They give anyone credit who is credit-worthy. That's just good business. However, he did not feel that he or other small retailers would be able to handle the proposed letter of rejection. This regulatory overkill is forcing merchants out of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

credit business and many who stay in business at all are having to rely on bank credit cards. This not only hurts business for the independent retailer but it limits the financing choices for the consumer.

In conclusion, I find abhorrent any discrimination in the granting of credit not related to an applicant's willingness and ability to pay. However, I do not feel that the proposed legislation will contribute to its stated goals and could be counterproductive by increasing the cost of credit for the consumer and could very well limit the availability of credit and credit options for those intended to be aided by the bill. I fear the overall effect of the legislation will be to drive more **422 small business people out of the credit business and into the hands of large credit grantors. Ultimately, this could lead to a monopoly of credit granting in the hands of large national firms or the government itself. I do not believe that is in anyone's best interest.

JESSE HELMS.

## *21 ADDITIONAL VIEWS OF MR. GARN

Although I completely agree with the objectives of the Equal Credit Opportunity Amendments, I have reservations concerning some of the specific provisions of the legislation.

### Exemption of Business Credit

The Subcommittee bill considered by the full Committee provided that the Federal Reserve may by regulations exempt from the provisions of the Act any class of transactions not primarily for personal, family or household purposes. Language was added by the full Committee to require that prior to exempting any class of transactions the Board make an express finding that the application of such provision or provisions would not contribute substantially to carrying out the purposes of the Act. Since there was a paucity of evidence at the hearings on the legislation indicating that there had been abuses in the business credit area, I would hope that the Board take prompt action to exempt business credit from provisions of the Act written with consumer credit in mind.

For example, the requirement for written reasons for credit declinations was not fashioned in the light of commercial practice. Commercial credit involves the extension of credit between merchants for inventory stock, plant equipment, and the like. The very nature of most business to business relationships means that purchases are made frequently and continuously, often without a lot of red tape. Making this provision applicable to business credit would be very expensive and place impediments in the way of commercial transactions. The additional expense and paper work would be astronomical and would not contribute to the achievement of the purposes of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Act.

## Written Reasons for Adverse Action

Although the Committee was wise in not requiring automatic written reasons for denial of credit it does require a written notification to the applicant of his or her rights to the reasons for the denial. I am concerned with the potential burden that this provision will place on credit grantors. The cost of compliance will ultimately be borne by the consumer.

Industry practice differs regarding the giving of notice of denial of credit. Some large retailers and credit-card grantors mail a written notification of a declination while other retailers and finance companies prefer to notify an applicant orally that the credit application has been denied. The cost of such written notifications can run into millions of dollars.

The authors of this provision seem to ignore the lesson of Truth in Lending and RESPA that what is intended as a simple disclosure provision too often turns out to be a bureaucratic nightmare of paperwork. I am particularly concerned with the burden this section will put on small business. Without question, its effect will be to force an increasing number of small credit grantors out of the credit business.

## *22 **423 Good Faith Reliance on Board Opinions

The Committee by a tie vote failed to approve an amendment which would permit creditors to rely upon interpretations to be issued by duly authorized officials or employees of the Federal Reserve System, in addition to the present permission for them to rely upon regulations and interpretations issued by the Board.

The need for that provision is twofold. The simplicity perceived by the authors of Truth in Lending has not materialized, leaving credit grantors with a maze of unclear and often complicating statutory provisions, regulations and court opinions which make compliance next to impossible. Although the Federal Reserve System has been helpful in issuing staff letters of advice, neither the Board nor Congress have done much to clarify the law. Whereas cases in the 5th and 9th Federal Circuits have held staff opinions to be entitled to great deference, the 2nd Circuit in Ives v. Grant (CA 2, July 31, 1975) gave staff opinions 'short shrift.'

In failing to solve the problem arising under Truth in Lending by clearly drafted legislation and binding interpretative opinions Congress and the Board are merely shifting the burden and responsibility to the Federal court system. This is reflected in the 1975 Annual Report of the Administrative Office of the United States Courts showing a rise in Truth in Lending caseload from 415 in fiscal years 1972 to 2,237 in fiscal year 1975, a 439% increase. This solution has resulted

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

in more confusion, conflicting judgments, huge court costs and attorneys' fees with a great waste of time and energy of the courts and industry which could better be spent in solving more serious problems of our society.

### Due Process in the Rulemaking Procedure

During the consideration of the Equal Credit Opportunity Act Amendments I offered and with-drew, upon assurance that there would be later hearings on the subject, an amendment to provide for an adjudicatory proceeding when the Federal Reserve Board engages in rulemaking under the Equal Credit Opportunity Act. The purpose of this proposal is to assure that all parties have an opportunity to be heard and that a record be established sufficient for a judicial determination as to whether the agency has abused its discretion or acted in an arbitrary or capricious manner.

Since it is important that the public have confidence in the integrity of the regulatory process, I am hopeful that the Consumer Affairs Subcommittee at an early date will fully explore this mat-ter in oversight hearings.

### Civil Liability

One of the most controversial issues faced by the Committee dealt with the limitation of liabil-ity in class action suits. The Subcommittee had raised the present ceiling of $100,000.00 or 1 per cent of the net worth of the creditor, whichever is greater, to $50,000.00 or 1 per cent of the net worth of the creditor, whichever is the lesser. I offered an amendment to restore the present limi-tations on class action liability because I felt that the greater limitation in the Subcommittee's bill would be excessive.

A $50,000.00 maximum liability could wipe out a small business. On the other hand, a 1 per cent of net worth limitation for large firms **424** would be no limitation at all. *23 For example, 1 per cent of Exxon's net worth is $137,176,910.00. Bank of America's 1 per cent is $18,000,000.00 and First National City Bank of New York is $22,000,000.00. This would make it attractive to sue the large firm who generally are quite careful to comply with the law.

The National Small Business Association wrote the Subcommittee that a potential class action liability of $50,000.00 could, if awarded, be destructive to the total business of many small busi-nesses. The Association feels that the present civil penalty provisions of the Equal Credit Oppor-tunity Act are themselves harsh but at least there is some protection in the present liability limita-tions.

The Assistant Attorney General of the Civil Rights Division advised the Consumer Affairs Subcommittee that the $100,000.00 limitation is on the facts we have to date an adequate deter-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

rent. In his view an award of $100,000.00 punitive damages would not necessarily be a 'slap on the wrists', even for the largest creditor. To increase the maximum recovery to a figure greater than $100,000.00 might well encourage the filing of meritless law suits under the Act.

One of the greatest deterrents in class action exposure is the cost of the litigation to the defendant and the possibility that the defendant may be required to pay the attorneys' fees of the plaintiff. Class action attorneys' fees can be substantial. For example, the Senate Commerce Committee in its Class Action Study of June, 1974, made the following findings:

Attorneys' fees were often substantial and accounted for the greatest reduction in the recovery ultimately received by the class. In 20 of the 32 cases in which the class received awards and for which information was available, the plaintiff attorneys' fees exceeded $100,000. Antitrust and securities actions accounted for the largest fees comprising all the suits involving fees of over $500,000 and 35 percent of the cases with fees between $100,000 and $500,000. In slightly more than half of the 28 actions where information was available plaintiff attorney's fees represented 25 percent or less of the total recovery but in 3 cases fees amounted to over 50 percent of the total recovery. While plaintiffs' attorneys' fees did not consume the class recovery, they were nonetheless often quite substantial, particularly in securities and antitrust actions. There is no way to assess whether attorneys were grossly overcompensated but the question is legitimately raised when fees reach such great amounts. (Committee on Commerce, Class Action Study, June 1974, p. 29 and 30.)

In the Ratner case (Ratner v. Chemical Bank of New York Trust Company, 54 F.R.D. 412 (S.D.N.Y. 1972)) which involved a technical violation of the Truth in Lending law, the court did make an award of attorneys' fees to the plaintiff in the amount of $25,000.00

In a later case Weathersby, Jr. v. Fireside Thrift Company, No. 3-73-0563 (N.D. Calif. 1975) the United States District Court for the Northern District of California in commenting on Ratner stated that 'Nevertheless, plaintiff should find the prospect of mandatory award without proof of injury sufficient to stimulate them to bring suit, particularly since they may also recover attorneys' fees, which **24 **425 can be quite high even where the actual recovery for the plaintiff is small.'

In the Ratner case the outside defense counsel cost the Chemical Bank $250,000.00. Internal costs to the bank were $100,000.00. Plaintiff's attorney received $25,000.00 while the plaintiff who was unable to establish actual damages received punitive damages of $100.00. Total costs to the bank were $375,100.00

Attorneys' fees for plaintiff were $60,000.00 in Ives v. W. T. Grant. (C.A. 2, July 31, 1975) Individual plaintiffs received a mere $4.00 each. The defendant was found guilty for failure to itemize finance charges under Grant's credit plan even though staff letter of Federal Reserve had advised itemization not necessary.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Since in many cases the attorney's fees are the largest cost in class action suits, the question arises whether the present system for awarding counsel fees to winning litigants in public interest litigation is equitable. Professor John P. Dawson of Harvard in a recent article (Dawson, Lawyers and Involuntary Clients in Public Interest Litigation, 88 Harv.L.Rev. 849-930 (1975) concludes that the essentially uncontrolled and unguided discretion of trial judges to fix lawyers' rewards at times results in potentially enormous sums.

The American Bar foundation research publication on The Status of Class Action Litigation made the following finding concerning abuses in class action litigation:

What we have seen supports the charges-- and the beliefs-- that class actions have given rise to some distinctive abuses. Cases have been filed by attorneys who expect that the threat of class demands will yield settlements of claims so dubious as to be frivolous. Shady business has been involved on both sides where payments have been made to a plaintiff or to his attorney in return for abandonment of claims on behalf of an entire class. Settlements awarding much to attorneys and little to members of the class suggest abuse in some cases although such results may be quite proper in others. Too, attorneys have sometimes filed suits merely to tag along and claim fees for work done by others in cases filed earlier which cover the same classes. (G. W. Foster, Jr. The Status of Class Action Litigation, 1974, for the American Bar Association, pp. 26 and 27.)

Much of the litigation under Truth in Lending has been over technical violations. For example, in the Ratner case the violation involved the failure of the defendant to fill in the blank space indicating the annual percentage rate for a consumer who owed no service charge. The consumer suffered no injury. The experience of at least one large retailer under Truth in Lending Act is that every action seeking large punitive damages from the company has been based on trivial, purely mechanical violations.

Exposure to litigation will be substantial under the Equal Credit Opportunity Act because in each instance the granting of credit involves an exercise of judgment that goes into distinguishing between a good and a bad credit risk. The process could easily involve an unintended, nonmalicious mistake or an unknowing technical**426 *25 violation, of the act. This risk is compounded as technical regulations by both the federal government and states proliferate: already, approximately 30 states have enacted legislation forbidding credit discrimination based on sex or marital status, several providing for requirements which are different from the Federal Equal Credit Opportunity Act and Regulation B of the Federal Reserve Board.

The Committee accepted my proposal to restore the present approach to the civil liability limitation after adopting Senator Proxmire's amendment to raise the monetary limitation from $100,000.00 to $500,000.00. Although I feel that the $500,000.00 limitation is a bit excessive, the overall approach is a reasonable one.

Since there are obvious problems with the present class action section of the law, hearings

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:13-cv-08564 Document #: 19-6 Filed: 02/12/14 Page 24 of 159 PageID #:774

should be held to determine how the present class action section is operating and what changes, if any, should be made. This is a highly technical area and a number of other bodies have looked at it and made conflicting recommendations. The previously cited class action study of the Senate Commerce Committee did look at the use of class actions in enforcing consumer protection statutes. Also, the Judiciary Committee held hearings on the subject in 1970. The American Bar Association made a report on consumer class actions and made a recommendation that the present procedure under Federal Rule of Procedure 23 not be changed. Last year, Senators Proxmire and Brock introduced S. 3690 to provide an alternative to class action suits and recommended hearings on the subject.

JAKE GARN.

## *27 ADDITIONAL VIEWS OF MR. TOWER

While I agree with the objectives of the Equal Credit Opportunity Amendments, I share the concerns which Senator Garn has expressed over certain provisions of this legislation. I am particularly concerned over the requirement that creditors give written notification to those being denied credit. Ultimately, the costs of such written notification must be borne by borrowers, and the paper work burden and administrative expenses associated with such written notification could easily outweigh any realized or anticipated benefit. I believe that before it is implemented, those who advocated the adoption of the provision should demonstrate that this would not be the case.

I am also concerned over efforts to apply this Act to business credit. The Federal Reserve, of course, is authorized to exempt business credit from the provisions of this Act. The provisions of this Act are not really suited to all forms of business credit, and an exemption in such cases would be clearly appropriate. I would hope that the Federal Reserve would make such an exemption at an early date.

JOHN TOWER.

1 91 S.Ct. 849, 28 L.Ed.2d 158.

2 94 S.Ct. 2140, 40 L.Ed.2d 732.

(Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE   DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: *****.

2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

000669

SEARCH    USING  THE  PUBLIC  LAW  NUMBER,  e.g.,  TO(99-495))

S. REP. 94-589, S. Rep. No. 589, 94TH Cong., 2ND Sess. 1976, 1976 U.S.C.C.A.N. 403, 1976
WL 13838 (Leg.Hist.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

96TH CONGRESS    HOUSE OF REPRESENTATIVES    REPORT
2d Session    No. 96–865

## FAIR HOUSING AMENDMENTS ACT OF 1980

APRIL 1, 1980.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. EDWARDS of California, from the Committee on the Judiciary, submitted the following

# REPORT

together with

## SUPPLEMENTAL VIEWS

[To accompany H.R. 5200]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 5200) to amend title VIII of the Act commonly called the Civil Rights Act of 1968 to revise the procedures for the enforcement of fair housing, and for other purposes, having considered the same, report favorably thereon with an amendment and recommends that the bill as amended do pass.

The amendment strikes out all after the enacting clause of the bill and inserts a new text which appears in italic type in the reported bill.

## EXPLANATION OF THE AMENDMENT IN THE NATURE OF A SUBSTITUTE

The amendment in the nature of a substitute differs from the introduced bill primarily in the following respects: the procedure and court of review for administrative decisions is changed; the protections afforded the handicapped are clarified and narrowed; a legislative veto of title VIII rules is added; violations of the title on the grounds of minimum lot size must be supported by a showing of intent; time limits for the administrative process are inserted;

venues for administrative hearings and judicial review are restricted; referrals to certified State and local agencies are made mandatory.

## Purpose of the Bill as Amended by the Committee

The purposes of H.R. 5200, as amended, are twofold. One is to fulfill the promise made to the American people twelve years ago by the enactment of title VIII of the Civil Rights Act of 1968. That law effectively proscribed housing practices with the intent or effect of discriminating on account of race, color, national origin or religion,[1] but it failed to provide an effective enforcement system to make that promise a reality. This bill seeks to fill that void by creating an administrative enforcement system (subject to judicial review) within the Department of Housing and Urban Development, and by improvements lessening barriers to the use of court enforcement by private litigants and the Department of Justice. Secondly, H.R. 5200 extends the principle of equal housing opportunity to handicapped persons, who, like the other classes protected by title VIII, have been the victims of unfair and discriminatory housing practices.

## History

The Subcommittee on Civil and Constitutional Rights began hearings on the federal government's role in the achievement of equal opportunity in housing in the 92nd Congress. Nine days of hearings, which included the testimony of over 15 witnesses, lent support to the conclusion that serious inadequacies were present in the law and in the agencies' efforts.[2]

In the 93rd Congress, the United States Commission on Civil Rights presented to the Subcommittee its findings on "Equal Opportunity in Suburbia,"[3] documenting the increasingly segregated housing patterns, and attributing that to the forces of both the private sector (real estate practices, such as steering, discrimination in financing, shift of employment location to the suburbs) and to the public sector (land use practices imposed by local governments, and the variety of Federal government practices which foster segregation).

In the 94th Congress, 5 days of hearings on "Equal Opportunity in Housing"[4] further confirmed that massive problems of discrimination continued despite the 1968 Act and that enforcement authority in the Department of Housing and Urban Development was so inadequate as to invite noncompliance.

Also in the 94th Congress, the Subcommittee focused oversight hearings on the problems of equal opportunity in rural housing[5] and in housing programs administered by the Veterans Adminis-

---

[1] And, as amended in 1974, on account of sex. Public Law 93–383.
[2] *Federal Government's Role in the Achievement of Equal Opportunity in Housing: Hearings before the Civil Rights Oversight Subcommittee of the House Committee on the Judiciary,* First and Second Sessions, 92nd Congress, Serial No. 34.
[3] *Equal Opportunity in Housing: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary,* 94th Congress, Second Session, Serial No. 57.
[4] *Equal Opportunity in Housing: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary,* 94th Congress, Second Session, Serial No. 40 (parts 1 and 2).
[5] *Equal Opportunity in Rural Housing: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary,* 94th Congress, Serial No. 51.

3

tration.[6] Those five days of hearings confirmed that housing discrimination is national in scope and that discrimination in the private market is supported or tolerated by government agencies.

As a result of the evidence acquired in those hearings, in the 95th Congress H.R. 3504[7] and H.R. 7787[8] were introduced. The former bill contained an administrative enforcement system similar to that contained in H.R. 5200. The latter bill proposed to improve enforcement by vesting the Department of Housing and Urban Development with the authority to sue on behalf of individual title VIII complainants. The Subcommittee held 7 days of hearings on those measures; 17 witnesses testified and over 54 comprehensive additional written comments were received.[9]

Based upon the comments and suggestions from the preceding hearings, in the 96th Congress, the sponsors refined and redrafted H.R. 3504, and introduced H.R. 2540. That bill was the subject of 8 days of hearings (including 32 witnesses).[10] Like its predecessor, H.R. 2540 provided for the creation of administrative enforcement authority within the Department of Housing and Urban Development, and the inclusion of the handicapped as a protected class under title VIII.

Following 2 days of mark-up, on August 1, 1979, the Subcommittee, by a vote of 7 yeas and 2 nays ordered H.R. 2540 reported as a clean bill (subsequently introduced as H.R. 5200) to the full Committee on the Judiciary. The full Committee considered H.R. 5200 for four days, and on March 5, 1980, by a vote of 24 yeas to 6 nays ordered it favorably reported to the House, with a single amendment in the nature of a substitute.

## BACKGROUND AND NEED

On April 11, 1968, title VIII of the Civil Rights Act of 1968 was approved. While this was not the first Federal law to require equality of housing[11] opportunity for all Americans, it was the first comprehensive statutory framework guaranteeing this most basic of human rights.

That law was the product almost entirely of action taken on the Senate floor in 1968, in which the House of Representatives subsequently concurred. The result of this effort was the establishment of a clear national policy against housing discrimination, but little attention was paid to the details of implementation, resulting in what this Committee, in light of experience, now views as shortcomings.

[6] *Equal Opportunity in Veterans Administration Housing Programs: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary,* 94th Congress, Second Session, Serial No. 571.
[7] Introduced by Congressmen Don Edwards and Robert Drinan.
[8] Introduced by Congresswoman Gladys Spellman.
[9] *Fair Housing Act: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary,* 95th Congress, Second Session, Serial No. 46. (hereinafter, *Fair Housing Act: Hearings before . . .*)
[10] *Fair Housing Amendments Act of 1979: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary,* 96th Congress, First Session, Serial No. 12. (hereinafter *Fair Housing Amendments Act of 1979: Hearings before —*)
[11] See for example, 42 U.S.C. 1982 (Civil Rights Act of 1866) prohibiting race discrimination in the purchase, sale, lease, etc. of real and personal property (Until *Jones v. Alfred Mayer,* 392 U.S. 400, this was believed to be applicable only to state action); Executive Order 11063 (1962) and title VI the Civil Rights Act of 1964, prohibiting race discrimination in housing receiving federal assistance, but explicitly excluding assistance in the form of loan insurance or guaranty.

4

## ENFORCEMENT

The primary weakness in the existing law derives from the almost total dependence upon private efforts to enforce its provisions. For financially capable victims of housing discrimination, the Act has provided litigation remedies. For the vast majority of victims, however, this course of action is not feasible. Alternative enforcement under title VIII is limited to "pattern and practice" cases brought by the Attorney General. While these cases have dealt with virtually every important type of discrimination, and have had a significant impact on the state of the law, relief for individual victims of housing discrimination has not been readily available through this avenue.[12]

The present law, while giving the Department of Housing and Urban Development (HUD) the responsibility to receive and investigate complaints of housing discrimination, and while giving the agency adequate powers to investigate, gives HUD no real power to remedy the housing violations that its investigations reveal. If HUD fails to achieve a remedy for the violation through conciliation, aggrieved individuals are left to seek redress through private civil actions.

Without any power to back up its conciliation efforts, HUD has been unable to get respondents to take the process seriously. Many refuse to consider conciliation at all; fewer still agree to any kind of settlement that rectifies an act of discrimination.[13] In the words of former HUD Secretary Carla Hills, "* * * the most serious obstacle to an effective title VIII program is the lack of adequate enforcement powers * * * [T]he present law, in relying upon conciliation, is an invitation to intransigence."[14]

The consequence of HUD's powerlessness is that victims, too, do not perceive the conciliation process as offering any real hope of relief. In the entire country, not more than 4,000 complaints have ever been filed with HUD under title VIII in any given year, despite the objective evidence that discrimination is widespread and pervasive.

In addition to the visibly segregated housing patterns evident across the nation, recent studies confirm that minorities are more often than not subject to discriminatory housing practices when they seek housing. For example, one recent survey of the practices of nearly 3,200 real estate sales firms and rental agencies in 40 metropolitan areas found that the probability of a black home-seeker encountering discrimination would be 75 percent in the rental market and 62 percent in the sales market.[15]

---

[12] Since the enactment of the Fair Housing Act, only about 300 suits have been brought by the Department of Justice.

[13] In 1977, for example, about 3,391 complaints were filed with HUD. Of these, 277 were successfully conciliated, and of those, in only about a fourth of the cases was the contested housing obtained by the victim of discrimination. U.S. Commission on Civil Rights, *The Federal Fair Housing Enforcement Effort* (March 1979) at page 29 and 32. See also General Accounting Office, *Stronger Federal Enforcement Needed To Uphold Fair Housing Laws* (February 2, 1978), page 27. Both the Civil Rights Commission and the GAO recommended that HUD be granted administrative enforcement authority.

[14] *Equal Opportunity in Housing: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary,* 94th Congress, Second Session, Serial No. 40, part 2, at 118.

[15] *Fair Housing Act: Hearings before . . .* supra, at 46. These percentages do not take into account the possibility of encountering discrimination in other phases of the housing process—such as in financing, nor do they account for the illegal process of "steering," i.e. the selective

Footnotes continued on next page

5

A similar study, measuring discrimination against Mexican-Americans in the Dallas rental housing market, produced even more alarming results, i.e., that a dark-skinned Mexican-American has a 96 percent chance of experiencing discrimination when seeking a rental.[16]

The nature of discriminatory housing practices is relevant to the question of how best to remedy the apparent enforcement deficiencies. The aforementioned surveys, the title VIII charges filed with HUD, and the private suits filed under title VIII all lend support to the conclusion that most fair housing cases involve relatively simple questions of law and fact that could be best resolved in an administrative forum. For example, the survey cited above found that the usual forms of discrimination in marketing practices are subjecting minorities to higher sales or rental prices, larger down payment, longer waiting periods, higher interest rates, showing fewer homes or listings, requiring more credit information than similarly situated non-minority home seekers; false statements that no premises were available, and so forth. While these practices may be difficult to uncover, (in that the victim may not even realize that the illegal discrimination has occurred), once that evidence is acquired, the proof necessary to establish a violation is not complex.[17]

An administrative alternative will also respond to the high costs of such litigation and the inordinate length of time involved before final resolution of these cases.[18] Despite the possibility of an award of attorneys fees for prevailing plaintiffs, few private lawyers have been willing to take on such cases.[19] These factors tend to discourage all but those most persistent and steadfast in their determination to exercise rights guaranteed by the statutes.

The advantages of an administrative enforcement system over judicial enforcement render this an appropriate alternative for most fair housing cases. The simplicity of the administrative process (including the simplified rules of evidence and pre-hearing proceedings) permit the layman to participate in the proceedings without the assistance of counsel. Speed—especially important in housing cases, when the goal is often to obtain a needed dwelling unit—is

Footnotes continued from last page
showing of housing to white or blacks or other groups in a manner designed to perpetuate and extend residential concentration by such groups. Thus, the data may underestimate the true extent of discrimination.

[16] Light-skinned Mexican-Americans were found to be subject to a 65 percent chance of encountering discrimination. U.S. Department of Housing and Urban Development, Office of Policy Development and Research, *Discrimination Against Chicanos in the Dallas Rental Housing Market: An Experimental Extension of the Housing Market Practices Survey*, August 1979.

[17] Cases presented for litigation are also fairly simple. In a report prepared for HUD, Office of Fair Housing and Equal Opportunity, entitled *Remedies Obtained Through Litigation of Fair Housing Cases: Title VIII and the Civil Rights Act of 1866*, an analysis of a representative and randomly selected sample of such cases showed that "[m]ost of the lawsuits alleged discrimination based on race for refusal to sell, rent, lease, or finance." (at page 2).

[18] See, for example, the testimony of fomer HUD Secretary Robert Weaver, *Fair Housing Amendments Act of 1979: Hearings before. . .* supra, at page 175. The analysis cited above, *Remedies Obtained Through Litigation . . .* supra, showed that the average time period between filing and the date of the court's final order was approximately 21 months. Furthermore, the difficulties in obtaining counsel and funds for litigation may have been responsible for an additional average delay of two months before the case was filed.

[19] *Remedies Obtained Through Litigation. . . supra*, at page 48: "As the report indicates, most successful fair housing litigation is occurring in a limited geographical area. . . . These cases are being handled by a handful of attorneys." In nearly half the cases, the plaintiff's attorney was associated with a fair housing group or a civil rights organization. The relatively low award of damages ($2,913) and attorneys fees ($1,844), as well as the present law's indigency proviso regarding attorneys fees, in part may account for this phenomenon.

6

more easily obtainable. The flexibility of holding hearings and con-
ciliation meetings in locations close to the parties also makes the
process more convenient. The relative simplicity of the process re-
duces the cost for all sides, particularly for the victim of discrimi-
nation, on whose behalf HUD will gather and present evidence at
the hearings. Most important, the process of conciliation will be
given a vitality that is lacking when sanctions are absent. Under
the present enforcement system, the conciliation process not only
fails to produce results when used, but may simply be exploited as
a means of delaying any ultimate resolution.[20] With an adminis-
trative remedy, the expectation is that in the vast majority of cases
where reasonable cause is found, resolution will be reached without
resort to orders or hearings. This has been the experience under
state law where the agency has authority comparable to that given
to HUD under this bill.[21] Finally, the creation of administrative
authority to enforce title VIII demonstrates a commitment on the
part of the government to enforce this public right.[22]

At the same time, however, the Committee recognizes the
strengths of judicial enforcement, and the need to continue this
avenue of redress. Court proceedings, for example, are more suited
to managing complexity and to interpreting the law as it applies to
emerging variations of discrimination. Futhermore, as one witness
stated, "[W]hile government enforcement is essential for broad cov-
erage, private suit remains important also as a cutting edge, to
assure that government does its job effectively and to give confi-
dence to the minority community that, if necessary, it can rely on
its own resources—private lawyers."

To render judicial enforcement a more accessible alternative, the
Committee reviewed the procedural difficulites encountered by pri-
vate litigants and the Department of Justice when proceeding
under title VIII.

The relatively short statute of limitations,[23] the procedural am-
biguities in the present law,[24] the inhibitions on the award of at-
torneys fees,[25] all create barriers to litigation under title VIII. For
racial minorities who can assert a cause of action under alternative
statutes (e.g. 42 U.S.C. § 1982), many of these problems may be
avoided.[26] For other protected persons, however, such barriers may
effectively preclude any form of relief.

---

[20] See *Fair Housing Act: Hearings before. . . supra,* Statement of Assistant Attorney General
Drew Days III, p. 66.

[21] In Connecticut, for example, last year, out of 116 complaints, reasonable cause was found in
41; in 39 cases, conciliation was obained. Only 1 hearing was held. Likewise, last year the State
of Michigan (Department of Civil Rights) issued only one order, but successfully adjusted 103 of
its 175 cases.

[22] For further discussion of the advantages of administrative enforcement, see the memoran-
dum prepared by the Congressional Research Service, "Arguments for and against granting
HUD cease and desist authority in the area of Fair Housing reprinted in *Fair Housing amend-
ments Act of 1979: Hearings before . . . supra,* at page 647 et seq.

[23] 180 days.

[24] See for example, testimony *Fair Housing Amendments Act of 1979: Hearings before. . .
supra,* at page 6 and 8.

[25] Title VIII is the only civil rights attorneys fee provision which contains a limitation that
attorney fees be awarded to plaintiffs who are financially unable to assume such fees.

[26] See for Example, *Brown v. Ballas,* 331 F. Supp. 1033 (N.D. Texas, 1971) wherein a statute of
limitations problem was avoided by relying on the Civil War statute.

7

## CLARIFICATION OF COVERAGE

The second category of improvements in title VIII relates to the desirability of greater specificity in substantive coverage. Consistent with case law interpretation of provisions of the present law, and in the interest of providing improved notice to affected persons, certain clarifications were deemed appropriate, among these the explicit citation of mortgage redlining, discrimination in the providing of hazard insurance and in the making of appraisals as prohibited practices.

There are sound reasons for covering each link in the real estate chain. Discrimination by one participant can itself lead to the outright denial of housing, and also can provide the impetus for adverse or discriminatory decisions by other and subsequent participants in the process. For example, with respect to appraisals, reliance upon racial or ethnic factors may produce an under-valuation that prompts a financial institution to deny a loan, or to offer financing on less advantageous terms,[27] thereby providing the primary device by which redlining is accomplished. While the practices and policies of appraisers may have changed,[28] the Committee agreed that the law ought to be clear that racial and ethnic factors should not influence the decision-making process of any participant in the selling or renting of dwellings—whether it be brokers, sellers, landlords, financial institutions, or appraisers. To the extent a dwelling's value may be affected by an increase or decrease in demand generated by the racial or ethnic composition of a neighborhood, that change will be reflected in the objective, non-racial indicators of value that appraisers have always relied upon in determining value—factors such as comparable sales prices, employment stability, marketing time, rent levels, vacancy rates, and level of municipal services.

The explicit inclusion of appraisers under title VIII does not change existing law. Since the holding in *United States* v. *American Institute of Real Estate Appraisers*, 442 F. Supp. 1072 (N.D. Ill. 1977) it has been clear that the Fair Housing Act reaches the activities of the appraisal industry.[29]

Likewise, since *Dunn* v. *Midwestern Indemnity*, 472 F. Supp. 1106 (S.D. Ohio 1979), title VIII has been viewed as covering hazard insurance. In finding that a discriminatory failure or refusal to provide property insurance on a dwelling is a violation of Section

[27] The assumption upon which appraisers and underwriters relied for years was that racial integration had an adverse effect on property values. See *Fair Housing Amendments Act of 1979: Hearings before . . . supra*, at page 344–387, wherein teaching materials of two major appraiser organizations, (the American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers) are quoted. These teachings tended to perpetuate this presumption. See also the report of the U.S. Commission on Civil Rights, quoted, at page 430, *Id.* which confirms the adverse and discriminatory effects of this presumption.

[28] As a condition of the dismissal of a title VIII suit against them, the appraisal groups (noted above) have themselves issued policy statements which refute these assumptions. See policy statement of AIREA and SREA, quoted, in part, at pages 427–429, *Ibid.*

[29] The district court noted: "It is clear from the plain language of the provisions that appraisers are not exempt from their coverage; both sections are unrestricted with respect to the class of persons subject to their prohibition. The 'otherwise make unavailable or deny' language of section 804(a) has been applied to a variety of conduct to prohibit all practices which have the effect of denying dwellings on prohibited grounds . . . . The 'or interferes with' language of section 817 has been similarly broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the Act. . . . The Act requires a liberal construction if the statute is to prohibit effectively 'all forms of discrimination', sophisticated as well as simpleminded.'" *United States* v. *AIREA, supra*, at 1079.

8

804(a) of the Act, the court noted the interdependence of this phase of the housing process upon other phases:

> [T]he availability of appropriate insurance is a necessary predicate to the availability of financing, and financial assistance is a precondition to securing the availability of adequate housing. Id. at 1109.

Recent independent studies have documented the fact that discriminatory home insurance decisions are being made despite state insurance anti-discrimination laws.[30] While some state insurance commissions operate under laws that provide adequate anti-discrimination coverage and tools of enforcement, many do not.[31] In any case, the need to provide comprehensive federal coverage of all aspects of the housing process militates against exclusion for this industry, or any segment of the housing chain.

### COVERAGE OF HANDICAPPED PERSONS

The third significant improvement sought by this bill is the expansion of federal fair housing protections to handicapped persons. The enactment of the Rehabilitation Act of 1973 (29 U.S.C. 701 et seq.) was the first federal effort to extend anti-discrimination laws to the handicapped. However, housing discrimination was prohibited only to the extent the affected programs and activities receive federal financial assistance. The federal nondiscrimination policy does not now extend to the private market place.

Discrimination against handicapped individuals is rooted in the same myths and misconceptions which traditionally have resulted in discrimination against the historically recognized minorities and women who find protection in title VIII. The discrimination which handicapped individuals encounter arises from stereotyped notions which are frequently ill-founded. Where fears and prejudices are the justification for an act of housing discrimination, it is appropriate to include proscriptions against these actions within the framework of existing civil rights statutes.[32]

Housing discrimination against the handicapped often takes the form of simply refusing to rent, requiring an increased security de-

---

[30] See, for example, the report of the United States Commission on Civil Rights, *Insurance Redlining: Fact Not Fiction*, which found that "[d]espite industry claims that its underwriting practices are based on loss experience and other objective, empirical data, the [Midwestern] committees find that marketing decisions are frequently made on the basis of subjectivity and unfairly discriminatory factors." Similar conclusions were reached in studies of insurance redlining in Detroit, Illinois, New York, and Michigan, among others. See the report issued by the Federal Insurance Administration, *Insurance Crisis in Urban America* (1978) for a description of those studies. In that report, FIA itself concluded that " . . . redlining is a kind of arbitrary, guilt-by-association indictment of entire neighborhoods or even cities that excludes many decent risks from access to a free insurance market. It is by indirection choking credit and the means to maintain healthy core urban areas today in the Nation. Even in areas where FAIR plans provide essential coverage at affordable rates, redlining has stigmatized healthy neighborhoods as second class areas. This impacts negatively on investment and reinvestment opportunities for these areas."

[31] The Federal Emergency Management Agency, for example found that a legal review of many state statutes indicates a lack of both sufficient substantive coverage and power to order adequate remedies. Letter to Congressman Don Edwards, October 19, 1979, from Gloria M. Jimenez, Federal Insurance Administrator.

[32] Likewise, extending the Fair Housing Act to cover the handicapped constitutes a permissible congressional enactment under both the 14th Amendment and the Commerce Clause. See Memorandum prepared by the Congressional Research Service, reprinted in *Fair Housing Amendments Act of 1979: Hearings before . . ., supra*, pages 663–681.

9

posit or a higher rent, because it is presumed that a handicapped person is more likely to cause damage.[33]

In other situations, the dwelling may not be accessible or useable by the prospective handicapped occupant unless some physical modifications are made. These may range from the major (e.g., widening a door to permit wheelchair access) to the minor (e.g., installation of lights in lieu of a doorbell).[34] Under existing law, there is no legal compulsion for a landlord to permit any such change, even if the change increases value and utility for non-disabled persons, and even if there is an agreement to restore the premises to their original condition.

The cost of making these modifications also ranges from the insubstantial to major expenditures. However, in the view of the Committee, this bill should not place the responsibility should not be placed upon the private property owner, particularly since H.R. 5200 provides no federal financial assistance for those changes.

When the disabled tenant or buyer is willing to assume that financial burden, arbitrary refusals which thwart that effort to render a dwelling accessible should be prohibited.

The Committee recognizes, however, that although this will be important in principle, in reality, relatively few disabled persons are in a position to afford major architectural modifications. The isolation and dependence resulting from a handicap often are the cause of limited job opportunities and resources. Assistance—by the government or the private housing industry—therefore may be warranted to achieve an acceptable degree of accessibility for the 36 million Americans who are disabled. However, before proceeding with any such approach, the extent of the problem and the probable cost of its solution should be analyzed. Accordingly, the bill provides that the Architectural and Transportation Barriers Compliance Board undertake a study on these and related issues.

CONCLUSION

The effects of housing discrimination on both the individual and the society are truly pervasive; because free access to housing is basic to the enjoyment of many other liberties and opportunities, discrimination against minorities, women, and the handicapped has far reaching consequences. To the individual it means economic hardship, loss of job opportunities, humiliation, and alienation. To the society, it has meant the creation of the massive problems we now face, including the trauma of school busing to compensate for segregated housing patterns. As the Mayor of Indianapolis, William Hudnut III testified:

> [I]f we can stablize housing throughout the communites we live in and effectively combat discrimination and segregation through the adoption of nondiscriminatory housing * * * and financing practices, then the necessity for busing would be greatly reduced, if not eliminated.

---

[33] *Fair Housing Act: Hearings before . . ., supra,* pages 244–299, submitted comments at pages 573–589 and *Fair Housing Amendments Act of 1979: Hearings before . . ., supra,* pages 515–523 and pages 625–635.

[34] See, for example, the report prepared for the Office of Policy Development and Research, U.S. Department of Housing and Urban Development, entitled *Adaptable Dwellings,* which describes a variety of adaptive devices and architectural/interior design features that can be used to make a home usable for disabled people.

10

For the handicapped, housing discrimination has meant poverty and social isolation; for the society, it has necessitated the creation and support of expensive and dehumanizing institutions for the care of persons capable of living in the community.

There is, Mayor Hudnut continued, "a moral as well as a legal obligation to establish mechanisms in government that can assure people of those rights when they are trampled upon and when they are denied."

### SECTION-BY-SECTION ANALYSIS

#### SHORT TITLES

*Section 1.*—Provides that the short title of this Act will be the Fair Housing Amendments Act of 1980.

*Section 2.*—Provides that the short title of the 1968 Act (which is being amended) will be the Civil Rights Act of 1968. This simply establishes in the law itself the short title which is usually used when referring to the 1968 Act.

*Section 3.*—Provides that the short title of title VIII of the 1968 Act shall be the Fair Housing Act. Again, this simply establishes in the law a title normally used when referring to title VIII.

#### AMENDMENTS TO DEFINITION SECTION

*Section 4(a).*—Broadens the definition of "discrimatory housing practice" to include any violation under the Act and not merely those made illegal under Section 804, 805, or 806. Non-compliance with any provision of the Fair Housing Act which creates substantive obligations is therefore actionable under Section 8 of the bill.

This amendment recognizes that the obligation of federal agencies under subsection 808 of the Act (to administer their programs affirmatively to further the purposes of fair housing) should be actionable under title VIII. Several circuits have already held that violation of subsection 808 gives rise to a claim for relief on the part of aggrieved persons. See, *Shannon* v. *U.S. Department of Housing and Urban Development* 486 F2d 809 (3rd Cir 1970) and *Otero* v. *New York Housing Authority* 484 F2d 1122, 1133 (2d Cir. 1973).

To achieve the ends of title VIII, case-by-case resolution of fair housing complaints must be supplemented by a concerted effort by all federal agencies with housing program obligations. On the other hand, the amendment is not intended to create a new cause of action based upon the failure of individual subordinate federal agency employees to take steps to "affirmatively administer" housing programs. Rather, it is institutional non-feasance and malfeasance which may be challenged and for which judicial review may be obtained under the Administrative Procedure Act. The amendment is also not intended to effectuate *de novo* judicial review of HUD actions taken pursuant to its title VIII administrative enforcement responsibility.

This change also is intended to codify case law interpretations of Section 817 which have held that a violation of Section 817 constitutes a separate and distinct violation of title VIII. See *Smith* v.

11

*Stechel* 510 F2d 1162 (CA Cal. 1975) and *Laufman* v. *Oakley Building and Loan Company* 408 F Supp 487 (DC Ohio 1976).

*Section 4(b).*—Provides a definition of handicap to be used under the Act. The language is similar to that contained in other federal law (see, Rehabilitation Act of 1973 (29 U.S.C. 701 *et. seq.)* and it is intended that the definition be interpreted consistently with regulations clarifying the meaning of the similar provision found in subsection 504 of the Rehabilitation Act.[35]

However, the definition adopted by the Committee makes it clear that such impairments do not include current drug or alcohol abuse, or any other impairment that would constitute a direct threat to the safety or property of others. This definitional limitation reaffirms the limits placed on the scope of coverage afforded to the handicapped under new section 804(g). That is, to the extent a handicap manifests itself in behavior which would violate generally applicable rules, policies, practices, or be incompatible with services or facilities, and accommodation of any of those items would result in unreasonable inconvenience to other affected persons, then coverage is not afforded. (See discussion, *infra.*)

*Section 4(b).*—Also provides a definition of "aggrieved person" which is applicable to the entire title. In *Gladstone Realtors* v. *Village of Bellwood* 441 U.S. 91 (1979), the Supreme Court affirmed that standing requirements for judicial and administrative review are identical under title VIII. The bill adopts as its definition the language contained in subsection 810 of title VIII and thereby retains the court's interpretation of standing under title VIII. See, *Trafficante* v. *Metropolitan Life Insurance Co.* 409 U.S. 205, 209 (1972), and in *Bellwood, supra.*

## MODIFICATION OF EXEMPTION

*Section 5.*—Narrows the exemption which excludes from coverage of subsection 804 certain sales and rental transactions. The current exemption applies both to owner-occupied dwellings (section 803(b)(2)) and to sales and rentals where the owner no longer occupies the dwelling (subsection 803(b)(1)). The amendment preserves that part of the exemption which seeks to protect legitimate privacy interests by applying only when the exemption-seeker continues to reside in the dwelling. It also retains the policy excluding from exemption transactions that rely on sales or rental agents, brokers, or salesman, or discriminatory advertising. Thus, an

---

[35] See, for example, Regulation S. 84.3(j)(2) of the Department of Health, Education and Welfare which provides as follows:

(i) "Physical or mental impairment" means (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(ii) "Major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(iii) "Has a record of such an impairment" means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(iv) "Is regarded as having an impairment" means (A) has a physical or mental impairment that does not substantially limit major life activities but that is treated by a recipient as constituting such a limitation: (B) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; but is treated by a recipient as having such an impairment.

12

owner who occupies a unit in a building of four or fewer units may rely on the exemption so long as agents, etc. and discriminatory advertising are not utilized.

## DISCRIMINATORY HOUSING PRACTICE AMENDMENTS

*Section 6(a).*—Amends the catchline of section 804 of the Act and conforms to existing case law interpretation holding that other practices, in addition to discrimination in the sale or rental of housing, are unlawful under section 804.

*Section 6(b).*—Amends section 804 of the Act by providing that the new and narrower exemption, discussed above, exempts certain housing from section 804 prohibitions dealing with the sale or rental of housing.

*Section 6(c).*—Amends section 804 of the Act by making it unlawful for insurance companies and their agents to discriminate in the providing of hazard insurance because of the race, color, religion, sex, handicap or national origin of the owners, residents or neighbors of the home. Discrimination in the terms, conditions or privileges of a contract of insurance is intended to encompass any form of adverse disparate treatment (including termination) that impacts disproportionately on protected persons and which is not justified by sound business necessity. See *Griggs* v. *Duke Power Co.* 401 U.S. 424 (1971). Prospective tenants and prospective owners who are members of the protected groups of persons are to be included within the protections of this provision. The amendment codifies existing case law interpretation of title VIII. See *Dunn* v. *Midwestern Indemnity,* (472 F. Supp. 1106 (S.D. Ohio 1979) which held that discrimination in hazard insurance is a violation of title VIII.[36]

By making this proscription explicit (as well as those discussed *infra*), the Committee does not intend to suggest that interpretation of subsections 804 and 805 should be narrowed to encompass only those activities specifically identified in those sections. For example, the phrase "otherwise make unavailable or deny" has been construed to cover a number of practices not explicitly covered in the Act or these amendments.[37]

*Section 6(c)* also amends subsection 804 of the act by prohibiting certain practices relating to the transfer of real estate interests and access to dwellings for handicapped persons.

The addition of subsection (g), clause (1) to subsection 804 of the Act creates a prohibition against any practice which is intended to, or which has the effect of refusing to rent or sell because of a handicap (as defined above). The handicap which occasions the refusal must be prossessed by someone who is either a prospective buyer or renter or who is associated with a buyer or renter. Thus,

---

[36] "The availability of appropriate insurance is a necessary predicate to the availability of financing and financial assistance is a precondition of securing the availability of adequate housing. Since a discriminatory denial of financing violates subsection 3604(a) (subsection 804(a) of the Act), a discriminatory failure or refusal to provide property insurance dwellings also must violate subsection 3604(a)." *Id.* at 12. The court also correctly stated the Congressional intention behind this bill's provision—to clarify existing law by explicitly addressing this issue.

[37] See, for example, *Laufman* v. *Oakley Building & Loan Company,* 408 F. Supp. 489 (S.D. Ohio 1976); *United States* v. *City of Parma,* P.H.E.O.H. Rptr. 13,616 (N.D. Ohio 1973); *United States* v. *Hughes Memorial Home,* 395 F. Supp. 544 (W.D. Va. 1973); *United States* v. *American Institute of Real Estate Appraisers,* 422 F. Supp. 1072 (N.D. Ill. 1977); *United States* v. *City of Black Jack, Missouri,* 508 F. 2d 1179 (8th Cir. 1974); *Zuch* v. *Hussey,* 394 F. Supp. 1028 (E.D. Mich. 1975), *aff'd.* 547 F.2d 1168 (6th Cir. 1977).

13

for example, if a non-handicapped prospective tenant is turned down *because* his or her child, parent or rental agent is disabled, the prospective tenant may have a cause of action.

A seller or lessor may not presume that because an individual is mentally or physically handicapped, that the person's behavior will constitute a direct threat to safety or property of others or that he or she would be unable to conform to reasonable rules, practices, etc. A handicapped person must have a history of or there must be a demonstration of such behavior. Refusals to rent or sell may not be based upon unfounded assumptions that handicapped persons pose a greater potential for liability.

Refusals to rent or sell would be permitted, however, where the handicap is of such a nature that it is excluded in the definition provided above. Furthermore, if the behavioral manifestations of a handicap would prevent a prospective occupant from conforming to the reasonable rules, policies, or practices permitted by clause (2), then the refusal to rent or sell would be justified.

The addition of subsection (g), clause (2) to subsection 804 of title VIII creates a prohibition against discrimination against handi-capped persons in terms and conditions of sales and rentals. For handicapped persons, treatment identical to non-handicapped per-sons will not always provide equal opportunity for housing. Allow-ance is made in the amendment for this divergency by the use of general descriptions of what is and is not included in "discrimina-tion." Some interpretations of the amendment will require judg-ments about what is "reasonable." For example, what is or is not a reasonable accommodation in policies, practices, rules, services or facilities will depend upon examination of relevant facts. In no event, however, must reasonable policies, etc. be modified in such a way as to result in "unreasonable inconvenience to other affected persons."

In order to render a dwelling accessible and available to some handicapped persons, physical alterations in the premises may have to be made, subsection (g)(2) requires that reasonable modifi-cations be permitted. However, the expense need not be borne by the property owners or their agents, and in the case of rentals, the tenant may be required to agree to restore the premises to its origi-nal condition (less normal wear and tear). "Reasonable" architec-tural changes do not include those modifications which diminish the marketability or value of the dwelling, or those which would "materially alter the manner in which a building or its environs has been or is intended to be used."

In the case of sales, when a handicapped buyer negotiates for the purchase of a house under construction, it would be a violation of subsection (g)(2) to refuse to make alterations in construction which would not add to construction costs, or which could be added to the price of the house.

*Section 6(d).*—Amends sections 805 and 806, and subsections (c), (d) and (e) of section 804, by adding persons with handicaps as a protected class. Handicap protection would be added to present pro-hibitions on discrimination in advertising, blockbusting, mortgage and home improvement loans, and brokerage services, among others. Thus, denial of loans must be based on sound economic and financial reasons, and not on the basis of a general policy against making loans to particular classes of handicapped persons. A finan-

14

cial institution would be required to make credit judgments on an individual basis, and could not simply deny credit to a person because of generalized attitudes about the ability of particular classes of handicapped persons to sustain loan payments. Similar analyses should be used for new section 804(f).

*Section 6(e).*—Amends section 805 of the Act by deleting the present language and inserting language which is intended to remove possible ambiguity regarding the original version of this section. That language made it unclear whether the section's coverage was limited to discrimination involving the race or other characteristics solely of the applicant and specific classes of persons related to the applicant. This amendment makes clear that section 805, like section 804(a), is intended to eliminate all practices with the purpose or effect of denying loans on account of prohibited bases, or which contribute to or perpetuate a segregated housing market. This is consistent with current interpretation of the Fair Housing Act. See, *Laufman v. Oakley Building and Loan Co., supra,* and *United States v. American Institute of Real Estate Appraisers.* (AIREA), *supra.* It is also consistent with Regulation B under the Equal Credit Opportunity Act (12 CFR 202). So-called redlining practices would be prohibited under the amended language which, like subsection 804(a), proscribes all conduct which "makes housing unavailable" on account of race, etc.

By listing appraisers, sellers and brokers, this amendment recognizes the roles they play in the loan decision-making process. For example, sellers and brokers frequently arrange financing, direct clients and customers to sources of financing, pre-qualify applicants, give information about loan forms, or otherwise participate in the lending process. Appraisers, because their appraisals are relied upon by lenders in determining whether and upon what terms to loan, are also an important part of this process.

By referring to the purchasing and insuring of loans for residential property, this amendment recognizes the important direct and indirect roles often played by secondary market entities and mortgage insurance and guarantee agencies and firms in affecting the available funds in the primary market. The policies and practices of these categories of organizations can translate directly into terms and conditions of loans to borrowers.

It has been recognized that current language of the Act prohibits racial redlining; that is, the basing of any aspect of a loan decision on factors relating to race or ethnicity of persons residing or expecting to reside in the vicinity of a dwelling. See *Laufman, supra* and *AIREA, supra;* see also FHLBB regulations 12 CFR part 528 and 531.8. This amendment is intended to remove any possible ambiguity regarding the intention of Congress to eliminate redlining practices predicated on a prohibited basis.

*Section 6(f)* amends section 807 of the Act by providing a limited exception to the so-called "effects test" enunciated in *United States v. City of Black Jack, supra, Metropolitan Housing Development Corporation v. Arlington Heights,* 588 F. 2d. 1283 (7th Cir. 1977, on remand from the United States Supreme Court), and *Resident Advisory Board v. Rizzo,* 564 F. 2d. 126 (3rd Cir. 1977). With respect to zoning and land use practices which impose "minimum lot size for residences," there is no violation of title VIII unless an "intent to discriminate against a class protected by this title" is proven.

Case: 1:13-cv-08564 Document #: 19-6 Filed: 02/12/14 Page 41 of 159 PageID #:791

## FUNCTIONS OF SECRETARY

*Section 7(a)(1)*.—Requires the Secretary to delegate the function of presiding over administrative hearings to administrative law judges, appointed pursuant to the requirements of the Administrative Procedure Act. Therefore, neither the Secretary nor any designee other than a duly appointed Administrative Law Judge may preside over hearings conducted pursuant to this title. Further, subsection 7(a)(4) has the effect of eliminating administrative appeals of the hearing decisions. The decision of the Administrative Law Judge may be appealed only pursuant to section 8 of the bill (new section 811(c) of title VIII as amended by this bill).

*Section 7(a)(2)* conforms in title VIII the numeration change made in Public Law 95–454.

*Section 7(a)(3)* provides that administrative hearings, as well as conciliation meetings, "[i]nsofar as possible, shall be held in the cities or other localities where the discriminatory housing practices allegedly occurred."

*Section 7(c)*.—Amends section 808(e)(3) of the Act by clarifying HUD's authority to provide financial as well as technical assistance to public and private organizations seeking to remedy housing discrimination.

This provision does not require funding; it merely permits it. The authorization was deemed appropriate for several reasons. Most states, as well as HUD, rely on local, public and private organizations for information and research. Violations occur in many areas where public fair housing agencies may not be located. Under existing authority, funds appropriated to HUD for enforcement of title VIII cannot be used to reimburse these local groups; only "technical" assistance can now be rendered. This new authorization will permit the Secretary to make use of private fair housing resources as part of a coordinated and comprehensive title VIII enforcement effort. Furthermore, the authorization will permit assistance to state and local fair housing agencies that desire to upgrade their performance to reach the standard of "substantial equivalency."

## CONGRESSIONAL REVIEW OF RULES

*Section 7(d)* provides for a legislative veto procedure with respect to any proposed or existing rule promulgated by any agency under the authority of title VIII.

The analysis below refers to the new section 808(f) of title VIII as amended by this bill.

*Section 808(f)(1)(A)(i)* provides the methods by which Congress may render a proposed rule ineffective.

This provision applies to any "rule" being promulgated or repromulgated by any "agency," when that rule is related to compliance with title VIII. The rule must be submitted to the House and Senate Committees on the Judiciary. The rule does not become effective if either

(I) both Houses of Congress, within 90 days of the promulgation, adopt the concurrent resolution of disapproval set forth in this subsection or

16

(II) one House adopts the resolution within 60 days, and the other House does not disapprove that resolution within 30 days.

*Section 808(f)(1)(A)(ii).*—A proposed rule becomes effective within 60 days if:

1. No committee of Congress has reported a concurrent resolution of disapproval of the rule.

2. No committee has been discharged from considering such a resolution.

3. Neither House adopts such a resolution.

If any of the above occurs, the rule may not become effective until at least 90 days from the time the rule was promulgated, in order to permit either process of disapproval as set forth in clause (i) to be completed.

*Section 808(f)(1)(B)(i).*—Where a rule has been disapproved, the indentical rule may not be subsequently promulgated, unless an Act of Congress changes the agency's powers with respect to the subject matter of the rule.

*Section 808(f)(1)(B)(ii).*—Following a disapproval, if a new rule is promulgated within 12 months, pertaining to the same subject matter, only the parts of the rule being changed must go through the procedures described above for new rules. If more than a year has elapsed, the entire proposed rule is subject to that procedure.

*Section 808(f)(2)(A).*—As an alternate to disapproval, either House may adopt a resolution directing an agency to reconsider a rule.

*Section 808(f)(2)(B)(i).*—Where a resolution for reconsideration has been adopted by either House within 90 days of a rule's promulgation, that rule does not go into effect. The agency then must reconsider the rule, and, within 60 days, either withdraw or repromulgate the rule with changes. The agency shall determine what public participation in the reconsideration process is appropriate.

If the agency takes no action within 60 days of the resolution of reconsideration, the rule lapses. If a rule is issued, the procedure set forth above for congressional review of new rules is applicable.

*Section 808(f)(2)(B)(ii)* repeats the provisions found in (1)(A)(ii) with respect to a resolution of reconsideration.

*Section 808(f)(2)(C)* authorizes resolutions of reconsideration regarding rules already in effect. Such rules would lapse 180 days after passage of such a resolution unless the agency repromulgates that same rule. If the agency intends to repromulgate the rule, it must give notice of a proceeding to consider its repromulgation, and that notice must be made at least 60 days before the repromulgation. Provisions of the Administrative Procedure Act relating to rulemaking (5 U.S.C. 553 (a), (b) and (c)) are specifically made applicable, except that an opportunity for oral presentation must be given, and the exceptions following section 553(b)(3) are not available to the agency.

When a rule has been repromulgated within 180 days of the resolution for reconsideration, it is subject to the same congressional review as provided under paragraph (1)(A) (described above). However, during that time of congressional review, the rule remains in effect.

*Section 808(f)(2)(D).*—A concurrent resolution of disapproval supersedes a resolution for reconsideration of the same rule or part thereof.

*Section 808(f)(3).*—When a rule has been the subject of a resolution of disapproval or reconsideration, any statutory time limits for rulemaking begin to run from the date of the adoption of the resolution.

*Section 808(f)(4)* provides the way in which time is calculated for purposes of congressional review of rules under these provisions.

*Section 808(f)(5)(A)* describes the authority of the Congress to enact this congressional review procedure i.e. as an exercise of rulemaking power of each House.

*Section 808(f)(5)(B)(i).*—When a resolution of disapproval or reconsideration is introduced or received from the other House, it must be referred only to the Standing Committee with legislative and oversight responsibility over the title i.e. the Committees on the Judiciary.

*Section 808(f)(5)(B)(ii).*—When a resolution of disapproval or reconsideration has not been adopted by the other House, the committee to which the resolution has been referred is subject to a motion to discharge within the following time periods: 45 days, when the rule is considered under subsections (1)(A) or (2)(B) (i.e. proposed rules); 90 days, when the rule is considered under subsection (2)(C) (i.e. existing rules).

*Section 808(f)(5)(B)(iii).*—If a resolution of disapproval or reconsideration has been adopted by the other House, the Committee to which the resolution was referred is subject to a discharge motion if no action is taken with 15 days.

*Section 808(f)(5)(B)(iv).*—The motion for discharge must be supported by only one-fifth of the Members of the House involved; it is highly privileged; no amendments are allowed; floor debate on the motion is limited to one hour which is to be equally divided between opponents and proponents.

*Section 808(f)(5)(C)(i).*—Consideration of resolutions of disapproval or reconsideration are subject to the usual rules of each House except as provided below.

*Section 808(f)(5)(C)(ii).*—When a Committee has been discharged (as provided above), it is always in order to move to consider the resolution on the floor.

*Section 808(f)(5)(C)(iii).*—Debate on the resolution is limited to 2 hours, equally divided between opponents and proponents.

*Section 808(f)(6).*—Congressional inaction or rejection of a disapproval or reconsideration resolution shall not be deemed approval of the subject rule by the courts judicially reviewing the rule.

### ENFORCEMENT CHANGES

*Section 8.*—Amends title VIII by striking all the provisions relating to enforcement in existing title VIII and replacing them with an improved system for civil action by private parties and the Attorney General, supplemented by a complementary system of administratove enforcement within the Department of Housing and Urban Development (HUD). The analysis below refers to the new sections 810–815 of title VIII, as amended by this bill.

18

ADMINISTRATIVE ENFORCEMENT: PRELIMINARY MATTERS

*Section 810(a)(1)* provides for the investigation of alleged discriminatory housing practices at the initiative either of the Secretary or an "aggrieved person", as defined above. The Secretary is required to notify the party charged (the respondent) of the existence and nature of the charge. It is intended that such notice be sufficiently detailed so as to put the respondent on notice as to both the particular allegations and the administrative process as it will affect the respondent. With respect to the Secretary's duty in this subsection to provide notice to the aggrieved person, the bill specifically requires that this notice both acknowledge receipt of the charge and advise the aggrieved "of the time limits and choice of forums provided under this title."

These notice requirements underscore the roles to be played by HUD in the administrative process. Both the aggrieved person and the respondent may rely on HUD for information and advice, although parties may engage their own legal representatives to assist them.

In this subsection, and elsewhere, provisions relating to the process of conference, conciliation and persuasion are included and are intended to emphasize the desirability of this means of resolution of charges. To ensure a candid exchange of information and opinions in this process, those provisions in existing law prohibiting nonconsensual disclosure of the content of these discussions are retained.

The time limit for filing an administrative complaint is one year from the time the alleged discrimination occurred or terminated. The latter term is intended to encompass the concept of continuing violations. The one year statute of limitation marks an increase from the present law's limit of 180 days, but is shorter than the 2 year statute of limitations permitted for court actions. The subsection also clarifies that the Secretary's authority to investigate includes gathering information relevant to the initiation of charges by HUD and the promulgation of new title VIII rules.

*Sections 810(a)(2)(A)–(E)* provide the Secretary's authority to utilize various discovery measures, including the issuance of subpenas and interrogatories, obtaining and copying information, providing respondents with subpenas, paying witness and mileage fees, enforcing subpenas, and ordering remedies for disobeying such authority. These provisions are intended to continue without change the authority now provided pursuant to section 811 of the present law. One substantive change is effectuated—disobedience of this authority may no longer be punished by imprisonment.

*Section 810(a)(3)* provides the requirements for referring charges to state or local agencies for investigation and enforcement. The provisions continue the policy of encouraging the participation of state and local agencies in the resolution of housing discrimination charges filed originally with HUD. Those state and local agencies that effectively administer laws which are substantially equivalent to title VIII coverage must be certified for referrals.

When an agency administers a law that provides substantial equivalency in procedures and remedies, but which pertains to only part of the substantive coverage of title VIII, certification may be made when the charge pertains to that particular coverage. Thus,

19

when a charge pertains solely to discrimination in hazard insurance, that charge should be referred to a state insurance commission if the substantive coverage under the state law is at least as inclusive as new subsection 804(f) of title VIII, and the procedures and remedies are substantially equivalent to Section 8 of the bill.

The provisions differ from existing law pertaining to referrals in the following respects: the elements of substantial equivalency are described and certain time limits are changed or provided; to wit, the agency to which referral is made is given a minimum of 90 days (rather than 30) to commence proceedings and carry forward "with reasonable promptness;" the determination as to "substantial equivalency" must be made (or is deemed made) within 90 days of the time the agency requests such a decision; referrals must be made to certified agencies within 30 days. Furthermore, the Secretary is no longer permitted to recall referrals on the grounds that "the protection of the rights of the parties or the interests of the parties or the interest of justice require such action." Finally, the Secretary's decision on "substantial equivalency" is explicitly made judicially reviewable.

*Section 810(a)(4)* provides for cooperation, avoidance of duplication, and notification among all the federal agencies with fair housing responsibilities. It is anticipated that the particulars of these arrangements will be established through Memoranda of Understanding between the appropriate agencies. By this provision the Committee intends that the dual functions of regulation and investigation of individual complaints be coordinated. When a charge is received by HUD pertaining to discrimination by a financial institution, for example, it may be appropriate for the agency responsible for regulating that member institution to initiate a compliance review, based upon information generated in the HUD investigation on behalf of the individual complainant. Likewise, duplication of effort, and its attendant detrimental effects upon respondents, can be minimized when information is appropriately shared by federal agencies. For example, information acquired by a financial regulatory agency may be pertinent to HUD investigation of a particular complaint. Subject to the Privacy Act and other existing statutory restraints on inter-agency exchange of information, it is in the interests of justice that this information be shared.

*Section 810(b)* provides authority for temporary or preliminary relief to be obtained in the appropriate federal district court. Prior to such a request, a preliminary investigation by the Secretary must establish that prompt judicial action is necessary and that voluntary compliance will not achieve the same result. The Attorney General will conduct all litigation (including that pertaining to this provision) in which the Secretary participates as a party, unless the Attorney General specifically delegates that authority to the Secretary.

This provision specifically mandates that the requirements of the Federal Rules of Civil Procedure pertaining to temporary and preliminary relief (FRCP 65) apply. Thus, there must be a showing that the petitioner is likely to succeed and that irreparable harm will be incurred without the temporary relief. Further, the court should consider the potential harm to the public interest and to other parties interested in the proceeding.

20

*Section 810(c)* provides that if an investigation supports a finding of reasonable cause, the Secretary shall either refer the matter to the Attorney General for civil action (under section 813(b)) or file an administrative complaint (under section 811(a)). That decision must be made within 270 days of the filing of the charge. It is intended that this choice of forums will provide the Secretary with the flexibility necessary to most effectively and efficiently resolve cases. Some cases, (such as those involving complex or novel issues of law or fact, multiple parties from several jurisdictions, or other complicating factors) may be best handled in court, where procedures are better suited for handling complexity.

An aggrieved person's right to file a civil action, pursuant to section 812, does not require exhaustion of administrative remedies under this title. Consequently, a finding of no probable cause or no finding at all within the prescribed period in no way precludes the availability of judicial relief under sections 812 and 813. (However, as discussed below, if reasonable cause is found, an administrative complaint issued, and an administrative hearing begun, the aggrieved person has elected to forgo a civil action under section 812.)

After an investigation is completed by the Secretary (and a finding relative to reasonable cause issued), the Secretary must provide each aggrieved person and respondent a statement of findings of such investigation. This requirement is designed to put those persons on notice as to the content and adequacy of the case the Secretary is prepared to present at a hearing (if one is to be held). This is particularly important for the aggrieved person, whose right to change forums and pursue a claim in court (under section 812) will be cut off once an administrative hearing is begun.

This provision is not intended to provide the full scope of pre-hearing discovery rights available to the parties to an administrative hearing. It is expected that the Secretary, through rules, will provide for appropriate access to relevant investigatory documents when an administrative hearing is to be held.

### ADMINISTRATIVE ENFORCEMENT: HEARING PROCESS

*Section 811(a)* describes the procedure to be utilized in the hearing which the respondent may request if an administrative complaint has been issued. Since the hearing is "on the record," the relevant provisions of the Administrative Procedure Act, 5 U.S.C. 551 *et seq,* also apply except that the adjudicatory function must be delegated to administrative law judges, and administrative appeals are barred. Furthermore, this subsection specifically prohibits the Secretary from modifying any order or any decision of an administrative law judge issued under this title.

Conciliation—referred to throughout section 8—may occur at anytime during the administrative process. If an agreement is reached prior to the issuance of an administrative complaint, the approval of the Secretary is not required. If, however, reasonable cause has been found, then the Secretary must also approve the agreement. The requirement that—at this stage—both HUD and the aggrieved person consent to the conciliation is meant to underscore the goal of protecting both the interests of the individual victim of discrimination and the society. Title VIII violations involve not merely private disputes between complainants and re-

21

spondents, but matters of national policy. When the Secretary issues an administrative complaint, such official is proceeding "in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact." *Atlas Roofing Co.* v. *Occupational Safety and Health Review Commission*, 430 U.S. 442, at 450 (1977). Thus, the Secretary has an interest in assuring that a private agreement between the aggrieved and the respondent does not permit the perpetration of a violation of that public right.

On the other hand, the individual's interests may not always be identical to those of the larger society. Thus, this subsection also provides that the aggrieved may intervene as a separate party, with the right to obtain subpoenas and present testimony. Such intervention, however, is at the discretion of the administrative law judge.

It is intended that the procedures to be utilized at the hearing be controlled by the Administrative Procedure Act and rules promulgated by the Secretary. In addition, the subsection specifically provides the respondent with a minimum of 30 days to prepare for the hearing.

Subsequent to the hearing, the administrative law judge is required to issue findings of fact and conclusions of law. If an order is issued, it may include any form of relief that is legally and factually appropriate—such as requiring that the subject property or its equivalent be made available, payment of compensation to the aggrieved person for monetary losses, including out-of-pocket expenses incurred as a result of the discriminatory housing practice, and awarding the prevailing party costs and fees (as provided by proposed subsection 814(b)).

By not specifying what is "appropriate relief," it is intended that the relief available in this administrative forum be as broad as the Constitution permits, thereby maximizing the utility of the process. While the award of damages may be incidental to the broader role of enforcing the public interest (ending housing discrimination through equitable relief), damages may be the only means by which the victim or victims may be "made whole" for the losses suffered. See *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.* 301 U.S. 1 (1937) and *Block* v. *Hirsh*, 256 U.S. 135 (1921).

The administrative law judge also is explicitly authorized to impose a civil penalty of up to $10,000. It is anticipated that such fines will serve a function of deterrence. Consequently, it is intended that this sanction be used only where the violation is willful or egregious; guidelines governing the propriety and amount of civil penalties should therefore be established by the Secretary.

As in court proceedings (see discussion below, regarding proposed subsection 814(d)), the order of the administrative law judge may not interfere with the contractual rights of innocent third parties—buyers or tenants or lien holders who execute contracts relative to the subject property prior to receiving notice of the charge filed under this title. With respect to tenants, actual notice is required. Consequently, where a bona fide purchaser, encumbrancer or tenant is present, the remedial order normally may not require that possession of the subject property be transferred to the aggrieved person; other forms of relief to make the victim whole should therefore be considered.

22

This provision is intended to minimize the unintended adverse effects of a remedial order upon transactions that are linked to the subject property. Unless the *status quo* of a property is maintained by agreement or temporary court order, sales or rentals of the subject property (and the chain of transactions connected to it) may continue (unless the tenant or buyer is on actual or constructive notice of the charge) without the danger that those contracts will be set aside.

Finally, the subsection provides that the Secretary may not modify any decision of the administrative law judge. This provision has the effect of vesting the authority of the agency to render decisions solely in the administrative law judge, whose independence is ensured by the statutory provisions regarding their appointment and grounds for removal; see, e.g. 5 U.S.C. sections 3105, 5372, 7521, and section 554(d)(2), which provides that the administrative law judges in an agency must be organizationally separate from and not responsible to the investigatory or prosecuting arm of the agency.

*Section 811(b)* provides for service of the final administrative order upon each aggrieved person and respondent in the proceedings. The time for filing appeals (see below) runs from the date of service of such order.

*Section 811(c)* describes the procedure for filing an appeal of an administrative order to the appropriate federal district court. Venue is to lie where the subject property is located, unless no specific property is involved, in which case the relevant provisions of Title 28 should apply. The initial petition must be filed not later than 30 days after the order has been served. It must specify the objections to the order and those portions of the record or findings of an act and conclusions of law to which objection is made. However, in the event the record of the administrative proceeding has not been completed within that 30 day period, the parties may amend the petition as of right (within a reasonable time after the record is available) to supplement or modify those specific objections.

Any aggrieved person who was a complainant in the administrative proceeding is deemed a party for the purposes of standing to file a petition for judicial review under this subsection (and any subsequent judicial appeals). Therefore, if the Secretary determines that an appeal is not warranted, the aggrieved person may, on his or her own, pursue the claim through appellate review. Likewise, if the Secretary does file a petition, the aggrieved person may also appear in that proceeding as a party.

The administrative record may be supplemented by the district court by either recommitting the matter to the administrative law judge (with instructions as to which evidentiary issue to supplement and how) or by the court's receiving that evidence directly. However, this supplementation procedure is intended to be utilized sparingly—only in those cases where the evidence was improperly excluded below, or some other factor supports a conclusion, as provided in the bill, that there is "a compelling need for further evidence to support a factual determination." It is not intended that the judicial review be transformed into a trial *de novo*. To the maximum extent possible, the record established in the administrative proceeding should be relied upon. This will diminish duplication of effort, and take advantage of the special expertise of HUD

23

administrative law judges with respect to housing and title VIII violations.

The standard of review to be utilized by the district court is one of *"de novo* determination of the adequacy of the findings of fact and conclusions of law to which objection is made." The record upon which the court will make that determination will consist of the record of the proceeding below, as supplemented (if necessary) by additional evidence (as described above). The term "de novo" is meant to suggest that the court is not bound by any presumption of validity as to the findings and conclusions and order of the administrative law judge, although those findings and conclusions and order are also part of the record.

The court may accept, reject, or modify those findings and conclusions; the court's order may include any remedy that would have been appropriate in the administrative forum.

As with all court proceedings authorized under this title, judicial reviews under this subsection are to be given precedence over other civil proceedings. In cases involving possession of housing, prompt and final resolution of disputes is particularly appropriate; the interests of aggrieved person, respondents, and others with an indirect interest in the property require this. The victim of discrimination may be denied adequate housing during the pendency of the case. Where possession has been ordered transferred to the aggrieved, justice requires that the finality of that order quickly be resolved.

*Section 811(d)(1)* authorizes the administrative law judge to assess civil penalties for noncompliance with his or her final administrative order. Penalties may be imposed only after the order becomes unreviewable; i.e. 30 days after it is issued if no petition for review (under Subsection 811(c)) has been filed, or if the petition was filed, the date on which the decision of the last appellate court to which appeal has been made becomes final.[38]

Where final administrative orders are in force during the pendency of such appeals, non-compliance can be challenged in actions brought by the Attorney General under Subsection 813(b)(1).

*Section 811(e)* affirms the jurisdiction of the district court with respect to reviews of administrative orders under this title without regard to the amount in controversy. This is in conformity with 28 U.S.C. 331 and 343, which also provide jurisdiction to the district court for actions under Sections 812 and 813 without regard for the amount in controversy.

### PRIVATE ENFORCEMENT

*Section 812* continues a private right of action for aggrieved persons under title VIII with the following changes and clarifications:

*Section 812(a)(1).*—The statute of limitations is lengthened from 180 days to 2 years, running from the time the practice occurred, or if continuing, has terminated.

*Section 812(a)(2)* precludes simultaneous administrative and court proceedings involving the same aggrieved person. The Secretary is barred from commencing or continuing action under sections 810

---

[38] If, for example, an appeal is taken from the district court to the Court of Appeals, and no petition for certiorari to the Supreme Court is filed, the authority to assess such civil penalties would become available as soon as the Court of Appeals decision becomes final.

24

and 811 in response to a charge filed by an aggrieved person when a civil action has been filed by that aggrieved person. This provision would not preclude the Secretary from proceeding on the basis of charges filed by other persons, however, even if those charges arose from the same fact situation.

*Section 812(a)(3)* precludes the aggrieved person from pursuing relief under Section 812 if an administrative hearing on the record has begun. If the aggrieved person has filed a charge with HUD, a final election of original forums therefore must be made prior to the hearing.

*Section 812(a)(4)* permits the Attorney General to intervene in actions filed by aggrieved persons, but only when the case is "of general public importance."

*Section 812(b)* continues the existing title VIII provision permitting the appointment of an attorney for an aggrieved person, and waiving the payment of fees, costs, or security.

*Section 812(c)* describes the general character of relief which may be awarded in civil actions under this section. No change from existing law is intended except for the removal of the $1,000 limit on punitive damages for willful violations. This change will render this a more useful and realistic sanction available to the court under title VIII, and is in accord with relief available to racial minorities under the alternate remedy of 42 U.S.C. 1982.

### ENFORCEMENT ROLE OF ATTORNEY GENERAL

*Section 813(a)* continues the authority of the Attorney General to initiate civil actions involving either a "pattern or practice of resistance to the full enjoyment of any of the rights granted by title VIII or involving "any group of persons . . . denied any rights granted by this title [where] . . . such denial raises an issue of general public importance ." These bases have been and should continue to be interpreted consistently in that isolated violations involving a single individual do not give rise to a cause of action under this provision.

*Section 813(b).*—In addition to the authority to initiate pattern and practice cases (see above), cases may be brought upon referral from the Secretary (pursuant to subsections 810(c)), or for the purpose of enforcing final administrative orders and collecting civil penalties.

*Section 813(c)* clarifies the availability of the full range of judicial relief in actions brought by the Attorney General, including the authority to seek actual and punitive damages on behalf of victims of discrimination.

*Section 813(d)* permits the intervention of private parties in actions initially brought by the Attorney General, wherein that person is "aggrieved." This provision, along with subsection 812(a)(4), is intended to encourage consolidation of related cases, and thereby avoid duplication of effort and conflicting decisions.

### ANCILLARY AND PROCEDURAL MATTERS RELATING TO ENFORCEMENT

*Section 814(a)* authorizes the award of costs, including reasonable attorney and expert witness fees, to the prevailing party in any court proceeding under title VIII. Under existing law, the award of

25

attorney fees is limited to prevailing plaintiffs who are not finan-
cially able to assume those fees. This subsection is intended to put
the award of attorney fees under title VIII into conformity with
the standard established in other civil rights statutes.[39]

The court may award such costs in connection with the entry of
any interlocutory order which determines the substantial rights of
the parties. The United States, however, may not be awarded attor-
neys fees as a part of its costs, but shall be liable for such costs the
same as a private party.

*Section 814(b)* authorizes the administrative law judge presiding
over hearings under title VIII to award costs to the same extent
and under the same standards as in court proceedings.

*Section 814(c)* adopts the existing title VIII provision requiring
expedition of all court proceedings under title VIII.

*Section 814(d)* adopts the existing title VIII provision protecting
bona fide purchasers, encumbrancers and tenants (see discussion
above of the identical provision relative to administrative orders in
section 811(a)).

### EFFECT ON OTHER LAWS

*Section 815(a)* adopts the existing title VIII provision affirming
the validity of state or local laws which protect the same rights as
this title. However, if any such laws require or permit practices
that are illegal under title VIII, they are, to that extent, invalid.

There is, therefore, no requirement that charges filed initially
with a state or local fair housing agency, state insurance commis-
sion, etc., be referred to HUD, whether or not that agency has been
certified under subsection 810(a)(3).

*Section 815(b).*—This provision is intended to ensure that other
federal laws protecting the handicapped are not construed as being
repealed, superseded, or diminished by the amendments to Title
VIII extending fair housing rights to the handicapped. This clarifi-
cation is needed in light of other federal law that appears to re-
quire a greater degree of affirmative action towards the handi-
capped than does this title (see, for example, The Rehabilitation
Act of 1973).

By explicitly including this provision, the Committee does not
intend to suggest that other federal laws pertaining to fair housing
(e.g. 42 U.S.C. 1981 and 1982) are in any way repealed, superseded,
or diminished.

### INTERFERENCE, COERCION OR INTIMIDATION

*Section 9* conforming change (see section 4(a)).

### CONFORMING AMENDMENT TO TITLE IX OF THE 1968 CIVIL RIGHTS ACT

*Section 10* conforming change.

---

[39] See, for example, Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e–5(k), the Civil
Rights Attorneys' Fees Award Act (42 U.S.C. 1988); discretion in awarding such fees should be
consistent with the principles adopted by the Supreme Court in *Christianburg Garment Co.* v.
*E.E.O.C.*, 434 U.S. 412 (1977).

### RETROFITTING COST AND NEED STUDY

*Section 11.*—It is the view of the Committee that private housing suppliers should not, as a part of an anti-discrimination bill, be called upon to bear the expense of structural modification of dwellings in order to make them livable and accessible to handicapped persons.

However, the question of how important structural modification of private dwelling units is—to how many people—an open one deserving examination. Related questions of great concern include the potential cost of retrofitting activity in private housing, and who should bear such costs.

This provision authorizes and requires a "cost and need study", to be undertaken by the Architectural and Transportation Barriers Compliance Board, followed by a report to the Congress providing advice and recommendations for action.

The study must be completed within one year of the date of the bill's effective date.

### BUDGET AUTHORITY

*Section 12* delays authorization for appropriations under the bill to conform to the Congressional Budget Act.

## SUMMARY OF ADMINISTRATIVE ENFORCEMENT PROCESS

If a person believes he or she has or will be injured by a discriminatory housing practice, he or she may either file a civil action in the appropriate federal district court or file a charge with the Department of Housing and Urban Development. If the latter course is chosen, the charge will be referred (within 30 days) to the agency in the state or locality where the charge originated, whenever that agency has been certified as operating under a law and practice that is substantially equivalent to Title VIII. When referral occurs, that agency becomes responsible for investigation, conciliation, and remedial orders.

When no referral is made, HUD must investigate the charge, and seek to resolve it through conference, conciliation and persuasion. At any time when appropriate, the Secretary may seek a temporary or preliminary order from the appropriate court in order to preserve the *status quo*.

Within 270 days of the time the charge was filed, the Secretary must make a determination as to whether reasonable cause exists to believe the charge is true. If reasonable cause is found, the Secretary can either (1) refer the case to the Attorney General for civil action or (2) file an administrative complaint. If the latter is elected, there is then an opportunity for an administrative hearing (not less than 30 days after the complaint has been served), to be conducted by an Administrative Law Judge.

At the conclusion of the hearing, the Administrative Law Judge must issue findings of fact, conclusions of law, and, where appropriate, remedial orders—including compensatory and injunctive relief, and may assess civil penalties against the respondent.

Any party to the administrative proceeding (HUD, the aggrieved, the respondent) may file objections to the Administrative Law

Judge's findings and order to the appropriate federal district court. That review is a *de novo* determination of the adequacy of the findings and conclusions to which objection is made. The record may be supplemented in the district court or on remand to the Administrative Law Judge.

Simultaneous or duplicative administrative and judicial proceedings by the same complaint are prohibited. If the aggrieved files a civil action, HUD proceedings must cease. If an administrative hearing is commenced on the record, a civil action by that complainant is barred. (See accompanying chart.)

28



29

### Cost Estimate Required by Clause 7(a) of Rule XIII of the Rules of the House of Representatives

The Committee adopts the cost estimate prepared by the Congressional Budget Office (CBO) with reservations. The reservation pertains to the estimate for financial assistance to private and public agencies that work against housing discrimination. CBO's estimate was based primarily upon figures suggested by agencies that hope to receive funds under this provision. Any funding under this provision, however, would be totally discretionary. Consequently, HUD was unable to project this estimated budget request. The estimate offered by CBO is more akin to a statement of the need perceived by the potential grantees than to the realistic budget request.

Moreover, the purposes which would be served by this funding are more varied than counseling and investigation. In a letter to the Chairman of the Subcommittee on Civil and Constitutional Rights, following the CBO estimate, the Assistant Secretary for Fair Housing/Equal Opportunity made this clear:

Hon. DON EDWARDS,
*Chairman, House Subcommittee on Civil and Constitutional Rights, House of Representatives, Washington, D.C.*

DEAR MR. EDWARDS: We have received and reviewed the cost estimate for H.R. 5200 as developed by the Congressional Budget Office and would like to provide you with some further details regarding its contents.

The Department's formal estimates of the cost of H.R. 5200 would depend upon the President's program budget submission. However, it would be appropriate to clarify some of the purposes which would be served by the funding that would be provided to private agencies working against housing discrimination.

These services could include:

Development of comprehensive strategies for training activities and/or legal seminars in civil rights law.

Monitoring of conciliation agreements reached with HUD or a State human rights commission.

Monitoring performance of signatures to Voluntary Agreements signed by realtors and HUD.

Monitoring of performance of developers and local housing authorities who have agreed to Affirmative Fair Housing Marketing Plans or Equal Housing Opportunity Plans for assisted housing projects.

Counseling individuals about their rights under the 1968 Civil Rights Act.

Referring individuals who believe they have been discriminated against to the appropriate enforcement agency.

Educating the public to the requirements of the law.

Both technical assistance and financial assistance would also be used to support similar activities on the part of agencies concerned with housing discrimination against the handicapped.

I hope this information will assist you in your deliberations.

Sincerely,

STERLING TUCKER.

000700

30

## COMMITTEE'S ESTIMATED COST

| Fiscal year: | *Millions* |
|---|---|
| 1981 | 9.1 |
| 1982 | 8.9 |
| 1983 | 9.7 |
| 1984 | 10.5 |
| 1985 | 11.5 |
| 1986 | 12.5 |

## STATEMENTS UNDER 2(1)(3) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES

A. *Oversight statement.*—No oversight findings or recommendations required pursuant to clause 2(b)(1) of Rule X have previously been filed with respect to this area.

B. *Budget statement.*—This bill does not provide any new budget authority.

C. *Cost estimate from Congressional Budget Office.*—The following letter and enclosure was received from Alice M. Rivlin, Director of the Congressional Budget Office:

CONGRESSIONAL BUDGET OFFICE,
U.S. CONGRESS,
*Washington, D.C., March 25, 1980.*

Hon. PETER W. RODINO, Jr.,
*Chairman, Committee on the Judiciary,*
*U.S. House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has prepared the attached cost estimate for H.R. 5200, as ordered reported by the House Committee on the Judiciary, March 4, 1980.

Should the Committee so desire, we would be pleased to provide further details on this estimate.

Sincerely,

ALICE M. RIVLIN, *Director.*

## CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: H.R. 5200.
2. Bill title: Fair Housing Amendments Act of 1980.
3. Bill status: As ordered reported by the House Committee on the Judiciary, March 5, 1980.
4. Bill purpose: H.R. 5200 seeks to give the Department of Housing and Urban Development (HUD) the power to bring administrative action against those who violate the Fair Housing Act (Title VIII of the Civil Rights Act). The bill allows HUD to act on its own initiative or on behalf of individuals filing complaints with the department. The bill also includes the handicapped among the groups of people to be protected against housing discrimination. Such sums as may be necessary are authorized to carry out the purposes of this Act.
5. Cost estimate:

31

[In millions of dollars]

Estimated authorization level:

Fiscal year:

| | |
|---|---|
| 1981 | 9.1 |
| 1982 | 8.9 |
| 1983 | 9.7 |
| 1984 | 10.5 |
| 1985 | 11.5 |
| 1986 | 12.5 |

Estimated outlays:

Fiscal year:

| | |
|---|---|
| 1981 | 8.1 |
| 1982 | 9.0 |
| 1983 | 9.6 |
| 1984 | 10.5 |
| 1985 | 11.4 |
| 1986 | 12.4 |

The costs of this bill fall within budget subfunction 751.

6. Basis of estimate: H.R. 5200 grants HUD the authority to file on its own initiative a charge of discriminatory housing practice and conduct its own investigations. HUD estimates that it will require 110 additional staff members to carry out its new authority in this bill. The new positions consist of 50 field investigators, 12 lawyers, 7 administrative law judges, and support staff. The agency anticipates an increase in the number of complaints from 4,050 in 1980 to 6,000 in 1981. The estimated authorization level of $3.8 million in fiscal year 1981 includes salaries and overhead costs, and has been adjusted for inflation over the projection period. It is estimated that 90 percent of each year's funds will be spent in the first year and the remaining 10 percent in the following year.

The bill also allows HUD to give financial assistance to private agencies that work against housing discrimination. The financial aid HUD gives to private agencies will be used for counseling individuals and testing cases to see if there is probable cause for court action. It is estimated that approximately forty agencies will receive $100,000 each in 1981, and that the number of agencies will increase by 10 percent per year. Agencies concerned with housing discrimination against the handicapped are expected to account for a significant portion of this growth. It is also assumed that the amount of aid per agency will remain at $100,000 a year. It is estimated that 90 percent of each year's funds will go to the agencies in the first year, with the remaining 10 percent spent in the following year.

Under H.R. 5200, the Justice Department may bring civil action in federal court on behalf of individuals, at HUD's request. Based on information from the Department of Justice it is estimated that 5 new attorneys as well as support staff will be needed if this bill is enacted. In fiscal year 1981 salaries and overhead costs total $240,000. The following years are adjusted for inflation. It is assumed that 90 percent of this money will be spent each year, with the remaining 10 percent spent the following year.

32

The bill also requires the Architectural and Transportation Barriers Compliance Board to provide a report not later than October 1, 1981, on the private housing supply for handicapped people and make recommendations for further legislation. Based on information from the Board and their research on the cost of a similar report required of them by the Comprehensive Rehabilitation Amendments of 1978, it is estimated that this report will cost $1 million. It is estimated that 80 percent of the money will be spent in fiscal year 1981 and the remaining 20 percent in the following year.

H.R. 5200 allows the courts to assess civil penalties of up to $10,000 for violators of the Fair Housing Act and also to impose fines of up to $1,000 per day against those who refuse to comply with a court's final order. It is not possible to predict the amount of money the Treasury Department will gain as a result of this bill.

7. Estimate comparison: None.

8. Previous CBO estimate: None.

9. Estimate prepared by: Blaire French (225–7760).

10. Estimate approved by: James L. Blum, Assistant Director for Budget Analysis.

D. *Government operations oversight.*—No related oversight findings and recommendations have been made by the Committee on Government Operations under clause 4(c)(2) of Rule X.

STATEMENT UNDER CLAUSE 2(1)(4), OF RULE XI OF THE HOUSE OF REPRESENTATIVES CONCERNING ANY INFLATION IMPACT ON PRICES AND COSTS IN THE OPERATION OF THE NATIONAL ECONOMY

The committee concludes that there will be no inflationary impact on prices and costs in the operation of the national economy.

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of Rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

ACT OF APRIL 11, 1968

AN ACT To prescribe penalties for certain acts of violence or intimidation, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the the United States of America in Congress assembled, That this Act may be cited as the Civil Rights Act of 1968.*

\*     \*     \*     \*     \*     \*     \*

TITLE VIII—FAIR HOUSING

*SHORT TITLE*

*SEC. 800. This title may be referred to as the "Fair Housing Act".*

33

\*     \*     \*     \*     \*     \*     \*

### DEFINITIONS

SEC. 802. As used in this title—
(a) * * *

\*     \*     \*     \*     \*     \*     \*

(f) "Discriminatory housing practice" means an act that is unlawful under [section 804, 805, or 806] *this title.*

\*     \*     \*     \*     \*     \*     \*

*(h) "Handicap" means, with respect to a person, (1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment; but such term does not include any current impairment that consists of alcoholism or drug abuse, or any other impairment that would be a direct threat to the property or the safety of others.*

*(i) "Aggrieved person" includes any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur.*

### EFFECTIVE DATES OF CERTAIN PROHIBITIONS

SEC. 803. (a) Subject to the provisions of subsection (b) and section 807, the prohibitions against discrimination in the sale or rental of housing set forth in section 804 shall apply:
(1) * * *
(2) After December 31, 1968; *and before the date of the enactment of the Fair Housing Amendments Act of 1980,* to all dwellings covered by paragraph (1) and to all other dwellings except as exempted by subsection (b).
(b) [Nothing in section 804 (other than subsection (c))] *Before the date of the enactment of the Fair Housing Amendments Act of 1980, nothing in section 804 (other than subsections (c) and (e)) shall apply to—*

\*     \*     \*     \*     \*     \*     \*

(c) For the purposes of [subsection (b),] *subsections (b) and (d),* a person shall be deemed to be in the business of selling or renting dwellings if—
(1) * * *

\*     \*     \*     \*     \*     \*     \*

*(d)(1) After the date of the enactment of the Fair Housing Amendments Act of 1980, subject to the provisions of section 807, the prohibitions set forth in section 804 of this title shall apply to all dwellings, except that the prohibitions set forth in subsections (a), (b), and (d) of section 804 shall not apply with respect to any room or unit in a dwelling containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as the owner's residence, but only if such room or unit is sold or rented—*

34

*(A) without the use in any manner of the sales or rental facilities or the sales or rental services of any real estate broker, agent, or salesman, or of such facilities or services of any person in the business of selling or renting dwellings, or of any employee or agent of any such broker, agent, salesman, or person; and*

*(B) without the publication, posting, or mailing of any advertisement or written notice in violation of section 804(c) of this title.*

*(2) Nothing in this subsection shall prohibit the use of attorneys, escrow agents, abstractors, title companies, and other such professional assistance as necessary to perfect or transfer the title.*

### DISCRIMINATION IN THE SALE OR RENTAL OF HOUSING *AND OTHER PROHIBITED PRACTICES*

SEC. 804. As made applicable by section 803 and except as exempted by sections 803(b), *803(d),* and 807, it shall be unlawful—

(a) * * *

*     *     *     *     *     *     *

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, *handicap,* or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, *handicap,* or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, *handicap,* or national origin.

*(f) For a person in the business of insuring against hazards to refuse to enter into, or discriminate in the terms, conditions, or privileges of, a contract of insurance against hazards to a dwelling because of the race, color, religion, sex, handicap, or national origin of persons owning, or residing in or near, the dwelling.*

*(g)(1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, a dwelling to any person because of a handicap of a prospective buyer or renter or of any person associated with such buyer or renter unless such handicap would prevent a prospective dwelling occupant from conforming to such rules, policies, and practices as are permitted by paragraph (2) of this subsection.*

*(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of handicap. For purposes of this paragraph—*

*(A) discrimination includes—*

*(i) refusal to permit reasonable modifications of premises occupied, or to be occupied, by persons with a handicap which are necessary to afford such handicapped persons access to premises substantially equal to that of nonhandi-*

35

*capped persons, but in the case of a rental, only if the renter makes an agreement to restore the premises to the condition which existed before such modification, reasonable wear and tear excepted; and*

*(ii) refusal to make reasonable accommodations in policies, practices, rules, services, or facilities, when such accommodations are necessary to afford handicapped persons enjoyment of dwellings substantially equal to that of non-handicapped persons; and*

*(B) discrimination does not include—*

*(i) refusal to make alterations in premises at the expense of sellers, landlords, owners, brokers, building managers, or persons acting on their behalf;*

*(ii) refusal to make modification of generally applicable rules, policies, practices, services, or facilities where such modification would result in unreasonable inconvenience to other affected persons; or*

*(iii) refusal to allow architectural changes to, or modifications of, buildings which would materially decrease the marketability or value of a building or alter the manner in which a building or its environs has been, or is intended to be, used.*

[DISCRIMINATION IN THE FINANCING OF HOUSING

[SEC. 805. After December 31, 1968, it shall be unlawful for any bank, building and loan association, insurance company or other corporation, association, firm, or enterprise whose business consists in whole or in part in the making of commercial real estate loans, to deny a loan or other financial assistance to a person applying therefor for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate against him in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other financial assistance, because of the race, color, religion, sex, or national origin of such person or of any person associated with him in connection with such loan or other financial assistance or the purposes of such loan or other financial assistance, or of the present or prospective owners, lessees, tenants, or occupants of the dwelling or dwellings in relation to which such loan or other financial assistance is to be made or given: *Provided,* That nothing contained in this section shall impair the scope or effectiveness of the exception contained in section 803(b).]

*DISCRIMINATION IN CERTAIN TRANSACTIONS THAT AFFECT HOUSING FINANCING*

*SEC. 805. It shall be unlawful for any person whose business includes the making, purchasing, or insuring of loans, or selling, brokering, or appraising of real property, to deny or otherwise make unavailable a loan or other financial assistance which is for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other*

000706

36

*financial assistance, because of race, color, religion, sex, handicap, or national origin.*

DISCRIMINATION IN THE PROVISION OF BROKERAGE SERVICES

SEC. 806. After December 31, 1968, it shall be unlawful to deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, *handicap,* or national origin.

EXEMPTION

SEC. 807. Nothing in this title shall prohibit a religious organization, association, or society, or any nonprofit institution or organization operated, supervised or controlled by or in conjunction with a religious organization, association, or society, from limiting the sale, rental or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion, or from giving preference to such persons, unless membership in such religion is restricted on account of race, color, or national origin. Nor shall anything in this title prohibit a private club not in fact open to the public, which as an incident to its primary purpose or purposes provides lodgings which it owns or operates for other than a commercial purpose, from limiting the rental of occupancy of such lodgings to its members or from giving preference to its members. *Nothing in this title shall prohibit a minimum lot size requirement for residences unless such requirement is imposed with intent to discriminate against a class protected by this title.*

ADMINISTRATION

SEC. 808. (a) The authority and responsibility for administering this Act shall be in the Secretary of Housing and Urban Development.

(b) The Department of Housing and Urban Development shall be provided an additional Assistant Secretary.

(c) The secretary may delegate any of his functions, duties, and powers to employees of the Department of Housing and Urban Development or to boards of such employees, including functions, duties, and powers with respect to investigating, conciliating, hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter under this title. *The Secretary shall so delegate such functions, duties, and powers with respect to hearing, determining, and ordering under section 811 of this title.* The persons to whom such delegations are made with respect to hearing functions, duties, and powers shall be appointed and shall serve in the Department of Housing and Urban Development in compliance with sections 3105, 3344, 〚5362,〛 *5372,* and 7521 of title 5 of the United States Code. Insofar as possible, conciliation meetings *and hearings* shall be held in the cities or other localities where the discriminatory housing practices allegedly occurred. The Secretary shall by rule prescribe such rights of appeal from the de-

37

cisions of his hearing examiners [to other hearing examiners or to other officers in the Department, to boards of officers or to himself,] as shall be appropriate and in accordance with law.

(d) All executive departments and agencies shall administer their programs and activities relating to housing and urban development *(including any Federal agency having regulatory authority over financial institutions)* in a manner affirmatively to further the purposes of this title and shall cooperate with the Secretary to further such purposes.

(e) The Secretary of Housing and Urban Development shall—

(1) make studies with respect to the nature and extent of discriminatory housing practices in representative communities, urban, suburban, and rural throughout the United States;

(2) publish and disseminate reports, recommendations, and information derived from such studies;

(3) cooperate with and render *financial and* technical assistance to Federal, State, local, and other public or private agencies, organizations, and institutions which are formulating or carrying on programs to prevent or eliminate discriminatory housing practices;

(4) cooperate with and render such technical and other assistance to the Community Relations Service as may be appropriate to further its activities in preventing or eliminating discrtiminatory housing practices; and

(5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this title.

*(f)(1)(A)(i) Simultaneously with promulgation or repromulgation of any rule, issued for the purpose of compliance with this title, the agency promulgating such rule shall transmit a copy thereof to the Committees on the Judiciary of the House of Representatives and the Senate. Except as provided in clause (ii) of this subparagraph, rules other than emergency rules shall not become effective, if—*

*(I) within 90 calendar days of continuous session of Congress after the date of promulgation, both Houses of Congress adopt a concurrent resolution, the matter after the resolving clause of which is as follows: "That Congress disapproves the rule promulgated by _____ dealing with the matter of _____, which rule was transmitted to Congress on _____.", the first blank being filled with the name of the agency issuing the rule, the second blank being filled with the title of the rule and such further description as may be necessary to identify it, and the third being filled with the date of transmittal of the rule to Congress; or*

*(II) within 60 calendar days of continuous session of Congress after the date of promulgation, one House of Congress adopts such a concurrent resolution and transmits such resolution to the other House, and such resolution is not disapproved by such other House within 30 calendar days of continuous session of Congress after such transmittal.*

*(ii) If at the end of 60 calendar days of continuous session of Congress after the date of promulgation of a rule, other than an emergency rule, no committee of either House of Congress has reported or been discharged from further consideration of a concurrent resolution disapproving the rule, and neither House has adopted such a*

38

*resolution, the rule may go into effect immediately. If, within such 60 calendar days, such a committee has reported or been discharged from further consideration of such a resolution, or either House has adopted such a resolution, the rule may go into effect not sooner than 90 calendar days of continuous session of Congress after its promulgation unless disapproved as provided in clause (i) of this subparagraph.*

*(B)(i) An agency may not promulgate a new rule or an emergency rule identical to one disapproved under this paragraph unless an Act of Congress is adopted affecting the agency's powers with respect to the subject matter of the rule.*

*(ii) If an agency proposes a new rule dealing with the same subject matter as a disapproved rule, the agency shall comply with the procedures required for the issuance of a new rule, except that if less than 12 months have passed since the date of such disapproval, such procedures may be limited to changes in the rule.*

*(2)(A) Either House of Congress may adopt a resolution directing agency reconsideration of a rule other than an emergency rule. The matter after the resolving clause of such a resolution shall be as follows: "That the _____ directs _____ to reconsider its rule dealing with the matter of _____ which rule is found at _____." (or if a new rule "was transmitted to Congress on _____."), the first blank being filled with the House of Congress adopting the resolution, the second blank being filled with the name of the agency issuing the rule, the third blank being filled with the title of the rule and such further description as may be necessary to identify it, and the fourth blank being filled with the citation to the rule in the agency records or, if it is a new rule, the date on which it was transmitted to Congress.*

*(B)(i) If a resolution for reconsideration of a rule, other than an emergency rule, is adopted by either House within 90 calendar days of continuous session of Congress after the date the rule was promulgated, the rule shall not go into effect. The agency shall reconsider the rule and within 60 days either withdraw or repromulgate the rule with such changes and with such public participation as the agency determines appropriate. If the agency takes no action within 60 days such rules shall lapse. If promulgated, the rule shall be subject to congressional review and go into effect as provided in this subsection.*

*(ii) If at the end of 60 calendar days of continuous session of Congress after the date of promulgation of a rule, other than an emergency rule, no committee of either House of Congress has reported or been discharged from further consideration of a resolution of reconsideration of a rule, the rule may go into effect at the end of such period. If, within such 60 calendar days, such a committee has reported or been discharged from further consideration of such a resolution, the rule may go into effect not sooner than 90 calendar days of continuous session of Congress after its promulgation.*

*(C) One hundred and eighty days after passage of a resolution for reconsideration with respect to a rule which has taken effect, the rule shall lapse unless repromulgated by the agency. Unless excepted by subsection 553(a) of title 5, United States Code, the agency shall, not less than 60 days prior to repromulgating such a rule, give notice of a proceeding to consider its repromulgation. The notice and proceeding shall comply with subsections (b) and (c) of section 553 of*

39

title 5, United States Code, except that the exceptions contained in the matter which follows paragraph (3) in section 553(b) shall not be available to the agency and the agency shall hold a hearing for oral presentations. Rules repromulgated pursuant to this clause within 180 days of the passage of the resolution for reconsideration shall take effect as provided in paragraph (1)(A) of this subsection; and during the period for congressional review provided in that paragraph the reconsidered rule may remain in effect.

(D) A concurrent resolution of disapproval supersedes a resolution for reconsideration of the same rule or part thereof.

(3) If a resolution of Congress disapproves or directs reconsideration of a rule which was being promulgated subject to a statutory time limit for rulemaking, the adoption of the resolution shall not relieve the agency of its responsibility for adopting a rule, but any statutory time limit shall apply to such renewed rulemaking only from the date on which the resolution was adopted.

(4) For the purposes of this subsection—

(A) continuity of session is broken only by an adjournment sine die; and

(B) the days on which either House is not in session because of an adjournment of more than 3 days to a day certain are excluded in the computation of calendar days of continuous session.

(5)(A) The provisions of this paragraph are enacted by Congress—

(i) as an exercise of the rulemaking power of the Senate and the House of Representatives, respectively, and as such they are deemed a part of the rules of each House, respectively, but applicable only with respect to the procedure to be followed in that House in the case of resolutions described by paragraphs (1) and (2) of this subsection; and they supersede other rules only to the extent that they are inconsistent therewith; and

(ii) with full recognition of the constitutional right of either House to change the rules (so far as relating to the procedure of that House) at any time, in the same manner and to the same extent as in the case of any other rule of that House.

(B)(i) Resolutions of disapproval and resolutions for reconsideration of a rule shall, upon introduction or receipt from the other House of Congress be immediately referred by the presiding officer of the Senate or of the House of Representatives to the standing committee having oversight and legislative responsibility with respect to this title in accordance with the rules of the respective House; and such resolutions shall not be referred to any other committee.

(ii) If a committee to which is referred a resolution which has not been adopted by the other House of Congress, does not report out such resolution—

(I) within 45 calendar days of continuous session of Congress after referral, in the case of a resolution to disapprove or to require reconsideration of a rule pursuant to paragraphs (1)(A) or (2)(B) of this subsection; or

(II) within 90 calendar days of continuous session of Congress after referral, in the case of a resolution to require reconsideration of a rule pursuant to paragraph (2)(C) of this subsection;

it shall be in order to move to discharge such committee from further consideration of such resolution.

40

*(iii)* If a committee to which is referred a resolution which has been adopted by the other House of Congress does not report out such resolution within 15 calendar days of continuous session of Congress after referral, in the case of a resolution to disapprove a rule pursuant to paragraph (1)(A) of this subsection, it shall be in order to move to discharge such committee from further consideration of such resolution.

*(iv)* Such motion to discharge must be supported by one-fifth of the Members of the House of Congress involved, and is highly privileged in the House and privileged in the Senate (except that it may not be made after the committee has reported a resolution of disapproval or for reconsideration with respect to the same rule); and debate thereon shall be limited to not more than 1 hour, the time to be divided in the House equally between those favoring and those opposing the motion to discharge and to be divided in the Senate equally between, and controlled by, the majority leader and the minority leader or their designees. An amendment to the motion is not in order, and it is not in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

*(C)(i)* Except as provided in clauses (ii) and (iii) of this subparagraph, consideration of a resolution of disapproval or for reconsideration shall be in accord with the rules of the Senate and of the House of Representatives, respectively.

*(ii)* When a committee has reported or has been discharged from further consideration of a resolution with respect to a rule, it shall be in order at any time thereafter (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion is highly privileged and is not debatable. An amendment to the motion is not in order, and it is not in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

*(iii)* Debate on the resolution shall be limited to not more than 2 hours, which shall be divided equally between those favoring and those opposing the resolution. A motion further to limit debate is not debatable. An amendment to or motion to recommit, the resolution is not in order and it is not in order to move to reconsider the vote by which the resolution is agreed or disagreed to.

*(6)* Congressional inaction on or rejection of a resolution of disapproval or of a resolution for reconsideration shall not be deemed an expression of approval of such rule.

\* \* \* \* \* \* \*

### ⟦ENFORCEMENT

⟦Sec. 810. (a) Any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur (hereafter "person aggrieved") may file a complaint with the Secretary. Complaints shall be in writing and shall contain such information and be in such form as the Secretary requires. Upon receipt of such a complaint the Secretary shall furnish a copy of the same to the person or persons who allegedly committed or are about to commit the alleged discriminatory housing practice. Within thirty days after receiving a complaint, or

41

within thirty days after the expiration of any period of reference under subsection (c), the Secretary shall investigate the complaint and give notice in writing to the person aggrieved whether he intends to resolve it. If the Secretary decides to resolve the complaint, he shall proceed to try to eliminate or correct the alleged discriminatory housing practice by informal methods of conference, conciliation, and persuasion. Nothing said or done in the course of such informal endeavors may be made public or used as evidence in a subsequent proceeding under this title without the written consent of the persons concerned. Any employee of the Secretary who shall make public any information in violation of this provision shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $1,000 or imprisoned not more than one year.

〔(b) A complaint under subsection (a) shall be filed within one hundred and eighty days after the alleged discriminatory housing practice occurred. Complaints shall be in writing and shall state the facts upon which the allegations of a discriminatory housing practice are based. Complaints may be reasonably and fairly amended at any time. A respondent may file an answer to the complaint against him and with the leave of the Secretary, which shall be granted whenever it would be reasonable and fair to do so, may amend his answer at any time. Both complaints and answers shall be verified.

〔(c) Wherever a State or local fair housing law provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title, the Secretary shall notify the appropriate State or local agency of any complaint filed under this title which appears to constitute a violation of such State or local fair housing law, and the Secretary shall take no further action with respect to such complaint if the appropriate State or local law enforcement official has, within thirty days from the date the alleged offense has been brought to his attention, commenced proceedings in the matter, or, having done so, carries forward such proceedings with reasonable promptness. In no event shall the Secretary take further action unless he certifies that in his judgment, under the circumstances of the particular case, the protection of the rights of the parties or the interests of justice require such action.

〔(d) If within thirty days after a complaint is filed with the Secretary or within thirty days after expiration of any period of reference under subsection (c), the Secretary has been unable to obtain voluntary compliance with this title, the person aggrieved may, within thirty days thereafter, commence a civil action in any appropriate United States district court, against the respondent named in the complaint, to enforce the rights granted or protected by this title, insofar as such rights relate to the subject of the complaint: *Provided,* That no such civil action may be brought in any United States district court if the person aggrieved has a judicial remedy under a State or local fair housing law which provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title. Such actions may be brought without regard to the amount in controversy in any United States district court for the district in which the discriminatory housing practice is alleged

42

to have occurred or be about to occur or in which the respondent resides or transacts business. If the court finds that a discriminatory housing practice has occurred or is about to occur, the court may, subject to the provisions of section 812, enjoin the respondent from engaging in such practice or order such affirmative action as may be appropriate.

〔(e) In any proceeding brought pursuant to this section, the burden of proof shall be on the complainant.

〔(f) Whenever an action filed by an individual, in either Federal or State court, pursuant to this section or section 812, shall come to trial the Secretary shall immediately terminate all efforts to obtain voluntary compliance.

〔INVESTIGATION; SUBPENAS; GIVING OF EVIDENCE

〔SEC. 811. (a) In conducting an investigation the Secretary shall have access at all reasonable times to premises, records, documents, individuals, and other evidence or possible sources of evidence and may examine, record, and copy such materials and take and record the testimony or statements of such persons as are reasonably necessary for the furtherance of the investigation: *Provided, however,* That the Secretary first complies with the provisions of the Fourth Amendment relating to unreasonable searches and seizures. The Secretary may issue subpenas to compel his access to or the production of such materials, or the appearance of such persons, and may issue interrogatories to a respondent, to the same extent and subject to the same limitations as would apply if the subpenas or interrogatories were issued or served in aid of a civil action in the United States district court for the district in which the investigation is taking place. The Secretary may administer oaths.

〔(b) Upon written application to the Secretary, a respondent shall be entitled to the issuance of a reasonable number of subpenas by and in the name of the Secretary to the same extent and subject to the same limitations as subpenas issued by the Secretary himself. Subpenas issued at the request of a respondent shall show on their face the name and address of such respondent and shall state that they were issued at his request.

〔(c) Witnesses summoned by subpena of the Secretary shall be entitled to the same witness and mileage fees as are witnesses in proceedings in United States district courts. Fees payable to a witness summoned by a subpena issued at the request of a respondent shall be paid by him.

〔(d) Within five days after service of a subpena upon any person, such person may petition the Secretary to revoke or modify the subpena. The Secretary shall grant the petition if he finds that the subpena requires appearance or attendance at an unreasonable time or place, that it requires production of evidence which does not relate to any matter under investigation, that it does not describe with sufficient particularity the evidence to be produced, that compliance would be unduly onerous, or for other good reason.

〔(e) In case of contumacy or refusal to obey a subpena, the Secretary or other person at whose request it was issued may petition for its enforcement in the United States district court for the dis-

43

trict in which the person to whom the subpena was addressed resides, was served, or transacts business.

〔(f) Any person who willfully fails or neglects to attend and testify or to answer any lawful inquiry or to produce records, documents, or other evidence, if in his power to do so, in obedience to the subpena or lawful order of the Secretary, shall be fined not more than $1,000 or imprisoned not more than one year, or both. Any person who, with intent thereby to mislead the Secretary, shall make or cause to be made any false entry or statement of fact in any report, account, record, or other document submitted to the Secretary pursuant to his subpena or other order, or shall willfully neglect or fail to make or cause to be made full, true, and correct entries in such reports, accounts, records, or other documents, or shall willfully mutilate, alter, or by any other means falsify any documentary evidence, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

〔(g)The Attorney General shall conduct all litigation in which the Secretary participates as a party or as amicus pursuant to this Act.

〔ENFORCEMENT BY PRIVATE PERSONS

〔SEC. 812.(a) The rights granted by sections 803, 804, 805, and 806 may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction. A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred: *Provided, however,* That the court shall continue such civil case brought pursuant to this section or section 810(d) from time to time before bringing it to trial if the court believes that the conciliation efforts of the Secretary or a State or local agency are likely to result in satisfactory settlement of the discriminatory housing practice complained of in the complaint made to the Secretary or to the local or State agency and which practice forms the basis for the action in court: *And provided, however,* That any sale, encumbrance, or rental consummated prior to the issuance of any court order issued under the authority of this Act, and involving a bona fide purchaser, encumbrancer, or tenant without actual notice of the existence of the filing of a complaint or civil action under the provisions of this Act shall not be affected.

〔(b) Upon application by the plaintiff and in such circumstances as the court may deem just, a court of the United States in which a civil action under this section has been brought may appoint an attorney for the plaintiff and may authorize the commencement of a civil action upon proper showing without the payment of fees, costs, or security. A court of a State or subdivision thereof may do likewise to the extent not inconsistent with the law or procedures of the State or subdivision.

〔(c) The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees in the case of a prevailing plaintiff:

44

*Provided,* That the said plaintiff in the opinion of the court is not financially able to assume said attorney's fees.

### 〔ENFORCEMENT BY THE ATTORNEY GENERAL

〔Sec. 813. (a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this title, or that any group of persons has been denied any of the rights granted by this title and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court by filing with it a complaint setting forth the facts and requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order, or order against the person or persons responsibile for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of the rights granted by this title.

### 〔EXPEDITION OF PROCEEDINGS

〔Sec. 814. Any court in which a proceeding is instituted under section 812 or 813 of this title shall assign the case for hearing at the earliest practicable date and cause the case to be in every way expedited.

### 〔EFFECT ON STATE LAWS

〔Sec. 815. Nothing in this title shall be construed to invalidate or limit any law of a State or political subdivision of a State, or of any other jurisdiction in which this title shall be effective, that grants, guarantees or protects the same rights as are granted by this title; but any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this title shall to that extent be invalid.〕

### *ENFORCEMENT BY SECRETARY; PRELIMINARY MATTERS*

*Sec. 810. (a)(1) Whenever an aggrieved person, or the Secretary on the Secretary's own initiative, files a charge alleging a discriminatory housing practice, the Secretary shall serve a notice of the alleged discriminatory housing practice on the party charged (hereinafter in this title referred to as the "respondent") within 10 days after such filing, and shall make an investigation thereof. Upon receipt of such charge, the Secretary shall serve notice upon the aggrieved person acknowledging receipt of the charge and advising the aggrieved person of the time limits and choice of forums provided under this title. Such charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Secretary requires. At any time after the filing of a charge, the Secretary shall proceed to try to eliminate or correct the alleged discriminatory housing practice by informal methods of conference, conciliation, and persuasion. Nothing said or done in the course of such informal endeavors may be made public or used as evidence in a subsequent proceeding under this title without the written consent*

45

*of the persons concerned. Any employee of the Secretary who shall make public any information in violation of this provision shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $1,000 or imprisoned not more than one year. An aggrieved person shall file a charge under this section with the Secretary not later than one year after the alleged discriminatory housing practice occurred or terminated. The Secretary may also investigate housing practices to determine whether charges should be brought under this section or new rules should be made under this title.*

*(2)(A) In connection with any investigation of such charge, the Secretary shall, at reasonable times, have access to, and the right to copy, any information that is reasonably necessary for the furtherance of the investigation. The Secretary may issue subpenas to compel such access to or the production of such information, or the appearance of persons, and may issue interrogatories to a respondent, to the same extent and subject to the same limitations as would apply if the subpenas or interrogatories were issued or served in aid of a civil action in the United States district court for the district in which the investigation is taking place. The Secretary may administer oaths.*

*(B) Upon written application to the Secretary, a respondent shall be entitled to the issuance of a reasonable number of subpenas by and in the name of the Secretary to the same extent and subject to the same limitations as subpenas issued by the Secretary under clause (A) of this paragraph.*

*(C) Witnesses summoned by subpena of the Secretary under this title shall be entitled to the same witness and mileage fees as are witnesses in proceedings in United States district courts.*

*(D) The Secretary or other party at whose request a subpena is issued under this title may enforce such subpena in appropriate proceedings in the United States district court for the district in which the person to whom the subpena was addressed resides, was served, or transacts business.*

*(E) Any person who willfully fails to attend and testify or to answer any lawful inquiry or to produce records, documents, or other evidence, if in such person's power to do so, in obedience to the subpena or lawful order of the Secretary under this title, shall be fined not more than $1,000. Any person who, with intent thereby to mislead the Secretary shall make or cause to be made any false entry or statement of fact in any report, account, record, or other document produced pursuant to the Secretary's subpena or other order, or shall willfully fail to make or cause to be made full, true, and correct entries in such reports, accounts, records, or other documents, or shall willfully mutilate, alter, or by any other means falsify any documentary evidence, shall be fined not more than $1,000.*

*(3) Whenever a charge alleges a discriminatory housing practice within the jurisdiction of a State or local public agency certified by the Secretary under this paragraph, the Secretary shall, within 30 days after receiving such charge and before taking any action with respect to such charge, refer such charge to that certified agency. Except with the consent of such certified agency, the Secretary shall, after that referral is made, take no further action with respect to such charge, if the appropriate State or local law enforcement official has, before ninety days after the date the alleged offense has*

46

*been brought to such official's attention, commenced proceedings in the matter, and, having so commenced proceedings, carries forward such proceedings with reasonable promptness. An agency shall be certified under this paragraph if the Secretary determines that the substantive rights protected by that agency, the procedures followed by that agency, the remedies available to such agency, and the availability of judicial review of such agency's action, are substantially equivalent to those created by and under this title. Before making such certification, the Secretary shall take into account the current practices and past performance, if any, of such agency. Any State or local agency may submit a written request for certification to the Secretary. Unless the Secretary interposes a written objection within 90 days after such submission, such State or local agency shall be deemed certified within the meaning of this title. If the Secretary objects within the prescribed 90-day period, he shall provide the State or local agency with an explanation specifically outlining the reason for his decision, and such decision shall be subject to review by the appropriate United States district court.*

*(4) The Secretary and other Federal agencies having authority to prevent housing discrimination shall cooperate and seek to avoid duplication of effort in the exercise of their several authority. The Secretary and such other Federal agencies shall notify each other of any allegation of housing discrimination which may be within their respective responsibilities. The Secretary or such other Federal agency shall, upon such notification, take additional appropriate action.*

*(b) If the Secretary concludes on the basis of a preliminary investigation of a charge that the Secretary is unable to obtain voluntary compliance and prompt judicial action is necessary to carry out the purposes of this title, an action may be brought on behalf of the Secretary for appropriate temporary or preliminary relief pending final disposition of such charge. Any temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with rule 65 of the Federal Rules of Civil Procedure. An application for relief under this paragraph shall not affect the initiation or continuation of administrative proceedings under sections 810 and 811 of this title.*

*(c) If the Secretary determines, after an investigation under this section, that reasonable cause exists to believe the charge is true, the Secretary shall file an administrative complaint under section 811(a) of this title or refer the matter to the Attorney General for the filing of an appropriate civil action under section 813(b) of this title. Such determination in the case of a charge made by an aggrieved person may not be made later than 270 days after the filing of such charge. After each investigation under this section, the Secretary shall provide to each aggrieved person and each respondent a copy of the findings of such investigation.*

### ENFORCEMENT BY THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; HEARING PROCESS

*Sec. 811. (a) Upon filing an administrative complaint, the Secretary shall cause a copy of such complaint to be served on the respondent, together with a notice of opportunity for a hearing on the record at a place and time (not less than thirty days after the serv-*

47

ice of such complaint) specified in such notice. On the request of the respondent and with the consent of all other parties, a hearing may be rescheduled for a time earlier than the time specified in such notice. Any resolution of a charge or complaint by means of conciliation shall require the consent of the person who filed the charge, and any such resolution following the service of a complaint under this subsection shall also require the approval of the Secretary. The respondent shall have the right to file an answer to the administrative complaint and to appear in person or otherwise and give testimony at a hearing on the record. Any aggrieved person may be allowed to intervene in the proceeding, to appear in person or otherwise, to obtain the issuance of a reasonable number of subpenas in the manner set forth in section 810 of this title, and to present testimony. After the conclusion of such hearing, the administrative law judge conducting the hearing shall make findings of fact and conclusions of law, and may issue an order providing such relief as may be appropriate, and may impose a civil penalty of not to exceed $10,000. No such order shall affect any contract of sale, encumbrance, or lease executed before the issuance of such order, and involving a bona fide purchaser, encumbrancer, or tenant without actual notice of the charge filed under this title. The Secretary is not authorized to modify any order under this section, or the decision of the administrative law judge.

(b) The findings of fact and conclusions of law made with respect to a final order issued under subsection (a), together with a copy of such order, shall be served on each aggrieved person and each respondent in the proceeding.

(c) Any petition for judicial review of a final order under subsection (a) shall be filed in the Federal district court for the district in which the property is located not later than 30 days after service of such order. The petition may be amended after a reasonable opportunity to review the record of the administrative proceeding. For the purposes of judicial review of such an order, any aggrieved person shall be deemed a party in the administrative proceeding reviewed. The petition shall contain written objections to such order and shall specify those portions of the record or findings of fact and conclusions of law to which objection is made. The court shall make a de novo determination of the adequacy of the findings of fact and conclusions of law to which objection is made. The court may receive further evidence, or recommit the matter to the administrative law judge with instructions, if such evidence was improperly excluded by the administrative law judge or if the court determines that there is a compelling need for further evidence to support a factual determination. To the extent that further evidence is received by the court, such evidence shall be deemed a part of the record and shall be considered in the determination of whether to accept, reject, or modify the findings of fact and conclusions of law of the administrative law judge. Based on a review of the record as a whole, the court may accept, reject, or modify, in whole or in part, the findings of fact and conclusions of law made by the administrative law judge. All proceedings under this subsection in the Federal district court shall be given precedence over other civil proceedings pending therein and shall be in every way expedited.

(d)(1) Any person who violates a final order under subsection (a) shall be subject to a civil penalty assessed by the administrative law

48

judge holding the hearing of not more than $1,000 for each day during which such violation continues after the date on which such final order becomes unreviewable.

(2) For the purposes of paragraph (1) of this subsection, a final order becomes unreviewable—

(A) if a petition for review has not been filed in the appropriate Federal district court on the day 30 days after the service of such final order, or

(B) if such a petition is so filed within such 30-day limit, on the date on which the last appellate court's decision becomes final and not subject to any further appellate proceeding.

(e) The United States district courts shall have original jurisdiction over petitions for judicial review of final orders under subsection (a) of this section without regard for the amount in controversy.

PRIVATE ENFORCEMENT

SEC. 812. (a)(1) An aggrieved person may commence a civil action in an appropriate United States district court or State court at any time not later than two years after the alleged discriminatory housing practice occurred or terminated.

(2) After an aggrieved person has commenced a civil action under this section, the Secretary may not commence or continue proceedings toward the issuance of a remedial order based on such charge.

(3) An aggrieved person shall not commence a civil action under this subsection with respect to a charge made by that person to the Secretary if the Department of Housing and Urban Development (or a State or local agency to which the Secretary refers such charge) has commenced the hearing on the record with respect to that charge.

(4) Upon timely application, the Attorney General may intervene in such civil action, if the Attorney General certifies that the case is of general public importance.

(b) Upon application by an aggrieved person, any trial or appellate court may, in such circumstances as it deems just, appoint an attorney for such person and may authorize the commencement or continuation of the action without the payment of fees, costs, or security.

(c) In a civil action under this section, a court may award such relief as may be appropriate, which may include money damages, equitable and declaratory relief, and, in the case of a willful violation, punitive damages.

ENFORCEMENT ROLE OF ATTORNEY GENERAL

SEC. 813. (a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this title, or that any group of persons has been denied any of the rights granted by this title and such denial raises an issue of general public importance, the Attorney General may bring a civil action in an appropriate United States district court.

(b) The Attorney General may bring a civil action in an appropriate United States district court (1) to enforce any final order under section 811(a) of this title that is referred for enforcement by the Sec-

49

*retary; (2) to collect any civil penalty assessed under section 811 of this title; and (3) to remedy any discriminatory housing practice (A) with respect to which the Secretary has made a finding that reasonable cause exists under this title and (B) which the Secretary refers to the Attorney General for enforcement under this subsection.*

*(c) The court may award such relief in any civil action under this section as is authorized in section 812(c) of this title in cases brought under that section.*

*(d) A person may intervene in any civil action commenced under this section which involves an alleged discriminatory housing practice with respect to which such person is an aggrieved person.*

ANCILLARY AND PROCEDURAL MATTERS RELATING TO ENFORCEMENT

*Sec. 814. (a) In any action or proceeding under this title, the court, in its discretion, may allow a prevailing party (other than the United States with respect to attorney fees) reasonable attorney and expert witness fees as part of the costs, and the United States shall be liable for such costs the same as a private person. Such costs may also be awarded upon the entry of any interlocutory order which determines substantial rights of the parties.*

*(b) In any administrative proceeding based on a charge under section 810(a) of this title, any prevailing party (other than the United States with respect to attorney fees) may be awarded reasonable attorney and expert witness fees as a part of a final order under section 811(a) of this title.*

*(c) Any court in which a proceeding is instituted under this title shall assign the case for hearing at the earliest practicable date and cause the case to be in every way expedited.*

*(d) Any sale, encumbrance, or lease executed before the issuance of any court order under this title, and involving a bona fide purchaser, or encumbrancer, or tenant without actual notice of the existence of the filing of a complaint or civil action under this title shall not be affected by such court order.*

EFFECT ON OTHER LAWS

*Sec. 815. (a) Nothing in this title shall be construed to invalidate or limit any law of a State or political subdivision of a State, or of any other jurisdiction in which this title shall be effective, that grants, guarantees, or protects the same rights as are granted by this title; but any such law that purports to require or permit any action that would be a discriminatory housing practice under this title shall to that extent be invalid.*

*(b) Nothing in this title shall be construed to repeal, supersede, or diminish the protection provided to handicapped persons by any other Federal law.*

\*       \*       \*       \*       \*       \*       \*

INTERFERENCE, COERCION, OR INTIMIDATION

Sec. 817. It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or en-

50

joyment of, any right granted or protected by [section 803, 804, 805, or 806.] *this title*. This section may be enforced by appropriate civil action.

\* \* \* \* \* \* \*

## TITLE IX

### PREVENTION OF INTIMIDATION IN FAIR HOUSING CASES

SEC. 901. Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

(a) any person because of his race, color, religion, sex, *handicap (as defined in section 802 of this Act),* or national origin and because he is or has been selling, purchasing, renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing, or occupations of any dwelling, or applying for or participating in any service, organization, or facility relating to the business of selling or renting dwellings; or

(b) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—

(1) participating, without discrimination on account of race, color, religion, sex, *handicap (as defined in section 802 of this Act),* or national origin, in any of the activities, services, organizations or facilities described in subsection 901(a); or

(2) affording another person or class of persons opportunity or protection so to participate; or

(c) any citizen because he is or has been, or in order to discourage such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion, sex, *handicap (as defined in section 802 of this Act),* or national origin, in any of the activities, services, organizations of facilities described in subsection 901(a), or participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate—

shall be fined not more than $1,000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life.

\* \* \* \* \* \* \*

Case: 1:13-cv-08564 Document #: 19-6 Filed: 02/12/14 Page 77 of 159 PageID #:827

SUPPLEMENTAL VIEWS OF CONGRESSMAN ROBERT F. DRINAN TO H.R. 5200, THE FAIR HOUSING ACT AMENDMENT OF 1980

H.R. 5200, as originally introduced, included a provision that limited the use of land use practices to block the establishment of small group homes for the disabled. During our considerable discussion of this provision in the full Judiciary Committee, a consensus emerged that the states should be given more time to remedy this situation before federal prohibitions are adopted. However, the consensus also reflected the view that local land use practices can be used to create major obstacles to deinstitutionalization of the mentally and physically disabled.

The record supporting this conclusion is clear. For example, in early 1977, the General Accounting Office (FAO) sent a major report to the Congress on deinstitutionalization. The report concluded that "inadequate housing is a major obstacle to returning the mentally disabled to the community." This finding was echoed by the 1979 report of the President's Commission on Mental Health.

In hearings on this legislation before the Subcommittee on Civil and Constitutional Rights in both the 95th and 96th Congress, numerous witnesses supported this view. Commissioner Robert L. Okin of the Massachusetts Department of Mental Health told our Subcommittee that there were well over 5,000 persons housed in Massachusetts public mental hospitals solely because of the lack of residences in the community. In addressing the problem of exclusionary zoning he said:

> This type of exclusion can be devastating. They [the mentally disabled] are told in effect, at a time when they are struggling to gain or regain their self-esteem, that they are not worthy of living in a particular community, that they are second class citizens, and that they might as well live in the institution where they won't be exposed to such animosity.

Similar testimony was received from Congressman Christopher Dodd, The National Center for Law and the Handicapped, the American Council of the Blind, the American Coalition of Citizens With Disabilities, the Consortium Concerned With the Developmentally Disabled, the National Association of State Mental Health Program Directors, the National Association of State Mental Retardation Program Directors and the Mental Health Law Project.

Exclusionary zoning of group homes for the disabled is clearly contrary to now well-established federal and state policy that disabled persons should live and receive the services they need in their own communities and not in isolated and costly institutions.

In my view this is also a violation of disabled persons fundamental civil rights. Disabled citizens should have the same rights as others protected under the Fair Housing Act. But because of myth and prejudice they continue to be ostracized and feared. This is especially true with regard to the establishment of small group homes for the mentally disabled. As to the misperception that the mentally disabled are violent, the President's Commission on

52

Mental Health reported that "violence" of mentally disabled persons "is more a device of fiction than a fact of life." A number of recent studies have invalidated the often-cited assumption that the presence of group homes in a neighborhood will decrease property values.

## The process of excluding group homes

Zoning authority is a recognized part of a local government's common law power to enact laws protecting the health, safety and welfare of its citizens. This legitimate power has been seized upon as a means of excluding group homes for the disabled from a neighborhood. There are three basic types of zoning ordinances that have been used to discriminate against group homes:

(a) Some zoning ordinances explicitly exclude such homes by classifying them as a business, school, or medical facility, rather than as a residential use of property. Such homes are thus restricted to non-residential or business areas of a municipality.

(b) More commonly, group homes are not mentioned on the face of the ordinance, but residential areas are limited to single-family dwellings. When "family" is defined, it is limited to a number of persons related by blood, marriage or adoption living together in a single housekeeping unit. Because group homes consist of six to eight unrelated residents with one or two houseparents, they do not meet the technical requirements of the definition.

(c) The third type of ordinance allows group homes in specified residential districts, but only if they meet the conditions set out in local zoning laws and regulations or those imposed in an *ad hoc* fashion by the city government. A special use permit must be obtained. The conditions imposed often include elaborate building code standards; the procedure for obtaining the special use permit usually requires one or more public hearings. Sponsors of group homes often cannot afford to delay the opening of a home pending the outcome of expensive and lengthy local and state procedures. Thus, even a favorable court judgment can come too late to do any good. The zoning ordinance creates so many hurdles that, in effect, it excludes group homes for the disabled.

In a number of states, courts have invalidated the use of zoning to exclude group homes. The term "family" as used in local zoning ordinances has been interpreted to include small groups of disabled persons. The courts have seen that the group functions as a family with residents living as a single unit and participating in housekeeping and other activities as a "family" group. As long as the home is small, blends into the neighborhood and is residential rather than institutional in character, some courts have found no relevant difference for zoning purposes between a small group of disabled persons living as a family unit and a family.

## Need for Federal action

As already noted, court activity has been encouraging. Also, seventeen states have enacted statutes that bar municipalities from excluding small group homes for the disabled from residential zones. But, at the same time, court challenges to single-family ordinances and to state pre-emptive statutes are time-consuming and often result in the loss of the home in question. Sponsors of group

53

homes seldom have the financial resources for involvement in such costly litigation.

It is my hope that the Judiciary Committee will remain interested in the adverse effect local land use practices can have on group homes for the disabled. I have asked the General Accounting Office to undertake a study of the extent to which land use practices are hampering deinstitutionalization of the disabled and the progress being made at the state level to deal with this problem. It is my expectation that if the problem continues unabated, the Fair Housing Act will be amended at a later time to explicitly limit the use of exclusionary zoning against group homes for the disabled.

1. General Accounting Office, *Returning the Mentally Disabled to the Community: Government Need to Do More,* (January, 1977, HRD–76–1 52).

2. *Fair Housing Act: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary,* 95th Congress, Second Session, Serial No. 46 and *Fair Housing Amendments Act of 1979: Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary,* 96th Congress, First Session, Serial No. 12.

3. See, for example, "Legal Theories and Cases Encouraging Deinstitutionalization," Memorandum prepared by the Congressional Research Service of the Library of Congress, reprinted in *Fair Housing Amendments Act of 1979: Hearings before . . . , supra,* at 682–696.

4. PCMH, *Report to the President,* GPO (1978), I at 56 and Task Panel on Public Attitudes, IV at 1871, 1876. See also O. Wahl, "Fear and rejection—one social response," *These People, A Report,* Horizon House Institute (June, 1977); S. A. Shah, "Dangerousness and Civil Commitment of the Mentally Ill," *American Journal of Psychiatry,* Vol. 132, pp. 501–505 (1975).

5. *Group Homes for the Mentally Retarded: An Investigation of Neighborhood Property Impacts,* Julian Wolpert, Woodrow Wilson School of Public & International Affairs, Princeton University, August 31, 1978; *The Influence of Halfway Houses and Foster Care Facilities Upon Property Values,* City of Lansing Planning Department, Lansing, Michigan.

ROBERT DRINAN.

54

## SUPPLEMENTAL VIEWS OF HON. ROBERT McCLORY ON H.R. 5200

I was pleased to see that the Fair Housing Amendments Act passed the full Judiciary Committee by an impressive 24 to 6 vote. Had it not been for Republican sponsorship of a compromise proposal designed to resolve the impasse caused by the unchecked administrative procedure originally in the bill, victims of housing discrimination would still lack an effective mechanism to resolve their complaints. As a result of the Minority Compromise, authored by Congressman Tom Railsback, which I supported, the administrative procedure deemed necessary for purposes of expediting enforcement will be subject to substantial *de novo* review by a federal district judge. That judge will have the power to alter the administrative order if, in his opinion, the decision of the administrative law judge is not supported by the evidence. Further, he will be able to entertain additional evidence if he believes it will be useful for purposes of perfecting the record or guaranteeing equity.

Two items, however, gave me pause. One involved the inclusion of the insurance industry under proposed section 6(c) of the bill. At first glance, we are told that the industry's inclusion is merely intended to codify a federal district judge's decision last June in *Dunn* v. *The Midwestern Indemnity Mid-American Fire and Casualty Co.,* 472 F.Supp. 1106 (S.D. Ohio, 1979). In that case, the judge determined that the insurance industry is impliedly covered under section 804(a) of existing title VIII, which makes it illegal to:

> refuse to sell or rent after making a bona fide offer, or to refuse to negotiate for the sale or rental of, or to *otherwise make unavailable or deny,* a dwelling to any person because of race, color, religion, sex, or national origin. (Emphasis added.)

In holding against the insurance company, the judge appeared to give a great deal of weight to previous judicial decisions interpreting the "broadwise make unavailable or deny" language in section 804(a) "as broad[ly] as Congress could have made it." Whether or not *Dunn* remains the law is open to conjecture as it is only a district court decision. There are other decisions not relating to insurance but which apply the same logic and which interpret the same statutory language.

Unlike many other links in the housing chain, the insurance industry is heavily regulated, both at the state and federal level. Some sixteen states already specifically prohibit unfair discrimination based on factors or characteristics similar to those in proposed section 6(c) while an additional twenty-two generally prohibit unfair discrimination in a manner which would include those same individual factors or characteristics. Furthermore, the National Association of Insurance Commissioners has adopted a new model termination, declination and non-renewal bill which is currently pending in state legislatures nationwide and which is intended to remedy a number of minority complaints. To meet complaints that access to insurance is being denied, virtually every state with a property insurance availability problem has established a mandatory insurance company pooling mechanism, commonly known as a FAIR plan, in order to provide a guaranteed market for the basic

55

property insurance coverage needed to obtain a home mortgage. In short, the insurance industry is already responding to the problems of discrimination in the housing industry. While I cannot disagree that it should be held responsible for any discriminatory acts which deprive otherwise qualified individuals of housing, I am not prepared to accept the language which is contained in proposed section 6(c) which could grant broad federal authority over the insurance industry far beyond the requirements of a fair housing bill.

Another amendment which caught my interest was one offered by the gentleman from Virginia, Mr. Butler. His amendment, which eight democratic proxy votes helped defeat by a vote of 13 to 16, would have stricken a little known addition to the bill. Under existing law, section 808(e)(3) mandates that the Secretary of HUD "shall (3) cooperate with and render technical assistance to . . . agencies, organizations, and institutions" whose mission it is to eliminate discriminatory housing practices. H.R. 5200 would have inserted the words "financial and" before "technical" in this authorization. Given the fact that HUD already advises over 300 public and private groups whose responsibilities include eliminating housing discrimination, the potential outlay of funds could be dramatic. Even HUD admits that it does not know how much money could be involved.

It may well be that some federal funding is necessary to assist existing state and local agencies in their efforts to gain certification under proposed section 810(a)(3) and thereby qualify to receive and consider housing complaints before HUD does. I would support such action, and I plan to offer an amendment which would alter the bill's language in that regard. Failing that, I would feel constrained again to support Mr. Butler's efforts to eliminate from this legislation such authority for the funding of any number of newly established private organizations.

Finally, I want to reiterate my satisfaction with the compromise enforcement provisions which should enable the Department of HUD to resolve most unfair housing complaints. If this measure is enacted into law, I hope that HUD will exercise its broad new authority judiciously.

ROBERT McCLORY.

56

## SUPPLEMENTAL VIEWS TO H.R. 5200 BY MR. VOLKMER AND MR. SENSENBRENNER

Title VIII of the Civil Rights Act was enacted to prevent discrimination in the sale and leasing of housing. In recent years this act has been criticized because it does not provide sufficient enforcement powers to combat discrimination. H.R. 5200 is legislation which is aimed at meeting this criticism.

A major issue which remains to be resolved is what the most appropriate enforcement means will be. A choice will have to be made between the administrative enforcement procedures, which the reported bill establishes, and the Sensenbrenner-Volkmer approach, which utilizes the U.S. District Courts including U.S. Magistrates where possible and emphasizes a nonformal resolution of differences through conciliation. We offered such an amendment in the Committee markup but were defeated by a 10–20 vote.

This policy choice raises significant questions which must be answered:

1. Which approach improves an individual complainant's access to the system and speeds resolution of the issues?

2. Which approach will provide the best relief for a victim of discrimination while maintaining fairness?

3. Which approach provides the most incentive to settle disputes without resorting to formal procedures?

We believe that the Sensenbrenner-Volkmer approach provides the best answer to these questions.

H.R. 5200, as reported, envisions Administrative Law Judges as the enforcement mechanism. HUD officials have testified that they envision utilizing 7 ALJ's to handle the caseload for the entire nation. This is not even one ALJ for each of the 10 HUD regional offices. We find it hard to believe 7 individuals, who at best will ride circuit within the regions, can provide sufficient access to the enforcement system.

These 7 ALJ's must be compared with a court system to which we have recently added new judgeships and greatly expanded the powers of U.S. Magistrates. We believe the U.S. District Courts, which cover much smaller territorial area than HUD regions, are well staffed to handle the caseload within that particular district. When you consider that the District Courts are multi-judge, sit in more than one location, and that magistrates in appropriate situations may be utilized, the choice is clear.

Instead of HUD being the lead agency in actual enforcement proceedings, we would place Federal enforcement within the Department of Justice. This allows a more coordinated enforcement effort. In fact, the Civil Rights Commission in the recent report of the United States Civil Rights Commission "The State of Civil Rights: 1979" commended the Civil Rights Division of DOJ for its announced decision "to make a greater effort to focus on bringing (housing discrimination) cases that have a high impact in terms of number of units affected on the issues raised". The report goes on to state that DOJ's "interest in coordinating litigative action—makes a new and possibly useful future strategy."

57

The Sensenbrenner-Volkmer approach provides the best solution. By utilizing the courts we provide greater access. By spreading the caseload we provide greater speed. By allowing DOJ to be the lead Federal enforcement agency, we promote coordinated activity.

As reported, H.R. 5200 is deficient in providing relief for a victim of discrimination. The ALJ will not be able to award certain kinds of damages, i.e. pain and suffering and punitive damages. This can only be done by an article III court. Any administrative proceeding brought under the Act will benefit only the government (a civil penalty of up to $10,000.) while awarding the victim nothing.

Our amendment would not result in these deficiencies. Courts can award compensatory and punitive damages. The arbitration provision we will discuss later allows an award of up to $500, to be made by an arbitrator without a case going to court. These provisions will allow adequate monetary as well as specific relief to be granted a victim.

In addtion, the independence of the administrative forum, must be questioned. It must be remembered that the ALJ's will be employees of HUD. As written, the bill would allow HUD to assure the role of investigator, prosecutor and judge, all in the same case. We do not believe this is proper. Despite the Administrative Procedures Act, ALJ's will have a natural institutional bias. Utilization of the Courts under our amendment avoids a potential conflict.

We also believe that the Sensenbrenner-Volkmer approach better promoted the use of informal conciliation as a method of resolving disputes. While both present law and the reported bill do not in any way encourage conciliations we provide the necessary incentive by allowing sanctions to be imposed against those who refuse to make a good faith effort at conciliation. We allow the parties to submit, upon mutual consent, to binding arbitration of the dispute with HUD given administrative enforcement power over the arbitration award. An arbitrator will be able to award specific damages.

In the recent past HUD itself has been criticized in reference to its enforcement of fair housing laws by the Civil Rights Commission. These criticisms range from poorly trained staff, failure to issue guidelines and regulations to implement Title VIII and failure to promptly process discrimination complaints to failure to improve the conciliation rates for Title VIII complaints.

Because we believe many of these complaints are justified, we should not at this time create a new bureaucracy within HUD to enforce fair housing laws. The amendment which we will offer will provide a fair, speedy and effective enforcement mechanism while avoiding the problems inherent in the administrative procedure. We put teeth into fair housing enforcement without adding to the government bureaucracy.

HAROLD L. VOLKMER
JAMES F. SENSENBRENNER, Jr.

58

## SUPPLEMENTAL VIEWS OF MR. HYDE

I reluctantly voted for the passage of H.R. 5200 principally because I believe title VIII of the 1968 Civil Rights Act has been ineffective and because this legislation is a decided improvement. I trust Floor amendments will further improve this bill. However, two measures in particular require this dissident.

First, I believe that though the administrative procedure contained in the Edwards-Railsback Amendment is a vast improvement over what was initially contained in the bill, the mere existence of an administrative procedure within HUD, even if supervised by the federal courts, represents a major departure from the traditional avenues through which the civil rights laws have been enforced. The Sensenbrenner alternative, through which complaints would be referred by HUD to the Department of Justice, is a simpler, more sensible, course to take, and one which assures the likelihood of more even-handed adjudication. Having the investigator/prosecutor/judge all within the same agency is not my idea of due process. Accordingly, I expect to again support his amendment on the House Floor.

Second, the slim defeat of my amendment to acknowlede the right of appraisers to "take into consideration . . . all factors shown by documentation to be relevant to [their] estimate of the value of the property" was a grave mistake. Appraisers have a fiduciary obligation to their employers. The work product produced through that obligation serves as the basis for loans from banks and the federal government. In order to protect lenders who depend on accurate appraisals, appraisers must be permitted to rely on all factors which can be documented as relevant. I do not know how they can properly carry out the responsibilities otherwise.

In recent years, HUD and the Federal Home Loan Bank Board (FHLBB) have issued regulations prohibiting appraisers from including in their reports certain words and phrases which, in the view of the regulators tend to make race, ethnicity, religion, and national origin factors which adversely affect market value. For example, the FHLLB has prohibited the use of such presumably discriminatory phrases as "church", "synagogue", "prestigious neighborhood", or "poor schools." I believe none of these references necesarily has a discriminatory implication, but I suggest that they are all very relevant in determining fair market value.

Some might contend that each of the phrases I have mentioned is subject to a subjective assessment. True enough. But each is also subject to a documentary showing of impact on marketability and it is a documentary showing which my amendment requires. For example, Georgetown, in the District of Columbia, is clearly a prestigious neighborhood. In it reside representatives of all races and nationalities and its "prestigious" nature makes loans far easier to obtain and far more secure from the standpoint of a lender. Similarly, the quality of schools can be shown by a myriad of means, not the least of which are test scores. Lastly, the proximity of churches or synagogues are important stabilizing factors which are very significant to lenders whose collateral must retain its value

59

over the possible thirty-year life of a mortgage. We engage in self-deception by failing to recognize that appraisers—being human—cannot avoid making subjective judgments, not matter how hard they try to avoid them. Not permitting them to explain the relevant and documentable reasons for their appraisal is unprofessional and myopic. "Tell it like it is" apparently doesn't apply to appraisers. Next perhaps we shall be forbidding doctors from explaining their diagnosis for fear of a negative impact on the patient.

Federal money is often involved in loans made as a result of appraisals. Though a slight majority of the House Judiciary Committee fails to be persuaded by that fact, I trust the same will not be true of the Whole House. I intend to once again offer my amendment when this bill is considered on the Floor; I hope the result will be different.

HENRY J. HYDE.
DAN LUNGREN.
HAROLD S. SAWYER.

60

## SUPPLEMENTAL VIEWS OF HON. M. CALDWELL BUTLER

In 1968, the United States Congress enacted title VIII of the Civil Rights Act, known as the Fair Housing Act, which adopted as a Federal policy extension of the principle of Federal involvement in the elimination of discrimination in housing based on race, sex, religion, and national origin.

The principal enforcement mechanism was the creation of a private right of action for an aggrieved person with power in the Attorney General to institute suits where there is a "pattern or practice" of discrimination. The principal government enforcement mechanism, however, was vested in the Department of Housing and Urban Development (HUD) and was limited to efforts to obtain conciliation between the parties.

Civil rights advocates have expressed great disappointment with the effectiveness of this legislation, and the fifteen days of hearings held by the House Subcommittee on Civil and Constitutional Rights of the Judiciary Committee during the years 1978 and 1979 indicated that the present enforcement mechanism is deficient.

The earliest proposals for improving the enforcement machinery placed extensive authority in the Secretary of HUD. Originally introduced as H.R. 3504 in the 95th Congress, and thereafter as H.R. 2540 in this, the 96th Congress, the bill would have given the Secretary the right to order temporary or preliminary relief pending the final administrative disposition of a charge of discrimination in housing. In my view, such authority was unnecessary and excessive. Administrative proceedings can go on for months, even years, But the Secretary would have been empowered to halt a construction project or housing development, for example, if he felt such action "was necessary to carry out the purposes" of the legislation.

The bill also provided for an administrative procedure, within HUD, which would permit an administrative law judge to issue an injunction and impose a fine of up to $10,000 in cases where he believed housing discrimination existed. If, after issuance of an administrative order, the Secretary believed it to be inappropriate, for any reason, he retained the right to increase or decrease it. The only review of his decision would have been an appeal to the Federal circuit court of appeals under the "substantial evidence rule," a virtually impossible standard for reversal. In order to sustain the administrative law judge under this standard, the court of appeals need only find that there existed substantial evidence to support his decision, but the Supreme Court, more than forty years ago, defined "substantial evidence" as little more than a "mere scintilla" of evidence.

The enforcement provisions of H.R. 5200 are a compromise which is a good deal more reasonable and practical than that originally proposed. Essentially, it retains an administrative law mechanism within the Department of Housing and Urban Development but provides for appeal to a Federal district court as a matter of right. Once that appeal is taken, a Federal judge may make his own judgment as to the validity of the administrative law judge's ruling, with access to additional evidence if he believes it appropriate.

61

In my judgment, we have developed a legislative proposal for civil rights law enforcement which is reasonable, effective, and fair.

It imposes strict time limits on each phase of the process. In my judgment, that is significant. The essence of civil rights enforcement is speedy trial. Both the aggrieved person and the accused profit from a quick determination and suffer from lingering indecision.

Also gratifying is the bill's renewed emphasis on the use of state-created enforcement proceedings. Under existing law, where the Department is limited to the conciliation process alone, there is still a requirement of referral to those State agencies which meet minimum statutory requirements satisfactory to the Secretary of Housing and Urban Development.

This feature has been retained. Although new and perhaps insurmountable requirements have been imposed upon the States in order to gain "certification" pursuant to H.R. 5200, the principle that appropriate State agencies should review complaints of housing discrimination before they are sent to Washington has remained in the law.

The Department is required to act promptly in determining whether a State or local housing agency meets the necessary requirements for certification and its decision is reviewable in the U.S. district court. This provision is further strengthened by an amendment offered by the gentleman from New Jersey, Mr. Hughes, which further requires that HUD certify a State which qualifies.

It is my judgment, after reviewing this legislation with some care, that it simply undertakes to accomplish too much. It has been marketed as being necessary in order to give credibility to the enforcement process within HUD and the Department of Justice.

But H.R. 5200 does far more than that.

It extends statutory coverage of the Fair Housing Act to the insurance industry, the appraisal industry, the real estate industry, and the banking industry; it extends the statute of limitations for the commencement of a private civil action; it provides the Attorney General with the right to intervene in any private civil action; it extends coverage of the act to an entirely new and never clearly defined class called the handicapped; it creates a private right of action for handicapped persons, a first in the civil right statutes; and it contains a number of "sleepers" whose ultimate impact is neither documented nor predictable. It should be sufficient to streamline the enforcement process, as has been done through the compromise proposal drafted principally by the Minority, and to get the bugs out of existing title VIII before taking on new problems and unpredictable dimensions.

For this reason, I voted against reporting H.R. 5200 in full Committee. I can support this legislation, however, if it can be confined to the purposes for which its architects were originally employed.

I have undertaken to explain in the paragraphs which follow the amendments which I will offer and which, if adopted, will fashion it into a form I can support.

62

## I

Under Section 804(a) of the present Fair Housing Act, it is unlawful to:

> [R]efuse to sell or rent after making a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

There is no reference to insurance in Section 804(a). Only one case has decided the issue as to whether the insurance industry is affected by that section, and that case will be appealed. In my judgment, it was the clear intention of Congress in 1968 not to touch the insurance industry, and that is as it should be.

However, Section 6(e) of the proposed bill amends Section 804 of existing law in such a way as to make it:

> [U]nlawful for any person whose business includes the making, purchasing, or *insuring* of loans, or selling, brokering, or appraising real estate property, to deny or otherwise make unavailable a loan or other financial assistance which is for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate in the fixing of the amount, interest rate, duration, or other terms or conditions of such loans or other financial assistance, because of race, color, religion, sex, handicap, or national origin. (Emphasis added.)

In my judgment, this is a mistake. Congressman John M. Ashbrook, a Member of the Subcommittee, offered an amendment in full committee to strike Section 6(e). I expect to support him when he renews this motion on the floor and desire to associate myself with the views expressed by Congressman McClory on this provision.

## II

Existing law makes no reference to the appraisers of real estate. H.R. 5200 does, in such a manner as to comprise their professional integrity without serving any useful purpose.

I expect to support renewal of the effort by Congressman Henry J. Hyde to strike a compromise between the appraisal industry and the language presently in the bill, and desire to associate myself with his views on this issue.

## III

H.R. 5200 would make the underlined changes in Section 808(e)(3) of the Fair Housing Act, which provides that the Secretary "shall":

> (3) cooperate with and render *financial and* technical assistance to Federal, state, local and other public or private agencies, organizations, and institutions which are formulating or carrying on programs to prevent or eliminate discriminatory housing practices;

63

The hearing record is silent as to why the proposed change is requested or what it is designed to accomplish. We can only speculate as to that.

We do know, however, that it would authorize or possibly mandate a grant of federal funds for purposes not heretofore authorized. It is, therefore, a new federal grant program!

The anticipated beneficiaries of the proposed grant program are not immediately apparent since there are more than 300 private organizations involved in efforts to reduce housing discrimination, as well as a substantial number of State and local agencies.

We do have some indication of what it would cost: at least four million dollars the first year, with an increase of ten percent for each succeeding year.

Attention is called to the following excerpt from the cost estimate dated March 25, 1980:

> The bill also allows HUD to give financial assistance to private agencies that work against housing discrimination. The financial aid HUD gives to private agencies will be used for counseling individuals and testing cases to see if there is probably cause for court action. It is estimated that approximately forty agencies will receive $100,000 each in 1981, and that the number of agencies will increase by 10 percent per year. Agencies concerned with housing discrimination against the handicapped are expected to account for a significant portion of this growth. It is also assumed that the amount of aid per agency will remain at $100,000 a year. It is estimated that 90 percent of each year's funds will go to the agencies in the first year, with the remaining 10 percent spent in the following year.

I offered an amendment within the full Committee to strike the proposed change in this section, and it was defeated by a narrow margin. I expect to renew my amendment on the floor.

I would also like to associate myself with the views expressed by my colleague, Congressman Robert McClory, on this amendment.

## IV

Subject to relatively minor qualifications, two classes of people are exempt from the sanctions created by the existing Fair Housing Act:

1. The person who owns three houses or less, and leases two of them; and

2. The person who owns and lives in a rooming house with four or fewer rooms for rent. This person is often called "Mrs. Murphy" although there is no evidence that the Irish have copyrighted this lifestyle.

The reasons for these two exceptions are clear: private persons not engaged in the business of renting or selling houses are not themselves the causes of housing discrimination; they are not suited to extensive federal regulation and control; and they do not generally have the sophistication or the resources to understand fully what is expected of them.

64

H.R. 5200 removes these two exemptions from the law and subjects both Mrs. Murphy and the owner of three houses to the sanctions of this legislation.

The fifteen-day hearing record on this legislation is silent as to the reasons why we must extend the law to these heretofore exempt persons. There is no evidence that they have discriminated under existing law.

Bear in mind that the new law will tip the balance heavily in favor of an allegedly aggrieved person. HUD will be the legal enforcer and, if that's not enough, the Legal Services Corporation is standing in the wings.

Under these circumstances, if Mrs. Murphy or the owner of a few houses is confronted by the awesome power of the Federal Government charging her with discrimination, she will give up. Lawyers simply cost too much for Mrs. Murphy.

In my judgment the removal of these well-established exceptions is an unreasonable extension of the law and no improvement in it.

I will renew the amendments which I offered in the full Committee to strike these changes from the law and renew the existing exemptions.

## V

H.R. 5200 would make the underlined changes in Section 808(d) of the Fair Housing Act:

(d) All executive departments and agencies shall administer their programs and activities relating to housing and urban development *(including any Federal agency having regulatory authority over financial institutions)* in a manner affirmatively to further the purposes of this title and shall cooperate with the Secretary to further such purposes.

The hearing record is silent as to why this new parenthetical clause is requested or what it is designed to accomplish. We can only speculate as to what!

We do know that it will affect at least the following "federal regulatory agencies having authority over financial institutions": Federal Reserve Board; Federal Home Loan Bank Board; Federal Deposit Insurance Corporation; and Comptroller of the Currency.

It is subject to interpretation that the Secretary of HUD shall have the authority to impose affirmative action plans on independent federal agencies "to further the purposes of this title."

In my judgment, this is not the present intention of the House of Representatives.

If, however, this is the intention of the sponsors of the legislation they should have built a record to support it and they should have been candid enough to say so. They did neither.

Under these circumstances, this proposed change in the law should be stricken from the bill and it is my present intention to offer an amendment to do so.

65

## VI

Under existing law, a successful plaintiff in a private action for damages arising out of housing discrimination can recover actual damages plus punitive damages not to exceed $1,000.

H.R. 5200 would remove the limitation on the amount of punitive damages. The hearing record does not indicate a need for this change and in my judgment, it is a mistake.

Remember that H.R. 5200 enhances greatly the protections available to an allegedly aggrieved person. The grievance procedures within HUD represent substantial changes for his benefit.

There is no suggestion that the actual damages provable and receivable under existing laws are inadequate. Attorneys fees and court costs are added to improve his chances; and of course, the Legal Services Corporation will aid the impecunious one.

Punitive damages are frightening to contemplate because these are subject to the emotional and political considerations which have no place in the determination of damages.

It is my present intention to offer an amendment to return the law to its present limitation of $1,000 for punitive damages.

## VII

It is my view that the most appropriate way to approach any proposed expansion of federal regulatory authority by statute is to assume that those persons who will write the regulations implementing the legislation will be completely ignorant of the legislation itself, but firmly committed to the principle that the only limitation on Congressional intent is the imagination of the regulation writer; and further to assume that responsibility for enforcement of the legislation and accompanying regulation will be delegated to unprincipled zealots, fully assured in moments of doubt by the moral justification of their mission.

With this in mind, I have approached, with some trepidation, the proposed changes in the Fair Housing Act which are intended to add handicapped persons to the classes of persons protected by federal legislation from discriminatory housing practices.

The Fair Housing Act, in its present form, prohibits discrimination in housing which is based on race, color, religion, sex, or national origin. H.R. 5200 would add handicapped persons to the protected classes.

This is a big step!

Those who are concerned about the need to improve the existing protections against racial and sex discrimination should bear in mind that this new class of protected persons will command a substantial, and perhaps disproportionate, amount of federal resources committed to the fight against discrimination in housing.

The reason we can expect protecting the handicapped to be so expensive is the easily predictable and extensive explanations which will be required by federal regulations, guidelines, and the like.

Regulations concerning the handicapped already exist for a number of housing related programs. For example, there are regulations which discuss standards for the design of publicly owned residential structures in order to insure that the handicapped will have ready access to them (24 C.F.R. Part IV); which discuss stand-

66

ards and procedures relative to providing rent supplement payments (24 C.F.R. Part 215); which discuss school construction policies regarding the handicapped (41 C.F.R. Parts 112–113); and which promulgate standards and procedures for providing housing insurance for handicapped persons (24 C.F.R. Part 231).

There are also a number of federal regulations, apart from housing, which involve the handicapped. Some of them define handicapped for purposes of eligibility under the Small Business Act (13 C.F.R. Part 118); include handicapped among those eligible for certain student loans (20 C.F.R. § 1087ee); describe special learning programs for children with learning disabilities (20 C.F.R. § 1461); and define handicapped for eligibility under certain public contracts (41 C.F.R. § 48b). In all, there are some twenty different definitions of "handicapped" in the Code of Federal Regulations, only eight of which relate to housing.

The definition of handicapped which has been settled upon for this bill is one of the options already available in existing federal statutes. Specifically, Section 4b of H.R. 5200 tracks Section 504 of the Rehabilitation Act of 1973 by defining handicapped as meaning, with respect to persons:

> (1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such impairment.

Interestingly, this very same definition has recently come under attack following examination by those who will be obliged to interpret what it means. On March 6, 1980, the Federal Communications Commission (FCC) issued a report concering the extent to which the handicapped, as defined in the Rehabilitation Act, should be included in its equal opportunity rules. Briefly, the Commission noted that:

> The individuals covered are so diverse that case-by-case employer/employee resolutions will frequently be necessary if all are to be treated fairly. The definition, for example, encompasses individuals who have suffered cosmetic disfigurement, and, at the same time, individuals suffering from mental illness such that the illness substantially limits their life activities. (See Commission report, pages 11–12)

In addition, a *Washington Post* article reporting on the above findings of the FCC quoted an FCC official's description of the definition, as "one of the most absurd ever written by Congress or the bureaucracy."

This is also the definition adopted for use in H.R. 5200!

It is important to note, of course, that there are many protections for the handicapped in existing housing statutes. For example, under law already on the books, the Secretary of HUD is authorized to: makes loans to public or private groups which provide housing and related facilities for the handicapped (12 U.S.C. § 1701(q)); carry out research on housing designs, structures, facilities and amenities which most appropriately meet the needs of the handicapped (12 U.S.C. § 1701(z)); and provide rent supplement pay-

67

ments for lower income persons who are handicapped (12 U.S.C. §1701(s)).

Existing law also: prohibits discrimination, exclusions, or denial of benefits against qualified handicapped individuals by any program which receives federal assistance (29 U.S.C. §794); provides for special low-income housing projects for handicapped persons (42 U.S.C. §1438); permits the Secretary of Agriculture to grant financial assistance for farm housing for the handicapped (42 U.S.C. §1471); provides criteria for loans to build housing for handicapped persons in rural areas (42 U.S.C. §1490(a)); and creates urban development action grants for housing which addresses the needs of the handicapped (42 U.S.C. §5304).

In reality, the only housing for the handicapped not specifically addressed by existing law, and therefore the only real target of the proposed change, is the private housing industry, and it is fast drying up.

A March 23, 1980, article in the *New York Times* declared that sales in some portions of the country are already down 50% from a year ago. The prime rate, which may peak around mid-May at 20 or 21%, has made money so unavailable that housing starts have declined dramatically.

Add the potentiality of federal regulation to the fragile health of the housing industry caused by today's economic problems, and you have a compounded chilling effect on housing starts and the jobs they create. It is an industry without any need for further federal regulation!

Section 12 of H.R. 5200 provides some insight into what the regulators at HUD have in store for the housing industry. That section authorizes the Architectural and Transportations Barriers Compliance Board to provide a report, which the Congressional Budget Office estimates will cost $1 million, concerning:

(1) the extent to which architectural barriers and other obstacles are depriving handicapped persons of housing; (2) the extent to which private, public or cooperative public and private efforts have increased the availability of housing for the handicapped in the private market; and (3) *the cost of retrofitting existing units to make them suitable for the handicapped.* (Emphasis added.)

The inescapable result of studies like this is always increased federal regulation.

Although we fought one zoning battle in the full Committee, court cases indicate that the possibility remains open that judges will interpret zoning ordinances which allegedly discriminate against the handicapped, whether in fact or in effect, as discriminatory acts within the coverage of the proposed statute. For example, where race is concerned, the courts have already determined that discrimination exists when a jurisdiction's refusal to rezone effectively precludes the covered class (which will include handicapped if H.R. 5200 passes in its present form) from constructing low-cost housing within that community. Specifically, the Seventh Circuit has said that a violation of the Fair Housing Act "can be established by a showing of discriminatory effect without a showing of discriminatory intent." *Village of Arlington Heights v. Met-*

68

*ropolitan Housing Development Corp.,* 558 F. 2d 1283, 1290 (7th Cir., 1977), *cert. denied,* 434 U.S. 1025 (1978).

In my opinion, the net effect of including the handicapped within the protection of the Fair Housing Act, in view of existing case law concerning zoning, could be a federally required acceptance of community houses for former or potential criminals. I do not think Congress wants to do this.

Only three witnesses testified on that important aspect of H.R. 5200, which concerned discriminatory housing practices affecting the handicapped. Their testimony, however, was limited to explaining the problems attendant to the more familiar handicapped: the physically and developmentally disabled.

No attention was given in the hearings to those whose "handicap" is not so apparent but who have nevertheless been held by various courts to be entitled to the protection of other statutes. As proof of this claim, I need only cite a federal district court decision in Pennsylvania which held that persons with a history of drug abuse, including present participants in methadone maintenance programs, are "handicapped" within the meaning of the Rehabilitation Act. *Davis v. Bucher,* 451 F. Supp. 791, 796 (1978). Remember that the definition in the Rehabilitation Act is identical to the definitions first considered by the Committee.

Similarly, the Wisconsin court has held that asthma can be considered a handicap when it makes "achievement" unusually difficult. *Chicago v. State Department of Industry, Labor, and Human Relations,* 62 Wis. 2d 392.

In my judgment, the potential for regulatory disaster far outweighs the benefits to be derived from the inclusion of the handicapped in this bill. As I said earlier, H.R. 5200 undertakes to do too much with too little thought given to the possible consequences. It is my sincere hope that my colleagues in the House will conclude as I have that it would be unwise to add protection of the "handicapped" to this legislation at this time. It is enough for the present to develop an effective enforcement procedure.

M. CALDWELL BUTLER.

O

nism proposed by those who desire to amend this enforcement provision would constitute a distortion of basic principles underlying recent congressional legislation concerning the basic purpose of U.S. magistrates in that law which has only recently been passed and is still in the process of being organized.

Under the minority's proposal, hearings would be held, not by traditional administrative law judges, but by U.S. magistrates, who are agents of Federal district courts. These magistrate hearings would be without regard to the consent of the parties. Following a decision by the magistrate, there could be an appeal to the district court for a de novo jury trial. This would render the magistrate hearing process a useless exercise in that any party seeking a delay would undoubtedly demand—and receive—a de novo jury trial by the district court after the magistrate proceeding. So we are making it more difficult than it is now and more time consuming.

This proposal offers no real alternative to the existing unsatisfactory court enforcement mechanism afforded under title VIII. Indeed, it merely provides an additional cumbersome step to the existing court enforcement mechanism that has already demonstrated its unsatisfactory cumbersomeness. Further, its use of the magistrate mechanism would seriously compromise important procedural safeguards that provided the basis for successful enactment of the magistrates legislation.

First, under the magistrates legislation, enacted just last year, cases may not be referred to magistrates without the consent of the parties. By contrast, under the minority proposal, referral to magistrates would be mandatory, without regard to the consent of the parties, even without consultation with them.

Second, under the magistrates legislation, hearings by magistrates are not subject to a de novo jury trial by the district court. Rather, the magistrate's hearing, conducted with the consent of the parties, takes the place of the traditional district court trial. Again by contrast, under the minority proposal, the mandatory magistrate's hearing would be merely a prelude to the full-scale district court jury trial that is now, and has always been, available. Thus, the minority proposal would not only undermine basic principles of the recent—and relatively untested—magistrates legislation, but it would do so for no salutary purpose.

The purported justification of the need for this proposal is to assure due process. It is, mistakenly, argued in the report that title VIII was a criminal statute and thus the constitutional guarantee of a jury trial in all criminal cases was applicable. While the minority report seems to recognize that title VIII is a civil statute, it still asserts that the authority to impose civil penalties, as provided under S. 506, also invokes the constitutional jury trial requirement provided for under a criminal statute. So it seems to me there is a good deal of inconsistency there as far as the minority report contained on the bill.

This view of the requirements of the Constitution is plainly wrong. It ignores the fact that the courts, including the U.S. Supreme Court, have uniformly upheld and approved the imposition of civil penalties through administrative enforcement, and expressly rejected the assertion that a jury trial is constitutionally required. It also ignores the careful due process safeguards provided by the committee to assure full protection of the rights of all parties. These safeguards go well beyond those afforded under universally accepted administrative procedure. Further, it ignores more than five decades of experience in administrative enforcement, during which the courts have carefully scrutinized—and uniformly approved—similar enforcement procedures. Indeed, there are currently 348 Federal statutes that authorize the provision of civil penalties. Of these, 141 include an express delegation to an administrative agency with authority to impose the penalty. Many of these statutes contain procedures that provide considerably less in the way of assurances of fairness and impartiality than those contained in the Judiciary Committee bill.

Yet, the four minority members would single out fair housing as the one matter that should be subject to special jury trial requirements. Their arguments simply do not stand up under the test of logic, law, or experience. The committee considered, and wisely rejected, this proposal.

### 2. DISCRIMINATORY INTENT VERSUS DISCRIMINATORY EFFECT

The second proposal by the four minority Senators would make a radical change in the standard of proof in title VIII cases. It would require a demonstration of discriminatory intent for purposes of showing a violation of title VIII. Unlike their first proposal, which would nullify a salutary procedural change in existing title VIII, this minority proposal would represent a reversal of existing substantive court precedents on the standard of proof required under title VIII. The proposal would require that in all zoning or other land use cases, discriminatory intent must be proved to establish a violation of title VIII. It would also require that in all other cases brought under title VIII, discriminatory intent must be proved. The Senate should affirm the committee's decision.

First, the proposal is based on a set of factual premises that are simply wrong. The minority asserts that HUD, through administrative fiat, has established discriminatory effect as the standard of proof in title VIII cases. This is demonstrably wrong. HUD, which has no enforcement authority under title VIII, has issued no rulings on the title VIII standard of proof, either in land use or any other fair housing cases. Those rulings have been made by the courts, and in cases initiated almost entirely by private parties, not by the Government. Further, all zoning and other land use cases would have to be referred, under the bill, to the courts. They would not be eligible for administrative decision. Thus, the standard of proof in such cases would continue to be subject to court determination, on the traditional case-by-case basis.

Second, the proposal is based on the incorrect assessment of court decisions on the title VIII standard of proof. The courts are not, as the minority suggests, divided on the correct standard of proof under title VIII. Over the 12 years since title VIII was enacted, 6 of the 10 U.S. courts of appeals—second, third, fifth, seventh, eighth, and ninth—have rendered decisions on this issue in State or local land use cases. All have held that discriminatory effect is the correct standard. "Effect, not motivation, is the touchstone * * *" (under title VIII).[1]

In addition, the minority has misrepresented the meaning of discriminatory effect for title VIII purposes. It does not mean, as they suggest, that "proportional" representation of racial minorities in the local community is required. Nor does it mean that "economic status" is added to the scope of protection under title VIII. The fair housing law, by its terms, is concerned only with discrimination based on race, color, religion, sex, and national origin. It is solely in this context that the courts have evaluated the various cases. In so doing, they have looked at the inevitable result of the challenged conduct—the effect—not merely at the sometimes unknowable motivation underlying that conduct.

The courts have also been guided by the unbroken line of Supreme Court decisions in cases under title VII of the Civil Rights Act of 1964, the equal employment opportunity law. This is the functional equivalent of the fair housing law. The Supreme Court has uniformly held that discriminatory effect, not purpose or intent, is the correct standard of proof.

Thus, as the majority report accurately states, S. 506 would merely reaffirm existing judicial interpretation of title VIII. By contrast, the minority proposal would roll back more than 10 years of consistent court precedent and establish a totally different—and much more stringent—standard of proof under title VIII.

Third, the proposal would be unwise as a policy matter. Land use cases, as well as other complex or novel matters, must be referred to the courts for decision. The minority proposal would have the unfortunate result of tying the hands of the courts, preventing them from exercising their sound discretion and judgment in deciding fair housing cases. Instead, a rigid "intent" standard would be imposed for land use or other types of title VIII cases. In light of the minority's professed faith in the courts as the one institution to which protection of due process rights can be entrusted, this restriction sounds, at the least, a discordant note.

Fourth, the fair housing amendments bill is intended to strengthen title VIII. Indeed, all members of the committee profess full support for strengthening the law. But there can be no doubt that imposition of an "intent" test would constitute a significant weakening of the substance of the protections afforded under existing title VIII as interpreted

---

[1] Indeed, in the one contrary private housing discrimination case cited by the minority, the court acknowledged that in cases challenging governmental action, such as land use cases, discriminatory effect is the correct standard.

tion" all too often has proved inadequate means of securing compliance with the substantive provisions of Title VIII.

Based on this evidence, I th'nk we should be proud to bring this bill to the floor of the Senate. And I would particularly salute the sponsors of this fair housing bill, the distinguished Senator from Indiana, who has just spoken, Mr. BAYH, Mr. METZENBAUM, Mr. JAVITS, Mr. HEINZ, Mr. STAFFORD, Mr. GLENN, Mr. WEICKER, Mr. DOLE, Mr. LEAHY, Mr. TSONGAS, Mr. BIDEN, Mr. DURKIN, and, of course, the distinguished chairman of the Judiciary Committee who brings the bill to the floor today, the Senator from Massachusetts, Mr. KENNEDY.

Now, the bill is useful in spelling out the alternative routes which a person alleging a discriminatory housing practice can pursue at the Federal level. It gives the complainant the option of taking his or her complaint to the district court or of filing a formal complaint with HUD where an administrative hearing would be held by an independently appointed administrative law judge.

Let me repeat, by an independently appointed administrative law judge.

The bill further insures that HUD refers those cases to State and local agencies which have already been certified by HUD as "substantially equivalent." Once a complainant has come to HUD, then, the legislation provides that HUD may, with reasonable cause, subpena documents and witnesses, issue interrogatories, and represent the individual complainant. The administrative law judge may make findings of fact and conclusions of law, order relief, and impose a civil penalty.

The complainant is also given the option of commencing a civil action up to 2 years after the alleged discriminatory housing practice, provided a hearing before the administrative law judge has not begun. In such cases, the court can appoint an attorney for the plaintiff, and award monetary relief, declaratory relief, and/or punitive damages. The prevailing party in cases before HUD or the courts may also be awarded reasonable attorneys' fees.

Over 80 percent of this Nation's housing is covered by title VIII. The remainder is covered by the Civil Rights Act of 1866 with respect to racial discrimination. This bill clarifies the definition of those who are covered by title VIII to include the physically or mentally impaired.

Last, this bill continues to exempt single, shared units from title VIII coverage, insuring that persons in individual apartments and houses have the right to choose those with whom they share common facilities.

Within HUD, responsibility for implementing title VIII is delegated to the HUD regional offices. Each regional office has an assistant regional administrator for fair housing and equal opportunity who will have the day-to-day responsibility for supervising compliance, field support, and evaluation. A little over half of the time of the people involved in this effort is spent on enforcement of title VIII and practically all that effort today relates to processing of complaints.

The Department of Housing and Urban Development reports continuing progress in reducing the fair housing complaint backlog. During fiscal year 1978, HUD processed 3,910 title VIII complaints. It reduced its processing time and virtually eliminated the backlog. Of those 3,910 complaints, 341 or 8 percent were successfully conciliated. But this record, I think, reveals the weakness of the conciliation process. If it had a greater responsibility and a greater authority, and specifically the power to appear before an administrative law judge on behalf of individual complainants, then I think those conciliation cases would move along more quickly and a great many more would be resolved to the satisfaction of all the parties involved.

I think the time has come for HUD to have the authority to take positive action in the field of fair housing and equal opportunity.

We can do so by passing this bill today.

Mr. President, I ask unanimous consent at this time to have printed in the RECORD an extremely important letter addressed to me by Moon Landrieu, Secretary of Housing and Urban Development, under date of October 8, 1980, and which I think is a powerful argument for the adoption of pending legislation.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

THE SECRETARY OF HOUSING
AND URBAN DEVELOPMENT,
*Washington, D.C., October 8, 1980.*
Hon. CHARLES MCC. MATHIAS, Jr.,
*U.S. Senate,*
*Washington, D.C.*

DEAR SENATOR MATHIAS: This is in response to your letter of September 19, 1980 concerning S. 506, the "Fair Housing Amendments Act of 1980." I, too, am disturbed by the misinformation being circulated about the legislation and welcome the opportunity to clarify for the record those provisions of S. 506 which have been the subject of much of this misinformation.

As reported by the Senate Committee on the Judiciary, S. 506 retains the administrative hearing process which the President regards as the heart of the proposal to strengthen existing Federal fair housing enforcement. However, the Committee bill has provided special safeguards which exceed those already applicable to administrative hearings under the Administrative Procedure Act (APA) and which ensure an absolute separation of the function of hearing and determining disputes from the responsibility for the investigation of charges and the presentation of evidence. Only the latter functions remain with the Department of Housing and Urban Development. Under S. 506, the outcome of housing discrimination charges that cannot be resolved by negotiations and conciliation would be decided at a "hearing on the record" before an impartial administrative law judge. Such a hearing would be subject to all the procedural safeguards available for full-blown evidentiary, trial-type hearings under the APA.

Further to ensure the impartiality of the hearing process and the independence of the administrative law judges, the Committee bill would establish a Fair Housing Review Commission as a separate entity outside of HUD. The Commission would be composed of three persons appointed by the President with the advice and consent of the Senate, and the power of the President to remove the commissioners would be very limited. The Commission would appoint and employ the administrative law judges (hired according to established merit selection procedures and civil service regulations). The Senate bill contains special provisions on promulgation of a code of ethics to assure the independence of the administrative law judges. It also would require the Fair Housing Commission, within 180 days of its formulation, to promulgate rules of discovery consistent with the Federal Rules of Civil Procedure.

Additional due process protections under the Committee bill include a right by any party to an appeal of an order of an administrative law judge before the Fair Housing Review Commission and subsequent appeal to the appropriate circuit court of appeals.

Opponents of the administrative process provided in the bill have sought support for a system of magistrate hearings, as a substitute proposal. Proponents of similar change have already fought and lost in the House, both in Committee and on the floor. As you know, they were also unsuccessful in the Senate Judiciary Committee.

A major basis for supporting an administrative procedure as an alternative to court action is that it offers a more rapid, simpler and less expensive determination of the rights of the parties in most of the anticipated 6,000 housing discrimination charges received by HUD each year. The magistrate proposal, on the other hand, is an extremely ponderous procedure. As previously proposed before the Senate Committee, this procedure provided for judicial review in the district court, including a de novo jury trial if requested by either party, coupled with a second appeal as of right to the appellate court. It would thus be costly, time-consuming and (probably) seldom employed, since S. 506 permits direct access to the district court, as an alternative to the magistrate process, in any event.

In addition, magistrates, like district judges, hear cases in major cities only, and in many districts only part-time magistrates are available. Administrative law judges, on the other hand, would be available on a full-time basis and would travel to particular communities to hear isolated cases in a locale convenient to the parties.

Although most magistrates are well-qualified, the magistrate system has been revised recently and there are at present many inexperienced magistrates working in the Federal district courts. Furthermore, a particular magistrate would confront a housing discrimination case only occasionally, while performing other duties most of the time. Administrative law judges who developed experience in the hearing of housing discrimination cases would, therefore, be better qualified to determine such cases.

Opponents of the administrative procedure have asserted that administrative law judges cannot assess damages. The sponsors of the original bill have argued that damages can constitutionally be assessed in the administrative hearing. Only post-act litigation will settle this issue with any certainty, but it should be noted that the magistrate proposal considered in committee did not mandate that magistrate hearings include trial by jury at the magistrate level. Under existing law, jury trials are available before magistrates only if the parties consent, and damages cannot be awarded unless a jury is empaneled. It is very unlikely that a respondent would consent to a jury trial in a case where he was facing liability in damages. Thus, any possible disability on the part of administrative law judges to award damages is shared by magistrates, if they hear cases without juries. An ALJ's power to award damages is unclear and remains to be decided by the courts. It is already a certainty, however, that magistrates, as district

court officers, do not have power to award damages in the absence of a jury. See *Curtis v. Loether*, 94 S. Ct. (1974). ALJs, however, promise the chance to reach final decisions faster, thus affording more aggrieved parties direct relief in the form of the housing being sought.

Opponents of the administrative process have erroneously asserted that the bill provides for administrative hearings chiefly as havens for "testers" who, they say, will seek financial settlements and victimize respondents. Under S. 506, only direct injury controversies involving deprivation of housing or financing could be heard in the administrative tribunal. Any case involving indirectly injured parties would have to be referred to the Attorney General for litigation. The bill also prohibits the Secretary of HUD (or any other Federal officer or employee) from providing assistance to individuals or organizations to "induce violations of this title", unless such action is undertaken for the purpose of verifying a violation which the Secretary of HUD has reason to believe has occurred.

In our view, the only possible means available to provide for effective enforcement of individual fair housing rights lies in the development of an administrative hearing procedure. As indicated, such procedures ensure due process protections for the parties equivalent to those which would be provided under a magistrate system, while at the same time providing faster, less expensive and less cumbersome proceedings for the majority of cases that HUD receives. In addition, the Committee bill provides that complex cases involving novel legal issues and all land use disputes as well as cases involving substantial monetary loss be referred to the Attorney General for appropriate court action.

Finally, a major issue which has generated much concern and created a great deal of confusion involves zoning and local land use. Opponents of the bill have totally ignored the actual content of the bill, using S. 506 as a device for attacking the existing law. They have claimed that S. 506 gives HUD new authority to impose land use controls and prescribe the composition of entire neighborhoods. Neither the Senate version nor the House version of the Fair Housing Amendments Act purports to alter existing law with regard to land use matters, except for an amendment which would limit the use of the Fair Housing Act as a basis for attacking minimum lot size requirements without a showing of intent. In addition, both bills would require all land-use or zoning cases to be heard by courts, rather than by administrative law judges.

The efforts which have been made to destroy the so-called "effects test" in fair housing cases are, again, not directed at the content of S. 506, but rather are attempts to pull back from established case law. The "effects test" that opponents regard with such suspicion is emphatically not the mechanically-applied rule that the Committee Report's Minority Views implies, wherein any showing that a racial group is not proportionally represented leads to instant retribution by the courts.

As applied, the effects test is a balancing process under which courts have analyzed evidence of both invidious purpose and disproportionate racial impact. When the test is applied, a court accepts the assumption that in some cases racial discrimination may be determined by proof of racially disparate effect—but only in circumstances where a defendant fails to show adequate non-racial justification for his or her actions. Disproportionate racial impact alone, without regard to justification—the kind of effects test the Minority Views describes—is inadequate to establish a case of discrimination in any judicial circuit.

The courts have repeatedly noted the difficulty (particularly in zoning and land-use disputes) of establishing convincing proof of intent to discriminate. Discriminators seldom are so foolish as to take overt action indicating such intent. A zoning board or city council pressured by racially-based resistance to construction of an integrated housing project will seldom, if ever, take action which is openly responsive to racial opposition. It will be traffic problems, or sewer service, or overcrowding in the schools, which will go on the record as a basis for rejecting the project. In some cases such justifications may be valid, and in others they may not. The courts, wisely, have recognized that doing justice is more complicated than reading the minutes of a council meeting or trying to look into the minds of voting members.

Preservation of this rational, thoughtful mode of analyzing evidence is imperative to the success of civil rights law enforcement. The "proof of intent" test proposed by opponents of S. 506 will be offered on the Senate floor as an amendment to S. 506. If successful, such an amendment would repudiate the judiciary's carefully-balanced standard of proof developed over the past two decades.

Opponents of the bill have further tried to confuse the issue and divert attention away from the language of the legislation by referencing a notice of proposed rulemaking, published in the Federal Register in February 1980, indicating HUD's intention to promulgate regulations involving unlawful zoning and land use practices.

As you are aware, under existing law, HUD is required to accept and investigate complaints alleging violations of the prohibitions against discrimination in Title VIII and to make determinations as to whether to attempt to resolve matters involved in such complaints. The purpose of the proposed rulemaking is to provide guidance with respect to matters to be considered in processing complaints cognizable under Title VIII involving alleged discriminatory practices. Existing Title VIII has been judicially construed to include discriminatory zoning and land use actions. HUD does not intend, however, through publication of a regulation or any other action to infringe on local control of zoning and land use matters, but rather would enunciate the standard that HUD will use in determining whether a violation of Title VIII has occurred. It is our hope that such an articulation through the regulatory process will strengthen enforcement of the Act, and provide further guidance to the public and the state and local agencies involved in the various aspects of the housing industry.

It appears to me that you and the other sponsors of this vital legislation have extended yourselves to accept numerous amendments to this bill in order to assure proper separation of functions, adequate opportunity for pretrial discovery, and to guarantee an unbiased forum. The introduced bill always contained adequate due process protections, but the many accepted amendments have added unprecedented safeguards. The administrative hearing process set forth in the reported bill has my unqualified support.

Once again, thank you for contacting the Department and allowing us to provide you with this clarifying information.

Sincerely,

MOON LANDRIEU.

Mr. CHAFEE addressed the Chair.

The PRESIDING OFFICER. The Senator from Rhode Island.

Mr. CHAFEE. Mr. President, I rise in support of the legislation and hope we will proceed to its consideration.

What are we trying to do in this land of the free and the home of the brave?

It seems to me what we are trying to

do is to bring all Americans to the starting line with an equal chance to succeed. And what are the areas where equality is of such importance? Certainly, an equal chance to vote; certainly, an equal opportunity for a job, not just a job but all jobs; certainly, an equal chance for accommodations.

We want equality for all Americans in all areas, and this definitely includes the opportunity for equal housing.

The present legislation which we have on the books, Mr. President, has not succeeded. I think that is pretty clear from the documents which have been submitted for the RECORD by the distinguished senior Senator from Massachusetts and the senior Senator from Maryland.

So Mr. President, I think we ought to move on with this legislation. As I say, I support it. But I hope at least we will have an opportunity for the Senate to move to the consideration of it. If there are amendments let us consider them. Come forward with them and we will vote up or down on them.

In my own State of Rhode Island, Mr. President, we have legislation that is quite similar to the Federal legislation. It has not erased all the problems which have been pointed out by the opponents who testified or spoke when the legislation appeared before the Judiciary Committee.

Mr. President, I think this is extremely important legislation. I urge my fellow Senators to look upon it with favor and to vote for it, and, above all, to move forward with a consideration of the bill in the remaining hours of this waning session. Thank you, Mr. President.

Mr. JAVITS. Mr. President, we are not legislating in vacuums here, even though it is the last week or supposed to be, and this is a lameduck session. Who knows it better than I do? And the Senate will be continued with its new Members beginning in January and these great national issues will be dealt with. Therefore, the question properly before us, as this is a motion to take up this bill is, Why should we do it now? I wish to address myself to that particular point.

Mr. President, having participated in a very active way in the civil rights struggle of 1964 which resulted in the landmark bill now law, I can testify to the fact that it was then in answer to a strident national call which could not be denied except at the risk of grave instability and, indeed, as we all know, public disorder, with a large section of our population feeling that it was both depressed and oppressed.

So, with the concert of both majority and minority leaders here in the Senate and after a monumental struggle lasting for months, we finally passed the bill.

There is no doubt about the fact that it was imperfect, and there is no doubt about the fact that we have had to deal with its problems since. For example, we have given the EEOC, the Equal Employment Opportunity Commission, the power to sue to redress employment discrimination. Though we have chosen here in this bill as reported out by the committee to provide for administrative

*September 28, 1981*     CONGRESSIONAL RECORD—SENATE     **22155**

file a complaint with the Secretary of HUD. If, after a HUD investigation of such complaint, the Secretary finds reasonable cause to believe that a violation of title VIII has occurred, the Secretary is limited to resolving the complaint through informal methods of conference, conciliation, and persuasion. There is no power in the Secretary to take further actions. The Attorney General, after appropriate investigation, may institute a court action only in pattern and practice cases and in certain other limited cases involving issues of general public importance.

The Equal Access to Housing Act would add teeth to this enforcement mechanism. In the process, it would address one of the major criticisms of the original law.

Not only would an allegedly aggrieved individual be able to pursue an independent civil action—with new authority in the Attorney General to intervene in such actions on his behalf—but the Attorney General would be authorized to initiate actions on behalf of such individual. For the first time, an aggrieved person would have access to the resources of government in pursuing complaints of title VIII violations.

The proposed act would encourage the use of Federal magistrates in actions brought under its provisions in an effort to expedite such cases, while retaining the basic elements of due process that are guaranteed by our laws and Constitution.

The Equal Access to Housing Act, however, attempts to insure that such adversarial litigation will be a last, not a first, step in the process of resolving complaints. It does this by establishing a new conciliation process in the Justice Department designed to resolve controversies informally. At any time after the filing of a charge, the Attorney General may attempt conciliation. Such conciliation may culminate in an agreement, including one providing for binding arbitration among the parties, or it may lead to a decision by the Attorney General either to dismiss the charge or to initiate an action on behalf of the individual filing the charge.

As the Secretary is required to do under present law, the Attorney General would be required to refer all charges of title VIII violations to certified State housing discrimination agencies where they are in existence.

Certified agencies are those which administer laws providing rights and remedies which are reasonably equivalent to the rights and remedies provided by Federal law. Unlike present law, however, the Federal Government could not reassert jurisdiction over such charges unless it was prepared to decertify an agency. It could not, as is presently the case, retrieve the charge simply because it did not agree with the manner in which the individual case was being handled by the State agency.

HANDICAPPED PERSONS

The proposed measure would extend the protections of title VIII, for the first time, to handicapped individuals. Because of the differing nature of such discrimination, however, from discrimination on account of race or national origin, for example, it is necessary to define in far greater detail what constitutes a discriminatory housing practice in this context. The act is also clear in defining handicap in such a way as to exclude alcoholics and drug addicts, and others whose impairment would represent a direct threat to the safety or property of others.

APPRAISERS

Although HUD has chosen to interpret the act in the past to include coverage of real estate appraisers, the proposed measure would make this explicit. Discriminatory practices by property appraisers would constitute violations of title VIII.

DISCRIMINATION

The Equal Access to Housing Act would clarify that the standard of proof in identifying discrimination under title VIII is an intent standard. While I believe that the present language of the act, as well as its legislative history, indicate clearly that this is already the appropriate standard, there is a conflict on this issue among the Federal circuits, some of which have substituted an "effects" or "disparate impact" standard. The Supreme Court, although never interpreting the specific provisions of title VIII in this regard, has made clear that violations of the 14th amendment require proof of a discriminatory intent or purpose. *Arlington Heights* v. *Metropolitan Housing Corporation* 429 U.S. 252 (1977); *Washington* v. *Davis* 426 U.S. 229 (1976).

With respect to this extremely important issue, I would call the attention of my colleagues to my statement of December 1, 1980 (S15191) in which I discuss this issue in some detail. At this point, however, I would only like to observe that use of the effects test for identifying discrimination carries with it tremendous potential for involving the Federal Government in zoning and land use affairs that have always been the prerogative of State and local governments. Already, use of the effects test by HUD and the Civil Rights Division of the Justice Department has been the basis by which they have sought to impose their own notions of proper racial balance upon communities which have had no intent or purpose of discriminating against protected groups.

The intent test for identifying discrimination, allows courts to consider the totality of circumstances, including evidence of racially distinguishable effects. Under the pure effects test, however, the use of statistical evidence is not dispositive in and of itself in determining violations of title VIII and the burden of proof remains fully with the plaintiff.

Mr. President, the proposed bill makes a number of other changes that I believe to be positive changes in the present law: It would enable the Attorney General to pursue an injunction or temporary restraining order where prompt judicial action is necessary, it would limit the use of testers to those instances in which such a practice was necessary to confirm an alleged violation of the act, it would establish a legislative veto over rules and regulations promulgated under the authority of title VIII, and it would clarify the definition of aggrieved person in such a way to limit standing to individuals who are bona fide renters or purchasers.

I believe that the Equal Access to Housing Act draws the proper balance between the need to create a more effective enforcement mechanism under title VIII and the equally important need to protect the due process rights of local communities and individual realtors, home-sellers, and landlords. I do not believe that the legislation rejected by this body last year achieved this balance. On the one hand, the person who suffers discrimination in housing will, for the first time, be able to draw upon the resources of the Federal and State governments which will, if necessary, be prepared to sue on his behalf in a court of law.

On the other hand, the respondent will, in fact, have his day in court—not simply his day before a HUD administrative law tribunal. In addition, he will be assured that, before he is labeled a civil rights violator, there will have been some evidence of a discriminatory intent on his part, not simply evidence that his apartment building or his subdivision or his community lacked the right proportions of white, black, yellow, red, and brown faces.

The individual who is denied an apartment because of his skin color or a home because of his ethnic background will, in short, have more and stronger protections than he has ever had before. He will have access to the full resources of the Federal and State governments when he is treated, not as an individual, but as a member of some collective group, in his pursuit of a dwelling. At the same time, some of the so-called public interest groups, which have little to do beyond harassing small businessmen and communities, and some of the more creative and innovative minds in the bureaucracy who wish to remake America in their image, may have a more difficult time of it all. That is the way it ought to be, in my opinion.

I ask unanimous consent that the text of the proposed Equal Access to Housing Act be printed in the RECORD:

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

S. 1670

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SHORT TITLE

SECTION 1. This Act may be cited as the "Equal Access to Housing Act of 1981".

SHORT TITLE FOR 1968 ACT

SEC. 2. The Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by inserting immediately after the comma at the end of the enacting clause, the following: "That this Act may be cited as the 'Civil Rights Act of 1968'.".

SHORT TITLE FOR TITLE VIII

SEC. 3. Title VIII of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other

purposes" (Public Law 90–284, approved April 11, 1968) is amended by inserting immediately after the title's catchline the following:

"SHORT TITLE

SEC. (a) Section 801 of the Act entitled 'Equal Access to Housing Act'.".

AMENDMENTS TO POLICY SECTION

SEC. 4. (a) Section 801 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by striking out "for fair housing" and inserting in lieu thereof "for equal access to housing".

(b) Section 801 of such Act is amended by adding at the end thereof the following: "Such a policy means that individuals shall not be denied access to housing which they desire and can afford, because of race, color, religion, sex, handicap, or national origin. Such policy does not mean that any particular proportion of individuals of a particular race, color, religion, sex, handicap, or national origin will be assured housing within housing units, neighborhoods, or communities except as such proportions are the natural result of free housing choice.".

AMENDMENTS TO DEFINITIONS SECTION

SEC. 5. Section 802 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by—

(a) striking out subsection (a) and inserting in lieu thereof the following:

"(a) 'Attorney General' means the United States Attorney General."; and

(b) adding at the end the following:

"(h) 'Handicap' means, with respect to a person, a physical impairment which substantially limits the capacity to see, hear, or walk unaided or the capacity to live completely unattended. Such term does not include any alcohol, drug abuse, or any other impairment which would be a threat to the safety or the property of others.

"(i) 'Aggrieved person' includes any person whose bona fide attempt or bona fide offer to purchase, sell, lease, or rent, or whose bona fide attempt to obtain financing for a dwelling has been denied on the basis of race, color, religion, sex, handicap, or national origin, or made subject to terms of purchase, sale, lease, rental, or acquisition which discriminate on any such basis.".

DISCRIMINATORY HOUSING PRACTICE AMENDMENTS

SEC. 6. (a) Section 804(e) of such Act is amended by striking out the words "For profit, to" and inserting in lieu thereof "To".

(b) Section 804 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284) is amended by adding at the end the following:

"(f) (1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny a dwelling to any person because of such handicap of a prospective buyer or renter or of a person or persons to be occupying a dwelling with such buyer or renter unless such handicap would prevent a prospective dwelling occupant from conforming to such rules, policies, and practices as are permitted by paragraph (2) of this subsection.

"(2) To discriminate against any person in the terms or conditions of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of a handicap. For purposes of this subsection, (A) discrimination shall include: (1) refusal to permit reasonable modifications of premises occupied, or to be occupied by persons with a handicap where such modifica-

tions are necessary to afford such handicapped persons access to premises substantially equal to that of nonhandicapped persons: *Provided, however*, with respect to such premises, such handicapped persons have agreed to return them to their original condition if requested to do so by the landlord; or (ii) refusal to make reasonable accommodations in existing policies, practices, services, or facilities when such accommodations are necessary to afford handicapped persons enjoyment of dwellings substantially equal to that of nonhandicapped persons; but (B) discrimination shall not include (i) refusal to make alterations in premises at the expense of sellers, landlords, owners, brokers, building managers, or persons acting on their behalf; (ii) refusal to make modifications of existing policies, practices, services or facilities where such modifications would result in unreasonable inconvenience to other persons; or (iii) refusal to allow modifications of dwellings which would alter the marketability or appearance of a dwelling or the manner in which a dwelling or its environs has been, or is intended to be, used.".

(c) Subsections (c), (d), and (e) of section 804 and section 806 of such Act are each amended by inserting "handicap," immediately after "sex," each place it appears.

(d) Section 805 of such Act is amended by adding at the end thereof the following: "It shall also be unlawful for any person or other entity whose business includes the appraising of real property to discriminate in the estimation of property value on the basis of race, color, religion, sex, handicap, or national origin. It shall not be unlawful for such a person or other entity to take into consideration or to report to the person for whom the appraisal is being done all factors relevant to the appraiser's estimate of the fair market value of the property: *Provided,* That such factors are not used by the appraiser for the purpose of discriminating or denying rights guaranteed by this title.".

(e) Section 807 of such Act is amended by adding at the end the following: "Nothing in this title shall prohibit any action under such action is taken with the intent or purpose of discriminating against a person on account of race, color, religion, sex, handicap, or national origin.".

ROLE OF THE ATTORNEY GENERAL

SEC. 7. Section 808 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended—

(1) in subsection (a) by striking out "Secretary of Housing and Urban Development" and inserting in lieu thereof "Attorney General";

(2) by striking out subsection (b);

(3) by redesignating subsections (c), (d), and (e) as subsections (b), (c), and (d), respectively;

(4) in subsection (b) as redesignated by this section by striking out—

(A) "Secretary" each place it appears and inserting in lieu thereof "Attorney General";

(B) "Department of Housing and Urban Development" each place it appears and inserting in lieu thereof "Department of Justice";

(C) "sections 3105, 3344, 5362, and 7521 of title 5 of the United States Code" and inserting in lieu thereof "law"; and

(D) "5362" and inserting in lieu thereof "5372";

(5) in subsection (c) as redesignated by this section, by striking out "Secretary" and inserting in lieu thereof "Attorney General";

(6) in subsection (d) as redesignated by this section, by striking out "Secretary of Housing and Urban Development" and inserting in lieu thereof "Attorney General"; and

(7) by adding at the end the following:

"(e) (1) Simultaneously with the promulgation of any regulation or rule issued for the purpose of compliance with this title, the Attorney General shall transmit a copy thereof to the Committees on the Judiciary of the House of Representatives and the Senate. Such rule or regulation, other than an emergency rule, shall become effective at the end of the first period of sixty calendar days of continuous session of Congress, unless between the date of transmittal and the end of the sixty-day period, either House of Congress passes a resolution stating in substance that that House does not approve of the proposed rule or regulation.

"(2) Either House of Congress may adopt a resolution directing agency reconsideration of a rule other than an emergency rule. If such resolution is adopted within sixty calendar days of continuous session of Congress after the date the rule was transmitted to Congress, the rule shall not go into effect. The agency shall reconsider the rule and take such action as they deem appropriate.

EDUCATION AND CONCILIATION

SEC. 8. Section 809 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by—

(1) striking out "Secretary" each place it appears and inserting in lieu thereof "Attorney General";

(2) striking out "Secretary's" and inserting in lieu thereof "Attorney General's"; and

(3) adding at the end thereof the following sentence: "Nothing in this section shall authorize any payment of funds to any organization or entity formed by or pursuant to any agreements entered into under this section."

ENFORCEMENT CHANGES

SEC. 9. The Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by—

(1) redesignating sections 815 through 819 as sections 816 through 820, respectively; and

(2) striking out sections 810 through 815 and inserting in lieu thereof the following:

"PRELIMINARY MATTERS OF ENFORCEMENT

"SEC. 810. (a) Whenever an aggrieved person, or the United States Attorney General on the Attorney General's own initiative, files a charge alleging a discriminatory housing practice, the Attorney General shall serve a notice of the alleged discriminatory housing practice on the party charged (hereinafter in this title referred to as the 'respondent') within ten days after such filing, and shall make an investigation thereof. Upon receipt of such charge, the Attorney General shall serve notice upon the aggrieved person acknowledging receipt of the charge and advising the aggrieved person of the time limits and alternative means of enforcement provided under this title. Such charge shall be in writing, under oath or affirmation, and shall contain such information and be in such form as the Attorney General may require, including detailed information regarding: (1) specific discriminatory practices alleged; (2) the dates of such alleged practices; (3) the names of parties involved; and (4) other relevant facts. An aggrieved person shall file a charge under this section with the Attorney General not later than six months after the alleged discriminatory housing practice occurred or terminated.

"(b) (1) In connection with any investigation of such charge, the Attorney General shall, at reasonable times, have access to, and the right to copy, any information that is reasonably necessary for the furtherance of the investigation. The Attorney General

may issue subpoenas to compel such access to or the production of such information, or the appearance of persons, and may issue interrogatories, to the same extent and subject to the same limitations as would apply if the subpoenas or interrogatories were issued or served in aid of a civil action in the United States district court for the district in which the investigation is taking place. The Attorney General may administer oaths.

"(2) Upon written application to the Attorney General, a respondent shall be entitled to the issuance of a reasonable number of subpoenas and interrogatories by and in the name of the Attorney General to the same extent and subject to the same limitations as subpoenas issued by the Attorney General under paragraph (1) of this subsection.

"(3) Witnesses summoned by subpoena of the Attorney General under this title shall be entitled to the same witness and mileage fees as are witnesses in proceedings in United States district courts.

"(4) The Attorney General or other party at whose request a subpoena is issued under this title may enforce such subpoena in appropriate proceedings in the United States district court for the district in which the person to whom the subpoena was addressed resides, was served, or transacts business.

"(5) Any person who willfully fails or neglects to attend and testify or to answer any lawful inquiry or to produce records, documents, or other evidence in such person's power to do so, in obedience to the subpoena or lawful order of the Attorney General under this title, shall be fined not more than $1,000. Any person who, with intent thereby to mislead the Attorney General, shall make or cause to be made any false entry or statement of fact in any report, account, record, or other document produced pursuant to the Attorney General's subpoena or other order, or shall willfully neglect or fail to make or cause to be made full, true, and correct entries in such reports, accounts, records, or other documents, or shall willfully mutilate, alter, or by any other means falsify any documentary evidence, shall be fined not more than $1,000.

## "STATE ENFORCEMENT

"Sec. 811. (a) Whenever a charge alleges a discriminatory housing practice within the jurisdiction of a State or local public agency certified by the Attorney General under this subsection, the Attorney General shall, within twenty days after receiving such charge and before taking any action with respect to such charge, refer such charge to such agency. The Attorney General shall notify all parties involved of the referral to such agency. The Attorney General shall, after that referral is made, take no further action with respect to such charge unless the Attorney General determines that such agency no longer qualifies for certification. Wherever a State or local law provides rights and remedies which are reasonably equivalent to the rights and remedies provided by this title, the Attorney General shall certify the appropriate State or local agency administering such law. Any State or local agency may submit a written request for certification to the Attorney General. Unless the Attorney General offers a written objection within ninety days after such submission, such State or local agency shall be deemed certified within the meaning of this title. If the Attorney General objects within the prescribed ninety-day period, he shall provide the State or local agency with an explanation for his decision and such decision shall be subject to review by the appropriate United States district court.

"(b) The Attorney General shall not require, as a condition of such certification that the State or local law enforcement agency agree to waive its exclusive authority over charges alleging discriminatory housing practices.

## "CONCILIATION PROCESS

"Sec. 812. (a) If the Attorney General concludes, on the basis of a preliminary investigation of a charge, that prompt judicial action is necessary to carry out the purposes of this title, he may seek appropriate temporary or preliminary relief pending final disposition of such charge. Any temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with Rule 65 of the Federal Rules of Civil Procedure.

"(b) At any time after the filing of a charge, the Attorney General shall endeavor to resolve such charge by conciliation. If the respondent refuses to participate in the conciliation process, the Attorney General may grant to the aggrieved person not more than $1,000 for legal fees and other expenses of initiating a civil action under this title against such respondent. Nothing said or done in the course of the conciliation process may be made public or used as evidence in a subsequent proceeding under this title without the written consent of the persons concerned. Any employee of the Attorney General who makes public any information in violation of the immediately preceding sentence shall be fined not more than $1,000. The conciliation process may result in a conciliation agreement. Such agreement may provide for binding arbitration of the dispute arising from the complaint may award appropriate specific relief to the aggrieved person including damages of not more than $1,000. The Attorney General may issue such orders as are necessary to enforce any conciliation agreement, including, if the Attorney General has determined that there has been a breach of such agreement, an order that the breaching party pay to the United States not more than $1,000.

"(c) (1) If the Attorney General determines, after an investigation, and after initiation of the conciliation process under this section, that reasonable cause exists to believe a charge is true, the Attorney General shall file an appropriate civil action under section 814(b) of this title. Such determination in the case of a charge filed by an aggrieved person may not be made later than six months after the date of the filing of such charge.

"(2) After each investigation under this section, the Attorney General shall provide to each party a copy of the report of such investigation.

"(d) The Attorney General shall not employ the services of any person or organization, or provide direct or indirect assistance to any person or organization, to make an offer to purchase, rent, or obtain financing for a dwelling that is not a bona fide offer, except where such action is undertaken for the purpose of verifying a violation of this title which the Attorney General has reason to believe has occurred.

## "PRIVATE ENFORCEMENT

"Sec. 813. (a) (1) An aggrieved person may commence a civil action in an appropriate United States district court or State court at any time not later than six months after the alleged discriminatory housing practice occurred or terminated.

"(2) The Attorney General may, upon timely application, intervene in such civil action, if he personally certifies that the case is of general public importance.

Any court, upon application by an aggrieved person or a respondent, may, in such circumstances as it deems just, appoint an attorney for such party and may authorize the commencement or continuation of the action without the payment of fees, costs, or security.

"(c) In a civil action under this section, a court may award such relief as may be appropriate, including money damages, equitable and declaratory relief, and punitive damages not to exceed $1,000.

"(d) It is the sense of the Congress that, except in cases in which a municipality or State is involved, the use of United States magistrates should be encouraged to the maximum extent feasible in order to expedite litigation under this section.

## "ATTORNEY GENERAL ENFORCEMENT"

"Sec. 814. (a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this title, or that any group of persons has been denied any of the rights granted by this title and such denial raises an issue of general public importance, the Attorney General may bring a civil action in an appropriate United States district court.

"(b) The Attorney General may bring a civil action in an appropriate United States district court to remedy any discriminatory housing practice with respect to which the Attorney General has made a finding that reasonable cause exists under section 812(c) (1) of this title.

"(c) The court may award such relief in any civil action under this section as is authorized in section 813(c) of this title in cases brought under that section.

"(d) The filing of a civil action pursuant to a charge filed by an aggrieved person under this title by the Attorney General or by any State or local agency shall preclude the filing of a civil action under this title growing out of the same discriminatory housing practice by such aggrieved person. The filing of a civil action under this title by an aggrieved person shall preclude the filing of a civil action under this title growing out of the same discriminatory housing practice by the Attorney General or by any State or local agency pursuant to a charge filed by such aggrieved person.

"(e) It is the sense of the Congress that, except in cases in which a municipality or State is involved, the use of United States magistrates should be encouraged to the maximum extent feasible in order to expedite litigation under this section.

## "ANCILLARY AND PROCEDURAL MATTERS

"Sec. 815. (a) In any action or proceeding under this title, the court may allow a prevailing party (other than the United States with respect to attorney fees) reasonable attorney and expert witness fees as part of the costs. The United States shall be liable for such costs the same as a private person. Such costs may also be awarded upon the entry of any interlocutory order which determines substantial rights of the parties.

"(b) Any court in which an action is instituted under this title shall assign the case for hearing at the earliest practicable date and cause the case in every way to be expedited.

"(c) Any sale, encumbrance, or lease executed before the issuance of any order under this title, and involving a bona fide purchaser, encumbrancer, or tenant without actual notice of the existence of the filing of a charge or civil action under this title shall not be affected by such court order.

"(d) Any court having jurisdiction of an action brought under this title which enters a temporary restraining order or other order providing permanent or temporary relief sought by the Attorney General may, in such circumstances as it deems just, if a violation of this title is not ultimately found, enter an order providing reimbursement from the United States to the defendant for unavoidable economic losses incurred during the time that the temporary restraining order or preliminary or temporary relief was in effect which were a direct result of such temporary

restraining order or preliminary or temporary relief."

COOPERATION WITH STATE AND LOCAL AGENCIES

SEC. 10. Section 817 as redesignated by section 9 of this Act is amended by striking out "Secretary" each place it appears and inserting in lieu thereof "Attorney General".

CONFORMING AMENDMENT TO TITLE IX OF 1968 CIVIL RIGHTS ACT

SEC. 11. Section 901 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by inserting ", handicap (as defined in section 802 of this Act)," immediately after "sex" each place it appears.●

By Mr. MOYNIHAN:

S. 1671. A bill to amend the Internal Revenue Code to change the definition of a cooperative housing corporation; to the Committee on Finance.

COOPERATIVE HOUSING CORPORATIONS

● Mr. MOYNIHAN. Mr. President, I am introducing a bill today that would permit any cooperative housing corporation to receive up to half of its income from commercial tenants, without jeopardizing the tax deductions of its other tenants.

The bill amends section 216 of the Internal Revenue Code. Section 216 lets individuals who live in cooperative apartments deduct their proportionate shares of the real estate taxes and mortgage interest paid on the cooperative building and surrounding property. It was enacted in 1942. The idea was to put owners of cooperative apartments in the same position as owners of condominiums and single-family houses.

But there is a catch: Not all tenants in co-ops qualify for the deductions. First, a tenant must be a "tenant-stockholder." That is to say, he must be an individual, as opposed to a corporation or other entity. He must own stock in the cooperative that is fully paid up and that gives him the same stake in the cooperative as his apartment bears in relation to the cooperative's total property. And he must be entitled to occupy his apartment. All of this makes him a "tenant-stockholder."

Second, the cooperative he lives in must be a "cooperative housing corporation." It is a cooperative housing corporation only if 80 percent or more of its gross income comes from tenant-stockholders.

My bill would change the 80 percent to 50 percent. There is not a word in the legislative history about why Congress chose 80 percent in 1942, and not some different number. Nor do the committee prints explain why one needs a test of this kind at all.

One can guess. Congress may have worried about possible abuse. An example that is often heard: A co-op may find commercial tenants to pay the maintenance fees to keep the building and grounds in good condition. The commercial tenants would then write off these fees as "ordinary and necessary business expenses," when had the other tenants

paid them, the fees would not be tax deductible. They are a cost of living.

It is hard to see how an 80-percent test prevents this.

Another reason for the test is that Congress may simply have wanted to limit section 216 to residential properties. But if that was the reason, then a more general test would have been better: For example, the primary purpose of the corporation must be to provide dwelling units for the shareholders. A 50-percent test is shorthand for this, and the IRS would probably find it easier to administer.

The problem with the 80-percent test is that it produces odd results. A cooperative housing corporation that receives close to 20 percent of its income from commercial tenants can be disqualified if one of its residential tenants dies, because an estate does not count as a tenant-stockholder. The same thing happens when a residential tenant surrenders his apartment to the corporation and the corporation lets the apartment until a buyer can be found.

Some co-ops try to protect themselves by leasing the commercial space to an intermediary for an annual rent fixed at 19.9 percent of the co-op's income. The intermediary then sublets the property at a profit. This arrangement does not affect the residential character of the co-op. But it can affect the tax treatment. It also prevents the residential tenants from getting a fair market rent for the commercial property.

I feel safe in saying this result was not intended by Congress. We have had to amend section 216 five times since 1962 to treat similar side effects. The amendments are patchwork. They complicate section 216. One can see the need for more adjustments unless the 80-percent test is changed.

Mr. President, I ask unanimous consent that the text of my bill be printed in the RECORD.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

S. 1671

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That (a) subparagraph (D) of section 216 (b)(1) of the Internal Revenue Code (defining cooperative housing corporation) is amended by striking out "80 percent" and inserting in lieu thereof "50 percent".

(b) The amendment made by subsection (a) shall apply to taxable years beginning after the date of enactment of this Act.●

By Mr. BOSCHWITZ:

S. 1672. An Act to expand the membership of the U.S. Holocaust Memorial Council from 60 to 65 and for other purposes; to the Committee on the Judiciary.

HOLOCAUST MEMORIAL COUNCIL

● Mr. BOSCHWITZ. Mr. President, the Holocaust Memorial Council was established in 1980 to coordinate projects designed to memorialize the sufferings of 11 million victims of World War II con-

centration camps. The council also maintains a holocaust museum, which is an enduring monument of this human tragedy.

Mr. President, I am introducing legislation that would make two minor changes in the law (Public Law 96–388) which established the Holocaust Memorial Council. My bill would expand the membership of the council from 60 to 65 and make certain technical amendments in the appointment authority of the executive director.

I think these changes will improve the effectiveness of the council. I urge the adoption of my proposal by the Senate.●

By Mr. GRASSLEY (for himself, Mr. BAUCUS, Mr. GOLDWATER, Mr. WILLIAMS, and Mr. LEAHY):

S. 1673. An Act to amend the Internal Revenue Code of 1954 to provide for the awarding of reasonable court costs and certain fees to prevailing parties in civil tax actions, and for other purposes; to the Committee on Finance.

TAXPAYER PROTECTION AND REIMBURSEMENT ACT

● Mr. GRASSLEY. Mr. President, I am introducing a bill to include tax court cases within the ambit of the Equal Access to Justice Act passed last year, particularly the attorney's fees provision. The Equal Access to Justice Act did not include tax court cases; it covered only cases brought in Federal district court and the court of appeals. Unlike the Equal Access to Justice Act which requires the Government to show its position is substantially justified to prevent an award of attorney's fees to a prevailing party, this bill provides for the award of attorney's fees if the prevailing party can show the Government's position is unreasonable.

Senator BAUCUS introduced a bill earlier this session, S. 752, with these features. He and I are reintroducing the identical bill except we are raising the maximum amount of an award from $20,000 to $25,000. We feel this better reflects the true cost of fighting a tax case. Furthermore, the majority of cosponsors of S. 752 have approved this change and would like to be included on this measure.

The attorney's fees portion of the Equal Access to Justice Act becomes effective this week on October 1. As chairman of the Subcommittee on Oversight of the Internal Revenue Service, I have scheduled hearings on this issue and these bills on October 19, 1981 at 2 p.m. Any comments on this topic by any of my colleagues would be greatly appreciated by the subcommittee.●

By Mr. WEICKER:

S. 1674. A bill to amend or repeal certain provisions of the organic acts applicable to the Virgin Islands, and for other purposes; to the Committee on Energy and Natural Resources.

CERTAIN AUTHORITIES AFFECTING TERRITORIES AND POSSESSIONS OF THE UNITED STATES

● MR. WEICKER. Mr. President, I send to the desk, for appropriate reference,

of State and local governments. Already, use of the effects test by HUD and the Civil Rights Division of the Justice Department has been the basis by which they have sought to impose their own notions of proper racial balance upon communities which have had no intent or purpose of discriminating against protected groups.

The intent test for identifying discrimination, allows courts to consider the totality of circumstances, including evidence of racially disparate effects. Unlike the pure effects test, however, the use of statistical evidence is not dispositive in and of itself in determining violations of title VIII and the burden of proof remains fully with the plaintiff.

Mr. President, the proposed bill makes a number of other changes that I believe to be positive changes in the present law: It would enable the Attorney General to pursue an injunction or temporary restraining order where prompt judicial action is necessary, it would limit the use of testers to those instances in which such a practice was necessary to confirm an alleged violation of the act; it would establish a legislative veto over rules and regulations promulgated under the authority to title VIII; and it would clarify the definition of aggrieved person in such a way to limit standing to individuals who are bona fide renters or purchasers.

I believe that the Equal Access to Housing Act draws the proper balance between the need to create a more effective enforcement mechanism under title VIII and the equally important need to protect the due process rights of local communities and individual realtors, home-sellers, and landlords. I do not believe that the legislation rejected by this body during the 96th Congress achieved this balance.

On the one hand, the person who suffers discrimination in housing will, for the first time, be able to draw upon the resources of the Federal and State governments. On the other hand, the respondent will, in fact, have his day in court—not simply his day before a HUD administration law tribunal. In addition, he will be assured that, before he is labeled a civil rights violator, there will have been some evidence of a discriminatory intent on his part, not simply evidence that his apartment building or his subdivision lacked the right proportion of white, black, yellow, red, and brown faces.

The individual who is denied an apartment because of his skin color or a home because of his ethnic background will, in short, have more and stronger protections than he has ever had before. He will have access to the full resources of the Federal and State governments when he is treated, not as an individual, but as a member of some collective group, in his pursuit of a dwelling. At the same time, some of

the so-called public interest groups, which have little to do beyond harassing small businessmen and communities, and some of the more creative and innovative minds in the bureaucracy who wish to remake America in their image, may have a more difficult time of it all. That is the way it ought to be, in my opinion.

I ask unanimous consent that the text of the proposed Equal Access to Housing Act be printed in the RECORD.

There being no objection, the bill was ordered to be printed in the RECORD, as follows:

S. 140

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SHORT TITLE

SECTION 1. This Act may be cited as the "Equal Access to Housing Act of 1983".

SHORT TITLE FOR 1968 ACT

SEC. 2. The Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by inserting immediately after the comma at the end of the enacting clause, the following: "That this Act may be cited as the 'Civil Rights Act of 1968'.".

SHORT TITLE FOR TITLE VIII

SEC. 3. Title VIII of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by inserting immediately after the title's catchline the following:

"SHORT TITLE

"SEC. 800. This title may be cited as the 'Equal Access to Housing Act'.".

AMENDMENTS TO POLICY SECTION

SEC. 4. (a) Section 801 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by striking out "for fair housing" and inserting in lieu thereof "for equal access to housing".

(b) Section 801 of such Act is amended by adding at the end thereof the following: "Such a policy means that individuals shall not be denied access to housing which they desire and can afford, because of race, color, religion, sex, handicap, or national origin. Such policy does not mean that any particular proportion of individuals of a particular race, color, religion, sex, handicap, or national origin will be assured housing within housing units, neighborhoods, or communities except as such proportions are the natural result of free housing choice.".

AMENDMENTS TO DEFINITIONS SECTION

SEC. 5. Section 802 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by—

(a) striking out subsection (a) and inserting in lieu thereof the following:

"(a) 'Attorney General' means the United States Attorney General."; and

(b) adding at the end the following:

"(h) 'Handicap' means, with respect to a person, a physical impairment which substantially limits the capacity to see, hear, or walk unaided or the capacity to live completely unattended. Such term does not in-

clude any alcohol, drug abuse, or any other impairment which would be a threat to the safety or the property of others.

"(i) 'Aggrieved person' includes any person whose bona fide attempt or bona fide offer to purchase, sell, lease, or rent, or whose bona fide attempt to obtain financing for a dwelling has been denied on the basis of race, color, religion, sex, handicap, or national origin, or made subject to terms of purchase, sale, lease, rental, or acquisition which discriminate on any such basis.".

DISCRIMINATORY HOUSING PRACTICE AMENDMENTS

SEC. 6. (a) Section 804(e) of such Act is amended by striking out the words "For profit, to" and inserting in lieu thereof "To".

(b) Section 804 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284) is amended by adding at the end the following:

"(f)(1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny a dwelling to any person because of such handicap of a prospective buyer or renter or of a person or persons to be occupying a dwelling with such buyer or renter unless such handicap would prevent a prospective dwelling occupant from conforming to such rules, policies, and practices as are permitted by paragraph (2) of this subsection.

"(2) To discriminate against any person in the terms or conditions of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of a handicap. For purposes of this subsection, (A) discrimination shall include: (i) refusal to permit reasonable modifications of premises occupied, or to be occupied by persons with a handicap where such modifications are necessary to afford such handicapped persons access to premises substantially equal to that of nonhandicapped persons: *Provided, however,* That with respect to such premises, such handicapped persons have agreed to return them to their original condition if requested to do so by the landlord; or (ii) refusal to make reasonable accommodations in existing policies, practices, services, or facilities when such accommodations are necessary to afford handicapped persons enjoyment of dwellings substantially equal to that of nonhandicapped persons; but (B) discrimination shall not include (i) refusal to make alterations in premises at the expense of sellers, landlords, owners, brokers, building managers, or persons acting on their behalf; (ii) refusal to make modifications of existing policies, practices, services or facilities where such modifications would result in unreasonable inconvenience to other persons; or (iii) refusal to allow modifications of dwellings which would alter the marketability or appearance of a dwelling or the manner in which a dwelling or its environs has been, or is intended to be, used.".

(c) Subsections (c), (d), and (e) of section 804 and section 806 of such Act are each amended by inserting "handicap", immediately after "sex", each place it appears.

(d) Section 805 of such Act is amended by adding at the end thereof the following: "It shall also be unlawful for any person or other entity whose business includes the appraising of real property to discriminate in the estimation of the property value on the basis of race, color, religion, sex, handicap, or national origin. It shall not be unlawful

for such a person or other entity to take into consideration or to report to the person for whom the appraisal is being done all factors relevant to the appraiser's estimate of the fair market value of the property: *Provided,* That such factors are not used by the appraiser for the purpose of discriminating or denying rights guaranteed by this title.".

(e) Section 807 of such Act is amended by adding at the end the following: "Nothing in this title shall prohibit any action unless such action is taken with the intent or purpose of discriminating against a person on account of race, color, religion, sex, handicap, or national origin.".

### ROLE OF THE ATTORNEY GENERAL

SEC. 7. Section 808 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended—

(1) in subsection (a) by striking out "Secretary of Housing and Urban Development" and inserting in lieu thereof "Attorney General";

(2) by striking out subsection (b);

(3) by redesignating subsections (c), (d), and (e) as subsections (b), (c), and (d), respectively;

(4) in subsection (b) as redesignated by this section by striking out—

(A) "Secretary" each place it appears and inserting in lieu thereof "Attorney General";

(B) "Department of Housing and Urban Development" each place it appears and inserting in lieu thereof "Department of Justice";

(C) "sections 3105, 3344, 5362, and 7521 of title 5 of the United States Code" and inserting in lieu thereof "law"; and

(D) "5362" and inserting in lieu thereof "5372";

(5) in subsection (c) as redesignated by this section, by striking out "Secretary" and inserting in lieu thereof "Attorney General";

(6) in subsection (d) as redesignated by this section, by striking out "Secretary of Housing and Urban Development" and inserting in lieu thereof "Attorney General"; and

(7) by adding at the end the following:

"(e)(1) Simultaneously with the promulgation of any regulation or rule issued for the purpose of compliance with this title, the Attorney General shall transmit a copy thereof to the Committees on the Judiciary of the House of Representatives and the Senate. Such rule or regulation, other than an emergency rule, shall become effective at the end of the first period of sixty calendar days of continuous session of Congress, unless between the date of transmittal and the end of the sixty-day period, either House of Congress passes a resolution stating in substance that that House does not approve of the proposed rule or regulation.

"(2) Either House of Congress may adopt a resolution directing agency reconsideration of a rule other than an emergency rule. If such resolution is adopted within sixty calendar days of continuous session of Congress after the date the rule was transmitted to Congress, the rule shall not go into effect. The agency shall reconsider the rule and take such action as they deem appropriate.".

### EDUCATION AND CONCILIATION

SEC. 8. Section 809 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by—

(1) striking out "Secretary" each place it appears and inserting in lieu thereof "Attorney General";

(2) striking out "Secretary's" and inserting in lieu thereof "Attorney General's"; and

(3) adding at the end thereof the following sentence: "Nothing in this section shall authorize any payment of funds to any organization or entity formed by or pursuant to any agreements entered into under this section.".

### ENFORCEMENT CHANGES

SEC. 9. The Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by—

(1) redesignating sections 815 through 819 as sections 816 through 820, respectively; and

(2) striking out sections 810 through 815 and inserting in lieu thereof the following:

"PRELIMINARY MATTERS OF ENFORCEMENT

"SEC. 810. (a) Whenever an aggrieved person, or the United States Attorney General on the Attorney General's own initiative, files a charge alleging a discriminatory housing practice, the Attorney General shall serve a notice of the alleged discriminatory housing practice on the party charged (hereinafter in this title referred to as the 'respondent') within ten days after such filing, and shall make an investigation thereof. Upon receipt of such charge, the Attorney General shall serve notice upon the aggrieved person acknowledging receipt of the charge and advising the aggrieved person of the time limits and alternative means of enforcement provided under this title. Such charge shall be in writing, under oath or affirmation, and shall contain such information and be in such form as the Attorney General may require, including detailed information regarding: (1) specific discriminatory practices alleged; (2) the dates of such alleged practices; (3) the names of parties involved; and (4) other relevant facts. An aggrieved person shall file a charge under this section with the Attorney General not later than six months after the alleged discriminatory housing practice occurred or terminated.

"(b)(1) In connection with any investigation of such charge, the Attorney General shall, at reasonable times, have access to, and the right to copy, any information that is reasonably necessary for the furtherance of the investigation. The Attorney General may issue subpoenas to compel such access to or the production of such information, or the appearance of persons, and may issue interrogatories, to the same extent and subject to the same limitations as would apply if the subpoenas or interrogatories were issued or served in aid of a civil action in the United States district court for the district in which the investigation is taking place. The Attorney General may administer oaths.

"(2) Upon written application to the Attorney General, a respondent shall be entitled to the issuance of a reasonable number of subpoenas and interrogatories by and in the name of the Attorney General to the same extent and subject to the same limitations as subpoenas issued by the Attorney General under paragraph (1) of this subsection.

"(3) Witnesses summoned by subpoena of the Attorney General under this title shall be entitled to the same witness and mileage fees as are witnesses in proceedings in United States district courts.

"(4) The Attorney General or other party at whose request a subpoena is issued under this title may enforce such subpoena in appropriate proceedings in the United States district court for the district in which the person to whom the subpoena was addressed resides, was served, or transacts business.

"(5) Any person who willfully fails or neglects to attend and testify or to answer any lawful inquiry or to produce records, documents, or other evidence in such person's power to do so, in obedience to the subpoena or lawful order of the Attorney General under this title, shall be fined not more than $1,000. Any person who, with intent thereby to mislead the Attorney General, shall make or cause to be made any false entry or statement of fact in any report, account, record, or other document produced pursuant to the Attorney General's subpoena or other order, or shall willfully neglect or fail to make or cause to be made full, true, and correct entries in such reports, accounts, records, or other documents, or shall willfully mutilate, alter, or by any other means falsify any documentary evidence, shall be fined not more than $1,000.

"STATE ENFORCEMENT

"SEC. 811. (a) Whenever a charge alleges a discriminatory housing practice within the jurisdiction of a State or local public agency certified by the Attorney General under this subsection, the Attorney General shall, within twenty days after receiving such charge and before taking any action with respect to such charge, refer such charge to such agency. The Attorney General shall notify all parties involved of the referral to such agency. The Attorney General shall, after that referral is made, take no further action with respect to such charge unless the Attorney General determines that such agency no longer qualifies for certification. Wherever a State or local law provides rights and remedies which are reasonably equivalent to the rights and remedies provided by this title, the Attorney General shall certify the appropriate State or local agency administering such law. Any State or local agency may submit a written request for certification to the Attorney General. Unless the Attorney General offers a written objection within ninety days after such submission, such State or local agency shall be deemed certified within the meaning of this title. If the Attorney General objects within the prescribed ninety-day period, he shall provide the State or local agency with an explanation for his decision and such decision shall be subject to review by the appropriate United States district court.

"(b) The Attorney General shall not require, as a condition of such certification, that the State or local law enforcement agency agree, to waive, its exclusive authority over charges alleging discriminatory housing practices.

"CONCILIATION PROCESS

"SEC. 812. (a) If the Attorney General concludes, on the basis of a preliminary investigation of a charge, that prompt judicial action is necessary to carry out the purposes of this title, he may seek appropriate temporary or preliminary relief pending final disposition of such charge. Any temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with rule 65 of the Federal Rules of Civil Procedure.

"(b) At any time after the filing of a charge, the Attorney General shall endeavor to resolve such charge by conciliation. If

the respondent refuses to participate in the conciliation process, the Attorney General may grant to the aggrieved person not more than $1,000 for legal fees and other expenses of initiating a civil action under this title against such respondent. Nothing said or done in the course of the conciliation process may be made public or used as evidence in a subsequent proceeding under this title without the written consent of the persons concerned. Any employee of the Attorney General who makes public any information in violation of the immediately preceding sentence shall be fined not more than $1,000. The conciliation process may result in a conciliation agreement. Such agreement may provide for binding arbitration of the dispute arising from the complaint or may award appropriate specific relief to the aggrieved person including damages of not more than $1,000. The Attorney General may issue such orders as are necessary to enforce any conciliation agreement, including, if the Attorney General has determined that there has been a breach of such agreement, an order that the breaching party pay to the other party not more than $1,000.

"(c)(1) If the Attorney General determines, after an investigation and after initiation of the conciliation process under this section, that reasonable cause exists to believe a charge is true, the Attorney General shall file an appropriate civil action under section 814(b) of this title. Such determination in the case of a charge filed by an aggrieved person may not be made later than six months after the date of the filing of such charge.

"(2) After each investigation under this section, the Attorney General shall provide to each party a copy of the report of such investigation.

"(d) The Attorney General shall not employ the services of any person or organization, or provide direct or indirect assistance to any person or organization, to make an offer to purchase, rent, or obtain financing for a dwelling that is not a bona fide offer, except where such action is undertaken for the purpose of verifying a violation of this title which the Attorney General has reason to believe has occurred.

"PRIVATE ENFORCEMENT

"SEC. 813. (a)(1) An aggrieved person may commence a civil action in an appropriate United States district court or State court at any time not later than six months after the alleged discriminatory housing practice occurred or terminated.

"(2) The Attorney General may, upon timely application, intervene in such civil action, if he personally certifies that the case is of general public importance.

"(b) Any court, upon application by an aggrieved person or a respondent, may, in such circumstances as it deems just, appoint an attorney for such party and may authorize the commencement or continuation of the action without the payment of fees, costs, or security.

"(c) In a civil action under this section, a court may award such relief as may be appropriate, including money damages, equitable and declaratory relief, and punitive damages not to exceed $1,000.

"(d) It is the sense of the Congress that, except in cases in which a municipality or State is involved, the use of United States magistrates should be encouraged to the maximum extent feasible in order to expedite litigation under this section.

"ATTORNEY GENERAL ENFORCEMENT

"SEC. 814. (a) Whenever the Attorney General has reasonable cause to believe

that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this title, or that any group of persons has been denied any of the rights granted by this title and such denial raises an issue of general public importance, the Attorney General may bring a civil action in an appropriate United States district court.

"(b) The Attorney General may bring a civil action in an appropriate United States district court to remedy any discriminatory housing practice with respect to which the Attorney General has made a finding that reasonable cause exists under section 812(c)(1) of this title.

"(c) The court may award such relief in any civil action under this section as is authorized in section 813(c) of this title in cases brought under that section.

"(d) The filing of a civil action pursuant to a charge filed by an aggrieved person under this title by the Attorney General or by any State or local agency shall preclude the filing of a civil action under this title growing out of the same discriminatory housing practice by such aggrieved person. The filing of a civil action under this title by an aggrieved person shall preclude the filing of a civil action under this title growing out of the same discriminatory housing practice by the Attorney General or by any State or local agency pursuant to a charge filed by such aggrieved person.

"(e) It is the sense of the Congress that, except in cases in which a municipality or State is involved, the use of United States magistrates should be encouraged to the maximum extent feasible in order to expedite litigation under this section.

"ANCILLARY AND PROCEDURAL MATTERS

"SEC. 815. (a) In any action or proceeding under this title, the court may allow a prevailing party (other than the United States with respect to attorney fees) reasonable attorney and expert witness fees as part of the costs. The United States shall be liable for such costs the same as a private person. Such costs may also be awarded upon the entry of any interlocutory order which determines substantial rights of the parties.

"(b) Any court in which a proceeding is instituted under this title shall assign the case for hearing at the earliest practicable date and cause the case in every way to be expedited.

"(c) Any sale, encumbrance, or lease executed before the issuance of any order under this title, and involving a bona fide purchaser, encumbrancer, or tenant without actual notice of the existence of the filing of a charge or civil action under this title shall not be affected by such court order.

"(d) Any court having jurisdiction of an action brought under this title which enters a temporary restraining order or other order providing permanent or temporary relief sought by the Attorney General may, in such circumstances as it deems just, if a violation of this title is not ultimately found, enter an order providing reimbursement from the United States to the defendant for unavoidable economic losses incurred during the time that the temporary restraining order or preliminary or temporary relief was in effect which were a direct result of such temporary restraining order or preliminary or temporary relief.".

COOPERATION WITH STATE AND LOCAL AGENCIES

SEC. 10. Section 817 as redesignated by section 9 of this Act is amended by striking out "Secretary" each place it appears and inserting in lieu thereof "Attorney General".

CONFORMING AMENDMENT TO TITLE IX OF 1968 CIVIL RIGHTS ACT

SEC. 11. Section 901 of the Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90-284, approved April 11, 1968) is amended by inserting ", handicap (as defined in section 802 of this Act)," immediately after "sex" each place it appears.

By Mr. HATCH (for himself and Mr. THURMOND):

S. 141. A bill to provide a special defense to the liability of political subdivisions of States under section 1979 of the Revised Statutes (42 U.S.C. 1983) relating to civil actions for the deprivation of rights; to the Committee on the Judiciary.

MUNICIPAL LIABILITY

Mr. HATCH. Mr. President, during the post-Civil War Reconstruction era, the 42d Congress passed the Civil Rights Act of 1871 to protect persons from the deprivation, under the color of State law, "of any rights, privileges, or immunities secured by the Constitution of the United States." The Revised Statutes of the United States enacted in 1874, contained a remedial provision, now 42 U.S.C. 1983, for securing these rights. I am in strong agreement with the intent of these laws—to guarantee to every American the rights secured by the Constitution and laws providing for equal rights. Indeed, I feel one of our most sacred obligations is to insure the constitutional rights of all our citizens.

However, in two cases decided in recent years the Supreme Court significantly broadened the interpretation of section 1983 in ways that have little or nothing to do with anyone's constitutional rights, but will wreak havoc in the ability of our State and local governments to perform important services to the public.

In the case of *Maine* v. *Thiboutot*, 448 U.S. 1 (1980), the Court expressly ruled, for the first time ever, that the phrase "and laws" was intended by Congress to provide a section 1983 remedy for deprivations of rights secured by any law of the United States. Civil actions may now be brought against State and local officials under 42 U.S.C. 1983 based on violations of laws which have no relevance whatsoever to deprivations of constitutional or statutory equal rights.

In *Owen* v. *City of Independence*, 445 U.S. 622 (1980), the Court held that local governmental entities may not assert the good faith of their agents as a defense to liability under section 1983 suits. In other words, a local government may be liable in damages for violating a constitutional right that was unknown when the event occurred.

The burdens imposed by these holdings will be onerous. At the very least, our crowded courts will become even

**10890**    **Federal Register** / Vol. 50, No. 52 / Monday, March 18, 1985 / Proposed Rules

## FEDERAL RESERVE SYSTEM

**12 CFR Part 202**

**[Regulation B; Docket No. R-0541]**

**Equal Credit Opportunity; Revision of Regulation B; Official Staff Commentary**

**AGENCY:** Board of Governors of the Federal Reserve System.

**ACTION:** Proposed rule and proposed official staff interpretation.

**SUMMARY:** The Board is publishing a proposal to revise Regulation B, its regulation implementing the Equal Credit Opportunity Act (ECOA). This proposal stems from the Board's review of Regulation B, pursuant to its policy of reviewing periodically all of its regulations. The Board's review considered ways the regulation could be simplified to ease the burdens imposed on creditors, consistent with the Board's responsibility for implementing the ECOA, and whether the regulation could more effectively carry out the purposes of the act. The Board proposes some changes in the data collection requirements applicable to dwelling-related mortgage loan application, and a change in the definition of "applicant" to give guarantors (who already have certain protections under Regulation B) legal standing in the courts when there is an alleged violation of the regulation. The Board also proposes to update some provisions and revise others to facilitate creditor compliance. The revisions proposed include streamlined procedures for dealing with incomplete applications and a broader selection of sample forms for informing applicants of the reasons for credit denials.

The major portions of the existing regulatory provisions, however, remain virtually unchanged. This result is in keeping with the Board's analysis and with comments from creditors, enforcement agencies, and consumer and civil rights representatives, who generally believe that the regulation is achieving its intended goals and should be maintained substantially in its present form.

The Board is also publishing for public comment an official staff commentary that incorporates existing Board interpretations and that addresses questions about regulatory matters on which creditors and enforcement agencies have sought guidance over the years.

**DATE:** Comments must be received by June 14, 1985.

**ADDRESS:** Comments may be mailed to William W. Wiles, Secretary, Board of

Governors of the Federal Reserve System, Washington, D.C. 20551, or delivered to the C Street entrance, 20th and C Streets, NW., Washington, D.C. between 8:45 a.m. and 5:15 p.m. Comments may be inspected in Room B-1122 between 8:45 a.m. and 5:15 p.m. All material submitted should refer to Docket No. R-0541.

**FOR FURTHER INFORMATION CONTACT:** Regarding the proposed regulatory amendments and staff commentary, Lucy H. Griffin or John C. Wood (Senior Attorneys), Adrienne D. Hurt (Staff Attorney), or James K. Baebel (Senior Review Examiner), Division of Consumer and Community Affairs, Board of Governors of the Federal Reserve System, Washington, D.C. 20551 (202-452-2412); regarding the economic impact analysis, Glenn Canner (Director, Micro-Consumer Projects) or Robert D. Kurtz (Staff Economist), Division of Research and Statistics, Board of Governors of the Federal Reserve System, Washington, D.C. 20551 (202-452-2910).

**SUPPLEMENTARY INFORMATION:** (1) *General.* The Equal Credit Opportunity Act (15 U.S.C. 1691 *et seq.*), signed into law in 1974, made it unlawful for creditors to discriminate in any aspect of a credit transaction on the basis of sex or marital status. Under amendments enacted by Congress in 1976, the act also bars discrimination on the basis of race, color, religion, national origin, age, receipt of public assistance, and the good-faith exercise of rights under the Consumer Credit Protection Act. The Federal Reserve Board was given rule-writing authority to issue implementing regulations, and issued Regulation B (12 CFR Part 202) In October 1975, amending it in December 1976 to incorporate the act's expanded coverage.

The Board's policy under its Regulatory Improvement Project calls for the periodic review of each Board regulation. In keeping with that policy, the Board has made a detailed review to consider whether Regulation B could be simplified to ease the burdens imposed on creditors, consistent with the Board's responsibility for implementing the ECOA, and to consider also whether the regulation could more effectively carry out the purposes of the ECOA. The Board published a notice of intent to review the regulation in June 1983 (48 FR 28285), in order to ensure the participation of interested parties early in the review.

The initial phase of the review has now been completed. The Board believes, on the basis of public comments and other available

information, that the other regulation is achieving its intended goals. The Federal Reserve Banks and the other federal enforcement agencies report no major compliance problem. As a rule, creditors appear to consider the Regulation B requirements to be manageable, and review the regulations as providing certainty about how to comply with the ECOA. Civil rights and consumer advocates continue to view the regulation as providing important protections. To the extent that consumers' views can be discerned from board-sponsored surveys, consumers appear satisfied with the treatment they are receiving in the credit market.

Based on its review, the Board is now proposing a number of revisions to regulation B. One proposed revision would modify the coverage of the data collection requirements for certain dwelling-related loans. The modification would establish greater uniformity among financial regulatory agencies, as discussed under section 202.13, below. Another proposed change would expand the definition of "applicant" to cover guarantors, in order to give legal standing to persons who have certain rights under Regulation B but who do not currently have a legal remedy when there is a violation of those rights. (Refer to the discussion under section 202.2(e), below.)

The Board also is proposing technical changes to the regulation to make compliance easier for creditors without diminishing consumer protections. The revised regulation would, for example, provide creditors with a streamlined notification procedure for dealing with incomplete applications, and would give creditors a broader selection of sample forms for notifying an applicant of a credit denial and of the reasons for the denial. (For a detailed discussion of these proposals, see section 202.9 and Appendix C, below.)

The proposed regulation is shorter than current Regulation B by about one-sixth—a reduction largely attributable to the deletion of obsolete provisions and to the transfer of explanatory material to a proposed staff commentary. The regulation also has been improved by the rewriting of some sections and the editing of others to state the requirments more clearly. All but two of the 19 footnotes contained in the current regulations have been moved to the proposed staff commentary, making the regulation itself less cumbersome to use.

In light of the indications that major revisions are not needed, the proposal leaves most of the regulatory provisions unchanged. This is in contrast to the

extensive changes made when the Board engaged in a similar review of Regulation Z (Truth in Lending) and Regulation C (Home Mortgage Disclosure). The more limited nature of the revisions to Regulation B comes from the different circumstances that have surrounded the review of the regulation:

• The Board's review of the Truth in Lending and Home Mortgage Disclosure regulations implemented statutory amendments that, particularly in the case of Truth in Lending, made significant reductions in the disclosure requirements. In contrast, there are no statutory amendments of any kind to be implemented under the ECOA.

• The volume of litigation under the ECOA and Regulation B has been quite limited, and by and large the court decisions that have been reported do not reflect the need for simplification of requirements that was evident in the case of Truth in Lending.

• It came apparent, in the course of the review, that creditors consider Regulation B's current requirements to be manageable. Many creditors may find burdensome the notification requirements for adverse action, but they also generally recognize that these provisions are drawn directly from the statute. Some creditors encourage the Board to provide clarification on some points; others believe that the regulation is working and express a preference for leaving the regulation substantially unchanged.

• Civil rights and consumer advocates have opposed any diminution of ECOA protections. Because the ECOA is civil rights legislation, and not strictly a consumer protection law, there is particular concern that the Board not cut back on any protections currently provided.

• When issued in 1976, Regulation B was written in nontechnical language, and the regulation is for the most part already easy to understand.

• Consequently, the following general principles have been applied in the review and revision of the regulation:

• Make changes to the regulation that will facilitate compliance, provide clearer guidance about the Board's intent, clarify the standards to be used by the regulatory agencies, or enhance the act's protections.

• Minimize changes that would provide only marginal (or no) benefit to the industry; or that, similarly, would not significantly clarify the regulation or enhance protections.

In the review of the regulation, it was frequently found that no substantive change in regulatory provisions was required—that elaborating on a given

point in a staff commentary could more effectively facilitate creditor compliance. Accordingly, an official staff commentary has been prepared and is being proposed for comment. It provides needed guidance in a less formal manner than the regulation. The proposed commentary is discussed further in section (4) of this notice.

An economic impact analysis of the proposed regulatory revisions has been prepared as required by section 603 of the Regulatory Flexibility Act (5 U.S.C. 603). The analysis appears in section (3) below.

In accordance with section 3507 of the Paperwork Reduction Act of 1980, 44 U.S.C. Chapter 35, and 5 CFR 1320.13, the proposed revisions to Regulation B that pertain to third party disclosures will be submitted to the Board for review under Office of Management and Budget delegated authority after consideration of the comments received during the 90–day public comment period.

(2) *Proposed changes to regulation.* The following discussion covers the proposed revisions to Regulation B section by section. In a number of sections, changes are being proposed for the purpose of simplification or clarification of the text, with no substantive change in the regulatory requirements; where these changes are self-evident from reading the proposed text itself, they are not covered in the discussion.

*Section 202.1  Authority, Scope and Purpose.*

Proposed section 202.1 differs from the existing section in that certain provisions now appear elsewhere in the proposed regulation. Existing paragraphs (b), concerning administrative enforcement, and (c), on penalties and liabilities, appear in a new section 202.14; existing paragraph (d), regarding procedures for the issuance of staff interpretations, is in new Appendix D.

Paragraph (a), on authority and scope, remains unchanged except for the addition of a reference to the control number assigned to Regulation B by the Office of Management and Budget as required by the Paperwork Reduction Act; other minor changes include the deletion of footnote 1 as unnecessary. A new paragraph (b) is being added to outline the purpose of Regulation B, consistent with the format followed in other board regulations.

*Section 202.2  Definitions.*

In this section, the Board proposes a substantive change to the definition of "applicant" and a change to the

definition of "empirically derived, demonstrably and statistically sound credit system" that will broaden its applicability. Other changes are structural or editorial, without substantive effect. Material deleted from the regulation, for example, is being incorporated into the proposed staff commentary, as noted below.

The Board proposes to revise the definition of "applicant" in paragraph (e) to include guarantors, sureties, endorsers, and similar parties. The existing definition excludes them. The principal effect of this change would be to give guarantors and similar parties standing under the act to seek legal remedies when a violation occurs. The existing regulation prohibits creditors, in certain situations, from requiring an applicant to obtain a guarantor, surety, cosigner, or similar party. If a creditor violates this provision, however, a guarantor whose signature has been illegally required currently has no legal remedy because section 706 of the act confers standing to sue only upon an "aggrieved applicant." Including guarantors and similar parties within the definition of "applicant" would resolve the question of standing.

The Board believes that no operational problems would be created by the proposed change. Guarantors and similar parties are already excepted from the coverage of various sections of the regulation. For example, under section 202.9, a creditor need give a notification only to a "primary applicant," which would exclude a guarantor; under section 202.10, a creditor is required to follow certain procedures for reporting credit history only as to persons who are contractually liable "other than as a guarantor, surety, endorser, or similar party." The Board requests comment, however, on whether specific exclusion of guarantors from coverage under other sections is appropriate.

Under paragraph (f), which defines "application" and "completed application," material dealing with notice of incompleteness is being deleted. It is being incorporated into revised section 202.9(c), a new provision dealing with incomplete applications.

The Board proposes to broaden the definition in paragraph (p) of an "empirically derived, demonstrably and statistically sound credit system." Credit scoring systems that meet the standards as stated in existing paragraph (p) will continue to qualify under the proposed definition. The existing language appears to limit the applicability of the definition to systems that use the allocation of points or the assigning of

weights. The revised language makes clear that a system will meet the definition so long as the system is developed using acceptable statistical principles and methodology. Thus, decision-tree and other types of credit systems that meet these standards also qualify. Other conforming technical revisions result in no substantive change.

Structural changes include the proposed deletion of the following: footnote 2 to the introductory material in section 202.2; footnote 3 to paragraph (z), the definition of "prohibited basis"; paragraph (aa), the definition of "public assistance program"; and the rules of construction in paragraph (cc) and (dd). Comparable material appears in the proposed staff commentary. In paragraph (c), the definition of "adverse action," the cross reference to notification of action taken, statement of reasons for denial, and record retention is being deleted as unnecessary.

*Section 202.3   Limited Exceptions for Certain Classes of Transactions.*

The Board proposes to restructure this section for easier reference. In the proposed restructuring, the definition of each type of credit is immediately followed by the list of exceptions applicable to it. There is no substantive change to any of the existing provisions.

The definition of public utilities credit, proposed paragraph (a), is slightly revised and corresponds more closely to the one in Regulation Z (Truth in Lending). The list of exceptions applicable to governmental credit, proposed paragraph (e), is being simplified without substantive change.

In paragraph (d) on business credit, the provisions relating to notification of credit denial and to record retention are being placed in paragraph (d)(3), labeled "modified requirements," to emphasize that they essentially modify the procedures ordinarily required by Regulation B, rather than provide total exceptions. Paragraph (d)(3)(i) incorporates official staff interpretation EC–0009 to make clear that a creditor that denies a business credit application or takes other adverse action is required to notify the applicant of the action taken. The provision concerning record retention has been edited to make clear that the time period for requesting record retention runs from the notification of action taken.

*Section 202.5   Rules Concerning Taking of Applications.*

The Board proposes to formalize the taking of written applications for the types of credit subject to the data collection requirements of section 202.13

(i.e., certain types of dwelling-related loans); the requirement for written applications appears in revised paragraph (e). In all other types of credit transactions, written applications continue to be optional. A creditor may comply with the requirement by writing down the information that it normally considers in making a credit decision; use of a form is not required. Further discussion of written applications is presented in the material relating to section 202.13, below.

Other changes to this section are merely structural. Catchlines are being added to facilitate use of the regulation. Some of the material contained in existing paragraph (e) concerning the use of the model application forms contained in Appendix B is being moved to the introductory section of Appendix B.

In addition, existing footnote 4 is being renumbered footnote 1; the part of the footnote that is deleted from the regulation appears in the commentary. Footnote 5 and portions of existing paragraphs (b)(3) and (d)(2) are also being deleted; comparable material appears in the proposed staff commentary. Footnote 6 is being deleted as obsolete.

*Section 202.6   Rules Concerning Evaluation of Applications.*

The few changes proposed in this section are strictly structural. Catchlines are being added to facilitate use of the regulation. Existing footnote 7 is being renumbered footnote 2. The last sentence of the footnote, which currently cites portions of the legislative history of the act dealing with the "effects test," is being deleted from the regulation. No substantive change results; comparable material appears in the proposed staff commentary. Existing footnotes 8 and 9, as well as the material in existing paragraph (b)(5) regarding the factors that a creditor may consider in determining the likelihood of consistent payments, are also being deleted from the regulation, with comparable material appearing in the proposed staff commentary.

One of the topics on which the Board sought comment in the June 1983 **Federal Register** notice concerned paragraph (b)(6) of this section, which requires creditors to consider information pertaining to credit history shared with a spouse. The Board asked whether the regulation should be revised to more specifically identify under what circumstances and to what extent information offered by the applicant should be considered by the creditor. Most of the comments on this issue argued against any change in the

regulation. No change is being proposed in the regulation. The proposed staff commentary addresses some of the issues raised.

*Section 202.7   Rules Concerning Extensions of Credit.*

Except for minor revisions to the rules governing treatment of open-end accounts, proposed revisions to this section are structural or editorial, without substantive effect, and include the addition of catchlines for the reader's convenience.

The provisions of paragraph (c) on existing open-end accounts are being revised in minor ways. New language in paragraph (c)(2) makes clear that the provision applies only in the case of an applicant who is contractually liable. The term "earned by" is being deleted to clarify that the provision applies to any situation where the income of the applicant's spouse was relied upon in granting the credit. "Information available to the creditor" replaces existing language because it is believed to be a more appropriate basis for determining whether a creditor may require reapplication. "Current credit limit" is substituted for existing language because the credit limit is a more appropriate test for determining the applicant's overall ability to repay than the "amount of credit currently extended."

In the June 1983 **Federal Register** notice, the Board solicited comment on two specific areas regarding existing open-end accounts. First, the Board asked whether specific procedures should be provided for reapplications. The majority of commenters were opposed to having procedures established by the regulation. They believed creditors should have the same latitude to determine reapplication procedures as for initial applications. They also believed that a specific rule would be counterproductive and particularly burdensome because application procedures vary widely among creditors. In the absence of any indication that there is a problem under the procedures that creditors now use, the Board proposes to leave the regulatory provision unchanged. (See the proposed staff commentary to section 202.7(c).)

The Board also solicited comment as to whether the terms "contractually liable" and "authorized user" need clarification or change. On the basis of the comments, the Board believes that the current use of the term "contractually liable" as defined by the regulation is sufficiently understood by the industry, and is proposing no

change. The Board has similarly decided not to define "authorized user," in order to allow creditors continued flexibility in defining the rights and obligations of such parties.

There are some proposed editorial revisions in the signature rules, but no substantive change. Paragraph (d)(2) is being revised to make clear that, in applications for unsecured credit, if the applicant relies on jointly owned property, the creditor may require the signature of the co-owner only to assure access to the property but not to impose personal liability. The material concerning factors that the creditor may consider regarding property owned by the applicant has been deleted in the proposed version, but comparable material is in the proposed staff commentary.

Existing footnote 10 to paragraph (d)(5) concerning guarantors and similar parties is being deleted, but comparable material appears in the proposed staff commentary. Also, the last sentence of existing paragraph (d)(5) now appears as paragraph (d)(6), to better emphasize that all of the signature rules (i.e., paragraphs (d)(1) through (d)(5)) apply to guarantors.

The provisions regarding credit-related insurance, paragraph (e), prohibit a refusal to grant credit because certain types of credit-related insurance are not available due to the applicant's age. The coverage of this provision is being broadened to include "other credit-related insurance" as well as the specific types (credit life, health, etc.) already listed. The Board requests comment on the effect of this change, if any. The other provisions in existing paragraph (e) regarding differentiation in rates and the like are being deleted; comparable material appears in the proposed staff commentary.

*Section 202.8   Special Purpose Credit Programs.*

The wording of this section is edited in various places for clarity, without substantive change.

*Section 202.9   Notifications.*

The Board proposes to add a new paragraph (c) to provide a streamlined procedure for dealing with incomplete applications. Other proposed revisions to this section are strictly structural or editorial, without substantive change.

In the June 1983 **Federal Register** notice concerning the review of Regulation B, the Board solicited comment regarding incomplete and withdrawn applications. Some of the commenters criticized what they believed to be a double notice burden in the case of incomplete applications:

notifying an applicant that the application is incomplete, and later notifying the applicant that credit has been denied because the application remains incomplete.

In response to these comments, the Board proposes to streamline procedures for dealing with incomplete applications. Paragraph (c) provides that if a creditor receives an application that is incomplete regarding matters that the applicant can complete, the creditor shall either notify the applicant of its decision within 30 days, in accordance with section 202.9(a), or notify the applicant within that time that additional information is needed. The latter notification would specify the information needed, designate a time period for the applicant to submit the information, and inform the applicant that unless the information is provided there can be no further consideration of the application. If the applicant failed to respond within the designed time period, the creditor would have no obligation to provide further notification of any kind. If the applicant provided the requested information in a timely manner, the creditor would then take action on the application and give appropriate notice in accordance with section 202.9 (a) and (b). Paragraph (a)(1)(ii), dealing with the denial of an incomplete application, is being revised to include conforming language. Forms C–9 and C–10 in Appendix C are sample forms for notice of incompleteness under paragraph (c).

In response to public comment, the Board proposes to make changes to section 202.9 with respect to use of the term "adverse action." The words "denying" or "denial" of credit are being substituted for the words "adverse action." The Board believes that use of the term "adverse action" raises unnecessarily negative connotations, and has also led creditors to believe that they must use that term in communicating with applicants who have been denied credit. The Board believes that the provisions of paragraphs (a) and (b) remain sufficiently clear as to the creditor's obligation to notify an application when, in instances other than the denial of an application, the creditor takes action that warrants the sending of a notice under paragraph (b).

Other changes to this section are primarily editorial. The Board proposes to delete material that appears in existing paragraph (a)(1)(i), permitting notification of approval to be either express or implied; material in existing paragraph (b)(1), allowing the model ECOA notice to include references to similar state law and a state enforcement agency; existing paragraph

(b)(3), permitting inclusion of other required disclosures or other information generally; and existing paragraph (f), which provides a presumption of delivery. Comparable material appears in the proposed staff commentary. In existing paragraph (b)(2), the model notice of reasons for adverse action is being deleted. It is being replaced by a number of model notices in a new Appendix C, as discussed below.

Existing paragraph (d) provides a special rule on withdrawn applications that the Board believes is not needed; it is being deleted. There has also been some restructuring of the section. Existing paragraphs (c), (a)(3), (a)(4), and (e) are renumbered (d) through (g), respectively. That portion of existing paragraph (a)(4) dealing with liability for acts of third parties is being deleted; comparable material appears in the proposed staff commentary.

*Section 202.10   Furnishing of Credit Information*

This section is being totally rewritten and restructured for clarity and to delete obsolete material, but there is no substantive change from the existing rules. Footnote 11 to existing paragraph (a)(1) and footnote 12 to existing paragraph (a)(3) are being deleted; comparable material appears in the proposed staff commentary. Material in existing paragraph (c), dealing with the effect of signatures on liability and on the names in which an account is maintained, is being deleted, with comparable material appearing in the proposed staff commentary.

*Section 202.11   Relation to State law*

Existing footnote 16 is being deleted as unnecessary.

*Section 202.12   Record Retention*

The Board proposed to make minor revisions to this section, as discussed below.

Paragraph (a) permits the retention in files, under certain circumstances, of information that is generally prohibited. Existing paragraph (a)(2) applies this permission to information obtained from credit bureaus, and existing paragraph (a)(3) to information obtained from credit bureaus, and existing paragraph (a)(3) to information obtained from an applicant or others without the specific request of the creditor. These two paragraphs are being merged into a single paragraph (a)(2), so that the rule of "without specific request" will also apply to information from credit bureaus. There appears to be no justification for giving special

protection, as the current rule seems to do, if prohibited information is obtained from a credit bureau at the specific request of the creditor. There would be no violation under the proposed revision, however, if a creditor requested a credit report which happened to contain prohibited information. The words "at any time" are being deleted as unnecessary. Existing footnote 17 to paragraph (a) is being deleted as obsolete.

Paragraph (b)(1) requires retention of records for 25 months after a creditor notifies an applicant of action taken on an application. The proposal revises this provision to require the same record retention after a notification of incompleteness because, as discussed under section 202.9 above, a notification of incompleteness under section 202.9(c) may substitute for notification of action taken in certain instances. In addition, existing footnote 18 to paragraph (b)(1) is being deleted; comparable material appears in the proposed staff commentary.

A reference to the United States Attorney General is being added to paragraph (b)(3), to require retention of records until final disposition of an enforcement proceeding or investigation conducted by the Attorney General.

Under existing paragraph (b)(4), record retention is required in situations where, because the application is "shopped" among multiple creditors and another creditor has granted credit, a creditor does not have to notify the applicant of action taken. As revised, the record retention provision is somewhat broader. It applies whenever a creditor receives an application but is not required to comply with notification requirements, e.g., when an applicant submits an application for credit but then withdraws it prior to notification of the creditor's decision. This change would ensure more complete records of applications in order to better allow regulatory agencies to assess creditors' compliance.

*Section 202.13 Information for Monitoring Purposes*

The Board proposes to revise this section in several respects. In general, the revisions relate to types of loans covered and to the method of collecting data on the applicant's sex and race/national origin.

Section 202.13 currently requires a creditor that takes a written application for a loan to purchase residential real property, with a lien on that property as security, to ask the applicant to note certain personal characteristics; race/national origin, sex, marital status, and age. Applicants themselves may provide

the requested information if they choose; however, they are not required to do so. The data are requested to assist the enforcement agencies in determining if a creditor is approving or denying credit in a prohibited manner. The regulation permits other enforcement agencies to adopt more extensive data collection programs; the Federal Deposit Insurance Corporation (FDIC), the Federal Home Loan Bank Board (FHLBB), and the Office of the Comptroller of the Currency (OCC) have done so.

The Board's Consumer Advisory Council issued a report in July 1983 on the Federal Reserve's implementation of its responsibilities under the Community Reinvestment Act (CRA). The Council recommended a number of enhancements to the Board's efforts in carrying out the mandate of CRA and the antidiscrimination goals embraced by the ECOA and the Fair Housing Act. One recommendation was that the Board seek out and use improved methods for collecting and analyzing data on personal characteristics of applicants, so that examiners would be better able to detect prohibited

discrimination. The Council also suggested that the Board consider requiring creditors to use written applications to collect the data on applicants' personal characteristics.

When it considered the Council's recommendations, the Board also considered public comment it had received regarding the problems of bank holding companies whose subsidiary banks are subject to the jurisdiction of different financial regulators. Depending on which federal agency supervises the particular banks, there are different data collection rules. (The attached table briefly outlines the types of credit currently covered by the various agency rules and also describes coverage under the proposed rule, with emphasis added.)

Believing that a single rule applicable to all institutions would both reduce compliance burdens and enable the agencies to collect the data necessary to monitor compliance with the ECOA and the Fair Housing Act, the Board wrote to the other financial supervisory agencies and invited their participation in developing uniform requirements on data collection.

Comparison of Present and Proposed Coverage by Type of Loan

| | |
|---|---|
| OCC Special Rule (national banks) | • Any loan for the purpose of *purchasing, construction-permanent financing, or refinancing* of a house to be occupied as a principal residence and which will secure the loan. |
| FDIC Special Rule (state-chartered non-member banks). | • Any loan for the purpose of *purchasing, constructing, refinancing, improving, or maintaining* a dwelling to be occupied as a principal residence and which will secure the loan. |
| FHLBB Special Rule (S&Ls) | • Any *loan related to a dwelling.* |
| Present Reg. B (member banks and all other creditors). | • Any *written* application for consumer credit for the purpose of *purchasing* residential real property (including construction-permanent financing) where the loan will be secured by the property. |
| Proposed Rule | • Any application for credit primarily for the *purchase* (including construction-permanent financing), *refinancing, repair, or improvement* of a dwelling occupied, or to be occupied, by the borrower as a principal residence, where the extension of credit will be secured by the dwelling. |

Staff members of the FDIC, the FHLBB, the OCC, the Board, and the National Credit Union Administration (NCUA) have met to review their existing regulations and to consider a uniform approach. The Board proposal being published for public comment incorporates many of the observations made by this interagency staff group, though none of the other agencies has formally endorsed the proposal. The proposal would decrease the compliance burden for some creditors but increase the burden for others.

**Types of Covered Transaction**

The Board proposes to modify section 202.13, which currently covers only applications for residential purchase

money loans, to also cover refinancing, repair, or improvement of a dwelling that is or will be occupied by the borrower as a principal residence, when the credit will be secured by the dwelling. The proposal would increase the types of credit covered for state member banks, credit unions, mortgage bankers, and certain other lenders.

The focus of the proposal on credit related to dwelling reflects the longstanding national concern about discrimination in housing-related credit. The proposal would cover most of the areas of credit that are subject to the Fair Housing Act, representing a significant portion of the housing related credit extended in the country. Limiting the proposal to credit related to

dwellings makes it less likely to impose a substantial burden on creditors. If it were expanded to cover types of credit other than dwellings, as some persons have suggested, the economic burden of redesigning and purchasing new forms would be severely increased.

Coverage of secured home improvement loans is included because they appear to be an important element throughout the country in revitalizing many older neighborhoods. Home improvement lending is considered essential to helping meet the housing needs of many people in today's housing market.

Mobile homes also would be covered. In the U.S. Department of Commerce's 1981 Annual Housing Survey, mobile homes accounted for 4.7 percent of the total number of homes in the United States, yet they accounted for 10.3 percent of all owner-occupied homes where the annual household income was less than $12,500. A significant portion of the lower-priced housing market consists of mobile homes purchased to be placed on lots that are owned or rented by the purchasers. Regulation B presently excludes dwellings from coverage if they are not considered real property under state law. To exclude these dwellings from coverage merely because they are not defined by some state laws as real property (since they are not permanently attached to the ground) appears to be unwarranted.

### Rule for Obtaining of Data

The creditor would be required, under the Board's proposal, to request the race/national origin, sex, marital status, and age of the applicant, as in the existing regulation. Unlike the present rule, however, if the applicant did not voluntarily provide the requested information, the creditor would have to note the sex and race/national origin of the applicant on the basis of visual observation or surname. This is the rule currently used by the FDIC, the FHLBB, and the OCC. Thus, the proposal would represent a change for state member banks, credit unions, and mortgage bankers, all of which are currently collecting the information only on a voluntary basis. Requiring that creditors note the race/national origin and sex of applicants who choose not to do so would provide better data by which to determine a creditor's compliance with the ECOA and the Fair Housing Act. The requirement would also serve to remind creditors that these factors may not enter into determinations of creditworthiness.

### Written Applications

The Board also proposes to formalize the taking of written applications for the types of credit covered by section 202.13. (This requirement for written applications appears in revised section 202.5(e)). A creditor may satisfy the requirement by writing down the information that it normally considers in making a credit decision.) Enforcement of civil rights would be enhanced because enforcement agencies could make more informed determinations about a creditor's compliance with the ECOA and the Fair Housing Act if application files contained better documentation. Written credit applications and other supporting information that creditors generally use, such as appraisals and credit histories, would also assist in determining why a particular course of action was taken on an application.

Requiring written applications for such loans does not appear to impose any significant additional burden on creditors, since virtually all creditors already take written applications for these types of credit. Most banks and thrift institutions already are required to take written applications or to maintain equivalent records for most loans covered by the data collection provisions, under rules established by the FDIC, OCC, FHLBB, and NCUA. In addition, most mortgage bankers use standardized loan documents, including credit application forms, because of the growth of the secondary market for dwelling-related loans. FHLMC/FNMA forms are readily available that would meet the proposed requirements on data collection.

### Substitute Monitoring Programs

Existing section 202.13(d) authorizes other enforcement agencies to adopt substitute monitoring programs. If the proposed rule were implemented, the vast majority of the types of credit presently covered by other financial regulatory agencies' special rules on collection of monitoring data would also be covered by Regulation B. To the extent that these agencies continue to engage in substitute monitoring, there would be greater but not total uniformity. The Board requests specific comment on whether paragraph (d) should be deleted.

*Section 202.14   Enforcement, Penalties, and Liabilities.*

This is a proposed new section, consisting of material from current section 202.1 (b) and (c). The material has been edited for purposes of simplification, but there is no

substantive change. Paragraph (a) reflects the transfer of the enforcement functions of the Civil Aeronautics Board to the Secretary of Transportation (49 FR 50994, December 31, 1984).

*Appendix A—Federal Enforcement Agencies*

Appendix A, which lists the federal enforcement agencies, is not being republished at this time. Changes will be made, when the Board publishes revised Regulation B in final form, to reflect the substitution of the Secretary of Transportation for the Civil Aeronautics Board.

*Appendix B—Model Application Forms*

The introductory material to Appendix B incorporates material from existing section 202.5(e), so that all directions for the proper use of the model forms will appear in one place. The existing portion of the introductory material that permits creditors to add three specific items to the model forms is deleted, because creditors may add any item not prohibited by section 202.5 (not merely these three). The discussion of the FHLMC 65/ FNMA 1003 form is deleted; comparable material appears in the staff commentary. The Board is also publishing a sample disclosure and information request that would comply with revised section 202.13. If the proposal regarding monitoring data discussed above is ultimately adopted, this disclosure and request form would become part of the model application form for dwelling-related loans. The model application forms themselves are not being republished at this time because no other change is proposed. Comment is requested, however, on what changes (if any) may be necessary or appropriate in any of the model forms.

*Appendix C—Sample Notification Forms*

In the June 1983 Federal Register notice, the Board requested comment concerning the sample adverse action notice, including what changes should be made to the notice and whether more than one form should be provided. Based on the comments, the Board proposes to replace the single existing sample notice, which appears at section 202.9(b), with a number of sample notices. This proposed new appendix to the regulation contains ten sample notificaiton forms. Forms C–1 through C–4 are sample statements of reasons for credit denial or other adverse action. Forms C–5 and C–6 combine the statement of reaons with notice of a counteroffer. Form C–7 is a sample

notice for use with a credit scoring system; form C–8 is a disclosure of the right to request a statement of reasons, as provided for in section 202.9(a)(2)(ii). Forms C–9 and C–10 are requests for additional information, as provided for in proposed section 202.9(c).

As presented below, only forms C–4, C–6, and C–7 include the notice of rights under ECOA required by section 202.9(b)(1). In all of the other forms, the creditor would add it as indicated by the notation. Forms C–9 and C–10, the sample notices requesting additional information, do not require the ECOA notice because those forms do not relate to a credit denial.

Forms C–5 and C–6 as presented do not include the Fair Credit Reporting Act notice; it would need to be added if applicable.

As stated in the introductory material to proposed Appendix C, the sample forms are illustrative. In developing its own forms, a creditor would of course have to list the factors on which it based a credit denial.

Although ten samples forms are being published for comment, it may be that fewer than ten forms are needed. The Board requests comment on which of the proposed forms would be most useful to creditors and most informative to consumers.

The sample notices would be entirely optional for creditors, as is true of the existing notice. Accordingly, if any or all of the proposed forms are ultimately adopted in place of the existing sample form, creditors may continue ot use the existing sample form (or any other notice form), provided that it sets forth accurately the factors the creditor considers and is completed properly.

*Appendix D—Issuance of Staff Interpretations*

This proposed new appendix would replace section 202.1(d) of the existing regulation, which deals with requests for and issuance of staff interpretations of Regulation B. Because of changes in the procedures for staff interpretations (particularly the introduction of the official staff commentary as the vehicle for such interpretations), this appendix differs from existing sections 202.1(d); it is modeled primarily on Appendix C to Regulation Z, which deals with staff interpretations under that regulation.

*Appendix E—State Exemptions*

Proposed Appendix E would replace Supplement I to the existing regulation, which sets forth procedures relating to exemptions on the basis of similar state law. The revised version is modeled on Appendix B to Regulation Z, which also provides state exemption procedures;

consequently it is shorter and simpler than existing Supplement I, but the substance is largely unchanged.

(3) *Economic impact analysis—Introduction.* The Board's review suggests that (1) the definition of applicant be expanded to cover guarantors in order to give guarantors legal standing to sue when they believe a violation of their rights has occurred, (2) the effectiveness of compliance enforcement can be enhanced if creditors are required to take written applications for housing-related loans and to collect certain data regarding personal characteristics of these loan applicants, and (3) clarification and modification of the regulation are needed in the areas of incomplete and withdrawn applications.

The potential benefits and costs of the proposed revisions to Regulation B are discussed in this initial economic impact analysis. Two appendices are attached. Appendix A contains a summary of a Board study of economies of scale in the cost of complying with the Truth in Lending Act and Equal Credit Opportunity Act (ECOA). Appendix B contains a summary of a Board study of consumer perceptions regarding the benefits of ECOA protections. These studies were examined for their implications regarding the Regulation B review.

Redefinition of "Applicant" to Include Guarantors.

An applicant has standing to sue under Regulation B but a guarantor does not. The proposed rule would redefine "applicant" in section 202.2 to include guarantors. This modification of the rule would allow guarantors, who believe they have been injured by an ECOA violation, to bring suit, thereby enhancing consumer protections.

The new provisions may increase creditor's costs by increasing their exposure to litigation. Litigation would increase to the extent guarantors sue regarding alleged Regulation B violations, and the alleged violations would not have been litigated by applicants themselves. Initial analysis by the Division of Consumer and Community Affairs suggests that this situation would arise infrequently. Applicants would normally bring suit in their own right; and guarantors (if they had standing to sue) would merely join in the lawsuit. (Guarantors are often the spouse or business associate of the applicant.) If it becomes a matter of course in legal actions involving defaulted loans that both the applicant and the guarantor claim injury from the same alleged violation, litigation expense could be increased; the

increase probably would be small since the same alleged violation is involved.

Written Applications and Collection of Monitoring Data

Provisions in section 202.5 of the proposed rule will for the first time require covered creditors to take written applications for certain housing-related loans.[1] In addition, creditors would be required by section 202.13 to *collect* monitoring data on the race and other personal characteristics of applicants for these housing-related loans.[2] Regulation B presently requires creditors to *request* information from applicants regarding their race, sex, age and marital status only on written applications for a home purchase loan to be secured by the property. The current regulation does not require written applications for mortgage loans, nor does it require loan officers to note information on the personal characteristics (race/national origin, sex) of loan applicants if the customer does not volunteer such information upon request.

The proposed rule changes, to require written applications and to collect monitoring data, are expected to enhance consumer protection through more effective enforcement. They would also provide greater uniformity. Currently, banks and savings and loans regulated by the FDIC, the OCC, and the FHLBB are required by rules established by these agencies to take written applications and to collect monitoring data on most housing-related loans.[3] Commercial banks regulated by the Federal Reserve System (FRS) are not presently required to take written applications nor record monitoring data if not provided voluntarily by the applicant. Federally chartered credit unions are required by the National Credit Union Administration to take written applications but are not required to collect monitoring data. Mortgage bankers are not currently required to take written applications. However, since these firms generally sell loans they originate in the secondary market, they typically use standardized written

---

[1] Section 202.5 provisions would require written applications for credit requests covering loans primarily for the purchase, construction/permanent financing, repair or improvement of a dwelling occupied or to be occupied by the borrower as a principal residence. Only applications where the extension of credit will be secured by the dwelling are covered in the proposed rule.

[2] Data to be collected include race/national origin, sex, martial status and age of all applicants.

[3] Regulation B currently allows agencies charged with ECOA enforcement responsibilities to establish their own rules regarding the collection of monitoring data.

application forms as a matter of course. Consequently, the proposed rules are unlikely to have a significant impact on these firms.

Current ECOA enforcement techniques call for the consumer compliance examiners to use all available data to test for the presence or absence of discrimination on a prohibited basis, such as race, sex, marital status or national origin. The primary data for examiners are creditor loan files. In the case of the banks supervised by the Federal Reserve System, the absence of written applications and information on personal characteristics of loan applicants in many cases substantially reduces the examiners' ability to perform tests for possible discrimination.[4] Adoption of the proposed rules would therefore enhance consumer potection by facilitating more effective enforcement.

The extent to which the proposed rule would enhance consumer protection is uncertain. For example, the FDIC, OCC and FHLBB have cited a very small number of creditors for discrimination on the basis of race or national origin even though these agencies have access to written applications and monitoring data. The inability to detect ECOA violations may reflect widespread creditor compliance with ECOA provisions. To some extent the low number of violations may indicate that discrimination is effectively deterred by creditors' knowledge that examiners have access to written applications and monitoring data. Under these circumstances, the number of cases of actual discrimination detected by examiners would likely be small. To the extent the deterrent effect is important, adoption of the proposed rule would enhance consumer protection.

A further benefit of the proposed rule changes would be greater uniformity among the regulatory agencies. As a consequence, companies subject to monitoring requirements of more than one regulatory agency would benefit to the extent they would be able to use uniform application forms and employee training procedures for all banks in their company.

Since most creditors are currently covered by rules that require written housing-related loan applications and the collection of monitoring data, the proposed rule changes are unlikely to impose significant costs on covered institutions. The creditors most likely to

be affected by the proposed rule changes are banks supervised by the Federal Reserve System and credit unions. According to information available to the Board, most state member banks currently use written applications for housing-related loans. It is estimated that about 10 percent of the FRS supervised banks do not take written applications on such loans; most of these are small banks. Mortgage and home improvement loan application forms available from the Federal Home Loan Mortgage Corporation or from the Federal National Mortgage Association cost about 20 cents per form.[5] Using data collected pursuant to the Home Mortgage Disclosure Act, it is estimated that state member banks received about 80,000 mortgage and home improvement loan applications in 1983. Therefore, the estimated total cost of forms for written applications for these types of loans for all member banks is approximately $16,000 a year. The actual cost to obtain forms because of the proposed rule would be less to the extent member banks already take written applications.[6]

The proposal to require collection of monitoring data also imposes costs on creditors. Costs include employee training expenses and costs to modify existing written application forms if the monitoring data is to be included on the loan application form, or costs to print and store for record retention a separate form with the required monitoring data.

A final cost associated with a requirement to collect monitoring data involves the loss of personal privacy some loan applicants may feel if creditors note their personal characteristics even though they choose not to voluntarily supply such information. Such costs are difficult to quantify. However, information available to the Board indicates that in 1980 at least 10 percent of the applicants for housing-related loans at state member banks refused to voluntarily provide monitoring data when asked to do so. Presumably, these individuals are the most likely to be offended by the proposed rule change.

## Incomplete Applications

The current rule requires that adverse action notification be given when

reasonable efforts by creditors to obtain missing information regarding an application fail to elicit a response from the applicant. Under the proposal, creditors would not be required to provide adverse action notification if the applicant does not supply the information needed to complete the application within a reasonable period. As a consequence, creditors would need to provide one less notice in these circumstances, reduced since applicants who do not respond in a reasonable time period to a creditor's request for additional information probably are no longer interested in the loan from that creditor, or expect to be denied credit based on the lender's evaluation of that additional information.

## Record Retention of Withdrawn Applications

Under the current rule, there are no record retention requirements with respect to applications expressly withdrawn by the applicant. As a result, consumer compliance examiners are unable to determine whether some creditors are misclassifying denied applications as withdrawn. The absence of records on withdrawn applications hampers an examiner's investigation of an unusually low application denial rate which the creditor claims reflects a high rate of withdrawn applications. Therefore, the proposal to require record retention of applications withdrawn by the applicant may increase the effectiveness of enforcement.

If the proposal were adopted, most creditors would incur costs to expand record storage space for applications expressly withdrawn by the applicant. The cost per record of additional storage space will vary among creditors depending on record storage technology (mechanical versus electronic) and current storage capacity utilization. If examiners are correct in their belief that in general there are few nonbusiness applications expressly withdrawn by applicants relative to denials, then compliance costs of the proposal would be small for most creditors. Business applications expressly withdrawn would not have to be retained under the proposal because of the business credit provisions in section 202.3.

## Small Entities

Recent research on compliance costs for consumer protection regulations suggests that the smallest commercial banks have incurred the greatest compliance costs per account (see appendix A). Similarly, the potential compliance costs associated with some of the proposed revisions to the

[4] Survey results indicate that in 1980 about 25 percent of applications for housing-related loans from banks examined by the Federal Reserve did not contain monitoring data.

[5] The proposed regulation would not require creditors to use these specific application forms; however, use of these forms would satisfy the requirement to use written application forms.

[6] Available evidence indicates that many small banks do not currently use written applications. Consequently, the proposed rule requiring creditors to take written applications will have a disproportionate (although small) effect on smaller creditors.

regulation would tend to fall disproportionately on the smallest banks. In particular, the proposed requirement that creditors take written applications for dwelling-related credit would create additional costs for creditors who currently do not do so. According to the Board's consumer compliance examiners, about 10 percent of the FRS supervised banks would need to start using written application procedures, and most of these banks are relatively small. Although this proposal rule will have a somewhat harsher effect on small banks, the marginal costs of this new requirement are not likely to be large for any creditor.

Overall, the proposed revisions to Regulation B are unlikely to have a significant impact on small creditors' compliance costs.

## A Summary of an FRB Study of Economies of Scale in the Cost of Complying With the TILA and ECOA (Appendix A)

This appendix summarizes the implications for the Regulation B review of a recent study of economies of scale in the cost of complying with the Truth in Lending and Equal Credit Opportunity law.[7]

The data for the study are from a 1981 survey of financial institutions conducted by the Federal Reserve Board to determine compliance costs associated with selected consumer protection laws. Compliance costs in the survey are reported for eight functional areas of banks' operations: (1) Administration; (2) labor; (3) training of officers and nonofficers; (4) legal services; (5) printing or notices; (6) postage; (7) premises, furniture, supplies, and equipment; and (8) other costs.[8] Compliance costs were not estimated for the specific Regulation B provisions under review. Nonetheless, by considering the impact of specific provisions on activities in these functional areas, some general conclusions on the effect of the Regulation B proposals can be obtained.

The study examines economies of scale in compliance costs for Regulations Z and B combined. Only about one-third of the respondents reported compliance costs for Regulations Z and B separately.

Consequently, the number of cases was too small to permit statistical analysis of each regulation separately. The major finding of the study is that there are economies of scale in compliance costs for these regulations for commercial banks at levels of output up to 375,000 consumer credit accounts, beyond which there are small diseconomies of scale. At the lowest output levels, there are large unexploited scale economies. This suggests that the regulations impose a competitive disadvantage on banks with small consumer credit portfolios. The implication for the Regulation B review is that there is a need to evaluate changes to regulatory requirements in terms of the relative burden on creditors with different consumer credit portfolio size.

The survey results indicate that labor and administration expenses account for about 50 to 70 percent of total compliance costs at all levels of output and that compliance costs increase about proportionately with wage rates, suggesting that compliance activities for Regulations Z and B are labor intensive. However, administrative costs account for smaller shares of compliance costs at moderate and higher output levels. This result suggests that scale economies may arise from a more efficient use of high cost administrative personnel at banks with larger consumer credit portfolios. The implication for the Regulation B review is that the disproportionate impact of the regulation can be reduced by designing requirements that can be performed routinely by nonadministrative personnel and that do not require a high level of supervision or monitoring.

Respondents to the survey were asked for their perception of the most costly regulatory requirement in Regulation B. They reported the most costly requirement in Regulation B to be adverse action notification. The implication for the Regulation B review is that compliance costs might be reduced if unnecessary adverse action notices could be eliminated or requirements modified to allow creditors to provide notices at lower cost.

## A Summary of FRB Studies of Consumer Perceptions of Discrimination and Effectiveness of the ECOA (Appendix B)

Since passage of the ECOA, a number of researchers have attempted to examine credit market conditions before passage of the antidiscrimination law. Unfortunately, their efforts have been hampered by a lack of adequate data.[9]

The unavailability of adequate data for testing for the existence of discrimination has led researchers to use survey data to study consumers' perceptions of discrimination. Perceptions of discriminatory treatment cannot be regarded as proof that discrimination exists or does not exist, but perceptions may reflect consumers' experience and provide some information on the extent of any problems.

In 1981–82, the Federal Reserve Board sponsored survey questions to update and expand on information on perceptions of discrimination from the 1977 Consumer Credit Survey. First, respondents were asked to identify variables that they thought were important to creditors in deciding to grant credit. Applicants' credit and financial characteristics were mentioned most frequently as important variables in both 1981–82 and 1977, while personal characteristics such as age, race, sex, and marital status were mentioned relatively infrequently (less than 10 percent of mentions). Although respondents belonging to ECOA-protected groups were more likely than nonprotected respondents to believe that personal characteristics were important to creditors, most ECOA-protected respondents did not believe that personal characteristics were very important to creditors in deciding whether to grant credit. In both surveys, ECOA-protected respondents generally believed that credit would be more difficult to obtain than other groups of consumers. However, ECOA-protected groups were less likely to believe credit would be difficult to obtain in 1981 than in 1977.

A second series of questions asked respondents about credit turndowns and limitations. Responses to the 1981–82 and 1977 surveys are virtually identical. Only a few respondents reported that personal characteristics were given as reasons for credit turndowns and

---

[7] G. Elliehausen and R. Kurtz, "Economies of Scale in the Cost of Complying with the Truth in Lending and Equal Credit Opportunity Laws," Working Paper, Board of Governors of the Federal Reserve System, March 1984.

[8] The survey does not attempt to measure opportunity costs such as changes on loan losses due to information restrictions in credit evaluations or signature restrictions that affect contractual liability or availability of collateral.

[9] The following statistical studies provide information on discrimination in consumer credit

---

markets: J. Marshall, "Discrimination in Consumer Credit," in A.A. Heggestad and J.J. Mingo, eds., The Costs and Benefits of Public Regulation of Consumer Financial Services (Abt Associates 1979); R.L. Peterson, "An Investigation of Sex Discrimination in Commercial Banks' Direct Consumer Lending," Bell Journal of Economics, vol. 12 (Autumn 1981), pp. 547–561; R.B. Avery, "Discrimination in Consumer Credit Markets," Research Papers in Banking and Financial Economics (Board of Governors of the Federal Reserve System, Division of Research and Statistics, Financial Studies Section, 1982); and W.K. Brandt and R.P. Shay, "Consumer Perceptions of Discriminatory Treatment and Credit Availability and Access to Consumer Credit Markets," in Federal Reserve Bank of Boston, The Regulations of Financial Institutions, Conference Series No. 21, 1979.

limitations. When asked directly whether their age, race, nationality, sex, or marital status may have been a factor, over three-fourths of the respondents who were turned down or limited indicated that they did not believe that these characteristics were factors in the creditors' decision.

In order to obtain information about possible creditor screening, respondents to the 1981–82 surveys were asked whether they thought about using credit but did not apply because they expected that they might be turned down. About 10 percent of respondents reported that they thought about applying for credit. In most cases, the reasons respondents thought they would be turned down were related to their credit history or financial characteristics. Personal characteristics were seldom involved. In about a quarter of the cases, respondents indicated that the creditor suggested that a turndown might occur.

Respondent to the 1981–82 surveys were also asked about the usefulness of disclosure of reasons for adverse action. Although approximately half of the respondents who had been turned down or limited reported that they had thought a turndown or limitation might happen, for the reasons given, nearly three-fourths of those who had been turned down or limited indicated that knowledge of the reasons for adverse action had been useful to them. Respondents indicated that the reasons given were helpful because they wanted to know why they were turned down and to understand the credit granting process. But respondents also reported that the reasons given were often not specific enough or did not tell them anything they did not know already.

Respondents were also asked about the usefulness of the written disclosure statement. Receipt of a written statement apparently was not as important to consumers as knowledge of reasons for adverse action. Respondents who reported that they did not receive a written statement were just as likely as those who received written statements to say that knowledge of reasons for adverse action would be useful. However, about half of those receiving a written statement indicated that the written statement was not useful, and a third reported that verbal information was just as good as a written statement.

(4) *Discussion of proposed official staff commentary.* The Board is publishing a proposed commentary on the regulation. The final commentary will be issued as an official staff interpretation providing creditors with protection under section 706(e) of the Equal Credit Opportunity Act. Under that section, creditors acting in conformity with an official staff interpretation are protected from liability for violations arising from those actions.

The commentary format follows that already used for other Board regulations such as Regulation Z (Truth in Lending), and Regulation M (Consumer Leasing). The commentary will replace all existing staff interpretations, both official and unofficial, and official Board interpretations, that have been issued in response to individual inquiries or fact situations. Thus the commentary will replace six existing Board interpretations, thirteen official staff interpretations, and fifteen informal staff letters. The commentary will be the sole vehicle for interpreting the regulation.

As is the case with other staff commentaries, this commentary will give more general guidance, rather than the specific guidance given in letters. It is designed, however, to assist creditors in applying the regulation to specific fact situations. Further, the commentary uses material of general application to be useful to the widest possible audience.

Following the format used in the commentary to Regulation Z, each paragraph in the commentary is identified by the relevant section, and in some cases by subsection, of the regulation. For example, commentary to § 202.4 is labeled 4–1 while commentary to § 202.7 is further broken down and designated according to the particular subsection addressed, such as comments 7(c)–1 and 7(d)(2)–1. Unlike the commentary to Regulation Z, the commentary to Regulation .

The Board has previously determined that several state laws are not preempted by the ECOA and Regulation B. These nonpreemption determinations relate to laws that deal with the age of majority, notices to unmarried cosigners, and Spanish language translations of credit documents. Following the rule in Regulation Z, the Board proposes to include in the commentary only those determinations that result in the preemption of a state law or regulation. Consequently, the nonpreemption determinations are being omitted from the proposed staff commentary.

Three other Board interpretations—202.601, 202.801, and 202.901—have been integrated into the proposed staff commentary.

Official staff interpretation EC-0009 has been incorporated into the text of section 202.3(d) of the regulation, which now makes clear that a creditor that denies a business credit application must give the applicant notice of that denial within a reasonable time.

Certain official staff interpretations have been omitted for various reasons. Interpretation EC-0001, which addressed the requirements for sending credit history notices by June 1977, is obsolete. Interpretation EC-0004 is being omitted because the subject matter—the application of state laws governing graduated rates, maximum loan ceilings, and rate splitting—does not appear to warrant the amount of detailed treatment provided in that letter.

Others have been omitted because they appear to have limited applicability: EC-0011, which concluded that Regulation B generally does not apply to a lending operation carried on by a foreign corporation making loans solely outside the United States; and EC-0010, which dealt with the permissibility of inquiries about a potential customer's religion by a seller of religious books.

Interpretations that approved certain creditor forms—EC-0012 and EC-0015—are being incorporated into the commentary to Appendix B, which will become the vehicle for approving credit application forms used or distributed by federal or state agencies or federally chartered operations. EC-0013 related to a form no longer in use, and is omitted.

The answers provided in the other official staff interpretations have served as the basis for the sections of the proposed staff commentary to which they relate. Material from some of the 15 staff opinion letters originally published as public information letters also has been used.

Comment is welcomed on the substance of the material contained in the proposed commentary and on any material which creditors believe should also be included. Commenters are encouraged to focus on material of particular interest to them, and need not address every provision.

**List of Subjects in 12 CFR Part 202**

Banks, Banking, Civil rights, Consumer protection, Credit, Federal Reserve System, Marital status discrimination, Minority groups, Penalties, Religious discrimination, Sex discrimination, Women.

(5) *Regulatory text.* Certain conventions have been used to highlight the proposed revisions (except in sections that have been revised in their entirety). New language is shown inside bold-faced arrows, while language that would be deleted is set off with brackets.

## PART 202—[AMENDED]

Pursuant to the authority granted under section 703 of the Equal Credit Opportunity Act (15 U.S.C. 1691b), the Board proposes to amend 12 CFR Part 202 as follows:

1. 12 CFR Part 202 would be amended by removing the word "Part" every place it appears and inserting in its place the word "regulation"; by removing the word "subsection" every place it appears and inserting in its place the word "paragraph"; and by removing footnotes 1, 2, 3, 5, 6, and 8 through 19 and redesignating footnotes 4 and 7 as footnotes 1 and 2, respectively.

2. Section 202.1 would be revised to reads as follows:

► **§ 202.1 Authority, scope and purpose.**

(a) *Authority and scope.* This regulation is issued by the Board of Governors of the Federal Reserve System pursuant to Title VII (Equal Credit Opportunity Act) of the Consumer Credit Protection Act, as amended (15 U.S.C. 1601 *et seq.*). Except as otherwise provided herein, it applies to all persons who are creditors, as defined in § 202.2(l). Information-collection requirements contained in this regulation have been approved by the Office of Management and Budget under the provisions of 44 U.S.C. 3501 *et seq.* and have been assigned OMB No. 7100-0192.

(b) *Purpose.* The purpose of this regulation is to require creditors to make credit equally available to all creditworthy customers without regard to race, color, religion, national origin, sex, marital status, or age (provided the applicant has the capacity to contract); the fact that all or part of the applicant's income derives from any public assistance program; or the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The regulation prohibits certain creditor practices that would discriminate on the basis of one of these factors. The regulation also requires creditors to notify applicants of action taken on their applications, to report credit history in the names of both spouses on an account, and to retain records of credit applications. To assist enforcement efforts, the regulation requires creditors to collect monitoring information for certain loans in which the creditor takes a security interest in the applicant's principal dwelling.◄

3. Section 202.2 would be amended by revising the title and paragraphs (e), (f), and (p); removing existing paragraphs (aa), (cc), and (dd); and redesignating paragraph (bb) as paragraph (aa), to read as follows:

## § 202.2 Definitions [and rules of construciton].

\*   \*   \*   \*   \*

(e) *Applicant* means any person who requests or who has received an extension of credit from a creditor, and includes any person who is or may [be] ►become◄ contractually liable regarding an extension of credit [other than a guarantor, surety, endorser, or similar party]. ►The term includes guarantors, sureties, endorsers and similar parties.◄

(f) *Application* means an oral or written request for an extension of credit that is made in accordance with procedures established by a creditor for the type of credit requested. The term does not include the use of an account or line of credit to obtain an amount of credit that does not exceed a previously established credit limit. *A completed application for credit* means an application in connection with which a creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested (including, but not limited to, credit reports, any additional information requested from the applicant, and any approvals or reports by governmental agencies or other persons that are necessary to guarantee, insure, or provide security for the credit or collateral)►.◄[; provided, however, that the creditor has exercised] ►The creditor shall exercise◄ reasonable diligence in obtaining such information. [Where an application is incomplete respecting matters that the applicant can complete, a creditor shall make a reasonable effort to notify the applicant of the incompleteness and shall allow the applicant a reasonable opportunity to complete the application.]

\*   \*   \*   \*   \*

(p) *Empirically derived* ►*and other◄credit system*►*s*◄. (1) [The term means a] ►A◄ *credit scoring system* ►is any system◄ that evaluates an applicant's creditworthiness [primarily by allocating points (or by using a comparable basis for assigning weights) to] ►mechanically, based on◄ key attributes describing the applicant and other aspects of the transaction[. In such a system, the points (or weights) assigned to each attribute, and hence the entire score:

(i) Are derived from an empirical comparison of sample groups or the population of creditworthy and noncreditworthy applicants of a creditor who applied for credit within a reasonable preceding period of time; and

(ii) Determine]►, and that determines◄, alone or in conjunction with an evaluation of additional information about the applicant, whether an applicant is deemed creditworthy.

(2) A►*n empirically derived,*◄ *demonstrably and statistically sound* [, *empirically derived*] *credit system* is a system:

(i) ◄In which the data are derived from an empirical comparison of sample groups or the population of credit worthy and noncreditworthy applicants of a creditor who applied for credit within a reasonable preceding period of time; and► [in which the data used to develop the system, if not the complete population consisting of all applicants, are obtained from the applicant file by using appropriate sampling principles;]

(ii) Which is developed for the purpose of [predicting] ◄evaluating► the creditworthiness of applicants with respect to the legitimate business interests of the creditor utilizing the system, including, but not limited to, minimizing bad debt losses and operating expenses in accordance with the creditor's business judgment;

(iii) Which [, upon validation using appropriate statistical principles, separates creditworthy and non-creditworthy applicants at a statistically significant rate;] ◄is developed using acceptable statistical principles and methodology;► and

(iv) Which is periodically revalidated as to its predictive ability by the use of appropriate statistical principles ◄and methodology► and is adjusted as necessary to maintain its predictive ability.

(3) A creditor may use [a] ◄an empirically derived,► demonstrably and statistically sound [, empirically derived] credit system obtained from another person or may obtain credit experience from which such a system may be developed. Any such system must satisfy the tests set forth in [subsection (1) and] ◄paragraph (p)► (2); provided that, if a creditor is unable during the development process to validate the system based on its own credit experience [in accordance with subsection (2)(iii), then] ►the system must be validated when sufficient credit experience becomes available. A system that fails this validity test shall [henceforth be deemed not to be a] ◄no longer be an empirically derived,► demonstrably and statistically sound [, empirically derived] credit system for that creditor.

\*   \*   \*   \*   \*

[(aa) *Public assistance program* means any Federal, State, or local

governmental assistance program that provides a continuing, periodic income supplement, whether premised on entitlement or need. The term includes, but is not limited to, Aid to Families with Dependent Children, food stamps, rent and mortgage supplement or assistance programs, Social Security and Supplemental Security Income, and unemployment compensation.⟧

⟦(bb)⟧ ◄(aa)► *State* means any state, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

⟦(cc) Captions and catchlines are intended solely as aids to convenient reference, and no inference as to the substance of any provision of this Part may be drawn from them.

(dd) Footnotes shall have the same legal effect as the text of the regulation, whether they are explanatory or illustrative in nature.⟧

4. Section 202.3 is amended as follows"

A. Paragraph (a) introductory test, (a)(1) and (a)(2) would be removed, new (a)(2) introductory text would be added,

B. Paragraph (b) introductory text would be revised and redesignated as paragraph (a)(1), paragraph (b) (1), (2) and (3) would be redesignated as paragraphs (a)(2) (i), (ii) and (iii), new paragraph (b)(2) introductory text would be added,

C. Paragraph (c) introductory text would be revised and redesignated as paragraph (b)(1), paragraph (c)(1)–(8) would be redesignated as (b)(2)(i)–(viii), new paragraph (c)(2) introductory text would be added,

D. Paragraph (d) introductory text would be revised and redesignated as paragraph (c)(1), paragraph (d)(1)–(8) would be redesignated as paragraph (c)(2)(i)–(viii),

E. New paragraph (d) would be added, paragraph (e) would be revised and paragraph (f) would be removed.

### § 202.3  Limited exceptions for certain classes of transactions.

(a) *Public utilities credit.*—(1) *Definition.* For purposes of this section, public utilities credit refers to extensions of credit that involve public utility services provided through pipe, wire, or other connected facilities, or radio or similar transmission (including extentions of such facilities), if the charges for service, delayed payment, and any discount for prompt payment are filed with or regulated by any government unit.

(2) *Exceptions.* The following provisions of this regulation shall not apply to public utilities credit:◄ * * *

►(b) *Securities credit.*—(1) *Definition.* For purposes of this section, securities credit refers to extensions of credit subject to regulation under section 7 of the Securities Exchange Act of 1934 or extensions of credit by a broker or dealer subject to regulation as a broker or dealer under the Securities Exchange Act of 1934.

(2) *Exceptions.* The following provisions of this regulation shall not apply to securities credit:◄ * * *

►(c) *Incidental Credit.*—(1) *Definition.* For purposes of this section, incidental credit refers to extensions of consumer credit, other than of the types described in paragraphs (a) and (b) of this section:

(i) That are not made pursuant to the terms of a credit card account;

(ii) On which no finance charge as defined in § 226.4 of this Title (Regulation Z, 12 CFR 226.4) is or may be imposed; and

(iii) That are not payable by agreement in more than four installments.

(2) *Exceptions.* The following provisions of this regulation shall not apply to incidental credit:◄ * * *

►(d) *Business credit.*—(1) *Definition.* For purposes of this section, business credit refers to extensions of credit primarily for business or commercial purposes, including extensions of credit primarily for agricultural purposes, but excluding extensions of credit of the types described in paragraph (a) and (b).

(2) *Exceptions.* The following provisions of this regulation shall not apply to business credit:

(i) Section 202.5(d)(1) concerning information about marital status; and

(ii) Section 202.10 relating to furnishing of credit information.

(3) *Modified requirements.* The following provisions of this regulation apply to business credit as specified below:

(i) Section 202.9 (a) and (b) relating to notifications: the creditor shall notify the applicant, orally or in writing, when credit is denied or when other adverse actions have been taken; the creditor need provide a written statement of the reasons and the ECOA notice specified in section 202.9(b) only if the applicant makes a written request for the reasons within 30 days of that notification;

(ii) Section 202.12(b) relating to record retention: the creditor shall retain records as provided in § 202.12(b) if the applicant, within 90 days after notification that adverse action has been taken, requests in writing that records be retained.

(e) *Governmental credit.*—(1) *Definition.* For purposes of this section, governmental credit refers to extensions

of credit made to governments or governmental subdivisions, agencies, or instrumentalities.

(2) *Applicability of regulation.* Except for § 202.4, the general rule prohibiting discrimination on a prohibited basis, the requirements of this regulation do not apply to governmental credit.◄

* * * * *.

5. Section 202.5 would be amended by revising paragraphs (b)(2), (b)(3), (d)(2), and (e); revising footnote 1 to paragraph (b)(1); revising the headings for the section and for paragraphs (b), (d), and (e); and adding headings to paragraphs (b)(2),(b)(3),(c)(2),(c)(3), and (d)(1) through (d)(5), to read as follows:

### § 202.5  Rules concerning ►taking of◄ applications.

(b) ⟦*General rules*⟧ Rules concerning requests for information. (1) Except as otherwise provided in this section, a creditor may request any information in connection with an application.[1]

(2) ►*Exception for required collection of information.◄* Notwithstanding ⟦any other provision of ⟧ ►the limitations imposed by◄ this section, a creditor shall request ►information about◄ an applicant's race/national origin, sex, and marital status ►for monitoring purposes◄ as required in § 202.13 ⟦(information for monitoring purposes)⟧ ►for credit related to certain loans secured by the applicant's dwelling◄. In addition, a creditor may obtain such information as may be required by a regulation, order, or agreement issued by, or entered into with, a court or an enforcement agency (including the ►U.S.◄ Attorney General or a similar state official) to monitor or enforce compliance with the act, this regulation, or other federal or state statute or regulation.

(3) ⟦The provisions of this section limiting permissible information requests, are subject to the provisions of § 202.7(e) regarding insurance and § 202.8 (c) and (d) regarding special purpose credit programs.⟧ ►*Exception for special purpose credit.* A creditor may also obtain information that is otherwise restricted to determine eligibility for a special purpose credit program, as provided in § 202.8.◄

(c) *Information about a spouse or former spouse.* * * *

(2) ►*Permissible inquiries.* ◄ * * *

----

[1] This ⟦subsection is not intended to⟧ ►does not◄ limit or abrogate any federal or state law regarding privacy, privileged information, credit reporting limitations, or similar restrictions on obtainable information. ⟦Furthermore, permission to request information should not be confused with how it may be utilized, which is governed by §202.6 (rules concerning evaluation of applications).⟧

(3) ►*Other accounts of the applicant.*◄ * * *

(d) [*Information a creditor may not request.*] ►*Other limitations on information requests.*◄— (1)►*Marital status.*◄ * * *

(2) ►*Disclosure about income from alimony, child support, separate maintenance.*◄ A creditor shall not inquire whether any income stated in an application is derived from alimony, child support, or separate maintenance payments, unless the creditor appropriately discloses to the applicant that such income need not be revealed if the applicant does not desire the creditor to consider such income in determining the applicant's creditworthiness. Since a general inquiry about income, without further specification, may lead an applicant to list alimony, child support, or separate maintenance payments, a creditor shall provide an appropriate notice to an applicant before [inquiring] ►making such an inquiry◄ about the source of an applicant's income[.]►.◄ [unless the terms of the inquiry (such as an inquiry about salary, wages, investment income, or similarly specified income) tend to preclude the unintentional disclosure of alimony, child support, or separate maintenance payment.]

(3) ►*Sex.*◄ * * *

(4) ►*Childbering, childrearing.*◄ * * *

(5) ►*Race, color, religion, national origin.*◄ * * *

(e) [*Application forms.*] ►*Written applications.* A creditor shall take written applications for the types of credit covered by section 202.13(a).◄ A creditor need not [use] ►take◄ written applications ►for other types of credit◄. If a creditor [chooses to use] ►uses◄ [written] ►application◄ forms, it may design its own ►forms◄, use forms prepared by another person, or use the appropriate model application forms contained in Appendix B. [If a creditor chooses to use an Appnedix B form, it may change the form:

(1) By asking for additional information not prohibited by this section;

(2) By deleting any information request; or

(3) By rearranging the format without modifying the substance of the inquiries; provided that in each of these three instances the appropriate notices regarding the optional nature of courtesy titles, the option to disclose alimony, child support, or separate maintenance, and the limitation concerning marital status inquiries are included in the appropriate places if the items to which they relate appear on the creditor's form. If a creditor uses an appropriate

Appendix B model form or to the extent that it modifies such a form in accordance with the provisions of clauses (2) or (3) of the preceding sentence or the instructions to Appendix B, that creditor shall be deemed to be acting in compliance with the provisions of subsections (c) and (d)].

6. Section 202.6 would be amended by revising paragraph (b)(5); revising footnote 2 to paragraph (a); and adding headings to paragraphs (b)(2) through (b)(7), to read as follows:

**§ 202.6  Rules concerning evaluation of applications.**

(a) *General rule concerning use of information.* * * * [2]

(b) *Specific rules concerning use of information.* * * *

(2) ►*Age, receipt of public assistance.*◄ * * *

(3) ►*Childbearing, childrearing.*◄ * * *

(4) ►*Telephone listing.*◄ * * *

(5) ►*Income.*◄ * * * [Factors that a creditor may consider in determining the likelihood of consistent payments include, but are not limited to, whether the payments are received pursuant to a written agreement or court decree; the length of time that the payments have been received; the regularity of receipt; the availability of procedures to compel payment; and the creditworthiness of the payor, including the credit history of the payor where available to the creditor under the Fair Credit Reporting Act or other applicable laws.]

(6) ►*Credit history.*◄ * * *

(7) ►*Immigration status.*◄ * * *

* * * * *

7. Section 202.7 would be amended by revising paragraphs (c)(2), (d)(2), (d)(5), and (e); adding a new paragraph (d)(6); and adding headings to paragraphs (c)(1), (d)(1), (d)(3), and (d)(4) to read as follows:

**§ 202.7  Rules concerning extensions of credit.**

* * * * *

(c) *Action concerning existing open end accounts.*

(1) ►*Limitations.*◄ * * *

(2) ►*Requiring reapplication.*◄ A creditor may require a reapplication regarding an open end account on the basis of a change in [an applicant's] ►the◄ marital status [where] ►of an

applicant who is contractually liable if◄ the credit granted was based ►in whole or in part◄ on income [earned by] ►of◄ the applicant's spouse ►and◄ if ►information available to the creditor indicates that◄ the applicant's income [alone at the time of the original application would] ►may◄ not support the [amount of] ►current◄ credit [currently extended.] ►limit.◄

(d) *Signature of spouse or other person.*—(1) ►*Rule for qualified applicant.*◄ * * *

(2) ►*Unsecured credit.*◄ If an applicant requests unsecured credit and relies in part upon property [to establish creditworthiness, a creditor may consider state law; the form of ownership of the property; its susceptibility to attachment, execution, severance, and partition; and other factors that may affect the value to the creditor of the applicant's interest in the property. If necessary] ►that the applicant owns jointly with another person◄ to satisfy the creditor's standards of creditworthiness, the creditor may require the signature of the [applicant's spouse or] other person ►only◄ on [any instrument] ►the instrument(s)◄ [necessary, or reasonably believed by the creditor to be necessary, under applicable State law to make the property relied upon available to satisfy the debt in the event of default.] ►that, under the law of the state in which the property is located, would enable the creditor to reach the property being relied upon in the event of the death or default of the applicant.◄

(3) ►*Unsecured credit—community property state.*◄ * * *

(4) ►*Secured credit.*◄ * * *

(5) ►*Guarantors, co-signers.*◄ * * * [For the purposes of subsection (d), a creditor shall not impose requirements upon an additional party that the creditor may not impose upon an applicant.]

►(6) *Rights of guarantors, co-signers.* For the purposes of this paragraph, a creditor shall not impose requirements upon a guarantor, co-signer, or similiar additional party that the creditor is prohibited from imposing upon an applicant.◄

(e) *Insurance.* ►Differentiation in the availability, rates, and terms on which credit-related casualty insurance or credit life, health, accident, or disability insurance is offered or provided to an applicant shall not constitute a violation of the Act of this Part; but a ] ►A◄ creditor shall not refuse to extend credit and shall not terminate an account because credit life, health, accident, [or] disability ►,◄ or other credit-

---

[2] The legislative history of the act indicates that the Congress intended an "effects test" concept, as outlined in the employment field by the Supreme Court in the cases of *Griggs* v. *Duke Power Co.,* 401 U.S. 424 (1971), and *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness. [See Senate Report to accompany H.R. 6516, No. 94–589, pp. 4–5; House Report to accompany H.R. 6516, No. 94–210, p. 5.]

related◄ insurance is not available on the basis of the applicant's age. [Notwithstanding any other provision of this Part, information about the age, sex, or marital status of an applicant may be requested in an application for insurance.]

8. Section 202.8 would be amended by revising paragraphs (a) introductory, text (b), and (c), to read as follows:

**§ 202.8  Special Purpose Credit Programs.**

(a) *Standards for programs.* Subject to the provisions of paragraph (b), the act and this [part are not violated if] ►regulation permit◄ a creditor [refuses] to extend ►special purpose◄ credit to [an] applicant ►s◄ [solely because the applicant does not qualify under the program] ►who meet eligiblity◄ requirements [that define eligibility for ] ►under◄ the following types of [special purpose] credit programs: • • •

(b) [*Applicability of other rules.*] ►*Rules in other sections.*◄ (1) ►*General applicability.*◄ All of the provisions of this regulation shall apply to each of the special purpose credit programs described in paragraph (a) [to the extent that those provisions are not inconsistent with] ►except as modified by◄ the provisions of this section.

(2) ►Common characteristics.◄ A program described in paragraphs (a)(2) or (a)(3) shall qualify as a special purpose credit program [under subsection (a)] only if it was established and is administered so as not to discriminate against an applicant on [the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract), income derived from a public assistance program, or good faith exercise of any right under the Consumer Credit Protection Act or any state law upon which an exemption has been granted therefrom by the Board; except that] ►any prohibited basis; however,◄ all program participants may be required to share one or more [of those] ►common◄ characteristics ►(for example, race, national origin, or sex)◄ so long as the program was not established and is not administered with the purpose of evading the requirements of the act or this regulation.

(c) *Special rule concerning requests and use of information.* If all participants in special purpose credit program described in paragraph (a) are or will be required to possess one or more common characteristics [relating to race, color, religion, national origin, sex, marital status, age, or receipt of income from a public assistance program] ►(for example, race, national

origin, or sex)◄ and if the [special purpose credit] program otherwise satisfies the requirements of paragraph (a), then, notwithstanding the prohibitions of §§ 202.5 and 202.6, the creditor may request of an applicant and may consider, in determining eligibility for such program, information regarding the common characteristic(s). [required for eligibility. In such circumstances, the solicitation and consideration of that information shall not constitute unlawful discrimination for the purposes of the Act or this Part.]

*    *    *    *    *

9. Section 202.9 is amended as follows:

A. Paragraphs (a)(1) and (a)(2) are revised,

B. Paragraph (b)(1) introductory text, the flush paragraph at the end of (b)(1) and (b)(2) are revised. (The sample ECOA notice which follows (b)(1) remains unchanged.)

C. Paragraphs (b)(3), (d) and (f) are removed,

D. Paragraph (c) is redesignated as new paragraph (d), and the heading for newly designated paragraph (d) is revised, a new paragraph (c) is added,

E. Paragraph (e) is redesignated as paragraph (g),

F. Paragraph (a)(3) is redesignated as new paragraph (e), and (a)(4) would be revised and redesignated as new paragraph (f).

The amended and revised portions of § 202.9 read as follows:

**§ 202.9  Notifications.**

(a) *Notification of action taken, ECOA notice, and statement of specific reasons.*

(1) *Notification of action taken.* A creditor shall notify an applicant of action taken within:

(i) 30 days after receiving a completed application concerning the creditor's approval [of, or adverse action regarding,] ►or denial of◄ the application [(notification of approval may be express or by implication, where, for example, the applicant receives a credit card, money, property, or services in accordance with the application)];

(ii) 30 days after [taking adverse action on] ►denying◄ an [uncompleted] application ►that is incomplete, unless notice is provided in accordance with § 202.9(c)(2)◄;

(iii) 30 days after [taking adverse action regarding] ►terminating or changing adversely the terms of◄ an existing account; [and] ►or◄

(iv) 90 days after [the creditor has notified] ►notifying◄ the applicant of an offer to grant credit other than in substantially the amount or on substantially the terms requested by the

applicant if the applicant during those 90 days has not expressly, accepted or used the credit offered.

(2) *Content of notification.* ►when credit is denied or terminated◄. Any notification given to an applicant [against whom] ►when credit is denied or when other◄ adverse action is taken shall be in writing and shall contain: a statement of the action taken; a statement of the provisions of section 701(a) of the act; the name and address of the federal agency that administers compliance concerning the creditor giving the notification; and

(i) A statement of specific reasons for the action taken; or

(ii) A disclosure of the applicant's right to a statement of reasons within 30 days [after receipt by the creditor of a request made] ►, if it is requested◄ within 60 days of [such] ►the creditor's◄ notification; the disclosure [to] ►shall◄ include the name, address, and telephone number of the person or office from which the statement of reasons can be obtained. If the creditor chooses to provide the [statement of] reasons orally, the [notification shall also include a disclosure of] ►creditor shall also disclose◄ the applicant's right to [have any oral statement of reasons] ►having them◄ confirmed in writing within 30 days [after a written] ►of the applicant's◄ request [for confirmation is received by the creditor].

(b) *Form of ECOA notice and statement of specific reasons.*—(1) *ECOA notice.* [A creditor satisfies] ►To satisfy◄ the requirements of paragraph (a)(2) regarding [a statement of] the provisions of section 701(a) of the act [and the name and address of the appropriate federal enforcement agency if it provides] ►, the creditor shall provide◄ the following notice or one that is substantially similar:

*    *    *    *    *

[The sample notice printed above may be modified immediately following the required references to the federal act and enforcement agency to include references to any similar state statute or regulation and to a state enforcement agency.]

(2) *Statement of specific reasons.* [A] ►The◄ statement of reasons for adverse action [shall] ►required by paragraph (a)(2)(i) must◄ be [sufficient if it is] specific and indicate[s] the principal reason(s) for the adverse action. [A creditor may formulate its own statement of reasons in checklist or letter form or may use all or a portion of the sample form printed below, which, if properly completed, satisfies the requirements of subsection (a)(2)(i).]

**10904**    **Federal Register** / Vol. 50, No. 52 / Monday, March 18, 1985 / Proposed Rules

Statements that the adverse action was based on the creditor's internal standards or policies or that the applicant failed to achieve the qualifying score on the creditor's credit scoring system are insufficient. ►A creditor may formulate its own statement of reasons in checklist or letter form; sample forms and clauses are provided in Appendix C.◄

〔(3) *Other information.* The notification required by section (a)(1) may include other information so long as it does not detract from the required content. This notification also may be combined with any disclosures required under other titles of the Consumer Credit Protection Act or any other law, provided that all requirements for clarity and placement are satisfied; and it may appear on either or both sides of the paper if there is a clear reference on the front to any information on the back.〕

►(c) *Incomplete applications.* (1) Within 30 days after receiving an application that is incomplete regarding matters that an applicant can complete, the creditor shall notify the applicant (unless the applicant has expressly withdrawn the application) either:

(i) Of action taken, in accordance with § 202.9[a]; or

(ii) Of the incompleteness, in accordance with paragraph (c)(2).

(2) A creditor shall send a written notice to the applicant (a sample of which is provided in Appendix C) stating that additional information is needed from the applicant and specifying the information that is needed; designating a reasonable period of time for the applicant to provide the information; and informing the applicant that the failure to provide the information requested will result in no further consideration being given to the application. The creditor shall have no further obligation under this section if the applicant fails to respond within the designated period of time. Should the applicant supply the requested information within the designated period of time, the creditor shall take action on the application in accordance with paragraph (a).

(3) At its option, a creditor may inform the applicant orally that additional information is needed, but if the application remains incomplete the creditor shall send a notice in accordance with paragraph (c)(1).◄

〔(d) *Withdrawn applications.* Where an applicant submits an application and the parties contemplate that the applicant will inquire about its status, if the creditor approves the application and the applicant has not inquired within 30 days after applying, then the creditor may treat the application as

withdrawn and need not comply with subsection (a)(1).〕

〔(c)〕 ►(d)◄ *Oral notifications* ►*by small-business creditors◄.* * * *

〔(a)(3)〕 ►(e)◄ *Multiple applicants.* * * *

〔(f) *Notification.* A creditor notifies an applicant when a writing addressed to the applicant is delivered or mailed to the applicant's last known address or, in the case of an oral notification, when the creditor communicates with the applicant.〕

〔(a)(4)〕 ►(f)◄ *Multiple creditors.* 〔If a transaction involves more than one creditor and the applicant expressly accepts or uses the credit offered, this section does not require notification of adverse action by any creditor. If a transaction involves more than one creditor and either no credit is offered or the applicant does not expressly accept or use any credit offered, then each creditor taking adverse action must comply with this section. The required notification may be provided indirectly through a third party, which may be one of the creditors, provided that the identity of each creditor taking adverse action is disclosed. Whenever the notification is to be provided through a third party, a creditor shall not be liable for any act or omission of the third party that constitutes a violation of this section if the creditor accurately and in a timely manner provided the third party with the information necessary for the notification and was maintaining procedures reasonably adapted to avoid any such violation.〕 ►When an application on behalf of the applicant is made to more than one creditor and the applicant expressly accepts or uses credit offered by one of the creditors, notification by any of the other creditors is not required. If no credit is offered or if the applicant does not expressly accept or use any credit offered, each creditor taking adverse action must comply with this section, directly or through a third party. In the case of notification by a third party, the identity of each creditor taking adverse action shall be disclosed.◄

〔(e)〕 ►(g)◄ *Failure of compliance.* * * *

10. Section 202.10 would be revised to read as follows:

## § 202.10  Furnishing of credit information.

►(a) *Designation of account.*—(1) *New account.* Upon establishing an account, a creditor that furnishes credit information shall designate the account to reflect the participation of both spouses if the applicant's spouse is permitted to use or is contractually liable on the account (other than as a

guarantor, surety, endorser, or similar party).

(2) *Existing account.* Within 90 days after receipt of a written request, a creditor shall designate an account to reflect the participation of both spouses.

(b) *Routine reports to consumer reporting agency.* If a creditor furnishes credit information to a consumer reporting agency concerning an account designated to reflect the participation of both spouses, the creditor shall furnish the information in a manner that will enable the agency to provide access to the information in the name of each spouse.

(c) *Reporting in response to request.* If a creditor furnishes credit information in response to an inquiry concerning an account designated to reflect the participation of both spouses, the creditor shall furnish the information in the name of the spouse about whom the information is requested.

(d) *Failure of compliance.* A failure to comply with this section shall not constitute a violation when caused by an inadvertent error; provided that, on discovering the error, the creditor corrects it as soon as possible and commences compliance with the requirements of this section.◄

11. Section 202.12 would be amended by revising paragraph (a) and (b)(1) introductory text and (b)(1)(i) (3) and (4), to read as follows:

## § 202.12  Record retention.

(a) *Retention of prohibited information.* Retention in a creditor's files of any information, the use of which in evaluating applications is prohibited by the act or this regulation, shall not constitute a violation 〔of the act or this part where〕 ►if◄ such information was obtained;

(1) From any source prior to March 23, 1977; or

(2) 〔At any time〕 from consumer reporting agencies 〔; or (3) at any time from〕 ►,◄ an applicant ►,◄ or others without the specific request of the creditor; or

〔(4)〕 ►(3)◄ 〔At any time〕 as required to monitor compliance with the act and this regulation or other federal or state statutes or regulations.

(b) *Preservation of records.*—(1) For 25 months after the date that a creditor notifies an applicant of action taken on an application ►(or of incompleteness, under § 202.9(c))◄, the creditor shall retain as to that application in original form or a copy thereof:

(i) Any application 〔form〕 that it receives, any information required to be obtained concerning characteristics of an applicant to monitor compliance with

·

000769

the act and this regulation or other similar law, and any other written or recorded information used in evaluating the application and not returned to the applicant at the applicant's request:

(ii) * * *

(iii) * * *

*          *          *          *          *

(3) In addition to the requirements of paragraphs (b)(1) and (2), [any] ►a◄ creditor [that] ►shall retain information as required by those paragraphs if it◄ has actual notice that it is under investigation or is subject to an enforcement proceeding for an alleged violation of the act or this regulation►, by the U.S. Attorney General or◄ by an enforcement agency charged with monitoring that creditor's compliance with the act and this regulation, or [that] ►if it◄ has been served with notice of an action filed pursuant to section 706 of the act and [§ 202.1(b) or (c)] ►§ 20.14◄ of this regulation[.], ►. The creditor◄ shall retain the information [required in subsection (b)(1) and (2)] until final disposition of the matter, unless an earlier time is allowed by order of the agency or court.

(4) [In any transaction involving more than one creditor any] ►When a◄ creditor ►receives an application but is◄ not required to comply with ►the notification requirements of◄ § 202.9►,◄ [(notifications)] ►the creditor◄ shall retain for [the time period specified in subsection (b)] ►25 months◄ all written or recorded information in its possession concerning the applicant, including [a] ►any◄ notation of action taken [in connection with any adverse action].

*          *          *          *          *

12. Section 202.13 would be revised, to read as follows:

§ 202.13  Information for monitoring purposes.

►(a) *Information to be requested.*— (1) Any creditor that receives an application for credit primarily for the purchase, refinancing, repair or improvement of a dwelling occupied or to be occupied by the applicant as a principal residence, where the extension of credit will be secured by the dwelling, shall request as part of any application for such credit the following information regarding the applicant(s):

(i) Race/national origin, using the categories American Indian or Alaskan Native; Asian or Pacific Islander; Black; White; Hispanic; Other (Specify);

(ii) Sex;

(iii) Marital status, using the categories married, unmarried, and separated; and

(iv) Age.

(2) "Dwelling" means a residential structure that contains one to four units, whether or not that structure is attached to real property. The term includes, but is not limited to, an individual condominium unit, cooperative unit and manufactured (mobile) home.

(b) *Obtaining of information.* Questions regarding race/national origin, sex, marital status, and age may be listed, at the creditor's option, on the application form or on a separate form that refers to the application. The applicant(s) shall be asked but not required to supply the requested information. If the applicant(s) chooses not to provide the information or any of it, that fact shall be noted on the form. The creditor must then also note on the form, to the extent possible, the race of national origin and sex of the applicant(s) on the basis of visual observation or surname.

(c) *Disclosure to applicant(s).* The creditor shall inform the applicant(s) in writing that the information regarding race/national origin, sex, marital status, and age is being requested by the federal government for the purpose of monitoring compliance with federal statutes that prohibit creditors from discriminating against applicants on those bases. The written disclosure shall also inform the applicant(s) that the creditor is required to note the race/national origin and sex of the applicant(s) on the basis of visual observation or surname if the applicant(s) chooses not to provide the information. Sample disclosures are contained in Appendix B.

(d) *Substitute monitoring program.* Any monitoring program required by an agency charged with administrative enforcement under section 704 of the act may be substituted for the requirements contained in paragraphs (a), (b), and (c).◄

13. Section 202.14 would be added, to read as follows:

§ 202.14  Enforcement, penalties and liabilities.

(a) *Administrative enforcement.* (1) As set forth more fully in section 704 of the act, administrative enforcement of the act and this regulation regarding certain creditors is assigned to the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Board of Directors of the Federal Deposit Insurance Corporation, Federal Home Loan Bank Board (acting directly or through the Federal Savings and Loan Insurance Corporation), National Credit Union Administration, Interstate Commerce Commission, Secretary of Agriculture, Farm Credit Administration, Securities and

Exchange Commission, Small Business Administration, and Secretary of Transportation.

(2) Except to the extent that administrative enforcement is specifically committed to other authorities, compliance with the requirements imposed under the act and this regulation will be enforced by the Federal Trade Commission.

(b) *Penalties and liabilities.* (1) Sections 706(a) and (b) and 702(g) of the act provide that any creditor who fails to comply with any requirement imposed under the act or this regulation is subject to civil liability for actual and punitive damages in individual or class actions. Liability for punitive damages is restricted to nongovernmental entities and is limited to $10,000 in individual actions and the lesser of $500,000 or 1 percent of the creditor's net worth in class actions. Section 706(c) provides for equitable and declaratory relief, and section 706(d) authorization for the awarding of costs and reasonable attorney's fees to an aggrieved applicant in a successful action.

(2) Sections 706(g) and (h) provide that, if the agencies responsible for administrative enforcement are unable to obtain compliance with the act or this regulation, they may refer the matter to the Attorney General. On such referral, or whenever the Attorney General has reason to believe that one or more creditors are engaged in a pattern or practice in violation of the act or this regulation, the Attorney General may bring a civil action.◄

*          *          *          *          *

14. Appendix B would be amended by revising the introductory material, by removing the "Voluntary Information For Government Monitoring Purposes" portion from the "Residential Loan Application", and by inserting in its place "Information For Governmenta Monitoring Purposes", to read as set forth below:

Appendix B—Model Application Forms

This appendix contains five model credit application forms, each designed for use in a particular type of consumer credit transaction as indicated by the bracketed caption on each form (which should be removed prior to reproduction). The first sample form is intended for use in open end, unsecured transactions; the second for closed end, secured transactions; the third for closed end transactions, whether unsecured or secured; the fourth for use in transactions involving community property or occuring in community property states; and the fifth for use in secured residential real estate transactions.[The real estate form should be used only when a lender's representative is available to assist an applicant in completing the form.] ►The appendix also contains a

model disclosure for use in complying with the disclosure requirements of § 202.13 for certain dwelling-related loans.◄

The forms contained in this appendix are models; their use by creditors is optional. In all instances, the use or modification of these forms is governed by 【202.5(e) of this Part and】 the directions contained in this appendix.

►If a creditor chooses to use the forms contained in this appendix it may change the forms:

(1) By asking for additional information not prohibited by § 202.5;

(2) By deleting any information request; or

(3) By rearranging the format without modifying the substance of the inquiries; provided that in each of these three instances the appropriate notices regarding the optional nature of courtesy titles, the option to disclose alimony, child support, or separate maintenance, and the limitation concerning marital status inquiries are included in the appropriate places if the items to which they relate appear on the creditor's form.◄

【In addition to deleting any information request printed on the forms or rearranging their format, as specified in section 202.5(e), a creditor is expressly permitted to modify any of the model forms contained in this Appendix by adding any of the following three items:

(1) an inquiry about the names in which the applicant has previously received credit as authorized in § 202.5(c)(3);

(2) A request to designate a courtesy title as authorized in § 202.5(d)(3); or

(3) an inquiry about an applicant's permanent residence and United States immigration status as authorized by § 202.5(d)(5).】

►If a creditor uses an appropriate Appendix B model form or to the extent that it modifies such a form in accordance with the provisions and instructions contained in this appendix, that creditor shall be deemed to be acting in compliance with the provisions of paragraph (c) and (d) of § 202.5 of this regulation.◄

【The fifth form contained in this appendix, the model residential real estate mortgage loan application, was prepared in conjunction with the Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association. It is substantially identical to the joint FHLMC 65/FNMA 1003 Rev. 3/77 form, except for type face and the inclusion of the FHLMC/FNMA form of certain items required by the Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association. If a creditor wishes to participate in the secondary mortgage market involving the Federal Home Loan Mortgage Corporation, Federal National

Mortgage Association, or Government National Mortgage Association, it should either modify the model form as specified by the Federal Home Loan Mortgage Corporation and Federal National Mortgage Association or use form FHLMC 65/FNMA

1003 (Rev. 3/77) with supporting schedule FHLMC 65A/FNMA 1003A. Use of the FHLMC 65/FNMA 1003 (Rev. 3/77) form constitutes full compliance with paragraphs (c) and (d) of § 202.5 of this Part.】

*      *      *      *      *

```
   INFORMATION FOR GOVERNMENT MONITORING PURPOSES

      The following information is requested by the federal government for
a loan related to a dwelling in order to monitor the lender's compliance with
equal credit opportunity and fair housing laws.  You are not required to furnish
this information, but are encouraged to do so.  The law provides that a lender
may neither discriminate on the basis of this information, nor on whether you
choose to furnish it.  However, if you choose not to furnish the information,
under federal regulations this lender is required to note race and sex on the
basis of visual observation or surname.  If you do not wish to furnish the
information, please initial below.

BORROWER:  I do not wish to furnish this information (initials) _____.

RACE/       [] American Indian, Alaskan Native   [] Asian, Pacific Islander
NATIONAL    [] Black    [] Hispanic    [] White
ORIGIN      [] Other (specify) _____       SEX  [] FEMALE
                                                    [] MALE

---------------------------------------------------------------------

CO-BORROWER:  I do not wish to furnish this information (initials) _____.

RACE/       [] American Indian, Alaskan Native,  [] Asian, Pacific Islander
NATIONAL    [] Black    [] Hispanic    [] White
ORIGIN      [] Other (specify) _____       SEX  [] FEMALE
                                                    [] MALE
```

15. Appendices C and D would be added, to read as follows:

►Appendix C—Sample Notification Forms

This appendix contains ten sample notification forms. The sample forms in C–1 through C–8 are intended for use in notifying an applicant that credit has been denied. The sample forms are illustrative and may not be appropriate for all creditors. They were designed to include some of the factors that creditors most commonly consider.

If the reasons listed on the forms are not the factors actually used, a creditor will not satisfy the notice requirement by simply checking the closest identifiable factor listed.

For example, some creditors consider only bank references (and disregard finance company references altogether); their statement of reasons should disclose "insufficient bank references" (not "insufficient credit references"). Similarly, a creditor that considers bank references and other credit references as separate factors should treat the two factors separately and disclose them as appropriate. The creditor should either add those other factors to the form or check "other" and include the appropriate explanation. The creditor need not, however, describe how or why a factor adversely affected the application. For example, the notice may say "length of

residence" rather than "too short a period of residence."

The sample forms in C-9 and C-10 are designed for use in notifying an applicant that their application is incomplete and is subject to denial or no further consideration if not completed. Use of these forms constitutes full compliance with paragraph (c) of § 202.9.

## Appendix C

### Form C-1—Notification of Action Taken

Statement of Credit Denial, Termination, or Change

Date ——————————————
Applicant's Name: ——————————
Applicant's Address: —————————
Description of Account, Transaction, or Requested Credit:

Description of Action Taken:

Part I—Principal Reason(s) for Credit Denial, Termination, or Other Action Taken Concerning Credit. This section must be completed in all instances.

_____ Credit application incomplete
_____ Provided too few credit references
_____ Credit references are insufficient
_____ Unable to verify credit references
_____ Temporary or irregular employment
_____ Unable to verify employment
_____ Length of employment
_____ Amount of credit requested excessive for income
_____ Excessive obligations in relation to income
_____ Unable to verify income
_____ Length of residence
_____ Temporary residence
_____ Unable to verify residence
_____ No credit history
_____ Insufficient credit history
_____ Poor past credit performance with us
_____ Delinquent past or present credit obligations with others
_____ Garnishment, attachment, foreclosure, repossession, collection action, or judgment
_____ Bankruptcy
_____ Value of type of collateral not sufficent
_____ Other, specify:

Part II—Disclosure of Use of Information Obtained From an Outside Source. This section need only be completed if the credit decision was based in whole or in part on information that has been obtained from an outside source.

_____ Our credit decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below. The reporting agency that provided information played on part in the creditor's decision and is unable to supply specific reasons why credit was denied. You do, however, have a right to inspect and receive a copy of the information in your credit file at the consumer reporting agency, upon making a request.

Name:——————————————

Address:——————————————

Telephone number:——————————
_____ Our credit decision was based in whole or in part on information obtained from an outside source other than a consumer reporting agency. Under the Fair Credit Reporting Act, you have the right to make a written request, no later than 60 days after you receive this notice, for disclosure of the nature of the adverse information obtained from an outside source other than a consumer reporting agency.

*If you have any questions regarding this notice, you should contact:*
Creditor's name: ——————————
Creditor's address: ————————
Creditor's telephone number: ————
*You should know that:* [ADD ECOA NOTICE]

### Form C-2—Notification of Action Taken

Statement of Credit Denial, Termination, or Change

Date ——————————————
Applicant's Name: ——————————
Applicant's Address: —————————
Description of Account, Transaction, or Requested Credit:

Description of Action Taken:

Part I—Principal Reason(s) For Action Taken Concerning Credit. This section must be completed in all instances.

_____ Offered down payment insufficient
_____ Provided us with insufficient bank references
_____ Appraised value of property insufficient
_____ Other, specify: ——————

Part II—Disclosure of Use of Information Obtained From Outside Source. This section need only be completed if the credit decision was based in whole or in part on information that has been obtained from an outside source.

_____ In evaluating your application, we contacted the credit reporting agency listed below, and the information they provided affected our decision. You have a right to know the information they provided to us. To learn about this information, please contact:

Name ————————————————
Address ——————————————

_____ In evaluating your application, we obtained information about you from a person or business, and the information they provided affected our decision. You have a right to know the information provided to us by that person or business if you write to us and request it within 60 days. Please write to us at our office address.

[ADD ECOA NOTICE]

### Form C-3—Notification of Action Taken

Date ——————————————
Applicant's Name and Address ————

Dear Applicant: Thank you for recent application. Your request for [a loan/a credit card/ an increase in your credit limit] was carefully considered, and we regret that we are unable to approve your application at this time, for the following reason(s):

Your Income:

_____ is below our minimum guidelines.
_____ is insufficient to sustain payments on the amount of credit requested.
_____ reveals that current obligations are excessive in relation to income.
_____ could not be verified.
Your employment:
_____ length of employment is not sufficient to qualify at this time.
_____ could not be verified.
Your Credit history:
_____ history of making payments when due was not satisfactory.
_____ could not be verified:
Your Application:
_____ lacks sufficient credit references.
Other:———————————————

The consumer credit reporting agency contacted that provided information which influenced our decision in whole or in part was [name, address and telephone number of the credit bureau]. Any questions regarding information contained on your consumer credit report should be directed to [credit bureau].

If you have any questions regarding this letter you should contact us at [creditor's name address and telephone number].

You should know that: [ADD ECOA NOTICE]

### Form C-4—Statement of Denial

Date ——————————————

Dear Applicant: Thank you for your request of June 14, 19XX for a loan in the amount of $9,500 to purchase a new automobile.

I regret that we cannot grant you the funds you requested. We require that loan customers have a satisfactory history of repaying previous debts in a timely fashion. Your credit report showed that you have not paid previous borrowings on time.

In considering your application we obtained a credit report from the XYZ Credit Bureau located at XXX Main Street, Anytown, Anystate, which affected our decision. Their telephone number is XXX–XXXX.

You should know that the federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, martial status, age (with certain limited exceptions), because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection. The federal agency that administers compliance with this law concerning this creditor is (name and address as specified by the appropriate agency listed in Appendix A).

I regret that we could not be of service to you at this time.

Sincerely,

Credit Officer

### Form C-5—Statement of Denial and Counteroffer

Date ——————————————

Dear Applicant: We have received your application for credit. We are unable to offer you credit on the terms that you requested for the following reason(s):

We can, however, offer you credit on the following terms:

If this offer is acceptable to you, please notify us within [amount of time].

[Add FCRA disclosure, if applicable]
[ADD ECOA NOTICE]

*Form C–6—Statement of Denial and Counteroffer*

Date ————————————————

Dear Applicant: Thank you for your application for a home improvement loan in the amount of $45,000.

I regret that we are unable to grant you the amount of credit you have requested. It is the policy of our firm to grant home improvement loans for a maximum term of 15 years and you have requested the loan for 20 years.

We would be pleased to make you the loan in the amount you requested for a term of 15 years at a rate of ____% which would require monthly payments of $__ __ for 180 months. If you would like to accept this offer please notify us no later than ____ .

You should know that the federal government prohibits creditors, such as ourselves, from discriminating against credit applicants on the basis of their race, color, religion, sex, marital status, age or because they receive income from a public assistance program or because they may have exercised their rights under the Consumer Credit Protection Act. If you believe there has been discrimination in handling your application you should contact the [name of agency], XXX Street, Anytown, Anystate XXXXX, (XXX) XXX-XXXX.

We look forward to hearing from you by ____ .

Sincerely,
Credit Officer

*Form C–7—Statement of Reasons for Denial (Credit Scoring)*

Date ————————————————

Dear Applicant: Thank you for your recent application for

————————————————

We regret that we are unable to approve your request.

Your application was processed by a credit scoring system which assigns a numerical value to the various items of information we consider in evaluating an application. These numerical values are based upon the results of analyses of repayment histories of large numbers of customers.

The information you provided in your application did not score a sufficient number of points for approval of the application. The areas in which you did not score well compared to other applicants were:

* Bank references
* Occupation
* Credit rating

In evaluating your application we obtained information from a credit reporting agency that in whole or in part influenced our decision. The credit reporting agency played no part in our decision other than providing us with credit information about you. You have a right to know the information

provided to us. It can be obtained by contacting:
Name:————————————————
Address: ————————————————
—'s ————————————————
Telephone: ————————————————
Sincerely,

Notice: The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract), because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is (name and address as specified by the appropriate agency listed in Appendix A).

*Form C–8—Disclosure of Right To request Specific Reasons for Credit Denial*

Date ————————————————

Dear Applicant: Thank you for applying to us for

————————————————

After carefully reviewing your application, we are sorry to advise you that we cannot [open account/grant loan/increase credit limit] to you at this time.

If you would like a statement of specific reasons why your application was denied, please contact us within 60 days of the date of this letter. We will provide you with the reasons within 30 days after your request. Please contact us at:
Creditor's name
Creditor's address
Creditor's telephone number

If a consumer reporting agency was used in connection with your application, its name, address, and telephone number is shown below. You can find out about the information contained in your file (if one was used) by contacting:
Credit Bureau:
Phone:
Sincerely,
[ADD ECOA NOTICE]

*Form C–9—Notice Regarding Incompleteness of Application and Request for Additional Information*

Date ————————————————

Dear Applicant: We have received your application for credit. The following information is needed to make a decision on your application:

————————————————

We need to receive this information by (date). If we do not receive it by that date, we will regrettably be unable to grant you the credit requested.
Sincerely,
Credit Officer

*Form C–10—Notice Regarding Incomplete Application and Request for Additional Information*

Date ————————————————

Dear Applicant: Thank you for your application for a loan in the amount of $8,500 to purchase a new car.

In order to make a decision on whether we can grant you the amount you have requested we need some additional information about your income. Since you are self employed we would like to have copies of your tax returns for the past two years. As soon as we receive this information we will resume consideration of your request.

If we do not receive the information from by . , I regret we will be unable to grant you the loan on the basis of the current application.

Sincerely,
Credit Officer◄

►**Appendix D—Issuance of Staff Interpretations**

*Official Staff Interpretations*

Officials in the Board's Division of Consumer and Community Affairs are authorized to issue official staff interpretations of this regulations. These interpretations provide the protection afforded under section 706(e) of the act. Except in unusual circumstances, such interpretations will not be issued separately but will be incorporated in an official commentary to the regulation, which will be amended periodically.

*Requests for Issuance of Official Staff Interpretations*

A request for an official staff interpretation should be in writing and addressed to the Director, Division of Consumer and Community Affairs, Board of Governors of the Federal Reserve System, Washington, D.C. 20551. The request should contain a complete statement of all relevant facts concerning the issue, including copies of all pertinent documents.

*Scope of Interpretations*

No staff interpretations will be issued approving creditors' forms or statements. This restriction does not apply to forms or statements whose use is required or sanctioned by a government agency.◄

16. Supplement I is revised and redesignated as Appendix E, to read as follows:

►**Appendix E—State Exemption**

*Application*

Any state may apply to the Board for a determination that a class of transactions subject to state law is exempt from the requirements of the act and this regulation. An application must be in writing and signed by the appropriate state official. It should be addressed to the Secretary, Board of Governors of the Federal Reserve System, Washington, D.C. 20551.

*Supporting Documents*

An application should be accompanied by:
(1) The test of the state statute or regulation that is the subject of the application, and any other statute, regulation, or judicial or administrative opinion that implements, interprets, or applies it.
(2) A comparison of the state law with the corresponding provisions of the federal law.

(3) The text of the state statute or regulation that provides for civil and criminal liability and administrative enforcement of the state law.

(4) A statement of the provisions for enforcement, including an identification of the state office that administers the relevant law, information on the funding and the number and qualifications of personnel engaged in enforcement, and a description of the enforcement procedures to be followed, including information on examination procedures, practices, and policies. If an exemption application extends to federally chartered institutions, the applicant must furnish evidence that arrangements have been made with the appropriate federal agencies to ensure adequate enforcement of state law in regard to such creditors.

(5) A statement of reason to support the applicant's claim that an exemption should be granted.

*Public Notice of Application*

Notice of an application will be published, with an opportunity for public comment, in the **Federal Register**, unless the Board finds that notice and opportunity for comment would be impracticable, unnecessary, or contrary to the public interest and publishes its reasons for such decision.

Subject to the Board's Rules Regarding Availability of Information (12 CFR Part 261), all applications made, including any documents and other material submitted in support of the application, will be made available for public inspection and copying. A copy of the application also will be made available at the Federal Reserve Bank of each District in which the applicant is situated.

*Favorable Determination*

If the Board determines on the basis of the information before it that an exemption should be granted, notice of the exemption will be published in the **Federal Register**, and a copy furnished to the applicant and to each federal official responsible for administrative enforcement.

The appropriate state official shall inform the Board within 30 days of any change in its relevant law or regulations. The official shall file with the Board such periodic reports as the Board may require.

The Board will inform the appropriate state official of any subsequent amendments to the federal law, regulation, interpretations, or enforcement policies that might require an amendment to state law, regulation, interpretations, or enforcement procedures.

*Adverse Determination*

If the Board makes an initial determination that an exemption should not be granted, the Board will afford the applicant a reasonable opportunity to demonstrate further that an exemption is proper. If the Board ultimately finds that an exemption should not be granted, notice of an adverse determination will be published in the **Federal Register** and a copy furnished to the applicant.

*Revocation of Exemption*

The Board reserves the right to revoke an exemption if at any time it determines that the standards required for an exemption are not met.

Before taking such action, the Board will notify the appropriate state official of its intent, and will afford the official such opportunity as it deems appropriate in the circumstances to demonstrate that revocation is improper. If the Board ultimately finds that revocation is proper, notice of the Board's intention to revoke such exemption will be published in the **Federal Register** with a reasonable period of time for interested persons to comment.

Notice of revocation of an exemption will be published in the **Federal Register**. A copy of such notice will be furnished to the appropriate state official and to the federal officials responsible for enforcement. Upon revocation of an exemption, creditors in that state shall then be subject to the requirements of the federal law.◄

(6) *Text of proposed official staff commentary.* The proposed Official Staff Commentary on Regulation B (ECO–1, Supp. I to 12 CFR Part 202) reads as follows:

**OFFICIAL STAFF COMMENTARY—ECO–1**

**Introduction**

1. *Official status.* Section 706(e) of the Equal Credit Opportunity Act protects a creditor from civil liability for any act done or omitted in good faith in conformity with an interpretation issued by a duly authorized official of the Federal Reserve System. This commentary is the vehicle by which the Division of Consumer and Community Affairs of the Federal Reserve Board issues official staff interpretations of Regulation B. Good faith compliance with this commentary affords protection under section 706(e).

2. *Issuance of interpretations.* Any person may request an official staff interpretation. Interpretations will be issued at the staff's discretion and incorporated in this commentary following publication for comment in the **Federal Register**. Official staff interpretations will be issued only by means of this commentary.

3. *Status of previous interpretations.* Interpretations of Regulation B previously issued by the Federal Reserve Board and its staff have been incorporated into this commentary as appropriate. All other previous Board and staff interpretations, official and unofficial, are superseded by this commentary, effective ———.

4. *Comment designations.* Each comment in the commentary is identified by a number and the regulatory section or paragraph that it interprets. The comments are designated with as much specificity as possible according to the particular regulatory provision addressed. For example, some of the comments to § 202.7(d) are further divided by subparagraph, such as comment 7(d)(3)–T and 7(d)(3)–2.

*Section 202.1 Authority, Scope, and purpose.*

1(a) *Authority and scope.*

1. *Scope.* The Equal Credit Opportunity Act and Regulation B apply broadly to all credit—commercial as well as personal—without regard to the nature or type of the credit or creditor. If a transaction provides for the deferral of the payment of a debt, it is credit covered by Regulation B even though it may not be a credit transaction covered by Truth in Lending (Regulation Z). Further, the definition of creditor is not restricted to the party or person to whom the obligation is initially payable, as is the case under Truth in Lending. Moreover, the act, and regulation apply to all methods of credit evaluations, whether performed judgmentally or by use of a credit scoring system.

1(b) *Purpose.*

1. *Footnotes.* Footnotes shall have the same legal effect as the text of the regulation, whether they are explanatory or illustrative in nature.

*Section 202.2 Definitions.*

2(c) *Adverse action.*

Paragraph 2(c)(1)(ii).

1. *Termination.* When a credit card issuer terminates the open-end account of a customer because the customer has moved out of the card issuer's service area, the termination is "adverse action" for purposes of the regulation unless termination on this ground was explicitly provided for in the credit agreement between the parties. In cases where termination is adverse action, notification is required under § 202.9.

2. *Classification of accounts.* Under the "classification of accounts" exception, a creditor that terminates an entire category of credit plans, such as all overdraft checking lines or an open-end credit card program, has not taken adverse action on the accounts terminated. But a creditor must give adverse action notices when the classification terminated is only a narrow group or subgroup of accounts. For example, if a creditor terminates revolving credit accounts that have low credit limits (e.g., under $400) but keeps open other accounts with higher credit limits, the creditor must comply with the adverse action notification provisions as to the accounts terminated.

Paragraph 2(c)(2)(ii).

1. *Exercise of due-on-sale clauses.* If a mortgagor sells or transfers mortgaged property without the consent of the mortgagee, and the mortgagee exercises its contractual right to accelerate the mortgage loan, the mortgagee may treat both the mortgagor and the transferee as being in default. It does not have to give an adverse action notice to either party. (See commentary to § 202.2(e) for treatment of a purchaser who request to assume the loan.)

Paragraph 2(c) (2) (iii).

1. *Point-of-sale transactions.* Denial of credit at the point of sale does not constitute adverse action except for circumstances that are specified in the regulation. For example, denial at point of sale is not adverse action in the following situations:

• A credit cardholder presents an expired card or a card that has been reported to the card issuer as lost or stolen.

• The amount of a transaction exceeds a cash advance or credit limit.

• The circumstances (such as excessive use of a credit card in a short period of time) suggest that fraud is involved.

• The card issuer's authorization facilities are not functioning.

• Billing statements have been returned to the creditor for lack of a forwarding address. Paragraph 2(c) (2) (v).

1. *Type of credit for credit plan.* Denial of credit is not adverse action if the credit terms requested differ so much from a creditor's normal credit programs as to represent a type of credit or credit plan not offered by the creditor. For example:

• An applicant requests an open-end line of credit secured by equity in the applicant's home. The creditor makes equity loans but does not offer any open-end credit plan.

However, if the applicant requests a type of credit offered by the creditor but on terms that the creditor does not offer, the creditor's denial of the application is adverse action. For example:

• An applicant requests mortgage credit and requests a loan guarantee under a particular government program. Although the creditor does not participate in that particular guarantee program, it does make mortgage loans.

• An applicant requests an unsecured loan to buy a boat. Although the creditor requires that it receive a security interest in the boat, it does make boat loans.

The creditor's rejection of these applications requires notification under § 202.9(a)(1) and (2).

2(e) *Applicant.*

1. *Request to assume loan.* If a mortgagor sells or transfers the property securing a mortgage loan and buyer/transferee makes an application to the creditor to assume the mortgage loan, the creditor must treat the buyer/transferee as a new applicant.

2(f) *Application.*

1. *General.* A creditor has the latitude under the regulation to establish its own application process and to decide the type and amount of information it will require from credit applicants.

2. *"Procedures established."* The term refers to the actual practices followed by a creditor for making credit decisions—not just its formally stated application procedures. For example, if a creditor has a stated policy requiring all applications to be in writing on the creditor's application form, but does make credit decisions based on oral requests, that creditor takes both oral and written applications, and must act in accordance with § 202.9 for both types of applications.

3. *When an inquiry becomes an application.* A creditor is encouraged to provide consumers with information about loan terms. If, however, when giving information to the consumer the creditor also evaluates information about the applicant, determines to decline the request and communicates this to the applicant, it has treated the inquiry as an application and must then provide the applicant with the reasons for denial. Thus, whether the inquiry becomes an application depends on how the creditor responds to the applicant, not on what the applicant says or asks, as illustrated below:

• If a consumer calls to ask about loan terms and an employee explains the creditor's basic loan terms, such as interest rates, loan to value ratio, and debt to income ratio, no application has occurred. The employee has only given out information about the creditor's policies.

• If a consumer calls to ask about interest rates for car loans, and, in order to quote the appropriate rate, the loan officer asks for the make and sales price of the car and amount of the downpayment, then gives the consumer the rate, no application has occurred. The loan officer asked and used information about the transaction only to give the correct interest rate.

• If a consumer asks about terms for a loan to purchase a home and tells the loan officer her income and intended downpayment, but the loan officer only explains the creditor's loan to value ratio policy and other basic lending policies, no application has occurred. The loan officer has provided the consumer with information but has not told the consumer whether or not she qualifies for the loan.

• If a consumer calls to ask terms for a loan to purchase vacant land and states his income, the sale price of the property to be financed, and asks whether he qualifies for a loan, and the employee responds by describing the general lending policies, explains that he would need to look at all of the applicant's qualifications before making a decision and offers to send an application form to the consumer, no application has occurred. However, should the employee instead explain to the caller that his stated income is not sufficient to qualify for the loan amount he is requesting, an application has occurred. The employee has made a credit decision and communicated it to the consumer. The employee should then explain to the consumer that the loan cannot be approved because of the debt to income ratio and offer to send the consumer a written notice of denial if the consumer wishes to receive it.

4. *Completed application—diligence requirement.* The regulation defines completed application in terms that give a creditor the latitude to establish its own information requirements, but the creditor must act with diligence to collect any information needed to complete the application. For example, the creditor should request information from third parties, such as credit report, promptly after receiving the application. If additional information is needed from the applicant, such as an address or telephone number needed to verify employment, the creditor should contact the applicant promptly.

2(j) *Credit.*

1. *General.* Regulation B covers a wider range of credit transactions than Regulation Z because the definition of credit is broader than the definition of credit in Regulation Z (Truth in Lending). For purposes of Regulation B a transaction is credit if there is a right to defer payment of a debt— regardless of whether the credit is for personal or commercial purposes, the number of installments required for repayment, or whether the transaction is subject to a finance charge. There is no numerical test as in the case of Regulation Z.

2(l) *Creditor.*

1. *Officers and employees.* The term "creditor" includes employees or officers of the creditor who regularly participate in deciding whether to extend credit. Such individuals can be held personally liable for violations of the act or regulation.

2. *Assignees.* The term "creditor" includes all persons participating in the credit decision. This may include an assignee or a potential purchaser of the obligation who influences the credit decision by indicating whether it will purchase the obligation if the transaction is consummated. The term also includes a purchaser who makes its credit criteria known to the credit originator.

3. *Referrals to creditors.* For certain purposes, the term "creditor" includes persons such as real estate brokers who do not participate in credit decisions but who regularly refer applicants to creditors, or who select or offer to select creditors to whom credit requests can be made. These persons need comply only with § 202.4, the general rule prohibiting discrimination, and with § 202.5(a) on discouraging applications.

2(p) *Empirically derived and other credit systems.*

1. *Purpose of definition.* The definition under § 202.2(p)(2) sets forth the criteria that a credit system must meet in order to use age as a predictive factor. Credit systems that do not meet these criteria are judgmental systems, and may consider age only for the purpose of determining a "pertinent element of creditworthiness." Either system may favor an elderly applicant. (See § 202.6(b)(2).)

2. *Periodic revalidation.* The regulation does not specify how often credit scoring systems must be revalidated. To meet the requirements for statistical soundness, the credit scoring system should be revalidated frequently enough to assure that it continues to meet recognized professional statistical standards.

2(z) *Prohibited basis.*

1. *Persons related to applicant.* "Prohibited basis" as used in this regulation refers to the race, color, religion, national origin, sex, marital status, or age of an applicant (or officers of an applicant in the case of a corporation). The term also refers to the characteristics of individuals with whom an applicant is affiliated or with whom the applicant associates. This means, for example, that under the general rule stated in § 202.4, a creditor may not discriminate against an applicant because of that person's business dealings with members of a certain religion, because of the national origin of persons to whom the extension of credit relates (e.g., the tenants in the apartment complex being financed), or because of the race of other residents in the neighborhood where the property offered as collateral is located.

2. *National origin.* A creditor may not refuse to grant credit because an applicant comes from a particular country, but may take the applicant's immigration status into account. (See the commentary to § 202.6(b)(7).) A creditor may also take into account any applicable law, regulation, or executive order restricting dealings with citizens (or governments) of certain countries, or imposing limitations regarding credit extended for their use. Regulation B does not directly address whether a creditor could deny credit on the grounds that the applicant is not a United States citizen, but such a policy could violate 42 U.S.C. 1981 (Civil Rights Act of 1866).

3. *Public assistance program.* Any federal, state, or local governmental assistance program that provides a continuing, periodic income supplement, whether premised on entitlement or need, is "public assistance" for purposes of the regulation. The term includes (but is not limited to) Aid to Families with Dependent Children, food stamps, rent and mortgage supplement or assistance programs, Social Security and Supplemental Security Income, and unemployment compensation. Only physicians, hospitals, and others to whom the benefits are payable must consider Medicare and Medicaid as public assistance income.

*Section 202.3 Limited exceptions for certain classes of transactions.*

1. *Scope.* The reduction in requirements provided in this section relieves burdens on several types of credit for which full application of the procedural requirements would be inappropriate. All classes of transactions remain subject to the general rule against discrimination on a prohibited basis, and any other provision not specifically excepted.

3(a) *Public utilities credit.*

1. *Definition.* This definition applies only to credit for the purchase of the utility service, such as electricity, gas, or telephone service. Credit provided or offered by a public utility for some other purpose—for financing the purchase of durable goods, such as a gas dryer or telephone equipment, or for home improvements such as insulation—is not exempt.

2. *Security deposits.* A utility company is a creditor if it supplies utility service and bills the user after the service has been provided. Hence a requirement for a security deposit, for example, is a credit term subject to the regulation.

3(c) *Incidental credit.*

1. *Examples.* If a service provider (such as a hospital, doctor, lawyer or small retailer) allows the client or customer to defer the payment of a bill, this deferral of a debt is credit for purposes of the regulation, even though there is no finance charge and no agreement for payment in installments. Because of the exceptions provided by this section, however, these particular credit extensions are exempt from compliance with many of the procedural requirements of the regulation.

3(d) *Business credit.*

1. *Definition.* The test for deciding whether a transaction qualifies as business credit is one of primary purpose. If it is not clear that a transaction is primarily for business, commercial, or agricultural purposes, then the transaction does not qualify under this section. For example, credit for the purchase or improvement of rental property may not be business credit unless it is clear that the applicant is in the business of dealing in rental property. Similarly, an open-end credit account used for both personal and business purposes should not be treated as business credit unless the predominant purpose of the account is business-related.

Paragraph 3(d)(3).

1. *Notification.* A creditor must in all cases notify the business credit applicant of a credit denial or other adverse action. This notification may be written or oral, but it must be given within a reasonable time after the decision is made.

3(e) *Governmental credit.*

1. *Credit to governments.* The exception relates to credit extended to (not by) governmental entities. For example, credit extended by a creditor in the private sector to a local government is covered by this exception, but credit extended by a federal or state housing agency to consumers does not qualify for special treatment under this category.

*Section 202.4 General rule prohibiting discrimination.*

1. *Scope of section.* Other provisions of the regulation identify specific practices that are expressly prohibited by the act or that are impermissible because they could result in credit discrimination on a basis prohibited by the act. The general rule stated in this section covers all dealings, without exception, between an applicant and a creditor, whether or not addressed by other provisions of the regulation. It covers, for example: application procedures, criteria used to evaluate creditworthiness, communications with the applicant, administration of accounts, and treatment of delinquent or slow accounts. Thus, a credit practice that differentiates among applicants on a prohibited basis violates the act because it violates the general rule set forth in this section—even though the practice is not specifically prohibited in the regulation.

*Section 202.5 Rules concerning taking of applications.*

5(a) *Discouraging applications.*

1. *Potential applicants.* Generally, the regulation's protections apply only to applicants, persons who have requested or received an extension of credit. In keeping with the purpose of the act—to require that a creditor not discriminate on a prohibited basis in making credit equally available to all credit-worthy persons—section 202.5(a) covers certain acts or practices directed at potential applicants. It bars the creditor from an act or practice that would discourage someone, on a prohibited basis, from applying for credit. Examples of practices prohibited by this section include:

• A statement that the applicant shouldn't bother to apply, after the applicant states that he is retired.

• A pattern of using advertisements illustrated with people of only one race in a community that is multi-racial.

• Use of phrases or symbols that are known to exclude or offend a particular racial or ethnic group.

2. *Affirmative advertising.* A creditor may affirmatively solicit or encourage members of protected groups to apply for credit, especially groups that might not normally seek credit from that creditor.

5(b) *General rules concerning requests for information.*

Paragraph 5(b)(1).

1. *Requests for information.* This section governs the types of information that a creditor may gather. Section 202.6 governs how information may be used.

5(d) *Information a creditor may not request.*

Paragraph 5(d)(1).

1. *Indirect disclosure of prohibited information.* The fact that certain credit-related information may indirectly disclose marital status does not bar a creditor from seeking such information. For example, the creditor may ask about:

• The applicant's obligation to pay alimony, child support, or separate maintenance.

• The source of income to be used as the basis for repaying the credit requested, which could disclose that it is the income of a spouse.

• Whether any obligation disclosed by the applicant has a co-obligor, which could disclose that the co-obligor is a spouse or former spouse.

• The ownership of assets, which could disclose the interest of a spouse.

Paragraph 5(d)(2).

1. *Appropriate disclosure.* The sample application forms in Appendix B to the regulation illustrate how a creditor can inform applicants of their right not to disclose alimony, child support or separate maintenance income.

2. *Specific inquiry about income.* When it inquires about income, a creditor need not give the disclosure about alimony and the like if the inquiry is worded in a way that would not lead the applicant unintentionally to disclose alimony, child support or separate maintenance payments. For example, an inquiry asking the applicant to list specific types of income such as salary, wages, or investment income need not be prefaced by the disclosure. But if the application form asks for salary or wages, the creditor should also provide space for the applicant to report income from other sources.

5(e) *Application forms.*

1. *Requirement for written applications.* The requirement of written applications for certain types of dwelling-related loans, specified in section 202.13 is intended to assist the federal supervisory agencies in monitoring compliance with the ECOA and the Fair Housing Act. A creditor will satisfy the requirement for taking written applications by writing down the information that it normally considers in making a credit decision. Model application forms are provided in Appendix B, although use of a form is not required.

2. *Telephone applications.* A creditor who accepts applications by telephone for dwelling-related credit covered by § 202.13 can meet the requirements for written applications by writing down the information that is provided orally by the applicant. The creditor should also note on the form or other application record that the application was received by telephone.

*Section 202.6 Rules concerning evaluation of applications.*

6(a) *General rule concerning use of information.*

1. *Scope of rule.* When evaluating an application for credit, a creditor may generally use or consider any information obtained. However, a creditor may not consider in its evaluation of creditworthiness any information that it is barred by § 202.5

from obtaining. There are certain limited exceptions for considering age, under § 202.6(b)(2), and other exceptions for special purpose credit, under § 202.8.

2. *Effects test.* The effects test is a judicial doctrine that was developed in a series of employment cases decided by the Supreme Court under Title VII of the Civil Rights Act of 1964. Congress intended this doctrine to be applicable to a creditor's determination of creditworthiness. This Congressional intent is documented in the Senate Report that accompanied H.R 6516, No. 94–589, pp. 4–5; and in the House Report that accompanied H.R. 6516, NO. 94–210, p. 5. Thus, the act and regulation prohibit a creditor practice that is discriminatory in effect because it has a disproportionately negative impact on a protected class, even though the creditor has no intent to discriminate, and even though the practice appears neutral on its face. The fact that a credit standard has a disproportionately negative impact on a prohibited basis does not make it necessarily unlawful if use of the standard meets a legitimate business need that cannot be achieved by means that are less disparate. For example, requiring that applicants have incomes in excess of a certain amount to qualify for an overdraft line of credit could mean that women and minority applicants wil be rejected at a higher rate than men and non-minority applicants. So long as there is a demonstrable relationship between the income requirement and creditworthiness for the level of credit involved, use of the income standard will likely be permissible. However, to lessen the potential negative impact on protected groups, a creditor might make adjustments that will still serve its business purposes, for example, by establishing a lower credit limit for those with lower incomes.

6(b) *Specific rules concerning use of information.*

Paragraph 6(b)(1).

1. *Prohibited basis—marital status.* A creditor may not use marital status as a basis for determining the applicant's creditworthiness. However, a creditor may consider an applicant's marital status for the purpose of ascertaining the creditor's rights and remedies applicable to the particular extension of credit. For example, in a secured transaction involving real property, a creditor could take into account whether state law gives the applicant's spouse an interest in the property being offered as collateral.

2. *Prohibited basis—special purpose credit.* A creditor may in some cases consider a "prohibited basis" to determine whether the applicant possesses the characteristic needed for eligibility in a special-propose credit program. (See § 202.8.)

Paragraph 6(b)(2).

1. *Favoring the elderly.* In any system of evaluating creditworthiness, an creditor may take age into account for the purpose of favoring a credit applicant who is age 62 or older.

2. *Consideration of age in a credit scoring system.* Age may be taken directly into account in a credit scoring system that is "demonstrably and statistically sound," as defined in § 202.2(p), with one limitation: an applicant who is 62 years or older must be

treated at least as favorably as anyone who is under age 62.

3. *Consideration of age in a judgmental system.* Any credit scoring system that does not meet the definition in § 202.2(p)(2) is a judgmental system. In a judgmental system, a creditor may not take age directly into account in any aspect of the credit transaction. For example, a creditor may not reject an application or terminate an account because the applicant is approaching age 60, nor base the number of years for maturity of a mortgage on whether the applicant is 35 or 55 years old. But a creditor that uses a judgmental system may relate the applicant's age to other information about the applicant that the creditor considers in evaluating creditworthiness. For example:

• A creditor may take into account information such as the applicant's occupation and length of time to retirement to ascertain whether the applicant's income (including retirement income) will support the extension of credit to its maturity.

• A creditor may consider age to ascertain the adequacy of a security offered when the term of the credit extension exceeds the life expectancy of the applicant and the cost of realizing on the collateral could exceed the applicant's equity. (An elderly applicant might not qualify for a 5 percent down, 30 year mortgage loan, but might qualify with a large downpayment or a shorter loan maturity.)

• A creditor may consider an applicant's age to assess the significance of the applicant's length of employment (a young applicant may have just entered the job market) or length of time at an address (an elderly applicant may recently have retired and moved from a long-time residence).

4. *Use of a combined system.* A creditor that uses a credit scoring system that qualifies under § 202.2(p) may also consider other factors (such as a credit report or the applicant's cash flow) on a judgmental basis. Doing so will not affect the classification of the credit scoring system as "demonstrably and statistically sound." However, in the judgmental evaluation, the creditor may consider age only for the purpose of determining a "pertinent element of creditworthiness."

5. *Consideration of public assistance.* When considering income derived from a public assistance program, a creditor may take into account, for example:

• The length of time an applicant will likely remain eligible to receive such income.

• Whether the applicant will continue to qualify for benefits based on the status of the applicant's dependents (e.g., Aid to Families with Dependent Children of Social Security payments to a minor).

• Whether the creditor can attach or garnish the income to assure payment of the debt in the event of default.

Paragraph 6(b)(5).

1. *Consideration of individual applicant.* Certain types of income—such as income derived from part-time employment, alimony, child support or separate maintenance, retirement benefits, or public assistance— must be evaluated on an individual basis, not based on aggregate statistics. A creditor must assess the relibility or unreliability of an

applicant's income on the applicant's actual history, not on statistical measures derived from a group.

2. *Payments consistently made.* In determining the likelihood of consistent payments of alimony, child support or separate maintenance, a creditor may consider factors such as whether payments are received pursuant to a written agreement or court decree; the length of time that the payments have been received; whether the payments are regularly received by the applicant; the availability of procedures to compel payment; and the creditworthiness of the payor, including the credit history of the payor when available to the creditor.

3. *Consideration of income.* There are several acceptable methods for considering income, whether in a credit scoring on a judgmental system:

• A creditor can score or consider the amount of all income stated by the applicant without taking steps to evaluate the income.

• A creditor can evaluate each component of the applicant's income, and then score or consider reliable income separately from income that is not reliable, or the creditor may disregard a portion of income to the extent that it is not reliable before aggregating it with reliable income.

• A creditor that does not evaluate all income components for reliability must treat as reliable any component of protected income not evaluated.

In considering the separate components of an applicant's income, the creditor may not automatically discount or exclude from consideration any protected income.

4. *Part-time employment, sources of income.* A creditor may take into account the fact that an applicant has more than one source of earned income—a full-time and a part-time job; or two part-time jobs. A creditor may also score or treat earned income from a secondary source differently from earned income from a primary source. However, the creditor may not score or otherwise take into account the number of sources with respect to income from protected sources, e.g., retirement income, social security, alimony. Nor may the creditor treat negatively the fact that an applicant's only source of earned income is derived from a part-time job.

Paragraph 6(b)(6).

1. *Types of credit references.* A creditor has the latitude to set reasonable restrictions on the types of credit history and credit references that it will consider, provided that the restrictions are applied to all credit applicants without regard to sex, marital status, or any other prohibited basis. However, a creditor may not refuse to consider credit information solely because it is from another creditor (such as a credit union that does not regularly report credit history) rather than from a credit bureau. If a creditor denies an application because the applicant's credit references are not among the types that the creditor accepts, the statement of reasons given to the applicant must be specific on this point. (See the commentary to § 202.9.)

Paragraph 6(b)(7).

1. *National origin—immigration status.* The applicant's immigration status and ties to the community (such as employment and continued residence in the area) could have a bearing on a creditor's ability to obtain repayment. Accordingly, the creditor may consider and differentiate, for instance, between a noncitizen who is a long-term resident with permanent resident status and a noncitizen who is temporarily in this country on a student visa.

*Section 202.7 Rules Concerning Extensions of Credit*

7(a) *Individual accounts.*

1. *Open-end credit—authorized user.* A creditor may not require a creditworthy applicant seeking an individual credit account to provide additional signatures. However, the creditor may condition the designation by the account holder of an authorized user on the authorized user's becoming contractually liable for the account, as long as the creditor does not differentiate on any prohibited basis.

2. *Open-end credit—choice of authorized user.* A creditor that permits an account holder to designate an authorized user may not restrict this designation based on relationships that discriminate on a prohibited basis. For example, if the creditor accepts the designation of an applicant's spouse as an authorized user, it may not refuse to accept a non-spouse as an authorized user.

3. *Overdraft authority on transaction accounts.* If a transaction account includes an overdraft line of credit, the creditor may require that all persons authorized to draw on the account assume liability for any overdraft.

7(b) *Designation of name.*

1. *Single name on account.* A creditor may require that joint applicants on an open-end account designate a single name for purposes of administering the account and that a single name be embossed on the credit card(s) issued on the account. But the creditor may not require that the name be the husband's name. (See § 202.10 for rules governing the furnishing of credit history on accounts held by spouses.)

7(c) *Action concerning existing open end accounts.*

Paragraph 7(c)(1).

1. *Termination coincidental with marital status change.* When there is a change in an account holder's marital status, a creditor generally may not terminate an account unless it has evidence that the account holder is unable or unwilling to repay. But the creditor may terminate an account on which both spouses are jointly liable, even if the action coincides with a change in the account holder's marital status, when one or both spouses:

• Repudiate responsibility for future charges on the account.

• Request separate accounts in their own names.

• Request that the account be closed.

Paragraph 7(c)(2).

1. *Procedure pending reapplication.* A creditor may require a reapplication from a contractually liable party, even when there is no evidence of unwillingness or inability to

repay, if the credit was based on the qualifications of an applicant who is no longer available to support the credit. The creditor may specify a reasonable time period within which the consumer must submit the required information. While a reapplication is pending, the creditor must allow the account holder full access to the account under the existing contract terms. The creditor may terminate, suspend, or otherwise restrict access to a contractually liable party only as permitted by § 202.7(c)(1).

2. *Updating information.* A creditor may periodically request updated information from applicants, but may not use events related to a prohibited basis—such as an applicant's retirement or change in name, marital status, or age—to make such a request.

7(d) *Signature of spouse or other person.*

1. *Qualified applicant.* The signature rules assure that qualified applicants are able to obtain credit in their own names. Thus, when an applicant requests individual credit, a creditor may not require the signature of another person unless the creditor has first determined that the applicant alone does not qualify for the credit requested.

2. *Unqualified applicant.* When an applicant applies for individual credit but does not alone meet a creditor's standards, the creditor may require a cosigner, guarantor or the like—but cannot require that it be the spouse. (See commentary to § 202.7(d)(5) and (6).)

Paragraph 7(d)(1).

1. *Joint applicant.* The term "joint applicant" refers to someone who applies contemporaneously with the applicant for shared or joint credit. It does not refer to a person whose signature is required by a creditor as a condition for granting credit under § 202.7(b)(5).

Paragraph 7(d)(2).

1. *Jointly owned property.* In determining the value of the applicant's interest in jointly owned property, a creditor may consider factors such as the form of ownership and the property's susceptibility to attachment, execution, severance, or partition and the cost of such action. If the applicant's interest in the property does not support the amount and terms of credit sought, the creditor may give the applicant some other option of providing additional support for the extension of credit. For example:

• Offering the signature of the co-owner of the property on an instrument to assure access to the property, but not to impose personal liability.

• Requiring an additional party under § 202.7(d)(5).

• Offering to grant the applicant's request on a secured credit basis.

Paragraph 7(d)(3).

1. *Permissible questions.* In assessing the creditworthiness of a person who applies for credit in a community property state, a creditor may:

• Assume that the applicant is a resident of the state, unless the applicant indicates otherwise.

• Ask the applicant's marital status.

• Obtain any information about the spouse of an applicant that may be requested about an applicant.

2. *Consideration of community income.* Under the equal management laws of some community property states each spouse, acting alone, may have the power to manage and control all of the community property, including the earnings of the other spouse. In such a state, if one spouse requests unsecured credit relying on the nonapplicant's earnings, a creditor must treat the income as community property. It may not require the signature of the nonapplicant spouse on the application, note, or other credit instrument

Paragraph 7(d)(4).

1. *Creation of enforceable lien.* Some state laws require that both spouses join in executing any instrument by which real property is encumbered. If an applicant offers such property as security for credit, a creditor may require the applicant's spouse to sign the instruments necessary to create a valid security interest in the property. The creditor may not require the spouse to sign the note evidencing the credit obligation if signing the mortgage or other security agreement is sufficient to make the property available to satisfy the debt in the event of default. However, if under state law both spouses must sign the note to create an enforceable lien, the creditor may require them to do so.

2. *Need for signature—reasonable belief.* Generally, a signature to make the secured property available will only be needed on a security agreement. A creditor's reasonable belief that, to assure access to the property, the spouse's signature is needed on an instrument that imposes personal liability should be supported by a review of pertinent statutory and decisional law or an opinion of the state attorney general.

3. *Integrated instruments.* When a creditor uses an integrated instrument that combines the note and the security agreement, the spouse cannot be required to sign the integrated instrument if the signature is only needed to perfect the security. But the spouse could be asked to sign an integrated instrument which makes clear that the spouse's signature is only to perfect security and that signing the instrument does not impose personal liability. For example, a legend placed next to the spouse's signature could make clear that the signature is only to perfect security and does not impose personal liability.

Paragraph 7(d)(5).

1. *Qualifications of cosigners.* In establishing guidelines for eligibility of cosigners, a creditor may restrict the applicant's choice of cosigners but may not discriminate on the basis of sex, marital status or any other prohibited basis. For example, the creditor could require that the cosigner live in the creditor's market area, but not that the spouse be the cosigner.

2. *Income of another person.* An applicant who requests individual credit relying on the income of another person (such as a spouse) may be required to provide the signature of that other person to make the income available to pay the debt. In community property states, the signature may be required if the applicant relies on the separate income of another person, i.e.,

income or other property that, as a matter of state law, is not community property.

3. *Renewals.* When a fixed-term credit obligation is renewed, a creditor may not carry forward, or continue to require the signature of a cosigner or other additional party unless the creditor determines the applicant's creditworthiness at renewal continues to warrant an additional party.

Paragraph 7(d)(6).

1. *Guarantees.* A guarantee on an extension of credit is part of a credit transaction and therefore subject to the regulation. The rules contained in § 202.7(d) bar a creditor from requiring the signature of a guarantor's spouse in the same way that they bar the credit from requiring the signature of an applicant's spouse. For example, when all officers of a closely held corporation are required to personally guarantee a corporate loan, an officer who is married may not be required to provide the signature of the spouse if no additional signatures would be sought from an unmarried officer.

7 (e) *Insurance.*

1. *Differentiation.* Differentiation in the availability, rates, and terms on which credit-related casualty insurance or credit life, health, accident, or disability insurance is offered or provided to an applicant does not violate Regulation B.

2. *Insurance information.* A creditor may obtain information about an applicant's age, sex, or marital status for insurance purposes. The information may only be used, however, for determining eligibility and premium rates for insurance, and not in making the credit decision.

*Section 202.8   Special Purpose Credit Programs*

8(a) *Standard qualified programs.*

1. *Determining qualified programs.* The Board does not determine whether individual programs qualify for special purpose credit status, or whether a particular program benefits an "economically disadvantaged class of persons." The agency or creditor administering or offering a loan must make these decisions regarding the status of its program.

2. *Compliance with program authorized by federal or state law.* A creditor does not violate Regulation B when it complies in good faith with a regulation promulgated by the administering government agency implementing a special-purpose credit program under § 202.8(a)(1). The responsibility lies with the administering agency to promulgate a regulation that is consistent with applicable federal and state law.

3. *Expressly authorized.* A credit program expressly authorized by federal or state law includes programs authorized by federal, state and local statute, regulation or ordinance, or by judicial or administrative order.

8(b) *Rules in other sections.*

1. *Applicability of rules.* A creditor that denies an application because the applicant does not meet the eligibility requirements (common characteristic or financial need, for example) must still notify the applicant of action taken as required in § 202.9.

8(c) *Special rule concerning requests and use of information.*

1. *Example.* Examples of programs under which the creditor can ask for and consider information related to a prohibited basis are:

• Energy conservation improvements credit programs for the elderly, for which the creditor must consider the applicant's age.

• Programs under a Minority Enterprise Small Business Investment Corporation, for which a creditor must ask and consider the applicant's minority status.

8(d) *Special rule in the case of financial need.*

1. *Examples.* Examples of programs in which financial need is a criterion are:

• Housing subsidy programs for low to moderate income households, for which a creditor may have to consider the applicant's receipt of alimony or child support, the spouse's income, etc.

• Student loan program based on the family's financial need, for which a creditor may have to consider the spouse's financial resources.

2. *Student loans.* In a guaranteed student loan program, a creditor may obtain the signature of a parent as guarantor when it is required by federal or state law or agency regulation, or when the student does not meet the creditor's standards of creditworthiness. [See § 202.7(d)(1) and (5).] A signature may not be required when a student has a work or credit history that satisfies the creditor's standards.

*Section 202.9   Notifications*

1. *Withdrawn applications.* If an applicant expressly withdraws a credit application, the creditor is relieved of the notification requirements under § 202.9. The creditor must, however, comply with the record retention requirements of the regulation. [See § 202.12(b)(4).]

2. *Form of notice.* The information for notifications required under § 202.9 may appear on either or both sides of a paper if there is a clear reference on the front to any information on the back.

9(a) *Notification of action taken, ECOA notice, and statement of specific reasons.*

Paragraph 9(a)(1).

1. *Timing.* Once a creditor has obtained all the information it normally considers in making a credit decision, the application is complete and the creditor has 30 days in which to notify the applicant of the credit decision.

2. *Notification of action.* Notification occurs when a creditor delivers or mails a notification to the applicant's last known address or, in the case of an oral notification, when the creditor communicates with the applicant.

3. *Notification of approval.* Notification of approval may be express or by implication. For example, the creditor will satisfy the notification requirement if it gives the applicant the credit card, money, property, or services requested.

4. *Incomplete application.* A creditor that receives an application that is incomplete, but that contains sufficient information on which to base a credit decision, may deny the application and notify the applicant of the denial in accordance with § 202.9(a)(1). It

need not follow the alternative notice procedure contained in § 202.9(c).

5. *Timing of counteroffer.* A creditor must notify an applicant of a counteroffer within 30 days of receiving a completed application.

6. *Counteroffers.* Section 202.9(a)(1)(iv) does not require a creditor to hold a counteroffer open for 90 days or for any particular length of time.

7. *Counteroffer—combined notice.* A creditor that gives the applicant a combined counteroffer and adverse action notice that complies with § 202.9(a)(2) need not send a second adverse action notice if the applicant does not accept the counteroffer.

9(b) *Form of ECOA notice and statement of specific reasons.*

Paragraph 9(b)(1).

1. *Substantially similar notice.* The ECOA notice sent with a notification of a credit denial will comply with the regulation if it is "substantially similar" to the notice contained in § 202.9(b)(1). For example, a creditor may add a reference to the fact that the ECOA permits age to be considered in certain credit scoring systems. In addition, a creditor may include as part of the notice a reference to a similar state statute or regulation and to a state enforcement agency.

Paragraph 9(b)(2).

1. *Number of specific reasons.* A creditor must disclose the principal reasons for denying an application or taking other adverse action. The regulation does not mandate that a specific number of reasons be disclosed, but disclosure of more than four reasons is not likely to be helpful to the applicant.

2. *Source of specific reasons.* The specific reasons disclosed under § 202.9(a)(2) and (b)(2) must relate to and accurately describe the factors actually considered or scored by a creditor.

3. *Specificity of reason.* Creditors neet not describe how or why a factor adversely affected an applicant. For example, the notice may say "length of residence" rather than "too short a period of residence."

4. *Credit scoring system.* If a creditor bases the denial on a credit scoring system, the reason disclosed must relate only to those factors actually scored in the system. Moreover, no factor that was considered may be excluded from disclosure. The creditor must disclose reasons actually considered (for example, "age of automobile") even if the relationship of that factor to predicting creditworthiness may not be clear to the applicant.

5. *Judgmental system.* If a creditor uses a judgment system, the reasons for the denial must relate to those factors in the applicant's record actually reviewed by the person making the decision.

6. *Combined credit scoring/judgmental system.* If a creditor denies an application based on a credit evaluation system that employs both credit scoring and judgment components, the reasons for the denial must come from the component of the system that the applicant failed. For example, if a creditor initially credit score an application and denies the credit request as a result of that scoring, the reasons disclosed to the applicant must relate to the factors actually

score in the system. If the application passes the credit scoring stage but the creditor then denies the credit request based on a judgmental assessment of the applicant's record, the reasons disclosed must relate to the factors reviewed judgmentally.

7. *Automatic denial.* Some credit decision methods contain features that call for automatic denial because one or more negative factors in the applicant's record (such as the applicant's previous bad credit history with that creditor, the applicant's declaration of bankruptcy, or the fact that the applicant is a minor) cannot be offset by other information about the applicant. When a creditor denies the credit request because of an automatic factor, the creditor must disclose that specific factor.

8. *Credit scoring—method for selecting reasons.* The regulation does not require that any one method be used for selecting reasons for credit denial that is based on a credit scoring system. Various methods will meet the requirements of the regulation. One method is to identify the factors for which the applicant's score fell furthest below the average score for each of those factors achieved by applicants whose total score was at or slightly above the minimum passing score. Another method is to identify the factors for which the applicant's score fell furthest below the average score for each of those factors achieved by all applicants. These average scores could be calculated during the development or use of the system. Any other method that produces results substantially similar to either of these methods is also acceptable under the regulation.

9. *Combined ECOA–FCRA disclosures.* Sample forms C–1 through C–8 of Appendix C provide for two disclosures, one under the ECOA and the other under the Fair Credit Reporting Act (FCRA). The ECOA requires disclosure of the principal reasons for denying an application for an extension of credit. The FCRA requires that when a creditor has based a decision in whole or in part on information from a source other than the applicant or the creditor, that fact must be disclosed. Disclosing that a credit report was obtained and used to deny the application—the disclosure under FCRA—does not satisfy the requirement under the ECOA for disclosure of specific reasons. For example, if the applicant's credit history reveals delinquent credit obligations and the application is denied for that reason, to satisfy § 202.9(b)(2) the creditor must disclose that the application was denied because of the applicant's delinquent credit obligations. To satisfy the FCRA requirement, the creditor must also disclose that a credit report was obtained and used to deny credit.

9(c) *Incomplete applications.*

Paragraph 9(c)(2).

1. *Reapplication.* If the information requested is submitted after the expiration of the time period designated by a creditor, the creditor may require the applicant to make a new application.

Paragraph 9(c)(3).

1. *Oral inquiries for additional information.* If the applicant fails to provide the information in response to an oral request, a creditor must send a written notice to the applicant within the 30 day period specified in § 202.9(c)(1) and (c)(2). If the applicant does provide the information, the credit shall take action on the application pursuant to section 202.9(a).

9(f) *Multiple creditors.*

1. *Third-party notice—content.* If a single adverse action notice is being provided to an applicant on behalf of several creditors, and they are under the jurisdiction of different federal enforcement agencies, the notice need not name each agency; disclosure of any one of them will suffice.

2. *Inadvertent error.* When a notice is to be provided through a third party, a creditor is not liable for any act or omission of the third party that constitutes a violation of the regulation if the creditor accurately and in a timely manner provided the third party with the information necessary for the notification and maintains reasonable procedures adopted to prevent such violations.

*Section 202.10 Furnishing of Credit Information*

1. *Scope.* The requirements of section 202.10 for designating and reporting credit information apply only to creditors that furnish credit information to credit bureaus or to other creditors. There is no requirement for a creditor to engage in such reporting.

2. *Reporting on all accounts.* The requirements of § 202.10 apply only to accounts held or used by spouses. However, a creditor has the option of designating all joint accounts (or all accounts with an authorized user) to reflect the participation of both parties, whether or not the accounts are held by persons married to each other.

3. *Designating accounts.* In designating accounts and reporting credit information, a creditor need not distinguish between accounts on which the spouse is an authorized user and accounts on which the spouse is a contractually liable party.

4. *File and index systems.* The regulations does not require the creation or maintenance of separate files in the name of each participant on a joint or user account, or require any other particular system of recordkeeping or indexing. It requires only that a creditor be able to report information in the name of each spouse on accounts covered by § 202.10. Thus, if a creditor receives a credit inquiry about the wife, it should be able to locate her credit file without asking the husband's name. A creditor may establish whatever system will enable its employees to locate the credit file.

10(a). *Designation of accounts.*

1. *New parties.* If a creditor learns that new parties who are spouses have permanently undertaken payment on an account, as in the case of a mortgage loan assumption, the creditor should change the designation on the account to reflect the new parties, and should furnish subsequent credit information on the account in the new names.

2. *Request to change designation of account.* A request to change the manner in which information concerning an account is furnished does not alter the legal liability of either spouse upon the account and does not require a creditor to change the name in which the account is maintained.

*Section 202.12 Record Retention*

12(a) *Retention of prohibited information.*

1. *Use of retained information.* Although a creditor may retain information as provided in § 202.12(a), its use of the information remains subject to the limitations of § 202.6.

12(b) *Preservation of records.*

1. *Copies.* A copy of the original record includes carbon copies, photo copies, microfilm or microfiche copies, or copies produced by any other accurate retrieval system, such as documents stored and reproduced by computer.

2. *Computerized decisions.* A creditor that enters information items from a written application into a computerized or mechanized system and makes the credit decision mechanically, based only on the items of information entered into the system, may comply with §202.12(b) by retaining the information actually entered. It need not store the complete written application, nor is it required to enter the remaining items of information into the system. If the transaction is subject to § 202.13, however, the creditor is required to retain the data on personal characteristics in order to comply with the requirements of that section.

Paragraph 12(b)(4).

1. *Withdrawn and brokered applications.* In most cases, the 25-month retention period for applications runs from the date a notification is sent to the applicant granting or denying the credit requested. In certain transactions, a creditor is not obligated to provide a notice of the action taken. In such cases, the 25-month requirement runs from the date of application, as when:

• An application is withdrawn by the applicant.

• An application was submitted to more than one creditor on behalf of the applicant, and the application was approved by one of the other creditors.

12(c) *Failure of compliance.*

1. *Inadvertent errors.* Inadvertent errors include, but are not limited to, clerical mistake, calculation error, computer malfunction, and printing error. An error of legal judgment is not a *bona fide* error under the regulation.

*Section 202.13 Information Requests for Dwelling-Related Loans*

13(a) *Information to be requested.*

1. *Natural person.* The requirements of § 202.13 apply only to applications from natural persons.

2. *Principal residence.* The requirements of § 202.13 apply only if an application relates to a dwelling that is or will be occupied by the applicant as the principal residence. A credit application related to a vacation home or a rental unit is not covered. In the case of a two-to-four unit dwelling, the application is covered if the applicant intends to occupy one of the units as a principal residence.

3. *New principal residence.* A person can have only one principal residence at a time. However, if a person buys or builds a new dwelling that will become that person's principal residence within a year or upon completion of construction, the new dwelling is considered the principal residence for purposes of § 202.13.

**10916**    Federal Register / Vol. 50, No. 52 / Monday, March 18, 1985 / Proposed Rules

4. *Temporary financing.* An application for temporary financing to construct a dwelling is not subject to § 202.13. But an application for both a temporary loan to finance construction of a dwelling and a permanent mortgage loan to take effect upon the completion of construction is subject to § 202.13.

5. *Loan purpose.* Only loans made for the purposes stated in § 202.13 are covered. For example:

• A loan to finance school expenses is not for a covered purpose even though it is secured by the applicant's principal residence.

• A loan to finance an addition to the applicant's principal residence, and secured by it, to be used as a business office, if for a covered purpose since it is for an improvement to the dwelling.

• A loan to finance both an addition to the applicant's principal residence and a family vacation is not for a covered purpose if the primary purpose of the loan is the vacation. A creditor may rely on the statement of the applicant about the primary purpose of the loan to determine coverage.

6. *Open-end home equity loans.* An application for an open-end line of credit based upon the borrower's equity in a principal residence and secured by that dwelling is not subject to § 202.13.

7. *Refinancings.* An application submitted to the original creditor to change the terms and conditions of an existing extension of credit is not subject to § 202.13 if the monitoring information was obtained on the original application for credit or subsequent financing. However, § 202.13 does cover an application for refinancing that is made to other than the original creditor.

13(b) *Method of obtaining information.*

1. *Forms for collecting data.* A creditor may collect the information specified in § 202.13(a) either on an application form or on a separate form refering to the application.

2. *Written applications.* The regulation requires written applications for the types of credit covered by § 202.13. (See the commentary to § 202.5(e).)

3. *Telephone, mail applications.* If an applicant does not apply in person for the credit requested, a creditor does not have to complete the monitoring information. For example:

• A creditor that accepts applications by telephone does not have to request the monitoring information in the course of the telephone conversation.

• A creditor that accepts applications by mail does not have to make a special request to the applicant if the applicant fails to complete the monitoring information on the application form sent to the creditor. However, if the applicant later appears in person at the creditor's place of business to complete the processing of the application or to close the loan, the creditor should seek and note the information at that time. (See commentary to § 202.5(e)).

4. *Applications through loan shopping services.* When a creditor accepts applications through an unaffiliated loan shopping service, that application is not subject to the requirements of § 202.13. (See commentary to § 202.2(l).)

5. *Inadvertent notations.* If a creditor inadvertently obtains the monitoring information in a transaction not covered by § 202.13, the creditor may act on and retain the application without violating the regulation. (See § 202.12(a).)

13(c) *Disclosure to applicant(s).*

1. *Procedures for providing disclosures.* The disclosures to an applicant regarding the monitoring information must be provided in writing. Appendix B contains a sample disclosure. However, a creditor may devise its own disclosure so long as it is substantially similar. The creditor need not orally request the applicant to provide the monitoring information.

By order of the Board of Governors of the Federal Reserve System, March 7, 1985.

**William W. Wiles,**

*Secretary of the Board.*

[FR Doc. 85–5877 Filed 3–15–85; 8:45 am]

**BILLING CODE 6210-01-M**

**48018** Federal Register / Vol. 50, No. 224 / Wednesday, November 20, 1985 / Rules and Regulations

## FEDERAL RESERVE SYSTEM

**12 CFR Parts 202 and 202a**

**[Regulation B; Docket No. R–0541]**

**Equal Credit Opportunity; Revision of Regulation B; Official Staff Commentary**

**AGENCY:** Board of Governors of the Federal Reserve System.

**ACTION:** Final rule and final official staff interpretation.

**SUMMARY:** The Board is issuing a final rule revising Regulation B, its regulation implementing the Equal Credit Opportunity Act (ECOA). This rule results from the Board's review of Regulation B pursuant to its policy of periodically reviewing all of its regulations. The Board considered ways the regulation could be simplified to ease the burdens imposed on creditors, consistent with the Board's responsibility for implementing the ECOA, and also considered whether the regulation could more effectively carry out the purposes of the act. The Board has made changes in the data notation requirements applicable to dwelling-related mortgage loan applications, and in the definition of "applicant" to give guarantors legal standing in the courts when there is an alleged violation of the signature provisions of the act or the regulation. In light of renewed concern about availability of business credit to women and members of minority groups, the Board considered (but deferred a decision on) revising the rules applicable to business credit transactions; the Board will monitor developments in this area, and if it appears that regulatory changes are needed, the Board will take appropriate action. The Board also considered but did not revise the regulation to cover consumer leasing under the ECOA. The Board has updated some provisions of the regulation and revised others to facilitate creditor compliance. The revisions include streamlined procedures for dealing with incomplete applications and a broader selection of sample forms for informing applicants of the action taken on applications. The major portions of the existing regulatory provisions remain virtually unchanged.

The Board is also publishing an economic impact analysis and an official staff commentary. The commentary interprets the requirements of revised Regulation B—incorporating prior Board and staff interpretations. Good-faith compliance with the commentary affords creditors protection

from civil liability under section 706(e) of the ECOA.

**EFFECTIVE DATE:** Effective December 16, 1985, Part 202 is redesignated as Part 202a (Part 202a will be removed on October 1, 1986).

A new Part 202 is added to be effective on December 16, 1985.

**FOR FURTHER INFORMATION CONTACT:** Regarding the regulatory amendments and official staff commentary, John C. Wood (Senior Attorney), Adrienne D. Hurt (Staff Attorney), or James K. Baebel (Senior Review Examiner), Division of Consumer and Community Affairs, Board of Governors of the Federal Reserve System, Washington, DC 20551 (202–452–2412); regarding the economic impact statement, Glenn Canner (Director, Micro-Consumer Projects) or Robert D. Kurtz (Staff Economist), Division of Research and Statistics, Board of Governors of the Federal Reserve System, Washington, DC 20551 (202–452–2910); or Joy W. O'Connell, Telecommunication Device for the Deaf (TDD) (202–452–3244).

**SUPPLEMENTARY INFORMATION:** (1) *Introduction.* In keeping with its policy of reviewing all of its regulations periodically, the Board published a notice of intent to review Regulation B on June 21, 1983 (48FR 28285). On March 18, 1985, the Board published proposed revisions to Regulation B (50 FR 10890), and has now adopted a revised regulation in final form. The revised regulation and official staff commentary will become effective December 16, 1985. However, creditors have the option of continuing to comply with the Board's current regulation and existing interpretations, which remain in effect, until October 1, 1986.

Several new rules may require operational changes:

• Applications subject to data notation requirements under section 202.13 will have to be in writing and creditors will be required to note the applicant's sex and race or national origin by visual observation or surname for applicants who do not voluntarily provide that information.

• Under the new rules for incomplete applications, a creditor may act on the application and notify the applicant of the action taken in accordance with § 202.9(a) or, alternatively, may notify the applicant in writing that additional information is needed, under new § 202.9(c). The written notice of incompleteness must specify what information is needed and designate a reasonable time period for the applicant to provide the information

• Under the rules for record retention, a creditor will be required to maintain

records for 25 months or withdrawn applictions as well as on incomplete applications.

Other revisions, though substantive, will not require changes in operational procedures:

• The revised definition of applicant gives legal standing to guarantors and like parties (enabling them to sue for violations of the reguation's signature rules) but imposes no new requirements on creditors.

• The Board has redefined the criteria that a credit scoring system must meet to qualify as "demonstrably and statistically sound" in order to use the applicant's age as a factor. The change makes clear that the criteria can be met by "decision tree" and other systems, but does not affect the standing of systems that meet the current criteria.

The aforementioned rules and other regulatory changes are discussed in detail below.

(2) *Background.* The Equal Credit Opportunity Act (15 U.S.C. 1691 *et seq.*), signed into law in 1974, makes it unlawful for creditors to discriminate in any aspect of a credit transaction on the basis of sex or marital status. Under amendments enacted by Congress in 1976, the act also bars discrimination on the basis of race, color, religion, national origin, age, receipt of public assistance, and the good-faith exercise of rights under the Consumer Credit Protection Act. The Federal Reserve Board was given rulewriting authority to issue implementing regulations, and issued Regulation B (12 CFR Part 202) in October 1975, amending it in December 1976 to incorporate the act's expanded coverage.

The Board's policy under its Regulatory Improvement Project calls for the periodic review of each Board regulation. In keeping with that policy, the Board made a detailed review to consider whether Regulation B could be simplified to ease the burdens imposed on creditors, consistent with the Board's responsibility for implementing the ECOA, and to consider also whether the regulation could more effectively carry out the purposes of the ECOA. The Board published a notice of intent to review the regulation in June 1983, to ensure the participation of interested parties early in the review. Based upon its own internal analysis and public comments received, as well as information from other sources, the Board proposed a revised version of Regulation B in March 1985. The Board received 166 comments on that proposal from creditors, Federal Reserve Banks, federal and state agencies, trade

associations, consumer groups, and others.

The Board believes, on the basis of the public comments and other available information, that the regulation is achieving its intended goals. The Federal Reserve Banks and the other federal enforcement agencies report no major compliance problems. As a rule, creditors appear to consider the Regulation B requirements to be manageable, and view the regulation as providing certainty about how to comply with the ECOA. Civil rights and consumer advocates continue to view the regulation as providing important protections. To the extent that consumers' views can be discerned from Board-sponsored surveys, consumers appear satisfied with the treatment they are receiving in the credit market.

In light of the indications that major revisions are not needed, the Board's revisions leave most of the regulatory provisions substantially unchanged. This is in contrast to the extensive changes made when the Board engaged in similar reviews of Regulation Z (Truth in Lending) and Regulation C (Home Mortgage Disclosure). The more limited nature of the revisions to Regulation B comes from the different circumstances that have surrounded the review of the regulation:

• The Board's review of the Truth in Lending and Home Mortgage Disclosure regulations implemented statutory amendments, that, particularly in the case of Truth in Lending, made significant reductions in the disclosure requirements. In contrast, there are no statutory amendments of any kind to be implemented under the ECOA.

• The volume of litigation under the ECOA and Regulation B has been quite limited, and by and large the court decisions that have been reported do not reflect the need for simplification of requirements that was evident in the case of Truth in Lending.

• It became apparent, in the course of the review, that creditors have no major problems in complying with Regulation B. Many creditors may find burdensome the notification requirements applicable to credit denials and other adverse action, but these provisions are drawn directly from the statute. Some creditors asked the Board to provide clarification on various points; others believe that the regulation is working effectively and encouraged the Board to leave the regulation substantially unchanged.

• Civil rights and consumer advocates have opposed any diminution of ECOA protections. Because the ECOA is civil rights legislation, and not strictly a consumer protection law, there is particular concern that the Board not cut

back on any protections currently provided.

In the review of the regulation, it was frequently found that no substantive change in regulatory provisions was required—that elaborating on a given point in a staff commentary could effectively facilitate creditor compliance. Accordingly, an official staff commentary has been prepared. The commentary provides needed guidance in a less formal manner than the regulation. It is discussed further in section (5) of this notice; the commentary text follows the regulatory text set forth in section (7).

The revised regulation is shorter than current Regulation B by about one-sixth—a reduction largely attributable to the deletion of obsolete provisions and to the transfer of explanatory material to the official staff commentary. The regulation also has been improved by the rewriting of some sections and the editing of others to state the requirements more clearly. The substance of all but two of the 19 footnotes contained in the current regulation has been moved to the official staff commentary, making the regulation itself less cumbersome to use.

In accordance with section 3507 of the Paperwork Reduction Act of 1980 and 5 CFR 1320.13, the revisions to Regulation B that pertain to third-party disclosures were approved under authority delegated to the Board by the Office of Management and Budget.

An economic impact statement, required by section 604 of the Regulatory Flexibility Act (5 U.S.C. 604), appears in section (6) below.

(3) *Treatment of business credit and consumer leasing.* Two areas that received special attention in the review of Regulation B (although no changes resulted) deserve mention: the treatment accorded to business credit transactions and coverage of consumer leases under Regulation B.

The Board considered whether any changes might be appropriate in the rules applicable to business credit under the regulation, in light of renewed public and congressional concern about the availability of credit to businesses owned by women and members of minority groups. The ECOA and Regulation B apply to all credit transactions, including business credit. Regulation B modifies the rules applicable to business credit transactions, relieving creditors from some of the more technical procedural requirements of the regulation. These exceptions do not, however, affect the basic ECOA protections against discrimination. For example, a creditor may not take the business applicant's

marital status into account, and may not request information about a married applicant's spouse except when the spouse has some connection to the business. A creditor must comply with rules that prohibit requiring the spouse to guarantee the loan. Women and other business credit applicants are entitled to notice of the action taken and, upon request, to a written statement of the reasons for a denial. They have the right to ask the creditor to retain records for the full 25-month period applicable to consumer credit transactions.

The Board believes that these provisions should fully protect women and members of minority groups against unlawful discrimination in business credit transactions, but has not ruled out changing the regulation to increase protections. In particular, the Board discussed whether the rules should be modified to require creditors to give business applicants who are denied credit a written notice of their right to receive a statement of reasons for the denial. Modifying the business credit rules would require new rulemaking, however, since the Board's March 1985 proposal did not contain proposed changes to these rules. The Board has deferred a decision on whether to initiate such rulemaking. In the meantime, the Board is developing an educational pamphlet on the application of the ECOA and Regulation B to business credit transactions for distribution to business owners through government agencies, women's groups, and other organizations. Better informing women and minority business owners about their rights under the law could be an effective way to assist them in enforcing those rights, and less costly than subjecting business credit fully to the rules applicable to consumer credit transactions. The Board will monitor developments in this area, and if it appears that the regulatory changes are needed, the Board will take appropriate action.

In the review of Regulation B, the Board also addressed the issue of whether to establish a uniform rule extending ECOA coverage to consumer leases. In *Brothers* v. *First Leasing,* 724 F.2d 789 (9th Cir.), *cert. denied,* 105 S. Ct. 121 (1984), the U.S. Court of Appeals for the Ninth Circuit held that consumer leases are defined by the Consumer Leasing Act are subject to the ECOA. The appellate ruling in *Brothers* is binding law in California and other states within the jurisdiction of the Ninth Circuit, and is being enforced in those states by the Federal Reserve and other regulatory agencies.

On policy grounds there is some support for a regulatory amendment to cover lease transactions. It seems inconsistent to allow lessors to consider marital status, sex, and other characteristics while creditors are prohibited from doing so. In additon, some lease transactions are similiar in many ways to credit transactions; indeed, financing leases, or open-end leases, have been held to be functionally equivalent to credit.

Nevertheless, the Board believes that the Ninth Circuit interpreted the ECOA's definition of credit too broadly when it concluded in the *Brothers* case that the granting of a lease is an extension of credit. The Congress has consistently viewed lease and credit transactions as distinct and mutually exclusive financial transactions and has treated them separately under the Consumer Credit Protection Act. The Board believes that the Congress did not intend the ECOA, which on its face applies only to credit transactions, to cover lease transactions unless the transaction results in a "credit sale" as defined in the Truth in Lending Act and Regulation Z. In addition, aside from the *Brothers* case there is little evidence of discrimination by lessors based on the personal characteristics of lessees, in contrast to the situation that existed with respect to credit transactions before the ECOA was enacted. Furthermore, core provisions of Regulation B if applied to leasing transactions could impose significant burdens for certain segments of the industry—such as furniture and appliance leasing. (Other lessors would be less affected; financial institutions that engage in automobile leasing, for example, already comply with Regulation B in many cases.)

In light of those considerations, the Board has not applied Regulation B to leasing. Instead, the Board will monitor the practices followed in lease transactions through contacts with government agencies, the leasing industry, and consumers. The Federal Reserve's enforcement activities in the Ninth Circuit will also provide the Board with first-hand experience regarding the application of Regulation B to consumer leases. Should it later appear that action is warranted, the Board will engage in rulemaking or make legislative recommendations as appropriate.

(4) *Regulatory revisions.* The following discussion covers the revisions to Regulation B section by section. In a number of sections, changes in the text have been made for the purpose of simplification or clarification, with no substantive change in the regulatory requirements; these minor changes are not covered in the discussion.

### Section 202.1—Authority, Scope and Purpose

Paragraph (a), on authority and scope, remains unchanged except for the addition of a reference to the control number assigned to Regulation B by the Office of Management and Budget as required by the Paperwork Reduction Act; other minor changes include the deletion of footnote 1 as unnecessary. A new paragraph (b) has been added to outline the purpose of Regulation B, consistent with the format followed in other Board regulations.

Paragraph (b) of the current regulation, concerning administrative enforcement, has been moved to new § 202.14, as paragraph (c), on penalties and liabilities. Paragraph (d), regarding procedures for the issuance of official staff interpretations, has been moved to new Appendix D.

### Section 202.2—Definitions

In this section, the Board has made a substantive change to the definition of "applicant" and a change to the definition of "empirically derived, demonstrably and statistically sound, credit scoring system" that will broaden its applicability, as discussed below. Other changes are structural or editorial, without substantive effect.

The references to notification of action taken, statement of reasons for denial, and record retention in the definition of "adverse action" in paragraph (c)(1) of the current regulation have been deleted as unnecessary. Editorial revisions have been made in paragraph (c)(1)(i), which now explicitly defines a counteroffer, and other subparagraphs of this definition. No substantive change is intended.

The Board has revised the definition of "applicant" in paragraph (e) to include guarantors, sureties, endorsers, and similar parties for purposes of § 202.7(d), which contains rules regarding signatures. The Board had proposed in March to define such parties as applicants without limitation. The final version of the definition was modified in response to the concerns of industry commenters who believed that the unlimited inclusion of guarantors and similar parties in the definition might subject creditors to a risk of liability for technical violations of various provisions of the regulation.

The principal effect of the change is to give guarantors and similar parties standing to seek legal remedies when a violation occurs under § 202.7(d). The regulation prohibits creditors, in certain situations, from requiring the signature of an applicant's spouse as a guarantor, surety, cosigner, or similar party. If a creditor violates this provision, however, a guarantor whose signature has been illegally required currently has no legal remedy because section 706 of the act confers standing to sue only upon an "aggrieved applicant." The Board has included guarantors and similar parties within the definition of "applicant" to resolve this question of standing.

Material regarding notification to an applicant that an application is incomplete has been deleted from the definition of "application" in paragraph (f) and incorporated into § 202.9(c), a new provision dealing with incomplete applications.

The Board has broadened the definition of an "empirically derived, demonstrably and statistically sound, credit scoring system" contained in paragraph (p). The currrent language appears to limit the applicability of the definition to a system that uses the allocation of points or the assigning of weights. The revised language makes clear that, if the system is developed using accepted statistical principles and methodology, a decision-tree or other type of credit scoring system that meets these standards also qualifies. Other conforming technical revisions to this paragraph have resulted in no substantive change. Credit scoring systems that meet the criteria as stated in the current definition will continue to qualify as "demonstrably and statistically sound" under the revised definition.

Other changes to the definitional section include the deletion of: footnote 2 to the introductory material, the last sentence in the definition of "open-end credit" in paragraph (w), footnote 3 to the definition of "prohibited basis" in paragraph (z), the definition of "public assistance program" in paragraph (aa), and the rule of construction in paragraph (dd). Comparable material appears in the official staff commentary, 202.1(a)–1; 202.2(w)–1; 202.2(z)–1 and –3; and comment 4 to the Introduction, respectively. Paragraph (cc), a rule of construction regarding captions, has been deleted as unnecessary.

### Section 202.3—Limited Exceptions For Certain Classes of Transactions

The Board has restructured this section for easier reference. In the revised regulation, the definition of each type of credit is immediately followed by the list of exceptions applicable to it. There are no substantive changes to any of the existing provisions.

The definition of public utilities credit in paragraph (a) has been slightly revised to correspond more closely to the definition in Regulation Z (Truth in Lending).

In the section on business credit, the rules relating to notification and record retention have been placed in paragraph (d)(3) and labeled "modified requirements," to emphasize that they only modify the procedures ordinarily required by Regulation B, rather than provide total exceptions. Paragraph (d)(3)(i) incorporates official staff interpretation EC–0009, and makes clear that a creditor is required to notify the business credit applicant of the action taken on an application or of its incompleteness. The provision concerning record retention has been edited to make clear that the time period for requesting record retention runs from the notification of action taken or of incompleteness.

The list of exceptions applicable to government credit in paragraph (e) has been simplified without substantive change.

### Section 202.4—General Rule Prohibiting Discrimination

No changes have been made to this section.

### Section 202.5—Rules Concerning Taking of Applications

With the exception of paragraph (e), changes in this section are structural or editorial. Captions have been added to facilitate use of the regulation. With the deletion of the preceding footnotes, footnote 4 has been renumbered footnote 1. Footnote 5 and portions of paragraphs (b)(3) and (d)(2) also have been deleted; comparable material appears in the official staff commentary, 202.5(d)(1)–1; 202.7(e)–2; and 202.5(d)(2)–2 and –3, respectively. Footnote 6 has been deleted as obsolete.

Revised paragraph (e) requires that written applications be taken for dwelling-related loans that are subject to the data notation requirements of § 202.13. (In all other types of credit transactions, written applications continue to be optional.) This change, along with the changes in data notation requirements discussed under § 202.13, will increase the information available to enforcement agencies to monitor compliance. A creditor may comply with the new requirement by writing down the information that it normally considers in making a credit decision; use of a form is not required. Some of the material in paragraph (e) of the current regulation concerning the use of the Board's model application forms has been moved to the introductory section in Appendix B.

### Section 202.6—Rules Concerning Evaluating of Applications

The few changes in this section are structural or editorial only. Captions have been added to facilitate use of the regulation. Footnote 7 of the current regulation has been renumbered footnote 2. The last sentence of the footnote, citing portions of the legislative history of the act dealing with the "effects test," has been deleted from the regulation; comparable material appears in the official staff commentary, 202.6(a)–2. Footnotes 8 and 9 of the current regulation, as well as the material in paragraph (b)(5) regarding factors that a creditor may consider in determining the likelihood of consistent payments, have been deleted; comparable material appears in the official staff commentary to § 202.6(b). The provision regarding inadvertent errors has been deleted from paragraph (b)(6) and has been incorporated in new § 202.14(c).

### Section 202.7—Rules Concerning Extensions of Credit

Except for minor revisions to the rules governing the treatment of open-end accounts in paragraph (c), revisions to this section are structural or editorial, without substantive effect, and include the addition of captions for ease of reference.

In paragraph (c)(1)(i), a reference to paragraph (c)(2) has been added to clarify the relationship between the two paragraphs. Paragraph (c)(2) has been revised in minor ways from the current provision. New language makes clear that the provision applies only in the case of an applicant who is contractually liable. The term "earned by" has been deleted to clarify that the provision applies to any instance in which the creditor relied upon the income of the applicant's spouse in granting the credit. "Information available to the creditor" replaces existing language because it is believed to be a more appropriate basis for determining whether a creditor may require reapplication. In the proposal published in March, "current credit limit" was substituted for existing language because it appeared to be a more appropriate test for determining the applicant's overall ability to repay than the "amount of credit currently extended." Because some creditors do not have predetermined credit limits, the final version refers to the "current credit available."

Some editorial revisions have been made in the signature rules of paragraph (d), without substantive effect. Paragraph (d)(2) has been revised to make clear that, in applications for unsecured credit, if the applicant relies on jointly owned property, the creditor may require the signature of the co-owner only to assure access to the property; see the official staff commentary, 202.7(d)(2)–1. The material concerning factors that the creditor may consider regarding property owned by the applicant has been deleted. Comparable material appears in the official staff commentary, 202.7(d)(2)–1. In response to public comment, the "reasonable belief" standard omitted from the March proposal has been retained in the regulation.

Paragraph (d)(5) of the current regulation has been divided into two paragraphs, (d)(5) and (6), without substantive effect.

Paragraph (e) prohibits a refusal to grant credit because certain types of credit-related insurance are not available due to the applicant's age. The coverage of this paragraph has been broadened to include "other credit-related insurance" as well as credit life and other specific types already listed. The provisions in current paragraph (e) regarding differences in rates and the like have been deleted; comparable material appears in the official staff commentary to § 202.7(e).

### Section 202.8—Special Purpose Credit Programs

The wording of this section has been edited in various places for clarity, without substantive effect.

### Section 202.9—Notifications

Substantive as well as structural and editorial changes have been made to this section. As in other sections, captions have been added throughout for ease of reference.

In this section the Board had proposed in March to substitute the words "denying" or "denial" of credit or "changing adversely" for the term "adverse action." The proposed change was based on the Board's belief that use of the term "adverse action" in the regulation raises unnecessarily negative connotations and has also led creditors to believe that they must use that term in communicating with applicants who are denied credit. In response to public comment and upon further analysis, the Board has retained use of the term "adverse action" in this section. The substitution of a term defined by the act and regulation with such undefined (and not necessarily synonymous) words as

**48022** **Federal Register** / Vol. 50, No. 224 / Wednesday, November 20, 1985 / Rules and Regulations

"denial" could lead to confusion and inadvertent noncompliance. Guidance on use of the term "adverse action" has been provided in the official staff commentary, 202.9–1.

Language has been added to paragraph (a)(1)(i) to make clear that a creditor's counteroffer must be made within 30 days of the receipt of a completed application. Material that appears in the current regulation, permitting notification of the approval of an application to be either express or implied, has been deleted. Comparable material appears in the official staff commentary, 202.9(a)(1)–2. Editorial changes made to paragraph (a)(1)(iv) have no substantive effect.

In addition to the current requirements of paragraph (a)(2), the revised rule requires that an adverse action notice contain the name and address of the creditor, identification that is customarily but not always provided . That information will give rejected applicants a clearer indication of whom to contact if there are questions about the content of the notice. Editorial changes have been made to paragraph (a)(2)(ii), without substantive effect.

Paragraphs (a) (3) and (4) of the current regulation have been redesignated as paragraphs (f) and (g), and are discussed below.

Material in paragraph (b)(1) allowing modification of the model ECOA notice, to include references to similar state law and a state enforcement agency, has been deleted. Comparable material appears in the offical staff commentary, 202.9(b)(1)–1.

The second sentence of paragraph (b)(2) of the current regulation has been deleted. It states that a creditor may design its own notice form or use all or a portion of the Board's sample form, which if properly completed will satisfy the requirements of paragraph (a)(2)(i). Comparable language is contained in the revised introduction to Appendix C. The sample form itself has also been deleted. It has been replaced by a number of sample notices in new Appendix C, as discussed below.

Current paragraph (b)(3), concerning the format of disclosures, has been deleted. Comparable material appears in the official staff commentary, 202.9–4; see also 202.9(b)(1)–1.

Current paragraph (c) has been redesignated paragraph (d) and is discussed below. New paragraph (c) establishes a streamlined procedure for dealing with incomplete applications. It provides that if a creditor receives an application that is incomplete regarding matters that the applicant can complete, within 30 days the creditor must either

notify the applicant of its decision, under paragraph (a) of this section, or notify the applicant that additional information is needed. The latter notification must specify the information needed, designate a reasonable time period for submission of the information, and inform the applicant that unless the information is provided there will be no further consideration of the application. (Form C–6 in Appendix C is a sample form for a notice of incompleteness under this paragraph.) If the applicant fails to respond within the designated time period, the creditor has no obligation to provide further notification of any kind. If the applicant provides the requested information in a timely manner, the creditor must then take action on the application and give appropriate notice under paragraph (a). Paragraph (a)(1)(ii), concerning the denial of an incomplete application, has been revised to include conforming language.

Paragraph (d) on oral notifications is currently paragraph (c); changes are strictly editorial. Paragraph (e), currently paragraph (d), provides a special rule on withdrawn applications. It is virtually identical to the current provision.

Paragraph (f) is virtually identical to current paragraph (a)(3). Paragraph (g) is comparable to current paragraph (a)(4). That portion of current paragraph (a)(4) dealing with liability for acts of third parties has been deleted. Comparable material appears in the official staff commentary, 202.9(g)–3.

Paragraph (e) of the current regulation, regarding inadvertent errors, has been deleted. Comparable language is contained in new section 202.14(c). Paragraph (f) of the current regulation has also been deleted; comparable material appears in the official staff commentary, 202.9–3.

### Section 202.10—Furnishing of Credit Information

This section has been rewritten and restructured for clarity, with obsolete material deleted. There is no substantive change from the existing rules. Current footnotes 11 and 12 have been deleted; comparable material appears in the staff commentary, 202.10–3 and 202.10(a)–1. Some material in current paragraph (c), dealing with the legal effect of signing a request to change the manner in which information is furnished, has been deleted. Comparable material appears in the official staff commentary, 202.10(a)–2. Current paragraph 10(d) regarding inadvertent errors has also been deleted; comparable language is contained in new § 202.14(c).

### Section 202.11—Relation to State Law

This section is virtually identical to the current section except for editorial changes. Footnote 16 has been deleted as unnecessary.

### Section 202.12—Record Retention

The revised section requires creditors to maintain records on withdrawn applications as well as on incomplete applications. Other revisions are minor. Captions have been added for ease of reference.

Paragraph (a) permits the retention in files, under certain circumstances, of information that is generally prohibited. Paragraphs (a) (2) and (3) of the current regulation have been merged into paragraph (a)(2), so that a creditor is allowed to retain (without violating the regulation) prohibited information that it receives from a credit bureau, provided the creditor did not specifically request that information. There is no reason for giving special protection, as the current rule seems to do, when prohibited information is obtained from a credit bureau at the specific request of the creditor. A violation will not occur if a creditor requests and receives a credit report that happens to contain prohibited information. The words "at any time" have been deleted as unnecessary, and footnote 17 to paragraph (a) has been deleted as obsolete.

Paragraph (b)(1) requires retention of records for 25 months after the creditor notifies an applicant of action taken on an application. This paragraph has been revised to require the same record retention after a notification of incompleteness because, as discussed under section 202.9, a notification of incompleteness may substitute for notification of action taken in certain instances. In addition, footnote 18 to paragraph (b)(1) has been deleted; comparable material appears in the official staff commentary, 202.12(b)–1 and –2.

Under paragraph (b)(3), currently paragraph (b)(4), record retention is required of creditors who, under paragraph (a)(4) of the current regulation, do not have to give notice to an applicant of action taken. (This result occurs when an application has been "shopped" among several creditors and at least one creditor has granted credit.) As revised, the record retention provision also requires a creditor to retain records when an applicant submits an application for credit but then withdraws it prior to notification of the creditor's decision. This change will ensure more complete records of

applications and better enable regulatory agencies to assess creditors' compliance.

A reference to the Attorney General of the United States has been added to paragraph (b)(4), currently paragraph (b)(3), to require retention of records until final disposition of an enforcement proceeding or investigation conducted by the Attorney General. Current paragraph (c) regarding inadvertent errors has been deleted. Comparable language is contained in new § 202.14(c).

### Section 202.13—Information For Monitoring Purposes

This section requires creditors to request applicants for particular types of dwelling-related loans to provide certain information about their race or national origin, sex, age, and marital status. The purpose is to enable enforcement agencies to monitor creditors' compliance with the ECOA and Regulation B. In March, the Board proposed a number of changes in the section, with two purposes: first, to attempt to achieve greater uniformity in the data notation rules applicable to various groups of creditors; and second, to improve the ability of the Federal Reserve System and other agencies to carry out their responsibilities under the ECOA, Fair Housing Act, and Community Reinvestment Act. Revised § 202.13 differs from both the current regulation and the proposed version in some respects.

Under revised paragraph (a), a creditor must request information regarding an applicant's race or national origin, sex, marital status, and age upon receiving an application for the purchase or the refinancing of a dwelling occupied or to be occupied by an applicant as a principal residence, where the extension of credit will be secured by the dwelling. This differs from the current regulation in the following ways:

(1) The revised rule covers all applications for the specified types of loans, while the current rule applies only to written applications. (Section 202.5(e) of the revised regulation further requires that applications subject to § 202.13 be taken in writing, as discussed above.)

(2) The revised rule applies to refinancings as well as purchase loans (including construction-permanent financing).

(3) The revised rule covers loans related to the borrower's principal residence, including manufactured or mobile home loans whether or not the structure is attached to real property. The current provision, in contrast, only covers manufactured homes that are

considered real property under state law.

The March proposal would have covered, in addition, credit applications for the repair or improvement of the borrower's principal residence. The Board received 104 comments on the proposed revisions to § 202.13. Over half of the commenters generally opposed the proposal. Some argued that the addition of home improvement loans would be unduly burdensome not only because it would require data notation on additional loans but in particular because it would impose data notation requirements on new groups of creditors, those that do not make purchase money mortgage loans but do engage in secured home improvement lending. Moreover, some of them— finance companies and home improvement contractors, for example— are not subject to periodic examination as are financial institutions, making the usefulness of the notation questionable. The Board believes that the final revisions to this section move in the direction of uniformity without imposing undue burdens.

Under revised paragraph (b), a creditor is required to request the race or national origin, sex, marital status, and age of an applicant, as in the current regulation. If the applicant does not voluntarily provide the requested information, the creditor must note the sex and race or national origin of the applicant on the basis of visual observation or surname. This is the rule currently used by the Federal Deposit Insurance Corporation, the Federal Home Loan Bank Board, and the Office of the Comptroller of the Currency. Thus, the revision represents a change for state member banks, credit unions, and mortgage bankers, all of which currently collect the information only on a voluntary basis. The revision establishes a uniform rule for institutions supervised by federal financial regulatory agencies and will provide better data by which to determine a creditor's compliance with the ECOA and the Fair Housing Act. Paragraph (c) requires disclosure of the revised requirement.

Paragraph (d) of the current regulation permits other enforcement agencies to substitute their own monitoring programs for the Regulation B procedures. The Board requested specific comment on whether paragraph (d) should be deleted. Comments both from other federal enforcement agencies and from creditors were generally unfavorable. Therefore, the paragraph has been retained.

A provision for inadvertent errors in data notation is contained in new § 202.14(c).

### Section 202.14—Enforcement, Penalties and Liabilities

This is a new section, consisting primarily of material from current § 202.1 (b) and (c). The material has been edited for purposes of simplification, without substantive effect.

Paragraph (a), identifying administrative enforcement agencies, is comparable to current § 202.1(b), and reflects the transfer of the enforcement functions of the Civil Aeronautics Board to the Secretary of Transportation (49 FR 50994, December 31, 1984). Paragraph (b), discussing penalties and liabilities, is comparable to current § 202.1(c)(1). Paragraph (c) incorporates material from current §§ 202.6(b)(6), 202.10(d), and 202.12(c) regarding inadvertent errors, and adds a similiar provision relating to § 202.13.

### Appendix A—Federal Enforcement Agencies

Changes have been made to this appendix to reflect the current addresses of the various enforcement agencies.

### Appendix B—Model Application Forms

The introductory material to this appendix incorporates material from § 202.5(e) of the current regulation, so that all directions for the proper use of the model forms appear in one place. The material permitting the addition of three specific items to the model forms has been deleted because creditors may add any item not prohibited by § 202.5 (not merely these three). The discussion of the FHLMC 65/FNMA 1003 form has been deleted; approval of that form appears in the official staff commentary, app. B–1. The Board has also adopted a sample disclosure and information request form that may be used to comply with revised § 202.13; this disclosure and request form appears on page 2 of the model application form for residential real estate loans. No other change has been made to the model application forms. The model forms are being reprinted in this notice.

### Appendix C—Sample Notification Forms

The regulation currently provides a sample adverse action notification form in § 202.9(b)(2) that creditors may use to satisfy the requirements of § 202.9(a)(2)(i). In the June 1983 notice of intent to review Regulation B, the Board requested comment concerning that

sample form. The Board then developed a number of sample notices in response to suggestions received from various sources, including the industry, members of the Board's Consumer Advisory Council, staff of other enforcement agencies, and the Reserve Banks.

Ten sample forms were published in the March proposal. The Board requested comment on which of the proposed forms would be most useful to creditors and most informative to consumers. Comments on the proposed model forms were largely favorable; there was some concern, however, that ten forms were too many. Commenters specified which forms they felt were more useful than others, and also suggested changes in the text of a number of the forms.

New Appendix C to the regulation contains six sample notification forms. The Board dropped proposed forms C-2, C-4 and C-10, combined forms C-5 and C-6, and revised the text of some of the forms. The availability of a variety of model forms, in different formats, should better convey to creditors that they have wide latitude in the design and wording of their own forms.

No single form contains a comprehensive listing of possible reasons for denial. Creditors must incorporate into their forms the factors on which they actually base their credit evaluations; they should not simply reprint a model form and check a factor that most closely approximates the reason for adverse action. Forms C-1 through C-4 are sample statements of reasons for a credit denial or other adverse action. Form C-3 is a sample notice for use with a credit scoring system. Form C-4 combines the statement of reasons with notice of a counteroffer. Form C-5 is a sample disclosure of the right to receive a specific statement of reasons for a credit denial or other adverse action. Form C-6 is a request for additional information, as provided for in § 202.9(c); in that circumstance, the ECOA notice is not required.

Use of sample notices is entirely optional, as is true of the existing notice. A creditor may continue to use the existing sample form if the form sets forth accurately the factors the creditor considers.

*Appendix D—Issuance of Staff Interpretations*

This new appendix replaces § 202.1(d) of the current regulation, which deals with requests for and issuance of official staff interpretations of Regulation B. Because of changes in the procedures (particularly the introduction of the official staff commentary as the vehicle

for such interpretations), this appendix differs from current § 202.1(d); it is modeled on Appendix C to Regulation Z, which deals with staff interpretations under that regulation.

(5) *Discussion of official staff commentary.* The Board is publishing an official staff commentary to the revised regulation. Good-faith compliance with the commentary affords creditors protection from civil liability under section 706(e) of the ECOA.

A proposed version of the commentary was published in the **Federal Register** on March 18, 1985 (50 FR 10890). Some changes to the substance of the proposal were requested by the commenters; a number have been adopted in the final commentary. Certain provisions have been revised and clarified. In addition, comments have been added, modified or deleted as necessary.

The commentary format follows that already used for other Board regulations such as Regulation Z (Truth in Lending) and Regulation M (Consumer Leasing). The commentary replaces six existing Board interpretations, thirteen official staff interpretations, and fifteen informal staff letters that were designated public information letters. The commentary is the sole means for issuing official interpretations of the regulation.

As is the case with other staff commentaries, the commentary to Regulation B gives general guidance, and is designed to assist creditors in applying the regulation to specific fact situations. Following the format used in the commentary to Regulation Z, each paragraph in the commentary is identified by the relevant section or paragraph of the regulation. For example, commentary to § 202.7 is designated according to the particular paragraph addressed, such as comments 7(c)-1 and 7(d)(2)-1.

The Board has previously ruled that several state laws in Alabama, California, and Nebraska are not preempted by the ECOA and Regulation B. These nonpreemption determinations relate to laws that deal with the age of majority, notices to unmarried cosigners, and Spanish language translations of credit documents. The have been omitted from the official staff commentary, which will follow the rule in Regulation Z of including only those determinations that result in the preemption of a state law or regulation.

Official staff interpretation EC-0009 has been incorporated into the text of § 202.3(d) of the regulation, which now makes clear that a creditor that denies a business credit application must give the applicant notice of action taken or of

incompleteness within a reasonable time.

Certain official interpretations have been omitted for various reasons. Interpretation EC-0001, which addressed the requirements for sending credit history notices by June 1977, is obsolete. Interpretation EC-0004 has been omitted because it appears that the subject matter—the application of state laws governing graduated rates, maximum loan ceilings, and rate splitting—does not continue to warrant the detailed treatment provided in that letter. EC-0010, which dealt with the permissibility of inquiries about a potential customer's religion by a seller of religious books, has been omitted because of its limited applicability.

Interpretations that approved certain creditor forms—EC-0012 and EC-0015—have been incorporated into the commentary to Appendix B, the vehicle for approving credit application forms used on distributed by federal or state agencies or federally chartered operations. EC-0013 related to a form no longer in use, and has been omitted.

The answers provided in other official staff interpretations have served as the basis for the sections of the official staff commentary to which they relate. This includes EC-0011 regarding the applicability of Regulation B to lending operations outside of the United States, which had been omitted from the March proposal; see 202.1(a)-2. Material from some of the 15 staff opinion letters originally published as public information letters also has been used.

Proposed comment 202.2(1)-1 has been omitted from the final version. It appeared to create unnecessary confusion regarding possible liability for officers or employees of a creditor. The proposed comment had been included as a reminder that a court may hold an officer or employee accountable for individual acts of illegal discrimination, and not to suggest that officers or employees would be held liable for technical violations of the regulation. Since courts will make determinations about individual responsibility in any specific case involving illegal discrimination, withdrawal of the comment seems appropriate.

Proposed comment 202.7(d)(3)-2 also has been omitted from the final version of the official staff commentary. The comment, which was based on Public Information Letter 15, dealt with consideration of a spouse's earnings in community property states, taking the position that in an equal management state a creditor may not require the signature of the nonapplicant spouse on an application, note, or other credit

Case: 1:13-cv-08564 Document #: 19-6 Filed: 02/12/14 Page 145 of 159 PageID #:895

instrument. A U.S. district court in California recently ruled for the defendant in *United States.* v. *ITT Consumer Financial Corp.,* No. C–83–3924 JPV (N.D. Cal. Sept. 18, 1985) (order granting motion for summary judgment), allowing ITT to obtain the signature in such circumstances. (A decision by the government on the filing of a notice of intent to appeal is pending.) The U.S. District Court of Arizona, in *Clark* v. *Avco Financial Services,* No. 80–272 (D. Ariz. June 24, 1981), took a position contrary to the California ruling. Although the Board continues to believe that the position stated in proposed comment 202.7(d)(3)–2 as published in March 1985 is correct, this portion of the commentary is being omitted in view of the conflicting court decisions.

(6) *Economic impact analysis. Introduction.* The benefits and costs of the revisions to Regulation B are discussed in this economic impact analysis.

*Redefinition of "applicant" to include guarantors.* An applicant for credit has standing to sue under Regulation B but a guarantor does not. The rule redefines "applicant" in § 202.2(e) to include guarantors for purposes of the § 202.7(d) signature rules. This modification of the rule allows guarantors who believe they have been injured by an ECOA violation to bring suit, thereby enhancing protections.

The new provision may increase creditors' costs by increasing their exposure to litigation. Litigation would increase to the extent guarantors sue regarding alleged Regulation B signature rule violations, and the alleged violations would not have been litigated by applicants themselves. Analysis by the Division of Consumer and Community Affairs suggests that this situation will probably arise infrequently. Applicants normally bring suit in their own right, and guarantors, if they have standing to sue, would merely join in the lawsuit. Guarantors are often the spouse or business associate of the applicant. If it becomes a matter of course in legal actions involving defaulted loans that both the applicant and the guarantor claim injury from the same alleged violation, litigation expense may be increased; the increase will probably be small since the same alleged violation is involved.

*Written applications and notation of monitoring data.* Provisions in § 202.5 will for the first time require covered creditors to take written applications for certain home purchase and refinancing loans. Section 202.5 provisions will require written applications of credit requests covering loans for the purchase or refinancing of a dwelling occupied or

to be occupied by the borrower as a principal residence. Creditors can satisfy the requirement for taking written applications by writing down information that they normally consider in making a credit decision. In addition, creditors are required by § 202.13 to record monitoring data on the race or national origin, sex, age, and marital status of an applicant for home purchase and refinancing loans secured by the dwelling. If the applicant does not volunteer such information upon request, loan officers are required to observe and note the loan applicant's race or national origin and sex. The applicant must be informed orally or in writing about the purpose and provisions of § 202.13.

At present, Regulation B requires creditors to request the monitoring data from applicants for home purchase loans only if the application is in writing. The current regulation does not require written applications for home purchase loans or notation of monitoring data not volunteered by the applicant.

The changes are expected to enhance consumer protection through more effective enforcement. Current ECOA enforcement techniques call for the consumer compliance examiners to use all available data to test for the presence or absence of discrimination on a prohibited basis, such as race or national origin, sex, age, or marital status. The primary data for examiners are creditor loan files. In the case of banks supervised by the Federal Reserve System (FRS), the absence of written applications and information on personal characteristics of loan applicants in many cases substantially reduces the examiners' ability to perform tests for possible discrimination. (Survey results indicate that in 1980 and 25 percent of applications for housing-related loans from banks examined by the Federal Reserve did not contain monitoring data.) The changes will facilitate more effective enforcement.

While banks regulated by the FRS are not required at present to take written applications nor record monitoring data if not provided voluntarily by the applicant, this is not the case for many other creditors. Regulation B allows agencies charged with ECOA enforcement responsibilities to establish their own rules regarding the recording of monitoring data. Banks and savings and loan associations regulated by the Federal Deposit Insurance Corporation (FDIC), the Office of the Comptroller of the Currency (OCC), and the Federal Home Loan Bank Board (FHLBB) are required by rules established by these agencies to take written applications

and record monitoring data on most housing-related loans. Federally chartered credit unions are required by the National Credit Union Administration to take written applications but are not required to record monitoring data. Mortgage bankers are not currently required to take written applications. However, since these firms generally sell loans they originate in the secondary market, they typically use standardized written application forms as a matter of course.

The new rule requiring creditor notation will create uniformity in the compliance rules established by the various regulatory agencies regarding home purchase and refinancing loans. The major beneficiary of uniform rules will be the mortgage banking industry. Mortgage banking firms are currently in an untenable position. On the one hand, they must comply with Regulation B provisions that prohibit the notation of monitoring data by the loan officer when the applicant declines to provide the data. On the other hand, in order to sell loans in the secondary market, the loan application generally must include the monitoring data.

The extent to which the revised rule can be expected to result in the detection of an increased number of ECOA violations is uncertain. For example, the FDIC, OCC, and FHLBB have cited a very small number of creditors for discrimination even though these agencies have had access to written applications and monitoring data for a number of years. The inability to detect ECOA violations may reflect widespread creditor compliance with ECOA provisions. To some extent the low number of violations may indicate that discrimination is effectively deterred by creditors' knowledge that examiners have access to written applications and monitoring data. Under these circumstances, the number of cases of actual discrimination detected by examiners will likely be small. To the extent the deterrent effect is important, adoption of the rule will enhance consumer protection.

The changes are unlikely to impose significant costs on the industry because most creditors are currently covered by rules established by the FDIC, OCC, and the FHLBB that require written housing-related loan applications and the recording of monitoring data. The creditors most likely to be affected by the changes are banks supervised by the FRS, and to a lesser extent, federally chartered credit unions. These financial institutions would incur costs to modify existing written application forms if the monitoring data and section 202.13

disclosure statement are to be included on the loan application form, or costs to print and store for record retention a separate form with the required monitoring information. (Complying mortgage loan application forms available from the Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association cost about 20 cents per form.) Currently, a few small banks supervised by the FRS do not request monitoring data because they do not take written applications for home purchase or refinancing loans. Public comments indicate that these banks view the monitoring data requirements as a significant disturbance to the "relaxed" atmosphere in which business is conducted.

A final burden associated with a requirement to record monitoring data involves the loss of personal privacy some loan applicants may feel if creditors note their personal characteristics even though they choose not to voluntarily supply such information. Information available to the Board indicates that in 1980 about 10 percent of the applicants for home purchase loans at state member banks declined to voluntarily provide monitoring data when asked to do so. Presumably, these individuals are the most likely to be offended by the change. On the other hand, there is no record of consumer complaints about the recording of the monitoring data, even though the OCC, FDIC, and FHLBB have been requiring information for many years.

*Incomplete applications.* The current rule requires that adverse action notification be given when efforts by a creditor to obtain missing information regarding an application fail to elicit a response from the applicant. Under the revised regulation, creditors are not required to provide adverse action notification if the applicant does not supply the information needed to complete the application within a reasonable period. As a consequence, creditors may provide one less notice in these circumstances, thereby reducing costs. Consumer protections will not be significantly reduced since applicants who do not respond in a reasonable time period to a creditor's request for additional information probably are no longer interested in the loan from that creditor, or expect to be denied credit based on the lender's evaluation of that additional information.

*Record retention of withdrawn applications.* Under the current rule, there is no record retention requirement with respect to an application expressly withdrawn by the applicant. The absence of records on withdrawn applications hampers an examiner's investigation of an unusually low application denial rate which the creditor claims reflects a high rate of withdrawn applications. Therefore, the change requiring record retention of applications withdrawn by the applicant may increase the effectiveness of enforcement.

Because of the revision, some creditors may incur costs to expand record storage space for applications expressly withdrawn by the applicant. The cost per record of additional storage space will vary among creditors depending on record storage technology and current storage capacity utilization. If examiners are correct in their belief that in general there are few nonbusiness applications expressly withdrawn by applicants relative to denials, then compliance costs of the change will be small for most creditors. Business applications expressly withdrawn do not have to be retained under the revised regulation because of the business credit provisions in section 202.3.

*Small Entities*

Recent research on compliance costs for consumer protection regulations suggests that the smallest commercial banks have incurred the greatest compliance costs per account. Similarly, the compliance costs associated with the regulatory changes may tend to fall disproportionately on the smallest banks. According to the Board's consumer compliance examiners, a few FRS supervised banks will need to start using written application procedures, and most of these banks are relatively small. Even though many of these small banks may already satisfy the written application requirement by noting down information that they normally consider in making a credit decision, these small banks will be recording the monitoring data for the first time. However, the marginal costs of the revisions to Regulation B are not likely to be large for any creditor, regardless of the creditor's size.

**List of Subjects in 12 CFR Part 202**

Banks, Banking, Civil rights, Consumer protection, Credit, Federal Reserve System, Marital status discrimination, Minority groups, Penalties, Religious discrimination, Sex discrimination, Women.

(7) *Regulatory text.* Pursuant to the authority granted under section 703 of the Equal Credit Opportunity Act, 15 U.S.C. 1691b, the Board amends 12 CFR Chapter II as follows:

1. Effective December 16, 1985 Part 202 is redesignated as Part 202a (Part 202a will be removed on October 1, 1986). Part 202a is amended by adding the following note at the end of the table of contents to read:

*Effective date note:* Part 202 was effective on December 16, 1985, but creditors have the option of continuing to comply with this Part 202 (in lieu of Part 202) until October 1, 1986.

2. A new Part 202 is added to be effective on December 16, 1985 to read as follows:

## PART 202—EQUAL CREDIT OPPORTUNITY

Sec.
202.1   Authority, scope and purpose.
202.2   Definitions.
202.3   Limited exceptions for certain classes of transactions.
202.4   General rule prohibiting discrimination.
202.5   Rules concerning taking of applications.
202.6   Rules concerning evaluation of applications.
202.7   Rules concerning extensions of credit.
202.8   Special purpose credit programs.
202.9   Notifications.
202.10  Furnishing of credit information.
202.11  Relation to state law.
202.12  Record retention.
202.13  Information for monitoring purposes.
202.14  Enforcement, penalties and liabilities.
Appendix A—Federal Enforcement Agencies
Appendix B—Model Application Forms
Appendix C—Sample Notification Forms
Appendix D—Issuance of Staff Interpretations
Supplement I—Official Staff Interpretations

**Authority:** 15 U.S.C. 1691 et seq.

**Effective date note:** Effective December 16, 1985, but creditors have the option of continuing to comply with Part 202a until October 1, 1986.

## Regulation B (Equal Credit Opportunity)

### § 202.1  Authority, scope and purpose.

(a) *Authority and scope.* This regulation is issued by the Board of Governors of the Federal Reserve System pursuant to title VII (Equal Credit Opportunity Act) of the Consumer Credit Protection Act, as amended (15 USC 1601 et seq.). Except as otherwise provided herein, the regulation applies to all persons who are creditors, as defined in § 202.2(l). Information collection requirements contained in this regulation have been approved by the Office of Management and Budget under the provisions of 44 USC 3501 et seq. and have been assigned OMB No. 7100–0201.

(b) *Purpose.* The purpose of this regulation is to promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age (provided the applicant has the capacity to contract); to the fact that all or part of the applicant's income derives from a public assistance program; or to the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The regulation prohibits creditor practices that discriminate on the basis of any of these factors. The regulation also requires creditors to notify applicants of action taken on their applications; to report credit history in the names of both spouses on an account; to retain records of credit applications; and to collect information about the applicant's race and other personal characteristics in applications for certain dwelling-related loans.

§ 202.2  Definitions.

For the purposes of this regulation, unless the context indicates otherwise, the following definitions apply.

(a) *Account* means an extension of credit. When employed in relation to an account, the word *use* refers only to open-end credit.

(b) *Act* means the Equal Credit Opportunity Act (title VII of the Consumer Credit Protection Act).

(c) *Adverse action.* (1) The term means:

(i) A refusal to grant credit in substantially the amount or on substantially the terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered;

(ii) A termination of an account or an unfavorable change in the terms of an account that does not affect all or a substantial portion of a class of the creditor's accounts; or

(iii) A refusal to increase the amount of credit available to an applicant who has made an application for an increase.

(2) The term does not include:

(i) A change in the terms of an account expressly agreed to by an applicant.

(ii) Any action or forbearance relating to an account taken in connection with inactivity, default, or delinquency as to that account;

(iii) A refusal or failure to authorize an account transaction at a point of sale or loan, except when the refusal is a termination or an unfavorable change in the terms of an account that does not affect all or a substantial portion of a class of the creditor's accounts, or when

the refusal is a denial of an application for an increase in the amount of credit available under the account;

(iv) A refusal to extend credit because applicable law prohibits the creditor from extending the credit requested; or

(v) A refusal to extend credit because the creditor does not offer the type of credit or credit plan requested.

(3) An action that falls within the definition of both paragraphs (c)(1) and (c)(2) of this section is governed by paragraph (c)(2).

(d) *Age* refers only to the age of natural persons and means the number of fully elapsed years from the date of an applicant's birth.

(e) *Applicant* means any person who requests or who has received an extension of credit from a creditor, and includes any person who is or may become contractually liable regarding an extension of credit. For purposes of § 202.7(d), the term includes guarantors, sureties, endorsers and similar parties.

(f) *Application* means an oral or written request for an extension of credit that is made in accordance with procedures established by a creditor for the type of credit requested. The term does not include the use of an account or line of credit to obtain an amount of credit that is within a previously established credit limit. A *completed application* means an application in connection with which a creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested (including, but not limited to, credit reports, any additional information requested from the applicant, and any approvals or reports by governmental agencies or other persons that are necessary to guarantee, insure, or provide security for the credit or collateral). The creditor shall exercise reasonable diligence in obtaining such information.

(g) *Board* means the Board of Governors of the Federal Reserve System.

(h) *Consumer credit* means credit extended to a natural person primarily for personal, family, or household purposes.

(i) *Contractually liable* means expressly obligated to repay all debts arising on an account by reason of an agreement to that effect.

(j) *Credit* means the right granted by a creditor to an applicant to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment therefor.

(k) *Credit card* means any card, plate, coupon book, or other single credit device that may be used from time to

time to obtain money, property, or services on credit.

(l) *Creditor* means a person who, in the ordinary course of business, regularly participates in the decision of whether or not to extend credit. The term includes a creditor's assignee, transferee, or subrogee who so participates. For purposes of §§ 202.4 and 202.5(a), the term also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made. A person is not a creditor regarding any violation of the act or this regulation committed by another creditor unless the person knew or had reasonable notice of the act, policy, or practice that constituted the violation before becoming involved in the credit transaction. The term does not include a person whose only participation in a credit transaction involves honoring a credit card.

(m) *Credit transaction* means every aspect of an applicant's dealings with a creditor regarding an application for credit or an existing extension of credit (including, but not limited to, information requirements; investigation procedures; standards of creditworthiness; terms of credit; furnishing of credit information; revocation, alteration, or termination of credit; and collection procedures).

(n) *Discriminate against an applicant* means to treat an applicant less favorably than other applicants.

(o) *Elderly* means age 62 or older.

(p) *Empirically derived and other credit scoring systems.*

(1) A *credit scoring system* is a system that evaluates an applicant's creditworthiness mechanically, based on key attributes of the applicant and aspects of the transaction, and that determines, alone or in conjunction with an evaluation of additional information about the applicant, whether an applicant is deemed creditworthy. To qualify as an *empirically derived, demonstrably and statistically sound, credit scoring system,* the system must be:

(i) Based on data that are derived from an empirical comparison of sample groups or the population of creditworthy and noncreditworthy applicants who applied for credit within a reasonable preceding period of time;

(ii) Developed for the purpose of evaluating the creditworthiness of applicants with respect to the legitimate business interests of the creditor utilizing the system (including, but not limited to, minimizing bad debt losses

and operating expenses in accordance with the creditor's business judgment);

(iii) Developed and validated using accepted statistical principles and methodology; and

(iv) Periodically revalidated by the use of appropriate statistical principles and methodology and adjusted as necessary to maintain predictive ability.

(2) A creditor may use an empirically derived, demonstrably and statistically sound, credit scoring system obtained from another person or may obtain credit experience from which to develop such a system. Any such system must satisfy the criteria set forth in paragraph (p)(1) (i) through (iv) of this section; if the creditor is unable during the development process to validate the system based on its own credit experience in accordance with paragraph (p)(1) of this section, the system must be validated when sufficient credit experience becomes available. A system that fails this validity test is no longer an empirically derived, demonstrably and statistically sound, credit scoring system for that creditor.

(q) *Extend credit* and *extension of credit* mean the granting of credit in any form (including, but not limited to, credit granted in addition to any existing credit or credit limit; credit granted pursuant to an open-end credit plan; the refinancing or other renewal of credit, including the issuance of a new credit card in place of an expiring credit card or in substitution for an existing credit card; the consolidation of two or more obligations; or the continuance of existing credit without any special effort to collect at or after maturity).

(r) *Good faith* means honesty in fact in the conduct or transaction.

(s) *Inadvertent error* means a mechanical, electronic, or clerical error that a creditor demonstrates was not intentional and occurred notwithstanding the maintenance of procedures reasonably adapted to avoid such errors.

(t) *Judgmental system of evaluating applicants* means any system for evaluating the creditworthiness of an applicant other than an empirically derived, demonstrably and statistically sound, credit scoring system.

(u) *Marital status* means the state of being unmarried, married, or separated, as defined by applicable state law. The term "unmarried" includes persons who are single, divorced, or widowed.

(v) *Negative factor or value,* in relation to the age of elderly applicants, means utilizing a factor, value, or weight that is less favorable regarding elderly applicants than the creditor's experience warrants or is less favorable than the

factor, value, or weight assigned to the class of applicants that are not classified as elderly and are most favored by a creditor on the basis of age.

(w) *Open-end credit* means credit extended under a plan under which a creditor may permit an applicant to make purchases or obtain loans from time to time directly from the creditor or indirectly by use of a credit card, check, or other device.

(x) *Person* means a natural person, corporation, government or governmental subdivision or agency, trust, estate, partnership, cooperative, or association.

(y) *Pertinent element of creditworthiness,* in relation to a judgmental system of evaluating applicants, means any information about applicants that a creditor obtains and considers and that has a demonstrable relationship to a determination of creditworthiness.

(z) *Prohibited basis* means race, color, religion, national origin, sex, marital status, or age (provided that the applicant has the capacity to enter into a binding contract); the fact that all or part of the applicant's income derives from any public assistance program; or the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act or any state law upon which an exemption has been granted by the Board.

(aa) *State* means any State, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

### § 202.3 Limited exceptions for certain classes of transactions.

(a) *Public utilities credit.*—(1) *Definition.* Public utilities credit refers to extensions of credit that involve public utility services provided through pipe, wire, or other connected facilities, or radio or similar transmission (including extensions of such facilities), if the charges for service, delayed payment, and any discount for prompt payment are filed with or regulated by a government unit.

(2) *Exceptions.* The following provisions of this regulation do not apply to public utilities credit:

(i) Section 202.5(d)(1) concerning information about marital status;

(ii) Section 202.10 relating to furnishing of credit information; and

(iii) Section 202.12(b) relating to record retention.

(b) *Securities credit.*—(1) *Definition.* Securities credit refers to extensions of credit subject to regulation under section 7 of the Securities Exchange Act

of 1934 or extensions of credit by a broker or dealer subject to regulation as a broker or dealer under the Securities Exchange Act of 1934.

(2) *Exceptions.* The following provisions of this regulation do not apply to securities credit:

(i) Section 202.5(c) concerning information about a spouse or former spouse;

(ii) Section 202.5(d)(1) concerning information about marital status;

(iii) Section 202.5(d)(3) concerning information about the sex of an applicant;

(iv) Section 202.7(b) relating to designation of name, but only to the extent necessary to prevent violation of rules regarding an account in which a broker or dealer has an interest, or rules necessitating the aggregation of accounts of spouses for the purpose of determining controlling interests, beneficial interests, beneficial ownership, or purchase limitations and restrictions;

(v) Section 202.7(c) relating to action concerning open-end accounts, but only to the extent the action taken is on the basis of a change of name or marital status;

(vi) Section 202.7(d) relating to the signature of a spouse or other person;

(vii) Section 202.10 relating to furnishing of credit information; and

(viii) Section 202.12(b) relating to record retention.

(c) *Incidental credit.* (1) *Definition.* Incidental credit refers to extensions of consumer credit other than credit of the types described in paragraphs (a) and (b) of this section:

(i) That are not made pursuant to the terms of a credit card account;

(ii) That are not subject to a finance charge (as defined in Regulation Z, 12 CFR 226.4); and

(iii) That are not payable by agreement in more than four installments.

(2) *Exceptions.* The following provisions of this regulation do not apply to incidental credit:

(i) Section 202.5(c) concerning information about a spouse or former spouse;

(ii) Section 202.5(d)(1) concerning information about marital status;

(iii) Section 202.5(d)(2) concerning information about income derived from alimony, child support, or separate maintenance payments;

(iv) Section 202.5(d)(3) concerning information about the sex of an applicant, but only to the extent necessary for medical records or similar purposes;

(v) Section 202.7(d) relating to the signature of a spouse or other person;

(vi) Section 202.9 relating to notifications;

(vii) Section 202.10 relating to furnishing of credit information; and

(viii) Section 202.12(b) relating to record retention.

(d) *Business credit.*—(1) *Definition.* Business credit refers to extensions of credit primarily for business or commercial (including agricultural) purposes, but excluding extensions of credit of the types described in paragraphs (a) and (b) of this section.

(2) *Exceptions.* The following provisions of this regulation do not apply to business credit:

(i) Section 202.5(d)(1) concerning information about marital status; and

(ii) Section 202.10 relating to furnishing of credit information.

(3) *Modified requirements.* The following provisions of this regulation apply to business credit as specified below:

(i) Section 202.9 (a), (b), and (c) relating to notifications: the creditor shall notify the applicant, orally or in writing, of action taken or of incompleteness. When credit is denied or when other adverse action is taken, the creditor is required to provide a written statement of the reasons and the ECOA notice specified in section 202.9(b) if the applicant makes a written request for the reasons within 30 days of that notification; and

(ii) Section 202.12(b) relating to record retention: the creditor shall retain records as provided in § 202.12(b) if the applicant, within 90 days after being notified of action taken or of incompleteness, requests in writing that records be retained.

(e) *Government credit.*—(1) *Definition.* Government credit refers to extensions of credit made to governments or governmental subdivisions, agencies, or instrumentalities.

(2) *Applicability of regulation.* Except for section 202.4, the general rule prohibiting discrimination on a prohibited basis, the requirements of this regulation do not apply to government credit.

### § 202.4  General Rule Prohibiting Discrimination.

A creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction.

### § 202.5  Rules Concerning Taking of Applications.

(a) *Discouraging applications.* A creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application.

(b) *General rules concerning requests for information.* (1) Except as provided in paragraphs (c) and (d) of this section, a creditor may request any information in connection with an application.[1]

(2) *Required collection of information.* Notwithstanding paragraphs (c) and (d) of this section, a creditor shall request information for monitoring purposes as required by § 202.13 for credit secured by the applicant's dwelling. In addition, a creditor may obtain information required by a regulation, order, or agreement issued by, or entered into with, a court or an enforcement agency (including the Attorney General of the United States or a similar state official) to monitor or enforce compliance with the act, this regulation, or other federal or state statute or regulation.

(3) *Special purpose credit.* A creditor may obtain information that is otherwise restricted to determine eligibility for a special purpose credit program, as provided in § § 202.8 (c) and (d).

(c) *Information about a spouse or former spouse.* (1) Except as permitted in this paragraph, a creditor may not request any information concerning the spouse or former spouse of an applicant.

(2) *Permissible inquiries.* A creditor may request any information concerning an applicant's spouse (or former spouse under paragraph (c)(2)(v)) that may be requested about the applicant if:

(i) The spouse will be permitted to use the account;

(ii) The spouse will be contractually liable on the account;

(iii) The applicant is relying on the spouse's income as a basis for repayment of the credit requested;

(iv) The applicant resides in a community property state or property on which the applicant is relying as a basis for repayment of the credit requested is located in such a state; or

(v) The applicant is relying on alimony, child support, or separate maintenance payments from a spouse or former spouse as a basis for repayment of the credit requested.

(3) *Other accounts of the applicant.* A creditor may request an applicant to list any account upon which the applicant is liable and to provide the name and address in which the account is carried. A creditor may also ask the names in

which an applicant has previously received credit.

(d) *Other limitations on information requests.* (1) *Marital status.* If an applicant applies for individual unsecured credit, a creditor shall not inquire about the applicant's marital status unless the applicant resides in a community property state or is relying on property located in such a state as a basis for repayment of the credit requested. If an application is for other than individual unsecured credit, a creditor may inquire about the applicant's marital status, but shall use only the terms "married," "unmarried," and "separated." A creditor may explain that the category "unmarried" includes single, divorced, and widowed persons.

(2) *Disclosure about income from alimony, child support, or separate maintenance.* A creditor shall not inquire whether income stated in an application is derived from alimony, child support, or separate maintenance payments unless the creditor discloses to the applicant that such income need not be revealed if the applicant does not want the creditor to consider it in determining the applicant's creditworthiness.

(3) *Sex.* A creditor shall not inquire about the sex of an applicant. An applicant may be requested to designate a title on an application form (such as Ms., Miss, Mr., or Mrs.) if the form discloses that the designation of a title is optional. An application form shall otherwise use only terms that are neutral as to sex.

(4) *Childbearing, childrearing.* A creditor shall not inquire about birth control practices, intentions concerning the bearing or rearing of children, or capability to bear children. A creditor may inquire about the number and ages of an applicant's dependents or about dependent-related financial obligations or expenditures, provided such information is requested without regard to sex, marital status, or any other prohibited basis.

(5) *Race, color, religion, national origin.* A creditor shall not inquire about the race, color, religion, or national origin of an applicant or any other person in connection with a credit transaction. A creditor may inquire about an applicant's permanent residence and immigration status.

(e) *Written applications.* A creditor shall take written applications for the types of credit covered by § 202.13(a), but need not take written applications for other types of credit.

---

[1] This paragraph does not limit or abrogate any federal or state law regarding privacy, privileged information, credit reporting limitations, or similar restrictions on obtainable information.

## § 202.6  Rules Concerning Evaluation of Applications.

(a) *General rule concerning use of information.* Except as otherwise provided in the act and this regulation, a creditor may consider any information obtained, so long as the information is not used to discriminate against an applicant on a prohibited basis.[2]

(b) *Specific rules concerning use of information.* (1) Except as provided in the act and this regulation, a creditor shall not take a prohibited basis into account in any system of evaluating the creditworthiness of applicants.

(2) *Age, receipt of public assistance.* (i) Except as permitted in this paragraph (b)(2), a creditor shall not take into account an applicant's age (provided that the applicant has the capacity to enter into a binding contract) or whether an applicant's income derives from any public assistance program.

(ii) In an empirically derived, demonstrably and statistically sound, credit scoring system, a creditor may use an applicant's age as a predictive variable, provided that the age of an elderly applicant is not assigned a negative factor or value.

(iii) In a judgmental system of evaluating creditworthiness, a creditor may consider an applicant's age or whether an applicant's income derives from any public assistance program only for the purpose of determining a pertinent element of creditworthiness.

(iv) In any system of evaluating creditworthiness, a creditor may consider the age of an elderly applicant when such age is used to favor the elderly applicant in extending credit.

(3) *Childbearing, childrearing.* In evaluating creditworthiness, a creditor shall not use assumptions or aggregate statistics relating to the likelihood that any group of persons will bear or rear children or will, for that reason, receive diminished or interrupted income in the future.

(4) *Telephone listing.* A creditor shall not take into account whether there is a telephone listing in the name of an applicant for consumer credit, but may take into account whether there is a telephone in the applicant's residence.

(5) *Income.* A creditor shall not discount or exclude from consideration the income of an applicant or the spouse of an applicant because of a prohibited basis or because the income is derived from part-time employment or is an annuity, pension, or other retirement benefit; a creditor may consider the amount and probable continuance of any income in evaluating an applicant's creditworthiness. When an applicant relies on alimony, child support, or separate maintenance payments in applying for credit, the creditor shall consider such payments as income to the extent that they are likely to be consistently made.

(6) *Credit history.* To the extent that a creditor considers credit history in evaluating the creditworthiness of similarly qualified applicants for a similar type and amount of credit, in evaluating an applicant's creditworthiness a creditor shall consider:

(i) The credit history, when available, of accounts designated as accounts that the applicant and the applicant's spouse are permitted to use or for which both are contractually liable;

(ii) On the applicant's request, any information the applicant may present that tends to indicate that the credit history being considered by the creditor does not accurately reflect the applicant's creditworthiness; and

(iii) On the applicant's request, the credit history, when available, of any account reported in the name of the applicant's spouse or former spouse that the applicant can demonstrate accurately reflects the applicant's creditworthiness.

(7) *Immigration status.* A creditor may consider whether an applicant is a permanent resident of the United States, the applicant's immigration status, and any additional information that may be necessary to ascertain the creditor's rights and remedies regarding repayment.

(c) *State property laws.* A creditor's consideration or application of state property laws directly or indirectly affecting creditworthiness does not constitute unlawful discrimination for the purposes of the act or this regulation.

## § 202.7  Rules Concerning Extensions of Credit.

(a) *Individual accounts.* A creditor shall not refuse to grant an individual account to a creditworthy applicant on the basis of sex, marital status, or any other prohibited basis.

(b) *Designation of name.* A creditor shall not refuse to allow an applicant to open or maintain an account in a birth-given first name and a surname that is the applicant's birth-given surname, the spouse's surname, or a combined surname.

(c) *Action concerning existing open-end accounts.—(1) Limitations.* In the absence of evidence of the applicant's inability or unwillingness to repay, a creditor shall not take any of the following actions regarding an applicant who is contractually liable on an existing open-end account on the basis of the applicant's reaching a certain age or retiring or on the basis of a change in the applicant's name or marital status:

(i) Require a reapplication, except as provided in paragraph (c)(2) of this section;

(ii) Change the terms of the account; or

(iii) Terminate the account.

(2) *Requiring reapplication.* A creditor may require a reapplication for an open-end account on the basis of a change in the marital status of an applicant who is contractually liable if the credit granted was based in whole or in part on income of the applicant's spouse and if information available to the creditor indicates that the applicant's income may not support the amount of credit currently available.

(d) *Signature of spouse or other person.* (1) *Rule for qualified applicant.* Except as provided in this paragraph, a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested.

(2) *Unsecured credit.* If an applicant requests unsecured credit and relies in part upon property that the applicant owns jointly with another person to satisfy the creditor's standards of creditworthiness, the creditor may require the signature of the other person only on the instrument(s) necessary, or reasonably believed by the creditor to be necessary, under the law of the state in which the property is located, to enable the creditor to reach the property being relied upon in the event of the death or default of the applicant.

(3) *Unsecured credit—community property states.* If a married applicant requests unsecured credit and resides in a community property state, or if the property upon which the applicant is relying is located in such a state, a creditor may require the signature of the spouse on any instrument necessary, or reasonably believed by the creditor to be necessary, under applicable state law to make the community property available to satisfy the debt in the event of default if:

(i) Applicable state law denies the applicant power to manage or control sufficient community property to qualify for the amount of credit requested under

---

[2] The legislative history of the act indicates that the Congress intended an "effects test" concept, as outlined in the employment field by the Supreme Court in the cases of *Griggs v. Duke Power Co.,* 401 U.S. 424 (1971), and *Albemarle Paper Co. v. Moody,* 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness.

the creditor's standards of creditworthiness; and

(ii) The applicant does not have sufficient separate property to qualify for the amount of credit requested without regard to community property.

(4) *Secured credit.* If an applicant requests secured credit, a creditor may require the signature of the applicant's spouse or other person on any instrument necessary, or reasonably believed by the creditor to be necessary, under applicable state law to make the property being offered as security available to satisfy the debt in the event of default, for example, an instrument to create a valid lien, pass clear title, waive inchoate rights or assign earnings.

(5) *Additional parties.* If, under a creditor's standards of creditworthiness, the personal liability of an additional party is necessary to support the extension of the credit requested, a creditor may request a cosigner, guarantor, or the like. The applicant's spouse may serve as an additional party, but the creditor shall not require that the spouse be the additional party.

(6) *Rights of additional parties.* A creditor shall not impose requirements upon an additional party that the creditor is prohibited from imposing upon an applicant under this section.

(e) *Insurance.* A creditor shall not refuse to extend credit and shall not terminate an account because credit life, health, accident, disability, or other credit-related insurance is not available on the basis of the applicant's age.

§ 202.8 **Special Purpose Credit Programs.**

(a) *Standards for programs.* Subject to the provisions of paragraph (b) of this section, the act and this regulation permit a creditor to extend special purpose credit to applicants who meet eligibility requirements under the following types of credit programs:

(1) Any credit assistance program expressly authorized by federal or state law for the benefit of an economically disadvantaged class of persons;

(2) Any credit assistance program offered by a not-for-profit organization, as defined under section 501(c) of the Internal Revenue Code of 1954, as amended, for the benefit of its members or for the benefit of an economically disadvantaged class of persons; or

(3) Any special purpose credit program offered by a for-profit organization or in which such an organization participates to meet special social needs, if:

(i) The program is established and administered pursuant to a written plan that identifies the class of persons that the program is designed to benefit and sets forth the procedures and standards

for extending credit pursuant to the program; and

(ii) The program is established and administered to extend credit to a class of persons who, under the organization's customary standards of creditworthiness, probably would not receive such credit or would receive it on less favorable terms than are ordinarily available to other applicants applying to the organization for a similar type and amount of credit.

(b) *Rules in other sections.* (1) *General applicability.* All of the provisions of this regulation apply to each of the special purpose credit programs described in paragraph (a) of this section unless modified by this section.

(2)—*Common characteristics.* A program described in paragraph (a)(2) or (a)(3) of this section qualifies as a special purpose credit program only if it was established and is administered so as not to discriminate against an applicant on any prohibited basis; however, all program participants may be required to share one or more common characteristics (for example, race, national origin, or sex) so long as the program was not established and is not administered with the purpose of evading the requirements of the act or this regulation.

(c) *Special rule concerning requests and use of information.* If participants in a special purpose credit program described in paragraph (a) of this section are required to possess one or more common characteristics (for example, race, national origin, or sex) and if the program otherwise satisfies the requirements of paragraph (a) of this section, a creditor may request and consider information regarding the common characteristic(s) in determining the applicant's eligibility for the program.

(d) *Special rule in the case of financial need.* If financial need is one of the criteria under a special purpose program described in paragraph (a) of this section, the creditor may request and consider, in determining an applicant's eligibility for the program, information regarding the applicant's martial status; alimony, child support, and separate maintenance income; and the spouse's financial resources. In addition, a creditor may obtain the signature of an applicant's spouse or other person on an application or credit instrument relating to a special purpose program if the signature is required by federal or state law.

§ 202.9 **Notifications.**

(a) *Notification of action taken, ECOA notice, and statement of specific*

*reasons.* (1) *When notification is required.* A creditor shall notify an applicant of action taken within:

(i) 30 days after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application;

(ii) 30 days after taking adverse action on an incomplete application, unless notice is provided in accordance with paragraph (c) of this section;

(iii) 30 days after taking adverse action on an existing account; or

(iv) 90 days after notifying the applicant of a counteroffer if the applicant does not expressly accept or use the credit offered.

(2) *Content of notification when adverse action is taken.* A notification given to an applicant when adverse action is taken shall be in writing and shall contain: a statement of the action taken; the name and address of the creditor; a statement of the provisions of section 701(a) of the act; the name and address of the federal agency that administers compliance with respect to the creditor; and either:

(i) A statement of specific reasons for the action taken; or

(ii) A disclosure of the applicant's right to a statement of specific reasons within 30 days, if the statement is requested within 60 days of the creditor's notification. The disclosure shall include the name, address, and telephone number of the person or office from which the statement of reasons can be obtained. If the creditor chooses to provide the reasons orally, the creditor shall also disclose the applicant's right to have them confirmed in writing within 30 days of receiving a written request for confirmation from the applicant.

(b) *Form of ECOA notice and statement of specific reasons.*

(1) *ECOA notice.* To satisfy the disclosure requirements of paragraph (a)(2) of this section regarding section 701(a) of the act, the creditor shall provide a notice that is substantially similar to the following:

The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is (name and

address as specified by the appropriate agency listed in Appendix A of this regulation).

(2) *Statement of specific reasons.* The statement of reasons for adverse action required by paragraph (a)(2)(i) of this section must be specific and indicate the principal reason(s) for the adverse action. Statements that the adverse action was based on the creditor's internal standards or policies or that the applicant failed to achieve the qualifying score on the creditor's credit scoring system are insufficient.

(c) *Incomplete applications.*—(1) *Notice alternatives.* Within 30 days after receiving appliation that is incomplete regarding matters that an applicant can complete, the creditor shall notify the applicant either:

(i) Of action taken, in accordance with paragraph (a) of this section; or

(ii) Of the incompleteness, in accordance with paragraph (c)(2) of this section.

(2) *Notice of incompleteness.* If additional information is needed from an applicant, the creditor shall send a written notice to the applicant specifying the information needed, designating a reasonable period of time for the applicant to provide the information, and informing the applicant that failure to provide the information requested will result in no further consideration being given to the application. The creditor shall have no further obligation under this section if the applicant fails to respond within the designated time period. If the applicant supplies the requested information within the designated time period, the creditor shall take action on the application and notify the applicant in accordance with paragraph (a) of this section.

(3) *Oral request for information.* At its option, a creditor may inform the applicant orally of the need for additional information; but if the application remains incomplete the creditor shall send a notice in accordance with paragraph (c)(1) of this section.

(d) *Oral notifications by small-volume creditors.* The requirements of this section (including statements of specific reasons) are satisfied by oral notifications in the case of any creditor that did not receive more than 150 applications during the preceding calendar year.

(e) *Withdrawal of approved application.* When an applicant submits an application and the parties contemplate that the applicant will inquire about its status, if the creditor approves the application and the applicant has not inquired within 30

days after applying, the creditor may treat the application as withdrawn and need not comply with paragraph (a)(1) of this section.

(f) *Multiple applicants.* When an application involves more than one applicant, notification need only be given to one of them, but must be given to the primary applicant where one is readily apparent.

(g) *Applications submitted through a third party.* When an application is made on behalf of an applicant to more than one creditor and the applicant expressly accepts or uses credit offered by one of the creditors, notification of action taken by any of the other creditors is not required. If no credit is offered or if the applicant does not expressly accept or use any credit offered, each creditor taking adverse action must comply with this section, directly or through a third party. A notice given by a third party shall disclose the identify of each creditor on whose behalf the notice is given.

### § 202.10 Furnishing of Credit Information.

(a) *Designation of accounts.* A creditor tht furnishes credit information shall designate:

(1) Any new account to reflect the participation of both spouses if the applicant's spouse is permitted to use or is contractually liable on the account (other than as a guarator, surety, endorser, or similar party); and

(2) Any existing account to reflect such participation, within 90 days after receiving a written request to do so from one of the spouses.

(b) *Routine reports to consumer reporting agency.* If a creditor furnishes credit information to a consumer reporting agency concerning an account designated to reflect the participation of both spouses, the creditor shall furnish the information in a manner that will enable the agency to provide access to the information in the name of each spouse.

(c) *Reporting in response to inquiry.* If a creditor furnishes credit information in response to an inquiry concerning an account designated to reflect the participation of both spouses, the creditor shall furnish the information in the name of the spouse about whom the information is requested.

### § 202.11 Relation to State Law.

(a) *Inconsistent state laws.* Except as otherwise provided in this section, this regulation alters, affects, or preempts only those state laws that are inconsistent with the act and this regulation and then only to the extent of the inconsistency. A state law is not

inconsistent if it is more protective of an applicant.

(b) *Preempted provisions of state law.* (1) A state law is deemed to be inconsistent with the requirements of the act and this regulation and less protective of an applicant within the meaning of section 705(f) of the act to the extent that the law:

(i) Requires or permits a practice or act prohibited by the act or this regulation;

(ii) Prohibits the individual extension of consumer credit to both parties to a marriage if each spouse individually and voluntarily applies for such credit;

(iii) Prohibits inquiries or collection of data required to comply with the act or this regulation;

(iv) Prohibits asking or considering age in an empirically derived, demonstrably and statistically sound, credit scoring system to determine a pertinent element of creditworthiness, or to favor an elderly applicant; or

(v) Prohibits inquiries necessary to establish or administer as special purpose credit program as defined by § 202.8.

(2) A creditor, state, or other interested party may request the Board to determine whether a state law is inconsistent with the requirements of the act and this regulation.

(c) *Laws on finance charges, loan ceilings.* If married applicants voluntarily apply for and obtained individual accounts with the same creditor, the accounts shall not be aggregated or otherwise combined for purposes of determining permissible finance charges or loan ceilings under any federal or state law. Permissible loan ceiling laws shall be construed to permit each spouse to become individually liable up to the amount of the loan ceilings, less the amount for which the applicant is jointly liable.

(d) *State and federal laws not affected.* This section does not alter or annul any provision of state property laws, laws relating to the disposition of decedents' estates, or federal or state banking regulations directed only toward insuring the solvency of financial institutions.

(e) *Exemption for state-regulated transactions.* (1) *Applications.* A state may apply to the Board for an exemption from the requirements of the act and this regulation for any class of credit transactions within the state. The Board will grant such an exemption if the Board determines that:

(i) The class of credit transactions is subject to state law requirements substantially similar to the act and this regulation or that applicants are

afforded greater protection under state law; and

(ii) There is adequate provision for state enforcement.

(2) *Liability and enforcement.* (i) No exemption will extend to the civil liability provisions of section 706 or the administrative enforcement provisions of section 704 of the act.

(ii) After an exemption has been granted, the requirements of the applicable state law (except for additional requirements not imposed by federal law) will constitute the requirements of the act and this regulation.

### § 202.12 Record Retention.

(a) *Retention of prohibited information.* A creditor may retain in its files information that is prohibited by the act or this regulation in evaluating applications, without violating the act or this regulation, if the information was obtained:

(1) From any source prior to March 23, 1977;

(2) From consumer reporting agencies, an applicant, or others without the specific request of the creditor; or

(3) As required to monitor compliance with the act and this regulation or other federal or state statutes or regulations.

(b) *Preservation of records.*—(1) *Applications.* For 25 months after the date that a creditor notifies an applicant of action taken on an application or of incompleteness, the creditor shall retain in original form or a copy thereof:

(i) any application that it receives, any information required to be obtained concerning characteristics of the applicant to monitor compliance with the act and this regulation or other similar law, and any other written or recorded information used in evaluating the application and not returned to the applicant at the applicant's request;

(ii) A copy of the following documents if furnished to the applicant in written form (or, if furnished orally, any notation or memorandum made by the creditor):

(A) The notification of action taken; and

(B) The statement of specific reasons for adverse action; and

(iii) Any written statement submitted by the applicant alleging a violation of the act or this regulation.

(2) *Existing accounts.* For 25 months after the date that a creditor notifies an applicant of adverse action regarding an existing account, the creditor shall retain as to that account, in original form or a copy thereof:

(i) Any written or recorded information concerning the adverse action; and

(ii) Any written statement submitted by the applicant alleging a violation of the act or this regulation.

(3) *Other applications.* For 25 months after the data that a creditor receives an application for which the creditor is not required to comply with the notification requirements of § 202.9 the creditor shall retain all written or recorded information in its possession concerning the applicant, including any notation of action taken.

(4) *Enforcement proceedings and investigations.* A creditor shall retain the information specified in this section beyond 25 months if it has actual notice that it is under investigation or is subject to an enforcement proceeding for an alleged violation of the act or this regulation by the Attorney General of the United States or by an enforcement agency charged with monitoring that creditor's compliance with the act and this regulation, or if it has been served with notice of an action filed pursuant to section 706 of the act and § 202.14 of this regulation. The creditor shall retain the information until final disposition of the matter, unless an earlier time is allowed by order of the agency or court.

### § 202.13 Information for Monitoring Purposes.

(a) *Information to be requested.* A creditor that receives an application for credit primarily for the purchase or refinancing of a dwelling occupied or to be occupied by the applicant as a principal residence, where the extension of credit will be secured by the dwelling, shall request as part of the application the following information regarding the applicant(s):

(1) Race or national origin, using the categories American Indian or Alaskan Native; Asian or Pacific Islander; Black; White; Hispanic; Other (Specify);

(2) Sex;

(3) Marital status, using the categories married, unmarried, and separated; and

(4) Age.

"Dwelling" means a residential structure that contains one to four units, whether or not that structure is attached to real property. The term includes, but is not limited to, an individual condominium or cooperative unit, and a mobile or other manufactured home.

(b) *Obtaining of information.* Questions regarding race or national origin, sex, marital status, and age may be listed, at the creditor's option, on the application form or on a separate form that refers to the application. The applicant(s) shall be asked but not required to supply the requested information. If the applicant(s) chooses not to provide the information or any part of it, that fact shall be noted on the

form. The creditor shall then also note on the form, to the extent possible, the race or national origin and sex of the applicant(s) on the basis of visual observation or surname.

(c) *Disclosure to applicant(s).* The creditor shall inform the applicant(s) that the information regarding race or national origin, sex, marital status, and age is being requested by the federal government for the purpose of monitoring compliance with federal statutes that prohibit creditors from discriminating against applicants on those bases. The creditor shall also inform the applicant(s) that if the applicant(s) chooses note to provide the information, the creditor is required to note the race or national origin and sex on the basis of visual observation or surname.

(d) *Substitute monitoring program.* A monitoring program required by an agency charged with administrative enforcement under section 704 of the act may be substituted for the requirements contained in paragraphs (a), (b), and (c).

### § 202.14 Enforcement, Penalties and Liabilities.

(a) *Administrative enforcement.* (1) As set forth more fully in section 704 of the act, administrative enforcement of the act and this regulation regarding certain creditors is assigned to the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Board of Directors of the Federal Deposit Insurance Corporation, Federal Home Loan Bank Board (acting directly or through the Federal Savings and Loan Insurance Corporation), National Credit Union Administration, Interstate Commerce Commission, Secretary of Agriculture, Farm Credit Administration, Securities and Exchange Commission, Small Business Administration, and Secretary of Transportation.

(2) Except to the extent that administrative enforcement is specifically assigned to other authorities, compliance with the requirements imposed under the act and this regulation is enforced by the Federal Trade Commission.

(b) *Penalties and liabilities.* (1) Sections 706 (a) and (b) and 702(g) of the act provide that any creditor that fails to comply with a requirement imposed by the act or this regulation is subject to civil liability for actual and punitive damages in individual or class actions. Pursuant to sections 704 (b), (c), and (d) and 702(g) of the act, violations of the act or regulations also constitute violations of other federal laws. Liability

for punitive damages is restricted to nongovernmental entities and is limited to $10,000 in individual actions and the lesser of $500,000 or 1 percent of the creditor's net worth in class actions. Section 706(c) provides for equitable and declaratory relief and section 706(d) authorizes the awarding of costs and reasonable attorney's feeds to an aggrieved applicant in a successful action.

(2) As provided in section 706(f), a civil action under the act or this regulation may be brought in the appropriate United States district court without regard to the amount in controversy or in any other court of competent jurisdiction within two years after the date of the occurrence of the violation, or within one year after the commencement of an administrative enforcement proceeding or of a civil action brought by the Attorney General of the United States within two years after the alleged violation.

(3) Sections 706 (g) and (h) provide that, if an agency responsible for administrative enforcement is unable to obtain compliance with the act or this regulation, it may refer the matter to the Attorney General of the United States. On referral, or whenever the Attorney General has reason to believe that one or more creditors are engaged in a pattern or practice in violation of the act or this regulation, the Attorney General may bring a civil action.

(c) *Failure of compliance.* A creditor's failure to comply with §§ 202.6(b)(6), 202.9, 202.10, 202.12 or 202.13 is not a violation if it results from an inadvertent error. On discovering an error under §§ 202.9 and 202.10, the creditor shall correct it as soon as possible. If a creditor inadvertently obtains the monitoring information regarding the race or national origin and sex of the applicant in a dwelling-related transaction not overed by § 202.13, the creditor may act on and retain the application without violating the regulation.

## Appendix A—Federal Enforcement Agencies

The following list indicates the federal agencies the enforce Regulation B for particular classes of creditors. Any questions concerning a particular creditor should be directed to its enforcement agency.

*National Banks*

Comptroller of the Currency, Consumer Examinations Division, Washington, DC 20219.

*State Member Banks*

Federal Reserve Bank serving the district in which the state member bank is located.

*Nonmember Insured Banks*

Federal Deposit Insurance Corporation Regional Director for the region in which the nonmember insured bank is located.

*Savings Institutions Insured by the FSLIC and Members of the FHLB System (Except for Savings Banks Insured by FDIC)*

The Federal Home Loan Bank Board Supervisory Agent in the district in which the institution is located.

*Federal Credit Unions*

Regional office of the National Credit Union Administration serving the area in which the federal credit union is located.

*Air Carriers*

Assistant General Counsel for Aviation Enforcement and Proceedings, Department of Transportation, 400 Seventh Street, SW, Washington, DC 20590.

*Creditors Subject to Interstate Commerce Commission*

Office of Proceedings, Interstate Commerce Commission, Washington, DC 20523.

*Creditors Subject to Packers and Stockyards Act*

Nearest Packers and Stockyards Administration area supervisor.

*Small Business Investment Companies*

U.S. Small Business Administration, 1441 L Street, NW., Washington, DC 20416.

*Brokers and Dealers*

Securities and Exchange Commission, Washington, DC 20549.

*Federal Land Banks, Federal Land Bank Associations, Federal Intermediate Credit Banks, and Production Credit Associations*

Farm Credit Administration, 1501 Farm Credit Drive, McLean, Virginia 22102–5090.

*Retailers, Finance Companies, and All Other Creditors Not Listed Above*

FTC Regional Office for region in which the creditor operates or Federal Trade Commission, Equal Credit Opportunity, Washington, DC 20580.

## Appendix B—Model Application Forms

This appendix contains five model credit application forms, each designated for use in a particular type of consumer credit transaction as indicated by the bracketed caption on each form. The first sample form is intended for use in open-end, unsecured transactions; the second for closed-end, secured transactions; the third for closed-end transactions, whether unsecured or secured; the fourth in transactions involving community property or occurring in community property states; and the fifth in residential mortgage transactions. The appendix also contains a model disclosure for use in complying with § 202.13 for certain dwelling-related loans. All forms contained in this appendix are models; their use by creditors is optional.

The use or modification of these forms is governed by the following instructions. A creditor may change the forms: by asking for additional information not prohibited by § 202.5; by deleting any information request; or by rearranging the format without modifying the substance of the inquiries. In any of these three instances, however, the appropriate notices regarding the optional nature of courtesy titles, the option to disclose alimony, child support, or separate maintenance, and the limitation concerning marital status inquiries must be included in the appropriate places if the items to which they relate appear on the creditor's form.

If a creditor uses an appropriate Appendix B model form, or modifies a form in accordance with the above instructions, that creditor shall be deemed to be acting in compliance with the provisions of paragraphs (c) and (d) of § 202.5 of this regulation.

**BILLING CODE 6210-01-M**

**Federal Register** / Vol. 50, No. 224 / Wednesday, November 20, 1985 / Rules and Regulations **48035**

[Open end, unsecured credit]

## CREDIT APPLICATION

**IMPORTANT:** Read these Directions before completing this application.

- If you are applying for an individual account in your own name and are relying on your own income or assets and not the income or assets of another person as the basis for repayment of the credit requested, complete only Sections A and C.
- If you are applying for a joint account or an account that you and another person will use, complete all Sections, providing information in B about the joint applicant or user.
- If you are applying for an individual account, but are relying on income from alimony, child support, or separate maintenance or on the income or assets of another person as the basis for repayment of the credit requested, complete all Sections to the extent possible, providing information in B about the person on whose alimony, support, or maintenance payments or income or assets you are relying.

### SECTION A—INFORMATION REGARDING APPLICANT

Full Name (Last, First, Middle):

Present Street Address:                                   Birthdate:   /   /

City:                    State:         Zip:        Telephone:          Years there:

Social Security No.:            Driver's License No.:

Previous Street Address:                                           Years there:

City:                    State:         Zip:        Telephone:

Present Employer:                          Years there:        Telephone:

Position or title:                         Name of supervisor:

Employer's Address:

Previous Employer:                                               Years there:

Previous Employer's Address:

Present net salary or commission: $          per          No. Dependents:           Ages:

Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation.

Alimony, child support, separate maintenance received under: court order ☐ written agreement ☐ oral understanding ☐

Other income: $          per          Source(s) of other income:

Is income listed in this Section likely to be reduced in the next two years?  No ☐
☐ Yes (Explain in detail on a separate sheet.)  No ☐

Have you ever received credit from us?  What?

Checking Account No.:                      Institution and Branch:

Savings Account No.:                       Institution and Branch:

Name of nearest relative not living with you:                      Telephone:

Relationship:        Address:

### SECTION B—INFORMATION REGARDING JOINT APPLICANT, USER, OR OTHER PARTY (Use separate sheets if necessary)

Full Name (Last, First, Middle):                                   Birthdate:   /   /

Relationship to Applicant (if any):

Present Street Address:                                           Years there:

City:                    State:         Zip:        Telephone:

Social Security No.:            Driver's License No.:                 Years there:

Present Employer:                          Years there:        Telephone:

Position or title:                         Name of supervisor:

Employer's Address:

Previous Employer:                                               Years there:

Previous Employer's Address:

Present net salary or commission: $          per          No. Dependents:           Ages:

Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation.

Alimony, child support, separate maintenance received under: court order ☐ written agreement ☐ oral understanding ☐

Other income: $          per          Source(s) of other income:

Is income listed in this Section likely to be reduced in the next two years?  No ☐
☐ Yes (Explain in detail on a separate sheet.)  No ☐

Checking Account No.:                      Institution and Branch:

Savings Account No.:                       Institution and Branch:

Name of nearest relative not living with Joint Applicant, User, or Other Party:          Telephone:

Relationship:        Address:

### SECTION C—MARITAL STATUS
(Do not complete if this is an application for an individual account.)

Applicant: ☐ Married  ☐ Unmarried (including single, divorced, and widowed)
Other Party: ☐ Married  ☐ Separated  ☐ Unmarried (including single, divorced, and widowed)

### SECTION D—ASSET AND DEBT INFORMATION (If Section B has been completed, this Section should be completed giving information about both the Applicant and Joint Applicant, User, or Other Person. Please mark Applicant-related information with an "A." If Section B was not completed, only give information about the Applicant in this Section.)

#### ASSETS OWNED (Use separate sheet if necessary.)

| Description of Assets | Value | Subject to Debt? Yes/No | Name(s) of Owner(s) |
|---|---|---|---|
| Cash | $ | | |
| Automobiles (Make, Model, Year) | | | |
| Cash Value of Life Insurance (Issuer, Face Value) | | | |
| Real Estate (Location, Date Acquired) | | | |
| Marketable Securities (Issuer, Type, No. of Shares) | | | |
| Other (List) | | | |
| Total Assets | $ | | |

#### OUTSTANDING DEBTS (Include charge accounts, installment contracts, credit cards, rent, mortgages, etc. Use separate sheet if necessary.)

| Creditor | Type of Debt or Acct. No. | Name in Which Acct. Carried | Original Debt | Present Balance | Monthly Payments | Past Due? Yes/No |
|---|---|---|---|---|---|---|
| 1. (Landlord or Mortgage Holder) | ☐ Rent Payment ☐ Mortgage | | $ (Omit cents) | $ (Omit cents) | $ | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| Total Debts | | | $ | | | |
| (Credit References) | | | | | | Date Paid |
| 6. | | | | | | |
| 7. | | | | | | |

Are you a co-maker, endorser, or guarantor on any loan or contract?  Yes ☐  No ☐  If "yes" for whom?    To whom?

Are there any unsatisfied judgments against you?  Yes ☐  No ☐  Amount $   To whom?

Have you been declared bankrupt in the last 14 years?  Yes ☐  No ☐  Where?    Year

Other Obligations—(E.g., liability to pay alimony, child support, separate maintenance. Use separate sheet if necessary.)

Everything that I have stated in this application is correct to the best of my knowledge. I understand that you will retain this application whether or not it is approved. You are authorized to check my credit and employment history and to answer questions about your credit experience with me.

Applicant's Signature _____  Date _____   Other Signature _____  Date _____
                                              (Where Applicable)

**48036** Federal Register / Vol. 50, No. 224 / Wednesday, November 20, 1985 / Rules and Regulations

[Closed-end, secured credit]

## CREDIT APPLICATION

**IMPORTANT:** Read these Directions before completing this Application.

Check | ☐ If you are applying for individual credit in your own name and are not relying on your own income or assets or assets of another person as the basis for repayment of the credit requested, complete only Sections A, C, D, and E, omitting B and the second part of C.
Applicable | ☐ If this is an application for joint credit, complete all Sections, providing information in B about the joint applicant.
Box | ☐ If you are applying for individual credit, but are relying on income from alimony, child support, or separate maintenance or on the income or assets of another person as the basis for repayment of the credit requested, complete all Sections to the extent possible, providing information in B about the person on whose alimony, support, or maintenance payments or income or assets you are relying.

Amount Requested    Payment Plan Desired    Proceeds of Credit
$                                             To be Used For

### SECTION A—INFORMATION REGARDING APPLICANT

Full Name (Last, First, Middle):

Present Street Address:                                    Birthdate:  /  /
City:              State:       Zip:                       Years there:
Previous Street Address:
City:              State:       Zip:                       Years there:
Social Security No.:        Driver's License No.:
Present Employer:          Years there:    Telephone:
Position or title:         Name of supervisor:
Employer's Address:
Previous Employer:                                         Years there:
Previous Employer's Address:
Present salary or commission: $        per        Ages:
Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation. ☐ No Dependents
Alimony, child support, separate maintenance received under: court order ☐ written agreement ☐ oral understanding ☐
Other income: $        per        Source(s) of other income:

Is any income listed in this Section likely to be reduced before the credit requested is paid off?
☐ Yes (Explain in detail on a separate sheet.) No ☐     When?
Have you ever received credit from us? ☐
Checking Account No.                    Institution and Branch:
Savings Account No.                     Institution and Branch:
Name of nearest relative not living with you:             Telephone:
Relationship:
Address:

### SECTION B—INFORMATION REGARDING JOINT APPLICANT OR OTHER PARTY (Use separate sheets if necessary.)

Full Name (Last, First, Middle):
Relationship to Applicant (if any):                       Birthdate:  /  /
Present Street Address:                                    Years there:
City:              State:       Zip:       Telephone:
Social Security No.:        Driver's License No.:
Present Employer:          Years there:    Telephone:
Position or title:         Name of supervisor:
Employer's Address:
Previous Employer:                                         Years there:
Previous Employer's Address:
Present salary or commission: $        per        Ages:
Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation. ☐ No Dependents
Alimony, child support, separate maintenance received under: court order ☐ written agreement ☐ oral understanding ☐
Other income: $        per        Source(s) of other income:

Is any income listed in this Section likely to be reduced before the credit requested is paid off? No ☐
Checking Account No.                    Institution and Branch:
Savings Account No.                     Institution and Branch:

### SECTION C—MARITAL STATUS
Applicant: ☐ Married  ☐ Separated  ☐ Unmarried (including single, divorced, and widowed)
Other Party: ☐ Married  ☐ Separated  ☐ Unmarried (including single, divorced, and widowed)

---

### SECTION D—ASSET AND DEBT INFORMATION (If Section B has been completed, this Section should be completed giving information about both the Applicant and Joint Applicant or Other Person. Please mark Applicant-related information with an "A." If Section B was not completed, only give information about the Applicant in this Section.)

**ASSETS OWNED** (Use separate sheet if necessary.)

| Description of Assets | Value | Subject to Debt? Yes/No | Name(s) of Owner(s) |
|---|---|---|---|
| Cash | $ | | |
| Automobiles (Make, Model, Year) | | | |
| Cash Value of Life Insurance (Issuer, Face Value) | | | |
| Real Estate (Location, Date Acquired) | | | |
| Marketable Securities (Issuer, Type, No. of Shares) | | | |
| Other (List) | | | |
| Total Assets | $ | | |

**OUTSTANDING DEBTS** (Include charge accounts, installment contracts, credit cards, rent, mortgages, etc. Use separate sheet if necessary.)

| Creditor | Type of Debt or Acct. No. | Original Debt | Present Balance | Monthly Payments | Past Due? Yes/No |
|---|---|---|---|---|---|
| 1. (Landlord or Mortgage Holder) ☐ Rent Payment ☐ Mortgage | | $ (Omit cents) | $ (Omit cents) | $ | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| Total Debts | | | $ | | |
| (Credit References) | | | | | Due Paid |
| 1. | | | | | |

Are you a co-maker, endorser, or guarantor on any loan or contract?  ☐ Yes  ☐ No   If "yes," for whom?       To whom?
Are there any unsatisfied judgments against you?  ☐ Yes  ☐ No   Amount $   If "yes," to whom owed?
Have you been declared bankrupt in the last 14 years?  ☐ Yes  ☐ No   If "yes," Year
Other obligations—(E.g., liability to pay alimony, child support, separate maintenance. Use separate sheet if necessary.)

### SECTION E—SECURED CREDIT Briefly describe the property to be given as security:

and list names and addresses of all co-owners of the property:
Name                                          Address

If the security is real estate, give the full name of your spouse (if any):

Everything that I have stated in this application is correct to the best of my knowledge. I understand that you will retain this application whether or not it is approved. You are authorized to check my credit and employment history and to answer questions about your credit experience with me.

Applicant's Signature        Date        Other Signature (When Applicable)        Date

000801

(Check one, unsecured/secured credit)
**CREDIT APPLICATION**

IMPORTANT: Read these Directions before completing this Application.

☐ If you are applying for individual credit in your own name and are relying on your own income or assets and not the income or assets of another person as the basis for repayment of the credit requested, complete only Sections A and D. If the requested credit is to be secured, also complete the first part of Section C and Section E.

☐ If you are applying for joint credit with another person, complete all Sections except B, providing information in Sections A and B about the joint applicant.

☐ If you are applying for individual credit, but are relying on income from alimony, child support, or separate maintenance or on the income or assets of another person as the basis for repayment of the credit requested, complete all Sections except B about the person on whose alimony, support, or maintenance payments or income or assets you are relying. If the requested credit is to be secured, then complete Section E.

Check Appropriate Box ☐

Amount Requested    Payment Date Desired    Proceeds of Credit
$                                            To be Used For

**SECTION A—INFORMATION REGARDING APPLICANT**

Full Name (Last, First, Middle):
Present Street Address:                                      Birthdate:  /  /
City:                    State:        Zip:                  Years there:
Social Security No.:           Driver's License No.:
Previous Street Address:
City:                    State:        Zip:        Telephone:    Years there:
Present Employer:                                            Years there:
Position or title:                Name of supervisor:        Telephone:
Employer's Address:
Previous Employer:                                          Years there:
Previous Employer's Address:
Present net salary or commission: $      per      No. Dependents:      Ages:
Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation.
Alimony, child support, separate maintenance received under: court order ☐ written agreement ☐ oral understanding ☐
Other income: $      per      Source(s) of other income:
Is any income listed in this Section likely to be reduced before the credit requested is paid off?
☐ Yes (Explain in detail on separate sheet.)    ☐ No
Have you ever received credit from us?      When?      Office
Checking Account No.:                Institution and Branch:
Savings Account No.:                 Institution and Branch:
Name of nearest relative not living with you:
Relationship:                Address:                Telephone:

**SECTION B—INFORMATION REGARDING JOINT APPLICANT OR OTHER PARTY** (Use separate sheets if necessary.)

Full Name (Last, First, Middle):
Relationship to Applicant (if any):                         Birthdate:  /  /
Present Street Address:
City:                    State:        Zip:                  Years there:
Social Security No.:           Driver's License No.:        Telephone:
Present Employer:                                           Years there:
Position or title:                Name of supervisor:        Telephone:
Employer's Address:
Previous Employer:                                          Years there:
Previous Employer's Address:
Present net salary or commission: $      per      No. Dependents:      Ages:
Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation.
Alimony, child support, separate maintenance received under: court order ☐ written agreement ☐ oral understanding ☐
Other income: $      per      Source(s) of other income:
Is any income listed in this Section likely to be reduced before the credit requested is paid off?
☐ Yes (Explain in detail on separate sheet.)    ☐ No
Checking Account No.:                Institution and Branch:
Savings Account No.:                 Institution and Branch:
Name of nearest relative not living with Joint Applicant or Other Party:
Relationship:                Address:                Telephone:

**SECTION C—MARITAL STATUS**
(Do not complete if this is an application for individual unsecured credit.)
Applicant:  ☐ Married  ☐ Unmarried (including single, divorced, and widowed)
Other Party:  ☐ Married  ☐ Separated  ☐ Unmarried (including single, divorced, and widowed)

**SECTION D—ASSET AND DEBT INFORMATION** (If Section B has been completed, this Section should be completed giving information about both the Applicant and Joint Applicant or Other Party. Please mark Applicant-related information with an "A," if Section B was not completed, only give information about the Applicant in this Section.)

ASSETS OWNED (Use separate sheet if necessary.)

| Description of Assets | Value | Subject to Debt? Yes No | Name(s) of Owner(s) |
|---|---|---|---|
| Cash | $ | | |
| Automobiles (Make, Model, Year) | | | |
| Cash Value of Life Insurance (Issuer, Face Value) | | | |
| Real Estate (Location, Date Acquired) | | | |
| Marketable Securities (Issuer, Type, No. of Shares) | | | |
| Other (List) | | | |
| Total Assets | $ | | |

OUTSTANDING DEBTS (Include charge accounts, installment contracts, credit cards, mortgages, etc. Use separate sheet if necessary.)

| Creditor | Type of Debt or Acct. No. | Name in Which Acct. Carried | Original Debt | Present Balance | If "Yes," for whom? Monthly Payments | Past Due? Yes No |
|---|---|---|---|---|---|---|
| 1. (Landlord or Mortgage Holder) | ☐ Rent Payment ☐ Mortgage | | $(Omit cents) | $(Omit cents) | $(Omit cents) | |
| 2. | | | | $ | $ | |
| Total Debts | | | | $ | $ | |
| (Credit References) | | | | | | |
| 3. | | | $ | | | |

Are you a co-maker, endorser, or guarantor on any loan or contract?  Yes ☐  No ☐    If "Yes," for whom?   To whom?
Are there any unsatisfied judgments against you?  Yes ☐ No ☐    Amount $
Have you been declared bankrupt in the last 14 years?  Yes ☐ No ☐    Year
Other obligation—(E.g., liability to pay alimony, child support, separate maintenance. Use separate sheet if necessary.)

**SECTION E—SECURED CREDIT** (Complete only if credit is to be secured.) Briefly describe the property to be given as security:

and the names and addresses of all co-owners of the property:

Name                                    Address

If the security is real estate, give the full name of your spouse (if any):

Everything that I have stated in this application is correct to the best of my knowledge. I understand that you will retain this application whether or not it is approved. You are authorized to check my credit and employment history and to answer questions about your credit experience with me.

Applicant's Signature          Date          Other Signature (Where Applicable)          Date

[Commonly prepared]

## CREDIT APPLICATION

**IMPORTANT: Read these Directions before completing this Application.**

Check
Appropriate
Box

☐ If you are applying for individual credit in your own name, are not married, and are not relying on alimony, child support, or separate maintenance payments or on the income or assets of another person as the basis for repayment of the credit requested, complete only Sections A and D. If the requested credit is to be secured, also complete Section E.

☐ In all other situations, complete all Sections except E, providing information in B about your spouse, a joint applicant, user, or the person on whose alimony, support, or maintenance payments or income or assets you are relying if the requested credit is to be secured, also complete Section E.

| Amount Requested | Payment Date Desired | Proceeds of Credit |
|---|---|---|
| $ | | To be Used For |

### SECTION A—INFORMATION REGARDING APPLICANT

Full Name (Last, First, Middle):

Present Street Address:

City:                    State:                    Zip:

Social Security No.:              Driver's License No.:

Previous Street Address:

City:                    State:                    Zip:

Present Employer:                    Years there:

Position or title:                    Telephone:

Employer's Address:

Previous Employer:                    Years there:

Previous Employer's Address:                    Birthdate: / /

Present salary or commission: $     per     No. Dependents:          Ages:          Years there:

Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation.

Alimony, child support, separate maintenance received under: court order ☐ written agreement ☐ oral understanding ☐

Other income: $     per     Source(s) of other income:

Is any income listed in this Section likely to be reduced in the next two years or before the credit requested is paid off?
☐ Yes (Explain in detail on a separate sheet.)  No ☐

Have you ever received credit from us?          When?          Office:

Checking Account No.:                    Institution and Branch:

Savings Account No.:                    Institution and Branch:

Name of nearest relative not living with you          Telephone:

Relationship:                    Address:

### SECTION B—INFORMATION REGARDING SPOUSE, JOINT APPLICANT, USER, OR OTHER PARTY (Use separate sheets if necessary)

Full Name (Last, First, Middle):                    Birthdate: / /

Relationship to Applicant (if any):                    Years there:

Present Street Address:

City:                    State:                    Zip:

Social Security No.:              Driver's License No.:

Present Employer:                    Years there:

Position or title:                    Telephone:

Employer's Address:

Previous Employer:                    Years there:

Previous Employer's Address:                    Ages:

Present salary or commission: $     per     No. Dependents:

Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repayment.

Alimony, child support, separate maintenance received under: court order ☐ written agreement ☐ oral understanding ☐

Other income: $     per     Source(s) of other income:

Is any income listed in this Section likely to be reduced in the next two years or before the credit requested is paid off?
☐ Yes (Explain in detail on a separate sheet.)  ☐ No

Checking Account No.:                    Institution and Branch:

Savings Account No.:                    Institution and Branch:

Name of nearest relative not living with Spouse/Joint Applicant, User, or Other Party:          Telephone:

Relationship:                    Address:

### SECTION C—MARITAL STATUS

Applicant: ☐ Married    ☐ Separated    ☐ Unmarried (including single, divorced, and widowed)

Other Party: ☐ Married    ☐ Separated    ☐ Unmarried (including single, divorced, widowed)

### SECTION D—ASSET AND DEBT INFORMATION (If Section B has been completed, this Section should be completed giving information about the Applicant and the other Party. If not, Applicant only. Please mark Applicant-related information with an "A." If Section B was not completed, only give information about the Applicant in this Section.)

ASSETS OWNED (Use separate sheet if necessary.)

| Description of Assets | Value | Subject to Debt? Yes/No | Name(s) of Owner(s) |
|---|---|---|---|
| Cash | $ | | |
| Automobiles (Make, Model, Year) | | | |
| Cash Value of Life Insurance (Issuer, Face Value) | | | |
| Real Estate (Location, Date Acquired) | | | |
| Marketable Securities (Issuer, Type, No. of Shares) | | | |
| Other (List) | | | |
| Total Assets | $ | | |

OUTSTANDING DEBTS (Include charge accounts, installment contracts, credit cards, rent, mortgages, etc. Use separate sheet if necessary.)

| Name of Creditor | Type of Debt or Acct. No. | Name in Which Acct. Carried | Original Debt | Present Balance | Monthly Payments | Past Due? Yes/No |
|---|---|---|---|---|---|---|
| 1. (Landlord or Mortgage Holder) | ☐ Rent Payment ☐ Mortgage | | $ (One rent) | $ (Omit rent) | $ | |
| 2. | | | | | | |
| Total Debts | | | | $ | | |
| (Credit Reference) | | | | | | Date Paid |
| 1. | | | | $ | | |

Are you a co-maker, endorser, or guarantor on any loan or contract? Yes ☐  No ☐  If "yes," for whom?          To whom?

Are there any unsatisfied judgments against you? Yes ☐  No ☐  Amount $          To whom owed?

Have you been declared bankrupt in the last 14 years? Yes ☐  No ☐  If "yes," where?          Year

Other obligations—(E.g., liability to pay alimony, child support, separate maintenance. Use separate sheet if necessary.)

### SECTION E—SECURED CREDIT (Complete only if credit is to be secured.) Briefly describe the property to be given as security:

and the names and addresses of all co-owners of the property:

| Name | Address |
|---|---|
| | |

Everything that I have stated in this application is correct to the best of my knowledge. I understand that you will retain this application whether or not it is approved. You are authorized to check my credit and employment history and to answer questions about your credit experience with me.

| Applicant's Signature | Date | Other Signature (Where Applicable) | Date |
|---|---|---|---|
| | | | |

000803

RESIDENTIAL LOAN APPLICATION

BILLING CODE 6210-01-C