executed by HUD and NAREB in 1982. HUD is now in negotiations with NAREB with respect to renewal and revision of this agreement.

The VAMA with NAREB was adopted at the national level by NAREB leadership, and it commits each local Board of Realtists to its provisions. The HUD/NAREB VAMA also provides for HUD appointment of CHRBs to meet regularly with signatory Boards to assist them with problems of program implementation and new initiatives designed to further the purposes of fair housing and the objectives of the agreement. In practice, CHRBs appointed under the NAR agreement are used to serve the local NAREB Board as well in geographical areas in which both NAR and NAREB have participating Boards. The HUD/NAREB VAMA also provides that HUD will affirmatively seek the participation of NAREB representatives in CHRBs appointed under the NAR agreement.

As of December, 1987, the HUD/NAREB VAMA had been adopted by 28 of the 35 local NAREB Member Boards of Realtists.

A model VAMA for homebuilders was approved by HUD and the National Association of Homebuilders (NAHB) on October 22, 1976. The HUD/NAHB Agreement was revised and renewed for five years in 1984. Unlike the HUD/NAR VAMA, with respect to which the NAR maintains close scrutiny over content and operation, the HUD/NAHB model VAMA, when executed by HUD and State and local homebuilder groups, may contain deviations from the national model, so long as the resulting agreement is at least as comprehensive in its commitments as the national model. Home builder VAMAs are applicable to all housing developed, marketed, sold or rented by the builder, whether or not HUD-assisted or FHA-insured. The HUD/NAHB model also provides for HUD appointment of a Community Housing Resource Board.

A common feature of each of the VAMAs provides that signatories to association voluntary agreements executed by HUD are not required to file affirmative marketing plans for individual FHA-insured or HUD-assisted projects under HUD's Affirmative Fair Housing Marketing Regulations (24 CFR Part 200, Subpart M). While as a practical matter this provision is not applicable to many signatories of the NAR and NAREB agreements, it is significant to builder signatories of the home builders association VAMAs. It is of far-reaching importance that the commitments made by parties to any VAMA extend to conventionally developed and financed housing, which is not within the scope of HUD's programmatic regulatory authority.

During 1987, HUD sought to enlarge the number of housing industry groups who would enter into agreements with HUD to commit to a public-private partnership for affirmative action in the fair housing area. A number of these groups signed Statements of Intent, in which they indicated their willingness to undertake negotiations with HUD for development of voluntary affirmative fair housing agreements which they would encourage their respective members to adopt.

On November 9, 1977, the National Association of Real Estate License Law Officials (NARELLO) approved a model form of Affirmative Fair Housing Agreement to be entered into with HUD by State real estate licensing agencies. The Agreement is designed to assure that all real estate brokers and salespersons subject to regulation by the State agency will market real property in an affirmative manner consistent with the purposes of Title VIII. Objectives of the Agreement include the making of opportunities in the real estate field equally available to all; informing real estate professionals of their responsibilities under the fair housing laws; providing sanctions for violation of the fair housing laws by licensees; and sharing of information between HUD and the State agency. In addition, HUD agrees to provide technical assistance to help the agency to attain the objectives of the Agreement.

As of the end of 1987, licensing agencies in 46 States and the District of Columbia had entered into Affirmative Fair Housing Agreements with HUD.

## VII. Role of Private Fair Housing Groups

**Testing and Fair Housing Enforcement**—Fair housing testing, used to detect and document discriminatory housing practices on the part of real estate brokers, property managers and other housing providers, has long been an important tool in the enforcement of fair housing laws. Testing is a means of measuring differences in the quality, content and quantity of information and service given to customers by housing providers, attributable to a difference in race, color, religion, sex or national origin, or whatever other variable is being tested. Teams of persons, as similar as possible in all characteristics except the variable being tested, pose as homeseekers. The team members visit the same real estate office, rental agency, or apartment building at closely spaced intervals to apply for the same type of housing. Each tester records the responses and treatment received, and the reports are compared.

The results of such tests can be used to determine whether fair housing laws are being violated, to provide evidence in an enforcement action against a specific real estate firm or agent, or to provide information about the nature and level of discrimination practiced in the market. Beginning in the mid-1970's, HUD has encouraged the use and development of testing in both the enforcement and research contexts. Further, in 1984, HUD sponsored a national Fair Housing Testing Conference which covered a broad range of topics relating to testing techniques and the use of testing results. HUD efforts to foster increased use of testing have also included funding from 1980 to the present time for the development of local testing programs, such as that of the Regional Fair Housing Consortium, a network of human rights offices and fair housing groups which was formed to develop a cooperative program for fighting discrimination in the District of Columbia and its

suburbs in Virginia and Maryland and to document the existence of discrimination through the use of testing.

Paralleling the growth and development of testing programs by both public and private fair housing agencies has been the development of a solid case law supporting the admissibility of tester evidence in fair housing cases. Throughout the 1970's, private fair housing groups brought numerous Title VIII actions in Federal court, many relying heavily on tester evidence. These suits resulted in increasingly substantial damage and attorney fee awards for victims of housing discrimination. In 1982, in the landmark case of **Havens Realty Corporation** v. **Coleman**, 455 U.S. 372 (1982), the U.S. Supreme Court affirmed the standing of minority testers and fair housing organizations to sue on their own behalf under Title VIII. This decision has proved to be an important contribution to private enforcement efforts to achieve fair housing compliance. (For further discussion of this case, see Part VIII).

The role played by private fair housing groups in the enforcement of the fair housing laws has been a major one. The significance of that role may have been best expressed in a statement made by the General Counsel of HUD, John J. Knapp, before the Senate Subcommittee on Housing and Urban Affairs, on June 18, 1986:

"Private enforcement is vitally important to the Fair Housing Act. The statute provides for limited forms of governmental enforcement but it relies much more on private party pursuit of private complaints. This is not unique to the Fair Housing Act; the private right of action historically has been a major enforcement vehicle for our antitrust laws, civil rights laws, and others. The practical imperatives that make this especially applicable to the Fair Housing Act have been recognized explicitly by the Supreme Court, which said in its 1972 *Trafficante* opinion:

'Since HUD has no enforcement powers and since the enormity of the task of assuring fair housing makes the role of the Attorney General in the matter minimal, the main generating force must be private suits in which . . . the complainants act not only on their own behalf but also as private attorneys general in vindicating a policy that Congress considered to be of the highest priority.'[1]

"Private enforcement is a priority under the Fair Housing Act for practical reasons having to do with the nature of the acts of discrimination that we are trying to prevent, or to provide remedies for, and the multiplicity and variety of those acts. It is the multitude of daily acts of discrimination in the housing market against individual victims across the Nation that is our principal concern.

* * * *

[1]*Trafficante* v. **Metropolitan Life Insurance Co.**, 409 U.S. 205, 211 (1972).

"In the war against housing discrimination, the prevention and the redressing of that multitude of individual grievances is infantry work. The waging of that war cannot be left dependent upon Federal personnel resources, or on government enforcement procedures that are available only in widely-scattered Federal offices.

* * * *

"More importantly, the private organizations are essential as a source of the kind of evidence that is virtually indispensable in a Fair Housing Act case. The garden variety act of housing discrimination usually involves disparate treatment—a seeker of a sale or rental unit is treated differently from another for no reason other than race. That kind of differential treatment generally can be proved only by testing. There must be some kind of institutional arrangement that individual victims in the local market area can turn to in order to be able to obtain that kind of evidence through professionally trained testers. There is no alternative source for that particular kind of indispensable support of discrimination complaints by individual victims other than the private fair housing groups, and as long as that remains the fact, fair housing enforcement will not get very far without them."

With the enactment of the Housing and Community Development Act of 1987, HUD will be authorized for the first time to provide funds to private organizations carrying on programs to enforce fair housing laws. The impact of such funding on fair housing enforcement efforts, particularly in the areas of testing and systemic discrimination cases, will enhance the role of private organizations in the fight to end discrimination in housing.

**The Fair Housing Enforcement Demonstration**—In 1978, HUD joined with the National Committee Against Discrimination in Housing to undertake the Fair Housing Enforcement Demonstration Project, a 24-month experiment with nine locally-based, private fair housing groups. These groups were located in Atlanta, Boston, Chicago, Dallas, Detroit, Los Angeles, New York City, Northern New Jersey, and Richmond.

The demonstration started with each of the local groups on January 1, 1980, and continued through December 31, 1981, with seven of the groups. (Two groups were continued for a third year.) Under the terms of the cooperative agreements with HUD, each group received $20,000 per year for 2 years for three major fair housing tasks:

(1) receive and record complaints of housing discrimination;

(2) conduct tests and other investigative work related to the complaints and refer the documented complaints to the Office of Fair Housing and Equal Opportunity in the appropriate HUD Region; and

(3) conduct fair housing testing studies, unrelated to individual complaints, to uncover discriminatory practices and to report the discriminatory practices to the appropriate HUD Regional Office.

With regard to the eight local groups for which data were comparable, 1,545 fair housing complaints were recorded, 903 tests were conducted on

complaints, 734 complaints were referred to HUD, and 1,179 complaints were closed, with 302 (25 percent) resolved in favor of the aggrieved person.

Each of the local groups was able to process, test and document more cases than its normal work load. In addition, during the two-year period, HUD recorded an increase of 1,384 complaints from all 10 regions over the preceding two-year period. Thus, over 50 percent of the overall increase in complaints received by HUD occurred in the eight areas where the demonstration was being conducted.

All of the nine local groups conducted one or more "fair housing studies" using testers. These studies involved the targeting of significant groups in the housing industry for special pattern and practice examination. Twenty-three studies produced definite indications of unlawful discriminatory practices, and 18 of these supplied sufficient evidence to warrant enforcement action without further testing. The principal result of the experimental "fair housing study" activity was the demonstration that testing can be a highly productive device for identifying and developing hard evidence concerning the more blatant and pervasive forms of unlawful housing discrimination.

The Fair Housing Enforcement Demonstration went beyond the Housing Market Practices Survey (HMPS) conducted in 1977 (see discussion in Part IX, Paragraph C), which used audit-type testing procedures for research purposes. The demonstration, on the other hand, emphasized the role of testing for fair housing enforcement and established testing as a recognized mechanism for use by fair housing groups in documenting cases of discriminatory conduct.

**Fair Housing — Fair Lending Seminars—**One of the ways in which HUD has acted to further the policies of Title VIII is the sponsorship of Fair Housing — Fair Lending Seminars in cooperation with law schools and local bar associations. The enactment of new statutes, the promulgation of new regulations, and the many recent court decisions have significantly augmented the law of fair housing and fair lending since the first jointly-sponsored seminar, held in 1971 at the University of Illinois Law School.

The Fair Housing — Fair Lending seminars are designed for practicing attorneys and officials of lending institutions, to keep their knowledge current in this area of the law, and students from the co-sponsoring law school frequently also participate. The seminar lecturers, who include specialists in the practice of fair housing law, law professors and civil rights enforcement officials, are able ot provide seminar participants with the benefit of their broad experience. The seminars have achieved great success as a form of continuing legal education.

In 1987 four seminars were conducted, in Boston and Seattle and at the University of South Carolina and the University of Chicago.

**New Legislation — Fair Housing Initiatives Program—**The Fair Housing Initiatives Program, first proposed in the President's budget for Fiscal Year 1986, was authorized by the Congress in legislation passed in Decem-

ber 1987. Under this legislation (Section 561 of the Housing and Community Development Act of 1987), the Secretary of HUD is authorized to provide funding to State and local government agencies and to public or private organizations formulating or carrying out programs to prevent or eliminate discriminatory housing practices. The funds will enable the recipients to carry out activities designed to obtain enforcement of the rights guaranteed by Title VIII of the Civil Rights Act of 1968 or by substantially equivalent State or local laws, and education and outreach programs designed to inform the public concerning rights and obligations under those laws.

The Fair Housing Initiatives Program contains three separate thrusts: the Administrative Enforcement Initiative, the Education and Outreach Initiative, and the Private Enforcement Initiative.

The Administrative Enforcement Initiative will provide financial assistance to governmental agencies which administer State and local fair housing laws, in an effort to enhance their ability to enforce those laws.

The authorization of direct funding for private, non-profit organizations or other private entities for enforcement-related activities represents something new and is the principal focus of the Fair Housing Initiatives Program. This component, the Private Enforcement Initiative, will be used to expand the capacity of non-government entitles to help enforce fair housing laws. Private organizations have historically played a key role in the struggle for housing equality in the United States. These organizations would be funded to assist in the administrative and judicial enforcement of fair housing laws through support for testing, legal revolving funds for litigation, systemic investigations and capacity building. The extensive network of local, non-profit fair housing centers provides an important and natural source of assistance to persons complaining of discrimination in rental, sales, and credit transactions relating to housing.

The third component of the Fair Housing Initiatives Program is the Education and Outreach Initiative. Education and outreach programs are intended to inform the public, or appropriate segments thereof, of their rights and obligations under Title VIII and substantially equivalent State and local laws. HUD has previously been authorized to support outreach and education programs provided by State and local fair housing agencies and by Community Housing Resource Boards. This new initiative will enhance the Department's efforts to expand on the previously authorized education and outreach programs and assist a broader universe of public and private fair housing organizations.

The legislation authorizes funding in the amount of $5 million for each of Fiscal Years 1988 and 1989, and limits the amount available in each year for the Private Enforcement Initiative to $13 million. While there is no appropriation for Fiscal Year 1988, funds have been requested for Fiscal Year 1989.

## VIII. Federal Court Decisions Interpreting and Applying the Fair Housing Laws

**Pre-Title VIII Decisions**—The Case of **Buchanan** v. **Warley,** 245 U.S. 60 (1917), involved the constitutionality of a criminal ordinance enacted by the City of Louisville, Kentucky, prohibiting blacks and whites from occupying houses on blocks in which their respective races were in the minority. The U.S. Supreme Court unanimously struck down the ordinance as a violation of the due process clause of the Fourteenth Amendment. Although the precise question before the court involved the right of a white seller to dispose of his property free from restrictions as to the race or color of a potential purchaser, the opinion indicated that the ordinance was also offensive to the rights of those desiring to acquire and occupy property and barred on grounds of race or color. On that point, the court stated: "The Fourteenth Amendment and these statutes enacted in furtherance of its purpose [the Civil Rights Act of 1866, reenacted in 1870, subsequent to the adoption of the Fourteenth Amendment] operate to qualify and entitle a colored man to acquire property without state legislation discriminating against him solely because of color."

In reaching its decision that the ordinance was unconstitutional, the court distinguished previous cases holding valid laws "which separated the races on the basis of equal accommodations in public conveyances" (see **Plessy** v. **Ferguson,** 163 U.S. 537 (1896) and "which provide for separation in the public schools of white and colored pupils where equal privileges are given." Thus, the decision in **Buchanan** v. **Warley** made only a partial inroad into the doctrine of "separate but equal."

The case of **Shelley** v. **Kraemer,** 334 U.S. 1 (1948), involved the judicial enforcement by State courts in Michigan and Missouri of restrictive covenants on privately owned property restricting the use or occupancy of the property to persons of the "Caucasian race." The court first concluded that, by themselves, the restrictive agreements made among private individuals do not violate any rights guaranteed by the Fourteenth Amendment, which inhibits "only such action as may fairly be said to be that of the States." In reaching this conclusion, the court stated: "So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State and the provisions of the Amendment have not been violated."

The court then considered the further issue of whether the enforcement of the restrictions constitutes sufficient participation by the State to be violative of the prohibitory provisions of the Fourteenth Amendment, denying the plaintiffs "the equal protection of the laws which the Amendment was intended to insure." The court found sufficient State participation, concluding as follows:

"We hold that in granting judicial enforcement of the restrictive agreements in these cases, the States have denied petitioners the equal

protection of the laws and that, therefore, the action of the state courts cannot stand. We have noted that freedom from discrimination by the States in the enjoyment of property rights was among the basic objectives sought to be effectuated by the framers of the Fourteenth Amendment. That such discrimination has occurred in these cases is clear. Because of the race or color of these petitioners they have been denied rights of ownership or occupancy enjoyed as a matter of course by other citizens of different race or color."

In the companion case of **Hurd** v. **Hodge,** 334 U.S. 24 (1948), decided the same day, the Supreme Court struck down the similar enforcement of a racially restrictive covenant by a Federal court in the District of Columbia. Since no State action was involved, the equal protection clause of the Fourteenth Amendment was not applicable. However, the court found the judicial enforcement to be violative of the Civil Rights Act of 1866 and contrary to public policy.

In 1955, one year after the landmark Supreme Court decision in **Brown** v. **Board of Education,** which invalidated governmentally enforced school segregation, the Sixth Circuit Court of Appeals considered the issue of segregation in low-rent public housing. In **Detroit Housing Commission** v. **Lewis,** 226 F. 2d 180 (6th Cir. 1955), it was held that enforced segregation by local public housing authorities constituted State action in violation of the equal protection clause of the Fourteenth Amendment.

Thus far, the Civil Rights Act of 1866 had been construed to apply only in cases where State action was involved. However, that was changed on June 17, 1968 by the decision in **Jones** v. **Mayer Co.,** 392 U.S. 409 (1968). In that case, the Supreme Court held, in a 7-2 decision, that the racially motivated refusasl of a private residential developer to sell a home to the petitioners (a Black husband and white wife) violated the 1866 statute. The court upheld the constitutionality of this law, stating that it was a valid exercise of the power of Congress to enforce the Thirteenth Amendment, the anti-slavery amendment.

In rendering this decision, the majority opinion stated:

"Negro citizens, North and South, who saw in the Thirteenth Amendment a promise of freedom—freedom to 'go and come at pleasure' and to 'buy and sell when they please'—would be left with a 'mere paper guarantee' if Congress were powerless to assure that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man. At the very least, the freedom that Congress is empowered to secure under the Thirteenth Amendment includes the freedom to buy whatever a white man can buy, the right to live wherever a white man can live. If Congress cannot say that being a free man means at least this much, then the Thirteenth Amendment made a promise the Nation cannot keep."

In the same opinion the court said: "And when racial discrimination herds men into ghettos and makes their ability to buy property turn on the color of their skin, then it too is a relic of slavery."

39   000889

While the constitutionality of the 1866 law was based on the Thirteenth Amendment to the United States Constitution, the constitutionality of Title VIII is primarily based on the Commerce Clause and the Fourteenth Amendment. This was the position taken by the Attorney General in recommending the enactment of the 1968 Fair Housing Law. He contended that the Commerce Clause was applicable because the materials used in the construction of housing are in interstate commerce, the financing of housing is provided by financial institutions involved in interstate dealings and the people who purchase, rent and occupy housing frequently move from State to State. He urged further that the Fourteenth Amendment was applicable because Congress is empowered under this amendment to remove obstacles in the way of persons securing the equal benefits of government and to correct the evil effects of past unconstitutionally discriminatory government action. Although the plaintiffs in **Jones** v. **Mayer Co.** argued that the Fourteenth Amendment to the United States Constitution was applicable on the theory that State action is involved in the development of housing projects by the granting of building permits, the installation of water and sewer systems, the provision of roads and many other activities, the Supreme Court did not act on this contention and based its decision on the antislavery amendment.

The court in **Jones** v. **Mayer Co.** held that the Civil Rights Act of 1866, 42 U.S.C. 1982, and Title VIII of the Civil Rights Act of 1968 stand independently and do not limit or impinge on each other.

## Key Title VIII Judicial Precedents

**Coverage of Title VIII**—Subsection (a) of section 804 of Title VIII makes it unlawful "[to] refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin."

It has been clear from the outset that the provisions of Title VIII apply to the sale and rental of housing. However, the "otherwise make unavailable or deny" language of section 804(a) has been interpreted in court decisions to provide protection against a variety of racially discriminatory housing practices not specifically prohibited in Title VIII.

The practice of "steering" by real estate brokers may be seen as a deprivation of housing choice through discriminatory manipulation of information on the availability of dwellings. Thus, steering is not refusing to rent or sell, but rather directing prospective homeseekers with similar financial resources and shelter needs to different areas on the basis of their race. While steering artificially limits persons of all races in the opportunity to live where, and amongst whom, they prefer, the deprivation of choice usually falls hardest on minorities, many of whom are seeking both to escape from areas to which they were traditionally consigned and to avoid being directed to a newly segregating area.

In **Zuch** v. **Hussey**, 366 F. Supp. 553 (E.D. Mich. 1973), the court held that steering on a racial basis is prohibited by that portion of section 804(a) which makes it unlawful to "otherwise make unavailable or deny" housing because of race. With regard to that language, the court stated: "The foregoing phraseology appears to be as broad as Congress could have made it, and all practices which have the effect of making dwellings unavailable on the basis of race are therefore unlawful." The court concluded its opinion with this statement:

"[W]hen a real estate agent actively undertakes an effort to influence the choice of a prospective homebuyer on a racial basis, the agent either directly or indirectly discourages the prospective homebuyer from purchasing a home in a particular area and fosters and perpetuation of racially segregated communities where available housing has been traditionally denied to blacks because of their race."

In the majority opinion of the Supreme Court in **Gladstone, Realtors** v. **Village of Bellwood,** 441 U.S. 91 (1979) (see further discussion of this case below), the pervasive effects of the practice of "steering" were described as follows:

"Some whites who otherwise would purchase homes [in the integrated area of the Village of Bellwood] do not do so simply because [the defendant real estate firms] refrain from showing them what is available; conversely, some Negroes purchase homes in the affected area solely because [the defendant real estate firms] falsely lead them to believe that no suitable homes within the desired price range are available elsewhere in the general area."

The court noted that, if a real estate firm's steering practices significantly reduce the total number of buyers in a housing market, prices may be deflected downward. Moreover, that result would be worsened "if perceptible increases in the minority population directly attributable to racial steering precipitate an exodus of white residents." Not only individuals would be injured by steering, since a significant reduction in property values directly injures a community by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide municipal services to its residents. The court also recognized that other harms, such as school segregation, might flow "from the realities of a racially segregated community".

"Redlining" by a lending institution—the practice of arbitrarily denying loans for housing in neighborhoods of heavy minority-group concentration—was found to be a violation of section 804(a) in **Laufman** v. **Oakley Building & Loan Co.,** 408 F. Supp. 489 (S.D. Ohio 1976). The court stated:

"The cost of housing being what it is today, a denial of financial assistance in connection with a sale of a home would effectively 'make unavailable or deny' a 'dwelling.' When such denial occurs as a result of racial considerations, [section 804(a)] is transgressed."

41      000891

In **U.S.** v. **American Institute of Real Estate Appraisers**, 442 F. Supp. 1072 (N.D. Ill. 1977), it was alleged that the AIREA had engaged in unlawful discriminatory practices by promulgating appraisal standards which caused appraisers and lenders to treat race and national origin as negative factors in determining the value of dwellings and in evaluating the soundness of home loans. The court held that the promulgation of such standards may effectively "make unavailable or deny" a "dwelling" and may "interfere" with persons in the exercise and enjoyment of rights guaranteed by Title VIII. "When such denial or interference occurs as a result of considerations relating to race or national origin, sections 804(a) and 817 are transgressed." (Section 817 makes it unlawful to "interfere with any person in the exercise or enjoyment of" any right granted or protected by sections 803 through 806 of Title VIII.)

In **U.S.** v. **City of Parma**, P.H.E.O.H. Rptr. Par. 13,616 (N.D. Ohio 1973), the Government alleged that the City of Parma, Ohio, acting in accordance with its purported general policy of substantially excluding blacks from residing within its boundaries, prevented the construction of a federally assisted apartment development which would have offered accommodations to a fair percentage of black tenants and, further, adopted procedures designed to block any possibility of racially integrated federally assisted housing from being built in the city. The court held that these allegations, if proved, would constitute discriminatory housing practices falling within section 804(a), as well as violations of section 817.

Another case involving section 804(a) is **Dunn** v. **Midwestern Indemnity Ins. Co.**, 472 F. Supp. 1106 (S.D. Ohio 1979), which considered the practice of "redlining" by companies writing homeowner's insurance. Following the broad construction given to the "otherwise make unavailable or deny" phrase of section 804(a) by other courts, and giving weight to HUD's interpretation of its provisions as applicable to insurance redlining, the court held that "a discriminatory failure or refusal to provide property insurance on dwellings" must violate section 804(a). However, for a contrary opinion, see **Mackey** v. **Nationwide Ins. Co.**, 724 F. 2d 419 (4th Cir. 1984). See also **McDiarmid** v. **Economy Fire & Casualty Co.**, 604 F. Supp. 105 (S.D. Ohio 1984), in which the court rejected the Fourth Circuit's decision in **Mackey** and followed the holding in **Dunn**.

Other subsections of section 804 have also been construed to extend beyond the usual purview of the terms "sale or rental". For example, section 804(b) prohibits racial discrimination "in the provision of services or facilities" in connection with the sale or rental of a dwelling. This has been held to include municipal services such as sewage treatment. **United Farmworkers of Fla. Housing Proj., Inc.** v. **City of Delray Beach**, 493 F. 2d 799 (5th Cir. 1974).

Section 804(c) prohibits racially discriminatory advertising practices in connection with the sale or rental of housing. This subsection has been interpreted as prohibiting the Recorder of Deeds of the District of Columbia from

000892

accepting for filing instruments that contain racially restrictive covenants. **Mayers v. Ridley,** 465 F. 2d 630 (D.C. Cir. 1972).

**Standing to Sue**—Section 810(d) of Title VIII provides a right to bring suit to any "person aggrieved", defined in section 810(a) as "any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur." The term "discriminatory housing practice is defined in Section 802(f) to mean an act that is unlawful under section 804, 805 or 806 of Title VIII. Sections 804 through 806 make unlawful a number of discriminatory acts based on the race, color, religion, sex, or national origin of the person discriminated against. Thus, it is clear that any member of one of these protected groups who claims to have been injured by a discriminatory housing practice has standing to bring a Title VIII suit. However, the Supreme Court has interpreted section 810(a) broadly, to give standing also to persons who are not the direct objects of discriminatory housing practices.

In **Trafficante v. Metropolitan Life Ins. Co.,** 409 U.S. 205 (1972) two tenants of a San Francisco apartment complex filed administrative complaints with HUD, alleging that the owner of the complex had discriminated against non-whites on the basis of race in the rental of apartments within the complex in violation of section 804. One of the complainants was black and the other was white. HUD failed to obtain voluntary compliance, and the tenants brought suit in the Federal district court under section 810(d).

The district court held that the plaintiffs were not within the class of persons entitled to sue under Title VIII. The Ninth Circuit Court of Appeals affirmed, construing section 810(a) narrowly to permit complaints only by persons who are the objects of discriminatory housing practices. The Supreme Court reversed, finding "a congressional intention to define standing as broadly as is permitted by Article III of the Constitution."

The court found the necessary ingredient of "injury in fact" to the plaintiffs to be present in this case, stating that "the alleged injury to existing tenants by exclusion of minority persons from the apartment complex is the loss of important benefits from interracial associations." The court concluded the opinion with the following statement:

"We can give vitality to subsection 810(a) only by a generous construction which gives standing to sue to all in the same housing unit who are injured by racial discrimination in the management of those facilities. . . ."

**Gladstone, Realtors v. Village of Bellwood,** 441 U.S. 91 (1979), involved suits brought under section 812 of Title VIII against two real estate brokerage firms by the Village of Bellwood, a municipal corporation and suburb of Chicago, one black and four white residents of Bellwood, and one black resident of neighboring Maywood. During the fall of 1975, the individual plaintiffs and others, acting as "testers", consulted with the defendent firms, stating that they were interested in purchasing homes in the general suburban

area of which Bellwood is a part. The individual plaintiffs were testing for racial "steering", the practice of directing prospective homebuyers interested in equivalent properties to different areas according to their race.

Both suits charged that the defendant firms had steered prospective black homebuyers toward an integrated area of Bellwood and away from other, predominantly white areas. White customers, by contrast, were allegedly steered away from the integrated area of Bellwood. The complaints in both cases further alleged that the Village of Bellwood had been injured by having its housing market "wrongfully and illegally manipulated to the economic and social detriment of the citizens of [the] village", and that the individual plaintiffs "have been denied their right to select housing without regard to race and have been deprived of the social and professional benefits of living in an integrated society."

The defendant firms moved for summary judgment in both cases, on the grounds that the plaintiffs lacked standing to sue.

The Supreme Court first concluded that standing under section 812, like that found under section 810 in **Trafficante** (discussed above), is as broad as is permitted by Article III of the Constitution. Having held that sections 810 and 812 "provide parallel remedies to precisely the same prospective plaintiffs", the court then considered the standing of the Village of Bellwood and the individual plaintiffs in light of Article III.

With regard to the Village, the court held that if, as alleged, the sales practices of the defendant firms actually had begun to rob Bellwood of its racial balance and stability, the Village had standing to challenge the legality of that conduct.

The individual plaintiffs did not press their claim in the Supreme Court that they had standing to sue as testers, and the court did not deal with that issue. However, the court did consider the claims of four of the individual plaintiffs, who alleged injury as homeowners residing in the area of Bellwood against which the defendants' steering practices had been directed. The court held that these individuals had "standing to protest the intentional segregation of their community."

In **Havens Realty Corp.** v. **Coleman,** 455 U.S. 372 (1982), it was alleged that the Havens Realty Corporation, which owned and operated two apartment complexes in a suburb of Richmond, Virginia, and one of its employees had engaged in racial steering in violation of section 804 of Title VIII. Suit had been brought, under section 812, by HOME, a Virginia nonprofit corporation whose purpose was "to make equal opportunity in housing a reality in the Richmond Metropolitan Area", and three individual plaintiffs. One of the individuals, a black "renter plaintiff", in attempting to rent an apartment from the Havens firm, had inquired about the availability of an apartment and had been falsely told that none was available. The other two were "tester plaintiffs", one black and one white, employed by HOME to determine whether Havens practiced racial steering. On each of several occasions, the black tester was told that no apartments were available, and the white tester was told that there were vacancies.

The district court, on motion by defendants, had dismissed the claims of HOME and the two tester plaintiffs. One of the grounds for such dismissal was that these plaintiffs lacked standing to sue.

The Supreme Court first addressed the question of "tester" standing. The court found that, in adopting section 804(d) of Title VIII, which prohibits misrepresentation as to the availability of a dwelling with respect to "any person", Congress intended to confer on all "persons" a legal right to truthful information about available housing. Thus, a tester who has been the object of a misrepresentation made unlawful under section 804(d) "has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages. . . ."

With regard to the black tester, who had alleged injury to her statutorily created right to truthful housing information, the court held that, if the facts are as alleged, the plaintiff has suffered "specific injury" which satisfies the Article III requirement of injury-in-fact.

The court found the white tester's situation to be different, holding that, since he did not allege that he was a victim of a discriminatory representation, he had not pleaded a cause of action under section 804(d) and therefore had no standing to sue in his capacity as tester.

In determining whether HOME had standing, in its own right, under Title VIII, the court conducted the same inquiry as in the case of the individual plaintiffs. Holding that HOME did have such standing to litigate its claims of injury, the court stated: "If, as broadly alleged, [defendants'] steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury-in-fact."

**Standard for Discrimination — Intent or Effect?** Early in the enforcement of Title VIII, the Department of Justice brought suit against the City of Black Jack, Missouri alleging, among other things, that a zoning ordinance prohibiting the construction of any new multiple-family dwelling within the city violated the Fair Housing Act. **United States** v. **City of Black Jack,** 508 F.2d 1179 (8th Cir. 1974), **cert. denied,** 422 U.S. 1042 (1975). The ordinance was enacted shortly after HUD cleared the way for a new HUD-assisted project within Black Jack. Black Jack at the time was 99 percent white and the proposed project was expected to attract a substantial number of black applicants. The district court held that the United States failed to prove that the city operated with an intent to discriminate or that there was a racially discriminatory effect. The Eighth Circuit reversed, holding that the zoning ordinance had a discriminatory effect and constituted a violation of Title VIII. The court of appeals found that, in order to establish "a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect." Since "[t]here was ample proof that many blacks would live in the development, and that the exclusion of the townhouses would contribute to the perpetuation of segregation in a community which was 99 percent white", the court found

that the Department of Justice had established a discriminatory effect, and that the burden shifted to the city to demonstrate "that a compelling governmental interest was furthered by that ordinance." The court in **Black Jack** found that the city did not have a compelling governmental interest and held that the ordinance violated Title VIII.

The Eighth Circuit expressly declined to base its holding on a finding that there was an improper purpose even though there was evidence in the record to support that contention. Evidently, the **Black Jack** court viewed the "effects test" as a way of alleviating the often difficult burden of proving an intent to discriminate: "Effect, and not motivation, is the touchstone, in part because clever men may easily conceal their motivations...."

In the leading effects test litigation under Title VIII, plaintiffs sought to compel the Village of Arlington Heights, Illinois to rezone their property in order to permit the construction of housing to be built with Federal financial assistance under section 236 of the National Housing Act. Specifically, plaintiffs alleged that the Village's refusal to rezone was racially discriminatory and violated their rights under the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. §§1981-83, and Title VIII. The Seventh Circuit let stand the district court's finding that plaintiff had not proved discriminatory intent but nonetheless ruled that the Village violated the Equal Protection Clause of the Fourteenth Amendment. **Metropolitan Housing Development Corp.** v. **Village of Arlington Heights,** 517 F.2d 409, 412-15 (7th Cir. 1974). The Supreme Court reversed, 429 U.S. 252 (1977), holding that discriminatory intent is required to establish a violation of the Equal Protection Clause of the Fourteenth Amendment. However, the Supreme Court remanded the case to the Seventh Circuit to determine whether plaintiffs' showing of discriminatory effect was sufficient to establish a violation under Title VIII.

On remand, **Metropolitan Housing Development Corp.** v. **Village of Arlington Heights,** 558 F.2d 1283 (7th Cir. 1977), **cert. denied,** 434 U.S. 1025 (1978) (hereinafter **"Arlington Heights II"**), the Seventh Circuit took into account the similarity of Title VIII to Title VII of the Civil Rights Act of 1964 and noted the distinction the Supreme Court made between the standard of proof applicable under the Equal Protection Clause on the one hand and under Title VII on the other. **Washington** v. **Davis,** 426 U.S. 229 (1976). The Supreme Court held in **Washington** v. **Davis** that intent is required for equal protection cases but reaffirmed its holding in **Griggs** v. **Duke Power Co.,** 401 U.S. 424 (1971), that a violation of Title VII may be established without a showing of discriminatory intent. The Seventh Circuit, after examining the history and purpose of Title VIII, held that a violation of Title VIII can be established by a showing of discriminatory effect without a showing of discriminatory intent. The Seventh Circuit was concerned, as was the Eighth Circuit in **Black Jack,** that without an "effects test" racial discrimination would go unpunished in the absence of evidence of overt bigotry: "we cannot agree that Congress in enacting the Fair Housing Act intended to permit municipalities to systematically deprive minorities of housing opportunities simply because those municipalities act discreetly."

The Seventh Circuit did not utilize the **Black Jack** "compelling interest" formulation of the effects test. Rather, the court set forth four "critical factors" for determining "under what circumstances conduct that produces a discriminatory impact but which was taken without discriminatory intent will violate [Title VIII]." The four "critical factors" are:

(1) The strength of plaintiff's showing of discriminatory effect;

(2) Evidence of intent, though not enough to satisfy the constitutional standard;

(3) Defendant's interest in taking the action complained of; and

(4) Whether the plaintiff seeks to compel the defendant to provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

In reaching these conclusions, the Seventh Circuit stated its belief that the provisions of Title VIII must be interpreted broadly because the Congressional purpose in enacting Title VIII was "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. §3601.

**Resident Advisory Board** v. **Rizzo,** 564 F.2d 126 (3rd Cir. 1977), **cert. denied,** 435 U.S. 908 (1978), decided shortly after **Arlington Heights II,** involved a challenge to the termination of the Whitman Park Townhouse Project in Philadelphia. Although the district court found that two of the defendants, the Philadelphia Housing Authority (PHA) and the Redevelopment Authority of Philadelphia (RDA), had not acted with discriminatory intent, it found that the actions of these agencies with regard to the Whitman Park Project had a discriminatory effect and constituted a violation of Title VIII.

In reaching this conclusion, the Third Circuit considered both the similarities between Title VII and Title VIII and the legislative history of Title VIII. Under Title VII, it is clearly recognized that a violation may be established without a showing of discriminatory intent. **Griggs** v. **Duke Power Co.,** 401 U.S. 424 (1971). As for the legislative history of Title VIII, the court stated:

"During the long floor debate prior to passage of Title VIII in the Senate, several Congressmen spoke of the importance of Title VIII in eliminating the adverse discriminatory effect of past and present prejudice in housing. Significantly, . . . while the floor debate continued, Senator Baker introduced an amendment that would have required proof of discriminatory intent to succeed in establishing a Title VIII claim. . . . Senator Baker's amendment was rejected, with Senator Percy maintaining that if 'racial preference' was to be an element of the new legislation, 'proof would be impossible to produce.' "

In addition to the Third, Seventh and Eighth Circuits, five other circuits of the Court of Appeals have embraced the view that a violation of the Fair Housing Act can be established without proof of discriminatory intent: **Robinson** v. **12 Lofts Realty,** 610 F.2d 1032 (2d Cir. 1979); **Betsey** v. **Turtle Creek Associates,** 736 F.2d 983 (4th Cir. 1984); **Smith** v. **Town of Clarkton,** 682 F.2d 1055 (4th Cir. 1982) (following **Arlington Heights II**); **United States** v. **Mitchell,** 580 F.2d 789 (5th Cir. 1978); **Halet** v. **Wend Investment,** 672 F.2d 1305 (9th Cir. 1982); **United States** v. **Marengo County Commission,** 731 F.2d 1546, 1559,

000897

n. 20 (11th Cir. 1984), **cert. denied and appeal dismissed,** 105 S.Ct. 375 (1984). Only one Title VIII case, **Betsey** v. **Turtle Creek Associates, supra,** utilized an effects test borrowed directly from a Title VII disparate impact analysis. The effects test analysis found in the other cases was modified substantially from the Title VII disparate impact analysis.

The **Betsey** case involved a challenge to the eviction of many of the tenants of a particular apartment building in a complex with several buildings. Defendants asserted that the eviction notices were issued in order to institute an all-adult rental policy. Most of the tenants who received eviction notices were black. Plaintiffs alleged that the eviction notices were sent with a racially discriminatory intent and that the evictions would have a disparate racial impact. The district court ruled that plaintiffs proved a **prima facie** case of discriminatory intent in the all-adult conversion, but that defendants had rebutted that evidence by proof that they were motivated by economic considerations and not race. The district court also concluded that plaintiffs did not make out a **prima facie** case of disparate racial impact even though the conversion would have had a disproportionate impact on black tenants: 74.9 percent of the non-white tenants were given eviction notices while only 26.4 percent of the white tenants received such notices. Since there were many blacks in the project as a whole, the district court reasoned that conversion of one particular building would have only an insignificant impact on blacks in the local community.

The Fourth Circuit Court of Appeals reversed, holding that the district court had erred in assuming that plaintiffs had to show a disparate impact on the local community: "The correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied."

The Court of Appeals remanded the case to the district court to determine "whether there was a business necessity sufficiently compelling to justify the challenged practice." The court viewed this as a direct application to Title VIII of the Title VII disparate impact analysis. Finally, the court commented that the "burden confronting defendants faced with a **prima facie** showing of discriminatory impact is different and more difficult than what they face when confronted with a showing of discriminatory intent." The court indicated that a Title VIII defendant may overcome a **prima facie** case of discriminatory intent simply by articulating some legitimate nondiscriminatory reason for the challenged practice. "However, when confronted with a showing of discriminatory impact, defendants must prove a business necessity sufficiently compelling to justify the challenged practice."

**Damages and Other Relief**—Section 812(c) of Title VIII provides that a court may grant injunctive relief in a Title VIII case and "may award to the plaintiff actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees in the case of a prevailing plaintiff."

In the last ten years, the Federal courts have granted substantial awards of damages in fair housing cases, including increasing amounts of punitive damages awarded under the Civil Rights Act of 1866 (which, unlike Section 812, does not have a limit on punitive damages). This trend has motivated defendants in housing discrimination cases to enter into settlements for large amounts of money. At the same time, the Federal courts have been willing to impose injunctive relief in appropriate cases, in addition to monetary damages, and this has been reflected by the incorporation of affirmative action provisions in settlement agreements negotiated in recent years.

The case of **Miller** v. **Apartments and Homes of New Jersey, Inc.,** 646 F.2d 101 (3rd Cir. 1981), is illustrative with respect to the awarding of damages by a court. In this decision, the Third Circuit Court of Appeals upheld the district court's award of over $36,000 in compensatory and punitive damages, as well as nearly $22,000 in attorneys' fees, to a racially mixed couple who had been denied an apartment, because of the husband's race, in a building owned by the defendants. Since the defendants did not challenge the finding of liability below, the appellate decision dealt only with the award of damages and fees.

The district court had awarded the plaintiffs a total of $11,252 in compensatory damages, including $3,500 for the husband's pain and suffering and deprivation of rights, $2,500 for the wife's loss of consortium, and $4,451 to compensate for the difference in rent and utility payments between what the plaintiffs had to pay for a more expensive substitute apartment and what would have been required for the apartment which they were denied. Defendants had challenged only the $4,451 portion of the compensatory damage award, and the appellate court sustained it, concluding that the difference in rent and utility bills between the two apartments was the proper measure of damages in these circumstances.

With respect to the award of $25,000 in punitive damages, the court of appeals first decided that the $1,000 limit on the award of punitive damages contained in Section 812(c) of Title VIII does not create a ceiling of punitive damages with respect to liability concurrently established under both Title VIII and the Civil Rights Act of 1866. The court of appeals then upheld the district court's award of $25,000 in punitive damages against the building owners, stating:

"Considering that [the building owners] had previously entered into a consent decree agreeing to pursue a policy of non-discrimination, and that [one of the owners] blithely admitted, via deposition, that he had not taken any action either to implement or enforce a policy of non-discrimination, but rather his only interest was to make money...this Court is satisfied that the district court's assessment of $25,000 punitive damages against entities receiving between $300,000 and $400,000 per month in gross rentals was not an abuse of discretion."

**Park View Heights Corporation** v. **City of Black Jack,** 605 F.2d 1033 (8th Cir. 1979), involved the same discriminatory zoning ordinance that was invalidated by the 1974 decision in **U.S.** v. **City of Black Jack,** discussed above.

In the **Park View Heights** case, suit had been brought by the developers and eight prospective residents of a racially integrated town house development blocked by the zoning ordinance. On the eve of trial in January 1976, a consent decree was entered under which Black Jack agreed to pay $450,000 in damages to the developers to resolve the controversy.

While the consent decree precluded any claim for damages by the prospective residents, it did not bar equitable relief on their behalf. The prospective residents moved for equitable relief, but it was denied by the district court. The plaintiff class appealed, and the Eighth Circuit reversed the district court.

In its decision, the court broadly construed the Section 812(c) of Title VIII as giving the district court "the power it needs to fashion affirmative equitable relief calculated to eliminate as far as possible the discriminatory effects of violation of the Fair Housing Act."

The appellate court found that "absent enactment of the discriminatory zoning ordinance, the project would have been construed as planned." Although the City of Black Jack did not have the means to build the project on its own, the district court was not relieved "of the responsibility of considering other forms of relief requested by the class, or some alternative." Accordingly, the case was remanded to the district court to consider further the award of equitable relief.

In **Phillips** v. **Hunter Trails Community Association,** 685 F. 2d 184 (7th Cir. 1982), it was held that a homeowner association's efforts to prevent a black family from buying a house in a luxury subdivision constituted a violation of both Title VIII and the Civil Rights Act of 1866. The district court had awarded $25,000 each to the plaintiffs, Mr. and Mrs. Phillips, for humiliation and embarrassment and $50,000 each as punitive damages. While the appellate court reduced the amount of the intangible injury compensatory damages to $10,000 for each of the plaintiffs, to bring them more in line with damage awards in other decided cases, it affirmed the award of punitive damages without change. This action left the total amount of damages, including out-of-pocket expenses, at more than $120,000.

A good example of a recent settlement is the consent decree entered in **Betsey** v. **Turtle Creek Associates** (D. Md. 1986) R-80-1907 (see preceding section for discussion of the facts in this case). The decree provided for a monetary payment of $125,000, in settlement of all claims by plaintiffs for damages, attorneys' fees and expenses, plus additional affirmative relief for a three-year period. This included provisions relating to eviction procedures, education and training of employees involved in renting or managing apartments, advertising requirements and maintenance of racial data for all applicants and new tenants.

# IX. Problems And Issues For The Future

## Racial Hate and Violence

One of the most unfortunate realities of the fight to achieve equal housing opportunity is that the goal of fair housing throughout the United States will not be won merely through assuring that there is no discrimination in the real estate market place.

There are cases where individuals who have sought to avail themselves of fair housing rights or who have acquired dwellings are confronted by racial hate and violence which strips them of the right to the enjoyment of their property. Acts of racial hate and violence can involve rock throwing and crossburning, which seek to intimidate persons, or can involve firebombings and other actions intended to inflict physical harm.

Although Title IX of the Civil Rights Act of 1968 provides criminal penalties for persons found guilty of willful actions of intimidation or interference with persons exercising fair housing rights, the existence of racial hate and violence can have a dramatic and chilling impact on persons in the housing market.

Section 817 of Title VIII states:

"It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 803, 804, 805, or 806. This section may be enforced by appropriate civil action."

In addition, Section 808(e)(4) of Title VIII states:

"(e) The Secretary of Housing and Urban Development shall —

* * * *

(4) cooperate with and render such technical and other assistance to the Community Relations Service as may be appropriate to further its activities in preventing or eliminating discriminatory housing practices."

Taken together, these sections support the active involvement by HUD, in concert with the Department of Justice's Community Relations Service (CRS), in the area of racial hate and violence.

The severity of recent acts of hate and violence makes it imperative that steps be taken to prevent, where possible, the occurrence of racially motivated acts of violence. We must assure that persons seeking to avail themselves of their right to enjoy housing and related facilities, regardless of their race, color, religion, or national origin, are not burdened by the bigotry of the few persons who refuse to believe that under our laws all persons must be treated equally.

## The Housing Market Practices Survey

The Housing Market Practices Survey (HMPS) was a nationwide study of discrimination against blacks in the sale and rental of housing, conducted during the spring of 1977. Within 40 metropolitan areas across the country, approximately 300 whites and 300 blacks, in matched pairs, shopped for housing advertised in metropolitan newspapers. Each individual kept a careful record of his or her experience, and the treatments accorded black housing seekers and white housing seekers were systematically compared. This simulated housing search procedure is a type of testing known as auditing.

HUD staff analyzed the data from the study, which had been collected under contract by the National Committee Against Discrimination in Housing, and issued a report in April 1979. The report states that the study provided "definitive evidence that blacks are discriminated against in the sale and rental of housing." Not only were blacks sytematically treated less favorably with regard to housing availability, they "were treated less courteously, and were asked for more information than were whites."

The most important of the discrimination measures reported was an index of housing availability—a net measure of encounters in which housing was volunteered or made available to whites but not to blacks. According to this measure, discrimination in the rental market was 27 percent and in the sales market 15 percent. The effect on housing searches of blacks is cumulative: if 27 percent of rental agents discriminate, then a black homeseeker who visits four rental agents can expect to encounter at least one instance of discrimination 72 percent of the time; if 15 percent of sales agents discriminate, a black who visits four sales agents can expect to encounter one or more instances of discrimination 48 percent of the time.

When indices of discrimination in areas other than housing availability were looked at, there were usually smaller, but still statistically significant, differences unfavorable to blacks. For rental housing, these other areas were grouped into the categories of courtesy, terms and conditions, information requested, and information volunteered. Sales items were grouped into like categories of courtesy, service, and household information requested.

Several major observations were drawn from the report findings by its authors. First, racial discrimination exists in some form throughout all parts of the United States and is sufficiently prevalent to have major consequences on blacks' searches for housing. Thus, the tasks of eliminating racial discrimination faced by HUD, the Department of Justice, and other private and public fair housing agencies is far from complete.

Second, discriminatory treatment may be quite difficult to detect. In both the rental and sales markets, many black auditors experienced treatment that appeared favorable compared to their white counterparts. Systematic differential treatment unfavorable to blacks can be confirmed only by examining a large number of experiences. In the sales market, it may be especially difficult for a black person to perceive having been treated less well

000902

than a white person. This is partly because, although blacks may be served differently, both blacks and whites do receive service.

Third, although significant racial discrimination was observed, blacks and whites were treated no differently in a high percentage of the total number of tests. Blacks and whites were often both told that the housing they requested was immediately available. Thus the report indicates that unequal access to housing markets does not equate to total exclusion.

In testimony before the Senate Subcommittee on Housing and Urban Affairs, the HUD General Counsel, John J. Knapp, summarized the impact of the findings of the Housing Market Practices Survey as follows:

"It is the multitude of daily acts of discrimination in the housing market against individual victims across the Nation that is our principal concern. This Subcommittee is familiar with the often-cited audit survey of American housing markets that was conducted by the National Committee Against Discrimination in Housing in 1977, and published in 1979, under a HUD research grant. That survey reported that in a typical search for a rental or purchase, involving visits to four sales or rental agents, a black seeking to purchase a home had a 48% chance of encountered discrimination on at least one visit, and a black seeking to rent had a 72% chance of encountered discrimination on at least one visit. HUD staff extrapolated from those findings to conclude that about 2 million instances of housing discrimination occurred every year. Experts in statistical methodology may quibble over that extrapolation, but even if the estimate is wrong by half, it is nonetheless staggering and, to put in mildly, deeply disconcerting."

An educational effort remains for the future. The housing industry must be made aware of the impact that any differences in treatment can have on minority homeseekers; and homeseekers must be made aware of what they should expect in a transaction involving the sale or rental of housing, in order to have a basis for evaluating the treatment actually received.

Preparations are already underway at HUD to request proposals from qualified individuals and firms on conducting a major new audit survey similar in nature to HMPS. As in the 1977 study, HUD will be seeking to determine the levels of discrimination occurring in today's sales and rental housing markets. The Housing Discrimination Study, or HDS, will involve conducting audits in approximately 25 widely scattered locations and is scheduled for completion and publication in 1990. As did the 1977 study, HDS will serve as a catalyst to future educational and enforcement efforts in the struggle to eliminate housing discrimination in America.

**Stronger Enforcement Tools**

Section 810(a) of Title VIII provides for resolution of fair housing complaints filed with HUD "by informal methods of conference, conciliation, and

persuasion.'' However, if these informal efforts should fail to achieve reso-lution of a complaint, the statute provides no prompt and effective enforce-ment mechanism other than an individual lawsuit. Since shortly after the enactment of Title VIII, the absence of any such alternative mechanism has been recognized as a substantial weakness which frustrates the achieve-ment of the goal of fair housing.

As Secretary Pierce said in his April 29, 1987, testimony before the House Subcommittee on Civil and Constitutional Rights on proposed amend-ments to the Fair Housing Act:

"I recognize that there can never be true housing opportunity in this country until the Federal enforcement powers in title VIII have been strengthened. At present, there is no forceful back-up mechanism which provides an incentive to bring parties to the conciliation table with seri-ous intent to resolve issues then and there."

In several administrations, the President and members of Congress have made legislative proposals to strengthen the enforcement mechanism under Title VIII.

In 1980, a bill sponsored by Representatives Don Edwards and Robert Drinan was introduced. It would have provided authority for the Secretary of HUD to file formal administrative complaints, conduct hearings on them, and issue orders providing appropriate relief. This bill, with amendments, passed the House but died in the Senate, when proponents of the legisla-tion could not break a filibuster.

In 1983, President Reagan submitted an Administration bill providing for initiation of civil actions by the Government in instances where concili-ation efforts failed. The Administration's bill would also have expanded the protections of Title VIII to include handicapped persons and, at the request of Secretary Pierce, provided authority for courts to impose civil penalties of $50,000 and $100,000 in cases where discrimination was found. Also in that same year, Senators Kennedy and Mathias submitted a bill calling for administrative hearings initiated by the Secretary of HUD in cases where conciliation failed. This bill would have expanded the coverage of Title VIII to include discrimination based on familial status (children in family) as well as discrimination on the basis of handicap. There were no hearings or other Congressional action on these bills; they just died.

In early 1987, Congressman Hamilton Fish and other Representatives introduced a bill in the House and Senators Edward Kennedy and Arlen Spec-ter introduced a bill in the Senate providing for administrative hearings on complaints by administrative law judges, who would have authority to award actual and punitive damages. The Administration supported the efforts to strengthen Title VIII, but suggested the use of arbitration as the mechan-ism for obtaining resolution of complaints.

At the end of April 1987, the Supreme Court issued a decision which has raised doubt about the constitutionality of an administrative procedure under which an administrative law judge or arbitrator could award damages to a fair housing complainant. In **Tull** v. **U.S.**, 107 S.Ct. 1931 (1987). It was

held that the Seventh Admendment to the Constitution guarantees a jury trial to determine liability in court actions by the Government seeking civil penalties and injunctive relief. The court found that a Government suit under the Clean Water Act was analogous to a common law action in debt (within the jurisdiction of English courts of law prior to the enactment of the Seventh Amendment) and therefore should be tried by a jury. However, there is language in the opinion indicating that a Congressional delegation of authority to an administrative tribunal to award civil penalties and punitive damages would not present the same constitutional question as the court proceeding in **Tull.** The resolution of this issue is not yet clear.

Nevertheless, Secretary Pierce has continued in his efforts to develop an effective proposal for stronger fair housing enforcement tools for HUD. As a result of these efforts, on March 1, 1988, the Secretary and the Attorney General submitted to the Congress the proposed "Fair Housing Amendments Act of 1988," which would strengthen enforcement procedures under Title VIII by authorizing the Secretary to refer any complaint to the Attorney General for appropriate action, and by increasing the limit on punitive damages in private civil actions and authorizing civil penalties in actions brought by the Attorney General. The proposed legislation would also extend Title VIII coverage to prohibit housing discrimination on the basis of handicap.

000905



Public Law 90-284
90th Congress, H.R. 2516
April 11, 1968

# An Act

To prescribe penalties for certain acts of violence or intimidation, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled.*

Civil rights.

\* \* \*

## TITLE VIII—FAIR HOUSING [*]

### POLICY

SEC. 801. It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.

42 USC 3601.

### DEFINITIONS

SEC. 802. As used in this title—

(a) "Secretary" means the Secretary of Housing and Urban Development.

(b) "Dwelling" means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

(c) "Family" includes a single individual.

(d) "Person" includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in bankruptcy, receivers, and fiduciaries.

(e) "To rent" includes to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant.

(f) "Discriminatory housing practice" means an act that is unlawful under section 804, 805, or 806.

(g) "State" means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, or any of the territories and possessions of the United States.

---

* Note. Title VIII, as amended by Section 808(b) (1), (2), and (3) of the Housing and Community Development Act of 1974, Public Law 93-383, 93rd Congress, August 22, 1974.

A-1

EFFECTIVE DATES OF CERTAIN PROHIBITIONS

SEC. 803. (a) Subject to the provisions of subsection (b) and section 807, the prohibitions against discrimination in the sale or rental of housing set forth in section 804 shall apply:

(1) Upon enactment of this title, to—

(A) dwellings owned or operated by the Federal Government;

(B) dwellings provided in whole or in part with the aid of loans, advances, grants, or contributions made by the Federal Government, under agreements entered into after November 20, 1962, unless payment due thereon has been made in full prior to the date of enactment of this title;

(C) dwellings provided in whole or in part by loans insured, guaranteed, or otherwise secured by the credit of the Federal Government, under agreements entered into after November 20, 1962, unless payment thereon has been made in full prior to the date of enactment of this title: *Provided,* That nothing contained in subparagraphs (B) and (C) of this subsection shall be applicable to dwellings solely by virtue of the fact that they are subject to mortgages held by an FDIC or FSLIC institution; and

> FDIC or FSLIC institution.

(D) dwellings provided by the development or the redevelopment of real property purchased, rented, or otherwise obtained from a State or local public agency receiving Federal financial assistance for slum clearance or urban renewal with respect to such real property under loan or grant contracts entered into after November 20, 1962.

(2) After December 31, 1968, to all dwellings covered by paragraph (1) and to all other dwellings except as exempted by subsection (b).

> Exemptions.

(b) Nothing in section 804 (other than subsection (c)) shall apply to—

(1) any single-family house sold or rented by an owner: *Provided,* That such private individual owner does not own more than three such single-family houses at any one time: *Provided further,* That in the case of the sale of any such single-family house by a private individual owner not residing in such house at the time of such sale or who was not the most recent resident of such house prior to such sale, the exemption granted by this subsection shall apply only with respect to one such sale within any twenty-four month period: *Provided further,* That such bona fide private individual owner does not own any interest in, nor is there owned or reserved on his behalf, under any express or voluntary agreement, title to any right to all or a portion of the proceeds from the sale or rental of, more than three such single-family houses at any one time: *Provided further,* That after December 31, 1969, the sale or rental of any such single-family house shall be excepted from the application of this title only if such house is sold or rented (A) without the use in any manner of the sales or rental facilities or the sales or rental services of any real estate broker, agent, or salesman, or of such facilities or services of any person in the business of selling or renting dwellings, or of any employee or agent of any such broker, agent, salesman, or person and (B) without the publication, posting or

mailing, after notice, of any advertisement or written notice in violation of section 804(c) of this title; but nothing in this proviso shall prohibit the use of attorneys, escrow agents, abstractors, title companies, and other such professional assistance as necessary to perfect or transfer the title, or

(2) rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence.

(c) For the purposes of subsection (b), a person shall be deemed to be in the business of selling or renting dwellings if—

(1) he has, within the preceding twelve months, participated as principal in three or more transactions involving the sale or rental of any dwelling or any interest therein, or

(2) he has, within the preceding twelve months, participated as agent, other than in the sale of his own personal residence in providing sales or rental facilities or sales or rental services in two or more transactions involving the sale or rental of any dwelling or any interest therein, or

(3) he is the owner of any dwelling designed or intended for occupancy by, or occupied by, five or more families.

## DISCRIMINATION IN THE SALE OR RENTAL OF HOUSING

SEC. 804. As made applicable by section 803 and except as exempted by sections 803(b) and 807, it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, or national origin.

## DISCRIMINATION IN THE FINANCING OF HOUSING

SEC. 805. After December 31, 1968, it shall be unlawful for any bank, building and loan association, insurance company or

other corporation, association, firm or enterprise whose business consists in whole or in part in the making of commercial real estate loans, to deny a loan or other financial assistance to a person applying therefor for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate against him in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other financial assistance, because of the race, color, religion, sex, or national origin of such person or of any person associated with him in connection with such loan or other financial assistance or the purposes of such loan or other financial assistance, or of the present or prospective owners, lessees, tenants, or occupants of the dwelling or dwellings in relation to which such loan or other financial assistance is to be made or given: *Provided,* That nothing contained in this section shall impair the scope or effectiveness of the exception contained in section 803(b).

### DISCRIMINATION IN THE PROVISION OF BROKERAGE SERVICES

SEC. 806. After December 31, 1968, it shall be unlawful to deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, or national origin.

### EXEMPTION

SEC. 807. Nothing in this title shall prohibit a religious organization, association, or society, or any nonprofit institution or organization operated, supervised or controlled by or in conjunction with a religious organization, association, or society, from limiting the sale, rental or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion, or from giving preference to such persons, unless membership in such religion is restricted on account of race, color, or national origin. Nor shall anything in this title prohibit a private club not in fact open to the public, which as an incident to its primary purpose or purposes provides lodgings which it owns or operates for other than a commercial purpose, from limiting the rental or occupancy of such lodgings to its members or from giving preference to its members.

### ADMINISTRATION

Authority and responsibility.

SEC. 808. (a) The authority and responsibility for administering this Act shall be in the Secretary of Housing and Urban Development.

Assitant Secretary.

(b) The Department of Housing and Urban Development shall be provided an additional Assistant Secretary. The Department of Housing and Urban Development Act (Public Law 89-174, 79 Stat. 667) is hereby amended by—

42 USC 3533.

(1) striking the word "four," in section 4(a) of said Act (79 Stat. 668; 5 U.S.C. 624b(a)) and substituting therefor "five,"; and

A-4
000909

(2) striking the word "six," in section 7 of said Act (79 Stat. 669; 5 U.S.C. 624 (c)) and substituting therefor "seven."

(c) The Secretary may delegate any of his functions, duties, and powers to employees of the Department of Housing and Urban Development or to boards of such employees, including functions, duties, and powers with respect to investigating, conciliating, hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter under this title. The persons to whom such delegations are made with respect to hearing functions, duties, and powers shall be appointed and shall serve in the Department of Housing and Urban Development in compliance with sections 3105, 3344, 5362, and 7521 of title 5 of the United States Code. Insofar as possible, conciliation meetings shall be held in the cities or other localities where the discriminatory housing practices allegedly occurred. The Secretary shall by rule prescribe such rights of appeal from the decisions of his hearing examiners to other hearing examiners or to other officers in the Department, to boards of officers or to himself, as shall be appropriate and in accordance with law.

(d) All executive departments and agencies shall administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of this title and shall cooperate with the Secretary to further such purposes.

(e) The Secretary of Housing and Urban Development shall—

(1) make studies with respect to the nature and extent of discriminatory housing practices in representative communities, urban, suburban, and rural, throughout the United States;

(2) publish and disseminate reports, recommendations, and information derived from such studies·

(3) cooperate with and render technical assistance to Federal, State, local, and other public or private agencies, organizations, and institutions which are formulating or carrying on programs to prevent or eliminate discriminatory housing practices;

(4) cooperate with and render such technical and other assistance to the Community Relations Service as may be appropriate to further its activities in preventing or eliminating discriminatory housing practices; and

(5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this title.

### EDUCATION AND CONCILIATION

SEC. 809. Immediately after the enactment of this title the Secretary shall commence such educational and conciliatory activities as in his judgment will further the purposes of this title. He shall call conferences of persons in the housing industry and other interested parties to acquaint them with the provisions of this title and his suggested means of implementing it, and shall endeavor with their advice to work out programs of voluntary compliance and of enforcement. He may pay per diem, travel, and transportation expenses for persons attending such

*42 USC 3535.*

*Delegation of authority.*

*80 Stat. 415, 528.*

80 Stat. 499.

conferences as provided in section 5703 of title 5 of the United States Code. He shall consult with State and local officials and other interested parties to learn the extent, if any, to which housing discrimination exists in their State or locality, and whether and how State or local enforcement programs might be utilized to combat such discrimination in connection with or in place of, the Secretary's enforcement of this title. The Secretary shall issue reports on such conferences and consultations as he deems appropriate.

*Reports on conferences.*

ENFORCEMENT

*Complaints. Procedure for filing.*

SEC. 810. (a) Any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur (hereafter "person aggrieved") may file a complaint with the Secretary. Complaints shall be in writing and shall contain such information and be in such form as the Secretary requires. Upon receipt of such a complaint the Secretary shall furnish a copy of the same to the person or persons who allegedly committed or are about to commit the alleged discriminatory housing practice. Within thirty days after receiving a complaint, or within thirty days after the expiration of any period of reference under subsection (c), the Secretary shall investigate the complaint and give notice in writing to the person aggrieved whether he intends to resolve it. If the Secretary decides to resolve the complaint, he shall proceed to try to eliminate or correct the alleged discriminatory housing practice by informal methods of conference, conciliation, and persuasion. Nothing said or done in the course of such informal endeavors may be made public or used as evidence in a subsequent proceeding under this title without the written consent of the persons concerned. Any employee of the Secretary who shall make public any information in violation of this provision shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $1,000 or imprisoned not more than one year.

*Penalty.*

(b) A complaint under subsection (a) shall be filed within one hundred and eighty days after the alleged discriminatory housing practice occurred. Complaints shall be in writing and shall state the facts upon which the allegations of a discriminatory housing practice are based. Complaints may be reasonably and fairly amended at any time. A respondent may file an answer to the complaint against him and with the leave of the Secretary, which shall be granted whenever it would be reasonable and fair to do so, may amend his answer at any time. Both complaints and answers shall be verified.

(c) Wherever a State or local fair housing law provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title, the Secretary shall notify the appropriate State or local agency of any complaint filed under this title which appears to constitute a violation of such State or local fair housing law, and the Secretary shall take no further action with respect to such complaint if the appropriate State or local law enforcement official has, within thirty days from the date the alleged offense has been brought to his attention, commenced

proceedings in the matter, or, having done so, carries forward such proceedings with reasonable promptness. In no event shall the Secretary take further action unless he certifies that in his judgment, under the circumstances of the particular case, the protection of the rights of the parties or the interests of justice require such action.

(d) If within thirty days after a complaint is filed with the Secretary or within thirty days after expiration of any period of reference under subsection (c), the Secretary has been unable to obtain voluntary compliance with this title, the person aggrieved may, within thirty days thereafter, commence a civil action in any appropriate United States district court, against the respondent named in the complaint, to enforce the rights granted or protected by this title, insofar as such rights relate to the subject of the complaint: *Provided,* That no such civil action may be brought in any United States district court if the person aggrieved has a judicial remedy under a State or local fair housing law which provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title. Such actions may be brought without regard to the amount of controversy in any United States district court for the district in which the discriminatory housing practice is alleged to have occurred or be about to occur or in which the respondent resides or transacts business. If the court finds that a discriminatory housing practice has occurred or is about to occur, the court may, subject to the provisions of section 812, enjoin the respondent from engaging in such practice or order such affirmative action as may be appropriate.

*(Margin note: Commencement of civil actions.)*

(e) In any proceeding brought pursuant to this section, the burden of proof shall be on the complainant.

(f) Whenever an action filed by an individual, in either Federal or State court, pursuant to this section or section 812, shall come to trial the Secretary shall immediately terminate all efforts to obtain voluntary compliance.

### INVESTIGATIONS; SUBPENAS; GIVING OF EVIDENCE

SEC. 811. (a) In conducting an investigation the Secretary shall have access at all reasonable times to premises, records, documents, individuals, and other evidence or possible sources of evidence and may examine, record, and copy such materials and take and record the testimony or statements of such persons as are reasonably necessary for the furtherance of the investigation: *Provided,* however, That the Secretary first complies with the provisions of the Fourth Amendment relating to unreasonable searches and seizures. The Secretary may issue subpenas to compel his access to or the production of such materials, or to the appearance of such persons, and may issue interrogatories to a respondent, to the same extent and subject to the same limitations as would apply if the subpenas or interrogatories were issued or served in aid of a civil action in the United States district court for the district in which the investigation is taking place. The Secretary may administer oaths.

*(Margin note: Records and documents, access.)*

*(Margin note: Subpenas.)*

(b) Upon written application to the Secretary, a respondent shall be entitled to the issuance of a reasonable number of subpenas by and in the name of the Secretary to the same extent

A-7

and subject to the same limitations as subpenas issued by the Secretary himself. Subpenas issued at the request of a respondent shall show on their face the name and address of such respondent and shall state that they were issued at his request.

Witnesses, compensation.

(c) Witnesses summoned by subpena of the Secretary shall be entitled to the same witness and mileage fees as are witnesses in proceedings in United States district courts. Fees payable to a witness summoned by a subpena issued at the request of a respondent shall be paid by him.

(d) Within five days after service of a subpena upon any person, such person may petition the Secretary to revoke or modify the subpena. The Secretary shall grant the petition if he finds that the subpena requires appearance or attendance at an unreasonable time or place, that it requires production of evidence which does not relate to any matter under investigation, that it does not describe with sufficient particularity the evidence to be produced, that compliance would be unduly onerous, or for other good reason.

(e) In case of contumacy or refusal to obey a subpena, the Secretary or other person at whose request it was issued may petition for its enforcement in the United States district court for the district in which the person to whom the subpena was addressed resides, was served, or transacts business.

Failure to testify, penalty.

(f) Any person who willfully fails or neglects to attend and testify or to answer any lawful inquiry or to produce records, documents, or other evidence, if in his power to do so, in obedience to the subpena or lawful order of the Secretary, shall be fined not more than $1,000 or imprisoned not more than one year, or both. Any person who, with intent thereby to mislead the Secretary, shall make or cause to be made any false entry or statement of fact in any report, account, record, or other document submitted to the Secretary pursuant to his subpena or other order, or shall willfully neglect or fail to make or cause to be made full, true, and correct entries in such reports, accounts, records, or other documents, or shall willfully mutilate, alter, or by any other means falsify any documentary evidence, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

(g) The Attorney General shall conduct all litigation in which the Secretary participates as a party or as amicus pursuant to this Act.

## ENFORCEMENT BY PRIVATE PERSONS

SEC. 812. (a) The rights granted by sections 803, 804, 805, and 806 may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction. A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred: *Provided, however,* That the court shall continue such civil case brought pursuant to this section or section 810(d) from time to time before bringing it to trial if the court believes that the conciliation efforts of the Secretary or a State or local agency are likely to result in satisfactory settlement of the discriminatory housing practice complained of in

the complaint made to the Secretary or to the local or State agency and which practice forms the basis for the action in court: *And provided, however,* That any sale, encumbrance, or rental consummated prior to the issuance of any court order issued under the authority of this Act, and involving a bona fide purchaser, encumbrancer, or tenant without actual notice of the existence of the filing of a complaint or civil action under the provisions of this Act shall not be affected.

(b) Upon application by the plaintiff and in such circumstances as the court may deem just, a court of the United States in which a civil action under this section has been brought may appoint an attorney for the plaintiff and may authorize the commencement of a civil action upon proper showing without the payment of fees, costs, or security. A court of a State or subdivision thereof may do likewise to the extent not inconsistent with the law or procedures of the State or subdivision.

*Civil action without fees, etc.*

(c) The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees in the case of a prevailing plaintiff: *Provided,* That the said plaintiff in the opinion of the court is not financially able to assume said attorney's fees.

*Damages, limitation.*

## ENFORCEMENT BY THE ATTORNEY GENERAL

SEC. 813. (a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this title, or that any group of persons has been denied any of the rights granted by this title and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court by filing with it a complaint setting forth the facts and requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of the rights granted by this title.

## EXPEDITION OF PROCEEDINGS

SEC. 814. Any court in which a proceeding is instituted under section 812 or 813 of this title shall assign the case for hearing at the earliest practicable date and cause the case to be in every way expedited.

## EFFECT ON STATE LAWS

SEC. 815. Nothing in this title shall be construed to invalidate or limit any law of a State or political subdivision of a State, or of any other jurisdiction in which this title shall be effective, that grants, guarantees, or protects the same rights as are granted by this title; but any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this title shall to that extent be invalid.

### COOPERATION WITH STATE AND LOCAL AGENCIES ADMINISTERING FAIR HOUSING LAWS

SEC. 816. The Secretary may cooperate with State and local agencies charged with the administration of State and local fair housing laws and, with the consent of such agencies, utilize the services of such agencies and their employees and, not withstanding any other provision of law, may reimburse such agencies and their employees for services rendered to assist him in carrying out this title. In furtherance of such cooperative efforts, the Secretary may enter into written agreements with such State or local agencies. All agreements and terminations thereof shall be published in the Federal Register.

*Publication in Federal Register.*

### INTERFERENCE, COERCION, OR INTIMIDATION

SEC. 817. It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 803, 804, 805, or 806. This section may be enforced by appropriate civil action.

### APPROPRIATIONS

SEC. 818. There are hereby authorized to be appropriated such sums as are necessary to carry out the purposes of this title.

### SEPARABILITY OF PROVISIONS

SEC. 819. If any provisions of this title or the application thereof to any person or circumstances is held invalid, the remainder of the title and the application of the provision to other persons not similarly situated or to other circumstances shall not be affected thereby.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

## HOUSING DISCRIMINATION COMPLAINT

Form Approved OMB No. 63—R1226

| | FOR HUD USE ONLY |
|---|---|
| **INSTRUCTIONS:** Read this form and the instructions on reverse carefully before completing. All questions should be answered. However, if you do not know the answer or if a question is not applicable, leave the question unanswered and fill out as much of the form as you can. Your complaint should be signed and dated and, if possible, notarized. Where more than one individual or organization is filing the same complaint, each additional individual or organization should complete boxes 1 and 7 of a separate complaint form and attach it to the original form, but the other boxes need not be completed if the information is the same as in the original. Complaints may be (1) mailed to the Regional Office covering the State where the complaint arose (*see list at end of form*), or to an Area Office, or to Fair Housing, HUD, Washington, D.C. 20410, or (2) filed or presented in person at HUD in Washington, D.C. or at any HUD Regional or Area Office. | Number _____ <br> Date _____ <br> Filing Date _____ <br> **STATE OR LOCAL** <br><br> **FEDERAL COVERAGE** <br><br> **PRIOR ACTION** <br><br> **PRELIMINARY DETERMINATION** |

### PLEASE TYPE OR PRINT

1. Name of aggrieved person or organization *(Last Name – First Name – Middle Initial) (Mr. Mrs. Miss)*      Telephone Number

Street Address, City, County, State and ZIP Code

---

2. Whom is this complaint against?

Name *(Last Name – First Name – Middle Initial)*     Street Address, City, County, State and ZIP Code     Telephone Number

Is the party named above a: *(Check applicable box or boxes)*
☐ Builder ☐ Owner · ☐ Broker ☐ Salesman ☐ Supt. or Manager ☐ Bank or Other Lender ☐ Other

If you have named an individual above and you know that he was acting for a company in this case, check this box ☐ and write the name and address *(Street, City, County, State and ZIP Code)* of the company, in this space.

Name and Identify Others *(if any)* you believe violated the law in this case

---

3. What did the person you are complaining against do? *(Check applicable box or boxes)*
☐ Refuse to rent, sell, or deal with you
☐ Discriminate in the conditions or terms of sale, rental, occupancy, or in services or facilities
☐ Advertise in a discriminatory way
☐ Falsely deny housing was available
☐ Engage in blockbusting
☐ Discriminate in financing
☐ Discriminate in broker's services
☐ Other *(Explain in box 6 below)*

When did act or acts occur? *(Be sure to include most recent date, if several dates are involved)*

4. Do you believe there was discrimination because of? *(Check applicable box and write your race, color, religion, sex or national origin on the line below the box checked)*
☐ Race or Color

☐ Religion
☐ Sex

☐ National Origin

5. What kind of house or property was involved?
☐ Single family house
☐ A house or building for 2, 3, or 4 families
☐ A building for 5 families or more
☐ Other, including vacant land held for residential use *(Explain in box 6 below)*
Did the owner live there?
☐ Yes ☐ No ☐ Unknown
Is the house or property *(Check applicable box)*
☐ Being sold ☐ Being rented
What is the address of the house or property?
Street _____
City _____
County _____ State _____

---

6. Summarize in your own words what happened. Use this space for a brief and concise statement of the facts. Additional details of what happened may be provided on an attachment.

*NOTE: HUD will furnish copy of complaint to the person or organization against whom complaint is made.*

---

7. I swear or affirm that I have read this complaint *(including any attachments)* and that it is true to the best of my knowledge, information, and belief.

_____ *(Date)*      _____ *(Sign your name)*

---

8.              **NOTARIZATION:**

Subscribed and sworn to before me this _____ day of _____ 197__.

_____ *(Name)*      _____ *(Title)*

---

IF IT IS DIFFICULT FOR YOU TO GET A NOTARY PUBLIC TO SIGN THIS, SIGN YOUR OWN NAME AND MAIL IT WITHOUT NOTARIZATION. HUD WILL HELP YOU GET YOUR COMPLAINT SWORN TO.

HUD–903 (2–72) PREVIOUS EDITION IS OBSOLETE

**HOUSING DISCRIMINATION COMPLAINT**

## WHAT DOES THE FEDERAL FAIR HOUSING LAW PROVIDE?

Title VIII *(Fair Housing)* of the Civil Rights Act of 1968 declares that it is national policy to provide fair housing throughout the United States and prohibits seven specific kinds of discriminatory acts regarding housing if the discrimination is based on race, color, religion, sex or national origin.

1. Refusal to sell or rent or otherwise deal with a person.
2. Discriminating in the conditions or terms of sale, rental, or occupancy.
3. Falsely denying housing is available.
4. Discriminatory advertising.
5. Blockbusting—causing someone to sell or rent by telling him that members of a minority group are moving into the area.
6. Discrimination in financing housing by a bank, savings and loan association, or other business.
7. Denial of membership or participation in brokerage, multiple listing, or other real estate services

### WHAT DOES THE LAW EXEMPT?

The first three acts listed above do not apply (1) to any single-family house where the owner in certain circumstances does not seek to rent or sell it through the use of a broker or through discriminatory advertising, nor (2) to units in houses for two to four families if the owner lives in one of the units.

*NOTE: Coercion, threats, or other interference with an individual's rights under the law, including the right to file a complaint, are also prohibited.*

## WHAT CAN YOU DO ABOUT VIOLATIONS OF THE LAW?

Remember, Title VIII applies to discrimination based on race, color, religion, sex or national origin. If you believe you have been or are about to be, discriminated against or otherwise harmed by the kinds of discriminatory acts which are prohibited by the law, you have a right, within 180 days after the discrimination occurred to:

1. Complain to the Secretary by filing this form by mail or in person. HUD will investigate and if it finds the complaint is covered by the law and is justified, it will try to end the discrimination by conciliation. In cases where State or local laws give the same rights as Title VIII, HUD must first ask the State or local agency to try to resolve the problem.

2. Go directly to Court even if you have not filed a complaint with the Secretary. The Court may sometimes be able to give quicker, more effective, relief than conciliation can provide and may also, in certain cases, appoint an attorney for you (*without cost*).

You Should Also Report All Information about violations of Title VIII to HUD even though you don't intend to complain or go to court yourself.

---

**ADDITIONAL DETAILS**

If you wish to explain in detail in an attachment what happened, you should consider the following:

1. If you feel that others were treated differently than you, please explain the facts and circumstances.
2. If there were witnesses or others who know what happened, give their names, addresses, and telephone numbers.
3. If you have made this complaint to other government agencies or to the courts, state when and where and explain what happened.

You can obtain assistance (a) in learning about Title VIII, or (b) in filing a complaint at the HUD Regional Offices listed below:

**U.S. Department of Housing and Urban Development**
Assistant Secretary for Equal Opportunity
Washington, D.C. 20410

**Region I – Boston** *(Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont)*

HUD–Equal Opportunity
John F. Kennedy Federal Building
Boston, Massachusetts 02203

**Region II – New York** *(New Jersey, New York, Puerto Rico, Virgin Islands)*

HUD–Equal Opportunity
26 Federal Plaza
New York, New York 10007

**Region III – Philadelphia** *(Delaware, District of Columbia, Maryland, Pennsylvania, Virginia, West Virginia)*

HUD–Equal Opportunity
Curtis Building
6th and Walnut Streets
Philadelphia, Pennsylvania 19106

**Region IV – Atlanta** *(Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee)*

HUD–Equal Opportunity
1371 Peachtree Street, N.E.
Atlanta, George 30309

**Region V – Chicago** *(Illinois, Indiana, Michigan, Ohio, Wisconsin)*

HUD–Equal Opportunity
300 South Wacker Drive
Chicago, Illinois 60606

**Region VI – Dallas** *(Arkansas, Louisiana, New Mexico, Oklahoma, Texas)*

HUD–Equal Opportunity
New Dallas Federal Building
1100 Commerce Street
Dallas, Texas 75202

**Region VII – Kansas City** *(Iowa, Kansas, Missouri, Nebraska)*

HUD–Equal Opportunity
Federal Office Building, Room 300
911 Walnut Street
Kansas City, Missouri 64106

**Region VIII –** *(Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming)*

HUD–Equal Opportunity
Federal Building
1961 Stout Street
Denver, Colorado 80202

**Region IX – San Francisco** *(Arizona, California, Hawaii, Nevada, Guam, American Samoa)*

HUD–Equal Opportunity
450 Golden Gate Avenue
Post Office Box 36003
San Francisco, California 94102

**Region X – Seattle** *(Alaska, Idaho, Oregon, Washington)*

HUD–Equal Opportunity
Arcade Plaza Building
1321 Second Avenue
Seattle, Washington 98101

HUD–903 (2–72) Previous editions are obsolete

GPO 891-474

Form Approved
OMB No. 63-R1226

DEPARTAMENTO DE VIVIENDA Y DESARROLLO URBANO

## QUEJA DE DISCRIMINACION EN VIVIENDA

| PARA USO DE HUD NADA MAS |
|---|
| Number |
| Date |
| Filing Date |
| STATE OR LOCAL |
| FEDERAL COVERAGE |
| PRIOR ACTION |
| PRELIMINARY DETERMINATION |

INSTRUCCIONES: Antes de llenar esta forma, lea las instrucciones a la reversa con cuidado. Conteste todas las preguntas. Sin embargo, si no sabe la respuesta o si la pregunta no se refiere a su queja, no la conteste, pero llene todo lo que pueda de la forma. Fírmela y pongale la fecha, y si es posible llevela a que la certifique un notario público. Si su queja incluye más de un individuo u organización llene las casillas numeros 1 y 7 en las formas separadas e incluyalas con la forma orginal, pero no tiene que llenar todas las formas si la información es igual a la que mencionó en el orginal. Al terminar las formas, envíela a: (1) La Oficina Regional que cubre el Estado donde se origino su queja (favor de ver la lista en al final de esta forma); o a la Oficina de su area; o a la siguiente dirección: Fair Housing, HUD, Washington, D.C. 20410; o (2) envíela o llevela personalmente a HUD, Washington, D.C. o a cualquier Oficina de HUD en su Región o area.

### FAVOR DE IMPRIMIR O ESCRIBIR A MAQUINA

1. Nombre de persona u organización que hace este reclamo (Apellido, Nombre, Inicial) Sr. Sra. Srta.

Número de teléfono

| Fecha | Su Firma |

Dirección, Calle, Ciudad, Condado, Estado y Zip Code

2. ¿Contra quien se hace este reclamo?

| Nombre (Apellido, Nombre, inicial) | Dirección, Calle, Ciudad, Estado y Zip Code | Número de teléfono |

¿Es la persona arriba nombrada? (Marque la(s) casilla(s) appropiada(s))

☐ Constructor   ☐ Propietario   ☐ Agente   ☐ Vendedor   ☐ Supt o Conserje   ☐ Banco o Prestamista   ☐ Otro

Si la persona nombrada arriba actúa como representante de la compañía responsable, en este caso, marque esta casilla ☐ y el del nombre y la dirección de la compañía en este espacio (Calle, Ciudad, Condado, Estado, y Zip Code)

Nombre e identifique a otros (si los hay) quienes usted cree han violado la ley en este caso.

3. ¿Qué hizo la persona de quien usted se queja? (Marque la casilla apropiada)

☐ Nego alquilar, vender, o tratar con usted.

☐ Discrimino en cuanto a los terminos o condiciones de venta, de alquiler, o de posesion o en servicios o facilidades.

☐ Anuncio de una manera que discriminaba.

☐ Nego falsamente que había vivienda disponible.

☐ Discrimino en la finanza

☐ Discrimino en los servicios como Agente

☐ Otros (Explique en la pregunta No.6)

¿Cuando ocurrió el acto o actos? (Incluya la fecha más reciente, si ocurrieron durante más de una fecha)

4. ¿Cree usted que discriminaron por causa de su: (Marque el cuadro adecuado y anote su raza, color, sexo religion, u origen nacional en la linea siguiente del cuadro que marque)

Raza o color
☐ Blanco   ☐ Hispano
☐ Negro   ☐ Asiatico o de las Islas Pacificas
☐ Indio Norteamericano y Nativo de Alaska

☐ Religion

☐ Sexo
☐ Masculino   ☐ Femenino

☐ Origen Nacional (indique cual)

5. ¿A que tipo de casa o propiedad se refiere?

☐ Casa individual para una familia
☐ Una casa o edificio para 2, 3 o 4 familias
☐ Edificio para cinco familias o más
☐ Otro, incluyendo terreno vacante reservado para uso residencial (explique en la casilla No.6)

¿vivia el dueño alli?
☐ si.   ☐ no.   ☐ no se sabe

¿es solar (lote) o casa? (Marque la casilla adequada)
☐ en venta.   ☐ para renta

¿Cuál es la dirección de la casa o propiedad?
Calle
Ciudad
Condado ___ Estado

6. De un resumen en sus propias palabras de lo que sucedió. Use este espacio para dar un relato breve de los datos. Para más detalles, de lo que ocurrió incluya otra pagina. HUD dará una copia de esta queja a la persona y organización de quien usted se queja

7. Yo juro o afirmo que he leido esta queja (incluyendo cualquier agregación) y que es la verdad según mi leal saber y entender y creencia

| Fecha | Su Firma |

8. Subscribed and sworn to before me this    **NOTORIZATION**

_____ day of _____ 19___

Name ___    Title ___

SI LE ES DIFICIL CONSEGUIR UN NOTARIO PUBLICO QUE FIRME ESTA FORMA, FIRME SU PROPIO NOMBRE Y ENVIELA SIN SER NOTARIADA. HUD LE AYUDARA A DAR FE A ESTE DOCUMENTO.

Previous edition is obsolete.

HUD-903A(1-80)

B-3

## QUEJA DE DISCRIMINACIÓN EN VIVIENDA

### ¡QUE PROVEE LA LEY FEDERAL EN VIVIENDA?

El Titulo VIII (Vivienda Justa) de la Acta de Derechos Civiles de 1968, declara que la politica nacional es de proveer vivienda justa por todas partes de los Estados Unidos y prohibe siete tipos específicos de actos de discriminación en cuanto a vivienda si la discriminación es por razón de raza, color, religión, sexo, u origen nacional. Estos son:

1. Negar vender, alquilar, o negociar con una persona
2. Discriminar por medio de las condiciones o términos de venta, alquilar o posesión.
3. Falsamente negar la disponibilidad de vivienda.
4. Anuncios que discriminan.
5. "Blockbusting" — Causar que una persona venda o rente diciéndole que miembros de otra raza se están mudando a su vecindad.
6. La discriminación en el financiamiento de vivienda por un banco, asociación de préstamos y ahorros, u otros negocios.
7. Negar su participación como socio en el corretaje, listas múltiples u otros servicios de bienes inmuebles.

### ¡QUE EXIME LA LEY?

Los primeros tres actos enumerados arriba no se aplican a: (1) una residencia individual donde el dueño en ciertas circunstancias no busca vender o rentar por medio de un agente o por medio de anuncios que discriminan, ni (2) a unidades con viviendas para dos o cuatro familias si el dueño vive en una de las unidades.

Nota: También se prohibe usar fuerza, amenazar o intervenir con los derechos legales, de un individuo, incluyendo el derecho de registrar su queja.

### ¡QUE PUEDE HACER USTED CONTRA LAS INFRACCIONES DE LA LEY?

Recuerde que el Titulo VIII se refiere a la discriminación en vivienda por razón de raza, color, religión, sexo, u origen nacional. Si usted cree que ha sido o será discriminado o de otro modo ha sido perjudicado por actos de discriminación prohibidos por la ley, usted tiene el derecho de 180 días después de que haya ocurrido tal hecho a:

1. **Quejarse con el Secretario,** llevando esta forma en persona o enviándola por correo. HUD investigará su queja y si la investigación revela que su queja se incluye dentro de los hechos prohibidos por la ley y que su queja es justa, HUD tratará de terminar la discriminación por medio de una conciliación. En caso de que las leyes del Estado o el gobierno local proveen los mismos derechos proporcionados por el Titulo VIII de la Ley Federal, HUD debe primero darle la oportunidad a la Agencia Estatal o local de resolver tal problema.

2. **Usted puede llevar su queja directamente a la corte** aunque no la haya puesto con el Secretario de HUD. A veces la Corte puede proporcionar justicia más rapidamente, y con más eficacia que lo que se puede lograr por medio de una conciliación; y en ciertos casos, la Corte puede también nombrar un abogado para que lo represente sin costo alguno.

También usted debe de reportar a HUD todas las infracciones al Titulo VIII aunque no desee quejarse directamente o poner su demanda en la Corte personalmente.

### DETALLES ADICIONALES

Si desea dar una explicación más detallada de lo que occurrió debe tomar en cuenta lo siguiente:

1. Si usted crée que lo han tratado de una manera distinta a esa dada a otros, favor de dar los detalles y las circunstancias de lo ocurrido.

2. Si hubo testigo s u otras personas que se dieron cuenta de lo que sucedió dé los nombres, las direcciones y el número de teléfono de e s.

3. Si ha registrado esta queja con otras agencias del gobierno o en la corte, indique dónde y cuándo y explique lo que pasó.

### CATEGORIAS RACIALES/ETNICAS

1. **Blanco (No-Hispano)** — Descendiente de cualquiera de los grupos originarios de Europa, el norte de Africa, o el Medio este.

2. **Negro (No-Hispano)** — Descendiente de cualquiera de los grupos de la raza Negra de Africa.

3. **Indio Norteamericano o Nativo de Alaska** — Descendiente de cualquiera de los grupos originarios de Norteamerica, y que mantiene indentificación cultural por medio de su afiliación a la tribu o por el reconocimiento de la comunidad.

4. **Hispano** — Descendiente de Mexico, Puerto Rico, Cuba, centroamerica, sudamerica o de cultura u origen Español sin respeto alguno a la raza.

5. **De Asia o de las Islas Pacificas** — Descendiente de cualquiera de los grupos originarios del Oriente, del sudeste de Asia, del sub continente Indio, las Islas Pacifica. Esta área incluye Korea, las Islas Filipinas, y Samoa.

HUD-903A(1-80)

Usted puede recibir asistencia (a) en informarse acerca del Título VIII, o (b) en registrar una queja con las oficinas regionales de HUD inidicadas abajo:

U.S. Department of Housing and Urban Developement
Assistant Secretary for Fair Housing and Equal Opportunity (FHEO)
Washington, D.C. 20410

**Region I — Boston** (Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont)

HUD—FHEO
John F. Kennedy Federal Building
Boston, Massachusetts 02203

**Region II — New York** (New Jersey, New York, Puerto Rico, Virgin Islands)

HUD—FHEO
26 Federal Plaza
New York, New York 10007

**Region III —. Philadelphia** (Delaware, District of Columbia, Maryland, Pennsylvania, Virginia, West Virginia)

HUD—FHEO
Curtis Building
6th and Walnut Streets
Philadelphia, Pennsylvania 19106

**Region IV — Atlanta** (Alabama, Florida, Georgia, Kentucky Mississippi, North Carolina, South Carolina, Tennessee)

HUD—FHEO
75 Spring Street, S.W.
Atlanta, Georgia 30303

**Region V — Chicago** (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin)

HUD—FHEO
300 South Wacker Drive
Chicago, Illinois 60606

**Region VI — Fort Worth** (Arkansas, Louisiana, New Mexico, Oklahoma, Texas)

HUD—FHEO
221 W. Lancaster Avenue
P.O. Box 2905
Fort Worth, Texas 76113

**Region VII — Kansas City** (Iowa, Kansas, Missouri, Nebraska)

HUD—FHEO
Professional Building Rm 1200
1103 Grand Avenue
Kansas City, Missouri 64106

**Region VIII — I** (Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming)

HUD—FHEO
Executive Tower Building
1405 Curtis Street
Denver, Colorado, 80202

**Region IX — San Francisco** (Arizona, California, Hawaii, Nevada, Guam, American Samoa)

HUD—FHEO
450 Golden Gate Avenue
Post Office Box 36003
San Francisco, California 94102

**Region X — Seattle** (Alaska, Idaho, Oregon, Washington)

HUD—FHEO
Arcade Plaza Building
1321 Second Avenue
Seattle, Washington 98101

---

### Ley Confidencial Federal de 1974 (PL 93-579)
### (Privacy Act)

**Autoridad:** Título VIII (Vivienda Justa) de la ley de derechos civiles del 1968.

**Propósito:** La información solicitada será usada en la investigación y en procesar quejas de discriminación en la vivienda.

**Uso:** La información podrá ser revelada al Departamento de Justicia de los Estados Unidos para su uso en el registro de pleitos basados, sobre prácticas de discriminación en vivienda o en la prosecución de la persona que ha cometido el acto de discriminación que incluye violencia. También podrá ser revelada a agencias Estatales o locales que administran leyes que aseguran la vivienda justa que son substancialmente equivalentes a la ley Federal.

**Penalidad:** Dejar de dar alguna o toda la información pedida tendrá como consecuencia el retraso o la negación de asistencia de HUD.

*La Revelación de esta Información se hace Voluntariamente.*

✦U.S. G.P.O. 1980-720-998/66

HUD-903A(1-80)

 

HUD-1135-PA
April 1988

Westlaw.

H.R. Rep. No. 711, 100TH Cong., 2ND Sess. 1988, 1988 U.S.C.C.A.N. 2173, 1988 WL 169871, H.R. REP. 100-711 (Leg.Hist.)

**\*\*2173** P.L. 100–430, FAIR HOUSING AMENDMENTS ACT OF 1988

DATES OF CONSIDERATION AND PASSAGE

House June 29, August 8, 1988

Senate August 2, 1988

House Report (Judiciary Committee) No. 100–711

June 17, 1988 [To accompany H.R. 1158]

Cong. Record Vol. 134 (1988)

No Senate Report was submitted with this legislation.

(CONSULT NOTE FOLLOWING TEXT FOR IN-FORMATION ABOUT OMITTED MATERIAL.  EACH     COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

HOUSE REPORT NO. 100–711

June 17, 1988

**\*1** The Committee on the Judiciary, to whom was referred the bill (H.R. 1158) to amend title VIII of the Act commonly called the Civil Rights Act of 1968, to revise the procedures for the enforcement of fair housing, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

\* \* \* \* \*

**\*12** EXPLANATION OF THE AMENDMENT IN THE NATURE OF A SUBSTITUTE

EXPLANATION OF THE AMENDMENT IN THE NATURE OF A SUBSTITUTE

The amendment in the nature of a substitute adopted by the Committee differs from the introduced bill primarily in the following respects: clarifies that the handicap provisions do not require that a dwelling be provided to any person whose tenancy poses a direct threat to the health or safety of others; excludes current illegal users or addicts of controlled substances from protection as handicapped persons; allows

persons with handicaps to make reasonable modifications, at their expense, to existing premises to afford them full enjoyment of the premises; requires new multifamily dwelling of 4 or more units to be designed and constructed to allow access and use by handicapped persons; clarifies that the prohibition of discrimination against families with children does not apply to housing for older persons; clarifies that appraisers may consider relevant and nondiscriminatory factors; removes reference to hazard, mortgage and title insurance; eliminates the requirement that the Department of Housing and Urban Development (HUD) provide financial assistance to public and private agencies, **2174 *13 and to assist the poor; allows HUD to seek prompt judicial action with notice to the Attorney General; allows states and localities 40 months to retain "substantially equivalent" status and allows HUD to grant an additional 8 months in extraordinary circumstances; places Administrative Law Judges (ALJs) in the Department of Justice; creates deadlines for action by HUD and ALJs of 100 days for investigations and reasonable cause determinations, 120 days for hearings to commence after a charge has been issued, and 60 days for the ALJ to make findings of fact and conclusions of law; requires HUD to report annually the number of incidents in which the time lines were not met; requires that the Federal Rules of Evidence govern the presentation of evidence; allows ALJs to award actual damages, equitable relief, and to impose maximum civil penalties of $10,000, 25,000 and 50,000; eliminates the ability of ALJs to award punitive damages; brings attorney's fee language in title VIII closer to the model used in other civil rights laws.

## PURPOSE OF THE BILL AS AMENDED BY THE COMMITTEE

The purposes of H.R. 1158, as amended, are threefold. One is to fulfill the promise made to the American people 20 years ago by the enactment of title VIII of the Civil Rights Act of 1968. That law proscribes housing practices that discriminate on account of race, color, national origin or religion,[1] but it fails to provide an effective enforcement system to make that promise a reality. This bill seeks to fill that void by creating an administrative enforcement system, which is subject to judicial review, and by removing barriers to the use of court enforcement by private litigants and the Department of Justice. Second, H.R. 1158 extends the principle of equal housing opportunity to handicapped persons. Third, the bill extends protections to families with chirden. Both handicapped persons and families with children, like the other classes protected by title VIII, have been the victims of unfair and discriminatory housing practices.

1 And, as amended in 1974, on account of sex. Public Law 93–383.

## AMENDMENTS ADOPTED BY THE COMMITTEE

Clarifies language on new construction, families with children exemption, injunctive relief, removes reference to hazard insurance.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Clarifies that the handicap provisions of the bill do not require a dwelling to be made available to an individual whose tenancy would constitute a direct threat to the health or safety of others.

Excludes current illegal uses and addicts of controlled substances from the definition of handicapped persons.

Moves Administrative Law Judges from the Department of Housing and Urban Development to the Department of Justice.

Allows appraisers to take into consideration relevant and nondiscriminary factors when making appraisals.

Increases time from 30 to 40 months for substantially equivalent agencies to retain status. Allows Secretary discretion to extend period to 48 months in exceptional circumstances.

Clarifies rights of parties in administrative proceedings.

**\*\*2175 \*14** Creates new civil penalty structure for administrative proceedings, permitting maximum penalties of $10,000, $25,000 and $50,000 for violations. Sets time limits for determining the number of total violations, except for violations committed by the same natural person.

Clarifies the requirements for adaptive design features.

Removes references to mortgage insurance.

Removes reference to title insurance.

HISTORY

In 1980, the House of Representatives approved H.R. 5200, the Fair Housing Amendments Act of 1980, by a vote of 310–95. H.R. 5200 was similar to H.R. 1158 and provided for administrative enforcement and protection for handicapped persons. The bill was not passed by the Senate.

Passage of H.R. 5200 in the House in 1980 was the culmination of a long process beginning in the 92nd Congress,[2] with a series of oversight hearings on equal opportunity in housing. The oversight process led to the introduction of bills in the 95th and 96th Congresses, on which extensive hearings were held.[3] These earlier bills improved the enforcement system by either creating an administrative enforcement mechanism similar to the one contained in H.R. 1158, or vesting in the Department of Housing and Urban Development and the Department of Justice the authority to sue on behalf of individual title VIII complainants, similar to bills introduced in later Congresses.[4]

2 See e.g., "Federal Government's Role in the Achievement of Equal Opportunity in Housing," Hearings before the Civil Rights Oversight Subcommittee of the House Committee on the Judiciary, 1st and 2nd Sessions, 92nd Congress, Serial No. 34. "Equal Opportunity in Housing" Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Congress, 2nd Session, Serial Nos. 40 and 57.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

3 H.R. 3504 (administrative enforcement) and 7787 (increased litigation authority), "Fair Housing Act," Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 95th Congress, 2nd Session, Serial No. 46. H.R. 2540, "Fair Housing Amendments Act of 1979," Hearings before the Subcommittee on Civil and Constitutional Rights, 96th Congress, First Session, Serial No. 12.

4 See, e.g., H.R. 5143, 99th Congress, introduced by Mr. Sensenbrenner, and H.R. 4425, 100th Congress, introduced by Mr. Michel.

In the 99th Congress, the Subcommittee on Civil and Constitutional Rights held 2 hearings on H.R. 4119, introduced by Representatives Fish and Edwards, but took no action on it.[5] In the 100th Congress, the Subcommittee held extensive hearings on H.R. 1158.[6] An identical companion Senate bill, S. 558, was introduced by Senators Kennedy and Specter.[7] Like their predecessor bills, H.R. 4119 and 1158 created an administrative enforcement system and protected handicapped persons. The two bills also included protections based on familial status.

5 "Fair Housing Amendments Act," Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 99th Congress, 2nd Session, Serial No. 120. (Hereinafter 1986 Subcommittee hearings.)

6 H.R. 1158 was also introduced by Representatives Fish and Edwards. "Fair Housing Amendments Act of 1987," Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 100th Congress, 1st Session, Serial No. 9. (Hereinafter 1987 Subcommittee hearings.)

7 On June 27,m 1987, the Senate Judiciary Subcommittee on the Constitution ordered reported S. 558, as amended, for consideration by the full Committee. S. 558 as ordered reported is substantially similar to H.R. 1158 as reported.

**\*\*2176 \*15** On March 3, 1988, by voice vote, the Subcommittee ordered reported to the Committee H.R. 1158, as amended by an amendment in the nature of a substitute. The Committee considered H.R. 1158 as amended for 3 days. On April 27, 1988, by a 26–9 recorded vote, the Committee ordered H.R. 1158 reported favorably to the House, with a single amendment in the nature of a substitute.

## BACKGROUND AND NEED

Congress enacted what is popularly called the Fair Housing Act as title VIII of the Civil Rights Act of 1968, following urban unrest of the mid 1960s [8] and in the aftermath of the assassination of the Rev. Dr.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Martin Luther King, Jr. Although title VIII provides a clear national policy against discrimination in housing, it provides only limited means for enforcing the law. The Committee, after extensive review and analysis over a number of Congresses, views this shortcoming as the primary weakness in existing law.

8 See, e.g., Report of the National Advisory Commission on Civil Disorders (the Kerner Commission), 1968.

## RACIAL DISCRIMINATION CONTINUES

Twenty years after the passage of the Fair Housing Act, discrimination and segregation in housing continue to be pervasive. The Department of Housing and Urban Development estiamtes that 2 million instances of housing discrimination occur each year.[9] In the most recent national study of housing discrimination, HUD concluded that a black person who visits 4 agents can expect to encounter at least one instance of discrimination 72 percent of the time for rentals and 48 percent of the time for sales.[10]

Recent regional studies, using testers, confirm that discrimination continues. In Boston, MA, a study found that the probability that blacks would encounter some discrimination ranged between 29–43 percent for rentals and 24–3 percent for sales for one visit to real estate offices; and 91–98 percent for sales and 86–96 percent in seven visits.[11] In the Washington, DC, metropolitan area, including the Maryland and Virginia suburbs, a 1986 study found that blacks were discriminated against 53 percent of the time. A similar 1987 follow-up study found that discrimination had increased to 57 percent.[12] In Denver, CO, a 1983 study concluded that discrimination remains a problem for blacks and Hispanics, with the quality and quantity of information involving availability being inferior to that provided to whites.[13]

9 See, Testimony of John J. Knapp, General Counsel, Department of Housing and Urban Development, in "Issues in Housing Discrimination," U.S. Commission on Civil Rights, November 13, 1985, p. 107.

10 Wienk, "Measuring Racial Discrimination in American Housing Markets: the Housing Market Practices Survey," Office of Policy Development and Research, Department of Housing and Urban Development, 1979. Recently, HUD announced its intention to update this nationwide survey, with findings expected in 1990.

11 Abt Associates study for the City of Boston, in Feins, "Barred in Boston: Racial Discrimination in Housing," American Planning Association Journal, Summer 1983, p. 344.

12 Regional Fair Housing Consortium, "Race Discrimination in the Rental Housing Market: A Study of the Greater Washington Area," 1986 (See 1987 Subcommittee hearings, p. 106), follow-up study, 1987.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

13 Colorado Civil Rights Division, "Discrimination, Segregation and Minority Housing Conditions in the Sunbelt Cities: A Study of Denver, Houston and Phoenix," 1983.

**\*\*2177 \*16** Professor Douglas Massey of the University of Chicago recently examined residential segregation in 60 metropolitan areas, and found that blacks continue to experience very high levels of segregation. Among the 15 largest black settlements, the average degree of segregation was 78 percent in 1980. In Chicago, for example, the amount of segregation was 88 percent for blacks, 64 percent for Hispanics and 44 percent for Asians. Massey also found that black segregation remained high across all levels of socioeconomic status, whether measured in terms of education, income or occupation.[14]

The Committee did not examine the issue of race-conscious marketing methods to promote integration. The Committee intends to explore this issue in future hearings during the 100th Congress.

14 Testimony of Professor Douglas S. Massey, University of Chicago, "Issues Relating to Fair Housing," hearings before the Subcommittee on Housing and Community Development of the House Banking, Finance and Urban Affairs Committee, 100th Congress, 2nd Session, Serial No. 100–46.

## LACK OF EFFECTIVE ENFORCEMENT

Existing law has been ineffective because it lacks an effective enforcement mechanism. Private persons and fair housing organizations are burdened with primary enforcement responsibility. Although private enforcement has achieved some success, it is restricted by the limited financial resources of litigants and the bar, and by disincentives in the law itself. The federal enforcement role is severely limited.

Under existing law, although HUD investigates housing discrimination complaints, it can use only "informal methods of conference, conciliation, and persuasion" in an attempt to resolve them.[15] HUD can do no more than this and lacks the power even to bring the parties to the conciliation table. HUD cannot sue violators to enforce the law, as in other civil rights laws.[16]

15 42 U.S.C. 3610(a).

16 See, e.g., Section 706(f)(1) of title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e–5.

The Justice Department can sue, but can do so only in cases of a "pattern or practice" of discrimination.[17] In order to redress the ordinary individual case of discrimination, the victim of discrimination must bring a lawsuit in court. Although private enforcement has achieved success in a limited number of cases, its impact is restricted by the lack of private resources, and is hampered by a short statute of limitations,[18] and disadvantageous limitations on punitive damages [19] and attorney's fees.[20]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

17 42 U.S.C. 3613.

18 180 days.

19 $1,000.

20 Unlike other civil rights laws, attorneys fees are available to a prevailing plaintiff only if the plaintiff cannot afford to pay. "Compare" Civil Rights Attorney's Fees Act, 42 U.S.C. 1988.

There is bipartisan agreement that a change needs to be made to the Fair Housing Act. For example, President Reagan has stated:

Since its passage, however, a consensus has developed that the Fair Housing Act has delivered short of its promise because of a gap in its enforcement mechanism.

The gap in enforcement is the lack of a forceful back-up mechanism which provides an incentive to bring the parties to the conciliation table with serious intent to resolve the dispute then and there. When conciliation fails, the **2178 *17 Secretary has no place else to go. In those few cases where good will is absent, the exclusive reliance upon voluntary resolution is, in the words of former Secretary Carla Hills, and 'invitation to intransigence.'

Reform of the Fair Housing Act is a necessity that is acknowledged by all.[21]

21 Message from President Reagan transmitting the Proposed Fair Housing Amendments Act of 1983, July 12, 1983.

The debate, then, is not whether to improve existing law, but rather, how to improve it.

## ADMINISTRATIVE ENFORCEMENT

H.R. 1158 creates an administrative enforcement mechanism, so the federal government can and will take an active role in enforcing the law. HUD will continue to investigate complaints and will conciliate the conflict between the parties, who can also agree to arbitration. If conciliation fails and HUD determines that reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, then HUD can bring the case to a hearing before an Administrative Law Judge. Becuase HUD can continue to enforce the law if the conciliation is unsuccessful, there is a real incentive for both parties to conciliate and resolve the complaint in the early stages.

Administrative proceedings have been used for many years in other federal agencies [22] and are economical and efficient. Many states now use administrative proceedings to adjudicate housing discrimination complaints.[23] Continuing current law, states and localities with "substantially equivalent" fair housing laws will still be able to handle cases in their own administrative proceedings.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

22 Over 29 agencies regularly use administrative law judges.

23 At least 32 of 36 state agencies, and most local agencies, cerfitied by HUD as substantially equivalent under existing law use administrative hearings to adjudicate fair housing complaints. Most of these agencies hold hearings before a fair housing board, civil rights commission, or similar body.

The bill strengthens the private enforcement section by expanding the statute of limitations, removing the limitation on punitive damages, and brings attorney's fee language in title VIII closer to the model used in other civil rights laws. The bill allows the Attorney General to intervene in private cases of general public importance, continues the Justice Department's pattern or practice jurisdiction, and, at the suggestion of the Administration, allows the Justice Department to seek substantial civil monetary penalties against violators.

## COVERAGE OF HANDICAPPED PERSONS

H.R. 1158 includes handicapped persons as a protected class. Handicapped persons have been protected from some forms of discrimination since Congress enacted the Rehabilitation Act of 1973,[24] and the bill uses the same definitions and concepts from that well-established law. In the 1980 Fair Housing bill, Congress also included protections for individuals with handicaps.

24 U.S.C. 701 et seq.

**\*\*2179 \*18** Prohibiting discrimination against individuals with handicaps is a major step in changing the stereotypes that have served to exclude them from American life. These persons have been denied housing because of misperceptions, ignorance, and outright prejudice.

The Fair Housing Amendements Act, like Section 504 of the Rehabilitation Act of 1973, as amended,[25] is a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream. It repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals. Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion.

25 29 U.S.C. 794.

For example, people who use wheelchairs have been denied the right to build simple ramps to provide access, or have been perceived as posing some threat to property maintenance.[26] People with visual and hearing impairments have been perceived as dangers because of erroneous beliefs about their abilities. People with mental retardation have been excluded because of stereotypes about their capacity to live safely and independently.[27] People with Acquired Immune Deficiency Syndrome (AIDS) and people who

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

test positive for the AIDS virus have been evicted because of an erroneous belief that they pose a health risk to others.[28]

26 See, e.g., testimony of Sharon Mistler, 1986 Subcommittee hearings at 244, testimony of David Capozzi at 253.

27 In "City of Cleburne v. Cleburne Living Center," 473 U.S. 435 (1985), the Supreme Court held that there is no rational basis to exclude citizens with mental retardation from living in the community. In that case, the city's zoning board ruled that residents with mental retardation posed a variety of dangers which precluded them from safely living in a home in the community. The Court examined each alleged danger, and concluded that each was based on a stereotype, and not on actual fact.

28 See, e.g., New York City Commission on Human Rights, Report on Discrimination Against People with AIDS, August 1987.

All of these groups have experienced discrimination because of prejudice and aversion—because they make non-handicapped people uncomfortable. H.R. 1158 clearly prohibits the use of stereotypes and prejudice to deny critically needed housing to handicapped persons. The right to be free from housing discrimination is essential to the goal of independent living.

Because persons with mobility impairments need to be able to get into and around a dwelling unit (or else they are in effect excluded because of their handicap), the bill requires that in the future covered multifamily dwellings be accessible and adaptable. This means that the doors and hallways must be wide enough to accommodate wheelchairs, switches and other controls must be in convenient locations, most rooms and spaces must be on an accessible route, and disabled persons should be able to easily make additional accommodations if needed, such as installing grab bars in the bathroom, without major renovation or structural change.

These modest requirements will be incorporated into the design of new buildings, resulting in features which do not look unusual and will not add significant additional costs. The bill does not require the installation of elevators or "hospital-like" features, or the renovation of existing units.

**\*\*2180 \*19** COVERAGE OF FAMILIES WITH CHILDREN

H.R. 1158 also prohibits discrimination based on familial status (having children who are under 18). In many parts of the country families with children are refused housing despite their ability to pay for it. Although 16 states have recognized this problem and have proscribed this type of discrimination to a certain extent, many of these state laws are not effective.

Both the Congress and the courts have a long tradition of defining and protecting families as "perhaps

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

the most fundamental social institution of our society." [29] The Congress has consistently stressed the importance of the family in numerous social welfare programs intended to support children and their parents.[30] In 1949, the federal government made a commitment to "provide a decent home and suitable living environment for every American family." [31] Nearly 40 years after this commitment, however, discrimination against families with children prevents millions of American families from realizing this goal.

29 Trimble v. Gordon, 430 U.S. 763 (1977).

30 See, e.g., Aid to Families with Dependent Children, 42 U.S.C. 601; Adoption Assistance and Child Welfare Act, 42 U.S.C. 670 et seq.

31 42 U.S.C. 1441.

In the latest national survey of discrimination based on familial status, HUD found that 25 percent of all rental units did not allow children; 50 percent were subject to restrictive policies that limited the ability of families to live in those units; and almost 20 percent of families were living in homes they considered less desirable because of restrictive practices.[32]

32 Marans, "Measuring Restrictive Rental Practices Affecting Families with Children: A National Survey," Office of Policy Planning and Research, Department of Housing and Urban Development, 1980.

In another survey HUD found that 99 percent of respondents reported numerous problems related to housing discrimination against children. Of these respondents, 55 percent had searched for housing for over 9 weeks; 47 percent reported living in substandard conditions; 22 percent had been forced to move; 39 percent lived in overcrowded conditions; and 19 percent said that family members had to live apart during the past year.[33]

33 Greene, "How Restrictive Rental Practices Affect Families With Children" Office of Policy Planning and Research, Department of Housing and Urban Development, 1980.

Sixteen states have some law prohibiting discrimination against families,[34] but these laws vary tremendously. Some states exempt all-adult (over 18 years old) housing communities,[35] others allow families to be segregated within a complex,[36] and others exempt retirement communities with low entrance ages.[37] Nine states cover only rental and not sale housing.[38] Illinois and New Jersey protect only children under 14. New Jersey limits relief to no more than $200 for the first offense and $500 for each subsequent offense. Arizona relies on a criminal sanction for enforcement.

34 Arizona, California, Connecticut, Delaware, Illinois, Maine, Massachusetts, Michigan, Minnesota, Montana, New Hampshire, New Jersey, New York, Rhode Island, Vermont, Virginia.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

35 e.g. Arizona, Rhode Island, Virginia.

36 e.g. Maine, Massachusetts, Minnesota.

37 e.g. New Hampshire (45), Michigan (50).

38 Arizona, Connecticut, Delaware, Illinois, Maine, New Jersey, New York, Rhode Island, Vermont.
**\*\*2181 \*20** Even in states with laws, discrimination against families continues. In 1982 and 1983 the California Supreme Court found that the state anti-discrimination law protected families with children in both rental housing and condominiums.[39] In 1984 the state legislature codified and clarified these decisions.[40] But even after enactment, discrimination against children continued in California. In 1983, a year after the court decision, a study of apartment complexes in Sacramento found that 40 percent engaged in differential and discriminatory treatment towards families.[41] And in 1984, a survey in 11 major California cities found that 39 percent of landlords excluded or imposed restrictions on children.[42]

39 Marina Point Ltd. v. Wolfson, 30 Cal.3d. 721, 180 Cal.Rptr. 496, 640 P.2d 115 (1982) (rental housing). O'Connor v. Village Green Owners Association. 33 Cal.3d 790, 191 Cal.Rptr. 320, 662 P.2d 427 (1983) (condominiums).
Before the court made these decisions, a 1979 study found that staggering numbers of rental units, 71 percent in Los Angeles, 70 percent in San Jose, 65 percent in San Diego, 53 percent in Fresno, did not rent to families with children in California. Ashford, "The Extent and Effects of Discrimination Against Children in Rental Housing: A Study of Five California Cities," December 1979.

40 California Civil Code §§ 51.2 and 51.3. This prohibits discrimination against families in virtually all housing.

41 Human Rights/Fair Housing Commission of the City and County of Sacramento, "Discrimination Against Families With Children in the Sacramento Rental Market: Audit and Assessment," March 1983.

42 "Anti-children Bias Illegal But Common in L.A. Apartment," Los Angeles Times, part II, p. 1 (March 4, 1985).
Connecticut enacted its anti-discrimination law in 1981, but 5 years later, following state-wide hearings, the state concluded that "families with children are overtly and illegally discriminated against.[43] The Director of the Illinois Department of Human Rights said that the majority of fair housing complaints in the state are based on exclusion of children.[44]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

43 Connecticut Commission on Human Right and Opportunities, "Housing Discrimination and Opportunities in the State of Connecticut" at 18, April 1986.

44 1987 Subcommittee hearings at 655.

A 1986 study detailed the problem in New Jersey, which had prohibited discrimination against children in 1898. In Middlesex County, 75 percent of 1200 families seeking assistance in locating rental housing reported discrimination against them because of their children. The Monmouth County Board of Social Services Housing Unit estimated a 50 percent rate of discrimination against families they assisted. The New Jersey Tenants Organization, with 80,000 member households, reported at least 25 percent of households with children have had a problem with discrimination.[45]

45 "Adults Only, Discrimination Against Children in Rental Housing, Housing Coalition of Middlesex County, 1986.

In states without laws prohibiting discrimination, the situation is equally serious. In Des Moines, Iowa, a survey found that 48 percent of the landlords did not permit children and only a few of the landlords rented to families without any restrictions.[46] In Dallas, Texas, studies showed that 52 percent of the units within the central city prohibit children and an additional 12 percent have restrictions as to the number and age of children.[47] In the Dallas suburb of Iriving, only 13 of 40 apartment complexes built between **2182 *21 1983–85 accept families with children.[48] In Alexandria, Virginia, only 9 of the rental units accept families without restriction.[49]

46 Burke, "A Report on Discrimination against Children in Des Moines Rental Housing," prepared for the Des Moines Community Housing Resource Board, September 1985.

47 Greene, "An Evaluation of the Exclusion of Children from Apartments in Dallas Texas," J.G. & Associates, Inc., 1978.

48 "Apartment Hunting Complex with Kids," Irving Daily News, at 1 (October 25, 1985).

49 "Landlords' 'No Children' Policies Frustrate Parents Seeking Housing", Wall Street Journal, section 2, p. 35 (October 16, 1985).

Discrimination against families often has a racially discriminatory effect, because minority households are more likely to have children.[50] For example, in California, 69 percent of Hispanic families and 62 percent of black families have children, compared with 51 percent of white families.[51] Because minority households tend to be larger and exclusion of children often has a racially discriminatory effect, two

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

federal courts of appeal have held that adults-only housing may state a claim of racial discrimination under title VIII.[52]

50 See testimony of James Morales, 1987 Subcommittee hearings at 390.

51 U.S. Department of Commerce, Bureau of the Census, "General Population Characteristics," part 6–Cal., 52 (1981).

52 Betsey v. Turtle Creek Associates, 736 F.2d 983 (4th Cir.1984); Halet v. Wend Investment Co., 672 F.2d 1305 (9th Cir, 1982).

In addition, because predominantly white neighborhoods are more likely to have restrictive policies, racial segregation is exacerbated by the exclusion of children. For example, the national survey by HUD found that units in predominantly white neighborhoods restricted children at a rate of 28.9 percent compared with 17.5 percent in predominantly black neighborhoods, and also found that restrictions are greater in recently built units.[53]

53 Marans, fn. 32, supra, at 34, 44.

The bill specifically exempts housing for older persons. The Committee recognizes that some older Americans have chosen to live together with fellow senior citizen in retirement-type communities. The Committee appreciates the interest and expectation these individuals have in living in environments tailored to their specific needs.

## SECTION–BY–SECTION ANALYSIS

### SHORT TITLES AND REFERENCES

Section 1 provides that the short title of this Act will be the Fair Housing Amendments Act of 1988.

Section 2 provides that the short title of the 1968 Act (which is being amended) will be the Civil Rights Act of 1968. This simply establishes in the law itself the short title which is often used when referring to the 1968 Act.

Section 3 states that all references in the bill are to the 1968 Civil Rights Act unless otherwise specified.

Section 4 provides that the short title of title VIII of the 1968 Act shall be the Fair Housing Act. Again, this simply establishes in the law the title normally used when referring to title VIII.

### AMENDMENTS TO DEFINITIONS

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Section 5(a) broadens the definition of discriminatory housing practice to include prohibitions against coercion, intimidation, threats or interference under Section 817.

**\*\*2183 \*22** Section 5(b) amends the definition section. Adds new definitions of handicap, aggrieved person, complainant, familiar status, conciliation, conciliation agreement, respondent, and prevailing party.

Handicap. Provides a definition of handicap to be used under this Act. This language is substantially similar to the definition under the primary federal law prohibiting discrimination against the handicapped, the Rehabilitation Act of 1973.[54] The Committee intends that the definition be interpreted consistent with regulations clarifying the meaning of the similar provision found in Section 504 of the Rehabilitation Act.[55]

54 Definitions at 29 U.S.C. 706.

55 See, e.g., 45 CFR § 84.3; 45 CFR part 84, App. A., subpart A. As the regulations note, the definition of handicap does not include a list of specific diseases and conditions that constitute physical or mental impairments because of the difficulty of ensuring the comprehensiveness of any such list and because some conditions covered under the definition of handicap may not even been discovered or prevalent in the population at the time of passage of legislation. For example, AIDS and infection with the Human Immunodeficiency Virus (HIV) are covered under this Act, although such conditions were not even discovered when Section 504 was passed in 1973. See, e.g., Local 1812, American Federation of Government Employees v. U.S. Department of State, 662 F.Supp. 50, 54 (D.D.C.1987), Ray v. School District of DeSoto County, 666 F.Supp. 1524 (M.D.Fla.1987).

The definition adopted by the Committee makes it clear that current illegal users of or addicts to controlled substances, as defined by the Controlled Substances Act,[56] are not considered to be handicapped persons under the Fair Housing Act. This amendment is intended to exclude current abusers and current addicts of illegal drugs from protection under this Act. The definition of handicap is not intended to be used to condone or protect illegal activity.

56 21 U.S.C. 802.

This exclusion does not eliminate protection for individuals who take drugs defined in the Controlled Substances Act for a medical condition under the care of, or by prescription from, a physician. Use of a medically prescribed drug clearly does not constitute illegal use of a controlled substance.

Similarly, individuals who have a record of drug use or addiction but who do not currently use illegal drugs would continue to be protected if they fell under the definition of handicap. The Committee does not intend to exclude individuals who have recovered from an addition or are participating in a treatment program or a self-help group such as Narcotics Anonymous. Just like any other person with a disability,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

such as cancer or tuberculosis, former drug-dependent persons do not pose a threat to a dwelling or its inhabitants simply on the basis of status. Depriving such individuals of housing, or evicting them, would constitute irrational discrimination that may seriously jeopardize their continued recovery.

Individuals who have been perceived as being a drug user or an addict are covered under the definition of handicap if they can demonstrate that they are being regarded as having an impairment and that they are not currently using an illegal drug.

The exception for current illegal drug users does not affect their coverage in the Rehabilitation Act or other statutes. The World Health Organization and the American Psychiatric Association both classify substance abuse and drug dependence as a mental disorder, and most medical authorities agree that drug dependence is **2184 *23 a disease.[57] Indeed, Congress has defined the term "handicap" in the Rehabilitation Act to include drug addiction and to require that federal employers as well as recipients of federal financial assistance recognize drug addiction as a handicap.[58]

57 American Psychiatric Association, "Diagnostic and Statistical Manual of Mental Disorders," 3rd ed, 1980, pp. 163–179; World Health Organization, "International Classification of Diseases," 9th Rev., Clinical Modifications (ICD–9–CM) (1978), items 304 and 305; American Medical Association, Resolution 113 (1987), reprinted in U.S. Journal of Drug and Alcohol Dependence (July 1987).

58 See, e.g., 43 Op. Att'y. Gen. (1977), School Board of Nassau County v. Arline, 107 S.Ct. 1123, 1130, n. 14 (1987).

Aggrieved person. Provides a definition of aggrieved person to be used under this act. In Gladstone Realtors v. Village of Bellwood,[59] the Supreme Court affirmed that standing requirements for judicial and administrative review are identical under title VIII. In Havens Realty Corp. v. Coleman,[60] the Court held that "testers" have standing to sue under title VIII, because Section 804(d) prohibits the representation "to any person because of race, color, religion, sex or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." [61] The bill adopts as its definition language similar to that contained in Section 810 of existing law, as modified to reaffirm the broad holdings of these cases.

59 441 U.S. 91 (1979). [99 S.Ct. 1601, 60 L.Ed.2d 66]

60 455 U.S. 363 (1982). [102 S.Ct. 1114]

61 455 U.S. 363, 373, emphasis original.

Familial status. The Committee intends to cover by this definition a parent or other person having legal custody, or that individual's designee, domiciled with a child or children under age 18. The Committee

does not intend this definition to include marital status.

Prevailing party. Provides a definition of prevailing party to be used under this Act. This term makes clear that the same definition of prevailing party as used in the Civil Rights Attorney's Fees Act [62] is to be used in this Act.

62 [42 U.S.C. 1988](#).

## ADDITIONAL DISCRIMINATORY HOUSING PRACTICES

Section 6(a) amends the list of discriminatory housing practices to prohibit discrimination on the basis of handicap. New subsection 804(f)(1) would make it unlawful to discriminate or to otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap of that individual, someone associated with that individual, or of a resident or potential resident.

New subsection 804(f)(2) would similarly prohibit discrimination against the same persons in the terms, conditions, privileges, or provision of services or facilities. This provision is intended to prohibit special restrictive covenants or other terms or conditions, or denials of service because of an individual's handicap and which have the effect of excluding, for example, congregate living arrangements for persons with handicaps. It would guarantee, for example, that an individual could not be discriminatorily barred from access to recreation facilities, parking privileges, cleaning and janitorial services and other facilities, uses of premises, benefits and privileges made available to other tenants, residents, and owners. To the extent that terms, conditions, privileges, services or facilities**\*\*2185 \*24** operate to discriminate against a person because of a handicap, elimination of the discrimination would be required in order to comply with the requirements of this subsection.

The Committee intends these provisions to prohibit not only discrimination against the primary purchaser or named lessee, but also to prohibit denials of housing opportunities to applicants because they have children, parents, friends, spouses, roommates, patients, subtenants or other associates who have disabilities.

These new subsections would also apply to state or local land use and health and safety laws, regulations, practices or decisions which discriminate against individuals with handicaps. While state and local governments have authority to protect safety and health, and to regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities.[63] This has been accomplished by such means as the enactment or imposition of health, safety or land-use requirements on congregate living arrangements among non-related persons with disabilities. Since these requirements are not imposed on families and groups of similar size of other unrelated people, these requirements have the effect of discriminating against persons with disabilities.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 See, e.g., City of Cleburne v. Cleburne Living Center, 473 U.S. 435 (1985).

The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community. Under H.R. 1158, land use and zoning cases are to be litigated in court by the Department of Justice. They would not go through the administrative process.

Another method of making housing unavailable to people with disabilities has been the application or enforcement of otherwise neutral rules and regulations on health, safety and land-use in a manner which discriminates against people with disabilities.[64] Such discrimination often results from false or over-protective assumptions about the needs of handicapped people, as well as unfounded fears of difficulties about the problems that their tenancies may pose. These and similar practices would be prohibited.

64 Id.

New subsection 804(f)(3) sets out specific requirements to augment the general prohibitions under (f)(1) and (2). These include provisions regarding reasonable modifications to existing premises, "reasonable accommodation" and accessibility features in new multifamily housing construction.

New Subsection 804(f)(3)(A) makes it illegal to refuse to permit tenants with disabilities to make reasonable modifications, at his or her own expense, of existing premises if the modification is necessary for those persons' full enjoyment of the premises. During the hearing process, the Committee learned of instances in which landlords have refused to let tenants with handicaps make minor changes to their apartments, such as the installation of a lever door knob for a person with an artificial hand, or the installation **2186 *25** of grab bars in bathrooms, even if the tenant was willing to pay for the modification.[65] A landlord's refusal to allow such modifications operates, at worst, to deny housing to handicapped persons, and, at least, to deny them the opportunity to enjoy their premises safely and fully.

65 See, e.g., Testimony of Bonnie Milstein, 1986 Subcommittee hearings at 102.

The Committee understands that the nature of individual handicaps, and therefore the potential need for environmental modifications, varies greatly. Therefore the term "full enjoyment" has been used here to assure that reasonable modifications required by individual tenants to assure that he or she could fully use the premises would be protected under this Act. For example, persons who have a hearing disability could install a flashing light in order to "see" that someone is ringing the doorbell. Elderly individuals with severe arthritis may need to replace the doorknobs with lever handles. A person in a wheelchair may need to install fold-back hinges in order to be able to go through a door or may need to build a ramp to enter the unit. Any modifications protected under this section must be reasonable and must be made at the expense of the individual with handicaps.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

New Subsection 804(f)(3)(B) makes it illegal to refuse to make reasonable accommodation in rules, policies, practices, or services if necessary to permit a person with handicaps equal opportunity to use and enjoy a dwelling. The concept of "reasonable accommodation" has a long history in regulations and case law dealing with discrimination on the basis of handicap.[66] A discriminatory rule, policy, practice or service is not defensible simply because that is the manner in which such rule or practice has traditionally been constituted. This section would require that changes be made to such traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling.

66 See, Southeastern Community College v. Davis, 442 U.S. 397 (1979); 45 CFR § 84.12.

New Subsection 804(f)(3)(C) places modest accessibility requirements on "covered multifamily dwellings" designed and built for first occupancy 30 months after enactment. Covered multifamily dwellings are defined in Subsection 804(f)(5) to mean buildings of 4 or more units with elevators, or ground floor units in other, non-elevator buildings. The Committee does not intend this bill to require the installation of elevators.

The Committee understands that housing discrimination against handicapped persons is not limited to blatant, intentional acts of discrimination. Acts that have the effect of causing discrimination can be just as devastating as intentional discrimination. A person using a wheelchair is just as effectively excluded from the opportunity to live in a particular dwelling by the lack of access into a unit and by too narrow doorways as by a posted sign saying "No Handicapped People Allowed." In Alexander v. Choate,[67] the Supreme Court observed that discrimination on the basis of handicap is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect" and mentioned "architectural barriers" as one factor that can have a discriminatory effect.[68]

67 469 U.S. 287 (1985). [105 S.Ct. 712, 83 L.Ed.2d 661]

68 469 U.S. 297.

**2187 *26 Accessibility requirements can vary across a wide range. A standard of total accessibility would require that every entrance, doorway, bathroom, parking space, and portion of buildings and grounds be accessible. Many designers and builders have interpreted the term "accessible" to mean this type of standard. The Committee does not intend to impose such a standard. Rather, the Committee intends to use a standard of "adaptable" design, a standard developed in recent years by the building industry and by advocates for handicapped individuals to provide usable housing for handicapped persons without necessarily being significantly different from conventional housing.[69] This subsection sets forth certain features of adaptive design to be incorporated in new multifamily housing construction.

69 See Barrier Free Environments, Inc., "Adaptable Housing," Office of Policy Development and Re-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

search, Department of Housing and Urban Development, 1988, at 7.

The first requirement is that the public and common use portions of such dwellings be readily accessible to and usable by handicapped persons. This means that hallways, lounges, lobbies, passageways among and between buildings and other common areas and facilities not contain barriers to entrance and use by handicapped persons. This requires that one regular entrance to such areas be accessible to handicapped persons for the same purpose for which it is used by others. It does not require that all entrances be made accessible to handicapped persons.[70] It also does not require that amenities, such as laundry rooms or public bathrooms, be installed. The intent of the language is that only if such amenities are provided, then they must be readily accessible to and usable by handicapped persons.

70. The Committee understands that "readily accessible to and usable by" are terms of art used in other Federal statutes and regulations. See, e.g., Architectural Barriers Act of 1968, 42 U.S.C. 4151, et seq., and regulations under Section 504 of the Rehabilitation Act of 1973, 45 CFR §§ 84.1–15. The Committee intends that such term in this Act have the same meaning as in the others.

The second requirement is that passage doorways into and within all units be sufficiently wide to allow passage by handicapped persons in wheelchairs. This requirement is not intended to apply to doorways not designed to allow passage, such as into a linen closet, but would apply to a walk-in closet, since such a doorway is designed to allow passage. These slightly wider doors are not uncommon, and as they become increasingly uniform within the housing industry, the price can reasonably be expected to decrease as well.

The third requirement is that all premises contain four specified features of adaptive design. This requirement was refined during consideration by the Committee, to provide additional specificity for planners and builders, and was drafted in consultation with the American Institute of Architects and the National Association of Home Builders.

The first adaptable design feature is an accessible route. This means that persons in wheelchairs be able to have physical access into and throughout the unit equal to persons not in wheelchairs. The second feature is that light switches, electrical outlets, thermostats and other environmental controls be provided in accessible locations, neither too high nor too low. This provision is not intended **2188 *27 to increase the risk of danger to others or necessarily to require waist high controls.

The third feature is reinforcements in bathroom walls to allow the later installation of grab bars around the toilet, tub, shower stall and shower seat. This does not require that grab bars be installed in new construction, but rather that reinforcements be installed to allow the easy later installation of grab bars at a tenant's option and expense. When reinforcements are installed as a part of new construction, there is no aesthetic change to the bathroom and it is of minimal expense. Having to add reinforcements later, however, can be a major structural undertaking with associated expense.

The fourth feature is that kitchens and bathrooms be usable such that an individual in a wheelchair can

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

maneuver about the space. This provision is carefully worded to provide a living environment usable by all. Design of standard sized kitchens and bathrooms can be done is such a way as to assure usability by persons with disabilities without necessarily increasing the size of the space.[71] The Committee intends that such space be usable by handicapped persons, but this does not necessarily require that a turning radius be provided in every situation. This provision also does not require that fixtures, cabinetry or plumbing be of such design as to be adjustable.

71 See e.g., Barrier Free Environments, Inc., "Adaptable Housing," Office of Policy Development and Research, Department of Housing and Urban Development, 1988.

New Subsection 804(f)(4) was adopted during Committee consideration to assure designers of new multifamily housing that if they follow the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people, commonly cited as ANSI A117.1, then they will have met the adaptive design requirements. However, this section is not intended to require that designers follow this standard exclusively, for there may be other local or state standards with which compliance is required or there may be other creative methods of meeting these standards. But if designers do follow this standard, then they have satisfied the Act's requirements of adaptive design.

The Committee is sensitive to the possibility that certain natural terrain may pose unique building problems. For example, in areas which flood frequently, such as waterfronts or marshlands, housing may traditionally be built on stilts. The Committee does not intend to require that the accessibility requirements of this Act override the need to protect the physical integrity of multifamily housing that may be built on such sites.

The Committee believes that these provisions carefully facilitate the ability of tenants with handicaps to enjoy full use of their homes without imposing unreasonable requirements on homebuilders, landlords and non-handicapped tenants. The Committee believes that these basic features of adaptability are essential for equal access and to avoid future de facto exclusion of persons with handicaps, as well as being easy to incorporate in housing design and construction. Compliance with these minimal standards will eliminate many of the barriers which discriminate against persons **2189 *28 with disabilities in their attempts to obtain equal housing opportunities.

New Section 804(f)(6) ensures that State and local laws and regulations which impose stricter accessibility requirements than does this Act shall remain in force. Many States have enacted accessibility and equal opportunity requirements for persons with disabilities. It is the intent of the Committee that the Act simply establishes minimum standards for equal opportunity, and does not supplant or replace State or local laws which impose higher standards.

New Section 804(f)(7) was adopted during Committee consideration of the bill and states that it shall not be discrimination on the basis of handicap to deny a dwelling to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals. This provision was passed by the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:13-cv-08564 Document #: 19-8 Filed: 02/12/14 Page 62 of 151 PageID #:1048

Committee as a substitute to an amendment which would have excluded from the definition of "handicap" under the Act "any current impairment that consists of alcoholism, drug abuse, or any infectious, contagious or communicable disease whether or not such disease causes a physical or mental impairment during the period of contagion, or any other impairment which would be a direct threat to the property, health or safety of others."

The Committee rejected the approach of excluding a category of individuals with disabilities from the protection of the Act. Instead, the Committee affirmed that all individuals with handicaps, with the exception of current illegal abusers or addicts of controlled substances, have access to the housing protections established by this Act. While the Committee does not foresee that the tenancy of any individual with handicaps would pose any risk, much less a significant risk, to the health or safety of others by the status of being handicapped, the Committee added this provision to allay the fears of those who believe that the non-discrimination provisions of this Act could force landlords and owners to rent or sell to individuals whose tenancies could pose such a risk.[72]

72 Following adoption of the substitute amendment, another amendment was offered that would have excluded from the definition of handicap "any current impairment that consists of an infectious, contagious or communicable disease whether or not such disease causes a physical or mental impairment during the period of contagion." The debate on this amendment primarily centered around people infected with HIV (the AIDS virus). The amendment was defeated.

In adopting this amendment, the Committee drew on case law developed under Section 504 of the Rehabilitation Act of 1973. Section 504, which governs programs and activities receiving federal financial assistance, provides that no "otherwise qualified handicapped individual" may be subjected to discrimination solely on the basis of his or her handicap. Handicapped individuals are "otherwise qualified" if, with reasonable accommodation, they can satisfy all the requirements for a position or services.[73] An individual is not otherwise qualified if, for example, he or she would pose a threat to the safety of others, unless such threat can be eliminated by reasonable accommodation.[74]

73 See Southeastern Community College v. Davis, 442 U.S. 397, 406 (1979); Pushkin v. Regents of University of Colorado, 658 F.2d 1372, 1385–1387 (10th Cir.1981).

74 See School Board of Nassau County v. Arline, 107 S.Ct. 1123, 1130–1131 (1987); Strathie v. Department of Transportation, 716 F.2d 227, 232–234 (3rd Cir.1983).

The concept of reasonable accommodation is well established in regulations and case law. See fn. 66, supra. In regulations recently issued by the Department of Housing and Urban Development, the agency noted that the reasonable accommodation requirement applies to ensure usability of housing for tenants with disabilities 24 CFR § 8.24(b), 53 Fed.Reg. at 20239 (June 2, 1988). Although the Committee be-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

lieves it extremely unlikely that the tenancy of an individual with handicaps would ever pose a direct threat to others, such that the reasonable accommodation requirement would be necessary to eliminate the threat, the requirement exists for those situations in which it might be necessary.

**\*\*2190 \*29** The formulation of this amendment parallels the provision added to the Civil Rights Restoration Act of 1988 [75] with regard to individuals with contagious diseases and infections [76]—a provision Congress added in order to codify the recent Supreme Court decision in School Board of Nassau County v. Arline.[77] In Arline, the Court held that "[a] person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk." [78]

75 Public Law 100–259, 102 Stat. 28 (March 22, 1988).

76 See Section 9 of Public Law 100–259 amending Section 7(8) of the Rehabilitation Act of 1973, 29 U.S.C. 706.

77 107 S.Ct. 1123 (1987). [107 S.Ct. 1123, 94 L.Ed.2d 307]

78 107 S.Ct. at 1131, n. 16. While the amendment in the Civil Rights Restoration Act amended the definition of "individual with handicaps" in order to parallel a 1978 amendment added with regard to coverage of alcohol and drug users, Congress made clear that its purpose in adding the amendment was to codify the entire "otherwise qualified" standard of Arline.

While Arline dealt with employment in the context of Section 504, the Committee intends that same standard to apply in the context of housing under this Act. Thus, the direct threat requirement incorporates the Arline standard, and a dwelling need not be made available to an individual whose tenancy can be shown to constitute a direct threat and a significant risk of harm to the health or safety of others. If a reasonable accommodation could eliminate the risk, entities covered under this Act are required to engage in such accommodation pursuant to Section 6(f)(3) of the Act.

The provision adopted by the Committee specifically refers to a direct threat posed by an individual's tenancy. The purpose of this formulation is to require that the landlord or property owner establish that there is a nexus between the fact of the individual's tenancy and the asserted direct threat. Thus, under this provision, a court would need to evaluate whether a direct threat and a significant risk of harm existed in the context of the individual's tenancy.

Any claim that an individual's tenancy poses a direct threat and a substantial risk of harm must be established on the basis of a history of overt acts or current conduct. Generalized assumption, subjective fears, and speculation are insufficient to prove the requisite direct threat to others.[79] In the case of a person with a mental illness, for example, there must be objective evidence from the person's prior behavior that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

the person has committed overt acts which caused harm or which directly threatened harm.

79 See Arline, 107 S.Ct. at 1130–1131; Chalk v. U.S. District Court, 840 F.2d 701 (9th Cir.1988); New York State Association for Retarded Children v. Carey, 612 F.2d 644, 649–650 (2nd Cir.1979).

In practical terms, a landlord may not, for example, refuse to rent to an individual solely because the applicant uses a wheelchair, is mentally retarded or has a vision or hearing impairment. Similarly, if the landlord determines that the applicant has a history of a physical or mental illness, that fact alone is insufficient for **2191 *30 the landlord to use in determining whether or not to rent to that individual. The landlord may ask the applicant for references to determine the applicant's eligibility for tenancy, as he does for other applicants. If the landlord determines, by objective evidence that is sufficiently recent as to be credible, and not from unsubstantiated inferences, that the applicant will pose a direct threat to the health or safety of others, the landlord may reject the applicant as a tenant. In assessing information, the landlord may not infer that a recent history of a physical or mental illness or disability, or treatment for such illnesses or disabilities, constitutes proof that an applicant will be unable to fulfill his or her tenancy obligations.

This provision is not intended to give landlords and owners the right to ask prospective tenants and buyers blanket questions about the individuals' disabilities. Under Section 504 of the Rehabilitation Act, employers may not inquire, as part of pre-employment inquiries, whether an applicant is a handicapped person or as to the nature or severity of the handicap. Employers may only make pre-employment inquiries into an applicant's ability to perform job-related functions.[80] Similarly, under this provision, only an inquiry into a prospective tenant's ability to meet tenancy requirements would be justified. Thus, in assessing an application for tenancy, a landlord or owner may ask an individual the questions that he or she asks of all other applicants that relate directly to the tenancy (e.g., questions relating to rental history or a targeted inquiry as to whether the individual has engaged in acts that would pose a direct threat to the health or safety of other tenants), but may not ask blanket questions with regard to whether the individual has a disability. Nor may the landlord or owner ask the applicant or tenant questions which would require the applicant or tenant to waive his right to confidentiality concerning his medical condition or history. The only exception is that a landlord or owner may ask whether the individual is a current illegal abuser or addict of controlled substances.

80 See 45 CFR § 84.14 (1977).

Section 6(b) amends existing Section 806 and 804(c)–(e) to prohibit discrimination on the basis of handicap and amends existing section 806 and 804(a)–(e) to prohibit discrimination on the basis of familial status.

Section 6(c) amends Section 805 to prohibit discrimination in residential real estate-related transactions. It defines residential real estate-related transaction to include making or purchasing of real estate related

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

loans, or the selling, brokering, or appraising of residential real property.

Under amended Section 805, the provisions of the Act extend to the secondary mortgage market. The Committee does not intend that those purchasing mortgage loans be precluded from taking into consideration factors justified by business necessity (including requirements of Federal law) which relate to the financial security of the transaction or the protection against default or diminution in value of the security.

The provision prohibiting discrimination against families under Section 805(a), which deals with discrimination in the terms or conditions**2192 *31 of financing, is not intended to restrict or prohibit the legitimate consideration of actual obligations incurred in caring for children (such as on-going day care expenses and child support obligations), just as the lender considers other obligations incurred by other persons, when evaluating the ability of a person to qualify for a mortgage.

This section also clarifies that appraisers may take into consideration relevant and nondiscriminatory factors when making appraisals. Thus, it is intended that the appraisal process not operate to discriminate on the basis of race, color, religion, national origin, sex, handicap or familial status.

Section 6(d) amends Section 807 to make additional exemptions relating to the familial status provisions. These provisions are not intended to limit the applicability of any reasonable local, State, or Federal restrictions on the maximum number of occupants permitted to occupy a dwelling unit. A number of jurisdictions limit the number of occupants per unit based on a minimum number of square feet in the unit or the sleeping areas of the unit. Reasonable limitations by governments would be allowed to continue, as long as they were applied to all occupants, and did not operate to discriminate on the basis of race, color, religion, sex, national origin, handicap or familial status.

This section exempts from the familial status provisions any State or Federal program aimed at assisting the elderly.[81] It also exempts housing for older persons.

81 See, e.g., Section 202 of the Housing Act of 1959, 12 U.S.C. 1701q.

The Committee intends that the housing for older persons exemption be limited to communities consisting of dwellings intended for older persons. Housing for older persons is defined in a two pronged test; in order to meet the definition, at least one prong must be satisfied.

The first prong has two parts; both must be fulfilled. First, 90 percent of the units must be occupied by at least one person 55 or older. The Committee recognizes that persons over 55 may have spouses, dependents or other individuals under 55 who live with them and provide emotional and economic support. Such persons would still be allowed to live in the unit without jeopardizing the exemption for the community, as long as at least 90 percent of the units are occupied by at least one person 55 or older. This requirement is not intended to substitute an average age of 55 for the community. The Committee also recognizes that there may be rare instances in which only persons under 55 may reside in a unit in the community, such as a nurse providing care for a resident. Thus, the Committee does not require all units to be occupied by at least one person over 55, only that most units, 90 percent, be occupied by such older

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

persons.

The second part of the first prong requires significant facilities and services specifically designed to meet the physical or social needs of the older residents. As the President's Commission on Housing recently stated, "the frailties of old age need not result in institutionalization if accessible housing and adequate services are available." [82] Earlier, the President's Task Force on Aging noted **2193 *32 "the period of independence of older persons may be extended and the quality of their lives enhanced through provision of limited supportive services in apartments and villages designed especially for their use." [83]

83 Report of the President's Task Force on Aging: Toward A Brighter Future for the Elderly, 1971, at 38.

Such facilities and services include congregate dining facilities, social and recreational programs, emergency and preventive health care or programs, continuing education, welfare, information and counseling, recreational, homemaker, outside maintenance and referral services, transportation to facilities access to social services, and services designed to encourage and assist recipients to use the services and facilities available to them.[84]

84 See also, Section 202(f) of the Housing Act of 1959, 12 U.S.C. 1701q, listing examples of facilities and services for elderly persons.

In order to meet the specific physical needs of older persons, the community should be designed to meet the functional and safety needs of aging persons over time. While residents may be of generally good health when they enter a development, they are likely to experience a diminution of physical capacity as the years pass. This requires an environment which can accommodate the changing needs of such residents, and would typically include hand rails along steps and interior hallways to reduce the risk of falls, grab bars in bathrooms, routes that allow use of wheelchairs, canes and walkers, lever type doorknobs and single lever faucets.

The Committee does not intend that this listing of facilities and services be exclusive, or that a community is required to have all of the listed items. Rather, the list is to serve as an example for such communities. The Committee understands that most existing age-restricted retirement-type communities provide such facilities and services, and would meet the test for exemption. The Committee does not intend for this part to be met by the provision of minor amenities, such as putting a couch in a laundry room and labeling it a recreation center, or installing a ramp at the front entrance.

The second prong has a simple test: the community must be intended for and occupied solely by persons 62 years of age or older. The Committee intends that all persons, without exception, permanently living in the community, be over 62. The Committee does not intend to exclude temporary visitors, such as children, grandchildren or other visitors under 62, or necessary resident employees such as medical staff or maintenance personnel.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

## ADDITIONAL ADMINISTRATIVE AUTHORITY

Section 7(a) amends section 808(c) to place the administrative law judges within the Department of Justice. This amendment was adopted by the Committee during consideration of the bill.

Section 7(b) amends section 808(d) to clarify that federal agencies having regulatory or supervisory authority over financial institutions are required to cooperate with the Secretary.

Section 7(c) amends section 808(e) to require the Secretary to report annually to Congress on the following matters: the nature and extent of progress made in eliminating discriminatory housing practices and the obstacles that remain, a tabulation of the number **2194 *33 of instances and the reasons therefor that time limits are not met as specified in sections 810(a)(1)(B) (investigations), 810(g) (determinations of reasonable cause), and 812(g) (hearings, findings and conclusions). The section also requires an annual report to the Congress providing data about applicants, participants, and beneficiaries in programs or activities administered by the Department and subject to coverage by the various civil rights laws detailed in the following section. This information is necessary to allow the Congress an opportunity to evaluate objectively the effectiveness of programs involving and impacting on fair housing.

## ENFORCEMENT CHANGES

Section 8 amends title VIII by striking the provisions relating to enforcement in existing title VIII and replacing them with an administrative enforcement procedure and an improved system for civil action by private parties and the Attorney General. The analysis below refers to the new sections 810–814 of the bill.

## ADMINISTRATIVE ENFORCEMENT: PRELIMINARY MATTERS

Section 810(a) provides for the investigation of an alleged discriminatory housing practice, upon receipt of a complaint by an aggrieved person or on the Secretary's own initiative. The Secretary may also investigate housing practices to determine whether a complaint should be filed.

A complaint must be filed within one year from the time the alleged discrimination occurred or terminated. The latter term is intended to reaffirm the concept of continuing violations, under which the statute of limitations is measured from the date of the last asserted occurrence of the unlawful practice.[85] The one year statute of limitations represents an increase from the present law's limit of 180 days, but is less than the 2 year period provided for in civil cases.

85 See, Havens Realty Corp. v. Coleman, 455 U.S. 363, 380–81 (1982).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Secretary is required to notify both the aggrieved person and the respondent of the filing, advise the aggrieved person of the time limits and choice of forums provided by law, and advise the respondent of the alleged discriminatory housing practice, and his or her rights and obligations under law. The respondent has the right to file an answer to the complaint. The Committee intends that notice required under this section provide information about the administrative process, and provide sufficient information to enable the respondent to understand the charge. These notice requirements underscore the roles to be played by HUD in the administrative process. Both the aggrieved person and the respondent may rely on HUD for information and advice, although either or both may engage their own counsel to assist and represent them.

The Secretary will investigate the complaint following its filing and will complete the investigation within a 100 day period, unless it is impracticable to do so. The Committee intends that in these exceptional cases the investigation must be completed as soon as possible thereafter. If the Secretary cannot complete the investigation**\*2195 \*34** within 100 days, then the Secretary is required to notify the parties and explain the reasons for the delay.

Complaints and answers are required to be under oath or affirmation and may be reasonably amended at any time. The Committee intends that the complaints and answers contain truthful information, and are as comprehensive as possible. The Committee understands that additional information may be obtained over the passage of time, and expects that such information may be of assistance to HUD in its investigation.

Additional persons may be added as respondents during or after the course of the investigation. The Committee understands that during the course of an investigation additional or substitute respondents may be identified as additional facts are learned about the case. The Secretary is required to notify such additional respondents, and to explain the basis for adding new respondents.

Section 810(b) provides for the continuation of the present law's conciliation procedures. Thus, at the same time that the Secretary is investigating the complaint, the Secretary will seek to resolve the complaint through negotiations involving the aggrieved person, the respondent and the Secretary.

The Committee intends for conciliation to remain a primary feature of fair housing enforcement. Resolving a complaint in the early stages of the process benefits all parties. Unlike current law, however, under the bill, if conciliation fails, then HUD can continue to enforce the law through the administrative process.

If conciliation is successful, the complainant and respondent will develop a conciliation agreement that sets out the resolution of the complaint. The agreement is subject to approval by the Secretary. Because this is a voluntary agreement between the parties, the Committee does not intend to limit or prescribe the terms of the settlement.

The conciliation agreement may provide for binding arbitration, and may provide for the types of relief an arbitrator can award. If binding arbitration is agreed to, it is voluntary, and the parties should be allowed to agree to the limits of the arbitration.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

To encourage enforcement and compliance with the law, conciliation agreements will be made public, unless the parties otherwise agree and the Secretary concurs. If the Secretary determines that disclosure is not required to further the purposes of the law, then the Secretary shall concur.

At the end of an investigation, the Secretary shall prepare a final investigative report, containing pertinent information derived from the investigation. The final investigative report and the evidence referred to therein serve as the basis for issuing, or not issuing, a charge under Section 810(g).

Section 810(c) requires the Secretary to refer a suspected breach of a conciliation agreement to the Attorney General for enforcement under Section 814.

Section 810(d). In order to encourage settlement and provide confidentiality during the conciliation process, this provision prohibits making public or using in a subsequent proceeding under this title anything said or done in the course of conciliation. The parties may, however, obtain from the Secretary information derived from the investigation and any final investigative report.

**2196 *35** Section 810(e) provides authority for the Secretary to initiate appropriate action for temporary or preliminary relief, when the Secretary concludes that such action is necessary. This will be important where, for example, the dwelling unit is still available and the Secretary believes the complaint has merit.

Section 810(f) details the requirement for referral of a complaint to certified state or local agencies for disposition. As in current law, the Committee bill recognizes the valuable role state and local agencies play in the enforcement process, and this section would continue the current practice of referring cases to certified agencies.

The Secretary may certify agencies if the rights protected, procedures followed, remedies available and availability of judicial review are "substantially equivalent" to federal law. The Secretary must also consider the current practices and past history of the agency in making the certification.

Presently, there are 36 states and 76 local agencies certified by the Secretary as substantially equivalent under existing federal law. Many of these states provide for some degree of administrative enforcement, as well as protecting handicapped persons and families with children. The Committee expects that many states will be able to maintain their substantial equivalency status within the time period provided.

In order to provide a reasonable transition period for states to adjust to the new law, agencies currently certified on the day before the date of enactment will continue to remain certified for 40 months. This allows most jurisdictions sufficient time to conform their laws to the new federal standards so that they may remain certified. The Committee recognizes that some jurisdictions may need additional time because of the infrequency of legislative sessions, and the Secretary may grant an additional 8 months for this purpose.

If an agency currently certified on the day before the date of enactment does not provide anti-discrimination protection for the new covered classes, handicap and familial status, the Committee does not intend for complaints involving such classes to be referred to those agencies. Jurisdiction over these

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

complaints would remain with the Secretary, until the agency is certified as substantially equivalent for the new classes.

If a complaint is referred to a certified agency, then the Secretary will not take further action on a complaint unless the certified agency fails to commence proceedings within 30 days, fails to continue the proceedings with reasonable promptness, or no longer qualifies for certification.

Section 810(g). Within 100 days after the complaint is filed, following an investigation, the Secretary is required to make a determination whether or not there is reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur. If the Secretary cannot make a determination within 100 days, then the Secretary is required to notify the parties of the reasons for the delay. The Secretary is also required, under Section 808(e), to tabulate and report to Congress annually, the number of instances in which these time limits were not met.

**2197 *36** If reasonable cause is found, then the Secretary will issue a charge, which triggers administrative proceedings under section 812. If the Secretary does not find reasonable cause, then the complaint will be dismissed with public notice of the dismissal. Dismissal by the Secretary does not preclude an aggrieved person from filing a civil action under Section 813, but indicates the end of the Secretary's involvement with that complaint.

If the Secretary determines that the complaint involves zoning or other land use law, the Secretary is required to refer the complaint to the Attorney General, and may not issue a charge on the complaint.

The Secretary cannot issue a charge after the trial itself in a civil action brought by the same aggrieved person involving the same issues has begun. This is intended to prevent multiple adjudications, as do sections 812(f) and 813(a).

## SUBPOENAS; GIVING OF EVIDENCE

Section 811 grants the Secretary authority to issue subpoenas and order discovery. The Committee intends that subpoenas and discovery be available and ordered to the same extent as allowed in the U.S. district courts. This section also requires that witness fees are payable by the person requesting the subpoena, but if the person cannot afford to pay, then the Secretary will pay. The Committee intends that the Secretary will subpoena all relevant witnesses, and that in most instances parties will not have to request subpoenas. Criminal penalties of up to $100,000 and one year in prison are provided for violations of this section.

## ADMINISTRATIVE ENFORCEMENT; HEARING PROCESS

Section 812(a). If a charge is issued under Section 810(g), then an administrative law judge will conduct a hearing on the record to adjudicate the charge. The Committee intends that these hearings follow the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Administrative Procedure Act.[86] and that ALJs be appointed in the same manner that the Administrative Procedure Act Provides for other ALJs.[87]

86 5 U.S.C. 554, et seq.

87 U.S.C. 3105.

Section 812(b). The Secretary is also required to serve a copy of the charge on the respondents and aggrieved persons. The Secretary is also required to serve on respondents a notice of the opportunity for a hearing, indicating the time and place of the hearing.

Section 812(c) reiterates the rights of parties. The Committee intends that the rights of parties granted under this section be those provided under the Administrative Procedure Act. In order to provide additional procedural safeguards, this section explicitly provides the right of aggrieved persons to intervene, and that the Federal Rules of Evidence shall govern the presentation of evidence.

Section 812(d) requires to the greatest extent possible an expedited and inexpensive discovery and hearing process, consistent with the right of the parties to obtain a fair hearing. The Committee intends for both processes to be as informal and nonadversarial as **2198 *37 possible. The level of formality required in civil litigation is neither necessary, nor, in the Committee's view, desirable.

The Committee intends for the Secretary to issue rules to implement the discovery and hearing process within 180 days after enactment.

Section 812(e). If a charge is resolved before a final order by an ALJ, the resolution requires the consent of the aggrieved person on whose behalf the charge was issued.

Section 812(f) requires the cessation of administrative proceedings at the commencement of a trial brought by the same aggrieved person challenging the same alleged discriminatory housing practice. As with Sections 801(g) and 813(a), this is intended to prevent multiple adjudications of the same alleged discriminatory housing practice.

Section 812(g) provides for administrative hearings. The hearing must commence within 120 days after the issuance of a charge and the Committee intends that the hearing will be completed expeditiously. Within 60 days after the hearing has concluded, the ALJ is required to make findings of fact and conclusions of law. If the ALJ cannot meet these time limits, because of impracticability, then the ALJ is required to notify the parties of the reasons for not doing so. The Secretary is also required, under Section 808(e), to tabulate and report to Congress annually, the number of instances that time limits were not met.

If the ALJ finds a violation of this title, then the ALJ may award appropriate relief. Appropriate relief may include any or all of the following: compensatory damages, injunctive relief, other equitable relief, and a civil penalty.

The ALJ may also impose a civil penalty against a respondent up to a maximum of $10,000 if there is no prior violation, $25,000 if there has been one prior violation within the preceding 5 year period, and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

$50,000 if there have been two or more violations within the preceding 7 year period. The 5 and 7 year time periods are computed from the date of the filing of the current charge. If the discriminatory housing practices were committed by the same natural person, then the time limitations do not apply; however, this provision is not intended to alter existing caselaw respecting the liability of principals and owners for the actions of their agents.

The Committee intends that these civil penalties are maximum, not minimum, penalties, and are not automatic in every case. When determining the amount of a penalty against a respondent, the ALJ should consider the nature and circumstances of the violation, the degree of culpability, any history of prior violations, the financial circumstances of that respondent and the goal of deterrence, and other matters as justice may require.

Section 812(g)(4) provides that if a bona fide purchaser, encumbrancer or tenant does not have actual notice of the charge or subsequent action, then an ALJ order may not affect any contract, sale, encumbrance or lease consummated before the issuance of the order.

Section 812(g)(5). Persons who commit discriminatory housing practices are often licensed by governmental regulatory agencies, such as state real estate boards. A determination of a violation of **2199 *38 this law is often relevant to the agency in determining whether the person should continue to be licensed or certified by the agency. In order to assist licensing and regulatory agencies to carry out their duties, and to further the purposes of this title, the Secretary is required under this section to send copies of the findings of fact, conclusions of law, and the ALJ's order to the appropriate agencies, and recommend appropriate disciplinary action.

Section 812(g)(6). In order to assist the Attorney General in carrying out pattern or practice enforcement under Section 814, the Secretary is required to send a copy of the order to the Attorney General in cases where the respondent had been issued another order within the preceding 5 years. The Attorney General continues to maintain the discretion whether to bring a pattern or practice case against such respondents.

Section 812(g)(7). The ALJ is required to dismiss the charge if he or she finds that the respondent has not engaged or is not about to engage in a discriminatory housing practice. The Secretary is required to make a public disclosure of the dismissal.

Section 812(h). After the findings of fact, conclusions of law, and order have been made and issued, the Secretary shall serve them on each aggrieved persons and respondent.

Section 812(i) deals with judicial review of the ALJ's order. The ALJ's order is final for purposes of judicial review. A petition for review must be filed in the court of appeals in the circuit in which the discriminatory housing practice is alleged to have occurred, within 30 days after the order is entered. Such a petition may be filed by any party aggrieved by the ALJ's order. Review of the ALJ's order shall follow the provisions for review of agency orders in chapter 158 of title 28 of the United States Code.[88]

88 28 U.S.C. 2341 et seq.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Following the Administrative Procedure Act, the court of appeals will not set aside findings of fact unless such findings are unsupported by substantial evidence on the record taken as a whole.[89] This is the usual standard for judicial review of administrative decisions.

89 See 5 U.S.C. 706(2)(E)

Section 812(i) provides for Secretarial enforcement of the ALJ's order by filing a petition in an appropriate court of appeals. The Secretary may also seek appropriate temporary relief or restraining order. Upon the filing of a petition for relief, the Secretary will also file a copy of the record of the administrative proceedings for use by the court in reviewing the case. If the Secretary does not file a petition for enforcement within 60 days following the ALJ's order, and if no petition for review has been filed by that date, then any person entitled to relief may petition for relief under Section 812(m).

Section 812(k) sets out the relief a court of appeals may award on a petition to review or to enforce the ALJ's order. This section also allows any party before the ALJ to intervene in the proceeding before the court of appeals. No objection not made before the ALJ may be considered by the court, absent extraordinary circumstances.

**2200 *39** Section 812(l). The ALJ's findings and order will become final and conclusive if no petition for review is filed within 45 days after the order is entered. The order will thus be conclusive in any action for enforcement under Section 812(j) filed by the Secretary thereafter, or in any action by a person entitled to relief as authorized by Section 812(m).

Section 812(m) allows any person entitled to relief to petition for relief in the appropriate court of appeals if before the end of 60 days after the date the ALJ's order is entered no petition for review has been filed nor has the Secretary sought enforcement.

Section 812(n) provides for the clerk of the court of appeals to enter forthwith a decree enforcing the ALJ's order, upon petition filed under Sections 812(l) or (m), and to transmit a copy of the decree to the Secretary and the parties before the ALJ. The Committee intends that enforcement in these circumstances be automatic.

Section 812(o) allows the ALJ or the court, as the case may be, to award to a prevailing party other than the United States attorney's fees and costs.

## ENFORCEMENT BY PRIVATE PERSONS

Section 813 continues the private right of action under existing law, but eliminates certain restrictions on the exercise of that right.

Section 813(a) extends the statute of limitations from 180 days to 2 years. This time period runs from the time of the occurrence or termination of the alleged discriminatory housing practice, or breach of a conciliation agreement. This time period does not include time during which administrative proceedings

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

under Sections 810–812 are pending.

An aggrieved person is not required to exhaust the administrative process before filing a civil action. The Committee intends for the administrative proceeding to be a primary, but not exclusive, method for persons aggrieved by discriminatory housing practices to seek redress.

If a conciliation agreement has been entered into, with the informed consent of the aggrieved person, then the aggrieved person is not allowed to file a civil action under this title based on the same claims, except one to enforce a breach of the conciliation agreement. Further, if a hearing on a charge filed on behalf of an aggrieved person has commenced under Section 812, that person may not commence a civil action under this title with respect to the same alleged discriminatory housing practice. As in Section 810(g) and 812(f), this is intended to prevent multiple adjudication of the same alleged discriminatory housing practice.

Section 813(b) allows the court to appoint an attorney for any party and to waive the payment of fees, costs and security if the person is unable to pay. This section expands the power of the court to appoint attorneys and waive fees and costs from only the plaintiff to either or both parties on the basis of financial need.

Section 813(c) provides for the types of relief a court may grant. This section is intended to continue the types of relief that are provided under current law, but removes the $1000 limitation on the **2201 *40 award of punitive damages.[90] The Committee believes that the limit on punitive damages served as a major impediment to imposing an effective deterrent on violators and a disincentive for private persons to bring suits under existing law.[91] The Committee intends that courts be able to award all remedies provided under this section. As in Section 812(o), the court may also award attorney's fees and costs.

90 See section 810(d) (42 U.S.C. 3610) and 812(c) (42 U.S.C. 3612).

91 See, e.g., Testimony of Avery Friedman, 1987 Subcommittee hearings at 322.

Section 813(d). As in Section 812(g)(4), if a bona fide purchaser, encumbrancer or tenant does not have actual notice of the filing of a complaint with the Secretary of civil action, then relief granted by the court may not affect any contract, sale, encumbrance or lease consummated before granting of such relief.

Section 813(e) expands the ability of the attorney general to intervene in private civil actions if the case is of general public importance. Although the Committee does not intend for the Attorney General to intervene in every case, if the Attorney General certifies that the case raises issues of general public importance, then the Attorney General may intervene.

ENFORCEMENT BY THE ATTORNEY GENERAL

Section 814 continues the authority of the Attorney General to initiate civil actions in "pattern or prac-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

tice" cases and in cases where denial of rights to a group raises an issue of general public importance. This section also gives the Attorney General authority to commence zoning or other land use law cases referred under Section 810(g), breach of conciliation agreement cases referred under Section 810(c), and to enforce subpoenas.

Section 814(d) provides the types of relief a court may award in a civil action under this Section. Existing preventive relief continues,[92] as well as other appropriate relief including monetary damages for the persons aggrieved. The Committee intends that relief may be awarded to all persons affected by the discriminatory housing practice. Allowing the court to award monetary relief to persons aggrieved avoids later duplicative litigation as such persons bring actions to vindicate their rights.

92 Section 813 ([42 U.S.C. 3613)).

The court may also assess civil penalties against a defendant up to a maximum of $50,000 for a first violation and $100,000 for any subsequent violations. As with civil penalties provided under Section 812(g), these are maximum, not minimum, penalties, and are not automatic in every case. When determining the amount of a penalty against a defendant the court should consider the nature and circumstances of the violation, the degree of culpability, any history of prior violations, the financial circumstances of that defendant and the goal of deterrence, and other matters as justice may require.

As in Sections 812(o) and 813(c), the court may award reasonable attorney's fees and costs.

Section 814(e) allows aggrieved persons to intervene in cases brought by the Attorney General.

**\*\*2202 \*41** RULES TO IMPLEMENT TITLE

Section 815 provides authority for the Secretary to make rules to implement the title after public notice and after public notice and opportunity for comment. The Committee intends that the Secretary promulgate rules in a timely manner.

OTHER CONFORMING AND TECHNICAL AMENDMENTS

Section 9. Conforming amendment to title IX of the 1968 Act.

Section 10. Technical amendment to Section 818 as redesignated. This change is necessary because practices prohibited under Section 818 as redesignated have been added as a discriminatory housing practice, and thus may be enforced under provisions provided under this title.

Section 11. Conforming amendments to title 28. These amendments add fair housing complaints to categories which may be considered on review by the court of appeals.

Section 12. Disclaimer of preemptive effect on other federal acts or actions and rights under the Constitution.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Section 13. Effective date and initial rulemaking.
Section 14. Severability of provisions.

## OVERSIGHT

Pursuant to clause 2(1)(3) of rule XI of the Rules of the House of Representatives, no oversight findings have been presented to the Committee by the Committee on Government Operations. The findings of the Committee on the Judiciary are incorporated throughout this report.

## BUDGETARY INFORMATION

Clause 2(l)(3)(B) of rule XI of the rules of the House of Representatives is inapplicable because the instant legislation does not provide new budgetary authority.

## INFLATIONARY IMPACT

Puranant to clause 2(1)(4) of rule XI of the Rules of the House of Representatives, the Committee believes the legislation will have no significant inflationary impact on prices and costs in the operation of the national economy.

## ESTIMATE OF COST

Pursuant to clause 7 of rule XIII of the Rules of the House of Representatives, the Committee states that it concurs with the estimate submitted by the Congressional Budget Office as set forth below.

## CONGRESSIONAL BUDGET OFFICE ESTIMATE

Pursuant to clause 2(1)(3)(C) of rule XI of the Rules of the House of Representatives, the following estimate was prepared by the Congressional Budget Office and submitted to the Committee.

**2203 *42 U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
Washington, DC, June 17, 1988.

Hon. Peter W. Rodino, Jr.,
Chairman, Committee on the Judiciary,
House of Representatives, Washington, DC.

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the attached cost estimate for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

H.R. 1158, the Fair Housing Amendments Act of 1988.
  If you wish further details on this estimate, we will be pleased to provide them.
  Sincerely,

JAMES L. BLUM,
Acting Director.

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

  1. Bill number: H.R. 1158.
  2. Bill title: The Fair Housing Amendments Act of 1988.
  3. Bill status: As ordered reported by the House Committee on the Judiciary, April 21, 1988.
  4. Bill purpose: H.R. 1158 would amend provisions of the Civil Rights Act of 1968 affecting housing discrimination. The bill would require the Secretary of Housing and Urban Development (HUD) to investigate housing discrimination claims. The bill would charge administrative law judges employed by the Department of Justice with conducting hearings on alleged violations of the fair housing law; these judges would be authorized to award damages and assess penalties. The bill would also authorize the Attorney General to bring civil actions in federal court when patterns of housing discrimination appear to exist. The provisions of the bill would take effect six months after enactment.
  5. Estimated cost to the Federal Government:

| [By fiscal year, in millions of dollars] | | | | |
|---|---|---|---|---|
| | 1989 | 1990 | 1991 | 1992 | 1993 |
| HUD: | | | | | |
| Estimated authorization level | 1 | 3 | 3 | 3 | 3 |
| Estimated outlays | 1 | 3 | 3 | 3 | 3 |
| Department of Justice: | | | | | |
| Estimated authorization level | 2 | 2 | 3 | 3 | 3 |
| Estimated outlays | 2 | 2 | 3 | 3 | 3 |
| | | | | | |
| Total: | | | | | |
| Estimated authorization level | 3 | 5 | 6 | 6 | 6 |
| Estimated outlays | 3 | 5 | 6 | 6 | 6 |

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

The costs of this bill are in budget function 750.

Basis of estimate: This estimate assumes that the bill would be enacted around September 1, 1988 and that the amounts shown as estimated authorization levels would be appropriated for each fiscal year. The estimated outlays are based on historical spending patterns.

**\*\*2204 \*43** The estimated costs shown in the table above are based on information provided by HUD and the Department of Justice and reflect the following assumptions:

HUD would add 40 to 50 positions to the Office of Fair Housing and Equal Opportunity. These positions would include lawyers, investigators, and support staff, who would be responsible for investigating fair housing complaints.

Because of increased litigation related to fair housing disputes, annual costs at the Justice Department would increase by roughly $500,000 annually for attorneys and support staff.

The Justice Department would require 10 administrative law judges to adjudicate disputes brought under H.R. 1158. The costs per judge would be around $175,000 annually, which includes the judge's salary, law clerks, paralegal assistants, and support staff.

6. Estimated cost to State and local governments: None.

7. Estimate comparison: None.

8. Previous CBO estimate: None.

9. Estimate prepared by: Michael Sieverts.

10. Estimate approved by: C.G. Nuckols, for James L. Blum, Assistant Director for Budget Analysis.

\* \* \* \* \*

## \*67 ADDITIONAL VIEWS OF MR. GLICKMAN

I voted to report favorably the Fair Housing Bill (H.R. 1158) because I recognize the need to provide an effective enforcement mechanism for claims based on discrimination in the rental and purchase of housing. Statistics and studies demonstrate that discrimination in this area is still widespread. However, fundamental questions remain about the administrative proceeding set forth in the bill.

Under H.R. 1158 as reported by the Committee, and Administrative Law Judge's (ALJ) decision on the merits of a discrimination claim is final for purposes of judicial review. The bill grants the ALJ enforcement authority through a variety of means, including broad subpoena powers, injunctive releif, fines, and damages. Despite the unique administrative powers granted to an ALJ conducting a proceeding under this bill, the agency has no authority to review or oversee the ALJ's final decision. In virtually every other administrative proceeding, the Secretary of an executive agency makes the agency decision, and is thus accountable for it. While current law authorizes the head of an agency to allow an ALJ decision to become final unless a party appeals it to the agency head or the agency head decides on his or her own to review it,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

the responsible, and accountable, decisionmaker is always the head of the agency. This is because the decision in the case is an agency decision, not the decision of a single employee.

I assert that the lack of such accountability in H.R. 1158 is a weakness that compromises the rights of complaints and respondents alike. If the decision is only that an employee, rather than the **2205 agency, there is no policymaker accountable for the decision. This is particularly important because the only review available is in a federal circuit court which will review the hearing record under a "substantial evidence" standard, giving a high degree of deference to the ALJ's decision. Therefore, only the most glaring error committed in an agency proceeding may be overturned on appeal. A tremendous amount of discretion rests in the hands of the ALJ under the present scheme.

During the Committee markup, I offered an amendment intended to create accountability for a decision regarding discrimination in housing. The amendment would have authorized the Secretary of the Department of Housing and Urban Development (HUD) to review decisions by ALJs and to make the final Executive Branch decision on whether discrimination has occurred. However, an amendment offered by Mr. Kastenmeier was adopted earlier by the Committee which placed the ALJs who will hear these cases in the Department of Justice. Accordingly, the amendment I offered authorized the appropriate agency head, the Attorney General, to make the final decision on review of the ALJ's decision. Mr. Conyers then offered a perfecting amendment to my amendment which *68 placed final decision authority with the Secretary of HUD, rather than the Attorney General. The amendment was adopted as modified.

Upon further consideration, I asked for reconsideration and withdrawal of my amendment. I did so out of concern that we had, through a series of separate amendments, created a convoluted and unworkable procedure, under which there would be an investigation of a claim in HUD, a hearing in Justice, and final decision in HUD. I do not think this procedure makes good sense, and it is inconsistent with the well established system of federal administrative law. I remain convinced that accountability for Executive Branch decisions must be maintained, and that a final decision by the appropriate agency head is essential to preserve coherent and consistent administrative decisionmaking, and to protect the rights of complainants and respondents. I intend to work with my colleagues and the parties affected by this legislation to work out a constitutionally sound and expeditious procedure before floor consideration of H.R. 1158.

Dan Glickman.

## **2206 *69 ADDITIONAL VIEWS OF MESSRS. MOORHEAD, LUNGREN, SENSENBRENNER, McCOLLUM, SHAW, DeWINE, DANNEMEYER, COBLE, AND SMITH

The Committee missed an opportunity to adopt an enforcement mechanism in H.R. 1158 that could command a truly bipartisan consensus. An amendment was offered by Mr. Sensenbrenner that could have provided quick and strong enforcement of housing discrimination law suits through expedited jury trials on the issue of discrimination. Such trials would be forced to the top of the court's calendar because such

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

trials would be consolidated with a hearing for injunctive relief sought by the Secretary of HUD. Unfortunately, the Committee declined to adopt this proposal.

Instead, the Committee is proceeding with the tired, old formula of enforcement through administrative law judges (ALJs) adjudicating housing discrimination law suits. The ALJ provisions are demonstrably divisive, constitutionally suspect, and ineffective. Indeed, the ALJ provisions proved so cumbersome that the Committee struggled unsuccessfully for three markups to structure them in a satisfactory manner but were still unable to draft them into workable form. Incredibly, the Committee is proceeding to the floor with a bill containing admittedly flawed and defective enforcement provisions without knowing how these problems will be resolved on the floor.

Members of the full House would be wise, in the interest of passing a good Fair Housing bill this year, to avoid the legal and political thicket of ALJs. After eleven years of trying to strengthen a wholly inadequate enforcement mechanism in Federal Fair Housing law, the House will hopefully recognize that the enforcement mechanism of ALJs is a concept that just doesn't fit. Fortunately, there is a credible alternative that ensures prompt enforcement of discrimination claims at no expense to the aggrieved party without tearing the fabric of our judiciary. Such an alternative meets the concerns of civil rights groups and the National Association of Realtors. It is a logical and fair compromise. However, we first detail the deficiencies of ALJs enforcing Federal Fair Housing law and thus explain the need to support the alternative of expedited jury trials on the issue of discrimination.

## ALJ'S ARE CONTROVERSIAL

The search for an enforcement mechanism has been a divisive one. In 1980, the last time the full House of Representatives took up a fair housing bill and voted on this issue, a pitched battle was waged over the use of Administrative Law Judges (ALJs) with litigation authority for HUD as a backup enforcement mechanism.

The Leadership Conference on Civil Rights favored the use of ALJs because of speed and efficiency. The National Association of **70** Realtors opposed ALJs because they felt the ALJs were inefficient and lacked sufficient independence from HUD. After a 33–minute roll call vote, the ALJ proposal prevailed by a vote of 205–204. Despite victory on the narrowest of margins in the House, the ALJ **2207** proposal proved too controversial in the other body and the Fair Housing bill died there.

Unfortunately, this divisive proposal is once again included in H.R. 1158 as passed by the Committee.

Significantly, there have been several legal developments since that 1980 battle promising to make ALJs an even more controversial and troublesome issue in this Congress.

## ALJ'S ARE CONSTITUTIONALLY QUESTIONABLE

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

The legal climate surrounding ALJs has made the question of constitutionality more controversial. Even in 1980, constitutional questions abounded concerning ALJs for fair housing cases. In 1978, a legal opinion from the Office of Legal Counsel in the Carter Justice Department concluded that the ALJ provisions in the 1977 Fair Housing bill were "suspect under the recent Supreme Court decisions interpreting the Seventh Amendment." These views were echoed by Drew Days, Assistant Attorney General for Civil Rights in the Carter Justice Department, in the 1979 hearings: "Since the Supreme Court has held that rights currently conferred under the Act are in the matters of individual legal rights, and actions for damages for violations of those rights are triable by jury, Curtis v. Loether, 415 U.S. 189 (1974), it would risk unconstitutionality (emphasis added) to provide for damages in both courts and administrative forums." Fair Housing Amendments Act of 1979 Hearings before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, House of Representatives, 5 (1979). In a 1978 letter to a Judiciary Committee Counsel, the noted Administrative Law authority, Professor Walter Gellhorn of Columbia Law School, agreed with the Carter Justice Department. He stated as follows: "As the bill is now drafted, I fear that it would evoke strong constitutional challenges, and I think the likelihood of successful challenge is significantly large" (emphasis added), Fair Housing Amendments Act Hearings before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, House of Representatives 634 (1978). He concluded by stating that—

[w]hat must be avoided, however, is too naked a transfer of power from the judiciary to the executive, which is what I think is wrong with the present proposal. A determination in an enforcement proceeding might well inure to the benefit of identified individuals (as happens, for example, when the National Labor Relations Board orders reinstatement, with payment of back wages) upon a finding that an employee has been discharged for a forbidden reason. That is different, however, from stirring judicial resentment by simply moving conventional inter parties litigation from one forum (a court) to another (an executive department). Id. at 635.

Even advocates of the ALJ proposal conceded it is legally controversial. In testimony in 1979 hearings, E. Richard Larson of the **\*71** American Civil Liberties Union (ACLU) stated: "The ACLU is aware that any administrative awards of monetary relief may raise an arguable conflict with the right to a jury trial guaranteed by the Seventh Amendment." 1979 Hearings at 242.

**\*\*2208** Since the 1980 battle, the Supreme Court has handed down major separation-of-power decisions (Northern Pipelines, Chadha, Bowsher, e.g.) that raise questions whether Congress can delegate Article III judiciary power over Fair Housing cases to non-Article III forums. In testimony on July 17, 1986, before the Judiciary Subcommittee on Civil and Constitutional Rights, John Knapp, then General Counsel for HUD, observed:

The constitutionality of having an administrative law judge, a non-Article III judge, award damages of that sort, it seems to me, is still unresolved. If anything, I think it has been further complicated by subsequent judicial decisions, some of the ones that came out of the Bankruptcy Court or the bankruptcy

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

judge cases like Northern Pipeline. I think when you read or at least to me when you read that case's description of what are private rights and public rights, and private rights being reserved to Article III, and if you lay that alongside the Supreme Court's decision in the Fair Housing Act case, Curtis v. Loether, which I think is the case which determines that a Fair Housing Act damage case invokes the constitutional right to a jury trial, if you lay those together, I think you get a somewhat fuzzy picture." Fair Housing Amendments Act hearing before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, House of Representatives 83–84 (1986).

The risk of unconstitutionality was further heightened April 28, 1987, by the Supreme Court in its decision in Tull v. United States.[11] 107 S.Ct. 1831 (1987). In Tull, the Court unanimously ruled that a jury trial was required whenever the government files a suit for civil penalties under federal law. Central to this determination was the Seventh Amendment, which guarantees that:

11 95 L.Ed.2d 365.

In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved ...

Under the Seventh Amendment and Supreme Court precedents, a respondent is entitled to a jury trial whenever the government seeks civil penalties or damages for violations of federal law. Tull, supra. In addition, where a private person files a lawsuit under Title VIII or if one were to be filed under the proposed amendments to Title VIII, a right to a jury trial would be afforded to the parties, Curtis v. Loether, 415 U.S. 189 (1974).

Consequently, Section 814(d) of H.R. 1158 as passed by the Committee provides that the Attorney General can file suit in U.S. district court and seek civil penalties up to $50,000 for a first violation and up to $100,000 for any subsequent violation requires a jury trial under the Seventh Amendment. A civil suit filed by the aggrieved person under Section 813 in federal court seeking actual and punitive damages also must comport with the Seventh amendment's**2209 *72 protections. Curtis, supra., Pernell v. Southall Realty, 416 U.S. 363 (1974).

However, Section 812(g)(3) of H.R. 1158 as passed which allows the administrative law judge to determine actual and punitive damages as well as civil penalties, and subsection (j) which allows a circuit court of appeals to enforce the ALJ's order setting those damages, are unconstitutional to the extent that a jury trial is not provided.

There can be no doubt that where the Attorney General or the aggrieved party files suit in U.S. district court for alleged violations of Title VIII, that the parties have a right to a jury trial. As Justice Brennan, speaking for the Court in the Tull case, enunciated, "[a]ctions by the Government to recover civil penalties under statutory provisions ... have been viewed as one type of action in debt requiring trial by jury." Tull v. U.S., 107 S.Ct. at 1836. And as Justice Marshall declared for the unanimous court in Curtis v. Loether, suits brought under Title VIII for actual and punitive damages "is in action to enforce 'legal rights' within

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

the meaning of our Seventh Amendment decisions." 415 U.S. at 195. Accordingly, while neither Section 813 (suits by an aggrieved person) nor Section 814 (suits by the Attorney General) make any reference to the right of a jury trial, such a right unquestionably exists and would be provided in those cases if so demanded by the parties. See Testimony of Paul Kamenar, Esq., Fair Housing Amendments Act of 1987, Hearings before Senate Judiciary Subcommittee on the Constitution 609–620.

The controversy of this bill with respect to a jury trial does not center around Sections 813 or 814, but rather around Section 812 and the role of the administrative law judge (ALJ). Section 812 empowers an ALJ under subsection (g) to order civil penalties and unlimited actual and punitive damages. Unlike Section 814 which limits civil penalties to $50,000 for a first violation if suit is brought into Court with a right to a jury trial, the ALJ under Section 812 could impose unlimited damages as well as civil penalties. Subsections (i) and (g) permit the Secretary of HUD to petition the United States court of appeals for the circuit where the alleged housing discrimination took place. The circuit court is empowered to enforce the order, including any restraining order as well as the award of actual and punitive damages or assessment of civil penalties.

Those who believe that Congress can deny the right to a jury trial by merely having an administrative enforcement mechanism rely on the Supreme Court's decision in Atlas Roofing Co. v. Occupational Safety and Health Review Commission, 430 U.S. 442 (1977). In our view, reliance on this decision is misplaced. In the first place, the company in Atlas Roofing sought review of the ALJ's decision finding of a safety violation and imposition of fine in the court of appeals as provided in the Occupational Safety and Health Act. If the company simply had refused to pay the fine and forced the Secretary of Labor to file a civil suit or collection action in federal district court, cleary that action would have been an action in debt and, under the teachings of Tull v. U.S., would have required a jury trial.

**\*\*2210 \*73** Instead, Atlas Roofing argued that the initial adjudication of their violations to "an administrative agency in which no jury is available" would allow Congress to defeat their right to a jury trial. 430 U.S. at 450. The Supreme Court disagreed stating:

At least in cases in which "public rights" are being litigated—e.g., cases in which the Government sues in its sovereign capacity to enforce public rights created by statutues within the power of Congress to enact—the Seventh Amendment does not prohibit Congress from assigning the fact-finding function and initial adjudication to an administrative forum with which the jury would be incompatible. Id. (emphasis added).

Thus, the precise holding of Atlas Roofing is that a jury is not required at the administrative level, especially where this is only the "initial" adjudication. The Court did not hold that a jury trial could not be had if the Secretary of Labor filed suit to recover the fine. Nor did the Atlas Roofing court sanction ALJ's findings of legal liabilities, conclusions of law, or the setting of fines, but merely referred to the ALJ's "fact-finding function."

In any event, to the extent that Atlas Roofing allows Congress to foreclose a right to a jury trial in a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

"public rights" case, even where the government goes into court to collect the fine, this reading of Atlas Roofing is incompatible with the Seventh Amendment and the Supreme Court's recent decision in Tull v. U.S. See Testimony of Paul Kamenar, Esq., Fair Housing Amendments Act of 1987, Hearings before Senate Judiciary Subcommittee on the Constitution 609–620.

Tull stated that a right to a jury trial depends upon both the nature of the action and the type of remedy. Id. As for the nature of the action, the Tull Court stated, as noted previously, that the recovery of civil penalties is a type "of action in debt requiring trial by jury." 107 S.Ct. at 1836. In addition to being an action in debt, the underlying action in Title VIII dealing with the right to housing and accommodations is, as Justice Marshall noted, one at common law and not in equity. Curtis v. Loether, supra. Thus, the dual nature of the action in the Title VIII context underscores the legal rather than equitable nature of the action.

As for the second prong of the analysis, i.e., the nature of the remdy, the Tull Court stated that a "civil penalty was a type of remedy that could only be enforced in courts of law." Id. at 1838 (emphasis added). And as the Tull Court further noted "civil penalties is similar to the remedy of punitive damages, another legal remedy that is not a fixed fine." Id. at 1838, n. 7 (emphasis added).

If the Congress or the Courts can deny a constitutional right by merely characterizing the underlying right as a "public right," then the Seventh Amendment could be entirely eviscerated.

It seems that the rights to be protected under Title VIII are more characteristic of "private" rights rather than "public rights." For example, under Section 812(g)(3), the ALJ can award damages "suffered by the aggrieved person" or assess civil penalties predicated on a complaint filed by an aggrieved person under Section 180(a). Section 800 defines "aggrieved person" as "any person who—

**2211 *74 (1) claims to have been injured by a discriminatory housing practice; or

(2) believes that such person will be injured by a discriminatory housing practice that is about to occur.

Thus, the right that may be compensated is one that is personal to the person injured, unlike an OSHA violation where a fine may be assessed even if no workers were found to be injured. Accordingly, even if the "public rights" versus "private rights" distinction in Atlas Roofing is valid, the nature of the compensable underlying right to be protected and compensable under Title VIII is a "private right" rather than a "public" one.

Moreover, this administrative process is not aimed at resolving agency disputes arising under a regulatory scheme. Nor is it a procedure devised to deal with complex and technical issues requiring special expertise and competence beyond what is available in Article III courts. Rather, the entire impetus for administrative enforcement is to supplement or displace Article III courts and juries with a more streamlined and truncated review process, responsive to the "quick turnaround" housing needs of individual claimants.

If, however, this fair housing right is regarded as a "public right," it is hard to imagine any right to a jury trial where the government is suing. This result would be particularly unfortunate since our Founding

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Fathers drafted the Seventh Amendment precisely as a protection of the citizen against the weight of the government. For as Justice Rehnquist noted in Parklane Hosiery Co. v. Shore, 439 U.S. 322, 344 [12] (1979) (Rehnquist, J., dissenting):

12 99 S.Ct. 645, 58 L.Ed.2d 552.

The founders of our Nation considered the right of trial by jury in civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary.

The Office of Legal Counsel summed up the Seventh Amendment problem quite well in 1978, with respect to a nearly identical proposal to revise the Fair Housing Act:

It could be argued that Congress should not be able, under the vague rubric of "public right," to circumvent the Seventh Amendment completely by creating a chain of administrative courts capable of giving traditional common-law remedies to private litigants seeking relief from wrongs (such as dignitary torts) traditionally regarded as private in character.

Our constitutional concerns are fortified by recent legal opinion. Last summer two hearings were held in the other body concerning the constitutionality of ALJs in light of Tull. At the first hearing, a panel of law professors disagreed on the impact of Tull on ALJs in the Fair Housing bill. One of the panelists, Paul Kamenar, a Law Professor at Georgetown Law School, member of the Administrative Conference of the United States, and Executive Legal Director of the Washington Legal Foundation, summed up the constitutional problem:

It is our view that, based on the reasoning and holdings of Tull v. U.S. and Curtis v. Loether, a respondent in any **2212 *75 such action would have a right to a jury trial notwithstanding the role of the administrative law judge and the court of appeals provided in the bill. In other words, S. 558 does not expressly deny the right to trial, it attempts to undermine that right by providing for an administrative mechanism and judicial review procedure that would not functionlly accommodate a jury trial. There are no juries that assist ALJs in any agency nor are there juries in the court of appeals. The question, therefore, is whether Congress can constitutionally short-circuit a person's right to a jury trial in such a manner. If Congress can do it in this context, then the right to a jury trial could be extinguished altogether by the Congress by merely authorizing ALJs to adjudicate any matter under federal law with review limited to the court of appeals. (Emphasis added.) 1987 Senate Hearings at 614 and 615.

Richard R. Nageotte, the lawyer who represented Edward Tull, the petitioner in Tull, stated at the same hearing that he did not think S. 558 "would pass muster at all under Altas Roofing because it goes much further than the statute in Altas Roofing did in terms of the private rights aspect and I think that absolutely takes it out." 1987 Senate Hearings at 698.

The fears of unconstitutionality were confirmed on July 1, 1987, when the Justice Department Office of Legal Counsel released its legal opinion concerning the constitutionality of ALJs deciding Fair Housing

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

cases. In a comprehensive legal analysis, the Office of Legal Counsel concluded the Fair Housing bill in its current form is and "would likely be declared unconstitutional on Article III and Seventh amendment grounds." The opinion also adds: "All concerns under the Seventh Amendment and Article III would be alleviated, of course, by deletion of the provisions establishing an administrative hearing process."

We now have legal opinions on the constitutionality of ALJs for Fair Housing cases from the Carter and Reagan Justice Departments. They both conclude that ALJs for Fair Housing cases are probably unconstitutional. No less than the two distinguished leading supporters of ALJs for fair housing enforcement have both stressed the importance of passing a constitutional fair housing bill. Mr. Edwards has stated that Congress must enact fair housing legislation with "the absolute necessity for due process and constitutionality." 1987 Hearings at 314. Mr. Fish expressed his concern at the Committee markup that if there were no jury trials available in instances where actual damages are awarded to the aggrieved party, the Congress might enact legislation that would be later overturned by the Courts. The question for this House is whether it wants to take the extraordinary step of defying the legal opinions of two different Administrations and enact a Fair Housing with ALJs. Do we want to go down the road the way we did with bankruptcy judges and Gramm–Rudman? Is it fair to victims of discrimination to enact a Fair Housing bill promising immediate relief, but which will in all likelihood have its enforcement stayed for several years while constitutional questions are litigated?

**\*\*2213 \*76 ALJ'S ARE UNWORKABLE AND INEFFECTIVE**

The ALJs provisions in H.R. 1158 are arriving to the Floor in unworkable form as a matter of administrative law. The ALJs in H.R. 1158 are empowered to issue final orders which are reviewable under the most deferential standard by the Circuit Court of Appeals. However, such powers are inconsistent with our understanding of the Administrative Procedure Act (APA). Mr. Glickman, the well-regarded former Chairman of the Subcommittee on Administrative Law, pointed out at markup that ALJs cannot issue final orders. ALJs can only issue recommendations which may become final orders after reviews by the Secretary or the agency. However, the Committee was unable to decide whether the ALJs recommendation should be reviewed by the Attorney General of the Secretary of HUD.

The failure to resolve this question points out the inherent unworkability of ALJs in federal fair housing. The open question of review arose when the Committee recognized the problem of independence of ALJs remaining in HUD because HUD would in effect be tester, investigator, conciliator, prosecutor, adjudicator and executioner. Thus, an amendment offered by Mr. Kastenmeier was passed which placed the ALJs in the Department of Justice.

However, after placing ALJs in the Department of Justice, the Committee placed review of the ALJ order with the Secretary of HUD. After quickly realizing the lack of merit in this approach, the Committee decided to defer this question for the Floor while possibly resurrecting the independence problem by

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

taking out the Kastenmeier amendment.

In addition, the Committee failed to deal with the problem of judicial review by the Circuit Courts of Appeals. It is well-known how backlogged and overworked our Circuit Courts of Appeals are. While it is not extraordinary to have administrative orders reviewed by the Circuit Courts, review by the district courts are the preferred route. District Courts are in much better posture from a caseload standpoint to review administrative orders. The failure to place review with district courts further reveals the agenda of confining fair housing cases in fora where a jury trial would be incompatible.

Moreover, enforcement of the orders by the Circuit Courts could lead to long delays thus undercutting the goal of prompt resolution. Indeed, in his letter November 9, 1987 letter to Chairman Rodino concerning H.R. 1158, L. Ralph Mecham, Director of the Administrative Office of the United States Courts, indicated that the Judicial Conference "believed that, while prompt petitions for review on enforcement on an administrative record should be filed in the courts of appeals, enforcement of administrative orders after expiration of the time for court of appeals review would better be considered by district courts."

If the House retains ALJ enforcement with these orders enforced by the courts of appeals, these provisions will actually work to delay resolution of discrimination cases more than the status quo. We are told that where the aggrieved party sues in federal court, his case may be delayed up to two years.

**2214 *77** But consider this plausible scenario under H.R. 1158 in 5 years with the dubious assumption that the constitutionality of ALJs will have been upheld. The aggrieved party and a recalcitrant respondent are unable to resolve the case through conciliation. HUD files a charge for the aggrieved party. The ALJ hears the case in 4 months. The ALJ issues a recommendation against the respondent in another 2 months. Another month elapses as the Secretary or the Attorney General reviews and affirms the ALJ recommendation, making it a final order. The recalcitrant respondent decides to defy the order and does not petition for review. Another 1 1/2 months pass before the Secretary files a petition for enforcement with the Circuit Court of Appeals. Because of its backlog, the Circuit Court does not issue an enforcement order for another year. Thus, at this point, nearly two years have elapsed since the Secretary filed the charge. But the aggrieved party's ordeal is not over. The recalcitrant respondent refuses to comply with the enforcement order, forcing the government to sue him in district court for the civil penalties and damages. Thus, the respondent would be in Tull situation and entitled to a jury trial. At bottom, ALJ enforcement actually delays the process another 2 years!

Finally, ALJs are institutionally not appropriate for civil rights cases. Discrimination cases are emotionally charged, unlike the typical cases decided by ALJs now. Jury trials have been successfully used in discrimination cases. An article by a civil rights litigator noted "experience shows that juries are responsive in race discrimination cases." Wallas, Trial 44 (July 1987). Some civil rights practitioners admit more trust in a jury system rather than in an untested administrative system. As Jack Greenberg of NAACP Legal Defense and Educational Fund, Inc. indicated in 1979 concerning the Fair Housing bill:

Our reason for urging this change (de novo proceeding in federal court for a prevailing complainant in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

an ALJ proceeding) is grounded in our lack of confidence in the ability of the bureaucracy to handle adequately the high volume of complaints with which we will be faced. To say this is not to express a criticism of Secretary Harris. The fact is that there are no successful models in terms of organization and expertise among our civil rights agencies in the federal bureaucracy charged with similar enforcement responsibility. Given the relative importance of the rights with which Congress is concerned and our experiences with the other agencies, it is more appropriate to err on the side of caution. 1979 Hearings at 433.

## A COMPROMISE TO BREAK THE DEADLOCK

Basically, there has been a deadlock on the enforcement issue—with the Leadership Conference on Civil Rights favoring administrative enforcement (ALJs) and the National Association of Realtors favoring judicial enforcement (The Justice Department bringing suits in federal district courts).

We believe there is a compromise which can break this deadlock. The basic notion behind the proposal is that it could achieve the same goals of the ALJ system in this year's Fair Housing bill, H.R. **2215 *78 1158: strengthened HUD enforcement, expeditious resolution of the discrimination issue, emergency relief for discrimination victims, and a process which would not require money or a great deal of time from the victim.

This proposal has important advantages over the ALJ system: (1) it does not appear to be controversial on constitutional grounds and thus not as likely as the ALJ system to invite litigation staying enforcement of a new Fair Housing law for several years; (2) it is faster (cases could be heard within 45 days of filing an action rather than 120 days); (3) it is acceptable to the National Association of Realtors and could command a veto-proof consensus that important civil rights legislation deserves.

The proposal centers around HUD enforcement through consolidation of an action for an injunction or temporary restraining order with a jury trial on the issue of discrimination. The jury's decision would be binding on the discrimination issue in a subsequent lawsuit for damages. This enforcement mechanism provides for expedited treatment of unsettled housing discrimination cases because the federal courts are required to put these cases at the top of their calendar. It also preserves the right of a jury trial on the issue of liability in accordance with Tull. With the jury's decision being res judicata on the discrimination issue, the complainant's interest in damages is aided because respondents are likely to settle at this point. Even in the case of no settlement, the complainant should be able to secure counsel on a contingency fee basis to bring a lawsuit for damages. Finally, HUD's ability to obtain settlements during the conciliation process is strengthened because it now could go to federal court for expedited enforcement.

The enforcement action would come into play after conciliation failed. The action for injunctive relief or a T.R.O. could provide a home for an aggrieved party who needs housing immediately. It could also prevent the respondent from renting or selling the dwelling in question.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

It should be noted that this proposal would include a provision protecting innocent third parties. In addition, the aggrieved party would still have the right to intervene in the proceeding.

This proposal supports granting authority to HUD to bring not only temporary restraining orders or other preliminary relief but actual fair housing cases in federal courts under a unique procedure assuring prompt relief for discrimination victims. HUD litigation authority is a crucial ingredient to this year's Fair Housing bill. Indeed, in their January 21, 1987, "Dear Colleague" letter supporting H.R. 1158, the distinguished Vice Chairman of the House Judiciary Committee, Hamilton Fish, Jr., and the distinguished Chairman of the Judiciary Subcommittee on Civil and Constitutional Rights, Don Edwards, stated the following:

> Importantly (emphasis added), the powers of the HUD Secretary would be expanded by granting him the authority to seek a temporary restraining order or other preliminary relief in discrimination cases when he determines that prompt judicial action is necessary.

This proposal is a product of negotiation among Chairman Edwards, Mr. Sensenbrenner, the National Association of Realtors, **2216 *79 and the Leadership Conference on Civil Rights over two months last summer in an attempt to craft a bipartisan compromise bringing us a stronger Federal Fair Housing law. Indeed, Mr. Edwards stated that this proposal was "a good idea." He pointed out that "it can stop a sale or rental in its tracks. It's instant. There's nothing like a federal judge saying you can't sell or rent ... It's a good procedure. It's just not broad enough." Milwaukee Journal, August 9, 1987 at 2j. Ralph Neas, Executive Director of the Leadership Conference on Civil Rights called the proposal "thoughtful and serious," Id. It was serious enough that the proposal was adopted as a back-up mechanism to administrative enforcement in the February 3, 1988 draft substitute for H.R. 1158. It was omitted without explanation in the February 24, 1988 draft substitute for H.R. 1158.

The tireless efforts of the Realtors should not go unrecognized. By conceding on an important item—HUD litigation authority—the Realtors have made it possible to offer something new and different to break the logjam on Fair Housing. The Realtors have gone the extra mile so that this Congress can reach agreement on a vital civil rights bill. They have simply asked for fairness entitled to them and all other Americans under our Constitution.

The choice on Fair Housing in the 100th Congress is clear: either we go to war over ALJs like we did in 1980, or we go with a compromise proposal to reach a bipartisan consensus as we did in 1982 in extending the Voting Rights Act. This amendment provides the basis for that bipartisan consensus in that it deals with all the issues that have made the current fair housing laws ineffective in bringing about the necessary relief within a timely manner.

It provides for expedited treatment in the judicial system. It eliminates the constitutional questions that the Tull case and other cases have raised over whether administrative law judges have the power that this bill proposes to give them. Further more, because it is supported by the National Association of Realtors, if this amendment is adopted, the major opposition to extending fair housing legislation historically will

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

be put on board the passage of this bill.

We would urge the House to look favorably upon this amendment and to adopt it.

CARLOS J. MOORHEAD.
DANIEL E. LUNGREN.
F. JAMES SENSENBRENNER, Jr.
BILL McCOLLUM.
CLAY SHAW.
MIKE DeWINE.
BILL DANNEMEYER.
HOWARD COBLE.
LAMAR SMITH.

**\*\*2217 \*80** ADDITIONAL VIEWS OF MESSRS. SENSENBRENNER, McCOLLUM, SHAW, DANNEMEYER, AND COBLE

H.R. 1158 as passed by the Committee includes the additional provision for a federal building code imposed under the guise of antidiscrimination policy.

These building code requirements were not part of the original bill, and witnesses at the Subcommittee hearings had no fair opportunity to testify as to the merits and impact of these novel provisions.

The proposed building code represents a dramatic and revolutionary new departure for federal antidiscrimination law, yet it is presented to us without the benefit of hearings, without the benefit of reliable or comprehensive data reflecting the cost of these impositions, and without any deliberation on whether a private citizens' mere failure to build modest housing units in accordance with federal design dictates should be treated as illegal discrimination.

These provisions do not amend any current law. Indeed, the proposal of a federal building code in civil rights law is unprecedented. Coverage is triggered without any nexus to federal assistance. No justification has been given for opening up the floodgates of federal intrusion into the private sector. Moreover, this goes beyond the purpose of the bill. We are interested in protecting persons who are discriminated against based on status. These provisions go to specifications in construction.

We are extremely reluctant to legislate such a massive and unprecedented federal interference with individual freedom and private property rights without, at the very least, a thorough, reliable, and objective analysis for the costs, the burdens, and the inflationary impact of this measure.

The bill dictates that all "public use and common use portions" of covered dwellings must be "readily accessible to and usable by handicapped persons." The humanitarian objectives of this provision are commendable and worthy. The legal, economic, and inflationary implications are very unclear and, in our view, troublesome. Does this mean, for instance, that if a modest, four-unit rental property has a "com-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

mon" laundry room in the basement, it must have ramps or an elevator leading to that laundry room? The bill seems to indicate that result. But do we wish to impose such significant building requirements on every private citizen who builds a modest rental property?

The bill also dictates that "all premises within" newly built rental dwellings must contain certain "features of adaptive design." While the bill does specify to some extent "features of adaptive design," the cost and true impact are not clear. For example, it appears to eliminate half-bathrooms.

Finally, every single unit must be a special unit, not an exceptional unit. It isn't an accommodation for that percentage of the **\*81** population that might be handicapped or confined to a wheelchair; this is for everybody. Every unit in new construction of a building that is four or more units, including apartment hotels, must be constructed to accommodate handicapped people.

**\*\*2218** What is the impact going to be on the construction industry? What is the financial impact of this going to be on the housing industry and on the buying public and the renting public?

We all know that the cost of housing in this country is moving beyond the reach of many Americans. We are concerned that this federal building code will tend to aggravate this serious problem for millions of Americans. Our good intentions may be outrunning practical problems.

We submit that this provision has not received anything like the kind of careful study and deliberation which ought to precede such radical expansion of federal housing and discrimination law. We therefore strongly urge the House to support an amendment to eliminate this drastic new provision from this bill.

> BILL McCOLLUM.
> F. JAMES SENSENBRENNER, Jr.
> CLAY SHAW.
> BILL DANNEMEYER.
> HOWARD COBLE.

**\*82** ADDITIONAL VIEWS OF HENRY HYDE, F. JAMES SENSENBRENNER, JR., E. CLAY SHAW, JR., HOWARD COBLE, WILLIAM E. DANNEMEYER, D. FRENCH SLAUGHTER, JR.

I opposed passage of the Edwards Substitute to HR 1158 (the so-called "Fair Housing Amendments Act of 1988") for a number of reasons, a summary of which can be expressed as a dissatisfaction with our penchant for increasing government intrusion into the private lives of our citizens. The Edwards Substitute goes far beyond an attempt to make enforceable an otherwise ineffective anti-discrimination act; for example, if enacted into law, statutory coverage of the Fair Housing Act would be extended to include a prohibition against discrimination based on "familial status." This greatly expands the scope of Title VIII. Furthermore, as presently defined, alcoholics and persons with contagious diseases would receive protection under the "handicapped" provision. In essence, by inclusion in the definition of a "handicapped" person, drug abusers and persons with contagious diseases who pose a threat to others could not be re-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

jected housing by a landlord. I could not join in passing a law which would expose the remaining tenants to such a situation.

In an effort to eliminate one aspect of overreaching government regulation, I offered an amendment which would have deleted real estate appraisers from the bill's purview. Real estate appraisers do not have an opportunity to discriminate against buyers or sellers as they inevitably interact only with the lending institution involved. Furthermore, appraisers are bound by a HUD-approved form not to use race or racial composition of a neighborhood as a reliable appraisal factor in making a value determination on a property and have been subject to the Fair Housing Act since a 1977 Federal District Court decision.

Unfortunately, my amendment was never voted on—my colleague from California, Mr. Edwards, of-fered a substitute to my **2219 amendment which instructs appraisers to take into consideration factors other than race, color, religion, national origin, sex, handicap and familial status. The Edwards substitute was subsequently agreed to by a vote of 21–13. Under the Edwards substitute, appraisers must report on the market value of a piece of property without discussing such relevant factors as whether there is a church or synagogue in the neighborhood, or whether the property is located in a certain ethnic-oriented area. Should an appraiser not be able to include in his or her evaluation that the prospective home is in an overwhelmingly ethnic section of a particular city? I was raised in Chicago, Illinois which has always enjoyed many different kinds of ethnic neighborhoods. They have enriched the culture and communi-ty—must we pretend they don't exist or are irrelevant? Appraisers should have the opportunity to be open and honest in their assessments, with the chance to discuss relevant *83 factors which can be documented. The Edwards substitute prohibits such and I feel this results in an impediment to appraisers as well as an unfortunate situation for purchasers.

> HENRY HYDE.
> F. JAMES SENSENBRENNER, JR.
> CLAY SHAW.
> HOWARD COBLE.
> BILL DANNEMEYER.
> D. FRENCH SLAUGHTER, JR.

## *84 ADDITIONAL VIEWS OF MESSRS. SHAW, SENSENBRENNER, GEKAS, DANNEMEYER, COBLE, AND SLAUGHTER

The Fair Housing Amendments Act, H.R. 1158, includes a provision that would designate families with children as a protected class under the Civil Rights Act. Although this provision appears to be fair and equitable to all concerned, in reality, it would have a detrimental effect on many of the all-adult commu-nities across the nation.

Although the bill attempts to exempt retirement communities, it is so vague that we fear that an over-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

whelming majority of all-adult communities nationwide would slip through the cracks because they would not meet the test of being operated and designed for senior citizens. Furthermore, the idea of keeping percentages on the age of tenants is ridiculous!

For example, under the language contained in the bill, 90% of the units must have at least one individual who is at least 55 years or older per unit. What happens if you have a couple with one partner over the age of 55, and is married to a younger person—say 45—and the elder partner passes away. Does this mean that the younger spouse would have to leave? Maybe not, if the complex keeps their percentages in order, but it is absurd to think that this could happen!

Furthermore, many of these adult communities were designed for senior citizens and not for families with children. These communities will most likely not provide adequate grounds for recreational**2220 activities. The net result is added expense for these communities to put adequate facilities in place, and added expense for the seniors.

## STATE AND LOCAL ISSUE

The real problem is one of availability of affordable housing. Making families with children a protected class would only penalize the seniors in all-adult communities, while not at all increasing the number of affordable housing units.

While the 1980 HUD study says that approximately 20% of rental units excludes children, most of those are efficiencies, one- and two-bedroom apartments. Only 3.7 percent of rental units with three or more bedrooms do not permit children.

If some areas of the country are experiencing shortages of housing for families with children, let the state and local governments come up with appropriate laws. A blanket federal law does not take into account the special needs of states and localities.

## CURRENT LAW IN HOUSING

The 1937 Housing Act, as amended in 1977, states that, with regard to public housing and Section 8 projects, "the Secretary (of *85 HUD) shall prohibit high-rise elevator projects for families with children unless there is no practical alternative." This provision has been law for 50 years. Does this mean that once again, we in Congress are imposing one set of rules for federal housing projects and another set for everyone else?

## NEW PROTECTED CLASS

This brings us to the point that we have not adequately explored—adding this new protected class. In

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

fact, no other federal civil rights statute based on familial status has been enacted by Congress.

SENIORS

Finally, we would like to state that the Federal Government should not intervene in an area of regulation that is better left to the state and local governments—or, better yet, to each individual's choice. We believe that individuals who have chosen to live in a quiet environment, for either health reasons or personal choice, should be able to do so without interference from Washington, D.C.

As our society continues to age, the demand for senior community housing will increase. Local governments should have the freedom to act to meet these local needs.

AMENDMENT TO STRIKE PROVISION

For the reasons stated above, we supported an amendment offered by Mr. Shaw of Florida to strike this provision from the bill, which was unfortunately defeated by a vote of 19–15 in Committee. However, we believe that when the full House of Representatives studies this issue and realizes that it will have a negative impact **2221 on senior citizens nationwide, this provision will be removed from the bill.

> CLAY SHAW.
> F. JAMES SENSENBRENNER, Jr.
> GEORGE W. GEKAS.
> BILL DANNEMEYER.
> HOWARD COBLE.
> D. FRENCH SLAUGHTER, Jr.

**\*86** ADDITIONAL VIEWS OF MESSRS. MOORHEAD, SENSENBRENNER, SHAW, DeWINE, DANNEMEYER, AND COBLE

H.R. 1158 does not exclude alcoholics from coverage under its definition of "handicap". The bill should clarify that "handicap" does not mean any current impairment that consists of alcoholism. Amendments offered by Mr. Dannemeyer and Mr. Shaw would have provided exceptions to the definition of "handicap" in important but very limited circumstances. The "handicap" protections would not apply where a person is a current alcohol abuser, but this exclusion would not apply to reformed alcoholics.

In our judgment, landlords should be allowed the opportunity to reject housing applicants who are alcoholics as this condition could pose a threat to other tenants and visitors. Tenants, especially tenants with children, should not be required by law to be forced to be exposed to people with such a problem.

In addition, as a matter of policy we should make clear that the federal government has no intention of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

deeming alcoholics a protected class for purposes of employment, as is clear in the current provisions of Section 504 of the Rehabilitation Act, or for purposes of expanding the law's protections with regard to housing. On the one hand we are telling our children to say NO TO ALCOHOL and on the other enacting federal protections for these individuals.

While we endorse the concept of providing protections for persons with handicaps we believe that because housing is such an essential human need we should avoid language that may unnecessarily jeopardize the health or safety of society in general.

As a result of the logic of the Supreme Court ruling in the Arline case, it is possible under this bill as passed that landlords would have the burden to prove a direct threat from persons with infectious, contagious or communicable diseases. As a practical matter, this may be an impossible burden because of problems of discovery, such as medical records protected under the physician-patient privilege. This is an issue of public health and should not be treated lightly. The bill should clarify that "handicap" does not mean any impairment that consists of an infectious, contagious or communicable disease, whether or not such disease causes the individual to be physically or mentally impaired during the period of contagion.

This clarification is especially important in light of the AIDS epidemic this nation now faces. At present there are over 52,000 cases of AIDS of which 28,000 are already dead. In addition, it is estimated by the Centers for Disease Control that 1.5 million individuals are infected with this disease and capable of transferring it to another.**2222**   CDC estimates that 30–50% of these infections will result in cases of full-blown AIDS.

If this bill were to be enacted as presently written, landlords would be required to accommodate victims of this fatal disease despite**87** potential health threats to other tenants. The major threat posed by AIDS victims at this time is the threat of infecting others with the host of opportunistic diseases which plague them due to a severely compromised immune system. Many of these diseases are highly contagious and easily transferred to others. They include tuberculosis, mononucleosis, cytomegalovirus others. An example of this very real threat is the infection of 12 nurses in Urbana, Illinois who were infected with tuberculosis after caring for an AIDS patient who harbored this disease.

This additional, recent evidence indicates that the majority of asymptomatic carriers show signs of neurological impairment "Annuals of Internal Medicine," (1987—107:828–836). This impairment ranges anywhere from light memory loss to schizophrenia and poses serious safety questions about the ability of these persons to function in society. In recognition of this grave threat, the Department of Defense is removing HIV-positive individuals from certain employment situations, such as flying particular types of aircraft, which could pose a risk to the health and safety of others. In light of the uncertain status of medical knowledge on this and other aspects of the AIDS virus, it is unwise to enact sweeping provisions that would legislatively insulate these persons as a protected class and mandate housing despite inherent and apparent risks to the health and safety of others.

The bill further fails to exempt from protection persons with a record of violence or with a past record of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

child abuse or child molestation. In our estimation the record should reflect that these persons may pose a threat to the health, property or safety of others and therefore, should also be excluded from the definition of handicapped in this bill. This clarification is needed so that in a situation where a prospective tenant has a history of violence directed against other persons, these persons will not be deemed a protected class for purposes of obtaining housing. Few would disagree that child abusers should not be elevated to a protected status under federal law. Such heinous treatment of children is unacceptable, and we should not unduly expose families to persons with these propensities.

H.R. 1158, greatly expands the definition of "handicap" to include persons with mental handicaps and provides federal protection for these persons under our civil rights laws. Including the mentally handicapped as a protected class under the Civil Rights Act will enhance owners and landlords liability for acts committed by some of these individuals. For that reason an amendment should be adopted which provides that no greater liability can be imposed on owners/landlords for mentally handicapped tenants.

This expansion of the law will significantly increase the number of lawsuits brought against property owners by handicapped individuals whose rental applications are reasonably denied for legitimate health and safety concerns. The case of **2223 Samson v. Saginaw Professional Building, Inc. 393 Mich. 393, 224 N.W.2d 843 (1975) illustrates this point.

In Samson, the Supreme Court of Michigan imposed liability upon a landowner when the patient of a tenant attacked an employee of another tenant. Although the landlord had not experienced any problems with the clinic during its 11 year tenure and *88 did not have access to the clinic's medical files nor knowledge of any patient's violent tendencies, the court upheld the jury's determination that the threat of harm was foreseeable and that, therefore, the landowner's failure to take security measures or give warnings constituted negligence.

In Justice Williams' dissent in Samson he raised the issue of whether this decision meant that a landlord was required to check the background of a tenant for evidence of mental problems or criminal history and then, if he discovers such evidence, either exclude him or circulate a memo that a former or present mental patient works or lives in the building?

This Catch 22 is demonstrated by a 1985 Delaware case in which a landowner was sued under the state's Fair Housing Amendment for rejecting the application of a person suffering from manic depression who had demonstrated a propensity towards violence. Quaker Hill Place v. State Human Relations Commission, 498 A.2d 175 (Del.Sup., 1985). The applicant claimed that his behavior was a manifestation of his handicap and that, therefore, it could not be used as a criteria for rejection. The case was ultimately reviewed by the State Superior Court and remanded to the Commission for further inquiry.

Language must be included in the fair housing legislation which addresses these problems. If no language is included, landowners will be in an intolerable Catch 22 situation and subject to a massive increase in liability.

Another problem with H.R. 1158 is that it changes the requirement that handicapped tenants be assured

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

the "full enjoyment of" premises to "ready access to" the premises. Such an alteration is unwarranted and impossible to define. To address that problem, an amendment should be adopted which will sustain that standard. A standard of "ready access" assures persons with handicaps full and adequate protection without requiring landlords and owners to incur the unnecessary expense of ensuring that every aspect of all premises and facilities be modified to accommodate persons with handicaps to exactly the same extent as other persons. The use of this new language sets a standard which is not clear and is open to misinterpretation. There is no reason to digress from tried and proven language.

The purpose of this bill—to ensure fair housing—is a good one. However, the manner in which this legislation seeks to accomplish that goal is deeply flawed. The bill is undoubtedly a budget buster, although no costs are available to determine the magnitude of the final cost to taxpayers, it will undoubtedly be deemed unconstitutional by the courts, and lastly, it poses a grave health and safety threat to the citizens of this nation. In our judgment this bill does **2224 not ensure fair housing, but rather full employment for civil rights lawyers and their minions.

CARLOS J. MOORHEAD.

F. JAMES SENSENBRENNER, Jr.

CLAY SHAW.

MIKE DeWINE.

BILL DANNEMEYER.

HOWARD COBLE.

## *89 ADDITIONAL VIEWS OF MESSRS. SWINDALL, SENSENBRENNER, SHAW, DANNEMEYER, COBLE, AND SLAUGHTER

I vote against H.R. 1158 for a variety of reasons but one major basis for my position was that, in its present form, the bill may be used by advocacy groups, federal judges or bureaucrats to bust local zoning. I offered an amendment to the bill to prevent this, but the Committee chose to reject it. Nonetheless, it remains very important that Members be aware of the bill's far-reaching impact on state and local government zoning authority.

My amendment provided that if a locality or state decides to zone real property as available for certain uses, such as commercial development or single-family homes, or fails to zone real property with a particular classification, such a zoning decision is not a violation of the Fair Housing Act unless the decision was made with the intent to discriminate on the basis of race or other prohibited criteria under the Act. Similarly, the amendment mandated that if a local or state zoning grant or refusal to grant a variance is not a violation of the Act unless undertaken with discriminatory intent. This standard is the same as under the Constitution's equal protection guarantee of the 14th Amendment. Washington v. Davis 426 U.S. 229 (1976).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

My amendment would not remove zoning decisions from coverage under the Act to the extent such coverage already exists. It simply required a finding of intent before a zoning decision is struck down. Further, my amendment did not seek, implicitly or explicitly, to establish a standard of liability in any other context but zoning. My amendment left to caselaw and eventual Supreme Court resolution whether a discriminatory intent or discriminatory effects standard is appropriate for realtors, landlords, public housing authorities—all situations but zoning. Indeed, the amendment not only did not address these other situations, it stated that H.R. 1158 does not express approval or disapproval of current court decisions in these other contexts.

H.R. 1158, even as it adds an administrative law judge process, expressly exempts zoning matters under the act from the ALJ process. Instead, the bill forces zoning discrimination matters to go to the Attorney General.

This is particularly significant because zoning is quintessentially a local government decision. It is one of the most important, jealously guarded powers of the local government. It goes to the very heart of a community's character, growth, development, commercialization, mix of housing, and so forth. H.R. 1158's use of a discriminatory effects standard could devastate the ability of local **2225 communities to control their own destinies. Three very recent developments illustrate my concerns.

First, last month, the Committee rejected an amendment to strike familial status from the bill. No one can be sure of the effect *90 of this decision by the Committee. Suppose a small local community grants a variance to a developer to build a large apartment complex consisting entirely of efficiency and one-bedroom apartments and a handful of two bedroom apartments. Clearly, granting that variance will fall with a disproportionate impact on families with children—there will be only a few two-bedroom apartments out of several hundred. Would that variance become illegal under this bill? Suppose the local zoning board in this case had chosen to grant that variance, rather than a competing one which called for an apartment building with many two, three and four-bedroom apartment because the local community decided that the apartment complex with a smaller unit better met the needs of the population? These questions should not be left to HUD or the Department of Justice or to federal judges.

Second, the bill adds handicap to the protected categories. Suppose a local community refuses to grant a variance for a housing complex which will be built with accessibility features in a particular neighborhood because it is all single-family homes—no invidious purpose—and offers another location which is less accessible to the mass transit which the persons with handicaps need. That decision has more impact on persons with handicaps than on non-handicapped persons. The community thus will have violated the Fair Housing Act if this bill is enacted.

Third, on April 5, 1988, in the case of NAACP v. Huntington, N.Y., the Court of Appeals for the Second Circuit, the second most prestigious federal appellate court, rendered a major fair housing decision. It ruled that Huntington, Long Island, violated the Fair Housing Act by refusing to rezone a parcel for multi-family housing outside an urban renewal area in order to facilitate a housing project expected to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

contain a percentage of minorities greater than the percentage of minorities in the surrounding community. The Appellate Court had so ruled even though the District Court had fund no discriminatory intent. Indeed, the District Court had even applied a discriminatory effects standard, and still ruled for the community. Nevertheless, the Second Circuit applied it view of discriminatory effect and struck down the locality's decision.

Under the Second Circuit's decision, even if a community had legitimate reasons for not zoning or granting a variance in favor of a particular housing scheme (such as inadequate sewage, traffic congestion, inadequate parking, etc.), if that housing can be expected to attract a larger percentage of minorities than the surrounding community, that zoning decision will fall unless the community can meet a very high burden of justification. Here, Huntington, Long Island, could not satisfy these three federal judges after it had prevailed in the trial court. In effect, federal courts will routinely be making local zoning decisions whenever they wish to override a locality's judgment which conflicts with the judge's views under this intrusive standard.

**2226** The New York Times of April 6, 1988, quoted counsel for plaintiffs as saying, "The ruling imposes a heavy burden on town to justify blocking low-cost housing." The Times attributed to the attorney for defendants the view that the ruling "could wreak havoc with municipal planning departments and zoning boards nationwide."

*91* Clearly, no community should make any zoning decision or fail to make such a decision for the purpose of keeping out minorities or other protected classes. My amendment expressly forbade it. But nonetheless, almost every government action falls with disproportionate impact on some group. That should not be the linchpin of federal courts and bureaucrats seizing control over local land use decisions. The Supreme Court, in reaffirming the intent standard for the 14th Amendment, noted that many laws affect various groups unevenly, even though the law treats them the same as others. But the Constitution "guarantees equal laws, not equal results." Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 271–73 [13] (1979).

13 99 S.Ct. 2282, 60 L.Ed.2d 870.

Once disproportionate impact is shown, the burden on a community to justify its decision, even in the absence of intentional discrimination, is very, very heavy. Many courts have required a showing that the locality's purpose is not only legitimate but that there was no other way to meet that purpose that falls with less impact on the protected group, or that the government has a compelling purpose for the decision. That is a very tough burden and takes control effectively out of the locality's hands.

During debate on my amendment, some committee members raised the old canard that intent is too hard to prove. It isn't. Intent is the constitutional standard established in Washington v. Davis. Caselaw makes clear how intent can be discerned in zoning cases.

Discriminatory intent means more than merely being aware of a decision's adverse consequences on a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

group because almost all decisions have such an impact. Discriminatory intent means that a decisionmaker, such as a zoning board, "selected or reaffirmed a particular cause of action at least in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group." See Personnel Administrator of Massachusetts v. Feeney, 442 U.S. at 279.

In Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977), the Court discussed the intent standard in ruling that the locality did not violate the equal protection clause when it refused to rezone a 15–acre parcel from a single-family to a multiple-family classification. A developer sought the re-zoning in order to build 190 units in 20 two-story buildings—the units were expected to be racially integrated.

The locality refused to rezone because the area at issue had always been zoned single-family, and citizens living there had built or purchased in reliance on that zoning classification. Moreover, the locality's decade-old apartment policy called for multi-family zoning primarily to serve as a buffer between single-family residences and commercial or manufacturing uses. The proposed project in this case did not serve that purpose.

**2227** The Supreme Court said that determining whether discriminatory intent exists "demands a sensitive inquiry into such circumstantial and direct evidence of intent" as is available. Arlington Heights, 429 U.S. at 266. For example, the Court listed several types of evidence:

First. Disproportionate impact "may provide an important starting point"; 429 U.S. at 266, but more evidence is needed.

**\*92** Second. The historical background of the decision is important. 429 U.S. at 267. For example, if there had been a series of previous, similar refusals to rezone where race played a factor, then that is relevant.

Third. The particular sequence of events leading up to the zoning decision is relevant. For example, the Court noted that had the land in question already been zoned for multi-family use and then changed when the town learned of the plan to develop integrated housing, then that would be highly probative. 429 U.S. at 267.

The Court gave as an example a 1961 Seventh Circuit decision in which a park board purportedly condemned land for a park when it learned the homes to be built there would be sold under a marketing plan to assure integration. Progress Development Corp. v. Mitchell, 286 F.2d 222 (7th Cir.1961). Cited at 429 U.S. at 267, fn. 16.

Fourth. Departures from the normal procedural sequence are useful pieces of evidence. If, for example, the zoning process normally includes one public hearing and the zoning board holds no hearings before it undertakes an action, or allows more than one hearing to allow public, race-based opposition to grow, that is telling evidence.

Fifth. Substantive departures from normal decision-making are relevant, especially "if the factors usually considered important by the decision-maker strongly favor a decision contrary to the one reached."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

429 U.S. at 267. The Supreme Court gave as an example the case of Dailey v. City of Lawton, 425 F.2d 1037 (10th Cir.1970). There, plaintiffs intended to erect low-income housing on a former school site that they had bought. "The City refused to rezone the land from PF, its public facilities classification, to R–4, high-density residential. All the surrounding area was zoned R–4, and both the present and the former planning director for the City testified that there was no reason 'from a zoning standpoint' why the land should not be classified R–4. Based on this and other evidence," the appellate court found discriminatory intent. 429 U.S. 267, 2687, fn. 17.

Sixth. The legislative or administrative record, reports, and minutes are relevant. 429 U.S. at 268.

The Supreme Court said these factors are not intended to be exhaustive.

Three points must be stressed:

(1) You don't need the smoking gun of bigoted remarks to find intent;

(2) Discriminatory intent need not be the only factor behind a decision in order to strike it down, so long as discriminatory **2228 intent is found, legitimate reasons for a decision do not render the decision valid [Arlington Heights, 429 U.S. 265, 266], and

*93 (3) Agencies and courts do find—and have found—intentional discrimination in housing cases, including land use cases. In this case, the Court ruled that the locality had validly applied a neutral policy and refused to overturn the locality's decision under the Constitution.

> PAT SWINDALL.
> F. JAMES SENSENBRENNER, Jr.
> CLAY SHAW.
> BILL DANNEMEYER.
> HOWARD COBLE.
> D. FRENCH SLAUGHTER, Jr.

**94 DISSENTING VIEWS OF MESSRS. HYDE, SENSENBRENNER, GEKAS, DANNEMEYER, SWINDALL, AND SLAUGHTER

We oppose H.R. 1158 as reported by the Committee on the Judiciary.

We support amendments to the Fair Housing Act (Title VIII of the Civil Rights Act of 1968), including tougher enforcement provisions and protection against discrimination for persons with handicaps. We cannot, however, support the bill H.R. 1158 as reported.

Several reasonable amendments were offered during markup that would have allowed us to support the bill, had they been adopted. Unfortunately, most of them were not adopted in votes that split almost exclusively along partisan lines.

As a result, H.R. 1158 continues to contain a number of provisions that we believe are unnecessary, unreasonable, and unworkable. Moreover, the enforcement provisions of the bill that establish an ad-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:13-cv-08564 Document #: 19-8 Filed: 02/12/14 Page 102 of 151 PageID #:1088

ministrative law judge (ALJ) procedure for he adjudication of claims under the Fair Housing Act is most likely unconstitutional.

## NEW CONSTRUCTION REQUIREMENTS

Section 6 of the bill will require that all new multi-family construction of 4 or more units 30 months after the date of enactment of the Act must meet certain design characteristics. Even though amendments to the provisions were adopted at the Committee markup, the federal building requirements remaining in the bill are unnecessary and unreasonably expensive. Most States and a number of local jurisdiction have specifications for new construction that contain provisions to protect persons with handicaps. The provisions in H.R. 1158 are too sweeping and will cause rental costs to increase for all persons, including those with handicaps.

## EXCEPTIONS TO THE DEFINITION OF PERSONS WITH HANDICAPS

We applaud the adoption of one exception to the definition of persons with handicaps, which makes clear that such definition does not include a person involved in the current illegal use of or addiction to a controlled substance.

**2229** However, the Committee majority turned back several attempts to modify such definition in a similar manner to exclude persons with current alcohol abuse or persons with current contagious disease. A provision in the bill that provides that housing does not have to be provided to a person whose tenancy would constitute a direct threat to the health or safety of others is insufficient to provide adequate protection for others. The burden of proof will rest with the landlord to establish direct threat. Such a burden is unreasonable. A simple attempt to provide that landlords will not be **95** held to a higher standard of liability for mentally ill persons was rejected by the Committee.

The effect of the current provisions in the bill will be much higher insurance costs for landlords, and, therefore, higher rent for all tenants.

## RESTORATION COSTS

While acknowledging that their own bills in prior Congresses contained virtually identical language—and that the bill implicitly did not prohibit it—proponents in the Committee refused to support explicit language in the bill that would allow landlords to require renters to restore premises, which are modified to accommodate persons with handicaps, to original condition excepting reasonable wear and tear. Without such language, courts may disallow such requirements in rental agreements, once again causing higher rent for everyone.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

## FAMILIAL STATUS

On a very close vote, the Committee refused to delete a provision in the bill prohibiting discrimination on the basis of familial status. No other federal anti-discrimination statute prohibits discrimination on such basis. States are better able to address any problems with a shortage of family housing. Some States already have. Without further and in-depth consideration, the federal law should not be expanded in this manner. Exceptions to the provision dealing with housing for senior citizens are grossly insufficient to forestall a nationwide reduction in affordable housing for the elderly.

## CONSTITUTIONAL CONCERNS

Members on both sides of the aisle have expressed concern about the critical constitutional infirmity in the bill. The enforcement process in the bill will allow an ALJ to adjudicate the issue of liability for substantial damages and civil penalties without giving the respondent in such proceeding the right to a trial by jury. Such provision is, in our opinion and in the opinion of both a Republican and Democratic Administration, unconstitutional. We cannot support any measure which denies one civil right in the name of protecting another.

## **2230 CONCLUSION

For the foregoing reasons, we cannot support H.R. 1158 as reported. We hope that attempts to modify the bill on the floor of the House of Representatives to address these concerns will be successful, in order that we may be able to support passage of the measure.

> HENRY J. HYDE.
> F. JAMES SENSENBRENNER, Jr.
> GEORGE W. GEKAS.
> BILL DANNEMEYER.
> PAT SWINDALL.
> D. FRENCH SLAUGHTER, Jr.

(Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE    DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS:  *****.            2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH    USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

H.R. Rep. No. 711, 100TH Cong., 2ND Sess. 1988, 1988 U.S.C.C.A.N. 2173, 1988 WL 169871, H.R. REP. 100-711 (Leg.Hist.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

TOWN OF HUNTINGTON, NEW YORK, ET AL., APPELLANTS V. HUNTINGTON
BRANCH, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET
AL.

No. 87-1961

In the Supreme Court of the United States

October Term, 1987

On Appeal from the United States Court of Appeals for the Second
Circuit

Brief for the United States as Amicus Curiae

        TABLE OF CONTENTS
Question Presented
Interest of the United States
Statement
Discussion
Conclusion


                    QUESTION PRESENTED

    Whether the Town of Huntington's zoning ordinance, which on its
face prevented private construction of multi-family low-income housing
outside an urban renewal area, and the Town's refusal to rezone a
specific site to permit such construction violated Title VIII of the
Civil Rights Act of 1968 (Fair Housing Act), 42 U.S.C. 3601 et seq.,
on the basis of findings that the Town's actions had a discriminatory
effect on minority residents and lacked sufficiently legitimate
justifications.


                INTEREST OF THE UNITED STATES

    This case involves an application of Title VIII of the Civil Rights
Act of 1968 (Fair Housing Act), 42 U.S.C. 3601 et seq., as a
restriction on local governmental zoning practices.  The United States
Department of Housing and Urban Development (HUD) has responsibility
under the Fair Housing Act to receive, investigate, and attempt to
resolve complaints of discrimination through "conference,
conciliation, and persuasion" (42 U.S.C. 3610).  The United States
Department of Justice is further responsible under the statute for
redressing by judicial action patterns and practices of discriminatory
conduct.  See 42 U.S.C. 3613.


                        STATEMENT

    1. Appellant, the Town of Huntington, New York, according to 1980
census figures, had approximately 200,000 people, 95% of whom were
white and 3.35% of whom were black.  Roughly 70% of the Town's black
residents lived within six census tracts located in the Huntington
Station and South Greenlawn sections, which were also part of the
Town's urban renewal area.  J.A. App. 5a.  /1/ "Outside these two
neighborhoods, the Town's population was overwhelmingly white"

(ibid.).  The Town had a shortage of rental housing for low and
moderate-income households.  This shortage disproportionately affected
black residents:  7% of all of the Town's families needed subsidized
housing, but 24% of the Town's black families required such
assistance.  Ibid.

    As part of its efforts under the urban renewal program, the Town
created a zoning classification known as the "R-3M Garden Apartment
District" (J.S. App. 42a), and permitted multi-family housing to be
built in areas so designated.  The relevant zoning ordinance, Section
198-20 of the Code of the Town of Huntington, /2/ restricted private
construction of such multi-family housing to the urban renewal area;
the ordinance allowed the Huntington Housing Authority (HHA) to build
such housing "townwide" (J.S. App. 7a).  HHA's only multi-family
housing project was in the urban renewal area (ibid.).  Following
enactment of the Housing and Community Development Act of 1974, 42
U.S.C. (& Supp. III) 5301 et seq., the Town designated certain areas
as community development area (J.S. App. 40a), created the Huntington
Community Development Agency (CDA), and considered applications for
block grants for construction within the community development areas
(id. at 43a).  Evidence in the record suggests that, following these
developments, the Town neither read nor applied Section 198-20 as
prohibiting private construction of multi-family housing outside the
urban renewal area, but, instead, treated the ordinance as permitting
such development within the much larger "community development areas"
(J.S. App. 40a;  see id. at 7a n.4, 32a n.12, 57a;  R. E-14, E-175,
E-264 to E-265).  /3/

    Beginning in 1978, Housing Help, Inc. (HHI), a nonprofit housing
civil rights organization headquartered in Huntington, launched its
efforts to build a subsidized, low-income housing project for the
Town.  Although HHI found an available site within the urban renewal
area, HHI decided not to build on that site.  The organization wished
to sponsor an integrative housing project and the "(urban renewal)
area already had a substantial minority population" (J.S. App.
77a-78a;  see id. at 8a).  On January 23, 1980, HHI obtained an option
to purchase a vacant 14.8-acre site located in an area that was 98%
white.  The site was zoned "R-40" for single family homes on lots of
at least one acre.  Id. at 9a, 78a.  HHI intended to obtain a rezoning
from the Town for its planned 162-unit Matinecock Court project.  On
February 26, 1980, a director of HHI addressed the Town Board at a
public meeting and "filed a document * * * request(ing) 'a commitment
by the Town to amend the zoning ordinance * * to allow multi-family rental
construction by a private developer'" (id. at 78a;  see id. at 10a).

    On August 28, 1980, HHI filed with the United States Department of
Housing and Urban Development (HUD) its application for "Section 8"
funding for the Matinecock Court project.  /4/ On October 9, 1980, the
director of the CDA reviewed HHI's application for federal funding.
The CDA disapproved of the project on a number of grounds, including
the project's conflict with the Town's Housing Assistance Plan's goals
of no new construction, the site's existing R-40 zoning restriction,
the project's poor parking plans, the project's "inadequate"
recreation facilities and unit size, and the site's traffic
difficulties.  On October 14, 1980, a letter was sent expressing the
views of the "Town's professional staff in the Planning, Legal, and
Community Development Departments," recommending that HUD disapprove

000988

the proposal.  J.S. App. 10a-11a, 44a-45a & n.1.  /5/

    HHI's proposed project also met substantial opposition when it
became public.  Town residents formed the Concerned Citizens
Association and submitted to the Town Board a petition containing
4,100 signatures against the project.  Ultimately, on January 6, 1981,
the Town Board rejected HHI's

        propos(al) * * * that Huntington's zoning code be changed in
        order to build (the Matinecock Court project) * * * find(ing)
        that * * * the location of the project) is not an appropriate
        location due to lack of transportation, traffic hazard and
        disruption of the existing residential patterns in the * * *
        area.

    J.S. App. 12a-13a.

    2. On February 23, 1981, HHI, the Huntington Branch of the NAACP,
and several black, low-income residents of Huntington filed a
complaint against the Town and members of the Town Board in the United
States District Court for the Eastern District of New York.  The
complaint alleged, among other claims, /6/ that the Town had violated
Title VIII of the Civil Rights Act of 1968 (Fair Housing Act), 42
U.S.C. 3601 et seq., by restricting private construction of
multi-family housing to the urban renewal area and by refusing to
rezone the site of HHI's proposed project.  J.S. App. 38a-39a.  /7/
Following a bench trial, the district court, on three alternative
grounds, held that plaintiffs failed to prove that the Town had
violated the Fair Housing Act (id. at 78a-86a).  /8/

    First, the court reviewed plaintiffs' claims under the four-part
order of proof set forth in McDonnell Douglas Corp. v. Green, 411 U.S.
792, 802 (1973).  The court found that plaintiffs never formally
applied for rezoning of the site and thus concluded that their claim
failed for the reason alone because "the second McDonnell Douglas
element (was) missing" (J.S. App. 81a), namely, that plaintiffs applied
for and qualified to build the housing sought (id. at 79a-81a).

    Second, the court considered plaintiffs' claims under the four-part
test of Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights,
558 F.2d 1283 (7th Cir. 1977) (Arlington Heights II), cert. denied,
434 U.S. 1025 (1978).  The court found that the Town's actions had
only a slight "discriminatory effect" (J.S. App. 82a), the evidence
"did not give rise to an aura of discriminatory intent" (id. at 83a),
and the Town's actions "with respect to the zoning process and housing
in general were supported by (the) rational and legitimate concerns"
the Town had submitted to HUD in its October 14, 1980, letter (ibid.).
 The court thus concluded that, even assuming plaintiffs had applied
for rezoning, the evidence was insufficient to establish a prima facie
case of discrimination under the Fair Housing Act (id. at 83a-84a).

    Third, the court concluded that, assuming plaintiffs had
established a prima facie case under the balancing test of Arlington
Heights II, the Town adequately rebutted the allegations by
"legitimate, nondiscriminatory reasons for its conduct, and those
reasons (had) not been exposed as pretextual" (J.S. App. 84a).

000989

3. The court of appeals reversed (J.S. App. 1a-35a), holding that
the Town had violated the Fair Housing Act by refusing to permit
private construction of multi-family housing outside the urban renewal
area and by refusing to rezone plaintiffs' site (id. at 32a).  The
court ordered "site-specific" relief, directing the Town to rezone
plaintiffs' site, and also ordered the Town "to strike from (the)
zoning ordinance that portion which limits private multi-family
housing projects to the urban renewal area" (id. at 35a).

        After reviewing relevant case law, legislative history, and the
parallel to Title VII, the court concluded that the plaintiff need
only show "discriminatory impact" (J.S. App. 18a), and that "a Title
VIII violation can be established without proof of discriminatory
intent" (id. at 17a-20a).  Turning to the proper standard to evaluate
the defendant's conduct and justifications once the plaintiff
established a prima facie case, the court concluded that the
"defendant must present bona fide and legitimate justifications for
its actions with no less discriminatory alternatives available" (id.
at 27a).  /9/

        The court noted that the Town's zoning ordinance "impedes
integration by restricting low-income housing needed by minorities to
(the urban renewal) area already 52% minority" and found that the
Town's refusal to amend that "restrictive zoning ordinance to permit
privately-built multi-family housing outside the urban renewal area
significantly perpetuated segregation in the Town" (J.S. App. 25a
(footnote omitted)).  /10/ Similarly, given the greater percentage of
minority residents needing subsidized housing, the Town's refusal to
rezone plaintiffs' site "had a substantial adverse impact on
minorities" (id. at 27a (footnote omitted)).  The court thus concluded
(ibid.) that

        the disproportionate harm to blacks and the segregative
        impact on the entire community resulting from the refusal to
        rezone create a strong prima facie showing of discriminatory
        effect * * *.

        Reviewing the Town's asserted justifications for its actions, the
court concluded that the reasons outlined in the Town's October 14,
1980, letter to HUD were "entirely insubstantial," "weak and
inadequate," and not supported by the record (J.S. App. 31a).  In
holding that the Town's actions violated the Fair Housing Act, the
court stated that "the strong showing of discriminatory effect
resulting from the Town's adherence to its * * * zoning (ordinance)
and its refusal to rezone the Matinecock Court site far outweigh the
Town's weak justifications" (id. at 32a).

                                DISCUSSION

        1. This case comes before the Court as an appeal pursuant to 28
U.S.C. 1254(2).  Because the court of appeals struck down a portion of
the Town's ordinance, and because the Town's jurisdictional statement
is fairly understood to challenge that action, /11/ we believe that
this Court's appellate jurisdiction has been properly invoked.  The
case is appropriately treated as an appeal because the Town is
"relying on a State statute held by a court of appeals to be invalid
as repugnant to the * * * laws of the United States" (28 U.S.C.

                                000990

1254(2)).

    In contesting the court of appeals' invalidation of the ordinance
(as distinct from its order directing rezoning), however, the Town
raises no issue meriting this Court's plenary consideration.  The Town
conceded below that a discriminatory impact or effects test governs
the Title VIII challenge to the ordinance.  See Defendants' Trial Mem.
48;  Appellees' C.A. Br. 27-29, 37;  J.S. App. 16a-17a, 62a-63a.  And
we do not read the Town even now as arguing to the contrary.  It
rather appears to pursue the argument, initiated below, that the
properly applicable effects test has been misapplied.  See J.S. 21-28.

    We believe that there is a substantial question, meriting this
Court's attention, as to whether an intent test or an effects test
governs under Title VIII.  Indeed, we believe that the court below,
and the other courts of appeals which have addressed the issue, have
erred in holding that a showing of discriminatory effect will suffice.
Since the court below decided that discriminatory intent is not an
essential element of a Title VIII violation, that issue can be
reviewed by this Court.  At the same time, if the Court were disposed,
contrary to our recommendation, to exercise its discretion to decline
to hear the remainder of the case on the merits, /12/ see p. 11,
infra, it would be proper to affirm summarily the court of appeals'
partial invalidation of Section 198-20 of the Code of the Town of
Huntington.  We believe that such an action would be appropriate,
however, only to the extent that it made clear that no determination
of the proper burden of proof under Title VIII was thereby implied.

    2. Such a disposition of the issue on which appellate jurisdiction
is predicated would not dispose of the Town's challenge to the court
of appeals' order that it rezone the land in issue for multi-family
housing.  Indeed, the Town primarily emphasizes the rezoning issue in
its jurisdictional statement.  See J.S. 1-5, 28-30.  While this Court
need not review the rezoning issue simply because the Court's
appellate jurisdiction has been invoked with regard to the
accompanying issue of the invalidation of the ordinance, the Court may
appropriately exercise its discretion to reach and decide the
remaining issue in the case.  See Davis v. Scherer, 468 U.S. 183,
189-190 & n.7 (1984);  C. Wright, A. Miller & E. Cooper, Federal
Practice and Procedure:  Jurisdiction 2d Section 4037, at 62-64
(1988).  /13/ We believe that the Court should do so here.

    The exercise of discretion in the immediate context operates in the
same manner that is appropriate for determining whether to grant
certiorari.  Factors weighing against such an exercise of this Court's
discretion are readily identifiable.

    First, while the Town has technically preserved the position that
an intent test should be applied with regard to the rezoning decision,
it appears that the argument for that position has been pressed in an
ambiguous and internally inconsistent manner.  The Town defended its
refusal to rezone principally on the ground that plaintiffs had not
properly applied for rezoning.  See J.S. 4, 12-13, 15, 28;  J.S. App.
79a-80a;  Mar. 3, 1988 Tr. of Oral Arg. 30-31, 36-37;  R. A-39.  Its
repeated reference to the McDonnell Douglas test was directed
primarily to the point that plaintiffs had failed to satisfy a
critical element of the prima facie case -- the requirement of

application.  Further, the Town conceded below that a discriminatory
effect standard applied to plaintiffs' challenge to the zoning
ordinance and argued only that the McDonnell Douglas test governed
plaintiffs' rezoning claim.  See Appellees' C.A. Br. 26-47;  J.S. App.
16a-17a, 62a-63a.  More to the point, the Town's apparent assertion of
two distinct standards under the Fair Housing Act leaves substantial
uncertainty about whether and on what basis it is claiming that one
must ever prove intentional discrimination.  The Town's jurisdictional
statement itself contains little reference to that point.  Compare
J.S. at i with J.S. 20-28.  /14/

    Further, this is not a case presenting a sharp conflict in the
circuits.  The courts of appeals have consistently held that the Fair
Housing Act does not require proof of intentional discrimination.
/15/ And, while there are some troublesome discrepancies among the
courts regarding the appropriate standard for evaluating the
defendant's justifications, these differences do not constitute a
clear conflict.  /16/

    Notwithstanding these considerations, we urge the Court to exercise
it discretion to review the court of appeals' rezoning decision
holding that an effects rather than an intent test is applicable under
Title VIII.  We reach that conclusion based on the importance of the
issue and the incorrectness of the decision below.

    The principal operative provision of Title VIII (Section 804(a), 42
U.S.C. 3604(a)), makes it unlawful

        (t)o refuse to sell or rent after the making of a bona fide
    offer, or to refuse to negotiate for the sale or rental of, or
    otherwise make unavailable or deny, a dwelling to any person
    because of race, color, religion, sex, or national origin.

    Although proscribing a broad range of conduct, Congress limited
that proscription to action taken "because of race." /17/ The words
"because of" plainly connote a causal connection between the
housing-related action and the person's race or color.  The proscribed
action must have been caused, at least in part, by the individual's
race, which strongly suggests a requirement of discriminatory
motivation.  /18/ See Personnel Administrator v. Feeney, 442 U.S. 256,
279 (1979).  An action taken because of some factor other than race,
i.e., financial means, even if it causes a discriminatory effect, is
not an example of the intentional discrimination outlawed by the
statute.  /19/

    The legislative history reinforces the understanding that Congress
intended to require a showing of intentional discrimination.  /20/
Neither supporters nor opponents suggested that the legislation would
ban local zoning regulations merely because they had a racial effect,
without any showing that the local government intended to
discriminate.  Rather, the legislative history shows that Congress
sought to eliminate intentional refusals to sell or rent housing
because of the race of the renter or buyer and believed that financial
ability should remain the most important factor in property
transactions.  Members of Congress emphasized that the bill was
designed to make financial ability, rather than race, the principal
qualification for purchasing or renting housing.  See, e.g., 114 Cong.

000992

Rec. 2277 (1968) (Sen. Mondale).

   Senator Mondale, a leading sponsor of the legislation, stated:
"The bill simply reaches the point where there is an offering to the
public and the prospective seller refuses to sell to someone solely on
the basis of race." (114 Cong. Rec. 4974 (1968)).  Senator Hart echoed
these sentiments (see id. at 4976).  Senator Mondale also emphasized
the limits of the bill's prohibitions (id. at 5643):

          The bill permits an owner to do everything that he could do
     anyhow with his property * * *, except refuse to sell it to a
     person solely on the basis of his color or his religion.  That
     is all it does.  It does not confer any right.  It simply
     removes the opportunity to insult and discriminate against a
     fellow American because of his color and that is all * * *.

   Not only do the statute's language and legislative history show
that a violation of Title VIII requires intentional discrimination,
substantial practical problems result if this requirement is
discarded.  In particular, the courts have acknowledged the
difficulties in placing meaningful limits on the discriminatory effect
standard of liability.  See, e.g., Resident Advisory Bd. v. Rizzo, 564
F.2d at 148-149;  J.S. App. 23a.  While proponents of such a standard
have turned to Title VIII as a model, "in Title VIII cases there is no
single objective like job performance to which the legitimacy of the
facially neutral rule may be related" (J.S. App. 23a).  /21/ The
hundreds of zoning decisions made by localities every year inevitably
involve a mix of factors, some objective, such as traffic or sewage
concerns, and some aesthetic, such as density and recreation concerns.
 Indeed, intangible factors that contribute to the quality of life in
a community are legitimate subjects of zoning regulations entitled to
judicial deference.  See Village of Belle Terr v. Boraas, 416 U.S. 1
(1974).  The importance of permitting individuals to shape the
communities in which they live advises against invalidating zoning
decisions enacted without discriminatory intent.  And the subjective
nature of many of the goals served by zoning renders judicial review
of such zoning decisions particularly difficult.  The drifting away
from the statute's language requiring intentional discrimination has
only exacerbated the inherent difficulties of this judicial function.


                           CONCLUSION

   We urge the Court to note probable jurisdiction.  However, should
the court be disinclined as a matter of its discretionary jurisdiction
to reach the rezoning issue, it should summarily affirm the
invalidation of Section 198-20 of the Code of the Town of Huntington
on which the effects versus intent test issue has not been preserved),
making clear at that time that it is declining to reach the other
issues presented in the case.  See Davis v. Scherer, 468 U.S. at 190
n.7.


   Respectfully submitted

   CHARLES FRIED

     Solicitor General

WM. BRADFORD REYNOLDS

    Assistant Attorney General

MARK R. DISLER

ROGER CLEGG

    Deputy Assistant Attorneys General

MICHAEL R. LAZERWITZ

    Assistant to the Solicitor General

DAVID K. FLYNN

WILLIAM R. YEOMANS

    Attorneys

JUNE 1988

/1/ During the 1960a, the Town participated in the federal urban renewal program.  See Housing Act of 1949.  Tit. I, 42 U.S.C. (& Supp. III) 1450 et seq.  The state legislature created the Huntington Urban Renewal Agency, which in turn supervised the Town's urban renewal plan.  One aspect of the plan was the designation of that area of the Town which needed housing development.  J.S. App. 40a-41a.  The "urban renewal area" became the sections of the Town in and surrounding Huntington Station, which contained "(t)he greatest concentration of (the Town's) substandard dwelling units" (id. at 40a).  Congress terminated urban renewal programs in 1974 and enacted the Community Development Block Grant Program as part of the Housing and Community Development Act of 1974, 42 U.S.C. (& Supp. III) 5301 et seq.

/2/ Section 198-20, by reference to other zoning regulations, included restrictions related to such things as off-street parking and loading, height, area, and bulk, and site plan development.

/3/ The Town continues to maintain, as it has throughout this litigation, that Housing Help, Inc. (HHI), never properly applied for rezoning of its Matinecock Court project, and simply bypassed the Town's zoning procedures.  See J.S. 4, 12-13, 15, 28;  J.S. App. 79a-80a;  Mar. 3, 1988 Tr. of Oral Arg. 30-31, 36-37;  R. A-39.  The court of appeals, however, overturned the district court's finding that HHI had not effectively applied for rezoning (J.S. App. 13a-14a).

/4/ "Section 8" refers to a federal program that provided subsidies for newly built and substantially rehabilitated housing.  See 42 U.S.C. (& Supp. III) 1437f.

/5/ Under 42 U.S.C. (& Supp. III) 1439(a)(1), HUD must refer a Section 8 application for funding to the town having a Housing Assistance Plan previously approved by HUD;  the statute gives the town an opportunity to comment on the application's compatibility with the existing Plan.  See J.S. App. 10a, 46a.

/6/ Plaintiffs also alleged claims under the Equal Protection
Clause, 42 U.S.C. 1982 and 1983, and New York state law (J.S. App.
38a-39a).  These claims are no longer at issue.  See id. at 3a n.1.

/7/ The complaint also named as defendants HUD and its Secretary.
The district court initially dismissed the complaint, holding that
plaintiffs lacked standing (530 F. Supp. 838 (1981)).  The court of
appeals reversed and remanded (689 F.2d 391 (1982), cert. denied 460
U.S. 1069 (1983)).  Plaintiffs did not appeal the dismissal with
respect to the federal defendants, and thus the case proceeded against
only the Town.

On November 7, 1983, the district court certified the case as a
class action and defined the class as roughly "(a)ll black, Hispanic
and lower income persons in need of lower cost housing opportunities
in Huntington and surrounding areas" (J.S. App. 39a).

/8/ As a threshold matter, the court concluded that "(i)t (was) not
necessary for plaintiffs to prove discriminatory intent before they
may succeed on a claim under section 3604(a) (pertaining to
discriminatory sale or rental decisions)" (J.S. App. 75a).

/9/ The court rejected the district court's apparent requirement
that the plaintiff prove that the defendant's justifications were
pretextual because "an intent-based standard for disparate treatment
cases (was) inapposite to the disparate impact claim asserted" (J.S.
App. 28a).  The court similarly criticized the district court's
application of the McDonnell Douglas test and overturned the finding
that plaintiffs had not applied for rezoning.  According to the court
of appeals (id. at 14a), the record showed that the

        parties thus clearly understood that an application for a
        zoning change had been made * * * (and) the Town's refusal to
        amend the zoning code rendered meaningless a request to change
        the zoning on the (proposed project site), as R-3M
        classifications were reserved for property within the urban
        renewal area, and there were no other multi-family housing
        designations.

In light of the court of appeals' conclusion that plaintiffs need
not present proof of discriminatory intent, the court did not review
the district court's findings regarding the Town's intent to
discriminate (J.S. App. 24a n.7).

/10/ The court of appeals was unmoved by the argument of the Town
that

        R-3M zoning is available to any private developer * * * in
        any of the areas designated as community development area * * *
        (and) that there would be absolutely no objection on the Town's
        part * * * to amend the ordinance so as to be consistent with
        (the Town's asserted policy of) allowing private developers,
        wherever they are, in these community development areas.

Mar. 3, 1988 Tr. of Oral Arg. 27, 30.  See p. 3, supra.

The court concluded that "(a)ppellees cannot argue, as they do now,

that the zoning ordinance does not now limit private builders to the
urban renewal area when the Town Board in its January 6, 1981,
resolution refused to amend the ordinance to delete the restriction of
such housing to the urban renewal area, and appellees throughout this
litigation have defended that decision" (J.S. App 35a).

/11/ J.S. 29.  The Town appears to be concerned primarily with the
court of appeals' order of site-specific relief, rather than with the
court's striking down of the ordinance.  Each of the five questions
presented in the jurisdictional statement appears to have as its
central focus the court of appeals' action in overriding the Town's
refusal to rezone appellees' site for multi-family housing.

/12/ If the Court determines, as we recommend, to consider the
rezoning issue on the merits, and thus to review in that context the
issue of an intent versus an effects test under Title VIII, we urge
the Court simply to note probable jurisdiction, and defer judgment on
any aspect of the merits until after briefing and argument.

/13/ There is an "overriding policy, historically encouraged by
Congress, of minimizing the mandatory docket of this Court in the
interests of sound judicial administration." Gonzales v. Automatic
Employees Credit Union, 419 U.S. 90, 98 (1974) (footnote omitted).
See Fornaris v. Ridge Tool Co., 400 U.S. 41, 42 n.1 (1970) (referring
to Court's practice of strictly construing statutes authorizing
appeals).

/14/ In analogous circumstances, this Court has declined to review
cases where the

        issues * * * remain unfocused because they (were) not pressed
        * * * with that clear concreteness provided when a question
        emerges precisely framed and necessary for decision from a clash
        of adversary argument exploring every aspect of a multifaced
        situation * * *.

United States v. Fruehauf, 365 U.S. 146, 157 (1961).

/15/ E.g., Hanson v. Veterans Admin., 800 F.2d 1381, 1386 (5th Cir.
1986);  Arthur v. City of Toledo, 782 F.2d 565, 575 (6th Cir. 1986);
Smith v. Town of Clarkton, 682 F.2d 1055, 1065 (4th Cir. 1982);
Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 146-149 (3d Cir. 1977),
cert. denied, 435 U.S. 908 (1978);  Metropolitan Hous. Dev. Corp. v.
Village of Arlington Heights, 558 F.2d 1283, 1289-1290 (7th Cir. 1977)
(Arlington Heights II), cert. denied, 434 U.S. 1025 (1978);  United
States v. City of Black Jack, 508 F.2d 1179, 1184-1187 (8th Cir.
1974), cert. denied, 422 U.S. 1042 (1975).

This Court has not decided what proof the plaintiff must present to
establish unlawful discrimination under Title VIII.  Cf. Village of
Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252
(1977) (holding that a municipality's refusal to rezone a parcel of
land violated the Equal Protection Clause only upon a showing of
purposeful discrimination;  remanding the case for consideration of
whether the village had violated Title VIII).

/16/ In Arlington Heights II, 558 F.2d at 1290, the Seventh Circuit

8/23/13
Case: 1:13-cv-08564 Document #: 18-8 Filed: 02/12/14 Page 116 of 151 PageID #:1102
www.justice.gov/osg/briefs/1987/sg870004.txt

cautioned courts to exercise discretion when considering Title VIII
actions premised only on discriminatory effect and instructed courts
to evaluate the strength of the defendant's "interest" in taking the
challenged action.  The Third Circuit, in Resident Advisory Bd. v.
Rizzo, 564 F.2d at 149, agreed that courts must use their discretion
when deciding such lawsuits.  Moreover, the Rizzo court fleshed out
the standard for evaluating the defendant's proffered justification
for the challenged action (ibid. (footnote omitted)):

>     a justification must serve * * * a legitimate, bona fide
>     interest of the * * * defendant, and the defendant must show
>     that no alternative course of action could be adopted that would
>     enable that interest to be served with less discriminatory
>     impact.

    The Eighth Circuit, although using the phrase "compelling
governmental interest" in United States v. City of Black Jack, 508
F.2d at 1185, to describe the defendant's burden, actually adopted a
standard substantially similar to that later adopted by the Third
Circuit in Rizzo.  See id. at 1186-1187;  see also Hanson v. Veterans
Admin., 800 F.2d at 1386 ("showing of a significant discriminatory
effect" establishes violation of Title VIII).

    /17/ Three of the other prohibitions set forth in the Fair Housing
Act also pertain to actions taken "because of" race or color.  See 42
U.S.C. 3604(b) (terms or conditions of sale or rental), 42 U.S.C.
3604(d) (representation of unavailability of property for sale or
rental), and 42 U.S.C. 3605 (denial of financial assistance).  One
section, pertaining to real estate advertising, bars any indication of
"preference, limitation, or discrimination based on race, color * * *"
(42 U.S.C. 3604(c)), and another, relating to participation in
multiple listing services, prohibits discrimination "on account of"
race or color (42 U.S.C. 3606).  A final section makes it illegal to
attempt to induce any person to sell or rent "by representations
regarding the entry or prospective entry into the neighborhood of a
person or persons of a particular race (or) color" (42 U.S.C.
3604(e)).

    /18/ Interpretation of similar or related language in various civil
rights statutes does not resolve the meaning of Title VIII's "because
of" phrasing.  On the one hand, Congress has demonstrated its ability
unambiguously to adopt an effects test when it wishes to do so.  In
Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c, for
example, Congress required covered jurisdictions to seek preclearance
of any voting change and to show that such a change "does not have the
purpose and will not have the effect of denying or abridging the right
to vote on account of race or color * * *."

    In holding that Section 2 of the Voting Rights Act of 1965, 42
U.S.C. 1973, before its amendment in 1982, required a showing of
purposeful discrimination, the Court did not discuss that provision's
requirement that discriminatory action be taken "on account of race."
See City of Mobile v. Bolden, 446 U.S. 55, 60-65 (1980);  see also
Guardians Ass'n v. Civil Service Comm'n, 463 U.S. 582 (1983) (Title VI
of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq., which
prohibits exclusion from participation in federal programs "on the
ground of race," requires proof of discriminatory intent).

000997

    At the same time, in Griggs v. Duke Power Co., 401 U.S. 424 (1971),
the Court construed the "because of" language in 42 U.S.C.
2000e-2(a)(2) as prohibiting employment practices and that had
discriminatory effects and rejected the contention that the language
barred only intentional discriminatory practices.  See 401 U.S. at
432.  The Court has twice reserved the question whether 42 U.S.C.
2000e-2(a)(1), which contains "because of" phrasing, requires a
showing of discriminatory intent.  See General Electic Co. v. Gilbert,
429 U.S. 125, 137 (1976);  Nashville Gas Co. v. Satty, 434 U.S. 136,
144 (1977).

    /19/ The courts of appeals have not presented a plausible
alternative reading of the statutory language.  In Resident Advisory
Bd. v. Rizzo, 564 F.2d at 146, for example, the court acknowledged
that the "'because of race' language might seem to suggest that a
plaintiff must show some measure of discriminatory intent," but
rejected this logical consequence in part because such a requirement
would unduly burden Title VIII plaintiffs.  See id. at 146-147.
Similarly, in Arlington Heights II, 558 F.2d at 1288, the court noted
that "(t)he major obstacle to concluding that action taken without
discriminatory intent can violate (Title VIII) is the phrase 'because
of race' * * *." The court, however, proceeded to embrace "(t)he broad
view * * * that a party commits an act 'because of race' whenever the
natural and foreseeable consequence of that act is to discriminate
between races, regardless of his intent" (ibid.).  This reasoning is
directly at odds with Personnel Administrator v. Feeney, 442 U.S. 256
(1979), where this Court, in defining "discriminatory purpose," stated
(id. at 279 (citation and footnotes omitted)) that the phrase

        implies more than intent as volition or intent as awareness
        of consequences * * *.  It implies that the decisionmaker * * *
        selected or reaffirmed a particular course of action at least in
        part "because of," not merely "in spite of," its adverse effects
        upon an identifiable group.

    /20/ Because Title VIII, as enacted, was offered as a floor
amendment, there are no committee reports.  The legislative history
consists primarily of statements by representatives and senators on
their respective floors.  Congress also held hearings, the record of
which further supports reading Title VIII as requiring intentional
discrimination.  See Fair Housing Act of 1967:  Hearings Before the
Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking
and Currency, 90th Cong., 1st Sess.  22-23 (1967) (remarks of Sen.
Mondale) (bill is "designed to deal exclusively with the refusal to
sell or rent for racial reasons, and it does not apply to the
existence of other reasons or (sic) does not apply to zoning
requirements, ordinances, and the rest").

    /21/ Courts which adopt the discriminatory effect standard have
relied on two aspects of the legislative record.  See, e.g., Arlington
Heights II, 558 F.2d at 1289-1290.  The first is the language of 42
U.S.C. 3601, stating that the purpose of Title VIII is "to provide,
within constitutional limitations, for fair housing throughout the
United States." The second is Senator Mondale's statement that
Congress designed the Act to create "truly integrated and balanced
living patterns." 114 Cong. Rec. 3422 (1968);  see Trafficante v.

Metropolitan Life Ins. Co., 409 U.S. 205, 211 (1972).  The first
statement appears to offer little but a truism and the second,
although stating an admirable goal, does not address the means of
achieving it.  The argument that the ambitious goals of Title VIII
require an expansive reading of the statute to include a
discriminatory effect standard hardly surmounts the obstacles posed by
the statute's plain language and legislative history.

   Congress is currently considering legislation designed to
strengthen enforcement of the Fair Housing Act by permitting persons
aggrieved by housing discrimination to file administrative claims
subject to judicial review.  The proposed legislation would also
broaden the enforcement authority of the Attorney General and HUD.
See H.R. Rep. 100-711, 100th Cong., 2d Sess. (1988).

Mr. Thomas is married, has three children, and resides in Panama City Beach, FL.

## Nomination of Larry K. Mellinger To Be United States Executive Director of the Inter-American Development Bank
*September 12, 1988*

The President today announced his intention to nominate Larry K. Mellinger to be the United States Executive Director of the Inter-American Development Bank for a term of 3 years. He would succeed Jose Manuel Casanova.

Since 1986 Mr. Mellinger has been Alternate Executive Director of the Inter-American Development Bank in Washington, DC. Prior to this he was senior vice president and chief financial officer for Gruma Corp., 1985–1986. From 1968 to 1984, he was with Union Bank in Los Angeles, CA, serving as senior vice president for planning and development, senior vice president for the international banking department, senior vice president for Asia and the Pacific, and vice president for Latin America.

Mr. Mellinger graduated from the University of Kansas (B.A., 1967; B.S., 1968). He was born April 28, 1944, in Bakersfield, CA. He is married, has two children, and currently resides in Bethesda, MD.

## Remarks on Signing the Fair Housing Amendments Act of 1988
*September 13, 1988*

Well, please be seated, and welcome to the White House. You know, today is a day I've been waiting for, for 8 years. About this time 8 years ago, I noted that homeownership is "among the foremost values of the American people" and that this value was seriously in danger. The danger I was addressing then was economic. According to real estate industry economists, the average family at that time was making only 75 percent of what it needed to buy a home. And as Secretary [of Housing and Urban Development] Pierce's predecessor said, "For many hard-working families, housing is

growing beyond their reach." Well, today interest rates are down. Real incomes are up. And the average family is making approximately 110 percent of what it needs to buy a home. And once again, the American family can afford the American home.

When it comes to housing for low- and medium-income families who rent, national vacancy rates today average just under 8 percent, up from 5 percent when we took office, with even more progress for low-income units. This reflects that today we have an abundant supply of affordable rental housing for all Americans.

Today we address, at last, the other important obstacle to homeownership and rental: discrimination. Discrimination is particularly tragic when it means a family is refused housing near good schools, a good job, or simply in a better neighborhood to raise children. This bill is the product of years of bipartisan work and repairs a significant deficit—or defect, I should say—deficit is on my mind too—in civil rights law.

The Civil Rights Act of 1968 included, for the first time in our history, a fair housing provision. That was a major achievement, one that many Members of Congress, including a young Congressman named George Bush, had to show enormous courage to vote for. Unfortunately the fair housing title didn't work as well as had been hoped. It lacked teeth. Its conciliation provisions were ineffective, when used. And that's why our administration, and Secretary Sam Pierce, in particular, has devoted 8 years to redress the absence of penalties and the inability of the Government to initiate actions, except when a pattern of discrimination could be proven. These were shortcomings that made the statute difficult to enforce. In my State of the Union Address 5 years ago, I joined with Members of Congress on both sides of the aisle in vowing that "We will work to strengthen enforcement of fair housing laws for all Americans," and now we've achieved that goal.

The bill I sign today has a number of significant features. First, the law extends protection to families with children and persons with handicaps and continues to recognize and protect the special needs of the elderly. Second, for the first time, ag-

1140

grieved parties may avail themselves of an administrative enforcement procedure. Moreover, the administrative law judge may assess penalties against those who discriminate. The penalties are a $10,000 fine for the first violation, $25,000 for the second, and $50,000 for the third. Third, for the first time, in cases initiated by the Department of Justice, the Department may obtain monetary relief for victims and civil penalties of $50,000 for a first violation and $100,000 for subsequent violations. Fourth, the constitutional rights of all parties are protected. Both defendant and plaintiff have the option of a jury trial, or they can agree to the faster, simpler administrative procedure.

At the same time, I want to emphasize that this bill does not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that title 8 violations may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent. Title 8 speaks only to intentional discrimination.

There are so many people who deserve credit today. Secretary Pierce, of course, as well as the leadership of the Justice Department. When I signed the 1987 Housing Act, I called Sam [Pierce] the unsung hero of the administration. Well, it's time we all recognize Sam as the unsung hero of this, the most important civil rights legislation in 20 years.

And then there's Representative Hamilton Fish, who has worked for decades to strengthen our fair housing laws. Ham Fish was the architect of the key provisions in the bill that protect the constitutional right of Americans to civil jury trials.

Every Senator and Representative standing up here with me today played an important role in the passage of this landmark civil rights bill, and I want to mention especially Representative John Lewis. Twenty-five years ago, as a young leader of the civil rights movement, Congressman Lewis was standing in this very Rose Garden pressing for Federal action to eliminate housing discrimination. John's hard work to achieve that has brought us one step closer to realizing Martin Luther King's dream. To all of you and to everyone involved in the passage of this legislation, the Nation says thank you.

And now I have a little signing to do.

*Note: The President spoke at 11:04 a.m. in the Rose Garden at the White House. H.R. 1158, approved September 13, was assigned Public Law No. 100–430.*

## Accordance of the Personal Rank of Ambassador to William T. Pryce While Serving as Chief of the United States Delegation to the 1988 Meeting of the Inter-American Council for Education, Science, and Culture
*September 13, 1988*

The President today announced his intention to accord William T. Pryce, of California, a career member of the Senior Foreign Service, Class of Minister-Counselor, the personal rank of Ambassador while serving as chief of the United States delegation to the September 1988 meeting of the Inter-American Council for Education, Science, and Culture, scheduled to be held in Washington, DC.

Mr. Pryce joined the Foreign Service in 1958 after serving in the U.S. Navy from 1954 to 1958. From 1958 to 1961, he was staff assistant to the Assistant Secretary for Economic Affairs. From 1961 to 1963, he was vice consul and secretary at the U.S. Embassy in Mexico City. In 1964 he served as international relations officer at the Department of State and in 1965 attended the Foreign Service Institute for Russian Language Training. He was a political officer at the U.S. Embassy in Moscow, 1965–1968, and at the U.S. Embassy in Panama, 1969–1971. From 1971 to 1974, he served as chief of the political section at the U.S. Embassy in Guatemala. Mr. Pryce then returned to the Department of State, where he was chief of the Soviet Educational and Cultural Exchange Program, 1974–1976. From 1976 to 1977, he attended the National War College and from 1977 to 1978 was executive assistant to Ambassador at Large Ellsworth Bunker. From 1978 to 1981, he was Counselor for Political Affairs in Mexico City. In 1981 he was Deputy

1141

demand that effective measures be taken against Iraq. An issue of grave international concern like this one should be boldly addressed in this forum of nations.

At the very least, the crime must be named and Iraq held responsible.

The ominous silence cannot continue.

We must not turn our heads as a government attempts to eliminate an entire segment of its own citizenry.

We must not passively allow the Geneva protocol to also all force and meaning.

We must not squander this opportunity to push for stronger international prohibitions against chemical weapons.

Clearly, the Geneva protocol is flawed. It lacks enforcement mechanisms. It bans only the use of chemical weapons. There is an urgent need to go further—to ban the production, transfer, and stockpiling of these weapons—if we are to effectively prevent their use.

Cheap and easy to manufacture while posing a horrific military threat, chemical arms are the poor man's nuclear bomb. Chemical production technology continues to proliferate, eased across borders by Western commercial chemical exports. As nations rapidly acquire chemical weapons, the risk of their use in the next conflict increases.

The Senate has already expressed its unanimous support for American efforts to achieve an agreement banning the use, production, development, stockpiling, transfer, and acquisition of chemical weapons.

The time to push forward in chemical negotiations is now.

Sadly, the Reagan administration has not demonstrated a seriousness about pursuing a chemical weapons ban, even though chemical weapons pose an increasing threat to the people and environment of this planet. The need for leadership on this issue is clear.

The next administration must make a strong commitment to pursuing a comprehensive chemical weapons ban. No one pretends that it will be easy. But given political will and good faith negotiating, a chemical weapons treaty is well within reach.

The next administration should set itself a clear goal: attain a chemical weapons agreement within the next few years.

The next administration should make American policy consistent with that goal and discontinue the production of binary chemical weapons on our own soil.

If nothing else, Iraq's egregious use of chemical weapons, including its use against its own citizens, should convince the world of the need to successfully conclude the Geneva negotiations to prohibit the production and stockpiling of chemical weapons.

We must learn from our own human failures. We can act to prevent future deaths by poison gas.

I urge the nations of the world to join together to condemn and punish any country that violates the Geneva protocol banning the use of chemical weapons.

I sincerely hope that this President, the next President, and all national leaders will bring urgency and purpose to the ongoing chemical weapons negotiations. The need for immediate action has never been so clearly and tragically demonstrated as in the graphic deaths of innocent civilians poisoned by their own government.

---

## IN HONOR OF A SENATE LEADER

Mr. COHEN. Mr. President, when our distinguished colleague, the senior Senator from West Virginia, steps down as Democratic leader at the end of this Congress, we will be losing a man who has served in Congress for 36 years and who for 12 years has helped steer the Senate through often turbulent waters. ROBERT BYRD has won the admiration and respect of his colleagues on both sides of the aisle for his abilities as a leader, talent as a parliamentarian and skills as a representative of the people of his home State.

The Senator from West Virginia has risen from a humble background as a coal miner's son to national prominence as a legislator and statesman. Through determination, hard work and perseverance—epitomized in his successful nighttime pursuit of a law degree during his first Senate term—ROBERT BYRD has built one of the most successful careers in West Virginia and American politics. The high regard his constituents hold for him is indicated by the fact that he has served longer in his body than has anyone in the history of his State.

Senator BYRD's reverence for the institution of the Senate is well known. His passion for exploring the history of this body and his commitment to preserving its most important traditions reflect a respect for the Senate that has been an inspiration to all of us. I applaud the tireless dedication to guarding the Senate's vital role in American Government that has marked our colleague's stewardship as Democratic leader.

An undisputed master of Senate rules, ROBERT BYRD has skillfully shepherded a long and impressive list of key legislation through this body. He has served faithfully on the Appropriations, Judiciary and Rules Committees. His career in Congress has been marked by successes in almost every area of policy.

Guiding an assembly of 100 individuals who represent diverse interests and concerns is not an easy task. It demands a unique capacity for concilia-

tion, compromise and coalition-building. The retiring Democratic leader has managed to meet these demands while doing his best to keep the Senate above the political fray.

I have enjoyed working with ROBERT BYRD since coming to the Senate in 1979. The dedication and diligence that he has displayed during that period have been clear and consistent. I would like to take this opportunity to congratulate the Democratic leader on his many accomplishments and to wish him the best of luck in the future.

---

## CONSTRUING THE NEW FAIR HOUSING ACT

Mr. KENNEDY. Mr. President, yesterday was a special occasion in the history of civil rights in America, as President Reagan signed the Fair Housing Amendments Act of 1988 before a bipartisan group of Senators, Representatives and civil rights leaders at the White House. The signing caps a 25-year effort in Congress to strengthen and expand the scope of our fair housing laws.

Unfortunately, President Reagan used that historic occasion to announce an interpretation of the act that this flatly inconsistent with Congress's understanding of the law. The President suggested that the act should be read as requiring proof of discriminatory intent in order to establish a violation of the fair housing law.

The issue is part of the old bone of contention between Congress and the administration over the so-called intent versus effects test. But the President added a new twist—his attempt to tilt the meaning of the law by declaring his view of what he was signing.

As the principal Senate sponsor of the 1988 act, I can state unequivocally that Congress contemplated no such intent requirement. The act did not materially alter the 1968 Fair Housing Act provisions defining what is required to prove a discriminatory housing practice. All of the Federal courts of appeals that have considered the question have concluded that title VIII should be construed, at least in some instances, to prohibit acts that have discriminatory effects, and that there is no need to prove discriminatory intent.

As University of Kentucky law professor, Robert Schwemm, the author of a leading treatise on the 1968 law, testified before the Senate Constitution Subcommittee on April 9, 1987, 9 of the 12 Federal courts of appeals have addressed the issue, and all 9 have ruled that a showing of a discriminatory effect may be used to establish a violation. Professor Schwemm's testimony contains a de-

tailed analysis of the issue and the court decisions. In enacting the Fair Housing Amendments Act, Congress accepted this consistent judicial interpretation.

It is also well-established that under our constitutional system of separation of powers, Congress has the sole responsibility to enact legislation, and the President may not use a signing statement to attempt to rewrite the law in a manner contrary to the congressional intent.

Just last week, I had the opportunity to discuss this subject with Douglas Kmiec, the Acting Assistant Attorney General in charge of the Office of Legal Counsel in the Department of Justice. At his confirmation hearing, on September 8, 1988, Mr. Kmiec agreed with my view. As he testified:

To the extent that a signing statement would be used to thwart the express terms of [a] statute or was not giving due consideration to the legislative history that gave rise to the words of the statute, it would not be a proper use of that statement.

I then indicated my own view, that

[W]hen the Congress passes a law, it intends it to mean what it says. And the President obviously, if he has a differing view, has the opportunity to veto it and send it back for reconsideration. But if he does not, the congressional interpretation would be the guiding force in terms of interpretation.

Mr. Kmiec responded, "I do not disagree, Senator."

When President Reagan signed the Fair Housing Amendments Act yesterday, he tried to tilt the law toward the "intent" test, contrary to the will of Congress. Courts and others interpreting the act should not give weight to the President's attempt to obtain a signing statement what he could not achieve in the legislation itself.

---

## CONCERNING GOVERNOR DUKAKIS' SPEECH: "A STRONG AND SECURE AMERICA"

Mr. NUNN. Mr. President, this morning Governor Dukakis gave an important speech at Georgetown University on the subject of U.S. national security policy.

This speech, entitled "A Strong and Secure America," was a very solid, tough, and sober statement of Governor Dukakis' views on national defense. The range of issues discussed in the speech is impressive and comprehensive. The speech clearly demonstrates Governor Dukakis' commitment to a strong national defense for America.

Governor Dukakis knows what it will take to keep our Nation secure. In the speech, he stated his clear and unequivocal support for key new strategic modernization programs—the Stealth bomber, the Trident II D-5 missile, and the advanced cruise missile. He also made a welcome commitment to work with Congress to find a sensible, affordable way to maintain the effectiveness of the land-based missile leg of our strategic triad.

On the subject of strategic defense, Governor Dukakis stated his intention to abide by the ABM Treaty, and to insist that the Soviet Union dismantle the Krasnoyarsk radar. He also indicated his support for continued research in the area of strategic defenses to hedge against a Soviet breakout in this area and to allow us to make an informed judgment as to what strategic defense technology can and can't do.

Governor Dukakis underscored the importance of maintaining America's technological superiority in national defense. He cited antisubmarine warfare and the capability to destroy Soviet tanks as two critical areas where we need to direct our best and most innovative technological efforts. He went on to endorse the SSN-21, the Navy's new attack submarine, and the Air Force's new advanced tactical fighter.

One of the things that impressed me most about the speech, Mr. President, was Governor Dukakis' approach to Defense management. We have some serious management problems in the Pentagon today—in the number of programs relative to the size of the Defense budget, for example, and in the way we develop and buy new weapons. Governor Dukakis' speech indicates to me that the Governor understands these problems and is willing to make the long overdue, tough decisions to address them.

Mr. President, I ask unanimous consent that the full text of Governor Dukakis' speech be inserted in the RECORD. I urge my colleagues to review this speech.

There being no objection, the remarks were ordered to be printed in the RECORD, as follows:

MICHAEL S. DUKAKIS: A STRONG AND SECURE AMERICA, GEORGETOWN UNIVERSITY, WASHINGTON, DC

I'm running for President to restore respect for American leadership in a changing world.

The kind of respect that Franklin Roosevelt earned when he championed the Four Freedoms and crushed Hitler's armies during World War II.

The kind of respect that John Kennedy earned when he forced the withdrawal of Soviet missiles from Cuba and signed the world's first nuclear test ban agreement.

The kind of respect that America received when it served first as the arsenal and then as the breadbasket for the free world; when American goods reflected the world's highest quality and finest technology; when America put a man on the moon and a Peace Corps in the developing world; when people from around the globe looked to us for leadership and for hope.

I'm running for President because I want to see our country get that kind of respect from our allies, our trading partners, our friends and our adversaries.

But to build and maintain the respect we need, we must meet not just one, not just some, but every challenge to our national security; the new challenges of tough economic competition and of terrorism and of drugs that I talked about Monday; the challenge posed by the new leaders of the Soviet Union that I discussed yesterday; and the challenge of keeping America militarily strong, which is my subject today.

And military strength begins with the men and women of our armed forces. Our national defense depends on their skills and courage and commitment.

During the 1950's, I spent 16 months as a GI in the small Korean village of Munsan-Ni—not far from the demilitarized zone.

I, and those I served with, didn't ask for much in the way of material comforts. We had an obligation to serve, and we were proud to meet that obligation. All we wanted—and all we expected—was to be well-trained, to have weapons that worked, a mission that we understood, and to know that we were being remembered and supported in the thoughts and prayers of those back home.

That's not a lot to ask for, but for those on the frontline, it makes all the difference in the world.

And that's a lesson I will never forget.

It's a lesson that's especially important in this election year; for the job of defending freedom is not a Republican job. It is not a Democratic job. It's a responsibility we all have as Americans.

George Bush forgot that lesson last month when he persuaded the President to veto the defense bill—over the objections of the Secretary of Defense and the National Security Advisor. Mr. Bush's pollster apparently had more influence than they did.

That bill would have strengthened our military forces, provided needed pay increases to our military personnel, and given our armed forces a real role in the war against drugs.

My friends, we can't play politics with our national security.

We've got to have real leadership. Leadership that will put America's interests first. As President, I'm not going to make decisions that affect the well-being of our servicemen and women on the basis of what some poll tells me; and I'm not going to be looking for guidance on national security issues from J. Danforth Quayle.

Because we need a President who knows how to make tough decisions. A president who will call the shots. Assemble a team. Work with Congress. Replace officials who need to be replaced. And take the heat when things go wrong.

That's what governing is all about. And that's what a Dukakis Administration will be all about.

We're not going to have a laundry list of weapons systems; we're going to have a strategy for keeping America militarily strong.

We'll use force when it's necessary to protect our territory, our citizens or our vital interests; to meet our treaty commitments; and to deter or to respond to terrorist attacks.

We're going to put our defense dollars where our defense needs are greatest; we're going to buy weapons that work; we're going to make certain that the men and women of our armed forces have the equipment, the training and the support they need to defend our country; and we're going to clean up the mess in the Pentagon.

Above all, we're going to keep America strong, because as John Kennedy said 28 years ago, "only when our arms are sufficient beyond doubt can we be certain with-

# Title VIII Investigative Skills Training

## Fair Housing Amendments Act of 1988



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

## Office of
## Fair Housing and Equal Opportunity



EQUAL HOUSING
OPPORTUNITY

FAIR HOUSING AMENDMENTS ACT OF 1988 TRAINING
TITLE VIII INVESTIGATIVE SKILLS
AGENDA
QUALITY HOTEL
Arlington, Virginia
December 12 - 16, 1988

DAY 1

| | | |
|---|---|---|
| 9:00-10:00 | General Overview of Course/Administrative Details/PreTest | Dana Jackson/ Peggy Swift |
| 10:00-10:15 | Break | |
| 10:15-11:00 | Overview of the new Statute | Larry Pearl |
| 11:00-12:00 | Overview of Implementing Procedures | Sam Hutchinson |
| 12:00-1:00 | Lunch | |
| 1:00-1:15 | Office of General Counsel's Reasonable Cause Process | Kathy Coughlin |
| 1:15-2:30 | Requirements of Legal Sufficiency<br>- Jurisdiction and Standing<br>- Documentary Evidence<br>- Admissible v. Inadmissible Evidence | Kathy Coughlin<br>Jackie Ringhausen |
| 2:30-2:45 | Break | |
| 2:45-3:15 | - Disparate Treatment Analysis<br>- Pattern and Practice Cases | Kathy Coughlin |
| 3:15-4:00 | Subpoenas, Interrogatories, Penalties for Document Tampering | Jackie Ringhausen |
| 4:00-4:10 | Closing Remarks | Judith Brachman |
| 4:10-4:30 | Discussion of Evening Assignment | Dana Jackson |

2

<u>Day 2</u>

| | | |
|---|---|---|
| 9:00-9:30 | New Role of Investigators | Joe Rich, DOJ |
| 9:30-10:30 | Case Management Concepts | Joe Rich |
| 10:30-10:45 | Break | |
| 10:45-11:15 | Complaint Intake | Jackie Ringhausen |
| 11:15-12:00 | Planning and Implementation of Investigation | Joe Rich Paul Hancock |
| 12:00-1:00 | Lunch | |
| 1:00-2:00 | Planning and Implementation of Investigation (Cont) | |
| 2:00-2:45 | Organization of FIR | Kathy Coughlin Jackie Ringhausen |
| 2:45-3:30 | File Organization and Maintenance | Joe Rich Paul Hancock |
| 3:30-4:30 | Investigative Role verses Conciliation Role | Joe Rich Paul Hancock |
| 4:30-5:00 | Department of Justice's Responsibilities Under the Act | Joe Rich Paul Hancock |
| 5:00-5:15 | Assignment of Evening Exercises | Dana Jackson |

<u>Day 3</u>

| | | |
|---|---|---|
| 9:00-10:00 | Plenary Session - Discussion of Evening Exercises & Film | Dana Jackson |

3

| | | |
|---|---|---|
| 10:00-12:00 | Conciliation/Negotiation Process | Harold Davis, Federal Mediation & Conciliation Service |
| 12:00-1:00 | Lunch | |
| 1:00-4:00 | Conciliation/Negotiation Process (Cont.) | Harold Davis |
| 4:00-4:45 | Assignment of Evening Exercise | |

Day 4

| | | |
|---|---|---|
| 9:00-10:30 | Plenary Session - Discussion of Evening Exercise | |
| 10:30-10:45 | Break | |
| 10:45-12:00 | Administrative Law Judge's Hearing Process | Alan Heifetz, Chief ALJ Marshall Lippman, Attorney-at-Law |
| 12:00-1:00 | Lunch | |
| 1:00- 3:00 | Administrative Hearing (Cont.) | |
| 3:00-3:45 | Title VIII Contract Investigations | Wagner Jackson |
| 3:45-4:30 | Monitoring of Cases Referred to State/Local Agencies | Sue Ireland |
| 4:30-5:30 | Regional Meetings | |

Day 5

| | | |
|---|---|---|
| 9:00-10:15 | Plenary Session - Feedback from Regional Meetings | |
| 10:15-10:30 | Break | |
| 10:30-11:05 | Relationship of CDBG Regulations to Title VIII Amendments | Brenda Cleaver |
| 11:05-11:15 | Wrap Up - "This is a New Beginning" | William Wynn |
| 11:15-12:00 | Post Test/Course Evaluation | Dana Jackson |

Establishing Discriminatory Housing Practices under Title
VIII of the Civil Rights Act of 1968

THE EFFECTS TEST

While the Supreme Court has often considered the bases for establishing the occurrence of discriminatory employment practices, it has not decided any Fair Housing Act case which discusses or describes the basis for finding a discriminatory housing practice under Title VIII of the Civil Rights Act of 1968.

EFFECTS TEST 1

Court of Appeals decisions in Fair Housing Act cases involving standards of proof do not disclose any patterns or general rules for establishing discriminatory housing practices. However, no circuit court has explicitly rejected the effects test as a standard.

EFFECTS TEST 2

BUT WHAT IS THE EFFECTS TEST?

EFFECTS TEST 3

DOES IT MEAN

That any act which has the effect of denying or otherwise making unavailable a dwelling is a violation of Title VIII

OR

That it is not necessary to establish a purpose or an intention to discriminate in order to establish a violation of Title VIII

OR

That any act which has a significant adverse affect on persons of a particular race, color, religion, sex or national origin in unlawful.

EFFECTS TEST 4

In Metropolitan Housing Development Corp. v Village of Arlington Heights the Seventh Circuit Court of Appeals taking into account the similarity between Title VIII and Title VII set forth four critical factors for determining "under what circumstances conduct that produces a discriminatory impact but which was taken without discriminatory intent will violate [Title VIII]"

(1) The strength of plaintiff's showing of discriminatory effect

(2) Evidence of intent, though not enough to satisfy the constitutional standard

(3) Defendant's interest in taking the action complained of

(4) Whether the remedy is to compel provision of housing or merely to restrain defendant from interfering with owners who wish to provide housing

Metropolitan Development Corp. v Village of Arlington Heights 558 F2d 1283 (7th Cir. 1977)

EFFECTS TEST  p. 5

In Resident Advisory Board v Rizzo decided shortly after Arlington Heights in 1977 the Third Circuit joined the Seventh Circuit in concluding that "in Title VIII cases, unrebutted proof of discriminatory effect alone ..." may constitute violation of Title VIII

Resident Advisory Bd. v Rizzo
564 F2d 126 (3rd Cir. 1977)

EFFECTS TEST   p. 6

Recognizing vast differences between employment and housing discrimination cases the Court in Rizzo indicated that Title VIII rebuttal criteria must evolve on a case-by-case basis. However, the Court did state the following guidance:

"a justification must serve in theory and practice, a legitimate, bona fide interest of the Title VIII defendant, and the defendant must show no alternative course of action would enable that interest to be served with less discriminatory impact."

In the event the prima facie case is not rebutted, a violation of Title VIII is established.

Resident Advisory Bd. v Rizzo

EFFECTS TEST p. 7

Another Title VIII decision dealing with standards for establishing a violation is U.S. v City of Black Jack. In an opinion of the Eighth Circuit Court of Appeals the Court held that in order to establish "a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination.

The Court thus held that in responding to the prima facie case the burden shifted to the city to demonstrate "that a compelling government interest was furthered by that ordinance."

U.S. v City of Black Jack
508 F2d (8th Cir, 1974), cert. denied,
422 U.S. 1042, (1975)

N.B. The Third Circuit in Rizzo expressly declined to apply the Black Jack "compelling interest" analysis noting that it was not part of the Title VIII doctrine and that such a heavy burden should be reserved not for Title VIII defendants, but for those who seek to justify denials of equal protection.

EFFECTS TEST  p. 8

Several Title VIII "effects test" cases have involved clearly intentional practices.

US v Youritan Construction Co
Credit checks for blacks but not for whites

US v Mitchell
Steering of black to housing in only one
  section of complex

Smith v Anchor Bldg. Corp
Telling blacks that dwellings were not available
  while housing whites

Because of this fact the analysis of a prima facie case and the rebuttals provided are not developed in the decision - If an act is discriminatory what type of rebuttal would make it nondiscriminatory

EFFECTS TEST  p. 9

In Robinson v 12 Lofts Realty the second Circuit employed the Title VII disparate treatment analysis of McDonnell Douglas in reviewing a case of refusal by a cooperative to accept a contract for the sale of a dwelling. A similar analysis was used in subsequent district court case Dreher v Rana Management, Inc. It should be noted, however, that the Second Circuit decision in Boyd v the Lefrak Organization has been read to indicate that the Second Circuit has not adopted a pure effects test approach in Title VIII cases. In that case the court held that plaintiff although establishing a disparate impact had not established racial motivation. A similar analysis has been used in the Sixth Circuit. (See McHaney v Spears, 526 F. Supp. 566 (W.D. Tenn. 1981.)

EFFECTS TEST  p. 10

More recently the Fourth Circuit has adopted the position that intentional discriminatory conduct is not essential to establishing a violation of Title VIII. However, the Court of Appeals while determining that the Griggs disparate impact rationale should be applied to Fair Housing Act cases adopted the Arlington Heights four critical factor analysis. See also Atkins v Robinson, 545 F. Supp. 852 (E.D. Va. 1982).

EFFECTS TEST  p. 11

Although no Court has rejected the effects test, the Sixth Circuit has indicated in Skillken v City of Toledo that intent to discriminate must be shown to invalidate a zoning ordinance

Courts of Appeal in the Second, Third, Fourth, Fifth, Seventh, Eighth and Ninth Circuit have adopted the principle that intentional conduct is not needed to establish a violation of Title VIII

EFFECTS TEST  p. 12

While Courts of Appeal in 7 circuits have held Title VIII analogous to Title VII with respect to the burden of proof and production the three leading Title VIII effects test cases Black Jack, Resident Advisory Board and Arlington Heights, all involve governmental actions and provide for different analyses.

In another circuit the court has adopted Title VII Disparate Impact but employed a different analysis than that used in Title VII cases.

In two other circuits there is an effects test in place but no direction on the analysis to be provided.

The remaining circuit courts have adopted the McDonnell Douglas analysis.

EFFECTS TEST  p. 13



**Monday**
**January 23, 1989**

Part III

# Department of Housing and Urban Development

## Office of the Secretary

## Office of the Assistant Secretary for Fair Housing and Equal Opportunity

24 CFR Part 14 et al.
Implementation of the Fair Housing
Amendments Act of 1988; Final Rule

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

### Office of the Secretary

### Office of the Assistant Secretary for Fair Housing and Equal Opportunity

### 24 CFR Parts 14, 100, 103, 104, 105, 106, 109, 110, 115, and 121

[Docket No. R–89–1425; FR–2565]

### Implementation of the Fair Housing Amendments Act of 1988

**AGENCY:** Office of the Secretary and Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Final rule.

**SUMMARY:** HUD is adopting regulations to implement the changes made in Title VIII of the Civil Rights Act of 1968 by the Fair Housing Amendments Act of 1988, which was enacted September 13, 1988 and will become effective on March 12, 1989. Title VIII has prohibited discrimination in the sale, rental, and financing of dwellings based on color, religion, sex, or national origin. The Fair Housing Amendments Act expands the coverage of Title VIII to prohibit discriminatory housing practices based on handicap and familial status, establishes an administrative and judicial enforcement mechanism for cases where discriminatory housing practices cannot be resolved informally, and provides for monetary penalties in cases where housing discrimination is found. The Fair Housing Amendments Act also establishes design and construction requirements for certain new multifamily dwellings for first occupancy on or after March 13, 1991 (30 months after the date of enactment) and an exemption from the prohibitions against discrimination on the basis of familial status for certain housing for older persons.

This final rule adopts new regulations describing the nature of conduct made unlawful with respect to the sale, rental and financing of dwellings or in the provision of services and facilities in connection therewith (24 CFR Part 100); establishing procedures for the investigation of complaints of discriminatory housing practices (24 CFR 103); and establishing procedures for administrative proceedings involving discriminatory housing practices (24 CFR Part 104).

HUD is also revising existing regulations issued under Title VIII to reflect the expanded coverage of Title VIII. In addition, HUD is amending the regulations providing for the recognition of substantially equivalent state and local fair housing laws (24 CFR Part 115) to provide for the new certification procedure established by the Fair Housing Amendments Act.

**DATE:** This rule will become effective on March 12, 1989. The incorporation by reference of the American National Standard for buildings and facilities providing accessiblity and usability for physically handicapped people (ANSI A117.1–1986) is approved by the Director of the Federal Register as of March 12, 1989.

**FOR FURTHER INFORMATION CONTACT:** Harry L. Carey ((202) 755–5570, Office of the General Counsel, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC, 20410–0500. (The telephone number set forth above is not a toll-free number.) The toll-free TDD number is 1–800–543–8294.

This rule will be available in braille and on tape for persons with vision impairments in the Office of the Rules Docket Clerk, Room 10276, Department of Housing and Urban Development, at the above location.

**SUPPLEMENTARY INFORMATION:** The information collection requirements contained in this rule have been submitted to the Office of Management and Budget (OMB) for review under the Paperwork Reduction Act of 1980. The OMB control number, when assigned, will be announced in a separate notice in the *Federal Register*. The public reporting burden for each of these collections of information is estimated to include the time for reviewing the instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Information on the estimated public reporting burdens is provided under the preamble heading, *Other Matters*. Send comments regarding these burden estimates or any other aspect of these collections of information, including suggestions for reducing this burden, to the Department of Housing and Urban Development, Rules Docket Clerk, 451 Seventh Street, SW., Room 10276, Washington, DC 20410; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

### Background

Title VIII of the Civil Rights Act of 1968 (42 U.S.C. 3601–3619) made it unlawful to discriminate in any aspect relating to the sale, rental or financing of dwellings or in the provision of brokerage services or facilities in connection with the sale or rental of a dwelling because of race, color, religion, sex, or national origin. Under the provisions of Title VIII, persons who believed that they had been subjected to, or were about to be subjected to, a discriminatory housing practice could file a complaint with the Secretary of Housing and Urban Development. Title VIII required the Department of Housing and Urban Development to investigate each complaint and, where the Department determined to resolve the matters raised in a complaint, to engage in informal efforts to conciliate the issues in the complaint.

However, where these informal efforts to conciliate a case were unsuccessful, Title VIII did not provide the Secretary with any administrative mechanism for redressing acts of discrimination against an individual. In addition, while the Secretary could refer a case involving a pattern or practice of discrimination to the Attorney General for the initiation of a civil action, Federal courts did not award individual relief to the victims of discrimination in such cases.

The Fair Housing Amendments Act of 1988 (Pub. L. 100–430, approved September 13, 1988) was enacted to strengthen the administrative enforcement provision of Title VIII, to add prohibitions against discrimination in housing on the basis of handicap and familial status, and to provide for the award of monetary damages where discriminatory housing practices are found. The amended law, referred to as the Fair Housing Act, will become effective on March 12, 1989.

The provisions in the Fair Housing Act describing the nature of conduct which constitutes a discriminatory housing practice have been revised to extend the protections of the Fair Housing Act to persons with handicaps and to families with children. In this respect, sections 804, 805, and 806 of the Fair Housing Act prohibit discrimination in any activities relating to the sale or rental of dwellings, in the availability of residential real estate-related transactions, or in the provision of services and facilities in connection therewith because of race, color, religion, sex, handicap, familial status, or national origin.

The Fair Housing Act also specifically makes it unlawful to refuse to permit, at the expense of the handicapped person, reasonable modifications to existing premises occupied or to be occupied by such a person if such modifications are necessary to afford such person full enjoyment of the premises (section 804(f)(3)(A)). With respect to rental housing, the Fair Housing Act provides that a landlord may, where reasonable, condition permission for a modification

on the renter's agreeing to restore the interior of the premises to the condition that existed before the modification, reasonalbe wear and tear excepted. The Act also makes it unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services to afford a handicapped person equal opportunity to use and enjoy a dwelling.

Further, the Fair Housing Act makes it unlawful to design and construct certain multifamily dwellings for first occupancy after March 13, 1991, in a manner that makes them inaccessible to persons with handicaps. All premises within such dwelling also are specifically required to contain several features of adaptive design so that the dwelling is readily accessible to and usable by persons with handicaps.

With respect to the new protection for families with children, the Fair Housing Act prohibits discrimination because of familial status (generally, the presence of children under 18 in a family) in the sale or rental of housing. However, the act provides an exemption from this prohibition for housing which qualifies as "housing for older persons".

Section 805 of the Fair Housing Act, as revised, prohibits discrimination related to "residential real estate-related transactions" rather than merely referring to "financing". In addition, the definition of the term residential real estate-related transaction specifically indicates that the Fair Housing Act applies to the selling, brokering and appraising of dwelling and to secondary mortgage market activities with respect to securities affected or supported by dwellings, as well as to the making and purchasing of loans and other financial assistance for dwellings. The Act, however, does not prohibit a person engaged in the business of furnishing appraisals from taking into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.

Section 810 of the Fair Housing Act provides that any person who believes that he or she has been, or will be, subjected to a discriminatory housing practice because of race, color, religion, sex, handicap, familial status, or national origin may file a complaint with the Secretary of Housing and Urban Development. The section also authorizes the Secretary of Housing and Urban Development to file complaint on the Secretary's own initiative and to investigate housing practices in order to determine whether a complaint should be filed. Complaints must be filed not later than one year after an alleged discriminatory housing practice has occurred or terminated.

Upon the filing of a complaint, the Secretary is required to notify any respondent named in the complaint of the acceptance of the complaint and the discriminatory housing practice alleged in the complaint. The respondent may file, not later than 10 days after receipt of the notice of a complaint, an answer to the complaint. The Secretary is required to make an investigation of the alleged discriminatory housing practice and to complete the investigation within 100 days after the filing of the complaint, unless it is impracticable to do so.

At the end of each investigation, the Secretary is required to prepare a final investigation report. Under section 810(d), the final investigation report will be available to an aggrieved person or a respondent, upon request, at any time after the investigation is complete.

Section 810(b) of the Act directs the Secretary, to the extent feasible, to engage in efforts to conciliate the matters raised in the complaint at any time after the filing of the complaint.

Section 810(e) of the Act empowers the Secretary to authorize the Attorney General to file a civil action seeking appropriate preliminary or temporary relief pending final disposition of a complaint if, at any time after the filing of such complaint, the Secretary concludes that such action is necessary to carry out the purposes of the Act.

Whenever a complaint alleges a discriminatory housing practice within a State or locality which has a Fair Housing law or ordinance which has been certified by the Secretary as being substantially equivalent to the Fair Housing Act, the Secretary must refer the complaint to the agency administering such law or ordinance before taking any action with respect to the complaint. Except with the consent of a certified agency, or in other limited situations such as where a complaint is not being processed in a timely fashion or the State or local law or ordinance is found no longer to be substantially equivalent, the Secretary may not take any further action with respect to complaints referred to such agencies.

Section 810(f) of the Act permits the Secretary to certify an agency only where the Secretary determines that the rights protected by the agency, the procedures followed by the agency, the remedies available to the agency, and the availability of judicial review of the agency's actions are substantially equivalent to those created in the Fair Housing Act.

This section also provides that agencies which the Secretary has determined administer State and local fair housing laws which provide rights

and remedies for discriminatory housing practices that were substantially equivalent to those contained in Title VIII of the Civil Rights Act of 1968, or agencies which had been recognized for interim referral of complaints under Title VIII, will be considered certified for a period not to exceed 48 months for the purpose of referring complaints under the Fair Housing Act with respect to matters for which they had been certified on the day before the date of enactment of the Fair Housing Act (i.e., September 12, 1988).

Section 810(g) of the Act requires the Secretary, in cases where the matters raised in a complaint cannot be resolved by conciliation, to determine, based upon the facts, whether reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur. Such a finding must be made by the Secretary within 100 days after the filing of a complaint or within 100 days after the Secretary has commenced action on a complaint which had been referred to a certified agency, unless it is impracticable to do so. Where the Secretary makes a determination that reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, the Secretary must immediately issue a charge on behalf of the aggrieved person commencing a formal administrative proceeding before an administrative law judge.

Section 812(a) of the Act provides any complainant, aggrieved person, or respondent with an opportunity to elect not to proceed before an administrative law judge but to move the case to an appropriate Federal district court. Such an election must be made within 20 days after the receipt of the service upon such person of the charge filed by the Secretary. Upon notification that a person has elected to proceed to Federal district court, the Secretary will authorize the Attorney General to file a civil action on behalf of the aggrieved person. An action authorized by the Secretary must be brought within 30 days after the election is made.

Where no election is made, the case will be heard by an administrative law judge. Under section 812(c) of the Act, the Federal Rules of Evidence will apply to the presentation of evidence in the same manner that they apply to evidence presented in a civil action in Federal district court. Section 812(g) requires the administrative law judge to issue findings of fact and conclusions of law within 60 days after the end of a hearing.

Where the administrative law judge finds that a respondent has engaged in a

discriminatory housing practice, the Fair Housing Act provides for the issuance of an order for such relief as is appropriate, which may include actual damages and injunctive or other equitable relief. In order to vindicate the public interest, the order of an administrative law judge may assess a civil penalty against the respondent.

The decision of the administrative law judge can be reviewed by the Secretary. However, this review must be completed within 30 days after the decision is issued. Any final agency decision on the issue of discrimination is subject to review on appeal by the United States Courts of Appeals.

The Fair Housing Amendments Act directs the Secretary of Housing and Urban Development to issue regulations implementing the Fair Housing Act. Section 13 of the Fair Housing Amendments Act provides that "[I]n consultation with other appropriate Federal agencies, the Secretary shall, not later than the 180th day after the enactment of this Act, issue rules to implement title VIII as amended by this Act." That section also required the Secretary to give notice and opportunity for comment with respect to such rules.

On November 7, 1988, the Department published in the **Federal Register** (53 FR 44992) a proposed rule to provide the interpretation of the Secretary of Housing and Urban Development on the scope of the coverage provided and the nature of activities made unlawful by the Fair Housing Act. The proposed rule also contained the procedures which would be applicable to the receipt and processing of complaints and the initiation and conduct of formal enforcement proceedings.

Specifically, the Department proposed to add the three new parts to Subtitle B of Title 24 of the Code of Federal Regulations. The new Part 100 described the conduct made unlawful under the Fair Housing Act. The new Part 103 set forth the procedures for the receipt, investigation and conciliation of complaints and for the issuance of charges commencing formal administrative proceedings. The new Part 104 established rules for the conduct of administrative hearings before administrative law judges and provided rules of discovery in connection with such administrative proceedings.

It was further proposed that the existing departmental regulations authorizing the Secretary to collect racial, sex and ethnic data in departmental programs, located at 24 CFR Part 100, be redesignated as 24 CFR Part 121. These regulations were revised in the proposal to reflect the additional data requirements for HUD programs to meet the Department's responsibility to provide reports to Congress and to make available to the public data on persons eligible to participate and who are participating in HUD programs.

The proposed rule also made revisions in four existing departmental regulations implementing the Fair Housing Act to reflect the expansion of the coverage of the law to include handicap and familial status. Those regulations are: Fair Housing Administrative Meetings under Title VIII of the Civil Rights Act of 1968 (24 CFR Part 106), Fair Housing Advertising (24 CFR Part 109), Fair Housing Poster (24 CFR Part 110) and Certification of Substantially Equivalent Agencies (24 CFR Part 115).

The proposal provided a 30-day period for the submission of comments by the public, ending December 7, 1988. The Department received 6,425 public comments on the proposed rule by the end of the comment period. In addition, a substantial number of comments were received by the Department after the December 7 deadline. Even though those comments were not timely filed, they were reviewed to assure that any major issues raised were adequately addressed in comments that were received by the deadline.

Despite the extraordinary number of comments submitted (there were several thousand comments just from mobile home owners and operators of mobile home parks), each of the timely comments was read, and a list of all significant issues raised by those comments was compiled. All these issues were considered in the development of this rule.

In addition to consideration of public comments, HUD staff members met with representatives of several major interest groups who requested an opportunity to elaborate on the views expressed in their written comments. These staff members (with responsibility for the development of this rule) met with representatives of the National Apartment Association, the Society of Real Estate Appraisers, the American Institute of Real Estate Appraisers, the National Association of Home Builders, the Western Mobile Home Association, the Leadership Conference on Civil Rights, National Association for the Advancement of Colored People, NAACP Legal Defense Fund, Children's Defense Fund, American Civil Liberties Union, Mental Health Law Project, and representatives of various other Fair Housing Organizations. In each instance, the organization or organizations presented views identical to or consistent with positions taken in previously submitted written comments.

A record of each meeting was made, including the names of persons attending, the date, and a brief summary of the issues discussed. These meeting records appear in the Department's public comment file. The staff members also met with staff of the Senate Judiciary Committee.

## Part 100—Discriminatory Conduct Under the Fair Housing Act

Part 100 is a new part titled "Discriminatory Conduct Under The Fair Housing Act". The new Part 100:

—Indicates the conduct which is made unlawful under the Fair Housing Act;

—Includes guidance as to the responsibility of persons to permit reasonable modifications to dwellings and to make reasonable accommodations to rules and practices for persons with handicaps and further provides information as to the design and construction requirements applicable to certain new construction multifamily housing for first occupancy after March 13, 1991; and

—Describes the requirements which must be met for housing to be exempted from the prohibitions against discrimination based on familial status because it qualifies as housing for older persons.

The comments received with respect to Subparts A, B, and C of Part 100 raised several issues of general importance.

### Standard for Proving a Violation

The proposed rulemaking indicated that the descriptions of unlawful conduct contained in this part generally mirrored the language of the statutory prohibitions against discrimination under the Fair Housing Act. The proposed rule indicated that the specific prohibitions in each section of the regulations were amplified by examples of unlawful conduct provided in those sections. The preamble to the proposed rule stated that many of the practices so identified have been the subject of court decisions since the passage of Title VIII of the Civil Rights Act of 1968. The preamble further stated that other examples reflect the interpretation of HUD based on its experience since 1968 in the investigation of complaints of discriminatory housing practices. In addition, the preamble cautioned that the illustrations in Part 100 were only examples of the types of conduct made unlawful under the Fair Housing Act.

Although the Department viewed the illustrations of conduct unlawful under the Fair Housing Act in Part 100 to be descriptive of the types of conduct

prohibited, several commenters suggested that, in some instances, the illustrations could be read to suggest that the Department was using them to establish the legal standards for determining liability in the adjudication of matters under the Fair Housing Act.

Specifically, these commenters asserted that four illustrations in the proposed rule were susceptible to misinterpretation. With regard to §§ 100.70(c)(3), 100.75(c)(3) and 100.80(b)(3), they asserted that the use of the phrases "in order to discourage", "in order to deny" and "in order to preclude" could be viewed as limiting the types of activities which would constitute unlawful conduct. Similarly, these commenters asserted that, in § 170.70(d)(1), the phrase "to encourage, permit or reward" could also imply that intentional discriminatory conduct was necessary to establish that a discriminatory housing practice occurred. While the Department believes that the cited illustrations do not in any way imply the standard for determining the liability of persons, these regulations are not designed to resolve the question of whether intent is or is not required to show a violation and in order to assure that there will be no confusion as to the scope of Part 100, the illustrations in § 100.70(c)(3), 100.75(c)(3) and 100.80(b)(3) have been revised. The illustration in § 100.70(d)(1) has been deleted from the final rule for the reasons discussed in the following section of this preamble.

*Affirmative Fair Housing Activities*

Several commenters suggested that the proposed rule did not address affirmative efforts by localities to further the achievement of the goal of fair housing through the implementation of programs to promote integrated housing. Several commenters, including fair housing groups, persons and organizations involved in promoting fair housing and a number of local governments, interpreted certain illustrations of conduct made unlawful in the proposed rule as prohibiting the use of governmentally approved programs designed to promote greater housing opportunities for persons.

On the other hand, a comment from an association representing persons involved in the sale and rental of dwellings urged that the proposed rule be revised to make it clear that such practices are prohibited by the Fair Housing Act.

The Department does not believe that the proposed rule could be interpreted to make affirmative marketing programs, designed to make available information which broadens housing choices for persons, a violation of the Fair Housing Act.

The Department of Housing and Urban Development, shortly after the enactment of Title VIII of the Civil Rights Act of 1968, published regulations designed to promote greater opportunities for persons to participate in its housing programs. These Affirmative Fair Housing Marketing Regulations (24 CFR 200.600) implement the Department's policy of assuring that persons of similar income levels in a housing market area have a like range of housing choices available to them, regardless of race, color, religion, sex, or national origin.

The regulation provides for the development and implementation of an affirmative fair housing marketing plan. As part of this plan, participants in HUD housing programs must carry out an affirmative program to attract buyers or tenants, regardless of sex, of all minority and majority groups to the housing. In addition, the Department requires program participants to identify any groups of persons who are not likely to be aware of the available housing and to undertake special marketing efforts designed to make such persons aware of the available housing and their ability to obtain it on a nondiscriminatory basis.

Nothing in the amendments to the Fair Housing Act or their legislative history would support a conclusion that Congress sought to make choice-broadening activities, such as the Department's Affirmative Fair Housing Marketing Program, unlawful discriminatory housing practices.

Beyond these activities, both groups of commenters recommended that the final rule should indicate whether other practices designed to promote integrated housing patterns are permissible under the Fair Housing Act. Generally, these "pro-integrative" programs involve practices which are designed and operated to provide incentives for persons to make housing choices in a manner which results in the furtherance of integrated housing patterns.

The issue of programs designed to promote integrated housing patterns was considered by the Congress in connection with an amendment to the Fair Housing Amendments Act offered in the House which would have made it unlawful to use any preferences in the provision of any dwelling based on race, color, religion, gender or national origin. Before the amendment was defeated, Congressman Don Edwards, one of the chief sponsors of the Fair Housing Amendments Act, agreed to hold hearings on the subject of pro-integrative programs. (See 134 Cong. Rec. H4903 (daily ed. June 29, 1988).)

Very recently, on December 12, 1988, the House Committee on the Judiciary Subcommittee on Civil and Constitutional Rights held oversight hearings on Fair Housing. In this hearing, the subcommittee heard testimony concerning the issues raised in pro-integration efforts. In fact, much of the testimony involved activities which are the same as or similar to those referred to in the comments on the proposed rule.

In view of the legislative history concerning pro-integration programs and the Congressional action in this area, the Department has determined that it would not be appropriate to address the issue of pro-integration programs in this final rule.

Commenters pointed to several of the illustrations in the proposed rule which they believed could be read as indicating that the Department would view pro-integration activities as constituting unlawful conduct.

The Department believes that the illustrations contained in the proposed rule accurately reflect the types of activities which, when they result in choice limitations, would constitute unlawful conduct. However, in order to assure that the Department's rule implementing the Fair Housing Act does not impact on the consideration of the scope of permissible affirmative activities to promote integration, the Department has removed the illustrations that the commenters asserted could be construed as impacting either positively or negatively on the Congressional evaluation. Specifically, the illustrations in §§ 100.60(b)(5), 100.65(b)(2), 100.70(c)(1), 100.70(d)(1) and (2), 100.120(b)(1), (3), (4), (5), 6, and (7), 100.130(b)(1) and (4) and 100.135(d)(1), (2), and (3) have been removed. Further, the Department has rejected comments suggesting changes in § 100.70(a), and the addition of new illustrations in §§ 100.70(c), 100.75(c), 100.130(c), and 100.135(d) to indicate that pro-integration practices are unlawful.

In addition, several commenters requested that the provisions of the proposed rule regarding unlawful advertising practices in §100.50(b)(4) be revised. The language in this section has been changed to mirror the language contained in section 804(c) of the Fair Housing Act relating to unlawful advertising with respect to the sale or rental of a dwelling.

*Protection of New Covered Classes*

In the preamble to the proposed rule, the Department indicated that it interpreted the protections afforded to

handicapped persons and families with children in the same manner as the protections provided to others under the Fair Housing Act. A number of commenters suggested that it was unreasonable to assume that Congress intended to provide the same protections to the new classes of persons afforded protection under the amendments. One commenter supported this position by suggesting that it would be more appropriate to utilize standards developed under the Equal Protection Clause of the Fourteenth Amendment to the Constitution in determining the nature of the protections provided to handicapped persons and families with children. This commenter indicated that, under such a standard, classifications based on race and sex would stand on a different footing from classifications based on handicap and familial status, and that differential treatment of the handicapped or families with children in some particular contexts could be justified by a rational relationship to legitimate interests, even where similar differential treatment based on race or sex could not be justified.

While it is true that the Congress, in enacting Title VIII of the Civil Rights Act of 1968, sought to assure that persons would be accorded equal protection of the law, the Constitutional underpinnings of the law are also rooted in the Commerce Clause.

In a memorandum on the constitutionality of the Fair Housing Law, the Department of Justice set forth the support in the Commerce Clause for the legislation, stating:

"Discrimination in housing affects this interstate commerce in several ways. The confinement of Negroes and other minority groups to older homes in ghettoes restricts the number of new homes which are built and consequently reduces the amount of building materials and residential financing which moves across state lines. Negroes, especially those in the professions or in business, are less likely to change their place of residence to another state when housing discrimination would force them to move their families into ghettoes. The result is both to reduce the interstate movement of individuals and to hinder the efficient allocation of labor among the interstate components of the economy.

"The Commerce Clause grants Congress plenary power to protect interstate commerce from adverse effects such as these. The power is not restricted to goods or persons in transit. It extends to all activities which affect interstate commerce, even if the goods or persons engaged in the activities are

not then, or may never be, traveling in commerce. The power exists even when the effects upon which it is based are minor, or when taken individually, they would be insignificant. It is sufficient if the effects, taken as a whole, are present in measureable amounts. And it does not matter that when Congress exercises its power under the Commerce Clause, its motives are not solely to protect commerce. It can as validly act for moral reasons." (footnotes omitted) 114 Cong. Rec. 2536–2537. (February 7, 1968)

The Department believes that the legislative history of the Fair Housing Act and the development of fair housing law after the protections of that law were extended in 1974 to prohibit discrimination because of sex (Congress amended sections 804, 805, and 806 by adding sex to the classes of persons protected under Title VIII, see section 808(b)(1) of the Housing and Community Development Act of 1974, Pub. L. 93–383) support the position that persons with handicaps and families with children must be provided the same protections as other classes of persons.

*Increased Liability*

A significant number of commenters asserted that providing protections to persons with handicaps and families with children would restrict their ability to establish reasonable rules relating to the availability and the use of facilities provided in connection with dwellings. These commenters also suggested that a regulation requiring full access of handicapped persons and children to all facilities provided in connection with dwellings, and requiring the rental of dwellings on upper floors of a high-rise building, would result in increased tort liability.

The Department does not believe that, in enacting the Fair Housing Amendments Act, the Congress sought to limit the ability of landlords or other property managers to develop and implement reasonable rules and regulations relating to the use of facilities associated with dwellings for the health and safety of persons. However, there is no support for concluding that it is permissible to exclude handicapped persons or families with children from dwellings on upper floors of a high-rise, based on the assertion that such dwellings per se present a health or safety risk to such persons. Further, to permit such a practice would render meaningless the provisions of the law requiring that all dwellings in buildings consisting of 4 or more units and having one or more elevators be accessible to and usable by handicapped persons.

A number of commenters also urged the Department, in its final rule, to provide that a high-rise building could be exempted from the familial status provisions of the Act if it were certified that the high-rise building did not provide a safe and healthy living environment for children. In support of this type of exemption, several commenters pointed to language contained in Section 201 of the Housing and Community Development Act of 1977 which directed that the Secretary of HUD "prohibit high-rise elevator projects for families with children unless there is no practicable alternative." (See section 8(c)(1) of the Housing Act of 1937 (42 USC 1437f(c)(1)).). There is nothing in the Fair Housing Act to indicate that Congress in any way sought to limit the ability of families with children to obtain dwellings in a building other than those specifically exempted under the Act. Further, the department does not believe that the language in the Housing and Community Development Act of 1977, requiring HUD approval of the use of high-rise projects for providing housing for families with children would support a provision in this final rule which would provide an exemption from coverage of the Fair Housing Act for such buildings. As a result, these comments have not been adopted.

However, there is nothing in the provisions of the Fair Housing Amendments Act or its legislative history that indicates that Congress sought to impose any new liability on the owners and managers of housing. This interpretation is supported by a colloquy between Senator Specter and Senator Kennedy regarding the issue of liability:

Mr. Specter. It is my understanding that, as a result of this bill, a property owner does not assume a greater degree of vicarious liability as a result of injuries that may be caused by the tenants in the expanded categories of protected classes established under this bill. I believe it would be useful for the manager to confirm that it is not the intent of Congress that property owners will incur greater vicarious tort liability as a result of this statute because of the physical or mental characteristics of the tenants covered by this bill.

Mr. Kennedy. The Senator is correct. Congress does not intend to alter vicarious or secondary State tort law through the provisions of this bill. There is no objective evidence to link concerns about increased liability with any of the protected classes, and none should be assumed. Thus, we are stating, as a matter of clarification, that there is no relationship between this bill and existing State vicarious and secondary liability tort laws. 134 Cong. Rec. S10549 (daily ed. Aug. 2, 1988).

Subpart A—General

*Section 100.1  Authority.*

The Fair Housing Amendments Act authorizes the Secretary of Housing and Urban Development to issue regulations implementing the provisions of the Fair Housing Act (42 U.S.C. 3600–3620). The regulations contained in Part 100 are being issued under the Secretary's authority for the administration and enforcement of the Fair Housing Act.

*Section 100.5  Scope.*

The Fair Housing Act provides, within constitutional limitations, for fair housing throughout the United States. It provides that no person shall, on the basis of race, color, religion, sex, handicap, familial status, or national origin, be subjected to discrimination in the sale, rental or advertising for sale or rental of dwellings, in the provision of brokerage services, or in residential real estate-related transactions. Section 100.5(a) and (b) indicates that this part provides guidance as to the Department's interpretation of the coverage of the Fair Housing Act regarding discrimination related to the sale or rental of dwellings, the provision of services in connection therewith, and the availability of real estate-related transactions.

*Section 100.10  Exemptions.*

The Fair Housing Act exempts certain types of housing from the coverage of the law. Section 807 of the Fair Housing Act provides that, under certain circumstances, religious organizations and private clubs may limit the sale, rental or occupancy of housing, owned or operated for other than a commercial purpose, to their members. Section 807 also provides that nothing in the provisions regarding familial status applies to housing for older persons. Section 803 of the Fair Housing Act provides that nothing in the Fair Housing Act, other than the prohibitions against discriminatory advertising, applies to the sale or rental by an owner of certain single family houses without the use of a real estate broker or to the rental of rooms in dwellings containing living quarters occupied by no more than four families, provided that the owner actually occupies one of the units. Section 100.10 of this part reflects these exemptions to the coverage of the law.

Section 100.10(a)(3) states that nothing in this regulation limits the applicability of any reasonable local, State or Federal restrictions on the maximum number of occupants permitted to occupy a dwelling unit. This paragraph incorporates into the regulation the revisions to section 807 of the Fair Housing Act contained in section 6(d) of the Fair Housing Amendments Act of 1988. That provision is intended to allow reasonable governmental limitations on occupancy to continue as long as they are applied to all occupants, and do not operate to discriminate on the basis of race, color, religion, sex, handicap, familial status, or national origin. H.R. Rep. No. 711, 100th Congress, 2d Sess. 31 (1988) ("House Report"). No changes have been made in this section of the regulations.

A number of commenters indicated that the proposed rule did not adequately address the question of what occupancy standards, if any, can be used by persons in connection with the sale and rental of dwellings. Many of these commenters, generally persons involved in the rental of dwellings and associations representing owners and managers of rental dwellings, recommended that the final rule include a HUD-developed occupancy standard, and state that in the absence of a State or local occupancy code, owners or managers complying with the HUD standard would be considered to be in compliance with the Fair Housing Act with respect to the treatment of families with children. In the alternative, several commenters recommended that HUD indicate in the final rule that owners and managers of rental housing would be in compliance with the Fair Housing Act if they developed and implemented occupancy standards which are no less stringent than occupancy guidelines currently used in connection with HUD-assisted housing programs.

While the statutory provision providing exemptions to the Fair Housing Act states that nothing in the law limits the applicability of any reasonable Federal restrictions regarding the maximum number of occupants, there is no support in the statute or its legislative history which indicates any intent on the part of Congress to provide for the development of a national occupancy code. This interpretation is consistent with Congressional reliance on and encouragement for States and localities to become active participants in the effort to promote achievement of the goal of Fair Housing. Further, while the Department has developed occupancy guidelines for use by participants in HUD housing programs, these guidelines are designed to apply to the types and sizes of dwellings in HUD programs and they may not be reasonable for dwellings with more available space and other dwelling configurations than those found in HUD-assisted housing.

On the other hand, there is no basis to conclude that Congress intended that an owner or manager of dwellings would be unable in any way to restrict the number of occupants who could reside in a dwelling. Thus, the Department believes that in appropriate circumstances, owners and managers may develop and implement reasonable occupancy requirements based on factors such as the number and size of sleeping areas or bedrooms and the overall size of the dwelling unit. In this regard, it must be noted that, in connection with a complaint alleging discrimination on the basis of familial status, the Department will carefully examine any such nongovernmental restriction to determine whether it operates unreasonably to limit or exclude families with children.

Several commenters requested advice regarding the application of the Fair Housing Act to the sale of condominium and cooperative units and mobile homes by private persons.

As indicated in the proposed rule, the prohibitions against discrimination apply to all types of dwellings, including condominiums, cooperatives and mobile homes. Thus, discrimination in the sale or rental of such dwellings would be unlawful. However the Fair Housing Act provides a limited exemption for the sale of certain single family houses, and § 100.10(c) describes this statutory exemption. Specifically, this section indicates that the Fair Housing Act exempts from the provisions prohibiting discrimination any single family house sold by an owner, subject to certain conditions: the owner may not own or have an interest in more than three such houses at any one time; in the case of the sale of a single family house in which the owner was not the most recent occupant prior to its sale, the owner may not have made any other such sale within the preceding twenty-four months; and the unit must be sold or rented without the use of a real estate broker or agent, and without the use of any discriminatory advertisement.

Thus, the sale of a single family house, including the sale of a condominium or cooperative unit or a mobile home, by an owner would not be covered by the provisions of the Fair Housing Act, provided that the limitations in § 100.10(c) are met. However, it must be noted that the exemption in this section applies only to the *owner* of such a dwelling, and that the cooperative or condominium or mobile home park would be prohibited from engaging in any discriminatory conduct with respect to the dwelling notwithstanding the fact