Case: 1:13-cv-08564 Document #: 19-9 Filed: 02/12/14 Page 1 of 100 PageID #:1138

that the conduct of the owner was not covered.

*Section 100.20 Definitions.*

Section 100.20 provides definitions to be used for terms in Part 100. The definition of the term "dwelling" in the proposed rule stated that the term include mobile home parks, condominiums and cooperatives. A number of comments aruged that cooperatives, condominiums and mobile homes are not "dwellings" within the meaning of the statutory definition of the term. The Department disagrees. The statutory definition of a dwelling is "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." This definition is clearly broad enough to cover each of the types of dwellings enumerated in the proposed rule: mobile home parks, trailer courts, condominiums, cooperatives, and time-sharing properties. Several commenters suggested that the definitions of the terms "dwelling" and "person" should be expanded to provide some illustrations, particularly in the areas relating to handicap and familiar status.

Other commenters recommended that the final rule should contain the same definitions as those provided in the Fair Housing Act. These commenters indicated that the addition of certain types of persons, or certain examples of dwellings, could be viewed as indicating a restriction not contemplated in the law.

The Department has determined that, on balance, the need to leave open the extent and scope of the terms defined in the Fair Housing Act outweighs the need to provide comprehensive examples in connection with this rulemaking. As a result, the definitions of the terms "dwelling" and "person" have been revised to read as set forth in the statute.

A number of commenters objected to the inclusion of the phrase "is about to occur" in the definition of the term "aggrieved person". These commenters suggested that the addition of this phrase was inappropriate in that it would make unlawful acts that have not occurred.

The definition of the term "aggrieved person", as any person who claims to have been injured by a discriminatory housing practice, or who believes that he or she will be injured by a discriminatory housing practice that is about to occur, is statutory and has not

been changed in the final rule. The phrase "is about to occur" applies to a number of situations in which it is clear to a person that, if he or she takes an action, he or she will be subjected to a discriminatory act which will result in an injury. In such cases, the Fair Housing Act does not require these persons to expose themselves to the injury involved with the actual act of discrimination before filing a comlaint.

A number of commeters suggested that the definition of aggrieved person be expanded to incorporate into the text of the rule the statement in the preamble to the proposed rule that an "aggrieved person includes a fair housing organization as well as a tester or other person who seeks information about the availability of dwellings to determine whether discriminatory housing practices are occurring." In addition, several commenters suggested that references to providers of group homes for handicapped persons also be added to the definition.

As indicated above, the Department has determined that the definitions in these regulations which are terms defined in the Fair Housing Act should contain the statutory language. However, the Department has consistently interpreted the provisions of the fair housing law to permit the filing of a complaint by any person or organization which alleges that a discriminatory housing practice has occurred or is about to occur and which will result in an injury to them.

The proposed rule defined the "broker" or "agent" as any person authorized to perform an action on behalf of another person regarding any matter related to the sale or rental of dwellings, including offers, solicitations or contracts, and the administration of matters regarding such offers, solicitations or contracts or any real estate-related transactions. Several commenters pointed out that the Fair Housing Act did not contain a definition of these terms. These commenters also pointed out that the specific definition of these terms, for the purpose of this regulation, could result in a limitation on the types of persons who would be considered as brokers or agents in connection with any other aspect of a housing transaction.

The Department did not intend, in the proposed rule, to establish a universal definition of the terms "broker" or "agent." However the Department believes that since these terms appear in numerous places throughout the rule, guidance is necessary with respect to the scope of persons who are considered to be brokers and agents, particularly when such persons are involved in the

sale or rental of dwellings. Therefore, a definition of the terms "broker" or "agent" has been retained in the final rule. In order to avoid confusion as to whether persons otherwise involved in housing transactions are acting as brokers or agents, the definition has been revised to provide that a broker or agent "includes" rather than "means" persons described in the definition.

Several persons indicated that the term "person in the business of selling or renting dwellings", which was included as a defined term in the proposed rule, was never used in the text of the rule. These commenters suggested that the definition of this term be deleted. These commenters are in error, since the term appears in the exemption for the sale or rental of a single family house by an owner, in § 100.10(c)(l)(ii). The definition, which is taken from section 803(c) of the Fair Housing Act, has been retained in the final rule.

The remaining definitions in the proposed rule have not been changed in the final rule.

Subpart B—Discriminatory Housing Practices

*Section 100.50 Real estate practices prohibited.*

Section 100.50 of the rule states that Subpart B provides the Department's interpretation of the conduct made unlawful under section 804 and section 806 of the Fair Housing Act. In general, these provisions describe conduct made unlawful with regard to any aspect related to the sale, rental, or advertising of dwellings and to the provisions of brokerage services and facilities in connection with the sale or rental of dwellings.

Section 100.50(b) describes the specific conduct made unlawful in relation to the sale or rental of dwellings. The conduct described in this section forms the basis for the subsequent sections in Subpart B. Each of the subsequent sections provides illustrations of the scope and applicability of the rule to specific sales, rental and brokerage activities.

While the illustrations are set forth under the section of Subpart B which is most applicable to the discriminatory conduct described, § 100.50 indicates that an action described in one section can constitute a violation under other sections as well. In addition, the illustrations of discriminatory conduct in this subpart are only examples of discriminatory conduct that violates the Fair Housing Act and are not intended to limit the scope of discrimination in

housing made unlawful under the Fair Housing Act.

With the exception of the revision of § 100.50(b)(4), which was discussed earlier in this preamble, no changes have been made in the text of § 100.50.

*Section 100.60   Unlawful refusal to sell or rent or to negotiate for the sale or rental.*

Section 100.60 describes the actions which constitutes a refusal to sell or rent a dwelling when a *bona fide* offer is made or a refusal to negotiate with persons for the sale or rental of a dwelling and which are unlawful when they are taken because of race, color, religion, sex, handicap, familiar status, or national origin.

As discussed earlier, the illustration contained in § 100.60 (b) (5) has been removed, and the subsequent illustration has been renumbered accordingly. No other changes have been made in this section of the final rule.

*Section 100.65   Discrimination in terms, conditions and privileges and in services and facilities.*

Section 100.65 provides that differences in the treatment of persons in connection with the provision of services and facilities or in the terms or conditions relating to the sale or rental of a dwelling because of race, color, religion, sex, handicap, familial status, or national origin constitute discriminatory housing practices.

The illustrations in § 100.65(b) indicate that the coverage of this section extends beyond restrictions or differences in a lease or sales contract and the provision of different levels of maintenance. This section provides that denials of, or limitations on the use of privileges, services or facilities, relating to the sale or rental of a dwelling because of race, color, religion, sex, handicap, familial status, or national origin are also discriminatory housing practices.

In order to indicate the broad range of conduct which would constitute different terms and conditions, the department has added another illustration to this section (§ 100.65(b)(5)) indicating that denying or limiting services or facilities to persons based on a person failing or refusing to grant sexual favors can constitute a discriminatory housing practice.

A large number of comments received from persons owning or managing rental housing and associations representing such persons disagreed with the Department's interpretation of the Fair Housing Act as precluding different security deposit require nents for

persons with handicaps and families with children. These comments generally took the position that mobility impaired persons in wheelchairs and small children would cause more damage to the interior of dwellings, thus justifying the need for additional security to cover the exposure of the owner or manager to make needed repairs when units occupied by such persons are vacated. Since the Department has determined that in enacting the Fair Housing Act, Congress sought to provide the same protections to persons with handicaps and families with children as were made available to other classes of protected persons, no change in the illustration in § 100.65(a)(1) has been made.

A number of commenters indicated that they customarily provided for reduced security deposits for elderly persons renting units and asked whether continuing such practice would place them in violation of the Fair Housing Act. As long as such a policy is based solely on age, is available to persons if there are children in the family, and is not otherwise operated in a manner that results in the exclusion of families with children, such a practice would not be unlawful.

Another commenter indicated that charges for the provision of water, electricity, refuse collection and other services have been based on the number of persons who occupy a dwelling and asked whether such a policy would be permissible. In order to determine whether such a policy is permissible, it would be necessary to understand more fully why it was implemented and how it actually operates. Further, since policies such as this would require review on a case by case basis, the Department has determined that addressing this issue in the final rule would not be appropriate.

As discussed earlier in the preamble, the illustration in § 100.65(b)(2) has been removed, pending Congressional review of pro-integration programs.

*Section 100.70   Other prohibited sale and rental conduct.*

Section 100.70 provides that restricting or attempting to restrict the housing choices of persons, or engaging in any conduct relating to the sale or rental of a dwelling that otherwise makes unavailable or denies dwellings, because of race, color, religion, sex, handicap, familial status, or national origin, is a discriminatory housing practice.

Section 100.70(c) describes actions which result in limitations of housing choice that would violate the Fair Housing Act. These practices, which are

commonly referred to as "steering," include practices designed to discourage persons from seeking housing in a particular community, neighborhood, or development because of race, color, religion, sex, handicap, familial status, or national origin.

The illustrations in § 100.70(c)(1), (d)(1) and (d)(2) of the proposed rule have been removed in response to comments regarding Congressional activity in the area of affirmative action to promote integrated housing. In addition, it should be pointed out that the Department did not intend in the illustration in § 100.70(d)(2) of the proposed rule to imply that language or sign interpreters were required with respect to transactions involving a person who can not speak English or who has a hearing or vision impairment. The remaining illustrations in the section have been renumbered.

In the preamble discussion of § 100.70 in the proposed rule, it was stated, as an example, that a private developer's market-based decision to include only efficiency apartments in a new development would not violate the Fair Housing Act even though, "as a practical matter, such housing would be unavailable to families with children." A commenter pointed out that it would be possible for a single parent and child to live in an efficiency or one bedroom apartment, and that the example was not illustrative of a situation in which housing would be unavailable to families with children. The Department agrees with the commenter's assertion. However, even though the example may have been flawed, the Department wishes to reiterate that it does not interpret the Fair Housing Act as precluding the construction of apartment buildings with small units.

In order to clarify that an unlawful refusal to deal with brokers and agents includes a refusal based on the race, color, religion, sex, handicap, familial status, or national origin of the broker or agent as well as the race, color, religion, sex, handicap, familial status, or national origin of one or more of their clients the illustration in § 100.70(d)(2) has been revised.

A number of commenters suggested that the proposed rule did not address specifically situations in which families are discouraged from obtaining housing because of the presence or possible presence of children. As discussed earlier in this preamble, the illustrations provided in the final rule are intended to described discriminatory housing practices generally and are not intended to be exhaustive descriptions of all conduct made unlawful under the Fair

**3240** Federal Register / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations

Housing Act. For this reason, the department has determined not to add a separate illustration with respect to steering conduct based on familial status. Further, the illustrations in § 100.70(c) (2) and (3) indicate conduct designed to discourage persons from obtaining a dwelling by exaggerating drawbacks or by communicating that certain persons are incompatible with existing residents is unlawful. The department believes that these illustrations make it clear that representing that certain housing would not be appropriate for, or would not be available to families with children would be prohibited under the Act.

Several commenters also noted that the proposed rule did not address discriminatory local land use, health and safety, and zoning rules that eliminate community housing opportunities. As indicated in the preamble discussion relating to Subpart D of this rule, the department has determined not to publish rules regarding issues relating to local government exercise of police powers in the areas of land use and zoning. However, as discussed in the preamble to the proposed rule, discrimination in the provision of those services and facilities which are prerequisites to obtaining dwellings, including refusals to provide municipal services or adequate property or hazard insurance because of race, color, religion, sex, handicap, familial status or national origin render housing unavailable in violation of the Fair Housing Act. In order to indicate that the refusal to provide, or the provision of different municipal services or facilities and property or hazard insurance for dwellings because of race, color, religion, sex, handicap, or national origin can constitute a violation of "the otherwise make unavailable or deny" provisions in the Act, the language in § 100.70(d) has been revised and a new illustration (§ 100.70(d)(4)) has been added. In addition, the illustration relating to discriminatory advertisements in § 100.70(d)(6) of the proposed rule has been removed, since such practices are more appropriate for the conduct made unlawful under § 100.75 of the rule.

*Section 100.75 Discriminatory advertisements, statements, and notices.*

Although the Fair Housing Advertising Regulations (24 CFR Part 109) apply to all advertising for dwellings, the Department believes that it is appropriate, in connection with regulations describing prohibited conduct related to the sale or rental of housing, to include additional guidance

as to prohibited conduct regarding this specific area. Section 100.75 describes prohibited conduct related to advertisements, notices and statements by persons engaged in the sale or rental of housing or in the printing and publishing of such advertisements, notices and statements.

No comments raised substantial issues regarding this provision, and it has been included in the final rule as it was proposed.

*Section 100.80 Discriminatory representations on the availability of dwellings.*

Section 100.80 states that the provision of inaccurate or untrue information about the availability of dwellings for sale or rent because of race, color, religion, sex, handicap, familial status, or national origin constitutes a violation of the Fair Housing Act. A person who receives the inaccurate or untrue information need not be an actual seeker of housing in order to be the victim of a discriminatory housing practice under this section.

A number of commenters requested that the final rule specifically indicate that the provision of inaccurate information to "testers" because of race, color, religion, sex, handicap, familial status, or national origin is unlawful under the Fair Housing Act. These commenters also recommended that the final rule should state that "testers" who are provided inaccurate information are persons aggrieved by a discriminatory housing practice who may file a complaint with the Secretary.

In response to these comments, an additional illustration has been added to this section which indicates that the provision of false or inaccurate information regarding the availability of dwellings to any person, including testers, because of race, color, religion, sex, handicap, familial status, or national origin would be unlawful under the Fair Housing Act.

*Section 100.85 Blockbusting.*

Blockbusting consists of any effort, for profit, to induce or attempt to induce a person to sell or rent a dwelling by representations regarding the entry into a neighborhood of a person or persons of a particular race, color, religion, sex, handicap, familial status, or national origin, or with a handicap. Proposed § 100.85(b) stated that it was not necessary that there be in fact a profit realized as a result of blockbusting, as long as the availability of profit was a factor involved in the blockbusting activity. A number of commenters indicated that the term "blockbusting"

was archaic and could be misread as meaning only efforts to get people to move out of a block. In addition, these commenters suggested that the language "as long as the availability of profit was a factor" would be confusing, since most law in the area has focused on whether a profit-oriented business is involved as well as whether the actions were taken for profit.

The description of the conduct made unlawful under § 100.85 follows the statutory prohibitions against discrimination under section 804(e) of the Fair Housing Act. These practices have generally been referred to as blockbusting, and the term appears in the statute. The specific activities made unlawful under section 804(e) would not be limited merely because of the use of the term "blockbusting". Therefore, the Department has determined that, while another more current term also may aptly describe the type of activities covered by this section (e.g. panic selling and panic buying), changing the terminology in this area could result in substantial confusion as to whether the change in accepted terminology implied any change in the coverage of the provision. In addition, the Department believes that the language in the proposed rule regarding profit as a factor in unlawful blockbusting activities accurately describes the breadth of activities covered.

Because the illustration in § 100.85(c)(3) could be misinterpreted as implying that blockbusting activity involving uninvited solicitations for listings would violate the Act only if different or more intensive solicitation activity were involved, this illustration has been removed in the final rule. However, in order to make clear that such practices can constitute discriminatory housing practices, the illustration in § 100.85(c)(1) has been revised to include a specific reference to uninvited solicitation for listings which would constitute a violation of the Act.

*Section 100.90 Discrimination in the provision of brokerage services.*

Section 100.90 reflects the prohibition in the Fair Housing Act against denying any person access to, or membership or participation in, any multiple listing service, real estate brokers' organization or facility relating to the business of selling or renting dwellings on account of race, color, religion, sex, handicap, familial status, or national origin. This section also states that it is unlawful to discriminate against any person in the terms or conditions of such access, membership or participation because of race, color, religion, sex, handicap,

familial status, or national origin. Several commenters requested that the Department provide an additional example of unlawful conduct relating to restrictions on access to service through area limitations. In response to these commenters, a new illustration describing unlawful discrimination in establishing geographic boundaries or office or residence requirements because of race, color, religion, sex, handicap, familial status, or national origin has been added to this section.

## Subpart C—Discrimination in Residential Real Estate-Related Transactions

*Section 100.110 Discriminatory practices in residential real estate-related transactions.*

Section 100.110 indicates the general prohibition against discrimination in the availability of, or in the terms or conditions imposed in, any residential real estate-related transaction because of race, color, religion, sex, handicap, familial status, or national origin. The prohibitions against discrimination in Subpart C apply to any person or other entity whose business includes engaging in residential real estate-related transactions.

Several commenters recommended that the statement of general prohibition against discrimination in residential real-estate related transactions incorporate by reference, into the Fair Housing Act regulations, the regulatory implementation of the Equal Credit Opportunity Act by Federal financial regulatory agencies.

The Equal Credit Opportunity Act (15 U.S.C. 1691) makes it unlawful, in part, to discriminate against persons on the basis of race, color, religion, sex, national origin, marital status or age in any aspect related to a credit transaction.

The Equal Credit Opportunity Act provides for administrative enforcement by specified Federal financial regulatory agencies and empowers the Federal Trade Commission to provide for overall enforcement of the Act.

HUD has no enforcement authority under the Equal Credit Opportunity Act and no enforcement responsibility with respect to implementing regulations published by the Federal financial regulatory agencies under the Equal Credit Opportunity Act. As a result, the inclusion of such regulations in this section by reference would have no legal effect. This comment has been rejected.

*Section 100.115 Residential real estate-related transactions.*

This section incorporates into Part 100 the definition of the term "residential real estate-related transaction" contained in section 6(c) of the Fair Housing Amendments Act of 1988.

*Section 100.120 Discrimination in the making of loans and in the provision of other financial assistance.*

Section 100.120 states that it is unlawful for a person or entity engaged in residential real estate-related transactions to discriminate against persons because of race, color, religion sex, handicap, familial status, or national origin in making available loans or other financial assistance relating to dwellings. The prohibitions against discrimination in the making of loans and in the provision of other financial assistance reflects the language relating to discrimination in the financing of housing under Title VIII of the Civil Rights Act of 1968.

In connection with the development of § 100.120, the Department has been guided by its experience in connection with the past administration and enforcement of Title VIII. Since the definition of the term "residential real estate-related transactions" covers loans and other financial assistance which are secured by residential real estate, the defininition expands the types of financing transactions which were previously covered by the nondiscrimination requirements of Title VIII. However, there is nothing in the legislative history of the Fair Housing Amendments Act of 1988 to indicate that the Congress intended that loans and other assistance secured by a dwelling be treated any differently than loans for the purchase, construction, improvement, repair, or maintenance of a dwelling. Thus, this section applies equally to both types of loans.

As discussed earlier in this preamble, the illustrations of the application of this section that were contained in § 100.120(b)(1), (3), (4), (5), (6), and (7) of the proposed rule have been removed, pending Congressional action on the issue of pro-integration activities.

*Section 100.125 Discrimination in the purchasing of loans.*

The principal change in the nature of the conduct made unlawful regarding loans and other assistance with respect to dwellings is the inclusion of loans relating to the purchase of such loans. In prohibiting discrimination in the purchasing of loans, Congress extended the coverage of the Fair Housing Act to conduct in the secondary mortgage

market. However, the House Report on the Fair Housing Amendments Act of 1988 states, with regard to this expanded coverage, "The Committee does not intend that those purchasing mortgage loans be precluded from taking into consideration factors justified by business necessity (including requirements of Federal law) which relate to the financial security of the transaction or the protection against default or diminution in the value of the property." House Report at 30.

Section 100.125 sets forth the new coverage of secondary mortgage market activities under the Fair Housing Act. Since the protections provided under this section are new, the illustrations of discriminatory housing practices in this section focus on general areas of unlawful conduct under the Act. In this respect, the illustrations indicate that conduct made unlawful with regard to secondary mortgage market activities includes actions taken with respect to the purchase and pooling of mortgage loans as well as with respect to the terms and conditions of the sale of securities issued on the basis of such loans.

Commenters on this section were in general agreement with the overall content of the provisions in the proposed rule but recommended that certain language in the House Report, which they pointed out was also used by Senator Kennedy in a colloquy with Senator Sasser on the floor of the Senate, see 134 Cong. Rec. S10549 (daily ed. Aug. 2, 1988), be included in the text of the rule. Since there is a clear indication of congressional intent with respect to transactions involving the purchasing of loans, language relating to factors justified by business necessity have been added. Thus, this provision would not preclude considerations employed in normal and prudent transactions provided that no such factor may in any way relate to race, color, religion, sex, handicap, familial status or national origin.

One commenter representing mortgage bankers indicated that the term "purchasing" of housing loans in the mortgage banking business could involve a number of different and unrelated types of activities. This commenter described mortgage loan activities engaged in by mortgage bankers as involving the originating, selling and servicing of mortgages. This commenter pointed out that, in mortgage banking, the term "purchasing" has been used loosely to describe the purchase of rights to service mortgages. In this process, the equitable interest in the loan remains unaffected but the legal

title to the loan and the right to service the loan and retain servicing fees has been purchased. Based on this description, the commenter indicated its belief that such transactions would be outside the coverage of the Fair Housing Act because such transactions did not involve any financing decision by the purchaser (since the loan had been closed prior to the purchase of servicing rights) and suggested that the final rule define the term "purchase" in a manner to exclude such transactions from the Fair Housing Act.

Section 805 of the Civil Rights Act of 1968 made it unlawful "to deny a loan or other financial assistance to a person applying therefor * * * or to discriminate against him in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other financial assistance * * *"

In amending this section of the Fair Housing Act, Congress revised the thrust of the prohibitions covered under Section 805 to protect persons from discrimination in residential real estate-related transactions which were defined to include "the purchasing of loans * * * secured by residential real estate."

Under the Fair Housing Act, the nature of discriminatory conduct no longer can be limited to matters relating to the actual provision of financing. Further, the fact that the interest transferred in the servicing transaction involves only the legal title to the loans would not be a basis for concluding that there has not been a residential real estate-related transaction. For these reasons the recommendation in the comment has not been adopted in the final rule.

*Section 100.130 Discrimination in the terms and conditions for making available loans or other financial assistance.*

Section 100.130 states that it is unlawful to impose different terms or conditions for the availability of a loan or other financial assistance for a dwelling or which is, or will be secured by a dwelling because of race, color, religion, sex, handicap, familial status, or national origin.

As discussed earlier in the preamble, the illustrations proposed in § 100.130(b)(1) and (4) have been removed from the final rule in order to avoid anticipating the results of ongoing congressional analysis of issues relating to pro-integrative programs. Other illustrations and the general provision regarding discriminatory conduct under this section were not the subject of significant comment and have been retained in the final rule.

A substantial number of commenters had significant concerns relating to the issue of "redlining" as it was discussed in the preamble to the proposed rule. Much of the concern relating to this discussion focused on the statement that financial transactions in many cases involve "legitimate business judgments and complex financial, economic and social issues and problems". Many of the commenters asserted that this statement could be read to indicate that proof of actual intent to discriminate would be required in order to establish unlawful redlining under the Fair Housing Act. Other commenters indicated that the quoted language could be read as creating other considerations beyond those necessary in the business of making a decision on a loan (i.e., economic and social issues and problems) which have not been traditionally evaluated in the investigation of fair housing complaints and which are not relevant to the making of loans.

The Department agrees with the commenters that economic and social issues and problems are not relevant in connection with the review and analysis of cases under the Fair Housing Act. However, the Department does not believe that the reference to legitimate business judgments implies that proof of intent to discriminate is or is not required in redlining cases. The language in the preamble was intended to indicate that, in the decision to provide loans or other financial assistance, a lender may consider factors justified by business necessity, provided that such factors are unrelated to race, color, religion, sex, handicap, familial status, or national origin. This articulation is consistent with the preamble discussion relating to the purchasing of loans and the revised text of § 100.125 of the final rule.

Several commenters urged that the prohibition against redlining be included in the rule text. However, in view of the removal of the illustrations in § 100.130(1) (b) and (4), the Department has determined that it would not be appropriate to add such an illustration.

*Section 100.135 Unlawful practices in the selling, brokering, or appraising of residential real property.*

The prohibitions against discrimination because of race, color, religion, sex, handicap, familial status, or national origin in connection with residential real estate-related transactions apply to the selling, brokering and appraising of residential real property. Section 100.135(a) of the proposed rule stated that it is unlawful for any person whose business includes

engaging in the selling, brokering or appraising of residential real property to discriminate against any person in making available such services, or in the terms or conditions of such services, because of race, color, religion, sex, handicap, familial status, or national origin. Paragraph (a) of the final rule has been revised for the sake of clarity. It states that it is unlawful for any person or other entity whose business includes engaging in the selling, brokering or appraising of residential real property to discriminate against any person in making available such services or in the performance of such services because of race, color, religion, sex, handicap, familial status or national origin.

For the purpose of this rule, the term "appraisal" means an estimate or opinion of the value of a specified residential real property made in a commercial context in connection with the sale, rental, financing or refinancing of a dwelling or with any other residential real estate-related transaction, whether the appraisal is oral or written, or transmitted formally or informally.

The Fair Housing Act provides a specific exemption related to appraisals, stating that nothing in the Act prohibits a person in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, sex, handicap, familial status, or national origin. However, the Department indicated in the preamble to the proposed rule its position that consideration of any factor because of race, color, religion, sex, handicap, familial status, or national origin *does* constitute a discriminatory housing practice.

Two professional organizations representing appraisers agreed with the description of the coverage of appraisal practices but suggested that the language used in the illustrations could be read as precluding, in certain instances, the use of observable, verifiable data that affect the market value of property in a particular area, such as the proximity of certain facilities or services. In this respect, they suggested that the illustrations in this section should be revised to reflect more clearly the fact that appraisers can consider any factors other than race, color, religion, sex, handicap, familial status, or national origin in the appraisal of residential real property.

The illustrations in § 100.135(d) (1), (2), and (3) have been removed in the final rule, pending the result of congressional action with respect to the issue of pro-integrative activities, and since the regulation incorporates the

statutory language on the use of other factors. In addition, paragraph (d) has been shortened and revised so that it will not inadvertently prohibit appraisers from considering factors which may lawfully be considered. Paragraph (d) of the final rule states that practices which are unlawful under §100.135 include, but are not limited to, using an appraisal of residential real property in connection with the sale, rental, or financing of any dwelling where the person knows or reasonably should know that the appraisal improperly takes into consideration race, color, religion, sex, handicap, familial status or national origin. The word "improperly" was added so that it will be absolutely clear that an appraisal may, for example, consider an adaptable physical environment as a positive factor in estimating the value of residential real property. However, the Department wishes to stress that it would not be proper or lawful, for example, to consider factors such as race, sex or national origin in appraising residential real property.

These commenters also indicated that the use of the term "commercial context" in §100.135(b) would lead to confusion within the appraisal industry as to the type of structures to which the nondiscrimination requirements in the Fair Housing Act apply.

The use of the term "commercial context" in the regulation was intended to indicate that the situations covered were directly related to conduct of the business of appraising and were not intended to diminish the rights of persons with respect to their private rights under the First Amendment. To avoid the possibility of confusion in this area, the word "business" has been substituted for "commercial" in this section.

### Subpart D—Prohibitions Against Discrimination Because of Handicap

*Section 100.200   Purpose.*

Section 100.200 is unchanged from the proposed rule. It explains that the purpose of Subpart D is to effectuate the provisions concerning handicap in the Fair Housing Amendments Act of 1988. No comments were received on § 100.200.

*Section 100.201   Definitions.*

Section 100.201 proposed definitions to be used for terms used only in Subpart D. The definitions in Subpart A also apply to Subpart D. Substantial comments were received on the definitions in the proposed rule that are discussed below. The other definitions have not been modified.

An editorial change has been made to the final definition of "accessible". The proposed rule stated that a public or common use area that complies with the appropriate requirements of ANSI A117.1 or another standard that affords handicapped persons access essentially equivalent to or greater than that required by ANSI A117.1 is "accessible". The final rule states more simply that a public or common use area that complies with the appropriate requirements of ANSI A117.1–1986 or a comparable standard is "accessible". The final sentence of the definitions of "accessible route" and "building entrance on an accessible route" have also been changed for the sake of consistency.

"ANSI A117.1" means the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people. The American National Standards Institute, Inc. (ANSI) is a private, national organization that publishes standards on a wide variety of subjects. The Secretariat that developed the 1986 edition of the ANSI standard was composed of the National Easter Seal Society, the President's Committee on Employment of the Handicapped, and HUD. The current version of these standards was published in 1986 and is referred to as "ANSI A117.1–1986".

The preamble of the proposed rule explained that whenever ANSI A117.1 is used in Subpart D, the reference is to the most recently published edition of ANSI A117.1 as of the date bids for construction of a particular building are solicited. A number of commenters suggested that this statement should appear in the text of the regulation. Other commenters objected that an "open-ended" reference to future ANSI standards represents an unlawful delegation of the Department's rulemaking authority. According to these commenters, HUD should refer to a specific edition of the AMSI standards in its rule and should incorporate future editions only through rulemaking proceedings. Because of this concern the definition of ANSI A117.1 in the final rule is defined as the 1986 edition of ANSI ("ANSI A117.1–1986."). The Department intends to propose to amend the definition of ANSI as future editions of ANSI are published.

"Building" means a structure, facility or the portion thereof that contains or serves one or more dwelling units. For example, a structure that serves one or more dwelling units includes a structure containing recreational facilities for residents of an apartment complex. A substantial number of comments were received on this definition as it applies

to townhouses. The application of Subpart D to townhouses is discussed in connection with the definition of the term "covered multifamily dwellings". The definition of "building" has not been changed from the proposed rule.

"Common use areas" means rooms, spaces or elements inside or outside a building that are made available for the use of residents of a building or the guests thereof. The proposed rule cited as examples of common areas hallways, lounges, lobbies, laundry rooms, refuse rooms and passageways among and between buildings. A number of commenters suggested that mailrooms and recreational areas be added to this list. Other commenters, including the National Apartment Association, argued that the definition should not include "public amenities" such as swimming pools, jacuzzis, hot tubs, saunas or exercise facilities. They suggest that the legislative history is silent with respect to such facilities.

The definition of common use areas in the rule is a close adaptation of the definition of the term "common use" in ANSI A117.1–1986. Since the Act makes specific reference to ANSI, the Department believes that Congress intended that the ANSI definition apply. Furthermore, the House Report states that the Act's requirement that the public and common use portions of covered multifamily dwellings be readily accessible to and usable by handicapped persons "means that hallways, lounges, lobbies, passageways among and between buildings and other common areas *and facilities* not contain barriers to entrance and use by handicapped persons." House Report at 26 (emphasis supplied). Mailrooms and recreational areas can fairly be read as falling within this description. Therefore, these two additional examples have been added to the list of common use areas because they fall within the definition. The list in the final rule is illustrative and not exclusive. In this regard, the Department notes that the House Report states that the Act does not require that all entrances to public and common use areas be made accessible to handicapped persons. Rather, the Act requires that "one regular entrance to such areas be accessible to handicapped persons for the same purpose for which it is used by others." *Id.* Further, the Act does not require that amenities be installed. "The intent of the language is that only if such amenities are provided, then they must be readily accessible to and usable by handicapped persons." *Id.*

A "covered multifamily dwelling" means buildings consisting of 4 or more

dwelling units if such buildings have one or more elevators; and ground floor dwelling units in other buildings consisting of 4 or more dwelling units. The preamble of the proposed rule explained that a single structure consisting of 5 two-story townhouses is not a "covered multifamily dwelling" if the units do not have elevators, because the entire dwelling unit is not on the ground floor. In contrast, a single-story townhouse is a covered multifamily dwelling. A number of commenters agreed with this interpretation; some reasoned that townhouses are not multifamily buildings because each unit typically has a separate outside entrance.

Other commenters objected to this interpretation, arguing that townhouses are covered because Congress intended that there be a broad interpretation of the Act. They believe that Congress intended to exempt otherwise covered dwellings from accessibility requirements only if *no* part of the dwelling unit touched the ground floor. These commenters cited in support of their position a statement made by Senator Kennedy during the Senate debate on the Act, in which he referred to the need to make the ground floor of multi-level housing accessible so that friends and relatives with mobility impairments can visit. Specifically, Senator Kennedy stated as follows: "This legislation does not affect the single-family home. What we are talking about is the multifamily dwelling with four or more units. You only have to meet these very simple [accessibility] requirements if you actually have an elevator, or, if you do not have an elevator, only the bottom floor *unit is* covered." 134 Cong. Rec. S. 10538 (daily ed. August 2, 1988) (emphasis added). Senator Kennedy's later reference to the importance of making units accessible so that friends and relatives can visit was in response to Senator Humphrey's proposal to limit the scope of the Act's accessibility requirements to 20 percent of the units. *Id.* The Department believes that the Senate debate referenced by these commenters supports its interpretation because Senator Kennedy spoke of "bottom floor units." The first floor of a multi-story townhouse is not a bottom floor unit because the entire unit is not on the bottom or ground floor.

Most significantly, the accessibility requirements of the Act itself extend only to "ground floor units" in buildings without elevators. The commenters' position would require reading "ground floor units" as "ground floor *portions of* units." The Act also requires that all premises within covered multifamily

dwellings have an accessible route into and through the dwelling. A "covered" townhouse of more than one story would in most cases require an elevator in order to provide an accessible route throughout. This result would make the Act's distinction between buildings with elevators and buildings without elevators meaningless. Beyond this, the House Report (at p. 25) makes it clear that the Act was not intended to require the installation of elevators.

For these reasons the Department continues to believe that townhouses consisting of more than one story are covered only if they have elevators and if there are four or more such townhouses. Accordingly, the definition of "covered multifamily dwellings" in the final rule is unchanged from the proposed rule.

"Dwelling unit" was defined in the proposed rule as "any building, structure or portion thereof, which is occupied as, or designed or intended for occupancy as, a residence by one person or family." 53 FR 45029 (November 7, 1988). A significant number of comments, including comments submitted by Senators Kennedy and Specter and Representative Edwards, were concerned that the phrase "one person or family" would be too restrictive in that individuals with handicaps may require a personal attendant to live with them, or may find it beneficial to live with another individual, who is or is not also handicapped. For example, an individual with a disability may live with an attendant who is not a member of his or her family. Other commenters were concerned that the definition of "dwelling unit" is too similar to the definition of "dwelling" in § 100.20. They found the similarity confusing. In order to accommodate these concerns the definition of "dwelling unit" has been revised substantially in the final rule. The final rule defines "dwelling unit" as "a single unit of residence for a family or one or more persons." The definition in the final rule also contains a more comprehensive list of examples of dwelling units in order to further clarify the types of units that may be covered. Examples of dwelling units include a single family home and an apartment unit within an apartment building. In other types of dwellings (as defined in § 100.20) in which sleeping accommodations are provided but toileting or cooking facilities are shared by occupants of more than one room or portion of the dwelling, rooms in which people sleep are "dwelling units". For example, dormitory rooms and sleeping accommodations intended for

occupancy as a residence in shelters for homeless persons are "dwelling units".

"First occupancy" means a building that has never before been used for any purpose. This definition is unchanged from the proposed rule. A number of commenters stated that HUD should state explicitly that substantial rehabilitation is not covered. The Department believes that the definition clearly excludes a substantially rehabilitated building because one could not reasonably argue that such a building "has never before been used for any purpose."

"Ground floor" means any floor of a building with a building entrance on an accessible route. A building may have more than one ground floor. This definition was the subject of considerable public comment. Many commenters interpreted the proposed rule as *requiring* that covered buildings have more than one ground floor. This is not what the Department proposed. Section 100.205(a) requires that covered multifamily dwellings for first occupancy after March 13, 1991, be designed and constructed to have *at least one* building entrance on an accessible route unless it is impractical to do so because of the terrain or unusual characteristics of the site. The regulation does not require that any building have *more* than one ground floor; a covered building with one building entrance on an accessible route (*i.e.*, ground floor) satisfies the requirements of the regulation with regard to accessibility to the building. However, if a covered building in fact has more than one floor with a building entrance on an accessible route, then the rule requires that the units on *each* floor with an accessible building entrance satisfy the Act's accessibility requirements.

Other commenters correctly interpreted the proposed rule as requiring that there be one building entrance on an accessible route but nonetheless argued that *even if* a particular building, because of the terrain, has accessible entrances to more than one floor, the units on only one such floor should be required to meet the Act's accessibility requirements. The Department does not believe that Congress intended to exempt from the Act's accessibility requirements dwelling units that are on a floor of a building that can be entered through a building entrance on an accessible route. If a building does not have an elevator, then all of the units on accessible floors must meet the Act's accessibility requirements.

*Definition of "Handicap".* The term "handicap" means, with respect to a person, a physical or mental impairment which substantially limits one or more of such person's major life activities; a record of having such an impairment; or being regarded as having such an impairment. However, this term does not include current, illegal use of or addiction to a controlled substance. The term also does not include an individual solely because that individual is a transvestite. Paragraphs (a), (b), (c) and (d) of the definition clarify the key phrases in the definition: "physical or mental impairment"; "major life activities"; "has a record of such an impairment"; and "is regarded as having an impairment".

A substantial number of comments were received on the definition of "handicap" in the proposed rule. They fall generally into two different groups.

One group of commenters, including the National Association of Homebuilders and the National Association of Realtors, requested that paragraphs (a), (b), (c) and (d) of the definition in the proposed rule be deleted. These commenters are concerned that these paragraphs broaden the definition of handicap "far beyond" the intent of Congress as expressed in the plain language of the statute. Moreover, they are concerned that the definition of handicap is so broad that housing providers will be powerless to exclude handicapped persons with a tendency toward antisocial or dangerous behavior.

With the exception of current, illegal use of or an addiction to a controlled substance, the definition of "handicap" in the Act is very similar to the definition of the term "individual with handicaps" in the Rehabilitation Act of 1973. 29 U.S.C. 706. Congress intended that the definition of "handicap" in the Fair Housing Amendments Act be interpreted in a manner that is consistent with regulations interpreting the meaning of the similar provision found in section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794. House Report at 22; 134 Cong. Rec. S10492 (daily ed. August 1, 1988) (statement of Sen. Chafee); 134 Cong. Rec. H4689 (daily ed. June 23, 1988) (statement of Rep. Pelosi); 134 Cong. Rec. H4612 (daily ed. June 22, 1988) (statement of Rep. Schroeder).

Section 504 of the Rehabilitation Act prohibits discrimination against otherwise qualified individuals with handicaps in programs or activities receiving federal financial assistance as well as in federally conducted programs and activities. The Department of Justice's section 504 coordination regulation for federally assisted programs is at 28 CFR Part 41. HUD's section 504 regulation for federally assisted programs is at 24 CFR Part 8. Paragraphs (a), (b), (c) and (d) of the definition of "handicap" closely follow the definitions of these key phrases used in regulations interpreting section 504. In light of the clear legislative history indicating that Congress intended that the definition of "handicap" be fully as broad as that provided by the Rehabilitation Act, the Department does not believe that it would be appropriate to delete paragraphs (a), (b), (c) and (d) from the definition.

Some of the commenters who requested this change appear erroneously to assume that a housing provider must admit any person who has a handicap as defined in the rule. This is not the case. Just because an applicant for housing has a handicap does not preclude a housing provider from lawfully rejecting that particular applicant. For example, alcoholism is considered a "physical or mental impairment" and therefore alcoholics frequently will fall within the definition of "handicap". However, the fact that alcoholism may be a handicap does not mean that housing providers must ignore this condition in determining whether an applicant for housing is qualified. On the contrary, a housing provider may hold an alcoholic to the same standard of performance and behavior (*e.g.,* tenant selection criteria) to which it holds others, even if any unsatisfactory performance or behavior is related to the applicant's alcoholism. In other words, while an alcoholic may not be rejected by a housing provider because of his or her alcoholism, the behaviorial manifestations of the condition may be taken into consideration in determining whether or not he or she is qualified.

Thus, a housing provider may judge handicapped persons on the same basis it judges all other applicants and residents. A housing provider may consider for *all* applicants, including handicapped applicants, such concerns as past rental history, violations of rules and laws, a history of disruptive, abusive, or dangerous behavior. However, a housing provider may not treat handicapped applicants or tenants less favorably than other applicants or tenants. For example, a housing provider may not presume that applicants with handicaps are less likely to be qualified than applicants without handicaps.

Another group of commenters asked HUD to clarify that persons who are infected with the Human Immunodeficiency Virus ("HIV" or "AIDS virus") are understood to be persons with a "handicap" protected by the Act. The legislative history of the Act contains numerous statements that HIV-infected individuals are covered by the Act. *See* House Report at 22, n. 55; 134 Cong. Rec. H4922 (daily ed. June 29, 1988) (statement of Rep. Owens); 134 Cong. Rec. at H4221 (daily ed. June 29, 1988) (statement of Rep. Waxman); 134 Cong. Rec. H4612 (daily ed. June 22, 1988) (statement of Rep. Schroeder); 134 Cong. Rec. H4613 (daily ed. June 22, 1988) (statement of Rep. Coelho); 134 Cong. Rec. H4689 (daily ed. June 23, 1988) (statement of Rep. Pelosi). In addition, the Office of Legal Counsel of the U.S. Department of Justice issued an opinion dated September 17, 1988 concluding that section 504 of the Rehabilitation Act of 1973 protects symptomatic and asymptomatic HIV-infected individuals against discrimination in any covered program or activity on the basis of any actual, past or perceived effect of HIV infection that substantially limits any major life activity, so long as the HIV-infected individual is "otherwise qualified" to participate in the program or activity, as determined under the "otherwise qualified" standard set forth by the U.S. Supreme Court in *School Board of Nassau County v. Arline,* 107 S. Ct. 1123 (1987) (*Arline*). This opinion is significant because, as previously noted, the legislative history of the Fair Housing Amendments Act makes it clear that Congress intended the same definition of the term handicap that applies under section 504 to apply to the Fair Housing Act. In light of these authorities, the Department has added "Human Immunodeficiency Virus infection" to the illustrative list of "physical or mental impairments" in the final rule's definition of handicap.

"Interior" means the spaces, parts, components or elements of an individual dwelling unit. The comments received relative to this definition are discussed in connection with comments received on § 100.203 of the proposed rule relating to modifications of existing premises. The definition of "interior" has not been changed from the proposed rule.

"Premises" means the interior or exterior spaces, parts, components or elements of a building or a dwelling unit, including individual dwelling units and the public and common use areas of a building. The comments received relative to this definition are discussed in connection with the comments received on § 100.203 of the proposed rule relating to modifications of existing premises. The definition has not been changed from the proposed rule.

*Section 100.202 General prohibitions against discrimination because of handicap.*

Section 100.202 contains the general prohibitions against discrimination because of handicap and serves as the analytical foundation for the remaining sections of the subpart. The remaining sections of Subpart D explain in greater detail what conduct is discriminatory. Thus, whenever a person has violated any of the subsequent sections of Subpart D, that person has also violated § 100.202

Paragraph (a) is unchanged from the proposed rule. It restates the Fair Housing Amendments Act's mandate of nondiscrimination in the sale or rental of dwellings. Under paragraph (a), it is unlawful to discriminate against any person in the sale or rental of, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter, a person residing in or intending to reside in that dwelling after it is so sold, rented, or made unavailable, or any person associated with that buyer or renter.

Paragraph (b) is also unchanged from the proposed rule. It restates that Act's ban of discrimination in the terms, conditions, or privileges of the sale or rental of a dwelling. Paragraph (b) makes it unlawful to discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of a handicap of that buyer or renter, a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available, or any person associated with that person.

*Land Use and Zoning Rules and Practices.* The thrust of the public comments received on the general prohibitions in paragraphs (a) and (b) is that the rule does not address explicitly discriminatory local land use, health and safety, and zoning rules that "eliminate" community housing opportunities for persons with disabilities. These commenters ask that the Department add to the regulation a prohibition on rules and practices which establish unique requirements for housing for persons with disabilities and which create barriers to the development of such housing. These commenters correctly point out that the House Report discusses such matters in considerable detail. Specifically, the House Report states that the prohibition against discrimination against those with handicaps was intended to apply to zoning decisions and practices: "The

Act is intended to prohibit the application of special restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community." House Report at 24.

The Department does not believe that it would be appropriate to address the issue in these regulations. This concern is heightened since, under section 810(g)(2)(C) of the Fair Housing Act, as amended, if the Secretary determines that a matter involves the legality of any State or local zoning or other land use law or ordinance, the Secretary shall immediately refer the matter to the Attorney General for appropriate action under section 814 of the Fair Housing Act. Since the Secretary has no power to issue a charge of discrimination in matters involving zoning or other land use law, the Department believes that it is inappropriate to address this specific issue in these regulations. However, it should be noted that failing or refusing to provide municipal services for dwellings or providing such services differently because of race, color, religion, sex, handicap, familial status or national origin is a violation of § 100.70(c)(6) of these regulations.

*Applicant Selection Inquiries.* Paragraph (c) is an adaptation of the "pre-employment inquiries" provision in the section 504 regulations; it prohibits inquiries to determine whether an applicant for a dwelling, a person intending to reside in that dwelling after it is sold, rented or made available, or any person associated with that person has a handicap or to make inquiry as to the nature or severity of a handicap of such person.

Paragraph (c) also states that it does not prohibit five types of inquiries, provided these inquiries are made of all applicants, whether or not they have handicaps. Paragraph (c) resulted in considerable public comment.

Paragraph (c)(1) clarifies that a housing provider may inquire into an applicant's ability to meet the requirements of ownership or tenancy. Commenters generally considered this particular inquiry helpful in providing guidance to both housing providers and housing applicants.

Paragraph (c)(2) states that paragraph (c) does not prohibit inquiry to determine whether an applicant is qualified for a dwelling that is available only to persons with handicaps or to persons with a particular type of handicap. Paragraph (c)(3) provides that paragraph (c) does not prohibit an inquiry to determine whether an applicant for a dwelling is qualified for a

priority available to persons with handicaps or to persons with a particular type of handicap. These two inquiries where criticized by organizations representing persons with disabilities, including the Consortium for Citizens with Developmental Disabilities. These commenters fear that such inquiries will be abused by housing providers as a means of impermissibly inquiring about the extent or severity of a disability. Nonetheless, some of these commenters recognized that the ability to make these inquiries often is necessary to determine eligibility for government housing programs; for example, some Federal and State housing is designed for, and occupied by, persons with handicaps. Only persons with handicaps are eligible to live in such dwellings. Beyond this, as the Department explained in the proposed rule, the Fair Housing Amendments Act does not prohibit the exclusion of non-handicapped persons from dwellings. A privately owned unsubsidized housing facility may lawfully restrict occupancy to persons with handicaps. The owner or operator of such a housing facility must therefore be permitted to inquire of applicants to determine whether they have a handicap for the purpose of determining eligibility.

A housing provider may also choose to offer some or all of its units to persons with handicaps on a priority basis and may inquire whether applicants qualify for such a priority. For example, a housing provider may offer accessible units to persons with mobility impairments on a priority basis and may ask applicants whether they have a mobility impairment which would qualify them for such a priority but may not in such circumstances ask applicants whether they have other types of impairments.

After carefully considering the comments received the Department continues to believe that the inquiries permitted by paragraphs (c)(2) and (3) are consistent with the Act and that the benefits of permitting these inquiries outweigh the potential for abuse, because the circumstances in which such inquiries can be made are carefully circumscribed. A dwelling must either be available only to persons with handicaps or to persons with a particular type of handicap or the dwelling must genuinely be available on a priority basis to persons with a handicap or to persons with a particular type of handicap. Otherwise, such an inquiry cannot be made.

Paragraph (c)(4) provides that paragraph (c) does not prohibit inquiring

whether an applicant for a dwelling is a current illegal abuser of or addict to a controlled substance. The definition of "handicap" in the Fair Housing Amendments Act does not include current, illegal use of or addiction to a controlled substance. *See* House Report at 30. Paragraph (c)(4) was not the subject of substantial comment and is unchanged from the proposed rule.

Paragraph (c)(5) provides that paragraph (c) does not prohibit inquiring whether an applicant has been convicted of the illegal manufacture or distribution of a controlled substance. Section 807(b)(4) of the Fair Housing Act states that nothing in the Act prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance. Paragraph (c)(5) was not the subject of substantial comment and is unchanged from the proposed rule.

Paragraph (d) restates new section 804(f)(9) of the Fair Housing Act which provides that nothing in section 804(f) requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others. This paragraph was criticized by organizations representing disabled persons because it simply repeats the statutory language and provides no guidance concerning its proper implementation. Furthermore, the placement of the language contained in paragraph (d) was questioned, in that it follows a list of questions that housing providers are permitted to ask to determine the qualifications of applicants. These commenters fear that the absence of any detail beyond the statutory language might suggest that a housing provider need not follow any objective method for determining that an applicant "would constitute a direct threat to the health or safety of other individuals." At the same time, these commenters recognized that the preamble of the proposed rule contained considerable explanation of paragraph (d). 53 FR 45001–02 (November 7, 1988). The preamble discussion was considered by these commenters to be consistent with the intent of the statute. A number of commenters suggested that the preamble language be incorporated in the rule.

On the other hand, organizations representing housing providers are concerned that property owners or managers will not be able to determine whether or not an applicant poses a

threat to the safety of others without substantial amounts of information and that they ultimately will be subject to increased liability. They ask that the regulations be revised expressly to permit a property owner or manager to inquire into a prospective tenant's "history of antisocial behavior or tendencies." Alternatively, it was suggested that HUD promulgate a regulation that absolves a property owner or manager of liability for any injury caused by reason of a condition of a person with a handicap.

The Department does not believe that it is necessary or appropriate to incorporate detailed preamble language discussing the Supreme Court decision in *School Board of Nassau County v. Arline*, 107 S Ct. 1123 (1987), into the regulation. This is especially true since the case law in this area continues to develop at a relatively rapid pace. However, the Department wishes to stress that it will interpret and enforce paragraph (d) consistent with the discussion in the preamble of the proposed rule and envolving case law.

The Department also does not believe that it would be appropriate to revise § 100.202 expressly to permit inquiries into "antisocial" behavior or "tendencies." Language such as this might well be seen as creating or permitting a presumption that individuals with handicaps generally pose a greater threat to the health or safety of others than do individuals without handicaps. Such a presumption is unwarranted and would run counter to the intent and purpose of the Act. House Report at 28. Likewise, a regulatory provision stating that housing providers shall not be liable for personal injury or property damages caused by reason of another person's handicap could also be seen as creating a presumption that persons with handicaps are more likely to pose a threat to persons or property that are other persons and would run counter to the intent of the Act, since Congress made no such presumption. For example, the House Committee on the Judiciary stated that it did not "foresee that the tenancy of any individual with handicaps would pose any risk, much less a significant risk, to the health or safety of others by the status of being handicapped * * *." *Id.*

For these reasons, § 100.202 is unchanged from the proposed rule.

*Section 100.203   Reasonable modifications of existing premises.*

Paragraph (a) implements section 804(f)(3)(A) of the Fair Housing Act, as amended. Under paragraph (a), it is illegal to refuse to permit a tenant with

disabilities to make reasonable modifications, at his or her expense, of existing premises if the proposed modifications are necessary for the full enjoyment of the premises. In the case of a rental, the landlord may, where it is reasonable to do so, condition permission for a modification on the renter agreeing to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted.

Paragraph (a) allows reasonable modifications at the expense of the individual with handicaps to existing "premises". "Premises" is defined in § 100.201 to mean the interior or exterior parts, components or elements of a building or a dwelling unit, including the public and common use areas of a building. Thus, an individual with handicaps would be able, at his or her own expense, to make reasonable accommodations to lobbies, main entrances of apartment buildings, laundry rooms and other common and public use areas necessary to the full enjoyment of the premises. The Department proposed to define the term "premises" to encompass the public and common use areas because it appears that this is what Congress intended. The Act allows reasonable modifications of "existing premises" if necessary to afford the handicapped person full enjoyment of the premises. If the laundry room is not accessible, for example, a person with a mobility impairment will not have "full enjoyment" of the premises. "interior" is defined as the spaces, parts, components or elements of an individual dwelling unit.

*Restoration of Modifications to Public and Common Use Areas.* The Department specifically invited public comment on the definitions of the terms "premises" and "interior", especially in light of the fact that section 15 of the Fair Housing Amendments Act provides that, in the case of a rental, the landlord may, where it is reasonable to do so, condition permission for a modification on the renter agreeing to restore the *interior* of the premises to the condition that existed before the modification, reasonable wear and tear excepted.

Many of the comments received on this question were in agreement with the Department's definitions of these terms. For example, the American Institute of Architects stated that since the types of modifications made to the public and common use areas of a building's interior are on the order of those made to the exterior of the building, it would not be reasonable for the landlord to require the tenant to restore such

modifications to the preexisting condition.

Other commenters argued that public and common use areas should not be excluded from the restoration requirement, suggesting that the interpretation proposed by the Department will have the effect of forcing owners to take a narrow view of what constitutes a reasonable modification of a public or common use area.

After careful consideration, the Department continues to believe that the proposed rule's treatment of these issues is faithful to the statute. As the Department stated in the preamble of the proposed rule, reasonable modifications to public and common use areas will not detract significantly from the public and common use areas modified, and may be of benefit to other persons with and without handicaps.

Some commenters complained that the proposed rule did not discuss how a landlord's responsibilities under § 100.204 to make reasonable accommodations mesh with § 100.203. These commenters note that § 100.204 applies to services, and interpreted the proposed rule as assuming, for example, that if a laundry room is inaccessible, the only option open to the tenant is to pay for physical modifications necessary to make the room accessible. One commenter requested that the Department clarify that if the tenant chooses to ask a friend to do his or her laundry in the laundry room, the landlord must accommodate this situation by waiving any rule that prohibits non-tenants from gaining access to the laundry room. The Department agrees that this is the sort of accommodation required by § 100.204.

*"Security Deposits."* The final sentence of paragraph (a) of the proposed rule stated that a landlord may not increase for handicapped persons any customarily required security deposit for the purpose of securing payment for modifications. The Department invited public comment on this question as well, 53 FR 45003 (November 7, 1988), and received substantial comments on both sides of this issue.

A number of commenters stated their belief that a prohibition on an increased security deposit for handicapped persons who make modifications at their own expense is required by the Fair Housing Act. They point out that section 804(f)(2) of the Act makes it unlawful to discriminate in the terms, conditions, or privileges of the rental of a dwelling because of handicap and state that such deposits should not be necessary and would create an undue burden on

persons with handicaps not intended by the Act.

On the other side of this issue, commenters speaking from the standpoint of housing providers urged the Department to provide that a landlord may require a reasonable additional security deposit to secure a renter's agreement to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted. These commenters point out that such a deposit is particularly necessary in case of the occupant's death, or abandonment of the unit without any notice. The National Association of Homebuilders stated that it is standard practice to require additional security deposits as a condition of a housing provider's granting permission for modifications to be made to a dwelling unit. These commenters argue that deposits are necessary so that all tenants, handicapped and non-handicapped alike, are treated equally and fairly.

Upon further consideration of this question, the Department has come to the view that this is not truly a question relating to a traditional security deposit. Security deposits are generally paid at the time a tenant moves in. A tenant with handicaps may request a landlord's permission to make modifications at any time. For example, a tenant may become disabled during his or her tenancy and then ask for permission to make modifications. At this point the tenant has already paid any customarily required security deposit. Further, the Department agrees that there is no basis for requiring that handicapped persons pay a higher customarily required security deposit than is paid by non-handicapped persons. However, the Department is mindful of the financial exposure of a landlord who may be required to permit a tenant to make extensive modifications to the interior of a dwelling unit that can reasonably be expected to interfere with the landlord's or the next tenant's use and enjoyment of the premises. The Department believes that there are specific instances where it would be reasonable for a landlord to condition permission for making modifications on the tenant paying into an interest bearing escrow account a reasonable amount of money to ensure that funds will be available to pay for those restorations that the tenant is legally required to make at the end of the tenancy. Accordingly, paragraph (a) of § 100.203 has been revised to reflect this view.

The third sentence of paragraph (a) continues to state that the landlord may not increase, for handicapped persons, any customarily required security

deposit. A new fourth sentence states that, where it is reasonable to do so, the landlord may negotiate as part of a restoration agreement a provision requiring that the tenant pay into an interest bearing escrow account, over a reasonable time period, a reasonable amount of money not to exceed the cost of restoring the modifications. The interest in any such account shall accrue to the benefit of the tenant.

The language added to paragraph (a) balances the interests of a handicapped person seeking to make modifications to a dwelling unit so that he or she will be able to live in the unit with the interests of the landlord in assuring that all required restorations are made at the end of the tenancy at the expense of the tenant. The new language makes it clear that escrow payments may be negotiated only where it is reasonable to do so. Thus, a landlord may not routinely require that escrow payments be made. Rather, the landlord must make a case-by-case determination based upon such factors as the extent and nature of the proposed modifications, the expected duration of the lease, the credit and tenancy history of the individual tenant, and other information that may bear on the risk to the landlord that the premises will not be restored. It can be expected that generally a tenant making extensive modifications to a unit at his or her own expense will plan to live in that unit for more than a brief period of time. Both the amount and terms of the escrow payment are subject to negotiation between the landlord and the tenant. For example, if the proposed modifications which are subject to restoration are minor and the tenant has a good credit history or otherwise can provide reasonable assurances that he or she will be able to ensure that the restorations are carried out, then it would not be reasonable for the landlord to require any payment. On the other hand, if the tenant wishes to make extensive modifications that must be restored and has only a "fair" credit history, or other factors suggest that the tenant would not be able to ensure that the restorations are carried out, then it might be reasonable for a landlord to require a payment. Of course, the landlord may not require that the total amount to be paid exceed the reasonable cost of restoring the modifications that must be restored at the end of the tenancy. The Department expects that frequently a smaller amount will suffice to protect the interests of the landlord. Furthermore, landlords may not assume that persons with handicaps are less creditworthy

than persons without handicaps. Just because the facts warrant requiring *a payment* does not mean that the landlord may reasonably require that the full restoration costs be paid before the modifications are even made.

If a person with handicaps seeking to make modifications believes that a landlord is unreasonably withholding permission to make the requested modifications or has required an unreasonable escrow payment he or she may file a complaint with HUD.

The Department wishes to stress that the Fair Housing Act does not require a tenant to restore all modifications. For example, as example (2) in paragraph (b) makes clear, if a handicapped tenant seeks a landlord's permission to widen a doorway for a wheelchair to pass, it is unlawful for the landlord to refuse to permit the applicant to make the modification. Further, the landlord may not, in usual circumstances, condition permission for the modification on the applicant paying for the doorway to be narrowed at the end of the lease because a wider doorway will not interfere with the landlord's or the next tenant's use and enjoyment of the premises. However, if a tenant seeks, for example, to lower the kitchen cabinets to a height suitable for a person in a wheelchair, the landlord may condition permission on the tenant agreeing to restore the cabinets to their original height and, if it is reasonable to do so considering the financial resources and credit-worthiness of the tenant, may seek a reasonable escrow deposit. At the end of the lease the landlord may require that the tenant restore the cabinets to their original height unless the next occupant prefers that the cabinets remain where they are. If the next occupant does not wish that the modification be restored then the landlord must promptly return the tenant's escrow deposit, if any, in full. The landlord, in such a situation, may, where it is reasonable to do so, require that the new tenant establish a new interest bearing escrow account.

Comments from housing providers also asked that the rule state that housing providers have an "absolute right" to reject any proposed modifications if they are unreasonable and that the housing provider should have the authority to select or approve the party making the modifications. These commenters point out that prior approval is necessary so that the housing provider can be assured of quality workmanship done in accordance with local building code specifications.

Paragraph (a) makes it plain that the applicant or tenant must seek the landlord's approval before making modifications. A landlord, of course, is entitled to know what the proposed modifications are as well as reasonable assurances from the tenant that any required building permits will be obtained and that the work will be performed in a workmanlike manner. In order to address these concerns the Department has added a new paragraph (b) to § 100.204. It states that a landlord may condition permission for a modification on the renter providing a reasonable description of the proposed modifications as well as reasonable assurances that the work will be performed in a workmanlike manner and that any required building permits will be obtained. The description may be oral or written depending on the extent and nature of the proposed modifications. The Department does not believe it would not be possible, as some commenters suggested, to spell out a detailed approval procedure that would be applicable in all instances. What is reasonable will vary with the extent, location and nature of the modifications a particular tenant wishes to make. Some requested modifications will be simple and the approval process in such instances should be straightforward (e.g., installation of grab bars in a bathroom that already has the requisite blocking). Other requested modifications to the interior of a unit or public or common use area will be more complex. In such instances, the landlord may withhold permission until the tenant has described in reasonable detail the modifications to be made and identified to the landlord a responsible party to perform the work in question. However, since the tenant is paying for the modification, the landlord may not specify that only one particular contractor make the modifications. The modifications may be accomplished by any party reasonably able to complete the work in a workmanlike manner.

Paragraph (c) contains two examples that illustrate the application of paragraph (a). Some commenters felt the examples in paragraph (c) (paragraph (b) of the proposed rule) "raise more questions than they answer." These examples are intended to be illustrative and not exhaustive. The Department continues to believe that the regulation is clearer with these examples than without them. Therefore, they have been retained unchanged from the proposed rule.

*Section 100.204  Reasonable accommodations.*

Section 100.204 implements section 804(f)(3)(B) of the Fair Housing Act which makes it unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services if necessary to afford a person with handicaps equal opportunity to use and enjoy a dwelling. The concept of "reasonable accommodation" is also used in regulations and case law interpreting section 504 of the Rehabilitation Act of 1973. *See,* 28 CFR 41.53; 24 CFR 8.11 and 8.33; *Southeastern Community College v. Davis,* 442 U.S. 397 (1979); *Alexander v. Choate,* 469 U.S. 287 (1985).

The principal comments received on this section discuss the relationship between §§ 100.204 and 100.203 relating to reasonable modifications of existing premises. These comments were discussed in connection with § 100.203.

Paragraph (a) closely follows the statutory language and is unchanged from the proposed rule. It states that it is unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, including public and common use areas. A number of commenters were concerned that this language could be interpreted as requiring that housing providers provide a broad range of services to persons with handicaps that the housing provider does not normally provide as part of its housing. The Department wishes to stress that a housing provider is not required to provide supportive services, *e.g.,* counseling, medical, or social services that fall outside the scope of the services that the housing provider offers to residents. A housing provider is required to make modifications in order to enable a qualified applicant with handicaps to live in the housing, but is not required to offer housing of a fundamentally different nature. The test is whether, with appropriate modifications, the applicant can live in the housing that the housing provider offers; not whether the applicant could benefit from some other type of housing that the housing provider does not offer.

Paragraph (b) illustrates the application of paragraph (a) with two examples of reasonable accommodations. No substantial comments were received on these examples and they remain as they were proposed.

*Section 100.205  Design and construction requirements.*

Section 100.205 implements section 804(f)(3)(C) of the Fair Housing Act which places accessibility requirements

on "covered multifamily dwellings" designed and built for first occupancy 30 months after enactment.

The term "covered multifamily dwellings" means buildings consisting of 4 or more dwelling units if the building has one or more elevators, and "ground floor" dwelling units in other buildings consisting of 4 or more dwelling units. The ground floor is any floor of a building with a building entrance on an accessible route. A building may have more than one ground floor. A "building" is a structure, facility or the portion thereof that contains one or more dwelling units.

*Unusual Terrain or Site Characteristics.* Paragraph (a) of the proposed rule provided that "covered multifamily dwellings" for first occupancy after March 13, 1991 be designed and constructed to have at least one building entrance on an accessible route unless it is impractical to do so because of the terrain or unusual characteristics of the site. Paragraph (a) was the subject of considerable public comment.

Some commenters objected to the portion of paragraph (a) that exempts buildings from having an accessible building entrance where it is impractical to provide such an entrance because of the terrain or unusual characteristics of the site. These commenters argue that the statute contains an "absolute" requirement that "covered multifamily dwellings" for first occupancy after March 13, 1991 be made accessible. They believe that paragraph (a) introduces an exception not found in the Act.

Other commenters did not altogether object to an "impracticality" standard but considered the standard of "impracticality" proposed by the Department to be too broad. These commenters feel that the "impracticality" standard in paragraph (a) allows designers and builders to use their own standards and claim that because it is "impractical" to do so, they need not make their buildings accessible. In the view of these commenters, this "loophole" was not intended by Congress; they suggest that HUD establish a more specific standard. Some commenters stated that, where feasible, grading be made mandatory. Other commenters urged that the "impracticality" exemption accrue to dwellings where the *only* access is stairs which are higher than 10 feet. At this point they argue it is impractical for a ramp to be built.

Representative Barney Frank of Massachusetts submitted a comment stating his belief that the word "impractical" could be more of a loophole than was intended by Congress. Mr. Frank suggested tightening the standard by modifying the word "impractical" with adverbs such as "highly" or "extremely". Mr. Frank also stressed that it ought to be made clear that only unusual physical characteristics of the site would justify the invocation of the tighter standard of impracticality he suggested.

Other commenters argued for a broader standard than the one proposed by the Department. They did not interpret the proposed standard as relating in any way to the economic impact of designing and constructing a building on a particular site to have an accessible building entrance. These commenters argued that the Department should consider the economic impact of requiring at least one building entrance on an accessible route and not only whether access is physically impractical. These commenters noted that if the cost of providing an accessible entrance is too great, the project may become economically infeasible. They pointed out that Congress was sensitive to the impact of the Act's requirements on housing affordability. For example, the Act's accessibility provisions "carefully facilitate the ability of tenants with handicaps to enjoy full use of their homes without imposing unreasonable requirements on homebuilders, landlords and non-handicapped tenants." House Report at 27. These commenters suggest that economic loss beyond a *de minimis* amount is in many cases a viable and fair determinant of the impracticality of providing an accessible entrance.

Congress did not intend to impose an absolute standard that all covered multifamily dwelling units be made accessible without regard to the impracticality of doing so. Even though the statute itself does not contain an impracticality standard the legislative history makes it clear that Congress "was sensitive to the possibility that certain natural terrain may pose unique building problems." House Report at 27. For example, the House Report explicitly recognizes that in some locales it is common to construct housing on stilts because of flooding problems. A requirement that housing on such sites have an accessible entrance on an accessible route may be tantamount to prohibiting the construction of covered multifamily housing on such sites. This is not what Congress intended. The House Report further states that the "Committee does not intend to require that the accessibility requirements of this Act override the need to protect the physical integrity of multifamily housing that may be built on such sites." *Id.*

Further, the Department does not believe that it would be appropriate to constrain designers by adopting a highly specific building accessibility standard, as suggested by some commenters. For example, some commenters suggested that the rule state that, where feasible, grading be mandatory. A developer is required by paragraph (a) to design and construct one building entrance on an accessible route unless it is impractical to do so because of the terrain or unusual characteristics of the site. As a practical matter, it may sometimes be necessary to provide grading for persons in wheelchairs so that the requirements of paragraph (a) will be met and in many cases it will be the least expensive means of doing so. However, in other instances, it may be possible to design and construct an accessible building entrance in some other fashion. Designers are free to use any reasonable design that obtains the required result. The Department does not believe that Congress intended to dictate the method a designer must use to provide an accessible entrance. Innovative designs that are accessible to handicapped persons should be encouraged.

Since the statute itself does not contain an exemption, the Department feels constrained to follow closely the intent of Congress on this issue as expressed in the Act's legislative history. The discussion in the House Report on this issue is of "unique building problems" along the order of examples (1) and (2) in paragraph (b). The impracticality standard in paragraph (a), however, does not go so far as to require that it be "impossible" to design and construct a building entrance on an accessible route, because the Department does not believe that Congress intended that the standard be limited to such extreme instances.

On balance, and after carefully considering the various comments received on this issue, the Department believes that, based upon specific language in the House Report, Congress intended to apply the test the Department proposed for determining when the burdens of providing an accessible entrance are too great. Only when the terrain or unusual site characteristics make it impractical to design and construct an accessible building entrance at a particular site did Congress consider the burdens of providing such an entrance to be unreasonable. Since the standard in paragraph (a) already takes into account the burdens of making a building

accessible, the Department does not believe that it would be faithful to the statute to revise the standard to refer to an open-ended "economic impracticality" standard unrelated to the sorts of unusual site problems Congress expressly considered relevant.

*Determining "First Occupancy" After March 13, 1991.* A number of commenters stated that while the proposed rule properly limits the Act's design and construction requirements to covered multifamily housing for first occupancy after March 13, 1991, it fails to indicate how it will be determined whether covered multifamily housing is "for first occupancy after March 13, 1991." These commenters are concerned that coverage of the design and construction requirements *must* be determinable at the beginning of planning and development, arguing that it is unreasonable to base this determination on the actual date of first occupancy since this date may be affected by a variety of unexpected and uncontrollable events occurring during the lengthy planning and development process. In order to accommodate these legitimate concerns on the part of the building industry, the Department has added a sentence to paragraph (a). It states that, for purposes of § 100.205, covered multifamily dwellings shall be deemed to be designed and constructed for first occupancy *on or before* March 13, 1991 if they are occupied by that date or if the *last* building permit or renewal thereof for the covered multifamily dwellings is issued by a State, County or local government on or before January 13, *1990.* In other words, if a developer obtains a building permit on or before January 13, 1990 (which is not renewed after that date) and completes construction under that permit, the building in question need not comply with the accessibility requirements of § 100.205. Thus, a developer will not be penalized if a strike or Act of God prevents occupancy by a certain time. The date of January 13, 1990 was selected because it is fourteen months before March 13, 1991. Fourteen months represents a reasonable median construction time for multifamily housing projects of all sizes based upon data contained in the "Marshall Valuation Service." The Department considered adopting different construction times for different sized projects but ultimately found this approach cumbersome from an administrative and enforcement standpoint. The Department chose the issuance of a building permit as the appropriate point in the process, since such permits are issued in writing by

governmental authorities. Such a standard has the advantage of being clear and objective. In addition, any project that actually achieves first occupancy before March 13, 1991 will be judged to have met this standard even if the last building permit or renewal thereof was issued after January 13, 1990.

*Accessibility Guidelines.* Paragraph (b) contains three examples that illustrate the application of paragraph (a). Some commenters stated that the examples illustrating the application of paragraph (a) may reduce noncompliance at the extremes but do not satisfactorily indicate what constitutes sufficient compliance in most day-to-day situations. The Department does not believe that it is feasible to publish more specific guidance at this time. However, the Department will endeavor to provide as much additional guidance as possible in the accessibility guidelines HUD plans to develop. Many commenters expressed a desire to have an opportunity to comment on these guidelines. HUD intends to publish these guidelines in the Federal Register for full public comment as soon as they are ready.

The only change made to these three examples is a minor change to example (1). In the proposed rule example (1) related to a developer who planned to construct six townhouses on a site with hilly terrain. Some commenters were confused by the reference to townhouses, in view of the Department's interpretation that four or more townhouses are not covered multifamily dwellings unless the entire unit is on the ground floor or unless the townhouses have an elevator. In order to avoid this confusion, the reference to townhouses has been deleted. Instead, the example refers simply to six units of covered multifamily dwelling units. The purpose of the example is to explicate site impracticality because of hilly terrain.

Example (3), which describes an instance where building accessibility can be achieved only at the cost of a 4.7 percent density loss, was the subject of criticism by builders. They argued that a 4.7 percent density loss may render a project economically infeasible. Even though this may well be the case in some situations, the Department does not believe, in light of the discussion above, that Congress necessarily intended that a reduction of five units in a 105-unit building would be sufficient to exempt that building from the accessibility requirements of the Act. A more stringent standard was intended. (However, this example was not intended to mean that *any* loss of

density, no matter how great, would be insufficient to establish site impracticality.)

Paragraph (c) requires that all covered multifamily dwellings for first occupancy after March 13, 1991 with a building entrance on an accessible route satisfy certain accessibility requirements set forth in paragraph (c). Paragraphs (c) (1) and (2) set forth the specific accessibility requirements for covered multifamily dwellings for first occupancy after March 13, 1991 with a building entrance on an accessible route. Many commenters complained that the guidance provided in paragraph (c) is inadequate. Some commenters made highly detailed suggestions that the Department will carefully consider as it develops accessibility guidelines to help builders understand and comply with the specific accessibility requirements of the Fair Housing Act. The guidelines would, of course, not be mandatory. Rather, they would provide technical assistance to persons who must comply with paragraph (c). Until these guidelines are published for public comment, designers and builders may be guided by the requirements of ANSI in meeting the specific accessibility requirements of the Act.

Paragraph (d) provides two examples that illustrate the application of paragraph (c). These examples were not the subject of substantial public comment and are unchanged from the proposed rule.

Paragraph (e) states that compliance with the appropriate requirements of ANSI A117.1 suffices to satisfy the requirements of paragraph (c)(3). Paragraph (e) implements section 804(f)(4) of the Fair Housing Act. This section does not require that designers and builders follow ANSI A117.1 exclusively. However, if designers and builders do follow ANSI A117.1, then they will have satisfied the requirements of paragraph (c)(3). House Report at 27. Paragraph (e) was not the subject of substantial public comment, closely follows the statutory language and is unchanged from the proposed rule.

Paragraphs (f) and (g) implement the provisions of the Fair Housing Amendments Act designed to encourage enforcement, by the States and local governments, of the provisions of the Act regarding adaptability and accessibility requirements for newly constructed multifamily dwellings. 134 Cong. Rec. S10456 (daily ed. August 1, 1988) (Memorandum of Senators Kennedy and Specter Regarding Their Substitute Amendment).

Paragraph (f) states that compliance with a duly enacted law of a State or

**3252** Federal Register / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations

unit of general local government that includes the requirements of paragraphs (a) and (c) satisfies the requirements of paragraphs (a) and (c). Paragraph (f) was not the subject of substantial public comment and is unchanged from the proposed rule.

Paragraph (g)(1) was not the subject of substantial public comment and is unchanged from the proposed rule. It declares that it is the policy of HUD to encourage States and units of local government to include in their existing procedures for the review and approval of newly constructed covered multifamily dwellings, determinations as to whether the design and construction of such dwellings are consistent with paragraphs (a) and (c).

Paragraph (g)(2) states that a State or unit of general local government may review and approve newly constructed multifamily dwellings for the purpose of making determinations as to whether the requirements of paragraphs (a) and (c) are met. Paragraph (g)(2) was not the subject of substantial public comment and is unchanged from the proposed rule.

*Determinations of Compliance by State or Local Agencies.* Paragraph (h), which is unchanged from the proposed rule, states that determinations of compliance or noncompliance by a State or a unit of general local government under paragraph (f) or (g) are not conclusive in enforcement proceedings under the Fair Housing Act. Some commenters argued that this paragraph should be revised to state that determinations by State and local governments will be given substantial weight. These comments concede that neither the statute nor its legislative history indicates the weight to be given to such determinations. The Department believes it would be inappropriate to accord particular "weight" to determinations made by a wide variety of State and local government agencies involving a new civil rights law, without first having the benefit of some experience reviewing the accuracy of the determinations made by State and local authorities under the Fair Housing Act.

Paragraph (i) states that subpart D does not invalidate or limit any law of a State or political subdivision of a State that requires dwellings to be designed and constructed in a manner that affords handicapped persons greater access than is required by this subpart. Paragraph (i) was not the subject of substantial public comment. It is unchanged from the proposed rule.

## Subpart E—Housing for Older Persons

The Fair Housing Act prohibits discrimination because of familial status. However, the Act exempts "housing for older persons" from the prohibitions against discrimination because of familial status. The purpose of the prohibitions against discrimination because of familial status and the housing for older persons exemption is to protect families with children from discrimination in housing, without unfairly limiting housing choices for elderly persons. 134 Cong. Rec. S10465–66 (daily ed. August 1, 1988) (statement of Sen. Karnes). The statutory definition of "housing for older persons" comprises three categories of housing: (1) Housing provided under any State or Federal program that the Secretary of HUD determines is specifically designed and operated to assist elderly persons; (2) housing intended for, and solely occupied by, persons 62 years of age or older; and (3) housing intended for, and solely occupied by, at least one person 55 years of age or older per unit, provided that various criteria are met.

*Mobile Home Parks.* The Department received thousands of comments relating to the housing for older persons exemption. A significant portion of these comments came from people who live in mobile home parks which are currently restricted to adults. These commenters point out that mobile home park living is unique. Mobile home park residents typically own their own homes but rent the space. Frequently, there is relatively little space between homes. Many of these commenters state that they prefer to live in an all-adult atmosphere and that if children are admitted there will in most cases be no place for them to play. Furthermore, many commenters made it plain that they do not want or need special services or facilities. Rather, they want mobile home parks to provide an environment where they can be with others of their age group, while at the same time remaining independent and self-sufficient.

Some commenters asked that mobile home parks be exempted outright from the Fair Housing Act. Mobile home parks are covered by the Fair Housing Act. The Fair Housing Act makes it unlawful to refuse to sell or rent a "dwelling" because of race, color, religion, sex, handicap, familial status, or national origin. The statutory definition of "dwelling" includes vacant land which is offered for sale or lease for the construction or location thereon of a structure. In addition, the legislative history of the Fair Housing Amendments Act indicates that Congress intended

that mobile home parks would be covered by the Act, and specifically by the familial status provisions. *See* 134 Cong. Rec. S10551 (daily ed. Aug. 2, 1988) (colloquy between Sens. Wilson and Specter). Thus, the Department has no basis for exempting mobile home parks from the prohibition of discrimination against families with children.

Other commenters asked HUD to create an additional exemption for "over 40" or for "all-adult" mobile home parks. There is nothing in the Fair Housing Amendments Act or its legislative history to indicate that Congress intended that mobile home parks be afforded a housing for older persons exemption that is broader than the exemption that applies to other types of housing (*e.g.,* apartments and condominiums). To the contrary, the legislative history indicates that "mobile home parks ar eligible for the same exemptions as are other communities under the 'housing for older persons' provisions * * *" of the Act. *Id.* Therefore, mobile home parks are subject to the same rules that apply to other types of housing. More specific comments received on this subpart will be discussed in connection with the exemption for "55 or over" housing.

*"Dual Purpose Housing Facilities."* A number of commenters raised the question of whether it is permissible to operate a "dual purpose" housing facility. In a "dual purpose" housing facility specified units or sections would be designated for older persons and other units or sections would be open to everyone. For example, one commenter representing the interests of mobile home park owners suggested that regulations be promulgated to permit the operation of "dual purpose" properties, so that certain sections or units are not restricted to persons of a certain age and others are designated for housing for older persons. This commenter stated that the proposed rule did not address this question. However, this issue was addressed in the proposed rule. Section 100.70(c)(5) of the proposed rule (53 FR 45025, November 7, 1988) stated that it is unlawful to assign "any person to a particular section of a community, neighborhood or development or to a particular floor of a building because of * * * familial status * * *." This same prohibition appears as § 100.70(c)(4) of the final rule. As the Department explained in connection with public comments received on subpart A, the legislative history of the Fair Housing Act and the development of fair housing law after the protections of the Fair Housing Act

were extended in 1974 to prohibit discrimination because of sex support the position that persons with handicaps and families with children are entitled to the same protections as other classes of persons. For example, "dual housing" facilities segregated by race, color or religion clearly would violate the Fair Housing Act. Similarly, the Department believes that it is unlawful for a housing facility to segregate because of familial status.

*Section 100.300   Purpose.*

Section 100.300 explains that the purpose of subpart E is to effectuate the housing for older persons exemption in the Fair Housing Amendments Act. This section was not the subject of public comment and is unchanged from the proposed rule.

*Section 100.301   Housing for Older Persons Exemption.*

Section 100.301 provides the analytical framework for subpart E. Paragraph (a) implements the second sentence of section 807(b)(1) of the Fair Housing Act, as amended. It states that the prohibitions against discrimination because of familial status in this part do not apply to housing which satisfies the requirements of §§ 100.302 (*"State and Federal Elderly Housing Programs"*), 100.303 (*"62 or Over Housing"*), or 100.304 (*"55 or Over Housing"*). Paragraph (a) was not the subject of public comment and is unchanged from the proposed rule.

Paragraph (b) states that nothing in this part limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling. Paragraph (b) implements the first sentence of section 807(b)(1) of the Fair Housing Act. Many jurisdictions limit the number of occupants per unit based on a minimum number of square feet in the unit or the sleeping areas of the unit; HUD also issues occupancy guidelines in its assisted housing programs. Reasonable limitations do not violate the Fair Housing Act as long as they apply equally to all occupants. A substantial number of comments were received asking that the Department adopt occupancy restrictions that housing providers can apply in jurisdictions that do not have governmentally-adopted occupancy restrictions, and in jurisdictions where the governmentally-adopted restrictions are tantamount to no restrictions. There comments are discussed in the preamble discussion relating to Subpart A.

*Section 100.302   State and Federal Elderly Housing Programs.*

Section 100.302 implements section 807(b)(2)(a) of the Fair Housing Act. Section 100.302 exempts housing provided under any Federal or State program that the Secretary determines is specifically designed and operated to assist elderly persons, as defined in the State or Federal program from the prohibitions against discrimination because of familial status in this part. Section 100.302 was not the subject of substantial public comment and is unchanged from the proposed rule. It should be noted that the eligibility requirements for housing for elderly persons in HUD-assisted and insured programs differ from the requirements in §§ 100.303 and 100.304. State or Federal definitions are not superseded by those established in this Part for other housing.

*Section 100.303   62 or Over Housing.*

Section 100.303 implements § 807(f)(2)(B) of the Act. It exempts from the prohibitions against discrimination because of familial status housing intended for, and solely occupied by, persons 62 years of age or older.

*Transition Provision.* Paragraph (a)(1) contains a transition provision to ensure that the interests of current residents of housing that excludes children will not be unduly disturbed by the Fair Housing Act. 134 Cong. Rec. S10456 (daily ed. August 1, 1988) (Memorandum of Sens. Kennedy and Specter Regarding Their Substitute Amendment). It provides that housing satisfies the requirements of § 103.303 even though there were persons residing in such housing on September 13, 1988 who are under 62 years or age, *Provided* That all new occupants thereafter are persons 62 years of age or older.

Section 6(d) of the Fair Housing Amendments Act provides that housing shall not fail to meet the requirements for housing for older persons by reason of "persons residing in such housing *as of the date of enactment of this Act [i.e.,* September 13, 1988]" who do not meet the age requirements of the housing for older persons exemption, provided that all new occupants meet the age requirements of the housing for older persons exemption. Section 13(a) of the Act provides that "[t]his Act and the Amendments made by this Act shall take effect on the 180th day beginning after the date of enactment of this Act." The date described in section 13(a) is March 12, 1989. Several commenters questioned whether the appropriate date for the transition provision in

§ 100.303(a)(1) is September 13, 1988 or March 12, 1989.

In the preamble of the proposed rule the Department explained that if section 6(d) of the Act is applied literally, then housing providers, in order to avail themselves of this transition provision, had to begin filling units in accordance with the age requirements of the housing for older persons exemption on September 13, 1988, which is before the effective date of the Act. The proposed rule adopted this interpretation, but in view of the consequences of such a determination, invited public comment on the question. Comments were received on both sides of the issue.

One group of commenters argued that the transition rule should become effective on March 12, 1989 instead of September 13, 1988 as proposed by the Department. Some of these commenters conceded that the proposed rule followed the plain meaning of the statute, but argued that this is a case where adherence to the statute's plain language will frustrate Congress' intent to provide a workable transition rule that ensures that the interests of current residents of housing that excludes children will not be unduly disturbed by passage of the bill. 134 Cong. Rec. S10456 (daily ed. August 1, 1988) (Memorandum of Sens. Kennedy and Specter Regarding Their Substitute Amendment). These commenters also stated that a March 12, 1989 transition date would be fairer.

A different group of commenters agreed with the Department's interpretation of the transition provision that appeared in the proposed rule as consistent with the plain meaning of the Act and Congressional intent. These commenters agreed with the Department's statement in the preamble of the proposed rule that the general language in section 13(a) was not intended to render the more specific language in section 6(d) a nullity. Moreover, under the interpretation of the Act in the proposed rule there is no inconsistency between sections 6(d) and 13(a) of the Fair Housing Act. The Act will take effect on March 12, 1989 and, by its terms, the housing for older persons exemption will be satisfied even though, on September 13, 1988, there were persons in the housing facility who did not meet the age requirements, provided that all new occupants after September 13, 1988 meet the age requirements. Some commenters added that under fundamental principles of statutory construction the more specific language of the Act prevails over more general language covering the same subject. *See e.g., Ginsberg & Sons. v.*

**3254** Federal Register / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations

*Popkin*, 285 U.S. 204, 208 (1932) ("General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment."). Therefore, these commenters concluded that the more general language in section 13(a) describing the effective date of the Act as a whole should not be interpreted to delete the specific language in section 6(d) defining the appropriate date for the transition provision.

After carefully considering the comments received on this question, the Department has determined not to modify its interpretation of the transition provision that was included in the proposed rule because it appears that this is what Congress intended. The transition provision in section 805(b)(3) of the statute relating to persons residing in a housing facility who do not meet the age restrictions for housing for older persons is expressly limited to "persons residing in such housing as of the date of enactment of this Act." The same date (September 13, 1988) is, for the same reasons, referenced in §100.304(d)(1) ("55 or Over Housing").

In addition, some commenters proposed that the rule state that a mobile home park may change its age requirements to either family, 55 or over or 62 or over, at any time—arguing that such a provision would be consistent with the legislative intent of the Act to stop discrimination against families with children and to allow for distinct housing opportunities for older persons. As previously explained, the Department sees no legal basis for providing special treatment or exceptions for mobile home parks in light of the legislative history to the contrary. Furthermore, the transition provision in section 807(b)(3)(A) makes specific reference to the date of enactment. In light of this temporal limitation in the statute the Department does not believe it would be faithful to the statute to create in this rule a procedure permitting a housing provider to change its age requirements at any time in order to exclude families with children.

A related issue raised by some commenters is the relationship between the Act and various State laws that regulate existing relationships between landlords and tenants. For example, under the California Mobilehome Residency Law, a rule or regulation of a mobile home park may be amended at any time with the consent of a homeowner, or without his or her consent upon written notice to him or her of not less than six months.

California Civil Code § 798.25 (1982 & Supp. 1988). These commenters pointed out that this and other notice requirements make it very difficult, and in some cases, impossible for mobile home park owners to avail themselves of the transition provision in section 807(b)(3)(A) of the Act. On October 21, 1988 the General Counsel of HUD, J. Michael Dorsey, issued a legal opinion on this question. In that opinion, Mr. Dorsey concludes that the Fair Housing Act does not preempt or supersede § 798.25 of the California Civil Code since there is no language in the Fair Housing Act, as amended, or its legislative history to support a conclusion that the Act was intended to invalidate or limit any State law, unless that State law requires or permits a discriminatory housing practice. 42 U.S.C. 3616 (as redesignated by the Act). Section 798.25 of the California Civil Code neither requires nor permits a discriminatory housing practice; it simply sets forth a procedure that a mobile home park must follow in order to change a rule or regulation. In addition, the comments submitted by Senators Kennedy and Specter and Representative Don Edwards state as follows:

Since enactment of the 1988 Amendments to the Fair Housing Act, many mobile home parks have changed their status from an eighteen and older "adult" park, which is allowed under existing California law, but prohibited by the Fair Housing Amendments Act to a "housing for older persons" park in order to qualify for an exemption under the Act. Many of these parks have claimed that the Act preempts California law, and thus six months' notice of a change in policy is not required. This is an incorrect interpretation of the Act. It was not the intent of Congress to preempt this notice requirement, and the regulations should so specify. [Footnotes omitted.]

Paragraph (a)(2) states that housing satisfies the requirements of §100.303 even though there are unoccupied units (at any time), provided that such units are reserved for occupancy by persons 62 years of age or over. Paragraph (a)(2) was not the subject of substantial comment and is unchanged from the proposed rule.

A new paragraph (a)(3) has been added to the final rule. It states that housing satisfies the requirements of § 100.303 even though there are units occupied by employees of the housing (and their family members residing in the same unit) who are under 62 years of age provided they perform substantial duties directly related to the management or maintenance of the housing. This paragraph was added by the Department in recognition of the fact

that it is common for a manager of a housing facility or maintenance worker to reside in one of the units. Frequently, such arrangements benefit the residents of the housing facility. The Department does not believe that Congress intended for a housing owner to lose its "62 or over" exemption simply because the manager of the facility or a maintenance worker resides there. However, the Department wishes to stress that any employees who live at the housing facility must perform substantial duties directly related to the management or maintenance of the housing in question. For example, if the employee works primarily at a different housing facility, then that employee does not satisfy the requirements of paragraph (b)(3) and the housing facility where that employee lives will not qualify for the "62 or over" exemption.

Paragraph (b) contains two examples that illustrate the application of paragraph (a). These examples were not the subject of substantial comment and are unchanged from the proposed rule.

*Section 100.304 55 or Over Housing.*

Section 100.304 implements section 807(b)(2)(C) of the Fair Housing Act, which exempts housing intended and operated for occupancy by at least one person 55 years of age or over per unit that satisfy certain criteria. This section of the proposed rule was the subject of many public comments. As an initial matter, a number of commenters asked that the Department clarify the meaning of the phrase "housing intended and operated for occupancy *by at least one person* 55 years of age or older, per unit * * *" in paragraph (a).

Specifically, these commenters asked that HUD address the issue of the age of any other person occupying the unit along with a person 55 years of age or older per unit. A housing provider may use any non-discriminatory method of qualifying for the exemption that comports with applicable State and local laws. Since the Fair Housing Amendments Act does not prohibit discrimination because of age, nothing in the Act prohibits a housing provider seeking to qualify for the exemption for "55 or over" housing from setting age restrictions that are *more* stringent than those set forth in the Act. Thus, a housing provider *may*, for example, require that *all* residents be 55 years of age or older, provided that such a rule is consistent with applicable State and local laws. The other comments on § 100.304 fall within four areas.

First, some commenters stated that § 100.304(c)(1) should state that all units, upon initial occupancy, must be

occupied by at least one person 55 years of age or older. Under the Act, the exemption for housing for persons 55 years of age or older requires, among other things, that 80 percent of the dwellings have at least one resident who is 55 years of age or older *and* that the housing complex adhere to policies demonstrating an intent to provide housing to persons of that age group. Section 807(b)(2)(C). The Children's Defense Fund and other commenters state that Congress' purpose in permitting up to 20 percent of the units to be occupied solely by persons under the age of 55 was to prevent disruption of the lives of surviving spouses and cohabitants under age 55, when the over 55 member of a household dies or otherwise leaves the unit. *See* 134 Cong. Rec. H 6498 (daily ed. August 8, 1988) (statement of Representative Edwards); House Report at 31. Specifically, these commenters argue that the "55 or over" exemption was not meant to permit the owner of housing for older persons to "set aside" 20 percent of its units for *incoming* households (as opposed to surviving spouses or companions). These commenters feel that such a "set aside" is inconsistent with the exemption's requirement that the owner or manager demonstrate an intent to provide housing for persons 55 years of age or older.

These commenters correctly point out that statements in the legislative history discuss the need to permit up to 20 percent of the units to be occupied by persons all of whom are under 55 years old in 55 or over housing in order to accommodate persons such as surviving spouses under the age of 55 and nurses and other personnel to care for the elderly. 134 Cong. Rec. H 6498 (daily ed. August 8, 1988) (statement of Representative Edwards); House Report at 31. However, the Department does not believe that the examples that appear in the legislative history were intended to be exhaustive. Particularly, the Department is not of the view that these units for persons under 55 years of age cannot be occupied by *incoming* households (as opposed to surviving spouses or companions). Indeed, some incoming households may be persons under 55 related in some way to residents who are over 55 years old. For example, an elderly owner of a condominium might die and leave the condominium to a relative who is under 55 years old. If the 20 percent of the units available to persons under 55 years old were not open to incoming households then the recipient of the legacy would be in the anomalous situation of not being able to live in a

condominium he or she owns. Further, the Department does not believe that the proposed rule can fairly be characterized as establishing a 20 percent "set-aside" for persons under 55 years of age. In order to be assured of preserving the exemption, an owner of "55 or over" housing will not, as a practical matter, be able to sell or rent a full 20 percent of the units to incoming persons, all of whom are under 55 years of age, because if the owner does so he or she will risk losing the exemption if some of the over-55 occupants die with surviving spouses who are under 55 years old. In this regard, a number of commenters expressed concern about the last sentence of example 1A in paragraph (e). This sentence indicates that a housing provider could rent a unit to persons (John and Mary in the example) all of whom are under 55 years old even if doing so would reduce the percentage of units occupied by at least one person 55 years of age or older to just a fraction above 80 percent. Although the housing provider in fact could rent to John and Mary without losing the "55 or over" exemption the Department agrees that doing so is not advisable under the circumstances described in the example. Since the owner would be just a fraction above the 80 percent minimum required to maintain the "55 or over" exemption, renting to John and Mary could lead to the owner losing the exemption if some of the over-55 occupants die with surviving spouses who are under 55. In order to avoid any confusion, therefore, the last sentence of example 1A in paragraph (e) of the proposed rule has been deleted in the final rule.

Beyond this, the owner must take care to publish and adhere to policies and procedures which demonstrate an intent to provide housing for persons 55 years of age or older. For example, this requirement would preclude an owner or manager from marketing 80 percent of the units for persons 55 years of age or older and marketing the remaining 20 percent in a radically different way (*e.g.*, young adults). The policies and procedures for the housing facility *as a whole* must demonstrate an intent to provide housing for persons 55 years of age or older. "In essence, this means that the housing in question must in its marketing to the public and in its internal operations, hold itself out as housing for persons aged 55 or older." 134 Cong. Rec. S10456 (Memorandum of Senators Kennedy and Specter Regarding Their Substitute Amendment). Accordingly, the Department has determined not to revise paragraph (d)(2).

The second major issue relating to 55 or over housing concerns paragraph (c)(1), which requires that at least 80% of the units in the housing facility be occupied by at least one person 55 years of age or older unit *except that* a newly constructed housing facility for first occupancy after March 12, 1989 need not comply with paragraph (c)(1) of this section until 25% of the units in the facility are occupied. The exception for partially occupied newly constructed housing facilities was proposed by HUD to deal with the practical problem of filling units in a new and unoccupied housing facility in a reasonable manner, consistent with the "55 or over" exemption. For example, it would be unreasonable for a large newly constructed housing facility that intends to qualify for the exemption to lose its right to claim the exemption simply because the first unit happens to be filled with persons all of whom are under 55 years of age. However, once a certain percentage of units has been filled the housing facility can reasonably be expected to comply with the percentage requirement in paragraph (c)(1). Thus, the Department proposed to require that a housing facility comply with the 80% requirement in paragraph (c)(1) once 25% of the units in the housing facility have been filled and invited comment on the question of whether the 25% point is too high or too low.

The National Association of Homebuilders, among other commenters, felt this percentage was too low to make a meaningful assessment of a particular housing facility. The National Multi Housing Council argued that a building should be eligible for the "55 and Over" exemption during initial occupancy so long as not more than 20 percent of the total units are occupied by non-qualifying residents. The Council argues that marketing and market conditions will vary widely throughout the country and suggest that it is unnecessary for HUD to attempt to fix a universal demarcation point on this subject. The Council proposes that the final rule permit an owner to sell or rent the first 20 percent of the units to non-qualifying occupants, if he or she wishes.

On the other hand, the Children's Defense Fund and the Leadership Conference on Civil Rights, among other commenters, objected to paragraph (c)(1) since the 25 percent point referenced in the proposed regulation is not contained in the Act or its legislative history. These commenters further argue that this 25 percent point of reference be deleted because it stems from what they

regard as an incorrect interpretation of the 55 or over exemption. In other words, if the 20 percent of the units for non-qualifying households were restricted to surviving spouses, nurses and companions there would be no need for the 25 percent point of reference for initial occupancy.

Since the Department has not adopted the narrow interpretation of the 20 percent limitation urged by some commenters, the Department continues to believe that the regulation must contain some point of reference so that everyone concerned will know how to calculate whether a housing facility has complied with the 80 percent requirement during initial occupancy. However, the Department does not believe it would be consistent with the intent of the statute to permit an owner or manager seeking to qualify for the "55 or Over" exemption to sell or rent the first 20 percent of the units to persons all of whom are under 55 years of age. Filling so many units with non-qualifying persons might create an impression that the housing is not intended for older persons. Further, the owner would not have any leeway to provide for units occupied by under 55 surviving spouses and nurses or companions. For these reasons, the Department has retained paragraph (c)(1) as it was proposed.

In addition, as in § 100.303(a)(3), a new paragraph (d)(3) has been added to § 100.304 of the final rule. It states that housing satisfies the requirements of this section even though there are units occupied by employees of the housing (and family members residing in the same unit) who are under 55 years of age provided they perform substantial duties directly related to the management or maintenance of the housing. Thus, as in § 100.303, units occupied by employees of the housing who do not meet the age threshold are not considered in determining a project's eligibility as housing for older persons.

*"Significant Facilities and Services".* Third, the Department received a great many comments asking for clarification of the phrase "significant facilities and services designed to meet the physical or social needs of older persons." A large number of commenters viewed the definition in proposed paragraph (b)(1) as requiring facilities and services on the order of what one might expect to find in a facility for severely disabled elderly persons who are not able to care for themselves. Other commenters want to qualify for the "55 or Over" exemption and want to know precisely what services and facilities must be

provided in order to qualify for the exemption.

Paragraph (b)(1) of the proposed rule stated that "significant facilities and services specifically designed to meet the physical or social needs of older persons" include an accessible physical environment, congregate dining facilities, social and recreational programs, emergency and preventive health care or programs, continuing education, welfare, information and counseling, recreational, homemaker, outside maintenance and referral services, transportation to facilitate access to social services, and services designed to encourage and assist residents to use the services and facilities available to them. The list of significant facilities and services designed to meet the physical or social needs of older persons in the proposed rule is drawn from section 202(f) of the Housing Act of 1959, 12 U.S.C. § 1701q, listing examples of facilities and services for older persons. The House Report (at p. 32) relies heavily upon the listing in section 202(f) of the Housing Act of 1959 in its discussion of such facilities. In addition, the proposed rule made it clear that the housing facility need not have all of these features to qualify for the exemption.

Based upon the reaction hundreds of commenters had to the proposed definition of "significant facilities and services designed to meet the physical or social needs of older persons" it appears that the presence early on in the definition of "congregate dining facilities" and an "accessible physical environment" may have created an impression that only housing for older persons who are not capable of living independently would satisfy the requirements of paragraph (b)(1). The Department wishes to stress that a housing facility may have significant facilities and services designed to meet the physical *or* social needs of older persons and still provide housing for active older persons who live very independently. A housing facility, for example, need *not* necessarily have congregate dining facilities or an accessible physical environment in order to qualify. In fact, many of the facilities and services on the list can readily be associated with active older persons. These include social and recreational programs, preventive health care, information and counseling, recreational services, and transportation to facilitate access to social services. Moreover, the list of services on this list was not intended to be exclusive. As a result of this reaction, the Department has reordered the list of services and

facilities in the final rule. In addition, "welfare" has been deleted from the list because it appears only to have relevance in the context of governmental programs for elderly persons which are covered by § 100.301.

The facilities and services designed to meet the physical or social needs of older persons must be "significant" in order to satisfy paragraph (b)(1). It is not possible for the Department to define precisely what services and facilities must be present before they are considered "significant." The services and facilities will necessarily vary based on the geographic location and the needs of the residents. However, it is clear, for example, that the installation of a ramp at the front entrance of a housing facility would not constitute a "significant" facility designed to meet the physical needs of older persons. Similarly, the provision of minor amenities—such as putting a couch in a laundry room and labeling it a recreation center—would not constitute a "significant" facility designed to meet the social needs of older persons. House Report at 32.

*"Important Housing Opportunities for Older Persons".* Some commenters suggested that the Department establish a "precertification" procedure which would enable housing providers to seek HUD certification that a housing facility has "significant facilities and services designed to meet the physical or social needs of older persons" or that the housing facility satisfies the requirements of paragraph (b)(2). One commenter representing the interests of mobile home park owners argued that such a procedure would prevent many lawsuits and "frivolous" administrative complaints of discrimination from being filed. The Department does not believe at this early stage of the enforcement of the Fair Housing Amendments Act that there is a reasonable basis to conclude that many "frivolous" complaints will be filed unless a "pre-certification" procedure is established. Further, the Department does not believe that it has sufficient resources to support such a procedure. However, if experience with enforcement of the exemption for "55 or over" housing shows that such a procedure would be cost-effective the Department will consider adding a "pre-certification" procedure in the future.

The fourth area of major public comment concerns paragraph (b)(2) of the proposed rule. A housing facility may qualify for the "55 or over" exemption even if it does not satisfy the requirements of paragraph (b)(1). Under paragraph (b)(2), a housing facility that does not provide significant facilities

and services specifically designed to meet the physical or social needs of older persons may nonetheless qualify for the "55 or over" exemption. Such a housing facility must demonstrate that it is not practicable for it to provide significant facilities and services designed to meet the physical or social needs of older persons, and must also demonstrate that the housing facility is necessary to provide important housing opportunities for older persons.

The proposed rule contained eight factors, among others, that the Department proposed to consider in determining whether a housing facility satisfies the requirements of paragraph (b)(2). Paragraph (b)(2) was criticized by many commenters for not being sufficiently precise. These commenters state that listing eight factors is not sufficient, especially since the proposed rule did not state how many (or how few) of the factors must be fulfilled in order to obtain a waiver of the requirement of providing significant services and facilities.

Further, some commenters cited legislative history which they believe is helpful in construing the exception. Senator Kennedy stated that the exception was intended "to be narrowly used only when it can be demonstrated that the costs of providing the facilities and services would result in depriving low- and moderate-income persons of needed and desired housing. Independent and objective evidence must be provided to establish impracticability." 134 Cong. Rec. S10549 (daily ed. August 2, 1988) (statement of Sen. Kennedy). Representative Edwards explained that § 807(b)(2)(C)(i) was "not intended to provide a broad exemption * * *." 134 Cong. Rec. H6498 (daily ed. August 8, 1988) (statement of Representative Edwards). Mr. Edwards went on to explain the impracticability test as follows:

The fact that the facilities and services are expensive to provide is not alone sufficient to meet the standard of impracticability. This standard cannot be satisfied only by estimates of increased costs, business inefficiency or loss of profit. Independent and objective evidence must be provided to establish impracticability. Mere opinion that the provision of such facilities and services is impracticable is not sufficient.

*Id.*

With regard to the requirement that the housing qualify as an "important housing opportunity for older persons" Representative Edwards stated that it must be shown that "[a]ffordable housing for older persons of low or moderate incomes must not be

otherwise available in the community."
*Id.*

The Department agrees that additional guidance is needed and the Department has been guided by this legislative history in revising paragraph (b)(2) to provide for a somewhat more precise definition of this exception. The first sentence of paragraph (b)(2), which mirrors the statute, is unchanged from the proposed rule. The following sentence explicates this statutory test in a manner that is consistent with the legislative history regarding this exception. It states that an owner or manager, in order to satisfy the requirements of paragraph (b)(2), must demonstrate through credible and objective evidence that the provision of significant facilities and services designed to meet the physical or social needs of older persons would result in depriving older persons in the relevant geographic area of needed and desired housing. The Department believes that the revised standard is both clearer and consistent with the intent of Congress.

The eight factors in the proposed rule have been reduced to seven factors in the final rule. Specifically, the first and second factors that appeared in the proposed rule have been consolidated and clarified in the final rule. The seven relevant factors in the final rule are as follows:

(i) Whether the owner or manager of the housing facility has endeavored to provide significant facilities and services designed to meet the physical or social needs of older persons either by the owner or some other entity. Demonstrating that such services and facilities are more expensive to provide is not alone sufficient to demonstrate that the provision of such services is not practicable. The preceding sentence relating to the cost of providing significant services and facilities is based on the legislative history. *See* 134 Cong. Rec. H6498 (daily ed. August 8, 1988) (statement of Representative Edwards) ("The fact that the facilities and service [sic] are expensive to provide is not alone sufficient to meet the standard of impracticability.")

(ii) The amount of rent charged, if the dwellings are offered for rent. The price of the dwellings, if they are offered for sale.

(iii) The income range of the residents of the housing facility.

(iv) The demand for housing for older persons in the relevant geographic area.

(v) The range of housing choices for older persons within the relevant geographic area.

(vi) The availability of other similarly priced housing for older persons in the relevant geographic area. If similarly

priced housing for older persons with significant facilities and services is reasonably available in the relevant geographic area, then the housing facility does not meet the requirements of paragraph (b)(2). The second sentence is new and has been added to clarify the appropriate application of this factor.

(vii) The vacancy rate of the housing facility.

Subpart F—Interference, Coercion or Intimidation

*Section 100.400    Prohibited interference, coercion or intimidation.*

Subpart F provides the interpretation of the Department as to the conduct which constitutes a discriminatory housing practice under section 818 of the Fair Housing Act.

Section 100.400(b) states that it is unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having exercised or enjoyed, or on account of that person having aided or encouraged any person in the exercise or enjoyment of, any right granted or protected by Part 100. Such conduct can also involve harassment of persons because of race, color, religion, sex, handicap, familial status, or national origin.

The illustrations in this section also indicate that a broad range of activities can constitute a discriminatory housing practice. Threatening or intimidating actions include acts against the possessions of persons, such as damage to automobiles or vandalism, which limit a person's ability to have full enjoyment of a dwelling. In addition, the protections against discrimination reach any person, including persons selling or renting dwellings and persons engaged in activities promoting fair housing. Further, persons who are not involved in any aspect of the sale or rental of a dwelling are nonetheless prohibited from engaging in conduct to coerce, intimidate, threaten or interfere with persons in connection with protected activities, or from retaliating against any person involved in any way in a proceeding under the Fair Housing Act.

Part 103—Fair Housing Complaint Processing

*Enforcement responsibility within HUD*

Generally, the proposed regulations placed the responsibility for the reasonable cause determination and the prosecutorial functions with the General Counsel, while retaining the investigation and conciliation functions with the Assistant Secretary for Fair Housing and Equal Opportunity.

Several commenters urged that the Department modify the rule to leave all aspects of Fair Housing enforcement responsibility with the Assistant Secretary for Fair Housing and Equal Opportunity. Among other arguments, the experience of the Assistant Secretary in administering the several civil rights-related responsibilities of HUD was cited—particularly the twenty years of experience in administering the Fair Housing Act itself. In addition, commenters pointed out that the Civil Rights Act of 1968 provided for the creation of a new HUD assistant secretary position—clearly intended to serve as the lead official for civil rights responsibilities of the Department.

The Department agrees with the commenters that full utilization of the Assistant Secretary's experience must be assured, and that the original Fair Housing Act indeed intended that there be appointed an assistant secretary specializing in civil rights concerns. Had the proposed rule suggested removal of the responsibilities of the Assistant Secretary for Fair Housing and Equal Opportunity and the awarding of those responsibilities to the General Counsel, the above-summarized arguments would be well-taken. No such proposal has been made, however. Under the enforcement scheme set out in the proposed rule, the responsibilities of the Assistant Secretary as they relate to Fair Housing enforcement have been retained. The Assistant Secretary continues to have full responsibility for complaint intake, investigations, conciliations and for all related communications with the parties concerning their procedural rights and obligations. Quite clearly, given the greatly increased enforcement authority provided by the Fair Housing Amendments Act and the addition of important newly protected classes, the responsibilities of the Assistant Secretary have been augmented greatly.

It proves too much, however, to argue that the creation of a new assistant secretary's position in the 1968 Act somehow implies a duty in the Secretary to delegate subsequently enacted authority to that single officer. First, we note that the 1968 statute creating the new assistant secretary did not provide for administration or judicial enforcement of the Act, but only for the investigation and attempted conciliation of complaints. More importantly, both the 1968 Act and the 1988 Amendments Act refer, in *all* their substantive provisions, to responsibilities of the *Secretary* of Housing and Urban Development. Nothing in either Act purports to require the Secretary to

delegate this responsibility to any particular officer or officers. It is clear, then, that an argument that the Secretary is legally bound to delegate his authority in a particular manner cannot be supported.

Commenters also argued that as a matter of policy, the delegation to the General Counsel is inappropriate. Commenters noted that the Assistant Secretary for Fair Housing and Equal Opportunity does not share responsibility with any other office of the Department relative to the Assistant Secretary's exercise of authority under other civil rights statutes. These commenters are correct—up to a point—although they ignore the fact of HUD General Counsel participation in any and all matters involving civil rights and equal opportunity at the stage where the Department becomes involved in formal enforcement, either through the initiation of administrative enforcement proceedings or the referral of matters to the Department of Justice for the initiation of civil actions.

Given the clear intention of the amended Act that a HUD reasonable cause determination will create a virtual certainty of litigation, either in an administrative tribunal or in a Federal District Court, it is not only rational and sensible but consistent with current delegations of authority in the area of civil rights to provide that responsibility for such determinations be in the hands of the Department's legal officer. Similarly, the delegation of authority to the General Counsel to conduct hearings before administrative law judges under the Fair Housing Act seems to the Department not only to be a rational decision, but a rather obvious one. Such a division of responsibility is consistent with the practice of other agencies whose administrative processes make a separation of functions necessary or desirable.

One commenter noted that proposed § 109.16(a) provided that the Assistant Secretary is to make reasonable cause determinations in advertising cases. The proposed rule intended to delegate all responsibility for reasonable cause determinations to the General Counsel. This section has been revised.

Under the final rule, the General Counsel is delegated the responsibility for making the reasonable cause determination and for prosecuting administrative cases under the 1988 Amendments. One commenter noted that the General Counsel also has the responsibility to defend against charges that HUD has violated the Fair Housing Act. While the number of such cases may be small, the commenter argued

that proposed procedures cast suspicion on the impartiality of the General Counsel in such matters. In the rare instances that complaints involving such circumstances are filed, the Secretary will delegate the General Counsel's responsibility for the reasonable cause determination and, where an administrative proceeding is conducted, HUD's prosecuting duties to another qualified employee of the Department. Since such circumstances will rarely, if ever, occur, the text of the rule has not been revised to reflect this eventuality.

The division of responsibility in the final rule has been modified slightly to transfer certain duties from the General Counsel to the Assistant Secretary. These include: (1) The ability to elect to have the claims asserted in a charge decided in a civil action where HUD is the complainant (§§ 103.410 and 104.410); (2) the duty to notify the aggrieved person and the respondent when a reasonable cause determination can not be made within described time periods (§ 104.400(c)); and (3) the duty to notify Federal, State and local licensing and regulatory agencies under § 104.935(a). In addition, the final rule has been revised to require the notification of the Assistant Secretary at certain points during the administrative proceeding (see e.g. §§ 104.700(a), 104.910(d), 104.920 and 104.930(d)).

*Statutory limitations on HUD's complaint processing authority.*

In several instances, commenters suggested revisions to the proposed rules that cannot be adopted because they conflict with statutory limitations contained in the Fair Housing Act. The statutorily impermissable proposals included:

1. Some commenters argued that the rules should require complainants to file their complaint within 60 days of the date that an alleged discriminatory practice has occurred or terminated. Section 810(a)(1)(A)(i) of the Act permit complainants to submit complaints not later than one year after an alleged discriminatory housing practice has occurred or terminated. (See Subpart A.)

2. Commenters argued that respondents should have from 20 to 30 days to respond to the complaint. Section 810(a)(1)(B)(iii) of the Act provides that each respondent may file an answer to the complaint not later than 10 days from the date of receipt of the notice. (See §§ 103.50(b)(3) and 103.55.)

3. Commenters argued that the final rule should not permit the referral of cases to agencies until they are found to be substantially equivalent under the

new law, or should be revised to permit the complainant to choose whether to permit the referral under such circumstances. Under section 810(f)(4), each agency certified for the purposes of Title VIII on the day before the enactment date must be considered certified with respect to those matters for which the agency was certified on that date. The transition period is 40 months from the date of enactment. Under section 810(f)(1), HUD is required to make these referrals. (See Part 115)

4. Several commenters urged HUD to retain the existing practice of making a threshold determination to resolve based on facts developed in the investigation before commencing conciliation. Such procedures would be contrary to section 810(b)(1) which requires HUD to engage in conciliation with respect to the complaint, to the extent feasible, during the period *beginning with the filing of the complaint and ending with the filing of the charge or dismissal by HUD.*

5. Commenters objected to § 103.330(b) which permits the nondisclosure of conciliation agreements, where the aggrieved person and the respondent request the nondisclosure and the Assistant Secretary determines that disclosure is not required to further any purpose of the Fair Housing Act. Under section 810(b)(4), nondisclosure is permitted under such circumstances.

6. Commenters objected to the requirement for the public disclosure of complaints dismissed based on a finding of no probable cause. Section 810(g)(3) requires public disclosure.

Subpart A—Purpose and Definitions

*Section 103.1 Purpose and applicability.*

*Applicability.* Except for complaints involving allegations of discriminatory housing practices occurring before and continuing after the effective date of the 1988 Amendments (March 12, 1989), the proposed rule provided that:

—Complaints alleging discriminatory housing practices that occurred before the effective date of the 1988 Amendments are governed by the procedures in Part 105.

—Complaints alleging discriminatory housing practices that occur on or after the effective date of the 1988 Amendments are governed by the procedures in Part 103.

For complaints alleging violations that occur before and continue after March 12, 1989, the proposed rule provided:

—Complaints filed after March 12, 1989 would be processed under Part 103.

—Complaints filed before March 12, 1989 would continue to be processed

under Part 105; however, the Department would provide the complainant with a reasonable opportunity to elect to have the complaint processed under Part 103 in lieu of the Part 105 procedures.

Commenters argued that the final rules must be revised to provide retroactive application of the Act's new remedies and enforcement procedures to all complaints pending on March 12, 1989, including those that do not involve continuing violations. Other commenters argued that the regulations should not apply to any complaints filed under part 105 prior to March 12, 1989.

HUD has reviewed its determination regarding the applicability of the 1988 Amendments. Upon reconsideration, HUD believes that the proposed rules unduly restrict the cases to which the new remedies under the 1988 Amendments will be applied. It is clear that Congress did not intend the Act to receive the restricted application proposed by HUD. Significantly, the plain language of section 815 places no limitation upon its applicability, but rather provides: "This Act and the amendments made by this Act shall take effect on the 180th day beginning after the date of enactment of the Act." At no point does the Act suggest that its provisions should receive less than the broadest application of the effective date provision.

The general rule of statutory construction is that remedial and procedural legislation not affecting vested rights must be applied to any claim cognizable under the prior law that is pending on the effective date or that is filed thereafter. *Bradley v. Richmond School Board,* 416 U.S. 696 715–16 (1974). While it is true that statutes that affect substantive rights ordinarily may not be applied retroactively, *United States v. Security Industrial Bank,* 459 U.S. 70, 79 (1982), this principle has no applicability here. The 1988 Amendments (except as to discriminatory housing practices involving handicap and familial status) do not create new legal duties or responsibilities. Rather, they merely provide a new process by which aggrieved persons may enforce existing rights protected under Title VIII. *I.e.,* The 1988 Amendments create new procedures for the filing, investigation and conciliation of complaints concerning discriminatory housing practices and strengthen the remedies available to victims of housing discrimination by providing for administrative hearings, and by increasing the availability of civil penalties, attorney's fees, etc. Because the new remedies and enforcement procedures do not affect vested rights,

retroactive application is entirely appropriate, unless a manifest injustice would result. *See, e.g., Bradley, supra.* (increased availability of attorney's fees); *Friel v. Cessna Aircraft Co.,* 751 F.2d 1037 (9th Cir. 1985) (extension of limitations period); *Montana Power Co., v. Federal Power Comm.,* 445 F.2d 739 (D.C. Cir. 1970) (change in tribunal); and *Grummitt v. Sturgeon Bay Winter Sports Club,* 354 F.2d 564 (7th Cir. 1965 (change in procedure)).

To bring the final rule into conformance with the Act and the well-settled law, Parts 103 and 105 have been revised. Under the final rule, Part 103 will be applicable to all complaints alleging discriminatory housing practices on account of race, color, religion, sex or national origin pending on March 12, 1989 or filed thereafter; and to all complaints alleging discriminatory housing practices on account of handicap or familial status occurring on or after March 12, 1989. Part 105 will have no continuing validity and will be removed.

One commenter asked for clarification whether complaints that allege discriminatory housing practices involving handicap and familial status that occur before March 12, 1989 and will continue after that date may be filed prior to March 12, 1989. Discriminatory housing practices involving handicap or familial status do not violate the Act until March 12, 1989. Since it will be impossible to predict whether an individual will continue a previous practice after the practice becomes a violation of the Act, HUD will not accept any complaints alleging such discrimination filed before March 12, 1989. To ensure that complainants are aware of their right to file if the practice continues, the rejection will be accompanied by an explanation of the complainant's right to refile after March 12, 1989.

*Applicability of Part 103 to State and local agencies.* Several commenters sought clarification concerning the applicability of various requirements in Part 103 (and Part 104) to complaints filed with or referred to State and local agencies. Part 103 contains the procedures for the investigation and conciliation by HUD of complaints filed under section 810 of the Act and Part 104 contains the rules of practice and procedure applied by HUD's ALJs in administrative proceedings adjudicating charges issued under Part 103. These parts do not, by themselves, impose any requirements on the processing of complaints at the State or local level. Part 115, on the other hand, sets forth the criteria for HUD's certification that a

State or local law is substantially equivalent, and its requirements parallel many of the requirements contained in Parts 103 and 104.

Some commenters urged language specifically stating that certain provisions (e.g., HUD procedures for the investigation of complaints) are not binding on State and local agencys. HUD believes that §§ 103.1, 104.10 and 115.1 clearly state the applicability of the parts and that further clarification is unnecessary.

*Complaint processing and Section 504.* Proposed § 103.1(c) provided that HUD will conduct investigations and conciliations in accordance with section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794). One commenter argued that this paragraph should only apply when a complaint involves an allegation of discrimination that is based on handicap. The proposed section was designed to provide for the reasonable accommodation of persons with disabilities who are participants in the fair housing complaint process. The provisions of this section were not intended to be limited to complaints involving allegations of discrimination based on handicap. This section has been clarified in the final rule.

*Section 103.9   Definitions.*

In addition to revisions of aggrieved person, dwelling unit and person discussed in the comments to Part 100 above, comments on the definitions of personal service and receipt of notice were received.

One commenter argued that HUD should delete these proposed definitions and incorporate requirements for personal service and for receipt of service contained in the Federal Rules of Civil Procedure. Another commenter urged HUD to abandon certified mail as a permissible means of service on non-agency participants because service may be frustrated by an addressee's refusal to claim. HUD's current rules provide for the service of documents by certified mail or through personal service. (see § 105.18). These methods have not, as yet, presented significant practical difficulties in the processing of complaints and have been retained in the final rule.

Subpart B—Complaints

*Section 103.10   Submission of information.*

Proposed § 103.10 contains provisions governing the submission of information concerning alleged discriminatory housing practices and notes that, if the submitted information warrants, HUD may concurrently initiate compliance

reviews under other civil rights authorities. In response to commenters, the Age Discrimination Act of 1975 has been added to the list of civil rights authorities in this section and §103.5, and minor editorial change has been made for clarity.

*Section 103.15   Who may file complaints.*

Section § 103.15 permits any aggrieved person or the Assistant Secretary to file a complaint. One commenter noted that individuals who are subject to housing discrimination are likely to be low-income persons who cannot read, write, or express themselves articulately. The commenter suggested that § 103.15 be amended to require HUD personnel to provide full and comprehensive assistance throughout the complaint process, including assignment of an attorney. Similar revisions were requested for §§ 103.10(a), 103.30(b), 103.300(b), and 104.10(b). Section 103.15 also provides that a complaint may be filed with the assistance of an authorized representative of an aggrieved person, including any organization acting on behalf of an aggrieved person. One commenter would modify this provision to require HUD to notify the authorized representative acting on behalf of the aggrieved person, concerning the status of cases.

The Department agrees that it is vital that HUD provide full assistance to persons who wish to file a complaint and that HUD continue to provide assistance throughout the complaint processing procedure. Accordingly, the Department intends to pursue its current practice of providing appropriate assistance to such persons. In addition, HUD will, at the request of a complainant, provide information concerning the status of the complaint to an authorized representative in the same manner as such notification is provided to complainants. While the Department intends to provide such information, HUD does not believe that it is necessary to codify these policies in the regulations.

*Section 103.20   Persons against whom complaints may be filed.*

Under proposed § 103.20(a), a complaint may be filed against any person alleged to be engaged, to have engaged, or to be about to engage in a discriminatory housing practice. Commenters urged the deletion of language permitting complaints against respondents that are "about to engage" in a discriminatory housing practice. The cited language is a necessary adjunct to the definition of aggrieved

person found in the statute ("Aggrieved person means any person who * * * believes that such person will be injured by a discriminatory housing practice that is about to occur.") The cited regulatory provision is retained.

Proposed § 103.20(b) provides that a complaint may also be filed against any person who directs or controls or has the right to direct or control, the conduct of another person with respect to any aspect of the sale, rental, advertising, or financing of dwellings or the provision of brokerage services relating to the sale or rental of dwelling, if that other person, acting within the scope of his or her authority as employee or agent of the directing or controlling person, is engaged, has engaged or is about to engage in a discriminatory housing practice.

Commenters argued that the definition of agency relationships described in this paragraph is confusing, may be too narrow, and does not correspond to the standards established by case law. Other commenters suggested that this provision could be improved by the provision of examples drawn from case law and that problems concerning this section could be remedied by the deletion of the language "within the scope of his or her authority".

Paragraph (b) expands on the general provisions contained in § 103.20(a). This provision reflects HUD's current rules governing the types of persons against whom complaints may be filed (see § 105.13(b)). This Part 105 regulation was adopted in the final rule issued June 27, 1988 (53 FR 24184). In that rule, HUD explained that the provision was based on judicial precedent to the effect that persons involved in the sale, rental or financing of dwellings have a nondelegable duty to assure that all conduct relating to any aspect of the sale, rental or financing of dwellings complies with the Fair Housing Act and that a person who supervises, directs or employs other persons can be legally responsible for actions of such other persons which violate the Fair Housing Act. See *U.S. v. Youritan Construction Co.,* 370 F.Supp. 643 (N.D. Calif. 1973), modified as to relief and affirmed, 509 F.2d 623 (9th Cir. 1975); *Northside Realty v. U.S.,* 605 F.2d 1348 (5th Cir. 1979); *Marr v. Rife,* 503 F.2d 735 (6th Cir. 1974); *U.S. v. Northside Realty,* 474 F.2d 1164 (5th Cir. 1973); *Moore v. Townsend,* 525 F.2d 482 (7th Cir. 1975); *Johnson v. Jerry Pals, Real Estate,* 485 F.2d 528 (7th Cir. 1973); *Dillion v. AFBIC Development Corp.,* 420 F.Supp. 572 (S.D. Ala. 1976); and *U.S. v. Real Estate Development Corp.,* 347 F.Supp. 776 (N.D. Miss. 1972). Commenters on that rule asserted that

the judicial decisions did not establish a rule of liability without fault as the proposed rule (published October 16, 1984 (49 FR 40528)) suggested; and that the decided cases focused only on the liability of a broker for conduct of his or her salepersons, but did not manage absolute liability on the mere basis to direct or control without reference to instructions, policies, compliance programs, and other actions of the principal. In response to these comments, HUD announced that it was not its intent to impose absolute liability on any principal, but rather to follow the existing case law of the liability of the principal. As a result of this discussion, the language "acting within his or her authority" was added. The commenters on the proposed rule implementing the 1988 Amendments have presented no argument that convinces the Department that its current analysis of the case law on this point is incorrect.

*Section 103.25   Where to file complaints.*

Section 103.25 permits aggrieved persons to provide information to be contained in a complaint by telephone to HUD Regional and Field Offices. While some commenters have argued for the deletion of this procedure, HUD does not believe that the filing of complaints should be limited in the manner the commenters suggest. The final rule continues HUD's practice of reducing information provided by telephone to writing on the complaint form and sending the form to the aggrieved person for signature and affirmation.

A substantially equivalent agency complained that HUD's proposed procedures do not recognize that State and local agencies may have their own filing procedures and complaint formats. The agency argued that HUD's regulations should state that complaints may be filed with such agencies in accordance with their filing procedures and that complaints submitted on the agency forms will be accepted if they meet the requirements of § 103.30(c). These requirements are contained in the regulation at §§ 103.25(a)(3) and 103.30(b). The regulation is unchanged on this point.

*Section 103.30   Form and content of the complaint.*

In response to a commenter, §§ 103.30(a) and 103.55(a) have been amended to delete the requirement that complaints and answers must be attested to before a notary public or a duly authorized representative of the Assistant Secretary. This attestation burden is unnecessary. Section

810(a)(1)(D) requires only that complaints and answers be under oath and affirmation. Under 24 U.S.C. 1746, the oath and affirmation requirement is satisfied if the complainant (or respondent) signs the following statement: "I declare under penalty of perjury that the foregoing is true and correct."

*Section 103.42   Amendment of complaint.*

Section 103.42 has been revised to clarify that complaints may be reasonably and fairly amended at any time and that the list of circumstances under which complaints may be amended is illustrative only.

*Sections 103.45   Service of notice on aggrieved person and 103.50 Notification of respondent; joinder of additional or substitute respondents.*

Section 810(a)(1)(B)(i) of the Act requires the Secretary to serve notice upon the aggrieved person acknowledging the filing of a complaint and advising the person of the time limits and choice of forums provided under Title VIII. Section 810(a)(1)(B)(ii) of the Act requires the Secretary to serve a notice on the respondent within 10 days of the filing of the complaint (or within 10 days of the identification of a substitute or additional respondent).  This notice must identify the alleged discriminatory housing practice and advise the respondent of the procedural rights and obligations of respondents under Title VIII, and include a copy of the complaint. These sections are implemented at §§ 103.45 and 103.50 respectively.

Commenters emphasized the importance of the notice to aggrieved persons and respondents and suggested various additions to and modifications of the proposed regulations. The suggested changes included the addition of a requirement for the service of copies of Title VIII, applicable regulations and forms, and revisions of the description of the procedural rights and obligations under Title VIII and related laws to provide greater detail.

The regulation at §§ 103.45 and 103.50 describes, in general terms, the notification that will be provided to aggrieved persons and respondents. HUD intends to develop forms consistent with these regulatory provisions that will define with greater detail the procedural rights and obligations of the parties under the complaint processing procedures, and that will describe the additional information that will be provided to assist the parties. While HUD does not believe that it is necessary to detail

these provisions in the regulations, HUD will take the comments on these sections into consideration in developing its notification forms.

*Section 103.55   Answer to complaint.*

One commenter argued that § 103.55 (Answer to complaint) should be revised to state that the respondent is under no obligation to file an answer and that a decision not to answer will have no impact on the respondent's position in the case. This section clearly provides that the filing of an answer is permissive. Since answers will generally expedite complaint processing, the regulations should not include provisions that would discourage their filing.

Subpart C—Referral of Complaints to State and Local Agencies

*Section 103.100   Notification and referral to substantially equivalent State or local agencies.*

Section 103.100 states the procedures for the notification and referral of complaints to substantially equivalent State and local agencies and provides for the notification of the aggrieved person and the respondent of the referrals, including the notification of the right of the aggrieved person to commence a civil action under section 813 of the Fair Housing Act. A commenter suggested that the notification under this section (and under § 103.115—Notification upon reactivation) also state that a suit may be filed in State court as well as Federal court. The proposed revision has not been made since State and local jurisdictions must provide such notifications to the complainant and the respondent as a requirement of certification (see § 115.3(a)(1) (ii) and (iii).

*Section 103.110   Reactivation of referred complaints.*

Under § 103.110, HUD will reactivate a referral complaint under three circumstances. Comments regarding each of these circumstances are discussed below.

*Consensual reactivation.* The complaint may be reactivated when a substantially equivalent State or local agency consents to the reactivation. In response to a comment, this section has been clarified to add that the Assistant Secretary may reactivate a complaint with the consent or at the request of the agency.

*Prompt processing.* The complaint may be reactivated if the substantially equivalent State or local agency fails to commence proceedings with respect to

the complaint within 30 days of the date that the agency received the notification and referral of the complaint, or the agency commenced proceedings within this 30-day period, but the Assistant Secretary determines that the agency has failed to carry the proceedings forward with reasonable promptness. HUD will not reactivate a complaint under these conditions, however, until the appropriate HUD Regional Office has conferred with the agency to determine the reason for the delay in the processing of the complaint. If the Assistant Secretary believes that the agency will proceed expeditiously following the conference, HUD may leave the complaint with the agency for a reasonable time.

While commenters supported the provision for consultation prior to reactivation, several changes were recommended. Commenters suggested that the regulations should provide for a written notice announcing the time and place for the conference and stating the reasons that the proceeding may be reactivated. Consultation contemplated under this section will be an informal process. In many instances, HUD anticipates that the consultation will be best accomplished through such measures as a telephone, rather than a face-to-face, consultation. To ensure that the procedures to be used are flexible and best suited to the certified agency, the procedures for consultation will be negotiated with each certified agency and incorporated in the memorandum of understanding. The proposed change is not included in the final rule.

In order to prevent arbitrary actions by the regional offices, commenters recommended that HUD establish criteria for determining when an agency has failed to act with reasonable promptness. Specific suggestions included placing an upper limit on the amount of time that HUD may leave a complaint with an agency; and establishing procedures for the identification and time limits for processing of specific types of cases that require a greater processing time (*i.e.,* systemic cases).

The determination that an agency has failed to act with reasonable promptness is one that must be made on a case-by-case basis through consultation with the certified agency. Given the numerous factors that must be considered (e.g., the subject matter, the number of aggrieved persons, the complexity of the issues involved in the complaint, the progress made by the agency since the referral of the case, the workload and resources available to the

certified agency, scheduling difficulties between the agency, the aggrieved person and the respondent, etc.), HUD does not believe that it would be worthwhile to set forth the list of all relevant factors that may reflect a determination that an agency has failed to act with reasonable promptness.

Some commenters have argued that HUD's failure to provide greater specificity with regard to the issue of reasonable promptness and the reactivation of complaints is contrary to the goal of the 1988 Amendments to achieve expeditious resolution of complaints. HUD notes, however, that certified agencies must meet various performance standards for initial and continued certification, including limitations on the time for processing of complaints (see § 115.4). HUD believes that these limitations and the provisions for reactivation for failure to act with reasonable promptness are sufficient to serve the purposes of the Act.

A commenter requested regulatory clarification defining what is meant by "commenced proceedings". Because the 1988 Amendments provide for conciliation beginning as early as the filing of the charge, this term, as used in the final rule, could mean the start of investigation or the start of conciliation. Since the initial investigation or conciliation activity to be conducted will vary from agency to agency, HUD has not defined commencement of proceedings in the regulation. This term will be defined in the memorandum of understanding with each agency and will be based on the individual agency's procedures.

*Decertification.* Complaints may also be reactivated if the Assistant Secretary determines that the agency no longer qualifies for recognition as a substantially equivalent State or local agency and may not accept interim referrals with respect to the alleged discriminatory housing practice. No comments were received on this issue.

*Section 103.115  Notification upon reactivation.*

Under § 103.115, the Assistant Secretary is required to notify the certified State or local agency, the aggrieved person and the respondent of the reactivation of a complaint. A commenter noted that HUD staff often will notify the parties that they do not need to continue to cooperate with the certified agency after reactivation. The commenter argued that the notification in § 103.115 should clearly indicate that the agency may continue to process the complaint after reactivation and that the parties should continue to cooperate with such efforts.

HUD recognizes the certified agency's responsibility under State and local law to continue processing complaints following reactivation. The final rule has been amended to assure that the parties are aware of these responsibilities.

Subpart D—Investigation Procedures

*Procedural steps prior to investigation and conciliation*

One commenter, a mortgage banking association, feared that individuals frustrated by the rejection of loan applications for legitimate underwriting reasons will use the fair housing complaint process to appeal their rejection. The commenter urged HUD to provide a screening process to eliminate those complaints that fall outside of the fair housing area. If a complaint, on its face, sets forth an allegation of a discriminatory housing practice, HUD is obligated to accept the complaint and process it under its procedures. HUD cannot, and has not, provided a "screening process" to eliminate such complaints.

*Section 103.200  Investigations.*

*HUD-initiated investigations.* Upon the filing of a complaint, the Assistant Secretary is required to initiate an investigation. In addition to investigations initiated by complaints, the 1988 amendments permit HUD to initiate an investigation of housing practices to determine whether a complaint should be filed under Subpart B (see section 810(a)(1)(A)(iii) of the Act). The proposed rule would permit such investigations upon the written direction of the Assistant Secretary.

While many commenters supported the provisions permitting HUD to initiate complaints, they opposed the requirement that these investigations may be initiated only upon the written direction of the Assistant Secretary. Commenters argued that the requirement is impractical, will delay investigations and should be stricken. As an alternative, the commenters suggested that the regulations provide that the Assistant Secretary may delegate authority to the regions to initiate investigations under certain circumstances.

HUD emphasizes that the requirement for prior approval applies only to those investigations that are initiated by HUD. In the absence of a complaint alleging a discriminatory housing practice made by an aggrieved person, HUD believes that the approval of the Assistant Secretary is necessary to ensure that sufficient grounds for investigation exist and to ensure the efficient utilization of

resources. While the text of the rule states that the *Assistant Secretary* will make such approvals, as the Department develops uniform internal standards to govern the initiation of investigations and gains experience with HUD-initiated investigations, the Assistant Secretary will make appropriate delegations of authority for the initiation of investigations to the regional offices. Such delegations of authority can be made by **Federal Register** notice without the necessity of a rulemaking procedure.

*Testing during investigations.* One commenter argued that section 103.200 should provide that HUD will conduct professional testing or will fund other groups to conduct testing during the investigation stage. In connection with this revision, the commenters urge HUD to establish (with the assistance of housing professionals) the standards for conducting tests, what the tests should measure and the criteria to be used in determining whether discrimination exists.

Testing has been sanctioned by court decisions as an appropriate and essential tool of fair housing enforcement, and HUD will consider evidence developed through testing or auditing by fair housing groups or representatives of an aggrieved person in its investigations. HUD staff, however, does not engage in testing. Funding for private entities conducting projects designed to enforce the Fair Housing Act and substantially equivalent fair housing laws will be permitted under the Fair Housing Initiatives Program (proposed rule published July 7, 1988 (53 FR 25576)).

*Section 103.205   Systemic processing.*

Section 103.205 provides for the systemic processing of complaints. One commenter objected to the inclusion of this provision. The commenter argued that HUD's processing should be limited to the specific complaint, not other fair housing issues.

Section 810 clearly contemplates the investigation of matters related to, but not specifically alleged in, the filed complaint. (E.g., section 810(g)(2)(B) provides that the charge need not be limited to the facts or grounds alleged in the filed complaint.) The purpose of systemic processing is to provide for the investigation of discriminatory housing practices that are pervasive or institutional in nature and for the processing of complaints that involve complex issues, involve novel questions of fact or law, or affect a large number of persons. HUD believes that the cited revision is inconsistent with the scope of HUD's investigative authority and would undermine HUD's ability to

address complex issues. The proposed change has not been made in the final rule.

*Section 103.215   Conduct of investigations.*

Section 103.215(a) continues HUD's existing practice of seeking the voluntary cooperation of persons to obtain access to information necessary to further the investigation. One commenter argued that this section serves no useful purpose. Much of the information obtained through HUD's investigations is provided through cooperative efforts rather than through procedural discovery techniques. In recognition of the success of these efforts, paragraph (a) is being retained.

Section 103.215(b) states that the Assistant Secretary and the respondent may conduct discovery in aid of the investigation by the same methods and to the same extent that parties may conduct discovery in an administrative hearing under Part 104, except that the Assistant Secretary would have the power to issue subpoenas as described in § 104.590 in support of the investigation or at the request of the respondent. One commenter argued that paragraph (b) does not comport with the statute and appears to unnecessarily complicate discovery. The commenter suggested the substitution of language directing that discovery and subpoenas be issued in the same manner as in civil actions in the United States District Court for the district in which the investigation is taking place.

The reference in the rule to the Part 104 procedures provides uniformity in discovery techniques while assuring compliance with the statutory requirement in section 811, which provide that discovery and subpoenas be issued in the same manner as civil actions in the United States for the district in which the investigation is taking place. (See §§ 104.500(a) and 104.590(a)). The rule is unchanged.

Another commenter argued that since HUD should be neutral with respect to the parties during the investigation, there is no reason to deny the aggrieved person the right to conduct discovery while providing this same right to the respondent. While HUD is neutral with respect to the parties, the parties' positions during the investigation are not equal. The respondent is the focus of an investigation aimed at determining whether he or she has committed a discriminatory housing practice and, thus, must be offered the ability to discover information in its own defense. The complaining party, on the other hand, by filing a complaint rather than pursuing its own civil action under

section 813, places the conduct of the investigation in HUD's hands and will not be allowed to conduct separate discovery. HUD notes that the Fair Housing Act does not foreclose a discovery avenue to aggrieved persons who have filed complaints, since the complainant may file a civil action under section 813(a) with regard to the alleged discriminatory housing practice and obtain discovery through the court proceeding.

Subpoenas issued by the Assistant Secretary would require the approval of the General Counsel before issuance. Some commenters argued that only one entity should be involved in the issuance of subpoenas during the investigation. These commenters would delete the references to General Counsel's approval of subpoena issuances. Subpoenas issued by HUD in furtherance of an investigation may be challenged or enforced through judicial proceedings. Since the legal sufficiency of the subpoena will be at issue, it is necessary to ensure that the issuance is justified. Accordingly, the rule continues to provide for review by the General Counsel. A minor clarifying change has been included limiting the General Counsel's review to legal issues.

*Section 103.220   Cooperation of Federal, State and local agencies.*

Section § 103.220 reflects provisions currently contained in Part 105 which permit the Assistant Secretary, in processing Fair Housing Act complaints, to seek the cooperation and utilize the services of State and local agencies and of other appropriate Federal agencies. Proposed § 103.220 also contained language designed to ensure that other Federal agencies are aware of their responsibility under section 808 (d) and (e) of the Act and under Executive Order No. 12259.

Upon review, HUD has concluded that proposed § 103.220 may generate confusion concerning the agencies' obligations to provide information during the investigation process and their duty to ensure that programs and activities are administered in a manner that will affirmatively further fair housing and their duty to cooperate with the Assistant Secretary in furthering the purposes of the Fair Housing Act, including the conduct of investigations. To clarify these provisions, § 103.220 has been revised to state that the Assistant Secretary, in processing Fair Housing Act complaints, may seek the cooperation and utilize the services of Federal, State or local agencies, including any agency having regulatory or supervisory authority over financial

**3264**    **Federal Register** / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations

institutions. Provisions governing other agencies' duties to affirmatively further fair housing and for cooperating in furthering the purposes of the Fair Housing Act have been moved to a new § 103.515 entitled "Actions by other agencies".

One commenter argued that this section does not clearly announce what type of cooperation HUD will generally expect of banking regulators, or what role these agencies will play in providing material for investigations. The commenter also asserted that it is unclear whether material generated by banking regulators or financial institutions in response to regulatory requirements and for purposes unrelated to the proposed rule would, contrary to existing banking policy, become public documents. Another commenter supported the aims of § 103.220 but suggested specific regulatory provisions designed to address the duty of other agencies to cooperate in investigations and procedures to be followed in pursuing discovery from such agencies.

HUD intends to review and upgrade its memoranda of understanding with covered agencies to cover our cooperative understandings concerning the provision of in formation to HUD under the Fair Housing Act, including information to be provided pursuant to investigations. All terms and conditions of HUD access will be addressed in these agreements. Accordingly, it is not necessary to provide more specific regulations in this area.

*Section 103.225 Completion of investigation.*

*Completion of investigation.* Section 103.230 states that the investigation will remain open until the reasonable cause determination is made. A commenter argued that the General Counsel, who is charged with making the reasonable cause determination, could remove a case from the Assistant Secretary's control by issuing a determination on reasonable cause before the complaint is fully investigated. This commenter felt that conciliation should be available until the complaint is transferred by the Assistant Secretary to the General Counsel for a reasonable cause determination and the General Counsel has filed a charge or dismissed the complaint. To remedy this problem, § 103.400(c)(1) has been revised to provide that the General Counsel shall make the reasonable cause determination only after the Assistant Secretary forwards the matter for consideration.

*Deadline for completion of investigation.* Section 810(a)(1)(B)(iv) and (C) provide that HUD must

complete investigations within 100 days after the filing of the compliant (or, when a complaint has been referred to a substantially equivalent State or local agency and reactivated, within 100 days after service of the notification of reactivation), unless it is impracticable to do so. If the investigation cannot be completed within this time limit, HUD is required to notify the aggrieved person and the respondent of the reasons for the delay. Section 810(g)(1) requires HUD to make the reasonable cause determination within the same 100-day time period, and to provide notification of the reasons for any delay. These requirements were included in §§ 103.225 and 103.400(c) of the proposed rule.

Several commenters requested deletion of the impracticability exception. The impracticability exception was a recognition by Congress that there may be circumstances where investigations may not be completed, and the reasonable cause determination made, within the prescribed 100-day period. While HUD intends to meet these deadlines whenever it is within its power to do so, it is concerned that the imposition of a strict 100-day deadline will not recognize the need for a lengthier investigation in complaints involving complex issues or recalcitrant respondents, and that respondents could argue for the dismissal of an otherwise meritorious complaint based on the failure to complete an investigation. Since HUD perceives that no valid fair housing-related goal would be served by imposing a strict 100-day deadline in all cases, the impracticability standard has been retained.

Other commenters argued that the regulation must clearly identify the circumstances under which it will be impracticable to complete the investigation or issue a reasonable cause determination within the 100-day period. These commenters suggested that impracticability be defined as extraordinary circumstances in the specific case and that the rule should state that the routine processing of other cases will not be grounds for a finding of impracticability. The range of circumstances that could legitimately cause delay in a case is numerous, and HUD is not prepared to identify all possible circumstances that would make it "impracticable" to take the described actions within the prescribed time period. Moreover, even if HUD were to articulate all such circumstances, it would not preclude the consideration of the demands upon HUD's resources caused by other docketed cases. Such a definition would fail to recognize that

even the best-managed case inventory system may not posses sthe excess capacity to respond to extraordinary demands upon resources.

*Section 103.230 Final investigative report (FIR).*

Requirements governing the contents of the investigative report are codified at § 103.230. Paragraph (a)(1) of this section provides that the investigative report will disclose the names and dates of contacts with witnesses, but will not disclose the names of witnesses that request anonymity. As noted in the rule, however, HUD may be required to disclose the names of such witnesses during the course of an administrative hearing under Part 104 or in a civil action under Title VIII. Commenters argued that the provision for nondisclosure of the identity of witnesses should be eliminated. The questioned provision merely continues HUD's current policy with regard to the disclosure of the identity of witnesses. Contrary to the allegations of the commenters, this policy has not undermined the credibility of HUD's investigations nor has it stifled conciliation efforts. The provision has been retained in the final rule.

One commenter argued that the regulations also should bar the disclosure of personal information about third parties and safeguard information that potentially could endanger the physical safety of the parties or of a third party. While HUD's final investigative report will avoid the inclusion of extraneous information, it is impossible for HUD to bar the disclosure of all information about third parties and to guarantee the individual safety of parties or of a third party. The proposed provision has not been included.

One commenter was concerned that the format for the investigative report may not provide an adequate basis for a reasonable cause determination. The investigative report will not be the only document available in connection with the making of a reasonable cause determination. The actual statements of witnesses and documentary evidence as well as the analysis of the investigation also will be considered. Internal procedures relating to these matters will be developed by HUD. Such procedures are not appropriate for inclusion in this rule.

Commenters urged that the FIR requirements be expanded to include a recommendation by the investigator on the reasonable cause determination and to include the facts and legal basis for the investigator's recommendation. As a

matter of internal policy, HUD anticipates that the views of the investigator with regard to the reasonable cause determination will be communicated to the General Counsel's office. HUD does not believe that it is necessary to incorporate this requirement in the regulation.

As required under section 810(d)(2) of the Act, § 103.230(c) provides that the Assistant Secretary shall make information derived from an investigation, including the final investigative report, available to the aggrieved person and the respondent, upon request, at any time following the completion of the investigation. In response to a commenter, the final rule has been revised to require HUD, following the completion of the investigation, to notify the aggrieved person and the respondent that the FIR is complete and will be provided on or upon request. Under most circumstances, the notification will be provided with the charge, where a charge is issued under § 103.405, or with the notice of dismissal under § 104.400(a)(2).

Subpart E—Conciliation Procedures

*Section 103.310   Conciliation agreement.*

If conciliation is successful, the terms of the settlement are reduced to a written conciliation agreement. Section 810(b)(2) of the Act provides that a conciliation agreement shall be an agreement between the respondent and the complainant, and shall be subject to the approval of the Secretary. Section 103.310(b) incorporates these requirements and states that the Assistant Secretary will indicate HUD approval of the conciliation agreement by signing the agreement.

The final rule makes a minor revision to this provision. Under the proposed rule, if HUD is the complainant, the Assistant Secretary would execute the agreement only if the aggrieved person is satisfied with the relief provided to protect his or her interest. The final rule recognizes that there may be circumstances where HUD may file a complaint that identifies a class of aggrieved persons, rather than specific aggrieved persons. Under such circumstances it would be impossible to determine if all aggrieved persons in the class are satisfied with the relief accorded. Accordingly, the final rule permits the Assistant Secretary to execute the agreement if all aggrieved persons named in the compliant filed by HUD are satisfied with the relief provided to protect their interests.

Section 103.310(b)(2) would preserve the General Counsel's ability to issue a charge under § 103.405, where the aggrieved person and the respondent have executed a conciliation agreement that has not been approved by the Assistant Secretary.

Commenters argued that HUD should not be permitted to commence or continue the investigation once an agreement is reached between the aggrieved party and the respondent. The commenters argued that the retention of this provision would "chill" conciliation agreements between the aggrieved person and the respondent and would serve no purpose since the Assistant Secretary will have right to initiate complaints under the 1988 Amendments. HUD could lose the ability to initiate a new complaint if the time period for the filing of the complaint has passed. Moreover, it would be wasteful of administrative resources to require HUD to file another complaint and to maintain a second case file under these circumstances. The final rule does not adopt the commenter's suggestion.

*Section 103.315   Relief sought for aggrieved persons.*

Section 103.315 lists the types of relief that may be sought for the aggrieved person during conciliation. Under paragraph (a)(1), monetary relief in the form of damages, including damages caused by humiliation or embarrassment and attorneys fees. One commenter argued that monetary relief should be limited to "compensatory" damages. Another commenter argued against the provision of damages for humiliation or embarrassment, stating that such a practice would result in extraordinary and unreasonable damage awards.

HUD has left paragraph (a)(1) unchanged. Damages for humiliation and embarrassment and noncompensatory damages (i.e., punitive and exemplary damages) can be awarded in civil actions brought under Title VIII. Since respondents will seek a full release of all claims as a part of the conciliation, the regulation should permit negotiations that take such factors into account as a part of the settlement. Although monetary damages other than actual damages are usually not provided for in a conciliation agreement, it is HUD's intent that the rule not preclude the possibility of seeking punitive or exemplary damages for an aggrieved person in an appropriate situation.

Paragraph (a)(2) provides for other make-whole relief, including access to the dwelling at issue or to a comparable dwelling, the provision of services or facilities in connection with a dwelling,

or other specific relief. This provision has been amended to provide for "other equitable relief, including but not limited to" the listed actions. While one commenter felt that the provision for access to a comparable dwelling was redundant, HUD believes that the inclusion of this provision is appropriate to cover situations where the original dwelling at issue is no longer available.

Commenters argued that the provisions permitting the binding arbitration of disputes arising out of the complaint could be improved by the addition of a description of the rules and procedures that will be used in arbitration. This change has not been made. HUD wishes to keep the arbitration remedy as flexible as possible in order that individual aggrieved persons and respondents will have the opportunity to adopt the procedures that will best suit their circumstances.

*Section 103.320   Provisions sought for the public interest.*

Section 103.320 lists the types of provisions that may be sought for the vindication of the public interest. Commenters argued that the regulations should announce the standards that HUD will use in determining whether a conciliation agreement will adequately vindicate the public interest. No useful purpose would be served by listing every form of public interest that HUD may protect with conciliation agreement provisions. These provisions are often tailored to the circumstances of particular cases. The suggested change has not been adopted.

One commenter noted that civil penalties may be assessed in the administrative proceeding and the civil action. This commenter urged HUD to add a new provision permitting the seeking of civil penalties of up to $50,000 in conciliation. As noted above, HUD has not precluded the negotiation of damages in lieu of possible court-awarded punitive damages on behalf of the aggrieved person in conciliation, because such agreements are made in return for the full release by the aggrieved person of all claims against the respondent. However, since the public interest is vindicated by ensuring future compliance and by rectifying the effects of past discriminatory housing practices, rather than penalizing the respondent for such practices, civil penalties have not been added under §103.320.

One commenter argued that HUD should be permitted to seek compensation for private fair housing groups that have participated in

mediation or investigation before the complaint is filed. HUD recognizes that private fair housing groups often play a significant role in assisting and referring complaints on a Federal and State level, and in providing initial investigation and mediation assistance that is often useful in handling the complaint after it is filed. However, HUD does not believe that the conciliation agreement is an appropriate device for the recovery of such compensation on behalf of the fair housing group in any case where the group is not an aggrieved person. In other instances, HUD fears that attempts to recover compensation for such groups would be viewed as collusion between HUD and the groups.

*Section 103.330  Prohibitions and requirements with respect to disclosure of information obtained during conciliation, and § 103.300(a) Participation as conciliator and investigator.*

Under section 810(d), nothing said or done in the course of conciliation may be made public or used as evidence in a subsequent proceeding under Title VIII without the written consent of the persons concerned. Proposed § 103.330(a) implemented this provision with the additional statement that information disclosed during conciliation would not be used in the investigation of the complaint.

Upon reconsideration, HUD has decided to remove the additional statement concerning information disclosed during conciliation. By barring the use of conciliation statements or conduct "in an investigation", the proposed rule imposed greater restraints on the use of such information than are imposed under the statute. The statutory language represents a balance between the need to encourage candor in conciliation discussions and the need for a full development of the facts in the investigation and litigation of the complaint. The proposed language, in striking a different balance, may not conform to the statutory intent.

Although it is fairly obvious that statements made during conciliation might provide useful investigative leads, Congress did not preclude the use of such statements. The real concern of Congress was the effect on conciliation if statements made or conduct exhibited during conciliation were admissible in a later administrative proceeding or civil action.

By barring the investigative use of conciliation statements and conduct, HUD invites both complainants and respondents to argue that the investigation has somehow been "tainted" by information obtained

during the conciliation. This would invite wasteful litigation concerning whether HUD conducted its conciliation and investigation activities in accordance with its own regulations and would provide parties with an incentive to insulate themselves from the use of evidence at trial, by disclosing key facts during conciliation.

In the final rule, the prohibition against the use of conciliation information in investigations will be dropped. HUD notes that the use of such information in administrative hearings and civil actions will be governed by Rule 408 of the Federal Rules of Evidence. (See § 104.730) Rule 408 makes inadmissible at trial "evidence of conduct or statements made in compromise negotiations," but "does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations."

As a related matter, § 103.300(c) limits the participation of officers, employees, and agents of HUD engaged in the investigation of a complaint under Part 103 in the conciliation of the same complaint or in any factually related complaint. While the original purpose of this general limitation was to ensure that information gathered during the conciliation process is not used in the investigation of the complaint, HUD continues to believe that conciliation of individual complaints can be best promoted where the investigation and conciliation functions are kept separate, so § 103.300(c) is being retained despite the adjustments made in § 103.330, discussed above.

Section 103.300(c) continues to recognize that there may be circumstances where a dual role for the HUD employee may be necessary. This section permits the investigator to suspend fact finding and engage in efforts to resolve the complaint by conciliation where the rights of the aggrieved person and the respondent can be protected and the prohibitions with respect to the disclosure of information obtained during conciliation can be observed. HUD emphasizes that such conciliations will generally occur where the investigator, during the course of investigation, is requested by the parties to conciliate and will rarely be initiated by the investigator.

One commenter, concerned that any suspension of fact finding would unduly delay the completion of the investigation, opposed this provision. The suspension of the investigation envisioned under this provision should not delay the investigation appreciably and should not prevent the Department from fulfilling its 100-day deadline for

investigation and the reasonable cause determination.

Section 103.330(b) provides an exception to the prohibition against disclosure of conciliation information. This section provides that conciliation agreements will be made public, unless the aggrieved person and the respondent request nondisclosure and the Assistant Secretary determines that disclosure is not required to further the purposes of the Fair Housing Act. One commenter suggested that the provision should note that one of the purposes to be considered in determining whether disclosure should be required is the education of people about their fair housing rights and remedies and to show that meaningful redress can result from reporting possible violations to HUD and utilizing the conciliation process. While HUD agrees that the cited factor is significant in determining whether disclosure of a conciliation agreement will further the purposes of the Fair Housing Act, HUD is required to consider other purposes in making the disclosure determination. The final rule has not been changed to highlight this purpose.

One commenter asked how conciliation agreements would be made public. Where the terms of a conciliation agreement do not otherwise provide, HUD intends to issue a press release setting out the fact of successful conciliation and outlining the major terms of the agreement. The statute also requires "public disclosure" in the case of any complaint where the Secretary has determined that no reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, and has dismissed the complaint. The Department intends to employ press releases for this purpose as well. Where a complaint is dismissed on a finding of no reasonable cause and the respondent specifies that even public disclosure absolving the respondent would be unwelcome, the Department will refrain from issuing a press release. However, HUD interprets the Amendments Act as requiring some form of public disclosure on the occasion of a dismissed complaint, and accordingly the Department's policy will be to disclose this information to the public if a specific request is received.

*Section 103.335  Review of compliance with conciliation agreements.*

Proposed § 103.335 stated that HUD may, from time to time, review compliance with the terms of any conciliation agreement. Whenever HUD has reasonable cause to believe that a

respondent has breached a conciliation agreement, HUD shall refer the matter to the Attorney General with a recommendation that a civil action be filed under section 814(b)(2) of the Act for the enforcement of the terms of the conciliation agreement.

One commenter argued that the language used in this section indicates that review of compliance agreements will be "haphazard and perfunctory." The commenter recommended the deletion of the phrase "from time to time" and would make compliance review mandatory and periodic (at least once a year) whether or not HUD has reasonable cause to believe that a breach has occurred.

Requiring HUD staff to monitor every conciliation agreement on a mandatory and periodic basis is not the most effective used of HUD's limited resources. Compliance reviews under this section will not be performed on a haphazard or perfunctory basis. Rather, compliance reviews will be performed on a random sampling basis, or if HUD has reason to believe that the signatories are not complying with the terms of a particular agreement. The final rule is unchanged.

Subpart F—Issuance of Charge

*Section 103.400   Reasonable cause determination.*

*Reasonable cause standard.* Proposed § 103.400(a) provided that if a conciliation agreement has not been executed by the complainant and the respondent and approved by the Assistant Secretary, the General Counsel, within specified time limits, shall determine, based on the totality of the factual circumstances known at the time of the decision, whether reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur. The reasonable cause determination shall be based on all facts concerning the alleged discriminatory housing practice, provided by the complainant and respondent and otherwise, disclosed during the investigation. In making the reasonable cause determination, the General Counsel shall consider whether the facts concerning the alleged discriminatory housing practice are sufficient to warrant the initiation of a civil action in federal court.

A number of commenters objected to the reasonable cause standard announced in this section. Some argued that the standard is overly restrictive and may unduly limit the number of charges that will be issued by HUD. Others alleged that the meaning of the proposed standard is unclear and may

open the door for subjective decisions and may permit the consideration of irrelevant factors. (*I.e.,* Some commenters suggested that the proposed language would permit HUD to consider any matters that could have a bearing on a decision to bring a lawsuit, including: an assessment of the strength of the suit, the amount of anticipated damages, the government's resources that would be devoted to the proceeding, the availability of witnesses, docket scheduling, and other factors generally bearing on the exercise of prosecutorial discretion). Commenters argued that language of the statute and relevant legislative history limit HUD's assessment to the issue of liability alone.

Contrary to the allegations of the commenters, a fair reading of the regulation clearly demonstrates HUD's intent to limit the reasonable cause assessment to the issue of whether a discriminatory housing practice has occurred or is about to occur. HUD, by repetition in the regulation, expressed its position that the reasonable cause determination is to be based solely on the issue of liability. No less than three passages state this proposition. (*I.e.,* the regulation states that the determination will be "based on the totality of the factual circumstances"; that the reasonable cause determination "shall be based on all facts concerning the alleged discriminatory housing practice"; and "the General Counsel shall consider whether the facts concerning the alleged discriminatory housing practice are sufficient to warrant the initiation of the civil action." While the proposed language would foreclose the consideration of extraneous matters not related to the factual determination of liability, HUD has made an additional modification in the final rule to reflect HUD's intent that the reasonable cause determination is to be based *solely on* the facts determined during investigation.

The source of many commenters' dissatisfaction is the provision that requires the General Counsel to determine whether the facts concerning the alleged discriminatory housing practice are sufficient to warrant the initiation of a civil action. Rather than permitting consideration of the probability of winning the case, this standard is merely intended to require that the charge is well-grounded in the facts and that the conduct that is the subject of the complaint appears to constitute a violation of the Act.

Commenters suggested several alternative standards. These standards are, in some cases, identical to the standard contained in the proposed rule.

For example, some commenters proposed that the standard should be whether the information disclosed warrants the initiation of a civil action or an administrative proceeding under Part 104. In other cases, the alternative standards are substantially the same as the standard contained in the proposed rule (e.g., whether a reasonable and fair-minded trier of fact could conclude that a discriminatory housing practice has occurred or is about to occur, etc.). Accordingly, the proposed standards have not been incorporated in the final rule.

Other commenters argued that, in addition to the reasonable cause standard, HUD should make certain presumptions in favor of the aggrieved person when making the determination (e.g., to construe the facts in favor of the aggrieved person or to assume that the evidence offered by the aggrieved person is true) or that HUD should reserve all issues of material fact for determination at the hearing or trial. Such presumptions and reservations are inconsistent with HUD's duty to analyze and make a reasoned judgment concerning the alleged discriminatory housing practice and would obviate any need for a HUD investigation, as required by the statute. For this reason, the suggestions are rejected.

*Written reasonable cause determination.* Commenters argued that all determinations of reasonable cause or lack of reasonable cause must be in writing and set forth in an opinion which states the facts and legal conclusions. The commenters argued that such a requirement would discourage subjective determinations and establish accountability on the part of the fact finder and respect for the administrative process.

HUD has made minor changes to the final rule to clarify that all determinations will be made in writing and will set forth a brief summary of the factual basis of the determination. An extensive factual recitation will be unnecessary, since the complete investigative report will contain this information and will be available to the aggrieved person and the respondent. (The rules already provide that where a finding of reasonable cause is made, the charge will include a short and plain statement of the facts the General Counsel has found reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur). The notification will not state the legal theory upon which the determination is made since the Department feels that such a statement would encourage needless litigation by

encouraging the participants to mount collateral attacks on the reasonable cause determination.

*Appeal of reasonable cause determination.* The regulation provides no right to appeal a reasonable cause determination. Commenters argued that such an appeal is necessary to permit review of errors of law or facts, and that failure to provide such an appeal is contrary to standard administrative procedure. Some commenters would limit appeals to determinations of no reasonable cause.

The statute does not contemplate a review of the reasonable cause determination. Section 810(g)(1) requires HUD to make the reasonable cause determination within a 100-day time period from the filing of the complaint and to take specified actions immediately (or promptly) after the determination is made. (The statute directs HUD to "immediately" issue a charge on behalf of the aggrieved person after reasonable cause is found (section 810(g)(2)) and to "promptly dismiss" the complaint and make public disclosure of the dismissal where no reasonable cause is found (section 810(g)(3)).) In light of these directions, HUD believes that it is significant that the Act does not specifically provide for an appeal of the reasonable cause determination, particularly where such procedures are specified within other sections. (See section 812(h), which provides for Secretarial review of the ALJ's initial decision.) Moreover, HUD believes that appeals of the determination of reasonable cause would be contrary to the legislative history of the 1988 Amendments, which supports the expeditious resolution of complaints. The additional review would delay the resolution of proceedings by civil action or administrative hearings under Part 104.

HUD notes that the failure to provide for the review of the reasonable cause determination will not preclude an aggrieved person from filing a civil action under section 813 of the Act. Nor will the dismissal prevent an aggrieved person from refiling a complaint based on newly discovered or previously unavailable information, provided the one-year time limit for the filing of a complaint is met. (In this regard, one commenter argued that the regulations should permit HUD to toll the statutory one-year statute of limitation for filing where a complaint is refiled. This change has not been made since there is no statutory authority for such an action.)

*Reasonable cause determination and State and local zoning cases.* Under proposed § 103.400(a)(1), if the General

Counsel determines that reasonable cause exists, the General Counsel shall immediately issue a charge on behalf of the aggrieved person, unless the matter involves the legality of a State or local zoning or other land use law or ordinance. If such a law or ordinance is involved, HUD is required to refer the matter to the Attorney General for appropriate action under section 814(b)(1) of the Act. One commenter argued that the rule should state that the referral of such a case will not be made until an investigation has been completed and conciliation has been attempted. It is HUD's intention to investigate complaints alleging discriminatory housing practices that involve the legality of a State or local law and to forward its investigation to the Department of Justice. This section has been revised to provide further clarity on this point. See § 103.400(a)(2) of the final rule.

*Adoption of a reasonable cause determination made by a certified agency.* Commenters argued that the final rule should state that a finding of reasonable cause by a substantially equivalent agency will automatically be adopted by HUD, and require the Secretary to issue a charge. Commenters argued that the failure to include this provision will deny complainants the full protection of the new law during the 40-month period that currently substantially equivalent agencies have to conform their procedures and remedies.

The 1988 Amendments require HUD to make referrals for up to 40 months following the date of enactment to agencies that are certified (including agencies that are certified for interim referrals under Part 115) on the date of enactment. As noted in the preamble to the proposed rule, it is unlikely that such agencies will immediately provide the full range of remedies accorded to complainants under the 1988 Amendments. Given the limited statutory authorization for reactivation provided under section 810(f)(2) of the Act, it does not appear that HUD has unilateral authority to reactivate the complaint to provide the full range of remedies available under the Act absent other circumstances.

Under the limited circumstance where HUD will be able to reactivate and where the State or local agency has issued a reasonable cause determination (the existence of such a determination is highly unlikely until the State or local agency has modified its existing procedures to conform to the 1988 Amendments), HUD cannot automatically adopt the local agency's determination. HUD must ensure that

the determination rests on a firm factual basis. While HUD may use the information gathered by such agencies (with appropriate supplementation through a HUD investigation) to make its independent evaluation of the factual circumstances surrounding the alleged discriminatory housing practice, the responsibility for making the reasonable cause determination cannot be delegated in such a manner.

*Deadline for reasonable cause determination.* Issues regarding 100-day deadline for the reasonable cause determination are discussed above.

*Participation of the Assistant Secretary in the reasonable cause determination.* Several commenters argued that the regulations should state that the reasonable cause determination will be made in consultation with the Assistant Secretary's office, and with due regard to the recommendations of the investigator. Another commenter feared that the investigation report, without further supporting data, may not be sufficient for the General Counsel to make the reasonable cause determination. The commenter asked whether the General Counsel would have access to the complete file. whether the General Counsel may send the case back for further investigation, and whether the General Counsel would be permitted to conduct his or her own independent investigation.

As noted under the discussion of the investigation report, the General Counsel will provide due deference to the recommendations of the Assistant Secretary and the investigator. There obviously will be communications between the two offices concerning this determination and access to files and additional investigative materials. Since such communications will be a matter of internal administrative procedures at HUD, it is not necessary to set forth the procedures in the regulation.

With regard to the investigation of additional matters, the final rule provides that the investigation will remain open until the reasonable cause determination is made. This provision was intended to permit the General Counsel to request the Assistant Secretary to make a further investigation where the investigative report is insufficient to determine whether reasonable cause exists, and to make direct inquiries to supplement the investigation.

Several commenters asserted that permitting the General Counsel to conduct his or her own investigation would be contrary to the intention of the legislation, would undermine the Assistant Secretary's investigative

function; may needlessly duplicate investigative activity; and would delay the disposition of cases. The General Counsel does not have the resources to engage in extensive fact-finding. Accordingly, where such fact-finding is required, the Assistant Secretary will be requested to conduct further investigation. Whenever there are minor issues capable of expeditious resolution, however, nothing prevents the General Counsel from resolving the issues through direct inquiries. The internal procedures for the conduct of such further inquiries will be worked out through agreements between the Assistant Secretary and the General Counsel.

*Section 103.405   Issuance of charge.*

Section 103.405 governs the issuance of the charge. Paragraph (a)(5) of this section provides that the charge need not be limited to the facts or grounds that are alleged in the complaint. A commenter argued that HUD should not be able to set forth new facts or new grounds in the charge. The commenter argued that HUD should be required to amend the complaint if new acts or grounds are found. Following the amendment, the respondent and aggrieved person should be given an opportunity to enter a conciliation agreement based upon the additional facts or grounds.

Section 810(g)(2)(B) expressly provides that the charge need not be based on the facts or grounds alleged in the complaint. Where additional grounds are discovered during the processing of the complaint, HUD intends to inform the respondent of the additional grounds and to seek information from the respondent concerning such matters. HUD will not require the amendment of the complaint as long as the record of the investigation clearly indicates that the respondent has been given notice and an opportunity to respond to the new allegations. The final rule at § 103.405(a)(3) has been amended to reflect this policy.

*Section 103.410   Election of civil action or provision of administrative proceeding.*

Section 103.410 governs the election of a civil action under section 810(o) or the provision of an administrative proceeding under Part 104.

One commenter stated that the rule should clarify whether the agreement of the complainant and the respondent is necessary for Part 104 procedure to apply. If no person makes a timely election to proceed with a civil action under section 810(o) of the Act, Part 104 will apply. The Department has made

minor revisions to the regulations to clarify this point.

Paragraph (e) of the proposed rule provided that the General Counsel shall be available for consultation concerning any legal issues raised by the Attorney General regarding how best to proceed in the event that commencement of a civil action would implicate Rule 11 of the Federal Rules of Civil Procedure. Numerous commenters claimed that paragraph (e) is unnecessary, serves no useful purpose, may be used by the Department of Justice (DOJ) to reduce its litigation caseload, is not required by statute, and should be deleted.

Following the reasonable cause determination and an election, the statute provides that the Attorney General shall commence and maintain a civil action not later than 30 days from the election (section 810(o)). While we believe that the need for such consultation will be infrequent, we do not believe that Congress intended to preclude the two Federal agencies from discussing an appropriate method of proceeding in light of new relevant factual information or court decisions. Allowing 20 days for the election, the Attorney General's complaint may be filed as many as 50 days following the issuance of the charge. During that time period, new facts may be discovered or court decisions rendered which demonstrate that there is no reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur. In such circumstances, it would be senseless for the Attorney General to institute a civil action. Under such circumstances, HUD will take such action as is necessary to supplement the investigative report (see section 810(b)(5)(B) which provides that a final investigative report may be amended if additional evidence is later discovered) and, if further evidence to support a finding is not developed, to void the reasonable cause determination *ab initio*. This procedure is designed for the sole purpose of assuring that all civil actions are supportable at the time of filing and, in line with the intention of Congress, to ensure that the Secretary is the official making the determination whether to proceed with a charge or civil action. At the same time, the procedure helps to ensure that the Secretary will have the necessary information to make the required decision.

Some commenters argued that the reference in paragraph (e) to Rule 11 of the Federal Rules of Civil Procedure is unnecessary. As discussed above, the purpose of the DOJ/HUD consultation is to examine new court decisions and newly discovered evidence that are

relevant to the reasonable cause determination. While the Rule 11 standard might be implicated if a civil action is filed where a new decision or evidence indicates a lack of a basis for a reasonable cause determination, HUD agrees that the specific reference to this rule of procedure should be excluded from the final rule. The final rule has been revised to emphasize that the General Counsel will be available for "consultation concerning any legal issues raised by the Attorney General as to how best to proceed in the event that a new court decision or newly discovered evidence is regarded as relevant to the reasonable cause determination."

Several commenters argued that DOJ must publish regulations or make public all proposed procedures for handling the civil actions authorized under section 812(o). DOJ's procedures for pursuing such actions are beyond the jurisdiction of the Secretary, and thus not appropriate for addressing in this rule.

Subpart G—Other Actions by the Department

*Section 103.500   Prompt judicial action.*

Proposed § 103.500(a) provided: "If at any time following the filing of a complaint, the General Counsel concludes that prompt judicial action is necessary to carry out the purposes of Part 103 or Part 104, the General Counsel will request that the Attorney General commence a civil action for appropriate temporary or preliminary relief pending the final disposition of the complaint."

One commenter objected to the language stating that the General Counsel would "request" the Attorney General to commence a civil action. The commenter argued that the language implies that following the request, it is within the Attorney General's discretion to file the civil action. The commenter noted that section 810(e) *requires* the Attorney General promptly to commence action after the Secretary *authorizes* the action. The statute does provide that when the Secretary authorizes the civil action, the Attorney General shall promptly commence and maintain such action and the final rule has been revised to track the statute.

Before making the determination to request such action, the proposed rule stated that the General Counsel would consult with the Assistant Attorney General for the Civil Rights Division. Commenters urged deletion of the consultation requirement. Commenters argued that the provision: (1) Adds time-consuming steps to the process of seeking emergency relief; (2) is not

necessary, since HUD is free to consult with DOJ at any time; (3) will be unnecessary when HUD acquires enforcement experience; and (4) is inconsistent with the statute and with the legislative intent to provide the simplest and fastest method to obtain emergency relief for discrimination victims.

The final rule is unchanged on this point. As noted above, once the general Counsel issues the authorization, the Attorney General is *required* to commence and maintain the action. In light of this mandate, it is crucial that authorized civil actions are justified on both the facts and the law. As noted in the preamble to the proposed rule, prior consultation will ensure that the civil action can be maintained by providing HUD with access to DOJ's extensive experience in seeking relief in different factual situations and in different forums.

Commenters' fears that the consultation requirement will impede the process of obtaining temporary and preliminary relief are unfounded. The consultation envisioned under this section will not be a time-consuming process. Rather, HUD and DOJ plan to consult through informal contacts between representative, of the two agencies. Moreover, HUD expects and intends that the conferences will expedite, rather than delay, proceedings by providing DOJ with important background information in individual proceedings before the issuance of an authorization and by providing DOJ with advance information concerning upcoming litigation. With such information, DOJ should be better prepared to act expeditiously to preserve the aggrieved person's rights when the authorization is issued. To emphasize this point, § 103.500(a) has been revised to provide that the purpose of the DOJ consultation is to ensure the prompt initiation of the civil action.

Section 103.500(b), which implements section 810(e)(2) of the Act, has been revised slightly to more closely reflect the statutory provision.

*Section 103.510 Other action by HUD.*

Section 103.510 addresses other actions that HUD may take with respect to matters asserted in a complaint. A commenter felt that the proposed rule's list of proceedings that may be initiated under other civil rights authorities was incomplete. The commenter urged the addition of the Age Discrimination Act of 1975 (42 U.S.C. 6101) and Executive Order 12259. The final rule has been amended to add the Age Discrimination Act. The cited executive order addresses HUD's authority to

coordinate the fair housing efforts of federal agencies, is not an enforcement authority, and has not been added.

**Part 104—Administrative Proceedings Under Section 812 of the Fair Housing Act**

*Statutory limitations applicable to administrative procedures*

In many instances, commenters suggested revisions to the proposed administrative procedures that cannot be adopted because they conflict with statutory requirements contained in the Fair Housing Act. The statutorily impermissible suggestions included:

1. The deletion of the provision contained in § 104.590(e) which states that HUD will pay witness fees and mileage if the party requesting the issuance of the subpoena is unable to pay. Section 811(b) of the Act requires HUD to pay the fees under such circumstances.

2. The increase or decrease of the amount of the ceiling on civil penalties that may be awarded. Section 812(g)(3) provides for civil penalty ceilings ranging from $10,000 to $50,000. These ceilings are reflected in § 104.910(b)(3).

3. The deletion of provisions contained in § 104.940 requiring HUD to pay attorney's fees to the extent provided under the Equal Access to Justice Act (5 U.S.C. 504). Section 812(p) imposes this liability on the United States.

4. The reconciliation of the proposed deadline for a petition for review of the final decision in a United States Court of Appeals (30 days from issuance of decision); and the date that findings of fact and the final decision become conclusive in connection with a petition for enforcement (45 days after the date of issuance of the decision, if no petition for review is filed). These time periods are imposed under sections 812 (i) and (*l*) of the Act.

Subpart A—General Information

*Section 104.20 Definitions*

Section 104.20 contains the definitions used in Part 104. In addition to the comments on definitions addressed above, a commenter urged HUD to define separately "hearing" and "hearing on the record". While "hearing" is defined and used in Part 104, the phrase "hearing on the record" does not appear in the part. While the commenter noted that a civil action under section 813 is barred after the commencement of "a hearing of the record" by the ALJ (see 813(a)(3)), it is inappropriate to prescribe by HUD regulation the limitations on the jurisdiction of the United States District

Court imposed under section 813 of the Act.

*Section 104.30 Computation of time.*

Section 104.30 governs the computation of time periods. A commenter suggested a clarification in § 104.30(a) to provide that the time computations relate only to filing and serving papers. The section is intended to apply to all computations of time (e.g., deadlines for the commencement of the hearing (§ 104.700); issuance of the initial decision (§ 104.910(d)); and the notification of appropriate governmental entities following the issuance of the final decision (§ 104.935(a)(2)). Accordingly, the proposed change has not been made.

*Section 104.40 Service and filing.*

Section 104.40 requires the filing of all documents in Washington, DC. One commenter argued that this provision places a burden on the aggrieved person, could have a chilling effect and is contrary to legislative intent to provide relief to persons in outlying areas. This commenter would revise § 104.40(a) to require filing in Washington, DC until the Assistant Secretary designates local addresses for filing. While HUD intends to conduct the hearing at a place in the vicinity in which the discriminatory housing practice is alleged to have occurred or to be about to occur (§ 104.700), all other administrative functions will be performed at the Office of the Administrative Law Judges in Washington, DC. Since service and filing can be accomplished by mail, HUD does not believe that this requirement will impose an undue burden on persons outside the Washington, DC area.

Subpart B—Administrative Law Judge

*Section 104.100 Designation.*

Section 104.100 provides that a presiding ALJ for the proceeding shall be appointed by HUD's Chief ALJ. One commenter argued that, consistent with statutory intent for the expeditious handling of complaints, the rules must include procedures for the appointment of the presiding ALJ. HUD believes that the deadlines for the commencement of the hearing are sufficient to ensure the timely appointment of a presiding ALJ and that there is no need to impose a regulatory deadline for appointments by the presiding ALJ.

The commenter also argued that the rules must prescribe the qualifications for ALJ. The qualifications for the appointment of ALJs are fully set forth in 5 U.S.C. 3105, which is specifically

cited at § 104.100. Section 104.100 is unchanged.

### Section 104.130  Ex parte communications.

Section 104.130 governs the prohibitions of ex parte communications. One commenter argued that the listed sanctions for ex parte communications are too harsh, particularly where an aggrieved person is unrepresented by counsel and inadvertently makes an improper contact. To remedy this problem, the commenter would delete the list of sanctions from the regulations. This section places the decision to sanction and the choice of sanctions within the sound discretion of the ALJ. The rule clearly provides that the listed sanctions are illustrative and that the ALJ may provide for other, more appropriate, sanctions.

### Section 104.140  Separation of functions.

Under § 104.140, no officer, employee or agent of the Federal government engaged in the performance of investigative, conciliatory, or prosecutorial functions in connection with the proceeding or any factually related proceeding under Part 104 may participate or advise in the decision of the ALJ, except as witness or counsel during the proceedings. One commenter would revise this section to provide that no officer, employee, or agent * * * may participate or advise in the decision of the ALJ, except as a witness or counsel to a party during the proceedings. Persons filing amicus briefs are not "parties" to the proceedings under § 104.200. The proposed change has not been made since it could have the effect of prohibiting participation by such persons.

### Subpart C—Parties

### Section 104.200  In general.

Under § 104.200 the parties to the proceedings are HUD, the respondent named in the charge and against whom relief is sought, and any intervenors. In accordance with section 812(c) of the Act, the proposed rule permitted the intervention by any aggrieved person. No other intervnention is permitted in the proceedings, although briefs of amicus curiae may be permitted at the discretion of the ALJ (§ 104.200(a) and (c)).

Commenters objected to the proposed rules governing intervention. One commenter noted that the proposed rule would permit any potential complainant to intervene without regard to the relevance of his or her concerns in the

case. HUD agrees that the proposed rules governing intervention are too broad and has revised this section to permit any aggrieved person to file a timely request for intervention (see discussion below on the timeliness of petitions for intervention). Intervention shall be permitted where the intervenor is the aggrieved person on whose behalf the charge is issued. Intervention shall also be permitted where the intervenor is an aggrieved person who claims an interest relating to the property or transaction that is the subject matter of the charge and the disposition of the action may, as a practical matter, impair or impede the aggrieved person's ability to protect that interest, unless the aggrieved person's interest is adequately represented by the existing parties. The revised provisions are based on the rules of intervention as of right under Rule 24 of the Federal Rules of Civil Procedure.

The commenters also noted that the rule would not permit non-aggrieved persons to intervene. The statute addresses intervention only by aggrieved persons (see section 812(c)). HUD is reluctant to expand the classes of persons that may be permitted to intervene, particularly in light of the statutory time limitations on the issuance of administrative decisions. HUD notes, however, that other persons may be permitted to submit briefs of amicus curiae under § 104.205(c).

### Section 104.210  Representation.

Section 104.210 governs representation of the parties. Under § 104.210(b)(5), parties may be represented by an attorney admitted to practice before a Federal Court or before the highest court in any State. One commenter would permit representation only by attorneys who are admitted to practice before a Federal Court. Attorneys in good standing before State or Federal courts may be sufficiently qualified to represent the parties in a Part 104 proceeding. It is unnecessary to limit the parties' choice of representatives as proposed by the commenter.

Under § 104.210(d), the attorney or other representative must file a written notice of intent before withdrawal from the proceeding. One commenter urged HUD to limit the representative's ability to withdraw. The rule does not prescribe such limitations. To the extent that the commenter fears that withdrawals may be used to delay the proceeding, we note that such dilatory tactics would be prohibited under the standards of conduct (§ 104.220). The commenter suggested that the rule require, at a minimum, service of the written

notification of withdrawal on all parties. This service is already required under § 104.40.

One commenter argued that the regulations do not unambiguously provide that complainants may employ private counsel to represent their interests in the administrative hearings, in addition to the representation provided by HUD. The regulations clearly provide that aggrieved persons may intervene as parties (§ 104.200(b)) and that parties may be represented by counsel (§ 104.210(a)(5)). HUD does not believe that further clarification is necessary.

### Subpart D—Pleadings and motions

### Section 104.410  The charge.

The requirements governing the filing, service and contents of the charge are found at § 104.410. Paragraph (b)(2) of this section refers to "an election * * * to use the administrative procedure." A commenter observed that the administrative procedure will be used if no election is made to have the claim litigated in a civil action and may not be the result of a deliberate election by the parties. The final rule has been revised to clarify this point.

### Section 104.430  Requests for intervention.

Within 30 days after the service of the charge, any aggrieved person may file a request for intervention and participate as a party to the proceeding. No other intervention was permitted under the proposed rule. Commenters suggested the revision of this section to permit intervention after the expiration of the 30-day period.

While the 1988 Amendments require the commencement of a hearing and the issuance of an initial decision within specified periods, the statute imposes no absolute deadline for intervention. To ensure that aggrieved persons will not be unnecessarily excluded from a proceeding, the final rule has been amended to permit the filing of a timely request for intervention after the 30-day period. In determining whether intervention will be permitted, the ALJ may consider such factors as: the progress of the litigation when intervention is sought; the delay in seeking intervention and the reasons for the delay; and the prejudice to other parties if intervention is permitted. All requests for intervention submitted within 30 days of the filing of the complaint will be considered to be timely filed.

*Section 104.450  Motions.*

Section 104.450(b) states that any party may file an answer to a written motion. Further responsive documents are prohibited, unless otherwise ordered by the ALJ. One commenter would clarify further that prohibited responsive documents would not include exhibits, memoranda, or briefs. The Department does not believe that it is necessary to list all types of responsive documents that would be excluded under this rule. The final rule is unchanged.

Subpart E—Discovery

*Section 104.500  Discovery*

Section 104.500 contains the general provisions governing discovery. Paragraph (d) provides that the frequency and sequence of the discovery methods are not limited, unless otherwise ordered by the ALJ or restricted under Subpart E. One commenter suggested that the final rule require that the ALJ hold an initial pretrial conference addressing discovery issues as a part of the prehearing procedures under Subpart G. At the pretrial conference, the parties would be required to describe the nature and amount of discovery to be undertaken. The discovery plans would be reduced to a written order and all discovery would be completed in accordance with the order. The commenter noted that this procedure is consistent with limitations on discovery imposed in the United States District Courts.

It is not necessary to provide a pretrial discovery conference and order for every proceeding. Where such a procedure is required to expedite the proceeding, however, a pretrial discovery conference may be conducted and a discovery order issued as a part of a prehearing conference under proposed § 104.610. The final rule is unchanged on this point.

Section 104.500(e) provides that all discovery must be completed 15 days before the date scheduled for the hearing. A commenter argued that this date was too close to the hearing. As an alternative, the commenter suggested that the rule provide that all discovery be completed within 80 days of the issuance of the charge.

The 15-day deadline was imposed to ensure that parties' final preparation for hearing will not be interrupted by late-filed discovery requests, and HUD continues to believe that the 15-day time period is a sufficient buffer. The Department notes that the proposed 80-day deadline would not always ensure more uninterrupted time for trial preparation, since hearings may be

commenced at any time within 120 days following the issuance of the charge.

Several commenters noted that the proposed rule will not always permit discovery from a non-intervening aggrieved person on whose behalf the complaint was filed and who is the real party in interest. The commenters argued that such persons should be required to comply with discovery requests (and that the results of this discovery should be admissible in the hearing) as if the aggrieved person were a party to the charge.

Because the administrative decision will depend upon the course of dealings between the respondent and the aggrieved person and the extent of damage will depend upon the injury suffered by the aggrieved person, HUD believes that it is appropriate to allow all forms of discovery to be used against nonintervening aggrieved persons. Accordingly, the final rule includes a new § 104.500(f) stating that for the purposes of obtaining discovery from a non-intervening aggrieved person, the term "party" as used in the subpart includes the aggrieved person on whose behalf the charge was issued.

*Section 104.510  Depositions.*

Section 104.510 governs depositions upon oral examination and written interrogatories. At the request of a commenter, paragraph (d), which explains the procedures and grounds for requesting suspension of a deposition, has been clarified to permit the suspension of a deposition for improper conduct in addition to improper questioning. (For example, a deposition may be suspended if the party makes improper objections or improper instructions to a witness during the deposition.)

*Section 104.520  Use of deposition at hearings.*

Section 104.520 governs the use of depositions at hearings. One commenter would amend this provision to deny third parties the right to use information contained in depositions. The 1988 Amendments contemplate that the administrative proceeding is a public proceeding. As such, HUD cannot preclude the use of information contained in the record of the proceeding. HUD notes, however, that the discovery of information and the use of discovered information may be limited in accordance with protective orders issued under §§ 104.570 and 104.740.

*Section 104.530  Interrogatories.*

The proposed rule permitted unlimited use of interrogatories. One commenter

suggested that the number of interrogatories that may be served without an ALJ order should be limited to 20 interrogatories. A rule limiting the number of interrogatories is consistent with practice in Federal courts and will force the parties to focus on pertinent issues when drafting interrogatories. HUD believes, however, that a 20-interrogatory limitation would unduly restrict discovery under this section. As revised, § 104.530 permits a party to serve up to 30 interrogatories on any other party without an ALJ order. Where necessary for full and complete discovery, the parties are permitted to serve additional interrogatories with an ALJ order.

*Section 104.570  Protective orders.*

One commenter argued that the ALJ must narrow discovery to specific matters raised by the complaint. Part 104 contemplates that discovery will be pursued through the voluntary efforts of the parties and that the ALJ will intervene in the process only where it is necessary to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense. Where necessary to protect the person or party, the ALJ may issue an appropriate protective order directing that certain irrelevant matters may not be the subject of discovery (see § 104.570(d)).

*Section 104.580  Failure to make or cooperate in discovery.*

Section 104.580 governs motions to compel discovery and the imposition of sanctions. One commenter requested the deletion of § 104.580(d)(1), which permits an inference to be drawn in favor of a requesting party if another party fails to comply with a discovery order issued by the ALJ. The cited provision provides the ALJ with an effective method of compelling compliance with orders by parties or persons who unjustifiably resist discovery. It is retained in the final rule.

Subpart F—Subpoenas

*Section 104.590  Subpoenas.*

Section 104.590 provides for the issuance of subpoenas in aid of administrative hearings. Paragraph (f) of the proposed rule addressed motions to quash or limit subpoenas. One commenter argued that all evidence must be allowed into discovery and urged the deletion of this provision. While Part 104 is designed to permit the discovery of any matter, not privileged, that is relevant to the subject matter involved in the proceeding, § 104.590 recognizes that there may be occasions

where a subpoena should be quashed because it is unreasonable and oppressive or for other good cause, or where the subpoena should be conditioned upon the discovering party's advancing the reasonable cost of producing subpoenaed books, papers or documents. The proposed provision is retained.

## Subpart G—Prehearing procedures

Subpart G governs prehearing statements (§ 104.600); prehearing conferences (§ 104.610); and settlement negotiations before a settlement judge (§ 104.620). Except for a commenter addressing the addition of a discovery conference discussed above, no commenters addressed this subpart.

## Subpart H—Hearing Procedures

### Section 104.720    Waiver of right to appear.

Section 104.720 permits the parties to waive the right to an oral hearing and present the matter for decision on a written record. Commenters urged the revision of this section to prohibit waiver unless non-party aggrieved persons agree to the waiver. Alternatively, the commenters would provide notice of the proposed waiver to non-party aggrieved persons and would permit such persons to intervene within 15 days of the notice.

Those aggrieved persons interested in participating in the proceeding as an intervenor and controlling the procedural conduct of the litigation as a party are permitted to intervene of right (aggrieved persons on whose behalf the charge is issued) or by permission of the ALJ (other aggrieved persons). Where such persons have not filed timely requests for intervention, or where their interest is not sufficient to justify intervention, HUD does not believe that any purpose would be served by a regulation permitting the person the right to control the conduct of selected aspects of the proceeding. Part 104 was drafted with the expectation that the HUD representative, in the absence of intervention by the aggrieved person on whose behalf the charge is issued, will keep that person informed of the course of the proceedings where necessary for the proper disposition of the charge. Therefore, provision for notification to such persons of this procedural step is not mandated by the rules.

### Section 104.740    In camera and protective orders.

Section 104.740, which governs in camera inspections and protective orders contains a minor editorial revision suggested by commenters.

### Section 104.750    Exhibits.

Section 104.750 provides for the prehearing exchange of exhibits to be offered into evidence. One commenter noted that some parties may attempt to use the requirement for the prehearing exchange of exhibits to prevent the use of rebuttal exhibits that have not been exchanged. At the request of the commenter, HUD has revised this section to exclude unanticipated rebuttal exhibits from the exchange requirement.

### Section 104.760    Authenticity.

At the request of a commenter, § 104.760 has been clarified to state that the authenticity of all documents submitted *"and furnished to the parties as required under § 104.750"* as proposed exhibits in advance of the hearing shall be admitted.

### Section 104.780    Record of hearing.

Under § 104.780, all oral hearings must be recorded and transcribed by a reporter designated by and under the supervision of the ALJ. One commenter observed that this section requires all hearings to be transcribed and argued that this requirement will be expensive. The commenter recommended that this section be revised to require transcripts only if requested by a party or an aggrieved party, or ordered by the ALJ. HUD believes that the provision of a transcript is necessary for the full and complete record in the case and to ensure the adequate review of the proceeding by the Secretary under § 104.930, and by the courts under section 812(i), and to permit court enforcement of the Administrative order under section 812(j).

## Subpart I—Dismissals and Decisions

### Section 104.900    Dismissal.

Under § 104.900, the ALJ is required to dismiss the proceeding:

—Where the complainant, the respondent or the aggrieved person on whose behalf the complaint was filed makes a timely election to have the claims asserted in the charge decided in a civil action under section 812(o) of the Act (see §104.900(a)); or

—Where an aggrieved person has commenced a civil action under an Act of Congress or a State law seeking relief with respect to the discriminatory housing practice and the trial of the civil action has commenced. The commencement of a civil action for appropriate temporary or preliminary relief under section 810(e) or proceedings for such relief under section 813 of the Fair Housing Act do not affect administrative proceedings under Part

104. (see § 104.900(b)). At the suggestion of a commenter, this provision has been clarified to provide that the administrative proceeding will not be affected by such proceedings as a hearing on the temporary or preliminary relief or the issuance of a decision or order granting or denying such relief.

One commenter noted that Part 104 procedures are applicable where the respondent and the aggrieved person do not act (*i.e.*, neither the respondent nor the aggrieved person elects the civil remedy). The commenter argued that Part 104 should include a procedure for an ALJ order by default. Even though the aggrieved person and the respondent may choose not to participate actively in a case, HUD's representative will be required to present sufficient evidence to make a *prima facie* case that a discriminatory housing practice has occurred or is about to occur. Accordingly, there are no provisions for default in the regulation.

### Section 104.910    Initial decision of administrative law judge.

Under § 104.910, if the ALJ determines that the respondent has engaged, or is about to engage in a discriminatory housing practice, the ALJ is required to issue an initial decision against the respondent and to order appropriate relief including damages; injunctive or other equitable relief; and civil penalties. The following issues were raised regarding relief.

*Injunctive or such other equitable relief.* Under proposed § 104.910(b)(2) the ALJ may impose injunctive or such other equitable relief as may be appropriate. One commenter argued that the regulations should discuss the types of affirmative relief (e.g., the posting of fair housing posters) that may be ordered by the ALJ. Given the range of affirmative remedial activities that may be accorded to overcome discriminatory housing practices, HUD believes that it would be counterproductive to undertake a listing of all types of such relief under this section.

The proposed rule provides that no order for injunctive or other relief may affect any contract, sale, encumbrance, or lease consummated before the issuance of the initial decision that involves a *bona fide* purchaser, encumbrancer, or tenant without actual knowledge of the charge.

Commenters noted that a considerable amount of the time may elapse between the filing of the complaint and the issuance of the charge, and from the issuance of the charge to the issuance of the initial decision. They argued that the

**3274** Federal Register / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations

regulations do not provide a mechanism for providing third parties with notice that a complaint or charge has been filed. They charged that the failure to include such requirements threatens the efficacy of the equitable relief provisions. Commenters asserted that a respondent seeking to avoid the injunctive or other equitable relief will have sufficient time to contract for the sale, encumbrance or lease to another during this period. The commenters suggested the addition of provisions requiring the respondent to give actual notice to such persons. Alternatively, commenters suggested that the rule provide that, simultaneously with the issuance of the charge, the Secretary will exercise the authority under section 810(e) to secure an injunction which preserves the status of all property identified in the charge until final resolution of the charge.

HUD agrees that the proposed rule did not adequately address this issue. To remedy this problem, the final rule requires the respondent to give actual notice to third parties with whom the respondent engages in a contract, sale, encumbrance, or lease involving the property that is the subject of the charge. The copy of the charge would be provided before the respondent and the third party enter into the contract, sale, encumbrance or lease.

Commenters also recommended that the final rule should provide that the failure to give the notice would constitute a separate discriminatory housing practice. HUD does not believe that such actions constitute an actionable discriminatory housing practice. This change has not been made.

Some commenters suggested that the respondent be required to provide the notice to third parties following the issuance of the charge while others would require notice following the filing of the complaint. Section 812(g)(4) provides that no order shall affect the described transactions consummated before the order and involving a third party without actual notice of the *charge*. Accordingly, the notice will be required only after the issuance of the charge. The proposed change is included at §104.410(b)(3).

*Civil penalties.* Under § 104.910(b)(3), the ALJ may assess a civil penalty against the respondent. The amount of the civil penalty is subject to ceilings of $10,000 to $50,000. The ceiling will depend on the number of previous discriminatory housing practices the respondent has been adjudged to have committed within designated time periods in any administrative hearing or civil action permitted under the Fair Housing Act or any State or local fair housing law, or in any licensing or regulatory proceeding conducted by a Federal, State or local governmental agency.

Under the proposed rule, if the ALJ determines that more than one respondent has been engaged or is about to engage in a discriminatory housing practice, the ALJ would be permitted to assess the civil penalty, up to the maximum permitted under the rule, against each respondent. One commenter argued that this provision penalizes the respondent who has not committed a prior act, simply for an association with another respondent that has committed such act. The commenter alleged that such a penalty is unfair. This section was intended to address civil penalties where multiple respondents are involved and to permit the ALJ to assess a civil penalty against each respondent. The section has been revised for clarity.

*Section 104.925 Resolution of the charge.*

The resolution of the charge prior to the issuance of a final decision by the ALJ is addressed in § 104.925. Commenters argued that the proposed language does not account for the possibility that some, but not all, of the aggrieved persons of whose behalf the charge is issued may agree to resolve the charge. The final rule has been revised to provide for such resolutions.

*Section 104.930 Final decision.*

Section 104.930 permits the Secretary to review the ALJ's initial decision and issue a final decision. The Secretary may affirm, modify or set aside, in whole or in part, the initial decision, or remand the initial decision for further proceedings. If no final decision is issued by the Secretary within 30 days after the initial decision, the initial decision of the ALJ would become the final decision of the Department.

The proposed rule does not place any time limitation for issuance of the ALJ decision on remand. Commenters claimed that this omission creates the possibility for substantial delay in decisionmaking which is contrary to the congressional goals of assuring expedited processing. The regulation has been revised to state that the ALJ is required to issue the decision on remand within 60 days of the date of issuance of the Secretary's decision, unless it is impracticable to do so. If the ALJ is unable to issue such a decision on remand within this time period (or within any succeeding 60-day period following the initial 60-day period), the ALJ is required to notify all parties and the aggrieved person on whose behalf the charge was filed in writing of the reasons for the delay. This approach is consistent with section 812(g)(2) of the Act. All remanded proceedings will be conducted in accordance with the requirements of Part 104.

Section 812(h) provides that the Secretary may review any finding, conclusion or order issued by the ALJ. In accordance with this section, the final rule has not been revised to include a standard for Secretarial review of the initial decision, as suggested by one commenter.

*Section 104.940 Attorney's fees and costs.*

Several commenters addressed § 104.940, which provides for the recovery of fees and costs. While some commenters argued that the rules regarding attorney's fees and costs were proper and identical to those governing the Federal courts, others argued that the specificity of this section was unnecessary.

HUD continues to believe that the regulation should provide some regulatory direction concerning the amount of attorney's fees that may be awarded. There appears to be no specific objection to § 104.940(b)(1) which governs the payment of attorney's fees by HUD to the respondent (see section 812(p) which makes the Equal Access to Justice Act applicable to such payments) or to § 104.940(b)(2) which states that intervenors should be liable to the respondent for reasonable attorney's fees only to the extent that the intervenor's participation in the administrative proceeding was frivolous or vexatious, or was for the purposes of harassment. (see *Hughes v. Rowe*, 449 U.S. 5, 11 (1980) and *Christianberg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 422 (1978)).

Numerous commenters raised the issue of the appropriate standard for the recovery of attorney's fees by prevailing intervenors. The Act provides in section 812(p) that the ALJ or the court may allow the prevailing party a reasonable attorney's fee. That statutory direction is applicable to prevailing intervenors. This entitlement to fees is identical to that provided in a private enforcement action under section 813 and an enforcement action by the Attorney General under section 814. The Department believes that such factors as the appropriateness, necessity and effectiveness of any work performed by a prevailing party are among the factors relevant to the factual determination by an ALJ or court as to whether or what amount of attorney's fees are

"reasonable". Similarly, the issue of whether the amount of fees sought by a prevailing party is reasonable given the participation of federal attorneys is a question of fact to be determined by the ALJ or the court. Accordingly, the rule is unchanged.

## Part 106—Fair Housing Administrative Meetings Under Title VIII of the Civil Rights Act of 1968

Part 106 establishes procedures for public meetings or conferences to gather information to assist the Assistant Secretary in achieving the aims of the Fair Housing Act for the promotion and assurance of equal housing opportunity under the Fair Housing Act. No substantive comments were received on the proposed part. It is adopted without change.

## Part 109—Fair Housing Advertising

The Fair Housing Advertising Regulations (Part 109) are being revised to reflect the expansion of the classes of persons protected under the Fair Housing Act from discriminatory advertising.

### General

The purpose of the HUD Fair Housing Advertising Regulations is to assist all advertising media, advertising agencies and advertisers in complying with the requirements of the Fair Housing Act with respect to advertisements for the sale, rental or financing of housing. These regulations also describe the matters which the Department will consider in evaluating compliance with the Fair Housing Act in connection with the investigation of complaints alleging discrimination in advertising.

Section 804(c) of the Fair Housing Act has been amended to expand the prohibitions or discrimination in advertising for the sale or rental of a dwelling. The amendment added "handicap" and "familial status" to the existing prohibitions on discrimination on the basis of race, color, religion, sex, or national origin.

The Department is revising the Fair Housing Advertising Regulations to reflect the expanded coverage of the Fair Housing Act with respect to discrimination in advertising. Following is a section-by-section description of the changes made in Part 109.

### Section 109.5 Policy.

This section describes the statutory provisions on which the Fair Housing Advertising Regulations are based. The two new protected coverages of the amended statute—"handicap" and "familial status"—have been added in

two places to the existing list of bases on which discrimination is prohibited. In addition, a reference to appraisal services has been inserted in the list of discriminatory practices specifically made unlawful under the Fair Housing Act. Because of the exemption in section 807(b) of the Fair Housing Act for "housing for older persons", a sentence has been added to § 109.5 to explain that the prohibitions of the act regarding familial status do not apply with respect to such housing.

In addition, references to Title VIII of the Civil Rights Act of 1968 have been changed to the new short title of the statute, the "Fair Housing Act", both in this section and throughout these regulations.

### Section 109.10 Purpose.

The Department has made only editorial changes in this section.

### Section 109.15 Definitions.

This section contains definitions of the major terms used in Part 109. The Department has added definitions of the terms "handicap" and "familial status" in paragraphs (h) and (i), respectively. These new definitions are the same as the definitions contained in the Fair Housing Act. In addition, the definition of "Secretary" has been eliminated since the term is not used in the regulations, a definition of "General Counsel" has been added, and the definitions of "person" and "discriminatory housing practice" have been revised to reflect statutory changes.

### Section 109.16 Scope.

This section explains the use of the criteria contained in Part 109 by the Department with regard to action on complaints alleging discriminatory advertising with respect to advertising media and persons placing advertisements. The Department has made changes in the introductory language of paragraph (a) and in the language of paragraphs (a)(1) and (a)(2) to reflect the changes in complaint processing brought about by the Fair Housing Act amendments. Under the new procedure, the General Counsel will make determinations as to whether there is reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur. Thus, § 109.16 would indicate that the General Counsel will consider the use or the failure to use the criteria in this part in making a determination of reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur.

### Section 109.20 Use of words, phrases, symbols, and visual aids.

Several commenters objected to the statement in the first sentence of proposed § 109.20 that the words, phrases, symbols, and forms set forth in this section have been used in advertising to "convey either overt or tacit discriminatory intent" and that therefore their use should be avoided, because that statement appears to focus solely on the intent that may lie behind discriminatory real estate advertising. The Department agrees that the language, which was already contained in § 109.20, could be construed as a limitation on the types of activities considered to constitute unlawful conduct. Since the Department wishes to maintain a neutral position on the issue of whether discriminatory intent is necessary for advertising to be considered violative of the Fair Housing Act, the statement has been revised. In addition, similar revisions have been made in § 109.20(e) and (f). These revisions also make it clear that this regulation does not prohibit the use of any of the words, phrases, symbols or visual aids in this section, but instead is intended to suggest that the use of such words, phrases and symbols can indicate a preference in particular contexts.

The undesignated introductory paragraph in § 109.20 has also been revised to state that the Department will consider whether, in a particular case,. there is a need for "further proceedings on" the complaint, rather than a need for "seeking resolution of" the complaint. This change reflects the new complaint processing procedures under the amended act.

In paragraph (a), which provides examples of words descriptive of dwelling, landlord, and tenants which should not be used in advertising, the Department has added the phrase "adult building".

In paragraph (b), which lists examples of words indicative of persons in the protected groups covered by the Fair Housing Act, the Department has added specific provisions on words relating to handicap and familial status. In paragraph (b)(6), the rule provides that nothing in Part 109 restricts the inclusion of information about the availability of accessible housing in advertising of dwellings. In paragraph (b)(7), concerning familial status, the Department has included a statement making it clear that nothing in Part 109 would restrict advertisements of dwellings which are intended and operated for occupancy by older persons

**3276** **Federal Register** / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations

and which constitute "housing for older persons" as defined in section 807(b) of the Fair Housing Act. In addition, paragraph (b)(8) has been revised and the word "exclusive" has been substituted for the words "ghetto" and "disadvantaged".

In paragraphs (c) and (d), the words "handicap" and familial status" have been added to the list of protected groups.

With regard to paragraph (e), one commenter expressed doubt that directions to real estate could imply a discriminatory preference. However, it has been the Department's experience that references to real estate location in terms of landmarks significant with respect to race, national origin or religion may indicate a preference to certain homeseekers or convey a negative implication to others. Accordingly, this paragraph has not been changed.

*Section 109.25   Selective use of advertising media or content.*

This section indicates examples of how the selective use of advertising media or content can be used exclusively with respect to particular housing developments or sites, with discriminatory results.

In paragraph (c), which concerns selective use of human models when conducting an advertising campaign, the Department has made changes in the last two sentences of the paragraph to provide an example of selective advertising with respect to familial status.

*Section 109.30   Fair housing policy and practices.*

This section discusses actions that advertisers can take which would be considered as evidence of compliance with the prohibitions against discrimination in advertising under the Fair Housing Act.

The Department has added the words "handicap" and "familial status" where appropriate in paragraphs (a) and (b). In addition, the Department has added language in paragraph (b), concerning use of human models, to indicate that models used in display advertising should represent families with children, when appropriate, as well as both majority and minority groups in the metropolitan area and both sexes.

Two commenters suggested that paragraph (a) be revised to provide that use of the equal housing opportunity logotype, without more, would be sufficient to indicate compliance with the advertising provisions of the Fair Housing Act. However, the use of the logotype (or the equal housing

opportunity statement or slogan) is only one indication of compliance, and such use would not preclude the use, in the same advertisement, of words, phrases, symbols, or forms which convey a discriminatory preference or limitation (see § 109.20). Accordingly, suggested change has not been made.

Minor editorial changes have been made in paragraphs (c) and (d) of § 109.30.

*Appendix to Part 109*

The appendix to Part 109 contains three tables intended to serve as a guide for the use of the Equal Housing Opportunity logotype, statement, slogan, and publisher's notice for advertising. The Department has added the words "handicap" and "familial status" where appropriate in the three tables.

**Part 110—Fair Housing Poster**

Part 110 sets forth the procedures established by the Secretary of Housing and Urban Development with respect to the display of a fair housing poster by persons subject to sections 804 through 806 of the Fair Housing Act. The Department has amended Part 110 to reflect the changes made by the Fair Housing Amendments Act of 1988. The major changes in the poster regulations are in § 110.25, Description of Posters. The legend of the poster has been revised to add "handicap" and "familial status" to the bases of illegal discriminatory acts. The legend has also been revised to show that discrimination in the appraising of housing is illegal. In addition to the above amendments, editorial modification has been made for clarification purposes and for consistency in terminology.

**Part 115—Recognition of Jurisdictions With Substantially Equivalent Laws**

Part 115 has been revised to comply with the requirements of the Fair Housing Act. This part: (1) Provides a revised process for certifying agencies as substantially equivalent in place of the recognition process as provided in the current Part 115; (2) defines the requirements for certification with the specificity required by the Act; (3) defines the effect of the Act on agencies recognized on September 12, 1988 as substantially equivalent under current Part 115; (4) requires that in order to become certified, agencies must provide protection against discrimination based on "handicap" and "familial status"; and (5) provides a prohibition against coercion, intimidation and threats.

To obtain certification State and local agencies must administer laws which

prohibit all discriminatory housing practices which are prohibited by the Act and must include as protected classes all classes protected by the Act. Discrimination on the basis of handicap is described in the statutory language and only those provisions of section 804 (f) of the Act which clearly do not apply to State or local agencies may be omitted from the law or ordinance the agency administers if certification is to be granted. Further, the remedies available to a certified agency must be substantially equivalent to the remedies available under the Act. Final agency actions must be subject to judicial review and aggrieved persons must have the right of access to a State or local court. The Act also requires that the procedures followed by a certified agency be shown to be substantially equivalent to those created by the Act. Such procedures as: Filing of complaints by the agency; acknowledgment of receipt of complaints and notice of procedural rights and obligations, completion of investigation and investigative report within 100 days and notice of cause for delay; provision for conciliation and a conciliation agreement which shall be made public under certain conditions; were provided as examples of procedural matters which must be included in the law or ordinance administered by a certified agency.

The regulations require that the law or ordinance provide for resolution of a complaint by a body empowered to grant relief substantially equivalent to the relief which may be granted by the Secretary under the Act.

The Department received a number of comments. These comments can be divided into five major categories: (1) Should procedures in Fair Housing laws of States and localities be required to mirror the Fair Housing Act rather than be "substantially equivalent" to the Act; (2) Should an agency be certified which protects less than all of the classes protected by the Act; (3) Should building codes and other laws or ordinances administered by State or local agencies other than the agency administering the fair housing law be considered in determining the adequacy of the law; (4) Should State or local fair housing laws be required to include an exemption from discrimination based on familial status for housing of the elderly; and (5) Should State and local agency enforcement mechanisms be required to be substantially equivalent to the Act. Significant comments in these areas were focused principally on §§ 115.3 and 115.3a of the proposed rule.

It appears that many commenters misunderstood the requirements in § 115.3(e) for a determination that a State or local law "on its face" satisfies the criteria for certification, indicating that they believed the ordinance or law standing alone must meet the criteria. Both the preamble and the proposed rule indicate that a determination as to whether a State or local law "on its face" is adequate, is not limited to an analysis of the literal text of the law but must take into account regulations, directives and rules of procedure of a State or local agency, as well as other relevant matters of State or local law or interpretations by competent authorities. However, in order to avoid any possible confusion as to matters which will be considered as part of a determination of the adequacy of a law "on its face," § 115.3(e) has been clarified by substituting the word "all" for the word "such" in the second sentence thereof.

*Procedures for Investigations*

Several commenters suggested that time limits, provisions for notices to complainants and respondents and similar procedural criteria are inappropriate, burdensome and may require substantial amendments to current laws or ordinances. Under section 804(f)(3)(A) the Secretary is required to determine that the procedures followed by an agency administering a fair housing law are substantially equivalent to those in the Act. The Department believes the procedural aspects which were contained in the proposed rule are essential to providing adequate procedural protections to persons and that the absence of such protections would substantially weaken a fair housing law. These requirements have been retained in the rule.

A number of commenters objected to the requirement that investigations be commenced within 30 days of the filing of a complaint and that the processing of such complaints be completed within one year of filing. Both the Act and the regulations refer to commencement of proceedings within 30 days of filing. The proposed regulations do not refer to a date for commencement of the investigation, and requiring that the disposition of the complaint be completed within one year of filing of the complaint is reasonable.

*Protected Classes*

A number of commenters urged that the final rule provide that State and local fair housing laws should be eligible for certification even though they do not include coverage of the new classes of persons protected by the Act, if they

meet all other requirements for recognition. Some commenters suggested in the alternative that certification should be permitted based on protections of a certain number of protected classes (e.g. coverage for five or six of the seven protected classes).

The Department believes that the legislative history of the Fair Housing Act supports the position in the proposed regulation that coverage of all protected classes is essential to a substantial equivalency certification.

In connection with the inclusion in section 810(f) of the Act of a provision relating to the grandfathering of substantially equivalent agencies, the House Judiciary Committee Report on the Fair Housing Amendments Act described the process as follows:

Presently, there are 36 states and 76 local agencies certified by the Secretary as substantially equivalent under existing federal law. Many of these states provide for some degree of administrative enforcement, as well as protecting handicapped persons and families with children. The Committee expects that many states will be able to maintain their substantial equivalency status within the time period provided.

In order to provide a reasonable transition period for states to adjust to the new law, agencies currently certified on the day before the date of enactment will continue to remain certified for 40 months. This allows most jurisdictions sufficient time to conform their laws to the new federal standards so that they may remain certified. The Committee recognizes that some jurisdictions may need additional time because of the infrequency of legislative sessions, and the Secretary may grant an additional 8 months for this purpose. Report p. 35.

Thus, it appears clear that Congress intended to provide grandfathered agencies time to broaden their protections to encompass the new protected classes. For this reason the final regulation retains the requirement that State and local laws provide protection to all the classes of persons protected under the Federal law.

*Enforcement Procedures*

Comments that the proposed regulations unreasonably require certified agencies to amend their laws to provide relief which they are currently not authorized to grant appear to be objections to the Act rather than to the regulations. The Fair Housing Amendments Act put "teeth" into the fair housing law. It grants the Department authority to take action against those who commit acts made unlawful by the Fair Housing Act. Consequently, those agencies to which the Department must refer complaints must administer laws which provide the State or local agency with the same

authority to take action against those who commit unlawful acts.

Some commenters in this area insisted that agencies be required to provide for administrative judges and alternative choices—administrative tribunal or civil court—by either complainant or respondent as well as an independent right to go immediately to civil court. We believe it is sufficient that a certified agency be authorized to obtain relief by whatever procedure its law or ordinance provides as long as those procedures provide rights and protections substantially equivalent to those in the Fair Housing Act. This articulation recognizes that it is possible that agencies will be authorized to provide more effective relief on behalf of aggrieved persons through judicial enforcement mechanisms, which are no more burdensome on complainants, without any administrative enforcement procedure. Under the final rule States and localities are permitted to provide such judicial enforcement mechanisms as an alternative to a administrative enforcement—civil action mechanism such as that in the Fair Housing Act.

*Building Codes*

Several commenters indicated that incorporating into the certification procedures a requirement that States and localities provide accessibility requirements for new construction which are substantially equivalent to section 804(f) of the Act was onerous and inconsistent with State and local fair housing enforcement procedures. These commenters pointed out that building code ordinances and mechanisms are not part of fair housing enforcement in most areas and that generally, enforcement of requirements is not handled in the same manner as fair housing cases. These commenters suggested that the requirement in § 115.3a(b)(3) be deleted.

The Department is aware that enactment of accessibility requirements will in some cases present problems for States and localities. However, the Department believes that the legislative history of the Act and particularly the discussion of the importance of the involvement of States and localities in the implementation of new construction accessibility requirements in the Statement of Managers in the Senate, 134 Cong. Rec. S10456 (daily ed. Aug. 1, 1988) supports the determination of the Department to require local construction requirements as part of the HUD certification process.

Protection against housing discrimination because of handicap including accessibility requirements has

**3278** Federal Register / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations

been made a part of the Fair Housing Act and must be a part of a fair housing act of a State or locality which obtains certification. A certified agency must have authority and responsibility to receive and process complaints of discrimination based on handicap including complaints of violations of the accessibility standards.

*Housing for Older Persons*

The Fair Housing Act exempts from the familial status provisions certain housing for older persons. This exemption reflects the unique status of housing for older persons described in the House Report on the Fair Housing Amendments Act:

The bill specifically exempts housing for older persons. The Committee recognizes that some older Americans have chosen to live together with fellow senior citizens in retirement-type communities. The Committee appreciates the interest and expectation these individuals have in living in environments tailored to their specific needs. (Report p. 21).

The Act delineates with specificity the nature of housing for older persons which is exempt from the prohibitions against discrimination because of familial status. In the proposed rule, the department indicated that it intended to require that the State or local law assure that no prohibition based on familial status applies to housing for older persons as a condition for certification. The preamble noted that, while HUD had not previously required States or localities to include in their laws or ordinances any exceptions or exemptions which the Federal law contains, in view of the Congressional concern that the prohibitions against discrimination because of familial status not impinge on housing for older persons, provisions providing for housing for older persons should be required in State or local fair housing laws.

Many commenters objected to the requirement that certified agencies administer a fair housing law which provides the same protections for housing for older persons as those contained in the Fair Housing Act. Some commenters pointed out that as a result of the proposed requirement their fair housing laws would have to be amended to limit existing protections for families with children in order to obtain certification.

While the Department believes that Congress intended to promote housing opportunities to address the needs of older persons, there is nothing in the statute or legislative history to indicate that Congress sought to limit the ability of States and localities to provide

additional protections. For this reason, the final rule has been revised to delete the requirement for an exemption for housing for older persons in State or local laws.

However, in order to reflect the congressional interest in the protection of housing opportunities for older persons, the final rule specifically indicates that State and local fair housing laws may include an exemption for housing for older persons. This provision is intended to encourage States and localities to consider the needs of older persons in connection with the development of fair housing laws.

In addition to the above comments some commenters objected to the provision that certified agencies administer a law requiring that conciliation agreements be made public. (Section 115.3(a)(2)(vi)).

The Department is aware that there are strong arguments for and against disclosure of conciliation agreements. However, Congress has chosen to require such disclosure (The Fair Housing Act (Sec. 810(b)(4))). Uniformity of procedures, in this regard, followed by the Department and certified agencies is preferable to dissimilar practices from State to State and locality to locality. Both complainants and respondents will have the knowledge that no matter the location of the discriminatory housing practice resulting in a Title VIII complaint, any conciliation agreement arising out of conciliation engaged in by the Department or any certified agency will be governed by the same disclosure rules.

Finally, in order to provide consistency in connection with State and local enforcement procedures, § 115.3(b)(1)(iv) has been amended to clarify that a certified agency must have authority to seek injunctive or other equitable relief in a court of competent jurisdiction, as an alternative to the stated authority to grant such relief. This change allows the agency an alternative similar to the alternatives provided in § 115.3(b)(1) (iii) and (v).

**Part 121—Collection of Data**

The Department is recodifying 24 CFR Part 100, entitled "Racial, Sex, and Ethnic Data", as a new Part 121 of Title 24. Part 100 was originally adopted in 1971 under the heading "Racial and Ethnic Data", to enable the Secretary of Housing and Urban Development to obtain information concerning minority-group identification to assist the Secretary in carrying out responsibility for administering the national policies prohibiting discrimination and providing

for fair housing. In 1975, in light of the 1974 amendment of Title VIII to prohibit discrimination on the basis of sex, Part 100 was amended to provide for obtaining information on sex, as well as minority-group, identification.

Section 562 of the Housing and Community Development Act of 1987 (Pub. L. 100–242, approved February 5, 1988) requires the Secretary of Housing and Urban Development to collect data on the racial and ethnic characteristics of persons eligible for, assisted, or otherwise benefitting under each community development, housing assistance, and mortgage and loan insurance and guarantee program administered by the Secretary, and to include a summary and evaluation of such data in the Secretary's annual report to the Congress.

Section 808(e)(6) of the Fair Housing Act, 42 U.S.C. 3608(e)(6), as added by section 7(b)(1)(D) of the Fair Housing Amendments Act of 1988, requires the Secretary to collect data on the race, color, religion, sex, national origin, age, handicap and family characteristics of persons and households who are applicants for, participants in, or beneficiaries or potential beneficiaries of, programs administered by the Department, to the extent that such persons and households are within the coverage of the civil rights laws and executive orders referred to in section 808(f) of the Fair Housing Act or specified by the Secretary by publication in the Federal Register and to the extent that the Secretary determines the data to be necessary or appropriate.

Since Part 100 is now being used for regulations setting forth the coverage of the Fair Housing Act, the regulations concerning collection of data have been moved to a new Part 121—Collection of Data. The Department proposed a revision of the provisions contained in the old Part 100 to provide a more specific regulatory framework for the Secretary to use in carrying out the new data collection and reporting responsibilities mandated by the legislation described above.

A number of commenters asserted that the Department has had authority for some time to collect the types of data which are needed for reporting to Congress but that it has failed to generate such data. These commenters offered various suggestions for the restructuring of Part 121 to accomplish that purpose.

The Department does not believe that any restructuring of Part 121 is necessary. The language of proposed § 121.2 was drawn largely from that

contained in section 808(e)(6) of the Fair Housing Act, described above, to enable HUD to meet the responsibilities mandated by that legislation. HUD remains committed to that objective and believes that the provisions of Part 121, as proposed, will enable HUD to achieve that purpose.

Accordingly, the Department has adopted Part 121 in this final rule with no changes from the proposed rule.

*Legislative review issues*

A number of commenters, including members of the Banking Committees of the House and Senate and two leading Senate Judiciary Committee proponents of the Fair Housing Amendments Act, asserted that the Department violated section 7(o) of the Department of HUD Act—HUD's legislative review statute—by failing to supply the Banking Committees with copies of HUD's proposed rule for 15 session days before the rule's publication.

Aside from the substantial constitutional question whether the section 7(o) rule-request process is valid and enforceable against HUD (See *INS v. Chadha*, 462 U.S. 910 (1983)), HUD had *no duty* to submit this rule for prepublication review for two reasons, either of which is dispositive:

—the explicit direction contained in the Fair Housing Amendments Act regarding publication of rules for comment, and for effect within 180 days of enactment, coupled with the then-pending adjournment of the Congress, made compliance with section 7(o)(2) impossible (and therefore unnecessary); and

—there was no timely request from either Committee for prepublication review of the rule, as required by section 7(o)(2) of the Department of HUD Act.

*Impossibility of compliance with section 7(o).* In the proposed rule, the Department compared the specific rule-production requirements set out in the Fair Housing Amendments Act with the legislative review requirements in section 7(o). The Department looked at the 1988 legislative calendar, which called for October 5, 1988 adjournment *sine die.* The Department looked at the September 13, 1988 approval date for the Fair Housing Amendment Act, and concluded that the Congress could not possibly have intended for HUD to adhere to the requirements of both Acts.

If the Department had waited for the opening of the new session to expose its rule to the required 15-session-day review, a *proposed* rule could not have been published before February 6, 1989. (HUD published its proposed rule at its earliest opportunity, after developing it

on an accelerated schedule. The Department could not possibly have completed the 15-day prepublication review *before* the Congress adjourned on October 22, 1988, notwithstanding the fact that adjournment was delayed beyond the earlier October 5 projection.)

HUD's long experience with section 7(o) compliance does not comport with the commenters' suggestion that HUD could have followed the dictates of *both* laws—the rapid-pace rulemaking requirements of the Amendments Act, and the leisurely, all-purpose dictates of section 7(o). The requirements of these two statutes could not be in greater conflict, and the Department followed the correct course in choosing the Amendment Act's particularity over section 7(o)'s generality.

Many of the same public commenters who insisted that prepublication review should have been afforded to the Banking Committees under section 7(o) also complained that the Department should have afforded the public a longer period for public comment on its published proposed rule. HUD notes that if both of these requests had been honored the public comment period would have expired approximately one month after the March 12, 1989 effective date of the Amendments Act, and that no rules for implementation of the rights granted by the Fair Housing Amendments Act could have been published for effect until at least June 1989.

*Lack of timely request for congressional review.* Beyond the question of statutory interpretation, prepublication review under section 7(o) was not required because the Banking Committees failed to make a timely request for such review. The following facts are relevant to this issue:

1. By letter of September 14, 1988, the General Counsel submitted to the Banking Committees of both Houses HUD's semiannual agenda of rules, as required by section 7(o). This agenda, normally submitted in October of each year, was provided to the Committees one month early because adjournment was scheduled for October 5, 1988. (Under section 7(o), the Committees have a period of 15 *session* days to review the agenda and request that particular HUD rules be submitted to the Committees for prepublication review.)

2. In the letter transmitting the semiannual agenda, the General Counsel asked for committee restraint in requesting proposed rules from the agenda, since the effect of any such request made during September would be to delay HUD publication of the requested rules until the following February. The General Counsel also

notified the Committees that HUD did not regard certain rules arising out of statutory enactments that contained their own rules-production deadlines as *subject* to the requirements of legislative review. "Notably," the General Counsel's letter continued, "the Fair Housing Amendments Act and the Indian Housing Act contain difficult production deadlines for rulemaking that coincide with congressional recess and adjournment periods. Since it is clearly not possible to honor these deadlines *and* those in the legislative review statute, we intend to focus our efforts on meeting the explicit production deadlines contained in these statutes."

3. The Committees' statutory review period for the submitted agenda expired on September 30, 1988. Neither the House nor the Senate Banking Committee made a timely response to HUD's semiannual agenda submission by that date.

By letter dated October 18, 1988 (and apparently forwarded to HUD six days later), the Secretary received a request from the Chairmen of the House and Senate Banking Committees that HUD "follow the requirements of section 7(o) and provide the proposed Fair Housing Amendments Act rules for review by the Committees before publication." A similar letter was received from Senators Kennedy and Specter of the Senate Judiciary Committee. In deference to these requests, the Banking Committees and Senators Kennedy and Specter were provided copies of the proposed rule shortly before its publication. The Department, however, did *not* delay the rule's publication for 15 session days, or for any other designated period, pending their review.

*Public comment period*

Section 13 of the 1988 Amendments requires the Department to provide an opportunity for public notice and comment. While HUD's general policy is to afford the public not less than 60 days for the submission of public comments (see 24 CFR 10.1), based on the 180-day production schedule and the requirement that a final rule be effective by March 12, 1989, the Department provided 30 days for public comment on this proposed rule.

The Department agrees with the commenter that the period available for public comment, coupled with the size and scope of the proposed rule, made public response difficult. Despite the abbreviated comment period, however, the rule attracted more than 6,400 timely comments—by far the greatest number in HUD's recent history. Many hundreds

of these comments reflected thoughtful consideration of the rule and the issues it raised, and lengthy analytical comments were received from virtually all major housing industry organizations, civil rights and handicapped rights groups, and other interested organizations. Hundreds of additional comments have been received since the close of the December 7, 1988 public comment period, and all of these have been read to determine whether any novel issues were raised that were not treated in the timely comments. The Department is convinced that the public comment period permitted full exploration of the issues.

Equally important, as a result of providing less time for the receipt of public comments, the Department has been able to issue this final rule in advance of the law's March 12, 1989 effective date. It is vital that persons subject to the law's greatly increased penalties and newly proscribed conduct have as much advance notice as possible concerning the types of conduct made illegal under the amended statute. Issuance of this rule on or near the effective date of the statute would have ill-served housing suppliers subject to the law's requirements and to HUD regulations interpreting those requirements.

As indicated earlier, HUD found it impossible to follow both the regulation-writing requirements specified in the Amendments Act and the more general requirements of section 7(o) of the Department of HUD Act. Nevertheless, publication of this rule in January permits the Department to provide for a waiting period following publication before the final rule takes effect—a procedure that comports with HUD's rule on rules, 24 CFR Part 10, and which meets the requirements of section 7(o)(3) of the Department of HUD Act, which requires 30 session days after publication before HUD final rules may become effective. While HUD does not believe that this rule, with its difficult statutory production schedule, is technically subject to the 30-session-day waiting period required by section 7(o)(3), we nevertheless believe that given the controversial issues involved, it is useful and helpful to provide the Congress with time to consider whether any facet of this rule making calls for a legislative response.

In summary, the Department believes that the public interest was well-served by HUD's early publication of a proposed rule, that the public comments received on that rule were of unusually high quality and were complete in their exploration of legal and policy issues,

and that early publication of the final rule—well before its scheduled effectiveness—also serves the public interest and provides the Congress time to assess whether the rule comports fully with congressional intent.

The Department regrets that resource constraints prevented the proposed rule's being made more widely available on tape. However, the Regulations Division of HUD (the Office of the Rules Docket Clerk) received no requests for the tape be made available for the specific use of any person outside the Washington, DC area.

*Codification of analysis of regulations*

One commenter recommended that the final regulations include, as an appendix, an analysis of the regulations, similar in form to the preamble to the proposed rule.

The Department has attempted to make the guidance provided by its rule text as helpful as possible, and has provided examples of conduct where appropriate to assist in understanding the text. In addition, we have added the analytical guidance contained in the preamble to the final rule as an appendix to the regulation. The preamble will, thus, be codified in the 1989 edition of the Code of Federal Regulations. This will assure the availability of this preamble to interested persons in the future.

*Regulatory Impact Analysis*

One commenter argued that a preliminary regulatory impact analysis should have been prepared based upon the proposed rule's impact on consumers. The Director of the Office of Management and Budget waived the requirement for the preparation of a preliminary Regulatory Impact Analysis under section 3 of the Executive Order based on a determination that compliance with the requirement for a preliminary Regulatory Impact Analysis may unduly delay the rule and may prohibit the issuance of a final rule effective by March 12, 1989. The proposed rule announced that the final Regulatory Impact Analysis would be prepared before the publication of the final rule.

Commenters argued that the effects of the proposed rule on consumers and the housing industry are significant and complex. Commenters also argued that HUD's finding that the proposed rule would not cause a major increase in costs or prices for consumers is incorrect. A commenter noted that the changing of all-adult communities to family communities will result in major expenditures which will require commensurate increases in rents.

Increased costs would include redesign of advertising, brochures, signs, etc., rewriting and reprinting of management documents, increased management and maintenance staff, the addition of playgrounds and play areas for children, higher repair and maintenance expenses because of children, higher potential legal liability and increased insurance rates. One commenter argued that a housing affordability analysis based upon current data should be conducted.

The Department agrees that this rule constitutes a "major rule" as defined in section 1(b) of Executive Order 12291 and has prepared a final Regulatory Impact Analysis as required by the Executive Order. This analysis is available in the Office of HUD's Rules Docket Clerk at the address cited above.

*Environment*

A Finding of No Significant Impact with respect to the environment has been made in accordance with HUD regulations in 24 CFR Part 50, which implements section 102(C) of the National Environmental Policy Act of 1969. The Finding of No Significant Impact is available for public inspection during regular business hours in the Office of General Counsel, Rules Docket Clerk, at the address listed above.

*Regulatory Flexibility Act*

Several commenters objected to HUD's finding that this rule making would not have a significant economic impact on small entities. The commenters argued that the date in the Steinfeld study (cited in the proposed rule) was over ten years old, and the study's assumptions did not reflect common construction practices. Because HUD did not update this data for OMB, neither HUD nor OMB have considered the major increases in costs or prices adversely impacting housing affordability for consumers, a commenter claimed. In contrast to the Steinfeld study, the commenter asserted that 1988 data indicates a 25 percent loss in profitability of garden-style multifamily units alone. The commenter asserted that it could find no basis for the minimal increases in costs contemplated by the Steinfeld study, unless exterior design site planning and construction considerations bearing on density loss were omitted from the calculations. The minimal expenditure of funds envisioned by HUD is therefore seriously flawed and the impact of the rule upon consumers is vastly understated.

In addition to these issues, commenters also felt that the proposed rule did not adequately consider the

fiscal impact on small governmental entities. The commenter stated that there will be an increase in costs to become certified a substantially equivalent, to make required changes, and to handle the increased caseload associated with the addition of handicap and familial status. The commenter noted that this will require additional FHAP funds to permit the increase in staff once local laws are amended.

Other commenters argued that the regulatory flexibility analysis should have considered the economic impact on communities and municapalities planned for senior citizens. (*I.e.,* The design of such homes on small lots with significant common areas and facilities and which have a direct effect on the demand for service from municipalities in which they are located. Such communities also have significantly reduced demand for schools and certain recreational activities). Each of these factors will have an impact on the organization of municipal governments and their budgets and facilities, a commenter asserted.

While all of these comments reflect what may well be realistic difficulties associated with compliance with the requirements of the Fair Housing Amendments Act, and while the economic impact of the statute may in fact be greater than HUD's preliminary analysis indicated, the Department fails to see what latitude exists for affording regulatory relief based upon the fact that some businesses or governmental entities affected by the statute's requirements are "small entities". The purpose of the Regulatory Flexibility Act is to establish, as a principle of regulatory issuance,

that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulations. (5 U.S.C. 601 note)

The Department has reviewed the objectives of the Fair Housing Amendments Act and finds that its principal objective is stepped-up law enforcement and the expansion of civil rights. There is no suggestion in the statute that HUD is being provided with discretion to apply the law's requirements differentially, depending upon whether a prospective respondent is a large corporation, or a small entity

within the meaning of the Regulatory Flexibility Act. While it is true that future regulation by HUD in such limited areas as compliance reporting or other record-maintenance functions may permit provisions calling for lesser burdens on small entities, the basic prohibitions, compliance procedures, discovery procedures, hearing rights, and other requirements of this final rule are not of a nature that invites regulatory flexibility. To the extent that small entities are subject to the Fair Housing Act's requirements, they are subject as well to the requirements of the rule—to the same extent and in the same manner that larger entities are so subject. Accordingly, HUD's Regulatory Impact Analysis and Regulatory Flexibility Analysis are concerned with the costs of compliance with the law, but having accomplished those analyses, the Department sees its discretion to alter the impact of this rule on small entities as extremely limited by the statute. There are no significant alternatives to the regulatory scheme provided for in the rule that are consistent with the objectives of the Fair Housing Amendment Act.

*"Takings" Analysis*

A commenter suggested that HUD should conduct a "takings analysis" in accordance with Executive Order 12630 of March 15, 1988, "Governmental Actions and Interference with Constitutionally Protected Property Rights".

A takings analysis involves assessing the economic impact of a proposed policy or action to determine, to the extent possible, what economic or property interests are likely to be affected by the proposed action of government.

The economic impact of this rule on identified property interests, according to many commenters, is expected to be significant, but this fact alone does not end the inquiry. Additionally, in accordance with Guidelines issued by the Attorney General relative to agency analyses under Executive Order 12630, consideration is to be given to:

. . . Whether the proposed policy or action carries benefits to the private property owner that offset or otherwise mitigate the adverse economic impact of the proposed policy or action; and
*Whether alternative actions are available that would achieve the underlying lawful*

*governmental objective* and would have a lesser economic impact (Emphasis Added)

As indicated earlier in our discussion of Regulatory Impact and Regulatory Flexibility Act considerations, the Department does not perceive any "alternative actions" available to the rule maker except to follow the expressed intention of the Congress and provide for enforcement of the Fair Housing Amendments Act. Nor does the Department regard the effects of this rule on private property rights as being sufficiently severe as to "effectively deny economically viable use of any distinct legally protected property interest of [a property owner], or to have the effect of, or result in, a permanent or temporary physical occupation, invasion, or deprivation." (The quoted phrase is part of the Attorney General's advisory to agencies with reference to determinations of policies having "takings" implications.)

Agencies conducting takings analyses are encouraged by the Executive Order and the accompanying Guidelines to strive, to the extent permitted by law, to undertake policies or actions in a way which minimizes their takings implications. This, the Department has done. Compliance with the Fair Housing Amendments Act will, in some circumstances, limit owner discretion concerning admissions policies and will require builders of multifamily housing to comply with additional construction-related criteria associated with accessibility by handicapped persons. There are other aspects of the Amendments Act that will have some economic impact and will thus affect property rights. None of these impacts, in the Department's view, rises to the level of a "taking" within the meaning of the Fifth Amendment of the United States Constitution.

*Paperwork Reduction Act*

The information collection requirements contained in this rule have been submitted to OMB for review under section 3504(h) of the Paperwork Reduction Act of 1980. Sections 100.304(c)(2), 103.30, 115.3(a)(i), 115.5, 115.7 and 115.9 of this proposed rule have been determined by the Department to contain collection of information requirements. Information on these requirements are provided as follows:

### TABULATION OF ANNUAL REPORTING BURDEN PROPOSED RULE—FAIR HOUSING AMENDMENTS ACT OF 1988

| Description of information collection and section of 24 CFR affected | Number of respondents | Number of responses per respondent | Total annual responses | Hours per response | Total hour |
|---|---|---|---|---|---|
| Policy and Procedures—Housing for Persons 55 years and older—§ 100.304(c)(2)...................... | 1,231 | 1 | 1,231 | 1 | 1,231 |
| Housing Discrimination Complaint Forms HD-903 & 903A Spanish Version (2529-0011)—§§ 103.30 & 115.3(a)(1).......... | 8,400 | 1 | 8,400 | 1 | 8,400 |
| Certification Request Documentation (2529-0025)—§§ 115.5, 115.7 & 115.9.......................... | 30 | 1 | 30 | 17 | 510 |
| Total annual burden.......................... | | | | | 10,141 |

Collections of information conducted or sponsored by HUD during the conduct of an administrative action or investigation against specific individuals or entities after a case file is opened are not covered by 5 CFR Part 1320—Controlling Paperwork Burdens on the Public (see 5 CFR 1320.3(c)). Accordingly, the tabulation above, does not include the information collection hours associated with §§ 104.420, 104.530, 104.540(b)(4), 104.540(c), 104.550(a), 104.550(b), 104.590, 104.600(b), 104.620(b)(2), 104.700(a), 104.720, 104.790(b), 104.910(d), 115.3(a)(ii), (iii) and (iv), and 115.4(b)(2)(i). No burden hours are reported for Part 110 since public disclosure of information originally supplied by the Federal Government to the recipient for the purposes of disclosure is not a collection of information. (See 5 CFR 1230.7(c)(2)). No burden hours are included for § 121.2 because information collection requirements on race, color, religion, sex, national origin, age, handicap, and family characteristics will be imposed under the regulations applicable to the specific HUD program.

*Impact on Family*

The General Counsel, as the Designated Official under Executive Order No. 12606—The Family, has determined that this rule, if implemented, may have a significant impact on family formation, maintenance and general well-being because the rule provides Federal law enforcement assistance to families confronting housing discrimination based on race, color, religion, national origin, familial status or handicap. However, review under the Order is not required because the statutory mandate leaves little effective discretion in the Department to lessen the family impact. In any event, the purpose of the statute is to have a positive impact on family values by offering a measure of protection to persons confronting illegal discrimination.

*Federalism*

The General Counsel, as the Designated Official under section 6(a) of Executive Order No. 12612—Federalism, has determined that the policies contained in this rule would, if implemented, have federalism implications and are subject to review under the Order. Specifically, the amended statute continues to provide for referral to State and local fair housing enforcement agencies. However, in the future the determination of substantial equivalency will depend upon State and local enforcement machinery that matches up with the much-strengthened Federal law. Accordingly, the effect of the amended Fair Housing Act will be to encourage States and localities to amend their laws to match the Federal enforcement machinery, or suffer the eventual loss of recognition as substantially equivalent State or local agencies and possible loss of function if citizens of the jurisdiction do not choose to file complaints with State or local officials. Additionally, jurisdictions losing equivalency status will lose eligibility for grant funds available to co-enforcers of fair housing laws.

While the rule would have federalism impacts, review under the Federalism Executive Order is not required because the implementation of the statute leaves little discretion with HUD to lessen these impacts. HUD's statutory mandate is clear—it must accept complaints nationwide, and refer complaints for processing (after the initial grandfather period) only to jurisdictions with substantially equivalent laws. Moreover, since the statute addresses the Federalism issue by declaring that certain conduct will be illegal and by providing machinery for referral to State and local authority under appropriate circumstances, further study of Federalism implications could not appreciably affect the approach taken in the implementing regulations.

*Other matters*

This rule was listed in the Department's Semiannual Agenda of Regulations published October 24, 1988 (53 FR 41974, 42605) under Executive Order 12291 and the Regulatory Flexibility Act.

The Catalog of Federal Domestic Assistance program number and title is 14.400 Equal Opportunity in Housing.

List of Subjects

*24 CFR Part 14*

Equal access to justice, Lawyers, Claims

*24 CFR Part 100*

Fair housing, Incorporation by reference, Nondiscrimination

*24 CFR Part 103*

Administrative practice and procedure, Fair housing

*24 CFR Part 104*

Administrative practice and procedure, Fair housing

*24 CFR Part 105*

Administrative practice and procedure, Fair housing

*24 CFR Part 106*

Administrative practice and procedure, Fair housing

*24 CFR Part 109*

Advertising, Fair housing, Signs and symbols

*24 CFR Part 110*

Fair housing, Signs and symbols

*24 CFR Part 115*

Fair housing, Intergovernmental relations.

*24 CFR Part 121*

Fair housing, statistics, Reporting and Recordkeeping requirements.

Accordingly, Title 24 of the Code of Federal Regulations is amended as follows:

## PART 14—IMPLEMENTATION OF THE EQUAL ACCESS TO JUSTICE ACT IN ADMINISTRATIVE PROCEEDINGS

1. The authority citation for Part 14 is revised to read as follows:

Authority: Sec. 504(c)(1) of the Equal Access to Justice Act (5 U.S.C. 504(c)(1); sec. 7(d) of the Department of Housing and Urban Development Act (42 U.S.C. 3535(d)).

2. In §14.115, the phrase "or" at the end of paragraph (a)(8) is removed, the period at the end of paragraph (a)(9) is removed and in its place the phrase "; or" is added, and new paragraph (a)(10) is added to read as follows:

### § 14.115  Proceedings covered.

(a) * * *

(10) Title VIII of the Civil Rights Act of 1968 (42 U.S.C. 3600–3620) and 24 CFR Part 104.

*    *    *    *    *

3. Part 100 is revised to read as follows:

## PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

### Subpart A—General

Sec.
100.1    Authority.
100.5    Scope.
100.10    Exemptions.
100.20    Definitions.

### Subpart B—Discriminatory Housing Practices

100.50    Real estate practices prohibited.
100.60    Unlawful refusal to sell or rent or to negotiate for the sale or rental.
100.65    Discrimination in terms, conditions and privileges and in services and facilities.
100.70    Other prohibited sale and rental conduct.
100.75    Discriminatory advertisements, statements and notices.
100.80    Discriminatory representations on the availability of dwellings.
100.85    Blockbusting.
100.90    Discrimination in the provision of brokerage services.

### Subpart C—Discrimination in Residential Real Estate-Related Transactions

100.110    Discriminatory practices in residential real estate-related transactions.
100.115    Residential real estate-related transactions.
100.120    Discrimination in the making of loans and in the provision of other financial assistance.
100.125    Discrimination in the purchasing of loans.
100.130    Discrimination in the terms and conditions for making available loans or other financial assistance.
100.135    Unlawful practices in the selling, brokering, or appraising of residential real property.

### Subpart D—Prohibitions Against Discrimination Because of Handicap

100.200    Purpose.
100.201    Definitions.
100.202    General prohibitions against discrimination because of handicap.
100.203    Reasonable modifications of existing premises.
100.204    Reasonable accommodations.
100.205    Design and construction requirements.

### Subpart E—Housing for Older Persons

100.300    Purpose.
100.301    Exemption.
100.302    State and Federal elderly housing programs.
100.303    62 or over housing.
100.304    55 or over housing.

### Subpart F—Interference, Coercion or Intimidation

100.400    Prohibited interference, coercion or intimidation.

Authority: Title VIII, Civil Rights Act of 1968, 42 U.S.C. 3600–3620; section 7(d), Department of HUD Act, 42 U.S.C. 3535(d).

### Subpart A—General

#### § 100.1  Authority.

This regulation is issued under the authority of the Secretary of Housing and Urban Development to administer and enforce Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 (the Fair Housing Act).

#### § 100.5  Scope.

(a) It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States. No person shall be subjected to discrimination because of race, color, religion, sex, handicap, familial status, or national origin in the sale, rental, or advertising of dwellings, in the provision of brokerage services, or in the availability of residential real estate-related transactions.

(b) This part provides the Department's interpretation of the coverage of the Fair Housing Act regarding discrimination related to the sale or rental of dwellings, the provision of services in connection therewith, and the availability of residential real estate-related transactions.

(c) Nothing in this part relieves persons participating in a Federal or Federally-assisted program or activity from other requirements applicable to buildings and dwellings.

#### § 100.10  Exemptions.

(a) This part does not:

(1) Prohibit a religious organization, association, or society, or any nonprofit institution or organization operated, supervised or controlled by or in conjunction with a religious organization, association, or society, from limiting the sale, rental or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion, or from giving preference to such persons, unless membership in such religion is restricted because of race, color, or national origin;

(2) Prohibit a private club, not in fact open to the public, which, incident to its primary purpose or purposes, provides lodgings which it owns or operates for other than a commercial purpose, from limiting the rental or occupancy of such lodgings to its members or from giving preference to its members;

(3) Limit the applicability of any reasonable local, State or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling; or

(4) Prohibit conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance as defined in Section 102 of the Controlled Substances Act (21 U.S.C. 802).

(b) Nothing in this part regarding discrimination based on familial status applies with respect to housing for older persons as defined in Subpart E of this part.

(c) Nothing in this part, other than the prohibitions against discriminatory advertising, applies to:

(1) The sale or rental of any single family house by an owner, provided the following conditions are met:

(i) The owner does not own or have any interest in more than three single family houses at any one time.

(ii) The house is sold or rented without the use of a real estate broker, agent or salesperson or the facilities of any person in the business of selling or renting dwellings. If the owner selling the house does not reside in it at the time of the sale or was not the most recent resident of the house prior to such sale, the exemption in this paragraph (c)(1) of this section applies to only one such sale in any 24-month period.

(2) Rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his or her residence.

#### § 100.20  Definitions.

As used in this part:

"Aggrieved person" includes any person who—

(a) Claims to have been injured by a discriminatory housing practice; or

(b) Believes that such person will be injured by a discriminatory housing practice that is about to occur.

"Broker" or "Agent" includes any person authorized to perform an action on behalf of another person regarding any matter related to the sale or rental of dwellings, including offers, solicitations or contracts and the administration of matters regarding such offers, solicitations or contracts or any residential real estate-related transactions.

"Department" means the Department of Housing and Urban Development.

"Discriminatory housing practice" means an act that is unlawful under section 804, 805, 806, or 818 of the Fair Housing Act.

"Dwelling" means any building, structure or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure or portion thereof.

"Fair Housing Act" means Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 (42 U.S.C. 3600–3620).

"Familial status" means one or more individuals (who have not attained the age of 18 years) being domiciled with—

(a) A parent or another person having legal custody of such individual or individuals; or

(b) The designee of such parent or other person having such custody, with the written permission of such parent or other person.

The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.

"Handicap" is defined in § 100.201.

"Person" includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11 of the United States Code, receivers, and fiduciaries.

"Person in the business of selling or renting dwellings" means any person who:

(a) Within the preceding twelve months, has participated as principal in three or more transactions involving the sale or rental of any dwelling or any interest therein;

(b) Within the preceding twelve months, has participated as agent, other than in the sale of his or her own personal residence, in providing sales or rental facilities or sales or rental services in two or more transactions involving the sale or rental of any dwelling or any interest therein; or

(c) Is the owner of any dwelling designed or intended for occupancy by, or occupied by, five or more families.

"Secretary" means the Secretary of the Department.

"State" means any of the several states, the District of Columbia, the Commonwealth of Puerto Rico, or any of the territories and possessions of the United States.

## Subpart B—Discriminatory Housing Practices

### § 100.50  Real estate practices prohibited.

(a) This subpart provides the Department's interpretation of conduct that is unlawful housing discrimination under section 804 and section 806 of the Fair Housing Act. In general the prohibited actions are set forth under sections of this subpart which are most applicable to the discriminatory conduct described. However, an action illustrated in one section can constitute a violation under sections in the subpart. For example, the conduct described in § 100.60(b)(3) and (4) would constitute a violation of § 100.65(a) as well as § 100.60(a).

(b) It shall be unlawful to:

(1) Refuse to sell or rent a dwelling after a *bona fide* offer have been made, or to refuse to negotiate for the sale or rental of a dwelling because of race, color, religion, sex, familial status, or national origin, or to discriminate in the sale or rental of a dwelling because of handicap.

(2) Discriminate in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with sales or rentals, because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Engage in any conduct relating to the provision of housing which otherwise makes unavailable or denies dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Make, print or publish, or cause to be made, printed or published, any notice, statement or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation or discrimination because of race, color, religion, sex, handicap, familial status, or national origin, or an

intention to make any such preference, limitation or discrimination.

(5) Represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that a dwelling is not available for sale or rental when such dwelling is in fact available.

(6) Engage in blockbusting practices in connection with the sale or rental of dwellings because of race, color, religion, sex, handicap, familial status, or national origin.

(7) Deny access to or membership or participation in, or to discriminate against any person in his or her access to or membership or participation in, any multiple-listing service, real estate brokers' association, or other service organization or facility relating to the business of selling or renting a dwelling or in the terms or conditions or membership or participation, because of race, color, religion, sex, handicap, familial status, or national origin.

(c) The application of the *Fair Housing Act* with respect to persons with handicaps is discussed in Subpart D of this part.

### § 100.60  Unlawful to sell or rent or to negotiate for the sale or rental.

(a) It shall be unlawful for a person to refuse to sell or rent a dwelling to a person who has made a *bona fide* offer, because of race, color, religion, sex, familial status, or national origin or to refuse to negotiate with a person for the sale or rental of a dwelling because of race, color, religion, sex, familial status, or national origin, or to discriminate against any person in the sale or rental of a dwelling because of handicap.

(b) Prohibited actions under this section include, but are not limited to:

(1) Failing to accept or consider a *bona fide* offer because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Refusing to sell or rent a dwelling to, or to negotiate for the sale or rental of a dwelling with, any person because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Imposing different sales prices or rental charges for the sale or rental of a dwelling upon any person because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Using different qualification criteria or applications, or sale or rental standards or procedures, such as income standards, application requirements, application fees, credit analysis or sale or rental approval procedures or other requirements, because of race, color, religion, sex, handicap, familial status, or national origin.

(5) Evicting tenants because of their race, color, religion, sex, handicap, familial status, or national origin or because of the race, color, religion, sex, handicap, familial status, or national origin of a tenant's guest.

### § 100.65 Discrimination in terms, conditions and privileges and in services and facilities.

(a) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to impose different terms, conditions or privileges relating to the sale or rental of a dwelling or to deny or limit services or facilities in connection with the sale or rental of a dwelling.

(b) Prohibited actions under this section include, but are not limited to:

(1) Using different provisions in leases or contracts of sale, such as those relating to rental charges, security deposits and the terms of a lease and those relating to down payment and closing requirements, because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Failing or delaying maintenance or repairs of sale or rental dwellings because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Failing to process an offer for the sale or rental of a dwelling or to communicate an offer accurately because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Limiting the use of privileges, services or facilities associated with a dwelling because of race, color, religion, sex, handicap, familial status, or national origin of an an owner, tenant or a person associated with him or her.

(5) Denying or limiting services or facilities in connection with the sale or rental of a dwelling, because a person failed or refused to provide sexual favors.

### § 100.70 Other prohibited sale and rental conduct.

(a) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development.

(b) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to engage in any conduct relating to the

provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons.

(c) Prohibited actions under paragraph (a) of this section, which are generally referred to as unlawful steering practices, include, but are not limited to:

(1) Discouraging any person from inspecting, purchasing or renting a dwelling because of race, color, religion, sex, handicap, familial status, or national origin, or because of the race, color, religion, sex, handicap, familial status, or national origin of persons in a community, neighborhood or development.

(2) Discouraging the purchase or rental of a dwelling because of race, color, religion, sex, handicap, familial status, or national origin, by exaggerating drawbacks or failing to inform any person of desirable features of a dwelling or of a community, neighborhood, or development.

(3) Communicating to any prospective purchaser that he or she would not be comfortable or compatible with existing residents of a community, neighborhood or development because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Assigning any person to a particular section of a community, neighborhood or development, or to a particular floor of a building, because of race, color, religion, sex, handicap, familial status, or national origin.

(d) Prohibited activities relating to dwellings under paragraph (b) of this section include, but are not limited to:

(1) Discharging or taking other adverse action against an employee, broker or agent because he or she refused to participate in a discriminatory housing practice.

(2) Employing codes or other devices to segregate or reject applicants, purchasers or renters, refusing to take or to show listings of dwellings in certain areas because of race, color, religion, sex, handicap, familial status, or national origin, or refusing to deal with certain brokers or agents because they or one or more of their clients are of a particular race, color, religion, sex, handicap, familial status, or national origin.

(3) Denying or delaying the processing of an application made by a purchaser or renter or refusing to approve such a person for occupancy in a cooperative or condominium dwelling because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Refusing to provide municipal services or property or hazard insurance for dwellings or providing such services or insurance differently because of race,

color, religion, sex, handicap, familial status, or national origin.

### § 100.75 Discriminatory advertisements, statements and notices.

(a) It shall be unlawful to make, print or publish, or cause to be made, printed or published, any notice, statement or advertisement with respect to the sale or rental of a dwelling which indicates any preference, limitation or discrimination because of race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation or discrimination.

(b) The prohibitions in this section shall apply to all written or oral notices or statements by a person engaged in the sale or rental of a dwelling. Written notices and statements include any applications, flyers, brochures, deeds, signs, banners, posters, billboards or any documents used with respect to the sale or rental of a dwelling.

(c) Discriminatory notices, statements and advertisements include, but are not limited to:

(1) Using words, phrases, photographs, illustrations, symbols or forms which convey that dwellings are available or not available to a particular group of persons because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Expressing to agents, brokers, employees, prospective sellers or renters or any other persons a preference for or limitation on any purchaser or renter because of race, color, religion, sex, handicap, familial status, or national origin of such persons.

(3) Selecting media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Refusing to publish advertising for the sale or rental of dwellings or requiring different charges or terms for such advertising because of race, color, religion, sex, handicap, familial status, or national origin.

(d) 24 CFR Part 109 provides information to assist persons to advertise dwellings in a nondiscriminatory manner and describes the matters the Department will review in evaluating compliance with the Fair Housing Act and in investigating complaints alleging discriminatory housing practices involving advertising.

**3286** Federal Register / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations

**§ 100.80 Discriminatory representations on the availability of dwellings.**

(a) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to provide inaccurate or untrue information about the availability of dwellings for sale or rental.

(b) Prohibited actions under this section include, but are not limited to:

(1) Indicating through words or conduct that a dwelling which is available for inspection, sale, or rental has been sold or rented, because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Representing that covenants or other deed, trust or lease provisions which purport to restrict the sale or rental of dwellings because of race, color, religion, sex, handicap, familial status, or national origin preclude the sale of rental of a dwelling to a person.

(3) Enforcing covenants or other deed, trust, or lease provisions which preclude the sale or rental of a dwelling to any person because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Limiting information, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because of race, color, religion, sex, handicap, familial status, or national origin.

(5) Providing false or inaccurate information regarding the availability of a dwelling for sale or rental to any person, including testers, regardless of whether such person is actually seeking housing, because of race, color, religion, sex, handicap, familial status, or national origin.

**§ 100.85 Blockbusting.**

(a) It shall be unlawful, for profit, to induce or attempt to induce a person to sell or rent a dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, familial status, or national origin or with a handicap.

(b) In establishing a discriminatory housing practice under this section it is not necessary that there was in fact profit as long as profit was a factor for engaging in the blockbusting activity.

(c) Prohibited actions under this section include, but are not limited to:

(1) Engaging, for profit, in conduct (including uninvited solicitations for listings) which conveys to a person that a neighborhood is undergoing or is about to undergo a change in the race, color, religion, sex, handicap, familial status, or national origin of persons residing in it, in order to encourage the person to offer a dwelling for sale or rental.

(2) Encouraging, for profit, any person to sell or rent a dwelling through assertions that the entry or prospective entry of persons of a particular race, color, religion, sex, familial status, or national origin, or with handicaps, can or will result in undesirable consequences for the project, neighborhood or community, such as a lowering of property values, an increase in criminal or antisocial behavior, or a decline in the quality of schools or other services or facilities.

**§ 100.90 Discrimination in the provision of brokerage services.**

(a) It shall be unlawful to deny any person access to or membership or participation in any multiple listing service, real estate brokers' organization or other service, organization or facility relating to the business of selling or renting dwellings, or to discriminate against any person in the terms or conditions of such access, membership or participation, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) Prohibited actions under this section include, but are not limited to:

(1) Setting different fees for access to or membership in a multiple listing service because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Denying or limiting benefits accruing to members in a real estate brokers' organization because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Imposing different standards or criteria for membership in a real estate sales or rental organization because of race, color, religion, sex, handicap, familial status, or national origin.

(4) Establishing geographic boundaries or office location or residence requirements for access to or membership or participation in any multiple listing service, real estate brokers' organization or other service, organization or facility relating to the business of selling or renting dwellings, because of race, color, religion, sex, handicap, familial status, or national origin.

**Subpart C—Discrimination in Residential Real Estate-Related Transactions**

**§ 100.110 Discriminatory practices in residential real estate-related transactions.**

(a) This subpart provides the Department's interpretation of the conduct that is unlawful housing discrimination under section 805 of the Fair Housing Act.

(b) It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

**§ 100.115 Residential real estate-related transactions.**

The term residential "real estate-related transactions" means:

(a) The making or purchasing of loans or providing other financial assistance—

(1) For purchasing, constructing, improving, repairing or maintaining a dwelling; or

(2) Secured by residential real estate; or

(b) The selling, brokering or appraising of residential real property.

**§ 100.120 Discrimination in the making of loans and in the provision of other financial assistance.**

(a) It shall be unlawful for any person or entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available loans or other financial assistance for a dwelling, or which is or is to be secured by a dwelling, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) Prohibited practices under this section include, but are not limited to, failing or refusing to provide to any person, in connection with a residential real estate-related transaction, information regarding the availability of loans or other financial assistance, application requirements, procedures or standards for the review and approval of loans or financial assistance, or providing information which is inaccurate or different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin.

**§ 100.125 Discrimination in the purchasing of loans.**

(a) It shall be unlawful for any person or entity engaged in the purchasing of loans or other debts or securities which support the purchase, construction, improvement, repair or maintenance of a dwelling, or which are secured by residential real estate, to refuse to purchase such loans, debts, or securities, or to impose different terms or conditions for such purchases, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) Unlawful conduct under this section includes, but is not limited to:

(1) Purchasing loans or other debts or securities which relate to, or which are secured by dwellings in certain communities or neighborhoods but not in others because of the race, color, religion, sex, handicap, familial status, or national origin of persons in such neighborhoods or communities.

(2) Pooling or packaging loans or other debts or securities which relate to, or which are secured by, dwellings differently because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Imposing or using different terms or conditions on the marketing or sale of securities issued on the basis of loans or other debts or securities which relate to, or which are secured by, dwellings because of race, color, religion, sex, handicap, familial status, or national origin.

(c) This section does not prevent consideration, in the purchasing of loans, of factors justified by business necessity, including requirements of Federal law, relating to a transaction's financial security or to protection against default or reduction of the value of the security. Thus, this provision would not preclude considerations employed in normal and prudent transactions, provided that no such factor may in any way relate to race, color, religion, sex, handicap, familial status or national origin.

§ 100.130   Discrimination in the terms and conditions for making available loans or other financial assistance.

(a) It shall be unlawful for any person or entity engaged in the making of loans or in the provision of other financial assistance relating to the purchase, construction, improvement, repair or maintenance of dwellings or which are secured by residential real estate to impose different terms or conditions for the availability of such loans or other financial assistance because of race, color, religion, sex, handicap, familial status, or national origin.

(b) Unlawful conduct under this section includes, but is not limited to:

(1) Using different policies, practices or procedures in evaluating or in determining creditworthiness of any person in connection with the provision of any loan or other financial assistance for a dwelling or for any loan or other financial assistance which is secured by residential real estate because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Determining the type of loan or other financial assistance to be provided with respect to a dwelling, or fixing the amount, interest rate, duration or other terms for a loan or other financial assistance for a dwelling or which is secured by residential real estate, because of race, color, religion, sex, handicap, familial status, or national origin.

§ 100.135   Unlawful practices in the selling, brokering, or appraising of residential real property.

(a) It shall be unlawful for any person or other entity whose business includes engaging in the selling, brokering or appraising of residential real property to discriminate against any person in making available such services, or in the performance of such services, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) For the purposes of this section, the term appraisal means an estimate or opinion of the value of a specified residential real property made in a business context in connection with the sale, rental, financing or refinancing of a dwelling or in connection with any activity that otherwise affects the availability of a residential real estate-related transaction, whether the appraisal is oral or written, or transmitted formally or informally. The appraisal includes all written comments and other documents submitted as support for the estimate or opinion of value.

(c) Nothing in this section prohibits a person engaged in the business of making or furnishing appraisals of residential real property from taking into consideration factors other than race, color, religion, sex, handicap, familial status, or national origin.

(d) Practices which are unlawful under this section include, but are not limited to, using an appraisal of residential real property in connection with the sale, rental, or financing of any dwelling where the person knows or reasonably should know that the appraisal improperly takes into consideration race, color, religion, sex, handicap, familial status, or national origin.

Subpart D—Prohibition Against Discrimination Because of Handicap

§ 100.200   Purpose.

The purpose of this subpart is to effectuate sections 6 (a) and (b) and 15 of the Fair Housing Amendments Act of 1988.

§ 100.201   Definitions.

As used in this subpart:

"Accessible", when used with respect to the public and common use areas of a building containing covered multifamily dwellings, means that the public or common use areas of the building can be approached, entered, and used by individuals with physical handicaps. The phrase "readily accessible to and usable by" is synonymous with accessible. A public or common use area that complies with the appropriate requirements of ANSI A117.1–1986 or a comparable standard is "accessible" within the meaning of this paragraph.

"Accessible route" means a continuous unobstructed path connecting accessible elements and spaces in a building or within a site that can be negotiated by a person with a severe disability using a wheelchair and that is also safe for and usable by people with other disabilities. Interior accessible routes may include corridors, floors, ramps, elevators and lifts. Exterior accessible routes may include parking access aisles, curb ramps, walks, ramps and lifts. A route that complies with the appropriate requirements of ANSI A117.1–1986 or a comparable standard is an "accessible route".

"ANSI A117.1–1986" means the 1986 edition of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR Part 51. Copies may be obtained from American National Standards Institute, Inc., 1430 Broadway, New York, New York 10018. Copies may be inspected at the Department of Housing and Urban Development, 451 Seventh Street, S.W., Room 10276, Washington, D.C., or at the Office of the Federal Register, 1100 L Street, N.W., Room 8401, Washington, D.C.

"Building" means a structure, facility or portion thereof that contains or serves one or more dwelling units.

"Building entrance on an accessible route" means an accessible entrance to a building that is connected by an accessible route to public transportation stops, to accessible parking and passenger loading zones, or to public streets or sidewalks, if available. A building entrance that complies with ANSI A117.1–1986 or a comparable standard complies with the requirements of this paragraph.

"Common use areas" means rooms, spaces or elements inside or outside of a building that are made available for the use of residents of a building or the guests thereof. These areas include hallways, lounges, lobbies, laundry rooms, refuse rooms, mail rooms,

recreational areas and passageways among and between buildings.

"Controlled substance" means any drug or other substance, or immediate precursor included in the definition in section 102 of the Controlled Substances Act (21 U.S.C. 802).

"Covered multifamily dwellings" means buildings consisting of 4 or more dwelling units if such buildings have one or more elevators; and ground floor dwelling units in other buildings consisting of 4 or more dwelling units.

"Dwelling unit" means a single unit of residence for a family or one or more persons. Examples of dwelling units include: a single family home; an apartment unit within an apartment building; and in other types of dwellings in which sleeping accommodations are provided but toileting or cooking facilities are shared by occupants of more than one room or portion of the dwelling, rooms in which people sleep. Examples of the latter include dormitory rooms and sleeping accommodations in shelters intended for occupancy as a residence for homeless persons.

"Entrance" means any access point to a building or portion of a building used by residents for the purpose of entering.

"Exterior" means all areas of the premises outside of an individual dwelling unit.

"First occupancy" means a building that has never before been used for any purpose.

"Ground floor" means a floor of a building with a building entrance on an accessible route. A building may have more than one ground floor.

"Handicap" means, with respect to a person, a physical or mental impairment which substantially limits one or more major life activities; a record of such an impairment; or being regarded as having such an impairment. This term does not include current, illegal use of or addiction to a controlled substance. For purposes of this part, an individual shall not be considered to have a handicap solely because that individual is a transvestite. As used in this definition:

(a) "Physical or mental impairment" includes:

(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning

disabilities. The term "physical or mental impairment" includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, Human Immunodeficiency Virus infection, mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.

(b) "Major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.

(c) "Has a record of such an impairment" means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(d) "Is regarded as having an impairment" means:

(1) Has a physical or mental impairment that does not substantially limit one or more major life activities but that is treated by another person as constituting such a limitation;

(2) Has a physical or mental impairment that substantially limits one or more major life activities only as a result of the attitudes of other toward such impairment; or

(3) Has none of the impairments defined in paragraph (a) of this definition but is treated by another person as having such an impairment.

"Interior" means the spaces, parts, components or elements of an individual dwelling unit.

"Modification" means any change to the public or common use areas of a building or any change to a dwelling unit.

"Premises" means the interior or exterior spaces, parts, components or elements of a building, including individual dwelling units and the public and common use areas of a building.

"Public use areas" means interior or exterior rooms or spaces of a building that are made available to the general public. Public use may be provided at a building that is privately or publicly owned.

"Site" means a parcel of land bounded by a property line or a designated portion of a public right of way.

§ 100.202  General prohibitions against discrimination because of handicap.

(a) It shall be unlawful to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to

any buyer or renter because of a handicap of—

(1) That buyer or renter;

(2) A person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(3) Any person associated with that person.

(b) It shall be unlawful to discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—

(1) That buyer or renter;

(2) A person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(3) Any person associated with that person.

(c) It shall be unlawful to make an inquiry to determine whether an applicant for a dwelling, a person intending to reside in that dwelling after it is so sold, rented or made available, or any person associated with that person, has a handicap or to make inquiry as to the nature or severity of a handicap of such a person. However, this paragraph does not prohibit the following inquiries, provided these inquiries are made of all applicants, whether or not they have handicaps:

(1) Inquiry into an applicant's ability to meet the requirements of ownership or tenancy;

(2) Inquiry to determine whether an applicant is qualified for a dwelling available only to persons with handicaps or to persons with a particular type of handicap;

(3) Inquiry to determine whether an applicant for a dwelling is qualified for a priority available to persons with handicaps or to persons with a particular type of handicap;

(4) Inquiring whether an applicant for a dwelling is a current illegal abuser or addict of a controlled substance;

(5) Inquiring whether an applicant has been convicted of the illegal manufacture or distribution of a controlled substance.

(d) Nothing in this subpart requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others.

§ 100.203  Reasonable modifications of existing premises.

(a) It shall be unlawful for any person to refuse to permit, at the expense of a handicapped person, reasonable

modifications of existing premises, occupied or to be occupied by a handicapped person, if the proposed modifications may be necessary to afford the handicapped person full enjoyment of the premises of a dwelling. In the case of a rental, the landlord may, where it is reasonable to do so, condition permission for a modification on the renter agreeing to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted. The landlord may not increase for handicapped persons any customarily required security deposit. However, where it is necessary in order to ensure with reasonable certainty that funds will be available to pay for the restorations at the end of the tenancy, the landlord may negotiate as part of such a restoration agreement a provision requiring that the tenant pay into an interest bearing escrow account, over a reasonable period, a reasonable amount of money not to exceed the cost of the restorations. The interest in any such account shall accrue to the benefit of the tenant.

(b) A landlord may condition permission for a modification on the renter providing a reasonable description of the proposed modifications as well as reasonable assurances that the work will be done in a workmanlike manner and that any required building permits will be obtained.

(c) The application of paragraph (a) of this section may be illustrated by the following examples:

*Example (1):* A tenant with a handicap asks his or her landlord for permission to install grab bars in the bathroom at his or her own expense. It is necessary to reinforce the walls with blocking between studs in order to affix the grab bars. It is unlawful for the landlord to refuse to permit the tenant, at the tenant's own expense, from making the modifications necessary to add the grab bars. However, the landlord may condition permission for the modification on the tenant agreeing to restore the bathroom to the condition that existed before the modification, reasonable wear and tear excepted. It would be reasonable for the landlord to require the tenant to remove the grab bars at the end of the tenancy. The landlord may also reasonably require that the wall to which the grab bars are to be attached be repaired and restored to its original condition, reasonable wear and tear excepted. However, it would be unreasonable for the landlord to require the tenant to remove the blocking, since the reinforced walls will not interfere in any way with the landlord's or the next tenant's use and enjoyment of the premises and may be needed by some future tenant.

*Example (2):* An applicant for rental housing has a child who uses a wheelchair.

The bathroom door in the dwelling unit is too narrow to permit the wheelchair to pass. The applicant asks the landlord for permission to widen the doorway at the applicant's own expense. It is unlawful for the landlord to refuse to permit the applicant to make the modification. Further, the landlord may *not*, in usual circumstances, condition permission for the modification on the applicant paying for the doorway to be narrowed at the end of the lease because a wider doorway will not interfere with the landlord's or the next tenant's use and enjoyment of the premises.

### § 100.204 Reasonable accommodations.

(a) It shall be unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, including public and common use areas.

(b) The application of this section may be illustrated by the following examples:

*Example (1):* A blind applicant for rental housing wants live in a dwelling unit with a seeing eye dog. The building has a "no pets" policy. It is a violation of § 100.204 for the owner or manager of the apartment complex to refuse to permit the applicant to live in the apartment with a seeing eye dog because, without the seeing eye dog, the blind person will not have an equal opportunity to use and enjoy a dwelling.

*Example (2):* Progress Gardens is a 300 unit apartment complex with 450 parking spaces which are available to tenants and guests of Progress Gardens on a "first come first served" basis. John applies for housing in Progress Gardens. John is mobility impaired and is unable to walk more than a short distance and therefore requests that a parking space near his unit be reserved for him so he will not have to walk very far to get to his apartment. It is a violation of § 100.204 for the owner or manager of Progress Gardens to refuse to make this accommodation. Without a reserved space, John might be unable to live in Progress Gardens at all or, when he has to park in a space far from his unit, might have great difficulty getting from his car to his apartment unit. The accommodation therefore is necessary to afford John an equal opportunity to use and enjoy a dwelling. The accommodation is reasonable because it is feasible and practical under the circumstances.

### § 100.205 Design and construction requirements.

(a) Covered multifamily dwellings for first occupancy after March 13, 1991 shall be designed and constructed to have at least one building entrance on an accessible route unless it is impractical to do so because of the terrain or unusual characteristics of the site. For purposes of this section, a covered multifamily dwelling shall be deemed to be designed and constructed

for first occupancy on or before March 13, 1991 if they are occupied by that date or if the last building permit or renewal thereof for the covered multifamily dwellings is issued by a State, County or local government on or before January 13, 1990. The burden of establishing impracticality because of terrain or unusual site characteristics is on the person or persons who designed or constructed the housing facility.

(b) The application of paragraph (a) of this section may be illustrated by the following examples:

*Example (1):* A real estate developer plans to construct six covered multifamily dwelling units on a site with a hilly terrain. Because of the terrain, it will be necessary to climb a long and steep stairway in order to enter the dwellings. Since there is no practical way to provide an accessible route to any of the dwellings, one need not be provided.

*Example (2):* A real estate developer plans to construct a building consisting of 10 units of multifamily housing on a waterfront site that floods frequently. Because of this unusual characteristic of the site, the builder plans to construct the building on stilts. It is customary for housing in the geographic area where the site is located to be built on stilts. The housing may lawfully be constructed on the proposed site on stilts even though this means that there will be no practical way to provide an accessible route to the building entrance.

*Example (3):* A real estate developer plans to construct a multifamily housing facility on a particular site. The developer would like the facility to be built on the site to contain as many units as possible. Because of the configuration and terrain of the site, it is possible to construct a building with 105 units on the site provided the site does not have an accessible route leading to the building entrance. It is also possible to construct a building on the site with an accessible route leading to the building entrance. However, such a building would have no more than 100 dwelling units. The building to be constructed on the site must have a building entrance on an accessible route because it is not impractical to provide such an entrance because of the terrain or unusual characteristics of the site.

(c) All covered multifamily dwellings for first occupancy after March 13, 1991 with a building entrance on an accessible route shall be designed and constructed in such a manner that—

(1) The public and common use areas are readily accessible to and usable by handicapped persons;

(2) All the doors designed to allow passage into and within all premises are sufficiently wide to allow passage by handicapped persons in wheelchairs; and

(3) All premises within covered multifamily dwelling units contain the following features of adaptable design:

(i) An accessible route into and through the covered dwelling unit;

(ii) Light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

(iii) Reinforcements in bathroom walls to allow later installation of grab bars around the toilet, tub, shower, stall and shower seat, where such facilities are provided; and

(iv) Usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

(d) The application of paragraph (c) of this section may be illustrated by the following examples:

*Example (1):* A developer plans to construct a 100 unit condominium apartment building with one elevator. In accordance with paragraph (a), the building has at least one accessible route leading to an accessible entrance. All 100 units are covered multifamily dwelling units and they all must be designed and constructed so that they comply with the accessibility requirements of paragraph (c) of this section.

*Example (2):* A developer plans to construct 30 garden apartments in a three story building. The building will not have an elevator. The building will have one accessible entrance which will be on the first floor. Since the building does not have an elevator, only the "ground floor" units are covered multifamily units. The "ground floor" is the first floor because that is the floor that has an accessible entrance. All of the dwelling units on the first floor must meet the accessibility requirements of paragraph (c) of this section and must have access to at least one of each type of public or common use area available for residents in the building.

(e) Compliance with the appropriate requirements of ANSI A117.1–1986 suffices to satisfy the requirements of paragraph (c)(3) of this section.

(f) Compliance with a duly enacted law of a State or unit of general local government that includes the requirements of paragraphs (a) and (c) of this section satisfies the requirements of paragraphs (a) and (c) of this section.

(g)(1) It is the policy of HUD to encourage States and units of general local government to include, in their existing procedures for the review and approval of newly constructed covered multifamily dwellings, determinations as to whether the design and construction of such dwellings are consistent with paragraphs (a) and (c) of this section.

(2) A State or unit of general local government may review and approve newly constructed multifamily dwellings for the purpose of making determinations as to whether the requirements of paragraphs (a) and (c) of this section are met.

(h) Determinations of compliance or noncompliance by a State or a unit of general local government under

paragraph (f) or (g) of this section are not conclusive in enforcement proceedings under the Fair Housing Amendments Act.

(i) This subpart does not invalidate or limit any law of a State or political subdivision of a State that requires dwellings to be designed and constructed in a manner than affords handicapped persons greater access than is required by this subpart.

## Subpart E—Housing for Older Persons

### § 100.300  Purpose.

The purpose of this subpart is to effectuate the exemption in the Fair Housing Amendments Act of 1988 that relates to housing for older persons.

### § 100.301  Exemption.

(a) The provisions regarding familial status in this part do not apply to housing which satisfies the requirements of §§ 100.302, 100.303 or § 100.304.

(b) Nothing in this part limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling.

### § 100.302  State and Federal elderly housing programs.

The provisions regarding familial status in this part shall not apply to housing provided under any Federal or State program that the Secretary determines is specifically designed and operated to assist elderly persons, as defined in the State or Federal program.

### § 100.303  62 or over housing.

(a) The provisions regarding familial status in this part shall not apply to housing intended for, and solely occupied by, persons 62 years of age or older. Housing satisfies the requirements of this section even though:

(1) There are persons residing in such housing on September 13, 1988 who are under 62 years of age, provided that all new occupants are persons 62 years of age or older;

(2) There are unoccupied units, provided that such units are reserved for occupancy by persons 62 years of age or over;

(3) There are units occupied by employees of the housing (and family members residing in the same unit) who are under 62 years of age provided they perform substantial duties directly related to the management or maintenance of the housing.

(b) The following examples illustrate the application of paragraph (a) of this section:

*Example (1):* John and Mary apply for housing at the Vista Heights apartment

complex which is an elderly housing complex operated for persons 62 years of age or older. John is 62 years of age. Mary is 59 years of age. If Vista Heights wishes to retain its "62 or over" exemption it must refuse to rent to John and Mary because Mary is under 62 years of age. However, if Vista Heights does rent to John and Mary, it might qualify for the "55 or over" exemption in § 100.304.

*Example (2):* The Blueberry Hill retirement community has 100 dwelling units. On September 13, 1988, 15 units were vacant and 35 units were occupied with at least one person who is under 62 years of age. The remaining 50 units were occupied by persons who were all 62 years of age or older. Blueberry Hill can qualify for the "62 or over" exemption as long as all units that were occupied after September 13, 1988 are occupied by persons who were 62 years of age or older. The people under 62 in the 35 units previously described need not be required to leave for Blueberry Hill to qualify for the "62 or over" exemption.

### § 100.304  55 or over housing.

(a) The provisions regarding familial status shall not apply to housing intended and operated for occupancy by at least one person 55 years of age or older per unit, *Provided That* the housing satisfies the requirements of § 100.304 (b)(1) *or* (b)(2) *and* the requirements of § 100.304(c).

(b)(1) The housing facility has significant facilities and services specifically designed to meet the physical or social needs of older persons. "Significant facilities and services specifically designed to meet the physical or social needs of older persons" include, but are not limited to, social and recreational programs, continuing education, information and counseling, recreational, homemaker, outside maintenance and referral services, an accessible physical environment, emergency and preventive health care of programs, congregate dining facilities, transportation to facilitate access to social services, and services designed to encourage and assist residents to use the services and facilities available to them (the housing facility need not have all of these features to qualify for the exemption under this subparagraph); or

(2) It is not practicable to provide significant facilities and services designed to meet the physical or social needs of older persons *and* the housing facility is necessary to provide important housing opportunities for older persons. In order to satisfy this paragraph (b)(2) of this section the owner or manager of the housing facility must demonstrate through credible and objective evidence that the provision of significant facilities and services designed to meet the physical or social

needs of older persons would result in depriving older persons in the relevant geographic area of needed and desired housing. The following factors, among others, are relevant in meeting the requirements of this paragraph (b)(2) of this section—

(i) Whether the owner or manager of the housing facility has endeavored to provide significant facilities and services designed to meet the physical or social needs of older persons either by the owner or by some other entity. Demonstrating that such services and facilities are expensive to provide is not alone sufficient to demonstrate that the provision of such services is not practicable.

(ii) The amount of rent charged, if the dwellings are rented, or the price of the dwellings, if they are offered for sale.

(iii) The income range of the residents of the housing facility.

(iv) The demand for housing for older persons in the relevant geographic area.

(v) The range of housing choices for older persons within the relevant geographic area.

(vi) The availability of other similarly priced housing for older persons in the relevant geographic area. If similarly priced housing for older persons with significant facilities and services is reasonably available in the relevant geographic area then the housing facility does not meet the requirements of this paragraph (b)(2) of this section.

(vii) The vacancy rate of the housing facility.

(c)(1) At least 80% of the units in the housing facility are occupied by at least one person 55 years of age or older per unit *except that* a newly constructed housing facility for first occupancy after March 12, 1989 need not comply with this paragraph (c)(1) of this section until 25% of the units in the facility are occupied; and

(2) The owner or manager of a housing facility publishes and adheres to policies and procedures which demonstrate an intent by the owner or manager to provide housing for persons 55 years of age or older. The following factors, among others, are relevant in determining whether the owner or manager of a housing facility has complied with the requirements of this paragraph (c)(2) of this section:

(i) The manner in which the housing facility is described to prospective residents.

(ii) The nature of any advertising designed to attract prospective residents.

(iii) Age verification procedures.

(iv) Lease provisions.

(v) Written rules and regulations.

(vi) Actual practices of the owner or manager in enforcing relevant lease provisions and relevant rules or regulations.

(d) Housing satisfies the requirements of this section even though:

(1) On September 13, 1988, under 80% of the occupied units in the housing facility are occupied by at least one person 55 years of age or older per unit, provided that at least 80% of the units that are occupied by new occupants after September 13, 1988 are occupied by at least one person 55 years of age or older.

(2) There are unoccupied units, provided that at least 80% of such units are reserved for occupancy by at least one person 55 years of age or over.

(3) There are units occupied by employees of the housing (and family members residing in the same unit) who are under 55 years of age provided they perform substantial duties directly related to the management or maintenance of the housing.

(e) The application of this section may be illustrated by the following examples:

*Example 1:* A. John and Mary apply for housing at the Valley Heights apartment complex which is a 100 unit housing complex that is operated for persons 55 years of age or older in accordance with all the requirements of this section. John is 56 years of age. Mary is 50 years of age. Eighty (80) units are occupied by at least one person who is 55 years of age or older. Eighteen (18) units are occupied exclusively by persons who are under 55. Among the units occupied by new occupants after September 13, 1988 were 18 units occupied exclusively by persons who are under 55. Two (2) units are vacant. At the time John and Mary apply for housing, Valley Heights qualifies for the "55 or over" exemption because 82% of the occupied units (80/98) at Valley Heights are occupied by at least one person 55 years old or older. If John and Mary are accepted for occupancy, then 81 out of the 99 occupied units (82%) will be occupied by at least one person who is 55 years of age or older and Valley Heights will continue to qualify for the "55 or over" exemption.

B. If only 78 out of the 98 occupied units had been occupied by at least one person 55 years of age or older, Valley Heights would still qualify for the exemption, but could not rent to John or Mary if they were both under 55 without losing the exemption.

*Example 2:* Green Meadow is a 1,000 unit retirement community that provides significant facilities and services specifically designed to meet the physical or social needs of older persons. On September 13, 1988, Green Meadow published and thereafter adhered to policies and procedures demonstrating an intent to provide housing for persons 55 years of age or older. On September 13, 1988, 100 units were vacant and 300 units were occupied only by people who were under 55 years old. Consequently, on September 13, 1988 67% of the Green Meadow's occupied units (600 out of 900)

were occupied by at least one person 55 years of age or older. Under paragraph (d)(1) of this section, Green Meadow qualifies for the "55 or over" exemption even though, on September 13, 1988, under 80% of the occupied units in the housing facility were occupied by at least one person 55 years of age or older per unit, provided that at least 80% of the units that were occupied after September 13, 1988 are occupied by at least one person 55 years of age or older. Under paragraph (d) of this section, Green Meadow qualifies for the "55 or over" exemption, even though it has unoccupied units, provided that at least 80% of its unoccupied units are reserved for occupancy by at least one person 55 years of age or over.

*Example 3:* Waterfront Gardens is a 200 unit housing facility to be constructed after March 12, 1989. The owner and manager of Waterfront Gardens intends to operate the new facility in accordance with the requirements of this section. Waterfront Gardens need not comply with the requirement in paragraph (c)(1) of this section that at least 80% of the occupied units be occupied by at least one person 55 years of age or older per unit *until* 50 units (25%) are occupied. When the 50th unit is occupied, then 80% of the 50 occupied units (*i.e.,* 40 units) must be occupied by at least one person who is 55 years of age or older for Waterfront Gardens to qualify for the "55 or over" exemption.

## Subpart F—Interference, Coercion or Intimidation

### § 100.400  Prohibited interference, coercion or intimidation.

(a) This subpart provides the Department's interpretation of the conduct that is unlawful under section 818 of the Fair Housing Act.

(b) It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of that person having exercised or enjoyed, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this part.

(c) Conduct made unlawful under this section includes, but is not limited to, the following:

(1) Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the sale or rental of a dwelling or in connection with a residential real estate-related transaction because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons.

(3) Threatening an employee or agent with dismissal or an adverse employment action, or taking such adverse employment action, for any effort to assist a person seeking access to the sale or rental of a dwelling or seeking access to any residential real estate-related transaction, because of the race, color, religion, sex, handicap, familial status, or national origin of that person or of any person associated with that person.

(4) Intimidating or threatening any person because that person is engaging in activities designed to make other persons aware of, or encouraging such other persons to exercise, rights granted or protected by this part.

(5) Retaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act.

4. Part 103 is added to read as follows:

## PART 103—FAIR HOUSING—COMPLAINT PROCESSING

### Subpart A—Purpose and Definitions

Sec.
103.1    Purpose and applicability.
103.5    Other civil rights authorities.
103.9    Definitions.

### Subpart B—Complaints

103.10   Submission of information.
103.15   Who may file complaints.
103.20   Persons against whom complaints may be filed.
103.25   Where to file complaints.
103.30   Form and content of complaint.
103.40   Date of filing of complaint.
103.42   Amendment of complaint.
103.45   Service of notice on aggrieved person.
103.50   Notification of respondent; joinder of additional or substitute respondents.
103.55   Answer to complaint.

### Subpart C—Referral of Complaints to State and Local Agencies

103.100  Notification and referral to substantially equivalent State or local agencies.
103.105  Cessation of action on referred complaints.
103.110  Reactivation of referred complaints.
103.115  Notification upon reactivation.

### Subpart D—Investigation Procedures

103.200  Investigations.
103.205  Systemic processing.
103.215  Conduct of investigation.
103.220  Cooperation of Federal, State and local agencies.
103.225  Completion of the investigation.
103.230  Final investigative report.

### Subpart E—Conciliation Procedures

103.300  Conciliation.
103.310  Conciliation agreement.
103.315  Relief sought for aggrieved persons.
103.320  Provisions sought for the public interest.
103.325  Termination of conciliation efforts.
103.330  Prohibitions and requirements with respect to disclosure of information obtained during conciliation.
103.335  Review of compliance with conciliation agreements.

### Subpart F—Issuance of Charge

103.400  Reasonable cause determination.
103.405  Issuance of charge.
103.410  Election of civil action or provision of administrative proceeding.

### Subpart G—Prompt Judicial Action

103.500  Prompt judicial action.

### Subpart H—Other Action

103.510  Other action by HUD.
103.515  Action by other agencies.

**Authority:** Title VIII, Civil Rights Act of 1968, 42 U.S.C. 3600–3620; section 7(d), Department of HUD Act, 42 U.S.C. 3535(d).

### Subpart A—Purpose and Definitions

#### § 103.1  Purpose and applicability.

(a) This part contains the procedures established by the Department of Housing and Urban Development for the investigation and conciliation of complaints under section 810 of the Fair Housing Act, 42 U.S.C. 3610.

(b) This part applies to:

(1) Complaints alleging discriminatory housing practices because of race, color, religion, sex or national origin; and

(2) Complaints alleging discriminatory housing practices on account of handicap or familial status occurring on or after March 12, 1989.

(c) Part 104 governs the administrative proceedings before an administrative law judge adjudicating charges issued under § 103.405.

(d) The Department will reasonably accommodate persons with disabilities who are participants in complaint processing.

#### § 103.5  Other Civil Rights authorities.

In addition to the Fair Housing Act, other civil rights authorities may be applicable in a particular case. Thus, where a person charged with a discriminatory housing practice in a complaint filed under section 810 of the Fair Housing Act is also prohibited from engaging in similar practices under Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d–2000d–5), section 109 of the Housing and Community Development Act of 1974 (42 U.S.C. 5309), Executive Order 11063 of November 20, 1962, on Equal Opportunity in Housing (27 FR 11527–11530, November 24, 1962), section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), the Age Discrimination Act (42 U.S.C. 6101) or other applicable law, the person may also be subject to action by HUD or other Federal agencies under the rules, regulations, and procedures prescribed under Title VI (24 CFR Parts 1 and 2), section 109 (24 CFR 570.602)), Executive Order 11063 (24 CFR Part 107), section 504 (24 CFR Part 8), or other applicable law.

#### § 103.9  Definitions.

As used in this part,

*Aggrieved person* includes any person who:

(a) Claims to have been injured by a discriminatory housing practice; or

(b) Believes that such person will be injured by a discriminatory housing practice that is about to occur.

*Assistant Secretary* means the Assistant Secretary for Fair Housing and Equal Opportunity in HUD.

*Attorney General* means the Attorney General of the United States.

*Complainant* means the person (including the Assistant Secretary) who files a complaint under this part.

*Conciliation* means the attempted resolution of issues raised by a complaint, or by the investigation of a complaint, through informal negotiations involving the aggrieved person, the respondent, and the Assistant Secretary.

*Conciliation agreement* means a written agreement setting forth the resolution of the issues in conciliation.

*Discriminatory housing practice* means an act that is unlawful under section 804, 805, 806 or 818 of the Fair Housing Act, as described in Part 100.

*Dwelling* means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, or any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

*Fair Housing Act* means Title VIII of the Civil Rights Act of 1968, 42 U.S.C. 3600–3620.

*General Counsel* means the General Counsel of HUD.

*HUD* means the United States Department of Housing and Urban Development.

*Person* includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustee in cases under Title 11 of the United States Code, receivers and fiduciaries.

*Personal service* means handing a copy of the document to the person to be served or leaving a copy of the document with a person of suitable age and discretion at the place of business,

residence or usual place of abode of the person to be served.

*Receipt of notice* means the day that personal service is completed by handing or delivering a copy of the document to an appropriate person or the date that a document is delivered by certified mail.

*Respondent* means:

(a) The person or other entity accused in a complaint of a discriminatory housing practice; and

(b) Any other person or entity identified in the course of investigation and notified as required under § 103.50.

*State* means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, or any of the territories and possessions of the United States.

*Substantially equivalent State or local agency* means a State or local agency certified by HUD under 24 CFR Part 115 (including agencies certified for interim referrals).

*To rent* includes to lease, to sublease, to let, and otherwise to grant for consideration the right to occupy premises not owned by the occupant.

## Subpart B—Complaints

### § 103.10 Submission of information.

(a) The Assistant Secretary will receive information concerning alleged discriminatory housing practices from any person. Where the information constitutes a complaint within the meaning of the Fair Housing Act and this part and is furnished by an aggrieved person, it will be considered to be filed under § 103.40. Where additional information is required for purposes of perfecting a complaint under the Fair Housing Act, HUD will advise what additional information is needed and will provide appropriate assistance in the filing of the complaint.

(b) HUD may also concurrently initiate compliance reviews under other appropriate civil rights authorities, such as E.O. 11063 on Equal Opportunity in Housing, Title VI of the Civil Rights Act of 1964, section 109 of the Housing and Community Development Act of 1974, section 504 of the Rehabilitation Act of 1973 or the Age Discrimination Act (42 U.S.C. 6101). The information may also be made available to any other Federal, State or local agency having an interest in the matter. In making available such information, steps will be taken to protect the confidentiality of any informant or complainant where desired by the informant or complainant.

### § 103.15 Who may file complaints.

Any aggrieved person or the Assistant Secretary may file a complaint no later than one year after an alleged discriminatory housing practice has

occurred or terminated. The complaint may be filed with the assistance of an authorized representative of an aggrieved person, including any organization acting on behalf of an aggrieved person.

### § 103.20 Persons against whom complaints may be filed.

(a) A complaint may be filed against any person alleged to be engaged, to have engaged, or to be about to engage, in a discriminatory housing practice.

(b) A complaint may also be filed against any person who directs or controls, or has the right to direct or control, the conduct of another person with respect to any aspect of the sale, rental, advertising or financing of dwellings or the provision of brokerage services relating to the sale or rental of dwellings if that other person, acting within the scope of his or her authority as employee or agent of the directing or controlling person, is engaged, has engaged, or is about to engage, in a discriminatory housing practice.

### § 103.25 Where to file complaints.

(a)(1) Aggrieved persons may file complaints in person with, or by mail to: Fair Housing, Department of Housing and Urban Development, Washington DC 20410, or any HUD Office. A list of Regional Offices (with addresses and areas of jurisdiction) and Field Offices (with addresses) is contained in an appendix to this part.

(2) Aggrieved persons may provide information to be contained in a complaint by telephone to any Regional or Field Office of HUD. HUD will reduce information provided by telephone to writing on the prescribed complaint form and send the form to the aggrieved person to be signed and affirmed as provided in § 103.30(a).

(3) Complaints may be filed in person or by mail with any substantially equivalent State or local agency. Complaints filed with a substantially equivalent State or local agency will be considered to be complaints dual filed with the agency under its own law, and with HUD under the Fair Housing Act.

(b) Generally, complaints will be processed through HUD's Regional Administrator having jurisdiction in the State in which the alleged discriminatory housing practice occurred. However, where a complaint has been identified for systemic processing under § 103.205, that complaint may be processed in the Office of the Assistant Secretary in Washington, DC.

### § 103.30 Form and content of complaint.

(a) Each complaint must be in writing and must be signed and affirmed by the aggrieved person filing the complaint or,

if the complaint is filed by HUD, by the Assistant Secretary. The signature and affirmation may be made at any time during the investigation. The affirmation shall state: "I declare under penalty of perjury that the foregoing is true and correct."

(b) The Assistant Secretary may require complaints to be made on prescribed forms. Complaint forms will be available in any HUD office or in any substantially equivalent State or local agency. Notwithstanding any requirement for use of a prescribed form, HUD will accept any written statement which substantially sets forth the allegations of a discriminatory housing practice under the Fair Housing Act (including any such statement filed with a substantially equivalent State or local agency) as a Fair Housing Act complaint. Personnel in these offices will provide appropriate assistance in filling out forms and in filing a complaint.

(c) Each complaint must contain substantially the following information:

(1) The name and address of the aggrieved person.

(2) The name and address of the respondent.

(3) A description and the address of the dwelling which is involved, if appropriate.

(4) A concise statement of the facts, including pertinent dates, constituting the alleged discriminatory housing practice.

### § 103.40 Date of filing of complaint.

(a) Except as provided in paragraph (b) of this section, a complaint is filed when it is received by HUD, or dual filed with HUD through a substantially equivalent State or local agency, in a form that reasonably meets the standards of § 103.30.

(b) The Assistant Secretary may determine that a complaint is filed for the purposes of the one-year period for the filing of complaints, upon the submission of written information (including information provided by telephone and reduced to writing by an employee of HUD) identifying the parties and describing generally the alleged discriminatory housing practice.

(c) Where a complaint alleges a discriminatory housing practice that is continuing, as manifested in a number of incidents of such conduct, the complaint will be timely if filed within one year of the last alleged occurrence of that practice.

### § 103.42 Amendment of complaint.

Complaints may be reasonably and fairly amended at any time. Such amendments may include, but are not limited to: amendments to cure technical

defects or omissions, including failure to sign or affirm a complaint, to clarify or amplify the allegations in a complaint, or to join additional or substitute respondents. Except for the purposes of notifying respondents under § 103.50, amended complaints will be considered as having been made as of the original filing date.

### § 103.45  Service of notice on aggrieved person.

Upon the filing of a complaint, the Assistant Secretary will notify, by certified mail or personal service, each aggrieved person on whose behalf the complaint was filed. The notice will:

(a) Acknowledge the filing of the complaint and state the date that the complaint was accepted for filing.

(b) Include a copy of the complaint.

(c) Advise the aggrieved person of the time limits applicable to complaint processing and of the procedural rights and obligations of the aggrieved person under this part and Part 104.

(d) Advise the aggrieved person of his or her right to commence a civil action under section 813 of the Fair Housing Act in an appropriate United States District Court, not later than two years after the occurrence or termination of the alleged discriminatory housing practice. The notice will state that the computation of this two-year period excludes any time during which a proceeding is pending under this part or Part 104 with respect to a complaint or charge based on the alleged discriminatory housing practice. The notice will also state that the time period includes the time during which an action arising from a breach of a conciliation agreement under section 814(b)(2) of the Fair Housing Act is pending.

(e) Advise the aggrieved person that retaliation against any person because he or she made a complaint or testified, assisted, or participated in an investigation or conciliation under this part or an administrative proceeding under Part 104, is a discriminatory housing practice that is prohibited under section 818 of the Fair Housing Act.

### § 103.50  Notification of respondent; joinder of additional or substitute respondents.

(a) Within ten days of the filing of a complaint under § 103.40 or the filing of an amended complaint under § 103.42, the Assistant Secretary will serve a notice on each respondent by certified mail or by personal service. A person who is not named as a respondent in a complaint, but who is identified in the course of the investigation under Subpart D of this part as a person who

is alleged to be engaged, to have engaged, or to be about to engage in the discriminatory housing practice upon which the complaint is based may be joined as an additional or substitute respondent by service of a notice on the person under this section within ten days of the identification.

(b)(1) The notice will identify the alleged discriminatory housing practice upon which the complaint is based, and include a copy of the complaint.

(2) The notice will state the date that the complaint was accepted for filing.

(3) The notice will advise the respondent of the time limits applicable to complaint processing under this part and of the procedural rights and obligations of the respondent under this part and Part 104, including the opportunity to submit an answer to the complaint within 10 days of the receipt of the notice.

(4) The notice will advise the respondent of the aggrieved person's right to commence a civil action under section 813 of the Fair Housing Act in an appropriate United States District Court, not later than two years after the occurrence or termination of the alleged discriminatory housing practice. The notice will state that the computation of this two-year period excludes any time during which a proceeding is pending under this part or Part 104 with respect to a complaint or charge based on the alleged discriminatory housing practice. The notice will also state that the time period includes the time during which an action arising from a breach of a conciliation agreement under section 814(b)(2) of the Fair Housing Act is pending.

(5) If the person is not named in the complaint, but is being joined as an additional or substitute respondent, the notice will explain the basis for the Assistant Secretary's belief that the joined person is properly joined as a respondent.

(6) The notice will advise the respondent that retaliation against any person because he or she made a complaint or testified, assisted or participated in an investigation or conciliation under this part or an administrative proceeding under Part 104, is a discriminatory housing practice that is prohibited under section 818 of the Fair Housing Act.

### § 103.55  Answer to complaint.

(a) The respondent may file an answer not later than ten days after receipt of the notice described in § 103.50. The respondent may assert any defense that might be available to a defendant in a court of law. The answer must be signed and affirmed by the

respondent. The affirmation must state: "I declare under penalty of perjury that the foregoing is true and correct."

(b) An answer may be reasonably and fairly amended at any time with the consent of the Assistant Secretary.

## Subpart C—Referral of Complaints to State and Local Agencies

### § 103.100  Notification and referral to substantially equivalent State or local agencies.

(a) Whenever a complaint alleges a discriminatory housing practice that is within the jurisdiction of a substantially equivalent State or local agency and the agency is certified or may accept interim referrals under 24 CFR Part 115 with regard to the alleged discriminatory housing practice, the Assistant Secretary will notify the agency of the filing of the complaint and refer the complaint to the agency for further processing before HUD takes any action with respect to the complaint. The Assistant Secretary will notify the State or local agency of the referral by certified mail.

(b) The Assistant Secretary will notify the aggrieved person and the respondent, by certified mail or personal service, of the notification and referral under paragraph (a) of this section. The notice will advise the aggrieved person and the respondent of the aggrieved person's right to commence a civil action under section 813 of the Fair Housing Act in an appropriate United States District Court, not later than two years after the occurrence or termination of the alleged discriminatory housing practice. The notice will state that the computation of this two-year period excludes any time during which a proceeding is pending under this part or Part 104 with respect to complaint or charge based on the alleged discriminatory housing practice. The notice will also state that the time period includes the time during which an action arising from a breach of a conciliation agreement under section 814(b)(2) of the Fair Housing Act is pending.

### § 103.105  Cessation of action on referred complaints.

(a) After a complaint is referred under § 103.100, the Assistant Secretary will take no futher action with respect to the complaint, except as provided in § 103.110.

(b) A referral under § 103.100 does not prohibit the Assistant Secretary from taking appropriate action to review or investigate matters in the complaint that raise issues cognizable under other civil

rights authorities applicable to departmental programs (see § 103.5).

### § 103.110  Reactivation of referred complaints.

The Assistant Secretary may reactivate a complaint referred under § 103.100 for processing by HUD if:

(a) The substantially equivalent State or local agency consents or requests the reactivation;

(b) The Assistant Secretary determines that, with respect to the alleged discriminatory housing practice, the agency no longer qualifies for certification as a substantially equivalent State or local agency and may not accept interim referrals; or

(c) The substantially equivalent State or local agency has failed to commence proceedings with respect to the complaint within 30 days of the date that it received the notification and referral of the complaint; or the agency commenced proceedings within this 30-day period, but the Assistant Secretary determines that the agency has failed to carry the proceedings forward with reasonable promptness. HUD will not reactivate a complaint under this paragraph (c) of this section until the appropriate HUD Regional Office has conferred with the agency to determine the reason for the delay in processing of the complaint. If the Assistant Secretary believes that the agency will proceed expeditiously following the conference, the Assistant Secretary may leave the complaint with the agency for a reasonable time, notwithstanding the expiration of the 30-day period or a previous failure to carry the proceedings forward with reasonable promptness.

### § 103.115  Notification upon reactivation.

(a) Whenever a complaint referred to a State or local fair housing agency under § 103.100 is reactivated under § 103.110, the Assistant Secretary will notify the substantially equivalent State or local agency, the aggrieved person and the respondent of HUD's reactivation. The notification will be made by certified mail or personal service.

(b) The notification to the respondent and the aggrieved person will:

(1) Advise the aggrieved person and the respondent of the time limits applicable to complaint processing and the procedural rights and obligations of the aggrieved person and the respondent under this part and Part 104.

(2) State that HUD will process the complaint under the Fair Housing Act and that the State or local agency to which the complaint was referred may continue to process the complaint under State or local law.

(3) Advise the aggrieved person and the respondent of the aggrieved person's right to commence a civil action under section 813 of the Fair Housing Act in an appropriate United States District Court, not later than two years after the occurrence or termination of the alleged discriminatory housing practice. The notice will state that the computation of this two-year period excludes any time during which a proceeding is pending under this part or Part 104 with respect to a complaint or charge based on the alleged discriminatory housing practice under Part 104. The notices will also state that the time period includes the time during which an action arising from a breach of conciliation agreement under section 814(b)(2) of the Fair Housing Act is pending.

## Subpart D—Investigation Procedures

### § 103.200  Investigations.

(a) Upon the filing of a complaint under § 103.40, the Assistant Secretary will initiate an investigation. The purpose of an investigation are:

(1) To obtain information concerning the events or transactions that relate to the alleged discriminatory housing practice identified in the complaint.

(2) To document policies or practices of the respondent involved in the alleged discriminatory housing practice raised in the complaint.

(3) To develop factual data necessary for the General Counsel to make a determination under § 103.400 whether reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, and to take other actions provided under this part.

(b) Upon the written direction of the Assistant Secretary, HUD may initate an investigation of housing practices to determine whether a complaint should be filed under Subpart B of this part. Such investigations will be conducted in accordance with the procedures described under this subpart.

### § 103.205  Systemic processing.

Where the Assistant Secretary determines that the alleged discriminatory practices contained in a complaint are pervasive or institutional in nature, or that the processing of the complaint will involve complex issues, novel questions of fact or law, or will affect a large number of persons, the Assistant Secretary may identify the complaint for systemic processing. This determination can be based on the face of the complaint or on information gathered in connection with an investigation. Systemic investigations may focus not only on documenting

facts involved in the alleged discriminatory housing practice that is the subject of the complaint but also on review of other policies and procedures related to matters under investigation, to make sure that they also comply with the nondiscrimination requirements of the Fair Housing Act.

### § 103.215  Conduct of investigation.

(a) In conducting investigations under this part, the Assistant Secretary will seek the voluntary cooperation of all persons to obtain access to premises, records, documents, individuals, and other possible sources of information; to examine, record, and copy necessary materials; and to take and record testimony or statements of persons reasonably necessary for the furtherance of the investigation.

(b) The Assistant Secretary and the respondent may conduct discovery in aid of the investigation by the same methods and to the same extent that parties may conduct discovery in an administrative proceeding under 24 CFR Part 104, except that the Assistant Secretary shall have the power to issue subpoenas described in 24 CFR 104.590 in support of the investigation or at the request of the respondent. Subpoenas issued by the Assistant Secretary must be approved by the General Counsel as to their legality before issuance.

### § 103.220  Cooperation of Federal, State and local agencies.

The Assistant Secretary, in processing Fair Housing Act complaints, may seek the cooperation and utilize the services of Federal, State or local agencies, including any agency having regulatory or supervisory authority over financial institutions.

### § 103.225  Completion of investigation.

The investigation will remain open until the reasonable cause determination is made under § 103.400, or a conciliation agreement is executed and approved under § 103.310. Unless it is impracticable to do so, the Assistant Secretary will complete the investigation of the alleged discriminatory housing practice within 100 days of the filing of the complaint (or where the Assistant Secretary reactivates the complaint, within 100 days after service of the notice of reactivation under § 103.115). If the Assistant Secretary is unable to complete the investigation within the 100-day period, the Assistant Secretary will notify the aggrieved person and the respondent, by certified mail or personal service, of the reasons for the delay.

## § 103.230  Final investigative report.

(a) At the end of each investigation under this part, the Assistant Secretary will prepare a final investigative report. The investigative report will contain:

(1) The names and dates of contacts with witnesses, except that the report will not disclose the names of witnesses that request anonymity. HUD, however, may be required to disclose the names of such witnesses in the course of an administrative hearing under Part 104 or a civil action under Title VIII of the Fair Housing Act;

(2) A summary and the dates of correspondence and other contacts with the aggrieved person and the respondent;

(3) A summary description of other pertinent records;

(4) A summary of witness statements; and

(5) Answers to interrogatories.

(b) A final investigative report may be amended at any time, if additional evidence is discovered.

(c) Notwithstanding the prohibitions and requirements with respect to disclosure of information contained in § 103.330, the Assistant Secretary will make information derived from an investigation, including the final investigative report, available to the aggrieved person and the respondent. Following the completion of investigation, the Assistant Secretary shall notify the aggrieved person and the respondent that the final investigation report is complete and will be provided upon request.

## Subpart E—Conciliation Procedures

### § 103.300  Conciliation.

(a) During the period beginning with the filing of the complaint and ending with the filing of a charge or the dismissal of the complaint by the General Counsel, the Assistant Secretary will, to the extent feasible, attempt to conciliate the complaint.

(b) In conciliating a complaint, HUD will attempt to achieve a just resolution of the complaint and to obtain assurances that the respondent will satisfactorily remedy any violations of the rights of the aggrieved person, and take such action as will assure the elimination of discriminatory housing practices, or the prevention of their occurrence, in the future.

(c) Generally, officers, employees, and agents of HUD engaged in the investigation of a complaint under this part will not participate or advise in the conciliation of the same complaint or in any factually related complaint. Where the rights of the aggrieved party and the respondent can be protected and the prohibitions with respect to the disclosure of information can be observed, the investigator may suspend fact finding and engage in efforts to resolve the complaint by conciliation.

### § 103.310  Conciliation agreement.

(a) The terms of a settlement of a complaint will be reduced to a written conciliation agreement. The conciliation agreement shall seek to protect the interests of the aggrieved person, other persons similarly situated, and the public interest. The types of relief that may be sought for the aggrieved person are described in § 103.315. The provisions that may be sought for the vindication of the public interest are described in § 103.320.

(b)(1) The agreement must be executed by the respondent and the complainant. The agreement is subject to the approval of the Assistant Secretary, who will indicate approval by signing the agreement. The Assistant Secretary will approve an agreement and, if the Assistant Secretary is the complainant, will execute the agreement, only if:

(i) The complainant and the respondent agree to the relief accorded the aggrieved person;

(ii) The provisions of the agreement will adequately vindicate the public interest; and

(iii) If the Assistant Secretary is the complainant, all aggrieved persons named in the complaint are satisfied with the relief provided to protect their interests.

(2) The General Counsel may issue a charge under § 103.405 if the aggrieved person and the respondent have executed a conciliation agreement that has not been approved by the Assistant Secretary.

### § 103.315  Relief sought for aggrieved persons.

(a) The following types of relief may be sought for aggrieved persons in conciliation:

(1) Monetary relief in the form of damages, including damages caused by humiliation or embarrassment, and attorney fees;

(2) Other equitable relief including, but not limited to, access to the dwelling at issue, or to a comparable dwelling, the provision of services or facilities in connection with a dwelling, or other specific relief; or

(3) Injunctive relief appropriate to the elimination of discriminatory housing practices affecting the aggrieved person or other persons.

(b) The conciliation agreement may provide for binding arbitration of the dispute arising from the complaint. Arbitration may award appropriate relief as described in paragraph (a) of this section. The aggrieved person and the respondent may, in the conciliation agreement, limit the types of relief that may be awarded under binding arbitration.

### § 103.320  Provisions sought for the public interest.

The following are types of provisions may be sought for the vindication of the public interest:

(a) Elimination of discriminatory housing practices.

(b) Prevention of future discriminatory housing practices.

(c) Remedial affirmative activities to overcome discriminatory housing practices.

(d) Reporting requirements.

(e) Monitoring and enforcement activities.

### § 103.325  Termination of conciliation efforts.

(a) HUD may terminate its efforts to conciliate the complaint if the respondent fails or refuses to confer with HUD; the aggrieved person or the respondent fail to make a good faith effort to resolve any dispute; or HUD finds, for any reason, that voluntary agreement is not likely to result.

(b) Where the aggrieved person has commenced a civil action under an Act of Congress or a State law seeking relief with respect to the alleged discriminatory housing practice, and the trial in the action has commenced, HUD will terminate conciliation unless the court specifically requests assistance from the Assistant Secretary.

### § 103.330  Prohibitions and requirements with respect to disclosure of information obtained during conciliation.

(a) Except as provided in paragraph (b) of this section and § 103.230(c), nothing that is said or done in the course of conciliation under this part may be made public or used as evidence in a subsequent administrative hearing under Part 104 or in civil actions under Title VIII of the Fair Housing Act, without the written consent of the persons concerned.

(b) Conciliation agreements shall be made public, unless the aggrieved person and respondent request nondisclosure and the Assistant Secretary determines that disclosure is not required to further the purposes of the Fair Housing Act. Notwithstanding a determination that disclosure of a conciliation agreement is not required, the Assistant Secretary may publish tabulated descriptions of the results of all conciliation efforts.

## § 103.335 Review of compliance with conciliation agreements.

HUD may, from time to time, review compliance with the terms of any conciliation agreement. Whenever HUD has reasonable cause to believe that a respondent has breached a conciliation agreement, the General Counsel shall refer the matter to the Attorney General with a recommendation for the filing of a civil action under section 814(b)(2) of the Fair Housing Act for the enforcement of the terms of the conciliation agreement.

## Subpart F—Issuance of Charge

### § 103.400 Reasonable cause determination.

(a) If a conciliation agreement under § 103.310 has not been executed by the complainant and the respondent, and approved by the Assistant Secretary, the General Counsel, within the time limits set forth in paragraph (c) of this section, shall determine whether, based on the totality of the factual circumstances known at the time of the decision, reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur. The reasonable cause determination will be based solely on the facts concerning the alleged discriminatory housing practice, provided by complainant and respondent and otherwise, disclosed during the investigation. In making the reasonable cause determination, the General Counsel shall consider whether the facts concerning the alleged discriminatory housing practice are sufficient to warrant the initiation of a civil action in Federal court.

(1) In all cases not involving the legality of local zoning or land use laws or ordinances:

(i) If the General Counsel determines that reasonable cause exists, the General Counsel will immediately issue a charge under § 103.405 on behalf of the aggrieved person, and shall notify the aggrieved person and the respondent of this determination by certified mail or personal service.

(ii) If the General Counsel determines that no reasonable cause exists, the General Counsel shall: issue a short and plain written statement of the facts upon which the General Counsel has based the no reasonable cause determination; dismiss the complaint; notify the aggrieved person and the respondent of the dismissal (including the written statement of facts) by certified mail or personal service; and make public disclosure of the dismissal. Public disclosure of the dismissal shall be by issuance of a press release, except that the respondent may request that no

release be made. Notwithstanding a respondent's request that no press release be issued, the fact of the dismissal, including the names of the parties, shall be public information available on request.

(2) If the General Counsel determines that the matter involves the legality of local zoning or land use laws or ordinances, the General Counsel, in lieu of making a determination regarding reasonable cause, shall refer the investigative materials to the Attorney General for appropriate action under section 814(b)(1) of the Fair Housing Act, and shall notify the aggrieved person and the respondent of this action by certified mail or personal service.

(b) The General Counsel may not issue a charge under paragraph (a) of this section regarding an alleged discriminatory housing practice, if an aggrieved person has commenced a civil action under an Act of Congress or a State law seeking relief with respect to the alleged discriminatory housing practice, and the trial in the action has commenced. If a charge may not be issued because of the commencement of such a trial, the General Counsel will so notify the aggrieved person and the respondent by certified mail or personal service.

(c)(1) The General Counsel shall make the reasonable cause determination after the Assistant Secretary forwards the matter for consideration. The General Counsel shall make a reasonable cause determination within 100 days after filing of the complaint (or where the Assistant Secretary has reactivated a complaint, within 100 days after service of the notice of reactivation under § 103.115), unless it is impracticable to do so.

(2) If the General Counsel is unable to make the determination within the 100-day period specified in paragraph (c)(1) of this section, the Assistant Secretary will notify the aggrieved person and the respondent, by certified mail or personal service, of the reasons for the delay.

### § 103.405 Issuance of charge.

(a) A charge:

(1) Shall consist of a short and plain written statement of the facts upon which the General Counsel has found reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur;

(2) Shall be based on the final investigative report; and

(3) Need not be limited to facts or grounds that are alleged in the complaint filed under Subpart B of this part. If the charge is based on grounds that are alleged in the complaint, HUD will not issue a charge with regard to the

grounds unless the record of the investigation demonstrates that the respondent has been given notice and an opportunity to respond to the allegation.

(b) Within three business days after the issuance of the charge, the General Counsel shall:

(1) Obtain a time and place for hearing from the Chief Docket Clerk of the Office of Administrative Law Judges;

(2) File the charge along with the notifications described in § 104.410(b) with the Office of Administrative Law Judges;

(3) Serve the charge and notifications in accordance with 24 CFR 104.40; and

(4) Notify the Assistant Secretary of the filing of the charge.

### § 103.410 Election of civil action or provision of administrative proceeding.

(a) If a charge is issued under § 103.405, a complainant (including the Assistant Secretary, if HUD filed the complaint), a respondent, or an aggrieved person on whose behalf the complaint is filed may elect, in lieu of an administrative proceeding under 24 CFR Part 104, to have the claims asserted in the charge decided in a civil action under section 812(o) of the Fair Housing Act.

(b) The election must be made not later than 20 says after the receipt of service of the charge, or in the case of the Assistant Secretary, not later than 20 days after service. The notice of the election must be filed with the Chief Docket Clerk in the Office of Administrative Law Judges and served on the General Counsel, the Assistant Secretary, the respondent, and the aggrieved persons on whose behalf the complaint was filed. The notification will be filed and served in accordance with the procedures established under 24 CFR Part 104.

(c) If an election is not made under this section, the General Counsel will maintain an administrative proceeding based on the charge in accordance with the procedures under 24 CFR Part 104.

(d) If an election is made under this section, the General Counsel shall immediately notify and authorize the Attorney General to commence and maintain a civil action seeking relief under section 812(o) of the Fair Housing Act on behalf of the aggrieved person in an appropriate United States District Court. Such notification and authorization shall include transmission of the file in the case, including a copy of the final investigative report and the charge, to the Attorney General.

(e) The General Counsel shall be available for consultation concerning

**3298    Federal Register / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations**

any legal issues raised by the Attorney General as to how best to proceed in the event that a new court decision or newly discovered evidence is regarded as relevant to the reasonable cause determination.

**Subpart G—Prompt Judicial Action**

**§ 103.500    Prompt judicial action.**

(a) If at any time following the filing of a complaint, the General Counsel concludes that prompt judicial action is necessary to carry out the purposes of this part or 24 CFR Part 104, the General Counsel may authorize the Attorney General to commence a civil action for appropriate temporary or preliminary relief pending final disposition of the complaint. To ensure the prompt initiation of the civil action, the General Counsel will consult with the Assistant Attorney General for the Civil Rights Division before making the determination that prompt judicial action is necessary. The commencement of a civil action by the Attorney General under this section will not affect the initiation or continuation of proceedings under this part or administrative proceedings under Part 104.

(b) If the General Counsel has reason to believe that a basis exists for the commencement of proceedings against the respondent under section 814(a) of the Fair Housing Act (Pattern or Practice Cases), proceedings under section 814(c) of the Fair Housing Act (Enforcement of Subpoenas), or proceedings by any governmental licensing or supervisory authorities, the General Counsel shall transmit the information upon which that belief is based to the Attorney General and to other appropriate authorities.

**Subpart H—Other Action**

**§ 103.510    Other action by HUD.**

In addition to the actions described in § 103.500, HUD may pursue one or more of the following courses of action:

(a) Refer the matter to the Attorney General for appropriate action (e.g., enforcement of criminal penalties under section 811(c) of the Act).

(b) Take appropriate steps to initiate proceedings leading to the debarment of the respondent under 24 CFR Part 24, or initiate other actions leading to the imposition of administrative sanctions where HUD determines that such actions are necessary to the effective operation and administration of Federal programs or activities.

(c) Take appropriate steps to initiate proceedings under:

(1) 24 CFR Part 1, implementing Title VI of the Civil Rights Act of 1964;

(2) 24 CFR 570.912, implementing section 109 of the Housing and Community Development Act of 1974;

(3) 24 CFR Part 8, implementing section 504 of the Rehabilitation Act of 1973;

(4) 24 CFR Part 107, implementing Executive Order 11063; or

(5) The Age Discrimination Act, 42 U.S.C. 6101.

(d) Inform any other Federal, State or local agency with an interest in the enforcement of respondent's obligations with respect to nondiscrimination in housing.

**§ 103.515    Action by other agencies.**

In accordance with section 808 (d) and (e) of the Fair Housing Act and Executive Order No. 12259, other Federal agencies, including any agency having regulatory or supervisory authority over financial institutions, are responsible for ensuring that their programs and activities relating to housing and urban development are administered in a manner affirmatively to further the goal of fair housing, and for cooperating with the Assistant Secretary in furthering the purposes of the Fair Housing Act.

5. A new Part 104 is added to read as follows:

## PART 104—ADMINISTRATIVE PROCEEDINGS UNDER SECTION 812 OF THE FAIR HOUSING ACT

**Subpart A—General Information**

Sec.
104.10    Scope.
104.20    Definitions.
104.30    Time computations.
104.40    Service and filing.

**Subpart B—Administrative Law Judge**

104.100    Designation.
104.110    Authority.
104.120    Disqualification.
104.130    Ex Parte communications.
104.140    Separation of functions.

**Subpart C—Parties**

104.200    In general.
104.210    Representation.
104.220    Standards of conduct.

**Subpart D—Pleadings and motions**

104.400    In general.
104.410    The Charge.
104.420    Answer to charge.
104.430    Request for intervention.
104.440    Amendments and supplemental pleadings.
104.450    Motions.

**Subpart E—Discovery**

104.500    Discovery.
104.510    Depositions.
104.520    Use of Deposition at hearings.
104.530    Written interrogatories.

104.540    Production of documents and other evidence; entry upon land for inspection and other purposes; and physical and mental examinations.
104.550    Admissions.
104.560    Supplementation of responses.
104.570    Protective orders.
104.580    Failure to make or cooperate in discovery.

**Subpart F—Subpoenas**

104.590    Subpoenas.

**Subpart G—Prehearing procedures**

104.600    Prehearing statements.
104.610    Prehearing conference.
104.620    Settlement negotiations before a settlement judge.

**Subpart H—Hearing procedures**

104.700    Date and place of hearing.
104.710    Conduct of hearings.
104.720    Waiver of right to appear.
104.730    Evidence.
104.740    In camera and protective orders.
104.750    Exhibits.
104.760    Authenticity.
104.770    Stipulations.
104.780    Record of hearing.
104.790    Arguments and briefs.
104.800    End of hearing.
104.810    Receipt of evidence following hearing.

**Subpart I—Dismissals and Decisions**

104.900    Dismissal.
104.910    Initial decision of administrative law judge.
104.920    Service of initial decision.
104.925    Resolution of charge.
104.930    Final decision.
104.935    Action upon issuance of final decision.
104.940    Attorney's fees and costs.

**Subpart J—Judicial Review and Enforcement of Final Decision**

104.950    Judicial Review of Final Decision.
104.955    Enforcement of Final Decision.

Authority: Title VIII, Civil Rights Act of 1968 (42 U.S.C. 3600–3620); section 7(d), Department of Housing and Urban Development Act (42 U.S.C. 3535(d)).

**Subpart A—General Information**

**§ 104.10    Scope.**

(a) *Applicability.* This part contains the rules of practice and procedure established by the Department of Housing and Urban Development for administrative proceedings before an Administrative Law Judge adjudicating the claims asserted in a charge issued under 24 CFR Part 103, where no party—the complainant, the respondent, or an aggrieved party—elects to have the claims decided in a civil action under section 812(o) of the Fair Housing Act.

(b) *General application of rules.* Hearings under this subpart shall be conducted as expeditiously as possible, and inexpensively as possible, consistent with the needs and rights of the parties

to obtain a fair hearing and a complete record.

(c) *Conduct of proceedings.* The Department will reasonably accommodate persons with disabilities who are participants in the hearing process or interested members of the general public.

### § 104.20 Definitions.

*Aggrieved person* includes any person who:

(a) Claims to have been injured by a discriminatory housing practice; or

(b) Believes that such person will be injured by a discriminatory housing practice that is about to occur.

*Attorney General* means the Attorney General of the United States.

*Complainant* means the person (including the Assistant Secretary for Fair Housing and Equal Opportunity) who filed the complaint under 24 CFR Part 103.

*Complaint* means a complaint filed under 24 CFR Part 103.

*Charge* means the statement of facts issued under 24 CFR 103.405 upon which HUD has found reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur.

*Discriminatory housing practice* means an act that is unlawful under section 804, 805, 806 or 818 of the Fair Housing Act.

*Fair Housing Act* means Title VIII of the Civil Rights Act of 1968, 42 U.S.C. 3600–3620.

*General Counsel* means the General Counsel of HUD.

*Hearing* means that part of an administrative proceeding that involves the submission of evidence, either by oral presentation or written submission, and includes the submission of briefs and oral arguments on the evidence and applicable law.

*HUD* means the United States Department of Housing and Urban Development.

*Party* means a person or agency named or admitted as a party to a proceeding. Party includes an aggrieved person who intervenes under § 104.430.

*Person* includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11 of the United States Code, receivers and fiduciaries.

*Personal service* means handing a copy of the document to the person to be served or leaving a copy of the document with a person of suitable age and discretion at the place of business,

residence or usual place of abode of the person to be served.

*Prevailing party* has the same meaning as the term has in section 722 of the Revised Statutes of the United States (42 U.S.C. 1988).

*Respondent* means the person accused in a charge of discriminatory housing practice.

*State* means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, or any of the territories and possessions of the United States.

### § 104.30 Time computations.

(a) *In general.* In computing time under this part, the time period begins the day following the act, event, or default and includes the last day of the period, unless the last day is a Saturday, Sunday, or legal holiday observed by the Federal Government, in which case the time period includes the next business day. When the prescribed time period is seven days or less, intermediate Saturdays, Sundays, and legal holidays shall be excluded from the computation.

(b) *Modification of time periods.* Except for time periods required by statute, the administrative law judge may enlarge or reduce any time period required under this part where necessary to avoid prejudicing the public interest or the rights of the parties.

(c) *Entry of orders.* In computing any time period involving the date of the issuance of an order or decision by an administrative law judge, the date of issuance is the date the order or decision is served by the Chief Docket Clerk.

(d) *Computation of time for delivery by mail.* (1) Documents are not filed until received by the Chief Docket Clerk. However, when documents are filed by mail, three days shall be added to the prescribed time period.

(2) Service is effected at the time of mailing.

(3) When a party has the right or is required to take an action within a prescribed period after the service of a document upon the party, and the document is served by mail, three days shall be added to the prescribed period.

### § 104.40 Service and filing.

(a) *Generally.* Copies of all filed documents shall be served on all parties of record. All filed documents shall clearly designate the docket number, if any, and title of the proceeding. All documents to be filed shall be delivered or mailed to the Chief Docket Clerk, Office of Administrative Law Judges,

Room 2158, 451 Seventh Street, SW., Washington, DC 20410.

(b) *By parties.* Parties shall file all documents with the Office of Administrative Law Judges with a copy to all other parties of record. Service of documents upon any party may be made by personal service or by mailing a copy to the last known address. When a party is represented by an attorney, service shall be made upon the attorney. The person serving the document shall certify to the manner and date of service.

(c) *By the Office of Administrative Law Judges.* The Office of Administrative Law Judges shall serve all notices, orders, decisions and all other documents by mail to the last known address.

## Subpart B—Administrative Law Judge

### § 104.100 Designation.

Proceedings under this part shall be presided over by an administrative law judge appointed under 5 U.S.C. 3105. The presiding administrative law judge shall be designated by the chief administrative law judge at HUD.

### § 104.110 Authority.

The administrative law judge shall have all powers necessary to the conduct of fair and impartial hearings including, but not limited to, the power:

(a) To conduct hearings in accordance with this part.

(b) To administer oaths and affirmations and examine witnesses.

(c) To issue subpoenas in accordance with § 104.590.

(d) To rule on offers of proof and receive evidence.

(e) To take depositions or have depositions taken when the ends of justice would be served.

(f) To regulate the course of the hearing and the conduct of parties and their counsel.

(g) To hold conferences for the settlement or simplification of the issues by consent of the parties.

(h) To dispose of motions, procedural requests, and similar matters.

(i) To make initial decisions as described under Subpart I of this Part.

(j) To exercise such powers vested in the Secretary as are necessary and appropriate for the purpose of the hearing and conduct of the proceeding.

### § 104.120 Disqualification.

(a) *Disqualification.* If an administrative law judge finds that there is a basis for his or her disqualification in a proceeding, the Administrative law judge shall withdraw from the proceeding. Withdrawal is

accomplished by entering a notice in the record and by providing a copy of the notice to the chief administrative law judge.

(b) *Motion for recusal.* If a party believes that the presiding administrative law judge should be disqualified in a proceeding for any reason, the party may file a motion to recuse with the administrative law judge. The motion shall be supported by an affidavit setting forth the alleged grounds for disqualification. The administrative law judge shall rule on the motion. If the administrative law judge denies the motion, the administrative law judge shall incorporate a written statement of the reasons for the denial in the record.

(c) *Redesignation of administrative law judge.* If an administrative law judge is disqualified, the chief administrative law judge shall designate another administrative law judge to preside over further proceedings.

### § 104.130  Ex Parte communications.

(a) *General.* An ex parte communication is any direct or indirect communication concerning the merits of a pending proceeding, made by a party in the absence of any other party, to the administrative law judge assigned to the proceeding and which was neither on the record nor on reasonable prior notice to all parties. Ex parte communications do not include communications made for the sole purpose of scheduling hearings, requesting extensions of time, or requesting information on the status of cases.

(b) *Prohibition.* Ex parte communications are prohibited.

(c) *Procedure upon receipt.* If the administrative law judge receives an ex parte communication that the administrative law judge knows or has reason to believe is prohibited, the administrative law judge shall promptly place the communication, or a written statement of the substance of the communication, in the record and shall furnish copies to all parties. Unauthorized communications shall not be taken into consideration in deciding any matter in issue. Any party making a prohibited ex parte communication may be subject to sanctions including, but not limited to, exclusion from the proceeding, and adverse ruling on the issue that is the subject of the prohibited communication.

### § 104.140  Separation of functions.

No officer, employee, or agent of the Federal Government engaged in the performance of investigative, conciliatory, or prosecutorial functions

in connection with the proceeding shall, in that proceeding or any factually related proceeding other than part, participate or advise in the decision of the administrative law judge, except as a witness or counsel during the proceedings.

### Subpart C—Parties

### § 104.200  In general.

(a) *Parties.* Parties to the proceeding include:

(1) HUD. HUD files the charge under 24 CFR 103.405 seeking appropriate relief for an aggrieved party and vindication of the public interest.

(2) Respondent. A respondent is a person named in the charge issued under 24 CFR 103.405 against whom relief is sought.

(3) Intervenors. Any aggrieved person may file a request for intervention under § 104.430. Intervention shall be permitted if the request is timely and;

(i) The intervenor is the aggrieved person on whose behalf the charge is issued; or

(ii) The intervenor is an aggrieved person who claims an interest in the property or transaction that is the subject of the charge and the disposition of the charge may as a practical matter impair or impede the aggrieved person's ability to protect that interest, unless the aggrieved person is adequately represented by the existing parties.

(b) *Rights of parties.* Each party may appear in person, be represented by counsel, examine or cross-examine witnesses, introduce documentary or other relevant evidence into the record, and request the issuance of subpoenas.

(c) *Amicus Curiae.* Briefs of amicus curiae may be permitted at the discretion of the administrative law judge. Such participants are not parties to the proceeding.

### § 104.210  Representation.

(a) *Representation of HUD.* HUD is represented by the General Counsel.

(b) *Representation of other parties.* Other parties may be represented as follows:

(1) Individuals may appear on their own behalf.

(2) A member of a partnership may represent the partnership.

(3) An officer of a corporation, trust or association may represent the corporation, trust or association.

(4) An Officer or employee of any governmental unit, agency or authority may represent that unit, agency or authority.

(5) An attorney admitted to practice before a Federal Court or the highest court in any State. The attorney's

representation that he or she is in good standing before any of these courts is sufficient evidence of the attorney's qualifications under this section, unless otherwise ordered by the administrative law judge.

(c) *Notice of appearance.* Each attorney or other representative of a party shall file a notice of appearance. The notice must indicate the party of whose behalf the appearance is made. Any individual acting in a representative capacity may be required by the administrative law judge to demonstrate authority to act in that capacity.

(d) *Withdrawal.* An attorney or other representative of a party must file a written notice of intent before withdrawing from participation in the proceeding.

### § 104.220  Standards of conduct.

(a) *In general.* All persons appearing in proceedings under this part shall act with integrity and an ethical manner.

(b) *Exclusion.* The administrative law judge may exclude parties or their representatives for refusal to comply with directions, continued use of dilatory tactics, refusal to adhere to reasonable standards of orderly and ethical conduct, failure to act in good faith, or violations of the prohibitions against ex parte communications. If an attorney is suspended or barred from participation in a proceeding by an administrative law judge, the administrative law judge shall include in the record the reasons for the action. An attorney that is suspended or barred from participation may appeal to the chief administrative law judge. The proceeding will not be delayed or suspended pending disposition on the appeal, except that the administrative law judge shall suspend the proceeding for a reasonable time to enable the party to obtain another attorney.

### Subpart D—Pleadings and motions

### § 104.00  In general.

(a) *Form.* Every pleading, motion, brief, or other document shall contain a caption setting forth the title of the proceeding, the docket number assigned by the Office of Administrative Law Judges, and the designation of the type of document (*e.g.,* charge, answer or motion to dismiss).

(b) *Signature.* Every pleading, motion, brief, or other document filed by a party shall be signed by the party, the party's representative, or the attorney representing the party, and must include the signer's address and telephone number. The signature constitutes a

certification that the signer has read the document; that to the best of the signer's knowledge, information and belief there is good ground to support the document; and that it is not interposed for delay.

(c) *Timely filing.* The administrative law judge may refuse to consider any motion or other pleading that is not filed in a timely fashion and in compliance with this part.

### § 104.410   The charge.

(a) *Filing and service.* Within three days after the issuance of a charge under 24 CFR 103.405, the General Counsel shall file the charge with the Chief Docket Clerk in the Office of Administrative Law Judges and serve copies (with the additional information required under paragraph (b) of this section) on the respondent and the aggrieved person on whose behalf the complaint was filed.

(b) *Contents.* The charge shall consist of a short and plain written statement of the facts upon which the General Counsel has found reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur. The following notifications shall be served with the charge:

(1) The notice shall state that a complainant (including HUD, if HUD filed the complaint), a respondent, or an aggrieved person on whose behalf the complaint was filed may elect to have the claims asserted in the charge decided in a civil action under section 812(o) of the Act, in lieu of an administrative proceeding under this part. The notice shall state that the election must be made not later than 20 days after the receipt of the service of the charge. Where HUD is the complainant, the Assistant Secretary must make the election not later than 20 days after the service of the charge. The notice shall state that the notification of the election must be served on the Chief Docket Clerk in the Office of Administrative Law Judges, the respondent, the aggrieved party on whose behalf the complaint was filed, the Assistant Secretary and the General Counsel.

(2) The notice shall state that if no person timely elects under paragraph (b)(1) of this section to have the claims asserted in the charge decided in a civil action under section 812(o) of the Act, an administrative proceeding will be conducted. The notice shall state that if an administrative hearing is conducted:

(i) The parties will have an opportunity for a hearing at a date and place specified in the notice.

(ii) The respondent will have an opportunity to file an answer to the

charge within 30 days of the date of service of the charge.

(iii) The aggrieved person may participate as a party to the administrative proceeding by filing a timely request for intervention.

(iv) All discovery must be concluded 15 days before the date set for hearing.

(3) The notice shall state that if at any time following the service of the charge on the respondent, the respondent intends to enter into a contract, sale, encumbrance, or lease with any person regarding the property that is the subject of the charge, the respondent must provide a copy of the charge to the person before the respondent and the person enter into the contract, sale, encumbrance or lease.

### § 104.20   Answer to charge.

Within the 30 days after the service of the charge, a respondent contesting material facts alleged in a charge or contending that the respondent is entitled to judgement as a matter of law shall file an answer to the charge. An answer shall include:

(a) A statement that the respondent admits, denies, or does not have and is unable to obtain sufficient information to admit or deny, each allegation made in the charge. A statement of lack of information shall have the effect of a denial. Any allegation that is not denied shall be deemed to be admitted.

(b) A statement of each affirmative defense and a statement of facts supporting each affirmative defense.

### § 104.30   Request for intervention.

Upon timely application, any aggrieved person may file a request for intervention to participate as a party to the proceeding. Requests for intervention submitted within 30 days after the filing of the charge shall be considered to be timely filed.

### § 104.440   Amendments and supplemental pleadings.

(a) *Amendments*—(1) By right. HUD may amend its charge once as a matter of right prior to filing of the answer.

(2) *By leave.* Upon such conditions as are necessary to avoid prejudicing the public interest and the rights of the parties, the administrative law judge may allow amendments to pleadings upon motion of the party.

(3) *Conformance to the evidence.* When issues not raised by the pleadings are reasonably within the scope of the original charge and have been tried by the express or implied consent of the parties, the issues shall be treated in all respects as if they had been raised in the pleadings and amendments may be

made as necessary to make the pleading conform to evidence.

(b) *Supplemental pleadings.* The administrative law judge may, upon reasonable notice, permit supplemental pleadings concerning transactions, occurrences or events that have happened or been discovered since the date of the pleadings and which are relevant to any of the issues involved.

### § 104.450   Motions.

(a) *Motions.* Any application for an order or other request shall be made by a motion which, unless made during an appearance before the administrative law judge, shall be made in writing. Motions or requests made during an appearance before the administrative law judge shall be stated orally and made a part of the transcript. All parties shall be given a reasonable opportunity to respond to written or oral motions or requests.

(b) *Answers to written motions.* Within five days after a written motion is served, any party to the proceeding may file an answer in support of, or in opposition to the motion. Unless otherwise ordered by the administrative law judge, no further responsive documents may be filed.

(c) *Oral argument.* The administrative law judge may order oral argument on any motion.

## Subpart E—Discovery

### § 104.500   Discovery.

(a) *In general.* This subpart governs discovery in aid of administrative proceedings under this Part. Except for time periods stated in these rules, to the extent that these rules conflict with discovery procedures in aid of civil actions in the United States District Court for the District in which the investigation of the discriminatory housing practice took place, the rules of the United States District Court apply.

(b) *Scope.* The parties are encouraged to engage in voluntary discovery procedures. Discovery shall be conducted as expeditiously and inexpensively as possible, consistent with the needs of all parties to obtain relevant evidence. Unless otherwise ordered by the administrative law judge, the parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the proceeding, including the existence, description, nature, custody, condition, and location of documents or persons having knowledge of any discoverable matter. It is not grounds for objection that information sought will not be admissible if the information

sought appears reasonably calculated to lead to the discovery of admissible evidence.

(c) *Methods.* Parties may obtain discovery by one or more of the following methods:

(1) Deposition upon oral examination or written questions.

(2) Written interrogatories.

(3) Requests for the production of documents or other evidence, for inspection and other purposes, and physical and mental examinations.

(4) Requests for admissions.

(d) *Frequency and sequence.* Unless otherwise ordered by the administrative law judge or restricted by this subpart, the frequency or sequence of these methods is not limited.

(e) *Completion of discovery.* All discovery shall be completed 15 days before the date scheduled for hearing.

(f) *Not intervening aggrieved person.* For the purposes of obtaining discovery from a non-intervening aggrieved person, the term "party" as used in this subpart includes the aggrieved person on whose behalf the charge was issued.

### § 104.510  Depositions.

(a) *In general.* Depositions may be taken upon oral examination or upon written interrogatory before any person having the power to administer oaths.

(b) *Notice.* Any party desiring to take the deposition of a witness shall indicate to the witness and to all parties the time and place of the deposition, the name and post office address of the person before whom the deposition is to be taken, the name and address of the witness, and the subject matter of the testimony of the witness. Notice of the taking of a deposition shall be given not less than five days before the deposition is scheduled. The attendance of a witness may be compelled by subpoena under § 104.590.

(c) *Procedure at deposition.* Each witness deposed shall be placed under oath or affirmation, and other parties shall have the right to cross-examine. The questions propounded and all answers and objections made to the propounded questions shall be reduced to writing; read by or to, and subscribed by, the witness; and certified by the person before whom the deposition was taken.

(d) *Objections.* During a deposition, a party or deponent may request suspension of the deposition on grounds of bad faith in the conduct of the examination, oppression of a deponent or party, or improper questioning or conduct. Upon the request for suspension, the deposition will be adjourned. The objecting party or deponent must immediately move the

administrative law judge for a ruling on the objections. The administrative law judge may then limit the scope or manner of taking the deposition.

(e) *Payment of costs of deposition.* The party requesting the deposition shall bear all costs of the deposition.

### § 104.520  Use of deposition at hearings.

(a) *In general.* At the hearing, any part or all of a deposition, so far as admissible under the Federal Rules of Evidence, may be used against any party who was present or represented at the taking of the deposition or who had due notice of the taking of the deposition, in accordance with the following provisions:

(1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of the deponent as a witness.

(2) The deposition of expert witnesses, may be used by any party for any purpose, unless the administrative law judge rules that such use is unfair or a violation of due process.

(3) The deposition of a party or of anyone who at the time of the taking of the deposition was an officer, director, or duly authorized agent of a public or private corporation, partnership, or association that is a party, may be used by any other party for any purpose.

(4) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the administrative law judge finds:

(i) That the witness is dead;

(ii) That the witness is out of the United States or more than 100 miles from the place of hearing, unless it appears that the absence of the witness was procured by the party offering the deposition;

(iii) That the witness is unable to attend to testify because of age, sickness, infirmity, or imprisonment;

(iv) That the party offering the deposition has been unable to procure the attendance of the witness by subpoena; or

(v) Whenever exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open hearing, to allow the deposition to be used.

(5) If a part of a deposition is offered in evidence by a party, any other party may require the party to introduce all of the deposition that is relevant to the part introduced. Any party may introduce any other part of the deposition.

(6) Substitution of parties does not affect the right to use depositions previously taken. If a proceeding has

been dismissed and another proceeding involving the same subject matter is later brought between the same parties or their representatives or successors in interest, all depositions lawfully taken in the former proceeding may be used in the latter proceeding.

(b) *Objections to admissibility.* Except as provided in this paragraph, objection may be made at the hearing to receiving in evidence any deposition or part of a deposition for any reason that would require the exclusion of the evidence if the witness were present and testifying.

(1) Objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the basis of the objection is one which might have been obviated or removed if presented at that time.

(2) Errors and irregularities occurring at the oral examination in the manner of taking the deposition, in the form of the questions or answers, in the oath or affirmation, or in the conduct of parties, and errors of any kind which might be obviated, removed or cured if promptly presented, are waived unless reasonable objection is made at the taking of the deposition.

(3) Objections to the form of written interrogatories are waived unless served in writing upon the party propounding the interrogatories.

### § 104.530  Written interrogatories.

(a) *Written interrogatories to parties.* Any party may serve on any other party written interrogatories to be answered by the party served. If the party served is a public or private corporation, a partnership, an association, or a governmental agency, the interrogatories may be answered by any authorized officer or agent who shall furnish such information as may be available to the party. A party may serve not more than 30 written interrogatories on another party without an order of the administrative law judge.

(b) *Responses to written interrogatories.* Each interrogatory shall be answered separately and fully in writing under oath or affirmation, unless the party objects to the interrogatory. If a party objects to an interrogatory, the response shall state the reasons for the objection in lieu of an answer. The answer and objections shall be signed by the person making them, except that objections may be signed by the counsel for the party. The party upon whom the interrogatories were served shall serve a copy of the answers and objections upon all parties within 15 days after service of the interrogatories.

## § 104.540 Production of documents and other evidence; entry upon land for inspection and other purposes; and physical and mental examinations.

(a) *In general.* Any party may serve on any other party a request to:

(1) Produce and permit the party making the request, or a person acting on the party's behalf, to inspect and copy any designated documents, or to inspect and copy, test, or sample any tangible things that are in the possession, custody, or control of the party upon whom the request is served;

(2) Permit entry upon designated land or other property in the possession or control of the party upon whom the request is served for the purpose of inspection and measuring, photographing, testing, or other purposes stated in paragraph (a)(1) of this section; or

(3) Submit to a physical or mental examination by a physician.

(b) *Contents of request.* The request shall:

(1) Set forth the items to be inspected by individual item or by category of items;

(2) Describe each item or category with reasonable particularity;

(3) Specify a reasonable time, place and manner for making the inspection and performing the related acts; and

(4) Specify the time, place, manner, conditions, and scope of the physical or mental examination, and the person or persons who will make the examination. A report of the examining physician shall be made in accordance with Rule 35(b) of the Federal Rules of Civil Procedure.

(c) *Response to request.* Within 15 days of the service of the request, the party upon whom the request is served shall serve a written response on the party submitting the request. The response shall state, with regard to each item or category:

(1) That inspection and related activities will be permitted as requested; or

(2) That objection is made to the request in whole or in part. If an objection is made, the response must state the reasons for the objection.

## § 104.550 Admissions.

(a) *Request for admissions.* A party may serve on any other party a written request for the admission of the genuineness and authenticity of any relevant document described in or attached to the request, or for the admission of the truth of any specified relevant matter of fact.

(b) *Response to request.* (1) Each matter for which an admission is requested is admitted unless, within 15 days after service of the request, the party to whom the request is directed serves on the requesting party:

(i) A written statement specifically denying the relevant matters for which an admission is requested;

(ii) A written statement setting forth in detail why the party cannot truthfully admit or deny the matters; or

(iii) Written objections to the request alleging that the matters are privileged or irrelevant, or that the request is otherwise improper.

(2) The party to whom the request is directed may not give lack of information or knowledge as a reason for failure to admit or deny, unless the party states that it has made a reasonable inquiry and that the information known or readily obtainable is insufficient to enable the party to admit or deny.

(c) *Sufficiency or response.* The party requesting admissions may move for a determination of the sufficiency of the answers or objections. Unless the administrative law judge determines that an objection is justified, the administrative law judge shall order that an answer be served. If the administrative law judge determines that an answer does not comply with the requirements of this section, the administrative law judge may order either that the matter is admitted or that an amended answer be served.

(d) *Effect of admission.* Any matter admitted under this section is conclusively established unless, upon the motion of a party, the administrative law judge permits the withdrawal or amendment of the admission. Any admission made under this section is made for the purposes of the pending proceeding only, is not an admission by the party for any other purpose, and may not be used against the party in any other proceeding.

(e) *Service of requests.* Each request for admission and each written response must be served on all parties and filed with the Office of administrative law judges.

## § 104.560 Supplementation of responses.

(a) *In general.* A party who responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information acquired after the response was made except:

(1) A party is under a duty to timely supplement responses with respect to any question directly addressed to:

(i) The identity and location of persons having knowledge of discoverable matters; and

(ii) The identity of each person expected to be called as an expert witness at the hearing, the subject matter on which the expert witness is expected to testify, and the substance of the testimony.

(2) A party is under a duty to timely amend a previous response if the party later obtains information upon the basis of which:

(i) The party knows the response was incorrect when made; or

(ii) The party knows the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is, in substance, a knowing concealment.

(b) *By order or agreement.* A duty to supplement responses may be imposed by order of the administrative law judge or by agreement of the parties.

## § 104.570 Protective orders.

Upon motion of a party or a person from whom discovery is sought or in accordance with § 104.580(c), the administrative law judge may make appropriate orders to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense as a result of the requested discovery request. The order may direct that:

(a) The discovery may not be had;

(b) The discovery may be had only on specified terms and conditions, including a designation of time and place for discovery;

(c) The discovery may be had by a method of discovery other than that selected by the party seeking discovery;

(d) Certain irrelevant matters may not be the subject of discovery, or that the scope of discovery be limited to certain matters;

(e) Discovery may be conducted with no one present other than persons designated by the administrative law judge;

(f) A trade secret or other confidential research, development or commercial information may not be disclosed, or may be disclosed only in a designated way; or

(g) To protect privileged matters, the administrative law judge may take such other action permitted under § 104.740.

## § 104.580 Failure to make or cooperate in discovery.

(a) *Motion to compel discovery.* If a deponent fails to answer a question propounded, or a party upon whom a request is made under §§ 104.530 through 104.550 fails to respond adequately, objects to a request, or fails to permit inspection as requested, the discovering party may move the administrative law judge for an order

compelling a response or an inspection in accordance with the request. The motion shall:

(1) State the nature of the request;

(2) Set forth the response or objection of the party upon whom the request was served;

(3) Present arguments supporting the motion; and

(4) Attach copies of all relevant discovery requests and responses.

(b) *Evasive or incomplete answers.* For the purposes of this section, an evasive or incomplete answer or response will be treated as a failure to answer or respond.

(c) *Administrative law judge ruling.* In ruling on a motion under this section, the administrative law judge may enter an order compelling a response or an inspection in accordance with the request, may issue sanctions under paragraph (d) of this section, or may enter a protective order under § 104.570.

(d) *Sanctions.* If a party fails to comply with an order (including an order for taking a deposition, the production of evidence within the party's control, a request for admission, or the production of witnesses) the administrative law judge may:

(1) Draw an inference in favor of the requesting party with regard to the information sought;

(2) Prohibit the party failing to comply with the order from introducing evidence concerning, or otherwise relying upon, testimony relating to the information sought;

(3) Permit the requesting party to introduce secondary evidence concerning the information sought;

(4) Strike any appropriate part of the pleadings or other submissions of the party failing to comply with such order; or

(5) Take such other action as may be appropriate.

## Subpart F—Subpoenas

### § 104.590 Subpoenas

(a) *In general.* This section governs the issuance of subpoenas in administrative proceedings under this part. Except for time periods stated in these rules, to the extent that this rule conflicts with procedures for the issuance of subpoenas in civil actions in the United States District Court for the District in which the investigation of the discriminatory housing practice took place, the rules of the United States District Court apply.

(b) *Issuance of subpoena.* Upon the written request of a party, the chief administrative law judge or the presiding administrative law judge may issue a subpoena requiring:

(1) The attendance of a witness for the purpose of giving testimony at a deposition;

(2) The attendance of a witness for the purpose of giving testimony at a hearing; and

(3) The production of relevant books, papers, documents or tangible things.

(c) *Time of request.* Requests for subpoenas in aid of discovery must be submitted in time to permit the conclusion of discovery 15 days before the date scheduled for the hearing. If a request for subpoenas of a witness for testimony at a hearing is submitted three days or less before the hearing, the subpoena shall be issued at the discretion of the chief administrative law judge or the presiding administrative law judge, as appropriate.

(d) *Service.* A subpoena may be served by any person who is not a party and is not less than 18 years of age. Service on a person shall be made by delivering a copy of the subpoena to the person and by tendering witness fees and mileage to that person. When the subpoena is issued on behalf of HUD, witness fees and mileage need not be tendered with the subpoena.

(e) *Amount of witness fees and mileage.* A witness summoned by a subpoena issued under this part is entitled to the same witness and mileage fees as a witness in proceedings in United States District Courts. Fees payable to a witness summoned by a subpoena shall be paid by the party requesting the issuance of the subpoena, or where the administrative law judge determines that a party is unable to pay the fees, the fees shall be paid by the Department.

(f) *Motion to quash or limit subpoena.* Upon a motion by the person served with a subpoena or by a party, made within five days of the service of the subpoena (but in any event not less than the time specified in the subpoena for compliance), the administrative law judge may:

(1) quash or modify the subpoena if it is unreasonable and oppressive or for other good cause shown; or

(2) condition denial of the motion upon the advancement, by the party on whose behalf the subpoena was issued, of the reasonable cost of producing subpoenaed books, papers or documents. Where the circumstances require, the administrative law judge may act upon such a motion at any time after a copy of the motion has been served upon the party on whose behalf the subpoena was issued.

(g) *Failure to comply with subpoena.* If a person fails to comply with a subpoena issued under this section, the party requesting the subpoena may refer the matter to the Attorney General for enforcement in appropriate proceedings under section 814(c) of the Fair Housing Act.

## Subpart G—Prehearing Procedures

### § 104.600 Prehearing statements.

(a) *In general.* Before the commencement of the hearing, the administrative law judge may direct parties to file prehearing statements.

(b) *Contents of statement.* The prehearing statement must state the name of the party or parties presenting the statement and, unless otherwise directed by the administrative law judge, briefly set forth the following:

(1) Issues involved in the proceeding.

(2) Facts stipulated by the parties and a statement that the parties have made a good faith effort to stipulate to the greatest extent possible.

(3) Facts in dispute.

(4) Witnesses (together with a summary of the testimony expected) and exhibits to be presented at the hearing.

(5) A brief statement of applicable law.

(6) Conclusions to be drawn.

(7) Estimated time required for presentation of the party's case.

(8) Such other information as may assist in the disposition of the proceeding.

### § 104.610 Prehearing conference.

(a) *In general.* Before the commencement or during the course of the hearing, the administrative law judge may direct the parties to participate in a conference to expedite the hearing.

(b) *Matters considered.* At the conference, the following matters may be considered:

(1) Simplification and clarification of the issues.

(2) Necessary amendments to the pleadings.

(3) Stipulations of fact and of the authenticity, accuracy, and admissibility of documents.

(4) Limitations on the number of witnesses.

(5) Negotiation, compromise, or settlement of issues.

(6) The exchange of proposed exhibits.

(7) Matters of which official notice will be requested.

(8) A schedule for the completion of actions discussed at the conference.

(9) Such other information as may assist in the disposition of the proceeding.

(c) *Conduct of conference.* The conference may be conducted by telephone, correspondence or personal attendance. Conferences, however, shall generally be conducted by a conference call, unless the administrative law judge determines that this method is impracticable. The administrative law judge shall give reasonable notice of the time, place and manner of the conference.

(d) *Record of conference.* Unless otherwise derected by the administrative law judge, the conference will not be stenographically recorded. The administrative law judge will reduce the actions taken at the conference to a written order or, if the conference takes place less than seven days before the beginning of the hearing, may make a statement on the record summarizing the actions taken at the conference.

### § 104.620  Settlement negotiations before a settlement judge.

(a) *Appointment of settlement judge.* The administrative law judge, upon the motion of a party or upon his or her own motion, may request the chief administrative law judge to appoint another administrative law judge to conduct settlement negotiations. The order appointing the settlement judge may confine the scope of settlement negotiations to specified issues. The order shall direct the settlement judge to report to the chief administrative law judge within specified time periods.

(b) *Duties of settlement judge.* (1) The settlement judge shall convene and preside over conferences and settlement negotiations between the parties and assess the practicalities of a potential settlement.

(2) The settlement judge shall report to the chief administrative law judge describing the status of the settlement negotiations, evaluating settlement prospects, and recommending the termination or continuation of the settlement negotiations.

(c) *Termination of settlement negotiations.* Settlement negotiations shall terminate upon the order of the chief administrative law judge issued after consultation with the settlement judge. The conduct of settlement negotiations shall not unduly delay the commencement of the hearing.

## Subpart H—Hearing Procedures

### § 104.700  Date and place of hearing.

(a) *Date.* The hearing shall commence not later than 120 days following the issuance of the charge under § 103.405, unless it is impracticable to do so. If the hearing cannot be commenced within this time period, the administrative law judge shall notify in writing all parties, the aggrieved persons on whose behalf the charge was filed, and the Assistant Secretary, of the reasons for the delay.

(b) *Place.* The hearing will be conducted at a place in the vicinity in which the discriminatory housing practice is alleged to have occurred or to be about to occur.

(c) *Notification of time and place for hearing.* The charge issued under 24 CFR 103.405 will specify the time, date and place for the hearing. The administrative law judge may change the time, date or place of the hearing, or may temporarily adjourn or continue a hearing for good cause shown. If such a change is made or the hearing is temporarily adjourned, the administrative law judge shall give the parties at least five days notice of the revised time, date and place for the hearing, unless otherwise agreed by the parties.

### § 104.710  Conduct of hearings.

The hearing shall be conducted in accordance with the Administrative Procedure Act (5 U.S.C. 551–559).

### § 104.720  Waiver of right to appear.

If all parties waive their right to appear before the administrative law judge or to present evidence and arguments, it is not necessary for the administrative law judge to conduct an oral hearing. Such waivers shall be made in writing and filed with the administrative law judge. Where waivers are submitted by all parties, the administrative law judge shall make a record of the relevant written evidence submitted by the parties and pleadings submitted by the parties with respect to the issues in the proceeding. These documents shall constitute the evidence in the proceeding and the decision shall be based upon this evidence. Such hearings shall be deemed to commence on the first day that written evidence may be submitted for the record.

### § 104.730  Evidence.

The Federal Rules of Evidence apply to the presentation of evidence in hearings under this part.

### § 104.740  In camera and protective orders.

The administrative law judge may limit discovery or the introduction of evidence, or may issue such protective or other orders necessary to protect privileged communications. If the administration law judge determines that information in documents containing privileged matters should be made available to a party, the administrative law judge may order the preparation of a summary or extract of the nonprivileged matter contained in the original.

### § 104.750  Exhibits.

(a) *Identification.* All exhibits offered into evidence shall be numbered sequentially and marked with a designation identifying the party offering the exhibit.

(b) *Exchange of exhibits.* One copy of each exhibit offered into evidence must be furnished to each of the parties and to the administrative law judge. If the administrative law judge does not fix a time for the exchange of exhibits, the parties shall exchange copies of exhibits at the earliest practicable time before the commencement of the hearing. Exhibits submitted as rebuttal evidence are not required to be exchanged before the commencement of the hearing if the submission of such evidence could not reasonably be anticipated at that time.

### § 104.760  Authenticity.

The authenticity of all documents furnished to the parties as required under § 104.750 and submitted as proposed exhibits in advance of the hearing shall be admitted unless a party files a written objection to the exhibit before the commencement of the hearing. Upon a clear showing of good cause for failure to file such a written objection, the administrative law judge may permit the party to challenge the authenticity.

### § 104.770  Stipulations.

The parties may stipulate to any pertinent facts by oral agreement at the hearing or by written agreement at any time. Stipulations may be submitted into evidence at any time before the end of the hearing. When received into evidence, the stipulation is binding on the parties.

### § 104.780  Record of hearing.

(a) *Hearing record.* All oral hearings shall be recorded and transcribed by a reporter designated by, and under the supervision of, the administrative law judge. The original transcript shall be a part of the record and shall constitute the sole official transcript. All exhibits introduced as evidence shall be marked for identification and incorporated as a part of the record. Transcripts may be obtained by the parties and by the public from the official reporter at rates not to exceed the applicable rates fixed by the contract with the reporter.

(b) *Corrections.* Corrections to the official transcript will be permitted upon motion of a party. Motions for correction must be submitted within five days of

the receipt of the transcript. Corrections of the official transcript will be permitted only where errors of substance are involved and upon the approval of the administrative law judge.

### § 104.790   Arguments and briefs.

(a) *Arguments.* Following the submission of evidence at an oral hearing, the administrative law judge may hear oral arguments at the hearing. The administrative law judge may limit the time permitted for such arguments to avoid unreasonable delay.

(b) *Submission of written briefs.* The administrative law judge may permit the submission of written briefs following the adjournment of the oral hearing. Written briefs shall be simultaneously filed by all parties and shall be due not later than 30 days following the adjournment of the oral hearing.

### § 104.800   End of hearing.

(a) *Oral hearings.* Where there is an oral hearing, the hearing ends on the day of the adjournment of the oral hearing or, where written briefs are permitted, on the date that the written briefs are due.

(b) *Hearing on written record.* Where the parties have waived an oral hearing, the hearing ends on the date set by the administrative law judge as the final date for the receipt of submissions by the parties.

### § 104.810   Receipt of evidence following hearing.

Following the end of the hearing, no additional evidence may be accepted into the record, except with the permission of the administrative law judge. The administrative law judge may receive additional evidence upon a determination that new and material evidence was not readily available before the end of the hearing, the evidence has been timely submitted, and its acceptance will not unduly prejudice the rights of the parties. However, the administrative law judge shall include in the record any motions for attorney's fees (including supporting documentation), and any approved corrections to the transcripts.

### Subpart I—Dismissals and Decisions

### § 104.900   Dismissal.

(a) *Election of judicial determination.* If the complainant, the respondent, or the aggrieved person on whose behalf a complaint was filed makes a timely election to have the claims asserted in the charge decided in a civil action under section 812(o) of the Act, the administrative law judge shall dismiss the administrative proceeding.

(b) *Effect of a civil action on administrative proceeding.* An administrative law judge may not continue an administrative proceeding under this part regarding an alleged discriminatory housing practice after the beginning of the trial of a civil action commenced by the aggrieved person under an act of Congress or a State law seeking relief with respect to that discriminatory housing practice. If such a trial is commenced, the administrative law judge shall dismiss the administrative proceeding. The commencement and maintenance of a civil action for appropriate temporary or preliminary relief under section 810(e) or proceedings for such relief under section 813 of the Fair Housing Act does not affect administrative proceedings under this part.

### § 104.910   Initial decision of administrative law judge.

(a) *In general.* Within the time period set forth in paragraph (d) of this section, the administrative law judge shall issue an initial decision including findings of fact and conclusions of law upon each material issue of fact or law presented on the record. The initial decision of the administrative law judge shall be based on the record of the proceeding.

(b) *Finding against respondent.* If the administrative law judge finds that a respondent has engaged, or is about to engage, in a discriminatory housing practice, the administrative law judge shall issue an initial decision against the respondent and order such relief as may be appropriate. The relief may include, but is not limited to, the following:

(1) The administrative law judge may order the respondent to pay damages to the aggrieved person (including damages caused by humiliation and embarrassment).

(2) The administrative law judge may provide for injunctive or such other equitable relief as may be appropriate. No such order may affect any contract, sale, encumbrance or lease consummated before the issuance of the initial decision that involved a bona fide purchaser, encumbrancer or tenant without actual knowledge of the charge issued under § 104.405.

(3) To vindicate the public interest, the administrative law judge may assess a civil penalty against the respondent.

(i) The amount of the civil penalty may not exceed:

(A) $10,000, if the respondent has not been adjudged to have committed any prior discriminatory housing practice in any administrative hearing or civil action permitted under the Fair Housing Act or any State or local fair housing law, or in any licensing or regulatory

proceeding conducted by a Federal, State or local governmental agency.

(B) $25,000, if the respondent has been adjudged to have committed one other discriminatory housing practice in any administrative hearing or civil action permitted under the Fair Housing Act, or any State or local fair housing law, or in any licensing or regulatory proceeding conducted by a Federal, State, or local government agency, and the adjudication was made during the five-year period preceding the date of filing of the charge.

(C) $50,000, if the respondent has been adjudged to have committed two or more discriminatory housing practices in any administrative hearings or civil actions permitted under the Fair Housing Act or any State or local fair housing law, or in any licensing or regulatory proceeding conducted by a Federal, State, or local government agency, and the adjudications were made during the seven-year period preceding the date of the filing of the charge.

(ii) If the acts constituting the discriminatory housing practice that is the subject of the charge were committed by the same natural person who has previously been adjudged, in any administrative proceeding or civil action, to have committed acts constituting a discriminatory housing practice, the time periods set forth in paragraphs (b)(3)(i) (B) and (C) of this section do not apply.

(iii) In a proceeding involving two or more respondents, the administrative law judge may assess a civil penalty as provided under paragraph (b) of this section against each respondent that the administrative law judge determines has been engaged or is about to engage in a discriminatory housing practice.

(c) *Finding in favor of respondent.* If the administrative law judge finds that a respondent has not engaged, and is not about to engage, in a discriminatory housing practice, the administrative law judge shall make an initial decision dismissing the charge.

(d) *Date of issuance.* The administrative law judge shall issue an initial decision within 60 days after the end of the hearing, unless it is impracticable to do so. If the administrative law judge is unable to issue the initial decision within this time period (or within any succeeding 60-day period following the initial 60-day period), the administrative law judge shall notify in writing all parties, the aggrieved person on whose behalf the charge was filed, and the Assistant Secretary, of the reasons for the delay.

### § 104.920 Service of initial decision.

Simultaneously with the issuance of the initial decision, the administrative law judge shall serve the initial decision on all parties, the aggrieved person on whose behalf the charge was filed, the Assistant Secretary and the Secretary of HUD. The initial decision will include a notice stating that the initial decision will become the final decision of the Department unless the Secretary issues a final decision under § 104.930 within 30 days of the date of issuance of the initial decision.

### § 104.925 Resolution of charge.

At any time before the issuance of a final decision under § 104.930, the parties may submit an agreement resolving the charge. The agreement must be signed by the General Counsel, the respondent, and the aggrieved person upon whose behalf the charge was issued. The administrative law judge shall accept the agreement by issuing an initial decision based on the agreed findings. The submission of an agreement resolving the charge constitutes a waiver of any right to challenge or contest the validity of a decision entered in accordance with the agreement.

### § 104.930 Final decision.

(a) *Issuance of final decision by Secretary.* The Secretary of HUD may review any finding of fact, conclusion of law, or order contained in the initial decision of the administrative law judge and issue a final decision in the proceeding. The Secretary may affirm, modify or set aside, in whole or in part, the initial decision or remand the initial decision for further proceedings. The Secretary shall serve the final decision on all parties no later than 30 days from the date of issuance of the initial decision of the administrative law judge. The final decision shall be served on all parties, the aggrieved person on whose behalf the charge was filed, and the Assistant Secretary.

(b) *No final decision by Secretary.* If the Secretary of HUD does not serve a final decision within the time period described above, the initial decision of the administrative law judge will become the final decision of the Department. For the purposes of this part, such a final decision will be considered to have been issued 30 days following the date of issuance of the initial decision.

(c) *Public disclosure.* HUD shall make public disclosure of each final decision.

(d) *Decisions on remand.* If the Secretary remands the decision for further proceedings, the administrative law judge shall issue an initial decision

on remand within 60 days of the date of issuance of the Secretary's decision, unless it is impractical to do so. If the administrative law judge is unable to issue the initial decision within this time period (or within any succeeding 60-day period following the initial 60-day period), the administrative law judge shall notify in writing the parties, the aggrieved person on whose behalf the charge was filed, and the Assistant Secretary, of the reasons for the delay.

### § 104.935 Action upon issuance of a final decision.

(a) *Licensed or regulated businesses.* (1) If a final decision includes a finding that a respondent has engaged or is about to engage in a discriminatory housing practice in the course of a business that is subject to licensing or regulation by a Federal, State or local governmental agency, the Assistant Secretary will notify the governmental agency of the decision by:

(i) Sending copies of the findings of fact, conclusions of law and the final decision to the governmental agency by certified mail; and

(ii) Recommending appropriate disciplinary action to the governmental agency, including, where appropriate, the suspension or revocation of the license of the respondent.

(2) The Assistant Secretary will notify the appropriate governmental agencies within 30 days after the date of issuance of the final decision, unless a petition for judicial review of the final decision as described in § 104.950 has been filed before the issuance of the notification of the agency. If such a petition has been filed, the Assistant Secretary will provide the notification to the governmental agency within 30 days of the date that the final decision is affirmed upon review. If a petition for judicial review is timely filed following the notification of the governmental agency, the Assistant Secretary will promptly notify the governmental agency of the petition and withdraw his or her recommendation.

(b) *Notification to the Attorney General.* If a final decision includes a finding that a respondent has engaged or is about to engage in a discriminatory housing practice and another final decision including such a finding was issued under this part within the five years preceding the date of issuance of the final decision, the General Counsel will notify the Attorney General of the decisions by sending a copy of the final decisions in each administrative proceeding.

### § 104.940 Attorney's fees and costs.

Following the issuance of the final decision under § 104.930, any prevailing party, except HUD, may apply for attorney's fees and costs. The administrative law judge will issue an initial decision awarding or denying such fees and costs. The initial decision will become the final decision of HUD unless the Secretary reviews the initial decision and issues a final decision on fees and costs within 30 days. The recovery of reasonable attorney's fees and costs will be permitted as follows:

(a) If the respondent is the prevailing party:

(1) HUD will be liable for reasonable attorney's fees and costs to the extent provided under the Equal Access to Justice Act (5 U.S.C. 504) and HUD's regulations at 24 CFR Part 14; and

(2) An intervenor will be liable for reasonable attorney's fees and costs only to the extent that the intervenor's participation in the administrative proceeding was frivolous or vexatious, or was for the purpose of harassment.

(b) To the extent that an intervenor is a prevailing party, the respondent will be liable for reasonable attorney's fees unless special circumstances make the recovery of such fees and costs unjust.

## Subpart J—Judicial Review and Enforcement of Final Decision

### § 104.950 Judicial review of final decision.

(a) *Petition for review.* Any party adversely affected by a final decision under § 104.930 may file a petition in the appropriate United States Court of Appeals for review of the decision under section 812(i) of the Fair Housing Act. The petition must be filed within 30 days of the date of issuance of the final decision.

(b) *No petition for review.* If no petition for review is filed under paragraph (a) within 45 days from the date of issuance of the final decision, the findings of facts and final decision shall be conclusive in connection with any petition for enforcement described under § 104.955(a) filed thereafter by the General Counsel, and in connection with any petition for enforcement described under § 104.955(b).

### § 104.955 Enforcement of final decision.

(a) *Enforcement by HUD.* Following the issuance of a final decision under § 104.930, the General Counsel may petition the appropriate United States Court of Appeals for the enforcement of the final decision and for appropriate temporary relief or restraining order in accordance with section 812(j) of the Fair Housing Act.

(b) *Enforcement by others.* If before the expiration of 60 days from the date of issuance of the final decision under § 104.930, no petition for review of the final decision described under § 104.950 has been filed, and the General Counsel has not sought enforcement of the final decision as described in paragraph (a) of this section, any person entitled to relief under the final decision may petition the appropriate United States Court of Appeals for the enforcement of the final decision in accordance with section 812(m) of the Fair Housing Act.

**PART 105—FAIR HOUSING**

6. The appendix to Part 105 is redesignated as the appendix to Part 103 and the remainder of Part 105 is removed.

**PART 106—FAIR HOUSING ADMINISTRATIVE MEETINGS UNDER THE FAIR HOUSING ACT**

7. The title to Part 106 is revised as set forth above.

8. The authority citation for Part 106 is revised to read as follows:

**Authority:** Title VIII, Civil Rights Act of 1968 (42 U.S.C. 3600–3620); sec. 7(d), Department of Housing and Urban Development (42 U.S.C. 3535(d)).

9. Section 106.1 is revised to read as follows:

**§ 106.1 Purpose.**

The purpose of this part is to establish procedures for public meetings or conferences that may be used to assist the Assistant Secretary in achieving the aims of the Fair Housing Act for the promotion and assurance of equal opportunity in housing with regard to race, color, religion, sex, handicap, familial status, or national origin and, specifically, to carry out those responsibilities delegated to him or her by the Secretary of Housing and Urban Development under sections 808(e) (1), (2), and (3), and 809 of the Fair Housing Act.

10. Section 106.2 is revised to read as follows:

**§ 106.2 Definitions.**

As used in this part:

(a) "Assistant Secretary" means the Assistant Secretary for Fair Housing and Equal Opportunity in the Department of Housing and Urban Development.

(b) "Meeting" means a public meeting or conference held under the authority of the Fair Housing Act and this part.

(c) "Fair Housing Act" means Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing

Amendments Act of 1988, 42 U.S.C. 3600–3620.

11. Part 109 is revised to read as follows:

**PART 109—FAIR HOUSING ADVERTISING**

Sec.
109.5  Policy.
109.10  Purpose.
109.15  Definitions.
109.16  Scope.
109.20  Use of words, phrases, symbols, and visual aids.
109.25  Selective use of advertising media or content.
109.30  Fair housing policy and practices.
Appendix I to Part 109—Fair Housing Advertising.

**Authority:** Title VIII, Civil Rights Act of 1968 (42 U.S.C. 3600–3620); sec. 7(d), Department of Housing and Urban Development (42 U.S.C. 3535(d)).

**§ 109.5  Policy.**

It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States. The provisions of the Fair Housing Act (42 U.S.C. 3600, *et seq.*) make it unlawful to discriminate in the sale, rental, and financing of housing, and in the provision of brokerage and appraisal services, because of race, color, religion, sex, handicap, familial status, or national origin. Section 804(c) of the Fair Housing Act, 42 U.S.C. 3604(c), as amended, makes it unlawful to make, print, or publish, or cause to be made, printed, or published, any notice, statement, or advertisement, with respect to the sale or rental of a dwelling, that indicates any preference, limitation, or discrimination because of race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination. However, the prohibitions of the act regarding familial status do not apply with respect to "housing for older persons", as defined in section 807(b) of the act.

**§ 109.10  Purpose.**

The purpose of this part is to assist all advertising media, advertising agencies and all other persons who use advertising to make, print, or publish, or cause to be made, printed, or published, advertisements with respect to the sale, rental, or financing of dwellings which are in compliance with the requirements of the Fair Housing Act. These regulations also describe the matters this Department will review in evaluating compliance with the Fair Housing Act in connection with investigations of complaints alleging discriminatory housing practices involving advertising.

**§ 109.15  Definitions.**

As used in this part:

(a) "Assistant Secretary" means the Assistant Secretary for Fair Housing and Equal Opportunity.

(b) "General Counsel" means the General Counsel of the Department of Housing and Urban Development.

(c) "Dwelling" means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

(d) "Family" includes a single individual.

(e) "Person" includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11 of the United States Code, receivers, and fiduciaries.

(f) "To rent" includes to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant.

(g) "Discriminatory housing practice" means an act that is unlawful under section 804, 805, 806, or 818 of the Fair Housing Act.

(h) "Handicap" means, with respect to a person—

(1) A physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) A record of having such an impairment, or

(3) Being regarded as having such an impairment.
This term does not include current, illegal use of or addiction to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)). For purposes of this part, an individual shall not be considered to have a handicap solely because that individual is a transvestite.

(i) "Familial status" means one or more individuals (who have not attained the age of 18 years) being domiciled with—

(1) A parent or another person having legal custody of such individual or individuals; or

(2) The designee of such parent or other person having such custody, with the written permission of such parent or other person. The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual

who has not attained the age of 18 years.

§ 109.16  Scope.

(a) *General.* This part describes the matters the Department will review in evaluating compliance with the Fair Housing Act in connection with investigations of complaints alleging discriminatory housing practices involving advertising. Use of these criteria will be considered by the General Counsel in making determinations as to whether there is reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur.

(1) *Advertising media.* This part provides criteria for use by advertising media in determining whether to accept and publish advertising regarding sales or rental transactions. Use of these criteria will be considered by the General Counsel in making determinations as to whether there is reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur.

(2) *Persons placing advertisements.* A failure by persons placing advertisements to use the criteria contained in this part, when found in connection with the investigation of a complaint alleging the making or use of discriminatory advertisements, will be considered by the General Counsel in making a determination of reasonable cause to believe that a discriminatory housing practice has occurred or is about to occur.

(b) *Affirmative advertising efforts.* Nothing in this part shall be construed to restrict advertising efforts designed to attract persons to dwellings who would not ordinarily be expected to apply, when such efforts are pursuant to an affirmative marketing program or undertaken to remedy the effects of prior discrimination in connection with the advertising or marketing of dwellings.

§ 109.20  Use of words, phrases, symbols, and visual aids.

The following words, phrases, symbols, and forms typify those most often used in residential real estate advertising to convey either overt or tacit discriminatory preferences or limitations. In considering a complaint under the Fair Housing Act, the Department will normally consider the use of these and comparable words, phrases, symbols, and forms to indicate a possible violation of the act and to establish a need for further proceedings on the complaint, if it is apparent from the context of the usage that

discrimination within the meaning of the act is likely to result.

(a) *Words descriptive of dwelling, landlord, and tenants.* White private home, Colored home, Jewish home, Hispanic residence, adult building.

(b) *Words indicative of race, color, religion, sex, handicap, familial status, or national origin*—(1) *Race*—Negro, Black, Caucasian, Oriental, American Indian.

(2) *Color*—White, Black, Colored.

(3) *Religion*—Protestant, Christian, Catholic, Jew.

(4) *National origin*—Mexican American, Puerto Rican, Philippine, Polish, Hungarian, Irish, Italian, Chicano, African, Hispanic, Chinese, Indian, Latino.

(5) *Sex*—the exclusive use of words in advertisements, including those involving the rental of separate units in a single or multi-family dwelling, stating or tending to imply that the housing being advertised is available to persons of only one sex and not the other, except where the sharing of living areas is involved. Nothing in this part restricts advertisements of dwellings used exclusively for dormitory facilities by educational institutions.

(6) *Handicap*—crippled, blind, deaf, mentally ill, retarded, impaired, handicapped, physically fit. Nothing in this part restricts the inclusion of information about the availability of accessible housing in advertising of dwellings.

(7) *Familial status*—adults, children, singles, mature persons. Nothing in this part restricts advertisements of dwellings which are intended and operated for occupancy by older persons and which constitute "housing for older persons" as defined in Part 100 of this title.

(8) *Catch words*—Words and phrases used in a discriminatory context should be avoided, e.g., "restricted", "exclusive", "private", "integrated", "traditional", "board approval" or "membership approval".

(c) *Symbols or logotypes.* Symbols or logotypes which imply or suggest race, color, religion, sex, handicap, familial status, or national origin.

(d) *Colloquialisms.* Words or phrases used regionally or locally which imply or suggest race, color, religion, sex, handicap, familial status, or national origin.

(e) *Directions to real estate for sale or rent (use of maps or written instructions).* Directions can imply a discriminatory preference, limitation, or exclusion. For example, references to real estate location made in terms of racial or national origin significant landmarks, such as an existing black

development (signal to blacks) or an existing development known for its exclusion of minorities (signal to whites). Specific directions which make reference to a racial or national origin significant area may indicate a preference. References to a synagogue, congregation or parish may also indicate a religious preference.

(f) *Area (location) description.* Names of facilities which cater to a particular racial, national origin or religious group, such as country club or private school designations, or names of facilities which are used exclusively by one sex may indicate a preference.

§ 109.25  Selective use of advertising media or content.

The selective use of advertising media or content when particular combinations thereof are used exclusively with respect to various housing developments or sites can lead to discriminatory results and may indicate a violation of the Fair Housing Act. For example, the use of English language media alone or the exclusive use of media catering to the majority population in an area, when, in such area, there are also available non-English language or other minority media, may have discriminatory impact. Similarly, the selective use of human models in advertisements may have discriminatory impact. The following are examples of the selective use of advertisements which may be discriminatory:

(a) *Selective geographic advertisements.* Such selective use may involve the strategic placement of billboards; brochure advertisements distributed within a limited geographic area by hand or in the mail; advertising in particular geographic coverage editions of major metropolitan newspapers or in newspapers of limited circulation which are mainly advertising vehicles for reaching a particular segment of the community; or displays or announcements available only in selected sales offices.

(b) *Selective use of equal opportunity slogan or logo.* When placing advertisements, such selective use may involve placing the equal housing opportunity slogan or logo in advertising reaching some geographic areas, but not others, or with respect to some properties but not others.

(c) *Selective use of human models when conducting an advertising campaign.* Selective advertising may involve an advertising campaign using human models primarily in media that cater to one racial or national origin segment of the population without a

**3310**     **Federal Register** / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations

complementary advertising campaign that is directed at other groups. Another example may involve use of racially mixed models by a developer to advertise one development and not others. Similar care must be exercised in advertising in publications or other media directed at one particular sex, or at persons without children. Such selective advertising may involve the use of human models of members of only one sex, or of adults only, in displays, photographs or drawings to indicate preferences for one sex or the other, or for adults to the exclusion of children.

**§ 109.30   Fair housing policy and practices.**

In the investigation of complaints, the Assistant Secretary will consider the implementation of fair housing policies and practices provided in this section as evidence of compliance with the prohibitions against discrimination in advertising under the Fair Housing Act.

(a) *Use of Equal Housing Opportunity logotype, statement, or slogan.* All advertising of residential real estate for sale, rent, or financing should contain an equal housing opportunity logotype, statement, or slogan as a means of educating the homeseeking public that the property is available to all persons regardless of race, color, religion, sex, handicap, familial status, or national origin. The choice of logotype, statement or slogan will depend on the type of media used (visual or auditory) and, in space advertising, on the size of the advertisement. Table I (see Appendix I) indicates suggested use of the logotype, statement, or slogan and size of logotype. Table II (see Appendix I) contains copies of the suggested Equal Housing Opportunity logotype, statement, and slogan.

(b) *Use of human models.* Human models in photographs, drawings, or other graphic techniques may not be used to indicate exclusiveness because of race, color, religion, sex, handicap, familial status, or national origin. If models are used in display advertising campaigns, the models should be clearly definable as reasonably representing majority and minority groups in the metropolitan area, both sexes, and, when appropriate, families with children. Models, if used, should portray persons in an equal social setting and indicate to the general public that the housing is open to all without regard to race, color, religion, sex, handicap, familial status, or national origin, and is not for the exclusive use of one such group.

(c) *Coverage of local laws.* Where the Equal Housing Opportunity statement is used, the advertisement may also include a statement regarding the coverage of any local fair housing or human rights ordinance prohibiting discrimination in the sale, rental or financing of dwellings.

(d) *Notification of fair housing policy*—(1) *Employees.* All publishers of advertisements, advertising agencies, and firms engaged in the sale, rental or financing of real estate should provide a printed copy of their nondiscrimination policy to each employee and officer.

(2) *Clients.* All publishers or advertisements and advertising agencies should post a copy of their nondiscrimination policy in a conspicuous location wherever persons place advertising and should make copies available for all firms and persons using their advertising services.

(3) *Publishers' notice.* All publishers should publish at the beginning of the real estate advertising section a notice such as that appearing in Table III (see Appendix I). The notice may include a statement regarding the coverage of any local fair housing or human rights ordinance prohibiting discrimination in the sale, rental or financing of dwellings.

**Appendix I to Part 109—Fair Housing Advertising**

The following three tables may serve as a guide for the use of the Equal Housing Opportunity logotype, statement, slogan, and publisher's notice for advertising:

Table I

A simple formula can guide the real estate advertiser in using the Equal Housing Opportunity logotype, statement, or slogan.

In all space advertising (advertising in regularly printed media such as newspapers or magazines) the following standards should be used:

| Size of advertisement | Size of logotype in inches |
|---|---|
| ½ page or larger............................................ | 2×2 |
| ¼ page up to ½ page.................................... | 1×1 |
| 4 column inches to ⅛ page............................ | ½ × ½ |
| Less than 4 column inches........................... | (¹) |

¹ Do not use.

In any other advertisements, if other logotypes are used in the advertisement, then the Equal Housing Opportunity logo should be of a size at least equal to the largest of the other logotypes; if no other logotypes are used, then the type should be bold display face which is clearly visible. Alternatively, when no other logotypes are used, 3 to 5 percent of an advertisement may be devoted to a statement of the equal housing opportunity policy.

In space advertising which is less than 4 column inches (one column 4 inches long or two columns 2 inches long) of a page in size, the Equal Housing Opportunity slogan should be used. Such advertisements may be grouped with other advertisements under a caption which states that the housing is available to all without regard to race, color, religion, sex, handicap, familial status, or national origin.

Table II

Illustrations of Logotype, Statement, and Slogan. Equal Housing Opportunity Logotype:



**EQUAL HOUSING OPPORTUNITY**

Equal Housing Opportunity Statement: We are pledged to the letter and spirit of U.S. policy for the achievement of equal housing opportunity throughout the Nation. We encourage and support an affirmative advertising and marketing program in which there are no barriers to obtaining housing because of race, color, religion, sex, handicap, familial status, or national origin.

Equal Housing Opportunity Slogan: "Equal Housing Opportunity."

Table III

Illustration of Media Notice—Publisher's notice: All real estate advertised herein is subject to the Federal Fair Housing Act, which makes it illegal to advertise "any preference, limitation, or discrimination because of race, color, religion, sex, handicap, familial status, or national origin, or intention to make any such preference, limitation, or discrimination."

We will not knowingly accept any advertising for real estate which is in violation of the law. All persons are hereby informed that all dwellings advertised are available on an equal opportunity basis.

**PART 110—FAIR HOUSING POSTER**

12. The authority citation for Part 110 is revised to read as follows:

Authority: Title VIII, Civil Rights Act of 1968 (42 U.S.C. 3600–3620); sec. 7(d), Department of Housing and Urban Development Act (42 U.S.C. 3535(d)).

13. Section 110.1 is revised to read as follows:

**§ 110.1   Purpose.**

The regulations set forth in this part contain the procedures established by the Secretary of Housing and Urban Development with respect to the display of a fair housing poster by persons subject to sections 804 through 806 of the Fair Housing Act, 42 U.S.C. 3604–3606.

14. In § 110.5, paragraphs (b), (e), (g) and (h) are revised to read as follows:

### § 110.5  Definitions.

\* \* \* \* \*

(b) "Discriminatory housing practice" means an act that is unlawful under section 804, 805, 806, or 818 of the Act.

\* \* \* \* \*

(e) "Person" includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11 of the United States Code, receivers and fiduciaries.

\* \* \* \* \*

(g) "Fair housing poster" means the poster prescribed by the Secretary for display by persons subject to sections 804–806 of the Act.

(h) "The Act" means the Fair Housing Act (The Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988), 42 U.S.C. 3600, et seq.

\* \* \* \* \*

15. In § 110.10, paragraph (a) introductory text and paragraph (c) is revised to read as follows:

### § 110.10  Persons subject.

(a) Except to the extent that paragraph (b) of this section applies, all persons subject to section 804 of the Act, Discrimination in the Sale or Rental of Housing and Other Prohibited Practices, shall post and maintain a fair housing poster as follows:

\* \* \* \* \*

(c) All persons subject to section 805 of the Act, Discrimination In Residential Real Estate-Related Transactions shall post and maintain a fair housing poster at all their places of business which participate in the covered activities.

\* \* \* \* \*

16. Section 110.15 is revised to read as follows:

### § 110.15  Location of posters.

All fair housing posters shall be prominently displayed so as to be readily apparent to all persons seeking housing accommodations or seeking to engage in residential real estate-related transactions or brokerage services as contemplated by sections 804 through 806 of the Act.

17. In § 110.25, paragraph (a) is revised to read as follows:

### § 110.25  Description of posters

(a) The fair housing poster shall be 11 inches by 14 inches and shall bear the following legend:



EQUAL HOUSING OPPORTUNITY

We do Business in Accordance With the Fair Housing Act

(The Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988)

IT IS ILLEGAL TO DISCRIMINATE AGAINST

ANY PERSON BECAUSE OF RACE, COLOR, RELIGION, SEX, HANDICAP, FAMILIAL STATUS (HAVING ONE OR MORE CHILDREN), OR NATIONAL ORIGIN

• In the sale or rental of housing or residential lots.
• In advertising the sale or rental of housing.
• In the financing of housing.
• In the appraisal of housing.
• In the provision of real estate brokerage services.
• Blockbusting is also illegal.

Anyone who feels he or she has been discriminated against should send a complaint to:

U.S. Department of Housing and Urban Development, Assistant Secretary for Fair Housing and Equal Opportunity, Washington, DC 20410

or

HUD Region or [Area Office stamp]

\* \* \* \* \*

18. Part 115 is revised to read as follows:

### PART 115—CERTIFICATION OF SUBSTANTIALLY EQUIVALENT AGENCIES

Sec.
115.1  Purpose.
115.2  Basis of determination.
115.3  Criteria for adequacy of law.
115.3a  Criteria for adequacy of law—discrimination because of handicap.
115.4  Performance standards.
115.5  Request for certification.
115.6  Procedure for certification.
115.7  Denial of certification.
115.8  Withdrawal of certification.
115.9  Conferences.
115.10  Consequences of certification.
115.11  Interim referrals.

**Authority:** Title VIII, Civil Rights Act of 1968 (42 U.S.C. 3600–3620); sec. 7(d), Department of Housing and Urban Development Act, 42 U.S.C. 3535(d)).

### § 115.1  Purpose.

(a) Section 810(f) of the Fair Housing Act, (The Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 (the Act)) provides that: whenever a complaint alleges a discriminatory housing practice within the jurisdiction of a State or local public agency that has been certified by the Secretary as substantially equivalent, the Secretary shall refer the complaint to that certified agency before taking any action with respect to the complaint. Except with the consent of the certified agency, the Secretary, after referral is made, shall take no further action with respect to the complaint unless:

(1) The certified agency has failed to commence proceedings with respect to the complaint before the end of the 30th day after the date of referral;

(2) The certified agency, having commenced proceedings, fails to carry forward proceedings with reasonable promptness; or

(3) The Secretary determines that the certified agency no longer qualifies for certification.

The Secretary has delegated the exercise of functions and duties under section 810(f) of the Act to the Assistant Secretary for Fair Housing and Equal Opportunity (the Assistant Secretary).

(b) The purpose of this part is to set forth:

(1) The basis for agency certification.

(2) The procedure by which a determination to certify is made by the Assistant Secretary.

(3) The basis and procedure for withdrawal of certification.

(4) The consequences of certification.

### § 115.2  Basis of determination.

A determination to certify an agency as substantially equivalent involves a two-phase procedure. The determination requires examination and an affirmative conclusion by the Assistant Secretary on two separate inquiries:

(a) Whether the law, administered by the agency, on its face, provides that:

(1) The substantive rights protected by the agency in the jurisdiction with respect to which certification is to be made;

(2) The procedures followed by the agency;

(3) The remedies available to the agency; and

(4) The availability of judicial review of the agency's actions;

Are Substantially substantively equivalent to those created by and under the act; and

(b) Whether the current practices and past performance of the agency demonstrate that, in operation, the law in fact provides rights and remedies which are substantially equivalent to those provided in the Act.

§ 115.3   Criteria for adequacy of law.

(a) In order for a determination to be made that a State or local fair housing agency administers a law which, on its face, provides rights and remedies for alleged discriminatory housing practices that are substantially equivalent to those provided in the Act, the law or ordinance must:

(1) Provide for an administrative enforcement body to receive and process complaints and provide that:

(i) Complaints must be in writing;

(ii) Upon the filing of a complaint the agency shall serve notice upon the complainant acknowledging the filing and advising the complainant of the time limits and choice of forums provided under the law;

(iii) Upon the filing of a complaint the agency shall promptly serve notice on the respondent or person charged with the commission of a discriminatory housing practice advising of his or her procedural rights and obligations under the law or ordinance together with a copy of the complaint;

(iv) A respondent may file an answer to a complaint.

(2) Delegate to the administrative enforcement body comprehensive authority, including subpoena power, to investigate the allegations of complaints, and power to conciliate complaint matters, and require that:

(i) The agency commence proceedings with respect to the complaint before the end of the 30th day after receipt of the complaint;

(ii) The agency investigate the allegations of the complaint and complete the investigation in no more than 100 days after receipt of the complaint, unless it is impracticable.

(iii) If the agency is unable to complete the investigation within 100 days it shall notify the complainant and respondent in writing of the reasons for not doing so;

(iv) The agency make final administrative disposition of a complaint within one year of the date of receipt of a complaint, unless it is impracticable to do so. If the agency is unable to do so it shall notify the complainant and respondent, in writing, of the reasons for not doing so;

(v) Any conciliation agreement arising out of conciliation efforts by the agency shall be an agreement between the respondent and the complainant and shall be subject to the approval of the agency;

(vi) Each conciliation agreement shall be made public unless the complainant and respondent otherwise agree and the agency determines that disclosure is not required to further the purposes of the law or ordinance.

(3) Not place any excessive burdens on the complainant that might discourage the filing of complaints, such as:

(i) A provision that a complaint must be filed within any period of time less than 180 days after an alleged discriminatory housing practice has occurred or terminated;

(ii) Anti-testing provisions;

(iii) Provisions that could subject a complainant to costs, criminal penalties or fees in connection with filing of complaints.

(4) Not contain exemptions that substantially reduce the coverage of housing accommodations as compared to Section 803 of the Act (which provides coverage with respect to all dwellings except, under certain circumstances, single family homes sold or rented by the owner and units in owner-occupied dwellings containing living quarters for no more than four families).

(5) Be sufficiently comprehensive in its prohibitions to be an effective instrument in carrying out and achieving the intent and purposes of the Act, i.e., prohibit the following acts:

(i) Refusal to sell or rent based on discrimination because of race, color, religion, sex, familial status, or national origin;

(ii) Refusal to negotiate for a sale or rental based on discrimination because of race, color, religion, sex, familial status, or national origin;

(iii) Otherwise making unavailable or denying a dwelling based on discrimination because of race, color, religion, sex, familial status, or national origin;

(iv) Discriminating in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, based on discrimination because of race, color, religion, sex, familial status, or national origin;

(v) Advertising in a manner that indicates any preference, limitation, or discrimination because of race, color, religion, sex, familial status, or national origin;

(vi) Falsely representing that a dwelling is not available for inspection, sale, or rental because of discrimination because of race, color, religion, sex, familial status, or national origin;

(vii) Coercion, intimidation, threats, or interference with any person in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other person in the exercise of enjoyment of any right granted or protected by section 803, 804, 805, or 806 of the Act;

(viii) Blockbusting based on representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, familial status, or national origin;

(ix) Discrimination in residential real estate-related transactions by providing that: It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, familial status, or national origin. Such transactions include:

(A) The making or purchasing of loans or the provision of other financial assistance for purchasing, constructing, improving, repairing, or maintaining a dwelling; or the making or purchasing of loans or the provision of other financial assistance secured by residential real estate; or

(B) The selling, brokering, or appraising of residential real property;

(x) Denying a person access to, or membership or participation in, a multiple listing service, real estate brokers' organization, or other service because of race, color, religion, sex, familial status or national origin.

(b) In addition to the factors described in paragraph (a) of this section, the provisions of the State or local law must afford administrative and judicial protection and enforcement of the rights embodied in the law.

(1) The agency must have authority to:

(i) Seek prompt judicial action for appropriate temporary or preliminary relief pending final disposition of a complaint if the agency concludes that such action is necessary to carry out the purposes of the law or ordinance;

(ii) Issue subpoenas;

(iii) Grant actual damages or arrange to have adjudicated in court at agency expense the award of actual damages to an aggrieved person;

(iv) Grant injunctive or other equitable relief, or be specifically authorized to seek such relief in a court of competent jurisdiction.

(v) Assess a civil penalty against the respondent, or arrange to have adjudicated in court at agency expense

the award of punitive damages against the respondent.

(2) Agency actions must be subject to judicial review upon application by any party aggrieved by a final agency order.

(3) Judicial review of a final agency order must be in a court with authority to grant to the petitioner, or to any other party, such temporary relief, restraining order, or other order as the court determines is just and proper; affirm, modify, or set aside, in whole or in part, the order, or remand the order for further proceedings; and enforce the order to the extent that the order is affirmed or modified.

(c) The requirement that the State or local law prohibit discrimination on the basis of familial status does not require that the State or local law limit the applicability of any reasonable local, State or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling.

(d) The State or local law may assure that no prohibition based on discrimination because of familial status applies to housing for older persons substantially as described in Part 100, Subpart E.

(e) A detemination of the adequacy of a State or local fair housing law "on its face" is intended to focus on the meaning and intent of the text of the law, as distinguished from the effectiveness of its administration. Accordingly, this determination is not limited to an analysis of the literal text of the law but must take into account all relevant maters of State or local law, *e.g.*, regulations, directives and rules of procedure, or interpretations of the fair housing law by competent authorities, as may be necessary.

(f) A law will be held to be not adequate "on its face" if it permits any of the agency's decision making authority to be contracted out or delegated to a non-governmental authority. For the purposes of this paragraph, "decision making authority" shall include:

(1) acceptance of the complaint;

(2) Approval of the concilliation agreement;

(3) Dismissal of a complaint;

(4) Any action specified in Section 115.3(a)(2)(iv) or 115.3(b)(1).

(g) The State or local law must provide for civil enforcement of the law or ordinance by an aggrieved person by the commencement of an action in an appropriate court not less than 1 year after the occurrence or termination of an alleged discriminatory housing practice. The court should be empowered to:

(1) Award the plaintiff actual and punitive damages;

(2) Grant as relief, as it deems appropriate, any temporary or permanent injunction, temporary restraining order or other order;

(3) Allow reasonable attorney's fees and costs.

§ 115.3a  Criteria for adequacy of law-discrimination because of handicap.

(a) In addition to the provisions of § 115.3, in order for a determination to be made that a State or local fair housing agency administers a law which, on its face, provides rights and remedies for alleged discriminatory housing practices, based on handicap, that are substantially equivalent to those provided in the Act, the law or ordinance must be sufficiently comprehensive in its prohibitions to be an effective instrument in carrying out and achieving the intent and purposes of the Act, *i.e.*, it must prohibit the following acts:

(1) Advertising in a manner that indicates any preference, limitation, or discrimination because of handicap;

(2) Falsely representing that a dwelling is not available for inspection, sale, or rental based on discrimination because of handicap;

(3) Blockbusting, based on representations regarding the entry or prospective entry into the neighborhood of a person or persons with a particular handicap;

(4) Discrimination in residential real estate-related transactions by providing that: It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms and conditions of such a transaction, because of handicap. Residential and real estate-related transactions include:

(i) The making or purchasing of loans or the provision of other financial assistance for purchasing, constructing, improving, repairing, or maintaining a dwelling; or the making or purchasing of loans or the provision of other financial assistance secured by residential real estate; or

(ii) The selling, brokering, or appraising of residential real property;

(5) Denying a person access to, or membership or participation in, multiple listing services, real estate brokers' organizations, or other services because of handicap;

(6) Discrimination in the sale or rental, or otherwise making unavailable or denying, a dwelling to any buyer or renter because of a handicap of that buyer or renter, or of a person residing in or intending to reside in that dwelling after it is sold, rented, or made

available, or of any person associated with the buyer or renter;

(7) Discrimination against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with the dwelling, because of a handicap of that person, of a person residing in or intending to reside in the dwelling after it is sold, rented, or made available, or of any person associated with that person.

(b) For purposes of this section, discrimination includes—

(1) A refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by the handicapped person, if the modifications may be necessary to afford the handicapped person full enjoyment of the premises, except that, in the case of a rental, the landlord may, where it is reasonable to do so, condition permission for a modification on the renter's agreeing to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted;

(2) A refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling; or

(3) In connection with the design and construction of covered multifamily dwellings for first occupancy after March 13, 1991, a failure to design and construct dwellings in such a manner that—

(i) The dwellings have at least one building entrance on an accessible route, unless it is impractical to do so because of the terrain or unusual characteristics of the site;

(ii) With respect to dwellings with a building entrance on an accessible route—

(A) The public use and common use portions of the dwellings are readily accessible to and usable by handicapped persons;

(B) All the doors designed to allow passage into and within all premises are sufficiently wide to allow passage by handicapped persons in wheelchairs; and

(C) All premises within covered multifamily dwelling units contain an accessible route into and through the dwelling; light switches, electrical outlets, thermostats, and other environmental controls are in accessible locations; there are reinforcements in the bathroom walls to allow later installation of grab bars; and there are

**3314** Federal Register / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations

usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

(c) The law or ordinance administered by the State or local fair housing agency may provide that compliance with the appropriate requirements of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people (commonly cited as "ANSI A117.1–1986") suffices to satisfy the requirements of paragraph (b)(3)(ii)(C) of this section.

(d) As used in this section, the term "covered multifamily dwellings" means buildings consisting of four or more units if such buildings have one or more elevators and ground floor units in other buildings consisting of four or more units.

**§ 115.4 Performance standards.**

(a) The initial and continued certification that a State or local fair housing law provides rights and remedies substantially equivalent to those provided in the Act will be dependent upon an assessment of the current practices and past performance of the appropriate State or local agency charged with administration and enforcement of the law to determine that, in operation, the law is in fact providing substantially equivalent rights and remedies. The performance standards set forth in paragraph (b) of this section will be used in making this assessment.

(b) A State or local agency must:

(1) Engage in comprehensive and thorough investigative activities; and

(2) Commence proceedings with respect to a complaint before the end of the 30th day after the receipt of the complaint, carry forward proceedings with reasonable promptness, and in accordance with the memorandum of understanding described in section 115.6 of this part, make final administrative disposition of a complaint within one year of the date of receipt of the complaint and, within 100 days of receipt of the complaint, complete the following proceedings:

(i) Investigation, including the preparation of a final investigative report containing—

(A) The names and dates of contacts with witnesses;

(B) A summary and dates of correspondence and other contacts with the aggrieved person and the respondent;

(C) A summary description of other pertinent records;

(D) A summary of witness statements; and

(E) Answers to interrogatories.

(ii) Conciliation activity.

(3) Conduct compliance reviews of all settlements, conciliation agreements and orders issued by or entered into to resolve discriminatory housing practices.

(4) Consistently and affirmatively seek and obtain the type of relief designed to prevent recurrences of such practices;

(5) Consistently and affirmatively seek the elimination of all prohibited practices under its fair housing law;

(c) Where the State or local agency has duties and responsibilities in addition to administration of the fair housing law, the Assistant Secretary may consider such matters as the relative priority given to fair housing administration, as compared to such other duties and responsibilities, and the compatibility or potential conflict of fair housing objectives with the agency's other duties and responsibilities.

**§ 115.5 Request for certification.**

(a) A request for certification under this part may be filed with the Assistant Secretary by the State or local official having principal responsibility for administration of the State or local fair housing law. The request shall be supported by the following materials and information:

(1) The text of the jurisdiction's fair housing law, the law creating and empowering the agency, any regulations and directives issued under the law, and any formal opinions of the State Attorney General or the chief legal officer of the jurisdiction that pertain to the jurisdiction's fair housing law.

(2) Organization of the agency responsible for administering and enforcing the law.

(3) Funding and personnel made available to the agency for administration and enforcement of the fair housing law during the current operating year, and not less than the preceding three operating years (or such lesser number during which the law was in effect).

(4) Data demonstrating that the agency's current practices and past performance comply with the performance standards described in § 115.4.

(5) Any additional information which the submitting official may wish to be considered.

(b) The request and supporting materials shall be filed with the Assistant Secretary for Fair Housing and Equal Opportunity, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410. A copy of the request and supporting materials will be kept

available for public examination and copying at:

(1) The office of the Assistant Secretary, and

(2) the HUD Regional Office in whose jurisdiction the State or local jurisdiction seeking recognition is located, and

(3) the office of the State or local agency charged with administration and enforcement of the State or local law.

**§ 115.6 Procedure for certification.**

(a) Upon receipt of a request for certification filed under § 115.5, the Assistant Secretary may request further information that he or she considers relevant to the determinations required to be made under this part.

(b) If the Assistant Secretary determines, after application of the criteria set forth in §§ 115.3 and 115.3a, that the State or local fair housing law, on its face, provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in the Act, the Assistant Secretary shall inform the submitting State or local official in writing of that determination. Except under circumstances where the Assistant Secretary determines that interim referrals or other utilization of services under § 115.11 is appropriate, the Assistant Secretary shall publish a notice in the Federal Register which advises the public of the determination that the law, on its face, is substantially equivalent, and shall invite interested persons and organizations, during a period of not less than 30 days following publication of the notice, to file written comments relevant to the determination whether the current practices and past performance of the State or local agency charged with administration and enforcement of such law demonstrates that, in operation, the State or local law in fact provides rights and remedies which are substantially equivalent to those provided in the Act. The Federal Register notice shall also invite comments on the Department's determination as to the adequacy of the law on its face.

(c) If the Assistant Secretary determines, on the basis of the standards specified in § 115.4 and after considering the materials and information submitted pursuant to § 115.5, additional material obtained under paragraph (a) of this section, and any written comments filed under paragraph (b) of this section, that, in operation, a State or local fair housing law in fact provides rights and remedies which are substantially equivalent to

Case: 1:13-cv-08564 Document #: 19-9 Filed: 02/12/14 Page 78 of 100 PageID #:1215

Federal Register / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations    **3315**

those provided in the Act, the Assistant Secretary shall offer to enter into a written agreement with the appropriate State or local agency providing for referral of complaints to the agency and for procedures for communication between the agency and HUD that are adequate to permit the Assistant Secretary to monitor the continuing substantial equivalency of the State or local law. The written agreement may, but need not, be incorporated in a Memorandum of Understanding as described in 24 CFR 111.104(a)(2). Upon execution of a satisfactory agreement, the Assistant Secretary shall publish notice of certification under this part in the Federal Register.

(d) During the period which begins on September 13, 1988 and ends January 13, 1992, each State or locality recognized as substantially equivalent under 24 CFR Part 115 (including any State or locality which had entered into an agreement for interim referrals under § 115.11, unless the State or locality is subsequently denied recognition under 24 CFR 115.7) for the purposes of the Fair Housing Act before September 13, 1988 shall, for the purposes of this paragraph, be considered certified under this part with respect to those matters for which the agency was previously recognized. If the Secretary determines in an individual case that a State or locality has not been able to meet the certification requirements within this 40-month period because of exceptional circumstances (such as the infrequency of legislative sessions in that jurisdiction), the Secretary may extend the period of temporary certification to no later than September 13, 1992.

(1) No State, locality or agency thereof shall be considered certified under this paragraph for the purpose of processing complaints alleging—

(i) Discrimination based on familial status;

(ii) Discrimination based on handicap; or

(iii) Coercion, intimidation or threats as described in § 115.3(a)(5)(vii).

(2) Certification under this paragraph is not a determination that the administrative or judicial remedies provided by the State or locality is substantially equivalent to those provided by the Act.

(e) Certification of a State or local fair housing agency under this part shall remain in effect until withdrawn under § 115.8.

(f) Not less frequently than annually, the Assistant Secretary will cause to be published in the Federal Register a notice which sets forth:

(1) An updated, consolidated list of all certified agencies;

(2) A list of all agencies whose certification under this part has been withdrawn since publication of the previous notice;

(3) A list of agencies with respect to which notice of denial of certification has been published under § 115.7(c) since issuance of the previous notice;

(4) A list of agencies with respect to which a notice for comment has been published under paragraph (b) of this section whose request for certification remains pending;

(5) A list of agencies for which notice of proposed withdrawal of certification has been published under § 115.8(c) whose proposed withdrawal remains pending; and

(6) A list of agencies with which an agreement for interim referrals or other utilization of services has been entered under § 115.11 and remains in effect.

§ 115.7  Denial of certification.

(a) If the Assistant Secretary determines, after application of the criteria set forth in §§ 115.3 and 115.3a, that a State or local fair housing law, on its face, fails to provide rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in the Act, the Assistant Secretary shall inform the submitting State or local official in writing of the reasons for that determination. The Assistant Secretary's advice may include specification of the manner in which the State or local law could be amended in order to provide substantially equivalent rights and remedies. The Assistant Secretary shall extend to the State or local official an opportunity to submit data, views, and arguments in opposition to the Assistant Secretary's determination and to request an opportunity for a conference in accordance with § 115.9. If no submission or request is made, no further action shall be required to be taken by the Assistant Secretary. If the State or local official submits materials but does not request a conference, the Assistant Secretary shall evaluate any arguments in opposition or other materials received from the State or local agency. If, after that evaluation, the Assistant Secretary is still of the opinion that the law, on its face, fails to provide rights and remedies for alleged discriminatory housing practices that are substantially equivalent to the rights and remedies provided in the Act, the Assistant Secretary shall inform the submitting State or local official in writing that certification is denied.

(b) If the Assistant Secretary determines, after considering the

materials and information submitted under § 115.5, any additional information obtained under § 115.6(a), an assessment of the current practices and past peformance of the agency in meeting the standards of § 115.4(b), and any written comments received under § 115.6(b), that it has not been demonstrated that, in operation, a State or local fair housing agency in fact provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to those provided in the Act, the Assistant Secretary shall communicate this determination in writing to the State or local agency and shall allow the agency not less than 15 days to submit data, views, and arguments in opposition and to request an opportunity for a conference in accordance with § 115.9. If a request for a conference is not received within the time provided, the Assistant Secretary shall evaluate any arguments in opposition or other materials received from the State or local agency and, if after that evaluation the Assistant Secretary is still of the opinion that certification should be denied, the Assistant Secretary shall inform the submitting State or local official in writing that certification is denied.

(c) Where comment on a request for certification was invited in accordance with § 115.6(b), notice of denial of certification under this section shall be published in the Federal Register.

§ 115.8  Withdrawal of certification.

(a) Not less frequently than every 5 years, the Assistant Secretary shall determine whether each agency certified under this part continues to qualify for certification. The Assistant Secretary shall take appropriate action with respect to any agency not so qualifying.

(b) The Assistant Secretary shall periodically review the administration of fair housing laws recognized under this part. If the Assistant Secretary finds, as a result of a periodic review, upon the petition of an interested person or organization, or otherwise, that taken as a whole, the agency's administration of its fair housing law or the law, on its face, no longer meets the requirements of this part, the Assistant Secretary shall propose to withdraw the certification previously granted.

(c) The Assistant Secretary shall propose withdrawal of certification unless review establishes that the current fair housing law administered by the certified agency meets the criteria of § 115.3 and that current practices and past performance of the agency meet the standards of § 115.4.

(d) Before the Assistant Secretary publishes notice of a proposed withdrawal of certification, the Assistant Secretary shall inform the State or local agency in writing of his or her intention to withdraw certification. The communication shall state the reasons for the proposed withdrawal and provide the agency not less than 15 days to submit data, views, and arguments in opposition and to request an opportunity for a conference in accordance with § 115.9.

(e) Notice of a proposed withdrawal shall be published in the Federal Register. The notice shall allow the State or local agency and other interested persons and organizations not less than 30 days in which to file written comments on the proposal.

(f) If a request for a conference in accordance with § 115.9 is not received within the time provided, the Assistant Secretary shall evaluate any arguments in opposition or other materials received from the State or local agency and other interested persons or organizations, and if after that evaluation the Assistant Secretary is still of the opinion that certification should be withdrawn, the Assistant Secretary shall withdraw certification and shall publish notice of the withdrawal in the Federal Register.

### § 115.9  Conferences.

(a) Whenever an opportunity for a conference is timely requested by a State or local agency in accordance with § 115.7 or § 115.8, the Assistant Secretary shall issue an order designating an officer who shall preside at the conference. The order shall indicate the issues to be resolved and any initial procedural instructions that might be appropriate for a particular conference. It shall fix the date, time and place of the conference. The date shall not be less than 20 days after the date of the order. The date and place shall be subject to change for good cause.

(b) A copy of the order shall be served on the State or local agency and:

(1) In the case of a denial of certification, on any person or organization that files a written comment in accordance with § 115.6(b); or

(2) in the case of a withdrawal of certification, on any person or organization that files a petition in accordance with § 115.8(a) or written comment in accordance with § 115.8(c). The agency and all such persons and organizations shall be considered to be participants in the conference. After service of the order designating the conference officer, and until the officer submits a recommended determination,

all communications relating to the subject matter of the conference shall be addressed to that officer.

(c) The conference officer shall have full authority to regulate the course and conduct of the conference. A transcript shall be made of the proceedings at the conference. The transcript and all comments and petitions relating to the proceedings shall be made available for inspection by interested persons.

(d) The conference officer shall prepare proposed findings and a recommended determination, a copy of which shall be served on each participant. Within 20 days after service, any participant may file written exceptions. After the expiration of the period for filing exceptions, the conference officer shall certify the entire record, including the proposed findings and recommended determination, and any exceptions to the findings and recommendations, to the Assistant Secretary, who shall review the record and issue a final determination within 30 days. Where applicable, this determination shall be published in the Federal Register.

### § 115.10  Consequences of certification.

(a) Where all alleged violations of the Act contained in a complaint received by the Assistant Secretary appear to constitute violations of a State or local fair housing law administered by an agency that has been certified as substantially equivalent, the complaint shall be referred promptly to the appropriate State or local agency, and no further action shall be taken by the Assistant Secretary with respect to such complaint, except as provided for by the Act, this Part, and by §§ 103.100 through 103.115 or § 105.20 through 105.22 of this chapter.

(b) Notwithstanding paragraph (a) of this section, no complaint based in whole or in part on allegations of discrimination on the basis of familial status or handicap shall be referred to any State, locality or agency thereof whose certification was granted in accordance with § 115.6(d) or section 810(f)(4) of the Act, without regard to whether the fair housing law administered by such certified agency appears to prohibit discrimination based on familial status or handicap.

(c) Notwithstanding paragraph (a) of this section, whenever the Secretary has reason to believe that a complaint shows a basis may exist for the commencement of proceedings against any respondent under section 814(a) of the Act, or for proceedings by any governmental licensing or supervisory authorities, the Secretary shall transmit the information upon which that belief is

based to the Attorney General, or to appropriate governmental licensing or supervisory authorities.

### § 115.11  Interim referrals.

If the Assistant Secretary determines after application of the criteria set forth in § 115.3, that a State or local fair housing law on its face provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to those provided in the Act, but that the law has not been in effect, or the appropriate State or local agency in operation, for a sufficient time to permit a demonstration of compliance with the performance standards described in § 115.4, the Assistant Secretary may enter into a written agreement with the State or local agency providing for referral of complaints to the agency on such terms and conditions as the Assistant Secretary shall prescribe, or providing for other utilization of the services of the State or local agency and its employees upon agreed terms, and providing further for procedures for communications between the agency and HUD that are adequate to permit the Assistant Secretary to monitor the agency's administration and enforcement of its law and to assist the Assistant Secretary in making the determination required in § 115.2(b). The agreement may provide for reactivation of referred complaints by the Assistant Secretary without regard to the limitations described in § 115.10. If such an agreement for interim referrals or other utilization of services is entered, the Assistant Secretary may defer final determination under § 115.6 or § 115.7 for a reasonable period determined by the Assistant Secretary to be necessary in order to permit a fair assessment of the agency's performance. In no event shall this period extend more than two years beyond the date of entry into the agreement for interim referrals or other utilization of services. This two-year limitation does not apply to agencies certified in accordance with § 115.6(d). However, an agreement under this section shall not be extended beyond the date of certification under § 115.6 or denial of recognition under § 115.7. Notice of entry into an agreement under this section shall be published in the Federal Register.

19. Part 121 is added to read as follows:

## PART 121—COLLECTION OF DATA

Sec.
121.1  Purpose.
121.2  Furnishing of data by program participants.

**Federal Register** / Vol. 54, No. 13 / Monday, January 23, 1989 / Rules and Regulations **3317**

Authority: Title VIII, Civil Rights Act of 1968 (42 U.S.C. 3600–3620); E.O. 11063, 27 FR 11527; sec. 602, Civil Rights Act of 1964 (42 U.S.C. 2000d–1); sec. 562, Housing and Community Development Act of 1987 (42 U.S.C. 3608a); sec. 2, National Housing Act, 12 U.S.C. 1703; sec. 7(d), Department of Housing and Urban Development Act, 42 U.S.C. 3535(d).

### § 121.1  Purpose.

The purpose of this part is to enable the Secretary of Housing and Urban Development to carry out his or her responsibilities under the Fair Housing Act, Executive Order 11063, dated November 20, 1962, Title VI of the Civil Rights Act of 1964, and section 562 of the Housing and Community Development Act of 1987. These authorities prohibit discrimination in housing and in programs receiving financial assistance from the Department of Housing and Urban Development, and they direct the Secretary to administer the Department's housing and urban development programs and activities in a manner affirmatively to further these policies and to collect certain data to assess the extent of compliance with these policies.

### § 121.2  Furnishing of data by program participants.

Participants in the programs administered by the Department shall furnish to the Department such data concerning the race, color, religion, sex, national origin, age, handicap, and family characteristics of persons and households who are applicants for, participants in, or beneficiaries or potential beneficiaries of, those programs as the Secretary may determine to be necessary or appropriate to enable him or her to carry out his or her responsibilities under the authorities referred to in § 121.1.

20. The text of the preamble to this rule beginning at the heading "BACKGROUND" and ending before the heading *Legislative review issues,*" is added as Appendix I to Subchapter A of Chapter I as follows:

**Appendix I to Subchapter A—Preamble to Final Rule Implementing Fair Housing Amendments Act of 1988 (Published January 19, 1989)**

Dated: January 12, 1989.

Samuel R. Pierce, Jr.,

*Secretary.*

[FR Doc. 89–1211 Filed 1–19–89; 8:45 am]

**BILLING CODE 4210-32-M**



**FILE COPY**

U. S. Department of Housing and Urban Development
Washington, D.C. 20410-2000

December 17, 1993

THE FAIR HOUSING ACT
25th Anniversary
1968 - 1993
U.S. DEPARTMENT OF HUD

OFFICE OF THE ASSISTANT SECRETARY
FOR FAIR HOUSING AND EQUAL OPPORTUNITY

MEMORANDUM FOR: All Regional Directors, Office of Fair Housing
and Equal Opportunity

FROM: Roberta Achtenberg, Assistant Secretary for Fair Housing
and Equal Opportunity, E

SUBJECT: Applicability of Disparate Impact Analysis to Fair
Housing Cases

Cases which have been brought under the Fair Housing Act
should now be analyzed using a disparate impact analysis, to the
extent that this theory is applicable to a particular case.

Under a disparate impact analysis, a policy, standard,
practice or procedure which, in operation, disproportionately
adversely affects persons protected by the Fair Housing Act
coverages may violate the Act.

According to a Secretarial decision in <u>Secretary v. Mountain
Side Mobile Estates</u>, dated July 19, 1993, a <u>prima facie</u> case of
disparate impact may be established by statistical evidence,
including national statistics where there is no evidence of a
large variation from local statistics, establishing that a
facially neutral policy has a disparate impact on persons who are
protected against discrimination. This theory only applies where
there is a policy which is, on its face, neutral, but which
operates to disproportionately disadvantage persons because of
race, color, national origin, religion, handicap, sex or familial
status. Other theories will be applicable where the policy is
unequally applied or where it is discriminatory on its face.

For purposes of investigation, this suggests that a position
that a <u>prima facie</u> case has been established should be buttressed
by an analysis of the evidence supporting the belief that a
particular policy, practice, standard or procedure disadvantages
a group or a portion of a group protected against discrimination.
In some instances, this will be by analysis of waiting lists,
applicant flow or occupancy data. In other cases, this will be
done by an analysis of the effect of a policy on potential
applicants or the population of a community in a particular
income bracket.

In a second Secretarial decision in the same case, dated October 20, 1993, the Secretary confirmed that a respondent may rebut a _prima facie_ case by evidence that the policy is justified by a business necessity which is sufficiently compelling to overcome the discriminatory effect. The business necessity justification may not be hypothetical or speculative.

For purposes of investigation, all of the respondent's justifications for its policy should be requested, with any supporting documentation. Each should be investigated to determine if there are genuine business reasons for the policy. The respondent should also be queried as to whether or not the respondent considered any alternatives to the particular policy and what the reasons for rejecting the alternatives, if any, were. Even if the respondent did not consider discriminatory alternatives, the investigation should consider whether there are any less discriminatory ways in which the respondent's business justifications may be addressed. These steps are important because if there is a less discriminatory way by which genuine business necessities may be addressed, it may be argued that the respondent should have adopted the less discriminatory alternative.

The disparate impact analysis may be applicable in a variety of situations, ranging from cases in which a local residency preference disproportionately excludes minorities from housing residency, to policies refusing to count alimony as income for purposes of housing eligibility, to occupancy cases in which a facially neutral policy disproportionately excludes or disadvantages families with children.[1]

Copies of the two Secretarial decisions are attached for your consideration.

Further examples and additional guidance will follow this memo. If you have any questions, please contact Sara Pratt, Director, Office of Investigations at (202) 708-0836.

---

[1] Because the Frank Keating memorandum of March 21, 1991 addressing occupancy restrictions has not been withdrawn, occupancy cases involving a disparate impact aspect should also be analyzed using the memorandum as a guide.

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN AND DEVELOPMENT
OFFICE OF THE SECRETARY

| | |
|---|---|
| The Secretary, United States Department of Housing and Urban Development, on behalf of Jacqueline, Jaime, Michael, and Shea VanLoozenoord, | : |
| Charging Party, | : |
| v. | : |
| Mountain Side Mobile Estates Partnership, and Mr. and Mrs. R. D. Dalke, | : |
| Respondents. | : |
| AND | : |
| The Secretary, United States Department of Housing and Urban Development, on behalf of Michael Brace, | : |
| Charging Party, | : |
| v. | : |
| Mountain Side Mobile Estates Partnership, and Mr. and Mrs. R. D. Dalke, | : |
| Respondents. | : |

HUDALJ 08-92-0010-1
HUDALJ 08-92-0011-1

Dorothy Crow-Willard, Esq.
Sara K. Pratt, Esq.
Harry L. Carey, Esq.
Carole W. Wilson, Esq.
    For the Charging Party

Stephen E. Kapnik, Esq.                                                    2
        For the Respondents

Before:    Henry G. Cisneros
           Secretary of Housing and Urban Development

### DECISION AND ORDER

### Statement of the Case

Mountain Side Mobile Estates ("the Park") is a trailer park located at 17190 Mt. Vernon Road, Golden, Colorado, in unincorporated Jefferson County. It was developed in the 1960's. It has 229 lots for mobile homes, with an average of 10 lots per acre. The Park has limited recreational facilities and narrow streets compared to trailer parks built in the 1970's and later, and small "single-wide" mobile homes. The Park has a total of 458 bedrooms. Nevertheless, the Park has a population of approximately 320 persons, with approximately 30 families with children under 18 years of age. Approximately 76% of the homes in the Park are two bedroom, 13% are three bedroom, and 11% are one bedroom homes. The Park sits on a flood plain.

Prior to the effective date of the Fair Housing Amendments Act of 1988, the Park was an "adults only" Park. Respondents determined that it would not be feasible to qualify for the "55 and older" statutory exemption. See 42 U.S.C. § 3607(b)(2). However, fearing an unlimited expansion of the Park's population, they instituted a three person per unit occupancy limit on March 8, 1989. The Fair Housing Amendments of 1988 became effective on March 12, 1989.

This case arose as a result of complaints filed by Jacqueline VanLoozenoord, her three minor children, and Michael Brace ("Complainants"), alleging discrimination based on familial status in violation of the Fair Housing Act, as amended, 42 U.S.C. 3601, et seq. ("the Act"). On July 24, 1992, following an investigation and a determination that reasonable cause existed to believe that discrimination had occurred, the Department of Housing and Urban Development ("the Charging Party") issued a charge against Mountain Side Mobile Estates Partnership, Robert Dalke, and Marilyn Dalke ("Respondents"), alleging that they had engaged in discriminatory practices in violation of 42 U.S.C. 3604 because they had imposed an occupancy limitation of three persons per mobile home (unit). Respondents had attempted to evict Complainants because they were in violation of the unit occupancy limitation.

A hearing was held and Administrative Law Judge William C. Cregar issued an Initial Decision and Order on March 22, 1993, finding that the Charging Party failed to prove that Respondents had violated the Act and dismissing the charge of discrimination.

3

On April 21, 1993, the Secretary of Housing and Urban Development remanded the Initial Decision and Order in the above-captioned case to permit consideration of the Charging Party's April 13, 1993, Motion for Partial Reconsideration and any opposition thereto. *See* 24 C.F.R. § 104.930(a) and (d). ALJ Cregar issued an Order for the submission of briefs in support of the Charging Party's Motion, and in opposition. Both parties timely filed briefs.

The Charging Party moved for reconsideration of that portion of ALJ Cregar's Initial Decision and Order that found no violation of 42 U.S.C. § 3604(a) and (b) and requested the assessment of damages against Respondents for those alleged violations. Respondents argued that the Initial Decision contained no clear error, and accordingly, the determination should not be modified. In his Initial Decision on Remand and Order, dated June 18, 1993, ALJ Cregar again found that Respondents did not violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3601, et seq. ("the Act"), and he again denied the Charging Party's request for relief.

On July 7, 1993, the Charging Party filed a Motion to Set Aside Initial Decisions and Enter a Final Decision Granting Relief, and also filed a Memorandum in Support of Motion to Set Aside Initial Decision on Remand and Order and Issue a Final Decision Granting Relief ("Memorandum"). On July 14, 1993, Respondents timely filed an Opposition to HUD's Motion to Set Aside Initial Decision. On July 19, 1993, the Secretary again remanded the case to the ALJ. The ALJ had held that Charging Party had not proven a prima facie case and further held that, even if a prima facie disparate impact case had been shown, Respondents had carried their burden of rebuttal by demonstrating that their three person per unit occupancy restriction served their legitimate goals and was not a mere unsubstantial justification. The Secretary reversed the ALJ. He held that the Charging Party had established a prima facie case based upon the disparate impact theory. He further held that the ALJ had improperly relied upon the analysis of business necessity as set forth in Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642 (1989). The Secretary then directed a remand for the ALJ to consider the Respondents' business necessity defenses in light of the standard set forth in Betsy v. Turtle Creek Associates, 736 F.2d 983 (4th Cir. 1984).

On September 20, 1993, Judge Cregar issued a Second Initial Decision on Remand and Order in which he held that the Respondents had met the business necessity test under Betsy and that the Charging Party had failed to demonstrate that a less discriminatory alternative to the three person per unit occupancy policy existed. Charging Party filed a Motion to Set Aside the Second Initial Decision and Order on October 5, 1993. The NAACP

4

Legal Defense and Educational Fund, Inc. filed an <u>amicus curiae</u> brief on October 5, 1993.

Summary of Second Initial Decision on Remand and Order

The ALJ determined that both economic viability and concern for the safety and health of tenants are legitimate business concerns. He held as follows:

> Drawing an analogy from the Title VII job relatedness tests, I conclude that the "business necessity" test as applied to Title VIII has two components. First, the challenged practice must bear a demonstrable relationship to a housing provider's legitimate business interests; and second, objective evidence must establish that the means selected to serve those interests must be reasonably likely to effectuate those interests and not otherwise be unlawful.

Second Initial Decision at 5. It was his view that economic viability was the <u>sine qua non</u> of a business, including a housing provider. He then cited 42 U.S.C. §1437 for the proposition that "it is the policy of the United States to promote the general welfare of the Nation by employing its funds and credit ... to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income." Based on this provision, he held that the business necessity standard under Title VIII included consideration of health and safety concerns.

Using these twin business concerns he ruled that the three person per unit policy constituted business necessity for several reasons. Second Initial Decision at 5-7. First, the policy prevented overcrowding. Overcrowding, according to the ALJ, "could put the health of [Mountain Side Mobile Estates] Park population at risk by overwhelming the sewer system." In support of the health risk, he noted that the record demonstrated that overcrowding would result if the number of occupants of the Park exceeded 916. Second, overcrowding could affect the Park's economic viability because "it could result in an exodus of tenants seeking to avoid these conditions. The same unsanitary conditions causing the exodus could discourage or prevent new tenants from moving into the Park." The ALJ held that the three person per unit occupancy limit was not otherwise illegal and would stem the risk of overcrowding.

The ALJ also ruled that objective evidence established that the occupancy limit was "reasonably likely to maintain a healthy and economically viable park." He noted that although the

5

occupancy limit would establish a Park population lower than the capacity of the Park's sewer system, the lower limit would allow for seasonal visitors and would allow the smaller population to live in greater comfort. He cited as objective evidence the QCI Report that establishes that more than four persons per unit could lead to unsanitary conditions and testimony that there were seasonal visitors.

The ALJ then discussed and dismissed each of a number of suggested alternatives presented by the Charging Party. The alternatives to the three person per unit occupancy limit were: (1) adoption of an alternate occupancy limit, (2) physical alterations to the Park and (3) the imposition of restrictions on the terms and conditions of residence. The ALJ rejected all three as unacceptable because they would discriminate or be impractical or prohibitively expensive.

The ALJ rejected the Charging Party's suggestion that Respondents impose an overall maximum population ceiling on the Park regardless of the number of occupants. He held that this alternative was economically impractical because total Park population could be reached before Respondents are able to rent all of their lots. He noted that the Respondents might be compelled to prohibit the sale of units and rental spaces once the limit was reached. He also noted that once the limit was reached, Respondent's refusal to rent a unit could subject them to disparate treatment charges.

The ALJ rejected the Charging Party's suggestion that Respondents impose an occupancy limit based on the number of occupants per bedroom. He noted that because of the number of bedrooms, that a potential for overcrowding existed because of the sewer system limitations.[1]

Charging Party also suggested physical alterations to the Park, such as replacement of a section of sewer pipe that could prevent sewer blockages. The ALJ ruled that, although the solution would not be expensive, it involved major impediments,

---

[1] Charging Party also suggested the adoption of a minimum square footage requirement for each occupant's sleeping area. The ALJ ruled, however, that this suggestion would not necessarily prevent overcrowding. He also ruled that the record failed to demonstrate that adoption of a square footage requirement for sleeping areas or for whole units would not result in a less discriminatory impact on families with children. Charging Party further suggested that sewer overload could be prevented by limiting the number of toilets per unit or instituting water conservation and demand control. The ALJ, however, ruled that Park residents could then be faced with too few toilets and an intrusive police enforcement mechanism.

such as obtaining a permit from FEMA and possibly removing the Park from the flood plain on which it rests. He further ruled that there was credible testimony that replacing the section of pipe might not cure the sewerage problems.

## Motion to Set Aside Second Initial Decision and Enter a Final Decision Granting Relief

In its Motion to Set Aside Second Initial Decision and Enter a Final Decision Granting Relief, Charging Party argues that the ALJ misinterpreted the standard required for a respondent to establish that a discriminatory housing practice is justified by business necessity, improperly required the Charging Party to bear the burden of proving that there were less discriminatory alternatives to the challenged three person per unit occupancy restriction and, regardless of which party bears the burden of production, incorrectly found that there were no less discriminatory alternatives which would meet the respondents' claimed business concerns.

The Charging Party argues that the ALJ improperly substituted the concept of "legitimacy" for the requirement that a policy be a "necessity." Charging Party argues that, under Betsy and other cases, a business necessity must be compelling, not just legitimate. Charging party further argues that the necessity must be manifest or apparent rather than speculative. In addition, Charging Party urges that even if Respondents' interests are substantial, they cannot automatically outweigh significant disparate effects and must be weighed against and shown to outweigh the showing of discriminatory effect.

Charging Party further argues that the record does not support a conclusion that the three person per unit occupancy policy was justified by business necessity. First, Charging Party notes that the Respondents presented no evidence that overcrowding would actually or predictably occur, citing that only 341 persons resided in the Park in the months preceding Complainants' purchase of their unit and that this number was barely more than one third of the alleged maximum number allowable because of the sewer capacity of the Park.

Second, Charging Party points to the lack of any meaningful study of the Park or its sewer system at the time the Respondents imposed the three person per unit limitation. For example, Charging Party points to the testimony of the manager of the Park who admitted that the Respondents had no objective evidence in March 1989 on which to base their restriction, notes that an alleged population study conducted in 1988 was not raised as a defense during the investigation of the charge, and that the QCI engineering report never mentioned the population study.

7

Charging Party also faults the ALJ for relying on the QCI Report, which was not conducted until 1991. Charging Party strongly urges that the QCI Report only concluded that overall occupancy not routinely exceed the limit of 916 persons (two persons per bedroom) and provided no evidence that occupancy lower than 916 would create health or sanitation problems for the Park. Third, Charging party argues that the issue of seasonal visitors was a bald assertion, not supported by any evidence and unaccompanied by testimony as to the extent to which residents of the Park took vacations or had visitors.[2]

In the remainder of its Motion, Charging Party argues that various alternative proposals would have accomplished the Respondents' goals with less adverse impact and asks for judgment and damages against the Respondents. Charging Party states that there was no necessity for any occupancy restriction based upon the current population of the Park, that the two persons per bedroom alternative was within the parameters of the QCI Report or that an overall Park maximum occupancy could have been instituted. Charging Party seeks $1250.05 in economic damages and $50,000 in emotional distress damages for Complainants Michael Brace and Jacqueline VanLoozenoord and $500 for Jaime VanLoozenoord.

On October 14, 1993, Respondents filed an Objection to Staff's Third Attempt to Negate ALJ Decision (hereafter "Objection") and filed a Motion to Strike NAACP's Second Amicus Curiae Letter.[3] Respondents' Objection complains about the conduct of Departmental employees during the course of the investigation and hearing on the charge in this case, alleges that the Department should have engaged in rulemaking, rather

_____

[2] Charging Party also argues that the ALJ failed to weigh the substance of the Respondents' justifications against the severity of the policy itself. The Charging Party states that since the Secretary has previously held that the three person per unit policy had a severe impact on a family with more than one child, such severe impact far outweighs the alleged potential overcrowding was based on guesswork or speculation. In its Motion, Charging Party takes the position that the Respondents bear the burden of demonstrating that no less discriminatory alternative exist. Charging party suggests that ALJ Cregar's decision is in conflict with ALJ Streb's decision in HUD v. Carter, HUDALJ 03-90-0058-1 (1992), in which the burden to demonstrate a less discriminatory course of action was placed on respondent.

[3] The NAACP Legal Defense and Education Fund, Inc. (the "Fund") as amicus curiae filed a letter on October 5, 1993. The Fund's letter was not considered in this Secretarial review.

001122

than attempt to establish new case law on a case by case basis, and argues that the Secretary will subvert the administrative process if he reverses the ALJ again.

8

## DISCUSSION

### I. Business Necessity in General

In remanding this case to the ALJ on July 19, 1993, the Secretarial Decision and Order directed the application of a business necessity rebuttal standard after finding that the Charging Party had demonstrated a prima facie case of disparate impact discrimination regarding the three person per unit occupancy policy. It cited the Betsy decision as authority for the application of the business necessity standard. Id. at 9. Unfortunately, the business necessity standard was not correctly set forth by the ALJ in this case.

The business necessity standard in Title VIII cases is imported from employment discrimination case law under Title VII. Business necessity in the employment discrimination arena requires that the alleged discriminatory practice "have a manifest relationship to the employment in question." Griggs v. Duke Power Co., 401 U.S. 424, 432 (1971) (emphasis added). A discriminatory employment practice must be shown to be "necessary to safe and efficient job performance to survive a Title VII challenge." Dothard v. Rawlinson, 433 U.S. 321, 331, n.14 (1977) (emphasis added). The Eleventh Circuit has emphasized the word "necessity" and has properly dismissed the standard embodied in the phrase "legitimate employment goals":

> Prior to 1989, the "business necessity" showing was an affirmative defense for which the defendant bore the burden of proof and the risk of nonpersuasion. [Citations omitted.] In 1989, the Supreme Court in Wards Cove, changed the law, holding that the defendant bore only the burden of coming forward with an alleged business-related justification for the challenged practice, which the plaintiff would then have to disprove in order to prevail. Wards Cove at 659.... The court also broadened the scope of the necessity defense by holding that practices causing a disparate

impact were permissible even if they could not be shown to be absolutely necessary, so long as they served in a significant way the legitimate employment goals of the employer. _Id_. at 659.... These changes were statutorily reversed by 1991 Civil Rights Act of 1991, Pub. L. No. 102-166, §105(a)....

_Patrick v. City of Atlanta_, LEXIS #24682 at 16 (11th Cir., Sept. 27, 1993). Accordingly, under Title VII law, the business necessity test means that the policy or practice at issue must serve a necessary relationship to the employer's needs, not merely serve the employer's legitimate goals.

As with current Title VII law, under Title VIII law, the need for a true necessity is also required. In _Betsy_, the court held that when confronted with a showing of discriminatory impact, "defendants must prove a business necessity _sufficiently compelling_ to justify the challenged practice." _Id_. at 988 (emphasis added). In _United States v. City of Black Jack, Mo._, 508 F.2d 1179, 1186 (8th Cir. 1974), the court held that after the finding of a prima facie case, the defendant was required to "demonstrate a _compelling_ . . . . interest." (Emphasis added.) Clearly, the word "compelling" correlates to the word "necessary."

Further, under Title VII, only objective evidence, as opposed to the employer's mere speculation or subjective opinion, that a practice addresses an employer's job relatedness concerns can establish a legal rebuttal. _See_ _Dothard_; _Albemarle Paper Co. v. Moody_, 422 U.S. 405,428, n.23 (1975) ("Job relatedness⁴ cannot be proved through vague and unsubstantiated hearsay.") The same rule applies under Title VIII law. _See_, e.g., _Keith v. Volpe_, 858 F.2d 467 (9th Cir. 1988). Additionally, _post hoc_ rationalizations are accorded little weight by courts, _Huntington Branch, NAACP v. Town of Huntington, NY_, 844 F.2d 926 (2d Cir. 1988), and will be accorded little weight by this agency.

---

⁴ _Griggs_ and its progeny use the terms "business necessity" and "job relatedness" interchangeably. Also, the most recent amendment to Title VII, the Civil Rights Act of 1991, upon which the Secretary relied in rejecting the _Wards Cove_ standard, considers "job relatedness" to be consistent with "business necessity." _See_ 42 U.S.C. §2000e-2(k)(1)(A)(i) and 137 Cong. Rec. S15276 (daily ed. October 25, 1991)(Interpretive Memorandum) reprinted in 1991 Code Cong. and Admin. News, 102d Cong., 1st Sess. at 767.

10

2. <u>Business Necessity as Applied to This Case</u>

The evidence in this case fails to demonstrate that the three person per unit occupancy policy meets the business necessity standard. The existing evidence consists of speculation, <u>post hoc</u> rationalizations and vague hearsay. Accordingly, this decision finds that the Respondents have not met the business necessity test.

The ALJ erroneously set forth a test that would require significantly less than a "business necessity" when he ruled that the "challenged practice must bear a demonstrable relationship to a housing provider's legitimate business interests." As was noted above, the standard for a business necessity can only be met by establishing compelling need or necessity. The evidence in this case does not support a compelling need or necessity for the three person per unit policy. At the time the policy was implemented, the Park only had a population of 320 people. Second Initial Decision at 3.[5] The QCI Report concluded that the sewer system could support 916 residents. Thus, during the period in question, between 1988 and 1991, there existed no compelling need or necessity for an occupancy limit of three persons per unit. In fact, based on that report, the Park could have tripled in size without having caused sewer problems.

Furthermore, the figure of 916 was not absolute. Mr. Walker, who prepared the QCI Report, testified that <u>assuming</u> the Park reached 916 residents, and <u>assuming</u> that everyone were at home on a hot afternoon, and <u>assuming</u> that guests were visiting, there might potentially be a problem with the sewer system. Tr. III at 146-147. He did not state that 916 or even 925 was an absolute maximum. Rather, he testified that "We're into probability and we're into statistics." <u>Ibid</u>. Thus, the Report itself, assuming it is given full weight, does not establish business necessity. <u>See HUD v. Carter</u>, 2 Fair Housing-Fair Lending ¶25,029 at 25,318 (HUDALJ May 1, 1992); <u>HUD v. Denton</u>, 2 Fair Housing-Fair Lending ¶25,014 at 25,204 (HUDALJ November 12, 1991).

In addition, the QCI Report was not completed until three years after the imposition of the occupancy limitation. This

_____

[5] The Charging Party used the figure of 341 Park residents as of a few months prior to the purchase of the mobile home unit by Complainants, that is in August 1991. Memorandum in Support of Motion to Set Aside at 3, 12. Since the ALJ's figure was based on the date the three person per unit policy was implemented in 1988, only 21 additional people became residents in three years. At this rate, the Park would not reach a resident population of 687 (the three person per unit limit) until 2039.

11

report constitutes a <u>post hoc</u> rationalization for the occupancy limitation. As such, it will be accorded little weight. <u>Huntington</u>, <u>supra</u>.

The ALJ also rested his decision on the fact that there would be visitors to the Park who, if the Park ever reached its maximum of 916 residents, would overly stress the sewer system and cause unsanitary conditions as well as result in a flight of residents to avoid such consequences. The question of visitors, however, was never an issue raised by Respondents until well into discovery and trial. Mr. Edward Brooks, a son of one of the owners and President of Prime Management, which manages the Park, mentioned seasonal visitors only one time. Tr. III at 236. The reference to seasonal visitors is vague and unsubstantiated; no specific numbers of visitors were cited and the testimony is speculative. Further, it is a <u>post hoc</u> rationalization. Additionally, the argument of overcrowding on the basis of seasonal visitors, at a period of time when the population of the Park was one-third the 916 suggested by the QCI Report, is sheer speculation by the ALJ. Speculation is not objective evidence, and theoretical problems do not a business necessity make.

In summary, the use of the three person per unit occupancy limit was not necessary or based upon a compelling need to control the population of the Park. Nor was the occupancy limit imposed based upon objective evidence known to Respondents at the time the occupancy limit was adopted. The QCI Report was conducted after the fact and provides a <u>post hoc</u> rationalization. Nor does the ALJ's reliance on seasonal visitors pass muster. The evidence is vague, speculative and a <u>post hoc</u> rationalization.

## 3. <u>Respondents' Claims Are Misplaced</u>

In their Objections, as noted above, Respondents raised three issues concerning the alleged abuse of the administrative process by the Department and its employees. First, the Respondents allege that Departmental employees engaged in questionable conduct during the course of the investigation and hearing of this case. These matters are best dealt with by the ALJ in the course of officiating over the case. In this case, however, the ALJ made no mention of any such alleged improprieties in the course of his 13 page decision dated October 1, 1993. Since there were no findings of fact relating to improprieties, there is no basis on the record as it now exists for any action by the Secretary in response to these vague allegations.

001126

Second, the Respondents allege that the Department should have engaged in rulemaking, rather than attempt to establish new law on a case by case basis. Respondents cite no authority for their position. Nor is this argument persuasive. A criminal prosecutor enjoys the advantages of great latitude in enforcement, Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978), and civil enforcers enjoy even greater latitude, since the principle that ambiguities in criminal statutes must be resolved in favor of lenity does not apply to the civil enforcement context. United States v. Batchelder, 442 U.S. 114, 121 (1979); see also United States v. Goodwin, 457 U.S. 368 (1982). The Department has no duty under the law to warn landlords by regulation that their conduct violates the Fair Housing Act. Further, the enforcement of a statutory scheme is best left to the responsible agency, since it alone is "empowered to develop that enforcement best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and econom- ically." Moog v. FTC, 355 U.S. 411, 413 (1958). Accordingly, Respondents' second argument in their Objections is unpersuasive.

Third, Respondents argue that a Secretarial reversal of the ALJ would negate a year of litigation, undermine Federal law and the integrity of the administrative law system, and politicize the administrative process. This review does not negate a year of litigation or subvert the administrative process. Under 42 U.S.C. §3612(h), the Secretary may review any finding, conclusion or order. There is no limitation on this review authority. In this case, the ALJ did not properly set forth the standard for business necessity. Correcting that error falls within the purview of §3612(h) and in no way undermines the integrity of the administrative law process. Assuring that this Nation's fair housing laws are enforced uniformly and in concert with precedent is not a politicization of the administrative process.

Accordingly, this decision and order finds that the Respondents have failed to establish the business necessity of their three person per unit occupancy policy. Based upon this finding and the earlier finding by this Office on July 19, 1993, that the Charging Party had demonstrated a prima facie case, judgment must be, and hereby is, entered against Respondents. The case is remanded to the ALJ to determine the amount of damages to be assessed in this case.

13

## ORDER

Upon consideration of the Motion to Set Aside the Second
Initial Decision and Enter a Final Decision Granting Relief in
the above captioned case, and pursuant to 42 U.S.C. 3612(h)(1)
and 24 CFR 104.930(a) and (d), the Secretary hereby enters
judgment for the Charging Party in the above captioned case and
remands it for 60 days so that the Administrative Law Judge may
take further action consistent with the above Decision.

10/20/93
_____
Date

_____
BRUCE KATZ
Chief of Staff
Office of the Secretary

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN AND DEVELOPMENT
OFFICE OF THE SECRETARY

The Secretary, United States
Department of Housing and Urban
Development, on behalf of
Jacqueline, Jaime, Michael,
and Shea VanLoozenoord,

       Charging Party,

    v.

Mountain Side Mobile Estates
Partnership, and Mr. and Mrs.
R. D. Dalke,

       Respondents.

    AND

The Secretary, United States
Department of Housing and Urban
Development, on behalf of
Michael Brace,

       Charging Party,

    v.

Mountain Side Mobile Estates
Partnership, and Mr. and Mrs.
R. D. Dalke,

       Respondents.

HUDALJ 08-92-0010-1
HUDALJ 08-92-0011-1

Dorothy Crow-Willard, Esq.
Jane S. O'Leary, Esq.
Sara K. Pratt, Esq.
Harry L. Carey, Esq.
Carole W. Wilson, Esq.
   For the Charging Party

Stephen E. Kapnik, Esq.
    For the Respondents

Before:   Henry G. Cisneros
          Secretary of Housing and Urban Development

## DECISION AND ORDER

### Statement of the Case

This matter arose as a result of complaints filed by Jacqueline VanLoozenoord, her three minor children, and Michael Brace ("Complainants"), alleging discrimination based on familial status in violation of the Fair Housing Act, as amended, 42 U.S.C. 3601, et seq. ("the Act"). On July 24, 1992, following an investigation and a determination that reasonable cause existed to believe that discrimination had occurred, the Department of Housing and Urban Development ("the Charging Party") issued a charge against Mountain Side Mobile Estates Partnership, Robert Dalke, and Marilyn Dalke ("Respondents"), alleging that they had engaged in discriminatory practices in violation of 42 U.S.C. 3604.

A hearing was held and, as discussed more fully below, Administrative Law Judge William C. Cregar issued an Initial Decision and Order on March 22, 1993, finding that the Charging Party failed to prove that Respondents had violated the Act and dismissing the charge of discrimination.

On April 21, 1993, the Secretary of Housing and Urban Development remanded the Initial Decision and Order in the above-captioned case to permit consideration of the Charging Party's April 13, 1993, Motion for Partial Reconsideration and any opposition thereto. *See* 24 C.F.R. § 104.930(a) and (d). ALJ Cregar issued an Order for the submission of briefs in support of the Charging Party's Motion, and in opposition. Both parties timely filed briefs.

The Charging Party moved for reconsideration of that portion of ALJ Cregar's Initial Decision and Order that found no violation of 42 U.S.C. § 3604(a) and (b) and requested the assessment of damages against Respondents for those alleged violations. Respondents argued that the Initial Decision contained no clear error, and accordingly, the determination should not be modified. In his Initial Decision on Remand and Order, dated June 18, 1993, ALJ Cregar again found that Respondents did not violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3601, et seq. ("the Act"), and he again denied the Charging Party's request for relief.

On July 7, 1993, the Charging Party filed a Motion to Set Aside Initial Decisions and Enter a Final Decision Granting

001130

2

In a second Secretarial decision in the same case, dated October 20, 1993, the Secretary confirmed that a respondent may rebut a <u>prima facie</u> case by evidence that the policy is justified by a business necessity which is sufficiently compelling to overcome the discriminatory effect. The business necessity justification may not be hypothetical or speculative.

For purposes of investigation, all of the respondent's justifications for its policy should be requested, with any supporting documentation. Each should be investigated to determine if there are genuine business reasons for the policy. The respondent should also be queried as to whether or not the respondent considered any alternatives to the particular policy, and what the reasons for rejecting the alternatives, if any, were. Even if the respondent did not consider discriminatory alternatives, the investigation should consider whether there are any less discriminatory ways in which the respondent's business justifications may be addressed. These steps are important because if there is a less discriminatory way by which genuine business necessities may be addressed, it may be argued that the respondent should have adopted the less discriminatory alternative.

The disparate impact analysis may be applicable in a variety of situations, ranging from cases in which a local residency preference disproportionately excludes minorities from housing residency, to policies refusing to count alimony as income for purposes of housing eligibility, to occupancy cases in which a facially neutral policy disproportionately excludes or disadvantages families with children.[1]

Copies of the two Secretarial decisions are attached for your consideration.

Further examples and additional guidance will follow this memo. If you have any questions, please contact Sara Pratt, Director, Office of Investigations, at (202) 708-0836.

Attachments

---

[1] Because the Frank Keating memorandum of March 21, 1991 addressing occupancy restrictions has not been withdrawn, occupancy cases involving families with children with a disparate impact aspect should also be analyzed using the memorandum as a guide.

3

Relief, and also filed a Memorandum in Support of Motion to Set Aside Initial Decision on Remand and Order and Issue a Final Decision Granting Relief ("Memorandum"). On July 14, 1993, Respondents timely filed an Opposition to HUD's Motion to Set Aside Initial Decision.

### Summary of Initial Decision and Order

Mountain Side Mobile Estates ("the Park") is a trailer park located at 17190 Mt. Vernon Road, Golden, Colorado, in unincorporated Jefferson County. It was developed in the 1960's. It has 229 lots for mobile homes, with an average of 10 lots per acre. The Park has limited recreational facilities and narrow streets compared to trailer parks built in the 1970's and later, and small "single-wide" mobile homes, typically with two bedrooms. The Park has a population of approximately 320 person, with approximately 30 families with children under 18 years of age. Because the Park is located in a flood plain, significant modifications of the Park's infrastructure would require compliance with regulations of, and approval by, the Federal Emergency Management Agency, and could involve expenditures in the hundreds of thousands of dollars.

Prior to the effective date of the Fair Housing Amendments Act of 1988, the Park was an "adults only" Park. Respondents determined that it would not be feasible to qualify for the "55 and older" statutory exemption. See 42 U.S.C. § 3607(b)(2). However, fearing an unlimited expansion of the Park's population, they considered instituting occupancy limits. Having undertaken a Park population study and expressing a concern that overcrowding would place a burden on the water and sewer capacity and result in a decline in the quality of life, Respondents imposed a three persons per unit occupancy limit. Following the conciliation of a housing discrimination complaint, Respondents retained QCI Development Services Group, Inc. ("QCI") to conduct an independent assessment of the Park's facilities and to assist in evaluating Respondents' occupancy standard. As a result of its assessment of the sewer system and the Park's physical limitations, in May 1991, QCI recommended a two persons per bedroom standard with a maximum limit of 916 Park residents. Respondents elected to maintain their existing limit of three persons per unit, thus restricting the total Park occupancy to 687 residents, well within the cap recommended by QCI.

Complainants are an unmarried couple, Jacqueline VanLoozenoord and Michael Brace, and Ms. VanLoozenoord's three minor children. After Complainants purchased a mobile home without informing the Park managers, Respondents brought eviction proceedings against them because the number of occupants in their dwelling exceeded three persons. The Jefferson County court granted judgment for Respondents, but HUD's conciliation efforts