4

resulted in a stay of the eviction pending the outcome of this proceeding.

HUD presented statistical evidence concerning household composition through documents and the testimony of James Coil, a HUD economist. Mr. Coil testified that as of March 1991, at least 71.2% of all U.S. households with four or more persons contained one or more children under 18 years of age.

The Charging Party attempted to prove that Respondents' institution of the three-person occupancy limit was discriminatory against Complainants based on their familial status on both disparate treatment and disparate impact theories. The ALJ held that the Charging Party had failed to meet its burden under either theory. First, he found that the record did not establish direct evidence of disparate treatment. Regarding indirect evidence of disparate treatment, he determined that the Charging Party had made out a prima facie case. However, he determined that the QCI study established that the sewerage system and Park's physical limitations warranted some action to limit the population of the Park, and that the Charging Party had failed to demonstrate that Respondents' choice of a limit of three persons per unit was pretextual. The ALJ held that he did not need to decide whether the Act contemplates a disparate impact analysis, because the Charging Party's statistics failed to support a prima facie case of disparate impact. The ALJ also concluded that even were a prima facie case of disparate impact established, the Respondents had produced evidence of a business justification and the Charging Party had failed to demonstrate the existence of practical or affordable alternatives.

## Initial Decision on Remand and Order

In his Initial Decision on Remand and Order, the ALJ rejected a contention by the Charging Party that the second prong of the shifting burdens analysis of McDonnell Douglas v. Green, 411 U.S. 792 (1973), was inapplicable to the case because Respondents were claiming an exemption under the Act, i.e., the provision in 42 U.S.C. 3607(b)(1) that "[n]othing in this title limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." The Charging Party asserted that the assertion of this affirmative defense superseded the McDonnell Douglas scheme and shifted the burden to Respondents to prove the reasonableness of the exemption. The ALJ rejected the Charging Party's contentions because, inter alia, the arguments had not been raised earlier, and the statutory provision applies

5

only to local, State and Federal occupancy restrictions.[1]

With regard to disparate impact analysis, the Initial Decision on Remand also rejected the Charging Party's assertion that, contrary to the March 22 Initial Decision, nationwide statistics regarding the composition of households, along with the testimony of HUD economist James Coil, were inadequate to demonstrate a prima facie case of disparate impact on families with children. The ALJ also held on remand that even if he were to conclude that a disparate impact analysis should apply in this case and that a prima facie case was established thereunder,[2] Respondents had demonstrated that their three persons per unit occupancy restriction served their legitimate business goals and was not a mere insubstantial justification. Citing Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642 (1989), the ALJ held that the practice at issue need not be essential or indispensable. Finally, he held that the Charging Party, rather than Respondents, had the burden of persuasion to demonstrate the existence of alternative methods that would satisfy Respondents' legitimate business interests while lessening the impact on families with children, and that the Charging Party had yet to demonstrate the existence of any such alternatives.

The ALJ also rejected arguments by the Charging Party that it had shown the existence of pretext with regard to Respondents' three person per unit occupancy restriction.

### Motion to Set Aside Initial Decision on Remand and Opposition Thereto

In its Memorandum in support of its Motion to Set Aside, the Charging Party for the most part reiterates the arguments that it raised in its previous memorandum in support of Motion for Partial Reconsideration. In its current Memorandum, the Charging Party abandoned the earlier claim that a statutory exemption for occupancy limits is at issue. However, the Charging Party reasserts that in lieu of the usual burden on Respondents of articulating a legitimate, nondiscriminatory reason for their action, once a prima facie case of disparate treatment has been established, under the shifting burdens analysis of McDonnell Douglas, supra, the assertion by Respondents of a nongovernmental

---

[1] In its Memorandum in Support of Motion to Set Aside, the Charging Party has abandoned its argument that a statutory exemption is at issue.

[2] The ALJ's March 22, 1993 Initial Decision held that he did not need to determine whether a discriminatory effect is, by itself, sufficient to establish a violation of the Act since he found that the Charging Party had failed to establish a prima facie case of disparate impact.

6

occupancy restriction requires "heightened scrutiny", and that the ALJ had failed to "carefully examine" the occupancy restriction, as required by the Preamble to 24 CFR Part 104 (24 CFR Ch. I, subch. A, App. I, p. 879 (1982)). The Charging Party reasserted its other arguments, including those regarding the adequacy of its statistical showing as a prima facie case of disparate impact; its argument that, following establishment of a prima facie case, Respondents have a burden of demonstrating something akin to business necessity, rather than merely a legitimate nondiscriminatory reason, for the policy in question; and the assignment to Respondents rather than the Charging Party of the burden of showing less discriminatory alternatives.

In its memorandum in opposition to the Motion to Set Aside, Respondents assert, _inter alia_, that the Secretary can reverse findings by a HUD ALJ only for clear abuse of discretion, which has not been alleged; that Respondents are by corporate policy opposed to discrimination; that limitations on total occupancy in the Park were necessary because of the Park's limitations and functional obsolescence, and there are no reasonable alternatives; that the Park has limited ability to control utilization of space in an individual home; and that some of the complainants' bedrooms do not meet the applicable building code. Respondents also oppose the Charging Party's arguments that any occupancy policy that provides for two persons per bedroom should be "presumptively unreasonable" and that nongovernmental occupancy policies should be presumed to be unfair.

DISCUSSION

## 1. Preliminary matters

The Respondents assert in their opposition to the Motion to Set Aside that the Secretary can reverse findings by a HUD ALJ only for a "clear abuse of discretion", citing HUD v. Holiday Manor Estates Club, Inc., Fair Housing-Fair Lending (P-H) ¶35,024 (1992). I find that the authority of the Secretary is not so limited. The Secretarial decision in Holiday Manor merely indicated that with respect to the particular issue of the appropriate amount of compensatory pain and suffering damages, the Secretary found that it would be "inappropriate" to substitute his judgment for that of the ALJ in the absence of a clear abuse of discretion, since, among other things, the ALJ had observed the witness's credibility. The decision does not suggest a lack of authority on the Secretary's part to reverse in the absence of an abuse of discretion, but merely a judgment that in the circumstances of that case it would have been inappropriate to reverse on that particular issue. In any event, Title VIII and HUD's procedural Title VIII regulations do not limit the Secretary's authority to reverse. Section 104.930(a) of HUD's Title VIII regulations state in relevant part that:

7

[t]he Secretary of HUD may review any finding of fact, conclusion of law, or order contained in the initial decision of the administrative law judge and issue a final decision in the proceedings. The Secretary may affirm, modify or set aside, in whole or in part, the initial decision or remand the initial decision for further proceedings. [24 CFR 104.930(a)]

Neither Title VIII nor the cited regulation imposes the limitation urged by Respondents. Accordingly, I need not find a "clear abuse of discretion" in order to reverse an initial decision by an ALJ or to remand for further proceedings.

2. Disparate impact

As outlined above, the ALJ did not decide whether disparate impact (discriminatory impact) alone is sufficient to establish a violation of the Act, since he concluded that the Charging Party failed to establish a prima facie case of disparate impact. I find that the Charging Party did establish a prima facie case of disparate impact and that a disparate impact, if proven, would establish a violation of the Act.

First, in declining to consider discriminatory effect as sufficient to establish a violation of the Act, the ALJ found merely that this question is "not completely settled". The ALJ concluded not that such a rule would conflict with the law of the Tenth Circuit, but rather that the Tenth Circuit has not yet ruled whether facially neutral policies which have a disparate impact on a protected class violate the Act. Initial Decision (March 22) at 25. The ALJ conceded that most of the United States circuit courts of appeal have held that evidence of discriminatory effect is sufficient to establish a prima facie case. Id. The authority and responsibility for administering the Act is in the Secretary of Housing and Urban Development. 42 U.S.C. 3608(a). In view of the judicial authority for applying the discriminatory effects test, I find that this test should have been applied in this case.

The ALJ concluded that on the facts of this case, nationwide statistics are inadequate to demonstrate a prima facie case of disparate impact on families with children. Initial Decision on Remand at 6; Initial Decision (March 22) at 26. The Charging Party relied upon statistics and the testimony of HUD economist James Coil which the ALJ found establish that at least 71.2% of all U.S. households with four or more persons contain at least one child under the age of 18; that at least 50.5% of U.S. families with minor children have four or more individuals; and that at most, 11.7% of households without minor children have four or more persons. The ALJ found no evidence that statistics which establish the percentage of families with minor children nationwide are the same in Jefferson County or the Denver

metropolitan area. He stated that Mr. Coil tried to address this deficiency by pointing out that the percentage of households with four or more individuals that are families in Jefferson County (for which statistics are available) is almost identical to the nationwide percentage. However, the ALJ stated that he was unwilling to speculate that the same correlation exists as to the percentage of households with minor children. Initial Decision (March 22) at 25. On remand, the ALJ stated that:

> [r]ather than there being "no reason to suppose" that the area around Golden, Colorado, does not statistically differ in the proportion of families with children under 18 from the rest of the United States, I see no reason to suppose that it would be the same. For example, it may well be that, due to depressed economic circumstances, in some areas a higher percentage of adult children live with their parents than are reflected in the nationwide statistics . . . [while] in communities with large populations of university students or young working adults, there may be a higher incidence of congregate housing arrangements. Mr. Coil assumes that because the nationwide and local percentage of family households with four or more persons is similar, the same relationship exists between the nationwide and local percentage of households with minor children. Based on this record, such an assumption is unsupported and speculative. [Initial Decision on Remand at 6]

The ALJ distinguished the Supreme Court's approval, in <u>Dothard v. Rawlinson</u>, 433 U.S. 321, 330 (1977), of reliance on nationwide statistics where there is "no reason to suppose" that regional statistics do not differ markedly from the national statistics. That Title VII case concerned reliance on general population data regarding physical height and weight characteristics, where there was "no reason to suppose" that such data for the Alabama population differed markedly from such data for the national population.

It is possible that there may be greater variation among local populations with respect to percentage of households with children (even where the local and national percentage of households with four or more individuals that are families are virtually identical) than there is among local populations with respect to height and weight characteristics. However, in the absence of any showing of a large variation from the national statistics in the case of the locality in question, and where the economist discussing the statistics testified that the likelihood of finding a family household in the four-or-more-person household category in Jefferson County is apparently virtually identical to the national average, I believe that the possibility of such a significant variation is more speculative and

unsupported than a supposition of its absence. As the Charging Party argues, if a party "discerns fallacies or deficiencies in the data offered by the plaintiff, [the party] is free to adduce countervailing evidence of his own." Dothard, supra, 433 U.S. at 331. In these circumstances, then, I conclude that the Charging Party established a prima facie case of disparate impact.

The ALJ went on to conclude that, even if a prima facie disparate impact case is made, as I now conclude, Respondents have carried their burden of rebuttal by demonstrating that their three persons per unit occupancy restriction serves their legitimate goals and is not a mere unsubstantial justification; in this regard, the ALJ held, the practice need not be essential or indispensable. The ALJ cited Wards Cove, supra, 490 U.S. 642 at 658-59 as authority for this formulation of the burden of rebuttal. The ALJ notes in his Initial Decision of March 22 that Wards Cove is an employment discrimination case under Title VII of the Civil Rights Act of 1964 and that Congress subsequently eliminated the Wards Cove analysis for purposes of Title VII in the Civil Rights Act of 1991, Pub. L. 102-166. The ALJ concluded, however, that since the Civil Rights Act of 1991 did not amend Title VIII, the Wards Cove analytical framework would continue to apply to cases arising under Title VIII. Initial Decision (March 22), p. 25, n. 24.

I reach the opposite conclusion, however. Regardless of what impact Wards Cove might eventually have had on Title VIII case law that had previously applied a higher test to Respondents' burden of rebuttal, I do not believe that Wards Cove, having been overruled by Congress to the extent that it did not require consistency with business necessity in its own sphere of Title VII cases, could nevertheless stand as authority for this lesser burden in Title VIII cases. While Title VII case law may often serve as the genesis of Title VIII case law on analogous issues, I find no basis for following a Title VII decision in an area in which it has been specifically overruled by Congress. I do not find Congress's failure to amend Title VIII to be persuasive, since Congress was not faced with a comparable authoritative judicial decision by the nation's highest court establishing a less-than-business-necessity standard under Title VIII. To the contrary, there is authority for the application of a standard of business necessity in Title VIII cases. See, e.g., Betsey v. Turtle Creek Associates, 736 F.2d 983 (4th Cir. 1984). I conclude that the business necessity standard is the appropriate rebuttal standard for the respondents to meet in this case. Accordingly, I remand this case for a determination by the ALJ as to whether Respondents have met their burden under the business necessity standard, in justification of their three person per unit occupancy policy. Depending on whether the Respondents have met their burden, further review of the existence of alternatives to the three persons per unit policy may or may not be warranted.

10

## ORDER

Upon consideration of the Motion to Set Aside Initial Decisions and Enter a Final Decision Granting Relief in the above captioned case and Respondents' Opposition thereto, and pursuant to 42 U.S.C. 3612(h)(1) and 24 CFR 104.930(a) and (d), the Secretary hereby remands the above captioned case for 60 days so that the Administrative Law Judge may take further action consistent with the above Decision.

7/19/93
_____
Date

BRUCE KATZ
Chief of Staff
Office of the Secretary

**U. S. Department of Housing and Urban Development**
Washington, D.C. 20410-0000

MAR 29 1994

MEMORANDUM FOR:  All Regional Counsel

                 All Regional Directors of Fair Housing and
                 Equal Opportunity

FROM:  Nelson A. Díaz, General Counsel, G

       Roberta Achtenberg, Assistant Secretary for
       Fair Housing and Equal Opportunity, E

SUBJECT:  Occupancy Fees and Familial Status Discrimination
          under the Fair Housing Act


     This memorandum is designed to facilitate your review of
complaints under the Fair Housing Act (the Act).  The Department
has received a number of complaints involving allegations that
housing providers who impose additional fees on households based
on the number of occupants in the dwelling discriminate because
of familial status.  This memorandum outlines the principles
applicable to analyzing such complaints and discusses the
experiences of the Office of General Counsel's Fair Housing
Division with such cases.

     The complaints that the Fair Housing Division has reviewed
involving occupancy fees have thus far arisen in the rental
context.  However, the principles for analyzing complaints
involving occupancy based fees are equally applicable whether
housing is rented, sold, or made available through other means.
For example, if a condominium or home owners association were to
assess fees based on the number of occupants in a dwelling, such
a policy would be analyzed in the same manner as where landlords
impose additional fees based on the number of occupants in a
unit.

     In some cases in which housing providers charge occupancy
fees, the fees are only imposed on households in which children
under the age of 18 are present.  It has been the experience of
the Fair Housing Division, however, that more often the fees are
imposed on any households which contain more than a specified
number of occupants, regardless of familial status.  This
memorandum discusses the discriminatory nature of each type of
occupancy fee structure.



2

I.    Occupancy Fees Imposed Only On Families With Children

Singling out families with children for additional occupancy
fees is sometimes a product of an express policy, which on its
face may make the fee applicable only where children are present.
In other cases, uneven enforcement of a facially neutral policy
by the housing provider may result in the fee, in practice, only
being collected where children are present.

Whether by policy or enforcement practice, such fee
practices violate the Act by treating families with children less
favorably because of the presence of children in the family.
Therefore, it will be appropriate to issue charges of
discrimination in cases where the evidence supports such a claim.

A.    Disparate Treatment Standard

Occupancy fees applicable by policy or practice only where
children are present in a household single out families with
children for disparate treatment by increasing the cost of the
dwelling unit to such families.  Subsection 804(b) of the Act
prohibits discrimination "against any person in the terms,
conditions, or privileges of sale or rental of a dwelling ...
because of ... familial status...."  42 U.S.C. § 3604(b);
24 C.F.R. § 100.65(a).  The Department has implemented this
statutory provision through regulations which provide,
"Prohibited actions under this section include, but are not
limited to:  (1) Using different provisions in leases ..., such
as those relating to rental charges ... and the terms of a lease
..., because of ... familial status ...."  24 C.F.R. § 100.65(b)
(1993).  Such occupancy fees violate these prohibitions by
imposing a different term or condition (i.e., higher rent or
charges) based on familial status in violation of subsection
804(b) of the Act.

In addition, especially in cases where the fees are high in
absolute terms or relative to the base rent, the fees may
discourage occupancy by families with children and result in
their exclusion by making rental at the housing facility
prohibitively expensive or out of line with market rents for
similarly sized units at other housing facilities in the area.
Fees which operate in this manner may violate not only subsection
804(b), as discussed, supra, but subsection 804(a) of the Act as
well.  Subsection 804(a) prohibits making unavailable or denying
a dwelling because of familial status.  The Department has
implemented subsection 804(a) through regulations which prohibit
"Imposing different sales prices or rental charges for the sale
or rental of a dwelling ... because of familial status,"
24 C.F.R. § 100.60(b)(3) (1993), and which prohibit
"discouraging" persons from "inspecting, purchasing, or renting a
dwelling because of ... familial status," 24 C.F.R.
§ 100.70(c)(1) and (2) (1993).  Fees targeted at families with
children may violate both of these regulatory prohibitions.

3

B.    Case Studies

     The Fair Housing Division has issued determinations of
reasonable cause and charges of discrimination in at least four
cases that involved additional occupancy fees that were imposed
differently depending upon the familial status of the household.
In one case, the Department entered into a Consent Order
resolving the matter.  In the other three, an election was made
to have the claims adjudicated in Federal district court and the
Department of Justice ("Justice") entered into Consent Orders
or Stipulated Judgments resolving the matters.  All these cases
are summarized below:

     1.    HUD v. Wellington d/b/a Wellington Arms Apartments,
Determination of Reasonable Cause and Charge of Discrimination,
HUDALJ 05-89-0528-1 (May 12, 1992).  In this case the Department
alleged that the respondent discriminated because of familial
status by charging the complainant, whose household consisted of
one adult and three minor children, a higher rent than the
respondent charged to households composed of two adults and two
children.  The Department alleged that the complainant was
charged a base rent of $675 and additional occupancy fees of $100
per child for a total rent of $875, whereas the respondent
generally rented two bedroom apartments for approximately $570 to
$580.  The Department alleged that the respondent imposed the
additional charge to compel the complainant to rent a three
bedroom apartment instead of a two bedroom apartment and in
retaliation for the complainant having filed a fair housing
complaint.

     The Department entered into a Consent Order which required
the respondents to compensate the complainant $8,500, to pay a
$1,500 civil penalty, and which imposed a variety of record
keeping, reporting, and employee education requirements.  Most
importantly, the Consent Order also required the respondent to
revise its occupancy policies so as to allow at least two persons
per bedroom regardless of whether the persons are adults or
children, and to allow as many as two adults and three children
in a two bedroom apartment under certain circumstances without
subjecting such households to an additional occupancy fee.  HUD
v. Wellington d/b/a Wellington Arms Apartments, HUDALJ
05-89-0528-1 (HUD Office of Admin. Law Judges 11-30-92) (Initial
Decision and Consent Order).

     2.    HUD v. Alfaya, Determination of Reasonable Cause and
Charge of Discrimination, HUDALJ 05-89-0766-1 (Feb. 11, 1991).
In this case, the Department alleged that the respondents
discriminated because of familial status against the complainant,
a family composed of a couple and a minor child.  The respondent
maintained a policy of charging $55 extra per month over a base
rent of $395 per month if a unit were occupied by more than two
persons, but only charged the extra fee if there were children
present in the unit.

001143

4

An election was made in this case to have the claims adjudicated in Federal district court.  Justice entered into a Consent Order which required the respondents to pay $3,000 to compensate the complainant and which imposed a variety of reporting and record keeping requirements.  Moreover, the Consent Order explicitly enjoined the respondents from "discriminating in the terms or conditions of rental on the basis of familial status, including imposing on families with children any charges in addition to the normal rent fixed for each apartment." United States v. Alfaya, No. C-1-91-229 (S.D. Ohio 1992) (Consent Order).

3.  HUD v. Mahroom, Determination of Reasonable Cause and Charge of Discrimination, HUDALJ 09-90-1257-1 (July 10, 1991).  In this case, the Department alleged that the respondents discriminated because of familial status against the complainant, a family composed of one adult and six children.  The respondent maintained a policy of charging $1,200 per month rent for the rental of a house if a husband and wife rented it, $1,300 if a husband, wife, and one child rented it, and $1,400 if a husband, wife, and two children rented it.

An election was made in this case to have the claims adjudicated in Federal district court.  Justice entered into a Consent Order which required the respondents to pay $9,000 to compensate the complainants and which imposed employee education, advertising, and outreach requirements.  The Consent Order also enjoined the respondents from "imposing different terms and conditions in the rental of dwelling on account of familial status."  The Consent Order did not, however, specifically require a change in the rental fee structure.  Indeed, the Consent Order categorized the case as one involving a refusal to rent due to the number of children without making reference to the discriminatory rent fee structure.  United States v. Mahroom, No. C91-20538 JW (PVT) (N.D. Cal. 1992) (Consent Order).

4.  HUD v. Spann d/b/a Valle Grande Mobile Home Park, Determination of Reasonable Cause and Charge of Discrimination, HUDALJ 06-89-0372-1 (Oct. 15, 1990).  In this case, the Department alleged that the respondents maintained several policies which discriminated because of familial status by excluding families with children.  One such policy involved charging $10 extra per month "if a baby is born after moving into the park."  Another policy required residents to move out of the park once their children reached two years of age.

An election was made in this case to have the claims adjudicated in Federal district court.  Justice entered into a Stipulated Judgment in which the respondents agreed to pay $5,000 to compensate the complainants.  The Stipulated Judgment did not include any provision requiring the respondents to eliminate their occupancy fee policy.  United States v. Valle Grande Mobile

5

Home Park, Inc., et al., No. 90-1149 JP (D.N.M. 1992) (Stipulated Judgment).

## II. Fees that Apply Regardless of Familial Status

More common than fees which only apply to families with children are fees that are structured to apply to any household which contains more than a specified number of occupants, regardless of familial status. As housing providers continue to become more aware of the familial status protections of the Act and more subtle in their discriminatory practices, one would expect the incidence of this type of fee to remain more prevalent than fees which on their face apply only to families with children.

Occupancy fees which are structured to apply equally to all households with a certain number of occupants, regardless of the familial status of the occupants, may violate the Act, even if the fees are enforced in an even handed manner against all households of a certain size. It is important to emphasize, however, that occupancy fees structured and enforced in this type of facially neutral manner do not necessarily violate the Act. Even in cases where, in practice, a disproportionate percentage of the households subject to the fees are families with children (due to the fact that larger-sized households tend disproportionately to be composed of families with children), the fees would not necessarily violate the Act. In order to determine if the fees violate the Act, consideration would have to be given not only to whether the fee structure imposes a disproportionate burden on families with children, but would also have to be given to whether the fee structure was compelled by business necessity and, if so, whether there were less discriminatory alternatives that would meet that business necessity.

In the preamble to its regulation, the Department discussed the application of 24 C.F.R. § 100.65(b), the regulation discussed, supra, that prohibits the use of different rental charges and terms of a lease because of familial status:

> [A] commenter indicated that charges for the provision of water, electricity, refuse collection and other services have been based on the number of persons who occupy a dwelling and asked whether such a policy would be permissible. In order to determine whether such a policy is permissible, it would be necessary to understand more fully why it was implemented and how it operates.... [P]olicies such as this would require review on a case by case basis....

24 C.F.R. Subtitle B, Ch. I, Subch. A, App. I at 921 (1993).

Where there is evidence that an additional occupancy fee was implemented with a discriminatory intent, e.g., with the intent to discourage occupancy by families with children through an unfavorable rent structure, the fees violate the Act. Such fees violate the Act for much the same reasons as would fees imposed by rule or practice only upon families with children, as discussed, supra. Absent evidence of discriminatory intent, whether or not the occupancy fees violate the Act depends on the effect of the policy.

A.   Discriminatory Effect Standard

Where the fee policy has an adverse discriminatory effect on families with children, the fee policy violates the Act unless there is a compelling business necessity for the fee policy and less discriminatory alternatives that would meet the housing provider's business necessity are not available.

1.   Demonstrating Discriminatory Effect

Census statistics demonstrate what common sense suggests -- that generally, households with more members are more likely than households with fewer members to contain one or more children under age 18. The Appendix to this memorandum summarizes pertinent national census bureau statistics and provides relevant definitions. The Bureau of the Census does not maintain statistics that directly address the precise question applicable to determining if a disparate impact exists under the Act, i.e., what percentage of dwelling units of various numbers of occupants contain families with children. The Bureau does, however, provide data that are extremely helpful to estimating this answer. The Bureau provides data on the percentage of "families" of varying sizes in which children are domiciled with a parent, custodian, or designee.

The data show that families with three or more members are more likely to contain one or more children, as compared to two member families; families with four or five members are even more likely than three member families to contain children. Whereas only about 11 percent of two person families contain children, about 63 percent of three person families contain children, about 84 percent of four person families contain children, and about 88 percent of five person families contain children. Moreover, a policy that imposes additional charges only on families with 3 or more persons, will have no adverse consequences for about 73 percent of those families without children, whereas it will adversely affect about 91 percent of families with children, meaning that most families with children will be negatively affected, whereas most families without children will not be negatively affected. Even an occupancy fee policy that only imposes a surcharge on families with 5 or more people, which would only adversely affect about 24 percent of families with

children, will still have a disproportionate adverse effect on families with children. While 76 percent of families with children would suffer no negative consequences under such a policy, about 96 percent of families without children will suffer no adverse effect.

Thus, a policy of imposing occupancy fees based on the number of occupants in the unit would be expected to have a disproportionate adverse impact upon families with children. The discrepancy between the adverse effect on families with children and families without children would be expected to be most significant when the occupancy fee is one that imposes an additional surcharge for households with 3 or more, 4 or more, or 5 or more occupants. In contrast, if the occupancy fee only applies when households contain 6 or more persons or seven or more persons, relatively few families with or without children would be adversely affected, so the policy would have minimal adverse impact.

The statistics summarized in the Appendix that are available from the Bureau are nationwide statistics. Breakdowns for specific locales, states, or regions are not maintained or available from the Bureau. While it is possible that in any given locale large households may be disproportionately composed of unrelated adults (which the Bureau does not categorize as "families"), rather than families with children, national statistics may be used to prove disparate impact. National statistics are used to prove discriminatory impact in employment discrimination cases. E.g., Dothard v. Rawlinson, 433 U.S. 321, 339 (1977). The Secretary's July 19, 1993 Decision and Order in HUD v. Mountain Side Mobile Estates, 2 Fair Housing-Fair Lending (P-H), ¶ 25,053 (HUD Secretary 7-19-93), is strong precedent for applying national statistics to prove discriminatory impact in fair housing cases.

HUD v. Mountain Side Mobile Estates involved the legality of an occupancy limit, an issue closely related to the legality of occupancy fees. As the Secretary's decision held:

It is possible that there may be greater variation among local populations with respect to percentage of households with children (even where the local and national percentage of households with four or more individuals that are families are virtually identical) than there is among local populations with respect to height and weight characteristics. However, in the absence of any showing of a large variation from the national statistics in the case of the locality in question, and where the economist discussing the statistics testified that the likelihood of finding a family household in the four-or-more-person household category in Jefferson County is apparently virtually

identical to the national average, I believe that the
possibility of such a significant variation is more
speculative and unsupported than a supposition of its
absence.  As the Charging Party argues, if a party
"discerns fallacies or deficiencies in the data offered
by the plaintiff, [the party] is free to adduce
countervailing evidence of his own."  Dothard, supra,
433 U.S. at 331.  In these circumstances, then, I
conclude that the Charging Party established a prima
facie case of disparate impact.

HUD v. Mountain Side Mobile Estates, supra, ¶ 25,053 at 25,493.

Therefore, national statistics may be used to determine if a
disparate impact exists, when making a determination of
reasonable cause.  Such statistics, however, should be considered
in the context of other evidence which may have been provided by
the respondent or uncovered by the investigator during the course
of the investigation that would bear on whether household
composition in the locale reflects the national statistics for
families.

   2.   Demonstrating Business Necessity and Lack of Less
        Discriminatory Alternatives

Once it is determined that an occupancy fee policy creates a
discriminatory adverse impact for families with children,
consideration should then turn to whether the need for the
occupancy fee policy is compelled by business necessity.
The Secretary's October 20, 1993 Decision and Order in HUD v.
Mountain Side Mobile Estates, reflects that establishing a
business necessity is a rigorous standard.  It is not sufficient
that a challenged practice bears a demonstrable relationship to a
housing provider's legitimate business interests.  HUD v.
Mountain Side Mobile Estates, HUDALJs 08-92-0010-1 and 08-92-
0011-1 (HUD Secretary 10-20-93), slip op. at 10.  Rather, "[T]he
standard for a business necessity can only be met by establishing
compelling need or necessity."  Id.  As the Secretary's decision
held:

     As with current Title VII law, under Title VIII
     law, the need for a true necessity is also required.
     In Betsy [v. Turtle Creek Associates, 736 F.2d 983 (4th
     Cir. 1984)], the court held that when confronted with a
     showing of discriminatory impact, "defendants must
     prove a business necessity sufficiently compelling to
     justify the challenged practice."  Id. at 988 (emphasis
     added).  In United States v. City of Black Jack, Mo.,
     508 F.2d 1179, 1186 (8th Cir. 1974), the court held
     that after the finding of a prima facie case, the
     defendant was required to "demonstrate a compelling ...

interest." (Emphasis added.) Clearly, the word "compelling" correlates to the word "necessary."

HUD v. Mountain Side Mobile Estates, supra, slip op. at 9.

As the Secretary also held, under Title VIII, as under Title VII, only objective evidence, as opposed to mere speculation or subjective opinion, can establish a legal rebuttal demonstrating that a practice is compelled by business necessity. HUD v. Mountain Side Mobile Estates, supra, slip op. at 9 and 11 (citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 428 n.23 (1975) and Keith v. Volpe, 858 F.2d 467 (9th Cir. 1988)). In addition, post hoc rationalizations for a practice are to be accorded little weight. HUD v. Mountain Side Mobile Estates, supra, slip op. at 9 and 11 (citing Huntington Branch, NAACP v. Town of Huntington, NY, 844 F.2d 926 (2d Cir. 1988)).

The type of information that housing providers most commonly provide to attempt to justify their occupancy fees is information on the housing facility's variable costs. For example, housing providers may attempt to demonstrate that the amount of the fee is based on the amount that charges or taxes for water, sewage, or garbage collection increase for each additional occupant who is added to a unit. Whatever information the housing provider provides should be analyzed to determine if the increased costs are truly variable costs or are in actuality fixed costs that the housing provider would incur regardless of the number of residents in a unit. The figures provided should also be scrutinized to assess whether the occupancy fee charge is limited to the amount which variable costs increase based on the number of occupants in a unit, or whether the fee exceeds that amount, even factoring in a reasonable profit margin.

Housing providers may also assert that the occupancy fee is justified by the increased wear and tear on a unit from each additional occupant. As with claims concerning increased variable costs, housing providers should be asked for information demonstrating the link between costs such as repairs to units or replacement of parts per unit and the number of occupants in the dwelling, rather than mere speculation.

Even if an occupancy fee policy were determined to be compelled by business necessity, consideration must also be given to whether less discriminatory alternatives exist which would meet the respondents' business necessity with less discriminatory impact. HUD v. Carter, 2 Fair Housing-Fair Lending (P-H), ¶ 25,029 at 25,317 (HUD Office of Admin. Law Judges 5-1-92) (citing Resident Advisory Board v. Rizzo, 564 F.2d 126, 146-49 (3d Cir. 1977), cert. denied, 435 U.S. 908 (1978)). As part of the investigation of such complaints, the respondents should be asked to explain whether alternatives were considered, and, if so, why such alternatives would not meet their business necessity.

For example, housing providers could raise the base rent for all units rather than imposing additional fees based on the number of occupants. Housing providers could meter utilities and bill each dwelling unit based on actual usage of utilities, rather than charging households based on speculative concepts of how usage may vary depending on the number of occupants. Housing providers could recoup the costs of repairs and replacements based on actual wear and tear on a unit caused by the unit's occupants through neutrally imposed and enforced maintenance surcharges assessed per call or through security deposits (as is more common). Where respondents assert that alternatives are not feasible, they should be asked for credible and objective evidence to support their position. Exploring the availability of alternatives with respondents is not only relevant to determining whether an occupancy fee policy is compelled by business necessity, but may also be useful in facilitating conciliation.

B.    Case Studies

The Fair Housing Division has issued charges in at least five cases which contained an allegation that a facially neutral occupancy fee discriminated because of its discriminatory effect on families with children. In one case, the Department litigated the issue and lost that claim before an administrative law judge ("ALJ"). In another, the Department entered into a Consent Order resolving the matter. In the other three, an election was made to have the claims adjudicated in Federal district court. In one of these cases, Justice litigated the issue and won an injunction against the practice. In the other two, Justice entered into Consent Orders resolving the matters. These cases are summarized below:

1.    HUD v. Murphy, HUDALJs 02-89-0202-1, 0203-1, 0204-1, 0205-1, 0206-1, 0209-1, 0212-1, 0213-1, 0243-1, Determination of Reasonable Cause and Charge of Discrimination (Nov. 15, 1989). In this case, the Department alleged that the respondents had discriminated against families with children through a variety of policies and practices. Among the policies which the Department alleged were discriminatory was a policy of charging $5 per person for each occupant in excess of one person (if a single person) or in excess of two persons (if a married couple). The complainants included households which in addition to base rents of approximately $200 per month were also charged either $5 or $10 per month in additional occupancy fees depending on the number of occupants in the unit.

While the main focus of the case was the respondent's failure to qualify its mobile home park as housing for older persons age 55 or older, the ALJ decision briefly addressed the Department's allegation that the $5 fee discriminated. The ALJ ruled that while the respondent had discriminated in a number of

other respects, the Department had failed to demonstrate that this particular policy was discriminatory. Rather, the ALJ indicated that the rule served legitimate purposes, such as maintaining the condition of existing facilities. HUD v. Murphy, 2 Fair Housing-Fair Lending (P-H), ¶ 25,002 at 25,020 and 25,053 (HUD Office of Admin. Law Judges 7-13-90).

This allegation, however, was not central to the Department's case and the issue was not fully litigated. The Department did not make a disparate impact argument against the policy. Thus, the challenge to the practice proceeded solely on the disparate treatment theory. The decision did not address directly whether such a policy could violate the Act due to its disparate impact and should not be taken as precluding this type of claim in other cases.

2. HUD v. Reyes, HUDALJ 09-91-1699-1, Determination of Reasonable Cause and Charge of Discrimination (Aug. 3, 1992). In this case, the Department alleged that the respondent discriminated because of familial status by imposing an occupancy fee of $100 per person for each person in excess of two persons in a two bedroom apartment. The complainant was a single woman who sought to rent a two bedroom apartment for herself, her live in companion, one child, and an additional child who would reside part time in the unit. Both children were under age 18.

The Department entered into a Consent Order that required the respondent to pay the complainant $1,500 and imposed a variety of record keeping and reporting requirements. In addition, the Consent Order required the respondent to reduce the occupancy fee for families with children from $100 per person to $15 per person. While the justification for the $15 per person occupancy fee is not stated in the Consent Order, the basis for the fee was supported by evidence that this portion of the fee was related to variable costs (for water usage and garbage collection) that increased on average approximately $15 for each occupant over two. The Consent Order did not, however, require the respondents to abandon the occupancy fee entirely and adopt less discriminatory alternatives, such as recouping these costs by raising the basic apartment rent for all units. HUD v. Reyes, HUDALJ 09-91-1699-1 (HUD Office of Admin. Law Judges 4-30-93) (Initial Decision and Consent Order).

3. HUD v. Dickinson, HUDALJ 10-89-0402-1, Determination of Reasonable Cause and Charge of Discrimination (Dec. 5, 1990). In this case, the Department alleged that the respondents discriminated because of familial status through a policy of charging an occupancy fee of $85 for each person in excess of two persons for the rental of a townhouse. The complainant was a woman who sought to rent a unit for herself, her husband, and a minor child.

An election was made in this case to have the claims adjudicated in Federal district court.  Justice filed suit in Federal district court.  Prior to trial, the respondents made a motion for summary judgment.  Justice responded to the summary judgment motion by arguing that the case involved disparate treatment, without making a disparate impact argument.  The judge denied summary judgment on the ground that there was a genuine issue of fact as to whether the defendants intended to discriminate and whether the fee was reasonable.  Justice proceeded to litigate the case on the disparate treatment theory before a jury.  The jury returned a verdict in favor of the complainant, but awarded only $5 in damages.  After the jury verdict, the judge ordered "that the defendants shall discontinue imposing and shall not impose on families with children any per-person rental or other per-person charge connected with the rental of an apartment ... in excess of the basic rental rate for an apartment."  <u>United States v. Dickinson</u>, No. C91-73Z (W.D. Wash. 1992), <u>slip</u> <u>op.</u> at 2 (Order).

4.  <u>HUD v. McMahan</u>, HUDALJ 05-91-0430-1, Determination of Reasonable Cause and Charge of Discrimination (Aug. 3, 1992).  In this case, the Department alleged that the respondents discriminated because of familial status through a policy of imposing an additional $15 per month fee for each occupant in excess of two persons per mobile home lot.  The complainant was a woman who rented a lot in which she, her husband, and four minor children resided.  They were charged occupancy fees of $60 per month in addition to a basic lot rent which varied from $105 to $115 per month over the course of their residency.  The evidence submitted by the respondents to support its necessity for an occupancy fee arguably supported a claim that variable costs for items such as water and sewage increased $8 to $9 for each additional occupant added to a unit, but did not support the $15 fee charged, nor did the respondents explain why alternative methods of increasing revenues, such as raising the basic lot rent for all units, or installing water saving devices or water meters to charge units based on actual usage were not available alternatives that would have a less discriminatory effect.

An election was made in this case to have the claims adjudicated in Federal district court.  Justice entered into a Consent Order which ordered the respondents to compensate the complainant $1,605.  The Consent Order also enjoined the respondents from discriminating because of familial status in any aspect of the ownership or management of the mobile home park, but did not specifically state that respondents were enjoined from charging an occupancy fee.  The Consent Order did make clear, however, that the allegation in the case was that the additional occupancy fee policy discriminated because of familial status.  <u>United States v. McMahan</u>, No. C-3-92-389 (S.D. Ohio 1993) (Consent Order).

5.   <u>HUD v. Colonial Inn Mobile Home Park and Guccini</u>, HUDALJ 08-89-0146-1, Determination of Reasonable Cause and Charge of Discrimination (Nov. 2, 1990).  In this case, the Department alleged that the respondents discriminated because of familial status through a variety of policies, including charging a $50 per month occupancy fee for each occupant in excess of two persons per mobile home lot, in addition to a basic lot rent of $215 per month.

An election was made in this case to have the claims adjudicated in Federal district court.  Justice entered into a Consent Order which ordered the respondents to compensate the complainant $10,000 and imposed a variety of reporting and record keeping requirements.  In addition, the Consent Order required the respondents to change their rules in order to ensure that all spaces would be available on a nondiscriminatory basis.  The required rules deleted reference to a charge of any additional occupancy fees.  <u>United States v. Guccini d/b/a Colonial Inn Mobile Home Park</u>, No. 90 N 2278 (D. Colo. 1991) (Consent Order).


III.  <u>Conclusion</u>

While this memorandum focuses on the experience of the Fair Housing Division, Regional Counsels and Regional Directors of Fair Housing and Equal Opportunity (FHEO) no doubt have additional valuable experiences handling occupancy fee cases. Sharing this information with headquarters and the regions would benefit all involved.  Therefore, the regions are encouraged to contact the Fair Housing Division to share their insights and experiences in investigating, reviewing, and litigating these cases and to provide their reaction to the framework set forth in this memorandum.  Supplementary guidance may be provided based on the comments received from the regions.

If you wish to comment on this memorandum, relate your experiences or insights, or pose questions directly related that you believe could be addressed in supplementary guidance, please write or call the Fair Housing Division or headquarters FHEO within 30 days of the date of this memorandum.  The contact person in the Fair Housing Division is Richard Bennett, Attorney, tel. (202) 708-0340.  The contact person in FHEO is Waite H. Madison, III, Deputy Director of Investigations, tel. (202) 708-4211.

Attachment (Appendix)

Appendix

Note:   The statistics used to compile these table are taken
        from in:  Bureau of the Census, U.S. Department of
        Commerce, Pub. No. P20-467, Current Population Reports
        -- Population Characteristics -- Household and Family
        Characteristics 85 (March 1992), relevant pages of
        which follow this Appendix

TABLE 1

| Family Size (# of people) | # of Families | # with Own/Adopted Children under 18 | % with Own/Adopted Children under 18 |
|---|---|---|---|
| 2 | 28,202,000 | 3,100,000 | 10.99 |
| 3 | 15,594,000 | 9,836,000 | 63.08 |
| 4 | 14,162,000 | 11,844,000 | 83.63 |
| 5 | 6,030,000 | 5,287,000 | 87.68 |
| 6 | 1,986,000 | 1,698,000 | 85.50 |
| 7 or more | 1,200,000 | 980,000 | 81.67 |
| Total | 67,173,000 | 32,746,000 | |

Note:   Columns may not compute due to rounding.

TABLE 2

A policy of imposing an occupancy fee on all households with A or
more members would not adversely affect B percent of families
with children, would adversely affect C percent of families with
children, would not adversely affect D percent of families
without children, and would adversely affect E percent of
families without children where A, B, C, D, and E are:

| A # in household | B % Families w/ Children No Effect | C % Families w/ Children Neg. Effect | D % Families w/o Children No Effect | E % Families w/o Children Neg. Effect |
|---|---|---|---|---|
| 2 or more | 0.0 | 100.0 | 0.0 | 100.0 |
| 3 or more | 9.5 | 90.5 | 72.9 | 27.1 |
| 4 or more | 39.5 | 60.5 | 89.6 | 10.4 |
| 5 or more | 75.7 | 24.3 | 96.4 | 3.6 |
| 6 or more | 91.8 | 8.2 | 98.5 | 1.5 |
| 7 or more | 97.0 | 3.0 | 99.4 | 0.6 |

Appendix (cont.)



CENSUS



DEP. 0001A   CURRENT POPULATION REPORTS

AUG 4 1993   **Population Characteristics**

P20-467



# Household and Family Characteristics: March 1992

by Steve W. Rawlings

U.S. Department of Commerce
Economics and Statistics Administration
BUREAU OF THE CENSUS

Appendix (cont.)

85

Table 9. **Families, by Type, Presence of Own Children Under 18 Years, and Race and Hispanic Origin of Householder: March 1992**

Numbers in thousands except for averages and medians. For meaning of symbols, see text]

| Characteristic | All families — Total | Without own children under 18 | With own children under 18 | Married-couple families — Total | Without own children under 18 | With own children under 18 | Male householder — Total | Without own children under 18 | With own children under 18 | Female householder — Total | Without own children under 18 | With own children under 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ALL RACES** | | | | | | | | | | | | |
| **Metropolitan-Nonmetropolitan Residence** | | | | | | | | | | | | |
| Families | 67 173 | 34 427 | 32 746 | 52 457 | 28 037 | 24 420 | 3 025 | 1 742 | 1 283 | 11 692 | 4 648 | 7 043 |
| In MSA's | 51 677 | 26 227 | 25 451 | 39 709 | 21 028 | 18 681 | 2 396 | 1 407 | 989 | 9 572 | 3 792 | 5 780 |
| Central cities | 19 034 | 9 599 | 9 435 | 12 954 | 7 056 | 5 898 | 1 122 | 677 | 445 | 4 958 | 1 866 | 3 092 |
| Ring | 32 643 | 16 627 | 16 016 | 26 755 | 13 972 | 12 783 | 1 274 | 730 | 544 | 4 614 | 1 925 | 2 688 |
| MSA's of 2,500,000 or more | 20 686 | 10 566 | 10 119 | 15 565 | 8 193 | 7 372 | 1 075 | 695 | 380 | 4 046 | 1 678 | 2 367 |
| Central cities | 7 434 | 3 815 | 3 620 | 4 847 | 2 629 | 2 218 | 475 | 328 | 147 | 2 112 | 857 | 1 254 |
| Ring | 13 252 | 6 752 | 6 500 | 10 718 | 5 564 | 5 154 | 600 | 367 | 233 | 1 934 | 821 | 1 113 |
| MSA's of 1,000,000 to 2,499,999 | 12 168 | 6 077 | 6 090 | 9 421 | 4 921 | 4 500 | 515 | 288 | 227 | 2 232 | 817 | 1 414 |
| Central cities | 4 272 | 2 105 | 2 167 | 2 865 | 1 559 | 1 306 | 140 | 109 | 31 | 1 159 | 407 | 752 |
| Ring | 7 896 | 3 973 | 3 923 | 6 556 | 3 413 | 3 143 | 267 | 149 | 118 | 1 073 | 411 | 662 |
| MSA's of 250,000 to 999,999 | 12 572 | 6 364 | 6 208 | 9 730 | 5 135 | 4 594 | 525 | 289 | 235 | 2 318 | 939 | 1 379 |
| Central cities | 4 615 | 2 327 | 2 288 | 3 238 | 1 782 | 1 456 | 249 | 138 | 111 | 1 128 | 406 | 722 |
| Ring | 7 957 | 4 037 | 3 920 | 6 492 | 3 353 | 3 139 | 276 | 151 | 125 | 1 190 | 533 | 656 |
| MSA's of 249,999 or less | 6 252 | 3 219 | 3 033 | 4 993 | 2 728 | 2 266 | 281 | 134 | 147 | 977 | 357 | 620 |
| Central cities | 2 713 | 1 353 | 1 360 | 2 004 | 1 086 | 918 | 150 | 71 | 79 | 559 | 196 | 363 |
| Ring | 3 539 | 1 866 | 1 673 | 2 990 | 1 642 | 1 348 | 131 | 63 | 68 | 417 | 161 | 257 |
| Not in MSA's | 15 496 | 8 200 | 7 296 | 12 748 | 7 009 | 5 739 | 628 | 335 | 294 | 2 120 | 857 | 1 263 |
| **Size of Family** | | | | | | | | | | | | |
| Families | 67 173 | 34 427 | 32 746 | 52 457 | 28 037 | 24 420 | 3 025 | 1 742 | 1 283 | 11 692 | 4 648 | 7 043 |
| Two persons | 28 202 | 25 101 | 3 100 | 20 838 | 20 838 | - | 1 837 | 1 214 | 623 | 5 527 | 3 049 | 2 477 |
| Three persons | 15 594 | 5 758 | 9 836 | 11 503 | 4 598 | 6 905 | 722 | 282 | 440 | 3 370 | 879 | 2 491 |
| Four persons | 14 162 | 2 318 | 11 844 | 12 219 | 1 809 | 10 410 | 282 | 130 | 152 | 1 656 | 374 | 1 282 |
| Five persons | 6 030 | 742 | 5 287 | 5 257 | 489 | 4 768 | 97 | 55 | 42 | 676 | 199 | 477 |
| Six persons | 1 986 | 287 | 1 698 | 1 709 | 179 | 1 530 | 47 | 34 | 12 | 230 | 74 | 156 |
| Seven or more persons | 1 200 | 220 | 980 | 931 | 124 | 807 | 35 | 22 | 13 | 234 | 74 | 160 |
| Total family members | 212 716 | 85 854 | 126 862 | 169 557 | 68 109 | 101 448 | 8 368 | 4 801 | 3 567 | 34 790 | 12 944 | 21 847 |
| Average per family | 3.17 | 2.49 | 3.87 | 3.23 | 2.43 | 4.15 | 2.77 | 2.76 | 2.78 | 2.98 | 2.78 | 3.10 |
| **Age of Householder** | | | | | | | | | | | | |
| Families | 67 173 | 34 427 | 32 746 | 52 457 | 28 037 | 24 420 | 3 025 | 1 742 | 1 283 | 11 692 | 4 648 | 7 043 |
| 15 to 19 years | 222 | 68 | 154 | 69 | 23 | 46 | 34 | 23 | 11 | 119 | 22 | 97 |
| 20 to 24 years | 2 420 | 867 | 1 553 | 1 402 | 626 | 776 | 227 | 151 | 76 | 790 | 89 | 701 |
| 25 to 29 years | 5 859 | 1 736 | 4 123 | 4 205 | 1 463 | 2 742 | 368 | 173 | 195 | 1 285 | 100 | 1 185 |
| 30 to 34 years | 8 520 | 1 582 | 6 938 | 6 486 | 1 362 | 5 124 | 354 | 136 | 218 | 1 680 | 84 | 1 596 |
| 35 to 39 years | 8 896 | 1 427 | 7 470 | 6 815 | 1 104 | 5 711 | 386 | 142 | 244 | 1 695 | 180 | 1 514 |
| 40 to 44 years | 8 637 | 2 108 | 6 529 | 6 704 | 1 556 | 5 148 | 397 | 136 | 262 | 1 535 | 416 | 1 119 |
| 45 to 49 years | 6 806 | 3 245 | 3 561 | 5 411 | 2 888 | 2 888 | 289 | 146 | 143 | 1 087 | 557 | 530 |
| 50 to 54 years | 5 382 | 3 949 | 1 433 | 4 398 | 3 222 | 1 176 | 234 | 179 | 54 | 557 | 355 | 202 |
| 55 to 59 years | 4 733 | 4 144 | 589 | 3 937 | 3 437 | 498 | 177 | 135 | 43 | 621 | 573 | 49 |
| 60 to 64 years | 4 563 | 4 302 | 261 | 3 824 | 3 608 | 216 | 157 | 141 | 16 | 582 | 553 | 29 |
| 65 to 74 years | 7 330 | 7 209 | 121 | 6 269 | 6 180 | 89 | 239 | 221 | 19 | 823 | 809 | 14 |
| 75 to 84 years | 3 244 | 3 232 | 12 | 2 560 | 2 555 | 6 | 131 | 128 | 3 | 552 | 548 | 4 |
| 85 years and over | 561 | 558 | 3 | 359 | 359 | - | 30 | 30 | - | 172 | 170 | 2 |
| Median | 44.4 | 57.7 | 37.4 | 45.5 | 58.1 | 38.1 | 41.8 | 48.7 | 37.9 | 40.9 | 57.9 | 34.8 |
| **Marital Status of Householder** | | | | | | | | | | | | |
| Total | 67 173 | 34 427 | 32 746 | 52 457 | 28 037 | 24 420 | 3 025 | 1 742 | 1 283 | 11 692 | 4 648 | 7 043 |
| Married, spouse present | 52 457 | 28 037 | 24 420 | 52 457 | 28 037 | 24 420 | - | - | - | - | - | - |
| Married, spouse absent | 2 507 | 627 | 1 880 | - | - | - | 458 | 201 | 257 | 2 049 | 426 | 1 623 |
| Separated | 2 099 | 498 | 1 601 | - | - | - | 339 | 130 | 209 | 1 759 | 367 | 1 392 |
| Other | 408 | 129 | 279 | - | - | - | 118 | 70 | 48 | 290 | 59 | 231 |
| Widowed | 2 938 | 2 436 | 503 | - | - | - | 480 | 383 | 97 | 2 458 | 2 052 | 406 |
| Divorced | 5 337 | 1 891 | 3 446 | - | - | - | 1 052 | 466 | 586 | 4 285 | 1 425 | 2 860 |
| Never married | 3 935 | 1 437 | 2 498 | - | - | - | 1 035 | 692 | 343 | 2 900 | 745 | 2 155 |
| **Members 18 and Over, Other Than Householder or Spouse** | | | | | | | | | | | | |
| Families | 67 173 | 34 427 | 32 746 | 52 457 | 28 037 | 24 420 | 3 025 | 1 742 | 1 283 | 11 692 | 4 648 | 7 043 |
| No other member 18 and over | 49 685 | 22 436 | 27 248 | 41 859 | 21 546 | 20 312 | 1 280 | 192 | 1 088 | 6 546 | 698 | 5 848 |
| One other member 18 and over | 13 562 | 9 115 | 4 448 | 7 989 | 4 683 | 3 307 | 1 417 | 1 262 | 156 | 4 155 | 3 170 | 985 |
| Two or more other members 18 and over | 3 926 | 2 876 | 1 050 | 2 609 | 1 808 | 801 | 328 | 288 | 40 | 990 | 780 | 210 |
| **Members Under 18** | | | | | | | | | | | | |
| Families | 67 173 | 34 427 | 32 746 | 52 457 | 28 037 | 24 420 | 3 025 | 1 742 | 1 283 | 11 692 | 4 648 | 7 043 |
| No members under 18 | 32 303 | 32 303 | - | 27 090 | 27 090 | - | 1 512 | 1 512 | - | 3 701 | 3 701 | - |
| One member under 18 | 14 515 | 1 330 | 13 185 | 9 939 | 665 | 9 273 | 888 | 144 | 745 | 3 688 | 521 | 3 167 |
| Two members under 18 | 13 001 | 507 | 12 494 | 9 991 | 194 | 9 797 | 452 | 46 | 406 | 2 558 | 267 | 2 291 |
| Three members under 18 | 5 138 | 199 | 4 939 | 3 883 | 63 | 3 820 | 125 | 28 | 98 | 1 130 | 109 | 1 021 |
| Four members under 18 | 1 557 | 59 | 1 498 | 1 119 | 19 | 1 100 | 36 | 9 | 27 | 402 | 31 | 371 |
| Five members under 18 | 425 | 16 | 409 | 303 | 5 | 298 | 8 | 2 | 6 | 115 | 9 | 104 |
| Six or more members under 18 | 235 | 13 | 222 | 133 | 1 | 132 | 3 | 2 | 1 | 99 | 11 | 88 |
| Total members under 18 | 64 863 | 3 298 | 61 565 | 47 936 | 1 341 | 46 595 | 2 362 | 389 | 1 974 | 14 564 | 1 568 | 12 997 |
| Average per family | .97 | .10 | 1.88 | .91 | .05 | 1.91 | .78 | .22 | 1.54 | 1.25 | .34 | 1.85 |

See footnote at end of table.

### Appendix (cont.)

Table 9. **Families, by Type, Presence of Own Children Under 18 Years, and Race and Hispanic Origin of Householder: March 1992**—Con.

[Numbers in thousands except for averages and medians. For meaning of symbols, see text]

| Characteristic | All families | | | Married-couple families | | | Other families | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Male householder | | | Female householder | | |
| | Total | Without own children under 18 | With own children under 18 | Total | Without own children under 18 | With own children under 18 | Total | Without own children under 18 | With own children under 18 | Total | Without own children under 18 | With own children under 18 |
| **ALL RACES—Con.** | | | | | | | | | | | | |
| **Members 18 to 64** | | | | | | | | | | | | |
| Families | 67 173 | 34 427 | 32 746 | 52 457 | 28 037 | 24 420 | 3 025 | 1 742 | 1 283 | 11 692 | 4 648 | 7 043 |
| No members 18 to 64 | 6 362 | 6 307 | 55 | 5 951 | 5 935 | 16 | 84 | 71 | 13 | 326 | 300 | 26 |
| One member 18 to 64 | 11 430 | 4 536 | 6 894 | 2 942 | 2 859 | 83 | 1 472 | 405 | 1 067 | 7 016 | 1 272 | 5 744 |
| Two members 18 to 64 | 38 361 | 16 968 | 21 393 | 34 000 | 13 791 | 20 209 | 1 093 | 933 | 160 | 3 268 | 2 244 | 1 024 |
| Three members 18 to 64 | 7 980 | 4 525 | 3 456 | 6 883 | 3 658 | 3 225 | 250 | 233 | 28 | 837 | 634 | 203 |
| Four members 18 to 64 | 2 398 | 1 654 | 745 | 2 134 | 1 434 | 547 | 86 | 76 | 10 | 179 | 144 | 35 |
| Five or more members 18 to 64 | 642 | 438 | 204 | 547 | 359 | 188 | 29 | 24 | 5 | 66 | 55 | 11 |
| Total members 18 to 64 | 127 512 | 62 904 | 64 608 | 104 291 | 49 971 | 54 320 | 5 253 | 3 695 | 1 558 | 17 968 | 9 238 | 8 730 |
| Average per family | 1.90 | 1.83 | 1.97 | 1.99 | 1.78 | 2.22 | 1.74 | 2.12 | 1.21 | 1.54 | 1.99 | 1.24 |
| **Members 65 and Over** | | | | | | | | | | | | |
| Families | 67 173 | 34 427 | 32 746 | 52 457 | 28 037 | 24 420 | 3 025 | 1 742 | 1 283 | 11 692 | 4 648 | 7 043 |
| No members 65 and over | 54 242 | 22 076 | 32 166 | 40 623 | 18 074 | 23 981 | 2 405 | 1 153 | 1 252 | 9 782 | 2 849 | 6 933 |
| One member 65 and over | 5 775 | 5 252 | 523 | 3 622 | 3 233 | 389 | 533 | 503 | 31 | 1 619 | 1 516 | 104 |
| Two members 65 and over | 7 056 | 6 999 | 57 | 6 704 | 6 655 | 50 | 84 | 84 | 1 | 267 | 261 | 6 |
| Three or more members 65 and over | 100 | 100 | 1 | 76 | 75 | 1 | 2 | 2 | - | 22 | 22 | - |
| Total members 65 and over | 20 341 | 19 652 | 689 | 17 330 | 16 797 | 532 | 753 | 717 | 36 | 2 258 | 2 138 | 120 |
| Average per family | .30 | .57 | .02 | .33 | .60 | .02 | .25 | .41 | .03 | .19 | .46 | .02 |
| **Own Children Under 18** | | | | | | | | | | | | |
| Families | 67 173 | 34 427 | 32 746 | 52 457 | 28 037 | 24 420 | 3 025 | 1 742 | 1 283 | 11 692 | 4 648 | 7 043 |
| Without own children under 18 | 34 427 | 34 427 | - | 28 037 | 28 037 | - | 1 742 | 1 742 | - | 4 648 | 4 648 | - |
| With own children under 18 | 32 746 | - | 32 746 | 24 420 | - | 24 420 | 1 283 | - | 1 283 | 7 043 | - | 7 043 |
| One own child under 18 | 13 615 | - | 13 615 | 9 520 | - | 9 520 | 768 | - | 768 | 3 327 | - | 3 327 |
| Two own children under 18 | 12 364 | - | 12 364 | 9 728 | - | 9 728 | 391 | - | 391 | 2 244 | - | 2 244 |
| Three own children under 18 | 4 836 | - | 4 836 | 3 757 | - | 3 757 | 99 | - | 99 | 980 | - | 980 |
| Four own children under 18 | 1 379 | - | 1 379 | 1 035 | - | 1 035 | 18 | - | 18 | 326 | - | 326 |
| Five own children under 18 | 367 | - | 367 | 267 | - | 267 | 6 | - | 6 | 94 | - | 94 |
| Six or more own children under 18 | 186 | - | 186 | 114 | - | 114 | - | - | - | 72 | - | 72 |
| Total own children under 18 | 60 490 | - | 60 490 | 45 955 | - | 45 955 | 1 932 | - | 1 932 | 12 604 | - | 12 604 |
| Average per family | .90 | - | 1.85 | .88 | - | 1.88 | .64 | - | 1.51 | 1.08 | - | 1.79 |
| Average per family with children | 1.85 | (B) | 1.85 | 1.88 | (B) | 1.88 | 1.51 | (B) | 1.51 | 1.79 | (B) | 1.79 |
| **Own Children Under 6** | | | | | | | | | | | | |
| Families | 67 173 | 34 427 | 32 746 | 52 457 | 28 037 | 24 420 | 3 025 | 1 742 | 1 283 | 11 692 | 4 648 | 7 043 |
| Without own children under 6 | 51 769 | 34 427 | 17 342 | 40 532 | 28 037 | 12 495 | 2 516 | 1 742 | 774 | 8 721 | 4 648 | 4 073 |
| With own children under 6 | 15 404 | - | 15 404 | 11 925 | - | 11 925 | 509 | - | 509 | 2 970 | - | 2 970 |
| One own child under 6 | 10 642 | - | 10 642 | 8 153 | - | 8 153 | 392 | - | 392 | 2 097 | - | 2 097 |
| Two own children under 6 | 4 030 | - | 4 030 | 3 255 | - | 3 255 | 101 | - | 101 | 673 | - | 673 |
| Three own children under 6 | 656 | - | 656 | 479 | - | 479 | 14 | - | 14 | 163 | - | 163 |
| Four or more children under 6 | 77 | - | 77 | 38 | - | 38 | 1 | - | 1 | 38 | - | 38 |
| Total own children under 6 | 20 846 | - | 20 846 | 16 258 | - | 16 258 | 647 | - | 647 | 3 941 | - | 3 941 |
| Average per family | .31 | - | .64 | .31 | - | .67 | .21 | - | .50 | .34 | - | .56 |
| Average per family with children | 1.35 | (B) | 1.35 | 1.36 | (B) | 1.36 | 1.27 | - | 1.27 | 1.33 | (B) | 1.33 |
| **Own Children Under 3** | | | | | | | | | | | | |
| Families | 67 173 | 34 427 | 32 746 | 52 457 | 28 037 | 24 420 | 3 025 | 1 742 | 1 283 | 11 692 | 4 648 | 7 043 |
| Without own children under 3 | 58 158 | 34 427 | 23 731 | 45 344 | 28 037 | 17 307 | 2 737 | 1 742 | 995 | 10 077 | 4 648 | 5 429 |
| With own children under 3 | 9 015 | - | 9 015 | 7 113 | - | 7 113 | 288 | - | 288 | 1 614 | - | 1 614 |
| One own child under 3 | 7 908 | - | 7 908 | 6 300 | - | 6 300 | 241 | - | 241 | 1 367 | - | 1 367 |
| Two own children under 3 | 1 059 | - | 1 059 | 790 | - | 790 | 45 | - | 45 | 224 | - | 224 |
| Three or more children under 3 | 49 | - | 49 | 23 | - | 23 | 2 | - | 2 | 23 | - | 23 |
| Total own children under 3 | 10 454 | - | 10 454 | 8 208 | - | 8 208 | 359 | - | 359 | 1 886 | - | 1 886 |
| Average per family | .16 | - | .32 | .16 | - | .34 | .12 | - | .28 | .16 | - | .27 |
| Average per family with children | 1.16 | (B) | 1.16 | 1.15 | (B) | 1.15 | 1.25 | (B) | 1.25 | 1.17 | - | 1.17 |
| **WHITE** | | | | | | | | | | | | |
| **Metropolitan-Nonmetropolitan Residence** | | | | | | | | | | | | |
| Families | 57 224 | 30 178 | 27 045 | 47 124 | 25 607 | 21 517 | 2 374 | 1 334 | 1 040 | 7 726 | 3 238 | 4 488 |
| In MSA's | 43 255 | 22 680 | 20 575 | 35 221 | 18 976 | 16 245 | 1 837 | 1 070 | 767 | 6 198 | 2 635 | 3 563 |
| Central cities | 13 867 | 7 298 | 6 568 | 10 513 | 5 802 | 4 711 | 756 | 451 | 304 | 2 598 | 1 045 | 1 553 |
| Ring | 29 389 | 15 382 | 14 007 | 24 708 | 13 174 | 11 534 | 1 081 | 618 | 463 | 3 599 | 1 589 | 2 010 |
| MSA's of 2,500,000 or more | 16 572 | 8 688 | 7 884 | 13 291 | 7 097 | 6 193 | 804 | 516 | 288 | 2 477 | 1 074 | 1 403 |
| Central cities | 4 948 | 2 590 | 2 358 | 3 632 | 1 963 | 1 669 | 306 | 215 | 91 | 1 010 | 412 | 598 |
| Ring | 11 624 | 6 098 | 5 526 | 9 659 | 5 135 | 4 525 | 498 | 301 | 197 | 1 467 | 662 | 805 |
| MSA's of 1,000,000 to 2,499,999 | 10 294 | 5 422 | 4 873 | 8 502 | 4 606 | 3 895 | 384 | 218 | 167 | 1 409 | 599 | 810 |
| Central cities | 3 064 | 1 660 | 1 404 | 2 356 | 1 325 | 1 031 | 160 | 98 | 63 | 548 | 241 | 307 |
| Ring | 7 230 | 3 761 | 3 469 | 6 146 | 3 281 | 2 865 | 224 | 122 | 101 | 861 | 358 | 503 |
| MSA's of 250,000 to 999,999 | 10 803 | 5 619 | 5 184 | 8 817 | 4 716 | 4 100 | 413 | 226 | 188 | 1 573 | 677 | 896 |
| Central cities | 3 568 | 1 867 | 1 701 | 2 743 | 1 530 | 1 213 | 172 | 90 | 82 | 653 | 247 | 406 |
| Ring | 7 235 | 3 752 | 3 483 | 6 074 | 3 186 | 2 888 | 241 | 136 | 105 | 920 | 430 | 490 |
| MSA's of 249,999 or less | 5 586 | 2 952 | 2 634 | 4 612 | 2 557 | 2 055 | 235 | 110 | 125 | 739 | 285 | 454 |
| Central cities | 2 287 | 1 181 | 1 106 | 1 782 | 984 | 798 | 118 | 59 | 59 | 367 | 145 | 222 |
| Ring | 3 299 | 1 771 | 1 529 | 2 829 | 1 572 | 1 257 | 118 | 51 | 67 | 352 | 139 | 212 |
| Not in MSA's | 13 969 | 7 498 | 6 471 | 11 903 | 6 631 | 5 272 | 538 | 264 | 273 | 1 528 | 603 | 925 |

See footnote at end of table.

5

B-2                                   Appendix (cont.)

...udes married persons living apart because either the husband or wife was employed and living at a considerable distance from home, was serving away from home in the Armed Forces, had moved to another area, or had a different place of residence for any other reason except separation as defined above.

**Household.** A household consists of all the persons who occupy a housing unit. A house, an apartment or other group of rooms, or a single room, is regarded as a housing unit when it is occupied or intended for occupancy as separate living quarters; that is, when the occupants do not live and eat with any other persons in the structure and there is direct access from the outside or through a common hall.

A household includes the related family members and all the unrelated persons, if any, such as lodgers, foster children, wards, or employees who share the housing unit. A person living alone in a housing unit, or a group of unrelated persons sharing a housing unit as partners, is also counted as a household. The count of households excludes group quarters.

**Group quarters.** As of 1983, group quarters were defined in the Current Population Survey as noninstitutional ...g arrangements for groups not living in conventional ...sing units or groups living in housing units containing ten or more unrelated persons or nine or more persons unrelated to the person in charge. (Prior to 1983, group quarters included housing units containing five or more persons unrelated to the person in charge.) Examples of persons in group quarters include a person residing in a rooming house, in staff quarters at a hospital, or in a halfway house. Beginning in 1972, inmates of institutions have not been included in the Current Population Survey.

**Householder.** The householder refers to the person (or one of the persons) in whose name the housing unit is owned or rented (maintained) or, if there is no such person, any adult member, excluding roomers, boarders, or paid employees. If the house is owned or rented jointly by a married couple, the householder may be either the husband or the wife. The person designated as the householder is the "reference person" to whom the relationship of all other household members, if any, is recorded.

Prior to 1980, the husband was always considered the householder in married-couple households. The number of householders is equal to the number of ...seholds. Also, the number of family householders is ...al to the number of families.

**Head versus householder.** Beginning with the 1980 CPS, the Bureau of the Census discontinued the use of the terms "head of household" and "head of family." Instead, the terms "householder" and "family householder" are used. Recent social changes have resulted in greater sharing of household responsibilities among

the adult members and, therefore, have made the term "head" increasingly inappropriate in the analysis of household and family data. Specifically, the Census Bureau has discontinued its longtime practice of always classifying the husband as the reference person (head) when he and his wife are living together.

In this report, the term "householder" is used in the presentation of data that had previously been presented with the designation "head." The householder is the first adult household member listed on the questionnaire. The instructions call for listing first the person (or one of the persons) in whose name the home is owned or rented. If a home is owned jointly by a married couple, either the husband or the wife may be listed first, thereby becoming the reference person, or householder, to whom the relationship of other household members is to be recorded.

**Reference person.** The reference person is the person with regard to whom the relationship of other persons in the household is recorded. The household reference person is the person listed as the householder (see definition of "Householder"). The subfamily reference person is either the single parent or the husband/wife in a married-couple situation.

**Family.** A family is a group of two persons or more (one of whom is the householder) related by birth, marriage, or adoption and residing together; all such persons (including related subfamily members) are considered as members of one family. Beginning with the 1980 CPS, unrelated subfamilies (referred to in the past as secondary families) are no longer included in the count of families, nor are the members of unrelated subfamilies included in the count of family members.

**Family household.** A family household is a household maintained by a family (as defined above), and any unrelated persons (unrelated subfamily members and/or secondary individuals) who may be residing there are included. The number of family households is equal to the number of families. The count of family household members differs from the count of family members, however, in that the family household members include all persons living in the household, whereas family members include only the householder and his/her relatives. See the definition of family.

**Stepfamily.** In this report a stepfamily is a married-couple family household with at least one child under age 18 who is a stepchild (i.e., a son or daughter through marriage, but not by birth) of the householder.

**Related subfamily.** A related subfamily is a married couple with or without children, or one parent with one or more own never-married children under 18 years old, living in a household and related to, but not including, the person or couple who maintains the household. One

001788

example of a related subfamily is a young married couple sharing the home of the husband's or wife's parents. The number of related subfamilies is not included in the count of families.

**Unrelated subfamily.** An unrelated subfamily (formerly called a secondary family) is a married couple with or without children, or a single parent with one or more own never-married children under 18 years old living in a household. Unrelated subfamily members are not related to the householder. An unrelated subfamily may include persons such as guests, partners, roommates, or resident employees and their spouses and/or children. The number of unrelated subfamily members is included in the total number of household members, but is not included in the count of family members.

Beginning in 1989, any person(s) who is not related to the householder and who is not the husband, wife, parent, or child in an unrelated subfamily is counted as an unrelated individual.

**Family group.** A family group is any two or more persons (not necessarily including a householder) residing together, and related by birth, marriage, or adoption. A household may be composed of one such group, more than one, or none at all. The count of family groups includes family households, related subfamilies, and unrelated subfamilies.

**Married couple.** A married couple, as defined for census purposes, is a husband and wife enumerated as members of the same household. The married couple may or may not have children living with them. The expression "husband-wife" or "married-couple" before the term "household," "family," or "subfamily" indicates that the household, family, or subfamily is maintained by a husband and wife. The number of married couples equals the count of married-couple families plus related and unrelated married-couple subfamilies.

**Unmarried couple.** An unmarried couple is composed of two unrelated adults of the opposite sex (one of whom is the householder) who share a housing unit with or without the presence of children under 15 years old.

**Unrelated individuals.** Unrelated individuals are persons of any age who are not members of families or subfamilies.

**Nonfamily householder.** A nonfamily householder is a person maintaining a household while living alone or exclusively with persons to whom they are not related.

**Secondary individuals.** Secondary individuals are persons of any age who reside in a household, but are not related to the householder (except unrelated subfamily members). Persons who reside in group quarters are also secondary individuals. Examples of a secondary individual include (1) a guest, partner, roommate, or

resident employee; (2) a foster child; or (3) a person residing in a rooming house, a halfway house, staff quarters at a hospital, or other type of group quarters.

**Own children and related children.** "Own" children in a family are sons and daughters, including stepchildren and adopted children, of the householder. Similarly, "own" children in a subfamily are sons and daughters of the married couple or parent in the subfamily. (All children shown as members of related subfamilies are own children of the person(s) maintaining the subfamily.) "Related" children in a family include own children and all other children in the household who are related to the householder by birth, marriage, or adoption. For each type of family unit identified in the CPS, the count of own children under 18 years old is limited to never-married children; however, "own children under 25" and "own children of any age," as the terms are used here, include all children regardless of marital status. The totals include never-married children living away from home in college dormitories.

The count of related children in families was formerly restricted to never-married children. However, beginning with data for 1968 the Bureau of the Census includes ever-married children under the category of related children. This change added approximately 20,000 children to the category of related children in March 1968.

**Tenure.** A housing unit is "owned" if the owner or co-owner lives in the unit, even if it is mortgaged or not fully paid for. A cooperative or condominium unit is "owned only if the owner or co-owner lives in it. All other occupied units are classified as "rented," including units rented for cash rent and those occupied without payment of cash rent.

**Size of household, family, or subfamily.** The term "size of household" includes all persons occupying a housing unit. "Size of family" includes the family householder and all other persons in the living quarters who are related to the householder by birth, marriage, or adoption. "Size of related subfamily" includes the husband and wife or the lone parent and their nevermarried sons and daughters under 18 years of age. "Size of unrelated subfamily" includes the reference person and all other members related to the reference person. If a family has a related subfamily among its members, the size of the family includes the members of the related subfamily.

**Units in structure.** In the determination of the number of units in a structure, all housing units, both occupied and vacant, were counted. The statistics are presented in terms of the number of occupied housing units in structures of specified size, not in terms of the number of residential structures.

**Years of school completed.** In this report, data on years of school completed were derived from the combination of answers to two questions, (a) "What is the

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

### Office of Federal Housing Enterprise Oversight

[Docket No. N–94–3751; FR–3706–N–01]

## DEPARTMENT OF JUSTICE

## DEPARTMENT OF THE TREASURY

### Office of the Comptroller of the Currency

[Docket No. 94–04]

### Office of Thrift Supervision

[Docket No. 94–41]

## FEDERAL RESERVE SYSTEM

[Docket No. R–0834]

## FEDERAL DEPOSIT INSURANCE CORPORATION

## FEDERAL HOUSING FINANCE BOARD

## FEDERAL TRADE COMMISSION

## NATIONAL CREDIT UNION ADMINISTRATION

### Policy Statement on Discrimination in Lending

**AGENCIES:** Department of Housing and Urban Development; Office of Federal Housing Enterprise Oversight; Department of Justice; Office of the Comptroller of the Currency, Treasury; Office of Thrift Supervision, Treasury; Board of Governors of the Federal Reserve System; Federal Deposit Insurance Corporation; Federal Housing Finance Board; Federal Trade Commission; National Credit Union Administration.

**ACTION:** Notice of approval and adoption of "Policy Statement on Discrimination in Lending"; and Solicitation of Comments regarding its application.

**SUMMARY:** The Department of Housing and Urban Development (HUD), the Office of Federal Housing Enterprise Oversight (OFHEO), the Department of Justice (DOJ), the Office of the Comptroller of the Currency (OCC), the Office of Thrift Supervision (OTS), the Board of Governors of the Federal Reserve System (Board); Federal Deposit Insurance Corporation (FDIC); Federal Housing Finance Board (FHFB), the Federal Trade Commission (FTC), and the National Credit Union Administration (NCUA) (collectively, "the Agencies") have adopted a statement entitled "Policy Statement on Discrimination in Lending" that describes the general principles that

these Agencies will consider to identify lending discrimination in violation of the Equal Credit Opportunity Act or the Fair Housing Act. The principles outlined are general in nature. Their application in specific situations will depend on the facts involved and is subject to continuing development. The Agencies welcome comments about application of the principles to specific policies and practices. The Agencies anticipate providing further clarification and elaboration on the application of the principles in the future.

**DATES:** *Effective date:* April 15, 1994.
*Comment due date:* June 14, 1994.

**ADDRESSES:**
**HUD:** Comments should be directed to the Rules Docket Clerk, Office of General Counsel, Room 10276, Department of Housing and Urban Development, 451 Seventh Street SW., Washington, DC 20410. Communications should refer to the above title.

**OFHEO:** Comments should be directed to: Communications and Public Affairs, Office of Federal Housing Enterprise Oversight, 1700 G Street, Fourth Floor, NW., Washington, DC 20552.

**DOJ:** Comments should be mailed to: U.S. Department of Justice, Housing and Civil Enforcement Section, P.O. Box 65998, Washington, DC 20035–5998.

**OCC:** Comments should be directed to: Communications Division, Office of the Comptroller of the Currency, 250 E Street SW., Washington, DC 20219, Attention Docket No. 94–04. Comments will be available for public inspection and photocopying at the same location.

**OTS:** Send comments to: Director, Information Services Division, Public Affairs, Office of Thrift Supervision, 1700 G Street NW., Washington, DC 20552, Attention Docket No. 94–41. These submissions may be hand delivered to 1700 G Street NW., from 9 a.m. to 5 p.m. on business days; they may be sent by facsimile transmission to FAX number (202) 906–7755. Comments will be available for inspection at 1700 G Street NW., from 1 p.m. until 4 p.m. on business days. Visitors will be escorted to and from the Public Reading Room at established intervals.

**BOARD:** Comments should refer to Docket No. R–0834 and mailed to William W. Wiles, Secretary, Board of Governors of the Federal Reserve System, Washington, DC 20551. Comments addressed to Mr. Wiles may also be delivered to room B–2222 of the Eccles Building between 8:45 a.m. and 5:15 p.m. weekdays, or to the guard station in the Eccles Building courtyard

entrance on 20th Street NW (between Constitution Avenue and C Street NW) at any time. Comments may be inspected in room MP–500 of the Martin Building between 9 a.m. and 5 p.m. weekdays, except as provided in the Board's rules regarding the availability of information (12 CFR 261.8).

**FDIC:** Comments should be directed to: Robert E. Feldman, Acting Executive Secretary, FDIC, 550 17th Street NW., Washington, DC 20429. They may be hand delivered to room 402, 1776 F Street NW., Washington DC between 8:30 a.m. and 5:15 p.m. on business days. Comments may also be faxed to (202) 898–3838.

**FHFB:** Comments should be directed to: Elaine L. Baker, Associate Director and Executive Secretary, Federal Housing Finance Board, 1777 F Street NW., Washington, DC 20006.

**FTC:** Comments may be filed in person or mailed to: Secretary, Federal Trade Commission, 6th Street and Pennsylvania Avenue NW., Washington, DC 20580.

**NCUA:** Comments should be directed to: Mr. Michael J. McKenna, Staff Attorney, Office of General Counsel, National Credit Union Administration, 1775 Duke Street, Alexandria, VA 22314–3428.

**FOR FURTHER INFORMATION CONTACT:**
**HUD:** Peter Kaplan, Director, Office of Regulatory Initiatives and Federal Coordination, (202) 708–2904 (voice) or 1–800–877–TDDY (Federal Information Relay Service).

**OFHEO:** Kevin G. Chavers, Chief of Staff, Office of Federal Housing Enterprise Oversight, (202) 414–3800.

**DOJ:** Alexander C. Ross, (202) 514–2303, or Richard J. Ritter, (202) 514–4739, Housing and Civil Enforcement Division, or (202) 514–0383 (TDD).

**OCC:** R. Russell Bailey, Fair Lending Specialist, Compliance Management, (202) 874–4446; Margaret Hesse, Attorney, Bank Operations and Assets Division, (202) 874–4460.

**OTS:** Timothy R. Burniston, Deputy Assistant Director for Policy, (202) 906–5629; David H. Enzel, Special Counsel, (202) 906–6844; or Vicki Hawkins-Jones, Senior Attorney, (202) 906–7034.

**BOARD:** Glenn E. Loney, Associate Director, (202) 452–3585; or Michael S. Bylsma, Senior Attorney, (202) 452–3667; Division of Consumer and Community Affairs, Board of Governors of the Federal Reserve System.

**FDIC:** Ken A. Quincy, Chief, Compliance and Special Review Section, Division of Supervision, (202) 898–6753; Bobbie Jean Norris, Deputy Director, Office of Consumer Affairs, (202) 898–6760; Ann Loikow, Counsel, (202) 898–3796.

**FHFB:** Sylvia C. Martinez, Director, Housing Finance Directorate, (202) 408–2825 (voice) or (202) 408–2579 (TDD).

**FTC:** Peggy L. Twohig, Assistant Director for Credit Practices, Bureau of Consumer Protection, (202) 326–3224.

**NCUA:** Robert M. Fenner, General Counsel, or Michael J. McKenna, Staff Attorney, Office of General Counsel, (703) 518–6540.

**SUPPLEMENTARY INFORMATION:** The following Federal Agencies—HUD, OFHEO, DOJ, OCC, OTS, the Board, FDIC, FHFB, FTC, and the NCUA—sharing a concern that some prospective homebuyers and other borrowers may be experiencing discriminatory treatment in their efforts to obtain loans, formed an Interagency Task Force on Fair Lending to establish uniform policy against discriminatory lending.

On March 8, 1994, the Interagency Task Force on Fair Lending met to approve or recommend approval to their respective Agencies of the "Policy Statement on Discrimination in Lending," published in this notice, as a statement of the Agencies' general position on the Equal Credit Opportunity Act and the Fair Housing Act for purposes of administrative enforcement of those statutes. The Policy Statement is intended to be consistent with those statutes and their implementing regulations and provide guidance to lenders seeking to comply with them. The Policy Statement does not create or confer any substantive or procedural rights on third parties which could be enforceable in any administrative or civil proceeding.

The Agencies have all approved the Policy Statement and welcome comments from the public about application of the principles set forth in the Policy Statement to specific lending policies and practices. The Agencies anticipate providing further clarification and elaboration on the application of the fair lending principles, and these comments will be taken into consideration as they do so.

Accordingly, the following policy statement is the Policy Statement on Discrimination in Lending adopted by the Interagency Task Force on Fair Lending.

**Policy Statement on Discrimination in Lending**

The Department of Housing and Urban Development ("HUD"), the Department of Justice ("DOJ"), the Office of the Comptroller of the Currency ("OCC"), the Office of Thrift Supervision ("OTS"), the Board of Governors of the Federal Reserve System (the "Board"), the Federal Deposit Insurance Corporation

("FDIC"), the Federal Housing Finance Board ("FHFB"), the Federal Trade Commission ("FTC"), the National Credit Union Administration ("NCUA"), and the Office of Federal Housing Enterprise Oversight ("OFHEO") (collectively, "the Agencies") are concerned that some prospective home buyers and other borrowers may be experiencing discriminatory treatment in their efforts to obtain loans. The 1992 Federal Reserve Bank of Boston study on lending discrimination, Congressional hearings, and agency investigations have indicated that race is a factor in some lending decisions. Discrimination in lending on the basis of race or other prohibited factors is destructive, morally repugnant, and against the law. It prevents those who are discriminated against from enjoying the benefits of access to credit. The Agencies will not tolerate lending discrimination in any form. Further, fair lending is not inconsistent with safe and sound operations. Lenders must continue to ensure that their lending practices are consistent with safe and sound operating policies.

This policy statement applies to all lenders, including mortgage brokers, issuers of credit cards, and any other person who extends credit of any type. The policy statement is being issued for several reasons, including:

• To provide guidance about what the agencies consider in determining if lending discrimination exists; and

• To provide a foundation for future interpretations and rulemakings by the Agencies.

A number of federal statutes seek to promote fair lending. For example, the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. 2801 et seq., seeks to prevent lending discrimination and redlining by requiring public disclosure of certain information about mortgage loan applications. The Community Reinvestment Act ("CRA"), 12 U.S.C. 2901 et seq., seeks affirmatively to encourage institutions to help to meet the credit needs of the entire community served by each institution covered by the statute, and CRA ratings take into account lending discrimination by those institutions. The Americans with Disabilities Act, 42 U.S.C. 12101 et seq., prohibits discrimination against persons with disabilities in the provision of goods and services, including credit services. This policy statement, however, is based upon and addresses only the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. 1691 et seq., and the Fair Housing Act ("FH Act"), 42 U.S.C. 3601 et seq, the two statutes that specifically prohibit discrimination in lending.

This policy statement has been approved and adopted by the signatory Agencies listed above as a statement of the Agencies' general position on the ECOA and the FH Act for purposes of administrative enforcement of those statutes. It is intended to be consistent with those statutes and their implementing regulations and to provide guidance to lenders seeking to comply with them. It does not create or confer any substantive or procedural rights on third parties which could be enforceable in any administrative or civil proceeding.

This policy statement will discuss what constitutes lending discrimination under these statutes and answer questions about how the Agencies will respond to lending discrimination and what steps lenders might take to prevent discriminatory lending practices.

*A. Lending Discrimination Statutes and Regulations*

(1) The ECOA prohibits discrimination in any aspect of a credit transaction. The ECOA is not limited to consumer loans. It applies to any extension of credit, including extensions of credit to small businesses, corporations, partnerships, and trusts.

The ECOA prohibits discrimination based on:

• Race or color;
• Religion;
• National origin;
• Sex;
• Marital status;
• Age (provided the applicant has the capacity to contract);
• The applicant's receipt of income derived from any public assistance program; and
• The applicant's exercise, in good faith, of any right under the Consumer Credit Protection Act.

The Federal Reserve Board's Regulation B, found at 12 CFR part 202, implements the ECOA. Regulation B describes lending acts and practices that are specifically prohibited, permitted, or required. Official interpretations of the regulation are found in Supplement I to 12 CFR part 202.

(2) The FH Act prohibits discrimination in all aspects of residential real-estate related transactions, including, but not limited to:

• Making loans to buy, build, repair or improve a dwelling;
• Purchasing real estate loans;
• Selling, brokering or appraising residential real estate; and
• Selling or renting a dwelling.

The FH Act prohibits discrimination based on:

• Race or color;

**18268**   **Federal Register** / Vol. 59, No. 73 / Friday, April 15, 1994 / Notices

- National origin;
- Religion;
- Sex;
- Familial status (defined as children under the age of 18 living with a parent or legal custodian, pregnant women, and people securing custody of children under 18); and
- Handicap.

HUD's regulations implementing the FH Act are found at 24 CFR Part 100.

Because both the FH Act and the ECOA apply to mortgage lending, lenders may not discriminate in mortgage lending based on any of the prohibited factors in either list.

Liability under these two statutes for discrimination on a prohibited basis is civil, not criminal. However, there is criminal liability under the FH Act for various forms of interference with efforts to enforce the FH Act, such as altering or withholding evidence or forcefully intimidating persons seeking to exercise their rights under the FH Act.

What is prohibited. Under the ECOA, it is unlawful for a lender to discriminate on a prohibited basis in any aspect of a credit transaction and, under both the ECOA and the FH Act, it is unlawful for a lender to discriminate on a prohibited basis in a residential real estate related transaction. Under one or both of these laws, a lender may not, because of a prohibited factor:

- Fail to provide information or services or provide different information or services regarding any aspect of the lending process, including credit availability, application procedures, or lending standards;
- Discourage or selectively encourage applicants with respect to inquiries about or applications for credit;
- Refuse to extend credit or use different standards in determining whether to extend credit;
- Vary the terms of credit offered, including the amount, interest rate, duration, or type of loan;
- Use different standards to evaluate collateral;
- Treat a borrower differently in servicing a loan or invoking default remedies; or
- Use different standards for pooling or packaging a loan in the secondary market.

A lender may not express, orally or in writing, a preference based on prohibited factors or indicate that it will treat applicants differently on a prohibited basis.

A lender may not discriminate on a prohibited basis because of the characteristics of:

- A person associated with a credit applicant (for example, a co-applicant, spouse, business partner, or live-in aide); or
- The present or prospective occupants of the area where property to be financed is located.

Finally, the FH Act requires lenders to make reasonable accommodations for a person with disabilities when such accommodations are necessary to afford the person an equal opportunity to apply for credit.

### B. Types of Lending Discrimination

The courts have recognized three methods of proof of lending discrimination under the ECOA and the FH Act:

- "Overt evidence of discrimination," when a lender blatantly discriminates on a prohibited basis;
- Evidence of "disparate treatment," when a lender treats applicants differently based on one of the prohibited factors; and
- Evidence of "disparate impact," when a lender applies a practice uniformly to all applicants but the practice has a discriminatory effect on a prohibited basis and is not justified by business necessity.

**Overt Evidence of Discrimination.** There is overt evidence of discrimination when a lender openly discriminates on a prohibited basis.

**Example:** A lender offered a credit card with a limit of up to $750 for applicants aged 21–30 and $1500 for applicants over 30. This policy violated the ECOA's prohibition on discrimination based on age.

There is overt evidence of discrimination even when a lender expresses—but does not act on—a discriminatory preference:

**Example:** A lending officer told a customer, "We do not like to make home mortgages to Native Americans, but the law says we cannot discriminate and we have to comply with the law." This statement violated the FH Act's prohibition on statements expressing a discriminatory preference.

**Evidence of Disparate Treatment.** Disparate treatment occurs when a lender treats a credit applicant differently based on one of the prohibited bases. Disparate treatment ranges from overt discrimination to more subtle disparities in treatment. It does not require any showing that the treatment was motivated by prejudice or a conscious intention to discriminate against a person beyond the difference in treatment itself. It is considered by courts to be intentional discrimination because no credible, nondiscriminatory reason explains the difference in treatment on a prohibited basis.

**Example:** Two minority loan applicants were told that it would take several hours

and require the payment of an application fee to determine whether they would qualify for a home mortgage loan. In contrast, a loan officer took financial information immediately from nonminority applicants and determined whether they qualified in minutes, without a fee being paid. The lender's differential treatment violated both the ECOA and the FH Act.

Redlining refers to the illegal practice of refusing to make residential loans or imposing more onerous terms on any loans made because of the predominant race, national origin, etc., of the residents of the neighborhood in which the property is located. Redlining violates both the FH Act and the ECOA.

Disparate treatment may more likely occur in the treatment of applicants who are neither clearly well-qualified nor clearly unqualified. Discrimination may more readily affect applicants in this middle group for two reasons. First, because the applications are all "close cases," there is more room and need for lender discretion. Second, whether or not an applicant qualifies may depend on the level of assistance the lender provides the applicant in preparing an application. The lender may, for example, propose solutions to problems on an application, identify compensating factors, and provide encouragement to the applicant. Lenders are under no obligation to provide such assistance, but to the extent that they do, the assistance must be provided in a nondiscriminatory way.

**Example:** A nonminority couple applied for an automobile loan. The lender found adverse information in the couple's credit report. The lender discussed the credit report with them and determined that the adverse information, a judgment against the couple, was incorrect since the judgment had been vacated. The nonminority couple was granted their loan. A minority couple applied for a similar loan with the same lender. Upon discovering adverse information in the minority couple's credit report, the lender denied the loan application on the basis of the adverse information without giving the couple an opportunity to discuss the report.

**Example:** Two minority borrowers inquired with a lender about mortgage loans. They were given applications for fixed-rate loans only and were not offered assistance in completing the loan applications. They completed the applications on their own and ultimately failed to qualify. Two similarly situated nonminority borrowers made an identical inquiry about mortgage loans to the same lender. They were given information about both adjustable-rate and fixed-rate mortgages and were given assistance in preparing applications that the lender could accept.

Both of these are examples of disparate treatment of similarly situated applicants, apparently based on a

prohibited factor, in the amount of assistance and information the lender provided. The lender might also generally exercise its discretion to disfavor some individuals or favor others in a manner that results in a pattern or practice of disparate treatment that cannot be explained on grounds other than a prohibited basis.

If a lender has apparently treated similar applicants differently on the basis of a prohibited factor, it must provide an explanation for the difference in treatment. If the lender is unable to provide a credible and legitimate nondiscriminatory explanation, the agency may infer that the lender discriminated.

If an agency determines that a lender's explanation for treating some applicants differently is a pretext for discrimination, the agency may find that the lender discriminated, notwithstanding the lender's explanation.

**Example:** A lender rejected a loan application made by a female applicant with flaws in her credit report but accepted applications by male applicants with similar flaws. The lender offered the explanation that the rejected application had been processed by a new loan officer who was unfamiliar with the bank's policy to work with applicants to correct credit report problems. However, an investigation revealed that the same loan officer who processed the rejected application had accepted applications from males with similar credit problems after working with them to provide satisfactory explanations.

When a lender's treatment of two applicants is compared, even when there is an apparently valid explanation for a particular difference in treatment, further investigation may establish disparate treatment on a prohibited basis. For example, seemingly valid explanations for denying loans to minority applicants may have been applied consistently to minority applicants and inconsistently to nonminority applicants; or "offsetting" or "compensatory" factors cited as the reason for approving nonminority applicants may involve information that the lender usually failed to consider for minority applicants but usually considered for nonminority applicants.

A pattern or practice of disparate treatment on a prohibited basis may also be established through a valid statistical analysis of detailed loan file information, provided that the analysis controls for possible legitimate explanations for differences in treatment. Where a lender's underwriting decisions are the subject of a statistical analysis, detailed information must be collected from

individual loan files about the applicants' qualifications for credit. Data reported by lenders under the HMDA do not, standing alone, provide sufficient information for such an analysis because they omit important variables, such as credit histories and debt ratios. HMDA data are useful, though, for identifying lenders whose practices may warrant investigation for compliance with fair lending laws. HMDA data may also be relevant, in conjunction with other evidence, to the determination whether a lender has discriminated.

### Evidence of Disparate Impact

When a lender applies a policy or practice equally to credit applicants, but the policy or practice has a disproportionate adverse impact on applicants from a group protected against discrimination, the policy or practice is described as having a "disparate impact." Policies and practices that are neutral on their face and that are applied equally may still, on a prohibited basis, disproportionately and adversely affect a person's access to credit.

Although the precise contours of the law on disparate impact as it applies to lending discrimination are under development, it has been clearly established that proof of lending discrimination using a disparate impact analysis encompasses several steps. The single fact that a policy or practice creates a disparity on a prohibited basis is not alone proof of a violation. Where the policy or practice is justified by "business necessity" and there is no less discriminatory alternative, a violation of the FH Act or the ECOA will not exist.

The existence of a disparate impact may be established through review of how a particular practice, policy or standard operates with respect to those who are affected by it. The existence of disparate impact is not established by a mere assertion or general perception that a policy or practice disproportionately excludes or injures people on a prohibited basis. The existence of a disparate impact must be established by facts. Frequently this is done through a quantitative or statistical analysis. Sometimes the operation of the practice is reviewed by analyzing its effect on an applicant pool; sometimes it consists of an analysis of the practice's effect on possible applicants, or on the population in general. Not every member of the group must be adversely affected for the practice to have a disparate impact. Evidence of discriminatory intent is not necessary to establish that a policy or practice adopted or implemented by a lender

that has a disparate impact is in violation of the FH Act or ECOA.

Identifying the existence of a disparate impact is only the first step in proving lending discrimination under this method of proof. When an Agency finds that a lender's policy or practice has a disparate impact, the next step is to seek to determine whether the policy or practice is justified by "business necessity." The justification must be manifest and may not be hypothetical or speculative. Factors that may be relevant to the justification could include cost and profitability.

Even if a policy or practice that has a disparate impact on a prohibited basis can be justified by business necessity, it still may be found to be discriminatory if an alternative policy or practice could serve the same purpose with less discriminatory effect.

**Example:** A lender's policy is not to extend loans for single family residences for less than $60,000.00. This policy has been in effect for ten years. This minimum loan amount policy is shown to disproportionately exclude potential minority applicants from consideration because of their income levels or the value of the houses in the areas in which they live. The lender will be required to justify the "business necessity" for the policy.

**Example:** In the past, lenders primarily considered net income in making underwriting decisions. In recent years, the trend has been to consider gross income. A lender decided to switch its practices to consider gross income rather than net income. However, in calculating gross income, the lender did not distinguish between taxable and nontaxable income even though nontaxable income is of more value than the equivalent amount of taxable income. The lender's policy may have a disparate impact on individuals with disabilities and the elderly, both of whom are more likely than the general applicant pool to receive substantial nontaxable income. The lender's policy is likely to be proven discriminatory. First, the lender is unlikely to be able to show that the policy is compelled by business necessity. Second, even if the lender could show business necessity, the lender could achieve the same purpose with less discriminatory effect by "grossing up" nontaxable income (i.e., making it equivalent to gross taxable income by using formulas related to the applicant's tax bracket).

Lenders will not have to justify every requirement and practice every time that they face a compliance examination. The Agencies recognize the relevance to credit decisions of factors related to the adequacy of the borrower's income to carry the loan, the likely continuation of that income, the adequacy of the collateral to secure the loan, the borrower's past performance in paying obligations, the availability of funds to close, and the existence of adequate reserves. While lenders should

think critically about whether widespread, familiar requirements and practices have an unjustifiable disparate impact, they should look especially carefully at requirements that are more stringent than customary. Lenders should also stay informed of developments in underwriting and portfolio performance evaluation so that they are well positioned to consider all options by which their business objectives can be achieved.

## C. Answers to Questions Often Asked by Financial Institutions and the Public

Lending institutions and others often ask the Agencies questions about various aspects of lending discrimination. The Agencies have compiled this list of common questions, with answers, in order to provide further guidance.

Q1: Are disparities in application, approval, or denial rates revealed by HMDA data sufficient to establish lending discrimination?

A: HMDA data alone do not prove lending discrimination. The data do not contain enough information on major credit-related factors, such as employment and credit histories, to prove discrimination. Despite these limitations, the data can provide "red flags" that there may be problems at particular institutions. Therefore, regulatory and enforcement agencies may use HMDA data, along with other factors, to identify institutions whose lending practices warrant more scrutiny. Furthermore, HMDA data can be relevant, in conjunction with other data and information, to the determination whether a lender has discriminated.

Q2: Does a lending institution that submits inaccurate HMDA data violate lending discrimination laws?

A: An inaccurate HMDA data submission constitutes a violation of the HMDA, the Federal Reserve Board's Regulation C, and other applicable laws, and may subject the lending institution to an enforcement action, which could include civil money penalties, and, if the lender is a HUD-approved mortgagee, the sanctions of the HUD Mortgagee Review Board. An inaccurate HMDA data submission, however, is not in itself a violation of the ECOA or the FH Act. However, a person who intentionally submits incorrect or incomplete HMDA data in order to cover up a violation of the FH Act may be subject, under the FH Act and federal criminal statutes, to a fine or prison term or both. In addition, a failure to ensure accurate HMDA data may be considered as a relevant fact during a FH Act investigation or an examination of the institution's lending activities.

Q3: Does a second review program only for loan applicants who are members of a protected class violate laws prohibiting discrimination in lending?

A: Such programs are permissible if they do no more than ensure that lending standards are applied fairly and uniformly to all applicants. For example, it is permissible to review the proposed denial of applicants who are members of a protected class by comparing their applications to the approved applications of similarly qualified individuals who are not members of a protected class to determine if the applications were evaluated consistently. It is impermissible, however, to review the applications of members of a protected class in order to apply standards to those applications different from the standards used to evaluate other applications for the same credit program or to apply the same standards in a different manner, unless such actions are otherwise permitted by law, as described in Question 4.

Other types of second review programs are also permissible. For example, lenders could review the proposed denial of all applicants within a certain income range. Lenders also could review a sampling of all applications proposed for denial, or even review all such applications.

Q4: May a lender apply different lending standards to applicants who are members of a protected class in order to increase lending to that sector of its community?

A: Generally, a lender that applies different lending standards or offers different levels of assistance on a prohibited basis, regardless of its motivation, would be violating both the FH Act and the ECOA. There are exceptions to the general rule; thus, applying different lending standards or offering different levels of assistance to applicants who are members of a protected class is permissible in some circumstances. For example, the FH Act requires lenders to provide reasonable accommodation to people with disabilities. In addition, providing different treatment to applicants to address past discrimination would be permissible if done in response to a court order or otherwise in accord with applicable legal precedent. However, the law in this area is complex and developing. Before implementing programs of this sort, a lender should seek legal advice.

Of course, affirmative advertising and marketing efforts that do not involve application of different lending standards are permissible under both

the ECOA and the FH Act. For example, special outreach to a minority community would be permissible.

Q5: Should a lender engage in self-testing?

A: Principles of sound lending dictate that adequate policies and procedures be in place to ensure safe and sound lending practices and compliance with applicable laws and regulations, and that a lender adopt appropriate audit and control systems to determine whether the institution's policies and procedures are functioning adequately. This is as true in the area of fair lending as in other operations. Lenders should employ reliable measures for auditing fair lending compliance. A well-designed and implemented program of self-testing could be a valuable part of this process. Lenders should be aware, however, that data documenting lending discrimination discovered in a self-test generally will not be shielded from disclosure.

Corrective actions should always be taken by any lender that discovers discrimination. Self-testing and corrective actions do not expunge or extinguish legal liability for the violations of law, insulate a lender from private suits, or eliminate the primary regulatory agency's obligation to make the referrals required by law. However, they will be considered as a substantial mitigating factor by the primary regulatory agencies when contemplating possible enforcement actions. In addition, HUD and DOJ will consider as a substantial mitigating factor an institution's self-identification and self-correction when determining whether they will seek additional penalties or other relief under the FH Act and the ECOA. The Agencies strongly encourage self-testing and will consider further steps that might be taken to provide greater incentives for institutions to undertake self-assessment and self-correction.

Q6: What should a lender do if self-testing evidences lending discrimination?

A: If a lender discovers discriminatory practices, it should make all reasonable efforts to determine the full extent of the discrimination and its cause, e.g., determine whether the practices were grounded in defective policies, poor implementation or control of those policies, or isolated to a particular area of the lender's operations. The lender should take all appropriate corrective actions to address the discrimination, including, but not limited to:

• Identifying customers whose applications may have been inappropriately processed, offering to extend credit if they were improperly

denied; compensating them for any damages, both out-of-pocket and compensatory; and notifying them of their legal rights;

• Correcting any institutional policies or procedures that may have contributed to the discrimination;

• Identifying, and then training and/ or disciplining, the employees involved;

• Considering the need for community outreach programs and/or changes in marketing strategy or loan products to better serve minority segments of the lender's market; and

• Improving audit and oversight systems in order to ensure there is no recurrence of the discrimination.

An institution is not required to report to the Agencies a lending discrimination problem it has discovered. However, a lender that reports its discovery can ensure that the corrective actions it develops are appropriate and complete and thereby minimize the damages to which it will be subject.

Q7: Will a lender be held responsible for discriminatory lending engaged in by a single loan officer where the lending institution has good policies and procedures in place, is otherwise in full compliance with all applicable laws and regulations and neither knows nor reasonably could have known that the officer was engaged in illegal discriminatory conduct?

A: Fair lending violations can occur even in the most well-run lending institutions that have good policies in place to ensure compliance with fair lending laws and regulations. Of course, the chances that such violations will occur can be greatly reduced by backing up those policies with proper employee training and supervision and subjecting the lending process to proven systems of oversight and review. Self-testing can further reduce the likelihood that violations may occur. Notwithstanding these efforts, a single loan officer might still improperly apply policies or, worse yet, deliberately circumvent them and manage to conceal or disguise the true nature of his or her practices for a time. It may be particularly difficult to discover this type of behavior when it occurs in the pre-application process.

In any case where discriminatory lending by a lending institution is identified, the lender will be expected to identify and fairly compensate victims of discriminatory conduct just as it would be expected to compensate a customer if an employee's conduct resulted in physical injury to the customer. In addition, such a violation might constitute a "pattern or practice" that must be referred to DOJ or a violation that must be referred to HUD.

As in other cases of discriminatory behavior, where a lender takes self-initiated corrective actions, such actions will be considered as a substantial mitigating factor by the Agencies in determining the nature of any enforcement action and what penalties or other relief would be appropriate.

Q8: If a federal financial institutions regulatory agency has "reason to believe" that a lender has engaged in a pattern or practice of discrimination in violation of the ECOA, the ECOA requires the agency to refer the matter to DOJ. What constitutes a "reason to believe"?

A: A federal financial institutions regulatory agency has reason to believe that an ECOA violation has occurred when a reasonable person would conclude from an examination of all credible information available that discrimination has occurred. This determination requires weighing the available evidence and applicable law and determining whether an apparent violation has occurred. Information supporting a reason to believe finding may include loan files and other documents, credible observations by persons with direct knowledge, statistical analysis, and the financial institution's response to the preliminary examination findings.

Reason to believe is more than an unfounded suspicion. While the evidence of discrimination need not be definitive and need not include evidence of overt discrimination, it should be developed to the point that a reasonable person would conclude that a violation exists.

Q9: If a federal financial institutions regulatory agency has reason to believe that a lender has engaged in a "pattern or practice" of discrimination in violation of the ECOA, the agency will refer the matter to DOJ. What constitutes a "pattern or practice" of lending discrimination?

A: Determinations by federal financial institutions regulatory agencies regarding a pattern or practice of lending discrimination must be based on an analysis of the facts in a given case. Isolated, unrelated or accidental occurrences will not constitute a pattern or practice. However, repeated, intentional, regular, usual, deliberate, or institutionalized practices will almost always constitute a pattern or practice. The totality of the circumstances must be considered when assessing whether a pattern or practice is present. Considerations include, but are not limited to:

• Whether the conduct appears to be grounded in a written or unwritten

policy or established practice that is discriminatory in purpose or effect;

• Whether there is evidence of similar conduct by a financial institution toward more than one applicant. Note, however, that this is not a mathematical process, e.g., "more than one" does not necessarily constitute a pattern or practice;

• Whether the conduct has some common source or cause within the financial institution's control;

• The relationship of the instances of conduct to one another (e.g., whether they all occurred in the same area of the financial institution's operations); and

• The relationship of the number of instances of conduct to the financial institution's total lending activity. Note, however, that, depending on the circumstances, violations that involve only a small percentage of an institution's total lending activity could constitute a pattern or practice.

Depending on the egregiousness of the facts and circumstances involved, singly or in combination, these factors could provide evidence of a pattern or practice.

Q10: How does the employment of few minorities and individuals from other protected classes in lending positions—e.g., Account Executive, Underwriter, Loan Counselor, Loan Processor, Staff Appraiser, Assistant Branch Manager and Branch Manager—affect compliance with lending discrimination laws?

A: The employment of few minorities and others in protected classes, in itself, is not a violation of the FH Act or the ECOA. However, employment of few members of protected classes in lending positions can contribute to a climate in which lending discrimination could occur by affecting the delivery of services.

Therefore, lenders might consider the following steps, as appropriate to their institutions:

• Advertising lending job openings in local minority-oriented publications;

• Notifying predominantly minority organizations of such openings;

• Seeking employment referrals from current minority employees, minority real estate boards and local historically minority colleges and other institutions that serve minority groups in the community; and

• Seeking qualified independent fee appraisers from local minority appraisal organizations.

Similar outreach steps could be considered to recruit women, persons with disabilities, and other persons protected by the FH Act and the ECOA.

Q11: What is the role of the guidelines of secondary market purchasers and

Case: 1:19-cv-05684 Document #: 73-15 Filed: 02/11/22 Page 36 of 74 PageID #:1272

private and governmental loan insurers in determining whether primary lenders practice lending discrimination?

A: Many lenders make mortgage loans only when they can be sold on the secondary market, or they may place some loans in their own portfolios and sell others on the secondary market. The principal secondary market purchasers, Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac"), publish underwriting guidelines to inform primary lenders of the conditions under which they will buy loans. For example, ability to repay the loan is measured by suggested ratios of monthly housing expense to income (28%) and total obligations to income (36%). However, these guidelines allow considerable discretion on the part of the primary lender. In addition, the secondary market guidelines have in some cases been made more flexible, for example, with respect to factors such as stability of income (rather than stability of employment) and use of nontraditional ways of establishing good credit and ability to pay (e.g., use of past rent and utility payment records). Lenders should ensure that their loan processors and underwriters are aware of the provisions of the secondary market guidelines that provide various alternative and flexible means by which applicants may demonstrate their ability and willingness to repay their loans. Fannie Mae and Freddie Mac not infrequently purchase mortgages exceeding the suggested ratios, and their guidelines contain detailed discussions of the compensating factors that can justify higher ratios (and which must be documented by the primary lender).

A lender who rejects an application from an applicant who is a member of a protected class and who has ratios above those of the guidelines and approves an application from another applicant with similar ratios should be prepared to show that the reason for the rejection was based on factors that are applied consistently without regard to any of the prohibited factors.

These same principles apply equally to the guidelines of private and governmental loan insurers.

Q12: What criteria will be employed in taking enforcement actions or seeking remedial measures when lending discrimination is discovered?

A: Enforcement sanctions and remedial measures for lending discrimination violations vary depending on whether such sanctions are sought by the appropriate federal financial institutions regulatory agencies, DOJ, HUD or other federal agencies charged with enforcing either

the ECOA or the FH Act. The following discussion sets out the criteria typically employed by the federal banking agencies (i.e., OCC, OTS, the Board and FDIC), NCUA, DOJ, HUD, OFHEO, FHFB and FTC in determining the nature and severity of sanctions that may be used to address discriminatory lending practices. As discussed in Questions 8 and 9, above, in certain situations, the primary regulatory agencies will also refer enforcement matters to HUD or DOJ.

The federal banking agencies:

The federal banking agencies are authorized to use the full range of their enforcement authority under 12 U.S.C. 1818 to address discriminatory lending practices. This includes the authority to seek:

• Enforcement actions that may require both prospective and retrospective relief; and

• Civil money penalties ("CMPs") in varying amounts against the financial institution or any institution-affiliated party ("IAP") within the meaning of 12 U.S.C. 1813(u), depending, among other things, on the nature of the violation and the degree of culpability.

In addition to the above actions, the federal banking agencies may also take removal and prohibition actions against any IAP where the statutory requirements for such actions are met.

The federal banking agencies will make determinations as to the appropriateness of any potential enforcement action after giving full consideration to a variety of factors. In making these determinations, the banking agencies will take into account:

• The number and duration of violations identified;

• The nature of the evidence of discrimination (i.e., overt discrimination, disparate treatment or disparate impact);

• Whether the discrimination was limited to a particular office or unit of the financial institution or was more pervasive in nature;

• The presence and effectiveness of any anti-discrimination policies;

• Any history of discriminatory conduct; and

• Any corrective measures implemented or proposed by the financial institution.

The severity of the federal banking agencies' enforcement response will depend on the egregiousness of the financial institution's conduct. Voluntary identification and correction of violations disclosed through a self-testing program will be a substantial mitigating factor in considering whether to initiate an enforcement action.

In addition, the federal banking agencies may consider whether an institution has provided victims of discrimination with all the relief available to them under applicable civil rights laws.

The federal banking agencies may seek both prospective and retrospective relief for fair lending violations.

Prospective relief may include requiring the financial institution to:

• Adopt corrective policies and procedures and correct any financial institution policies or procedures that may have contributed to the discrimination;

• Train financial institution employees involved;

• Establish community outreach programs and change marketing strategy or loan products to better serve all sectors of the financial institution's service area;

• Improve internal audit controls and oversight systems in order to ensure there is no recurrence of discrimination; or

• Monitor compliance and provide periodic reports to the primary federal regulator.

Retrospective relief may include:

• Identifying customers who may have been subject to discrimination and offering to extend credit if the customers were improperly denied;

• Requiring the financial institution to make payments to injured parties:

• *Restitution*: This may include any out-of-pocket expenses incurred as a result of the violation to make the victim of discrimination whole, such as: fees or expenses in connection with the application; the difference between any greater fees or expenses of another loan granted elsewhere after denial by the discriminating lender; and, when loans were granted on disparate terms, appropriate modification of those terms and refunds of any greater amounts paid.

• *Other Affirmative Action As Appropriate to Correct Conditions Resulting From Discrimination*: The federal banking agencies also have the authority to require a financial institution to take affirmative action to correct or remedy any conditions resulting from any violation or practice. The banking agencies will determine whether such affirmative action is appropriate in a given case and, if such action is appropriate, the type of remedy to order.

• Requiring the financial institution to pay CMPs:

The banking agencies have the authority to assess CMPs against financial institutions or individuals for violating fair lending laws or

regulations. Each agency has the authority to assess CMPs of up to $5,000 per day for any violation of law, rule or regulation. Penalties of up to $25,000 per day are also permitted, but only if the violations represent a pattern of misconduct, cause more than minimal loss to the financial institution, or result in gain or benefit to the party involved. CMPs are paid to the U.S. Treasury and therefore do not compensate victims of discrimination.

National Credit Union Administration

For federal credit unions, NCUA will employ criteria comparable to those of the federal banking agencies, pursuant to its authority under 12 U.S.C. 1786.

The Department of Justice

The Department of Justice is authorized to use the full range of its enforcement authority under the FH Act and the ECOA. DOJ has authority to commence pattern or practice investigations of possible lending discrimination on its own initiative or through referrals from the federal financial institutions regulatory agencies, and to file lawsuits in federal court where there is reasonable cause to believe that such violations have occurred. DOJ is also authorized under the FH Act to bring suit based on individual complaints filed with HUD where one of the parties to the complaint elects to have the case heard in federal court.

The relief sought by DOJ in lending discrimination lawsuits may include:
• An injunction which may require both prospective and retrospective relief; and,
• In enforcement actions under the FH Act, CMPs not to exceed $50,000 per defendant for a first violation and $100,000 for any subsequent violation.

Prospective injunctive relief may include:
• A permanent injunction to insure against a recurrence of the unlawful practices;
• Affirmative measures to correct past discriminatory policies, procedures, or practices, so long as consistent with safety and soundness, such as:
• Expansion of the lender's service areas to include previously excluded minority neighborhoods;
• Opening branches or other credit facilities in under-served minority neighborhoods;
• Targeted sales calls on real estate agents and builders active in minority neighborhoods;
• Advertising through minority-oriented media;
• Self-testing;
• Employee training;

• Changes to commission structures which tend to discourage lending in minority and low-income neighborhoods; and
• Changes in loan processing and underwriting procedures (including second reviews of denied applications) to ensure equal treatment without regard to prohibited factors; and
• Record keeping and reporting requirements to monitor compliance with remedial obligations.

Retrospective injunctive relief may include relief for victims of past discrimination, actual and punitive damages, and offers or adjustments of credit or other forms of loan commitments.

The Department of Housing and Urban Development

The Department of Housing and Urban Development is fully authorized to investigate complaints alleging discrimination in lending in violation of the FH Act and has the authority to initiate complaints and investigations even when an individual complaint has not been received. HUD issues determinations on whether or not reasonable cause exists to believe that the FH Act has been violated. HUD also may authorize actions for temporary and preliminary injunctions to be brought by DOJ and has authority to issue enforceable subpoenas for information related to investigations.

Following issuance of a determination of reasonable cause under the FH Act, HUD enforces the FH Act administratively unless one of the parties elects to have the case heard in federal court in a case brought by DOJ.

Relief under the FH Act that may be awarded by an administrative law judge ("ALJ") after a hearing, or by the Secretary on review of a decision by an ALJ, includes:
• Injunctive or other appropriate relief, including a variety of actions designed to correct discriminatory practices, such as changes in loan processes or procedures, modifications of loan service areas or branching actions, approval of previously denied loans to aggrieved persons, additional record-keeping and reporting on future activities or other affirmative relief;
• Actual damages suffered by persons who are aggrieved by any violation of the FH Act, including damages for mental distress and out-of-pocket losses attributable to a violation; and
• Civil penalties of up to $10,000 for each initial violation and up to $25,000 and $50,000 for successive violations within specific time frames.

HUD also is authorized to direct Fannie Mae and Freddie Mac to

undertake various remedial actions, including suspension, probation, reprimand, or settlement, against lenders found to have engaged in discriminatory lending practices in violation of the FH Act or the ECOA.

The Office of Federal Housing Enterprise Oversight

The Office of Federal Housing Enterprise Oversight is authorized to use its enforcement authority under 12 U.S.C. 4631 and 4636, including cease and desist orders and CMPs for violations by Fannie Mae and Freddie Mac of the fair housing regulations promulgated by the Secretary of HUD pursuant to 12 U.S.C. § 4545.

The Federal Housing Finance Board

While the Federal Housing Finance Board does not have enforcement authority under the ECOA or the FH Act, in reviewing the members of the Federal Home Loan Bank System for community support, it may restrict access to long-term System advances to any member that, within two years prior to the due date of submission of a Community Support Statement, had a final administrative or judicial ruling against it based on violations of those statutes (or any similar state or local law prohibiting discrimination in lending). System members in this situation are asked to submit to the Finance Board an explanation of steps taken to remedy the violation or prevent a recurrence. See 12 U.S.C. 1430(g); 12 CFR 936.3 (b)(5).

The Federal Trade Commission

The Federal Trade Commission enforces the requirements of the ECOA and Regulation B for all lenders subject to the ECOA, except where enforcement is specifically committed to another agency. The FTC may exercise all of its functions and powers under the Federal Trade Commission Act ("FTC Act") to enforce the ECOA, and a violation of any requirement under the ECOA is deemed to be a violation of a requirement under the FTC Act. The FTC has the power to enforce Regulation B in the same manner as if a violation of Regulation B were a violation of an FTC trade regulation rule.

This means that the FTC has the power to investigate lenders suspected of lending discrimination and to use compulsory process in doing so. The Commission, through DOJ or on its own behalf where the Justice Department declines to act, may file suit in federal court against suspected violators and seek relief including:
• Injunctions against the violative practice;

• Civil penalties of up to $10,000 for each violation; and

• Redress to affected consumers.

In addition, the Commission routinely imposes recordkeeping and reporting requirements to monitor compliance.

Q13: Will a financial institution be subjected to multiple actions by DOJ or HUD and its primary regulator if discriminatory practices are discovered?

A: In all cases where referrals to other agencies are made, the appropriate federal financial institutions regulatory agency will engage in ongoing consultations with DOJ or HUD regarding coordination of each agency's actions. The Agencies will coordinate their enforcement actions and make every effort to eliminate unnecessarily duplicative actions. Where both a federal financial institutions regulatory agency and either DOJ or HUD are contemplating taking actions under

their own respective authorities, the Agencies will seek to coordinate their actions to ensure that each agency's action is consistent and complementary. The financial institutions regulatory agencies also will discuss referrals on a case-by-case basis with DOJ or HUD to determine whether multiple actions are necessary and appropriate.

Dated: April 6, 1994.

**Henry G. Cisneros,**
*Secretary, U.S. Department of Housing and Urban Development.*

Aida Alvarez,
*Director, Office of Federal Housing Enterprise Oversight.*

Janet Reno,
*Attorney General, Department of Justice.*

Eugene A. Ludwig,
*Comptroller of the Currency.*

Jonathan L. Fiechter,
*Acting Director, Office of Thrift Supervision.*

Alan Greenspan,
*Chairman, Board of Governors of the Federal Reserve System.*

Andrew C. Hove, Jr.,
*Acting Chairman, Federal Deposit Insurance Corporation.*

Nicolas P. Retsinas,
*HUD—Secretary, Designee to the Board, Federal Housing Finance Board.*

Donald S. Clark,
*Secretary, Federal Trade Commission.*

Norman E. D'Amours,
*Chairman, National Credit Union Administration.*

Norman E. D'Amours,
*Chairman, National Credit Union Administration.*

Norman E. D'Amours,
*Chairman, National Credit Union Administration.*

[FR Doc. 94–9214 Filed 4–14–93; 8:45 am]

**BILLING CODES 4210–32–P; 4210–01–P; 15–01–0004–P; 4810–33–P; 6720–01–P; 6210–01–P; 6714–01–P; 6725–01–P; 6750–01–P; and 753–501–P**

**U. S. Department of Housing and Urban Development**
Washington, D.C. 20410-2000

October 7, 1994



OFFICE OF THE ASSISTANT SECRETARY
FOR FAIR HOUSING AND EQUAL OPPORTUNITY

MEMORANDUM FOR:  Fair Housing and Equal Opportunity Enforcement
Directors
Field Enforcement Staff
Staff, Office of Investigations

FROM:  Susan Forward, Deputy Assistant Secretary for Enforcement
and Investigations, EE

SUBJECT:  Redelegation of Authority to Make Determinations under
the Fair Housing Act

As you know, as of October 1, 1994, the authority for making
determinations under the Fair Housing Act has been assigned to
the Assistant Secretary for Fair Housing and Equal Opportunity,
with the concurrence of counsel.  A final rule was published in
the Federal Register on August 6, 1994, and a revised final rule
was published on September 12, 1994, changing the authority.
Revised delegations of authority, which delegate the authority to
issue cause determinations to the Assistant Secretary with the
concurrence of counsel will be issued shortly.  That authority
will be delegated concurrently to the Enforcement Directors with
the concurrence of the Assistant General Counsels.  Copies of the
delegations will be provided to you following publication.  This
is preliminary guidance on internal processing procedures to be
followed in investigating cases, analyzing investigative
information and making determinations of cause and no cause under
the Act.

<u>NEW PROCEDURES</u>

**Determinations:**

Under the revised system, FHEO will make all determinations
of cause and no cause, with close coordination with field counsel
or the Office of General Counsel Fair Housing Enforcement
Division.  All cases except cases involving novel issues of law
or complex facts will be enforced by field counsel, with the Fair
Housing Enforcement Division enforcing the novel and complex
cases.

All determinations of cause and no cause under the Act will be jointly delegated to the Assistant Secretary (and the Deputy Assistant Secretary for Enforcement and Investigations) and to the Directors of the Enforcement Centers. The Enforcement Center staff will prepare determinations, which will be reviewed and approved by Headquarters before issuance. The Assistant General Counsel will concur (or non-concur) on cases which originate in the field office and OGC-Fair Housing Enforcement Division will concur (or non-concur) on cases investigated by the Office of Investigations, including all Secretary-initiated complaints.

**Office of Counsel Involvement:**

Field counsel and OGC's Fair Housing Enforcement Division will work closely with FHEO staff to provide informal guidance as needed by FHEO at any stage of case processing. The mechanisms for developing a coordinated system to identify legal issues early in the process and legal input into the conduct of the investigation will be left to the respective offices to develop. We encourage staff meetings between FHEO and counsel to review all cases before preparation of a determination with one or more fair housing lawyers to ensure that all legal perspectives are considered before a determination is made. (This would systematize a process which now seems to work informally in several regions, where there is close interaction between one or more regional counsel on questions arising during the intake/investigation process and joint sessions to review cases before FHEO forwards the case to Headquarters).

**Format for Determinations:**

Determinations (which will resemble the current case summary used in no cause cases, see attached Exhibit 1 for format) in both cause and no cause cases will be prepared by the Enforcement Centers and sent to the Office of Investigations, with a case analysis summary package, which will highlight any factual or legal issues and summarize the evidence. The case analysis summary package will consist of one or more completed Case Analysis Worksheets (attached as Exhibit 2), a memorandum from counsel either concurring or non-concurring on the determination, any recommendation which counsel or FHEO wishes to make regarding whether the case should be handled as a novel or complex case, and the Final Investigative Report. A cover "Record of Clearances" (Form HUD-1047 (4/91)) will be attached, which will contain the record of concurrences initiated with the investigator, including the supervisor, the Enforcement Director and counsel. The form will be used to record further clearances at Headquarters as necessary.

Only in cases involving discrimination in mortgage lending, appraisals, insurance or any other allegation of a violation of Section 805 of the Act should a copy of the case file be forwarded to the Office of Investigations.

### Office of Investigations Review Process:

All determinations will be reviewed by the Office of Investigations and will be approved by the Assistant Secretary or the Deputy Assistant Secretary for Enforcement and Investigations. Informal consultation by telephone on any questionable determination will be the preferred mechanism for resolution of concerns by the Office of Investigations. In some instances, where there may be questions regarding the proposed determination, the Office of Investigations may request the entire case file or portions of the file. After a brief Headquarters review, no cause determinations will be approved and returned to the Enforcement Centers to be issued by the Enforcement Director.

### Resolution of Disputes:

Any disagreement between field FHEO and counsel regarding a proposed determination will be resolved as follows: If the Office of Investigations agrees with counsel, it will modify the determination accordingly or return the determination for revision by the field. If the Office of Investigations agrees with the Enforcement Center, the issue will be addressed at the staff level between the Office of Investigations and OGC-Fair Housing, and, if necessary, by the Assistant Secretary and the General Counsel, or ultimately by the Secretary.

### Cause Cases:

After approval by the Assistant Secretary or her designee, cause cases will be sent to OGC's Fair Housing Division if they are novel or complex, or if they are Headquarters initiated. Otherwise they will be returned to field counsel for preparation and issuance of a charge. In cause cases, the determination will be served with the charge. In no cause cases, the determination will be provided to the parties, as the case summary is currently provided. Any enforcement action before ALJs will be taken by the assigned office.

### Prompt Judicial Relief:

Pursuant to a delegation of authority published on March 8, 1994, requests for temporary restraining orders generally are referred by Assistant General Counsels to the Department of

4

Justice.  FHEO staff should ensure that adequate information is gathered to support such a referral, including preparation of written summaries of all available facts, a HUD 903 form, and information which indicates that the circumstances indicate that irreparable harm may occur if prompt judicial action is not taken.  The Fair Housing Division will handle any TRO matters occurring while cases are being reviewed in the Office of Investigations, as well as any cases involving Systemic or Secretary-initiated complaints.

**Criminal referrals, Zoning Cases, Pattern and Practice Referrals:**

Criminal referrals to DOJ, pattern and practice referrals to DOJ and zoning cases will continue to be referred to the Office of Investigations, which will refer them to the Department of Justice.

**Breach of Conciliation Agreements:**

Cases involving allegations that a conciliation agreement has been breached may be referred directly to the Department of Justice by the Enforcement Director.  The referral must include a copy of the agreement sought to be enforced.  Please ensure that the agreement was still in effect as of the date of the alleged breach.  Additionally, the referral should include information gathered through investigation which documents the breach, including such items as statements by the complainant, results of tests conducted to check compliance with the agreement, or statements of appropriate level staff which indicate a failure to provide timely or complete reports.  In all cases, documentation of efforts to achieve compliance with the agreement should be included, including at least one written communication with the respondent advising of non-compliance and seeking compliance.  A transmittal memo should be prepared from the Enforcement Director, to the Chief of the Housing and Civil Enforcement Branch, U.S. Department of Justice, describing the areas of the breach and efforts to achieve compliance.  Copies of the referral packet should be sent to the Director, Office of Investigations, so that monitoring and follow up may occur.

**Subpoena Issuance and Enforcement:**

Subpoena issuance and enforcement procedures will remain unchanged.

5

**Requests for Reconsideration:**

Requests for reconsideration should be reviewed in the Enforcement Center and then forwarded to the Office of Investigations with a recommendation as to whether the reconsideration should be approved and the reasons for the recommendation.

## CURRENT CASE INVENTORY

As of October 1, 1994, all cases in our inventory will be handled as follows:

1. Cases in field FHEO will be handled under the new procedures, i.e., a determination, a completed case analysis worksheet, a record of concurrences and the FIR will be prepared in FHEO, reviewed by counsel with concurrence or a non-concurrence memo and sent to Headquarters for approval.

2. Cases in the Office of Investigations will have worksheets and determinations prepared in the Office of Investigations. For cause cases, if the case is novel or complex, it will be sent to OGC-Fair Housing Enforcement Division for preparation and issuance of a charge. If the case is not novel or complex, it will be sent to field counsel for preparation and issuance of a charge. The counsel's office which receives the determination may concur or non-concur on the determination, since counsel would not have previously reviewed the case. If counsel non-concurs, that office should address its non-concurrence to the Office of Investigations, which will respond to the non-concurrence.

Determinations of cause in such cases will be signed by the Enforcement Director or the Assistant Secretary, as appropriate. In no cause cases, the determination will be prepared in the Office of Investigations and issued from Headquarters.

If, in the opinion of the Office of Investigations, further investigation is necessary before a determination can be made, the case may be discussed by telephone with appropriate field staff or remanded to the field. If a case is remanded, the field will complete the investigation and make a determination based on the further investigation. The Office of Investigations will monitor remanded cases to ensure that the investigation is adequate.

3. Cases with field counsel and OGC-Fair Housing Enforcement Division will, on a time frame to be established based on case load, prepare draft determinations, using the FHEO model, which will be reviewed and signed by the appropriate FHEO authority (Enforcement Directors in the field, the Assistant Secretary or

6

will be reviewed and signed by the appropriate FHEO authority (Enforcement Directors in the field, the Assistant Secretary or the Deputy Assistant Secretary for Enforcement and Investigations at Headquarters). A charge will be drafted by counsel as well. When the determination is signed by FHEO the charge will be signed and issued by counsel, with the determination served simultaneously with the charge.

## COOPERATIVE RELATIONSHIP WITH COUNSEL

For cases which are currently being filed as complaints or being investigated, FHEO and field counsel should develop procedures which will facilitate an on-going cooperative interchange on cases. In this process, in essence, FHEO is the client consulting with counsel to strengthen FHEO's analysis of the case, allow FHEO to identify early in the process legal issues relating to the case (on which counsel will provide assistance in resolving), in the context of an exchange of ideas on how the investigation can effectively gather relevant information. It is not designed to be a "second-guessing" of FHEO directions, but a supportive and mutually assistive process. Discussions could include anything from questions arising during the intake process involving jurisdiction or First Amendment concerns, to effective data gathering techniques in a particularly difficult case, to development of new strategies for gathering information when direct investigation is not identifying reliable information. By the end of the investigation, there should generally have been several opportunities to discuss each cases.

## FURTHER INFORMATION

Guidance which will address more detailed procedures and time frames for FHEO and OGC actions under the new procedures will be communicated shortly. In the meantime, for further information contact Sara K. Pratt, Director, Office of Investigations, at (202) 708-0836, ext. 221.

Attachments

Exhibit #1

Outline of information to be contained in a Determination

The outlined format should be used for all determinations, cause and no cause. It thus replaces existing formats for the "case summary" currently used in no cause cases. A determination will be prepared in all cases, except those closed by administrative closure. In some situations it is appropriate to prepare one determination which involves more than one complaint, where the facts of separate complaints are closely interrelated.

DETERMINATION

I. Case name(s), identifying all parties
Case number(s)

II. <u>Jurisdiction</u>: A paragraph which states the facts found in the investigation which support a conclusion that the complaint is jurisdictional. It will include a one or two sentence summary of the complaint, which will demonstrate subject matter jurisdiction and basis of the complaint and refer to information relating to standing and statute of limitations. This information will be similar to that provided in the case analysis worksheet. In non-jurisdictional complaints, this information will be substantial, and completion of this section will also be the conclusion of the determination.

III. <u>Complainant's Allegations</u>: A short paragraph which describes the specific factual allegations of the complainant(s).

IV. <u>Respondent's Defenses</u>: A short paragraph which briefly summarizes each of the defendant(s) responses to the allegations, beginning with words such as "The respondent denies discrimination and states that...." (if in fact the respondent denies discrimination.

V. <u>Findings</u>: A more lengthy paragraph or series of paragraphs which normally would start with words such as "The investigation revealed...." Each of the claims made by the complainant and each of the responses made by the respondent should be covered in this section, with particular reference to the evidence which supports or refutes each claim or response.

VI. <u>Conclusion</u>: A short summary and conclusion paragraph which may be as simple as "Based upon the information set forth above, there is reasonable cause to believe that the Fair Housing Act was violated, as alleged.

VII. The final paragraph should indicate the source for a copy of a final investigative report.

VIII. Signature of Enforcement Director

Exhibit #2

DELIBERATIVE DOCUMENT-ADMINISTRATIVELY CONFIDENTIAL

CASE ANALYSIS WORKSHEET

FHEO Enforcement Center _____

FHAP Agency _____

Reviewer _____

Investigator _____

CASE NAME _____

NUMBER _____

BASIS: _____

ISSUE: _____

I. JURISDICTION:

  Standing _____

  _____

  _____

  _____

  _____

  _____

  _____

Statute of Limitations (indicate the last date on which unlawful discrimination occurred.  If still continuing, indicate)

_____

_____

_____

_____

Respondent jurisdiction _____

_____

_____

_____

_____

Subject matter jurisdiction _____

_____

_____

_____

Any remaining jurisdiction issues? _____

_____

_____

If there are any persons who are aggrieved persons, but not complainants, identify and briefly describe the reason(s) they are not complainants.

_____

## II. PROOF FORMULA:

OVERT _____

UNEQUAL TREATMENT _____

DISPARATE IMPACT _____

### PRIMA FACIE CASE

### RESPONDENT DEFENSES

A. _____

AFFIRM

_____

_____

_____

_____

_____

_____

REFUTE

_____

_____

_____

_____

_____

B. _____

_____

_____

AFFIRM

_____

_____

_____

_____

REFUTE

_____

_____

_____

_____


C. _____

_____

_____

_____

_____


AFFIRM

_____

_____

_____

_____


REFUTE

_____

_____

_____

D. _____

_____

_____

_____

_____

AFFIRM

_____

_____

_____

_____

REFUTE

_____

_____

_____

IS ANY FURTHER INVESTIGATION NECESSARY? WHY? _____

_____

_____

_____

_____

_____

_____

_____

III. CONCILIATION EFFORTS:(Describe as to all issues and all parties) _____

_____

_____

_____

_____

_____

## IV. CONCLUSION

CAUSE _____(Describe as to all issues and parties)_____

_____

_____

_____

_____

_____

_____

NO CAUSE _____ (Describe as to all issues and all parties) _____

_____

_____

_____

_____

_____

COMMENTS:

Exhibit #3

## CASE ANALYSIS WORKSHEET INSTRUCTIONS

A case analysis worksheet should be completed on each case, whether the case is cause or no cause. In some situations, one worksheet may be used for several proof formulas. Each worksheet should include the name of the case, the case number, the name of the investigator and the region. The space called "reviewer" is for use of Headquarters. If more than one worksheet is used, the first one should include information regarding jurisdictional points for all parties. For each factual assertion made on the worksheet, the Tab where the underlying information is included should be listed after the assertion. Any relevant legal opinion should be included in the file and referenced as necessary on the worksheet.

If the complaint is clearly non-jurisdictional, the remainder of the worksheet need not be completed, other than the recommendation section.

The Worksheet is a deliberative document and therefore is not subject to public disclosure requirements. It is not for public release; it describes the factual information gathered in the case and the analytical process by which an investigator determines which information is relevant and what the information means to the case. An investigator may complete a deliberative memorandum if desired, but it is not necessary.

JURISDICTION:

Standing-the information provided should briefly indicate the factual basis for a conclusion that the complainant(s) have standing. In many cases, that information will be extremely brief, i.e. the complainant is African-American. (Tab C-5) In other cases, it may be more detailed. E.g., "the complainant, a private fair housing group, has as its mission fair housing counseling of applicants for housing throughout the community and, specifically, the referral of disabled applicants to accessible housing. The Complainant cannot refer disabled applicants to respondents' housing because of respondents' practices excluding persons with disabilities. (Interview with C, Tab C-10)".

Statute of Limitations-the information provided should describe what the investigation found to be the last discriminatory incident, its date and the date on which the complaint was filed. E.g., "the complainant's application was rejected by the respondent by letter sent on March 27, 1994 and received on April 1, 1994. The complaint was filed on June 15, 1994. (Tab C-21, Tab C-12, Tab C-2)".

Respondent Jurisdiction-In most cases, the facts provided will be brief. E.g., "the respondents are the owners (Property tax records, Tab C-12), district manager and property manager (Tab C-10) of Seven Oaks Apartments, a 63 unit rental complex". In some cases, this area will need a large amount of factual specificity, especially where the issue is whether the respondent is exempt from the Act, or from certain of its provisions. For example, when the complaint alleges discrimination based on familial status and the investigation has addressed the respondent's claim that it is exempt as housing for older persons, the information contained in this section will, in summary fashion, describe the facts found through investigation of each element of the possible exemption.

Subject Matter Jurisdiction-In virtually all cases, this will contain a brief statement, such as "the respondent engages in the provision of housing" or "the respondent engages in the provision of homeowners insurance". In some cases, where subject matter jurisdiction may be in question, more detail may be necessary.

PROOF FORMULAS:

SPECIFIC INFORMATION COVERING EACH OF THESE ELEMENTS MUST BE INCLUDED ON THE CASE ANALYSIS WORKSHEET FOR EACH APPLICABLE PROOF FORMULA:

Overt Discrimination:

1. Prima facie case: Evidence found through investigation (NOT the allegations in the complaint) indicating that the complainant has been subjected to some form of overt discrimination. E.g., "Advertisement placed by respondent in the Gatlinburg, TN Hornet states 'no children', or "Complainant's witness, her real estate agent, states that respondent said to the agent that she should not have shown the house to complainant because the respondent would never sell her house to Hispanics."

2. Respondent's defense: The respondents defense(s) should be detailed. Sources for this information are typically the respondents' answer and the interview(s) of the respondents. For each defense, state the investigative information which either affirms (supports) the defense or refutes (contradicts) the defense.

If, for example, the respondent defends by stating that the advertisement was run by mistake, that is the defense. The investigative facts affirming or refuting the defense would discuss what the investigation found about why and by whom the advertisement was placed.

If the respondent denies making the overt statement, the investigative facts would identify the information available which would support the respondents' defense (for example, "R owner denies making the discriminatory statement" under Affirm and under refute might be stated that "Witness real estate agent states that at two points in her conversation with the respondent following the showing of the house, respondent owner made statements such as "I wish you had talked to me before you showed the house to the complainant because I never would have let you show the house to Hispanics. Agent made detailed notes of the conversation. (Tab C-11). Agent terminated relationship with owner describing substance of the conversation by letter dated two days after the conversation. (Tab C-8)."

In some cases, the result of the review of investigative evidence may not result in a final conclusion of the investigation. For example, the complainant may allege that a discriminatory statement was made and respondent may deny making the statement, and no other witnesses exist to support either version of the story, resulting in a "swearing contest." In such cases, the case should also be investigated and analyzed under a disparate treatment analysis.

If the speech of the respondent is protected by the First Amendment, the rationale/legal opinion/other information indicating the protected nature of the speech should be included here.

Unequal Treatment:

1. Prima facie case: Describe the facts found in the investigation for each element of the relevant prima facie case. For example, in a failure to rent case, the prima facie case section might contain the following kind of information: "Complainant is an African-American male. He completed an application for an apartment on March 15, 1994. (Tab C-22). His income of $23,450 qualified him for the $650 monthly rent. (Tab C-14, C-15). He was told by telephone by R. Smith on March 25 that his application was rejected. (Tab C-11, C-14). The apartment in question was rented to a white female who applied on March 16, 1994 and who had an income of $25,000."

2. Respondents' defense(s): List each of the defenses, express or implied, which the investigative evidence indicates. For each defense, indicate the evidence which supports the defense under "Affirm" and the evidence which does not support or contradicts the defense under "Refutes". For example, the respondent defenses might be that the complainant has poor credit and that the complainant made insufficient income to afford the apartment. (Note that the latter defense amounts to a rejection

4

of the element of the prima facie case regarding income eligibility.  This may occur in some situations.  The prima facie case element is designed to address whether an applicant superficially is qualified, not to anticipate a respondent defense to the specific complainant).

Under each defense, the investigative facts should be listed which either support or reject the defense.  For example, for the poor credit defense, under "affirm" would be the indication that the complainant's credit report (Tab C-15) indicates that the complainant has two accounts which were turned over for collection two years earlier.  Under affirm might also be included the fact that respondents' written tenanting policies state 'any applicant with one or more accounts turned over for collection within the preceding four years will be rejected."  Under "Refutes" might be included evidence which indicates that the white female applicant did not have a credit report run by the respondents, that a review of 23 files indicates that credit reports were run on all black applicants and only on one white applicants.  All comparative data and all information indicating that a respondent's defense is or is not pretextual should be included under the "Affirm" or "Refute" categories.

Disparate Impact:

1. Prima facie case:  The evidence should be summarized which indicates:

a. the policy, practice or standard which is identified as possibly having a disparate impact.

b. The evidence which shows that the policy disparately affects a group on line covered by the Act, including identification of the group which is being analyzed.

c. Information which shows that the effect is adverse in some fashion.

For example, a factual summary under disparate impact might read as follows: "Respondent has a policy, which was put into effect in June, 1994, of refusing to accept applicants who hold Section 8 certificates or vouchers.  Prior to that date, respondent accepted certificates and vouchers.  In addition, respondent is seeking to evict all certificate/voucher holders.  This policy has a disparate impact on African-Americans because the Section 8 waiting list in this community is 60% African-American (Tab C-13), while the general population in the community residing in rental housing is 15% African-American. (Tab C-11).  When the respondent began participating in the program in 1980, the Section 8 list was approximately 10% African-American. (Tab D-11).  Furthermore, of respondent's 500

units, 100 are occupied by African-Americans. (Tab C-18). Of that number, 90 are Section 8 certificate or voucher holders. (Tab C-15). Of the remaining 400 units, 95% are occupied by white families. (Tab C-15). Therefore, 90% of the tenants who will be evicted will be African-American. Only 10% will be white.

## 2. Respondent Defense(s):

Each of respondents' business necessity justifications should be summarized as individual defenses, and the factual evidence which either supports or contradicts a conclusion that the policy, practice or standard is a business necessity should be summarized. Respondents' consideration (or lack of consideration of) less discriminatory alternatives should be summarized under the defense as well. If there is other evidence which supports a conclusion that less discriminatory alternative ways of meeting business needs were or were not available, it should also be summarized under either 'affirms" or "refutes".

For example, if the respondent justifies its restrictive occupancy standard by a concern for excessive costs associated with higher water usage, the "affirm" column might indicate "Since respondent instituted its policy, water usage costs have dropped by 10%. (Tab D-11). There is no individual metering system per unit to allow allocation of costs based on use per unit. (Tab C-9)." Under the "refutes" column, there might be information such as "the difference in water cost attributable to additional occupants amounts to $500 per year, (based on comparative data from the year preceding institution of the policy and the year following its implementation) in a complex which has a total gross profit of $100,000 dollars and a net profit of $20,000. (Tab C-10, D-12). The cost of installing water saving devices in units occupied by more than four occupant would amount to approximately $400, based on current occupancy."

The "Conciliation Efforts" section should include a brief summary of all efforts of conciliation, ensuring that efforts have been made, where feasible, as to all parties, and on all issues or claims, especially where new issues or claims were identified and added to the complaint during the course of the investigation. A summary of offers and counter offers should be included.

"Cause" or "no cause" recommendations should be entered for each issue analyzed. If there are several bases alleged or several portions of the Act alleged to have been violated, indicate "cause" or "no cause" as to each. The "Comments" section may include any additional analysis or assessment of the case, or additional items for investigation or discovery following issuance of a charge.

# TABLE OF CONTENTS

| | PAGE |
|---|---|
| SUBJECT MATTER AND APPELLATE JURISDICTION | 1 |
| ISSUES PRESENTED | 2 |
| STATEMENT OF THE CASE | 3 |
|     A. Procedural History | 3 |
|     B. Facts | 4 |
|         1. Mountain Side's Three-Person Occupancy Rule | 4 |
|         2. Disparate Impact of the Three-Person Rule | 7 |
|         3. The VanLoozenoords and Brace | 7 |
|         4. Eviction Proceedings | 9 |
|         5. Conciliation Efforts | 10 |
|     C. ALJ's and Secretary's Opinions | 11 |
| ARGUMENT | 15 |
|     I. HUD PROVED A VIOLATION OF THE FAIR HOUSING ACT UNDER THE DISPARATE IMPACT THEORY OF DISCRIMINATION | 15 |
|         A. Standards Of Review | 15 |
|         B. The Disparate Impact Theory Applies To Fair Housing Act Claims Against Private Housing Providers | 16 |
|         C. The Secretary's Finding That HUD Established A Prima Facie Case Of Discrimination Is In Accordance With Law And Is Supported By Substantial Evidence In The Record | 25 |
|         D. Mountain Side Failed To Rebut The Prima Facie Case Of Discrimination | 29 |
|             1. The Secretary applied the correct definition of "business necessity" | 29 |

- i -

PAGE

2. The Secretary's finding that Mountain Side failed to prove business necessity is supported by substantial evidence in the record . . . . . . . . . . . . . . . 32

II. THE SECRETARY HAD PLENARY AUTHORITY TO REVERSE THE ALJ'S DECISIONS . . . . . . . . . . . . . 35

III. THE SECRETARY HAD JURISDICTION TO ISSUE EACH OF HIS DECISIONS IN THIS MATTER . . . . . . . . . 37

IV. COMPLAINANTS' DECISION NOT TO ATTEND A CONCILIATION MEETING DOES NOT JUSTIFY DISMISSAL OF THE CHARGES OR REVERSAL OF THE DAMAGE AWARD . . 40

V. COMPLAINANTS ARE "AGGRIEVED PERSONS" WHO HAVE STANDING TO PURSUE FAIR HOUSING ACT CLAIMS . . . . 42

VI. RES JUDICATA DID NOT BAR HUD'S CLAIMS . . . . . . 44

VII. THE ALJ DID NOT ABUSE HIS DISCRETION IN AWARDING INJUNCTIVE RELIEF THAT INCLUDED RECORDKEEPING AND REPORTING REQUIREMENTS . . . . . . . . . . . 48

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 50

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . 50

ADDENDUM

## TABLE OF AUTHORITIES

CASES:

PAGE

Aasgaard v. Spar Consolidated Mining & Dev. Co., 522 P.2d 726 (Colo. 1974) . . . . . . . . . . . . . 45

Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975) . . . . . . . . . . . . . . . . . . . . 25

Alexander v. Choate, 469 U.S. 287 (1985) . . . . . . . . . 24

Arco Oil & Gas Co. v. EPA, 14 F.3d 1431 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . 16

Arthur v. City of Toledo, 782 F.2d 565 (6th Cir. 1986) . . . . . . . . . . . . . . . . . . . 19

Asbury v. Brougham, 866 F.2d 1276 (10th Cir. 1989) . . . . 19

- ii -

**CASES (cont.):**

PAGE

Aspen Plaza Co. v. Garcia, 691 P.2d 763
(Colo. App. 1984) . . . . . . . . . . . . . . . . 45

Baumgardner v. HUD, 960 F.2d 572
(6th Cir. 1992) . . . . . . . . . . . . . . . . . 49

Betsey v. Turtle Creek Assocs., 736 F.2d
983 (4th Cir. 1984) . . . . . . . . . . . . . passim

Bradley v. Pizzaco of Nebraska, Inc., 939
F.2d 610 (8th Cir. 1991), cert. denied,
112 S. Ct. 933 (1992) . . . . . . . . . . . . . . 26

Bradley v. Pizzaco of Nebraska, Inc., 7 F.3d
795 (1993) . . . . . . . . . . . . . . . . . . . 31

Brown v. Artery Org., Inc., 654 F. Supp. 1106
(D.D.C.), motion granted in part, denied
in part, 691 F. Supp. 1459 (D.D.C. 1987) . . . . 24

Butler v. Farner, 704 P.2d 853 (Colo. 1985) . . . . 46

Casa Marie, Inc. v. Superior Court of Puerto
Rico, 988 F.2d 252 (1st Cir. 1993) . . . . . . . 19

Chevron U.S.A., Inc. v. Natural Resources Defense
Council, 467 U.S. 837 (1984) . . . . . . . 16, 37, 38

Crosslin v. Mountain States Tel. & Tel. Co.,
400 U.S. 1004 (1971) . . . . . . . . . . . . . . 38

Doe v. Butler, 892 F.2d 315 (3d Cir. 1989) . . . . 19

Dothard v. Rawlinson, 433 U.S. 321 (1977) . . . . passim

Edwards v. Johnston County Health Dep't,
885 F.2d 1215 (4th Cir. 1989) . . . . . . . . . . 19

EEOC v. St. Louis-San Francisco Ry. Co.,
743 F.2d 739 (10th Cir. 1984) . . . . . . . . 26, 28

EEOC v. United Parcel Serv., 860 F.2d 372
(10th Cir. 1988) . . . . . . . . . . . . . . . . 48

Elliott v. City of Athens, 960 F.2d 975
(11th Cir.), cert. denied, 113 S. Ct.
376 (1992) . . . . . . . . . . . . . . . . . . . 24

- iii -

CASES (cont.):

PAGE

FCC v. Allentown Broadcasting Corp., 349 U.S.
358 (1955) . . . . . . . . . . . . . . . . . . . . . 36

FDIC v. Hulsey, 22 F.3d 1472 (10th Cir. 1994) . . . . . . . 40

Fierro v. Bowen, 798 F.2d 1351 (10th Cir. 1986),
cert. denied, 480 U.S. 945 (1987) . . . . . . . . . . 37

Ford Motor Co. v. NLRB, 305 U.S. 364 (1939) . . . . . . . . 38

Garcia v. United States, 469 U.S. 70 (1984) . . . . . . . . 22

General Tel. Co. v. EEOC, 446 U.S.
318 (1980) . . . . . . . . . . . . . . . . . . . . . . 48

Glaziers Local Union 558 v. NLRB, 787 F.2d
1406 (10th Cir. 1986) . . . . . . . . . . . . . . . . 37

Green v. USX Corp., 896 F.2d 801 (3d Cir. 1990),
cert. denied, 498 U.S. 814 (1990) . . . . . . . . . . 33

Griggs v. Duke Power Co., 401 U.S. 424 (1971) . . . . . passim

Gutierrez v. Municipal Court of Southeast Judicial
Dist., 838 F.2d 1031 (9th Cir. 1988), vacated
as moot, 490 U.S. 1016 (1989) . . . . . . . . . . . . 31

Hackford v. Babbitt, 14 F.3d 1457 (10th Cir. 1994) . . . . 42

Halet v. Wend Inv. Co., 672 F.2d 1305
(9th Cir. 1982) . . . . . . . . . . . . . . . . . 22, 25

Hanson v. Veterans Admin., 800 F.2d 1381
(5th Cir. 1986) . . . . . . . . . . . . . . . . . . . 19

Hazelwood Sch. Dist. v. Unites States, 433 U.S.
299 (1977) . . . . . . . . . . . . . . . . . . . . . 29

Honce v. Vigil, 1 F.3d 1085 (10th Cir. 1993) . . . . . . . 19

Housing Auth. of Kaw Tribe of Indians of
Oklahoma v. City of Ponca City, 952 F.2d
1183 (10th Cir. 1991), cert. denied,
112 S. Ct. 1945 (1992) . . . . . . . . . . . . 20, 37, 47

HUD v. Holiday Manor Estates Club, Inc., 2 Fair Housing-
Fair Lending (P-H) ¶ 25,027 (HUD Secretary
1992) . . . . . . . . . . . . . . . . . . . . . . 36, 37

- iv -

CASES (cont.):

PAGE

Huntington Branch, NAACP v. Town of Huntington,
844 F.2d 926 (2d Cir.), aff'd, 488 U.S.
15 (1988) . . . . . . . . . . . . . . . . . . . . 19, 21, 35

International Bhd. of Teamsters v. United States,
431 U.S. 324 (1977) . . . . . . . . . . . . . . . . . 29

Jackson v. Okaloosa County, 21 F.3d 1531
(11th Cir. 1994) . . . . . . . . . . . . . . . . . . . 19

Jackson v. Seaboard Coastline R.R., 678 F.2d 992
(11th Cir. 1982) . . . . . . . . . . . . . . . . . . . 31

Keene Corp. v. United States, 113 S. Ct. 2035 (1993) . . . 20

Keith v. City of Volpe, 858 F.2d 467 (9th Cir. 1988),
cert. denied sub nom. Hawthorne v. Wright,
493 U.S. 813 (1989) . . . . . . . . . . . . . . . . 19, 33

Lorillard v. Pons, 434 U.S. 575 (1978) . . . . . . . . . 20

Magliocco v. Olson, 762 P.2d 681
(Colo. App. 1987) . . . . . . . . . . . . . . . . 45, 47

Marable v. Walker, 704 F.2d 1219
(11th Cir. 1983) . . . . . . . . . . . . . . . . . . . 49

Marino v. Willoughby, 618 P.2d 728
(Colo. App. 1980) . . . . . . . . . . . . . . . . . . 46

Marrese v. American Academy of Ortho.
Surgeons, 470 U.S. 373 (1985) . . . . . . . . . . . . 44

Mason Jar Restaurant v. Industrial Claim Appeals
Office of Colo., 862 P.2d 1026 (Colo. App. 1993) . . . . 45

Metropolitan Housing Dev. Corp. v. Village of
Arlington Heights, 558 F.2d 1283 (7th Cir.
1977), cert. denied, 434 U.S. 1025 (1978) . . . . . 19, 24

Morgan v. HUD, 985 F.2d 1451 (10th Cir. 1993) . 16, 40, 49, 50

National R.R. Passenger Corp. v. Boston & Maine
Corp., 112 S. Ct. 1394 (1992) . . . . . . . . . . . 15, 37

New York City Transit Auth. v. Beazer, 440 U.S.
568 (1979) . . . . . . . . . . . . . . . . . . . . 28, 29

Newark Branch, NAACP v. Harrison, 940 F.2d 792
(3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . 33

- v -

CASES (cont.):

PAGE

North Haven Bd. of Educ. v. Bell, 456 U.S.
   512 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . 21

Resident Advisory Bd. v. Rizzo, 564 F.2d 126
   (3d Cir. 1977), cert. denied sub nom. City
   of Philadelphia v. Resident Advisory Bd.,
   435 U.S. 908 (1978) . . . . . . . . . . . . . . . . . . . . 23

Roberts v. Colorado State Bd. of Agriculture,
   998 F.2d 824 (10th Cir.), cert. denied,
   114 S. Ct. 580 (1993) . . . . . . . . . . . . . . . . . . . 48

Rowe v. Cleveland Pneumatic Co., 690 F.2d 88
   (6th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . 31

Scroggins v. State of Kansas, Dep't of Human
   Resources, Div. of CETA, 802 F.2d 1289
   (10th Cir. 1986) . . . . . . . . . . . . . . . . . . 44-45, 47

Smith v. Anchor Bldg. Corp., 536 F.2d 231
   (8th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . 25

State Engineer v. Smith Cattle, Inc., 780 P.2d 546
   (Colo. 1989) . . . . . . . . . . . . . . . . . . . . . 44, 48

Satsky v. Paramount Communications, Inc., 7 F.3d
   1464 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . 44

Thomas v. Metroflight, Inc., 814 F.2d 1506
   (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 30

Thournir v. Meyer, 803 F.2d 1093 (10th Cir. 1986) . . . . . 47

Town of Huntington v. Huntington Branch, NAACP,
   488 U.S. 15 (1988) . . . . . . . . . . . . . . . . . . . . 20

Trafficante v. Metropolitan Life Ins. Co.,
   409 U.S. 205 (1972) . . . . . . . . . . . . . . . 18, 19, 43

United States v. Mitchell, 580 F.2d 789
   (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Raddatz, 447 U.S. 667 (1980) . . . . . . . 36

United States v. West Peachtree Tenth Corp.,
   437 F.2d 221 (5th Cir. 1971) . . . . . . . . . . . . . . . 49

Vermont Yankee Nuclear Power Corp. v. Natural Resources
   Defense Council, 435 U.S. 519 (1978) . . . . . . . . . . . 39

- vi -

CASES (cont.):

PAGE

Wards Cove Packing Co. v. Atonio, 490 U.S.
642 (1989) . . . . . . . . . . . . . . . . . . . . . . . passim

Williams v. Colorado Springs, Colo. Sch. Dist.,
641 F.2d 835 (10th Cir. 1981) . . . . . . . . . . . . . 30

Williams v. Matthews Co., 499 F.2d 819 (8th Cir.),
cert. denied, 419 U.S. 1021 (1974) . . . . . . . . . . . 25

Wilson v. Town of Avon, 749 P.2d 990 (Colo.
App. 1987) . . . . . . . . . . . . . . . . . . . . . . 46

STATUTES AND REGULATIONS:

PAGE:

Administrative Procedure Act, 5 U.S.C. 551-559 . . . . . . 36
5 U.S.C. 557(b) . . . . . . . . . . . . . . . . . . 36

Civil Rights Act of 1964, Title VII . . . . . 17, 18, 23, 28, 32
42 U.S.C. 2000e-2(a)(2) . . . . . . . . . . . . . . . 17

Civil Rights Act of 1991, Pub. L. No. 102-166 . . . . . . 31, 32
Section 2(2), 105 Stat. 1071 (1991) . . . . . . . . 23, 32
Section 3, 105 Stat. 1071 (1991) . . . . . . . . . . 23
Section 3(2), 105 Stat. 1071 (1991) . . . . . . . . 23, 32
Section 105(b), 105 Stat. 1075 (1991) . . . . . . . 31, 32

Fair Housing Act, as amended, 42 U.S.C.
3601 et seq. . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. 3602(i) . . . . . . . . . . . . . . . . . . . . 43
42 U.S.C. 3602(k) . . . . . . . . . . . . . . . . . . . . 43
42 U.S.C. 3604 . . . . . . . . . . . . . . . . . . . . . 3, 5, 11, 42
42 U.S.C. 3604(a) . . . . . . . . . . . . . . . . . 3, 5, 11, 42
42 U.S.C. 3604(b) . . . . . . . . . . . . . . . . . . . . 17
42 U.S.C. 3607(b)(1) . . . . . . . . . . . . . . . . . . 17
42 U.S.C. 3608 . . . . . . . . . . . . . . . . . . . . . 5
42 U.S.C. 3608(c) . . . . . . . . . . . . . . . . . . 15, 48
42 U.S.C. 3610(a)(1)(A)(i) . . . . . . . . . . . . . . . 39
42 U.S.C. 3610(b)(1) . . . . . . . . . . . . . . . . 15, 48
42 U.S.C. 3610(d) . . . . . . . . . . . . . . . . . . . . 39
42 U.S.C. 3610(g) . . . . . . . . . . . . . . . . . . . . 43
42 U.S.C. 3612 . . . . . . . . . . . . . . . . . . . . . 3
42 U.S.C. 3612(b)-(h) . . . . . . . . . . . . . . . . . . 48
42 U.S.C. 3612(g) . . . . . . . . . . . . . . . . . . . . 1
42 U.S.C. 3612(g)(3) . . . . . . . . . . . . . . . . . . 48
42 U.S.C. 3612(h) . . . . . . . . . . . . . . . . . . . . 49
42 U.S.C. 3612(h)(1) . . . . . . . . . . . . . . . . . . 36
42 U.S.C. 3612(i) . . . . . . . . . . . . . . . . . . 1, 38
42 U.S.C. 3612(i)(2) . . . . . . . . . . . . . . . . . . 2
42 U.S.C. 3612(k) . . . . . . . . . . . . . . . . . . . . 2
. . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

001198

## STATUTES AND REGULATIONS (cont.):

PAGE:

42 U.S.C. 3614a . . . . . . . . . . . . . . . . . . . . 15, 37
42 U.S.C. 3617 . . . . . . . . . . . . . . . . . . . . 3, 11

28 U.S.C. 1738 . . . . . . . . . . . . . . . . . . . . 44
28 U.S.C. 2342(6) . . . . . . . . . . . . . . . . . . . 2

24 C.F.R. 104.710 . . . . . . . . . . . . . . . . . . . 36
24 C.F.R. 104.930(a) . . . . . . . . . . . . . . . 4, 36, 38
24 C.F.R. 104.930(d) . . . . . . . . . . . . . . . . . . 4

Colo. Rev. Stat. Section 13-40-101, et seq. . . . . . . . . 9
Colo. Rev. Stat. Section 13-40-114 . . . . . . . . . . . 46

## LEGISLATIVE HISTORY:

H.R. 1, Section 701(o) . . . . . . . . . . . . . . . . 31

H.R. Rep. No. 711, 100th Cong., 2d Sess. (1988),
    reprinted in 1988 U.S.S.C.A.N. 2173 . . 21, 22, 25, 32, 36

H.R. Rep. No. 102-40(I), 102d Cong., 1st Sess. (1991),
    reprinted in 1991 U.S.S.C.A.N. 549 . . . . . . . . . 29, 31

114 Cong. Rec. 2699 (1968) . . . . . . . . . . . . . . 22
114 Cong. Rec. 3422 (1968) . . . . . . . . . . . . . . 18
114 Cong. Rec. 5214-5222 (1968) . . . . . . . . . . . . 23
114 Cong. Rec. 5216 (1968) . . . . . . . . . . . . . . 23
114 Cong. Rec. 5218 (1968) . . . . . . . . . . . . . . 23
134 Cong. Rec. 23711-23712 (1988) . . . . . . . . . . . 23
134 Cong. Rec. 23712 (1988) . . . . . . . . . . . . . . 20
137 Cong. Rec. S15276 (daily ed. Oct. 25, 1991) . . . 23, 31, 32

## MISCELLANEOUS:

K. Davis & R. Pierce, Jr., Administrative Law
    Treatise, Section 11.2 (3d ed. 1994) . . . . . . . . . 36

### STATEMENT OF PRIOR OR RELATED APPEALS

There have been no prior appeals. The Secretary is not aware of any related appeals.

- viii -

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

No. 94-9509

MOUNTAIN SIDE MOBILE ESTATES PARTNERSHIP, et al.,

Petitioners

v.

SECRETARY, UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,
on behalf of Jacqueline, Jaime,
Michael and Shena VanLoozenoord, and
on behalf of Michael Brace,

Respondent

JACQUELINE VANLOOZENOORD, JAIME VANLOOZENOORD,
MICHAEL VANLOOZENOORD, SHENA VANLOOZENOORD
and MICHAEL BRACE,

Intervenors

ON PETITION FOR REVIEW OF A DECISION OF THE
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

BRIEF FOR THE SECRETARY AS RESPONDENT

SUBJECT MATTER AND APPELLATE JURISDICTION

The Administrative Law Judge (ALJ) and the Secretary of the
United States Department of Housing and Urban Development (HUD)
had subject matter jurisdiction under 42 U.S.C. 3612(b)-(h).  The
ALJ issued an initial decision and order on December 17, 1993,
which disposed of all claims.  That decision became final without
modification by the Secretary on January 18, 1994.  See 42 U.S.C.
3612(h)(1).  Petitioners timely filed their petition for review
in this Court on February 11, 1994.  This Court has jurisdiction

- 2 -

pursuant to 42 U.S.C. 3612(i) and 28 U.S.C. 2342(6).  Venue properly lies in this Court because the discriminatory housing practices took place in Jefferson County, Colorado, within this Circuit.  See 42 U.S.C. 3612(i)(2).

ISSUES PRESENTED

1.  Whether the Secretary's finding that a private housing provider's three-person occupancy rule violated the familial status provisions of the Fair Housing Act (Act) under a disparate impact standard is in accordance with law and supported by substantial evidence in the record.

2.  Whether the Secretary has plenary authority to review decisions of an ALJ.

3.  Whether the Secretary had jurisdiction to issue his decisions.

4.  Whether the failure of the discrimination victims to attend a conciliation meeting required dismissal of their administrative complaints or reversal of their damages award.

5.  Whether the complainants are aggrieved persons who have standing to bring claims under the Fair Housing Act.

6.  Whether HUD's administrative action, which followed an eviction proceeding in state court, is barred by res judicata.

7.  Whether the ALJ abused his discretion in awarding injunctive relief that included recordkeeping and reporting requirements.

- 3 -

## STATEMENT OF THE CASE

### A. Procedural History

This case arises from complaints filed with HUD pursuant to 42 U.S.C. 3610(a)(1)(A)(i) by Jacqueline VanLoozenoord (on behalf of herself and her three minor children) and Michael Brace in October 1991 and July 1992 (Gov't Exs. 2, 25, 26).[1] The complaints alleged that the petitioners -- Mountain Side Mobile Estates Partnership and Robert and Marilyn Dalke -- had engaged in discriminatory practices based on familial status in violation of the Fair Housing Act, as amended, 42 U.S.C. 3601 et seq.

The Secretary issued a Determination of Reasonable Cause and Charge of Discrimination on July 24, 1992 (Doc. 1). See 42 U.S.C. 3610(g). The Charge alleged that petitioners (collectively Mountain Side) had discriminated against the VanLoozenoords and Brace on the basis of familial status in violation of 42 U.S.C. 3604. HUD later amended the charge to allege that Mountain Side had also violated 42 U.S.C. 3617 (Doc. 29).[2]

An ALJ held an evidentiary hearing on October 29 and 30, 1992, and issued an Initial Decision and Order on March 22, 1993 dismissing the charge of discrimination (Doc. 36). The Secretary

---

[1] "Doc. __" refers to the document number on the List of Pleadings filed with the administrative record. "Tr. __ at __" refers to the volume and page number of the transcript of the hearing before the ALJ. "Gov't Ex." and "D. Ex." refer to the government's and Mountain Side's exhibits, respectively, admitted at the hearing. "Br." refers to petitioners' opening brief.

[2] The addendum to this brief includes the text of relevant statutory provisions and regulations.

- 5 -

Mountain Side Mobile Estates Partnership. Petitioners Robert and
Marilyn Dalke have been the Park's resident managers since
December 1989 (Gov't Ex. 10 at responses 5-7; Tr. I at 225; Tr.
III at 194). The Park consists of 229 mobile home lots, 226 of
which were occupied in 1991 (D. Ex. 14 at 2). It had 318
residents in October 1988, 320 in March 1989, and 341 in 1991
(Tr. I at 236; Doc. 62 at 10; Tr. III at 164). Prior to March
1989, Mountain Side prohibited persons under 21 years of age from
living in the Park, but imposed no limit on the number of
residents who could live in each mobile home (Gov't Ex. 10 at
responses 26, 27).

On March 8, 1989, Mountain Side instituted a new occupancy
policy in direct response to the Fair Housing Amendments Act of
1988, which was to take effect on March 12, 1989 (Gov't Ex. 17).
Those amendments prohibit discrimination on the basis of familial
status -- i.e., discrimination based on the presence of children
under 18 in the household -- unless a housing provider can meet
the narrow exemption for "housing for older persons." See 42
U.S.C. 3604, 3607(b)(1). Mountain Side decided that it could not
meet this exemption and thus had no choice under the Act but to
allow children to live in the Park (see Tr. I at 253-254).[3]
Concurrently with elimination of its no-children policy, the Park
adopted a new occupancy rule prohibiting more than three persons

_____

[3] Even after the familial status provisions of the Act took
effect in March 1989, Mountain Side continued to use a Mobile
Home Lot Agreement stating that "[a]ll persons living in the
COMMUNITY must be an adult." (Doc. 36 at 4-5; Gov't Ex. 11a at

Case: 1:13-cv-08564 Document #: 19-10 Filed: 02/12/14 Page 72 of 74 PageID #:1309

- 6 -

from living in any mobile home, regardless of the size of the unit or the number of bedrooms it contained (Gov't Ex. 17).

When Mountain Side's officials adopted the three-person rule in March 1989, they had no objective evidence on which to base the restriction, according to the testimony of petitioners' own witness (Tr. III at 249). Nor did they consider alternatives to the three-person limit (Tr. III at 250). After adoption of the three-person rule, Mountain Side's counsel advised Park officials that their opinion alone might not be sufficient to support the three-person limit and recommended hiring an independent expert to evaluate the policy (Tr. III at 234-235, 239).

In 1991, Mountain Side retained QCI Development Services Group, Inc. and its engineer, Roger Walker, to study the Park's infrastructure to determine the population it could support (Tr. III at 122). Walker was not asked to suggest alternatives or improvements to the Park's infrastructure that might allow for a larger population (ibid.). QCI completed the study in March 1991, two years after Mountain Side adopted the three-person rule (D. Ex. 14; Tr. III at 122-123). The study concluded that based on its existing infrastructure -- in particular the sewer system -- the Park could support a population of 916 residents (D. Ex. 14 at 12). The QCI report recommended a limit of two persons per bedroom in each mobile home and a maximum population of 916 (D. Ex. 14 at 11-12). The report explicitly noted that its recommendation would allow six persons to live in the Park's three-bedroom homes (ibid.; Tr. III at 166-167). If Mountain

side had followed QCI's recommendation, the VanLoozenoord-Brace household would have met the occupancy standard and would have had no cause to file the instant fair housing complaint.

Mountain Side rejected QCI's recommendations. Instead of imposing a limit of two persons per bedroom with a cap of 916 residents, Mountain Side retained its three-person rule for all mobile homes (regardless of size), which would allow for a maximum of 687 persons to live in the Park (Tr. III at 235-238).

## 2. Disparate Impact of the Three-Person Rule

Census data show that: (1) using the most conservative calculation available, 71.2% of all households in the United States consisting of four or more persons are families with minor children; (2) at least 50.5% of families in the United States with minor children have four or more individuals; and (3) at most, 11.7% of households in the United States without minor children have four or more persons (Doc. 36 at 11; Tr. II at 32-38; Gov't Ex. 29, Table 16 and notes). Mountain Side's three-person rule would thus exclude families with children at more than four times the rate of households without minor children (50.5% vs. 11.7%).

## 3. The VanLoozenoords and Brace

Jacqueline VanLoozenoord and Michael Brace are an unmarried couple who reside together (Tr. I at 57, 66). They consider themselves husband and wife "for all intents and purposes" (Tr. I at 66, 122-124). VanLoozenoord has three minor children: Jaime, Michael and Shena, who were 10, 8 and 5 years old, respectively,

- 8 -

in October 1991 (Tr. I at 58, 149). VanLoozenoord's children have lived with her and Brace at all times relevant to this case. Brace's minor son, Myron, has lived with his father and the VanLoozenoords since the summer of 1992 (Tr. I at 113).

In the late summer of 1991, VanLoozenoord, her three children and Brace were living in a crowded one-bedroom apartment in Arvada, Colorado. They needed larger accommodations, but could not afford to buy or rent a house (Tr. I at 58-60). They eventually purchased a three-bedroom mobile home in Mountain Side's Park for $5,000 (Gov't Ex. 12; Tr. I at 115-116). The sellers (who rented a lot from Mountain Side) never advised VanLoozenoord or Brace that the Park had a three-person occupancy limit (Tr. I at 62-63).

VanLoozenoord, her three children and Brace moved into the Park in September 1991. About a week later, Robert Dalke contacted Brace and inquired as to the number of residents in the mobile home. When informed that five persons lived there, Dalke told Brace that the Park had a three-person limit per unit and that he and his family would have to move (Tr. I at 65-66). The day after his conversation with Dalke, Brace picked up an application for tenancy at the Park's management office, but neither he nor VanLoozenoord submitted the application to Mountain Side because they thought it a futile gesture in light of Dalke's comments (Tr. I at 67, 71, 136; Gov't Ex. 6 at 34-36). Mountain Side served VanLoozenoord and Brace with a notice, dated October