**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:13-cv-08564 |
| v. | ) ) | Judge Amy J. St. Eve |
| SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) | Magistrate Judge Susan E. Cox |
| Defendants. | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF
THE PROPERTY CASUALTY INSURERS ASSOCIATION
OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**</u>

Rowe W. Snider (# 03125194)
Ashlee M. Knuckey (# 6300237)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Tel.: (312) 443-0700
Fax: (312) 896-0336
Email: rsnider@lockelord.com

Seth P. Waxman (*pro hac vice*)
Brian M. Boynton (*pro hac vice*)
Matthew J. Tokson (*pro hac vice*)
Lynn Eisenberg (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: seth.waxman@wilmerhale.com

*Attorneys for Plaintiff*

February 14, 2014

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 5

    I.   THE PROVISION AND PRICING OF INSURANCE ............................................... 5

    II.  STATE REGULATION OF INSURANCE ............................................................... 7

    III. THE FAIR HOUSING ACT AND HUD'S DISPARATE IMPACT RULE ............. 10

        A.  The Proposed Disparate Impact Rule ............................................................ 10

        B.  Comments To The Rule ................................................................................. 11

        C.  The Final Rule ............................................................................................... 13

ARGUMENT ....................................................................................................................... 15

    I.   APPLICATION OF THE DISPARATE IMPACT RULE TO INSURANCE WOULD
        VIOLATE THE MCCARRAN-FERGUSON ACT (COUNT I) ............................... 16

        A.  The Rule Would Interfere With State Administrative Regimes ..................... 17

        B.  The Rule Would Invalidate And Impair State Insurance Laws Permitting Use
            Of Risk-Based Pricing ..................................................................................... 20

        C.  The Rule Would Invalidate And Impair State Insurance Laws Requiring Risk-
            Based Pricing ................................................................................................... 23

        D.  The Rule Would Invalidate And Impair State Insurance Laws Providing For
            State Administrative Review of Insurance Rates ............................................ 24

    II.  HUD'S FAILURE TO ADDRESS THE MCCARRAN-FERGUSON ACT WAS
        ARBITRARY AND CAPRICIOUS (COUNT II) ..................................................... 26

    III. HUD'S FAILURE TO CONSIDER AND ADDRESS THE RULE'S EFFECT ON
        INSURERS WAS ARBITRARY AND CAPRICIOUS (COUNTS III & IV) ........... 28

        A.  HUD Failed To Weigh The Effect Of Applying Disparate Impact To Insurers
            ..................................................................................................................... 29

        B.  HUD Failed To Acknowledge That Insurers Have A Legitimate Interest In
            Considering Actuarially Justified Risk Factors Or To Grant An Exemption For
            Insurance ......................................................................................................... 30

    IV. HUD'S FAILURE TO ADDRESS THE FILED-RATE DOCTRINE WAS
        ARBITRARY AND CAPRICIOUS (COUNT V) ..................................................... 31

    V.  THE RULE'S BURDEN-SHIFTING FRAMEWORK IS ARBITRARY AND
        CAPRICIOUS AND CONTRARY TO LAW AS APPLIED TO INSURANCE
        (COUNT VI) ............................................................................................................ 32

CONCLUSION ................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Boulware v. Dep't of Insurance*,
No. CV 09-4325, 2009 WL 3830640 (C.D. Cal. Nov. 16, 2009)............................................20

*California Indep. Sys. Operator Corp. v. FERC*,
372 F.3d 395 (D.C. Cir. 2004) ............................................................................................27

*Camp v. Pitts*,
411 U.S. 138 (1973)............................................................................................................15

*Chair King, Inc. v. Houston Cellular Corp.*,
No. Civ.A. H-95-1066, 1995 WL 1760037 (S.D. Tex. Nov. 3, 1995) ....................................20

*Dexter v. Equitable Life Assurance Society*,
527 F.2d 233 (2d Cir. 1975)................................................................................................20

*Director, Office of Workers' Comp. Programs v. Greenwich Collieries*,
512 U.S. 267 (1994)............................................................................................................34

*Doe v. Mutual of Omaha Insurance Co.*,
179 F.3d 557 (7th Cir. 1999) ...................................................................................... passim

*Fax Telecommunicaciones Inc. v. AT&T*,
138 F.3d 479 (2d Cir. 1998)................................................................................................31

*Graoch Assocs.#33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n.*,
508 F.3d 366 (6th Cir. 2007) .........................................................................................30, 34

*Hill v. BellSouth Telecommunications, Inc.*,
364 F.3d 1308 (11th Cir. 2004) ..........................................................................................31

*Humana Inc. v. Forsyth*,
525 U.S. 299 (1999)..............................................................................................17, 20, 25

*In re Title Insurance Antitrust Cases*,
702 F. Supp. 2d 840 (N.D. Ohio 2010)................................................................................31

*In re Workers' Compensation Insurance Antitrust Litigation*,
867 F.2d 1552 (8th Cir. 1989) ............................................................................................20

*Int'l Fabricare Institute v. EPA*,
972 F.2d 384 (D.C. Cir. 1992) ............................................................................................26

*Koretoff v. Vilsack*,
707 F.3d 394 (D.C. Cir. 2013) ............................................................................27

*Korte v. Allstate Insurance Co.*,
48 F. Supp. 2d 647 (E.D. Tex. 1999) ...................................................................31

*Little Co. of Mary Hospital v. Sebelius*,
587 F.3d 849 (7th Cir. 2009) ...............................................................................15

*Louisiana Public Service Commission v. FCC*,
476 U.S. 355 (1986) .............................................................................................27

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .............................................................................................16

*McClain v. Shelter General Insurance Co.*,
No. 97-1139-cv-W, 2007 WL 844769 (W.D. Mo. Mar. 16, 2007) .........................32

*McKenzie v. S. Farm Bureau Casualty Insurance Co.*,
No. 3:06-cv-013, 2007 WL 2012214 (N.D. Miss. July 6, 2007) ............................23

*Metropolitan Housing Development Corp. v. Village of Arlington Heights*,
558 F.2d 1283 (7th Cir. 1977) .............................................................................11

*Motor Vehicles Mfrs.'s Ass'n v. State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983) .........................................................................................28, 30

*N.L.R.B. v. Louis A. Weiss Mem'l Hospital*,
172 F.3d 432 (7th Cir. 1999) ...............................................................................34

*NAACP v. American Family Mut. Ins. Co.*,
978 F.2d 287 (7th Cir. 1992) .................................................................6, 7, 17, 29

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.*,
656 F.3d 580 (7th Cir. 2011) .........................................................................16, 27

*Paul v. Virginia*,
75 U.S. (8 Wall.) 168 (1868) .................................................................................7

*PPL Wallingford Energy LLC v. F.E.R.C.*,
419 F.3d 1194 (D.C. Cir. 2005) ...........................................................................26

*Rempfer v. Sharfstein*,
583 F.3d 860 (D.C. Cir. 2009) .............................................................................16

*Saunders v. Farmers Insurance Exchange*,
537 F.3d 961 (8th Cir. 2008) ...............................................................................25

iv

*Smith v. City of Jackson, Miss.*,
    544 U.S. 228 (2005)...........................................................................33

*Steadman v. SEC*,
    450 U.S. 91 (1981)............................................................................34

*Stevens v. Union Planters Corp.*,
    No. Civ. A. 00-cv-1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000) ..............................32

*Taylor v. American Family Insurance Group*,
    No. 8:07-cv-493, 2008 WL 3539267 (D. Neb. Aug. 11, 2008)..............................23

*United Mine Workers of America, Int'l Union v. Dole*,
    870 F.2d 662 (D.C. Cir. 1989).................................................................28

*United States v. South-Eastern Underwriters Ass'n*,
    322 U.S. 533 (1944)..........................................................................7

*University Medical Center of S. Nevada v. Shalala*,
    173 F.3d 438 (D.C. Cir. 1999)................................................................16

*Wabash Valley Power Ass'n v. Rural Electrification Admin.*,
    988 F.2d 1480 (7th Cir. 1993) ...............................................................27

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011).......................................................................32

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989)...................................................................... passim

*Wegoland Ltd. v. NYNEX Corp.*,
    27 F.3d 17 (2d Cir. 1994).....................................................................31

**State Cases**

*Blackburn & McCune, PLLC v. Pre-Paid Legal Services, Inc.*,
    398 S.W.3d 630 (Tenn. Ct. App. 2010)........................................................31

*Blue Cross & Blue Shield of Delaware, Inc. v. Elliott*,
    479 A.2d 843 (Del. Super. Ct. 1984) ......................................................10, 25

*Cain v. Fortis Insurance Co.*,
    694 N.W.2d 709 (S.D. 2005) .................................................................21

*Cole v. State Farm Insurance Co.*,
    128 P.3d 171 (Alaska 2006)..................................................................21

*Fire Insurance Rating Bureau v. Rogan,*
    91 N.W.2d 372 (Wis. 1958)..................................................................10, 25

*In re Universal Underwriters Life Insurance Co.,*
    685 N.W.2d 44 (Minn. Ct. App. 2004)...................................................10

*Insurance Commissioner for the State v. Engelman,*
    692 A.2d 474 (Md. 1997) ........................................................................21

*Kuebler v. Equitable Life Assurance Society of the U.S.,*
    555 N.W.2d 496 (Mich. Ct. App. 1996) ...............................................21

*Milkman v. Am. Travellers Life Insurance Co.,*
    No. 3375, 2002 WL 778272 (Pa. Com. Pl. Apr. 1, 2002) .................. 31-32

*Schermer v. State Farm Fire & Casualty Co.,*
    721 N.W.2d 307 (Minn. 2006)................................................................32

## FEDERAL STATUTES, CODES & REGULATIONS

5 U.S.C. § 553(b)(2) ...............................................................................27

5 U.S.C. § 556(d) ....................................................................................34

5 U.S.C. § 706 .........................................................................................16

5 U.S.C. § 706(2) .......................................................................................3

5 U.S.C. § 706(2)(A)....................................................................... passim

15 U.S.C. § 1011 .....................................................................................16

15 U.S.C. § 1012(b) ...............................................................1, 16, 17, 20

42 U.S.C. § 3604(b) ................................................................................10

42 U.S.C. § 3604(f)(2) ............................................................................10

42 U.S.C. § 3612(b) ................................................................................34

42 U.S.C. § 3612(o) ................................................................................34

24 C.F.R. § 100.70(d)(4) (2013) ............................................................10

24 C.F.R. § 100.500 (2013) ....................................................................13

24 C.F.R. § 100.500(a) (2013) ...............................................................13

24 C.F.R. § 100.500(b) (2013)..............................................................13, 23

24 C.F.R. § 100.500(c)(1) (2013) .........................................................15, 23

24 C.F.R. § 100.500(c)(2) (2013) .................................................................15

24 C.F.R. § 100.500(c)(3) (2013) .................................................................15

76 Fed. Reg. 70921 (Nov. 16, 2011)....................................................10, 11

78 Fed. Reg. 11460 (Feb. 15, 2013) ..................................................... passim

## STATE STATUTES, CODES & REGULATIONS

Idaho Code Ann. § 41-1427 ...........................................................10, 25

215 Ill. Comp. Stat. 5/132 .............................................................10, 25

215 Ill. Comp. Stat. 5/132.3 ..........................................................10, 25

215 Ill. Comp. Stat. 5/424(3) ...........................................................8, 21

Ill. Admin. Code Title 50, § 2603.40(a) ..................................................8

Ind. Code Ann. § 27-1-22-3(a)(1) ....................................................9, 24

Ind. Code Ann. § 27-1-22-4(a) ........................................................9, 24

Ind. Code Ann. § 27-1-22-5 ...........................................................10, 25

N.J. Stat. Ann. § 17:29A-7 .............................................................10, 25

Ohio Revised Code Ann. § 3935.03 .................................................10, 25

Ohio Revised Code Ann. § 3935.04 .................................................10, 25

Wis. Stat. Ann. § 625.11(4) ..............................................................8, 21

Wis. Stat. Ann. § 625.12(1) ..............................................................9, 24

Wis. Stat. Ann. § 625.13 ...................................................................9, 25

Wis. Stat. Ann. § 625.13(1) ..............................................................9, 25

RULES

Fed. R. Civ. P. 56(a) ...................................................................................................15

OTHER AUTHORITIES

1 Steven Plitt et al., *Couch on Insurance* (3d ed. 2013) ..........................................5, 17

Alejandro Lazo, *Nearly one-third of U.S. Homeowners have no mortgage*, Jan. 10, 2013, Jan. 10, 2013. *available at* http://articles.latimes.com/2013/jan/10/business/la-fi-free-and-clear-20130110 ....................................................................................................6

Casualty Actuarial Society's Statement of Principles Regarding Property and Casualty Insurance Ratemaking: Adopted by the Board of Directors of the Casualty Actuarial Society, May 1988*, available at* http://www.casact.org/professionalism/standards/princip/sppcrate.pdf. ........................5, 8, 21

Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403 (1985) ......................................................................................................5, 6

Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates, Casualty Actuarial Society E-Forum* (Winter 2009....................................................5, 6, 8, 18

Robert Detlefsen, *"Disparate Impact" Theory Provides No Support for Banning Credit Scoring in Insurance*, Legal Backgrounder, Apr. 8, 2005, *available at* http://www.wlf.org/upload/040805LBDetlefsen.pdf ................................................6

Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L. J. 29 (2012)..........................................................................................................................6, 29

State of New Jersey Department of Banking & Finance, *The Use of Occupation and Education Factors in Automobile Insurance* 51 (April 2008), *available at* http://www.state.nj.us/dobi/division_insurance/pdfs/ed_occ_april2008.pdf..........................18

## INTRODUCTION

In 2013, the United States Department of Housing and Urban Development ("HUD") issued a Final Rule entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard."[1]  The Rule purported to "formalize[]" the agency's belief "that liability under the Fair Housing Act ["FHA"] may arise from a facially neutral practice that has a discriminatory effect" on a group of persons defined by race, color, religion, sex, handicap, familial status, or national origin "regardless of whether there was an intent to discriminate."  78 Fed. Reg. at 11460, 11463 (A.R. 611, 614); (SUMF ¶ 14).  This case does not seek to vacate HUD's Disparate Impact Rule as a whole.[2]  Rather, it is a narrowly targeted challenge to HUD's unprecedented decision in that Rule to apply a disparate impact standard to homeowners, property, and hazard insurance ("homeowners insurance").  Whatever the merits of a disparate impact standard in the traditional housing context, HUD's application of the Rule to homeowners insurance violates the McCarran-Ferguson Act, as well as the Administrative Procedure Act ("APA"), and therefore should be vacated.

The McCarran-Ferguson Act was enacted in 1945 to safeguard the primary role of the states in regulating the business of insurance.  It provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).  The FHA does not specifically relate to the business of insurance and is thus subject to McCarran's limitations.  HUD has now—for the first time—

---

[1] *See* 78 Fed. Reg. 11460 (Feb. 15, 2013) (A.R. 611) ("Disparate Impact Rule" or "Rule"); Plaintiffs Local Rule 56.1 Statement of Undisputed Material Facts ("SUMF") ¶ 14.  Citations to "A.R." are to the Administrative Record lodged with the Court on February 12, 2014.

[2] Plaintiff Property Casualty Insurers Association of America ("PCI") does not concede that the FHA embodies disparate impact liability.

adopted a rule purporting to apply a disparate impact standard to the provision of homeowners insurance.  Application of such a standard under the FHA would subject homeowners insurers to two fundamentally inconsistent regulatory regimes and requirements.  Federal courts would be asked to review and pass further judgment on the actuarial soundness of insurance practices comprehensively regulated under state law.  As the Seventh Circuit has made clear, the McCarran-Ferguson Act prohibits this kind of additional federal court review, which "obviously would interfere with the administration of state law."  *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999) (Posner, J.).  HUD's application of the Disparate Impact Rule to homeowners insurance is squarely foreclosed by the Seventh Circuit's decision in *Mutual of Omaha* and must be vacated for that reason alone.

In addition to impermissibly subjecting state-regulated insurance practices to federal court review, the Rule imposes a new standard on insurers that directly conflicts with state law standards for underwriting and rating of homeowners insurance.  It is well settled under state law that insurers are permitted to make rating and underwriting decisions on the basis of objective risk factors analyzed by certified insurance actuaries.  Indeed, most states *require* insurers to consider actuarially justified risk factors in rating homeowners insurance.  The Disparate Impact Rule, however, would impose liability on insurers under the FHA for doing precisely what is permitted and indeed required under these state laws.  By imposing liability for use of actuarially sound risk factors in compliance with state law, the Rule would invalidate and impair state laws permitting and requiring such use, and would thus violate the McCarran-Ferguson Act.

The APA prohibits agency action that is "not in accordance with law."  5 U.S.C. § 706(2)(A).  It thus required HUD to abide by the requirements of all federal laws, including the McCarran-Ferguson Act.  Because HUD's extension of the Rule to homeowners insurance

violates the McCarran-Ferguson Act, that decision must be held "unlawful and set aside" under the APA. *Id.* § 706(2). Unless that decision is vacated, homeowners insurers will be subjected to two conflicting and uncertain schemes of insurance regulation—a result that cannot be reconciled with the text, history, or purpose of the McCarran-Ferguson Act.

HUD's application of the Disparate Impact Rule to homeowners insurance was also "arbitrary" and "capricious" in violation of the APA. 5 U.S.C. § 706(2)(A). Under established principles of administrative law, an agency has an obligation to respond meaningfully to comments and to engage in reasoned decision-making. Settled case law also makes clear that an agency has no power to act unless authorized by federal law and that an agency must address the basis for its authority before taking action. *See infra* at pp. 27-28. HUD utterly disregarded these obligations. During the rulemaking process, the insurance industry explained in detail how applying the Rule to insurance would violate the McCarran-Ferguson Act. HUD offered no substantive response, seeking instead to sidestep the issue. Rather than consider whether applying the Rule to homeowners insurance would invalidate, impair, or supersede state law, HUD simply asserted—with no support whatsoever—that only courts, not agencies, must consider the McCarran-Ferguson Act. *See* 78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶ 23). This is not, and cannot be, the law. Agencies cannot ignore federal statutes. HUD's total refusal to consider the limits on its authority imposed by the McCarran-Ferguson Act is an independent reason to vacate HUD's application of the Rule to homeowners insurance.

HUD also disregarded the fundamental inconsistency between a disparate impact standard and established risk-based insurance practices. In order to provide homeowners insurance at premiums that reflect the risks being covered, insurers must rely on actuarial data regarding past losses. Insurers use an array of actuarial risk factors to group insureds into

different risk pools.  For example, insurers may consider (among many other risk factors) whether a house being insured is made of wood or brick because this factor bears on the risk of loss from fire.  Consideration of such objective, verifiable actuarial risk factors, which have developed through analysis of risk experience over time, is fundamental to the business of insurance.  HUD, however, did not even acknowledge that insurers have a legitimate business interest in considering actuarial risk factors, and HUD provided no reasoned explanation for refusing to create an exemption for risk-based insurance.

HUD further failed to address how the Disparate Impact Rule can be reconciled with state laws that require insurers to file their rates for state review and/or approval.  As commenters explained to HUD, the "filed rate" doctrine precludes challenges to rates approved by a state regulator—precisely what the Disparate Impact Rule would permit.  HUD acknowledged receiving these comments, but then inexplicably failed to provide any response to them whatsoever.  Under the APA, HUD was obligated to consider all comments and to provide a meaningful response.  HUD's failure to do so violated the APA.

Finally, the Rule's burden-shifting framework for determining what a plaintiff must prove to establish an FHA claim is contrary to law as applied to homeowners insurance.  HUD's proposed framework repeatedly deviates from the procedures required under settled precedent and the APA—and, in each case, the deviation disfavors insurers.  By adopting such a skewed framework, HUD has ensured that the use of actuarially sound risk factors approved under state law will subject insurers to FHA liability in many and uncertain circumstances.

For each of these independent reasons, the Court should vacate HUD's application of the Disparate Impact Rule to the provision of homeowners insurance.

## BACKGROUND

### I. THE PROVISION AND PRICING OF INSURANCE

Insurance is a means of transferring the risk of loss from one party to another in exchange for an agreed-upon rate. Traditionally, rates are determined based on numerous factors including the probability and amount of potential loss, policy limits, deductibles, and the insurer's cost of doing business. *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* § 1:6 (3d ed. 2013). The probability and amount of potential loss is also central to underwriting decisions—*e.g.*, decisions concerning whether to insure a particular risk or class of risk. *Id.* at § 1:2.

Determinations about the probability and amount of potential losses are made by actuaries. Actuaries are trained and certified professionals who apply mathematical, statistical, and economic expertise to analyze the financial implications of future contingent events with respect to insurance.[3] When forecasting the probability and amount of potential loss, actuaries consider a host of verifiable factors that correlate with losses. *See* Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985). For homeowners insurance, these factors might include, among many others, the types of construction materials used to build a house, history of previous losses, proximity to fire hydrants, and the presence of a security system. (*See* Comments of the National Association of Mutual Insurance Companies (Jan. 17, 2012) (A.R. 372, 376).) In applying these actuarial factors, insurers consider risk, not race or any other

---

[3] In setting property and casualty insurance rates, actuaries adhere to the Casualty Actuarial Society's Statement of Principles Regarding Property and Casualty Insurance Ratemaking: Adopted by the Board of Directors of the Casualty Actuarial Society, May 1988 ("CAS Principles"). The Statement of Principles are available at http://www.casact.org/professionalism/standards/princip/sppcrate.pdf.

protected characteristic.  As the Seventh Circuit noted, "[r]isk discrimination is not race

discrimination."  *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992)

(Easterbrook, J.); *see also id.* at 298 ("[C]lassification of risks is important to insurance, and

assigning higher rates to greater risks differs from assigning rates by race.").

      Reliance on neutral, actuarially justified factors to calculate the probability and amount of

potential losses is fundamental to the insurance industry's ability to correlate risks to rates.  The

insurance market operates most efficiently and fairly when each consumer pays a rate that

accurately reflects the cost of providing insurance to that consumer and other similarly situated

consumers.  Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.  If insurers could not set

rates based on neutral, actuarially justified factors and risk calculations, the insurance industry

could not function properly.[4]  If risk were not considered in setting rates, lower-risk customers

would be overcharged for insurance relative to the risk of loss that they pose, and many lower-

risk customers would choose not to purchase insurance rather than pay too much for it.  *Id.* at

407, 422; (A.R. 378); (SUMF ¶ 39).  Such adverse selection would cause prices to rise for all.

*See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial

Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19

Conn. Ins. L. J. 29, 44 (2012).  Those consumers who must have a minimum level of insurance

to meet mortgage requirements and those who ultimately sustain uninsured losses, among others,

would suffer from the Rule's risk distorting process, as would the insurance industry.[5]

---

[4] *See, e.g.*, Robert Detlefsen, *"Disparate Impact" Theory Provides No Support for Banning Credit Scoring in Insurance*, Legal Backgrounder, Apr. 8, 2005, at 1, *available at* http://www.wlf.org/upload/040805LBDetlefsen.pdf.

[5] *See* Alejandro Lazo, *Nearly one-third of U.S. homeowners have no mortgage, L.A. Times*, Jan. 10, 2013, *available at* http://articles.latimes.com/2013/jan/10/business/la-fi-free-and-clear-20130110.

The Seventh Circuit has described this very phenomenon:

> Insurance works best when the risks in the pool have similar characteristics. For example, term life insurance costs substantially more per dollar of death benefit for someone 65 years old than for one 25 years old, although the expected return per dollar of premium is the same to both groups because the older person, who pays more, also has a higher probability of dying during the term. Auto insurance is more expensive in a city than in the countryside, because congestion in cities means more collisions. Putting young and old, or city and country, into the same pool would lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out. A single price for term life insurance would dissuade younger persons from insuring, because the price would be too steep for the coverage offered; the remaining older persons would pay a price appropriate to their age, but younger persons would lose the benefits of insurance altogether. To curtail adverse selection, insurers seek to differentiate risk classes with many variables.

*American Family*, 978 F.2d at 290 (noting the difference between disparate treatment claims and disparate impact claims in addressing the application of the McCarran-Ferguson Act).

## II.      STATE REGULATION OF INSURANCE

The provision and pricing of homeowners insurance has traditionally been regulated by state law. Until the mid-twentieth century, insurance was largely immune from federal regulation because the business of insurance was not considered "commerce" that could be regulated by Congress. *See Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1868). Shortly after the Supreme Court determined in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of insurance across state lines was interstate commerce susceptible to federal regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, to ensure that decision did not undermine state regulation of insurance.

As the Seventh Circuit has noted, "[s]tate regulation of insurance is comprehensive and includes rate and coverage issues." *Mutual of Omaha Ins. Co.*, 179 F.3d at 564. Several features of state insurance regulation are relevant here.

*First*, state insurance law affirmatively permits risk-based pricing. Insurance law generally prohibits insurers from charging "excessive, inadequate, or unfairly discriminatory rates." As explained in the Casualty Actuarial Society Statement of Ratemaking Principles, "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an *actuarially sound* estimate of the expected value of all future costs associated with an individual risk transfer." CAS Principles 4. For purposes of state insurance law, rates are "unfairly discriminatory" if "premium differences . . . do not correspond to expected losses and average expenses or if there are expected average cost differences that are not reflected in the premium differences." Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates, Casualty Actuarial Society E-Forum* at 283 (internal quotation marks omitted).

For example, Illinois law prohibits "any unfair discrimination between individuals or risks *of the same class or of essentially the same hazard and expense element*." 215 Ill. Comp. Stat. 5/424(3) (emphasis added). Rates may differ on the basis of sex, sexual preference, or marital status if "such classification or differentiation is based upon expected claim costs and expenses *derived by applying sound actuarial principles* to relevant and reasonably current company or intercompany studies, claim costs and expense experience." Ill. Admin. Code tit. 50, § 2603.40(a) (emphasis added). Similarly, Wisconsin law provides:

> One rate is unfairly discriminatory in relation to another in the same class if it clearly fails to reflect equitably the differences in expected losses and expenses. Rates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy.

Wis. Stat. Ann. § 625.11(4). Other state laws include similar provisions. *See* Compl. ¶¶ 31-32; Appendix A (attached).

8

*Second*, many states not only permit risk-based pricing but expressly *require* insurers to consider past losses and other actuarially relevant factors in developing insurance rates. For example, the Indiana Code provides that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, … [and] to all other relevant factors, including trend factors, within and outside this state …." Ind. Code Ann. § 27-1-22-3(a)(1). Wisconsin law likewise mandates that "[d]ue consideration shall be given" to "[p]ast and prospective loss and expense experience within and outside of this state"; "[c]atastrophe hazards and contingencies"; "[t]rends within and outside of this state"; and "all other relevant factors, including the judgment of technical personnel." Wis. Stat. Ann. § 625.12(1). Other states have similar laws. *See* Compl. ¶ 34; Appendix A.

*Third*, state insurance commissioners actively review the rates charged by insurers to protect consumers. The vast majority of states require insurers to file insurance rates with state regulators for review and/or approval. *See, e.g.*, Ind. Code Ann. § 27-1-22-4(a) ("Every insurer shall file with the commissioner every manual of classifications, rules, and rates, every rating schedule, every rating plan, and every modification of any of the foregoing which it proposes to use."); Wis. Stat. Ann. § 625.13(1) ("[E]very authorized insurer and every rate service organization licensed under s. 625.31 which has been designated by any insurer for the filing of rates under s. 625.15(2) shall file with the commissioner all rates and supplementary rate information and all changes and amendments thereof made by it for use in this state within 30 days after they become effective."); *see also* Appendix A; Compl. ¶ 35.

State regulators carefully review insurance rates—with the assistance of their own actuaries—to ensure that the rates reflect all of the factors required by state law and that the rates are not excessive, inadequate, or unfairly discriminatory. *See, e.g.*, Wis. Stat. Ann. § 625.13

(insurance commissioner shall prohibit the use of rates if he finds upon review that the rate is excessive, inadequate, or unfairly discriminatory); *In re Universal Underwriters Life Ins. Co.*, 685 N.W.2d 44, 47 (Minn. Ct. App. 2004).[6]  Even in those few states, like Illinois, where homeowners rates are not filed with the insurance commissioner, those rates are nonetheless subject to review.  *See* 215 Ill. Comp. Stat. 5/132, 5/132.3 (requiring periodic examinations of insurers for compliance with state laws); *see also* Idaho Code Ann. § 41-1427 (same).

## III.  THE FAIR HOUSING ACT AND HUD'S DISPARATE IMPACT RULE

The FHA makes it unlawful, among other things, "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b); *see also id.* § 3604(f)(2) (prohibiting discrimination because of "handicap").  The FHA makes no reference to either disparate impact or homeowners insurance.  HUD previously promulgated regulations applying the FHA to homeowners insurance, *see* 24 C.F.R. § 100.70(d)(4) (2013), but *before* adopting the Rule, it had *not* enacted regulations purporting to apply a disparate impact standard to homeowners insurance.

### A.  The Proposed Disparate Impact Rule

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effect's Standard."  *See* 76 Fed. Reg. 70921 (Nov. 16, 2011)

---

[6] *See also, e.g.*, N.J. Stat. Ann. § 17:29A-7 (insurance commissioner must review and approve filed rates or disapprove them if they "are unreasonably high or excessive, or are not adequate for the safeness and soundness of the insurer, or are unfairly discriminatory between risks in this State involving essentially the same hazards and expense elements"); Ind. Code Ann. § 27-1-22-5; Ohio Revised Code Ann. §§ 3935.04, 3935.03; *Fire Ins. Rating Bureau v. Rogan*, 91 N.W.2d 372, 375 (Wis. 1958) (In reviewing proposed rates, the duty of the commissioner and his staff is to "estimate what future expenses and future losses will be."); *Blue Cross & Blue Shield of Delaware, Inc. v. Elliott*, 479 A.2d 843, 847 (Del. Super. Ct. 1984) ("The Commissioner must … determine whether or not the insurer's filed rates are 'excessive, inadequate or unfairly discriminatory'…." (citation omitted)).

(A.R. 1); (SUMF ¶ 9). In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate." 76 Fed. Reg. at 70921 (A.R. 1); (SUMF ¶ 10). The proposal cited "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." 76 Fed. Reg. at 70924 (A.R. 4) (SUMF ¶ 11). The proposal, however, did not even mention the McCarran-Ferguson Act, nor did it explain how the Rule could possibly be reconciled with state insurance laws that expressly permit or require risk-based pricing and underwriting.

The proposed rule also noted "some variation in the application of the discriminatory effects standard" among the courts. 76 Fed. Reg. at 70921 (A.R. 1); (SUMF ¶ 13). HUD explained that while many federal courts use a "three-step burden-shifting approach," other courts—including the Seventh Circuit—"apply a multi-factor balancing test" and others apply a hybrid of the two. 76 Fed. Reg. at 70923 & n.24 (A.R. 3) (citing *Metro. Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977)). To "establish[] a uniform standard of liability," HUD proposed to adopt a version of the "burden-shifting approach" that imposes extraordinary hurdles on insurers forced to justify every day actuarial practices. 76 Fed. Reg. at 70924 (A.R. 4); (SUMF ¶ 20, 54-62).

## B. Comments To The Rule

Representatives of the insurance industry submitted detailed comments seeking an exemption from the proposed Rule and explaining why applying the Rule to homeowners insurance would be unlawful and ill-advised. (*See* Comments of the Property Cas. Insurers Ass'n of America (Jan. 17, 2012) (A.R. 553); Comments of the Nat'l Ass'n of Mut. Ins. Cos.

11

(Jan. 17, 2012) (A.R. 372); Comments of the Am. Ins. Ass'n (Jan. 17, 2011) (A.R. 455); (SUMF ¶ 21). These comments explained that:

- The use of actuarial factors to calculate risk would be limited by the application of disparate impact liability because any such factor could affect protected groups differently. (*See* A.R. 376-377; SUMF ¶ 36).

- Application of disparate impact liability to homeowners insurance is fundamentally inconsistent with consideration of actuarially sound risk-based factors and would violate the McCarran-Ferguson Act. (*See* A.R. 552; A.R. 376; SUMF ¶ 22).

- To ensure that "no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process" and insurers "would have to charge everyone the same rate, regardless of risk." (A.R. 377; SUMF ¶ 36).

- Eliminating risk-based pricing would have significant negative consequences: "adverse selection will increase, and coverage availability will suffer. Perversely, application of the proposed rule could in fact harm all insurance consumers, including the very groups it purports to protect." (A.R. 378; SUMF ¶ 39).

- Because state laws expressly contemplate consideration of actuarially significant risk factors, the application of disparate impact liability would violate the McCarran-Ferguson Act. (*See* A.R. 376, 379-380; SUMF ¶ 22).

- Pricing of homeowners insurance falls within states' common law "filed rate" doctrine, which bars private claims based on insurance rates filed with state regulatory entities. Applying disparate impact liability to insurance rates would undermine state regulators' approval of insurance rates. (*See* A.R. 378; SUMF ¶ 43).

12

Given the inherent conflict between disparate impact liability and insurers' use of

actuarial risk factors, representatives of the insurance industry made clear that the Rule could not

lawfully apply to insurance and specifically asked HUD to exempt insurance underwriting and

pricing from the Rule or to provide regulatory safe harbors for long-recognized actuarial risk

factors, such as age and condition of a property or distance from a fire station.  (*See* A.R. 555;

A.R. 380; SUMF ¶¶ 45-46).

Finally, the insurance industry's comments explained that each step of HUD's proposed

burden-shifting framework for resolving disparate impact claims conflicted with the Supreme

Court's decision in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), and would stack the

deck against insurers.  (A.R. 381-382; SUMF ¶ 53).

### C.  The Final Rule

On February 15, 2013, HUD promulgated its final Disparate Impact Rule.  78 Fed. Reg.

at 11460 (A.R. 612); (SUMF ¶ 14).  The regulations adopted in the Rule provide that "[a]

practice has a discriminatory effect where it actually or predictably results in a disparate impact

on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns

because of race, color, religion, sex, handicap, familial status, or national origin."  24 C.F.R.

§ 100.500(a) (2013).  They further provide that a challenged "practice [with a discriminatory

effect] may still be lawful if supported by a legally sufficient justification," *id.* § 100.500,

meaning that: (1) the challenged housing practice "[i]s necessary to achieve one or more

substantial, legitimate, nondiscriminatory interests of the respondent" and (2) "[t]hose interests

could not be served by another practice that has a less discriminatory effect," *id.* § 100.500(b).

Notwithstanding the insurance industry's comments, the final Rule did not meaningfully

address whether extension of disparate impact liability to homeowners insurance would interfere

with state regulation of insurance in violation of the McCarran-Ferguson Act.  The final Rule

13

merely asserted that the McCarran-Ferguson Act applies only to courts, not federal agencies construing statutes during the rulemaking process: "McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs *courts* on how to construe federal statutes, including the Act." 78 Fed. Reg. at 11475 (A.R. 627) (emphasis added); (SUMF ¶ 23). HUD thus did not consider whether the Rule conflicts with state laws and policies permitting risk-based pricing and underwriting.

The Rule also failed to meaningfully address insurance industry comments demonstrating that the application of disparate impact liability is inconsistent with established risk-based insurance practices. HUD did not dispute that the use of actuarial risk factors will result in a disparate impact on some populations or that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk." 78 Fed. Reg. at 11475 (A.R. 627) (quoting a comment); (SUMF ¶ 36). To the contrary, HUD acknowledged that insurers will have to justify in court any disparate impact caused by risk-based pricing and underwriting—HUD's sole response was that an insurance company "has a full opportunity to defend the business justifications for its policies." *Id.*; *see also id.* (A.R. 627) ("Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification."); (SUMF ¶ 38). HUD thus acknowledged *the possibility* that the use of risk-based pricing and underwriting could be a sufficient business justification for any resulting disparate impact. But HUD declined to confirm that the legitimate use of actuarial risk factors in fact *is* a legitimate business practice and went on to reject the insurance industry's requests for an exemption for insurance or a safe harbor for the use of risk-based pricing and underwriting. *See* 78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶ 47-48).

The Rule noted that "commenters stated that application of the disparate impact standard

14

would interfere with state regulation of insurance in violation of … the common law 'filed rate doctrine.'" 78 Fed Reg. at 11474 (A.R. 626); (SUMF ¶ 43-44). But despite acknowledging this issue, HUD altogether failed to address it. *See id.* at 11475 (A.R. 627); (SUMF ¶ 44).

Finally, HUD adopted its proposed burden-shifting framework. Under the final Rule, the plaintiff or charging party has the initial "burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1) (2013). If the plaintiff or charging party meets that burden, "the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). If the defendant or respondent meets its burden, the plaintiff or charging party "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3). HUD rejected a "significance requirement" for disparate impact liability, 78 Fed. Reg. at 11468 (A.R. 620); (SUMF ¶ 56), and declined to require an alternative practice that has a less discriminatory effect be "equally effective" at serving the defendant's substantial, legitimate, nondiscriminatory interest. 78 Fed. Reg. at 11473 (A.R. 625); (SUMF ¶ 62). The Rule also rejected comments urging HUD to require a plaintiff or charging party to challenge a "specific" practice. 78 Fed. Reg. at 11469 (A.R. 621); (SUMF ¶¶ 55-56).

## ARGUMENT

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Review under the APA is based on the administrative record that was before the agency when it issued the regulation or decision at issue. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009). As PCI

15

and HUD agreed in the January 8, 2014 Joint Status Report (*see* Dkt. No. 16 at 4), whether an agency's decision to promulgate a regulation was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706, is a question of law that is resolved by the Court on dispositive motions, *see, e.g., Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (review of agency action under the APA is based entirely on the agency's record and thus can be resolved at the motion to dismiss stage); *Univ. Med. Ctr. of S. Nevada v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) ("[T]he question whether HHS acted in an arbitrary and capricious manner is a legal one ....").[7]

## I. APPLICATION OF THE DISPARATE IMPACT RULE TO INSURANCE WOULD VIOLATE THE MCCARRAN-FERGUSON ACT (COUNT I)

In Section 1 of the McCarran-Ferguson Act, Congress declared "that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U.S.C. § 1011. Section 2 of the Act provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). Under the McCarran-Ferguson Act, federal law is reverse-preempted if it "directly conflict[s] with state regulation" or when "application of the federal law

---

[7] There can be "little question that" HUD's application of the Rule to homeowners insurance and refusal to grant an exemption for homeowners insurance have caused injury to PCI's members who are homeowners insurers because they are parties regulated under the Rule—they are the "object[s] of" HUD's actions. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Owner-Operator Indep. Drivers Ass'n v. Federal Motor Carrier Safety Admin.*, 656 F.3d 580, 585 (7th Cir. 2011). Indeed, the administrative record demonstrates the severity of the harm posed by the Rule to the insurance industry, including PCI's members. (*See* SUMF ¶¶ 66-73).

would … frustrate any declared state policy or interfere with a State's administrative regime." *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).

Application of the Disparate Impact Rule to the pricing and underwriting of homeowners insurance would violate the McCarran-Ferguson Act. The FHA—which does not mention insurance and applies broadly to the provision of housing—plainly does not "specifically relate[] to the business of insurance." *See, e.g.*, *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 295 (7th Cir. 1992) ("The Fair Housing Act is an 'Act of Congress' that does not 'specifically relate [ ] to the business of insurance.'") (alteration in original)). Thus, application of the Disparate Impact Rule to homeowners insurance is preempted under the McCarran-Ferguson Act if it would "invalidate, impair, or supersede" state insurance law, 15 U.S.C. § 1012(b), or "frustrate any declared state policy or interfere with a State's administrative regime," *Humana*, 525 U.S. at 310. As explained below, it would do so in numerous respects.

### A. The Rule Would Interfere With State Administrative Regimes

Seventh Circuit precedent makes clear that application of the Disparate Impact Rule to homeowners insurance would violate the McCarran-Ferguson Act by fundamentally interfering with the comprehensive state administrative regimes that regulate insurance. The Rule impermissibly requires federal courts to determine whether the use of certain risk factors is actuarially justified and thus would "inject[] federal courts into the heart of the regulation of the insurance business by the states." *Mutual of Omaha*, 179 F.3d at 564.

As the Court of Appeals has explained, "[s]tate regulation of insurance is comprehensive" and covers ratemaking, scope of coverage, marketing, fees, and numerous other matters. *Mutual of Omaha*, 179 F.3d at 564; 1 Steven Plitt et al., *Couch on Insurance* §§ 2:7, 2:20 (3d ed. 2013); *see also infra* Part I.D. State insurance commissioners actively regulate and supervise the insurance business and enforce insurance laws and punish violators. 1 Plitt et al.,

*Couch on Insurance* §§ 2:7-2:8. Yet HUD's Rule contemplates that insurers will be forced to justify their rate-making practices in federal court under a federal burden-shifting standard even though one or more state insurance regulators have already reviewed the rates and determined that they are not excessive, inadequate, or unfairly discriminatory. Comments from the insurance industry explained that any risk-based factor could affect protected groups differently. (*See* A.R. 376-377; SUMF ¶ 30); *see also* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284 ("[P]rotected classes, most if not all of the time, will not be evenly distributed throughout the various risk classifications.").[8] In the final Rule, HUD did not dispute this basic proposition. *See* 78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶ 31). Instead, HUD asserted that insurers will have to justify the disparate impact caused by risk-based pricing and underwriting in federal court in challenges brought under the FHA. *See* 78 Fed. Reg. 11475 (A.R. 627) (insurers will "ha[ve] a full opportunity to defend [in court] the business justifications for its policies"); (SUMF ¶ 32).

Under HUD's burden-shifting framework, once a plaintiff shows that the use of an actuarial factor would have a disparate impact, "the burden shifts to the insurer to show that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests." *See* 78 Fed. Reg. at 11475 (A.R. 627). Even if the insurer meets that burden, it will lose if a plaintiff can convince the fact-finder that an interest "could be served by another practice that has a less discriminatory effect." *Id.* at 11482 (A.R. 634). HUD has rejected any requirement that such an alternative practice be "equally effective" at serving the

---

[8] *See also* State of New Jersey Department of Banking & Finance, *The Use of Occupation and Education Factors in Automobile Insurance* 51 (April 2008) ("[L]ong-accepted rating factors such as accidents, comprehensive claims, territory and perhaps moving violations all may appear to correlate with higher-than-average minority populations and lower-than-average income levels."), *available at* http://www.state.nj.us/dobi/division_insurance/pdfs/ed_occ_april2008.pdf.

defendant's substantial, legitimate, nondiscriminatory interest. *Id.* at 11473 (A.R. 625); (SUMF ¶ 62). Insurers thus must establish in federal court, to a jury, the strict necessity of each actuarial factor they relied upon in setting rates even though a state insurance regulator has already found the rates not to be excessive, inadequate, or unfairly discriminatory under state law. If an insurer fails to make this showing, then a federal court applying the Rule would have to declare the insurers' rates unlawful and order the insurer to make a new rate based on a set of court-approved risk factors that may be inconsistent with state law and that can only be approved by the states. Under the Rule, the final regulation of insurance rate-setting would thus be largely "displac[ed] … into federal court" which would "obviously interfere with the administration of state law." *Mutual of Omaha*, 179 F.3d at 564.

The Seventh Circuit has recognized that regulating core insurance practices under federal law in federal court litigation would interfere with a State's administrative regime and thus violate the McCarran-Ferguson Act. In *Mutual of Omaha*, the Seventh Circuit held that application of the Americans with Disabilities Act ("ADA") to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." 179 F.3d at 564 (noting that it would violate the McCarran-Ferguson Act "to require federal courts to determine whether limitations on coverage are actuarially sound and consistent with state law"). The court explained that if insurers were required to litigate whether their practices are "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA— "the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" unless pursuant to a federal law specifically relating to insurance. *Id.*

19

The same is true here. Under the Disparate Impact Rule, insurers would have to litigate in federal court whether their core risk-based pricing and underwriting practices are "actuarially sound" in order to try to satisfy their burden of demonstrating a legitimate business justification for their practices. Federal courts would find themselves mired in disputes about whether risk factors other than those selected by insurers and permitted under state law would adequately serve insurers' business needs. This kind of comprehensive federal regulation of insurance practices—on the basis of the Fair Housing Act, a law that does not even mention insurance—is the exact problem that the McCarran-Ferguson Act is intended to prohibit, 15 U.S.C. § 1012(b); *Humana*, 525 U.S. at 310, and the exact issue decided in *Mutual of Omaha*.

### B. The Rule Would Invalidate And Impair State Insurance Laws Permitting Use Of Risk-Based Pricing

HUD's Disparate Impact Rule would also invalidate and impair state insurance laws permitting the use of risk-based pricing and underwriting. Under the McCarran-Ferguson Act, a federal law must give way if it would prohibit practices that state insurance law permits. *See, e.g., In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1558 n.9 (8th Cir. 1989) (under the McCarran-Ferguson Act, states have "the power to permit practices that would otherwise violate federal…laws."); *Dexter v. Equitable Life Assurance Soc'y*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (the McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ.A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (holding that the Telephone Consumer Protection Act of 1991 was preempted by Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations).

20

Here, the Disparate Impact Rule violates the McCarran-Ferguson Act because state insurance laws expressly *permit* consideration of actuarially justified risk factors. Under traditional state insurance law principles, "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an *actuarially sound* estimate of the expected value of all future costs associated with an individual risk transfer." CAS Principles 4; *see also supra* at p. 8. For example, as noted above, Illinois law prohibits only "unfair discrimination" that is "between individuals or risks *of the same class or of essentially the same hazard and expense element*." 215 Ill. Comp. Stat. 5/424(3) (emphasis added). Similarly, under Wisconsin law, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." Wis. Stat. Ann. § 625.11(4).

The rule is the same across the states. *See* Appendix A; Compl. ¶ 31; *see also, e.g., Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) (noting that "statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any ... of the terms and conditions of the insurance.'"); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Insurance Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. … Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v.*

21

*Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

Hornbook insurance law thus confirms that insurers may make distinctions based on the actuarial risk posted by insureds. But the Rule's dictates would prohibit exactly that. HUD did not dispute insurance industry comments explaining that at least *some* actuarial risk factors will turn out to have a disparate impact on some protected group of people. (*See* A.R. 676-677.) This tripwire will be particularly sensitive because HUD expressly declined to require that any disparate impact be "significan[t]." 78 Fed. Reg. at 11468 (A.R. 620). Rather than dispute that some actuarial risk factors will likely have a disparate impact, HUD asserted that insurers can simply defend each lawsuit brought against them—on a case-by-case basis—by demonstrating "the business justifications for its policies." 78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶ 38). But that is no answer. Requiring insurers to litigate this issue case-by-case would impose tremendous burdens on insurers and create crippling uncertainty and expense that would impair the ability of insurers to operate as permitted, and even required, by state insurance law. Insurers do not collect data about the race of their customers and thus have no way of knowing what actuarial risk factors might turn out to have a disparate impact on a particular group in a particular territory. (*See* A.R. 383; SUMF ¶ 33.) And, of course, they have no way of knowing with certainty how a jury will rule on their business justification defense, particularly under HUD's one-sided burden-shifting framework. Allowing the propriety of state-law authorized actuarial risk factors to be determined after-the-fact and on a case-by-case by a lay jury in federal court under federal law is unworkable and precisely what *Mutual of Omaha* held would violate the McCarran-Ferguson Act. *See* 179 F.3d at 564.

HUD's burden-shifting framework exacerbates this problem by ensuring that federal lay juries would end up overriding state insurance regulators' expert judgments in violation of the McCarran-Ferguson Act. Under HUD's new framework, insurers are prima facie liable for risk-based pricing unless they can meet their burden of proving that (1) use of that factor is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent" and (2) "[t]hose interests could not be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(b) (2013); *see also id.* § 100.500(c) (placing burden of proof on defendant once a disparate impact is shown). Moreover, HUD has rejected any requirement that the alternative practice under element (2) be "equally effective" at serving the defendant's substantial, legitimate, nondiscriminatory interest. 78 Fed. Reg. at 11473 (A.R. 625); (SUMF ¶ 62). Thus, insurers could be held liable for using actuarially sound risk factors approved by state regulators merely because they failed to use some other, less predictive factor. In this way, the Rule would inevitably impose liability on insurers for making actuarially sound judgments that were in full compliance with state law. This after-the-fact regulation through federal litigation is not permitted by the McCarran-Ferguson Act. *See McKenzie v. S. Farm Bureau Cas. Ins. Co.*, No. 3:06-cv-013, 2007 WL 2012214, at *3 (N.D. Miss. July 6, 2007) ("Mississippi has enacted a regulation authorizing the activity about which the plaintiff complains, and therefore the plaintiff's 'challenge to that practice under the auspices of the Fair Housing Act' is untenable." (emphasis removed)); *Taylor v. American Family Ins. Grp.*, No. 8:07-cv-493, 2008 WL 3539267, at *5 (D. Neb. Aug. 11, 2008).

### C. The Rule Would Invalidate And Impair State Insurance Laws Requiring Risk-Based Pricing

The Rule would also invalidate and impair state insurance laws *requiring* consideration of actuarial risk factors. The vast majority of states expressly require that insurers set rates based

on past losses and other actuarially relevant risk factors. *See* Appendix A; *see also* Compl. ¶ 34. For example, Indiana law mandates that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, … [and] to all other relevant factors, including trend factors, within and outside this state …." Ind. Code Ann. § 27-1-22-3(a)(1). Wisconsin law similarly requires insurers to give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and outside of this state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of this state," and "all other relevant factors." Wis. Stat. Ann. § 625.12(1).

These laws would be directly invalidated and impaired by applying disparate impact liability to homeowners insurance. Insurers charging different rates to different customers based on their risk profiles (past payouts, risk factors, home attributes, etc.) would likely impact different groups differently. And, as explained above, under HUD's burden-shifting framework, there is a high likelihood that use of some actuarially justified risk factor mandated by state law will give rise to liability under HUD's interpretation of the FHA because a jury will determine that some other less effective factor that serves the same general purpose could have been used instead. But subjecting insurers to liability if they charge different prices to different customers based on differing risks directly contradicts the state laws *requiring* insurers to take such differing risks into consideration when setting rates.

**D.  The Rule Would Invalidate And Impair State Insurance Laws Providing For State Administrative Review of Insurance Rates**

The Rule would likewise invalidate and impair state laws providing for the review and approval of insurance rates by state insurance commissioners. Almost every state requires insurers to file insurance rates with state regulators, and all states provide mechanisms for regulators to review and/or approve such rates. *See* Appendix A; Ind. Code Ann. § 27-1-22-4(a)

24

(requiring filing of rates); Wis. Stat. Ann. § 625.13(1) (same). State regulators carefully review insurance rates to ensure that the rates are based on sound actuarial factors and are not excessive, inadequate, or unfairly discriminatory. *See, e.g.*, Wis. Stat. Ann. § 625.13; N.J. Stat. Ann. § 17:29A-7; Ind. Code Ann. §27-1-22-5; Ohio Rev. Code Ann. §§ 3935.04, 3935.03; *Fire Ins. Rating Bureau*, 91 N.W. 2d at 375 (Wis. 1958); *Blue Cross & Blue Shield of Delaware, Inc.*, 479 A. 2d at 847 (Del. Super. Ct. 1984); *see also* 215 Ill. Comp. Stat. 5/132, 5/123.3 (requiring periodic examinations of insurers by the Director for compliance with state laws); Idaho Code Ann. § 41-1427 (same).

As the United States Court of Appeals for the Eighth Circuit concluded in *Saunders v. Farmers Insurance Exchange*, 537 F.3d 961 (8th Cir. 2008), state-law administrative rate review procedures would be impaired by the application of disparate impact liability to homeowners insurance. As the *Saunders* Court observed:

> [T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials. If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'

*Id.* at 968. The imposition of disparate impact liability on insurers who charge differing rates to different customers based on differing risk factors and loss histories would undermine—and essentially invalidate—state approvals of filed rates and state procedures for reviewing insurance rates. Imposing such liability in after-the-fact litigation would "frustrate [a] declared state policy [and] interfere with a State's administrative regime," and would therefore violate the McCarran-Ferguson Act. *Humana Inc.*, 525 U.S. at 310.

25

For all of these reasons, HUD's application of the Rule to homeowners insurance violates the McCarran-Ferguson Act and must be vacated as "not in accordance with law." 5 U.S.C. § 706(2)(A).

## II. HUD'S FAILURE TO ADDRESS THE MCCARRAN-FERGUSON ACT WAS ARBITRARY AND CAPRICIOUS (COUNT II)

HUD's failure even to address whether application of its Disparate Impact Rule to insurance violated the McCarran-Ferguson Act was arbitrary and capricious in violation of the APA and is an independent basis to set aside HUD's application of the Rule to homeowners insurance. Under the APA, "[a]n agency's 'failure to respond meaningfully' to objections raised by a party renders its decision arbitrary and capricious." *PPL Wallingford Energy LLC v. F.E.R.C.*, 419 F.3d 1194, 1198 (D.C. Cir. 2005); *see also Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992). Indeed, courts have "stressed that [u]nless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned." *PPL Wallingford Energy*, 419 F.3d at 1198 (internal quotation marks omitted). Here, HUD failed to meet that obligation.

During the rulemaking process, the insurance industry explained in detail that the application of disparate impact liability to insurance practices would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act. (S*ee* A.R. 554; A.R. 375-381; SUMF ¶ 22.) In its final Rule, however, HUD did not address whether extension of disparate impact liability to insurance practices would violate the McCarran-Ferguson Act. Rather than grapple with this key issue, HUD claimed that the McCarran-Ferguson Act applies only to courts, not federal agencies construing statutes during the rulemaking process: "McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs *courts* on how to construe federal

statutes, including the Act." 78 Fed. Reg. at 11475 (A.R. 627) (emphasis added); (SUMF ¶ 23). HUD thus failed to consider whether the Disparate Impact Rule conflicts with state laws and policies permitting the use of risk-based pricing and underwriting.

HUD's failure even to consider the McCarran-Ferguson Act requires vacatur of its application of the Rule to homeowners insurance. There is no support for HUD's novel contention that an agency need not consider whether its actions are consistent with federal law. It is certainly true that courts review agency actions, but that is as true under every other statute as it is with respect to the McCarran-Ferguson Act. The mere fact of judicial review obviously does not relieve agencies of their obligations to consider whether they are acting lawfully.

The Supreme Court has made clear that "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). An agency must identify "a source of authority in either the express language or the purpose and operation of [a statute] to justify" its regulations. *Wabash Valley Power Ass'n v. Rural Electrification Admin.*, 988 F.2d 1480, 1491 (7th Cir. 1993); *see also California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 398 (D.C. Cir. 2004) ("It is therefore incumbent upon [an agency] to demonstrate that some statute confers upon it the power it purport[s] to exercise …."). Indeed, an agency has an obligation to examine its statutory authority to act. *See, e.g.*, 5 U.S.C. § 553(b)(2) ("The notice [of proposed rulemaking] shall include ... reference to the legal authority under which the rule is proposed ...."); *Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013) ("It is certainly true that agencies are required to ensure that they have authority to issue a particular regulation."). As a result, failure to consider a statutory limitation is "necessarily arbitrary and capricious." *Owner-Operator Indep. Drivers Ass'n v. Federal Motor*

27

*Carrier Safety Admin.*, 656 F.3d 580, 587-88 (7th Cir. 2011); *United Mine Workers of Am., Int'l Union v. Dole*, 870 F.2d 662, 667 (D.C. Cir. 1989) ("[A]gency failure to explicitly consider statutory limits on authority in [its] statement of basis and purpose renders [a] rulemaking defective.").

HUD thus was obligated to determine whether applying the Disparate Impact Rule to homeowners insurance was consistent with federal law. The McCarran-Ferguson Act limits the reach of federal statutes like the FHA that are not specific to insurance. To properly consider its statutory authority under the FHA and whether application of the Disparate Impact Rule to homeowners insurance was consistent with federal law, HUD necessarily had to consider the McCarran-Ferguson Act. Because HUD failed to consider the limitations on its authority and on its construction of the FHA imposed by the McCarran-Ferguson Act, it acted arbitrarily and capriciously, in violation of 5 U.S.C. § 706(2)(A).

## III.   HUD'S FAILURE TO CONSIDER AND ADDRESS THE RULE'S EFFECT ON INSURERS WAS ARBITRARY AND CAPRICIOUS (COUNTS III & IV)

Application of the Disparate Impact Rule to homeowners insurance was also arbitrary and capricious because HUD failed (A) to consider the Rule's effect on insurers and the insurance business; and (B) to acknowledge that insurers have a legitimate interest in considering actuarially justified risk factors and grant an exemption for insurance. An agency decision is arbitrary and capricious if the agency fails to consider the "relevant factors" and fails to engage in "reasoned decisionmaking." *Motor Vehicles Mfr.'s Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 52 (1983). Moreover, as noted above, an agency has an obligation to respond meaningfully to comments submitted to it. *See supra* at p. 26. Here, HUD failed to satisfy these obligations in two respects.

28

### A.    HUD Failed To Weigh The Effect Of Applying Disparate Impact To Insurers

As insurers explained during the notice-and-comment process, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk."  (A.R. 376; SUMF ¶ 27.)  Without risk segmentation, the insurance industry would be radically different and might cease to function altogether.  If every customer paid the same price, regardless of risk, then many lower-risk customers would choose not to purchase insurance rather than pay too much for it.  This would cause prices to rise for remaining customers, causing more and more customers to forego insurance.  It would also remove an incentive for the construction of safer houses and the maintenance of existing homes.  *See, e.g.*, Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L. J. 29 at 66-67; (A.R. 378); *American Family*, 978 F.2d at 290.  Yet, the use of neutral risk factors would be impaired by the application of disparate impact liability because *any* factor could affect protected groups differently.  (A.R. 376-377 (emphasis added).)

In response to insurers' comments raising these concerns, HUD did not question the importance to the insurance industry of considering actuarial risk factors.  (*See* SUMF ¶¶ 27-32.)  Nor did HUD dispute that, as a statistical matter, "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk."  78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶ 36.  HUD's only response to these concerns was to note that an insurance company "has a full opportunity to defend [in court] the business justifications for its policies."  78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶ 56).  But HUD failed to consider the harms to the insurance industry of deterring insurers from using neutral and otherwise valid actuarial factors in calculating risk; it failed to consider the potentially massive litigation costs and uncertainty that would result from imposing prima facie liability on insurers simply for engaging in the business of insurance in full compliance with state law; and it failed to weigh these costs against

29

any supposed benefits of applying its new rule to insurers. This failure to address the effect of the Rule on the insurance industry was arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A). *See State Farm*, 463 U.S. at 54-55 (an agency should weigh benefits and costs of potential regulation).

**B.  HUD Failed To Acknowledge That Insurers Have A Legitimate Interest In Considering Actuarially Justified Risk Factors Or To Grant An Exemption For Insurance**

In light of concerns that implementation of the Disparate Impact Rule would violate the McCarran-Ferguson Act and would have a significant negative impact on the business of insurance, commenters requested that HUD exempt insurance underwriting and pricing from the Disparate Impact Rule. (*See* A.R. 555; A.R. 380; SUMF ¶¶ 45-46.) HUD, however, failed to meaningfully address this request, rejecting it in a cursory two-sentence paragraph. *See* 78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶¶ 47-48).

HUD claimed that "[c]reating exemptions or safe harbors related to insurance is unnecessary because … insurance practices with a legally sufficient justification will not violate the Act." 78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶ 49). It also asserted that "creating exemptions beyond those found in the Act would run contrary to Congressional Intent." 78 Fed. Reg. at 11475 n.141 (A.R. 627) (citing *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n.*, 508 F.3d 366 (6th Cir. 2007)); (SUMF ¶ 50). But the very case HUD relied upon held that "categorical bars are justified" when there is "no reason to require courts to engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success." *Graoch,* 508 F.3d at 376.

The *Graoch* court explained "that if *no* disparate-impact challenge to a particular practice ever could succeed under the burden-shifting framework, then a court categorically may bar *all* disparate impact challenges to that practice." 508 F.3d at 375. HUD should have done precisely

30

that here in response to the insurance industry's request for an exemption. It should have made

clear that the legitimate use of actuarial risk factors by insurers cannot give rise to disparate

impact liability because it is a legitimate business practice. There was no reason for HUD to

require insurers to litigate that issue in individual cases and investigations across the country.[9]

## IV. HUD'S FAILURE TO ADDRESS THE FILED-RATE DOCTRINE WAS ARBITRARY AND CAPRICIOUS (COUNT V)

The final Rule is also arbitrary and capricious because HUD failed to address comments

explaining that application of disparate impact liability to insurance would violate the filed-rate

doctrine. The filed-rate doctrine provides that "any 'filed rate'—that is, one approved by the

governing regulatory agency—is per se reasonable and unassailable in judicial proceedings

brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994). The

filed-rate doctrine maintains the separation of powers by "preserv[ing] the exclusive role of

agencies in approving rates." *Korte v. Allstate Ins. Co.*, 48 F. Supp. 2d 647, 650 (E.D. Tex.

1999). It also prevents courts from having to set new rates themselves, thereby "keeping courts

out of the rate-making process." *Fax Telecomms. Inc. v. AT&T*, 138 F.3d 479, 489 (2d Cir.

1998); *see also Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1316 (11th Cir. 2004);

*Blackburn & McCune, PLLC v. Pre-Paid Legal Servs., Inc.*, 398 S.W.3d 630, 662 (Tenn. Ct.

App. 2010).

The filed-rate doctrine applies to insurance and bars claims against insurance companies

based on rates that have been submitted and approved by state regulatory agencies. *See, e.g.*, *In*

*re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 888-89 (N.D. Ohio 2010) (citing federal cases

applying the filed-rate doctrine to insurance claims); *Milkman v. Am. Travellers Life Ins. Co.*,

---

[9] For the reasons explained in Section I above, the McCarran-Ferguson Act provided an additional basis for HUD to grant an exemption for the insurance industry.

No. 3375, 2002 WL 778272, at *15 (Pa. Com. Pl. Apr. 1, 2002) (citing state cases applying the filed-rate doctrine to insurance claims); *Stevens v. Union Planters Corp.*, No. Civ. A. 00-cv-1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000).  This includes disparate impact discrimination claims based on insurance rates.  *See Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307 (Minn. 2006); *see also McClain v. Shelter Gen. Ins. Co.*, No. 97-1139-cv-W, 2007 WL 844769, at *9-10 (W.D. Mo. Mar. 16, 2007) (noting as problematic that "[i]f the McCarran Ferguson Act were found not to apply, this Court would be forced to determine what a fair and non-discriminatory rate for the plaintiff's policies would have been.").

Accordingly, commenters explained that applying disparate impact liability to insurance rates under the Rule would undermine state regulators' approval of insurance rates.  (*See* A.R 378; SUMF ¶ 43.)  HUD acknowledged in its Final Rule that "[s]ome commenters stated that application of the disparate impact standard would interfere with state regulation of insurance in violation of … the common law 'filed rate doctrine.'"  78 Fed Reg. at 11474 (A.R. 626); (SUMF ¶ 44).  But HUD never addressed those comments.  *See* 78 Fed Reg. 11460-11482 (A.R. 612-634); (SUMF ¶ 44).  That alone is a basis to set aside HUD's application of the Rule to insurance.  *See supra* at p. 26 (explaining that an agency must respond to comments).

**V.      THE RULE'S BURDEN-SHIFTING FRAMEWORK IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW AS APPLIED TO INSURANCE (COUNT VI)**

Application of the Disparate Impact Rule to homeowners insurance should also be set aside because HUD disregarded critical safeguards in the burden-shifting framework it adopted. In *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), the Supreme Court delineated the framework applicable to proving disparate impact liability in the Title XII context.  Although the version of Title VII analyzed in *Wards Cove* has been superseded by statute, *see Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2555 (2011), the Supreme Court has continued to apply

the *Wards Cove* framework outside of the employment context, *see, e.g.*, *Smith v. City of Jackson, Miss.*, 544 U.S. 228 (2005) (applying the *Wards Cove* analysis to the ADEA). In the Disparate Impact Rule, HUD declined to incorporate the burden-shifting framework set forth in *Wards Cove*. This was improper in multiple respects, particularly as applied to insurance.

 *First*, HUD implemented a framework that does not require a plaintiff to show that the challenged practice creates a "significant" disparate impact on a protected group. *Wards Cove* requires that, to demonstrate a prima facie case of disparate impact discrimination, a plaintiff must be able to show that the specific practice in question would cause a "significantly disparate impact" on a protected class. 490 U.S. at 658. Rather than apply this standard, the Rule requires only that plaintiffs demonstrate that the "challenged practice caused or predictably will cause a discriminatory effect." 78 Fed. Reg. at 11482 (A.R. 634). HUD expressly rejected a "significance" requirement. *Id.* at 11468 (A.R. 620); (SUMF ¶ 56). That is especially burdensome to the insurance industry because, as previously noted, almost any actuarial risk factor can have *some* disparate impact in some circumstances. (*See* SUMF ¶¶ 36-38.)

 *Second*, the Rule rejects the Supreme Court's mandate in *Wards Cove* that "a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack." 490 U.S. at 657. Rather than apply this limitation, HUD indicated that a party may be permitted "to challenge the decision-making process as a whole." 78 Fed. Reg. at 11469 (A.R. 621); (SUMF ¶ 56). Allowing this type of claim would impose unwarranted burdens on insurers if they were subject to the Rule.

 *Third*, HUD erred in shifting the burden of proof to the defendant after the plaintiff makes a prima facie showing of disparate impact. The Supreme Court in *Wards Cove* made clear that even after a plaintiff makes a prima facie case, the burden of persuasion "remains with

the disparate-impact plaintiff." 490 U.S. at 659-60. Similarly, under the APA, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d); *see also Steadman v. SEC*, 450 U.S. 91, 98 (1981) (discussing the proper construction of the APA standard). Because a charge brought by HUD under the FHA may be heard in an administrative proceeding, *see* 42 U.S.C. § 3612(b) & (o), the burden-shifting standards established in the Rule must satisfy the APA requirement that the proponent of a proposed "order"—here, a proposed finding of a violation of the FHA—bear the burden of proof. *See N.L.R.B. v. Louis A. Weiss Mem'l Hosp.*, 172 F.3d 432, 442 (7th Cir. 1999) (burden-shifting framework inconsistent with § 556(d)); *Director, Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 276-277 (1994) (same).

*Fourth*, the Rule incorrectly raises the showing that a defendant must make to rebut a plaintiff's prima facie case. In *Wards Cove*, the Supreme Court explicitly rejected a requirement that a legitimate business practice be strictly necessary: "[T]here is no requirement that the challenged practice be 'essential' or 'indispensable' to the employer's business for it to pass muster." 490 U.S. at 659. Even *Groach* (cited by HUD) required only a showing of a "legitimate business reason." 508 F.3d at 374. The Rule, however, requires that a defendant demonstrate that "the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." 78 Fed. Reg. at 11482 (A.R. 634); *see also id.* at 11471-11472 (A.R. 623-624).

*Finally*, the Rule fails to require a plaintiff to demonstrate that any proposed alternative practice it proffers will serve the defendant's legitimate business interest "equally effectively" as the challenged practice. The Supreme Court in *Wards Cove* held that "any alternative practices which respondents offer up in this respect must be equally effective as petitioners' chosen hiring

34

procedures in achieving petitioners' legitimate employment goals." 490 U.S. at 661. But HUD summarily rejected this standard, stating only that "the 'wider range and variety of practices covered by the [Fair Housing] Act ... are not readily quantifiable,'" making an "equally effective" standard inappropriate. 78 Fed. Reg. at 11473 (A.R. 625); (SUMF ¶ 62). Whatever merit HUD's position might have in the housing context, it makes no sense applied to insurance and, in fact, violates the McCarron-Ferguson Act. *See supra* p. 23.

Together, HUD's systematic tilting of each step of the burden-shifting framework against insurers would impose a significant and unwarranted burden on insurers if the Disparate Impact Rule were found to apply to them. Any minor statistical deviation could trigger the Rule. An insurer would then have the burden of showing in federal court that the risk factor challenged was strictly "necessary" to its business—a standard distinct from that applied under state insurance law. Even then, a plaintiff could prevail by merely suggesting some other less effective factor that has not been approved under state law. The result—systematic federal court second-guessing of state-approved, actuarially-sound insurance practices—cannot be what Congress intended. To the contrary, imposing such a regime is arbitrary and capricious and contrary to law.

## CONCLUSION

For each of the independent reasons stated above, the Court should grant PCI's motion and vacate HUD's application of the Disparate Impact Rule to homeowners insurance.

Dated:      February 14, 2014

Respectfully submitted,

By: /s/ Seth P. Waxman

_____

Seth P. Waxman (*pro hac vice*)
Brian M. Boynton (*pro hac vice*)
Matthew J. Tokson (*pro hac vice*)
Lynn Eisenberg (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND
DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: seth.waxman@wilmerhale.com

Rowe W. Snider (# 03125194)
Ashlee M. Knuckey (# 6300237)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Tel.: (312) 443-0700
Fax: (312) 896-0336
Email: rsnider@lockelord.com

*Attorneys for Plaintiff*

# APPENDIX A

**State Laws on Insurance Risk Requirements and Rate Filing**

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Alabama | Ala. Code § 27-13-27 | | Ala. Code § 27-13-3; Ala. Code § 27-13-30 |
| Alaska | Alaska Stat. § 21.39.030 | Alaska Stat. § 21.39.030 | Alaska Stat. § 21.39.040 |
| Arizona | Ariz. Rev. Stat. Ann. § 20-356; Ariz. Rev. Stat. Ann. § 20-383; Ariz. Rev. Stat. Ann. § 20-384 | Ariz. Rev. Stat. Ann. § 20-356(4); Ariz. Rev. Stat. Ann. § 20-384 | Ariz. Rev. Stat. Ann. § 20-357 |
| Arkansas | Ark. Code Ann. § 23-67-208(d); Ark. Code Ann. § 23-67-209 | Ark. Code Ann. § 23-67-209(b); Ark. Code Ann. § 23-67-210 | Ark. Code Ann. § 23-67-211(a) |
| California | | | Cal. Ins. Code § 1861.05(b) |
| Colorado | Colo. Rev. Stat. § 10-4-403 | Colo. Rev. Stat. § 10-4-403(4) | Colo. Rev. Stat. § 10-4-404; Colo. Rev. Stat. § 10-4-406 |
| Connecticut | | Conn. Gen. Stat. § 38a-803(4) | |
| Delaware | 18 Del. Code § 2503(a)(3) | 18 Del. Code § 2503(a)(5); 18 Del. Code § 2503(b) | 18 Del. Code § 2504 |
| Florida | | Fla. Stat. § 627.062(e)(6); Fla. Stat. § 626.9741 | Fla. Stat. § 627.062; Fla. Stat. § 627.0645 |
| Georgia | Ga. Code Ann. § 33-9-4(4) | Ga. Code Ann. § 33-9-4(7) | Ga. Code Ann. § 33-9-21, Ga. Code Ann. § 33-9-9; Ga. Code Ann. § 33-9-26 |
| Hawaii | | | Haw. Rev. Stat. § 431:14-104(a); Haw. Rev. Stat. § 431:14-106(a) |
| Idaho | Idaho Code Ann.§ 41-1437(1) | Idaho Code Ann.§ 41-1437(3) | |
| Illinois | | 215 Ill. Comp. Stat. 5/424(3); Ill. Admin. Code tit. 50, § 2603.40 | |
| Indiana | Ind. Code § 27-1-22-3(a)(1) | Ind. Code § 27-1-22-3(a)(2) | Ind. Code § 27-1-22-4(a); Ind. Code § 27-1-22-5(a) |
| Iowa | | Iowa Code Ann. § 515F.4 | Iowa Code Ann. § 515F.5 |
| Kansas | | Kan. Stat. Ann. § 40-953 | Kan. Stat. Ann. § 40-955 |
| Kentucky | Ky. Rev. Stat. Ann. § 304.13-057 | | Ky. Rev. Stat. Ann. § 304.13-051 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Louisiana | La. Rev. Stat. Ann. § 22:1454(B)(1) | La. Rev. Stat. Ann. § 22:1454(B)(2); La. Rev. Stat. Ann. § 22:1454(B)(5) | La. Rev. Stat. Ann. § 22:1451; La. Rev. Stat. Ann. § 22:1464 |
| Maine | Me. Rev. Stat. Ann. 24-A, § 2303(1)(C) | Me. Rev. Stat. Ann. 24-A, § 2303(1)(G) | Me. Rev. Stat. Ann. 24-A, § 2304-A |
| Maryland | Md. Code Ann., Ins. § 11-205(c) | Md. Code Ann., Ins. § 11-205(f) | Md. Code Ann., Insurance § 11-206 |
| Massachusetts | Mass. Gen. Laws Ann. 174A, § 5; Mass. Gen. Laws Ann. 175A, § 5 | Mass. Gen. Laws Ann. 175A, § 5(a)(3) | Mass. Gen. Laws Ann. 174A, § 6; Mass. Gen. Laws Ann. 175A, § 6 |
| Michigan | Mich. Comp. Laws Ann. § 500.2110; Mich. Comp. Laws Ann. § 500.2403(1)(a) | Mich. Comp. Laws Ann. § 500.2110(3); Mich. Comp. Laws Ann. § 500.2110a; Mich. Comp. Laws Ann. § 500.2403(1)(c) | Mich. Comp. Laws Ann. § 500.2406; Mich. Comp. Laws Ann. § 500.2408 |
| Minnesota | Minn. Stat. Ann. § 70A.04; Minn. Stat. Ann. § 70A.05(1) | Minn. Stat. Ann. § 70A.05(2) | Minn. Stat. Ann. § 70A.06 |
| Mississippi | Miss. Code. Ann. § 83-2-3(2)(a) | Miss. Code. Ann. § 83-2-3(2)(b) | Miss. Code. Ann. § 83-2-7 |
| Missouri | Mo. Ann. Stat. § 379.318(1) | Mo. Ann. Stat. § 379.318(2) | Mo. Ann. Stat. § 379.321 |
| Montana | Mont. Code Ann. § 33-16-201(2)(a) | Mont. Code Ann. § 33-16-201(4) | Mont. Code Ann. § 33-16-203 |
| Nebraska | | Neb.Rev.St. § 44-7510(3) | Neb. Rev. St. § 44-7508 |
| Nevada | Nev. Rev. Stat. Ann.§ 686B.060(1) | Nev. Rev. Stat. Ann. § 686B.060(2) | Nev. Rev. Stat. Ann. § 686B.110  (As modified by 2013 Nevada Laws Ch. 73 (S.B. 114)) |
| New Hampshire | N.H. Rev. Stat. Ann. § 412:15(II)(a) | N.H. Rev. Stat. Ann. § 412:15(I)(d) | N.H. Rev. Stat. Ann. § 412:16 |
| New Jersey | N.J. Stat. Ann. § 17:29A-4(c); N.J. Stat. Ann. § 17:29A-11 | N.J. Stat. Ann. § 17:29A-7 | N.J. Stat. Ann. § 17:29A-6; N.J. Stat. Ann. § 17:29A-7 |
| New Mexico | N.M. Stat. Ann. § 59A-17-7(A) | N.M. Stat. Ann. § 59A-17-7(B) | N.M. Stat. Ann. § 59A-17-9 |
| New York | N.Y. Ins. Law § 2304(a) | N.Y. Ins. Law § 2304(b), (c) | N.Y. Ins. Law § 2305(b); N.Y. Ins. Law § 2305(a) |
| North Carolina | N.C. Gen. Stat. Ann. § 58-40-25(1) | N.C. Gen. Stat. Ann. § 58-40-20 | N.C. Gen. Stat. Ann. § 58-40-40; N.C. Gen. Stat. Ann. § 58-40-45 |
| North Dakota | N.D. Cent. Code Ann. § 26.1-25-03(1)(a) | N.D. Cent. Code Ann. § 26.1-25-03(1)(c) | N.D. Cent. Code Ann. § 26.1-25-04 |

2

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Ohio | Ohio  Rev. Code Ann. § 3935.03; Ohio Rev..Code Ann. § 3937.02(A) | Ohio Rev. Code Ann. § 3937.02(C) | Ohio Rev. Code Ann. § 3935.04 |
| Oklahoma | | Okla. Stat. Ann. tit. 36, § 985 | Okla. Stat. Ann. tit. 36, § 987 |
| Oregon | |  Or. Rev. Stat. Ann. § 737.310 | Or. Rev. Stat. Ann. § 737.205; Or. Rev. Stat. Ann. § 737.325 |
| Pennsylvania | | | 40 PA. Cons. Stat. § 710-5(a); 40 PA. Cons. Stat. § 710-7 |
| Rhode Island | R.I. Gen. Laws Ann. § 27-44-5(e)(1) | R.I. Gen. Laws Ann. § 27-44-5(d) | R.I. Gen. Laws Ann.§ 27-44-6(a) |
| South Carolina | S.C. Code Ann. § 38-73-430(1) | S.C. Code Ann.§ 38-73-430(3) | S.C. Code Ann.§ 38-73-520 |
| South Dakota | S.D. Codified Laws § 58-24-6.1 | S.D. Codified Laws § 58-24-6 | S.D. Codified Laws § 58-24-10 |
| Tennessee | Tenn. Code Ann. § 56-5-304 | Tenn. Code Ann. § 56-5-303(d) | Tenn. Code Ann. § 56-5-305 |
| Texas | Tex. Ins. Code Ann.§ 2251.051; Tex. Ins. Code Ann.§ 2251.052(a) | Tex. Ins. Code Ann.§ 2251.052(c) | Tex. Ins. Code Ann.§ 2251.101; Tex. Ins. Code Ann.§ 2251.103 |
| Utah | Utah Code Ann. § 31A-19a-202 | Utah Code Ann.§ 31A-19a-201(4)(a) | Utah Code Ann.§ 31A-19a-203 |
| Vermont | Vt. Stat. Ann. tit. 8, § 4686(1) | Vt. Stat. Ann .tit. 8, § 4686(2) | Vt. Stat. Ann. tit. 8, § 4688(c); Vt. Stat. Ann. tit. 8, § 4688(a) |
| Virginia | Va. Code Ann. § 38.2-1904(A) | Va. Code Ann. § 38.2-1904(A)(3) | Va. Code Ann. § 38.2-1906 |
| Washington | Wash. Rev. Code Ann. § 48.19.030(3) | Wash. Rev. Code Ann. § 48.19.030(2)(b) | Wash. Rev. Code Ann. § 48.19.060 |
| West Virginia | | W. Va. Code § 33-20-3 | W.Va. Code § 33-20-4 |
| Wisconsin | Wis. Stat. Ann. § 625.12(1) | Wis. Stat. Ann. § 625.12(2); Wis. Stat. Ann.. § 625.11(4) | Wis. Stat. Ann. § 625.13 |
| Wyoming | | Wyo. Stat. Ann. § 26-14-105 | Wyo. Stat. Ann. § 26-14-107 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 14, 2014, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to counsel of record in this case.

    s/ Seth P. Waxman_____

Seth P. Waxman

WILMER CUTLER PICKERING HALE AND

DORR LLP

1875 Pennsylvania Avenue, NW

Washington, DC 20006

Tel.: (202) 663-6000

Fax: (202) 663-6363

Email: seth.waxman@wilmerhale.com