IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PROPERTY CASUALTY INSURERS ) <br> ASSOCIATION OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> SHAUN DONOVAN, in his official capacity as ) <br> Secretary of Housing and Urban Development, ) <br> and UNITED STATES DEPARTMENT OF ) <br> HOUSING AND URBAN DEVELOPMENT, ) <br> ) <br> Defendants. ) | Case No. 1:13-cv-08564 <br><br> Judge Amy J. St. Eve <br><br> Magistrate Judge Susan E. Cox |

**PLAINTIFF'S LOCAL RULE 56.1**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1 of the United States District Court for the Northern District of Illinois, Plaintiff Property Casualty Insurers Association of America hereby submits the following statement of undisputed material facts. Because this case concerns a challenge under the Administrative Procedure Act ("APA"), review is based on the administrative record that was before the agency when it issued the regulation or decision at issue. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009). This statement therefore principally addresses the record materials that were before the United States Department of Housing and Urban Development ("HUD") and the relevant portions of HUD's proposed rule and final rule. Whether HUD's action was "not in accordance with law" or "arbitrary" and "capricious" under 5 U.S.C. § 706(2)(A) is a question of law. *See* Joint Status Report (Dkt. No. 16) at 4; *see also, e.g., Rempfer v. Sharfstein*, 583 F. 3d 860, 865 (D.C. Cir. 2009) (review of agency action under the APA is based entirely on the agency's

record and thus can be resolved at the motion to dismiss stage); *Univ. Med. Ctr. of S. Nevada v. Shalala*, 173 F.3d 438, 441 n.3 (D.C.Cir.1999) ("[T]he question whether HHS acted in an arbitrary and capricious manner is a legal one ....").

**Plaintiff Property Casualty Insurers Association of America**

1. Property Casualty Insurers Association of America ("PCI") is an Illinois-based trade association of property and casualty insurers representing more than 1,000 member companies. (*See* Declaration of Robert Gordon ¶ 2; A.R. 553.)

2. PCI's members provide homeowners, property, and hazard insurance ("homeowners insurance"), subject to state insurance regulations, in every state of the United States. (*See* Declaration of Robert Gordon ¶ 3.)

3. PCI's mission is to promote and protect the viability of a competitive private insurance market for the benefit of consumers and insurers. (*See* Declaration of Robert Gordon ¶ 4.)

4. PCI advocates on behalf of its members on policy issues at the state and federal levels and provides its members with information relevant to legal and public policy developments affecting the property and casualty insurance industry. (*See* Declaration of Robert Gordon ¶ 4.)

**Defendants Department of Housing and Urban Development and Shaun Donovan**

5. Defendant Department of Housing and Urban Development is an executive agency of the United States Government, 5 U.S.C. §§ 101, 105, established by the Department of Housing and Urban Development Act of 1965, 42 U.S.C. § 3531 et seq., Pub. L. No. 89–117, 79 Stat. 451. (*See* Complaint ¶ 13.)

6. Defendant Shaun Donovan is the Secretary of the Department of Housing and Urban Development and is responsible for the Department's promulgation of the challenged regulations. (*See* Complaint ¶ 14.)

**Venue and Jurisdiction**

7. Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff PCI resides in this district and no real property is involved in this action. (*See* Declaration of Robert Gordon ¶ 2.)

8. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because PCI brings this action under the Administrative Procedure Act and the McCarran-Ferguson Act. (*See* Complaint ¶ 15.)

**HUD's Proposed Rule**

9. On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effect's Standard." 76 Fed. Reg. 70921 (Nov. 16, 2011) (A.R. 1).

10. The proposed rule purported to "confirm" that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, regardless of whether the practice was adopted for a discriminatory purpose. 76 Fed. Reg. at 70924 (A.R. 4).

11. The proposed rule cited "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." 76 Fed. Reg. at 70924 (A.R. 4).

12. The proposed rule did not discuss the McCarran-Ferguson Act. 76 Fed. Reg. at 70924 (A.R. 4).

13. The proposed rule noted that there had been "some variation in the application of the discriminatory effects standard" among the courts and set forth a three-step burden-shifting framework for determining whether a challenged practice violates the rule. 76 Fed. Reg. at 70921 (A.R. 1).

**HUD's Final Rule**

14. On February 15, 2013, HUD issued its final rule, entitled "Implementation of the Fair Housing Act's Discriminatory Effect's Standard" (the "Disparate Impact Rule" or the "Rule"). 78 Fed. Reg. 11460 (Feb. 15, 2013) (A.R. 612).

15. The Rule purported to "formalize[]" HUD's view that the FHA's prohibition on discrimination may be violated by practices that have a discriminatory effect in the absence of a discriminatory intent. 78 Fed. Reg. at 11460 (A.R. 612).

16. In adopting the Rule, HUD purported to apply its disparate impact standard to homeowners insurance. 78 Fed. Reg. at 11474-11475 (A.R. 626-627).

17. In adopting the Rule, HUD rejected requests by the insurance industry for an exemption from the Rule or the creation of safe harbors for insurance. 78 Fed. Reg. at 11474-11475 (A.R. 626-627).

18. The Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 78 Fed. Reg. at 11482 (A.R. 634) (adding 24 C.F.R. § 100.500(a)).

19. The Rule provides that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification." 78 Fed. Reg. at 11482 (A.R. 634) (adding 24 C.F.R. § 100.500).

20. The Rule sets forth a three-step burden-shifting framework for determining whether the Rule has been violated. 78 Fed. Reg. at 11482 (A.R. 634) (adding 24 C.F.R. § 100.500(c)(1)-(3)).

**Comments by The Insurance Industry on HUD's Proposed Rule and HUD's Responses**

21. In response to HUD's proposed rule, insurance industry groups submitted detailed comments to HUD, raising numerous objections. (*See* Comments of the Property Casualty Insurers Association of America (Jan. 17, 2012) (A.R. 552-556); Comments of the National Association of Mutual Insurance Companies (Jan. 17, 2012) (A.R. 371-383); Comments of the American Insurance Association (Jan. 17, 2011) (A.R. 454-459).)

<u>The McCarran-Ferguson Act</u>

22. Comments from the insurance industry explained that the application of disparate impact liability to homeowners insurance would violate the McCarran-Ferguson Act. (*See* A.R. 554; A.R. 378-379.)

23. In the final Rule, HUD responded by asserting that federal agencies need not consider whether their regulations comply with the McCarran-Ferguson Act because that Act is directed at courts, not agencies. 78 Fed. Reg. at 11475 (A.R. 627).

<u>The Incompatibility of Disparate Impact and Homeowners Insurance</u>

24. Comments from the insurance industry explained that the imposition of disparate impact liability is fundamentally inconsistent with the business of insurance. (A.R. 554; A.R. 376.)

25. In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11475 (A.R. 627).

26. HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11475 (A.R. 627).

27. Comments from the insurance industry explained that the foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk. (A.R. 376; A.R. 554.)

28. In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11475 (A.R. 627).

29. HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11475 (A.R. 627).

30. Comments from the insurance industry explained that insurers use actuarially justified risk factors to group policyholders for the purpose of treating those with similar risk profiles similarly. (A.R. 376.)

31. In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11475 (A.R. 627).

32. HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11475 (A.R. 627).

33. Comments from the insurance industry explained that race or other protected class characteristics are not part of the risk assessment process. (A.R. 376.)

34. In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11475 (A.R. 627).

35. HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11475 (A.R. 627).

36. Comments from the insurance industry explained that, to eliminate statistical disparities among different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process, and insurers would have to charge everyone the same rate regardless of risk. (A.R. 377.)

37. In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11475 (A.R. 627).

38. HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11475 (A.R. 627).

39. Comments from the insurance industry explained that eliminating risk-based pricing would have significant negative consequences including "adverse selection." (A.R. 378.)

40. In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11475 (A.R. 627).

41. HUD's only response was that under the Rule insurers have an opportunity to defend the business justifications for their policies in litigation or administrative proceedings. 78 Fed. Reg. at 11475 (A.R. 627).

42. In the final Rule, HUD did not confirm that the legitimate use of actuarial risk factors is a legitimate business interest. 78 Fed. Reg. at 11475 (A.R. 627).

The Filed Rate Doctrine

43. Comments from the insurance industry explained that application of the proposed rule to homeowners insurance would violate the "filed rate" doctrine. (A.R. 378.)

44. In the final Rule, HUD acknowledged this comment, but did not respond to it. 78 Fed. Reg. at 11474 (A.R. 626).

An Exemption or Safe Harbor for Insurance

45. Comments from the insurance industry requested that, in light of the inherent conflict between disparate impact liability and risk-based insurance practices, HUD exempt insurance underwriting and pricing from the Disparate Impact Rule. (A.R. 555; A.R. 380.)

46. Comments from the insurance industry requested, in the alternative, that HUD provide regulatory safe harbors for "long-recognized risk-related factors, such as use of prior insurance claims, age and condition of property, and distance from fire station." (A.R. 380.)

47. In the final Rule, HUD refused to grant an exemption for homeowners insurance. 78 Fed. Reg. at 11475 (A.R. 627).

48. In the final Rule, HUD refused to create a safe harbor for the use of any risk factors. 78 Fed. Reg. at 11475 (A.R. 627).

49. In response to insurance associations' requests for an exemption for insurance or safe harbors for certain risk factors, HUD stated that "[c]reating exemptions or safe harbors

-8-

related to insurance is unnecessary because, as discussed above, insurance practices with a legally sufficient justification will not violate the Act." 78 Fed. Reg. at 11475 (A.R. 627).

50.     HUD also asserted that "creating exemptions beyond those found in the Act would run contrary to Congressional intent." 78 Fed. Reg. at 11475 (A.R. 627).

51.     Comments from the insurance industry explained that the failure to provide safe harbor protection for the use of factors historically allowed by state insurance regulators would subject insurers to baseless litigation and threaten the sound actuarial standards underpinning the insurance market. (A.R. 380.)

52.     In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11475 (A.R. 627).

### The Burden-Shifting Framework

53.     Comments from the insurance industry explained that HUD's proposed three-step burden-shifting approach for resolving disparate impact claims conflicted with the Supreme Court's decision in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989). (A.R. 381-382; A.R. 458.)

54.     In the final rule, HUD asserted that *Wards Cove* does not govern FHA claims. 78 Fed. Reg. at 11473 (A.R. 625).

55.     Comments from the insurance industry explained that the framework improperly failed to require a plaintiff to challenge a "specific" practice and failed to require a plaintiff to show a "significant" disparate impact. (A.R. 381-382.)

56.     In the final rule, HUD rejected a requirement that a plaintiff challenge a "specific" practice and rejected a "significance requirement" for disparate impact liability. 78 Fed. Reg. at 11468-11469 (A.R. 620-621).

57.     Comments from the insurance industry explained that the framework improperly required the defendant to show that the challenged practice has "a necessary and manifest relationship" to one or more "legitimate, nondiscriminatory interest[s]," instead of adopting a "legitimate goal" standard.  (A.R. 382.)

58.     In the final rule, HUD rejected commenters' suggestions to remove the "necessary" requirement from the burden-shifting regime.  78 Fed. Reg. at 11471 (A.R. 623).

59.     Comments from the insurance industry explained that the framework improperly shifted the burden of persuasion to the defendant.  (A.R. 458; A.R. 382.)

60.     In the final rule, HUD rejected suggestions that it keep the burden of proof on plaintiffs throughout the process of establishing a disparate impact claim.  78 Fed. Reg. at 11473-74 (A.R. 625-626).

61.     Comments from the insurance industry explained that the framework improperly failed to require the plaintiff to prove that a proposed alternative practice would be "equally as effective" as the challenged practice.  (A.R. 381-82.)

62.     In the final rule, HUD rejected a requirement that an alternative "practice that has a less discriminatory effect" be "equally effective" at serving the defendant's substantial, legitimate, nondiscriminatory interest.  78 Fed. Reg. at 11473 (A.R. 625).

63.     HUD's only explanation was that housing practices covered by the Act are "not readily quantifiable."  78 Fed. Reg. at 11473 (A.R. 625).

64.     Comments from the insurance industry explained that insurers do not collect data on race and ethnicity and, therefore, that insurers are unable to assess whether facially neutral risk-related underwriting and rating factors have a disparate impact on protected classes.  (A.R. 383.)

65. In the final Rule, HUD did not deny this assertion. 78 Fed. Reg. at 11475 (A.R. 627).

**Harm to PCI and Its Members**

66. PCI and its insurer members are injured by the Disparate Impact Rule. (*See* A.R. 552-556; A.R. 371-383; A.R. 454-459; Declaration of Robert Gordon ¶¶ 6-7.)

67. The Rule directly regulates homeowners insurers, including PCI's member companies. *See* 78 Fed. Reg. at 11474-11475 (A.R. 626-627); (A.R. 553 ("The issue the rule presents for insurers is whether non-racially motivated and sound actuarial underwriting principles recognized by state insurance regulators that permit accurate risk-based pricing for consumers can be prohibited by federal regulators who find them to have a 'disparate impact' and whether such HUD actions would violate a federal statute reserving the power to regulate insurance to the states.")); (A.R. 554 ("HUD's reference to insurance in the preamble of the proposed rule suggests that it may use its disparate impact rule to become a federal regulator of insurance underwriting practices despite McCarran-Ferguson's explicit reservation of insurance regulatory powers to the states.")); (A.R. 455 (The proposed rule "would seek to add regulation or enforcement at the federal level.")); (A.R. 373).

68. The ability to consider actuarially justified risk factors is critical to the business of insurance. (*See* A.R. 554 (Insurers "need … to distinguish between different types and degrees of risk. Indeed, risk discrimination is the foundation of insurance underwriting …."); A.R. 376 ("The foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk. Insurers make decisions based on actuarial and business principles that group policyholders for the purposes of treating those with similar risk profiles similarly."); A.R. 376 ("To actuarially determine rates that most accurately

measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly. This practice is the very essence of risk-based pricing.").)

69. If the Rule remains in effect, insurers' ability to consider actuarially justified risk factors in underwriting and rating insurance will be impaired. (A.R. 377 ("To achieve a condition in which no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process. In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk.").)

70. The Rule would thus prevent accurate risk assessment, result in adverse selection, and reduce insurance coverage, all of which would injure homeowners insurers. (A.R. 378 ("If the standard of disparate impact prevails over the historical standard that mandates unfairly discriminatory rates, accurate risk assessment will be threatened, adverse selection will increase, and coverage availability will suffer.").)

71. To attempt to comply with the Rule, insurance companies would be required to incur expense collecting demographic data that they do not currently obtain from their customers and analyzing that data to determine whether their use of facially neutral underwriting and rating factors have a disparate impact. (A.R. 383 ("Unlike banks, real estate settlement practices or rental real estate practices, insurers do not collect data on race and ethnicity. Without collecting such data indicative of protected class, insurers could not assess whether its facially neutral risk-related underwriting and rating factors have a disparate impact or discriminatory effect on protected classes.").)

72. The Rule would impose significant new burdens on insurers required to justify their practices in litigation under the burden-shifting framework adopted in the Rule. (*See* A.R. 382-383; A.R. 458.)

73. PCI and its member companies have expended substantial resources analyzing the Rule and potential compliance with the Rule. If the Rule is not set aside, PCI and its member companies will continue to expend substantial resources analyzing these issues. (*See* Declaration of Robert Gordon ¶ 7.)

Dated: February 14, 2014

Respectfully submitted,

By: /s/ Seth P. Waxman
_____
Seth P. Waxman (*pro hac vice*)
Brian M. Boynton (*pro hac vice*)
Matthew J. Tokson (*pro hac vice*)
Lynn Eisenberg (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: seth.waxman@wilmerhale.com

Rowe W. Snider (# 03125194)
Ashlee M. Knuckey (# 6300237)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Tel.: (312) 443-0700
Fax: (312) 896-0336
Email: rsnider@lockelord.com

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

      I hereby certify that, on February 14, 2014, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to counsel of record in this case.

       /s/ Seth P. Waxman
      Seth P. Waxman
      WILMER CUTLER PICKERING HALE AND DORR LLP
      1875 Pennsylvania Avenue, NW
      Washington, DC 20006
      Tel.: (202) 663-6000
      Fax: (202) 663-6363
      Email: seth.waxman@wilmerhale.com