**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, <br><br>            Plaintiff, <br><br>    v. <br><br> SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, <br><br>            Defendants. | Case No. 1:13-cv-08564 <br><br> Judge Amy J. St. Eve <br><br> Magistrate Judge Susan E. Cox |

**BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION, THE AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS, THE CHICAGO AREA FAIR HOUSING ALLIANCE, THE CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, INC., LATINOJUSTICE PRLDEF, THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE AND THE NAACP MILWAUKEE BRANCH, THE NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., THE NATIONAL COMMUNITY REINVESTMENT COALITION, THE NATIONAL CONSUMER LAW CENTER, THE NATIONAL FAIR HOUSING ALLIANCE, THE NATIONAL HOUSING LAW PROJECT, THE POVERTY & RACE RESEARCH ACTION COUNCIL, AND THE SHERMAN PARK COMMUNITY ASSOCIATION AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTERESTS OF AMICI ................................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................... 1

ARGUMENT ....................................................................................................................... 4

    I.    DISPARATE IMPACT ENFORCEMENT IS VITAL IN LIGHT OF HISTORICAL AND CONTINUING DISCRIMINATION IN HOMEOWNER'S INSURANCE .......... 4

        A.    Past intentional discrimination set the stage for the unjustified impediments that continue to limit equal access to homeowner's insurance .................................... 5

        B.    Insurers continue to employ policies that result in adverse racial impacts but cannot be justified by actuarial risk ........................................................................ 7

            1.    *Maximum-age and Minimum-value Requirements* .................................... 9

            2.    *Credit Scoring* .................................................................................................... 10

    II.    PLAINTIFF'S ARGUMENT MISCHARACTERIZES THE RELATIONSHIP BETWEEN DISPARATE IMPACT ANALYSIS AND THE "BUSINESS OF INSURANCE." ......................................................................................................................... 12

        A.    The disparate impact standard prohibits discrimination in insurance practices that are not, in fact, "actuarially justified." .................................................. 12

            1.    *The "business of insurance" consists of many elements that are not actuarially based* .............................................................................................. 14

            2.    *The disparate impact standard distinguishes between those aspects of the insurance business that are based on legitimate actuarial considerations and those that are not* .............................................................. 16

        B.    The prevalence of state law disparate impact enforcement further undermines Plaintiff's assertion that the Discriminatory Effects Rule is in conflict with the "business of insurance." ....................................................................................... 18

CONCLUSION .......................................................................................................................... 21

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Bowman v. City of Des Moines Mun. Hous. Agency*, 805 N.W.2d 790 (Iowa 2011) .................. 20

*Burrell v. State Farm & Cas. Co.*, 226 F. Supp. 2d 427 (S.D.N.Y. 2002) .................................... 7

*Comm'n on Human Rights & Opportunities v. Sullivan Associates*, 739 A.2d 238
    (Conn. 1999) ................................................................................................................. 20

*DeHoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003) ........................................................... 17

*DeHoyos v. Allstate Corporation*, 240 F.R.D. 269 (W.D. Tex. 2007) ........................................ 12

*DeHoyos v. Allstate Corporation*, No. CIV.ASA01CA1010FB, 2002 WL 1491650
    (W.D. Tex. Apr. 5, 2002)............................................................................................... 12

*Dunn v. Midwestern Indem. Mid-Am. Fire & Cas. Co.*, 472 F. Supp. 1106 (S.D. Ohio 1979)...... 5

*Fuller v. Teachers Ins. Co.*, No. 06-cv-00438, 2007 WL 2746861 (E.D.N.C. Sept. 19, 2007) ..... 7

*Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*,
    508 F.3d 366 (6th Cir. 2007) ....................................................................................... 3

*Jones v. Travelers Cas. Ins. Co. of Am.*, No. 13-CV-02390, 2013 WL 4511648
    (N.D. Cal. Aug. 22, 2013)............................................................................................. 7

*Lewis v. City of Chicago*, 560 U.S. 205 (2010) ........................................................................... 3

*Lumpkin v. Farmers Grp., Inc.*, No. 05-2868 Ma/V, 2007 WL 6996584
    (W.D. Tenn. Apr. 26, 2007)......................................................................................... 11

*Malibu Inv. Co. v. Sparks*, 996 P.2d 1043 (Utah 2000)............................................................... 20

*Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209 (11th Cir. 2001) ........................................ 17

*NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992) ...................................... 7, 18

*Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46
    (D.D.C. 2002) ............................................................................................................... 17

*Nevels v. W. World Ins. Co., Inc.*, 359 F. Supp. 2d 1110 (W.D. Wash. 2004) .............................. 6

*Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205 (9th Cir. 2010) ......................................................... 21

*Ojo v. Farmers Grp., Inc.*, No. CV 05-5818-JFW, 2006 WL 4552707
    (C.D. Cal. Mar. 7, 2006) .............................................................................................. 10

*Old West End Ass'n. v. Buckeye Fed. Sav. & Loan*, 675 F. Supp. 1100
(N.D. Oh. 1987) ................................................................................................ 3

*Resident Advisory Bd. v. Rizzo*, 564 F.2d 126 (3d Cir. 1977) .............................. 3

*Saville v. Quaker Hill Place*, 531 A.2d 201 (Del. 1987) ..................................... 20

*State of Indiana, Civ. Rights Comm'n v. Cnty. Line Park, Inc.*, 738 N.E.2d 1044
(Ind. 2000) ..................................................................................................... 20

*Thompson v. Metro. Life Ins. Co.*, 149 F. Supp. 2d 38 (S.D.N.Y. 2001) ................ 5

*Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 704 N.E.2d 667
(Ohio Ct. Com. Pl. 1997) ................................................................................ 9

*Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 705 N.E.2d 1
(Ohio Ct. Com. Pl. 1998) .......................................................................... 10, 20

*Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205 (1972) ..................................... 6

*United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974) ..................... 1

*United States v. Mort. Guar. Ins. Corp.*, Civ.A. No. 2:11-00882-RCM,
2012 WL 1606235 (W.D. Pa. Apr. 30, 2012) .................................................. 5

*Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1 (D.D.C. 1999) ..................................... 6

## COURT FILINGS

Consent Decree, *United States v. Am. Family Mut. Ins. Co.* and *NAACP v. Am. Family Mut. Ins. Co.* (Dep't of Justice July 13, 1995), *available at*
http://www.justice.gov/crt/about/hce/documents/amfamsettle.php .......................... 10

## STATUTES AND CONGRESSIONAL MATERIALS

12 U.S.C. § 2803 ................................................................................................ 18

42 U.S.C. § 3610(f) ............................................................................................ 19

Cal. Gov't Code § 12955.8 (West 2012) ............................................................ 19

D.C. Code § 2-1401.03 (2012) ........................................................................... 19

Fair Housing Act of 1968 (FHA), Pub. L. No. 90-284, 82 Stat. 81 (1968)
(codified as amended at 42 U.S.C. §§ 3601-3631) ........................................... 1

N.C. Gen. Stat. § 41A-5(a)(2) (West 2009) ....................................................... 19

## FEDERAL RULES AND REGULATIONS

24 C.F.R. § 100.500(b) ............................................................................................. 12

24 C.F.R. § 100.500(c) ............................................................................................ 3, 8

54 Fed. Reg. 3232 (Jan. 23, 1989) (codified at 24 C.F.R. § 100.70(d)(4)) ................................... 7

HUD, Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013) ....................................................... 2, 8

## OTHER AUTHORITIES

Tom Baker & Karen McElrath, *Whose Safety Net? Home Insurance and Inequality*, 21 Law and Social Inquiry 229 (1996) ........................................................ 9

Birny Birnbaum, Insurers' Use of Credit Scoring for Homeowners Insurance In Ohio: A Report to the Ohio Civil Rights Commission (Jan. 2003) ................................. 11

Board of Directors of the Casualty Actuarial Society, Statement of Principles Regarding Property and Casualty Insurance Ratemaking (May 1988), *available at* http://www.casact.org/professionalism/standards/princip/sppcrate.pdf ................................. 15

Civil Rights Division, U.S. Dep't of Justice, *Title VI Legal Manual* (2001) ................................. 3

Stephen M. Dane, *The Potential for Racial Discrimination by Homeowners Insurers Through the Use of Geographic Rating Territories*, 24 J. Ins. Regulation 21 (2006) ........ 10, 16

Meryl Golden & Mike Miller, Introduction to Price Optimization (Earnix 2014), *available at* http://www.naic.org/documents/committees_c_d_auto_insurance_study_group_140317_materials.pdf ................................................ 16

Carol A. Heimer, *The Racial And Organizational Origins Of Insurance Redlining*, X:3 J. Intergroup Relations (Autumn 1982) ........................................... 5

Brent Kabler, State of Missouri Department of Insurance, Insurance-Based Credit Scores: Impact on Minority and Low Income Populations in Missouri (Jan. 2004) ........................... 11

Dana L. Kaersvang, *The Fair Housing Act and Disparate Impact in Homeowners Insurance*, 104 Mich. L. Rev. 1993 (2006) ............................................... 14, 18

Robert W. Klein, *Availability and Affordability Problems in Urban Homeowners Insurance Markets*, *in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions (Gregory D. Squires ed., 1997) ........................... 8, 14, 16

Donald Light, Transforming Underwriting: From Risk Selection to Portfolio Management (Celent, March 2004), http://www.edmblog.com/weblog/files/insurance_transformingunderwriting_celent_wp.pdf 15

Gail McGiffin, Are Underwriters Smarter Than Predictive Models? (Ernst & Young, LLP 2013), *available at* http://www.ey.com/Publication/vwLUAssets/EY_-_Insurance_underwriters_vs_predictive_models/$FILE/EY-Insurance-underwriters-vs-predictive-models.pdf. ........................................................................................ 15

N.J. Citizen Action et al., Insurance Redlining: Is It Happening in Your Neighborhood? (Feb. 2004), *available at* www.njcitizenaction.org/craredlining.html........................................ 8

National Consumer Law Center & Center for Economic Justice, Credit Scoring and Insurance: Costing Consumers Billions and Perpetuating the Economic Racial Divide (June 2007) ....... 10

D.J. Powers, *The Discriminatory Effects of Homeowners Insurance Guidelines*, *in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions (Gregory D. Squires ed., 1997) ........................................................................................ passim

President's National Advisory Panel on Insurance in Riot Affected Areas, Meeting the Insurance Crisis of Our Cities (U.S. Government Printing Office 1968) ............... 6

Jay D. Schultz, *Homeowners Insurance Availability and Agent Location*, *in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions (Gregory D. Squires ed., 1997) .............................................................................................................. 14

Gregory D. Squires & Jan Chadwick, *Linguistic Profiling: A Continuing Tradition of Discrimination in the Home Insurance Industry?*, 41 Urb. Aff. Rev. 400 (2006)...................... 6

Gregory D. Squires, *Race, Politics, and the Law: Recurring Themes in the Insurance Redlining Debate*, *in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions (Gregory D. Squires ed., 1997) ................................................................ 6

U.S. Bureau of the Census, American Housing Survey for the United States: 2011 Table C-01-OO (2013), *available at* http://www.census.gov/programs-surveys/ahs/data/2011/h150-11.html ................................................................................................................................... 9

U.S. Bureau of the Census, American Housing Survey for the United States: 2011 Table C-13-OO (2013), *available at* http://www.census.gov/programs-surveys/ahs/data/2011/h150-11.html ................................................................................................................................. 10

Barbara Van Kerkhove, The Homeowners Insurance Gap: How Race and Neighborhood Composition Explain Cost and Access Disparities in Rochester and Monroe County, NY (May 2005)............................................................................................................................. 8

Women's Law Project & Pennsylvania Coalition Against Domestic Violence, Insurance Discrimination Against Victims of Domestic Violence (1998) ................................. 7

## INTERESTS OF AMICI

*Amici* are the American Civil Liberties Union, the American Civil Liberties Union of Illinois, the Chicago Area Fair Housing Alliance, the Chicago Lawyers' Committee for Civil Rights Under Law, Inc., LatinoJustice PRLDEF, the Lawyers' Committee for Civil Rights Under Law, the National Association for the Advancement of Colored People and the NAACP Milwaukee Branch, the NAACP Legal Defense & Educational Fund, Inc., the National Community Reinvestment Coalition, the National Consumer Law Center, the National Fair Housing Alliance, the National Housing Law Project, the Poverty & Race Research Action Council, and the Sherman Park Community Association. Each is a non-profit organization that has long sought to eliminate the vestiges of our nation's history of housing segregation and promote equal housing opportunity for all. These organizations also have experience utilizing the disparate impact framework to combat discrimination in housing and other contexts. More detailed statements of interest are contained in the accompanying appendix.

## INTRODUCTION AND SUMMARY OF ARGUMENT

When Congress enacted the Fair Housing Act of 1968 (FHA), Pub. L. No. 90-284, 82 Stat. 81 (1968) (codified as amended at 42 U.S.C. §§ 3601-3631), in the immediate aftermath of Martin Luther King Jr.'s tragic assassination, it intended to combat not only overt prejudice but also those housing policies that impose unnecessary and unjustified burdens based on race and other FHA-protected categories and, thus, are as "disastrous and unfair to private rights and the public interest as the perversity of a willful scheme." *United States v. City of Black Jack*, 508 F.2d 1179, 1185 (8th Cir. 1974) (internal quotation marks omitted). The FHA's prohibition against such forms of disparate impact discrimination has been consistently acknowledged by federal courts and by the U.S. Department of Housing and Urban Development (HUD), which

1

codified its longstanding interpretation in a final rule promulgated last year. *See* HUD, Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013) [hereinafter "Discriminatory Effects Rule" or "Rule"].

Plaintiff Property Casualty Insurers Association of America seeks to invalidate the Rule's application to the insurance industry, despite several decades of court rulings and agency action making clear that the industry is subject to the FHA and its disparate impact standard. Plaintiff's arguments suffer from numerous legal flaws and would unsettle well-established law and practice designed to eliminate discrimination from this important area of the housing market. However, this Court need not grapple with the sweeping nature of Plaintiff's claims. *Amici* agree with HUD that Plaintiff's claims contain significant jurisdictional defects and are substantively meritless.

*Amici* write separately to emphasize two serious problems with Plaintiff's attack on the Discriminatory Effects Rule. *First*, Plaintiff repeatedly, but erroneously, insists that application of the Discriminatory Effects Rule will disrupt the homeowner's insurance markets. To the contrary, disparate impact enforcement is vital to ensuring fairness in such markets by combating a variety of policies and practices that unnecessarily limit many Americans' ability to become and remain homeowners. Discriminatory practices have deep roots in the homeowner's insurance market, and discrimination in that area persists. Invalidating the Rule's application to the insurance industry would therefore expose minorities, persons with disabilities, families with children, and others to harmful discrimination without an effective remedy.

Disparate impact enforcement, moreover, is fully consistent with sound actuarial practices, despite dire warnings to the contrary from Plaintiff. Under the three-part burden-shifting framework endorsed in the Discriminatory Effects Rule, defendants – including

insurance providers – may rebut a prima facie case of adverse impact by demonstrating that the challenged practice is justified by an interest that is "substantial" (*i.e.*, "a core interest of the organization that has a direct relationship to the function of that organization"), "legitimate" (*i.e.*, "genuine and not false"), and itself "nondiscriminatory." 78 Fed. Reg. at 11,470; 24 C.F.R. § 100.500(c)(2); *see Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 374-75 (6th Cir. 2007) ("Of course, not every housing practice that has a disparate impact is illegal. We use the burden-shifting framework described above . . . to distinguish the artificial, arbitrary, and unnecessary barriers proscribed by the FHA from valid policies and practices crafted to advance legitimate interests."). If a defendant succeeds at this second stage, plaintiffs prevail only if they demonstrate that those interests "could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3). This burden-shifting framework redresses the unjustified denial of housing opportunities, while protecting policies and practices that are necessary to achieve legitimate, non-discriminatory objectives. Its effectiveness at achieving this balance is illustrated not only by its longstanding application in fair housing cases, *see, e.g.*, *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126 (3d Cir. 1977); *Old West End Ass'n. v. Buckeye Fed. Sav. & Loan*, 675 F. Supp. 1100 (N.D. Oh. 1987), but also in equal employment litigation, *see, e.g.*, *Lewis v. City of Chicago*, 560 U.S. 205 (2010); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), and other contexts, *see, e.g.*, Civil Rights Division, U.S. Dep't of Justice, *Title VI Legal Manual* 47-53 (2001).

*Second*, Plaintiff's argument proceeds from the unsound factual premise that the "business of insurance" is entirely "actuarially-based" – that is, grounded in objective scientific calculations. Plaintiff repeatedly trumpets the supposed tension between the Discriminatory Effects Rule and the functioning of the insurance industry, arguing that disparate impact

enforcement undermines the integrity of actuarially-based practices. Plaintiff is wrong to assert that any such conflict exists, given the operation of the burden-shifting standard. But Plaintiff's factual premise is flawed for other reasons. Plaintiff describes "the business of insurance" in broad strokes, as if it were defined in totality by actuarial calculation. In fact, the business of insurance is multifaceted and built upon many components – such as marketing and product design – that may have a discriminatory effect but cannot be reduced to the mechanics of actuarial calculation; indeed, insurers regularly adjust putatively actuarial models for a variety of business-related reasons. Similarly, Plaintiff's characterization of the "business of insurance" as grounded in state law and therefore incompatible with a federal disparate impact standard is undercut by the existence of numerous state law regimes that incorporate disparate impact standards. All of this militates against deciding the abstract legal questions posed by Plaintiff, which would be more appropriately addressed in concrete enforcement actions or lawsuits. These considerations thus amplify the ripeness problems identified in HUD's brief.

## ARGUMENT

### I. DISPARATE IMPACT ENFORCEMENT IS VITAL IN LIGHT OF HISTORICAL AND CONTINUING DISCRIMINATION IN HOMEOWNER'S INSURANCE.

Plaintiff's challenge to the Discriminatory Effects Rule could upset decades of well-settled civil rights law, yet it claims a narrow focus. Challenging the supposed consequences of applying disparate impact enforcement to insurance providers, Plaintiff warns that "the imposition of disparate impact liability is fundamentally inconsistent with the business of insurance." Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts ("Pl.'s 56.1 Statement") ¶ 24, ECF No. 21-1. This is a curious allegation in light of the FHA's longstanding application to homeowner's insurance. *See* HUD Br. at 13-15, ECF No. 29. More

4

fundamentally, Plaintiff elides the history and persistence of discrimination in the homeowner's

insurance industry, as well as the actual operation of disparate impact enforcement.

**A.      Past intentional discrimination set the stage for the unjustified impediments
        that continue to limit equal access to homeowner's insurance.**

For decades before and after the FHA's enactment in 1968, insurers unabashedly treated

homeowners seeking insurance differently based on their race or the racial composition of the

neighborhoods in which they lived.[1]  The term "redlining" originally referred to the widely-used

practice of color-coding neighborhoods, typically defined by their racial or ethnic composition,

to describe where financial services would be limited or denied.  *See, e.g.*, Carol A. Heimer, *The*

*Racial And Organizational Origins Of Insurance Redlining*, X:3 J. Intergroup Relations 49

(Autumn 1982).  As late as the 1960s, homeowner's insurance underwriting guidelines utilized

such maps to indicate where agents should avoid writing policies or should issue them only after

special review or with different terms.  *Id.*

Even though courts found such disparate treatment unlawful under the FHA as early as

1979, *see Dunn v. Midwestern Indem. Mid-Am. Fire & Cas. Co.*, 472 F. Supp. 1106 (S.D. Ohio

1979), it persisted long afterward.  A treatise on insurance redlining recounts stark examples of

explicitly discriminatory practices in the 1970s and 1980s:

> In 1977 the chief actuary of the New York Department of Insurance
> stated:  "Take Harlem, for example.  They don't need any insurance
> because they don't have anything of value to insure."  In 1988 some
> American Family Mutual Insurance Company agents were instructed in
> writing to "*quit writing* all those *blacks*."  . . .  In 1994 the Texas
> commissioner told the U.S. Senate Committee on Banking, Housing, and
> Urban Affairs that "we still find insurance companies making

---

[1] Homeowner's insurance is but one area in which insurers have engaged in intentional discrimination.
*See, e.g.*, *United States v. Mort. Guar. Ins. Corp.*, Civ.A. No. 2:11-00882-RCM, 2012 WL 1606235 (W.D. Pa. Apr.
30, 2012) (consent order settling challenge to practice of denying mortgage insurance to applicants on maternity
leave, resulting in differential treatment on the basis of sex and familial status); *Thompson v. Metro. Life Ins. Co.*,
149 F. Supp. 2d 38, 42 (S.D.N.Y. 2001) (challenging policies steering African Americans to substandard and
"significantly more expensive" life insurance).

> underwriting decisions based on all kinds of factors that have nothing to do with a statistically measured or measurable probability of risk."

Gregory D. Squires, *Race, Politics, and the Law: Recurring Themes in the Insurance Redlining Debate*, *in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions 6-7 (Gregory D. Squires ed., 1997) (internal citations omitted) [hereinafter "Insurance Redlining"].

During the 1990s, discriminatory treatment was revealed by a study in which African-American testers with addresses in African-American neighborhoods were paired with white testers with addresses in white neighborhoods to contact homeowner's insurance companies in nine different cities. Gregory D. Squires & Jan Chadwick, *Linguistic Profiling: A Continuing Tradition of Discrimination in the Home Insurance Industry?*, 41 Urb. Aff. Rev. 400, 404, 407 (2006). In 221 tests, the white caller received more favorable treatment nearly twice as often as the African-American caller did. *Id.* at 405.[2]

Such discriminatory insurance practices create or entrench precisely the kind of segregated living patterns that the FHA was designed to dismantle. *See Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972) (noting Congress's purpose in enacting the FHA "to replace the ghettos by truly integrated and balanced living patterns" (internal quotation marks omitted)). As observed by a presidential commission the year the FHA was passed, "[i]nsurance is essential to revitalize our cities. . . . Without insurance, buildings are left to deteriorate; services, goods and jobs diminish. Efforts to rebuild our nation's inner cities cannot move forward. Communities without insurance are communities without hope." President's National

---

[2] Although this brief focuses on race, insurers also have engaged, and continue to engage, in disparate treatment based on other FHA-protected categories. *See, e.g.*, *Nevels v. W. World Ins. Co., Inc.*, 359 F. Supp. 2d 1110, 1118 (W.D. Wash. 2004) (finding plaintiffs stated FHA claim where defendant did "not deny that Plaintiffs' [property] insurance policies were cancelled because Plaintiffs cared for individuals with mental disabilities"); *Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1 (D.D.C. 1999) (insurer refused coverage for homeowners who operated group homes for adults, resulting in differential treatment on the basis of disability).

Advisory Panel on Insurance in Riot Affected Areas, Meeting the Insurance Crisis of Our Cities 1 (U.S. Government Printing Office 1968).

In recognizing that the FHA reaches discrimination related to homeowner's insurance, the Seventh Circuit put it succinctly: "No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 296 (7th Cir. 1992); *see also Burrell v. State Farm & Cas. Co.*, 226 F. Supp. 2d 427, 441 (S.D.N.Y. 2002) (noting that "property insurance is often a condition for obtaining housing or rentals, such that redlining practices can effectively prevent equal opportunities to housing or rental resources"). The FHA's application to homeowner's insurance also has been confirmed by longstanding HUD regulations. *See* 54 Fed. Reg. 3232, 3285 (Jan. 23, 1989) (codified at 24 C.F.R. § 100.70(d)(4)).

### B. Insurers continue to employ policies that result in adverse racial impacts but cannot be justified by actuarial risk.

Due in large part to enforcement of the FHA and other anti-discrimination statutes, insurance practices that overtly discriminate on the basis of race have become significantly less common, but insurance underwriting is still tainted by "practices that are fair in form, but discriminatory in operation." *Griggs*, 401 U.S. at 431 (1971).[3] For instance, some neutral underwriting policies cause minority homeowners, and homeowners who live in heavily minority neighborhoods, to be more frequently rejected for homeowner's insurance than those residing in

---

[3] The disparate impact standard is equally vital to eliminate unjustified discriminatory effects of insurance practices on the basis of other protected characteristics. *See, e.g.*, *Jones v. Travelers Cas. Ins. Co. of Am.*, No. 13-CV-02390, 2013 WL 4511648 (N.D. Cal. Aug. 22, 2013) (insurer ended coverage for rental property upon discovering it housed Section 8 tenants, resulting in alleged disparate impact on the basis of race, sex, age, and familial status); *Fuller v. Teachers Ins. Co.*, No. 06-cv-00438, 2007 WL 2746861 (E.D.N.C. Sept. 19, 2007) (denying motion to dismiss disparate impact claims based on insurer's cancellation of coverage for group home for people recovering from drug and alcohol addiction because of the unjustified adverse impact on individuals with mental and physical disabilities); Women's Law Project & Pennsylvania Coalition Against Domestic Violence, Insurance Discrimination Against Victims of Domestic Violence 4-7 (1998) (detailing property and casualty insurance policies that had disparate adverse impact on the basis of sex by precluding coverage for domestic violence victims).

predominantly white areas, and, where they do secure insurance, to pay higher premiums. A comprehensive study of the availability and price of homeowner's insurance in thirty-three metropolitan neighborhoods, conducted by the National Association of Insurance Commissioners (NAIC) in the mid-1990s, found that the racial composition of a neighborhood had a statistically significant relationship to the number and cost of insurance policies that could not be adequately justified based on actuarial risk factors. Robert W. Klein, *Availability and Affordability Problems in Urban Homeowners Insurance Markets*, *in* Insurance Redlining 44-45. Regression analysis showed that none of the potentially legitimate business explanations for those disparities, including loss costs, demographic variables, and housing characteristics, could account for the disparate racial impact. *See generally id.* at 43-78.[4]

When such policies with disparate effects cannot be justified by actuarial principles, the FHA requires the insurer to search for less-discriminatory alternatives. Yet it is misleading to assert, as Plaintiff does, that there is an "inherent conflict between disparate impact liability and insurers' use of actuarial risk factors." Pl.'s Br. at 13. An insurer's consideration of factors resulting in adverse effects will not give rise to disparate impact liability if those factors actually correlate to actuarial risk and there is no less-discriminatory means of achieving that goal. *See* 24 C.F.R. § 100.500(c); 78 Fed. Reg. at 11,475. It is therefore hard to fathom how the Discriminatory Effects Rule impedes insurance companies' "use of actuarial risk factors." A racially disproportionate effect that does not satisfy the rest of the disparate impact analysis is

---

[4] Findings at the local level echo NAIC's national research. One study found that homeowners in the most heavily minority areas of Rochester, New York received premiums nearly three times higher than in the surrounding towns, which were overwhelmingly white. *See* Barbara Van Kerkhove, *The Homeowners Insurance Gap: How Race and Neighborhood Composition Explain Cost and Access Disparities in Rochester and Monroe County, NY* at 3 (May 2005). After testing variables that might legitimately explain these differences, the report concluded that almost all of those variables had no correlation, or were negatively correlated, to racial disparities in premiums. *Id.* at 5; *see also* N.J. Citizen Action et al., *Insurance Redlining: Is It Happening in Your Neighborhood?* (Feb. 2004) (analysis of four New Jersey cities finding significantly higher costs of homeowner's insurance for Hispanic customers, and no significant variations in house price or unit size that accounted for this disparity).

*per se* insufficient to establish FHA liability.

The discussion below illustrates how several specific underwriting practices have been found to foster unjustified disparate impacts based on race.[5]  It also demonstrates how the disparate impact standard balances insurers' legitimate needs with the imperative of non-discrimination.

### 1.     *Maximum-age and Minimum-value Requirements*

Underwriting guidelines sometimes include a requirement that the insured dwelling not exceed a certain age.  As a result of residential segregation, however, such "maximum age" policies tend to disproportionately exclude homeowners in heavily minority neighborhoods.  As of 2011, 29.6% of all owner-occupied homes nationwide had been built prior to 1960, compared to 35.6% of African-American owner-occupied homes.  *See* U.S. Bureau of the Census, American Housing Survey for the United States: 2011 Table C-01-OO (2013) [hereinafter "American Housing"]; *see also Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 704 N.E.2d 667, 674 (Ohio Ct. Com. Pl. 1997) (discussing expert report showing maximum-dwelling-age guideline effectively excluded 92.6% of homes in African-American neighborhoods, but only 61.3% of homes in white neighborhoods); *see also* D.J. Powers, *The Discriminatory Effects of Homeowners Insurance Guidelines*, *in* Insurance Redlining at 126 (noting that age-of-home underwriting guidelines "represent[] one of the greatest barriers to homeowner's insurance for members of protected classes who are disproportionately located in older, inner-city neighborhoods and unable to afford the required improvements").

---

[5] This brief aims only to provide a general overview of some areas where FHA disparate impact enforcement is important in combating persistent discrimination, not to comprehensively detail the historic or continuing forms of discrimination in this sector.  For example, evidence suggests serious problems with discrimination not just in the availability of insurance or differences in premiums, but also in practices relating to the payment of claims, *see, e.g.*, Tom Baker & Karen McElrath, *Whose Safety Net? Home Insurance and Inequality*, 21 Law & Soc. Inquiry 229, 237 (1996), and other aspects of insurance policies.

Underwriting guidelines also may include a "minimum value" requirement – *i.e.*, homes must have a market value above a certain threshold in order to be eligible for homeowner's insurance. These policies also tend to have an adverse effect on racial minorities. In 2011, for example, 26.3% of all owner-occupied homes nationwide were valued at less than $100,000, but 40.7% of homes owned by African-Americans, and 35.7% of those owned by Latinos, fell below this threshold. *See* American Housing at Table C-13-OO; *see also* Powers, *in* Insurance Redlining at 126.

Fair housing enforcement at the state and federal level has led to a dramatic shift in these practices: most insurers no longer use maximum-age or minimum-value requirements in underwriting. *See, e.g.*, Consent Decree, *United States v. Am. Family Mut. Ins. Co.* and *NAACP v. Am. Family Mut. Ins. Co.* (Dep't of Justice July 13, 1995); *Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 705 N.E.2d 1 (Ohio Ct. Com. Pl. 1998); Stephen M. Dane, *The Potential for Racial Discrimination by Homeowners Insurers Through the Use of Geographic Rating Territories*, 24 J. Ins. Regulation 21, 21-22 (2006).[6] Plaintiff has certainly not explained how these reforms, enacted at least in part due to disparate impact principles, have proven inconsistent with sound actuarial practice.

### 2. Credit Scoring

In recent years, homeowner's insurance companies have shifted toward relying on specialized insurance credit scores as part of the underwriting process. *See Ojo v. Farmers Grp., Inc.*, No. CV 05-5818-JFW, 2006 WL 4552707, at *2 (C.D. Cal. Mar. 7, 2006), *rev'd and remanded*, 565 F.3d 1175 (9th Cir. 2009). Credit scoring is a blunt instrument, and its proponents within the insurance industry have had difficulty articulating why a homeowner with a lower credit score is more likely to cause a higher loss to her insurer. *See* National Consumer

---

[6] *Amici* note that the author of the cited article is counsel on this brief.

Law Center & Center for Economic Justice, Credit Scoring and Insurance: Costing Consumers Billions and Perpetuating the Economic Racial Divide 4 (June 2007) [hereinafter "Credit Scoring Report"][7];  Powers, *in* Insurance Redlining at 137 ("The use of credit history as an underwriting guideline offers an excellent example of how even the largest insurers use underwriting guidelines with little or no justification."); Birny Birnbaum, Insurers' Use of Credit Scoring for Homeowners Insurance In Ohio: A Report to the Ohio Civil Rights Commission 16-19 (Jan. 2003) [hereinafter "Insurers' Use of Credit Scoring"].

While justifications for credit scoring remain elusive, its adverse impact is clear: credit scoring has an enormously disproportionate impact on racial minorities.  *See* Insurers' Use of Credit Scoring at 19-21; Credit Scoring Report at 12-13 (collecting studies demonstrating racial disparity in credit scores); *see also Lumpkin v. Farmers Grp., Inc.*, No. 05-2868 Ma/V, 2007 WL 6996584, at *4 (W.D. Tenn. Apr. 26, 2007) (finding plaintiff made out prima facie case by alleging that racial minorities as a group have lower credit scores than whites, and racial minorities are therefore charged higher prices for identical policies).  For example, the Missouri Department of Insurance has found that, even when controlling for factors legitimately linked to actuarial risk, "race/ethnicity proved to be the most robust single predictor of credit scores; in most instances it had a significantly greater impact than education, marital status, income and housing values."  Brent Kabler, State of Missouri Department of Insurance, Insurance-Based Credit Scores: Impact on Minority and Low Income Populations in Missouri 11 (Jan. 2004).  The same report concluded, based on statistical modeling, that "African-American and Hispanic insureds had scores in the worst credit score group at a rate of about 30 percentage points higher than did other individuals."  *Id*. at 12.

---

[7] *Amici* note that one of the institutional authors of the cited report, the National Consumer Law Center, is *amicus* and also counsel on this brief.

Litigation challenging specific credit scoring policies demonstrates how the disparate impact standard operates effectively in practice to root out unjustified discrimination. In *DeHoyos v. Allstate Corp.*, No. CIV.ASA01CA1010FB, 2002 WL 1491650, at *1 (W.D. Tex. Apr. 5, 2002), *aff'd*, 345 F.3d 290 (5th Cir. 2003), for example, a nationwide class of African Americans and Latinos alleged that Allstate improperly factored credit information into a "secretive credit scoring formula" that caused non-white customers to be charged higher rates than their white counterparts. As part of a court-approved settlement agreement, Allstate was not required to abandon its credit-scoring formula entirely; rather, it agreed to adopt a new policy that had been extensively tested by plaintiffs' experts and did not result in the same disparate impact. *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 276 (W.D. Tex. 2007). While there are serious concerns about the use by insurers of credit scores apart from their disparate impact, this remedy demonstrates the central fallacy in Plaintiff's characterization of how disparate impact enforcement interacts with actuarial underwriting: disparate impact does not necessarily foreclose the use of any particular underwriting tool. Indeed, it may yield alternative methods of using that tool without generating unjustified racial disparities. This is the careful balance struck through the burden-shifting framework that the Discriminatory Effects Rule endorses. *See* 24 C.F.R. § 100.500(b).

## II.     PLAINTIFF'S ARGUMENT MISCHARACTERIZES THE RELATIONSHIP BETWEEN DISPARATE IMPACT ANALYSIS AND THE "BUSINESS OF INSURANCE."

### A.     The disparate impact standard prohibits discrimination in insurance practices that are not, in fact, "actuarially justified."

For the reasons described above, Plaintiff's attack on the Discriminatory Effects Rule, if successful, would seriously weaken antidiscrimination protections in a sector of the housing market where discrimination has long persisted. But even beyond this danger, the challenge to

the Discriminatory Effects Rule suffers from another fundamental defect: it proceeds from the unsound premise that there is a direct conflict between the Rule and the integrity of "actuarially justified" practices. Plaintiff asserts that "the foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." Pl.'s 56.1 Statement ¶ 27. Arguing that disparate impact analysis "impair[s]" the ability of insurers to sort by risk, Plaintiff intimates that disparate impact enforcement may cause the insurance industry to "cease to function altogether." Pl.'s Br. at 29. This is a highly distorted picture.

The "business of insurance" consists of much more than assessing the "risk of loss." Insurance companies direct sales teams and sales agents. They have marketing departments. They operate claims departments. They establish pricing strategies by taking into account both actuarial determinations and non-actuarial factors, such as profitability levels, competitor prices, rating territory boundaries, and trending assumptions. Any of these practices may result in unjustified race disparities. Plaintiff seeks to invalidate the application of the Discriminatory Effects Rule to *everything* the insurance industry does by reciting the mantra that "actuarial" principles govern their business, but those principles are relevant to just *some* aspects of that business. This overstatement highlights the ripeness concerns articulated in the Government's brief. *See* HUD Br. at 15-19. The "business of insurance" is not a unitary enterprise, designed to follow mechanically from actuarial calculations, but a cluster of related practices, many totally removed from actuarial calculation but nonetheless carrying the potential for discriminatory effects. Accordingly, the legal claims asserted by Plaintiff should be resolved in the context of ripe disputes involving specified business practices.

> **1.** **The "business of insurance" consists of many elements that are not actuarially based.**

Not all homeowner's insurance business practices are actuarially based. For example, marketing and advertising campaigns, sales techniques, agent office placements, insurance product design and benefits, and processes for settling claims and renewing policies are not based on actuarial analysis or modeling. Yet such business practices may have significantly different impacts on populations protected by the FHA. *See, e.g.*, Klein, *in* Insurance Redlining at 47-48 (identifying several non-risk related barriers that can influence the availability and affordability of homeowners insurance in urban markets, including agent bias, prejudicial views of decision-making personnel, adverse selection, agent commission structures, etc.); Jay D. Schultz, *Homeowners Insurance Availability and Agent Location*, *in* Insurance Redlining 83 (analyzing impact of agent locations on availability of insurance); Dana L. Kaersvang, *The Fair Housing Act and Disparate Impact in Homeowners Insurance*, 104 Mich. L. Rev. 1993, 2013-17 (2006) (identifying several insurer business practices with a disparate impact that may not be justified by business necessity).

Indeed, even insurance "underwriting guidelines," the rules that determine whether an applicant is eligible to purchase homeowner's insurance, may not be actuarially based. *See* Powers, *in* Insurance Redlining at 119 ("Today, we still find insurance companies making underwriting decisions based on all kinds of factors that have nothing to do with a statistically measured or measurable probability of risk." (quoting *S. Comm. on Banking, Hous., and Urban Affairs*, 103rd Cong. (1994) (statement of J. Robert Hunter, former Texas Insurance Commissioner))). "Underwriting guidelines are typically not the result of careful, statistical studies. Rather, they are often based on hunches and subjective stereotypes about classes of consumers and types and geographic location of property." *Id.* at 137; *see also generally id.* at

14

125-33. "Historically, underwriters have relied on experience, market knowledge, intuition and oral history more than statistical insights when evaluating risk." *See* Gail McGiffin, Are Underwriters Smarter Than Predictive Models? 3 (Ernst & Young, LLP 2013).

During the underwriting process, human judgment interacts with actuarial calculations. As a starting point, an underwriting score may be calculated based on actuarial criteria. *See* Donald Light, Transforming Underwriting: From Risk Selection to Portfolio Management 6-7, 12 (Celent, March 2004). The score is then subject to a discretionary review to determine whether the application is accepted, rejected, or in need of further review. *See id.* at 7. There is significant variation among insurers in how this process is actually implemented, and varying levels of quality control. *See id.* Even when underwriting scores are available, "half or more of the underwriting decisions may be ultimately made . . . by human underwriters." *Id.* at 7. *See also* McGiffin at 7 ("Few, if any, underwriting decisions are truly binary. That's why insurers still need teams of people who know how to balance the nuances of risk quality, emerging exposures, market contexts and competitive strategies as they make critical underwriting decisions.").

Further, actuarially-based insurance rates may be modified or ignored for reasons unrelated to risk. This is because state law generally permits insurance companies to modify their rates based on business judgment and competition. Indeed, the Casualty Actuarial Society's Statement of Principles Regarding Property and Casualty Insurance Ratemaking – which Plaintiff itself cites, Pl.'s Br. at 5 – acknowledges that, although the actuary's role is to derive an estimation of future costs resulting from the transfer of risk, "other business considerations are also a part of ratemaking"; those considerations may include marketing, underwriting, and finance. *See* Board of Directors of the Casualty Actuarial Society, Statement

15

of Principles Regarding Property and Casualty Insurance Ratemaking 4:143-44 (May 1988).  *See also* Dane, 24 J. Ins. Regulation at 24-27 (discussing aspects of the homeowner's insurance ratemaking function that allow for subjective and non-actuarial judgments).

For example, despite what a company's actuaries may determine is a fair and reasonable rate for a specific insurance product in a specific geographic rating territory based on expected loss costs, company executives may reject that determination for competitive reasons, *i.e.*, in order to beat a competitor's price and sell more policies.  *See, e.g.*, Meryl Golden & Mike Miller, Introduction to Price Optimization 7, 10 (Earnix 2014) (listing certain competitive adjustments that are often made to indicated loss costs during the rate setting process).  The actuarially-determined rates might be rejected or modified by business executives in order to penetrate (or withdraw from) a specific market.  *See id*. at 7.  Or they might be adjusted in response to agent input or customer responses.  *Id.*

### 2. *The disparate impact standard distinguishes between those aspects of the insurance business that are based on legitimate actuarial considerations and those that are not.*

Insurance companies do in fact make pricing and underwriting decisions that are affected by considerations other than risk.  These aspects of the insurance business have been found to cause racial disparities that cannot be explained by risk of loss.  *See e.g.*, Klein, *in* Insurance Redlining at 72-73 (concluding that the "relationship between race and the availability of insurance persists, even imperfectly controlling for the risk of loss.").  The purpose and effect of the disparate impact standard is to root out such practices, which cannot be justified on the basis of legitimate actuarial factors.

Indeed, measured against the reality of the insurance business, it is not surprising that the core claim advanced by Plaintiff here has been rejected by courts as overly "sweeping," *Nat'l*

*Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 60 (D.D.C. 2002),

and even "fanciful," *DeHoyos v. Allstate Corp.*, 345 F.3d 290, 297 n.5 (5th Cir. 2003). The court

in *Prudential* elaborated:

> Essentially, [Prudential's] argument turns on the purportedly unique nature of the insurance industry, which must "discriminate" based on an assessment of risk. However, this argument is unavailing in light of the availability of the "business justification" defense. Plaintiffs do not challenge Prudential's right to evaluate homeowners insurance risks fairly and objectively. Rather, plaintiffs allege that the underwriting policies and practices employed by Prudential are *not* purely risk-based. Furthermore, defendants cannot point to anything in the FHA itself that would justify this Court in carving out an exception for a particular type of organization.

208 F. Supp. 2d at 60. The Fifth Circuit similarly observed that the insurance industry's

"ominous" description of how disparate impact will force federal courts to act as "super

actuar[ies,] . . . although colorful, is incorrect." *DeHoyos*, 345 F.3d at 297 n.5. Courts are

regularly called upon to evaluate whether a practice with a disparate impact is nevertheless

justified by a business necessity, and the "attempt to distinguish the business of insurance from

other businesses is unpersuasive." *Id.* The court also noted that the supposed conflicts between

disparate impact enforcement and state insurance laws "are entirely conjectural." *Id.* at 299 n.7;

*see also Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, 1220-23 (11th Cir. 2001) (noting

that "Liberty National argues that racial discrimination is acceptable in the Alabama . . .

insurance context so long as those racial distinctions have an actuarial basis," and holding that

"[a]bsent more convincing evidence that racial discrimination in the insurance context is an

integral part of Alabama's regulatory scheme, Liberty National's argument must fail.").

The Seventh Circuit similarly observed, in *NAACP v. American Family Mutual Insurance

Company*, that insurers are no different from lenders when it comes to risk assessment. Like

insurers, lenders must evaluate risks, such as whether to extend credit in the first instance and

17

what rate of interest to charge. *Am. Family Mut. Ins. Co.*, 978 F.2d at 298-99. Yet, the FHA indisputably applies to lenders, so "it is difficult to see risk classification as a principled ground to exclude insurers" from disparate impact analysis. *Id.* at 299; *see also* Kaersvang, 104 Mich. L. Rev. at 2010-11 (discussing how empirical evidence undermines the argument that risk assessment by insurers differs from risk assessment by lenders and others).

* * *

Plaintiff's reliance on "actuarial necessity" as the linchpin of the "business of insurance" is a chimera in this context – a sophisticated-sounding catchphrase that ignores whole swaths of the insurance business that may cause discriminatory effects but which are outside the domain of actuarial science.[8] Accordingly, even if the court were to pause over Plaintiff's insistence that the disparate impact standard is in tension with actuarial analysis – and for reasons explained above, that premise is fatally flawed – that would still fail to justify Plaintiff's invitation to declare the Discriminatory Effects Rule inapplicable to the insurance industry as a whole.

### B. The prevalence of state law disparate impact enforcement further undermines Plaintiff's assertion that the Discriminatory Effects Rule is in conflict with the "business of insurance."

Plaintiff observes that insurance is primarily "state-regulated," and that the McCarran-Ferguson Act prohibits HUD from interpreting or applying the Act in a manner that would

---

[8] In addition to asserting that the Discriminatory Effects Rule interferes with the actuarial analysis that insurers purportedly rely on, Plaintiff complains that the Discriminatory Effects Rule poses an undue burden to its members because "[i]nsurers do not collect data about the race of their customers" and they would therefore be required to "collect demographic data" that they do not currently obtain. Pl.'s Br. at 22; Pl.'s 56.1 Statement ¶¶ 64, 71. But the Rule does not impose any new recordkeeping requirement, so homeowner's insurers are no different from other businesses that are subject to the FHA. Apartment managers do not record the race of housing applicants or tenants. Real estate sales agents do not record the race of their buyers. Although some lenders are required by federal law to collect and report racial and gender demographic data of loan applicants, 12 U.S.C. § 2803, they are not required to collect or report data about the other protected class characteristics (such as religion, disability, or familial status). In other words, a regulated entity's preexisting collection of demographic data is not a precondition for application of the disparate impact standard.

"invalidate and impair" state laws regulating the business of insurance. Pl.'s Br. at 2, 7, 16-24.[9] Plaintiff describes the Discriminatory Effects Rule as requiring insurers to satisfy a "*federal* burden-shifting standard,*" id.* at 18 (emphasis added), that will inevitably invalidate practices that are "permitted under state law," *id*. at 20.

The problem with this syllogism is that disparate impact analysis is not exclusive to federal law. Many states allow disparate impact fair housing claims, even against insurance companies, and thus disparate impact analysis does not necessarily "directly conflict" with state laws, as Plaintiff contends, *see, e.g.*, Pl.'s Br. at 2. Although it is true that states have historically been the primary regulators of insurance, and that the federal government has historically deferred to such state regulation, many state civil rights laws are in complete harmony with the federal Fair Housing Act. Indeed, many state fair housing laws have been deemed "substantially equivalent" to the FHA[10] and so, to the same extent as the federal law, would apply the principles of disparate impact to homeowners insurers.

For example, California, North Carolina, and the District of Columbia expressly provide by statute for disparate impact fair housing claims without exemptions for any particular type of business, including homeowner's insurers. *See* Cal. Gov't Code § 12955.8 (West 2012); N.C. Gen. Stat. § 41A-5(a)(2) (West 2009); D.C. Code § 2-1401.03 (2012). Additionally, several states' supreme courts have interpreted their state fair housing laws to encompass disparate

---

[9] Notably, almost all of Plaintiff's discussion in this section of its Memorandum is limited to insurer "rate-making" practices and filings, relying most heavily on a health insurance rate case filed under the ADA. *See, e.g.*, Pl.'s Br. at 19 (discussing *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557 (7th Cir. 1999)); *id.* at 7-9, 20-25 (discussing only risk-based "pricing" and "rates" and state regulation of "pricing"). Plaintiff conflates the different state regulatory standards that apply to *rate* filings (often, but not always, requiring state pre-approval) and those that apply to *underwriting* guidelines (rarely required to be filed or approved).

[10] *See* 42 U.S.C. § 3610(f) (allowing HUD to certify any state agency for referrals of complaints when the agency enforces fair housing rights that are "substantially equivalent" to the Fair Housing Act); the list of equivalent state jurisdictions is available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/fair_housing_equal_opp/partners/FHAP/equivalency (last visited Apr. 17, 2014).

impact claims, even if their statutes do not explicitly use that term. *See, e.g., Comm'n on Human Rights & Opportunities v. Sullivan Associates*, 739 A.2d 238, 255-56 (Conn. 1999); *Saville v. Quaker Hill Place*, 531 A.2d 201, 205-06 (Del. 1987); *Bowman v. City of Des Moines Mun. Hous. Agency*, 805 N.W.2d 790,798-99 (Iowa 2011); *Malibu Inv. Co. v. Sparks*, 996 P.2d 1043, 1050-51 (Utah 2000); *State of Indiana, Civ. Rights Comm'n v. Cnty. Line Park, Inc.*, 738 N.E.2d 1044, 1049 (Ind. 2000).

   *Toledo Fair Housing Center v. Nationwide Insurance Company* illustrates the problem with Plaintiff's characterization of how the Rule interacts with state law. In that case, a class of homeowners and a local fair housing agency sued Nationwide Insurance under Ohio state law for alleged redlining. Specifically, plaintiffs alleged that two of Nationwide's underwriting guidelines had a disparate impact on homeowners in African-American neighborhoods, and therefore violated the state's fair housing law. 704 N.E.2d at 670. Nationwide moved for summary judgment, arguing that a disparate impact approach would both "undermine[] the insurance business" and "conflict[] with the Ohio Insurance Code." *Id*. The court rejected both arguments, finding first that "the disparate impact approach does not unduly undermine the business of selling insurance" because the theory does not impede an insurer from showing a legitimate business justification. *Id*. Significantly, the court further found that disparate impact liability against an insurer "does not conflict with Ohio insurance law." *Id*. at 671.

   This and similar cases and state statutes refute Plaintiff's basic premise that the Rule generally "conflicts" with the state insurance laws. *See, e.g.*, Pl.'s Br. at 2. There may indeed be some situations where the McCarran-Ferguson Act will reverse-preempt a FHA claim challenging a specific insurance business practice in a specific state. But that determination can only be made on a case-by-case basis. Until the court is presented with such particularized facts,

it cannot invalidate the Rule in the abstract and immunize all insurance practices in all states.

*See, e.g.*, *Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010).

## CONCLUSION

For the reasons stated above, *Amici* urge the Court to grant Defendants' motion to

dismiss and/or for summary judgment and to deny Plaintiff's motion for summary judgment.

Dated: April 18, 2014                                     Respectfully Submitted,


                                                         */s/ Elizabeth Shuman-Moore*
                                                         Elizabeth Shuman-Moore (Atty. no. 6183639)
                                                         CHICAGO LAWYERS' COMMITTEE FOR
                                                         CIVIL RIGHTS UNDER LAW
                                                         100 North LaSalle Street, Suite 600
                                                         Chicago, IL 60602
                                                         Telephone: (312) 630-9744
                                                         Fax: (312) 630-1127

                                                         Dennis D. Parker
                                                         Laurence M. Schwartztol
                                                         Rachel E. Goodman
                                                         Peter W. Beauchamp
                                                         AMERCIAN CIVIL LIBERTIES UNION
                                                         FOUNDATION
                                                         125 Broad Street, 18th Floor
                                                         New York, NY 10004
                                                         Telephone: (212) 549-2500

                                                         Joseph D. Rich
                                                         Thomas Silverstein
                                                         LAWYERS' COMMITTEE FOR CIVIL
                                                         RIGHTS UNDER LAW
                                                         1401 New York Avenue, N.W., Suite 400
                                                         Washington, DC 20005
                                                         Telephone: (202) 662-8600
                                                         Fax: (202) 783-5113

                                                         Kim Keenan
                                                         Marshall Taylor
                                                         Victor Goode
                                                         NAACP OFFICE OF GENERAL COUNSEL

1156 15th Street, NW Suite 915
Washington, DC 20005
Telephone: (202) 463-2940
Fax: (202) 463-2953

James Hall
William H. Lynch
NAACP MILWAUKEE BRANCH
UNIT 3254
2745 N. Dr. Martin Luther King Drive
Suite 202
Milwaukee, WI 53212
Telephone: (414) 562-1000

Sherrilyn Ifill
Director-Counsel
Christina A. Swarns
ReNika C. Moore
Ria Tabacco Mar
NAACP LEGAL DEFENSE &
EDUCATIONAL
FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-2200

Stuart Rossman
BBO #430640
David Seligman
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th Floor
Boston, MA 02110
Telephone: (617) 542-8010

Morgan Williams
NATIONAL FAIR HOUSING ALLIANCE
1101 Vermont Ave. N.W., Suite 710
Washington, D.C. 20005
Telephone: (202) 898-1661

Stephen M. Dane
Glenn Schlactus
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, DC 20036
Telephone: (202) 728-1888
Fax: (202) 728-0848

Attorneys for *Amici Curiae*

22