**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:13-cv-08564 |
| v. | ) ) | Judge Amy J. St. Eve |
| SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) | Magistrate Judge Susan E. Cox |
| Defendants. | ) | |

## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF THE PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

Rowe W. Snider (# 03125194)
Ashlee M. Knuckey (# 6300237)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Tel.: (312) 443-0700
Fax: (312) 896-0336
Email: rsnider@lockelord.com

Seth P. Waxman (*pro hac vice*)
Brian M. Boynton (*pro hac vice*)
Matthew J. Tokson (*pro hac vice*)
Lynn Eisenberg (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: seth.waxman@wilmerhale.com

*Attorneys for Plaintiff*

May 16, 2014

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ................................................................................................ 1

ARGUMENT ....................................................................................................... 3

I.     HUD'S MOTION TO DISMISS FOR LACK OF STANDING IS
    MERITLESS ............................................................................................ 3

    A.     PCI's Members Have Standing As Parties Expressly Regulated By
    The Rule ........................................................................................ 3

    B.     PCI's Members Have Been Injured ............................................. 5

    C.     The Harm To PCI's Members Is Traceable To The Rule
    And Redressable ........................................................................... 9

II.     PCI'S MCCARRAN-FERGUSON ACT CHALLENGE IS RIPE ..................... 13

    A.     Fitness Of The Issues For Decision ........................................... 14

    B.     Hardship ..................................................................................... 17

III.     THE RULE VIOLATES THE MCCARRAN-FERGUSON ACT ....................... 18

    A.     The Disparate Impact Rule Is Invalid Under *Mutual of Omaha* ............... 19

    B.     The Rule Conflicts With Laws Permitting And Requiring Risk-Based
    Pricing ........................................................................................ 22

    C.     The Rule Would Invalidate And Impair State Regulatory Regimes .......... 26

    D.     None Of The Cases Cited By HUD Are Controlling Or Persuasive ......... 27

IV.     HUD'S FAILURE TO MEANINGFULLY CONSIDER THE MCCARRAN-
    FERGUSON ACT'S LIMITATION ON HUD'S POWER TO CONSTRUE
    THE FHA WAS ARBITRARY AND CAPRICIOUS ......................................... 28

V.     HUD'S FAILURE TO MEANINGFULLY CONSIDER THE RULE'S
    EFFECT ON INSURERS WAS ARBITRARY AND CAPRICIOUS ................ 32

    A.     HUD Failed To Meaningfully Address The Impact Of The Rule
    On Insurers .................................................................................. 32

    B.     HUD Summarily Dismissed An Exemption For Insurance And
    Failed To Confirm That Consideration Of Actuarial Risk Factors Is
    Legitimate ................................................................................... 34

VI.     HUD FAILED TO ADDRESS THE FILED-RATE DOCTRINE ....................... 35

VII.     THE RULE'S BURDEN-SHIFTING FRAMEWORK IS CONTRARY TO
    LAW ....................................................................................................... 37

CONCLUSION .................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbott Laboratories v. Gardner*,
    387 U.S. 136 (1967) ..................................................................................................13, 18

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ........................................................................................37

*Am. Bankers Ins. Co. of Fla. v. Inman*,
    436 F.3d 490 (5th Cir. 2006) ..........................................................................................14

*American Chemistry Council v. Department of Transportation*,
    468 F.3d 810 (D.C. Cir. 2006) ......................................................................................6, 7

*Ass'n of Private Sector Colleges & Univs. v. Duncan*,
    681 F.3d 427 (D.C. Cir. 2012) ......................................................................................6, 7

*Axiom Insurance Managers Agency, LLC v. Indemnity Insurance Corp.*,
    2011 WL 3876947 (N.D. Ill. 2011) ................................................................................21

*Camarena v. Safeway Ins. Co.*,
    2002 WL 472245 (N.D. Ill. 2002) ..................................................................................20

*Chamber of Commerce of U.S. v. Reich*,
    57 F.3d 1099 (D.C. Cir. 1995) ........................................................................................18

*Clean Air Implementation Project v. EPA*,
    150 F.3d 1200 (D.C. Cir. 1998) ......................................................................................18

*Cohen v. United States*,
    650 F.3d 717 (D.C. Cir. 2011) ........................................................................................18

*Datacor, Inc. v. Heritage Warranty Ins. Risk Retention Group, Inc.*,
    2009 WL 5062137 (E.D. Mo. 2009) ..............................................................................14

*Dehoyos v. Allstate Corp.*,
    345 F.3d 290 (5th Cir. 2003) .................................................................11, 17, 21, 27, 36

*Director, Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*,
    512 U.S. 267 (1994) ........................................................................................................38

*Doe v. Mutual of Omaha Insurance Co.*,
    179 F.3d 557 (7th Cir. 1999) ................................................................................ *passim*

*EEOC v. Benicorp Insurance Co.*,
    2000 WL 724004 (S.D. Ind. 2000) ................................................................................21

*Fund for Animals, Inc. v. Norton*,
    322 F.3d 728 (D.C. Cir. 2003) ...................................................................................3

*Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human Relations
    Commission*, 508 F.3d 366 (6th Cir. 2007) ....................................................34, 35

*Hettinga v. United States*,
    770 F. Supp. 2d 51 (D.D.C. 2011), *aff'd*, 677 F.3d 471 (D.C. Cir. 2012) .............13

*Humana, Inc. v. Forsyth*,
    525 U.S. 299 (1999) .......................................................................................15, 16, 25

*Hunt v. Washington State Apple Adver. Comm'n*,
    432 U.S. 333 (1977) ...................................................................................................3

*In re Managed Care Litig.*,
    185 F. Supp. 2d 1310 (S.D. Fla. 2002) ...............................................................14, 15

*Int'l Fabricare Inst. v. EPA*,
    972 F.2d 384 (D.C. Cir. 1992) ...................................................................................3

*Inv. Co. Inst. v. Commodity Futures Trading Comm'n*,
    891 F. Supp. 2d 162 (D.D.C. 2012) ...........................................................................6

*Koretoff v. Vilsack*,
    707 F.3d 394 (D.C. Cir. 2013) .................................................................................40

*La Barre v. Credit Acceptance Corp.*,
    175 F.3d 640 (8th Cir. 1999) ...................................................................................14

*Los Angeles Haven Hospice, Inc. v. Sebelius*,
    638 F.3d 644 (9th Cir. 2011) .....................................................................................3

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...................................................................................................3

*Lumpkin v. Farmers Group, Inc.*,
    2007 WL 6996584 (W.D. Tenn. 2007) ....................................................................36

*Lumpkin v. Farmers Group, Inc.*,
    2007 WL 6996777 (W.D. Tenn. 2007) ...............................................................17, 27

*Magner v. Gallagher*,
    132 S. Ct. 548 (2011) ...............................................................................................11

*McRaith v. American Re-Insurance Co.*,
    2010 WL 624857 (N.D. Ill. 2010) ...........................................................................21

*Metavante Corp. v. Emigrant Sav. Bank*,
    619 F.3d 748 (7th Cir. 2010) ........................................................................39

*Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cnty.*,
    325 F.3d 879 (7th Cir. 2003) ...................................................................13, 14

*Moab v. Gonzales*,
    500 F.3d 656 (7th Cir. 2007) ........................................................................24

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................28, 32

*NAACP v. American Family Mutual Insurance Co.*,
    978 F.2d 287 (7th Cir. 1992) ................................................................ *passim*

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    663 F.3d 470 (D.C. Cir. 2011) .................................................................12, 13

*Nat'l Fair Housing Alliance, Inc. v. Prudential Ins. Co. of Am.*,
    208 F. Supp. 2d 46 (D.D.C. 2002) ..................................................................11

*Nat'l Mining Ass'n v. U.S. Dep't of Interior*,
    70 F.3d 1345 (D.C. Cir. 1995).........................................................................8

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003)....................................................................................13

*Nationwide Mutual Insurance Co. v. Cisneros*,
    52 F.3d 1351 (6th Cir. 1995) .............................................................13, 16, 17

*Neighborhood Assistance Corp. v. CFPB*,
    907 F. Supp. 2d 112 (D.D.C. 2012) .................................................................11

*Nevels v. Western World Ins. Co.*,
    359 F. Supp. 2d 1110 (W.D. Wash. 2004).........................................................17

*NLRB v. Louis A. Weiss Mem'l Hosp.*,
    172 F.3d 432 (7th Cir. 1999) ........................................................................38

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998)....................................................................................18

*Ojo v. Farmers Group, Inc.*,
    356 S.W. 3d 421 (Tex. 2011).........................................................................10

*Ojo v. Farmers Group, Inc.*,
    600 F.3d 1205 (9th Cir. 2010) ..................................................................10, 31

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*,
    2010 WL 6019677 (7th Cir. 2010) .......................................................................4

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*,
    656 F.3d 580 (7th Cir. 2011) ................................................................... *passim*

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm.*,
    461 U.S. 190 (1983)..............................................................................................14

*Saunders v. Farmers Ins. Exch.*,
    440 F. 3d 940 (8th Cir. 2006) (*Saunders I*)..................................................16, 36

*Saunders v. Farmers Ins. Exch.*,
    537 F.3d 961 (8th Cir. 2008) (*Saunders II*) ..........................................10, 16, 27

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)........................................................................................24, 25

*Smith v. City of Jackson*,
    544 U.S. 228 (2005)..............................................................................................38

*State Civil Rights Comm'n v. County Line Park, Inc.*,
    738 N.E.2d 1044 (Ind. 2000) ...............................................................................25

*State National Bank of Big Spring v. Lew*,
    958 F. Supp. 2d 127 (D.D.C. 2013) ...................................................................5, 6

*Toledo Fair Housing Ctr. v. Nationwide Mutual Insurance Co.*,
    704 N.E.2d 667 (Ohio Ct. Com. Pl. 1997)...........................................................28

*Township of Mount Holly v. Mt. Holly Gardens Citizens in Action, Inc.*,
    133 S. Ct. 2824 (2013).........................................................................................11

*United Mine Workers of Am., Int'l Union v. Dole*,
    870 F.2d 662 (D.C. Cir. 1989) ............................................................................29

*United States v. Students Challenging Regulatory Agency Procedures*,
    412 U.S. 669 (1973)...........................................................................................5, 8

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989).......................................................................................37, 38

*Wisconsin Central, Ltd. v. Shannon*,
    539 F.3d 751 (7th Cir. 2008) ...............................................................................14

## FEDERAL AUTHORITIES

5 U.S.C.

§ 556(d) ................................................................................................37, 38, 39
§ 706(2)(C) ..............................................................................................29

15 U.S.C. § 1012(b) ...........................................................................25, 29, 31

24 C.F.R.

§ 100.70(d)(4) (2013) .............................................................................12
§ 100.500(b)(1) (2013) ...........................................................................35
§ 100.500(b) (2013) ...............................................................................32
§ 100.500(c)(2) (2013) ...........................................................................32
§ 100.500(c)(3) (2013) ...........................................................................33

76 Fed. Reg. 70921 (Nov. 16, 2011).................................................................4, 22

78 Fed. Reg. 11460 (Feb. 15, 2013) ............................................................... *passim*

## STATE AUTHORITIES

Ala. Admin. Code r. 482-1-127.06 .....................................................................23

Alaska Stat. § 21.36.460(c).............................................................................23

Ark. Code Ann. § 23-66-206(14)(C) ..................................................................23

Colo. Rev. Stat. § 10-3-1104(1)(f)(XIV) ...........................................................23

Conn. Gen. Stat. § 38a-689(a) ...........................................................................26

Del. Code Ann. tit 18, § 4124 ..........................................................................23

Fla. Admin. Code Ann. r. 69O-170.013(1)(b) ...................................................26

Ga. Code Ann. § 33-9-21(a) .............................................................................26

Ga. Code Ann. § 33-9-26 ..................................................................................26

Ind. Code Ann. § 27-1-22-5 .............................................................................26

Ind. Code Ann. § 27-2-17-5 .............................................................................22

Ind. Code Ann. § 27-2-17-5(b) .........................................................................23

Kan. Stat. § 40-955 (a), (l) ...............................................................................26

Ky. Rev. Stat. § 304.13-051(4) .................................................................26

Md. Code, Ins. § 27-501(c)(1) .....................................................................8

Md. Code, Ins. § 27-501(h)(2) ...................................................................26

24-A Me. Rev. Stat § 2938-A ....................................................................26

Mich. Comp. Laws Ann. § 500.2119 ..........................................................26

Mo. Code Regs. Ann. tit. 20, § 500-9.100 ...................................................26

N.J. Stat. Ann. § 17:22-6.14a1 ...................................................................26

N.J. Stat. Ann. § 17:29A-7 .........................................................................26

N.M. Stat. Ann. § 59A-17-5.1 ....................................................................26

N.Y. Ins. Law § 2802 .................................................................................23

Ohio Rev. Code Ann. § 3935.03(C) ............................................................28

Tenn. Code Ann. § 56-5-304(1) ..................................................................27

28 Tex. Admin. Code § 5.9342 ...................................................................26

Utah Admin. Code r. R590-127 ..................................................................26

Va. Code Ann. § 38.2-508(5) ......................................................................23

Vt. Stat. Ann. tit. 8, § 4688 ........................................................................26

W. Va. Code Ann. § 33-17A-6(h) ...............................................................23

W. Va. Code R. § 114-74-4 .........................................................................26

Wis. Admin. Code Ins. § 6.68 .....................................................................22

Wis. Admin. Code Ins. § 6.68(3)(a) ............................................................23

Wis. Stat. Ann. § 625.13 ............................................................................26

## INTRODUCTION

PCI's initial brief demonstrated that HUD's application of its Disparate Impact Rule to the pricing and provision of homeowners insurance fundamentally conflicts with state regulation of insurance in violation of the McCarran-Ferguson Act in multiple respects. PCI's members thus face an immediate and concrete clash of incompatible federal and state regulatory requirements for writing homeowners insurance—precisely what the McCarran-Ferguson Act was designed to prevent. HUD's brief submitted in support of its motion to dismiss and/or summary judgment and in opposition to PCI's motion for summary judgment offers no support for the agency's decision to apply disparate impact liability to homeowners insurance. As the Court of Appeals made clear in *Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557 (7th Cir. 1999), the McCarran-Ferguson Act precludes federal courts from being called upon to review and evaluate whether challenged insurance practices are actuarially sound and in compliance with state insurance regulation. But that is exactly what HUD's Rule would require. The Rule also directly conflicts with state laws that permit—and indeed require—the use of actuarial risk factors. As the Seventh Circuit explained in *NAACP v. American Family Mutual Insurance Co.*, 978 F.2d 287, 290 (7th Cir. 1992), disparate impact liability is fundamentally inconsistent with actuarial risk-based insurance. Likewise, the Rule impairs the comprehensive state regulatory regimes that vest state insurance commissioners with the authority and responsibility to review and approve the insurance practices subject to challenge under the Rule.

HUD is unable to justify its failure in the challenged rulemaking to meaningfully address the McCarran-Ferguson Act. The insurance industry submitted detailed comments explaining why the proposed rule violated the McCarran-Ferguson Act. Rather than consider that issue—as required under the APA—HUD simply deferred to the courts, boldly asserting without logic or

legal support that the McCarran-Ferguson Act does not govern agency interpretations of the law. HUD has now submitted a lengthy brief belatedly addressing the McCarran-Ferguson Act. In contrast, its discussion of the McCarran-Ferguson Act in the rulemaking itself was contained in a single paragraph. HUD also summarily rejected the insurers' request for an exemption from the Rule without ever addressing the Rule's impact on homeowners insurance. HUD did so, moreover, relying on authority that directly contradicted its position. HUD's refusal to exempt insurance is even more unreasonable given the Rule's one-sided burden-shifting framework.

Continuing its reluctance in the rulemaking to address the direct conflict between the Disparate Impact Rule and state regulation of insurance, HUD now goes to great lengths to avoid reaching the merits of this case. It first takes the position that the very insurance companies that HUD expressly subjected to the Rule lack standing. But where—as here—the parties bringing suit are the "objects" of the agency action being challenged, standing is "easily met." *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 585 (7th Cir. 2011). In these circumstances, standing is *presumed*. In any event, the administrative record and the declarations PCI has submitted make clear that its members will suffer imminent and significant injury if the Disparate Impact Rule applies to homeowners insurance. HUD's principal standing argument is that the injury to insurers is not "fairly traceable" to the Rule because the Rule supposedly merely confirmed preexisting law. But HUD's Rule has the binding force of law, and it clearly does much more than just confirm previously settled law.

HUD's other threshold defense—that PCI's challenge is not ripe for review because McCarran-Ferguson Act challenges can only be brought on a case-by-case basis—is equally flawed. HUD does not cite a single case holding that McCarran-Ferguson Act challenges must always be brought on a case-by-case basis. It is well established that purely legal challenges to

agency regulations are presumptively fit for review and the regulated party need not make a separate showing of hardship. Here, PCI's purely legal challenges to the Rule under the McCarran-Ferguson Act and the APA do not turn on particular *facts* and do not require the Court to consider specific applications of the Rule to certain insurers.

PCI does not challenge the application of the FHA to insurance insofar as it prohibits intentional discrimination. Disparate impact liability, however, is not compatible with risk-based pricing and underwriting, which are already comprehensively regulated under state law. HUD's refusal to exempt the pricing and underwriting of homeowners insurance from the Rule conflicts with the McCarran-Ferguson Act, was arbitrary and capricious, and should be vacated.

## ARGUMENT

## I. HUD'S MOTION TO DISMISS FOR LACK OF STANDING IS MERITLESS

HUD does not dispute that PCI meets the requirements for associational standing as long as at least one of its members has Article III standing. *See* HUD Br. 11-12; *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343-44 (1977); (Gordon Decl. ¶ 4). But HUD takes the untenable position that the insurance companies to which the Disparate Impact Rule applies somehow lack standing to challenge it. HUD's contention is wrong in numerous respects.

### A. PCI's Members Have Standing As Parties Expressly Regulated By The Rule

When "the plaintiff is himself an object of the [agency] action (or forgone action) at issue … there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). Parties regulated by an agency's rules "clearly … have standing to bring their challenges" to it. *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 390 (D.C. Cir. 1992); *see also, e.g.*, *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 734 (D.C. Cir. 2003); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011).

The Seventh Circuit in *Owner-Operator*, 656 F.3d at 585, held that regulated parties "easily met" the standing requirement because they were the "objects" of the regulation at issue. The Court rejected the argument that the regulated party's injury was speculative because the party would not actually be harmed unless it was found to have violated the applicable regulations. *Id*. In that case, the Federal Motor Carrier Safety Administration (FMCSA) promulgated a regulation requiring the use of electronic engine monitors by companies found to have violated rules regarding the maximum number of working hours per day for truck drivers. *Id.* at 582-84. The government argued that an organization representing truckers lacked standing to challenge the regulation because none of its members had yet been found to have violated the regulation and forced to install an electronic monitor. *Id.* at 586-87; *see* Br. for Resp. *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 2010 WL 6019677, at *13 (7th Cir. 2010). The Court rejected this argument, concluding that the point of the regulation was to motivate trucking companies to reduce the amount of time drivers spent at the wheel, so as to avoid having to install electronic monitors. 656 F. 3d at 586; *see id.* at 587 (regulation "is meant to induce the trucking industry to change their behavior or risk costly sanctions").

Under this well-settled precedent, PCI unquestionably has standing because its members are the "objects" of the regulation at issue. (*See* HUD Br. 12 (agreeing that insurers are parties regulated under the Rule and the objects of HUD's action).) In its proposed rule, HUD expressly listed "the provision and pricing of homeowner's insurance" as one example of "a housing policy or practice that may have a disparate impact" under the Rule. 76 Fed. Reg. 70921, 70924 (Nov. 16, 2011) (A.R. 4); (Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts ¶ 11, Dkt. No. 21-1 ("Pl. SUMF").) In the final rule, HUD confirmed that homeowners insurance is covered by the Rule. 78 Fed. Reg. 11460, 11475 (Feb. 15, 2013) (A.R. 627). The Rule has the

force of law and, as was the case for the trucking companies in *Owner-Operator*, will require PCI's members either to change their behavior or risk costly sanctions. *See* 656 F.3d at 586-87.

HUD relies on (at 12) *State National Bank of Big Spring v. Lew*, 958 F. Supp. 2d 127 (D.D.C. 2013), but that case actually *supports* PCI's standing arguments. In *State National Bank*, a bank challenged the portion of the Dodd-Frank Act creating the Consumer Financial Protection Bureau (CFPB). *Id.* at 127. In finding that the bank lacked standing, the court noted that merely being "subject to the authority of [an] agency" with the hypothetical power to regulate banks did not confer standing on the bank, which had not actually been regulated by any CFPB rule. *Id.* at 150. The court acknowledged, though, that a party actually subject to a rule or enforcement action would have standing to challenge it. *Id.* at 150 & n.18. Here, homeowners insurers are directly regulated under HUD's Rule and therefore have standing to challenge it.

## B.  PCI's Members Have Been Injured

The factual record before the Court further confirms PCI's standing. Although even the smallest injuries establish standing, *see, e.g.*, *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973), PCI's members' declarations and facts in the administrative record demonstrate that they will suffer substantial, imminent harm if HUD's decision to apply the Disparate Impact Rule to homeowners insurance is not set aside.

There can be no dispute that the Rule imposes significant compliance costs on PCI's members. PCI and its members have already "expended substantial resources analyzing the Rule and potential compliance with the Rule" and will be forced to "continue to expend substantial resources analyzing these issues" if the Rule is not set aside. (Pl. SUMF ¶ 73; Gordon Decl. ¶ 7.) HUD does not dispute that PCI and its members have incurred these costs. (Defendants' Response to Plaintiff's Rule 56.1 Statement of Undisputed Material Facts ¶ 73, Dkt. No. 29-1 ("Defs. SUMF Resp.").) Instead, citing the *State National Bank* case, HUD argues (at 12-13)

that costs incurred "to determine *whether* [a party] needs to satisfy a legal mandate" do not give rise to standing. But in this case, there is no debate over *whether* PCI's members need to satisfy the Disparate Impact Rule. (*See* HUD Br. at 12 (agreeing that insurers are parties regulated under the Rule and the objects of HUD's action).) *State National Bank* is thus wholly inapposite. In that case, the plaintiff bank pointed to costs incurred "monitoring CFPB proposals and actions to determine *if* the Bureau will take any actions that will affect the Bank." 958 F. Supp. 2d at 153 (emphasis in original). Here, HUD has already taken action that *will* affect insurers, and insurers have expended resources analyzing how to *comply* with the Disparate Impact Rule. Compliance expenses incurred by PCI's members clearly confer standing. *See Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 457-58 (D.C. Cir. 2012); *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 891 F. Supp. 2d 162, 185 (D.D.C. 2012).

Moreover, as PCI explained in its Statement of Undisputed Material Facts, "[t]o attempt to comply with the Rule, insurance companies would be required to incur expense collecting demographic data that they do not currently obtain from their customers and analyzing that data to determine whether their use of facially neutral underwriting and rating factors have a disparate impact." (Pl. SUMF ¶ 71.) Other than to dispute that this expense is traceable to the Rule (an issue discussed below), HUD's only response is to argue that comments in the administrative record "are not evidence of injury at the summary judgment stage." (Defs. SUMF Resp. ¶ 71.) But the case HUD cites, *American Chemistry Council v. Department of Transportation*, 468 F.3d 810 (D.C. Cir. 2006), recognized that standing *can* be established from facts in the administrative record. The *American Chemistry* court noted that declarations are required only where standing is not evident "'from the administrative record.'" *Id.* at 819. And it indicated that standing can be shown from "declarations *or citations to the record* from petitioners that establish a concrete

6

harm to one of petitioners' members." *Id.* at 820 (emphasis added). On the specific facts of that case, the court concluded that the comments in the administrative record did not establish standing. *See id.* at 819. But the case does not purport to impose a categorical rule barring reliance on comments in an administrative record for purposes of establishing standing.

HUD suggests in its motion to dismiss (at 13) that the declaration submitted with PCI's motion failed to set forth enough "specific" facts supporting the injury to its members. While that declaration was more than sufficient, particularly given PCI's members' status as regulated parties, PCI has submitted additional detailed declarations in response to HUD's motion to dismiss that further demonstrate the specific harm the Rule imposes on its members. As explained in those declarations, PCI's members do not currently collect data on the race, color, religion, national origin, or disability of their policyholders. (Decl. of Teresa C. Cracas ¶ 6; Decl. of Michael Dawdy ¶ 11; Decl. of Ronald Zaleski, Sr. ¶ 11; Decl. of Peter Drogan ¶ 7.) In order to ensure compliance with the Disparate Impact Rule, PCI's members would have to start collecting and analyzing this kind of data. (Cracas Decl. ¶ 7; *see* Dawdy Decl. ¶ 14.) Collecting, storing, and analyzing this data would impose significant expenses on insurers. (Cracas Decl. ¶ 8-12; Dawdy Decl. ¶ 14; Zaleski Decl. ¶ 18; Drogan Decl. ¶ 11.) Among other things, it would require modification of insurers' business practices and computer systems. (Cracas Decl. ¶ 10-12; Dawdy Decl. ¶ 14.) Insurers would also be required to continuously monitor the data they collect to ensure continued compliance. (Cracas Decl. ¶ 12.) These additional expenses should come as no surprise to HUD. It recognized in the rulemaking that covered entities will have to "conduct consistent self-testing and compliance reviews" to ensure compliance. 78 Fed. Reg. at 11472 (A.R. 624). The compliance costs alone are more than sufficient to establish injury. *See Ass'n of Private Sector Colleges & Univs.*, 681 F.3d at 457-58 (costs to implement new

compliance procedures give rise to standing); *Owner-Operator*, 656 F. 3d at 586 (plaintiff need

not have already spent money to comply with regulations before challenging them).

The administrative record also shows that the Rule will significantly harm insurers by

requiring them to fundamentally change the way they do business.  HUD does not dispute that

"[t]he ability to consider actuarially justified risk factors is critical to the business of insurance."

(Defs. SUMF Resp. ¶ 68.)  And the administrative record shows that "[i]f the Rule remains in

effect, insurers' ability to consider actuarially justified risk factors in underwriting and rating

insurance will be impaired."  (Pl. SUMF ¶ 69; *see also* Zaleski Decl. ¶ 19-20; Drogan Decl.

¶ 14.)  Consequently, the Rule would "prevent accurate risk assessment, result in adverse

selection, and reduce insurance coverage, all of which would injure homeowners' insurers."  (Pl.

SUMF ¶ 70.)  HUD argues that insurers will not face liability if they have a "legally sufficient

justification" for their actions.  (Defs. SUMF Resp. ¶¶ 69-70.)  But, as PCI has explained (*see*

PCI Br. 23), HUD's one-sided burden-shifting framework ensures that insurers *will* face liability

for using legitimate actuarial risk factors if HUD or a plaintiff can point to some other factor that

serves the same general function even if it is less predictive than the challenged factor.  (*See* PCI

Br. 34-35.)  Moreover, the cost of litigating the defense would itself suffice to show injury in

fact.  (Cracas Decl. ¶ 13); *Students Challenging*, 412 U.S. at 689 n.14.

Finally, the Rule injures PCI's members by subjecting them to competing state and

federal standards.[1]  *See infra* Part III; (Dawdy Decl. ¶¶ 6-9,; Drogan Decl. ¶ 9; Zaleski Decl. ¶¶

11-17).  This inflicts a cognizable injury.  *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d

---

[1] Some of PCI's members write homeowners insurance policies in Maryland.  (*See* Dawdy Decl.
¶ 11; Zaleski Decl. ¶ 5; Drogan Decl. ¶ 8.)  Maryland law prohibits the collection of data on the
race, creed, color, or national origin of insurance customers.  Md. Code, Ins. § 27-501(c)(1).  In
order to comply with the Disparate Impact Rule, however, insurers would have to collect this
data.  The Rule therefore subjects PCI's members to conflicting obligations under state and
federal law.  (Dawdy Decl. ¶ 13; Zaleski Decl. ¶ 17; Drogan Decl. ¶ 8.)

1345, 1349 (D.C. Cir. 1995) (conflicting obligations under federal and state law caused injury).

### C. The Harm To PCI's Members Is Traceable To The Rule And Redressable

According to HUD, the Disparate Impact Rule is meaningless—it merely "confirms preexisting legal requirements." (HUD Br. 14.) HUD argues (at 13) that the harm to PCI's members from "having to collect demographic data and to 'identify' and 'disregard' pricing and underwriting factors that could have a disparate impact" is the result of "the longstanding administrative and judicial recognition of disparate impact liability under the FHA and the coverage of insurers under the FHA." This argument fails in numerous respects.

*First*, until HUD applied the Rule to insurance, it was an open question in this Circuit whether disparate impact liability under the FHA applied to insurance. As HUD recognizes (at 13 n.9), the Seventh Circuit has expressly "declined to decide whether the FHA provide[s] for disparate impact claims involving insurance." Indeed, the Court has voiced significant skepticism about the application of disparate impact liability to insurance:

> [W]e must assume that the plaintiffs can establish disparate treatment and not just a disparate impact of decisions made on actuarial grounds. The distinction is important not only because the Supreme Court has yet to decide whether practices with disparate impact violate Title VIII, but also because of the nature of insurance. Insurance works best when the risks in the pool have similar characteristics. … Putting young and old, or city and country, into the same pool would lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out. A single price for term life insurance would dissuade younger persons from insuring, because the price would be too steep for the coverage offered; the remaining older persons would pay a price appropriate to their age, but younger persons would lose the benefits of insurance altogether. To curtail adverse selection, insurers seek to differentiate risk classes with many variables. … Risk discrimination is not race discrimination.

*NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) (citation omitted).

In light of these concerns, the Seventh Circuit in *American Family* went out of its way to make clear it was *not* deciding whether disparate impact could apply to insurance: "All we decide is

whether the complaint states claims on which the plaintiffs may prevail if they establish that the insurer has drawn lines according to race rather than actuarial calculations." *Id.* at 291.[2]  The Seventh Circuit still has not resolved whether disparate impact applies to insurance.

The Eighth Circuit has also expressly declined to decide whether disparate impact liability applies to insurers.  *See Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 964 (8th Cir. 2008) (*Saunders II*) (noting the Court had "recognized a disparate impact Fair Housing Act claim against private actors in another context" but acknowledging that, "at least with respect to insurers, the question is not free from doubt" and expressly declining to reach the issue because the argument had not been raised).  In fact, although most courts of appeals have recognized disparate impact liability in some form under the FHA, there is very little authority for the application of disparate impact liability to insurers under the FHA.

The principal support cited by HUD (at 5-6) is testimony to Congress in 1994 by HUD's Assistant Secretary for Fair Housing and Equal Opportunity and a single paragraph of a *complaint* filed by the United States in Ohio in 1997.  HUD also cites the Ninth Circuit's decision in *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205 (9th Cir. 2010), but the FHA challenge in that case was ultimately rejected because the McCarran-Ferguson Act preempted the application of disparate impact liability.  *See Ojo v. Farmers Group, Inc.*, 356 S.W. 3d 421, 434-35 (Tex. 2011).  The only arguable support for the application of disparate impact liability under the FHA to insurance that HUD can muster are decisions from the Fifth Circuit and the D.C. District Court, neither of which addressed the McCarran-Ferguson Act challenge PCI raises here.  (*See*

---

[2] HUD's amici suggest that *American Family* held that "'it is difficult to see risk classification as a principled ground to exclude insurers' from disparate impact analysis."  Dkt. No. 33 ("Amici Br.") at 18.  But the quote is from a portion of the opinion holding that insurers could be covered by the FHA if they engaged in *intentionally discriminatory treatment*.  978 F.2d at 298-99.

HUD Br. 6); *Nat'l Fair Housing Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46 (D.D.C. 2002); *infra* p. 27 (discussing *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003)).

Thus, prior to promulgation of the Rule, it was not established that disparate impact liability could lawfully be imposed on insurers—especially in the Seventh and Eighth Circuits, where courts had expressly left that issue open. PCI's members do business in those circuits. (*See, e.g.*, Gordon Decl. ¶ 3; Dawdy Decl. ¶ 4; Zaleski Decl. ¶ 5; Cracas Decl. ¶ 3.) The fact that HUD's Rule purports to change the law in these circuits (as well as the many circuits where no court has addressed whether disparate impact liability can be applied to insurance) means that PCI's members are harmed by, and therefore have standing to challenge, the Rule. *See, e.g.*, *Neighborhood Assistance Corp. v. CFPB*, 907 F. Supp. 2d 112, 122 (D.D.C. 2012) (plaintiffs had "identified jurisdictions where the Final [Rule] … is the cause of their injury").

*Second*, before the Rule, it was not even established that disparate impact is a viable theory of liability under the FHA. The Supreme Court has not decided the issue. The Court granted certiorari in two cases addressing whether disparate impact liability can be imposed under the FHA, *Magner v. Gallagher*, 132 S. Ct. 548 (2011) and *Township of Mount Holly v. Mt. Holly Gardens Citizens in Action, Inc.*, 133 S. Ct. 2824 (2013). But both cases settled before the Court could issue a decision. Although most courts of appeals have held that disparate impact liability is available under the FHA, HUD acknowledges (at 5 n.1) that the D.C. Circuit has not addressed the issue. As a result, the Rule necessarily does more than confirm preexisting legal requirements in the District of Columbia, where several of PCI's members do business. (*See* Zaleski Decl. ¶ 5; Drogan Decl. ¶ 4.) That alone is sufficient to show that the Rule is the cause of PCI's members' injury. *Neighborhood Assistance Corp.*, 907 F. Supp. 2d at 122.

*Third,* the Rule changes the law by modifying the burden-shifting framework applicable

to disparate impact claims. HUD concedes that before the Rule, there was "variation in how courts evaluated the evidence to assess liability in a disparate impact case." (HUD Br. 6-7 (claiming the variation was "minor")). Although most courts "had adopted a three-step burden-shifting approach," HUD acknowledges (at 7) that "the Seventh Circuit applied a four-factor balancing test." Thus, the Rule creates new law in this Circuit on this point as well.

*Fourth*, the Rule applies disparate impact liability under the FHA to *homeowners* insurance, *see* 78 Fed. Reg. at 11475 (A.R. 627), whereas HUD's prior regulation applied the FHA just to "property or hazard insurance," which is merely one component of a homeowners insurance policy. 24 C.F.R. §100.70(d)(4) (2013); (Dawdy Decl. ¶ 5; Drogan Decl. ¶ 5).

*Finally*, HUD's position that the Rule has no effect on PCI's members ignores the fact that it is a *binding regulation*. HUD relies on a D.C. Circuit case holding that the issuance of a permit that merely signaled that the Army Corps of Engineers believed it had certain jurisdiction under the Clean Water Act "in no way aggravated" the plaintiff's "risk of sanctions" and thus did not give rise to standing. *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 663 F.3d 470, 474 (D.C. Cir. 2011) (noting that the Corps had already established that it considered some upland ditches to be federal waters in a notice issued seven years earlier). That holding does not apply in this situation where HUD has promulgated a new regulation with the force of law. The Rule is binding on insurers and makes it more likely that PCI's members will face actions by HUD and private parties. Indeed, HUD has already begun to take action against insurers under the new Rule.[3] Because the Rule has " increased the threat" of harm to PCI's members and vacatur of the Rule would "in [some] way diminish the threat they face," PCI's

---

[3] HUD served Travelers Casualty Insurance Company with an administrative complaint alleging disparate impact liability on July 18, 2013, five months after the promulgation of the Rule. Decl. of Peter Schwartz in Supp. of Pls. Opp. to Defs. Motion to Dismiss, *Am. Ins. Ass'n v. U.S. Dep't of Housing and Urban Dev.*, No. 13-cv-00966, Dkt. 27-1, at ¶¶ 5, 7 (D.D.C. Feb. 24, 2014).

members have standing to challenge the Rule. *Id.* In *Hettinga v. United States*, 770 F. Supp. 2d 51 (D.D.C. 2011), the court held that plaintiffs had standing to challenge a statutory cap on milk production even though USDA regulations already imposed an identical cap. *Id.* at 56-57. The passage of a statute created new federal law, directly regulated the challenging party, and made it less likely that the cap would be withdrawn or changed. The same is true in this case: HUD has created new federal law, directly regulating PCI's members, and made it less likely that disparate impact liability will be withdrawn or overturned. PCI could thus challenge the Rule even if other sources of law did "impose identical restraints." *Id.* at 57.[4]

## II.     PCI'S MCCARRAN-FERGUSON ACT CHALLENGE IS RIPE

There is no support for HUD's contention that PCI's McCarran-Ferguson Act challenge to the Rule (Count I) is not ripe for review and that McCarran-Ferguson Act challenges can only be brought on a case-by-case basis. *See* HUD Br. 15-19 (ripeness), 20-23 (merits).[5] In deciding whether a challenge to agency action is ripe, courts consider two factors: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Since this test was established in *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), "pre-enforcement review of final rules has become the norm." *Owner-Operator*, 656 F.3d at 586; *see also* HUD Br. 16. Purely legal questions are presumptively fit for review. *Owner-Operator*, 656 F.3d at 586; *Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cnty.*, 325 F.3d 879, 882 (7th Cir. 2003). Here, PCI's claims are fit for immediate adjudication under these standards.

---

[4] Citing an amicus brief filed by other insurance associations supporting Supreme Court review of the decision in *Nationwide Mutual Insurance Co. v. Cisneros*, 52 F.3d 1351 (6th Cir. 1995), HUD suggests that insurers were concerned about disparate impact liability in 1996. The Sixth Circuit's decision, however, did not establish that disparate impact could apply to insurance. It noted that "HUD has never applied a disparate impact analysis to insurers." *Id.* at 1362.

[5] HUD does not dispute that PCI's claims that HUD acted arbitrarily and capriciously are ripe.

A.     **Fitness Of The Issues For Decision**

HUD concedes that this case presents only legal issues.  (HUD Br. 16 (McCarran-Ferguson challenge is "a legal challenge to a final regulation"); Defs. SUMF Resp. at 1-2 (the case involves "purely legal" questions and therefore does not require fact-finding).)  Indeed, it is well settled that a preemption challenge raises "almost purely legal issues" that are "quintessentially fit" for present judicial resolution.  *Metro. Milwaukee*, 325 F.3d at 882; *see Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm.*, 461 U.S. 190, 201 (1983) ("The question of pre-emption is predominantly legal" and thus ripe for judicial resolution).  HUD cites (at 16-17) *Wisconsin Central, Ltd. v. Shannon*, 539 F.3d 751 (7th Cir. 2008), but that case does not support HUD's position.  The court there noted that "[i]ssues of express or field preemption are generally purely legal questions, where the matter can be resolved solely on the basis of the state and federal statutes at issue," *id.* at 759, but explained that the Railway Labor Act is an exception because it requires a court to determine whether the interpretation of a collective bargaining agreement is involved in a claim, *id.* at 757-58.

Courts often strike down federal laws that conflict with state insurance laws under the McCarran-Ferguson Act where the basis for preemption is clear as a matter of law without reference to specific facts, as is the case here.  *See, e.g.*, *Am. Bankers Ins. Co. of Fla. v. Inman*, 436 F.3d 490, 492 (5th Cir. 2006) (Federal Arbitration Act (FAA) conflicts with Mississippi insurance law and therefore preempted under McCarran-Ferguson as a matter of law); *La Barre v. Credit Acceptance Corp.*, 175 F.3d 640, 643 (8th Cir. 1999) (RICO claims conflict with Minnesota law and therefore preempted under McCarran-Ferguson as a matter of law); *Datacor, Inc. v. Heritage Warranty Ins. Risk Retention Group, Inc.*, 2009 WL 5062137 (E.D. Mo. 2009) (FAA conflicts with Nebraska insurance law and therefore preempted under McCarran-Ferguson as a matter of law); *In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1315 (S.D. Fla. 2002)

14

(insurance laws in Florida, New Jersey, California, and Virginia preempt application of RICO claims to insurers). The fact that PCI has identified substantially similar laws from multiple states does not disable this Court from making legal determinations about whether those state laws conflict with HUD's Rule. *See In re Managed Care Litig.*, 185 F. Supp. 2d at 1315 (holding that non-identical insurance laws in multiple states broadly preempt the application of RICO claims to insurers in each of those states). As explained in more detail below, the Seventh Circuit held in *Mutual of Omaha*, 179 F.3d at 564, that federal courts cannot be called upon to review whether challenged insurance practices are actuarially sound and in compliance with state insurance regulation. That, however, is precisely what HUD's Rule does in every case involving the provision and pricing of homeowners insurance by requiring insurers to put forward a business justification for the use of every underwriting and rating factor that happens to have a disparate impact. Moreover, HUD does not dispute that state insurance laws generally permit— and indeed require—consideration of actuarial risk factors. *See infra* Part III.B. PCI's McCarran-Ferguson Act challenge thus presents a purely legal question that is fit for review.

HUD's suggestion (at 17 & 20-21) that *Humana, Inc. v. Forsyth*, 525 U.S. 299 (1999), held that a McCarran-Ferguson Act claim can be decided only by analyzing a specific claim brought under a potentially offending statute is incorrect. In *Humana*, the Court happened to be faced with particular RICO claims asserted against a health insurer in Nevada. Accordingly, the Court indicated that the question presented by the case was: "Would RICO's application to the … claims at issue 'invalidate, impair, or supersede' Nevada's laws regulating insurance?" *Id.* at 307; *see* HUD Br. 20. The Court then applied the relevant legal standard "to the facts of th[e] case" before it. 525 U.S. at 311. That routine exercise of deciding the case before it in no way supports the sweeping conclusion that McCarran-Ferguson Act challenges can *only* be

brought on a case-by-case basis when a particular law has been enforced against an insurer.[6]

HUD also relies on snippets of dicta from the Eighth Circuit's *Saunders* decisions that suggest that whether a statute violates McCarran-Ferguson is a "fact-specific issue." (HUD Br. 17, 21); *see Saunders v. Farmers Ins. Exch.*, 440 F. 3d 940, 945 (8th Cir. 2006) (*Saunders I*); *Saunders II*, 537 F.3d at 967. But the actual McCarran-Ferguson analysis in *Saunders*—conducted at the motion to dismiss stage—was anything but fact-specific. Instead, the Eighth Circuit held that Missouri insurance laws providing for review of insurance filings conflict with and preempt disparate impact claims against insurers in Missouri. *Saunders II*, 537 F.3d at 968. The analysis was not limited to any factual context; it applied to all potential disparate impact claims against insurers in Missouri. HUD (at 17) quotes *Saunders II* as saying that a statute "might 'impair' state insurance laws when applied in some ways, but not in others." But the full quote from the decision actually *supports* PCI's position, making clear that the court was merely drawing a distinction between disparate *treatment* claims and disparate *impact* claims:

> Federal civil rights statutes are drafted broadly, so a statute might 'impair' state insurance laws when applied in some ways, but not in others. [A] federal claim alleging that an insurer's coverage denial was the product of overt racial animus would doubtless be in harmony with state insurance regulation, while a suit challenging the racially disparate impact of industry-wide rate classifications may usurp core rate-making functions of the State's administrative regime.

537 F.3d at 967.

The other cases HUD cites (at 18, 21-22) are equally inapposite. *Nationwide Mutual Insurance Co. v. Cisneros*, 52 F.3d 1351 (6th Cir. 1995), dealt with a challenge to the HUD regulation applying the FHA to insurance. The plaintiffs argued that HUD might try to use a disparate impact theory in the future even though the rule did not mention it. *Id.* at 1362. HUD

---

[6] *Humana* had no occasion to address the issue of ripeness or to consider whether a pre-enforcement challenge to an agency rule violating the McCarran-Ferguson Act would be ripe.

argued "that because it has never applied a disparate impact approach to insurance providers, this issue is not ripe for review." *Id.* at 1361. The court found the plaintiffs' McCarran-Ferguson argument unripe because the regulation did not impose disparate impact liability on anyone. *Id.* at 1362. The court explained: "HUD has never applied a disparate impact analysis to insurers. Plaintiffs rely on the possibility that HUD might so apply its regulation in the future." *Id.* HUD has now done exactly that. Because HUD's Rule expressly applies disparate impact liability to insurance, a challenge to the Rule is clearly ripe under *Nationwide*'s reasoning.

*Dehoyos v. Allstate Corp.*, 345 F.3d 290, 299 n.7 (5th Cir. 2003), did not even discuss ripeness. Rather, it addressed the merits of the defendants' McCarran-Ferguson Act defense. The court focused primarily on claims for intentional discrimination rather than disparate impact. *See id.* at 295-97 (discussing disparate treatment cases), 299 n.7 ("We therefore decline to differentiate claims of disparate impact and claims of intentional discrimination at this preliminary stage of litigation."). In rejecting the McCarran-Ferguson defense, the court found that the defendants had not "identif[ied] a state law or policy that would be impaired by the application of the federal statutes" at issue. *Id.* at 297-98. The court declined to address disparate impact claims in greater detail because the claims had not been fully articulated by the defendants. *See id.* 297 n.5 (describing disparate impact argument as a "new theory" raised on appeal), 298 (noting failure to identify conflicting state laws). Here, PCI has identified specific laws that expressly conflict with HUD's Rule. (*See* PCI Br., Appendix A.)[7]

### B.    Hardship

When a legal issue is fit for review, there is generally no need to consider the hardship to

---

[7] Nothing in *Lumpkin v. Farmers Group, Inc.*, 2007 WL 6996777 (W.D. Tenn. 2007), or *Nevels v. Western World Ins. Co.*, 359 F. Supp. 2d 1110 (W.D. Wash. 2004), indicates that a court cannot consider a pre-enforcement challenge under the McCarran-Ferguson Act.

the parties of withholding court consideration. *See Owner-Operator*, 656 F.3d at 586; *Cohen v. United States*, 650 F.3d 717, 735 (D.C. Cir. 2011) (en banc). Nonetheless, PCI's members easily satisfy the hardship prong. Hardship "need not take the form of an actual enforcement action; the threat of enforcement is sufficient because the law is in force the moment it becomes effective and a person made to live in the shadow of a law that she believes to be invalid should not be compelled to wait and see if a remedial action is coming." *Owner-Operator*, 656 F.3d at 586. Thus, where a plaintiff faces a choice between "taking immediate action to their detriment and risking substantial future penalties for non-compliance, [that] presents a paradigm case of 'hardship' under the second prong of *Abbott Laboratories*." *Chamber of Commerce of U.S. v. Reich*, 57 F.3d 1099, 1101 (D.C. Cir. 1995). That is precisely the situation in which PCI's members find themselves—they must either cease engaging in the core insurance practices of state-regulated risk-based pricing and underwriting or risk substantial liability under the Disparate Impact Rule. This predicament differs sharply from the situations in the two cases cited by HUD. *See Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1205 (D.C. Cir. 1998) (no hardship to plaintiffs because "EPA's rule does not require them to engage in, or to refrain from, any conduct" and they "need not change their behavior or risk costly sanctions"); *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998) (no hardship to Sierra Club, which had not "pointed to any other way in which the Plan could now force it to modify its behavior in order to avoid future adverse consequences, as, for example, agency regulations can sometimes force immediate compliance through fear of future sanctions.").

## III. THE RULE VIOLATES THE MCCARRAN-FERGUSON ACT

On the merits, HUD cannot rebut PCI's demonstration that application of the Rule to homeowners insurance fundamentally conflicts with state law in multiple respects.

### A. The Disparate Impact Rule Is Invalid Under *Mutual of Omaha*

As PCI explained in its opening brief (at 19), the Seventh Circuit held in *Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557, 564 (7th Cir. 1999), that "requir[ing] federal courts to determine whether [challenged insurance practices] are actuarially sound and consistent with state law" violates the McCarran-Ferguson Act. The Seventh Circuit explained that "[s]tate regulation of insurance is comprehensive and includes rate and coverage issues, so if federal courts are now to determine whether [particular insurance practices] are actuarially sound and consistent with principles of state law they will be stepping on the toes of state insurance commissioners." *Id.* at 563-64 (citation omitted). The Disparate Impact Rule, however, mandates exactly that kind of federal court review of state-regulated practices. It requires insurers to show in federal court that any insurance practice that has a disparate impact is "necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests"—in other words, to show that the practice, which is already subject to state insurance regulation, is actuarially sound. 78 Fed. Reg. at 11475 (A.R. 627); (PCI Br. 17-20).

Indeed, a centerpiece of HUD's defense is its repeated contention that insurers can defend their practices in federal court under the Rule's business justification defense. (*See* HUD Br. 10, 12, 18-19, 33, 34, 36.)[8] HUD thus asks federal courts to do exactly what *Mutual of Omaha* says they cannot—second-guess state insurance commissioners by judging the actuarial soundness of challenged insurance practices subject to their regulation. *See* 179 F.3d at 564. Regulation of insurance rate-setting and underwriting under the Rule would be largely "displac[ed] … into federal court," which would "obviously interfere with the administration of state law." *Id.* That

---

[8] HUD's amici also argue that the purpose of applying disparate impact to insurers is to permit federal courts to "distinguish[] between those aspects of the insurance business that are based on legitimate actuarial considerations and those that are not." (Amici Br. 16.)

inevitable result provides ample basis, standing alone, to set aside HUD's application of the Rule to homeowners insurance.

HUD has no meaningful response to *Mutual of Omaha*. HUD neither disputes that the Seventh Circuit held that federal courts cannot be called upon to review the actuarial soundness of insurance practices nor that the Disparate Impact Rule would require federal courts to do precisely that in order to adjudicate a business justification defense. HUD claims (at 22) that *Mutual of Omaha* merely decided "whether a specific application of federal law to a specific insurance practice" violated the McCarran-Ferguson Act. But the Court in *Mutual of Omaha* did not limit its McCarran-Ferguson holding to the specific facts of that case. It simply decided the case presented. Nothing in the Court's rationale or holding suggests the decision would not apply to any situation where application of a non-insurance-specific federal law would displace review of the actuarial soundness of insurers' practices and the administration of state insurance laws into federal courts. *See Camarena v. Safeway Ins. Co.*, 2002 WL 472245, at *7 (N.D. Ill. 2002) (citing *Mutual of Omaha* and holding claims foreclosed by McCarran-Ferguson Act because litigating them would "necessarily cause[] federal courts to decide whether an insurance policy is actuarially sound and consistent with state law, thereby stepping on the toes of state insurance commissioners."). HUD further argues (at 22) that "[i]mplicit in the Seventh Circuit's decision is a recognition that a challenge to insurance practices under the ADA in a different context would not raise the same preemption issue." But the portion of the decision HUD cites centered on whether the ADA could be read to apply to insurance coverage caps for certain medical conditions, not whether application of the ADA would violate the McCarran-Ferguson Act. *See* 179 F.3d at 563 ("There is … a difference between refusing to sell a health-insurance policy at all to a person with AIDS … and … offering insurance policies that contain caps for

20

various diseases ….").[9]  Contrary to HUD's suggestion (at 22), PCI does not urge "wholesale"

preemption of any law touching on insurance—or field preemption.  PCI seeks only to apply the

Seventh Circuit's holding in *Mutual of Omaha* to this case.

HUD relies (at 23) on *EEOC v. Benicorp Insurance Co.*, 2000 WL 724004 (S.D. Ind.

May 17, 2000), but the brief discussion of *Mutual of Omaha* in that case did not purport to limit

the Seventh Circuit's reasoning.  The court simply concluded that it was possible the EEOC

would be able to pursue an ADA claim not preempted by McCarran-Ferguson.  *Id.* at *4.[10]  Here,

the Disparate Impact Rule's burden-shifting approach will inevitably run afoul of *Mutual of

Omaha*.  HUD also cites *Dehoyos*, but the footnote in that case attempting to distinguish *Mutual

of Omaha* was incorrect.  *See* 345 F.3d at 295 n.6.  Contrary to the *Dehoyos* court's assertion, the

*Mutual of Omaha* court did not rely on a particular state law permitting the coverage caps

challenged under the ADA.  *Mutual of Omaha* recognized that the outcome under state law was

uncertain:  "If in fact the AIDS caps in the defendant's policies are not consistent with state law

and sound actuarial practices … , the plaintiffs can obtain all the relief to which they are entitled

from the state commissioners who regulate the insurance business."  179 F.3d at 564-65.  *Mutual

of Omaha* concluded that *federal* courts cannot sit in judgment of the actuarial soundness and

---

[9] This Court's decision in *Axiom Insurance Managers Agency, LLC v. Indemnity Insurance Corp.*, 2011 WL 3876947 (N.D. Ill. 2011), is not to the contrary.  That case held that the McCarran-Ferguson Act did not bar RICO insurance fraud claims given that Illinois law prohibited the same conduct and expressly provided that plaintiffs could bring suit under other laws.  *Id.* at *9.  Nor is *McRaith v. American Re-Insurance Co.*, 2010 WL 624857, at *1-*3 (N.D. Ill. 2010), which merely held that the McCarran-Ferguson Act did not prohibit the removal to federal court of a contract dispute between the overseer of an insurer and two reinsurers.

[10] *Mutual of Omaha* concluded that to the extent the ADA "forbids an insurer to turn down an applicant merely because he is disabled," rather than dictating the content of insurance policies, the ADA "relates specifically to the business of insurance" and would not conflict with state insurance law.  179 F.3d at 564.  The court in *Benicorp* was simply recognizing this aspect of *Mutual of Omaha*.  *See* 2000 WL 724004, at *4 ("This court cannot conclusively determine in this proceeding that the EEOC seeks to regulate the content of Benicorp's insurance.").

21

validity under *state* law of challenged insurance practices.[11]

### B. The Rule Conflicts With Laws Permitting And Requiring Risk-Based Pricing

1. PCI's opening brief demonstrated that HUD's Rule would conflict with state insurance laws that expressly permit the use of risk-based pricing. (*See* PCI Br. 8, 20-23.) PCI also showed that many state laws expressly *require* the use of risk-based pricing. (*See* PCI Br. 9, 23-24.)[12] The Rule would invalidate or impair these laws because it would impose liability on any insurer who charged insureds different rates based on differences in actuarial loss probability, if such differences happened to have a disparate impact. (*See* PCI Br. 22-24.)

In its response, HUD has not contested that the laws cited by PCI permit or require the use of risk-based pricing. HUD notes (at 25-26) that insurance laws permitting the use of risk-based pricing are not identical across every state. But PCI has never argued that every state insurance law permitting the use of risk-based pricing is identical. (*See* PCI Br. 21; *see also* Compl. ¶¶ 29-32 (quoting various states' laws).) The common element running through these laws, however, is that insurers either may or must charge different rates to customers based on actuarial risk factors, so each of these laws conflicts with HUD's Disparate Impact Rule.

---

[11] HUD's amici note (at 12-14) that some peripheral aspects of the insurance business, such as marketing, do not involve actuarial calculations. But the FHA cannot be stretched to cover *every* activity conducted by an insurer. As the Seventh Circuit held in *American Family*, the FHA "applies to discriminatory denials of insurance [*i.e.*, underwriting practices], and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant." 978 F.2d 287, 301. Peripheral practices are not so closely related to insuring homeowners that they could "effectively preclude" home ownership. *See* 76 Fed. Reg. at 70924 (A.R. 4) (proposing to apply Rule only to "provision and pricing of homeowner's insurance").

[12] States also allow insurers to take legitimate actuarial factors into account when making underwriting decisions, just as they do for rate-setting decisions. *See, e.g.*, Ind. Code § 27-2-17-5(an insurer may "refus[e] to issue or renew or [cancel] a policy based on sound underwriting or actuarial principles reasonably related to actual or anticipated loss experience or any other sound business purpose."); Wis. Admin. Code § Ins 6.68 (permitting insurers to differentiate between insureds in underwriting decisions on the basis of their risk profile and hazards).

2.      Rather than dispute the general principle—applicable across the States—that insurers may, and often must, take into account actuarially justified risk factors, HUD cites (at 26) a number of state laws governing insurers' ability to consider four specific risk factors: credit histories, geographic location, domestic violence victimization, and property age.  These laws do not support HUD's position.  Indeed, they typically permit insurers to take things like geographic location, age of dwelling, and credit history into account so long as they do so *in accordance with* "sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience."  *See, e.g.*, Colo. Rev. Stat. § 10-3-1104(1)(f)(XIV) (permitting insurers to take geographic location into account so long as it is related to anticipated loss experience); Ark. Code Ann. § 23-66-206(14)(C) (permitting insurers to consider geographic location so long as it is not a mere pretext for discrimination); Ind. Code § 27-2-17-5(b) (same); Wis. Admin. Code Ins. § 6.68(3)(a) (same); Ala. Admin. Code r. 482-1-127.06 (prohibiting insurers from making decisions based *solely* on credit score or using credit history for any unfairly discriminatory reason); Alaska Stat. § 21.36.460(c) (permitting insurers to use credit history so long as they use it in combination with other substantive factors); N.Y. Ins. Law § 2802 (same); W. Va. Code Ann. § 33-17A-6(h) (same); Del. Code Ann. tit 18, § 4124 (permitting insurers to base decisions on age of property if decisions are "for a business purpose which is not a mere pretext for unfair discrimination"); Va. Code Ann. § 38.2-508(5) (same).[13]  These statutes complement, rather than conflict with, related statutes permitting insurers to engage in risk-based pricing.

In any event, targeted laws limiting the use of a handful of risk factors cannot save the Rule, which applies disparate impact liability across the board to *all* risk-based underwriting and

---

[13] Some of the laws cited by HUD prohibit insurers from using domestic violence victim status as a factor under any circumstances, but there is little reason to think that such status would be useful as an actuarial factor for homeowners insurers in any event.

pricing practices—not just the four risk factors enumerated by HUD.  Moreover, under the

Rule's framework, federal courts deciding challenges to insurers' use of one of the particular

factors addressed in the laws identified by HUD will still be required to pass judgment on the

actuarial soundness and validity of these factors under state law.  But, again, that is precisely

what *Mutual of Omaha* forbids.  *See supra* p. 19.  As in *Mutual of Omaha*, the proper remedy for

any plaintiff challenging an insurer's use of things like credit history in violation of state law is a

state-law remedy either in state court or before a state's insurance commissioner.  *Mutual of*

*Omaha*, 179 F.3d at 564-65 ("If in fact … defendant's policies are not consistent with state law

and sound actuarial practices … , the plaintiffs can obtain all the relief to which they are entitled

from the state commissioners who regulate the insurance business.").

Finally, HUD did not rely on this argument in rulemaking.  Under the APA, agency

action is reviewed on the basis of the reasoning provided by the agency *at the time it made its*

*decision*.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("a reviewing court 'must judge

the propriety of [agency] action solely by the grounds invoked by the agency'"); *see also Moab*

*v. Gonzales*, 500 F.3d 656, 659-60 (7th Cir. 2007) (discussing *Chenery* doctrine).  Rather than

narrowly hold that disparate impact can be applied only to specific pricing and underwriting

decisions *already prohibited by state law*, HUD painted in broad strokes, adopting a rule that on

its face applies across the board to insurance practices permitted by state law.  Under *Chenery*,

HUD cannot circumvent the APA process by trying to justify its sweeping action on the targeted

"post hoc" rationale articulated by HUD's counsel in this litigation.

3.     HUD also argues (at 28) that some states' fair housing laws may encompass

disparate impact liability because they are similar to the federal FHA.  But, unless state fair

housing laws specifically displace state insurance laws, the state insurance laws remain valid,

and the McCarran-Ferguson Act preempts any federal law that conflicts with them. HUD has not shown that any state's general fair housing laws displace the state's more specific insurance provisions permitting (or requiring) the use of actuarial risk factors.[14] The cases HUD cites in support of this argument (at 28) merely note that state courts often look to federal cases for guidance in interpreting state civil rights laws. *See, e.g.*, *State Civil Rights Comm'n v. County Line Park, Inc.*, 738 N.E.2d 1044, 1048-49 (Ind. 2000). The cases do not interpret state fair housing laws to apply disparate impact analysis to homeowners insurance. Moreover, state *fair housing laws* are not even relevant. The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ....." 15 U.S.C. § 1012(b). State fair housing laws were not enacted "for the purpose of regulating the business of insurance."[15]

Furthermore, even if HUD could show that a state's fair housing law was identical to the FHA and that it was relevant to the McCarran-Ferguson Act analysis, the Rule would still violate McCarran-Ferguson. A reviewing federal court would still be called upon to review the actuarial soundness of a challenged practice, which *Mutual of Omaha* precludes. The Rule also would still impair the detailed state regulatory regimes governing insurance. *See infra* Part III.C. Finally, even if HUD could have elected to apply the Rule only where a state fair housing law affords precisely the same protection, HUD did not take a limited approach, opting instead for a broad-reaching rule that cannot be affirmed under any rationale. *See Chenery*, 332 U.S. at 196.

---

[14] It is irrelevant that six state Attorneys General submitted a short comment generally supporting disparate impact liability. The comment does not address whether the Rule conflicts with state insurance laws, and an Attorney General cannot waive the McCarran-Ferguson Act.

[15] HUD contends (at 27) that under *Humana* courts "must take into account the entire body of state law that applies to insurance practices." But *Humana* merely considered "a common-law duty 'to negotiate with its insureds in good faith and to deal with them fairly.'" 525 U.S. at 312. Such a duty is state common law "regulating the business of insurance." 15 U.S.C. § 1012(b).

### C.    The Rule Would Invalidate And Impair State Regulatory Regimes

PCI demonstrated (at 24-25) that the Rule also would invalidate and impair state laws providing for the review and approval of insurance rates by state insurance commissioners. Nearly every state requires insurers to file insurance rates with state regulators and provides mechanisms for regulators to review and/or approve such rates. (*See* PCI Br., Appendix A.) Some states similarly require the filing of underwriting guidelines, which can also be reviewed in examinations of insurers if not submitted in advance.[16] State regulators carefully review insurance rates to ensure that the rates are based on sound actuarial factors and are not excessive, inadequate, or unfairly discriminatory. *See, e.g.*, Wis. Stat. Ann. § 625.13; N.J. Stat. Ann. § 17:29A-7; Ind. Code Ann. § 27-1-22-5. State regulators may also review underwriting guidelines.[17] Allowing federal courts to second-guess these rates and underwriting guidelines would impair the ability of insurance commissioners to regulate insurance practices.

HUD argues (at 27) that "some states … assume no role in approving or disapproving rates." Indeed, Appendix A of PCI's summary judgment brief notes three such states; but each of these states has other insurance laws that plainly conflict with the Rule. (*See* PCI Br., Appendix A.) The remaining forty-seven states have rate-filing laws. While not identical, these laws all provide for some form of rate approval, rate review, investigation of compliance with

---

[16] *See, e.g.*, Conn. Gen. Stat. § 38a-689(a) ("Each insurance company which issues homeowners insurance policies in this state shall file with the Insurance Commissioner the rules and regulations, or any modifications of such rules and regulations, used by such company to determine whether or not to underwrite such policies."); Fla. Admin. Code Ann. r. 69O-170.013(1)(b) ("Underwriting guidelines for private passenger automobile, homeowners' and mobile homeowners' insurance, for both new and renewal business, shall be filed pursuant to this rule."); Ga. Code Ann. § 33-9-21(a); Ky. Rev. Stat. § 304.13-051(4); 24-A Me. Rev. Stat § 2938-A; Mo. Code Regs. Ann. tit. 20, § 500-9.100; N.M. Stat. Ann. § 59A-17-5.1; 28 Tex. Admin. Code § 5.9342; Utah Admin. Code r. R590-127.

[17] *See, e.g.*, Ga. Code Ann. § 33-9-26; Kan. Stat. § 40-955 (a), (l); Md. Code, Ins. § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; N.J. Stat. Ann. § 17:22-6.14a1; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4.

rate setting and related state laws, or other procedure for state administrators to approve the insurance rates set in their states. (*See* PCI Br., Appendix A; PCI Br. 24-25; Zaleski Decl. ¶ 14-16.) If federal courts intervene to reject rates approved as "not unfairly discriminatory" by state insurance commissioners and determine the procedures by which insurers can set rates, as HUD contemplates, then the federal courts will usurp state insurance regulation in violation of the McCarran-Ferguson Act. *Saunders II*, 537 F.3d at 968; *see Mutual of Omaha*, 179 F.3d at 564.

### D. None Of The Cases Cited By HUD Are Controlling Or Persuasive

HUD argues (at 23-25) that a handful of courts have concluded that disparate impact liability can be applied to insurers without violating the McCarran-Ferguson Act. But the cases HUD cites are neither controlling nor persuasive. As noted above, *Dehoyos* focused in large measure on disparate treatment, not disparate impact, which it addressed only in passing. *See* 345 F.3d at 295-97 (discussing disparate treatment cases), 299 n.7. In addition, the *Dehoyos* court concluded that the defendants' McCarran-Ferguson Act argument was not viable because the defendants had not identified *any* state statute or policy that might be impaired by federal liability. *Id.* at 297. In contrast, PCI has identified specific state laws that are invalidated and impaired by the application of disparate impact liability to insurers. (PCI Br., Appendix A.)

*Lumpkin v. Farmers Group, Inc.*, 2007 WL 6996777 (W.D. Tenn. 2007), is an unpublished order denying a request for reconsideration. In that case, the court correctly noted that, under Tennessee law, "[i]nsurance rates are not deemed to be unfairly discriminatory merely because different premiums are charged to insureds with like loss exposure but different expenses or to insureds with like expenses but different loss exposure, so long as the different rates reflect those differences reasonably accurately." *Id.* at *6. But the court failed to recognize that such a law permits risk differentiation. In any event, the court did not address Tenn. Code Ann. § 56-5-304(1), which affirmatively requires insurers to consider past and prospective loss

experience, catastrophe hazards, and all other relevant factors.  Likewise, *Toledo Fair Housing Ctr. v. Nationwide Mutual Insurance Co.*, 704 N.E.2d 667, 670 (Ohio Ct. Com. Pl. 1997), did not address any of the Ohio laws cited by PCI in this case, such as the Ohio statutes requiring insurers to consider certain actuarial risk factors.  *See, e.g.*, Ohio Rev. Code Ann. § 3935.03(C); (PCI Br., Appendix A (listing several Ohio laws that conflict with HUD's Rule).)

 *American Family* does not help HUD either.  It addressed claims for disparate treatment, not disparate impact.  As noted above, the Court specifically reserved the question whether disparate impact could lawfully be applied to insurers.  978 F.2d at 290-291.  Moreover, *American Family* did not consider any of the state laws involved in this case.  Rather, it turned on the absence of any Wisconsin law authorizing intentional redlining.  *Id.*  The portion of the case HUD relies on thus has no bearing on whether Wisconsin's insurance laws conflict with HUD's Disparate Impact Rule, which they plainly do.  (*See* PCI Br. 21, 24, 25.)[18]

## IV. HUD'S FAILURE TO MEANINGFULLY CONSIDER THE MCCARRAN-FERGUSON ACT'S LIMITATION ON HUD'S POWER TO CONSTRUE THE FHA WAS ARBITRARY AND CAPRICIOUS

 At a minimum, HUD's failure in the rulemaking to grapple with the limitations on its authority imposed by the McCarran-Ferguson Act was arbitrary and capricious.  HUD does not dispute that it was obligated to "'respond meaningfully'" to comments explaining that the Disparate Impact Rule would violate the McCarran-Ferguson Act.  (*See* PCI Br. 26; HUD Br. 30.)  Nor does HUD dispute that an agency must consider the "relevant factors" and engage in "reasoned decisionmaking."  *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 52 (1983); (PCI Br. 28).  HUD suggests (at 32) that its obligation to address its authority was discharged merely by pointing to a general rulemaking provision.  An agency,

---

[18] HUD's amici point (at 5) to "[p]ast intentional discrimination."  But that is not what is at issue here.  PCI is challenging only the application of disparate impact liability to insurance.

however, is obligated to discuss not just its authority to promulgate rules but also any statutory *limits* on its authority. *See Owner-Operator*, 656 F.3d at 587-88 (vacating rule in light of FMCSA's failure to provide more than a "superficial or perfunctory" discussion of a relevant statutory limitation); *United Mine Workers of Am., Int'l Union v. Dole*, 870 F.2d 662, 673 (D.C. Cir. 1989) (Secretary's failure to address a statutory limit on authority under relevant provision).

Here, HUD violated the APA when it shunted its obligation to address the McCarran-Ferguson Act to the courts. In response to comments that the Rule violates the Act, HUD said:

> The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance * * * unless such Act specifically relates to the business of insurance." McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act. How the Act should be construed in light of McCarran-Ferguson depends on the facts at issue and the language of the relevant State law "relat[ing] to the business of insurance." Because this final rule does not alter the instruction of McCarran-Ferguson or its application as described in *Ojo v. Farmers Group*, it will not interfere with any State regulation of the insurance industry.

78 Fed. Reg. at 11475 (A.R. 627). This was the entirety of HUD's response. Having concluded that McCarran-Ferguson merely "instructs courts on how to construe federal statutes," HUD did not even attempt to analyze whether the Rule conflicts with state insurance laws.

HUD's view of the McCarran-Ferguson Act is plainly incorrect. As a federal agency, HUD cannot promulgate rules "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C); *see also id.* § 706(2)(A) (agency rules cannot be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."). Despite HUD's suggestion to the contrary, the McCarran-Ferguson Act equally constrains federal agencies and courts. It provides in relevant part that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless such Act specifically relates to the business of insurance" 15 U.S.C.

29

§ 1012(b). The Act thus, by its plain terms, limits HUD's own possible constructions of the FHA. If the FHA cannot, consistent with the McCarran-Ferguson Act, impose disparate impact liability on homeowners insurers for pricing and underwriting activities, then HUD likewise cannot make its Rule applicable to those activities. Agency rulemaking is a form of construing federal statutes. Nothing in McCarran-Ferguson limits its application to a *court's* construction of federal law, as opposed to a federal agency's.

HUD focuses in its brief on the assertion in the rulemaking that the "final rule does not alter the instruction of McCarran-Ferguson or its application." (HUD Br. 31; *see also id.* at 47 ("[I]t is simply wrong to suggest that the Rule conflicts with McCarran-Ferguson, when it does nothing to change the operation of the statute.").)[19] But the fact that the Rule does not purport *to modify* the command of the McCarran-Ferguson Act does not mean the Rule's interpretation of the FHA *complies* with the Act. As noted above, the McCarran-Ferguson Act is not a rule of civil procedure that simply governs proceedings in federal courts. It is a substantive limitation on the reach of federal laws that do not specifically relate to the business of insurance. An agency cannot disregard the Act—by adopting a regulation that interprets a federal law in a way that invalidates, impairs, or supersedes state insurance regulation—by simply positing that the courts will be able to apply the Act in a manner that limits the reach of the regulation. Indeed, by that same reasoning, an agency could adopt a rule that plainly violates the First Amendment or that vastly exceeds the agency's statutory authority and merely assert that the courts will be able to cabin the rule in a manner that avoids these infirmities. That cannot be the law.

---

[19] HUD notes (at 31) that the rulemaking indicated that application of the McCarran-Ferguson Act would "'depend[] on the facts at issue and the language of the relevant State law.'" But that single sentence was part of HUD's effort to disclaim application of the Act to agencies, rather than courts. *See* 78 Fed. Reg. at 11475 (A.R. 627). In any event, HUD's assertion that McCarran-Ferguson can be applied only on a case-by-case basis is incorrect. *See supra* p. 15-17.

Implicitly recognizing the inadequacy of its discussion of the McCarran-Ferguson Act, HUD now contends (at 31-32) that its rulemaking "incorporated" the reasoning of the *Ojo* decision, which HUD contends "makes clear that the proper construction of the FHA … and the question of McCarran-Ferguson preemption of an *application* of the FHA are two distinct inquiries." To the extent HUD is arguing that the McCarran-Ferguson Act is not relevant to "the proper construction of the FHA" and thus did not constrain HUD's rulemaking, that argument is foreclosed by the plain text of the Act: "No Act of Congress shall be *construed* to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance …." 15 U.S.C. § 1012(b). In any event, nothing in *Ojo* supports the proposition that the McCarran-Ferguson Act does not apply to *construction* of the FHA. *Ojo* was a class action filed against an insurer challenging its use of credit based insurance scores to price insurance. The insurers' (ultimately successful) McCarran-Ferguson defense thus arose in the context of a particular application of the FHA. But nothing in the decision indicates that the McCarran-Ferguson Act governs only the case-by-case *applications* of the FHA. HUD notes (at 31) that the *Ojo* court addressed whether the FHA even applies to "the denial and pricing of homeowner's insurance" before turning to the McCarran-Ferguson Act discussion. But that in no way suggests that McCarran-Ferguson does not govern the construction of the FHA. Thus, even if HUD's passing reference to *Ojo* could somehow "incorporate[]" the court's reasoning— which HUD has not shown—it would not resuscitate HUD's faulty response.

If the extensive briefing by the parties in this case has revealed anything, it is that the McCarran-Ferguson Act questions raised by application of the Rule to homeowners insurance are substantial. Those questions are too substantial to be addressed in a single paragraph— particularly one that offers no substantive response and defers entirely to the courts. Because

there is no justification for HUD's refusal to cogently address the McCarran-Ferguson Act,

HUD's decision to apply the Rule to homeowners insurance must be vacated and remanded.

## V.   HUD'S FAILURE TO MEANINGFULLY CONSIDER THE RULE'S EFFECT ON INSURERS WAS ARBITRARY AND CAPRICIOUS

### A.   HUD Failed To Meaningfully Address The Impact Of The Rule On Insurers

HUD does not dispute that insurance industry comments explained the significant

adverse effect that the Rule would have on the provision of homeowners insurance.  (*See* Defs.

SUMF Resp. ¶¶ 27, 30, 36, 39.)  Nor does HUD dispute that it failed to discuss the *substance* of

any of these comments in its rulemaking.  Rather, HUD's sole response was that an insurer "has

a full opportunity to defend [in court] the business justifications for its policies."  78 Fed. Reg. at

11475 (A.R. 627); (Pl. SUMF ¶ 26); *see also* HUD Br. 33 ("a practice is not prohibited, even

where it results in a disparate impact, so long as it is supported by a 'legally sufficient

justification'").  That non-response fails to satisfy the requirements of the APA in multiple ways.

As an initial matter, HUD offers no justification for refusing to address the impact of the

Rule on insurance and instead simply deferring to the courts.  Under the APA, agencies are

required to consider "important aspect[s]" of the issues before them.  *State Farm Mut. Auto. Ins.

Co.*, 463 U.S. at 43.  Here, HUD completely failed to address the substance of this issue.

Additionally, as PCI explained in its opening brief (at 23) and HUD has not disputed, the

Rule's burden-shifting framework will ensure that some actuarially-justified insurance practices

will subject insurers to liability.  Under the Rule, a plaintiff or HUD can meet its initial burden

by showing *any* disparate impact—HUD has expressly rejected a requirement that the disparate

impact be "significan[t]."  78 Fed. Reg. at 11468 (A.R. 620).  An insurer would then be required

to prove that the challenged underwriting or rating factor is "necessary to achieve one or more

substantial, legitimate, nondiscriminatory interests."  24 C.F.R. § 100.500(b), (c)(2) (2013).

Even if that burden is met, the plaintiff or HUD can still prevail if it shows merely that the interests "*could be served* by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3) (emphasis added). The plaintiff or HUD need not show that the proposed alternative approach would be "equally effective" at serving the insurers' needs; HUD expressly rejected that requirement. 78 Fed. Reg. at 11473 (A.R. 625); (Pl. SUMF ¶ 62). Under this framework, an insurer can be held liable under the Rule for using an actuarially justified risk factor if some other—concededly *less* predictive factor—would have served the same general purposes. It is thus insufficient to say that insurers can try to defend their practices in litigation.

Moreover, there is no support for HUD's efforts (at 33) to downplay the massive cost of having to litigate, on a case-by-case basis, the validity of insurers' use of numerous different actuarial risk factors. HUD points to an assertion in the rulemaking that it "does not believe that the rule will lead to frivolous investigations or create excessive exposure for respondents or defendants." (HUD Br. 33-34 (quoting 78 Fed. Reg. at 11472 (A.R. 624).) But the portion of the rulemaking HUD cited related to general application of the Rule, not its specific application to insurers. HUD made no "predictive … determination[]" of the potential number of challenges that might be brought against insurers under the Rule. (*Cf.* HUD Br. 34.) Generalized assertions about disparate impact claims cannot be applied blindly to insurance. Application of the Rule to insurance poses a unique challenge because it is inevitable that some actuarial risk factors will ultimately have some unintended disparate impact on some protected group of people, even though the insurers have no demographic information about the protected class. (*See* A.R. 376-77.) But use of actuarial factors and the practice of classifying risks are the foundation of insurance. Applying the Rule to insurance thus puts insurers—unlike any other businesses subject to the FHA—in the untenable position of potentially having to defend countless routine

and legitimate business activities. The fact that claims can be disposed of under "Rules 11, 12, and 56" is of no benefit. Insurers will still face litigation costs, burdens, and uncertainty, particularly given HUD's refusal even to acknowledge that consideration of actuarial risk is a legitimate business interest, *see infra* p. 3.

### B. HUD Summarily Dismissed An Exemption For Insurance And Failed To Confirm That Consideration Of Actuarial Risk Factors Is Legitimate

HUD does not dispute that commenters sought an exemption for homeowners insurance or the creation of safe harbors for certain risk related factors. (HUD Br. 34.) Those requests were grounded in the McCarran-Ferguson Act and significant concerns about the effect of the Disparate Impact Rule on the business of insurance. (*See* A.R. 375-380.) HUD, however, responded to those fundamental concerns in just two sentences. *See* 78 Fed. Reg. at 11475 (A.R. 627). HUD now claims (at 34-35) that its response was "reasonable, albeit brief," arguing that the comments it was responding to contained no "meaningful analysis" of the issue. But that is not true. (*See* A.R. 378-80; *see also* A.R. 375-77.)

HUD's two-sentence response not only was cursory, it was unreasonable. The first sentence merely pointed to the availability of a "legally sufficient justification" defense. *See* 78 Fed. Reg. at 11475 (A.R. 627). For all of the reasons discussed above, insurers cannot be forced to incur the risk and expense of having to try to justify their fundamental business practices on a case-by-case basis under a skewed burden-shifting framework. *See supra* p. 32-34. HUD's second sentence asserted that "creating exemptions beyond those found in the Act would run contrary to Congressional intent," and cited *Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human Relations Commission*, 508 F.3d 366 (6th Cir. 2007). As noted in PCI's opening brief (at 30), immediately after the sentence in *Graoch* cited by HUD, the court made clear that "categorical bars are justified"—even though not expressly provided for in the FHA—

if the balancing test would always come out the same way.  *See id.* at 375-76.  Indeed, citing the

Seventh Circuit's discussion of disparate impact in *American Family*, the court in *Groach*

pointed to homeowners insurance as an example of such a situation where application of

disparate impact is "never" appropriate:

> In *NAACP v. American Family Mutual Insurance Co.*, for example, the court held
> that insurers never can face disparate-impact liability for "*charging higher rates
> or declining to write insurance for people who live in particular areas*," reasoning
> that "[i]nsurance works best when the risks in the pool have similar
> characteristics."  978 F.2d at 290.  Conducting an inquiry analogous to our inquiry
> at the third step in the burden-shifting framework, it concluded that the strength of
> the insurer's interest in declining to insure in certain areas outweighed the
> strength of any possible disparate impact the policy could have.  *See id.* at 290-91.

*Id.* at 375 (emphasis added).  Strikingly, HUD failed to acknowledge this discussion in its

rulemaking and now in its brief.  (*See* HUD Br. 35 n.19 (discussing the *other* example from

*Graoch*).)  HUD's reliance on *Graoch* to support the precise opposite of what the court said is

the epitome of arbitrary agency decision-making.[20]

At a minimum, HUD should have acknowledged that use of actuarial risk factors is a

"substantial, legitimate, nondiscriminatory interest."  24 C.F.R. §100.500(b)(1).  Even if HUD

was unwilling to exempt risk-based pricing and underwriting from the Rule, there is no basis to

deny that use of actuarial risk factors is a legitimate business purpose.  But HUD refuses to

acknowledge the legitimacy of that interest even in its brief in this Court.

## VI.    HUD FAILED TO ADDRESS THE FILED-RATE DOCTRINE

HUD concedes (at 37) that it "did not separately refer to the [filed-rate] doctrine by name

in its explanation."  Rather, HUD contends that it addressed comments about the filed-rate

---

[20] HUD argues (at 36 n. 19) that it is not "'impossible' that an insurance practice could have a
discriminatory impact without a legally sufficient justification."  But the exemptions sought by
the commenters were for risk-based underwriting and pricing—not *any* insurance practice.  Risk-
based underwriting and pricing are fundamental to insurance and should not give rise to disparate
impact liability in any setting, as the Seventh Circuit in *American Family* strongly suggested.

doctrine "implicit[ly]" (HUD Br. 37) by "group[ing]" the topic with the comments about the McCarran-Ferguson Act (HUD Br. 36). This is the type of post-hoc justification that the APA does not tolerate. The rulemaking provides no hint that HUD thought its argument about McCarran-Ferguson should also apply to the filed-rate doctrine. *See* 78 Fed. Reg. at 11474-11475 (A.R. 626-27). Seeking to justify its failure to address the filed-rate doctrine, HUD now claims that courts have considered the filed-rate doctrine to be "ancillary" to the McCarran-Ferguson Act. That was not true in *Saunders I* (cited by HUD), where the Court addressed the filed-rate argument but remanded for consideration of the distinct McCarran-Ferguson Act claim. *See* 440 F.3d at 946. Nor was it true in *Lumpkin v. Farmers Group, Inc.*, 2007 WL 6996584 (W.D. Tenn. 2007) (also cited by HUD), which treated the two arguments as distinct. *See id.* at *7-8 (separate sections). Even in *Dehoyos*, which used the term "ancillary," the court deemed the filed-rate doctrine argument sufficiently distinct to have been waived. *See* 345 F.3d at 297 n.5 (finding the filed-rate argument not "fairly included" in McCarran-Ferguson challenge).

HUD suggests (at 37) that its "implicit rejection" of comments regarding the filed-rate doctrine was permissible because there was only "a single reference to the filed rate doctrine among the hundreds of pages of comments received during the rulemaking." But the comment at issue included a lengthy paragraph raising the objection. (*See* A.R. 378.) HUD acknowledges (at 30) that it was required to respond to "significant" comments. Here, the commenter's discussion of the filed-rate doctrine was at least as significant as HUD's entire discussion of the McCarran-Ferguson Act. *Compare* A.R. 378 *with* 78 Fed. Reg. at 11475 (A.R. 627). HUD's failure to respond is basis alone to conclude that HUD acted arbitrarily and capriciously.

HUD urges the Court (at 38 n.20) not to vacate its application of the Rule to insurance if the Court finds its reasoning lacking. The decision whether to vacate, however, turns in part on

"the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (internal quotation marks omitted). Here, HUD has taken the position in opposing PCI's standing that application of its Rule to insurers is essentially meaningless—that HUD imposed no new legal obligations on insurers. (*See* HUD Br. 13-15.) HUD cannot argue now that vacatur poses a threat of serious disruption. In fact, vacatur of HUD's new Rule will not disrupt any current practices—it is the Rule itself that will disrupt longstanding insurance practices. Vacatur is also especially appropriate in light of HUD's fundamental failure even to address critical issues.

## VII. THE RULE'S BURDEN-SHIFTING FRAMEWORK IS CONTRARY TO LAW

HUD contends that it was entitled to select a burden-shifting framework different from the one adopted in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), and required by Section 556(d) of the APA. HUD's burden-shifting framework, however, is unreasonable as a matter of law and thus not entitled to deference. At each stage of the process, the Disparate Impact Rule ignores the requirements of *Wards Cove* and puts a thumb on the scale against insurers:

*First*, the Rule does not require that a plaintiff show a "significant" disparate impact. (*See* PCI Br. 33.) HUD suggests (at 44-45) that its refusal to adopt this requirement means only that it "refrained from specifying 'the showing that would be required to demonstrate a discriminatory effect in each of the[] contexts' the Rule covers." The fact that the Rule covers many different contexts, however, does not prevent HUD from distinguishing between significant disparate impacts and trivial ones. HUD was not required to adopt a particular numeric metric or create context-specific significance requirements to adopt the general "significance" requirement.

*Second*, the Rule does not require that plaintiffs identify a specific practice that creates a disparate impact and thus permits plaintiffs to raise complicated claims about the alleged disparate impacts of a combination of practices. (*See* PCI Br. 33.) HUD suggests that it was proper to follow the approach taken in 1991 amendments to Title VII, but the Supreme Court has made clear that those amendments apply only to Title VII. *See Smith v. City of Jackson*, 544 U.S. 228, 240 (2005) ("While the relevant 1991 amendments expanded the coverage of Title VII, they did not amend the ADEA or speak to the subject of age discrimination. Hence, *Wards Cove's* pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA.").

*Third*, the Rule improperly shifts the burden of proof to defendants after a prima facie showing of disparate impact. (*See* PCI Br. 33-34.) HUD offers no persuasive response to PCI's demonstration that this burden-shifting framework violates 5 U.S.C. § 556(d). That section mandates that except as "otherwise provided by statute, the proponent of a rule or order has the burden of proof" in formal agency adjudications. Citing *Director, Office of Workers' Comp. Programs, Dep't of Labor* v. *Greenwich Collieries*, 512 U.S. 267, 278 (1994), HUD argues (at 46) that it is permissible for the Rule to shift the burden to defendants at the second step of the burden-shifting framework. But in *Greenwich Collieries*, the Court merely found that it was permissible to "place the burden of persuasion on the employer *as to its affirmative defense*" after the employee proved its case. 512 U.S. at 278 (emphasis added). The Seventh Circuit has made clear that, under *Greenwich Collieries,* § 556(d) does not permit the burden of persuasion to shift if the charging party merely "establish[es] a prima facie case." *NLRB v. Louis A. Weiss Mem'l Hosp.*, 172 F.3d 432, 442 (7th Cir. 1999). Here, the Disparate Impact Rule violates § 556(d) because it requires that a plaintiff make only a "*prima facie*" showing of disparate

impact before shifting the burden to the defendant to prove business necessity. *See* 78 Fed. Reg. at 11460 (A.R. 612). HUD does not address *Lewis A. Weiss* and does not contend that step two of its framework constitutes an affirmative defense. HUD suggests (at 46-47) that the Rule falls within § 556(d)'s "otherwise provided by statute" exception, but HUD can point to no provision in the FHA addressing the framework for litigating disparate impact claims, much less the appropriate burden of proof.[21]

HUD's contention (at 45-46) that this burden-shifting argument was not raised before the agency is meritless. The precise issue in question—whether the burden of persuasion must remain with the plaintiff at each step of the disparate impact analysis—was indisputably addressed in comments from the insurance industry. (A.R. 381 ("The most common deviation [from the *Wards Cove* burden-shifting framework] is mistakenly shifting the burden of persuasion, as opposed to the burden of production, to the defendant at the second step in the analysis. The proposed rule replicates this error."); A.R. 458 ("[T]he plaintiff in any FHA disparate impact case has the burden of persuasion *throughout* the entire process.").) The failure to cite a particular *legal authority* in support of that argument does not amount to a waiver of the argument. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 773 n.20 (7th Cir. 2010)

---

[21] HUD also argues (at 47) that, even if the Rule violates § 556(d) as applied to agency adjudications, it cannot be struck down because it *also* applies to private civil litigation. But HUD did not specify in the rulemaking that the Rule's burden-shifting framework applies in judicial determinations but not agency adjudications. HUD's decision therefore must be vacated and remanded to allow HUD to consider whether employing different burden-shifting frameworks in court and before the agency makes sense as a matter of policy and to allow HUD to determine what procedures to employ in agency adjudications.

(party may offer "new legal authority" for position advanced below).[22]

*Fourth*, the Rule requires that defendants make a showing that the challenged practice is "necessary." (*See* PCI Br. 34.) HUD does not directly respond to this issue, but it is of critical importance in practice. Showing that a practice is strictly "necessary" can be exceedingly difficult. Very few practices in any business are strictly "necessary." Requiring insurers to make such a showing for each risk factor they consider is unreasonable and unworkable.

*Fifth*, HUD's regulations do not require that plaintiffs show that any alternative practice they contend the defendant should have employed is "equally effective" as the challenged practice. (*See* PCI Br. 34-35.) HUD does not directly respond to this shortcoming of the Rule, which ensures that insurers face potential liability even for using actuarially justified risk factors.

## CONCLUSION

Accordingly, the Court should deny HUD's motion to dismiss, grant PCI's motion for summary judgment, and vacate HUD's application of the Disparate Impact Rule to homeowners insurance.

---

[22] *Koretoff v. Vilsack*, 707 F.3d 394 (D.C. Cir. 2013), cited by HUD (at 46), is not to the contrary. There, the petitioner argued in court that USDA lacked "authority to require the treatment of all almonds irrespective of whether they are contaminated," but before the agency parties had raised only the more general question whether USDA had authority to mandate treatment at all. *See* 707 F.3d at 398. The case involved a new argument, not merely new authority.

Dated:      May 16, 2014

Respectfully submitted,

By:  /s/ Brian M. Boynton

_____

Seth P. Waxman (*pro hac vice*)
Brian M. Boynton (*pro hac vice*)
Matthew J. Tokson (*pro hac vice*)
Lynn Eisenberg (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: seth.waxman@wilmerhale.com

Rowe W. Snider (# 03125194)
Ashlee M. Knuckey (# 6300237)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Tel.: (312) 443-0700
Fax: (312) 896-0336
Email: rsnider@lockelord.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 16, 2014, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to counsel of record in this case.

        s/  Brian M. Boynton
Brian M. Boynton
WILMER CUTLER PICKERING HALE AND
DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
Email: seth.waxman@wilmerhale.com