IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) | Case No. 1:13-cv-08564 |
| v. | ) ) | Judge Amy J. St. Eve |
| SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | Magistrate Judge Susan E. Cox |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' LOCAL RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1 of the United States District Court for the Northern District of Illinois, Plaintiff Property Casualty Insurers Association of America ("PCI") hereby submits the following response to Defendants' Statement of Undisputed Material Facts. Because this case concerns a challenge under the Administrative Procedure Act ("APA"), review is based on the administrative record that was before the agency when it issued the regulation or decision at issue. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009); *see also* Defendants' 56.1 Statement of Undisputed Material Facts 1-2, Dkt. No. 30-2 ("Defs. SUMF"). Whether HUD's action was "not in accordance with law" or "arbitrary" and "capricious" under 5 U.S.C. § 706(2)(A) is a question of law. *See* Joint Status Report 4, Dkt. No. 16; Defs. SUMF 1-2; *see also, e.g., Rempfer v. Sharfstein*, 583 F. 3d 860, 865 (D.C. Cir. 2009) (review of agency action under the APA is based entirely on the agency's record and thus can be resolved at the motion to dismiss stage); *Univ.*

*Med. Ctr. of S. Nevada v. Shalala*, 173 F.3d 438, 441 n.3 (D.C. Cir.1999) ("[T]he question whether HHS acted in an arbitrary and capricious manner is a legal one ....").

Subject to the foregoing, Plaintiff responds to the individually numbered paragraphs in Defendants' 56.1 Statement of Undisputed Material Facts as follows (retaining Defendants' headings).

**Defendants**

1. Defendant Department of Housing and Urban Development ("HUD") is the federal executive agency responsible for administering and interpreting the Fair Housing Act, Pub. L. No. 90-284, 82 Stat. 81 (1968) (codified as amended at 42 U.S.C. §§ 3601-3619). *See* 42 U.S.C. § 3614a; *see also* 78 Fed. Reg. 11,460, 11,460 (Feb. 15, 2013).

> **Response:** This paragraph contains only legal conclusions to which no response is required.

2. Defendant Shaun Donovan is the Secretary of Housing and Urban Development and is sued in his official capacity. *See* Compl. ¶ 14.

> **Response:** Undisputed.

**The Recognition of Disparate Impact Liability Prior to the Challenged Rule**

3. In 1980, in a letter entered into the congressional record, the Secretary of HUD expressed HUD's view that disparate impact liability under the FHA is "imperative to the success of civil rights law enforcement." 126 Cong. Rec. 31,167 (1980) (A.R. 743).

> **Response:** Undisputed that the referenced letter was entered into the congressional record in 1980. The letter, however, is immaterial. The views of HUD's Secretary as expressed in a letter have no legal force. In any event, the letter does not mention

insurance or the application of disparate impact liability to insurance. Moreover, the disparate impact standard discussed in the letter is qualitatively different from the standard established by HUD in its Disparate Impact Rule. Additionally, HUD's position on disparate impact liability has changed over the years. For example, in 1988, both President Reagan and the Solicitor General disavowed the existence of any disparate impact liability under the Fair Housing Act (FHA). U.S. Br. 16, *Town of Huntington v. Huntington Branch, NAACP*, 488 U.S. 15 (1988) (No. 87-1961); Remarks on Signing the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1140, 1141 (Sept. 13, 1988) ("Title 8 speaks only to intentional discrimination.") (A.R. 1002).

4. HUD's formal adjudications as well as its published guidance, internal guidance, and litigating positions have repeatedly recognized the discriminatory effects theory of liability under the FHA. *See* 78 Fed. Reg. at 11,461-62 & nn.18-27 (cataloguing examples of HUD's longstanding interpretation); *see also* A.R. 1,007-13; 1,114-40; 1,141-70; 1,171-90; 1,191-249; 1,250-68; 1,269-77; 1,305-25; 1,406-52.

> **Response:** Undisputed that HUD has at times recognized some form of disparate impact liability under the FHA. The cited sources, however, are immaterial. None of the sources cited by HUD deals with insurance or mentions the application of disparate impact liability to insurers. Further, HUD's prior authorities or positions have no bearing on the ability of a regulated entity to challenge HUD's Disparate Impact Rule. *See Hettinga v. United States*, 770 F. Supp. 2d 51, 56-57 (D.D.C. 2011) (a regulated party had standing to challenge a statutory cap on milk production even though USDA regulations already imposed an identical cap), *aff'd*, 677 F.3d 471 (D.C. Cir. 2012); *see*

*also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). Additionally, HUD's position on disparate impact liability has changed over the years. For example, in 1988, both President Reagan and the Solicitor General disavowed the existence of any disparate impact liability under the FHA. U.S. Br. at 16, *Town of Huntington v. Huntington Branch, NAACP*, 488 U.S. 15 (1988) (No. 87-1961); Remarks on Signing the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1140, 1141 (Sept. 13, 1988) ("Title 8 speaks only to intentional discrimination.") (A.R. 1002).

5. In 1994, HUD's Assistant Secretary for Fair Housing and Equal Opportunity, in testimony to Congress, expressed HUD's view about the applicability of disparate impact liability to insurance: "[insurance company] practices that are neutral on their face [and] have a disproportionate racial impact . . . may violate the [Act] where they cannot meet the established test of business necessity and the showing that there is no less discriminatory alternative." Homeowners Insurance Discrimination: Hearing Before the S. Comm. on Banking, Hous., and Urban Affairs, 103d Cong. 50 (1994) (stmt. of Roberta Achtenberg, Ass't Sec'y for Fair Hous. & Equal Opportunity).

> **Response:** Undisputed, but immaterial. Statements to Congress by an Assistant Secretary at HUD have no legal force.

6. The United States has also pursued FHA disparate impact claims against the insurance industry in federal court. *See, e.g.*, Paragraph 12 of Complaint in United States v. Nationwide Mut. Ins. Co., No. 97-291 (S.D. Ohio Mar. 10, 1997) (available at http://www.justice.gov/crt/about/hce/documents/nationcomp.php).

**Response:** Undisputed that the referenced complaint was filed in 1997. The complaint, however, is immaterial. The views of the United States as expressed in the complaint have no legal force. The fact that the United States may have filed a complaint against an insurer resting in part on a disparate impact theory once in the forty-five years between the enactment of the Fair Housing Act and the promulgation of HUD's Disparate Impact Rule obviously does not establish that disparate impact liability can lawfully be applied to insurers under the FHA. Moreover, HUD's prior authorities or positions have no bearing on the ability of a regulated entity to challenge HUD's Disparate Impact Rule. *See Hettinga v. United States*, 770 F. Supp. 2d 51, 56-57 (D.D.C. 2011) (a regulated party had standing to challenge a statutory cap on milk production even though USDA regulations already imposed an identical cap), *aff'd*, 677 F.3d 471 (D.C. Cir. 2012); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992).

7. In 1996, two insurance groups (that also submitted comments in the rulemaking at issue in this case) filed an amicus brief in the Supreme Court that acknowledged that insurers then faced the possibility of being held liable for disparate impact discrimination:

> [P]roperty insurers will be forced to fend off FHA disparate impact challenges to underwriting and rating standards and rules sanctioned by state insurance regulators. HUD has actively advocated a disparate impact standard for FHA claims generally, and has issued a regulation providing that the FHA applies to property insurance. . . . [T]he federal circuits . . . have held that, at least in some circumstances, a claim under the FHA can be established by proof of disparate impact alone. These facts have already precipitated and will inevitably continue to precipitate disparate impact challenges to property insurers' underwriting and rating standards. . . . HUD has received and is investigating complaints against [insurers] which include claims of disparate impact, and has given every indication of its intention to employ a disparate impact theory in enforcing the FHA against insurers.

Brief for Nat'l Ass'n of Mut. Ins. Cos. & Am. Ins. Ass'n as Amici Curiae in Support of the Petition, *Nationwide Mut. Ins. Co. v. Cisneros*, 516 U.S. 1140 (1996) (No. 95-714), 1996 WL 33467765, at *14-15 & n.11.

> **Response:** Undisputed that two insurance groups—not including Plaintiff PCI—filed this amicus brief in support of a petition for certiorari in 1996. The brief, however, is immaterial. Assertions by third parties in an amicus brief have no legal force. Moreover, the Sixth Circuit's decision that gave rise to the petition for certiorari did not establish that disparate impact liability applies to insurance. It noted that "HUD has never applied a disparate impact analysis to insurers." *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1362 (6th Cir. 1995). Ambiguity regarding whether disparate impact liability could be lawfully applied to insurers persisted long after 1996. *See, e.g.*, *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 964 (8th Cir. 2008).

**The Rulemaking**

8. On November 16, 2011, HUD issued a Notice of Proposed Rulemaking ("NPRM"), in which HUD proposed to "add[] a new subpart . . . to its Fair Housing Act regulations . . . [to] confirm that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect." 76 Fed. Reg. 70,921, 70,924 (Nov. 16, 2011).

> **Response:** Undisputed that HUD issued an NPRM on November 16, 2011 containing (among other things) the quoted statement.

9. In that same NPRM, HUD proposed "establish[ing] a uniform standard of liability for facially neutral housing practices that have a discriminatory effect" to resolve "minor variation in how HUD and the courts have applied th[e] theory." 76 Fed. Reg. at 70,923.

**Response:** Undisputed that HUD so stated. Whether the "variation in how HUD and the courts have applied th[e] theory" was "minor" is a question of law. Any relevant legal assertions herein are addressed in PCI's briefs. (*See* PCI Br. Part V; PCI Reply Br. Part VII.)

10. HUD proposed adopting an approach whereby "liability is determined by a burden-shifting approach" modeled after the well-established frameworks applicable to disparate impact claims brought under other antidiscrimination laws such as Title VII. 76 Fed. Reg. at 70,923.

**Response:** Undisputed that HUD stated that "[t]his proposed rule establishes a uniform standard of liability for facially neutral housing practices that have a discriminatory effect. Under this rule, liability is determined by a burden-shifting approach." 76 Fed. Reg. at 70923 (A.R. 3). Whether the framework established in the Rule is consistent with "the well-established frameworks applicable to disparate impact claims brought under other antidiscrimination laws such as Title VII" is a question of law. Any relevant legal assertions herein are addressed in PCI's briefs. (*See* PCI Br. Part V; PCI Reply Br. Part VII.)

11. HUD issued its Final Rule on February 15, 2013, which made several changes to the wording of its proposed rule in response to comments suggesting a need for greater clarity, but it retained the basic substance of the proposal. 78 Fed. Reg. 11,460.

**Response:** Undisputed that HUD issued its Final Rule on February 15, 2013. Whether the Final Rule "retained the basic substance of the proposal" is a question of law. No response is required to any incidental legal assertions herein.

12. In the preamble to that Rule, HUD announced that it was "formaliz[ing] its longstanding view that discriminatory effects liability is available under the Act and establishes uniform standards for determining when a practice with a discriminatory effect violates the Fair Housing Act." 78 Fed. Reg. at 11,463.

> **Response:** Undisputed that HUD so stated. As noted above, however, HUD's position on disparate impact liability has changed over the years. For example, in 1988, both President Reagan and the Solicitor General disavowed the existence of any disparate impact liability under the Fair Housing Act (FHA). U.S. Br. 16, *Town of Huntington v. Huntington Branch, NAACP*, 488 U.S. 15 (1988) (No. 87-1961); Remarks on Signing the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1140, 1141 (Sept. 13, 1988) ("Title 8 speaks only to intentional discrimination.") (A.R. 1002).

13. HUD noted that its construction of the FHA to encompass disparate impact was consistent with the interpretation adopted by eleven courts of appeals. 78 Fed. Reg. at 11,476.

> **Response:** Undisputed that HUD so stated. Whether HUD's construction in the Rule is "consistent with the interpretation adopted by eleven courts of appeals" is a question of law. Any relevant legal assertions herein are addressed in PCI's briefs. (*See* PCI Reply Br. Part I.C.)

14. In the preamble to the Rule, HUD observed that "for the minority of entities that have, in the over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this

rulemaking, the costs [of the Rule] will simply be the costs of compliance with a preexisting statute, administrative practice and case law." 78 Fed. Reg. at 11,479.

> **Response:** Undisputed that HUD so stated. Whether the costs of complying with the Rule will "simply be the costs of compliance with a preexisting statute, administrative practice and case law" is a question of law. Any relevant legal assertions herein are addressed in PCI's briefs. (*See* PCI Reply Br. Part I.C.)

15. HUD adopted a three-part burden-shifting framework where: (1) the party bringing the claim of discrimination first bears the burden of proof to show that a practice actually or predictably results in a discriminatory effect; (2) if the first step is satisfied, the defendant or respondent has the burden of proving that the practice is "necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests"; and (3) if the second step is satisfied, the party bringing the claim may still prevail upon proving that the asserted interest "could be served by another practice that has a less discriminatory effect." 78 Fed. Reg. at 11,482 (quoting 24 C.F.R. § 100.500(b)-(c)).

> **Response:** Undisputed.

16. HUD noted that the Rule's framework was "not a significant departure from HUD's interpretation to date or that of the majority of federal courts." 78 Fed. Reg. at 11,480.

> **Response:** Undisputed that HUD so stated. Whether the Rule's framework was "a significant departure from HUD's interpretation to date or that of the majority of federal courts" is a question of law. Any relevant legal assertions herein are addressed in PCI's briefs. (*See* PCI Br. Part V; PCI Reply Br. Part VII.)

17.     HUD concluded that the three-part burden shifting framework adopted in the Rule was "the fairest and most reasonable approach to resolving" discriminatory effects claims under the FHA. 78 Fed. Reg. at 11,473-74.

>   **Response:** Undisputed that HUD so stated. Whether the three-part burden shifting framework adopted in the Rule is "the fairest and most reasonable approach to resolving" discriminatory effects claims under the FHA is a question of law. Any relevant legal assertions herein are addressed in PCI's briefs. (*See* PCI Br. Part V; PCI Reply Br. Part VII.)

**HUD's Final Rule**

18.     During the comment period, HUD received nearly 100 public comments in response to its proposed rule (many of which had multiple signatories) from entities representing a wide variety of interests, including individuals, fair housing and legal aid organizations, state and local fair housing agencies, state Attorneys General, state housing finance agencies, public housing agencies, mortgage lenders, credit unions, banks, real estate agents, and law firms. A.R. 9-610.

>   **Response:** Undisputed.

19.     Three trade associations representing the homeowner's insurance industry, including Plaintiff, also submitted comments. A.R. 372-83 (Cmt. of Nat'l Ass'n of Mut. Ins. Cos.); 455-59 (Cmt. of Am. Ins. Ass'n); 553-56 (Cmt. of Prop. Cas. Insurers Ass'n of Am.).

>   **Response:** Undisputed.

20. Six state Attorneys General submitted a joint comment during the rulemaking that strongly "commend[ed]" the Rule at issue, calling the availability of disparate impact claims "squarely aligned with the interest of our states" and noting that the Rule would complement the states' own "extensive efforts" to address the lingering "barriers to equal housing opportunities." A.R. at 560-61.

> **Response:** Undisputed, but immaterial. This comment does not mention the word "insurance" or address whether the Disparate Impact Rule conflicts with state insurance laws. In any event, a comment by state Attorneys General is irrelevant to the legal analysis of this case. (*See* PCI Reply Br. 25 n.14)

21. HUD received comments that contended that the proposed burden-shifting framework was too favorable to the party bringing the claim and other comments that contended that it was too favorable to the party subject to the claim. *Compare, e.g.*, A.R. at 381-83 (Cmt. of Nat'l Ass'n of Mut. Ins. Cos.) (arguing that framework places too heavy a burden on defendants), *with, e.g.*, A.R. 481-483 (Cmt. of Nat'l Fair Hous. Alliance, et al.) ("We respectfully suggest that the burden of proof should be assigned to the defendant or respondent to show that there is no less discriminatory alternative. . . . In litigation involving insurance or lending – where private companies scrupulously protect proprietary information such as credit scores, actuarial data and risk assessment – there is an even stronger rationale for imposing the burden on the defendant, whose knowledge will be vastly superior to that of a plaintiff and who will uniquely possess information with respect to less discriminatory alternatives.").

> **Response:** Undisputed, but immaterial.

**HUD's Responses to Comments**

22. HUD grouped the comments it received into 42 different issues and responded to each of those 42 issues in turn. See 78 Fed. Reg. at 11,465-79.

> **Response:** Disputed. As explained in PCI's briefs, HUD did not address all of the issues raised in comments. In particular, HUD failed altogether to address a comment explaining that the Rule violates the "filed rate doctrine." (*See* A.R. 378.) HUD acknowledged receiving that comment, along with comments about the McCarran-Ferguson Act and HUD's reliance on *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205 (9th Cir. 2010) (per curiam). *See* 78 Fed. Reg. at 11474 (A.R. 626) ("Some commenters stated that application of the disparate impact standard would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act (15 U.S.C. 1011-1015) or the common law 'filed rate doctrine.' Some commenters stated that HUD's use of *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205 (9th Cir. 2010), in the preamble of the proposed rule was not appropriate."). But although HUD purported to respond to the comments about the McCarran-Ferguson Act and the *Ojo* case, it did not address the filed-rate doctrine in its response. *See* 78 Fed. Reg. at 11475 (A.R. 627). HUD also failed to meaningfully address the McCarran-Ferguson Act, the significant adverse effect that the Rule would have on the provision of homeowners' insurance, and insurers' request for an exemption or safe harbors. (*See* PCI Br. Parts II & III; PCI Reply Br. Parts IV & V.)

23. HUD acknowledged and rejected comments from insurance groups based on the McCarran-Ferguson Act and the "filed-rate" doctrine because, "[b]y formalizing the

-12-

discriminatory effects standard, the rule will not, as one commenter suggested, undermine the states' regulation of insurance." 78 Fed. Reg. at 11,475 (internal quotation marks omitted).

> **Response:** Disputed. As explained above in response to paragraph 22, HUD did not respond to comments regarding the "filed-rate" doctrine. The "filed-rate" doctrine is not mentioned at all in HUD's responses to comments. *See* 78 Fed. Reg. at 11475 (A.R. 627). HUD made the quoted statement in its short discussion of the McCarran-Ferguson Act. *See id.*

24. HUD noted that "McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies," and that the Rule does "not alter the instruction of McCarran-Ferguson or its application," which "depends on the facts at issue and the language of the relevant State law relating to the business of insurance." 78 Fed. Reg. at 11,475 (internal quotation marks and brackets omitted).

> **Response:** Undisputed that the quoted words appear on the cited page of the rulemaking. The passage, however, omits the following critical sentence: "Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act." It is undisputed that HUD stated:
>
>> McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act. How the Act should be construed in light of McCarran-Ferguson depends on the facts at issue and the language of the relevant State law "relat[ing] to the business of insurance." Because this final rule does not alter the instruction of McCarran-Ferguson or its application as described in *Ojo v. Farmers Group*, it will not interfere with any State regulation of the insurance industry.

78 Fed. Reg. at 11475 (A.R. 627). The meaning of the McCarran-Ferguson Act and the effect of the Disparate Impact Rule on state regulation of insurance are questions of law. Any relevant legal assertions herein are addressed in PCI's briefs. (*See* PCI Br. Part I; PCI Reply Br. Part III.)

25. HUD acknowledged and rejected comments from insurance groups about the purported effect the Rule would have on the insurance industry, indicating that it found the concerns raised by the insurance groups to be "misplaced." 78 Fed. Reg. at 11,475.

**Response:** Undisputed that HUD so stated. Disputed that HUD meaningfully responded to comments regarding the effect of the Rule on insurance and disputed that concerns raised by insurance groups were "misplaced." (*See* PCI Br. Part III; PCI Reply Br. Part V.)

26. HUD noted that comments from the insurance industry about the effect of the Rule were based on an "incorrect" assumption "that once a discriminatory effect is shown, the policy or practice at issue is *per se* illegal." 78 Fed. Reg. at 11,475. HUD explained that the Rule distinguishes "unnecessary barriers proscribed by the [Act] from valid policies and practices crafted to advance legitimate interests," such that "even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification." *Id.*

**Response:** Undisputed that HUD so stated. Disputed that HUD meaningfully responded to comments regarding the effect of the Rule on insurance. (*See* PCI Br. Part III; PCI Reply Br. Part V.)

27. HUD acknowledged and rejected comments from insurance groups that requested that the insurance industry be exempted from the Rule, or that safe harbors be created for certain insurance practices. 78 Fed. Reg. at 11,475.

> **Response:** Undisputed that HUD so stated. Disputed that HUD meaningfully responded to the insurance industry's requests for an exemption or safe harbors. (*See* PCI Br. Part III; PCI Reply Br. Part V.)

28. HUD explained that it found the creation of special exemptions for the insurance industry to be "unnecessary" and that "creating exemptions beyond those found in the Act would run contrary to Congressional intent." 78 Fed. Reg. at 11,475.

> **Response:** Undisputed that HUD so stated. Disputed that HUD meaningfully responded to the insurance industry's requests for an exemption or safe harbors. (*See* PCI Br. Part III; PCI Reply Br. Part V.) Whether an exemption would be "unnecessary" or "run contrary to Congressional intent" are questions of law. Any relevant legal assertions herein are addressed in PCI's briefs. (*See* PCI Br. Part III.B; PCI Reply Br. Part V.B.)

29. In responding to comments that argued that the Rule would lead to increased litigation burdens for entities subject to the FHA, HUD explained that it "does not believe that the rule will lead to frivolous investigations or create excessive litigation exposure for respondents or defendants." 78 Fed. Reg. at 11,472. HUD based this conclusion in part on "how the discriminatory effects framework has been applied to date by HUD and by the courts." *Id.*

> **Response:** Undisputed that HUD so stated in its general discussion of the Rule, at page 11472. HUD did not consider the potential for frivolous investigations or excessive

litigation exposure in the insurance context nor the potential costs to insurers from the promulgation of a Rule that may make risk-based insurance practices a prima facie violation of federal law.  *See* 78 Fed. Reg. 11475 (A.R. 627).

30.     HUD acknowledged and rejected comments that it should alter the burdens of proof in the proposed burden-shifting standard, concluding that its chosen framework "is the fairest and most reasonable approach . . . because it does not require either party to prove a negative . . . [and] will ensure consistency in applying the discriminatory effects standard while creating the least disruption because . . . ."  78 Fed. Reg. at 11,473-74.

>   **Response:** Undisputed that HUD so stated.  Whether HUD's chosen framework "is the fairest and most reasonable approach," will "require either party to prove a negative," and "will ensure consistency" are questions of law.  Any relevant legal assertions herein are addressed in PCI's briefs.   (*See* PCI Br. Part V; PCI Reply Br. Part VII.)

31.     HUD acknowledged and rejected comments that it should adopt a burden-shifting framework identical to the one set forth in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989).  HUD explained that the burden-shifting standard in *Wards Cove*, which was adopted by the Supreme Court for use in Title VII claims but quickly abrogated by Congress, does not and should not govern FHA claims, "in light of the wider range and variety of practices covered by the Act that are not readily quantifiable." 78 Fed. Reg. at 11,472-73.  HUD further explained that its choice "is consistent with … Congress's codification of the disparate impact standard in the employment context."  [78] Fed. Reg. at 11473.

> **Response:** Undisputed that HUD so stated. This paragraph otherwise contains legal conclusions to which no response is required. Any relevant legal assertions herein are addressed in PCI's briefs. (*See* PCI Br. Part V; PCI Reply Br. Part VII.)

32. HUD acknowledged and rejected comments that it should remove the word "necessary" from the definition of a "legally sufficient justification." HUD explained that it rejected this suggestion because "HUD's substantial experience in administering the Fair Housing Act confirms that requiring a challenged practice with a discriminatory effect to be necessary best effectuates the broad, remedial goal of the Act" and "is also consistent with Congress's 1991 enactment of legislation codifying that, in the employment context, a practice that has a disparate impact must be consistent with 'business necessity' and must also be 'job related.'" 78 Fed. Reg. at 11,472 (citing 42 U.S.C. § 2000e-2(k)(1)(A)[)].

> **Response:** Undisputed that HUD so stated. This paragraph otherwise contains legal conclusions to which no response is required. Any relevant legal assertions herein are addressed in PCI's briefs. (*See* PCI Br. Part V; PCI Reply Br. Part VII.)

Dated: May 16, 2014

Respectfully submitted,

By: /s/ Brian M. Boynton

_____

Seth P. Waxman (*pro hac vice*)
Brian M. Boynton (*pro hac vice*)
Matthew J. Tokson (*pro hac vice*)
Lynn Eisenberg (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: seth.waxman@wilmerhale.com

Rowe W. Snider (# 03125194)
Ashlee M. Knuckey (# 6300237)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Tel.: (312) 443-0700
Fax: (312) 896-0336
Email: rsnider@lockelord.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 16, 2014, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to counsel of record in this case.

    s/ Brian M. Boynton
Brian M. Boynton
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
Email: seth.waxman@wilmerhale.com