IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, ) ) ) Plaintiff, ) ) v. ) ) SHAUN DONOVAN, in his official capacity as ) Secretary of Housing and Urban Development, ) and UNITED STATES DEPARTMENT OF ) HOUSING AND URBAN DEVELOPMENT, ) ) Defendants. ) | Case No. 1:13-cv-08564<br><br>Judge Amy J. St. Eve<br><br>Magistrate Judge Susan E. Cox |

## DECLARATION OF PETER DROGAN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

I, Peter Drogan, declare as follows:

1. I am over eighteen years of age and am not suffering under any legal or physical disability.

2. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment and in opposition to Defendants' Motion To Dismiss and/or for Summary Judgment. I am testifying to the statements below based on my personal knowledge.

3. I am the Vice President and Chief Actuary of Amica Mutual Insurance Company, and a Fellow of the Casualty Actuarial Society. My duties include overseeing property and casualty ratemaking in the 50 jurisdictions in which Amica provides insurance coverage.

4. Amica is a Rhode Island domiciled Mutual Insurance Company, based in Lincoln, Rhode Island, and is a member of the Property Casualty Insurers Association of America.

Amica is a direct writer of insurance and provides automobile, homeowners, excess liability and related personal lines insurance to nearly 800,000 households located in the District of Columbia and every state in the United States (except Hawaii).

5. Homeowners insurance is a multi-line insurance product that includes property coverage, contents coverage and liability coverage, as well as other related protections for Amica insureds.

6. I understand that on November 16, 2011 the Department of Housing and Urban Development published its proposed rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard. HUD issued its final rule on February 15, 2013, providing that the Federal Housing Act, 42 U.S.C. 3604 ("FHA") prohibits "disparate impact" discrimination (the "Disparate-Impact Rule").

7. Amica does not collect data indicating the race, color, religion, national origin, or disability of its policyholders and therefore does not use such data in developing rates for homeowners insurance. Amica does not analyze such data in any geographic area either before submitting rates to state insurance commissioners or before selling insurance.

8. Amica writes homeowners insurance in Maryland. I understand that Maryland law prohibits the collection of such data. MD Code Ins. § 27-501(e)(1).

9. Amica develops rates based upon factors that are predictive of future losses. For homeowners insurance, these factors include such items as protective devices, building code grading, loss mitigation devices/construction, remodeled age, policyholder claim history, presence of additional lines of insurance with Amica, longevity with Amica, and insurance bureau score. Amica's rates are generally submitted and approved by state insurance commissioners following the insurance department's actuarial review of the rate filing and prior

2

to usage by Amica, and any changes are likewise subject to a rate filing process prior to approval and implementation of such rates.

10. Collecting and storing the data necessary to determine compliance with the Disparate Impact Rule would present a substantial expense to Amica. Collecting that data would also inconvenience policyholders.

11. Analyzing the data collected would also impose additional expenses on Amica. To perform a Disparate Impact Analysis, an insurer such as Amica may need to engage the services of an expert and may need to gather voluminous records to provide to that expert. For example, the insurer may need to gather and provide information regarding policyholders and policies for a multi-year period, including information relating to the creation, modification and termination of the policy such as would be necessary for an expert to perform a complex multi-variate regression type of analysis to determine whether the challenged practice did, in fact, result in any disparate impact.

12. The cost of performing the Disparate Impact Analysis may vary based on the size and scope of the analysis to be done (that is, the cost may depend on the amount of data and records analyzed, as well as the number of different geographic areas encompassed by such an analysis).

13. Even if all of the necessary information could be accurately collected and analyzed, Amica would still not know if its rating processes created a Disparate Impact on a particular group on insureds or how to change its ratemaking processes to avoid a Disparate Impact.

14. To attempt to comply with the Disparate Impact Rule, Amica would need to base its pricing on factors other than risk based pricing.

3

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 16, 2014.

_____
Peter Drogan

## CERTIFICATE OF SERVICE

      I hereby certify that, on May 16, 2014, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to counsel of record in this case.

                                                                             /s/ Brian M. Boynton
                                                    Brian M. Boynton
                                                    WILMER CUTLER PICKERING HALE AND DORR LLP
                                                    1875 Pennsylvania Avenue, NW
                                                    Washington, DC 20006
                                                    Tel.: (202) 663-6000
                                                    Fax: (202) 663-6363
                                                    Email: seth.waxman@wilmerhale.com