## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Case No. 1:13-CV-08564** |
| **vs.** | ) ) | **Judge Amy J. St. Eve** |
| **SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT** | ) ) ) ) ) ) | **Magistrate Judge Susan E. Cox** |
| **Defendants.** | ) ) | |

## BRIEF OF THE STATE OF OKLAHOMA ex rel. JOHN D. DOAK, INSURANCE COMMISSIONER, AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND/OR MOTION FOR SUMMARY JUDGMENT

Christopher D. Wolek, OBA#19612
Michael P. Womack, OBA #20895
GIBBS ARMSTRONG BOROCHOFF
   MULLICAN & HART, P.C.
601 South Boulder Avenue, Suite 500
Tulsa, Oklahoma 74119
(918) 587-3939
(918) 582-5504 *facsimile*

**ATTORNEYS FOR AMICUS CURIAE**

# TABLE OF CONTENTS

I.    INTERESTS OF AMICUS ....................................................................................1

II.   INTRODUCTION AND SUMMARY OF ARGUMENT ..............................................1

III.  ARGUMENTS & AUTHORITIES ........................................................................2

       I.      The Purely Legal Question of Whether the Rule is
                 Preempted is Ripe for Judicial Determination .......................................................2

       II.     The Disparate Impact Rule is Preempted by the
                 McCarran-Ferguson Act .................................................................................3

             A.     The FHA is not Specifically Related to the Business of Insurance ............3

             B.     The Disparate Impact Rule Impairs Oklahoma Law
                    and Interferes with Oklahoma's Regulatory Regime .................................6

             C.     The Rule is as Arbitrarily Destructive as a Tornado .................................13

       III.    The Disparate Impact Rule Raises Grave Federalism Concerns .........................15

IV.  CONCLUSION ...........................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baumgardner v. State ex rel. Dept. of Human Services*
    789 P.2d 235, 236, n. 1 (Okla. 1990)...........................................................................10

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ....................................................................................16, 17

*Davis v. Michigan Dept. of Treasury*
    489 U.S. 803, 809 (1989)...................................................................................16

*Doe v. Mutual of Omaha Insurance Co.*
    179 F.3d 557 (7th Cir. 1999) ...............................................................................6

*Gonzales v. Oregon*
    546 U.S. 243 (2006) .....................................................................................17, 18

*Group Life & Health Ins. Co. v. Royal Drug Co.,*
    440 U.S. 205 (1979)......................................................................................4, 5

*Humana Inc. v. Forsyth*
    525 U.S. 299, 310 (1999)...................................................................................2

*Int'l Bhd. of Teamsters v. U.S.*
    431 U.S. 324, 335-36, n. 15 (1977....................................................................8

*N.A.A.C.P. v. American Family Mut. Ins. Co.*
    978 F.2d 287, 295 (7th Cir. 1992) .............................................................5, 11, 14, 17

*Ojo v. Farmers Group, Inc.,*
    565 F.3d 1175 (9th Cir. 2009) (*Ojo I*) .............................................................8, 9

*Ojo v. Farmers Group, Inc.*
    600 F.3d 1205 (9th Cir. 2010) (*Ojo II*) ...........................................................8, 9

*Ojo v. Farmers Group, Inc.,*
    356 S.W.3d 421, 425-26 (Tex. 2011)(*Ojo III*) .............................................8, 9, 10, 11, 12

*United States v. South-Eastern Underwriters Ass'n.*
    322 U.S. 533 (1944)..........................................................................3, 4

*Wards Cove Packing Co. v. Atonio*
    490 U.S. 642 (1989)..........................................................................10

*Watters v. Wachovia Bank, N.A.*
    550 U.S. 1 (2007), ........................................................................18, 19


**Statutes**

12 U.S.C. § 1, *et seq* ........................................................................18

15 U.S.C. § 1011........................................................................1, 3, 4

15 U.S.C. § 1011(a) ........................................................................3, 4

15 U.S.C. § 1012........................................................................16

15 U.S.C. § 1012(a) ........................................................................1

15 U.S.C. § 1012(b)........................................................................1, 4, 5

21 U.S.C. § 801, *et seq.,* ........................................................................17

78 Fed. Reg. at 11460 ........................................................................3, 6

78 Fed. Reg. at 11475 ........................................................................6

78 Fed. Reg. at 11481 (§ 100.5) ........................................................7, 15

78 Fed. Reg. at 11482 (§ 100.500). ........................................................7, 8

Ariz. Rev. Stat. § 20-384 ........................................................................11

Ark. Code § 23-67-209 ........................................................................11

Haw. Rev. Stat. § 431:14-103 ........................................................................11

Kan. Stat. Ann. § 40-954 ........................................................................11

La. Rev Stat. Ann. § 22:1454 ........................................................................11

Me. Rev. Stat. Ann. tit. 24-A, § 2303 .................................................................11

Miss. Code Ann. § 83-2-3 ...................................................................................11

Nev. Rev. Stat. § 686B.060 .................................................................................11

N.H. Rev. Stat. Ann. § 412:15 ............................................................................11

N.D. Cent. Code § 26.1-25-03 ............................................................................11

Okla. Stat. Ann. tit. 36, § 953 ........................................................................10, 12

Okla. Stat. Ann. tit. 36, § 985(A)(3) .............................................................*passim*

Okla. Stat. Ann. tit.36, § 1204(7)(c) ..........................................................7, 12, 14

R.I. Gen. Laws § 27-44-5 ....................................................................................11

Tenn. Code Ann. § 56-5-502 ...............................................................................11

Tex. Ins. Code §§ 544.002(a)(1), 560.002(c)(3) ................................................11

Utah Code § 31A-19a-202 ...................................................................................11

Wyo. Stat. § 26-14-105 ........................................................................................11

**Rules, Regulations and Acts**

Oklahoma Constitution, Article 6, §§ 22 and 23 ...........................................................15

HUD Final Rule, *Implementation of the Fair Housing Act's*
    *Discriminatory Effects Standard,*
        78 Fed. Reg. 11,460 (Feb. 15, 2013) ....................................................................2

*The McCarran-Ferguson Act of 1945:*
    *Reconceiving the Federal Role of Insurance Regulation*
        68 N.Y.U. L.Rev. 13 (1993) ...................................................................................4

## INTERESTS OF AMICUS

*Amicus*, Commissioner John D. Doak, is the duly elected Insurance Commissioner for the State of Oklahoma and the chief officer of the Oklahoma Insurance Department ("OID"). The OID and the office of Insurance Commissioner are empowered under the Oklahoma Constitution to execute the laws of the State of Oklahoma related to insurance and insurance companies doing business in the State. Article 6, Sections 22 and 23. The Commissioner is one of only eleven (11) state insurance commissioners who are elected. As such, the Commissioner can offer this Court his unique perspective as an elected official doing the actual work of regulating the insurance industry. Moreover, the Commissioner has a particular interest in this matter to the extent that the U.S. Department of Housing and Urban Development ("HUD") is attempting to usurp the powers granted to the OID by the Oklahoma Constitution, which are traditionally and statutorily vested with the several States.

## INTRODUCTION AND SUMMARY OF ARGUMENT

It is the States, not the Federal government, who have the authority to regulate the insurance industry. This is our national policy. *See* 15 U.S.C. § 1011. Though Congress can regulate the business of insurance under the Commerce Code, they specifically deferred that power to the States (*see* 15 U.S.C. § 1012(a)), and further protected the States' role in regulating the business of insurance by including a reverse-preemption provision in the McCarran-Ferguson Act prohibiting federal law from invalidating, impairing, or superseding state law unless the federal law "*specifically* relates to the business of insurance." *See* 15 U.S.C. § 1012(b) (emphasis added). The Fair Housing Act ("FHA") that HUD purports to act under does not *specifically* relate to the business of insurance. Thus, as applied to the business of insurance, HUD has passed a facially invalid rule in defiance of Congress's express command as set forth in § 1102

of the McCarran-Ferguson Act. *See* HUD, Final Rule, *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013) (the "Rule" or the "Disparate Impact Rule"). The Rule is preempted as a matter of law and therefore deferring judicial review for another day, as Defendant advocates, is of no use.

The Rule also raises grave federalism concerns. The disparate impact liability and its accompanying burden-shifting framework called for under the Rule are directly in conflict with the laws of the State of Oklahoma, as well as numerous other states, that expressly disavow disparate impact liability for insurance ratemaking. Moreover, the power reserved to the States to be the final voice in setting ratemaking standards is being usurped by the Federal government.

## ARGUMENTS AND AUTHORITIES

### I. The Purely Legal Question of Whether the Rule is Preempted is Ripe for Judicial Determination

Defendant's standing and ripeness arguments lack merit and ignore the fundamental nature of the issue before the Court. The preemptive effect of the McCarran-Ferguson Act on the Rule is not, as Defendant contends, a fact-specific issue. It is a purely legal question, and as Plaintiff accurately states in its Response to HUD's Motion to Dismiss [Dkt. No. 44], "[c]ourts often strike down federal laws that conflict with state insurance laws under the McCarran-Ferguson Act where the basis for preemption is clear as a matter of law without reference to specific facts, as is the case here." *Id.* at pp. 14-15.

The purely legal question under *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999), is whether the Rule interferes with a State's administrative regime. If it does, then McCarran-Ferguson precludes its application. *Id.* The Rule does not just interfere with the administrative regimes of several States, it supersedes and replaces them. No additional factual context is needed because the basis for preemption is clear as a matter of law.

2

Oklahoma is a prime example of the Rule's supersession of state law. Oklahoma law forbids a disparate impact analysis of ratemaking standards by providing, "[n]o rate in a competitive market shall be considered unfairly discriminatory unless it classifies risk on the basis of race, color, creed, or national origin." *See* Okla. Stat. Ann. tit. 36, § 985(A)(3). The very nature of the disparate impact analysis under the Rule presumes "that liability under the Fair Housing Act may arise from a facially neutral practice that has a discriminatory effect." *See* 78 Fed. Reg. at 11460. This is in direct conflict with § 985(A)(3), thus demonstrating that the purely legal question of whether the Rule interferes with the administrative regimes of the several States is ripe for adjudication without any further reference to specific facts.

Moreover, Defendant's argument that the harm caused by the Rule is at this point abstract and hypothetical has no foundation in the realities of insurance regulation. Unlike Defendant and the *amici curiae* supporting its position, the Commissioner and OID are actually involved in the day-to-day work of regulating the insurance industry. The OID is trying to figure out how it can do its job of regulating the business of insurance in Oklahoma in light of the Rule which, on its face, calls all of Oklahoma's administrative regime into question. The only entities to claim the harm is hypothetical are those not actually involved in the regulation of the business of insurance. To the State entities empowered to regulate the business of insurance and the insurers they regulate, the harm of the Rule is imminent, substantial and concrete.

## II. The Disparate Impact Rule is Preempted by the McCarran-Ferguson Act

### A. The FHA is not Specifically Related to the Business of Insurance

The regulation of the insurance industry has traditionally been the exclusive province of the States. When these powers were threatened by the holding in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), Congress reacted swiftly by passing the McCarran-

Ferguson Act, the first section of which expressly assigns to the States exclusive regulatory jurisdiction over the insurance industry and disavows the value of federal regulation: "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." *See* 15 U.S.C. § 1011. Though *South-Eastern Underwriters* confirmed that Congress has the authority to regulate the business of insurance under the Commerce Clause, Congress deferred that authority to the States with 15 U.S.C. § 1011(a), which provides: "The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." This renunciation of federal interference with the states' regulation of the business of insurance gives the insurance industry a unique place in the law. As Professors Macey and Miller noted, "[a]mong America's financial institutions, insurance firms alone are largely immune from federal regulation...The federal government not only has eschewed regulation; it has affirmatively declared a policy of not regulating the business of insurance." Jonathan R. Macey and Geoffrey P. Miller, *The McCarran-Ferguson Act of 1945: Reconceiving the Federal Role of Insurance Regulation*, 68 N.Y.U. L.Rev. 13 (1993).

Not only did Congress declare that it is the province of the States to regulate the business of insurance and defer any authority it had in this regard to the States, it took the extra step of affirmatively protecting the States' authority to do so from federal encroachment. *See, generally, Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979). The reverse-preemption provision of the McCarran-Ferguson Act provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the

business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." *See* 15 U.S.C. § 1012(b).

The reason for the insurance industry's unique position in the law and Congress's express intent to have the industry regulated by the States, not the federal government, is evident. Insurance, at its most basic level, is the transfer of the risk of loss from an insured to an insurer in exchange for premium payments. The risk exposure drives the premium rate required to cover the risk. These risks vary from state to state, with Florida having a higher exposure to the risk of hurricanes than Oklahoma and Oklahoma having a higher exposure to the risk of massive tornadoes than Florida. The types of risk are not nationally uniform, and thus a one-size-fits-all regulatory regime at the federal level does not serve the public interest because it does not allow the flexibility to deal with the actual risks encountered by insureds and insurers.

Here, the Disparate Impact Rule promulgated by HUD under the FHA replaces the sound actuarial standards employed by the States with a disparate impact standard. This is precisely what the reverse-preemption provision of McCarran-Ferguson expressly prohibits *unless* the law—here, the FHA—specifically relates to the business of insurance. As the United States Supreme Court has recognized, "the fixing of rates is the 'business of insurance.'" *Group Life & Health Ins. Co.*, 440 U.S. at 224, n. 32 (1979). There is no question that the FHA does not specifically relate to the business of insurance, "even obliquely." *N.A.A.C.P. v. American Family Mut. Ins. Co.*, 978 F.2d 287, 295 (7th Cir. 1992) ("The Fair Housing Act is an 'Act of Congress' that does not 'specifically relate [ ] to the business of insurance'"). Thus, the Disparate Impact Rule violates the McCarran-Ferguson Act because it purports to regulate the business of insurance under a statute that is not specifically related to the business of insurance.

HUD has taken the position that, "McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act." 78 Fed. Reg. 11460, 11475. While the Commissioner disagrees with HUD's cavalier assertion that it can ignore a federal statute that expressly limits the ways in which HUD can act, it does agree with HUD's statement that McCarran-Ferguson instructs this Court on how to construe the Rule. Just because HUD chose to ignore federal law does not mean the Court can, and this Court has to do what HUD refused to do: consider whether the Rule attempts to regulate the business of insurance under a law that does not relate specifically to insurance. Under the controlling precedent of *Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557 (7th Cir. 1999), the Rule does not pass muster under the McCarran-Ferguson Act because it is preempted by the laws of the States.[1]

## B. The Disparate Impact Rule Impairs Oklahoma Law and Interferes with Oklahoma's Regulatory Regime

As the Seventh Circuit noted in *Mutual of Omaha*, it is inappropriate under McCarran-Ferguson to have a state's determination of "whether limitations on coverage are actually sound and consistent with state law" second-guessed by a federal court; or, perhaps more appropriately, a party before a federal court creating out of whole-cloth disparate impact claims out of virtually any set of racially-neutral and actuarially sound risk factors. 179 F.3d at 564. It is up to the States to make the ultimate decision on what the ratemaking standards in the States will be, and to enforce them accordingly. Lest there be any doubt, the Disparate Impact Rule's imposition of a federal disparate impact analysis standard that can trump *all* of a state's actuarial sound ratemaking standards is in direct conflict with Oklahoma law:

---

[1] The Court has received extensive briefing on the *Mutual of Omaha* case and the Commissioner cannot offer any additional insight other than rehashing the arguments previously made. Suffice to say that the Commissioner concurs with the analysis and effect of *Mutual of Omaha* previously provided by Plaintiff.

| Oklahoma Statutes, Title 36 | HUD Disparate Impact Rule |
|---|---|
| • A rate may not be determined to be unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense levels, or like expenses but different loss exposures, or if it averaged broadly among persons insured within a group, franchise or blanket policy or a mass-marketed plan. No rate in a competitive market shall be considered unfairly discriminatory unless it classifies risk on the basis of race, color, creed, or national origin. *See* § 985(A)(3) <br><br> • Risks may be classified in any way except that no risk may be classified on the basis of race, color, creed, or national origin. *See* § 985(F) <br><br> • As to kinds of insurance other than life and accident and health, no person shall make or permit any unfair discrimination in favor of particular persons, or between insureds or subjects of insurance having substantially like insuring, risk, and exposure factors, or expense elements, in the terms or conditions of any insurance contract, or in the rate or amount of premium charged therefor. *See* § 1204(7)(c) | • The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent...*See* 78 Fed. Reg. at 11481 (§ 100.5). <br><br> • Liability may be established under the Fair Housing Act based on a practice's discriminatory effect, as defined in paragraph (a) of this section, even if the practice was not motivated by a discriminatory intent...A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin. *See* 78 Fed. Reg. at 11482 (§ 100.500). |

The Rule directly contradicts Oklahoma law, and if allowed to stand, will supersede Oklahoma law—just as McCarran-Ferguson prohibits.[2] Under § 985(A)(3) Oklahoma law requires discriminatory intent for a rate to be unfairly discriminatory, while under the Rule,

---

[2] It should be noted that, as Plaintiff referred to in ¶34 of its Complaint, Oklahoma law expressly requires insurance companies to consider actuarially relevant factors in developing insurance rates. *See* § 985(B) and (C).

liability can be established "even if the practice was not motivated by discriminatory intent." *See* 78 Fed. Reg. at 11482. The entire premise of the Disparate Impact Rule is the consideration of non-discriminatory factors in setting rates, which is precisely what Oklahoma law prohibits. These two competing standards cannot be reconciled.

Oklahoma law disclaims any disparate impact liability, instead embracing a disparate treatment standard. As the Supreme Court noted, disparate treatment is discrimination against a group "because of their race," while disparate impact encompasses "practices that are facially neutral…but that in fact fall more harshly on one group than another." *Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 335-36, n. 15 (1977). The express rejection of disparate impact liability is found in § 985(A)(3)'s language that no rate "shall be considered unfairly discriminatory unless it classifies risk on the basis of race, color, creed, or national origin." This language unequivocally embraces a disparate treatment standard by prohibiting direct discrimination "because of race." *Int'l Bhd. of Teamsters*, supra. This language also unequivocally disclaims disparate impact liability under Oklahoma law, as the entire premise of disparate impact liability is that a facially-neutral risk *not* classified on the basis of a protected status could nevertheless lead to a discriminatory rate. The additional language in § 985(A)(3) disallowing a finding of unfair discrimination where "different premiums result for policyholders with like loss exposures but different expense levels" and vice versa further shows that Oklahoma has rejected disparate impact liability in the context of insurance, as comparing like loss exposures with different expense levels (and vice versa) is precisely what a disparate impact analysis does.

Because Oklahoma law has expressly disclaimed a disparate impact analysis in the context of setting insurance rates, the Court should follow the *Ojo v. Farmers Group, Inc.* line of cases and hold that the Rule is reverse-preempted under the McCarran-Ferguson act. *Ojo*

involved a disparate impact claim brought under the FHA premised on the insurers' use of credit-rating scores as a risk factor. The insurers argued that this claim was preempted under McCarran-Ferguson because it conflicted with the applicable insurance laws of the State of Texas. Initially, the Ninth Circuit held that the claim was not preempted because the FHA was in harmony with the laws of Texas. *Ojo v. Farmers Group, Inc.*, 565 F.3d 1175 (9th Cir. 2009) (*Ojo I*). The dissent correctly argued that the claim should have been preempted because Texas law explicitly allows for the use of credit scores in setting insurance rates. *Id.* at 1191-92. Moreover, Texas law did not allow for disparate impact liability. *Id.* Shortly after *Ojo I*, the Ninth Circuit granted an *en banc* rehearing. *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205 (9th Cir. 2010) (*Ojo II*). In *Ojo II*, the Ninth Circuit changed course, holding that the FHA *can* be reverse-preempted by McCarran-Ferguson and then certifying to the Supreme Court of Texas the question of whether Texas law permits an insurance company to price insurance by using credit-score factors that have a racially disparate impact that, were it not for the McCarran-Ferguson Act, would violate the FHA. *Id.* at 1207.

In *Ojo III*, the Texas Supreme Court answered the certified question by holding that Texas Insurance Code did not allow for disparate impact liability, and therefore the FHA was preempted under McCarran-Ferguson, just as the dissent in *Ojo I* had predicted. The Texas Supreme Court noted that the Texas Insurance Code spoke in terms of intentional discrimination, not disparate impact. Specifically, Texas law prohibited unfairly discriminatory insurance rates "as those that charge differently 'because of' or 'based wholly or partly on' race." *Ojo v. Farmers Group, Inc.*, 356 S.W.3d 421, 425-26 (Tex. 2011)(*Ojo III*) *quoting* Tex. Ins. Code §§ 544.002(a)(1), 560.002(c)(3). These statutes "do not include the type of broad prohibitory language that gives rise to disparate impact claims. Rather, both sections focus exclusively on the

9

manner in which insureds are classified; that is, they prohibit classifications because of or based on race," and do not use the "expansive language" that allows for a disparate impact analysis. *Ojo III*, 356 S.W.3d at 429. This meant that "[a]s long as insurers use race-neutral factors in credit scoring to set insurance rates, they do not run afoul of the Texas Insurance Code." *Id.* Additionally, the Texas legislature provided for disparate impact liability in other contexts, but not in the insurance context. This lead the Texas Supreme Court to hold, "[t]he Texas Insurance Code is void of any language creating a cause of action for a racially disparate impact. The Texas Legislature has demonstrated that it is well aware of how to create a cause of action for disparate impact in other contexts, but it has chosen not to do so in the field of insurance." *Id.* at 434. Thus, "[a]llowing a claim against Texas insurers for using completely race-neutral factors in credit scoring would frustrate the regulatory policy of Texas that the [McCarran-Ferguson Act] is meant to protect, which is the continued regulation of the field of insurance by the states without unintentional congressional intrusion." *Id.*

A similar scenario is present here. As in *Ojo III*, the Oklahoma insurance statutes speak in terms of disparate treatment, *not* disparate impact. *See* § 985(A)(3) ("No rate in a competitive market shall be considered unfairly discriminatory unless it classifies risk on the basis of race, color, creed, or national origin"); *see also* § 985(F) ("Risks may be classified in any way except that no risk may be classified on the basis of race, color, creed, or national origin"). Additionally, as in *Ojo III*, the Oklahoma legislature has considered disparate impact liability in contexts outside of insurance, but chose not to do so in the field of insurance. *See, generally*, *Baumgardner v. State ex rel. Dept. of Human Services*, 789 P.2d 235, 236, n. 1 (Okla. 1990)(discussing bill introduced in the wake of *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989) that expressly called for disparate impact liability in the context of labor law). And just as

in *Ojo III*, the Oklahoma insurance code "is void of any language creating a cause of action for a racially disparate impact." Accordingly, the Court should follow *Ojo III* and find that since the Rule impairs and supersedes state law, it is preempted under McCarran-Ferguson.

Indeed, this is the result that *American Family* requires. While PCI and HUD have both briefed various points raised in *American Family*, the following is perhaps the most important statement from *American Family* for determining the issues in front of this Court:

> Nothing in this conclusion permits federal law to displace states' choices about the proper conduct of the business of insurance. **If Wisconsin wants to authorize redlining, it need only say so; if it does, any challenge to that practice under the auspices of the Fair Housing Act becomes untenable.**

978 F.2d at 297 (emphasis added). The Seventh Circuit was crystal clear that if a state makes a choice about the proper conduct of the business of insurance, then FHA challenges become untenable. All a state has to do is "say so." Here, Oklahoma has made that choice and enacted legislation prohibiting the exact disparate impact liability for insurance ratemaking that the Rule calls for. *See* § 985. So has Texas. *See* Tex. Ins. Code §§ 544.002(a)(1), 560.002(c)(3). So have at least 16 other States, whose legislature have enacted identical or virtually identical language.[3] These States having "sa[id] so," the inquiry is over under *American Family*. Pursuant to the reverse-preemption provision of the McCarran-Ferguson Act, HUD simply cannot regulate the business of insurance in a manner that is diametrically opposed to the policies of the several States who have expressly prohibited disparate impact liability for insurance ratemaking.

---

[3] *See* Ariz. Rev. Stat. § 20-384; Ark. Code § 23-67-209; Haw. Rev. Stat. § 431:14-103; Kan. Stat. Ann. § 40-954; La. Rev Stat. Ann. § 22:1454; Me. Rev. Stat. Ann. tit. 24-A, § 2303; Miss. Code Ann. § 83-2-3; Nev. Rev. Stat. § 686B.060; N.H. Rev. Stat. Ann. § 412:15; N.D. Cent. Code § 26.1-25-03; R.I. Gen. Laws § 27-44-5; Tenn. Code Ann. § 56-5-502; Utah Code § 31A-19a-202; and Wyo. Stat. § 26-14-105. While these statutes, which are largely taken from the National Association of Insurance Commissioner's model legislation, offer the most extreme example of a direct supersession of state law by the Rule, it should not be inferred that the administrative regimes of other States will not be significantly impaired by the Rule, as the broad, sweeping nature of the Rule will impact all States.

It is not just Oklahoma's bases for an unfairly discriminatory rate that is impaired, it is also Oklahoma's entire approach to risk classification. The Rule impairs Oklahoma law by forcing insurers to consider the factors prohibited from consideration by Oklahoma law when setting rates. Oklahoma law forbids insurers from considering race and other discriminatory factors in classifying risk, but like Texas, allows for the use of race-neutral credit-scoring factors. *See* Okla. Stat. Ann. tit. 36, §§ 953 and 985(F). Just as in *Ojo III*, this means that "[a]s long as insurers use race-neutral factors in credit scoring to set insurance rates, they do not run afoul of the" Oklahoma Insurance Code. *Ojo III*, 356 S.W.3d at 429. On the other hand, under the Rule, insurers will be forced to consider these discriminatory factors in analyzing *all* of their risk classifications to ensure there is no disparate impact on protected classes, no matter how non-discriminatory and actuarially sound. The federal rule requires what the state rule prohibits, and as such, the two are irreconcilable.

The Rule also turns Oklahoma law on unfair insurance practices on its head. Under § 1204(7)(c), an insurer cannot set rates "in favor of particular persons, or between insureds or subjects of insurance having substantially like insuring, risk, and exposure factors." Thus, if two groups of people, one of which is a protected class, share the same risk factor that puts them at a higher risk (and thus, a higher rate) than the general public, the non-protected class would be charged the higher rate associated with the risk factor while the protected class would have to be charged the lesser rate applicable to the general public, since otherwise the rate would result in a disparate impact. In other words, a disparate impact standard would require insurers to set rates that favor protected classes over non-protected classes with the exact same risk factors. This would result in two groups of equal risk being charged unequal rates. Again, what Oklahoma law prohibits is what the Disparate Impact Rule requires.

12

It is thus clear that the Disparate Impact Rule impairs state law, and moreover, for those States like Oklahoma that have disclaimed disparate impact liability for insurance ratemaking, the Rule acts as a wholesale supersession of the states' ratemaking policies.[4] This is precisely what the McCarran-Ferguson Act forbids. As such, summary judgment should be entered for Plaintiff and the Rule vacated as applied to homeowners' insurance.

### C. The Rule is as Arbitrarily Destructive as a Tornado

As noted above, one of the risks that Oklahoma faces with greater frequency than most States is the risk of massive tornadoes. No community in Oklahoma has felt the devastation of these tornadoes like Moore, Oklahoma, a southern suburb of Oklahoma City. In 1999, the highest wind speeds ever recorded on the globe descended on Moore in the form of an F5 tornado, killing 41 people and leaving $1 billion in damage.[5] Another F2/F3 tornado hit Moore in May of 2003, and its path overlapped with that of the 1999 tornado.[6] In May of 2013, another massive EF5 tornado again descended on Moore, following a similar track as the 1999 tornado.[7] Last year's tornado left 25 people dead and caused an estimated $2 billion in damage.[8]

These tornadoes did not repeatedly level whole neighborhoods in Moore because of the race, color, religion, sex, handicap, familial status or national origin of the people living there. None of the Oklahomans who perished in these tornadoes did so because they were part of a

---

[4] Of course, the Rule's wholesale supersession of the ratemaking policies of Oklahoma and other states belies HUD's claim that the harm here is abstract or hypothetical.

[5] National Weather Service, http://www.srh.noaa.gov/oun/?n=events-19990503-storma (last modified April 28, 2014).

[6] National Weather Service, http://www.srh.noaa.gov/oun/?n=events-20030508 (last modified May 18, 2011).

[7] National Weather Service, Norman Office https://twitter.com/NWSNorman/status/336593182760517633/ (posted May 20, 2013).

[8] Associated Press, http://www.kjrh.com/news/local-news/oklahoma-insurance-department-moore-tornado-damage-cost-may-top-2-billion (last updated May 22, 2013).

protected group. Tornadoes are indiscriminate in doling out destruction; yet these tornadoes and the experience of the city of Moore exemplifies why the Rule has to be vacated.

As the Seventh Circuit stated in *American Family*, "**[r]isk discrimination is not race discrimination**." 978 F.2d at 290 (emphasis added). Some risk exposures naturally lead to higher rates, regardless of the race, color or creed of those affected. Living in Moore, Oklahoma is one of those risk exposures based on the history of devastating tornadoes hitting Moore.

This is the sort of risk that states have to deal with, and which the Commissioner has to deal with specifically. If the Rule is allowed to stand, OID and the Commissioner will not be able to adequately regulate the business of insurance as applied to this risk due to the Rule's requirement that a disparate impact analysis—which has <u>nothing</u> to do with tornadoes—has to be the overarching concern in setting rates.

Under Oklahoma law, the solution is simple. Rates can be approved for the Moore area that, under Okla. Stat. Ann. tit. 36, §1204(A)(7), do not discriminate among Moore residents with "substantially like insuring, risk, and exposure factors." Moreover, if enough insurers pull out of the market to make it a noncompetitive market, then additional actuarial concerns will have to be addressed. *See* § 985(B). But what Oklahoma law permits in this regard would be prohibited under the Disparate Impact Rule.

The tornadoes that have repeatedly devastated Moore have followed roughly the same path. It naturally follows that anyone living in that path is going to have a higher risk of suffering loss because of a tornado, and thus, would pay a higher insurance rate. However, if some portions of the neighborhoods along that pathway are predominantly comprised of a protected class, then a disparate impact could be claimed under the Rule since their rates are higher than those of the general public. This not only violates § 1204(A)(7), but undermines the whole

purpose of risk-based rate making, as ratemaking would have to account for the presence of protected-status classes in Moore instead of focusing solely on a known, utterly race-neutral risk.

In this regard, the Rule's effect is every bit as destructive and arbitrary as that of a tornado. Just like a tornado may level one house, skip over the house next to it, and level the house on the other side of the untouched one, the Rule will obliterate one state-approved rate as applied to a protected class while leaving *the same rate* untouched as it applies to unprotected classes. In other words, like a tornado, the Rule will be completely arbitrary, and its force will be utterly destructive to the regulation of the business of insurance.

### III. The Disparate Impact Rule Raises Grave Federalism Concerns

Commissioner Doak was elected by the people of Oklahoma to regulate the business of insurance in Oklahoma. Under Article 6, §§ 22 and 23 of the Oklahoma Constitution, he is sworn to uphold and execute the laws of the State of Oklahoma related to the business of insurance. These laws require a disparate treatment standard while disavowing a disparate impact standard. HUD's Rule usurps the Commissioner's constitutional obligation by replacing these laws with the very disparate impact standard that these laws reject.

This conflict raises grave federalism concerns as, at its heart, the Rule seeks to usurp the statutorily-enshrined powers of the States. In promulgating the Rule, HUD gave short shrift to the grave federalism implications, stating: **"This final rule does not have federalism implications** and does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order [13132]." 78 Fed. Reg. at 11481 (emphasis added). This summary declaration, unsupported by any actual analysis, is easily disproven. As discussed in Section II(B), supra, Oklahoma and at least 17 other States have enacted statutes rejecting any disparate impact liability as applied to insurance rates. The

federalism implications are not only present, they are severe, as HUD's Disparate Impact Rule will supersede these state laws. HUD has chosen to ignore the federalism implications. The Commissioner asks that this Court not do the same.

It is HUD's refusal to deal with the federalism implications that undermines their request for *Chevron* deference under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). HUD's Memorandum in Support of its Motion to Dismiss and/or for Summary Judgment jumps straight to the second step of the *Chevron* analysis. *See* Memorandum [Dkt. No. 31], p. 38. The problem with HUD's position is that it completely bypasses the first step of *Chevron* deference, which is fatal to its position.

The *Chevron* analysis begins with an inquiry into whether "the intent of Congress is clear" as to the "precise question at issue." *Chevron*, 467 U.S. at 842. If the statutory text lacks a "clear" and "unambiguous" meaning, then it is presumed that Congress "left a gap for the agency to fill." *Id.* at 842-43. While HUD relies on the FHA as the source of its authority, the FHA does not exist in a vacuum and cannot be construed in a vacuum. *See, generally, Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989) ("statutory language cannot be construed in a vacuum"). Rather, it has to be construed in conjunction with other laws. Thus, in analyzing whether there is a "gap" for HUD to fill, consideration has to be given to the McCarran-Ferguson Act as well because it directly speaks to whether there was a gap for HUD to fill.

The reverse-preemption provision of the McCarran-Ferguson Act states: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." *See* 15 U.S.C. § 1012. As the Seventh Circuit has held, "'*No Act of Congress*' could not be more comprehensive. The McCarran–Ferguson Act creates a rule of construction applicable to *all other federal laws*, a 'plain

16

statement' approach." *American Family*, 978 F.2d at 294 (emphasis added). The statutory text is clear and unambiguous under *Chevron* and demonstrates that not only was there no "gap" left for HUD to fill, but that HUD was expressly prohibited from trying to fill any gaps. That power was reserved specifically for the states, not the federal government. Properly viewed, the Rule was not a gap-filling measure, but rather an attempt by HUD to seize the very powers of the States that Congress has specifically reserved to the States. With no gap to fill, the Disparate Impact Rule is entitled to no deference whatsoever under *Chevron*.

*Gonzales v. Oregon*, 546 U.S. 243 (2006), is instructive on the application of federalism principles to agency action. There, the Attorney General issued an Interpretive Rule under the Controlled Substances Act ("CSA"), 21 U.S.C. § 801, *et seq.*, dealing with the Oregon Death With Dignity Act, which exempts from civil or criminal liability state-licensed physicians who dispense or prescribe a lethal dose of drugs upon the request of a terminally ill patient. 546 U.S. at 249. The Attorney General's Interpretive Rule declared that using controlled substances to assist suicide is not a legitimate medical practice and that dispensing or prescribing them for this purpose will expose a state-licensed physician to prosecution under the CSA. *Id*. The Supreme Court rejected the Attorney General's Interpretive Rule, citing federalism concerns. *Id*. at 269-70. While the CSA allows the Attorney General to classify narcotics, the Supreme Court held that absent a clear statement from Congress, it did not authorize the Attorney General to regulate the practice of medicine, a power traditionally reserved to the states. In doing so, the Supreme Court stated that, "the background principles of our federal system also belie the notion that Congress would use such an obscure grant of authority to regulate areas traditionally supervised by the States' police power." *Id*. at 274.

Just as in *Gonzales*, this case involves a federal agency grossly exceeding the confines of its authority under general principles of federalism. Like the practice of medicine, the business of insurance is a power traditionally reserved to the States. The Supreme Court recognized that the practice of medicine is not squarely within the authority of the Attorney General or directly related to the areas over which he has authority, and thus allowing him to regulate the practice of medicine under the auspices of the CSA would represent "an obscure grant of authority to regulate areas traditionally supervised by the States' police power." The same is true here, as it is not the traditional role of HUD to regulate the business of insurance and the setting of rates, nor does the FHA fairly encompass the business of insurance. Allowing HUD to nevertheless become the final arbiter for insurance ratemaking would be the same "obscure grant of authority" that the Supreme Court rejected in *Gonzales*.

*Watters v. Wachovia Bank, N.A.*, 550 U.S. 1 (2007), is also instructive on the application of federalism principles to agency action, as it is the mirror-image of the case at bar. In *Watters*, at issue was a Michigan statute that required subsidiaries of national banks to register with the State's Office of Financial and Insurance Services and submit to state supervision. *Id.* at 8-9. Wachovia Bank had a subsidiary known as Wachovia Mortgage which initially complied with the Michigan law but, upon becoming a wholly owned subsidiary of Wachovia Bank, surrendered its state registration. *Id.* The State of Michigan advised the subsidiary that it would no longer be authorized to engage in mortgage lending in the State. *Id.* Wachovia Bank filed suit seeking injunctive and declaratory relief on the basis that that federal law in the banking industry preempted Michigan's law. *Id.* The Supreme Court agreed, reasoning that the National Bank Act ("NBA"), 12 U.S.C. § 1, *et seq.* had granted the federal government, through the Office of the Comptroller of the Currency, the power to supervise, oversee and regulate the banking industry.

550 U.S. at 11. Along with this grant of authority, the NBA contained a provision that had a preemptive effect on state laws that impaired the federal government's authority to regulate the banking industry. *Id.* at 13-14. Thus, Michigan's law, which invaded the powers of the federal government, could not stand.

The mirror-image of *Watters* is present in this case. While the regulation of the banking industry is almost exclusively the domain of the federal government, the regulation of the insurance industry is almost exclusively the province of the States. The law at issue in *Watters* contained a specific grant of authority to the federal government along with a corollary preemption provision, while here, the McCarran-Ferguson Act contains a specific grant of authority to the several States with a corollary reverse-preemption provision. In *Watters*, a State invaded the province of the federal government, while here, it is the federal government invading the province of the States. Thus, applying the federalism principle of *Watters*, when one governing authority is expressly given the power by statute to act in an area and preempt the laws of the other governing authority, the non-empowered authority must yield.

Despite HUD's perfunctory dismissal of the federalism implications of the Rule, those federalism concerns are present and they are grave. The regulation of the business of insurance is not just a power traditionally reserved the States, it is a power of the States enshrined in federal law. Unlike the banking industry or the railroad industry or any number of other industries subject to virtually exclusive federal regulation, in the insurance industry it is the States who are the last stop for the protection of consumers. It is the States who are the final arbiters of what rates and what risk classification are and are not allowed. It is this power that HUD is attempting to usurp from the Commissioner (and every other State's chief insurance regulator). Under the Disparate Impact Rule, it would be the federal government who would have final authority over

19

every single rate and risk classification approved by state law, impairing and superseding numerous State regulatory regimes in the process. Simply put, with no regulatory gap to fill and, in fact, a congressional edict to not fill any gaps, the Disparate Impact Rule is a power grab by an overreaching federal agency invading the traditional—and codified—authority of the States.

## CONCLUSION

The purely legal issue of the facial invalidity of the Rule in light of the McCarran-Ferguson Act is ripe for adjudication as the harm it presents to the regulation of the business of insurance is concrete, substantial and imminent. HUD had no authority to promulgate the rule under McCarran-Ferguson, as it directly impairs and supersedes State law. This unlawful intrusion into the statutorily-enshrined powers of the States raises grave federalism implications that further demonstrate why the Rule should be vacated. Accordingly, the Commissioner requests that the Court grant Plaintiff's Motion for Summary Judgment.

WHEREFORE, premises considered, *amicus* State of Oklahoma, ex rel. John D. Doak, Insurance Commissioner, respectfully urge the Court to grant Plaintiff's Motion for Summary Judgment and deny Defendant's Motion to Dismiss and/or for Summary Judgment.

Respectfully Submitted,

   /s Christopher D. Wolek
Christopher D. Wolek, OBA #19612
Michael P. Womack, OBA #20895
GIBBS, ARMSTRONG, BOROCHOFF,
        MULLICAN & HART, P.C.
601 South Boulder Avenue, Suite 500
Tulsa, Oklahoma 74119
Telephone: 918-587-3939
Facsimile: 918-582-5504

AND

Kevin W. Baldwin
DALEY MOHAN GROBLE, P.C.
55 West Monroe Street, Suite 1600
Chicago, Illinois 60603
Telephone: (312)422-6527
Facsimile: 312-422-5370

**ATTORNEYS FOR AMICUS CURIAE**

### CERTIFICATE OF SERVICE

I hereby certify that, on May 30, 2014, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to counsel of record in this case.

/s/Christopher D. Wolek

21