# EXHIBIT A



West's Hawai'i Revised Statutes Annotated Currentness
   Division 2. Business
      Title 24. Insurance
         Chapter 431. Insurance Code (Refs & Annos)
            Article 13. Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance (Refs & Annos)
               Part I. General Provisions
               ➡➡ **§ 431:13-103. Unfair methods of competition and unfair or deceptive acts or practices defined**

(a) The following are defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:

  (1) Misrepresentations and false advertising of insurance policies. Making, issuing, circulating, or causing to be made, issued, or circulated, any estimate, illustration, circular, statement, sales presentation, omission, or comparison which:

    (A) Misrepresents the benefits, advantages, conditions, or terms of any insurance policy;

    (B) Misrepresents the dividends or share of the surplus to be received on any insurance policy;

    (C) Makes any false or misleading statement as to the dividends or share of surplus previously paid on any insurance policy;

    (D) Is misleading or is a misrepresentation as to the financial condition of any insurer, or as to the legal reserve system upon which any life insurer operates;

    (E) Uses any name or title of any insurance policy or class of insurance policies misrepresenting the true nature thereof;

    (F) Is a misrepresentation for the purpose of inducing or tending to induce the lapse, forfeiture, exchange, conversion, or surrender of any insurance policy;

    (G) Is a misrepresentation for the purpose of effecting a pledge or assignment of or effecting a loan against any insurance policy;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(H) Misrepresents any insurance policy as being shares of stock;

(I) Publishes or advertises the assets of any insurer without publishing or advertising with equal conspicuousness the liabilities of the insurer, both as shown by its last annual statement; or

(J) Publishes or advertises the capital of any insurer without stating specifically the amount of paid-in and subscribed capital;

(2) False information and advertising generally. Making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in a newspaper, magazine, or other publication, or in the form of a notice, circular, pamphlet, letter, or poster, or over any radio or television station, or in any other way, an advertisement, announcement, or statement containing any assertion, representation, or statement with respect to the business of insurance or with respect to any person in the conduct of the person's insurance business, which is untrue, deceptive, or misleading;

(3) Defamation. Making, publishing, disseminating, or circulating, directly or indirectly, or aiding, abetting, or encouraging the making, publishing, disseminating, or circulating of any oral or written statement or any pamphlet, circular, article, or literature which is false, or maliciously critical of or derogatory to the financial condition of an insurer, and which is calculated to injure any person engaged in the business of insurance;

(4) Boycott, coercion, and intimidation.

(A) Entering into any agreement to commit, or by any action committing, any act of boycott, coercion, or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance; or

(B) Entering into any agreement on the condition, agreement, or understanding that a policy will not be issued or renewed unless the prospective insured contracts for another class or an additional policy of the same class of insurance with the same insurer;

(5) False financial statements.

(A) Knowingly filing with any supervisory or other public official, or knowingly making, publishing, disseminating, circulating, or delivering to any person, or placing before the public, or knowingly causing, directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false statement of a material fact as to the financial condition of an insurer; or

(B) Knowingly making any false entry of a material fact in any book, report, or statement of any insurer

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:13-cv-08564 Document #: 92-1 Filed: 08/20/14 Page 4 of 35 PageID #:2727

with intent to deceive any agent or examiner lawfully appointed to examine into its condition or into any of its affairs, or any public official to whom the insurer is required by law to report, or who has authority by law to examine into its condition or into any of its affairs, or, with like intent, knowingly omitting to make a true entry of any material fact pertaining to the business of the insurer in any book, report, or statement of the insurer;

(6) Stock operations and advisory board contracts. Issuing or delivering or permitting agents, officers, or employees to issue or deliver, agency company stock or other capital stock, or benefit certificates or shares in any common-law corporation, or securities or any special or advisory board contracts or other contracts of any kind promising returns and profits as an inducement to insurance;

(7) Unfair discrimination.

(A) Making or permitting any unfair discrimination between individuals of the same class and equal expectation of life in the rates charged for any policy of life insurance or annuity contract or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the contract;

(B) Making or permitting any unfair discrimination in favor of particular individuals or persons, or between insureds or subjects of insurance having substantially like insuring, risk, and exposure factors, or expense elements, in the terms or conditions of any insurance contract, or in the rate or amount of premium charge therefor, or in the benefits payable or in any other rights or privilege accruing thereunder;

(C) Making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazards by refusing to issue, refusing to renew, canceling, or limiting the amount of insurance coverage on a property or casualty risk because of the geographic location of the risk, unless:

(i) The refusal, cancellation, or limitation is for a business purpose which is not a mere pretext for unfair discrimination; or

(ii) The refusal, cancellation, or limitation is required by law or regulatory mandate;

(D) Making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazards by refusing to issue, refusing to renew, canceling, or limiting the amount of insurance coverage on a residential property risk, or the personal property contained therein, because of the age of the residential property, unless:

(i) The refusal, cancellation, or limitation is for a business purpose which is not a mere pretext for unfair discrimination; or

(ii) The refusal, cancellation, or limitation is required by law or regulatory mandate;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:13-cv-08564 Document #: 92-1 Filed: 08/20/14 Page 5 of 35 PageID #:2728

(E) Refusing to insure, refusing to continue to insure, or limiting the amount of coverage available to an individual because of the sex or marital status of the individual; however, nothing in this subsection shall prohibit an insurer from taking marital status into account for the purpose of defining persons eligible for dependent benefits;

(F) Terminating or modifying coverage, or refusing to issue or renew any property or casualty policy or contract of insurance solely because the applicant or insured or any employee of either is mentally or physically impaired; provided that this subparagraph shall not apply to accident and health or sickness insurance sold by a casualty insurer; provided further that this subparagraph shall not be interpreted to modify any other provision of law relating to the termination, modification, issuance, or renewal of any insurance policy or contract;

(G) Refusing to insure, refusing to continue to insure, or limiting the amount of coverage available to an individual based solely upon the individual's having taken a human immunodeficiency virus (HIV) test prior to applying for insurance; or

(H) Refusing to insure, refusing to continue to insure, or limiting the amount of coverage available to an individual because the individual refuses to consent to the release of information which is confidential as provided in section 325-101; provided that nothing in this subparagraph shall prohibit an insurer from obtaining and using the results of a test satisfying the requirements of the commissioner, which was taken with the consent of an applicant for insurance; provided further that any applicant for insurance who is tested for HIV infection shall be afforded the opportunity to obtain the test results, within a reasonable time after being tested, and that the confidentiality of the test results shall be maintained as provided by section 325-101;

(8) Rebates. Except as otherwise expressly provided by law:

(A) Knowingly permitting or offering to make or making any contract of insurance, or agreement as to the contract other than as plainly expressed in the contract, or paying or allowing, or giving or offering to pay, allow, or give, directly or indirectly, as inducement to the insurance, any rebate of premiums payable on the contract, or any special favor or advantage in the dividends or other benefits, or any valuable consideration or inducement not specified in the contract; or

(B) Giving, selling, or purchasing, or offering to give, sell, or purchase as inducement to the insurance or in connection therewith, any stocks, bonds, or other securities of any insurance company or other corporation, association, or partnership, or any dividends or profits accrued thereon, or anything of value not specified in the contract;

(9) Nothing in paragraph (7) or (8) shall be construed as including within the definition of discrimination or rebates any of the following practices:

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(A) In the case of any life insurance policy or annuity contract, paying bonuses to policyholders or otherwise abating their premiums in whole or in part out of surplus accumulated from nonparticipating insurance; provided that any bonus or abatement of premiums shall be fair and equitable to policyholders and in the best interests of the insurer and its policyholders;

(B) In the case of life insurance policies issued on the industrial debit plan, making allowance to policyholders who have continuously for a specified period made premium payments directly to an office of the insurer in an amount which fairly represents the saving in collection expense;

(C) Readjustment of the rate of premium for a group insurance policy based on the loss or expense experience thereunder, at the end of the first or any subsequent policy year of insurance thereunder, which may be made retroactive only for the policy year; and

(D) In the case of any contract of insurance, the distribution of savings, earnings, or surplus equitably among a class of policyholders, all in accordance with this article;

(10) Refusing to provide or limiting coverage available to an individual because the individual may have a third-party claim for recovery of damages; provided that:

(A) Where damages are recovered by judgment or settlement of a third-party claim, reimbursement of past benefits paid shall be allowed pursuant to section 663-10;

(B) This paragraph shall not apply to entities licensed under chapter 386 or 431:10C; and

(C) For entities licensed under chapter 432 or 432D:

(i) It shall not be a violation of this section to refuse to provide or limit coverage available to an individual because the entity determines that the individual reasonably appears to have coverage available under chapter 386 or 431:10C; and

(ii) Payment of claims to an individual who may have a third-party claim for recovery of damages may be conditioned upon the individual first signing and submitting to the entity documents to secure the lien and reimbursement rights of the entity and providing information reasonably related to the entity's investigation of its liability for coverage.

Any individual who knows or reasonably should know that the individual may have a third-party claim for recovery of damages and who fails to provide timely notice of the potential claim to the entity, shall be deemed to have waived the prohibition of this paragraph against refusal or limitation of coverage. "Third-party claim" for purposes of this paragraph means any tort claim for monetary recovery or damages that the individual has against any person, entity, or insurer, other than the entity licensed under

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

chapter 432 or 432D;

(11) Unfair claim settlement practices. Committing or performing with such frequency as to indicate a general business practice any of the following:

(A) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(B) With respect to claims arising under its policies, failing to respond with reasonable promptness, in no case more than fifteen working days, to communications received from:

(i) The insurer's policyholder;

(ii) Any other persons, including the commissioner; or

(iii) The insurer of a person involved in an incident in which the insurer's policyholder is also involved.

The response shall be more than an acknowledgment that such person's communication has been received, and shall adequately address the concerns stated in the communication;

(C) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(D) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

(E) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

(F) Failing to offer payment within thirty calendar days of affirmation of liability, if the amount of the claim has been determined and is not in dispute;

(G) Failing to provide the insured, or when applicable the insured's beneficiary, with a reasonable written explanation for any delay, on every claim remaining unresolved for thirty calendar days from the date it was reported;

(H) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(I) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the insureds;

(J) Attempting to settle a claim for less than the amount to which a reasonable person would have believed the person was entitled by reference to written or printed advertising material accompanying or made part of an application;

(K) Attempting to settle claims on the basis of an application which was altered without notice, knowledge, or consent of the insured;

(L) Making claims payments to insureds or beneficiaries not accompanied by a statement setting forth the coverage under which the payments are being made;

(M) Making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration;

(N) Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician or advanced practice registered nurse of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

(O) Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage to influence settlements under other portions of the insurance policy coverage;

(P) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; and

(Q) Indicating to the insured on any payment draft, check, or in any accompanying letter that the payment is "final" or is "a release" of any claim if additional benefits relating to the claim are probable under coverages afforded by the policy; unless the policy limit has been paid or there is a bona fide dispute over either the coverage or the amount payable under the policy;

(12) Failure to maintain complaint handling procedures. Failure of any insurer to maintain a complete record of all the complaints which it has received since the date of its last examination under section 431:2-302. This record shall indicate the total number of complaints, their classification by line of insurance, the nature of each complaint, the disposition of these complaints, and the time it took to process each complaint. For purposes of this section, "complaint" means any written communication primarily expressing a grievance;

(13) Misrepresentation in insurance applications. Making false or fraudulent statements or representations on

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

or relative to an application for an insurance policy, for the purpose of obtaining a fee, commission, money, or other benefit from any insurer, producer, or individual; and

(14) Failure to obtain information. Failure of any insurance producer, or an insurer where no producer is involved, to comply with section 431:10D-623(a), (b), or (c) by making reasonable efforts to obtain information about a consumer before making a recommendation to the consumer to purchase or exchange an annuity.

(b) The commissioner shall by certified mail notify the insurer's agent, as designated pursuant to section 431:2-205, of each complaint filed with the commissioner under this section.

(c) Three or more written complaints received by the commissioner within any twelve-month period charging separate violations of this section shall constitute a rebuttable presumption of a general business practice.

(d) Evidence as to numbers and types of complaints to the commissioner against an insurer, and the commissioner's complaint experience with other insurers writing similar lines of insurance, shall be admissible in an administrative or judicial proceeding brought under this section. No insurer shall be deemed in violation of this section solely by reason of the numbers and types of such complaints except if the presumption under subsection (c) is not rebutted.

(e) If it is found, after notice and an opportunity to be heard, that an insurer has violated this section, each instance of noncompliance may be treated as a separate violation of this section for the purposes of section 431:2-203.

(f) An insurer or licensee shall issue a written response with reasonable promptness, in no case more than fifteen working days, to any written inquiry made by the commissioner regarding a claim, consumer complaint, or sales or marketing practice. The response shall be more than an acknowledgment that the commissioner's communication has been received, and shall adequately address the concerns stated in the communication.

CREDIT(S)

Laws 1987, ch. 347, § 2; Laws 1988, ch. 330, § 2; Laws 1989, ch. 396, § 1; Laws 1997, ch. 83, § 4; Laws 2000, ch. 29, § 1; Laws 2002, ch. 155, § 81; Laws 2002, ch. 228, § 1; Laws 2003, ch. 212, § 104; Laws 2007, ch. 257, § 3, eff. Jan. 1, 2008; Laws 2008, ch. 227, § 2, eff. July 8, 2008; Laws 2009, ch. 11, § 22, eff. June 30, 2011; Laws 2010, ch. 116, § 1, eff. July 1, 2010; Laws 2014, ch. 45, § 11, eff. April 23, 2014.

Current through Act 235 [End] of the 2014 Regular Session of the Hawai'i Legislature. For research tips relating to undesignated enactments, see Scope.

(C) 2013 Thomson Reuters

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

West's Hawaiʻi Revised Statutes Annotated
   Division 2. Business
     Title 24. Insurance
       Chapter 431. Insurance Code (Refs & Annos)
         Article 14. Rate Regulation
           Part I. Casualty, Surety, Property, Marine and Transportation Rate Regulation (Refs & Annos)

HRS § 431:14-103

§ 431:14-103. Making of rates

Currentness

(a) Rates shall be made in accordance with the following provisions:

  (1) Rates shall not be excessive, inadequate, or unfairly discriminatory.

  (2) Due consideration shall be given to:

    (A) Past and prospective loss experience within and outside this State; provided that if the claim does not exceed the selected deductible amount pursuant to section 386-100, and the employer reimburses the insurer for the amount, the claims shall not be calculated in the employer's experience rating or risk category;

    (B) The conflagration and catastrophe hazards, if any;

    (C) A reasonable margin for underwriting profit and contingencies;

    (D) Dividends, savings, or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members, or subscribers;

    (E) Past and prospective expenses both country-wide and those specially applicable to this State;

    (F) Investment income from unearned premium and loss reserve funds; and

    (G) All other relevant factors within and outside this State.

  (3) In the case of fire insurance rates, consideration shall be given to the experience of the fire insurance business during a period of not less than the most recent five-year period for which that experience is available.

(4) The systems of expense provisions included in the rates for use by any insurer or group of insurers may differ from those of other insurers or groups of insurers to reflect the requirements of the operating methods of any insurer or group with respect to any class of insurance, or with respect to any subdivision or combination thereof for which subdivision or combination separate expense provisions are applicable.

(5) Risks may be grouped by classifications for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans that establish standards for measuring variations in hazards or expense provisions, or both. These standards may measure any differences among risks that can be demonstrated to have a probable effect upon losses or expenses. No risk classification may be based upon race, creed, national origin, or the religion of the insured.

(6) Manual, minimum, class rates, rating schedules, or rating plans shall be made and adopted, except in the case of:

(A) Special rates where manual, minimum, class rates, rating schedules, or rating plans are not applicable; and

(B) Specifically rated inland marine risks.

(7) No insurer authorized to do business in this State shall issue any policy that provides or makes available to any risks preferred rates based upon any grouping of persons, firms, or corporations by way of membership, license, franchise, contract, agreement, or any other means, other than common majority ownership of the risks, or except where:

(A) A common stock ownership in and management control of the risks are held by the same person, corporation, or firm;

(B) Permitted or authorized by filings in existence as of January 1, 1988, under the casualty rating law and the fire rating law, as these filings may be amended from time to time;

(C) Health care providers, as defined in section 671-1 that could have joined the patients' compensation fund as it existed in chapter 671, part III, prior to May 31, 1984, joined together with one or more groups of related or unrelated health care providers;

(D) Permitted under article 12; or

(E) Otherwise expressly provided by law.

(b) In cases of workers' compensation insurance, all rates made in accordance with this section shall be given due consideration for good safety records of employers. By premium reductions, dividends, or both, insurance carriers shall recognize good safety performance records of employers in this State.

(c) Upon the issuance of a certificate by a certified safety and health professional to an employer that the employer has an effective safety and health program pursuant to section 396-4.5, the insurer shall provide the employer with a workers'

compensation insurance premium discount of at least five per cent; provided that the employer shall maintain the effective safety and health program throughout the policy period. Standards for the issuance of certificates shall be included in rules adopted by the department of labor and industrial relations pursuant to chapter 91.

(d) For the purpose of ratemaking, all insurers shall treat a volunteer firefighter the same as a firefighter employed by a county fire department; provided that the volunteer firefighters are attached to a station where a firefighter or volunteer firefighter who has been trained and certified to drive a commercial motor vehicle by either the state or county government, as appropriate, and who maintains a category (3) license as defined by section 286-102(b)(3) is on duty at all times or at least four firefighters or volunteer firefighters who have been trained and certified to drive a commercial motor vehicle by either the state or county government, as appropriate, and who maintain a category (3) license as defined by section 286-102(b)(3) are members of the volunteer unit.

(e) Except to the extent necessary to meet the provisions of subsection (a)(1), uniformity among insurers in any matters within the scope of this section is neither required nor prohibited.

**Credits**
Laws 1987, ch. 347, § 2; Laws 1990, ch. 255, § 8; Laws 1993, ch. 269, § 2; Laws 1995, ch. 234, § 18; Laws 1997, ch. 18, § 1; Laws 1997, ch. 72, § 1.

H R S § 431:14-103, HI ST § 431:14-103
Current through Act 235 [End] of the 2014 Regular Session of the Hawai'i Legislature. For research tips relating to undesignated enactments, see Scope.

---

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

Purdon's Pennsylvania Statutes and Consolidated Statutes
   Title 40 P.S. Insurance (Refs & Annos)
      Chapter 5. Insurance Rates
         Casualty, Surety and Title Insurance (Refs & Annos)

40 P.S. § 1183

§ 1183. Making of rates

Currentness

All rates shall be made in accordance with the following provisions:

(a) Due consideration shall be given to past and prospective loss experience within and outside this Commonwealth, to physical hazards, to safety and loss prevention factors, to underwriting practice and judgment to the extent appropriate, to catastrophe hazards, if any, to a reasonable margin for underwriting profit and contingencies, to dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members or subscribers, to past and prospective expenses both country wide and those specially applicable to this Commonwealth, and to all other relevant factors within and outside this Commonwealth.

(b) The systems of expense provisions included in the rates for use by any insurer or group of insurers may differ from those of other insurers or groups of insurers to reflect the requirements of the operating methods of any such insurer or group with respect to any kind of insurance, or with respect to any subdivision or combination thereof for which subdivision or combination separate expense provisions are applicable.

(c) Risks may be grouped by classifications for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. Such standards may measure any differences among risks that can be demonstrated to have a probable effect upon losses or expenses.

(d) Rates shall not be excessive, inadequate or unfairly discriminatory. No rate shall be held to be unfairly discriminatory unless, allowing for practical limitations, it clearly fails to reflect with reasonable accuracy the differences in expected losses and expenses. A rate is not unfairly discriminatory because different premiums result for policyholders with like-loss exposures but different expense factors, so long as the rate reflects the differences with reasonable accuracy. A rate is not unfairly discriminatory if it is averaged broadly among persons insured under a group, franchise or blanket policy.

(e) This section shall not be construed to prohibit rates for automobile insurance which are based, in whole or in part, on factors, including, but not limited to, sex, if the use of such a factor is supported by sound actuarial principles or is related to actual or reasonably anticipated experience; however, such factors shall not include race, religion or national origin.

**Credits**

1947, June 11, P.L. 538, § 3. Amended 1986, April 14, P.L. 80, No. 27, § 1, imd. effective.

**Editors' Notes**

**REPEALED IN PART**

<Section 31 of Act 1990, Feb. 7, P.L. 11, No. 6, repealed this section insofar as it is inconsistent with 75 Pa.C.S.A. Ch. 20 (relating to motor vehicle insurance rate review procedures).>

Notes of Decisions (6)

40 P.S. § 1183, PA ST 40 P.S. § 1183
Current through 2014 Regular Session Acts 1 to 130

**End of Document**                                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw.

West's Ann.Cal.Ins.Code § 1860.1 Page 1

C

**Effective:[See Text Amendments]**

West's Annotated California Codes Currentness
  Insurance Code (Refs & Annos)
    Division 1. General Rules Governing Insurance (Refs & Annos)
      Part 2. The Business of Insurance (Refs & Annos)
        Chapter 9. Rates and Rating and Other Organizations (Refs & Annos)
          Article 9. Miscellaneous (Refs & Annos)
            → → **§ 1860.1. Applicability of other laws**

No act done, action taken or agreement made pursuant to the authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance.

CREDIT(S)

(Added by Stats.1947, c. 805, p. 1907, § 1, operative Jan. 1, 1948.)

Current with urgency legislation through Ch. 187 of 2014 Reg.Sess., Res. Ch. 1 of 2013-2014 2nd Ex.Sess., and all propositions on the 6/3/2014 ballot.

(C) 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

115 Cal.Rptr.3d 893, 10 Cal. Daily Op. Serv. 12,914, 2010 Daily Journal D.A.R. 15,583

188 Cal.App.4th 1427
Court of Appeal, Second
District, Division 3, California.

Amber MacKAY et al., Petitioners,

v.

The SUPERIOR COURT of Los
Angeles County, Respondent;
21st Century Insurance
Company, Real Party in Interest.
21st Century Insurance Company, Petitioner,

v.

The Superior Court of Los
Angeles County, Respondent;
Amber MacKay et al., Real Parties in Interest.

Nos. B220469, B223772. | Oct. 6, 2010. |
As Modified Oct. 20, 2010. | Rehearing Denied
Oct. 22, 2010. | As Modified Oct. 22, 2010.

**Synopsis**

**Background:** Insureds under automobile policies brought class action against insurer under Unfair Competition Law (UCL), for alleged improper consideration of prior automobile insurance coverage in setting rates. The Superior Court, Los Angeles County, Nos. BC297438 and BC266219, John S. Wiley, Jr. and Anthony J. Mohr, JJ. granted summary adjudication for insurer in part, and denied summary adjudication for insurer in part. Insureds and insurer filed mandamus petitions.

**Holdings:** The Court of Appeal, Croskey, J., held that:

[1] "accident verification" procedure which allegedly subjected insureds to higher rates because of lack of prior insurance was an approved rating factor;

[2] an insurance rate approved by the DOI may only be challenged administratively; and

[3] exemption from civil proceedings for acts done pursuant to ratemaking authority is not limited to concerted acts.

Ordered accordingly.

West Headnotes (14)

**[1] Judgment**
👉 Presumptions and burden of proof

**Judgment**
👉 Showing to be made on supporting affidavit

On a defendant's motion for summary judgment, as to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense, and only then will the burden shift to the plaintiff to demonstrate the existence of a triable, material issue of fact.

4 Cases that cite this headnote

**[2] Judgment**
👉 Existence or non-existence of fact issue

There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.

3 Cases that cite this headnote

**[3] Insurance**
👉 Rates and Rate Setting

If an insurance rate approved by the Department of Insurance (DOI) is subsequently determined to have been illegal, the insurer may no longer charge the rate, but that cannot retroactively invalidate the DOI's prior approval, even if the DOI includes in its approval letters a provision that "if any portion of the application or related documentation conflicts with California law, that portion is specifically not approved." West's Ann.Cal.Ins.Code § 1858.07(b).

Cases that cite this headnote

**[4] Insurance**
👉 Factors and Standards

**Insurance**
👉 Review

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

115 Cal.Rptr.3d 893, 10 Cal. Daily Op. Serv. 12,914, 2010 Daily Journal D.A.R. 15,583

In determining whether a rating factor or an underwriting guideline was approved by the Department of Insurance (DOI) in the statutory rate preapproval process, as would preclude a civil action challenging the factor or guideline, the issue is whether the factor or guideline was submitted to the DOI as a factor affecting the rates to be charged. West's Ann.Cal.Ins.Code § 1861.01.

Cases that cite this headnote

**[5]** **Insurance**
👉 Factors and Standards

**Insurance**
👉 Actions and Proceedings

Automobile insurer's use of an "accident verification" procedure which allegedly subjected some insureds to higher rates because of their lack of prior insurance was a "rating factor" approved by the Department of Insurance (DOI), and thus the procedure could not give rise to penalties against insurer, where after insurer stopped using the procedure the commissioner of insurance adopted a stipulation in an enforcement action that insurer's use of the procedure had been approved by the DOI. West's Ann.Cal.Ins.Code §§ 1858.07(b), 1860.1, 1861.02(c); 10 CCR § 2632.2(a).

*See Cal. Civil Practice (Thomson Reuters 2010) Business Litigation, § 60:14; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2009) ¶ 14:55 (CAINSL Ch. 14-B); 2 Witkin, Summary of Cal. Law (10th ed. 2005) Insurance, § 10.*

Cases that cite this headnote

**[6]** **Insurance**
👉 Actions and Proceedings

**Insurance**
👉 Review

An insurance rate which has been previously approved by the Department of Insurance (DOI) may only be challenged by means of the administrative procedure, with judicial review, set forth in the Insurance Code. West's

Ann.Cal.Ins.Code §§ 1858 et seq., 1860.1, 1860.2, 1861.03(a).

3 Cases that cite this headnote

**[7]** **Antitrust and Trade Regulation**
👉 Insurance

**Insurance**
👉 Actions and Proceedings

Under the statute providing that the business of insurance is subject to all other California laws applicable to business, to the extent it is alleged that an act which violates the insurance ratemaking chapter also violates another law applicable to business generally, such as the Unfair Competition Law (UCL), an action under the latter statute may proceed. West's Ann.Cal.Ins.Code §§ 1860.2, 1861.03(a).

1 Cases that cite this headnote

**[8]** **Insurance**
👉 Actions and Proceedings

**Insurance**
👉 Insurance companies and related entities

An insurer charging a preapproved rate is doing an act or taking an action pursuant to the authority conferred by the ratemaking chapter of the Insurance Code, within the meaning of the statute exempting from "prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance" any "act done, action taken or agreement made pursuant to the authority conferred by" the ratemaking chapter. West's Ann.Cal.Ins.Code § 1860.1.

2 Cases that cite this headnote

**[9]** **Insurance**
👉 Actions and Proceedings

**Insurance**
👉 Insurance companies and related entities

The statute providing that the "business of insurance shall be subject to the laws of California applicable to any other business," does not undermine the statute providing that

any "act done, action taken or agreement made pursuant to the authority conferred by" the ratemaking chapter of the Insurance Code is exempt from "prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance." West's Ann.Cal.Ins.Code §§ 1860.1, 1861.03(a).

2 Cases that cite this headnote

[10]   **Insurance**
       👉 Actions and Proceedings

       **Insurance**
       👉 Insurance companies and related entities

       The statute exempting from "prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance" any "act done, action taken or agreement made pursuant to the authority conferred by" the ratemaking chapter of the Insurance Code is not limited to circumstances in which the insurer defendants are charged with improper concerted acts. West's Ann.Cal.Ins.Code § 1860.1.

       1 Cases that cite this headnote

[11]   **Statutes**
       👉 Construction and operation of initiated statutes

       In the interpretation of initiative statutes, the voters are presumed to be aware of existing law.

       Cases that cite this headnote

[12]   **Insurance**
       👉 Review

       The filed rate doctrine, which provides that rates duly adopted by a regulatory agency are not subject to collateral attack in court, applies to California insurance rates. West's Ann.Cal.Ins.Code § 1860.1.

       5 Cases that cite this headnote

[13]   **Insurance**

       👉 Rates and Rate Setting

       The fact that an excess insurance premium may be rebated does not in any way impact the controlling fact that, once a rating plan has been approved, the insurer may charge no other rate. West's Ann.Cal.Ins.Code § 1860.

       Cases that cite this headnote

[14]   **Mandamus**
       👉 Mandamus Ineffectual or Not Beneficial

       The Court of Appeal would exercise its discretion to retain jurisdiction and file its decision on writ petitions in insureds' class action challenging automobile insurer's alleged improper consideration of prior automobile insurance coverage in setting rates, even though the parties notified the Court of Appeal that a tentative settlement of the class action had been negotiated, where the settlement was negotiated after the matter had been submitted for decision, the settlement was only tentative and subject to further court proceedings as well as potential objections by class members, and the issues presented by the petitions were clearly of continuing public interest and were likely to recur. West's Ann.Cal.Ins.Code § 1861.02(c).

       Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*895**  Roxborough, Pomerance, Nye & Adreani and Drew E. Pomerance, Woodland Hills; Goshgarian & Marshall, Mark Goshgarian and Merak Eskigian, Calabasas, for Petitioners, Amber MacKay, an Individual, on behalf of the General Public; and Jacqueline Leacy, an Individual, on behalf of the General Public.

**\*\*896**  Kabateck Brown Kellner and Brian S. Kabateck, Los Angeles, for Consumer Attorneys of California as Amicus Curiae on behalf of Petitioners MacKay et al.

No appearance for Respondent.

Barger and Wolen, Kent R. Keller, Steven H. Weinstein, Marina M. Karvelas and Peter Sindhuphak, Los Angeles, for Petitioner, 21st Century Insurance Company.

Case: 1:13-cv-08564 Document #: 92-1 Filed: 08/20/14 Page 20 of 35 PageID #:2743

MacKay v. Superior Court, 188 Cal.App.4th 1427 (2010)
115 Cal.Rptr.3d 893, 10 Cal. Daily Op. Serv. 12,914, 2010 Daily Journal D.A.R. 15,583

Sedgwick, Detert, Moran & Arnold and Vanessa O. Wells, San Francisco, for Personal Insurance Federation of California, Association of California Insurance Companies, and American Insurance Association as Amicus Curiae on behalf of 21st Century Insurance Company, Petitioner (B223772) and Real Party in Interest (B220469).

**Opinion**

CROSKEY, J.

 **\*1431**  In California, a casualty insurance company cannot charge a rate unless the rate is part of a rate plan which has been approved in advance by the Department of Insurance (DOI). The Insurance Code provides specific administrative remedies which may be pursued in order to challenge a rate as illegal, even after the rate has been approved. Judicial review of the administrative proceedings is available by means of a petition for writ of mandate. In this case, the insureds attempted to pursue their administrative remedy, but after the DOI declined to hold a hearing, the insureds filed a civil action against the insurer, rather than seeking judicial review of the DOI's administrative decision to decline jurisdiction. The principal question presented by these writ proceedings is whether, after a rate has been approved, an insured  **\*1432** may pursue a civil action to challenge what it believes to be an illegal rate. We conclude that the statutory provisions for an administrative process (and judicial review thereof) are the exclusive means of challenging an approved rate. As there is no triable issue of fact as to the issue of the approval of the rates at issue in this case, we conclude the insurer is entitled to summary judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On April 24, 2001, Dana Poss filed an action against 21st Century Insurance Company (21st Century) challenging two of its rating practices as violative of the Insurance Code. Under Insurance Code section 1861.02, there are certain factors which *must* be considered in determining automobile insurance rates; there are other factors which *may* be considered. Subdivision (c) of Insurance Code section 1861.02 provides, in pertinent part, "The absence of prior automobile insurance coverage, *in and of itself,* shall not be a criterion for determining eligibility for a Good Driver Discount policy,[1] or generally for automobile rates, premiums, or insurability." (Italics added.) At issue in this

case are two rating practices which are alleged to violate this provision, "accident verification," and "persistency."

It is undisputed that one of the mandatory factors to be considered in rate setting, indeed, the factor to be given the most weight, is the "insured's driving safety record." (Ins.Code, § 1861.02, subd. (a)(1).) 21st Century had four ways of determining an applicant's driving safety record, although three of the four methods depended on the applicant then having insurance,[2] and not all applicants who were uninsured were eligible to use the fourth method.[3] It is alleged that, as most applicants  **\*\*897** would be unable to verify their driving records in the absence of prior insurance, 21st Century's "accident verification" practices violated the prohibition on the use of the "absence of  **\*1433** prior automobile insurance coverage, in and of itself, [as] a criterion for determining ... automobile rates, premiums, or insurability."[4]

Similarly, one of the factors which an insurance company may consider in rate setting is "persistency." (Cal.Code Regs., tit. 10, § 2632.5(d)(11).) The applicable regulation was initially silent as to the definition of "persistency," and insurance companies used two different interpretations: (1) "loyalty persistency," which referred to an insured's previous coverage with the insurer itself or a related entity; or (2) "portable persistency," which referred to an insured's previous coverage with *any* insurer. (*Foundation for Taxpayer & Consumer Rights v. Garamendi* (2005) 132 Cal.App.4th 1354, 1360–1361, 34 Cal.Rptr.3d 354.) It is alleged that 21st Century's use of "portable persistency" violated the prohibition on the use of the "*absence of prior automobile insurance coverage, in and of itself, [as] a criterion for determining ... automobile rates, premiums, or insurability.*"[5]

Poss filed his action challenging 21st Century's accident verification and persistency practices under Business and Professions Code section 17200, proceeding as a private attorney general on behalf of the general public. Poss and 21st Century then stipulated to a voluntary dismissal without prejudice, and a tolling agreement, in order to permit Poss to pursue his administrative remedy before the DOI. Poss filed a formal complaint with the DOI, and requested a hearing. On January 29, 2002, the DOI declined to exercise jurisdiction as the DOI was proposing new regulations to resolve the issue of persistency. After further communications were exchanged, the DOI issued a similar order on April 25, 2002, declining

jurisdiction over the issue of accident verification, as the DOI was similarly addressing the issue in a proposed regulation.

Believing that the DOI "has done all it [wa]s going to do," and further believing that the administrative remedy is not the exclusive means of challenging approved rates, Poss's counsel filed a new civil action against 21st Century. The operative complaint is the second amended complaint; the plaintiffs are now Amber MacKay and Jacqueline Leacy, suing on behalf of themselves and all others similarly situated.

Class certification was granted. The class is defined as "[a]ll persons who purchased automobile insurance from 21st Century at any time from October 1, 1997 through October 31, 2005 and who paid increased premiums due to a **\*1434** lack of prior insurance." The definition includes "all those individuals who paid increased premiums because they could not verify their accident record due to a lack of prior **\*\*898** insurance, as well as all of those individuals who paid increased premiums because they were not 'persistent' due to a lack of prior insurance."

21st Century moved for summary adjudication regarding its use of portable persistency. While 21st Century raised multiple legal theories, the one with which we are concerned was 21st Century's argument that every time it used the rating factor of portable persistency, it did so pursuant to a rating plan which had been approved by the DOI. Although plaintiffs initially opposed the motion for summary adjudication on the basis that there was a triable issue of fact as to whether the DOI had actually reviewed those elements of 21st Century's rating plans which specifically referenced portable persistency, they do not pursue that challenge in the instant writ proceeding. A hearing was held before Judge John Shepard Wiley Jr., who ultimately granted summary adjudication on the basis that challenges to approved rates may only be made via the administrative procedure set forth in the Insurance Code, not by means of separate civil action under Business and Professions Code section 17200.

Plaintiffs filed a petition for writ of mandate (No. B220469) on November 24, 2009. However, by this time, 21st Century had moved for summary adjudication regarding the accident verification factor. We deferred ruling on plaintiffs' writ petition pending a trial court ruling on the accident verification summary adjudication motion. At the January 28, 2010 hearing, the trial judge, now Judge Anthony J. Mohr, indicated his tentative belief that Judge Wiley's interpretation of the law was correct. However, Judge Mohr was concerned

that, with respect to accident verification, there was a triable issue of fact as to whether that rating factor had actually been approved by the DOI. The court ultimately issued a ruling declining to reach the legal issue, as the evidence failed to clearly establish that 21st Century's use of accident verification had been approved by the DOI. Thus, summary adjudication was denied. 21st Century filed its own petition for writ of mandate (No. B223772). We have consolidated the two petitions for hearing and disposition in a single opinion.

## ISSUES PRESENTED

We first consider the factual issue; that is, whether a triable issue of fact exists as to the approval by the DOI of 21st Century's use of accident verification. We conclude that no triable issue of fact exists. Second, we turn to the legal issue; that is, whether the approval of a rating factor by the DOI precludes a civil action against the insurer challenging the use of that rating factor. We conclude that it does.

## *1435 DISCUSSION

### 1. Standard of Review

**[1] [2]** " 'A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.' (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) The pleadings define the issues to be considered on a motion for summary judgment. (*Sadlier v. Superior Court* (1986) 184 Cal.App.3d 1050, 1055 [229 Cal.Rptr. 374].) As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense. Only then will the burden shift to the plaintiff to demonstrate the existence of a triable, material issue of fact. (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064–1065 [225 Cal.Rptr. 203].)" ( **\*\*899** *Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252, 38 Cal.Rptr.2d 65.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 107 Cal.Rptr.2d 841, 24 P.3d 493.) We review orders granting or denying a summary judgment motion de novo. (*FSR Brokerage, Inc. v. Superior Court* (1995) 35 Cal.App.4th 69, 72, 41 Cal.Rptr.2d 404; *Union Bank v. Superior Court* (1995) 31

Case: 1:13-cv-08564 Document #: 92-1 Filed: 08/20/14 Page 22 of 35 PageID #:2745

MacKay v. Superior Court, 188 Cal.App.4th 1427 (2010)
115 Cal.Rptr.3d 893, 10 Cal. Daily Op. Serv. 12,914, 2010 Daily Journal D.A.R. 15,583

Cal.App.4th 573, 579, 37 Cal.Rptr.2d 653.) We exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222, 38 Cal.Rptr.2d 35.)

### 2. *The Accident Verification Factor was Approved by the DOI*

[3] 21st Century's use of the accident verification factor, and the DOI's approval thereof, during the class period of October 1997 through October 2005, is somewhat complex. The plaintiffs do not dispute that 21st Century's use of accident verification was included in the papers that it submitted to the DOI. However, they contend that accident verification was not an approved *rating factor,* but only an unapproved *underwriting guideline.* Indeed, plaintiffs point to evidence in some DOI approval letters stating, "If any portion of the application or related documentation conflicts with California law, that portion is specifically not approved.[6] *This approval does not constitute an* **\*1436** *approval of underwriting guidelines* nor the specific language, coverages, terms, covenants and conditions contained in any forms, or of the forms themselves. Policy forms and *underwriting guidelines included in this filing were reviewed only insofar as they relate to rates contained in this filing* or currently on file with the [DOI]." (Italics added.)

[4] Applicable regulations define "rating factor" as "any factor, including discounts, used by an insurer which establishes or affects the rates, premiums, or charges assessed for a policy of automobile insurance." (Cal.Code Regs., tit. 10, § 2632.2, subd. (a).) There is no definition provided for the term "underwriting guideline."[7] Mike Edwards, the person most **\*\*900** knowledgeable at the DOI regarding the approval of class plans, testified that the two terms are "very close." It appears that the elements of the rules which determine premiums are rating factors, but the utilization of those elements is considered underwriting. In our view, the distinction is an unnecessary one, as the relevant difference, in this case, depends on the language submitted to the DOI for approval. For example, an insurer could submit to the DOI a rate plan indicating the use of "driving safety record," and setting forth (mathematically) the impact of a "good" and "bad" safety record on an insured's premiums, but if the insurer then determined, as an internal matter, that an applicant's age or gender would be used as a proxy for driving

safety, the use of age or gender would be an unapproved underwriting guideline. However, if the same insurer instead submitted for DOI approval a rate plan which included, among the factors to be given weight in determining a premium, an applicant's age or gender, such use would then be a "rating **\*1437** factor." Thus, the issue is not whether a particular factor (in this example, age or gender) is, standing alone, to be called a "rating factor" or an "underwriting guideline." Instead, the issue is whether it is submitted to the DOI as a factor affecting the rates to be charged.

[5] In this case, we conclude that 21st Century's use of accident verification was, in fact, a rating factor approved by the DOI. As we now explain, the Commissioner of Insurance (commissioner) adopted a stipulation, in an enforcement action, that 21st Century's use of accident verification was, in fact, approved by the DOI.

We are here concerned with the use of accident verification from October 1, 1997 through October 31, 2005. In early 1997, 21st Century submitted a rate plan for approval. On May 15, 1997, during the approval process, 21st Century wrote the DOI a letter specifically indicating that one of the changes to its then-current rates was that it sought to use accident verification. 21st Century submitted an exhibit to the DOI clearly explaining its use of accident verification, and indicating that it would go into effect for policies originating after October 1, 1997. The Department responded that it no longer had issues with 21st Century's submitted rate plan, and subsequently approved it.

On October 17, 1997, 21st Century submitted a new rate plan, although the new rate plan made no changes to the accident verification factor. 21st Century did not submit another new rate plan until 2000. Thus, in 1998, the rate plan in effect, with respect to accident verification, was the rate plan that went into effect on October 1, 1997, at the start of the class period.

In 1998, the DOI conducted a field rating and underwriting examination of 21st Century. This examination was conducted by Jerome Tu, a Senior Insurance Rate Analyst within the Field Rating and Underwriting Bureau at the DOI. Tu's job was not to approve rating plans, but to conduct examinations of insurance companies to determine whether they were in compliance with the applicable laws and **\*\*901** regulations. As a result of Tu's 1998 examination of 21st Century, he was concerned that 21st Century's use of accident verification violated Insurance Code section 1861.02, subdivision (c). 21st Century disagreed with Tu's

Case: 1:13-cv-08564 Document #: 92-1 Filed: 08/20/14 Page 23 of 35 PageID #:2746

MacKay v. Superior Court, 188 Cal.App.4th 1427 (2010)
115 Cal.Rptr.3d 893, 10 Cal. Daily Op. Serv. 12,914, 2010 Daily Journal D.A.R. 15,583

determination and declined to make any changes to its use of accident verification. 21st Century indicated that it would wait for a response from DOI's legal division. [8] Although no response was forthcoming, the DOI did not pursue an enforcement action against 21st Century for this purported code violation.

 **\*1438**  In 2001, Tu conducted another examination of 21st Century. In January 2002, a letter was sent to 21st Century setting forth the results of that examination, and again challenging 21st Century's use of accident verification. In the letter, Tu expressed his belief that 21st Century remained out of compliance with the law ever since he had raised the concern following the 1998 examination. 21st Century again disagreed. Ultimately, Tu submitted his final report to the commissioner, setting forth his position that 21st Century's use of accident verification was improper, and including a summary of 21st Century's belief that its use of accident verification was not illegal, and, in fact, had always been approved. The issue was presented to the commissioner by Tu as "unresolved." In August 2003, 21st Century responded with a letter to the commissioner, indicating its position regarding the legality, and prior approval, of accident verification. [9]

In 2006, the DOI brought an enforcement action against 21st Century, arising out of Tu's 2001 examination. In 2007, the enforcement action was resolved by means of a consent order. The consent order identified 14 "rating and underwriting practices" which had been criticized by the DOI, the first of which was, "application of a non-verifiable driving record surcharge," which is the accident verification factor. As to this practice, 21st Century and the DOI agreed, "the practices and rates that were the subject of this criticism had been submitted to and approved by the [DOI] in rate filings." [10] On April 2, 2007, the commissioner adopted the consent order.

In sum, the 2006 enforcement action was based on the 2001 field rating and underwriting examination, which itself challenged 21st Century's use of accident verification going back as far as the 1998 examination. Yet the 2006 enforcement action was resolved by a consent order, *adopted by the commissioner,* which stipulated **\*\*902** that the accident verification factor was a "practice[ ] and rate[ ] that ... had been submitted to and approved by the [DOI] in rate **\*1439** filings." When the commissioner himself has stipulated that the DOI approved the rating factor in question, there can be no disputing the approval. [11]

The trial court denied summary adjudication on the basis that the DOI's initial approval of the accident verification factor had not been a *knowing* approval. Instead, the court concluded that 21st Century's plan had been simply *deemed approved* as the time period for the DOI to act had expired before the DOI could disapprove. This was based on an excerpt from the deposition of Mike Edwards, who testified that there was one filing from 21st Century which inappropriately included, as a rating factor, whether the applicant had prior insurance. This was the one filing that, in Edwards's entire history at the DOI, was deemed approved due to the passage of time, although he felt the filing was improper. Edwards thereafter reported to his superior that this filing should not have been approved. Edwards could not recall what happened, but believed that the DOI might have made an attempt to get 21st Century not to put the plan into practice. The trial court concluded that a triable issue of fact existed as to whether the DOI actually approved the use of the accident verification factor, given: (1) the rating plan was deemed approved only because of the passage of time; (2) the DOI attempted to prevent 21st Century from putting the plan into practice; and (3) Tu's report shortly thereafter indicated to 21st Century his disagreement with the propriety of the rating factor.

However, in the instant writ proceeding, 21st Century has augmented the record with the entirety of Edwards's deposition, which had not been before the trial court. Upon review of the complete deposition, it is apparent that the rate plan which was deemed approved by passage of time *was not a rate plan including accident verification.* Instead, Edwards was speaking of a *1994* filing, which predated the period at issue in this litigation, in which 21st Century had expressly included as a rating factor whether the applicant had prior insurance. The fact that 21st Century's 1994 rate plan, which did *not* include accident verification, was deemed approved by the passage of time cannot undermine the conclusion that the *subsequent* plans which did include that factor were approved by the DOI. As the commissioner adopted a consent order in which it was stipulated that accident verification had, in fact, been approved, and there is no evidence that *these* approvals occurred solely due to the passage of time, we conclude there is no triable issue of fact.

 **\*1440  3.** *Prior Approval of a Rate Precludes a Civil Action Challenging It*
 **[6]**    As both persistency and accident verification were approved by the DOI as part of rate plans filed by 21st

MacKay v. Superior Court, 188 Cal.App.4th 1427 (2010)

115 Cal.Rptr.3d 893, 10 Cal. Daily Op. Serv. 12,914, 2010 Daily Journal D.A.R. 15,583

Century, we now turn to the heart of the matter at issue in these writ proceedings: whether a rate which has been previously approved by the DOI may only be challenged by **903 means of the administrative procedure (with judicial review) set forth in the Insurance Code.

### a. *The Relevant Statutory Language*

Our discussion of the statutory language will revolve around three statutes, two of which appear to be contradicted by the third. Before we address those statutes however, a brief discussion of context is necessary.

Division 1 of the Insurance Code is entitled, "General Rules Governing Insurance." Part 1 of division 1 is entitled, "The Contract," while part 2 of division 1 is entitled, "The Business of Insurance." We are concerned with the latter. The "Business of Insurance" part consists of several chapters, covering topics as diverse as "Reciprocal Insurers" (chapter 3), "Bail Licenses" (chapter 7), and the "Insurance Frauds Prevention Act" (chapter 12). We are here concerned with chapter 9 of the "Business of Insurance" part, governing "Rates and Rating and Other Organizations."

Article 10 of chapter 9 is entitled "Reduction and Control of Insurance Rates." It was adopted by the voters by Proposition 103, approved November 8, 1988. Pursuant to this article, beginning on November 8, 1989, "insurance rates subject to this chapter must be approved by the commissioner prior to their use." [12] (Ins.Code, § 1861.01, subd. (c).) A procedure was established whereby: (1) an insurer who desires to change a rate files a rate plan application with the commissioner (Ins.Code, § 1861.05, subd. (b)); (2) the commissioner gives notice to the public of the application (Ins.Code, § 1861.05, subd. (c)); (3) a consumer may request a public hearing, or the commissioner may decide on his or her own motion to hold one (Ins.Code, § 1861.05, subd. (c)); and (4) the rate is deemed approved unless the commissioner disapproves it (Ins.Code, § 1861.05, subd. (c)). Judicial review of the commissioner's decision, including the decision not to hold a hearing, is available. (Ins.Code, § 1861.09.)

*1441 After a rate has been approved by the commissioner, it is still possible for an insured to challenge it. The procedure for such a challenge is set out in article 7 of chapter 9 ("Hearings, Procedure and Judicial Review"). "Any person aggrieved by any rate charged, rating plan, rating system, or underwriting rule followed or adopted by an insurer ... may file a written complaint with the commissioner requesting that the commissioner review the manner in which the rate, plan, system, or rule has been applied with respect to the insurance afforded to that person. In addition, the aggrieved person may file a written request for a public hearing before the commissioner, specifying the grounds relied upon." (Ins.Code, § 1858, subd. (a).) If, after a hearing, the commissioner finds a violation, the commissioner shall order that the insurer discontinue the violating practice, and may also order necessary and proper corrective action. (Ins.Code, § 1858.3, subd. (a).) "Any finding, determination, rule, ruling or order made by the commissioner under this chapter shall be subject to review by the courts of the State and proceedings on review shall be in accordance with the provisions of the **904 Code of Civil Procedure." (Ins.Code, § 1858.6.)

In short, article 10 of chapter 9 provides that all rates must be approved by the commissioner prior to use, and provides a system for a consumer to seek a hearing prior to approval and judicial review of the approval. Article 7 of chapter 9 provides a procedure whereby a consumer can bring an administrative proceeding before the commissioner to challenge a rate subsequent to its approval, and may seek judicial review of the commissioner's decision. We now turn to the statutory provisions that are at the heart of this proceeding.

In article 9 ("Miscellaneous") of chapter 9, we find Insurance Code sections 1860.1 and 1860.2. Section 1860.1 provides, "No act done, action taken or agreement made pursuant to the authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance." Section 1860.2 provides, "The administration and enforcement of this chapter shall be governed solely by the provisions of this chapter. Except as provided in this chapter, no other law relating to insurance and no other provisions in this code heretofore or hereafter enacted shall apply to or be construed as supplementing or modifying the provisions of this chapter unless such other law or other provision expressly so provides and specifically refers to the sections of this chapter which it intends to supplement or modify."

These two statutes, taken together, appear to exempt insurance ratemaking (i.e., "this chapter") from the remainder of the Insurance Code ( *1442 Ins.Code, § 1860.2) and all California laws outside the chapter itself (Ins.Code, § 1860.1). Indeed, "[h]istorically, these sections have been interpreted to provide exclusive original jurisdiction over

115 Cal.Rptr.3d 893, 10 Cal. Daily Op. Serv. 12,914, 2010 Daily Journal D.A.R. 15,583

issues related to ratemaking to the commissioner." (*Walker v. Allstate Indemnity Co.* (2000) 77 Cal.App.4th 750, 755, 92 Cal.Rptr.2d 132 [*Walker* ].)

The third statute, however, appears to call into question whether that interpretation is still viable. Insurance Code section 1861.03, subdivision (a) is also found within chapter 9, relating to ratemaking, but is part of article 10 that was added by Proposition 103. Insurance Code section 1861.03, subdivision (a) provides, "The business of insurance shall be subject to the laws of California applicable to any other business, including, but not limited to, the Unruh Civil Rights Act (Sections 51 to 53, inclusive, of the Civil Code), and the antitrust and unfair business practices laws (Parts 2 (commencing with Section 16600) and 3 (commencing with Section 17500) of Division 7 of the Business and Professions Code)." This statute, which makes all of "the laws of California applicable to any other business" applicable to "[t]he business of insurance," appears to contradict Insurance Code sections 1860.1 and 1860.2, which limit ratemaking enforcement to the statutes set forth in the ratemaking chapter itself. Faced with this apparent contradiction, our task is to adopt the construction that best harmonizes the statutes. (*Air Machine Com SRL v. Superior Court* (2010) 186 Cal.App.4th 414, 422, 112 Cal.Rptr.3d 482.)

[7]    Initially, we find no conflict between Insurance Code sections 1860.2 and 1861.03. Insurance Code section 1860.2 provides that "administration and enforcement" of the ratemaking chapter "shall be governed solely by the provisions of this chapter." It further provides that no other law relating to insurance shall apply to the provisions of this chapter, "[e]xcept as provided in this chapter." But Insurance Code section 1861.03, which makes the **905 "business of insurance" subject to all other California laws applicable to business, *is itself part of the ratemaking chapter,* although it is located in a different and later enacted article. Thus, Insurance Code section 1861.03 clearly falls within the exception provided for in Insurance Code section 1860.2. It therefore follows that, to the extent it is alleged that an act which violates the ratemaking chapter also violates another law applicable to business generally, such as Business and Professions Code section 17200, an action under the latter statute may proceed. (See *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 382–383, 6 Cal.Rptr.2d 487, 826 P.2d 730; *Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 968, 984–985, 11 Cal.Rptr.3d 45.)

[8]    [9]    We, however, reach an entirely different conclusion with respect to Insurance Code sections 1860.1 and 1861.03. As already noted, **\*1443** Insurance Code section 1860.1 exempts from "any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance" any "act done, action taken or agreement made pursuant to the authority conferred by this chapter." It does not exempt all acts done "pursuant to" the chapter—which is to say, all ratemaking acts—but instead exempts acts done "pursuant to the authority conferred by this chapter." (Cf. *State Comp. Ins. Fund v. Superior Court* (2001) 24 Cal.4th 930, 936, 103 Cal.Rptr.2d 662, 16 P.3d 85 [noting the use of similar language in another statute].) The ratemaking chapter confers on the DOI the exclusive authority to approve insurance rating plans. An insurer charging a preapproved rate is doing an act or taking an action pursuant to the authority conferred by the chapter. (*Walker, supra,* 77 Cal.App.4th at p. 757, 92 Cal.Rptr.2d 132.) Thus, Insurance Code section 1860.1 exempts such acts from "prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance." That Insurance Code section 1861.03 provides that the "business of insurance shall be subject to the laws of California applicable to any other business," does not undermine this provision. The "business of insurance" is quite broad—indeed, the ratemaking chapter is only one of several chapters making up the part of the Insurance Code titled, "The Business of Insurance."

Our task, therefore, is to harmonize a broad statute, subjecting the entirety of the business of insurance to all California laws governing business, and a very narrow one, exempting from other California laws acts done and actions taken pursuant to the ratemaking authority conferred by the ratemaking chapter. " ' "It is well settled ... that a general provision is controlled by one that is special, the latter being treated as an exception to the former. A specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to include the subject to which the more particular provision relates." ' " (*Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 738, 112 Cal.Rptr.3d 439.)

In short, we conclude that: (1) while Insurance Code section 1861.03 subjects the entirety of the business of insurance to the laws governing business generally; and (2) Insurance Code sections 1860.2 and 1861.03 taken together provide that the statutes in the ratemaking chapter of the Insurance Code may be enforced by the laws governing business generally (if

applicable); nonetheless, (3) Insurance Code section 1860.1 exempts from other California laws acts done and actions taken pursuant to the ratemaking authority **906 conferred by the ratemaking chapter, *including the charging of a preapproved rate.* (See *Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 936–937, 20 Cal.Rptr.3d 485 ["The Insurance Code does not, however, displace the UCL 'except as to ... activities related to rate setting.' [Citation.] ... 'In general, a claim that directly challenges a rate and seeks a remedy to limit or control the rate prospectively or retrospectively is an *1444 attempt to regulate rates,' but 'a claim that directly challenges some other activity, *such as false advertising* ... is not rate regulation.' [Citation.] A claim predicated on a violation of the Insurance Code not related to ratemaking may thus be framed as a claim under the UCL. [Citation.]"].)

### b. *Legislative History Does Not Limit Insurance Code Section 1860.1 to Concerted Acts*

[10] *Walker, supra,* 77 Cal.App.4th 750, 92 Cal.Rptr.2d 132 supports our conclusion. That court held, "If [Insurance Code] section 1860.1 has any meaning whatsoever (which under the accepted rules of statutory construction it must), the section must bar claims based upon an insurer's charging a rate that has been approved by the commissioner pursuant to the [ratemaking chapter]." (*Id.* at p. 756, 92 Cal.Rptr.2d 132.) Plaintiffs contend, however, that the legislative history of the relevant statutes compels the conclusion that *Walker* must be limited to circumstances in which the insurer defendants are charged with improper *concerted* acts; plaintiffs argue that Insurance Code section 1860.1 can have no application to a case in which a single defendant insurer is charged with improper acts it committed alone. We disagree; as discussed below, Insurance Code section 1860.1 is not so limited.

The history of Insurance Code section 1860.1 has already been discussed, at length, in several cases. (*State Comp. Ins. Fund v. Superior Court, supra,* 24 Cal.4th at pp. 938–939, 103 Cal.Rptr.2d 662, 16 P.3d 85; *Donabedian v. Mercury Ins. Co., supra,* 116 Cal.App.4th at p. 990, 11 Cal.Rptr.3d 45; *Karlin v. Zalta* (1984) 154 Cal.App.3d 953, 966–970, 201 Cal.Rptr. 379.) In summary, the statute was part of the McBride–Grunsky Insurance Regulatory Act of 1947. In 1944, the United States Supreme Court had determined that insurance constituted interstate commerce, and was therefore subject to federal antitrust and related laws. (*United States v. South–Eastern Underwriters Assn.* (1944) 322 U.S. 533, 64 S.Ct.

1162, 88 L.Ed. 1440.) In 1945, Congress passed a statute (the McCarran–Ferguson Act; 15 U.S.C. § 1011 et seq.) imposing a moratorium on this application until 1948, at which time insurance was not regulated by state law. (See generally, Croskey, et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2009) ¶¶ 14:7ff.) The McBride–Grunsky Act was California's response. (*State Comp. Ins. Fund v. Superior Court, supra,* 24 Cal.4th at pp. 938–939, 103 Cal.Rptr.2d 662, 16 P.3d 85; *Karlin v. Zalta, supra,* 154 Cal.App.3d at p. 966–967, 201 Cal.Rptr. 379.) Thus, Insurance Code section 1860.1 was enacted, in the first instance, in order to immunize insurers from antitrust laws. (*Donabedian v. Mercury Ins. Co., supra,* 116 Cal.App.4th at p. 990, 11 Cal.Rptr.3d 45.) This, however, is the beginning of the analysis, not the end of it.

The McBride–Grunsky Act did more than immunize insurers from antitrust laws. It enacted the entirety of *1445 chapter 9 of part 2 of division 1 of the Insurance Code, governing "Rates and Rating and Other Organizations." It enacted provisions permitting rating organizations (Ins.Code, **907 fmr. §§ 1854–1854.4); permitting insurers to act in concert (Ins.Code, fmr. § 1853); indicating the limited circumstances in which rates would be considered excessive or inadequate (Ins.Code, fmr. § 1852); and similar provisions.

The McBride–Grunsky Act also enacted Insurance Code section 1858, which provided (and still provides) [13] an administrative remedy before the commissioner for an insured aggrieved by an insurer's rates or rating system. Insurance Code sections 1860.1 and 1860.2 rendered that administrative remedy the *exclusive* remedy for violations of the McBride–Grunsky Act. (*Karlin v. Zalta, supra,* 154 Cal.App.3d at p. 972, 201 Cal.Rptr. 379.) Thus, while the initial motivation behind Insurance Code section 1860.1 may have been exemption from antitrust laws in particular, it was recognized that the language of the exemption was, in fact, broader. Deputy Attorney General Harold Haas wrote Governor Warren, prior to its enactment, explaining, "The exemption is a very broad one.... If other business regulations such as the Fair Trade Act are applicable to insurance, the exemption applies to them also." (Deputy Attorney General Harold Haas, Interdepartmental Communication to Governor Earl Warren, June 11, 1947, p. 3.)

The McBride–Grunsky Act also enacted Insurance Code former section 1850, which explained, "The purpose of this chapter is to promote the public welfare by regulating

115 Cal.Rptr.3d 893, 10 Cal. Daily Op. Serv. 12,914, 2010 Daily Journal D.A.R. 15,583

insurance rates as herein provided to the end that they shall not be excessive, inadequate or unfairly discriminatory, to authorize the existence and operation of qualified rating organizations and advisory organizations and require that specified rating services of such rating organizations be generally available to all admitted insurers, and to authorize cooperation between insurers in rate making and other related matters. [¶] It is the express intent of this chapter to permit and encourage competition between insurers on a sound financial basis and nothing in this chapter is intended to give the Commissioner power to fix and determine a rate level by classification or otherwise."

Forty years later, the voters enacted Proposition 103. As explained earlier, Proposition 103 was a rejection of the rate-setting system enacted by the McBride–Grunsky Act, and a replacement of that system with one under which all rates charged had to be preapproved by the commissioner. Proposition 103 repealed many provisions of the McBride–Grunsky Act discussed above, including those permitting rating organizations, permitting **\*1446** insurers to act in concert, and setting forth the limited circumstances in which rates were then considered excessive or inadequate. (Ins.Code, fmr. §§ 1854–1854.4, 1853, 1852.) It also repealed Insurance Code former section 1850, setting forth the purpose of the chapter. As a partial replacement for the repealed statutes, Proposition 103 enacted article 10 of the chapter, entitled, "Reduction and Control of Insurance Rates," requiring, among other things, an immediate rollback of insurance rates and the preapproval of future rates. (Ins.Code, § 1861.01.) Proposition 103 set forth new, stricter, standards for whether a rate is to be considered excessive or inadequate. (Ins.Code, § 1861.05, subd. (a).)

As relevant to the instant case, Proposition 103 also enacted Insurance Code section 1861.03, of which subdivision (a) **\*\*908** makes the business of insurance subject to the laws of California applicable to any other business. [14] But of equal significance, however, is the fact that Proposition 103 left untouched Insurance Code section 1860.1, as well as the administrative enforcement mechanism set forth in Insurance Code sections 1858 et seq. [15]

Under the circumstances, we believe it is inappropriate to focus on the intent of the Legislature in initially enacting Insurance Code section 1860.1; the relevant inquiry is to determine the intent of the voters in leaving that statute standing when approving Proposition 103, which repealed the great bulk of the McBride–Grunsky Act, including the

provision setting forth the purpose of that Act. It is difficult to believe that Insurance Code section 1860.1 is currently intended to serve the purpose it served in 1947, as the express statement of that purpose has since been repealed. Indeed, it is clear from the official ballot pamphlet analyses and arguments in connection with Proposition 103, that it was intended, in part, to repeal the then-existing antitrust exemption. (Ballot Pamp., Gen. Elec. (Nov. 8, 1988) analysis of Prop. 103 by the Legislative Analyst, p. 98 ["Insurance companies are not subject to the state's anti-trust laws." The "measure makes insurance companies subject to the state's antitrust laws."]; *id.*, argument in favor of Prop. 103, **\*1447** p. 100 ["Proposition 103 will also end the insurers' exemption from the antimonopoly laws."]; see *Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 281–282, 41 Cal.Rptr.2d 220, 895 P.2d 56.) Given that Proposition 103 was intended to eliminate insurers' exemption from antitrust laws, we cannot conclude that Insurance Code section 1860.1 is currently to be interpreted in accordance with its *initial* intent, which was to exempt insurers from antitrust laws.

For this reason, we find the plaintiffs' reliance on the analysis in *State Comp. Ins. Fund v. Superior Court, supra,* 24 Cal.4th 930, 103 Cal.Rptr.2d 662, 16 P.3d 85 unpersuasive. In that case, the California Supreme Court considered Insurance Code section 11758, a statute in the workers' compensation insurance context with very similar language to Insurance Code section 1860.1. At the time the alleged misconduct at issue in that case occurred, the statute which set forth the purpose of the relevant article to be the regulation of concert of action between insurers *was still in existence.* (*State Comp. Ins. Fund v. Superior Court, supra,* 24 Cal.4th at p. 935, 103 Cal.Rptr.2d 662, 16 P.3d 85.) Thus, the Supreme Court interpreted the statute in light of the then-existing express purpose of the article. Our case, involving the interpretation of **\*\*909** Insurance Code section 1860.1 *after the repeal* of the statute initially setting forth the intent of the chapter in which it appears, is thus distinguishable.

 **[11]** Plaintiffs argue that Insurance Code section 1860.1 is merely a "vestigial remnant[ ]" of the McBride–Grunsky Act. Such a conclusion would mean that Proposition 103 failed to repeal Insurance Code section 1860.1 by mistake. We do not assume such an intent on the part of the electorate. To the contrary, "[t]he voters are presumed to be aware of existing law." (*Farmers Ins. Exchange v. Superior Court, supra,* 137 Cal.App.4th 842, 855, 40 Cal.Rptr.3d 653.) Plaintiffs argue that Insurance Code section 1860.1 can have no present application except with respect to concerted

action between insurers, even though it is clear that: (1) Insurance Code section 1860.1 was always understood to have a broader reach than simply an exemption from antitrust laws; and (2) Proposition 103 clearly intended to eliminate the then-existing antitrust exemption. [16] In sum, we conclude that it is inappropriate to limit the **\*1448** interpretation of Insurance Code section 1860.1 by the now-superseded purpose for which it was initially enacted. Instead, it is properly interpreted in the context of the entirety of the ratemaking chapter, as we have done above.

### c. Case Authority Supports Our Conclusion

We have concluded that Insurance Code section 1860.1 precludes a challenge to an approved rate brought under laws outside the Insurance Code. As already discussed, this conclusion was also reached by Division Two of the First Appellate District in *Walker, supra,* 77 Cal.App.4th 750, 92 Cal.Rptr.2d 132.

In *Walker,* the plaintiffs brought a putative class action against several insurers, [17] alleging causes of action seeking damages or disgorgement of allegedly excessive premiums "that the insurers have been authorized to collect." (*Id.* at p. 752, 92 Cal.Rptr.2d 132.) The defendant insurers successfully demurred on the basis of Insurance Code section 1860.1, and the appellate court affirmed. The court explained that, "under the statutory scheme enacted by the voters, the charging of an approved rate cannot be deemed 'illegal' or 'unfair' for purposes of the Unfair Business Practices Act or, indeed, tortious." (*Id.* at p. 756, 92 Cal.Rptr.2d 132.) The court continued that the plaintiffs' argument "seems an obvious attempt to avoid **\*\*910** consumer participation provisions of Proposition 103 that appellants deem burdensome or impractical and thus frustrate the power granted to the commissioner by the voters to set insurance rates after soliciting both insurer and consumer input into his decision. To read section[ ] 1861.03 ... as appellants urge would result in an unnecessary conflict between [that] statute [ ] and section 1860.1, which embodies the finality of the commissioner's ratemaking decision. Put another way, to accept appellants' argument would require violation of well-accepted principles of statutory construction." (*Id.* at p. 758, 92 Cal.Rptr.2d 132.)

 **[12]** **[13]** The *Walker* court reached its conclusion based on statutory construction, and did not rely on the filed rate doctrine. However, the court acknowledged that the

filed rate doctrine is "analogous to the scheme explicitly embodied in the Insurance Code and, to the extent it is relevant at all, is consistent with our interpretation of the statutory provisions at issue in this case." (*Walker, supra,* 77 Cal.App.4th at p. 757, fn. 4, 92 Cal.Rptr.2d 132.) We agree. The filed rate doctrine provides that rates duly adopted by a regulatory agency are not subject to collateral attack in court. Numerous state courts have applied the **\*1449** filed rate doctrine to approved insurance rates. (e.g., *Anzinger v. Illinois State Medical Inter–Insurance Exchange* (1986) 144 Ill.App.3d 719, 721, 723, 98 Ill.Dec. 533, 494 N.E.2d 655; *Commonwealth v. Anthem Insurance Companies, Inc.* (Ky.App.1999) 8 S.W.3d 48, 51–52; *City of New York v. Aetna Casualty & Surety Company* (1999) 264 A.D.2d 304, 693 N.Y.S.2d 139, 140). Indeed, one such case noted that while the filed rate doctrine originated in federal courts, "it 'has been held to apply equally to rates filed with state agencies by every court to have considered the question.' " (*Commonwealth v. Anthem Insurance Companies, Inc., supra,* 8 S.W.3d at p. 52.) We thus must disagree with *Fogel v. Farmers Group, Inc.* (2008) 160 Cal.App.4th 1403, 1418, 74 Cal.Rptr.3d 61, to the extent that it rejected the application of the filed rate doctrine to California insurance rates. The *Fogel* court noted that the parties before it had identified no cases in which the filed rate doctrine had been applied in the context of a rate approved by a state regulatory agency. [18] Thus, the filed rate doctrine supports our conclusion that there is no tort liability for charging a rate that has been approved by the commissioner. [19]

We note, however, the limited nature of our holding. Insurance Code section 1860.1 protects from prosecution under laws outside the Insurance Code only "act[s] done, action[s] taken [and] agreement[s] made pursuant to the authority conferred by" the ratemaking chapter. It **\*\*911** does not extend to insurer conduct *not* taken pursuant to that authority.

Thus, cases which apparently reached a different result when the underlying conduct was *not* the **\*1450** charging of an approved rate are distinguishable on this basis. (See e.g., *Donabedian v. Mercury Ins. Co., supra,* 116 Cal.App.4th at p. 992, 11 Cal.Rptr.3d 45 [expressly acknowledging that the plaintiff "contends the Insurance Commissioner did not approve Mercury's use of the lack of prior insurance to determine, for example, eligibility for the Good Driver Discount or insurability"].) Indeed, if the underlying conduct challenged was not the charging of an approved rate, but the *application* of an unapproved underwriting guideline,

115 Cal.Rptr.3d 893, 10 Cal. Daily Op. Serv. 12,914, 2010 Daily Journal D.A.R. 15,583

Insurance Code section 1860.1 would not be applicable. " 'It is possible for an insurance carrier to file with the [DOI] a rate filing and class plan that [satisfies] all of the ratemaking components of the regulations, and still result in a violation of the Insurance Code *as applied.* Such a [situation] would not involve a question of rates, but rather, it could easily involve the very separate, factual question of how the components of the class plan are applied toward members of the public.' " (*Id.* at p. 993, 11 Cal.Rptr.3d 45.) Similarly, cases which considered allegations of the improper collection of attorney-in-fact fees by a reciprocal insurance exchange (*Fogel v. Farmers Group, Inc., supra,* 160 Cal.App.4th at p. 1414, 74 Cal.Rptr.3d 61) and the way an insurer analyzed data before reporting it to the Workers' Compensation Insurance Rating Bureau (*State Comp. Ins. Fund v. Superior Court, supra,* 24 Cal.4th at pp. 936–937, 103 Cal.Rptr.2d 662, 16 P.3d 85) do not involve the charging of approved rates, and are therefore distinguishable.

Finally, we consider plaintiffs' argument based on *Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th 377, 6 Cal.Rptr.2d 487, 826 P.2d 730. In that case, the Supreme Court considered a Business and Professions Code section 17200 action against multiple insurers, alleging that they violated the law by refusing to offer a "Good Driver Discount" to all eligible applicants, considering the absence of prior insurance as a criterion for considering eligibility for the Good Driver Discount, and unfairly discriminating in eligibility and rates for persons who qualify for the Good Driver Discount. (*Id.* at pp. 381–382, 6 Cal.Rptr.2d 487, 826 P.2d 730.) The Supreme Court concluded that, under the doctrine of primary jurisdiction, the action should be stayed pending pursuit of the administrative remedy before the commissioner. (*Id.* at p. 381, 6 Cal.Rptr.2d 487, 826 P.2d 730.)

Although the case did not consider the application of Insurance Code section 1860.1, plaintiffs argue that the case, of necessity, included an approved rate. They therefore argue that the Supreme Court's conclusion that primary jurisdiction *stayed* the Business and Professions Code section 17200 action, without holding that the administrative remedy *completely precluded* it, necessarily includes the implicit holding that an approved rate can, in fact, be challenged in a

Business and Professions Code section 17200 case. Plaintiffs argue that, "in this post Proposition 103 world, a carrier can not offer insurance to the public without *first* having its rates and class plan approved by the DOI. Therefore, in practice, a [p]laintiff would not even bring a [Business and Professions Code section 17200] action seeking restitution until *after* the illegal rating plan had been approved and implemented." The argument is without merit. [20] Plaintiffs' argument is based on the premise that an insurer that wishes to charge an illegal rate would submit **\*1451** the illegal rate as part of a rating plan and hope to obtain approval for it—where it is equally, if not more, likely that an insurer wishing to charge an illegal rate would submit a legal rating plan and then simply *not follow it.* **\*\*912** Moreover, as discussed above, the fact that a rate plan may have been approved does not mean that the application of that rate plan, through unapproved underwriting guidelines, has also been approved. There is nothing in the opinion in *Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th 377, 6 Cal.Rptr.2d 487, 826 P.2d 730 indicating that the challenged practices were part of an approved rate plan. Therefore, it has no bearing on our resolution of this appeal.

### DISPOSITION

[14] The petition for writ of mandate filed by plaintiffs (No. B220469) is denied; the petition for writ of mandate filed by 21st Century (No. B223772) is granted and the trial court is directed to vacate its order denying 21st Century's motion for summary adjudication with respect to accident verification and to enter a new order granting the motion. As the two summary adjudication motions resolve plaintiffs' action in its entirety, the trial court is directed to enter judgment in favor of 21st Century. The parties shall bear their own costs in this proceeding. [21]

We Concur: KLEIN, P.J., and KITCHING, J.

**Parallel Citations**

188 Cal.App.4th 1427, 10 Cal. Daily Op. Serv. 12,914, 2010 Daily Journal D.A.R. 15,583

Footnotes

1   Insurance Code section 1861.02, subdivision (b) requires insurers to offer a Good Driver Discount policy to insureds meeting established qualifications.

115 Cal.Rptr.3d 893, 10 Cal. Daily Op. Serv. 12,914, 2010 Daily Journal D.A.R. 15,583

2    These methods were: (1) a letter of experience from the applicant's current/prior insurer; (2) a current renewal offer from the applicant's current/prior insurer including years insured and claims history; and (3) policy information from the applicant's current/prior insurer including years insured and claims history.

3    The fourth method was "[a]n acceptable form of written verification of an accident driving record ... from a disinterested third party." Examples included a claims history report from a third-party loss reporting agency, a letter from the insured's employer setting forth accident history if the insured had been driving a company car, and a letter from the insured's commanding officer if the insured had been in the military stationed overseas. There was no option for an applicant to verify his or her own driving record.

4    We express no opinion on whether 21st Century's accident verification practices did, in fact, violate this statutory provision.

5    In 2003, the Legislature enacted a statute which permitted insurers to use portable persistency as a rating factor. (*Foundation for Taxpayer & Consumer Rights v. Garamendi, supra,* 132 Cal.App.4th at p. 1362, 34 Cal.Rptr.3d 354.) The statute was determined to be invalid. (*Id.* at p. 1362, 34 Cal.Rptr.3d 354.)

6    We are not long detained by plaintiffs' suggestion that, by including this provision in its approval letters, the DOI can, as a general matter, prospectively disapprove any rating factor which may subsequently be determined to have been in conflict with California law. Insurers are statutorily prohibited from charging a rate which has not been preapproved by the DOI. (Ins.Code, § 1861.01, subd. (c).) An approved rate has the imprimatur of the DOI; it has been approved as compliant with the law, to the best of the DOI's determination. If that rate is subsequently determined to have been illegal, the insurer may no longer charge the rate, but that cannot retroactively invalidate the DOI's prior approval. Insurance Code section 1858.07, subdivision (a) provides for a civil penalty for the use of "any rate, rating plan, or rating system in violation of this chapter." However, subdivision (b) of that section provides that "no penalty shall be imposed by the [DOI] if a person has used any rate, rating plan, or rating system that has been approved for use by the commissioner in accordance with the provisions of this chapter." (Ins.Code § 1858.07, subd. (b).) Subdivision (b) would be unnecessary if DOI approval of a rate later determined to be illegal had no legal efficacy prior to the time of such determination. Put another way, the insurer's use of an approved rate is condemned or prohibited only prospectively from the time it is determined to be illegal.

7    In *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 113 Cal.Rptr.2d 399, we considered the meaning of "underwriting rule" for the purpose of Insurance Code section 1858, which provides an administrative remedy for any person "aggrieved by any rate charged, rating plan, rating system, or underwriting rule" followed or adopted by an insurer. We concluded that an underwriting rule "is properly characterized as a rule followed or adopted by an insurer ... which either (1) *limits* the conditions under which a policy will be issued or (2) *impacts* the rates that will be charged for that policy." (*Smith v. State Farm Mutual Automobile Ins. Co., supra,* 93 Cal.App.4th at p. 726, 113 Cal.Rptr.2d 399.) Our discussion is not inconsistent with this definition.

8    Shawna Ackerman worked for the DOI from 1989 through 1998, in positions ranging from Insurance Rate Analyst to Senior Casualty Actuary. 21st Century submitted deposition testimony from Ackerman indicating that, during her time at the DOI, the topic of whether accident verification was a permissible rating factor was a subject of discussion, with the DOI ultimately concluding that accident verification was, in fact, approvable. Mike Edwards also testified to vaguely remembering that, in the late 1990's, "the issue of accident verification became an issue of discussion within the [DOI], and the ultimate result of those discussions [was] essentially a direction that the accident—direction from executive staff filtered down through to us that the accident verification process was allowable."

9    In the interim, on November 30, 2002, the Department had adopted a new regulation which required insurers to permit drivers to certify their own driving history by means of a declaration under penalty of perjury. (Cal.Code Regs., tit. 10, § 2632.13, subd. (i).) The regulation gave insurers 120 days to file complying rate plans. (*Ibid.*) On January 6, 2003, 21st Century submitted a new plan which permitted drivers to self-certify. However, with the DOI's approval, this change was not put into effect for a number of years.

10   They also agreed that 21st Century had since changed its practices and the challenged practices were no longer used.

11   In 21st Century's separate statement of undisputed facts in support of its motion for summary adjudication, 21st Century proposed the undisputed fact that the DOI had agreed, in the consent order, that these practices and rates "had been submitted to and approved by the [DOI] in rate filings." Plaintiffs disputed the fact only on the bases that the DOI cannot approve an illegal practice and that it does not "approve underwriting guidelines, which is what 21st Century's accident verification procedures are." Plaintiffs' bases for dispute cannot undermine the commissioner's adoption of the stipulation that these practices and rates had actually been approved. (See fn. 6, *ante.*)

12   Prior to the adoption of Proposition 103, California was a so-called "open rate" state, meaning that rates were set by insurers without prior or subsequent approval by the commissioner. The commissioner was empowered to prohibit a rate only if a reasonable degree of competition did not exist in the area and the rate was found to be excessive, inadequate, or unfairly discriminatory. (*California Auto. Assigned Risk Plan v. Garamendi* (1991) 232 Cal.App.3d 904, 909–910, 283 Cal.Rptr. 562.)

13   Insurance Code section 1858, and, indeed, much of article 7 ("Hearings, Procedure and Judicial Review") of the ratemaking chapter, was amended after its original enactment by the McBride–Grunsky Act.

115 Cal.Rptr.3d 893, 10 Cal. Daily Op. Serv. 12,914, 2010 Daily Journal D.A.R. 15,583

14    Proposition 103 also enacted Insurance Code section 1861.10, which provides, in pertinent part, "Any person may initiate or intervene in any proceeding permitted or established pursuant to this chapter, challenge any action of the commissioner under this article, and enforce any provision of this article." (Ins.Code, § 1861.10, subd. (a).) In *Farmers Ins. Exchange v. Superior Court* (2006) 137 Cal.App.4th 842, 40 Cal.Rptr.3d 653, we concluded that this statute simply increased the *standing* to use procedures already extant; it did not create a private right of action for violations of the statutes enacted by Proposition 103. (*Id.* at p. 854, 40 Cal.Rptr.3d 653.)

15    Indeed, Proposition 103 explicitly referred to this enforcement mechanism. Proposition 103 enacted Insurance Code section 1861.05, which permits the public to request a hearing on an insurer's rate application. It also enacted Insurance Code section 1861.09, which provides that "[j]udicial review shall be in accordance Section 1858.6." Insurance Code section 1858.6 was originally enacted as part of the McBride–Grunsky Act, and governs judicial review of the commissioner's administrative enforcement decisions.

16    Plaintiffs attempt to identify a situation in which their interpretation of Insurance Code section 1860.1 would not be empty. They point to subdivision (b) of Insurance Code section 1861.03. After subdivision (a) of that statute provides that the business of insurance is subject to the laws of California applicable to any other business, subdivision (b) sets forth several exceptions, specifically providing that "[n]othing in this section shall be construed to prohibit (1) any agreement to collect, compile and disseminate historical data on paid claims or reserves for reported claims, provided such data is contemporaneously transmitted to the commissioner, [and] (2) participation in any joint arrangement established by statute or the commissioner to assure availability of insurance...." (Ins.Code § 1861.03, subd. (b).) But if Insurance Code section 1861.03, subdivision (b) immunizes from prosecution under other statutes the identified concerted acts, there is no need for Insurance Code section 1860.1 to do the same thing.

17    The action was initially brought against more than 70 insurers, but the appeal was taken only with respect to two of them. (*Walker, supra,* 77 Cal.App.4th at pp. 752, 754, 92 Cal.Rptr.2d 132.) Despite plaintiffs' suggestion to the contrary, the fact that more than one insurer was a named defendant in the case does not imply that the causes of action were based on claims of concerted action. Indeed, nothing in the appellate opinion indicates that the number of defendant insurers had any effect on the court's analysis.

18    That case also found it significant that "under California's system regulating insurance rates, insurers are allowed to rebate excess premiums to their policyholders." (*Fogel v. Farmers Group, Inc., supra,* 160 Cal.App.4th at p. 1418, 74 Cal.Rptr.3d 61.) We do not see this as a bar to the application of the filed rate doctrine. Indeed, as a plan for rebating excess premiums to policyholders "shall not be deemed a rating plan or system," (Ins.Code, § 1860), the fact that an excess premium may be rebated does not in any way impact the controlling fact that, once a rating plan has been approved, the insurer may charge no other rate.

19    Plaintiffs repeatedly argue that our conclusion grants insurers "immunity" for their illegal practices. Insurance Code section 1860.1 does not grant immunity; it simply limits plaintiffs to an administrative remedy (with judicial review). Plaintiffs' concern is not that insurers will be left free to charge illegal rates, but, rather, that they will be unable to collect damages or obtain disgorgement of any illegal premiums collected. There is no injustice in exempting an insurance company from disgorging premiums collected pursuant to a rate which has been approved in advance by the commissioner. (Cf. Ins.Code, § 1858.07 [providing no civil penalties may be imposed for the use of an approved rate].)

20    Indeed, it undermines plaintiffs' argument that the "accident verification" factor was not approved by the DOI in this case.

21    This court has been advised by written communications from the parties, each dated September 29, 2010, that a tentative "settlement" of this class action has been negotiated. We have nonetheless determined to exercise our discretion to retain jurisdiction and file our decision in this matter. There are two reasons for doing so. First, as both parties have recognized, the negotiated settlement is only tentative and subject to further court proceedings as well as potential objections by class members. In addition, such settlement was negotiated after this matter had been submitted for decision. (*Cadence Design Systems, Inc. v. Avant! Corp.* (2002) 29 Cal.4th 215, 218, fn. 2, 127 Cal.Rptr.2d 169, 57 P.3d 647; *Castro v. Superior Court* (2004) 116 Cal.App.4th 1010, 1014, fn. 3, 10 Cal.Rptr.3d 865.) Second, the issues presented by these consolidated writ petitions and addressed in this opinion are of major importance to both insurers and policy holders in California and are clearly of continuing public interest and are likely to recur. (See *People v. Eubanks* (1996) 14 Cal.4th 580, 584, fn. 2, 59 Cal.Rptr.2d 200, 927 P.2d 310.)

---

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

West's District of Columbia Code Annotated 2001 Edition
Division V. Local Business Affairs
Title 31. Insurance and Securities. (Refs & Annos)
Subtitle II. Regulation of Insurance Industry Generally.
Chapter 22A. Unfair Insurance Trade Practices.

DC ST § 31-2231.13

§ 31-2231.13. Unfair discrimination and rebates prohibited; property, casualty, and surety insurance.

Effective: June 25, 2008

Currentness

(a) No person offering property, casualty, or surety insurance, or an employee or representative thereof, shall pay, allow, or give, or offer to pay, allow, or give, directly or indirectly, as an inducement to insure, or after insurance has been effected, a rebate, discount, abatement, credit, or reduction of the premium named in a policy of insurance, or a special favor or advantage in the dividends or other benefits to accrue thereon, or a valuable consideration or inducement whatsoever, not specified or provided for in the policy, except to the extent provided for in an applicable filing with the Commissioner as allowed by law.

(b) An insured named in a policy, or an employee of the insured, shall not knowingly receive, offer, or accept, directly or indirectly, a rebate, discount, abatement, credit, or reduction of premium, or a special favor or advantage or valuable consideration or inducement, as proscribed by subsection (a) of this section.

(c) No insurer shall make or permit an unfair discrimination between insured property having like insuring or risk characteristics, in the premium or rates charged for insurance, in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance.

(d) Notwithstanding any other provision in this section, an insurer shall not make or permit a differential in ratings, premium payments, or dividends based on the marital status, race, color, personal appearance, sexual orientation, gender identity or expression, matriculation, or political affiliation of an applicant or policy holder unless there is actuarial justification for the differential. For the purposes of this subsection, the term "matriculation" shall have the same meaning as in § 2-1401.02(18). Nothing in this section shall limit or otherwise restrict any discount, rating, or credit program filed with the Commissioner.

(e) Nothing in this section shall be construed as prohibiting the payment of commissions or other compensation to duly licensed agents or brokers or as prohibiting any insurer from allowing or returning to its participating policyholders, members or subscribers, lawful dividends, savings, or unabsorbed premium deposits.

(f) No person shall commit or permit an unfair discrimination between individuals or risks of the same class and of essentially the same hazard by refusing to insure, refusing to renew, canceling, or limiting the amount of insurance coverage on a property or casualty risk solely because of the geographic location of the individual or risk, unless the action is for a sound business purpose that is not a mere pretext for unfair discrimination, or unless the refusal, cancellation, or limitation is required by law or regulatory mandate.

(g) No person shall commit or permit an unfair discrimination between individuals or risks of the same class and of essentially the same hazard by refusing to insure, refusing to renew, canceling, or limiting the amount of insurance coverage on the residential property risk, or the personal property contained in a residential property risk, solely because of the age of the residential property.

(h)(1) For purposes of § 31-2231.12 or this section, the term "valuable consideration" shall not include any educational materials, promotional materials, or articles of merchandise that cost less than $10, regardless of whether a policy or contract is purchased.

(2) For the purposes of this section, the term "insurance" shall include suretyship and the term "policy" shall include a bond.

(3) This section shall not apply to wet marine and transportation insurance.

**Credits**

(Apr. 3, 2001, D.C. Law 13-265, § 113, 48 DCR 1225; Oct. 3, 2001, D.C. Law 14-28, § 2702(b), 48 DCR 6981; June 25, 2008, D.C. Law 17-177, § 16(c), 55 DCR 3696.)

Copyright (c) 2012 By the District of Columbia. Content previously published in the District of Columbia Official Code, 2001 Edition is used with permission. Copyright (c) 2014 Thomson Reuters.

DC CODE § 31-2231.13

Current through July 13, 2014.

---

**End of Document**                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

West's District of Columbia Code Annotated 2001 Edition
  Division V. Local Business Affairs
    Title 31. Insurance and Securities. (Refs & Annos)
      Subtitle III. Fire, Casualty, Marine, Motor Vehicle and Related Insurance.
        Chapter 27. Regulation of Casualty and Other Insurance Rates.

DC ST § 31-2704

Formerly cited as DC ST 1981 §35-1704

§ 31-2704. Filing requirements of individual companies; adjustment of rates; removal of discriminations.

Effective: March 14, 2007

Currentness

(a) On and after July 1, 1948, every company shall file with the Commissioner, either directly or through a licensed rating organization of which it is a member or subscriber, except as to rates on inland marine risks which are not made by a rating organization and which by general custom of the business are not written according to manual rates or rating plans, all rates and rating plans, rules, and classifications which it uses or proposes to use in the District.

(b) Whenever it shall be made to appear to the Commissioner, either from his own information or from complaint of any party alleging to be aggrieved thereby, that there are reasonable grounds to believe that the rates on any or on all risks or classes of risks or kinds of insurance within the scope of this chapter are not in accordance with the terms of this chapter, it shall be his duty, and he shall have the full power and authority, to investigate the necessity for an adjustment of any or all such rates.

(c)(1) After an investigation of the rates, the Commissioner shall, before ordering an adjustment, hold a hearing upon not less than 10 days' written notice specifying the matters to be considered at the hearing, to every company and rating organization which filed the rates; provided, that the Commissioner shall not be required to hold the hearing if he or she is advised by every such company and rating organization that they do not desire the hearing. The cost of the hearing shall be borne by the insurance company requesting the rate increase. If, after the hearing, the Commissioner determines that any or all of the rates are excessive or inadequate, he or she shall order an adjustment. Pending the investigation and order of the Commissioner, the rates shall be deemed to have been made in accordance with the terms of this chapter.

(2)(A) An order of adjustment shall not affect any contract or policy made or issued prior to the effective date of the order unless:

(i) The adjustment is substantial and exceeds the cost to the companies of making the adjustment; and

(ii) The order is made after the prescribed investigation and hearing and within 30 days after the filing of rates affected.

(B) An order of adjustment shall not affect an existing contract or policy other than:

(i) A medical malpractice, workmen's compensation, or automobile liability insurance policy required by law, order, rule, or regulation of a public authority; or

(ii) A contract or policy of any type as to which the rates are not, by general custom of the business or because of rarity and peculiar characteristics, written according to normal classification or rating procedure.

(d) In determining the necessity for an adjustment of rates, the Commissioner shall be bound by all of the provisions of § 31-2703.

(e) The Commissioner is further empowered to investigate and to order removed at such time and in such manner as he shall specify any unfair discrimination existing between individual risks or classes of risks.

**Credits**

(May 20, 1948, 62 Stat. 243, ch. 324, § 4; May 21, 1997, D.C. Law 11-268, § 10(t), 44 DCR 1730; Mar. 24, 1998, D.C. Law 12-81, § 30(a), 45 DCR 745; Mar. 14, 2007, D.C. Law 16-263, § 101(c), 54 DCR 807.)

Notes of Decisions (5)

Copyright (c) 2012 By the District of Columbia. Content previously published in the District of Columbia Official Code, 2001 Edition is used with permission. Copyright (c) 2014 Thomson Reuters.
DC CODE § 31-2704

Current through July 13, 2014.