```
 1                  IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3
    PROPERTY CASUALTY INSURERS        )  Docket No. 13 C 8564
 4  ASSOCIATION OF AMERICA,           )
                                      )
 5                       Plaintiff,   )
                                      )
 6            vs.                     )
                                      )
 7  SHAUN DONOVAN, in his official    )
    capacity as Secretary of Housing and )
 8  Urban Development, AND UNITED STATES )
    DEPARTMENT OF HOUSING AND URBAN   )
 9  DEVELOPMENT,                      )  Chicago, Illinois
                                      )  August 19, 2014
10                       Defendants.  )  2:11 o'clock p.m.

11
                   TRANSCRIPT OF PROCEEDINGS - ORAL ARGUMENT
12                 BEFORE THE HONORABLE AMY J. ST. EVE

13
    APPEARANCES:
14

15  For the Plaintiff:          WILMER, CUTLER, PICKERING, HALE
                                   AND DORR, LLP
16                              BY:  MR. SETH P. WAXMAN
                                     MR. BRIAN M. BOYNTON
17                                   MR. MATTHEW J. TOKSON
                                1875 Pennsylvania Avenue, N.W.
18                              Washington, D.C.  20006

19
    For the Defendants:         U.S. DEPARTMENT OF JUSTICE
20                              Civil Division
                                BY:  MS. KYLE R. FREENY
21                              20 Massachusetts Avenue, N.W.
                                Washington, D.C.  20001

22
                                U.S. DEPARTMENT OF JUSTICE
23                              Civil Rights Division, Housing Sect.
                                BY:  MR. DANIEL P. MOSTELLER
24                              950 Pennsylvania Avenue, N.W.
                                Washington, D.C.  20530

25
```

2

1   APPEARANCES (Cont'd):

2
    Also Present:               MS. AYELET WEISS, HUD
3

4   Court Reporter:             MR. JOSEPH RICKHOFF
                                Official Court Reporter
5                               219 S. Dearborn St., Suite 1232
                                Chicago, Illinois  60604
6                               (312) 435-5562

7                  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

8
                        PROCEEDINGS RECORDED BY
9                       MECHANICAL STENOGRAPHY
                   TRANSCRIPT PRODUCED BY COMPUTER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE CLERK:  13 C 8564, Property Casualty Insurance
 2    Association of America vs. Donovan.
 3              THE COURT:  Good afternoon.
 4              MR. WAXMAN:  Good afternoon.
 5              MS. FREENY:  Good afternoon.
 6              THE COURT:  If you would identify yourselves for me,
 7    please.
 8              MR. WAXMAN:  I'm Seth Waxman, if your Honor please,
 9    representing the plaintiff.
10              MR. BOYNTON:  Brian Boynton also for plaintiff.
11              MR. TOKSON:  Matthew Tokson also for plaintiff.
12              MS. FREENY:  Kyle Freeny, your Honor, with the
13    Justice Department Civil Division on behalf of defendants
14    Department of Housing and Urban Development and Secretary
15    Julián Castro.
16              MR. MOSTELLER:  Donald Mosteller with the Civil
17    Rights Division of the Department of Justice.  And I also have
18    here at counsel table Ayelet Weiss, Of Counsel from the
19    Department of Housing and Urban Development.
20              THE COURT:  Good afternoon.
21              Sorry for the delay.  That was unexpected.  It will
22    give you civil lawyers a little exposure to criminal law.
23              (Laughter.)
24              THE COURT:  You are here for oral argument this
25    afternoon on the pending summary judgment motion and motion to
```

4

1    dismiss.

2          Mr. Waxman, are you arguing for the plaintiff?

3          MR. WAXMAN:  I am.  Thank you.

4          THE COURT:  Okay.

5          It is your burden, so go ahead.

6          MR. WAXMAN:  May it please the Court.

7          The McCarran-Ferguson Act says that federal laws of

8    general applicability "shall not be construed to impair the

9    operation of state insurance law."  That mandate binds HUD, as

10   it binds this Court; but, HUD's rule does exactly that.  The

11   Supreme Court has explained in Humana that impairment occurs

12   whenever one of two things happen:  Either that the

13   application of federal law would "interfere with a state

14   administrative regime" or that it would "frustrate any

15   declared state policy."  Applying HUD's rule to risk-based

16   pricing and underwriting does both.

17         First, it plainly interferes with the state's

18   administrative regimes, which all provide for the review of

19   insurance rates and practices by state authorities.  As the

20   Seventh Circuit explained in Doe, permitting federal courts to

21   evaluate "whether limitations on coverage are actuarially

22   sound and consistent with state law obviously would interfere

23   with the administration of state law."  That is precisely what

24   HUD's rule does.

25         Secondly, it also independently "frustrates state

1    policy," because whereas every state permits or requires

2    pricing and underwriting to be based on actuarial calculations

3    of risk and/or requires insurers to charge only filed rates,

4    HUD declares that all such practices are prima facie illegal

5    if they happen to disparately affect a protected class and

6    they are per se illegal unless the insurer can prove that they

7    are necessary.  That is flatly inconsistent with the law of

8    every state.

9         THE COURT:  What weight should the Court put on the

10   Illinois amicus that was filed saying it does not frustrate

11   Illinois state policy?

12        MR. WAXMAN:  Well, as we've explained, your Honor, in

13   our brief responding to that, the blank declaration that it

14   doesn't frustrate state policy is entitled to no weight in the

15   absence of an explanation why the Illinois Insurance Code

16   provision that we have cited and provided to your Honor does

17   not, in fact, constitute a law that permits and requires

18   risk-based actuarial pricing and underwriting.

19        They have no answer to that.  The most they say is

20   that we have general laws that prohibit discrimination that

21   arguably apply to housing.  There is not a single case

22   suggesting that the latter would trump the former.

23        And, in fact, they have -- we have provided -- we

24   have cited to the Court Illinois Supreme Court decisions

25   establishing, number one, that in the absence of a direct

1   conflict or even in the presence of a direct conflict, the

2   latter-enacted statute prevails -- which is the case here --

3   and, in separate jurisprudence in the state, that the more

4   specific prevails over the more general.

5          So, you know, our challenge, of course, is not

6   limited to Illinois.  Our challenge is to the application of

7   this rule as applied to risk-based underwriting and pricing.

8          Now --

9          THE COURT:  Are there any examples where application

10  of the McCarran-Ferguson preclusion would not bar a disparate

11  impact claim?

12         MR. WAXMAN:  There are no cases that have ever so

13  held, and we don't think there ever could be a case that

14  properly could so hold for two different reasons.

15         THE COURT:  I think we can all admit there are not a

16  lot of cases dealing with the disparate impact in this

17  context.

18         MR. WAXMAN:  Right.

19         So, the first reason that it couldn't ever happen is,

20  if you will, a procedural reason; and, it was the basis for

21  Judge Posner's decision for the Seventh Circuit in Doe, which

22  was that requiring federal -- "requiring federal courts to

23  determine whether limitations on coverage are actuarially

24  sound and consistent with state law -- " and I'm belying a few

25  words here " -- requires a federal court to decide whether -- "

1  "would displace the administration of state laws into federal

2  court requiring a federal court to decide whether an insurance

3  policy is consistent with state law, obviously interfering

4  with the administration of the state law."

5          So, even if you had a situation -- which I think the

6  government is positing hypothetically -- that there could be

7  some state law somewhere that itself imposed a disparate

8  impact test on insurance pricing and underwriting, under the

9  holding in Doe, the McCarran-Ferguson Act would preempt

10  application of the federal law in that circumstance.

11          As the Court said in Doe, "Even if the formal

12  criteria are the same under federal and state law, displacing

13  their administration into federal court, requiring a federal

14  court to decide whether an insurance policy is consistent with

15  state law, obviously, interferes with the administration of

16  state law."

17          So --

18          THE COURT:  Is it your position, then, that all

19  applications of this rule, if they went into federal court and

20  were challenged on a disparate impact basis, would require the

21  Court to determine whether or not the coverage was actuarially

22  sound?

23          MR. WAXMAN:  Yes, because every state law permits --

24  or most of them actually require -- that underwriting and

25  pricing of homeowner's insurance be based on actuarially

1   sound, risk-based calculations.

2          THE COURT:  Could there be any challenges under this

3   rule that would not bring the "actuarially sound" into focus

4   in court?

5          MR. WAXMAN:  Yes.

6          THE COURT:  Give me an example, please.

7          MR. WAXMAN:  Well, disparate treatment claims;

8   intentional discrimination claims, which are not at issue

9   here.

10         THE COURT:  That is not at issue.  That is why I am

11  talking about on this rule --

12         MR. WAXMAN:  Yeah.

13         THE COURT:  -- and what is at issue here.

14         The disparate impact or disparate effect, could there

15  be any challenges brought in federal court that would not

16  raise the "actuarially sound" defense for that --

17         MR. WAXMAN:  I'm hesitating only "could not be

18  brought," because, of course, anybody can bring a lawsuit.

19         But if one imagines a world without this rule, the

20  world that existed before this rule, someone comes in and

21  says, you know, "I'm suing this insurance company because the

22  insurance company charges -- you know, I'm a woman and, you

23  know, I paid more than a man that I think is in exactly the

24  same position."  That states a claim under the Fair Housing

25  Act, assuming -- we don't contest it for purposes of this

1    case, that the Fair Housing Act applies to insurance.

2            THE COURT:  Right.  Right.

3            MR. WAXMAN:  The insurance company would have, under

4    the McCarran-Ferguson Act, an absolute defense if the

5    insurance company said, "We priced her insurance in accordance

6    with state law permitting or requiring that we price it based

7    on actuarially sound risk calculations."  That would be a

8    12(b)(6) motion that would require dismissal.

9            THE COURT:  Correct.  I understand that.

10           Are there ever -- could there ever be a situation

11   under application of this rule where the defense would not

12   turn on actuarially sound principles, where the defense might

13   be something else?

14           MR. WAXMAN:  Not as to -- I don't believe as to --

15   underwriting and pricing because insurance companies -- that

16   is how they calculate pricing.  I mean, if there were an

17   allegation -- and, again, I know -- I don't mean to retreat to

18   disparate treatment; but, if there's an allegation that -- you

19   know, if somebody said, "Well, I understand all that, but

20   that's not what the insurance company is doing," you know,

21   that would stay the claim, assuming that --

22           THE COURT:  Correct.

23           MR. WAXMAN:  -- there were evidence.

24           But I think --

25           THE COURT:  And that is a separate issue.

1          MR. WAXMAN:  Yeah.

2          I think our submission is really twofold.  First of

3   all, a disparate impact claim under the Fair Housing Act as to

4   insurance pricing -- and underwriting is just a process by

5   which a price is arrived at -- by definition is preempted by

6   the McCarran-Ferguson Act because, as the Seventh Circuit

7   explained in Doe, it interferes with state processes to have

8   federal judges decide whether, in fact, the pricing is fair or

9   consistent with state law.

10         THE COURT:  Is your challenge, then, based on

11  disparate impact claims based on underwriting and pricing

12  only --

13         MR. WAXMAN:  It --

14         THE COURT:  -- or does it go broader than that?

15         Because reading your papers, it is --

16         MR. WAXMAN:  I realize -- yeah.

17         THE COURT:  -- it is a little bit of a moving

18  target --

19         MR. WAXMAN:  I realize there's --

20         THE COURT:  -- which is why I am asking.

21         MR. WAXMAN:  I realize there's some confusion, and I

22  will plead a certain degree of innocence in this regard.  When

23  HUD promulgated its rule, the proposed rule proposed to

24  include pricing and underwriting of insurance.  That's what we

25  understood was being done.  And that is consistent with the

1  law of this circuit in American Family, which says that the

2  Fair Housing Act applies to pricing and underwriting.

3      I don't think that other things that insurance

4  companies happen to do -- their sales forces and where they

5  have their offices and all that stuff -- is covered by the

6  Fair Housing Act at all.  It may be covered by other laws.

7      And, so, when we said that it can't be applied to

8  homeowner's insurance -- the homeowner's insurance business --

9  we understood that that is all that the HUD rule is proposing

10  to extend it to.  To the extent that the HUD were proposing to

11  extend it further, I think I would say a couple things.

12      First of all, as I said, we don't think that it -- it

13  already applies to a practice that has the effect of denying

14  home ownership; and, therefore, we don't think it's covered by

15  the FHA.

16      And, second of all, the only cases that HUD has

17  pointed to in its briefing in this court -- I'm not sure

18  whether it's HUD or the civil rights groups -- are to some

19  cases involving claims processing.  And both of those cited

20  cases were disparate treatment cases, where there was no --

21  it's hard to imagine what a disparate impact would be -- claim

22  would look like -- with respect to claims processing.

23      So, we -- our complaint is addressed -- I mean, the

24  whole core theory is, look, we are permitted to and required

25  to price and underwrite based on risk; and, as long as we are

1    permitted to do that, those decisions cannot be challenged

2    under a disparate impact theory under federal law.

3          Now, we also think, looking at the second prong of

4    impairment, that the fact that -- and this goes, I think, to

5    your first question, if I recall it.  We think that the law of

6    all 50 states permits or requires us to do this.  And many of

7    them also have what's called the filed-rate doctrine, which

8    says if you charge according to rates that are filed, there

9    is -- one cannot file a lawsuit challenging that; your only

10   remedies are administrative.  And we think that that is the

11   law in all jurisdictions.

12         Now, HUD has said, "Well, but there may be laws --

13   there may be state laws -- of general applicability."  And, as

14   I said, we don't know of any state law of general

15   applicability that would impose a disparate impact standard on

16   insurance pricing and underwriting.

17         But even if there were some, the government is quite

18   wrong in saying that because we are raising a facial

19   challenge, we have to -- in their reply brief, they cite Reno

20   vs. Flores saying we can only get the rule vacated if we

21   "establish that no set of circumstances exists under which the

22   regulation would be valid."  And I want to note a couple of

23   things for the Court because this came up in their reply.

24         First, this is not a facial challenge.  This is a

25   challenge to a regulation as applied to risk-based

1    underwriting and pricing.

2         Second of all, even if this were a facial challenge,

3    the Flores test, which used to be known as the Salerno test,

4    is not, in fact, the appropriate test.  The Seventh Circuit in

5    Mann vs. Calumet City, which is reported at 588 F.3d 949, so

6    held.  And earlier -- and that was a 2009 decision.

7         In 2002, in a case called A Woman's Choice vs.

8    Newman, 305 F.3d 684, the court also recognized that the test

9    that the Supreme Court applies to challenges of this sort is,

10   in fact, whether or not the regulation or statute is invalid

11   "in a large fraction of circumstances."  And that's -- that

12   was the test that was applied in Casey vs. Planned Parenthood.

13   It's also been applied in Bowen vs. Kendrick.

14        In the Glucksberg -- the Supreme Court's case in

15   Glucksberg -- Justice Stevens characterized the test as a

16   burden to demonstrate that the rule or statute lacks a plainly

17   legitimate sweep.

18        So, in other words, even if HUD could come up with a

19   couple of instances, hypothetical or actual, in which some

20   state law would allow a disparate impact claim, that would not

21   save the rule.

22        THE COURT:  And are you saying that is a test for the

23   merits of the rule or a test for ripeness or do they merge?

24        MR. WAXMAN:  That is a test for the merits of the

25   rule, but I guess it could also extend to ripeness, as well.

1        I mean, you know, as to ripeness, you know, HUD's

2   argument is, well, you know, McCarran-Ferguson is an intensely

3   fact-based inquiry.  That's not right.  McCarran-Ferguson is a

4   rule of preemption.  And preemption is a legal question.  The

5   cases are legion that recognize that.

6        And there are no facts that are necessary in this

7   case.  The rule -- and we've provided the Court with Appendix

8   A.  The rule conflicts with state laws that permit or require

9   risk-based pricing.

10        The government cites the Eighth Circuit's decision in

11  Saunders -- the two decisions in Saunders -- and says "Ah-hah,

12  they say it is intensely fact determinative."  What the Eighth

13  Circuit said in Saunders, when it used that language, was it

14  is a far different case to bring a disparate treatment

15  discrimination claim than a disparate impact discrimination

16  claim.

17        There are no other facts that could be developed in

18  order to allow us to be able to establish that application of

19  this Disparate Impact Rule to ensure its pricing is preempted

20  by McCarran-Ferguson because it puts federal judges in the

21  position of deciding whether or not the rates that were

22  charged are consistent with state law and because state law,

23  in fact, allows us to do exactly what it is that we do.

24        THE COURT:  What about the Saunders holding, relying

25  on Humana, that in order to make a determination about the

1   applicability of McCarran-Ferguson, you have to look at the

2   plaintiff's claim -- a single claim -- and how that is

3   phrased?

4          MR. WAXMAN:  Well --

5          THE COURT:  Aren't you asking the Court to do

6   something much bigger here than just look at a single claim

7   presented?

8          MR. WAXMAN:  As to the latter, yes.  I mean, this is

9   a challenge to the rule.  There never has been a rule in

10  place.  Whereas, in Saunders, there was a challenge brought by

11  a class of people against an insurance company.

12          So, one always has to look at the claim.  The claim

13  in that -- when Saunders said you have to look at the claim,

14  in Saunders 2, the second decision, they explained that what

15  you have to look at is determine whether or not what is being

16  alleged is disparate treatment.  That is, different treatment

17  because of race or another protected class or a disparate

18  impact.

19          And Saunders then went on to quote the Seventh

20  Circuit's decision in American Family -- and I can't remember

21  what else -- by saying it's hard to conceive of how a

22  disparate impact claim on pricing could survive

23  McCarran-Ferguson.

24          And, so, the only inquiry one needs to make into the

25  claim of any instance of a violation of the disparate impact

 1   standard would be what is being -- what is the nature of the

 2   allegation.  And in a disparate impact case, as opposed to a

 3   disparate treatment case, the allegation is:  We are not

 4   alleging that this insurance company was treating African

 5   Americans or women or the disabled or anybody different

 6   because of that; we are alleging that they were engaging in a

 7   neutral practice that has a disparate impact for minorities.

 8          And that claim, as a matter of law, is preempted by

 9   McCarran-Ferguson.

10          THE COURT:  Okay.

11          MR. WAXMAN:  Unless the Court has any other

12   questions, that's all I have.

13          Thank you.

14          THE COURT:  One second.  I thought you were just

15   finishing that aspect.

16          Standing.

17          MR. WAXMAN:  Yes.

18          THE COURT:  Before HUD issued this rule, your members

19   certainly had to litigate certain McCarran-Ferguson Act

20   challenges on a case-by-case basis, and we have talked about

21   some of those cases.

22          MR. WAXMAN:  Yes.

23          THE COURT:  After HUD issued the rule, your members

24   still need to litigate these acts -- or these cases under the

25   McCarran-Ferguson Act.

1          What is the harm to your members if they faced the

2     same issue before the rule that they face now?

3          MR. WAXMAN:  Several.  Let me mention three that

4     immediately come to mind.

5          One, this rule applies -- this rule applies a

6     binding -- this rule announces -- because HUD has legislative

7     rulemaking authority under the FHA, this rule establishes a

8     legislative rule that our members have to comply with in haec

9     verba throughout the country.  And that is different than the

10    regime that existed before in three different ways, each of

11    which burdens our members.

12         One, it was not the uniform rule before HUD

13    applied -- in this country before HUD's rule either that

14    disparate impact liability applied to insurance.  Both the

15    Seventh Circuit and the Eighth Circuit have expressly reserved

16    on that question and reserved in a way, I think, that can only

17    be fairly characterized as very skeptical.  So, we are now

18    bound by HUD's rule in those two circuits.

19         It is also not the law, for example, in the District

20    of Columbia, that the Fair Housing Act even imports a

21    disparate impact standard.  Now, we haven't challenged that in

22    this case, but another insurance association has challenged

23    that; and, the case is awaiting decision in D.C., in the

24    District of Columbia district court.

25         And, therefore, it was not the law in the District of

1   Columbia either that a disparate impact standard under the

2   Fair Housing Act could be applied to our members.  So, that's

3   one thing, which is geographic.

4           Another thing is -- well, it's also substantive.

5           The HUD rule, if you look at the standard that HUD

6   applies -- and it's the last page of the Federal Register

7   provision that's attached to our complaint -- they establish a

8   three-part test that is both procedurally and substantively

9   different than the rule that otherwise would occur.

10          First of all, once there is a prima -- once they

11  establish -- in order to shift the burden to us, they don't

12  have to show that the disparate impact was substantial.  They

13  don't have to identify, according to HUD, any specific

14  practice that itself provides the disparate impact.

15          And, most significantly, the burden then shifts to us

16  not just to say, hey, we are allowed under state law to do

17  what we are doing; under HUD's standard, under its rule, at

18  Step 2, we also have to establish that it was "necessary" to

19  achieve a substantial, legitimate, non-discriminatory

20  interest.

21          And that is -- that standard appears nowhere in the

22  Fair Housing Act and, in fact, is substantively inconsistent

23  with the way that a McCarran-Ferguson issue would be

24  ordinarily adjudicated absent the rule.

25          Absent the rule, they would come in and say, you

1    know, you're doing something and it has a disparate impact.

2    We would say what we are doing is allowed by state law and

3    that would be the end of the matter.

4         Under HUD's rule, we now have to show not only is it

5    allowed by state law, but it is necessary that we do so.  And

6    even if we show that it is necessary, HUD's regulation then

7    provides that it will nonetheless be illegal, even if

8    necessary, if our interests "could be served by another

9    practice."  Not equally served, but served by another

10   practice.

11        So, in other words, under HUD's rule -- unlike

12   McCarran-Ferguson, a Fair Housing Act unenhanced by HUD's

13   rule -- insurers will be liable for using totally legitimate

14   actuarial risk factors if the plaintiff can point to some

15   other factor that serves the same general function, even if

16   it's less predictive than the challenged factor.  And that is

17   substantively different and much more onerous than the

18   application of the Fair Housing Act itself would be, even

19   under a disparate impact standard.

20        So, we think those are the reasons why we are

21   certainly harmed by the rule, in addition to those that are

22   put forth in the declarations that we submitted in our second

23   brief.

24        THE COURT:  In the situation you just explained, why

25   wouldn't, on a case-by-case basis, the McCarran-Ferguson Act

1    preempt in that situation rather than the Court having to make

2    that determination?

3            MR. WAXMAN:  Well, because the application -- you

4    know, the rule that HUD has promulgated applies to us.  It

5    applies to us without acknowledging or recognizing that if we,

6    in fact, engage in underwriting and risk-based -- actuarially

7    -based, risk-based underwriting and pricing, that that is a

8    legitimate practice that is not inconsistent with the Fair

9    Housing Act.

10           THE COURT:  On a case-by-case basis, again, if there

11   is an individual challenge along the one that you have just

12   explained, why wouldn't the court still do the

13   McCarran-Ferguson Act?

14           I understand you are asking the --

15           MR. WAXMAN:  Okay.  Now I understand.

16           THE COURT:  -- Court to say McCarran-Ferguson in

17   every situation should trump this --

18           MR. WAXMAN:  Uh-huh.

19           THE COURT:  -- and the rule is, as applied, invalid,

20   given McCarran-Ferguson --

21           MR. WAXMAN:  Okay.

22           THE COURT:  -- to any such case.

23           The example you just gave me was based on an

24   individual case; and, you said that when you get to Step 2,

25   you would run into problems because something that the state

```
 1    has already said is actuarially sound --

 2              MR. WAXMAN:  Yeah.

 3              THE COURT:  -- would no longer be if there was

 4    something equally appropriate that would work.

 5              But before you ever get to the burden shifting, in

 6    that individual case, why couldn't the insurer still bring the

 7    12(b)(6) and say under McCarran-Ferguson this case gets

 8    kicked?

 9              MR. WAXMAN:  Okay.  So, imagine in the post-HUD rule

10    world there would now be not only -- not a one-count

11    complaint; there would be a two-count complaint.  Count 1

12    would be you're violating the Fair Housing Act because there's

13    a disparate impact.  Count 2 is you're violating HUD's rule

14    because there's a disparate impact and you don't have an

15    adequate excuse.

16              We would still have the same defense to Count 1.

17              THE COURT:  Does the rule provide for a separate

18    cause of action as opposed to just clarification?

19              MR. WAXMAN:  Oh, I think that HUD could proceed

20    against us and, I understand, has, in fact, engaged in an

21    administrative proceeding against -- I think it's the

22    Travelers Insurance Company -- we cited it in our papers --

23              THE COURT:  I thought it was an investigation.

24              MR. WAXMAN:  -- based on its rule.

25              Or maybe -- they can certainly proceed based on its
```

1    rule.  Their rule is binding legislative authority against us.

2         And as to -- if they proceeded just by saying, "You

3    are violating our rule; we're authorized to promulgate this

4    rule and you are violating it," it's not enough for us to say

5    in response to the rule, "Hey, we're allowed to do this by

6    state law," because their rule says we also have to prove that

7    it's necessary for us to do it that way; and, even if you show

8    that, if we can show that there's some other way that you

9    could have done it, you have violated federal law to do that.

10   And both of those are different and more onerous.

11        I would also say that even if that weren't the case,

12   your Honor, it doesn't justify the imposition of their rule.

13   Imagine -- I was thinking about this on the way in from the

14   airport last night.  Imagine in the wake of Citizens United

15   that the Federal Election Commission -- which always hated

16   that ruling and probably still does -- promulgates a rule that

17   says corporations may not make contributions in connection

18   with federal elections and in the preamble they say, "Of

19   course, we recognize that there is a First Amendment and," you

20   know, "if the First Amendment doesn't permit this, you know,

21   it won't be effective."

22        We challenge it -- or a corporation comes in -- and

23   maybe it would be my client -- comes in and says, "That's not

24   right.  The Supreme Court said we have a First Amendment right

25   to do this."  And the agency says, "Oh, no, no, no, there's

1   some circumstances where you can't do it, like, for example,

2   if there's a quid pro quo.  If your donation is for a quid pro

3   quo, then our rule could be applied."

4          I mean, it's fantastic to think that a court would

5   not strike that rule down, because in the vast majority of

6   instances it is invalid.  It states an invalid principle of

7   law.  And that's what we have here.

8          THE COURT:  But would the court strike it down in

9   that individual case as opposed to saying as applied it cannot

10  go anywhere?

11         MR. WAXMAN:  No.  What -- this would -- assuming that

12  this were a APA challenge to the FEC's rule, we would say that

13  it's arbitrary and capricious and not in accordance with law

14  because it does not have a plainly legitimate sweep and that,

15  you know, to quote the Casey test, it would be invalid in a

16  "large fraction of circumstances."

17         And that's what we have here.  This rule that is the

18  application of this rule to risk-based underwriting and

19  pricing, we think, will always be invalid.  And in any event,

20  even if it isn't always invalid, it certainly would be invalid

21  in a large fraction of cases.  And I don't understand HUD to

22  be necessarily contesting the latter.

23         So, I mean, I take your point.  We are bringing to

24  the Court an APA challenge to this rule.  We are not defending

25  ourselves against HUD's claim in a particular case.  We're

1  just saying that it's arbitrary and capricious and not in

2  accordance with the law to promulgate this rule without

3  acknowledging and, you know, really wrestling with the fact

4  that what we do -- actuarially-based underwriting -- is

5  legitimate under the Fair Housing Act.

6     THE COURT:  But I understand one of HUD's responses

7  to be you are not losing anything because you can still raise

8  this on an individual basis, on a case-by-case basis.

9     MR. WAXMAN:  Well, that runs headlong into the

10  Supreme Court's decision in Abbott Laboratories and many other

11  cases that permit pre-enforcement challenges of rules.  We

12  don't have to wait until HUD or a civil rights group or a

13  plaintiff comes and sues us under the regulation.  If we can

14  show that the regulation lacks "plainly legitimate sweep" as

15  applied to our business and that it will be invalid in a large

16  fraction of cases with respect to our practices, then the

17  Court is required, under the Administrative Procedure Act, to

18  strike it down.

19     THE COURT:  I want to come back to the burden

20  shifting for a minute.

21     The burden shifting that is set up under the rule is

22  different than what the Seventh Circuit has established.

23     MR. WAXMAN:  Yes, it is.

24     THE COURT:  Can an agency trump a burden shifting

25  that courts have developed?  Do they have the authority to do

1   that?

2          I do not think it is something that was raised in the

3   briefs, but it is something that I was curious about.

4          And I will ask you the same question.  So, you can

5   get ready for it.

6          But is that something that an agency has the

7   authority to do through the rulemaking process, to change a

8   burden-shifting procedure that has been developed by the

9   courts?

10          MR. WAXMAN:  So, I think in -- I think what the

11   Supreme Court juris prudence would show is that the agencies

12   can -- HUD has independent legislative rulemaking authority

13   and it's well advised to take into account the decisions of

14   federal courts in terms of how to apply the statute.

15          But, you know, in the Brand X case, the telecom case

16   the Supreme Court decided a couple terms ago, they said, yes,

17   you know, the FCC can nonetheless, in its own administrative

18   rulemaking proceeding, come up with a different standard and

19   the courts will then have to deal with that standard and

20   address it.

21          What HUD has done here, I think, is to do something

22   different, which is to say, you know, "Congress passed a broad

23   general statute.  It doesn't say anything about insurance;

24   doesn't say anything about disparate impact; doesn't say

25   anything about burdens.  It gave us legislative rulemaking

1  authority to promulgate rules and regulations to implement

2  this.  This is our rule.  And our rule announces a substantive

3  standard -- disparate impact as applied to insurance -- and it

4  announces a procedure for adjudicating alleged violations of

5  our rule."

6        And they probably can do that so long as they don't

7  act in a manner that is arbitrary and capricious or not in

8  accordance with law.

9        I mean, I would hasten to point out for your Honor

10 that the burden shifting -- the four-step balancing model --

11 that the Seventh Circuit applies as opposed to what every

12 other, you know -- each circuit's variation applied to, that

13 is burden shifting generally under the Fair Housing Act that

14 is disparate treatment burden shifting.  And that is a far

15 different kettle of fish than burden shifting -- applying

16 disparate impact to insurance companies.

17       THE COURT:  As long as we are on the burden

18 shifting -- I am not going to let you sit down yet.

19       MR. WAXMAN:  No, no, no.

20       THE COURT:  Open that back up.

21       (Laughter.)

22       MR. WAXMAN:  Believe me -- I'm used to having the red

23 light go off -- I can't tell you how happy I am to be here.

24       THE COURT:  We do not have lights in district court,

25 one of the many beauties of it.

1          (Laughter.)

2          THE COURT:  HUD argues, with respect to the burden

3    shifting, that Chevron deference applies.  And you did not

4    really address that; or, at least if you did, the couple times

5    I read through everything, I missed it a couple times.  I do

6    not think you addressed it.

7          Do you agree that Chevron analysis applies to this

8    issue?

9          MR. WAXMAN:  Yes, I do.  I think that the agency gets

10   Chevron deference.  But, of course, you know, we would -- we

11   have argued -- maybe not to a sufficient length, but -- we

12   don't think that Chevron deference carries the day because if

13   it is, in fact, arbitrary, capricious or not in accordance

14   with law, it's invalid.

15         THE COURT:  And under Chevron, you agree the Court

16   only has to decide if it is reasonable?

17         MR. WAXMAN:  The Court would have to decide --

18         THE COURT:  I do not have to weigh and figure out

19   which one is better.  I might think something else is better,

20   but all I have to decide is if it is reasonable.

21         MR. WAXMAN:  Right.

22         So, the first thing you would decide is, is the

23   statute itself ambiguous; and, secondly, is -- if Chevron

24   deference -- if the agency gets Chevron deference in deciding

25   how the burden should shift, is their determination

1    reasonable?

2            And our view is that it is not, because, for the

3    reasons I've explicated, it imposes both a procedure and

4    substantive burdens at Step 2 and Step 3 that are different

5    than the Fair Housing Act and inconsistent with the way the

6    Fair Housing Act must be interpreted in light of the

7    McCarran-Ferguson preemption principle.

8            THE COURT:  Okay.

9            I think that is all I have for you.  Now your light

10   is on.

11           (Laughter.)

12           THE COURT:  Thank you.

13           MR. WAXMAN:  Thank you very much, your Honor.

14           THE COURT:  Ms. Freeny.

15           Good afternoon.

16           MS. FREENY:  Good afternoon, your Honor.

17           Does the Court mind if I have a water bottle here?

18           THE COURT:  Not at all.

19           MS. FREENY:  Thank you.

20           Good morning, your Honor.  Again, Kyle Freeny for

21   defendants in this case.

22           Plaintiffs have demonstrated no legal basis that

23   would entitle the entire insurance industry from a court-

24   ordered exemption from HUD's interpretation of the Fair

25   Housing Act as formalized in the 2013 rulemaking, which

1   construes the Fair Housing Act to encompass disparate impact

2   liability.

3           Now, I think, as an initial matter, I want to note

4   the backdrop against which the rule was promulgated and

5   against which the litigation arises and, in particular, the

6   fact that the prospect of disparate impact claims against

7   insurers sits at the logical intersection between two

8   different principles that are not subject to challenge in this

9   litigation.

10          The first of those is that the Fair Housing Act, by

11  its terms, covers the provision of homeowner's insurance

12  because homeowner's insurance is critical to home ownership.

13  And plaintiffs don't -- plaintiff does not challenge that

14  here.

15          The second principle is that the Fair Housing Act

16  prohibits housing-related practices that, while facially

17  neutral, are discriminatory in effect.  That is the

18  interpretation that HUD formalized in the 2013 rule subject to

19  challenge here.  And it was an interpretation that plaintiffs

20  do not challenge and that accords with the interpretation

21  adopted by all 11 Courts of Appeal to have addressed the

22  issue.

23          THE COURT:  And do you agree with something that was

24  noted earlier, that the rule just addresses pricing and

25  underwriting?

1          MS. FREENY:  No, your Honor.

2          So -- and, again, to emphasize, the rule is not

3     specific to insurance.  It addresses an interpretation of the

4     Fair Housing Act as it applies to all practices that fall

5     within that Act coverage, and that includes -- it does include

6     -- rate making and underwriting, but it may include other

7     practices.

8          THE COURT:  Are there any other practices that would

9     be applicable to the insurance industry outside of --

10         MS. FREENY:  Yes, your Honor.

11         THE COURT:  Okay.

12         And what would those be?

13         MS. FREENY:  So, for example, claim settlement

14    processes or marketing.  Those were two examples, I believe,

15    defendants cited in our reply brief.  And those are cases in

16    which the Fair Housing Act has been construed to extend to

17    those practices.

18         It's difficult, of course, to talk in the abstract

19    about what sorts of practices might be -- might subject --

20    might be subject to the Fair Housing Act, because we are in

21    this very abstract pre-enforcement facial challenge.  But I do

22    want to address Mr. Waxman's claim that the Fair Housing Act

23    only prohibits insurance practices that make housing

24    unavailable.

25         That is actually not true.  That is a reference to

1   one provision of the Fair Housing Act, Section 340(a).  But

2   the Seventh Circuit has also found Section 340(b) -- excuse

3   me, let me say that, again -- 3604(b) to apply to homeowner's

4   insurance, as well.  And that extends also to services in

5   connection with, I believe, the sale of housing.  In any

6   event, it applies to a range of practices.

7           And plaintiffs seek a court-ordered exemption from

8   that on the basis of the McCarran-Ferguson Act, on the basis

9   of the Administrative Procedure Act and on the basis of Wards

10  Cove.  But none of those provide a basis for the relief that

11  they seek; and, in any event, plaintiffs failed to demonstrate

12  standing.

13          I think unless the Court has other designs, I would

14  first like to turn to plaintiff's primary claim, the

15  McCarran-Ferguson Act challenge.

16          THE COURT:  Before you do that, Mr. Waxman has said

17  this is not a facial challenge; this is an "as applied."  And

18  you just referred to it as a facial challenge.  Why don't you

19  explain that.

20          MS. FREENY:  Okay.  I will do my best, your Honor.

21          I don't think the terms actually matter here.  We are

22  in a unique area of the law.  And it is -- the important thing

23  is that the case is in a pre-enforcement basis and outside the

24  context of any particular application, and it is on a

25  nationwide basis.

1       I'm not sure what it would mean to say that it's an

2  "as applied" challenge under the McCarran-Ferguson Act because

3  the McCarran-Ferguson Act itself only regards insurance.  And,

4  so, what plaintiffs are asking -- whether you call it facial

5  challenge or an "as applied" challenge -- is to have the Court

6  hold the rule invalid as to the entire industry.  And that is

7  precluded by Humana, by the inquiry necessary to complete the

8  preemption -- the McCarran-Ferguson preemption -- analysis.

9       Turning to that sort of analysis, the incompatibility

10  between plaintiff's sort of, what I'm going to call, facial

11  claim -- I'm happy to refer to it in any other manner, but

12  whatever it is, this very unique species of claim that is not

13  cognized by the McCarran-Ferguson Act -- it's simply contrary

14  to the analytical framework endorsed by the Supreme Court in

15  Humana, in which the Supreme Court rejected the notion that

16  the McCarran-Ferguson Act provides for field preemption and

17  indicated that the McCarran-Ferguson Act does not preempt an

18  application of federal law unless there is an express or

19  direct conflict with federal law or unless the particular

20  application would impair a declared state policy or frustrate

21  an administrative regime.

22       Again, the focus is on the application.  And, indeed,

23  in Humana, the Supreme Court entertained an argument by the

24  insurer in that case that a particular -- that RICO -- that

25  was the claim -- the federal claim -- at issue -- that RICO

1    would impair an identified Nevada law.  And the Supreme Court

2    rejected that because it did not appear from the record in

3    that case that that law would be implicated.

4         As the Court, I think, noted, the rule does not alter

5    the operation of the McCarran-Ferguson Act.  It accommodates a

6    possibility that some application might be impaired, but

7    determines, consistent with Humana, that the decision about

8    impairment should await the appropriate case-by-case

9    adjudication.

10        THE COURT:  Does the rule provide a separate cause of

11   action?

12        MS. FREENY:  The rule does not provide a separate

13   cause of action.  What the rule does is the rule construes a

14   general provision.  The --

15        THE COURT:  Mr. Waxman gave the example earlier of a

16   two-count complaint, one with the Fair Housing Act disparate

17   impact claim and one with the claim under the rule.

18        Is that something that is feasible?

19        It did not seem to me that the rule created a

20   separate cause of action.  It was more clarification or

21   interpretation of the Fair Housing Act.

22        MS. FREENY:  That is my understanding, your Honor.  I

23   understand the rule to adopt the interpretation, again, as

24   across all covered practices and provides when there is a

25   claim under the Fair Housing Act employing a disparate impact

1    standard, that is cognizable under the Act.

2           And it bears emphasis that although plaintiff claims

3    in this case to attempt to preserve state prerogatives on the

4    regulation of insurance, if adopted, plaintiff's view of

5    McCarran-Ferguson actually would disrespect the different

6    state choices in regulating insurance.

7           So, plaintiff asked this Court to assume that states

8    would not want the Fair Housing -- the disparate impact claims

9    to be available under the Fair Housing Act or to assume that

10   such claims would impair state administration and, also, asks

11   this Court to override the views of the State of Illinois, the

12   state in which this Court sits; but, expressing the view that

13   at least in Illinois the rule complements rather than impairs

14   state law.

15          Plaintiffs would have, ironically, this Court

16   override that in the name of preserving state prerogatives.

17          Plaintiffs, again, cite no case to support the

18   posture that we're in or the availability of this sort of

19   facial McCarran-Ferguson Act claim.  And although they cite

20   the Seventh Circuit's decision in Doe v. Mutual of Omaha as

21   though it did support that position, it doesn't.  It doesn't

22   support that position for a couple of different reasons, your

23   Honor.

24          The first and most important is that that case

25   arose -- that preemption inquiry in that case arose -- in the

1    context of a specific application of federal law.  So, that

2    was a case in which a -- I believe an insurance beneficiary

3    brought a federal claim under the Americans With Disabilities

4    Act.  And, so, the preemption inquiry that the Seventh Circuit

5    undertook in Doe was precisely the inquiry that Humana

6    instructed -- an inquiry on a case-by-case basis.

7            THE COURT:  Although Doe, while you are correct, was

8    a specific application, the language in there that goes on to

9    say it would obviously interfere with the administration of

10   state law if courts had to determine actuarially sound

11   principles goes much broader than just the individual claim

12   there.

13           MS. FREENY:  Your Honor, the language doesn't go any

14   broader than I think what the holding could be, even if this

15   were understood to be a holding.  Again, this is -- the

16   language in Doe is dicta because the outcome of the case

17   turned not on the McCarran-Ferguson issue, but on a statutory

18   interpretation issue with respect to the ADA.

19           THE COURT:  Correct.

20           And it may be dicta, but it is not limited -- I

21   understood what you were just saying is I should disregard Doe

22   in the Seventh Circuit, where we are, because it dealt only

23   with a specific application.  While the claim in Doe was a

24   specific application, the language that the plaintiff is

25   relying on here went much broader than just the specific

1    application in that case.

2         So, I do not think that argument carries the day.

3         MS. FREENY:  So, if I suggested that the Court should

4    ignore Doe, I certainly did not mean to do so.  It's not

5    controlling on this case because, again, it cannot be read to

6    stand for the proposition that there is some sort of separate

7    facial preemption standard under the McCarran-Ferguson Act.

8    Again, the reason, because, number one, nothing fully actually

9    says that; and, two, it arose in this specific case-by-case

10   context, and that's what the court was looking at.

11        And were it read to the contrary, were Doe read more

12   expansively beyond literally what it says and the context and

13   the posture in which it arose, it would be contrary to Humana.

14        In addition, Doe dealt with a different federal law.

15   And, so, some of the language in Doe is specific to the

16   federal law that it was addressing.  So, some of the language

17   on -- addressing state law, the validity of something under

18   state law is very specific to the ADA claim that was at issue

19   in that case because the ADA claim in that case, by the

20   language of the statute, incorporated aspects of the state law

21   and required a court to determine whether a practice was valid

22   under state law.

23        So, that was -- that's very fact specific.  That just

24   illustrates the necessity to view these on a case-by-case,

25   fact-specific basis.

```
 1              THE COURT:  How is Doe contrary to Humana?
 2              MS. FREENY:  Doe is not contrary to Humana.
 3    Plaintiff's reading of Doe is contrary to Humana.
 4              THE COURT:  Okay.  I thought you said Doe was
 5    contrary.
 6              Go ahead.
 7              MS. FREENY:  I apologize.  I should be very, very
 8    clear on it.
 9              Doe is an application of Humana by considering
10    whether a pending RICO claim is preempted by McCarran-Ferguson
11    and concluding on the facts of that case that it is.
12    Plaintiff's reading of it is what is contrary to Humana, to
13    suggest that it would authorize on a nationwide basis
14    preemption without having to do the inquiry that Humana
15    necessitates -- looking at different state regimes, looking at
16    what the contours of the federal claim are and considering
17    whether that would impair any particular state's regime or any
18    state law.
19              And yet another distinguishing feature, I believe
20    that Doe involved Illinois -- the State of Illinois -- and
21    state law.  I don't believe there was an amicus brief in that
22    case.  The Seventh Circuit has indicated that the views of a
23    state when filed as an amicus brief in these McCarran-Ferguson
24    claims are significant; and, here we do have the State of
25    Illinois indicating that, no, HUD's rule does not impair their
```

1    state regulation and, in fact, bolsters state policy.

2          I also want to address one argument that plaintiffs

3    make in their brief that -- reading Doe to stand for the

4    proposition that courts are somehow disabled from deciding

5    questions of state law.  It doesn't say that.  And clearly it

6    doesn't mean that courts are disabled from deciding questions

7    of state law in connection with the McCarran-Ferguson defense.

8    That is how a question of state law is most likely to arise on

9    a case-by-case basis when claims are adjudicated under the

10   Fair Housing Act as construed by the rule.

11         And, so, as your Honor was discussing with

12   Mr. Waxman, this may arise.  If a disparate impact claim is

13   brought against an insurer, the insurer can raise as a defense

14   the McCarran-Ferguson Act.  The rule preserves the space for

15   that issue to be adjudicated on a case-by-case basis where one

16   can actually see the contours of the claim, the contours of

17   state law and make an appropriate decision.

18         THE COURT:  Ms. Freeny, are there any examples you

19   can come up with where the McCarran-Ferguson preclusion would

20   not bar a disparate impact claim based on practices relating

21   to pricing of insurance?

22         MS. FREENY:  Your Honor, it's difficult for me to

23   speak in the abstract.  Not only because it's hard to imagine

24   the claims, but also because I hesitate to commit HUD to a

25   position that they have not had an occasion to opine on.  So,

```
 1    if we're just speaking purely hypothetically --

 2              THE COURT:  I am speaking purely hypothetically.

 3              Can you describe any type of claim for the Court --

 4    if you cannot, that is fine.  But can you describe any type of

 5    claim alleging disparate impact based on pricing of an

 6    insurance policy where the McCarran-Ferguson preclusion would

 7    not apply?

 8              MS. FREENY:  So, speaking hypothetically, I think the

 9    prime example would be in states where the state law provides

10    a parallel cause of action for disparate impact against the

11    insurance.  The State of Illinois is one of those, as their

12    amicus brief demonstrates.  There may be other states, as

13    well, because --

14              THE COURT:  So, that would be a claim brought in

15    state court then, not in federal court?

16              MS. FREENY:  It could also be brought in federal

17    court.  As the State of Illinois indicates --

18              THE COURT:  Based on state law?

19              MS. FREENY:  No.  No, your Honor, it would not be on

20    the basis of state law.  It would be on the basis of federal

21    law.

22              But it would be -- it could proceed to the extent

23    that it would not interfere with state law.  It would

24    nevertheless be a claim under federal law.  And, as the State

25    of Illinois indicated in its amicus brief, that would not
```

1    disrupt, at least in the State of Illinois, the administration

2    of their insurance regulations.

3              Other examples -- so, it's hard for me to --

4              THE COURT:  A claim in Illinois law based on pricing

5    of an insurance policy, a disparate impact claim -- whether

6    brought under federal law or the state law -- wouldn't that

7    require a court to determine or to assess the actuarially

8    sound principles?

9              MS. FREENY:  I --

10             THE COURT:  Is there ever a situation where it would

11   not?

12             MS. FREENY:  I think there may be, your Honor.

13             It's not clear what the defense to a disparate impact

14   claim under the FHA would be in any given situation.  It's not

15   clear, in fact, you know, whether or not the insurer may be

16   relying on, for instance, some sort of factor that is

17   prohibited both under state law -- for instance, some states

18   might prohibit reliance on a geographic area or various other

19   factors; so, it might be prohibited under state law -- as well

20   as under federal law, because it results in a disparate

21   impact.

22             Now, the result of that is that the claim may be able

23   to proceed under federal law.  It's not able to proceed under

24   state law.  But the reason it can proceed, notwithstanding the

25   McCarran-Ferguson Act, would be because that particular

 1    application does not impair state law.

 2            And, in any event, again, it's difficult -- it

 3    requires a sort of imagination or hypotheticals that would be

 4    better ascertained in the context of a specific adjudication.

 5    And in that situation, it would become clear, for instance,

 6    whether or not actuarial justification was even a basis.

 7            There are practices in the insurance industry that

 8    are not based on strictly actuarial calculations, but based on

 9    business judgment.  And, so, for example, that may be in any

10    particular state an example.  Again, I hesitate to say in

11    which state without -- you know, without knowing the precise

12    contours, I don't know; but, that certainly is a potential

13    application.

14            And, indeed, there are recognized areas of congruity,

15    as we note in our brief, between disparate impact and state

16    insurance.

17            So, for example, in the State of Ohio, a state court

18    rejected the notion that plaintiffs advance here that the

19    state regulation of insurance, including their prohibition on

20    unfair discrimination, is inconsistent with disparate impact.

21    The state court said, no, it is not, it is not inconsistent

22    with disparate impact.

23            Plaintiffs ask this Court to override that, again,

24    all in -- ostensibly to respect state choices.

25            THE COURT:  Did HUD consider whether or not the rule

 1    conflicts with state laws and policies permitting risk-based

 2    pricing and underwriting or did HUD -- did HUD consider the

 3    substantive arguments about the McCarran-Ferguson Act and

 4    their applicability or did HUD just determine, as it looks

 5    like in the rulemaking process, that this is something that

 6    should be left to the courts?

 7         MS. FREENY:  It did both.  So, it did consider

 8    comments submitted by three insurance industry groups,

 9    including the plaintiff in this case, arguing that the rule is

10    both per se precluded by the McCarran-Ferguson Act --

11         THE COURT:  Is there anything in the record -- other

12    than the one paragraph response citing the Ojo vs. Farmers

13    Group case, is there anything in the record -- that you can

14    point the Court to that reflects HUD's consideration or

15    analysis about the applicability of the McCarran-Ferguson Act?

16         MS. FREENY:  Well, so, HUD's response is the

17    paragraph that you mentioned in which HUD indicates that the

18    application would depend on the facts at issue and the

19    language of the relevant state law.  HUD also acknowledged the

20    receipt of those comments.  And, so, those would be comments

21    that HUD considered.

22         And, so, HUD would consider the application but

23    determine, quite appropriately, under Humana that that

24    couldn't be decided on an abstract basis; and, again, because

25    there have been, in the past, instances in which claims --

1    disparate impact claims -- have proceeded without

2    interference, impairment of state regulation of insurance.

3    And we cite those in our brief.  One in the, I believe,

4    Western District of Tennessee, for example.

5           And, so, because there are these demonstrated

6    instances, because there is an entire state in which claims

7    could proceed without interference, plaintiffs are not

8    entitled to assert the facial relief they seek in this case.

9           Now, I do want to address sort of the various state

10   laws that plaintiffs have cited.  They have attached an

11   appendix to their brief which purports to cite state laws.

12          THE COURT:  Before you go on, I just want to make

13   sure I did not miss something.

14          Is the entirety of your response on McCarran-Ferguson

15   the one paragraph that we have been talking about and you

16   noted?  Is there more?  Is there anything else in the record

17   beyond the one paragraph citing the Ojo case?

18          MS. FREENY:  And that's 11,475, your Honor, of the

19   Federal Register?

20          THE COURT:  I think it is.  Yes.  11,476 is where the

21   issue is presented -- 11,474 is where the issue is presented,

22   at the bottom, and 11,475 is where it --

23          MS. FREENY:  Yes, that is HUD's response.

24          THE COURT:  Okay.

25          MS. FREENY:  I'm happy to, at this point, turn to

1   plaintiff's sort of procedural attack on that as insufficient,

2   if the Court would like, or continue with McCarran-Ferguson as

3   a substantive matter.

4          THE COURT:  I do not care which order you do it in.

5   At some point I would like you to address the --

6          MS. FREENY:  Okay.

7          THE COURT:  -- procedural, and I will likely have

8   more questions.  But go ahead.

9          MS. FREENY:  All right.

10          With the Court's indulgence, I will finish up on

11   plaintiff's substantive McCarran-Ferguson Act claim.

12          THE COURT:  Okay.

13          MS. FREENY:  And just to dispense with plaintiff's

14   citation to sort of isolated provisions in the insurance code,

15   these are not sufficient to demonstrate entitlement to the

16   relief they seek because, for the reasons we were talking

17   about, it's difficult to make an assessment on a case-by-case

18   -- or on an abstract basis.

19          So, for example, plaintiffs cite various regulations

20   about state approval of rates.  They differ across states.

21   For instance, Illinois does not require approval.  And it's

22   not even clear whether a future hypothetical claim would

23   involve a rate that was approved by a state.

24          It would be appropriate to make the determination

25   about the intersection between these laws at that point in

1   time when it can actually be said "Yes" or "No," this impairs

2   that law.

3         And, in fact, I think this Court's analysis in Axiom

4   demonstrates the level of detail, the level of consideration

5   that would be required; and, that plaintiffs are attempting to

6   end run around here by taking a step back and trying to get

7   this wholesale exemption.

8         And, finally, plaintiff's analysis -- well,

9   plaintiff's analysis makes some unwarranted assumptions about

10  the exclusivity of particular insurance regulations without

11  demonstrating such exclusivity and, significantly, because

12  many states' insurance codes have preservation clauses

13  preserving the availability of remedies elsewhere.

14  Plaintiff's failure to account for state fair housing laws,

15  which affects their entire analysis of state law, prevents

16  them from establishing impairment.

17        The Illinois brief illustrates this aptly because the

18  Illinois Human Rights Act applies to insurance and applies

19  disparate impact claims to insurance.  And because many states

20  both have fair housing laws that apply to insurance and have

21  fair housing laws that are read in concert or parallel to the

22  federal Fair Housing Act, that needs to be taken into account.

23  And we're not in a position to do that here because plaintiffs

24  are attempting to demonstrate impairment on such an abstract

25  basis based on assumptions about what states want or based on

1    assumptions about state law not tied to the entire regime.

2          Your Honor, before turning to the procedural claim, I

3    would like to address the issue of ripeness because I think

4    that is the other side of the coin in plaintiff's reliance on

5    a facial McCarran-Ferguson challenge, if you will.

6          As demonstrated by the foregoing and, in fact, as

7    demonstrated by Mr. Waxman's statement that it would be hard

8    to imagine certain types of claims, in his words, this case is

9    not the proper context to make these determinations.  If

10   plaintiffs are having a hard time imagining what context a

11   challenge to a claim settlement process should arise, the

12   answer is to await that context, not to ask for this Court in

13   the abstract to prevent it.

14         And this case is similar in that respect to the

15   Seventh Circuit's decision in Wisconsin Central, which

16   recognizes that where preemption is a fact-based inquiry or a

17   case-by-case inquiry, it's appropriate to await decision until

18   those facts actually materialize or until the contours of the

19   legal issues are clear.  And here Saunders tells us, Humana by

20   its principle tells us that this is a fact-based inquiry.

21         Now, clearly it is a legal question for sure, but

22   that doesn't mean that facts aren't necessary to understand

23   the contours of the legal claims.  For instance, whether

24   actuarial justification is, indeed, a defense.  What types of

25   claims -- what types of insurance practices are being

1    challenged.

2           We just don't have the kind of factual setting that

3    is necessary to adjudicate the claim, and we would submit that

4    the ripeness doctrine -- which is an aspect of the case in

5    controversy -- requirement should prevent adjudication of this

6    abstract dispute until it takes on more concrete terms.

7           I promised to turn to the procedural claim, although

8    I --

9           THE COURT:  Whenever you are ready.

10          MS. FREENY:  I first do want to very briefly address

11   a separate jurisdictional barrier, and that's standing.

12   Because, again, it is a jurisdictional matter, a part of the

13   case in controversy requirement.

14          So, plaintiff's claim is separately barred by the

15   doctrine of standing, that is independent from the ripeness

16   claim.

17          THE COURT:  Are increased litigation costs sufficient

18   to confer standing?

19          I know you have addressed in your brief that they are

20   not sufficient to address the ripeness question, that there is

21   certainly some over overlap between ripeness and standing.

22          But are increased litigation costs sufficient?

23          MS. FREENY:  Your Honor, I would submit that that is

24   actually the intersection of standing and ripeness in the

25   sense that it's not clear that plaintiff or its members would,

1  in fact, face increased risk of litigation costs.

2         So, this is not a case in which plaintiff says, "I am

3  subject to this claim."  This is a case where plaintiffs

4  project conjecturally that they will be subject to future

5  litigation costs.

6         THE COURT:  Has HUD done any internal predictions of

7  potential increases in challenges that might result as a

8  result of the rule?

9         MS. FREENY:  So, in the course of the rulemaking, HUD

10  received a number of comments about the disparate impact

11  standard, predicting that it would increase the risk of

12  liability or -- excuse me, increase the risk of litigation,

13  including frivolous litigation.  And HUD rejected that based

14  on its experience to date -- or to the date of the rule -- in

15  administering the Fair Housing Act.

16         And, again, it's worth remembering that this is not

17  the first time HUD formalized or announced a disparate impact

18  standard.  This is the formalization for noticing comment

19  rulemaking.  But HUD had been pursuing disparate impact claims

20  for years.  So, they do have the experience to evaluate those

21  sorts of predictions and rejected the prediction of excessive

22  litigation.

23         So, in that context, it is conjectural whether

24  plaintiff's members would, in fact, face an increased risk of

25  litigation as a result of the rule.

1          THE COURT:  Assuming they would, is that sufficient

2    to confer standing?

3          MS. FREENY:  Assuming they would, that would be

4    sufficient to demonstrate injury, but it would -- again, I'm

5    not sure -- if it were traceable to the rule, I suppose.

6          THE COURT:  What about compliance costs?

7          MS. FREENY:  Compliance costs, no doubt, can confer

8    standing as a general matter.  The question is whether those

9    compliance costs are attributable to the rule or something

10   else.  And the "something else" is the fact that plaintiff's

11   members have been facing the risk of disparate impact

12   liability for many years.  In fact, the insurance industry

13   told the Supreme Court in an amicus brief in 1996, "We are now

14   facing disparate impact liability.  We are suffering all these

15   woes.  We believe frivolous litigation will ensue."  And, of

16   course, no such thing happened.

17          Now, your Honor, turning to plaintiff's procedural

18   claims, the plaintiff's attack on the rule under the

19   Administrative Procedure Act, again, is purely procedural.  It

20   goes to the process that HUD undertook in the rulemaking and

21   not the outcome.  And the Court's review is limited to that

22   process, whether or not HUD considered the issues that

23   plaintiff challenges and claims they did not consider and

24   explain its explanation.

25          THE COURT:  Adequately addressed it.

1          MS. FREENY:  Yes.

2          So long as the agency's path may be discerned, its

3     explanation must be upheld.  And it is not a demanding

4     standard, and it is a standard that HUD's rule clearly meets

5     here.

6          With respect to plaintiff's claim that HUD failed to

7     address the McCarran-Ferguson Act issue, it's plainly not true

8     from the face of the rule that HUD failed to consider that.

9     HUD considered comments submitted by the insurance industry

10    claiming that the McCarran-Ferguson Act per se barred this

11    particular interpretation of the Act and rejected it because

12    the effect of McCarran-Ferguson depends on the facts at issue

13    and the language of the relevant state law.

14         So, it considered the issue, and it rejected it.  And

15    it left open, again, the possibility for any particular

16    application to be considered on a case-by-case basis.  The

17    rule didn't alter the operation of the McCarran-Ferguson Act.

18    It simply found that there was no basis for facial preemption.

19    And that is in line with the controlling McCarran-Ferguson

20    analysis.

21         For that reason, plaintiff's procedural attack is

22    essentially a reformulation of their substantive attack.  It's

23    basically saying, "HUD didn't meaningfully consider this

24    because it adopted a different legal view than we did."  And,

25    so, it rises and falls with that other claim.

1          THE COURT:  Although I think it is a little

2    different.  I read it as saying, "We did not meaningfully

3    consider it because all you gave was one paragraph without any

4    real analysis as to how the McCarran-Ferguson Act would be

5    implicated in these cases."

6          MS. FREENY:  So, what -- the explanation that HUD

7    provided is legally sufficient, and it is, in fact, true.  The

8    application of McCarran-Ferguson Act depends on the facts at

9    issue and the law.

10          And, so, plaintiffs point out that in this

11    litigation, in defense of plaintiff's primary cause of action,

12    the substantive claim, that HUD has now expounded on that and

13    provided additional explanation in brief.  That is, of course,

14    to be expected, but that doesn't mean that the original

15    explanation is not sufficient; and, here it is.

16          And I would draw the Court's attention to the

17    standard that is applicable by reference to a Supreme Court

18    case.  I believe it was called Long Island Care at Home v.

19    Coke.  I think it is cited in at least one of our briefs.

20    It's a case in which the Supreme Court upheld as reasonable

21    and sufficient an agency's explanation that its interpretation

22    in a rule was more consistent -- "more consistent" -- with the

23    language of the statute.

24          Now, no doubt in that case, in defending its

25    interpretation, the agency provided additional explanation in

1    a brief.  But the Supreme Court held that explanation to be

2    sufficient.

3           Here, HUD has provided far more explanation, and, in

4    fact, it is precisely the same position that HUD is

5    articulating in court that HUD articulated in rulemaking.

6           I do want to briefly address plaintiff's claim --

7    because they make a lot of it in their briefs -- that HUD

8    disavowed application of McCarran-Ferguson to agencies.

9           HUD did not do that, and HUD does not do that.  HUD

10   does not dispute that McCarran-Ferguson Act applies to

11   agencies.  It merely considered the facial preemption issue,

12   and it used a reference to the court as a sort of shorthand

13   for that case-by-case consideration.

14          And it's not surprising that HUD used that

15   language -- even though it perhaps, in retrospect, may not

16   have been the most artful language you could have used --

17   because the commenters discussed the McCarran-Ferguson issue

18   in the context of case-by-case court adjudications.

19          And, in any event, it -- even if it were -- even if

20   this Court were not to think it was the most artful language

21   doesn't go to the integrity of the decision.  And, so, the

22   rule of prejudicial error tells us when there's a hyper-

23   technical complaint about a rulemaking process, about an

24   agency's explanation, that's not a basis for overturning the

25   agency's decision where it doesn't go to the integrity of the

1    decision.

2          THE COURT:  What about the comments on the filed-rate

3    doctrine or the lack thereof?

4          MS. FREENY:  Sure.

5          HUD actually did respond to that comment, but it did

6    so in conjunction with other comments about state regulation

7    of insurance.

8          So, what HUD did was group several different comments

9    together -- comments about the filed-rate doctrine; comments

10   about the McCarran-Ferguson Act; and, then, comments generally

11   about state regulation of insurance -- asserting that the rule

12   would broadly impair state regulation of insurance.  HUD

13   grouped them together, acknowledged them, and then explained

14   why it disagreed with them.

15         Notably, although plaintiffs claim that this is a

16   significant comment and challenges the length of the

17   explanation, it is not a comment that plaintiff itself raised.

18         It's also notable that plaintiff doesn't argue here

19   that the rule in any sense violates the filed-rate doctrine

20   and for good reason.  A number of courts have found that the

21   filed-rate doctrine is inapplicable under this sort of

22   circumstance and, in fact, what really is at issue would be

23   McCarran-Ferguson.

24         And, so, it makes sense in that sense that HUD

25   addressed all of those issues together, because they are part

1    and parcel of the same issue.

2           I am happy to address plaintiff's other two

3    procedural claims, if the Court is interested.

4           THE COURT:  Yes, please.

5           MS. FREENY:  Okay.

6           The third of the failed procedural attacks is the

7    plaintiff's claim that HUD failed to consider -- or failed to

8    meaningfully consider, in plaintiff's words -- the effect of

9    the rule on insurance.

10          It is clear from the face of the rule that HUD

11   entertained comments by the insurance industry predicting dire

12   consequences as a result of the rule; and, that HUD explained

13   in the rulemaking why it rejected those comments.  I noted

14   previously one basis for rejection; and, that is, that HUD,

15   simply based on its views and its experience, did not expect

16   the kind of floodgates to frivolous litigation that plaintiffs

17   predict.

18          Plaintiffs have been subject -- plaintiff's members

19   have been subject -- to disparate impact, again.  And, so, HUD

20   was able to look at sort of past practices and understand that

21   the predictions submitted by the insurance industry were not

22   consistent with its views and experience; and, HUD explained

23   that in the face of the rule.

24          That is all the APA requires -- that HUD consider the

25   comment and reject it.  It doesn't require the party to accept

1    as true every single factual premise that underlies the

2    comments.  That is really the nature of plaintiff's dispute,

3    is the substance.  But their attack is a procedural one, and

4    it fails.

5           The final procedural attack, that plaintiffs mount

6    unsuccessfully, is a claim that HUD failed to consider

7    comments asking for an exemption or safe harbor for the

8    insurance industry.  And, again, it's clear from the rule that

9    HUD consider those comments and that HUD explain the reasons

10   for rejecting them.  That is all that the APA requires.

11          So, HUD explains two things.  HUD explains that that

12   exemption was not necessary because, contrary to the views

13   articulated by one of the commenters, a practice that results

14   in a disparate impact is not per se illegal.

15          And it also explained that carving out an exemption

16   to disparate impact liability for the insurance industry would

17   be contrary to congressional intent.  It would be contrary to

18   congressional intent to create an exemption beyond those found

19   in the Act.  And that reference, exemptions found in the Act,

20   that includes exemptions created by Congress.

21          So, for example, an exemption to disparate impact

22   liability that Congress created for appraisal decisions.

23   Appraisal decisions are exempt from disparate impact

24   liability.  And HUD concluded, no, we are not going to create

25   one in this case.

1          So, HUD considered the comments, explained why it

2    rejected the comments.  Again, that is sufficient.

3          And I would just note plaintiff takes aim at the fact

4    that HUD did not identify anything that would be per se a

5    legitimate -- a legally sufficient justification under the

6    Act.  That's because the purpose of the rule was to formalize

7    an interpretation of the Fair Housing Act and establish a

8    framework for disparate impact claims, not to decide sort of

9    in any given case what would or would not be a legally

10   sufficient justification, and reasonably decided that could be

11   determined on a case-by-case basis.

12         Lastly, your Honor, I will turn to plaintiff's

13   challenge to the burden-shifting framework adopted by HUD.

14         Plaintiffs claim that the burden-shifting approach

15   adopted by HUD -- which is a three-part burden shifting

16   approach -- is contrary to the requirements in the Supreme

17   Court's decision in Wards Cove.  This is, of course, based on

18   an erroneous predicate that Wards Cove supplies requirements

19   for the Fair Housing Act.

20         Plaintiffs cite no case that applies Wards Cove,

21   treats Wards Cove as controlling on the FHA.  Wards Cove, of

22   course, dealt with Title VII, not the FHA; and, it was almost

23   immediately abrogated by Congress.  Moreover, HUD's approach

24   is a reasonable approach.

25         Now, Mr. Waxman doesn't dispute that, so long as

```
 1    there is ambiguity in a statute.  And there is here, because I

 2    heard Mr. Waxman say the statute doesn't provide one way or

 3    the other for the appropriate approach.  Deference must be

 4    accorded to the interpretation adopted by HUD because HUD was

 5    delegated rulemaking authority.

 6          We certainly know that the statute was ambiguous

 7    because prior to promulgation of the rule, different circuits

 8    had different approaches.  And following promulgation of the

 9    rule, the Fifth Circuit, in a case called Inclusive

10    Communities, adopted HUD's approach; found HUD's approach to

11    be in accordance with disparate impact principles and affirmed

12    it.

13          HUD's three-part burden-shifting framework adopts the

14    approach that was employed by the majority of circuits prior

15    to promulgation of the rule.  And, in that sense, that alone

16    is sufficient to demonstrate its reasonableness.

17          It is true that the Seventh Circuit, prior to

18    promulgation of the rule, adopted a different approach.  But,

19    as Mr. Waxman noted, Brand X stands for the proposition that

20    where an agency exercises delegated authority to construe an

21    ambiguous statute, it receives deference notwithstanding any

22    prior contrary judicial precedent construing that ambiguity.

23          And more to the point, plaintiffs do not seek -- do

24    not ask this Court to find that the Seventh Circuit's approach

25    reigned, notwithstanding HUD's rule.  They ask this Court to
```

1    adopt the Wards Cove standard, that no court finds to be

2    applicable to the Fair Housing Act.

3            And the burden-shifting approach accords with what

4    Seventh Circuit has said about the Fair Housing Act, that the

5    Fair Housing Act is the functional equivalent of Title VII and

6    should be given like construction and application.  And the

7    burden-shifting approach that HUD adopted in its rule mirrors

8    the current approach employed under Title VII.

9            The rule is also -- it's also practical.  It leaves

10   the burden of establishing a legally sufficient justification

11   for a challenged practice on the business, which is in the

12   best position to decide it.  And it also is the framework that

13   parties who litigate under the Fair Housing Act are most

14   familiar with.

15           I'm happy to address plaintiff's -- what I think is a

16   separate claim or argument under Section 556(d) of the APA, if

17   the Court is interested.

18           THE COURT:  You may.  Go ahead.

19           MS. FREENY:  Okay.

20           Your Honor, that fails because preliminarily

21   plaintiffs waived it.  It is a straightforward principle of

22   administrative law that in order to challenge a regulation, at

23   least on a pre-enforcement facial basis, an argument needs to

24   be presented to the agency.  This argument was not presented.

25           Plaintiffs try to evade that rule by calling this

1    simply new authority.  But this really genuinely is a new

2    argument.  It is an argument that HUD should have applied a

3    different standard in adjudications -- normal adjudications,

4    which are governed by 556(d), and court proceedings, which are

5    not.  HUD was simply not on notice of this argument at all.

6              It also fails on the merits because plaintiffs

7    concede that the second step of the burden-shifting

8    framework -- let me start that one over.

9              It fails on the merits because plaintiffs concede

10   that 556(d) does not prevent the burden being shifted for an

11   affirmative defense.  And plaintiffs themselves refer to the

12   second step of the burden-shifting framework as a business

13   justification defense.

14             It also makes sense to consider it, for purposes of

15   556(d), as an affirmative defense because, unlike the sort of

16   the familiar McDonnell Douglas burden-shifting framework --

17   which applies to motive in which an inference of

18   discriminatory motive needs to be proved, after which evidence

19   is used to rebut that showing -- here we're talking about

20   disparate impact claims, which do not require a showing of

21   motive.

22             And, so, the first step is to demonstrate disparate

23   effect.  The respondent comes in not to -- and to be clear,

24   that is not just to raise an inference of disparate impact; it

25   is to actually prove.  That makes it quite different from the

 1    McDonnell Douglas-type framework.

 2            After that has -- that first prong has -- been

 3    proved, the respondent comes in not to rebut it, but, in fact,

 4    to justify it, which is functionally similar to an affirmative

 5    defense.

 6            Unless the Court has any other questions, we would

 7    request that the Court grant defendants' motion for -- motion

 8    to dismiss or for summary judgment.

 9            THE COURT:  I do not think I have anything else for

10    you, Ms. Freeny.  Thank you.

11            MS. FREENY:  Thank you.

12            MR. WAXMAN:  May I?

13            THE COURT:  Yes.

14            MR. WAXMAN:  Just a couple of points, your Honor.

15            First, to return back to the oft-cited, -quoted and

16    -discussed Doe vs. Mutual of Omaha, HUD's argument is, well,

17    there's dicta in that case that could be read broadly, but you

18    shouldn't; and, you, of course, shouldn't ignore the Seventh

19    Circuit's majority decision, but you should treat it for what

20    it's worth.

21            I think we need to be extremely clear about this

22    because I think that Doe is completely dispositive of this

23    case, notwithstanding what you think about what one state law

24    provides or the other.

25            The Doe decision describes its ruling on

1    McCarran-Ferguson as a holding.  It says -- and,

2    unfortunately, I just have the Westlaw printout.  So, I don't

3    have the page.

4            THE COURT:  I have it here before me.

5            MR. WAXMAN:  Okay.

6            THE COURT:  I have it.

7            MR. WAXMAN:  It says in the -- this actually happens

8    to be the last paragraph of the majority opinion.  The end of

9    the first -- the first sentence is a compound sentence and the

10   second part of the compound is "because an interpretation of

11   the section -- " that is, the ADA " -- as regulating the

12   content of insurance policies is barred by the

13   McCarran-Ferguson Act, the judgment must be reversed with

14   directions to enter judgment for the defendant."

15           That is a holding of the court.  And it is not a

16   holding of the court that is limited to the facts presented in

17   that case.  And we know that if we go to the very first

18   paragraph of the Seventh Circuit's opinion.

19           The third sentence of the first paragraph in Doe says

20   Mutual of Omaha has stipulated that it "has not shown, and

21   cannot show, that its AIDS Caps are or ever have been

22   consistent with sound actuarial principles, actual or

23   reasonably anticipated experience, bona fide risk

24   classification, or state law."

25           That was a case in which, at the outset, the

1    insurance company said, "We can't justify this based on any

2    sort of actuarially based, risk-based pricing"; and,

3    nonetheless, the Seventh Circuit held that because inquiries

4    about discrimination in the pricing of health insurance

5    policies required federal courts to sit in judgment about

6    whether they were, in fact, consistent with sound actuarial

7    practices or other provisions of state law, they were, in

8    fact, preempted by the McCarran-Ferguson Act.  That kind of

9    inquiry cannot occur.

10           And I would commend the Court's attention -- I

11   realize it's not binding on Court, but nonetheless it might be

12   at least interesting -- to Judge Gettleman's decision in the

13   Camarena case, which we cited, in which Judge Gettleman --

14   who, himself, is relying on Judge Manning's decision in

15   McKenzie vs. Interstate Bankers Casualty says -- "This

16   inquiry -- " that is, the inquiry we've just discussed " -- is

17   improper because it necessarily causes federal courts to

18   decide whether an insurance policy is actuarially sound and

19   consistent with state law, thereby stepping on the toes of

20   insurance commissioners," citing and quoting Doe.

21           Now, your Honor asked the Court -- you asked HUD, you

22   know, to come up with examples where, in fact, what we say

23   state law permits or requires wouldn't dictate the outcome.

24   And what we heard was not surprising, which is, "Well, it's

25   very difficult to think of a hypothetical, and it's not our

1    burden to think of a hypothetical."  Well, the latter is

2    wrong.  The former is certainly true.  The latter is very

3    wrong.

4              This was the number one objection by the insurance

5    industry, all three commenters, to the application of this

6    rule to their business.  And it certainly was HUD's obligation

7    in the rulemaking to wrestle with this and to explain why, in

8    fact, it was not categorically inconsistent with state

9    insurance practices to impose a federal disparate impact

10   standard.

11             And whether there is a procedural violation or not --

12   and we think there is, and that's the basis for Count 2 of our

13   complaint -- in this case -- in this court as to our

14   substantive claim on Count 1, we have come before the Court

15   and said we are asking you to strike down the application of

16   this rule to this whole category of business.  We tried to get

17   the agency to say no.  It refused.  It didn't explain why,

18   other than to say that the McCarran-Ferguson Act doesn't

19   preclude it from promulgating a regulation and courts will

20   address how the McCarran-Ferguson Act applies.

21             We have now challenged that application.  We have

22   provided the Court with -- we have stated that every single

23   state law allows us to do this; and, that being the case, it

24   is inconsistent for HUD substantively to say we can't do it or

25   that what we're doing is either prima facie or per se illegal.

1   It is their burden in this litigation now, defending their

2   regulation, to do more than say, "Gee, it's really hard to

3   imagine a circumstance in which this might be -- it might be

4   okay to apply disparate impact."  That is, in fact, their

5   number one obligation as a defendant in this case.

6          Now, what they say is -- I think what Ms. Freeny said

7   is -- well, imagine a state -- she says it's like Illinois,

8   but it is not, for the reasons we've addressed in our brief --

9   where a state provides a completely parallel cause of action

10  that will, in fact, trump the state insurance pricing laws.

11  Again, as I said earlier, that is a point that Doe

12  specifically addressed and specifically rejected and said even

13  if the state and federal requirements are identical, the

14  McCarran-Ferguson Act nonetheless preempts the -- nonetheless

15  displaces -- application of the federal rule displaces the

16  administration of state laws into federal court requiring a

17  federal court to decide whether an insurance policy is

18  consistent with state law, which would obviously interfere

19  with the administration of the state law.

20         So, even if they could demonstrate that there is a

21  state that actually does apply a disparate impact standard to

22  risk-based pricing -- which they have not -- it nonetheless --

23  McCarran-Ferguson, as opposed to the application of that state

24  law, would be preempted.

25         And in any -- oh, the other example they have is,

1    well, maybe some insurance -- you know, insurance companies

2    may price according to not just actuarially based risk

3    judgment, risk evaluations but, also, "business judgment" and

4    that should be challenged.

5            The point -- I mean, I don't know of a state law that

6    does not allow insurance companies to exercise business

7    judgment in pricing.  In fact, they do.  That's expected.  The

8    point is that either state law does or doesn't allow it.  And

9    whether it does or does not allow it, Doe precludes a federal

10   court in an insurance case from inquiring that.  And I think

11   it is worth --

12           THE COURT:  Cannot inquire into the business

13   judgment?

14           MR. WAXMAN:  Cannot inquire into whether state law

15   would permit an insurance company to exercise business

16   judgment in figuring out, in light of what the actuaries say,

17   what the price to a category of risk should be.

18           And I think it's important to bear in mind how --

19   just to recall how -- the McCarran-Ferguson Act came to be.

20           Up until the Supreme Court's decision in Southeast

21   Underwriters vs. United States, the Supreme Court somehow

22   considered the business of insurance not to be interstate

23   commerce.  When the Supreme Court said, no, it is interstate

24   commerce, Congress immediately enacted a law that said,

25   nonetheless, this is an area of interstate commerce that is

 1    going to be regulated by states and not by the federal

 2    government, absent a law specifically addressed to insurance.

 3          It adopts a wholesale preemption rule that speaks not

 4    to just what courts do in deciding a defense, but says that a

 5    federal law of general applicability "shall not be construed

 6    by anybody to impair."  And that is -- for the reasons stated

 7    in Doe, that is -- exactly what the application of HUD's rule

 8    to this category of business does.

 9          Now, I'll just --

10          THE COURT:  What about a claim under the Fair Housing

11    Act based on marketing?

12          MR. WAXMAN:  Based on?

13          THE COURT:  Marketing.  As opposed to pricing or

14    underwriting.

15          MR. WAXMAN:  Right.  So --

16          THE COURT:  We did not talk about that earlier.

17          Would that require a court to look into the actuarial

18    soundness?  Because that seems to be what Doe --

19          MR. WAXMAN:  Yeah.

20          THE COURT:  -- turns on.

21          MR. WAXMAN:  Yeah, well, Doe certainly says the

22    molten core of what's preempted is any inquiry into

23    underwriting or pricing.  Doe doesn't address marketing.

24          I guess, as to marketing I'll say the following:

25    Number one, we don't think the Fair Housing Act covers

1   marketing; but, if it did, I'm having a hard time

2   understanding what a disparate impact case would be rather

3   than a disparate treatment case on marketing.

4         There also would be -- I have to say I'm sure if such

5   a case were brought, we would hear this in response, but, I

6   mean, is marketing "the business of insurance"?  There's a

7   pretty developed federal case law on what is or isn't the

8   business of insurance for --

9         THE COURT:  What about the claim settlement process?

10        MR. WAXMAN:  So, the claim settlement process, we

11   think -- again, I don't think that claim settlement has

12   anything to do with the availability of housing.  This is --

13   somebody has already bought a house and they're claiming that

14   their claim is being settled in a discriminatory way.  All of

15   the claim settlement processing cases that we've seen -- and I

16   think we've seen two -- allege disparate treatment:  "I was -- "

17   "I was prejudiced because I'm a woman" or "because I'm

18   disabled" or "because I'm a minority."

19         There's no argument that any of those claims are

20   preempted if, in fact, they're covered by the Fair Housing Act

21   or any other federal non -discrimination statute.  But I, in

22   my mind, haven't been able to imagine what a disparate impact

23   claim based on -- I don't know how disparate impact could fall

24   into, you know, the treatment of claims.  It seems to me that

25   if there's a problem with what an insurance company is doing

1   on a discriminatory basis, it has to be because people are

2   being treated in a discriminatory fashion.

3          If I may, I'll just say two things about standing and

4   ripeness that tap into questions that your Honor had.  With

5   respect to our contention that this -- that the

6   promulgation of this -- the application of this rule to our

7   practices would, in fact, you know, pose very substantial

8   economic burdens on us, HUD's response, which is on Page

9   11,472 of the Federal Register, is a response not directed at

10  the burden it would place on insurance companies.

11         We specifically said because we price and underwrite

12  based on risk, it's a particular burden on us.  This is just a

13  general response to everybody who said, "Oh, my God, this is

14  going to cost us more money."  And, so, it is not addressing

15  the point that we made.  But insofar as their response is

16  relevant at all, it demonstrates what our additional costs

17  will be.

18         HUD's response to "Oh, my God, this is going to cause

19  more litigation and other people are going to be liable," what

20  HUD said -- and I'm quoting from the middle -- two-thirds of

21  the way down the middle paragraph -- "Covered entities can

22  conduct consistent self-testing and compliance reviews,

23  document their substantial legitimate non-discriminatory

24  interest and resolve potential issues so as to prevent future

25  litigation."

1            That's exactly what our affiants have said is the

2    injury.  We don't -- there is no property and casualty company

3    that collects data based on protected race, you know,

4    ethnicity, et cetera, et cetera.  In at least one state, the

5    State of Maryland, we are precluded from doing it.  If we are

6    going to avoid the litigation costs that HUD said in its

7    rulemaking we could by engaging in consistent self-testing and

8    compliance reviews, obviously we're going to have to do

9    something very substantial that we haven't done and that at

10    least in one state we are precluded from doing.

11            Now, on the issue of ripeness per se, the government

12    is, again, citing your Honor to a statement made by an

13    insurance group in an amicus brief in the Cisneros case

14    decided by the Sixth Circuit.  It is so incredibly revealing

15    that that's what the government is relying on.  That was a

16    challenge brought to the previous HUD rule.  And one of the

17    challenges was, gee, HUD might apply the Fair -- a disparate

18    impact standard under the Fair Housing Act to insurance.

19            The HUD -- I mean, the government, which participated

20    to argue it in that case, convinced the Sixth Circuit to find

21    that that challenge was not ripe.  Why?  Because it said, "HUD

22    has never interpreted -- " and I'm quoting from the Sixth

23    Circuit's opinion -- "HUD has never interpreted the Fair

24    Housing Act to apply a disparate impact standard."

25            That same finding was made in the Eighth Circuit's

1    2008 decision in the Saunders case, Saunders 2.

2            And, so, the notion that this -- you know, whether

3    the rule does or doesn't have independent legislative force --

4    and I'm surprised, but comforted, to hear the government say

5    that it doesn't -- it nonetheless is applying as a mandatory

6    rule that binds all of its regulated entities, which is us --

7    includes us -- to a standard that as recently as 2008 federal

8    courts understood HUD was not asserting.  This is very, very

9    different, very, very definitely a sea change in the

10   determination and application of the law to insurance

11   companies.

12           Now, on the procedural points, it is -- the United

13   States says, well, yes, the agency has to acknowledge that it

14   got comments, and it has to decide what to do based on those

15   comments.  I don't recall the exact wording.  But that is not,

16   in fact, what the law requires.  The law requires that they

17   engage in a reasoned explanation for the decision to reject

18   certain comments.

19           And whatever they might hypothesize about the

20   filed-rate doctrine, they did not address the filed-rate

21   doctrine; and, it is not the case that they understood the

22   filed-rate doctrine or that any court has understood the

23   filed-rate doctrine to be just another way of saying

24   McCarran-Ferguson.

25           The only court that they cite -- and I think it was

 1    the Fifth Circuit Dehoyos decision that said that they are

 2    related -- in fact, found that the filed-rate doctrine had not

 3    been adequately presented and, therefore, wouldn't be

 4    considered.

 5         With respect to their consideration of

 6    McCarran-Ferguson as to insurance, I think I've already

 7    addressed it; but, I mean, the notion that they have engaged

 8    in reasoned explanation of why they are rejecting our

 9    proposition that risk-based insurance pricing and underwriting

10    is a legitimate practice under the Fair Housing Act, it

11    doesn't exist.  I mean, it simply was not done.  It had to be

12    done.  And they don't have an answer to it now.

13         As to the -- I guess, finally, as to the -- question

14    of burden shifting, I don't deny, as I said earlier, that the

15    agency's judgment about what the burden should be and how and

16    when it should shift is entitled to Chevron deference.  But

17    Chevron deference has limits.

18         There's no question where that this was an issue -- a

19    challenge -- to the proposed shifting and weight of the

20    burdens that HUD's rule imposed, that we did address.  And

21    HUD's response, in its brief and at oral argument today, is

22    Wards Cove was about Title VII, not about Title VIII; and,

23    therefore, it is not an abuse of discretion to apply -- it was

24    not unreasonable to apply -- to refuse to apply the Wards Cove

25    analysis both as to the weight of the burdens and the shifting

1   of the burdens.

2           The government is quite right that Title VII and

3   Title VIII are very close cousins.  They are almost cognate

4   twins.  They both prohibit discrimination based on race and

5   other protected factors.  When Congress enacted the Civil

6   Rights Act of 1991 in response to Smith, it didn't say, "We're

7   rejecting the Supreme Court's analysis in Smith."  They're

8   saying, "We are amending the law to ourselves change --

9   distribute and allocate the burdens, including requiring the

10  defendant to prove business necessity."  It did not amend

11  Title VIII.

12          And the notion that the Supreme Court's understanding

13  of what the words "because of race" meant in Title VII

14  shouldn't be applied to Title VIII is incredibly strained,

15  particularly given the Supreme Court's subsequent decision in

16  Smith vs. Jackson in which they held that the Civil Rights Act

17  of 1991 applied only to Title VII and would not apply to the

18  Age Discrimination Act, which is not even as closely in haec

19  verba to Title VII as Title VIII.

20          And, finally -- this is a small point, but what our

21  comments said is you cannot impose -- you cannot shift the

22  burden to us to justify the way we have priced under state

23  law.  The burden always has to remain with the plaintiff.  The

24  plaintiff has to prove that there is a disparate impact that

25  is not justified by state law.  And we made that claim.

1          It is true that we did not cite Section 556(d), but

2     that is just another reason why they can't do it.  And we

3     don't think that it's waived.  And we also don't think that

4     they have an answer.

5          And I think it's -- just in closing, what's really, I

6     think, remarkable about all this litigation is that even

7     today, HUD still does not contest that consideration of

8     actuarial risk factors and underwriting and pricing based on

9     them is, in fact, a legitimate business interest.  But it has

10    refused, and continues to refuse, to acknowledge that in the

11    rule, despite the fact that we specifically asked them to do

12    so.

13         Unless the Court has any further questions, I'll say

14    that my red light is on.

15         THE COURT:  I do not.  Thank you, Mr. Waxman.

16         MR. WAXMAN:  Thank you.

17         THE COURT:  I will take this under advisement.

18         You have a status on August 27th, I am going to

19    strike.  I do not need to see you, again, next week.

20         I will set a status over for September 30th at 8:30.

21    In all likelihood, you will get a resolution before then.

22         Thank you for coming in this afternoon.  Thank you,

23    both sides, for your excellent briefs in the case.  It is

24    always very helpful to the Court.  Unfortunately, I do not

25    always get them, but I always appreciate it when I do.

1          Thank you.

2          MR. WAXMAN:  Thank you, your Honor.

3          MS. FREENY:  Thank you, your Honor.

4                    *    *    *    *    *

5

6  I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.
7

8
   /s/ Joseph Rickhoff                    September 17, 2014
9  Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25