# EXHIBIT 1



# FEDERAL REGISTER

Vol. 78        Friday,

No. 32        February 15, 2013

Part IV

## Department of Housing and Urban Development

24 CFR Part 100
Implementation of the Fair Housing Act's Discriminatory Effects Standard;
Final Rule

**11460** Federal Register / Vol. 78, No. 32 / Friday, February 15, 2013 / Rules and Regulations

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Part 100**

**[Docket No. FR–5508–F–02]**

**RIN 2529–AA96**

## Implementation of the Fair Housing Act's Discriminatory Effects Standard

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Final rule.

**SUMMARY:** Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act or Act), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin.[1] HUD, which is statutorily charged with the authority and responsibility for interpreting and enforcing the Fair Housing Act and with the power to make rules implementing the Act, has long interpreted the Act to prohibit practices with an unjustified discriminatory effect, regardless of whether there was an intent to discriminate. The eleven federal courts of appeals that have ruled on this issue agree with this interpretation. While HUD and every federal appellate court to have ruled on the issue have determined that liability under the Act may be established through proof of discriminatory effects, the statute itself does not specify a standard for proving a discriminatory effects violation. As a result, although HUD and courts are in agreement that practices with discriminatory effects may violate the Fair Housing Act, there has been some minor variation in the application of the discriminatory effects standard.

Through this final rule, HUD formalizes its long-held recognition of discriminatory effects liability under the Act and, for purposes of providing consistency nationwide, formalizes a burden-shifting test for determining whether a given practice has an unjustified discriminatory effect, leading to liability under the Act. This final rule also adds to, and revises, illustrations of discriminatory housing practices found in HUD's Fair Housing Act regulations. This final rule follows a November 16, 2011, proposed rule and takes into consideration comments received on that proposed rule.

**DATES:** *Effective Date:* March 18, 2013.

**FOR FURTHER INFORMATION CONTACT:** Jeanine Worden, Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410–0500, telephone number 202–402–5188. Persons who are deaf, are hard of hearing, or have speech impairments may contact this phone number via TTY by calling the Federal Relay Service at 800–877–8399.

**SUPPLEMENTARY INFORMATION:**

## I. Executive Summary

### A. Purpose of Regulatory Action

*Need for the Regulation.* This regulation is needed to formalize HUD's long-held interpretation of the availability of ''discriminatory effects'' liability under the Fair Housing Act, 42 U.S.C. 3601 *et seq.,* and to provide nationwide consistency in the application of that form of liability. HUD, through its longstanding interpretation of the Act, and the eleven federal courts of appeals that have addressed the issue agree that liability under the Fair Housing Act may arise from a facially neutral practice that has a discriminatory effect. The twelfth court of appeals has assumed that the Fair Housing Act includes discriminatory effects liability, but has not decided the issue. Through four decades of case-by-case application of the Fair Housing Act's discriminatory effects standard by HUD and the courts, a small degree of variation has developed in the methodology of proving a claim of discriminatory effects liability. This inconsistency threatens to create uncertainty as to how parties' conduct will be evaluated. This rule formally establishes a three-part burden-shifting test currently used by HUD and most federal courts, thereby providing greater clarity and predictability for all parties engaged in housing transactions as to how the discriminatory effects standard applies.

*How the Rule Meets the Need.* This rule serves the need described above by establishing a consistent standard for assessing claims that a facially neutral practice violates the Fair Housing Act and by incorporating that standard in HUD's existing Fair Housing Act regulations at 24 CFR 100.500. By formalizing the three-part burden-shifting test for proving such liability under the Fair Housing Act, the rule provides for consistent and predictable application of the test on a national basis. It also offers clarity to persons seeking housing and persons engaged in housing transactions as to how to assess potential claims involving discriminatory effects.

*Legal Authority for the Regulation.* The legal authority for the regulation is found in the Fair Housing Act. Specifically, section 808(a) of the Act gives the Secretary of HUD the ''authority and responsibility for administering this Act.'' (42 U.S.C. 3608(a)). In addition, section 815 of the Act provides that ''[t]he Secretary may make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out this title. The Secretary shall give public notice and opportunity for comment with respect to all rules made under this section.'' (42 U.S.C. 3614a.) HUD also has general rulemaking authority, under the Department of Housing and Urban Development Act, to make such rules and regulations as may be necessary to carry out its functions, powers, and duties. (See 42 U.S.C. 3535(d).)

### B. Summary of the Major Provisions

This rule formally establishes the three-part burden-shifting test for determining when a practice with a discriminatory effect violates the Fair Housing Act. Under this test, the charging party or plaintiff first bears the burden of proving its prima facie case that a practice results in, or would predictably result in, a discriminatory effect on the basis of a protected characteristic. If the charging party or plaintiff proves a prima facie case, the burden of proof shifts to the respondent or defendant to prove that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests. If the respondent or defendant satisfies this burden, then the charging party or plaintiff may still establish liability by proving that the substantial, legitimate, nondiscriminatory interest could be served by a practice that has a less discriminatory effect.

This rule also adds and revises illustrations of practices that violate the Act through intentional discrimination or through a discriminatory effect under the standards outlined in § 100.500.

### C. Costs and Benefits

Because the rule does not change decades-old substantive law articulated by HUD and the courts, but rather formalizes a clear, consistent, nationwide standard for litigating discriminatory effects cases under the Fair Housing Act,[2] it adds no additional costs to housing providers and others engaged in housing transactions. Rather,

---

[1] This preamble uses the term ''disability'' to refer to what the Act and its implementing regulations term a ''handicap.'' Both terms have the same legal meaning. *See Bragdon* v. *Abbott,* 524 U.S. 624, 631 (1998).

[2] *See* nn. 12, 28, *supra,* discussing HUD administrative decisions and federal court rulings.

the rule will simplify compliance with the Fair Housing Act's discriminatory effects standard and decrease litigation associated with such claims by clearly allocating the burdens of proof and how such burdens are to be met.

## II. Background

The Fair Housing Act was enacted in 1968 (Pub. L. 90–284, codified at 42 U.S.C. 3601–3619, 3631) to combat and prevent segregation and discrimination in housing, including in the sale or rental of housing and the provision of advertising, lending, and brokerage services related to housing. The Fair Housing Act's "Declaration of Policy" specifies that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." [3] Congress considered the realization of this policy "to be of the highest priority." [4] The Fair Housing Act's language prohibiting discrimination in housing is "broad and inclusive;" [5] the purpose of its reach is to replace segregated neighborhoods with "truly integrated and balanced living patterns." [6] In commemorating the 40th anniversary of the Fair Housing Act and the 20th anniversary of the Fair Housing Amendments Act, the House of Representatives reiterated that "the intent of Congress in passing the Fair Housing Act was broad and inclusive, to advance equal opportunity in housing and achieve racial integration for the benefit of all people in the United States." [7] (See the preamble to the November 16, 2011, proposed rule at 76 FR 70922.)

The Fair Housing Act gives HUD the authority and responsibility for administering and enforcing the Act,[8] including the authority to conduct formal adjudications of Fair Housing Act complaints [9] and the power to promulgate rules to interpret and carry out the Act.[10] In keeping with the Act's "broad remedial intent," [11] HUD, as the following discussion reflects, has long interpreted the Act to prohibit practices that have an unjustified discriminatory effect, regardless of intent. (See also the

preamble to the November 16, 2011, proposed rule at 76 FR 70922–23.)

In formal adjudications of charges of discrimination under the Fair Housing Act over the past 20 years, HUD has consistently concluded that the Act is violated by facially neutral practices that have an unjustified discriminatory effect on the basis of a protected characteristic, regardless of intent.[12] In one such formal adjudication, the Secretary of HUD reviewed the initial decision of a HUD administrative law judge and issued a final order stating that practices with an unjustified discriminatory effect violate the Act. In that case, the Secretary found that a mobile home community's occupancy limit of three persons per dwelling had a discriminatory effect on families with children.[13] When the housing provider appealed the Secretary's order to the United States Court of Appeals for the Tenth Circuit, the Secretary of HUD defended his order, arguing that statistics showed that the housing policy, while neutral on its face, had a discriminatory effect on families with children because it served to exclude them at more than four times the rate of families without children.[14] Similarly, on appeal of another final agency decision holding that a housing policy had a disparate impact on families with children,[15] the Secretary of HUD, in his brief defending the decision before the United States Court of Appeals for the Ninth Circuit, discussed in detail the text and legislative history of the Act, as well as prior pronouncements by HUD that proof of a discriminatory intent is not

required to establish liability under the Act.[16]

HUD has interpreted the Act to include discriminatory effects liability not only in formal adjudications, but through various other means as well. In 1980, for example, Senator Charles Mathias read into the Congressional Record a letter that the Senator had received from the HUD Secretary describing discriminatory effects liability under the Act and explaining that such liability is "imperative to the success of civil rights law enforcement." [17] In 1994, HUD joined with the Department of Justice and nine other federal regulatory and enforcement agencies in approving and adopting a policy statement that, among other things, recognized that disparate impact is among the "methods of proof of lending discrimination under the * * * [Fair Housing] Act." [18] In this Policy Statement on Discrimination in Lending (Joint Policy Statement), HUD and the other regulatory and enforcement agencies recognized that "[p]olicies and practices that are neutral on their face and that are applied equally may still, on a prohibited basis, disproportionately and adversely affect a person's access to credit," and provided guidance on how to prove a disparate impact fair lending claim.[19]

Additionally, HUD's interpretation of the Act is further confirmed by regulations implementing the Federal Housing Enterprises Financial Safety and Soundness Act (FHEFSSA), in which HUD prohibited Fannie Mae and Freddie Mac from engaging in mortgage purchase activities that have a discriminatory effect in violation of FHEFSSA.[20] In addressing a concern for how the impact theory might operate under FHEFFSA, HUD explained that "the disparate impact (or discriminatory effect) theory is firmly established by Fair Housing Act case law" and concluded that this Fair Housing Act disparate impact law "is applicable to all segments of the housing marketplace, including the GSEs" (government-sponsored enterprises).[21] In

---

[3] 42 U.S.C. 3601.

[4] *Trafficante* v. *Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972) (internal citation omitted).

[5] Id. at 209.

[6] Id. at 211.

[7] H. Res. 1095, 110th Cong., 2d Sess., 154 Cong. Rec. H2280–01 (April 15, 2008) (2008 WL 1733432).

[8] *See* 42 U.S.C. 3608(a).

[9] *See* 42 U.S.C. 3610, 3612.

[10] *See* 42 U.S.C. 3614a.

[11] *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 380 (1982).

[12] *See, e.g., HUD* v. *Twinbrook Village Apts.*, No. 02–00025600–0256–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) ("A violation of the [Act] may be premised on a theory of disparate impact."); *HUD* v. *Carlson*, No. 08–91–0077–1, 1995 WL 365009 (HUD ALJ June 12, 1995) ("A policy or practice that is neutral on its face may be found to be violative of the Act if the record establishes a prima facie case that the policy or practice has a disparate impact on members of a protected class, and the Respondent cannot prove that the policy is justified by business necessity."); *HUD* v. *Ross*, No. 01–92–0466–18, 1994 WL 326437, at *5 (HUD ALJ July 7, 1994) ("Absent a showing of business necessity, facially neutral policies which have a discriminatory impact on a protected class violate the Act."); *HUD* v. *Carter*, No. 03–90–0058–1, 1992 WL 406520, at *5 (HUD ALJ May 1, 1992) ("The application of the discriminatory effects standard in cases under the Fair Housing Act is well established.").

[13] *HUD* v. *Mountain Side Mobile Estates P'ship*, No. 08–92–0010–1, 1993 WL 307069 (HUD Sec'y July 19, 1993), aff'd in relevant part, 56 F.3d 1243 (10th Cir. 1995).

[14] Brief for HUD Secretary as Respondent, *Mountain Side Mobile Estates P'ship* v. *HUD*, No. 94–9509 (10th Cir. 1994).

[15] *HUD* v. *Pfaff*, No. 10–93–0084–8, 1994 WL 592199, at *17 (HUD ALJ Oct. 27, 1994), rev'd on other grounds, 88 F.3d 739 (9th Cir. 1996).

[16] Brief for HUD Secretary as Respondent, *Pfaff* v. *HUD*, No. 94–70898 (9th Cir. 1996).

[17] 126 Cong. Rec. 31,166–31,167 (1980) (statement of Sen. Mathias reading into the record letter of HUD Secretary).

[18] Policy Statement on Discrimination in Lending, 59 FR 18266, 18269 (Apr. 15, 1994) ("Joint Policy Statement").

[19] *Id.*

[20] *See* 24 CFR 81.42 (2012).

[21] The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), 60 FR 61846, 61867 (Dec. 1, 1995).

promulgating this regulation, HUD also emphasized the importance of the Joint Policy Statement, explaining that "[a]ll the Federal financial regulatory and enforcement agencies recognize the role that disparate impact analysis plays in scrutiny of mortgage lending" and have "jointly recognized the disparate impact standard as a means of proving lending discrimination under the Fair Housing Act." [22]

Consistent with its longstanding interpretation of the Act, over the past two decades, HUD has regularly issued guidance to its staff that recognizes the discriminatory effects theory of liability under the Act. For instance, HUD's Assistant Secretary for Fair Housing and Equal Opportunity (FHEO) issued a memorandum in 1993 instructing HUD investigators to be sure to analyze complaints under the disparate impact theory of liability. [23] HUD's 1995 Title VIII Complaint Intake, Investigation and Conciliation Handbook (Enforcement Handbook), which set forth guidelines for investigating and resolving Fair Housing Act complaints, emphasized to HUD's enforcement staff that disparate impact is one of "the principal theories of discrimination" under the Fair Housing Act and required HUD investigators to apply it when appropriate. [24] HUD's 1998 version of the Enforcement Handbook, which is currently in effect, also recognizes the discriminatory effects theory of liability and requires HUD investigators to apply it in appropriate cases nationwide. [25]

In 1998, at Congress's direction, HUD published in the **Federal Register** previously-internal guidance from 1991 explaining when occupancy limits may violate the Act's prohibition of discrimination because of familial status, premised on the application of disparate impact liability. [26] More recently, HUD posted on its Web site guidance to its staff and others discussing how facially neutral housing policies addressing domestic violence can have a disparate impact on women in violation of the Act. [27]

Although several of the HUD administrative decisions, federal court holdings, and HUD and other federal agency public pronouncements on the discriminatory effects standard just noted were discussed in the preamble to HUD's November 16, 2011, proposed rule, HUD has described these events in the preamble to this final rule to underscore that this rule is not establishing new substantive law. Rather, this final rule embodies law that has been in place for almost four decades and that has consistently been applied, with minor variations, by HUD, the Justice Department and nine other federal agencies, and federal courts. In this regard, HUD emphasizes that the title of this rulemaking, "Implementation of the Fair Housing Act's Discriminatory Effects Standard," indicates that HUD is not proposing new law in this area.

As discussed in the preamble to the proposed rule (76 FR 70921, 70923), all federal courts of appeals to have addressed the question agree that liability under the Act may be established based on a showing that a neutral policy or practice has a discriminatory effect even if such a policy or practice was not adopted for a discriminatory purpose. [28] There is minor variation, however, in how evidence has been analyzed pursuant to this theory. For example, in adjudications, HUD has always used a three-step burden-shifting approach, [29] as do many federal courts of appeals. [30] One federal court of appeals applies a multi-factor balancing test, [31] other courts of appeals apply a hybrid between the two, [32] and one court of appeals applies a different test for public and private defendants. [33]

Another source of variation in existing law is in the application of the burden-shifting test. Under the three-step burden-shifting approach applied by HUD and the courts, the plaintiff (or, in administrative adjudications, the charging party) first must make a prima facie showing of either a disparate impact or a segregative effect. If the discriminatory effect is shown, the burden of proof shifts to the defendant (or respondent) to justify its actions. If the defendant (or respondent) satisfies its burden, the third step comes into play. There has been a difference of approach among the various appellate courts and HUD adjudicators as to which party bears the burden of proof at this third step, which requires proof as to whether or not a less discriminatory alternative to the challenged practice exists. All but one of the federal courts of appeals that use a burden-shifting approach place the ultimate burden of proving that a less discriminatory alternative exists on the plaintiff, [34] with some courts analogizing to the burden-shifting framework established for Title VII of the Civil Rights Act of 1964 (Title VII), which addresses employment discrimination. [35] The remaining court of appeals places the burden on the

[22] Id.

[23] Memorandum from the HUD Assistant Secretary for Fair Housing & Equal Opportunity, The Applicability of Disparate Impact Analysis to Fair Housing Cases (Dec. 17, 1993).

[24] HUD, No. 8024.1, *Title VIII Complaint Intake, Investigation & Conciliation Handbook* at 7–12 (1995).

[25] HUD, No. 8024.1, *Title VIII Complaint Intake, Investigation & Conciliation Handbook* at 2–27 (1998) ["a respondent may be held liable for violating the Fair Housing Act even if his action against the complainant was not even partly motivated by illegal considerations"]; *id.* at 2–27 to 2–45 (HUD guidelines for investigating a disparate impact claim and establishing its elements).

[26] *See* 63 FR 70256 (Dec. 18, 1998) (publishing "Keating Memo" regarding reasonable occupancy standards); Quality Housing and Work Responsibility Act of 1998, Public Law 105–276, 112 Stat. 2461, § 589 (Oct. 21, 1998) (requiring publication of Keating Memo).

[27] Memorandum from HUD Office of Fair Housing & Equal Opportunity, Assessing Claims of Housing Discrimination Under the Fair Housing Act & the Violence Against Women Act 5–6 (Feb. 9, 2011). *http://www.hud.gov/offices/fheo/library/11-domestic-violence-memo-with-attachment.pdf.*

[28] *See, e.g., Graoch Assocs. #33, L.P.* v. *Louisville/Jefferson Cnty. Metro Human Relations Comm'n,* 508 F.3d 366, 374–78 (6th Cir. 2007); *Reinhart* v. *Lincoln Cnty.,* 482 F.3d 1225, 1229 (10th Cir. 2007); *Hallmark Developers, Inc.* v. *Fulton County, Ga.,* 466 F.3d 1276, 1286 (11th Cir. 2006); *Charleston Hous. Auth.* v. *U.S. Dep't of Agric.,* 419 F.3d 729, 740–41 (8th Cir. 2005); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 49–50 (1st Cir. 2000); *Simms* v. *First Gibraltar Bank,* 83 F.3d 1546, 1555 (5th Cir. 1996); *Jackson* v. *Okaloosa Cnty., Fla.,* 21 F.3d 1531, 1543 (11th Cir. 1994); *Keith* v. *Volpe,* 858 F.2d 467, 484 (9th Cir. 1988); *Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 937–38 (2d Cir. 1988), aff'd, 488 U.S. 15 (1988) (per curiam); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 148 (3d Cir. 1977); *Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 987–89 & n.3 (4th Cir. 1984); *Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290–91 (7th Cir. 1977); *United States.* v. *City of Black Jack,* 508 F.2d 1179, 1184–86 (8th Cir. 1974).

[29] *See, e.g.,* HUD v. *Twinbrook Village Apts.,* No. 02–00025600–0256–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); *HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994) rev'd on other grounds, 88 F.3d 739 (9th Cir. 1996); *HUD* v.

[30] *See, e.g., Charleston,* 419 F.3d at 740–42; *Langlois,* 207 F.3d at 49–50; *Huntington Branch,* 844 F.2d at 939.

[31] *See, e.g., Metro. Hous. Dev. Corp.,* 558 F.2d at 1290 (applying a four-factor balancing test).

[32] *See, e.g., Graoch,* 508 F.3d at 373 (balancing test incorporated as elements of proof after second step of burden-shifting framework); *Mountain Side Mobile Estates* v. *Sec'y HUD,* 56 F.3d 1243, 1252, 1254 (10th Cir. 1995) (incorporating a three-factor balancing test into the burden-shifting framework to weigh defendant's justification);.

[33] The Fourth Circuit has applied a four-factor balancing test to public defendants and a burden-shifting approach to private defendants. *See, e.g., Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 989 n.5 (4th Cir. 1984).

[34] *Compare Mt. Holly Gardens Citizens in Action, Inc.* v. *Twp. of Mount Holly,* 658 F.3d 375, 382 (3d Cir. 2011) (burden of proving less discriminatory alternative ultimately on plaintiff), *and Gallagher* v. *Magner,* 619 F.3d 823, 834 (8th Cir. 2010) (same), *and Graoch,* 508 F.3d at 373–74 (same), *and Mountain Side Mobile Estates,* 56 F.3d at 1254 (same), *with Huntington Branch,* 844 F.2d at 939 (burden of proving no less discriminatory alternative exists on defendant).

[35] *See, e.g., Graoch,* 508 F.3d at 373 ("[C]laims under Title VII and the [Fair Housing Act] generally should receive similar treatment").

*Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993); *HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992); *see also* Joint Policy Statement, 59 FR 18269.

defendant to show that no less discriminatory alternative to the challenged practice exists.[36] HUD's administrative law judges have, at times, placed this burden of proof concerning a less discriminatory alternative on the respondent and, at other times, on the charging party.[37]

Through this rulemaking and interpretative authority under the Act, HUD formalizes its longstanding view that discriminatory effects liability is available under the Act and establishes uniform standards for determining when a practice with a discriminatory effect violates the Fair Housing Act.

## III. The November 16, 2011, Proposed Rule

On November 16, 2011, HUD published a proposed rule in the **Federal Register** (76 FR 70921) addressing the discriminatory effects theory of liability under the Act. Specifically, HUD proposed adding a new subpart G to 24 CFR part 100, which would formalize the longstanding position held by HUD and the federal courts that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, regardless of whether the practice was adopted for a discriminatory purpose, and would establish uniform standards for determining when such a practice violates the Act.

In the proposed rule, HUD defined a housing practice with a "discriminatory effect" as one that "actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin."

A housing practice with a discriminatory effect would still be lawful if supported by a "legally sufficient justification." HUD proposed that a "legally sufficient justification" exists where the challenged housing practice: (1) Has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent or defendant; and (2)

[36] *Huntington Branch,* 844 F.2d at 939.

[37] *Compare, e.g., HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992) (respondent bears the burden of showing that no less discriminatory alternative exists), *and HUD* v. *Twinbrook Village Apts.,* 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) (same), *with HUD* v. *Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (charging party bears the burden of showing that a less discriminatory alternative exists), *and HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994) (same).

those interests cannot be served by another practice that has a less discriminatory effect.

Consistent with its own past practice and that of many federal courts, HUD proposed a burden-shifting framework for determining whether liability exists under a discriminatory effects theory. Under the proposed burden-shifting approach, the charging party or plaintiff in an adjudication first bears the burden of proving that a challenged practice causes a discriminatory effect. If the charging party or plaintiff meets this burden, the burden of proof shifts to the respondent or defendant to prove that the challenged practice has a necessary and manifest relationship to one or more of its legitimate, nondiscriminatory interests. If the respondent or defendant satisfies this burden, the charging party or plaintiff may still establish liability by demonstrating that the legitimate, nondiscriminatory interest can be served by another practice that has a less discriminatory effect.

In the proposed rule, HUD explained that violations of various provisions of the Act may be established by proof of discriminatory effects, including 42 U.S.C. 3604(a), 3604(b), 3604(f)(1), 3604(f)(2), 3605, and 3606 (see 76 FR 70923 n.20), and that discriminatory effects liability applies to both public and private entities (see 76 FR 70924 n.40).

HUD also proposed to revise 24 CFR part 100 to add examples of practices that may violate the Act under the discriminatory effects theory.

## IV. Changes Made at the Final Rule Stage

In response to public comment, a discussion of which is presented in the following section, and in further consideration of issues addressed at the proposed rule stage, HUD is making the following changes at this final rule stage:

### A. Changes to Subpart G

The final rule makes several minor revisions to subpart G in the proposed rule for clarity. The final rule changes "housing practice" to "practice" throughout proposed subpart G to make clear that the standards set forth in subpart G are not limited to the practices addressed in subpart B, which is titled "Discriminatory Housing Practices." The final rule replaces "under this subpart" with "under the Fair Housing Act" because subpart G outlines evidentiary standards for proving liability under the Fair Housing Act. The final rule also replaces the general phrase "prohibited intent" with

the more specific "discriminatory intent."

The final rule slightly revises the definition of discriminatory effect found in proposed § 100.500(a), without changing its meaning, to condense the definition and make it more consistent with terminology used in case law. Proposed § 100.500(a) provided that "[a] housing practice has a discriminatory effect where it actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin." Final § 100.500(a) provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."

To clarify "legally sufficient justification" and in particular, what HUD meant in the proposed rule by "a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests," HUD is revising the definition found in proposed § 100.500(b) to read as follows: "(1) A legally sufficient justification exists where the challenged practice:

(i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and (ii) Those interests could not be served by another practice that has a less discriminatory effect. (2) A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative * * *." This revision to the definition of "legally sufficient justification" includes changing "cannot be served," the phrasing used in the proposed rule, to "could not be served."

This revised definition of "legally sufficient justification" also appears in § 100.500(c)(2) and, in essentially the same form, in § 100.500(c)(3). The final rule also replaces the word "demonstrating" with "proving" in § 100.500(c)(3) in order to make clear that the burden found in that section is one of proof, not production.

In addition to these changes, the final rule makes several minor corrections to § 100.500. The final rule substitutes "42

U.S.C. 3610'' with ''42 U.S.C. 3612'' in § 100.500(c)(1) because the procedures for a formal adjudication under the Act are found in 42 U.S.C. 3612. Also in § 100.500(c)(1), the final rule changes ''proving that a challenged practice causes a discriminatory effect'' to ''proving that a challenged practice caused or predictably will cause a discriminatory effect.'' This edit is required for consistency with the Fair Housing Act and § 100.500(a), which prohibit actions that predictably result in discrimination.

The final rule further corrects proposed § 100.500(c)(1) and (2) to replace ''complainant'' with ''charging party'' because in cases tried before HUD administrative law judges, the charging party—and not the complainant—has the same burden of proof as a plaintiff in court. Under the provisions of the Act governing adjudication of administrative complaints, an aggrieved person may file a complaint with the Secretary alleging a discriminatory housing practice, or the Secretary may file such a complaint,[38] but it is the Secretary who issues the charge of discrimination and prosecutes the case before the Administrative Law Judge, on behalf of the aggrieved person.[39] Any aggrieved person may intervene as a party in the proceeding,[40] in which case the intervener would bear the same burden of proof as the charging party or a plaintiff in a judicial action.

### B. Changes to Illustrations

The illustrations added in this rule, as well as the existing illustrations in part 100, represent HUD's interpretation of conduct that is illegal housing discrimination under the Fair Housing Act. Liability can be established for the conduct illustrated in part 100 through evidence of intentional discrimination, or based on discriminatory effects pursuant to the standards set forth in subpart G, depending on the nature of the potential violation.

In order to make clear that the Fair Housing Act violations illustrated in part 100 may be proven through evidence of intentional discrimination or discriminatory effects, as the evidence permits, and that any potential discriminatory effects violation must be assessed pursuant to the standards set forth in § 100.500, the final rule amends paragraph (b) of § 100.5 to add at the end the following sentence: ''The illustrations of unlawful housing discrimination in this part may be

established by a practice's discriminatory effect, even if not motivated by discriminatory intent, consistent with the standards outlined in § 100.500.''

The final rule revises the illustrations of discriminatory housing practices in the proposed rule, rephrasing them in more general terms. The language of the added illustrations, which in the proposed rule included paraphrasing the definition of discriminatory effect from subpart G, is revised to eliminate the paraphrasing, which is unnecessary after the addition to paragraph (b) of § 100.5. This revision is also intended to eliminate any potential negative implication from the proposed rule that the existing illustrations in part 100 could not be proven through an effects theory. In addition to this general streamlining of the illustrations in the proposed rule, the final rule makes the following specific revisions to the illustrations.

In order to avoid redundancy in HUD's Fair Housing Act regulations, this final rule eliminates proposed § 100.65(b)(6). The substance of proposed § 100.65(b)(6), which covers ''Providing different, limited, or no governmental services such as water, sewer, or garbage collection'' is already captured by existing § 100.65(b)(4), which prohibits ''Limiting the use of privileges, services, or facilities associated with a dwelling,'' and existing § 100.70(d)(4), which prohibits ''Refusing to provide municipal services * * * for dwellings or providing such services differently.''

In response to public comment, the final rule adds ''enacting'' and ''ordinance'' to § 100.70(d)(5). These changes confirm that an ordinance is one type of land-use decision that is covered by the Act, under a theory of intentional discrimination or discriminatory effect, and that land-use decisions may discriminate from the moment of enactment. This final rule therefore revises proposed § 100.70(d)(5) to give the following as an illustration of a prohibited practice: ''Enacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.'' The final rule removes ''cost'' and ''terms or conditions'' from proposed § 100.120(b)(2) and adds them to § 100.130. This revision is not intended to make any substantive changes to HUD's interpretation of the Act's coverage, but rather is for organizational purposes only: § 100.120 addresses

discrimination in the making and provision of loans and other financial assistance, while § 100.130 addresses discriminatory terms or conditions. Other minor streamlining changes are made to existing § 100.120(b). Accordingly, this final rule revises § 100.120(b) to read as set forth in the regulatory text of the rule.

The final rule amends existing § 100.130(b)(2) to add ''or conditions'' and the term ''cost'' to the list of potentially discriminatory terms or conditions of loans or other financial assistance. It also adds new § 100.130(b)(3), which, in response to a public comment, illustrates that servicing is a condition of loans or other financial assistance covered by section 805.[41] Because, as noted above, at the final rule stage ''terms and conditions'' is removed from proposed § 100.120(b)(2), new § 100.130(b)(3) also addresses the provision of loans or other financial assistance with terms or conditions that have a discriminatory intent or effect. As a result of these changes, new § 100.130(b)(3) reads as follows: ''Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin.''

### V. The Public Comments

The public comment period for the November 16, 2011, proposed rule closed on January 17, 2012. Ninety-six public comments were received in response to the proposed rule. Comments were submitted by a wide variety of interested entities, including individuals, fair housing and legal aid organizations, state and local fair housing agencies, Attorneys General from several States, state housing finance agencies, public housing agencies, public housing trade associations, insurance companies, mortgage lenders, credit unions, banking trade associations, real estate agents, and law firms.[42] This section of the preamble, which addresses significant issues raised in the public

---

[38] 42 U.S.C. 3610(a)(1)(A).

[39] 42 U.S.C. 3610(g)(2)(A), 3612.

[40] 42 U.S.C. 3612(c).

[41] 42 U.S.C. 3605. Discrimination in residential mortgage servicing may also violate section 804 of the Act, 42 U.S.C. 3604.

[42] All public comments on this rule can be found at *www.regulations.gov*, specifically at *http://www.regulations.gov/#!searchResults;rpp=50;po=0;dktid=HUD-2011-0138.*

comments, organizes the comments by subject category, with a brief description of the issue (or set of related issues) followed by HUD's response.

Many comments were received in support of the rule generally and in support of the proposed discriminatory effects standard in particular. This summary does not provide a response to comments that expressed support for the proposed rule. Supportive comments included statements asserting that the rule: advances the goals of the Fair Housing Act; offers a well-reasoned standard for analyzing discriminatory effects claims; provides a national standard for courts, housing providers, municipalities and the financial and insurance industries; provides clarity to housing providers, housing seekers, and others; will decrease litigation by clarifying the burdens of proof; and will help address a lack of adequate housing for older persons even though age is not a protected characteristic under the Act because older persons may be affected by practices with a discriminatory effect based on disability. Commenters stated that the rule is particularly necessary to maintain protections against discriminatory and abusive practices in the mortgage industry, as the Fair Housing Act covers activities in residential real estate-related transactions that may not be covered by the Equal Credit Opportunity Act (ECOA).[43] A commenter stated that the rule's flexible standard is appropriate, as no rigid formula fits the variety of practices that exist in a rapidly evolving housing market.

Several commenters supported discriminatory effects liability under the Act in general, stating that it is widely agreed that discriminatory effects analysis is critically important to vigorous enforcement of the Fair Housing Act, and that the rule is consistent with HUD's longstanding interpretation and the interpretation of the federal courts of appeals. Commenters in support of the importance of the effects test proffered the following: if the effects approach were no longer available, "the proverbial door to equal housing opportunity will be slammed in the face of many victims"; the effects analysis is particularly important with respect to

the protection of persons with disabilities and in familial status cases; municipal land use decisions are more likely to have a discriminatory effect on minorities when they unreasonably attempt to restrict affordable housing; the effects analysis is important to environmental justice investigations; the discriminatory effects standard encourages housing providers to develop creative ways to achieve their economic objectives while promoting diversity; the effects standard gives HUD and fair housing advocates the tools to reveal the effects of racism, poverty, disability discrimination, and adverse environmental conditions on the health and well-being of individuals protected by the law; the rule provides practical administrative guidance for HUD attorneys and administrative law judges, as well as for the state and local fair housing agencies that share responsibility with HUD for adjudicating fair housing complaints; and the disparate impact standard is important in addressing discrimination in lending and denial of access to credit, which are often the results of neutral policies that have a disparate impact on protected groups.

Some commenters supported the proposed rule's allocation of the burden of proof, stating that the rule is practical and supported by longstanding precedent, and that it provides clear guidance to housing providers and government agencies in adopting rules and policies and an objective method for courts to evaluate discriminatory effect claims. A commenter stated that the perpetuation of segregation theory of effects liability is supported by the legislative history of Title VIII and the obligation to affirmatively further fair housing found in 42 U.S.C. 3608(d).

Following are the remaining issues raised by the public comments and HUD's responses.

### A. Validity of Discriminatory Effects Liability Under the Act

*Issue:* Some commenters opposed the rule because, in their view, the Act's text cannot be interpreted to include liability under a discriminatory effects theory. Commenters stated that the Fair Housing Act does not include an effects standard because it does not use the phrase "adversely affect," as in Title VII, the Age Discrimination in Employment Act (ADEA), or the Americans with Disabilities Act. One of these commenters stated that the Fair Housing Act does not include any of the words in other statutes that have been interpreted as giving rise to disparate impact claims, such as "affect" and "tend to." A commenter found the

"otherwise make unavailable or deny" language in the Fair Housing Act unpersuasive evidence that Congress intended the Act to include an effects test because it is a catchall phrase at the end of a list of prohibited conduct, and it must be read as having a similar meaning as the specific items on the list.

Some commenters stated that the Act's prohibition of certain practices "because of," "on account of," or "based on" a protected classification necessitates a showing of discriminatory intent. A commenter stated that "because of" and "on account of," as used in every provision of the Act, require evidence of intent because the same phrases are used in two provisions of the Act that cannot plausibly be interpreted to employ discriminatory effects liability. In this regard, this commenter pointed to 42 U.S.C. 3631, which uses the phrase "because of" to create criminal liability for specific fair housing violations, and 42 U.S.C. 3617, which uses the phrase "on account of" to ban coercion and intimidation of those exercising fair-housing rights.

Other commenters expressed support for a rule setting out the discriminatory effects theory of liability. Some of these commenters stated that Congress intended that such liability exist and that the text of the Act readily supports this position. Commenters stated that discriminatory effects liability best effectuates Congress's broad, remedial intent in passing the Fair Housing Act and the Act's stated purpose of providing for fair housing, within constitutional limitations, throughout the country. Commenters pointed out, through examples of neutral practices with discriminatory results that they have encountered, that an effects theory of liability continues to be vital in achieving the Act's broad goal. Commenters stated that, consistent with HUD's interpretation of the Act, federal courts have unanimously held that liability may be established by proof of discriminatory effects.

*HUD Response:* As the preamble to the proposed rule and this final rule make clear, both HUD and the federal courts have long interpreted the Fair Housing Act to prohibit actions that have an unjustified discriminatory effect, regardless of whether the action was motivated by a discriminatory intent. Section 804(a) of the Act makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex,

---

[43] ECOA prohibits any creditor from discriminating in credit transactions on the basis of race, color, national origin, religion, age, sex, marital status, or public assistance program participation. *See* 15 U.S.C. 1691(a). By comparison, Section 805 of the Fair Housing Act prohibits any person whose business includes engaging in residential-related transactions from discriminating in such transactions on the basis of race, color, religion, sex, disability, familial status, or national origin. *See* 42 U.S.C. 3605.

familial status, or national origin."[44] Similarly, section 804(f)(1) makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap."[45] This "otherwise make unavailable or deny" formulation in the text of the Act focuses on the effects of a challenged action rather than the motivation of the actor. In this way, the provisions are similar to the "otherwise adversely affect" formulation that the Supreme Court found to support disparate impact liability under Title VII and the ADEA.[46] And, indeed, the federal courts have drawn the analogy between Title VII and the Fair Housing Act in interpreting the Act to prohibit actions that have an unjustified discriminatory effect, regardless of intent.[47]

In addition, many of the Fair Housing Act's provisions make it unlawful "to discriminate" in certain housing-related transactions based on a protected characteristic.[48] "Discriminate" is a term that may encompass actions that have a discriminatory effect but not a discriminatory intent.[49] HUD's extensive experience in administering the Fair Housing Act and in investigating and adjudicating claims arising under the Act, which is discussed in this preamble and that of the proposed rule,[50] informs its conclusion that not only can the term "discriminate" be interpreted to encompass discriminatory effects liability, but it must be so interpreted in order to achieve the Act's stated purpose to provide for fair housing to the extent the Constitution allows.[51] Indeed, as far back as 1980, the HUD Secretary explained to Congress why discriminatory effects liability under the Fair Housing Act is "imperative to the success of civil rights enforcement."[52] Only by eliminating practices with an unnecessary disparate impact or that unnecessarily create, perpetuate, increase, or reinforce segregated housing patterns, can the Act's intended goal to advance equal housing opportunity and achieve integration be realized.[53] In keeping with the broad remedial goals of the Fair Housing Act,[54] HUD interprets the term "discriminate," as well as the language in sections 804(a) and 804(f)(1) of the Act, to encompass liability based on the results of a practice, as well as any intended effect.

The "because of" phrase found in sections 804 and 805 of the Act[55] and similar language such as "on account of" or "based on" does not signal that Congress intended to limit the Act's coverage to intentional discrimination. Both section 703(a)(2) of Title VII[56] and section 4(a)(2) of the ADEA[57] prohibit certain actions "because of" a protected characteristic, yet neither provision requires a finding of discriminatory intent.[58] Moreover, the fact that the phrases "on account of" and "because of" appear in sections 817 and 831 of the Fair Housing Act[59] does not preclude finding discriminatory effects liability under the Act's other substantive provisions using the same language because, as discussed above, HUD bases its interpretation of those other provisions on other language not found in sections 817 and 831, such as the phrase "otherwise make unavailable or deny a dwelling" and the term "discriminate."

HUD's interpretation is confirmed by the fact that the Act's text contains three exemptions that presuppose that the Act encompasses an effects theory of liability. For one, section 805(c) of the Act allows "a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status."[60] If the Act prohibited only intentional discrimination, it would not be unlawful to "take into consideration factors other than" protected characteristics in the first instance, and this exemption would be superfluous. Second, section 807(b)(1) of the Act states that "[n]othing in this title limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling."[61] Since "the number of occupants permitted to occupy a dwelling" is not a protected classification under the Act, this provision makes sense only as authorizing occupancy limits that would otherwise violate the Act based on an effects theory.[62] Indeed, in 1991, HUD issued a memorandum to its staff explaining when occupancy limits would violate the Act based on disparate impact liability, and Congress later directed HUD to publish these guidelines in the **Federal Register**.[63] Third, section 807(b)(4) of the Act states that "[n]othing in this title prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance."[64] As with the two exemptions discussed above, this provision would be wholly unnecessary if the Act prohibited only intentional discrimination.

---

[44] 42 U.S.C. 3604(a).

[45] 42 U.S.C. 3604(f)(1).

[46] *See Griggs* v. *Duke Power Co.,* 401 U.S. 424, 431 (1971) (holding that Title VII includes a disparate impact standard); *Smith* v. *City of Jackson, Miss.,* 544 U.S. 228, 235 (2005) (affirming that the holding in *Griggs* represented the best reading of Title VII's text); *id.* at 240 (holding that section 4(a)(2) of the ADEA includes a disparate impact standard); *see also Nat'l Cmty. Reinvestment Coalition* v. *Accredited Home Lenders Holding Co.,* 573 F. Supp. 2d 70, 78 (D.DC 2008) (holding that the Fair Housing Act encompasses disparate impact liability because, among other reasons, language in the Act is analogous to language in the ADEA found by the Supreme Court to include disparate impact).

[47] *See Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 146 (3d Cir. 1977) ("[I]n Title VIII cases, by analogy to Title VII cases, unrebutted proof of discriminatory effect alone may justify a federal equitable response."); *Graoch,* 508 F.3d at 374 (quoting *Griggs,* 401 U.S. at 431) ("The Supreme Court held that Title VII, which uses similar language [to Title VIII], 'proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.' The same analysis justifies the existence of disparate-impact liability under the FHA.").

[48] *See* 42 U.S.C. 3604(b), 3604(f)(1), 3604(f)(2), 3605, and 3606.

[49] *See, e.g., Alexander* v. *Choate,* 469 U.S. 287, 299 (1985) (assuming without deciding that section 504 of the Rehabilitation Act of 1973, which prohibits "subject[ing] to discrimination" otherwise qualified handicapped individuals, "reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped"); *Board. of Ed.* v. *Harris,* 444 U.S. 130, 140–41 (1979) (concluding that the term "discrimination," as used in the 1972 Emergency School Aid Act, was ambiguous and proscribed actions that had a disparate impact).

[50] *See supra* nn. 12–27; preamble to the November 16, 2011, proposed rule at 76 FR 70922–23.

[51] In enacting the Fair Housing Act, Congress expressed its desire to provide, within constitutional limitations, for fair housing throughout the United States. *See* 42 U.S.C. 3601.

[52] *See* 126 Cong. Rec. 31,166–31,167 (1980) (statement of Sen. Mathias) (reading into the record letter of HUD Secretary).

[53] *See supra* nn. 3–7; *infra* nn. 65–69.

[54] *See supra* note 11.

[55] 42 U.S.C. 3604 and 3605.

[56] 42 U.S.C. 2000e–2(a)(2).

[57] 29 U.S.C. 623(a)(2).

[58] *See Meacham* v. *Knolls Atomic Power Lab.,* 554 U.S. 84, 96 (2008) (explaining that, "in the typical disparate-impact case" under the ADEA, "the employer's practice is 'without respect to age' and its adverse impact (though 'because of age') is 'attributable to a nonage factor' "); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 147 (3d Cir. 1977) ("[T]he 'because of race' language is not unique to § 3604(a): that same language appears in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h), yet a prima facie case of Title VII liability is made out when a showing of discriminatory effect (as distinct from intent) is established.").

[59] 42 U.S.C. 3617 and 3631.

[60] 42 U.S.C. 3605(c).

[61] 42 U.S.C. 3607(b)(1).

[62] *See City of Jackson,* 544 U.S. at 238–39 (explaining that the ADEA's provision that allows an employer "to take any action otherwise prohibited * * * where the differentiation is based on reasonable factors other than age discrimination" would be "simply unnecessary" if the ADEA prohibited only intentional discrimination).

[63] *See supra* note 26.

[64] 42 U.S.C. 3607(b)(4).

The legislative history of the Act informs HUD's interpretation. The Fair Housing Act was enacted after a report by the National Advisory Commission on Civil Disorders, which President Johnson had convened in response to major riots taking place throughout the country, warned that "[o]ur Nation is moving toward two societies, one black, one white—separate and unequal." [65] The Act's lead sponsor, Senator Walter Mondale, explained in the Senate debates that the broad purpose of the Act was to replace segregated neighborhoods with "truly integrated and balanced living patterns." [66] Senator Mondale recognized that segregation was caused not only by "overt racial discrimination" but also by "[o]ld habits" which became "frozen rules," [67] and he pointed to one such facially neutral practice—the "refusal by suburbs and other communities to accept low-income housing." [68] He further explained some of the ways in which federal, state, and local policies had formerly operated to require segregation and argued that "Congress should now pass a fair housing act to undo the effects of these past" discriminatory actions. [69]

Moreover, in the approximately 20 years between the Act's enactment in 1968 and its amendment in 1988, the nine federal courts of appeals to address the issue held that the Act prohibited actions with a discriminatory effect. [70] Congress was aware of this widespread judicial agreement when it significantly amended the Act in 1988. [71] At that time, the House Committee on the Judiciary specifically rejected an amendment that would have provided that "a zoning decision is not a violation of the Fair Housing Act unless the decision was made with the intent to discriminate." [72] Instead of adding this intent requirement to the Act, Congress chose to maintain the Act's operative text barring discrimination and making unavailable or denying housing, to extend those prohibitions to disability and familial status, and to establish the exemptions discussed above that presuppose the availability of a discriminatory effects theory of liability. [73] The failed attempt in 1988 to impose an intent requirement on the Act followed five other failed attempts, in 1980, [74] 1981, [75] 1983, [76] 1985, [77] and 1987. [78]

*Issue:* Two commenters stated that, when promulgating regulations implementing the Fair Housing Amendments Act of 1988, HUD stated in the preamble that the "regulations are not designed to resolve the question of whether intent is or is not required to show a violation" of the Act. [79] A commenter faulted HUD for failing to explain what the commenter perceived as a change in its official interpretation of the Act, and urged HUD to eliminate disparate impact liability from the rule. Some commenters stated that President Reagan, when signing the Fair Housing Amendments Act of 1988, expressed his opinion that the amendment "does not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that [Fair Housing Act] violations may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent." [80] Some commenters also stated that, in 1988, the United States Solicitor General submitted an amicus brief to the U.S.

Supreme Court in *Huntington Branch, NAACP* v. *Town of Huntington* asserting that a violation of the Fair Housing Act requires a finding of intentional discrimination. [81]

*HUD Response:* While HUD chose not to use the regulations implementing the Fair Housing Amendments Act of 1988 to opine formally on whether a violation under the Act may be established absent discriminatory intent, it has never taken the position that the Act requires a finding of intentional discrimination. On the contrary, through formal adjudications and various other means, including other regulations, interpretive guidance, and statements to Congress, HUD has consistently construed the Act as encompassing discriminatory effects liability. [82] HUD's prior interpretations of the Act regarding the discriminatory effects standard are entitled to judicial deference. [83] Neither President Reagan's signing statement nor the Solicitor General's amicus brief in *Huntington Branch* affects or overrides the longstanding, consistent construction of the Act by HUD, the agency with delegated authority to administer the Act and to promulgate rules interpreting it. Moreover, the Department of Justice both before and after *Huntington Branch* has taken the position that the Fair Housing Act includes discriminatory effects liability. [84]

### B. Definition of Discriminatory Effect, § 100.500(a)

In order to make it more concise and more consistent with terminology used in case law without changing its substance, this final rule slightly revises the definition of "discriminatory effect."

Proposed § 100.500(a) provided that "[a] housing practice has a discriminatory effect where it actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin."

Final § 100.500(a) provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of

---

[65] Report of the National Advisory Commission on Civil Disorders 1 (1968).

[66] 90 Cong. Rec. 3422 (1968).

[67] 114 Cong. Rec. 3421 (1968).

[68] *Id.* at 2277.

[69] *Id.* at 2669.

[70] *See, e.g., Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 935–36 (2d Cir.), aff'd, 488 U.S. 15 (1988); *Hanson* v. *Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir. 1986); *Arthur* v. *City of Toledo,* 782 F.2d 565, 574–75 (6th Cir. 1986); *United States* v. *Marengo Cnty. Comm'n,* 731 F.2d 1546, 1559 n.20 (11th Cir. 1984); *Smith* v. *Clarkton,* 682 F.2d 1055, 1065 (4th Cir. 1982); *Halet* v. *Wend Inv. Co.,* 672 F.2d 1305, 1311 (9th Cir. 1982); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 146 (3d Cir. 1977); *Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978); *United States* v. *City of Black Jack,* 508 F.2d 1179, 1184–85 (8th Cir. 1974).

[71] *See, e.g.,* H.R. Rep. No. 100–711, at 2182 (1988) (citing courts of appeals decisions in discussing a policy that could have a "discriminatory effect" on minority households ("[b]ecause minority households tend to be larger"); 134 Cong. Rec. 23711–12 (1988) (Statement of Sen. Kennedy) (noting unanimity of courts of appeals as to the disparate impact test); Fair Housing Amendments Act of 1987: Hearings Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary, 100th Cong., 1st Sess. 529–557 (1987) (testimony of Prof. Robert Schwemm, Univ. of Ky. Law Sch.) (discussing "strong consensus" in federal courts of

appeals that the Fair Housing Act prohibited disparate impact discrimination).

[72] *See* H.R. Rep. No. 100–711, at 89–91 (1988) (dissenting views of Rep. Swindall).

[73] *See* Fair Housing Amendments Act of 1988, Pub. L. 100–430, 102 Stat. 1619 (1988).

[74] H.R. Rep. No. 96–865, at 2 (1980) (The Act "effectively proscribed housing practices with the intent or effect of discriminating on account of race, color, national origin, or religion."); 126 Cong. Rec. 31,164 (1980) (explaining that the addition of an intent requirement "would make a radical change in the standard of proof in title VIII cases") (statement of Sen. Bayh).

[75] 127 Cong. Rec. 22,156 (1981).

[76] 129 Cong. Rec. 808 (1983).

[77] S. 139, 99th Cong. § 6(e) (1985).

[78] 133 Cong. Rec. 7178 (1987).

[79] 54 FR 3232, 3235 (Jan. 23, 1989).

[80] Remarks on Signing the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1140, 1141 (Sept. 13, 1988).

[81] *See* Brief for United States as Amicus Curiae, *Town of Huntington* v. *Huntington Branch, NAACP,* 488 U.S. 15 (1988) (No. 97–1961).

[82] *See, e.g.,* nn. 12–27, *supra.*

[83] *See, e.g., United States* v. *Mead Corp.,* 533 U.S. 218, 230 & n.12 (2001) (*Chevron* deference is warranted for formal adjudications).

[84] *See United States.* v. *City of Black Jack,* 508 F.2d 1179, 1184–86 (8th Cir. 1974); *see also* Brief for the United States as Amicus Curiae, *Magner* v. *Gallagher,* 132 S. Ct. 1306 (2012) (No. 10–1032).

persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.''

Commenters raised a number of issues with respect to the definition of ''discriminatory effect.''

*Issue:* Two commenters requested that HUD expand the definition of ''housing practice'' to include the language from the preamble to the proposed rule that provided examples of facially neutral actions that may result in a discriminatory effect, ''e.g. laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria,'' to make clear that the Act does not apply only to housing ''practices.''

*HUD Response:* The Act and HUD regulations define ''discriminatory housing practice'' broadly as ''an act that is unlawful under section 804, 805, 806, or 818.''[85] As HUD explained in the preamble to the proposed rule, any facially neutral actions, e.g., laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act. Given the breadth of the definition of ''discriminatory housing practice,'' and the examples provided in the preamble to the proposed rule, HUD does not agree that it is necessary to provide those examples in the text of the regulation. The final rule does, however, replace ''housing practice'' with ''practice'' in order to make clear it applies to the full range of actions that may violate the Fair Housing Act under an effects theory.

*Issue:* A commenter stated that, in light of the Supreme Court's decision in *Wal-Mart Stores, Inc.* v. *Dukes,*[86] HUD should ''remove those aspects of the proposed rule that would give rise to disparate impact liability based on the exercise of discretion.''

*HUD Response:* HUD does not agree that the Supreme Court's decision in *Wal-Mart* means that policies permitting discretion may not give rise to discriminatory effects liability under the Fair Housing Act. The opinion in *Wal-Mart* did not address the substantive standards under the Fair Housing Act but instead addressed the issue of class certification under Title VII. Moreover, even in that context, the opinion in *Wal-Mart* does not shield policies that allow for discretion from liability under Title

VII. On the contrary, the Supreme Court confirmed that an employer who permits his managers to exercise discretion may be liable under Title VII pursuant to a disparate impact theory, ''since an employer's undisciplined system of subjective decision-making can have precisely the same effects as a system pervaded by impermissible intentional discrimination.''[87]

*Issue:* Some commenters asked HUD to remove the word ''predictably'' from the proposed definition. One commenter made this request out of concern that such a definition would make good faith compliance with the Act difficult, and another because claims based on a predictable impact are too speculative. Another commenter expressed support for the inclusion of ''predictably'' in the definition because discrimination cases often involve members of a protected class who predictably would be impacted by the challenged practice. As an example, the commenter stated that a challenge to a zoning or land use ordinance might focus on persons who would be excluded from residency by application of the ordinance.

*HUD Response:* HUD agrees with the latter commenter that the Act is best interpreted as prohibiting actions that predictably result in an unjustified discriminatory effect. HUD's interpretation is supported by the plain language of the Fair Housing Act, which defines ''aggrieved person'' as any person who ''believes that such person will be injured by a discriminatory housing practice that is about to occur,''[88] and which specifically authorizes HUD to take enforcement action and ALJs and courts to order relief with respect to discrimination that ''is about to occur.''[89] Moreover, courts interpreting the Fair Housing Act have agreed that predictable discriminatory effects may violate the Act.[90]

*Issue:* A commenter requested that the preamble or the text of the final rule make clear that reasonable data, such as data from the U.S. Census Bureau, data required by the Home Mortgage Disclosure Act (HMDA), and HUD data

on the occupancy of subsidized housing units, can be used to demonstrate that a practice predictably results in a discriminatory effect.

*HUD Response:* The purpose of the rule, as identified in the November 16, 2011, proposed rule, is to formalize a long-recognized legal interpretation and establish a uniform legal standard, rather than to describe how data and statistics may be used in the application of the standard. The appropriate use of such data is discussed in other federal sources, including the Joint Policy Statement.

*Issue:* Several commenters expressed concern that the proposed rule did not explain the degree to which a practice must disproportionately impact one group over another. A few commenters expressed the opinion that, in order for a practice to violate the Act, the practice must result in a significant or non-trivial discriminatory effect. A commenter wrote that members of a protected class must be impacted in a manner that is ''meaningfully different'' from any impact on other individuals. Another commenter suggested defining a disparate impact as a 20 percent difference between the relevant groups. Another stated that the impact should be ''qualitatively different.'' A commenter wrote that, in the lending context, a disparate impact should not exist where statistics only show that a protected class, on an aggregate basis, has not received as many loans as the general population. Another commenter stated concern that the rule would allow small statistical differences in the pricing of loans to be actionable.

*HUD Response:* As stated in the response to the preceding issue, this rule concerns the formalization of a long-recognized legal interpretation and burden-shifting framework, rather than a codification of how data and statistics may be used in the application of the standard. To establish a prima facie case of discriminatory effects liability under the rule, the charging party or plaintiff must show that members of a protected class are disproportionately burdened by the challenged action, or that the practice has a segregative effect. Whether a particular practice results in a discriminatory effect is a fact-specific inquiry. Given the numerous and varied practices and wide variety of private and governmental entities covered by the Act, it would be impossible to specify in the rule the showing that would be required to demonstrate a discriminatory effect in each of these contexts. HUD's decision not to codify a significance requirement for pleading purposes is consistent with the Joint

---

[85] 42 U.S.C. 3602(f); 24 CFR 100.20.
[86] 131 S. Ct. 2541 (2011).

[87] Id. at 2554 (internal brackets and quotation omitted).
[88] 42 U.S.C. 3602(i).
[89] *See* 42 U.S.C. 3610(g)(2)(A); 3612(g)(3); 3613(c)(1); 3614(d)(1)(A).
[90] *See, e.g., Pfaff v. HUD,* 88 F.3d at 745 (''‘Discriminatory effect' describes conduct that actually or predictably resulted in discrimination.''); *United States.* v. *City of Black Jack,* 508 F.2d at 1184 (''To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect.'').

**Federal Register** / Vol. 78, No. 32 / Friday, February 15, 2013 / Rules and Regulations  **11469**

Policy Statement,[91] the statutory codification of the disparate impact standard under Title VII,[92] and the Consumer Financial Protection Bureau's interpretation of the disparate impact standard under ECOA.[93]

*Issue:* Two commenters stated that, in order to establish a prima facie case of discriminatory effect liability, a charging party or plaintiff should have to identify a specific practice and show that the alleged discriminatory effect is caused by that specific practice, with a commenter referring to *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989), in support of this position.

*HUD Response:* HUD addressed this issue at the proposed rule stage, and its analysis is not changed in this final rule. Under this rule, the charging party or plaintiff has the burden of proving that a challenged practice causes a discriminatory effect.[94] In HUD's experience, identifying the specific practice that caused the alleged discriminatory effect will depend on the facts of a particular situation and therefore must be determined on a case-by-case basis. Moreover, as recognized in the employment context under Title VII, the elements of a decision-making process may not be capable of separation for analysis,[95] in which case it may be appropriate to challenge the decision-making process as a whole. For example, in a reverse redlining case, there may be multiple acts or policies which together result in a discriminatory effect.[96]

*Issue:* Commenters expressed concern with the definition of "discriminatory effect" because it included a practice that has "the effect of creating, perpetuating, or increasing segregated housing patterns" based on protected class. A commenter asked that "segregation" be removed from the proposed definition. Another commenter expressed concern that this portion of the definition would extend liability beyond the factual circumstances of the cases HUD cited as examples in the proposed rule's preamble because, according to the commenter, most of those cases raised at least a suggestion of intentional discrimination. A commenter stated that "perpetuating" should be more clearly defined so that the rule states, for example, whether the term requires an attempt to segregate further, or merely a practice that continues existing patterns of segregation. Another commenter expressed the related opinion that "not explicitly fostering integration" should never form the basis for liability under the Act.

*HUD Response:* As discussed in the preambles to both the proposed rule and this final rule, the elimination of segregation is central to why the Fair Housing Act was enacted.[97] HUD therefore declines to remove from the rule's definition of "discriminatory effects" "creating, perpetuating, or increasing segregated housing patterns."[98] The Fair Housing Act was enacted to replace segregated neighborhoods with "truly integrated and balanced living patterns."[99] It was structured to address discriminatory housing practices that affect "the whole community" as well as particular segments of the community,[100] with the goal of advancing equal opportunity in housing and also to "achieve racial integration for the benefit of all people in the United States."[101] Accordingly, the Act prohibits two kinds of unjustified discriminatory effects: (1) harm to a particular group of persons by a disparate impact; and (2) harm to the community generally by creating, increasing, reinforcing, or perpetuating segregated housing patterns.[102] Recognizing liability for actions that impermissibly create, increase, reinforce, or perpetuate segregated housing patterns directly addresses the purpose of the Act to replace segregated neighborhoods with "truly integrated and balanced living patterns." For example, the perpetuation of segregation theory of liability has been utilized by private developers and others to challenge practices that frustrated affordable housing development in nearly all-white communities and thus has aided attempts to promote integration.[103]

Moreover, every federal court of appeals to have addressed the issue has agreed with HUD's interpretation that the Act prohibits practices with the unjustified effect of perpetuating segregation.[104] In one such case, for example, the court of appeals held that a zoning ordinance that prevents the construction of multifamily housing in areas that are primarily white may violate the Act by "reinforcing racial

[91] *See* Joint Policy Statement, 59 FR 18,266, 18,269 (Apr. 15, 1994) (defining "disparate impact" as "a disproportionate adverse impact" on applicants from a protected group).

[92] *See* 42 U.S.C. 2000e-2(k)(1)(A)(i) (complaining party must demonstrate "that a respondent uses a particular employment practice that causes a disparate impact").

[93] *See* 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)-2 (discriminatory effect may exist when a creditor practice "has a disproportionately negative impact on a prohibited basis").

[94] *See* 24 CFR 100.500(c); *see also* 76 FR 70925.

[95] *See* 42 U.S.C. 2000e–2(k)(1)(B)(i) ("[T]he complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice").

[96] *See, e.g., Hargraves* v. *Capital City Mortg. Corp,* 140 F. Supp. 2d 7, 20–22 (D.D.C. 2000) (finding that "predatory lending" in African American neighborhoods, which included exorbitant interest rates, lending based on the value of the asset rather than a borrower's ability to repay, profiting by acquiring the property through default, repeated foreclosures, and loan servicing procedures with excessive fees, could disparately impact African Americans).

[97] *See* nn. 6–7, 65–69 and accompanying text, *supra;* 76 FR 70922.

[98] As discussed in the "Definition of Discriminatory Effect" section, the final rule amends the definition of "discriminatory effect" to make it more concise and more consistent with terminology used in case law, but its substance is unchanged.

[99] *Trafficante,* 409 U.S. at 211 (citing 114 Cong. Rec. 3422 (Feb. 20, 1968) (statement of Senator Mondale)).

[100] *Trafficante,* 409 U.S. at 211 (citing 114 Cong. Rec. 2706 (1968) (Statement of Senator Javits)).

[101] H.R. Res. 1095, 110th Cong., 154 Cong. Rec. H2280–01 (April 15, 2008).

[102] *See, e.g., Graoch,* 508 F.3d at 378 (there are "two types of discriminatory effects which a facially neutral housing decision can have: The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups."); *Huntington Branch,* 844 F.2d at 937 ("the discriminatory effect of a rule arises in two contexts: adverse impact on a particular minority group and harm to the community generally by the perpetuation of segregation * * * recognizing this second form of effect advances the principal purpose of Title VIII to promote, open, integrated residential housing patterns.") (internal citations and quotation marks omitted); *Metro. Housing Dev. Corp.* v. *Village of Arlington Heights,* 558 F.2d at 1290 ("There are two kinds of racially discriminatory effects which a facially neutral decision about housing can produce. The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.") (internal citations omitted); *Hallmark Developers, Inc.* v. *Fulton County,* 386 F. Supp. 2d 1369, 1383 (N.D. Ga. 2005) ("Of course there are two kinds of racially discriminatory effect which can be produced by a facially neutral decision. If the decision or action perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.") (internal citations omitted).

[103] *See, e.g., Huntington Branch,* 844 F.2d at 937; *Arlington Heights,* 558 F.2d at 1291; *Black Jack,* 508 F.2d at 1184–86; *Summerchase Ltd. Pshp. I, et al.* v. *City of Gonzales, et al.,* 970 F. Supp. 522, 527–28 (M.D. La. 1997); *Dews,* 109 F. Supp. 2d at 567–68.

[104] *See supra* note 28.

segregation in housing.'' [105] For consistency with the terminology used in this case law, the final rule adds the term ''reinforces'' to the definition of ''discriminatory effect.''

In response to the comment regarding the facts of the cases HUD cited as examples in the proposed rule's preamble, HUD notes that those cases [106] are not exhaustive and therefore should not be viewed as the only ways that a violation of the Act may be established based on a discriminatory effects theory. Moreover, even if the facts of a particular case suggest intentional discrimination, in many instances both an intent to discriminate and a discriminatory effect may exist, and a charging party or plaintiff may bring a claim alleging either or both intent and effect as alternative theories of liability. Regardless, as explained throughout this preamble, and in case law, discriminatory intent is not required for a violation of the Act under an effects theory.

## C. Legally Sufficient Justification, § 100.500(b)(1)

In response to comments, this final rule slightly revises the first prong of ''legally sufficient justification,'' as provided in the November 16, 2011, proposed rule, which is required to sustain a practice with a discriminatory effect under the Act.

Proposed § 100.500(b)(1) provided: ''A legally sufficient justification exists where the challenged housing practice: (1) Has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent * * * or defendant.''

Final § 100.500(b)(1) provides: ''A legally sufficient justification exists where the challenged practice: (1) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent * * * or defendant * * * A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative.''

Comments were received with respect to proposed § 100.500(b)(1), some agreeing with the standard as stated; some recommending that § 100.500(b)(1) set either a higher or lower standard of proof for defendants and respondents; and some suggesting that HUD provide definitions for certain terms or use slightly different terms to make the regulatory provision easier to understand and apply.

## 1. Substantial, Legitimate, Nondiscriminatory Interests, § 100.500(b)(1)

*Issue:* Although some commenters supported the use of the phrase ''legitimate, nondiscriminatory interest,'' a commenter asked that the final rule provide a definition of the phrase to ensure that the standard is applied uniformly. Commenters stated that the word ''substantial'' or ''clearly'' should modify the phrase ''nondiscriminatory interests,'' reasoning that justifying discrimination with an interest that may be of little or no importance to the defendant or respondent would run contrary to Congress's goal of providing for fair housing within constitutional limitations.

*HUD Response:* HUD agrees that, in order to effectuate the Fair Housing Act's broad, remedial goal, practices with discriminatory effects cannot be justified based on interests of an insubstantial nature. Accordingly, HUD is making clear in this final rule that any interest justifying a practice with a discriminatory effect must be ''substantial.'' A ''substantial'' interest is a core interest of the organization that has a direct relationship to the function of that organization. The requirement that an entity's interest be substantial is analogous to the Title VII requirement that an employer's interest in an employment practice with a disparate impact be job related.[107] HUD uses the more general standard of substantiality because there is no single objective, such as job-relatedness, against which every practice covered by the Fair Housing Act could be measured. The determination of whether goals, objectives, and activities are of substantial interest to a respondent or defendant such that they can justify actions with a discriminatory effect requires a case-specific, fact-based inquiry.

The word ''legitimate,'' used in its ordinary meaning, is intended to ensure that a justification is genuine and not false,[108] while the word ''nondiscriminatory'' is intended to ensure that the justification for a challenged practice does not itself discriminate based on a protected characteristic. HUD and federal courts interpreting the Fair Housing Act have

been applying these concepts without incident.[109]

*Issue:* Commenters requested that ''legitimate, nondiscriminatory interests'' be replaced or equated with ''business necessity.'' This would, in their view, be consistent with judicial interpretations of the Fair Housing Act, with HUD's regulations governing Fannie Mae and Freddie Mac, and with the Joint Policy Statement. Commenters stated that the Joint Policy Statement is well established and provides a clear, predictable standard to covered entities. Several commenters expressed concern that the proposed standard requiring a ''legitimate'' justification was weaker than, and would be interpreted as requiring less than, the ''business necessity'' standard.

*HUD Response:* In its adjudications under the Fair Housing Act, HUD has required respondents to prove that their challenged practices are justified by business necessity.[110] The other federal regulatory and enforcement agencies involved in the investigation of lending discrimination have taken the same approach.[111] The ''substantial, legitimate, nondiscriminatory interest'' standard found in § 100.500(b)(1) is equivalent to the ''business necessity'' standard found in the Joint Policy Statement. The standard set forth in this rule is not to be interpreted as a more lenient standard than ''business necessity.'' HUD chooses not to use the phrase ''business necessity'' in the rule because the phrase may not be easily understood to cover the full scope of practices covered by the Fair Housing Act, which applies to individuals, businesses, nonprofit organizations, and public entities. Using the phrase ''business necessity'' might confuse litigating parties and the courts as to how the term might apply, for example, to a nonprofit organization that provides housing or housing-related services, or to a branch of state or local government carrying out its functions. The standards in § 100.500 apply equally to individuals, public entities, and for-

---

[105] *Huntington Branch,* 844 F.2d at 937–38.
[106] *See* 76 FR 70925.

[107] *See* 42 U.S.C. 2000e-2(k)(1)(A)(i).
[108] *See, e.g.,* Legitimate Definition, Merriam-Webster's Dictionary, *http://www.merriam-webster.com/dictionary/necessary* (last visited Mar. 15, 2012) (defining ''legitimate'' as ''neither spurious nor false'').

[109] *See, e.g., Darst-Webbe Tenant Ass'n Bd.* v. *St. Louis Hous. Auth.,* 417 F.3d 898, 902 (8th Cir. 2005) (defendant must prove that challenged action is necessary to achieve ''legitimate, non-discriminatory policy objectives''); *Charleston Hous. Auth.* v. *U.S. Dept. of Agric.* 419 F.3d 729 (same).
[110] *See, e.g.,* 1998 Enforcement Handbook at 2–30 (instructing HUD investigators that a respondent's policy must be justified by a ''business necessity''); *HUD* v. *Carlson,* 1995 WL 365009, at *14 (HUD ALJ June 14, 1995) (''The Respondent has the burden to overcome the prima facie case by establishing a business necessity for the policy.''); Joint Policy Statement, 59 FR at 18269 (requiring a challenged policy or practice to be ''justified by 'business necessity' '').
[111] *See* Joint Policy Statement, 59 FR at 18269.

profit and nonprofit private entities because, as discussed below, neither the text of the Act nor its legislative history supports drawing a distinction among them. Accordingly, HUD has chosen terminology that, while equivalent to its previous guidance in the Joint Policy Statement, applies equally to all covered entities and all covered activities.

*Issue:* Some commenters expressed concern that the term "legitimate" allows for subjective review of a proffered justification.

*HUD Response:* HUD and courts have reviewed justifications proffered by covered entities for many years. While the review is very fact intensive, it is not subjective. Whether an interest is "legitimate" is judged on the basis of objective facts establishing that the proffered justification is genuine, and not fabricated or pretextual.[112] HUD and courts have engaged in this inquiry for decades without encountering issues related to the subjectivity of the inquiry. HUD therefore believes that concerns about subjective reviews of proffered justifications are not warranted.

*Issue:* A commenter requested that the final rule expressly state that increasing profits, minimizing costs, and increasing market share qualify as legitimate, nondiscriminatory interests. Similarly, another commenter asked that the final rule codify examples of tenant screening criteria such as rental history, credit checks, income verification, and court records that would be presumed to qualify as legally sufficient justifications.

*HUD Response:* HUD is not adopting these suggestions because the Fair Housing Act covers many different types of entities and practices, and a determination of what qualifies as a substantial, legitimate, nondiscriminatory interest for a given entity is fact-specific and must be determined on a case-by-case basis. Accordingly, the final rule does not provide examples of interests that would always qualify as substantial, legitimate, nondiscriminatory interests for every respondent or defendant in any context.

2. Relationship Between Challenged Practice and Asserted Interest, § 100.500(b)(1)

*Issue:* Several commenters expressed concern with HUD's use of the term "manifest" in the proposed requirement that the challenged practice have a "necessary and manifest relationship" to one or more legitimate, nondiscriminatory interests of the respondent or defendant. Commenters

expressed uncertainty about what the term was intended to mean and how it would be interpreted by HUD or by federal courts. Two commenters expressed concern that the term "manifest" may involve a subjective evaluation and others did not understand the evidentiary concept embodied in the term. A commenter urged HUD to make clear in the language of the final rule, in addition to the preamble, that a justification may not be hypothetical or speculative.

*HUD Response:* In the proposed rule, the term "manifest" was used to convey defendants' and respondents' obligation to provide evidence of the actual need for the challenged practices, instead of relying on speculation, hypothesis, generalization, stereotype, or fear. HUD recognizes that some commenters were confused by the term "manifest." In response to these concerns, HUD is replacing the term "manifest" in the final rule with the requirement, added in § 100.500(b)(2), that "a legally sufficient justification must be supported by evidence and may not be hypothetical or speculative." This language is intended to convey that defendants and respondents, relying on a defense under § 100.500(b)(1), must be able to prove with evidence the substantial, legitimate, nondiscriminatory interest supporting the challenged practice and the necessity of the challenged practice to achieve that interest. This language is consistent with HUD's longstanding application of effects liability under the Fair Housing Act, is easy to understand, can be uniformly applied by federal and state courts and administrative agencies, and is unlikely to cause confusion or unnecessary litigation about its meaning. HUD notes that this language is also consistent with the application of the standard by other federal regulatory and enforcement agencies under both the Fair Housing Act and ECOA,[113] with the approach taken under Title VII,[114] and with the approach taken by a number of federal courts interpreting the Fair Housing Act.[115]

[113] *See* Joint Policy Statement, 59 FR at 18269 ("The justification must be manifest and may not be hypothetical or speculative.")

[114] *See* 42 U.S.C. 2000e–2(k)(1)(A)(i) (the respondent must "*demonstrate* that the challenged practice is job related for the position in question and consistent with business necessity") (emphasis added).

[115] *See, e.g., Charleston Hous. Auth.* v. *U.S. Dep't of Agric.,* 419 F.3d 729, 741 (8th Cir. 2005) (the challenged housing practice must have a "manifest relationship" to the defendant's objectives); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d at 149 ("a justification must serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant") (emphasis added); *Huntington Branch,*

*Issue:* A commenter suggested that the phrase "necessary and manifest" should be defined.

*HUD Response:* As discussed above, HUD has removed the word "manifest" in the final rule in order to avoid any potential confusion. Thus, § 100.500(b)(1) is slightly revised at this final rule stage to state that a respondent or defendant seeking to defend a challenged practice with a discriminatory effect must prove that the practice "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" of the respondent or defendant. In the proposed rule, as well as in this final rule, HUD uses "necessary" in its ordinary, most commonly used sense.

*Issue:* Some commenters suggested that HUD remove the word "necessary" to make the standard found in § 100.500(b)(1) consistent with the Title VII standard set out in the Supreme Court's opinion in *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989). Commenters suggested various standards without the word "necessary," including requiring that the challenged practice have "a legitimate business purpose," that the challenged practice have "a legitimate nondiscriminatory purpose," or that the challenged practice be "rationally related to a legitimate, nondiscriminatory goal."

*HUD Response:* HUD declines to adopt the commenters' suggestion to remove "necessary" from the rule. HUD's substantial experience in administering the Fair Housing Act confirms that requiring a challenged practice with a discriminatory effect to be necessary best effectuates the broad, remedial goal of the Act. Indeed, in 1994 HUD and ten other federal agencies notified lenders of the requirement to justify the discriminatory effect of a challenged lending practice under the Fair Housing Act and ECOA by showing that the practice is necessary to their business.[116] Moreover, in 1997, HUD

*NAACP* v. *Town of Huntington,* 844 F.2d at 938, aff'd, 488 U.S. 15 (1988) (per curiam) (same).

[116] *See* Joint Policy Statement, 59 FR 18,269 (the second step of a disparate impact analysis under the Fair Housing Act and ECOA is to "determine whether the policy or practice is justified by 'business necessity.' ") *id.* (giving an example of a policy that may violate the Fair Housing Act and ECOA since "the lender is unlikely to be able to show that the policy is compelled by business necessity"); *see also* Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation, Federal Reserve Board, Office of Thrift Supervision, National Credit Union Administration, The Interagency Fair Lending Examination Procedures app. at 28, August 2009, available at *http://www.ffiec.gov/pdf/fairappx.pdf.*

[112] *See* note 109, *supra.*

promulgated a regulation recognizing that section 805 of the Act [117] does not prevent consideration, in the purchasing of loans, of factors that are necessary to a business.[118] In addition, in 1988 the House Committee on the Judiciary, in advancing a bill amending the Fair Housing Act, recognized that liability should not attach when a justification is necessary to the covered entity's business.[119] HUD's view is also consistent with Congress's 1991 enactment of legislation codifying that, in the employment context, a practice that has a disparate impact must be consistent with "business necessity" and must also be "job related." [120] HUD also notes that a similar necessity requirement is found in ECOA, which requires that a challenged practice "meets a legitimate business need." [121] HUD's final rule therefore uses language that is consistent with its longstanding interpretation of the Fair Housing Act, comparable to the protections afforded under Title VII and ECOA, and fairly balances the interests of all parties.

*Issue:* A commenter expressed concern that requiring a "necessary" relationship may interfere with loss mitigation efforts, including those under the Home Affordable Modification Program (HAMP) and Home Affordable Refinance Program (HARP)—federal programs that encourage mortgage servicers to offer modifications of loans or refinances—because such efforts are voluntary and participation in them may not be perceived as "necessary."

*HUD Response:* Since at least the date of issuance of the Joint Policy Statement in 1994, lenders have been on notice that they must prove the necessity of a challenged practice to their business under both the Fair Housing Act and ECOA. This requirement has not prevented lenders or servicers from engaging in effective loss mitigation efforts. The mere fact that a policy is voluntarily adopted does not preclude it from being necessary to achieve a substantial, legitimate, nondiscriminatory interest. By formalizing the process of proving

business necessity in a rule that clearly allocates the burdens of proof among the parties, HUD is not changing substantive law, but merely clarifying the contours of an available defense so that lenders may rely upon it with greater clarity as to how it applies.

*Issue:* A commenter expressed the concern that requiring a respondent or defendant to prove necessity would subject the respondent or defendant to unnecessary and possibly frivolous investigations and litigation. Another commenter took the opposite position, stating that the rule would not create excessive litigation exposure for respondents or defendants because numerous procedural mechanisms exist to dispose of meritless cases. A commenter stated that, at the second stage of the burden-shifting analysis, a defendant should have the opportunity to demonstrate not only a legally sufficient justification, but also that the charging party or plaintiff did not satisfy its prima facie case because the challenged practice did not result in a discriminatory effect.

*HUD Response:* Given how the discriminatory effects framework has been applied to date by HUD and the courts, HUD does not believe that the rule will lead to frivolous investigations or create excessive litigation exposure for respondents or defendants. As discussed above, since at least 1994, when the Joint Policy Statement was issued, lenders have known that they must prove the necessity of a challenged practice to their business. Moreover, HUD believes that promulgation of this rule—with its clear allocation of burdens and clarification of the showings each party must make—has the potential to decrease or simplify this type of litigation. For example, with a clear, uniform standard, covered entities can conduct consistent self-testing and compliance reviews, document their substantial, legitimate nondiscriminatory interests, and resolve potential issues so as to prevent future litigation. A uniform standard is also a benefit to entities operating in multiple jurisdictions. To the extent that the rule results in more plaintiffs being aware of potential effects liability under the Fair Housing Act, it should have the same impact on covered entities, resulting in greater awareness and compliance with the Fair Housing Act. Additionally, as a commenter noted, the Federal Rules of Civil Procedure provide various means to dispose of meritless claims, including Rules 11, 12, and 56. Moreover, a respondent or defendant may avoid liability by rebutting the charging party's or plaintiff's proof of

discriminatory effect.[122] If the fact-finder decides that the charging party or plaintiff has not proven that the challenged practice resulted in a discriminatory effect, liability will not attach.

*Issue:* A commenter expressed concern that, under the proposed rule, a legally sufficient justification under § 100.500(b)(1) may not be hypothetical or speculative but a discriminatory effect under § 100.500(a) may be, creating an imbalance in the burden of proof in favor of the charging party or plaintiff.

*HUD Response:* This comment indicates a misunderstanding of what § 100.500 requires. Requiring the respondent or defendant to introduce evidence (instead of speculation) proving that a challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests in order to benefit from the defense to liability is not different in kind from requiring the charging party or plaintiff to introduce evidence (not speculation) proving that a challenged practice caused or will predictably cause a discriminatory effect. As discussed in this preamble, the language of the Act makes clear that it is intended to address discrimination that has occurred or is about to occur, and not hypothetical or speculative discrimination.

### D. Less Discriminatory Alternative, § 100.500(b)(2)

Some comments were received with respect to § 100.500(b)(2) of the proposed rule. With that provision, HUD proposed that a practice with a discriminatory effect may be justified only if the respondent's or defendant's interests cannot be served by another practice with a less discriminatory effect. In response to these comments, the final rule makes one slight revision to the proposed provision by substituting "could not be served" for "cannot be served."

*Issue:* A commenter requested that HUD replace "cannot be served" with "would not be served" because, under the Supreme Court's analysis in *Wards Cove,* a plaintiff cannot prevail by showing that a less discriminatory alternative could in theory serve the defendant's business interest. This commenter also stated that, in order for liability to attach, a less discriminatory alternative must have been known to and rejected by the respondent or

[117] 42 U.S.C. 3605.

[118] *See* 24 CFR 100.125(c); *cf. Darst-Webbe Tenant Ass'n Bd.* v. *St. Louis Hous. Auth.,* 417 F.3d, at 902 (the challenged practice must be "necessary to the attainment of" the defendants' objectives) (internal citation omitted); *see also Affordable Hous. Dev. Corp.* v. *City of Fresno,* 433 F.3d 1182, 1195 (9th Cir. 2006) (describing the Eighth Circuit's approach as "sound").

[119] H.R. Rep. No. 100–711, at 2191 (1988) ("The Committee does not intend that those purchasing mortgage loans be precluded from taking into consideration factors justified by business necessity.").

[120] *See* 42 U.S.C. 2000e–2(k)(1)(A).

[121] 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)(2).

[122] *See, e.g., Dothard* v. *Rawlinson,* 433 U.S. 321, 331 (1977) (Title VII case explaining that a defendant is "free to adduce countervailing evidence of his own" in order to discredit a plaintiff's evidence of disparate impact).

defendant. Other commenters stated that, in order for liability to attach, the alternative practice must be equally effective as the challenged practice, or at least as effective as the challenged practice, with some of these commenters pointing to *Wards Cove* in support of this position. A number of other commenters, on the other hand, cited to Fair Housing Act case law for the proposition that liability should attach unless the less discriminatory alternative would impose an undue hardship on the respondent or defendant under the circumstances of the particular case.

*HUD Response:* HUD agrees that a less discriminatory alternative must serve the respondent's or defendant's substantial, legitimate nondiscriminatory interests, must be supported by evidence, and may not be hypothetical or speculative. For greater consistency with the terminology used in HUD's (and other federal regulatory agencies') previous guidance in the Joint Policy Statement,[123] the final rule replaces "cannot be served" with "could not be served." A corresponding change of "can" to "could" is also made in § 100.500(c)(3) of the final rule. HUD does not believe the rule's language needs to be further revised to state that the less discriminatory alternative must be "equally effective," or "at least as effective," in serving the respondent's or defendant's interests; the current language already states that the less discriminatory alternative must serve the respondent's or defendant's interests, and the current language is consistent with the Joint Policy Statement, with Congress's codification of the disparate impact standard in the employment context,[124] and with judicial interpretations of the Fair Housing Act.[125] The additional modifier

"equally effective," borrowed from the superseded *Wards Cove* case, is even less appropriate in the housing context than in the employment area in light of the wider range and variety of practices covered by the Act that are not readily quantifiable. For a similar reason, HUD does not adopt the suggestion that the less discriminatory alternative proffered by the charging party or plaintiff must be accepted unless it creates an "undue hardship" on the respondent or defendant. The "undue hardship" standard, which is borrowed from the reasonable accommodation doctrine in disability law, would place too heavy a burden on the respondent or defendant.

In addition, HUD does not agree with the commenter who stated that *Wards Cove* requires the charging party or plaintiff to show that, prior to litigation, a respondent or defendant knew of and rejected a less discriminatory alternative,[126] or that *Wards Cove* even governs Fair Housing Act claims. HUD believes that adopting this requirement in the housing context would be unjustified because it would create an incentive not to consider possible ways to produce a less discriminatory result. Encouraging covered entities not to consider alternatives would be inconsistent with Congress's goal of providing for fair housing throughout the country.

*Issue:* Two commenters expressed concern that, under the proposed rule's language, the discriminatory effect of an alternative would be considered but a lender's concerns such as credit risk would be irrelevant.

*HUD Response:* HUD believes these commenters' concerns will not be realized in practice because a less discriminatory alternative need not be adopted unless it could serve the substantial, legitimate, nondiscriminatory interest at issue. The final rule specifically provides that the interests supporting a challenged practice are relevant to the consideration of whether a less discriminatory alternative exists. As stated in § 100.500(c)(3), the charging party or plaintiff must show that the less discriminatory alternative could serve the "interests supporting the challenged practice." Thus, if the lender's interest in imposing the challenged practice relates to credit risk, the alternative would also need to effectively address the lender's concerns about credit risk.

*E. Allocations of Burdens of Proof in § 100.500(c)*

In the proposed rule, HUD set forth a burden-shifting framework in which the plaintiff or charging party would bear the burden of proving a prima facie case of discriminatory effect, the defendant or respondent would bear the burden of proving a legitimate, nondiscriminatory interest for the challenged practice, and the plaintiff or charging party would bear the burden of proving that a less discriminatory alternative exists.

*Issue:* Some commenters stated that the plaintiff or charging party should bear the burden of proof at all stages of the proceedings, either citing *Wards Cove* in support of this position or reasoning that, in our legal system, the plaintiff normally carries the burden of proving each element of his claim. Other commenters asked HUD to modify § 100.500(c)(3) in order to place the burden of proving no less discriminatory alternative on the defendant or respondent. Those recommending that the burden allocation be modified in this way reasoned that the respondent or defendant is in a better position to bear this burden because of greater knowledge of, and access to, information concerning the respondent's or defendant's interests and whether a less discriminatory alternative could serve them. Several commenters stated that this is particularly true in the context of government decisions, as complainants and plaintiffs will generally be outside the political decision-making process, and in the context of insurance and lending decisions, where proprietary information and formulas used in the decision making process may be vigorously protected.

Commenters stated that complainants and plaintiffs may not have the capacity to evaluate possible less discriminatory alternatives. Some commenters also pointed out that assigning this burden to the respondent or defendant may avoid intrusive and expensive discovery into a respondent's or defendant's decision-making process, and would incentivize entities subject to the Act to consider less discriminatory options when making decisions. Commenters also stated that courts have placed this burden of proof on the defendant, others have placed it on the party for whom proof is easiest, and reliance on Title VII is inappropriate because of the unique nature of less discriminatory alternatives in Fair Housing Act cases.

*HUD Response:* HUD believes that the burden of proof allocation in § 100.500(c) is the fairest and most

---

[123] *See* Joint Policy Statement, 59 FR at 18269 ("Even if a policy or practice that has a disparate impact on a prohibited basis can be justified by business necessity, it still may be found to be discriminatory if an alternative policy or practice could serve the same purpose with less discriminatory effect.")

[124] *See* 42 U.S.C. 2000e–2(k)(1)(A)(i) ("the concept of 'alternative employment practice'" under Title VII "shall be in accordance with the law as it existed on June 4, 1989"); *Albemarle Paper Co.* v. *Moody*, 422 U.S. 405, 425 (1975) ("[I]t remains open to the complaining party to show that other tests or selection devises, without a similarly undesirable racial effect, would also serve the employer's legitimate interest.").

[125] *See, e.g., Darst-Webbe*, 417 F.3d at 906 ("plaintiffs must offer a viable alternative that satisfies the Housing Authority's legitimate policy objectives while reducing the [challenged practice's] discriminatory impact"); *Huntington*, 844 F.2d at 939 (analyzing whether the "[t]own's goal * * * can be achieved by less discriminatory means"); *Rizzo*, 564 F.2d at 159 (it must be analyzed whether an alternative "could be adopted

that would enable [the defendant's] interest to be served with less discriminatory impact.").

[126] *See Wards Cove Packing Co., Inc.* v. *Atonio*, 490 U.S. 642, 660–61 (1989).

**11474** **Federal Register** / Vol. 78, No. 32 / Friday, February 15, 2013 / Rules and Regulations

reasonable approach to resolving the claims. As the proposed rule stated, this framework makes the most sense because it does not require either party to prove a negative. Moreover, this approach will ensure consistency in applying the discriminatory effects standard while creating the least disruption because, as discussed earlier in this preamble, HUD and most courts utilize a burden-shifting framework,[127] and most federal courts using a burden-shifting framework allocate the burdens of proof in this way.[128] In addition, HUD notes that this burden-shifting scheme is consistent with the Title VII discriminatory effects standard codified by Congress in 1991.[129] It is also consistent with the discriminatory effects standard under ECOA,[130] which borrows from Title VII's burden-shifting framework.[131] There is significant overlap in coverage between ECOA, which prohibits discrimination in credit, and the Fair Housing Act, which prohibits discrimination in residential real estate-related transactions.[132] Thus, under the rule's framework, in litigation involving claims brought under both the Fair Housing Act and ECOA, the parties and the court will not face the burden of applying inconsistent methods of proof to factually indistinguishable claims. Having the same allocation of burdens under the Fair Housing Act and ECOA will also provide for less

confusion and more consistent decision making by the fact finder in jury trials.

With respect to expressed concerns about the ability of plaintiffs and complainants to demonstrate a less discriminatory alternative, plaintiffs in litigation in federal courts may rely on Rule 26(b)(1) of the Federal Rules of Civil Procedure for the discovery of information "that is relevant to any party's claim or defense,"[133] and parties in an administrative proceeding may rely on Rule 26(b)(1) and a similar provision in HUD's regulations.[134] The application of those standards would plainly provide for the discovery of information regarding the alternatives that exist to achieve an asserted interest, the extent to which such alternatives were considered, the reasons why such alternatives were rejected, and the data that a plaintiff or plaintiff's expert could use to show that the defendant did not select the least discriminatory alternative. An appropriately tailored protective order can be issued by the court to provide access to proprietary information in the context of cases involving confidential business information, such as those involving insurance or lending, while providing to respondents and defendants adequate protection from disclosure of this information. Moreover, as noted above, in administrative adjudications, it is the charging party, not non-intervening complainants, who bear this burden of proof.

*F. Application of Discriminatory Effects Liability*

Comments were received with respect to how the discriminatory effects standard would be applied and how it might impact covered entities. These comments expressed varying concerns, including the retroactivity of the rule, its application to the insurance and lending industries, and its impact on developing affordable housing.

*Issue:* A commenter stated that each of the cases listed in the proposed rule as examples of practices with a segregative effect involved a government actor, while another commenter asked HUD to clarify whether liability may attach to private parties.

*HUD Response:* Liability for a practice that has an unjustified discriminatory effect may attach to either public or private parties according to the standards in § 100.500, because there is nothing in the text of the Act or its legislative history to indicate that

Congress intended to distinguish the manner in which the Act applies to public versus private entities.[135]

*Issue:* A commenter expressed the opinion that the Fair Housing Act does not grant HUD the power to promulgate retroactive rules, and therefore HUD should make clear that the final rule applies prospectively only.

*HUD Response:* This final rule embodying HUD's and the federal courts' longstanding interpretation of the Act to include a discriminatory effects standard will apply to pending and future cases. HUD has long recognized, as have the courts, that the Act supports an effects theory of liability. This rule is not a change in HUD's position but rather a formal interpretation of the Act that clarifies the appropriate standards for proving a violation under an effects theory. As such, it "is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand."[136]

*Issue:* A commenter stated that the most appropriate remedy for a violation of the Act under an effects theory is declaratory or injunctive relief. This commenter expressed the opinion that the use of penalties or punitive damages generally does not serve the underlying purpose of the Fair Housing Act to remedy housing discrimination.

*HUD Response:* HUD disagrees with the commenter. The Fair Housing Act specifically provides for the award of damages—both actual and punitive—and penalties.[137]

*Issue:* Commenters from the insurance industry expressed a number of concerns about the application of the proposed rule to insurance practices. Some commenters stated that application of the disparate impact standard would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act (15 U.S.C. 1011–1015) or the common law "filed rate doctrine." Some commenters stated that HUD's use of *Ojo* v. *Farmers Group, Inc.,* 600 F.3d 1205 (9th Cir. 2010), in the preamble of the proposed rule was not appropriate.

---

[127] *See supra* notes 29–33.

[128] *See supra* notes 34, 35.

[129] *See* 42 U.S.C. 2000e–2(k).

[130] ECOA prohibits discrimination in credit on the basis of race and other enumerated criteria. *See* 15 U.S.C. 1691.

[131] *See* S. Rep. No. 94–589, at 4–5 (1976) ("[J]udicial constructions of antidiscrimination legislation in the employment field, in cases such as *Griggs* v. *Duke Power Company,* 401 U.S. 424 (1971), and *Albemarle Paper Co.* v. *Mood,* [422 U.S. 405 (1975)], are intended to serve as guides in the application of [ECOA], especially with respect to the allocations of burdens of proof."); 12 CFR 1002.6(a) ("The legislative history of [ECOA] indicates that the Congress intended an 'effects test' concept, as outlined in the employment field by the Supreme Court in the cases of *Griggs* v. *Duke Power Co.,* 401 U.S. 424 (1971) and *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness."); 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)–2 ("Effects test. The effects test is a judicial doctrine that was developed in a series of employment cases decided by the Supreme Court under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e *et seq.*), and the burdens of proof for such employment cases were codified by Congress in the Civil Rights Act of 1991 (42 U.S.C. 2000e–2).").

[132] *See* Joint Policy Statement, 59 FR 18266. Indeed, the Joint Policy Statement analyzed the standard for proving disparate impact discrimination in lending under the Fair Housing Act and under ECOA without any differentiation. *See* 59 FR 18269.

[133] Fed. R. Civ. P. 26(b)(1).

[134] *See* 24 CFR 180.500(b) ("parties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the proceeding").

[135] *See* 42 U.S.C. 3602(f) (defining "discriminatory housing practice" as "an act that is unlawful under section 804, 805, 806, or 818," none of which distinguish between public and private entities); *see also* Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am., 208 F. Supp. 2d 46, 59–60 & n.7 (D.D.C. 2002) (applying the same impact analysis to a private entity as to public entities, and noting that a "distinction between governmental and non-governmental bodies finds no support in the language of the [Act] or in [its] legislative history").

[136] *Pope* v. *Shalala,* 998 F.2d 473, 483 (7th Cir. 1993) (quoting *Manhattan General Equip. Co.* v. *Comm'r,* 297 U.S. 129, 135 (1936)).

[137] *See* 42 U.S.C. 3612–14.

*HUD Response:* HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance,[138] and courts have agreed with HUD, including in *Ojo* v. *Farmers Group.*[139] Moreover, as discussed above, HUD has consistently interpreted the Act to permit violations to be established by proof of discriminatory effect. By formalizing the discriminatory effects standard, the rule will not, as one commenter suggested, "undermine the states' regulation of insurance." The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance * * * unless such Act specifically relates to the business of insurance." McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act. How the Act should be construed in light of McCarran-Ferguson depends on the facts at issue and the language of the relevant State law "relat[ing] to the business of insurance." Because this final rule does not alter the instruction of McCarran-Ferguson or its application as described in *Ojo* v. *Farmers Group,* it will not interfere with any State regulation of the insurance industry.

*Issue:* Some commenters stated that liability for insurance practices based on a disparate impact standard of proof is inappropriate because insurance is risk-based and often based on a multivariate analysis. A commenter wrote that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk," or might be forced to violate state laws that require insurance rates to be actuarially sound estimates of the expected value of all future costs associated with an individual risk transfer.

*HUD Response:* HUD believes that these concerns are misplaced. First, they presume that once a discriminatory effect is shown, the policy at issue is *per se* illegal. This is incorrect. Rather, as § 100.500 makes clear, the respondent or defendant has a full opportunity to defend the business justifications for its policies. This "burden-shifting framework" distinguishes "unnecessary barriers proscribed by the [Act] from valid policies and practices crafted to advance legitimate interests." [140] Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification.

*Issue:* Some commenters asked HUD to exempt insurance pricing from the rule, exempt Fair Access to Insurance Requirements ("FAIR") plans, or establish safe harbors for certain risk-related factors.

*HUD Response:* Creating exemptions or safe harbors related to insurance is unnecessary because, as discussed above, insurance practices with a legally sufficient justification will not violate the Act. Moreover, creating exemptions beyond those found in the Act would run contrary to Congressional intent.[141]

*Issue:* Another commenter stated that the "burden of proof issues" are difficult for insurers because they do not collect data on race and ethnicity and state insurance laws may prohibit the collection of such data.

*HUD Response:* The burden of proof is not more difficult for insurers than for a charging party or plaintiff alleging that an insurance practice creates a discriminatory effect. The charging party or plaintiff must initially show the discriminatory effect of the challenged practice using appropriate evidence that demonstrates the effect. If the charging party or plaintiff makes that showing, the burden shifts to the insurer to show that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests.

*Issue:* A commenter expressed concern that the rule may create strict liability for entities complying with contractual obligations set by third parties, including the federal government.

*HUD Response:* The commenter misconstrues the discriminatory effects standard, which permits a defendant or respondent to defend against a claim of discriminatory effect by establishing a legally sufficient justification, as specified in § 100.500.

*Issue:* Another commenter expressed concern that the citation to *Miller* v. *Countrywide Bank, N.A.,* 571 F. Supp. 2d 251 (D. Mass. 2008), in the preamble to the proposed rule suggested that liability could exist under the Act for the neutral actions of third parties and that such liability would be inconsistent with the Supreme Court's decision in *Meyer* v. *Holley,* 537 U.S. 280 (2003). This commenter requested that HUD revise the proposed rule to articulate the standard set forth in *Meyer.*

*HUD Response:* HUD does not agree with the commenter's suggestion. HUD recognizes that pursuant to *Meyer,* liability under the Act for corporate officers is determined by agency law. The proposed rule cited *Miller* as an example of how a lender's facially neutral policy allowing employees and mortgage brokers the discretion to price loans may be actionable under the Fair Housing Act. The decision in *Miller* is not inconsistent with the Supreme Court's ruling on agency in *Meyer,* and therefore HUD does not believe that the final rule needs to be revised in response to this comment.

*Issue:* Several commenters expressed concern that adoption of the proposed discriminatory effects standard would lead to lawsuits challenging lenders' use of credit scores, other credit assessment standards, or automated underwriting. A commenter stated that a lender's consideration of credit score or other credit assessment standards such as a borrower's debt-to-income ratio may have a disparate impact because of demographic differences. This commenter cited studies which indicate that borrowers who live in zip codes with a higher concentration of minorities are more likely to have lower credit scores and fewer savings. A commenter stated that credit scores are often used as the determining factor in a lender's origination practices and that certain underwriting software and investor securitization standards require a minimum credit score. The commenter further stated that HUD's Federal Housing Administration (FHA) program has recognized the value of credit scores in setting underwriting standards for FHA insured loans. According to the commenter, lenders have little ability or desire to override credit score standards, because manual underwriting is time consuming and staff-intensive. Another commenter expressed concern that, even if a lender was successful in defending its credit risk assessment practices under the burden-shifting approach, the lender would have to defend an expensive lawsuit and suffer harm to its reputation.

---

[138] *See, e.g.,* 24 CFR 100.70(d)(4) (Mar. 15, 1989) (defining "other prohibited sale and rental conduct" to include "refusing to provide * * * property or hazard insurance for dwellings or providing such * * * insurance differently" because of a protected class); 53 FR 44,992, 44,997 (Nov. 7, 1988) (preamble to proposed regulations stating that "discriminatory refusals to provide * * * adequate property and hazard insurance * * * has been interpreted by the Department and by courts to render dwellings unavailable").

[139] *See Ojo* v. *Farmers Group, Inc.,* 600 F.3d at 1208; *NAACP* v. *American Family Mut. Ins. Co.,* 978 F.2d 287, 297–301 (7th Cir. 1993); *Nationwide Mut. Ins. Co.* v. *Cisneros,* 52 F.3d 1351, 1355–1360 (6th Cir. 1995). *But see Mackey* v. *Nationwide Ins. Cos.,* 724 F.2d 419, 423–25 (4th Cir. 1984) (pre-Fair Housing Amendments Act and regulations pursuant thereto holding that Act does not cover insurance).

[140] *Graoch,* 508 F.3d at 374–75.

[141] *See Graoch,* 508 F.3d at 375 ("we cannot create categorical exemptions from [the Act] without a statutory basis" and "[n]othing in the text of the FHA instructs us to create practice-specific exceptions").

Commenters from the lending industry also stated that the rule may have a chilling effect on lending in lower income communities. A commenter stated that the rule will create uncertainty in a skittish market, so lenders will be cautious about lending in lower income communities for fear of a legal challenge. Some of these commenters reasoned that underwriting requirements and risk requirements pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act (the Dodd-Frank Act (Pub. L. 111–203, approved July 21, 2010)), such as ability to repay, down payment requirements, and qualified residential mortgages, may result in a disparate impact because of demographic differences. Another commenter explained that the rule would eliminate in-portfolio mortgage loans at community banks, which provide mortgage credit to borrowers who may not qualify for a secondary market transaction.

*HUD Response:* HUD does not believe that the rule will have a chilling effect on lending in lower income communities or that it will encourage lawsuits challenging credit scores, other credit assessment standards, or the requirements of the Dodd-Frank Act. As discussed above, the rule does not change the substantive law; eleven federal courts of appeals have recognized discriminatory effects liability under the Act and over the years courts have evaluated both meritorious and non-meritorious discriminatory effects claims challenging lending practices.[142] As HUD has reiterated, the rule formalizes a substantive legal standard that is well recognized by both courts and participants in the lending industry for assessing claims of discriminatory effects. Indeed, in the lending context, at least since the issuance of the Joint

Policy Statement nearly 18 years ago, non-depository lenders, banks, thrifts, and credit unions have been on notice that federal regulatory and enforcement agencies, including HUD and the Department of Justice, may apply a disparate impact analysis in their examinations and investigations under both the Fair Housing Act and ECOA. The regulations and Staff Commentary implementing ECOA also explicitly prohibit unjustified discriminatory effects.[143] Thus, neither a chilling effect nor a wealth of new lawsuits can be expected as a result of this rule. Rather, HUD anticipates that this rule will encourage the many lenders and other entities that already conduct internal discriminatory effects analyses of their policies to review those analyses in light of the now uniform standard for a legally sufficient justification found in § 100.500. Indeed, lender compliance should become somewhat easier due to the rule's clear and nationally uniform allocation of burdens and clarification of the showings each party must make.

*Issue:* Some commenters expressed concern that faced with the threat of disparate impact liability, lenders might extend credit to members of minority groups who do not qualify for the credit.

*HUD Response:* The Fair Housing Act does not require lenders to extend credit to persons not otherwise qualified for a loan. As discussed previously, the final rule formalizes a standard of liability under the Act that has been in effect for decades. HUD is unaware of any lender found liable under the discriminatory effects standard for failing to make a loan to a member of a minority group who did not meet legitimate nondiscriminatory credit qualifications.

*Issue:* Several other commenters expressed a concern that discriminatory effects liability might have a chilling effect on efforts designed to preserve or develop affordable housing, including pursuant to HUD's own programs, because much of the existing affordable housing stock is located in areas of minority concentration. A commenter stated that resources designed to support the development of affordable housing will be "deflect[ed]" away so as to respond to claims of disparate impact discrimination. Another commenter requested that HUD issue guidance to the affordable housing industry as they administer HUD programs.

Other commenters expressed concern about potential liability for administrators of the federal Low Income Housing Tax Credit (LIHTC) program. These commenters reasoned that the concentration of affordable housing stock in low-income areas, combined with federal requirements and incentives which encourage the deployment of tax credits in low-income communities, may result in discriminatory effects liability for agencies administering the LIHTC program. Several commenters asked HUD to specify in the final rule that the mere approval of LIHTC projects in minority areas alone does not establish a prima facie case of disparate impact under the Act or that locating LIHTC projects in low-income areas is a legally sufficient justification to claims of disparate impact discrimination. A commenter requested that HUD provide guidance to such agencies.

*HUD Response:* HUD does not expect the final rule to have a chilling effect on the development and preservation of affordable housing because, as discussed above, the rule does not establish a new form of liability, but instead serves to formalize by regulation a standard that has been applied by HUD and the courts for decades, while providing nationwide uniformity of application. The rule does not mandate that affordable housing be located in neighborhoods with any particular characteristic, but requires, as the Fair Housing Act already does, only that housing development activities not have an unjustified discriminatory effect.

Concerns of a chilling effect on affordable housing activities are belied by the prevalence of cases where the discriminatory effects method of proof has been used by plaintiffs seeking to develop such housing[144] and even by the less frequent instances where

---

[142] *Compare Ramirez* v. *GreenPoint Mortg. Funding, Inc.,* 633 F. Supp. 2d 922, 927–28 (N.D. Cal. 2008) (holding that the Act permits disparate impact claims and finding that plaintiffs adequately pled a specific and actionable policy that had a disparate impact on members of a protected class); *Miller* v. *Countrywide Bank, N.A.,* 571 F. Supp. 2d 251, 258 (D. Mass. 2008) (denying defendants motion to dismiss and finding that plaintiffs adequately pled a specific and actionable policy, a disparate impact, and facts raising a sufficient inference of causation); and *Hoffman* v. *Option One Mortg. Corp.,* 589 F. Supp. 2d 1009, 1011–12 (N.D. Ill. 2008) (holding that the Actpermits disparate impact claims and finding that plaintiffs adequately pled a specific and actionable policy, a disparate impact, and facts raising a sufficient inference of causation), *with Ng* v. *HSBC Mortgage Corp.,* No. 07–CV–5434, 2010 WL 889256, *12 (E.D.N.Y. Mar. 10, 2010) (dismissing plaintiff's claim of disparate impact discrimination and finding that the claim was "alleged with little more than buzzwords and conclusory labels").

[143] *See* 12 CFR 1002.6(a); 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)–2 ; *see also* Consumer Financial Protection Bureau Bulletin 2012–04 (Apr. 18, 2012) ("CFPB reaffirms that the legal doctrine of disparate impact remains applicable as the Bureau exercises its supervision and enforcement authority to enforce compliance with the ECOA.").

[144] *See, e.g., Huntington Branch,* 844 F.2d at 926 (reversing district court and finding Fair Housing Act violations based on discriminatory effect of town's refusal to rezone site for affordable housing); *Greater New Orleans Fair Hous. Action Ctr.* v. *St. Bernard Parish,* 648 F. Supp. 2d 805 (E.D. La. 2009) (finding parish's subversion of attempts to develop affordable housing had a discriminatory effect in violation of the Fair Housing Act); *Dews* v. *Town of Sunnyvale,* 109 F. Supp. 2d 526 (N.D. Tex. 2000) (finding that developer established Fair Housing Act violation based on Town's rejection of development application under discriminatory effects method); *Sunrise Dev.* v. *Town of Huntington,* 62 F. Supp. 2d 762 (E.D.N.Y. 1999) (finding the plaintiff had established prima facie case of discriminatory effect and granting preliminary injunction requiring town to consider plaintiff's zoning application); *Summerchase Ltd. Pshp. I* v. *City of Gonzales,* 970 F. Supp. 522 (M.D. La. 1997) (denying defendant's motion for summary judgment on developer's claim that parish's denial of building permits for affordable housing development had a discriminatory effect in violation of the Fair Housing Act).

agencies administering affordable housing programs have been defendants.[145] Rather than indicating a chilling effect, existing case law shows that use of the discriminatory effects framework has promoted the development of affordable housing, while allowing due consideration for substantial, legitimate, nondiscriminatory interests involved in providing such housing. Moreover, recipients of HUD funds already must comply with a variety of civil rights requirements. This includes the obligation under Title VI of the Civil Rights Act of 1964 and its applicable regulations to refrain from discrimination, either by intent or effect, on the basis of race, color, or national origin; the obligation under the Fair Housing Act to affirmatively further fair housing in carrying out HUD programs; and HUD program rules designed to foster compliance with the Fair Housing Act and other civil rights laws. As discussed throughout this preamble, allegations of discriminatory effects discrimination must be analyzed on a case-by-case basis using the standards set out in § 100.500. HUD will issue guidance addressing the application of the discriminatory effects standard with respect to HUD programs.

*Issue:* Like commenters who requested "safe harbors" or exemptions for the insurance and lending industries, some commenters requested that the proposed rule be revised to provide "safe harbors" or exemptions from liability for programs designed to preserve affordable housing or revitalize existing communities. A commenter requested that the final rule provide safe harbors for state and local programs that have legitimate policy and safety goals such as protecting water resources, promoting transit orientated development, and revitalizing communities. Other commenters requested safe harbors or exemptions for entities that are meeting requirements or standards established by federal or state law or regulation, such as the Federal Credit Union Act, the Dodd-Frank Act, HAMP and HARP, or by government-sponsored enterprises or investors.

*HUD Response:* HUD does not believe that the suggested safe harbors or exemptions from discriminatory effects liability are appropriate or necessary. HUD notes that, in seeking these exemptions, the commenters appear to misconstrue the discriminatory effects

standard, which permits practices with discriminatory effects if they are supported by a legally sufficient justification. The standard thus recognizes that a practice may be lawful even if it has a discriminatory effect. HUD notes further that Congress created various exemptions from liability in the text of the Act,[146] and that in light of this and the Act's important remedial purposes, additional exemptions would be contrary to Congressional intent.

*Issue:* Several commenters expressed concern that in complying with the new Dodd-Frank Act mortgage reforms, including in determining that consumers have an ability to repay, a lender necessarily "will face liability under the Proposed Rule."

*HUD Response:* HUD reiterates that the lender is free to defend any allegations of illegal discriminatory effects by meeting its burden of proof at § 100.500. Moreover, if instances were to arise in which a lender's efforts to comply with the Dodd-Frank Act were challenged under the Fair Housing Act's discriminatory effects standard of liability, those same activities most likely would be subject to a similar challenge under ECOA and Regulation B, which also prohibit lending practices that have a discriminatory effect based on numerous protected characteristics.[147] The Dodd-Frank Act created the Consumer Financial Protection Bureau to combat both unfair and deceptive practices and discriminatory practices in the consumer financial industry, and it gave the Consumer Financial Protection Bureau authority to enforce ECOA.[148] *See* Dodd-Frank Act sections 1402–1403 (enacting section 129B of the Truth in Lending Act "to assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive," and, as part of that section, requiring the Consumer Financial Protection Bureau to create regulations that prohibit "abusive or unfair lending practices that promote disparities among consumers of equal credit worthiness but of different race, ethnicity, gender, or age"); *see also* Dodd-Frank Act section 1013(c) (establishing the Consumer Financial Protection Bureau's Office of Fair Lending and Equal Opportunity to provide enforcement of fair lending laws, including ECOA, and coordinate

fair lending efforts within the Bureau and with other federal and state agencies); *id.* section 1085 (transferring regulatory authority for ECOA to the Consumer Financial Protection Bureau).

*G. Illustrations of Practices With Discriminatory Effects*

Consistent with HUD's existing Fair Housing Act regulations, which contain illustrations of practices that violate the Act, the proposed rule specified additional illustrations of such practices. The November 16, 2011, rule proposed to add illustrations to 24 CFR 100.65, 100.70 and 100.120. The final rule revises these illustrations in the manner described below.

Because the illustrations in HUD's existing regulations include practices that may violate the Act based on an intent or effects theory, and proposed § 100.65(b)(6) describes conduct that is already prohibited in § 100.65(b)(4)—the provision of housing-related services—and § 100.70(d)(4)—the provision of municipal services—this final rule eliminates proposed § 100.65(b)(6). This will avoid redundancy in HUD's Fair Housing Act regulations, and its elimination from the proposed rule is not intended as a substantive change.

Commenters raised the following issues with respect to the proposed rule's illustrations of discriminatory practices.

*Issue:* A commenter stated that the examples specified by the proposed rule describe the types of actions that the commenter's "clients encounter regularly." Examples of potentially discriminatory laws or ordinances cited by commenters include ordinances in largely white communities that establish local residency requirements, limit the use of vouchers under HUD's Housing Choice Voucher program, or set large-lot density requirements. Commenters suggested that language should be added to proposed § 100.70(d)(5), which provides, as an example, "[i]mplementing land-use rules, policies or procedures that restrict or deny housing opportunities in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns" based on a protected class. Commenters stated that this example should include not just the word "implementing," but also the words "enacting" "maintaining," and/or "applying" because the discriminatory effect of a land-use decision may occur from the moment of enactment. A commenter suggested that the word "ordinances" should be added to the example to make clear that the Act applies to all types of exclusionary land-use actions.

---

[145] *Compare, e.g., In re Adoption of 2003 Low Income Housing Tax Credit Qualified Allocation Plan,* 369 N.J. Super. 2 (N.J. Sup. Ct. App. Div. 2004) *with Inclusive Cmtys. Project, Inc.* v. *Tex. Dep't of Hous. & Cmty. Affairs,* 749 F. Supp. 2d 48 (N.D. Tex. 2010).

[146] *See, e.g.,* 42 U.S.C. 3603(b)(1) (exempting from most of section 804 of the Act an owner's sale or rental of his single-family house if certain conditions are met).

[147] *See* 15 U.S.C. 1691 *et seq;* 12 CFR part 1002.

[148] *See* 12 U.S.C. 5491 *et seq.*

*HUD Response:* HUD reiterates that the illustrations contained in HUD's regulations are merely examples. The scope and variety of practices that may violate the Act make it impossible to list all examples in a rule. Nevertheless, HUD finds it appropriate to revise proposed § 100.70(d)(5) in this final rule in order to confirm that a land-use ordinance may be discriminatory from the moment of enactment. The final rule therefore changes "[i]mplementing land-use rules, policies, or procedures * * * " to "[e]nacting or implementing land-use rules, ordinances, policies, or procedures * * * ." It is not necessary to add "maintaining" or "applying" to § 100.70(d)(5) because the meaning of these words in this context is indistinguishable from the meaning of "implementing."

Because the illustrated conduct may violate the Act under either an intent theory, an effects theory, or both, HUD also finds it appropriate to replace "in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns" because of a protected characteristic with "otherwise make unavailable or deny dwellings because of" a protected characteristic. As discussed in the "Validity of Discriminatory Effects Liability under the Act" section above, the phrase "otherwise make unavailable or deny" encompasses discriminatory effects liability. This revised language, therefore, is broader because it describes land-use decisions that violate the Act because of either a prohibited intent or an unjustified discriminatory effect. The final rule makes a similar revision to each of the illustrations so they may cover violations based on intentional discrimination or discriminatory effects.

*Issue:* A commenter requested that HUD add as an example the practice of prohibiting from housing individuals with records of arrests or convictions. This commenter reasoned that such blanket prohibitions have a discriminatory effect because of the disproportionate numbers of minorities with such records. The commenter stated further that HUD should issue guidance on this topic similar to guidance issued by the Equal Employment Opportunity Commission. Another commenter expressed concern that the rule would restrict housing providers from screening tenants based on criminal arrest and conviction records. This commenter also asked HUD to issue guidance to housing providers on appropriate background screening.

*HUD Response:* Whether any discriminatory effect resulting from a housing provider's or operator's use of criminal arrest or conviction records to exclude persons from housing is supported by a legally sufficient justification depends on the facts of the situation. HUD believes it may be appropriate to explore the issue more fully and will consider issuing guidance for housing providers and operators.

*Issue:* Several commenters suggested revisions to proposed § 100.120(b)(2), which specifies as an example "[p]roviding loans or other financial assistance in a manner that results in disparities in their cost, rate of denial, or terms or conditions, or that has the effect of denying or discouraging their receipt on the basis of race, color, religion, sex, handicap, familial status, or national origin." These commenters stated that proposed § 100.120(b)(2) does not contain language concerning the second type of discriminatory effect, i.e., creating, perpetuating or increasing segregation. They urged HUD to add language making clear that the provision of loans or other financial assistance may result in either type of discriminatory effect.

In addition, several commenters asked HUD to clarify that mortgage servicing with a discriminatory effect based on a protected characteristic may violate the Act.

*HUD Response:* As discussed above, proposed § 100.120(b)(2) is revised in the final rule to cover both intentional discrimination and discriminatory effects. HUD also agrees that residential mortgage servicing is covered by the Act. It is a term or condition of a loan or other financial assistance, covered by section 805 of the Act.[149] Accordingly, the final rule adds a § 100.130(b)(3), which provides an illustration of discrimination in the terms or conditions for making available loans or financial assistance, in order to show that discriminatory loan servicing (and other discriminatory terms or conditions of loans and other financial assistance) violate the Act's proscription on "discriminat[ing] * * * in the terms or conditions of [a residential real estate-related transaction]."

*Issue:* A commenter expressed concern that the language in proposed § 100.120(b)(2) would allow for lawsuits based only on statistical data produced under HMDA.

*HUD Response:* HUD and courts have recognized that analysis of loan level data identified though HMDA may indicate a disparate impact.[150] Such a showing, however, does not end the inquiry. The lender would have the opportunity to refute the existence of the alleged impact and establish a substantial, legitimate, nondiscriminatory interest for the challenged practice, and the charging party or plaintiff would have the opportunity to demonstrate that a less discriminatory alternative is available to the lender.

*Issue:* A commenter stated that HUD should not add any of the new examples unless the final rule makes clear that the specified practices are not *per se* violations of the Act, but rather must be assessed pursuant to the standards set forth in § 100.500. According to the commenter, the new examples may be misconstrued because they state only the initial finding described in § 100.500.

*HUD Response:* HUD agrees that, when a practice is challenged under a discriminatory effects theory, the practice must be reviewed under the standards specified in § 100.500. The final rule therefore adds a sentence to the end of § 100.5(b), which makes clear that discriminatory effects claims are assessed pursuant to the standards stated in § 100.500.

### H. Other Issues

*Issue:* A commenter requested that HUD examine the overall compliance burden of the regulation on small businesses, noting that Executive Order 13563 requires a cost-benefit analysis.

*HUD Response:* In examining the compliance burden on small institutions, the governing authority is the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.,* which provides, among other things, that the requirements to do an initial and final regulatory flexibility analysis "shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." Thus, the focus is on whether the rule—and not the underlying statute or preexisting administrative practice and case law—will have a significant economic impact. For this rule, the impact primarily arises from the Fair Housing Act itself, not only as interpreted by HUD, but also as interpreted by federal courts. Because this final rule provides a uniform burden-shifting test for determining

---

[149] 42 U.S.C. 3605. Discrimination in residential mortgage servicing may also violate § 804 of the Act. 42 U.S.C. 3604.

[150] *See City of Memphis and Shelby Cnty.* v. *Wells Fargo, N.A.,* No. 09–2857–STA, 2011 U.S. Dist.

LEXIS 48522 at *45 (W.D. Tenn. May 4, 2011); *Mayor and City Council of Baltimore* v. *Wells Fargo Bank, N.A.,* No. JFM–08–62, 2011 U.S. Dist. LEXIS 44013 (D. Md. April 22, 2011); *Steele* v. *GE Money Bank,* No. 08–C–1880, 2009 U.S. Dist. LEXIS 11536 (N.D. Ill. Feb. 17, 2009); *Taylor* v. *Accredited Home Lenders, Inc.,* 580 F. Supp. 2d 1062 (S.D. Cal. 2008).

whether a given action or policy has an unjustified discriminatory effect, the rule serves to reduce regulatory burden for all entities, large or small, by establishing certainty and clarity with respect to how a determination of unjustified discriminatory effect is to be made.

The requirement under the Fair Housing Act not to discriminate in the provision of housing and related services is the law of the nation. We presume that the vast majority of entities both large and small are in compliance with the Fair Housing Act. Furthermore, for the minority of entities that have, in the over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will simply be the costs of compliance with a preexisting statute, administrative practice, and case law. Compliance with the Fair Housing Act has for almost 40 years included the requirement to refrain from undertaking actions that have an unjustified discriminatory effect. The rule does not change that substantive obligation; it merely formalizes it in regulation, along with the applicable burden-shifting framework.

Variations in the well-established discriminatory effects theory of liability under the Fair Housing Act, discussed earlier in the preamble, are minor and making them uniform will not have a significant economic impact. The allocation of the burdens of proof among the parties, described in the rule, are methods of proof that only come into play if a complaint has been filed with HUD, a state or local agency or a federal or state court; that is, once an entity has been charged with discriminating under the Fair Housing Act. The only economic impact discernible from this rule is the cost of the difference, if any, between defense of litigation under the burden-shifting test on the one hand, and defense of litigation under the balancing or hybrid test on the other. In all the tests, the elements of proof are similar. Likewise, the costs to develop and defend such proof under either the burden-shifting or balancing tests are similar. The only difference is at which stage of the test particular evidence must be produced. There would not, however, be a significant economic impact on a substantial number of small entities as a result of this rule.

Executive Order 13563 (Improving Regulations and Regulatory Review) reaffirms Executive Order 12866, which requires that agencies conduct a benefit/cost assessment for rules that "have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments or communities." As stated in Section VII of this preamble below, this rule is not "economically significant" within the meaning in Executive Order 12866, and therefore a full benefit/cost assessment is not required. This final rule does not alter the established law that facially neutral actions that have an unjustified discriminatory effect are violations of the Fair Housing Act. What this rule does is formalize that well-settled interpretation of the Act and provide consistency in how such discriminatory effects claims are to be analyzed.

## VI. This Final Rule

For the reasons presented in this preamble, this final rule formalizes the longstanding interpretation of the Fair Housing Act to include discriminatory effects liability and establishes a uniform standard of liability for facially neutral practices that have a discriminatory effect. Under this rule, liability is determined by a burden-shifting approach. The charging party or plaintiff in an adjudication first must bear the burden of proving its prima facie case of either disparate impact or perpetuation of segregation, after which the burden shifts to the defendant or respondent to prove that the challenged practice is necessary to achieve one or more of the defendant's or respondent's substantial, legitimate, nondiscriminatory interests. If the defendant or respondent satisfies this burden, the charging party or plaintiff may still establish liability by demonstrating that these substantial, legitimate, nondiscriminatory interests could be served by a practice that has a less discriminatory effect.

### A. Discriminatory Effect—Subpart G

#### 1. Scope

This final rule adds a new sentence to the end of paragraph (b) in § 100.5, which states: "The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent, consistent with the standards outlined in § 100.500."

#### 2. Discriminatory Effect Prohibited (§ 100.500)

Consistent with HUD's November 16, 2011, proposed rule, this final rule adds a new subpart G, entitled

"Discriminatory Effect," to its Fair Housing Act regulations in 24 CFR part 100. Section 100.500 provides that the Fair Housing Act may be violated by a practice that has a discriminatory effect, as defined in § 100.500(a), regardless of whether the practice was adopted for a discriminatory purpose. The practice may still be lawful if supported by a legally sufficient justification, as defined in § 100.500(b). The respective burdens of proof for establishing or refuting an effects claim are set forth in § 100.500(c). Section 100.500(d) clarifies that a legally sufficient justification may not be used as a defense against a claim of intentional discrimination. It should be noted that it is possible to bring a claim alleging both discriminatory effect and discriminatory intent as alternative theories of liability. In addition, the discriminatory effect of a challenged practice may provide evidence of the discriminatory intent behind the practice. This final rule applies to both public and private entities because the definition of "discriminatory housing practice" under the Act makes no distinction between the two.

#### 3. Discriminatory Effect Defined (§ 100.500(a))

Section 100.500(a) provides that a "discriminatory effect" occurs where a facially neutral practice actually or predictably results in a discriminatory effect on a group of persons protected by the Act (that is, has a disparate impact), or on the community as a whole on the basis of a protected characteristic (perpetuation of segregation). Any facially neutral action, e.g., laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act and this rule. For examples of court decisions regarding policies or practices that may have a discriminatory effect, please see the preamble to the proposed rule at 76 FR 70924–25.

#### 4. Legally Sufficient Justification (§ 100.500(b))

Section 100.500(b), as set forth in the regulatory text of this final rule, provides that a practice or policy found to have a discriminatory effect may still be lawful if it has a "legally sufficient justification."

#### 5. Burden of Proof (§ 100.500(c))

Under § 100.500(c), the charging party or plaintiff first bears the burden of proving its prima facie case: that is, that a practice caused, causes, or predictably will cause a discriminatory effect on a

group of persons or a community on the basis of race, color, religion, sex, disability, familial status, or national origin. Once the charging party or the plaintiff has made its prima facie case, the burden of proof shifts to the respondent or defendant to prove that the practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant. If the respondent or defendant satisfies its burden, the charging party or plaintiff may still establish liability by proving that these substantial, legitimate, nondiscriminatory interests could be served by another practice that has a less discriminatory effect.

### B. Illustrations of Practices With Discriminatory Effects

This final rule adds or revises the following illustrations of discriminatory housing practices:

The final rule adds to § 100.70 new paragraph (d)(5), which provides as an illustration of other prohibited conduct "[e]nacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings because of race, color, religion, sex, handicap, familial status, or national origin."

Section 100.120, which gives illustrations of discrimination in the making of loans and in the provision of other financial assistance, is streamlined, and paragraph (b)(2) now reads as set forth in the regulatory text of this final rule

In § 100.130, the final rule also amends paragraph (b)(2) and adds new paragraph (b)(3). The words "or conditions" is added after "terms," and "cost" is added to the list of terms or conditions in existing paragraph (b)(2). New paragraph (b)(3) includes servicing as an illustration of terms or conditions of loans or other financial assistance covered by section 805 of the Act: "Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin."

### VII. Findings and Certifications

*Regulatory Review—Executive Orders 13563 and 12866*

Executive Order 13563 ("Improving Regulation and Regulatory Review")

directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs, emphasizes the importance of quantifying both costs and benefits, of harmonizing rules, of promoting flexibility, and of periodically reviewing existing rules to determine if they can be made more effective or less burdensome in achieving their objectives. Under Executive Order 12866 ("Regulatory Planning and Review"), a determination must be made whether a regulatory action is significant and therefore, subject to review by the Office of Management and Budget (OMB) in accordance with the requirements of the order. This rule was determined to be a "significant regulatory action" as defined in section 3(f) of Executive Order 12866 (although not an economically significant regulatory action, as provided under section 3(f)(1) of the Executive Order).

This rule formalizes the longstanding interpretation of the Fair Housing Act to include discriminatory effects liability, and establishes uniform, clear standards for determining whether a practice that has a discriminatory effect is in violation of the Fair Housing Act, regardless of whether the practice was adopted with intent to discriminate. As stated in the Executive Summary, the need for this rule arises because, although all federal courts of appeals that have considered the issue agree that Fair Housing Act liability may be based solely on discriminatory effects, there is a small degree of variation in the methodology of proof for a claim of effects liability. As has been discussed in the preamble to this rule, in establishing such standards HUD is exercising its rulemaking authority to bring uniformity, clarity, and certainty to an area of the law that has been approached by HUD and federal courts across the nation in generally the same way, but with minor variations in the allocation of the burdens of proof.[151] A uniform rule would simplify compliance with the Fair Housing Act's discriminatory effects standard, and decrease litigation associated with such claims. By providing certainty in this area to housing providers, lenders, municipalities, realtors, individuals engaged in housing transactions, and courts, this rule would reduce the burden associated with litigating discriminatory effect cases under the Fair Housing Act by clearly establishing which party has the burden of proof, and how such burdens are to be met. Additionally, HUD believes the rule

may even help to minimize litigation in this area by establishing uniform standards. With a uniform standard, entities are more likely to conduct self-testing and check that their practices comply with the Fair Housing Act, thus reducing their liability and the risk of litigation. A uniform standard is also a benefit for entities operating in multiple jurisdictions. Also, legal and regulatory clarity generally serves to reduce litigation because it is clearer what each party's rights and responsibilities are, whereas lack of consistency and clarity generally serves to increase litigation. For example, once disputes around the court-defined standards are eliminated by this rule, non-meritorious cases that cannot meet the burden under § 100.500(c)(1) are likely not to be brought in the first place, and a respondent or defendant that cannot meet the burden under § 100.500(c)(2) may be more inclined to settle at the pre-litigation stage.

Accordingly, while this rule is a significant regulatory action under Executive Order 12866 in that it establishes, for the first time in regulation, uniform standards for determining whether a housing action or policy has a discriminatory effect on a protected group, it is not an economically significant regulatory action. The burden reduction that HUD believes will be achieved through uniform standards will not reach an annual impact on the economy of $100 million or more, because HUD's approach is not a significant departure from HUD's interpretation to date or that of the majority of federal courts. Although the burden reduction provided by this rule will not result in economically significant impact on the economy, it nevertheless provides some burden reduction through the uniformity and clarity presented by HUD's standards promulgated through this final rule and is therefore consistent with Executive Order 13563.

The docket file is available for public inspection in the Regulations Division, Office of the General Counsel, Room 10276, 451 7th Street SW., Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at 800–877–8339.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires

---

[151] *See, e.g.,* the extensive discussion of the various options in *Graoch,* 508 F.3d at 371–375.

an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. For the reasons stated earlier in this preamble in response to public comment on the issue of undue burden on small entities, and discussed here, HUD certifies that this rule will not have significant economic impact on a substantial number of small entities.

It has long been the position of HUD, confirmed by federal courts, that practices with discriminatory effects may violate the Fair Housing Act. As noted in the preamble to the proposed rule (76 FR 70921) and this preamble to the final rule, this long-standing interpretation has been supported by HUD policy documents issued over the last decades, is consistent with the position of other Executive Branch agencies, and has been adopted and applied by every federal court of appeals to have reached the question. Given, however, the variation in how the courts and even HUD's own ALJs have applied that standard, this final rule provides for consistency and uniformity in this area, and hence predictability, and will therefore reduce the burden for all seeking to comply with the Fair Housing Act. Furthermore, HUD presumes that given the over 40-year history of the Fair Housing Act, the majority of entities, large or small, currently comply and will remain in compliance with the Fair Housing Act. For the minority of entities that have, in the over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will simply be the costs of compliance with a preexisting statute. The rule does not change that substantive obligation; it merely sets it forth in a regulation. While this rule provides uniformity as to specifics such as burden of proof, HUD's rule does not alter the substantive prohibitions against discrimination in fair housing law, which were established by statute and developed over time by administrative and federal court case law. Any burden on small entities is simply incidental to the pre-existing requirements to comply with this body of law. Accordingly, the undersigned certifies that this final rule will not have a significant economic impact on a substantial number of small entities.

*Environmental Impact*

This final rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled ''Federalism'') prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) Imposes substantial direct compliance costs on state and local governments and is not required by statute, or (ii) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This final rule does not have federalism implications and does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

*Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (UMRA) establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and on the private sector. This final rule does not impose any federal mandates on any state, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

List of Subjects in 24 CFR Part 100

Civil rights, Fair housing, Individuals with disabilities, Mortgages, Reporting and recordkeeping requirements.

For the reasons discussed in the preamble, HUD amends 24 CFR part 100 as follows:

## PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

■ 1. The authority citation for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

## Subpart A—General

■ 2. In § 100.5, add the following sentence at the end of paragraph (b):

### § 100.5  Scope.

\*      \*      \*      \*      \*

(b) \* \* \* The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent,

consistent with the standards outlined in § 100.500.

\*      \*      \*      \*      \*

## Subpart B—Discriminatory Housing Practices

■ 3. In § 100.70, add new paragraph (d)(5) to read as follows:

### § 100.70  Other prohibited conduct.

\*      \*      \*      \*      \*

(d) \* \* \*

(5) Enacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

## Subpart C—Discrimination in Residential Real Estate-Related Transactions

■ 4. In § 100.120, revise paragraph (b) to read as follows:

### § 100.120  Discrimination in the making of loans and in the provision of other financial assistance.

\*      \*      \*      \*      \*

(b) Practices prohibited under this section in connection with a residential real estate-related transaction include, but are not limited to:

(1) Failing or refusing to provide to any person information regarding the availability of loans or other financial assistance, application requirements, procedures or standards for the review and approval of loans or financial assistance, or providing information which is inaccurate or different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Providing, failing to provide, or discouraging the receipt of loans or other financial assistance in a manner that discriminates in their denial rate or otherwise discriminates in their availability because of race, color, religion, sex, handicap, familial status, or national origin.

■ 5. In § 100.130, revise paragraph (b)(2) and add new paragraph (b)(3) to read as follows:

### § 100.130  Discrimination in the terms and conditions for making available loans or other financial assistance.

\*      \*      \*      \*      \*

(b) \* \* \*

(2) Determining the type of loan or other financial assistance to be provided with respect to a dwelling, or fixing the amount, interest rate, cost, duration or other terms or conditions for a loan or

other financial assistance for a dwelling or which is secured by residential real estate, because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin.

■ 6. In part 100, add a new subpart G to read as follows:

## Subpart G—Discriminatory Effect

### § 100.500   Discriminatory effect prohibited.

Liability may be established under the Fair Housing Act based on a practice's discriminatory effect, as defined in paragraph (a) of this section, even if the practice was not motivated by a discriminatory intent. The practice may still be lawful if supported by a legally sufficient justification, as defined in paragraph (b) of this section. The burdens of proof for establishing a violation under this subpart are set forth in paragraph (c) of this section.

(a) *Discriminatory effect.* A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.

(b) *Legally sufficient justification.* (1) A legally sufficient justification exists where the challenged practice:

(i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and

(ii) Those interests could not be served by another practice that has a less discriminatory effect.

(2) A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative. The burdens of proof for establishing each of the two elements of a legally sufficient justification are set forth in paragraphs (c)(2) and (c)(3) of this section.

(c) *Burdens of proof in discriminatory effects cases.* (1) The charging party, with respect to a claim brought under 42 U.S.C. 3612, or the plaintiff, with respect to a claim brought under 42 U.S.C. 3613 or 3614, has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect.

(2) Once the charging party or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.

(3) If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.

(d) *Relationship to discriminatory intent.* A demonstration that a practice is supported by a legally sufficient justification, as defined in paragraph (b) of this section, may not be used as a defense against a claim of intentional discrimination.

Dated: February 8, 2013.

**John Trasviña,**

*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2013–03375 Filed 2–14–13; 8:45 am]

**BILLING CODE 4210–67–P**