## SMALL BUSINESS ADMINISTRATION

### 13 CFR Part 107

### Small Business Investment Companies—Early Stage SBICs; Public Webinar

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Proposed rule; notice of public webinar.

**SUMMARY:** The U.S. Small Business Administration (SBA) announces that it is holding a public webinar regarding its Early Stage Small Business Investment Companies proposed rule, which was published on September 19, 2016. The webinar will describe the changes proposed in the rulemaking and answer questions regarding the proposed rule.

**DATES:** The webinar will be held on October 12, 2016, at 1 p.m. EST. Attendees must pre-register by October 10, 2016, at 11:59 p.m. EST.

**ADDRESSES:** Parties interested in attending the webinar must pre-register by sending an email request to SBA's Office of Investment and Innovation at *applySBIC@sba.gov,* as further described in section III of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** Scott Schaefer, SBA Office of Investment and Innovation at (202) 205–6514 or *applySBIC@sba.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Background Information

The Early Stage SBIC program was launched in 2012 as a 5-year effort as part of President Obama's Startup America Initiative. The intent of the Early Stage SBIC program was to license and provide SBA-guaranteed leverage to Early Stage SBICs that would focus on making investments in early stage small businesses. Although 62 investment funds applied to the program, few satisfied SBA's licensing criteria. To date, SBA has only licensed five Early Stage SBICs.

On September 19, 2016, SBA published a proposed rule regarding the Early Stage Small Business Investment Company (SBIC) program (81 FR 64075), which proposes to make the Early Stage SBIC program a permanent part of the SBIC program. In addition, the rule proposes changes to the Early Stage SBIC Program with respect to licensing, non-SBA borrowing, and leverage eligibility.

The proposed Early Stage SBIC rule may be viewed at *https:// www.regulations.gov/document?D=SBA-2015-0002-0009.* The comment period for the proposed rule closes on October

19, 2016. In order to familiarize the public with the content of the Early Stage SBIC proposed rule, SBA will host a webinar on the proposed rule before the closing date. The webinar will be transcribed and become part of the administrative record for SBA's consideration when the Agency deliberates on the final Early Stage SBIC regulations.

### II. Webinar Schedule

| Webinar date and time | Registration closing date |
| --- | --- |
| October 12, 2016, 1 p.m. EST. | October 10, 2016, 11:59 p.m. EST. |

The session is expected to last no more than 1 hour.

### III. Registration

If you are interested in attending the webinar, you must pre-register by the registration closing date. To pre-register, send an email to *applySBIC@sba.gov.* In the body of the email, please provide the following: Participant's Name, Title, Organization Affiliation, Address, Telephone Number, and Email Address. You must submit your email by the applicable registration closing date listed in this notice.

Due to technological limitations, attendance is limited to 120 participants per session. If demand exceeds capacity for the webinar, SBA will hold another one. SBA will announce any additional sessions through a **Federal Register** document and on its Web site, *www.sba.gov/inv/earlystage.*

SBA will confirm the registration via email along with instructions for participating. SBA will post any presentation materials associated with the webinar on the day of the webinar by 10 a.m. EST at *www.sba.gov/inv/ earlystage.*

If there are specific questions you would like SBA to address in the webinar, SBA must receive them no later than October 9, 2016. Since the Early Stage SBIC regulations are in the proposed rulemaking stage, SBA will not be able to answer questions that are outside of clarification of the proposed rule.

**Mark L. Walsh,**

*Associate Administrator for Investment and Innovation.*

[FR Doc. 2016–24031 Filed 10–4–16; 8:45 am]

**BILLING CODE 8025–01–P**

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

### 24 CFR Part 100

[Docket No. FR–5508–N–03]

### Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Reconsideration of public comments; implementation of the Fair Housing Act's Discriminatory Effects Standard.

**SUMMARY:** HUD is issuing this document to supplement its responses to certain insurance industry comments to HUD's proposed rule implementing the Fair Housing Act's ("Act") discriminatory effects standard. These commenters requested, *inter alia,* total or partial exemptions or safe harbors from liability under the Act's discriminatory effects standard. After careful reconsideration of the insurance industry comments in accordance with the court's decision in *Property Casualty Insurers Association of America (PCIAA)* v. *Donovan,* HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with the broad fair housing objectives and obligations embodied in the Act. HUD continues to believe that the commenters' concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis.

**DATES:** Supplemental Responses issued on October 5, 2016.

**FOR FURTHER INFORMATION CONTACT:** Jeanine Worden, Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410–0500; (202) 402–5188 (this is not a toll-free number). Persons with hearing or speech impairments may contact this number via TTY by calling the toll-free Federal Relay Service at 800–877–8399.

**SUPPLEMENTARY INFORMATION:**

### Background

Title VIII of the Civil Rights Act of 1968, as amended ("Fair Housing Act" or "Act"), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin.[1] On November 16,

---

[1] 42 U.S.C. 3601–3619.

**Federal Register** / Vol. 81, No. 193 / Wednesday, October 5, 2016 / Proposed Rules

**69013**

2011, HUD issued a proposed rule seeking to formalize, through notice-and-comment rulemaking, HUD's longstanding interpretation of the Act as prohibiting practices with an unjustified discriminatory effect and to standardize the analytical framework for evaluating such cases.[2] In response to the proposed rule, HUD received nearly one hundred comments from a range of interested parties, including from three insurance trade associations requesting exemptions or safe harbors. The National Association of Mutual Insurance Companies ("NAMIC") and the American Insurance Association ("AIA") requested an exemption from discriminatory effects liability for all insurance practices. NAMIC also requested, in the alternative, exemptions for insurance pricing, for Fair Access to Insurance Requirements ("FAIR") plans, and/or safe harbors for recognized risk factors. The Property Casualty Insurers Association of America ("PCIAA") requested an exemption for all insurance underwriting practices.

On February 15, 2013, HUD published its final rule, entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" ("Rule").[3] In the Rule, HUD declined to grant the requested exemptions or safe harbors for any insurance practices, explaining that the commenters' concerns could be addressed on a case-by-case basis. On November 27, 2013, PCIAA filed an action in the U.S. District Court for the Northern District of Illinois ("the court") alleging that HUD's Rule violated the McCarran-Ferguson Act[4] ("McCarran-Ferguson") and the Administrative Procedure Act.[5]

On September 3, 2014, the court issued a decision in *PCIAA* v. *Donovan*.[6] The court upheld the Rule's burden-shifting framework for analyzing discriminatory effects claims as a reasonable interpretation of the Fair Housing Act.[7] The court also held that a violation of McCarran-Ferguson can be adjudicated by a court only in the context of a concrete dispute challenging the application of the Rule to a particular insurance practice, and not in the abstract.[8] Distinguishing between adjudication and agency rulemaking, the court concluded that HUD had not adequately explained why case-by-case adjudication was preferable

to using its rulemaking authority to provide exemptions or safe harbors related to homeowners insurance.[9] The court remanded the matter to HUD for further proceedings consistent with its ruling.[10]

After careful reconsideration of the comments from insurance industry representatives and the court's opinion, HUD continues to believe that case-by-case adjudication is preferable to creating the requested exemptions or safe harbors for insurance practices. The Fair Housing Act's broad prohibitions on discrimination in housing are intended to eliminate segregated living patterns while moving the nation toward a more integrated society. When Congress enacted the Fair Housing Act in 1968 and amended it in 1988, it established exemptions for certain practices[11] but not for insurance. Rather, Congress stated that the Act is intended to provide for fair housing throughout the United States.[12] The Supreme Court has recognized the Act's broad remedial purpose.[13] Among other things, the Act requires HUD to affirmatively further fair housing in all of its housing-related programs and activities,[14] one of which is the administration and enforcement of the Act.[15] McCarran-Ferguson, enacted in 1945, restricts only those applications of federal law that directly conflict with state insurance laws, frustrate a declared state policy, or interfere with a State's

administrative regime.[16] For HUD to create the requested exemptions or safe harbors would allow to go uncorrected at least some discriminatory insurance practices that can be subject to disparate impact challenges consistent with McCarran-Ferguson and the filed rate doctrine. Thus, to create such exemptions or safe harbors would undermine the efficacy of the Act and run counter to the Act's purpose and HUD's statutory responsibilities. The concerns raised by the insurance industry commenters do not outweigh this loss of efficacy in the administration and enforcement of the Act. Rather, the case-by-case approach appropriately balances these concerns against HUD's obligation to give maximum force to the Act by taking into account the diversity of potential discriminatory effects claims, as well as the variety of insurer business practices and differing insurance laws of the states, as they currently exist or may exist in the future. Moreover, in light of the variety of practices and relevant state laws, as well as the substantial range of possible discriminatory effects claims, it is practically impossible for HUD to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application.

Accordingly, HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with HUD's statutory mandate. The discriminatory effects standard imposes liability only for those insurance practices that actually or predictably result in a discriminatory effect and that lack a legally sufficient justification.[17] It takes into account an insurer's interest in the challenged practice and, for the reasons explained below, any conflict with a specific state insurance law can and should be addressed on a case-by-case basis in the context of that state law. HUD provides the following supplemental responses to the public comments submitted by the three insurance trade associations that sought exemptions or safe harbors.

**Revised Responses to Insurance Industry Comments**

*Issue:* Two commenters requested exemptions from the Rule for all

---

[2] 76 FR 70921 (Nov. 16, 2011).

[3] 78 FR 11460 (Feb. 15, 2013).

[4] 15 U.S.C. 1011–1015.

[5] 5 U.S.C. 551–559.

[6] *Prop. Cas. Insurers Ass'n of Am.* v. *Donovan* (*PCIAA*), 66 F. Supp. 3d 1018 (N.D. Ill. 2014).

[7] *Id.* at 1051–53.

[8] *Id.* at 1037–42.

---

[9] *Id.* at 1049.

[10] *Id.* at 1054.

[11] *See, e.g.,* 42 U.S.C. 3605(c) (exempting appraisal practices from disparate impact liability), 3607(b)(1) (exempting reasonable governmental occupancy limits from disparate impact liability), 3607(b)(4) (exempting practices related to certain controlled substance convictions from disparate impact liability); *see also Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2520–21 (2015) (discussing these "exemptions from liability").

[12] *See* 42 U.S.C. 3601.

[13] *See Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 380 (1982) (recognizing Congress's "broad remedial intent" in passing the Act); *Trafficante* v. *Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) (recognizing the "broad and inclusive" language of the Act); *see also Inclusive Cmtys.*, 135 S. Ct. at 2521 (describing the "central purpose" of the Act as "to eradicate discriminatory practices within a sector of our Nation's economy").

[14] *See* 42 U.S.C. 3608(e)(5).

[15] *See, e.g.,* 42 U.S.C. 3608 (the Secretary's administrative responsibilities under the Act), 3609 (education, conciliation, conferences, and reporting obligations to further the purposes of the Act), 3610 (investigative authority), 3611 (subpoena power), 3612 (administrative enforcement authority), 3614a (rulemaking authority), 3616 (authority to cooperate with state and local agencies in carrying out the Secretary's responsibilities under the Act), 3616a (authority to fund of state and local agencies and private fair housing groups to eliminate discriminatory housing practices prohibited by the Act).

---

[16] *Humana Inc.* v. *Forsyth*, 525 U.S. 299, 310 (1999) ("When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.").

[17] *See* 24 CFR 100.500(b).

insurance practices, and a third commenter requested an exemption for insurance underwriting practices. All three of these insurance industry commenters raised McCarran-Ferguson in support of their requests for an exemption. One of these three commenters urged HUD to delete the insurance example from the Rule, stating that McCarran-Ferguson dictates that ''state insurance law trumps the application of any federal law to state regulated insurance, except under very narrow circumstances, which are not met here.'' [18] Another questioned ''whether non-racially motivated and sound actuarial underwriting principles recognized by state insurance regulators that permit accurate risk-based pricing for consumers can be prohibited by federal regulators who find them to have a 'disparate impact.' '' [19]

The third commenter was concerned that ''the disparate impact standards would impair state unfair discrimination standards,'' which have ''historically been a cost based concept'' prohibiting ''underwriting and rating distinctions 'between individuals or risks of the same class and essentially the same hazard.' '' [20] The commenter expressed concern that if the Rule is applied to homeowners insurance, ''accurate risk assessment will be threatened, adverse selection will increase, and coverage availability will suffer.'' [21] This commenter also sought, in the alternative, ''safe harbors for long-recognized risk-related factors,'' stating that ''[f]ailure to provide safe harbor protection for the use of factors historically allowed by state insurance regulators would subject insurers to baseless litigation and threaten the sound actuarial standards underpinning the insurance market.'' [22]

*HUD Response:* HUD does not agree that it is necessary or appropriate to create an exemption from discriminatory effects liability for all insurance practices or for all underwriting practices in order to accommodate the insurance industry's concerns. McCarran-Ferguson does not require HUD to do so, and categorical exemptions would undermine the Act's

broad remedial purpose and contravene HUD's own statutory obligation to affirmatively further fair housing. HUD also declines to create safe harbors from discriminatory effects liability for the use of particular risk factors. HUD disagrees with the commenter's assertions about the consequences that would befall the insurance industry if HUD does not grant the requested safe harbors for ''long-recognized risk-related factors'' or ''historically allowed'' factors. Establishing safe harbors for specific risk-related criteria would be overbroad, arbitrary, and quickly outdated.

The Act's broad remedial purpose is ''to provide . . . for fair housing throughout the United States.'' [23] Thus, the Act plays a ''continuing role in moving the Nation toward a more integrated society.'' [24] Ensuring that members of all protected classes can access insurance free from discrimination is necessary to achieve the Act's objective because obtaining a mortgage for housing typically requires obtaining insurance, too.[25] Likewise, obtaining insurance may be a precondition to securing a home in the rental market.[26] Insurance is also critical to maintaining housing because fire, storms, theft, and other perils frequently result in property damage or loss that would be too costly to repair or replace without insurance coverage.

Yet the history of discrimination in the homeowners insurance industry is long and well documented,[27] beginning with insurers overtly relying on race to deny insurance to minorities and evolving into more covert forms of discrimination.[28] At times, agents were

given plainly discriminatory instructions, such as ''get away from blacks' and sell to 'good, solid premium-paying white people,''' or they simply were told, ''We don't write Blacks or Hispanics.'' [29] Underwriting guidelines contained discriminatory statements, such as listing ''population and racial changes'' among ''red flags for agents.'' [30] Minorities were offered inferior products, such as coverage for repairs rather than replacement, or were subject to additional hurdles during the quote and underwriting process.[31] Additionally, discrimination took the form of insurers redlining predominantly minority neighborhoods and disproportionately placing agents and offices in predominately white neighborhoods.[32] Minorities also were denied access to insurance through property-location and property-age restrictions, even when data had demonstrated that such restrictions are not justified by risk of loss.[33] This history of discrimination led to

---

[18] American Insurance Association, Comment Letter on Proposed Rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard (Jan. 17, 2012).

[19] Property Casualty Insurers Association of America, Comment Letter on Implementation of the Fair Housing Act's Discriminatory Effects Standard (Jan. 17, 2012).

[20] National Association of Mutual Insurance Companies, Comment Letter on Proposed Rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard (Jan. 17, 2012).

[21] *Id.*

[22] *Id.*

[23] 42 U.S.C. 3601; *see also* cases cited *supra* note 13.

[24] *Inclusive Cmtys.,* 135 S. Ct. at 2526.

[25] *NAACP* v. *Am. Family Mut. Ins. Co.,* 978 F.2d 287, 297 (7th Cir. 1992) (''No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable.'').

[26] *See, e.g.,* Or. Rev. Stat. 90.222(1) (''A landlord may require a tenant to obtain and maintain renter's liability insurance in a written rental agreement.''); Va. Code Ann. 55–248.7:2(B) (''A landlord may require as a condition of tenancy that a tenant have renter's insurance. . . .'').

[27] Although the discussion that follows focuses on race and national origin discrimination because of their historic prevalence, examples of discrimination in insurance against other protected classes exist as well. *See e.g., Nevels* v. *W. World Ins. Co.,* 359 F. Supp. 2d 1110, 1120–21 (W.D. Wash. 2004) (disability).

[28] *See generally, Homeowners' Insurance Discrimination: Hearings Before the S. Comm. on Banking, Housing and Urban Affairs,* 103d Cong. (1994) [hereinafter *1994 Hearings*]; *Insurance Redlining Practices: Hearings before the Subcom. on Commerce, Consumer Protection & Competitiveness of the H. Comm. on Energy and Commerce,* 103d Cong. (1993) [hereinafter *Mar. 1993 Hearings*]; *Insurance Redlining: Fact or Fiction: Hearing before the Subcom. On Consumer*

*Credit and Insurance of the H. Comm. on Banking, Finance & Urban Affairs,* 103d Cong. (1993) [hereinafter *Feb. 1993 Hearing*]; *Insurance Redlining: Fact Not Fiction* (Feb. 1979) [hereinafter Comm'n on Civil Rights] (report of the Illinois, Indiana, Michigan, Minnesota, Ohio and Wisconsin Advisory Committees to the U.S. Commission on Civil Rights); President's National Advisory Panel on Insurance in Riot-Affected Areas, Meeting the Insurance Crisis of Our Cities (1968) [hereinafter Nat'l Advisory Panel].

[29] *See* 139 Cong. Rec. 22,459 (1993) (statement of Rep. Joseph P. Kennedy, II); *see also, e.g.,* Nat'l Advisory Panel, *supra* note 28, at 116 (quoting an insurance broker as explaining, ''No matter how good [a customer] is, they [the insurers] take that into consideration, the fact he is a Negro.'').

[30] *Feb. 1993 Hearing, supra* note 28 at 19, 27 (statement of Gregory Squires, Prof. U. Wis. Milwaukee).

[31] *1994 Hearings, supra* note 28, at 15, 47–48 (statements of Deval Patrick, DOJ Ass't Attorney Gen. for Civil Rights); *id.* at 18–19, 51 (statements of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity).

[32] *Feb. 1993 Hearing, supra* note 28, at 7 (statement of John Garamendi, Cal. Ins. Comm'r) (''There may be some people that deny that redlining exists. They are not telling you the truth, or they just don't know what they are talking about. It is real, it does exist, and it is a very serious socioeconomic problem.''); Comm'n on Civil Rights, *supra* note 28, at 5 (listing ''[p]lacing agents selectively in order to reduce the opportunity to secure business in certain areas'' among the types of documented redlining practices).

[33] *See, e.g.,* Comm'n on Civil Rights, *supra* note 28, at 34–39 (''The greater the minority concentration of an area and the older the housing, independent of fire and theft, the less voluntary insurance is currently being written.''); *1994 Hearings, supra* note 28, at 18 (statement of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity) (noting the ''disparate impact on minority communities'' of property age and value requirements, and explaining that ''47 percent of black households, but just 23 percent of white households, live in homes valued at less than $50,000'' and that ''40 percent of black households compared to 29 percent of white households live in homes build before 1950.'').

Federal Register / Vol. 81, No. 193 / Wednesday, October 5, 2016 / Proposed Rules

**69015**

minorities being unjustifiably denied insurance policies or paying higher premiums.[34]

HUD's long experience in administering the Act counsels that discriminatory effects liability does not threaten the fundamental nature of the insurance industry. HUD's position that discriminatory effects liability applies to insurance dates back more than three decades,[35] as does the industry's concern that such liability makes it "near impossible for an insurer to successfully defend himself." [36] HUD has maintained for decades that remedying discrimination in insurance, including discriminatory effects claims, requires examination of each allegedly discriminatory insurance practice on a case-by-case basis,[37] and HUD sees no reason to deviate now from this longstanding approach.

HUD recognizes that risk-based decision making is an important aspect of sound insurance practice, and nothing in the Rule prohibits insurers from making decisions that are in fact risk-based. Under the standard established by the Rule, practices that an insurer can prove are risk-based, and for which no less discriminatory alternative exists, will not give rise to discriminatory effects liability.[38] All the

Rule requires is that if an insurer's practices are having a discriminatory effect on its insureds and "an adjustment . . . can still be made that will allow both [parties'] interests to be satisfied," the insurer must make that change.[39] Risk-based decision making is not unique to insurance, and discriminatory effects liability has proven workable in other contexts involving risk-based decisions, such as mortgage lending, without the need for exemptions or safe harbors.[40] Moreover, some states provide for discriminatory effects liability against insurers under state laws, further undermining the industry's claim that providing for such liability as a matter of federal law threatens the fundamental nature of the industry.[41]

Consistent with the Act's broad scope and purpose, as well as HUD's own obligation to affirmatively further fair housing, HUD declines to foreclose viable discrimination claims by creating an overbroad exemption. For the reasons detailed below, wholesale exemptions for all insurance practices or all insurance underwriting practices would necessarily be overbroad, allowing some practices with unjustified discriminatory effects to go uncorrected. Wholesale exemptions also would invariably sweep within their scope potential intentional discrimination in the insurance market as well because "disparate-impact liability under the [Fair Housing Act] also plays a role in uncovering discriminatory intent: It permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment." [42]

Some discriminatory effects claims against insurers will survive a McCarran-Ferguson defense depending on a host of case-specific variables, and therefore wholesale exemptions would be overbroad. McCarran-Ferguson

specifically provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." [43] As interpreted by the Supreme Court in *Humana* v. *Forsyth,* McCarran-Ferguson applies only when a particular application of a federal law directly conflicts with a specific state insurance regulation, frustrates a declared state policy, or interferes with a State's administrative regime.[44] Accordingly, the mere fact that a state has the authority to regulate insurance or has adopted ratemaking regulations does not suffice on its own to create the kind of conflict, frustration of purpose, or interference that triggers McCarran-Ferguson.[45] Rather, the inquiry required by *Humana* depends on the relevant state law and other case-specific variables.[46]

For example, in *Dehoyos* v. *Allstate,*[47] the Fifth Circuit rejected a McCarran-Ferguson defense to a disparate impact claim where the insurer did not identify a specific state law that was impaired. In so ruling, the Fifth Circuit reasoned that the Seventh Circuit's holding in *Doe* v. *Mutual of Omaha* [48] does not foreclose all discriminatory effects claims against insurers as barred by McCarran-Ferguson. Instead, the Fifth Circuit distinguished *Doe,* where McCarran-Ferguson was held to bar a claim of discrimination under the Americans with Disabilities Act [49] ("ADA"), by explaining that "[i]n *Doe,* there was an actual *state insurance law* which purportedly conflicted with the application of the [ADA] to the particular question at issue." [50] Thus,

---

[34] *See, e.g.* 139 Cong. Rec. 22,459 (1993) (statement of Rep. Joseph P. Kennedy, II) ("[S]hocking anecdotal evidence was supported by 12 years of data submitted by Missouri State Insurance Commissioner Jay Angoff. . . . It shows that, in the cities of St. Louis and Kansas City, low-income minorities had to pay more money for less coverage than their white counterparts, despite the fact that losses in minority areas were actually less than those in white areas. This evidence directly challenges industry assertions that minorities are too risky to insure.").

[35] *Fair Housing Amendments Act of 1979: Hearings before the Subcom. on Civil and Constitutional Rights of the H. Comm. on the Judiciary,* 96th Cong. 79 (1979) (statement of Patricia Roberts Harris, Sec'y of HUD).

[36] *Fair Housing Act: Hearings before the Subcom. on Civil and Constitutional Rights of the H. Comm. on the Judiciary,* 95th Cong. 20, 616 (1978) (statement of the Am. Ins. Ass'n.).

[37] *1994 Hearings, supra* note 28, at 19 (statement of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity) (discussing insurers' property age and value requirements and stating that "when practices with such racial impacts are not legally or otherwise justified, a case-by-case, Fair Housing Act analysis is warranted"); *id* at 50 (stating that "it is important to stress that the finding of a [Fair Housing Act] violation occurs on a case by case basis" for insurance practices that are "neutral on their face [but] have a disproportionate racial impact" and "cannot meet the established test of business necessity and . . . less discriminatory alternative").

[38] 24 CFR 100.500(b); *see also Toledo Fair Hous. Ctr.* v. *Nationwide Mut. Ins. Co.,* 94 Ohio Misc. 2d 151, 157 (Ohio Ct. Com. Pl. 1997) ("[T]he disparate-impact approach does not unduly undermine the business of selling insurance. Assuming . . . that the insurance industry is based on 'fair' risk discrimination, the disparate-impact approach will

not impede such fair discrimination if the insurer can show a business necessity.").

[39] *Ave. 6E Invs., LLC* v. *City of Yuma,* 818 F.3d 493, 513 (9th Cir. 2016).

[40] *See, e.g.,* Policy Statement on Discrimination in Lending, 59 FR 18266 (Apr. 15, 1994); *Interagency Fair Lending Examination Procedures* (Aug. 2009); *see also 1994 Hearings, supra* note 28, at 20 (statement of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity) ("As in other areas of fair housing law enforcement, standards to determine [insurance] discrimination will . . . [include] disparate impact. . . . The investigative techniques we will utilize will include those that have grown from our fair housing investigative experience across the board . . . the kinds of tactics that we currently utilize . . . in lending discrimination investigations.").

[41] *See infra* notes 61 thru 64 and accompanying text.

[42] *Inclusive Cmtys.,* 135 S. Ct. at 2522.

[43] 15 U.S.C. 1012(b).

[44] *Humana,* 525 U.S. at 310 ("When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.").

[45] *Dehoyos* v. *Allstate Corp.,* 345 F.3d 290, 295 (5th Cir. 2003) (disparate impact under the Act); *Nationwide Mut. Ins. Co.* v. *Cisneros,* 52 F.3d 1351, 1363 (6th Cir. 1995) (disparate treatment under the Act); *Moore* v. *Liberty Nat'l Life Ins. Co.,* 267 F.3d 1209, 1221 (11th Cir. 2001) (disparate treatment in life insurance).

[46] *See PCIAA,* 66 F. Supp. 3d at 1038 ("McCarran-Ferguson challenges to housing discrimination claims [depend on] the particular, allegedly discriminatory practices at issue and the particular insurance regulations and administrative regime of the state in which those practices occurred.").

[47] *Dehoyos,* 345 F.3d 290.

[48] 179 F.3d 557 (7th Cir. 1999).

[49] 42 U.S.C. 12101–12213.

[50] *Dehoyos,* 345 F.3d at 298 n.6. Although in HUD's view the Fifth Circuit persuasively distinguished the Seventh Circuit's holding in *Doe,*
Continued

where no state law is impaired, McCarran-Ferguson will not bar a discriminatory effects claim against an insurer.

Past cases demonstrate also that discriminatory effects claims brought under the Fair Housing Act against insurers survive McCarran-Ferguson defenses even when an insurer points to a specific state law and alleges that it is impaired. Although the commenters provided examples of cases in which state laws were found to be impaired by a particular discriminatory effects challenge, other cases provide examples of state laws that were not. For instance, in *Lumpkin* v. *Farmers Group*, the court rejected a McCarran-Ferguson defense to a disparate impact challenge to credit scoring in insurance pricing, holding that disparate impact liability in that context did not impair the state's law mandating that "insurance rates cannot be 'unfairly discriminatory.'"[51] In so ruling, the court held it erroneous to read a state law prohibiting "unfairly discriminatory" rates "too broadly" and rejected the insurer's argument that such state laws require that practices with an unjustified discriminatory effect must be permitted "as long as the rates are actuarially sound."[52] The court then cited other provision of the state's insurance code specifically dealing with credit scoring, concluding that they too were not impaired.[53]

McCarran-Ferguson requires a fact-intensive inquiry that will vary state by state and claim by claim. Thus, even those cases in which impairment was found support the case-by-case approach herein adopted by HUD because, in such cases, the finding of impairment was made only after considering the particularities of the challenged practices and the state law at hand. In *Saunders* v. *Farmers Insurance Exchange*, for example, prior to ruling that McCarran-Ferguson barred a discriminatory effects claim under the Act,[54] the Eighth Circuit first remanded the case for further inquiry into several unknowns about the facts and Missouri law.[55]

The many ways in which one state's insurance laws can differ from another's, as well as the ways in which a single state's insurance laws can change over time, mean that even an exemption for specific insurance practices would be overbroad and quickly outdated. For example, variations in state insurance laws have resulted in discriminatory effects challenges to similar insurance practices surviving a McCarran-Ferguson defense in regard to some state laws but not others.[56] Past cases also demonstrate that the insurance laws of each state can change over time in significant ways,[57] and state insurance regulators respond to new practices as they become common and their effects become clear.[58] Given the variation in state insurance laws across more than fifty jurisdictions and over time, HUD declines to fashion a one-size-fits-all exemption that would inevitably insulate insurers engaged in otherwise unlawful discriminatory practices from Fair Housing Act liability.

A one-size-fits-all exemption is also inappropriate in light of the fact that insurance practices are not governed solely by "hermetically sealed" state insurance codes,[59] but are also governed by a range of other state laws, including state fair housing laws. Many state fair housing laws track the Act's applicability to insurance and provision of effects liability, indicating that those states do not consider disparate impact liability to conflict with the nature of insurance. Categorical exemptions or safe harbors of the types requested by the commenters would deprive all states of federal support in addressing discriminatory insurance practices— even those states that welcome or depend on such support. This outcome would be at odds with the purpose of McCarran-Ferguson to support the autonomy and sovereignty of each individual state in the field of insurance.[60] Connecticut's Discriminatory Housing Practices Act, for example, "provides similar (albeit broader) protection against housing discrimination as the [Fair Housing Act], which is strong indication that application of the federal antidiscrimination law will not impair Connecticut's regulation of the insurance industry, but rather is complementary with Connecticut's overall regulatory scheme."[61] Similarly, a state court found that "the disparate-impact approach does not conflict with Ohio Insurance law" and thus allowed a disparate impact claim against an insurer to proceed under the state's fair housing law.[62] In another case where the court rejected a McCarran-Ferguson defense to a discriminatory effects claim against an insurer, the court explained that it was "not persuaded that California law would allow [the challenged] practice" and therefore "the Fair Housing Act complements California law in this regard."[63] Furthermore, the allocation of authority to enforce a state's protections against discrimination in insurance can impact whether McCarran-Ferguson is a viable defense to a discriminatory effects claim in a given state.[64] The case-by-case approach thus affirms state autonomy

---

the case-by-case approach appropriately accommodates any variations among the circuits that may exist, now or in the future, as to how McCarran-Ferguson should be applied. This includes the Second Circuit's skepticism over whether McCarran-Ferguson applies at all to "subsequently enacted civil rights legislation." *Viens* v. *Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 572 (D. Conn. 2015) (quoting *Spirt* v. *Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1065 (2d Cir. 1982)).

[51] *Lumpkin* v. *Farmers Grp.* (*Lumpkin II*), No. 05–2068 Ma/V, 2007 U.S. Dist. LEXIS 98949, at *19 (W.D. Tenn. July 6, 2007).

[52] *Id.*

[53] *Id.* at *19–20.

[54] *Saunders* v. *Farmers Ins. Exch.* (*Saunders II*), 537 F.3d 961 (8th Cir. 2008).

[55] *Saunders* v. *Farmers Ins. Exch.* (*Saunders I*), 440 F.3d 940 (8th Cir. 2006). These variables included where Missouri insurance law provided a private right of action to challenge the conduct at issue, and whether determinations by the state insurance agency were subject to judicial review. The court explained that "the mere fact of overlapping complementary remedies under federal and state law does not constitute impairment for McCarran-Ferguson purposes." *Id.* at 945.

[56] For example, in cases challenging the discriminatory effect of insurers' reliance on credit scores, the McCarran-Ferguson defense has failed in some states but succeeded in others. *Compare Dehoyos*, 345 F.3d 290 (McCarran-Ferguson defense fails) *and Lumpkin II*, 2007 U.S. Dist. LEXIS 98949 (same) *with Saunders II*, 537 F.3d 961 (McCarran-Ferguson defense succeeds) *and McKenzie* v. *S. Farm Bureau Cas. Ins. Co.*, No. 3:06CV013–B–A, 2007 U.S. Dist. LEXIS 49133 (N.D. Miss. July 5, 2007) (same). *See also PCIAA*, 66 F. Supp. 3d at 1039 ("Variations among state regulatory regimes . . . provide an additional variable that may complicate any hypothetical McCarran-Ferguson analysis.").

[57] *Compare Ojo* v. *Farmers Grp., Inc.*, 356 SW.3d 421 (Tex. 2011) (recognizing a McCarran-Ferguson defense to a credit scoring disparate impact claim based on the state legislature "expressly authoriz[ing] the use of credit scoring in setting insurance rates in 2003") *with Dehoyos*, 345 F.3d 290 (rejecting a McCarran-Ferguson defense to the same type of claim based on Texas law in effect before 2003).

[58] *See, e.g.*, Nat'l Ass'n of Ins. Comm'rs, *Price Optimization White Paper* (Nov. 19, 2015) *http://www.naic.org/documents/committees_c_catf_related_price_optimization_white_paper.pdf* [hereinafter *NAIC White Paper*] (discussing the responses of state regulators to the rising increase in use of price optimization practices by insurance providers).

[59] *Humana*, 525 U.S. at 312.

[60] *See* 15 U.S.C. 1011 (explaining the purpose of McCarran-Ferguson as "the continued regulation . . . by the several States of the business of insurance is in the public interest").

[61] *Viens*, 113 F. Supp. 3d at 573 n.20 (finding that McCarran-Ferguson does not bar an FHA disparate impact claim against an insurer related to a property located in Connecticut).

[62] *Toledo*, 94 Ohio Misc. 2d at 157.

[63] *Jones* v. *Travelers Cas. Ins. Co. of Am.*, Tr. of Proceedings Before the Honorable Lucy H. Koh U.S. District Judge, No. C–13–02390 LHK (N.D. Cal. May 7, 2015), ECF No. 269–1.

[64] *Toledo*, 94 Ohio Misc. 2d at 157 (recognizing discriminatory effects liability in homeowners insurance under state law in part because the Superintendent of Insurance lacks "primary jurisdiction" over such claims).

and furthers the Act's broad remedial goals by ensuring that HUD is not hindered in fulfilling its statutory charge to support and encourage state efforts to protect fair housing rights.[65]

The commenters' concerns about the incompatibility between HUD's Rule and the fundamental nature of insurance do not warrant the requested exemptions. Although the commenters assert that a broad exemption for *all* insurance practices or *all* underwriting decisions is necessary to preserve "sound actuarial underwriting" and the "risk-based insurance 'unfair discrimination' standard," HUD declines to create a broad exemption of that sort because doing so would immunize a host of potentially discriminatory insurance practices that do not involve actuarial or risk-based calculations. Insurers regularly engage in practices, such as marketing and claims processing and payment, that do not involve risk-based decision making and to which the Act applies in equal force.[66] In addition, a discriminatory effects claim also can challenge an insurer's underwriting policies as "*not purely risk-based*" without infringing on the insurer's "right to evaluate homeowners insurance risks fairly and objectively."[67] Even practices such as ratemaking that are largely actuarially-based can incorporate an element of non-actuarially-based subjective judgment or discretion under state law. Indeed, many of the state statutes referenced by commenters mandating that rates be reasonable, not excessive, inadequate, or unfairly discriminatory permit insurers, via the very same section of the insurance code, to rely on "judgment factors" in ratemaking.[68] The example of price optimization practices,[69] which a minority of states have started regulating, illustrates how non-actuarial factors, such as price

elasticity of market demand,[70] can impact insurance pricing in a manner similar to how such considerations affect pricing of products in non-actuarial industries.[71]

HUD likewise declines to craft a safe harbor for any risk-based factor or for the specific "long-recognized" factors suggested by one commenter because it would be arbitrary and overbroad. Creating a safe harbor for the use of any factor that an insurer could prove is in fact risk-based would be overboard because it would foreclose claims where the plaintiff could prove the existence of a less discriminatory alternative, such as an alternative risk-based practice. Moreover, if HUD were to provide a safe harbor for the use of any factor that an insurer could prove is purely risk-based, entitlement to the safe harbor would inevitably necessitate a determination of whether the use of the factor is, in fact, risk-based. As stated above, if an insurance practice is provably risk-based, and no less discriminatory alternative exists, the insurer will have a legally sufficient justification under the Rule as is. The arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification. Thus, an exemption for all provably risk-based factors would offer little added value for insurers not already provided by the Rule itself while foreclosing potentially meritorious claims in contravention of the Act's broad remedial goals and HUD's obligation to affirmatively further fair housing.

Selecting a few factors for exemption, such as those suggested by the commenter, based on bare assertions about their actuarial relevance, without data and without a full survey of all factors utilized by the homeowners insurance industry, would also be arbitrary. Even if such data were available and a full survey performed, safe harbors for specific factors would still be overboard because the actuarial relevance of a given factor can vary by context.[72] Also, while use of a particular

risk factor may be generally correlated with probability of loss, the ways in which an insurer uses that factor may not be. Furthermore, the actuarial relevance of any given factor may change over time as societal behaviors evolve, new technologies develop, and analytical capabilities improve.

In light of the long, documented history of discrimination in the homeowners insurance industry, including the use of "risk factors" by insurers and regulators that were subsequently banned as discriminatory, as well as the fact-specific nature of McCarran-Ferguson analysis and the non-actuarial or hybrid nature of many insurance practices, HUD considers it inappropriate to craft any exemptions or safe harbors for insurance practices. HUD's longstanding case-by-case approach can adequately address any McCarran-Ferguson concerns and better serves the Act's broad remedial purpose and HUD's statutory obligation to affirmatively further fair housing, including by supporting fair housing efforts undertaken by states.[73]

*Issue:* One commenter requested that HUD "exempt insurance pricing from the discriminatory effects standards." The commenter argued that pricing is not covered by the Act because the Act only covers insurance practices that "make[ ] homeowners insurance unavailable" and pricing does not do so. The commenter also asserted that pricing is "subject to the filed rate doctrine" and should therefore be exempted because the filed rate doctrine precludes "private claims for damages based on challenges to filed rates."

*HUD Response:* HUD disagrees with the commenter's characterization of the Act as only covering insurance practices that make insurance unavailable, as well as with the commenter's premise that pricing does not do so. HUD also declines to craft an exemption for insurance pricing based on the filed rate doctrine because HUD does not anticipate that the filed rate doctrine will bar discriminatory effects claims involving insurance pricing. In light of the broad remedial goals of the Act and HUD's obligation to affirmatively further fair housing, HUD continues to prefer

---

[65] *See, e.g.,* 42 U.S.C. 3610(f); 24 CFR pt. 115 (HUD's Fair Housing Assistance Program); 42 U.S.C. 3608(d); 80 FR 42272 (July 16, 2015) (HUD's rule on Affirmatively Furthering Fair Housing).

[66] *See, e.g., Franklin* v. *Allstate Corp.,* No. C–06–1909 MMC, 2007 U.S. Dist. LEXIS 51333 (N.D. Cal. July 3, 2007) (applying the Act to claims processing); *Burrell* v. *State Farm & Cas. Co.,* 226 F. Supp. 2d 427 (S.D.N.Y. 2002) (same).

[67] *Nat'l Fair Hous. Alliance* v. *Prudential Ins. Co. of Am.,* 208 F. Supp. 2d 46, 60 (D.D.C. 2002).

[68] *See, e.g.,* Ga. Code Ann. 33–9–4; Mont. Code Ann. 33–16–201; *see also NAIC White Paper, supra* note 58, at 1 ¶ 5 ("Making adjustments to actuarially indicated rates is not a new concept; it has often been described as 'judgment.' ").

[69] The term "price optimization" can refer to "the process of maximizing or minimizing a business metric using sophisticated tools and models to quantify business considerations," such as "marketing goals, profitability and policyholder retention." *NAIC White Paper, supra* note 58, at 4 ¶ 14(a).

[70] The term "price elasticity of demand" refers to "the rate of response of quantity demanded due to a price change. Price elasticity is used to see how sensitive the demand for a good is to a price change." *Id.* at 4 ¶ 14(f) (internal quotations omitted).

[71] *Id.* at 9 ¶ 30 ("Price optimization has been used for years in other industries, including retail and travel. However, the use of model-driven price optimization in the U.S. insurance industry is relatively new.").

[72] For example, in some high-crime neighborhoods the higher-than-average risk of loss from theft could be offset by a lower-than-average

risk of other losses, such as those caused by weather. Therefore, the legitimacy of declining to issue insurance policies in all locations with high crime rates would depend on other features of those locations.

[73] *Cf. CROSSRDS* v. *MSP Crossroads Apts., LLC,* No. 16–233 ADM/KMM, 2016 U.S. Dist. LEXIS 86965 at *32 n.6 (D. Minn. July 5, 2016) (declining to adopt a per se rule that a certain category of disparate impact claims could not be brought in part because "HUD has indicated a preference for case-by-case review of practices alleged to cause a disparate impact").

**69018** Federal Register / Vol. 81, No. 193 / Wednesday, October 5, 2016 / Proposed Rules

case-by-case adjudication over the requested exemption.

In addition to Section 804(a),[74] which prohibits discrimination that "make[s] unavailable" a dwelling, there are several other provisions of the Act that can prohibit discriminatory insurance practices, including pricing.[75] One of those is Section 805(a),[76] which prohibits discrimination in the "terms or conditions" of "residential real estate-related transactions." Another is Section 804(b),[77] which prohibits discrimination in the "provision of services . . . in connection" with a dwelling. Indeed, HUD's fair housing regulations since 1989 have specifically stated that the Act prohibits "[r]efusing to provide . . . property or hazard insurance for dwellings *or providing such . . . insurance differently*" because of a protected characteristic.[78] Courts have applied the Act to insurance pricing,[79] as well as to other practices such as marketing and claims processing,[80] irrespective of whether the

discriminatory conduct occurred in conjunction with or subsequent to the acquisition of a dwelling.

HUD is not aware of any case, and no commenter cited one, in which a court has applied the filed rate doctrine to defeat any sort of claim under the Act, although several courts have rejected such attempts.[81] "The filed rate doctrine bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable." [82] The doctrine primarily serves two purposes: First, preventing litigants from securing more favorable rates than their non-litigant competitors, and second, preserving for agencies rather than courts the role of ratemaking.[83]

The fit between the filed rate doctrine and discriminatory effects claims is attenuated, at best, because discriminatory effects claims "do not challenge the reasonableness of the insurance rates" but rather their discriminatory effects.[84] To the extent there is any conflict between the directives of the federal Fair Housing Act and those of state ratemaking regulations, "the Supremacy Clause tips any legislative competition in favor of the federal antidiscrimination statutes." [85] Unlike filed rate doctrine cases involving a conflict between *federal* ratemaking and a federal statute, applying the filed rate doctrine to prioritize *state* ratemaking over a federal statute "would seem to stand the Supremacy Clause on its head." [86] Moreover, the filed rate doctrine "does not preclude injunctive relief or prohibit the Government from seeking civil or

criminal redress," [87] which are types of relief often obtained for violations of the Act.[88]

Because "the law on the filed rate doctrine is extremely creaky," [89] abundant variations exist among the courts as to how the doctrine applies. Even where it does apply, a filed rate doctrine defense "must be examined specifically in the context of the laws and regulatory structures at issue." [90] This would be a "fact-intensive issue" [91] that would include consideration of the particular state's ratemaking structures.[92] The case-by-case approach best accommodates these variations.

For all the foregoing reasons, HUD does not agree that the filed rate doctrine, nor the commenter's assertions about the Act's scope, warrant an exemption for insurance pricing.

*Issue:* One commenter sought an exemption from discriminatory effects liability for FAIR plans because "the operation of FAIR plans facilitates private conduct that otherwise would not have occurred."

*HUD Response:* FAIR plans were first enacted by many states in response to the federal Urban Property Protection and Reinsurance Act of 1968,[93] which was passed by Congress to address the problem of inadequate property insurance availability in the nation's urban areas due to insurance redlining. FAIR plans operate as insurance pools that sell property insurance to

---

[74] 42 U.S.C. 3604(a).

[75] Depending on the circumstances, discriminatory insurance practices can violate 42 U.S.C. 3604(a), (b), (c), (f)(1), (f)(2), 3605, and 3617. *See, e.g., Nationwide Mut. Ins. Co.* v. *Cisneros,* 52 F.3d at 1360 (holding that section 3604 of the Act prohibits discriminatory insurance underwriting); *Nevels,* 359 F. Supp. 2d at 1120–21 (recognizing that sections 3604(f)(1), 3604(f)(2), 3605 and 3617 of the Act cover insurance practices); *Nat'l Fair Hous. Alliance,* 208 F. Supp. 2d at 55–58 (holding that sections 3604(a), 3604(b), and 3605 of the Act prohibit discriminatory insurance underwriting practices); *Owens* v. *Nationwide Mut. Ins. Co.,* No. 3:03–CV–1184–H, 2005 U.S. Dist. LEXIS 15701, at *16–17 (N.D. Tex. Aug. 2, 2005) (holding that section 3604(b) of the Act prohibits discriminatory insurance practices); *Francia* v. *Mount Vernon Fire Ins. Co.,* No. CV04032039S, 2012 Conn. Super. LEXIS 665 (Conn. Super. Ct. Mar. 6, 2012) (relying on section 3604(c) to interpret an analogous state law as prohibiting a discriminatory statement in an insurance quote).

[76] 42 U.S.C. 3605(a).

[77] 42 U.S.C. 3604(b).

[78] 24 CFR 100.70(d)(4) (emphasis added). As used in this regulation, the phrase "property or hazard insurance for dwellings" includes insurance purchased by an owner, renter, or anyone else seeking to insure a dwelling. *See* 42 U.S.C. 3602(b) (defining "dwelling" without reference to whether the residence is owner- or renter-occupied).

[79] *See, e.g., NAACP,* 978 F.2d at 301 ("Section 3604 of the Fair Housing Act applies to discriminatory denials of insurance, and *discriminatory pricing,* that effectively preclude ownership of housing because of the race of the applicant.") (emphasis added); *Dehoyos,* 345 F.3d at 293 (holding that a claim alleging discriminatory insurance pricing was not barred by McCarran-Ferguson).

[80] *See* sources cited *supra* note 66; *see also Owens,* 2005 U.S. Dist. LEXIS 15701, at *17 (Insurance practices are covered by the Act "whether the insurance is sought in connection with the maintenance of a previously purchased home or with an application to purchase a home."); *Lindsey* v. *Allstate Ins. Co.,* 34 F. Supp. 2d 636, 643 (W.D. Tenn. 1999) ("It would seem odd to construe a statute purporting to promote fair housing as prohibiting discrimination in providing property

insurance to those seeking a home, but allowing that same discrimination so long as it takes place in the context of renewing those very same insurance policies.").

[81] *See Saunders I,* 440 F.3d at 944–46 ("The district court erred in invoking the judicially created filed rate doctrine to restrict Congress's broad grant of standing to seek judicial redress for race discrimination."); *Dehoyos,* 345 F.3d at 297 n.5 (finding "unpersuasive" the argument that the filed rate doctrine barred a Fair Housing Act disparate impact claim); *Lumpkin v. Farmers Grp., Inc.* (*Lumpkin I*), No. 05–2868 Ma/V, 2007 U.S. Dist. LEXIS 98994, at *20–22 (W.D. Tenn. Apr. 26, 2007) (ruling that "the filed rate doctrine does not apply" to a Fair Housing Act disparate impact claim).

[82] *Wegoland Ltd.* v. *NYNEX Corp.,* 27 F.3d 17, 18 (2d Cir. 1994).

[83] *Id.*

[84] *Lumpkin I,* 2007 U.S. Dist. LEXIS 98994, at *21; *see also Dehoyos,* 345 F.3d at 297 n.5 ("[T]he application of anti-discrimination laws cannot be reasonably construed to supplant the specific insurance rate controls of [states].").

[85] *Saunders I,* 440 F.3d at 944.

[86] *Perryman* v. *Litton Loan Servicing, LP,* No. 14–cv–00261–JST, 2014 U.S. Dist. LEXIS 140479, at *20–22 (N.D. Cal. Oct. 1, 2014).

[87] *In re Title Ins. Antitrust Cases,* 702 F. Supp. 2d 840, 849 (N.D. Ohio 2010); *see also Marcus* v. *AT&T Corp.,* 138 F.3d 46, 62 (2d Cir. 1998).

[88] *See* 42 U.S.C. 3612(g)(3), 3613(c), 3614(d).

[89] *Town of Norwood* v. *New England Power Co.,* 202 F.3d 408, 420 (1st Cir. 2000). The filed rate doctrine has also been described as a "weak and forcefully criticized doctrine." *Cost Mgmt. Servs.* v. *Wash. Natural Gas Co.,* 99 F.3d 937, 946 (9th Cir. 1996).

[90] *Munoz* v. *PHH Corp.,* 659 F. Supp. 2d 1094, 1099 (E.D. Cal. 2009).

[91] *Saunders I,* 440 F.3d at 945.

[92] For example, the Seventh Circuit has questioned the applicability of the filed rate doctrine to any claims involving property insurance in Illinois because "[a]lthough [a property insurance provider] is required to file its insurance rates with the Illinois Department of Insurance, it is not at all clear that the Department has the authority to approve or disapprove property-insurance rates." *Cohen* v. *Am. Sec. Ins. Co.,* 735 F.3d 601, 607 (7th Cir. 2013). States vary considerably in the degree to which they regulate rate-setting, with six different types of rate regulatory systems in use across the country: Prior approval; file and use; use and file; flex rating; modified prior approval; and no file. *See* NAIC, 2 Compendium of State Laws on Insurance Topics, Health/Life/Property/Casualty II–PA–10–21 (2011). As the classifications indicate, these rate regulatory systems vary with respect to whether or when an insurance company is required to file its rates with a state insurance agency before those rates can be used.

[93] Public Law 90–448, 82 Stat. 555 (1968).

individuals who are unable to purchase insurance in the voluntary market.

HUD declines to categorically exempt FAIR plans from discriminatory effects liability under the Act. To do so, without any consideration of the particular insurance practice or state requirements at issue, would be inconsistent with the broad remedial purpose of the Act and HUD's obligation to affirmatively further fair housing. Like state regulation of voluntary market insurance practices, state laws governing the provision and pricing of FAIR plans vary across jurisdictions. Variations in state regulation of FAIR plans include the types of coverage provided by such plans,[94] the amount of coverage allowed under such plans,[95] and the conditions under which an individual or property will qualify for such plans.[96] Additionally, even within a given state, FAIR plan regulations are subject to revision over time.

Given such variation and changeability, exempting all FAIR plans from application of the discriminatory effects standard would be overbroad and would deprive individuals of the protections afforded by the Fair Housing Act. Indeed, one state court has held "the disparate impact approach does not interfere with the Ohio FAIR Plan." [97] In light of this demonstrated compatibility, and because insurers retain some discretion in the operation of FAIR plans,[98] HUD determines that case-by-case adjudication is preferable to the requested exemption of FAIR plans.

---

[94] Compare, e.g., Conn. Agencies Regs. 38a–328–3(c) (defining "basic insurance" for purposes of the Connecticut FAIR plan to include liability coverage for any dwelling of up to three families) with Mass. Gen. Laws ch. 175c, § 1 (defining "basic property insurance" for purposes of the Massachusetts FAIR plan to include liability coverage for only non-owner occupied dwellings of up to four families) and 98–08 Wash. Reg. 4 (April 15, 1998) (excluding liability coverage from the definition of "essential property insurance" for purposes of the Washington FAIR plan).

[95] Compare, e.g., Mo. Rev. Stat. 379.825 (limiting maximum insurance coverage for a dwelling under the Missouri FAIR plan to $200,000) with 98–08 Wash. Reg. 5 (April 15, 1998) (limiting maximum insurance coverage for a dwelling under the Washington FAIR plan to $1.5 million).

[96] Compare, e.g., Ohio Rev. Cod. Ann. 3929.44(D) (requiring applicant to certify that two insurance companies declined to provide coverage for purposes of FAIR plan eligibility) with 215 Ill. Comp. Stat. 5/524(1) (restricting FAIR plan eligibility to applicants who have been declined insurance coverage by three companies).

[97] Toledo, 94 Ohio Misc. 2d at 157.

[98] See, e.g., Cal. Ins. Code 10094 (leaving discretion to governing committee of participating insurers to establish "reasonable underwriting standards" for determining whether a property for which FAIR plan coverage is sought is insurable); 215 Ill. Comp. Stat. 5/524(1) (same); Ohio Rev. Code. Ann. 3929.43(C) (same).

Dated: September 23, 2016.

**Gustavo Velasquez,**
*Assistant Secretary for Fair Housing and Equal Opportunity.*
[FR Doc. 2016–23858 Filed 10–4–16; 8:45 am]
**BILLING CODE 4210–67–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

**[EPA–R04–OAR–2016–0489; FRL–9953–63–Region 4]**

### Air Plan Approval; Georgia: Volatile Organic Compounds

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing to approve portions of two revisions to the Georgia State Implementation Plan submitted by the Georgia Department of Environmental Protection on July 25, 2014, and November 1, 2015. These revisions modify the definition of "volatile organic compounds" (VOC). Specifically, these revisions add two compounds to the list of those excluded from the VOC definition on the basis that these compounds make a negligible contribution to tropospheric ozone formation. This action is being taken pursuant to the Clean Air Act.

**DATES:** Written comments must be received on or before November 4, 2016.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R04–OAR–2016–0489 at *http://www.regulations.gov*. Follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from *Regulations.gov*. EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider comments or comment contents located outside of the primary submission (i.e., on the web, cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit

*http://www2.epa.gov/dockets/commenting-epa-dockets.*

**FOR FURTHER INFORMATION CONTACT:** Sean Lakeman, Air Regulatory Management Section, Air Planning and Implementation Branch, Air, Pesticides and Toxics Management Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW., Atlanta, Georgia 30303–8960. Mr. Lakeman can be reached by phone at (404) 562–9043 or via electronic mail at *lakeman.sean@epa.gov*.

**SUPPLEMENTARY INFORMATION:** In the Final Rules Section of this **Federal Register**, EPA is approving the State's implementation plan revision as a direct final rule without prior proposal because the Agency views this as a noncontroversial submittal and anticipates no adverse comments. A detailed rationale for the approval is set forth in the direct final rule. If no adverse comments are received in response to this rule, no further activity is contemplated. If EPA receives adverse comments, the direct final rule will be withdrawn and all public comments received will be addressed in a subsequent final rule based on this proposed rule. EPA will not institute a second comment period on this document. Any parties interested in commenting on this document should do so at this time.

Dated: September 23, 2016.

**V. Anne Heard,**
*Acting Regional Administrator, Region 4.*
[FR Doc. 2016–23971 Filed 10–4–16; 8:45 am]
**BILLING CODE 6560–50–P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

### 43 CFR Part 8360

**[LLCO910000.L16300000.NU0000.16X]**

### Notice of Proposed Supplementary Rules for Public Lands in Colorado

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Proposed supplementary rules.

**SUMMARY:** The Bureau of Land Management (BLM) is proposing supplementary rules to protect natural resources and provide for public health and safety. The proposed supplementary rules would apply to all public lands and BLM facilities in Colorado.

**DATES:** You should submit your comments by December 5, 2016.

**ADDRESSES:** You may submit comments by the following methods: Mail or hand

# Meeting The Insurance Crisis Of Our Cities

A Report by The President's National Advisory Panel
on Insurance in Riot–Affected Areas





# MEETING THE
# INSURANCE CRISIS
# OF OUR CITIES

A Report by
**THE PRESIDENT'S NATIONAL
ADVISORY PANEL ON INSURANCE
IN RIOT-AFFECTED AREAS**

# FOREWORD

In his address to the nation on civil disorders, delivered on July 27, 1967, President Johnson sounded a call for action: "Let us clear the streets of rubble and quench the fires that hatred set. Let us feed and care for those who have suffered at the rioter's hands."

"What can be done," the President asked, "to help innocent people and vital institutions escape serious injury?"

"What is the proper public role in helping cities repair the damage that has been done?"

How best can we insure "steady progress in meeting the needs of all our people"?

On the same date, President Johnson appointed the National Advisory Commission on Civil Disorders to investigate the origins of the disorders and to make recommendations for measures to prevent or contain them in the future.

Deciding that a separate and expert group could deal more expeditiously with the insurance problems of urban core residents and businessmen, the Commission, after consulting with the President, appointed on August 10, 1967, the National Advisory Panel on Insurance in Riot-Affected Areas.

The Panel was asked by the Commission to seek answers to questions raised by the difficulties and high costs of obtaining insurance in areas where riots occurred or might be a threat. In this regard, it was pointed out that the recent disorders had served to highlight problems of availability of insurance that had long existed as a corollary to urban blight. Further, it was recognized that insurance of the riot peril is directly affected by the degree to which law and order are maintained, but that this subject goes far beyond insurance problems and is a major part of the inquiry of the Commission itself.

Our members include a Governor and a former Governor, the Mayor of Washington, the presidents of a leading stock insurance company and a leading mutual insurance company, the president of a life insurance company that invests heavily in center city property, and an Assistant Attorney General of the United States. We believe that this composite of private and public experience has furnished a balanced view. We have attempted to give full weight to the various interests that must be drawn together to meet the problem of providing adequate and reasonably priced insurance in urban core areas.

Our first task was to provide leadership to prevent the insurance situation from deteriorating. On September 15, therefore, we set forth a preliminary program, calling upon state insurance commissioners, the insurance industry, and others to halt further contraction of the urban insurance market. On October 26, we suggested the possibilities for and invited comment on a comprehensive program, including expanded urban area plans, industry pooling, government backup, tax measures, and other steps.

At public hearings held on November 8 and 9, we considered the views of consumers, residents and businessmen of inner city areas, insurance brokers, industry representatives, and government officials. They gave us the benefit of their insights into urban core problems, and this was most helpful to us in developing the program recommended in this report.

ii

*Robert Horn*

We gathered information from across the country. We conducted interviews in various cities, systematically surveyed urban homeowners and businessmen, and requested written information from a variety of interested parties: state regulators, insurers and reinsurers, agents and brokers, bankers, savings and loan associations, mortgage brokers, city officials, police and fire departments, and others.

People from all walks of life have responded to our questions and contributed to our work. We acknowledge here our sincere thanks and appreciation to them for the cooperation we have received. Their help has been essential to the preparation of this report.

Most of all, we wish to express our deep appreciation for the dedicated effort put forth by the Panel's staff. Only the remarkable productivity of their work enabled us to prepare this report in the short time of a few months. Our warm gratitude goes to Stanford Ross, the Executive Director of the Panel, who directed this highly resourceful and imaginative staff effort, and to each of his colleagues.

After four months of intensive study, we believe that we have identified the nature and causes of the urban insurance problem and the steps necessary for a solution. In doing so, we have verified beyond doubt the existence of a problem of critical proportions that requires immediate action.

There is a close relationship between urban blight and insurance. Insuring property in decaying urban areas is difficult. Yet the failure to insure such properties only increases the blight. Good property that is not insured becomes deteriorating property.

The cities must be revitalized. Insurance is a basic force in this effort. In combination with other measures, insurance will help to improve the deplorable conditions of our inner cities. Our findings and recommendations, therefore, deal with a significant aspect of the broad inquiry undertaken by the National Advisory Commission on Civil Disorders.

Executing the program we recommend will contribute toward the goal expressed by President Johnson—"cities richer in opportunity; cities more full of promise; cities of order, progress, and happiness."

RICHARD J. HUGHES
WILLIAM W. SCRANTON
FRANK L. FARWELL
GEORGE S. HARRIS
A. ADDISON ROBERTS
WALTER E. WASHINGTON
FRANK M. WOZENCRAFT

January 1968

iii

# THE COVER

The cover picture is an aerial view of a riot-torn center city area of Detroit on July 23, 1967. Fire-bombed businesses and homes are in flames, and the threat to undamaged property is patent. The picture shows graphically one aspect of the insurance crisis of our cities.

iv

## THE PANEL

### Chairman
RICHARD J. HUGHES
*Governor of New Jersey*

### Vice Chairman
WILLIAM W. SCRANTON
*Former Governor of Pennsylvania*

FRANK L. FARWELL
*President, Liberty Mutual
Insurance Company*

GEORGE S. HARRIS
*President, Chicago Metropolitan
Mutual Assurance Company*

A. ADDISON ROBERTS
*President, Reliance Insurance
Company*

WALTER E. WASHINGTON
*Commissioner,
District of Columbia
Former Chairman,
New York City Housing Authority*

FRANK M. WOZENCRAFT
*Assistant Attorney General
In Charge of
Office of Legal Counsel
United States Department of Justice*

## THE STAFF

*Executive Director:*
STANFORD G. ROSS

*Assistant Director:*
RONALD B. LEWIS

*Operations Director and Associate
General Counsel:*
RICHARD TEBERG

*General Counsel:*
JAMES J. McLAUGHLIN

*Assistant General Counsel:*
DAVID BLISS

*Editorial Consultant:*
MARTIN BLUMENSON

*Research Director and Special Counsel:*
HERBERT S. DENENBERG

*Staff Consultants:*
J. D. HAMMOND
DENNIS F. REINMUTH
GEORGE REJDA

*Special Consultants:*
JUAN B. APONTE
MIGUEL A. VALENCIA

v

# CONTENTS

|  | Page |
|---|---|
| Foreword | ii |
| CHAPTER I—BASIC FINDINGS AND RECOMMENDATIONS | 1 |
| The Insurance Problem | 1 |
| Insurance: A Necessity for Homeowners and Businessmen | 1 |
| Insurance: An Essential Force in Revitalizing Our Cities | 1 |
| The Urban Core Insurance Crisis | 2 |
| Unavailability and High Cost | 2 |
| Impact of the Riot Peril | 3 |
| Factors Underlying the Crisis | 5 |
| Stop-Gap Measures | 7 |
| The Urgent Need for a Comprehensive Program | 7 |
| Summary of Recommendations | 8 |
| A. FAIR Plans | 9 |
| B. State Pools or Other Facilities | 11 |
| C. National Insurance Development Corporation | 13 |
| D. Tax Deferral Measures | 14 |
| E. Other Necessary Steps | 15 |
| CHAPTER II—THE INSURANCE ENTERPRISE AND THE URBAN CORE MARKET | 17 |
| The Nature of Insurance | 17 |
| Limitations of the Insurance Process | 18 |
| Major Types of Property Insurance | 18 |
| Fire Insurance and Allied Lines | 18 |
| Crime Insurance | 20 |
| Relative Importance of Major Lines | 20 |

vi

|  | Page |
|---|---|
| Structure of the Industry | 22 |
| In General | 22 |
| Characteristics of Insurance Companies | 23 |
| Marketing | 24 |
| In General | 24 |
| Marketing Insurance in the Urban Core | 25 |
| Underwriting | 28 |
| In General | 28 |
| Underwriting Property in the Urban Core | 29 |
| Rating | 32 |
| In General | 32 |
| Urban Core Rating Problems | 33 |
| Reinsurance | 35 |
| In General | 35 |
| Relation to Urban Core Market Problems | 39 |
| Profits | 40 |
| In General | 40 |
| Relation to Urban Core Insurance Problems | 47 |
| State Regulation | 48 |
| In General | 48 |
| Regulation in Practice | 49 |
| State and National Problems | 51 |
| Conclusion | 52 |
| CHAPTER III—PRESENT RESPONSES TO URBAN CORE INSURANCE PROBLEMS | 55 |
| In General | 55 |
| Urban Area Plans | 56 |
| The Boston Plan | 56 |
| The Michigan Fire Insurance Inspection Plan | 61 |
| The Cleveland Fire Insurance Inspection Plan | 64 |
| The Voluntary Inspection and Advisory Committee for Milwaukee Core Area Fire Insurance | 66 |
| The Buffalo and New York City Fire and Extended Coverage Inspection Plan | 68 |
| The Pennsylvania and Delaware Sub-Standard Plan | 70 |
| The Louisiana Owner-Occupied Insurable Dwelling Program | 71 |
| The Minnesota Core Area Plan | 71 |
| The Oakland, San Francisco, and Los Angeles County |  |

CHAPTER III—PRESENT RESPONSES TO URBAN
CORE INSURANCE PROBLEMS—Continued

Page

Fire and Extended Coverage Insurance Inspection
Plan_____ 72
The North Carolina Fire and Extended Coverage Plan
for Properties in Beach Area of Zone 1_____ 73
The Wichita Agents' Plan_____ 74
The Chicago Home Inspection Plan_____ 75

The Watts Pool_____ 75

Other State Responses_____ 79
Proposals for State Pools_____ 79
State and Municipal Liability for Riot Damage_____ 80

Proposals of State Commissioners_____ 81

Industry Proposals_____ 82

Proposals for Federal Legislation_____ 84

Conclusion_____ 85

CHAPTER IV—RECOMMENDED PROGRAM TO
SOLVE URBAN CORE INSURANCE PROBLEMS___ 87

A. FAIR Plans: Major Expansion of Urban Area Plans__ 87

B. State Pools or Other Facilities, Where Needed, for
Insurable Properties Declined under FAIR Plans__ 95

C. National Insurance Development Corporation to
Carry Out Vital but Unfulfilled Insurance Func-
tions_____ 99

D. Tax Deferral Measures to Increase Capacity for In-
suring Urban Core Properties_____ 105

E. Other Necessary Steps to Meet Special Problems of
the Urban Core Insurance Market_____ 107

Precedents for the Panel's Program_____ 109

APPENDICES

A. Materials on the Availability and Cost of Insurance in
the Urban Core_____ 115
Statements of Urban Core Residents and Their
Representatives_____ 115
Survey of Six Cities_____ 126
Cities Surveyed_____ 126
Size and Nature of Sample_____ 126

|                                                                          | Page |
|--------------------------------------------------------------------------|------|
| Survey Results                                                           | 127  |
|     Insurance for Businesses                        | 128  |
|     Insurance for Dwellings                         | 142  |
| Other Studies                                                            | 149  |
|   Crime Commission Survey                                     | 149  |
|   Congressional Hearings                                      | 150  |
|   Massachusetts Study                                         | 151  |
|   Cleveland Study                                             | 151  |
|   New York Study                                              | 151  |
|   Survey by the National Association of Insurance Commissioners | 151  |
|   Watts Study                                                 | 152  |
|   National Institute of Public Affairs Study                  | 152  |
| Some Aspects of the Cost of Insurance                                    | 152  |
| B. Methods of Obtaining Information                                       | 161  |
| C. Other Staff Assistance                                                | 165  |

001830

## ORGANIZATION OF REPORT

Chapter I is a summary of the entire report, containing the basic findings and recommendations of the Panel.

The detailed recommendations of the Panel are presented in Chapter IV.

Chapters II and III and Appendix A, prepared by the Panel's staff, present necessary background and supporting material for the Panel's recommended program. They place the inner city insurance problem and the steps required to meet that problem in broader perspective.

Chapter II is a description of the major aspects of the property insurance enterprise in the United States as they relate to urban insurance problems. Chapter III analyzes the present responses to deal with the insurance problems of the urban core. Appendix A provides additional detail on those problems.

x

# Chapter 1

# BASIC FINDINGS AND RECOMMENDATIONS

## The Insurance Problem

There is a serious lack of property insurance in the core areas of our nation's cities. For a number of years, many urban residents and businessmen have been unable to purchase the insurance protection they need. Now, riots and the threat of riots are aggravating the problem to an intolerable degree. Immediate steps must be taken to make insurance available to responsible persons in all areas of our cities.

### Insurance: A Necessity for Homeowners and Businessmen

Insurance is a basic necessity for a property owner. By paying a premium that represents a relatively small amount compared to the value of his home or business, an owner acquires protection against the possibility that his property may be damaged or destroyed. The opportunity for every responsible individual to obtain security for his savings and investments is vital in a free society. This requires fair access to insurance.

Without insurance, the savings of millions of individual citizens are exposed to the risk of loss from natural and man-made hazards they cannot control.

Society cannot erase the suffering of the innocent victims of fire, windstorm, theft, or riot. But it can at least provide the opportunity to obtain insurance to safeguard their capital, and thereby prevent a disastrous occurrence from becoming a permanent tragedy.

### Insurance: An Essential Force in Revitalizing Our Cities

Insurance is essential to revitalize our cities. It is a cornerstone of credit. Without insurance, banks and other financial institutions will not—and cannot—make loans. New housing cannot be constructed, and existing housing cannot be repaired. New businesses cannot be opened, and existing businesses cannot expand, or even survive.

Without insurance, buildings are left to deteriorate; services, goods, and jobs diminish. Efforts to rebuild our nation's inner cities cannot move forward. Communities without insurance are communities without hope.

1

## The Urban Core Insurance Crisis

*Unavailability and High Cost.* A great deal of evidence confirms that there is a serious lack of property insurance in our nation's inner cities. Residents and businessmen from urban core areas throughout the nation have stated that they cannot purchase the property insurance they need. Some say they cannot find insurance at all. Others say that they cannot obtain insurance at prices they are able to afford. Some who now have insurance are afraid that their insurance will be cancelled in the near future or not renewed. Many do not make legitimate claims for fear of losing the insurance they have.

In Newark, New Jersey, when a butcher was asked whether he had any insurance, he answered: "No, sir. Nobody wants to insure us. No insurance—everyone I see. I [would] give my right hand [for it]."

A Detroit, Michigan, homeowner told us:

"I was paying $85 previously for three years' coverage, and now they told me [it would cost] the same amount of money for one year."

The owner of a shoe repair store in Omaha, Nebraska, was asked whether he had insurance on his merchandise, and responded:

"No sir, not a penny * * *. [T]en days after the riot, automatically all insurance was dropped out."

These are not isolated voices.* Insurance problems have affected whole communities. At our hearings, the president of a leading savings and loan association in the Watts area of Los Angeles testified:

*A full presentation of statements received by the Panel is contained in Appendix A.

**2**

"Real estate activity is practically at a standstill. Residents in this curfew area, wanting to purchase property outside the area, find it almost impossible because of their inability to sell the property they presently occupy. The sale of these properties is dependent upon financing through reputable financial institutions, which are reluctant to do so because adequate fire insurance coverage is not available. * * *"

"The problems now being faced by residents of ghettos in this country are the result of long periods of discrimination, and we should not permit the results of discrimination to be used as an excuse for doing nothing. The problems of the ghetto must be solved, and we submit that a lack of adequate insurance coverage adversely affects the economy of a community."

Adequate insurance is unavailable not only in our major cities but in other areas as well. One insurance company executive said:

"[W]e emphasize that the problem is not alone that of the core areas of a limited number of metropolitan centers, but also that of hundreds of towns and cities of every size throughout America."

In order to determine the intensity of the problem, we conducted a systematic survey including personal interviews of approximately 1,500 homeowners and 1,500 businessmen in poverty areas of Boston, Cleveland, Detroit, Newark, Oakland, and St. Louis.

The survey disclosed that over 40 percent of businessmen and close to 30 percent of homeowners had serious property insurance problems.

Over 20 percent of the businessmen and 6 percent of the homeowners surveyed

did not have basic fire insurance coverage. In Boston, over 35 percent of the businessmen surveyed had no fire insurance, and in Detroit over 12 percent of the homeowners were without it.

Of those who were uninsured, 35 percent of the businessmen and over 50 percent of the homeowners said that insurance was unavailable. Close to 30 percent of the uninsured businessmen and homeowners said that insurance cost too much.

Nearly 50 percent of the businessmen surveyed had no burglary and theft insurance. In Boston the figure was 74 percent.

Of those businessmen without burglary and theft insurance, nearly 30 percent said they wanted it but it cost too much; nearly 25 percent said they wanted it but could not get it at any price.*

*Impact of the Riot Peril.* Recent riot losses have further constricted the supply of insurance in our inner cities. Regardless of whether the management of the insurance industry anticipates rioting in the future, it feels that it must—in the interest of its policyholders and stockholders—prepare for even the remote possibility of extraordinary losses from civil disorders.

This theme has been repeatedly emphasized by a broad spectrum of insurance company spokesmen. The president of the American Insurance Association, an organization representing 170 companies, testified at our hearings:

"It is not enough merely to hope that riots will not recur and that, if they do, the damage will not be beyond the capacity of insurers to absorb in their normal operations. Watts served notice on all of us, and still the public and

insurers were largely unprepared for what happened in 1967. The lesson is all too clear. I hope that we will profit by this costly experience and not be lulled into complacency and nonaction by wishful thinking that losses cannot reach catastrophic proportions."

The general manager of the American Mutual Insurance Alliance, an organization of 122 companies, told the Panel:

"Some companies are especially concerned over their exposure to the continuing threat of sporadic civil disorders. These companies are being asked to maintain existing insurance in urban areas, and so far they are doing so. But they may not be able to continue doing so, out of concern for their solvency, unless some method can be found to neutralize this excessive riot exposure. * * *"

"[W]e have to recognize the possibility, however remote, that future disorders could develop large enough dimensions to threaten the future ability of insurers to meet their obligations to policyholders."

The president of the National Association of Independent Insurers, an organization representing 350 .companies, testified:

"[O]ur industry does not possess either the power to forestall future riots or the ability to predict the scope and severity of any which may occur. We must therefore reckon with the possibility—whether imminent or remote—that more riots may occur, and that they might conceivably produce insurance losses far surpassing the financial capacity of the companies involved to absorb."

The industry is not the only knowl-

*The complete results of the survey are presented in Appendix A.

3

edgeable group that sees in recent riots a formidable threat to the supply of insurance and the solvency of the insurance business. Thus, the National Association of Insurance Commissioners—an organization of the insurance commissioners of the 50 states—on the basis of the studies of a select committee on the insurance problems of civil disorders has recently reported:

"The hazard of loss from riot or civil disorders viewed in the context of recent events poses grave underwriting, rating and capacity problems for the private property and casualty insurance industry. Civil unrest has manifest itself throughout many parts of our nation. Its future course is uncertain. This fact has apparently led major insurer managements and underwriters to conclude that they must either be individually relieved, in whole or in part, from exposure to these perils or guard themselves by careful control on writings in areas regarded as vulnerable. These conditions and attitudes constitute not only a deterrent to the development of programs designed to expand the availability of fire and extended coverage insurance in most cities, but threaten to result in even more serious constriction of such markets."

Insured property losses from riots in the summer of 1967 were under $75 million, far less than the $715 million loss caused by Hurricane "Betsy" in 1965 and less than 3 percent of the total property losses that will be paid for 1967. Nevertheless, the sum approximated 13 percent of the entire underwriting profit of the insurance industry in 1966.

Riot losses have further burdened those lines of insurance already relatively unprofitable and those segments of the industry already the most heavily committed to writing urban core business. Thus, even though the Panel has no doubt that the insurance industry has the financial strength to absorb losses even greater than those sustained in the summer of 1967, we believe that the industry is justifiably concerned about the threat—no matter how unlikely—of future riot losses.

Another aspect of the industry's concern, in view of the civil disorders, is uncertainty about whether it can obtain enough reinsurance—insurance purchased by insurance companies to protect themselves against excessive loss. One of the largest reinsurers in the world has informed the Panel that reinsurance will continue to be available, but at higher rates and on more restrictive terms. The insurance executive wants security against catastrophic loss just like any other businessman. As one insurance executive described the situation at our hearings:

"Still another threat to the solvency of our companies is the probability * * * that reinsurers in our country and other countries—particularly in England and the Continent—will restrict or withdraw their riot coverage. If this happens, it will mean that primary underwriters will not be able to spread their catastrophic losses for the riot peril. Such an event is in contradiction to our basic operating procedures and would further expose the solvency of the primary insurers. * * *"

"It is an inescapable fact, gentlemen, that a direct relationship exists between insurance market inadequacies and the financial capacities of our insurance companies. Our industry just

4

does not have, nor can it be expected to have, the financial structure to cope with widespread civil disorder. It cannot continue to expose its very solvency no matter how remote the recurrence of widespread rioting may be.''

Executives of our nation's most respected insurance companies have stated that without some financial assistance from government to protect them against catastrophic riot losses, they will be unable to continue offering property insurance in the center city. They stress that this is a matter of urgency. As one said at our hearings:

"[W]e believe that the best and only way to induce insurance companies to provide coverage on all otherwise insurable risks is to relieve them of the exposure to catastrophic riot loss * * *. In other words, in the absence of such governmental backup, the Urban Areas Plan could result in risks which are found on inspection to be "insurable" still not finding a market because of the magnitude of the riot exposure alone."

The insurance problems created by riots cannot be allowed to jeopardize the availability of property insurance in center city areas. But the problem of providing adequate and reasonable insurance in the urban core cannot be solved merely by supplying financial assistance to protect insurance companies against catastrophic riot losses. It is clear that adequate insurance was unavailable in the urban core even before the riots. Our survey indicates that property insurance problems are severe in St. Louis—where there were no riots—as well as in Detroit; in Oakland—where riots were minor—as well as in Newark. We are dealing with an inner city insurance problem that is broad in scope and complicated in origin, and riots are only one aspect of it.

*Factors Underlying the Crisis.* For a variety of reasons explained in detail in Chapter II, the insurance industry believes that providing insurance to homeowners and businessmen in the urban core is generally unprofitable. As a result, the insurance enterprise does not function well to meet insurance needs in these areas.

The number of insurance agents and brokers selling insurance to residents and businessmen in urban core areas is relatively small. The effort to place the business may be more time-consuming and the results less lucrative than with business from other city areas and the suburbs. Agents and brokers who seek business in urban core areas find that their applications for insurance are screened carefully by the insurance companies with which they deal. An agent who submits too many applications that a company considers too risky may have his agency contract terminated.

Many agents simply avoid urban core business. An agent in Kansas City, Missouri, told the Panel:

"Probably less than 1 percent of our premium volume comes from the areas which are generally thought to be trouble spots or potential trouble spots. One reason for this truthfully is probably that I know it is hard to place this business and not only do not solicit it but actually discourage it."

An agent in Washington, D.C., said:

"We don't have any trouble with business in blighted areas because we stay away from it. It's bad business."

The basic factor underlying the shortage of insurance in urban core areas is

**5**

that insurance companies generally regard any business in those areas as relatively unprofitable. Instead of basing their decisions to insure solely on the merits of individual properties, many companies consider the application of an inner city homeowner or businessman on the basis of the neighborhood where his property is located.

Underwriting materials sent to the Panel in response to requests for information reveal clearly that business in certain geographic territories is restricted. For example, one underwriting guide states:

"An underwriter should be aware of the following situations in his territory:

    1. The blighted areas.

    2. The redevelopment operations.

    3. Peculiar weather conditions which might make for a concentration of windstorm or hail losses.

    4. The economic makeup of the area.

    5. The nature of the industries in the area, etc."

"This knowledge can be gathered by drives through the area, by talking to and visiting agents, and by following local newspapers as to incidents of crimes and fires. A good way to keep this information available and up to date is by *the use of a red line* around the questionable areas on territorial maps centrally located in the Underwriting Division for ease of reference by all Underwriting personnel." (Italics added.)

A New York City insurance agent at our hearings put it more pointedly:

"[M]ost companies mark off certain areas * * * to denote a lack of interest in business arising in these areas. In New York these are called K.O. areas—meaning knock-out areas; in Boston they are called redline districts. Same thing—don't write the business."

The companies' motives for restricting the supply of insurance in urban core areas are not hard to find. Every company has a limited capacity to accept risks, and every company legitimately seeks to maximize profits on the insurance it writes. In doing so, company underwriters are given incentives for choosing the least hazardous risks in relation to the amount of premium charged. Thus, in attempting to select only better risks, they find it easier to block out areas considered to be blighted than to evaluate properties individually.

In considering center city properties to be relatively poor risks, insurance companies may have in mind that buildings in these areas may be older and less fire resistant than new buildings in other areas or the suburbs. They may have defective heating and electrical systems. Narrow and congested streets may hamper firemen. The density of construction and the closeness of properties may invite the spread of individual fires into conflagrations. Damage from heat, smoke, and water may be widespread.

Companies may also feel that environmental hazards generally exist. Property in excellent condition may be exposed to nearby fire risks. It may be vulnerable to unusual crime hazards. Newly-arrived residents from rural areas may be unaccustomed to the requirements of urban living. Overcrowding increases tension and antisocial behavior.

The added risk of riots, even though regarded as a remote possibility, has now prompted some companies to state that continued deterioration of the present

6

situation would make them positively un-willing to provide any insurance in urban core areas.

Yet none of these factors may be of significance with respect to any individual property. What could be regarded as generally reasonable procedures may be arbitrary and discriminatory when applied in any particular case. Applications for insurance must be considered on their individual merits if everyone is to have fair access to insurance.

## Stop-Gap Measures

In response to the urgency of the center city insurance problem, this Panel, on September 15, 1967, called for state regulators and the insurance industry to prevent mass cancellations and nonrenewals and to halt a further constriction of the market. As a first step toward increasing the availability of insurance in center cities, we also urged the adoption and expansion of "Urban Area Plans." Under these plans, individual properties are insured unless a physical inspection discloses demonstrable reasons why the property itself cannot be insured.*

Encouraging developments are taking place. State insurance commissioners, in consultation with the industry, have taken actions to maintain existing insurance coverage. Thus, in Michigan and New Jersey, for example, commissioners have extended a moratorium against cancellations and nonrenewals and have begun to work with the industry on steps to enlarge the supply of insurance in urban core areas. Some states—for example, Illinois and Kansas—have adopted Urban Area Plans; others, such as New

Jersey and Connecticut, are working to develop these and similar methods to overcome the insurance crisis. The National Association of Insurance Commissioners has made its concern a matter of record and has encouraged action to meet the problems.

Insurance companies have generally acted responsibly while awaiting the development of a more basic solution to the problem. They have not engaged in mass cancellations or nonrenewals. They have endeavored to maintain existing markets.

Despite these constructive efforts, there is great uncertainty over the future of the inner city insurance market. In some cases, the moratoria on cancellations and nonrenewals imposed by state insurance departments in the wake of the summer's riots are by their terms limited in time. Clearly, critical problems remain to be solved.

## The Urgent Need for a Comprehensive Program

We believe that further steps must be taken immediately. We recommend that a comprehensive and affirmative program be placed into operation at once. The resources and talents of the insurance industry and of local, state and federal governments must be marshalled to assure property owners everywhere fair access to insurance.

Unless bold and cooperative action is taken without delay, the problems of insurance availability will only become more serious, and solutions will be even more difficult to achieve.

Some representatives of insurance companies have said that if the underlying problems of urban blight were corrected, insurance would be readily avail-

---

*Existing Urban Area Plans and other responses to urban core insurance problems are described in Chapter III.

7

able. But if insurance were more readily available for property that is adequately maintained, the underlying problems of urban blight would be more readily corrected.

Owners of well-maintained homes and businesses in urban core areas should not be asked to wait for better days to come. Indeed, they will not wait—those who can will move out at the first opportunity. Those who do not move will have less incentive to keep up their properties. Insurance must be made available now.

Yet any workable program must take other realities into account. Insurance companies are legitimately interested in profits and in maintaining their financial safety and stability. They therefore seek to avoid high risks. The states are already burdened with urgent demands on their resources. The federal government's responsibilities already more than match its tax revenues.

We believe that a successful program can be designed to operate within the context of the existing structure of the insurance industry and the existing pattern of state regulation and taxation of the insurance industry.

We believe also that federal measures should support rather than supplant local efforts. Action by the federal government should encourage and assist those with front-line responsibilities.

We are convinced that the solution of the insurance problem of the center cities lies in the cooperative efforts of all who are involved. No single interested segment—the insurance industry, local, state and federal governments, or the residents and businessmen of the urban core—can, acting alone, ameliorate the complex and interdependent conditions that cause this problem.

All must accept a measure of responsibility. By doing so, the insurance crisis can be met.

The principal alternative to this approach is for government itself to provide insurance directly. We believe that so marked a departure from the free enterprise insurance system is unjustified at this time. We have confidence in the strength of the insurance industry and the abilities of the state insurance departments. We feel that they can, with limited federal assistance, meet the challenge posed by the critical insurance needs of our center cities.

## Summary of Recommendations*

We propose a five-part program of mutually supporting actions to be undertaken immediately by all who have a responsibility for solving the problem:

—We call upon the insurance industry to take the lead in establishing voluntary plans in all states to assure all property owners fair access to property insurance.

—We look to the states to cooperate with the industry in establishing these plans; and to supplement the plans, to whatever extent may be necessary, by organizing insurance pools and taking

---

*Chapter IV explains these recommendations in greater detail and contains information that will be helpful for those who have the responsibility of implementing them.

8

other steps to facilitate the insuring of urban core properties.

—We urge that the federal government enact legislation creating a National Insurance Development Corporation (NIDC) to assist the insurance industry and the states in achieving the important goal of providing adequate insurance for inner cities. Through the NIDC, the state and federal governments can provide backup for the remote contingency of very large riot losses.

—We recommend that the federal government enact tax deferral measures to increase the capacity of the insurance industry to absorb the financial costs of the program.

—We suggest a series of other necessary steps to meet the special needs of the inner city insurance market—for example, programs to train agents and brokers from the core areas; to assure the absence of discrimination in insurance company employment on racial or other grounds; and to seek out better methods of preventing losses and of marketing insurance in low income areas.

The fundamental thrust of our program is cooperative action. Thus, only those companies that participate in plans and pools at the local level, and only those states that take action to implement the program, will be eligible to receive the benefits provided by the National Insurance Development Corporation and by the federal tax deferral measures. We firmly believe that all concerned must work together to meet the urban insurance crisis. Everyone must contribute; no one should escape responsibility.

Our specific recommendations for a five-part program are:

## A. FAIR Plans

We recommend that the insurance industry, in cooperation with the states, institute in all states plans establishing fair access to insurance requirements (FAIR Plans).

A FAIR Plan assures every property owner in a state:

—Inspection of his property;

—Written notice of any improvements or loss prevention measures that may be required to make his property insurable; and

—Insurance if the property is adequately maintained according to reasonable insurance standards.

FAIR Plans make these assurances applicable to:

—All dwellings and commercial risks, including buildings and contents;

and for these basic lines of insurance:

—Fire and extended coverage (damages from wind, hail, explosion, riot, civil commotion, aircraft, vehicle, and smoke);

—Vandalism and malicious mischief; and

—Burglary and theft.

FAIR Plans envision a substantial expansion of Urban Area Plans that have been in operation on a limited scale since 1960. Urban Area Plans generally cover only residential properties in limited geographical areas, offer only fire and extended coverage insurance, and have procedural inadequacies. Experience with Urban Area Plans demonstrates their promise, but also exposes their limitations. FAIR Plans will fulfill that promise.

One of the most notable extensions FAIR Plans will make over Urban Area

9

Plans is to provide burglary and theft insurance as well as fire and extended coverage. What is commonly termed "burglary and theft insurance" encompasses a multitude of different coverages, each presenting difficult underwriting problems. This line of insurance has been a very minor part of total industry writings. It has been much more expensive to market, and increasing crime rates are making it even more expensive. The problems of burglary and theft insurance have received relatively little study, and the potential for improvement is great. While the ultimate answer to the problem lies in the reduction of crime and in loss prevention, FAIR Plans can provide the incentive to insurance companies to develop innovations in the burglary and theft line that will make the basic coverages more available to the public.

The major differences between Urban Area Plans and FAIR Plans have led us to formulate the new name, which has the added merit of conveying to the public the overriding purpose of the Plans.

We believe that FAIR Plans will:

—End the practice of "red-lining" neighborhoods and eliminate other restrictive activities;

—Secure for all property owners equitable access to all basic lines of property insurance; and

—Encourage property improvement and loss prevention by responsible owners.

FAIR Plans will also furnish accurate information to local and state governments on neighborhoods and on the condition of individual properties in poverty areas. We strongly urge forceful action at local levels to remedy the known environmental hazards of these areas. Action should include the development and enforcement of effective building and fire codes, the provision of more adequate police and fire protection, and the improvement of health, safety and related local services.

If the information produced by FAIR Plans leads to constructive governmental action, environmental hazards, which generate many of the insurance problems that make the FAIR Plans necessary, will be removed. Thus, FAIR Plans contain, in themselves, a broader implication. They serve as a stimulus to cure the basic conditions which have created the need for FAIR Plans at this time.

We recognize that the successful operation of FAIR Plans depends to a large extent on a sincere effort on the part of each insurance company to accept center city insurance risks.

We are confident that the insurance industry will take the steps required to help solve what is not only a complex and troublesome insurance problem, but a profound social problem.

FAIR Plans establish minimum standards that are essential to overcome center city insurance problems. Every state will develop and implement a plan in conformance with its own local institutions, and every state may, indeed, establish criteria beyond those suggested by the Panel.

The rates for insuring properties are an important aspect of FAIR Plans. Since the regulation of insurance rates is a state function, the states will bear the responsibility for the rates payable for properties insured under FAIR Plans.

We urge that, insofar as possible, the level of rates generally applicable in a state also apply to properties insured under FAIR Plans. Surcharges, if needed, should be permitted only for

10

demonstrable hazards of the property itself. Wherever possible, there should be no additional rate for environmental hazards.

We recognize the need for flexible and adequate rates. A risk must bear an appropriate rate; if a property is significantly more hazardous than average, it must yield a commensurately higher premium. Nevertheless, we hope that the states will consider placing a maximum limit on surcharges. Excessive or discriminatory rates must not be permitted to undermine the goals of the FAIR Plan.

## B. State Pools or Other Facilities

We recommend that states, in cooperation with the insurance industry, form pools of insurance companies (or other facilities) to make insurance available for insurable properties that do not receive coverage under the FAIR Plans.

State pools will supplement FAIR Plans. Some owners of well-maintained property will be unable to obtain insurance even after an inspection under the FAIR Plan. Although the property itself is in good condition, it may be adjacent to an extremely high fire risk, exposed to unusual crime hazards, or subject to other environmental hazards which presently make property uninsurable.

Owners of these properties, usually declined by individual insurance companies, must have fair access to insurance. The responsible owner who cares for his property must not be penalized because of his neighborhood. He must not be denied insurance for reasons beyond his control. To do so not only treats him unfairly, but encourages the spread of urban blight.

It is important to recognize the distinction between this property and un-

insurable property that itself is in hazardous condition and cannot or will not be repaired by the owner. Uninsurable property of this latter sort should not be insured, but should, instead, be the object of renewal programs designed to revitalize blighted areas.

We recommend that state insurance pools be formed where necessary to insure well-maintained property, regardless of its location. A pool is an association of insurance companies that agree to share income, expenses and losses according to a predetermined arrangement. A pool may be voluntary if all but an insignificant part of the industry participates. In some states it may have to be mandatory to obtain the broad industry participation that is necessary.

State pools will:

—Guarantee to the property owner insurance if his property meets insurable standards, even when his property is subjected to environmental hazards;

—Provide a method of spreading equitably throughout the insurance industry the risks from environmental hazards unacceptable to a single company;

—Create a convenient facility for government financial assistance if it is needed to provide insurance for these risks.

Some states may well choose a different method to achieve the same results expected from pools. They may elect some other arrangement more suitable to their own local institutions—for example, a state insurance company to underwrite the properties directly or a state insurance fund to provide reinsurance for these risks. The point is, state pools or

**11**

some other facility may be needed to achieve the goals of the FAIR Plans.

In some states, properties adversely affected by environmental hazards may be insignificant in number. They may be insured without the necessity of organizing a state pool. Diligent effort exercised by property owners and social responsibility exercised by state officials and the insurance industry—for example, by modifying underwriting standards—may succeed in providing adequate insurance through the FAIR Plans alone.

States that are uncertain whether a pool is necessary may wish to wait a year or two until they evaluate the data developed under their FAIR Plan. In this case, they would have the benefit of the experience of those states that have moved forward more rapidly with pool arrangements.

We recognize that very little is known about insuring core area risks under a pool arrangement. The experience of the Watts Pool is helpful; but since that pool is restricted to fire insurance at highly surcharged rates for commercial properties in a limited geographic area, it is not necessarily a model that can be used generally. Pooling, however, is a standard insurance arrangement, and there is every reason to expect that it can function effectively to handle center city insurance problems.

The underwriting standards of the pool should be set by the state insurance department after consulting with the insurance industry. All properties meeting reasonable standards of insurability should be accepted regardless of environmental hazards.

It is recognized that deductibles and other limits on liability may be needed in making insurance available through a pool.

Rates for property insured in the pool will be regulated by the states. Each state will determine its own appropriate pattern of rates. We recognize that flexible rates may be necessary. But we urge that the pool charge no additional rate for environmental hazards, and that, if surcharges are needed, they be subjected to a maximum limit in order to keep the premium costs within the means of the urban core resident.

It may well be that intensive loss prevention and educational campaigns, deductibles and other similar insurance devices, as well as prudent pool management, can make the pool profitable over a reasonable period of time.

We recognize, however, that the rates charged for pool risks and the type of risks undertaken by the pool may make recurring losses inevitable. Handling these losses might be resolved in a number of ways. If rates are adequate throughout a state to permit substantial profits by companies generally, companies might be assessed some portion of their underwriting income on non-pool property. Or, a state might itself provide funds from premium taxes or general revenues and subsidize to a certain extent the risks in the pool. Just as a state provides funds for other programs designed to revitalize core areas, it could consider its insurance pool as a related undertaking.

Another alternative for covering pool losses is for the state pool to apply to the National Insurance Development Corporation for financial backing against losses. In this event, federal as well as state funds would be available to spread the cost of subsidization.

12

## C. National Insurance Development Corporation

We recommend that the federal government charter a National Insurance Development Corporation (NIDC) to undertake responsibility for a variety of vital but unfulfilled functions in support of the actions of private industry and states in the operations of FAIR Plans and state pools.

The National Insurance Development Corporation would have no shareholders, but rather directors appointed by the President and representing all the parties vitally interested in the inner city insurance problem—residents of urban cores, insurance industry representatives, state officials (including state regulators), federal officials, and members of the public. It would not seek to make a profit but to discharge important functions in making insurance more widely available to the public.

The Corporation would discharge these functions:

—Provide reinsurance against the risk of extraordinary loss from civil disorders, and thereby remove the burden from a single group of persons or segment of the insurance industry;

—Provide a source of reinsurance for state pools;

—Assess the performance of FAIR Plans, state pools, and other insurance programs designed to deal with the problems of the inner cities, by gathering information, analyzing data, and preparing studies for the benefit of the public, the industry, and government.

At the present time, standard insurance policies in many lines of insurance include coverage against loss from riots. We strongly believe that the insurance industry should continue to include this riot coverage in all lines of insurance in which it presently exists.

We believe that the riot risk should, however, be neutralized as a factor hampering the underwriting of insurance in center cities and the placement of private reinsurance. Accordingly, the NIDC would issue riot reinsurance to member companies which are participating fully in FAIR Plans and, where they exist, in state pools.

Any company desiring this riot reinsurance would pay a premium to the NIDC. The premiums paid in will provide a fund from which to pay losses should they occur. The companies would retain the primary coverage of riot damage. The NIDC reinsurance would cover only the contingency of very large losses.

Maintaining law and order is primarily a state and local responsibility. Thus, any state desiring reinsurance for riot risks located in that state would be required to accept a state layer of financial backup of some kind in the event that disorders actually take place in that state.

To the extent that losses on reinsured policies exceed the fund accumulated by company premiums and state contributions, the NIDC would have authority to borrow from the Federal Treasury amounts needed to pay for losses in excess of its assets up to whatever limit may be prescribed by Congress. The borrowings would be repaid by subsequent accumulations of premiums or by Congressional appropriations.

In addition, we recognize that there is great uncertainty as to how state pools

13

will function, and how their financial aspects will be handled. We feel strongly, however, that pools should be undertaken now where they are required to meet urban core insurance problems. To aid the operation of state pools, the NIDC could receive direct appropriations for the purpose of helping the pools achieve their important objectives.

Finally, we recognize that our proposed program, like all new measures, will not be put into operation without difficulties. The program needs to be monitored to see that it is accomplishing its objectives, and this might best be undertaken by the NIDC.

The monitoring function includes:

—Collecting statistics on the operation of FAIR Plans and the state pools.

—Conducting surveys and studies in cooperation with state insurance departments and the insurance industry to assure that the program is achieving its objectives.

—Gathering statistics and preparing studies of reinsurance—especially alien reinsurance—and of direct insurance placed abroad.

—Publishing the results of studies and surveys and providing information and analysis to the public, the insurance industry, and state and federal governments.

—Making recommendations for any changes needed in the program to achieve its purposes.

## D. Tax Deferral Measures

We recommend federal legislation authorizing tax deferral measures to permit insurance companies participating in FAIR Plans and, where they exist, in state pools, to accumulate, as quickly as possible, more adequate reserves for "catastrophe losses."

Federal tax measures would operate as follows:

—The federal government would defer tax on any amount placed by insurance companies in special reserves to meet catastrophe losses. Any company desiring tax deferral must participate in FAIR Plans and, where they exist, in state pools.

—That portion of the special reserve that would otherwise have been paid in taxes to the federal government would instead be invested in interest-free, non-transferable United States Treasury securities. Should the companies incur catastrophe losses, these securities could be redeemed for cash, which would then be available to pay the losses.

—Limits would be placed on the amount of funds that could be accumulated in the tax-deferred reserves. Funds set aside in pools and in special reserves which are later returned to the companies for general use would become taxable at the time of the return.

The states would authorize, within these limits, whatever reserves and premiums they determined to be desirable and appropriate. This action would trigger the federal tax deferral.

The Panel believes that when sufficient reserves are accumulated, the financial backup of government against catastrophe losses may no longer be necessary. Tax deferral measures therefore contain the promise of phasing out governmental support and restoring the entire enterprise to private hands.

14

## E. Other Necessary Steps

We recommend other measures to meet special problems of the urban core insurance market, specifically:

1. *Manpower Training Programs* to be sponsored by government to train residents of blighted areas as agents and brokers with special competence to handle the insurance needs of center city areas.

2. *Recruitment and Training Programs* to be expanded by insurance companies in order to attract residents of center city areas to fill personnel needs at all levels of the business.

3. *More Economical Methods of Marketing Insurance* to be studied by the insurance industry; for example, new forms of contracts, as well as new marketing and underwriting techniques designed to improve the insurance market in center cities.

4. *Better Procedures to Handle Policyholder Complaints* to be developed by state insurance departments in order to have better records of complaints, cancellations, nonrenewals, and other statistics that measure insurance company performance.

5. *Research Programs* to be established by the insurance industry in cooperation with state pools and government to develop new loss prevention techniques and other methods of improving the insurance market in center city areas.

6. *More Refined Statistics* to be compiled by rating bureaus and insurance companies on loss experience in order to facilitate rate regulation and loss prevention.

7. *Lending Programs* to be accelerated in the urban core with particular attention to providing needed funds to small businessmen and other property owners for removal and control of fire and crime hazards.

8. *Contractors' Bid and Performance Bonds for Urban Core Businessmen* to be made more readily available to encourage construction work in these areas.

**15**

## Chapter II

## THE INSURANCE ENTERPRISE AND THE URBAN CORE MARKET

Insurance is first of all a business. Property owners seeking to protect themselves against financial loss purchase a policy from an insurance company. Insurance companies and their shareholders legitimately expect to make a profit by selling the policy.

But insurance is more than a business. A society based on private ownership of property requires an insurance enterprise that functions effectively. The social purposes achieved by insurance are vital to the growth and prosperity of America.

Insurance is a complex enterprise. The purpose of this chapter is to describe the major aspects of the property insurance business in the United States as they relate to urban core problems. A description of how insurance operates requires an analysis of many interrelated elements. An understanding of these elements is essential for a proper evaluation of the nature and causes of the insurance crisis of our cities and for developing a program to meet that crisis.

## The Nature of Insurance

By making a payment, called a premium, a property owner purchases protection against the risk of having his home or business damaged or destroyed by a natural phenomenon or human act. He is thereby insured.

The premium an insured pays is a relatively small amount compared to the value of his home or business. If a loss actually occurs for which the owner is insured, he makes a claim for reimbursement to the extent of his loss. The repayment he then receives enables him to repair and restore his property.

If a person wishes to purchase or improve property and seeks a loan for this purpose, he must assure his creditor that the property is insured. Otherwise, the lender has no security for the amount of his loan in the event that the property is destroyed.

Thus, insurance provides financial protection and psychological security to the individual homeowner and businessman, and satisfies a primary requirement for credit.

The insured purchases a policy from and pays his premium to an insurance company. The premiums collected by the company from the insureds create a fund large enough to pay the unfortunate few who actually suffer losses.

17

It is certain that some insureds will suffer losses; but most will not. What the company does is to distribute the losses of the few among the relatively large group of people who pay premiums. In effect, the small premium paid by each insured is his share of the total losses of the group.

## Limitations of the Insurance Process

Life is full of risks, avoidable and unavoidable. Risks may result in financial losses, large or small. Insurance, like prevention, is one way to protect against these losses.

Private insurance companies are unable to insure against every kind of loss. Losses incapable of exact identification are uninsurable. In this category are small theft and pilferage losses sustained by retail merchants, who cannot always ascertain and differentiate them from losses the result of, for example, bookkeeping errors.

Small and recurring losses, even if capable of exact identification, are uneconomical to insure, for the benefits do not justify the expense of insurance. Individual owners and businessmen absorb these losses by budgeting for them in the same way as for normal operating expenses. In insurance terminology, this is called self-assumption.

Self-assumption may be only partial. It can be combined with insurance through the use of deductibles—the property owner assumes a small specified amount of loss before the insurance company pays. Thus, minor windstorm losses are generally subject to a $50 deductible. The loss of $50 of shingles remains with the owner; the loss of a $1,000 roof is covered by $950 of insurance.

If a risk is expected to produce large and frequent losses, it is also uninsurable. Insurance is only practical when the probability of loss (and hence the premium charged) is relatively small. People do not want to pay $500 for $1,000 worth of insurance. Many face this pattern with respect to theft insurance.

Risks of widespread catastrophic loss are also uninsurable, for should they occur, an insurance company would lack the funds to reimburse the insureds. Thus, there is no insurance by private companies for damages from war or revolution.

Since an insurer must predict future losses with some precision, it finds some risks uninsurable because it has no way of predicting their occurrence. When risks are both incalculable in nature and possibly catastrophic in scope, an insurance company cannot take the chance of accepting the liability. An example is the unlimited risk involved in the possibility of a major nuclear accident resulting from an atomic reactor.

The insurance process depends to a large degree on statistics and actuarial calculations, but it is not a science. What is considered insurable is essentially a matter of judgment on the part of the insurer. Whether the insurer is correct will ultimately affect its financial stability and the service it provides.

If premiums are commensurate with the risks being covered, the industry is operating on a financially sound basis. When it is socially desirable or necessary to insure a risk that cannot be handled by the private insurance process, a government program may be necessary.

This may be the case if the expected losses are regarded as too great to be assumed by private insurers, or if the premiums are beyond the financial capacity of the potential insureds. In cases where public policy demands that the protection nonetheless be provided, this can be accomplished by coordinated efforts on the part of private companies, by the government itself, by a government program administered by the private industry, or by private enterprise with governmental backing. There are precedents for all varieties of insurance programs that supplement the private insurance enterprise to achieve basic social goals.

## Major Types of Property Insurance

The property insurance coverages important to urban insurance problems have traditionally been marketed on a mass basis by private insurance companies.

### Fire Insurance and Allied Lines

*In General.* Except for property depreciation and obsolescence, which are regarded as normal

18

operating expenses, fire represents the greatest single cause of physical loss to property. In 1966, fires were responsible for more than $1.9 billion of property damage in the United States. It is estimated for 1967 the figure may approximate $2 billion.

Fire insurance is considered the basic form of protection for buildings and their contents. It is the foundation for other coverages that are obtained either by amendments, called endorsements, to the fire policy, or by a broader policy coverage—for example, all risks—that includes fire within a larger category of risks.

*Extended Coverage Endorsement.* The most important endorsement to a fire insurance policy is called extended coverage. Although priced separately, it is generally an integral part of the fire insurance policy and is usually sold as a unit together with fire coverage.

The extended coverage endorsement provides protection against damages arising from windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles, and smoke.

By far the most important of these risks has been windstorm, which includes hurricanes, tornadoes, and hail storms. Of approximately 200 catastrophic losses of $1 million or more that have occurred since January 1, 1953, involving fire and extended coverage policies, all but 11 were caused by windstorm. Hurricane "Betsy" in 1965 alone accounted for $715 million in insured property losses—a sum far larger than the total premiums collected that year for extended coverage.

The other risks covered have been of lesser importance, except for the riot and civil commotion coverage, which has become significant in recent years. The approximate $50 to $75 million total of insured losses in 1967 from riots represent about 10 to 15 percent of total extended coverage premiums.

The coverage granted by a particular endorsement is defined technically and is not always apparent from the name of the perils listed. For example, "smoke" is carefully defined in the extended coverage endorsement and excludes damage from fireplaces and industrial apparatus.

Riot, together with civil commotion, is not specifically defined. The endorsement usually indicates only that:

> Loss by riot, riot attending a strike or civil commotion shall include direct loss by acts of striking employees of the owner or tenant of the described building while occupied by said striking employees and shall also include direct loss from pillage and looting occurring during and at the immediate place of a riot, riot attending a strike or civil commotion.

Policyholders must thus look to state law for a definition of riot. In some states, riot is defined for insurance purposes by statute; in others, the definition has been developed by the courts through case law. In most, the definition is much like the following:

> 'A tumultous disturbance of the peace by three persons or more assembling of their own authority with an intent mutually to assist one another against anyone who shall oppose them in the execution of some enterprise of a private nature, and afterwards actually executing the same in a violent and turbulent manner to the terror of the people, whether the act intended were of itself lawful or unlawful;' quoted from 8 R.C.L. 330 in *Symonds v. State,* 66 Okla. Cr. 49, 54, 88 P. 2d 970, 973 (1939).

Although insurance policies cover losses caused by riots, virtually all property insurance contracts specifically exclude losses caused by insurrection. Like the terms "riot" and "civil commotion," the term "insurrection" is not defined in the standard policy. Hence, the policyholder must look to statutory or common law definitions.

The cases that have interpreted "insurrection" in its insurance context have generally defined it to mean an organized and violent uprising against lawful authority, with the intention of overthrowing and replacing the existing government. A leading case holds: "to constitute an insurrection or rebellion within the meaning of these policies, there must have been a movement accompanied by action specifically intended to overthrow the constituted government and to take possession of the inherent powers thereof" (*Home Ins. Co.* v. *Davila,* 212 F.2d 731, 736 (C.A. 1, 1954)).

Insurance companies have made no attempt to avoid paying claims arising from the recent disorders by calling them acts of insurrection.

*Vandalism and Malicious Mischief Endorsement.* When property is destroyed by persons acting willfully but without the open defiance of authority and the tumult associated with riot, the loss is generally considered to be caused by vandal-

**19**

ism or malicious mischief. This endorsement is important in borderline situations that might fall short of meeting the definition of riot. It also takes care of other kinds of losses, for example, a brick thrown through a window of a home by a juvenile.

*Allied Lines.* The two endorsements, extended coverage and vandalism and malicious mischief, are called allied lines of the fire insurance coverage, because they are usually sold with the fire policy. Other allied lines are, for example, sprinkler leakage insurance and earthquake insurance.

*Package Policies.* Package policies are often written to cover a variety of liability and other risks in addition to fire and allied lines. They are usually multiple line policies, in that they include fire and marine lines as well as casualty lines. Package policies represent a development in direct response to demands for more complete protection in a simplified format. They are a convenient way of providing fire and allied lines coverage and represent the direction of future market developments. Written for homeowners, commercial establishments, and institutions, they increased—in terms of premiums collected—about eightfold between 1957 and 1966.

Package policies are most commonly used to insure low-hazard property and are less important in blighted areas of a city than in other areas or the suburbs. One of the reasons is that companies carefully assess the basic coverages in blighted areas and are unwilling to add coverages that may increase exposure without a truly commensurate premium.

### Crime Insurance

*Burglary and Theft Lines.* Reported and unreported crime losses to property have been estimated at almost $4 billion a year. Whatever the real magnitude of property losses from criminal activity, crime insurance is viewed by those exposed to loss as an essential protection. Losses from criminal acts are insured under burglary and theft policies. Coverage is provided under these policies for burglary (breaking and entering), robbery (forcible taking from a person), theft or larceny (unlawful taking of property, including embezzlement) and similar acts that cause destruction and disappearance of property under circumstances that indicate criminal activity. Fidelity coverages

20

protect against loss from the dishonesty of employees and of others in positions of trust.

Burglary and theft are defined in different ways by various insurance contracts. Insurance policies establish their own contractual definitions for crime, which may differ from definitions commonly employed for purposes of the criminal law.

Burglary and theft insurance may be written as a separate policy or be included in a broader package or multiple peril policy. Special burglary and theft contracts have been designed for homeowners and tenants. The homeowners policy, for example, specifically covers burglary and theft.

A businessman might want protection against only some kinds of criminal acts depending upon the nature of his business and how large a premium he wants or is able to pay. Each kind of coverage carries its own price. The size of stock or inventory, the amount of money kept on the premises during and after business hours, and various other factors are important in determining desired coverages.

For example, a grocer generally wants a mercantile open stock burglary policy to protect his merchandise. He may also want a mercantile robbery policy, which covers the loss of money, securities, and other valuable property.

A storekeeper's burglary and robbery policy has been created to cover seven different kinds of protection in a single contract. It includes, for example, protection against burglary, robbery, employee dishonesty, and damage to premises.

*Plate Glass.* Plate glass protection, though usually not considered crime insurance, is often sought in conjunction with it to protect against store window breakage. Glass insurers normally replace the broken glass instead of paying claims in cash, and the insurance may be purchased more for this convenience than for the financial protection which characterizes most insurance transactions.

### Relative Importance of Major Lines

Fire insurance produces the largest premium volume of the property lines. In 1966, fire premiums were $1.6 billion compared with $479 million for extended coverage, $197 million for other allied lines (including vandalism and malicious mischief), $110 million for burglary and theft, and $42 million for plate glass. Fire and other prop

Case: 1:13-cv-08564 Document #: 134-2 Filed: 08/11/17 Page 40 of 190 PageID #:3321

TABLE 1. NET PROPERTY-LIABILITY INSURANCE PREMIUMS WRITTEN,[1] 1964–66

[In millions]

| | 1964 | 1965 | 1966 |
|---|---|---|---|
| Auto bodily injury liability | $3,515 | $3,871 | $4,280 |
| Auto property damage liability | 1,372 | 1,553 | 1,766 |
| Physical damage (auto) | 2,509 | 2,861 | 3,258 |
| Liability (other than auto) | 1,111 | 1,137 | 1,205 |
| Fire insurance | 1,534 | 1,548 | 1,606 |
| Extended coverage | 490 | 481 | 479 |
| Other allied lines | 188 | 186 | 197 |
| Homeowners multiple peril | 1,333 | 1,523 | 1,703 |
| Commercial multiple peril | 371 | 509 | 649 |
| Workmen's compensation | 1,868 | 2,042 | 2,348 |
| Inland marine | 455 | 489 | 520 |
| Ocean marine | 248 | 262 | 295 |
| Surety and fidelity | 392 | 409 | 448 |
| Burglary and theft | 111 | 110 | 110 |
| Boiler and machinery | 103 | 91 | 91 |
| Glass | 42 | 41 | 42 |

[1] Net premiums written represent premium income retained by insurance companies, direct or through reinsurance, less payments made for business reinsured.

SOURCE: *Best's Aggregates and Averages*, 1967, pp. 141-144, 209-212.

erty insurance is also included in multiple peril policies, which for both dwellings and commercial properties accounted for $2.4 billion in 1966. Premium volume for all property-liability lines is presented in Table 1.

Tables 2 and 3 show comparative proportions of these lines over time by considering them as percentages of the total premium volume of stock and mutual insurance companies, respectively. Fire represented 8.69 percent of the stock companies' overall premium volume and 4.91 percent of the mutual companies' in 1966. When fire, extended coverage, and other allied lines are included, these figures increase to 12.15 percent and 7.5 percent respectively. Burglary and theft represented only 0.64 percent of stock premium volume and 0.21 percent of mutual premium volume. The comparable percentages for plate glass were 0.24 and 0.11.

TABLE 2. STOCK COMPANY PREMIUMS WRITTEN BY SELECTED LINES, 1957–1966

[In millions]

| Year | Total premiums | Fire | Percent | Extended coverage | Percent | Other allied lines | Percent | Burglary and theft | Percent | Glass | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1966 | $15,197 | $1,321 | 8.69 | $394 | 2.59 | $132 | 0.87 | $98 | 0.64 | $36 | 0.24 |
| 1965 | 13,855 | 1,272 | 9.18 | 398 | 2.87 | 126 | .91 | 98 | .71 | 35 | .25 |
| 1964 | 12,648 | 1,259 | 9.95 | 406 | 3.21 | 130 | 1.03 | 100 | .79 | 36 | .28 |
| 1963 | 11,881 | 1,288 | 10.84 | 415 | 3.50 | 142 | 1.20 | 106 | .89 | 39 | .33 |
| 1962 | 11,599 | 1,356 | 11.70 | 441 | 3.80 | 141 | 1.21 | 104 | .90 | 36 | .31 |
| 1961 | 10,783 | 1,337 | 12.40 | 449 | 4.16 | 123 | 1.14 | 104 | .97 | 37 | .35 |
| 1960 | 10,527 | 1,387 | 13.18 | 480 | 4.56 | 122 | 1.16 | 106 | 1.01 | 42 | .40 |
| 1959 | 9,931 | 1,434 | 14.44 | 532 | 5.35 | 110 | 1.10 | 107 | 1.08 | 35 | .35 |
| 1958 | 9,077 | 1,363 | 15.01 | 526 | 5.79 | 105 | 1.15 | 100 | 1.10 | 34 | .37 |
| 1957 | 8,640 | 1,336 | 15.45 | 511 | 5.92 | 97 | 1.12 | 106 | 1.23 | 41 | .47 |

SOURCE: *Best's Aggregates and Averages*, 1967, pp. 34-35.

21

001852

TABLE 3. MUTUAL COMPANY PREMIUMS WRITTEN BY SELECTED LINES, 1957–66

[In millions]

| Year | Total premiums | Fire | Percent | Extended coverage | Percent | Other allied lines | Percent | Burglary and theft | Percent | Glass | Percent |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 1966 | $5,788 | $284 | 4.91 | $84 | 1.46 | $65 | 1.13 | $12 | 0.21 | $6 | 0.11 |
| 1965 | 5,196 | 276 | 5.31 | 83 | 1.61 | 60 | 1.16 | 11 | .22 | 6 | .12 |
| 1964 | 4,767 | 275 | 5.76 | 84 | 1.77 | 59 | 1.23 | 11 | .23 | 6 | .13 |
| 1963 | 4,447 | 284 | 6.38 | 87 | 1.95 | 54 | 1.22 | 12 | .26 | 6 | .13 |
| 1962 | 4,038 | 267 | 6.60 | 82 | 2.02 | 53 | 1.31 | 11 | .26 | 6 | .14 |
| 1961 | 3,945 | 282 | 7.14 | 91 | 2.30 | 47 | 1.19 | 10 | .26 | 5 | .14 |
| 1960 | 3,723 | 280 | 7.52 | 94 | 2.52 | 43 | 1.15 | 10 | .27 | 5 | .15 |
| 1959 | 3,475 | 276 | 7.93 | 101 | 2.90 | 38 | 1.10 | 9 | .27 | 5 | .14 |
| 1958 | 3,120 | 263 | 8.45 | 100 | 3.22 | 36 | 1.15 | 9 | .29 | 5 | .15 |
| 1957 | 2,890 | 258 | 8.94 | 98 | 3.37 | 34 | 1.17 | 8 | .28 | 5 | .17 |

SOURCE: *Best's Aggregates and Averages*, 1967, p. 191.

About 70 percent of insured Detroit and Newark riot losses were paid under fire and extended coverage contracts, according to a study by the National Insurance Actuarial and Statistical Association. The next largest losses were under commercial multiple peril and inland marine policies, in that order. Losses were much lighter under burglary and theft, homeowners multiple peril, glass, automobile physical damage, and other allied lines.

Burglary and theft premiums tend to be higher than fire and allied lines premiums for equivalent amounts of insurance. This reflects the higher frequency of crime losses and the higher expenses associated with the marketing of burglary and theft insurance.

The relatively high cost of burglary and theft insurance creates underwriting problems. It makes the protection attractive only to those most exposed to loss. This raises loss ratios and in turn premiums, which makes it still less attractive to the less exposed risks. This cycle, if allowed to proceed unchecked, may make the burglary and theft perils virtually uninsurable. When only the most exposed want the coverage, premiums soon become too high even for them.

There are, however, underwriting techniques such as deductibles, packaging of coverages, and requirements for protective devices that can overcome some of the tendencies toward uninsurability. Much can be done by research, loss prevention, and policy design, to make the line more readily available at a lower price.

Plate glass insurance generally protects against relatively small and budgetable losses, in contrast to the other two lines. The maximum probable plate glass loss is rarely, if ever, catastrophic. As a result, plate glass generates relatively little premium volume and is not considered as important to the typical insured as the other two lines.

## Structure of the Industry

### In General

By any yardstick, the insurance industry is one of the largest enterprises in the United States. It has assets of more than $208.2 billion. Its premium income in 1966 was almost $50 billion.

The insurance enterprise is divided into two main branches: life insurance and property-liability insurance. Our focus is on the latter.

At the end of 1966, the property-liability insurance industry had assets of about $41 billion. Its premium income in 1966 was $22 billion.

Automobile insurance, which is outside the scope of our inquiry, represented the single largest segment—over $9 billion of total premium volume—of this branch of the industry in 1966. Property

22

lines, of special importance to the urban core in-surance problem, were the next largest segment with premiums of over $5 billion in 1966.

## Characteristics of Insurance Companies

There are approximately 3,000 insurance companies with home offices in every state and in the District of Columbia. Some are giants, some are small family firms, and some are controlled affiliates of industrial businesses.

Insurance companies vary greatly in the manner of their operation. The pattern of the insurance industry can be understood by considering these characteristics of companies: (1) the lines of insurance they write, (2) their intercorporate relationships, (3) their legal form of organization, (4) their marketing methods and strategy, (5) their pricing policies, (6) their regulatory status, and (7) their reinsurance activities.

*Lines of Insurance Written.* Companies are described by the types—or "lines"—of insurance they write. A company writing only life, automobile, or fire insurance is described, accordingly, as a life, automobile, or fire insurance company. In recent years, companies increasingly have tended to write all or most of the property-liability lines—and they are called multiple-line companies.

Insurance coverages have developed in separate lines for a host of historical and legal reasons. Laws still generally prohibit a single company from writing both life and property-liability insurance; a company wishing to do both must form a subsidiary or related corporation to carry on a branch of the business. Most of the largest property-liability insurers have life affiliates.

*Intercorporate Relationships.* To broaden their markets and to accomplish other legal and financial objectives, companies often operate as members of a group or fleet of companies doing business under common ownership or management. The importance of groups may be gauged from the fact that the twenty largest groups write over half of the total premium volume of the entire industry.

Insurers have recently started to form holding companies to expand their operations into other fields. A corporate parent may now be involved in insurance, mutual funds, consumer finance, and other businesses related, as well as unrelated, to insurance.

*Legal Form of Organization.* Insurers are organized as stock companies, mutuals, reciprocals, or Lloyd's associations.

*Stock companies.* A stock company is a corporation owned and controlled by stockholders who seek a profit on their investment. Stock companies number about 800 and are the largest factor in the property-liability business. They account for about 70 percent of aggregate premiums and 75 percent of assets of the entire industry. Fourteen of the twenty largest property-liability insurance groups are organized as stock companies. Shares of most of the large stock companies are traded in the over-the-counter securities market.

*Mutuals.* A mutual is a corporation owned and controlled by its policyholders. There are about 2,000 mutuals. Mutuals account for 27 percent of the premium volume and 24 percent of the assets of the property-liability industry. Five of the largest twenty groups are organized as mutuals. The majority are small, local organizations supplying the needs of special or local groups.

*Reciprocals.* A reciprocal is an unincorporated association owned and subject to control by its policyholders. It differs from a mutual primarily because it is unincorporated and managed, under a contract called a subscribers' agreement, by an attorney-in-fact. There are about sixty reciprocals. One is among the twenty largest groups. Most of the business written by reciprocals is automobile insurance.

*Lloyd's associations.* A Lloyd's association is a group of individuals issuing policies, with each member personally liable for a stated share of the insurance issued. The ones organized in the United States are relatively small and not an important factor in the American insurance industry.

Lloyd's of London, on the other hand, is one of the world's largest property-liability insurers and a very important factor in the United States insurance market. Not actually an insurance company, it is an organization somewhat analogous to a closely-held stock exchange. The members of Lloyd's write insurance as individuals and assume unlimited personal responsibility for any risk they accept. In addition to the personal liability of the individual members, a system of security is provided by special members' deposits, a trust fund into which premiums must be deposited, an underwriting reserve, guarantee policies backing each member—in A m e r i c a n terminology, surety bonds—and a central deposit fund.

The 6,000 individual members of Lloyd's are organized into 300 syndicates. Each Lloyd's syndicate takes all or a portion of a risk for its individual members, and in the latter case, other syndicates may take the remainder.

In addition to writing marine insurance and direct coverage, Lloyd's of London is one of the world's largest sources of reinsurance—insurance bought by insurance companies.

*Marketing Methods and Strategy.* Most stock companies and some mutuals, called agency companies, sell their insurance through independent agents, who are businessmen owning their own agencies and risking their own capital. Agency companies account for about 80 percent of the property-liability insurance business written.

Independent agents usually represent several companies and work on a commission basis. They write policies, collect premiums, and perform other functions for their companies and clients. They are said to own their renewals—that is, the insurer has no interest in policies placed by an agent if he chooses to transfer the insureds to another company.

Other insurers, called non-agency companies, use a direct-writing system that utilizes employees and exclusive agents, and sometimes only mail-order solicitation. These employees and agents generally receive salaries; sometimes they are paid commissions, or they may be compensated by a combination of both.

Brokers, persons who represent the applicant for insurance rather than the company, also produce business for companies. Brokers are paid by the company on a commission basis. Some insurers depend on both exclusive agents and brokers.

The term "producer" is often used to describe all of these people who bring applications for insurance to a company.

Some insurers market all their lines nationally to virtually all classes of consumers. Others direct their marketing efforts toward particular targets, for example, druggists, army officers, senior citizens, and the like. Some specialize in substandard business and write heavily in urban core areas; others seek only low hazard business.

*Pricing Policies.* Many companies price their insurance according to the standard rates set by a rating bureau. Sometimes called bureau rates, they are based on the pooled experience of all the member and subscribing companies.

Companies not making rates through bureaus are called independents. Companies connected with a bureau but using different rates are sometimes called rate deviation companies.

Companies that pay their policyholders dividends when losses and expenses are less than premiums collected are called participating companies. The dividend in effect constitutes a partial refund of the price paid for the insurance.

Some companies, usually small mutuals, have the right to assess their policyholders if losses exceed income. This in effect amounts to an additional premium payment. The larger mutuals are usually non-assessable.

*Regulatory Status.* An admitted company is one authorized by a state insurance department to do business in that state. A non-admitted company is not so authorized; it does business in that state through "surplus line" brokers, who are authorized by law to place business with non-admitted companies when admitted companies cannot provide the insurance needed.

Companies organized under a state's laws are called domestic companies, those organized under the laws of other states are called foreign, and those organized under the laws of other countries are called alien.

*Reinsurance Activities.* Companies that write insurance for the public are called primary insurers. Some primary insurers also write reinsurance. Companies that insure only insurance companies are called professional reinsurers.

## Marketing

### In General

The property owner seeking to buy insurance and the company seeking to sell insurance must be brought together. The central figure wh brings both parties together is the producer—th agent or broker.

Agents and brokers generally work for com

24

missions. They are paid a percentage of the premiums they write. Employee agents may work for a salary rather than commissions, but they sometimes look to bonuses or promotions. Income for agents and brokers goes up when they write an abundance of insurance on good risks.

Commission and brokerage fees are an important expense item for insurers. Stock companies allocated about 18 percent of premiums for commissions in 1966; mutual companies, about 9 percent. For fire insurance, stock companies paid 24.7 percent of premiums for commissions; mutual companies, 15.4 percent.

The property owner's problem is deceptively simple—he wants insurance in the amount he believes he needs at a cost he feels he can afford. But the risk he presents must be properly evaluated, and the appropriate policy and company must be found to meet his needs. As a practical matter, the technicality of the contract and the complexity of the insurance arrangement make him highly dependent on the skill and good faith of his agent or broker.

The insurance company's problem is complicated because it must obtain what it conceives to be a proper aggregation or "book" of risks. The larger the number of risks insured, the more reliable the calculation of anticipated losses is likely to be. The better dispersed or spread the risks, the less is the chance of excessive or catastrophic loss in a particular area. Ultimately, the success or failure of the company depends on the business produced by the marketing system.

The producer's problem is to satisfy the needs of both the consumer and the insurance company. But he also has his own personal motivation—he wants to maximize his income. If he brings in better-than-average risks or a larger volume of business, he can expect to make more money himself.

## Marketing Insurance in the Urban Core

The amount of insurance written in inner city areas depends in part upon the number of producers in those areas and upon their capacity to satisfy the needs of the individual homeowners and businessmen there.

Facts are unavailable on exactly how many agents write insurance in inner city or blighted areas. Most insurance companies do not have reliable statistics on where agents actually seek business.

The following statement of an insurance executive is typical:

> We have no information as to location either by number * * * [or] nature of agency forces in blighted areas. Our agents are licensed to write at large, and they may or may not write in such described areas. Consequently, we have no knowledge of any particular problems with such agencies.

Available evidence indicates that the number of insurance agents in blighted areas is small and that the number of Negro insurance agents is even smaller. A survey of 108 property-liability companies indicated that the number of Negro agents was practically nil.

According to a community leader in the Dorchester area of Boston who was asked whether there were many Negro insurance agents in the area: "I don't think there are too many. I know of one. There might perhaps be two or three others, but I'm not aware of them."

Not only are there relatively few agents in urban core areas, but the marketing system requires that the business they write be screened carefully. A Negro agent in Cleveland explained his situation in this way:

> [M]y difficulty is in trying to get a company that will license me to sell business, period. I think this is largely because they feel that anyone of my race would probably be selling in the ghetto areas, and they don't want that * * *.

> Q. Have you ever had in your experience any specific instances where that was stated to you by a particular company?

> A. Well, they don't state it to you in those words, but I have had them make an appointment to come and see me about an agency appointment, and they walk in and start talking about, "We are not placing any agents now, we are getting rid of agents." And I say, "Well, why did you come to see me in the first place if you weren't interested?"

> Q. In other words, they take action upon your letter which does not reveal, of course, your race?

> A. That's right.

25

Q. And the refusal occurs after the company is aware of your race?

A. Yes, that is my feeling. I have had that happen perhaps a couple of dozen times.

Q. Within your experience, have you been in contact with other Negro agents who have encountered the same difficulties?

A. Yes.

Q. Do you have any present recollection of how many times you have encountered such experiences by other agents?

A. I know of five or six agents who would like to have companies to represent and seem to be unable to get them.

Q. These are other Negro agents?

A. Yes. I understand that some white agents are having difficulty too, but this for them has occurred mainly in the last couple years. But for me it occurred when I first started even five years ago or four years ago or three years ago, when I tried very hard to get companies.

Q. Are your clients primarily colored?

A. Yes.

Q. Do they primarily reside in the central core area?

A. Yes, primarily, and the east side of Cleveland, yes. Not the central core area, no. The majority of my business is done with people buying homes, where we handle the home owner's policy, and then we sell them whatever else we can, auto and life.

Q. This is an area in which in a relatively recent period of time they have had an influx of Negro residents, is that not so?

A. Yes * * * it is an area opening up to Negro buyers, we might say.

The Insurance Commissioner of California, in describing the Watts area of Los Angeles at our hearings, stated:

[T]here are not many [agents] indigenous to the area. * * *

And one thing I think, purely as an aside, that the insurance industry should be doing on a voluntary basis, is attempting to develop a better indigenous agency force within these [urban core] areas. They could do something in that area to create better markets for the Negro agents and brokers.

If an agent writes risks considered by company underwriters to be extra hazardous for the pre-

mium, or if his risks produce excessive losses, he may have his agency contract terminated by the company.

An agent in Detroit said:

I was recently cancelled by the company that I did represent.

Q. What reason did they give?

A. Loss ratio.

Q. How bad was your loss ratio?

A. Oh, I imagine it got up to probably better than 50 percent—probably 85 percent, something like that. The first year I had a very good loss ratio—practically no losses. And then the next year I had a few and then all of sudden it looked like every time I wrote a policy, somebody would come along and start a fire. You would think it was perpetrated or something, but maybe it really wasn't. Nevertheless, the losses were there.

An insurance agent in Cleveland described his situation:

Q. Do you have authority to bind your companies?

A. Yes.

Q. Are there limitations on that authority?

A. Well, the limitations are merely to select good risks that you don't feel will be creating a claim because the agent's contract with the company is contingent upon a decent claim ratio.

Agents themselves avoid urban core business. Most agents receive additional compensation if there are few losses on their business. They therefore try to avoid any business that is likely to produce losses and thus reduce their contingent commissions.

There are other problems with urban core business from the standpoint of agents. If a higher than standard premium for a risk has to be charged, an agent may have to spend time explaining why to the client, who may be resentful. It is easier to write and service one $50,000 policy than five $10,000 policies—the commission income to the agent may be about the same, and the expenses much less. Even after the policy is issued, there may be more problems on renewal or because of cancellation.

An independent agent in Kansas City said:

It has been my experience reflecting back over the past five to ten years that even with

26

my limited experience the loss ratios on that business which I did write and areas in which the companies normally do not like to write has been excessively bad. Unfortunately, this led to the feeling in our agency that economically it was not feasible to handle this type of insurance.

An agent in Detroit stated:

I haven't much of a problem because I've steered away from these areas since I started selling insurance twelve years ago.

An independent agent in Rochester, New York said:

My office has steered away from all business in blighted areas, eliminating a great concern and holding to a minimum our problems * * *

A Los Angeles agent summarized his attitude toward writing insurance in the Watts area:

We avoid the writing of property insurance in the 'curfew area' [Watts] as much as possible because of: (1) Difficulties in placement, (2) The complicated procedure of the Industry Facility [Watts Pool], and (3) the high cost.

We are not looking for problems or unprofitable operations. Commissions on business for the 'curfew area' and time spent in placing business have resulted in avoidance of these clients. The problem exists to a very large extent on all types of commercial buildings.

Many agents said they wrote only "accommodation" business in the urban core; that is, if the insured had other desirable business, the agency would provide the urban core coverage as a favor. For example, a Stockton, California agent said:

We are not at present writing any business in the blighted areas other than accomodation and then only if there is substantial other business.

Some companies discourage their producers from soliciting insurance business from persons with incomes below a stated minimum. Low income may simply mean low market potential. But it may also be related to characteristics they associate with persons of low income. Whatever the reasons, the effect is to reduce the number of agents doing business in urban core areas.

Generally speaking, direct writing companies

try to maintain lower rates than their agency counterparts. Normally, lower prices directly benefit the consumer. But lower prices also may create the need to select better risks, which could then be a factor limiting business in the urban core.

Surplus lines brokers are specially authorized to place business with non-admitted companies when admitted companies refuse to write it. They can be of great assistance to an insured by finding an insurance company for hard-to-place risks at higher than standard rates. They place much fire insurance, but little crime insurance and even less plate glass.

Even the surplus lines markets pose problems for agents and brokers. The executive vice president of a large surplus lines brokerage firm stated the following view:

The deterioration in company interest or ability to cope with substandard insurance problems has discouraged most reputable agents and brokers from concerted effort to handle this type of insurance. Add to this the high service and administrative cost of handling this type of insurance and you find very little incentive for solicitation or brokering.

The commission structure of the insurance industry poses some further problems. This is most apparent in regard to burglary and theft coverage for businesses. Commissions on that line are among the highest paid by the industry. They average approximately 25 percent, compared to 15–20 percent or less for fire and other lines. The higher commissions have been justified on the grounds that the burglary and theft line is unusually difficult to sell and the typical premium is small. In fact, neither is the case in the urban core or elsewhere. Burglary and theft insurance is in great demand in the urban core and it is no longer a small premium policy.

As a result of the high commissions, the expenses of marketing this line are high. At the Panel's hearings, the vice president of a large insurer was asked:

Q. Does part of the burglary and theft problem relate to the fact that expense ratios on some burglary and theft lines run over 50 percent?

A. It certainly is directly related to that, yes.

**27**

# Underwriting

## In General

Underwriting is the process by which an insurer decides to accept or reject an application for insurance. The goal of underwriting is to produce a safe and profitable distribution of business for the company. The underwriter is the company's control over the marketing system. He determines whether or not an agent's production is sound and helps decide whether the agent should be continued or terminated.

In making decisions, the underwriter follows basic guides established by the management of the company. These deal with lines to be written, geographical areas and perils to be avoided, and maximum exposures acceptable in particular areas. For example, disastrous windstorm losses along parts of the Atlantic coast in recent years have prompted some insurers to withdraw entirely from certain localities.

The acceptance and rejection of risks also involves decisions to cancel or not renew policies in force. Cancellation or nonrenewal, however, is done on the basis of actual experience with a particular risk while experience is not generally available in the case of a new risk.

*Basic Factors.* In analyzing a risk, the underwriter takes into consideration the physical features of the property and the personal characteristics of the applicant. In fire insurance, many of the basic considerations are physical: type of construction, fire protection available, water supply, proximity to fire hazards, location, and occupancy.

The underwriter also evaluates what is called the moral hazard and attempts to screen out those individuals who are likely to cause a loss intentionally in order to collect the insurance proceeds. He tries to safeguard against insuring dishonest individuals who might inflate a claim beyond the loss actually incurred or who might submit a claim for a loss not actually occurring. He also tries to avoid insuring persons who would be careless toward the insured risk simply because they have insurance.

Moral hazard is an especially important factor in underwriting burglary and theft insurance. The insurer is highly dependent on the insured in determining the exact nature and amount of any loss that occurs.

*Objectives.* The underwriter strives to show a profit for his company by carefully selecting the risks to insure. He seeks better than average risks—those with a lower expectation of losses. The lower the losses and expenses of the insurer, the greater the ability to attract better than average risks through lower prices. A favorable expense position often justifies lower prices, making possible selective underwriting.

The more surplus an insurer has, the easier it is for him to accept more business. The larger the surplus of a company, the larger the risks it can write.

There is a direct relationship between underwriting and rates. If the underwriter decides that the premium for a risk is inadequate, and if his rating rules permit him to do so, he may charge a higher rate. If his rating rules do not so permit, he may decline the risk. Some risks, of course, are unacceptable at any rate.

Although a certain type of risk may be profitable, the underwriter may reject it if its acceptance increases the insurer's exposure to loss beyond the limit of its capacity to absorb loss. For example, a small insurer may be unable to accept a million dollar building. Or, a desirable dwelling may be declined if a company has already accepted several buildings in the same block—a conflagration would extend the insurer beyond its financial capacity.

To obtain additional capacity, the insurer transfers some of its potential liability on the policies it writes by purchasing reinsurance. In this way the company can accept more risks and write a larger premium volume.

The underwriter must gauge the value of the property to be insured. He generally tries to avoid overinsuring or underinsuring the property. He has no desire to insure for $50,000 a building or stock of goods worth $25,000—he would be suspicious of the moral hazard presented. Nor might he wish to insure a building worth $20,000 for only $10,000; since the probability of partial loss is higher than total loss, underinsurance results in an inadequate premium. He may, however, prefer or even require underinsurance—in order to limit the extent of his liability—when he feels that the chances of loss are high, yet he is unable, for other reasons, to decline the business.

28

Underwriters are judged by the profitability of the business they accept. In the long run, their compensation depends on their performance. Underwriters with a record of a consistently good loss ratio, that is, whose insured risks incur few losses, are rewarded. As a result, underwriters seek the safer risks, and try to eliminate those applicants whose exposure to loss is excessive for the rate. Insurance people often say that the best underwriters are basically pessimists.

### Underwriting Property in the Urban Core

Insurers generally consider applications from urban core areas to be undesirable business, and insurance companies and their agents and brokers freely admit it.

At the Panel's public hearings, when an executive of a major insurance company was asked whether underwriters were instructed to take into account the special problems of a blighted area, he replied:

> Yes. We have no specific red-line area which says under no circumstances may you write in this area, but most prudent companies certainly try to guide their staff in identifying areas and hazards which are beyond normal contemplated by the rate structure * * *.

Another executive, replying to a similar question, said:

> We only inspect in the high risk areas of our big cities, and these are, of course, what you call red-line districts.

Underwriting materials supplied by insurance companies in response to our requests for information reveal clearly that business in certain geographic areas or territories is restricted. The following are all from the twenty largest property-liability insurance groups in the country. There is reason to believe that many smaller companies follow even more restrictive practices.

One underwriting guide states:

> An underwriter's knowledge of the Branch Office or Production Office territory is vital to his effective operation and, on the other hand, it is the most intangible underwriting tool available.
>
> An underwriter should be aware of the following situations in his territory:
>
> 1. The blighted areas.

2. The redevelopment operations.
3. Peculiar weather conditions which might make for a concentration of windstorm or hail losses.
4. The economic makeup of the area.
5. The nature of the industries in the area, etc.

> This knowledge can be gathered by drives through the area, by talking to and visiting agents, and by following local newspapers as to incidents of crimes and fires. A good way to keep this information available and up to date is by *the use of a red line* around the questionable areas on territorial maps centrally located in the Underwriting Division for ease of reference by all Underwriting personnel. (Italics added)

Many underwriting guides include the general statement that each risk should be considered on its own merits. The more specific instructions, however, are often quite to the contrary. For example, this specific underwriting instruction:

> Deteriorating neighborhoods automatically provide claims problems due to vandalism, poor housekeeping, and inadequate maintenance. Overcrowding of dwellings as well as ramshackle conversions of old, large dwellings into inexpensive apartments create abnormal loss possibilities. These areas tend to expand.
>
> Avoid new business and reunderwrite renewal business which is being surrounded by neighborhoods of this type.

Underwriting material from other companies proposes more modest restrictions. For example, according to one company:

> Each risk must be considered on its individual merits usually evaluated by an inspection. Acceptance or rejection should be based on these determined characteristics. This policy prohibits rejection or cancellation which is capricious based on ethnic background, or (apart from classes like plate glass) solely on location.

Another insurer, in a "selectivity guide," describes conditions which give "cause to consider special underwriting problems." This company requires that information on problem areas be subject to "full communication, understanding, and a written record." It cautions further that "nothing shall preclude or discourage the conversion of this information into more usable form

**29**

for application to day-to-day underwriting procedures * * *."

Among the problem areas specified are the following:

> Towns, cities or defined localities where depressed economic situations create vacancy and unoccupancy, poor maintenance and housekeeping, depressed living conditions and latent or active moral hazards as evidenced by theft, larceny and major crime incidence.

> Specific sections of metropolitan areas where age, neglect, poor maintenance, a large proportion of the properties (habitational, commercial and institutional) have deteriorated, or their proximity to physically good properties requires immediate and current underwriting information, not only from physical inspection but evaluation of burglary and other crime exposures. Generally, these recordings should be according to street address and include (1) the already affected so-called "blighted" area, and (2) the peripheral "caution" area into which the actual physical and moral deterioration might spread during the life of our policy.

Agents and brokers are more explicit about underwriting restrictions they perceive. A New York City broker said:

> * * * [M]ost companies mark off certain areas of the city to denote a lack of interest in business arising in these areas. In New York these are called K.O. areas—meaning knockout areas, in Boston they are called redline districts. Same thing—don't write the business.

> The companies explain their policy by describing these areas as blighted, substandard, disadvantaged, high risk and by other cliches. The implication is that chances of loss far outweigh the chances of profit in these areas solely because of the condition of the risk.

> \*　　\*　　\*　　\*　　\*

> Without condescension, however, I must concede that there is some degree of merit in the arguments posed by the companies in not writing some of this business. I must concede further that the property-casualty companies are in business to make a profit and not to make love * * *.

Another agent from Detroit wrote that he knew

of one company that had ruled out 50 percent of the community:

> Anyone residing in this blocked-out area is not eligible for property or auto insurance, and this includes whites and Negroes.

A Grand Rapids, Michigan, agent wrote that many companies "black out" the inner city.

A Cambridge, Massachusetts, agent wrote:

> * * * [O]ne of the seven companies in our office specifically telephoned us to request that we not submit to them any new risk in the so-called riot or blighted areas of Boston.

A South Bend, Indiana, agent received the following instructions from one of his companies:

> * * * [W]e cannot underwrite against racial disturbances * * * [We] will insist that your writings be confined to areas where there is minimum likelihood of such disturbances * * *

An agent in Omaha, Nebraska, described his view of company underwriting by location:

> Now there have been some years we have experienced no difficulty getting residential coverage which is considered part of the core or ghetto area. There are other sections in the older part of it that is taboo. If you get any coverage you are real lucky. But it is almost a complete ban in some sections of the city or in the older area here.

Companies restrict particular classes of business as well as geographic areas. The underwriting bulletin of one company states:

> We continue to hear of companies withdrawing completely from difficult areas, withdrawing binding privileges on certain difficult classes such as bowling alleys, restaurants, supermarkets, and taverns, and now have positive proof that some companies are drastically reducing commissions on this business as a most emphatic means of curtailing production.

> We have no desire to adopt the reduced commission technique for all risks in a difficult class. At the same time, we do expect everyone in the field to be alert to individual situations where increased rate is an absolute necessity.

Riots have tended to strike certain kinds of businesses—so-called "target risks." Among them are drug, liquor, grocery, and clothing stores, laundries, and dry cleaners. This strongly influences underwriters, who are also aware of the fact that riot losses to residential property were rela-

tively slight in Los Angeles and Newark and not overly severe in Detroit.

A well-established underwriting technique is to issue lists of "Do not solicit risks," or "prohibited risks." One company's "Do not solicit" list includes boarding and lodging houses, bowling alleys, match factories, taverns, and tents.

Another important underwriting technique is to restrict the amount of coverage of the policy, or to raise the rate. These alternatives are summarized in an underwriting letter on the subject of "Watts-Type Riots":

> The form and rate should reflect the individual situation and this will sometimes require the use of non-standard forms and other than tariff rates developed by one or more of the following techniques:
>
> 1. "Substandard risk rating" plans.
> 2. Excess rate filings.
> 3. Limitation of term to one year.
> 4. Reduced commissions.
> 5. Restricted perils.
>
> These techniques have been available in most states for some time. Their use looms more important as market conditions become more difficult. They cannot make every risk insurable and are not a substitute for firm underwriting decisions.

A businessman in the urban core of Omaha, Nebraska, received the following letter from an insurance company:

> For a number of years we have carried insurance on the contents of your liquor store and you have been an excellent insured. Due to the location of your store, however, and the more than probably uncontrollable damage which might occur at any time, due to riot, we do not feel that we can carry insurance in this case.
>
> Because of our previous fine association, however, we feel we can continue on a part of this coverage. And enclosed herewith is an endorsement reducing your coverage from $34,000 to $1,000.

Agents also complain of the application of this kind of underwriting restriction. When interviewed, an Omaha, Nebraska, agent described how riot coverage was taken out of policies issued:

> Now, there are some companies that will cover us in here [urban core] but it is still a most difficult area to get coverage and nor-

mally you will have to take a reduced coverage if you get it. * * *

> If they will cover it, it will be probably with restrictive clauses.
>
> Q. At the present time are you getting riot exclusion clauses on them?
>
> A. Many of them. And we have been able to replace the fire and extended, but it has a riot [exclusion] clause in it.

A St. Paul, Minnesota, agent mailed us a letter and endorsement which some companies are using on all new and renewal business in the urban core. The company asks the insured to sign a letter which reads:

> The company shall not be liable for loss: (a) by pillage and looting resulting from riot and civil commotion * * *.

A Youngstown, Ohio, agent described another technique for limiting coverage: "All companies insist on a $50 deductible clause on policies written in these questionable areas."

Larger deductibles are often used for especially hazardous exposures. A representative of a Washington, D.C., liquor dealers' association described a $7500 policy for which the standard rate was $376 but which is unavailable at that price. He said a liquor dealer would have to pay $1050 and there would be a $1000 deductible.

Some substandard rating plans, often used to insure urban core property, have specific provisions for use of deductibles. Deductibles can be a desirable underwriting technique. Insurance works most efficiently on large losses, and becomes expensive and inefficient for the handling of small losses. Thus, insurers often admit they have not given the deductible principle sufficient attention in the design of burglary and theft policies, where it could be used to reduce premiums and make the risk more readily and more soundly insurable.

Other underwriting restrictions can also have positive results. The underwriter may show an insured how to prevent loss and save property and lives. He may point to the need for fire extinguishers, safer heating equipment, burglar alarms, iron bars, and other protective devices. The underwriter may advise the insured on how to use safer methods of sending messengers to the bank or of timing deposits.

A Washington, D.C., agent reported:

> Companies are requiring many new safety features and burglary equipment which may prove expensive for small businesses. * * *

31

A community leader in Columbus, Ohio, stated:

Insurance companies are requiring installation of burglary alarms and fire detection systems for most business in order to qualify for even limited insurance coverage.

Underwriting decisions take place not only when the policy is written but periodically throughout the life of the contract. A claim under the policy may call for underwriting action. Claims of loss on an insured property are a possible indication of unprofitable business. They may lead to post-claims underwriting decisions to cancel or not renew risks.

The underwriting guide of one company states: "Sound underwriting judgment should determine when a policy should be cancelled for claims reasons." The same manual then catalogues the kinds of claims that raise the need for considering cancellation. But the guide adds: "In other situations where a claim indicates an undesirable condition, cancellation or other action should be taken regardless of the number of losses."

Another insurer gives its views on cancellations and nonrenewal as follows:

[S]elections continue to deteriorate. We must not accept new business in undesirable localities or in unstable areas which are experiencing manifest or potential changes in character. Likewise, we must continually review our book of business to determine which accounts no longer meet our established underwriting standards.

A New York broker described this aspect of underwriting as follows:

Where a company is providing coverage in the normal way, recall or cancellation after inception for "underwriting reasons" is not an uncommon thing. In fact, when summer disorders became popular about three years ago, recall was an automatic reaction on the part of too many companies * * * The disorders on the West Coast were the signal for underwriters all over the country to run for cover.

Although insurance companies have catalogued a list of restrictions on underwriting urban core business, responses to the Panel's requests for information established that companies have virtually no separate statistical information on their experience in urban core areas.

One insurer wrote:

Our property underwriting procedure considers each risk on its own merits. In most instances, therefore we have no information on an area basis.

Another company responded:

The * * * Group has no data available, which would provide premiums, losses, or exposure for areas within a city.

An insurance company president said at the Panel's hearings:

It is my personal guess that the urban areas plan is producing quite a loss for the insurance companies, but I can't prove that.

Although the property-liability insurance industry in its underwriting practices is saying that inner city business generally is bad and to be avoided, it cannot show the extent to which this judgment is accurate.

Underwriters traditionally handle uncertainty by erring on the side of pessimism, and they may be treating urban core business more harshly than it deserves. Without reliable underwriting data, there may be too much room for underwriters to base decisions on subjective and irrelevant considerations. The industry would be in a better position to underwrite fairly and reasonably, and to make this clear to the public, if it maintained reliable loss statistics by area. The industry has recently taken some steps in this direction.

## Rating

### In General

The rate is the price charged for a unit of insurance. Thus, if the rate for fire insurance is fifteen cents per 100 dollars of insurance, the premium for $10,000 of coverage is fifteen dollars.

Rating and underwriting are closely related. The underwriter's decision is based primarily on three factors: a description of the risk to be insured, the appropriate rate to be charged for a described category of risks, and the contractual provisions of the policy to be written. He brings

32

these three basic considerations together by classifying the hazard in accordance with the company's rating system and insurance policy forms.

Information on the nature of the risk is generally obtained from the agent and from credit reports and underwriting inspections. The policy forms may be prescribed by statute or designed by the insurer. The rating system of the company may be designed by a bureau, or by the insurer itself.

If the underwriter works only with a standard rate—that is, if only one rate may be charged on all risks similarly exposed, or said to be in the same class—he decides whether to accept or reject a particular risk on the basis of whether or not that rate is adequate for the coverage contemplated. If the underwriter works with a more flexible schedule of rates, his decision also involves selecting the appropriate rate to be charged. A rate may also be made adequate by restricting the policy form. In all cases, the underwriter tries to determine whether the rate that can be charged justifies the exposure to loss that the company is being asked to accept.

Rates are expected to generate sufficient premium income not only to pay for the insurer's losses and expenses, but also to produce a profit for the company. The process of setting rates requires that the amounts of future losses and operating expenses be estimated with a fair degree of accuracy.

Statistics on past losses and expenses furnish a helpful guide in many cases. But natural occurrences vary in frequency and area; and in a rapidly changing society, the patterns of man-made events in the future may well differ from those of the past. An example of the latter is the riot risk. Further, costs and expenses may go up, especially if the economy is experiencing some degree of inflation. Thus, the rating process must allow for considerable uncertainty, and all rating decisions are to some degree matters of judgment.

Rating must also rely on some rough approximations. Property is classified and rated by general characteristics. All two-story dwellings in a city, for example, may be subject to the same rate regardless of where they are located in a city. These general classifications are usually so broad that they include a considerable range of risks with approximately, but not precisely, the same loss exposure.

The problems of rating are not only of concern to the companies. The consumer, too, has an important interest in rating; it determines the price he pays for his insurance. The discretion inherent in rating helps make rates one of the greatest sources of friction among consumers, companies, and state insurance departments.

## Urban Core Rating Problems

*Problems of Class Rating.* Urban core properties present difficult rating problems. In most instances, territories used for rating purposes encompass an entire city, a county, or even a larger area. This means that the best—least hazardous—property in a given classification is charged the same rate as the most hazardous property. A system employing these broad categories is called class rating. Underwriters working with a limited capacity to accept risks and a fixed rate for all within a class of properties, attempt to accept only the better risks.

Rate flexibility has been introduced in some areas in an attempt to meet the problems of class rating. To allow for substandard conditions of risk, surcharges may be added to the rate. The excerpt from the Ohio dwelling schedule reprinted in Table 4 shows a typical plan.

This plan permits surcharges for specified deficiencies. For example, there may be a surcharge of 10 cents per $100 of insurance on a dwelling if it has an unsafe arrangement of heating devices. There may be further surcharges for wiring, conversion, physical condition, and housekeeping, up to a maximum of 50 cents per hundred.

An $8,000 frame dwelling (with $2,000 in contents) in Cleveland being insured for fire, extended coverage, and vandalism and malicious mischief, would require an annual standard premium of $37.00. However, the 50 cent maximum condition charge would add $50 and thereby produce a surcharged premium of up to $87.00. Thus, in this example, the surcharges could result in a premium increase of up to 135 percent. For a brick building under similar circumstances, the standard premium would be $30, and therefore the 50 cents per hundred surcharge would increase the premium to $80, an increase of 167 percent.

Another important method of achieving rate flexibility is the use of "Schedule ER" [Excess Rates] type rating plans which are in effect in about half of the states. These plans permit the underwriter to set higher rates based on hazards or

**33**

TABLE 4. CHARGES FOR SUB-STANDARD CONDITIONS PROMULGATED BY OHIO INSPECTION BUREAU

The following charges per $100 of insurance, when applicable, shall be added to the annual premium for both buildings and contents for dwellings, flats, apartments, private boarding and roominghouses, private garages and outbuildings.

[NOTE 1.—When any of the conditions indicated in this item apply, properties shall be submitted to the insuring company for review of the charges. NOTE 2.—Charges under Subitems *a*, *b*, *c*, *d*, and *e* are cumulative.]

| | Dwellings private garages and outbuildings | Flats and apartments boarding and rooming houses |
|---|---|---|
| *a.* Heating: Unsafe arrangement of heating devices, including chimneys, stovepipes and gas vents | $0.10 | $0.25 |
| *b.* Wiring: Unsafe or inadequate electric wiring, non-standard extensions, overloading, overfusing, etc | .10 | .25 |
| *c.* Conversion: Subdivision or conversion of the original living spaces into multiple units with overcrowded occupancy, inadequate sanitary facilities, unsafe arrangement of cooking devices, etc | .10 | .50 |
| *d.* Physical condition: Building not in good repair, roof or chimneys deteriorating, wood surfaces unpainted or decaying, garages or porches not well maintained | .10 | .25 |
| *e.* Housekeeping: Yards, basements, hallways or attics not kept clean and free from rubbish and litter | .10 | .25 |

SOURCE: Ohio Inspection Bureau Dwelling Schedule.

conditions not taken into account by bureau (standard) rate schedules. Such conditions include block congestion, high valued buildings without adequate fire protection services, and buildings with large open areas susceptible to the spread of fire and to riot exposure. If necessary, the underwriter under these plans may also restrict the scope of protection by, for example, special exclusions.

The use of an ER plan, unlike the Ohio dwelling schedule described above, requires the written consent of the insured and permits complete rate flexibility. It does not catalogue specific deficiencies and charges. Premiums under an ER plan are subject to disapproval by the rating bureau and the state insurance commissioner.

Rate flexibility raises problems of its own. The surcharged rate may or may not be more appropriate for the risk than the standard rate. The substandard conditions permitting the surcharge may or may not, over a period of time, result in a higher incidence of loss. Although it may be logical to expect a higher incidence of loss because of the hazardous conditions, there are no insurance data available to confirm this expectation. When all is said and done, the apparent precision of a surcharge plan may only obscure the fact that the higher rate still reflects an underwriter's judgment that may not be an accurate forecasting of the potential loss.

Rates for insurance involve basic considerations of achieving equity among the various individuals affected. The property owners subjected to surcharges may well be those who are least able to pay the additional premiums. Surcharges that are not based on demonstrable hazards are unfair. One broker, for example, described what she considered to be a widespread practice:

> If the inspector finds a seam in the plaster or peeling paint, the cost of insurance is more than doubled and the fire hazard has not been increased whatsoever.

Some would prefer to eliminate surcharges altogether. This may not be possible, however, in a competitive insurance market. If one company attempted to spread increased costs evenly, its competitors would be able to undercut it in low-hazard areas. For example, if an insurer attempted to use a 10¢ rate in all areas instead of a 5¢ rate in low-hazard areas and a 15¢ rate in high-hazard areas, its competitors could answer with a 5¢ rate in low-hazard areas. The insurer charging the 10¢ rate would, therefore, tend to lose the low-hazard risks and get only the high-hazard risks. Further, its 10¢ rate would then be inadequate because it would be too low for the high-hazard risks with which it would be left.

In addition to the demands of competition, the rating laws require that rates be equitable. That

34

is, rates should reflect anticipated loss exposure and expense requirements. Each class of insureds should pay its share of losses and expenses.

In a real sense, the problem of rating inner city properties is part of the larger problem of underwriting them. Underwriters generally consider the rate in urban core areas to be inadequate, even for well-maintained property. Thus, they are hesitant to accept blighted area property even if the rate is considered adequate, for they dislike high-hazard business;and they prefer to err on the side of safety. One company described the situation as follows:

> Rate levels for casualty, fire, marine, and multiple-peril lines are not immediately responsive during short periods of change, and do not contemplate abnormal or unusual conditions which may arise. It is therefore of particular importance that location of risk be afforded prime underwriting consideration for all lines of insurance * * *

> [W]e expect you will decline new business and review existing business from areas which have deteriorated and will no longer meet our established standards.

The loss experience of the Watts Pool has been low, although it has only been in existence for a short time and its experience could therefore change. Also, some insurance companies have reported only small losses under business written through urban area plans. The development of loss statistics on urban core areas will facilitate more precision both in underwriting and rating. It will also provide a better basis for effective loss prevention activity.

*Rating Problems of the Riot Peril.* The riot peril has compounded the problems of rating in the urban core. As many insurers view it, this peril presently constitutes an incalculable catastrophe risk. Many insurers believe an increase of 1 to 4 percent, distributed over fire and other riot-affected lines, is called for. An increase of that order could generate approximately $50,000,000 to well over $100,000,000 each year, an amount adequate to cover riot losses of the 1965–1967 level.

Only a few rating bureaus have in fact requested increases as a result of recent riots. The rating bureau with jurisdiction over burglary and theft and glass insurance has not. Many of the bureaus which have not yet done so, have indicated they are awaiting the advice of their national advisory organization—the Fire Insurance Research and Actuarial Association (FIRAA).

The rating laws generally require that any requested rate increase be based on statistical data. Actual riot loss experience can justify increases, but not predictions as to the possibility of future riot losses. At least sixteen states do not even authorize projection factors, whereby rate increases take into account the fact that loss levels may be increasing and will continue to increase in the future.

Increases, if justified by actual riot losses, might be across the board or only on those classes of risks or in those areas most subject to riot damage. All areas may be regarded as subject to riot damage, not just urban core areas. Another possibility is to vary the increases as between classes of risks and areas depending upon an evaluation of the potentiality for riot damage in each case.

A possibility other than a general rate increase is a special earmarked "loading" in the rate for riot losses. There is at present generally a 1 percent loading in the fire and extended coverage premium for all catastrophes, including riots. Recent riot losses are regarded by some as justifying increasing this loading in some states.

These problems of rating for the riot peril are part of the more general problems of insurance rating, which are the basic responsibility of the states.

•

# Reinsurance

### In General

Insurance companies typically assume risks far in excess of their assets. To protect themselves from the possibility of excessive financial loss from those risks, insurance companies purchase insurance called reinsurance.

If an insurer's actual losses and expenses do not exceed those that were expected at the time of underwriting its "book" of risks, the insurer's

premium income should be adequate to pay losses and expenses. In practice, however, actual losses seldom precisely match expectations, particularly in any single year. Fluctuations are expected and the underwriting process makes allowance for some uncertainty. Abnormal fluctuations, resulting from an unusually large number of ordinary losses or from large losses from a catastrophic event (like Hurricane Betsy in 1965 or the fire at Chicago's McCormick Place in 1967), present a risk that primary insurers seek to cover by purchasing reinsurance.

The recent riot losses are generally regarded by insurers as the kind of catastrophic and unpredictable losses which require reinsurance. Industry estimates of insured losses from the three largest riots are $38 million in Watts in 1965, $49 million in Detroit in 1967, and $10 million in Newark in the same year. (The Insurance Department of Michigan estimated insured riot losses in Detroit to be around $33 million.) Other insured riot losses in 1967 are estimated at $10 to $15 million, and none was in excess of $1 million. Thus, insured riot losses in 1967 approximate $50 to $75 million.

Insurers normally purchase reinsurance coverages for a combination of reasons—to stabilize their underwriting results, protect their capital, and enlarge their capacity to provide insurance. They negotiate for reinsurance on a risk-by-risk basis (called facultative), or arrange in advance for business to be placed as it develops (called treaty). Under some reinsurance contracts, the reinsurer takes over a specified pro rata share of the premiums and losses of the primary writing company (called quota share and surplus share). Under another form of contract, the primary insurer bears all losses up to a certain point, and the reinsurer assumes losses over this retention, but only up to a specified limit (called excess of loss). Excess of loss reinsurance includes catastrophe reinsurance which covers loss to many insureds in a single incident, as by windstorm or riot.

The availability of reinsurance influences the capacity of primary insurers to underwrite the risks of the general public. It permits underwriting a larger volume of risks than would otherwise be possible and it enables an insurer to accept a large amount of exposure in a particular area or kind of area.

For example, two of the twenty largest insurers reported a total loss exposure of over $6 billion in the ten largest cities of the United States. One company had an exposure to loss of $2.3 billion in Los Angeles alone—equal to almost forty times its policyholders surplus. (These figures appear in Table 5.)

Thus, the capacity of primary insurers to insure more properties in inner city areas and to continue to insure property owners everywhere against the riot risk is in important respects influenced by their ability to purchase reinsurance for these risks.

*Availability of Reinsurance.* There is no centralized reinsurance market. Primary insurers seek reinsurance wherever the sources seem most promising at any given time. One of the world's largest and oldest reinsurers, Lloyd's of London—which

Table 5. Exposure to Loss Under Property Insurance Contracts in 10 Large Cities of 2 Leading Insurance Groups

| City | Total exposure | | Exposure as a percent of policyholders surplus | |
|------|----------------|--|------------------------------------------------|--|
| | Company I | Company II | Company I | Company II |
| New York | $1,950,000,000 | $465,000,000 | 394 | 798 |
| Chicago | 1,110,000,000 | 1,519,000,000 | 224 | 2610 |
| Los Angeles | 1,335,000,000 | 2,308,000,000 | 270 | 3967 |
| Philadelphia | 450,000,000 | 195,000,000 | 91 | 335 |
| Detroit | 675,000,000 | 683,000,000 | 136 | 1173 |
| Baltimore | 130,000,000 | 324,000,000 | 26 | 556 |
| Houston | 500,000,000 | 192,000,000 | 101 | 330 |
| Cleveland | 650,000,000 | 257,000,000 | 131 | 442 |
| Washington | 690,000,000 | 38,000,000 | 139 | 65 |
| St. Louis | 470,000,000 | 411,000,000 | 95 | 707 |
| Total | 7,960,000,000 | 6,392,000,000 | 1608 | 10983 |

Source: Questionnaire to Twenty Largest Property-Liability Insurance Groups, The National Advisory Panel on Insurance in Riot-Affected Areas.

36

has carried on business since the late 17th century—accounts for about 30 percent of the reinsurance written for United States companies. Its practices have a substantial influence on other reinsurers. There are other alien reinsurers, for example, in Switzerland, but they are relatively unimportant in the American market.

In recent years, especially since World War II, American reinsurers have grown rapidly. They now play a substantial role in reinsurance. In 1966, they provided about 65 percent—about 40 percent by professional reinsurers, and 25 percent by primary insurers—of the total reinsurance written for United States insurers.

Domestic reinsurers also have increased their sales of reinsurance abroad. Reinsurance sold to foreign countries, however, is less than that purchased from abroad—$125.3 million sold as compared to $353.9 million purchased in 1966. It has been growing at a faster rate, however; in the last decade, reinsurance sold by United States companies abroad increased about fourfold, while reinsurance purchased by United States companies from reinsurers abroad increased only 1.7 times.

Primary insurers in the United States have also increased rapidly their share of the reinsurance market—from about 7 percent in 1950, to over 25 percent in 1966. A number of primary insurers

have established new reinsurance departments within the last few years. But their reinsurance operations have been much less profitable than those of professional reinsurers.

The supply of reinsurance is essentially uncontrolled and unaffected by government. The capital available to provide reinsurance is entirely private and is drawn there by the rate of return it can earn. Thus, the availability of reinsurance is related to its profitability and not necessarily to the needs of the public.

In recent years, both primary insurers and professional reinsurers have had adverse experience in the reinsurance business. There has been a series of catastrophe losses from windstorm, riot, and fire, and ordinary losses have been heavy. Windstorm has been the dominant cause of catastrophe loss—those in excess of $1 million—on fire and extended coverage policies for the industry. Riot losses, although widely publicized, have been a relatively small cause of catastrophe losses. Seventeen of the twenty largest groups of property-liability companies responded to the Panel's questionnaire, and the distribution of catastrophe losses for those companies is shown in Table 6. Table 7 shows the same figures for fifteen professional reinsurers.

TABLE 6. REPORTED GROSS CATASTROPHE LOSSES BY CAUSE AS A PERCENTAGE OF TOTAL REPORTED GROSS CATASTROPHE LOSSES (FOR EACH OF 17 PRIMARY INSURERS), 1960–1967

[In percent]

| Company | Fires | Riots | Hurricanes | Hail and windstorms | Tornadoes | Total wind losses |
|---|---|---|---|---|---|---|
| C1 | 11.5 | 3.4 | 69.3 | 10.7 | 5.1 | 85.1 |
| C2 | .4 | 4.7 | 66.4 | 17.5 | 11.0 | 94.9 |
| C3 | — | 1.5 | 58.5 | 19.6 | 20.4 | 98.5 |
| C4 | 8.3 | 5.1 | 70.5 | 9.1 | 7.0 | 86.6 |
| C5 | — | 1.1 | 50.1 | 17.2 | 31.6 | 98.9 |
| C6 | — | 7.2 | 76.2 | 10.7 | 5.9 | 92.8 |
| C7 | — | 29.7 | 23.1 | — | 47.2 | 70.3 |
| C8 | .3 | 8.4 | 60.0 | 21.5 | 9.8 | 91.3 |
| C9 | 2.0 | 8.5 | 68.0 | 14.4 | 7.1 | 89.5 |
| C10 | .5 | 10.1 | 61.6 | 11.8 | 16.0 | 89.4 |
| C11 | .7 | 6.6 | 55.2 | 19.4 | 18.1 | 92.7 |
| C12 | — | 3.6 | 34.7 | 33.7 | 28.0 | 96.4 |
| C13 | .4 | 9.8 | 89.8 | (1) | (1) | 89.8 |
| C14 | — | 22.2 | 77.8 | — | — | 77.8 |
| C15 | 3.7 | 9.7 | 54.8 | 19.8 | 12.0 | 86.6 |
| C16 | 3.5 | 6.0 | 55.0 | 16.1 | 19.4 | 90.5 |
| C17 | 2.4 | 5.4 | 64.9 | 16.7 | 10.6 | 92.2 |

1 Not available.

SOURCE: Questionnaire to 20 largest property-liability insurance groups, The National Advisory Panel on Insurance in Riot-Affected Areas.

37

TABLE 7. REPORTED GROSS CATASTROPHE LOSSES BY CAUSE AS A PERCENTAGE OF TOTAL REPORTED GROSS CATASTROPHE LOSSES (FOR EACH OF 15 PROFESSIONAL REINSURERS), 1960–1967

[In percent]

| Company | Fires | Riots | Hurricanes | Hail and windstorms | Tornadoes | Total wind losses |
|---------|-------|-------|------------|--------------------|-----------|--------------------|
| P1 | 3. 9 | 7. 3 | 65. 7 | (¹) | 23. 1 | 88. 8 |
| P2 | 9. 2 | 10. 2 | 71. 7 | 2. 4 | 6. 5 | 80. 6 |
| P3 | 4. 4 | 9. 7 | 53. 4 | 9. 7 | 22. 8 | 85. 9 |
| P4 | . 1 | 1. 6 | 72. 1 | 7. 4 | 18. 8 | 98. 3 |
| P5 | 12. 8 | 71. 1 | 1. 5 | — | 14. 6 | 16. 1 |
| P6 | — | 5. 3 | 65. 5 | 12. 8 | 16. 4 | 94. 7 |
| P7 | 1. 0 | 2. 3 | 43. 6 | 11. 3 | 41. 8 | 96. 7 |
| P8 | — | 2. 1 | 60. 9 | 11. 4 | 25. 6 | 97. 9 |
| P9 | 10. 2 | 18. 4 | 71. 4 | (¹) | (¹) | 71. 4 |
| P10 | — | — | 96. 0 | | 4. 0 | 100. 0 |
| P11 | 1. 1 | 3. 0 | 80. 6 | — | 15. 3 | 95. 9 |
| P12 | — | 4. 5 | 81. 9 | 5. 5 | 8. 1 | 95. 5 |
| P13 | 5. 1 | 8. 1 | 76. 5 | . 1 | 10. 2 | 86. 8 |
| P14 | 11. 4 | 6. 9 | 71. 3 | — | 10. 4 | 81. 7 |
| P15 | — | — | 100. 0 | — | — | 100. 0 |

¹ Not available.

SOURCE: Questionnaire to professional reinsurers, The National Advisory Panel on Insurance in Riot-Affected Areas.

For a variety of reasons, primary insurers have made heavier demands for reinsurance in recent years. In addition to their adverse experience with recent catastrophes, they have been called upon to insure greater concentrations of property, and they have had to contend with rising property values stemming from economic growth and inflation, and with increased vulnerability of some property to destruction, characteristic of some modern construction. At the same time, higher prices and requirements for larger risk retentions have constricted the amount of reinsurance the primary insurers are able to buy.

Eighteen of the twenty largest property-liability insurance groups, asked to indicate the likelihood of one or more specific developments resulting from the riot risk, answered as follows:

| Number of companies indicating each specified result | Specified result |
|---|---|
| 12 | Contraction of market for ceding of catastrophe coverage by your company. |
| 12 | Efforts to increase rates by your company. |
| 10 | Contraction of market for ceding pro rata coverage by your company. |
| 7 | Contraction of direct insurance writings by your company. |
| 6 | Contraction of the market for ceding of excess of loss other than catastrophe coverage by your company. |
| 5 | Contraction of pro rata coverage assumed by your company. |
| 5 | Contraction of catastrophe coverage assumed by your company. |
| 3 | Contraction of excess of loss other than catastrophe coverage assumed by your company. |
| 1 | Don't know. |

Fifteen professional reinsurers replied to the same question as follows:

| Number of companies indicating each specified result | Specified result |
|---|---|
| 10 | Contraction of market for ceding catastrophe coverage by your company. |
| 7 | Efforts to increase rates by your company. |
| 4 | Contraction of catastrophe market for ceding excess insurance other than catastrophe. |
| 3 | Contraction of market for ceding pro rata coverage by your company. |
| 2 | Contraction of pro rata coverage assumed by your company. |
| 1 | Contraction of excess of loss other than catastrophe coverage assumed by your company. |

38

Interviews with company executives also indicate that the riot risk will have an adverse effect on the reinsurance market. Many are concerned that the situation may get worse.

Thus, the supply of reinsurance apparently has tightened and this in turn has tightened the primary insurance market. For without adequate reinsurance, insurers must limit more than otherwise their premium writings to prevent the assumption of liabilities beyond their financial capacity.

Reinsurance is a relatively important expense item for insurers. Reinsurance is normally sold on an annual basis, and it is customary to renegotiate the price and other terms every year. Primary insurers are, therefore, vulnerable on short notice to a tightening of the reinsurance market. This is particularly significant if they are undertaking long-range plans for growth which depend to some extent upon reinsurance to provide additional capacity.

*Alternatives to Reinsurance.* Because of the increasing restrictions in the availability of reinsurance, primary insurers have tried to expand their own financial capacity to retain risks and to diminish their d e p e n d e n c y on reinsurance by increasing their capital and surplus and by the accumulation of more adequate catastrophe reserves. Fourteen of the sixteen reinsurers responding to our question said that the present income tax structure was a major obstacle inhibiting them from building up adequate voluntary reserves for catastrophe losses.

Another alternative to reinsurance is insurance company pooling. By spreading risks among themselves, companies in pools aggregate the member insurers' individual capacities to cover risks. The result is a broader spreading of risks resembling the results achieved by reinsurance.

Pools require that the members be skilled in risk selection and not contribute disproportionately to pool losses. Many pools presently in existence have been formed to insure, for example, liability and property damage arising out of nuclear accident; shipping, aviation, and railroad risks; and special kinds of property such as cotton, grain, and movie film. There have been numerous instances, however, in which pool arrangements have been abandoned because of unfavorable performance on the part of some members. For example, whereas a few years ago there were forty facultative reinsurance pools in the United States, today there are only four or five.

## Relation to Urban Core Market Problems

Primary insurers will have to expand their capacities to undertake more extensive underwriting of risks in inner city areas. They can do so by (1) purchasing reinsurance from private reinsurers or from a newly-created government reinsurance facility, (2) pooling, and (3) accumulating more adequate catastrophe reserves.

The need for the industry to continue insuring the riot risk also establishes new demands for reinsurance. The potential losses from this risk have become demonstrably greater in recent years. In the light of the amount of insured losses from civil disorders in the summer of 1967, the primary insurers understandably want more reinsurance.

In 1965, riot losses were less than 1 percent of the fire and extended coverage premiums for seventeen of the eighteen primary companies responding to the Panel's questionnaire. In 1967, only five of these companies sustained so low a loss. This is illustrated in Table 8.

At the same time, reinsurers are less willing to provide protection against catastrophe risks. Lloyd's of London has stated:

Catastrophe [reinsurance] contracts, once they have been running for a period, are rated on 'results'. 'Results' show the skill of the reassured in conducting his direct business for which he is entitled to recognition. Undoubtedly rates and deductibles are higher than they were immediately before Hurricane Betsy.

Nine of twelve professional reinsurers surveyed by the Panel indicated that before 1965, they regarded the riot risk as being absorbed without premium. Now, they are generally not only seeking substantial premiums, but restricting the amount of the risk they will accept. On the question of riot reinsurance, a memorandum from Lloyd's dated November, 1967, states:

Whilst the market at the present time is still prepared to shoulder these liabilities [riot peril], there must soon be realistic action—for example, as regards the premium element.

If primary insurers cannot obtain reinsurance to the extent they desire, their own capacity to

Case: 1:13-cv-08564 Document #: 134-2 Filed: 08/11/17 Page 59 of 190 PageID #:3340

TABLE 8. FREQUENCY DISTRIBUTION OF COMPANIES BY PERCENTAGE OF NET CATASTROPHE RIOT LOSSES TO TOTAL FIRE AND EXTENDED COVERAGE PREMIUMS [1]

| Net riot losses as percentage of fire and extended coverage premiums | Number of companies | | Percentage of companies | |
|---|---|---|---|---|
| | 1965 | 1967 | 1965 | 1967 |
| Less than 1 percent | 17 | 5 | 94. 4 | 27. 8 |
| 1 but less than 2 percent | 1 | 4 | 5. 6 | 22. 2 |
| 2 but less than 3 percent | — | 3 | — | 16. 7 |
| 3 but less than 4 percent | — | 2 | — | 11. 1 |
| 4 percent or over | — | 4 | —. | 22. 2 |
| Total | 18 | 18 | 100. 0 | 100. 0 |

[1] Data on fire and extended coverage premiums earned in 1967 not available so 1966 premiums used.

SOURCE: Questionnaire to 20 largest and property-liability insurance groups The National Advisory Panel on Insurance in Riot-Affected Areas.

insure becomes more limited, and the number of risks they can underwrite diminishes. Yet the availability of insurance must keep pace with American economic growth and prosperity. In the program recommended by the Panel, we have taken account of the need for greater insurance capacity in the interest of increasing the availability of insurance in the center cities.

# Profits

## In General

An evaluation of the profitability of the insurance industry, and in particular of the stock insurers, is necessary for an understanding of the industry's reaction to the emergence of the riot risk and to demands upon the industry for writing more insurance in urban core areas.

Profits are needed to attract capital, to support growth, and to provide greater financial safety. For these reasons, the availability of insurance relates directly to the profits of the property insurance industry. If profits are low, companies will seek to raise rates, establish more stringent underwriting standards, or withdraw from the insurance business. Any of these alternatives may reduce the ability of a property owner to obtain insurance. Rate increases raise the cost of insurance to property owners. Stricter underwriting standards reduce the number of risks that companies will accept at standard rates. The reduction in the number of companies writing insurance is also likely to increase rates and possibly restrict underwriting standards. The result is more risks without insurance or covered at surcharged rates.

Profits also are directly related to the industry's capacity to absorb catastrophe losses—infrequent losses of large dimensions—such as those produced by the riots of recent months or the windstorms of the past years. Unless a rate has a proper allowance for an accumulation of contingency reserves, catastrophe losses deal a severe blow to profits, and may even impair the solvency of the company.

Insurer profits are a function of many factors: loss experience, operational expenses, price and rate level changes, and investment results. The results of underwriting and rating decisions are slow to unfold. They are best assessed over an extended period of time such as five to ten years.

The insurance business generates profits from two sources: underwriting profit from the premium payments of the insureds, and investment profit from the assets held by the company.

*Underwriting Profits.* The insurance industry generally takes the position that it must seek an underwriting profit without regard to investment income. A figure of 5 percent of premiums is frequently mentioned as a target; but there is no generally accepted standard. Most importantly, there are alternative ways of measuring underwriting profits for varying legal and financial purposes.

40

There are several approaches to measuring underwriting profits for property-liability insurance companies. Three of the most common are: (1) combined loss and expense ratio; (2) statutory underwriting profits; and (3) adjusted statutory underwriting profits.

*Combined loss and expense ratio.* This method is commonly used to evaluate the profit of a line of insurance and overall underwriting results. The combined loss and expense ratio is the sum of the loss ratio (losses and loss adjustment expenses incurred over premiums earned) and the expense ratio (expenses incurred over premiums written).

A ratio above 100 percent indicates the percentage by which losses and expenses have exceeded premiums; a ratio of less than 100 percent indicates the percentage by which losses and expenses have been lower than premiums. An aggregate combined loss and expense ratio for all lines of insurance can be used as a measure of profitability of overall company underwriting operations.

Table 9 compares the aggregate loss and expense ratios of stock and mutual insurers. Over the last ten years, the mutuals have had more profitable underwriting results. With the same or lower premium rates, the mutuals have used less of their premium income to pay losses and expenses. In fact, if many mutual insurers had not elected to lower their initial rates in anticipation of expected excesses of premiums over losses and expenses, the combined ratios for the mutuals might have been even lower. Some stock insurers also charge lower-than-standard rates, but this is a less common practice.

A principal reason for the more profitable underwriting results of mutual insurers is their lower expense ratios. For all lines over the last ten years, the mutual expense ratio was nine points lower than the corresponding stock insurer ratio. If allowances were made for the difference in the premium bases, the mutuals would have had an even more marked expense advantage.

The loss ratios in Table 9 show that mutuals paid out more in claims per dollar of earned premium income than did stock insurers. However, if mutual premiums were adjusted to the stock insurer rate level, an adjustment for which the necessary data are not available, it would probably indicate a lower loss ratio for mutuals than for stock insurers. The lower loss ratio can be explained by the fact that mutuals as a group have been more selective in their underwriting than stock insurers. In part, this greater selectivity has been made possible because lower premiums

TABLE 9. AGGREGATE LOSS AND EXPENSE RATIOS OF STOCK AND MUTUAL PROPERTY-LIABILITY COMPANIES, 1957–1966

[In percent]

| Year | Stock companies | | | Mutual companies | | |
|---|---|---|---|---|---|---|
| | Loss ratio [1] | Expense ratio [2] | Combined loss and expense ratio | Loss ratio [1] | Expense ratio [2] | Combined loss and expense ratio |
| 1966 | 66.1 | 31.8 | 97.9 | 70.9 | 24.2 | 95.1 |
| 1965 | 69.1 | 32.8 | 101.9 | 73.1 | 25.0 | 98.1 |
| 1964 | 68.0 | 33.9 | 101.9 | 73.4 | 25.9 | 99.3 |
| 1963 | 66.3 | 34.7 | 101.0 | 71.4 | 26.5 | 97.9 |
| 1962 | 64.5 | 34.5 | 99.0 | 66.7 | 25.7 | 92.4 |
| 1961 | 64.4 | 35.0 | 99.4 | 63.6 | 25.6 | 89.2 |
| 1960 | 63.6 | 34.8 | 98.4 | 64.3 | 25.6 | 89.9 |
| 1959 | 62.5 | 35.3 | 97.8 | 64.7 | 25.3 | 90.0 |
| 1958 | 63.7 | 36.3 | 100.0 | 64.9 | 25.5 | 90.4 |
| 1957 | 66.2 | 36.7 | 102.9 | 65.5 | 25.8 | 91.3 |
| 1957–1966 | 65.6 | 34.4 | 100.0 | 68.5 | 25.4 | 93.9 |

[1] Losses incurred over premiums earned.
[2] Expenses incurred over premiums written.
SOURCE: *Best's Aggregates and Averages,* 1958–1967.

41

charged by mutuals have enabled them to select a better than average group of risks.

Table 10 shows combined loss and expense ratios for various lines of insurance for stock and mutual companies over the last ten years. The figures indicate generally unfavorable experience for the fire, extended coverage, and burglary and theft lines for stock insurers. In most years, the combined loss and expense ratios for these lines exceed 100%. The mutual insurers' experience has

generally been favorable for fire and allied lines but it is also relatively unfavorable for burglary and theft.

*Statutory underwriting profits.* A second measure of profits is statutory underwriting profit: losses and expenses incurred are subtracted from premiums earned.

This calculation produces profits or losses described as "statutory" because it is prescribed by law. By this method premiums earned are deter-

TABLE 10. COMBINED LOSS AND EXPENSE RATIOS FOR STOCK AND MUTUAL PROPERTY-LIABILITY INSURERS FOR SELECTED LINES OF INSURANCE, 1957–1966

[In percent]

| | 1957–1966 | 1966 | 1965 | 1964 | 1963 | 1962 | 1961 | 1960 | 1959 | 1958 | 1957 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **STOCK INSURERS** | | | | | | | | | | | |
| Straight fire insurance | 102.0 | 100.4 | 102.1 | 103.5 | 109.7 | 103.0 | 100.8 | 99.9 | 98.9 | 100.7 | 101. |
| Extended coverage | 103.9 | 89.3 | 127.3 | 108.6 | 97.5 | 105.3 | 113.4 | 106.2 | 95.3 | 92.4 | 104. |
| Other allied lines | 90.8 | 89.6 | 96.1 | 87.9 | 93.2 | 93.0 | 91.9 | 82.1 | 85.7 | 88.4 | 99. |
| Homeowners multiple peril | 104.5 | 99.9 | 107.2 | 112.1 | 108.0 | 105.2 | 104.4 | 98.3 | 91.3 | 97.4 | 99. |
| Commercial multiple peril | 95.9 | 93.2 | 97.4 | 94.7 | 95.1 | 92.7 | 92.6 | 103.2 | 103.8 | 116.3 | 123. |
| Glass | 103.1 | 101.1 | 104.0 | 107.4 | 104.9 | 104.1 | 106.0 | 100.9 | 102.3 | 101.0 | 99. |
| Inland marine | 100.1 | 102.1 | 102.7 | 98.9 | 100.4 | 95.3 | 98.5 | 97.5 | 97.9 | 101.4 | 107. |
| Miscellaneous bodily injury liability | 94.3 | 97.4 | 94.6 | 92.5 | 91.0 | 89.0 | 92.7 | 94.7 | 96.5 | 99.7 | 98. |
| Automobile bodily injury liability | 105.2 | 103.7 | 104.8 | 105.5 | 103.0 | 102.3 | 103.3 | 102.8 | 105.5 | 110.4 | 114. |
| Automobile property damage liability | 102.6 | 103.0 | 106.7 | 109.1 | 104.5 | 101.9 | 98.2 | 97.2 | 97.7 | 101.3 | 105. |
| Automobile collision | 97.7 | 95.5 | 101.9 | 105.5 | 101.0 | 97.6 | 93.9 | 93.0 | 92.5 | 95.1 | 100. |
| Automobile fire, theft, and comprehensive | 93.9 | 83.4 | 93.5 | 94.5 | 93.1 | 95.5 | 94.3 | 94.2 | 92.7 | 100.2 | 106. |
| Burglary and theft | 101.8 | 105.3 | 104.6 | 105.6 | 102.7 | 99.2 | 101.6 | 102.9 | 97.7 | 101.9 | 96. |
| **MUTUAL INSURERS** | | | | | | | | | | | |
| Straight fire insurance | 85.3 | 86.2 | 87.4 | 89.0 | 93.9 | 83.3 | 82.3 | 82.0 | 84.5 | 82.4 | 81. |
| Extended coverage | 91.4 | 81.5 | 108.3 | 101.7 | 86.7 | 95.0 | 93.6 | 96.1 | 82.6 | 82.1 | 88. |
| Other allied lines | 88.3 | 79.4 | 100.5 | 102.8 | 88.9 | 90.0 | 88.8 | 85.4 | 71.1 | 75.1 | 77. |
| Homeowners multiple peril | 97.8 | 95.9 | 104.6 | 106.9 | 101.9 | 95.6 | 91.1 | 90.8 | 79.3 | 81.4 | 84 |
| Commercial multiple peril | 88.9 | 86.5 | 92.0 | 92.0 | 87.3 | 77.4 | 81.4 | 93.5 | 97.2 | 95.9 | 107 |
| Glass | 98.5 | 101.0 | 99.1 | 106.8 | 103.0 | 95.3 | 98.3 | 96.1 | 95.9 | 92.4 | 92 |
| Inland marine | 89.7 | 92.4 | 91.0 | 90.5 | 89.5 | 84.6 | 87.5 | 92.8 | 88.3 | 87.8 | 92 |
| Miscellaneous bodily injury liability | 87.6 | 92.3 | 88.8 | 87.9 | 86.1 | 79.1 | 85.0 | 90.6 | 88.7 | 90.0 | 89 |
| Automobile bodily injury liability | 101.8 | 102.6 | 102.8 | 105.6 | 104.4 | 97.3 | 96.5 | 97.0 | 102.3 | 104.5 | 104 |
| Automobile property damage liability | 99.6 | 101.7 | 104.0 | 106.7 | 103.5 | 97.0 | 94.2 | 94.5 | 95.3 | 96.4 | 97 |
| Automobile collision | 90.4 | 90.9 | 97.3 | 100.8 | 95.7 | 89.7 | 84.8 | 84.2 | 82.5 | 81.7 | 87 |
| Automobile, fire, theft, and comprehensive | 89.3 | 79.4 | 87.3 | 90.5 | 91.9 | 92.5 | 93.2 | 89.7 | 90.1 | 88.7 | 92.4 | 99 |
| Burglary and theft | 99.5 | 110.0 | 100.7 | 103.4 | 103.4 | 93.2 | 94.0 | 99.2 | 92.5 | 96.0 | 9 |

SOURCE: *Best's Aggregates and Averages*, 1967, pp. 141–144 and 209–212.

mined on a pro-rata basis but most of the expenses are charged off at the inception of the policy.

*Adjusted statutory underwriting profits.* A third measure of profitability is adjusted statutory underwriting profit, so called because the procedure amounts to an adjustment of the statutory figure properly to reflect the incidence of expenses. This method is frequently employed by financial analysts.

*Comparison of statutory and adjusted statutory methods.* Table 11 shows underwriting profit and loss by statutory and adjusted statutory methods. The table illustrates that the impact of the adjustment is to increase the indicated profit. This is so because the period under review has been one of increasing premium writings, and therefore one during which expenses are overstated by the statutory method.

Stock insurers had cumulative statutory losses of over $1 billion in the last ten years. However, with adjustment, they made a cumulative profit of $11 million for the ten-year period.

The impact of the adjustment is less for mutual companies. One reason for this is the lower expense ratio of the mutuals. Mutuals show a ten-year profit of over $2 billion by either method. There was a general decline in profitability in most recent

years, however. The record of the mutual insurers would have been even more impressive if many had not elected to reduce their initial premium rates.

*Investment Profit.* Insurers keep the bulk of their assets in investment securities and, thus, they generate an investment profit through interest, dividends, and capital gains.

Table 12 shows for both stocks and mutuals the investment income and total investment profit or loss over the last ten years.

Investment income, shown in column 1 of Table 12, excludes realized and unrealized capital gain. Investment profit or loss, on the other hand, shown in column 2, includes investment income as well as realized capital gains, and unrealized capital gains due to changes in the market value of common stocks and changes in the amortized value of bonds.

The investment income of stock insurers has exceeded that of mutual insurers because the stock companies have more assets. Capital gains have influenced the investment profit of stock insurers much more than the profit of mutual insurers because stock insurers invest a larger proportion of their assets in common stocks.

Comparisons of stock and mutual underwriting results are complicated by the fact that these two types of insurers have differing legal and financial structures.

TABLE 11. UNDERWRITING PROFIT OR LOSS OF STOCK AND MUTUAL PROPERTY-LIABILITY INSURERS, 1957–66

[In millions]

| Year | Stock insurers | | Mutual insurers | |
|---|---|---|---|---|
| | Statutory profit | Adjusted statutory profit [1] | Statutory profit | Adjusted statutory profit [1] |
| 1966 | +$103 | +$306 | +$228 | +$275 |
| 1965 | −425 | −253 | +51 | +96 |
| 1964 | −348 | −235 | −2 | +33 |
| 1963 | −219 | −116 | +31 | +89 |
| 1962 | +3 | +113 | +307 | +308 |
| 1961 | +30 | +64 | +402 | +420 |
| 1960 | +66 | +164 | +351 | +369 |
| 1959 | +71 | +210 | +306 | +336 |
| 1958 | −93 | 0 | +263 | +291 |
| 1957 | −361 | −242 | +216 | +243 |
| 10-year total | −1,173 | +11 | +2,153 | +2,460 |

[1] The adjusted statutory underwriting profit is calculated by multiplying premiums earned by (100% minus the combined loss and expense ratio).

SOURCE: Data based on figures from *Best's Aggregates & Averages*, 1958–1967, *passim*.

43

TABLE 12. FINANCIAL RESULTS FOR STOCK AND MUTUAL PROPERTY-LIABILITY INSURERS, 1957-1966

[In millions]

| Column | Stock | | | | | Mutual | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| Year | Net investment income [1] | Investment profit or loss [2] | Operating gain on statutory basis [3] | Operating gain on adjusted basis [4] | Total realized gain [5] | Net investment income [1] | Investment profit [2] | Operating gain on statutory basis [3] | Operating gain on adjusted basis [4] | Total realized gain [5] | Dividends to policyholders |
| 1966 | $896 | −$552 | $998 | $1,202 | $1,517 | $291 | $91 | $519 | $566 | $597 | $253 |
| 1965 | 852 | 1,466 | 428 | 599 | 847 | 253 | 332 | 304 | 349 | 397 | 228 |
| 1964 | 782 | 1,821 | 435 | 547 | 738 | 226 | 448 | 224 | 259 | 303 | 228 |
| 1963 | 721 | 2,017 | 502 | 605 | 766 | 206 | 318 | 237 | 295 | 314 | 233 |
| 1962 | 673 | −230 | 676 | 786 | 888 | 192 | 92 | 498 | 500 | 517 | 194 |
| 1961 | 621 | 2,516 | 650 | 685 | 860 | 175 | 369 | 578 | 595 | 609 | 215 |
| 1960 | 592 | 655 | 658 | 757 | 836 | 160 | 175 | 510 | 529 | 533 | 211 |
| 1959 | 534 | 1,021 | 605 | 744 | 825 | 137 | 167 | 444 | 473 | 475 | 203 |
| 1958 | 489 | 2,074 | 396 | 489 | 585 | 118 | 280 | 382 | 409 | 414 | 195 |
| 1957 | 461 | −166 | 100 | 219 | 280 | 108 | 60 | 324 | 352 | 354 | 199 |
| 1966-1957 | 6,621 | 10,622 | 5,448 | 6,633 | 8,142 | 1,867 | 2,332 | 4,020 | 4,327 | 4,513 | 2,159 |

[1] Gross investment income minus investment expenses but before taxes and excluding realized and unrealized capital gains and losses.

[2] Includes net investment income and realized and unrealized gains and losses.

[3] Net investment income plus statutory underwriting profit (excluding realized and unrealized capital gains and losses).

[4] Net investment income plus adjusted underwriting profit (excluding realized and unrealized capital gains and losses).

[5] Net investment income plus adjusted underwriting profit plus realized capital gains.

SOURCE: Best's Aggregates and Averages, 1958-1967, passim.

44

*Overall Profitability.* The underwriting and investment operations combined make up the total profit picture for any one insurer and for the industry as a whole. Charts 1 and 2 display graphically investment income, investment profit, and statutory underwriting profit and loss for stock and mutual companies since 1957. They show the relative volatility of underwriting profits as compared to the steady growth of investment income. Investment profits (investment income plus realized and unrealized capital gains), on the other hand, are even more volatile than underwriting profits.

A comparison of Tables 11 and 12 shows that stock companies more than offset their underwriting losses with investment income. The figures in columns 3 and 8 labeled "Operating Gain on Statutory Basis" in Table 12 indicate that in no year did the property-liability insurance industry incur an operating loss. The same results are reached on an adjusted basis (columns 4 and 9).

This is true not only for the ten-year period shown in Table 12 but for every year beginning with 1913, the earliest year for which aggregate data are readily available.

Columns 5 and 10 include totals of investment income, realized (but not unrealized) capital gains, and adjusted underwriting profit. Column 11 indicates the amount of dividends paid to policyholders by mutuals—over $2 billion during 1957–1966.

*Rate of Return.* The rate of return on investment is a common financial measure. It can be calculated in a number of ways depending both on the definition of return and the definition of the investment base to which the return is related. Table 13 shows the return measured in four different ways: (1) operating return on a statutory basis: investment income, plus statutory underwriting profit, are divided by policyholders surplus; (2) return on adjusted basis plus realized capital gains: investment income, plus adjusted underwriting

CHART 1

STOCK UNDERWRITING AND INVESTMENT RESULTS

1957–1966





**CHART 2**

**MUTUAL UNDERWRITING AND INVESTMENT RESULTS**

**1957–1966**

TABLE 13. RETURNS ON INVESTMENT FOR STOCK AND MUTUAL PROPERTY-LIABILITY INSURERS
1957–66

| Column | Stock | | | | | Mutual |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| Year | Policy-holders surplus | Operating return on statutory basis [1] | Return on adjusted basis plus realized capital gains [2] | Return on statutory basis plus all capital gains [3] | Return on adjusted basis plus all capital gains [4] | Policy-holders surplus |
| | *Millions* | *Percent* | *Percent* | *Percent* | *Percent* | *Millions* |
| 1966 | $12,007 | 8.3 | 12.6 | −3.7 | −2.1 | $2,896 |
| 1965 | 13,660 | 3.1 | 6.2 | 7.6 | 8.9 | 2,814 |
| 1964 | 13,691 | 3.2 | 5.4 | 10.8 | 11.6 | 2,689 |
| 1963 | 12,642 | 4.0 | 6.1 | 14.2 | 15.0 | 2,527 |
| 1962 | 11,146 | 6.1 | 8.0 | −2.0 | −1.1 | 2,448 |
| 1961 | 11,719 | 5.5 | 7.3 | 21.7 | 22.0 | 2,323 |
| 1960 | 9,495 | 6.9 | 8.8 | 7.6 | 8.6 | 1,960 |
| 1959 | 9,381 | 6.5 | 8.8 | 11.6 | 13.1 | 1,802 |
| 1958 | 8,619 | 4.6 | 6.8 | 23.0 | 24.1 | 1,647 |
| 1957 | 7,073 | 1.4 | 4.0 | −7.5 | −5.8 | 1,424 |
| 1966–57 weighted average | — | 5.0 | 7.4 | 8.6 | 9.7 | — |

46

TABLE 13. RETURNS ON INVESTMENT FOR STOCK AND MUTUAL PROPERTY-LIABILITY INSURERS 1957–66—Continued

| Column | Mutual—Continued | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 7 | | 8 | | 9 | | 10 | |
| Year | Operating return on statutory basis [1] | | Return on adjusted basis plus realized capital gains [2] | | Return on statutory basis plus all capital gains [3] | | Return on adjusted basis plus all capital gains [4] | |
| | Before dividends | After dividends | Before dividends | After dividends | Before dividends | After dividends | Before dividends | After dividends |
| | *Percent* | *Percent* | *Percent* | *Percent* | *Percent* | *Percent* | *Percent* | *Percent* |
| 1966 | 17.9 | 9.2 | 20.6 | 11.7 | 11.0 | 2.3 | 12.6 | 3.9 |
| 1965 | 10.8 | 2.7 | 14.1 | 6.0 | 13.6 | 5.5 | 15.2 | 7.1 |
| 1964 | 8.3 | −0.1 | 11.3 | 2.8 | 16.6 | 8.1 | 17.9 | 9.4 |
| 1963 | 9.4 | +0.1 | 12.4 | 3.2 | 13.8 | 4.6 | 16.1 | 6.9 |
| 1962 | 20.3 | 12.4 | 21.1 | 13.2 | 16.3 | 8.3 | 16.3 | 8.4 |
| 1961 | 24.9 | 15.6 | 26.2 | 17.0 | 33.2 | 24.0 | 34.0 | 24.7 |
| 1960 | 26.0 | 15.3 | 27.2 | 16.4 | 26.8 | 16.0 | 27.7 | 16.9 |
| 1959 | 24.6 | 13.3 | 26.4 | 15.1 | 26.3 | 15.0 | 27.9 | 16.6 |
| 1958 | 23.2 | 11.3 | 25.1 | 13.3 | 33.0 | 21.2 | 34.7 | 22.8 |
| 1957 | 22.8 | 8.8 | 24.9 | 10.9 | 19.4 | 5.4 | 21.3 | 7.3 |
| 1966–57 weighted average | 17.8 | 8.2 | 20.0 | 10.4 | 19.9 | 10.3 | 21.3 | 11.7 |

[1] Investment income plus statutory underwriting profit divided by policyholders surplus.

[2] Investment income, plus realized capital gains and losses, plus adjusted underwriting profit or loss divided by policyholders surplus.

[3] Investment income, plus realized and unrealized gains and losses, plus statutory underwriting profit or loss divided by policyholders surplus.

[4] Investment income, plus realized and unrealized gains and losses, plus adjusted underwriting profit or loss divided by policyholders surplus.

SOURCE: Computed from *Best's Aggregates and Averages, 1958–1967*, passim.

profit, plus realized (but not unrealized) capital gains, all divided by policyholders surplus; (3) return on statutory basis plus all capital gains: investment income, plus statutory underwriting profit, plus realized and unrealized capital gains, all divided by policyholders surplus; and (4) return on adjusted basis plus all capital gains: the same as (3) but using adjusted rather than statutory underwriting profit.

These four returns appear in columns 2–5 for stocks and 7–10 for mutuals. The mutuals show all returns before and after dividends.

Table 13 reveals that both the stock and mutual insurers have generated profit over the last ten years on the funds provided by owners and policyholders. The mutual companies have been more profitable than the stocks.

However, mutual insurer returns, after dividends to policyholders, are closer to the stock company returns.

The inclusion of capital gains in the calculations raises the ten-year average return on investment more for the stock companies because their assets are more heavily invested in common stocks than

are mutual company assets. However, associated with this higher rate of return is a much greater variability in the annual rates.

**Relation to Urban Core Insurance Problems**

Given this overall profit picture, it is not difficult to see why insurance companies are reluctant to write urban core business. They view it as undesirable business, for it most directly affects the most unprofitable lines. The emergence of the riot risk makes urban core business even more undesirable, because it threatens solvency as well as profitability. It adds a new catastrophe to windstorm and other perils.

The riot losses had their greatest impact on the fire and extended coverage lines. These are among the most unprofitable of all insurance lines. Affected by a long series of catastrophic windstorm losses, they have registered high loss ratios.

Fire and extended coverage losses have had their greatest impact on the stock insurers because they write proportionately more of this kind of cov-

47

erage than their mutual counterparts. Stocks write about 80 percent of all fire and extended coverage premiums. Also, stocks are more vulnerable to adverse effects from these lines, since they write more fire and extended coverage premiums per dollar of policyholders surplus than mutuals. In 1966, for example, stocks wrote fifteen cents of fire and extended coverage premium per dollar of surplus while the mutuals wrote only twelve cents per dollar of surplus. The stocks also have a higher loss ratio on fire and extended coverage than the mutuals. In 1966, the stock fire and extended coverage loss ratios were 59.6 and 46.7 percent respectively while mutual ratios were 51.7 and 44.5, respectively.

Further, the stock companies most adversely affected are the large ones. In 1966, of the 800 stock companies in existence, 150—each writing at least $2 million in fire premium—wrote about 90 percent of all stock fire premiums. The top 20 stock groups wrote about 55 percent of all fire insurance premiums and about 60 percent of all stock fire premiums.

The mutuals write less fire and extended coverage than stocks, both proportionately and in absolute amounts. They have lower combined loss and expense ratios because of lower expenses and more selective underwriting. The survey of the twenty largest groups of property-liability insurers conducted by the Panel found that the twelve largest stock companies reported net incurred riot catastrophe losses during 1965–1967 ten times larger than the six largest non-stock companies (five mutuals and one reciprocal). These comparisons include losses paid to reinsureds, and deduct recoveries from reinsurers.

In brief, riot losses in particular and urban core business in general most directly affect relatively unprofitable property insurance lines—lines already burdened with heavy catastrophe losses and exposures. Further, these lines are written most heavily by the least profitable segment of the insurance business.

## State Regulation

### In General

The insurance industry is subject to extensive governmental regulation. Each state has voluminous laws establishing the terms on which insurance companies may do business in the state.

Rules limit the organization, reorganization, and liquidation of insurance companies. Each state provides extensive criteria governing the day-to-day operations of insurance companies, including such matters as the lines of insurance they can write, the rates they may charge, the policy forms they must use, the investments they may undertake, the capital and surplus they must maintain, the reserves they must establish, the reports they must file, and the trade practices they must avoid.

The extensive regulation of insurance companies is no accident. The public's interest in a properly functioning insurance system requires governmental supervision.

*Fair Dealing.* The insurance contract is a technical legal document, establishing a complex business arrangement. The average consumer is ill-equipped to evaluate the contract or the likelihood of its performance. In most cases, the policyholder understands neither the terms of the contract nor the activities of the insurer standing behind it. Without regulation, there is no assurance of fair policy forms and trade practices.

*Financial Integrity.* Because of the complexities of the insurance process, insurance ventures, in the absence of careful regulation, would provide tempting opportunities for financial speculation, or even fraud. Premiums are paid to the insurer at the outset, but the obligations of the insurer to pay losses may not arise for many years. Consequently, insurers are like trustees—they hold other people's money. If the insurance protection purchased is in fact to be available when losses occur, the safety and solvency of the insurer must be preserved.

*Prices.* Another major function of regulation is to protect the insurance consumer against having to pay excessive or unfair premiums. Most states provide that rates shall not be "excessive, inadequate, or unfairly discriminatory." State regulation can not guarantee that insurance will be within the insured's means, but it can help prevent

48

rates from being excessive in relation to the risk assumed by the company.

In order to have sufficient statistical data to make rates, insurers are allowed to pool statistics and make rates together. This in a sense is a legalized form of price-fixing, but it is regulated by the state insurance departments.

A significant segment of the industry claims that rate regulation is, in fact, contributing to an inadequate insurance supply. According to a survey of the insurance industry in April, 1967, conducted by the National Association of Insurance Commissioners in eleven states representing the most important types of rate regulation: (1) Almost one-third of the companies indicated some tightening of their fire insurance underwriting because of rate regulation; and almost one-half reported that they had either intentionally reduced their operations or expanded their operations less than they had originally planned because of the effects of rate regulation; (2) Many companies said they believed an adequate supply of insurance was less likely under the most common form of regulatory laws than under other types of laws permitting freer competition; and (3) A large proportion of insurers reported inadequate rates, and with some exceptions, more insurers claimed rate inadequacies in states with rigid rate regulatory laws than in states with more flexible laws.

According to this industry viewpoint, greater price flexibility would increase the supply of insurance. At the same time, however, it might permit unfair price discrimination based on such factors as underwriting and pricing by area alone.

Price flexibility in special situations is now achieved in a variety of ways: (1) The state insurance commissioner may approve substandard risk rating plans. These plans may include deductibles and carry a schedule of special charges. (2) Most states have consent-to-rate provisions under which an insured may agree in writing to accept a higher-than-standard rate. Most of these consent-to-rate provisions require that such rates be approved in each individual case by the state insurance department. (3) Excess, or surplus lines, insurance written by companies not licensed (admitted) to do business in a state, is usually controlled by surplus lines statutes. These statutes are directed mainly toward the agent or broker who places the business. Prices are flexible; but, by definition, the non-admitted market lacks some of the regulatory safeguards protecting the admitted market.

*Availability.* In addition to these traditional functions, state regulation has increasingly recognized the interest of consumers in obtaining fair access to needed insurance coverages. The insurance enterprise is increasingly being treated as a public utility in the sense that the industry has a duty to offer basic coverages on equal terms to all those who need it.

This trend is obvious with respect to workmen's compensation and automobile insurance. All states now attempt to guarantee a market for both of these lines by assigned risk plans or assigned risk pools. These plans and pools furnish insurance to qualified applicants who can not obtain protection in the regular market. More recently, some commissioners have acted vigorously to maintain an adequate urban core property insurance market, even in the absence of specific statutory mandates to do so.

## Regulation in Practice

In most states, regulation is carried out by an insurance department headed by a commissioner. The department may be an independent regulatory agency or part of another state agency. The commissioner is appointed directly by the governor in about thirty states. In about eight states he is appointed by someone other than the governor. In about twelve states he is himself an elected official. In one he is a civil servant.

It may go too far to describe the commissioner as "a combination judge, prosecuting attorney, and hangman," as one noted expert on insurance regulation has said. But it is no exaggeration to say that the commissioner wields enormous influence over a powerful and important industry. His legal powers over the insurance industry are extensive, and so are his powers of moral suasion. The state insurance commissioner, in a real sense, determines the content of state regulation by the way he administers his authority.

In some respects, however, it is easy to credit the commissioners with more power than they may in practice have, especially when considering a newly emerging responsibility for availability in urban core areas. Thus, the insurance commis-

**49**

sioner has only limited authority to regulate cancellations, non-renewals, and refusals to write. He may promulgate directives and rely on moral suasion. He may pressure insurance companies to enter urban area plans and pools. He may exact voluntary concessions and commitments from companies. But whether such approaches can be effective over the long run is an open question.

The commissioner's control over insurance company underwriting policy is quite limited. Even the authority to prohibit mass cancellations is unclear. The Attorney General of Michigan ruled on August 11, 1967, that cancellations during a riot period would be illegal, but this ruling has not been tested in the courts, and it was not meant to apply after a riot.

Although recent statutory enactments and contractual provisions have restrained individual automobile cancellations, no legislative restraints exist for property coverages.

It is not clear whether state regulators have adequate authority to control restrictive underwriting and to prohibit red-lining, blackout maps, keep-out areas, and other area underwriting practices. A commissioner may attempt to act under laws relating to "unfair or deceptive practices" and "methods and practices" not in the interests of the policyholders. But the present statutory framework may be inadequate to provide protection against practices that unfairly deny a policyholder needed insurance.

Many commissioners are hampered in their regulatory activities by limited financial resources and personnel. As a result, commissioners in recent years have attempted to identify the crucial regulatory areas and to concentrate on them. For example, there has been recent emphasis on higher capital and surplus requirements, as one of the most important methods of assuring company solvency and safety.

The lack of resources affects the ability of the state insurance departments to keep abreast of consumer needs. When an insurance consumer is unable to obtain needed insurance, when he is asked to pay excessive rates, when his policies are cancelled or not renewed; when he has any problem relating to the availability of insurance, he normally seeks help first from his agent, broker or company.

If this proves unsatisfactory, he may in some instances resort to the courts. But even if there is a

legal remedy, the costs of legal advice and litigation are likely to be prohibitive.

The consumer may turn to his trade union, a community action group, or similar organization. Many private groups of this nature have been resourceful in aiding their members with insurance problems. But many consumers lack knowledge of insurance and not all have access to these sources of assistance.

Some consumers look to their city governments. Even though city officials are interested in the fundamental causes of insurance market problems and are sympathetic toward relieving them, they usually lack the time, inclination or legal authority to become directly involved. A survey conducted by the Panel disclosed that most city governments simply refer complaints to the state insurance department.

The response of insurance departments to consumers' problems varies from state to state. Most states have a separate complaint division in the department, but their offices are generally located only in one city. Some understaffed departments have delegated authority for investigating complaints to insurance agents.

Most state insurance departments feel a strong responsibility to hear and resolve consumer complaints. Some state departments maintain informal placement facilities to help secure insurance for some problem risks. But most try to avoid becoming an insurance consulting service or an alternative marketing conduit.

Some departments do not keep adequate complaint records, which can be important indicators of the nature and extent of consumer problems. Complaints made in writing are filed, but telephone messages are rarely recorded and sometimes not even accepted. As a result, it is more difficult to use complaints as a basis for developing corrective measures.

Most consumers are probably unaware that state insurance departments exist to help them. In fact, those who need the help of the department most are often the least likely to know of its existence; and passive procedures, simply receiving complaints, will not lead to an adequate urban market. Consumer protection requires aggressive actions— for example, publicity and educational campaigns, and surveys to test the adequacy of the insurance market.

**50**

*Read*

## State and National Problems

Besides renewed concern with problems within their states, insurance commissioners have also been taking a more careful look at interstate aspects of their problems. The National Association of Insurance Commissioners (NAIC), an organization of all fifty state insurance commissioners, has moved recently to coordinate state efforts more fully.

With fifty states regulating insurance, sometimes in different ways and often without power to act beyond their borders, regulatory conflicts and vacuums are bound to arise. Mail order insurance, for example, has been an especially troublesome problem.

For another example, reinsurance—a vital aspect of the industry—is not examined in any depth at the state level. Information and data concerning reinsurance are practically non-existent. State law relating to reinsurance mainly concerns its impact on the financial statement and the effect on solvency. Also, because reinsurance is heavily international, it is questionable whether the states can be expected to exercise effective control over it.

The lack of regulation of reinsurance has been justified on the theory that reinsurer and reinsured are both knowledgeable and can protect their own interests. The lack of basic information, however, cannot be justified. The primary insurers are heavily dependent on the reinsurance market. There should be adequate information about that market to be sure it performs its function, and to be able to discover and prevent market inadequacies before their impact becomes critical. The December 1967 meeting of the NAIC devoted some attention to proposals for a study of reinsurance. An NAIC official at that meeting noted that there was a lack of information about reinsurance, and that prior investigators have been unable to obtain needed data. A study of life reinsurance was initiated.

Perhaps the most conspicuous aspect of governmental regulation of insurance is its almost exclusive control by the fifty states. There is probably no other major industry that has so little involvement with the federal government.

The reason for the pattern of state regulation goes back to a decision by the United States Supreme Court in 1869, in *Paul* v. *Virginia*, 8 Wall. 168, that insurance contracts were not articles of commerce, and that therefore the insurance industry and state regulation of it were not sub-

ject to federal jurisdiction. This decision remained the law until 1944, when the Supreme Court, in *United States* v. *South Eastern Underwriters Association*, 322 U.S. 533, held that Congress had the power to regulate insurance under the Commerce Clause of the Constitution.

By then, however, the roots of the insurance industry in the states were deep. Within nine months of the Supreme Court decision, the Congress passed the McCarran-Ferguson Act ("Public Law 15"), declaring that continued regulation and taxation of insurance by the states were in the public interest and generally exempting the industry from federal antitrust laws.

Over the years, many critics, including some in Congress, have appraised state regulation and found it wanting, at least in some respects. In 1958, for example, a Senate Sub-Committee on Antitrust and Monopoly launched an investigation to determine "whether the states have faithfully honored the mandate of the McCarran-Ferguson Act * * * by regulating the insurance industry in the public interest." It concluded that the basic weaknesses of state regulation pointed out in an early 1923 study were still apparent. Among its other conclusions were that:

The compensation paid insurance commissioners in most states is grossly inadequate to attract and retain qualified people.

Many states are both understaffed in their insurance departments and poorly staffed in terms of qualification of their personnel.

The budgets of insurance departments are generally inadequate for the responsibilities placed on them.

The admission and licensing of foreign insurers has not been conducted in as efficient and direct manner as the public interest dictates.

The evidence gathered on state action for enforcement of statutes on restraint of trade, monopoly, and unfair trade practices indicate lax supervision * * *.

Recently, a report on automobile insurance problems by the staff of the Antitrust Sub-Committee of the Committee of the Judiciary of the House of Representatives observed that while some individual commissioners were performing outstanding jobs, "a number of factors point to the inadequacy of State insurance regulation."

As with governmental regulation of any indus-

51

try, the basic question is whether the regulation stifles or encourages the industry's incentive and ability to meet the needs of the public. Insurance is currently the subject of intense public concern. There are critical problems with automobile liability insurance, life insurance, and property insurance. The problems in each of these insurance areas are complex and the answer to the effect and adequacy of state regulation may differ depending on which of these insurance problems is being considered. As a practical matter, each of these problems may well have to be resolved within its own terms on a pragmatic basis.

It is important to recognize that while the regulation of insurance is extensive, the content of the regulation has by no means been static. As the insurance business has grown in response to the changing needs of the public, the pattern of regulation has had to adapt to new problems presented. As the current crises in various insurance areas are resolved, a basic underlying question is whether the increasing prevalence of problems that are national in scope and importance can be handled by the states. Further, to the extent that solutions call for some sort of national approach, the question becomes what form it should take—specifically, what role should the federal government play. Our recommendations have attempted to answer this difficult and controversial question with respect to the inner city property insurance problems. We basically believe in the abilities of the state insurance commissioners to take the primary responsibility for attacking these problems, and that any federal role should be supplementary to this effort.

The National Association of Insurance Commissioners has recently urged a cooperative effort by the insurance industry and all levels of government to solve this critical problem. The NAIC stated:

> The existence of stable and continuous markets for those property coverages ordinarily required for residential and mercantile financing is essential to orderly economic development and any consideration of the insurance problems of urban areas must be seen in that perspective.

> The broadest possible distribution of the financial burden of the riot and civil commotion hazard at the local, state and national levels is necessary to the end that the underwriting deterrent, which unlimited exposure to these perils creates, may be alleviated.

> In this situation and for such temporary period until civil conditions stabilize, it is recognized that unusual measures will be necessary. These may include required special civil disorder loading of all property premiums, pooling of the premium funds so produced, and of the risk in whole or in part at both the state and national levels.

> The NAIC calls upon the property and casualty insurance industry, as a whole, to come forward promptly with a voluntary plan to accomplish these objectives. Failing the prompt creation of workable, voluntary solutions, the NAIC recognizes the need for and is not opposed to reasonable plans statutorily created or implemented by the state and/or federal governments to secure such objectives.

We welcome this constructive statement and believe that our recommendations provide the necessary cooperative program to meet the insurance crisis of our cities.

## Conclusion

The insurance enterprise is a private business that seeks to make a profit by providing essential protections to property owners. Homeowners and businessmen in urban core areas require the protection provided by fire and allied coverage and crime insurance in the same way as any other property owners.

Yet the insurance enterprise has not functioned well to provide coverage in the urban core. The reasons for this are varied and mutually reinforcing, and it is clear that changes must be made in the operations of the insurance process in order to supply the insurance needs of urban core residents and businessmen.

Thus, under present arrangements, agents are not writing sufficiently in urban core areas, and

52

indeed, are discouraged from writing there. The insurance marketing system has an inherent tendency to avoid urban core business.

The underwriting process discourages the acceptance of urban core risks. Inner city risks have not received equal treatment with those from other city areas and the suburbs. The underwriting function has taken place in general without careful verification of the actual extent of particular inner city hazards.

The same pattern prevails with respect to rating. Rates are set in a manner which discourages insuring inner city risks. Far more data and concern for the impact of rates on inner city homeowners and businessmen are required to overcome these imperfections of the present system.

But to point out that the insurance enterprise works inadequately in serving the urban core market is not to condemn any individual insurance companies. An analysis of the profits of these companies shows clearly that their underwriting of business must be cautious so as to avoid excessive losses.

In addition, primary insurance companies are under pressure from reinsurers, and this limits their capacity to write in the urban core areas. The reinsurance available to insurers relates directly to the amount of inner city risks which may be underwritten and to the industry's ability to continue to cover the riot risk.

Any attack on the insurance crisis of the inner city must take into account the details of the insurance process and how it operates. The Panel's recommended program has been developed with these detailed workings in mind. It has taken account of the present regulatory pattern and has attempted to preserve this traditional pattern while facilitating the ability of the states, the industry, and the federal government to cooperate to meet the insurance needs of our cities.

**53**

# Chapter III

# PRESENT RESPONSES TO URBAN CORE INSURANCE PROBLEMS

## In General

The insurance problems of urban core residents have led to efforts in a good number of communities to seek solutions.

Some state insurance departments have assisted individuals who have complained that insurance was unavailable. As part of their regular operations, they have informally encouraged companies to write more heavily in urban core areas.

In some areas, the industry, in cooperation with state and local officials, has voluntarily set up formal arrangements to induce greater writing of insurance in urban core areas. These are usually called Urban Area Plans—or sometimes, the Boston Plan, after the first one developed. Most of these plans are of relatively recent origin, and their operations have been neither well-understood nor widely publicized. This chapter describes all of the Urban Area Plans now in existence.

In one instance, the response to urban core insurance problems has been a pool of insurance company resources. After the Watts riot in 1965, the industry, at the request of the California Insurance Department, set up a voluntary arrangement to provide insurance to businessmen in the Watts area of Los Angeles. Although highly limited in scope, the Watts pool has received considerable attention because of the possibilities it suggests for helping to solve urban core area insurance problems.

Many states have considered legislation to create assigned risk pools or similar arrangements that would compel companies to write policies for those inner city risks meeting basic standards set by the state. In Michigan, for example, the Insurance Department has drafted a plan of this type which the Governor has placed before the State Legislature with a request for prompt enactment. In New Jersey, the Insurance Department has held several meetings with the industry to work out agreement on a pool plan. In New York, Connecticut, Ohio, Texas, and other states, plans of this nature are receiving active consideration.

Concern with urban core insurance problems is not limited to the state and local levels. In the present session of Congress, more than 200 insurance bills, incorporating a variety of goals and approaches, have been introduced. Several Congressional committees have held hearings and have undertaken the preparation of appropriate legislation.

The insurance industry has also come forward in recent months with suggestions for dealing with urban core insurance problems, principally at the public hearings held by the Panel.

This chapter describes the principal actions that have already taken place, and those additional ones that have been proposed to solve urban core insurance problems. This material provides important background for consideration of the Panel's recommended program.

001886

Case: 1:13-cv-08564 Document #: 134-2 Filed: 08/11/17 Page 75 of 190 PageID #:3356

# Urban Area Plans

On December 1, 1967, Urban Area Plans were in effect, formally or informally, in thirteen states: California, Delaware, Illinois, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, New York, North Carolina, Ohio, Pennsylvania, and Wisconsin.

In some cases, the plan covers only a specified city or area; in others, it applies to the entire state. While the plans differ somewhat in detail—sometimes in very important details—their operating patterns are basically the same.

Generally, the plans provide that, upon request, the local rating (inspection) bureau will inspect a property and prepare an inspection report without cost to the property owner. The report includes information on pertinent structural and occupancy features of the building for which insurance is sought and on relevant features of nearby structures. The purpose of the inspection is to distinguish between properly maintained properties and those that have hazards which affect their insurability.

A copy of the inspection report is sent to the insurance company designated by the persons requesting the inspection. Based on information in the report, the company makes a decision. It may decide to:

1. Insure the property.
2. Insure the property if certain conditions it considers unfavorable are corrected.
3. Decline to insure the property.

The decision is reported to the rating bureau and made known to the property owner. Under some plans, a decision declining to write coverage is also reported directly to the state insurance department.

Under almost all plans, the rating bureau informs the state insurance department periodically of the decisions made by each individual company as reported to the bureau under the plan. These reports vary in detail from plan to plan, but generally they are designed to inform the department on the number of risks under the plan that each company has (1) accepted, (2) accepted on condition that certain improvements be made, and (3) declined. In this way, the state insurance department can monitor the operation of the plan and the performance of each participating company. It also places the department in a position to inquire why a company received only a few or no applications for insurance under the plan.

There are two principal types of Urban Area Plans:

1. Those requiring an inspection by the rating bureau, or a waiver of the inspection, before insurance can be declined or written above standard rates.

2. Those providing for an inspection only upon the request of the insurance company or producer; but no inspection is required before insurance is written above standard rates.

Other differences in existing Urban Area Plans are best understood in the light of the background, operation, and requirements of each individual plan.

## The Boston Plan

The Urban Area Plan originated in 1960 in Boston, Massachusetts. It was designed to relieve a severe shortage of fire and extended coverage insurance in an area of the city known as Roxbury.

*Background of the Boston Plan.* Before the plan was adopted, the insurance industry considered all of Roxbury as "blighted" and regarded all residential properties there as substandard. To support this conclusion the industry could point out that Roxbury had the highest rate of fire loss of any locality in Massachusetts.

By 1960, most, if not all, standard rate companies had already ceased providing insurance protection for residential property in Roxbury regardless of its condition. Even companies that specialized in providing insurance at rates in excess of standard—to compensate for increased fire hazards—had started to withdraw from the area.

To assist Roxbury residents in obtaining property insurance, some members of the Massachusetts Legislature proposed adopting an assigned risk plan. This plan would have required companies to provide insurance. In response to this proposed legislation, the New England Insurance Rating Association undertook a study to find alternative ways of providing property insurance.

The essential reason for an inadequate insurance market in Roxbury, the Association found, was the failure of the companies to distinguish between

56

good and bad risks. Agents and brokers did not inspect properties in Roxbury for the companies, perhaps because inspections were thought to be distasteful or uneconomic; it may also have been that some agents and brokers preferred to receive the higher commissions available from writing policies at rates in excess of standard.

An all-industry committee, representing the Rating Association, the mutual and stock companies, and agents and brokers, was formed to develop a solution. The committee agreed that (1) there should be a thorough inspection report on all properties within the problem area, and (2) no company writing fire insurance in the State of Massachusetts should reject a risk solely because of the area in which it was located.

The committee proposed that the inspections be performed by the staff of the New England Insurance Rating Association and without charge to the property owner. The New England Insurance Rating Association is a nonprofit association which provides its affiliated insurance companies with various services and bills them for its costs in proportion to the amount of premiums they write in the State of Massachusetts.

This Association had already been inspecting mercantile and commercial property in Massachusetts for fire and extended coverage rating purposes. Its staff of inspectors was, therefore, trained and experienced in detecting fire hazards.

The committee also proposed that a company, agent, or broker be required to obtain an inspection by the New England Insurance Rating Association, before fire and extended coverage insurance could be written at more than standard rates. The standard rate included a long-existing district charge in Roxbury of five to fifteen cents per hundred dollars of coverage to compensate for the conflagration risk.

The committee considered allowing the companies to add an additional amount to the premium rate for specific fire hazards found by the inspectors. But they rejected this surcharge rating plan on the theory that surcharges provided neither a sufficient incentive to the property owner to correct the condition nor adequate compensation to the companies for taking the risk. Instead, the committee preferred a plan which would provide insurance only to those who removed the fire hazard from their property.

Further, the committee proposed that the companies report on an action sheet to the Rating Association their decision to (1) accept a risk, (2)

accept it if certain specified conditions were corrected, or (3) decline a risk.

If a company agreed to write the coverage after certain conditions were improved, it had to designate specifically in the action report what the property owner needed to do before coverage would be provided. If the company declined to provide coverage, it had to state in the action report the reasons for its decision.

Each month, the Rating Association would transmit to the Massachusetts Insurance Department the decisions of each company in response to the applications for insurance submitted under the plan.

Based on the information in these reports, the Insurance Department could determine whether individual companies were discriminating against property owners in Roxbury by unreasonably refusing to provide coverage.

The Massachusetts Insurance Department approved the proposal and requested each insurance company admitted to write fire and extended coverage business in Massachusetts to affirm to the Department that it would cooperate in the plan. The companies did so by sending formal letters stating their commitment.

The plan became operational on October 3, 1960.

*Problems with the Original Plan.* The plan started slowly. From October 3, 1960, to the year end, only 273 requests for inspections were received by the Rating Association. After inspection, 149 of these risks were declined. The situation improved somewhat in 1961, when 1,632 requests for inspections were received and only 289 of the risks declined.

Notwithstanding this improvement, several problems were evident. Most residents simply did not know about the plan. Neither agents nor brokers informed them of the plan or encouraged them to use it. And it appeared that some agents and brokers were taking advantage of the lack of public knowledge to continue to obtain the higher commissions available from writing policies at rates in excess of standard. Those few residents and community leaders of Roxbury who were aware of the program were suspicious of its purpose and unenthusiastic about its potential.

Late in 1961, several steps were taken to correct these problems:

1. An educational program was undertaken to inform residents of the availability and operation of the plan. For example, a

**57**

brochure prepared by the Rating Association was widely distributed to the residents of Roxbury, and Rating Association personnel spoke at civic and church meetings. Newspapers contributed to the publicity.

Educational efforts have continued since then on a limited scale. The Boston Redevelopment Authority, for example, now distributes a one-page explanation of the program, and Rating Association personnel still, but only occasionally, speak about the plan at civic and church meetings.

2. The plan was revised to permit property owners to ask for an inspection. Orginally, only an agent, broker, or company could request an inspection, and this was required to be in writing. To facilitate requests, the property owner was allowed to ask for an inspection, and the requirement for a written request was abandoned.

3. A change in procedure was made. Only after three companies declined an application for insurance at standard rates could a policy be written at rates in excess of standard. This prevented agents and brokers from turning down applications for insurance without company knowledge.

4. When it became widely known that the Massachusetts Insurance Department was considering suspending the license of a particular broker who was not complying with the requirements of the plan, agents and brokers began to cooperate more fully in carrying out the objectives of the plan.

Following the adoption of these changes in the plan, the number of requested inspections increased while the proportion of declined risks decreased:

| Year | Applications received [1] | Risks declined [1] | Percentage of risks declined |
|---|---|---|---|
| 1962 | 4, 452 | 581 | 13 |
| 1963 | 3, 959 | 284 | 7 |
| 1964 | 3, 760 | 285 | 8 |
| 1965 | 3, 735 | 186 | 5 |
| 1966 | 3, 920 | 176 | 4 |
| 1967—January through August | 2, 773 | 94 | 3 |

[1] Information received from the Rating Association.

The plan has been widely publicized as applicable to dwellings and their contents only in Rox-

bury. Nevertheless, the Rating Association will also inspect properties anywhere in Massachusetts if the property owner complains of trouble in obtaining fire and extended coverage insurance, including coverage on mercantile and commercial property.

On September 21, 1967, the plan was publicized as being applicable to the North Dorchester area of Boston, a community contiguous to Roxbury. Now, the Insurance Department generally will disapprove an application to write a policy in this area at an excess rate unless the property has been inspected and three declinations at standard rates are on file with the Rating Association.

*Day-to-Day Operation of the Boston Plan.* Two Rating Association employees inspect properties under the plan on a full-time basis.

Requests for inspections are generally received by telephone, often from the property owner. After a request is received, a time for inspection is set when the building owner or his representative can accompany the inspector. The inspection is generally made within one or two days after the request is received, but it can be scheduled sooner if necessary to meet the needs of the property owner.

Inspections are usually made during the Rating Association's normal working hours. Occasionally, when a property owner cannot afford to take time off from his work and cannot arrange for someone else to accompany the inspector through the property during the Rating Association's working hours, the inspectors are willing to rearrange their schedule to accommodate the needs of the owner.

The presence of the building owner, or his representative, during the inspection is considered essential to the purposes of the program, for two reasons.

First, it is necessary to go inside the building to make a meaningful inspection, and for this, the Rating Association must be sure it has the property owner's unqualified consent.

Second, the purpose of the plan in Boston is to have the building owner make the necessary improvements, inside and out, to remove any fire hazards found during the inspection.

The inspector looks into every room for accumulated rubbish, overloaded wiring, broken plaster, overcrowded living conditions, and other hazards. He checks the general upkeep of the building, both inside and out. He also inspects the exterior of the

58

surrounding structures to determine whether they pose a potential hazard of fire that might spread to the property being inspected.

If any of the surrounding properties is a fire trap, there is, of course, little if anything the person seeking insurance can do to correct the situation; and it is almost certain that he will be unable to obtain insurance at standard rates. Indeed, he may not be able to buy insurance at any price.

When there is no problem with the surrounding buildings, necessary improvements in the applicant's property can usually be made at nominal cost.

Table 1 is a compilation of the reasons given by companies for declining to write coverage on 104 residential and commercial risks inspected under the Boston Plan. It was prepared from a probability sample drawn from the Roxbury area. It shows that the most frequent reasons given for declination are "rubbish accumulations" and "interior of building in disrepair or poorly maintained." It also shows that property is often considered uninsurable because of the condition of adjoining property ("exposing building in poor condition").

The inspector explains what needs to be repaired and how the repairs can be made, and encourages the building owner to make them. In most cases, the building owner has been willing to meet the inspector's requests.

If the inspector notes an immediate fire hazard, he calls the fire department, which will help to remove the hazard.

Frequently, when the inspector believes that needed minor repairs to a property will be made within a short period of time, he will hold up sending the inspection report to a company. Since there are no provisions for surcharging the owner if the property has hazards that need to be removed, the inspector thus saves the insurance companies from having to report to the Rating Association that certain conditions need correction before they will write coverage at standard rates.

Whether or not the inspector has held up the inspection report, the owner, after making the requested improvements, notifies the Rating Association, and a time is set to reinspect the property.

The inspector makes no promise that the property owner will obtain insurance at standard rates. Nor does he recommend, when the inspection report goes to the insurance company, whether or not the property should be insured at standard rates.

After the company receives the inspection report, it informs the Rating Association whether it will accept or decline the risk or whether other improvements must be made before it will accept the risk.

If the company conditions its acceptance of a risk on the completion of certain improvements, the Rating Association inspector will explain to the owner what needs to be done and how it can be done.

The companies have confidence in the inspectors and generally rely fully on their inspection reports in determining whether to provide coverage. Only very occasionally do the companies send their own representatives to look at a property inspected by the Rating Association.

*Cost of the Boston Plan.* The Assistant Executive Manager of the Rating Association said that the total cost, direct and indirect, of an inspection is now about five dollars. Instead of assessing the property owner, the Rating Association includes the cost in its total costs, which are shared by the member insurance companies in proportion to the total premiums they write in Massachusetts.

*Controls Over the Boston Plan.* The Massachusetts Insurance Department exercises general supervision over the operation of the plan by reviewing the reports sent to it each month by the Rating Association. So far, the Department has never taken any formal action against a company for failure to participate in the plan.

The Department also checks with the Rating Association when a consent-to-rate application in Roxbury does not identify three companies as having declined the risk at standard rates under the Plan.

For the most part, however, the Rating Association supervises the day-to-day operation of the plan and company performance. Both the Insurance Department and the Rating Association seem more genuinely interested in helping property owners to obtain insurance than in assuring that individual companies fully participate in the plan.

*Results Under the Boston Plan.* According to the Rating Association, from October 3, 1960, through August 31, 1967, approximately 25,000 requests for inspections were received; only 2,040 risks were reported declined.

Fire losses in Roxbury have, according to all reports, substantially declined since 1960.

*How many are repeats?* **59**

TABLE 1. REASONS FOR DECLINING INSURANCE ON 104 PROPERTIES INSPECTED UNDER THE BOSTON PLAN

| Reasons for declination | Total | | Residential | | Nonresidential | | Property both residential and nonresidential | |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| 1. Admission refused to entire building | 2 | 1.9 | — | — | 1 | 6.3 | 1 | 1.9 |
| 2. Poor condition of basic building structure | 9 | 8.7 | — | — | 3 | 18.8 | 6 | 11.1 |
| 3. Building in poor repair or run down | 28 | 27.0 | 7 | 20.6 | 4 | 25.0 | 17 | 31.5 |
| 4. Outbuildings in poor repair, rundown condition or congested occupancy | 1 | 1.0 | — | — | 1 | 6.3 | — | — |
| 5. Rubbish accumulations: | | | | | | | | |
| (a) yard and alley | 32 | 30.8 | 8 | 23.5 | 3 | 18.8 | 21 | 38.9 |
| (b) adjacent yard | 19 | 18.3 | 5 | 14.7 | 2 | 12.5 | 12 | 22.2 |
| (c) porches or under porches | 2 | 1.9 | — | — | 1 | 6.3 | 1 | 1.9 |
| (d) basement | 55 | 52.9 | 12 | 35.3 | 6 | 37.5 | 37 | 68.5 |
| (e) attic | 1 | 1.0 | — | — | — | — | 1 | 1.9 |
| (f) hallways | 3 | 2.9 | — | — | — | — | 3 | 5.6 |
| (g) occupied areas of this building | 24 | 23.1 | 5 | 14.7 | 4 | 25.0 | 15 | 27.8 |
| (h) vacant areas of this building | 12 | 11.5 | — | — | 1 | 6.3 | 11 | 20.4 |
| 6. Exposing building in poor condition | 29 | 27.9 | 9 | 26.5 | 1 | 6.3 | 19 | 35.2 |
| 7. Exposure considered excessively severe | 17 | 16.3 | 7 | 20.6 | 1 | 6.3 | 9 | 16.7 |
| 8. Metal or tile chimneys not acceptable | 3 | 2.9 | 1 | 2.9 | 2 | 12.5 | — | — |
| 9. Heating arrangements within building not acceptable | 27 | 26.0 | 3 | 8.8 | 3 | 18.8 | 21 | 38.9 |
| 10. Use of glass jug oil receptacles not satisfactory | 3 | 2.9 | 1 | 2.9 | — | — | 2 | 3.7 |
| 11. Oil stored in hallways | 11 | 10.6 | — | — | — | — | 11 | 20.4 |
| 12. Electric wiring in doubtful condition, overloaded or insufficient wall outlets | 30 | 28.8 | 5 | 14.7 | 4 | 25.0 | 21 | 38.9 |
| 13. Interior of building in disrepair or poorly maintained | 49 | 47.1 | 12 | 35.3 | 5 | 31.3 | 32 | 59.3 |
| 14. Restaurant occupancy | 5 | 4.8 | — | — | 3 | 18.8 | 2 | 3.7 |
| 15. Broker did not work in behalf of his insured | 6 | 5.8 | 2 | 5.8 | 1 | 6.3 | 3 | 5.6 |
| 16. Unsafe arrangement of spray paint booth | 1 | 1.0 | — | — | 1 | 6.3 | — | — |
| 17. Broken or boarded windows | 10 | 9.6 | 1 | 2.9 | 4 | 25.0 | 5 | 9.3 |
| 18. Areas of broken plaster | 13 | 12.5 | 5 | 14.7 | 3 | 18.8 | 5 | 9.3 |
| 19. Charred timbers in basement | 1 | 1.0 | — | — | 1 | 6.3 | — | — |
| 20. Class of occupancy | 1 | 1.0 | — | — | 1 | 6.3 | — | — |
| 21. Hallways in need of paint | 2 | 1.9 | — | — | — | — | 2 | 3.7 |
| 22. Vacant areas | 6 | 5.8 | — | — | — | — | 6 | 11.1 |
| 23. Fire damaged | 4 | 3.8 | — | — | — | — | 4 | 7.4 |
| 24. Nightclub occupancy | 1 | 1.0 | — | — | — | — | 1 | 1.9 |
| 25. Luncheonette occupancy | 2 | 1.9 | — | — | — | — | 2 | 3.7 |
| 26. Drycleaning system unapproved | 1 | 1.0 | — | — | — | — | 1 | 1.9 |
| 27. Boxed cornice in need of repair | 2 | 1.9 | 1 | 2.9 | — | — | 1 | 1.9 |
| Number of Properties | 104* | **— | 34* | **— | 16* | **— | 54* | **— |

*Totals would exceed number of properties because of multiple responses.

**Percentage totals would add to more than 100 percent because of multiple responses.

SOURCE: Survey by the National Advisory Panel on Insurance in Riot-Affected Areas.

Clearly, companies are now more willing to write coverage in Roxbury. At the outset of the plan, a one-year policy for $25,000 was often split among ten companies. Now, a single company is generally willing to provide coverage of $10,000 to $15,000, and some companies will even provide coverage for three years.

The success of the Boston Plan has been aided greatly by the work of the Boston Redevelopment Authority. This agency has replaced a substantial amount of condemned property with new low-cost housing and has helped many owners improve their property with grants and low-cost loans.

Some upper-middle income families are now moving into the area and renovating their properties. In some parts of Roxbury, run-down room-

60

001891

ing houses and vacant, open, and abandoned buildings stand near homes valued at $40,000.

Whether the insurance industry would have supported the Boston Plan as it has if the area had continued to decay is an open question. On the other hand, it seems clear that the plan has made an important contribution to the overall community development effort by offering a meaningful incentive for owners to improve their properties and thereby to improve their neighborhood.

## The Michigan Fire Insurance Inspection Plan

The Michigan Fire Insurance Inspection Plan began operations on January 1, 1966. It is closely patterned on the Boston Plan. There is one major difference. The standard rate for fire and extended coverage may be increased for specific fire hazards noted during the inspection.

Those who support a surcharge for specific fire hazards say it has three principal advantages. First, it compensates the company for providing insurance on property with certain hazards that increase the probability of fire or the amount of the loss in the event of a fire. Second, the higher premium charge purportedly gives property owners an incentive to remove fire hazards. Third, the surcharge permits insurance without the delay necessitated by repairs.

*Background of the Michigan Plan.* Like the Boston Plan, the Michigan Fire Insurance Inspection Plan (Michigan Plan) was initiated as the result of public complaints about the availability of insurance at standard rates. Hearings were held by the Detroit Common Council as early as 1962 to determine whether these complaints were justified, but the insurance industry considered the results inconclusive.

In mid-1965, the Acting Insurance Commissioner of Michigan moved to establish an inspection plan in Detroit similar to the Boston Plan. He appointed a committee representing the Michigan Inspection Bureau (an organization resembling the New England Insurance Rating Association), the mutual and stock insurance companies, insurance agents, and the City of Detroit's Common Council, Housing Commission, and Department of Buildings and Safety Engineering. Less than three months later, the committee had drafted an urban area plan and had agreed to put it into effect on January 1, 1966.

Before and after the plan became operational, it was publicized in the press, on radio and television, and through speeches by staff members of the Michigan Inspection Bureau and the Michigan Insurance Department. More than 20,000 copies of a brochure were distributed to explain the plan. The Bureau and the Department made substantial efforts to explain the operation of the plan to the companies and, with the help of the companies, to their agents.

*Details of the Michigan Plan.* The rules of the Michigan Plan apply to Detroit and two suburbs, Hamtramck and Highland Park. All property and liability insurance companies admitted to do business in Michigan, except for a few factory mutuals, have signed pledges not to decline an application for fire and extended coverage insurance on habitational property in these areas without an inspection.

Inspections are made without cost to the property owner by the Michigan Inspection Bureau (MIB).

Although the Michigan Plan applies only to real property—dwellings and apartments—the MIB also makes inspections to help tenants get insurance on personal property—the furniture and other contents in a home.

The Michigan Plan requires that a property be inspected and that the application for insurance be declined by three companies before a policy can be written at more than standard rates, except that condition charges may be assigned by the MIB inspector.

Within the Michigan Plan area, the standard rate for fire and extended coverage insurance may be increased for certain fire hazards noted by the MIB inspector in his report. A company, however, is not required to charge more than the standard rate. The amount of additional charge and the conditions that may be charged are set forth in a surcharge rating plan filed with the Michigan Insurance Department.

If three companies decline to write insurance on a risk under the Michigan Plan, the insurance may be written by a company charging more than the standard rate plus applicable condition charges. Generally, these companies file a rating plan with the Insurance Department, which allows them to charge three times the standard rate. Companies charging these higher rates are referred to as "substandard companies." Alternatively, the insurance

61

may be written under a consent-to-rate plan or in the nonadmitted market.

Outside the plan area, a company may, on information received from its agents, add a surcharge to the standard rate. Insurance may also be written outside the plan area by a "substandard" company, under the consent-to-rate procedure without an inspection or three company declinations of the risk or under the surplus lines laws.

The Michigan Plan specifically states that any building meeting the requirements of the applicable city building and sanitation codes, as well as other legal requirements, will "generally be considered acceptable for insurance against the perils of Fire and those of the Extended Coverage Endorsement." An MIB inspector stated, however, that very few of the properties he inspects meet all the applicable city ordinances and that the companies are nevertheless willing to provide fire and extended coverage insurance at standard rates if there are no violations which pose fire hazards.

*Problems with the Original Plan.* Because of the time spent in obtaining three declinations, this requirement was considered detrimental to those who needed immediate coverage. Moreover, some property owners knew their property was in poor condition and had no intention of repairing it. Therefore, to save time and inspection costs, the plan was amended on January 28, 1966, to allow property owners and mortgagees to waive the right to an inspection and three declinations before paying more than the standard rate.

The waiver also allows an owner whose property would be insured if certain defects were corrected, to obtain insurance without making the requested improvements. Under the plan, a conditional acceptance by a company is not counted as a declination. The owner thus either has to make the improvements or go without insurance if he does not waive his "rights" under the plan.

To make certain that the property owner fully understands his right to a free inspection and three declinations, he must sign the waiver at the MIB office. There, a MIB employee carefully explains the provisions of the Michigan Plan. If a personal visit to the MIB office is too great a hardship on the property owner, an explanation is given over the telephone.

The MIB staff estimates that less than half of the people who sign waivers are aware of the plan before they come to the MIB offices. Apparently, many owners are merely told by their insurance agents that they must sign the waiver before they can get fire and extended coverage insurance. Some agents do not look at the property to determine its condition; they automatically tell the owner to sign the waiver.

Over ninety percent of the property owners who appear at the MIB offices to sign waivers do not ask for an inspection after the MIB explanation. At that point, an owner may feel that he has gone to enough trouble already, or he may need immediate coverage and does not want to remain uninsured while waiting for an inspection. Some owners are aware that their property would not be found insurable after an inspection; others may prefer not to have their property inspected.

Some persons ask for an inspection at the same time they sign a waiver. In this way they get immediate coverage at a rate above standard, and, if their property is well maintained, coverage at lower rates after the inspection.

A mortgagee may also sign a waiver when the policy on a mortgaged property is in his name. Since the owner must pay the premium, the mortgagee may be less interested than the owner in obtaining fire and extended coverage insurance at a low cost. To protect the owner, the MIB requires the mortgagee to have notified the owner of the expiration of his insurance and to have mentioned the availability of an inspection under the plan before the MIB will accept a waiver from the mortgagee.

*Day-to-Day Operation of the Michigan Plan.* An inspection may be requested by the property owner, an agent, or a company. The plan states that the application must be made in writing, but the MIB will accept a request for inspection by telephone. If the owner requests an inspection, he must tell the MIB where to send a copy of the inspection report, since copies of the report go only to an insurance company.

The MIB has three full-time inspectors for the Michigan Plan. After a request for inspection is received from an owner, agent, or company, a time is set when the owner or his representative can accompany the MIB inspector through the property. Inspections are generally made during the normal working hours of the MIB, but can be made at other hours to accommodate the owner or his representative. Normally, the inspection is made within 4 or 5 days after the request is re-

62

ceived. One full-time employee of the MIB schedules inspection appointments.

At the agreed time, one of the inspectors, accompanied by the owner or his representative, goes through the building to be insured. The inspector checks the exterior and interior of the property. He looks through all rooms, if possible, watching mainly for broken windows, litter, overloaded wiring, improper fuses, unsafe heating conditions, and overcrowded living conditions. If he finds any of these conditions, he explains to the owner, or his representative, how they should be corrected and assigns condition charges for the defects.

After the interior inspection is completed, the inspector takes a picture of the exterior. The insurance companies originally wanted the MIB to include the market value of the property in its inspection report to allow the companies to determine whether the property owner was seeking sufficient insurance to cover the value of the property. The MIB believed that this was an inappropriate job and compromised by agreeing to provide a picture of the property to the companies.

The inspector also examines the exterior of the nearby structures to determine whether any pose a significant hazard of fire which might spread to the property being inspected.

The MIB inspector does not explain to the owner to what extent a condition charge will raise his insurance premiums. Instead, he emphasizes the safety factors. Reportedly this is done because companies are not required to demand the permitted surcharge.

Unfortunately, many property owners do not understand the intricacies of insurance rating. As a consequence, they may not realize how much they can save by making the requested improvements and having the surcharge eliminated. This is particularly unfortunate when the requested repairs are inexpensive—for example, removing rubbish or replacing oversized fuses.

The MIB inspectors do not report their findings to city officials. The inspector tries to have immediate fire hazards removed, but he makes no attempt to get assistance from the city government. He refrains from doing so because the MIB believes that if property owners thought the inspectors might report their findings to city officials, owners would refuse to allow them inside their property, and no meaningful inspections could then be performed.

Unlike in Boston, the inspector generally does not hold up a report to allow the owner an opportunity to make the suggested repairs to this property. With a surcharge plan, a company may be willing to provide insurance even if the conditions are uncorrected.

After the inspection, a copy of the report and the photograph are promptly sent to the insurance company designated by the owner or insurance agent. The company has three choices. It may: (1) agree to provide coverage at the standard or surcharged rate; (2) agree to provide coverage if the defects found during the inspection are corrected; or (3) decline to provide coverage.

The companies report their decisions to the MIB on an action sheet. If a company conditionally accepts a risk, it explains in the action sheet specifically what defects must be corrected before coverage can be provided. The company or its agent explains to the owner what needs to be done. If the company declines a risk it must state its reasons in the action sheet.

As a matter of practice, companies rarely write coverage with a surcharge under the Michigan Plan. They usually insist that hazardous conditions be remedied.

A leading insurance company executive in Detroit said there are two reasons the companies do not provide coverage at the surcharged rate: (1) the surcharge does not fully compensate for the risk; and (2) if the owner were to correct the defect shortly after the policy was written at the surcharge rate, it would cost more to refund him his pro-rata portion of the surcharge than it was worth.

If the owner repairs his property to meet the conditions of the insurance company, he can ask the MIB to reinspect the property. In this way the company can be sure that the defects are properly corrected. A new inspection report is then sent to the insurance company.

Every three months the MIB reports to the Michigan Insurance Department on the number of risks accepted, conditionally accepted, or declined by each company that received an application for insurance under the Plan.

The insurance companies apparently have confidence in the MIB inspection reports. No one with whom we spoke was aware that any company made spot-checks on the accuracy of the MIB's reports.

**63**

*Costs of the Michigan Plan.* The manager of the MIB estimates the direct costs of each inspection under the Michigan Plan average about $10. This includes salaries of employees assigned to the plan full-time, automobile expenses, and film for pictures. The cost is included in the total operating costs of the MIB, which are shared by the member companies in proportion to their total premium volume in the state.

*Controls over the Michigan Plan.* The Michigan Insurance Department monitors the operation of the Michigan Plan by reviewing the quarterly reports filed with it by the MIB. It thus has an indication of those companies that are cooperating under the plan and those that are not.

For the most part, however, the MIB handles the day-to-day supervision of company performance under the plan. In some respects, the supervision by the MIB and the Michigan Insurance Department is similar. Both review policies written at more than the standard rate to be sure that either a waiver of the inspection or an inspection report and three declinations are on file.

Both the Insurance Department and the MIB reportedly have, on occasion, called companies to encourage their greater participation in the plan. As with the Boston Plan, we obtained the impression that both the MIB and the Michigan Insurance Department were more concerned with obtaining insurance for owners than with securing the full cooperation of all companies.

*Results under the Michigan Plan.* The MIB reported that it had received from January 1966 to the end of September 1967, the following action reports from companies:

| | Number | Percent |
|---|---|---|
| Accepted at standard or surcharge rates after first inspection | 2,519 | 36.5 |
| Accepted after reinspection | 929 | 13.5 |
| Total accepted | 3,448 | 50.0 |
| Would accept if certain conditions were corrected | 1,131 | 16.4 |
| Declined | 2,312 | 33.6 |
| Total action reports to MIB | 6,891 | 100.0 |

The following list is a compilation by the MIB of the reasons given by companies for declining to write coverage during the period from January 1, 1966, to December 31, 1966. Generally, more than one reason was given for declining a property.

64

### MICHIGAN FIRE INSURANCE INSPECTION PLAN REASONS FOR DECLINATION

| Reasons | Times used |
|---|---|
| 1. Not satisfied with information concerning identity of building owner | 12 |
| 2. Applicant uninterested in purchasing insurance to value | 48 |
| 3. Admission refused to part of building | 72 |
| 4. Poor condition of basic building structure | 1,092 |
| 5. Metal smokestacks or masonry chimney in unsatisfactory condition | 296 |
| 6. Porches in poor condition | 247 |
| 7. Rubbish accumulations (outside) | 365 |
| 8. Rubbish accumulations (inside) | 1,032 |
| 9. Exposing buildings in poor condition or severe exposure | 403 |
| 10. Heating arrangements unacceptable | 179 |
| 11. Oil storage unacceptable | 12 |
| 12. Ashes in combustible receptables | 47 |
| 13. Electric wiring unsafe, overfused, or in doubtful condition | 1510 |
| 14. Living conditions unsatisfactory | 238 |
| 15. Roof surfacing unacceptable | 117 |
| 16. Water heater or cooking device unsafe | 24 |
| 17. Reasons other than physical condition of property | 437 |

*Waivers.* The right to inspection and three declinations was waived on 11,316 properties between January, 1966, and the end of September 1967—or almost twice the number of properties on which companies reported to the MIB their decision on inspection reports. Waivers on 4,004 (35.4%) of these properties were by owner-occupants. The remaining 7,312 (64.6%) waivers were by absentee owners.

### The Cleveland Fire Insurance Inspection Plan

The Cleveland Fire Insurance Inspection Plan (Cleveland Plan) was put into effect on April 15, 1966. Unlike the Boston and Michigan Plans, the Cleveland Plan requires no inspection or waiver of an inspection before an owner is insured at above standard rates.

The proponents of this type of urban area plan say that its principal advantage is that it does not disturb the market for high-hazard insurance—insurance at prices in excess of the standard rates to compensate for additional hazards. Indeed, the official outline of the plan states: "It is *not* designed to be used as, or substitute for, or an instrument of, the high hazard insurance market presently available." (emphasis in original)

*Background of the Cleveland Plan.* In March, 1965, the Director of the Ohio Insurance Department asked the Ohio Inspection Bureau (OIB) to conduct an investigation of the insurance market in the Mount Pleasant, Wade Park-Superior, Glenville, and Hough areas of Cleveland.

After auditing all policies written and cancelled by its members in Cleveland for a thirty-day period, and after separating those referred to in the specified areas of the city for the purpose of comparison, the OIB found that 14.2 percent of the fire and extended coverage policies in the area under study were written at greater than manual rates, whereas only 3.1 percent of the policies written in other parts of Cleveland were written at greater than manual rates. The survey also disclosed that the area under study accounted for 22.6 percent of the policies written in the city and 23.9 percent of the cancellations. The study, however, did not examine refusals to renew policies, a frequent complaint in the inner city and a practice that insureds generally equate with cancellation.

After the study, the Ohio Insurance Director concluded that an urban area plan should be adopted in Cleveland.

The Cleveland Plan was designed in cooperation with insurance companies, agents, the Ohio Inspection Bureau, local civic and action groups, and various agencies of the city of Cleveland responsible for health, police and fire protection, and urban renewal.

The plan was publicized in the newspapers and in a brochure prepared by the Ohio Inspection Bureau.

*Details of the Cleveland Plan.* To avoid designating any particular area as a problem, the Cleveland Plan includes the entire city.

All companies admitted in Ohio and writing fire and extended coverage insurance have now agreed not to refuse an application for fire and extended coverage insurance on a class-rated dwelling or apartment building in Cleveland without an inspection.

An inspection may be requested only in writing and only by an insurance agent or company.

Inspections under the Cleveland Plan are performed without cost to the property owner by the Ohio Inspection bureau, an organization similar to the New England Fire Insurance Rating Association.

Unlike the requirements of the Boston and Michigan Plans, an inspection by the bureau is not necessary before an agent can place a customer with a "substandard" company, on a consent-to-rate basis, or in the non-admitted market. In addition, the company may add surcharges based on only the agent's inspection of the risk.

*Day-to-Day Operation of the Cleveland Plan.* After a request for an inspection is received, the inspection process under the Cleveland Plan is much like that under the Boston and Michigan Plans.

A time must be set when the owner can accompany the inspector. Normally, the inspection takes place within three to five days.

During the inspection of both the exterior and interior of the property, the inspector points out to the property owner or his representative the defects that might be subject to condition charges to be set by the company—for example, broken windows, overloaded wiring, unsafe heating units, and overcrowded living conditions. He also explains how these defects can be corrected. But, as under other plans, he does not indicate whether or not insurance coverage will be offered.

The inspector also makes an inspection of the exterior of the nearby properties and takes a photograph of the property to be insured. After the inspection, a copy of the inspection report and a photograph of the property are sent to the designated company. The company returns an action sheet to the OIB indicating whether it (1) accepts the risk; (2) will accept it if certain deficiencies are removed; or (3) declines the risk.

If the company conditionally accepts a risk, it states in the action report the defects in the property that must be improved before it will provide insurance. The company or its representative then advises the property owner what specific improvements need to be made.

If the property owner makes the required improvements, he notifies the OIB, and it reinspects the property to assure the company that the conditions have been properly corrected.

If the risk is declined, the company must state the reasons for its decision in the action report.

If one company declines a risk under the Cleveland Plan, the OIB will, if requested, send a copy of the inspection report to another company.

The owner can obtain a copy of the inspection report for submission to a company, but so far no one has ever requested a copy.

Each month the OIB reports to the Ohio Insurance Department on the requests for inspec-

65

tions it has received, the number of inspections performed, and the decisions made by each insurance company to: (1) accept a risk; (2) accept a risk on condition that certain conditions be corrected; or (3) decline a risk.

*Costs of the Cleveland Plan.* The manager of the OIB estimates that the direct costs of the program from April to December, 1966, totalled about $9,000, or approximately $30 per inspection—substantially more than that under other plans for which cost data were available. Part of the reason for the high cost is undoubtedly the low volume of inspections. In Detroit, for example, an inspector is able to inspect several properties on one trip, but this is impossible in Cleveland where only a few requests are received for inspections in widely separated areas.

*Results under the Cleveland Plan.* Between April 15, 1966, and September 30, 1967, the OIB informed the Ohio Insurance Department that companies had reported their decisions on 330 risks. Of these, seventy-four (22 percent) were accepted; eighty-five (26 percent) were accepted on condition that certain conditions be improved; and 169 (51 percent) were declined.

In view of the high percentage of conditional acceptances and declinations, it appears that the companies are as reluctant in Ohio to use the surcharge rating plan in connection with the urban area plan as in Michigan.*

## The Voluntary Inspection and Advisory Committee for Milwaukee Core Area Fire Insurance

The Voluntary Inspection and Advisory Committee for Milwaukee Core Area Fire Insurance (Milwaukee Plan) began operations on October 24, 1966. It is a less formal plan than those previously discussed and has several distinct operating characteristics.

*Background of the Milwaukee Plan.* The problem of obtaining insurance in the Milwaukee urban core was first investigated in 1963, by a committee appointed by the Wisconsin Insurance Commissioner. The committee of seven—one representing the Fire Insurance Rating Bureau, five representing insurance companies, and one representing insurance agents—met with civic and action groups as well as with local and state political leaders and

figures. It concluded that if landlords and tenants kept their property in adequate condition, there would be no insurance problem.

The Milwaukee urban core insurance problem was again raised during the fall of 1966. At that time, the State Insurance Commissioner appointed a three-man committee representing the insurance companies and the Fire Insurance Rating Bureau to develop a solution to the insurance problems of the Milwaukee urban core. Within three weeks, the committee formulated the Milwaukee Plan.

The Plan was publicized in the newspapers and carefully explained to local civic and political leaders who were likely to receive complaints about urban core insurance problems. Operations began on October 24, 1966.

*Requirements of the Milwaukee Plan.* The Milwaukee Plan is designed to aid all property owners in the Milwaukee urban core to obtain fire and extended coverage insurance. It covers dwelling, mercantile and commercial property, and provides help for both the building owner and the tenant.

The use of the plan is entirely voluntary. No inspection under the Milwaukee Plan is required before insurance can be written at rates in excess of standard or in the non-admitted market.

Under the plan, a property owner who can not obtain fire and extended coverage insurance makes contact with the Fire Insurance Rating Bureau, which is similar to the New England Insurance Rating Association discussed previously.

The Rating Bureau normally requests the property owner to seek insurance from at least three agents. If after this the owner is still unable to obtain insurance, the Rating Bureau will inspect the property without cost to the property owner.

The procedures followed by the Rating Bureau in aranging for and performing inspections are like those under other urban area plans. The property owner seeking insurance, or his representative, must accompany the inspector during the inspection. The inspector points out hazardous conditions that might make the property uninsurable at standard rates—for example, deficiencies in wiring or heating, poor general maintenance, or overcrowding. Written recommendations are then made for needed corrections.

The building owner is not required to be present during an inspection to assist a tenant in obtaining insurance on his personal property. This is a departure from other plans that provide coverage for tenants.

---

*An illustration of the Ohio surcharge rating plan is discussed in Chapter II at pp. 33–34.

66

If the property is well maintained, or if the hazardous conditions are found to have been corrected on reinspection, the Rating Bureau will assist the property owner obtain insurance. The Rating Bureau first calls the insurance company that cancelled or failed to renew the insurance on the risk and requests a reconsideration of the decision. According to Rating Bureau reports, all insurance companies thus requested have renewed coverage on property believed by the Rating Bureau to be in insurable condition.

If the company that had previously insured the property is already providing insurance on a considerable number of properties in the area, or is no longer in business, or no longer admitted in Wisconsin, the Rating Bureau calls member companies in alphabetical order. This procedure equitably distributes the urban core risks. As of December 1, 1967, the Rating Bureau had called only twenty-five members to replace coverage previously written by another company.

A company may refuse to provide insurance under the plan. But if a company declines to provide insurance on a property that the Rating Bureau believes is insurable at standard rates, the three-man committee appointed by the Insurance Commissioner will meet with the company's executives to discuss the situation. As of December 1, 1967, this had not been necessary. The Rating Bureau reported that each company it had called about an insurable risk had agreed to provide at least a portion of the insurance sought by the property owner.

A dwelling is normally insured with one company. High-value commercial property may be insured by several companies in order to limit individual exposure in any location. When one company called by the Rating Bureau is willing to provide only a portion of the insurance on a risk, the Rating Bureau calls the next company on its alphabetical list of members. This process continues until the amount of needed insurance is placed.

The Insurance Rating Bureau is performing the job of placing insurance that is normally carried out by an insurance agent or broker. The Rating Bureau, however, receives no commission. Nor does it service the policy after issue. Thus, an agent must be found to receive the commission and service the policyholder. Some companies simply select an agent to receive the commission on business directed to it by the Rating Bureau. Other companies ask the property owner to choose an agent. Still others give the commission to an agency within the local office of the insurance company which, in effect, allows the company to retain the commission.

The Rating Bureau will not ask one of its affiliated companies to insure a property unless it believes the property is insurable at standard rates. Although surcharges can be added for specific hazards, the Rating Bureau normally insists that hazards found by the inspector, unless minor, be removed before it will directly help the owner obtain insurance. If significant hazards are not removed, the Rating Bureau will tell the owner only how he can attempt to obtain insurance from a "substandard" company, on a consent-to-rate basis, or from an insurer in the non-admitted market.

*Results under the Milwaukee Plan.* The Milwaukee Plan started slowly. From its inception on October 24, 1966, to June 1, 1967, the Rating Bureau received complaints from only thirty-six persons. It was able to help twenty-two of these obtain insurance. But since the Milwaukee riots last summer, the Rating Bureau has received far more complaints.

From October 24, 1966, to November 16, 1967, the Rating Bureau, under the Milwaukee Plan, received inquiries from 140 persons. Of these, forty were apparently able to obtain insurance after being advised by the Rating Bureau to make contact with a new sales source—they did not subsequently ask for an inspection. Of the remaining one hundred, eighty-eight persons stated they were unable to obtain any, or a sufficient amount of, fire and extended coverage insurance, and twelve indicated that they could obtain insurance only at higher than standard rates.

Inspections were made of eighty-one residential buildings and seventeen commercial buildings. Inspections on other properties were pending at the time the report was made. Recommendations for improvements were made for eighty-nine of these properties. Although only twenty residential and only two commercial building owners satisfactorily complied with all of the Rating Bureau's recommendations, the Bureau was able to help forty-seven persons obtain insurance. The deficiencies in the remaining properties were regarded as too hazardous for the Rating Bureau to request one of its members to provide insurance unless the deficiencies were corrected.

67

## The Buffalo and New York City Fire and Extended Coverage Inspection Plan

The Buffalo and New York City Fire and Extended Coverage Insurance Inspection Plan (New York Plan) was inaugurated on April 1, 1967. While its literal procedural requirements are similar to the Cleveland Plan, its day-to-day operations are more nearly like the Boston and Michigan Plans.

*Background of the New York Plan.* The New York Plan was initiated after the New York Insurance Department investigated the problems of obtaining insurance in blighted areas. In its report of March 7, 1967, to the Governor on fire insurance in congested areas, the Insurance Department concluded that the market for fire insurance in certain areas of New York City and Buffalo was inadequate. The reason for the inadequacy was attributed to the practice of underwriting class-rated property by area rather than by individual risk. Evidence developed during the investigation and public hearings showed many good risks in areas that were considered blighted. Believing that some method of inspecting these risks needed to be developed, the Department suggested the adoption of an urban area plan.

With the help of representatives of the New York Fire Insurance Rating Organization, insurance companies, and agents and brokers, a plan was drawn up. It received considerable publicity in the press and in radio spot announcements, and the New York Fire Insurance Rating Organization sent a letter explaining the plan to every broker and agent in New York City and Buffalo.

*Details of the New York Plan.* The New York Plan includes Buffalo and the five boroughs of New York City.

All property and casualty companies admitted to do business in the State of New York have agreed not to refuse an application for fire and extended coverage insurance in the plan area without an inspection.

An unusual characteristic of the New York Plan is a specific provision that in addition to insurers, no broker or agent shall decline an application for fire and extended coverage insurance without an inspection.

The plan covers all class-rated property in New York City and Buffalo. This includes homes and apartment buildings, even if there is also mercantile occupancy, as well as one-story mercantile buildings without dwellings; and fire and extended coverage insurance on tenants' household contents. The plan requires the building owner or his representative to accompany the inspector through the property, together with the tenant, if insurance is sought on the tenant's contents.

The New York Plan does not, itself, require an inspection before a policy can be written at more than the standard rate as do the Boston and Michigan Plans. Nevertheless, the plan does, in fact, operate similarly to the Boston and Michigan Plans because of the operation of the rating laws in New York.

In New York, there are three ways to write insurance above the manual rate:

1. *Surplus Lines.* Insurance can be written in the surplus lines market after an agent has diligently tried, but without success, to obtain coverage in the admitted market. Generally, the agent must request an inspection to meet this test.

2. *Consent to Rate.* An insured can consent to be rated above manual, but he is told precisely how much he is paying over manual. If the owner is aware of the inspection program, his signed consent to a higher rate can be viewed as a waiver of the inspection. This procedure, however, lacks the safeguards for the consumer of the waiver under the Michigan Plan, where the individual is told of his right to an inspection at the time he signs a waiver.

3. *Substandard Rating Plan.* On January 4, 1965, the Insurance Department authorized surcharges on class-rated property for specified conditions. These surcharges can be assigned only by the New York Fire Insurance Rating Organization (NYFIRO) after an inspection. Moreover, a company must impose the surcharges set by NYFIRO, and the surcharged condition must be repaired before the manual rate is permitted. In most other states with a surcharge plan, the charges can be set by the company, if it wishes, after inspection by an agent or other person on behalf of the company.

The Insurance Department reportedly had hoped that the Substandard Rating Plan would expand the market for fire insurance because it offered higher premiums for insurance on property in substandard condition. In practice, however, the plan was rarely used. During 1965 and 1966, only about 480 properties were inspected.

68

Even where it was used, the Insurance Department's investigation (referred to above) disclosed that insurance was offered by the companies at the surcharged rate in less than half the cases.

The Insurance Department was persuaded that the substandard plan would be used more often if owners were more certain of obtaining coverage after inspection. This could be accomplished, the Department believed, through an urban area plan backed by Departmental supervision of company performance under the plan.

*Day-to-Day Operation of the New York Plan.* Inspections under the plan are performed by the New York Fire Insurance Rating Organization (NYFIRO), an organization similar to the New England Insurance Rating Association described above.

NYFIRO has 18 inspectors in New York City who devote full time to inspecting property under the plan in the city. In Buffalo, one man is assigned full time to perform inspections, and other members of the staff do inspections on a part-time basis.

An inspection must be requested in writing by an agent, broker, or company; it cannot be requested by the property owner. The inspection and post-inspection procedures are similar to those under the other plans described, except in one respect. That is, if the company declines the risk, copies of the inspection report and action sheet setting forth the reasons for declination are sent to the owner as well as to the New York Department of Insurance. In addition, a copy of the report goes to NYFIRO.

No one voiced concern that the inspection system and the filing of a copy of a report with a state agency might be used as a means of enforcing the building and sanitation codes.

Moreover, there is no evidence that property owners avoid inspection out of fear that it will lead to discovery of a building or sanitation code violation.

Copies of other action reports, where the company agrees to accept the risk as is or after certain conditions are improved, are filed with NYFIRO.

NYFIRO is required to maintain copies of the action reports on file. It must also submit semi-annual reports to the New York State Insurance Department setting forth, by individual company, (1) the number of risks under the plan which have been inspected; (2) the number of risks accepted; (3) the number of risks accepted on condition that certain improvements be made; and (4) the number of risks declined.

*Results under the New York Plan.* The statistics on the operation of the plan, between April 3, 1967 and September 29, 1967, as reported by NYFIRO to the Insurance Department, are indicated in Table 2.

The results of the New York Plan set it apart from other Urban Area Plans. The percentage of conditional acceptances and declinations is very low, and the percentage of coverage written at the manual or surcharged rate is high.

The reason for this difference is not clear. It may be because the companies are aware that the New York Insurance Department is notified immediately of declinations under the New York Plan.

Or, it may be because apartment buildings are the predominant type of property inspected under the New York Plan. They require a substantial amount of insurance and consequently carry a large dollar premium.

Or, it may be because company officials feel that the premium rate, which frequently includes a substantial surcharge, is adequate to allow them to underwrite the risks involved.

To test the frequency and amount of the sur-

TABLE 2.—OPERATIONAL STATISTICS OF THE NEW YORK PLAN: INSPECTIONS, REINSPECTIONS, AND ACTIONS ON APPLICATIONS FOR INSURANCE, APRIL 3, 1967—SEPTEMBER 29, 1967.

| | New York City | Buffalo | Total | Percent |
|---|---|---|---|---|
| Number of risks inspected | 5,454 | 827 | 6,281 | |
| Number of reinspections | 359 | 103 | 462 | |
| Cumulative actions taken by all participating companies: | | | | |
| Number of acceptances | 4,840 | 606 | 5,446 | 83.6 |
| Number of declinations | 362 | 61 | 423 | 6.5 |
| Number of conditional acceptances | 516 | 128 | 644 | 9.9 |
| Total number of actions | 5,718 | 795 | 6,513 | 100.0 |

69

charge, a member of the Panel's staff reviewed 115 files, selected at random, on property inspected in the New York City area. The results were as follows:

1. Two buildings were vacant and subject to a standard 8.00 per hundred premium rate, but no surcharge.

2. Three properties inspected were specifically rated and not subject to the plan.

3. In three cases, the owner did not keep an appointment or refused inspection.

4. The statistics on the remaining 107 properties were as follows:

| | | |
|---|---|---|
| No surcharge | | 17 |
| 1.1–1.4 times standard | | 2 |
| 1.5–1.9 " " | | 11 |
| 2.0–2.4 " " | | 25 |
| 2.5–2.9 " " | | 12 |
| 3.0–3.4 " " | | 11 |
| 3.5–3.9 " " | | 11 |
| 4.0–4.4 " " | | 10 |
| 4.5–4.9 " " | | 5 |
| 5.0–5.4 " " | | 2 |
| 5.5–5.9 " " | | 0 |
| 6.6 times standard and above | | 1 |

The unweighted average rate for inspected property was 2.5 times the standard rate. The unweighted average rate for surcharged property was 2.9 times the standard rate.

According to information received from the New York State Insurance Department the rates under the consent-to-rate plan have been somewhat higher, averaging about 3.75 times the standard rate on all consent-to-rate applications received in 1967 for all classes of property.

It would seem that property owners who had previously used the consent-to-rate procedure would now obtain an inspection under the plan to determine whether they could get insurance at a lower cost. This does not seem to have occurred.

Only 471 fewer consent-to-rate applications were filed in New York State for both class and specific rated property in the first nine months of 1967 as compared with the same period in 1966:

| | |
|---|---|
| January through September 1966 | 2,634 |
| January through September 1967 | 2,163 |

### The Pennsylvania and Delaware Sub-Standard Plan

The Pennsylvania and Delaware Sub-Standard Plan (Sub-Standard Plan) operates much like the New York Plan, except that insurance companies report their decision on whether to accept or reject a risk only to their agents. By auditing the policies written, the Middle Department Association of Fire Underwriters (Middle Department) determines whether property with conditions for which a surcharge was added has been insured. The Middle Department is similar to the New England Insurance Rating Association and performs the inspections under the Sub-Standard Plan.

*Background of the Sub-Standard Plan.* Following the Philadelphia riot in the summer of 1964, the Pennsylvania Insurance Department began to receive complaints by urban renewal officials, real estate agents, mortgage brokers, and others that adequate fire insurance coverage was unavailable. There were indications that similar problems existed in other parts of Pennsylvania and in sections of Delaware. In response to these complaints both the Pennsylvania and Delaware Insurance Departments approved the adoption by the Middle Department of a voluntary plan designed to eliminate the problem. The plan was put into effect on March 1, 1965, and was modified on September 1, 1965.

*Requirements of the Sub-Standard Plan.* The Sub-Standard Plan covers all class rated dwellings and apartment buildings in Pennsylvania and Delaware, but most applications for inspections are received from the urban core of the major cities in these states.

An inspection under the program may be requested by an agent, a broker, or by or on behalf of a property owner. After receipt of a request the inspection procedure is much like that under the other plans discussed in this chapter.

After inspection the report is given to the agent or company. The applicable surcharges for certain specified conditions—for example, unsafe heating conditions, cooking devices, wiring, or poor physical condition—are noted in the report, since surcharges can only be added by the Middle Department. The company, after examining the report, then notifies the agent whether or not it will accept the risk. It is not, however, required to notify the Middle Department of its decision.

The Middle Department, as a service to its members, audits the policies they write to determine whether the appropriate rate has been charged. During this audit it notes those policies written with a surcharge. In this way the Middle Depart-

ment is able to check whether a policy is subsequently written on a property for which the Middle Department, after an inspection, has assigned a surcharge. The Middle Department does not attempt to check whether policies are written on property which it considers insurable at the standard rate.

*Results under the Sub-Standard Plan.* From March 1, 1965, to September 30, 1967, the Middle Department reported having completed 15,482 inspections in Pennsylvania and Delaware. Of these, 6,604 (42 percent) properties were found eligible for insurance at the standard rate, surcharges were added to the rate on 6,741 (44 percent) properties, and 2,137 (14 percent) of the inspections made could not be satisfactorily completed.

Of the 6,741 properties for which surcharges were authorized by the Middle Department, 3,290 (46.5 percent) were written by the companies at the surcharged rate. Information on the remaining properties is unavailable.

## The Louisiana Owner-Occupied Insurable Dwelling Program

The Louisiana Owner-Occupied Insurable Dwelling Program (Louisiana Plan) was inaugurated on April 1, 1967. The Plan differs from other Urban Area Plans in two significant aspects: (1) It aplies only to owner-occupied dwellings; and (2) inspections under the plan are made by an insurance agent or other person designated by the company.

*Background of the Louisiana Plan.* The Louisiana Plan was put into effect after the State Legislature directed the Louisiana Rating and Fire Prevention Bureau (Rating Bureau) to devise a plan to assist in providing fire and extended coverage on owner-occupied dwellings. The Rating Bureau is similar to the New England Insurance Rating Association.

The legislative directive was prompted by continuing complaints that many persons in Louisiana, particularly along the seacoast, were unable to obtain fire and extended coverage insurance at reasonable rates.

*Requirements of the Louisiana Plan.* The Plan covers all owner-occupied dwellings in Louisiana. No inspection is required before insurance can be

written at more than standard rates. Instead, the Plan is invoked by an agent whenever he deems it appropriate.

If an agent experiences difficulty in obtaining insurance on an owner-occupied dwelling he, or someone designated by the insurance company, inspects the property without cost to the owner. During the inspection, the owner is told what conditions might prompt the addition of a surcharge to the insurance premium—for example, overloaded wiring, improper fuses, or overcrowded living conditions.

A copy of the inspection report is sent to the company, which sends an action report to the agent and the Rating Bureau on its decision to: (1) accept the risk; (2) accept it on condition that certain improvements be made; or (3) decline the risk. The company may modify the policy form (as well as the rate) if necessary to take into account the special hazards of the property. If the company refuses the risk, it must explain its reasons, or list the conditions that must be improved before it will provide coverage.

The Plan provides that any applicant may request the Rating Bureau to inspect his property if he believes his application has been declined because of incorrect information developed by the inspection.

The action reports are kept on file in the Bureau, and are subject to examination by the Commissioner of Insurance.

The Bureau files quarterly reports with the State Insurance Department on the decisions reported to it by each of its member companies.

*Results under the Louisiana Plan.* From April 1, 1967, to December 8, 1967, the Rating Bureau reported that 253 properties had been inspected under the Plan. Of these 207 (82 percent) were accepted, thirty (12 percent) were declined, and sixteen (6 percent) were accepted on condition that certain improvements be made.

## The Minnesota Core Area Plan

The Minnesota Core Area Plan (Minnesota Plan) was initiated June 12, 1967. It is similar to the Milwaukee Plan, except that the Minnesota State Insurance Department, rather than the local rating bureau, seeks to help the property owner obtain insurance.

*Background of the Minnesota Plan.* The Min-

nesota Plan was initiated by sixteen insurance companies in cooperation with the Minnesota Insurance Department after extensive newspaper publicity highlighted the unavailability of insurance in the Summit-University area of the Twin Cities. The companies initially agreed that they would underwrite fire and extended coverage insurance on any insurable property in the Twin Cities. Two other companies later signed pledges to support this program, and the Minnesota Insurance Department has made it clear that it expects all admitted companies to cooperate.

*Requirements of the Minnesota Plan.* The Minnesota Plan covers all Minnesota metropolitan core areas, although this fact has never been widely publicized. As of September 28, 1967, it had been used only in the Twin Cities.

Like the Milwaukee and Cleveland Plans, the Minnesota Plan is entirely voluntary. No inspection is required before the insurance can be written at rates in excess of standard or in the non-admitted market.

In general, a property owner whose fire and extended coverage insurance has been cancelled or has not been renewed is expected to make contact with three different agents to try to obtain insurance. If the owner is still unable to get insurance, he can file an application for inspection with the Minnesota Insurance Department.

Inspections under the plan are made without cost to the property owner by the Fire Underwriters Inspection Bureau, which is similar to the New England Insurance Rating Association discussed previously.

The inspection procedures under the Minnesota Plan are like those of most other plans, except that after the inspection a copy of the inspection report is sent to the Deputy Insurance Commissioner of Minnesota rather than to an insurance company. The Deputy Commissioner attempts to get coverage at standard rates for the property owner. If he fails, he may try to get the owner coverage in a "substandard" company.

*Results under the Minnesota Plan.* As of September 28, 1967, the Minnesota Deputy Commissioner said he had received only ten requests for inspection under the program. In only five cases was it necessary to obtain an inspection before he was able to assist the owner in obtaining fire and extended coverage insurance. In only one of the five cases where an inspection was made was he unable to obtain coverage at standard rates.

The small number of requests received under the Minnesota Plan may be due to a lack of knowledge of its existence. Although the plan has received a limited amount of newspaper publicity, field interviews disclosed that at least one agent who wrote a considerable amount of insurance in the Summit-University area had never heard of it. This agent reported that he had little problem in providing protection to area residents under a homeowners policy. When he did, he placed the business with a "substandard" company.

The Fire Underwriters Inspection Bureau reportedly plans to start collecting statistics on policies written by "substandard" companies to help the Minnesota Insurance Department better evaluate whether property owners are obtaining insurance at reasonable rates.

## The Oakland, San Francisco, and Los Angeles County Fire and Extended Coverage Insurance Inspection Plan

The Oakland, San Francisco, and Los Angeles County Fire and Extended Coverage Insurance Inspection Plan (California Plan) was put into effect on July 19, 1967. The requirements and operating procedures of the plan are similar to those of the Cleveland Plan.

*Background of the California Plan.* The California Plan was adopted after the introduction in the California Legislature of assigned risk legislation to require companies to make insurance available to California property owners. The California Plan was offered by the insurance industry as an alternative way of providing insurance to those who had experienced difficulty in acquiring fire and extended coverage insurance.

*Requirements of the California Plan.* The California Plan covers buildings exclusively occupied as dwellings in Oakland, San Francisco, and Los Angeles County, except for properties in the so-called brush fire areas which are inspected under other plans developed specifically to deal with the brush fire risk.

Application for an inspection may be made only by an agent, broker, or company.

Inspections are made by the Pacific Fire Rating Bureau, an organization similar to the New England Insurance Rating Association.

After the request for inspection is received, a time is set when the property owner or his rep-

72

resentative can accompany the inspector through the property. During the inspection, the inspector points out the risks that might give rise to extra charges for fire and extended coverage insurance.

The Pacific Fire Rating Bureau does not set the amount of the surcharge as in New York, Pennsylvania and Delaware. Each company is free to apply its own surcharge rating plan and set the amount it will charge for specific hazards. The rate is subject to review by the Commissioner of Insurance.

After the inspection, a copy of the report and a photograph of the property are sent to the designated company. The company may: (1) agree to provide coverage at the standard or surcharged rate, (2) agree to write the coverage if certain fire hazards are removed, or (3) decline to write the coverage. In all cases, the company completes an action report promptly and notifies the owner or his representative of its decision.

If the company conditionally accepts a risk, either the company or its representative informs the property owner of the conditions that must be improved before the company will provide coverage. This information is also included in the action report.

If the company declines a risk, it states the reasons for its decision in its action report.

Copies of the action reports are returned to the Pacific Fire Rating Bureau where they are kept on file and are subject to examination by the California Commissioner of Insurance.

The Bureau has agreed to submit quarterly reports to the Commissioner of Insurance setting forth, by individual company: (1) the number of risks inspected under the plan; (2) the number of risks accepted; (3) the number of risks conditionally approved and reinspections made; and (4) the number declined.

As under the Cleveland Plan, no inspection under the plan is required before writing insurance at more than standard rates. Nor is an inspection under the plan required before going to the non-admitted market.

It is specifically stated in the outline of the California Plan, as in the Cleveland Plan, that the plan is not designed to be used as a substitute for the high hazard insurance market presently available.

*Results under the California Plan.* Between June 19, 1967, and September 29, 1967, the Pacific Fire Rating Bureau obtained the following action reports:

|  | San Francisco | Oakland | Los Angeles |
|---|---|---|---|
| Accepted | 3 | 0 | 2 |
| Accepted if certain improvements made | 1 | 0 | 0 |
| Declined | 7 | 0 | 1 |

The Bureau was awaiting replies from companies on five inspection reports in San Francisco and two in Oakland at the time of its report.

## The North Carolina Fire and Extended Coverage Plan For Properties in Beach Area of Zone 1

The North Carolina Fire and Extended Coverage Plan (North Carolina Plan) was initiated September 18, 1967. While the Plan is similar to other Urban Area Plans, it is designed principally to assist owners of beach and seacoast properties in obtaining fire and extended coverage insurance.

*Background of the North Carolina Plan.* The North Carolina Plan was proposed by the insurance industry in response to an amendment to the North Carolina insurance law adopted this year, authorizing the Insurance Commissioner to approve a voluntary industry plan designed to provide fire and extended coverage insurance on insurable beach area properties. If no acceptable plan was submitted to the Commissioner by the industry, the amendment authorized him, after public hearings, to develop such a plan.

The act was adopted as the result of complaints that insurance companies unjustifiably refused or were reluctant to write fire and extended coverage insurance on beach area properties. The North Carolina Legislature believed that this was tending to impede the normal economic growth and well-being of the areas.

Under the new law, the Insurance Commissioner is required to file periodic reports with the Legislative Research Commission and is authorized to adopt reasonable rules and regulations to carry out the provision.

That act also provides that an insurance company must notify the Insurance Commissioner, within twenty days, of its reasons for cancellation, failure to renew, or refusal to provide fire and ex-

73

tended coverage insurance on beach properties, unless the reason is non-payment of premium, transfer of ownership of property, cancellation by the insured, termination of an agency, or other reasons acceptable to the Commissioner. The act further provides that any agent licensed to write fire and extended coverage insurance in North Carolina who refuses to accept an application for insurance and submit it to a company he represents must, if requested by the property owner, report the reason to the Insurance Commissioner within twenty days.

*Requirements of the North Carolina Plan.* The plan applies to all buildings in Beach Area, Zone 1 which is defined as "All localities South and East of the Inland Waterway from the South Carolina line to Fort Macon (Beaufort Inlet), thence South and East of Core, Pamlico, Roanoke and Currituck Sounds to the Virginia line, being those properties of land generally known as the Outer Banks".

Inspection under the plan is made by the North Carolina Fire Insurance Rating Bureau, which is similar to the New England Rating Association.

Like the Cleveland plan, no inspection is required before an owner is insured at rates above standard. The inspection and reporting procedures under the North Carolina Plan are also similar to the Cleveland Plan.

*Results Under the North Carolina Plan.* As of November 27, 1967, 200 member companies of the North Carolina Fire Insurance Rating Bureau had signed statements of participation in the Plan. Together, they represent 85 percent of the companies writing fire and allied lines in the state.

From September 18, 1967 to November 27, 1967, forty inspections were made under the Plan. Because some applications for insurance involved more than one company, fifty-two action reports were returned to the Bureau indicating thirty-two (62 percent) acceptances, eight (15 percent) declinations, and twelve (23 percent) acceptances on condition that certain improvements be made.

## The Wichita Agents' Plan

The Wichita Agents' Plan (Wichita Plan) began operations on December 1, 1967. It differs from other plans designed to resolve inner city insurance problems in that it marshals the efforts of insurance agents to obtain insurance rather than relying on an inspection by a rating bureau.

*Background of the Wichita Plan.* Following the riot in Wichita last summer, the Kansas Insurance Department began receiving complaints from city officials that property owners in the riot-affected area were experiencing difficulty in obtaining fire and extended coverage insurance. The Department investigated the complaints and found that the owners of two commercial establishments had been unable to obtain insurance. After a request from the Department, the Insurance Agents' Association in Wichita obtained fire and extended coverage insurance for these owners.

Partly to prevent the development of a serious insurance problem and partly in response to this Panel's recommendation on September 15, 1967, that urban area plans be widely implemented, the Insurance Department asked the insurance agents to help it develop a program for the State of Kansas. Together, they devised the Wichita Plan.

The Plan has already been receiving publicity. The Insurance Department has explained it to many state and city officials and has called on the insurance industry to cooperate in carrying it out. The companies have also been asked to explain the plan to their local branch offices and to instruct the branches to cooperate fully.

*Requirements of the Wichita Plan.* The Wichita Plan applies to all property risks in the state of Kansas.

The Plan provides that if an agent experiences difficulty in obtaining insurance through the companies he represents on a risk that has been cancelled or not renewed, he will request a governing committee of insurance agents to help him locate a market for the risk. The governing committee is composed of agents appointed by officers of the Wichita Association of Independent Agents.

After receiving a request for assistance, the governing committee inspects the property. The committee informs the owner of any improvements it believes are necessary to make the property insurable at standard rates.

Following the inspection the committee attempts to obtain insurance on the property at standard rates. If this is not possible, it attempts to obtain insurance at a higher rate under a consent to rate plan or through a "substandard" company.

If the governing committee is successful, the property owner's agent is entitled to receive a portion of the commission. The remainder is kept by the agent representing the company which ac-

74

cepted the risk. Under Kansas law the division of the commission is mutually agreed upon by the agents involved.

If the governing committee is unsuccessful in obtaining coverage, it provides the Kansas Insurance Department with (1) a description of the property and its location, (2) the reasons why it was unsuccessful, (3) an opinion on whether the particular property merits insurance, and (4) any other pertinent information.

### The Chicago Home Inspection Plan

The Chicago Home Inspection Plan (CHIP Plan) became effective December 1, 1967. It covers all class rated dwelling and apartment houses in Chicago. The plan was proposed by the insurance industry as an alternative to an assigned risk plan being considered by the Illinois Legislature.

Inspections are performed by the Illinois Inspection Bureau, which is similar to the New England Insurance Rating Association. The procedures for inspection and reporting under the CHIP Plan are much like those under the Cleveland Plan.

Efforts have been made to give wide publicity to the plan. Its procedures have been explained to city officials and copies of a brochure prepared by the inspection bureau have been distributed to property owners. In addition, the inspection bureau has mailed a letter explaining the plan to every Chicago insurance agent and broker.

From December 1, to December 23, 1967, ten applications for inspection of properties were recieved. Of these, five were in adequate condition and five were considered uninsurable by inspection bureau personnel.

## The Watts Pool

Within four months after the riots in the Watts area of Los Angeles in August, 1965, the California insurance industry voluntarily pooled its resources through a separate facility to make fire and extended coverage insurance available to merchants in Watts.

The official title of this facility is "The Insurance Industry Facility," but it is more commonly referred to as the "Watts Pool." It is designed to be a source of last resort for businessmen who cannot get fire and extended coverage insurance elsewhere.

One hundred and ten insurance companies now share an agreed percentage of the premium income, expenses, and losses on policies written by the Watts Pool. In this way, no single company must bear the full brunt of loss on an individual property.

### Background of the Watts Pool

Immediately following the Watts riots, the California Insurance Department began receiving complaints that companies were cancelling their policies in the area. The Department had received about twenty complaints when the California Insurance Commissioner called a group of insurance company executives into his office to discuss the problem. At the time, the Commissioner had reason to believe that companies were about to cancel their policies and withdraw from the area.

At the meeting he asked the companies to stay on all current risks and to continue writing new business in the area. He also appointed a nine-man committee, which became known as the Insurance Industry Committee, to help him handle complaints.

From September through December 1965, this committee handled complaints forwarded to it by the California Insurance Department. Each member was assigned a portion of the complaints. Inspections of problem properties were made, and the members tried to place the needed coverage. If immediate coverage was necessary while the committee was trying to locate a normal market, a general agent wrote coverage on the property, sight unseen, at ten times the standard rate.

Although the committee was able to place risks in almost all cases, it soon became evident that a more formal outlet for particularly difficult risks was necessary. The Committee finally decided to create a pool, a suggestion of the Commissioner

75

they had rejected on September 2nd. The pool became operational in January 1966.

Even after the pool was formed, the Insurance Industry Committee remained fairly active until around March, 1966, when the staff of the pool assumed most of the day-to-day work.

Between September 2, 1965, and March 14, 1966, the Committee handled 199 cases referred to it by the Insurance Department. The Committee obtained coverage at standard rates or below in seventy-nine cases; obtained partial or total coverage at above standard rates in eight-seven cases; and verified by physical inspection that property was uninsurable in eleven cases. The remaining twenty-two cases were in the process of being resolved.

### Details of the Operation of the Watts Pool

The Watts Pool operates under the general supervision of the Insurance Industry Committee, the members of which are appointed by the Commissioner of Insurance.

Providing only fire and extended coverage insurance on retail mercantile businesses located in the forty-six square-mile area surrounding Watts that was designated as the curfew area during the August, 1965 riot, the pool operates as follows: various insurance companies agree to reinsure a certain percentage of the coverage written by the pool through its "fronting" company, the United States Liability Insurance Company, which issues policies. The United States Liability Insurance Company is liable for only a portion of any loss. The 110 participating companies, which together write about 98 percent of the property insurance in California, have not all taken a share of the reinsurance in proportion to their California business, and the difference is made up largely by Lloyd's of London, which has a 23 percent participation.

Initially, the capacity of the facility—the amount of risks it could undertake—was $10 million. It was raised to $25 million in January, 1967.

The facility is managed by a general agent, that charges a management fee of 22½ percent of gross premiums. Another 5 percent is taken by the producer. There are no other expenses, thus giving the pool a 27½ percent expense ratio.

At present, the pool has two professional employees who act as co-managers of the pool. They do most of the work previously handled by the Committee in screening complaints and in placing the insurance either in normal markets or in the pool.

The pool also has an inspector. The accounting, policy-writing, and other paper work is handled by the general agent as a part of its normal business.

*Some Objections to the Insurance Industry Facility*

*Agents and brokers.* Insurance agents and brokers dislike the procedural rules of the pool that require them to make contact with several companies before the pool will provide coverage. They also object to having their commission limited to 5 percent of the premium. They believe, too, that the pool takes too long to provide coverage.

As a consequence, agents and brokers are reluctant to use the pool. Insofar as this feeling causes agents and brokers to seek insurance in the voluntary market, it reserves the pool for those who actually need it. But insofar as it encourages agents and brokers to turn owners away without trying to obtain insurance for them, it is detrimental to the interest of property owners.

*Insurance companies.* Insurance companies have also raised objections to the pool. If they do not ordinarily write insurance in the Watts area, they object to participating in the pool because they are unfamiliar with the area. If they do write insurance in Watts, they object to participating in the pool because they feel they are already over-committed there.

Some also say that they believe the 22½ percent management fee, along with the 5 percent commission to the producer, is too high.

But principally, they are wary of any arrangement that commits them to accept a risk without giving them the opportunity to make the underwriting decision.

For these reasons, the Insurance Industry Committee and the California Insurance Commission have had difficulty in persuading companies to take even a small percentage of participation in the pool for more than one year. The Committee must arrange annually for the insurance companies to agree to participate in the pool.

76

*Procedure for Obtaining Insurance through the Pool.* The property handled by the pool typically goes through the following process:

After an insurance agent or broker has tried unsuccessfully to obtain insurance in both the admitted and the non-admitted market, he helps the property owner prepare a letter to the California Insurance Department requesting coverage by the pool. This letter is reviewed by the insurance department and forwarded to the pool on behalf of the Insurance Industry Committee.

One of the co-managers of the pool makes contact with the producer and requests him to set out in a letter the names of the companies from which he has tried to obtain coverage and the names of the companies he represents. There is no set number of companies from which the pool management expects the producer to obtain declinations. The procedure is designed only to assure that the producer has made a bona-fide attempt to place coverage.

If the co-manager believes that the producer has not used sufficient diligence in trying to obtain insurance, he will ask him to make contact with other companies. In some cases, he will telephone a company directly to help the producer place the business.

Occasionally, the co-manager will try to get the property owner to find another producer—since some producers do not represent a sufficient cross-section of the industry—to be sure that insurance is not available in the voluntary market. If the property owner refuses, the pool will consider providing the insurance.

At some point in this process, which is fairly flexible and informal, an inspection is made by the pool's inspector. The inspection report provides the co-manager with information that may help him get the property insured in the voluntary market. If this is impossible, the inspection report is used to determine the premium rate for the property and whether the property meets the pool's underwriting standards. As of September 1, 1967, the pool had rejected only fifteen properties.

After the pool has decided to accept a risk, the agent is notified and billed for the coverage. Since the pool grants no credit, the premium must be received before a policy is issued.

Policies are normally written for twelve months. A thirty-day binder is issued if that portion of the premium is paid, thus giving the property owner time to obtain the remaining premium charge.

The entire procedure is repeated when a policy is renewed to be sure that the agent tries to place the business in the normal markets.

The process usually takes from two to four weeks, and sometimes longer.

While the procedure outlined above is typical, the pool's management bends the procedural rules for obtaining coverage to fit the needs of the situation. For example, little pressure is exerted to get liquor stores covered in the normal markets because experience indicates that this coverage is unavailable.

Pool personnel now initially handle all complaints referred to the Insurance Industry Committee by the California Insurance Department. Between September 2, 1965, and September 15, 1967, the Insurance Department referred 1,271 complaints to the Committee, an average of about fifty-three complaints per month.

Complaints had fallen to an average of about 30 to 36 per month by July 1967, but they jumped to 68 in August, possibly reflecting the insurance industry's reaction to the summer's disturbances in other parts of the nation.

Of the total number of complaints, only about 770 (60 percent) have at one time or another been satisfied by coverage from the pool. The remaining properties have been insured in the normal markets, have been deemed uninsurable, or were regarded as ineligible for pool coverage.

## Limitations on Risks

To limit its liability on any one risk and also to make the limited capacity of the pool available to as many persons as possible, the pool established certain limitations on the amount of coverage it would provide on any single risk. Initially, the pool limited its coverage to $250,000 per location. This was reduced to $150,000 in January, 1967. Extensive efforts have been made to limit liability in any one block, and on September 5, 1967, the highest liability in any city block was $288,500.

In January, 1967, coverage was also limited to $25,000 on the stock, furniture and fixtures of pawnshops, liquor stores, and jewelry stores. The pool management believes that these businesses can be operated with an inventory of less than $25,000 in one location, and consequently feels no responsibility to write higher coverage in view of the particularly large risks of loss presented.

**77**

While these coverage limitations may seem small, a great many policies in the pool are for less than $10,000. For risks needing insurance above the pool's limits, the pool management frequently is able to obtain coverage for the owner in the normal market.

## Liability in Force

On September 15, 1967, the facility had 480 policies in force, covering 2.15 percent of the approximately 22,300 eligible mercantile risks in the 46-square mile area of South Central Los Angeles known as the "curfew area".

The pool's in-force liability was $12,947,000. Demand for coverage by the pool reached a peak in April, 1967, when $14,606,000 was in force. The declining demand for pool coverage, however, may be reversing itself due to the disorders that occurred elsewhere in the summer of 1967.

The type of risks covered by the pool are as follows:

|  | Percent |
|---|---|
| Liquor Stores | 40 |
| Food Stores | 12 |
| Furniture Stores | 9 |
| Wearing Apparel Stores | 5 |
| Pawn Shops | 4 |
| Vacant Buildings | 4 |
| Drug Stores | 3 |

The remaining coverage is written on various types of retail mercantile establishments, including restaurants, auto repair shops, beauty and barber shops, pool halls, churches, training centers, dry cleaners, and similar establishments.

## Pool Rates

The pool has developed its own special rating schedule which is designed to take into account the risk of loss from a riot. The rates were determined largely by judgment since there was no experience on which to draw.

The pool rate is set by starting with the rate established by the Pacific Fire Rating Bureau for the type of coverage requested: building, furniture and fixtures, or stock. A surcharge is then added to this rate based on the occupancy of the building. The occupancy rate for frame buildings (called "D" Class) is as follows:

| Occupancy | Charge |
|---|---|
| 1. Liquor stores or any type of store with a liquor department; jewelry stores, pawn shops | $1.25 |
| 2. Appliance, furniture, drug, hardware, variety, auto supply stores, discount houses | 1.00 |
| 3. Food markets, sporting goods, wearing apparel, dry cleaners, office equipment, and business machines | .75 |
| 4. Not otherwise classified | .50 |

The surcharge is reduced for other types of buildings. Buildings constructed of masonry and wood ("C" class) are surcharged only 75 percent of the rate for a "D" class building. A reinforced concrete floor and roof building ("B" class) is surcharged only 50 percent of the rate for a "D" class building. A structural steel frame building with concrete floors and roof ("A" class) is surcharged only 25 percent of the rate for a "D" class building.

In a multiple-occupancy building, the surcharge for the highest rated occupancy is used. In other words, a stationery store located in a "D" class building with a jewelry store would pay a $1.25 surcharge instead of the $.50 surcharge that would otherwise apply.

These rates may be further modified by credits or debits which take into consideration various risk characteristics. The schedule is as follows:

| Risk characteristics | Range of modification | |
|---|---|---|
|  | Credit | Debit |
| A. Management.—Cooperation in matters of safeguarding and proper handling of property insured | $0.50 | $0.50 |
| B. Building features.—Age, condition and unusual structural features | .50 | .50 |
| C. Premises and equipment.—Care and condition | .50 | .50 |
| D. Ownership.—Absentee or owner occupied—reputation in the community | .50 | .50 |

The amount of debit or credit is determined by the inspector's assessment of the situation on a five-point scale ranging from excellent to poor:

| | |
|---|---|
| Excellent | subtract $0.50 |
| Good | subtract .25 |
| Average | no change |
| Fair | add .25 |
| Poor | add .50 |

The total debits cannot exceed $1.00 and the total credits cannot reduce the surcharge by more than 50 percent. In other words, the maximum

78

surcharge for occupancy as modified for risk characteristics is $2.25 per hundred—for example, on a liquor store in a "D" class building. The minimum surcharge is .0625 per hundred—for example, on an unclassified occupant who receives the maximum amount of credit in a class "A" building.

In practice, this can mean, for example, that a standard .372 per hundred rate on a "D" class building can be raised by $2.25 or 2.622 per hundred, or a rate that is over seven times standard. If $30,000 in coverage is sought (the average size of a pool policy), the premium would be increased from $111.60 per year to $786.60 per year. If this increase is passed on to a tenant, it would mean a rent increase of about $55 per month.

The maximum surcharge for occupancy and risk is rarely charged.

A member of the Panel's staff reviewed a random sample of around 12 percent of the policies in force. The rates charged in excess of standard were roughly as follows:

| | Percent |
|---|---|
| 2–2.9 times standard | 33 |
| 3–3.9 " " | 28 |
| 4–4.9 " " | 27 |
| 5–5.9 " " | 9 |
| 6–6.9 " " | 3 |

The above figures are based on the manual rate for both fire and extended coverage.

## Losses

From the pool's formation until September 1, 1967, losses on thirty-two claims aggregated about $55,000. This reportedly represented a loss ratio of 17.4 percent on earned premiums of over $315,000.

The only major loss, around $25,000, was caused by a fire bomb which totally destroyed a furniture store.

# Other State Responses

### Proposals for State Pools

In several states, consideration is being given to pooling insurance company resources in the state to meet urban core insurance problems. In New Jersey, for example, the State Insurance Commissioner has been meeting with insurance industry representatives to design a workable state insurance pool. In New York, a proposal for a mandatory pool of insurance companies has recently been put forward by the Governor and the Superintendent of Insurance.

A detailed state pool plan has been developed by the State Insurance Commissioner of Michigan. The Michigan legislature now has before it this proposal, which calls for a mandatory pooling of insurance company resources to provide fire and extended coverage insurance for insurable property—regardless of any environmental hazards or exposure to riot losses—that is not voluntarily insured under an urban area plan.

This proposed legislation would expand the existing urban area plan—which covers only dwelling risks in Detroit and two suburbs and excludes tenants' personal property—to cover all dwelling, mercantile, and commercial risks in Michigan, including the personal property of tenants, except property used for farm purposes.

The proposed legislation requires risks included under the urban area plan to be inspected by the rating bureau or other agency designated by the Commissioner before insurance could be written under Michigan's consent-to-rate law or in the non-admitted market—unless the owner signs a statement waiving his rights under the plan. The owner's agent must make a sworn statement that the owner has been fully advised of his rights to an inspection and furnished with a written statement of those rights.

The inspection and reporting procedures under the expanded plan would be the same as those now used, except that a copy of the report would go to the owner or his agent on request.

If, after inspection, the owner cannot obtain insurance after making a diligent effort, he could apply for fire and extended coverage insurance from the state pool of insurance companies.

The law would require all insurance companies licensed to provide fire and extended coverage insurance in Michigan (with certain technical

79

exceptions) to participate in the pool as a condition of their authority to continue to do business in the state. Each member of the pool would participate in the premiums, expenses, profits, and losses of the pool proportionately to the ratio of premiums received for fire and extended coverage insurance in Michigan. In other words, a company writing 1 percent of the total fire and extended coverage insurance written in Michigan, whether or not such coverage was included under a package policy, would be assigned a 1 percent participation in the state pool.

Managed by a board of nine directors to be elected by its members, the pool would function under a "plan of operation"—to be approved by the insurance commissioner—designed to assure a fair, equitable, and non-discriminatory operation, and to provide for agents' commissions and other matters. If no appropriate plan was formulated within ninety days of the enactment of the law, the commissioner would be authorized to adopt a plan.

The proposed legislation would limit the capacity of the pool. Annual premiums could not exceed 25 percent of the total fire and extended coverage premiums in the state written by authorized insurers during the previous calendar year—but excluding premiums written by the pool.

The bill spells out two principal criteria for judging risks:

1. The property must be free of building code violations affecting fire and extended coverage insurance underwriting; and

2. The property must be free of any occupancy characteristics violating public policy.

Beyond this, the pool management is responsible for underwriting standards. But these must be approved by the commissioner. If he disapproves, he would set the underwriting criteria of the pool.

If the pool refuses a risk, the owner would be given a written statement indicating the measures he needs to take to make his property insurable. The property owner could appeal the pool's decision to the insurance commissioner, who could require the pool to accept the risk.

The pool would charge the standard rate for policies written in the voluntary market, plus any applicable surcharges for specified hazardous conditions found during the inspection. Pool deficits or profits would be used to help set rates throughout the state for voluntary business.

80

The proposed legislation also gives the insurance commissioner authority to adopt rules and regulations necessary to implement the law. The bill further provides that the commissioner need not establish a pool so long as he is satisfied that the companies are voluntarily making insurance generally available for all qualified property throughout the state.

### State and Municipal Liability for Riot Damage

Generally, in the absence of a special statute, state and local governments are not liable for damages resulting from riots and civil disorders. At the present time, sixteen states have statutes providing for varying degrees of governmental financial liability. Enacted during the nineteenth century, the impetus for these laws originally came from lynch mobs and Civil War draft riots. The statutes for many years were dormant; but claims have now been filed under a number of them to recover for damages caused by the civil disorders in the summer of 1967.*

The philosophical basis for these laws rests on the English Statute of Winchester, enacted in 1285. This held the residents of a neighborhood collectively responsible to a considerable extent for crimes committed in their community. In upholding the constitutionality of the Illinois statute in *Chicago* v. *Sturgess* (222 U.S. 313 (1911)), the Supreme Court referred to the English tradition and further stated:

> The law in question is a valid exercise of the police power of the State of Illinois. It rests upon the duty of the State to protect its citizens in the enjoyment and possession of their acquisitions, and is but a recognition of the obligation of the State to preserve social order and the property of the citizen against the violence of a riot or a mob.

Not all types of riot damage and injury are compensable. Minnesota, Nebraska and Ohio hold cities liable only for personal injuries. Connecticut, Kansas and Wisconsin provide for recovery of losses for both personal injury and property damage. The remaining states provide recovery

*The sixteen states with these statutes are Connecticut, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Missouri, Montana, Nebraska, New Hampshire, New Jersey, Pennsylvania, Rhode Island, South Carolina, and Wisconsin.

for only property damage, and Maine, Massachusetts and Rhode Island limit recovery to three fourths of the value of damaged property in excess of fifty dollars.

In four states, Connecticut, Kansas, Kentucky and Maryland, no recovery is allowed if it is satisfactorily shown that the officials used all reasonable diligence to prevent or suppress the riot. In other states, cities may be held liable regardless of the action taken by officials.

New Hampshire, New Jersey, Pennsylvania, Rhode Island, South Carolina and Wisconsin specifically deny recovery to a participant in the disorder. New Jersey, Pennsylvania, Wisconsin and Rhode Island deny recovery if the claimant was negligent in failing to take measures to protect himself or his property.

The laws of all states except Pennsylvania affect every city and municipality therein. In Pennsylvania, recovery for riot damage is provided only in the city of Philadelphia and in Allegheny and Northhampton Counties.

There are other variations in the laws of the different states, and the application of these laws to the extensive damage resulting from recent riots is still open to question. Although Philadelphia paid about one half of the amount of each valid claim resulting from the riots there in 1964, other cities such as Boston, Chicago and Newark are now contesting liability on various grounds. Even if the statutes are held applicable to some claims there will still remain questions whether they apply to insured losses and thus permit an insurance company to recover from the states the losses it has paid to its policyholders; none of the statutes specifically deals with this problem.

There is also the question whether states will continue to maintain these laws in force. California repealed its law in 1963; Illinois repealed its law in August 1967; and repeal is being considered in other states.

## Proposals of State Commissioners

The National Association of Insurance Commissioners (NAIC) appointed on August 25, 1967, a select committee of its members to make recommendations to it concerning insurance problems raised by civil disorders. On November 9, 1967, the NAIC placed in the record of our hearings the following resolution that it had adopted:

WHEREAS, many urban areas have implemented property inspection plans (such as the Boston Plan) for relief of insurance shortages; the following is recommended:

That the states consider the creation or implementation of urban areas inspection plans and/or consider assigned risk pools for property insurance, on a voluntary or compulsory basis, if the conditions present in the state indicate that such programs would help meet the social need of providing a property insurance market for insurable property.

On December 5, 1967, the NAIC urged the industry to adopt a voluntary program to assure a stable and continuous market for property insurance in urban areas. Doing this, it said, might require unusual measures including "special civil disorder loading of all property premiums, pooling of the premium funds so produced, and of the risk in whole or in part at both the state and national levels." If a workable, voluntary plan was not adopted, it said "reasonable plans statutorily created or implemented by the state and/or federal governments to secure such objectives" might be needed.

The NAIC also recommended to us at our hearings a detailed plan to defer federal income taxes on funds held in reserve to meet possible catastrophe losses. The proposal, the NAIC urged, would help the industry accumulate funds more rapidly to pay catastrophe losses, and thus would make it more financially feasible for the industry to provide insurance protection in areas where companies might suffer catastrophe losses from civil disorders or other insured perils. Specifically, the NAIC suggested that federal income taxes be deferred on funds set aside in reserves in the amount and to the extent required by state law. Funds placed in these reserves would come from premium income and could be used only to pay catastrophic losses, and losses resulting from

81

the insolvency of other fire and casualty companies. While being held in the reserve accounts, the funds could be invested only in accordance with state requirements. Under the NAIC proposal, these funds would be fully taxable when returned to the company for general use.

# Industry Proposals

In response to our request, insurance companies individually and through their associations presented suggestions for developing a program to meet urban core insurance problems.

## Urban Area Plans

Industry representatives generally agreed they had an obligation to contribute to a viable insurance market in which all property owners maintaining their property in insurable condition are able to obtain insurance protection. To accomplish this, they generally advocated the expansion of Urban Area Plans wherever needed to cover both dwelling and commercial risks.

## State and National Pools

The industry representatives conceded that where the Urban Area Plans did not operate to meet fully the needs of urban core residents, mechanisms to spread the risk of loss widely might be needed to supply the market.

Most industry representatives did not believe pools would be needed to provide fire and extended coverage insurance. But if protection was also to be provided for losses from burglary and theft, they believed that perhaps both pools and some governmental financial assistance would be needed.

One company suggested specifically a national pool with government financial backing to insure all properties not insured under an Urban Area Plan for reasons beyond the control of the owner. The lines of insurance to be written by the national pool would include: fire and extended coverage, homeowners multiple peril, commercial multiple peril, inland marine, liability other than automobile, glass, and burglary and theft. Each participating company would be free to reinsure whatever portion of a line it wished with the pool.

The company further suggested that the national pool pay 2 percent of the premiums it re-

ceived to the federal government in return for reinsurance to reimburse the pool in the event its annual losses and expenses (not including the reinsurance premium) exceeded 103 percent of its earned premiums. Provision would be made for repaying out of future profits any reinsurance payments made by the federal government.

Most industry representatives, however, believed that if pools were required to solve the problems they should be operated on a state-by-state basis. Some suggested consideration of having state pools administered by a regional or national management in the interest of efficiency.

Industry representatives also suggested that participation in the pools be voluntary, but that participation be a necessary condition to obtaining any governmental assistance to protect companies from catastrophic riot losses. Few specific suggestions were made regarding the organization or operation of such pools. It was generally agreed that the specific details would have to be worked out later, probably at the state and local levels.

## Governmental Reinsurance for the Riot Peril

With a single exception, all industry spokesmen who appeared at our hearings agreed that some governmental assistance was needed to help the industry provide insurance protection against riot damage, and even the exception did not oppose such a program, but only expressed doubt that his company needed it. If this protection were not provided, industry spokesmen generally said companies would have no choice but to reduce in one way or another the amount of insurance written in inner city areas to avoid losses in these areas in the event of future civil disorders.

They suggested that this protection be provided through reinsurance of the riot peril purchased from the federal government in return for a small percentage of the premium on the lines which they reinsured. They further suggested that

82

this reinsurance be provided on a state-by-state basis.

Three different suggestions were made for the method of providing this reinsurance.

The American Mutual Insurance Alliance (AMIA), a national trade association representing 122 mutual property and casualty companies, suggested that approximately 1 to 3 percent of the annual premiums collected in each state on each reinsured line be paid to an interstate reinsurance facility. This facility, to be managed by a governing committee of state insurance commissioners and representatives of the industry and federal government, would pay all claims arising out of riot damage on reinsured lines up to an annual maximum of $150 million. After that, the federal government would provide additional protection up to a maximum of $500 million. If riot losses exceeded that amount in any one year, the companies would pay the remainder of the claims. To assist the reinsurance facility in meeting its financial commitment before a $150 million fund was built up, the AMIA suggested the facility be permitted to borrow funds from the United States Treasury, the loans to be repaid with interest in subsequent years.

The AMIA also suggested that the premiums for reinsurance from the interstate facility would be provided by the states either through assessment upon property insurers or by appropriation from state revenues. To provide the states with time to adopt needed enabling legislation, the AMIA suggested that during the first three years, reinsurance be offered in any state where companies writing 75 percent of the state's property insurance premiums participated in the interstate facility. After three years, the reinsurance protection would be unavailable in any state which had not joined the facility.

The American Insurance Association (AIA), a national trade association representing 170 stock property and casualty companies, suggested another approach. Under its proposal, insurance companies would purchase, through a state pool, riot reinsurance protection for each line of insurance in each state for which this protection was desired. In return for an appropriate premium, the federal government would reimburse the companies for all riot losses in excess of 3 percent of their annual premiums earned on reinsured lines in the state where the loss occurred.

To help eliminate the riot peril from a company's decision whether or not to insure in a particular area, the AIA suggested that any company that did not experience riot losses of 3 percent of its reinsured lines be required to pay up to that amount into the state pool before the federal government would be called upon to make payments. These funds would be used by the state pool to reimburse companies which suffered riot losses in excess of 3 percent of their annual earned premium in the state. In this way, all companies acquiring riot reinsurance in the state would stand to lose up to 3 percent of their annual premium volume on reinsured lines, even though some of these companies may not have suffered losses of that amount from the riot.

It was generally conceded that this riot reinsurance protection should be available only to companies that participated fully in Urban Area Plans and other plans designed to provide a viable urban core insurance market.

One company proposed a plan similar in approach to that suggested by the AIA, but with somewhat different details. Under this proposal, the federal government would reimburse companies which participated in the national pool for 95 percent of their riot losses which exceeded 2 percent of the annual premiums earned on reinsured lines in the state in which the losses occurred. A company having less than $2 million in assets would also be eligible for this protection, even if it did not participate in the national pool. In return for reinsurance protection, a company would pay, through the national pool, one tenth of one percent of its annual earned premiums on reinsured lines.

The National Association of Independent Insurers, an association of 350 property and casualty insurers of all types—stocks, mutuals and reciprocals—also favored development of a governmental reinsurance program for the riot peril. It made no specific suggestion, but recommended a task force of representatives of the various segments of the industry to work out the details.

## Tax Measures

Most insurance industry representatives favored some form of tax deferment plan which would allow them to accumulate catastrophe reserves at a faster rate, but no specific proposals were presented.

83

# Proposals for Federal Legislation

More than 200 bills were introduced in the Congress in 1967 to deal with various property insurance problems.

Some call for studies to determine the extent to which insurance is available for protection against losses arising from civil disorders and to determine whether legislation is needed to assure the availability of this protection.

Some bills provide for compensating insurance companies for losses incurred in "major civil disorders," the President to determine when a major civil disorder has taken place, and the insurance companies to be reimbursed for claims arising out of the disorder from funds appropriated for that purpose.

A number of proposals would authorize grants to states for assistance to homeowners and businesses suffering uninsured property losses from riots or other civil disorders. Under one approach the federal government would pay one-half of the cost of rehabilitating damaged property and the state and property owner would share equally the remainder. Other bills would provide assistance to property owners through disaster relief funds to be made available by appropriations.

Still other legislation proposes that the federal government offer reinsurance or direct insurance against losses from riots up to a set maximum face value amount, the purpose being to make insurance against the riot peril available at "reasonable rates." Where these "reasonable rates" are regarded as actuarially unsound, appropriated funds would from time to time be added to accumulated premiums to pay possible losses. If these funds were insufficient to pay claims, the administrator of the program would be authorized to borrow funds from the United States Treasury.

Many proposals deal with an aspect of the center city insurance problem—protecting small businessmen against losses from criminal activity, including losses resulting from riots or other civil disorders. The purpose is generally to provide crime insurance at "reasonable rates" to businessmen who use appropriate loss prevention techniques to safeguard their property. Some bills envisage direct protection by the government, but specify that every effort is to be made, including the offer of reinsurance by the government, to encourage the private insurance industry to provide the protection. They generally limit the amount of insurance or reinsurance offered by the government to a specific maximum figure. In some cases, funds for paying losses are to be paid out of a revolving fund consisting of accumulated premiums and funds to be appropriated when the legislation is enacted. In other cases, the administrator of the program would be authorized to borrow additional money from the United States Treasury if needed to meet losses.

One recent proposal would provide federal reinsurance for riot losses on various lines of insurance to companies participating fully in state-wide urban area plans designed to assist all property owners to obtain fire and extended coverage insurance. In addition, lending programs would provide funds needed by property owners to make their property insurable.

In this proposal, the program is to be administered by the federal government with the advice of an advisory panel selected from the insurance industry, state and local governments, and the general public.

Losses on reinsured lines would be paid from accumulated premiums for reinsurance. If these were insufficient, the administrator of the program would be authorized to borrow from the United States Treasury amounts sufficient to meet claims.

The Executive Branch of the federal government has commented on some of these Congressional proposals, but has taken no position pending the completion of the Panel's work. At our hearings, the Special Assistant to the President for Consumer Affairs, and representatives of the Department of Housing and Urban Development, the Department of Commerce and the Small Business Administration pointed out various considerations which have aided us in developing our recommended program. The Panel has received the full cooperation of all parts of the Executive Branch during the course of its work.

# Conclusion

The principal actions that have been taken thus far to deal with urban core insurance problems—Urban Area Plans—provide important insights into what is needed to solve the insurance problems of the urban core residents. The plans disclose the necessity of assuring conscientious efforts at the local level to cause individual properties to be judged on their merits. They suggest a promising approach for obtaining insurance at reasonable rates for property owners in all areas of a city.

But it is equally important to recognize the limitations of the present Urban Area Plans. Our survey showed that the Roxbury section of Boston has the highest rate of uninsured and underinsured property of any of the six poverty areas surveyed. The data from our survey also disclosed major insurance problems in Cleveland, Detroit, and Oakland, which have Urban Area Plans of more recent origin.

The survey does not suggest that the Urban Area Plans have failed or not been beneficial. For example, in Boston, according to all reports, almost no one was able to obtain insurance at standard rates in 1960 when the plan was initiated, and over the last six years thousands of property owners have been able to do so under the plan. But the survey does clearly suggest that additional steps beyond present Urban Area Plans are needed to meet the insurance problems of urban core residents and businessmen.

These plans need to be expanded to cover more property owners and to provide additional lines of insurance. Moreover, the procedural requirements of the plans need to be improved to provide more assistance and better protection for the insurance consumer, to disclose more precise information on the nature and extent of the urban core insurance problems, and to develop more refined techniques for insuring urban core properties.

Even with these improvements, there are likely in many cities to remain some insurable properties which cannot be fully insured in the voluntary market due to environmental hazards or other reasons. The experience gained under the Watts Pool has shown that the technique of pooling insurance industry resources can be effectively utilized to insure this type of property. Some states are now considering greatly expanded pools to provide protection to all owners of insurable property who cannot obtain coverage in the voluntary market.

The many thoughtful legislative proposals made by the state insurance commissioners, industry spokesmen, and members of Congress illustrate several different ways the federal government could contribute to a solution of urban core insurance problems. We generally agree with the goals underlying these various proposals for federal legislation and believe our program meets such goals. But we believe that greater efforts should be made to marshal the resources of others concerned—property owners, the insurance industry, state and local government—before relying on the federal government and its resources.

Most importantly, we believe that the primary focus of any legislation should be on developing a comprehensive program to meet the needs of all property owners—the tenant as well as the home owner, the large as well as the small businessman. This program should help property owners obtain fire and extended coverage, vandalism and malicious mischief, and burglary and theft insurance. Each of these lines is important to property owners and lenders, and vital to the flow of private resources and efforts into the inner cities.

85

# Chapter IV

# RECOMMENDED PROGRAM TO SOLVE URBAN CORE INSURANCE PROBLEMS

Drawing on the background and supporting material provided by the discussion of the insurance enterprise, the urban core insurance market, and the present responses to urban core insurance problems, this part of the report describes in detail the Panel's recommended program. The discussion here is intended to be helpful to those with the responsibility for implementing the program.

## A. FAIR Plans: Major Expansion of Urban Area Plans

### 1. Potential of Urban Area Plans

The Urban Area Plan can have many advantages. It can inform property owners about repairs, if any, they need to make to reduce their risk and obtain needed insurance. It can offer a useful and inexpensive method of furnishing insurance companies with valuable underwriting information on the physical condition of risks. It can generate information useful for code enforcement and loss prevention purposes. It can discourage companies from drawing a red line around urban core areas and refusing to provide coverage there without considering the condition of a particular risk. It can keep state insurance departments informed of the nature of the problems that the urban core property owner has in obtaining insurance.

In the Urban Area Plans currently in operation, this potential has not yet been realized. The plans

should be revised and expanded to assure every property owner fair access to the property insurance he needs.

The broader and more inclusive type of plan we believe necessary to meet the insurance needs of property owners should have a distinctive name which conveys to the public its nature and purpose.

*The Panel Recommends:*

**The insurance industry, in cooperation with the states, should institute in all states plans establishing Fair Access to Insurance Requirements (FAIR Plans).**

### 2. Area Served

Most Urban Area Plans now in existence are limited, either by their terms or in practice, to specified cities or to areas within cities. Their restricted scope is the result of special efforts to make insurance available in those areas with the most acute problems. However, property owners outside the boundaries of the present Urban Area Plans may also experience difficulty in obtaining insurance. Since the principal objective of the FAIR Plan is to assure that no property owner is denied insurance without a fair evaluation of the underwriting risks of his individual property, the Plan's procedures should be available to all property owners in a state. This avoids designating any particular area as a prob-

lem and assures all property owners equal treatment regardless of where they live.

Where property owners can obtain needed insurance protection without using the FAIR Plan, the existence of the Plan costs the insurance industry neither time nor expense to operate. But when a property owner is experiencing difficulty in obtaining insurance, the benefits of the FAIR Plan should be available to him before his general area becomes a problem.

We recognize that some areas exposed to natural hazards, such as seashores, pose different problems which states may wish to handle separately. Some states may prefer to concentrate their efforts on solving the problem of providing adequate insurance in urban core areas only. Therefore, we believe that the states should have the option of excluding seashore areas and similar properties which involve special insurance problems and policy considerations unrelated to those of the urban core.

*The Panel Recommends:*

**FAIR Plan inspections and procedures should be available to all property owners in a state; except that a state may exclude seashore or similar properties.**

### 3. Eligible Property

Most Urban Area Plans now assist only owners of homes and apartment buildings. We have found that owners of mercantile and commercial buildings in the urban core also have difficulty in obtaining insurance.

The growth of new businesses and the expansion of existing ones in the inner city are essential to revitalize these areas. This can occur only if adequate insurance protection is available.

The same reasons adequate insurance is unavailable for dwellings explain why it is unavailable for mercantile and commercial property—there is a failure to distinguish between good and bad risks in an area regarded as "blighted." The problem, always chronic, has now become acute, as insurance companies have increasingly become reluctant to provide insurance in areas that might possibly be damaged by riots.

The application of the FAIR Plan to mercantile and commercial risks, together with other measures we recommend, would alleviate this problem.

Manufacturing risks and automobiles are excluded. Manufacturing plants require more specialized underwriting and are usually insured without difficulty and without regard to the extra hazards of their location. Automobile insurance underwriting involves many special factors not related to the location or physical condition of the property. These types of insurance have not been part of our study.

*The Panel Recommends:*

**FAIR Plans should apply to all dwelling, mercantile, and commercial property except manufacturing plants and automobiles.**

### 4. Eligibility of Tenants

Most Urban Areas Plans assist only the owner of a building to obtain insurance. Inspectors nonetheless have often helped tenants obtain insurance on their property, even though the plan does not specifically provide for it. It is doubtful, however, that many tenants know that such unofficial assistance is available.

Many residents and businessmen in the urban core are tenants. They cannot be excluded from the benefits of the plans without discrimination against the very people who may need help the most.

*The Panel Recommends:*

**FAIR Plans should assist both building owners and tenants in obtaining insurance on buildings and contents.**

### 5. Absence of Owner During Inspection

Where a plan provides for helping a tenant obtain coverage, it usually requires the building owner or his representative, as well as the tenant, to be present during the inspection. Requiring the presence of the building owner or his representative has the advantage of assuring that the owner is made aware of certain unsafe conditions of his building which should be corrected; it also helps assure the inspector access to all parts of the building. But the experience under the Milwaukee Plan has demonstrated that the availability of insurance to a tenant need not necessarily be conditioned on the willingness of the building owner to be present during an inspection.

88

*The Panel Recommends:*

**The absence of the building owner or his representative during an inspection should not preclude a tenant seeking insurance from obtaining an inspection under the FAIR Plan.**

## 6. Lines of Insurance

Urban Area Plan inspections are now available to assist property owners in obtaining only fire and extended coverage insurance. As noted earlier, this is the most basic property insurance. But it is not the only critically important line of insurance that needs to be available in the urban core.

At a minimum, basic protection against losses from crime and vandalism should also be available. The availability of these lines of insurance is essential to rebuilding and revitalizing the urban core.

The urban core poses special problems for the crime insurance underwriter. It may be necessary to redesign crime policies—by appropriate use of deductibles, requirements for protective devices, and other underwriting controls—in order to make such policies economically sound from the point of view of the insurer and the insured. More research on and experience with crime insurance in the urban core is essential. FAIR Plans should be able to offer at least a basic opportunity to those wishing to purchase crime insurance, while at the same time providing the impetus for the necessary research and innovation.

*The Panel Recommends:*

**FAIR Plans should assist property owners in obtaining:**
   **—Fire and extended coverage insurance;**
   **—Vandalism and malicious mischief insurance; and**
   **—Burglary and theft insurance.**
**A state insurance department may decide to include additional lines or kinds of insurance in the FAIR Plan administered in that state.**

## 7. Importance of Agents and Brokers

Insurance involves a complicated business transaction. Most people need the help of an insurance agent or broker to obtain the appropriate insurance, and, indeed, most insurance companies sell insurance only through agents and brokers.

A significant practical problem in existing Urban Area Plans is that inner city property owners may be unable to find an insurance agent or broker who is willing to assist them in obtaining insurance, or even in obtaining an inspection. Many agents and brokers have little desire to handle business in the urban core. Their business arrangements with insurance companies sometimes make it uneconomic for them to write urban core business.

*Business Arrangements.* Each agent licensed to write insurance by a state must develop his own arrangements to place insurance with particular companies. Agents normally can write insurance for only those companies with which they have a formal arrangement. Some agents represent several companies, while others represent only one.

Theoretically, a broker can place insurance with any company. As a matter of practice, however, a broker normally deals with only a few general agents who represent several companies. A broker doing a substantial amount of business may develop direct contacts with a few companies, but only if he provides a substantial and profitable premium volume.

A primary consideration for an agent or broker is the preservation of his relationship with the companies or general agents with whom he places insurance. Without outlets for his clients' insurance, the agent or broker is out of business. As a result, although the agent or broker is usually an independent businessman, his independence is restricted by rules imposed by the companies or general agents he represents.

For example, unless an agent or broker produces a substantial amount of premium volume for a company or general agency, he may find that it will cease accepting any business from him.

Moreover, substantial losses on the properties insured through a particular agent or broker in relation to the amount of premiums he produces may also prompt companies or general agents to cease accepting his business.

*Compensation Structure.* Most agents or brokers are paid a commission that is a percentage of the premiums their customers pay. The actual percentage varies from company to company and for different lines of insurance.

Agents representing only one company may be paid a salary. But the salary generally depends on the amount of premium volume the agent produces.

89

He, too, is under pressure to write a large volume of business.

Since the compensation structure for agents and brokers is based upon their volume of premiums rather than time spent, the amount of time an agent can afford to spend on helping a client to obtain insurance is limited.

The values of most homes in the urban core area, as well as of their contents, are low, and the premiums for the amount of insurance the owner wants to buy are normally small. Yet many insurance companies, as a result of tightening their underwriting standards, have required agents and brokers to provide them with a detailed inspection report on property in the inner city and, in some cases, a photograph of the property. Even then the company may decline the risk. In that case, to receive any compensation for his efforts, the producer must try another company. The Urban Area Plan relieves the agent or broker from performing a detailed property inspection, but it too can involve extra paper work with no increase in commission. As a consequence, many agents and brokers refuse to take applications for insurance in the inner city. It is more profitable to devote their time to business in other areas.

Most agents also have contingency commission agreements with the companies they represent. If the losses on the business an agent writes are substantially less than the premiums earned, the agent receives additional compensation. This financial stake gives him a strong incentive to avoid writing insurance on properties he believes might sustain losses. Losses cost him a portion of his commission. And if the losses become large in relation to the premiums he has written, the company or general agent may cease accepting business from him altogether.

Existing Urban Area Plans do not protect the agent from loss of his contingent commissions, nor do they keep him from being penalized by a company or general agent for having a high loss ratio.

A few companies have recognized that the contingent commission agreements may operate to discourage their agents from processing applications for insurance in the inner city. They have relieved their agents of these agreements in urban plan areas. But companies have rarely sought to encourage their agents to write business in the inner city. Indeed, some have actively discouraged their agents from accepting business there.

We believe that all responsible agents should accept as much business in the inner city as possible.

A company imposes penalties on agents accepting business with high losses, ostensibly to eliminate agents with poor underwriting judgment. Under the Urban Area Plan, the company relies on an inspection report from the rating bureau rather than on the judgment of its agent. Therefore, the agent should not be penalized if the business happens to yield losses. He should instead be encouraged to provide an adequate urban core insurance market.

*The Panel Recommends:*

**FAIR Plans should provide that**

**a. No insurance company shall direct any agent or broker or other producer not to solicit business through the Plan; and no agent, broker, or other producer shall be penalized in any way by an insurance company for submitting applications to it for insurance under the Plan.**

**b. Losses on property insured under the Plan shall not reduce the agent's or broker's contingent commission income from premiums written on other property; and such losses shall not be included in calculating losses on business submitted by the agent or broker.**

## 8. Acceptance of Applications by Agents and Brokers

Since the agent is not to be penalized for submitting applications for insurance through the Plan, and since the inspection will be performed by the rating bureau, an agent should not be permitted to turn down an application for insurance without an inspection. Agents are licensed by the state to sell insurance, and they enjoy a public privilege. They should meet their responsibility to help all property owners obtain insurance.

*The Panel Recommends:*

**No agent or broker should be permitted to refuse an application for a line of insurance which he is licensed to write.**

## 9. All-Industry Placement Facility

Some companies avoid writing insurance in the inner city by not appointing agents who are likely

**90**

to receive applications from that area and by discouraging agents from accepting applications from the area. The task of meeting the insurance needs of urban core owners thus falls on a relatively small group of companies.

It is prudent business judgment for an insurance company to spread the risks it has insured. If it insures only risks in a small geographic area, it can suffer large losses as the result of a single local catastrophe.

Most Urban Area Plans do not now provide a mechanism for distributing the applications for insurance from the urban core among the insurance companies admitted to do business in the state. A mechanism of this sort is necessary to prevent particular companies from holding back from these areas.

*The Panel Recommends:*

**Any agent or broker should be permitted to submit an application for insurance, along with an inspection report, to an All-Industry Placement Facility, licensed to do business with all companies participating in a FAIR Plan; and this facility will seek to place the insurance.**

## 10. Commission Paid by the Facility

The All-Industry Placement Facility will perform the task ordinarily performed by an agent or broker in seeking out a company to provide insurance. If an agent or broker could obtain the same commission from using the placement facility as he obtains from the companies he normally places business with, he might rely on the facility rather than canvass his normal market. We do not intend that the facility be a substitute for the agent's normal market. To avoid this, the commission paid on business written through the facility should be less than the normal commissions paid by insurance companies.

Nevertheless, the commission should not be reduced to such an extent as to discourage the agent from seeking out inner city business.

A balance must be struck so that the use of the facility is sufficiently attractive to the producer to encourage him to seek out business in the inner city, while leaving a further incentive for him to place the business through his normal markets when he believes this is practicable.

Each FAIR Plan can best determine what commission arrangement will best strike this balance.

For example, one Plan might make commissions 85 percent* of normal commissions, others might use other figures. The difference between the usual commission and that paid on regular business can be used to help defray the expenses of the All-Industry Placement Facility. A slightly reduced commission should not, however, discourage the producer from seeking inner city business in view of the assistance that will be provided by the placement facility on hard-to-place risks.

*The Panel Recommends:*

**The commission allowable to an agent, broker, or other producer submitting an application for insurance through the All-Industry Placement Facility should be somewhat less than the normal commission rate paid by the company that accepts the application. If the company normally pays no commission, an appropriate commission rate should be established.**

## 11. When an Inspection Should Be Required

*Type of Plan.* There are two types of Urban Area Plans:

1. Those requiring an inspection by the Rating Bureau, or a waiver of the inspection, before insurance can be declined or written above standard rates. For the purpose of this discussion, this type of plan will be referred to as a "mandatory inspection plan."

2. Those providing an inspection only on request of the insurance company or agent; but no inspection is required before insurance is written above standard rates. For the purpose of this discussion, this type of plan will be called the "selective inspection plan."

Each type of plan has advantages and disadvantages. A selective inspection plan is the least costly to administer. It helps provide insurance for those property owners who are sufficiently sophisticated about the intricacies of insurance costs and about the insurance marketing and regulatory system to know when and where to complain. But as the facts gathered in the course of the Panel's work show, most people lack this knowledge. Consequently, they receive little help. They are frequently sold insurance at prices in excess of the standard rate even though their property presents no unusual risk. Thus, while selective inspection

---

*Figure is illustrative only.

91

plans serve to help those who complain, they do little to provide insurance in the urban core at reasonable prices.

Mandatory inspection plans have the advantage of giving every property owner who has difficulty obtaining insurance at standard rates an opportunity to have his property inspected by an impartial and disinterested expert. If the property has defects which present significant risks, they are specifically pointed out to the owner, so that he has an opportunity to correct them. This may not only save him money on insurance premiums but, more significantly, may help prevent a fire that could take the lives of the owner and his family. If he does not correct the defects in a state with a surcharge rating plan, he will pay an extra insurance premium for only the specific defects that go uncorrected.

Moreover, the required inspection plan provides a record on properties that may be appropriate targets for community development programs. Further, statistics developed under the required inspection plans will aid the state insurance departments to develop better information on loss experience and thereby facilitate rate regulation and loss prevention.

The Panel recognizes that the required inspection plan tends to disrupt part of the present market for insurance sold at more than standard rates—the high hazard or so-called substandard market. It deprives this market of properties that are insurable at the FAIR Plan rates. We do not believe, however, that it will totally disrupt this market. There will still remain properties in poor condition that cannot be insured under the FAIR Plan and might be uninsurable even in the state pools. These risks may then be appropriate for the high hazard insurance market until corrective action can be taken to improve or demolish the property.

*Waivers.* All Urban Area Plans now allow an owner to waive his rights under the plan in one way or another. The waiver is susceptible to considerable abuse. As noted in the discussion of the waiver provisions under the Michigan Plan, some agents, without knowledge of the actual condition of their clients' property, try to get their clients to sign waivers. As a result, much of the advantage of the inspection program is lost. Moreover, the statistics developed under the plan are less meaningful.

We do not believe that an owner should be required to have his property thoroughly inspected by a private organization as a condition to obtaining insurance. On the other hand, we do not believe that a waiver provision should be included in the FAIR Plans. If the owner will not allow the inspector into his property—and experience in Boston, Buffalo, and New York indicates that this is a relatively rare occurrence—at least an exterior inspection should be included in the FAIR Plans.

*The Panel Recommends:*

**No risk should be written at a rate in excess of the applicable FAIR Plan rate, or by a non-admitted company, unless the property has been declined by an admitted company at the FAIR Plan rate, based on information from an inspection report under the FAIR Plan.**

## 12. Requests for Inspection

Some existing Urban Area Plans allow the property owner to request an inspection. Indeed, the Minnesota Plan requires the property owner to make the request. Other plans allow only the producer or the company to request an inspection.

An advantage of permitting the property owner to request an inspection is that he can obtain an inspection even when he cannot locate an agent or broker to request one for him. While this problem should be greatly alleviated under the FAIR Plan, other advantages accrue from allowing the property owner to request an inspection. First, he may wish to deal with a company that has or wants no agents in his area. Second, he may have more confidence in the inspection system if it is keyed to him rather than to the company. This seemed important to property owners in Boston, where the original plan was amended to allow property owners to request inspections.

Some plans require a written request for an inspection. Experience under plans that have no such requirement, or where it is not enforced, has demonstrated that the requirement is unnecessary. Omitting it facilitates rapid operation of the inspection plans.

*The Panel Recommends:*

**A property owner or his representative, an insurance agent or broker, or an insurance company should be entitled to request a FAIR Plan inspection. The request need not be in writing.**

92

## 13. Inspections

Inspections under existing Urban Area Plans are made by the local rating bureau. This organization normally inspects and sets the rates for fire and extended coverage insurance for each mercantile and commercial building in metropolitan areas. It therefore has been the logical choice to inspect dwelling properties under the Urban Area Plans. Since the expenses of the bureau are shared by the affiliated insurance companies in the state in proportion to the amount of premiums they each receive in the state, using the rating bureau to perform inspections under Urban Area Plans spreads the costs of core area inspections throughout the state's insurance industry. The expansion of the plans may require other or additional means of spreading the costs of inspections. Individual property owners have not been charged for the inspections, and this should continue to be the case under FAIR Plans.

Because some bureaus may lack the facilities to perform inspections outside of the larger metropolitan centers they normally serve and because crime insurance is not within the jurisdiction of rating bureaus now involved in Urban Area Plans, some state insurance departments may wish to designate another agency to perform the FAIR Plan inspections or to make appropriate divisions of responsibility between different agencies. We believe the state insurance departments should have this flexibility.

It should be recognized that some insurance companies and some producers may request inspections even when they are not necessary to determine insurability. Provision should be made in the Plan to provide that, subject to review by the state insurance department, such company or producer be charged the cost for unwarranted inspections under the Plan.

*The Panel Recommends:*

**Inspections under FAIR Plans should be made without cost to the property owner by the local rating bureau or any other agency designated by the state insurance department. Subject to review by the state insurance department, a company or producer may be charged for unwarranted inspections under the Plan.**

## 14. Procedure After Inspections

We have found that under existing Urban Area Plans, when a company receives an inspection report, it is generally faithful to its commitment to provide insurance without regard to the area in which the property is located.

We have also found that the reporting procedures under the plans provide valuable information. Under a few plans, the state insurance department is provided with a copy of the inspection report if a company declines to provide coverage. In this way, the insurance department can discuss the risk with the company if the company seems to have given an inadequate reason for its refusal. This procedure appears to us to offer the greatest promise of assuring that all participating companies will discharge their responsibility to help provide an adequate insurance market in the inner city. Moreover, it provides a record of problem property that cannot be insured and that may need to become the target of other programs designed to revitalize inner cities.

A copy of the report should also be given to the insurance department when the insurance company agrees to write the risk on condition that certain hazards be removed. In this manner, the department can keep a current check on the existing conditions that give rise to insurance problems.

The property owner should also receive a copy of the report whenever the company does not provide coverage, together with an explanation of either (1) the conditions that must be corrected before coverage will be written or (2) the reasons why the company will not provide insurance. This explanation will help the property owner repair his property to bring it up to insurable condition. The explanation should also advise the property owner of his right to appeal any adverse decision to the insurance commissioner.

*The Panel Recommends:*

**After the FAIR Plan inspection report is received, the company should determine whether the property meets reasonable underwriting standards at the applicable premium rate. The company may then:**

**a. Write the coverage;**

**b. Agree to write the coverage if certain improvements are made, which are specifically noted in an action report; or**

93

c. Decline to write the coverage, the reasons for declination to be clearly specified in an action report.

In all cases, the company should notify the inspection bureau or other agency designated by the insurance department of its decision and return the inspection and action reports to the designated agency. These reports should be kept on file with that agency.

If the company declines the risk or agrees to write it on condition that the property be improved as specified, the company should also send a copy of the inspection and action reports to the applicant for insurance and the insurance department. The company should inform the applicant of his right to appeal to the state insurance commissioner.

### 15. Amounts of Insurance

Present Urban Area Plan statistics indicate that a risk has been accepted if any insurance is written on the property. But in some cases the insurance may be significantly less than the owner requested, and inadequate to protect his investment.

There are a number of reasons why an individual insurance company may wish to provide coverage for less than the full value of the property being insured. Whatever the reason, when the property owner's agent or broker lacks the connections with a sufficient number of companies to apportion the risk among several companies, the property owner may be left exposed to considerable loss. Indeed, where the owner has a substantial mortgage on his property, he may stand to lose his entire equity in the property if he is unable to obtain coverage for the full insurable value of his property.

To help prevent this, we believe that the insurance industry, through the All-Industry Placement Facility, should assist the owner in obtaining insurance for the full insurable value of his property.

We nevertheless recognize the possible need for deductibles, percentage participation clauses, requirements for protective measures, and other common underwriting devices to avoid excess claims adjustment expenses and to encourage loss prevention measures by the owner. For example, special deductibles and policy limitations may be appropriate for burglary and robbery coverage on liquor stores and pawnshops.

*The Panel Recommends:*

Insurance coverage should be available to the full insurable value of a property. If any single company will not underwrite the full insurable value, the All-Industry Placement Facility will assist the owner and his agent or broker in obtaining the desired coverage from other participating companies. Less than full coverage may be provided only where deductibles, percentage participation clauses, and other common underwriting devices are needed to meet special problems of insurability.

### 16. Records

All policies written under the FAIR Plan should be separately coded so that statistical records may be kept for purposes of rating, loss prevention, and other studies of the operation of the Plan. At present, too little is known about the causes and the extent of hazards in the inner cities.

Better information needs to be developed about the causes of fires in inner city areas so that they can be reduced or eliminated, and so that appropriate insurance rates can be determined and appropriate underwriting techniques employed.

New statistics must also be maintained on crime losses to determine the best and most effective loss prevention devices to deter crime and keep losses to a minimum.

The FAIR Plan should issue annual reports on its operation so that all interested parties may judge its results.

The rating bureau or other agency designated by the insurance department should send quarterly reports, in addition to the annual report, on the operation of the Plan to the insurance department. These reports should also be sent to each city in which the Plan operates, as they will be useful to those charged with the responsibility of administering building and safety codes.

*The Panel Recommends:*

The inspection bureau should submit to the insurance department and to each city in which the plan operates quarterly reports setting forth by individual company the number of risks inspected under the FAIR Plan, the number of risks accepted, the number of risks conditionally approved and reinspections made, the number of risks declined, and other information as the insurance department

94

may request. These reports, as well as an annual report on the operation of the Plan, should be made public.

Daily reports for policies written under the FAIR Plan should be separately coded so that proper statistical records can be kept.

## 17. Regulation

We believe that the Plans should be regulated by the state insurance departments and that their operation should receive much more supervision than have the Urban Area Plans.

One criticism of the Urban Area Plans is that they do not provide coverage promptly. While waiting for coverage, the property owner must suffer the risk of loss or pay an insurance premium that may bear no relationship to the degree of risk presented by his property. Every effort should be made to provide prompt inspections of property and prompt decisions by the insurance companies.

In some states it may be desirable to extend the period of notice for cancellation by companies so as to give property owners an opportunity to determine whether coverage can be placed under the FAIR Plan or the state pool.

The state insurance department may also wish to establish additional procedural requirements to assure the successful operation of the Plan in the light of local needs.

*The Panel Recommends:*

**FAIR Plans should be subject to regulation by the state insurance departments. An insurance department may promulgate rules and regulations applicable to the Plan to limit cancellations, assure prompt issuance of policies, and establish other procedural requirements to assure the successful operation of the Plan.**

## 18. Rates

Each state has developed its own laws regarding the regulation of premium rates for insurance. We believe that the states should continue to regulate them.

We believe, however, that the level of rates generally applicable in the state should also be applicable under the FAIR Plan and that, to the extent practicable, no additional rate should be charged for environmental hazards.

Surcharges, if needed, should be permitted only for demonstrable hazards of the property itself. Care must be exercised by state regulators to assure that any conditions being surcharged are in fact additional hazards and not merely a means of obtaining an unjustified general increase in the premium rate in the blighted area.

*The Panel Recommends:*

**Rates under FAIR Plans should be regulated by the states. To the extent practicable, no additional rate should be charged for environmental hazards. Surcharges, if allowed, should be carefully limited to demonstrable hazards and a maximum should be established.**

## 19. Public Education

We have found that many property owners are unaware of the existence of Urban Area Plans in their community. Indeed, we discovered that many agents and brokers are unaware of the plans. Property owners must know that the FAIR Plan exists before it can meet their needs.

*The Panel Recommends:*

**A cooperative and continuing public education program should be undertaken by the insurance industry, local officials, news media, rating bureaus, and state insurance departments to assure that FAIR Plans are given the full publicity they need.**

## B. State Pools or Other Facilities, Where Needed, for Insurable Properties Declined Under FAIR Plans

Under the FAIR Plans, the individual insurance companies make the underwriting decision as to which properties will be insured. This is entirely appropriate and, if an adequate insurance market for insurable properties will then result, can be sufficient to meet inner city insurance problems. There must, however, be governmental supervision to assure that all responsible property owners who meet reasonable underwriting standards have the opportunity to obtain needed insurance protection.

In this section we suggest various methods by which a state can supervise and supplement its

95

Case: 1:13-cv-08564 Document #: 134-2 Filed: 08/11/17 Page 115 of 190 PageID #:3396

FAIR Plan to assure that the property insurance needs of its citizens are being met. In many instances our recommended program here is less detailed than our discussion of the FAIR Plans themselves. There may be a variety of means by which a state can take vigorous action to meet any property insurance needs beyond those handled through its FAIR Plan. We believe that the states should continue to have the primary responsibility for choosing the means most appropriate to meet their particular needs.

In some states governmental supervision of the FAIR Plans in operation may be adequate to meet the insurance needs of the public. In other states, a special facility may be needed.

## 1. State Pool

We believe this facility in most instances can be efficiently created by insurance companies combining their resources to form a state pool. This arrangement utilizes the existing talents and resources of the private insurance industry to the fullest extent.

*Alternatives.* Some states may believe that providing insurance for problem risks can be better handled through a different method more suitable to local institutions. For example, a state could develop a state insurance fund to provide reinsurance for companies directly writing problem risks, or a state insurance company to underwrite problem properties directly.

If a state does use an alternative method to support and supplement its FAIR Plan, the issues discussed below in the context of state pools will nevertheless be generally relevant. The underlying problems to be solved will be the same whatever mechanism is decided upon.

*Insurable Properties.* It is difficult to draw the line between those properties which a state pool should insure and those it should not. The problem is complicated by a lack of detailed knowledge of specific hazards which present significant insurance risks and, consequently, significant risks to the lives and property of the owners and other residents in the community.

Generally speaking, compliance with all building and sanitation code provisions should not be an automatic prerequisite to obtaining insurance. Some building and sanitation code violations present obvious fire hazards, and some may make a

property an open target for crime. But others have no bearing on insurance risks. Violators of these latter ordinances should, of course, be subject to the penalties provided by law; but we do not believe they should also incur the additional penalty of being deprived of insurance protection.

Without attempting to specify where the line for state pool help in providing insurance should be drawn, the Panel believes that all well-maintained property in the hands of responsible owners should be insurable without regard to environmental hazards.

*Environmental Hazards.* Some responsible owners of well-maintained property may be unable to obtain insurance even after an inspection under the FAIR Plan. Although the property itself is in good condition, it may be next door to a firetrap or other extra-hazardous building, exposed to unusual crime risks, or subject to other environmental hazards. Insurance for this property should, nevertheless, be available.

The responsible property owner who keeps his property in good condition should not be unfairly penalized because of his neighborhood. If he is denied insurance for reasons beyond his control, he will lose an incentive to give his property the care it needs. The result can only be a decline in the area and a further spread of urban blight. Looking at it another way, the responsible owner who wants to rehabilitate or improve his property should have the incentive of knowing that his property will be insured when it is in adequate condition. This can help to reverse the spread of urban blight.

The insurance industry in the past has ordinarily declined this type of property. In some states, FAIR Plans may now enable this property to be insured without the necessity of resorting to a state pool. The All-Industry Placement Facility licensed to do business with all participating FAIR Plan companies holds particular promise as a means of fairly and equitably distributing these problem risks on a voluntary basis.

In other states the volume of problem risks may make handling them under the FAIR Plan unfeasible. These states may want to establish pools to distribute environmental risks more equitably throughout the insurance industry. A pool also has the advantage of being a convenient means through which the government can participate, if necessary, in helping to insure environmental risks.

*Uninsurable Properties.* State pools cannot guarantee access to insurance for all property.

96

There will be property in the hands of irresponsible owners that cannot be insured on any terms. There will also undoubtedly be a category of property that cannot, as a practical matter, be insured—property that is itself in hazardous condition and cannot or will not be repaired by the owner. We do not suggest that this property be insured. We believe that these hazards to life and surrounding property should be the target of renewal programs designed to revitalize blighted areas.

*Lines of Insurance, Areas Served, and Eligible Property.* The purpose of recommending a state pool is to supplement the FAIR Plans by providing needed insurance coverage where the FAIR Plans alone are not sufficient to provide it. We believe that fire and extended coverage, vandalism and malicious mischief, and burglary and theft insurance—the lines of insurance most essential to rebuilding and revitalizing the urban core—should be available under the FAIR Plan throughout the state. A state may determine that additional kinds of or lines of insurance should be included. A state in cooperation with the insurance industry is free to specify where and what type of coverage will be offered by its pool in order to meet the particular insurance needs of its citizens that are not being met through its FAIR Plan.

Some states may wish to create a state pool for fire and extended coverage insurance, including the vandalism and malicious mischief endorsement, before creating a pool for burglary and theft insurance. This would represent a useful step forward. It would be preferable to delaying the creation of a pool until complete data have been gathered on all of the insurance problems of the state's citizens.

Other states may find that the FAIR Plan is adequate to meet its citizens' insurance needs for one kind or one line of insurance but not for another. In that event a state might create a pool for only those kinds or lines of insurance necessary to provide needed coverage.

Some states may also find that the FAIR Plan is adequate to meet the insurance needs of its citizens except those located in specific areas. Consequently, the state may wish to limit the areas in which the state pool will provide coverage.

While a state pool could be used to provide insurance on seashore and similar properties, a state may prefer to exclude these properties in order to concentrate its efforts and resources on the urban core insurance problems.

The pools should apply to those dwelling, mercantile, and commercial risks that are not covered adequately by FAIR Plans, and they should, if necessary, provide coverage for both buildings and contents.

The Panel is hopeful that most of the basic insurance needs of our nation's property owners can be met through voluntary efforts under the FAIR Plans. To the extent this is impossible, additional action should be taken to meet these needs and provide the required coverage.

*The Panel Recommends:*

**State pools or other similar facilities should be established to assure, to the extent needed and practicable, the availability of:**

**—Fire and extended coverage insurance;**

**—Vandalism and malicious mischief insurance; and**

**—Burglary and theft insurance;**

**for all insurable dwelling, mercantile and commercial property, including both building and contents.**

## 2. Further Study of Problems

Some states may recognize that their existing insurance problems are substantial and may wish to establish pools immediately. States that are uncertain whether a pool is necessary may wish to evaluate the data developed under their FAIR Plans for one or two years before deciding whether to establish a pool. During this time these states can evaluate the nature and extent of their own insurance problems; they can review the operations and experience of pools in those states that have moved forward more rapidly. Additional data should also then be available on loss experience and loss prevention techniques. All this information should help a state establish reasonable underwriting criteria and determine whether a pool is necessary to provide insurance at reasonable prices to all responsible property owners who adequately maintain their property.

*The Panel Recommends:*

**Within two years, a state will certify to the National Insurance Development Corporation (as described in part (C) below) whether a problem of availability of property insurance remains for property that meets reasonable underwriting standards without regard to environmental hazards. If a problem does remain, the insurance industry and**

the state have one additional year in which to form a pool (or other similar facility) for providing the needed insurance. This action will be a condition to continued availability of reinsurance from the NIDC against the risk of extraordinary riot losses in that state.

## 3. Pool Organization and Management

There are many different ways in which a state pool might be organized. Membership in the pool might be voluntary in those states where all but an insignificant portion of the industry are willing to cooperate to form a pool. Other states may want to assure broad industry participation in the pool by requiring membership.

Some states may wish to place a maximum limitation on the amount of insurance to be written by the state pool, as is now done under the Watts Pool.

Other states, however, may wish to allow the state pool to provide insurance to the full extent needed, whatever its amount.

Some states may want the pool management to limit the number of risks insured by the state pool by attempting to place any risk offered to the pool in the voluntary insurance market. Other states may believe that the state pool would benefit from insuring a broad range of properties and consequently be willing to insure some properties that might have been placed in the normal insurance markets.

Procedures also need to be developed for submitting problem risks to the state pool. The All-Industry Placement Facility may be one promising possibility. Its advantage lies in making certain that the normal market has been exhaustively and unsuccessfully canvassed before a risk is sent to the state pool. Some states may desire to have the insurance companies that declined risks submit them directly to the pool, a procedure that could be faster than going through the All-Industry Placement Facility.

Not enough is presently known about the operation of pools in the urban core for the Panel to make any detailed recommendations on their organizational structure. We believe that each state should have the opportunity to develop whatever type of pool it deems appropriate and desirable.

We also believe that each state should determine whether its pool will be managed by representatives of the participating companies alone, or whether there will be state government or other representation.

*The Panel Recommends:*

**Where a state pool or other facility is needed, each state should develop the organizational structure, operating procedures, and management policies it deems necessary to meet promptly the basic insurance needs of its citizens.**

## 4. Agents' and Brokers' Commission

In our discussion of FAIR Plans, we pointed out that the commission structure should encourage agents and brokers to seek insurance for property owners through their normal market channels. The same considerations apply here. Commissions should not be reduced to an extent under the state pool—which is not a "normal market channel"—that discourages producers from handling urban core business that might be placed with the pool.

In the discussion of the Watts Pool and elsewhere, it was noted that a commission structure that is too low can operate to the detriment of the consumer. Where commissions are too low, the producer will lack an adequate incentive to perform the job needed to provide insurance for center city property.

*The Panel Recommends:*

**The commission for agents or brokers on policies written by the state pool or similar facility should be somewhat less than the average commission paid by the insurance industry in the state for policies written at standard rates.**

## 5. Operation of the State Pools

The states have various means available to assure the adequacy of state pools in meeting the public's needs, while at the same time assuring their fairness to the participating insurance companies. The states, for example, will determine:

—the underwriting standards for admitting business into the pools;

—the limits of the pools' capacity;

—the rates to be charged for business placed outside the pools; and

—the premium taxes to be assessed on insurance companies throughout each state.

98

With these and other variables, the states have sufficient powers to assure the successful operation of the pools.

We believe that state pools should be designed to offer needed insurance protection for all well-maintained properties in the hands of responsible owners at reasonable prices regardless of environmental hazards.

We recommend that the pool charge no additional rate for environmental hazards. We recognize, however, that some states may depart from this recommendation because of financial limitations or other valid reasons. Yet we believe that it is incumbent on the states and on the insurance industry to try to provide needed insurance on well maintained property without penalizing the owner because of environmental risks over which he has no control. Should an additional charge for environmental hazards prove necessary, we recommend that it be kept to the absolute minimum possible so as to keep insurance premium costs within the financial reach of the urban core resident.

Some states may decide that the most appropriate method for limiting losses in the pool would be for the state to provide a direct financial backup to the pool.

Alternatively, if insurance rates are adequate throughout a state to permit sufficient profits by companies generally, companies might be assessed some portion of their underwriting premiums. Special credits might be given to companies providing insurance on problem risks that might otherwise have been placed in the pool. This would avoid an excessive financial burden on those companies that actively underwrite urban core properties and would encourage other companies to seek this business.

After a state has established a workable pool, it might reinsure a share of non-riot (as well as riot) losses with the National Insurance Development Corporation. The terms on which such reinsurance would be available could be negotiated by the state and the National Insurance Development Corporation.

None of these financing measures may be necessary. It may well be that intensive loss prevention and education campaigns, deductibles and other similar insurance devices, as well as prudent pool management, may keep pool losses within limits that can be absorbed, through premiums, by the pool itself. But if this is not possible, then some additional form of financial support will be necessary.

*The Panel Recommends:*

**A state pool or similar facility, where needed, should offer insurance for all well maintained properties regardless of environmental hazards. To the extent possible, no additional rate should be charged for environmental hazards.**

**If necessary, the states, in cooperation with the National Insurance Development Corporation, should institute a program to provide financial support to state pools (or similar facilities) to pay any significant losses and expenses in excess of the pools' premium income and accumulated profits.**

## 6. Records

Each state pool should maintain adequate records to detail its income, expenses and losses, and the causes of loss. The information developed on loss experience and causes of loss should be made available to the National Insurance Development Corporation as well as to the state insurance departments and cities in which the pool operates. Information on loss experience, cause of loss, and loss prevention techniques can then be developed on a nationwide scale. Such information would be a valuable aid in developing techniques for insuring properties in urban core areas, as well as in developing techniques to protect lives and property from loss.

The pool should issue detailed quarterly reports on its operations and a full annual report analyzing the experience of the year.

*The Panel Recommends:*

**State pools should maintain adequate records and issue quarterly and annual reports on their operation, to be sent automatically to state insurance departments and cities in which the pools operate, and made available to the National Insurance Development Corporation.**

## C. National Insurance Development Corporation To Carry Out Vital But Unfulfilled Insurance Functions

A number of vital insurance functions remain to be fulfilled even after FAIR Plans and state pools are in operation.

99

Despite constructive actions by state insurance departments in encouraging companies to offer insurance in urban areas and developing special programs to expand the insurance market there; and despite the fact that most insurance companies have acted responsibly and have continued to offer existing levels of insurance in the urban core, the recent civil disorders have further constricted the already tight market in inner cities. Some insurance companies are already considering how to avoid future losses in areas that past experience has indicated might conceivably be damaged from riots.

Testimony before the Panel during public hearings underscored the need of insurance companies for some form of backup to protect against catastrophic riot losses. The acute withdrawal of insurance protection that might otherwise result would have tragic consequences for urban core property owners.

## 1. Formation of the National Insurance Development Corporation

To eliminate the riot risk as an impediment to the active participation of companies in the urban core insurance market, and to preserve coverage against the riot peril in the standard lines of insurance in which it presently exists, protection must be provided against extraordinary riot losses. We believe this protection can be best provided by marshalling the resources of the insurance industry and adding to this the assistance of state and federal governments. As the medium for bringing the essential elements together, we propose that a National Insurance Development Corporation (NIDC) be organized pursuant to federal legislation. The NIDC could distribute the risk of extraordinary loss from civil disorders—a problem of importance to all Americans—throughout American society.

The NIDC will also provide an organizational framework for performing a number of vital functions in support of FAIR Plans and state pools. It can gather essential information on inner city insurance markets and provide loans to help state and federal governments reduce the number of problem risks in the urban core. When its assets are sufficient, it can provide funds to assist the operations of state pools.

*The Panel Recommends:*

**The Federal Government should organize a National Insurance Development Corporation to take responsibility for a number of vital but unfulfilled functions in support of the actions of private industry and states in the operation of FAIR Plans and state pools.**

## 2. Organizational Structure and Management

The National Insurance Development Corporation would have no shareholders. It would not seek to make a profit but would use its assets to make insurance more widely available to the public. The NIDC would be managed by a board of directors appointed by the President. The board would be composed of representatives of the public, the insurance industry, the states, and the federal government. The non-government representatives would be subject to confirmation by the Senate.

For example, there might be nineteen directors: six directors could be chosen from the public; four from the states—perhaps two governors and two state insurance commissioners; three from the insurance industry; and six from the federal government—representatives of the Department of the Treasury; the Department of Justice; the Department of Housing and Urban Development; the Department of Commerce; the Small Business Administration; and the Office of Economic Opportunity.

The day-to-day operating functions of the NIDC should be carried out by an Executive Director appointed by the President, confirmed by the Senate, and working under the general supervision of the board of directors.

This form of organization would provide the NIDC with a broad spectrum of knowledge, experience, and points of view. It would also provide a meaningful working ground for each segment of society which must share the responsibility for meeting the insurance needs of our nation's cities.

*The Panel Recommends:*

**The NIDC would be managed by a board of directors and an executive director appointed by the President of the United States. The executive director would be responsible for the day-to-day operations of the NIDC and operate under the general supervision of the board of directors.**

100

### 3. Coverage Offered by the NIDC

The NIDC would offer participating insurance companies reinsurance against catastrophic losses arising from riots. By thus reinsuring the companies' primary liability for damage from civil disorders, the NIDC would provide the protection the insurance industry finds necessary to write insurance actively on inner city property.

NIDC reinsurance would be offered only to those companies fully participating in FAIR Plans and, where they exist, in state pools. We believe that companies unwilling to carry out to the full their social responsibility in meeting the insurance problems of our cities, should be ineligible for governmental assistance designed to alleviate these problems.

NIDC reinsurance would be available for all lines of insurance for which participating companies pay reinsurance premiums. This broad coverage will assure the continuation of riot protection in all lines of insurance in which it presently exists.

Property insurance protection always involves establishing a maximum amount of liability to be borne by the insurer. The coverages written by the primary insurer establish an overall limit of liability for itself and its reinsurers. The primary insurer has a basic retention of liability and then seeks to reinsure all or a part of the remainder of its liabilities. Depending upon the amount of premium the primary insurer is willing to retain, and the nature and extent of the reinsurance it seeks, various reinsurance arrangements are possible.

From the reinsurer's standpoint, the maximum exposure it will accept will depend on the amount of premium it receives, the type of reinsurance that is written, the exposure to loss, and other variables. In general, a reinsurer accepts a maximum liability that is safely within its financial capacity, which may involve an outer limit below that of the underlying policies reinsured. Such outer limits may be set by government reinsurance programs just as in the case of private reinsurance. Whether this should be done, and if done, what the precise limits should be, depends upon an assessment of all the elements of the reinsurance arrangement, including what is necessary to accomplish its basic purposes.

Thus, two of the principal questions that must be resolved in establishing the reinsurance arrangement are:

    1. What level of losses should the participating companies retain?

    2. What amount and type of reinsurance should be provided?

The reinsurance, for example, might apply to 90 percent* of each member company's riot losses in excess of, say 3 percent* of the company's annual premiums earned on reinsured lines in the state in which a riot occurs. This form of reinsurance is referred to as "stop-loss reinsurance".

The industry would participate, for example, in 10 percent* of the losses above the stop-loss point to give it a financial interest in the settlement of claims.

With this proposed riot reinsurance, the insurance industry will have new incentives to provide property insurance—including protection against civil disorders—to all property owners.

*The Panel Recommends:*

**The NIDC should offer stop-loss riot reinsurance to companies that fully participate in FAIR Plans and, where they exist, in state pools, for all lines of insurance for which the company pays reinsurance premiums. Companies would retain a small percentage participation above the stop-loss point, to assure the responsible settlement of claims.**

### 4. Premiums

To obtain reinsurance, a company will pay a premium to the NIDC. The amount of the premium, for example, could be 2 percent* of its annual premiums earned in each state for each line of insurance for which it desires reinsurance protection. These premiums, held by the NIDC, would create a fund to pay reinsured losses.

If, for example, the property insurance companies in the thirteen states which now have Urban Area Plans had paid a 2 percent premium in 1966 for reinsurance on all lines of coverage providing riot protection, the NIDC would have received approximately $50.2 million.** If the

---

*Figures are illustrative only.
** Figures calculated from premiums on the following lines of insurance: fire, extended coverage, other allied lines, homeowners (85% of premiums used), commercial multiple peril (65% of premiums used), inland marine, glass, and burglary and theft. The figures would be considerably larger if automobile physical damage were included.

101

property insurance companies in all states had paid the same reinsurance premium in 1966 on all lines of insurance providing riot protection, the NIDC would have received approximately $94.2 million.

In addition, if a state actually suffers a riot, each participating company in that state could also be assessed an additional premium if the NIDC pays any riot losses there. This assessment would be made only on companies that had not sustained riot losses in that state equal to the 3 percent* retention. The assessment would not exceed 3 percent* of a company's annual premiums earned in the state in which the riot occurred, less any riot losses paid in that state by the company, and would be made for only those lines of insurance which were reinsured.

The purpose of the assessment is to neutralize the riot risk as a factor in insurance company underwriting decisions. If a riot occurs in any area of the state, each participating company may be called upon to pay up to 3 percent* of its annual earned premiums on lines reinsured in that state, whether or not it provided insurance in the riot-affected area.

We believe that companies should pay reinsurance premiums on a state-by-state basis, and that losses should also be calculated in the same way. To do otherwise would disadvantage companies that write insurance in more than one state, by requiring them to absorb larger losses before obtaining the benefits of reinsurance.

We also believe that within a state, the 3 percent* retention should apply to all reinsured lines combined, and not to each particular line, to avoid processing and paying claims at too low a level.

*The Panel Recommends:*

**(a) Insurance companies should pay reinsurance premiums to the NIDC equal to a percentage of the annual premiums earned in each state for which the company desires riot reinsurance protection; and**

**(b) Companies should be assessed an additional reinsurance premium of up to the stop-loss percentage of the premiums earned for each reinsured line of insurance in a state in which the NIDC pays any riot losses, less any riot losses actually paid in that state by the company.**

*Figures are illustrative only.

102

## 5. State Participation

Maintaining law and order is primarily a local responsibility. We believe, therefore, that a state should assume a portion of the financial burden in the event that riots occur in that state. Further, the states regulate and collect substantial taxes from the insurance industry. Thus, any state that as part of its pattern of dealing with the insurance enterprise desires reinsurance from the NIDC for riot risks in that state, should pass appropriate legislation making provision for a state government layer of financial backup. This action should be taken within a reasonable period, say one year, after federal legislation is enacted to authorize federal backup of the NIDC (as described below) and should be retroactive to the date of enactment of the federal statute. If such state action is not taken within the one year period, then the insurance industry in that state would be ineligible for future riot reinsurance coverage from the NIDC on new policies; existing policies would, however, continue to be covered until the expiration of their term. Upon renewal, they would be treated as new policies and not be reinsured by the NIDC.

The state would assume responsibility for the first layer of losses within its jurisdiction after the reinsurance premiums collected from insurance companies for risks in that state were exhausted. This layer could be, for example, 5 percent* of the industry's annual property insurance premiums earned in that state. The state, however, would not be called upon to replace any reinsurance premiums paid by the state's insurance industry. It would instead pay only the actual losses, up to its limit, in excess of the premiums paid for reinsured lines in that state.

Funds for the state backup might be provided from existing or augmented premium taxes assessed on a state's insurance companies, or the funds might be provided from general revenues. A state might also wish to share its responsibility with units of local government to assure their continued cooperation in the maintenance of law and order and the prevention and control of riots.

We believe that it is equitable for a state in which a riot actually occurs to assume a portion greater than the other states of the financial burden for the losses resulting from the riot. Under our proposal, a state would not be called upon to make any

payment unless a riot actually occurs in that state, and then only if reinsurance premiums from that state are inadequate to pay the claims.

*The Panel Recommends:*

**Any state desiring reinsurance from the NIDC for risks in that state must pass appropriate legislation making provision for a state government layer of financial backup of the NIDC within one year after federal legislation is enacted authorizing federal financial backup of the NIDC. This commitment would be retroactive and would be a condition for the insurance industry in that state obtaining NIDC riot reinsurance on policies issued after the one-year period.**

### 6. Federal Participation

Thus far, our proposal has provided two sources of funds for the NIDC: reinsurance premiums; and state contributions for riots that actually occur. We do not believe this nation will experience riots that cause damage approaching the magnitude of these funds. Nevertheless, it is incumbent upon us to provide assurance that assistance will be available in the event of catastrophic riot losses which exceed the funds paid in to the NIDC.

This assurance can be provided by the federal government's giving the NIDC the authority to borrow from the United States Treasury the amounts needed to meet claims in excess of its assets, up to whatever limit might be prescribed by the Congress. This will assure immediate payments on reinsured riot losses. The loan would be of indefinite duration and would be repaid either from future reinsurance premium income received by the NIDC or, if necessary, by Congressional appropriations.

*The Panel Recommends:*

**Federal legislation should be enacted to provide that in order to permit immediate payment of reinsured riot losses, in excess of accumulated premiums of the NIDC and the states' contributions, the NIDC should have authority to borrow from the United States Treasury amounts needed to pay for losses in excess of its assets.**

**At the end of each year, the NIDC will use any assets in excess of liabilities to repay any federal government payments which it has received.**

*Example of the Operation of the NIDC Reinsurance Program.*

The NIDC reinsurance program would operate as follows:

Assume, for example, that during the first year of the NIDC's operation, insurance companies, after forming FAIR Plans, seek riot reinsurance in only sixteen states, and pay premiums into the NIDC of $40,000,000.*

If a riot occurs in one of these states, the companies would pay property owners for their insured losses. The companies paying losses would be reimbursed by the NIDC for 90 percent of their riot losses in excess of 3 percent of their annual premiums earned on all reinsured lines in that state (the retention). The NIDC would pay these losses from (1) its premium income (including assessments); (2) state backup; and (3) federal backup.

More specifically, assume a riot occurred in City A of State X and that the riot damage insured by member companies was $10,000,000. Members would assume losses equal to 3 percent of their annual premiums earned in State X plus 10 percent of the losses above the retention. Assume that the annual premiums earned in State X amounted to $100,000,000; 3% of that amount equals $3,000,000; 10 percent of the remaining $7,000,000 equals $700,000, for a total industry loss of $3,700,000.

The NIDC would then assume 90 percent of each member's losses in excess of the retention. This would be $6,300,000.

The NIDC would first pay out of its assets the amount of premiums (including assessments) contributed by its members to reinsure against riot losses in State X. Assume this to be $2,300,000.

This would leave $4,000,000 in additional reinsured losses to be paid through the NIDC.

State X, by adopting appropriate legislation (which would be required within one year from the formation of the NIDC) would be responsible for paying losses through the NIDC of up to 5 percent of the annual premiums earned by the property insurance industry in State X. Assume the 5 percent figure to equal $5,000,000. The state would pay the NIDC only $4,000,000, which would be enough to pay what remains of the NIDC's liability. The state might be called on to pay an additional $1,000,000 if another riot should occur in State X during that year.

---

*All figures and percentages in the example are illustrative only.

After reimbursement from the state, the NIDC would have $37,700,000 in assets ($40,000,000 − $2,-300,000 − $4,000,000 + $4,000,000).

Suppose that in the same year a riot then occurred in City B of State Y and member-company insured losses total $83,000,000. Member companies would absorb losses equal to 3 percent of their annual premiums earned in State Y plus 10 percent of the losses above the retention. Assume $100,000,000 total earned premiums in State Y, so the 3 percent equals $3,000,000; added to this would be 10 percent of the remaining $80,000,000 of loss or $8,000,000, for a total industry loss of $11,000,000.

The NIDC would assume 90 percent of each member's losses in excess of the retention, or $72,000,000.

State Y, by adopting appropriate legislation, would reimburse the NIDC for reinsured losses of 5 percent of the annual premiums earned on property insurance in that state, or $5,000,000.

The remaining losses to be paid by the NIDC would be $67,000,000. The NIDC would use its assets, $37,700,000, to reimburse the member companies, and would borrow $29,300,000 from the federal government in order to make immediate payments to the companies that had sustained losses in State Y.

This loan from the federal government would be repaid from future reinsurance premiums paid to the NIDC or by monies appropriated by the federal government.

If State Y had not adopted appropriate legislation (either before or after the riot), the federal government would have to pay an additional $5,000,000. In this case, riot coverage in State Y issued after the first year, would not be eligible for reinsurance from the NIDC.

## 7. Investment of Money Accumulated in the NIDC

It may well be that the NIDC will accumulate a substantial amount of money. Consistent with NIDC's basic purpose of not seeking profits but of accomplishing social purposes, this money can and should be put to a variety of socially desirable uses.

For example, part of the funds could be made available to state or federal agencies to help urban core property owners rehabilitate their property to meet reasonable insurance underwriting standards. Funds could also be made available to the state

and local governments for the purpose of furthering police and fire protection, building and safety code enforcement, urban renewal, and similar programs. Such uses of funds would do much to help reduce the insurance risks in the urban core and help rebuild and revitalize these areas.

*The Panel Recommends*:

**The NIDC should be authorized to use its funds for socially desirable purposes related to its basic functions.**

## 8. Possible Aid to State Pools

As we have stated previously, we recognize that there is great uncertainty as to how state pools will function, and that their financing is subject to a number of variables.

The NIDC will be one possible source of support for state pools. When the NIDC has accumulated sufficient reserves, some of its assets might be available to reinsure state pools against significant non-riot losses as well as riot losses. The terms on which funds could be available would be negotiated between the states and the NIDC.

The need for the development of pools may intensify so rapidly that there will be no opportunity for the NIDC to accumulate reserves. To overcome the reluctance of the industry and the states to organize state pools, the NIDC might receive direct appropriations or loans from the federal government to help state pools achieve their results by offering them reinsurance on the non-riot as well as the riot risk.

A state pool which demonstrates that it is meeting the insurance needs of inner city areas would be eligible for this reinsurance. The state pool would also have to demonstrate that it was being prudently managed and that the state had made provision, to the full extent of its capacity to do so, for the financing of the pool.

Thus, a state might show that it was providing for the basic financing of the risks in the pool by the premium level throughout the state, the premium level for properties in the pool, direct subsidization, or some other manner. The NIDC would then supply a source of federal funds to back up this fully mobilized industry-state effort.

A small initial federal appropriation for this purpose might allow the NIDC to provide funds for a few states which move early to attack the problem aggressively. As experience is gained, this

**104**

would benefit all the states and provide the basis for determining whether additional appropriations are necessary.

Since the NIDC would be carrying out an expenditure of federal funds in discharging this function, the federal directors of the NIDC might need special powers in connection with these programs. Thus, a majority of the federal directors might have a veto on any reinsurance for state pools to make sure that they felt it was a prudent use of federally appropriated money. Nonetheless, the entire Board of Directors, including the state, industry, and public representatives, would be basically setting the terms of new uses of the NIDC backup.

Such a program would allow the states and the insurance industry to move forward more quickly in fully carrying out the objective of assuring all property owners equitable access to property insurance without regard to location or environmental hazards.

*The Panel Recommends:*

**The NIDC should be authorized to provide reinsurance to state pools for non-riot as well as riot losses.**

### 9. Responsibility to Assess Program

There are always uncertainties and difficulties connected with implementing new and wide-ranging programs. We are fully aware that the program we recommend may prove to be no exception. For this reason, the program must be monitored to assure that it is accomplishing its goals. This will require a staff to perform at least the following functions:

—Gather statistics on the operation of FAIR Plans and the state pools.

—Conduct surveys and studies in cooperation with state insurance departments and the insurance industry to assure that the program is working well to achieve its objectives.

—Gather statistics and prepare studies of reinsurance—especially alien reinsurance—and of direct insurance placed with alien companies. Very little is known about this vitally important part of the insurance industry which has significant bearing on the capacity of the industry to provide insurance and the rates it charges.

—Publish the results of studies and surveys and provide information and analysis to the public, the insurance industry, and state and federal governments.

—Make recommendations for any changes needed in the program to achieve its purposes.

The NIDC will be in a unique position to perform these functions. It can work in cooperation with the state insurance departments and the insurance industry in developing information on the types of hazards which present significant insurance risks and in developing effective and inexpensive loss prevention techniques.

The NIDC should help answer these and other questions relating to the problems of providing basic insurance protection in our cities at reasonable cost.

*The Panel Recommends:*

**The NIDC should monitor the operation of the Panel's recommended program, conduct studies and surveys in cooperation with state insurance departments and the insurance industry, and make recommendations for any changes needed in the program to achieve its purposes.**

### 10. Modification of the NIDC

The special income tax measures we propose (see section D) should help the insurance industry accumulate sufficient catastrophe reserves to eliminate the need for the special governmental financial backup of the riot peril provided through the NIDC. It would then be desirable to modify the functions of NIDC to provide for the full task of insuring the riot peril to be borne by the private insurance industry.

*The Panel Recommends:*

**The functions of the NIDC should be modified as soon as possible to eliminate the special government financial backing of the riot peril.**

### D. Tax Deferral Measures To Increase Capacity for Insuring Urban Core Properties

To aid the rapid development of our recommended program, we believe that the reserves of the state pools and the NIDC should be built up as quickly as possible. Further, we believe that individual insurance companies should be permitted

105

to accumulate reasonable contingency reserves for extraordinary losses from all insured perils.

Additional catastrophe reserves would assist the industry in meeting the basic insurance needs of the urban core.

The accumulation of these reserves would facilitate the growth and development of the American insurance market. It would also provide state insurance departments with more flexibility to require special contingency reserves for protecting against large losses. Finally, it may permit the industry to insure without government assistance new risks involving possible catastrophic loss—for example, the forthcoming supersonic transports.

An impediment to developing substantial catastrophe reserves at the present time is the operation of the existing federal income tax laws. Federal income taxes are based on the annual earnings of a company. Insured catastrophes such as windstorms, floods, earthquakes and riots, however, know no yearly bounds; they may occur at intervals of a few years or of several decades. They are predictable neither as to time of occurrence nor as to amount of probable loss.

Premiums to cover catastrophe risks are now taxed as income during non-catastrophe years. These taxes reduce the amounts that can be accumulated during these years to pay claims in future years when extraordinary losses actually occur. As a result, American insurance companies have relied more on reinsurance than they would otherwise do if they could develop greater contingency reserves.

Premiums paid to purchase reinsurance are now deductible from an insurance company's taxable income. We believe that funds added to contingency reserves should also be deductible in computing federal income taxes in the year the funds are added, provided a portion of such reserves—an amount equal to the tax benefit involved—are invested in special interest-free United States Treasury securities. Federal taxes on income added to the reserve would thus be deferred as long as the funds are held in the contingency reserve. The funds would then be available to pay losses, or if they are returned to the company's general funds, they would be taxable in the year they are returned.

Within such limits as may be prescribed by the federal law, each state under this proposal will authorize whatever reserves and premiums it determines to be desirable and appropriate. Thus,

limits will be placed on the amount of funds that can be accumulated in the tax-deferred reserves and restrictions placed on the circumstances under which these reserves will be available to pay catastrophe losses or, alternatively, to be returned to a company's general accounts.

These measures should allow substantial reserves to be accumulated. The portion of the reserves not invested in special securities would produce an investment return. In addition, it has been suggested to us that insurance companies should be allowed to obtain the benefits of investment return on the funds invested in special federal securities. We would not go so far.

Equitable tax treatment would be provided by requiring that the portion of the additions to the contingency reserves that would otherwise have been paid in taxes, be invested in special, interest-free United States Treasury securities. In this manner, the federal government will have the use of amounts that otherwise would have been paid in taxes. At the same time, the securities would be redeemable on demand whenever insurance companies needed funds to pay extraordinary losses. The securities could also be used to pay any taxes due whenever funds set aside in the catastrophe reserve accounts are returned to the companies to be used for other purposes.

We believe this approach equitably balances the need to allow the property insurance industry to accumulate catastrophe reserves, with the need to preserve the integrity of the federal tax structure. An approach similar to the one we recommend, designed to assist mortgage guarantee insurance companies in developing adequate contingency reserves, has recently been adopted by the Congress.

We also believe that the states should consider deferring some state taxes, at least on the amount of the premium referable to the catastrophe risk, to help facilitate the accumulation of catastrophe reserves.

Such tax deferral measures should be available only to those companies that elect to participate in FAIR Plans and, where they exist, in state pools.

When sufficient company reserves are accumulated, the financial backup by government we have proposed for the riot peril may no longer be necessary. The accumulation of reserves therefore holds the promise of phasing out this governmental support and restoring the full task of insuring the

106

riot and other unmeasurable perils to private resources.

*The Panel Recommends:*

**The federal government should enact legislation authorizing deferral of federal income taxes on amounts set aside by insurance companies in special reserves to meet extraordinary losses. Such legislation should provide for the following:**

**1. Any company desiring tax deferral would be required as a condition to participate in FAIR Plans and, where they exist, in state pools.**

**2. The portion of a company's reserve that would otherwise have been paid in taxes to the federal government will be invested in United States Treasury securities. These securities will be interest-free and non-transferable. Should the company incur catastrophe losses, these securities will be available to be redeemed for cash.**

**3. States will place limits on the amount of funds to be accumulated in the tax deferred reserves, within the limits established by the federal law, and will determine the restrictions on the circumstances under which the reserves can be used to pay losses or can be returned to the companies, within the limits established by the federal tax law.**

**4. Funds set aside in special reserves which are returned to the companies for general use will be taxable at the time of return.**

**The states should also consider deferring certain state taxes to facilitate the accumulation of catastrophe reserves.**

## E. Other Necessary Steps to Meet Special Problems of the Urban Core Insurance Market

The program we have recommended is designed to provide insurance to responsible owners who maintain their property in insurable condition. There are additional, related center city problems which require resolution by the insurance industry and government.

### 1. Manpower Training Programs

Manpower training programs should be developed by the Office of Economic Opportunity and the Department of Labor in cooperation with the insurance industry to train residents of urban core areas as agents and brokers. These persons should be specially trained to handle the insurance needs of inner city areas.

One program might provide that the agent being trained to help inner city property owners be paid a salary instead of commissions. Devoting his full time to studying how best to meet the insurance needs of owners of low-value dwellings and businesses, he could take the time that is often necessary to assist property owners to improve their properties and to obtain needed insurance.

These agents and brokers could do much to publicize FAIR Plans and other aspects of the program we recommend and could assist property owners who mistakenly believe that insurance is unavailable.

After an appropriate training period, these agents and brokers would have the knowledge and experience to establish their own agencies.

### 2. Recruitment and Training Programs

Recruitment and training programs should be expanded by the insurance industry to attract residents of inner city areas to fill personnel needs at all levels of the business. In addition to providing new job opportunities to inner city residents, the insurance industry would open up new channels of communication that would help correct basic misunderstandings between the industry and urban core residents.

### 3. More Economical Methods of Marketing Insurance

More economical methods of marketing insurance should be encouraged. The insurance industry should study new forms of contracts and new marketing and underwriting techniques that may improve the insurance market in inner cities. A reduction in expenses in handling inner city insurance business would make a greater percentage of the premium charged available to cover losses; it could make the inner city a profitable area in which to seek business without an increase in premiums charged.

107

001938

### 4. Better Procedures to Handle Consumer Complaints

Better procedures to handle consumer complaints should be developed by state insurance departments.

Consumer complaints can be an important indicator of the nature and extent of insurance availability problems and can provide needed information on potential trouble spots before serious problems develop. More adequate records need to be maintained on consumer complaints and the consumer needs to be better informed on where and when to make a complaint.

Complaints made in writing are now generally filed by the state insurance departments; but in many cases complaints received by telephone are not recorded, and sometimes not even accepted.

Most insurance departments have a separate complaint division, but its offices are usually located in only one city. Many consumers are unaware that the state insurance department exists. In fact, those who need help the most are often the least likely to know of its existence.

Because of inadequate records and the failure to receive complaints from consumers with insurance problems, it is often difficult to use complaints as a basis for general regulatory corrective measures.

New steps must be taken to publicize the services of state insurance departments and to better inform citizens about their rights as insurance consumers. New methods and procedures need to be developed by state insurance departments to obtain, record, analyze, and help resolve consumer complaints. The staffs of the state pools and the special agents and brokers we propose, should provide assistance to the state insurance departments in performing this task.

### 5. Research Programs

Research programs should be established by the insurance industry in cooperation with government and state pools to develop new loss prevention techniques and other methods of improving the insurance markets in inner city areas. Far too little is known about the conditions that pose significant fire hazards and how these conditions can be inexpensively corrected. Far too little is known

about loss prevention techniques that will reduce or even eliminate losses from crime. Significant efforts in these areas would minimize insurance losses and help protect lives and property from the ravages of fire and crime.

### 6. More Refined Statistics

More refined statistics should be compiled by rating bureaus and insurance companies on loss experience to facilitate rating, rate regulation, underwriting, and loss prevention.

Additional premiums are now being charged for insurance on property that seems unusually exposed to loss from fire or crime; but little is known about precisely what conditions might lead to loss and whether the additional premiums being charged are appropriate. The rating bureaus and the insurance industry, in cooperation with state insurance departments and the NIDC, should collect data on property insured at a higher than standard rate. Information should be obtained on the type of conditions leading to a greater premium charge. This information should then be correlated with the reasons for actual loss to determine whether additional premiums are being charged for the appropriate conditions. More specific information on the cause of loss would also facilitate the development of appropriate loss prevention techniques.

This information will help state insurance departments regulate insurance rates and protect the interest of the insurance consumer. It will also help the states to set appropriate underwriting standards for state pools and determine the rates to be charged by the pool.

### 7. Lending Programs

Lending programs in the urban core should be stepped up. The Small Business Administration should give particular attention to providing needed funds to small businessmen in inner city areas for the removal and control of fire and crime hazards.

The Federal Reserve Board, the Federal Deposit Insurance Corporation, the Comptroller of the Currency, and the Federal Home Loan Bank Board should review their policies to determine methods of expanding the availability of credit

108

in inner city areas for needed property improvements.

Other state and federal agencies administering programs affecting credit or providing financial assistance for property improvements should also review their programs to determine where revision or expansion could facilitate property improvements and reverse the spread of urban blight.

### 8. Contractors' Bonds for Urban Core Businessmen

Contractors' bonds for urban core businessmen should be made more readily available.

A contractor bidding on a construction project is generally required to obtain a bid bond. This bond protects the principal against default by the contractor on his bid. If the contractor wins the bid, he generally is then required to obtain a performance bond. This bond operates to guarantee that the project will be completed. Obtaining these necessary bonds is often difficult, if not impossible, for the small contractor who seeks to perform construction work in urban core areas. This restricts the ability of these contractors to expand their business, and reduces competition for construction work in the urban core.

Various approaches to provide these bonds are possible. For example, the NIDC might consider providing reinsurance to surety companies that offer these contractors bid and performance bonds at reasonable rates.

*To Summarize these Supplementary Measures, The Panel Recommends:*

1. **Manpower training programs should be developed by the Office of Economic Opportunity and the Department of Labor in cooperation with the insurance industry, to train residents of the inner city as agents and brokers with special competence to handle the insurance needs of the inner city.**

2. **Recruitment and training programs should be expanded by the insurance industry to attract inner city residents to fill personnel needs at all levels of the business.**

3. **Better procedures to handle consumer complaints should be developed by the state insurance departments.**

4. **More economical methods of marketing insurance should be studied by the insurance industry.**

5. **Research programs should be established by the insurance industry in cooperation with state pools, state insurance departments, and the NIDC to develop new loss prevention techniques and other methods of improving the inner city insurance market.**

6. **More refined statistics should be compiled by rating bureaus and insurance companies on loss experience and causes of loss to facilitate rating, rate regulation, underwriting, and loss prevention.**

7. **Lending programs should be accelerated in the urban core with particular attention to providing needed funds to small businessmen and other property owners for removal and control of fire and crime hazards. State and federal regulatory authorities that influence the granting of credit or that administer loans and grants should review their policies, procedures and programs to determine where revision or expansion could assist property improvement in the inner city.**

8. **Contractors' bid and performance bonds for urban core businessmen should be made more readily available.**

## Precedents for the Panel's Program

The program recommended by the Panel draws upon knowledge and experience developed at the national and state levels to meet other critical insurance problems. Although insurance in the United States is a private enterprise, many problems have arisen over the years that have been beyond the capabilities of the industry to handle without governmental assistance. When the public interest has required insurance to further basic social objectives, pragmatic programs have been developed by which government has joined with industry to attain those goals. The approach has generally been to utilize the resources of the private insurance industry to the maximum extent. This private effort is then backed by governmental resources to fulfill purposes that can be achieved only by the partnership of government and private enterprise.

109

In this concluding section, the major precedents that we have found most relevant to the urban core insurance problem are described.

## War Damage Corporation

When war damage threatened the lives and properties of Americans shortly after Pearl Harbor, the risk of catastrophic loss was so great that it was far beyond the financial capacity of the private insurance industry to bear. In response to public demand, the federal government established the War Damage Corporation to insure American property owners against losses that could have resulted from bombardment or other enemy attack.

Under the program established, the insurance industry in 1942 sold more than eight million war damage policies in ninety days through its normal channels. It also handled premium collection and claims settlement. Receiving a modest agent's fee (5 percent) and expense reimbursement (3½ percent), the participating insurance companies agreed to share 10 percent of the profits and losses, up to $20 million. All profits and losses beyond those limits were to be assumed by the War Damage Corporation.

The War Damage Corporation was financed by the insurance premiums it received and by the sale of $1 million in stock to the Reconstruction Finance Corporation (RFC). The RFC had the authority, if needed, to borrow from the United States Treasury and to purchase additional stock.

The program was highly successful. It met a vital need for giving a concerned public security against the risk of loss from the war. In the end, it was also profitable. Claims for damages totaled only $1¼ million—for the most part from losses in the Aleutian Islands, Hawaii, and the Pacific Islands. When the War Damage Corporation was dissolved in June, 1947, it paid $210 million to the United States Treasury and around $20 million to the insurance industry.

## Nuclear Liability Insurance

The growing industrial uses of atomic energy more recently presented the possibility of enormous liability claims from nuclear accidents which private insurance companies alone were unable to cover. When the fear of uninsured catastrophic losses threatened to impede the development and use of atomic energy by private industry, the Congress enacted the Price-Anderson Act in 1957.

The act established a cooperative industry-government insurance program. The insurance industry pooled its resources to provide amounts of insurance greater than any single company could offer, while the government assumed a layer of liability above that.

All private users of atomic energy are now required to purchase liability insurance to the extent that it is available on reasonable terms from private insurers and to the extent that it is deemed necessary. Above this limit, the Atomic Energy Commission provides the private user with an "indemnity agreement" for an additional $500 million.

No premium commensurate with the risk is paid to the government for its indemnity agreement. The insureds are so few and the maximum potential losses so large that an attempt to allocate potential costs among those exposed to loss would make the cost prohibitive. The Commission, however, is authorized to collect a fee from any person with whom an indemnification agreement is executed.

So far the claims paid by the insurance industry have been minor, and no claims have been paid by the federal government.

## Federal Deposit Insurance Corporation—Federal Savings and Loan Insurance Corporation

The bank and savings and loan association failures during the economic crises of the 1930's jarred the confidence of the public and threatened to undermine the entire financial structure of the nation. The unpredictability of fluctuations in the economy and the possibility of massive bank failures placed insurance for these losses well beyond the capabilities of the private insurance industry. Yet a limited guarantee of deposits was deemed necessary to preserve these financial institutions and the public's confidence in the banking system.

To provide the needed protection, the Congress established the Federal Deposit Insurance Corporation (FDIC) in 1933 to insure depositors against the insolvency of banks and to foster loss prevention by supervising banks and examining them. The Federal Savings and Loan Insurance Corporation (FSLIC) was established in 1934 to provide

110

similar protection for depositors in savings and loan associations.

Both the FDIC and the FSLIC are self supporting from annual assessments (premiums) received from insured financial institutions. The FDIC has built up reserves of more than $3¼ billion; the FSLIC has accumulated reserves of almost $700 million. The FDIC may borrow up to an additional $3 billion from the United States Treasury to meet its liabilities, and the FSLIC may borrow up to $750 million. Neither has had to exercise this authority. Relatively minor losses have been paid from reserves accumulated from premium income.

### Federal Mortgage Guarantee Insurance Programs

The depression years fostered another insurance program designed to spur a troubled economy.

In 1934, almost one-third of the 4,000,000 families on public relief were connected with the building trades. Virtually no repairs had been made to existing housing since 1929 and almost no new housing was being constructed. Although capital was available, the banks were not lending funds on real estate mortgages.

To encourage the flow of private resources into repairing and building housing and thus to provide needed jobs and better housing for millions of Americans, the Congress enacted the National Housing Act in 1934. This act created the Federal Housing Administration (FHA) to insure creditors against mortgage losses.

The FHA insures against the possibility of loss to a lender in the event that the market value of a mortgaged property is less than the outstanding indebtedness at the time of foreclosure. The annual premium for this insurance—½ of one percent of the outstanding balance of the loan—is paid by the borrower.

One of the central features of the program is the option of the FHA Administrator to pay claims with debentures guaranteed by the United States Government. This makes it unnecessary to liquidate foreclosed property in times of financial stress in order to pay claims. When the economy recovers, the properties may be sold and the bonds redeemed. The option allows the program to cope with recession and constitutes a major safeguard against catastrophe losses in a manner which could not be accomplished by private insurance companies acting alone.

The program has been an economic and social success. The FHA has repaid the federal funds advanced during its early years to meet operating expenses and has built up reserves of over $1.1 billion under the various types of mortgage insurance programs it now administers. While doing so, the FHA has been able to reform mortgage lending practices, broaden the opportunities for home ownership, and raise the standard of housing throughout the nation.

### Foreign Credit Insurance

Various risks involved in international commercial transactions have been considered uninsurable by the private insurance industry. The risk of unfavorable political action by a foreign government—for example, expropriation of property and "freezing" of foreign currencies—is ordinarily unpredictable, and the risk of loss therefrom is usually deemed to be uninsurable. In foreign commercial sales of substantial size, the risk of insolvency or protracted default by a foreign buyer is also considered difficult to insure.

In 1962, the Congress adopted a program of foreign credit insurance to provide insurance against these risks and thereby to foster the expansion of United States exports. The program is a cooperative industry-government effort under which the insurance industry provides coverage for the risks it can bear, and the government reinsures losses above that level through a federal agency, the Export-Import Bank.

The policies are written by a specially formed association of sixty insurance companies named the Foreign Credit Insurance Association (FCIA). Insurance policies issued by the FCIA cover both the commercial risk and the political risk. For commercial risks, FCIA bears the first $150,000 in losses on each insured short-term loan and shares pro rata in losses above that figure on each insured one-to-five year loan, up to total annual losses of $2.5 million. Losses beyond that limit are reinsured by the Export-Import Bank. In return for providing reinsurance, the Export-Import Bank receives a pro rata share of the direct premium. An additional portion of the premium collected by the FCIA is paid to the Export-Import Bank for bearing the entire political risk.

Although the Export-Import Bank has the authority to borrow from the United States Treas-

**111**

ury, it has not yet been required to do so. During the fiscal year 1965–66, premiums and guarantee funds amounted to $3 million while only approximately $1 million in losses were paid.

## State Automobile and Workmen's Compensation Insurance

The states have developed considerable experience in assuring their citizens needed insurance protection in two major areas: workmen's compensation and automobile liability.

Workmen's compensation insurance programs grew out of state-enacted changes in the common law recovery rights of employees for job-related injuries. Generally speaking, workmen's compensation laws establish the right of an employee to recover from his employer whether or not the injury was caused by anyone's fault. These laws require the employer to carry insurance unless it is reasonably certain that he has sufficient assets to meet potential liability claims.

Having required employers to carry insurance, it was incumbent on the states to make insurance protection available even to high risk employers which the private insurance industry was reluctant to insure. Several states created a state insurance fund to cover all risks. In other states, a state insurance fund competes with the private insurance market. In still other states, the required insurance is provided through a state pooling of insurance company resources. In some others, it is provided by assigning to individual insurance companies risks difficult to place.

States have also sought ways to assure that an innocent injured party in an automobile accident could recover damages from the person at fault.

Some states require their drivers to carry automobile liability insurance as a condition to obtaining a driver's license. Other states have created uninsured motorists funds from amounts collected from drivers who do not have insurance. All states have recognized the necessity to provide a mechanism to assure that a driver can buy automobile liability insurance for the protection of innocent victims of automobile accidents. This has been accomplished by a voluntary or mandatory system for equitably assigning applications for insurance by high risk drivers to individual insurance companies.

## Conclusion

There are many instances in addition to those described where state and federal governments have taken a measure of responsibility for an insurance program that the private insurance industry could not handle alone. The reasons for governmental aid have generally been the unpredictability of losses, the possibility of catastrophe losses beyond private insurance resources, or the likelihood that premium charges would be too great for those members of the public who needed the insurance.

In most cases, the imperative leading to the development of a federal government program of assistance has been the presence of a problem national in scope, and a legitimate concern by the insurance industry with potentially vast losses. In virtually every instance, however, the disaster that people feared and sought insurance against has not occurred, and the government program has not cost federal tax dollars.

Programs originally established through governmental appropriations, like the FHA mortgage insurance fund and the FDIC, have reimbursed the originally appropriated funds with interest and have now developed substantial reserves with which to pay losses in the event they occur. The War Damage Corporation returned far more to the United States Treasury than it originally was given. Under the nuclear liability insurance program and the foreign credit insurance program, the insurance industry has been able to cover losses within the private framework without the expenditure of government funds.

We have every conviction that a similar pattern will develop here. There is a public concern about the potential damage that could result from riots and civil disorders; but we are convinced that responsible action will prevent or contain such occurrences in the future. The program we have designed will then operate on a self-supporting basis and generate reserves for the payment of any substantial losses should they occur.

Some have asserted that those who seek to develop an insurance scheme to deal with riots are predicting the certainty of their occurrence. Nothing could be further from the truth. We believe instead that providing insurance in center city areas will be the stimulus that is needed to attract private resources and effort to improve and rebuild these areas—to provide goods, services, and jobs

112

for their residents and to foster the development of better housing. This in turn will help alleviate the conditions that have led to civil disorders.

This result cannot be obtained solely by providing protection against the riot peril. It is clear that the lack of adequate property insurance in the urban core antedated the recent riots by many years. The civil disorders have only accentuated the problem. The problem exists in every major city and in many smaller cities throughout the country, whether or not they have suffered the ravages of riots.

Meeting the insurance crisis of our cities requires more than riot reinsurance and government aid. It requires that the full resources of property owners, the insurance industry, and local, state, and federal governments be brought together to achieve a solution. That is what our program is designed to do.

**113**

## Appendix A

# MATERIALS ON THE AVAILABILITY AND COST OF INSURANCE IN THE URBAN CORE

This appendix presents some detailed materials on the availability and cost problems of the urban core insurance market. Interviews with numerous urban core residents and businessmen make it clear that complaints about the difficulties of obtaining insurance are widespread and intense. Wherever they went, our field investigators found the same basic situation: people with insurance problems.

We attempted to define the problems more precisely by requesting data from 74 individual insurers and the leading insurance trade associations. In the aggregate they account for almost all of the insurance written in the United States. We received useful information, but the companies and associations were generally unable to document their experience in urban core areas. We sought information from every state insurance department. The responses were helpful in establishing that problems existed throughout the nation, and in some cases were of major proportions; but this provided no statistical basis for measuring the problems. Some studies that have examined aspects of the urban core insurance problems, as described later in this appendix, have been helpful; and the written information supplied by a variety of persons has been useful in corroborating the existence of a critical problem.

In an attempt to measure more closely the exact extent of the problem, the Panel conducted a systematic survey, using scientific sample survey techniques, of the insurance problems of urban core residents and businessmen in six major cities. The results are set out in detail in this appendix. The survey provides important new data on the availability and cost of insurance in urban core areas, and, in conjunction with the other information received, suggests the critical magnitude of the problem. It is, to date, the only comprehensive survey ever made on the cost and availability of insurance in the urban core.**

## Statements of Urban Core Residents and Their Representatives

Numerous residents and businessmen in urban core areas throughout the nation, as well as those who represent and serve them, have stated that they cannot purchase the property insurance protection they need. Here, in their own words, is what some of these people have said.*

The owner of a hot dog stand in the Roxbury area of Boston, Massachusetts:

> [I pay] $400 for $5,000 fire insurance. Burglary and theft insurance? We haven't had that for years because of the price that was quoted us. Too expensive. Plate glass coverage? That's prohibitive also.

---

*The following quotations are taken from the official transcripts of hearings held by the Panel, interviews conducted by our field investigators, and letters both unsolicited and received in response to our questionnaires. All these materials are in the official files of the Panel.

**A full description of the Panel's methods of gathering information may be found in Appendix B.

115

An insurance broker in Boston:

Many of the companies have refused to take insurance in certain of these areas. In fact, some years ago they informed me that some of these areas were redlined, a circle around it with a red line, and inside of there they take nothing no matter how good it is or how well protected that property may be. * * *

Sometimes when I bring a policy in to be written, they say, "This is for colored," as if to say if he is, they might not write him up or feel he is not too responsible or something of that nature. No matter how good he is, they take that into consideration, the fact he is a Negro. Many of the companies do apparently * * *.

Some of them [agents] were doing a good business years ago and have lost all their accounts. They can't place insurance anymore. It's a really bad situation.

A real estate and insurance broker in Boston:
Can't obtain it [insurance].

The director of a community aid organization in Boston:

* * * the people simply are not able to get it [insurance].

The owner of a candy and food store in Boston:
We can't get any. That's the trouble. * * *
I can't get any. I've tried several times.

The owner of a small grocery and liquor store in Boston:

I never put in a claim. * * * I didn't put in for anything. We paid for the broken windows ourself because we don't want to get difficulty from the insurance [company].

A real estate broker in Boston:

Every bank requires insurance before they will take a mortgage. * * * a lot of banks stopped taking mortgages because the buyers couldn't be covered by insurance or that the insurance policies would be cancelled after the mortgage was placed.

* * * Practically impossible to get [burglary and theft insurance]. Household furniture, goods, very few people can obtain it * * *.

Any property within the red line area, no broker was supposed to write it. But the thing about a redline area, it is not even limited. The property outside of the red line

but bordering the red line becomes affected, so it spreads out into a much wider area than just the redline area.

A real estate broker in Boston:

Lloyd's of London doesn't really turn you down completely. He just charges you excessive rates. * * * It's 80 percent co-insurance clause, and if you want to pay for the full rate, then they sock you good.

The consumer director of a social agency in the Dorchester area of Boston:

The home owners, especially the Negro home owners, cannot get coverage for their buildings; and sometimes the Negro businessman has the same problem. He is either paying, if he does get coverage, he is probably paying exorbitant rates compared to other areas for the same type of deal.

A Boston lawyer:

* * * the whole area was redlined both for standard risk insurance in the fire and public liability areas.

A real estate and insurance broker in Boston:

I have been forced to self-insurance because of the rates. * * * I can't afford an insurance at 2½, three times the rate because in the type of units we operate, I'm lucky to make $600 a year. By the time you take out a few dollars for maintenance and so forth, I can't afford to spend $350 for insurance. I'd go out of business. * * *

To rehabilitate, I have to re-borrow; and to re-borrow, I have to re-insure; so, therefore, I have to take the insurance at excess rates. So, naturally rather than pay $600 for an insurance policy on a six-family house, I don't bother to rehabilitate because by the time I spend the money and spend the $600 a year on insurance, I haven't made any money, and I can't operate without a profit.

An official with a social agency in Boston:

The rate is so high actually that the insurance companies charge, that the individuals have a little store, and the insurance would be so high, that it doesn't pay. * * * the insurance is sometimes higher than the business they are doing. Believe me, it's a high insurance.

116

From Providence, the President of the Rhode Island AFL–CIO:

* * * would-be purchasers of homes * * * have been refused insurance in numerous instances. * * * The very thing we need to do, and what working men want to do, so that they can own their homes, is defeated. * * *

A Brooklyn, New York, insurance broker:

* * * the market for all kinds of insurance, personal and commercial, is tighter than traffic on the Long Island Expressway at 8:30 in the morning. Naturally, most brokers servicing the [urban core] area have had to resort to markets not under the supervision of the State Insurance Department—the excess and surplus markets—where rates are arbitrarily established and applied, often three to five times above manual rates.

A Brooklyn, New York, real estate broker:

Homeowners are, for the most part, underinsured, and the non-availability of insurance is not limited to areas that were affected by the riots, but in my opinion, any area that is predominantly occupied by non-white groups.

The president of a real estate board in the Bedford-Stuyvesant area of Brooklyn, New York:

[The average homeowner is] not even able to place a sufficient amount of insurance to protect the mortgage. * * * [The only way to get any insurance is] to resort to the excess companies whose rates are four times manual [standard] rates.

A New York City agent:

[Business is] difficult to place. Companies accepting very limited amounts and only from their good producers. Getting worse.

A mortgage broker in New York City:

Our Corporation presently * * * [has] 176 mortgages of which approximately 50% are underinsured.

An agent in New Rochelle, New York:

We have noticed that it is difficult to place any new business in areas where the riot problem might occur.

An insurance agent in Rochester, New York:

* * * the tightness of the market certainly exists. * * *

A Rochester agent:

The fire market is better than for burglary, theft, glass and liability; actually, there are no markets for burglary and glass. This situation has existed for the last three years.

The mayor of Rochester:

The preservation of the commercial centers within the urban center is dependent to a large degree upon the ability of the store owner to obtain adequate insurance coverage at reasonable rates.

A Newark, New Jersey, grocer:

[Insurance] on the stock of a store? You can't get it anywhere. * * * you need fire insurance around here. You can't get it around here. * * * [Everybody is] complaining they can't get insurance.

The owner of a toy store in Newark:

[Burglary and theft,] I can't get it.

A storekeeper in Newark:

[I pay] * * * about $600 a year for $8,500 [insurance].

An insurance broker in Newark:

[It would cost] * * * $250 a year for $1,000 of coverage with a $100 deductible.

An insurance agent in Newark:

[The cost:] a five hundred percent increase in the premium.

Another insurance agent in Newark:

[In one area, the price went from] $70 a year premium to a present quote of $510 annually.

Still another agent in Newark:

We want these people to have a chance to protect their life investment. [Their house] * * * is their life's savings. It does not seem like much on the outside, but this is a whole life of savings. [They have] * * * sacrificed [to buy it] and they can't protect it at any price. * * * Contents too. We can't get any of that.

From the chief of Economic Development of the City Government of Newark:

The insurance situation in Newark is extremely serious.

The owner of a gas station and garage in Newark:

After we had the riot here, I was cancelled out on my fire insurance policies.

Q. * * * Then what happened after you were cancelled?

A. * * * I could get it again if I wanted to pay a bigger rate.

Q. How much bigger a rate?

A. Almost double.

Q. * * * Do you have any burglary and theft coverage?

117

A. No.

Q. Did you ever have?

A. I did.

Q. What happened?

A. They were cancelled out after I put in a claim about three, four years ago for some minor thing that we collected on.

Q. About how much was the claim?

A. Oh, sixty, seventy dollars.

Q. Did you ever try to obtain burglary and theft after that?

A. Yes, we did.

Q. What rates were you offered at that time?

A. I was told plain up and down I couldn't get it, period.

Q. Did you ever carry plate glass insurance?

A. Yes, that was also cancelled * * * after I also put in a claim.

Q. For how much?

A. This one here, $15.

Q. Did you try to obtain insurance after that?

A. I did. Can't get it.

Q. Were you offered it at a higher rate?

A. No. Just can't get it * * * Not available. That is, in this particular area. Burglary insurance also. I can't get it.

Q. You talked to other businessmen about this problem, have you not? * * * What have they said?

A. Same problem I got.

Q. That is, cancellation?

A. Cancellation. Can't get it * * * I couldn't sell my business now if I wanted to give it away.

From the Mayor of Philadelphia, Pennsylvania:

The problem is * * * broader than simply cancellations. It extends much deeper into the field of non-renewals and an extreme reluctance, if not outright refusal initially, to write such insurance in major segments of our cities * * *

Far from being the result of blighting influences, the inability to obtain adequate and reliable insurance is in itself a serious cause of blight. It holds back developers and discourages private rehabilitation by making virtually impossible mortgage financing, mortgage insurance, and rehabilitation loans.

In short, it has an adverse effect on all of our efforts, public and private, to go forward with improved housing and commercial development.

An agency in Baltimore, Maryland:

I find it increasingly difficult in writing property insurance in Baltimore City on dwellings, small businesses and certain institutions. * * *

It is even worse on low cost housing when it is not owner-occupied. * * *

Another great problem is the cancellation of fire insurance on Negro churches. Certain of the large companies are turning down churches although the property is in excellent condition and the experience has almost been perfect.

Small shops, beauty parlors, cleaning and dying establishments, restaurants, painting shops, grocery stores and taverns are almost prohibitive. * * *

I am glad to know that somebody is interested in the plight of these people. I sincerely hope something may be done right away to help them.

In Washington, D.C., when a tenant of an apartment requested coverage on her personal property, she was informed: "We don't insure in your area".

Another Washington, D.C., resident, concerned that her television set might be stolen, said:

I can't get any insurance to cover my TV. I wanted something to cover the TV in case it got taken and the police can't find it. I wanted to be able to get the money to buy another one.

I saw two or three different agencies. One said they didn't have theft insurance. Another said they had it, but the price was so high, it would not be worth the money I put into it.

I was sold fire insurance for $5 and something per month for one year. What I wanted was theft, but they don't have it. I wanted theft insurance because they were stealing TVs around me. If mine was stolen, I wouldn't be able to buy another one.

From a trade association in Washington, D.C.:

Restaurants have problems and are unable to obtain fire and extended coverage. Our organization represents twenty large chains and we are thinking about self-insurance because we cannot obtain insurance. * * *

118

A questionnaire to 300 liquor stores indicated that 40 percent have no insurance or negligible amounts. Lloyd's of London writes insurance at three times regular rates. The regular rate for a $7500 policy is $376, but you can't get it. Lloyd's wants $1050 and the policy has a 20 percent deductible. Llody's is a slow payer.

From a banker in Washington, D.C.:

* * * placing any property insurance in center-city areas, including and excluding blighted areas, is not an easy matter. Companies are concerned about risks that are exposed to any type of factor that could be called adverse. Our city has not experienced a riot per se, but underwriters are conscious of the threat.

A Washington, D.C. insurance agent:

Being a downtown agency, all of these problems apply to us. They seem insurmountable. * * *

Our estimate of the number of cancellations in the blighted areas and the number of clients for whom we were unable to furnish insurance are probably 90 percent or more.

In Nashville, Tennessee, a savings and loan officer:

In this particular area, we have had a problem getting adequate fire insurance on people's homes, the cheaper type dwellings which tend to predominate the area, particularly on $5,000 or below.

Some of these people, especially in this class who have a $5,000 mortgage or less, they have a rather limited budget, and to make an increase of a note payment of $5 to $10 [for higher insurance costs], while it might not mean much to some people, it means a lot to these people. It throws their budget all out of line.

A Nashville insurance agent:

It has always been a little hard to get the companies to go along with commercial risks in this particular area.

I have not been able to provide burglary coverage for that area for some time.

* * * there has been a tremendous increase in vandalism and burglary, hold-ups, and that sort of thing. And that has made it almost impossible for the insurance companies to live with.

A banker in Nashville:

[The insurance companies] * * * now charge more for one year's premium than they previously charged for three years.

It is almost impossible for anyone here to get insurance and we cannot lend them any money if they cannot get insurance.

An insurance agent in Nashville:

It is now practically impossible to obtain multi-peril policies in the ghetto areas. * * *

I have had repeated requests for insurance from residents of the area, homeowners who have lived in houses for 40 or 50 years whose insurance has been cancelled or whose insurance has tripled [in cost].

A grocer in Nashville:

The banks are not going to finance me any more, and the sole reason is because I am in a ghetto—and it's not really a ghetto, if you look at it—but I am in an income area that has the taint of a riot and exorbitant insurance costs. * * * And yet the banks say that I have to have the insurance if I am going to continue to have that mortgage.

A Nashville real estate broker:

* * * we have experienced difficulty all along in finding major [insurance] companies that would service our clients at standard rates. We have had some difficulty all along on that. * * *

* * * we had wholesale cancellations of policies.

A Nashville insurance agent:

The company has told me for five or six years that we can't get an adequate rate for the hazard we are assuming. That is where the problem is.

In Nashville, the acting director of the Metropolitan Action Commission, an agency sponsoring and carrying out social programs:

* * * insurance was available, but at extremely high rates, several times that of the manual rate, and for a shorter period of time. In other words, there are persons who are seeking this insurance, and find that they are paying more for one year now than they previously paid for three years, and the extent of the coverage is less. * * *

By protection, I mean insurance that they need to sustain themselves and their businesses. Now, several businessmen that I have talked to now have the feeling that maybe it

isn't worth it to remain in business, and if this is true, if this happens, then the possibilities of jobs for youth and adults in the ghetto area will be even further reduced.

The Fire Chief of Nashville:

The foremost insurance problem will center in all probability in the areas of arbitrary cancellations or the exercise of exceptions contained in the policies issued.

The Mayor of Atlanta, Georgia:

It may be stated generally that low income families because of the condition of their housing or property must pay excessively high rates for property insurance.

An insurance agent in Mississippi:

Our problems lie in the low valued dwellings both protected and unprotected. We have practically no market.

An insurance agent in Cleveland, Ohio:

Now, when anything comes in from the Hough area, I don't care if a judge lives there, you know, we don't want this insurance business.

* * * there are many rehabilitation programs going on in the city of Cleveland now on paper that are held up for one reason: insurance. Held up because lending institutions do not want to loan money unless there is some guarantee that there is some kind of insurance going to be placed on the property.

* * * more and more companies are pulling out of the problem areas.

A delicatessen owner in Cleveland:

I think I was paying around $119 * * * and about 1964 or 1965 they went up on my rates. They wanted to charge $450, $500 a year for insurance. And I said it was ridiculous. * * * I just let it go. * * * I take a chance and pray nothing happens.

The director of a neighborhood social organization in Cleveland:

There hasn't been a standard rate in these areas, to my knowledge, in the last four years, at least.

* * * burglary, plate glass insurance, vandalism is very, very difficult to get.

A city councilman in Cleveland:

I discovered that I was paying a much higher rate [for my insurance]. * * *And I had less coverage.

I began to pay more attention to complaints which came to me about insurance being can-

celled and persons who couldn't get insurance, and I started checking it out.

* * * while fire insurance rates are high, theft and burglary insurance in those same areas is virtually impossible to obtain.

An insurance agent in Cleveland:

* * * even standard risks, what would have been a few years ago a standard risk, is now—the companies just don't seem to want comercial business * * * because it is in the central city, congested area, not necessarily poverty area, but congested area where there is a lot of burglaries and different types of things. And naturally they are steering away from it.

I feel for the people who have bought buildings, and all of a sudden their insurance is cancelled after having claim-free years for eight or ten years, all of a sudden it is cancelled and they can't get insurance except by paying excessive rates. I have had a lot of them come to me, but I couldn't do anything for them.

The manager of a grocery store in Cleveland:

I think we still have fire insurance, but they told us we wouldn't get any more.

The Director of the Ohio Department of Welfare:

Before the Hough riots, it was difficult to secure most types of insurance on homes and businesses.

The reason generally given was the high risk of fires in the central areas of the city. This applied to homes as well as to businesses.

Special to business, was the difficulty of getting insurance on plate glass; burglary; hold-up; security bonds on employees, trucks and automobiles.

Insurance companies are requiring installation of burglary alarm and fire detection systems for most business in order to qualify for even limited insurance coverage.

Cancellations are general after a fire to any premises. If the area is one where companies are desirous of getting out of, cancellations come when the present policies expire.

The general practice is to charge penalty rates to all new or renewed policies. Most of these policies are written by second-rate or specialty companies.

The only change I have noted is that any kind of insurance on any real or personal

120

property is getting to be more difficult if not, in many cases, prohibitive or impossible.

An agency in Youngstown, Ohio:

The tightness of the market for burglary and theft coverages is becoming exceeding tight and difficult to place.

Another agency in Youngstown:

The placing of fire insurance as well as burglary and theft coverage in city areas has become increasingly more difficult.

An insurance agency in Cincinnati, Ohio:

We have had a few cancellations and a great many declinations to write business which has been offered this agency as a result of a distressed situation brought about by cancellation by some other carrier. * * * the market is * * * very tight for fire, burglary and theft coverages, especially in the central areas of the city. * * * the risks particularly hard to handle are hardware stores, clothing stores, automatic laundries, drug stores and dry cleaners.

An agent in Cincinnati:

The market in Cincinnati tightened considerably after our riots in June, 1967.

The city manager of Toledo, Ohio:

It is certainly important to all the community that property insurance be available throughout the urban area. For if insurance is unavailable and, as is often the case, if mortgage money is also difficult to obtain, this means an acceleration in the decline of a particular neighborhood or area. This can be a big drawback in attempts to rebuild the older areas of the central city, when such rebuilding is essential to the vitality of our urban areas.

The owner of a commercial building in Detroit, Michigan:

I own a building of seven stores. I have had them insured for about twenty years. * * * Last year I had a registered letter from the insurance company saying that it was cancelled. I wondered why. I called and asked why. They told me that that area was undesirable for insurance. * * * So I asked them why. I got no reply. * * * I haven't had any fire or anything to amount to anything since I have been there. * * * I could never understand why they cancelled my insurance, because they had no trouble getting paid. But they never explained to me.

The owner of an art gallery in Detroit:

We contacted Mr. * * * and he said he would insure us if we got a burglar alarm, which we agreed to do, and if we made sure that our gates were locked, which we agreed to do also. He did in fact give us the insurance. But the next three or four weeks * * * we received a notice with our check. * * * back from the insurance company [saying] that we were not insurable.

The director of a social agency in Detroit:

I think that all of the inner city, lower socio-economic, mainly black communities, are designated as blighted. * * * the problem of insurance is tremendous for these people. They have a fire, they lose everything in the fire.

* * * I do not know anybody who got insurance in that neighborhood in the last year. I do not know any home owner who got insurance in the last year in that community.

A homeowner in Detroit:

The policy was for 80-some dollars for one year, and I had paid 70-some dollars previously for three years. But I didn't say anything about that. I went ahead. I paid it.

Now, after the civil disorders, I got a letter from the agency telling me that the * * * company had canceled me out. And I would have to send them $101 to be insured with [another] company. And I have mailed that. And that is only for one year, which is almost four times as much as * * * [I previously paid].

An insurance agent in Detroit:

* * * there should be more Negroes representing these companies. * * * The amount of good property and good business in the city serviced by agents in the suburbs—they are not doing the city any good, because the money is not [coming in and] allowing the city to grow. This is encouraging the deterioration of the city, because it is taking away the very blood from the city, the money from the city.

A newspaper editor in Detroit:

We have had continued complaints from our readers concerning what they consider discriminatory practices as far as insurance companies are concerned, particularly in the area of fire insurance.

**121**

* * * the specific complaint was the unexplainable cancellation or the inability to get property * * * [insurance].

* * * these are the areas, the older homes, the older communities are being taken over primarily by Negroes. * * * The risk pattern, as far as overcrowding of areas and the homes which are not built with certain fire-prevention codes being followed, plus the * * * failure of the city to see that building codes are enforced in the inner city and core city areas—these are the areas that have been taken over by the Negroes, and when a community becomes Negro, your municipal agencies do not enforce the codes. The insurance companies being aware of this, they become a little bit more concerned about whether or not they should insure the property.

* * * most of your older houses—most of them are frame, and do not have the kind of fire precautions that most recent engineering has learned to eliminate in building new homes. When the average Negro has to buy a home two years or older, he is buying a house which is more subject to fire, and so there is a higher incidence of fire. He is victimized by this. He is saying, "This means because I am black." The insurance company says, "It just happens there are more fires in this particular area." How can you convince the Negro of this?

An insurance agent in Detroit:

Some agencies, because of company limitations, just would not or could not provide insurance in these areas, essentially because of the area itself. * * * So some of the better-kept properties were penalized * * * because they were in this area, they were just lumped in, and the companies would not insure them.

* * * the agents themselves did not want to insure these properties, for fear they would burn, and [this would] jeopardize their loss ratio. They didn't feel the same kind of compunction to insure the properties that we do. We feel, as Negro agents, and 90 percent of our clientele is Negro, that we had to try to provide a market for them, because if we didn't, no one would.

* * * in some places they consider almost all of Detroit the inner city. * * * The cost [of crime coverage] is phenomenal.

Another insurance agent in Detroit:

* * * cannot get insurance, not even at the standard or substandard rate sometimes.

A priest in Detroit:

* * * many wonderful people live in the neighborhood, keep up their housing excellently, cannot get insurance because they come under the generalization * * * that rules them out, and therefore they suffer.

* * * the inarticulate, the hopeless, the ones who are on a shoestring, the ones who are renting, who have no [insurance] protection whatever—they lose everything.

From a mortgage banker in Detroit:

Currently, we are finding it very difficult to obtain adequate coverage on properties located in the riot affected areas. We have experienced some difficulty with cancellation of coverage but our big problem is obtaining renewal policies upon expiration of the policy in force. The agent and company of record will not renew and it has become very difficult to obtain a source for placing the coverage on the part of the property owner and this office.

An insurance agent in Detroit:

Burglary and theft coverages are almost impossible to place. It always was difficult. The riots have made a major difference.

From another insurance agent in Detroit:

* * * the extent of the problem is serious to an extreme point of 95 percent at least. I would say that about 95 percent of the people are unable to obtain adequate insurance at the standard rate, and about 75 percent are unable to obtain insurance at all.

This has been going on prior to the riot, although the riot has made it a more serious problem.

Cancellations and refusals have been going on at a tremendous rate, I would say to the extent of 65 percent. Very often, almost any time anyone needs insurance it would have to be paid at a surcharge rate, 99 percent I would say. These problems have been getting more serious.

A banker in Detroit:

We have been experiencing more cancellations of hazard insurance policies on properties located in what is termed "high risk areas" even though the mortgagor has not sustained any loss. The mortgagor is then forced to seek out insurance companies that issue high

122

risk insurance, and many times they call on our bank to assist them in obtaining this insurance. This creates a hardship on the mortgagors because they are forced to pay rates that are three and four times larger than rates on the same type of property located in another location.

A mortgage broker in Detroit:

We generally feel it is more difficult now than three years ago to obtain adequate insurance protection for residential properties in blighted areas.

A real estate agent in Detroit:

In simple language, it is becoming next to impossible to place insurance coverages in any area that is presently beginning to become or has become resegregated.

An insurance agent in Detroit:

Lenders will not place mortgages on properties unless insurance is obtainable. We are often able to assist in obtaining Hi-Risk Sub-Standard Insurance, but buyers will not, and cannot, afford the hi rates!

A mortgage broker in Detroit:

Seventy-five percent of all available buyers for this type of property cannot afford a $100 per month mortgage payment and still support their family on their $4,500 to $6,500 annual salaries. In essence, what this implies is that fewer people can afford large payments created by higher cost of fire insurance, and this therefore creates an abundance of buyers with a definite lack of housing that they can afford to buy.

In Detroit, an association of dry cleaning and laundry establishments reported that 323 member establishments were uninsured or in the process of having their insurance canceled:

The effect of the riot of 1967 * * * has closed, or is closing, the insurance market of which we speak to practically all of our members in the inner city.

The Mayor of Detroit:

It is my conviction that the availability of adequate insurance is essential to the future of any city. When a section of a city is denied insurance it is denied a future. Business cannot exist without insurance. Where it is unavailable, few merchants * * * will operate without it. When it is available only at extremely high rates, few can afford to operate with such costly overhead. In either case, local business will be severely curtailed or wiped out, and local consumers will be left with limited shopping opportunities.

Immediate action is clearly necessary to prevent the continued deterioration of "hard to insure" areas. Easing the conditions and terms under which insurance protection will be available is one of the quickest and most effective steps we can take to deal with this problem.

The Mayor of Grand Rapids, Michigan:

We recently held a meeting with over one hundred businessmen from the riot affected area. One of the most frequently voiced complaints was that their fire and extended coverage insurance had been canceled.

An insurance agent in South Bend, Indiana:

We've had numerous cases of non-renewals of existing business and almost a total rejection of new business in that general area.

* * * all of the companies I have access to have turned down the risk, they would not accept it. * * * There was no reason given in this case.

The executive director of a social agency in South Bend:

The rates are substantially higher than what we normally would consider to be a fair rate for the coverage.

* * * we've had a couple of people who have mentioned that if their insurance coverage became any higher [in cost] that it might seriously affect their ability to do business at all. * * *

I have been told by many [businessmen] that they are unable to get glass breakage coverage at all. This is just a prohibited item.

An attorney in South Bend:

[My client's policy] came up for renewal and was renewed and then he received a letter telling him that it had been cancelled and no reason given.

In Chicago, Illinois, an insurance agent:

A $14,000 fire loss was not submitted because of fear of cancellation. The policy was for $1 million which was written at manual rates.

Another insurance agent in Chicago:

Burglary and theft coverages are impossible to place in high risk areas. Grocery stores, liquor, and furniture stores are difficult to place.

123

A Chicago insurance agency:

Thus far our problems have been pretty much limited to having our carriers request reduction in their lines of insurance at expiration, even though almost without exception no losses have occurred.

An agent in Rockford, Illinois:

Although our problems are not particularly acute at this time, we nevertheless anticipate requests for non-renewal and declination in the future. Historically, insurance markets which tighten particular coverages in metropolitan areas have pursued the same underwriting procedures in non-metropolitan communities. The consensus of this office indicates that market problems will face us in the relatively near future.

A mortgage banker in Kansas City, Missouri:

Not only is fire and extended coverage getting very hard to obtain but we are also being wholesale cancelled on existing policies. Homeowners [policies] are almost imposible to obtain in these areas that would normally be considered middle-class residential areas if it wasn't for the race of the residents.

An insurance broker in Kansas City:

We are in a position to place most business at three or four times the going rate, some times as much as five and six times the going rate.

An insurance agency in Kansas City:

All coverages previously in effect have been declined in advance of renewal date—so we are unable to renew. Our problem is not with excessive rates, we are just unable to handle any of the business we formerly did in these areas.

We have * * * no market among any company we represent for new business in predominantly Negro and center city areas. * * * We did have a reasonably good volume in these areas, now we have none.

The Mayor of Kansas City, Missouri:

Inability to secure fire or other property insurance inside a city today is to some degree evidence that civilization in that city is breaking down.

An agent in St. Louis, Missouri:

Market is tight. Companies are strict.

The Mayor of St. Louis, Missouri:

I believe the situation is critical for those who own any type of property in depressed areas.

An Omaha, Nebraska, storekeeper:

* * * the premium is tripled and I cannot afford it.

An Omaha real estate broker:

* * * for the average small businessman any major loss either from a break-in or from a riot, from anything like that, is just curtains * * * almost bankruptcy. We are not financially strong enough to sustain a substantial loss without the insurance.

We must have coverage if we stay in business. * * * There are businesses that are moving out of the area because they cannot get coverage and there are other businesses who can't get into the area because of the difficulty of getting insurance coverage. Their property, we can't sell, depreciates in value, simply because we can't get it [insurance].

The owner of a shoe-repair business in Omaha:

I was turned down [for insurance] because I was in this district. * * * I would be glad to take one [a policy] tomorrow morning. We are just out.

The owner of a hardware store in Omaha:

First of all we were cancelled on our glass policies. * * * Then we were cancelled on fire. We replaced it at three times the amount of the cost with everything excluded except fire.

The owner of a drug and package liquor store in Omaha:

* * * [I was] cancelled out. * * * Everything has been cancelled.

A grocer in Omaha:

We were cancelled out on plate glass. * * * Burglary and theft—unobtainable in this area.

An insurance agent in Omaha:

Straight burglary policies in that area are practically unobtainable. * * * Plate glass is practically an impossibility to write in that particular area.

The Fire Chief of St. Paul, Minnesota:

The method of establishing insurance rates doesn't really benefit the occupants of the urban areas as much as the occupants of the suburban areas and the rural areas who do very little in preventing or combating fire losses in the blighted areas.

124

In San Antonio, Texas, an insurance agent:

Since we normally do not write coverage in blighted areas we have had no real problems. These areas not only produce unsatisfactory loss experience and real placement problems, generally they produce premium collection problems for the agent. For the most part we have stayed away from these areas.

An insurance broker in Oakland, California:

Serious social and insurance problems exist in many urban areas, including the San Francisco Bay area, where there are substantial segments of economically depressed persons which often are predominantly of minority races.

* * * The market is extremely tight * * * for theft, vandalism, riot and fire insurance in these areas.

An agency in Stockton, California:

* * * generally liquor stores and restaurants are "tight," especially in slum areas.

Another agency in Stockton:

Burglary and theft coverages are becoming increasingly difficult to place—not because of riots or civil disorders, but because of adverse loss experience for the past several years.

An insurance broker in Los Angeles, California:

Our major market area is south central Los Angeles * * * the Watts area or the McCone area. The problems since mid-1965 in residential coverage can be summarized as increased selectivity of risks by the companies, inspection reports and photos to accompany applications, increase in minimum limits for low valued dwellings, total withdrawal from the market area by the carriers (and this latter on geographical lines), increasing cancellations at company election, withdrawal of binding authority and declinations to issue multi-peril package policies.

In commercial risks the above conditions are existent and amplified by even broader demands for acceptable risks * * * e.g. will accept coverage on furniture and equipment but exclude stock, even for basic fire coverage.

In our view the market for the coverages mentioned is very tight at manual rates and extremely limited in the surcharge market * * *.

Since late 1965, our best estimate would be 150 to 200 clients in our market area have been unable to replace or renew wanted coverages through this office.

From an agency in Los Angeles:

The problem of placing Commercial Property Coverage in my area is acute and getting worse. By my area, I mean the so-called Curfew area * * *.

Another agency in Los Angeles:

* * * the market generally for fire, burglary and theft coverages in this area has tightened. Not only in so-called blighted areas but in many of our more affluent and prosperous areas.

A Los Angeles agency:

* * * we are unable to purchase the amount of insurance desired or necessary to equal present day replacement or depreciated value of the property to be insured. * * *

Burglary and Theft coverage are very difficult * * *.

An agency, Los Angeles:

We are unable to provide any coverage for Plate Glass, Burglary, Money and Securities. This is not available in any Insurance Market that we tried.

* * * if you try hard, you can, somehow, obtain Fire Insurance and other lines. But no Burglary, Plate Glass or Holdup.

From an insurance agency in San Diego, California:

We have found some tightness of market in burglary and theft coverages, also glass, but in most cases this was overcome if we wrote other businesses for an insured.

From an agent in Burbank, California:

Companies shied away from blighted areas even before riots.

A member of the Governor's Committee on Youth writing from Compton, California:

* * * procuring insurance in every category is excessively difficult. * * *

In the business world of this area, the insurance coverage is saddening. * * *

Most of the merchants carry only partial coverage because of excessive charges, while the burglary, hold-up and plate glass insurance is almost prohibitive. * * *

The surcharges are assessed on original or renewal basis. Many merchants with three year policies are not being allowed to renew.

125

A vice-president of the United States Savings and Loan League wrote:

> The lending operations of our member savings and loan associations have been substantially, if not entirely, curtailed so far as additional loans are concerned in center city properties which might come to be considered as areas affected by the possibility of future riots or civil disorders. This applies particularly to declining neighborhoods, even though the individual property may be insurable so far as normal fire and extended coverage underwriting policies are concerned.
>
> The greatest problem facing our business in this respect is maintaining insurance on properties which were financed a number of years ago and where the decline in the area has substantially changed. We have had reports from associations in almost all the major metropolitan areas which have been adversely affected in this respect and are finding it extremely difficult to maintain insurance coverage on such properties. In many instances the only recourse has been to call on Lloyds of London, Ltd., which generally will cover these risks on a premium basis, roughly two and one-half times the standard board rates.

The President of the National Association of Real Estate Brokers said:

> * * * many retail sales have fallen through when the buyer could not obtain adequate insurance to protect his investment. Since the summer of unrest, reports from members of our organization in many communities reveal that it is almost completely impossible to obtain insurance on commercial and business properties. This has caused many small businesses to close.

## Survey of Six Cities

### Cities Surveyed

The Panel conducted a systematic survey of property insurance problems encountered by residents and businessmen in Boston, Cleveland, Detroit, Newark, Oakland, and St. Louis.

Disorders of varying intensity have occurred in the first five cities; St. Louis, which has experienced no recent disorders, was chosen for the purpose of comparison.

The Panel's survey defined urban core areas of five of the six cities by reference to maps of poverty areas prepared by the United States Bureau of the Census. These areas represent major concentrations of poverty in metropolitan areas based on five characteristics: percent of all housing units in dilapidated condition or lacking some or all plumbing facilities; percent of families with cash incomes under $3,000; percent of children under eighteen years old not living with both parents; percent of males twenty-five years old and over with less than eight years of school completed; and percent of unskilled males (laborers and service workers) aged fourteen or older in the employed civilian labor force.

For Boston, instead of using a similarly defined poverty area, the Panel surveyed Roxbury—the area initially covered by the Urban Area Plan. Roxbury lies almost entirely within the Boston poverty area (except for an area of several blocks which is inconsequential for the purpose of this survey).

For the purpose of comparison, a non-poverty area in Oakland was selected in addition to the poverty area in that city. Oakland also has an unusual city ordinance that requires business establishments to take precautions against burglary losses.

### Size and Nature of Sample

About 3,000 personal interviews were conducted in the six cities. About 1,500 dwelling units, including single family units, apartment houses, and larger units, were sampled, as were about 1,500 businesses and institutions, including schools, churches, and public buildings.

In the case of dwelling units, only the owner was interviewed; for businesses and institutions, owners and tenants were interviewed.

126

## Survey Results

The survey established that the residents and businessmen had substantial insurance problems—primarily shortages of insurance and high costs.

The problems are more serious for businesses than for dwellings, more acute for burglary and theft than for fire insurance. They are more serious in some urban core areas than in others, but substantial in every case.

The problems are serious not only in Detroit and Newark, which experienced major riots, but in the other cities surveyed. The general problems in some areas may even be more severe than the survey indicates, because of recent moratoria on cancellations.

Over 40 percent of businessmen in the six areas reported fire or burglary and theft insurance problems.* (See Table 1). About 28 percent had no insurance because it was unavailable or cost too much. Another 8 percent, who had no availability or cost problem, were underinsured. And about 5 percent—who had no availability, cost, or underinsurance problem—said they paid excess rates.

Over 30 percent of businessmen in the six poverty areas had fire insurance problems. (See Table 2). About the same percentage had problems relating to burglary and theft insurance and plate glass insurance.

Businessmen in Boston had the most serious insurance problems of those in the cities surveyed. Over 61 percent of Roxbury businessmen had problems relating to fire and extended coverage or burglary and theft insurance. (See Table 3). About half were uninsured for one of these two basic lines while around another 14 percent were either underinsured or paying more than manual rates. Over 40 percent of businessmen in Cleveland, Detroit, and Newark had an insurance problem relating to the two basic lines. This figure was 34.3 percent in St. Louis and around 25 percent in both areas of Oakland.

The Oakland figures indicate insurance problems are not confined to poverty areas.

About 30 percent of owners of dwellings in the six poverty areas reported fire insurance problems. (See Table 4). Over 5 percent had no insurance because of availability or cost. Another 14 percent, who had no availability or cost problems, were underinsured. Of those remaining, about 9 percent said they paid excess rates.

Almost 37 percent of owners of dwellings in Roxbury had fire insurance problems and in the other poverty areas at least 20 percent of the dwelling owners reported fire insurance problems. (See Table 3). In the non-poverty area of Oakland, only 9 percent had problems.

---

*The term businessman will be used to include institutions for purposes of summarizing results. Summary figures in the tables and text are for poverty areas only, unless otherwise noted. This report uses unweighted arithmetic means to summarize findings for the poverty areas studied. Appropriate weighting factors were not available to permit computation of weighted averages. Summary figures indicating whether an uninsured had problems relating to cost or availability were compiled by so categorizing responses to the question, "Why don't you carry * * * insurance?" The following were considered to relate to availability: "It is unavailable;" "I have been refused insurance in the last three years;" "I have been canceled within the past three years;" and "Conditions are impossible to satisfy." The following was considered to relate to cost: "It is too expensive." Such answers as "No agent has contacted me" or "Don't know" were not considered problems reported.

---

TABLE 1. BUSINESS ESTABLISHMENTS AND INSTITUTIONS—PERCENT REPORTING EITHER FIRE OR BURGLARY AND THEFT INSURANCE PROBLEMS BY OWNERSHIP STATUS FOR 6 POVERTY AREAS AND 1 NONPOVERTY AREA

[In percent]

| Item | Poverty areas | | | Nonpoverty area | | |
|---|---|---|---|---|---|---|
| | Total | Owners | Tenants | Total | Owners | Tenants |
| (1) Uninsured because of problems of cost or availability | 28.2 | 21.2 | 32.9 | 20.8 | 18.2 | 22.1 |
| (2) Insured, but having less insurance than wanted | 7.7 | 8.4 | 7.1 | 1.0 | 3.0 | —* |
| (3) Paying more than manual rates but without other cost, availability, or underinsurance problems | 5.2 | 5.9 | 4.2 | 4.0 | 6.1 | 2.9 |
| Total (1) through (3) | 41.1 | 36.1 | 44.1 | 25.8 | 27.3 | 25.0 |

*Dashes in this and subsequent tables represent less than 0.05 percent.
NOTE: In Tables 1–40, the figures are unweighted arithmetic means.

SOURCE FOR TABLES 1–40: Survey conducted by the National Advisory Panel on Insurance in Riot-Affected Areas.

127

TABLE 2. BUSINESS ESTABLISHMENTS AND INSTITUTIONS—PERCENT REPORTING INSURANCE PROBLEMS BY LINE OF INSURANCE AND OWNERSHIP STATUS FOR 6 POVERTY AREAS AND 1 NONPOVERTY AREA

[In percent]

| Item | Poverty areas | | | Nonpoverty area | | |
|------|------|--------|--------|------|--------|--------|
| | All | Owners | Tenants | All | Owners | Tenants |
| **FIRE** | | | | | | |
| Uninsured: | | | | | | |
| 1. Problems of cost | 5.6 | 2.6 | 7.6 | 2.0 | — | 2.9 |
| 2. Problems of availability | 7.6 | 4.2 | 10.0 | 2.0 | — | 2.9 |
| Insured: | | | | | | |
| 3. Having less insurance than wanted | 10.5 | 12.7 | 8.9 | 2.0 | 6.1 | — |
| 4. Paying more than manual rates | 8.4 | 9.6 | 7.3 | 6.9 | 6.1 | 7.4 |
| Total (1) through (4) | 32.1 | 29.1 | 33.8 | 12.9 | 12.2 | 13.2 |
| **BURGLARY AND THEFT** | | | | | | |
| Uninsured: | | | | | | |
| 1. Problems of cost | 13.8 | 11.5 | 15.1 | 13.9 | 12.1 | 14.7 |
| 2. Problems of availability | 11.8 | 8.2 | 14.3 | 3.0 | 3.0 | 2.9 |
| Insured: | | | | | | |
| 3. Having less insurance than wanted | 4.2 | 3.5 | 4.7 | 1.0 | | 1.5 |
| 4. Problem of availability | 4.1 | 5.2 | 3.2 | 5.9 | 3.0 | 7.4 |
| Total (1) through (4) | 33.9 | 28.4 | 37.3 | 23.8 | 18.1 | 26.5 |
| **PLATE GLASS** | | | | | | |
| Uninsured: | | | | | | |
| 1. Problems of cost | 11.5 | 10.3 | 12.3 | 7.9 | 15.2 | 4.4 |
| 2. Problems of availability | 14.2 | 11.0 | 16.4 | 4.0 | 9.1 | 1.5 |
| Insured: | | | | | | |
| 3. Having less insurance than wanted | 1.6 | 2.1 | 1.4 | 2.0 | — | 2.9 |
| 4. Problems of availability | 3.6 | 4.1 | 3.0 | 4.0 | 3.0 | 4.4 |
| Total (1) through (4) | 30.9 | 27.5 | 33.1 | 17.9 | 27.3 | 13.2 |

## A. Insurance for Businesses

### Do Businessmen Have Insurance?

*Fire and Extended Coverage.* Businessmen were asked: "Do you carry a package policy covering fire and extended coverage and burglary and theft, or do you carry fire and extended coverage insurance?" Less than half in the poverty areas had a package policy and 20 percent were uninsured completely. The percentage of uninsured was as high as 35 percent in Boston and as low as 6.9 percent in the non-poverty area of Oakland. The percent of those uninsured was over 20 percent in four of the six poverty areas. (See Table 5.)

The percentage of uninsured was more than 18 points higher among tenants (27.4 percent) than owners (9.3 percent).

Package policies were most commonly found in the Oakland non-poverty area (73.2 percent), while only 22 percent had package policies in Boston.

*Burglary and Theft.* Businessmen were asked: "Do you carry burglary and theft insurance?" Forty-eight percent were uninsured for burglary and theft. (See Table 6). The percent of uninsured was as high as 74 percent in Boston and as low as 30 percent in the poverty area of Oakland. It was 21 percent in the nonpoverty area of Oakland.

In the six poverty areas studied, tenants were more often uninsured (51.5 percent) than owners (43.1 percent). In Boston, almost 80 percent of

128

TABLE 3. DWELLINGS, BUSINESS ESTABLISHMENTS, AND INSTITUTIONS—PERCENT REPORTING INSURANCE PROBLEMS BY LINE OF INSURANCE FOR 6 POVERTY AREAS AND 1 NONPOVERTY AREA

[In percent]

| | Poverty areas | | | | | | Non-poverty area—Oakland |
|---|---|---|---|---|---|---|---|
| | Boston | Cleveland | Detroit | Newark | St. Louis | Oakland | |
| **DWELLING UNITS** | | | | | | | |
| Fire and extended coverage: | | | | | | | |
| Uninsured: | | | | | | | |
| 1. Problems of cost | 1.3 | 1.5 | 5.2 | — | 2.5 | — | — |
| 2. Problems of availability | 2.6 | 5.2 | 6.3 | 3.1 | 4.6 | 0.3 | — |
| Insured: | | | | | | | |
| 3. Having less insurance than wanted | 20.6 | 13.5 | 6.6 | 21.4 | 7.6 | 13.7 | 6.8 |
| 4. Paying more than manual rates | 12.4 | 11.3 | 8.0 | 9.2 | 8.6 | 6.5 | 2.3 |
| Total (1) through (4) | 36.9 | 31.5 | 26.1 | 33.7 | 23.3 | 20.5 | 9.1 |
| **BUSINESS ESTABLISHMENTS AND INSTITUTIONS** | | | | | | | |
| Fire, extended coverage, and burglary and theft: | | | | | | | |
| 5. Uninsured because of problems of cost or of availability | 48.2 | 33.8 | 27.9 | 22.0 | 24.8 | 12.5 | 20.8 |
| 6. With underinsurance but without problems of cost or availability | 4.8 | 5.2 | 8.6 | 13.4 | 6.6 | 7.4 | 1.0 |
| 7. Paying more than manual rates but without other cost, availability, or underinsurance problems | 8.9 | 4.2 | 5.6 | 5.9 | 2.9 | 3.7 | 4.0 |
| Total (5) through (7) | 61.9 | 43.2 | 42.1 | 41.3 | 34.3 | 23.6 | 25.8 |

NOTE: Plate glass insurance is not included.

TABLE 4. DWELLING UNITS—PERCENT REPORTING FIRE AND EXTENDED COVERAGE INSURANCE PROBLEMS BY OWNERSHIP STATUS FOR 6 POVERTY AREAS AND 1 NONPOVERTY AREA

[In percent]

| Item | Poverty | | | Nonpoverty | | |
|---|---|---|---|---|---|---|
| | Total | Occupants | Non-occupants | Total | Occupants | Non-occupants |
| 1. Uninsured because of problems of cost or availability | 5.5 | 4.5 | 7.1 | — | — | — |
| 2. Insured, but having less insurance than wanted | 13.9 | 11.0 | 17.0 | 6.8 | 6.3 | 11.1 |
| 3. Paying more than manual rates, but without other cost, availability, or underinsurance problems | 9.3 | 6.6 | 14.3 | 2.3 | 2.5 | — |
| Total (1) through (3) | 28.7 | 22.1 | 38.4 | 9.1 | 8.8 | 11.1 |

**129**

## TABLE 5. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Do you carry a package policy covering fire, extended coverage, burglary and theft or do you carry fire and extended coverage insurance (FEC)?

| City | Total | | | | | Owners | | | | | Tenants | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of interviews | With package | With FEC | Uninsured | Other[1] | Number of interviews | Package | FEC | Uninsured | Other[1] | Number of interviews | Package | FEC | Uninsured | Other[1] |
| | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent |
| Boston | 247 | 22.3 | 42.5 | 35.2 | — | 111 | 28.8 | 50.5 | 20.7 | — | 136 | 16.9 | 36.0 | 47.1 | — |
| Cleveland | 213 | 44.6 | 34.3 | 21.1 | — | 77 | 54.6 | 37.7 | 7.8 | — | 136 | 39.0 | 32.4 | 28.7 | — |
| Detroit | 233 | 50.6 | 27.9 | 21.4 | — | 91 | 55.0 | 31.9 | 13.2 | — | 142 | 47.9 | 25.4 | 26.8 | — |
| Newark | 186 | 51.1 | 38.7 | 10.2 | — | 82 | 56.1 | 40.2 | 3.7 | — | 104 | 47.1 | 37.5 | 15.4 | — |
| St. Louis | 242 | 40.5 | 33.1 | 24.4 | 2.0 | 98 | 46.9 | 43.9 | 7.1 | 2.0 | 144 | 36.1 | 25.7 | 36.1 | 2.1 |
| Oakland: | | | | | | | | | | | | | | | |
| Poverty | 272 | 61.2 | 30.7 | 8.1 | — | 87 | 61.7 | 34.9 | 3.4 | — | 185 | 60.9 | 28.8 | 10.3 | — |
| Nonpoverty | 101 | 73.2 | 19.9 | 6.9 | — | 33 | 79.8 | 20.2 | — | — | 68 | 70.0 | 19.7 | 10.3 | — |
| All poverty areas | 1,393 | 45.1 | 34.5 | 20.1 | .3 | 546 | 50.5 | 39.9 | 9.3 | .3 | 847 | 41.3 | 31.0 | 27.4 | .3 |

NOTE: This and subsequent tables report on 6 poverty areas and 1 nonpoverty area (in Oakland).

[1] In this and subsequent tables, Other includes nonresponses, refusal to answer questions, and don't know.

130

TABLE 6. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Do you carry burglary and theft insurance?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 247 | 25.5 | 74.1 | 0.4 | 111 | 31.5 | 67.6 | 0.9 | 136 | 20.6 | 79.4 | — |
| Cleveland | 213 | 53.5 | 46.0 | .5 | 77 | 58.5 | 41.6 | — | 136 | 50.7 | 48.5 | 0.7 |
| Detroit | 233 | 55.8 | 44.2 | — | 91 | 62.6 | 37.4 | — | 142 | 51.4 | 48.6 | — |
| Newark | 186 | 58.1 | 37.6 | 4.3 | 82 | 61.0 | 31.7 | 7.3 | 104 | 55.8 | 42.3 | 1.9 |
| St. Louis | 242 | 42.6 | 55.8 | 1.6 | 98 | 46.9 | 49.0 | 4.1 | 144 | 39.6 | 60.4 | — |
| Oakland: | | | | | | | | | | | | |
| Poverty | 272 | 68.7 | 30.5 | .7 | 87 | 67.8 | 31.2 | — | 185 | 69.2 | 29.7 | 1.1 |
| Nonpoverty | 101 | 79.2 | 20.8 | — | 33 | 84.9 | 15.2 | — | 68 | 76.5 | 23.5 | — |
| All poverty areas | 1,393 | 50.7 | 48.0 | 1.3 | 546 | 54.7 | 43.1 | 2.1 | 847 | 47.9 | 51.5 | .6 |

tenants were uninsured and in all but one poverty area over 42 percent of the tenants were uninsured.

Oakland, which has an unusual city ordinance requiring merchants to meet minimum security standards for the protection of their property, had the lowest rate of uninsureds.

*Plate Glass Insurance.* Businessmen were asked: "Do you carry plate glass insurance?" Almost two-thirds were uninsured for plate glass. In five of the six poverty areas, the percent of uninsureds was over 55 percent. In the nonpoverty area of Oakland, about 32 percent were uninsured, the lowest percentage in any area surveyed. (See Table 7).

Relatively more tenants (67.7 percent) were uninsured than owners (58.4 percent). In three poverty areas over 77 percent of tenants were uninsured.

## Why Don't Businessmen Have Insurance?

*Fire Insurance.* We asked those who were uninsured why they did not carry fire insurance: 35.4 percent said it was a problem of availability; 29.1 percent said the insurance cost too much; and 34.4 percent indicated they did not need insurance, that they had discontinued it voluntarily, or that no agent had called on them. (See Table 8).

*Burglary and Theft Insurance.* We asked those who were uninsured why they did not carry bur-

TABLE 7. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Do you carry plate glass insurance?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 247 | 21.9 | 78.1 | — | 111 | 26.1 | 73.9 | — | 136 | 18.4 | 81.6 | — |
| Cleveland | 213 | 28.2 | 71.8 | — | 77 | 39.0 | 61.1 | — | 136 | 22.1 | 77.9 | — |
| Detroit | 233 | 36.9 | 63.1 | — | 91 | 38.5 | 61.5 | — | 142 | 35.9 | 64.1 | — |
| Newark | 186 | 40.9 | 55.9 | 3.2 | 82 | 37.8 | 56.1 | 6.1 | 104 | 43.3 | 55.8 | 1.0 |
| St. Louis | 242 | 29.8 | 67.4 | 2.9 | 98 | 41.8 | 53.1 | 5.1 | 144 | 21.5 | 77.1 | 1.4 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 272 | 50.7 | 48.2 | 1.1 | 87 | 54.0 | 44.8 | 1.1 | 185 | 49.2 | 49.7 | 1.1 |
| Nonpoverty | 101 | 68.4 | 31.7 | — | 33 | 69.7 | 30.3 | — | 68 | 67.6 | 32.4 | — |
| All poverty areas | 1,393 | 34.7 | 64.1 | 1.2 | 546 | 39.5 | 58.4 | 2.1 | 847 | 31.7 | 67.7 | .6 |

131

TABLE 8. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If you do not carry fire insurance, what are the reasons?

| City | Total | | | | | Owners | | | | | Tenants | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of uninsureds | Problem of cost | Problem of availability | No problem reported | Other | Number of uninsureds | Problem of cost | Problem of availability | No problem reported | Other | Number of uninsureds | Problem of cost | Problem of availability | No problem reported | Other |
| | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent |
| Boston | 87 | 33.3 | 34.5 | 32.2 | — | 23 | 39.1 | 30.4 | 30.4 | — | 64 | 31.2 | 35.9 | 32.8 | — |
| Cleveland | 46 | 23.9 | 54.4 | 21.7 | — | 7 | — | 85.7 | 14.3 | — | 39 | 28.2 | 48.7 | 23.0 | — |
| Detroit | 50 | 24.0 | 50.0 | 26.0 | — | 12 | 25.0 | 58.3 | 16.7 | — | 38 | 23.7 | 47.3 | 29.0 | — |
| Newark | 19 | 36.8 | 42.1 | 21.1 | — | 3 | 33.3 | 66.7 | — | — | 16 | 37.5 | 37.5 | 25.0 | — |
| St. Louis | 59 | 20.3 | 27.1 | 50.9 | 1.7 | 7 | 28.5 | 14.3 | 57.2 | — | 52 | 19.2 | 28.8 | 50.0 | 1.9 |
| Oakland: | | | | | | | | | | | | | | | |
| Poverty | 22 | 36.4 | 4.5 | 54.5 | 4.5 | 3 | 33.3 | — | 66.7 | — | 19 | 36.8 | 5.3 | 52.6 | 5.3 |
| Nonpoverty | 7 | 28.6 | 28.6 | 42.8 | — | — | — | — | — | — | 7 | 28.6 | 28.6 | 42.8 | — |
| All poverty areas | 283 | 29.1 | 35.4 | 34.4 | 1.1 | 55 | 26.5 | 42.6 | 30.9 | — | 228 | 29.4 | 33.9 | 35.4 | 1.2 |

001963

glary and theft insurance: 28.6 percent said it was a problem of cost; 23.5 percent said it was a problem of availability; 41.9 percent said the insurance was unnecessary or gave another reason for not carrying it. (See Table 9).

*Plate Glass Insurance.* We asked those who were uninsured why they did not carry plate glass insurance: 17.6 percent said it was a problem of cost; 21.1 percent said it was a problem of availability; 54.3 percent, including some who had no plate glass exposure, said it was unnecessary or gave another reason for not carrying it. (See Table 10).

### Do Businessmen Who Are Insured Have The Amount of Insurance Wanted?

*Fire and Extended Coverage.* To determine whether businessmen were unable to obtain adequate insurance or, by contrast, were purchasing more than they felt they needed, we asked: "If fire insurance is carried, do you have amount wanted, less than amount wanted, or more than amount wanted?"

About 14 percent had less than they wanted, and about 3 percent more than they wanted.

There was little difference between tenants and owners in most areas. (See Table 11.)

Almost half of those who had less fire insurance than they wanted said company restrictions were the cause. About 40 percent said they carried less than they wanted because it was too expensive. (See Table 12).

*Burglary and Theft Insurance.* Businessmen who carried burglary and theft insurance were asked whether they had the desired amounts. About 8 percent said they did not. This figure ran as high as 12 percent in Detroit, and as low as 1 percent in the nonpoverty area of Oakland. (See Table 13).

*Plate Glass Insurance.* Almost all businessmen who had plate glass insurance said they had the right amount. About 4 percent said they did not. (See Table 14).

### How Do Businessmen Obtain Insurance?

To provide another indicator of the fire insurance market problems of businessmen, we asked whether they had contacted more than one agent.

About 18 percent said yes. Only 8.5 percent contacted more than one agent in the nonpoverty area of Oakland, while in Boston this figure was 27.5 percent. (See Table 15).

We also asked businessmen whether their property was inspected by an agent or company before they obtained the insurance. In Boston, where the Urban Area Plan applies to commercial as well as residential property, the question was specifically related to inspections under the plan.

The highest percentage of inspections was reported in the nonpoverty area of Oakland, the lowest in Boston. (See Table 16.) The results were surprising, since the Boston Plan goes back to 1960. But some property owners may have been unaware of inspections that took place; and some may have interpreted other inspections, for example, by the fire department, as an insurance inspection.

Boston businessmen whose property had not been inspected were asked why. About half said they were unaware of the Boston Urban Area Plan, while about 30 percent said they obtained insurance without it. (See Table 17.)

We asked those whose properties had been inspected whether inspection resulted in obtaining the fire insurance they wanted. About 85 percent said yes, 14 percent said no. (See Table 18.)

We then asked whether the inspection report had called for property improvement. About 13 percent said yes. This figure was highest in Boston (25.7 percent) and lowest in the nonpoverty area of Oakland (3.3 percent). (See Table 19.)

The next question was whether the required improvements were made. About 77 percent said yes.

### How Much Do Businessmen Pay for Insurance?

Businessmen were asked whether they paid more or less than the regular (or standard) rate for fire and extended coverage insurance. About 25 percent said more, while about 8 percent said less. (See Table 20.)

As a check on the validity of these responses, businessmen were asked whether they had to sign an affidavit, waiver, or other statement to obtain the insurance. These generally would be required under consent-to-rate laws to obtain insurance at more than regular rates. About 7 percent indi-

**133**

TABLE 9. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

What are the reasons for not carrying burglary and theft insurance?

| City | Total | | | | | Owners | | | | | Tenants | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number uninsured | Prob-lem of cost | Problem of availa-bility | No prob-lem reported | Other | Number uninsured | Prob-lem of cost | Problem of availa-bility | No prob-lem reported | Other | Number uninsured | Prob-lem of cost | Problem of availa-bility | No prob-lem reported | Other |
| | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent |
| Boston | 183 | 30.6 | 27.3 | 39.3 | 2.7 | 75 | 36.0 | 22.7 | 40.0 | 1.3 | 108 | 28.9 | 30.6 | 38.9 | 3.7 |
| Cleveland | 98 | 33.7 | 29.7 | 36.6 | — | 32 | 30.3 | 18.2 | 51.5 | — | 66 | 35.3 | 35.3 | 29.4 | — |
| Detroit | 103 | 35.0 | 23.3 | 36.0 | 5.8 | 34 | 32.4 | 20.6 | 44.1 | 2.9 | 69 | 36.2 | 24.6 | 31.9 | 7.2 |
| Newark | 70 | 20.0 | 35.7 | 40.0 | 4.3 | 26 | 11.5 | 34.6 | 46.2 | 7.7 | 44 | 25.0 | 36.4 | 36.4 | 2.2 |
| St. Louis | 135 | 20.0 | 19.2 | 48.9 | 11.9 | 48 | 22.9 | 10.4 | 47.9 | 18.8 | 87 | 18.4 | 24.2 | 49.4 | 8.0 |
| Oakland: | | | | | | | | | | | | | | | |
| Poverty | 83 | 32.5 | 6.0 | 50.6 | 10.8 | 28 | 14.3 | 7.1 | 60.7 | 17.9 | 55 | 41.8 | 5.5 | 45.5 | 7.3 |
| Nonpoverty | 21 | 66.7 | 14.3 | 9.5 | 9.5 | 5 | 80.0 | 20.0 | — | — | 16 | 62.5 | 12.5 | 12.5 | 12.5 |
| All poverty areas | 672 | 28.6 | 23.5 | 41.9 | 5.9 | 243 | 24.6 | 18.9 | 48.4 | 8.1 | 429 | 30.6 | 26.1 | 38.6 | 4.7 |

TABLE 10. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

What are the reasons for not carrying plate glass insurance?

| City | Total | | | | | Owners | | | | | Tenants | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number uninsured | Prob-lem of cost | Problem of availa-bility | No prob-lem reported | Other | Number uninsured | Prob-lem of cost | Problem of availa-bility | No prob-lem reported | Other | Number uninsured | Prob-lem of cost | Problem of availa-bility | No prob-lem reported | Other |
| | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent |
| Boston | 193 | 28.1 | 34.4 | 35.4 | 2.1 | 82 | 32.1 | 28.4 | 37.0 | 2.5 | 111 | 25.2 | 37.7 | 34.2 | 1.8 |
| Cleveland | 153 | 9.9 | 28.3 | 61.8 | — | 47 | 10.6 | 14.9 | 74.4 | — | 106 | 9.5 | 34.3 | 56.2 | 9.1 |
| Detroit | 147 | 21.1 | 21.1 | 53.1 | 4.8 | 56 | 12.5 | 28.6 | 55.4 | 3.6 | 91 | 26.4 | 16.5 | 51.7 | 5.5 |
| Newark | 104 | 17.3 | 27.9 | 50.0 | 4.8 | 46 | 10.9 | 21.7 | 63.0 | 4.3 | 58 | 22.4 | 32.8 | 39.7 | 5.2 |
| St. Louis | 163 | 14.7 | 9.8 | 55.8 | 19.6 | 52 | 19.2 | 3.8 | 40.4 | 36.5 | 111 | 12.6 | 12.6 | 63.1 | 11.7 |
| Oakland: | | | | | | | | | | | | | | | |
| Poverty | 131 | 14.5 | 5.3 | 69.5 | 10.7 | 39 | 18.0 | 10.3 | 59.0 | 12.8 | 92 | 13.0 | 3.3 | 74.0 | 9.8 |
| Nonpoverty | 32 | 25.0 | 12.5 | 56.2 | 6.3 | 10 | 50.0 | 30.0 | 20.0 | — | 22 | 13.6 | 4.5 | 72.7 | 9.1 |
| All poverty areas | 891 | 17.6 | 21.1 | 54.3 | 7.0 | 322 | 17.2 | 18.0 | 54.9 | 10.0 | 569 | 18.2 | 23.0 | 53.2 | 5.6 |

134

TABLE 11. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If fire insurance is carried, do you have amount wanted, less than wanted or more than wanted?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Amount wanted | Less | More | Number of insureds | Amount wanted | Less | More | Number of insureds | Amount wanted | Less | More |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 160 | 73.7 | 25.7 | 0.6 | 88 | 74.4 | 24.5 | 1.1 | 72 | 72.8 | 27.2 | — |
| Cleveland | 168 | 85.1 | 13.1 | 1.8 | 71 | 85.9 | 11.3 | 2.8 | 97 | 84.5 | 14.4 | .1 |
| Detroit | 183 | 84.9 | 11.7 | 3.4 | 79 | 84.8 | 11.4 | 3.8 | 104 | 84.9 | 12.0 | 3.0 |
| Newark | 167 | 78.6 | 17.8 | 3.6 | 79 | 71.1 | 24.9 | 4.0 | 88 | 85.1 | 11.5 | 3.4 |
| St. Louis | 178 | 86.2 | 9.8 | 4.0 | 89 | 88.4 | 8.1 | 3.5 | 89 | 83.9 | 11.5 | 4.6 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 250 | 92.1 | 5.4 | 2.5 | 84 | 90.2 | 7.3 | 2.5 | 166 | 93.1 | 4.4 | 2.5 |
| Nonpoverty | 94 | 97.8 | 2.1 | — | 33 | 93.9 | 6.1 | — | 61 | 100.0 | — | — |
| All poverty areas | 1,106 | 83.4 | 13.9 | 2.7 | 490 | 82.5 | 14.5 | 2.9 | 616 | 84.0 | 13.6 | 2.3 |

TABLE 12. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If you carry less fire insurance than you want, what are the reasons?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of under-insureds | Too expensive | Company restrictions | Other | Number of under-insureds | Too expensive | Company restrictions | Other | Number of under-insureds | Too expensive | Company restrictions | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 40 | 52.5 | 32.5 | 15.0 | 21 | 66.7 | 14.3 | 19.0 | 19 | 36.8 | 52.6 | 10.6 |
| Cleveland | 22 | 27.3 | 54.5 | 18.2 | 8 | 12.5 | 50.0 | 37.5 | 14 | 35.7 | 57.1 | 7.2 |
| Detroit | 21 | 33.3 | 52.4 | 14.3 | 9 | 22.2 | 77.8 | — | 12 | 41.7 | 33.3 | 25.0 |
| Newark | 29 | 24.1 | 65.5 | 10.4 | 19 | 26.3 | 63.2 | 10.5 | 10 | 20.0 | 70.0 | 10.0 |
| St. Louis | 17 | 52.9 | 47.1 | — | 7 | 71.4 | 28.6 | — | 10 | 40.0 | 60.0 | — |
| Oakland: Poverty | 13 | 46.2 | 46.2 | 7.7 | 6 | 50.0 | 50.0 | — | 7 | 42.9 | 42.9 | 14.3 |
| All poverty areas | 142 | 39.4 | 49.7 | 10.9 | 70 | 41.5 | 47.3 | 11.2 | 72 | 36.2 | 52.7 | 11.2 |

NOTE: Nonpoverty area of Oakland is not included because of small number of underinsureds.

TABLE 13. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If burglary and theft insurance is carried, do you have desired amounts?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 63 | 88.9 | 6.4 | 4.8 | 35 | 88.6 | 5.7 | 5.8 | 28 | 89.3 | 7.1 | 3.6 |
| Cleveland | 114 | 92.1 | 7.9 | — | 45 | 97.8 | 2.2 | — | 69 | 88.4 | 11.6 | — |
| Detroit | 130 | 88.5 | 11.5 | — | 57 | 87.7 | 12.3 | — | 73 | 89.1 | 11.0 | — |
| Newark | 108 | 88.0 | 9.3 | 2.8 | 50 | 88.0 | 8.0 | 4.0 | 58 | 87.9 | 10.3 | 1.7 |
| St. Louis | 103 | 89.3 | 8.7 | 1.9 | 46 | 93.5 | 2.2 | 4.3 | 57 | 86.0 | 14.0 | — |
| Oakland: | | | | | | | | | | | | |
| Poverty | 187 | 91.4 | 5.9 | 2.7 | 59 | 91.5 | 6.8 | 1.7 | 128 | 91.4 | 5.5 | 3.1 |
| Nonpoverty | 80 | 98.7 | 1.3 | — | 28 | 100.0 | — | — | 52 | 98.1 | 1.9 | — |
| All poverty areas | 705 | 89.7 | 8.3 | 2.0 | 292 | 91.2 | 6.2 | 2.6 | 413 | 88.7 | 9.9 | 1.4 |

135

TABLE 14. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If plate glass insurance is carried, do you have desired amounts?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of in-sureds | Yes | No | Other | Number of in-sureds | Yes | No | Other | Number of in-sureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 54 | 94.4 | 5.6 | — | 29 | 96.5 | 3.4 | — | 25 | 92.0 | 8.0 | — |
| Cleveland | 60 | 98.4 | — | 1.7 | 30 | 100.0 | — | — | 30 | 96.7 | — | 3.3 |
| Detroit | 86 | 91.9 | 4.7 | 3.5 | 35 | 97.1 | 2.9 | — | 51 | 88.2 | 5.9 | 5.9 |
| Newark | 76 | 93.4 | 6.6 | — | 31 | 90.3 | 9.7 | — | 45 | 95.5 | 4.4 | — |
| St. Louis | 72 | 95.8 | 1.4 | 2.8 | 41 | 95.1 | 2.4 | 2.4 | 31 | 96.8 | — | 3.2 |
| Oakland: | | | | | | | | | | | | |
|   Poverty | 138 | 92.0 | 7.2 | .7 | 47 | 87.2 | 10.6 | 2.1 | 91 | 94.5 | 5.5 | — |
|   Nonpoverty | 69 | 97.1 | 2.9 | — | 23 | 100.0 | — | — | 46 | 95.7 | 4.3 | — |
|    All poverty areas | 486 | 94.3 | 4.2 | 1.5 | 213 | 94.4 | 4.8 | .8 | 273 | 94.0 | 4.0 | 2.0 |

TABLE 15. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Did you contact more than 1 agent to buy your fire insurance?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 160 | 27.5 | 70.0 | 2.4 | 88 | 31.8 | 65.9 | 2.2 | 72 | 22.2 | 75.0 | 2.8 |
| Cleveland | 168 | 12.0 | 87.5 | .5 | 71 | 11.3 | 88.7 | — | 97 | 12.4 | 86.6 | 1.0 |
| Detroit | 183 | 13.1 | 82.0 | 4.9 | 79 | 7.6 | 91.2 | 1.3 | 104 | 17.3 | 75.0 | 7.7 |
| Newark | 167 | 16.8 | 77.2 | 6.0 | 79 | 20.2 | 75.9 | 3.9 | 88 | 13.6 | 78.4 | 7.9 |
| St. Louis | 178 | 23.0 | 74.2 | 2.8 | 89 | 21.3 | 73.0 | 5.6 | 89 | 24.7 | 75.3 | — |
| Oakland: | | | | | | | | | | | | |
|   Poverty | 250 | 14.8 | 81.2 | 4.0 | 84 | 11.9 | 86.9 | 1.2 | 166 | 16.3 | 78.3 | 5.4 |
|   Nonpoverty | 94 | 8.5 | 91.4 | — | 33 | 12.1 | 87.9 | — | 61 | 6.6 | 93.4 | — |
|    All poverty areas | 1,106 | 17.9 | 78.7 | 3.4 | 490 | 17.4 | 80.3 | 2.3 | 616 | 17.8 | 78.1 | 4.1 |

136

## TABLE 16. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Have you ever had your property inspected by an agent or company as a condition for obtaining fire insurance? If in Boston, has your property ever been inspected under the Boston Plan as a condition for obtaining fire insurance?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 247 | 28.3 | 67.6 | 4.0 | 111 | 31.5 | 63.1 | 5.4 | 136 | 25.7 | 71.3 | 2.9 |
| Cleveland | 213 | 56.8 | 33.8 | 9.4 | 77 | 63.7 | 33.8 | 2.6 | 136 | 52.9 | 33.8 | 13.2 |
| Detroit | 233 | 55.8 | 21.9 | 22.3 | 91 | 61.5 | 20.9 | 17.6 | 142 | 52.1 | 22.5 | 25.4 |
| Newark | 186 | 75.8 | 18.8 | 5.4 | 82 | 79.2 | 15.8 | 4.8 | 104 | 73.1 | 21.2 | 5.8 |
| St. Louis | 242 | 67.4 | 24.8 | 7.9 | 98 | 82.6 | 9.2 | 8.1 | 144 | 56.9 | 35.4 | 7.7 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 272 | 70.2 | 27.2 | 2.6 | 87 | 80.5 | 18.4 | 1.1 | 185 | 65.4 | 31.3 | 3.2 |
| Nonpoverty | 101 | 90.1 | 4.0 | 5.9 | 33 | 97.0 | 3.0 | — | 68 | 86.8 | 4.4 | 8.8 |
| All poverty areas | 1,393 | 59.1 | 32.4 | 8.5 | 546 | 66.5 | 26.9 | 6.6 | 847 | 54.4 | 35.9 | 9.7 |

## TABLE 17.—BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If your property was not inspected under the Boston Plan, why wasn't it? [1]

| City | Total [1] | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of responses | Not aware of plan | Got insurance without it | Other | Number | Not aware of plan | Got insurance without it | Other | Number | Not aware of plan | Got insurance without it | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston only | 167 | 46.7 | 31.1 | 27.6 | 70 | 44.3 | 35.7 | 30.0 | 97 | 48.5 | 27.8 | 25.7 |

[1] Total may exceed 100 percent because of multiple responses.

## TABLE 18. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If your property was inspected by an insurance agent or company, did the inspection result in getting the fire insurance you wanted? If inspected under the Boston Plan, did it result in getting the fire insurance you wanted?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number responses | Yes | No | Other | Number responses | Yes | No | Other | Number responses | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 70 | 61.4 | 34.3 | 4.3 | 35 | 80.0 | 20.0 | — | 35 | 42.9 | 48.6 | 8.6 |
| Cleveland | — | — | — | — | — | — | — | — | — | — | — | — |
| Detroit | — | — | — | — | — | — | — | — | — | — | — | — |
| Newark | 141 | 89.4 | 10.6 | — | 65 | 92.3 | 7.7 | — | 76 | 86.8 | 13.2 | — |
| St. Louis | 163 | 94.5 | 4.9 | .6 | 81 | 96.3 | 3.7 | — | 82 | 92.7 | 6.1 | 1.2 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 191 | 93.2 | 4.7 | 2.1 | 70 | 92.9 | 5.7 | 1.4 | 121 | 93.4 | 4.1 | 2.5 |
| Nonpoverty | 91 | 98.9 | 1.1 | — | 32 | 96.9 | 3.1 | — | 59 | 100.0 | — | — |
| All poverty areas | 565 | 84.6 | 13.6 | 1.8 | 251 | 90.4 | 9.3 | .3 | 314 | 78.9 | 18.0 | 3.1 |

137

TABLE 19. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If the property was inspected, did the inspection require property improvement?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other |
| | | *Percent* | *Percent* | *Percent* | | *Percent* | *Percent* | *Percent* | | *Percent* | *Percent* | *Percent* |
| Boston | 70 | 25.7 | 68.6 | 5.7 | 35 | 34.3 | 62.9 | 2.9 | 35 | 17.1 | 74.3 | 8.6 |
| Cleveland | 121 | 10.7 | 89.3 | — | 49 | 8.2 | 91.8 | — | 72 | 12.5 | 87.5 | — |
| Detroit | 130 | 8.5 | 91.5 | — | 56 | 12.5 | 87.5 | — | 74 | 5.4 | 94.6 | — |
| Newark | 141 | 12.8 | 87.2 | — | 65 | 16.9 | 83.1 | — | 76 | 9.2 | 90.7 | — |
| St. Louis | 163 | 9.8 | 87.1 | 3.1 | 81 | 9.9 | 88.9 | 1.2 | 82 | 9.8 | 85.4 | 4.9 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 191 | 12.6 | 86.4 | 1.0 | 70 | 14.3 | 85.7 | — | 121 | 11.6 | 86.8 | 1.7 |
| Nonpoverty | 91 | 3.3 | 96.7 | — | 32 | — | 100.0 | — | 59 | 5.1 | 94.9 | — |
| All poverty areas | 816 | 13.4 | 85.0 | 1.6 | 356 | 16.0 | 83.3 | .7 | 460 | 10.9 | 86.6 | 2.5 |

cated that they had signed such a statement. (See Table 21). The difference may mean that more people believe they are paying excess rates than is the case, or it may mean that people are unaware of the significance of waivers they are asked to sign.

**What Problems Are Encountered After Insurance Is Obtained?**

Market conditions were also tested by measuring the impact of cancellation on the three lines of insurance studied. The measurements are somewhat understated for the figures pertaining to fire and extended coverage, because they exclude policy-holders who were cancelled but were able to replace their insurance. For all lines of insurance, non-renewals are excluded.

Cancellations can be analyzed according to two different measures: (1) the cancellation rate of those currently or previously insured; and (2) the cancellation rate of uninsureds.

The first measure indicates the number of insureds over a three year period affected by cancellation. The second measure indicates the number uninsured because of cancellation.

TABLE 20. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

If you carry fire and extended coverage insurance, do you pay the regular rate, less than regular, or more than regular?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Pay regular | Pay less | Pay more | Number of insureds | Pay regular | Pay less | Pay more | Number of insureds | Pay regular | Pay less | Pay more |
| | | *Percent* | *Percent* | *Percent* | | *Percent* | *Percent* | *Percent* | | *Percent* | *Percent* | *Percent* |
| Boston | 160 | 41.5 | 4.9 | 53.6 | 88 | 40.6 | 5.7 | 53.6 | 72 | 42.5 | 3.7 | 53.7 |
| Cleveland | 168 | 63.7 | 8.0 | 28.2 | 71 | 68.7 | 7.8 | 23.5 | 97 | 59.6 | 8.1 | 32.2 |
| Detroit | 183 | 77.4 | 4.7 | 17.9 | 79 | 76.7 | 7.2 | 16.1 | 104 | 78.1 | 2.7 | 19.2 |
| Newark | 167 | 73.8 | 3.7 | 22.4 | 79 | 67.7 | 2.9 | 29.4 | 88 | 80.3 | 4.5 | 15.2 |
| St. Louis | 178 | 70.5 | 14.3 | 15.2 | 89 | 71.2 | 15.2 | 13.6 | 89 | 69.8 | 13.3 | 16.9 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 250 | 74.0 | 13.8 | 12.2 | 84 | 78.7 | 4.3 | 17.0 | 166 | 80.8 | 7.7 | 11.5 |
| Nonpoverty | 94 | 89.4 | 1.2 | 9.4 | 33 | 90.0 | — | 10.0 | 61 | 89.1 | 1.8 | 9.1 |
| All Poverty Areas | 1,106 | 66.8 | 8.2 | 24.9 | 490 | 67.3 | 7.1 | 25.5 | 616 | 68.5 | 6.7 | 24.8 |

138

TABLE 21. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Did you have to sign an affidavit or waiver, or any statement to obtain your fire insurance?

| City | Total | | | | Owners | | | | Tenants | | | |
|------|-------|---|---|---|--------|---|---|---|---------|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 160 | 17.5 | 79.4 | 3.1 | 88 | 17.0 | 79.5 | 3.4 | 72 | 18.1 | 79.2 | 2.8 |
| Cleveland | 168 | 3.0 | 92.9 | 4.1 | 71 | 1.4 | 94.3 | 4.2 | 97 | 4.1 | 91.8 | 4.1 |
| Detroit | 183 | 6.6 | 89.6 | 3.8 | 79 | 1.3 | 97.5 | 1.3 | 104 | 10.6 | 83.7 | 5.8 |
| Newark | 167 | 6.6 | 86.2 | 7.2 | 79 | 5.1 | 89.8 | 5.1 | 88 | 8.0 | 82.9 | 9.1 |
| St. Louis | 178 | 3.4 | 91.0 | 5.6 | 89 | 2.2 | 91.0 | 6.7 | 89 | 4.5 | 91.0 | 4.5 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 250 | 2.8 | 92.0 | 5.2 | 84 | 3.6 | 91.7 | 4.8 | 166 | 2.4 | 92.2 | 5.4 |
| Nonpoverty | 94 | 3.2 | 96.7 | — | 33 | 3.0 | 97.0 | — | 59 | 3.3 | 96.7 | — |
| All poverty areas | 1,106 | 6.7 | 88.5 | 4.8 | 490 | 5.1 | 90.6 | 4.3 | 616 | 8.0 | 86.8 | 5.2 |

*Impact of Cancellations on Insureds.* The ratio of cancellations applies to those insured at any time during the last three years.

There were no reported fire cancellations in Oakland. Elsewhere the proportion of cancellations ranged from 2 to 10 percent of the insured group. (See Line 6 of Table 22).

The cancellation rates for burglary and theft were at least 10 percent in all areas other than Oakland. (See Line 8 of Table 23).

The plate glass cancellation rates ranged from less than 6 percent in the Oakland poverty area to over 27 percent in Boston. (See Line 8 of Table 24).

*Cancellation as a Cause of Being Uninsured.* In four of the six poverty areas, those who were uninsured because of cancellation during the last three years ranged from 18 to 21 percent for fire and extended coverage (see Line 4 of Table 22), 5 to 13 percent for burglary and theft (see Line

TABLE 22. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Estimated cancellation rates for fire and extended coverage insurance for business firms and institutions in 6 poverty areas during the period of November 1964 to November 1967

| Item | Boston | Cleveland | Detroit | Newark | St. Louis | Oakland poverty area | All |
|------|--------|-----------|---------|--------|-----------|---------------------|-----|
| 1. Total number of business firms and institutions currently insured | 160 | 168 | 183 | 167 | 178 | 250 | 1,106 |
| 2. Total number of uninsured business firms and institutions | 87 | 45 | 50 | 19 | 59 | 22 | 282 |
| 3. Number of uninsured business firms and institutions reporting cancellations within the last 3 years | 18 | 8 | 9 | 4 | 5 | — | 44 |
| | | | | Percent | | | |
| 4. $\frac{\text{Total number of uninsured reporting cancellations}}{\text{Total number of uninsured}} \times 100$ [(Item 3) ÷ (Item 2)] × 100 | 20.7 | 17.8 | 18.0 | 21.1 | 8.5 | — | 14.4 |
| 5. $\frac{\text{Total number of uninsured reporting cancellations}}{\text{Total number insured} + \text{Total number uninsured}} \times 100$ [[(Item 3) ÷ [(Item 1) + (Item 2)]] × 100 | 7.3 | 3.8 | 3.9 | 2.2 | 2.1 | — | 3.2 |
| 6. $\frac{\text{Total number of uninsured reporting cancellations}}{\text{Total number insured} + \text{Total number uninsured} + \text{reporting cancellations}} \times 100$ [[(Item 3) ÷ [(Item 1) + (Item 3)]] × 100 | 10.1 | 4.5 | 4.7 | 2.3 | 2.7 | — | 4.1 |

NOTE: Oakland nonpoverty area is excluded because of small sample size.

139

6 of Table 23), and 8 to 10 percent for plate glass (see Line 6 of Table 24).

*Relation of Claims and Cancellation.* About 8 percent of insured businesses reported that their premiums had been raised after they submitted a burglary or theft claim (see Table 25); 5 percent reported cancellation after submitting a claim. (See Table 26).

Businessmen were also asked how fear of cancellation influenced their submission of burglary and theft claims. About 9 percent reported that they had not submitted at least one claim within the last three years because of fear of cancellation. This ranged from 4 percent in the Oakland poverty area to 16 percent in Detroit. (See Table 27). About 8 percent of businessmen reported they had not submitted a plate glass claim because of fear of cancellation.

In order to better evaluate responses relating to the effect of cancellations, policyholders were asked how many burglary and theft claims they had submitted in the last three years. About 76 percent reported none, while 22 percent reported one or more.

### TABLE 23. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Estimated cancellation rates for burglary and theft insurance for business firms and institutions in 6 poverty areas during the period of November 1964 to November 1967

| Item | Boston | Cleveland | Detroit | Newark | St. Louis | Oakland poverty area | All |
|---|---|---|---|---|---|---|---|
| 1. Total number of business firms and institutions currently insured | 63 | 114 | 130 | 108 | 103 | 187 | 705 |
| 2. Total number of uninsured business firms and institutions | 183 | 98 | 103 | 70 | 135 | 83 | 672 |
| 3. Number of insured business firms and institutions that reported cancellations within the last 3 years | 3 | 6 | 6 | 6 | 9 | 5 | 35 |
| 4. Number of uninsured business firms and institutions reporting cancellations within the last 3 years | 9 | 6 | 12 | 9 | 2 | — | 38 |
| 5. Total number of business firms and institutions that had burglary and theft insurance within the last 3 years: (Item 1) + (Item 4) | 72 | 120 | 142 | 117 | 105 | 187 | 743 |
| | | | | Percent | | | |
| 6. $\frac{\text{Total number of uninsureds reporting cancellations}}{\text{Total number of uninsureds}} \times 100$ [(Item 4) ÷ (Item 2)] × 100 | 4.9 | 6.1 | 11.7 | 12.9 | 1.5 | — | 6.2 |
| 7. $\frac{\text{Total number of insureds reporting cancellations} + \text{Total number of uninsureds reporting cancellations}}{\text{Total number insureds} + \text{Total number uninsureds}} \times 100$ [[(Item 3) + (Item 4)] ÷ [(Item 1) + (Item 2)]] × 100 | 4.9 | 5.7 | 7.7 | 8.4 | 4.6 | 1.9 | 5.5 |
| 8. $\frac{\text{Total number of insureds reporting cancellations} + \text{Total number of uninsureds reporting cancellations}}{\text{Total number that had insurance}} \times 100$ [[(Item 3) + (Item 4)] ÷ [(Item 5)]] × 100 | 16.7 | 10.0 | 12.7 | 12.8 | 10.5 | 2.7 | 10.9 |

NOTE: Oakland nonpoverty area is excluded because of small sample size.

140

### TABLE 24. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Estimated cancellation rates for plate glass insurance for business firms and institutions in 6 poverty areas during the period of November 1964 to November 1967

| Item | Boston | Cleveland | Detroit | Newark | St. Louis | Oakland poverty area | All |
|---|---|---|---|---|---|---|---|
| 1. Total number of business firms and institutions currently insured | 54 | 60 | 86 | 76 | 72 | 138 | 486 |
| 2. Total number of uninsured business firms and institutions | 193 | 153 | 147 | 104 | 163 | 131 | 891 |
| 3. Number of insured business firms and institutions that reported cancellations within the last 3 years | 1 | 0 | 4 | 2 | 3 | 7 | 17 |
| 4. Number of uninsured business firms and institutions reporting cancellations within the last 3 years | 19 | 12 | 13 | 8 | 3 | 1 | 56 |
| 5. Total number of business firms and institutions that had plate glass insurance within the last 3 years (Item 1) + (Item 4) | 73 | 72 | 99 | 84 | 75 | 139 | 542 |
| | Percent | | | | | | |
| 6. $\dfrac{\text{Total number of uninsureds reporting cancellations}}{\text{Total number of uninsureds}} \times 100$ [(Item 4) ÷ (Item 2)] × 100 | 9.8 | 7.8 | 8.8 | 7.7 | 1.8 | .8 | 6.1 |
| 7. $\dfrac{\text{Total number of insureds reporting cancellations + Total number of uninsureds reporting cancellations}}{\text{Total number insureds + Total number uninsureds}} \times 100$ [[(Item 3) + (Item 4)] ÷ [(Item 1) + (Item 2)]] × 100 | 8.1 | 5.6 | 7.3 | 5.6 | 2.6 | 3.0 | 5.4 |
| 8. $\dfrac{\text{Total number of insureds reporting cancellations + Total number of uninsureds reporting cancellations}}{\text{Total number that had insurance}} \times 100$ [[(Item 3) + (Item 4)] ÷ (Item 5)] × 100 | 27.4 | 16.7 | 17.2 | 11.9 | 8.0 | 5.8 | 14.5 |

NOTE: Oakland nonpoverty area is excluded because of small sample size.

### TABLE 25. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Have your premiums for burglary and theft insurance been raised within the last 3 years after submitting a claim?

| City | Total | | | | Owners | | | | Tenants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 63 | 4.8 | 90.5 | 4.8 | 35 | — | 94.3 | 5.7 | 28 | 10.7 | 85.7 | 3.6 |
| Cleveland | 114 | 6.1 | 93.0 | .9 | 45 | 4.4 | 93.3 | 2.2 | 69 | 7.2 | 92.7 | — |
| Detroit | 130 | 11.5 | 88.5 | — | 57 | 8.8 | 91.2 | — | 73 | 13.7 | 86.3 | — |
| Newark | 108 | 9.3 | 81.0 | 10.3 | 50 | 10.0 | 80.0 | 10.0 | 58 | 8.6 | 81.0 | 10.3 |
| St. Louis | 103 | 6.8 | 87.4 | 5.8 | 46 | 8.7 | 80.4 | 10.8 | 57 | 5.3 | 93.0 | 1.8 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 187 | 7.5 | 87.2 | 5.3 | 59 | 6.8 | 91.5 | 1.7 | 128 | 7.8 | 85.2 | 7.0 |
| Nonpoverty | 80 | 5.0 | 93.7 | 1.3 | 28 | 3.6 | 96.4 | — | 52 | 5.8 | 92.3 | 1.9 |
| All poverty areas | 705 | 7.6 | 87.9 | 4.5 | 292 | 6.5 | 88.4 | 5.1 | 413 | 8.9 | 87.3 | 3.8 |

141

TABLE 26. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Has your burglary and theft insurance been canceled within the last 3 years after submitting a claim?

| City | Total | | | | Owners | | | | Tenants | | | |
|------|-------|---|---|---|--------|---|---|---|---------|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 63 | 4.8 | 90.5 | 4.8 | 35 | 5.7 | 88.6 | 5.7 | 28 | 3.6 | 92.9 | 3.6 |
| Cleveland | 114 | 5.3 | 94.7 | — | 45 | 4.4 | 95.6 | — | 69 | 5.8 | 94.2 | — |
| Detroit | 130 | 4.6 | 95.4 | — | 57 | 5.3 | 94.7 | — | 73 | 4.1 | 96.0 | — |
| Newark | 108 | 5.6 | 92.6 | 1.9 | 50 | 6.0 | 90.0 | 4.0 | 58 | 5.2 | 94.8 | — |
| St. Louis | 103 | 8.7 | 88.4 | 2.9 | 46 | 17.4 | 78.3 | 4.3 | 57 | 1.8 | 96.5 | 1.8 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 187 | 2.7 | 95.2 | 2.1 | 59 | 1.7 | 98.3 | — | 128 | 3.1 | 93.8 | 3.1 |
| Nonpoverty | 80 | 3.8 | 96.2 | — | 28 | 3.6 | 96.4 | — | 52 | 3.8 | 96.2 | — |
| All poverty areas | 705 | 5.3 | 92.8 | 1.9 | 292 | 6.8 | 90.9 | 2.3 | 413 | 3.9 | 94.7 | 1.4 |

TABLE 27. BUSINESS ESTABLISHMENTS AND INSTITUTIONS

Have you had, within the last 3 years, a burglary or theft claim which you did not submit because of fear of cancellation?

| City | Total | | | | Owners | | | | Tenants | | | |
|------|-------|---|---|---|--------|---|---|---|---------|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 63 | 7.9 | 87.3 | 4.8 | 35 | 11.4 | 82.9 | 5.7 | 28 | 3.6 | 92.9 | 3.6 |
| Cleveland | 114 | 7.0 | 93.0 | — | 45 | — | 100.0 | — | 69 | 11.6 | 88.4 | — |
| Detroit | 130 | 16.1 | 83.8 | — | 57 | 19.3 | 80.7 | — | 73 | 13.7 | 86.3 | — |
| Newark | 108 | 13.0 | 85.2 | 1.9 | 50 | 20.0 | 78.0 | 2.0 | 58 | 6.9 | 91.4 | 1.7 |
| St. Louis | 103 | 3.9 | 93.2 | 2.9 | 46 | 4.3 | 91.3 | 4.3 | 57 | 3.5 | 94.7 | 1.8 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 187 | 3.7 | 95.2 | 1.1 | 59 | 1.7 | 98.3 | — | 128 | 4.7 | 93.8 | 1.6 |
| Nonpoverty | 80 | 5.0 | 95.0 | — | 28 | — | 100.0 | — | 52 | 7.7 | 92.3 | — |
| All poverty areas | 705 | 8.6 | 89.6 | 1.7 | 292 | 9.5 | 88.5 | 2.0 | 413 | 7.3 | 91.2 | 1.5 |

# B. Insurance for Dwellings

### Do Homeowners Have Insurance?

Owners of houses and apartment buildings in poverty areas were asked: "Do you have a package policy covering fire and extended coverage and burglary and theft, or do you carry only fire and extended coverage insurance?" Almost half had no package policy; and about 7 percent of them had no fire and extended coverage insurance. The results varied from poverty area to poverty area, with Detroit having the highest rate of uninsured (12.2 percent) and Oakland the lowest (1.6 percent). (See Table 28.)

Absentee owners are more often uninsured (8.9 percent) than owners who occupy their property (5.2 percent). While the percentage of uninsured may seem low, it is much higher than in the nonpoverty area of Oakland, where all dwelling units had at least fire and extended coverage insurance. Moreover, in the nonpoverty area of Oakland 83 percent of property owners had a package policy, whereas only 50 percent had such policies in the poverty areas we surveyed.

## TABLE 28. DWELLINGS

Do you have a package policy covering fire and extended coverage and burglary and theft or do you carry fire and extended coverage insurance (FEC)?

| City | Total | | | | | Owner-occupants | | | | | Absentee owners | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of Interviews | Home-owners package | FEC | Unin-sured | Other | Number of Interviews | Home-owners package | FEC | Unin-sured | Other | Number of Interviews | Home-owners package | FEC | Unin-sured | Other |
| | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent | | Percent | Percent | Percent | Percent |
| Boston | 233 | 39.9 | 55.3 | 4.7 | — | 174 | 46.0 | 50.0 | 4.0 | — | 59 | 22.0 | 71.2 | 6.8 | — |
| Cleveland | 327 | 40.7 | 50.8 | 8.3 | .2 | 194 | 52.1 | 42.3 | 5.7 | — | 133 | 24.1 | 63.2 | 12.0 | .7 |
| Detroit | 288 | 55.2 | 32.6 | 12.2 | — | 256 | 58.2 | 29.7 | 12.1 | — | 32 | 31.2 | 56.3 | 12.5 | — |
| Newark | 98 | 58.2 | 38.8 | 3.0 | — | 53 | 79.2 | 17.0 | 3.8 | — | 45 | 33.3 | 64.4 | 2.3 | — |
| St. Louis | 197 | 49.7 | 41.1 | 9.1 | — | 123 | 68.3 | 26.8 | 4.9 | — | 74 | 18.9 | 64.8 | 16.2 | — |
| Oakland: | | | | | | | | | | | | | | | |
| Poverty | 306 | 57.5 | 40.9 | 1.6 | — | 202 | 67.8 | 31.7 | .5 | — | 104 | 37.5 | 58.7 | 3.8 | — |
| Nonpoverty | 88 | 83.0 | 17.0 | — | — | 79 | 87.3 | 12.7 | — | — | 9 | 44.4 | 55.6 | — | — |
| All poverty areas | 1,449 | 50.2 | 43.3 | 6.5 | — | 1,002 | 61.9 | 32.9 | 5.2 | — | 447 | 27.8 | 63.1 | 8.9 | .1 |

001974

TABLE 29. DWELLINGS

If you do not carry fire insurance, what are the reasons?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of uninsureds | Problem of cost | Problem of availability | No problem reported | Number of uninsureds | Problem of cost | Problem of availability | No problem reported | Number of uninsureds | Problem of cost | Problem of availability | No problem reported |
| | | percent | percent | percent | | percent | percent | percent | | percent | percent | percent |
| Boston | 11 | 27.3 | 54.5 | 18.1 | 7 | 28.6 | 57.1 | 14.3 | 4 | 25.0 | 50.0 | 25.0 |
| Cleveland | 26 | 19.2 | 65.4 | 15.4 | 11 | 18.2 | 63.6 | 18.2 | 15 | 20.0 | 66.7 | 13.3 |
| Detroit | 35 | 42.9 | 51.4 | 5.7 | 31 | 38.7 | 54.8 | 6.5 | 4 | 75.0 | 25.0 | — |
| St. Louis | 18 | 22.2 | 50.0 | 27.8 | 6 | 33.3 | 50.0 | 16.7 | 12 | 25.0 | 50.0 | 25.0 |
| All | 90 | 27.9 | 55.3 | 16.8 | 55 | 29.7 | 56.4 | 13.9 | 35 | 36.3 | 47.9 | 15.8 |

NOTE: Newark and Oakland have been excluded because of small number of uninsureds.

## Why Don't Homeowners Have Insurance?

We asked those who were uninsured why they did not carry fire and extended coverage insurance; 55 percent indicated it was a problem of availability and 28 percent said that the insurance cost too much. The remaining 17 percent had either voluntarily cancelled their insurance or had not tried to obtain it. (See Table 29).

## Do Homeowners Who Are Insured Have the Right Amount of Insurance?

We asked, "If fire insurance is carried, do you have the amount wanted?" Overall, 15 percent of those in the poverty areas said they had less fire insurance than they wanted. In Newark, over 40 percent of the absentee owners said they had less fire insurance than they wanted.

In the nonpoverty area of Oakland, only 7 percent of property owners said they had less coverage than desired and close to 5 percent had more insurance than they wanted. (See Table 30).

Over half of those who had less fire insurance than they wanted said it was too expensive to buy the desired amounts, and about one-third mentioned company restrictions as the reason for being underinsured. In Detroit and Newark over 58 percent of those who owned their own homes gave company restrictions as the reason for underinsurance. (See Table 31).

TABLE 30. DWELLINGS

If fire insurance is carried, do you have amount wanted, less than wanted, or more than wanted?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Amount wanted | Less | More | Number of insureds | Amount wanted | Less | More | Number of insureds | Amount wanted | Less | More |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 222 | 75.0 | 21.8 | 3.2 | 167 | 74.5 | 23.1 | 2.4 | 55 | 75.9 | 18.5 | 5.5 |
| Cleveland | 300 | 83.7 | 15.0 | 1.3 | 183 | 86.6 | 11.7 | 1.7 | 117 | 78.9 | 20.2 | .9 |
| Detroit | 253 | 89.7 | 7.5 | 2.8 | 225 | 89.7 | 7.6 | 2.7 | 28 | 89.3 | 7.1 | 3.6 |
| Newark | 95 | 74.0 | 22.8 | 3.2 | 5 | 91.9 | 6.1 | 2.0 | 44 | 52.4 | 42.8 | 4.7 |
| St. Louis | 179 | 88.3 | 8.4 | 3.4 | 117 | 88.0 | 7.7 | 4.3 | 62 | 88.7 | 9.7 | 1.6 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 301 | 84.5 | 14.2 | 1.3 | 201 | 84.9 | 14.0 | 1.1 | 100 | 83.5 | 14.4 | 2.1 |
| Nonpoverty | 88 | 88.4 | 7.0 | 4.6 | 79 | 88.4 | 6.4 | 5.2 | 9 | 87.5 | 12.5 | — |
| All poverty areas | 1,350 | 82.5 | 15.0 | 2.5 | 944 | 85.7 | 11.7 | 2.6 | 406 | 78.1 | 18.7 | 3.2 |

**144**

TABLE 31. DWELLINGS

If you carry less fire insurance than you want, what are the reasons?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|------|-------|---|---|---|-----------------|---|---|---|-----------------|---|---|---|
| | Number of under-insureds | Too ex-pensive | Com-pany restric-tions | Other | Number of under-insureds | Too ex-pensive | Com-pany restric-tions | Other | Number of under-insureds | Too ex-pensive | Com-pany restric-tions | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston_____ | 48 | 51.1 | 31.9 | 17.0 | 38 | 50.0 | 31.6 | 18.4 | 10 | 50.0 | 30.0 | 20.0 |
| Cleveland_____ | 44 | 54.5 | 34.1 | 11.4 | 21 | 38.1 | 47.6 | 14.3 | 23 | 69.6 | 21.7 | 8.6 |
| Detroit_____ | 19 | 36.8 | 52.6 | 10.5 | 17 | 29.4 | 58.8 | 11.8 | 2 | 100.0 | — | — |
| Newark_____ | 21 | 61.9 | 38.1 | — | 3 | 33.3 | 66.7 | — | 18 | 66.7 | 33.3 | — |
| St. Louis_____ | 15 | 73.3 | 13.3 | 13.3 | 9 | 77.7 | 11.1 | 11.1 | 6 | 66.7 | 16.7 | 16.7 |
| Oakland: Poverty__ | 42 | 50.0 | 26.2 | 23.8 | 28 | 53.6 | 14.3 | 32.1 | 14 | 42.9 | 50.0 | 7.1 |
| All poverty areas____ | 189 | 54.6 | 32.7 | 12.7 | 116 | 47.0 | 38.4 | 14.6 | 73 | 66.0 | 25.3 | 8.7 |

Note: The nonpoverty area of Oakland is excluded because of the small number of underinsured.

## How Do Homeowners Obtain Insurance?

To determine what additional problems property owners in poverty areas have in obtaining insurance, we asked them whether they had to make contact with more than one agent or broker to buy their insurance. Overall close to 15 percent said they had made contact with more than one producer. (See Table 32).

## Was Property Inspected?

We also asked how many property owners had had their properties inspected as a condition of obtaining insurance. In areas lacking Urban Area Plans, inspections are normally carried out by the producer or the company.

In Boston, Cleveland, and Detroit we asked whether properties were inspected under the local Urban Area Plan. The responses contrasted with independent and more accurate data we had secured on inspections actually performed under these plans. They indicate that the property owner was often unaware whether his property was being inspected under the plan. Therefore, we believe that the responses to the question in these cities should be interpreted to indicate whether the owner believed his property was inspected before he obtained insurance, either under the plan or otherwise.

About 50 percent of the property owners said they had their properties inspected in the poverty areas, only 25 percent of owners said they had their property inspected in the nonpoverty area of Oakland. (See Table 33).

TABLE 32. DWELLINGS

Did you contact more than 1 agent to buy your fire insurance?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|------|-------|---|---|---|-----------------|---|---|---|-----------------|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston_____ | 222 | 18.5 | 79.3 | 2.3 | 167 | 16.1 | 82.0 | 1.8 | 55 | 25.4 | 71.0 | 3.6 |
| Cleveland_____ | 300 | 11.0 | 88.7 | .3 | 183 | 3.3 | 96.2 | .6 | 117 | 23.1 | 76.9 | — |
| Detroit_____ | 253 | 7.1 | 92.9 | — | 225 | 7.6 | 92.4 | — | 28 | 3.6 | 96.4 | — |
| Newark_____ | 95 | 31.6 | 67.4 | 1.1 | 51 | 18.0 | 80.4 | 2.0 | 44 | 48.1 | 52.1 | — |
| St. Louis_____ | 179 | 11.7 | 85.5 | 2.8 | 117 | 8.5 | 88.9 | 2.6 | 62 | 17.7 | 79.0 | 3.2 |
| Oakland: | | | | | | | | | | | | |
| Poverty_____ | 301 | 8.3 | 90.4 | 1.3 | 201 | 6.5 | 91.5 | 2.0 | 100 | 12.0 | 88.0 | — |
| Nonpoverty_____ | 88 | 4.5 | 95.5 | — | 79 | 5.1 | 94.9 | — | 9 | — | 100.0 | — |
| All poverty areas____ | 1,350 | 14.7 | 84.1 | 1.3 | 944 | 10.0 | 88.6 | 1.4 | 406 | 21.7 | 77.2 | 1.1 |

145

### Table 33. Dwellings

Have you ever had your property inspected under the (Boston) (Cleveland) (Michigan) fire insurance inspection plan? If not located in Boston, Cleveland, or Detroit, has your property been inspected by an insurance agent or company in connection with a request for fire insurance?

| City | Total | | | | Owners-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other | Number of interviews | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 233 | 39.5 | 45.5 | 15.1 | 174 | 36.2 | 50.0 | 13.8 | 59 | 49.1 | 32.2 | 18.6 |
| Cleveland | 327 | 44.0 | 51.1 | 4.9 | 194 | 40.7 | 55.2 | 4.1 | 133 | 48.9 | 45.1 | 6.0 |
| Detroit | 288 | 42.4 | 41.3 | 16.3 | 256 | 42.6 | 41.4 | 16.0 | 32 | 40.6 | 40.6 | 18.8 |
| Newark | 98 | 67.3 | 32.7 | — | 53 | 60.4 | 39.6 | — | 45 | 75.6 | 24.4 | — |
| St. Louis | 197 | 52.8 | 38.6 | 8.6 | 123 | 47.2 | 48.8 | 4.0 | 74 | 62.1 | 21.6 | 16.2 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 306 | 56.2 | 42.5 | 1.3 | 202 | 57.9 | 41.1 | 1.0 | 104 | 52.9 | 45.2 | 1.9 |
| Nonpoverty | 88 | 25.0 | 72.8 | 2.2 | 79 | 22.8 | 75.9 | 1.3 | 9 | 44.4 | 44.4 | 11.2 |
| All poverty areas | 1,449 | 50.4 | 42.0 | 7.7 | 100 | 47.5 | 46.1 | 6.5 | 447 | 54.9 | 34.9 | 10.2 |

In Boston, Cleveland, and Detroit we asked owners who had not had their property inspected why it had not been inspected under the plan. The response indicated that a substantial number of owners were unaware of the existence of the plan; and an additional 67 percent said they had not needed an inspection to obtain insurance. (See Table 34).

We asked those whose properties had been inspected whether inspection had resulted in their obtaining the insurance they wanted. Over 75 percent answered affirmatively. (See Table 35).

We also asked property owners whether they were required to make property improvements as the result of the inspection before obtaining insurance. Twenty-two percent indicated they were. (See Table 36).

We then asked these owners whether they had made the requested improvements, and about 85 percent said they had. (See Table 37).

When the property owner failed to make the requested improvements, we asked why. Most indicated that they obtained insurance without making the improvements, although a substantial number did not respond to the question.

### How Much Do Homeowners Pay for Insurance?

To determine the property owners' knowledge and reaction to the price they were paying for insurance we asked whether they paid more or less than regular (or standard) rates for fire and extended coverage insurance.

About 23 percent of those in poverty areas, as

### Table 34. Dwellings

If property was not inspected under the (Boston) (Cleveland) (Michigan) plan, why wasn't it?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of responses | Not aware of plan | Got insurance without it | Other | Number of responses | Not aware of plan | Got insurance without it | Other | Number of responses | Not aware of plan | Got insurance without it | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 108 | 22.2 | 69.4 | 8.4 | 89 | 24.7 | 69.7 | 5.6 | 19 | 10.5 | 68.4 | 21.1 |
| Cleveland | 180 | 29.4 | 62.8 | 7.8 | 116 | 30.2 | 64.7 | 5.1 | 64 | 28.1 | 59.4 | 12.5 |
| Detroit | 119 | 16.8 | 68.1 | 15.1 | 106 | 17.0 | 69.8 | 13.2 | 13 | 15.4 | 53.8 | 30.8 |
| All poverty areas | 407 | 22.8 | 66.8 | 10.4 | 311 | 24.0 | 67.9 | 8.0 | 96 | 18.0 | 60.5 | 21.5 |

146

## Table 35. Dwellings

If your property was inspected under the (Boston) (Cleveland) (Michigan) plan, did the inspection result in getting the fire insurance you wanted? If not located in Boston, Cleveland, or Detroit, did the inspection result in getting the fire insurance you wanted?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other |
| | | *Percent* | *Percent* | *Percent* | | *Percent* | *Percent* | *Percent* | | *Percent* | *Percent* | *Percent* |
| Boston | 92 | 79.3 | 20.6 | — | 63 | 77.8 | 22.2 | — | 29 | 82.8 | 17.2 | — |
| Cleveland | 144 | 57.6 | 37.5 | 4.9 | 79 | 59.5 | 38.0 | 2.5 | 65 | 55.4 | 36.9 | 7.7 |
| Detroit | 122 | 68.9 | 31.1 | — | 109 | 69.7 | 30.3 | — | 13 | 61.5 | 38.5 | — |
| Newark | 66 | 89.4 | 10.6 | — | 32 | 90.6 | 9.4 | — | 34 | 88.2 | 11.8 | — |
| St. Louis | 104 | 79.8 | 16.3 | 3.8 | 58 | 87.9 | 10.3 | 1.7 | 46 | 69.5 | 23.9 | 6.5 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 172 | 83.7 | 9.9 | 6.4 | 117 | 83.8 | 10.3 | 6.0 | 55 | 83.6 | 9.1 | 7.3 |
| Nonpoverty | 22 | 95.5 | 4.5 | — | 18 | 94.4 | 5.6 | — | 4 | 100.0 | — | — |
| All poverty areas | 700 | 76.5 | 21.0 | 2.5 | 458 | 78.2 | 20.1 | 1.7 | 242 | 73.5 | 22.9 | 3.6 |

opposed to 4 percent in the Oakland nonpoverty area, said that they were paying more than regular rates. About 4 percent in the poverty areas and about 9 percent in the Oakland nonpoverty area said they were paying less. (See Table 38).

The foregoing responses should not necessarily be interpreted to mean that property owners actually paid more than the regular rate for their insurance, since the question is highly technical.

Owners normally would sign a waiver, affidavit, or similar statement indicating their consent or knowledge that they are paying more than the regular rate. The smaller percentage who indicated that they had signed these statements (see Table 39) may be evidence that more people believe they are paying more than rgular rates than is probably the case, or that people are not fully aware of the meaning of waivers signed.

## Table 36. Dwellings

If the property was inspected under the (Boston) (Cleveland) (Michigan) plan did the inspection require property improvement? If not located in Boston, Cleveland, or Detroit, did the inspection require property improvement?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other |
| | | *Percent* | *Percent* | *Percent* | | *Percent* | *Percent* | *Percent* | | *Percent* | *Percent* | *Percent* |
| Boston | 92 | 27.2 | 65.2 | 7.6 | 63 | 20.6 | 68.2 | 11.1 | 29 | 41.4 | 58.6 | — |
| Cleveland | 144 | 16.0 | 81.2 | 2.8 | 79 | 15.2 | 82.3 | 2.6 | 65 | 16.9 | 80.0 | 3.0 |
| Detroit | 122 | 19.6 | 74.6 | 5.7 | 109 | 19.2 | 76.1 | 4.6 | 13 | 23.1 | 61.5 | 15.4 |
| Newark | 66 | 42.4 | 54.5 | 3.0 | 32 | 34.4 | 65.6 | — | 34 | 50.0 | 44.1 | 6.0 |
| St. Louis | 104 | 11.5 | 77.9 | 10.6 | 58 | 10.3 | 81.0 | 8.6 | 46 | 13.0 | 73.9 | 13.1 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 172 | 15.7 | 78.5 | 5.8 | 117 | 15.4 | 79.5 | 5.1 | 55 | 16.4 | 76.4 | 7.3 |
| Nonpoverty | 22 | 9.1 | 81.8 | 9.1 | 18 | 11.1 | 83.3 | 5.6 | 4 | — | 75.0 | 25.0 |
| All poverty areas | 700 | 22.1 | 72.0 | 5.9 | 458 | 19.2 | 75.5 | 5.3 | 242 | 26.8 | 65.8 | 7.5 |

147

## TABLE 37. DWELLINGS

### If property improvement was required by inspection, did you make this improvement?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other | Number of responses | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 25 | 92.0 | 8.0 | — | 13 | 92.3 | 7.7 | — | 12 | 91.7 | 8.3 | — |
| Cleveland | 23 | 87.0 | 13.0 | — | 12 | 91.7 | 8.3 | — | 11 | 81.1 | 18.2 | — |
| Detroit | 24 | 79.2 | 20.8 | — | 21 | 90.5 | 9.5 | — | 3 | — | 100.0 | — |
| Newark | 28 | 85.7 | 14.3 | — | 11 | 100.0 | — | — | 17 | 76.5 | 23.5 | — |
| St. Louis | 12 | 83.3 | 16.7 | — | 6 | 100.0 | — | — | 6 | 66.7 | 33.3 | — |
| Oakland: Poverty | 27 | 85.2 | 14.8 | — | 18 | 94.4 | 5.6 | — | 9 | 66.7 | 33.3 | — |
| All poverty areas | 139 | 85.4 | 14.6 | — | 81 | 94.8 | 5.2 | — | 58 | 63.9 | 36.1 | — |

NOTE: The nonpoverty area of Oakland is excluded because of the small number of respondents.

## TABLE 38. DWELLINGS

### If you carry fire and extended coverage insurance, do you pay the regular rate, less than regular, or more than regular?

| City | Total | | | | Owner-occupants | | | | Absentee owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Pay regular | Pay less | Pay more | Number of insureds | Pay regular | Pay less | Pay more | Number of insureds | Pay regular | Pay less | Pay more |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 222 | 62.1 | 6.7 | 31.2 | 167 | 62.8 | 8.0 | 29.2 | 55 | 60.0 | 4.0 | 36.0 |
| Cleveland | 300 | 66.4 | 4.9 | 28.7 | 183 | 82.1 | 2.4 | 15.5 | 117 | 48.1 | 7.7 | 44.3 |
| Detroit | 253 | 85.2 | 1.0 | 13.8 | 225 | 86.1 | 1.1 | 12.8 | 28 | 77.2 | — | 22.8 |
| Newark | 95 | 65.2 | 1.4 | 33.3 | 51 | 79.1 | 3.0 | 17.9 | 44 | 52.5 | — | 47.5 |
| St. Louis | 179 | 73.3 | 5.8 | 21.0 | 117 | 86.7 | 3.3 | 10.0 | 62 | 55.6 | 8.8 | 35.6 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 301 | 85.7 | 1.5 | 12.7 | 201 | 88.4 | — | 11.6 | 100 | 80.3 | 4.5 | 15.2 |
| Nonpoverty | 88 | 87.7 | 8.8 | 3.5 | 79 | 86.9 | 9.4 | 3.7 | 9 | 100.0 | — | — |
| All poverty areas | 1,350 | 73.0 | 3.6 | 23.4 | 944 | 80.9 | 2.9 | 16.2 | 406 | 62.3 | 4.2 | 33.5 |

## TABLE 39. DWELLINGS

### Did you have to sign an affidavit, or waiver, or any statement to obtain your fire insurance?

| City | Total | | | | Owner-occupants | | | | Absentee-owners | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other | Number of insureds | Yes | No | Other |
| | | Percent | Percent | Percent | | Percent | Percent | Percent | | Percent | Percent | Percent |
| Boston | 222 | 5.4 | 88.7 | 5.9 | 167 | 3.6 | 92.0 | 4.8 | 55 | 11.0 | 80.0 | 9.1 |
| Cleveland | 300 | 4.3 | 94.3 | 1.3 | 183 | 5.5 | 93.0 | 1.6 | 117 | 2.6 | 96.6 | .9 |
| Detroit | 253 | 8.7 | 89.3 | 2.0 | 225 | 8.4 | 89.8 | 1.8 | 28 | 10.7 | 85.7 | 3.6 |
| Newark | 95 | 20.0 | 73.7 | 6.3 | 51 | 14.0 | 82.3 | 4.0 | 44 | 27.3 | 64.0 | 9.1 |
| St. Louis | 179 | 10.1 | 84.9 | 5.0 | 117 | 12.8 | 81.2 | 6.0 | 62 | 4.8 | 92.0 | 3.2 |
| Oakland: | | | | | | | | | | | | |
| Poverty | 301 | 2.7 | 89.4 | 8.0 | 201 | 2.5 | 91.0 | 6.5 | 100 | 3.0 | 86.0 | 11.0 |
| Nonpoverty | 88 | 1.1 | 95.5 | 3.4 | 79 | 1.3 | 96.2 | 2.5 | 9 | — | 88.9 | 11.1 |
| All poverty areas | 1,350 | 8.5 | 86.7 | 4.8 | 944 | 7.8 | 88.2 | 4.1 | 406 | 9.9 | 84.1 | 6.2 |

148

**What Problems are Encountered After Insurance is Obtained?**

The impact of cancellation on owners of dwellings can be measured in two ways:

*Impact of Cancellation on Insureds.* The ratio of insureds who were cancelled ranged from 2 to 3 percent computed on a three-year base. (See Line 6 of Table 40). There were no cancellations in Oakland.

*Cancellation as a Cause of Being Uninsured.* About 30 percent of those without insurance were uninsured because of cancellations during the last three years. (See Line 4 of Table 40).

TABLE 40. DWELLINGS

Estimated cancellation rates for fire and extended coverage insurance for dwelling units in 6 poverty areas during the period of November 1964 to November 1967

| Item | Boston | Cleveland | Detroit | Newark | St. Louis | Oakland poverty area | All |
|---|---|---|---|---|---|---|---|
| 1. Total number of dwelling units currently insured | 222 | 300 | 253 | 95 | 179 | 301 | 1,350 |
| 2. Total number of uninsured dwelling units | 11 | 26 | 35 | 3 | 18 | 5 | 98 |
| 3. Number of uninsured dwelling units reporting cancellations within the last 3 years | 4 | 10 | 9 | 2 | 3 | — | 28 |
| | | | | Percent | | | |
| 4. $\frac{\text{Total number of uninsured reporting cancellations}}{\text{Total number of uninsured}} \times 100$ [Item 3 ÷ Item 2) × 100] | 36.4 | 38.5 | 25.7 | 66.7 | 16.7 | — | 30.7 |
| 5. $\frac{\text{Total number of uninsured reporting cancellations}}{\text{Total number insured} + \text{Total number uninsured}} \times 100$ [Item 3 ÷ (Item 1 + Item 2)] × 100 | 1.7 | 3.1 | 3.1 | 2.0 | 1.5 | — | 1.9 |
| 6. $\frac{\text{Total number of uninsured reporting cancellations}}{\text{Total number insured} + \text{Total number uninsured reporting cancellations}} \times 100$ [(Item 3) ÷ (Item 1 + Item 3)] × 100 | 1.8 | 3.2 | 3.4 | 2.1 | 1.6 | — | 2.0 |

NOTE: Oakland nonpoverty area is excluded because of small sample size.

## Other Studies

Various aspects of the urban core insurance problem have been examined by others. These are summarized in this section.

**Crime Commission Survey**

The President's Commission on Law Enforcement and the Administration of Justice (known as the Crime Commission) conducted in 1966 a study entitled "Insurance Problems of Business and Organizations in High Crime Rate Areas."

It concluded there was a serious shortage of insurance in the urban core areas it studied.

*Nature and Size of Sample.* The study interviewed a random sample of 768 business firms and organizations selected in eight police precincts— two in Boston, two in Chicago, and four in Washington, D.C. It was designed to examine the insurance problems of businesses and organizations in high crime rate areas. It gave special attention to burglary and theft insurance and considerably less consideration to fire and extended coverage. It did not look into the problems of homeowners, and did not include any city affected by a major riot.

*Summary of Conclusions.* The study found that about 50 percent of the businesses and institutions surveyed were uninsured for burglary and theft insurance, while about 16 percent were uninsured for fire and extended coverage insurance.

The study also found that those who had insurance were not fully utilizing it. Twenty-five percent of the insured businesses and organizations had losses for which they had not filed claims. The

**149**

two principal reasons for not filing claims were fear of cancellation and fear of higher rates.

These basic findings, although conducted a year earlier, in different areas than those surveyed by the Panel, and with a more limited sample, are consistent with the comparable results of the Panel's more comprehensive survey.

## Congressional Hearings

Recent hearings by three Congressional committees have produced evidence of an inadequate supply of insurance in urban core areas.

The first hearings were conducted by the Senate Select Committee on Small Business.* The hearings examined the impact of crime on small business and looked into the availability of burglary and theft insurance in some detail.

A member of the committee asked a Washington, D.C. restaurant owner whether he had burglary and theft insurance:

> No; I had burglary insurance when I opened up, I got insurance for a couple of years from two companies. And each one canceled me out, and I have not been able to get any since then.
>
> Q. Canceled you out after you had a couple of robberies?
>
> A. No; I did not report any robberies, I had not had any, they just sent me a notice that "your insurance is canceled."

The owner of a Washington, D.C., liquor store was asked whether he had burglary insurance:

> Yes, sir; we did.
>
> Q. Do you still have it?
>
> A. No, sir; they canceled it.
>
> Q. When was it canceled?
>
> A. I think about two years ago. * * *
>
> Q. Why was it canceled?
>
> A. I don't know. They have never paid any burglaries as far as I am concerned since I went into the business, not one cent for burglary.

Other witnesses also testified that burglary and theft insurance was generally not available in high crime areas.

The committee later reported:

> It is a fact that small businessmen in high-crime-rate localities often cannot obtain insurance against losses resulting from robbery, burglary, and acts of vandalism.
>
> It is a fact that their policies are often canceled after the first claim is made for recovery of money stolen or property damaged.
>
> It is a fact that in high crime areas, certain kinds of insurance, if available at all, cost more than the small businessman can afford to pay.*

Hearings were also conducted by the Senate Committe on Commerce to consider a resolution calling for a study of the availability of insurance protection against riots.** These hearings also indicated serious insurance problems in urban core areas.

A representative of the Mayor's Development Team in Detroit stated:

> This problem of insurance available only at prohibitive rates or totally unavailable in some areas is not unique to Detroit; it has arisen in other cities throughout the country. Nor is the problem a new one in Detroit; it has been with us for many years. * * *
>
> There is some evidence that such a "redline" does exist. Several people in the industry and in related work have admitted it to be a fact, but have declined to furnish us with written statements for the record.

The hearing record includes a study of insurance problems encountered in Seattle, Washington, thus indicating the problem is not confined to riot areas.

The most recent of the Congressional hearings, held in September, 1967, by the Subcommittee on Small Business of the Senate Committee on Banking and Currency, produced further evidence of an inadequate supply of insurance in urban core areas.***

The Executive Director of the Menswear Retailers of America told the subcommittee that 25 percent of the membership experienced difficulty in obtaining certain types of coverage, principally burglary, theft, and plate glass coverage. He also

---

*"A Review of the Impact of Crime on Small Business," Hearings Before the Select Committee on Small Business, United States Senate, April 24–26, 1967 (90th Congress, 1st Session).

*"Impact of Crime on Small Business," Report of the Select Committee on Small Business, United States Senate, on the Impact of Crime on Small Business in the Washington, D.C., Area, September 18, 1967 (90th Congress, 1st Session), p. 11.

**"Riot Insurance," Hearings Before the Committee on Commerce, United States Senate, on S.J. Res. 102, August 29, 1967 (90th Congress, 1st Session).

***Hearings before the Subcommittee on Small Business of the Committee on Banking and Currency on a bill to establish a Small Business Crime Protection Insurance Corporation and for other purposes, United States Senate, September 13 and 15, 1967 (90th Congress, 1st Session).

**150**

reported that rates have gone up on these coverages 20 to 30 percent in the past three years.

A representative of the New Jersey Furniture Association testified that in New Jersey "in any area which may be or has been designated a riot area, property insurance of any kind is either totally unobtainable or obtainable only at vastly increased cost."

Other trade associations that testified included the Associated Retail Bakers of America, the National Association of Retail Grocers, and the National Liquor Store Association. All said there was a serious shortage of insurance.

## Massachusetts Study

On October 23, 1967, the Insurance Department of Massachusetts reported on the availability of fire insurance in urban core areas of Boston, including the South End, Roxbury, and North Dorchester.

Department inspectors interviewed 224 property owners and found only about 5 percent uninsured.

They reported the following figures:

| Type of risk | Insured | | At what rates— | | | |
|---|---|---|---|---|---|---|
| | Yes | No | Manual | Excess | Surplus | Unknown |
| Dwellings | 115 | 7 | 82 | 1 | 8 | 24 |
| Mercantile | 93 | 9 | 55 | 4 | 18 | 16 |
| Total | 208 | 16 | 137 | 5 | 26 | 40 |

The survey reported that uninsured property owners did not have insurance for the following reasons: (1) could not afford insurance; (2) insured did not renew; (3) previously refused; (4) previously cancelled; (5) refused to pay above bureau (standard) rates; and (6) other miscellaneous reasons.

The survey also found no indications of mass cancellations, industry withdrawal from the area, or inability by those insured to purchase the amount of insurance desired.

The 5 percent figure is consistent with the Panel's findings for homeowners; but our survey of businessmen in Roxbury based on a considerably larger sample indicates that 35 percent of those interviewed did not have fire insurance.

## Cleveland Study

In 1965, the Ohio Department of Insurance studied the problem of availability of fire and extended coverage insurance in various center city areas of Cleveland.

The Department concluded that insurance companies were not cancelling or refusing fire coverage; that 90 percent of all policies carried standard rates; that no racial discrimination was proven; and that some properties were manifestly uninsurable because of physical condition or loss exposure.

## New York Study

In 1967, the New York Insurance Department studied fire insurance availability in certain low-income areas of Buffalo and New York City.

The study concluded that the market for fire insurance on residential properties in these areas was inadequate and that many property owners found it difficult or impossible to obtain needed insurance. The study found no evidence of discrimination on grounds of race, color, creed or national origin.

The primary cause of the problem was found to be the practice of underwriting residential properties without inspection of individual properties. Underwriters assumed that all business in low-income areas was bad, and therefore denied coverage to risks, good and bad alike.

As a result of this study, New York implemented a mandatory inspection plan in Buffalo and New York City. This plan is described in Chapter III.

## Survey by the National Association of Insurance Commissioners

A subcommittee of the National Association of Insurance Commissioners (NAIC) in 1966 surveyed the insurance commissioners of all jurisdictions on the availability of fire and extended coverage insurance on dwellings.

The commissioners indicated some problem of restricted markets in twenty-seven states. Eleven commissioners indicated a problem in rural and urban areas, six commissioners in urban areas only, and ten in rural areas only.

151

Most of the problem properties were low-value and substandard risks.

## Watts Study

The University of California conducted a survey of the insurance problems in Watts several months after the riots had subsided in 1965. Although this survey was not a probability sample, the responses of the 198 merchants interviewed are nonetheless useful as evidence of the fire and burglary and theft insurance problem. The study concluded that a serious availability problem existed.

## National Institute for Public Affairs Study

A survey of seven cities conducted by the staff of the National Institute for Public Affairs during the summer of 1967 concluded there was a serious problem of insurance availability in urban core areas.

Urban core areas were visited in Baltimore; Boston; Cleveland; Jackson and Lexington, Mississippi; New York City; and Philadelphia.

The study found numerous complaints about property insurance unavailability in most of these cities. Urban core residents also complained of arbitrary cancellations and excessive rates.

## Some Aspects of the Cost of Insurance

Consumer complaints about the high cost of property insurance were a recurring theme of our field interviews. Our survey showed that 28 percent of homeowners and 29 percent of businessmen who did not have fire and extended coverage insurance said they were without insurance because it was too expensive; 29 percent of businessmen gave the same reasons for not having burglary and theft insurance.

As discussed in Chapter II, the price that companies charge for insurance is a product of rating systems, underwriting judgments, and a host of other business and financial considerations that relate to the profitability and financial stability of the individual insurers. On the other hand, an individual consumer's judgment that insurance is too high or beyond his means reflects his personal assessment of his income, wealth, need for insurance, and benefits derived from insurance, not to mention a variety of even more subjective factors including social and economic value judgments.

In an attempt to shed some additional light on the consumer reaction to the cost of insurance, we looked at the premiums now being charged for typical homes or stores in various geographic areas for the lines of insurance covered in our study. We then compared, by using price indexes, the increase in premium costs in these lines to the price increases for other goods and services.

## Increasing Cost of Property Insurance

Using 1959 insurance premiums as the base for comparison (1959=100), 1966 fire insurance premiums rose faster (119.7) than the overall consumer price index (111.4); burglary and theft insurance premiums rose even more rapidly (139.3) than the much-publicized increases in medical costs (122.3), automobile bodily injury liability coverage (120.3) and automobile property damage liability coverage (131.9). (See Table 41).

Increases in property insurance costs are based on national averages. In some areas, there has been a small decline in insurance costs while in others the increase has been substantially greater than the average, particularly for burglary and theft coverage in areas that have experienced a considerable increase in crime since 1959. Some representative examples of changes in premium costs in certain major cities are set forth in Tables 42–49.

## Representative Premiums

*Fire and Extended Coverage—Dwellings.* The cost of fire and extended coverage insurance to the homeowner typically consumes only a relatively small proportion of his income and constitutes only a relatively small amount compared to the property value protected by the insurance.

For example, in eight cities we studied, the highest standard rate premium in 1967 for a homeowners package policy covering an $8,000 frame dwelling with $2,000 in contents was $75 in New York City. The lowest premium for the same amount of insurance was $19 in New York City, assuming only fire and extended coverage and vandalism and malicious mischief is purchased on a brick dwelling. In both cases, the premiums are lower than they were in 1960.

152

TABLE 41. DWELLINGS

Comparison of selected insurance rate level, consumer price level, and medical care indexes, 1959–66

[1959—100]

| Year | Consumer price index | Medical care price index | Fire insurance rate level index | Burglary and theft rate level index | Private passenger | |
|---|---|---|---|---|---|---|
| | | | | | Auto bodily injury liability rate level index | Auto property damage liability rate level index |
| 1959 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| 1960 | 101.6 | 103.5 | 99.9 | 103.2 | 98.1 | 96.8 |
| 1961 | 102.7 | 106.6 | 100.3 | 105.8 | 100.2 | 95.8 |
| 1962 | 103.8 | 109.4 | 101.9 | 115.3 | 103.0 | 97.3 |
| 1963 | 105.1 | 112.1 | 102.8 | 118.1 | 105.6 | 99.7 |
| 1964 | 106.5 | 114.4 | 108.0 | 121.6 | 108.0 | 106.5 |
| 1965 | 108.3 | 117.1 | 116.0 | 128.1 | 115.0 | 122.2 |
| 1966 | 111.4 | 122.3 | 119.7 | 139.3 | 120.3 | 131.9 |

NOTE: All indexes are based on 1959 for purposes of comparison.

SOURCES: Data supplied by the Department of Labor, Bureau of Labor Statistics; Fire Insurance Research and Actuarial Association; and National Bureau of Casualty Underwriters.

On the other hand, the premium for a like amount of fire and extended coverage and vandalism and malicious mischief on a frame dwelling in Chicago increased between 1960 and 1967 from $26 to $39 (50 percent) and in Detroit from $27 to $37 (37 percent). (See Tables 42 and 43.)

Many homeowners in the urban core pay two to three times standard rates, and rates may run as high as ten times standard.

*Fire and Extended Coverage—Businesses.* The annual premiums for fire, extended coverage, and vandalism and malicious mischief insurance for typical retail business firms in eight large cities for 1960 and 1967 are given in Table 44. These firms, and their characteristics for insurance rating purposes, were selected as being reasonably representative of businesses in urban core areas. With few exceptions, premiums have increased between 1960 and 1967. Premium increases in Newark and Philadelphia have been greater than in the other six cities examined.

The rates are standard rates based on a building in average condition and are generally derived by application of a schedule. The application of this schedule could easily result in premiums varying 10 to 20 percent or more above or below those indicated—depending on whether the building was above or below the average assumed for the study.

Further, location, building defects, or environmental hazards may make insurers unwilling to write a particular risk at less than two to five, and sometimes even ten times the standard rate.

The Panel's study of the Watts Pool (described in Chapter III), for example, concluded that over 67 percent of its insureds were paying rates in excess of three times standard or manual rates. The Panel's study of rates paid under New York's Urban Area Plan (described in Chapter III) found that 67 percent of insureds were paying rates in excess of two times standard or bureau. Other evidence indicates that rates charged under the consent-to-rate plan in New York have averaged about 3.75 times standard or bureau rates.

*Burglary and Theft—Businesses.* Many small retail businessmen have made especially strong complaints about the increase in the cost of burglary and theft coverage, particularly owners of marginal businesses in high crime areas who place a high priority on burglary and theft coverage.

The annual premiums in 1960 and 1967 for a mercantile open stock burglary policy for representative retail establishments in the District of Columbia and eight states which include major cities are illustrated in Table 45. This policy covers merchandise against loss by burglary. It is an important part of the burglary and theft protection required by most retailers.

Premiums have increased sharply in all cities, particularly in Boston (Suffolk County). For example, in 1960, the representative pawnbroker's premium was $725 for a $30,000 mercantile open stock burglary policy; this had increased around 140 percent to $1,737 by 1967.

153

TABLE 42. DWELLINGS

1967 approximate annual bureau (standard or regular) premiums for $8,000 dwelling building and $2,000 contents fire, extended coverage, and vandalism and malicious mischief insurance (FEV) and $8,000 homeowners (HO)* (Package), Form I or Form A.

| City and district | Protection class | Frame construction | | | | Brick construction | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | FEV a | Homeowners package | | | FEV a | Homeowners package | | |
| | | | Type of deductible d | | | | Type of deductible d | | |
| | | | None | Wind and hail | All peril | | None | Wind and hail | All peril |
| Boston, A | 2 | $66 | n/a | $51 | c $46 | $66 | n/a | $46 | c $41 |
| Boston, B | 2 | 67 | n/a | 51 | c 46 | 67 | n/a | 46 | c 41 |
| Boston, C | 2 | 71 | n/a | 55 | c 50 | 71 | n/a | 50 | c 45 |
| Boston, balance of city | 2 | 61 | n/a | 47 | c 42 | 61 | n/a | 42 | c 37 |
| Chicago | 2 | 39 | n/a | n/a | 32 | 39 | n/a | n/a | 28 |
| Detroit | 2 | b 37 | 47 | 37 | c 31 | b 37 | 47 | 37 | c 31 |
| Washington, D.C. | 2 | b 32 | 41 | 34 | c 30 | b 21 | 34 | 28 | c 23 |
| Los Angeles | 2 | c 25 | 61 | n/a | 40 | c 22 | 61 | n/a | 40 |
| Los Angeles | 4 | c 29 | 64 | n/a | 43 | c 25 | 61 | n/a | 40 |
| Newark | 2 | f 33 | n/a | 32 | 30 | c 29 | n/a | 28 | 26 |
| New York (Manhattan) | ** | 29 | 75 | g 64 | n/a | 19 | 70 | g 60 | n/a |
| Philadelphia | 2 | b 27 | n/a | 27 | c 23 | b 24 | n/a | 26 | c 21 |

a $50 straight deductible applicable to all perils unless otherwise indicated.
b $50 straight deductible applicable to all wind and hail losses only.
c $50 disappearing deductible applicable to all perils.
d $50 disappearing deductible applicable unless otherwise indicated.
e Except fire and lightning.
f $50 disappearing deductible applicable to fire and all extended coverage perils.
g $50 straight deductible applicable to fire, wind and hail.
*Either Homeowners Form I or Form A is used in most States. They both provide physical damage coverage for dwelling, appurtenant private structures, unscheduled personal property on and away from premises, and additional living expense—all against loss by fire, the extended coverage perils, vandalism and malicious mischief, and theft. In addition, coverage is provided for personal liability, personal medical payments, and physical damage to property of others.

The basic limits of liability for these coverages are:

| Coverage | Limit of liability |
|---|---|
| A. Dwelling building | $8,000. |
| B. Appurtenant structures | $800. |
| C. Personal property | $3,200 on premises; $1,000 off. |
| D. Additional living expense | $800. |
| E. Personal liability | $25,000. |
| F. Medical payments | $500. |
| G. Physical damage | $250. |

**NYC public fire protection has never been graded since its rates are based upon its own classified loss experience.
n/a=Not available.
SOURCE: Fire insurance rating bureaus.

TABLE 44. BUSINESS ESTABLISHMENTS

Approximate annual bureau (standard or regular) premiums for fire, extended coverage, and vandalism and malicious mischief insurance on building and contents for typical retail firms in selected cities in the United States, 1960–67

| Location | Drugstore | | | | Furniture store | | | | Grocery store | |
|---|---|---|---|---|---|---|---|---|---|---|
| | $40,000 on Building | | $20,000 on Contents | | $40,000 on Building | | $36,000 on Contents | | $40,000 on Building | |
| | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 |
| Boston | $212 | $252 | $244 | $244 | $256 | $308 | $464 | $464 | $212 | $252 |
| Chicago | 242 | 250 | 217 | 235 | 242 | 250 | 552 | 603 | 242 | 250 |
| Detroit | 162 | 186 | 179 | 183 | 174 | 190 | 365 | 396 | 162 | 186 |
| District of Columbia | 106 | 114 | 100 | 102 | 120 | 130 | 292 | 302 | 106 | 114 |
| Los Angeles | 116 | 142 | 114 | 142 | 130 | 160 | 220 | 270 | 116 | 142 |
| Newark | 234 | 365 | 214 | 278 | 334 | 545 | 513 | 680 | 234 | 365 |
| New York | 201 | 234 | 154 | 187 | 226 | 262 | 439 | 538 | 201 | 234 |
| Philadelphia | 192 | 262 | 240 | 308 | 192 | 262 | 433 | 554 | 192 | 262 |

154

TABLE 43. DWELLINGS

1960 approximate annual bureau (standard or regular) premiums for $8,000 dwelling building and $2,000 contents fire, extended coverage, and vandalism and malicious mischief insurance (FEV) and $8,000 homeowners (HO)* (Package) Form I or Form A

| City and district | Protection class | Frame construction | | | | Brick construction | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | FEV * | Homeowners package | | | FEV * | Homeowners package | | |
| | | | None | Type of deductible *| | | None | Type of deductible *| |
| | | | None | Wind and hail | All peril | | None | Wind and hail | All peril |
| Boston, A | 2 | $53 | n/a | $47 | $43 | $53 | n/a | $47 | $43 |
| Boston, B | 2 | 54 | n/a | 47 | 43 | 54 | n/a | 47 | 43 |
| Boston, C | 2 | 58 | n/a | 51 | 47 | 58 | n/a | 51 | 47 |
| Boston, balance of city | 2 | 48 | n/a | 44 | 40 | 48 | n/a | 44 | 40 |
| Chicago | 3 | b 26 | 33 | n/a | 25 | b 20 | 29 | n/a | 21 |
| Detroit | 2 | 27 | 40 | 32 | 28 | 24 | 40 | 32 | 28 |
| Washington, D.C. | 2 | 29 | 41 | 34 | 30 | 18 | 34 | 28 | 23 |
| Los Angeles | 3 | 18 | 44 | d 42 | n/a | 15 | 41 | d 39 | n/a |
| Lor Angeles | 4 | 19 | 44 | d 42 | n/a | 16 | 41 | d 39 | n/a |
| Newark | 2 | 28 | n/a | 32 | 30 | 25 | n/a | 28 | 26 |
| New York (Manhattan) | ** | 24 | 97 | d 90 | n/a | 20 | 83 | d 77 | n/a |
| Philadelphia, A | 2 | 22 | n/a | 28 | 23 | 20 | n/a | 26 | 22 |
| Philadelphia, B | 2 | 24 | n/a | 29 | 25 | 22 | n/a | 27 | 23 |

* $50 straight deductible applicable to wind and hail unless otherwise indicated.
b No deductible applicable.
c $50 disappearing deductible applicable unless otherwise indicated.
d $50 straight deductible.
*Either homeowners Form I or Form A is used in most states. They both provide physical damage coverage for dwelling, appurtenant private structures, unscheduled personal property on and away from premises, and additional living expenses—all against loss by fire, the extended coverage perils, vandalism and malicious mischief, and theft. In addition, coverage is provided for personal liability, personal medical payments and physical damage to property of others.

The basis limits of liability for these coverages are:

| Coverage | Limit of liability |
|---|---|
| A. Dwelling building | $8,000. |
| B. Appurtenant structures | $800. |
| C. Personal property | $3,200 on premises, $1,000 off. |
| D. Additional living expense | $800. |
| E. Personal liability | $10,000. |
| F. Medical payments | $250. |
| G. Physical damage | $250. |

**NYC public fire protection has never been graded since its rates are based upon its own classified loss experience.
n/a=Not available.
SOURCE: Fire insurance rating bureaus.

TABLE 44. BUSINESS ESTABLISHMENTS—Continued

Approximate annual bureau (standard or regular) premiums for fire, extended coverage, and vandalism and malicious mischief insurance on building and contents for typical retail firms in selected cities in the United States, 1960–67—Continued

| Location | Grocery store | | Jewelry store | | | | Liquor store | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | $24,000 on Contents | | $40,000 on Building | | $40,000 on Contents | | $40,000 on Building | | $20,000 on Contents | |
| | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 |
| Boston | $240 | $240 | $212 | $252 | $440 | $440 | $212 | $252 | $200 | $200 |
| Chicago | 320 | 354 | 242 | 250 | 534 | 590 | 242 | 250 | 287 | 315 |
| Detroit | 197 | 201 | 156 | 186 | 348 | 366 | 162 | 186 | 179 | 183 |
| District of Columbia | 100 | 99 | 106 | 114 | 217 | 223 | 106 | 114 | 109 | 108 |
| Los Angeles | 134 | 151 | 116 | 142 | 204 | 252 | 116 | 142 | 126 | 142 |
| Newark | 231 | 264 | 234 | 365 | 428 | 556 | 234 | 365 | 192 | 220 |
| New York | 234 | 316 | 201 | 234 | 308 | 375 | 201 | 234 | 154 | 207 |
| Philadelphia | 288 | 369 | 192 | 262 | 481 | 615 | 192 | 262 | 240 | 308 |

NOTE: All premiums are based on 80-percent coinsurance rates.
SOURCE: Fire insurance rating bureaus.

155

TABLE 45. BUSINESS ESTABLISHMENTS

Approximate annual bureau (standard or regular) premiums for mercantile open stock burglary insurance for typical retail establishments, 1960 and 1967

| Location | Drug store, $7,500 | | Furniture store, $15,000 | | Grocery store, $3,000 | | Jewelry store, $15,000 | | Liquor store, $7,500 | | Pawnbroker, $30,000 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 | 1960 | 1967 |
| Boston area: | | | | | | | | | | | | |
| Middlesex County | $162 | $405 | $197 | $493 | $47 | $118 | $290 | $726 | $135 | $338 | $404 | $1,008 |
| Norfolk County | 162 | 287 | 197 | 349 | 47 | 84 | 290 | 514 | 135 | 239 | 404 | 713 |
| Suffolk County including | | | | | | | | | | | | |
| Boston | 291 | 699 | 352 | 850 | 85 | 204 | 521 | 1,251 | 242 | 582 | 725 | 1,737 |
| Remainder | 162 | 351 | 197 | 428 | 47 | 103 | 290 | 630 | 135 | 293 | 404 | 874 |
| Chicago area: | | | | | | | | | | | | |
| Cook County including | | | | | | | | | | | | |
| Chicago | 491 | 467 | 602 | 518 | 145 | 136 | 889 | 836 | 413 | 389 | 1,234 | 1,161 |
| Remainder of Illinois | 216 | 268 | 262 | 327 | 63 | 78 | 386 | 481 | 180 | 224 | 536 | 668 |
| Detroit area: | | | | | | | | | | | | |
| Detroit City Metropolitan | | | | | | | | | | | | |
| District | 216 | 388 | 262 | 472 | 63 | 113 | 386 | 695 | 180 | 324 | 536 | 965 |
| Remainder of Michigan | 162 | 388 | 197 | 315 | 47 | 76 | 290 | 464 | 135 | 216 | 404 | 643 |
| District of Columbia | 237 | 603 | 287 | 734 | 69 | 164 | 425 | 1,080 | 197 | 502 | 590 | 1,499 |
| Los Angeles area: | | | | | | | | | | | | |
| Los Angeles County excluding | | | | | | | | | | | | |
| Catalina Island | 356 | 562 | 434 | 683 | 104 | 145 | 637 | 1,006 | 296 | 468 | 886 | 1,397 |
| Alameda County | 216 | 499 | 272 | 608 | 63 | 146 | 386 | 894 | 180 | 416 | 536 | 1,241 |
| San Francisco County | 237 | 499 | 287 | 608 | 69 | 146 | 425 | 894 | 197 | 416 | 590 | 1,241 |
| Remainder of State | 259 | 499 | 316 | 608 | 75 | 146 | 464 | 894 | 216 | 416 | 644 | 1,241 |
| Newark area: | | | | | | | | | | | | |
| Atlantic County | 216 | 434 | 262 | 529 | 63 | 127 | 386 | 778 | 180 | 362 | 536 | 1,081 |
| Bergen County | 146 | 248 | 177 | 303 | 43 | 72 | 261 | 444 | 122 | 207 | 362 | 617 |
| Camden County | 237 | 434 | 287 | 529 | 69 | 127 | 425 | 778 | 197 | 362 | 575 | 1,081 |
| Essex County including | | | | | | | | | | | | |
| Newark | 259 | 552 | 316 | 302 | 76 | 161 | 464 | 989 | 122 | 460 | 643 | 1,373 |
| Remainder of New Jersey | 129 | 284 | 157 | 302 | 37 | 72 | 231 | 444 | 108 | 207 | 321 | 617 |
| New York area: | | | | | | | | | | | | |
| Bronx County | 291 | 680 | 352 | 828 | 85 | 199 | 521 | 1,219 | 269 | 567 | 725 | 1,692 |
| Erie County | 146 | 371 | 177 | 451 | 43 | 108 | 261 | 664 | 135 | 309 | 404 | 922 |
| Kings County | 259 | 596 | 316 | 726 | 85 | 174 | 521 | 1,068 | 242 | 497 | 644 | 1,483 |
| Monroe County | 118 | 201 | 151 | 244 | 31 | 59 | 194 | 359 | 90 | 167 | 269 | 499 |
| Nassau County | 118 | 217 | 131 | 264 | 31 | 63 | 194 | 388 | 90 | 181 | 269 | 539 |
| New York County | 118 | 356 | 216 | 433 | 52 | 104 | 319 | 637 | 149 | 297 | 444 | 785 |
| Onondaga County | 118 | 142 | 131 | 173 | 31 | 42 | 194 | 255 | 90 | 119 | 269 | 354 |
| Queens County | 216 | 464 | 262 | 564 | 63 | 135 | 386 | 830 | 197 | 386 | 530 | 1,153 |
| Richmond County | 178 | 337 | 216 | 411 | 52 | 99 | 319 | 604 | 149 | 281 | 444 | 839 |
| Westchester County | 108 | 190 | 131 | 231 | 31 | 55 | 194 | 340 | 90 | 158 | 269 | 472 |
| Remainder of New York | 108 | 253 | 131 | 308 | 31 | 74 | 194 | 454 | 99 | 211 | 269 | 630 |
| Philadelphia area: | | | | | | | | | | | | |
| Allegheny County | 259 | 557 | 316 | 679 | 76 | 163 | 464 | 998 | 216 | 465 | 644 | 1,386 |
| Philadelphia County | 356 | 516 | 434 | 629 | 104 | 151 | 637 | 923 | 296 | 430 | 886 | 1,218 |
| Remainder of Pennsylvania | 108 | 193 | 131 | 235 | 31 | 56 | 194 | 380 | 90 | 161 | 269 | 480 |
| Cleveland area: | | | | | | | | | | | | |
| Cuyahoga County | 388 | 543 | 434 | 679 | 113 | 195 | 638 | 973 | 324 | 452 | 965 | 1,351 |
| Remainder of Ohio | 178 | 284 | 216 | 346 | 52 | 87 | 319 | 510 | 149 | 237 | 444 | 699 |

NOTE: The data do not reflect rate credits discounts for protective devices.

SOURCE: National Bureau of Casualty Underwriters.

156

TABLE 46. BUSINESS ESTABLISHMENTS

Insurance cost per thousand dollars of sales for representative businesses insured in the Watts Pool

| A<br>Business | B<br>Insurance coverage [1] | C<br>Annual premium | D<br>Sales to inventory [2] | E<br>Estimated net sales [3] | F<br>Insurance cost per $100 net sales [4] |
|---|---|---|---|---|---|
| Liquor [3] | $15,000 Stock<br>$7,500 FFE | $507 | 8. 0 | $120, 000 | $0. 42 |
| Liquor [3] | $15,000 Stock<br>$10,000 FFE | 664 | 8. 0 | 120, 000 | . 54 |
| Furniture | $50,000 Stock | 744 | 4. 5 | 225, 000 | . 33 |
| Food | $25,000 Stock | 502 | 16. 0 | 400, 000 | . 13 |
| Shoes | $36,670 Stock | 737 | 3. 3 | 121, 000 | . 61 |
| Men's Clothing | $69,000 Stock | 1, 194 | 3. 5 | 241, 500 | . 49 |
| Drug | $13,500 Stock | 221 | 5. 0 | 67, 500 | . 33 |
| Drug | $10,000 Stock | 132 | 5. 0 | 50, 000 | . 26 |
| Appliance | $42,500 Stock | 1, 114 | 5. 5 | 233, 750 | . 48 |

[1] Coverage limited to fire and extended coverage; FFE: Furniture, fixtures, and equipment.
[2] From Dun and Bradstreet. This ratio was used to estimate net sales upon basis of firm's average inventory. The ratio was developed from nationwide experience and a conservative figure was used.
[3] Stock in Column B × Column D.

[4] [Column C divided by Column E] × 100.

NOTE: These samples did not include coverage on buildings because most buildings in Watts are not tenant-owned.

SOURCE: Insurance Information Institute.

The highest premium for a grocery store—covering a $3,000 inventory—is in Boston: $204; the lowest, in Onondaga County, New York, is $42.

Again, these are standard rates. Insurance may actually be unavailable, or available only at higher rates—typically from 1.5–3 times the standard rates, and usually with a substantial deductible.

**Insurance Premiums as a Cost of Doing Business**

Studies have been made to compare the cost of insurance for business firms with their annual sales. For example, the Watts Pool undertook a random sampling of fire and extended coverage insurance premiums paid by firms that it insured and concluded that the premiums were less than 1 percent of the annual sales of the firms studied. (See Table 46).

The National Cash Register Company also published a report that shows total insurance costs of a business as a percentage of annual sales volume for selected businesses. It found that for most businesses insurance premiums are less than 1 percent of sales. (See Table 47).

**Insurance Premiums as a Percent of Insured Inventory**

Another and more meaningful method of analyzing insurance costs to a business firm is to compare premiums to the property values protected by the insurance. We did this for five representative small firms.

In order to analyze the relationship of insurance costs to a firm's annual sales and insured inventory, some assumptions must be made regarding the amount of inventory carried, stock turnover ratios, and estimated annual gross sales. For purposes of analysis, it was assumed that a firm carried fire and extended coverage insurance equal to 80 percent of inventory value and open stock burglary protection equal to the minimum co-insurance requirements.

The estimated annual gross sales for five small retail firms was determined by multiplying the average inventory on hand by the number of times the inventory is sold and replaced. Based on turnover ratios obtained from the Accounting Corporation of America, and considered representative for small firms, the estimated gross annual sales for five small firms are as follows:

| Inventory | | Stock turnover ratios | | Estimated gross annual sales |
|---|---|---|---|---|
| Drug | $25, 000 | × | 4. 13 | = $103, 250 |
| Furniture | 45, 000 | × | 4. 35 | = 195, 750 |
| Grocery | 30, 000 | × | 15. 05 | = 451, 500 |
| Jewelry | 50, 000 | × | 2. 50 | = 125, 000 |
| Liquor | 25, 000 | × | 6. 78 | = 169, 500 |

**157**

### TABLE 47. BUSINESS ESTABLISHMENTS

Insurance costs as a percentage of annual sales volume for selected retail businesses

| Business | Annual sales | Ratio of insurance costs to average annual sales (percent) |
|---|---|---|
| Appliance and radio-TV | Net sales below $250,000 | 0. 96 |
| Bakeries | Gross sales under $25,000 | . 90 |
| Book stores | Sales under $50,000 | . 70 |
| Cocktail lounges | Gross receipts under $25,000 | 1. 10 |
| Confectionery stores | Average sales under $100,000 | . 54 |
| Drugstores [1] | Sales under $40,000 | . 90 |
| Garages | Gross receipts under $25,000 | 1. 25 |
| Grocery stores | Gross sales under $50,000 | . 37 |
| Liquor stores | Gross sales under $50,000 | . 51 |
| Meat markets | Annual sales $50,000 to $100,000 | . 37 |
| Men's wear stores | Gross sales under $100,000 | . 60 |
| Prescription pharmacies | Average sales $176,181 | . 80 |
| Photographic studios and supply shops | Average gross sales $25,000 to $50,000 | . 94 |
| Drive-in restaurants | Assumed sales of $100,000 | 1. 00 |
| Specialty foods | Average sales under $50,000 | . 49 |
| Sporting goods stores | Sales less than $75,000 | . 80 |
| Taverns | Gross under $50,000 | . 85 |
| Variety stores | Average gross sales $25,000–$50,000 | . 94 |

SOURCE: *Expenses in Retail Businesses,* National Cash Register Company, undated.

[1] Insurance on building is not included.

*Fire and Extended Coverage Insurance—Business.* The relationship between fire and allied lines coverage premiums and insured inventory are given in Table 48. For the purpose of comparison these costs are also shown as a percentage of sales. In Boston, for example, the typical small retail drug store pays $1.22 for each $100 of insured stock although premiums are less than one-half of 1 percent of the annual sales. If the standard rate is doubled, the figures in the table would be doubled. For example, the same Boston drug store would pay $2.44 for each $100 of insured stock although the premium would still be less than one-half of 1 percent of gross sales.

*Burglary and Theft Insurance—Business.* Mercantile open stock burglary premiums as a percent of insured inventory and annual gross sales are given in Table 49. In Boston, for example, the

### TABLE 48. BUSINESS ESTABLISHMENTS

Approximate annual bureau (standard or regular) fire, extended coverage, and vandalism and malicious mischief contents premiums as a percent of annual gross sales and insured inventory for typical retail firms in selected cities in the United States, 1967

| Location | Drugstore: $20,000 coverage, $103,250 estimated annual gross sales | | | Furniture store: $36,000 coverage, $195,750 estimated annual gross sales | | | Grocery store: $24,000 coverage, $451,500 estimated annual gross sales | | |
|---|---|---|---|---|---|---|---|---|---|
| | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory |
| Boston | $244 | 0. 24 | 1. 22 | $464 | 0. 24 | 1. 29 | $240 | 0. 05 | 1. 00 |
| Chicago | 235 | . 23 | 1. 18 | 603 | . 31 | 1. 68 | 354 | . 08 | 1. 49 |
| Detroit | 183 | . 18 | . 92 | 396 | . 20 | 1. 10 | 201 | . 04 | . 84 |
| District of Columbia | 102 | . 10 | . 51 | 302 | . 15 | . 84 | 99 | . 02 | . 41 |
| Los Angeles | 142 | . 14 | . 71 | 270 | . 14 | . 75 | 151 | . 03 | . 63 |
| Newark | 278 | . 27 | 1. 39 | 680 | . 35 | 1. 89 | 264 | . 06 | 1. 10 |
| New York | 187 | . 18 | . 94 | 538 | . 27 | 1. 49 | 316 | . 07 | 1. 32 |
| Philadelphia | 308 | . 30 | 1. 54 | 554 | . 28 | 1. 54 | 369 | . 08 | 1. 54 |

TABLE 48. BUSINESS ESTABLISHMENTS—Continued

Approximate annual bureau (standard or regular) fire, extended coverage, and vandalism and malicious mischief contents premiums as a percent of annual gross sales and insured inventory for typical retail firms in selected cities in the United States, 1967—Continued

| Location | Jewelry store: $40,000 coverage, $125,000 estimated annual gross sales | | | Liquor store: $20,000 fire and extended coverage, $169,500 estimated annual gross sales | | |
| | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory |
|---|---|---|---|---|---|---|
| Boston | $440 | 0. 35 | 1. 10 | $200 | 0. 12 | 1. 00 |
| Chicago | 590 | . 47 | 1. 48 | 315 | . 19 | 1. 58 |
| Detroit | 366 | . 29 | . 92 | 183 | . 11 | . 92 |
| District of Columbia | 223 | . 18 | . 56 | 108 | . 06 | . 54 |
| Los Angeles | 252 | . 20 | . 63 | 142 | . 08 | . 71 |
| Newark | 556 | . 44 | 1. 39 | 220 | . 13 | 1. 10 |
| New York | 375 | . 30 | . 94 | 207 | . 12 | 1. 04 |
| Philadelphia | 615 | . 49 | 1. 54 | 308 | . 18 | 1. 54 |

NOTE: All premiums are based on 80 percent coinsurance rates.          SOURCE: Based on data in Table 44.

TABLE 49. BUSINESS ESTABLISHMENTS

Approximate annual bureau (standard or regular) mercantile open stock burglary bureau (standard) premiums as a percent of annual gross sales and insured inventory for typical retail firms in selected cities in the United States, 1967

| Location | Drugstore: $7,500 mercantile open stock burglary, $103,250 estimated annual gross sales | | | Furniture store: $15,000 mercantile open stock burglary, $195,750 estimated annual gross sales | | | Grocery store: $3,000 mercantile open stock burglary, $451,500 estimated annual gross sales | | |
| | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory |
|---|---|---|---|---|---|---|---|---|---|
| Boston | $699 | 0. 68 | 9. 32 | $850 | 0. 43 | 5. 67 | $204 | 0. 05 | 6. 80 |
| Chicago | 467 | . 45 | 6. 23 | 518 | . 26 | 3. 45 | 136 | . 03 | 4. 53 |
| Detroit | 388 | . 38 | 5. 17 | 472 | . 24 | 3. 15 | 113 | . 03 | 3. 77 |
| District of Columbia | 603 | . 58 | 8. 04 | 734 | . 37 | 4. 89 | 164 | . 04 | 5. 47 |
| Los Angeles | 562 | . 54 | 7. 49 | 683 | . 35 | 4. 55 | 145 | . 03 | 4. 83 |
| Newark | 552 | . 53 | 7. 36 | 302 | . 15 | 2. 01 | 161 | . 04 | 5. 37 |
| New York | 596 | . 58 | 7. 95 | 726 | . 37 | 4. 84 | 174 | . 04 | 5. 80 |
| Philadelphia | 516 | . 50 | 6. 88 | 629 | . 32 | 4. 19 | 151 | . 03 | 5. 03 |

TABLE 49. BUSINESS ESTABLISHMENTS—Continued

| Location | Jewelry store: $15,000 mercantile open stock burglary, $125,000 estimated annual gross sales | | | Liquor store: $7,500 mercantile open stock burglary $169,500 estimated annual gross sales | | |
| | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory | Standard (or regular) premium | Premiums as a percent of annual sales | Premiums as a percent of insured inventory |
|---|---|---|---|---|---|---|
| Boston | $1, 251 | 1. 00 | 8. 34 | $582 | 0. 34 | 7. 76 |
| Chicago | 836 | . 67 | 5. 57 | 389 | . 23 | 5. 19 |
| Detroit | 695 | . 56 | 4. 63 | 324 | . 19 | 4. 32 |
| District of Columbia | 1, 080 | . 86 | 7. 20 | 502 | . 30 | 6. 69 |
| Los Angeles | 1, 006 | . 80 | 6. 71 | 468 | . 28 | 6. 24 |
| Newark | 989 | . 79 | 6. 59 | 460 | . 27 | 6. 13 |
| New York | 1, 068 | . 85 | 7. 12 | 497 | . 29 | 6. 63 |
| Philadelphia | 923 | . 74 | 6. 15 | 430 | . 25 | 5. 73 |

NOTE: Insurance amounts are based on coinsurance limits. The data do not reflect rate credits or discounts for protective devices.          SOURCE: Based on Data in Table 45.

**159**

typical small drug store pays $9.32 for each $100 of insured inventory although the premiums are less than 1 percent of annual sales. If the standard rate is doubled, the figures in Table 49 would be doubled. For example, a Boston drug store would pay $18.64 for each $100 of insured inventory; this would amount to 1.36 percent of gross sales.

Thus, open stock burglary premiums generally represent not only a larger amount than fire and allied lines premiums, but also a larger percent of insured inventory. For example, for a drug store paying standard rates doubled, the open stock burglary premium is $1398 compared with $488 for fire and allied lines, and as a percentage of insured inventory it is 18.64 percent as against 2.44 for fire and allied lines.

160

## Appendix B

### Methods of Obtaining Information

The information presented in this report was obtained from a variety of sources. This appendix describes the fact-gathering methods of the Panel.

The Panel decided early in its deliberations that it should attempt to complete its study and make recommendations by the end of 1967. Urban core insurance problems were of immediate and practical concern to a large segment of the public, and the Panel felt it could best fulfill its task by reporting promptly.

The research undertaken was designed with this target date in mind. Requests for information were sent at an early stage to knowledgeable parties who might have information relating to the work of the Panel. By general announcement in the press, all interested parties were also invited to submit their views to the Panel.

Although the amount of time available for the preparation of the report was limited, a good deal of material was assembled that had never been developed heretofore.

The details of the Panel's methods of obtaining information are as follows:

#### Hearings and Meetings of the Panel

The Panel held seven meetings during the course of its work to determine the nature of the urban property insurance problem and to arrive at a recommended program to meet the problem. Five of these meetings lasted a long working day; two were of shorter duration. These meetings were held as closed executive sessions to facilitate the deliberations. At all but one meeting, witnesses presented their views to the Panel during a portion of the meeting. At the conclusion of one such meeting, held in Newark, New Jersey, on October 25, 1967, members of the Panel visited riot-affected areas of the city and discussed with residents and businessmen the property insurance problems they were encountering. The Panel and the staff talked frequently by telephone so that there was continuous communication throughout their work.

In addition, the Panel held public hearings on November 8 and 9, 1967, in Washington, D.C. At these hearings, residents and businessmen from center cities, agents and brokers, insurance industry representatives, state regulators, and federal government officials all presented their views. A number of other interested persons filed statements for the record.

#### Field Interviews

The Panel also interviewed witnesses in urban core areas across the United States. The cities visited included: Atlanta, Georgia; Boston, Massachusetts; Cedar Rapids, Iowa; Chicago, Illinois; Cleveland, Ohio; Columbus, Ohio; Detroit, Michigan; Lansing, Michigan; Lincoln, Nebraska; Los Angeles, California; Miami, Florida; Milwaukee, Wisconsin; Minneapolis, Minnesota; Nashville, Tennessee; New York, New York; Newark, New Jersey; Omaha, Nebraska; Philadelphia, Pennsylvania; St. Paul, Minnesota; San Francisco, California; South Bend, Indiana; and Washington, D.C. Telephone interviews were held with witnesses in many additional cities.

161

**Scientific Survey of Six Cities**

The Panel systematically surveyed the insurance problems of homeowners, businessmen, and institutions in Boston, Cleveland, Detroit, Newark, Oakland, and St. Louis. Appendix A contains a complete presentation of the survey results.

*Selection of Urban Core Areas to be Surveyed.* The Panel decided to survey poverty areas, as defined by the Census Bureau, for each of the cities selected other than Boston. In Boston, Roxbury was selected in order to cover the area first served by the Boston Plan. Roxbury, except for several blocks, lies within the poverty area of Boston.

All of these cities, except St. Louis, have experienced riots of varying intensity. Included are Detroit and Newark which experienced two of the most destructive riots during 1965–1967. St. Louis was selected for the purpose of comparison.

Oakland, in addition to having experienced civil disorders, was also selected because of its unique city ordinance requiring merchants to take minimum security precautions to prevent burglary losses. A non-poverty area in Oakland was also selected for purposes of comparison.

*Selection of the Sample of Dwelling Unit Owners.* It was decided to survey owners of dwellings but not tenants. This decision reduced considerably the utility as a sampling frame of the information contained in the census report on city block statistics.

Under the circumstances it was decided to make a systematic selection of blocks within the poverty and nonpoverty areas already selected, prepare lists of owners of residential properties in the selected blocks and subsample them systematically. To obtain the sample of blocks, all blocks, except those which the street maps identified as park areas, were numbered in a serpentine order. Then a sample of about fifty blocks was selected in each poverty area and twenty-five blocks from the Oakland nonpoverty area.

*Selection of Sample of Business Establishments and Institutions.* It was decided to use the same sample of blocks both for dwelling units and for business establishments and institutions. When the listings for business establishments and institutions were completed, additional listings were required. In order to complete an adequate number of interviews, the original sample of blocks was supplemented with a sample of street sections. To select this sample, those parts of the principal streets (which contained the highest concentration of business establishments) were subdivided into sections of about the same length. Then a random sample of street sections was obtained. The selected street sections were listed and the resulting lists subsampled systematically.

*Field Work.* A contract was entered into with Survey and Research Service, Inc. of Cambridge, Massachusetts to perform the field work in Boston; and with Marketing Research of Cleveland to perform the field of work in Cleveland and to supervise the field work in Detroit, Newark, Oakland, and St. Louis. Marketing Research of Cleveland in turn entered into contracts with four firms to do the field work in four of the cities—DVD Market Research Service (Detroit), Andrews Research Incorporated of New York City (Newark), Peters Marketing Research Inc. (St. Louis), and Mrs. Emma F. Kenney of Berkeley, California (Oakland).

Specific instructions on how to prepare listings, subsample the listings, and handle nonresponses were sent together with the questionnaires, maps, selected blocks and street sections to the firms contracted. Constant communication was maintained between members of the staff and the directors of the firms in charge of the field work.

*Nature of Data.* About 3,000 interviews were completed. The distribution of interviews appears in the following table.

**DISTRIBUTION OF THE SAMPLE BY CITIES AND KIND OF PROPERTY**

| City | Total number of cases | Number of dwelling units | Number of business firms and institutions |
|---|---|---|---|
| Boston | 480 | 233 | 247 |
| Cleveland | 540 | 327 | 213 |
| Detroit | 521 | 288 | 233 |
| Newark | 284 | 98 | 186 |
| St. Louis | 439 | 197 | 242 |
| Oakland: | | | |
|   Poverty | 578 | 306 | 272 |
|   Nonpoverty | 189 | 88 | 101 |
| Total | 3,031 | 1,537 | 1,494 |

In order to test the effect of non-response on the survey data, a special tabulation was prepared on the difference in response between cases inter-

viewed in the first attempt and those interviewed on call backs. The differences were not significant for most of the data, and in those cases where they were significant, they demonstrated a greater insurance problem than responses on first attempts.

Special tabulations had to be prepared in order to measure the degree of bias which could be introduced by combining the data obtained from the different samples (i.e. of blocks and street sections in business areas). A special tabulation for business establishments and institutions in Boston for both samples—sample of blocks and sample of street sections—showed no significant differences. Accordingly, the data from both samples was simply combined in all the cities.

*Summary Figure.* Since the main purpose of the survey was to estimate proportions of individuals having different types of insurance problems, it was considered that a simple arithmetic mean of the proportions observed in each city would be a useful method of presenting the data in summary form. However, in most cases the data are shown for individual cities as well.

*Sampling Error.* Crude measures of sampling error can be obtained by using simple random sampling formulas. Standard sets of statistical tables may be used to estimate sampling errors of proportions for each poverty and non-poverty area, based on sample size and level of confidence.

As the poverty areas included in this survey were not selected at random no inference based on probability theory can be made for all poverty areas in the United States.

### Written Requests for Information

The staff mailed to sixteen different groups specific requests for information to seek out what they knew about the insurance problems of center cities.

Some of this material is specifically referred to in the report. All of it was used as general background material in writing this report.

1. *Insurance Commissioners.* The insurance commissioners of every state were asked for their views on the nature of the insurance problem in center cities and for any statistical data or studies they kept on the problem.

2. *City Officials.* The mayors of the fifty largest cities in the United States and the mayors of thirty-seven other cities in which civil disorders occurred in the first seven months of 1967, were asked to give their views on the insurance problems in their cities and their methods of handling insurance complaints.

3. *Property and Liability Insurance Companies.* Canvassed for detailed information on experience in center city areas and other operational information were the twenty largest groups of property and liability insurance companies, as ranked by premium volume; plus thirty-five of the 176 largest stock companies; fifteen of the eighty-three largest mutual companies; and four of the twelve largest reciprocals—selected at random from the "Ranking of Companies and Groups," published in the *National Underwriter* of May 26, 1967.

The twenty top companies in order of total premium volume were: Aetna Life and Casualty; Travelers; State Farm; Allstate; Hartford; Continental Insurance; Continental National American; Insurance Company of North America; Firemens Fund American; Liberty Mutual; Connecticut General-Aetna; Home; United States Fidelity and Guarantee; Nationwide; Royal-Globe; Kemper; Farmers; Employers; Employers Insurance of Wausau; and St. Paul.

4. *Rating Bureaus.* A request for information went to all fire insurance rating bureaus. The request concerned rating problems relating to urban core insurance business.

5. *Reinsurance Companies.* Thirty-five representative professional reinsurers were asked for information relating to reinsurance market difficulties caused by civil disorders.

6. *Reinsurance Intermediaries.* A request for information was sent to a selected list of eighty-one reinsurance intermediaries asking for their views on the marketing problems resulting from civil disorders.

7. *Agents and Brokers.* Requests for information were sent to agents and brokers whose names were compiled from telephone directories of eight major cities. In addition, associations of agents and brokers also cooperated in distributing the requests to their membership. The National Association of Insurance Agents arranged for state agents associations to distribute the Panel's requests on a random basis to 1,235 agents in California, Connecticut, District of Columbia, Illinois, New Jersey, New York, and Ohio. The Mutual Agents' Association distributed 125 questionnaires at their annual convention. The National Association of Insurance Brokers similarly distributed approximately 200 copies of the request.

163

8. *Banks and Savings and Loan Associations.* Requests went to all banks and savings and loan associations located in fifty-seven cities where disorders occurred during the first seven months of 1967 for information on the difficulties encountered in their lending operations as a result of property insurance problems. The list of banks was drawn from the *International Bankers Directory* (First 1967 Edition, Rand McNally). The Federal Home Loan Bank Board provided the list of savings and loan associations.

9. *Mortgage Bankers.* All the mortgage brokers in fifty-seven cities where disorders occurred in the first seven months of 1967 were asked to detail any difficulties they encountered as a result of inability to obtain insurance on property. The list of mortgage brokers was drawn from the roster of members of the Mortgage Bankers Association of America, dated October 1, 1966.

10. *Real Estate Brokers.* A request for information was sent to seventy-one real estate brokers from several problem areas in and around Detroit, concerning the impact of insurance availability on real estate transactions. A request also went to local Board Presidents of the National Advisory Council of the National Association of Real Estate Brokers.

11. *Trade Associations.* Requests for information went to sixty-one trade associations, 135 national Negro business associations, fifteen associations of financial institutions, and to a selected list of trade associations chosen from the yellow pages of eight major cities.

12. *Community Leaders and Civil Rights Organizations.* Two hundred and seventy-five requests were sent to Negro leaders and civil rights leaders asking for their personal views and the views of their organizations on property insurance problems in center cities.

13. *Negro Life Insurance Companies.* A request for information went to all members of the National Insurance Association, a group of Negro life insurance companies, which are heavy investors in urban core properties.

14. *Unions.* To a group of 100 unions selected from the "Directory of National and International Labor Unions in the United States, 1965" (Bulletin No. 1493 of the U.S. Department of Labor, Bureau of Labor Statistics) went requests for information on the property insurance problems of union members in center city areas.

15. *Police Chiefs.* To the police chiefs of the fifty largest cities in the United States, as well as thirty-seven other cities where disorders occurred in the first seven months of 1967, went requests for information on local crime prevention programs.

16. *Fire Chiefs.* The fire chiefs in the same cities were asked for their fire loss statistics in center city areas and for related information.

164

# Appendix C

## Other Staff Assistance

In addition to the professional staff listed at the beginning of the report, the following consultants assisted the Panel on a part-time basis, ranging in individual cases from a few days to several weeks of work:

Bickelhaupt, David L.
Crane, Frederick G.
Dickerson, O. D.
Elliott, Curtis M.
Ferrari, J. Robert.
Fletcher, Linda B.
Gerdes, Victor
Hamburg, Morris
Hartman, Gerald R.
Hofflander, Alfred E.
Kimball, Spencer L.
Norgaard, Richard
Longley-Cook, L. H.
Mayerson, Alan L.
Mehr, Robert I.
Pfeffer, Irving
Ralston, August
Rokes, Willis P.
Roos, Nestor
Schultz, Raymond
Schultz, Robert
Stone, Gary

Weese, Sam H.
Wenck, Thomas L.
Wickman, James
Williams, C. Arthur, Jr.

In addition, the following did data tabulation work:

Johnstone, William F.
Miranda, Rosando
Perez, Federico

Student research assistants were:

Becker, William W.
Guardenier, William
Wardwell, Nathaniel P.
Woloshin, Rene

The supporting staff was headed by Mrs. Phyllis S. Danahy who was Personal Assistant to the Executive Director. Secretaries were: Dorothy Gooding, Joyce Roberson, Anastasia Soter, and Billie Whitted. Mrs. Margaret Frye, Mr. Ross' personal secretary, also contributed to the work on occasion.

Administrative support for the Panel was provided by The National Advisory Commission on Civil Disorders. Colonel Norman J. McKenzie, the Executive Officer of the Commission, served the Panel in the same capacity.

U. S. GOVERNMENT PRINTING OFFICE : 1968 O - 286-228

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402 - Price $1.00

001996

# FAIR HOUSING ACT

## HEARINGS

BEFORE THE

### SUBCOMMITTEE ON
### CIVIL AND CONSTITUTIONAL RIGHTS

OF THE

### COMMITTEE ON THE JUDICIARY
### HOUSE OF REPRESENTATIVES

NINETY-FIFTH CONGRESS

SECOND SESSION

ON

## H.R. 3504 and H.R. 7787

FAIR HOUSING ACT

———

FEBRUARY 2, 9, MAY 10, 11, 15, JUNE 7, JULY 27, 1978

———

## Serial No. 46



Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE

33-264 O    WASHINGTON : 1978

## COMMITTEE ON THE JUDICIARY

PETER W. RODINO, Jr., New Jersey, *Chairman*

JACK BROOKS, Texas
ROBERT W. KASTENMEIER, Wisconsin
DON EDWARDS, California
JOHN CONYERS, Jr., Michigan
JOSHUA EILBERG, Pennsylvania
WALTER FLOWERS, Alabama
JAMES R. MANN, South Carolina
JOHN F. SEIBERLING, Ohio
GEORGE E. DANIELSON, California
ROBERT F. DRINAN, Massachusetts
BARBARA JORDAN, Texas
ELIZABETH HOLTZMAN, New York
ROMANO L. MAZZOLI, Kentucky
WILLIAM J. HUGHES, New Jersey
SAM B. HALL, Jr., Texas
LAMAR GUDGER, North Carolina
HAROLD L. VOLKMER, Missouri
HERBERT E. HARRIS II, Virginia
JIM SANTINI, Nevada
ALLEN E. ERTEL, Pennsylvania
BILLY LEE EVANS, Georgia
ANTHONY C. BEILENSON, California

ROBERT McCLORY, Illinois
TOM RAILSBACK, Illinois
CHARLES E. WIGGINS, California
HAMILTON FISH, Jr., New York
M. CALDWELL BUTLER, Virginia
WILLIAM S. COHEN, Maine
CARLOS J. MOORHEAD, California
JOHN M. ASHBROOK, Ohio
HENRY J. HYDE, Illinois
THOMAS N. KINDNESS, Ohio
HAROLD S. SAWYER, Michigan

ALAN A. PARKER, *General Counsel*
GARNER J. CLINE, *Staff Director*
FRANKLIN G. POLK, *Associate Counsel*

---

SUBCOMMITTEE ON CIVIL AND CONSTITUTIONAL RIGHTS

DON EDWARDS, California, *Chairman*

JOHN F. SEIBERLING, Ohio
ROBERT F. DRINAN, Massachusetts
HAROLD L. VOLKMER, Missouri
ANTHONY C. BEILENSON, California

M. CALDWELL BUTLER, Virginia
ROBERT McCLORY, Illinois

THOMAS P. BREEN, *Counsel*
JANICE COOPER, *Assistant Counsel*
ROSCOE B. STAREK III, *Associate Counsel*

(II)

Digitized from Best Copy Available

# CONTENTS

## HEARINGS HELD

Page

February 2, 1978 ............................................................................................................ 1
February 9, 1978 ............................................................................................................ 35
May 10, 1978 .................................................................................................................. 105
May 11, 1978 .................................................................................................................. 169
May 15, 1978 .................................................................................................................. 243
June 7, 1978 ................................................................................................................... 301
July 27, 1978 .................................................................................................................. 353

## WITNESSES

Courshon, Arthur, National Savings and Loan League ............................................ 394
    Prepared statement ................................................................................................ 390
Days, Drew, Assistant Attorney General for Civil Rights Division, Department
    of Justice................................................................................................................... 43
    Prepared statement ................................................................................................ 36
Dodd, Hon. Christopher, a Representative in Congress from the State of
    Connecticut .............................................................................................................. 342
    Prepared statement ................................................................................................ 350
Fishman, Richard, former executive director, American Bar Association Com-
    mission on Housing and Urban Development ....................................................... 70
    Prepared statement ................................................................................................ 67
Flemming, Arthur, chairman, U.S. Commission on Civil Rights ........................... 326
    Prepared statement ................................................................................................ 321
Friedman, Avery, chief counsel, the Housing Advocates, Inc ................................ 143
    Prepared statement ................................................................................................ 147
Galbreath, Glenn, managing attorney, Advocates for Basic Legal Equality ....... 221
    Prepared statement ................................................................................................ 222
Harris, Hon. Patricia, Secretary of Housing and Urban Development ................. 3
    Prepared statement ................................................................................................ 29
Holmgren, Edward, director, National Commission Against Discrimination in
    Housing ..................................................................................................................... 106
    Prepared statement ................................................................................................ 106
Linn, Brian, National Center for Law and the Handicapped ................................. 260
    Prepared statement ................................................................................................ 260
Miller, Anita, member, Federal Home Loan Bank Board ....................................... 353
    Prepared statement ................................................................................................ 359
Mitchell, Clarence, chairman, Leadership Conference on Civil Rights................. 301
North, William, attorney, National Association of Realtors ................................... 169
    Prepared statement ................................................................................................ 170
Okin, Dr. Robert, commissioner, Commonwealth of Massachusetts, Department
    of Mental Health...................................................................................................... 244
    Prepared statement ................................................................................................ 255
Robrahn, Reese, director of research and governmental affairs of the American
    Council of the Blind................................................................................................. 257
    Prepared statement ................................................................................................ 257
Taylor, William C., chairman, Compliance and Enforcement Committee, Lead-
    ership Conference on Civil Rights ......................................................................... 301
    Prepared statement ................................................................................................ 305
Williams, Harding, general counsel, National Savings and Loan League............. 394

(III)

IV

## ADDITIONAL MATERIAL

| | Page |
|---|---|
| Background information and initial findings of the Housing Market Practices Survey | 112 |
| Commission memorandum regarding Federal use of testing under the Fair Housing Act | 338 |
| Department of Housing and Urban Development, memorandum on authority to issue title VIII regulation | 25 |
| Department of Justice, legal memorandum on civil damage provision | 15 |
| Department of Justice, memorandum on constitutionality of exclusionary zoning provision | 48 |
| Flemming, Arthur, chairman, U.S. Commission on Civil Rights, letter to Hon. Don Edwards | 338 |
| "Housing for All Under the Law," executive summary | 72 |
| Massachusetts Department of Mental Health, legal memorandum | 287 |
| U.S. Commission on Civil Rights response to questions posed by subcommittee members | 340 |

## APPENDIXES

| | Page |
|---|---|
| Appendix 1.— | |
| Ramseyer, title II, H.R. 3504 | 407 |
| Title II, H.R. 3504 | 422 |
| H.R. 7787 | 442 |
| Appendix 2.—Comments on H.R. 3504 | 444 |
| Appendix 3.—Memoranda prepared by Congressional Research Service, Library of Congress | 643 |

# FAIR HOUSING ACT

THURSDAY, FEBRUARY 2, 1978

U.S. House of Representatives,
Subcommittee on Civil and Constitutional Rights
of the Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met at 9:30 a.m., in room 2141 of the Rayburn House Office Building, Hon. Don Edwards (chairman of the subcommittee) presiding.

Present: Representatives Edwards, Drinan, Butler, and McClory.

Also present: Thomas P. Breen, counsel; Janice Cooper, assistant counsel; Roscoe B. Starek III, associate counsel.

Mr. Edwards. Today, we begin hearings on legislation which would amend title VIII of the Civil Rights Act of 1968, popularly known as the Fair Housing Act. I am most pleased to welcome as our first witness the Secretary of the Department of Housing and Urban Development, Patricia Roberts Harris. Madam Secretary, I am heartened by the progress that seems to be occurring at HUD. You have breathed new life into a department that, despite its youth, seemed to be moribund. Low- and moderate-income housing starts have increased dramatically, and there are other indications that the areas of greatest urban distress are finally getting more of the attention they need from HUD.

In the area of title VIII enforcement, however, we seem to be regressing. In the last Congress, in March and September 1976, we held oversight hearings on HUD's civil rights enforcement efforts. In the time between those hearings, HUD was able to substantially reduce the number of title VIII backlog of complaints.

However, I understand that at the end of fiscal year 1977, the backlog had nearly doubled, and even more disturbing, the successful conciliation rate of the closed cases had dropped significantly.

I am among those who believe that much of the problem of ineffective enforcement is rooted in the inadequacies of existing law, rather than a lack of will within HUD. I agree with the former Secretary of HUD, Carla Hills, who testified last year that "* * * the most serious obstacle to an effective title VIII program is the lack of adequate enforcement powers."

Today, we will consider two bills which approach the deficiencies of the existing law from somewhat different perspectives.

Title II of H.R. 3504, introduced by myself and my colleague, Father Drinan, would attempt to rectify both the enforcement and substantive difficulties encountered by advocates for fair housing. It would vest the Secretary of HUD with broad administrative enforcement powers, including the authority to issue cease-and-desist orders and to promulgate substantive regulations. The bill

(1)

would also vest HUD with the authority to refer individual complaints to the Attorney General for litigation in the name of the Secretary. Enforcement rights would also be strengthened by provisions relating to attorneys' fees, statute of limitations, referral to State and local agencies, and expansion of standing.

Substantively, H.R. 3504 would clarify and strengthen several areas including mortgage and insurance redlining, and exclusionary land use controls. It would also expand fair housing protection to the handicapped, and narrow the owner-occupied exemption.

H.R. 7787, introduced by Representative Gladys Spellman, focuses exclusively on strengthening enforcement powers. As in 3504, the bill would empower the Secretary of HUD to sue on behalf of individual complainants where compliance efforts have failed, and permit awards of attorneys' fees to successful plaintiffs without the current requirement that the plaintiff demonstrate an inability to afford that cost.

As most of you may recall, title VIII was born in a time of crisis. No doubt without the tragedy of the death of Dr. Martin Luther King, Jr., and the social unrest which followed, no legislation would have been enacted then. Unfortunately, a consequence of this circumstance was that much of the legislation was created on the floor of the Congress, without the kind of careful drafting and analysis of the problem necessary for a lasting and effective solution to the problem. Title VIII was a vital and helpful start, but I believe more is needed now, both to strengthen enforcement efforts, and to bring the substantive protections into line with the problems of the present and future.

Ten years ago, housing discrimination was not only widespread, but blatant, and the solution seemed relatively simple. We know now that unequal and segregated housing has at least as much to do with past government policies themselves as it has to do with individual cases of bias. State and local land use policies, sometimes enacted to cater to exclusionary desires of white residents, but more often created without discriminatory intent, have had the same effect. Banking and insurance policies, instituted for financial reasons, have also been a major reason for the decline of the housing stock available to low-income minorities. So, if anything, housing segregation and discrimination has become more pervasive and more intractable in the last 10 years. Title VIII can be revitalized to reverse this trend. Representative Drinan and I, and Representative Spellman, have given our suggestions. We want to know what others think.

However, in deciding whether or what kind of need exists for new legislative initiatives, we must consider HUD's record within the framework of existing law. Not all of the failures of enforcement can be blamed on the deficiencies of title VIII. Nor, of course, is the present administration responsible for all of those problems.

Fortunately, we have been given today the results of a study by the General Accounting Office. The report, entitled "Stronger Federal Enforcements Needed To Uphold Fair Housing Laws," is highly relevant to the subject of the morning's hearing.

By reviewing the handling and disposition of complaints in three regions between January 1973 and April 1976, the GAO was able to