assess HUD's effectiveness in identifying and resolving discriminatory acts.

The results are disturbing. The GAO not only concluded that the absence of enforcement authority hampered compliance; it also discovered that HUD had consistently failed to begin investigating complaints until long after the complaint was received. On the average, nearly 100 days elapsed between the time the acts occurred and the time HUD started its investigation. And when investigations were done, HUD failed to use "testers," the method proven to be most effective in proving discrimination. This report, then, increases our concern that even if HUD has the enforcement power, it will not use it effectively. So today, I am anxious not only to hear your views on this legislation, but also to find out if positive results have come from the changes instituted as a result of the GAO's study and the Department's own review of the problem.

I apologize for making such a long statement, but this is the first hearing on this important subject and all of this is necessary for background and to inform myself and others of the nature of the problem.

I now yield to the gentleman from Massachusetts, Mr. Drinan.

Mr. DRINAN. Thank you, Mr. Chairman, and Madam, I welcome you here and I commend you for all that you've been able to do in the short months that you've been Secretary. It's a welcome breath of fresh air to have somebody testifying, as you are going to do today, and I commend you now and I'm certain I can have faith. I hope that there's going to be a day of sunshine in integration in this country soon. Thank you very much.

Mr. EDWARDS. The Secretary and I have been very good friends for many years. I'm just delighted with the work you're doing. The subcommittee is pleased to have you here. You may proceed.

## TESTIMONY OF HON. PATRICIA ROBERTS HARRIS, SECRETARY OF THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Secretary HARRIS. Mr. Chairman, it is a pleasure to be here this morning with my former colleague, in a role that is most exciting and difficult. As dean of an institution and a professor of law, it gives me a sense of being among friends. It's a delight to be able to testify this morning and I'm particularly pleased to have this opportunity to testify before this subcommitee in support of title II of H.R. 3504. This title proposes comprehensive amendments to title VIII of the Civil Rights Act of 1968, known as the Federal fair housing law.

In April of 1978, we will celebrate the 10th anniversary of the signing of the bill which committed our government to the elimination of all barriers to equal opportunity in housing. Today, we have the benefit of the experience of almost 10 years of that effort to inform and guide us regarding needed change in title VIII.

The existing Fair Housing Act has accomplished a great deal:

For finacially capable victims of housing discrimination, it has provided satisfactory litigation remedies;

For advocates of an end to exclusionary zoning it has been an instrument used with some success in the battle against exclusionary land use practices;

For conscientious real estate dealers, land developers and financial institutions, it has provided the reinforcement of the law to help them carry out their business operations in an equitable manner.

Despite these advances, there are flaws in the present law which have been clearly revealed by the difficulties that have been experienced in efforts to secure its overall enforcement. The Senate compromise of March 1968, which led to the passage of the current statute had several regrettable effects:

First, the compromise bill took away the administrative cease and desist power which was at the heart of the original proposal.

Second, the bill provided, as an inadequate substitute for HUD enforcement authority, private litigation rights with two separate paths to the courts. The compromise bill thus badly confused a number of procedural issues that even now have not been entirely untangled.

Third, by providing for an abbreviated statute of limitations on civil actions and for unreasonably short time restraints on HUD complaint processing, the law has frequently cut off complainants' remedies prematurely.

I appear today in support of H.R. 3504. This bill might well be captioned "A Bill to Fulfill the Original Promise of the Federal Fair Housing Act To Provide, Within Constitutional Limitations, for Fair Housing Throughout the United States."

The Edwards-Drinan bill reflects a clear understanding of the problems encountered in fair housing law enforcement, and substantial efforts to find means of overcoming these problems. Although I have suggestions for changes in this proposal, I commend the sponsors and draftsmen for their dedicated and informed labors. This is a fair housing law worthy of the name, and it is needed legislation.

The proposal would fulfill the most compelling need related to fair housing—increased enforcement power in HUD and in the Department of Justice. Beyond that, the bill offers clarification of the law's original intent in several important areas. These provisions would greatly strengthen the tools necessary to fulfill the statutory purpose. That purpose remains unchanged, but with this bill, it could be realized.

The lack of adequate enforcement power has been the most serious obstacle to the development of an effective fair housing program within HUD. Our present authority is limited to a purely voluntary process of "conference, conciliation, and persuasion." I will not dwell upon the ironies associated with a law that mandates HUD to investigate and to establish the existence of violations of law, and then limits the Secretary to asking the discovered lawbreaker whether he wants to discuss the matter. Simply put, "conciliation" all too often has proved an inadequate means of securing compliance with the substantive provisions of title VIII. Respondents frequently ignore HUD'S conciliation process because there is no real inducement to cooperate. Where conciliation is successful, it is most often because the respondent knows that a

5

realistic threat of private litigation is present, should HUD's efforts fail.

But where the victim of discrimination meets with the HUD conciliator and with the respondent, and it is evident that the complainant is unrepresented by counsel, conciliation often collapses. There is no credible threat of "consequences" should the respondent refuse to cooperate.

The most significant deterrent to litigation remains its high cost. Many complainants do not have the necessary funds to initiate litigation, even with the prospect of having attorney's fees awarded should the complainant's position prevail. Thus, as a practical matter, many complainants are unable to utilize their right to seek a remedy through the courts, and therefore, must rely solely on the administrative process.

This is so despite the existence of another avenue of relief to correct discriminatory housing practices, the filing of a pattern or practice suit by the U.S. Department of Justice, pursuant to section 813. While pattern or practice suits can result in the correction of discriminatory practices, this type of civil action does not often provide an individual remedy.

This is the state of affairs which prompts me to believe that the single most important feature of H.R. 3504 is its machinery for full enforcement of the act.

Under the bill, HUD would be given the power, after investigation of the complaint, to conduct a hearing and issue a final administrative order. Orders issued pursuant to the hearing could provide such relief as would be available in private litigation, including monetary damages, equitable and declaratory relief and punitive damages not exceeding $10,000 in the case of each willful violation. The Secretary could, in the alternative, refer a complaint to the Attorney General for the purpose of filing a civil suit in the name of the Secretary.

The Attorney General would be directed by the statute to file such a suit when referred. The Attorney General would also enforce any final administrative orders which the Secretary might refer for enforcement. The Attorney General would continue to have the authority to file pattern or practice litigation. The same type of relief would be available through suit by the Attorney General as could be recovered through private litigation, thus clarifying the authority of the Justice Department to seek an individual remedy, including monetary damages.

Although I support the thrust of these provisions, I must recommend that the subcommittee consider modifications.

First, on our initial review of H.R. 3504, we were concerned about the constitutionality of much of the prescribed administrative process that would allow the assessment of damages by a hearing officer. The bill would allow an administrative officer to award the same relief as that which a court might assess.

Since the Supreme Court in *Curtis* v. *Loether* has found that jury trial is necessary in order to assess civil damages in fair housing cases, we had some doubt concerning whether this jury trial requirement could be circumvented by the creation of a parallel administrative process. Our Department requested a legal opinion on this point from the Office of Legal Counsel at the Department of

Justice, and we find that our doubts on this question are shared by that Office.

Even without the availability of personal damage awards in the administrative hearing process, we believe that the structure of this bill is sound. The recent Supreme Court case, *Atlas Roofing Company* v. *Occupational Safety and Health Review Commission*, would strongly suggest that there is no constitutional bar to a law providing for the assessment of civil penalties—payable to the Government—for the failure of housing suppliers to abide by the requirements of the fair housing law. Such penalties could be based on the very substantial public interest which has long been associated with the eradication of discrimination in housing. In short, I believe it is clear that the "public right" rationale which supplies constitutional justification for the assignment of hearing functions to administrative agencies very adequately applies to a strong administrative enforcement authority in HUD. I do not believe, however, that HUD's authority should include the assessment of damages payable to victims of discrimination.

H.R. 3504 very properly provides for an expansion of the Government's right to seek relief for complainants in court—even in cases which may not constitute a "pattern or practice" of discrimination or which involve deprivations of the rights of "groups of persons" as required by section 813 of the present law. With this expanded litigation authority in the Government, we would have an alternative means of protecting the rights of individual complainants, making provision for damages in the HUD administrative proceeding unnecessary. Where one or more individuals have suffered substantial damage as a result of a discriminatory act, a complaint would most properly be litigated by the Government, on the complainant's behalf. Where the major benefit of further enforcement proceedings would be the correction of discriminatory policies and the securing of housing for the complaining party, the administrative hearing process could accomplish these purposes.

The bill would modify the present law by adding a new section 811(b) which directs the Attorney General to bring civil actions in cases referred to him by the Secretary. Although I would expect to enter into an agreement with the Attorney General governing this case referral process to assure that litigation is brought in every appropriate instance, I do not believe the mandatory language contained in H.R. 3504 is necessary to provide such assurance.

Traditionally the Attorney General functions on behalf of Executive agencies in a manner generally analogous to the way a private attorney performs on behalf of his or her clients. A private attorney would not want his or her client "requiring" that a case be taken to court against the attorney's own legal judgment, and I do not expect the Attorney General to favor a bill which requires that other judgment be substituted for his on matters of litigation. A conventional nonmandatory referral process should be adequate to assure that the Justice Department meets this bill's goal of an aggressive litigative enforcement program.

I agree that the Attorney General's power to litigate "pattern or practice" cases should be augmented by clarified authority to seek damages for victims in such cases, as proposed in H.R. 3504.

We have noted that H.R. 3504 eliminates from title VIII all reference to the conciliation process. While conciliation is not expressly prohibited, it nowhere appears as an optional or required step in the bill's procedural scheme. I recognize that I have criticized the process of conciliation as inadequate, but I cannot agree with the bill's |implication that this process has no place in a comprehensive enforcement plan. Particularly in light of my recommendation that the administrative damages provision be replaced by language allowing for assessment of civil penalties, I recommend that the bill give recognition to conciliation as a desirable first step in remedying discriminatory housing practices. If a strong litigation and administrative hearing structure backs up conciliation, we can confidently expect a significant increase in the percentage of cases successfully settled without further action. I would also note that there is nothing to prevent conciliation settlements which include the award of compensation to victims of discrimination. This is done frequently under the present law and would doubtless be done with greater success with the enforcement powers provided for in H.R. 3504.

I find the clarifying amendments in H.R. 3504 on insurance and lender redlining practices helpful and necessary. While there are strong indications that such conduct is reached by the existing law, the more explicitly the statute addresses these issues, the more certain we can be that potential violators are fully aware of the conduct prohibited. In addition, victims of such conduct could more easily secure redress in the courts if the law clears away present doubt as to the extent of its coverage.

H.R. 3504 would prohibit exclusionary land use practices by units of local government. The profound negative impact of such practices recently has been recognized in the American Bar Association's massive study, "Housing for All Under Law." This report of the ABA Advisory Commission on Housing and Urban Growth finds that available legal and institutional devices must be reformed to more sentitively direct metropolitan regions to promote the "regional welfare" by requiring municipal governments to accept a fair share of responsibility for housing low income persons.

This bill's prohibitions against discriminatory planning and zoning practices by units of government deserve support. Part of this provision is nothing more than a codification of existing case law, but it represents important clarification of title VIII's full applicability to exclusionary land use practices.

Proposed subsection 804(g) goes beyond mere clarification, of course, in making unlawful zoning practices which exclude low or moderate-income housing because of the economic status of prospective occupants of such housing. This provision would break significant new ground.

Questions have already arisen concerning the Congress power to regulate land use decisionmaking in the manner contemplated by this bill. There appears to be no serious doubt concerning the constitutionality of the proposal to prohibit exclusion of housing based on its eligibility for governmental assistance. However, the second half of subsection 804(g), prohibiting discrimination based upon economic status, is viewed as presenting such an issue. It is

8

my personal belief that the Congress would be acting within its constitutional powers in enacting this new prohibition.

I am informed that the Justice Department has been asked to render a legal opinion on this issue, and that the Department's views will be available by February 9, when Mr. Days will testify before this subcommittee.

On another point related to this provision, I would suggest that the subcommittee explore further means of defining the prohibited conduct. The term "to exclude," standing alone, needs refinement if it is not to be merely a further source of litigative controversy.

My own suggestion would be that the conduct the bill seeks to prohibit be sharply focused on the practices of communities which have failed to make reasonable provision for housing persons of low and moderate-income. Something akin to a "fair share" or "reasonable access" concept should be incorporated into this proposal. I do believe it is absolutely necessary that the Federal Government have the power to act against those few communities which have, through misuse of their zoning authority, excluded whole classes of persons from their boundaries.

H.R. 3504 would also increase the filing time for Fair Housing complaints filed with the Secretary from 180 days to 3 years, and would comparably extend the statute of limitations on private actions. Although I support the goal of extending the time for filing court actions pursuant to the statute, I would suggest that a 180-day period would be adequate for filing complaints with the Department, particularly if the bill were explicitly to provide for the concept of the "continuing violation."

Our experience with administrative complaints has been that the ability to develop proof of a violation deteriorates rapidly with the passage of time. Private housing suppliers frequently do not maintain the kind of records necessary to establish a violation based on incidents which occurred many months earlier Accordingly, a too-lengthy filing period might have the detrimental effect of obligating HUD to conduct investigation of stale complaints.

Having said this, I could reemphasize that it is very important to extend the time for filing judicial complaints well beyond the current law's restrictive and somewhat ambiguous requirements. We believe that private litigants can determine for themselves whether, after a considerable period of time, they can still carry the burden of proof in a court of law. Housing discrimination is a tort. Three years is not a long time as tort limitations statutes go, and there is no apparent reason why this king of civil wrong should be subjected to a more stringent limitation period than any other.

Some of the ambiguity in the present law's procedural requirements would be eliminated by the bill's proposed redraft of section 812 of title VIII, providing for only one private litigation remedy in the law. The present act contains two such provisions—one applicable to private litigation following HUD complaint handling, the other providing for litigation by-passing the HUD process.

Most courts have correctly interpreted these provisions as permitting access to the courts whether or not an administrative complaint was previously filed, but in some instances, remedies have been limited in situations where the plaintiff had first sought relief through HUD. H.R. 3504 would make clear that the same

court remedies could be sought, whether or not a charge had been previously filed with HUD, and only HUD's institution of the administrative hearing process would act as a temporary bar to private court action. The bill would also allow, where necessary, additional time for the filing of a private suit following the conclusion of HUD administrative action.

The bill eliminates the complicated formula for single family exemptions, exempting only the renting of space within a single family dwelling unit occupied by the owner. This is desirable and would provide for a more efficient administration of the title by eliminating the time that is spent determining whether or not a particular complaint falls within the jurisdiction of title VIII. More importantly, it would make title VIII's coverage more nearly consistent with that provided under the 1866 Civil Rights Act (42 U.S.C. § 1982).

With respect to the proposal to include discrimination against handicapped persons as an additional basis for action under the fair housing law, I think there is a need to give further definition to the intended scope of the proposal. The bill lacks a definition of the term "handicapped" and consequently raises questions as to which individuals are to receive the law's protection. Moreover, unless clarification is provided, it is uncertain to what extent the amendment envisions a new obligation on the part of private housing suppliers to rebuild their units to accommodate handicapped persons.

If the preposal is not intended to require modification of existing property, then additional statutory language clarifying this issue seems necessary. Several States have recently enacted prohibitions on housing discrimination against the handicapped, and in some instances limitations have been included to make clear that the prohibition was not intended to requre modification of existing housing units, or to require a higher duty of care on the part of the landlord than would be required for other tenants.

These considerations aside, and even though I believe that the problem of racial discrimination differs significantly, as a matter of law and policy, from problems of discrimination against the handicapped, I support the prohibition of discrimination against persons because of their handicapped status.

The Fair Housing Loan Fund proposed in section 210 of the bill is one way of overcoming economic barriers to litigation, but we believe it requires more study, particularly in relation to other provisions in this bill, such as the administrative remedies.

The new enforcement powers provided for HUD and for the Department of Justice in the bill would go a long way toward limiting the need for the loan fund provisions. Broader authority in the Government to litigate on behalf of victims of discrimination, including the right to seek damages both in single victim cases and under the existing section 813 authority, will do much to close the enforcement gap which now exists in fair housing.

Providing HUD with power to hold hearings and order an end to discriminatory conduct will encourage more voluntary settlements of complaints, further limiting the need for the loan fund.

We see questions arising regarding administration of the fund—questions related to such matters as the amount of investigation

which would be appropriate before a governmental agency could properly decide that public funds should be made available to bring litigation involving private parties on both sides.

The kind of showing that ought to be made in order to demonstrate not only financial need, but also the existence of a prima facie case, would be considerable. Certainly the Federal Government would want to assure reasonable safeguards against spurious litigation conducted at public expense. Every allegation of discrimination has the sound of injustice, and most complainants are sincere in their belief that they have encountered illegal practices. Normally, however, only subsequent investigation can establish whether there is a prima facie case justifying litigation.

I would also question the appropriateness of assigning such loan administration functions to HUD in light of the Department's lead responsibility for fair housing law enforcement. Situations could arise in which HUD would have too many roles to play in connection with a fair housing dispute. If, for example, a complainant filed a charge with HUD, later withdrew the charge, and then petitioned for a litigation loan, HUD's impartiality in determining whether the loan should be made might be questioned. HUD administration of such a loan program strikes me as in potential conflict with the enforcement role provided elsewhere in the bill. For the foregoing reasons we do not support inclusion of the litigation loan fund provision as a part of this bill.

Although I support the bill's provision for greater discretion for the Secretary regarding case referrals to State and local agencies, I want to assure the subcommittee that we will make every effort to refer cases wherever local agencies have equivalent fair housing laws and appropriate enforcement capabilities. We believe this will avoid generating excessive administrative burdens on the Federal Government.

Turning to Mrs. Spellman's alternative proposal, H.R. 7787, I support its goal of providing additional enforcement power to the Secretary to litigate fair housing cases. This proposal certainly would improve the existing law. I must, however, express a clear preference for the more comprehensive amendments package represented by H.R. 3504.

When Congresswoman Spellman's approach is given further consideration by the subcommittee, I would strongly suggest that it be modified to provide significantly more time for the filing of litigation following completion of the HUD investigation and conciliation process. In our experience, it is simply not realistic to expect a case to be taken through the administrative process, and Government litigation filed, all in the space of the 60-day period provided for in that proposal.

In closing, I want to emphasize that, most of all, HUD needs the additional administrative and enforcement powers set out in H.R. 3504.

We also support that bill's clarification of the Attorney General's right to seek damages for victims pursuant to his "pattern or practice" authority. In addition, we endorse the bill's provision for broader coverage, and its expansion of the law's prohibitions sections to make clear that fair housing means elimination of discriminatory land use regulation, and redlining.

There are undoubtedly additional features of both the Edwards-Drinan proposal and Mrs. Spellman's bill which deserve comment. I will be pleased to discuss any matter pertaining to these bills which may be of interest to the subcommittee.

Thank you, Mr. Chairman.

Mr. EDWARDS. Thank you very much, Madam Secretary, for your splendid statement. I recognize the gentleman from Massachusetts, Mr. Drinan.

Mr. DRINAN. Thank You, Mr. Chairman, and I concur in the Chairman's comment, Madam Secretary, that your statement is excellent. Let me just ask a couple of questions. I think that the answer would be "yes." Would you approve of the provisions in 3504 that would permit HUD, in its discretion, not to go to the local agencies? In other words, HUD, under this proposed law, is given the discretion to waive deferring to the local agencies. I assume that you'd be in support of that.

Secretary HARRIS. Yes. We don't oppose that; however, I wanted to make clear in my statement that it would be our intention, should these amendments be enacted, to refer, onsofar as we could, as often as we could, these matters to the States, if they had in effect legislation and process for dealing with the complaint.

Mr. DRINAN. On the loan fund, I can see your point that there might be a potential conflict of interest there, and for that reason, you wouldn't support the loan fund. How would you feel if the loan fund were in another agency, not HUD, to be used as a catalytic agent to help people litigate? Would you feel that that would reduce or eliminate the potential hazards of the loan fund?

Secretary HARRIS. It certainly would elinimate the conflict of interest problem that I noted in my statement. However, I am not prepared to support or oppose the loan fund—as a loan fund—at this moment. My personal reaction is fairly conservative. My opinion is that it does have a litigative encouragement content. That is something we ought to be very careful about enacting into law. We are studying this at HUD at this moment. We have no conclusions on the desirability of institutionalizing such a concept, so I am not prepared to make an overall assessment.

Mr. DRINAN. Section 207 of the bill would give HUD express authority to provide financial, as well as technical assistance to governmental and private organizations which are engaged in fair housing programs and activities. I wonder how you would feel about using the proposed $10 million in the loan fund for grants to appropriate organizations engaging in fair housing work? In other words, you would concur, I think, in the objective of loan fund. Do you think we should have greater Federal assistance under 207 to promote fair housing?

Secretary HARRIS. Well, with respect to the strict language of greater assistance to institutions promoting fair housing, especially technical assistance, I could scarcely be opposed to that. The form of that assistance requires careful consideration. Again, loan funds tend to be their own encouragement to seeing just how well one could do in litigation, as opposed to necessarily requiring preliminary investigation of the potential for prevailing. I think such preliminary inquiry is a process every litigant ought to be put to, even if that litigant—that is every litigant and his counsel—even if

that litigant and his counsel are not as well off financially as they might be. That is the problem that worries me about having a floating loan fund out here—that we may be encouraging people to bring frivolous litigation.

Mr. DRINAN. You know the difficulties people have in financing housing discrimination suits.

I thank you for your statement on page 11, where you say that it's absolutely necessary for the Federal Government to have the power to act against those "few communities" which, through misuse of their zoning authority, exclude whole classes of persons. I would hope you are correct when you say "few communities." I wonder if you'd elaborate a little bit and contemplate the potential of this bill, if it's passed, to break down the use of zoning authority to exclude groups from the urban area, "whole classes" as you say. Would you just speculate how important this could be in opening up the suburbs?

Secretary HARRIS. Well, I think that it would be important with respect to those communities that have used zoning as a clear device for limiting the choices of developers, because this isn't just poor people whose choices are limited, but developers who may wish to provide for low and moderate and middle income people. The provision could be applied against communities that have seen this as a way of excluding poor, particularly nonwhite poor, from their areas.

It puts the question that must be answered: First of all, are there any poor black people in that community? If the answer is "they are not here because we're excluding them merely because of their race or their economic status," this bill provides that this would be an unlawful act on the part of that community.

I am unable to say, but I think that if one looks at the ABA report, one sees that this is a problem that appears to be general. The question we have to ask ourselves is, once we put the question of whether there is, in fact, exclusion, whether we will find it is for economic or racial reasons.

Mr. DRINAN. I agree completely because I see it in my own congressional district where moderate income people, white and nonwhite, are excluded from the suburbs. These communities are able to take advantage of Federal help and simultaneously exclude the lower middle class, which in this instance is virtually all white. So, I thank you particularly for your support of that.

Mr. Chairman, I have additional questions, but why don't I yield to the Chairman now and then I'll have other questions later.

Mr. EDWARDS. I thank you. The withholding of HUD assistance or benefits can be effective in making communities do better by all of their citizens, especially low-income people. But are you running into a situation on a nationwide basis, as in certain parts of California, where the communities will say they are just not interested in community block grants or HAPs or anything else, but, instead, want to run their own cities and zoning as they see fit. In those communities, you may not be able to find a clear indication that zoning has been designed to keep out low income people or minorities, but you still will see that land prices plus the zoning will result in a $25,000 lots.

13

Secretary Harris. The Congress has given to us the responsibility for asking each recipient community to identify its assisted housing needs by an identification of low- and moderate-income people presently in the community or expected to reside in the community, and we have census data that make it possible for us to check on such information coming from the communities.

When these communities file their housing assistance plans, we can raise with them whether or not they are, in fact, providing for low- and moderate-income people in a manner consistent with the housing assistance plan requirements, and we have been gratified in many instances by the willingness of communities to reorder their housing priorities after we have raised questions with them about their failure to meet their own housing assistance plans. I would be less than candid if I did not say that there have been some communities that have said, "If this is your requirement, we will not receive community development block grant funds; we will choose not to." There is nothing we can do about that at this moment. I would say they are not the majority of the communities, quite the reverse.

Mr. Edwards. Can we move for a moment to your current enforcement effort? I do understand that we have problems with staffing and with the amount of money that's available to the Department. Is that still the situation, that you don't have enough people?

Secretary Harris: I am not prepared to say that the conditions that exist with respect to our activities, especially with respect to title VIII enforcement, are due solely to staffing levels. We have instituted at the Department an overall management tracking system called the Executive Management Review Process, and it is very interesting that in the first month in this fiscal year of the operation of that process, we picked up, in our tracking process, the failures that are noted in the GAO report. We were not meeting our goals with respect to our equal opportunity responsibility. We are currently analyzing the problem to see what the cause is. One identification of difficulty that we have already made is that the nature of the problem has changed; that violations are no longer blatant, but are very sophisticated and difficult to prove. But that does not explain some of the conditions noted, such as the delay in moving to investigation.

I can only say to you, to the members of the committee, that this matter is under intense investigation as a part of our management process, and that we, first of all, expect to know what the cause of the problem is, and to be able to say whether it is indeed a staffing problem. It is always assumed that things are staffing problems. We don't assume that anymore. It may be the process. It may be that we need to make some deep changes in management.

Mr. Edwards. Well, that's a very candid answer. We appreciate it. Now, the GAO recommended that HUD use testers. Could you elaborate on that? I don't even know what a tester is.

Secretary Harris. Well, even if GAO had not used the term "tester," I know very well what a tester is. I assume you refer to the process by which persons who expect to be discriminated against send out other people to check the availability of housing for members of minority groups. And we believe that Federal em-

ployees ought not engage in this role, as Federal employees. As Federal employees, we represent everybody and should not be accused of going out to mislead somebody. But we are now evaluating a study that has been made by an outside agency under a contract with HUD to determine what does happen when a white person and a black person with the same economic condition, with the same housing needs, goes to seek housing services. That study is not yet complete, but it has indeed used the concept the GAO had in mind; but we are not using HUD employees to do it.

Mr. EDWARDS. Thank you. Mr. Starek?

Mr. STAREK. Thank you, Mr. Chairman. Madam Secretary, since his confirmation, the Attorney General has made several statements against the balkanization, as he has referred to it on one or two occasions, of Federal litigation efforts. Do you believe that the provisions of title II of H.R. 3504, which seek cease-and-desist authority, would encourage decentralization of the Federal litigation?

Secretary HARRIS. Well, it depends on your definition of litigation. I believe that the Attorney General's remarks had been directed to the representative of the Government before article III courts, and other courts of this Nation. HUD's having cease-and-desist power would not represent such governmental advocacy.

My short answer to your question is, cease-and-desist power is not related to the concept of the Attorney General, with respect to balkanization.

Mr. STAREK. Thank you. Has the Department done any studies or does it plan to conduct any studies on the number of additional employees who would be necessary if title II of the 3504 were enacted?

Secretary HARRIS. It is our present judgment that the total staff required, were H.R. 3504 to be enacted, would be approximately 110 additional persons, 69 of whom would be professional, and 41 of whom would be clerical and paraprofessional, and at present cost we would assume it would be about $2.3 million. It is based on our best estimate, based on our own experience.

Mr. STAREK. Thank you very much, Madam Secretary.

If civil action authority as proposed in H.R. 7787, were enacted into law, how many additional employees would be necessary?

Secretary HARRIS. I do not have those staffing figures available. Because of the broader commitments required by H.R. 3504, we did staff those out and checked on our estimates of the requirements there.

I do not have figures for Mrs. Spellman's bill.

Mr. STAREK. Thank you very much. Thank you, Mr. Chairman.

Mr. DRINAN. Coming back to the questions, we seem to have a conflict between the recommendations of GAO and HUD.

GAO says clearly on page 25 of the report, "HUD's current method of investigating complaints is substantially more complex and less effective than required * * * We believe that testing should be adopted as a more direct approach."

It goes on to state that testing is our method of gathering evidence by sending an individual, not necessarily a Federal agent, to find out if there has been discrimination. It very clearly recommends that HUD contract with local fair housing organizations to do the testing. It also states that HUD apparently feels that testing

is harassment, and that they are reluctant to do it, although HUD's General Counsel said the testing is legal.

Would you comment on what GAO says in its very firm recommendation that testing should be used by HUD?

Secretary HARRIS. I would like to take issue with the statement that there is a HUD policy, that testing is harassment. I do not know that——

Mr. DRINAN. Let me quote this:

HUD officials, however, are reluctant to use testing because some people view it as harassment.

I should have read all of that.

Secretary HARRIS. I am sorry. That is contrary to what I just said earlier, in response to the question on testing. We do not believe we ought to use Federal employees with respect to testing. We have come to no conclusion about the value of testing in the HUD enforcement process, and we are currently engaged in the analysis of a demonstration project that we funded to identify the value of those tested.

I want to say that the GAO conclusions that things could be inferred from the section you read, should not be taken to be any position that is presently the position at the Department of Housing and Urban Development. We will look upon that recommendation with considerable interest, and we do not say that we would not do what they recommended any more than I am prepared now to commit that we will.

Mr. DRINAN. Thank you very much.

On another point, on the question of monetary damages, it is my understanding that some agencies, like the ICC, do in fact give monetary damages to individual complainants before that agency, even without invoking judicial authority.

I wonder if you could share with the subcommittee the documents, the opinions of the Justice Department, and your own conclusions or opinions with regard to this practice.

Secretary HARRIS. I have here a memorandum from the Department of Justice, dated January 25, 1978, on the question of the issue of civil damages.

Mr. DRINAN. If it is agreeable, Mr. Chairman, I would like to have that as part of the record.

Mr. EDWARDS. Without objection, it will be made part of the record.

[The complete memorandum from the Department of Justice follows:]

DEPARTMENT OF JUSTICE,
*Washington, D.C., January 25, 1978.*

Re constitutionality of section 810 of H.R. 3504 (the Edwards-Drinan bill).

Memorandum: for Hon. Ruth T. Prokop, General Counsel, Department of Housing and Urban Development.

From: Larry A. Hammond, Deputy Assistant Attorney General, Office of Legal Counsel.

This is in response to your letter of November 18, 1977,[1] requesting this Office's opinion concerning the constitutionality of the civil damages provisions of the

---

[1] We wish to express our appreciation for the manner in which your request was prepared for presentation to this Office. While it has long been the practice of the Office of Legal Counsel to request that general counsels provide us with a statement of their views, we too frequently have not been aided by the sketchy and incomplete presentations provided. We have been materially assisted by the clear exposition of the issues as set forth in your submission.

16

Edwards-Drinan bill (H.R. 3504). Specifically, you have inquired whether the bill's administrative complaint procedure offends the Seventh Amendment guarantee that "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved. . . ." For the reasons that follow, it is our opinion that the provisions in question are suspect under the recent Supreme Court decisions interpreting the Seventh Amendment. As you are aware, the issue is a close one and would almost certainly be litigated. With these considerations in mind, we have suggested several ways in which the language of the provision could be altered to improve its chances of withstanding scrutiny.

I

H.R. 3504 would amend Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq., by creating three alternative mechanisms for enforcement of its fair housing provisions. Section 812 preserves private enforcement by means of civil suit; section 811 provides for "pattern or practice" actions by the Attorney General. Most importantly, for purposes of this discussion, the bill authorizes the Secretary of Housing and Urban Development (HUD), either in response to a private complaint or on her own initiative, to investigate allegations of discriminatory housing practices. If she finds reasonable cause to believe the charges to be true, she is required either to refer the matter to the Attorney General for the filing of a civil action against the offender, or to file an administrative complaint. If the administrative procedure is followed, the respondent is entitled to notice and to the opportunity for a hearing on the record; the person conducting the hearing may also allow any aggrieved person to intervene. The hearing officer, after making findings of fact and conclusions of law, may award various forms of relief including money damages, equitable and declaratory relief, and punitive damages up to $10,000; temporary or preliminary relief is also available pending final disposition of the complaint. Review is in the courts of appeal using a "substantial evidence" standard. The bill also authorizes the Secretary to assess a civil penalty of $1,000 for each day during which a violation continues after the date on which the administrative order becomes unreviewable. Section 811(b) empowers the Attorney General, at the request of the Secretary, to institute civil proceedings to enforce either final orders or civil penalties of this sort.

In applying the Seventh Amendment to this statutory scheme, two principles are immediately clear. First, it is now firmly established that the Seventh Amendment "does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Curtis* v. *Loether*, 415 U.S. 189, 194 (1974). Thus, the Supreme Court has held that a jury may be demanded in suits in the federal courts for actual and punitive damages under section 812 of the Civil Rights Act of 1968. *Id.* Similarly, in *Pernell* v. *Southall Realty*, 416 U.S. 363 (1974), the Court held that the Seventh Amendment applied in civil suits in the District of Columbia courts for recovery of possession of real property.

A second principle has also emerged—the Seventh Amendment simply does not apply where Congress has properly assigned the functions of factfinding and initial adjudication to an administrative tribunal with whose proceedings the use of a jury would be incompatible. Thus, in *Atlas Roofing Co.* v. *Occupational Safety and Health Review Commission*, 430 U.S. 442 (1977), the Supreme Court upheld Congress' choice of a specialized administrative body to ascertain whether employers were maintaining unsafe working conditions and to impose civil penalties. The Court found no constitutional right to a jury under such circumstances:

". . . when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.' Congress is not required by the Seventh Amendment to choke the already crowded federal courts with new types of litigation or prevented from committing some new types of litigation to administrative agencies with special competence in the relevant field. This is the case even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned to a federal court of law instead of an administrative agency. 430 U.S. at 455 (footnote omitted)." [2]

---

[2] In reaching this broad conclusion, the Court recharacterized the holding of an earlier case, *Kachen* v. *Landy*, 382 U.S. 323 (1966), which had upheld the power of a bankruptcy court, exercising summary jurisdiction without a jury, to adjudicate the otherwise legal issue of voidable preferences. Rather than treating this holding as compelled by the traditional distinction between courts of law and courts of equity, the Court observed that this specialized court of equity "constituted a forum before which a jury would be out of place and would go far to dismantle the statutory scheme." 430 U.S. at 454 n. 11.

While it is therefore clear that juries need not be imported into administrative proceedings designed by Congress to give effect to agency expertise, it is also apparent that Congress may not be altogether free to elect such administrative forums under any and all circumstances. Thus, in *Atlas Roofing,* the Court was careful to go no farther than to approve a jury-free administrative proceeding where "public rights" were involved. 430 U.S. at 458. Unfortunately, this talismanic phrase was not well defined. Instead the Court spoke somewhat circularly in terms of examples—"e.g., cases in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact" (id. at 450); "e.g., where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights" (id. at 458).

The sovereign's prerogative to sue and to be sued as it deems appropriate was similarly recognized and discussed at length in *Murray's Lessee* v. *Hoboken Land Co.,* 59 U.S. (18 How.) 272, 284 (1856) ("There are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which Congress may or may not bring within the cognizance of the courts of the United States as it may deem proper."). See also Ex Parte Bakelite, 279 U.S. 438, 451 (1929) ("Legislative courts also may be created as special tribunals to examine and determine various matters, arising between the government and others, which from their nature do not require judicial determination and yet are susceptible to it. The mode of determining matters of this class is completely within congressionasl control. Congress may reserve to itself the power to decide, may delegate that power to executive officers, or may commit it to judicial tribunals."). Accordingly, Congress' choice of administrative forums as means for collecting civil penalties to be deposited into the public treasury has repeatedly been upheld. See, e.g., *Helvering* v. *Mitchell,* 303 U.S. 391 (1938).

So, too, has the use of administrative bodies which, in the course of enforcing public policy, incidentally provide relief to private citizens. Thus, in *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U.S. 1 (1937), the Court upheld agency action under the National Labor Relations Act in requiring a private employer to reinstate an employee with back pay following an unfair labor practice. Likewise, in *Block* v. *Hirsh,* 256 U.S. 135 (1921), the Court rejected a Seventh Amendment challenge to a statute temporarily suspending the legal remedy of ejectment and establishing an administrative tribunal to determine fair rents at which tenants would be allowed to hold over despite the expiration of their leases.

Nevertheles, it cannot be concluded, based on this rather limited evidence, that administrative proceedings initiated by a public agency but providing the full panoply of judicial relief to private parties are necessarily permitted under the Seventh Amendment. The proceedings before the NLRB at issue in *Jones & Laughlin* were spurred by private complaint, yet the relief available—reinstatement with back pay or an award of back pay alone— was basically equitable in nature (cf. *Slack* v. *Havens,* 522 F.2d 1091, 1094 (9th Cir. 1975) (Title VII); moreover, the government agency authorized to hear and decide private complaints, not private individuals who might receive relief in the administrative forum, was alone empowered to trigger proceedings with respect to unfair employment practices and to seek enforcement of its orders in subsequent court proceedings (see *Amalgamated Utility Workers* v. *Consolidated Edison Co.,* 309 U.S. 261 (1940)). The holding of *Block* v. *Hirsh* also appears relatively narrow when closely examined. Although the result in that case has subsequently been characterized rather broadly,[3] the Court's reasoning may be misunderstood unless seen in context. Mr. Justice Holmes, writing for the Court, spoke specifically in terms of government regulation of the wartime housing industry. Thus, he emphasized that "[i]f the power of the Commission established by the statute to regulate the relation is established, as we think it is . . . this objection [concerning the unavailability of trial by jury] amounts to little. To *regulate* the relation and to decide the facts affecting it are hardly separable." 256 U.S. at 158 (emphasis added). In *Block,* therefore, the rent commission played a role comparable to that of the Interstate Commerce Commission or other federal agencies which control the prices charged by private entrepreneurs and incidentally benefit members of the public by requiring those regulated to comply with certain governmentally-set standards. The commission did not simply step into the shoes of a judicial tribunal and afford all-purpose relief to complaining private parties.

An even more important warning is found in *Crowell* v. *Benson,* 285 U.S. 22 (1932), which, while sustaining the role of an administrative tribunal in finding facts

---

[3] "We may assume that the Seventh Amendment would not be a bar to a congressional effort to entrust landlord-tenant disputes, including those over the right to possession, to an administrative agency," *Pernell* v. *Southall Realty, supra,* 416 U.S. at 383.

and awarding relief under the Longshoremen's and Harbor Workers' Compensation Act, characterized the case at bar as "one of private right, that is, of the liability of one individual to another under the law as defined," id. at 51. Thus, although the role of the administrative tribunal in *Crowell* was solely adjudicatory rather than also prosecutorial in nature, the Court did not dwell on this distinction but focused instead on the nature of the liability created. While the proceedings in *Crowell* were deemed to be adjunct to the admiralty jurisdiction of the federal courts and therefore to present no Seventh Amendment problem, two conclusions relevant to our consideration here are suggested by this statement: (1) more than a simple "public interest" sufficient to sustain Congressional legislation is necessary to come within the phrase "public right" as used in *Atlas Roofing;* and (2) the nature of relief afforded by an administrative tribunal may not necessarily be irrelevant for Seventh Amendment purposes merely because a government agency plays a formal role in instituting those administrative proceedings.

The constitutionality of the administrative proceedings envisioned by the Edwards-Drinan bill must be tested against this rather inconclusive standard of reference. The proposal and the context in which it arises differ sufficiently from administrative procedures approved under existing case law so as, at the very least, to leave room for doubt. Although HUD, rather than a private plaintiff, would actually be responsible for filing the administrative complaint and would do so only if, in the course of its investigation, it found a charge to be supported by reasonable cause, it would not be the sole enforcer of the statutorily created guarantee of fair housing practices as was true in *NLRB* v. *Jones & Laughlin*. Neither would it act in a regulatory capacity akin to that of the rent commission in *Block* v. *Hirsh*. Moreover, the Department would enter the fray, not at the outset, but nearly 10 years after the creation of a private cause of action in the district court which provides for identical remedies, and nearly four years after the Supreme Court expresly ruled that under such circumstances trial by jury must be available on demand. It is therefore unlikely that removing section 810's obvious cross-reference to section 812's civil cause of action or the adoption of cosmetic changes in nomenclature will suffice to obviate the potential constitutional questions inherent in the proposal.

It may well be that the courts, when asked to apply the Seventh Amendment in this context, would adopt a broad rule based on the specialized forum approach taken in *Atlas Roofing*[4] and the sovereign prerogative analysis of *Murray's Lessee*. Following this line of reasoning, so long as an administrative agency, and not simply private parties, played a prosecutorial as well as adjudicatory role in administrative proceedings, the Seventh Admendment simply would not apply. The existence of a related private right of action need not undercut the legitimacy of Congress' choice in this regard; rather, the continued availability of such a judicial forum merely provides an alternative means by which private citizens can vindicate the public interest also enforced by the sovereign in its own right.

Different reasoning could, however, dictate a different result. It could be argued that Congress should not be able, under the vague rubric "public right," to circumvent the Seventh Amendment completely by creating a chain of administrative courts capable of giving traditional common law remedies to private litigants seeking relief from wrongs (such as dignitary torts) traditionally regarded as private in character. Plainly, the Seventh Amendment question here is a close and difficult one. Were we to opine one way or the other our conclusion would probably favor a finding that section 810 is unconstitutional. Rather than concluding our views on this equivocal note, we have considered whether it might be possible to modify section 810 to improve its chances of withstanding constitutional attack. It should be clearly understood, at the outset, that we do not profess to share your Department's expertise and sensitivity to the policy and administrative considerations that would inevitably come into play here. Our advice should be seen as merely suggestive of ways in which the constitutional hurdles could be reduced.

## II

First, private actions in district court seeking actual and punitive damages and other relief might be preserved, but the nature of the proposed administrative proceedings altered. Use of an administrative forum to impose civil penalties without recourse to trial by jury was expressly approved in *Atlas Roofing;* provision for equitable relief in the form of temporary or permanent injunctions in no way offends the Seventh Amendment's preservation of juries in "Suits at common law."

---

[4] Such a ruling could also rest on the expansive dictum in Mr. Justice White's opinion in that case emphasizing the breadth of Congress' prerogative to select the manner in which it will go about resolving important "public" issues. 430 U.S. at 455.

It could be contended that to thus limit the administrative relief available by omitting any provision for awards of actual or punitive damages would not seriously undercut the efficacy of the proposal. Actual damages resulting from a dignitary tort are difficult to prove, and the threat of a civil penalty due the government would do as much to encourage compliance with the law as would the possible imposition of punitive damages.[5] This option would seem almost certainly to avoid any possible problem under the Seventh Amendment.

Second, the private action in district court might be eliminated, and the remedies now available in that forum instead provided in the course of administrative proceedings. The development of legislative history demonstrating a belief by Congress in the necessity for a strong governmental role in order to vindicate the public interest in nondiscriminatory housing practices would provide added support for the claim that the choice of an administrative forum was more than a ruse to eliminate Seventh Amendment rights incident to the existing civil cause of action. This option would be further strengthened if the provision for punitive damages were eliminated and civil penalties instead imposed to run in favor of the government rather than the private complainant.

Third, the bill's treatment of the mechanism by which administrative awards are to be enforced could be modified. Section 811(b) indicates that the Secretary of HUD may request the Attorney General to institute civil proceedings for this purpose; it may, therefore, be inferred that no power to sue for enforcement is meant to lie in the private complainant. Express language disallowing such claims by other than the Attorney General could enhance the claim that a public right, not a private right, is being vindicated. Consideration might also be given to vesting the reviewing circuit court of appeals with the power to enforce such awards (see, e.g., 15 U.S.C. § 45(d), the review provision applicable to orders of the Federal Trade Commission under Section 5 of the Federal Trade Commission Act) instead of simply incorporating the provision authorizing such courts to enjoin, set aside, suspend or determine the validity of orders as set forth in 28 U.S.C. § 2342. The awkward asymmetry of a civil suit in which jury trial is guaranteed pursuant to *Curtis,* and an enforcement action, also in the district court, which provides absolutely identical relief, would therefore be avoided.[6]

Finally, a requirement that the Secretary of HUD determine that administrative proceedings are in the public interest as is the case in FTC proceedings under 15 U.S.C. § 45 would enhance the emphasis upon the "public right" as opposed to "private right" aspects of this bill that are now left to be inferred from the statutory scheme. Although such a change is unlikely to be determinative to a court's interpretation of the measure, it may weigh the balance in favor of sustaining the proposed administrative procedure.

As stated above, we are not in a position to judge the practical merits of any of these options. Nor are we able to assure you that the adoption of any alterations would obviate the possibility of a successful challenge to the administrative procedures contemplated here. We would urge that, whatever course you follow, steps be taken during the legislative process to underline wherever possible the public benefit aspects of this bill.

Mr. DRINAN. Another point, on the definition of handicap, it is my understanding that within HUD there is an Office of Independent Living, which is focusing on these efforts to give greater opportunity to the handicapped. I wonder if any comments have come from that office yet on how broad the coverage should be in this area.

---

[5] Moreover, the bill as presently drafted seems to invite money-minded plaintiffs to bring charges in the administrative forum, then to return to the district court if their initial efforts prove unsuccessful. The resulting duplicated effort by administrative and judicial officers, costs to defendants, and problems of res judicata would seemingly be at least somewhat reduced if injunctive relief were the only remedy available in both forums.

[6] While such an enforcement action is arguably merely an extension of the administrative proceedings and would not, therefore, trigger a right to a jury determination of the underlying facts, a contrary rule has, in the past, been adopted by at least one court with regard to suits to enforce the imposition of civil penalties under the Federal Trade Commission Act. See *United States* v. *J. B. Williams Co., Inc.,* 498 F. 2d 414 (2d Cir. 1974). A court, faced with the incongruous availability of jury trials in suits by private plaintiffs but not in enforcement actions brought by HUD to provide private complainants with identical relief might well determine that jury trials should be afforded in both cases. Such a result could significantly limit the efficacy of the administrative tribunal as a means of speeding the disposition of housing discrimination cases.

Secretary HARRIS. There have been comments from that office, on the coverage. However, there has been no language presented to me yet by that office in terms of their recommendations. However, may I say that, as Secretary, I will reserve the right both to discuss the matter with the Office of Independent Living, and to determine whether or not their recommendations are recommendations that we would wish to forward as Departmental recommendations to this committee.

Mr. DRINAN. I wonder if we could have for our own use the recommendations that have been submitted by the Office of Independent Living?

Secretary HARRIS. I do not have a copy of the precise language.

Mr. DRINAN. As you know, this is a very sensitive area, and we are all learning in this area.

I, for my part, would like to know what the Office of Independent Living is thinking about in this very complex area where it may be we will have to impose new obligations on contractors and on builders. I am not certain, but is that the key question, as to whether these regulations should require new affirmative obligations of all builders?

Secretary HARRIS. The first line question is whether or not there should be an obligation for, heaven help us with that word, "retrofitting" existing units, which I would very very strongly recommend against, and what the affirmative responsibility is with respect to structures, and, third, what the definition of "handicap" is.

May I say, that the recommendations from the Office of Independent Living have not been discussed with me, and are not in a posture at this moment to be presented to this committee.

Mr. DRINAN. Well, thank you, but I think this is a very key element in the bill.

I am not certain we can go forward unless we have something satisfactory in this whole section of handicapped. With the hope that the bill is going to move along, we want to follow your sensible suggestion, that we have as comprehensive a definition of the handicapped as we can.

In another area, I take it that you support the provision of the bill forbidding so-called insurance redlining.

Do you have any studies that would support our conclusions that we ought to have new legislation against this so-called redlining?

Secretary HARRIS. I am not quite sure what you mean by studies to support, but let me make a preliminary comment.

We believe that the language in this statute simply clarifies and codifies existing law, and that, as a matter of fact, the present state of the law is such that the conduct here prohibited is not presently lawful.

Therefore, we would urge that this language be in the statute. There are numerous analyses and studies of the impact of redlining—of both insurance redlining and lending redlining—upon community structures, that is, upon people who experience it, in a neighborhood.

People can't get insurance, and have a choice to move elsewhere, and frequently do so; but there has been a development of the law over the past few years that makes it clear that deliberate redlin-

ing is unlawful. We welcome its codification and clarification in this statute.

Mr. DRINAN. You feel there is no new prohibitions in this law. It is just pulling together existing law.

Secretary HARRIS. And making it clear.

Mr. DRINAN. Thank you. One last question at this time, Mr. Chairman.

In the 1968 law on fair housing, the statute extended to activities relating to, "housing and urban development." It was mandated that Federal agencies have to act affirmatively in that area regarding their programs.

Do you think we should broaden that language so it would read, "housing and community development," rather than merely "urban development"?

Secretary HARRIS. I would say if you were to use the term "community development," you would open a Pandora's box, but whether you were extending or limiting the responsibiity, I would urge that we leave it where it is.

Mr. DRINAN. Do we want to extend it though?

Secretary HARRIS. The question is: What do you do about changing the words. This is an area of intense debate in these times.

Mr. DRINAN. I am anticipating debate on the other side, where they say this is related to urban areas, and agencies can't go into the lily white suburban areas.

Secretary HARRIS. Well, there are others: There is urban, suburban. I would suggest that is a problem we need not court at this moment.

Mr. DRINAN. I don't want to stir up problems, but I don't want people, later on, to restrict the nature of the bill.

Thank you, Mr. Chairman, and I yield back my time.

Mr. EDWARDS. The gentleman from Illinois, Mr. McClory.

Mr. McCLORY. Thank you, Mr. Chairman.

First of all, Mr. Chairman and Madam Secretary, I want to express my regret at being late. I was in attendance at the National Prayer Breakfast. I am afraid some of our national leaders overdid it by indulging in excessive prayer, which restricted my attendance at this meeting.

Perhaps I should direct some criticism at the Chairman for convening the meeting while the National Prayer Breakfast was being held. At any rate, I am delighted to be here.

Mr. EDWARDS. If the gentleman will yield, we had Father Drinan here.

Mr. McCLORY. You had a spokesman.

Mr. DRINAN. If the gentleman would yield——

Mr. McCLORY. I might say I saw the gentleman at a black-tie dinner the other night, and I directed some inquiries to him as to why he was not appropriately dressed.

Mr. DRINAN. I hope, in the future, the gentleman won't let his religious duties interfere with his duties as a congressman.

Mr. McCLORY. We were all combining duties there this morning. I am delighted to be here, even though I am a little tardy.

I am very interested in this subject. I do have a couple of general inquiries. There is great interest in my congressional district in developing a senior citizen housing project. Is there any demand or

any requirement to try to accommodate minorities, who may not be older Americans, but may nevertheless be on a waiting list?

I am asking this because I am concerned that if we try to integrate younger couples into senior citizen housing projects, it may cause some problems for older Americans.

Is there any requirement to accommodate younger people on a waiting list for a HUD financed senior citizen housing project?

Secretary HARRIS. Housing projects have made it possible for elderly and families to be housed either together or separately. First of all, the nature of elderly housing is such that it is usually not adequate for families or potential family members. I think this is a matter of the design of the building, and the preferences of the applicants with respect to their needs. Most of the elderly housing is just elderly housing.

Mr. McCLORY. I would suggest that it is important to maintain housing that way. I think that if the more elderly Americans are housed in a multiple-housing project with younger couples who have children milling about, it would create problems for these elderly citizens.

Secretary HARRIS. It is a matter of the individuals involved. I know older people, eligible for elderly housing, who are infuriated by the notion that they must be segregated from the ebb and flow of life, and that they must be segregated from younger people.

I think there also is a very serious question in our society, about the age ghettos that may be convenient for the elderly superficially, but certainly deprive young people of an opportunity to understand the range of life, youth versus age, age and middle age. I would hope that we not automatically assume that segregation is a good thing for the elderly themselves, or for the total society. To have some babushkas around in our communities, for young children in the United States, might not be a bad idea.

Mr. McCLORY. At the present time, is there any affirmative program to place younger couples in elderly citizens housing projects?

Secretary HARRIS. No.

Mr. McCLORY. The only other question I have also concerns my district.

Judge Austin, you may recall, entered a rather comprehensive order some 7 or 8 years ago, I believe, in which he opposed the development of further low-cost housing or public housing—primarily public housing—in the Chicago area. He found that these projects were causing a concentration of black Americans and other minorities in the city of Chicago. By court order, Judge Austin directed that waiting lists be developed and housing for the minorities in the suburban or outlying areas of Chicago should be found.

In my district, black Americans, Hispanics, and others, feel that they should be accommodated. There are those who are interested in developing projects to accommodate the local population. Yet there is some concern that they would be required to accommodate persons from a list in another area, possibly the city of Chicago, and there is resistance to that possibility.

Are you aware of that problem? More nondiscriminatory housing projects are called for in my district, but I must respond to the

apparent desire of the local community to accommodate local minorities, and not those from another area.

Will you help me?

Secretary HARRIS. Well, I am trying to respond to this in a way that is explanatory and understanding. The Gautreaux case was a case against the use of Federal programs to increase and perpetuate racial segregation. It did not require, per se, the movement of racial minorities anywhere, but did state a case against impaction of minorities and required that decisions with respect to the housing of minorities not be limited to areas where those minorities already live.

The concept that Judge Austin sought to have implemented by his decision is one that I think is very difficult for us—for any of us—to oppose. The use of Federal funds to create racial and economic ghettos of the deprived should be something we would all set our faces against.

Also, with respect to the wish of a locale to limit access to the benefits of its programs to people already there, this runs counter to the American principle of law, of mobility and access of people without regard to where they started out. My sense is, that if the community provides for housing for low- and moderate-income people, they will be taking care of people in the local community, but they cannot and should not be permitted to restrict access by people who are eligible from other communities.

Mr. MCCLORY. I would agree with that, but, at the same time, would you mandate that the minorities from another community must be accommodated in my area at the expense of the minorities already residing there?

Secretary HARRIS. The Congress, in setting forth the considerations to be used by local communities in determining their housing assistance plan, specifically asks local communities to look into the question of people "expected to reside" in that community— that is, low- and moderate-income people—in addition to those already residing. Therefore, I believe it is the intent of this body, and I think it appropriate, that communities, in fact, take into consideration the choice of people that come into that community, because we have always had a policy of permitting mobility and not excluding people. And so I would say that local communities, if they provide housing for low- and moderate-income people, should not restrict access to those buildings.

Mr. MCCLORY. I do not disagree with you. However, this voluntary effort appears to be submerged by Judge Austin's orders. What is happening, I am afraid, is that much-needed housing projects which might otherwise be developed in my district are just not being developed because the local housing authority is not able to reach an agreement with the Chicago Housing Authority.

They are not able to reach an agreement with the Chicago Housing Authority which is compatible, and consequently, I think our efforts to provide more housing are being frustrated.

Secretary HARRIS. May I say, I do not see any community that is unable to build low- and moderate-income housing because of the requirements of that case. The purpose to say "Only our own citizens will live in this housing," I think, is an undesirable purpose. It is one that is unnecessary to meet the local needs of that

community. The needs of both the low- and moderate-income people of that community and of people in the general region can be met. When a new housing unit goes up for upper income and middle income people in a community, no effort is made to say that only people already living here can live in this building.

It is only when we reach low- and moderate-income people, and people of minorities, that there is the effort to restrict access to those who are already in the community.

Mr. McCLORY. I agree with you.

Now, do I understand then that loans and grants can be approved by your office, providing there is ready access, but without any agreement with the Chicago Housing Authority, which would mandate a particular number of people on their list to move into that housing project?

Secretary HARRIS. I can't answer the question as you have posed it. The housing assistance plan requires that local communities—that is, the statute under which housing assistance plans are made—requires that local communities provide for persons expected to reside there, and if there are persons in the region who would reside in that community, would be expected to reside there, were appropriate housing available, and if the community where that housing is to be built refuses to permit those expected to reside there to reside there, I suspect that I would not approve the funding of such activity. I don't now. It is a question of who is expected to reside and whether or not adequate provision is made for persons who can reasonably be expected to reside there, if the housing were available.

Mr. McCLORY. May I say, in conclusion, that I hope this problem can be resolved because I fear that under the mandate of the *Gatreaux* decision and the authority of the Chicago Housing Authority in my district, development of low-cost public housing projects is being frustrated.

Secretary HARRIS. I am not aware of any necessary consequence of that nature, but it may be this is happening. We are in very close touch. We have entered into an agreement to cure the impaction of racial minorities by working for the availability of housing through the use of our rental assistance program, in the suburbs. I have met with representatives of those suburbs, who have told me that they are prepared to accept a fair share or persons expected to reside in that area and it is my hope that we can work this out on the basis of permitting free access to housing wherever it may be, and providing housing wherever there is need.

Mr. McCLORY. Thank you.

Mr. EDWARDS. Ms. Cooper.

Ms. COOPER. Thank you. One of the major problems faced by persons who would like to challenge exclusionary zoning practices has been that of standing. Typically, in a community that has no low- or moderate-income housing, builders and developers have not even attempted to get permission to build those kinds of projects because they know that it will be a difficult process, and the low- and moderate-income people who would like to live in those communities have been told by the Supreme Court that they don't have standing to challenge those zoning practices.

The approach of 3504 to expand standing is somewhat indirect. It broadens the definition of discriminatory housing practice to include any violation under the act, which includes the exclusionary zoning provision. Do you believe this approach is sufficient to given standing to those kinds of plaintiffs that I have been talking about? And if not, would you recommend that a definition be included in the bill?

Secretary HARRIS. I don't see the present standing problem as you have enunciated it in your question. I don't have the time to look at cases the way I once did, but it seems to me that *Trafficante* did provide for standing, and title VIII, under this proposed amendment would permit this, for attacking exclusionary zoning.

What troubles me, as a matter of fact, is by some redraft of the present bill, you may be cutting back on the results of *Trafficante*. I would urge that you be prepared to take a look, I would be prepared to have our counsel suggest to you what we see as some of the potential limiting effects of the redraft of the statute on the standing issue, as set forth in *Trafficante*.

Ms. COOPER. Thank you. In another provision of H.R. 3504, HUD would be authorized to issue substantive rules and regulations to implement the act. I understand now that the General Counsel of HUD has decided that under existing title VIII law, the Secretary already has the authority to issue regulations, although not regulations that have the effect of law.

[The complete memorandum follows:]

GENERAL COUNSEL OF HOUSING
AND URBAN DEVELOPMENT,
*Washington, D.C., December 7, 1977.*

Memorandum to: Chester C. McGuire, Assistant Secretary for Fair Housing and Equal Opportunity.
From: Ruth T. Prokop.
Subject: Promulgation and effect of title VIII regulations.

The Department has recently received inquiries from organizations urging the Department to issue substantive regulations under Title VIII of the Civil Rights Act of 1968.[1] Although the General Counsel has never ruled on the Secretary's authority to issue such regulations there appears to be a belief on the part of some officials in the department that the authority to do so has been questioned. This opinion is being issued in order to assure that such rules are not being withheld because of any assumed legal impediment.

Courts accord great deference to the construction of a statute given by the agency administering it if rulemaking power was explicitly provided in the statute. *Lau* v. *Nichols*, 414 U.S. 563 (1974); *Morton* v. *Ruiz*, 415 U.S. 199 (1974). See also, *Udall* v. *Tallman*, 380 U.S. 1, 16 (1964). The general principle is that administrative rules ". . . will have the force of law if the statute has granted authority to the administrator to issue them, if they are reasonable, and if they are issued pursuant to proper procedure." (Davis, Administrative Law Treatise (1970 Supp.), Section 5.04, P. 252.)

Even though there is no explicit rulemaking authority in Title VIII, the Department has issued regulations based on the statutory charge to the Secretary to "administer . . . [its] . . . programs and activities . . . in a manner affirmatively to further the policies of this title," i.e., provide for fair housing throughout the United States. Section 808(e)(5). The Affirmative Fair Housing Marketing Regulations fall in that category. Such rules fit well within the ambit of section 7(d)

---

[1] Most of the regulations HUD has issued in implementation of Title VIII are essentially "nonsubstantive," in that they do not establish standards of conduct under the statute. Regulations, for example, which spell out the manner in which Title VIII complaints are to be processed, are clearly within the Secretary's authority. Section 7(d) of the Department of Housing and Urban Development Act (42 U.S.C. 3535 (d)) provides that the Secretary ". . . may make such rules and regulations as may be necessary to carry out his functions, powers, and duties." Moreover, Section 808(a) assigns to the secretary the overall authority and responsibility for administering the Act.

authority to promulgate regulations to carry out the functions, powers and duties of the Secretary, and courts have long allowed such systematic clarification. *Skidmore* v. *Swift & Co.*, 323 U.S. 134 (1944). See also Davis, Administrative Law of the seventies (supplementing Administrative Law Treatise) (1976), Sections 5.03, 5.03–1 and 5.05.

Whether the same authorities will serve to support the issuance of substantive rules regarding the enforcement of Title VIII's prohibitions generally—as opposed to the manner in which the Department administers its programs—and to justify deference by courts is the issue here. A distinction is drawn between "legislative" rules issued under a clear grant of authority in the operative statute, as in Title VI of the Civil Rights Act of 1964, *Lau* v. *Nichols, supra*, and "interpretative" rules issued by an agency to advise the public of the agency's construction of the statute it administers. Rules in the latter category ". . . are ordinarily of an advisory character, indicating merely the agency's present belief concerning the meaning of applicable statutory language. They are not binding upon those affected, for, if there is disagreement with the agency's view, the question may be presented for determination by a court . . ." The Attorney General's Committee on Administrative Procedure, Final Report 27 (1941), cited in Davis, Administrative Law Text (3d Ed. 1972), Section 5.03, p. 126. The distinction is often blurred in court opinions so that the key factor is judicial interpretation of the substantive meaning of the statute. Supra, at 129.

Although the Department is not presently staffed to undertake the task on a comprehensive basis, one favorable indication for Title VIII rulemaking involves court deference to an administrative interpretation which was not even clothed in the authority of a regulation. In *Trafficante* v. *Metropolitan Life Insurance Co.*, 409 U.S. 205 (1972), the Supreme Court cited a letter from an Assistant Regional Administrator for HUD to counsel for the petitioners stating that "it is the determination of this office that the complainants are aggrieved persons and as such are within the jurisdiction" of the act, and noted that the court was informed that this is the consistent administrative construction of the Act. The court then stated "[s]uch construction is entitled to great weight" citing *Udall* v. *Tallman, supra*, and *Griggs* v. *Duke Power Co.*, 401 U.S. 424 (1971). The determination of who are "aggrieved persons" clearly goes beyond HUD program applicability and provides some indication of judicial deference to HUD interpretations of Title VIII. Moreover, the issuance of rules regarding subjects such as the tests to be applied in determining violations of Title VIII can certainly be supported as necessary and appropriate to guide HUD personnel in the administration of their responsibilities in investigating and conciliating complaints.

It appears reasonable to conclude that a court would accord weight to an interpretative regulation issued pursuant to proper procedure, but the degree of deference will depend on such factors as the thoroughness evident in its consideration, the validity of its reasoning, and its consistency with earlier and later pronouncements. *Skidmore* v. *Swift & Co., supra*.[2]

Ms. Cooper. I am wondering whether or not you plan to begin that process of issuing regulations, and if so, when will they be issued?

Secretary Harris. I can't tell you when you can expect to see them, because I have found that the regulatory process is such that there is a big gap between the decision to take a look at what the regulations will be, and final regulations. I am examining that possibility. It is presently my expectation that we will issue regulations, but we are literally at the beginning.

We have just received the opinion of our very able counsel that we can do it. We are looking into it.

Ms. Cooper. Do you think it would be valuable to have those kind of regulations promulgated?

Secretary Harris. Let me say one of the reasons for looking at it is to make certain that it's not a useless act and that I am in fact

---

[2] Courts are more likely to accord great weight to an agency's construction of its legislation when such construction is essentially contemporaneous with its enactment. *Zuber* v. *Allen* 396 U.S. 168 (1969); *Power Reactor Development Co.* v. *Electricians*, 367 U.S. 396 (1961). No interpretative rules have been issued under Title VIII in the nine intervening years since passage of the Act. However, I would not consider this delay a negation of the authority to issue such rules.

at the beginning stage of an analysis of how we ought to proceed, given the green light from the general counsel to proceed.

Ms. COOPER. One of the surprising facts that have come out of the institution of title VIII has been the relatively small number of complaints that have actually been filed with HUD or in court, at least compared with employment discrimination complaints.

Do you have any explanation for why this is so?

Secretary HARRIS. No, I don't have any study that can tell us why that has occurred.

I would venture a curbstone judgment that people don't usually undertake useless acts, and if it is apparent that there is not much point in bringing a complaint because one may have lots of meetings and lots of discussions, but there will be no remedy and certainly no quick remedy, the average complainant is not likely to come into the process. This is why I feel very strongly that we need enforcement potential.

As I said, we would like to keep the conciliation provisions in the bill, but we need to have the possibility of the club of enforcement in order to persuade people that it's worth coming to see us to right a wrong I'm convinced exists every day in this country.

Ms. COOPER. So if this bill were enacted, you would expect to see more complaints?

Secretary HARRIS. So if this bill were enacted, you would expect to see more complaints?

Secretary HARRIS. Not necessarily. As a matter of fact, if this bill were enacted, if we were able to show resolution of a few complaints, we might convince potential wrongdoers that they ought not violate the law. We might have the effect of reducing substantially the number of violations and thereby, the number of complaints, by having this enforcement power.

Mr. EDWARDS. The tardiness of the gentleman from Virginia can be forgiven because he was also at prayer breakfast.

The gentleman from Virginia.

Mr. BUTLER. Nevertheless, I am disappointed that I was not here for the entire testimony and the questions which followed. I am looking forward to reading the transcript with a good deal of care.

We appreciate your presence here, Madam Secretary. Hopefully, you will recall several weeks ago that we gave you a copy of what we called the Civil Rights Act of 1977.

I would like to know if you have had an opportunity to review that. If so, what is your opinion of the enforcement mechanism suggested by that legislation?

Perhaps you would like to compare it with the mechanism established in title II of this legislation.

Secretary HARRIS. The letter was received by us on the 25th of January. If it were sent earlier, I was not aware of it.

Happily, on this second day of February, I can't agree that it was sent several weeks ago. I raise this only, Mr. Congressman, because, frankly, other matters have been the subject of long delay. I have not had a chance to review it. I have only taken a very quick look at the bill and my preliminary reaction is that whatever may be the enforcement mechanism, I am rendered intensely nervous by any bill which would repeal all the provisions of titles VI and VII of the Civil Rights Act of 1964, title VIII of the Civil Rights Act

of 1968, section 109 of the Housing and Community Development Act of 1974, Executive Order 11246, and Executive Order 11063.

Having worked very hard to secure the enactment and promulgation of each one of these, my initial reaction was one of terror. But I have not been able to review the bill on any extensive basis. To compare them may be unnecessary.

Mr. BUTLER. As long as your terror is not pride of authorship but rather an anxiety about looking at the substantive rights created by this particular legislation, I would appreciate it if you would take a few tranquilizers and examine it and give us the benefit of your judgment.

Our purpose was to bring a greater degree of order out of what are not altogether consistent provisions. It has been our observation, that at times, a considerable amount of procedural energy is wasted without substantive results.

Our objective with this legislation was to alleviate this.

It is my hope that you will look at it carefully and give us the benefit of your judgment.

If it is your view that we have destroyed what we created so carefully, we would want to know that because it was certainly not our objective to do so.

I know, Mr. Chairman, we will run out of time in a second. I have just one or two points to bring up in order to better understand the Secretary's view of the legislation before us.

If you will turn to page 41 of the bill and refer to section F, found at the bottom of that page on line 23. This section prohibits descrimination by insurancers of dwellings against hazards based on race, color, or the national origin of the people residing in or near the dwelling.

In your view, would this prohibition extend to individuals who are not yet inhabiting a residence or who have not yet entered into a contract for occupation?

Secretary HARRIS. Insofar as the refusal of insurance was based on race, color, or national origin of a person residing in or near any dwelling, I would think this would prohibit the denial.

It seems to me that it is not really relevant whether or not the person who is to be insured is or is not at that moment occupying the dwelling.

If I wish to buy a house and enter into a contract to purchase a house, and as part of the process, seek to secure insurance of that structure, let us assume it's at the time of entering into an agreement to buy, but not to settle; I am disadvantaged by the racial discrimination, though I may not then be in the dwelling, if I'm denied insurance. I do not have access to that protection which anyone else would have, were there not elements of racial discrimination involved.

Mr. BUTLER. Well, that, of course, is the objective. Is this language clear to you or should it be more explicit?

Look at that more carefully.

The next question I have is why religion is not included in the section? Do you have an opinion on that?

Secretary HARRIS. We're not, here, dealing with the issue of religion, I don't think.

It seems to me the remedies being sought here are those of discrimination on the basis of race and a related economic status provision with respect to low or moderate income housing. But here it's simply the race, color, and national origin, which is, while related, not the same as religion.

Mr. BUTLER. So you think that was not an oversight.

Secretary HARRIS. I would assume it's not an oversight. But I do not know.

Mr. BUTLER. I know. You have to psychoanalyze the author of the bill. That is rather difficult to do.

Mr. Chairman, since we have to vote, I will not tie us up. I hope we will get another opportunity to chat with the Secretary. We look forward to receiving her judgment with respect to H.R. 8504.

Mr. EDWARDS. Madam Secretary, we thank you for your testimony. In the event we have some more questions, which I'm sure we do, will you consent to answering them in writing?

Secretary HARRIS. Yes.

Mr. EDWARDS. We are seeking your assistance, as we have today, and we appreciate it very much. We appreciate very much your excellent testimony. It has been a great deal of help to the subcommittee.

Secretary HARRIS. Thank you very much.

[The prepared Statement of Hon. Patricia R. Harris follows:]

STATEMENT OF HON. PATRICIA R. HARRIS, SECRETARY OF THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Mr. Chairman, and members of the subcommittee, I am pleased to have this opportunity to testify before this Subcommittee in support of Title II of HR 3504. This Title proposes comprehensive amendments to Title VIII of the Civil Rights Act of 1968, known as the Federal Fair Housing Law.

In April 1978, we will celebrate the tenth anniversary of the signing of the bill which committed our government to the elimination of all barriers to equal opportunity in housing. Today, we have the benefit of the experience of almost ten years of that effort to inform and guide us regarding needed change in Title VIII.

The existing Fair Housing Act has accomplished a great deal:

For financially capable victims of housing discrimination, it has provided satisfactory litigation remedies;

For advocates of an end to exclusionary zoning it has been an instrument used with some success in the battle against exclusionary land use practices;

For conscientious real estate dealers, land developers and financial institutions, it has provided the reinforcement of the law to help them carry out their business operations in an equitable manner.

Despite these advances, there are flaws in the present law which have been clearly revealed by the difficulties that have been experienced in efforts to secure its overall enforcement. The Senate compromise of March, 1968 which led to the passage of the current statute had several regrettable effects:

First, the compromise bill took away the administrative cease and desist power which was at the heart of the original proposal.

Second, the bill provided, as an inadequate substitute for HUD enforcement authority, private litigation rights with two separate paths to the courts. The compromise bill thus badly confused a number of procedural issues that even now have not been entirely untangled.

Third, by providing for an abbreviated statute of limitations on civil actions and for unreasonably short time restraints on HUD complaint processing, the law has frequently cut off complainants' remedies prematurely.

I appear today in support of H.R. 3504. This bill might well be captioned "A bill to fulfill the original promise of the Federal Fair Housing Act to provide, within constitutional limitations, for fair housing throughout the United States."

The Edwards-Drinan bill reflects a clear understanding of the problems encountered in Fair Housing Law enforcement, and substantial efforts to find means of overcoming these problems. Although I have suggestions for changes in this propos-

al, I commend the sponsors and draftsmen for their dedicated and informed labors. This is a Fair Housing Law worthy of the name, and it is needed legislation.

The proposal would fulfill the most compelling need related to Fair Housing— increased enforcement power in HUD and in the Department of Justice. Beyond that, the bill offers clarification of the law's original intent in several important areas. These provisions would greatly strengthen the tools necessary to fulfill the statutory purpose. That purpose remains unchanged, but with this bill, it could be realized.

The lack of adequate enforcement power has been the most serious obstacle to the development of an effective Fair Housing program within HUD. Our present authority is limited to a purely voluntary process of "conference, conciliation, and persuasion." I will not dwell upon the ironies associated with a law that mandates HUD to investigate and to establish the existence of *violations of law* and then limits the Secretary to asking the discovered lawbreaker whether he wants to *discuss* the matter. Simply put, "conciliation" all too often has proved an inadequate means of securing compliance with the substantive provisions of Title VIII.

Respondents frequently ignore HUD's conciliation process because there is no real inducement to cooperate. Where conciliation is successful, it is most often because the respondent knows that a realistic threat of private litigation is present, should HUD's efforts fail.

But where the victim of discrimination meets with the HUD conciliator and with the respondent, and it is evident that the complainant is unrepresented by counsel, conciliation often collapses. There is no credible threat of "consequences" should the respondent refuse to cooperate.

The most significant deterrent to litigation remains its high cost. Many complainents do not have the necessary funds to initiate litigation, even with the prospect of having attorney's fees awarded should the complainant's position prevail. Thus, as a practical matter, many complainants are unable to utilize the right to seek a remedy through the courts, and therefore, must rely solely on the administrative process.

This is so despite the existence of another avenue of litigation to correct discriminatory housing practices—the filing of a pattern or practice suit by the U.S. Department of Justice, pursuant to Section 813. While pattern or practice suits can result in the correction of discriminatory practices, this type of civil action does not often provide an individual remedy.

This is the state of affairs which prompts me to believe that the single most important feature of H.R. 3504 is its machinery for full enforcement of the Act.

Under the Bill, HUD would be given the power, after investigation of the complaint, to conduct a hearing and issue a final administrative order. Orders issued pursuant to the hearing could provide such relief as would be available in private litigation, including monetary damages, equitable and declaratory relief and punitive damages not exceeding $10,000 in the case of each willful violation. The Secretary could, in the alternative, refer a complaint to the Attorney General for the purpose of filing a civil suit in the name of the Secretary.

The Attorney General would be directed by the Statute to file such a suit when referred. The Attorney General would also enforce any final administrative orders which the Secretary might refer for enforcement. The Attorney General would continue to have authority to file pattern or practice litigation. The same type of relief would be available through suit by the Attorney General as could be recovered through private litigation, thus clarifying the Authority of the Justice Department to seek an individual remedy including monetary damages.

Although I support the thrust of these provisions, I must recommend that the Subcommittee consider modications.

First, on our initial review of H.R. 3504 we were concerned about the constitutionality of so much of the described administrative process as would allow the assessment of damages by a hearing officer. The bill would allow an administrative officer to award the same relief as that which a court might assess.

Since the Supreme Court in *Curtis* v. *Loether* has found that jury trial is necessary in order to assess civil damages in Fair Housing cases, we has some doubt concerning whether this jury trial requirement could be circumvented by the creation of a parallel administrative process. Our Department requested a legal opinion in this point from the Office of Legal Counsel at the Department of Justice, and we find that our doubts on this question are shared by that Office.

Even without the availability of personal damage awards in the administrative hearing process, we believe that the structure of this bill is sound. The recent Supreme Court case, *Atlas Roofing Company* v. *Occuptional Safety and Health Review Commission,* would strongly suggest that there is no constitutional bar to a

law providing for the assessment of civil penalties—payable to the Government—for the failure of housing suppliers to abide by the requirements of the Fair Housing Law. Such penalties could be based on the very substantial public interest which has long been associated with the eradication of discrimination in housing. In short, I believe it is clear that the "public right" rationale which supplies constitutional justification for the assignment of hearing functions to administrative agencies very adequately applies to a strong administrative enforcement authority in HUD. I do not believe, however, that HUD's authority should include the assessment of damages payable to victims of discrimination.

H.R. 3504 very properly provides for an expansion of the Government's right to seek relief for complainants in court—even in cases which may not constitute a "pattern or practice" of discrimination or which involve deprivations of the rights of "groups of persons" as required by section 813 of the present law. With this expanded litigation authority in the government, we would have an alternative means of protecting the rights of individual complainants, making provision for damages in the HUD administrative proceeding unnecessary. Where one or more individuals have suffered substantial damage as a result of a discriminatory act, a complaint would most properly be litigated by the government, on the complainant's behalf. Where the major benefit or further enforcement proceedings would be the correction of discriminatory policies and the securing of housing for the complaining party, the administrative hearing process could accomplish these purposes.

The bill would modify the present law by adding a new Section 811(b) which *directs* the Attorney General to bring civil actions in cases referred to him by the Secretary. Although I would expect to enter into an agreement with the Attorney General governing this case referral process to assure that litigation is brought in every approporated instance, I do not believe the mandatory language contained in H.R. 3504 is necessary to provide such assurance. Traditionally the Attorney General functions on behalf of Executive agencies in a manner generally analogous to the way a private lawyer performs on behalf of his clients. A private attorney would not want his client "requiring" him to go to court against his own legal judgment, and I do not expect the Attorney General to favor a bill which requires that other judgment be substituted for his on matters of litigation. A conventional non-mandatory referral process should be adequate to assure that the Justice Department meets this bill's goal of an aggressive litigative enforcement program.

I agree that the Attorney General's power to litigate "pattern or practice" cases should be augmented by clarified authority to seek damages for victims in such cases, as proposed in H.R. 3504.

We have noted that H.R. 3504 eliminates from Title VIII all reference to the conciliation process. While conciliation is not expressly prohibited, it nowhere appears as an optional or required step in the bill's procedural scheme. I recognize that I have criticized the process of conciliation as inadequate, but I cannot agree with the bill's implication that this process has no place in a comprehensive enforcement plan. Particularly in light of my recommendation that the administrative damages provision be replaced by language allowing for assessment of civil penalties, I recommend that the bill give recognition to conciliation as a desirable first step in remedying discriminatory housing practices. If a strong litigation and administrative hearing structure backs up conciliation, we can confidently expect a significant increase in the percentage of cases successfully settled without further action. I would also note that there is nothing to prevent conciliation settlements which include the award of compensation to victims of discrimination. This is done frequently under the present law and would doubtlessly be done with greater success with the enforcement powers provided for in H.R. 3504.

I find the clarifying amendments in H.R. 3504 on insurance and lender redlining practices helpful and necessary. While there are strong indications that such conduct is reached by the existing law, the more explicitly the statute addresses these issues, the more certain we can be that potential violators are fully aware of the conduct prohibited. In addition, victims of such conduct could more easily secure redress in the courts if the law clears away present doubt as to the extent of its coverage.

H.R. 3504 would prohibit exclusionary land use practices by units of local government. The profound negative impact of such practices recently has been recognized in the American Bar Association's massive study, "Housing for All Under Law: New Directions in Housing, Land Use, and Planning Law." This report of the ABA Advisory Commission on Housing and Urban Growth finds that available legal and institutional devices must be reformed to more sensitively direct metropolitan regions to promote the "regional welfare" by requiring municipal governments to accept a fair share of responsibility for housing low income persons.

This bill's prohibitions against discriminatory planning and zoning practices by units of government deserve support. Part of this provision is nothing more than a codification of existing case law, but it represents important clarification of Title VIII's full applicability to exclusionary land use practices.

Proposed subsection 804(g) goes beyond mere clarification, of course, in making unlawful zoning practices which exclude low- or moderate-income housing because of the economic status of prospective occupants of such housing. This provision would break significant new ground.

Questions have already arisen concerning the Congress' power to regulate land use decisionmaking in the manner contemplated by this bill. There appears to be no serious doubt concerning the constitutionality of the proposal to prohibit exclusion of housing based on its eligibility for governmental assistance. However, the second half of subsection 804(g), prohibiting discrimination based upon economic status, is viewed as presenting such an issue. It is my personal belief that the Congress would be acting within its constitutional powers in enacting this new prohibition.

I am informed that the Justice Department has been asked to render a legal opinion on this issue, and that the Department's views will be available by February 9, when Mr. Days will testify before this Subcommittee.

On another point related to this provision, I would suggest that the Subcommittee explore further means of defining the prohibited conduct. The term "to exclude," standing alone, needs refinement if it is not to be merely a further source of litigative controversy.

My own suggestion would be that the conduct the bill seeks to prohibit be sharply focused on the practices of communities which have failed to make reasonable provision for housing persons of low- and moderate-income. Something akin to a "fair share" or "reasonable access" concept should be incorporated into this proposal. I do believe it is absolutely necessary that the Federal Government have the power to act against those few communities which have, through misuse of their zoning authority, excluded whole classes of persons from their boundaries.

H.R. 3504 would also increase the filing time for Fair Housing complaints filed with the Secretary from 180 days to three years, and would comparably extend the statute of limitations on private actions. Although I support the goal of extending the time for filing court actions pursuant to the statute, I would suggest that a 180 day period would be adequate for filing complaints with the Department, particularly if the bill were explicitly to provide for the concept of the "continuing violation."

Our experience with administrative complaints has been that the ability to develop proof of a violation deteriorates rapidly with the passage of time. Private housing suppliers frequently do not maintain the kind of records necessary to establish a violation based on incidents which occurred many months earlier. Accordingly, a too-lengthy filing period might have the detrimental effect of obligating HUD to conduct investigations of stale complaints. Having said this, I would reemphasize that it is very important to extend the time for filing judicial complaints well beyond the current law's restrictive and somewhat ambiguous requirements. We believe that private litigants can determine for themselves whether, after a considerable period of time, they can still carry the burden of proof in a court of Law. Housing discrimination is a tort. Three years is not a long time as tort limitations statutes go, and there is no apparent reason why this kind of civil wrong should be subjected to a more stringent limitations period than any other.

Some of the ambiguity in the present law's procedural requirements would be eliminated by the bill's proposed redraft of section 812 of Title VIII, providing for only one private litigation remedy in the law. The present Act contains two such provisions—one applicable to private litigation following HUD complaint handling, the other providing for litigation by-passing the HUD process. Most courts have correctly interpreted these provisions as permitting access to the courts whether or not an administrative complaint was previously filed, but in some instances, remedies have been limited in situations where the plaintiff had first sought relief through HUD. H.R. 3504 would make clear that the same court remedies could be sought, whether or not a charge had been previously filed with HUD, and only HUD's institution of the administrative hearing process would act as a temporary bar to private court action. The bill would also allow, where necessary, additional time for the filing of a private suit following the conclusion of HUD administrative action.

The bill eliminates the complicated formula for Single Family exemptions, exempting only the renting of space within a single family dwelling unit occupied by the owner. This is desirable and would provide for a more efficient administration of the title by eliminating the time that is spent determining whether or not a particular complaint falls within the jurisdiction of Title VIII. More importantly, it

would make Title VIII's coverage more nearly consistent with that provided under the 1866 Civil Rights Act (42 USC § 1982).

With respect to the proposal to include discrimination against handicapped persons as an additional basis for action under the Fair Housing Law, I think there is a need to give further definition to the intended scope of this proposal. The bill lacks a definition of the term "handicapped" and consequently raises questions as to which individuals are to receive the law's protections. Moreover, unless clarification is provided, it is uncertain to what extent the amendment envisions a new obligation on the part of private housing suppliers to rebuild their units to accommodate handicapped persons.

If the proposal is not intended to require modification of existing property, then additional statutory language clarifying this issue seems necessary. Several states have recently enacted prohibitions on housing discrimination against the handicapped, and in some instance limitations have been included to make clear that the prohibition was not intended to require modifications of existing housing units, or to require a higher duty of care, on the part of the landlord, than would be required for other tenants.

These considerations aside, and even though I believe that the problem of racial discrimination differs significantly, as a matter of law and policy, from problems of discrimination against the handicapped, I support the prohibition of discrimination against handicapped persons because of their handicapped status.

The Fair Housing Loan Fund proposed in section 210 of the bill is one way of overcoming economic barriers to litigation, but we believe it requires more study, particularly in relation to other provisions in this bill, such as the administrative remedies.

The new enforcement powers provided for HUD and for the Department of Justice in the bill would go a long way toward limiting the need for the loan fund provisions. Broader authority in the Government to litigate on behalf of victims of discrimination, including the right to seek damages both in single victim cases and under the existing Section 813 authority, will do much to close the enforcement gap which now exists in Fair Housing.

Providing HUD with power to hold hearings and order an end to discriminatory conduct will encourage more voluntary settlements of complaints, further limiting the need for the loan fund.

We see questions arising regarding administration of the fund—questions related to such matters as the amount of investigation which would be appropriate before a governmental agency could properly decide that public funds should be made available to bring litigation involving private parties on both sides. The kind of showing that ought to be made in order to demonstrate not only financial need, but also the existence of a prima facie case, would be considerable. Certainly the Federal Government would want to assure reasonable safeguards against spurious litigation conducted at public expense. Every allegation of discrimination has the sound of injustice, and most complainants are sincere in their belief that they have encountered illegal practices. Normally, however, only subsequent investigation can establish whether or not the incident in fact involved discriminatory conduct and whether there is a prima facie case justifying litigation.

I would also question the appropriateness of assigning such loan-administration functions to HUD in light of the Department's lead responsibility for Fair Housing law enforcement. Situations could arise in which HUD would have too many roles to play in connection with a Fair Housing dispute. If, for example, a complainant filed a charge with HUD, later withdrew the charge, and then petitioned for a litigation loan, HUD's impartiality in determining whether the loan should be made might be questioned. HUD administration of such a loan program strikes me as a potential conflict with the enforcement role provided elsewhere in the bill. For the foregoing reasons, we do not support inclusion of the litigation loan fund provision as a part of this bill.

Although I support the bill's provision for greater discretion in the Secretary regarding case referrals to State and local agencies, I want to assure the Subcommittee that we will make every effort to refer cases wherever local agencies have equivalent fair housing laws and appropriate enforcement capabilities. We believe this will avoid generating excessive administrative burdens on the Federal government.

Turning to Ms. Spellman's alternative proposal H.R. 7787, I support its goal of providing additional enforcement power in the Secretary to litigate Fair Housing cases. This proposal certainly would improve the existing law. I must, however, express a clear preference for the more comprehensive amendments package represented by H.R. 3504.

When Congresswoman Spellman's approach is given further consideration by the Subcommittee, I would strongly suggest that it be modified to provide significantly more time for the filing of litigation following completion of the HUD investigation and conciliation process. In our experience, it is simply not realistic to expect a case to be taken through the administrative process, and Government litigation filed, all in the space of the sixty-day period provided for in that proposal.

In closing, I want to emphasize that, most of all, HUD needs the additional Administrative and enforcement powers set out in H.R. 3504.

We also support that Bill's clarification of the Attorney General's right to seek damages for victims pursuant to his "pattern or practice" authority. In addition, we endorse the bill's provision for broader coverage, and its expansion of the law's prohibitions sections to make clear that Fair Housing means elimination of discriminatory land use regulation, and redlining.

There are undoubtedly additional features of both the Edwards-Drinan proposal and Ms. Spellman's bill which deserve comment. I will be pleased to discuss any matter pertaining to these bills which may be of interest to the Subcommittee.

[Whereupon, at 11:10 a.m., the subcommittee adjourned.]

# FAIR HOUSING ACT

---

## THURSDAY, FEBRUARY 9, 1978

U.S. HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON CIVIL AND CONSTITUTIONAL RIGHTS
OF THE COMMITTEE ON THE JUDICIARY
*Washington, D.C.*

The subcommittee met at 9:30 a.m., in room 2237 of the Rayburn House Office Building, Hon. Don Edwards (chairman of the subcommittee) presiding.

Present: Representatives Edwards, Drinan, Volkmer, and McClory.

Staff present: Thomas P. Breen, Counsel; Janice Cooper, assistant counsel; and Roscoe B. Starek III, associate counsel.

Mr. EDWARDS. Today, we continue our hearings on legislation which would amend the Fair Housing Act. Last Thursday, we heard from the Secretary of the Department of Housing and Urban Development, Patricia Roberts Harris, who strongly supported most of H.R. 3504 (title II), and offered sound and extremely useful suggestions for modification of that bill. This morning we will hear from two witnesses whose expertise will add much to our understanding of housing discrimination and efforts to eradicate it. Testifying before us today are Hon. Drew Days, Assistant Attorney General for the Civil Rights Division and Mr. Richard Fishman, editor of the report just issued by the American Bar Association's Advisory Commission on Housing and Urban Growth, entitled "Housing for All Under Law."

We will begin with Mr. Days. Despite our mutual subject jurisdiction, this is your first appearance before this subcommittee. I am extremely pleased to welcome you here.

Both bills pending before this subcommittee, H.R. 3504 and H.R. 7787, would significantly broaden the scope of cases that the Department of Justice could pursue in court. Now limited basically to "pattern or practice" cases, these bills would permit Justice, on its own or at the request of HUD, to sue for relief in individual cases of discrimination. H.R. 3504 would also strengthen the enforcement effort of the Justice Department in several other ways—by clarifying and expanding substantive coverage, by permitting the award of damages in Department initiated cases, by raising the limit on award of punitive damages, and so on.

As numerous commentators have pointed out, enforcement of Title VIII has had a minimal effect on eradicating housing discrimination. However, the efforts of the Housing Section of the Justice Department's Civil Rights Division stand out as commendable and effective. Generally, your attorneys have been aggressive and creative and have contributed immeasurably to the development of

(35)

most of the existing fair housing case law. Yet, there is certainly a limit to how much can be accomplished by litigation under existing law and existing funding. We are therefore anxious to hear your comments this morning so that we will be able to fashion the most effective fair housing law.

Mr. Days, would you introduce your colleagues and proceed.

Mr. DAYS. Yes.

With me today are Frank Allen, who is a Deputy in the Appellate Division in the Civil Rights Division, and Frank Schwelb, who is the Chief of the Housing Section of the Civil Rights Division.

They assisted me extensively in the preparation of the text I'm going to give today.

Mr. EDWARDS. Good.

Mr. DRINAN?

Mr. DRINAN. I welcome Mr. Days here and look forward to his participation in the ongoing discussion about what I think more and more is a very important bill.

Thank you.

Mr. EDWARDS. You may proceed, Mr. Days.

Mr. DAYS. Thank you, Mr. Chairman.

With the chair's permission, what I'd like to do today is summarize my fairly extensive published remarks and ask that the entire statement be included in the record.

Mr. EDWARDS. Without objection, so ordered.

Mr. DAYS. Thank you.

[The prepared statement of Mr. Days follows:]

STATEMENT OF DREW S. DAYS, III, ASSISTANT ATTORNEY GENERAL, CIVIL RIGHTS
DIVISION DEPARTMENT OF JUSTICE

I am pleased to appear before the Subcommittee to testify on Title II of H.R. 3504 and H.R. 7787, which would amend Title VIII of the Civil Rights Act of 1968 by revising the procedures for enforcing the right to equal housing opportunity and clarifying the relief available to victims of housing discrimination.

Ever since the enactment of the Fair Housing Act almost ten years ago, the Department of Justice has been in the vanguard of its enforcement, and has helped to develop many of the major judicial precedents interpreting it. We have brought some 300 suits against perhaps three times as many defendants in virtually every metropolitan area in the country. Our litigation has covered every possible phase of fair housing law, including not only discrimination in sales, rental and advertising, but also racially exclusionary zoning, discriminatory lending practices, blockbusting, racial steering, racial redlining, discrimination in real estate appraisal, discriminatory recruitment of prospective purchases and exclusionary practices of real estate organizations. While a majority of our cases have involved racial discrimination against blacks, we have also developed important litigation relating to denials of equal housing opportunity to women, Hispanics American Indians, Asians, Jews, and several other groups. We have developed a number of innovative remedies designed to correct the effects of past discrimination, and we have participated in much of the important private fair housing litigation and attempted to improve the opportunity of individual litigants with meritorous cases to promote the public interest as private attorneys general. To date, our litigation record has been unusually successful, with only two losses on the merits in our 300 cases. We have also accorded high priority to the enforcement of existing court orders, and have brought 36 proceedings for civil contempt or supplemental relief, of which all except those still pending have been successfully concluded through renegotiation or contested litigation.

Based on our experience over almost a decade, we believe that we have been able to identify the weakness of the Fair Housing Act as presently written, and we welcome the opportunity to comment on the corrective proposals presently before the Congress.

As the Subcommittee is, no doubt, aware, the present fair housing law was the product almost entirely of action taken on the Senate floor in 1968, in which the House of Representatives subsequently concurred. While the original amendment sponsored by Senators Mondale and Brooke was, in essence, the same as the bill passed by the House in 1966, the measure which was finally adopted (known as the "Dirksen compromise") was a provision informally compiled and amended several times on the Senate floor.

The result of this effort, though laudable at the time, was an act which had never received the kind of detailed scrutiny that can be given to important legislation in committee and which contained what the department of Justice, in light of experience, now views as shortcomings.

### ADDITIONAL HOUSING COVERAGE

As a result of the compromise and floor amendments in 1968, the law does not cover all the housing which should be covered. See 114 Cong. Rec. 4568, 90th Cong., 2d Sess. (1968). Under Section 803(b), the owner of three or fewer houses may lawfully be exempted from the non-discrimination provisions of the Fair Housing Act if such owner does not use the services of a real estate broker and does not engage in discriminatory advertising prohibited by the Act.[1]

H.R. 3504 would remove this exemption of such housing, and, instead, would exempt only the renting of space in a single family home occupied by the owner— the "Mrs. Murphy's boarding house" exception. This change is a useful one, and would make the scope of the federal law more in accord with the scope of 42 U.S.C. 1982 which provides redress for racial discrimination in any real property transaction. See *Jones* v. *Alfred H. Mayer Co.*, 392 U.S. 409 (1968).

### INADEQUATE ENFORCEMENT POWERS

The present law, while giving the Department of Housing and Urban Development the responsibility to investigate complaints of housing discrimination, and while giving the agency adequate powers to investigate, gives HUD no real power to remedy housing violations which its investigations reveal. If HUD fails to remedy the violation through conciliation, aggrieved individuals are left to seek redress through private civil actions.

We believe that the principal impediment to realization of the purposes of the Fair Housing Act has been the lack of adequate enforcement authority. In *Trafficante* v. *Metropolitan Life Insurance Co.*, 409 U.S. 205 (1972), the Supreme Court commented on the "enormity" of the task of implementing fair housing in the light of the limited authority and resources of the Department of Justice and the lack of enforcement power on the part of HUD. Comparatively few suits have been brought by "aggrieved persons," in large part because lawsuits may be time-consuming and expensive. Few victims of discrimination actually sue when HUD conciliation efforts fail, and conciliation frequently fails because the Secretary has no authority to institute actions to support positions taken in conciliation efforts.

H.R. 3504 would provide one way of remedying this lack of authority by giving HUD authority when the Secretary has determined ". . . that reasonable cause exists to believe the charge [of housing discrimination] is true [to] refer the matter to the Attorney General for the filing of an appropriate civil action . . . or [to] file an administrative complaint . . . ."

H.R. 7787 would amend Title VIII by authorizing the Secretary of Housing and Urban Development to bring civil actions to enforce the rights secured by Title VIII. H.R. 3504 would authorize either civil actions or administrative enforcement proceedings. We do no believe that the litigation which would be filed under these proposals would increase the number of suits brought in federal courts. Conceivably, it could, over time, reduce the number of housing discrimination complaints by increasing the Secretary's credibility and effectiveness in negotiation. Most assuredly, it would give HUD the bargaining power it needs to carry out the intent of the Act.

Our experience, to date, in the federal system has been with enforcement of fair housing by courts; but administrative remedies would probably add an extra dimension to fair housing enforcement. We defer to the Secretary of HUD as to whether this would be something that her Department should undertake, and as to what resources would be necessary to carry it out. I can say that I believe we have the organization and the capability in the Department of Justice to handle any court litigation ancillary to administrative proceedings, and the increased attorney

---

[1] The discriminatory advertising provision states: "*Provided further*, [the exemption shall apply if the sale or rental is] . . . (B) without the publication, posting or mailing, *after notice* [emphasis added], of any advertisement or written notice in violation of section 804(c) . . ."

strength necessary, while depending on the volume of matters referred, would probably be slight.

I do have two suggestions, however, if the Congress decides to create this new procedure.

First, the procedure should recognize that informal methods of resolving violations, where appropriate, should be used. In this regard, we agree with the statement of the Secretary of HUD that H.R. 3504 should be amended in some way to recognize some latitude in HUD's authority so that conciliation and persuasion may be used to bring about compliance with the law when it can be accomplished in that way.

Second, some distinction should be made between the nature of the administrative proceedings and the private "legal" remedies available through lawsuits. Since the Supreme Court has held that rights currently conferred under the Act are in the nature of individual "legal" rights, and actions for damages for violations of those rights are triable by jury, *Curtis* v. *Loether*, 415 U.S. 189 (1974), it would risk unconstitutionality to provide for damages in both courts and administrative forums. Perhaps the best use of administrative procedures would be in issuing "cease and desist" type orders to obtain prospective relief or to prohibit the sale or rental of housing except to a person who has been unlawfully refused the sale or rental on a discriminatory basis. Additionally, administrative procedures could assess civil penalties payable to the United States for specific violations of the law. Such procedures would be new ones which meets special needs not adequately served by existing remedies. See *Atlas Roofing Co.* v. *Occupational Safety Commission*, 430 U.S. 442, 461 (1976).

Civil actions brought under the authority proposed in H.R. 7787 would be instituted and tried by the Department of Justice as required by present Section 811(g) of the Act, and H.R. 3504 describes a procedure for referring cases to the Attorney General for suit. In that regard, there is an aspect of H.R. 3504 about which we have serious reservations. On page 49, line 14, is the language:

"(b) The Attorney General *is directed* [emphasis added] to bring a civil action . . . (1) to enforce any final order under section 810 of this title that is referred for enforcement by the Secretary; (2) to collect any civil penalty assessed by the Secretary . . .; and (3) to remedy any discriminatory housing practice [referred for suit by HUD]."

We do not believe that it is consistent with the duties of the Attorney General's office for a statute to give such direction. Where suits by the Attorney General are authorized, it has uniformly been the law that the Attorney General has the discretion to decide whether the suit should be filed. See, *e.g., Powell* v. *Katzenbach*, 359 F.2d 234 (D.C. Cir. 1965). See also 28 U.S.C. 516–519 and Rule 11, F.R. Civ. P., which provides that an attorney's signature on a complaint constitutes certification that to the best of his belief, there is good ground to support the complaint. We believe that the Attorney General, and those attorneys acting under his authority should, at least, have the discretion to decide in consultation with HUD whether a case has merit before making an allegation in court, and we expect to reach understandings with HUD on suit referral procedures and standards for filing suit should these procedures be created.

We do, however, strongly endorse the concept of providing power in the government to back the negotiating positions of HUD.

### PROCEDURAL AMBIGUITIES

Based upon our experience over the past ten years, we have found that the fair housing law as it now reads has a number of procedural ambiguities. Any new legislation in this field should correct these problems. Conciliation and negotiation, for example, can be a very useful and inexpensive way of achieving compliance with the Act, if use of conciliation does not impair the rights of the individual to sue when conciliation fails, and if sanctions are available when conciliation fails. I have already mentioned HUD's lack of real power. Let me illustrate how the present Act discourages the use of HUD procedures.

The Fair Housing Act currently provides two direct ways in which allegedly aggrieved individuals may seek relief under the Act: (1) through utilization of HUD's administrative procedures under section 810, followed by suit under that section if administrative conciliation is unsuccessful; and (2) through suits brought directly in federal court under section 812, without initial use of the administrative process. In addition, an aggrieved individual may provide information to the Attorney General, who may bring a pattern or practice suit under Section 813. But there is uncertainty about the time allowed to individuals to file suit after HUD conciliation attempts have been unsuccessful. The time within which suit may be brought

under section 810 has been the subject of litigation under the Act, because the various subsections of section 810 are not consistent with each other.

Under Section 810(a), the Secretary has thirty days just to decide whether he will attempt to resolve the complaint.[2] However, section 810(d) contemplates that the Secretary will complete his conciliation efforts within that same thirty-day period.[3]

Thus, the literal language of section 810(d) would seem to require that HUD complete its conciliation efforts within thirty days after a complaint has been filed with the Secretary. Then if those efforts fail, the complainant has an additional thirty days in which to file suit. On its face, this language cannot be reconciled with section 810(a).

HUD has, by regulation, construed section 810 so as to provide some consistency.[4] Despite HUD's attempts to eliminate the ambiguites, federal district courts have reached varying conclusions on when suits under section 810 may be brought. One group of courts has held that a complainant may bring a section 810 suit within thirty days of receiving notification of HUD's failure to conciliate.[5] Other courts have held that a section 810 suit must be filed within sixty days after a complaint is filed with HUD, regardless of whether conciliation has been completed, or even begun.[6] One district court has even held that a section 810 suit must be brought within 180 days of the alleged act of discrimination—the same 180-day period in which a complaint must first be filed with HUD.[7]

It is incongruous and contrary to the intent of Congress to require that suits be initiated before conciliation efforts have been exhausted. Yet, this is how some courts have read section 810(d). Accordingly, new legislation should clarify the rights of aggrieved persons to file suits and adequate time periods allowed to fulfill the purpose of the Act.

One way of accomplishing this objective is that employed by H.R. 3504 which addresses private civil actions in one section and provides that such actions may be filed at any time up to three years after the alleged violation or one year after the completion of any government initiated procedure, whichever is later; this approach greatly simplifies the suit process and has the added advantage of not discouraging the use of HUD processes by fears that rights would be lost if an attempt is made to avail oneself on HUD resources.

In addition, the H.R. 3504 procedure would clarify the varying interpretations of the remedies available to aggrieved individuals under the present law.

Section 810(d) of the current Act provides that if the district court finds a violation of the Act, "the court may, subject to the provisions of section 812, enjoin the respondent from engaging in such practice or order such affirmative action as may be appropriate." Although one district court has held that damages are recoverable in a section 810 suit,[8] another court has held that a plaintiff may *not* obtain damages under that section.[9] This holding is inconsistent with the basic structure of

---

[2] Section 810(a) provides: "Any person who claims to have been injured by a discriminatory housing practice . . . may file a complaint with the Secretary. . . . Within thirty days after receiving a complaint, . . . the Secretary whall investigate the complaint and give notice in writing to the person aggrieved whether he intends to resolve it. If the Secretary decides to resolve the complaint he shall proceed to try to eliminate or correct the alleged discriminatory housing practice by informal methods of conference, conciliation, and persuasion. . . ."

[3] "If within thirty days after a complaint is filed with the Secretary . . . the Secretary has been unable to obtain voluntary compliance with this title, the person aggrieved may, within thirty days thereafter, commence a civil action in any appropriate United States district court, against the respondent named in the complaint. . . ."

[4] Upon receipt of a complaint, the complainant is notified that if the complaint is unresolved in thirty days, he or she may demand a right to sue letter, and within thirty days thereafter, may bring suit. See Fair Housing form Letter #1, *Title VIII Field Operations Handbook*, Appendix 4. Section 810(d) is construed as prescribing a limitation period of thirty days after HUD conciliation efforts have terminated. See 24 C.F.R. 105.16, 105.34. The complainant is notified when HUD believes it is unable to conciliate.

[5] See *James* v. *Stratford Hills General Partnership*, No. C-74-215-D, P.H. E.O.H. Rptr. ¶13,701 (M.D. N.C. 1975); *Taylor* v. *Fletcher Properties*, No. 74-H-850 (S.D. Tex. 1975); *Logan* v. *Richard E. Carmack & Associates*, 368 F. Supp. 121 (E. D. Tenn. 1973); *Brown* v. *Ballas, 331 F. Supp. 1033 (N.D. Tex 1971).*

[6] See *Tatum* v. *Myrick*, 425 F. Supp. 809 (M.D. Fla. 1977); *Brown* v. *Blake and Bane, Inc.*, 402 F. Supp. 621 (E.D. Va. 1975) *Sanford* v. *Corbin Realty, P.H. E.O.H. Rptr.* ¶13,740 (W.D. N.C 1975) *O Young* v. *AAA Realty Co.*, 350 F. Supp. 1382 (M.D. N.C. 1972) Judge Gordon, who decided *AAA Realty*, subsequently reconsidered his decision, and, in *James* v. *Stratford Hills General Partnership*, supra, held that a section 810 suit is timely if brought within thirty days after receiving notification of HUD's failure to conciliate.

[7] *Hodge* v. *Seiler*, No. 73-2556 (E.D. La. 1975), *vacated*, 558 F. 2d 284 (5th Cir. 1977).

[8] *Metropolitan Washington Planning and Housing Assoc., Inc.* v. *Oriental Building Assoc. Federal*, No. 76-0498 (D. D.C. April 26, 1977).

[9] *Brown* v. *Ballas, supra.*

the Fair Housing Act.[10] An aggrieved person should not have to sacrifice the recoverability of damages in order to use the investigation and conciliation procedure of present section 810. Section 3 of H.R. 7787 would avoid this result, as would section 208 of H.R. 3504 which authorizes monetary relief in suits brought by individuals, regardless of whether the suit followed the filing of a HUD complaint. We believe that an aggrieved individual who utilizes HUD's administrative conciliation machinery should not be penalized for doing so. Rather, if he brings suit after conciliation fails, he should be entitled to the same relief, including damages, attorney's fees and costs, as a plaintiff who sues under section 812 without recourse to HUD procedures.

### ATTORNEY'S FEES

Another feature of the present law which inhibits private enforcement of fair housing is the proviso in section 812(c) of the current law limiting the awarding of attorney's fees to plaintiffs who are financially unable to assume such fees. As with other aspects of the current law, this proviso was added as a Senate floor amendment by voice vote, see 114 Cong. Rec. 5514–15, 90th Cong., 2d Sess., and it is the only civil rights attorneys fee provision which contains such a limitation. Section 4 of H.R. 7787 would strike this proviso and section 208 of H.R. 3504 contains no such limitation. We support these provisions. As the Supreme Court noted in *Trafficante* v. *Metropolitan Life Insurance Co., supra,* 409 U.S. at 211, complainants who bring suits under the Fair Housing Act "act not only on their own behalf but also as private attorneys general in vindicating a policy that Congress considered to be of the highest priority." The pending bills, if enacted, will enable private litigants to carry our that function far more effectively. As in other civil rights statutes, attorney's fees would thus be recoverable in the absence of special circumstances that would render such an award unjust.[11]

We note that the attorney's fees provision of H.R. 3504 would make two other changes: (1) it would make the United States liable for attorney's fees the same as a private party, and (2) it would allow prevailing defendants—as well as prevailing plaintiffs—to recover fees. The bill does not prescribe the standards to be used in applying these provisions, but we assume that the standards would be the same as those applicable to the Civil Rights Attorneys Fees Awards Act of 1976—that prevailing plaintiffs (other than the United States) could recover fees in the absence of special circumstances and by virtue of their having acted in the public interest, and that a prevailing defendant could recover fees only in cases in which the "plaintiff's action was frivolous, unreasonable or without foundation. . . ." *Christiansburg Garment Co.* v. *EEOC,* No. 76–1383, ——— U.S. ———, January 23, 1978. See S. Rpt. No. 94–1011, 94th Cong. 2d Sess., pp. 4–5. If this is the way this section is to be read, then we also support these change's in the law.

### PUNITIVE DAMAGES

Sec. 812(c) allows a district court, in a private suit to enforce Title VIII, to award "to the plaintiff—not more than $1,000 punitive damages. . . ." In a class action or a multiple plaintiff action the defendant may be required to pay up to $1,000 to each prevailing plaintiff or each member of the plaintiff class who has been a victim of the defendant's discrimination. While punitive damages in excess of $1,000 have been awarded in some cases brought under 42 U.S.C. § 1982, we are not aware of multiple awards of punitive damages against one defendant under § 812(c).

The two bills before the Committee differ in their treatment of punitive damages. H.R. 3504 would raise the present ceiling from $1,000 to $10,000 for each violation, while H.R. 7787 would make no change in § 812(c)'s $1,000 ceiling.

Although we have found no legislative history on this point, we believe that the intent of providing for punitive damages was to build into the statute a deterrent against wrongdoing; the overall scheme of the statute is remedial rather than penal. The question thus arises whether § 812(c), as presently constituted, is an adequately strong deterrent. The kinds of relief § 812(c) allows are as follows:

(a) injunctive relief: threat of injunctive relief is a weak deterrent:

---

[10] For example, section 810(d) provides that section 810 suits are to be brought in state courts if the state or locality has a fair housing law "which provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided *in this title*" (emphasis added). Since Title VIII provides for damages and attorney's fees in section 812(c), deferral under section 812(d) is required only if damages and attorney's fees are available under state or local law. It would make little sense to require deferral only if local law authorizes damages and attorney's fees but to construe section 810, itself, as authorizing no such relief.

[11] See *Northcross* v. *Board of Education of the Memphis City Schools,* 412 U.S. 427, 428 (1937) (*per curiam*); *Newman* v. *Piggie Park Enterprises, Inc.* 390 U.S. 400, 402 (1968) (per curiam).

(b) out-of-pocket damages or restitution: where there could be sizeable out-of-pocket losses to the plaintiff, this is a significant deterrent; however, in some instances there are no out-of-pocket losses;

(c) monetary compensation for humiliation and for loss of statutory rights: the courts are beginning to recognize this as an element of actual damages, and large recoveries are theoretically available;

(d) punitive damages.

In deciding whether the ceiling for punitive damages should be raised the Congress should develop evidence as to the relative efficacy of the above elements of relief. We do not regard punitive damages as central to Title VIII, but they do have a role to play, and it is possible that the upper limit should be increased. No matter what the upper limit may be, the courts, in assessing punitive damages should apply conventional factors and considerations, as is other suits in which this remedy is available, such as the wealth of the wrongdoer, the degree of willfulness involved in the wrong, the extent of harm done to society in the general and the amount which will be a deterrent to the defendant and to other similar wrongdoers. See *Parker* v. *Shonfeld*, 409 F. Supp. 876 (N.D. Cal. 1976). (Punitive damages of $10,000 awarded in a housing discrimination case under 42 U.S.C. 1982). See also the Equal Credit Opportunity Act, 15 U.S.C. 1691e which limits punitive damages to $10,000 except in class actions where the limit is $500,000 or one percent of the defendant's net worth whichever is less.

### RELIEF IN PATTERN OR PRACTICE SUITS

In addition to the private enforcement difficulties which I have been discussing, there are ambiguities in the remedies available through suits brought under current section 813, which authorizes the Attorney General to bring suit "whenever [he] has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by [the Act], or that any group of persons has been denied any of the rights granted by [the Act] and such denial raises an issue of general public importance." Section 813 provides in pertinent part that the Attorney General may request "preventive relief . . . or other order . . . as he deems necessary to insure the full enjoyment of the rights granted by this title."

Federal courts have been divided on the question of whether the Attorney General may recover money for victims of discrimination in pattern or practice suits.[12] It is well settled that in pattern or practice suits brought by the Attorney General to enforce the right to equal employment opportunity under Title VII of the Civil Rights Act of 1964, individual monetary relief is obtainable.[13] We believe that such relief should also be available under the Fair Housing Act, and that the statute should contain explicit language authorizing this relief. Section 208 of H.R. 3504 provides that the Attorney General may obtain the same relief as is authorized in private enforcement suits, and we support this change. The addition of explicit authority to award damages in section 813 suits would significantly increase the Attorney General's enforcement powers by allowing him to recover damages for wrongs that might otherwise go uncompensated, because individual victims of discrimination are often unaware of their statutory rights and because the uncertainties and expense of litigation may make individual suits impracticable.

### SUBSTANTIVE PROTECTIONS

Section 206(e) of H.R. 3504 would prohibit the practice of denying a loan for the purchase of a house because of the racial or ethnic composition of the neighborhood in which the house is located. The present language of Section 804, 805 and 817 has been construed by courts [14] and the federal agencies charged with administering the

---

[12] Compare *United States* v. *J. C. Long*, 537 F.2d 1151 (4th Cir. 1975), cert. den. 429 U.S. 871 (1976); *United States* v. *Mitchell*, No. 3-7887-G (N.D. Tex. 1976) appeal pending No. 76–3880 (5th Cir.); *United States* v. *Dittmar*, P.H.E.O.H. Rptr. para. 13, 730 (E. D. Va. 1975); *United States* v. *Northside Realty Associates, Inc.*, No. 13932 (N.D. Ga. 1976) (holding damages are not recoverable) with *United States* v. *Berg Enterprises, Inc.*, No. WPS–75–139–CIV–CF (S.D. Fla. 1975); *United States* v. *Chatham*, No. 75–127A (N.D. Ga. 1975); *United States* v. *Hilton Sykes Rental Agency, Inc.*, P.H.E.O.H. Rptr. ¶ 13,727, No. 74–322–Civ. T–H (M.D. Fla. 1975); *United States* v. *West Suburban Board of Realtors*, P.H.E.O.H. Rptr. ¶ 13,641, No. 69–C–1460 (N.D. Ill. 1974) (holding damages are recoverable).

[13] See, *e.g.*, *United States* v. *Georgia Power Co.*, 474 F.2d 906 (5th Cir. 1973); *United States* v. *Wood, Wire & Metal Lathers Int'l Union No. 46*, 328 F. Supp. 429 (S.D.N.Y. 1971), aff'd 471 F.2d 408 (2d Cir., 1973) cert. denied, 412 U.S. 939 (1973).

[14] See, *Laufman* v. *Oakley Building & Loan Co.*, 408 F. Supp. 489 (S.D. Ohio 9176); *Harrison* v. *Otto G. Heinzeroth Mortgage Co.*, 414 F. Supp. 66 (N.D. Ohio 1976).

Fair Housing Act [15] as prohibiting such "redlining," and we support the proposed amendment as a clarification of the existing law. Congress has elicited extensive evidence on the contribution of redlining to the phenomenon of "white flight" and decay of the cities and to the inability of many minority homeseekers to obtain financing.[16]

Similarly, Section 206(c) of H.R. 3504 would prohibit redlining in the making of hazard insurance contracts, and we support this provision as a clarification of existing law. We note in this regard that although the McCarran-Ferguson Act, 15 U.S.C. 1012, exempts certain activities of insurance companies to the extent that they are subject to state regulation, insurance companies are not exempt from federal civil rights legislation even in the absence of an express provision regarding insurance.[17] Certainly they may be made the subject of this Act explicitly.

In addition, H.R. 3504 would prohibit governmental units responsible for regulating land uses from discriminating against low or moderate income housing because that housing may be governmentally assisted or because of the race, color or economic status of the prospective occupants of the housing.

We believe that one positive aspect of a provision of this nature could be in the codification of judicial interpretations about the reach of the present fair housing law. In *Arlington Heights* v. *Metropolitan Housing Corp.*, 429 U.S. 252 (1976), the Supreme Court held that refusal to grant a zoning variance for a low income governmentally assisted housing project which would have been utilized by a substantially integrated resident population did not violate the equal protection clause of the Fourteenth Amendment because no racially discriminatory purpose was shown. However, the Court remanded the case for consideration of whether the exclusion violated Title VIII of the 1968 Civil Rights Act—the present fair housing law. Upon remand, the Court of Appeals for the Seventh Circuit found, as have other lower courts,[18] that action which has a racially segregative effect could violate Title VIII if the plaintiff's interest is not outweighed by other non-racial interests of the community. *Metropolitan Housing Development Corp.* v. *Arlington Heights,* 558 F. 2d 1283, 1290–1293 (7th Cir. 1977)

We suggest that Congress might identify other practices of local governmental units which have a racially segregative effect, or which impede the construction of governmentally assisted housing, and include a section in this bill which would prohibit them when there is a less segregative alternative to achieve the community purpose which such practices are claimed to serve.

The bill, as presently drafted, appears to go beyond the clarification of prohibited practices, and the protection of federal housing efforts. Depending on how broadly the bill is intended to be read, it may prohibit a variety governmental land use practices which may have an economically discriminatory effect. This presents both policy and constitutional issues. In *James* v. *Valtierra,* 402 U.S. 137 (1971), the Supreme Court rejected the argument that every economic distinction in land use is, *per se*, a racial distinction, and held that a California requirement that there be a community referendum before building low income housing when such a referendum was not required for other land uses did not violate the equal protection clause of the Fourteenth Amendment. While there may be Fourteenth Amendment protection against some economic discrimination, apart from racially linked economic discrimination, Congress' power to regulate in this area, when such regulation would impinge upon local zoning or land use authority is far from clear. I am submitting a memorandum prepared in the Department of Justice which discusses these difficult issues in some detail. I would only suggest here, that the need for prohibitions against housing discrimination on account of economic status, which is

---

[15] See, *e.g.,* Hearings before the Senate Committee on Banking, Housing and Urban Affairs, 94th Cong., 2d Sess. (1976) at 126 (statement of James H. Blair, Assistant Secretary for Fair Housing and Urban Development), 485–489 (brief of Federal Home Loan Bank Board in *Laufman* v. *Oakley Building & Loan Co., supra).* This consistent administrative construction of the Act is entitled to great weight. *Trafficante* v. *Metropolitan Life Ins. Co.,* 409 U.S. 205, 210 (1972).

[16] See, *e.g.,* Hearings before the Senate Committee on Banking, Housing and Urban Affairs, 94th Cong., 2d Sess. (1976), at 17 (statement of John E. Shockey, Deputy Chief Counsel, Office of the Comptroller of the Currency), 127 (statement of James H. Blair, Assistant Secretary for Fair Housing and Equal Opportunity, Department of Housing and Urban Development), 241, *et seq.* ("Report on Savings & Loan Democracy by the Association of Concerned Depositors") 494 (brief for the Federal Home Loan Bank Board in *Laufman* v. *Oakley Building and Loan Co., supra).* See also *Laufman* v. *Oakley Building and Loan Co., supra,* 408 F. Supp. at 497.

[17] See *Ben* v. *General Motors Acceptance Corp.,* 374 F. Supp. 1199 (D. Colo. 1974). See also *Reichardt* v. *Payne,* 396 F. Supp. 1010 (N.D. Cal. 1975); *Stern* v. *Massachusetts Indemnity and Life Insurance Co.,* 365 F. Supp. 433 (E.D. Pa. 1973).

[18] See, e.g., *United States* v. *City of Black Jack,* 508 F. 2d 1179 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975); *Resident Advisory Board* v. *Rizzo,* 564 F. 2d 126 (3rd Cir. 1977)

not racially linked, and which does not impinge upon the provision of federally financed housing, be carefully assessed.

H.R. 3504 would also add "handicap" to the protected classes under the Fair Housing Act. We think that protection of handicapped persons is an important federal function. However, simply adding the word "handicap" in a series with race, color, national origin, religion and sex does not provide any guidance about what is to be protected, and what changes, if any, should be made in current practices. As you know, the problems of handicapped people are generically different from the problems of racial discrimination.

### COERCION AND INTIMIDATION

Section 209 of H.R. 3504 would amend present section 817 to protect the exercise of any rights under the entire Fair Housing title from coercion and intimidation. We hope that it will be made clear that this protects the right to file administrative or judicial complaints or to give information to the Attorney General, the FBI or HUD. Presently, the coverage of this provision is limited to the exercise of the substantive rights enumerated in certain sections, and, inexplicably, one of the sections included is section 803 which is concerned only with exemptions from the coverage of the Act.

### FAIR HOUSING LOAN FUND

The Department has some reservations about that aspect of H.R. 3504 which would create a new loan fund to finance the filing of private lawsuits. There is a fine line between helping individuals protect their rights and stirring up litigation. We should recognize that the way the provision is drafted, it is likely that in many instances it will be a subsidy of lawsuits rather than a loan because of the provision that loans may be forgiven to the extent that cost awards do not equal the amount of the loan.

I believe that plaintiffs should be aided in enforcing their rights through the ways which I have discussed—liberalized attorney's fees, damage awards and re-inforced conciliation measures. If this is insufficient, then increased assistance from legal aid agencies might be considered. The proposed fund, I fear, will require more in administration than it would be worth.

### CONCLUSION

As now stated in section 801 of the Fair Housing Act, "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." By clarifying and streamlining the enforcement of the Act by private individuals and the federal government, and by strengthening the relief obtainable in suits under the Act, this policy may one day receive the full measure of enforcement that our society requires. For these reasons, I hope that the Congress will act favorably upon legislation like that which is before this subcommittee.

## TESTIMONY OF DREW S. DAYS III, ASSISTANT ATTORNEY GENERAL, CIVIL RIGHTS DIVISION, DEPARTMENT OF JUSTICE, ACCOMPANIED BY FRANK E. SCHWELB AND FRANK D. ALLEN, JR.

Mr. DAYS. I'm pleased to appear before the subcommittee to testify on title II of H.R. 3504 and H.R. 7787, which would amend title VIII of the Civil Rights Act of 1968 by revising the procedures for enforcing the right to equal housing opportunity and clarifying the relief available to victims of housing discrimination.

Ever since the enactment of the Fair Housing Act almost 10 years ago the Department of Justice has been in the vanguard of its enforcement and has helped to develop many of the major judicial precedents interpreting it.

We have brought some 300 suits against perhaps three times as many defendants in virtually every metropolitan area in the country. Our litigation has covered every possible phase of fair housing law, including not only discrimination in sales, rental, and advertising but also racially exclusionary zoning, discriminatory lending practices, block busting, racial steering, racial reclining, discrimi-

nation in real estate appraisal, discriminatory recruitment of pro-
spective purchases, and exclusionary practices of real estate organi-
zations.

While a majority of our cases have involved racial discrimination
against blacks, we have also developed important litigation relating
to denials of equal housing opportunity to women, Hispanics,
American Indians, Asians, Jews, and several other groups.

We have developed a number of innovative remedies designed to
correct the effects of past discrimination, and we have participated
in much of the important private fair-housing litigation, and at-
tempted to improve the opportunity of individual litigants with
meritorious cases to promote the public interest as private attor-
neys general.

To date, our litigation record has been unusually successful, with
only two losses on the merits in our 300 cases.

We've also accorded high priority to the enforcement of existing
court orders, and have brought 36 proceedings for civil contempt or
supplemental relief, of which all except those still pending have
been successfully concluded through renegotiation or contested liti-
gation.

Based on our experience over almost a decade, we believe that
we have been able to identify the weakness of the Fair Housing
Act as presently written, and we welcome the opportunity to com-
ment on the corrective proposals presently before Congress.

Let me now address some of the specific general areas in the
legislation presently before this subcommittee.

First, additional housing coverage.

As a result of the compromise and floor amendments in 1968,
and as my complete testimony describes in more detail, the law
does not cover all housing which should be covered.

Under section 803(b) the owner of three or fewer houses may
lawfully be exempted from the nondiscrimination provisions of the
Fair Housing Act if such owner does not use the services of a real
estate broker and does not engage in discriminatory advertising
prohibited by the act.

H.R. 3504 would remove this exemption of such housing and
instead would exempt only the renting of space in a single-family
home occupied by the owner—the "Mrs. Murphy's boarding house"
exception.

We believe that this change is a useful one and would make the
scope of the Federal law more in accord with the scope of section
1982 of 42, U.S. Code, which provides redress for racial discrimina-
tion in any real property transaction.

With respect to inadequate enforcement powers, the present law,
while giving the Department of Housing and Urban Development
the responsibility to investigate complaints of housing discrimina-
tion, and while giving the agency adequate powers to investigate,
gives HUD no real power to remedy housing violations, which its
investigations reveal.

If HUD fails to remedy the violations through conciliation, ag-
grieved individuals are left to seek redress through private civil
actions.

H.R. 3504 would provide one way of remedying this lack of
authority by giving HUD authority when the Secretary has deter-

mined "that reasonable cause exists to believe the charge of housing discrimination is true to refer the matter to the Attorney General for the filing of an appropriate civil action or to file an administrative complaint."

H.R. 7787, on the other hand, would amend title VIII by authorizing the Secretary of Housing and Urban Development to bring civil actions to enforce the rights secured by title VIII.

With respect to both of these proposals, we do not believe that the litigation which would be filed would increase the number of suits brought in Federal courts. Conceivably, it could over time reduce the number of housing discrimination complaints by increasing the Secretary's credibility and effectiveness in negotiations. Most assuredly, it would give HUD the bargaining powers it needs to carry out the intent of the act.

There is one comment I'd like to make, however, Mr. Chairman, with respect to the question of litigation authority.

Civil actions brought under the authority proposed in 7787 would be instituted and tried by the Department of Justice as required by present section 811(g) of the act. And H.R. 3504 describes the procedure for referring cases to the Attorney General for suit. In that regard, there is an aspect of H.R. 3504 about which we have serious reservations.

On page 49, line 14, is the language, and I quote, only in part: "The Attorney General is directed to bring a civil action"—and then it goes on to describe the circumstances.

We do not believe that it is consistent with the duties of the Attorney General's Office to give direction with regard to such statute. Where suits by the Attorney General are authorized, it has uniformly been the law that the Attorney General has the discretion to decide whether the suit should be filed. We believe that the Attorney General and those attorneys acting under his authority should at least have the discretion to decide, in consultation with HUD, whether a case has merit before making an allegation in court, and we expect to reach understandings with HUD on suit referral procedures and standards for filing suit should these procedures be created.

We do, however, strongly endorse the concept of providing power in the Government to back the negotiating positions of HUD.

Our experience with the law has also identified certain procedural ambiguities.

For example, in light of our 10 years of experience with the act, we have found that the fair housing law as it now reads has unclear and ambiguous provisions that new legislation should correct. Conciliation and negotiation, for example, can be a very useful and inexpensive way of achieving compliance with the act, if use of conciliation does not impair the rights of the individual to sue when conciliation fails and if sanctions are available when conciliation fails.

But there is, under the present statute, uncertainty about the time allowed to individuals to file suit after HUD conciliation attempts have been unsuccessful. The time within which suit may be brought under section 810 has been the subject of litigation under the act because the various subsections of section 810 are not consistent with each other.

I said in my prepared statement the details of that.

In any event, we feel that it is incongruous and contrary to the intent of Congress to require that suits be initiated before conciliation efforts have been exhausted, which appears to be the construction given to the act by at least some courts.

Accordingly, new legislation should clarify the rights of aggrieved persons to file suits and adequate time periods allowed to fulfill the purpose of the act. We believe H.R. 3504 addresses this problem adequately.

In addition, the H.R. 3504 procedure would clarify the varied interpretations of the judicial remedies available to aggrieved individuals who pursue the conciliation process available under the present law prior to filing suit. One district court has held that a plaintiff who pursues the conciliation process first may not obtain damages under that section. This holding is inconsistent with the basic structure of the Fair Housing Act. An aggrieved person should not have to sacrifice the coverability of damages in order to use the investigation and conciliation procedure of present section 810.

Section 3 of H.R. 7787 would avoid this result, as would section 208 of H.R. 3504, which authorizes monetary relief in suits brought by individuals, regardless of whether the suit followed the filing of a HUD complaint.

We believe that an aggrieved individual who utilizes HUD's administrative conciliation machinery should not be penalized for doing so. Rather, if he brings suit after conciliation fails, he should be entitled to the same relief, including damages, attorneys' fees, and costs as a plaintiff who sues under section 812 without recourse to HUD procedures.

On the issues of attorneys' fees, the present law which inhibits private enforcement of fair housing law is a proviso in section 812(c) of the current law limiting the awarding of attorneys' fees to plaintiffs who are financially unable to afford such fees.

As with other aspects of the current law, this priviso was added as a Senate floor amendment by voice vote, and it is the only civil rights attorneys' fee provision which contains such a limitation.

Section 4 of H.R. 7787 would strike this proviso, and section 208 of H.R. 3504 contains no such limitation. We think that it's an undue restriction upon the availability of the private cause of action, and these amendments would bring title VIII actions more into line with other civil rights causes of actions now in the book.

One of the areas of particular interest to the Justice Department and to the Civil Rights Division has to do with relief in pattern or practice suits. In addition to the private enforcement difficulties which I have just discussed, there are ambiguities in the remedies available through suits brought under current section 813, which authorizes the Attorney General to bring suit.

Federal courts have been divided on the question of whether the Attorney General may recover money for victims of discrimination in pattern or practice suits. It is well settled that in pattern or practice suits brought by the Attorney General to enforce the right to equal opportunity under title VII of the Civil Rights Act of 1964, individual monetary relief is obtainable. We believe that such relief

should also be available under the Fair Housing Act and that the statute should contain explicit language authorizing this relief.

Section 208 of 3504 provides that the Attorney General may obtain the same relief as is authorized in private enforcement suits, and we support this change.

The addition of explicit authority to award damages in section 813 suits would significantly increase the Attorney General's enforcement powers by allowing him to recover damages for wrongs that might otherwise go uncompensated, because individual victims of discrimination are often unaware of their statutory rights and because the uncertainties and expense of litigation may make individual suits impracticable.

I'd like to address myself now to some of the substantive provisions of the proposed amendments to title VIII.

Section 206(e) of H.R. 3504 would prohibit the practice of denying a loan for the purchase of a house because of the racial or ethnic composition of the neighborhood in which the house is located.

Similarly, section 206(c) would prohibit redlining in the making of hazard insurance contracts.

And we support both those provisions as clarifications of existing law.

H.R. 3504 would also prohibit governmental units responsible for regulating land uses from discriminating against low- or moderate-income housing because that housing may be governmentally assisted or because of the race, color, or economic status of the prospective occupants of the housing.

I'd like to address this particular provision of section 3504 in a little bit more detail, Mr. Chairman.

We believe that one positive aspect of a provision of this nature could be in the codification of judicial interpretations about the reach of the present fair housing law. In the Arlington Heights case the Supreme Court held that refusal to grant a zoning variance for a low-income, governmentally assisted housing project which would have been utilized by a substantially integrated resident population did not violate the equal protection clause of the 14th amendment because no racially discriminative purpose was shown.

However, the court remanded the case for consideration of whether the exclusion violated title VIII.

Upon remand, the court of appeals for the seventh circuit found, as have other lower courts, that action which has a racially segregative effect could violate title VIII if the plaintiff's interest is not outweighed by other nonracial interests of the community.

Mr. Schwelb just informed me that the Supreme Court has denied certiorari with respect to the further review of the court of appeals' determination of that.

And so insofar as the seventh circuit is concerned, that constitutes the law that the effect test is appropriate and not the purpose or intent-to-discriminate tests that were articulated by the Supreme Court in Arlington, in *Washington* v. *Davis,* insofar as constitutional violations were concerned.

We suggest that Congress might identify other practices of local governmental units which have a racially segregative effect or which impede the construction of governmentally assisted housing,

and include a section in this bill which would prohibit them when there is a less segregative alternative to achieve the community purpose which such practices are claimed to serve.

The bill as presently drafted appears to go beyond the clarification of prohibited practices and the protection of Federal housing efforts. Depending on how broadly the bill is intended to be read, it may prohibit a variety of governmental land-use practices which may have an economically discriminatory effect. This presents both policy and constitutional issues.

In the *Valtierra* case the Supreme Court rejected the argument that every economic distinction in land use is, per se, a racial distinction, and held that a California requirement that there be a community referendum before building low-income housing when such a referendum was not required for other land uses did not violate the equal protection clause of the 14th amendment.

While there may be 14th amendment protection against some economic discrimination, apart from racially linked economic discrimination, Congress power to regulate in this area, when such regulation would impinge upon local zoning or land-use authority, is far from clear.

I am submitting a memorandum, copies of which, I believe, have already been distributed to the subcommittee, prepared in the Department of Justice, which discusses these difficult issues in some detail.

[The memorandum follows:]

DEPARTMENT OF JUSTICE,
*Washington, D.C., February 8, 1978.*

Memorandum for: Drew S. Days, III, Assistant Attorney General, Civil Rights division.

From: John M. Harmon, Assistant Attorney General, Office of Legal Counsel.

Subject: The constitutionality of the exclusionary zoning provision of H.R. 3504.

This memorandum discusses the constitutionality of the provision in § 206(b) of H.R. 3504 that would amend § 804 of the Fair Housing Act [1] so as to prohibit certain actions by state and local governments excluding low- or moderate-income housing. Our conclusions may be summarized as follows:

To the extent that this provision forbids actions based upon race, color or national origin, it is clearly an appropriate subject of legislation within Congress' power to implement the 14th Amendment. Also, Congress has the power to proscribe conduct motivated by opposition to federal subsidies to housing.[2] More difficult questions are raised by the provision concerning economic status. That provision of the bill in its present form is subject to several different interpretations. Under a narrow reading, this provision would apply only to local actions motivated by a bias against the poor or persons with moderate-income. While the legislation so limited would seem to be within Congress' power, its practical effects would be restricted. A broad interpretation would encompass zoning or other land-use actions having the effect of excluding persons with low- or moderate-income and would not require a showing of intent or purpose to exclude on that ground. Such a statute would raise serious issues regarding the extent of Congress' power to legislate under either the Commerce Clause or the 14th Amendment. It would call into question the authority of Congress to interfere with the exercise of basic powers of state and local governments. Whether a federal law of this type would be sustained by the courts would depend upon its terms and upon the factual justification for its enactment.

Often, when this Office is asked to comment on the constitutionality of proposed legislation, which has not been subjected to judicial scrutiny and as to which there is no developed legislative record, it is difficult to express an unequivocal opinion. In many such cases, there are important questions with respect to the meaning and

---

[1] 42 U.S.C. 3604 (1975 Supp.).

[2] For reasons explained below, if the bill is intended to embody a broad prohibition against all conduct simply because it has the effect of excluding federally assisted housing, this would raise serious constitutional questions.

scope of the bill's language. The present matter is in that category, and, as this memorandum suggests, there are a number of significant issues that preclude a definitive resolution of the constitutional issues raised here.

1. PROPOSED § 804(g)

At present, § 804 of the Fair Housing Act forbids certain types of housing discrimination based upon race, color, religions, sex or national origin.[3] The bill would add a provision, § 804(g), making it unlawful—

"(g) For any general or special purpose unit of government of a State or of a subdivision of a State . . . in the exercise or enforcement of powers with respect to planning, zoning, subdivision controls, building codes or permits, or other matters affecting land use or development, to exclude low- or moderate-income housing because of the eligibility of such housing for governmental assistance, or because of the race, color, national origin, or economic status of the prospective occupants of such housing."

This provision has three distinct aspects. First, it would forbid the exclusion of low- or moderate-income housing "because of the race, color [or] national origin . . . of the prospective occupants of such housing." This type of prohibition is already contained in the Fair Housing Act.[4] Congress has the power, under § 5 of the 14th Amendment, to enact such a prohibition.

Second, proposed § 804(g) would make unlawful exclusionary action taken "because of the eligibility of . . . [the] housing for governmental assistance." The term "governmental assistance" is not defined. If it is limited to federal assistance, Congress' authority to adopt this provision may be adequately supported by its spending power, Art. I, § 8, cl. 1, and the Necessary and Proper Clause.[5] Even if read as limited to federal assistance, however, it must be determined whether the bill's test is one of purpose or effect.[6] If effect suffices, even this part of the bill would present a substantial constitutional issue—whether Congress can infringe upon the states' police power over land use, absent racial, ethnic or similar discrimination.[7] If this provision also applies to assistance by state or local governments, then, to that extent, constitutional bases other than the spending power would have to be relied upon.[8]

Finally, proposed § 804(g) would proscribe excluding low- or moderate-cost housing "because of the . . . economic status of the prospective occupants . . . ." This part of the bill may be interpreted in various ways.

One question is the meaning of "low-income housing" and "moderate-income housing." These terms are not defined. From the standpoint of Congress' power under the 14th Amendment, there may be substantial differences between authority to protect low-income persons and authority to protect moderate-income persons. Although poverty is not treated as a suspect classification,[9] the courts have used the Equal Protection Clause to invalidate certain state laws that unduly burden the poor.[10] In contrast, depending upon how it is defined, the category of moderate-income persons may well constitute a majority in the nation, in each state and in many municipalities. Thus, the availability of the Equal Protection Clause is less clear regarding moderate-income persons.

Limiting our further discussion to low-income persons, the basic issue is whether proposed § 804(g) would be violated by action that has the effect of excluding such persons,[11] but not the purpose or intent of doing so. The term "because of" might

---

[3] See also § 817, 42 U.S.C. 3617, which prohibits interference with the exercise of § 804 rights.

[4] See, e.g., *United States* v. *City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975); *Metropolitan Housing Devel. Corp.* v. *Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977) (on remand from the Supreme Court).

[5] Cf. 18 U.S.C. 245(b)(1)(E).

[6] Another issue is the meaning of "eligibility" for government assistance. Must there be a showing that the sponsors of the housing have sought or will seek government assistance, or is the mere possibility of their doing so enough?

[7] This is the same issue which we will address below with respect to the bill's treatment of exclusion based upon economic status.

[8] Instead, Congress' authority would have to be located either in the Commerce Clause or in the 14th Amendment, and the resolution of the question of Congress' power would be decided in much the same way, again, as would the economic-discrimination issues.

[9] See *San Antonio Ind. School Dist.* v. *Rodriguez*, 411 U.S. 1, 29 (1973); *Citizens Committee for Faraday Wood* v. *Lindsay*, 507 F.2d 1065, 1068 (2d Cir. 1974), *cert. denied*, 421 U.S. 948 (1975).

[10] See, e.g., *Harper* v. *Virginia Board of Elections*, 383 U.S. 663 (1966).

[11] Another issue presented by the bill is the meaning of "to exclude [housing]." Does it refer to a pattern resulting in total or almost total exclusion of low-income housing from the particular municipality? Or is it a broader concept encompassing any action rejecting a particular low-income project? We will assume that there can be "exclusion" when a particular project is rejected, even though the city in question already has a substantial amount of low-income housing.

50

suggest that effect alone is not enough, but comparable language (regarding racial or ethnic discrimination) now contained in § 804 of the Fair Housing Act has not been construed in that way. The courts have held that an effects test applies. See, e.g., *Metropolitan Housing Devel. Corp.* v. *Village of Arlington Heights, supra,* 558 F.2d at 1288.[12]

### 2. CONGRESS' POWER TO FORBID EXCLUSION BASED UPON ECONOMIC STATUS

The question of Congress' authority depends, of course, upon the precise nature of the legislation. Under a narrow reading of proposed § 804, there would be no violation unless discriminatory purpose, as well as discriminatory effect, were shown. In other words, relief against exclusion of low-income housing could be obtained where the local government's action was so arbitrary that the only real explanation for it would be prejudice against the poor. Stated differently, relief would be denied if the defendant could show any rational or reasonable basis for its action, e.g., a desire to avoid congestion.

It seems likely that the kind of arbitrary conduct that would be prohibited under this approach would, without regard to any Act of Congress, be held to contravene the Equal Protection Clause.[13] In any event, such a federal statute would not represent a significant extension of judicially declared concepts of Equal Protection. It would follow that Congress has the power under § 5 of the 14th Amendment to enact such legislation.

It would appear, however, that a statute restricted to cases of express or clearly implied bias against the poor would have limited use. Given the broad scope traditionally accorded by the courts to the exercise of the states' police power where land-use planning or development is concerned, almost any justification for the governmental action might be regarded as reasonable and legally sufficient. Perhaps, the main values of such a limited federal statute would be (1) to make clear that such economic discrimination is impermissible and (2) to grant standing to sue to parties who lack standing under the principles of *Warth* v. *Seldin,* 422 U.S. 490, 501 (1975).

Under a broader construction of proposed § 804(g), a showing of discriminatory intent would not be essential. For example, a city might reject the request of a low-income-housing developer to alter restrictions on housing units per acre. The effect of the city's action would be to exclude the low-income-housing project, and this might be enough to warrant relief under a broader reading of § 804(g).

Such legislation would go beyond existing Equal Protection decisions of the Supreme Court. Cf. *James* v. *Valtierra,* 402 U.S. 137 (1971); *Village of Arlington Heights* v. *Metropolitan Housing Devel. Corp., supra.* This in itself would not be decisive, because Congress has at least some power to determine the meaning of Equal Protection. *Katzenbach* v. *Morgan,* 384 U.S. 641 (1966). But see also *Oregon* v. *Mitchell,* 400 U.S. 112 (1970).

Also pertinent here is Congress' power under the Commerce Clause, Art. I, § 8, cl. 3. Yet recent decisions of the Supreme Court point out that there are limits to the powers of Congress, including limits based upon the 10th Amendment and upon principles of federalism. Regarding the Commerce Clause, this is indicated by *National League of Cities* v. *Usery,* 426 U.S. 833 (1976).[14] In holding that the Commerce Clause does not empower Congress to regulate the wages and overtime of employees of state and local governments, the Court said:

"We have repeatedly recognized that there are attributes of sovereignty attaching to every state government which may not be impaired by Congress, not because Congress may lack an affirmative grant of legislative authority to reach the matter, but because the Constitution prohibits it from exercising the authority in that manner. * * *" (426 U.S. at 845.)

With regard to the 14th Amendment, a similar federalism-based limitation upon the authority of Congress is indicated by *Oregon* v. *Mitchell, supra,* where the majority held that Congress had no power to lower the age for voting in state elections.[15]

Moreover, Mr. Justice Brennan's opinion in *Katzenbach* v. *Morgan* establishes the basic ground rules for reviewing congressional enactments premised on the authori-

---

[12] In *Arlington Heights,* on remand from the Supreme Court, the court of appeals considered the statutory issue and held that, in some circumstances, there can be a violation of the Fair Housing Act where racial effect, but not racial intent, is shown.

[13] Cf., e.g., *Village of Arlington Heights* v. *Metropolitan Housing Devel. Corp.,* 429 U.S. 252, 263 (1977).

[14] But see, e.g., *Usery* v. *Charleston County School Dist.,* 558 F.2d 1169 (4th Cir. 1977) (applying Equal Pay Act to state governments held to be a proper exercise of Congress' authority under the 14th Amendment).

[15] But see *Fitzpatrick* v. *Bitzer,* 427 U.S. 445 (1976).

ty conferred by § 5 of the 14th Amendment. While that case makes clear that Congress may go beyond the rulings of the Supreme Court to provide greater protection to individuals than the Court itself would deem necessary, it is equally clear that Congress' power is not without limits. Most importantly, Congress must consider whether its proposed action is, to use the Court's phraseology, "consistent 'with the letter and spirit of the constitution.' " 384 U.S. at 656 (the Court was there quoting the famous articulation of Congress' legislative power from *McCulloch* v. *Maryland*, 4 Wheat, 316, 421). Where an Act of Congress touches upon powers and prerogatives traditionally reserved to the states—that is, where it raises serious questions of federalism and questions of the meaning of the 10th Amendment—the inquiry into whether Congress has departed from the "letter and spirit" of the Constitution will be a complex and serious one.

The question here is how to reconcile or to draw the line between (1) Congress' power under the 14th Amendment or the Commerce Clause and (2) the states' power over land use.[16] It is well established that the police power is a fundamental element of state authority and that it encompasses zoning and other forms of land-use control. See, e.g., *Village of Belle Terre* v. *Boraas*, 416 U.S. 1 (1974); *Warth* v. *Seldin, supra,* 422 U.S. at 508, n. 18.

Many provisions of zoning ordinances, building codes and similar laws increase the cost of housing and can have the effect of prohibiting or making infeasible low-income housing. Still, a federal statute with a broad economic-effects test could mean drastic interference with state and local authority. If such a clash could not be avoided through construction of the statute, our reading of the cases cited above suggests that the courts would hold the federal statute or at least certain applications of it to be invalid. To withstand this kind of attack, the legislation and its legislative history must be developed with special care. The legislative record must indicate the factual basis for Congress' action. Specifically, insofar as Congress is acting under the Commerce Clause, consideration should be given to the impact of exclusionary zoning upon interstate commerce. See, e.g., *Perez* v. *United States,* 402 U.S. 146, 154–56 (1971). Insofar as Congress is acting under § 5 of the 14th Amendment, a strong showing of discriminatory motivation underlying exclusionary land-use practices, as well as the discriminatory consequences of such activities, will be essential to support the legislation.

Regarding the terms of the legislation, key issues which must be dealt with explicitly are the elements of a violation (e.g., whether a finding of discriminatory purposes is required), allocation of burden of proof and the nature of defenses which can overcome a prima facie case. For example, can a defendant prevail if it shows a rational basis for its action, or must there be a showing of a compelling state interest? In litigation of this type, determining the proper remedy may be difficult; it might be advisable to provide guidance in the statute itself.

Under proposed § 814, the Secretary of Housing and Urban Development would be authorized to issue, in consultation with the Attorney General, regulations implementing the provisions of the Fair Housing Act, including proposed § 804(g). Some of the issues mentioned above—for example, the meaning of "low- or moderate-income housing"—could be adequately dealt with in regulations. In our view, however, the more basic issues of the degree to which Congress intends to displace state and local discretion regarding land-use control should be dealt with in the statute itself. Is the bill intended to mean in effect that low- and moderate-income housing is immune from regulation by state or local government? If not, to what extent is state or local regulation retained and on what grounds may it be justified? In applying these provisions, what factors are the federal agencies and the courts to consider? For example, is it proper to distinguish between (1) a long-standing and well-planned land-use-control system which results in rejection of a low-rent project and (2) a recent, hastily contrived zoning rule that was prompted by a particular effort to develop low-income housing? The problems here involve not only questions of federalism, but also the ability of the courts to evaluate land-use controls and to determine proper remedies.

CONCLUSION

The constitutional issues raised by proposed § 804(g) can only be resolved through a clear expression of congressional intent regarding the degree to which state and local control over land-use is to be displaced, coupled with a strong legislative record on the factual basis for Congress' conclusion that its action is authorized under the Commerce Clause and § 5 of the 14th Amendment.

---

[16] Access to housing has not been held by the courts to be a "fundamental right" for Equal Protection purposes. See, e.g., *Citizens Committee for Faraday Wood* v. *Lindsay, supra,* 507 F. 2d at 1068; *Lindsay* v. *Normet,* 405 U.S. 56, 74 (1972).

Mr. DAYS. I would also suggest here that the need for prohibitions against housing discrimination on account of economic status which is not racially linked and which does not impinge upon the provision of federally-financed housing be carefully assessed.

H.R. 3504 would also add handicap to the protected classes under the Fair Housing Act.

We think that protection of handicapped persons is an important Federal function. However, simply adding the word handicap in a series with race, color, national origin, religion, and sex does not provide any guidance about what is to be protected and what changes, if any, should be made in the current practices.

As you know, the problems of handicapped people are generically different from the problems of racial discrimination.

We believe that further drafting should be done to define with more precision the nature and scope of the bill's coverage in this regard. H.R. 3504 also contains provisions with respect to what is described as a fair housing loan fund. the Department has some reservations about that aspect of the bill primarily because we believe that there is a fine line between helping individuals protect their rights and stirring up litigation.

We should recognize that the way the provision is drafted, it is likely that in many instances it will be a subsidy of law suits rather than a loan because of the provision that loans may be forgiven to the extent that cost awards do not equal the amount of the loan.

I believe that plaintiffs should be aided in enforcing their rights through the ways which I have discussed—liberalized attorneys' fees, damage awards, and reinforced conciliation measures.

The discussion with respect to damage awards and reinforced conciliation measures is contained in my prepared statement, Mr. Chairman.

If this is insufficient, however, then increased assistance from legal aid agencies might be considered. The proposed fund would require more administration than it would be worth.

As now stated in section 801 of the Fair Housing Act:

It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.

By clarifying and streamlining the enforcement of the act by private individuals and the Federal Government, and by strengthening the relief obtainable in suits under the act, this policy may one day receive the full measure of enforcement that our society requires.

For these reasons, I hope that the Congress will act favorably upon legislation like that which is before this subcommittee.

Mr. Chairman, I'd be happy to entertain questions from the Chair and from the subcommittee at this time.

Mr. EDWARDS. Thank you very much, Mr. Days. That's very helpful testimony.

We'll be operating under the 5-minute rule, and I recognize the gentleman from Massachusetts, Mr. Drinan.

Mr. DRINAN. Thank you, Mr. Chairman.

Mr. Days, you've given a graphic, example of all of the evils that happen when legislation is written on the Senate floor or, I suppose, on the House floor, too.

I wasn't in the Congress at that time, but the disasters which have occurred are very clearly illustrated.

I have just a few questions, because you seem to approve of the thrust of the bill. I would just ask this: On page 7, I see your point about the Attorney General. But when we said in the bill the Attorney General is directed to bring a civil action, I don't think we intended he has to do that. There's some discretion. We wanted to say something more than authorized but less than mandated. I think that's what we meant.

Could you suggest language that would appropriately express what I recall is our intent?

Mr. DAYS. Yes; certainly, we'd be happy to provide that language to the subcommittee.

Mr. DRINAN. All right.

I think that I'm correct.

Mr. Chairman, would you want to comment on that? We wanted to say, Mr. Chairman—am I correct in interpreting the intent of what we meant in the bill, that when we said the Attorney General is directed to bring a civil suit, we did not mean that he's mandated without discretion. But we did mean to say more than what was authorized.

Mr. EDWARDS. Yes. We would like to discourage foot dragging.

Mr. DRINAN. I think, Mr. Days, too, that you and your associates could furnish us, and counsel here could furnish us with language appropriate to straighten out basic inconsistencies.

Now, on the attorneys' fees, I was one of the authors of that law that you mentioned, the Civil Rights Attorneys' Fees, Awards Act. I was the floor manager, and I would think that on page 14 that you say—if this is the way this section is to be read, well, I think that it is, and therefore we welcome your support. I can't see any reason at the moment why your interpretation on your hopes about that section would not actually be realized. Perhaps we could make that clear in the report.

Do you see any necessity of changing the language of the bill?

Mr. DAYS. I do not.

Mr. DRINAN. All right. Thank you.

Now, on the punitive damages, I guess there is no secret that $1,000 to $10,000 was taken out of the air somewhere.

You seem to be uncertain whether more punitive damages would in fact be desirable. How do you really come out on it?

I mean, would it be helpful?

You say that if we are going to do this, we should develop evidence as to the relative efficacy of the change. You people could supply that; you're in possession of all of the facts. In other words, we really can hardly develop that. You could give us the cases where punitive damages were assessed, and how much. Then you, I suppose, would be the only people that really could find out whether or not the realtor repented his sins and reformed. I suppose that would be one way of determining whether punitive damages are effected.

Mr. DAYS. I certainly—as my testimony reflects, courts have given punitive damages in excess of $1,000. But I think it's also fair to comment that there has not been a vigorous utilization by the courts of the punitive damage provision, so it's hard to say what would be the consequence if courts really took that provision seriously and utilized it against offending realtors or other persons covered by the second act.

And second, what would happen in the event that class action suits resulted in punitive damages of up to $1,000 for a number of people, what consequence that would have upon certain violators of the act?

So I think that's the core of the problem.

It's fair to state, also, that you have read very clearly some of the ambiguities within the the Department—or ambivalence, to use your phrase—about this issue and within the Civil Rights Division, but I think the truth of the matter is that we simply don't have enough experience with the vigorous application of a $1,000 rule to state that there is a need for an upping of that limit.

Mr. DRINAN. With regard to your point on page 17, you say the statute should contain explicit language authorizing the Attorney General to recover monetary relief.

You, I take it, would feel that the statute now, at least by implication, authorizes that relief, but you'd want to have a clarification, that's all?

Mr. DAYS. Exactly.

We've been arguing strenuously that it does include the right to recover damages.

Mr. DRINAN. My time has expired.

I want to thank you for all your very helpful suggestions. It's nice to have the Department of Justice giving us such help and support.

Thank you.

Mr. EDWARDS. The gentleman from Virginia, Mr. Butler.

Mr. BUTLER. Thank you, Mr. Chairman.

Thank you, Mr. Days, for your testimony. I would like to suggest how much more helpful it could have been if we'd had an opportunity to read it before you testified. We got it late last evening, and, of course, we were in session on the floor, and we didn't have the opportunity—but it places us at a great disadvantage. It wastes your time, for a good deal—because a lot of the questions you raised may be resolved in questions that I have. It could very well have been resolved in the careful reading of your testimony.

Mr. DAYS. Well, let me apologize to the members for that today.

Mr. BUTLER. I was about to observe that being a friend of the Department of Justice has saved you from the tongue of the representative of Massachusetts, because heretofore we've seen the assistant attorneys general limp out of here like whipped dogs because they were a half an hour late with their testimony.

So I just want you to know that you indeed represent a new era in the Department of Justice.

I have been instructed in this field by the master, and next time, if you are late, I will get out an old transcript and read it to you.

Mr. DRINAN. Will the gentleman yield?

It is my recollection that I received this fine testimony around 3 or 4 o'clock yesterday afternoon, and I had no difficulty reading it. I don't know what the gentleman from Virginia does after he leaves these sacred premises.

Mr. BUTLER. I would like to inquire, is it the policy of the Department of Justice to deliver it to Mr. Drinan at 3 o'clock and to me at 5 o'clock?

Mr. DAYS. We believe in equality of opportunity.

Mr. BUTLER. Either that, or this is a de facto situation, and really, I protest very strongly if that's been the practice, because I was asking for it all day long, and we didn't get it.

But I think I've used up all the time.

Of course, I could ask more intelligent questions if I read the testimony.

I think you've responded to me somewhat, but would it be fair to say that this is here standing an unprecedented relationship between the Secretary and the Attorney General when it comes to enforcement, as I heard Mr. Drinan allude to the requirement that the Justice Department must initiate a civil suit.

What is your view of this provision?

Basically, would that strip the Attorney General of his investigative authority and his discretion and force him to accept uncritically the legal judgment of the Secretary?

Mr. DAYS. Well, if it were mandatory referral, I think, yes, that would be the case.

Mr. BUTLER. Is that the view of the legislation—is that your view of the legislation here; if the Secretary says you shall institute suit, you shall?

Mr. DAYS. Well, my testimony reflects the fact that we're concerned about that language and that we would urge that the language be altered to clarify in some way so that that would not be the implication.

Mr. BUTLER. Do you feel pretty strongly, as does the Attorney General, that as the growing erosion of the capability of the Department of Justice and that if it becomes law, would become a classic example of it, would it not?

Mr. DAYS. Well, they are certainly related, but I think the erosion of the litigating authority is much broader than this particlar problem. This would deprive the Attorney General of what we regard as his constitutional role, in the statutory role, to determine what is in the best interest of the U.S. Government in bringing lawsuits, and has to make his own judgment about the propriety of filing suits.

Mr. BUTLER. I have asked you earlier to take a look at legislation which I and a number of my colleagues called the Civil Right Act of 1977 and H.R. 9804.

That legislation would establish a centralized civil rights enforcement proposal within your Department.

If you were to conduct your own separate investigate of civil rights complaints before initiating a civil suit under H.R. 3504, after the Secretary has completed hers, don't you think it would produce the wasteful duplication of efforts that you're trying to eliminate?

Wouldn't it make more sense for the Attorney General to review full investigative and administrative authority as provided under the United States Code?

Mr. DAYS. I believe that's a policy determination, really, that the Congress has to make, Mr. Butler. It certainly would adhere to produce some duplication. However, it's not unusual in the relationship between the Justice Department and other agencies to have the administrative responsibilities in the program agency and referrals to the Attorney General or the involvement of the Attorney General for litigation purposes. After all, I think we regard ourselves as best at litigation, and do not have a well-developed expertise in the administrative area.

Mr. BUTLER. Well, how about in the criminal complaint area? Do you have that?

Mr. DAYS. In the criminal complaint area?

Mr. BUTLER. Yes.

Mr. DAYS. Yes, we do have expertise.

Mr. BUTLER. But the civil rights are not in your expertise; is that what you're saying?

Mr. DAYS. No, not at all. I'm saying that our expertise is in the handling of litigation in the area of civil rights and not with the management of administrative schemes, as such.

The relationship that we've had with other agencies has essentially been a referral to the Department or the involvement of the Department for litigation purposes, not for administrative review or analysis.

Mr. BUTLER. All right. Thank you.

My time is expired. I yield.

Mr. EDWARDS. The gentleman from Illinois, Mr. McClory.

Mr. McCLORY. Thank you, Mr. Chairman.

I'm pleased to join here today in welcoming Mr. Drew Days to this meeting, and I'm just going to—I just want to report that one of his former students is now my legislative assistant, Mr. Ira Goldman, and according to Ira, he wouldn't be where he is today if it weren't for the expert tutelage he got at the hands of Professor Days. So I'm doubly pleased to be here.

Mr. DAYS. I got an education here, too.

Mr. McCLORY. Having been a former schoolteacher myself, I think perhaps the teacher gets as well educated as the student. The whole subject is a very troublesome one to me.

I note that several of your recommendations really are tied in with the so-called *Arlington Heights* case.

In Illinois, there is a community which is near the area that I represent in Illinois, and it is causing some concern, especially the local communities which are very jealous of their rights to control the zoning and building authority within their areas, and which is a prerogative that I have steadfastly supported, since I think that good community development depends upon a wide exercise of local authority.

And I'm wary of having the local officials dictated to in such a way that would impair their authority, even though it appears, in the minds of some people, that we can accelerate a movement of ethnic and racial minority groups into the suburban communities.

And I just don't know exactly how we could do that.

I am impressed by the increased emphasis on the conciliation. I think that we're going to do a lot more through persuasion than we are through litigation. This aspect bothers me and perhaps you could comment on it.

You indicate in your statement that through amendments that you're recommending, that we're going to increase the amount of federally funded low-cost housing in these outlying areas through these more stringent steps that you're recommending. And I'm wondering about that. I'm concerned right now that there seems to be a reduction in interrest in low-cost housing and in senior citizen housing, because of the apprehensions that there may be some compulsion to accept the persons that are not presently entitled, or not presently authorized, to occupy the housing. I'm thinking in terms of predicting about senior citizen housing which has developed quite well in my district, and the apprehensions that there might be on senior citizens who would be integrated into the senior citizen housing in a way which the senior citizens are very apprehensive about, and even the developers are concerned about, since it doesn't seem that they can mesh too harmoniously.

Mr. DAYS. Well, Mr. McClory, my testimony is not directed toward what the policy determination should be on the part of HUD or the administration with respect to programs for low- and middle-income housing or any other such programs.

What I do address myself to is the authority of Congress to reach actions on the part of the governmental entities that would discriminate, if you will, against housing based upon the fact that it was supported by Federal funds.

And my testimony indicates that there is some congressional authority for that, and only Congress can look to those particular issues and determine what, in fact, it wants to do.

I am not making a recommendation about a housing policy in a specific way of the United States.

Mr. McCLORY. You're not propounding the basis through which these amendments to the fair housing law would increase the amount of federally funded low-cost housing or senior citizen housing, if we acted affirmatively on those recommendations?

Mr. DAYS. No. I'm not making a proposal on the policy issues. Our experience has been with what, for want of a better phrase, I would describe as clearly established categories of discriminatory conduct against race, based upon race or national origin or sex, and so forth. And I think my testimony points out that the consideration of governmental funding and considerations of the exclusion of certain economic groups or standards with which we have had very little experience in terms of our litigation, when it comes down, as we try to suggest in the memorandum prepared in the Department of Justice, to a determination on several levels about the thrust of this legislation.

The question of essentially definition, what does one mean by governmental funding, or governmental assistance, what does one mean by low- and middle-income, and so forth, also raises questions of burden of proof. I've talked about the purpose and intent test on the one hand, and the effects or impact test on the other. And, certainly, the trust of this litigation will depend upon how Con-

gress uses the burden of proof or the standard of proof under its provisions.

Those two considerations will raise questions of the various constitutional powers that Congress has.

Spending power, for example, the commerce laws, section 5 of the 14th amendment, and so forth. And that in turn will raise questions about one, the rights reserved to the States under the Constitution, particularly the 10th amendment, and then much broader policy issues, the relationship between the Federal Government, on the one hand, and States on the other, in a federal system.

Mr. McCLORY. Thank you very much.

Thank you, Mr. Chairman.

Mr. EDWARDS. Mr. Days, is discrimination in housing against minorities in the United States a serious problem today?

Mr. DAYS. Absolutely.

Mr. EDWARDS. And it's so serious that the laws prohibiting discrimination should be strengthened? Do you believe that?

Mr. DAYS. Yes. That is our strong recommendation.

Mr. EDWARDS. Well, how do we prove that that discrimination exists?

Mr. DAYS. How do we go about proving that widespread discrimination against minorities exists? You mean in terms of preparing the legislation procedure in support?

Mr. EDWARDS. We shouldn't legislate unless we can prove that the wrongs are existing and are going on in a serious manner in the United States.

Mr. DAYS. I believe that it's been amply documented through the litigation that we brought, through litigation that we intend to bring through a number of studies that have been done in this area. I might say that I thought was less than naive when I came to Washington about discrimination, but I must admit that I've been shocked by some of the things that I've seen, since I got to Washington coming across my desk, particularly in the area of housing discrimination.

While in some other areas, it might be said, the outright, overt racism does not appear in great frequency, or with great frequency.

The housing cases that I have looked at contain precisely the type of racism and exclusion that I think most Americans would probably believe passed long ago from the national scene. It has not.

Mr. VOLKMER. Would you find that to be in all parts of this country and not in just one segregated area?

Mr. DAYS. Yes.

Mr. VOLKMER. So we are not just really looking at the South, are we?

Mr. DAYS. It is a national problem.

Mr. VOLKMER. That idea should be long gone too, that we do have discrimination in all parts of this country, in some of the more liberal parts of this country, as well as in some of the conservative parts.

Mr. DAYS. There is an equal distribution, I would think, with discrimination in regard to all parts of the country. It is not limited just to the South.

Mr. EDWARDS. I'm glad you brought that subject up, because the largest State of the Union is California, and we have a constitutional prohibition against publically-financed housing unless there is approval by a vote of the people. This referendum procedure make it virtually impossible in many communities to construct public housing, or for the housing agency or city to own any housing at all.

For example, in the city that I represent, San Jose, Calif., which has a population of 550,000, there is not a single unit of public housing owned by the city or by a public authority, because the referenda always fail.

Now, you pointed out that in the case that was brought to the California Supreme Court, and finally to the U.S. Supreme Court, the Court held that economic status was not a sufficient base for a finding of illegal discrimination. It would have to be racially motivated. Suppose that case had been based on an effect test—that is, that the referendum process had an adverse impact on minorities within the State of California.

Do you think that the outcome might have been different?

Mr. DAYS. Well, I can't speculate, but certainly after *Washington* v. *Davis* and *Arlington Heights,* basing it on the constitutional challenge, it would not be effective to show just the effect. But, certainly, I have often speculated in a classroom and elsewhere, that in the Valtierra record, if there had been a stronger showing of the racism indications of some of those actions, it might have been a more forceful presentation to the Supreme Court, but I'm not certain that the outcome would have been altered.

Mr. EDWARDS. Mr. Days, do you think that HUD needs the power to issue cease and desist orders?

Mr. DAYS. Well, certainly, as I indicated in my testimony, there is a great need for additional teeth at HUD to carry out these conciliation authorities under the present act. Cease and desist may be an appropriate power to give to HUD.

I'm not really in a position to comment definitely on that. But the bottom line is that HUD is presently sitting with a great deal of money, a great deal of programmatic responsibility, but no authority to make certain that there is a relationship between ending discrimination in housing and the type of funding that goes on.

The programs and policies that HUD administers.

Mr. EDWARDS. Granting such authority doesn't disturb you from a constitutional and legal, or from a due process point of view?

Mr. DAYS. Not at all.

Mr. EDWARDS. Thank you very much. Mr. Volkmer.

Mr. VOLKMER. Mr. Chairman, thank you. I have no questions of the witness. I am sorry, I haven't been here on the other hearings. But I've been busy.

We have a little problem with agriculture in this country at the present time also.

Mr. EDWARDS. Thank you, Mr. Volkmer.

Mr. Drinan?

Mr. DRINAN. Thank you, Mr. Chairman. Mr. Days, would you present to us anything about the exclusionary zoning predicated on race, but simply predicated on profiteering. We have, following

your fine testimony, Mr. Fishman, who represents the American Bar Association, and their study in this area.

Do you have a feeling that people are now, more and more around the country, using all types of exclusionary zoning tactics, legitimate things to preserve a community, and so forth? Are they using them in lieu of racial discriminatory tactics?

Mr. DAYS. I'm not in a position to access the frequency with which these techniques are being used to exclude certain groups from particular suburban communities in this country. There certainly is some of that, but it is also true that these zoning provisions, since the 1930's, have very much been part and parcel of the land-use process in America.

And if the Supreme Court was trying to do anything in Arlington Heights, it was attempting to strike a balance between the historic and legitimate use of these techniques and intentional designs to keep certain particular groups out of communities, who otherwise would be interested and able to reside there.

So, I can't really give you a quantitative answer.

Mr. DRINAN. Well, the ABA study is overwhelmingly clear that in almost every metropolitan area, the towns in surburbia are more and more skillfully keeping the poor and even the middle class—the lower and the middle class, out of suburbia by simply locking the people into their particular community at the same financial level.

I worry and wonder whether or not 3504 is strong enough to reach that universal, pervasive custom.

Mr. DAYS. Well, certainly by its language, it could be read and used to that type of problem that you have described. And what we have attempted to do in the memorandum prepared on this particular issue, is set out what the implications are—the constitutional and policy limitations are of such a broad reading, but, certainly, I think the language could be read to read the type of problem that you just described.

Mr. DRINAN. If you were counsel to one of the affluent suburbs of Boston, what argument would you use to evade and avoid the provisions that we have put into 3504?

Mr. DAYS. Well, I find it difficult to put myself in that position, Father Drinan.

Let me answer it this way: Stepping out of the hypothetical, that there are a number of legitimate reasons why communities want to limit certain types of land use. The pressures upon municipals, services, for example. The traditional concepts that are esthetic. And I think that probably communities that want to institute these types of provisions and wanted to define them once they were instituted, would look to these well-established principles of land use in the United States recognized by the Supreme Court for a number of years. It will then be a question of whether those were transparent as in Arlington Heights, for racism and discrimination, I think there is where they can be reached.

Mr. DRINAN. Well, the operative language in 3504 that was designed to reach this problem, goes this way: "For any general or special purpose unit of government of a State or of a subdivision of a State . . . in the exercise or enforcement of powers with respect to planning, zoning, subdivision controls, building codes or permits, or

other matters affecting land use or development, to exclude low- or moderate-income housing because of the eligibility of such housing for governmental assistance of because of the race, color," et cetera.

They may be able now to affect such exclusion. We want a policy that states that the towns in any congressional district should not any longer be able to have 1- or 2-acre zoning, because clearly the objective, even if they won't admit it, is to exclude people who may be eligible for 235 housing under a Federal housing program. Do you think the mere statement of the problem here is sufficient to give legal tools to people to assert their rights to move into the suburbs?

Mr. DAYS. Well, our memorandum addresses the standing consequences of having this language in the bill.

Mr. DRINAN. Legally, I think that we have done all the right things in the bill. But looking at the pervasiveness of the problem and the depth of feeling that people have about keeping their little suburb consistent with what they have dreamed of, do you think that this is strong enough?

Mr. DAYS. It can be read to require not a purpose or intent test, but an effect test, and if it is read in that fashion, certainly, it would reach the problem that you had, but that poses significant issues that we have discussed in our memorandum.

Mr. DRINAN. that is right.

Mr. DAYS. To get back to your question about how a lawyer would argue a defense, I suppose he would argue that that you are relly seeking a purpose or intent test in this language, not an effect test. For example, if the effect test were applied or held to be intended by Congress in this language. Something like a rule against multiple occupancy of a single-family house may be outlawed, because in many instances, poorer families cannot buy good single-family housing without pooling their resources. So that type of building code requirement would have a discriminatory effect upon persons of certain income classes. And it seems to us that those are the types of considerations that congress ought to be entertaining in determining how to handle this particular issue. Certainly, the language is broader than just exclusionary zoning issue. It gets to building code and some of the other matters that I've described.

It also does not adequately clarify what one means by exclusion. Whether it is a wholesale exlusion or whether any instance of exclusion that might have a discriminatory effect on a lower income class would constitute a violation of that particular provision.

And, as I understand, we have discussed these in some detail in the memorandum.

Mr. DRINAN. That's a very interesting point. My time has expired. thank you.

Mr. EDWARDS. Do you think—if you will yield, do you think that it would reach an area generally—a reasonably affluent neighborhood where the housing authority wanted to build in the center with the same density, 100 units of public housing?

Mr. DAYS. Yes; I think the language can be read to reach that, certainly.

Mr. EDWARDS. It would be a very important and beneficial national purpose in that this is what the law contemplates in various civil rights laws. Isn't that also correct that we don't want to have two societies or three societies?

Mr. DAYS. That's certainly correct, but generally that language is directed toward racial exclusion or exclusion based upon some other well-established practices in permissible classifications, such as religion, ethnic origin, or sex.

Mr. EDWARDS. Isn't that what you're talking about when a community doesn't want public housing in a particular area which is generally occupied by whites?

Mr. DAYS. I think the language could probably be improved to target that particular problem, better than is presently the case. As the language exists, it could be read, it reaches beyond economic discrimination that has a clear racial or ethnic impact to economic discrimination, standing alone.

In other words, the separation of a society into rich and poor. And it is that dichotomy that is indicated in the memorandum, because what U.S. policy in terms of constitutional justification would be, and how Congress would go about supporting the existence of the problem and the ability of this particular mechanism to address that problem.

Mr. EDWARDS. Mr. McClory?

Mr. McCLORY. Thank you, Mr. Chairman.

Now, with respect to this widespread or universal discrimination in housing, which we have made reference to, does that relate also to Chinese or orientals?

Mr. DAYS. Yes, it does.

Mr. McCLORY. I'm very concerned about that, because my daughter-in-law is Chinese. And she hasn't experienced any discrimination yet and hasn't communicated with me, but do you think that she and my family is in any jeopardy, as far as selecting the place where they want to live?

Mr. DAYS. Yes; I certainly think so.

Mr. McCLORY. With respect to the District of Columbia, I live right up here in Capitol Hill, and I think we have an entirely integrated community. I have black neighbors and white neighbors. I suppose there are orientals. I haven't located them yet. But the problem I have is that I'm also a member of the Capitol Hill Restoration Society. And there is a fairly active movement against restoring and improving our Capitol Hill area on the part of some racial minorities, on the ground that by improving the housing, that we are excluding blacks.

Now, if I persist in my support of the Capitol Hill Restoration Society and encourage—I invested in one restoration building there—am I going to be precluding—is this legislation going to preclude any Federal funding to the restoration of these old homes?

Mr. DAYS. I really can't answer that, Mr. McClory.

Mr. McCLORY. You know, I have an idea. I've been thinking about this, because the question gets posed to us more and more all the time about what should we do for the urban community. And I have the very strong feeling, and I think that it is something that the whole administration should give its attention to, and that's

this: I think we should preserve the urban community. I think we should resore it. I don't think we should demolish these wonderful old buildings that we have, which are built a whole lot better than any of the modern structures we get, and let any people live in there that want to live in there and can afford to live in there. But a policy which would prevent restoration and improvement of existing solidly foundationed buildings in a community would seem to me to be in direct opposition to preservation of our metropolitan areas.

Do you want to comment on that?

Mr. DAYS. Well, I agree with you, certainly, that preservation of urban housing is a good start and good objective. There is also need for adequate housing for those people that are displaced by preservation activities.

But you are speaking for a private citizen rather than as a Government official.

Mr. MCCLORY. We don't want to preserve the downgraded poor housing, in order that we can preserve this and get a low environment that somebody can afford, instead of improving it and making that a place that is attractive to us.

Mr. DAYS. Our earlier point, we have had successful housing discrimination litigation in the Washington area, so it is not something that is necessarily far removed from the everyday life of people like us, who live in Washington, work for the Federal Government.

Mr. MCCLORY. Let me just suggest another maze which I think is one we should be very wary about entering into. And that is my home is built on a 17-foot lot in Washington, D.C. That is against the law in my home community of Lake Bluff, Ill. But my home in Washington is now valued at more than $100,000, and I question that my house on my big lot in Lake Bluff in Illinois would be valued that high.

The size of a lot really has very little, if anything, to do with the value of the housing, does it?

Mr. DAYS. That's not within my area of expertise.

Mr. MCCLORY. Well, the only reason I ask you this, because we talked about zoning which would compel 1-acre, or 2-acre, or 3-acre lots in any areas. The reason we have that is because we permit septic systems on those kinds of lots, and we don't permit septic systems on 25-foot lots.

Mr. DRINAN. Would the gentleman yield?

Mr. MCCLORY. My time is up, but I'm glad to yield.

Mr. DRINAN. Would you feel that what is transpiring around the Capitol area violates the proposed 804(g)? That would make it unlawful for any unit of government to exclude people simply because they were low or moderate income, or because of the economic status of the prospective occupants of such housing.

Mr. MCCLORY. I don't think the restoration has one iota to do with the subject of race at all.

Mr. DRINAN. I didn't mention race. I mentioned economic status. I don't know whether the restoration is public or private. I suppose it is quasi-public, but, in effect, their policy would amount to the exclusion of certain persons because of the economic status of those prospective occupants.

Mr. McCLORY. I wouldn't think that there was any law which affected—which relates to discrimination on the basis of economic status. Otherwise, we would get involved in excluding people from a hotel who couldn't afford the hotel room or from any apartment who couldn't afford the apartment.

I don't think that we can enact any such law, not as a capitalist society, such as we have.

Mr. EDWARDS. Mr. Volkmer?

Mr. VOLKMER. I think my question may have been answered; it pertains to the same area of concern that the gentleman from Illinois has been expressing. The question is, Does the language contained in the bill create, if it is interpreted broadly, a new test of discrimination? Is such a test constitutional when it does not relate to race?

Mr. DAYS. Well, I think, certainly, Congress has authority on its spending power under the commerce law to reach issues such as the one that you are discussing.

I'm not providing the legal opinion to Congress on that issue, but, certainly, there is adequate basis in the law to think that Congress could reach certain types of economic discrimination under its existing power.

Mr. VOLKMER. Mr. McClory has brought out that you may have the different reasons, such as requirements relating to size of lots, which produce this result. This is true in any area. We provide that you can't build a house any closer than 50 feet from the lot line. That makes a lot cost more.

Is that economic discrimination?

Mr. DAYS. Well, it certainly has discriminatory consequences.

Mr. VOLKMER. Yes, it does. I agree with that. It ends up with that, but is that bad in a sense that that is a policy judgment that some of us can make? What type of living conditions one wants to live in?

Let me ask you one other thing.

Assume that there is a constitutional basis for this provision and that the Congress passes such a law. You've mentioned certain things such as building codes that would discriminate. Let's say that I wanted to put down a 40 unit high rise for low-income occupants in the middle of an exclusive area in some suburb. Now, sir, is that good for anybody, when you stop and think about it?

Mr. DAYS. It would depend upon the circumstances and also how the bill is construed and the intent of Congress, but I think there's been sufficient discussion on the importance of varied land use in the United States. Whether a particular community could be subjected to that is again not within my area of expertise, whether Congress should legislate on this particular issue.

Mr. VOLKMER. Would it be possible then, instead of constructing a low-income high rise, that I put a high-income high rise in the same place?

Mr. DAYS. I can't answer that.

Mr. VOLKMER. Then are you discriminating against the wealthy as well as the poor?

Mr. DAYS. Mr. Volkmer, you are certainly posing the questions to me that have to be——

65

Mr. VOLKMER. I'm not asking you a question. I just want some of the other members to think about it. I'm thinking out loud about the problems that arise when you start doing this.

Mr. BUTLER. But talking to you again about 804 and 3504, there are no time frames for the completion of investigations by the Secretary under 3504.

In view of the problems we have had in the past with over-whelming complaint backload, don't you think it would be advisable for any new civil rights bill to mandate specific time frames in as many ways as possible for the enforcement process?

Mr. DAYS. There have been experiences in some areas of administrative enforcement, but I don't know whether we can necessarily predict that HUD, given administrative authority and conciliation authority, as well as the right to enforce that power through referral to the Attorney General or administrative proceedings, will not be able to prevent backlog from developing, and that the process would be administered in an expeditious and reasonable fashion.

I don't know what we can do, other than conjecture about that. This is not an administrative process standing alone. It is an administrative process, as I understand it, that would have significant teeth.

Mr. BUTLER. Significant what?

Mr. DAYS. Teeth.

Mr. BUTLER. You're referring now to 804 or 3504?

Mr. DAYS. No, you are referring to the problems of 3504, and what I'm saying is that it is hard for me to speculate about what would be the consequences, if and when Congress would authorize a continuation of the Secretary's conciliation authority in conjunction with the power to refer matters to the Attorney General or goes to an administrative proceeding with sanctions attached to it.

I can't speculate as to whether that particular arrangement would cause backlogs to occur.

Mr. BUTLER. You have no preventive suggestions to make sure they do not occur?

Mr. DAYS. I think we do discuss in our testimony, the question of reconciling the timetables relating to the bringing of a private cause of action or investigation by the Secretary and subsequent suit by a complainant.

I think we have made recommendations that the timetables be made clear, so that the Secretary can carry out certain types of administrative proceedings and conciliation and yet have everyone know how much time the private party has to bring suit. And so, to that extent, there is some helpful discussion in 3504.

I'm not certain that rigid timetables are the answer, but that's certainly one way that the Congress can go in this respect.

Mr. BUTLER. You're not rejecting that, are you?

Mr. DAYS. No, I'm not.

Mr. BUTLER. Thank you, Mr. Chairman.

Mr. STAREK. Mr. Days. I'd like to follow up a question from the Chair, when the chairman asked whether or not you supported cease-and-desist authority. I'd like to know which you prefer, the provisions of enforcement in 3504, which would give an option by the civil action authority for cease-and-desist authority or simply

the provisions in 7787 which would authorize the Secretary civil action authority?

Mr. DAYS. I don't have a particular preference. I think it is reasonable to think that having the alternatives would result in the fullest protection for people who allege that they've been discriminated against in the housing area. But I don't have a preference. I think that some of the alternatives are quite attractive.

Mr. STAREK. On page 5 of your statement, where you discussed this, you indicated that you don't think that litigation would increase, as a result of the number of suits filed or the number of suits brought into Federal court.

I wonder if you could tell me why? What leads you to that conclusion?

Mr. DAYS. There is a tendency, in our estimation, for violators of the Housing Act to test out HUD in every instance, because there are no sanctions attached. Essentially, saying "Well, this is a wonderful way to spend time, but we know that we're not going to be bound in any way by this process," and we will go through the whole process, and at the end say, "No, we're not going to conciliate, we are not going to make any changes," and wait to be sued. So that whole administrative process is often just a formality and period in which the ultimate resolution is delayed.

And we think that if it were made clear to everyone that the Secretary had this authority and was willing to use it, there might be more willingness to go to conciliation.

If I may just say something about the title VI experience. Congress, when it enacted title VI, looked to administrative cutoffs in proceedings to cut off funds in conjunction with efforts to conciliate and resolve matters through the informal administrative process.

To the extent that cutoffs have been used, I think that there has been compliance, to the extent that cutoffs have not been regarded as a viable alternative in the administrative process. There has been a willingness to wait and allow the litigation mold to be employed, in order to enforce compliance.

So I just think that once this type of authority is made clear, there will be more incentive to conciliate and negotiate certain types of disputes.

Mr. STAREK. But there haven't been any fund cutoffs recently.

Mr. DAYS. I hope that that will change and certainly we do have some limited experience between 1966 and 1968, in which there was a response, because there appeared to be some intention to cut off funds through the administrative process.

Mr. STAREK. All right. Thank you, Mr. Chairman.

Mr. EDWARDS. Thank you very much, Mr. Days. Your testimony has been most informative and helpful.

Our second witness is Mr. Richard P. Fishman, former director of the American Bar Association's Advisory Commission on Housing and Urban Growth.

The Commission's report, entitled, "Housing For All Under Law: New Directions in Housing, Land Use, and Planning Law," focuses, as the subtitle suggests, on the segregated and discriminatory housing patterns that have arisen as a result of the exclusionary land use practice of post-World War II American society.

Attempts have been made under existing title VIII law to stem this tide, with limited success.

H.R. 3504 attempts to strengthen this effort.

The Commission's study sheds light on some of the existing gaps and inconsistencies in the law. So we are most pleased to hear from Mr. Fishman on this important and difficult aspect of fair housing law.

Mr. Fishman, we welcome you to introduce your colleague and proceed.

[Prepared statement of Mr. Fishman follows:]

### PREPARED STATEMENT OF RICHARD P. FISHMAN

Mr. Chairman and members of the subcommittee, my name is Richard P. Fishman. From 1974 to 1977, I was Executive Director of the American Bar Association's Advisory Commission on Housing and Urban Growth. I am currently a member of the law firm of Kutak Rock & Huie, Washington, D.C.

I am pleased to have the opportunity to appear before the House Judiciary Subcommittee on Civil and Constitutional Rights to testify in support of Title II of H.R. 3504, which proposes amendments to Title VIII of the Civil Rights Act of 1968, commonly known as the Federal Fair Housing Law.

Since I have been requested to testify in my capacity as former Director of the Advisory Commission and Editor of its Report, titled "Housing for All Under Law," I have limited the scope of my statement to Section 206(g) of the proposed bill, which makes unlawful any state or local land use practices which exclude low- or moderate-income housing because of either the eligibility of such housing for governmental assistance or because of the economic status of the prospective occupants. Many of the Report's findings bear directly on Section 206(g) of H.R. 3504.

The American Bar Association's Advisory Commission on Housing and Urban Growth was created in 1974 on the recommendation of the ABA's Special Committee on Housing and Urban Development Law. A distinguished interdisciplinary group of practicing attorneys, legal scholars, public officials, planners, economists, and urbanologists, the Advisory Commission was charged with examining some of the major legal inter-relationships among land use controls, planning, and housing, with the aim of formulating legislative, administrative, and judicial alternatives and reforms that would increase housing opportunities and choice and promote a more rational urban growth process. Supported by a substantial grant from the U.S. Department of Housing and Urban Development, the Advisory Commission and staff convened and conducted research over a period of almost three years; its efforts culminated last month with the publication of "Housing for All Under Law."

I request permission of the Chairman to submit as part of the record a copy of the 19-page Executive Summary of "Housing for All Under Law."

In 1968, both the National Commission of Urban Problems and the National Advisory Commission on Civil Disorders documented the pervasive racial and economic polarization existing between cities and their suburbs, and warned in the strongest terms of the critical problems this posed, both for the groups involved and for society at large. While the Civil Rights Acts of 1964 and 1968 provided an unequivocal bar against racial discrimination in the rental and sale of housing, there are no indications that the invidious patterns of urbanization have been significantly ameliorated by these laws. As a result, housing choice and the opportunity for social mobility continue to be thwarted for millions of Americans.

The residential segregation of our metropolitan areas, the sprawl on the edge, and the decay within the cities are the outgrowth of many complex economic, demographic, and social forces. While land-use controls—absent supporting market forces and other governmental actions—are not necessarily the most significant factor affecting patterns of growth, they are exceedingly important. It is through such controls that local governments substantially influence where, for what, and when growth will occur. In the view of the Advisory Commission on Housing and Urban Growth, it is clear that zoning and other traditional land-use controls, in attempting to guide growth, have too often prevented access to decent housing and instead have reinforced and aggravated patterns of racial and economic segregation.

The nature of zoning—the workhorse of American land-use regulations—is such that it is difficult to distinguish its control over physical development and land use per se from its influence over the economic status of prospective residents and its intentional or effective use in discriminating against ethnic or racial groups. Howev-

er, large-lot zoning, prohibitions on multiple dwellings, minimum building or lot sizes, bedroom limitations, exclusive single-family limitations, noncumulative industrial zones, and other such restrictive land-use practices have helped make the cost of new housing prohibitive for over half the population. Moreover, through zoning and other land-use devices, governmentally assisted housing has been effectively excluded from many suburban communities, with the burden for such housing falling on the central city. Whether the aim is to exlude persons unable to afford such housing or to achieve some other legitimate regulatory purpose, the effect is the same. Those with the lowest incomes have a limited choice of where to live and work, and where to send their children to school.

Even in the absence of excessive or discriminatory government control over land use, most lower income families would nevertheless find new housing beyond their reach. The only way these people could afford new housing would be through some form of subsidy or assistance. This situation has always existed, although it may have become more critical because of economic conditions in recent years. However, land-use controls have frequently aggravated a situation that would have been difficult enough at best, and have frequently operated to make various proposed solutions to the problems of housing for the lower income population more difficult or even impossible.

Breaking down restrictive land-use practices would thus not only help increase housing choice and freedom of movement—justifiable ends in themselves—but might also create a more equitable geographic distribution of the fiscal and social costs of dealing with other metropolitan-area problems such as transportation, education, and environmental degradation. It would, moreover, help to improve declining central-city areas without displacing urban decay to adjacent neighborhoods.

If, however, current land use practices continue, greater numbers of Americans will be denied housing choice, our cities will continue to decline, and racial and economic segregation will be perpetuated. The Advisory Commission on Housing and Urban Growth views this prospect with great dismay. It believes that the available legal and institutional devices must be reformed to shape and direct in a more sensitive way our metropolitan regions, and to truly promote "fair housing."

The enactment of Section 206(g) of H.R. 3504 would be a salutary step in this direction. Section 206(g) would amend Section 804 of Title VIII of the Civil Rights Act of 1968, by adding to the enumeration of unlawful housing practices the following language:

"(g) For any general or special purpose unit of government of a State or of a subdivision of a State (or other agency having jurisdiction within a State or States) in the exercise or enforcement of powers with respect to planning, zoning, subdivision controls, building codes or permits, or other matters affecting land use development, to exclude low- and moderate-income housing because of the eligibility of such housing for governmental assistance, or because of the race, color, national origin, or economic status of the prospective occupants of such housing."

The inclusion of this provision in the Civil Rights Act would be particularly propitious in light of the growing retreat of the federal courts as a sympathetic forum for constitutional challenges to exclusionary housing and land use practices. In the Advisory Commission's view, recent federal court decisions have unduly limited access of lower income persons to federal courts to contest discriminatory municipal land use regulations and have failed to extend the protections of the equal protection clause of the Fourteenth Amendment to the claims of lower income families disadvantaged by municipal land use regulations.

It appears from the procedural and technical barriers erected in recent decisions, that the federal courts would prefer that questions of exclusionary zoning, not involving claims of racial discrimination, be resolved in the state legislatures and in the state courts. However, to the extent that the issues in litigation involve rights created by federal statute, as would be the case were Section 206(g) of H.R. 3504 enacted, or revolve around the discharge of responsibilities by federal agencies (e.g. the mandate of HUD under the Housing and Community Development Act of 1974, to provide "Decent housing and a suitable living environment . . . primarily for persons of low and moderate income."), then the federal courts are clearly a proper forum for the vindication of these rights. Moreover, the Advisory Commission advocates a strong judicial role in entertaining challenges to exclusionary land use regulations on the basis of its conclusions that: (1) opportunities for decent living accommodations in decent environments, freedom from law-imposed discrimination based on income (and income as a surrogate for race), and access to employment opportunities are fundamental values (as state courts may decide under their state constitutions, see e.g. *Southern Burlington NAACP* v. *Mount Laurel*, 67 N.J. 151, 336

A. 2d 713 (1975), appeal dismissed and cert. denied, 423 U.S. 808 (1975)); (2) these values will not be satisfactorily achieved in the absence of judicial intervention since those adversely affected by parochial exclusionary decisions have little, if any, voice in their formulation and few effective political means to overturn them; and (3) the courts are competent to handle this type of litigation and fashion remedies to help bring about fundamental changes in metropolitan housing patterns. An active judicial role, moreover, invites an appropriate political response, namely, the creation of a regional planning structure.

To maximize the potential impact of Subsection 206(g), and, indeed, of the existing provisions of Title VIII, consideration should be given to adding language that would make clear that Congress intends private persons to have standing to the fullest extent permitted by the Constitution to challenge governmental land use actions that are economically and racially discriminatory. Such language could blunt the possibly deleterious effect on Title VIII litigation of *Warth* v. *Seldin,* 422 U.S. 490 (1975), which limited standing to challenge exclusionary zoning practices to situations in which a specific housing project could be pointed to as having been barred. The *Warth* holding, which has adversely influenced a number of lower federal courts considering standing in similar cases, leads to the anomolous result, as observed in the dissenting opinion, that "the Court turns the very success of the allegedly unconstitutional scheme into a barrier to a law suit seeking its invalidation."422 U.S. at 523.

The Advisory Commission on Housing and Urban Growth recommends that, contrary to recent federal judicial precedent, the following classes of plaintiffs should have standing to contest the validity of restrictive land use controls in federal courts upon proof that local land use controls have made "practically and economically impossible the construction of sufficient numbers of low- and moderate-income housing:" (a) former low- and moderate-income residents who were forced to move elsewhere in the region because of the absence of suitable residential opportunities within the municipality; (b) low- and moderate-income residents living in substandard housing elsewhere in the region who desire to secure decent housing accessible to suitable employment, education, and neighborhood services in the locality. Assuming that these classes of plaintiffs, in addition to other low- and moderate-income families living within the housing market area, have established that as a result of the municipality's exclusionary practices, they incurred higher transportation costs for work-related activities, received poor residential services, and were not able to secure an adequate level of housing elsewhere in the regional housing market, sufficient proof has been presented to satisfy "prudential" and constitutional requirements that there exists "injury in fact," and that the alleged injury is directly related to the claims sought to be adjudicated.

Precedent exists in other statutes in which Congress has given private parties the right to challenge federal and local agencies if federal court for failing to carry out their federally created obligations. E.g. Clean Air Act, 42 U.S.C. § 1857h–2(a); Noise Control Act of 1972, 42 U.S.C. § 4911(a). Moreover, in *Warth* v. *Seldin,* the majority agreed that ". . . Congress may grant an express right of action to persons who would otherwise be barred by prudential standing rules . . . [subject to] Article III's requirement. . . ." 422 U.S. at 501.

While the enactment of Section 206(g), as currently drafted, would have the salutary effect of reopening the doors of the federal courts to challenges to discriminatory land use practices, additional clarifying language would be useful to assist the courts in successfully managing litigation arising under the Act. Specifically, certain standards might be provided which could further clarify the prohibited "exclusionary" practices. In "Housing For All Under Law," the Advisory Commission on Housing and Urban Growth generally endorsed the standard employed by the New Jersey Supreme Court in the *Mount Laurel* case, *supra.* That standard, grounded in the "general welfare" provision of the state constitution, held in effect, that a municipality cannot foreclose the opportunity for low- and moderate-income housing by expressly prescribing requirements or restrictions which "preclude or substantially hinder it," and " in its regulations must affirmatively afford that opportunity at least to the extent of the municipality's fair share of present and prospective regional need therefor." While the definition of "region" is open to some debate (the metropolitan "housing market area," used by the Supreme Court in *Hills* v. *Gautreaux,* 425 U.S. 284 (1976) in a good starting point), and estimation of present and prospective low- and moderate-income housing needs must be based on a respectable methodological approach, the standard is amenable to to quantification and thus is in some respects analogous to the simple one-man-one-vote standard of the reapportionment cases. Moreover, acceptable methodologies do exist for translating "fair share" into dwelling units and, where necessary, into acreages, and also

for relating housing units to other important community concerns, such as employment opportunity, school capacity, public transportation and other essential services.

Another potentially useful guide to courts in reviewing local land use decisions is the Housing Assistance Plan (HAP), required of recipients of community development block grants under the Housing and Community Development Act of 1974. In preparing their Housing Assistance Plan, communities are required, inter alia, to assess the housing assistance needs of lower income persons "residing in or expected to reside in the community." However, reliance on the HAP is of little value in those communities which have elected to forego community development grants or have prepared HAPs that are not approved by HUD. In this same vein, the HAP will be a useful guide for the courts only to the extent that HUD assures that the HAP is consistent with the 1974 Act's statutory objectives.

In closing, I would like once again to assert that Section 206(g) of H.R. 3504 represents a very significant step in making Title VIII a truly comprehensive fair housing law. Its enactment will provides an essential judicial remedy for an entire class of citizens to vindicate arbitrary discrimination based on economic status.

I would also like to interject my personal view that the expanded enforcement provisions of H.R. 3504 should greatly strengthen the mechanisms for assuring compliance with the anti-discrimination provisions of Title VIII.

I will be pleased to elaborate on any matter raised in my statement which may be of interest to the Subcommittee.

## TESTIMONY OF RICHARD P. FISHMAN, FORMER EXECUTIVE DIRECTOR, AMERICAN BAR ASSOCIATION'S ADVISORY COMMISSION ON HOUSING AND URBAN GROWTH, ACCOMPANIED BY KATHERINE SULLIVAN, STAFF DIRECTOR, AMERICAN BAR ASSOCIATION, SPECIAL COMMITTEE ON HOUSING AND URBAN DEVELOPMENT LAW

Mr. Fishman. Thank you, Mr. Chairman, members of the subcommittee. My name is Richard F. Fishman. From 1974 to 1977, I was executive director of the American Bar Association's Advisory Commission on Housing and Urban Growth. I am currently a member of the law firm of Kutak Rock & Huie, Washington, D.C. I have with me today, Katherine Sullivan, who is staff director of the American Bar Association's Special Committee on Housing and Urban Development Law.

I am very pleased to have the opportunity to appear before the Judiciary Subcommittee on Civil and Constitutional Rights to testify in support of title II of H.R. 3504, which proposes amendments to title VIII of the Civil Rights Act of 1968, commonly known as the Federal Fair Housing Law.

Since I have been requested to testify in my capacity as former director of the ABA's Advisory Commission on Housing and Urban Growth and editor of its report, "Housing for All Under Law," I have limited the scope of my statement to section 206(g) a highly meritorious section of the proposed bill, which makes unlawful any State or local land-use practices which exclude low- or moderate-income housing because of either the eligibility of such housing for governmental assistance or because of the economic status of the prospective occupants. Many of the ABA report's findings bear directly on section 206(g) of the bill.

I would like to note at the present time, that while the findings of this report are endorsed by the American Bar Association's Commission on Housing and Urban Growth, and the ABA's Special Committee on Housing and Urban Development Law, they do not as yet represent the views of the American Bar Association. At the ABA's mid-year meeting, the special committee will be deciding

which recommendations will be brought before the ABA house of delegates for adoption at its annual meeting in August 1978.

The American Bar Association's Advisory Commission on Housing and Urban Growth was created in 1974 on the recommendation of the ABA's Special Committee on Housing and Urban Development Law. A distinguished interdisciplinary group of practicing attorneys, legal scholars, public officials, planners, economists, and urbanologists, the advisory commission was charged with examining some of the major legal inter-relationships among land-use controls, planning, and housing, with the aim of formulating legislative, administrative, and judicial alternatives and reforms that would increase housing opportunities and choice and promote a more rational urban growth process.

Supported by a substantial grant from the U.S. Department of Housing and Urban Development, the advisory commission and staff convened and conducted research over a period of almost 3 years; its efforts culminated last mongh with the publication of "Housing for All Under Law."

I would request permission of the chairman to submit as part of the record a copy of the 19-page executive summary of "Housing for All Under Law."

Mr. EDWARDS. Without objection, so ordered.

[The document referred to follows:]

# Housing for All Under Law: New Directions in Housing, Land Use, and Planning Law

**A Report by the American Bar Association Advisory Commission on Housing and Urban Growth**

Edited by Richard P. Fishman

Executive Summary

Ballinger Publishing Company • Cambridge, Massachusetts
*A Subsidiary of J.B. Lippincott Company*

Copyright © 1977 American Bar Association*

This study was made possible by a research grant from the Office of Policy Development and Research of the U.S. Department of Housing and Urban Development. The findings and recommendations contained in this publication are solely the views of the Advisory Commission on Housing and Urban Growth and the ABA Special Committee on Housing and Urban Development Law. The findings and recommendations do not necessarily represent the views or policies of the U.S. Department of Housing and Urban Development or the American Bar Association.

*The Government reserves the right of a royalty free, nonexclusive and irrevocable license to reproduce, publish or otherwise use, and to authorize others to use for U.S. Government purposes all copyrighted material resulting from the work performed under the HUD Ill. PD-12 contract. The copyright shall be held for five (5) years from the date of publication of the work after which time the work shall be in the public domain.

This Executive Summary is based upon HOUSING FOR ALL UNDER LAW: NEW DIRECTIONS IN HOUSING, LAND USE, AND PLANNING LAW. A Report of the American Bar Association Advisory Commission on Housing and Urban Growth

Edited by Richard P. Fishman

Published by Ballinger Publishing Company

74

## MEMBERS OF THE ABA ADVISORY COMMISSION ON HOUSING AND URBAN GROWTH

**Chairman**
W. Carloss Morris, Jr.
Morris, Harris, McCanne, Tinsley & Snowden, P.C.
Houston, Texas

**Vice Chairman**
Richard H. Keatinge
Keatinge, Bates & Pastor
Los Angeles, California

Richard F. Babcock
Ross, Hardies, O'Keefe, Babcock & Parsons
Chicago, Illinois

Derrick A. Bell, Jr.
Professor
Harvard Law School
Cambridge, Massachusetts

Panke Bradley
Atlanta City Council Member
Atlanta, Georgia

John G. Burnett
Vice President
Rockefeller Center Management Corporation
New York, New York
(Former President, New York State Urban Development
Corporation)

Lewis Cenker (1916–1975)
Smith, Cohen, Ringel, Kohler, Martin & Lowe
Atlanta, Georgia
(Former President, National Association of Home Builders)

Marion Clawson
Economic and Planning Consultant
(Former Acting President, Resources for the Future, Inc.)
Washington, D.C.

John J. Costonis
Professor
University of Illinois School of Law
Champaign, Illinois

3

Robert S. DeVoy
Real Estate Economist and Planner
Robert S. DeVoy Associates
Washington, D.C.

Herbert M. Franklin
Lane & Edson, P.C.
Washington, D.C.

Robert H. Freilich
Hulen Professor of Law in Urban Affairs
University of Missouri-Kansas City School of Law
Kansas City, Missouri

Robert Graham
Senator
State of Florida
Tallahassee, Florida

Frederick W. Hall
Associate Justice (Retired)
New Jersey Supreme Court
Somerville, New Jersey

George Lefcoe
Professor
University of Southern California Law Center
Los Angeles, California

Daniel R. Mandelker
Howard A. Stamper Professor of Law
Washington University School of Law
St. Louis, Missouri

William K. Reilly
President
The Conservation Foundation
Washington, D.C.

Florence W. Roisman
Attorney at Law
Washington, D.C.

William L. Slayton
Executive Vice President
The American Institute of Architects
Washington, D.C.

**4**

R. Joyce Whitley
Whitley & Whitley, Inc.
Architects & Planners
Shaker Heights, Ohio

Pete Wilson
Mayor of San Diego
San Diego, California

## ABA SPECIAL COMMITTEE ON HOUSING AND URBAN DEVELOPMENT LAW

**Chairmen**

John Edward Smith (August 1973–August 1976)
Steel, Hector & Davis
Miami, Florida

Laughlin E. Waters (August 1976–Present)
Judge, United States District Court
Central District of California
Los Angeles, California

## ADVISORY COMMISSION STAFF

**Director**
Richard P. Fishman

**Assistant Directors**
Timothy J. Hartzer
Katherine M. Sullivan
Randall W. Scott
Scott M. Reznick

**Research Assistants**
Jane S. Hardin
Ira J. Botvinick
Michael B. Phillips

**Support Staff**
Mavis W. Walker
Sophia C. Hantzes
Barbara J. Merryman
Barbara B. Egan

5

002076

## PRINCIPAL CONTRIBUTING CONSULTANTS

I. Michael Heyman
Vice-Chancellor and Professor of Law
University of California–Berkeley
Berkeley, California

Roselyn B. Rosenfeld
Attorney at Law
Berkeley, California

David Falk
Lane & Edson, P.C.
Washington, D.C.

Lawrence E. Susskind
Associate Professor
Department of Urban Studies and Planning
Massachusetts Institute of Technology
Cambridge, Massachusetts

Anne D. Aylward
Research Associate
Massachusetts Institute of Technology
Cambridge, Massachusetts

Mary E. Brooks
Director of Research
Suburban Action Institute
New York, New York

Connie Lieder
Housing and Planning Consultant
Baltimore, Maryland

Edward J. Sullivan
Legal Counsel to the Governor
Salem, Oregon

Michael J. Meshenberg
Daniel Lauber
American Society of Planning Officials
Chicago, Illinois

6

## INTRODUCTION AND CHAPTER SUMMARIES

*Housing for All Under Law: New Directions in Housing, Land Use, and Planning Law* is a Report of the American Bar Association Advisory Commission on Housing and Urban Growth, a distinguished interdisciplinary group composed of practicing attorneys, legal scholars, public officials, planners, economists, and urbanologists. Created in 1974, on the recommendation of the ABA's Special Committee on Housing and Urban Development Law, the Advisory Commission was charged with examining some of the major legal interrelationships among land use controls, planning, and housing, with the aim of formulating legislative, administrative, and judicial alternatives and reforms that will increase housing opportunity and choice, and promote a more rational urban growth process. The Report is designed to serve as a useful resource for private attorneys and planners as well as for courts and public policy-makers.

Since World War II, urbanization in America has been characterized by unplanned and haphazard growth that has spawned complex problems at every level of government, imposing huge social, environmental, and economic costs on the public and private sectors. This growth has been typified by sprawl and low-density development on the urban-rural fringe and decline in the central city. It has been accompanied by serious racial and economic polarization, with the poorer, minority population left in the central city while the more affluent white population spreads to the suburbs. As a result, housing choice and the opportunity for social mobility have been limited for millions of Americans.

The residential segregation of our metropolitan areas, the sprawl on the edge, and the decay within the cities are the outgrowth of many complex forces too numerous to be analyzed completely in this Report. It is clear that zoning and other traditional land use controls, in attempting to guide growth, too often have prevented access to decent housing and have reinforced and aggravated patterns of racial and economic segregation. Moreover, our courts and legislatures have done far too little to prevent this abuse of governmental power.

While land use controls—absent supporting market forces and other governmental actions—are not necessarily the most significant factor affecting patterns of growth, they are exceedingly important. It is through such controls that local governments substantially influence where, for what, and when growth will occur.

The nature of zoning, the workhorse of American land use regulations, is such that it is difficult to distinguish its control over physical development and land use per se from its influence over the eco-

7

nomic status of prospective residents and its intentional or effective use in discriminating against ethnic or racial groups. However, large lot zoning, prohibitions on multiple dwellings, minimum building sizes, bedroom limitations, and other devices have helped make the cost of new housing prohibitive for over half the population. Whether the aim is to exclude persons unable to afford such housing or to achieve some other legitimate regulatory purpose, the effect is the same. Those with the lowest incomes have a limited choice of where to live and work and where to send their children to school.

Even in the absence of excessive or discriminatory governmental control over land use, most lower income families would still find new housing beyond their reach. The only way these people could afford new housing would be through some form of subsidy or assistance. This situation has always existed, although it may have become more critical in recent years. However, land use controls have frequently aggravated a situation that would have been difficult enough at best, and have frequently operated to make various proposed solutions to the problems of housing for the lower income population more difficult or impossible.

Breaking down restrictive land use practices would thus not only help increase housing choice and freedom of movement—justifiable ends in themselves—but might also create a more equitable geographic distribution of the fiscal and social costs of dealing with other metropolitan area problems such as transportation, education, and environmental degradation. It would also help improve declining central city areas without displacing urban decay to adjacent neighborhoods. Eliminating the abuses in the administration of land use controls and providing an adequate planning base where none currently exists would promote more rational land use decision-making.

If, however, current patterns of growth continue, greater numbers of Americans will be denied housing choice, our cities will continue to decline, and racial and economic segregation will be perpetuated. The Advisory Commission on Housing and Urban Growth views this prospect with great dismay. It believes that the available legal and institutional devices must be reformed to more sensitively shape and direct our metropolitan regions and to promote the "living welfare of the people."

**Chapter I** of the Advisory Commission Report, *Current Dilemmas and Legal Issues in Housing and Urban Growth: An Overview*, sets forth many of the problems that will be addressed in subsequent chapters. It discusses some of the complex forces that have affected growth and housing opportunity in metropolitan America, with particular emphasis on the inadequacies of our land use control system.

8

**Chapter II**, *Judicial Doctrine for Inclusionary Land Use Programs*, explores the evolution and status of federal and state judicial doctrine relating to the validity of local land use regulations and the application of various federal programs which may inhibit housing choice among persons and families of low income. The analysis traces two diverging trends in the state and federal courts. The first is a growing retreat of the federal courts as a sympathetic forum for constitutional challenges to exclusionary housing and land use constraints. The other is a more enlightened anti-exclusionary attitude being exhibited by a number of important state courts that are closely scrutinizing local actions to evaluate their real impact on the public, both within and beyond the locality's boundaries. The Advisory Commission notes that under our system of federalism, and in constitutional jurisprudence, state courts may properly construe state constitutional counterparts of provisions of the Bill of Rights as guaranteeing citizens of their states even more protection than identically phrased federal provisions.

The doctrine of "regional general welfare" developed in Chapter II asserts that the "general welfare," as a basic state constitutional principle and the predicate for local police power regulations, should be regional and include the fundamentally important state interest that the housing needs of all income groups of the state be promoted and enhanced. Moreover, in exercising their police power authority, local governments have an affirmative legal duty to promote the "general welfare," which includes the welfare of the housing market area of which the jurisdiction is a part. This affirmative duty has several parts: (1) to plan for present and prospective housing in a regional context; (2) to eliminate those local regulatory barriers that make it difficult to provide housing for persons of low and moderate income; and (3) to offer regulatory concessions and incentives to the private sector in this regard.

The central issue addressed in **Chapter III**, *The Role of the Courts*, is the appropriateness of judicial intervention in reviewing and remedying legislative and administrative land use decisions alleged to frustrate housing choice. The Advisory Commission advocates a strong judicial role in entertaining challenges to exclusionary land use regulations on the basis of its conclusions that: (1) opportunities for decent living accommodations in decent environments, freedom from law-imposed discrimination based on income (and income as a surrogate for race), and access to employment opportunities are fundamental values; (2) these values will not be satisfactorily achieved in the absence of judicial intervention since those adversely affected by parochial exclusionary decisions have little, if any, voice in their formulation and few effective political means to overturn them;

9

and (3) the courts are competent to handle this type of litigation and fashion effective remedies to help bring about fundamental changes in metropolitan housing patterns. An active judicial role, moreover, invites an appropriate political response, namely, that the local legislature is initially better suited than a court for preparing new zoning provisions and policies.

Chapter III examines procedural matters likely to arise in exclusionary cases, including standing, joinder of parties, and burden of proof. It also deals with remedies available to a court, in the face of legislative intransigence, for restructuring all or portions of a zoning ordinance that has been invalidated because it precludes access to housing by any or a "fair share" of lower income households. Also explored is the use of a special master or a consultant to assist the court in assembling data and designing a regional housing allocation plan, in examining the adequacy of plans produced by the parties, or in monitoring local compliance. Finally, the chapter discusses the various options available to the court in enforcing its order when dealing with a recalcitrant municipality, such as suspension of state or federal grants or local laws that obstruct compliance, invalidation of all zoning, and contempt. It explains how a municipality can affirmatively foster the construction of low- and moderate-income housing by such means as establishing a local housing authority, granting incentives to private developers, and ordering required municipal services.

**Chapter IV,** *Improving the Administration of Land Use Controls,* traces the evolution of these controls from a self-executing, relatively rigid system that preregulated land uses into a highly discretionary system of administrative control in which applications for development are considered on an ad hoc case-by-case basis. As a result, fairness and rationality have often been severely strained. To inject greater procedural fairness and predictability into the system, the Commission endorses a recent judicial trend treating zoning amendments that affect only individual parcels of property, as opposed to the community at large, as "adjudicatory" acts. Traditionally, these decisions have been considered "legislative" because they are made by the local legislature. If zoning changes are treated as adjudicatory, they will be subject to the essentials of procedural due process that are traditionally expected of administrative bodies—adequate notice, an opportunity to present and rebut evidence, a record, a statement of findings—and will not be subject to voter referenda.

The chapter also examines such land use controls as planned unit developments, special permits, incentive zoning, and transferable development rights, which allow more flexible control over development but which are subject to a high degree of administrative discre-

10

tion and thus uneven application. It suggests that these techniques be applied so that they are consistent with comprehensive planning, encourage housing opportunity for all income groups, and accommodate the procedural safeguards essential to fair administration.

Numerous other procedural and substantive changes are discussed, including limitations on ex parte contacts between the parties to an action and the public officials involved, citizen participation in the decision-making process, and consolidation of administrative reviews and development permits. The implementation of many of the changes suggested in this chapter may impose additional administrative burdens on local government. To lessen these burdens, while at the same time assuring a more efficient and professional process, the utilization of a hearing examiner system should be considered. The experiences of hearing examiners in numerous locations throughout the country are evaluated.

As the substantive and procedural elements of land use decisions increase in complexity (often reinforced by federal and state legislation) to include new objectives such as lower income housing, environmental protection, and regional growth management, comprehensive planning is essential as a policy base to insure internal consistency, to provide predictability, and to reduce the tendency toward arbitrary local decision-making. **Chapter V**, *The Role of the Local Comprehensive Plan in Land Use Regulation*, explores the changing nature of planning practice, the evolving judicial attitude toward the role of the plan in land use administration, and new legislation mandating comprehensive planning. In Chapter V, the Commission concludes that state enabling legislation, traditionally permissive in its approach to local planning, be amended to require local comprehensive planning and to require that local land use controls be consistent with local comprehensive plans.

The essential elements of the mandatory planning process are discussed, as well as the implications of the consistency requirement for judicial and state review of local land use decisions. Finally, using a national survey of current planning practices, the chapter examines the capability of local governments to undertake mandatory planning.

The Commission considers housing planning to be an essential element of the local comprehensive plan. As discussed in **Chapter VI**, *Housing Planning*, the plan should consider housing for all economic segments of a community, particularly low- and moderate-income households, as well as regional housing circumstances and needs. These plans should include specific implementation proposals that are clearly related to the assessment of needs, resources, likely achievements, and other human and community development

11

objectives. They should also be formulated as comprehensive housing strategies that involve citizen groups and representatives of the public and private sectors interacting in an ongoing process of education, consensus, monitoring, goal-setting, action, and evaluation. Chapter VI attempts to provide the basic information necessary for formulating housing plans and strategies and for facilitating judicial review of alleged exclusionary land use actions.

Chapter VII, *State and Local Roles in Housing and Community Development*, examines the legal underpinnings of strategies that state and local governments can undertake to increase housing choice and opportunity. Some of the activities, such as financing low- and moderate-income housing by state housing finance agencies, reforming landlord and tenant law to equalize the bargaining power between the parties, and instituting property tax relief, have generally produced positive results. Others, such as land banking and "inclusionary" zoning ordinances, are somewhat speculative as there has not been sufficient experience to evaluate their potential efficacy. Still others, such as state review or override of local regulatory actions that adversely affect low- and moderate-income housing, have had mixed results but can be improved. While the Commission believes that the federal government has the primary resources and responsibility for meeting the national housing goal of "a decent home and suitable living environment for every American family," there is little doubt that more effort and cooperation from all levels of government and the private sector is essential for achieving this goal.

## SELECTED POLICY STATEMENTS FROM HOUSING FOR ALL UNDER LAW: NEW DIRECTIONS IN HOUSING, LAND USE, AND PLANNING LAW

The Advisory Commission on Housing and Urban Growth has adopted specific Policy Statements which summarize the major themes and findings of its Report. Some of the Policy Statements, which are developed in depth in *Housing for All Under Law: New Directions in Housing, Land Use, and Planning Law*, are listed below:

*Judicial Doctrine For Inclusionary Land Use Programs*

1. The "general welfare," as a basic state constitutional principle and the predicate for local police power regulations, should be under-

stood as being regional in context, and as including the fundamentally important state interest that the housing needs of all income groups of the state be promoted and enhanced.

2. In exercising their police power authority, local governments have an affirmative legal duty to promote the "general welfare." This affirmative duty has several parts: (a) to plan for present and prospective housing in a regional context; (b) to eliminate those local regulatory barriers that do not presumptively make it realistically possible to provide housing for persons of low and moderate income; and (c) to offer regulatory concessions and incentives to the private sector in this regard.

3. The obligations of communities to meet low- and moderate-income housing needs should be evaluated in terms of a determination of the local "fair share" of the region's housing needs. Preferably, legislatures should seek to establish standards and processes to aid in the measurement and allocation of such needs.

4. Contrary to recent federal judicial precedent, upon proof that a local land use control ordinance, through such regulatory devices as minimum lot area, population density limitations, and interceptor sewer extension policy, has made "practically and economically impossible the construction of sufficient numbers of low- and moderate-income housing," at least the following classes of plaintiffs should have standing to contest the validity of the restrictive land use controls in federal and state courts: (a) former low- and moderate-income residents who were forced to move elsewhere in the region because of the absence of suitable residential opportunities within the municipality; (b) low- and moderate-income residents living in substandard housing elsewhere in the region who desire to secure decent housing accessible to suitable employment, education, and neighborhood services in the locality. Assuming that these classes of plaintiffs have established that as a result of the municipality's exclusionary practices, they incurred higher transportation costs for work-related activities, received poor residential services, and were not able to secure an adequate level of housing elsewhere in the regional housing market, sufficient proof has been presented to satisfy "prudential" and constitutional requirements that there exists "injury in fact," and that the alleged injury is directly related to the claims sought to be adjudicated.

Congress should give serious consideration to enacting legislation which would reduce procedural barriers in the federal courts, and reverse the current trend toward an elaboration of technical rules of standing, ripeness, sovereign immunity, and exhaustion of administrative remedies.

5. In the Advisory Commission's view, recent federal court deci-

13

sions have unduly limited access to federal courts to contest municipal land use regulations and have failed to extend the protections of the equal protection clause of the Fourteenth Amendment to the claims of lower income families disadvantaged by municipal land use regulations. The Commission firmly believes that these judgments should not be reflected in the decisions of state courts interpreting their own state constitution and statutes. It is inherent in our system of federalism and in constitutional jurisprudence, that decisions of the Supreme Court are not necessarily dispositive of questions reguarding rights guaranteed by counterpart provisions of state law.

### The Role of The Courts

1. The Advisory Commission views opportunities for decent living accommodations in decent environments, freedom from law-imposed discrimination based on income (and income as a surrogate for race), and access to employment and educational opportunities as fundamental values. Moreover, history indicates the unlikelihood that these values will be satisfactorily vindicated in the absence of judicial intervention since those adversely affected by parochial exclusionary decisions have little, if any, voice in their formulation and few effective political means to overturn them. Consequently, the Advisory Commission advocates judicial intervention to the extent that the courts are competent to handle resulting litigation successfully.

Suggested criteria for evaluating judicial effectiveness in this area include: (a) the existence of a simple constitutional standard; and (b) adequate control by the courts over the means of effectuating enforcement. In the landmark case of *Southern Burlington County N.A.A.C.P. v Township of Mount Laurel*, 67 N.J. 151, 336 A.2d 713, *cert. denied* 423 U.S. 808 (1975), the New Jersey Supreme Court held that presumptively a municipality cannot foreclose opportunities for low- and moderate-income housing and "in its regulations must affirmatively afford that opportunity at least to the extent of the municipality's fair share of present and prospective regional need therefor." For the following reasons, the above criteria are substantially satisfied by the standard articulated in the *Mount Laurel* decision: (a) the definition of proper "region" is amenable to quantification within one of several readily available methodological frameworks for translating the resulting numbers into dwelling

**14**

units, and thus, where necessary, into acreages; (b) such a standard does not compel a relatively even distribution of low- and moderate-income housing throughout a region; it simply prohibits suburban localities from zoning out such a distribution should other incentives expect to bring it about; (c) such a standard is judicially administrable and does not invite deep judicial participation in sophisticated planning decisions, many of which are essentially political; and (d) this approach invites an appropriate political response, *e.g.*, creation of a regional planning structure.

The Advisory Commission concludes that courts can fashion effective remedies and thus help to bring about fundamental changes in metropolitan housing patterns. In addition, the Advisory Commission notes with approval a growing judicial trend to evaluate growth management regulations in light of their impact on lower income housing. It is not necessary that the courts specify a precise number for a locality's "fair share."

2. When a court has invalidated all or portions of the zoning ordinance of a defendant government because its regulations preclude entry of any or a "fair share" of low-income persons, the local legislature is better suited than a court to the task of preparing the new zoning provisions and policies. Compelling reasons must exist to alter these traditional roles. One such reason would be substantial intransigency by the town, for whatever reasons, to proceed in a timely and reasonable manner.

3. To assure the preparation of an acceptable plan or to facilitate the defendant government's task in amending its zoning ordinances to permit low-income housing: (a) court orders should be written with sufficient specificity so that the defendant knows exactly what it is expected to do and so the court can judge whether there has been compliance or default; (b) a short-range timetable (*e.g.*, 30–90 days) should be set by the court, with a concomitant requirement for status reports at regular intervals; (c) a committee should be appointed with the responsibility to accomplish the steps in the remedial process necessary for compliance with a court-mandated planning schedule; (d) the defendant city should not be able to deflect responsibility for compliance to an assortment of state, county, and municipal planning and permit-issuing agencies; and (e) the court, to compel a town to comply with a timetable, could either impose a moratorium on any other residential construction in the town pending compliance with the order, or impose a court-created plan.

4. Assuming that the court has determined that the defendant's plans and ordinances do not permit the location within it of a "fair share" of the region's low-income housing and that this failure

15

is actionable, numerous sophisticated methodological approaches exist for quantifying "fair share," determining the locational structure of the planning scheme, and establishing the procedural framework for implementing the plan.

*Improving The Administration of Land Use Controls*

1. A governmental body, in granting or denying development permission for a specific parcel of land at the request of a particular party, is engaged in an adjudicatory process. As such, the essentials of procedural due process that are normally expected of administrative bodies—adequate notice, an opportunity to be heard, a fair and impartial tribunal, findings based on an adequate record—must be met. Furthermore, such local actions, when reviewed by the courts, need not be accorded the traditional presumption of legislative validity.

The Advisory Commission recognizes that the local legislature, in enacting or amending a zoning ordinance applicable to all or a substantial part of a political jurisdiction, is acting in a different role than when making a decision on requests by parties or individuals for particular changes from the general scheme. The latter role is more akin to that of settling disputes, and therefore, to promote greater fairness and avoid the risk of arbitrariness, should be afforded greater due process standards. (This approach does not affect text amendments applying to classes of land use or a collection of parcels within an area, comprehensive or planning area rezonings, and adoption of the comprehensive plan (in whole or by area); such actions should retain their "legislative" characterization and be subject to the traditional standards of judicial review. The legislative characterization may continue to be appropriate for individual requests for development permission that have a substantial or disproportionate impact on the community, regardless of the size of the parcel or parcels at issue.)

2. State zoning enabling legislation should be amended so as to specify the requirements for administrative review of individual requests for zoning changes or development permission. Such legislation should be responsive to the varying financial capabilities and development activity existing in political jurisdictions of differing sizes, which would affect their ability to implement a sophisticated administrative process. (Small communities, for example, may

**16**

lack the financial resources or a sufficient level of development activity to justify the changes necessary for such an approach.)

While the shift in attitude toward local land use actions affecting specific parcels has been initiated largely by the judiciary, more flexible reform in this area could be brought about through legislative change (see, *e.g.*, the ALI Model Land Development Code).

3. To assure a fair and impartial tribunal for "quasi-judicial" actions, enabling legislation and local rules should be amended to limit pre-hearing or ex parte contacts between the parties to the action and the public officials involved, or to require that such contact (excepting routine informational discussions with professional staff members) be on the record.

This approach reduces the amount of "lobbying" or informal advocacy that often precedes the formal hearing and casts a shadow over the fairness of the entire proceedings.

4. Judicial review of the grant or denial of individual requests for development permission should proceed on the record established in the hearing below in accordance with general principles of administrative law or as prescribed by statute, unless otherwise determined by the court.

This approach seeks to avoid de novo review in such cases. Accordingly, the record established at the hearing would be called up and examined for errors without the court substituting its judgment for that of the lower body. The courts could remand the case to the administrative body for a new hearing, additional findings, or other actions in accordance with traditional judicial functions in administrative law. The efforts of the courts would thereby be focused on the record and findings made below, and the importance of fair and rational local government action would be emphasized.

*The Role of The Local Comprehensive Plan*

1. As the substantive and procedural elements of land use decisions increase in complexity to include new objectives such as environmental protection, lower income housing needs, and regional growth management, comprehensive planning is essential as a policy base to insure internal consistency, to provide predictability, and to reduce the tendency toward arbitrary local decision-making. State enabling legislation, traditionally permissive in its approach to local planning, should be amended to require local comprehensive plan-

17

ning and to require that the exercise of local land use controls be consistent with local comprehensive plans.

2. Consistency with local comprehensive plans is not to be viewed in terms of a direct, rigid relationship between a mapped land use in the plan and a corollary designation on the zoning map. Rather, the consistency envisioned here should encompass three factors:

a) The comprehensive plan and the requirement that it be consistent with local land use controls is important as a standard for judicial review by which the court can evaluate the extent to which local actions are responsive to the collective planning judgment of the community; therefore, the stringency of the consistency requirement should correlate with the court's perception of the appropriate standard for review in light of the character of the plan;

b) Because both the planning process and its products vary considerably between communities and as perceived by planners themselves (*i.e.*, the movement away from rigid, end-state documents toward flexible policy plans), the implementation of a plan through land use controls should not be required by the courts to be any more rigid than the plan itself—a flexible policy plan allowing for flexible consistency that is appropriate to the circumstances; and

c) Where state enabling legislation or, perhaps, state and federal constitutional law, provide a specific basis for consistency with the plan—*e.g.*, consideration of regional housing needs or protection of critical environmental areas—the requirement for consistency between local land use action and the plan may be necessarily more rigid and demanding due to the complexity and controversy associated with such issues.

3. Mandatory planning and the direct implementation of planning policies through land use control administration requires the provision of greater financial assistance to local governments so that they can prepare and implement the necessary planning policies and land use regulations. Continued and increasing federal and state financial support of local planning and plan implementation programs is an essential prerequisite for mandatory comprehensive planning.

4. In legislation requiring consistency between local comprehensive plans and local government actions, the coordination of comprehensive planning with capital improvement programming should be encouraged.

**18**

*Housing Planning*

1. Decent and affordable housing is one of the most important elements in the lives of American citizens. The realization of such housing will not occur without both private and public intervention. To this end, governments at all levels should engage in and coordinate housing planning and implementation efforts.

2. Housing planning should be mandated by state statutes as an essential element of a community's comprehensive plan. It involves planning for all economic segments of a community, particularly low- and moderate-income households.

3. State statutes, in mandating housing plans, should specify procedural considerations as well as types of goals to be achieved and obligations to be attained (*e.g.*, quantified regional and local housing needs). In fragmented metropolitan areas, there is a danger that mandatory local housing elements will be deficient in responding to regional housing needs. This problem can be remedied through a statutory declaration of state and regional housing needs, which would take into account the varying capacities of local governments to provide for housing.

4. For judicial review purposes, courts should take cognizance of the housing plans of municipalities and regional agencies; where such plans are deemed adequate and fairly designed, they should be given great weight in determining both the housing obligations of the community as well as in aiding the defense against challenges of exclusionary land use.

The complete 800-page volume, HOUSING FOR ALL UNDER LAW: NEW DIRECTIONS IN HOUSING, LAND USE, AND PLAN-NING LAW, with comprehensive legal citations, documentation, and references, will be available Spring, 1977, from Ballinger Publishing Company, 17 Dunster Street, Cambridge, MA 02138.

19

Mr. FISHMAN. In 1968, both the National Commission of Urban Problems and the National Advisory Commission on Civil Disorders documented the pervasive racial and economic polarization between cities and their suburbs, and warned in the strongest terms of the critical situation this posed, both for the groups involved and for society at large.

While the Civil Rights Acts of 1964 and 1968 provided an unequivocal bar against racial discrimination in the rental and sale of housing, there are no indications that the invidious patterns of urbanization have been significantly ameliorated by these laws.

As a result, housing choice and the opportunity for social mobility continue to be thwarted for millions of Americans.

The residential segregation of our metropolitan areas, the sprawl on the edge, and the decay within the cities are the outgrowth of many complex economic, demographic, and social forces. While land-use controls—absent supporting market forces and other governmental actions—are not necessarily the most significant factor affecting patterns of growth, they are exceedingly important. It is through such controls that local governments substantially influence where, for what, and when growth will occur.

In the view of the advisory commission on housing and urban growth, it is clear that zoning and other land-use controls, in attempting to guide growth, have too often prevented access to decent housing and instead have reinforced and aggravated patterns of racial and economic segregation.

The nature of zoning—the workhorse of American land-use regulations—is such that it is difficult to distinguish its control over physical development and land use per se from its influence over the economic status of prospective residents and its intentional or effective use in discriminating against ethnic or racial groups.

However, large-lot zoning, prohibitions on multiple dwellings, minimum building or lot sizes, bedroom limitations, exclusive single-family limitations, noncumulative industrial zones, and other such restrictive land-use practices have helped make the cost of new housing prohibitive for over half the population.

Moreover, through zoning and other land-use devices, governmentally assisted housing has been effectively excluded from many suburban communities, with the burden for such housing falling on the central city.

Whether the aim is to exclude persons unable to afford such housing or to achieve some other legitimate regulatory purpose, the effect is the same. Those with the lowest incomes have a limited choice of where to live and work and where to send their children to school.

Even in the absence of excessive or discriminatory Government control over land use, most lower income families would nevertheless find new housing beyond their reach. The only way these people could afford new housing would be through some form of subsidy or assistance.

This situation has always existed, although it may have become more critical because of economic conditions in recent years.

However, land-use controls have frequently aggravated a situation that would have been difficult enough at best, and have frequently operated to make various proposed solutions to the prob-

lems of housing for the lower income population more difficult or even impossible.

Breaking down restrictive land-use practices would thus not only help increase housing choice and freedom of movement—justifiable ends in themselves—but might also create a more equitable geographic distribution of the fiscal and social costs of dealing with other metropolitan-area problems, such as transportation, education, and environmental degradation. It would, moreover, help to improve declining central-city areas without displacing urban decay to adjacent neighborhoods.

If, however, current land-use practices continue, greater numbers of Americans will be denied housing choice, our cities will continue to decline, and racial and economic segregation will be perpetuated.

The advisory commission on housing and urban growth views this prospect with great dismay. It believes that the available legal and institutional devices must be reformed to shape and direct in a more sensitive and effectual way our metropolitan regions, and to truly promote "fair housing."

The enactment of section 206(g) of H.R. 3504 would be a salutary step in this direction. Section 296(g) would amend section 804 of title VIII of the Civil Rights Act of 1968, by adding to the enumeration of unlawful housing practices the following language:

(g) For any general or special purpose unit of government of a State or of a subdivision of a State (or other agency having jurisdiction within a State or States) in the exercise or enforcement of powers with respect to planning, zoning, subdivision controls, building codes or permits, or other matters affecting land use development, to exclude low- or moderate-income housing because of the eligibility of such housing for governmental assistance, or because of the race, color, national origin, or economic status of the prospective occupants of such housing.

The inclusion of this provision in the Civil Rights Act would be particularly propitious in light of the growing retreat of the Federal courts as a sympathetic forum for constitutional challenges to exclusionary housing and land-use practices.

In the advisory commission's view, recent Federal court decisions have unduly limited access of lower-income persons to Federal courts to contest discriminatory municipal land-use regulations and have failed to extend the protections of the equal protection clause of the 14th amendment to the claims of lower-income families disadvantaged by municipal land-use regulations.

It appears from the procedural and technical barriers erected in recent decisions, that the Federal courts would prefer that questions of exclusionary zoning, not involving claims of racial discrimination, be resolved in the State legislatures and in the State courts.

However, to the extent that the issues in litigation involve rights created by Federal statute, as would be the case were section 2106(g) of H.R. 3504 enacted, or revolve around the discharge of responsibilities by Federal agencies, for example, the mandate of HUD under the Housing and Community Development Act of 1974, to provide "decent housing and a suitable living environment * * * primarily for persons of low and moderate income," then the Federal courts are clearly a proper forum for the vindication of these rights.

Moreover, the advisory commission advocates a strong judicial role in entertaining challenges to exclusionary land use regulations on the basis of its conclusions that: (1) Opportunities for decent living accommodations in decent environments, freedom from law-imposed discrimination based on income, and income as a surrogate for race, and access to employment opportunities are fundamental values, as State courts may decide under their State constitutions (e.g. *Southern Burlington NAACP* v. *Mount Laurel,* 67 N.J. 151 (1975), appeal dismissed 423 U.S. 808 (1975)); (2) These values will not be satisfactorily achieved in the absence of judicial intervention, since those adversely affected by parochial exclusionary decisions have little, if any, voice in their formulation and few effective political means to overturn them; and (3) The courts are competent to handle this type of litigation and fashion remedies to help bring about fundamental changes in metropolitan housing patterns.

An active judicial role, moreover, invites an appropriate political response; namely, the creation of a regional planning structure.

To maximize the potential impact of section 206(g), and, indeed, of the existing provisions of title VIII, consideration should be given to adding language that would make clear that Congress intends private persons to have standing to the fullest extent permitted by the Constitution to challenge governmental land-use decisions that are economically and racially discriminatory.

Such language could blunt the possible deleterious effect on title VIII litigation of *Warth* v. *Seldin,* 422 U.S. 490 (1975), the recent Supreme Court decision which limited standing to challenge exclusionary zoning practices to situations in which a specific housing project could be pointed to as having been barred.

The *Warth* holding, which has adversely influenced a number of lower Federal courts considering standing in similar cases, leads to the anomalous result, as observed in the dissenting opinion of *Warth,* that "the Court turns the very success of the allegedly unconstitutional scheme into a barrier to a lawsuit seeking its invalidation." 422 U.S. at 523. That is, if the zoning practices are so restricted as to prevent developments from being planned or initiated, there are then no developments that can serve as the basis to standing for which to attack the exclusionary practices in the first place.

The Advisory Commission on Housing and Urban Growth recommends that, contrary to recent Federal judicial precedent, the following classes of plaintiffs, in addition to low- and moderate-income families living within the housing market area, should have standing to contest the validity of restrictive land-use controls in Federal courts upon proof that local land-use controls have made "practically and economically impossible the construction of sufficient numbers of low- and moderate-income housing:" (a) former low- and moderate-income residents who were forced to move elsewhere in the region, because of the absence of suitable residential opportunities within the municipality; (b) low- and moderate-income residents living in substandard housing elsewhere in the region who desire to secure decent housing accessible to suitable employment, education, and neighborhood services in the locality.

Assuming that these classes of plaintiffs have established that as a result of the municipality's exclusionary practices, they incurred higher transportation costs for work-related activities, received poor residential services, and were not able to secure an adequate level of housing elsewhere in the regional housing market, sufficient proof has been presented to satisfy "prudential" and constitutional requirements that there exists "injury in fact," and that the alleged injury is directly related to the claims sought to be adjudicated.

Precedent exists in other statutes in which Congress has given private parties the right to challenge Federal and local agencies in Federal court for failing to carry out their federally created obligations. The Clean Air Act, 42 U.S.C. § 1857h–2(a) and the Noise Control Act of 1972, 42 U.S.C. § 4911(a), are examples.

Moreover, in *Warth* v. *Seldin,* the majority agreed that "* * * Congress may grant an express right of action to persons who would otherwise be barred by prudential standing rules * * * [subject to] article III's requirements." 422 U.S. at 501.

While the enactment of section 206(g), as currently drafted, would have the salutary effect of reopening the doors of the Federal courts to challenges to discriminatory land-use practices, additional clarifying language would be useful to assist the courts in successfully managing litigation arising under the act.

Specifically, certain standards might be provided which could further clarify the prohibited "exclusionary" practices. In "Housing for All Under Law," the Advisory Commission on Housing and Urban Growth generally endorsed the standard employed by the New Jersey Supreme Court in *Southern Burlington County NAACP* v. *Township of Mount Laurel,* 67 N.J. 151, 336 A. 2d, 713 (1975), appeal dismissed, 423 U.S. 808 (1975).

That standard, grounded in the "general welfare" provision of the State constitution, held in effect, that a municipality cannot foreclose the opportunity for low- and moderate-income housing by expressly prescribing requirements or restrictions which "preclude or substantially hinder it," and "in its regulations must affirmatively afford that opportunity at least to the extent of the municipality's fair share of present and prospective regional need therefor."

While the definition of "region" is open to some debate, the metropolitan "housing market area," used by the Supreme Court in *Hills* v. *Gautreaux* 425 U.S. 284 (1976), would provide a good starting point, and estimation of present and prospective low- and moderate-income housing needs must be based on a respectable methodological approach, the standard is amenable to quantification and, thus, is in some respects analogous to the simple one-man-one-vote standard of the reapportionment cases. Moreover, acceptable methodologies do exist for translating "fair share" into dwelling units and, where necessary, into acreages, and also for relating housing units to other important community concerns, such as employment opportunity, school capacity, public transportation, and other essential services.

Another potentially useful guide to courts in reviewing local land use decisions is the housing assistance plan, required of recipients

of community development block grants under the Housing and Community Development Act of 1974.

In preparing their housing assistance plan, communities are required, among other things, to assess the housing assistance needs of lower income persons "residing in or expected to reside in the community."

However, reliance on the HAP is of little value in those communities which have elected to forgo community development grants or have prepared HAP's that are not approved by HUD.

In this same vein, the HAP will be a useful guide for the courts only to the extent that HUD assures that the HAP is consistent with the 1974 act's statutory objectives.

In closing, I would like once again to assert that section 206(g) of H.R. 3504 represents a very significant step in making title VIII a truly comprehensive fair housing law. Its enactment will provide an essential judicial remedy to enable an entire class of citizens to vindicate their rights in the face of arbitrary discrimination based on economic status.

I would also like to interject my personal view that the expanded enforcement provisions of H.R. 3504 should greatly strengthen the mechanisms for assuring compliance with the antidiscrimination provisions of title VIII.

I will be pleased to elaborate on any matter raised in my statement which may be of interest to the subcommittee.

Mr. EDWARDS. Thank you very much, Mr. Fishman, for a most challenging testimony.

Do you think that the recommendations in your report can be adopted at a general convention of the American Bar Association?

Mr. FISHMAN. I think there's a good possibility that several of the recommendations will, in fact, be adopted by the ABA.

Mr. EDWARDS. Well, I wish you success, because it will be an important contribution to fair housing in this country.

Do you have information in your files or in the report that support the need for legislation, such as in section 206(g) of 3504?

Mr. FISHMAN. Yes; the report documented and supported the documentation provided by prior Presidential commissions to demonstrate the pervasive economic exclusion, that does, in fact, exist in geographic areas throughout the country.

Mr. EDWARDS. That will be very helpful, because this provision is a very controversial suggestion. We understand what we're doing, and what we're attempting to do, but your recommendations are very controversial and will trigger opposition, there's no doubt about it.

How do you reply to the suggestion that there is a better answer than this law? That is, that as we improve the schools, improve opportunities for jobs, opportunities for better family life, minorities will have a better income, and they will be able to move into these neighborhoods, and that's generally true.

Mr. FISHMAN. I would not disagree with that at all. That is absolutely essential. I certainly do not view the provisions of this bill as an alternative approach for achieving that end.

Mr. EDWARDS. You also agree, I presume, that low-income housing must be subsidized. There is really no way to do it in a private sector.

Mr. FISHMAN. Yes; low-income housing cannot be provided without governmental subsidies. In addition, a very serious problem exists for families with incomes above those that would normally qualify for governmental assistance. A very large portion of the population cannot afford housing in many areas throughout the country. Young couples, blue-collar workers, teachers, for example, often are practically excluded from living in areas proximate to where they work, or where they teach.

Mr. EDWARDS. Well, doesn't that resolve some of the problems immediately, because Government agencies usually have more money than private developers. So if we take an earlier example that we were discussing with Mr. Days, where there's an apartment area—and more and more Americans are going to live in apartments—a subsidized number of units could be built, even though the land is very expensive. Is that correct?

Mr. FISHMAN. Right. By increasing densities, housing costs can be reduced. However, there are many areas in the country which all but preclude multifamily housing. Of the undeveloped land zoned for residential purposes in the New York metropolitan area, for example, over 99 percent is limited to single-family dwellings.

Mr. EDWARDS. Do you think there ought to be a metropolitan plan to set aside certain areas for multifamily dwellings within the communities that you've described?

Mr. FISHMAN. That's right.

The report advocates mandatory housing planning. As contemplated by the advisory commission, such planning would attempt to accommodate the very real concern of neighborhoods to maintain existing quality of neighborhood conditions, but also, in those communities in which space is available to meet the communities' fair share of the regional housing need, to prevent low- and moderate-income housing from being excluded by virtue of land use controls, governmental regulations.

But this planning has to be approached, in our view, on a regional or a metropolitan scale.

Mr. EDWARDS. But there is considerable resistance from individual cities when metropolitan or regional government is suggested.

Mr. FISHMAN. I'm aware of that problem. Some metropolitan governments, or councils of government, such as Minneapolis-St. Paul and Miami Valley, Ohio, however, have had some success in addressing those problems.

Mr. EDWARDS. A regional plan would be the best, wouldn't it?

Mr. FISHMAN. A State plan probably would be the optimal approach.

Mr. EDWARDS. A pie in the sky.

Mr. FISHMAN. Not necessarily. There are a number of States that have made attempts at developing a State plan. In Congressman Drinan's State, Massachusetts, there is a seminal law dealing with this problem, chapter 774, the zoning appeals law, known colloquially as the "antisnob" zoning law.

Mr. DRINAN. It is not a zoning law. It's not working very well.

Mr. FISHMAN. There have been problems, but it is a step in the right direction.

Mr. DRINAN. It's not in the right direction, if it's not working.

Mr. FISHMAN. Well, one reason it's not working is that subsequent legislation has been enacted in Massachusetts—environmental legislation—which is not covered by the provisions of the antisnob law, and there are very difficult problems of resolving real environmental considerations with other social and economic considerations. The problems are magnified when environmental objections are raised as a subterfuge for racially or economically discriminatory motives.

Mr. EDWARDS. Does the Massachusetts law preempt local zoning?

Mr. DRINAN. Well, I'm sure that this gentleman would be more specific about it than I would be at this moment. You tell the chairman for the record what the antisnob zoning is intended to do.

Mr. FISHMAN. The antisnob zoning law is intended to provided that every community throughout the State be zoned to permit a statutorily determined amount of low- and moderate-income housing. The statute provides for an expedited procedure in applying to a local zoning board to develop low-income housing. If an application is denied, provision is made for appealing that decision to the State housing appeals committee. The housing appeals committee is empowered to override the local decision and grant the necessary permits if it determines the community does not have its required share of low- and moderate-income housing.

Mr. EDWARDS. Has it affected any cities where the population is over 25,000 and all the houses sell for $85,000 to $200,000? Are there any such municipalities which, under this law, has had to absorb its share of low-income housing in Massachusetts?

Mr. FISHMAN. There are many cities in Massachusetts which now have low-income housing that would not otherwise have such housing.

Some of the reasons why the law has had only limited success stem from factors external to the law itself.

For example, the unavailability of Federal housing subsidies has effectively operated to preclude low-income housing in communities which were suitably zoned.

For several years, the Massachusetts Antisnob Zoning Act operated under a serious legal cloud. It was uncertain whether, in fact, the State had the authority to override local decisions in the face of strong home rule powers. That issue was favorably resolved when the Supreme Judicial Court of Massachusetts upheld the constitutionality of the law almost 4 years after it was enacted. It is working better than it was before, but difficulties still remain.

Mr. DRINAN. It does have an educational impact, too. Even the name of it focuses pejorative attention on various communities, the antisnob zoning, and I happen to have some rather affluent communities in my district that theoretically should be affected by it. By education and by pressure, they have, in fact, provided at least in a minimum way more low-income housing. Sometimes they have it for the elderly and that satisfies it.

But pursuing this question, do you think that that law could provide some analog to what we have in the bill here, H.R. 3504?

It's a different approach taken in Massachusetts than here. The language in the relevant section, quoted on page 6 of your state-

ment, 206(g), is not the same approach that Massachusetts took in the antisnob zoning.

Would you prefer one approach or the other?

Mr. FISHMAN. Section 206(g) would essentially provide a judicial remedy which is currently unavailable. Its enactment might also provide impetus for State legislative action to preempt restrictive land use regulation—an approach somewhat akin to Massachusetts and similar to that recommended in 1968 by the National Commission on Urban Problems. That would be my personal preference.

Mr. DRINAN. Who has recommended the language that we have in the bill, 206(g)? Which groups would advocate that?

Is there some known origin of that language?

Mr. FISHMAN. Of that particular language?

Mr. DRINAN. Or of that approach. Where else did we say that communities may not do anything that excludes low- or moderate-income housing provided under a Federal program, or because, and this is the bottom line, I suppose, of the economic status of the prospective occupants. That puts it very bluntly; they can't keep the poor out of the middle class areas.

Mr. FISHMAN. A small minority of States are judicially moving in that direction. Legislatively, there has been less activity. One example was New York State's Urban Development Corporation which was authorized to override local zoning decisions which adversely affected State-assisted housing.

Mr. DRINAN. Well, did they say that intent is required or does effect suffice?

Mr. FISHMAN. Actually, neither. The "effect/intent" distinction is largely a court-created test. The UDC was authorized to override local zoning at its own adminstrative discretion. No criteria was legislatively established—a factor which may ultimately have contributed to the legislature's withdrawing the power.

Mr. DRINAN. Under this section here, 206(g), do you think that effect would suffice, if it has the effect of excluding these people?

Mr. FISHMAN. I think from the existing body of case law on this subject, and specifically the seventh circuit's recent decision in Arlington Heights, which construed title VIII as a legal bar to actions with a discriminatory effect, rather than purpose, to rule, by analogy, I think that section 206(g) would be interpreted by employing the same rationale.

Mr. DRINAN. Would you comment on the statement made in the memo from the Department of Justice, that we do not define "exclude" in the bill? Obviously, this is a very vague term. Nor do we define low- or moderate-income housing. They suggest with respect to the latter that in due course HUD could define those terms in regulations. Could you suggest better language, clear language, to replace that term "exclude." Or how would you define "exclude?"

Does it mean all moderate income? Could a community evade this by saying: "Last year we allowed eight moderate income families into this particular suburb?"

Mr. FISHMAN. Well, I think on dealing with this specific question, again, you have to understand the advisory commission's view, and I think as a basic precept of urban planning, would have to ap-

proach the problem on regional or metropolitan level. Not community by community.

There certainly could be justification for large lot zoning, for example, in a small community.

Mr. DRINAN. No; I see that, and I agree with the definition that you cite from the *Gautreaux* case. But on the word "exclude," does that mean total exclusion, or is there someone to judge that if 10 families got in last year, that particular community would not be in violation of this section?

Mr. FISHMAN. Well, the advisory commission tried to establish certain criteria for exclusion. I could make those criteria available to the subcommittee. It is a very difficult question.

Mr. DRINAN. It is?

Mr. FISHMAN. Yes. Whether exclusions to absolutely prohibit or to make more difficult, for example, by increasing the cost.

I think some clarifying language would be very useful.

Mr. DRINAN. You see, as we said, in the Massachusetts law, they agreed that there has to be x number of low- or moderate-income people in a particular community.

If the community has less than that, then the community is deemed to be excluding that type of individual.

I would hope that we might get something that would approach that and say if a community does not have a certain minimum number of low- or moderate-income housing for the categories of people, then they could in due course be cut off from Federal subsidies.

Now, that's the ultimate stick.

Mr. FISHMAN. Right. One problem with the Massachusetts law in that respect, is that the number selected for minimum total acreage or minimum number of housing units that must be provided, was really an arbitrary number. It was the best number that the legislature could get enacted at that time.

However, methodologies have been developed for tying the numbers of housing that the community might be required to provide to employment opportunities, for example, or to the ability of local schools to assimilate children who would be living in such housing. Fairly sophisticated methodologies do exist; ones which provide a strong rationale for mandating low- and moderate-income housing.

Mr. DRINAN. Have any other States sought to follow the wisdom of Massachusetts?

Mr. FISHMAN. New York, as I mentioned, with their preemption of local zoning power. Again I must point out that the New York State Legislature repealed that provision 3 years after it was enacted, because of opposition from the suburban communities of Westchester County.

However, judicially, New York has moved back in that direction, as have New Jersey and Pennsylvania and California under State law, but there is no legislation, as such. New Jersey is attempting to implement the *Mount Laurel* decision through an executive order of the Governor.

Mr. DRINAN. That you very much. That's very helpful, and the language here is on the frontiers of the law, I would think. It is a very serious problem everywhere, and I think, frankly, that it's getting worse.

We have, as the chairman indicated earlier, two societies, one that is in the inner city that simply can't get out to surburbia or exurbia. I would hope that this language might, in due course, be enacted into law. But, unless it's very specific and has tough sanctions, I'm afraid it's going to be as ineffective as the Massachusetts law has been for a long time.

I thank you.

Mr. STAREK. Thank you, Mr. Chairman. I have a request on behalf of the ranking minority member, who had to leave. Would it be possible for you to make available to him and the rest of us, copies of your report?

Mr. FISHMAN. Yes.

Mr. STAREK. Thank you.

I am following up on some of the very tough questions that Father Drinan was asking you. Because I think what this language comes down to is what is interpreted either by the courts or by statute as to what "exclude" means. I'd like to just test you on something that may or may not be meant to be exclusionary.

Would you say that that means, exclusion would mean that regional housing authorities can exercise site selection?

In other words, could a regional housing authority choose a particular site and if a community's zoning laws prohibit that site from having multifamily dwellings, would that, if fact, be exclusionary? Or would that mean the community was excluding multifamily low- and moderate-income houses?

Mr. FISHMAN. Could you rephrase that?

Mr. STAREK. I'm sorry. I guess I'm not making myself clear. Let's assume that a regional housing authority says, "We want to build a low- or moderate-income housing facility, which is multifamily on a particular site in a particular community. If the community's longstanding zoning provisions excluded multifamily dwellings from that particular site, but offered in turn, alternative sites, could that community then be said to be excluding low- and middle-income housing?

Mr. FISHMAN. No, I don't think so, providing that community made available its fair share, based on the criteria that might be established for sites for such housing elsewhere in the community.

Mr. STAREK. Isn't that, in effect, what happened in the Arlington Heights case?

Didn't Arlington Heights offer several other sites which the Chicago Housing Authority rejected?

Mr. FISHMAN. Well, the Chicago Housing Authority was not involved in the Arlington Heights case. That was a privately—it was federally assisted, but privately deeloped. And the other sites that were available offered neither the locational advantages of the site that was proposed, which was to say, access to schools, access to commercial facilities.

In that event, then, perhaps you would have to view that hypothetical example you gave where one site is designated, and that is the only site which provides access to educational and other facilities or social services, then it may be viewed as exclusionary, in my view.

Mr. STAREK. Who would make the determination, as to whether a particular site in your scheme would be, would regional or State

agencies make the determination that one particular site has this access to schools and to commercial facilities?

Mr. FISHMAN. Local governments have been doing that since the advent of zoning.

Mr. STAREK. And you wouldn't propose to change that, would you?

Mr. FISHMAN. I would not propose to change the very strong control that local communities have over land use within that community, providing that sufficient land was available to low- and moderate-income housing. One or two States now, California, for example, under a State planning law passed 3 years ago, has required that local communities, in exercising their planning powers, provide for low- and moderate-income housing. A housing element, which is to provide for housing for all income groups, is one of eight elements that must be contained in local comprehensive plans.

Mr. DRINAN. If the gentleman would yield. Did they specify how much?

Mr. FISHMAN. No.

Mr. DRINAN. They have to have some?

Mr. FISHMAN. They are required to plan for housing.

Mr. DRINAN. If they rented to one family, it would be enough.

Mr. FISHMAN. I beg your pardon?

Mr. DRINAN. If they rented to one whole family, that would be enough to comply with the statute?

Mr. FISHMAN. Under the statute there is no numerical requirement. When the statute is read with developing California case law, one such project may not be enough. They're moving in the direction of fair share.

Mr. DRINAN. I thank the gentleman for yielding.

Mr. STAREK. Just one other question; I'd like to continue on this. What is exclusion? Because I think it is crucial to this section.

What if a community has a zoning procedure, which most communities, I think, have, where they have single-family dwellings and multifamily dwellings in particular areas.

And I, generally, I think multifamily dwellings closer into the commercial area, I think that's generally the way it is in the smaller towns, in suburbia. If a community were to tell a regional or a State housing authority that that would prefer to maintain this type of zoning structure and had no problem with low- and moderate-income housing, as long as it—which is multifamily, as long as it was within confines set aside from multifamily dwellings, as opposed to single-family dwellings, would there be, in fact, exclusion if a regional or State housing authority said no, it has to be on this particular site?

Mr. FISHMAN. I'm not aware of anyone who would consider that exclusion. The problem is that many, if not most, suburbs and communities in certain metropolitan areas make no provision whatsoever, for multifamily housing at all. That is exclusion.

Mr. STAREK. Indeed, you are right.

Thank you.

Ms. COOPER. Mr. Days, in his testimony, raised the question of whether or not the economic status aspect of the exclusionary land-

102

use provision might be constitutionally infirm. Do you have any opinion on that?

Mr. FISHMAN. Well, the Advisory Commission didn't address that issue. My own personal feeling is that under the commerce clause, it would be constitutional, in my own judgment——

Ms. COOPER. Do you see the need for legislation permitting low- and moderate-income housing in areas where its exclusion does not produce a racial discriminatory impact? Is economic segregation as much of a national problem as racial discriminatory exclusion?

Mr. FISHMAN. I think it is as much of a national problem as a racial problem. It is often exceedingly difficult to disentangle the two, but I think it is becoming more of a national problem, because of economic conditions.

Ms. COOPER. You stated that there are "acceptable methodologies that exist for quantifying the concept of fair share." Would you please expand on that and explain what that means and how those methodologies would work in approaching a particular situation.

Mr. FISHMAN. Well, I would like to respond to that. We discuss a variety of fair share methodologies in great detail in the report. They are designed to provide guidance in situations where large amounts of lower income housing can be accommodated in commu- nity or in instances where multifamily housing and, indeed, hous- ing for low-income families might create very serious fiscal burdens on a community or may be impossible because of environmental considerations. The methodologies that we have attempted to devel- op would take such factors into consideration.

In defining what a community's fair share responsibility in pro- viding land for low- or moderate-income housing would be the methodology establishes criteria based on the ability to assimilate children into schools, proximity to community services, et cetera; factors which would have a bearing on the exact number that would be required under state law.

Ms. COOPER. Are those basically the same factors or approaches that have been used in creating housing assistance plans, or they go beyond that?

Mr. FISHMAN. It goes well beyond that. The housing assistance plan is merely a statement of need, expressed largely in physical terms. It does not attempt to relate housing to other community concerns, as do the fair share methodologies, nor does it attempt to deal with housing needs in a regional context.

Ms. COOPER. Would you think that an improved housing assist- ance plan would be an acceptable defense in itself to the charge that a community has a discriminatory land-use practice?

Mr. FISHMAN. I think that a housing assistance plan, if approved by HUD pursuant to the very strong statutory language of the Housing and Community Develpment Act, would be sufficient.

It would not be the best approach, but in most instances, it would represent a significant advance over what now currently exists.

Mr. DRINAN. If the gentlelady will yield. But wouldn't it have the same built-in infirmities, if there were no subsidies to follow it up? You can write HAP's till you're sick, but nothing will happen.

Mr. FISHMAN. Right, similarly, eliminating exclusionary land-use practices does not build low-and moderate-income housing. It is

necessary both to provide more subsidies and to eliminate regulatory barriers. They are two separate but interrelated issues.

Mr. DRINAN. But rather than go for the new formula, which really is almost unheard of in the history of the law, in the proposed 804(g), we say that the economic status of the prospective occupants is in the same category as race, color or national origin.

Well, can't we do it by using the HAP's, and building upon the structure that is there? Wouldn't the same result be achieved, rather than fight for a new right, really the right not to be discriminated against just because you're poor.

Mr. FISHMAN. I think the same result would be achieved.

Mr. DRINAN. All right. Thank you, and thank you for yielding.

Mr. EDWARDS. What are you going to do about the surburb of 50,000 people that doesn't want any assistance from HUD, and the cheapest lot is $100,000?

Mr. FISHMAN. What am I going to do about that? [Laughter.]

Mr. EDWARDS. What's your suggestions?

Mr. FISHMAN. Well——

Mr. EDWARDS. What should we do about it?

Mr. FISHMAN. Under current Federal law, little could be done about it.

And for that reason, I think that that section 206(g) would be an important advance, enabling potential occupants or low- and moderate-income familes to have thier day in court.

The most effective alternative way of dealing with the problem would be Federal preemption or State preemption of local zoning law.

Mr. EDWARDS. Well, thank you very much, Mr. Fishman.

I do hope that you go to the national convention of the American Bar Association and get some good resolutions enacted, so that we can have the benefit of them which would increase our chances of enacting the type of legislation that I'm sure you are recommending and which a number of us feel is very necessary after today.

Mr. FISHMAN. Are there any further questions?

Mr. EDWARDS. No. We appreciate your testimony very much. Thank you.

Mr. FISHMAN. Thank you.

[Whereupon, at 11:50 a.m., the hearing was adjourned.]

002104

# FAIR HOUSING ACT

## WEDNESDAY, MAY 10, 1978

House of Representatives,
Subcommittee on Civil and Constitutional Rights
of the Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met, pursuant to notice, at 9:39 a.m., in room 2237, Rayburn House Office Building, Hon. Don Edwards (chairman of the subcommittee) presiding.

Present: Representatives Edwards, Drinan, Volkmer, and McClory.

Also present: Janice Cooper, assistant counsel, and Roscoe B. Starek III, associate counsel.

Mr. Edwards. The subcommittee will come to order.

We are going to continue our hearings today on title II of H.R. 3504, a bill to amend the Fair Housing Act. We will focus at this hearing on two issues pertinent to this proposed legislation: The extent and form of housing discrimination today and the procedures available for enforcing antidiscrimination laws.

H.R. 3504 is premised on the assumption that housing discrimination is relatively widespread, common, and infrequently remedied. The statistics on complaints to HUD and in court, however, do not necessarily support the conclusion that discrimination in housing is prevalent. Housing patterns, on the other hand, remain highly segregated.

Therefore, it is particularly important, in discussing the need for legislation in this area, that we get the facts firsthand.

Before I introduce our distinguished first witness, I would like to yield to the coauthor of the bill, the gentleman from Massachusetts, who has been a leader in all civil rights and civil liberties matters in the United States for many, many years.

Mr. Drinan?

Mr. Drinan. Thank you very much, Mr. Chairman.

I, too, hope that this bill will become law in the very foreseeable future. I commend the National Committee Against Discrimination in Housing for an excellent record over 28 years. I recall the battles we had in the fifties and sixties in Massachusetts. Hopefully, they paid off in 1968 with title VIII.

I know that all of the groups participating in this hearing will want to make a great deal of progress over that law. I hope that progress can come soon. Thank you.

Mr. Edwards. Our first witness today will assist the subcommittee significantly in this respect. Mr. Edward Holmgren is the Director of the National Committee Against Discrimination in Housing. NCDH, under contract from HUD, recently completed an ambi-

(105)

tious study on housing discrimination in a number of American cities. The results of that study are illuminating and disturbing and received widespread publicity.

Mr. Holmgren, we are most pleased to hear from you. Please proceed with your statement.

## TESTIMONY OF EDWARD HOLMGREN, EXECUTIVE DIRECTOR, NATIONAL COMMITTEE AGAINST DISCRIMINATION IN HOUSING

Mr. HOLMGREN. Thank you, Mr. Chairman.

Having submitted my prepared statement to you, I am going to summarize the comments in that statement with special emphasis on the results of the recently concluded HUD–NCDH Housing Market Practices Survey.

Mr. EDWARDS. Without objection, your full statement will be made a part of the record.

Mr. HOLMGREN. Thank you.

[The prepared statement of Mr. Holmgren follows:]

STATEMENT OF EDWARD L. HOLMGREN, EXECUTIVE DIRECTOR, NATIONAL COMMITTEE AGAINST DISCRIMINATION IN HOUSING, WASHINGTON, D.C.

I am Edward L. Holmgren, Executive Director of the National Committee Against Discrimination in Housing, (NCDH). We are a 28-year old civil rights organization engaged in legal services, research, public information, technical assistance, and monitoring government enforcement of fair housing laws. Our program is carried out in association with 54 metropolitan housing opportunity centers and several hundred local fair housing opportunity centers and several hundred local fair housing committees. It is funded by foundation grants and public subscription.

The passage of Title VIII in 1968 marked a high point in NCDH's efforts to secure statutory protection of the rights of racial minorities in the housing market equal to that of all Americans. Following the adoption of fair housing laws in over a score of states, enactment of Title VIII marked the successful culmination of our effort to bring almost all the nation's housing under statutory prohibition of racial discrimination. Regrettably, Congress' bold declaration in Title VIII that "it shall be unlawful * * * to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in provision of services or facilities in connection therewith, because of race, color, region, or national origin" was not accompanied by an equally bold grant of power to enforce the law.

Title VIII, with all of its shortcomings, has made a substantial impact on discrimination in housing. Gone are the blatant "white only" policies flouted by sellers and landlords before 1968. Gone is the obvious racial advertising of real estate. Though discriminatory practices are no more discreet, more camouflage, driven underground, this, in itself, is a measure of progress, because resort to elaborate concealment makes discrimination less effective.

A vast residue of discrimination remains, however, in the daily operations of the housing market. This situation was documented by NCDH in a recent survey of the practices of nearly 3,200 real estate sales firms and rental agents in 40 metropolitan areas conducted under contract to HUD. The survey found that blacks responding to advertisements for rental units in a local daily newspaper were discriminated against in 29.1 percent of their inquiries, and when responding to advertisements for sales of homes, were discriminated against in 21.5 percent of their inquiries.

If a black person's response to advertised units led him to inquire at four rental offices or four brokers, as is often the case in shopping the housing market, the probability of encountering discrimination would be 75 percent in the rental market and 62 percent in the sales market.

It should be noted that the findings released by HUD from the survey data are preliminary. This can possibly result in an underestimation of the true extent of discrimination in a reacially bifurcated housing market. Since the essence of this market is segregation by race, its operational norms are governed by practices designed to provide housing for each race within areas, or even within buildings in which it is already dominant or about to be. This practice has long ago been characterized by the housing/civil rights movement as "steering", i.e., the selective showing of housing to whites or blacks or other groups identified by race, religion,

country of origin or sex in a manner designed to perpetuate and extend residential concentration by such groups.

"Steering" is discrimination and, therefore, illegal. It is probably the single most widely practiced form of racial discrimination in the sales market. It is also exceedingly difficult to identify and document. Our survey for HUD is, perhaps, the most throughly scientific recording of information on steering ever undertaken. The data on steering has not yet been analyzed by HUD and, therefore, is not reflected in the previously cited percentages of incidents of discrimination.

The absence of findings on "steering" is germane to an understanding of the case by HUD's analysts of the categories "white favored" and "black favored" in their findings on discrimination. Since their break-down of information on findings to date is in the categories of "white favored" and "black favored" its true meaning must remain incomplete until related to the factor of steering.

Blacks are favored over whites by rental agents and brokers when the rental unit or house involved is located in a building or neighborhood in which blacks predominate or in which the agent or broker considers their predominance in the future to be most likely. Since interracial buildings or neighborhoods are viewed by such a large segment of the real estate industry, as merely transitional from one race to another, the presence of a significant number of minority persons causes agents and brokers to "write off" the building or neighborhood for white occupancy and, consequently, to favor blacks over whites in rentals and sales.

With this clarification of the function of "steering", and with an awareness of its possible role as cause for favoring persons of one race or another, let us now proceed to an examination of HUD's general findings on discrimination defined solely as a variance in treatment of the tester of one race compared to that of another, absent knowledge of the possible motivation of steering.

HUD's analysts measured differential treatment of the survey's white and black auditors who called on rental agents and brokers in response to advertisements.

With reference to the apartment inquired about being offered as available, whites were favored in 28 percent of the responses, compared to blacks favored in 12 percent. In the remaining 60 percent, treatment of whites and blacks could not be differentiated.

In volunteering apartments for inspection, whites were favored in 41 percent of the responses, compared to blacks favored 15 percent, with 45 percent equal.

In inspecting apartments, whites were favored in 28 percent of the responses, compared to blacks favored 16 percent, with 56 percent equal.

With placement on a waiting list, whites were favored in 38 percent of the responses, compared to blacks in 21 percent, with 42 percent equal.

With reference to the availability of sales housing requested, whites were favored in 22 percent of the responses, blacks in 9 percent, with 69 percent equal.

With reference to the number of houses the agent suggested, whites were favored in 52 percent of the responses, blacks in 25 percent, with 23 percent equal.

With number of houses invited to inspect, whites were favored in 46 percent of the responses, blacks in 30 percent, with 24 percent equal.

With number of houses inspected, whites were favored in 41 percent of the responses, blacks in 26 percent, with 33 percent equal.

Until HUD's analysts can subject the foregoing generalized findings to an identification of the impact of "steering", the most significant category in the generalized findings are not the extent to which one race is favored over another under circumstances that remain obscure, but the extent to which equal treatment is accorded to persons of every race. This is what the law of fair housing is about. This is the standard by which we must measure compliance. It is therefore shocking that after 10 years of Title VIII, HUD's analysts report that equal treatment was accorded whites and blacks in only 30 percent of the responses in the rental market and in only 10 in the sales market.

The sharp difference between the rental and sales markets in percentages of equal treatment is highly important to note in the light of our previous explanation of the importance of "steering" as a factor in discrimination. It is well known that "steering" is most prevalent in the sales market by virtue of the fact that the inquiry about sales housing takes place in a broker's office and the agent can select housing for inspection by racial composition of neighborhood.

HUD's findings as released to date do not give a geographical breakdown beyond the four major sections of the United States, Northeast, North Central, South and West. (Some unofficial tabulations for metropolitan areas have, however, been released by organizations that performed local survey services as subcontractors to NCDH, which we will cite subsequently.)

HUD's findings for the four major sections show relatively small variances in the "treated equally" column for rental housing, while showing significant variations in sales housing. In rental housing, the North Central sector shows the highest percentage of "treated equally" responses at 33 percent, with the South showing the lowest percentage at 28.5 percent. In sales housing, however, not only are the variances larger, but the roles of the sectors are reversed, with the North Central sector showing 5.9 percent "treated equally", compared to the South's surprisingly high percentage of 14.6 percent.

Having given some generalized findings of the survey and my caveat as to their limitations absent data on steering, it is useful to your understanding of both the significance of the survey and its reliability that I give in extremely summary fashion some background information on the scope and design of the survey.

The survey, known as the Housing Market Practices Survey (HMPS), was the first national-level survey of the real estate industry's fair housing practices. Furthermore, it is to date the most rigorously objective survey of compliance with fair housing law, adhering to strict statistical and social science controls in sample selection, survey techniques and data analysis.

A background paper on the survey has been released by HUD's Office of Policy Development and Research, a copy of which I append for the record, together with a statistical tabulation of their preliminary findings. I will quote brief excerpts from the paper to convey an understanding of the survey's organization.

"In June and July 1977, in 40 metropolitan areas across the country, 300 blacks and 300 whites, in pairs, shopped for housing advertised in their local newspapers. Their task was not to rent or buy but to gather information for the Department of Housing and Urban Development, which wanted:

"to measure the impact of the various fair-housing enforcement activities;

"to learn as much as possible about the extent of discrimination in American housing;

"to learn as much as possible about the form that discrimination takes;

"to determine a baseline measure of discrimination against which all future studies can be compared.

"The locations chosen for audits were selected from Standard Metropolitan Statistical Areas (SMSAs) having central cities with at least an 11 percent black population by a form of stratified random sampling called 'controlled selection.'

Beyond the formal structure of the survey organization and beyond the computer print-outs, is the story of the encounters experienced and the impressions formed of the 600 or so persons who conducted the audits. Their narratives and their unofficial local tabulations add flesh and blood to the more arid official social science accounting of what took place. A number of local accounts of auditing experiences were published in an article in NCDH's periodical Trends in Housing, a copy of which I append to the record of this hearing and from which, time permitting, I wish to quote.

A grass roots view of survey experiences and findings is supplied by Lee Porter, Executive Director of the Fair Housing Council of Bergen County, New Jersey, an organization that served as a subcontractor to NCDH in the survey. I quote from a release by the Fair Husing Council of Bergen County on April 17, 1976:

"While the extent and degree of discrimination will be determined by computer, Mrs. Porter noted that there were instances when white auditors were shown a large number and wide diversity of homes throughout the white communities covered by the broker. Sometimes, negative as well as false comments about the racial makeup of an integrated community were made to discourage white families from looking there. 'You wouldn't want to live in X, it is mixed and you have to send your kids to private school'; 'Y' is a dirty, rundown town". Mrs. Porter felt that in general, white customers were afforded more enthusiastic, helpful treatment by the broker than their black counterparts, often being given copies of listings, business cards, and local newspapers, or offered mortgage and legal assistance. White auditors were much more likely to be called back by the broker for a return appointment or to report a price drop or new listing.

"It was noted that on occasion black auditors, on the other hand, were shown no homes, only the home inquired about, or fewer serious offerings than his white counterparts, often being told there was nothing else available in his price range. At times, the homes they were shown tended to be in integrated neighborhoods or the 'hard to sell' houses in white neighborhoods—near factories or railroads, or in poor physical condition. black auditors seemed to have been more frequently questioned about their income; less frequently about the ownership of their present residence, an indication that brokers assume black families are all lower-income non-home-owners. for example, no inquiry in order to secure a house listing of a black auditor

who resides in an area that is well known as a very affluent community was made. We observed that callbacks were less frequent and the black auditors found that not only were they given less than enthusiastic encouragement and help by their salesperson, but were in some instances treated rudely—kept waiting long periods of time for appointments, seated in an obscure corner of an office, or left in the car while the broker talked with the homeowner privately.

"Other techniques encountered by the Council's auditing programs include: Black auditors asked for more complete credit information or told that a higher security deposit or mortgage rate was required; black auditors not given visual access to brokers' listing books; black auditors told different terms or house prices or shown houses above or below their price range; black auditors not told about waiting lists; discrimination on the telephone against an auditor with a black or ethnic accent. In one apartment audit, the black auditor was told there were no apartments available, while on the same afternoon, the white auditor was told there were three immediate vacancies and was given a great deal of information about rents, security deposits, credit checks, applications, etc."

Comparable to Lee Porter's report on Bergen County, New Jersey, is the recent report on the state of fair housing compliance in the Louisville and Lexington (Ky.) metropolitan areas, *Discriminatory Practices Determine Housing Choices in Fayette and Jefferson*, released by the Kentucky Commission on Human Rights.

Valuable for its accounts of both flagrant and subtle practices of discrimination and its computations of unofficial finding the extent of discrimination, the Kentucky report bears witness to our previously cited reference to steering as a likely explanation of broker's and agent's behavior favoring blacks:

"After a black man specified size, price and location he wanted an agent took him to inspect a home and quoted the selling price and required down payment. The same home had been shown to the white man by the same agent a few hours earlier. Comparison of the individual reports on the test revealed the black man had been given a price $2,500 lower than the white man; the down payment required was also lower for the black than the white: 10 percent as opposed to 20 percent. Supplementary information on the area in which the house was located indicated it was increasing in black population and decreasing in white. The agent wanted to sell the home to the black man; he encouraged the white man to consider homes at other locations.

"Other examples of appearing very friendly and helpful included 'In this area you're only paying for an address; if you want a real buy for your money you need to look at some places around ————.' The area then suggested to the black person would be transitional or predominantly black. On the other hand, the white teammate spent more than two hours driving through the area both testers had requested and received nothing but very positive comments about buying a home in that vicinity."

The continued existence of widespread discrimination in the sale and rental of housing throughout the nation appears, at first glance, to be contradicted by the relatively small number of complaints filed with HUD, never exceeding 4,000 per year. NCDH's close observation of the administration of fair housing laws by municipal and State agencies, as well as in the case of Federal fair housing law, has led us, and others familiar with the phenomenon, to the conclusion that effective enforcement results in an increased volume of complaints, while ineffective enforcement results in just the opposite.

The rationale for this conclusion becomes readily apparent upon a brief analysis of cause and effect in the relationship of enforcement results to volume of complaints. When the victims of discrimination who file complaints experience repeated delays and long drawn-out, and often repetitive, conciliation hearings which terminate with little or no satisfaction to the complainant, the filing of complaints is perceived by an increasing proportion of the minority population as an act of futility. As a consequence, even as an increasing number of minority persons discover the existence of fair housing law and its complaint process, a decreasing percentage of minority persons continue to consider the complaint process as a procedure likely to give them satisfactory redress.

Knowledge of the effectiveness or ineffectiveness of enforcement eventually becomes widespread throughout minority communities, both through published reports and by word of mouth. The growth of a negative attitude toward complaints of violations of fair housing law thus parallels and counteracts public information programs designed to make more minority persons aware of the law and the complaint process.

State and local fair housing enforcement programs have noted that the media's reporting of administrative or judicial decisions against brokers, rental agents or

landlords stimulate the filing of complaints. Especially is this the case when punishment included compensatory damage awards to the victim for financial losses entailed or humiliation suffered.

A typical example of HUD's inability to utilize title VIII to satisfy a minority complainant is cited in the recent report of the General Accounting Office:

"On January 8, 1976, HUD decided to resolve a rental discrimination complaint against an apartment manager. The black complainant had used a white friend as a tester and established unequal treatment. The respondent, however, was reluctant to discuss conciliation with HUD and referred the matter to her lawyer. The lawyer received a copy of HUD's proposed conciliation agreement, but HUD reported that when they tried to follow up on the agreement he did not respond to their phone calls. On June 25, 1976, HUD closed this complaint as an unsuccessful attempt to conciliate." (Stronger Federal Enforcements Needed to Uphold Fair Housing Laws, Report to Congress by the Comptroller General of the United States, February 2, 1978.

What this case typifies is HUD's ineffectiveness in the absence of enforcement powers. What it does not typify is the protracted time span between filing and termination. The six months that ensued in the above cited case seem a model of efficiency compared to the numerous cases that drag on for a year or two.

Procrastination and unsatisfactory termination—this image of Title VIII explains in large measure why such a small number of complaints are filed with HUD relative to the large number of discriminatory acts which continue to be perpetrated.

It is NCDH's considered opinion that Title VIII, as currently written, lacks the enforcement authority necessary to realize in the life of the nation's minorities the policy, set forth in the Act, "to provide, within constitutional limitations, for fair housing throughout the United States."

The product of legislative compromise, Title VIII was adopted with many deficiencies, the most glaring of which is reliance upon a conciliation procedure to secure compliance by respondents to complaints filed under the law. It limits those charged with enforcement to say to the accused violator "come, let us conciliate, and if we fail to persuade you to obey the law, your victim might sue you—provided he has funds to engage a lawyer."

Presently nearly one-half of the respondents to complaints who reach the conciliation stage remain in non-compliance when conciliation efforts are terminated; this despite the fact that only some 20 percent to 30 percent of complaints received reach the conciliation stage, most being eliminated by HUD after investigations or are not pursued by complainants.

If it were not for the possibility of court action by the victim after unsuccessful conciliation, there would be far fewer successful cases of conciliation. This conclusion is supported by NCDH's experience in trying to make Title VIII work. An outstanding example is the complaint against the development subsidiary of a major corporation, engaged in racially discriminatory advertising of its leisure and retirement community in Florida. After the complaint was filed with HUD in 1971 by a metropolitan fair housing center, HUD's efforts at conciliation were unsuccessful during some three years of legal sparring. However, when NCDH attorneys filed the case in Federal Court, the respondent corporation agreed to a consent order within three months. The consent order resolved to the satisfaction of the complainants all the issues raised in the original complaint to HUD which the respondents had resisted during the years of conciliation efforts.

The feebleness of concilation as an enforcement tool has caused HUD to place heavy emphasis upon such voluntary compliance efforts as marketing agreements, negotiated with the real estate and homebuilding industries to induce their observance of Title VIII. The increasing commitment of HUD's program efforts to effect voluntary compliance agreements beginning in 1974 caused NCDH to press for amending Title VIII to provide for stronger enforcement options. In testifying on the ineffectiveness of voluntary agreements to secure law enforcement, before your Subcommittee on Civil and Constitutional Rights in March 1976, NCDH President Robert C. Weaver suggested that it was time for Congress to review progress under Title VIII in order to determine whether the legislation is adequate to achieve the goals enunciated by Congress. We are delighted that there has been response in both houses of Congress in the form of proposed amendments that would strengthen HUD's enforcement capability.

We are pleased to endorse the amendments to Title VIII contained in H.R. 3504, now before this subcommittee for hearing. We favor its provisions for the coverage of additional categories of housing (specifically three or fewer houses under single ownership); empowering the Secretary of HUD to utilize administrative enforce-

ment proceedings or to institute civil action in enforcing rights secured by Title VIII; removing the limitation upon award of attorney's fees to plaintiffs financially unable to pay them; increasing to $10,000 permissible award of punitive damages; permitting courts to award damages to victims of discrimination in pattern and practice suits; strengthening Title VIII prohibitions of redlining and specifically adding insurance redlining to its prohibitions; protecting housing for low and moderate income from discrimination by local jurisdictions' utilization of zoning and other land use controls to exclude such housing because of governmental assistance or race or color of proposed occupants; and to strengthen the protection from coercion and intimidation of those seeking to exercise their Title VIII rights.

The logic of these amendments and their urgency, if we are to make good on the promise set forth in Title VIII, is underscored by every serious study of the effectiveness of the statute. I refer to the studies of the U.S. Commission on Civil Rights, the General Accounting Office, and of HUD itself.

Enactment of these amendments and their faithful and efficient execution would in time reverse the present lack of faith in Title VIII procedures by so many minority persons seeking remedies for discrimination in housing. It is the view of NCDH that such increased capability in enforcement would not only increase the credibility of fair housing law in the eyes of actual or potential victims of discrimination and, thereby, increase their recourse to complaint processes, but would also reduce the incidents of discrimination by conveying to likely discriminators an awareness of the dangerous folly of such practices.

The argument for such improved enforcement can be documented now in a way not possible when Title VIII was being debated in Congress ten years ago. The intervening time has provided a vast amount of experience in Federal fair housing enforcement that permits us to pinpoint the problems and prescribe more exact remedies.

The climate of public opinion has also become more favorable to fair housing during this ten-year period. When whites were asked in 1968 how they would react to having a black family with aobut the same income and education as next-door neighbors, only 46 percent said they "would not mind at all." In a recent New York Times/CBS News Poll, the percentage giving the same answer to this question went up to 66 percent. This should encourage favorable consideration of amendments to Title VIII to strengthen enforcement.

BACKGROUND INFORMATION AND INITIAL FINDINGS

OF THE HOUSING MARKET PRACTICES SURVEY

* * * *

This material was prepared for release by the
Department of Housing and Urban Development.
It includes the initial findings of the Housing
Market Practices Survey.  The survey data were
collected by the National Committee Against
Discrimination in Housing under contract number
H-2551 with HUD.  Analysis of the data is being
performed by the Division of Evaluation in HUD's
Office of Policy Development and Research.
Initial findings were presented at the National
Fair Housing Conference, sponsored by the
National Committee Against Discrimination in
Housing in cooperation with the U. S. Department
of Housing and Urban Development -- Shoreham
Americana Hotel, Washington, D. C., April 17, 1978.

Material prepared by:  Frederick J. Eggers, Director, Clifford E. Reid,
John C. Simonson, and Ronald E. Wienk - Division
of Evaluation, Office of Research, and by
Ruth Limmer - Office of the Assistant Secretary,
Policy Development and Research, U. S. Department
of Housing and Urban Development.

BACKGROUND INFORMATION AND INITIAL FINDINGS
OF THE HOUSING MARKET PRACTICES SURVEY


On Monday, April 17, 1978, Secretary Patricia Roberts Harris
addressed participants in the National Fair Housing Conference held
at the Shoreham Americana Hotel in Washington, D. C.. The conference
was arranged and sponsored by the National Committee Against Discrim-
ination in Housing (NCDH) in cooperation with the Department of
Housing and Urban Development and marked the tenth anniversary of
passage of the Civil Rights Act of 1968. The Secretary's speech con-
tained some of the initial findings of a major HUD-sponsored study
of racial discrimination in housing, a study which became known as
the "Housing Market Practices Survey." Both the speech and the study
were consistent with the theme of the conference: "Ten Years of
Federal Fair Housing Law: The Record and the Challenge."

The findings announced by Secretary Harris were presented in
greater detail in a session immediately following her address. The
presentation was made by Dr. Raymond J. Struyk, Deputy Assistant
Secretary for Research, and by Dr. Frederick J. Eggers, Director of
the Evaluation Division, both of HUD's Office of Policy Development
and Research. Assisting in the presentation were Dr. Clifford E.
Reid, and Ronald E. Wienk of the Evaluation Division. George
Schermer, who was Project Director for the NCDH team on the Housing
Market Practices Survey, served as moderator for the session.

The attached materials were distributed at the conference and
complement the oral presentation of initial findings. They are not
designed to stand alone as a formal announcement of findings, and
readers who were not present at the session may have difficulty
interpreting the results. The Department will release a full
description of the project by June and subsequent findings of the
study later this year. These materials serve only as a prelude to
the more comprehensive reports to be issued as further analysis of
the data is completed.

Office of Policy Development and Research
Department of Housing and Urban Development

The Fair Housing Evaluation -- A Background Paper

In June and July 1977, in 40 metropolitan areas across the country,
300 blacks and 300 whites, in pairs, shopped for housing advertised in
their local newspapers.  Their task was not to rent or buy but to gather
information for the Department of Housing and Urban Development, which
wanted:

- o  to measure the impact of the various fair-housing enforce-
  ment activities;

- o  to learn as much as possible about the extent of
  discrimination in American housing;

- o  to learn as much as possible about the form that
  discrimination takes;

- o  to determine a baseline measure of discrimination against
  which all future studies can be compared.

How the Answers Were Obtained

Tests of housing discrimination have been made before, and if one
is not concerned with uniformity or statistical reliability, they are
rather easily accomplished.  A member of a minority group goes into a
rental agency or real estate office, asks to look at housing appropriate to
the needs of his or her family, notes the response, and leaves.  Shortly
after, a white follows the same procedure, asking for precisely comparable
housing.  The observable difference in treatment, and in availability
of housing, is the mark of discrimination.

In the most general way, that was the procedure followed here,
EXCEPT:

o  The locations chosen for audits were selected from Standard
Metropolitan Statistical Areas (SMSAs) having central cities with at
least an 11 percent black population by a form of stratified random
sampling called "controlled selection."

o  Altogether, 40 sites were chosen -- from Boston in the
east to Vallejo in the west, from Ft. Lauderdale in the south to
Milwaukee in the north.  For the purposes of research, in each of
five representative SMSAs, a large number of audits were made,
for a total of 400 in home sales and 600 in apartment rentals -- a
thousand in all.  For evaluation and baseline purposes, a smaller
number of audits (usually 30, but in the larger SMSAs 40 or 50)
were made in the other 35 sites -- 1,255 in sales, 1,009 in rentals.
Grand total for the entire evaluation:  3,264.

o  The newspaper ads to which the auditors responded were selected randomly, in Washington, D.C., following methods carefully devised to assure that the selection procedures were identical for all 40 sites.

o  The auditors, selected from their own SMSAs to hold down travel costs and because they would be familiar with the conventions of the local housing markets, were paired to form credible, well-matched teams.  Most auditors were between 25 and 40 years old and looked to be of middle-income, white collar status.  Before going on their first audit, they were required to take extensive training (including role-playing and practice audits), during which they practiced filling out the all-important audit forms (the rental form had 37 questions; the sales form 33).

o  Instead of auditing only those sales and rental agencies suspected of discrimination -- a traditional practice and an excellent means of gathering evidence for litigation under Title VIII of the Civil Rights Act of 1968 -- the HUD audit chose randomly from all rental and sales agencies in a location.  There was no attempt at entrapment, and auditors were carefully selected and trained to insure the ojectivity required for this research project.

o  Finally, the audit procedures were debugged following a two-week pretest in Cincinnati in early 1977.

Determinants of Discrimination

The teams went out only once in response to each ad; they did not follow up.  But even in a single visit sales and rental agents can find many ways to discriminate against blacks:*

o  Most significantly, agents can simply deny that a house or apartment is available.

o  Agents can treat blacks less courteously than whites.  (So auditors provided information about how they were treated:  How long were they made to wait?  How were they greeted?  Were they offered a cigarette?  coffee?  literature to examine?)

o  Agents can ask for more background information from blacks than whites:  their income, assets, number of children, references....

---

*By selecting only blacks in this study, HUD does not mean to suggest that it is unconcerned about discrimination against other minorities. The limits of the audit were determined by costs and time and the levels of complexity that could be dealt with simultaneously.  We also note that the determinants of discrimiantion developed in this evaluation are directly transferable to future audits examining unfair treatment toward women, for example, or Hispanics.

o Agents can themselves provide less information to blacks about the availability of rental units or, in housing sales, about mortgage financing, down payments, going interest rates....

o Agents can expect blacks to meet more, and more stringent, terms and conditions: rent, credit checks, length of lease....

o Agents can steer blacks (and whites) into particular neighborhoods and away from others.

This fair-housing audit, the largest ever attempted in America, has collected exhaustive data on all these forms of differential treatment in both the sales and rental markets. HUD is now in process of analyzing the remaining items.

What Else Can Be Learned

Obviously the audit forms include questions about dwellings and personal characteristics. (How many houses were you invited to inspect? Did the agent request any information about your income? Your spouse's income? etc.) But the audit forms also ask, among other things, about:

o the age, sex, and race of the housing agents;

o the price range and amenities of the houses shown;

o the rent and number of bedrooms of the apartments shown;

o the form used to enter the auditor's name on the waiting list (printed form? standard-sized file card? back of envelope?)

These data will provide important ancillary information. From them we may also find new, useful keys to the nature of housing discrimiantion. For example:

o We may be able to determine that price differentials or segregation indices can serve as proxy for racial discrimination, or

o We may be able to predict degrees of discrimination because they correlate with, say, the size and number of employees in a rental agency, or

o We may be able to determine whether characteristics of the housing agent correlate with the differential behavior he or she exhibited.

And because this study covers 40 SMSAs, we have, or soon will
have, figures to show regional and metropolitan levels of discrimination.
That is, we will be able to document just how effectively the Fair
Housing Act has been enforced around the country.

Calendar of Future Reports

| | |
|---|---|
| Late May | - Predicting race on the basis of treatment |
| | - Correlating measured discrimination with measured segregation |
| July | - Identifying factors which increase the probability of encountering differential treatment |
| Late August | - More intensive analyses of testing data, including steering |
| | - Assessing effectiveness of anti-discriminatory activity |
| Late September | - Exploring linkage between behavior and attitudes |
| Late October | - Case studies of differential treatment in housing |

Why the Results Can Be Trusted

The slogan of the evaluation teams was: "There may be forty
different ways to conduct an audit, but in this project there is
only one correct way" -- the point being that the audits were as
controlled and as uniform -- and therefore as unassailably trust-
worthy -- as humanly (and computerly) possible.

Once its evaluation design is refined, the reliability of an
audit depends on a number of variables. Let us look first at:

Selecting Agencies to Audit: After inapropriate categories
were eliminated (boats for sale, mobile home sales, for sale by
owner, duplexes for rent...), all the housing ads from, usually, the
Sunday classified section of the local newspaper were numbered con-
secutively. The total number, together with the size of the sample
required, was fed into a computer to obtain a set of random numbers. Ads
with corresponding numbers then were translated into the representative
sample of rental and sales offices which the auditors visited. The
entire process was handled in Washington to eliminate any local
variations or biases.

Confidentiality: An audit that is discovered in process is in danger of becoming useless from that moment on. To avoid any hint that an audit was being carried out in the community, prospective auditors were not told what the job was about until the second interview, and both those who were finally selected and those who weren't were asked to remain mum about the audit. They might tell their spouses, but if questioned by friends, they were to temporize about "market research."

The auditor's manual was to be treated as confidential, and under no cirumstances was it or the audit form to be taken into the agent's office or left in an unlocked car.

Confidentiality was to be maintained until after the first findings were released -- that is, until noon Monday, April 17th. Only then will open discussion be permitted.

Despite this care, we suspect that in two locations (out of 40) the audit was discovered. In one site, a highly publicized fair-housing case was being heard simultaneously; it apparently caused at least some agents to suspect an audit. In the other location, an auditor was recognized as such. Analysis of data collected before and after the presumed detection will tell us whether agents behaved differently as a result. We predict they did not because in both locations auditing is frequent; one more suspected audit should make no difference in the behavior of seasoned real estate and rental agents.

## Recruiting and Selecting Auditors

The qualifications for auditors were credibility, reliability, prior experience as a home- or apartment-seeker, or experience as a salesperson or amateur actor. (Professional actors were discouraged; according to project directors, professionals tend to overact.)

The auditors were also to be low-profile, unobtrusive types, so that they would not cause conversation among agents or be recognized as, say, civil rights activists -- people who might be expected to participate in an audit. The whole point was to avoid anyone whose cover might be blown.

Age was also a factor in choice. Although an audit might include a couple of quite young or elderly people, most of the auditors were between the ages of 25 and 40.

Finally, they had to look unambiguously black or white.

Because they were pretending to be bona fide buyers or renters, auditors were expected to pattern themselves on "typical" consumers of

the units their audit assignments required them to ask about. Beyond that, the audit supervisor, who made the assignments, was careful to avoid sending someone who looked mature and middle class to inquire about rental housing in a student neighborhood; similarly, a young person might rouse suspicion if sent to examine property only affordable by an upper-income family.

Pairing: Having recruited and selected them, auditing supervisors -- one in each SMSA -- were responsible for pairing the auditors. Pairs were matched for age, sex, availability, experience, appearance, and apparent socio-economic status.

Training: Each auditor was given a 37-page instructional manual to read through before coming to the first training session. In it was written what their supervisors would repeat: that the audit was part of a nationwide research project to measure discriminatory market behavior. To that end, their work had to be conducted in strict accordance with the project's specifications.

No one was permitted to do an actual audit before he or she had (a) read the manual, (b) attended the six-hour training session, (c) performed two practice audits, one in sales and one in rental, and (d) participated in a debriefing and review session. Auditors earned $50 for completing the training course, but did not receive the money until after they had completed a minimum of assigned research audits. (They were paid for each completed audit by the number of units inspected, receiving between $10 and $19 per audit.)

Auditors were given to understand the importance of comparability. Not only had they to match their auditing partner in every way but race, but they also had to record their information in ways that matched teams in all the other sites across the country. Great emphasis was laid on filling out the audit forms "fully and accurately immediately after leaving the real estate or rental office," and on completing the forms independently. Although team members were to work in tandem, they were never to discuss the filling out of an actual audit form.

They were told to avoid asking questions about race or racial policy. Comments by agents having racial implications were to be ignored (but recorded on the audit form after the interview was over). If the comments were so blatant that they could not be overlooked, the auditor was allowed to respond with: "I see what you mean" or "Is that so."

Auditors were not to visit agents in neighborhoods where they might be recognized. If they were recognized by someone in the office, or by another seeker after housing, they were provided with cover

stories: Should the friend or agent say, "Patty, I didn't know you were looking for a house," the auditor replies, "I didn't think I was myself until just a day or two ago," or "Fred got a raise and we decided to look for something nicer," or "We decided that Donna needed a better school." On the whole, however, auditors were trained to meet the unexpected by developing their own cover stories, ones that felt comfortable and were close enough to their own lives to sound likely.

Actual Audit

No more than two or three audits were done in any one day to guard against carelessness in completing the audit form. Over and over, supervisors stressed the need, in filling out the forms, for accuracy and completeness. Finally,

> Remember, everything that transpires, every bit of informa-
> tion you obtain is important and should be recorded.
> However, the two most important pieces of information...are
> the precise address and prices (rents) of houses (apartments)
> suggested to you as serious possibilities.

(Addresses were then translated into census tract designations for the purpose of data storage and analysis, especially on steering as a method of discrimination.)

Sales Audit: The white goes first; the black member of the team follows the next day (maximum elapsed time: 32 hours).

Apart from the order of appearance and race, both members of the team proceed in the same fashion: they explain what they're interested in, asking for the same size, price range, and neighborhood as specified on their assignment sheet. If the requested housing isn't available, they ask for alternatives.

If handed a listing of available houses and asked to choose, both are to ask the salesperson to make the recommendations. If site visits are suggested, they are to accept -- the assumption is that auditors will inspect three houses in each audit visit -- and examine the house in the conventional home-seeker's way: checking, looking, asking questions.

If it becomes necessary to break off the audit because of an especially zealous or indefatigible agent, testers give one of the specified excuses: "Sorry, I must get home to the children," or "Before I go further, I should discuss what I've seen so far with my (spouse)."

If an agent follows up later, another set of terminating comments are provided, ranging from the thanks-but-we've-found-something-else to "we've changed our minds."

Rental Audit: The black team member goes first; the white follows within the hour. Both follow the scenario set out on their assignment sheet. If what the auditor requests is no longer available, (s)he is expected to switch requirements. If the efficiency apartment isn't available, for example, (s)he asks for a one-bedroom. If the one-bedroom is first choice and is no longer available, (s)he asks for two bedrooms. If no three is available, (s)he asks for two, and so forth.

If the second request is not available, the auditor asks what is available. If the answer is nothing, the auditor leaves, after asking:

-- Is there a waiting list?

-- How long will I have to wait?

-- May I see a model apartment?

When inspecting apartments, auditors act natually, inspect the unit as if they were authentically interested in renting it, ask about anything that hasn't been volunteered (terms of the lease, security deposit, etc.), and record what the agent says about application procedures, credit checks, and other terms and conditions.

Visible note-taking on such matters is expected. But auditors must not begin to fill out the official audit form until they've left the agent's environs; that is to guard against being observed and the audit detected.

Supervision of Research

The idea for this project originated in HUD's Office of Policy Development and Research. This Office, headed by Assistant Secretary Donna E. Shalala, is responsible for evaluating major ongoing Departmental programs.

As a beginning, the Office commissioned four papers to recommend how a fair-housing evaluation might best be done. The Office then subjected the papers to intense scrutiny by experts within and outside the Department, chose one approach, and let a competitive contract to supervise the research. The contract was won by the National Committee Against Discrimination in Housing -- executive director, Edward L. Holmgren, project director, George Schermer. The contractor then selected six regional coordinators, who had responsibility for from five to eight

audit sites (and supervisors). They in turn selected sponsoring local organizations and a qualified audit supervisor in each SMSA. It was these audit supervisors, one in each of the 40 sites, who recruited and selected auditors, formed the matching teams, conducted the training, assigned visits, and checked the completed audit forms.

In addition, the National Committee subcontracted for technical and statistical services with J. W. K. International and from Sidney Hollander Associates. Retained as consultants were Juliet Saltman, professor of sociology, Kent State University; Joseph Battle, housing consultant, Cleveland; Charles Foreman, National Committee Against Discrimination in Housing; Kale Williams and John Woltjen, Leadership Council for Metropolitan Open Communities, Chicago; and Eunice and George Grier, housing consultants, Washington.

HUD's in-house staff, in the Office of the Assistant Secretary for Policy Development and Research, is headed by Fred Eggers of the Division of Evaluation. The HUD research team consisted of Ron Wienk, John Simonson, and Clifford Reid. Dr. Eggers' team was also supported by consultants. Technical and statistical services come from HUD statisticians and from outside sources, especially from Edgar Olsen, University of Virginia, and George Caldwell, formerly of J. W. K. International. Auditing know-how was provided by the staff of HUD's Office of Fair Housing and Equal Opportunity, by the Department of Justice's Office of Housing, and, among others, by Barton Smith of the University of Houston, who, with Peter Mieszkowski, wrote the HUD-commissioned paper that originally proposed the audit approach to this evaluation.

April 16, 1976

STUDY OBJECTIVES

- Measure the extent of discrimination

- Identify discriminatory tactics

- Determine what factors affect the
  probability of encountering discrimination

- Assess the effectiveness of anti-discrimination
  activities

ADVANTAGES OF TESTING AS A RESEARCH TOOL

- Direct observation of discrimination

- Individual observations

- Replicable technique

MAGNITUDE OF STUDY

|  | RENTAL | SALES |
|---|---|---|
| 5 in-depth sites | 120 tests | 80 tests |
| 35 surface sites | 30 tests | 30-50 tests |
| Total number of useable tests | 1609 | 1655 |

IMPLEMENTATION STEPS

- Development of testing procedures & forms

- Pilot test

- Selection of sites

- Selection and training of testers

- Selection of firms to be .tested

- Test and record treatment

- Analysis of results


LIMITATIONS & QUALIFICATIONS

- Results are preliminary

- More intensive analysis yet to come

- Differential treatment vs discrimination

- Testing cannot detect all forms of discrimination

- Newspaper ads for sampling

LEVEL OF DISCRIMINATION

Rental or real estate agents found discriminating

      Rental    29.1%

      Sales    21.5%

Impact on blacks -- probability of encountering discrimination when
housing search includes visits to four agents

      Rental    75%

      Sales    62%

RENTAL HOUSING MARKET
MEASUREMENT OF DIFFERENTIAL TREATMENT


HOUSING AVAILABILITY
(PERCENT)[1]

| | WHITE FAVORED | TREATED EQUALLY | BLACK FAVORED |
|---|---|---|---|
| APARTMENT AVAILABILITY* | 28 | 60 | 12 |
| FIRST OR SECOND CHOICE* | 3 | 97 | 0 |
| APARTMENTS VOLUNTEERED* | 41 | 45 | 15 |
| APARTMENTS INSPECTED* | 28 | 56 | 16 |
| WAIT LIST* | 38 | 42 | 21 |

[1] The percentage may not add to 100% because of rounding error.

* Statistically significant at the .01 level.

SALES HOUSING MARKET
MEASUREMENT OF DIFFERENTIAL TREATMENT

HOUSING AVAILABILITY
(PERCENT)

|  | WHITE FAVORED | TREATED EQUALLY | BLACK FAVORED |
|---|---|---|---|
| AVAILABILITY OF HOUSING REQUESTED* | 22 | 69 | 9 |
| DID AGENT OFFER YOU A MULTI-LIST DIRECTOR | 16 | 68 | 16 |
| DID AGENT OFFER OTHER LISTING | 12 | 77 | 11 |
| NUMBER OF HOUSES AGENT SUGGESTED* | 52 | 23 | 25 |
| NUMBER OF HOUSES INVITED TO INSPECT* | 46 | 24 | 30 |
| NUMBER OF HOUSES INSPECTED* | 41 | 33 | 26 |

\* Statistically significant at the .01 level.

AGGREGATE MEASURE OF DISCRIMINATION


HOUSING AVAILABILITY
(PERCENT)


|          | WHITE FAVORED | TREATED EQUALLY | BLACK FAVORED | DIFFERENCE |
|----------|---------------|-----------------|---------------|------------|
| Rental*  | 49.4          | 30.3            | 20.3          | 29.1       |
| Sales*   | 55.5          | 10.5            | 34.0          | 21.5       |

*Statistically significant at the .01 level.


IMPORTANCE OF FINDINGS ON EXTENT OF DISCRIMINATION

Estimates are conservative:

- Steering not analyzed

- Newspapers as basis for sample

- Subtracted "black favored" from "white favored"

Cumulative effect on choice:

- Probability of encountering discrimination in housing searches
  involving visits to more than one agent or broker

- threat of potential discrimination discourages blacks

AGGREGATE MEASURE OF DISCRIMINATION

HOUSING AVAILABILITY
(PERCENT)

RENTAL HOUSING MARKET

|  | WHITE FAVORED | TREATED EQUALLY | BLACK FAVORED | DIFFERENCE |
|---|---|---|---|---|
| NATIONAL* | 49.4 | 30.3 | 20.3 | 29.1 |
| Northeast* | 45.1 | 30.7 | 24.1 | 21.0 |
| North Central* | 50.1 | 33.0 | 16.9 | 33.2 |
| South* | 52.5 | 28.5 | 19.0 | 33.5 |
| West* | 51.0 | 31.7 | 17.2 | 33.8 |

SALES HOUSING MARKET**

|  | WHITE FAVORED | TREATED EQUALLY | BLACK FAVORED | DIFFERENCE |
|---|---|---|---|---|
| NATIONAL* | 55.5 | 10.5 | 34.0 | 21.5 |
| Northeast* | 52.0 | 8.2 | 39.8 | 12.2 |
| North Central* | 67.1 | 5.9 | 27.0 | 40.1 |
| South* | 51.8 | 14.6 | 33.7 | 18.1 |
| West* | 52.4 | 12.1 | 35.5 | 16.9 |

* Statistically significant at the .01 level

** Does not include discrimination through steering

OTHER FINDINGS ON DIFFERENTIAL TREATMENT

No substantial differences on terms and conditions for apartments
(e.g., rents, leases, & security deposits)

No substantial differences on common courtesies

Real estate agents inquire about blacks' financial status
more frequently

Rental agents volunteer information more frequently to whites


RENTAL HOUSING MARKET
MEASUREMENT OF DIFFERENTIAL TREATMENT


TERMS AND CONDITIONS
(PERCENT)

|  | WHITE FAVORED | TREATED EQUALLY | BLACK FAVORED |
|---|---|---|---|
| MONTHLY RENT* | 9 | 86 | 5 |
| LEASE REQUIREMENTS | 5 | 90 | 5 |
| SECURITY DEPOSIT* | 7 | 84 | 9 |

1  The percentage may not add to 100% because of rounding error.

*  Statistically significant at the .01 level.

RENTAL HOUSING MARKET
MEASUREMENT OF DIFFERENTIAL TREATMENT

COURTESY
(PERCENT)[1]

|  | OCCURRED FOR WHITE ONLY | OCCURRED EQUALLY | OCCURRED FOR BLACK ONLY |
|---|---|---|---|
| DID AGENT INTRODUCE SELF* | 14 | 76 | 10 |
| DID AGENT SHAKE YOUR HAND | 3 | 93 | 4 |
| DID ANYONE OFFER CIGARETTES, ETC. | 1 | 97 | 2 |
| DID ANYONE OFFER LITERATURE* | 10 | 77 | 14 |
| DID AGENT INVITE YOU TO CALL BACK* | 22 | 65 | 14 |

1 The percentage may not add to 100% because of rounding error.

* Statistically significant at the .01 level.

SALES HOUSING MARKET
MEASUREMENT OF DIFFERENTIAL TREATMENT

COURTESY
(PERCENT)[1]

|  | OCCURRED FOR WHITE ONLY | OCCURRED EQUALLY | OCCURRED FOR BLACK ONLY |
|---|---|---|---|
| DID THE AGENT INTRODUCE SELF* | 19 | 73 | 9 |
| DID THE AGENT SHAKE YOUR HAND | 15 | 68 | 17 |
| DID ANYONE OFFER CIGARETTES, ETC.* | 18 | 71 | 11 |
| DID ANYONE OFFER LITERATURE* | 17 | 68 | 15 |
| DID AGENT INVITE YOU TO CALL BACK* | 11 | 84 | 6 |

1  The percentage may not add to 100% because of rounding error.

*  Statistically significant at the .01 level.

RENTAL HOUSING MARKET
MEASUREMENT OF DIFFERENTIAL TREATMENT


INFORMATION REQUESTED
(PERCENT)[1]

|  | REQUESTED OF WHITE ONLY | REQUESTED EQUALLY | REQUESTED OF BLACK ONLY |
|---|---|---|---|
| INCOME* | 2 | 95 | 4 |
| EMPLOYMENT* | 8 | 82 | 10 |
| REFERENCES* | 2 | 97 | 1 |
| PHONE NUMBER* | 7 | 85 | 9 |
| ADDRESS* | 4 | 88 | 7 |

1  The percentage may not add to 100% because of rounding error.

*  Statistically significant at the .01 level.

SALES HOUSING MARKET
MEASUREMENT OF DIFFERENTIAL TREATMENT

INFORMATION REQUESTED
(PERCENT)[1]

| | REQUESTED OF WHITE ONLY | REQUESTED EQUALLY | REQUESTED OF BLACK ONLY |
|---|---|---|---|
| INCOME* | 8 | 70 | 23 |
| SPOUSE'S INCOME* | 10 | 67 | 24 |
| DOWN PAYMENT CAPABILITY* | 19 | 57 | 25 |
| EMPLOYER'S NAME* | 10 | 75 | 16 |
| SPOUSE'S EMPLOYMENT* | 17 | 60 | 24 |
| PHONE* | 14 | 74 | 12 |
| ADDRESS* | 17 | 59 | 24 |

1   The percentage may not add to 100% because of rounding error.

*   Statistically significant at the .01 level.

RENTAL HOUSING MARKET
MEASUREMENT OF DIFFERENTIAL TREATMENT

INFORMATION VOLUNTEERED
(PERCENT)[1]

|  | VOLUNTEERED TO WHITE ONLY | VOLUNTEERED EQUALLY | VOLUNTEERED TO BLACK ONLY |
|---|---|---|---|
| LEASE REQUIREMENTS* | 21 | 62 | 17 |
| SECURITY DEPOSIT* | 24 | 59 | 17 |
| WAIT LIST* | 25 | 59 | 17 |
| APPLICATION** | 16 | 67 | 18 |
| CREDIT CHECK** | 14 | 71 | 16 |

1  The percentage may not add to 100% because of rounding error.

*  Statistically significant at the .01 level.

** Statistically significant at the .05 level.

NEXT STEPS

- More extensive analysis of testing data,
  including steering

- Predicting race on the basis of
  treatment

- Correlation between measured discrimination
  and measured segregation

- Identifying factors which increase the
  probability of encountering differential
  treatment

- Assess effectiveness of anti-discriminatory
  activity

- Explore linkage between behavior and
  attitudes

- Case studies of differential treatment in housing

IMPORTANT BY-PRODUCTS

- Baseline on discrimination

- Stimulate local fair housing group activity

- Advance the science of testing

- Possible basis for enforcement

137

STANDARD METROPOLITAN

STATISTICAL AREAS

1. Akron, Ohio
2. Albany-Schenectady-Troy, NY
3. Asheville, NC
4. Atlanta, GA*
5. Boston, MA*
6. Canton, OH
7. Cincinnati, OH-KY-IN
8. Columbus, OH
9. Dallas, TX*
10. Dayton, OH
11. Detroit, MI
12. Fort Launderdale-Hollywood, FL
13. Fort Wayne, IN
14. Forth Worth, TX
15. Greenville, SC
16. Harrisburg, PA
17. Hartford, CT
18. Indianapolis, IN
19. Lawton, OK
20. Lexington, KY

21. Los Angeles- Long Beach, CA
22. Louisville, KY-IN
23. Macon, GA
24. Milwaukee, WI*
25. Monroe, LA
26. Nashville-Davidson, TN
27. New York, NY
28. Oklahoma City, OK
29. Paterson-Clifton-Passaic, NJ
30. Peoria, IL
31. San Bernardino-Riverside- Ontario, CA
32. Sacramento, CA*
33. Saginaw, MI
34. Savannah, GA
35. Springfield-Chicopee~Holyoke, MA-CT
36. Stockton, CA
37. Tampa-St. Petersburg, FL
38. Tulsa, OK
39. Vallejo-Napa, CA
40. York, PA

*In-Depth Sites

STANDARD METROPOLITAN

STATISTICAL AREAS

**NORTHEAST (8)**

Albany-Schenectacy-Troy, NY
Boston, MA*
Harrisburg, PA
Hartford, CT
New York, NY
Paterson-Clifton-Passaic, NJ
Springfield -Chicopee-Holyoke, MA-CT
York, PA

**NORTH CENTRAL(11)**

Akron, Ohio
Canton, OH
Cincinnati, OH-KY-IN
Columbus, OH
Dayton, OH
Detroit, MI
Fort Wayne, IN
Indianapolis, IN
Milwaukee, WI*
Peoria, IL
Saginaw, MI

**SOUTH (16)**

Asheville, NC
Atlanta, GA*
Dallas, TX*
Fort Lauderdale-Hollywood, FL
Fort Worth, TX
Greenville, SC
Lawton, OK
Lexington, KY
Louisville, KY
Macon, GA
Monroe, LA
Nashville-Davidson, TN
Oklahoma City, OK
Savannah, GA
Tampa-St. Petersburg, FL
Tulsa, OK

**WEST (5)**

Los Angeles-Long Beach, CA
San Bernardino-Riverside- Ontario, CA
Sacramento, CA*
Stockton, CA
Vallejo- Napa, CA

*In-Depth Sites

Mr. HOLMGREN. The passage of title VIII in 1968 marked a high point in the efforts to secure statutory protection of the rights of racial minorities in the housing market equal to that of all Americans.

Following the adoption of fair housing laws in over a score of States, enactment of title VIII marked the successful culmination of our effort to bring almost all the Nation's housing under statutory prohibition of racial discrimination. Regrettably, Congress' bold declaration in title VIII that "it shall be unlawful . . . to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in provision of services or facilities in connection therewith, because of race, color, religion, or national origin" was not accompanied by an equally bold grant of power to enforce the law.

Title VIII, with all of its shortcomings, has made a substantial impact on discrimination in housing. Gone are the blatant "white only" policies flouted by sellers and landlords before 1968. Gone is the obvious racial advertising of real estate. Though discriminatory practices are now more discreet, more camouflaged, driven underground, this, in itself, is a measure of progress, because resort to elaborate concealment makes discrimination sometimes less effective.

A vast residue of discrimination remains, however, in the daily operations of the housing market. This situation was documented by NCDH in a recent survey of the practices of nearly 3,200 real estate sales firms and rental agents in 40 metropolitan areas conducted under contract to HUD.

The study, very briefly, became a very important effort in attempting to assess the level of discrimination, the forms of discrimination, and the various types of discrimination that occurred in the search for the purchase of a property or the rental of an apartment. We used a time tested technique of auditing, or testing or shopping in which evenly matched teams of black and white persons, matched as to sex, family size, income, occupation and age, visited real estate offices and rental complexes seeking the purchase of a home or the rental of an apartment. From then on they simply took in the information that was provided them by the agent.

This was all reported on standardized forms and the data was then put on computer tape and analyzed by HUD. The survey, in brief, found that blacks responding to advertisements for rental units in a local daily newspaper, were discriminated against in 29.1 percent of their inquiries and when responding for advertisements for sales of homes, were discriminated against in 21.5 percent of their inquiries.

A look behind these statistics needs to be provided in order to give the real significance. If a black person's response to advertised units led him to inquire at four rental offices or four real estate brokers as is often the case in shopping the housing market, the probability of encountering discrimination would be 75 percent in the rental market and 62 percent in the sales market.

It should be noted that the findings released by HUD a few weeks ago from the survey data are very preliminary. This can possibly result, therefore, in an underestimate of the true extent of discrimination in what is now, and has been for a long time, a racially bifurcated housing market.

Since the essence of this market is segregation by race, its operational norms are often, if not always, governed by practices designed to provide housing for each race within areas or even within buildings in which it is already dominant or about to be.

This practice has long been characterized by the housing civil rights movement as steering, that is, the selective showing of housing to whites or blacks or other groups identified by race, religion, country of origin or sex in a manner designed to perpetuate or extend residential discrimination by those groups.

Steering is discrimination and therefore illegal under title VIII. It is probably the single most widely practiced form of racial discrimination in the sales market. It is also exceedingly difficult to identify and document. Our survey for HUD is, perhaps, the most thoroughly scientific recording of information on steering ever undertaken. The date on steering has not yet been analyzed by HUD and, therefore, is not reflected in the previously cited percentages of incidents of discrimination.

HUD's analysis measured differential treatment of the surveyed white and black auditors who called on brokers with response to ads. With reference to the apartment being offered as available, whites were favored in 28 pecent of the responses compared to blacks favored in 12 percent. In the remaining 60 percent, treatment of whites and blacks could not be differentiated. In other words, they got equal treatment.

In volunteering apartments for inspection, whites were favored in 41 percent of the responses compared to blacks in 15 percent with 45 percent equal. Again, in all of these figures the analysis of the black figure deducted from the whites favored to get the level of discrimination.

It is important to point out that steering has not been analyzed as yet and in many of the cases it is our conviction that where blacks have been favored, it is a result of the steering phenomenon. Let me give you an example.

In one city, Louisville, the same house was shown to both a white and a black tester. The black was offered the house at a price $2,500 less than the white was offered that same house. The reason for that was that it was a case of steering. It was a neighborhood in which the broker wanted to sell the black person because he was being steered to that and wanted to discourage the white person from buying that house, because it was in a racially changing area.

There are other figures which are all a part of the report which I have appended for the record, Mr. Chairman, and I won't go into those.

Until HUD's analysts can subject the foregoing generalized findings to an identification of the impact of steering, the most significant category in the generalized findings are not the extent to which one race is favored over another under circumstances that remain obscure, but the extent to which equal treatment is accorded to persons of every race. This is what the law of fair housing is about. This is the standard by which we must measure compliance. It is therefore shocking that after 10 years of title VIII, HUD's analysts report that equal treatment was accorded whites and blacks in only 30 percent of the responses in the rental market and in only 10 percent in the sales market.

The sharp difference between the rental and sales markets in percentages of equal treatment is highly important to note in the light of our previous explanation of the importance of steering as a factor in discrimination. It is well known that steering is most prevalent in the sales market by virtue of the fact that the inquiry about sales housing takes place in a broker's office and the agent can select housing for inspection by racial composition of neighborhood to which he wants to direct that person seeking housing.

Beyond the formal structure of the survey organization and beyond the computer printouts is the story of the impressions formed by the over 600 persons who conducted the audits in the 40 areas. Their narratives, I think, add a great deal of flesh and blood to the more arid, official social science accounting of what took place. A number of local accounts of auditing experiences were published in an article in our newsletter, Trends in Housing, a copy of which I have appended to my testimony.

The continued existence of widespread discrimination in the sale and rental of housing throughout the Nation appears, at first glance, to be contradicted by the relatively small number of complaints filed with HUD, never exceeding 4,000 per year. NCDH's close observation of the administration of fair housing laws by municipal and State agencies, as well as in the case of Federal fair housing law, has led us, and others familiar with the phenomenon, to the conclusion that effective enforcement results in an increased

volume of complaints, while ineffective enforcement results in just the opposite.

The rationale for this conclusion becomes readily apparent upon a brief analysis of cause and effect in the relationship of enforcement results to volume of complaints.

When the victims of discrimination who file complaints experience repeated delays and long drawn out and often repetitive conciliation hearings which terminate with little or no satisfaction to the complainant, the filing of complaints is perceived by an increasing proportion of the minority population as an act of futility.

As a consequence, even as an increasing number of minority persons discover the existence of fair housing law and its complaint process, a decreasing percentage of minority persons continue to consider the complaint process as a procedure likely to give them satisfactory redress.

Knowledge of the effectiveness or ineffectiveness of enforcement eventually becomes widespread throughout minority communities, both through published reports and by word of mouth. The growth of a negative attitude toward complaints of violations of fair housing law thus parallels and counteracts public information programs designed to make more minority persons aware of the law and the complaint process.

One of the variables in our study was to analyze the probable impact of a local fair housing group, a vigorous enforcement program either by HUD or the local agency empowered to enforce the law, and to compare that with other places where there were not similar kinds of activities.

While all of the data has not been analyzed yet, it is clear from the preliminary analysis, Mr. Chairman, that there is a profound difference that can be reported in places where there is vigorous activity either by local groups or by HUD itself. That is a varying impact throughout the country.

State and local fair housing enforcement programs have noted that the media's reporting of administrative or judicial decisions against brokers, rental agents or landlords stimulate the filing of complaints. Especially is this the case when punishment has included compensatory damage awards to the victim for financial loss or humiliation suffered.

It is our opinion that title VIII, as currently written, lacks the enforcement authority necessary to realize in the life of the Nation's minorities the policy, set forth in the act, "to provide, within constitutional limitations, for fair housing throughout the United States."

The product of legislative compromise, title VIII was adopted with many deficiencies which I think we all agree on, the most glaring of which is reliance upon a conciliation procedure to secure compliance by respondents to complaints filed under the law. It limits those charged with enforcement to say to the accused violator "come, let us conciliate, and if we fail to persuade you to obey the law, your victim might sue you—provided he has funds to engage a lawyer."

Presently nearly one-half of the respondents to complaints who reach the conciliation stage remain in noncompliance when conciliation efforts are terminated; this, despite the fact that only some

20 percent to 30 percent of complaints received reach the conciliation stage, most being eliminated by HUD after investigations or are not pursued by complainants.

If it were not for the possibility of court action by the victim after unsuccessful conciliation, there would be far fewer successful cases of conciliation.

The feebleness of conciliation as an enforcement tool has caused HUD to place heavy emphasis upon such voluntary compliance efforts as marketing agreements negotiated with the real estate and homebuilding industries to induce their observance of title VIII. The increasing commitment of HUD's program efforts to effect voluntary compliance agreements beginning in 1974 has caused NCDH to press for amending title VIII to provide for stronger enforcement options.

In testifying on the ineffectiveness of voluntary agreements to secure law enforcement before your Subcommittee on Civil and Constitutional Rights in March 1976, NCDH President Robert C. Weaver suggested that it was time for Congress to review progress under title VIII in order to determine whether the legislation is adequate to achieve the goals enunciated by Congress. We are delighted that there has been response in both Houses of Congress in the form of proposed amendments that would strengthen HUD's enforcement capability.

The logic of these amendments and their urgency, if we are to make good on the promise set forth in title VIII, is underscored by every serious study of the effectiveness of the statute. I refer to the studies of the U.S. Commission on Civil Rights, the General Accounting Office, and of HUD itself.

Enactment of these amendments and their faithful and efficient execution would in time reverse the present lack of faith in title VIII procedures by so many minority persons seeking remedies for discrimination in housing.

It is the view of NCDH that such increased capability in enforcement would not only increase the credibility of fair housing law in the eyes of actual or potential victims of discrimination and, thereby, increase their recourse to complaint processes, but would also reduce the incidents of discrimination by conveying to likely discriminators an awareness of the dangerous folly of such continued practices.

The argument for such improved enforcement can be documented now in a way not possible when title VIII was being debated in Congress 10 years ago. The intervening time has provided a vast amount of experience in Federal fair housing enforcement that permits us to pinpoint the problems and prescribe more exact remedies.

The climate of public opinion has also become more favorable to fair housing during this 10-year period. When whites were asked in 1968 how they would react to having a black family with about the same income and education as next door neighbors, only 46 percent said they "would not mind at all."

In a recent New York Times/CBS News Poll, the percentage giving the same answer to this question went up to 66 percent, two thirds of white respondents. This should encourage favorable consideration of amendments to title VIII to strengthen enforcement.

Mr. EDWARDS. Thank you very much, Mr. Holmgren.

We would like to now ask Mr. Friedman to give his testimony. Both testimonies fit together and with your permission we can ask you questions as a panel. Is that all right?

Mr. HOLMGREN. Fine.

Mr. DRINAN. Mr. Chairman, I have one question.

Mr. Holmgren, when you say steering, would that be covered by our amendments to title VIII?

Mr. HOLMGREN. Steering is, frankly, presently covered in title VIII, but I think that——

Mr. DRINAN. Are you proposing further legislation to ban steering?

Mr. HOLMGREN. No, we are not proposing further legislation because I think the legislation presently in title VIII does ban steering as a practice. I think it is in the enforcement and detection of steering which becomes important and the ability to find out the degree to which it is a problem in most instances can only now be determined by an assumption, or by having a test conducted to discover that this is going on.

But I don't think that additional legislation is necessary, Mr. Drinan, for dealing with that problem.

Mr. DRINAN. Thank you.

Mr. EDWARDS. I hope you will extend your compliments to the members of your committee who were involved in this excellent report and project.

Mr. HOLMGREN. Thank you.

Mr. EDWARDS. Our second witness today is Mr. Avery S. Friedman, Chief Counsel of the Housing Advocates, Inc., a Cleveland-based public interest law firm that has specialized in housing discrimination cases.

Mr. Friedman has earned his reputation as a highly respected expert in this field not only through his success in a number of significant lawsuits, but also through his extensive legal writings and addresses and community and professional involvement.

As a Federal fair housing practitioner I believe his perspective will be particularly useful to the subcommittee; effective law enforcement of civil rights laws has often depended on the efforts of the private bar. H.R. 3504 seeks to improve enforcement efforts in a number of ways and I am very pleased to have Mr. Friedman testify today on this subject.

Mr. Friedman?

### TESTIMONY OF AVERY S. FRIEDMAN, CHIEF COUNSEL, THE HOUSING ADVOCATES, INC.

Mr. FRIEDMAN. Mr. Chairman and members of the panel, I appreciate the opportunity to address the specific issues of Federal fair housing enforcement. I share with you a perspective of having gone through or being presently involved in over 60 Federal fair housing actions under title VIII and related statutes and, in addition, the experience of working with HUD in various fair housing enforcement agencies.

I hope to share with you that experience not only in terms of the proposed legislation but also in terms of comments previously sub-

mitted to you by Secretary Harris and Assistant Attorney General Days.

With respect to scope, by and large, while housing bias is practiced at all different levels, we find it most commonly occuring at the front-line, small owner-property manager level. Taken collectively, that element of the housing delivery system is a substantial portion of the housing market.

So, indeed, unless housing discrimination is addressed on the front-line level, it can never be eradicated. If minority home seekers, for example, secure entry in areas which are traditionally called nontraditional areas by obtaining their first apartment or first home not through a large management firm necessarily or a large real estate broker, then the path is set and other minority families will have the opportunity to enter into particular neighborhoods which perhaps had been previously all white and the stigma attached to that.

Housing bias is practiced as we have seen in our litigation by elements of lending institutions and appraisers. A point of reference, a case recently reported in the Northern District of Ohio, *Harper* v. *Union Savings Association,* in which the court acknowledged that the appraisal form itself designated neighborhoods on the basis of American, whatever an American neighborhood is, or a mixed neighborhood, whatever a mixed neighborhood is. These practices still go on. They still occur.

It would be easy and probably quite time consuming to laundry list the types of specific examples demonstrating the scope. Suffice it to say that housing discrimination, notwithstanding the 10-year existence of title VIII, is still pervasive. Simply put, at least in the private sector the primary way of eradicating racial discrimination in housing is through private litigation.

The Supreme Court discussed this in the *Trafficante* case at 409 U.S. 205 as the main generating force in combatting housing discrimination. Simply stated, if housing discrimination is made economically disadvantageous, it is not going to be practiced.

There still exists in this country an assumption, a myth, that by selling to minorities, renting to minorities, it is going to have a detrimental affect on property values. You can read changes in the code of ethics by the National Association of Realtors, by the American Society of Appraisers, changing the standard, but it is practiced in the field and we see it on a day-to-day basis.

We agree with the statement made by Justice Tom Clark sitting by designation in the United States Court of Appeals for the Seventh Circuit in 1974 when he said that access to housing, to use his language, was the most important domestic problem facing America today. Justice Clark particularly pointed out the greater Cleveland area as having aggravated conditions. We see these circumstances everyday.

Specifically, with respect to the proposed amendments, we disagree with the position taken by the Department of Justice with respect to the change in the attorneys' fees provision, that rather than the statute as it exists now, a prevailing plaintiff should secure costs and fees, that the modification of the statute providing for recovery of costs and fees to the prevailing party will indeed chill the interest of housing bias victims for fear that the inexperi-

ence and the very few lawyers in this field who perhaps want to get involved in the fair housing enforcement effort will not undertake the case for fears of racism in a jury or indeed in a district judge.

Because of the modification in that statute from prevailing plaintiff to prevailing party, that indeed may chill vigorous fair housing enforcement.

Second, we are very concerned with the new section 12 which provides that a civil action may not be instituted after a complaint is filed with HUD or during the time a complaint is filed with HUD. We believe, and the courts seems to uniformly hold except for one decision in the ninth circuit, that the Fair Housing Act and Congress intended in the enaction of this act to provide for concurrent remedies.

Indeed, by using HUD, the Federal mechanism, and by using the district courts, a victim should have various accesses to these very serious kinds of problems. By giving HUD, in effect, exclusive jurisdiction, you are stripping away from the housing bias victim direct access to the courts.

As a practical matter, in everyday fair housing enforcement the way it works by and large is simply this: A victim of housing bias, once he or she discovers it, will secure legal counsel pursuant to section 812(c) of the Fair Housing Act—an individual has the power to go directly into the United States Court.

Our experience has shown that a Federal district judge in the appropriate circumstance, particularly involving a small fair housing case, will consolidate a trial on the merits, indeed take care of the whole matter within 24 to 48 hours once the application for a temporary restraining order is filed.

With the modification of the statute, if an individual unknowingly goes to HUD and files a complaint at HUD, is he not precluded from this opportunity which now exists under the law?

We are very pleased with the proposed amendment noted in 813 (a) and (b) which provides for the recovery of costs for expert witnesses, for interlocutory orders. As a practical matter, when a housing bias victim goes to court and secures temporary relief, in order to pay for his expert witness or the court costs and the marshal's service and the related costs, that very money could have been the money that a bias victim could have used for his mortgage payment, a down payment or the first month's rent and security deposit on an apartment. But indeed the money goes to taking care of the U.S. Marshal. This interim cost provision may be very important in terms of practical fair housing enforcement.

We, of course, concur that modifying the statute to include protection of those hundreds of thousands of Americans who are handicapped is a vital, vital amendment. Many States, including Ohio, have provisions in the State law to protect handicapped individuals from housing bias. However, from a practical fair housing enforcement standpoint, there is a vast difference in civil rights sensitivities between the State courts and the Federal courts. Indeed, those hundreds of thousands of Americans who are afflicted with handicaps should have the same rights as minorities and as women.

On February 2, Secretary Harris manifested justifiable frustration at her agency in the failure of HUD to really do anything about fair housing. I concur with Mr. Holmgren and other witnesses who have held that HUD's fair housing enforcement efforts are simply inadequate.

The statute gives HUD no power, no practical power. The process of conciliation, persuasion after violation of the law, has not worked. It has not worked. Particularly, the large management firms and real estate firms know it. There is no economic incentive to comply with the law.

The U.S. Court of Appeals for the Seventh Circuit this year put it a little more graphically and they talked about HUD being a toothless agency, at least with respect to fair housing.

Granting these additional powers to HUD from a practical standpoint will be helpful to them. However, from the standpoint of a fair housing practitioner in the field, we believe it will have very little impact. The fact is that private litigation will be and will continue to be the main generating force. Cease and desist, administrative judges and the like may be helpful to HUD in terms of their spiritual strength, in terms of the agency's commitment to fair housing and we hope it works. We are very, very pessimistic that it will have much of a practical impact.

It is inconceivable to me how section 208 which grants an administrative judge damages can possibly withstand constitutional challenges. The U.S. Supreme Court in 1974 in *Curtis* v. *Loether* at 415 U.S. 189 set that issue to rest. If the legislation were modified to provide for civil penalties, perhaps it could withstand constitutional challenge. As written, I think it has problems.

Finally, based on a practical matter, the issue of damages should be in the hands of the jury. It should not be in the hands of an administrative judge, but a Federal judge. Although many of us were very reluctant to bring these cases to a jury, since the Curtis case in 1974—it was perhaps one of the most important developments in the fair housing area—because our experience has been that interracial juries or all white juries have been more outraged about housing bias than the most sensitive of Federal judges.

The result, the jury verdicts as a result of title VIII litigation have grown significantly. If anything at all, that is the most important deterrent effect to eradicate housing discrimination, substantial verdicts.

We think HUD's attention in fair housing, and we mean this from practical experience in working with HUD officials in the field, should be most directed to monitoring and guaranteeing performance of local and regional government under the Housing and Development act of 1974. Built into that act is a fair housing requirement, section 808.

Let HUD aggressively monitor local governments who are recipients of CDBG. The private administration is an area that will require aggressive private enforcement. HUD will have very little effect, even with the increased powers. Their priorities should be looking at the local and regional government, making sure that they comply with the law passed by Congress that local governments shall participate in affirmative fair housing.

Maybe on a day-to-day contact with victims of housing bias who are subjected to the most outrageous conduct, one would have to see it to understand it. The Justice Department and HUD often don't have the opportunity to see it. Specific example: *Bishop* v. *Peksoc*, a very recent case, 1976, management firm, interracial applicants, where the management firm actually stated that, "not only would housing not be available, but the way to solve the social problems of America is to send the niggers back to Africa." If you think that doesn't happen today, it does and you have to be in the streets in the enforcement process to understand it.

That kind of "pants down" vaudeville discrimination still exists and the only way it is stopped is through damage awards, making housing bias too expensive to practice.

We are astonished that Assistant Attorney General Days was noncommital in response to a question as to whether or not the punitive damage ceiling should be raised from $1,000 to $10,000. If *Bishop* v. *Peksoc*, which is at 431 F. Supp. 34, tells us anything, we should understand that kind of outrageous conduct goes on all over this country and indeed that ceiling should be raised to a more realistic figure.

In conclusion, at a time in our history when housing discrimination still exists and decent housing is a rare and very valuable commodity for black and white citizens of this country, access to housing becomes even more important, more important than when Justice Tom Clark talked about it being the most important domestic problem four years ago. It is even more of a problem.

If the effect of practicing discrimination can be made economically disadvantageous, and we think H.R. 3504 can accomplish that with some modification, then we think fair housing can be achieved. Understanding fair housing and understanding the law is the key to making it a reality.

Thank you very much.

[The prepared statement of Mr. Friedman follows:]

STATEMENT OF AVERY S. FRIEDMAN

SUPPLEMENTAL MEMORANDUM

*I. Introduction*

The purpose of this memorandum is to supplement a 36-page memorandum to the Subcommittee filed April 15, 1977 by invitation of Chairman Don Edwards.

With respect to the proposed amendments to the Federal Fair Housing Act (the Act hereinafter referred to as "Title VIII") incorporated in Title II of H.R. 3504, the Subcommittee has heard the testimony of two witnesses: On February 2, 1978, Patricia Roberts Harris, Secretary of the U.S. Department of Housing & Urban Development (HUD), representing HUD, offered comments on Title II; Drew S. Days, Assistant Attorney General for Civil Rights, representing the U.S. Department of Justice, testified on February 9, 1978.

While the testimony of both HUD and the Justice Department have been important, neither agency is involved in the day-to-day fair housing judicial enforcement mechanism.[1]

*II. The role of the Federal Government*

In *Trafficante* v. *Metropolitan Life Insurance Company*, 409 U.S. 205 (1972), the U.S. Supreme Court concluded that fair housing enforcement by HUD and the Justice Department has been "minimal." This conclusion was reaffirmed in the United States Civil Rights Commission's February, 1978 Report, The State of Civil

---

[1] Under Title VIII, HUD has no power to secure any relief for aggrieved persons in the courts. 42 U.S.C. § 3610. The Justice Department's jurisdiction in fair housing cases is generally limited to "pattern and practice" violations only. 42 U.S.C. § 3613.

Rights: 1977, at 16–18. While HUD-sponsored "Affirmative Marketing Agreements" and Justice Department consent decrees have been valuable in the development of understanding fair housing, in the absence of compliance monitoring, it continues to pay to discriminate.

The importance of HUD in the fair housing arena will *not* be in the private sector. The key to fair housing success by HUD will be through effective monitoring and grantee performance of Housing Assistance Plans (HAPs) under the Housing and Community Development Act of 1974, as amended, 42 U.S.C. Sections 5301, et. seq. While increased HUD powers of ceast-and-desist may contribute minimally to fair housing, the over-all bureaucratic effect may balance out its value. Failure of community development block grant (CDBG) recipients to comply with affirmative fair housing duties [2] mandates HUD to limit, enjoin or even recoup millions of dollars of federal funds or, alternatively, to induce local governments to address issues of potentially exclusionary land use practices in order to benefit from the CDBG program.

Accordingly, while increased powers under Title VIII may have some effect, we believe HUD's attention must be heightened to address fair housing in the public sector.

HUD must also coordinate efforts through private fair housing organizations in order to achieve meaningful fair housing. Greater Cleveland and Greater Akron groups have been successful in the federal courts in securing injunctive relief, a well as some of the highest verdicts in bias damages in the nation. This has been done, by and large, without any HUD aid.

Concurrently, Justice Department enforcement has been stifled, not necessarily by "pattern and practice" limitations, but simply by lack of staff. Generally, the lawyers of the Housing and Lending Section of the Department's Civil Rights Division have never exceeded two dozen. To cover the entire nation's pervasive fair housing problems with a handful of attorneys, as dedicated and competent as they are, is at best naive and at worst a fraud on the American people who should have been entitled to count on the federal government to help meet their fair housing needs.

### III. The private fair housing enforcement effort and title II

The U.S. Supreme Court accurately recognized that the "main generating force" in fair housing enforcement is through private litigation. In order to "generate" the force, Congress must provide the necessary inducement to America's private bar to undertake what has become fairly specialized and complex litigation in many instances. Likewise, Congress must demonstrate its sensitivity to the plight of housing bias victims in providing express damage expectancies for the interference with statutory civil rights.

We believe the Justice Department's testimony reflected a serious lack of sensitivity to the private fair housing enforcement effort. First, rather than being "noncommital" [3] in raising the punitive damage ceiling from a mere $1,000.00 to $10,000.00, the Department should recognize that intentional and malicious racial or sex bias in housing is personally dehumanizing "there is nothing more humiliating." [4] The individual housing bias victim often has little contact with the federal machinery; likewise, the machinery has little to do with the sole victim. Thus, the government's perspective in understanding the need to make fair housing outlaws increasingly financially accountable may not be wholly lucid.

Likewise, revising the standard of attorney fees suggested by the Justice Department suggests additional insensitivity to the need to attract the private bar in aggressive federal fair housing enforcement. The "prevailing party" standard, rather than "prevailing plaintiff," has chilled many bias victims who fear the inexperience of their counsel might result in an adverse financial responsibility by reason of their failure to prevail. In order to attract lawyers who serve as "private attorneys general," both the victims and their counsel must have a reasonable expectation in our free enterprise system that the injury sustained by way of bias and the need to recover the costs for the injury must exist.

---

[2] Section 808, 42 U.S.C. Section 3608.
[3] Metropolitan Housing Memorandum, The Potomac Institute, 78–2 at 4 (March 13, 1978).
[4] 114 Cong. Rec. 2282 (1968), observation by then-Senator Walter Mondale on the pending Title VIII legislation.

*IV. Conclusion*

Notwithstanding very recent successes in federal fair housing consent decreees and verdicts in the courts in Northeastern Ohio,[5] there still exists an intensive need to eradicate the "aggravated"[6] conditions of racial discrimination in housing throughout Greater Cleveland and Adron, as well as the rest of the nation.

Congress must clearly see that those elements of the housing delivery system— the real estate brokers, property managers, insurance companies and appraisers— who do not believe that fair housing is the law and is a law with substance must be made accountable financially for their actions. The answer to soving much of the problem is vigorous, aggressive enforcement of the law. This, by and large, will continue to be done by the private sector, not the federal government. Title II will be important from the standpoint of private enforcement. Increased Justice Department staff, along with deleting "pattern. and practice" limitations will also be significant.

Mr. EDWARDS. Thank you very much, Mr. Friedman, for very helpful testimony.

The gentleman from Illinois, Mr. McClory.

Mr. McCLORY. Thank you, Mr. Chairman.

I thank both gentlemen for your testimony on this legislation. I can tell from your testimony that you have had broad experience in this field, and I know that your views are very candid and that they are intended to be very supportive of the role of this committee.

I am particularly interested, Mr. Friedman, in the fact that you are undoubtedly a legal scholar and have analyzed all the cases related to fair housing. I think your comments are very important to the extent that they relate to the limitations on administrative remedies and enforcement through the Department of Housing and Urban Development regarding the of types of cases that really require a judicial tribunal for a decision.

Are you aware of any precedent for the kind of administrative remedy that is set forth in H.R. 3504?

Mr. FRIEDMAN. In terms of other administrative agencies?

Well, the Equal Employment Opportunity Commission, of course, grants equitable relief, and assuming there is a modification of the role of the administrative judge in awarding civil damages and related equitable relief I think you will find that the EEOC and NLRB, of course, have discretion in granting relief.

Mr. McCLORY. But in a sense, the type of remedy that is suggested in H.R. 3504 is a legal remedy, is it not?

Mr. FRIEDMAN. I am not familiar with any comparable power granted any other Federal administrative agency. Again, my position is that I think there may be some constitutional deficiencies in the statute as it exists at this time.

Mr. McCLORY. Are you aware of the legislation which has been introduced by Representative Cardiss Collins, one of my colleagues from Illinois, regarding funds for low income housing? That subject is affected by the *Gautreaux* case which applies in the district I

[5] *Sutton v. Bloom*, C77–767 (March 29, 1978 N.D. Ohio) ($63,100.00 verdict); *Dyer v. Schecter*, C76–306 (March 20, 1978 N.D. Ohio) ($41,000.00 settlement); *Thomas v. Goudreaux Management Co.*, C77–1095 (April 14, 1978 N.D. Ohio) ($10,000.00 verdict); *Phenix v. Sudler Interstate Management Co.*, C75–429 (N.D. Ohio 1977) ($17,500.00 settlement).

[6] *Gautreaux v. Chicago Housing Authority*, 503 F. 2d 930, 938, aff'd in relevant part sub nom. *Hills v. Gautreaux*, 425 U.S. 285 (1976). Justice Tom Clark characterized Cleveland's fair housing problems as "aggravated" while sitting by designation in the United States Court of Appeals for the Seventh Circuit, writing the *Gautreaux* opinion. The Housing Advocates have undertaken several studies documenting racially discriminatory housing and land use practices throughout the Greater Cleveland and Greater Akron areas affirming the validity of Justice Clark's observation.

represent as well as the city of Chicago. Representative Collins seeks to overturn that case so that instead of all of these agencies trying to comply with a program outlined by late Judge Richard Austin, authority would be reinstated to HUD. This would prohibit mandated action by the local regional and municipal housing authorities which, in fact, appear to have brought low-income housing to a virtual standstill.

Mr. FRIEDMAN. Since 1970 in a very important decision by the third circuit, *Shannon* v. *HUD,* there has been imposed on local housing authorities the same affirmative fair housing obligation as is placed on HUD under section 808 of the Fair Housing Act.

I am not convinced that making HUD exclusively responsible for disbursal of low-income housing or low- and moderate-income housing is the answer. I think that given the guidelines—for example, if we refer to the U.S. Supreme Court's 1976 *Gautreaux* decision at 425 U.S. 289, I think the Court made clear that both HUD and the housing authority have an obligation to look at a metropolitan-wide area.

I guess the specific answer to your question would be that I am not sure that giving HUD this power alone is the answer. I think with the proper guidelines, local and regional housing authorities can do the job.

Mr. MCCLORY. The problem appears to be that in the district I represent, a list of minority persons in the city of Chicago has been compiled, and through some kind of administrative mathematical quota determination, the bureaucracy wants to mandate what persons shall be located in what area. It is, it seems to me, an artificial type of forced integration a method which mandates removal of people from one area to another. It does not seem to be effective or appealing for any of the areas.

Mr. FRIEDMAN. Indeed, Mr. McClory, it is artificial. A colleague of Mr. Holmgren and mine, Mr. Polokoff, in Chicago has, of course, been very responsible for trying to secure equal access to housing. What the Supreme Court said in 1976 is a broad, remedial plan in many circumstances is necessary. Until there is true freedom of choice in the housing market, it may very well be that the so-called artificial devices for the time being on an interim basis may have to be employed.

Mr. MCCLORY. As the chairman knows, I have been a strong supporter of civil rights legislation, including fair housing legislation. I have a deep feeling that fair housing is developing in at least a large part of the area that I represent—in the Waukegan and north Chicago and Zion areas north of Chicago—where the minority groups appear to want to live.

At least in that area, it seems to me that gradual integration of minorities is continuing in a harmonious atmosphere with just a little encouragement and perhaps a little outside coercion.

I am wondering if those techniques or those developments are not preferable to the large judgments you have mentioned or the rather severe administrative remedies that are suggested in this legislation?

Mr. FRIEDMAN. I am convinced that there must be a concurrent approach. I think that vigorous enforcement is one part of it and if I may, I would like to defer to Mr. Holmgren who is very conver-

sant with the specific, very creative program involved in the greater Chicago area which seeks to achieve in a harmonious fashion what you have stated.

Mr. HOLMGREN. Mr. Chairman, in response to some of the questions from Mr. McClory, I think that the results of the *Gautreaux* decision to which you refer have not been one of mandating a specific movement of specific families to housing available in the counties beyond the city of Chicago.

There are two aspects of this: In the first place, the so-called cessation of development of public housing as a result of this decision is not a fact. Housing, public housing development was ceased as a result of the moratorium of January 1973 which practically cut off public housing construction throughout the country.

What we are seeing now is the development of the new section 8 program being provided in the Chicago metropolitan area under a special program which is being implemented by contract between HUD and the leadership council for metropolitan open communities in making opportunities for public housing—eligible families on the waiting list who were the plaintiffs as a class in the Gautreaux litigation, making their opportunities available in housing throughout the metropolitan area under the section 8 program which is as you know, dealing essentially with existing housing in existing low-and moderate-income housing developments in which a certain portion of the rent is subsidized by the Federal Government.

So it does not mean the creation of public housing projects, per se. This has not resulted in quotas. As a matter of fact, most of the families, I understand some 300 families have been placed throughout the metropolitan area outside the city of Chicago in the 2 years that the program has been underway without any substantial change in the marketing processes or in the racial character of those communities to which they are going.

So that I think that if the affirmative aspects of the Housing and Community Development Acts are to be carried out, this kind of program needs to be implemented not just in the Chicago metropolitan area but everywhere else because the housing market in the final analysis is a market of that entire metropolitan area in which it finds itself and housing opportunities are not divisible between the city and the surrounding community. They should be available because job opportunities are also most available in our growing economy in the suburban communities.

By the linkage of housing and job opportunities, I think we can deal more effectively with some of the other problems of unemployment and social unrest.

Mr. McCLORY. We have had a skyrocketing of Latino population in both the Waukegan area and the Elgin area without any court order or any outside influences.

Let me ask this one question: Do you disagree with Representative Cardiss Collins who says that a vast percentage of the $8.3 million now allocated for Chicago's low income and elderly housing may not be spent, and furthermore, emphasizing her support of open housing, she said the remedy required by the courts is unworkable and it inflicts severe damage on the entire Chicago community? Do you disagree with those two statements?

152

Mr. HOLMGREN. I have not seen that particular legislation or that bill, sir. My own observation, which is limited by the distance from the situation in Chicago, is that there has not been a cessation of funds going in Chicago under CDBG.

Mr. McCLORY. Both of you, of course, seem to emphasize that HUD should have authority to control, and inflict its judgment on local zoning and local communities with regard to low-income housing.

I feel that these efforts to influence from the outside in these local and regional housing boards and zoning boards is bringing low income and public housing projects and even elderly housing projects to a virtual standstill. I think a lot of the people we are trying to benefit are the ones being victimized by this policy.

Mr. HOLMGREN. The primary importance here, it seems to me, of this issue is related to the legislation in the 1974 Housing and Community Development Act with the amendments in 1977 in which the law clearly stated that the primary beneficiaries were to be persons of low and moderate income. That is in all of the community development and housing activities supported by the Federal Government.

Since the housing market is a metropolitan market and since there is also a requirement that in developing the housing plan each applicant, city or urban county, must take into account the needs for low- and moderate-income persons in their community based on the so-called expected-to-reside provision. The expected-to-reside provision requires a calculation of the need for low- and moderate-income housing based on the planned or present employment opportunities in that community.

Many suburban communities are stratified communities in economic terms. They have practically a single kind of housing market. This is not really characteristic of what the real American city is like or historically has been like. The real American city has had a broad range of economic strata in that community.

So what we are talking about here finally is the administration of that law also to insure that the access to that housing by all income groups is protected against racial discrimination.

Mr. FRIEDMAN. If I may make just one brief comment in response to your question and comment: The 1974 Housing Act addresses a regional approach to meeting the needs of low- and moderate-income housing. It incorporates the Fair Housing Act. It incorporates title VIII. If we look back in the congressional history of the law, because it is obviously not in the statute, when then Senator Mondale drafted that portion of the act that dealt with persons aggrieved he explained at least what in his mind was the whole idea of title VIII.

He said: "The purpose of this law is to replace the ghettos with truly balanced housing patterns." He thought that through this 1968 legislation it could be achieved. Well, we are 10 years later and it has not been achieved.

So perhaps by coupling what Senator Mondale had in mind then along with the regional approach to housing in the 1974 act along with the proposed amendments now, we may become a little closer.

Mr. McCLORY. Or perhaps we will perpetuate the problem.

Thank you, Mr. Chairman.

Mr. Edwards. Thank you, Mr. McClory.

Mr. Holmgren, your study concerned itself with black families; is that correct?

Mr. Holmgren. Yes, sir.

Mr. Edwards. Does the same or similar discrimination exist with regard to other minorities such as Latinos, Spanish Americans?

Mr. Holmgren. For the purpose of this study, it was determined that it would be best to have a discreet minority test conducted. Since as minorities the black population represents the largest single racial minority in the American population, it was thought best to do it with this minority. I think the imputation can be drawn that a similar level of discrimination exists against other racial minorities.

The point is that it would be a simple matter to do the same kind of testing program involving other minorities. But from a point of view of getting a clean picture, as it were, of the single largest racial minority, it was decided to deal solely with the black population.

Mr. Edwards. Is it a nationwide phenomena?

Mr. Holmgren. Yes. The figures to date that have been released show very little difference on a regional basis, that is, between North, South, East, and West. The only places that were not studied were the Mountain States and the Northwest simply because the standard which we had to select for the selection of a given metropolitan area was based on a percentage of its black population. Most all of the Mountain cities and Northwestern cities did not have black populations, based on the 1970 census, of 11 percent or more.

Mr. Edwards. Thank you.

Mr. Holmgren. Interestingly enough, Congressman, for your interest, the Western cities all were in California and there were five.

Mr. Edwards. There is plenty of discrimination in each one.

Mr. Holmgren. Yes.

Mr. Edwards. Mr. Friedman, getting back to your discussion with Mr. McClory, it seems to me that, except for perhaps a couple of aspects of the bill, such as the exclusionary zoning provision, this is a rather modest bill. It merely strengthens certain mechanisms of enforcement of title VIII.

Would you agree with that?

Mr. Friedman. Yes, I would, Mr. Chairman.

Mr. Edwards. I don't think it is a revolutionary bill at all, except perhaps in those two areas which I think will have a great deal of difficulty being enacted, quite frankly.

Mr. Friedman. I think they clarify some terribly difficult issues that we have had over the last 5 years. In that respect it is helpful. It cleans up the bill procedurally, if you will, but it is far from revolutionary.

Mr. Edwards. In California, or at least in the area that I represent, the San Francisco Bay area, whether or not many of the communities can get community bloc grants is not terribly important to them, especially if they are cities of 50,000 to 100,000 with $100,000 houses and $200,000 houses. They could care less if they got the money.

However, cities like San Jose with 550,000 people and a city where there is housing for low-income people and minorities, a city like that is very interested in those funds. But a city like that doesn't need the compulsive aspects. Cities like that—Oakland, San Francisco, and Los Angeles—are determined to take care of their disadvantaged, low-income people. But that is only part of the State.

I would say most of the suburban cities have a very subtle way of discrimination. Part of it is involved in either accepting the Federal money and somehow or another avoiding low-income housing or not taking the funds at all.

Mr. FRIEDMAN. That, in a sense, bears out the position that we took that if HUD has any important role in fair housing, it will be with the CDBG recipients. With the millions of dollars disbursed to regional and local governments—and if indeed there is a local government that receives Federal funds, not simply housing, transportation, or education funds—in any event, if fair housing is not being practiced within the community, then there are constraints that must be placed upon that community until there is compliance with the law.

What we are talking about is the existing Federal mechanism involved in a compliance effort, a monitoring effort. We hope to see that intensified, hopefully this year, in how HUD looks at the CDBG program. For those communities that receive no Federal funds, I think they are awfully few and far between because in some fashion or another most communities do receive Federal funds. So in effect there is a handle.

Mr. EDWARDS. Yes; they do, but tying the receipt of miscellaneous Federal funds to these cities providing housing is a most difficult problem because they are all represented by Members of Congress, too, and there are a lot of them. I am not necessarily hopeful that it can be accomplished, especially since the land is so terribly expensive. In most of these suburban areas we are talking about $100,000 to $200,000 an acre for this property.

But this bill doesn't have a lot to do with that except in section 206. The bill is intended primarily to address the kind of discrimination that the NCDH report addresses in a nationwide manner.

Mr. Friedman, can you tell us a little bit about a couple of the lawsuits that you have been involved in without identifying the parties? What kind of lawsuits are they?

Mr. FRIEDMAN. It covers the gamut from a case involving about 20,000 black and white citizens of a racially balanced suburb of Cleveland, Cleveland Heights, challenging racial steering, the practice Mr. Holmgren discussed this morning.

In that case HUD's *Community Congress* v. *Rosenblatt,* 73 FRD 1, in northern Ohio, 1975, involved the concern of a community to maintain and perpetuate a racially balanced city, a city of 60,000 people. In that case, the real estate firm, the president of whom was coincidentally president of the Cleveland Area Board of Realtors, was alleged to have shown whites only certain areas and blacks in others. This practice, of course, would have resulted in the virtual resegregation of a balanced, integrated community.

The result of that case was a judgment by way of settlement, but more importantly, the judge in that case, Chief Judge Battisti of

the U.S. district court in Cleveland, discussed the nature of the Fair Housing Act, the breadth and importance.

Other litigation involved the efforts on the part of single women, for example, who have a very difficult time in securing equal housing opportunities. As the chairman well knows, title VIII was amended in August 1974. Cleveland had the first title VIII sex bias and housing case in the country in which a single woman with a child was told: "You can't rent here because you don't know anything about plumbing." Of course, they never asked the men applicants that.

Other cases involved a situation of direct racial statements and what we commonly find, and I think it probably occurs around the country, is a response such as: "Well, I have no objection to renting to you, but you see, this is a very prejudiced neighborhood. We would be terribly concerned that your child may be injured on her way to school or your automobile damaged."

So through the innuendo, through shifting the responsibility of discrimination off on the neighborhood, it is still practiced.

Another example that we see quite commonly is the situation where as a result of a recent school desegregation order real estate firms will come into white pockets located around predominantly black areas of Cleveland with large, imprinted signs saying, "It is time now to sell. It may be too late." That is blockbusting as a result of school desegregation. Again, when you address fair housing, this is intrinsically related to the issues of equal eduational opportunities.

What we are experiencing in Cleveland is probably no different than any other metropolitan area. When you are dealing with the courts mandating relief because of segregation in the schools, it clearly affects housing. We have circumstances of white flight attributable to blockbusting tactics. So you can see Cleveland perhaps is a microcosm of this country and we have experienced the gamut.

Ms. COOPER. Mr. Holmgren, most of the discriminatory events that are compiled in your report, aside from perhaps steering, would probably be unsuspected by victims. Unless they have the opportunity actually to compare the treatment they got with that treatment a person of another race had received, victims cannot know they have been discriminated against.

Thus, for a typical minority homeseeker, there may be no apparent reason to gather any evidence of discrimination having occurred. This is a dilemma that is really not faced in the bill as written.

I am wondering if you have any suggestions for how enforcers or how the legislation should deal with this problem?

Mr. HOLMGREN. Well, I think that this is a problem which has been apparent ever since the adoption of title VIII and indeed the earlier State statutes on fair housing. That is, that it is very possible that in many cases the appearance of a discriminatory act is not readily evident to the alleged victim. That is why, as a matter of fact, the process of testing or auditing has become such a common aspect of these kinds of cases when they go to litigation. The evidence of testers has become a very important tool in the litigation process.

Now it is true that the effect of this kind of specific discriminatory act is not going to be always readily apparent to the potential victim. I think, however, if the forms of discrimination that can occur are well publicized through the various kinds of educational techniques that are available through HUD and local and State agencies, that people will be more sensitive to the probability that this has occurred to them in a given situation and would enable them to therefore seek the possibility of redress through the State or HUD itself.

It really is a sensitizing issue, it seems to me, and I think that much of whatever discrimination that is now occurring is underground, is subtle and discreet. It is very hard to detect except by this kind of process and it is going to make it even more difficult in the future because of the fact that it can occur, discrimination can occur at any point in the process of looking for a house or an apartment.

Mr. FRIEDMAN. Unless I am misreading or perhaps misunderstanding what the subcommittee intended in this legislation, 207 which would amend section 808(e)(3) would require HUD to assist or suggest that HUD assist private fair housing groups. That is in the legislation.

I frankly interpreted that to mean that Congress would be directing HUD to work with organizations that are involved in the auditing process to ferret out evidence of discrimination if it exists. So unless the legislation had something else in mind, it was my feeling that that is really what the subcommittee contemplated in drafting section 207.

Also, if I may just very briefly, a number of very important points were made. Often a victim of discrimination doesn't know that they have been discriminated against. Perhaps this is anticipatory rebuttal, but tommorrow you will have the benefit of the testimony of William North, a distinguished lawyer, testifying in behalf of the National Association of Realtors.

On page 9 of his formal submission he states that the injury attributable to a discriminatory act is almost immediately known or knowable. That is absolutely incorrect. There is no foundation in fact to that kind of a statement. Without the involvement of fair housing organizations through an auditing process, unless we have what has been characterized as a "pants down" vaudeville situation of direct racial statements, a victim will not be aware that discrimination has been practiced.

Ms. COOPER. Would you agree that the use of testers is the most effective way of gathering that kind of evidence?

Mr. FRIEDMAN. To use the unbroken line of authority in the Federal courts in a case like *United States* v. *Wisconsin,* for example, the court held it was virtually impossible to uncover housing discrimination without the process of checking and testing. In that case Wisconsin made it a crime to be a tester and the United States instituted action in the district court and the court held in effect that this was an interference with fair housing rights for people who assist in the achievement of fair housing and that particular State statute was invalidated.

So the bottom line is that without an audit process you are not going to find out whether or not this kind of illegal conduct is going on in your community.

Mr. HOLMGREN. This is especially true in dealing with "pattern and practice" types of action. I think the Justice Department in its pursuit of that kind of litigation relies very heavily on the testing process. In most instances, they rely on local, private fair housing groups to provide that kind of background for their litigation. I would say that it is one of many tools and probably first among equals in that process of enforcement.

Ms. COOPER. Secretary Harris in testimony before this committee indicated that she personally, and other people at HUD, were opposed to the use of Federal employees as testers, but they were supporting the possibility of contracting with local fair housing groups to do the testing for them.

Do you agree that there is something unethical or otherwise improper about Federal employees actually doing the testing?

Mr. FRIEDMAN. One Federal judge talked about testing in terms of fulfilling a civic responsibility, almost a patriotic duty to make sure there is compliance with the law. If that is being done, I can't conceive how such conduct would be unethical.

Mr. HOLMGREN. In other kinds of enforcement, public officials are used in the testing process.

I think one of the examples of this is that public officials are used to test weights and measures of local markets and the like. It has been charged that this is entrapment, but it is clearly, in the case of testing as well as this kind of an examination of scales and the like to see that people are getting honest measure, it is a kind of consumer protection.

I think that testing in the instance of housing discrimination is the same kind of consumer protection. I don't agree that it would be a violation of individual rights nor indeed of a public official's responsibilities.

Ms. COOPER. One of the problems of HUD enforcement in the past has been the delay in getting down to the actual investigation and gathering of evidence. Do you think it would be more effective for HUD to rely on local housing groups that have the capacity and the practice of responding more quickly to complaints and sending testers out immediately?

Mr. FRIEDMAN. I think as a practical matter it would be better because of the expertise that groups like NCDH have to employ that approach.

Mr. HOLMGREN. The problem with it, however, is that local fair housing groups and local expertise is not nationwide. It does not exist in all places. In fact, there are areas of the entire South where there are no local fair housing groups. There are some just now beginning to organize, but our network of affiliated local groups numbers about 55 metropolitan fair housing centers throughout the Nation.

Well, obviously, that covers only a very minuscule portion of the total number. So that I think you would have to have, therefore, a balanced kind of system which would rely both on whatever local resources are available as well as the official agency.

158

Ms. COOPER. Following up on the subject of HUD enforcement, Mr. Friedman, you stated before that you were fairly pessimistic about HUD's ability to be effective in an administrative enforcement scheme.

Do you favor creation of litigative authority only in HUD or do you favor the dual system that is in this bill?

Mr. FRIEDMAN. Well, I support the dual system in terms of the Federal Government's role in fair housing enforcement, that is, HUD and the Justice Department. I think that the Federal Government could be much more responsive in fair housing enforcement, not through the broadening of powers to HUD, but simply by and through the support of the existing structure.

The housing section of the Civil Rights Division at the Justice Department is superb. They are staffed generally by extraordinarily talented and creative lawyers. But they have never exceeded more than two dozen in the history of title VIII, two dozen lawyers. To think that we can expect fair housing to be enforced by at least the Department with those few number of lawyers is just an impossibility. If there were additional lawyers with the Department, I think we would see substantially more of an enforcement effort.

Mr. EDWARDS. Are you saying that if Justice had a lot more lawyers under existing law, that much more progress could be made?

Mr. FRIEDMAN. Yes; I am, Mr. Edwards, in part.

Ms. COOPER. Are you suggesting that HUD play an investigative role for the Department of Justice, then, in developing the typical individual, nonpattern or practice type of case?

Mr. FRIEDMAN. HUD does at this time, of course, but the Department under 813 of the act is limited to pattern and practice. I think the role of HUD at this point will be modified through this proposed legislation by increased referrals.

Now I think Secretary Harris, to use her language, suggested a nonmandatory referral program. I think that is how she put it. That sounds realistic. However, I would agree both with her and with Mr. Days that you are going to have to rely on the discretion of the Department as to what suit to bring rather than to make it mandatory.

So in that respect I would support both, but clearly HUD should have an investigatory role and work with the Department.

Mr. EDWARDS. Mr. Starek?

Mr. STAREK. Thank you, Mr. Chairman.

Mr. Holmgren, I wanted to ask you a couple of questions about your recent survey.

In your statement you indicate that this was the first national level survey of the real estate industry's fair housing practices. Were you commissioned to do this? Was this a contract lot by HUD?

Mr. HOLMGREN. It was a contract with HUD, competitive contract, yes.

Mr. STAREK. If this law has been on the books for 10 years, why is this the first national level survey that has been conducted?

Mr. HOLMGREN. Part of the reason I would think for this, sir, is that the degree of improvement since 1968 had been very modest, at best.

On the other hand, testing as a process was going on, has been going on for some period of time. Moreover, I think that the cost of this kind of thing—it is not something that you can do easily on a national basis—is probably something which deterred HUD in prior years. It was also the growing recognition by HUD, and others outside of HUD, that there was ineffective enforcement going on both by HUD itself and, I think, the industry at large which required some kind of documentation on a national basis.

As I have said, this has been going on locally, but this is the first time we have a national baseline now against which to measure subsequent diminution of discrimination in America.

So I think that the demand for this kind of thing was going on almost from the very moment that title VIII was adopted. But I think that the limitations on cost and the magnitude of the task prevented them from making a decision before.

Now that is only a speculation on my part. I don't know what the other reasons might be.

Mr. STAREK. Thank you.

I am sure steering exists in some degree, and once your data is analyzed that will probably be the conclusion. Of course, if steering is done purely on racial motivations, it would clearly be discrimination and therefore illegal.

But will the data reflect any economic steering? In other words, I assume steering exists, but my thought is that it exists primarily on economic or financial limitations not based on race. If that is the case or if that is what will be determined, how would you be able to prove that steering is in fact racially and not financially motivated?

Mr. HOLMGREN. The steering in all the cases which we will discover in this survey will not have been based on economic factors because each of the testers, black and white alike, ascribed the same income and capability for purchasing or renting an apartment. Therefore, the steering that does go on, what is really more aptly called, I think, racial steering, is fairly evident when the examples such as the one I gave in Louisville where the broker wanted to sell to that black person in that neighborhood because it was a predominantly black or changing neighborhood at that time and wanted to discourage the white from seeking housing, thereby making it unrealistically available to him in terms of price.

It is this kind of phenomenon, I think, that operates to perpetuate this kind of a system. I think this is very important because I think more than anything else today perhaps which tends to continue the concentration of segregated patterns and the creation of new ones, resegregation, is the steering phenomenon. That is limiting the opportunities to certain segments of the population or directing the opportunities to the other segment of the population away from communities in which housing of one kind or another may be predominant.

Mr. STAREK. Mr. Friedman, do you want to comment on that?

Mr. FRIEDMAN. In a tester audit situation you have the variables that may be raised fairly controlled and fairly structured. If, for example, an individual looking for a $60,000 home enters a real estate office and states the factors or the elements which he or she looks for in a home and one individual happens to be white and

perhaps earns $28,000 a year, and one being black, of course, in this kind of controlled environment and earns the same, we have no problems.

The question actually is much more complicated. What happens where there is economic steering? I think that is what you are asking here.

Mr. STAREK. Yes, it is.

Mr. FRIEDMAN. First of all, I think we have to recognize that this legislation does not address that issue. It does not. Nor do I think the subcommittee in studying the legislation intended to address this issue.

On the other hand, since 1949 the Congress has said that every American family is entitled to a decent home and suitable living environment. By the process of economic steering are we again contributing or perpetuating the promise that will never become a reality?

All I can respond is that in the area of fair housing as we have grown to at least as we understand it today, I don't think that that issue can be addressed with legislation such as this, but must be addressed perhaps through a more intensve monitoring of the 1974 Housing Act and perhaps some amendments to it, but not with this legislation.

Mr. STAREK. Fine.

I would like to pursue one other point and that is with respect to the enforcement mechanisms which are proposed in this legislation.

Mr. Holmgren, you refer in your statement to the repeated delays and long, drawn out enforcement problems. Is there any evidence that the mechanism itself in the current law causes these delays or are they the result, as we learned in the last Congress during oversight hearings, of just pure HUD inefficiency?

Mr. HOLMGREN. I think it is a combination of those things.

To a large extent, whatever HUD inefficiency which is there is the result of inadequate resources available to HUD in terms of trained personnel to pursue these cases, but it is also a fact that the conciliation process, and this is really basically what we are talking about, the conciliation process can be, unlike a court process, somewhat lengthy and drawn out because of delays which can be sought by either party and also by the fact that in many instances these complaints arise out of cities that are distant from the HUD Fair Housing-Equal Opportunity staff people who are responsible for investigating and conducting the conciliation.

So there is a time factor and a distance factor which operates there also to cause this.

Mr. STAREK. Would the addition of time frames, for instance, for the conduct of complaint investigations help solve the enforcement delays? For example, which stipulate that time frames within 180 days a complaint will be processed and resolved?

Mr. HOLMGREN. In other words, within which they will have to investigate? I think so, I think it would.

Mr. STAREK. With respect to conciliation, you would know that it will be concluded within such and such a time or the complaint goes to the Federal court.

Mr. HOLMGREN. I think this is very important.

Mr. STAREK. Would that be preferable to cease and desist authority?

Mr. HOLMGREN. No, it would not. I think the cease and desist authority is still of paramount importance as an effective enforcement tool. The others, the time certain aspects of it are important, but it is not nearly as important as the ultimate cease and desist authority which is in effect a veiled fist.

Mr. EDWARDS. Do you disagree?

Mr. FRIEDMAN. My position is that cease and desist will have very little practical effect. I think it will assist the agency in escaping the frustrations they have had in terms of hoping to achieve something. I think the amendments to section 814 will do just as much because what you are doing is empowering HUD and the Department to work together and establish a rulemaking procedure where some guidelines can be set forth. You are giving HUD the strength to attempt to deal with the issue.

My position was from a practical fair housing practitioner's standpoint. That is not to suggest that it will have no effect. Perhaps there are reasons to be optimistic. Perhaps the efficiency quotient may be significantly improved and staff morale may be improved by the involvement of these powers and the powers under section 814. But that remains to be seen.

Mr. McCLORY. Earlier the Chairman asked a question. He said, "Do you think that additional attorneys to handle the litigation and to enforce the fair housing laws might provide improvements? I do not know that there was an answer to his question.

Before you answer, I would like to say this: I am reminded that the very important consent decree was entered into just about a week ago in Dallas, Tex. This involved 10 apartment complexes and over 2,000 units. The decree provided for payment of damages, I assume for support to some of the minorities who were granted access to these apartment buildings.

Would additional attorneys and additional enforcement from the Department of Justice be an adequate answer under existing law?

Mr. HOLMGREN. If I may, Mr. McClory and Mr. Chairman, the Justice Department's role in enforcement is limited to the so-called pattern and practice element, not the individual complaints. So the cease and desist authority which HUD will be granted under these amendments would speak to the individual complaints of alleged discrimination.

Nevertheless, I still would support an increase in the Justice Department's capability in pursuing these kinds of cases. While the record of the Justice Department as Mr. Friedman has suggested, is an excellent one, an exemplary one, it is still limited by the resources which they have presently at hand.

So I don't think that these are conflicting issues. I think that both cease and desist as an element of HUD's enforcement authority needs to be granted and I think that all of the tools, including the Justice Department, including private opportunities for litigation, also are a tool that must be available to persons seeking to find redress in this area and that the importance of cease and desist, I think, is there and we do support the granting of that power to HUD.

162

Mr. McCLORY. It has been alluded to earlier, and we will have testimony here tomorrow, I believe, relative to the subject of red-lining and its attendant discrimination in granting mortgages in the inner city. Yet I suppose that if one were a shareholder in a financial institution which was being required to grant loans under a law, which was enacted to prevent redlining, there would be economic reasons for saying we don't want that kind of Federal legislation to be imposed on a financial institution in which we have an economic interest.

Mr. EDWARDS. That is already illegal.

Mr. HOLMGREN. Redlining has been interpreted by the courts in two cases in Ohio to be in violation of title VIII.

Mr. McCLORY. My attention has been called to a proposed piece of legislation by another colleague from Illinois. My colleagues from Illinois seem to be very busy with regard to legislation relating to this subject.

Mr. Annunzio is proposing a $10 billion loan guarantee program which is estimated to result in freeing approximately $50 billion from savings and loan institutions for making loans in the inner city, presumably more in the area of restoring existing structures.

Mr. HOLMGREN. The State of Illinois General Assembly has adopted an anti-redlining statute also, as has the city of Chicago. A number of other States and cities have done similarly in the last couple of years during which time redlining has become a very important issue.

It would seem to me that what Mr. Annunzio's proposal seeks to get at is the kind of redlining which is often called geographic redlining in which the whole neighborhood is looked at, and because some parts of it may be on the decline, the whole area is in effect, redlined.

There are various kinds of redlining, racial being another one. But I think this is important if we are going to revitalize our cities, that this kind of cutting off of the flow of investment dollars for the revitalization be stopped.

Mr. McCLORY. Would you favor a loan guaranteed program like that?

Mr. HOLMGREN. I have not been able to look at that that closely to see what the elements are, but I think on balance it would probably be a very desirable thing.

Mr. McCLORY. Those are all the questions I have, and I am pleased to have your response.

Thank you.

Mr. EDWARDS. While you were out of the room, Mr. McClory, we were discussing the nature and the thrust of the bill. It was my observation that except for the 206 and the fund, the Fair Housing Loan Fund, both of which I think would have a great deal of difficulty in being enacted—because whenever anything has the indication of national zoning it just doesn't have the votes as we know—except for those two aspects of the bill it is rather a modest bill. It really seeks to address what Mr. Holmgren's organization study found pervasive in American society. I don't think it really goes much further than that. Is that correct? Do the witnesses agree with me generally?

Mr. HOLMGREN. That would be my judgment, yes, sir.

Mr. EDWARDS. It doesn't build any houses. It doesn't really say where houses are going to be built.

Mr. FRIEDMAN. But in effect it codifies many of these recent developments that have made fair housing so difficult to achieve. It makes it clear in black and white what Congress intended with this law rather than having to wait years and years for Federal judicial interpretation. That alone makes this legislation so terribly important.

Mr. EDWARDS. The gentleman from Massachusetts.

Mr. DRINAN. Thank you, Mr. Chairman. I am sorry I had to go to another subcommittee. We were trying to reform the system by which U.S. attorneys are appointed. It is almost as intractable as this topic.

Let me ask a question which I don't think has been asked. What about the creation of a fair housing loan fund? Mrs. Harris was not enthusiastic about that when she testified. Would you have any thoughts on the matter?

Mr. HOLMGREN. Well, sir, having operated a program in which title VIII—this was in the Chicago metropolitan area in the early 1970's—litigation was funded by HUD and is still going on, but no longer under HUD auspices. This program provided legal services to victims of discrimination. I know how important that can be. I also know that it is also very controversial.

I think that if the legislation which would include awarding of fees and of compensatory and punitive damages could have the effect of establishing such a program—given the difficulty that such a fund would have, I think in this Congress, it would probably be best to rely most on the probability of attorneys' fees for the plaintiffs that prevail and the awarding of damages, by increasing the limits of damage awards by the courts.

Mr. FRIEDMAN. From the vantage point of the private fair housing lawyer, section 818 is very desirable. As a practical matter, when a housing bias victim has to get into court, and again most fair housing lawyers do not charge initial fees, they are required to prevail on the merits in order to secure the costs of their work, but for the individual who wants to go out and put down a down payment or the first month's rent or security deposit, that money winds up being eaten up in the first line of depositions, filing fees, U.S. marshal fees. Indeed, that may make the difference of whether or not a victim of housing discrimination ever gets the house.

You know the bottom line in this law, if we look at it on an individual basis, is securing the home. So 818 would be very desirable in the sense that at least preliminary discovery and court-related costs could be covered. Indeed, if the individual prevails, the statute provides for a payback procedure.

Again, I view this from the standpoint of the individual who earns between $8,500 to $30,000 a year, a typical middle-income minority family. It is very difficult for them to on the one hand have the money for their down payment and their first month's rent and deposit and also be responsible for the almost prohibitive costs of Federal litigation. So we think it is very important.

Mr. DRINAN. Thank you.

On that question of the private litigation, if HUD were to issue substantive regulations under title VIII, would it make your litigation more simple?

Mr. FRIEDMAN. It would. It would assist fair housing litigation immensely. Those of us in the field have been urging HUD to do this.

Mr. DRINAN. Why don't they do that? I know you have been urging it for a couple of years. What is the obstacle?

Mr. FRIEDMAN. We believe the power is there.

Mr. DRINAN. I know that. What is the obstacle?

Mr. HOLMGREN. The obstacle in the past, at least up to this administration, is that the determination of the Office of General Counsel of HUD is that HUD did not have the statutory authority to make regulations on title VIII. The recent ruling has been that they do have statutory authority. They are presumably in the process of developing such regulations now regarding title VIII.

Mr. FRIEDMAN. The turn-around in that decision was only in December of 1977, if I am not mistaken, so they are in that process now.

Mr. DRINAN. Do you believe that what we have said about the standing to challenge zoning practices is going to be a problem under the bill?

Mr. FRIEDMAN. I think the bill incorporates the important developments in the area of standing that again have been very difficult to achieve over the past 3 or 4 years. The bill is very important in that respect, but as I mentioned before, before you returned, it is in effect the codification of what we have seen slowly and painfully evolving in the Federal courts. It will be a very important part of future challenges in the public sector.

Mr. DRINAN. I thank you both very much for your testimony. It is another block in the edifice that we are building which I think is going to bring about very significant legislation.

Thank you.

Mr. EDWARDS. Miss Cooper?

Ms. COOPER. Secretary Harris testified that she would favor shortening the statute of limitations from 3 years to 180 days so far as complaints filed with HUD. She would leave the opportunity open to file in court privately after the 3 years in order to minimize the problem of their having to investigate old complaints.

I know you are lukewarm on the subject of HUD administrative enforcement, but what do you think of that proposal in terms of what the typical victim does after having discrimination?

Mr. FRIEDMAN. Contrary to what Mr. North's testimony will be in the capability of a victim to discover the injury, I would respectfully disagree with the Secretary. Very often it will take months and months to learn whether or not one has been discriminated against.

If, for example, a community organization does not audit, which is publicized, then an individual who perhaps 2 years after being steered out of a community will learn what happened. So I am not really sure I understand, other than perhaps the administrative problems, why the agency which should be aggressvely enforcing fair housing would want to limit the time period under which the

aggrieved person could file. I think the 3-year period is very appropriate.

Mr. HOLMGREN. I would agree with that, yes.

Ms. COOPER. You mentioned the problem of discrimination against a single woman with children. Has it been your experience that the prohibition against sex discrimination covers that situation or is an amendment needed to cover marital status?

Mr. FRIEDMAN. The amendment is clearly necessary. The position we take in the law is that discrimination against a single parent with children in effect is sex discrimination because in effect a disproportionate number of the single parents are women. Though we have not had the opportunity to have a final determination by a Federal court, certainly the reasonable way to do it would be to make unlawful marital status bias. That is one of the most serious problems that those of us living in the Midwest in our observation of housing discrimination have seen. We have seen individuals because they are divorced being denied quite directly housing opportunities by many major management firms.

Ms. COOPER. What is the rationale for that? Why do they discriminate?

Mr. FRIEDMAN. The rationale, and it is stated in different ways, is simply this: That while a parent is perhaps employed, there is no other spouse at home watching the children. Therefore, there is no one in responsibility that would be in the apartment or in the home to avoid the potential destruction by children and those type of comments.

Mr. HOLMGREN. This type of discrimination can be racial, but it cuts across racial lines also. There is a growing problem now of discrimination against single-headed households with children. There has been a proliferation in the last several years of so-called adult communities, rental communities in which only adults are admitted despite the fact that the apartment sizes will accommodate a family with one or two children. I know that in southern California that has been a particular problem. Some States have had laws on the books for years. Illinois, I know, is one that has had a law since 1908 that bans discrimination against families with children in apartment housing.

But these laws have not been adequately enforced and it is a growing problem which may or may not be racial in character.

Ms. COOPER. So the discrimination, then, is really more likely to occur against single parents with children and having an amendment against discrimination on the basis of marital status would not be enough, would it? We would have to include age discrimination.

Mr. FRIEDMAN. No; parental status perhaps. But I think if you ever have sex and marital status proscriptions, then that will often address that type of problem. Frankly, there is no place for them to go. In greater Cleveland we have most of the major management firms which employ this very limiting device and there is no housing available or very little housing available.

Ms. COOPER. Well, an alternate approach that is being studied by the subcommittee on exclusionary zoning gets into the concept of regional fair share. Do you think that kind of concept could be adopted for this type of discrimination providing that certain per-

centages of the housing units in the community must be made available to families?

Mr. FRIEDMAN. The 1974 Housing Community Development Act specifically addresses that issue. When you deal with a regional approach to housing, among the factors that a community must consider would be female head of household, looking at generally reliable data in considering these factors. So Congress is already requiring this in other areas.

Ms. COOPER. Getting beyond our initial subject, but do you see any constitutional difficulties with the exclusionary zoning section as written in 3504 as it applies to economic discrimination rather than race discrimination?

Mr. FRIEDMAN. That is a very difficult question, probably the most difficult question the subcommittee will have to address. There may be constitutional deficiencies in the question of whether or not a local government's efforts in their zoning codes, building codes, has the effect of economic discrimination. If in some fashion the subcommittee can establish in its record what effect exclusionary zoning may have, perhaps on interstate commerce, then clearly under enabling legislation it would be an appropriate area in which to legislate.

In the absence of that, I don't think there is any question that dealing with racial issues would clearly be appropriate through legislation under the 13th amendment. But I think we run into a very, very foggy area on what at least the courts have done in treating economic discrimination. In certain areas, for example, in the area of criminal law there are certain protections. In the area, for example, of housing, in a 1972 Supreme Court case the Supreme Court held there is no fundamental right to decent housing. So I do see potential problems.

Mr. DRINAN. Would you think that the validation of the Massachusetts anti-snob zoning laws by the Supreme Court of Massachusetts would hold up for legal reasoning at the Federal level?

Mr. FRIEDMAN. No.

Mr. DRINAN. I am sorry I asked the question.

Mr. EDWARDS. If the gentleman will yield, I am sorry but I think the case Mr. Friedman refers to has to do with California referenda.

Mr. FRIEDMAN. No, I am not talking about *James* v. *Valtierra*. That statement was in a forceable entry and detainer action out of Oregon. That is 16 U.S.C. and I forgot the page number.

Mr. EDWARDS. That is the first one you forgot.

Mr. DRINAN. Would you elaborate under that?

Mr. FRIEDMAN. Yes.

Clearly, the Massachusetts anti-snob zoning is a proper exercise of local police powers based upon the legislature's determination of wealth and welfare. The problem you run into is that Massachusetts' definition of what is best for its residents may not necessarily be what perhaps Ohio feels is best. Ohio, for example, as in California, believes that the referendum process dealing with land use practices, in other words, determination by the people as to the best use of the land, may be the best approach to land use, the best exercise of police power. Those rights reserved, of course, under the 10th amendment.

When that issue, of course, comes into the whole sensitive, delicate federalistic balance, the role of the Federal Government perhaps in interstate commerce, frankly, I don't know what the answer is. But I think that what has happened in Massachusetts cannot be used as an example as to what would happen in the other 49 States. It just would not.

Mr. DRINAN. I thank you. I thank counsel for yielding.

Mr. EDWARDS. Well, the civil rights laws generally don't protect poor people.

Mr. FRIEDMAN. That is correct.

Mr. EDWARDS. That is what the Supreme Court found in California.

Mr. FRIEDMAN. Valtierra was the test of whether or not the equal protection clause created that suspect classification, if you will. In a 5 to 4 decision the Supreme Court rejected, even though Justice Marshall in his dissent stated that perhaps it is too late in the day—and I am sure he was not talking about what time of day it was—too late in the day to make distinctions between economic discrimination, indeed the Court did.

Mr. EDWARDS. Are there any further questions?

Well, this has been very, very helpful to the subcommittee. We thank you both very much for a splendid testimony. It is very possible we might seek your counsel again. This is very difficult legislation to write and enact. It is terribly important legislation and you certainly have been a great aid to us and we thank you.

The next hearing will be tomorrow at 9:30 in the same room.

[Whereupon, at 11:30 a.m. the subcommittee recessed, to reconvene at 9:30 a.m., Thursday, May 11, 1978.]

# FAIR HOUSING ACT

---

## THURSDAY, MAY 11, 1978

House of Representatives,
Subcommittee on Civil and Constitutional Rights
of the Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met, pursuant to notice, at 9:35 a.m., in room 2237, Rayburn House Office Building, Hon. Don Edwards (chairman of the subcommittee) presiding.

Present: Representatives Edwards, Seiberling, Drinan, Volkmer, and Butler.

Also present: Janice Cooper, assistant counsel, and Roscoe B. Starek III, associate counsel.

Mr. EDWARDS. The subcommittee will come to order.

We will continue our hearings this morning on title II of H.R. 3504, and the testimony today will focus on the problem of exclusionary land use practices by State and local entities. The bill seeks to expand the opportunity for low- and moderate-income housing beyond those localities that already have a high concentration of low income and minority persons; it also seeks to extend Federal limits on land-use controls to those localities that may not wish to receive community development block grants.

The subcommittee has also considered a reformulation of that provision, reflecting the viewpoint of some of the comments we have received. It contains the concepts of regional fair share of low- and moderate-income housing.

Our first witness today is Mr. William North, attorney for the National Association of Realtors. Mr. North represents an organization with the primary goal of protecting the interests of realtors and property owners.

We have had the pleasure of your testimony for this nationwide organization before. Mr. North, if you could come to the witness table and introduce your colleague, we would be pleased to include your full statement, without objection, in the record. You may proceed.

## TESTIMONY OF WILLIAM NORTH, ESQ., ACCOMPANIED BY ATILLA ILKSON, DIRECTOR OF CONSUMER AFFAIRS, REPRESENTING NATIONAL ASSOCIATION OF REALTORS

Mr. NORTH. Thank you, Mr. Chairman. I would like to introduce Mr. Atilla Ilkson, who is director of consumer affairs for the national association.

I am general counsel and I am a partner in the law firm of Kirkland & Ellis in Chicago.

(169)

The National Association appreciates the opportunity to present its testimony on the Fair Housing Amendments Act of 1974, and our fuller testimony is presented in our prepared statement.

[The prepared statement of Mr. North follows:]

STATEMENT OF WILLIAM D. NORTH ON BEHALF OF THE NATIONAL ASSOCIATION OF REALTORS [1]

The National Association of Realtors is deeply grateful for this opportunity to present its views concerning the "Fair Housing Amendments Act of 1977."

The National Association of Realtors is a national association of real estate brokers, salespersons, appraisers, managers, counselors and others engaged in the real estate business. It is the nation's largest trade and professional association with a membership of nearly 600,000 organized into fifty state associations of Realtors and over 1,700 member boards.

Founded in 1908, the National Association has for over seventy years devoted itself to the professionalization of the real estate business, the protection and promotion of private ownership of real property, and the protection of the buying and selling public.

The National Association of Realtors was the first housing industry group to adopt and implement an Affirmative Marketing Agreement. The agreement, designed for voluntary adoption by member boards and state associations of Realtors on a national basis, and developed through three years of effort and cooperation with the Department of Housing and Urban Development and the Department of Justice, was jointly approved by HUD and the National Association in 1975 and obtained HUD's approval for implementation in mid 1976.

But the agreement's history predates that by many years. For more than 60 years the Realtor Code of Ethics has required more than mere compliance with the law. In fact, the Code of Ethics to which every Realtor and Realtor-Associate is answerable represents one of the most significant commitments to affirmative action ever developed in any industry or profession. Article 10 of that code provides:

"The Realtor shall not deny equal professional services to any person for reasons of race, creed, sex or country of national origin. The Realtor shall not be a party to any plan or agreement to discriminate against a person or persons on the basis of race, creed, sex, or country of national origin."

The following evaluation of H.R. 3504 has been developed in terms of the Association's commitment to and objective of assuring Equal Opportunity in Housing for all.

*Section 205*

The National Asociation strongly supports the modification of the owner-occupied exemption proposed by Section 205 of the Act as a necessary and proper extension of the prohibition against discrimination in housing. This is consistent with the Association's traditional position that the propriety of discrimination should not depend on whether property is sold or rented by an owner or an agent.

*Section 206*

The National Association opposes adoption of Section 206(c) not because of its prohibition of zoning and other local land use controls based on race, color, national origin, but rather because of its prohibition based on economic status. Such prohibitions build into the law a stereotype of minorities as inherently deprived and depressed, which stereotype is not only false but could be self-fulfilling in its consequences.

Instead of attacking the problem of inadequate low income and middle income housing directly through intensified support of such programs as Urban Revitaliza-

---

[1] The National Association of Realtors is comprised of more than 1,720 local boards of Realtors located in every state of the Union, the District of Columbia, and Puerto Rico. Combined membership of these boards is approximately 600,000 persons actively engaged in sales, brokerage, management, counseling, and appraisal of residential, commercial, industrial, recreational and farm real estate. The activities of the Association's membership involve all aspects of the real estate industry, such as mortgage banking, home building, and construction and sales of condominiums. The Association has the largest membership of any association in the U.S. concerned with all facets of the real estate industry. Principal officers are: Tom Grant, Jr., President, Tulsa, Oklahoma; Donald I. Hovde, First Vice President, Madison, Wisconsin; and H. Jackson Pontius, Executive Vice President. Headquarters of the Association are at 430 North Michigan Avenue, Chicago, Illinois, 60611. The Washington office is located at 925 Fifteenth Street, N.W., Washington, D.C. 20005. Telephone 202-637-6800.

tion and Rehabilitation (in which the National Association is an active participant), this Section appears to propose a nationwide "Share the Slum" Program.

This is a "non-solution" to housing needs and is clearly unintended by Congress. Moreover, it is premised on a thesis which is as evil as it is counter-productive.

Section 206(c) clearly reflects the opinion that low income groups must be scattered among higher income groups in order to be rendered harmless. But for the hidden minority bias inherent in this "scatter concept," there could be absolutely no reason for the federal government to mandate that rich and poor live side by side.

The National Association believes that Section 206(c) is guaranteed to succeed in producing the very slum conditions it is aimed at correcting. Gresham's law is of general applicability and no less so in the case of housing. The Program would introduce uncertainties and hence additional development costs into the creation of new housing which would, in turn, both reduce the number and increase the cost of housing units built. Before essentially any project could be planned or built, it would be necessary to identify the economic status of the prospective occupants of such housing. Such identification is substantially impossible in the absence of governmental stereotyping since the economic status of a purchaser is not necessarily measured by the price of the house purchased, especially in the case of "non-subsidized" housing which might be defined as "moderate income."

For many of the same reasons heretofore outlined, the proposed amendment to Section 206(c) is a counter-productive approach to providing "low and moderate income housing." The way to provide low and moderate income housing is simply to produce housing affordable by people having low and moderate incomes. The cost of such housing is not reduced by using "high value" land in an affluent community. On the contrary the cost is increased and with such increase comes a need for increased subsidization and consequently the diversion of funds from other projects which generate more housing.

But perhaps more objectionable is the prospect and probability of unlimited litigation and delay arising out of the need to clarify the infinite vagaries of such concepts as "reasonable opportunity of the development," and "fair share of the regional need for low and moderate income housing." The approach taken in the proposed amendment requires criteria to determine what is a "reasonable opportunity," what is the "regional need for housing," and what is each government unit's "fair share" of such "need." The proposed amendment thus requires a bureaucracy of monumental magnitude to establish these criteria, not once and for all, but on a continuing basis as concepts of regionalism shift, regional needs increase or diminish, and changes in community demographics dictate shifts in "unit shares."

But here again the concept of "fair share of regional need" reintroduces the stereotype of "low-income and middle-income housing and people" as some form of "pollutant" of the body politic which must be thoroughly diluted with the affluent in order to avoid poisoning the social system.

The National Association does not subscribe to this stereotype and believes that the millions and even billions of dollars which the "Share the Slum" Program would require "to administer" would be better spent "to produce" decent housing.

*Section 206(d)*

The National Association endorses the concept of prohibiting discrimination on account of "handicap," but believes that the term "handicap" as defined in Title I, Section 103(a)(4) is entirely too vague to be acceptable. Under that definition, one is handicapped not merely if he has a physical or mental impairment, but also if he is "regarded" as having one.

The definition provides no clue as to when a person can be "regarded" as having an impairment. Is it enough that the person regards himself as being impaired? Further, how is the seller or landlord to know or learn how the person is "regarded." Then too what are the person's "major life activities" which must be impaired and how are they to be distinguished from "minor life activities?" And how is the seller or landlord to discover the "person's major life activities."

The definition of "handicapped" is a non-definition, creating infinitely greater ambiguities and uncertainties than if the term was not defined at all. The law you cannot understand is the law you cannot obey.

*Section 208*

The National Association is deeply concerned with and opposed to Section 208. This Section, and particularly the support given it by the Secretary of the Department of Housing and Urban Development, appears to be categorical repudiation of the philosophical concept of Affirmative Action in support of Equal Opportunity in Housing.

It substitutes a bludgeon for persuasion. It sanctions coercion in lieu of voluntary action.

The National Association is committed to the concept of Affirmative Action to achieve equal opportunity in housing. It has entered into an Affirmative Marketing Agreement with HUD which has now been implemented by over 400 Boards of Realtors representing over 250,000 real estate brokers and salespersons.

Nearly one-half of the membership of the National Association have subscribed to Affirmative Marketing in the eighteen months the program has been in operation. This is a subscription rate of nearly 14,000 brokers and salespersons per month. The National Association is confident that this is one of the best, if not the best, record of achievement in support of Affirmative Marketing in the nation's history. Moreover, we are confident that this record would have been even better had HUD had the resources to process agreements and implement their terms.

Pursuant to its commitment to affirmative marketing and Equal Opportunity in Housing, the National Association has published a wide range of educational materials for use by its members and for dissemination to the public concerning their obligations under the law. These materials include equal opportunity advertising kits, slide/film presentations, brochures and booklets. Moreover, it has included in its national education programs for brokers and salespersons in-depth discussions and analyses of the obligations imposed by the fair housing laws and their implementation in the real estate business.

The National Association believes that Affirmative Action, which is gaining momentum and expanding every day, can achieve voluntarily on a permanent basis every objective which Section 208 could hope to accomplish on a temporary basis by force and coercion. This is especially true in view of the fact that other organizations prominent in the real estate industry such as apartment associations, the National Association of Real Estate Brokers, and the state and local builder associations, are now adding their support and impetus to the affirmative marketing program.

The National Association believes that it is premature for HUD to abandon its effort to achieve equal opportunity in housing through voluntary compliance. Therefore, the National Association believes that it is unwise for Congress to tempt HUD to abandon this effort by providing it with the tools of coercion afforded by Section 208.

The National Association recognizes bases for administration frustration in the persistence of certain forms of housing discrimination. At the same time, however, the National Association believes that there are better ways presently available to cure these problems than the way proposed by Section 208.

The solution which the National Association favors to correct the problem of discrimination in housing is already provided in its Affirmative Marketing Agreement with HUD. That Agreement provides for the creation of Community Housing Resources Boards consisting of representatives of those community organizations throughout a given area with a substantial interest in housing and equal opportunity. The Agreement contemplates that these Community Housing Resources Boards will work with representatives of the real estate industry to identify discriminatory housing practices so that affirmative programs can be undertaken to cure such practices without resort to litigation and the polarization which it inevitably produces.

The National Association believes that the discriminatory housing practices which HUD has recently observed to exist could largely have been eliminated had resources been committed by HUD to the creation of Community Housing Resources Boards in accordance with the terms of its Agreement. In this connection, although over 436 Affirmative Marketing Agreements have been adopted, only 102 Community Housing Resources Boards have been established by HUD and of these a mere ten are actually functioning. If Congress adopts Section 208, it may be anticipated that even the limited resources now committed to affirmative marketing by HUD will be diverted to enforcement action.

In the two years since the National Association embarked upon its Affirmative Marketing Program with HUD, it has expended in excess of $474,000 to promote the program and this figure is aside from and in addition to substantially greater aggregate expenditures made by individual Boards and State Associations.

Aside and apart from the fundamental change in the philosophy and role of HUD which would be effected by enactment of Section 208, the National Association objects to it for other and more specific reasons.

First, the National Association objects to the six fold increase in the period within which a grievance must be brought from 180 days to three years. This extension imposes intolerable recordkeeping burdens on every broker and salesperson since

without complete records there is little or no possibility of disproving a charge of discrimination involving steering. Moreover, given the high rate of turnover of salespersons, the chances are 4 to 1 that the perpetrator of any discrimination will not be associated with the broker who is sued. Beyond any question this extension of the statute of limitations will produce gross miscarriages of justice.

Second, the National Association objects to the elimination of the "obligation" of HUD to refer controversies to the appropriate state and local fair housing law enforcement authorities and makes such reference discretionary. This change creates the potential of federal and state proceedings for the same grievance. Such duplication is harassment and is unnecessary and should not be authorized by Congress.

Third, the National Association objects to the authorization granted HUD to order temporary or preliminary relief to be granted to a complainant. Such authorization can do irreparable damage to a respondent. If such authorization is to be granted, the complainant should at least be required to obtain a bond to cover damages incurred by an innocent respondent.

Fourth, for the same reasons detailed above, the National Association objects to the extension of the time within which a private suit may be commenced from 18 months to 3 years. Unlike some forms of tort, the injury attributable to a discriminatory act is almost immediately known or knowable. There is simply no reason for allowing a three-year delay in the effort to vindicate such injury. Such stale witnesses and stale records produce little truth and accidental justice, if any.

Fifth, the National Association objects to the right granted a private complainant to file a complaint even though the Secretary has investigated the complaint and deemed it unworthy of prosecution. This means that a respondent may be put through the cost and expense of a complete HUD investigation only to then be subjected to a private action. Even more objectionable, the investigation conductd by HUD at government expense will provide the complainant with substantially all the discovery and trial preparation he needs for the preparation of his case. Thus, while the respondent must pay his own legal costs for the investigation and trial preparation, the complainant can ride free. While it is true that Section 208 permits attorneys fees and costs to be awarded to the prevailing party (in contrast to the prevailing plaintiff as at present), such awards are discretionary with the HUD hearing officer and hence can be discounted as a benefit to respondents.

Sixth, the National Association objects to the staggering escalation of the punitive damages which may be assessed in a private action from $1,000 to $10,000. Such damages are in addition to compensatory damages and equitable relief and are simply unwarranted in a "private action." Punitive damages of this order of magnitude invite legalized extortion because of their capacity to coerce settlements of cases which should be tried on their merits.

Finally, the National Association objects strenously to the enforcement system contemplated by Section 208 which constitutes HUD employees the investigators, prosecutors, and judges of complaints of alleged discrimination. As has been proved repeatedly in other contexts, such arrangement creates pressures for conviction which give justice short shrift.

*The critical need*

The most serious defect in H.R. 3504 is that it ignores completely the most flagrant and powerful offenders of the fair housing laws—those cities, towns and neighborhood organizations which have established and are implementing quota systems and residential permit systems.

By adopting ordinances instituting such systems, they have created in the name of "integration" a "minority scatter plan" which absolutely guarantees the continued supremacy and political dominance of the community majority power structure until such time as the minority population becomes an absolute majority in some vaguely defined larger regional or metropolitan areas.

These "minority scatter plans" are premised on the racist and biased stereotype of minority concentrations as inherently a threat to the health, safety and welfare of the community.

Their essential objective is to dissipate minority numbers, unity, and resources. While their rationale is minority integration, their inevitable product is minority subordination. The minority "scatter plan" is nothing but a modern version of the policy of dispersing minorities widely among the dominant majority which has been employed since the days of the Romans as a means of minority assimilation and control.

The minority "scatter plan" permanently guarantees the minority status of the minority in the community. It therefore permanently guarantees that the minority will never be able to establish the political power base required to achieve meaning-

174

ful minority representation; that is, until the minority anywhere becomes a majority everywhere. Adoption of the minority "scatter plan" by communities generally in metropolitan areas and the dispersion of minorities in accordance with such plan would vest in the dominant majority total political control and deny even such limited representation as now exists.

The minority "scatter plan" is the modern alternative to the now illegal practice of "redistricting" to preserve majority political dominance, but with a "twist." Instead of redistricting to dilute minority concentrations which might elect minority representatives, the "scatter plan" directly attacks and disperses such concentrations. Paradoxically, the "scatter plan" is potentially more affective than "redistricting" as a means of denying minority representation. "Redistricting" was effective in assuring that minority representation was disproportionately less, but the "scatter plan" is capable of assuring that minority representation is non-existent since, by definition, in no community, neighborhood, or subdivision does the "scatter plan" permit the minority to become a majority.

Three communities which have adopted the minority "scatter plan" have tried to confuse the concept of "integration" with the concept of "assimilation." But the concept of "integration" does not require the submergence or disappearance of minority identity.

Integration does not require the assimilation of different groups of individuals into one homogeneous whole. Integration merely requires the incorporation of individuals of different groups into society as equals.

The critical element of the concept of integration is not that identity is lost but that equality is gained. This is why the concept of "equal opportunity in housing" serves integration and the "scatter plan" does not. Identity and its concomitant elements, pride, culture, heritage, and "roots," are too important to be made the price of equality.

Equality must be achieved with identity intact if equality is to be a right instead of a privilege. And this is because identity alone is capable of unifying minority members in defense of their right to equality.

But minority identity cannot survive in isolation. By seeking to isolate minority members, the "scatter plan" carries segregation to its ultimate extreme—apartheid on a block by block basis. With such isolation comes only weakness, then acquiescence, and then silence.

. Underlying the "scatter plan" is the assumption that concentrations of minorities are bad per se. There is no other assumption which could possibly justify a community's using its police powers to require the dispersal of minority concentrations. Police powers are not available to regulate land use except where the safety, health and welfare of the community is deemed to be involved.

But to suggest that minority concentrations constitute a threat to the health, safety, and welfare of a community is to stereotype the minority and each member of it as undesirable. Moreover, the fact that such stereotype is reflected in law must prompt community residents and others to accept the stereotype as reflecting community consensus and experience. As such, the impact of the community's negative stereotype of minorities must be more influential and hence more virulent than one which does not enjoy the imprimatur of government.

Nor can the impact of the biased, racist stereotype created by these community sanctioned scatter plans be mitigated or justified on the grounds that the quota system implicit in the "scatter plan" is merely a means of redressing the dislocations produced by past discrimination in housing. However helpful or legitimate quotas may be in redressing past discrimination in other contexts such as employment or education, they are not appropriate remedies for housing discrimination.

This is simply because an employment or educational quota expands the range of opportunities available to minorities while a locational housing quota limits opportunities. The fact that the locational choice purports to be made in the interest of assuring minorities better housing is no justification for the "scatter plan" approach.

The measure of equality is opportunity not lifestyle.

If, as the title of H.R. 3504 suggests, the objective of this Act is Fair Housing, then the National Association suggests that the focus of the Congress and of the Act must be on those who are "defying" not those who are "trying."

Therefore, the National Association urges that the Congress stop the creation of minority scatter plans by communities which establish quotas for minority residents and coerce real estate brokers and salespersons to operate under them.

The National Association urges that the Congress prohibit the establishment of Residential Occupancy Permit Systems under which every person desiring to buy or

sell a home must be specifically screened and approved as a resident and must obtain prior approval to open his home to any other occupant, even a new wife.

The National Association urges that the Congress prohibit local governmental officials from conspiring with neighborhood associations and voluntary "neighborhood stabilization groups" to coerce, by direct threat and innuendo, brokers and salespersons to preserve the racial composition and the majority political dominance of a community by denying equal opportunity in housing.

Finally, the National Association urges once more reliance on conciliation and voluntary compliance with a full commitment by HUD and protection from community scatter plan coercion.

Mr. NORTH. We also look forward to the opportunity after these remarks, and remarks of the other witnesses, to discuss with the committee questions and concerns which it has.

The national association, as you may know, as is stated in our prepared testimony, is an organization of approximately 600,000 people who are engaged in the real estate business as brokers, salespersons, appraisers, and we have long had a fundamental concern for providing of equal opportunity in housing. We have been working for the past 6 years with HUD and with the Department of Justice on various initiatives to attempt to promote the concept of equal opportunity in housing, and in fact we developed the first nationwide affirmative marketing plan which has now been in effect approximately 18 months.

The concern that we have with H.R. 3504 is that it appears to reflect a fundamental change in philosophy—from support of voluntary action to promote equal opportunity in housing to support of what we have to view as some form of coercion or quota system. We believe very sincerely that this is not only counterproductive but also, and probably more important, that it is premature in light of the actions which are presently being taken under the affirmative programs and voluntary programs which, while delayed, are nevertheless gaining significant momentum.

In the past 18 months we have enlisted under affirmative marketing plans over 250,000 of our real estate brokers and salespersons at a rate of 14,000 per month. We anticipate that this rate of adoption will accelerate now that the program is established.

We recognize that 10 years have passed since the Fair Housing Act was enacted. We also believe that a great deal has been accomplished, especially considering the size of the job undertaken, which was substantially to sensitize an entire nation to a problem that very few really were aware of and many were antagonistic to.

We believe, as I said earlier, that we are on the threshold of one of the most massive civil rights breakthroughs in the history of this country. We feel that if this Congress will abide with the concept of voluntary action and will provide HUD with the support it needs to implement the programs that it has already entered into with the national association and the other industry associations that are concerned with equal opportunity in housing, we will achieve a great deal. In fact, I think we will achieve substantially all that Congress desires and the Constitution requires.

I would like to address myself to section 206. Section 206 reflects a very real concern with the problem of impaction. The problem exists. The real estate brokers and salespersons would be the last to deny this. The problem is, however, that when the solution

proposed by section 206 is applied to low- and moderate-income housing it will have counterproductive effects.

Basically we are concerned that section 206 will have three counterproductive effects. We believe that, No. 1, the implementation of section 206 will divert attention and funds from the revitalization and rehabilitation program which has been inaugurated and which in our view must be given the primary focus.

We believe that it will in this regard contribute to the sprawl of the city and exacerbate all of the problems that this Congress is presently attempting to cope with; for example, your problems of transportation, environment, energy, and pollution.

It is a simple fact that we must, at all costs, solve the problems of the city because of the loss of jobs which are contributing to the poverty of the people in the city. If it is true, as I have seen some statistics, that 90 percent of the minorities are living in the city then, it must follow, that we must rehabilitate the inner city because it is impossible to move any significant percentage of this 90 percent anywhere else, unless we engage in some sort of massive relocation program which under some sort of mandate, which would raise some significant constitutional questions. In our opinion,we must bring the jobs back into the city, we must revitalize and rehabilitate our basic housing stock in the city.

This is where the focus of primary concern should be. We feel that if we can bring the jobs back into the city, the income levels can be raised and we can achieve many of the objectives which are aimed at by this program.

The second concern we have is this. We are concerned that the section 206 approach will increase the cost of housing by utilizing high-cost land for low-income housing. When high-cost land is used for low-income housing, several consequences must follow: you have to produce greate density, and it is density that many people are trying to escape from, and is a primary cause of urban blight; or alternatively you must produce cheaper housing, and of course cheaper housing deteriorates faster and produces the very slums you were trying to eliminate; or alternatively you must build higher-cost housing and then subsidize to a greater extent the cost of living in that housing. This obviously represents diversion of necessary and limited resources from the creation of more and better housing, which is what is really needed, to the subsidization of unnecessary housing.

Then, of course, there is the third concern; that is that section 206 could create in essence a Federal blockbusting program of the type that the Department of Justice has fought against with, I think, increasing effectiveness. The only beneficiaries we see of this program will be speculators who will enter into communities and buy up properties which lose their value, and lawyers, of course, who will be able to engage in a significant amount of litigation.

We believe that section 206 is counterproductive. We believe that it should not be adopted at least until we see that the present initiatives for which we have the highest hope to revitalize our urban society and achieve equal opportunity in housing through affirmative marketing proves unworkable. In this connection we believe 18 months—this is what we are really talking about; 18 to

24 months—is too short a period to abandon a program which is on the threshold of success.

I thank you very much for your attention.

Mr. EDWARDS. Thank you very much, Mr. North.

Mr. Drinan.

Mr. DRINAN. Thank you, Mr. North. Could you spell out what you mean on page 8, that the bill represents "a fundamental change in the philosophy"? Nobody has said that before. Previous witnesses involved in housing have said this is not a change; this is just curing some of the manifest defects in the present role of HUD.

Mr. NORTH. We do not believe that this is the case. We believe that in the nature of things the enforcement by direct action is very much easier and, therefore, more likely to be pursued than conciliation, than voluntary action, than the government's working together with the private sectors to achieve objectives.

Mr. DRINAN. You are assuming that all of that is working well?

Mr. NORTH. We believe, Congressman, that it will work well if this Congress will provide the support which HUD needs to implement the program. In this connection if you will note in our testimony, we have now outstanding 436 affirmative marketing agreements encompassing 250,000 real estate brokers and salespersons, and that is just in the brokerage and sales area.

There are to date only 103 community resources boards, and this was pivotal organization which was going to supervise and monitor the implementation of equal housing opportunity under these programs. Of the 103 HUD has only had the funds or resources available to cause 10 to be operational.

We would hope that before this approach and this initiative, which was developed over 3 administrations and literally over 8 years of effort is abandoned by the election of an alternative approach, that it would be given a real try. It has not been given a real try.

We are adding 14,000 new subscribers to these programs every single month, and the number is increasing. We have not had the implementation by HUD of the necessary mechanism of the community resources board to assistant member boards of realtors and to bring together the various interests in the community to achieve the type of result we want.

Mr. DRINAN. Do you agree there is a lot of voluntary steering going on?

Mr. NORTH. The voluntary steering we have observed with most prominence has been that by the cities and towns.

Mr. DRINAN. You do not believe on the part of realtors there is a lot of steering going on?

Mr. NORTH. I do not believe so.

Let me say this. We believe there is a great deal of education to be done.

Mr. DRINAN. Wait, let's answer the question. You say there is very little voluntary steering going on on the part of realtors.

Mr. NORTH. Yes, sir.

Mr. DRINAN. Can you get somebody else to say that?

Mr. NORTH. Yes, sir.

Mr. DRINAN. Besides realtors?

Mr. NORTH. Yes.

Mr. DRINAN. All the evidence for 10 years has been contrary, by everybody involved, including testimony that we heard yesterday that voluntary steering occurs. Realtors, bankers, and city officials are all involved in a de facto conspiracy to segregate and resegregate.

Mr. NORTH. And that testimony does not comport with our information, Congressman. We find that the steering has been promoted by the cities and the communities. I have a letter, if you will allow me, which reflects the reason that we are accused of steering. I think it should reveal quite a bit. Here is a letter from Mr. J. Thomas Love, president of the Town Homes of Russet Oakes Home Owners Association. It is a 1978 letter and it is addressed:

DEAR REALTOR: As you well know, Park Forest South is fighting to maintain its racial stability. As president of this home owners association I am particularly concerned with the changing racial composition of Russet Oaks. Enclosed you will find a map of the area marking each residence by race and ownership in order to prevent further clustering of minorities and subsequent fears which current residents experience.

I would appreciate your informing your sales staff of the sensitivity of these areas. I would also encourage your cooperation in bringing in as many majority buyers as possible to see these homes in order to balance the demand by minorities. We are proud of the quality of our neighborhood. We have an excellent maintenance program with a strong and active home owners association and we have every intention of keeping things that way. TROHA—that is the homeowners association—is working with the village government and the South Suburban Housing Center to insure that no laws are being violated. We expect and ask your cooperation and help.

TOWNHOMES OF RUSSET OAKS HOMEOWNERS ASSOCIATION,
*Park Forest South, Ill., March 10, 1978.*

DEAR REALTOR: As you well know, Park Forest South is fighting to maintain its racial stability. As president of TROHA, I am particularly concerned with the changing racial composition of Russet Oaks (White Oak and Pin Oak Lanes).

Enclosed you will find a map of the area marking each residence by race and ownership. In order to prevent further clustering of minorities and the subsequent fears current residents experience, I would appreciate you informing your sales staff of the sensitivity of certain of these areas. I would also encourage your cooperation in bringing in as many majority buyers as possible to see these homes in order to balance the demand by minorities.

We are proud of the quality of our neighborhood. Recently a three bedroom end unit with no walk-out basement sold to a majority family for $34,700.00. We know our homes are worth that and more. We have an excellent maintenance program with a strong and active homeowner's association, And we have every intention of keeping things that way.

TROHA is working with the Village Government and the South Suburban Housing Center to ensure that no laws are being violated. We ask and expect your cooperation and help.

We would appreciate in particular an acknowledgement of this letter. We wish to know what the response of your staff is and what your and their intentions are concerning the marketing of our area.

Thank you.
    Sincerely,

J. THOMAS LOVE, *President.*

Here is a map showing each black mark and a concerted program addressed to the realtors to steer. Now, if you are a realtor in this area and you have the prospect of being placed on the nonpreferred brokers list by this city of Park Forest South and by the city of Bellwood, if you do not comply with demands like this, how is steering going to be reflected when you are tested? This is typical. This is why I say that the biggest problem that we are encounter-

ing is the demand for steering, and the realtor is not being protected from that demand by city officials.

[The letter follows:]

VILLAGE OF BELLWOOD,
DEPARTMENT OF COMMUNITY RELATIONS,
*Bellwood, Ill., February 22, 1977.*

CARSON'S REALTY,
*West Suburban Board of Realtors,*
*Broadview, Ill.*

DEAR REAL ESTATE BROKER: This letter is to serve as introduction to the Bellwood Housing Center. In response to public demand the Village of Bellwood has recently instituted a housing information and referral center which will serve the public at the new village hall.

As the Villages' Housing specialist, the issue I am sworn to address, one which I am sure is a concern of yours also, is that of avoiding the resegregation of Bellwood. It is my duty to promote balanced integration at the neighborhood level. Suburban history shows that when residential areas experience racial change too rapidly and in an uncontrolled manner, there is a tendency for healthy community relations to break down, along with neighborhood pride and property values. Consequently everyone suffers—buyer, seller and broker alike.

I am confident that the vast majority of real estate agents practicing in the West Suburban area operate ethically and with the best interests of the community in mind. Yet because of your position of public visibility and profit, when a neighborhood does resegregate the finger of blame is often pointed your way.

Together we can work to rectify this situation, for certainly you realize your professional responsibility encompasses more than simply trading homes. Initially I feel a need to sit with you and fill out the outline of an affirmative marketing program designed to use our resources and your expertise to sell Bellwood to the racially under-represented portion of our housing demand.

While the market evolves towards this goal, the Housing Center will offer counseling to prospective home purchasers, promoting our township and the benefits of living in a truly balanced, integrated neighborhood. By all means please mention this service to buyers whom you feel might benefit from it. Likewise, as my clientele grows I hope to compile a list of cooperating brokers as Bellwoods' Preferred Real Estate Agents, to recommend to buyers and sellers.

If there are any questions (or answers), please do not hesitate to call or write. As plans progress, our Community Relations Director, Tom Redding, and I will be in further contact with you. Hoping our relationship can be fruitful,

Sincerely,

JAMES W. KUBIESA,
*Housing Specialist.*

Mr. DRINAN. Has the National Association of Realtors adopted resolutions against such practices?

Mr. NORTH. Absolutely. We filed a complaint addressed to HUD and requested relief from this. We have been confronted in this particular community and in at least 10 others that I would be pleased to provide the committee with information on.

[The information follows:]

Among the communities which are demanding, supporting or participating in programs which purport to achieve "racial balance" by so-called affirmative steering techniques are Oak Park, Maywood, Hazel Crest, Homewood, Park Forest, Chicago Heights, Calumet Park, Park Forest South, Hoffman Estates, and the Beverly Morgan Park neighborhood of Chicago, Illinois. In addition, similar programs have been inaugurated in other communities throughout the country from Berkeley, California's Neighborhood Preservation Ordinance to the Anti-Solicitation Order applicable to Kings and Queens Counties, New York.

Mr. NORTH. We have been placed in the position where the State of Illinois has said if we engage in this type of steering we are in violation of the State law against steering. And on the other hand if we refuse to, we are placed on the nonpreferred brokers list by the city.

I have other evidence if you desire it. This is the most serious problem confronting us, and it is the major barrier to the ultimate elimination of steering. When the legal forces in the community, the law enforcement officials, the ordinances, say that the bringing in of minorities impairs community values and they are to be scattered, the community has provided a basis for every citizen in that community to say to the realtor: Don't talk to me; I don't want to have any of those people around.

A realtor will represent, particularly under our code of ethics, any person who desires to sell his home, regardless of race, creed, color, religion, or national origin. He makes no distinction in terms of services. But the pressure to steer arises from the community.

Mr. DRINAN. My time has expired, sir. Thank you.

Mr. EDWARDS. The gentleman from Virginia, Mr. Butler.

Mr. BUTLER. I have no questions, Mr. Chairman.

Mr. EDWARDS. Mr. North, the subcommittee would welcome any additional information you have regarding the actions of these cities. I would presume that these cities would become ineligible for community block grants and other benefits from the Federal Government. Is that correct?

Mr. NORTH. Not so. They have been subsidized by HUD and their programs have been subsidized by HUD, and we understand that there are programs presently under consideration by HUD to enable them to purchase homes so that they can sell on a selective basis—federally owned property. This is a shocking thing and this is typical, thousands and thousands of letters of this type [indicating]. If I might take just one more moment, here is a quote—I do not think I am taking this out of context. I will be happy to provide you with the text.

While the market evolves towards this goal—the goal that the community shall not have in it any more than that percentage of minorities in the total regional area—the housing center will offer counseling to prospective home purchasers promoting our township and the benefits of living in a truly balanced and integrated neighborhood. By all means mention the service to buyers who you feel might benefit from it. Likewise, as my clientele grows, I hope to compile a list of cooperating brokers as Bellwood's preferred real estate agents, to recommend to buyers and sellers.

This is by the city's housing specialist.

Mr. EDWARDS. Thank you. I am sure you are acquainted with the recent study by the National Committee Against Discrimination in Housing and the results that indicated only one of four blacks is given the same choice as a white person seeking an apartment. This study consists of 2,364 tests in 45 cities and the results were actually that discrimination is much worse than any of us had imagined.

Mr. NORTH. Mr. Chairman, unfortunately we asked for a copy of the study so that we could examine it and find out what it said. We were not provided with a copy and therefore these statements which are being made are incapable of being evaluated by us.

Mr. EDWARDS. Are you saying that HUD refused to give you one?

Mr. NORTH. What I am saying is that we have seen alternative studies and we know that there can be a skewing of statistical results and analyses.

One thing we would like to point out, there is a problem of steering and it is of critical importance to know where the steering

occurs because I have—and again we can provide you with scripts provided by housing specialists like the Far South Suburban Housing Service which is subsidized by a large number of communities—these scripts provide a message for minority buyers and a very different message for majority buyers. These are scripts prepared with the approval and money of local communities and are designed to affirmatively steer, and all for clearly differential treatment on the basis of race.

EXHIBIT C1

# HOUSING CENTER

Community Relations Department  Village of Bellwood   3200 Washington Boulevard  Bellwood, Illinois 60104
Telephone: (312) 547-6364 or (312) 547-1517

James Kubiesa
Housing Specialist

Thomas A. Redding
Department Director

August 4, 1977

Dear Real Estate Broker:

In an effort to be of greater service to you and those you serve,
the Bellwood Housing Center is stepping up its housing counseling pro-
gram. Beginning Monday, August 8 the Center will be open for the con-
venience of you and your clients from noon to 8 p.m. Monday through
Friday, and noon to 5 p.m. on Saturday.

For months communications with local brokers and salespeople have
led to sincere expressions of concern that racial fears and prejudice
could lead to the eventual resegregation of a viable suburban community.
It would be a shame.

Yet, today the physical and social character of Bellwood is most
satisfactory to the vast majority of those who live here, black and
white. Unfortunately a different picture is sometimes circulated out-
side the village, inhibiting many from making a purchase.

The Bellwood Housing Center, through its counseling program, is
prepared to help you deal factually and affirmatively with sensitive
racial matters, and in doing so begin to bring the demand for housing
in Bellwood back in line with the present racial proportion in the
Village.

Enclosed is the latest report from the Center, illustrating racial
purchase patterns in the Village during May & June. It is not reflec-
tive of overall population make up, but simply shows recent real estate
activity. We include it as a confidential guide to help you determine
who, on the basis of initial preferences, will need counseling to help
effect balanced racial demand. You will receive an update of this
report periodically.

We are now open on a schedule closer to yours. It is our sincere
hope that through support of the counseling program we will be able
to move beyond mere law enforcement to constructive cooperation. It's
a tough job -- please allow us to help you and permit the people of
Bellwood to see it accomplished.

Respectfully,

James W. Kubiesa

James W. Kubiesa
Housing Specialist

JWK:hb
enclosure 1



Moves into Bellwood by Race -- May 16 - June 30, 197_

Total: 138 Moves

49 white
63 black
26 unknown

EXHIBIT C



Far South Suburban Housing Service

3350 South Trail, Suite C, Richton Park, Il L. C0471   (312) 740-2300

AFFIRMATIVE MARKETING FOR INTEGRATION PROMOTION AND
MAINTENANCE COUNSELING:  A GUIDE

General Orientation:

Racial issues are emotional.  Discussing race is uncom-
fortable for most of us, black, white or other.  We would
prefer simply to ignore them.

As a result, fair housing counseling often has taken a
color-blind approach.  That is, a black homeseeker is referred
to a predominantly white area with little or no discussion of
the reasons for such a referral.  That approach may work in
some areas, particularly areas of relatively high family income,
deficient black or other minority traffic in the real estate
market, and homeseekers who are sophisticated, well educated
and prosperous.

Such an approach is less effective in areas where inte-
gration maintenance and open housing are equally important
components of affirmative marketing.  In such areas, a color
blind approach to promoting and maintaining integration is less
likely to be effective.  In these situations counselors must
learn to promote a positive racial consciousness.  Such an ap-
proach is not always comfortable, for counselor or homeseeker.
But, in order to counter the forces that promote a dual housing
market--one for whites and one for blacks-- counselors must be
willing to endure modest levels of personal discomfort.



Far South Suburban Housing Service

3209 Sauk Trail, Suite C, Richton Park, ILL. C0471   (312) 748-2300

Affirmative marketing in this context is a considerably
different job than simply providing objective information a-
bout housing opportunities in predominantly white areas to
minority homeseekers. Affirmative marketing means coming to
a full understanding of the detrimental effects of a dual
housing market, then working actively to use that understanding
to modify the behavior of the homeseeker. It is hard work,
often accompanied by high levels of tension.

This manual is designed to help equip open housing
counselors to perform affirmative marketing work. Counselors
will have to learn sensitive lists of "do's" and "don'ts"
to practice good verbal communication skills and, above all,
to listen carefully. None of this, however, will be effective
unless the counselor is convinced of the value of his work not
only to his own family and community, but to surrounding com-
munities and the metropolitan area.

This is highly sensitive work. The counselor practicing
affirmative marketing is selling an idea, which is never as
easy as selling houses or leasing apartments. He or she is
then using that idea to modify behavior, without crossing the
invisible line which separates affirmative marketing from
offensive or unlawful infringement of individual rights.

The setting is important. The appearance of the room,

(2)



Far South Suburban Housing Service

3359 Sauk Trail, Suite C, Richton Park, ILL. 60471   (312) 748-2300

physical arrangements and carefully prepared props all can
contribute to a cordial interview.  Props which cause the
client to open an inquiry into what the organization is doing
and why, can be valuable.  As in virtually any selling, af-
firmative marketing will work best if your message comes not
in the form of a formal spiel, but emerges in bits and pieces
during a casual conversation.  In the end, all of the pieces
will have come out.  Such props could be large photographs of
an interracial board of directors, or staff.  In the south
suburban area, for example, a good prop would be a large
photograph of the late Harry Teshima, an early and effective
proponent of integration and its maintenance in the Village
of Park Forest.  A conversation about Harry Teshima and his
work would be the most positive way to begin a comfortable
orientation of a client to the values of integration, its
maintenance and the need for affirmative marketing.

Always DO some things; DON'T ever do some others:

> DO remember to welcome home seekers.  Fuss over
> them a little.  Take coats, help them be seated,
> get coffee.  Get, repeat and use names.
>
> DO listen.  Acknowledge what the home seeker says.
> Make your sales pitch in response to what he or
> she says.

(3)



Far South Suburban Housing Service

3050 Dixie Trail, Suite C, Richton Park, Ill.. 60471  (312) 748-2300

DO ask questions for clarification, and to get
an indication of the client's orientation and
reaction.  Keep them talking.

DO gently correct factual or judgmental errors
about the area.

Do always be animated.  Speak with enthusiasm, as
though you believed and lived everything you
say.  This conversation and your perspectives
on the issues under discussion are of over-
riding  importance to you.

DO refer to maps, photographs and other visual props
when  possible in telling the story.

DO pause occasionally, especially if you have been
forced to carry the bulk of the conversation.
Let the home seeker respond, even if a few
seconds of silence intervene.  Ask questions to
get the home seeker talking.

DON'T ever say "you people" and try to avoid such second
references as "them" or "they" when referring to
minority people generally.

DON'T say "too integrated" or "too many blacks".  That
would be offensive.

DON'T use the first names of adults unless specifically
asked to do so.

(4)



3959 Sauk Trail, Suite C, Richton Park, ILL. 63471   (312) 748-2300

DON'T talk for a long time without allowing the client
    to respond, or at least acknowledge your remarks.
    It might be you are selling an idea to a client
    who is already sold.  Listen.
DON'T let the client dominate the interview.
DON'T avoid frequent eye contact.  This is very
    important.
DON'T forget to talk to each individual present.


THE MESSAGE:

    The office, the props and the interview are all supports
for the message we are trying to convey.  We are selling a con-
cept to influence important decisions in the lives of others
which may have a positive or negative impact on the social
health of the entire area.  What we are selling is in our
interest, in the client's interest and crucial to the com-
munity.

    A counselor should not memorize and repeat a script.
The situation will vary.  There are, however, some important
pieces of information that should get to the client sometime
during the conversation.  Most of this does not apply if
a black home-seeker enters and specifically inquires about
a community which is deficient in minority traffic, or a
white home-seeker inquires about a community that is deficient
in majority traffic.  In those cases, simply provide as much

(5)

information as possible about the community to reinforce the
client's interest.

The important pieces of information which make up the
message are:

Organizational orientation: The Home Directory Service
(HDS) is a service of the Far South Suburban Housing
Service, a not-for-profit, tax exempt Illinois
corporation. It is funded by grants from area
communities, by the sale of rehabilitated houses and by
dues and donations. Our purpose is to strengthen the
housing market of the far south suburbs. Our services
are free.

| Black home-seeker | White home-seeker |
|---|---|
| Integration: The HDS was established primarily to promote and to maintain integration in the housing market. Interracial living is important to all of us, directors and staff. In a society such as ours, with a long history of segregated housing, integration is something which required diligent work to be achieved and kept. I'm certain you both agree, don't you? It would be nice if it would | Integration: The HDS was set up primarily to make sure that persons seeking housing in the area can receive information about the south suburbs without commercial pressure to buy a specific house and also to help people consider all the options. Full competition assures maximum property values. People of all kinds are competing fully in the housing market. Are you familiar with housing available throughout the area? |

(6)

33-264 O - 78 - 13

002189

just happen, but it does not
seem to happen naturally.

Benefits of Integration: The
HHS is concerned with both the
social and the economic bene-
fits of integration. The
economic effects are simple.
Property value is determined
by the laws of supply and de-
mand. The more demand for the
supply, the greater the value.
The less demand, the lower the
value. It makes sense to buy
in an area where demand is
strong and can be expected to
continue strong. That means
maximum appreciation. If all
people, black, white, and
others, who can afford certain
housing are competing for it
equally, then you have 100% of
the potential demand. If only
whites are competing, that
area is sacrificing something
like 23% of the demand that is
black. If only blacks are
competing, then the area is

Benefits of Integration: Most
people want a community where
they feel comfortable and
where they can feel they are
getting a good bargain --- as
much house and community ser-
vices for the dollar as
possible and as much value
appreciation as possible. Many
people also value a community
where the future is planned
and does not develop out of
control. A place where people
are working hard to insure
their future.
As an example, Park Forest is a
planned community. It has the
best fire rating and lowest
crime rate of any comparably
sized community, largely
because of planning. It is also
ethnically diverse, yet it is
very stable. It determines its
own future through professional
services and good government.

(7)

losing 77% of the demand. If an area has a deficiency in the traffic of either race, the property values will suffer. If there is no demand from whites then, because of their larger numbers, property values will be sacrificed to a considerable extent no matter how well homes are maintained. You can see very simply how active competition from blacks and whites together protects values and investment. There is no stock or bond traded that offers the kind of investment opportunity that you can get with owner-occupied housing. But only if the market remains strong and open to total demand. The social benefits of living in an area where all races are competing for housing equally are just as important. Good, strong, effective governmental services can be supported. Diverse groups of friends and associates are available.

Don't forget, when you buy or rent housing, you also buy into a community. Its safety record, its schools, its conveniences or lack of them are part of the package. I'm certain these things are as important to you as they are to all of us, aren't they?

(8)

002191

Children can learn to deal
effectively with all kinds of
kids in neighborhood schools
where academic achievement is
highly valued. These are bene-
fits for the entire community, as
well as for the individual. I'm
sure we could both list a lot of
others.

We don't use the word "integration"
to refer to a housing market
situation which is mixed for the
present but where wholesale racial
trasition is threatening to take
place because of whites dropping
out of competition --- maybe
because they have been steered away
by their employers or by real
estate brokers. Does that idea of
integration as competition make
sense? Is it something you value?
For us, integration is a situation
in which houses trade just as
easily from black to white as from
white to black.

(9)

We promote integration by collecting information about communities in the area, and then passing it along to people looking for housing in the south suburbs. We get general information about price ranges and services, and information about integration. We get it from real estate professionals, rental housing managers, village governments and special demographic studies. All of this allows us to determine or estimate the nature of demand in the housing market. Then we pass it along to consumers and encourage the individual to make his own choice after considering all of the alternatives.

As an example, we have determined that in Park Forest South, and to a lesser degree in Park Forest, there is some recent deficiency in white demand. Black housing demand has been stable, or rising

Have you done any shopping for housing in Park Forest or Park Forest South? You really should consider them. They have about the best municipal services and amenities of any communities in the area. Between them, you can find housing in almost any price range. Because they are diverse ethnically, and because they are both carefully planned communities, housing values will appreciate there more than anywhere else in the area. Etc.

(10)

002193

slightly, but demand from whites
has been soft. On the other
hand, nearby communities such as
Crete, Matteson or Richton Park
have black people living in them,
but there is a deficiency of
black demand. There is not
enough black competition in
those communities for maximum
housing values. Unfortunately,
not enough black people are being
told about these housing options.
Let me tell you about some of
these towns. We can give you
community profiles of them, and
put you in touch with volunteers,
black or white, who already live
there.


REFERRAL:

After having conveyed the message to the counselee and,
hopefully, gained the counselee's confidence to some degree,
ask the counselee if you have his/her permission to call one
of HDS's cooperating affirmative marketing realtors. If so,
contact the "up" realtor and arrange for realtor and client
to get together as soon as possible --- immediately in the
Housing Service office (or the realtors office as a second
choice) if it can be arranged.

(11)

RENTERS:

The candidate for rental (or cooperative) housing, very probably the lion's share of HDS traffic, can be assumed to be both much like and much different from the buyer. Renters are interested in convenience, safety, value, prestige, etc. just as are buyers. They too are "buying" community as well as personal living space. Some of their differences from buyers make counseling them easier and some differences make the task more difficult.

Most renters can be expected to be less future-oriented and less caring about "what the community is going to be like in ten years". They tend to be interested in now. Since they will not be concerned about building equity (or only a little concerned with regard to cooperative housing), appeals about future property values will tend not to sway them.

On the other hand, the renter's lower level of financial investment and commitment, coupled with the relative ease with which he/she can make a change if not satisfied with the rental housing, is also a plus. A white individual or family "can afford to take a chance" on a multi-racial rental area. A black individual or family can justify giving an over-whelmingly white-occupied project consideration if there's some reason to believe that it'll be relatively hassle-free. Individuals or childless couples, black or white, may be expected to be even more open to "taking a chance" than will families with children.

These renters need to be made favorably familiar with rental options where their race is underrepresented in the

(12)

current occupancy and/or demand. After the prospective
renter outlines his/her requirements, the counselor must be
able to match them with a couple of rental possibilities
about which the counselor is fairly familiar. Work towards
calling the rental agent to expect your referral after saying
to ones counselee, "Would you like to see it?" and "May I
call to tell them to expect you?" or "Do you have time to go
over there with me now?"

It will not hurt to be candid with a counselee about the
racial composition of a complex if he/she should ask and if you
have or can readily find the information. Remember, however,
to present it in the light which will probably seem most
reassuring to the counselee. If you sense that a white
counselee is prone to choose someplace else because of a
white tenant composition, let the counselee know that HDS is
now working to increase the black tenancy there while stimulating
white demand for the complex he/she may be about to remove from
the list of options. If a black counselee is reticent about a
rental area being "too white", let him/her know that HDS is
working on and expects to see a more inclusive tenancy there.
In any event, HDS and "its friends" will be available should
the counselee encounter problems.

While a counselor should not be offensive or overly curt,
a counselee who has definitely decided to make a move counter
to that to be served by HDS objective need be assisted only to a
limited extent, such as giving directions to the desired
destination and being supplied with correct information should
they voice factual errors about the area.

(13)

002196

HARDSHIP CASES:

A counselor must learn to recognize hardship cases (persons who have very limited financial means, very restricted choices, need a whole host of social service help in addition to housing) and to deal with them as hardship cases. This kind of case (people with very little means) can very often not be counseled in terms of integration and its maintenance. You need not try to convince them to explore new options that they cannot afford.

If the hardship case counselee is a current resident of our primary service area and can be assisted to retain housing now occupied, the appropriate effort (to be learned from full time staff) should be made. If new housing is being sought and the limited options available happen to afford an opportunity to advance on HDS objectives, then the effort should be extended. If not, it will usually be much wiser to refer the counselee to sources of aid which might serve to address other problems (e.g. money, health).

If the hardship case is seeking to move into the area from outside, try to refrain from providing that assistance, unless it can be given consistent with HDS objectives. In those cases where it cannot, try to refer the counselee back to services close to home. If you do not have an answer and cannot find one, say so and express your regrets.

In short, avoid spending a great deal of time and energy, which is supposed to be devoted to integration promotion and maintenance, on cases which are not candidates for the service HDS offers. Hardship cases should be primarily handled by persons trained for and assigned to that purpose.

(14)

FOLLOW-UP:

Each counselor should be responsible for checking back with the counselee and the realtor or rental manager to whom counselee was referred. It is important that HDS learn what decisions counselee has made. If we are to fully benefit from our experiences we msut have feedback. Follow-up is also needed for planning and reporting purposes.

IF THERE IS A HITCH:

If you experience difficulty in some phase of counseling, tell the staff and staff will seek to provide assistance. If you have ideas for doing things differently, communicate them to the staff. As this kind of counseling does not have a long history, your input is valuable. You are not encouraged to be too experimental without consultation.

(15)

Mr. North. The question is not whether there is steering. The question is, where there is steering, what prompts it? Who motivates it? And is the real estate broker getting protection or is he the initiator of the steering?

In other words, I would have to say in the first instance that the many real estate brokers and salespeople feel that they are the victims of steering pressures and not the initiator of those steering pressures. Their commission comes, their services are paid for, whether or not the purchaser or the seller is a black, an Oriental, or a majority person.

But there is another point, and this causes me concern about the study. I think this committee ought, before it accepts that study as gospel, to permit organizations like ours and others to analyze it and respond to some of the points. This study was conducted in primarily May and August of 1977. The fact of the matter is that this was less than 6 months after the HUD-national association affirmative nationwide marketing program was inaugurated—less than 6 months. We would like to see how many of these communities that were tested were covered by affirmative marketing agreements which are pretty rigorous in their prohibitions of steering. We would like to know if the testing occurred in areas that were not covered by affirmative marketing agreements which are now covered? Was there a difference between the results in communities where we had affirmative marketing agreements which were operational and those which were not?

These are the key points. Just one other point. It is as embarrassing for HUD as I am sure it is for the national association and the real estate industry, that the noble concepts of title II have gone for 10 years without full implementation.

We would call your attention to this. Title VIII was passed in 1968, whereupon the National Association of Realtors Code of Ethics was amended immediately to conform with its spirit and intent. First HUD regulations relating to title VIII were not promulgated until 1970. By 1972 the national association had developed its Code For Equal Opportunity In Housing and had entered into negotiations with the Civil Rights Division of the Department of Justice to develop a compliance program and had started formulating an affirmative marketing agreement with HUD.

In 1973—and this was less than one year later—we presented to HUD a proposed nationwide affirmative marketing agreement which would have encompassed the entire Nation. HUD turned us down in 1973. They would not accept a nationwide program, preferring instead a local or regional approach. We offered it each year after that until 1976, when they said the regional approaches were not working, and shifted go to the national approach.

At that point, we started working with HUD for the development of handbooks, guidebooks, and educational materials, and in 1977 our program was inaugurated. This program has been effective.

We have spent nearly half a million dollars in promotional work. Every real estate broker has brochures, every customer has brochures intended to discourage or prevent steering. All of our educational materials have been revised to avoid steering. We have embarked upon a successful program, but we could not embark

until HUD agreed that this program conducted on a nationwide basis was the appropriate way to go.

We very sincerely believe that there was not time, when this study was conducted, to really see the effect of this program. We feel that given a study conducted in the areas where we have these programs functioning, paticularly if the Congress will fund HUD to provide us with these housing resources boards, you will see a tremendous change and a tremendous result.

Mr. EDWARDS. You would agree that steering is already illegal under Federal law; that is correct? And yet you are suggesting that instead of enforcing the Federal law, that we are going to accept your suggestion that the Federal Government fund a program of volunteerism. Is that correct?

Mr. NORTH. No; that is not correct. It is illegal under Federal law. We have supported, and we do support lawsuits, actions taken in accordance with congressional mandate, against persons who are guilty of steering. In fact, we have supported before real estate license commissions the revocation of licenses for engaging in steering activities. We do not support illegal activities. But we are concerned with not only the illegal activities but the course of such activities—their encouragement, sponsorship, and even requirement by cities and communities.

Mr. EDWARDS. You make it easier for the people who are being discriminated against to sue. Doesn't that make that sense?

Mr. NORTH. No; it does not to me because I do not think it solves the problem.

Mr. EDWARDS. Why would you object to it? Is that not the right of every person?

Mr. NORTH. Simply because its effect is to inhibit the whole procedure for making available equal opportunity in housing. It inhibits it because there is nothing like a threat of litigation to result in the absolute diminution of services to an absolute nothing. You offer services to nobody. You do not help anybody. You just show them some listings and keep quiet, and that does not help people who need help. People do not find housing by placing the person best able to help them in the position where he says anything at his peril.

Moreover—and this goes back to the basic thrust of my concern—you do not place a real estate broker that you want to perform in a nondiscriminatory fashion, in the position where he has the choice of violating a city ordinance and being banned from business in that city or violating the State license law or engaging in steering.

In fact, there is a letter which HUD has a copy of that says affirmative steering is desirable and we ought to engage in it.

I know of no distinction which Congress has made between steering. It is all bad. However, there is what is known as affirmative steering, and HUD is well aware of it. There are many communities and many people, as I have discussed the subject with in HUD, that think affirmative steering is very good.

Mr. DRINAN. Affirmative steering is legal, you are saying?

Mr. NORTH. Is it?

Mr. DRINAN. Steering is illegal but affirmative steering is legal?

Mr. NORTH. That is what they tell me.

Mr. DRINAN. Who is "they"? What does the realtor say?

Mr. NORTH. The realtor says all steering is bad.

Mr. DRINAN. Including affirmative steering?

Mr. NORTH. Including affirmative steering.

Mr. DRINAN. What is this letter that HUD has?

Mr. NORTH. It is a letter from Bellwood.

Mr. DRINAN. Who at HUD has ever said that affirmative steering is okay? Do you have a piece of paper on that?

Mr. NORTH. No. In discussions.

Mr. DRINAN. But you have no proof that anybody at HUD says affirmative steering is okay. Do you want to retract that?

Mr. NORTH. Do I want to name anybody at HUD who will admit affirmative steering is legal?

Mr. DRINAN. Either that or retract the allegation.

Mr. NORTH. I will retract the allegation.

Mr. DRINAN. Thank you very much.

I have the study that you have challenged the methodology of. It has been out a month, since April 17. It was discussed by the Secretary, I take it you are just challenging the methodology and you are saying if the realtors' plan had been given a fair shake, if they had factored in this, the results would be different. Have you made that known to anybody at HUD?

Mr. NORTH. Yes.

Mr. DRINAN. In black and white?

Mr. NORTH. In a 5- or 6-page telegram to Mrs. Harris immediately upon notification of the fact that the report had been issued.

[The information follows:]

NATIONAL ASSOCIATION OF REALTORS,
*Chicago Ill., April 28, 1978.*

Ms. PATRICIA ROBERTS HARRIS,
*Secretary of Housing and Urban Development.*

DEAR SECRETARY HARRIS: We at the National Association of Realtors were pleased to participate in the NCDH/HUD National Fair Housing Conference as part of the association's commitment to our equal opportunity program.

One of the primary purposes for the conference was to reveal preliminary data obtained in the HUD housing market practices survey. In a November 4, 1977 letter we requested a meeting with you to discuss the data complied in the survey and implicaitons of it for our affirmative marketing agreement. On November 28, 1977, Assistant Secretary McGuire replied that when plans for use of the data were complete a meeting would be arranged with us to discuss proposed use of it.

We, of course, have only seen preliminary data revealed at the National Fair Housing Conference. However, we are somewhat dismayed over the sweeping implications that it reveals widespread discrimination in housing. There is also concern over misunderstanding and misinterpretation of information revealed at the conference which creates the incorrect image that the real estate industry may be responsible for inequality of treatment in this country.

The National Association of Realtors has made a substantial leadership and staff commitment to the equal opportunity program. The affirmative marketing agreement has been adopted by 382 member boards of Realtors representing 45 percent of the total membership of the National Association of Realtors. The code for equal opportunity in housing has been adopted by 1,071 of our 1,724 member boards covering 82 percent of our membership. Our concern continues to be that data revealed by the NCDR will not be used in a manner which will deter our significant progress to date.

We feel the National Association of Realtors has developed considerable educational materials in relation to elimination of discriminatory practice and to affirmative marketing in which we would be capable of assisting NCDH in developing educational materials in the housing marketing practices survey for which you have awarded a grant of $28,000. Our proposal, however, is in no way requesting or soliciting any part of the grant.

We also point with great pride to the national association affirmative marketing agreement and its partnership with HUD. However, we are further concerned with the $500,000 grant you awarded which will be used without consideration of further HUD staff support in the office of voluntary compliance, in the interest of giving the affirmative marketing agreement and the industry its much needed HUD support in development of community housing resource guards. It is our feeling that if the structural organization agreed upon were in effect, it would have caused a common benefit and best served objectives of the affirmative marketing agreement. Had the cares been in operation, they could have eliminated much of the need for the $1,000,000 housing marketing practices survey. You may have this under consideration for utilizing part of the allocated funding or future funding for this purpose.

Therefore, we request a meeting with you do discuss the manner in which specific findings will be drawn from the NCDH data and how these findings will be utilized by HUD.

Sincerely,

H. JACKSON PONTIUS,
*Executive Vice President.*

Mr. DRINAN. But you had never seen the report? It has been out a long time. We had it here weeks ago. It is very accessible and available.

Mr. NORTH. The report is not available. The summary is.

Mr. DRINAN. This is the essence of the whole thing. You are just challenging the whole methodology, and that is not very satisfactory from my point of view. Unless you come in with some sociologists or statisticians and say this is erroneous, I am not prepared to just set this thing aside. Insofar as I can comprehend the total statistical balance here or basis, it seems valid to me. Except you say there is a new dimension because of the plan the realtors have devised; but the burden, sir, is upon you.

Mr. NORTH. I think I did not say there is a new dimension because of the plan the realtors devised. I think I said there is a new dimension because HUD and the realtors and a large number of other organizations have entered into nationwide affirmative marketing agreements. It is not something that we devised. We worked with it, developed it in collaboration with the Civil Rights Division of the Department of Justice and HUD, and this joint program has been approved by all of those agencies charged with enforcement of civil rights. It is not our program. We played a very important part in it because it was directed at us. It was requested that we participate in it. But it is a program which we were told at the time was to aid the Government implementing its objectives.

Mr. DRINAN. Let's go back to H.R. 3504. Since the end of World War II, or even before, patterns of segregated housing have developed in those cities. It is my belief that pattern has deepened and intensified and has not really altered and changed. That is the basis really why the bill under discussion was proposed. It is a very serious problem, a chronic problem, and voluntary compliance that you are recommending so enthusiastically has not cured the problem.

Would you agree that is the background from which H.R. 3504 developed?

Mr. NORTH. I would say affirmative marketing of the type we are talking about has not been tried under any concerted program supported by agencies of the Government.

Mr Drinan. When is the first date on which we will have some evaluation of that plan?

Mr. NORTH. I would hope that by the end of this year we would be in a position to respond.

Mr. DRINAN. I did not mean that, sir. When is the earliest point when you can demonstrate statistically this is altering the pattern that has developed over the last 30 years in America?

Mr. NORTH. Well, I do not know.

Mr. DRINAN. I do not know either, sir. That is why I think we should enact 3504. I am not prepared to wait for some indefinite date when you cannot even predictably say what is going to transpire. What would you do if you were a Member of Congress sitting here watching over the past 30 years something develop which is fundamentally contrary to the essence of equality that we believe in?

The Members of Congress have an affirmative duty to develop a plan by which the realtors and all of us are guided toward be equality of housing. The overwhelming evidence is that people, the minorities and, the poor, simply cannot get equality in housing. You say, let's wait for one further plan. Yet you cannot give me any date when possibly we might get some shred of hope that plan is going to work.

Mr. NORTH. The problem is your new program does not have a date either, and what we are saying is that you already have a good program. A program which will produce, which you devised and which, if I recall correctly, was considered by the Congress and was viewed in the same terms and as having the same objectives, but it has not been given the opportunity to work.

Mr. DRINAN. Sir, to the best of my recollection this was not approved by the Congress. This was devised by two previous administrations. I do not recall any legislation that we had that devised this particular program that you are talking about. I would assume our conclusion is when we filed H.R. 3504 that was not an adequate program it was just another spinoff of the voluntary compliance that is not working. All of the experts have recommended that cease and desist power be given to in HUD and these other things that we have incorporated in H.R. 3504.

My time has run out, but you can respond to this or any other point if you would like.[1]

Mr. EDWARDS. The gentleman from Virginia.

Mr. BUTLER. I would like to ask the witness if he feels he has had an opportunity to answer fully on the subject of steering?

Mr. NORTH. I think we have expressed our position on this and our deep concern with the fact that the steering which is going on is in our experience the product in large measure of attitudes which can be changed and which are being changed. But we re-

---

[1] Responding to Congressman Drinan's request for comment in his impression that the Congress did "not" approve the type of affirmative marketing program developed between HUD and the National Association of Realtors, the National Association of Realtors believes that the Congressman's impression is incorrect. The affirmative marketing agreement was developed pursuant to Section 809 of the federal fair housing law enacted by Congress. Section 809 directs the Secretary of HUD to: "* * * call conferences of persons in the housing industry and other interested parties to acquaint them with the provisions of this title and his suggested menas of implementing it, and shall endeavor with their advice to work out programs of voluntary compliance and enforcement."

The affirmative marketing program is precisely the type of "program of voluntary compliance and efforcement" mandated by section 809 and hence by the Congress in enacting that section. If the affirmative marketing program is not the type of program intended by Congress we are unable to perceive the intent of Congress in section 809.

quire the Congress to protect the private sector against these communities that are engaging in affirmative steering.

For example, one community now has a residential occupancy permit. You cannot live in that community, you cannot buy in that community, you cannot sell in that community unless you first are permitted to do so by application to the city. Moreover, if you get married and want to bring your wife into your home, you must have a modification of your permit to authorize her to move in because she is not among those permitted to live in your house. This exists.

The permit is here, and I will provide the committee with a copy. This is the way it is going.

---

**VILLAGE OF BELLWOOD, ILLINOIS**
**APPLICATION FOR RESIDENTIAL OCCUPANCY**

EXHIBIT E

APPLICATION NO. 18206

I hereby request permission for those named below to occupy as a single family dwelling unit, the premises known as:

1. Address: _____ Bellwood, Illinois

2. Head of Household: _____ 3 Spouse in Residence _____

4. Present Address: _____ Phone: _____

5. Place of Employment - Head _____ _____ Occupation _____

6. Place of Employment - Spouse _____ Occupation _____

7. Date of Proposed Occupancy __/__/__ 8. Rental __ Purchase __ Other Tenure _____

9. FHA __ VA __ Conventional ___ No Information ___

10. Real Estate firm or owner with whom applicant has dealt _____

11. Previous address, if moved in last 12 months _____

12. CHILDREN OF HOUSEHOLD HEAD OR SPOUSE WHO WILL OCCUPY THE DWELLING UNIT:

| First and last name | Birth month, year | First and last name | Birth month, year |
|---|---|---|---|
| _____ | __/__ | _____ | __/__ |
| _____ | __/__ | _____ | __/__ |
| _____ | __/__ | _____ | __/__ |
| _____ | __/__ | _____ | __/__ |

13. ALL OTHER PERSONS WHO WILL OCCUPY THE DWELLING UNIT:

| First and last name | Relationship to Head | Birth Date | Place of Employment |
|---|---|---|---|
| _____ | _____ | __/__ | _____ |
| _____ | _____ | __/__ | _____ |
| _____ | _____ | __/__ | _____ |

14. WILL ANY PART OF PREMISES BE USED FOR BUSINESS PURPOSES? __ Total No. of Occupants __

*I understand that it is unlawful to occupy these premises without first receiving a permit and that it is unlawful to permit any person to occupy these premises who is not named above. I certify that the answers contained herein are true and accurate in all respects to the best of my knowledge and belief.*

15. Date of Application __/__/__ 21. Signature of Applicant _____

Signature of applicant witnessed by: _____

Mailing address if other than present address:

_____

_____

Occupancy complies with all provisions of the Bellwood Housing Code certificate issued by the Building Commissioner on

_.—Issued without special conditions
_.—Conditionally issued. See letter

Authorized signature

You ask why people continued to be denied equal opportunity in housing. It is because many officials at the community level do not want equal opportunity in housing. I think there is a cure for this problem in your community housing resources board—properly funded and properly organized as HUD knows how to do, because the ones that have operated have gone far to achieve these objectives. You have a good program, which does not depend on coercion and this type of legalized harassment. That is basically our position.

We feel section 206 will be counterproductive in the extreme. It is what I said in the prepared testimony, and perhaps this is harsh but this is the way we feel. It is a share-the-slum program because it will result in the same type of expanded blight that we have experienced in the past. This Congress has provided effective programs with great promise but they have to work themselves out. Time is required for the solution to big problems, especially when you have psychological barriers.

Your new program and President Carter's focus on revitalization, in which we have a major role, is, in my opinion, and in the opinion of our 600,000 members, the way to go. We do not need the quota system that is proposed to achieve these results. I thank you very much for your kindness.

Ms. COOPER. I have just a few questions. You have characteried the proposal to distribute low-income housing to other areas as a share-the-slum kind of approach, but do you and your organization recognize any other advantages that might accrue from having low-income persons reside in more affluent areas, given the way jobs and services are distributed in this country at this time at least?

Mr. NORTH. You see, our problem is basically this, and it is what I said earlier in my testimony. The problem is too urgent to try these types of peripheral, slow solutions. If 90 percent of the minorities, or let's say 90 percent of the low-income unemployed people, are living in an area, then you have to focus your resources, in our opinion, on bringing the jobs closer to the place where people live and upgrading the quality of housing that they have access to. Because the only alternative is to find a place to put a 1,000 units in Lake Forest, and a 1,000 units in Arlington Heights and a 1,000 units in Barrington, taking the suburbs of Chicago, but that does not solve your problem. It takes care of 3,000 units and there are half a million people that need upgraded housing.

The most effective program, or at least in our view, and the program you have inaugurated is to bring the jobs back and focus on upgrading the inner city. This is the solution.

Ms. COOPER. But the jobs in the tax base are moving to the suburbs.

Mr. NORTH. That is the key, and you are already started on a reversal of this through tax credits and a wide variety of programs that are going to bring the jobs back into the city. We cannot afford the type of urban sprawl that is taking the best farmland and making public transportation impossible. We can not afford the type of urban sprawl where everybody drives out a little further and a little further because there is always somebody left behind.

What we are talking about now is the people that are left behind. We have to cure that, and the solution is equal opportunity in housing.

Ms. COOPER. To what do you attribute the patterns of racial segregation that have arisen? You have talked about the policies of certain communities to promote affirmative steering but clearly, if it is indeed a practice that is widespread today, it is a relatively recent phenomenon, yet the patterns of segregation between the city and suburbs have been developing steadily for the last 30 or 40 years.

Mr. NORTH. You are absolutely right. The thing I attribute that to is the mistake that everybody made in common. I note, for example, that it was 30 years ago—and our housing stock goes back a long time that when *Shelly* v. *Kramer* was adopted, and that was the first time that the Supreme Court said that private racial covenants were void and a lot of people have forgotten the fact that until 1948 racial covenants were legal. When I moved into a community—my folks did—there was a racial covenant on the books and all of the houses that were built in that community were sold and arranged according to that racial covenant.

Back before that, remember that cities were entitled to enforce racial restrictions. In fact, if I am not incorrect, until approximately 1915, cities themselves had the right to establish segregated housing patterns. I am not sure you are aware that until after World War II the FHA manual provided that:

"The Valuator," the person that makes FHA loans, should investigate areas surrounding the location to determine whether or not incompatible racial and social groups are present, to the end that an intelligent prediction may be made regarding the possibility or probability of the location being invaded by such groups. If a neighborhood is to retain stability, it is necessary that property shall be continued to be occupied by the same social and racial classes. Underwriting manual, U.S. Federal Housing Administration, Part II, Sec. 233 this was federal policy which is now changed.

So if you are talking about segregated patterns of behavior, it is one of those things for which we must all share the responsibility. I will say this, the Realtors for a long time did not recognize their share of the responsibility. They said, we just do what the people, the community and our bosses, the sellers of real estate and the buyers of real estate, tell us to do.

But now we have recognized—and the recognition has not been easy—that we have an independent responsibility, and it has been in connection with that independent responsibility that we have initiated these affirmative marketing programs. We feel that they are the solution. Because voluntary action is the only solution which will be lasting. Go the other way and I am afraid there will be backsliding.

Mr. EDWARDS. We are certainly going to welcome this new attitude, Mr. North. Are you in all sincerity telling us we can look forward to the real estate profession and the realtors of the country supporting, for example, local initiatives that would finance through Federal assistance low-income housing? That has never happened in California. The realty boards and the state organizations always resisted that and put up some money so they would not be constructed. Are you telling us from now on your national association will be against these cities having zoning only for in-

dustrial purposes and not for small lots so that cheaper houses and apartments can be built? Is that a new thrust?

Mr. NORTH. What I am saying, Congressman, is that we have been involved at least since 1973 with a large number of initiatives concerning expansion of the housing stock and assistance to low-income families requiring housing. But I just left a meeting in Chicago yesterday, at which the national association, by unanimous vote of its board of directors, without one dissent, committed yet another $200,000 to its equal opportunity program—$200,000 until the next meeting in November.

The realtors are foursquare behind this concept of equal opportunity. We may still have some disagreements with certain people in the Congress or certain people outside the Congress as to how things should be done in terms of providing low- and moderate-income housing. Our basic thrust is that we feel that the private sector should do more and can do more, given appropriate incentives, tax allocations, and that sort of thing. But I would like to say, and I say this unequivocally, that the recognition of the problem is there and unequivocal.

The commitment of the national association to a real and effective role in the solution to this problem is there and unequivocal, and what we are looking for is a role which we can play. We feel we have found one in the affirmative marketing program, and we are very much distressed at this point to see that program may be discouraged. It is a source of great dismay to us, especially when we think there has been nothing that has produced the reaction of favor and participation like this program.

The mortgage bankers, the contractors, the homebuilders are all meeting with us, getting behind this program. This program coupled with the urban revitalization program has truly caught the imagination and the enthusiasm of the entire real estate industry, and we just think it is something that the Congress ought to see.

Mr. EDWARDS. Thank you.

Mr. Volkmer.

Mr. VOLKMER. Thank you, Mr. Chairman. I am sorry I had to leave but I had another commitment. I will not try to hit anything that has already been placed in the record.

Do you know of any studies that have been made on the desires of minorities as to where they wish to live?

Mr. NORTH. Yes, sir. There are some studies that are recited in a book entitled "Affirmative Discrimination" which analyzes this area very extensively. I think perhaps one of the finest analyses of this subject has been done—and I have to say we did not pay for it; we did not even know about it until I happened to locate it as a result of representation of another association in the library community—is a book entitled "Affirmative Discrimination" by Nathan Glazer. It is published by Basic Books, Inc., New York, and I believe that Mr. Glazer's credentials are outstanding. I commend to you the bibliography which is contained in it—I have had occasion to review the bibliographic sources and I think they are reliable. They include, of course, Brookings and Downes—reports by Anthony Downes. That is one that comes to mind immediately but I am sure that given some time, Congressman, we would be delighted to provide you with additional sources.

[The information follows:]

Harrison, Bennett. Urban Economic Development. Washington, D.C.: The Urban Institute. 1974.

Freeman, Richard B. "Changes in the Labor Market for Black Americans, 1966–72". Brookings Papers on Economic Activity, 1973.

Kantrowitz, Nathan. Ethnic and Racial Segregation in the New York Metropolis. New York: Praeger. 1973.

Downs, Anthony. Opening Up the Suburbs. New Haven: Yale University Press. 1973.

Mr. VOLKMER. Does your association have any information as to the present feelings of many whites when blacks do move into the neighborhood or minorities move into the neighborhood? I can remember back years ago when a minority would move into a neighborhood everybody immediately put up for-sale signs and some cities had to pass ordinances preventing the for-sale signs.

Mr. NORTH. That practice now is illegal, you know, under the *Lindmark* decision.

Mr. VOLKMER. Yes; I know.

Mr. NORTH. We have found this seems to be a function of income levels. In other words, when you are talking about discrimination, if the income levels are comparable there is not this feeling except at the lower end of the income spectrum. There seems to be a significant concern between the blue-collar worker minority and the blue-collar worker majority people. This is where the tension line seems to be.

We have seen a diminution of it, and a very significant diminution, in the upper middle-class and in the affluent areas.

Mr. VOLKMER. So you are not seeing any longer the fleeing-of-the-neighborhood-type attitude?

Mr. NORTH. No; I do not think so. We are not seeing the block-busting. In fact—and this relates to what we were saying earlier—with the experience that we now have, blockbusting techniques are readily identifiable, and the FBI and the Department of Justice have been extremely efficient along with local State agencies in pinpointing blockbusting activities. You will find the brokers and salespeople who are losing their licenses—and there are many of them—are almost invariably found guilty of blockbusting programs.

We have a mechanism through the local boards of realtors for receiving complaints relating to blockbusting, some of which are turned over to real estate commissions and other authorities. We are committed to do this under our equal opportunity housing program.

Mr. VOLKMER. Have you addressed what you are doing in regard to steering? If you have, let it go.

Mr. NORTH. I just want to repeat it.

Mr. VOLKMER. No.

Mr. NORTH. No, I could not repeat all of it—you would not have that much time—but I did want to say this: We would be the last people to say steering does not go on but we feel that a major part of the steering is steering dictated by the conduct of local communities. This is where we are concerned. We feel that if you, the Congress, or HUD, or the Department of Justice—and we have looked to the Department of Justice, and we have looked to HUD and as yet they have not been able to help us—if you can relieve

the real estate broker and the salespeople from the sanctions which the cities can and do impose, and if we, the broker and the salespeople, do not have to steer to achieve what the community views as its proper demographic profile, you will in large measure eliminate steering in this country.

I mean that very sincerely. Because the real estate broker frankly could care less whether he receives his commission from a minority person or from a majority person. He is interested in one thing, and that is supplying the housing needs of the people who want his services. Therefore, to the extent that he may be influenced to steer, that influence may well be the result of factors over which he may not have any control. When the city tells the real estate broker to feed minority people into majority areas, and majority people into minority areas, there cannot help but be steering. There cannot help but be steering, or how else are you going to get them to go there?

You are all, I am sure, aware of multiple listing policies. We have a standing policy that when any person comes in and says they would like to see houses that are available, if there is any sense on the part of that broker or salesperson that that person does not feel he has seen them all, he is to be shown the multiple listing book, which contains every listing available, and given the opportunity to go through the listings one by one.

Our policy and absolute commitment is to make equal opportunity in housing available to all and to find new ways—and this is where Congress can do enormous benefit—to permit more people to afford a broader range of homes through financing, through lower interest rates, through subsidized downpayments, and through variable mortgage interest rates. If we enable people to afford a wider range of homes, they will go wherever they want.

Mr. VOLKMER. I have one more question. Do you have members of your association that are minorities?

Mr. NORTH. Yes, sir. Moreover, we have for the past 5 years invited the National Association of Real Estate Brokers, which is a predominantly minority organization, to merge with us; but notwithstanding we have a very significant number of minority brokers and we have constant liaison with the National Association of Real Estate Brokers and a wide variety of other groups.

Mr. STAREK. Proponents of cease and desist authority argue that the provision in the bill is necessary because HUD has virtually no recourse when conciliation fails. You strongly support continuation of the current practice of voluntary compliance.

Has it been your experience that cease and desist authority would change this? In other words, how often does conciliation fail, and would cease and desist authority in HUD really alter the current practice?

Mr. NORTH. This is our concern. I do not see that the authority you have proposed to grant to HUD is what you do when conciliation fails. What I see it as is something that you do instead of conciliation. The fact of the matter is that to the best of our knowledge conciliation, to the extent it has failed, has failed not because people ignore the results of the conciliation but because there is such a tremendous backlog of conciliation problems to be resolved.

In other words, all you are doing is shifting an existing backlog of an administrative agency into certain court backlog or from one division of HUD into another. I hate to see this sort of thing happen. If somebody ignores a conciliation agreement, I think there are many ways of taking care of that—very effective ways, not the least of which is a suit for breach of contract. I would support, for example, a program which permitted HUD in the event of a breach of conciliation contract finance the litigation required to obtain specific performance. I think that such a program would be vastly simpler, cheaper, and much more effective administratively than what is proposed here. It is not the conciliation procedure which is at fault but the fact that the backlog is so large that justice is delayed, and justice delayed is justice denied.

Mr. STAREK. This subcommittee held oversight hearings on that very problem.

Mr. NORTH. I was not aware of those.

Mr. STAREK. What would you think of a proposal to add a time frame requirement within which an investigation will be completed within 180 days?

Mr. NORTH. Frankly, the difficulty in the steering area is one of proof because charges of steering involve very subjective interpretations of conduct. It is simply impossible to maintain the type of records that are required to adequately defend yourself against a charge of steering if, for example, a complainant can wait 3 years before bringing a lawsuit.

I know from time to time it is said this is an appropriate tort limitation. However, while a good number of torts may be difficult to discover within 3 years, usually people know when they have been the object of discrimination almost instantly.

Mr. STAREK. That is interesting because yesterday we received testimony that said, it is very subtle and it takes a long time to realize that you have been discriminated against. That is not your experience?

Mr. NORTH. That is not our experience. As a practical matter, you walk in, are shown houses and are either told a house is available or not available. If you discover that a house you were told was sold or off the market was sold to somebody else or you see a for-sale sign on that house or are offered the house by another broker you can fairly perceive discrimination. Certainly, it does not take you 3 years to find out that something is wrong. People do not need a house for 3 years. People do not look for a house for 3 years.

The discriminatory action occurs in a steering case at the time that a minority person walks in and is left sitting out on the porch stoop while six white families walk in and get the full treatment. Our experience has been that the complaints and reports we get come soon after the contact with the broker or not all.

But I will say this, the problem of defending yourself gets extremely difficult as time passes. Our sales staff turns over about 25 percent a year. That means, as I said in my testimony, that if a complaint occurs today, and you bring the suit in 3 years, that salesperson has a one-in-four chance of not being around. He is going to be a broker or working for somebody else. The Department of Justice has taken the position the broker may be liable for

misconduct of the salesperson, so the broker is in the position of trying to get the witness in, the salesperson, the culprit, to testify when his testimony is in essence damaging who is now his competition.

Mr. STAREK. Let me ask one more question. You indicate that the cost to administer 206(c) as written in H.R. 3504 would be astronomical or exorbitant. I wonder if you have any projection of what that cost would be?

Mr. NORTH. That is quite difficult. We can only go by the problems that have apparently been encountered in trying to administer the affirmative marketing plan. The first problem is the backlog of conciliations. You referred to it. I do not have the precise statistics but you have a staggering backlog. If you have a backlog of conciliations, you are certainly going to have a greater backlog, given the same amount of resources, on complaints which should involve—I would hope they would involve—a much more complex and careful procedure.

No. 2, if we can believe what I understand to have been the previous testimony, we are not going to abandon the conciliation procedure; we are going to superimpose this new program on it. That is an add-on cost of some administrative complexity, and if you cannot finance and support and administer the conciliation program, it seems to me that you are going to have a fundamental restructuring of values and priorities if you are going to engage in this new program.

But most important—at least our greatest concern is this—that given the power, the great power to get into the investigation business, and the prosecution business, and the judge business, which is described in here. The temptation is going to be irresistible to do it. And when you do it you are going to have to divert needed resources from the voluntary approaches. As I say, I come back to what admittedly was the concept of a different administration—but I think it is consistent with at least some of the philosophy of this administration—the concept of the community housing resources board, where we could bring all people concerned with housing opportunity together under the aegis of HUD with the sanctions available through the Justice Department, and involve the State regulatory agencies and local equal opportunity organizations in the community to cope with community housing problems.

That program has worked where it has existed, and we have 10 community housing resource boards in existence. I would like to see this Congress carry on an investigation, and we would be happy to assist it in looking into the quality of performance of these resources boards. But, as I say, there are 103 out there that are not functional at all. There are 330 that do not exist at all because HUD has been unable to implement them. We feel that you have more than enough power out there in HUD and in Justice and in the form of private and State causes of action to prevent illegal conduct. We say all forms of steering are against the law and we have to stop them.

Mr. EDWARDS. Mr. North, we would appreciate any information or studies that have been made on these successful projects. I have not personally heard of any articles being written about them. I have not heard of any documents that your organization has pub-

lished, so we would appreciate evidence reaffirming your testimony. Thank you very much.

[Response of Chicago Metropolitan Strategy Group to testimony of William North.]

SUBCOMMITTEE ON CIVIL
AND CONSTITUTIONAL RIGHTS,
*May 17, 1978.*

DONALD DEMARCO,
*Assistant Village Manager, Community Relations,*
*Village of Park Forest, Park Forest, Ill.*

DEAR MR. DEMARCO: Thank you for your letter of May 12, 1978 offering to respond to the comments made by William North, attorney for the National Realtors Association, at a hearing before the Subcommittee on Civil and Constitutional Rights on May 11, 1978.

In his prepared statement Mr. North referred to "minority scatter plans by communities which establish quotas for minority residents and coerce real estate brokers and salespersons to operate under them." He alluded to a "Residential Occupancy Permit Systems under which every person desiring to buy or sell a home must be specifically screened and approved as a resident, and must obtain prior approval to open his home to any other occupant, even a new wife."

In testimony before the Subcommittee, Mr. North referred again to "steering * * * promoted by the cities and communities." Later he specifically alluded to such actions by the Town Homes of Russet Oakes Home Owners Association of Park Forest South, and by the city of Bellwood.

I understand that these communities are in the Chicago metropolitan area, and that you have been in a leadership position with regard to efforts to maintain racial balance in those areas. While I do not know if Mr. North's comments pertain to communities other than those in the Chicago area, I believe it would be helpful to the Subcommittee's study of the problem of housing discrimination to gather more information on this subject from your organization. Specifically, we would be grateful for a description and explanation of the actions of the Chicago Metropolitan Strategy Group which pertains to comments of Mr. North.

Sincerely,

DON EDWARDS, *Chairman.*

————

VILLAGE OF PARK FOREST,
*Park Forest, Ill., May 30, 1978.*

Hon. DON EDWARDS,
*Chairman, Subcommittee on Civil and Constitutional Rights,*
*Committee on the Judiciary, House of Representatives, Washington, D.C.*

DEAR CHAIRMAN EDWARDS: On behalf of the Chicago Metropolitan Strategy Group, I again express our appreciation for the opportunity to make known to you and the subcommittee our interests, to refute the gross misrepresentations of Mr. North, and to support the bill which will give much needed enforcement powers to HUD. The enclosed statement was approved at the Strategy Group's meeting of May 25, 1978.

Your May 17, 1978 dated letter arrived at my office on May 27, 1978. In drafting the CMSG statement, we had the benefit of a copy of Mr. North's prepared remarks. We did not have the knowledge you have provided of his comments specific to Bellwood and to Park Forest South; however, I am confident that the Strategy Group members, and specifically the representatives of those two communities, would approve my telling you that Mr. North's statement ("Residential Occupancy Permit Systems under which every person desiring to buy or sell a home must be specifically screened and approved as a resident, and must obtain prior approval to open his home to any other occupant, even a new wife.") is totally false and patently rediculous. It is difficult to believe that he even said something like this. I trust that such a statement caused the subcommittee to call into doubt many of Mr. North's other assertions.

It may be that Mr. North is making an obtuse reference to ordinance provisions which require or request residents who intend to rent or sell their property to give notice to the municipality in order to facilitate monitoring of real estate activity (necessary to fight unlawful real estate practices) and make appropriate building department inspections, in furtherance of legitimate municipal interests. Bellwood

and Park Forest South can provide you with copies of the ordinances which Mr. North has so mischaracterized as to intent and to process.

If we can provide additional information useful to the subcommittee, do not hestitate to call upon us.

Yours truly,

Donald L. DeMarco,
*National Strategies Chairman,*
*Chicago Metropolitan Strategies Group.*

Statement of Donald L. DeMarco, on Behalf of the Chicago Metropolitan Strategy Group

The Chicago Metropolitan Strategy Group (CMSG) is composed of white and black representatives (elected and staff) of interracial communities and representatives of this Chicago Fair Housing Center Network (a consortium of private non-profit agencies) working together to seek to promote and maintain racial diversity in housing demand throughout Chicagoland market areas. Municipalities represented include Bellwood, Maywood, Oak Park, Hazel Crest, Homewood, Chicago Heights, Calumet Park, Hoffman Estates, Park Forest, and Park Forest South, and the Beverly-Morgan Park neighborhood of Chicago. The cities of Evanston and Chicago have been participant observers in our activities as have the Regional office of HUD, Operation PUSH, NAACP, Southern Christian Leadership Conference, and the Urban League; Fair Housing Agency representatives include Leadership Council for Metropolitan Open Communities, Home Investments Fund, Oak Park Housing Center, and South Suburban Housing Center.

The Chicago Metropolitan Strategy Group appreciates being given the opportunity to be on the record regarding its position on H.R. 3504 and to respond to the outrageous statement made purportedly on behalf of the National Association of Realtors.

There is so much that is misleading and untrue in the May 11, 1978 statement made by William D. North, general counsel of the NAR, that it poses a problem of choice as to where to start and on what to focus our remarks. But let us begin.

Founded in 1908, the National Association has been a leading opponent of virtually every piece of national fair housing legislation (and its state and local affiliates have similar records), yet Mr. North attempts to leave the impression that "for more than 60 years the Realtor Code of Ethics has required more than mere compliance with the law. In fact, the Code of Ethics to which every Realtor and Realtor-Associate is answerable represents one of the most comprehensive commitments to affirmative action ever developed in an industry or profession." He argues that HUD needs no better enforcement powers because (of the NAR's 1,720 local boards) "over 400 Boards of Realtors representing over 250,000 (of about 600,000) real estate brokers and salespersons" have signed the NAR–HUD Affirmative Marketing Agreement.

North's claims are so blatantly false as to hardly require refutation except for the uninitiated. But let us look at the record: The Code of which the NAR spokesman points with pride declared from 1924 until 1950: "A Realtor should never be instrumental in introducing into a neighborhood * * * members of any race or nationality, or any individual whose presence will clearly be detrimental to property values in that neighborhood" (Code, 1928, Art. 34). Lists of racial and population groups were circulated to give explicit meaning to the Code. Through restrictive covenants and the Code, Realtors have worked "affirmatively" to develop dual and unequal housing markets. Realtors have opposed civil rights advocates in the Supreme Court's 1917 decision against block-by-block segregation, opposed civil rights advocates regarding the Court's 1948 decision preventing enforcement of racially restrictive covenants, opposed the Court's 1954 decision outlawing "Separate-but-Equal," opposed the 1962 Executive Order 11063, opposed Title VIII of the Civil Rights Act of 1968, against HUD's affirmative marketing requirements of the early 70's, and against scores of fair housing initiatives (e.g. inclusionary zoning, scattered site low- and moderate-income housing) prior to and subsequent to 1968. Traditionally, Realtors have based their opposition on private property rights. The Realtors Code has changed on its face, but the ends are the same and the practices have changed but a little for the most. Very recently, the anti-rights NAR posture has been tried to benefitting blacks—be concentrating them so that they may achieve solidarity and politically power. This is the old "separate development" scenario, known as apartheid in the Republic of South Africa.

Let us look at the NAR argument against enforcement power for HUD. North says it is unnecessary because of the NAR–HUD Agreement. What does this Agree-

ment mean to Realtors? A typical understanding is that of the (Chicago) South Suburban Board of Realtors (Torch, May 15, 1978):

"PRINCIPALS, HAVE YOU SIGNED NAR–HUD AFFIRMATIVE MARKETING AGREEMENT YET?

"Those principals new to this board may wish a review on the National Association of Realtors—Department of Housing and Urban Development Affirmative Marketing Agreement, sometimes referred to as the NAR–HUD Agreement.

"Your board signed and became a party to this agreement some time ago. This commits only your board, and not the individual Realtor principal and his company.

"For your own company to become a voluntary signer to this agreement, it is required that the (or one) Principal broker be the signer. By becoming a party to the NAR–HUD agreement, you will see by reading the agreement, that you are promising to abide by equal opportunity for all as spelled out in the law of the land, and you will be doing no more than you are right now. You are simply affirming that you are obeying the law. Signing this agreement will not guarantee that you will never be investigated by HUD; it will, however, stand in your favor should such inquiry occur.* * *

"Also on hand in your board office is the Affirmative Marketing handbook, which will detail everything you always wanted to know about Affirmative Marketing. This is a book we suggest you purchase by having your board order if for you."

It is readily apparent that 250,000 brokers and salespersons are not actually voluntarily bound by the Agreement—only their Boards are. And what is really "affirmative" about this so-called affirmative marketing agreement. According to the Realtors, nothing. It requires nothing more than obeying the law in the same manner that brokers are doing now.

And how are they doing now on obeying the law? United Press International, reporting on a HUD-National Committee Against Discrimination in Housing national audit, tells us:

BLACKS STILL FIND WIDESPREAD HOUSING BIAS, STUDY INDICATES

WASHINGTON (UPI), April 17, 1978 Sun-Times: Blacks still are quite likely to encounter racial bias when they try to buy or rent a place to live, particularly in parts of the Midwest, according to preliminary results of a major new survey for the government.

Sources said computer data indicate that blacks must contend with a 75-percent chance of discrimination on an average search of four or more agencies for an apartment, and more than a 60-percent chance on an average house hunt.

When other key factors are measured in coming weeks, including incidents of "racial steering" of blacks to selected neighborhoods, the discrimination figures are expected to go even higher.

In the most extensive such study ever conducted, the National Committee against Discrimination in Housing hired whites and blacks across the nation to pose as prospective buyers or renters. The $1-million survey consisted of 3,300 checks of real estate and rental firms in 40 metropolitan areas.

The Department of Housing and Urban Development, for which the project was carried out, will formally announce the findings Monday at a conference with fair housing and real estate groups. Housing Secretary Patricia R. Harris is expected to announce new fair-housing initiatives.

HUD researchers, taking into account for statistical purposes the fact that blacks were favored about 25 percent of the time as prospective buyers or renters, concluded that between 20 and 30 percent of the tested firms engaged in discrimination.

But the researchers indicated they suspect that most cases in which blacks were favored involved "racial steering"—where they were shown listings of homes and apartments other than those offered whites, usually diverting them to all black or racially changing sections.

"Racial steering," considered probably the biggest contributor to segregated housing patterns, is prohibited under the 1968 civil rights law.

Among factors measured so far are the terms and conditions of a sale or rental; the proportional availability of a particular house or apartment unit to black and white buyers, and the courtesy the sales agent showed the prospective buyer.

In all but a few of the cases, blacks and whites were treated differently in one or more of those factors, according to the study.

Sources said the figures have not been broken down by city, but have been by region, and that the worst discrimination occurred in 13 urban areas of the Midwest.

Business as usual plainly means the perpetuation of the dual housing market—perpetuation due both to current violations of law and to the present pervasive effects of past patterns and practices of discrimination.

The NAR, a traditional foe of fair housing practices, continues to support segregation and oppose government power to attack the dual market practice. Its "cloak of virtue," that is private property rights, has been put aside for a new cloak. Mr. North asserts that "the most serious defect in H.R. 3504 is that it ignores completely the most flagrant and powerful offenders of the fair housing laws—those cities, towns, and neighborhood organizations which have extablished (sic) and are implementing quota systems and residential permit systems." He goes on to say "by adopting ordinances instituting such systems, they have created in the name of 'integration' a 'minority scatter plan' which absolutely guarantees the continued supremacy and political dominance of the community majority power structure until such time as the minority population becomes an absolute majority in some vaguely defined larger regional or metropolitan areas."

This displacement technique, and new cloak of virtue as a protector of minority interests, in light of history and current events, is incongruous. North asserts that the integrationists' "essential objective is to dissipate minority numbers, unity, and resources."

Mr. North's case for segregation and separate development is nothing more than an apology for Realtor power and profit through residential apartheid. Let us look at the integrationists, black and white. What are their essential interests and by what means do they seek to achieve them?

The Chicago Metropolitan Strategy Group, composed of ten interracial communities and several private non-profit fair housing centers working to promote and perpetuate interracial living, addressed HUD in March, 1978, beginning by quoting HUD's Fair Housing and Equal Opportunity Assistant Secretary Chester McGuire:

"There are some who still would say that there should not be any . . . attempted management, that integration should be just a laissez faire operation. But the market is currently stacked against that."

*What is our goal?*

Historically, as blacks and other non-whites have begun to move to an area, whites have stopped competing for housing. The consequence has been rapid racial transition and resegregation. Real integration in the housing market, that is a single, inclusive market with whites, blacks and others—all competing as their resources would permit—has been rare and fleeting. Segregation and resegregation are costly in dollar terms and in human terms. There are many persons who feel that this situation can be corrected by what is known as affirmative marketing for the promotion and maintenance of integration, which is our goal.

If the demand for a supply of housing includes 100% of the majority and minority people who are interested in the kind (price) of housing available, then the seller can get top dollar for his or her house (and the taxes paid on the value of that house provide a top level of service). If some of the demand—majority and minority—is pushed out (unlawful racial steering) or drops out or never considered the option (self-steering, not illegal but a present consequence of past segregatory patterns and practices), then value is lost. Too much value is being lost. Attaining our goal will maximize value for all our residents.

*What is our objective?*

Our objective is to measurably increase the housing traffic and demand where it is racially underrepresented—whether that underrepresentation is majority or minority. We are committed to doing this without violating the rights of individuals. We eschew any option-limiting methods for reaching this objective and we are committed to methods that are option expanding. Such option expanding methods are sometimes termed affirmative marketing, which HUD as defined as "efforts to reach those persons who traditionally would not have been expected to apply for housing. For instance . . . if the housing is located in an area of minority (purchasing or renting) concentration, special steps may be needed to make its availability known to whites." (HUD circular 80000.4, Feb. 25, 1974, appendix 3, page 3.)

*How can HUD help?*

HUD can help rectify the effects of past discrimination and promote the policy of the Civil Rights Act of 1968, Title VIII, including abatement of (re)segregation, by clearly and publicly distinguishing between unlawful racial (option limiting) steering and legal affirmative marketing for a unitary housing market.

HUD can define unlawful racial steering as: Influencing or attempting to influence by any words or acts a prospective seller, purchaser, occupant, landlord or

tenant of real estate, in connection with viewing, buying or leasing of real estate, so as to promote, or tend to promote, the continuance or maintenance of racially and religiously segregated housing, or so as to retard, obstruct, or discourage racially integrated housing on or in any street, block, neighborhood or community.

Affirmative marketing is the antithesis of the above. If this is made clear to housing providers, including Realtors, interracial communities will have an improved position from which to seek option-expanding cooperation.

The Strategy group, a principal unnamed target of Mr. North's scurrilous attack, is asking HUD to issue a statement. What does that statement call for?

The following is a draft statement offered for possible issuance by HUD:

It is the policy of the United States to provide, within Constitutional limitations, for fair housing throughout the United States. The Secretary of Housing and Urban Development has the authority and responsibility for administering the Fair Housing Act. All executive departments and agencies of the federal government have a responsibility to administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of the Act and to cooperate with the HUD Secretary in so doing.

HUD has concentrated its fair housing resources and energies during the past decade on providing remedies for individuals alleging violations of fair housing law. This HUD thrust for enforcement of non-discrimination provisions of federal law must continue to be refined and made more effective. Remedies for individuals—minorities and more recently women—have often been effectively worked out through conciliation. Little has been done, however, to rectify the damages done to communities by the dual housing markets.

It is also incumbent upon us at HUD to work toward voluntary compliance with fair housing law. HUD has done this via memoranda of understanding negotiated with public and private organizations impacting on the American housing market.

Despite these and other federal efforts, despite the efforts of many private organizations and individuals, the dual housing markets, one primarily for whites and another for minorities, separate and unequal, continue to exist. They exist because of ongoing violations of the law; they exist also as a present consequence of past discrimination—both long past (pre-fair housing law) and recent past (post-fair housing law).

Voluntary compliance agreements and better enforcement—including housing market auditing as well as processing complaints of individuals—are appropriate responses to acts violative of law.

Rectification of the present deleterious effects of past discrimination, however, requires more than law enforcement or even voluntary observance. It requires affirmative action to promote a unitary housing concept and market. Such a market is one wherein people of different races, ethnic groups, and religions are actually competing throughout all various housing markets in numbers generally reflective of their presence in the total area population. This means 100 percent of the people in the market competing for 100 percent of the housing options, with some allowances for individual economic circumstances.

Continued failure to rectify past wrongs damages the interests of both majority and minority Americans and perpetuates residential separation—that is, segregation and rapid racial transition or resegregation of neighborhoods. The responsibility of HUD and other federal executive agencies to administer their programs so as affirmatively to further the purposes of national fair housing policy means more than protecting the rights of individuals. It means acting to break down patterns of residential racial segregation. The administration of federal funds might well take the form of adopting the use of Housing Marketing Impact Statements and standards on the model of Environmental Impact Statements and Standards.

This approach gives a high priority to investigating and settling those complaints which provide the greatest promise for breaking down the barriers to racially and ethnically diverse and stable neighborhoods. It also involves cooperation with local and regional efforts to promote a unitary housing market, such programs as have been undertaken in various places around the nation. These programs are all directed toward affirmative marketing for the promotion and maintenance of racially and ethnically diverse markets, which strives to expand homeseekers' perceived options.

HUD recognizes that while all communities are open as a matter of law, many are not open as a matter of housing consumer perception. Nor are some open as a matter of fact and some of these are continuing to receive federal grants. This must stop.

Affirmative marketing goes beyond compelled or voluntary compliance with the law. It involves encouraging majority group people to compete or to continue to buy

housing in neighborhoods where substantial numbers of minorities are buying housing. It involves encouraging minorities to consider housing options outside those neighborhods for which there is already substantial demand from minorities. Such affirmative marketing is race-conscious in a positive fashion and is option-expanding, the antithesis of unlawful racial steering which is option-limiting.

While we at HUD are in no position to offer carte blanche endorsement to any and all programs which purport to be affirmative marketing for the establishment of a unitary housing market, we do generally look with favor upon such local and regional efforts and believe that their effect is to further the purposes of national housing policy, beneficial to both majority and minority Americans and to communities. Their success can obviate the terrible social and economic costs of residential segregation, whether de jure or de facto. HUD recognizes that communities which are closed or perceived to be closed diminish the ability of thse communities which are open to maintain their representative racial inclusiveness.

HUD policy endorses affirmative marketing to establish racially unitary housing markets and encourages all public and private parties to do likewise, always being mindful of the essential option-expanding nature of such efforts and being careful to avoid option-limiting infringements on protected civil and human rights of individuals.

The de facto segregation and isolation of races, that is the historical pattern, has not empowered blacks as Mr. North and the NAR would have America believe. The contrary is generally true, as the Supreme Court recognized in *Brown* v. *Board of Education.*

The Strategy Group and others who positively value integration, which we contend is a prime purpose of the 1968 Fair Housing Act (as does principal author Sen. Walter Mondale: to replace ghettos "by truly integrated and balanced living patterns") disavow quotas and any abridgment of civil rights. Affirmative marketing, however, if it is to have any positive effect on our racially divided society, must be more than merely neutral. The touchstone for whether a means to integration is acceptable (in furtherance of the law) or unacceptable (and contrary to law) is whether or not the method is option-expanding or option-limiting. We disavow option limitation and embrace option-expansion.

In operational terms, what is it that integrationist communities wish of Realtors? Little more than this: When "Mr. and Mrs. Black" ask to see a house in "Blackstown" or "Mixedburg," the Realtor should also encourage them to look at "Whitesville" (the perceived non-option). When "Mr. and Mrs. White" ask to see a house in "Whitesville," also encourage them to see "Mixedburg" and "Blackstown." Then let the folks choose after looking at the full range of options—foreclosing none on the basis of race. The Strategy Group favors free and informed choice—with real options; it is strongly opposed to "force resegregation," however it might be disguised.

The Chicago Metropolitan Strategy Group favors adoption of H.R. 3504 and generally endorses the testimony of Drew S. Days, III, Assistant Attorney General, Civil Rights Division, Department of Justice, when he appeared before your subcommittee on February 9, 1978. There is, however, an exception to this concurrence. The Strategy Group believes that exposing unsuccessful plaintiffs to payment of defendants' attorneys fees may have a "chilling effect" on the "private attorneys general." We favor retention of the present protection advantage given plaintiffs.

Moreover, the Strategy Group urges the Subcommittee to seek inclusion of language in the bill which would give HUD clear guidance along the lines suggested in our proposed statement for HUD issuance or, at least, such language as the following: "Nothing in the Act shall be construed to prohibit programs, whether voluntary or require by State or local law, which seek to increase the number of persons from underrepresented racial groups seeking housing, or which aim at expanding the number of housing options shown to all persons, so long as such practices are not specifically contravened by the Act and such practices do not have the effect of fostering racial dual housing markets."

---

SOUTH SUBURBAN HOUSING CENTER,
*Park Forest South, Ill., May 30, 1978.*

Mr. DON EDWARDS,
*Chairman, Subcommittee on Civil and Constitutional Rights,*
*Committee on the Judiciary, House of Representatives, Washington, D.C.*

DEAR MR. EDWARDS: I have seen a copy of your letter to Donald DeMarco dated May 17, in which reference is made to alleged "steering" promoted by the Russets Oaks Home Owners Association (TROHA) of Park Forest South. As a resident of

that association and as a staff member of the South Suburban Housing Center, a regional fair housing center, I feel compelled to respond to the charge.

From its inception, the entire community of Park Forest South has been integrated. Russet Oaks is no exception. Developed in 1971–1972, Russet Oaks (173 townhome units) has always had and welcomed black residents. In the recent past, however, individual residents noted that few whites were being shown units in our area. In response, then, to what the Board perceived to be illegal racial steering by the real estate community, a letter was sent to all south suburban real estate offices requesting that they make attempts to balance the already strong minority demand by purposefully showing the area to whites. To quote Tom Love, then President, in what I view the key passage in the letter, "I would also encourage your cooperation in bringing in as many majority buyers as possible to see these homes in order to balance the demand by minorities." Note that the Association was not asking Realtors to bring in only whites to the exclusion of blacks, but to affirmatively market the area by making attempts to attract the underrepresented group—at this time majority buyers. Black demand is strong and will continue.

White demand, which is soft, must be encouraged in order to maintain integration in Russet Oaks and elsewhere. This practice is certainly consistent with the Housing Center's understanding of affirmative marketing. In fact, we apply the definition used by HUD in their affirmative marketing plans. (HUD circular 8030—2 REV) as "A program which should include efforts to reach those persons who traditionally would not have been expected to apply for the housing. For instance, for housing in a white suburban area, special steps may be needed to make its availability known to minorities; similarly, if the housing is located in an area of minority concentration, special steps may be needed to make its availability known to whites".

I have forwarded your letter and a copy of mine to the current President of TROHA, Barry Helbert, in the hope that he, too, will want to respond on behalf of the TROHA Board to the unfounded and untrue statements advanced by Mr. North.

If I can be of any further assistance, please feel free to contact me.

Sincerely,

KATHY CARDONA,
*Community Action Coordinator,*
*Park Forest South Office.*

———

VILLAGE OF PARK FOREST,
*Park Forest, Ill., June 5, 1978.*

Hon. DON EDWARDS,
*Chairman, Subcommittee on Civil and Constitutional Rights,*
*Committee on the Judiciary, House of Representatives, Washington, D.C.*

DEAR CHAIRMAN EDWARDS: The Board of Trustees of the Village of Park Forest is alarmed over the irresponsible remarks made to the Subcommittee on May 12, 1978 by Mr. William D. North on behalf of the National Association of Realtors. It is inconceivable that Mr. North can be representing the more reputable Realtors serving our area.

The Village Board of Trustees is totally in sympathy with the response to Mr. North recently forwarded to you by the Chicago Metropolitan Strategy Group.

Your consideration for the positions taken in the Strategy Group's testimony will be appreciated by the Village of Park Forest.

Yours truly,

MAYER SINGERMAN,
*Village President.*

———

COMMUNITY RELATIONS DEPARTMENT,
VILLAGE OF BELLWOOD,
*Bellwood, Ill., June 5, 1978.*

Mr. DON EDWARDS,
*Chairman, Subcommittee on Civil and Constitutional Rights,*
*House of Representatives, Washington, D.C.*

DEAR MR. EDWARDS: Don DeMarco sent me a copy of your letter to him dated May 17, 1978. In this letter you quote Mr. William North, attorney for the National Realtors Association, as making references to Bellwood at a hearing before the Subcommittee on Civil and Constitutional Rights on May 11, 1978. In connection with Bellwood, Mr. North spoke of "Residential Occupancy Permit Systems under

which every person desiring to buy or sell a home must be specifically screened and approved as a resident, and must obtain prior approval to open his home to any other occupant, even a new wife." He also described "minority scatter plans by communities which establish quotas for minority residents and coerce real estate brokers and salespersons to operate under them." And he alluded to "steering promoted by the cities and communities."

Mr. North's charges are ridiculous and demonstrate no first hand knowledge of what he is talking about. I am sending a copy of our Occupancy Permit Ordinance and the letter of explanation which we sent to real estate agents. The occupancy permit is concerned with the quality of the housing and extends to rentals as well as to sales. It is designed primarily to protect the consumer whoever, he may be, by making sure that the property is up to code and is of adequate size for his family according to the standards of the Village Code (which are less stringent than those of the National Building Code). It is not the person who is being "screened and approved," as in Mr. North's distortion, but the dwelling. In no way does the race of the prospective buyer or renter enter into the granting of the permit.

As far as "minority scatter plans" are concerned, "which establish quotas," Bellwood has none.

Bellwood has an official policy statement affirming the value of interracial living and decrying the evil of block-by-block resegregation (copy enclosed).

Bellwood also has a fair housing code which forbids racial steering in the traditional language of such legislation. In spite of the code and persistent efforts to enforce it there is evidence of pervasive steering in the Village of Bellwood and within the communities covered by the West Suburban Board of Realtors. Perhaps the most glaring indication of steering is the fact that the West Suburban Board markets houses in nine communities but sells houses to blacks in only three of them.

Frequently we attempt to spell out to the real estate industry what it means not to engage in illegal racial steering. Steering is essentially an option—limiting process—a limiting of whites to all white areas, a limiting of blacks to all black or changing areas. That is why it is unjust. The opposite of steering is an option-expanding process. Concretely it means to make sure that whites are aware of their options to buy in what are perceived as black areas and that blacks are aware of their options to buy in what are perceived as white areas. In no way are we asking realtors to show whites *only* in changing areas or to show blacks *only* in white areas. We explain ourselves carefully in every communication to the realtors; but spokesmen such as Mr. North pretend not to hear us and charge us with asking them to "counter steer." We are as opposed to countersteering as to steering; both are essentially option-limiting and unjust.

This option-expanding process is called "affirmative marketing for integration maintenance," based in part on terminology used by HUD in its 1972 regulations for advertising multiple-dwellings constructed with FHA insured loans.

We communicate these concepts principally in two ways: in seminars on affirmative marketing for real estate agents and in letters pointing out districts within the Village particularly in need of affirmative marketing. Four such letters have gone out from us, with a map showing streets where the members of the Board for the most part are bringing only minority prospects (Sample copy enclosed). The letters do not ask realtors not to bring black buyers (which is illegal), but ask them to do two things in line with affirmative marketing:

(1) to encourage white buyers to consider the properties on those streets among their options, and

(2) to make sure that black prospects are fully aware of their choices in the rest of the communities under the West Suburban Board of Realtors.

Many real estate agents say that they are hesitant to discuss racial matters for fear of being misunderstood and charged with discriminatory treatment. Our letters, therefore, invite them to send their prospective purchasers in areas indicated on the map to our Housing Center where we will counsel them along the lines described above.

The purpose of my letter is to correct Mr. North's careless and ill-informed remarks about Bellwood before the Subcommittee. I might add that through our participation in the Chicago Metropolitan Strategy Group we are aware of the programs of other communities in the area; none to my knowledge engages in any of the practices Mr. North describes. While none of us go to the lengths Mr. North alleges, it is clear that we all do have to maintain special and costly programs to counteract the effects of steering by the real estate industry. Obviously if realtors practiced open housing aggressively and affirmatively, Villages like Bellwood wouldn't need to figure out ways to make them do their duty. Anything the

Subcommittee can do to strengthen the Civil Rights Act, particularly its enforcement, would greatly aid us.

If racial integration is to work, it must work precisely in the areas between the all-black and the all-white communities. As long as the real estate industry continues to steer black buyers into the integrated zones and white buyers away, integration has no chance to work. The area will inevitably resegregate. The day every buyer is encouraged to look at all the options regardless of race is the day integration will begin to work in our society.

Sincerely,

THOMAS A. REDDING, *Director.*

———

OCTOBER 5, 1977.

DEAR REAL ESTATE BROKER: We have been asking you to send prospects to the Bellwood Housing Center for counseling prior to their making an offer to purchase on a "sensitive" block. The purpose of the counseling is to explain the integration maintenance policy of the Village, to give helpful information about the neighborhood under consideration and to make sure that the prospect understands all of his options. White people tend to foreclose their option to buy in a transitional neighborhood, while blacks tend to foreclose their option to buy in unintegrated areas. For a fully free choice under the Civil Rights Act they need encouragement to look at all possibilities before deciding. Afterwords the prospect is returned to you (unless you choose to come along) for your continued professional guidance.

Since August 4 we have sent you two maps showing in general moves by race into the Village during the preceding period. With this letter we begin listing specifically the streets which we regard as currently the ten most sensitive, the most in danger of resegregation.

Please send us all your serious prospects. Truly the entire Village, east and west, is sensitive these days.

But especially we urge you to send us any prospects seeking to buy on one of the streets listed on the enclosure.

Kindly give copies of this list to your associates and explain the purpose for it.

Sincerely,

THOMAS A. REDDING,
*Director.*

JAMES W. KUBIESA,
*Housing Specialist.*

———

OAK PARK COMMUNITY RELATIONS COMMISSION,
*July 27, 1978.*

Representative DON EDWARDS,
*Chairman, Subcommittee on Civil and Constitutional Rights,*
*Committee on the Judiciary, House of Representatives, Washington, D.C.*

DEAR MR. EDWARDS: The Community Relations Commission of Oak Park, Illinois understands that your subcommittee is presently considering amendments to Title VIII of the Civil Rights Act of 1964. We are writing this letter in support of the amendment (Section 206(c)) which would make illegal governmental discrimination in housing based upon economic status.

Oak Park is an interracial suburb on the western border of Chicago. We, as well as a number of similar communities in the metropolitan area, are committed to promoting open housing within our own community, while working toward creating similar opportunities for all people in the Chicago metropolitan area. It is because our goals are to some extent interdependent that we are writing this letter. With notable exceptions, a dual housing market exists all around us. Minorities are confined, either overtly or covertly, to limited areas and thus denied substantial housing opportunities as well as nearby employment. If history is any guide, either the dual markets which now exist around us are destroyed, or Oak Park will not remain an integrated, pluralistic suburb.

The Community Relations Commission feels that the prohibition against governmental discrimination based on economic status will help destroy the dual market system. It is an unfortunate fact of life that the average income of black or Latino families in the United States is significantly less than it is for whites. Thus, when communities move to exclude low income persons through a variety of techniques, the effect is to maintain the segregated nature of the population. There is no doubt that this occurs continually. (e.g. *James* v. *Valtierra* 402 U.S. 137 (1971) in your

district; *Village of Arlington Heights* v. *Metropolitan Housing Development Corporation* 429 U.S. 752 (1977) here.) The problem, of course, is that it is extraordinarily difficult to prove racial animus, or even the less burdensome effect standard for Title VIII adopted by the Court of Appeals here. *Arlington Heights* 558 F. 2d 1283 (7th Cir. 1977). Thus, facially neutral economic discrimination has been a relatively safe technique for precluding or limiting the minority population in presently white communities.

Second, we support the provision on its face, without reaching for notions of racially discriminatory impact. We are no more in favor of a class segregated society than we are of racial discrimination.

Our Commission is further concerned that your subcommittee consider the issue of affirmative marketing. (See letter of Donald DeMarco to you, February 22, 1978, and the testimony contra to your committee by William D. North on behalf of the National Association of Realtors, May 11, 1978.) In our view, affirmative marketing is necessary to the maintenance of integration in Oak Park, as well as the destruction of the dual markets. We urge your committee to either add language to your amendments sanctioning the concept or alternatively, to indicate through report and debate that you believe the concept is consistent with the principals of the Fair Housing Act, as amended.

It is fair to say that many forces, economic, social, fear and greed, have made stable integrated communities very much the exception in the United States. To counter those forces, communities such as Oak Park have sought to vigorously enforce their own open housing laws, promote integration within the entire community when possible, and to create opportunities for minorities in neighboring, segregated communities. By contrast, laissez-faire deference to the forces fostering segregation is a sure "cure" for an integrated community, just as untrammeled economic discrimination results in segregated communities. Unfortunately, one of the groups which regularly takes advantage of and exploits those forces is segments of the real estate community.

Real estate brokers can be progressive members of an integrated community, as they have become in Oak Park. However, any suggestion that the real estate community can, as a whole, be relied upon to further open integrated communities must be rejected out of hand. Mr. North, who testified before you two months ago in opposition to your bill and to affirmative marketing, testified in opposition to the proposed Oak Park Fair Housing Ordinance in 1968. Panic peddling by real estate brokers was largely responsible for the Austin neighborhood of Chicago (which borders Oak Park) changing from all white to all black within five years in the late 1960's and early 1970's. Racial steering continues unabated in much of the Chicago area today. Indeed, Mr. North's touted Voluntary Affirmative Marketing Agreement (weak by its own terms) was entered into only after a civil rights suit brought by the government. Both history and present reality make it clear that communities which wish to remain integrated must not rely upon an unregulated market to reach that result.

Affirmative Marketing denies no one a home. It imposes no quotas, turns no one away. To the contrary, it seeks to enhance opportunity by breaking down barriers. It seeks to insure that all people have a right to live everywhere by challenging the forces that otherwise insure with uncanny inevitability that minorities are kept separate and apart from the rest of us. We urge you to consider this issue as you debate further your positive amendments to Title VIII.

Thank you for your consideration.

Sincerely,

ROBERT MASUR, *Chairman.*

Mr. EDWARDS. Our next witness is Mr. Galbreath of the Advocates for Basic Legal Equality. Mr. Galbreath has represented poor and minority homeseekers in numerous legal actions, challenging the land-use practices in the Toledo, Ohio, area.

Mr. Galbreath, we are delighted to have you here. Without objection, your full statement will be made a part of the record. You may proceed.

Mr. GALBREATH. Thank you, Mr. Chairman.

[The prepared statement of Mr. Galbreath follows:]

STATEMENT OF R. MICHAEL FRANK, DIRECTOR, AND GLENN GALBREATH, MANAGING
ATTORNEY OF ADVOCATES FOR BASIC LEGAL EQUALITY

I am Glenn G. Galbreath, an attorney with Advocates for Basic Legal Equality, Inc. (ABLE) in Toledo, Ohio. I deal primarily with housing discrimination cases. With me is R. Michael Frank, the Director of ABLE. ABLE is a Legal Services Corporation funded program providing legal representation for low income persons. For the past nine (9) years, ABLE has been involved in housing discrimination litigation particularly as it involves exclusionary zoning and land use regulations.[1]

We are very pleased to have been invited to appear before the Subcommittee to testify on Title II of H.R. 3504 on behalf of our low income and minority clients. While we wholeheartedly support the proposed amendments to the Civil Rights Acts of 1964 and 1968, we have chosen to limit our comments to Section 206(c) which would prohibit state or local government bodies from employing exclusionary land use practices to block the development of low or moderate income housing because of their subsidized nature or because of the race, color, national origin, or economic status of their prospective occupants.[2]

Our interest in this particular provision is especially strong due to the active reliance by local government in the Toledo area upon land use regulation to limit the development of low income family public housing only to areas of minority and low income concentration. It has been our experience that as blatant racial discrimination has become less fashionable so-called "economic discrimination" has replaced it as an acceptable means of accomplishing the same objective.

We are also concerned with this section in that a redraft of the amendment[3] is being discussed which not only limits the scope of the amendment, but could conceivably weaken existing case law.[4]

The Toledo metropolitan area is racially segregated. Even though the percentage of blacks in Lucas County is only 11.3 percent, almost 90 percent of them live in Black Impacted census tracts.[5] As to public housing programs, over 70 percent of the housing authority units are located in minority Concentrated areas[6] and of those, over 80 percent are occupied by minority tenants.[7] Furthermore, there is a desper-

[1] *Davis* v. *City of Toledo*, 54 F.R.D. 386 (N.D. Ohio 1970); *Skilken* v. *City of Toledo*, 380 F. Supp. 228 (N.D. Ohio 1974), 528 F. 2d 867 (6th Cir. 1975), *reversed and remanded*, 426 U.S. 945 (1977), *vacated and remanded*, 558 F. 2d 350 (1977), *aff'd earlier reversal and remand*; *Dotson* v. *U.S. Department of Housing and Urban Development*, Civil No. C74–531 (N.D. Ohio W.D. 1974); and *Jaimes* v. *Toledo Metropolitan Housing Authority*, Civil No. C74–68 (N.D. Ohio W.D. 1974).

[2] H.R. 3504, Title II, Section 206(c) (exclusionary land use section—other prohibited practices): "(g) for any general or special purpose unit of government of a State or of a subdivision of a State (or other agency having jurisdiction within a State or States) in the exercise or enforcement of powers with respect to planning, zoning, subdivision controls, building codes or permits, or other matters affecting land use or development, to exclude low or moderate income housing because of the eligibility of such housing for governmental assistance, or because of the race, color, national origin, or economic status of the prospective occupants of such housing."

[3] *Redraft* of H.R. 3504, Title II, Section 206(g) (exclusionary land use section—other prohibited practices): "(g) For any general or special purpose unit of government of a State or of a subdivision of a State (or other agency having jurisdiction within a State or States) in the exercise or enforcement of powers with respect to planning, zoning, subdivision controls, building codes or permits, or other matters affecting land use or development, to fail or refuse to afford a reasonable opportunity for the development of such unit's fair share of the regional need for low and moderate income housing."

[4] The redraft of Section 206(g) as shown in footnote 3 above could be interpreted to proscrible exclusionary land use regulations or actions *only* when the local governmental body does not already have its "fair share" of low income housing. This may be effective against the local jurisdiction which has little or no low income housing, but it does not appear to proscribe actions by local governments which already have their "fair share" and choose to locate it all in areas of low income and minority concentration. It could therefore be argued that the substitution of the redraft for the present amendment of Section 206(g) is a statement of Congressional intent to go no further in the area of land use regulation. This section of the Act could then be made ineffective against local governments which have plenty of low income housing but simply refuse to locate any of it in white or middle class areas of their jurisdiction. See the following cases where the cities involved undoubtedly had their "fair share" of low income housing but still used land use practices to block the production and dispersal within their jurisdiction: *Resident Advisory Board* v. *Rizzo*, 564 F. 2d 126 (3rd Cir. 1977) (Philadelphia); *Banks* v. *Perk*, 341 F. Supp. 1175 (N.D. Ohio 1972) *aff'd in relevant part*, 473 F. 2d 910 (6th Cir. 1973) (Cleveland); *Hills* v. *Gautreaux*, 425 U.S. 284 (1976) (Chicago—did not rely though on the Fair Housing Act).

[5] See Exhibit A, which is page 2 of "Extent and Impact of Residential Segregation by Race in Toledo and Lucas County, Ohio," by Phillip Weitzman, Ph. D., January 23, 1978, National Social Science and Law Project, Washington, D.C. and Exhibit C.

[6] See Exhibits B, C, and D.

[7] See Exhibit E.

ate need for low income housing.[8] While over the past ten (10) years the City of Toledo has spent over $80 million in federal urban renewal and community development funds, all conditioned on promises to provide and disperse low income housing, it has engaged in actions which affirmatively denied equal housing opportunities to low income and minority persons.

### RECENT HISTORY OF FAMILY PUBLIC HOUSING IN TOLEDO, OHIO

Segregation is maintained in Toledo, in part, by a pattern of vetoes affecting every public housing development proposed for a location outside Black Impacted areas in the last ten (10) years.

Since federally assisted public housing was first introduced in Toledo in 1939,[9] the City of Toledo has, on at least thirteen (13) distinct occasions, blocked the development of low income family public housing outside areas of low income and minority concentration. Because the amendment of the Fair Housing Act of 1968 is the subject of this hearing, we shall deal only with the nine (9) City "vetoes" since 1968.

### 1970—FOUR OFFICIAL VETOES OF DISPERSED LOW INCOME HOUSING SITES

In 1970 the housing authority selected four (4) sites for the location of low income family housing, all outside areas of minority and low income concentration. White resident opposition was immediate, intense and, at times violent. In an unprecedented action, the Toledo City Council passed a resolution declaring the four (4) sites "unavailable" for public housing. ABLE filed a lawsuit and in June of 1970, the U.S. District Court declared the Council resolution unlawful and ordered the City to refrain from any action which would impede the construction of the housing. Three of the four sites were ultimately developed only because of that lawsuit.[10]

### 1974—THREE OFFICIAL VETOES OF DISPERSED LOW INCOME HOUSING SITES

In 1974, the housing authority located a developer who was willing to build low income family housing on three (3) sites in essentially white neighborhoods. Two of the three sites were properly zoned and only required routine platting approval by the City Plan Commission. The third site required rezoning and platting. The Plan Commission's staff recommended approval of the platting and zoning requests for all three (3) sites.

The first site's platting was routinely approved by the Commissioners. Shortly thereafter, though, white residents of the area demanded and received a reconsideration of the plat because it had not been clear that public housing had been planned for the site. After learning this, the Commissioners rescinded their approval.[11] By the time the second parcel came on for hearing, the fact that public housing was to be built on the site was well-known. Again, the Commissioners denied platting, contrary to the staff's recommendation, on the alleged ground that the proposal was not in the "best interests of the residents of the area."[12]

In June of 1976, we made a study of platting decisions by the Plan Commission. We found that from 1969 to the survey date, the Plan Commission considered 133 cases in which platting was the only issue. Of those 133 platting requests, 119 were approved and 14 were disapproved. Of the 14 that were disapproved, the Plan Commission overruled a staff recommendation for approval only five (5) times. Of those five (5) cases, four (4) involved the platting of a public housing site in predominately white neighborhoods.

On the third site proposed in 1974, the developer planned to locate 50 single family public housing units on a 15 acre parcel. Rezoning was denied when residents of the area complained that the project would create traffic congestion,

---

[8] The local housing authority has a waiting list of over 4,000 low income applicants some of whom have been on the list since 1968. In addition, the City of Toledo commissioned a study in 1977 by a private consultant which found a need for 15,000 additional units of low and moderate income housing by 1982 in order to meet the need.

[9] The local housing authority for the Toledo metropolitan area was formed in 1933 as the Toledo Metropolitan Housing Authority and has jurisdiction throughout Lucas County which includes the City of Toledo as well as a number of other incorporated and unincorporated communities. Its name has since been changed to the Lucas Metropolitan Housing Authority (LMHA). It owns approximately 2,800 low income housing units of which 1,350 are family occupied. In addition, it administers approximately 900 units under the Section 23—Leased Housing and Section 8—Rent Supplement Programs. See Exhibit B.

[10] *Davis* v. *City of Toledo, supra.*

[11] At the subsequent trial (*Skilken* v. *City of Toledo, supra.*) both Commissioner Cline and staff member William Jaquot testified that to their knowledge the Plan Commission had never rescinded a plat which had been approved.

[12] William Jaquot, a Plan Commission staff member for 12 years, further testified that he knew of no instance when a plat was disapproved for this reason. *Skilken* v. *City of Toledo, supra.*

overcrowd their schools, and adversely affect property values. Two years later, a developer of private housing sought to have the same site, plus 13 additional acres, rezoned to multi-family resident lots. He proposed to build 268 units on less than twice the space. The petition for rezoning was granted. No one complained that 268 multi-family units on 28 acres would overcrowd the schools, cause traffic congestion, or diminish property values.

In October of 1974, the U.S. District Court in Toledo overturned the action of the Toledo City Council and Plan Commission, declaring that action to be "a sad display of bigotry and intolerance." On appeal, the Sixth Circuit Court of Appeals, impressed with the apparently unfettered power of a city to regulate the use of land within its jurisdiction, reversed the district court as to one of the sites. The other two were remanded for further hearings. Due to the four (4) year delay, both the developer and the housing authority have lost their interest in the projects. Had Section 206(c) existed at the time, with its clear proscription against land use practices which discriminate against subsidized housing for low income persons, the result might have been very different and those units would be occupied today.

1976–1977—TWO MORE OFFICIAL VETOES AND A CITIZEN REFERENDUM ON DISPERSED LOW INCOME HOUSING SITES

In response to criticism that it often placed too many units on each of its sites (generally 50 or more), the housing authority in 1976 purchased two (2) sites upon each of which it proposed approximately 16 units of single family housing. Neighborhood opposition did not diminish. Some claimed the units were too expensive, while others claimed they were not expensive enough. The primary concern alleged, though, was that the units would overload sewers in the area [even though hundreds of other homes in the area have recently been tied into the same sewer interceptor without any objections [13] ]. Initially both the Plan Commission, contrary to staff recommendation, and the City Council, denied platting and sewer extensions to the sites.[14]

When HUD threatened to cut off federal funds to the City, for acting in an apparent violation of Title VI of the Civil Rights Act of 1964, both the Plan Commission and City Council reversed their actions and granted platting and sewers. The "concerned citizens" were not to be deterred. They petitioned the two (2) sewer extension ordinances to referendum, and defeated them. Nevertheless, in the seven (7) months that have passed since the referendum, the City Council has routinely adopted three (3) more ordinances connecting a minimum of 233 lots to the same sewer interceptor.[13]

Undoubtedly many of the City's actions are illegal under existing law.[15] But litigation rarely builds houses and the most effective way to avoid years of delay is by enacting law that clearly means what it says and does not require dozens of courts to interpret it. Section 206(c) as written in H.R. 3504 provides the sort of notice to local governments that could prevent many discriminatory decisions and subsequent litigation. By its addition of criteria relating to the subsidized nature of the housing and the economic status of the prospective occupants, the amendment further clarifies the fact that there is nothing inherently undesirable about persons and families who are indigent and who reside in public housing.

The proposed redraft of Section 206(c) referred to in Footnote 3 does not provide explicit notice to local governments of their limitations with reference to subsidized housing and its prospective low income occupants. In fact, for those jurisdictions, like the City of Toledo, who may very well have their "fair share" of low income housing, the redraft provides no clear proscription against the location of *all* that housing in the minority concentrated areas of the City. A possible resolution of this shortcoming could be the insertion of the phrase "and equitable distribution" after

---

[13] See Exhibit F which lists the sewer extensions granted to the same sewer interceptor into which public housing was not permitted to tap. The first twenty (20) extensions were granted between 1970 and the date of the referendum (September 13, 1977). The last three (3) were granted after the referendum. Talmadge Wood was the name of the public housing development which was blocked.

[14] Sewer extensions were denied even though the housing authority and the City of Toledo had entered into a Cooperation Agreement in 1968 which provided, *inter alia:* 6. In respect to any Project the municipality further agrees that within a reasonable time after receipt of a written request therefor from the local authority: (c) It will provide, or cause to be provided, water mains, and storm and sanitary sewer mains, leading to such project and serving the bounding streets (in consideration whereof the local authority shall pay to the municipality such amount as would be assessed against the Project site for such work if such site were privately owned)."

[15] 42 U.S.C. 1441, *et seq.;* 1981; 1982; 1983; 2000d; 3601, *et seq.;* 4601, *et seq.;* 5301, *et seq.;* and the regulations promulgated pursuant thereto; and the Fifth, Thirteenth and Fourteenth Amendments to the U.S. Constitution.

the word "development." [16] Ideally, the combination of this modification to the redraft coupled with the original version of Section 206(c) would provide the best protection to the low income individuals and minorities we represent. [17]

### CONCLUSION

As individuals and governmental bodies become more sophisticated and subtle in the methods used to veil discriminatory actions against minorities and low income persons, the need for clearly defined prohibitions becomes more apparent. In keeping with the "policy of the United States to provide, within Constitutional limitations, for fair housing through the United States," [18] we strongly urge this body to further clarify the Civil Rights Acts of 1964 and 1968 as they relate to exclusionary land use practices by adopting one of the above-mentioned amendments to Section 206(c). [2] [16] [17]

---

[16] Proposed modification of the *redraft* of Section 206(c) to Title II of H.R. 3504 referring to prohibited exclusionary land use practices: "(g) For any general or special purpose unit of government of a State or of a subdivision of a State or States) in the exercise or enforcement of powers with respect to planning, zoning, subdivision controls, building codes or permits, or other matters affecting land use or development, to fail or refuse to afford a reasonable opportunity for the development *and equitable distribution* of such unit's fair share of the regional need for low and moderate income housing."

[17] Proposed modification of Section 206(c) to Title II of H.R. 3504 combining both the original version with the modified redraft of that section:

"(g) For any general or special purpose unit of government of a State or of a subdivision of a State (or other agency having jurisdiction within a State or States) in the exercise or enforcement of powers with respect to planning, zoning, subdivision controls, building codes or permits, or other matters affecting land use or development, to:

(1) Exclude low or moderate income housing because of the eligibility of such housing for governmental assistance, or because of race, color, national origin, or economic status of the prospective occupants of such housing, or

(2) Fail or refuse to afford a reasonable opportunity for the development and equitable distribution of such unit's fair share of the regional need for low or moderate income housing."

[18] Civil Rights Act of 1968, 42 U.S.C. § 3601, Declaration of Policy.

-2-

EXHIBIT A

TABLE 1

BASIC SOCIAL INDICATORS, 1970
TOLEDO AND LUCAS COUNTY, OHIO

| Area | Persons | | Negro | | | Income Below Poverty Level | | | | Juvenile Offenses | | Unemployment | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent of Lucas County | Number of Persons | Percent of Area | Percent of Lucas County | Number of Persons | Percent of Area | Percent of Lucas County | Median Family Income | Number | Rate Per 1,000 Residents | Number of Persons | Percent of Civilian Labor Force |
| Lucas County | 484,370 | 100.0 | 54,694 | 11.3 | 100.0 | 46,739 | 9.6 | 100.0 | $10,883 | N.A. | N.A. | 8,120 | 4.1 |
| Toledo | 383,818 | 79.2 | 52,915 | 13.8 | 96.7 | 41,209 | 10.7 | 88.2 | $10,424 | 4,249 | 11.1 | 6,819 | 4.3 |
| Black Impacted Areas[a] | 80,099 | 16.5 | 48,339 | 60.3 | 88.4 | 17,681 | 22.1 | 37.8 | $ 8,023 | 1,594 | 19.9 | 2,244 | 7.1 |
| Lucas County Less Toledo | 100,552 | 20.8 | 1,779 | 1.8 | 3.3 | 5,529 | 5.5 | 11.8 | $12,194 | N.A. | N.A. | 1,301 | 3.3 |
| Lucas County Less the Black Impacted Areas | 404,271 | 93.4 | 6,355 | 1.6 | 11.6 | 29,057 | 7.2 | 62.2 | N.A. | N.A. | N.A. | 5,876 | 3.6 |

[a]The Black Impacted Areas are census tracts 11, 16, 19, 21, 22, 23, 24.02, 25, 26, 27, 32, 33, 34, 35, 36, 37, 38, 40, 66 and 94.

Sources:  U.S. Bureau of the Census, Census of Population and Housing, 1970, Census Tracts, Final Report PHC(1)-215, Toledo, Ohio-Mich. SMSA (1972) and Toledo - Lucas County Plan Commissions, Population and Housing Characteristics: Original Data Index (March 1976), Table 8b.

PERCENTAGES OF PUBLIC HOUSING UNITS     **EXHIBIT B**
LOCATED IN IMPACTED AREAS

| COMPARISON INDEX | IMPACTED AREAS | |
|---|---|---|
| | Black Impaction | Minority Concentrat |
| % Total Conventional | 1396 ÷ 2830 = 49.3% | 2206 ÷ 2830 = 78.0% |
| % Family | 604 ÷ 1356 = 44.5% | 984 ÷ 1356 = 72.6% |
| % Elderly | 792 ÷ 1474 = 53.7% | 1222 ÷ 1474 = 82.9% |
| % Leased | 261 ÷ 557 = 46.9% | 295 ÷ 557 = 53.0% |
| % Family | 90 ÷ 195 = 46.2% | 124 ÷ 195 = 63.6% |
| % Elderly | 171 − 362 = 47.2% | 171 ÷ 362 = 47.2% |
| % Section 8 | 117 ÷ 322 = 36.3% | 170 ÷ 322 = 52.8% |
| % Family | 98 ÷ 213 = 46.0% | 125 ÷ 213 = 58.7% |
| % Elderly | 19 ÷ 109 = 17.4% | 45 ÷ 109 = 41.3% |
| Total Housing | 1774 ÷ 3709 = 47.8% | 2671 ÷ 3709 = **72.0%** |
| % Total Family | 792 ÷ 1764 = 44.9% | 1233 ÷ 1764 = 69.9% |
| % Total Elderly | 982 ÷ 1945 = 50.5% | 1438 ÷ 1945 = 73.9% |
| % Total Housing-Sec. 8 | 1657 ÷ 3387 = 48.9% | 2501 ÷ 3387 = 73.8% |
| % Fam. − Sec. 8 | 694 ÷ 1551 = 44.7% | 1108 ÷ 1551 = 71.4% |
| % Elderly − Sec. 8 | 963 ÷ 1836 = 52.5% | 1393 ÷ 1836 = 75.9% |

Numerator = number of available housing units within
defined area.

Denominator = number of available housing units, all
census tracts.





EXHIBIT E

PERCENTAGES OF MINORITIES LIVING IN LMHA
CONVENTIONAL HOUSING AND SECTION 8 HOUSING
LOCATED IN IMPACTED AREAS

| Comparison Index | IMPACTED AREAS | |
| --- | --- | --- |
| | Black Impaction | Minority Concentration |
| % Total Conventional | 1049 ÷ 1512 = 69.4% | 1274 ÷ 1512 = 84.3% |
| % Family | 596 ÷ 976 = 61.1% | 772 ÷ 976 = 79.1% |
| % Elderly | 453 ÷ 536 = 84.5% | 502 ÷ 536 = 93.7% |
| % Section 8 | 108 ÷ 185 = 58.4% | 123 ÷ 185 = 66.5% |
| % Leased | 194 ÷ 282 = 68.8% | 228 ÷ 282 = 80.8% |
| % All Housing Units | 1351 ÷ 1979 = 68.3% | 1625 ÷ 1979 = 82.1% |

Numerator = # of minority units within defined area
Denominator = total # of minority units, all tracts



EXHIBIT F

SEWER EXTENSIONS BETWEEN 1970-1977 TO SANITARY SEWER #49

| | Name | Date | Lots |
|---|---|---|---|
| 1. | Benelex | 1/12/70 | 155 |
| 2. | Brooke Park, Plat 2 | 6/8/70 | 18 |
| 3. | Talmadge Road | 10/26/70 | 72 |
| 4. | Woods Avenue | 6/21/71 | 23 |
| 5. | Lewis and Northville | 6/28/71 | 23 |
| 6. | Maple Grove Extension 1 | 4/4/72 | 12 |
| 7. | Maple Grove Extension 2 | 4/4/72 | 14 |
| 8. | Statesville | 5/30/72 | 25 |
| 9. | Sunningdale Woods, Plat IV | 9/22/72 | 3 |
| 10. | Shadowood Estates, Plat III | 1/19/73 | 45 |
| 11. | Douglas Road | 6/19/73 | 25 |
| 12. | Charlecote Park, Plat III | 5/16/74 | 17 |
| 13. | Charlecote Park, Plat IV | 5/30/73 | 13 |
| 14. | Innsbrook, Plat I | 8/27/74 | 29 |
| 15. | Brook Park, Plat III | 8/27/74 | 28 |
| 16. | Brook Park, Plat IV | 4/22/75 | 8 |
| 17. | Helene Court | | 18 |
| 18. | Fairfield, Larkhaven, Seagert | 5/13/75 | 16 |
| 19. | Innsbrook, Plat II | 4/6/76 | 23 |
| 20. | Poinsetta Park | 9/21/76 | 30 |
| 21. | Talmadge Gardens | 10/11/77 | 223 |
| 22. | Murray Hill Estates | 7/5/77 | 10 |
| 23. | Haughton Acres | ? | 7 |
| | | TOTAL | 840 |
| | Talmadge Wood (Denied) | 9/13/77 | 16 |

002231

232

## TESTIMONY OF GLENN GALBREATH, MANAGING ATTORNEY, REPRESENTING ADVOCATES FOR BASIC LEGAL EQUALITY

Mr. GALBREATH. Thank you, Mr. Chairman. For the past 9 years ABLE—Advocates for Basic Legal Equality—has been involved in housing discrimination litigation particularly as it involves exclusionary zoning and land-use regulations. I am very pleased to have been invited to appear before the subcommittee to testify on title II of H.R. 3504 on behalf of our low-income and minority clients.

While we wholeheartedly support the proposed amendments to the Civil Rights Acts of 1964 and 1968, we have chosen to limit our comments to section 206(c) which would prohibit State or local government bodies from employing exclusionary land-use practices to block the development of low- or moderate-income housing because of their subsidized nature or because of the race, color, national origin, or economic status of their prospective occupants.

Our interest in this particular provision is especially strong due to the active reliance by local government in the Toledo area upon land-use regulation to limit the development of low-income family public housing only to areas of minority and low-income concentration. It has been our experience that as blatant racial discrimination has become less fashionable so-called economic discrimination has replaced it as an acceptable means of accomplishing the same objective.

The Toledo metropolitan area is racially segregated. Even though the pecentage of blacks in Lucas County is only 11.3 percent, almost 90 percent of them live in black-impacted census tracts. As to public housing programs, over 70 percent of the housing authority units are located in minority-concentrated areas and of those, over 80 percent are occupied by minority tenants.

If I might, I would like to refer to the map we brought along. Essentially, the map shows Lucas County. Inside Lucas County is the city of Toledo, which is this section in the center. Within that we color coded the areas which are essentially minority impacted or minority concentrated. Those are the darkened areas in the city of Toledo as well as one area out in the county.

On the other extreme we indicated the areas where there is actually less than 1 percent black population. We colored those yellow. As the map indicates, it is very clear the minorities, and low-income people in particular, are concentrated in the central part of the city. Not only are they concentrated there, but there are almost no minorities living in the so-called white areas of the city of Toledo or Lucas County.

Segregation is maintained in Toledo, in part, by a pattern of vetoes affecting every family public housing development proposed for a location outside black-impacted areas in the last 8 years.

If I might point out, the small dots, yellow, blue, and red, all indicate low-income housing that is operated by the local housing authority. They represent three different types of housing.

It is a little deceptive because you do see a number of blue and yellow dots out in the white areas of the city. The fact is that most of those are one unit here, one unit there, and when you do get a larger groups, such as the 45 units out here, they are elderly units.

One of the major causes of this pattern is that over the past 8 years there have been nine separate occasions where the city has deliberately blocked, through one means or another, the develop-

ment of low-income family housing in the outlying areas Those are all indicated by the squares with the white dots in the middle.

If I might, I would like to go into some of the details on those sites so you have a better idea just how exclusionary zoning and land-use practices have been utilized to block that kind of development.

I might add, those nine projects were, in fact, the only family projects the housing authority has tried to locate in white areas of the city of Toledo. Every one of them has been blocked.

In 1970, the housing authority selected four sites for the location of low-income family housing, all outside areas of minority and low-income concentration. White resident opposition was immediate, intense and, at times violent. This opposition came from the middle and upper classes of white population; not just the blue-collar whites referred to by Mr. North.

In an unprecedented action, the Toledo City Council passed a resolution declaring the four sites unavailable for public housing. ABLE filed a lawsuit and, in June 1970, the U.S. district court declared the council resolution unlawful and ordered the city to refrain from any action which would impede the construction of the housing. Three of the four sites were ultimately developed only because of that lawsuit.

In 1974, the housing authority located a developer who was willing to build low-income family housing on three more sites in esentially white neighborhoods. Two of the three sites were properly zoned and only required routine platting approval by the city plan commission. The third site required rezoning and platting. The plan commission's staff recommended approval of the platting and zoning requests for all three sites.

The first site's platting was routinely approved by the commissioners. Shortly thereafter, though, white residents of the area demanded and received a reconsideration of the plat because it had not been clear that public housing had been planned for the site. After learning this, the commissioners rescinded their approval. By the time the second parcel came on for hearing, the fact that public housing was to be built on the site was well known. Again, the commissioners denied platting, contrary to the staff's recommendation, on the alleged ground that the proposal was not in the best interests of the residents of the area.

In June 1976, we made a study of platting decisions by the plan commission. We found that, from 1969 to the survey date, the plan commission considered 133 cases in which platting was the only issue. Of those 133 platting requests, 119 were approved and 14 were disapproved. Of the 14 that were disapproved, the plan commission overruled a staff recommendation for approval only five times. Of those five cases, four involved the platting of a public housing site in a white neighborhood.

A third site was particularly interesting. The developer of this low-income housing—this is single-family, low-income housing—proposed to put 50 units on 15 acres. He did need a rezoning. The rezoning was blocked, the platting was blocked, and the reason given by the white opposition was that it would cause school overcrowding, traffic congestion, and diminish the property values in the area.

After the public housing developer could no longer keep options on the property, a private developer came in 2 years later and said he wanted to put on that same 15-acre parcel, plus 13 more, 268 units of multifamily housing. For some reason there was not any citizen opposition, planning commission opposition, or city council opposition to a rezoning which was even less restrictive than that sought by the public housing developer. For some reason traffic congestion, school overcrowding, and property diminution evaporated in that 2-year period.

We again were forced to go into court on those three sites and at the district court level all of those platting and zoning decisions were overturned and declared to be a sad display of bigotry and intolerance.

On appeal, the sixth circuit court of appeals, impressed with the apprently unfettered power of a city to regulate the use of land within its jurisdiction, reversed the district court as to one of the sites. The other two were remanded for further hearings. Due to the 4-year delay, both the developer and the housing authority have lost their interest in the projects. Had section 206(c) existed at the time, with its clear proscription against land-use practices which discriminate against subsidized housing for low-income persons, the result might have been very different and those units would be occupied today.

In response to criticism that it often placed too many units on each of its sites—generally 50 or more—the housing authority in 1976 purchased two more sites upon each of which it proposed approximately 16 units of single-family housing. Neighborhood opposition did not diminish. Some claimed the units were too expensive, while others claimed they were not expensive enough. The primary concern alleged, though, was that the units would overload sewers in the area—even though hundreds of other homes in the area have recently been tied into the same sewer interceptor without any objections. Initially, both the plan commission, contrary to staff recommendation, and the city council, denied platting and sewer extensions to the sites. Under HUD pressure, platting and sewers were finally granted only to be later overturned by a citizen referendum on sewer extensions.

During the 8 years before the referendum, sewer connections were granted to the same sewer interceptor covering over 600 lots. Why 600 private homes dumping sewage into a sewer interceptor do not overload a sewer while 16 public housing units do, I will never know. In fact, after the referendum, which blocked the sewer extensions to these two public housing sites, there were three more sewer extensions granted connecting over 230 private homes to the same sewer interceptor. This was subsequent to the vote by the people of Toledo saying they did not want additional sewer extensions in this area because it would cause overtaxing of the sewers.

Undoubtedly many of the city's actions are illegal under existing law. But litigation rarely builds houses, and the most effective way to avoid years of delay is by enacting law that clearly means what it says and does not require dozens of courts to interpret it. Section 206(c) as written in H.R. 3504 provides the sort of notice to local governments that could prevent many discriminatory decisions and subsequent litigation. By its addition of criteria relating to the

subsidized nature of the housing and the economic status of the prospective occupants, the amendment further clarifies the fact that there is nothing inherently undesirable about persons and families who are indigent and who reside in public housing.

The proposed redraft of section 206(c) referred to in footnote 3 may not provide explicit notice to local governments of their limitations with reference to subsidized housing and its prospective low-income occupants. In fact, for those jurisdictions, like the city of Toledo, who may very well have their "fair share" of low-income housing, the redraft provides no clear proscription against the location of all that housing in the minority concentrated areas of the city. A possible resolution of this shortcoming could be made by the insertion of the phrase "and equitable distribution" after the word "development." Ideally, the combination of this modification to the redraft coupled with the original version of section 206(c) would provide the best protection to the low-income individuals and minorities we represent.

As individuals and governmental bodies become more sophisticated and subtle in the methods used to veil discriminatory actions against minorities and low-income persons, the need for clearly defined prohibitions becomes more apparent. In keeping with the "policy of the United States to provide, within constitutional limitations, for fair housing through the United States," we strongly urge this body to further clarify the Civil Rights Acts of 1964 and 1968 as they relate to exclusionary land-use practices by adopting one of the above-mentioned amendments to section 206(c).

Mr. EDWARDS. Thank you, Mr. Galbreath. We have a vote on the floor of the House now so we will recess for 10 minutes and come back, and I am sure we will have some questions for you.

Thank you. It was excellent testimony.

Mr. GALBREATH. Thank you.

[Short recess.]

Mr. EDWARDS. The subcommittee will come to order.

Mr. Galbreath, what has happened in Toledo is not unique in the United States.

Mr. GALBREATH. No, sir.

Mr. EDWARDS. It is a very sticky problem. It is very sticky in an area such as I represent, San Jose, Calif., a city of 550,000 people surrounded by suburbs and suburban cities, generally affluent cities ranging from 40,000 to 115,000 in population, all of which have successfully resisted any movement to accept low-income families or subsidized housing. An exception is Palo Alto, which is not within my district; it is a rather forward-thinking city and has been able to have one city council after another that recognizes its responsibilities and does a very good job.

San Jose has the same burden, we will call it, as Toledo, which is that it accepts practically all of the low-income people and minorities for the entire region and tries to make them welcome and tries to provide some housing, although the housing is all in one particular area.

Let's assume that the section you refer to becomes law. How do you handle the fact that most of the land you are talking about outside the area, the "all-white area," is probably much more expensive?

Mr. GALBREATH. There is no question, of course, that the upper and middle-income areas obviously have higher land costs, to begin with. But frankly what we are interested in in Toledo is such a reltively small number of units to be built in those areas, that the additional costs I think would not be significant enough to seriously cut back on the number of units.

In Toledo, the housing authority has almost 3,000 units which it actually owns. It has another 1,000 or so units which it provides with rent subsidies. But of those 3,000 units it has built and owned, they have tried to locate literally only a few hundred out in the more expensive or so-called white areas.

Had those units been built, we probably would not be objecting as strenuously as we are. We do not expect low-income housing to be equally dispersed with mathematical precision to such a degree that there will be one low-income person on every block. The idea is simply to provide some equal opportunity.

At this point our clients have no opportunity at all in those areas. In fact, the white areas of the cities are the ones where although you are having your so-called suburban sprawl, you also have better schools, better shopping facilities. The new job rate is exploding about 8 times that of the central city. If our clients are going to get employment, they are going to have to be near it. They prefer to be near their work and be in an area where they are going to have those amenities they do not have in the central part of the city.

Mr. EDWARDS. You recall the Section 23 housing. Did they use that while it was in existence?

Mr. GALBREATH. Yes. The yellow dots (on the map) are section 23 housing. They are dispersed a little better than the orange dots which represent housing authority owned units.

Mr. EDWARDS. The classic old-fashioned type of housing, where the housing authority owns the units?

Mr. GALBREATH. Yes.

Mr. EDWARDS. If they use something like section 23, what you object to could not take place?

Mr. GALBREATH. That is possible. In fact, the newest program, section 8, which is the rent supplement program, is providing a little more dispersal, and that is a very positive sign. Still, about 80 percent of the section 8 housing is still located in the central part of the city.

The problem we have run into particularly in Toledo in the area of section 8 housing, is not only is it still difficult to disperse it, but it is very difficult to find large family size units in the nontraditional areas for low-income people.

For that reason we had testimony in a trial two months ago where the housing authority itself said we have to continue to do new construction if we are going to serve the needs, particularly of larger families, because there is no way it can be provided on a rent supplement basis because the units are not available at the fair market rents that are permitted by HUD.

Mr. EDWARDS. Your lawsuits would seem to prove that existing law provided that this type of zoning is illegal. Are you saying what we are trying to do in section 602(c) is just a codification of existing case law?

Mr. GALBREATH. Very much so, except that the redraft, by leaving out the dispersal element, could conceivably weaken such laws. At least I can imagine arguments coming our direction saying, since Congress only talked about the production of a fair share and did not indicate that fair share should be equitably dispersed within a jurisdiction, that therefore those cases which did provided that, such as the cases in Philadelphia and Chicago, where undoubtedly those cities had their fair share, could be weakened to some degree.

I do not think that is likely to happen. I am just saying that is a conceivable argument. It is one that could be avoided if in fact there were some mention of the need for dispersing within the jurisdiction that has its fair share.

Mr. EDWARDS. Thank you very much.

Ms. Cooper.

Ms. COOPER. In the Toledo area it appears that the use of zoning decision to exclude low income projects have usually resulted in an adverse racial impact. Are you aware of other communities where the same problem exists in trying to locate low- and moderate-income housing but there really is not that kind of adverse racial impact?

Mr. GALBREATH. I am sure there are. Frankly, I do not have any personal experience in those areas. The waiting list for the local housing authority has about 50 percent minority applicants. In the family housing area it is about 70 percent, and this is with a citywide population of no more than 15 percent.

Mr. EDWARDS. What is the population makeup there?

Mr. GALBREATH. In Lucas County, which includes Toledo, it is about 11.3 percent. As far as the city itself, it is about 15 percent.

Mr. EDWARDS. Black?

Mr. GALBREATH. Black. But as far as the waiting list for the housing authority, it is between 50 and 70 percent.

Mr. EDWARDS. How large is Toledo?

Mr. GALBREATH. About a third of a million population for the city, and about half a million for the metropolitan area.

Mr. EDWARDS. That should be a very manageable area.

Mr. GALBREATH. One would certainly think so.

Ms. COOPER. Do you therefore think that the provision relating to discrimination on the basis of economic status is really needed? The Justice Department, among others, questions the constitutionality of such a provision. I would like to know your opinion on the question of constitutionality of that, and second, whether you believe there is a need for adding on that additional factor?

Mr. GALBREATH. I think there definitely is a need. The reason is that racial statements are no longer fashionable in this country. People still make them. But you are not going to find too many city officials, even people circulating petitions, who are going to say the reason they do not want that housing in their area is because they do not want minorities in there. What is being used now is that they do not want lower-income people in their area because for some reason they are undesirable and they are going to hurt the property values.

The fact is when you seek to find what it is that really makes people vote the way they do, it often comes down to the issue of

race, and economic discrimination is just used as a screen to cover over racial discrimination. Our position is that Congress, in recognition of the fact that people are sophisticated enough not to openly base their decision on racial factors, should prohibit economic discrimination which has as much adverse effect on low-income minorities as any direct racial discrimination could have. The Constitution certainly permits Congress to look beyond the initial public statements that are made by officials and others and to recognize the discrimination for what it really is.

Ms. Cooper. But if there is adverse racial impact, a good lawyer can prove that, and under the test that has been employed under title VIII you could base the lawsuit on that showing of adverse racial impact.

But where that cannot be proved because the citizens who are trying to get low-income housing are not predominantly minority, the economic status section may be needed to cover that situation. In order to prevail, the intended residents cannot be put to the test of proving adverse racial impact.

Mr. Galbreath. I think the Supreme Court and other courts have on a number of occasions said poverty in and of itself is not a suspect classification, but those were decisions by the Court in relation to constitutional arguments. They were not saying the Congress does not have the power to go beyond that. They were simply saying as the Constitution, as it was presented to them in those situations, did not empower the Court to find, to read into, prohibited activity. It was a simple recognition of the Court's limited role and the fact that they do not have the legislative facts and background to make that kind of policy decision—only Congress does. As we all know, this Court has been complaining for years about having Congress say what it meant and come right out and give them clear guidance. They do not want to have to make those kinds of interpretations. I think this is the ideal opportunity for Congress to do just that.

Mr. Edwards. Have the realty boards been of any help to you?

Mr. Galbreath. I found some of the comments of the National Association of Realtors to be very interesting. To answer your question, Mr. Chairman, no, the realty boards have not been particularly helpful at all. We do not have one of the affirmative marketing plans in Toledo that was so widely touted by Mr. North. I found one thing somewhat disturbing and that is the unusual interest by the National Association of Realtors in the possibility of dispersing the power base of low-income and minority people. It just seems incongruous to me that one of the parties that was primarily responsible for the perpetuation and the initiation of these kinds of housing patterns is now all of a sudden worried about dispersing the black power base so they will be powerless to have any control over their own city government.

In Toledo it does not make any difference because everybody is voted at large and a black voter has the same power to vote for a councilperson whether he lives right downtown or in northern Toledo.

Mr. Edwards. Why don't they have districts?

Mr. Galbreath. I do not know, they just do not.

Ms. COOPER. I would like to get into the problem of standing to challenge exclusionary land-use practices. If your alternative, in conjection with the fair share concept, were employed, do you foresee a reduction in the problems of standing that have been faced by plaintiffs in various cases challenging exclusionary land-use practices?

Mr. GALBREATH. I see it possibly reducing that problem. The courts have been on such a conservative bent to insure that plaintiffs who challenge this sort of activity do not get before the courts. I think these amendments would certainly increase the availability of the courts. When the Congress specifically states that we are going to protect low-income people and minorities, and communities are going to provide a fair share of low-income housing, gives plaintiffs a much stronger basis to get before a court and raise these issues. In the recent past, courts have been looking for every device they can to keep that kind of client out of the courts, making it impossible for us to even litigate cases. We have the additional problem that even when you litigate a case the inherent delays involved severely limit the likelihood that housing will actually be built as a result. That is the reason we are pushing so much for the clarification.

So when a planning commissioner sees he has before him a decision to make, and on the other hand his counsel tells him: Congress tells you you cannot discriminate against this project because it has minorities, or low-income tenants—maybe we can avoid some of the litigation. Maybe we can get the sort of decisions at the lower levels that are not going to generate the years and years of delay that have been built into this kind of litigation in the past.

Mr. STAREK. I really did not understand your answer to counsel about your opinion as to the constitutionality of 206(c) as drafted and as redrafted.

Mr. GALBREATH. I think Congress has the power to look at the facts and to determine that, in fact, economic discrimination is being used as a cover for racial discrimination. There is no question whatsoever that Congress can go beyond the use of blatant racially motivated actions to proscribe actions which discriminate against low-income people, if in fact low-income discrimination is being used to create racial discrimination.

Mr. STAREK. That is the second point I wanted to explore with you. You made that allegation, and I would like to know what evidence you have to back it up.

Mr. GALBREATH. Right there [pointing to chart]. In every one of those instances of vetoes they based their decisions on sewers, low-income people, traffic, and property values. Very rarely would anyone say they were voting against it because they did not want blacks in the neighborhood. The fact is because it is widely known that public housing in Toledo is predominantly minority housing, the other reasons are just used as a veil to keep the minority housing out of the white neighborhoods.

Mr. STAREK. It would appear it is a mind-reading process if you say you are unable to really find people who will admit to that fact.

Mr. Galbreath. It is a mind-reading process to the degree that people are not so unsophisticated that they are going to let their prejudices come to the forefront in an official body hearing, but the result is still the same, and there are certain statements that are still made by those who may be a little less sophisticated. That is the reason they are voting against it. The fact is that when a private housing developer wants to build the same kind of development, it goes in. It is almost a matter of exclusion. What else is left?

Mr. Starek. I would have to agree with you, based on the cases that you cited in your testimony. Let me ask just one more question. Are there examples in Toledo or elsewhere that go against what you have presented here? Are there examples where communities have acccepted low-income housing or does every community fight it all the time?

Mr. Galbreath. I am sure there are communities that have accepted it, maybe in some cases reluctantly, but I am also sure they are probably in the minority when one considers the amount of litigation generated on these issues. My experience has been primarily in Toledo.

Mr. Starek. Are there white areas in Toledo that have low-income housing, whether it be single- or multi-family, where there has not had to be litigation?

Mr. Galbreath. No.

Mr. Starek. Thank you.

Mr. Galbreath. I might clarify that. To be honest, there is some elderly housing in the white areas. I think this is probably true nationwide, that elderly housing has not run into the same opposition that family housing has. There are units of elderly housing that are either on the fringe of the minority concentrated areas or in some cases actually in white areas. Even that, though, is in small amounts and it is interesting that when you look at the occupancy patterns within that housing, somehow white tenants always end up in those units and the black elderly always end up downtown. There is litigation concerning that with our local housing authority right now.

But as far as family housing, there is almost no local public housing in the white areas of the city. It is almost all in the minority concentrated areas.

Mr. Edwards. California has a constitutional requirement for a referendum whenever a housing authority wants to build public housing and own or rent it itself. In a city that I represent, San Jose, with 550,000 people, there has never been a single referendum for public housing that has been approved by the voters, although we have high hopes that an elderly project will be approved on June 6 in the primary election. The only reason we think so is because it is for the elderly and not other low-income persons, so the wave of prejudice hopefully will not overwhelm the voters. A lot of money is always put up against the referendum. San Francisco and Oakland and Los Angeles have had some success, but in most cities the constitutional provision absolutely prohibits public housing.

Mr. Galbreath. The referendum has been a real setback for the dispersal and production of low-income housing. I do not know

what the ultimate answer to that is. We are right now challenging the referendum on the sewer votes for the two sites that I last mentioned, but in that case I think we can show fairly clearly that the result of that referendum was utterly irrational when the city denies sewer extensions to 16 housing units but permits over 800 sewer taps to private housing. Hopefully we will prevail on that but we probably will not know for years.

Ms. Cooper. I have one more question. Some of the groups and individuals who have commented on section 206(c) have felt that perhaps it went too far—that it would basically create a Federal preemption of local zoning and related regulations; that basically no defenses were built into the provision—such as that the community had turned down a zoning change because it did not fit into a long-standing community plan.

What defenses you think would be available to a community to defend itself against a suit brought under this provision?

Mr. Galbreath. Undoubtedly a city should be able to defend to some degree. They should not be forced to take low-income housing wherever the housing authority decides it is going to place housing. Obviously the city has to maintain some control. I do not think it would be absolutely necessary that Congress enumerate every possible exception because undoubtedly the courts are going to do it anyhow, although I have nothing against adding clarity to what some of those defenses are going to be. I think we would endorse the draft amendment prepared by the Potomac Law Institute, where they did provide a city the option of turning down low-income housing when in fact that low-income housing was absolutely contrary to a housing plan that had been approved by HUD or if in fact the housing authority was trying to build housing in an area that was absolutely unsuitable, because of some legitimate technical engineering reason.

In essence, all we in Toledo have been asking is that public housing be treated in the same way they treat private housing. If we can get that out of them we would be a step ahead.

As far as getting a fair share, that is ideally what we would want, but Toledo is so far behind we are even looking at something possibly less.

Mr. Edwards. I believe we have no more questions. We thank you very much. It has been very good testimony and it is going to be of great value to us. Congratulations on the efforts you make on a day-to-day basis. It is nice to have you here.

Our next hearing on this subject is Monday at 9:30 in this room. We are adjourned.

[Whereupon, at 11:50 a.m., the subcommittee adjourned, to reconvene 9:30 a.m., Monday, May 15, 1978.]

# FAIR HOUSING ACT

MONDAY, MAY 15, 1978

House of Representatives,
Subcommittee on Civil and Constitutional Rights
of the Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met, pursuant to notice, at 9:40 a.m., in room 2237, Rayburn House Office Building, the Hon. Don Edwards, (chairman of the subcommittee) presiding.

Present: Representatives Edwards, Drinan, Volkmer, and Butler.

Also present: Thomas P. Breen, counsel; Janice Cooper, assistant counsel; and Roscoe B. Starek III, associate counsel.

Mr. Edwards. The subcommittee will come to order.

We continue today hearing witnesses on H.R. 3504 and today we are going to focus on the addition of "handicapped" to the prohibited grounds of discrimination under the Federal Fair Housing Law.

Although discrimination against the handicapped, like discrimination against minorities and women, is based on a status that is beyond the control of the individual, legal prohibitions against this type of discrimination involve some significantly different issues.

Part of the problem in considering this legislation is that, frankly, it is not readily apparent from the bill itself what the prohibition would or should mean. Will it require private housing to be structurally altered and, if so, at whose expense?

What about tort liability?

What definition of "handicapped" would be appropriate?

Some particular problems of the handicapped in housing are not addressed in this bill, but perhaps they should be.

Our first witness today will address one such issue, the problem of exclusionary zoning as it affects efforts to establish group living facilities in communities.

Dr. Robert L. Okin is the Massachusetts Commissioner of Mental Health. We are very pleased and honored to have you appear today, and I yield to my colleague from Massachusetts, Father Drinan.

Mr. Drinan. Thank you.

I, too, want to welcome the distinguished commissioner of mental health in Massachusetts, Dr. Robert L. Okin, a psychiatrist, a distinguished physician, and a former commissioner of mental health in the State of Vermont.

He has brought a lot of initiative, resourcefulness, and creativity to the very difficult task that he is doing so ably in the Commonwealth of Massachusetts.

I am happy to also note that he is accompanied by Mr. Richard Goldstein, Esquire, the general counsel for the department of

(243)

mental health. I am happy to say Mr. Richard Goldstein graduated from my very favorite law school, Boston College Law School, in 1974.

We welcome both of you and I know your testimony, which I have already read, will be very useful to the subcommittee.

Mr. EDWARDS. You may proceed, Dr. Okin.

Without objection, all of the statements of the witnesses will be made a part of the record and they may proceed as they so wish.

## TESTIMONY OF DR. ROBERT L. OKIN, MASSACHUSETTS COM-MISSIONER OF MENTAL HEALTH, ACCOMPANIED BY RICH-ARD S. GOLDSTEIN, LEGAL COUNSEL, DEPARTMENT OF MENTAL HEALTH.

Dr. OKIN. Thank you, Mr. Chairman and members of the sub-committee.

Thank you for giving me this opportunity to express my views on H.R. 3504.

My name is Dr. Robert L. Okin.

I am the Commissioner of the Massachusetts Department of Mental Health. I also serve as the Chairman of the Task Force on Deinstitutionalization of the National Association of State Mental Health Program Directors and as a member of the Department of Health, Education, and Welfare Task Force on Deinstitutionalization.

I would like to address today what I believe to be a major civil rights violation directed against handicapped persons and, particularly, against the mentally disabled.

I very strongly support this bill insofar as it further extends civil rights protections to the handicapped. However, there is one significant form of discrimination which the bill does not take into account: The use of restrictive zoning laws by local governments to prohibit the establishment of group homes for mentally disabled persons.

Traditionally, services for the mentally ill and mentally retarded were provided in institutional settings. However, there has occurred a dramatic change in our clinical perspective, particularly over the past 20 years, and it is now widely held that the overly restrictive environments of large, antiquated institutions, impede rather than promote an individual's ability to improve and develop.

Institutionalized persons never learn or soon forget basic living skills such as cooking, personal hygiene, how to use banks and shopping centers, public transportation, activities which most people take for granted. Long-term patients become dependent on institutions, their capabilities atrophying or never developing.

Today, there is a vigorous movement away from reliance on institutional care towards the provision of mental health services in community-based settings. I believe that the most humane and effective way of delivering quality mental health care is through such a community-based system where patients can maintain ties with families, friends, and homes.

Very recently, the report to the President of the President's Commission on Mental Health reaffirmed the need for community-based services and recommended their expansion.

Reinforcing this clinical perspective, the courts have acted as a major force in this movement with the recognition that the mentally handicapped have a right to receive care and treatment in the least restrictive environment consistent with their needs. But perhaps the greatest impetus to community mental health care has come from the leadership role of Congress.

In 1963 the Mental Retardation Facilities and Community Mental Health Centers Construction Act was passed. In the past 15 years over 1.5 billion Federal dollars have been invested as a result of this measure and the amendments which have followed. In 1975 the Developmentally Disabled Assistance and Bill of Rights Act became law and recognized the need to develop facilities that are the least restrictive to disabled persons.

As amended in 1975, the Community Mental Health Centers Act calls for the provision of 12 essential services. One of these services is community residential alternatives. Persons leaving institutions must have a place to live. It is a cruel hoax to open the doors of institutions without adequate residential services. The callous "dumping" of the mentally disabled that has been so well described in the GAO report to the Congress, simply cannot be tolerated.

The backbone of community residential alternatives is the congregate living facility. Such group homes provide a supportive environment in neighborhood surroundings where the residents can intermingle with the community. A congregate living arrangement can facilitate the integration of the mentally disabled into the mainstream of society, particularly those who have been institutionalized for a number of years.

Typically, these facilities are staffed by trained and dedicated professionals or paraprofessionals who help the residents develop or redevelop the skills they need to cope in the community. It is hoped that group homes will be a transitional phase for the residents on the road to increasingly independent living arrangements.

However, we have faced major obstacles as we have attempted to establish community residences. One roadblock has been the shortage of available, affordable, and suitable housing stock. We do not want to establish institutional ghettos in the least desirable sections of cities or towns. This would simply promote the current stagnation of the mentally disabled.

One of the most serious problems we have encountered and, frankly, the reason I am here today, is the community resistance which the establishment of group homes often engender.

It is our policy in Massachusetts to work with neighbors and local leaders to familiarize them with what we are attempting to do and thereby to ameliorate opposition. However, despite our best efforts, we don't always succeed.

Local opposition typically crystallizes in the form of prohibitive zoning laws preventing or restricting the establishment of group homes for the mentally disabled. Where zoning restrictions have been applied, we are faced with a terrible choice. We could give up and move on to another community where resistance is not so strong. But the effect on disabled individuals of that decision can be devastating.

The handicapped are told, in effect, at a time at which they are struggling to gain or regain their own self-esteem, that they are

not worthy of living in a particular community, that they are second-class citizens, and that they might as well live in the institution where they won't be exposed to such animosity.

We can decide, on the other hand, to commence litigation to fight the zoning restriction. But even if we are successful in court, litigation is a time consuming and costly process. Even more profoundly, the necessity of litigation in order to permit the mentally disabled to live in a community has a strong, chilling effect on the establishment of group homes, and once again carries the message that our clients are unwanted and unworthy, as second- or third-class citizens in our society.

Under the very best of circumstances, the transition from life in an institution to life in the community is a difficult and frightening experience. The burden of having to litigate one's right to live freely makes this transition even harder to bear.

Our efforts to move clients out of inappropriate institutions have been frustrated due to the unavailability of community residential alternatives. We estimate that in Massachusetts alone there are well over 5,000 persons who are institutionalized solely because there are inadequate alternative living arrangements in the community.

There are countless others who will be institutionalized in the future simply because of this inadequate living arrangement in the community. Although it is impossible to compile exact figures, it is clear that zoning restrictions severely limit the availability of residential services and thus effectively exclude the handicapped from life outside of the walls of institutions.

In Massachusetts, we have had several appellate court cases which have defined community residences as "public educational uses" and therefore exempt under State law from zoning prohibition. However, despite these favorable decisions we still encounter serious zoning difficulties in establishing group residences.

We are currently involved in, or aware of, a number of cases throughout the State where the zoning issue is being litigated or where court action appears inevitable.

I suspect the reason this issue persists and has not been effectively resolved by State law is that at present when the handicapped are excluded from living in a community, most people do not regard it as a civil rights violation. If cast in those terms, I would hope that much greater respect would be shown to the rights of the handicapped.

With the passage of the Rehabilitation Act of 1973, particularly section 504, Congress recognized the dire need of the handicapped for civil rights protections. Congress saw that the handicapped are subject to widespread discrimination similar to that of minorities and women. In H.R. 3504, these civil rights are expanded to include protections against discrimination in employment and housing.

I would like to compliment Chairman Edwards and Congressman Drinan, as sponsors of this bill, for addressing these very critical problems of the handicapped.

However, H.R. 3504 does not address the matter of zoning exclusion to which I have referred and which I believe is a major civil rights issue and perhaps one of the most major obstacles to the

development of the adequate residential services for people who might otherwise be institutionalized.

Secion 206(c) of the bill would make it illegal for a local government to use its zoning or other land use powers to exclude low or moderate income housing or occupants of housing on the basis of their "race, color, national origin, or economic status."

However, the provision regarding zoning omits the handicapped from its purview. In light of the bill's very laudable intent to extend civil rights protections to the handicapped, this omission is particularly unfortunate. I realize, of course, that the problem of zoning exclusion may not have been widely recognized, and I am grateful for this opportunity to address it.

I am asking, therefore, that the bill be amended to make it illegal for a local community to prohibit group homes for handicapped persons through zoning or other land use powers. I believe that this amendment could be accomplished quite simply by placing at the end of section 206(c) the clause: "or because the prospective occupants of such housing are a group of handicapped individuals".

By the way, I do not think that simply using the phrase handicapped as opposed to the phrase, "group of handicapped individuals" will really accomplish the end, because most zoning exclusions do not address handicapped people, they address groups of people.

The matter of zoning exclusion of community residences is a civil rights violation of great magnitude, not only in Massachusetts but also in other States where attempts are being made to phase out institutional care. This exclusion has not only undermined State efforts to provide community-based care, but has also frustrated the intent of Congress as expressed in the Community Mental Health Centers Act, that adequate community-based services be provided.

The mentally disabled need your help. Congress has traditionally taken a strong leadership role in helping the disenfranchised and the less powerful members of our society.

This is not a battle that should be fought on a case by case basis in the courts nor on a State by State basis in the legislatures. Particularly since 1964, Congress has taken the initiative in civil rights, and has not been willing to wait for the States to act.

Without the tremendous power of moral suasion that Congress can bring to this issue, I fear that our battle will be long and agonizing. People who for years have been shunted away in institutions are not alien beings; they are our friends, our family, our neighbors, our fellow citizens. They have a right to live in the community. Until this right can be exercised through the prohibition of the exclusionary and discriminatory zoning restrictions, it will remain a meaningless paper right.

With your help, the reality of quality community-based mental health services can be fulfilled.

Thank you.

Mr. EDWARDS. Thank you, Dr. Okin.

Mr. Drinan?

Mr. DRINAN. Thank you, Mr. Chairman, and thank you, Dr. Okin.

I am entirely sympathetic to what you are proposing here.

I have personal experience with this in my congressional district because the Gardner Hospital was closed. There has been controversy there, and the Fernald Home for Retarded in Waltham, in my congressional district, has been cut back severely with consequent controversy. Also the Medfield State Hospital has released people, some of whom are in Framingham.

I recall there is a Massachusetts law against unrelated people living together at the local level, some communities have that. What is the origin of that law and was it intended originally to exclude groups like this?

Dr. OKIN. Are you talking about a State law? Certainly most cities and towns——

Mr. DRINAN. No; it's a local ordinance.

Dr. OKIN. Well, I am not positive about the history. My guess, however, is that in many cases this was simply, these ordinances developed long before the efforts of the Federal Government to provide commmunity alternatives.

Mr. DRINAN. But they are using those ordinances now.

Dr. OKIN. That is right, they are using those ordinances effectively to exclude our clients.

Mr. DRINAN. In one community I represent, the local officials were using that ordinance. When the handicapped group suggested that they should not be under this, the town officials said that that ordinance was designed to protect the solidarity of family life, and they didn't want unrelated individuals living together.

In the litigation that you people have brought, along with others, do you expect essentially to establish some type of civil rights of handicapped people to live together?

Dr. OKIN. That is what we hope to do by this.

Mr. DRINAN. You are on the way to do that, I guess.

Dr. OKIN. What we hope to do through our testimony and through this bill is establish through the Congress that the right of handicapped people to live in a family setting as a civil right and that the restriction that you described that was, I guess, initially developed to protect the family quality of neighbors should not be applied here, because in virtually all cases that we are talking about the group of handicapped people living in a group residence really do constitute a kind of family, and that would be our argument to cities and towns that far from contrasting with the family life of the community, our community residence or group home really attempts to integrate fully with that family lifestyle.

These residents eat together, they cook together, they sleep together, metaphorically, they shop together, and they support each other, they are friends with each other. These are some of the qualities other than the biological qualities of a family; these are some other qualities of family existance.

Mr. DRINAN. I know personally several communities like that, and they are most commendable. It's extraordinary how much can be done to give these people dignity and decency. At the same time, Doctor, I am not certain that the words you propose here to be added to 206(c) are strong enough.

How would you define "handicapped"? Is that a given? Is there a fixed magic legal definition of the handicapped now?

Dr. OKIN. I would have to say no, to my knowledge there is not, and in each subsequent congressional act the definition is expanded. In section 504 I understand that there is some definition of handicapped to include, I guess, that would be through regulation rather than statute, in which handicapped is defined.

Mr. DRINAN. I would see the town officials being persuaded by this language that you propose that physically handicapped individuals should not be discriminated against. But I am inclined to think that in certain communities, at least, they would argue that handicapped, as said here, would not, in fact, include those who are emotionally disturbed or mentally retarded.

Do you think, therefore, that this language should be fleshed out, that it should be made more specific, to reach the objective that you discuss so well?

Dr. OKIN. Yes; I think so. The only reason that I am hesitating even momentarily is wondering whether spelling it out in detail like that compromises the bill's chance of passage, but I would really leave that to you. I think if it could be strengthened and clarified in the way you suggest, I think that would be excellent.

Mr. DRINAN. It probably would make it more complicated, but, one last point. I assume that all of the mental health groups would be in favor of this and they will give us support for the enactment of this particular amendment.

Dr. OKIN. Yes. I can say without having talked to each of them individually, I certainly have talked to them en masse, and we know they would support it. It is my impression that we could get national support for this. But that is an impression from my experience working nationally, and is not an ironclad commitment.

Mr. DRINAN. I take it, Doctor, that this definition here would not include halfway houses for former criminals?

Dr. OKIN. We did not intend the word "handicapped" to mean that.

Mr. DRINAN. All right. Thank you. It's very persuasive testimony.

Dr. OKIN. Thank you.

Mr. EDWARDS. The gentleman from Virginia, Mr. Butler.

Mr. BUTLER. Following up on that question, what about juveniles residing in halfway houses who are not criminals? I do not know how they fall into your definition.

Is it your view we should enact legislation which would make it illegal for localities to prohibit this sort of home in a given area?

Dr. OKIN. The question is a very tough one, and I will try to ultimately answer it specifically with a yes or no. But let me preface my yes or no with the following remarks:

I think the reason it's such a tough question is that kids who have gotten into serious trouble and act up very frequently, often have gotten into the juvenile correctional system simply because a police officer had to catch them before they found their way into a mental health facility, and that frequently there are only few differences between kids in certain juvenile settings and kids who you might think are mentally handicapped.

That is why it's a tough question. Because it's really a gray zone area, as it were, and in terms of a civil rights perspective, as a person, I would say that it should include that as well.

However, I have got to, to some extent, confine my point of view on this to my position as commissioner of the department of mental health and, therefore, at least in my testimony, advocate that handicapped be used to include mentally ill and mentally retarded citizens.

The reason I am waivering on it is I am afraid to spell it out in those terms, and including that group would make the passage of this bill almost impossible, and it makes me worry that a real extension of civil rights to groups of people who are now not covered would fail simply because other groups that unfortunately are more noxious to the community are included. But I want to differentiate my point of view as a civil libertarian from my point of view as commissioner of the department of mental health responsible for the mentally disabled.

Mr. BUTLER. Of course, I judge the only limitation on your question is whether it jeopardizes passage of the legislation, and, of course, I think we may have passed that threshhold a long time ago. We are not certain about that at this point.

Turning then to the other side of the question, how much of their own destiny do you think localities ought to be privileged to retain versus imposition of Federal legislation in this area?

Dr. OKIN. That is, I guess, the critical question, and my point of view on that is that local governments, localities, cities and towns, should be allowed wide discretion as long as it does not interfere with the civil rights of citizens living in the society, and when it does, when that discretion does interfere, I don't think that cities and towns should have that discretion.

Mr. BUTLER. Of course, that is the law now. As we extend certain civil rights to statutory rights then, of course, we are back to the same question. What civil rights should we create by statute that override the traditional right to local self-government? Where would you draw that line, if anywhere, on political expediency?

Dr. OKIN. In this case we are really suggesting that the right of handicapped people to live where they want to live does not constitute a danger to the community and, therefore, the policy power of the community as reflected in zoning ordinances should not be used to exclude those people.

Mr. BUTLER. Of course, what you are saying is that Congress can make a better judgment as to what is better for the locality than the local people can make, is that right?

Dr. OKIN. The phrase "what is better for the localities" I would disagree with that. That is not what I am saying.

Mr. BUTLER. It's what is more appropriate?

Dr. OKIN. I am not even saying what is more appropriate. What I am saying is that there are times when, in my opinion, the civil rights of the citizens of this country weigh heavier than the rights of cities and towns to self-determination or to determine something.

It is a balancing act basically and in my opinion this is a civil right and so it takes, or it should take, greater precedence.

Mr. BUTLER. You are the commissioner of the department of mental health for the Commonwealth of Massachusetts.

Dr. OKIN. Yes.

Mr. BUTLER. Is your view of how far we should go in this particular area an official position or is this your personal opinion?

Dr. OKIN. It is my personal view.

Mr. BUTLER. It is your view?

Dr. OKIN. Yes; if you are referring to the question you asked earlier about juvenile correction, whether we should extend it to that, I am not at this point, my official view——

Mr. BUTLER. All I am asking is does the Governor of Massachusetts require you to clear this statement with him or are you here on your own?

Dr. OKIN. I have discussed this issue with my Governor on numerous occasions. He has been very supportive in the past in our attempts to both litigate these issues and enact State legislation which would allow mentally disabled people to live in cities and towns, and I might simply add with respect to juveniles, in those cases in which juveniles can be considered handicapped people, and that would have been on a case by case basis, then the definition of mentally handicapped might or might not apply to them.

At this point, however, my testimony really deals with people who are mentally ill and mentally retarded and does not deal either by exclusion or inclusion with juveniles.

Mr. BUTLER. My question was a little broader than that, but I thank you. Basically, what you are doing is inviting Federal legislation in a given area. It is going to encroach on State and local self-government and thus we are faced with a policy decision.

You come down obviously on the side of greater Federal intervention. What I was asking you is does your Governor know you are saying that and does he agree with you?

Dr. OKIN. The executive branch does. The Lieutenant Governor's office, which often speaks for the Governor on matters of testimony before Congress, has read and cleared the statement.

Mr. BUTLER. Fine. If the Lieutenant Governor is the son of our Speaker, then I guess the legislation will have no problem.

I yield back.

Mr. EDWARDS. The gentleman from Missouri, Mr. Volkmer.

Mr. VOLKMER. Thank you, Mr. Chairman.

I have several questions.

Basically, what you would like for us to do is to carve out an exemption within the provision or zoning ordinances for one family unit for the mentally handicapped; is that correct?

Dr. OKIN. Yes.

Mr. VOLKMER. Now, I have a couple of little problems with that.

One is once we start where do we end that type of problem? You have already addressed that. And if it's good for one, why not for others, including in a college town, I am sure if somebody would promote this idea with some college organizations they would probably like that idea.

You understand what I am addressing.

The second is when we get into mentally handicapped and the type of community-based home, which you describe, I also know some that are operated basically as boarding homes for the handicapped, basically, where most services are provided on almost a 24-hour basis required, and yet they are not really, they are kind of like a family.

252

Some of them are able to make their beds and things like that, and some of them are just incapable of doing other things, cooking and things like that, and some of them are.

Would you include that type of facility within your definition?

Dr. OKIN. Let me try to speak to both issues which are related. The first question is the general statement of once we start where do we stop?

Mr. VOLKMER. Yes.

Dr. OKIN. I think if that is meant to some extent rhetorically as a problem with this, I guess——

Mr. VOLKMER. It's a problem with me, because how do I justify it for mentally handicapped and not justify it for others who may feel or their people feel they are entitled to the exemption just as much as the mentally handicapped?

Dr. OKIN. How does one justify similar civil rights protections on the basis of race, national origin, color, sex? I mean, one starts——

Mr. VOLKMER. Wait. Let me ask you this question: Can two families of a minority live together in a one family zoning area?

Dr. OKIN. No.

Mr. VOLKMER. OK.

Dr. OKIN. But the general statement of the question is once we start on trying to give people civil rights, where do we stop? That is really the general framework of your question, and I am simply saying that one could have advanced that argument in general to the notion of race, and creed, and color when civil rights of people who were black, for example, were extended.

With respect to the specific question whether boarding homes should be included, I guess that would really depend on what the definition of boarding home was.

Mr. VOLKMER. What is the definition of a community-based care facility?

Dr. OKIN. The way we have defined a group home, it's a group of handicapped people living together with supervision, 24-hour supervision living in the home in a family kind of atmosphere. If your notion of boarding home fits into that, then I would say it's included. If it does not fit into that definition——

Mr. VOLKMER. That would fit in.

Now, the next question that I have, and I should know the answer from your testimony, but I would like to know why there are not sufficient families and areas available within multifamily zoning.

Dr. OKIN. We have found in some cities and towns there are, in fact, but in many cities and towns there are not——

Mr. VOLKMER. Does the city and town, excuse me for interrupting, do this because cities and towns just have one-family zoning throughout the city? Do you find that very much? I can think of several in Missouri, but I cannot think of very many.

Dr. OKIN. It's my impression that some do, but in others the multifamily areas are often but not clearly, not exclusively, are often in declining neighborhoods, and what we are attempting, the problem with that in the cases in which it does occur is if the mentally disabled are restricted from single-family settings and they gravitate, therefore, to multifamily settings, two things happen.

One is that they bear one other stigma and, second, it creates a kind of ghettoization of the mentally disabled, and that is one of the major problems, I would think, from the point of view of cities and towns, even though they might not recognize it, that a restrictive zoning ordinance in one part of town really creates the tendency to ghettoization in another part of the town and that ghettoization seems to me to be bad both for the town, and it's certainly bad for the mentally disadvantaged, and there are certainly many places in a lot of States, New York, California, et cetera, in which that has been an unfortunate consequence early on of deinstitutionalization.

Literally, ghettos have been created of mentally disabled people because they could not find, they could not get in, as it were, to other sections of town.

Mr. VOLKMER. Taking over old homes and converting them into that type of thing, large homes?

Dr. OKIN. Yes; and in a neighborhood of multifamily dwellings where it's the only place they could get in, literally block by block mentally disabled people have moved in and converted old dwellings, and so on and so forth, and then people on the other side of town say: "You see, those mentally disabled people are living in impoverished situations; we don't want them in our part of town," and it serves to foster the notion mentally disabled people cannot live where other folks live.

Mr. VOLKMER. All right. Then, assume that Congress does pass language as you prefer. What type of family then would be available in the single-family zoned areas?

Dr. OKIN. I am simply suggesting that what I was defining as a group home would be a group home of a small number of people, I would say 8 or less, 12 or less, but small with the kind of definition I described before.

That is the only kind of facility that I am suggesting at the moment.

Mr. VOLKMER. I mean, it would have to be a fairly small facility for a fairly small number of people, would it not?

Dr. OKIN. Right.

Mr. VOLKMER. Thank you very much, Mr. Chairman.

Mr. EDWARDS. Thank you very much, Dr. Okin.

I thought your statement was excellent, and I can't disagree with anything you said.

We appreciate the fact that you understand that there are serious political implications in our amendnment, and whether or not there would be enough votes for it, even on the subcommittee, is problematical, because it is a rather revolutionary idea.

However, I don't think there is a member of the subcommittee that would not agree that a properly integrated America—and that is what you are really talking about in the long run—is the best thing for the good health of America. And we are not, insofar as these people are concerned, we are moving toward a more integrated country, but very slowly.

I know in my home area they are moving very slowly, and there are whole different groups of people who are being impacted in one particular area, an area where there is the least resistance and all of the halfway houses, the ones that are narcotic connected, the

exoffenders, people that we are trying to help integrate themselves back into society after being incarcerated, alcoholics. It is a real problem integrating them and, of course, students too.

So, you do have a problem doing it if you want to also move ahead and say these people have civil rights that are being violated because their civil rights are being violated, they are being discriminated against.

We have abandoned schools all over California; they have them all over the United States, housing patterns changing, demographic patterns changing, and it would be a pretty good idea to use some of those abandoned schools and turn them into livable units, which they can be, and you also have open space surrounding them.

It's not too bad an idea for some of them, but I can assure you that your amendment will be considered seriously by the subcommittee, and I have an idea who might offer the amendment. I am sure there will be a lively debate on it, and it will have every fair chance of consideration.

I thank you very much for your testimony.

Counsel, any questions?

Mr. Drinan?

Mr. DRINAN. No, I just want to thank Dr. Okin, too, and state I think popular sentiment, especially from the professional groups, would be most important to popularize this and make it politically viable.

Thank you.

Dr. OKIN. Thank you.

Mr. EDWARDS. Are there other questions?

Mr. STAREK. I just have one or two questions, Mr. Chairman.

Doctor, most of your argument is based on the fact that mentally impaired persons would not constitute any threat on the community. I would like to explore that a little further.

Are there, in fact, mentally impaired persons who would constitute a threat to a community? Are there people whose institutionalization is a result of the fact that they could cause danger to the community or to themselves?

Dr. OKIN. There have been a number of studies to deal with this question, because it is obviously a paramount one, and in a number of studies that have been done on this issue it has been found that mentally disabled people are no more likely to commit crimes than the rest of the population at large.

Mr. STAREK. We used to refer, I believe, to people as being criminally insane, and I assume you are not suggesting that those people to be in these types of homes.

Dr. OKIN. No; I am not. People who are criminally insane, who have been adjudged criminally insane during the time they retain that status are generally locked up in institutions, so that is not the person I am talking about.

Mr. STAREK. Do you envision these dwellings, then, to serve as halfway houses for criminally insane persons who have been found to have been cured?

Dr. OKIN. If someone has a mental handicap and has committed a crime in the past and has been found psychotic, and that that was the reason they committed the crime was subsequently civilly committed, spent a certain amount of time in getting treatment,

255

was subsequently cured, is no longer found to be a danger to society and was released, then such a person theoretically would be eligible.

I want to mention, though, that you are talking about a very, very small number of people compared to the group that I was talking about. I would simply say that the people I am talking about are people who studies have shown do not commit crimes at a higher rate than the rest of humanity.

Mr. STAREK. Thank you very much.

Thank you, Mr. Chairman.

Mr. EDWARDS. If there are no further questions of this witness, we thank you very much, Dr. Okin.

Dr. OKIN. Thank you, Mr. Chairman.

[The prepared statement of Dr. Okin follows:]

### STATEMENT OF ROBERT L. OKIN, M.D.

Mr. Chairman and Members of the Subcommittee. Thank you for giving me this opportunity to express my views on H.R. 3504. My name is Dr. Robert L. Okin. I am the Commissioner of the Massachusetts Department of Mental Health. I also serve as the Chairman of the Task Force on Deinstitutionalization of the National Association of State Mental Health Program Directors and as member of the Department of Health, Education, and Welfare Task Force on Deinstitutionalization.

I would like to address today what I believe to be a major civil rights violation directed against handicapped persons and, particularly, against the mentally disabled. I very strongly support this bill insofar as it further extends civil rights protections to the handicapped. However, there is one significant form of discrimination which the bill does not take into account: the use of restrictive zoning laws by local governments to prohibit the establishment of group homes for mentally disabled persons.

Traditionally, services for the mentally ill and mentally retarded were provided in institutional settings. However, there has occurred a dramatic change in our clinical perspective, particularly over the past 20 years, and it is now widely held that the overly restrictive environments of large, antiquated institutions impede, rather than promote, an individual's ability to improve and develop. Institutionalized persons never learn or soon forget basic living skills such as cooking, personal hygiene, and using public transportation, activities which most people take for granted. Long term patients become dependent on institutions, their capabilities atrophying or never developing.

Today, there is a vigorous movement away from reliance on institutional care towards the provision of mental health services in community-based settings. I believe that the most humane and effective way of delivering quality mental health care is through such a community-based system, where patients can maintain ties with families, friends, and homes. Very recently, the Report to the President of the President's Commission on Mental Health reaffirmed the need for community-based services and recommended their expansion.

Together with the changed clinical perspective, a major force in this movement has been a recognition by a number of courts that the mentally handicapped have a right to receive care and treatment in the least restrictive environment consistent with their needs. But perhaps the greatest impetus to community mental health care has come from the leadership role of Congress. In 1963 the Mental Retardation Facilities and Community Mental Health Centers Construction Act was passed. In the past fifteen years over 1.5 billion federal dollars have been invested as a result of this measure and the amendments which have followed. In 1975 the Developmentally Disabled Assistance and Bill of Rights Act became law and recognized the need to develop facilities that are the least restrictive to disabled persons.

As amended in 1975, the Community Mental Health Centers Act provides for the provision of twelve essential services. One of these services is community residential alternatives. Persons leaving institutions must have a place to live. It is a cruel hoax to open the doors of institutions without adequate residential services. The callous "dumping" of the mentally disabled cannot be tolerated.

The backbone of community residential alternatives is the congregate living facility. Such group homes provide a supportive environment in a neighborhood surrounding where the residents can intermingle with the community. A congregate

living arrangement can facilitate the integration of the mentally disabled, particularly those who have been institutionalized for a number of years, into the mainstream of society. Typically, these facilities are staffed by trained and dedicated professionals or paraprofessionals who help the residents develop or redevelop the skills they need to cope in the community. It is hoped that group homes will be a transitional phase for the residents on the road to increasingly independent living arrangements.

However, we have faced major obstacles as we have attempted to establish community residences. One roadblock has been the shortage of available, affordable, and suitable housing stock. We do not want to establish institutional ghettos in the least desirable sections of cities or towns.

Another serious problem we have encountered and, frankly, the reason I am here today, is the community resistance which the establishment of group homes often engender. It is our policy in Massachusetts to work with neighbors and local leaders to familiarize them with what we are attempting to do and thereby to ameliorate opposition. However, despite our best efforts, we don't always succeed.

Local opposition typically crystallizes in the form of prohibitive zoning laws preventing or restricting the establishment of group homes for the mentally disabled. Where zoning restrictions have been applied, we are faced with a Hobson's choice. We could give up and move on to another community where resistance is not so strong. But the effect on disabled individuals of that decision can be devastating. The handicapped are told, in effect, at a time at which they are struggling to gain or regain their own self-esteem, that they are not worthy of living in a particular community, that they are second class citizens, and that they might as well live in the institution where they won't be exposed to such animosity.

We can decide, on the other hand, to commence litigation to fight the zoning restriction. But even if we are successful in court, litigation is a time-consuming and costly process. Even more profoundly, the necessity of litigation in order to permit the mentally disabled to live in a community has a strong chilling effect on the establishment of group homes, and once again carries the message that our clients are unwanted and unworthy. Under the very best of circumstances, the transition from life in an institution to life in the community is a different and frightening experience. The burden of having to litigate one's right to live freely makes this transition even harder to bear.

Our efforts to move clients out of inappropriate institutions have been frustrated due to the unavailability of community residential alternatives. We estimate that in Massachusetts alone there are well over 5,000 persons who are institutionalized solely because there are inadequate alternative living arrangements in the community. Although it is impossible to compile exact figures, it is clear that zoning restrictions severely limit the availability of residential services.

In Massachusetts, we have had several appellate court cases which have defined community residences as "public educational uses" and therefore exempt under state law from zoning prohibition. However, despite these favorable decisions we still encounter serious zoning difficulties in establishing group residences. We are currently involved in, or aware of, a number of cases throughout the state where the zoning issue is being litigated or where court action appears inevitable. I suspect the reason this issue persists and has not been effectively resolved by state law is that at present when the handicapped are excluded from living in a community, most people do not regard it as a civil rights violation. If cast in those terms, I believe that much greater respect would be shown to the rights of the handicapped.

With the passage of the Rehabilitation Act of 1973, particularly Section 504, Congress recognized the dire need of the handicapped for civil rights protections. Congress saw that the handicapped are subject to widespread discrimination similar to that of minorities and women. In H.R. 3504, these civil rights are expanded to include protections against discrimination in employment and housing. I would like to compliment Chairman Edwards and Congressman Drinan, as sponsors of this bill, for addressing these very critical problems of the handicapped.

However, House 3504 does not address the matter of zoning exclusion to which I have referred and which I believe is a major civil rights issue. Section 206(c) of the bill would make it illegal for a local government to use its zoning or other land use powers to exclude low or moderate income housing or occupants of housing on the basis of their "race, color, national origin, or economic status." However, the provision regarding zoning omits the handicapped from its purview. In light of the bill's very laudable intent to extend civil rights protections to the handicapped, this omission is particularly unfortunate. I realize, of course, that the problem of zoning exclusion may not have been widely recognized, and I am grateful for this opportunity to address it.

I am asking, therefore, that the bill be amended to make it illegal for a local community to prohibit group homes for handicapped persons through zoning or other land use powers. I believe that this amendment could be accomplished quite simply by placing, at the end of section 206(c) the clause: "or because the prospective occupants of such housing are a group of handicapped individuals".

The matter of zoning exclusion of community residences is a civil rights violation of great magnitude, not only in Massachusetts but also in other states where attempts are being made to phase out institutional care. This exclusion has not only undermined state efforts to provide community-based care, but has also frustrated the intent of Congress as expressed in the Community Mental Health Centers Act, that adequate community-based services be provided.

Quite honestly, the mentally disabled need your help. Congress has traditionally taken a strong leadership role in helping the disenfranchised and the less powerful members of our society. This is not a battle that should be fought on a case by case basis in the courts nor on a state by state basis in the legislatures. Particularly since 1964, Congress has taken the initiative in civil rights, and has not been willing to wait for the states to act. Without the tremendous power of moral suasion that Congress can bring to this issue, I fear that our battle will be long and agonizing. People who for years have been shunted away in institutions are not alien beings; they are our friends, our family, our neighbors, our fellow citizens. They have a right to live in the community. With your help, the reality of quality community-based mental health services can be fulfilled.

Thank you.

Mr. EDWARDS. Our second witness is Mr. Reese Robrahn, who is the Director of Research and Governmental Affairs of the American Council of the Blind.

Mr. Robrahn, we are pleased to welcome you and you may proceed with your testimony.

## TESTIMONY OF REESE ROBRAHN, DIRECTOR OF RESEARCH AND GOVERNMENTAL AFFAIRS OF THE AMERICAN COUNCIL OF THE BLIND

Mr. ROBRAHN. Thank you very much.

I wish to express my appreciation of both the American Council of the Blind and the American Coalition of Citizens with Disabilities, both organizations represented by me at these hearings, for this opportunity to appear and testify on this very important piece of legisation.

We wish to commend the subcommittee on its insight and its recognition of the need of handicapped persons by proposing amendments which will be another step forward in providing for handicapped persons their total civil rights so they can participate fully in the activities and life of thier communities.

I submitted a written statement, and I wish to apologize for my late arrival. The public transit system did not cooperate very well this morning in the rain, and my office has a great deal of material to get out and we are short on staff, and I want to apologize for delivering my statement at the time of the hearing itself and not prior to that time.

[The statement follows:]

STATEMENT JOINTLY SUBMITTED BY THE AMERICAN COUNCIL OF THE BLIND AND THE AMERICAN COALITION OF CITIZENS WITH DISABILITIES

(Prepared by Reese H. Robrahn, Attorney-at-Law, ACB's Director of Research and Governmental Affairs, ACCD's Secretary)

The American Council of the Blind is a national organization (nonprofit) primarily of individuals having visual impairment, and having 52 affiliated organizations, 42 state organizations and 10 professional and special interest organizations.

The American Coalition of Citizens with Disabilities (nonprofit) is a membership coalition of 62 national organizations of handicapped individuals and state coalitions and local organizations of handicapped individuals.

While we have not conducted an exhaustive review of all of the proposed amendments, we express our general approval of the proposed changes in the Act; and we particularly commend the action of the Subcommittee in proposing amendments to bring handicapped citizens of this nation within the purview and protections of the Act which, if adopted by the Congress, will represent another step in the securing of the civil rights of a long neglected segment of our society—another step to enable and assure the rights of handicapped persons to participate fully or to their optimum potential in the activities of the community and in the mainstream of society.

We make the following comments and suggestions in the hope that they will be helpful to the Subcommittee and to the Congress in their deliberations:

(1) *Definition.*—One of the persisting problems in the application of laws and regulations and in achieving compliance, arises from the inability of members of the general public to understand legal duties and obligations stated in overly complex language or in overly broad language dealing with a complicated subject. All too frequently laws and regulations needlessly set forth diverse and/or divergent definitions, standards, and guidelines. In the interest of avoiding the foregoing we prefer the definition of the term "handicapped" as used in the Rehabilitation Act of 1973, as amended, appearing under Title I of H.R. 3504 on page 3; however, the entirety of the definition should be used in order to avoid differing interpretations of such terms as "major life activity."

(2) *Scope of affirmative obligations.*—We believe that handicapped persons are entitled to the right of total accessibility to all buildings, facilities, dwellings, transportation, and all places of public accommodation; therefore total accessibility is our goal. However, we also believe that best immediate results can be achieved through the avoidance of measures which would require great expenditures of funds and which therefore would have an adverse economic impact on society in general. To require at the outset that all housing shall be fully accessible to handicapped persons, we believe, would be unacceptable because of the adverse economic impact. A more feasible and reasonable approach is to require that local communities meet certain standards and comply with certain guidelines established by the Housing and Urban Development Department to guarantee that there will be a "fair share" of accessible housing to handicapped persons within the local community and at all levels of cost and in all geographic locations. The foregoing could be achieved through the imposition of penalties and through incentive programs. The modification of one story dwellings or those dwellings already having elevators, under ordinary circumstances, should not require an unreasonable expenditure of funds to meet accessibility standards.

In other words, it is our position that to require retrofitting of all existing housing in the United States in order to achieve total accessibility to handicapped persons is not economically feasible; however, handicapped persons as members of our society should have available to them in each community a "fair share" of all of available kinds of housing so that there is guaranteed a reasonable freedom of choice.

(3) *Land use.*—Consistent with the foregoing, we are committed to favor prohibitions in the use of zoning laws and regulations to exclude housing to any of the protected groups under the Act; we believe handicapped persons should be designated as one of the protected groups. We are opposed to the elimination of specifically designated protected groups through the use of some general term such as "any class of persons." We believe that it is essential to retain the proposed language appearing in H.R. 3504 as introduced in order to guarantee reasonable freedom of choice in housing.

(4) *Degree of care.*—We believe that there is no justification, philosophically or practically, for the imposition of a greater or higher degree of exercise of care by landlords toward tenants who are handicapped. While it may be true that under those circumstances where the landlord may be required to give notice of a temporary potentially dangerous condition, the means of communicating such notice may be different for persons with communication handicaps, such as deaf persons or blind persons; non the less the landlord's degree of care would not be different.

Mr. ROBRAHN. I dealt very briefly and concisely, I hope, with four major issues.

The first one is the matter of definition, and I know that there are certain organizations for handicapped persons that might pro-

pose different definitions of the term "handicapped" or the term "handicapped person."

But I would prefer to go with the defintion as it is set forth in the regulations under section 504 of the Rehabilitation Act of 1973 and, as a matter of fact, that definition does occur in H.R. 3504 in the first title on page 3, that is simply that a handicapped person is any person who, number one, has a physical or mental impairment which substantially limits one or more of the major life activities; two, has a record of such impairment; or three, is regarded as having such an impairment.

But, in addition, in the definitions under the regulations under section 504, some of the major terms within the initial definition are further defined such as, what is a major life activity and what is a physical or mental impairment.

Then I would suggest that the total definition as set forth in the 504 regulation should be used, and I think it would be appropriate to be used in this legislation.

The second matter that I dealt with is the major issue here. While the American Council of the Blind and the American Coalition of Citizens with Disabilities certainly believe that handicapped persons have the right to total accessibilty to all buildings and facilities, public accommodations, transportation and so forth, nonetheless, we realize that to impose that kind of requirement at a given moment might have an adverse economic impact and, therefore, we believe that is not the best way to go at this time.

We believe that the better way to go would be to simply require that there is a fair share of housing in every local community at all cost levels, and in all geographic areas of the community available to the handicapped persons.

I think that would achieve the best results, and that is not too much to require, because many housing units are one story and in such instances the cost of making a one story facility accessible would not be great at all, and in other kinds of housing facilities, where elevators already exist, the same would be true, that the cost of making those facilities totally accessible would not be great.

Any time that there is a major piece of machinery to be installed or a major alteration the cost could be great. But we believe to require every local community to have a fair share of all housing withn the community available for handicapped persons so there is freedom of choice will achieve the purpose. We are not suggesting that there be complete retrofitting of all housing and dwellings in the United States at this time.

The third matter that I dealt with in my brief statement was the one that was dealt with by the first witness, prohibition against restrictive zoning regulations and laws, and we substantially agree with what the doctor has said. We would concur in his specific proposal for how the matter could be dealt with, what language should be used and where it should be included in the bill.

We suggest that it might be helpful to have the definition of "handicapped," as I have already suggested, and also to include a definition of "group home" or "community based group home for handicapped persons," that kind of definition, that kind of term might be helpful.

The fourth issue that I dealt with was the matter of whether a higher degree of care should be imposed upon landlords toward handicapped tenants, and we certainly do not believe that there is any philosophical or practical reason to support that.

We believe that in some instances the action that a landlord might be required to take might be slightly different from that which he might take for a so-called non-handicapped person or the general public, but that would not increase the degree of care.

What I am alluding to, to be more specific, is that if the landlord were required under a given set of circumstances to give notice to his tenants or the general public of a temporarily dangerous condition that has arisen with regard to his housing facility, if there were a handicapped person living in the dwelling, it might be required that he communicate the notice in a different way, such as for a blind person, posting a notice on the board in print would not be sufficient.

So I am suggesting that there might be some different kinds of actions to be taken as a matter of avoiding negligence through the exercise of due care, nevertheless, the care would be no greater.

Those are the four points I covered, and I will be happy to answer any questions.

Thank you very much.

Mr. EDWARDS. Thank you very much, Mr. Robrahn.

I think that since the subject of the two statements is similar that we will postpone the questioning time after we have heard from Mr. Brian Linn, who is an attorney with the National Center for Law and the Handicapped, Inc.

Mr. Linn, we welcome you and you may proceed and we will ask all three of the witnesses to operate as a panel at the completion of your testimony.

## TESTIMONY OF BRIAN LINN, ATTORNEY WITH THE NATIONAL CENTER FOR LAW AND THE HANDICAPPED, INC.

Mr. LINN. Thank you.

Mr. Chairman and members of the subcommittee, the National Center for Law and the Handicapped, Inc. (NCLH) is pleased to testify in support of the Fair Housing Amendments Act of 1977 and its attempt to include individuals with handicapping conditions within the ambit of the prohibited bases of discrimination defined in title VIII of the Civil Rights Act of 1968.

I have submitted a rather lengthy statement, and at this time I will summarize that statement, leaving out a number of the specific points and all of the citations which are included within the lengthier statement.

[The prepared statement of Mr. Linn follows:]

STATEMENT BY BRIAN J. LINN, STAFF ATTORNEY, THE NATIONAL CENTER FOR LAW AND THE HANDICAPPED, INC.

INTRODUCTION

The National Center for Law and the Handicapped, Inc. (NCLH) is pleased to respound to the invitation to testify before the Subcommittee on Civil and Constitutional rights of the Committee on the Judiciary of the House of Representatives with regard to the Fair Housing Amendments Act of 1977 as contained in H.R. 3504.

NCLH is a nonprofit, private corporation which was established in July 1972, to advocate for the legal rights of all handicapped individuals. NCLH is jointly funded

by the Bureau of Education for the Handicapped, Office of Education, Department of Health, Education, and Welfare, and as a project of national significance by the Developmental Disabilities Office, Office of Human Development, Department of Health, Education, and Welfare. Its sponsoring agencies are the National Association for Retarded Citizens, the Family Law Division of the American Bar Association, the University of Notre Dame School of Law, and the Council for the Retarded of St. Joseph County (Indiana).

THE NEED TO AMEND TITLE VIII OF THE CIVIL RIGHTS ACT OF 1968 TO INCLUDE PROTECTIONS
FOR INDIVIDUALS WITH HANDICAPPING CONDITIONS

NCLH is pleased to testify in support of the "Fair Housing Amendments Act of 1977" and its attempt to include individuals with handicapping conditions within the ambit of the prohibited basis of discrimination defined in Sections 206(d) and 901 of the Fair Housing Act. The need for substantive provisions such as those proposed in Title II of H.R. 3504 is well documented.

While Title V of the Rehabilitation Act of 1973, 29 U.S.C. §§ 790–794, has been lauded by many as a civil rights act for individuals with handicapping conditions, its limitations are many. With regard to housing discrimination, Section 504 of that Act. 29 U.S.C. § 794, prohibits discrimination in programs and activities receiving federal financial assistance. Nearly five years after the passage of this important legislation, the Department of Housing and Urban Development has only recently published proposed rules for implementing Section 504. 43 F.R. 16652 (1978). Even assuming prompt promulgation of final rules and full and effective enforcement of their mandate, Section 504 will not provide substantive legal protection from discrimination in housing to handicapped individuals in the private market place.

Despite its limited reach, the enactment of Section 504 has brought to light the extent to which handicapped individuals face discrimination in various aspects of their lives. Two recently filed cases involving allegations of housing discrimination are illustrative of the need to amend the Fair Housing Act.

In *LaMarche* v. *Gatewood Associates*, C.A. No. 77–0332 (D. R.I.), the plaintiff brought suit under Section 504 against a housing project for elderly and disabled persons in North Smithfield, Rhode Island and its management. Gatewood Apartments were allegedly financed through a mortgage insured by the Department of Housing and Urban Development pursuant to Section 8 of the United States Housing Act of 1937, as amended by the Housing and Community Development Act of 1974 and the Housing Authorization Act of 1976, 42 U.S.C.A. 1437. Ms. LaMarche is a quadriplegia woman whose sole source of income was supplemental security income and survivor's benefits from her deceased father.

In rejecting her application for housing in Gatewood Apartments, the president of the firm which manages the apartments wrote to Ms. LaMarche that: "In my opinion, I find that the restricted limitations of mobility with regard to your condition would put an overwhelming burden on yourself, yourneighbors and staff personnel at Gatewood Apartments." (A copy of this letter, which was filed as Exhibit A to the Complaint filed in federal district court, is attached hereto as "Attachment A").

On February 3, 1978, *Cotton* v. *Evangelist Temple Homes, Inc.*, Civil Action No. J78–0045(c), (S.D. Miss.), was filed as a class action by Mississippi Legal Services on behalf of a visually handicapped woman who was denied admission to a low income multi-family federally subsidized housing project in Jackson, Mississippi. The management of the Lincoln Garden Apartment allegedly felt that Ms. Cotton might have such "difficulties" as tripping in potholes and other irregularities in the driveway and parking lot of the apartments.

At common law neither Ms. LaMarche nor Ms. Cotton would have an opportunity to receive legal redress for such discriminatory actions. In the absence of Section 504, a legal remedy for either plaintiff would at best be speculative. unlike members of several of the existing "protected classes" under Title VIII, it does not appear that individuals with handicapping conditions will even receive protections under Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1982, because of judicial restraint in holding that "badges and incidents of slavery" have not historically attached to handicapped individuals. *Civil Rights Cases*, 109 U.S. 3, 20 (1883), see generally *Jones* v. *Alfred H. Mayer Company*, 392 U.S. 409 (1968); cf. *Simon* v. *St. Louis County*, 14 E.P.D. ¶ 7703 (E.D. Mo. 1977).

In addition to the basic need to expand the coverage of federal nondiscrimination policy, the concept of including new substantive protections for individuals with handicapping conditions within the framework of existing statutes for other "protected classes" is highly desirable. Discrimination against handicapped individuals is rooted in the same myths and misconceptions which have traditionally resulted in

discrimination against the historically recognized minorities and women who find protection in Title VIII. The discrimination which handicapped individuals encounter arises from stereotyped notions which are frequently ill-founded. *See generally* Hull, *Forward—The Specter of Equality: Reflections on the Civil Rights of Physically Handicapped Persons,* 50 Temple L. Q. 944 (1977); Burgdorf & Burgdorf, *A History of Unequal Treatment: The Qualifications of Handicapped Persons as a "Suspect Class" Under The Equal Protection Clause,* 15 Santa Clara Law. 855 (1975); Kriegel, *Uncle Tom and Tiny Tim: Some Reflections on the Cripple as Negro,* 38 Am. Scholar 412 (1969).

To deny handicapped individuals the legislative protections granted to others under Title VIII ignores the realities of discrimination in the world in which they live. Not only should the substantive protections be granted, but they should be granted in the context of the same statutory framework which protects individuals faced with discrimination of the same genre.

Where individuals with disabilities, or families with one or more disabled child, are denied rental housing based upon a landlord's belief that such individuals cannot live independently in the community, the discrimination which occurs is as amenable to judicial or administrative resolution as is similar discrimination against women and minorities. Where fears and prejudices, sometimes bordering upon superstition, are the justification for an act of housing discrimination, there must exist a national policy prohibiting such actions. Title VIII includes no such national policy for individuals with handicapping conditions.

The lack of knowledge on the part of prospective landlords concerning the abilities of disabled person can lead to a refusal to rent, and increased security deposit or a higher rent where it is presumed that a handicapped person is more likely to cause damage to an apartment or house. Misguided concerns about fires and other emergencies can lead a landlord to refuse to rent to a handicapped individual who is fully capable of living independently; the likelihood that such discriminatory action will take place increases with the demand for rental units in the locality. In areas where demand far out-strips supply, landlords currently find it attractive not to "bother" with the supposed inconvenience of a handicapped tenant. Stereotypes about the "creditworthiness" of handicapped persons may lead to discrimination in housing practices.

The same threats to the social status of a particular community and the same fears of lower market values for properties within a community, which formed an important impetus for the original enactment of Title VIII, exist in the context of handicapped individuals. One developer, when approached on the issue of designing a new community which would assume accessible living arrangements to handicapped persons through the removal of architectural barriers, reportedly "said he didn't want a bunch of cripples living there because marketability would be hurt." Quoted in a statement of Paul F. Noll in *Architectural and Transportation Barriers Compliance Board, Freedom of Choice: Report to the President and Congress on Housing Needs of Handicapped Individuals* 57, 60 (1975). Marie McGuire Thompson has succinctly described the misconceptions about handicapped persons which impact upon the housing market. She describes common prejudices which are as equally insidious as those which brought forth the need for the prohibited bases of discrimination contained in Title VIII. "Not all persons will spontaneously or readily accept, as neighbors, persons they regard as 'unusual'. Some may fear an adverse influence on their children, the character of the neighborhood, or property values." Thompson, *Housing and Handicapped People* 51, (1976) (Published by The President's Committee on Employment of the Handicapped).

The 1970 census made clear the correlation between status as an individual with a handicapping condition and poverty. President's Committee on Employment of the Handicapped, *One in Eleven: Handicapped Adults in America* (1975). As a nation, we have recognized the influence of segregation upon the cycle of poverty in many instances, and we have made it our public policy to prohibit those discriminatory acts which support such segregation. However, our official policy does not yet recognize the ingrown tendency to isolate handicapped individuals in a manner which necessarily limits the growth and development of such individuals by the environmental parameters which are drawn by segregation.

The discrimination which occurs is no more defensible than the discrimination which has effected the traditional "protected class." The rationale of the Supreme Court in *Jones* v. *Alfred H. Mayer Company,* 392 U.S. 409 (1968), was amazingly simple:

"So long as a Negro citizen who wants to buy or rent a home can be turned away simply because he is not white, he cannot be said to enjoy 'the same right . . . as is

enjoyed by white citizens . . . to purchase [and] lease . . . real and personal property." (Id. at 421.)

Although H.R. 3504 will not be the full realization of all the civil rights to which handicapped individuals should be entitled, the enactment of an amendment to Title VIII is a necessary step toward the eventual acknowledgment of full and complete equality.

THE DEFINITION OF "HANDICAPPED" INDIVIDUALS

NCLH supports the inclusion of the definition of "handicapped" which is contained in the Committee Print proposed revision of H.R. 3504 which calls for the addition of Section 802(h) to Title VIII. Consistency and uniformity are greatly enhanced by the adoption of a definition which reflects the statutory definition of "handicapped" individual already enacted for the civil provisions of Title V of the Rehabilitation Act of 1973. 29 U.S.C. § 706(6). Case law interpreting states statutes which have failed to define the handicapping conditions which fall within the ambit of the "protected class" have occasionally posed difficulties for the judiciary. The utilization of the definition contained in the Rehabilitation Act furthers the public policy underlying that act and H.R. 3504 ensures consistent judicial interpretations. Compare *Providence Insurance Company* v. *Mason*, 12 E.P.D. ¶11,080 (R.I. 1976) (narrowly construing the Rhode Island Fair Employment Practices Act to exclude individuals with temporary disabilities from statutory coverage) with *Milwaukee* v. *Wisconsin Department of Industry, Labor and Human Relations*, 62 Wis. 2d 392, 215 N.W. 2d 443 (1974) (liberally construing the Wisconsin Fair Employment Law to protect individuals with asthma from employment discrimination).

A broad definition of "handicapped" is necessary in order to fully effectuate the purposes of an amendment to Title VIII. The need to provide statutory protection to individuals with a history of impairment and to individuals who are regarded as having an impairment is evidenced by cases filed under the Rehabilitation Act by plaintiffs who did not perceive of themselves as handicapped, *e.g. Duran* v. *City of Tampa*, 430 F. Supp. 75 (M.D. Fla. 1976) (the plaintiff asserted protection from employment discrimination under Sections 503 and 504 of the Rehabilitation Act when he was denied an opportunity to apply for a position as a police officer as a result of four episodes of epileptic seizures in 1958 and 1959, despite the contention of neurologists that his proclivity for having seizures at the present time was no greater than any person in the general population); *Cortez* v. *Balzano*, Civil Action No. 77 0158 Fw (C.D. Ca.) (action filed under Section 501 alleging discrimination on the basis of handicapping condition where the plaintiff was denied a position with the Peace Corps as a result of a medical disqualification based upon a tendon dysfunction of the small and ring fingers of the left minor hand despite the plaintiff's feeling that this minor "disability" in no way affected a major life activity).

Such cases reflect the need for a broadly defined legislative class. Discrimination against individuals with handicapping conditions is not always confined to those persons one might consider handicapped. Where an individual can show that housing discrimination occurred as a result of perceptions of disability on the part of the discriminator, Title VIII should provide coverage.

SCOPE OF AN AMENDMENT TO TITLE VIII TO INCLUDE HANDICAPPED INDIVIDUALS

Legislators who consider enacting a civil rights law to protect handicapped individuals from discrimination in housing may question whether the affirmative removal of architectural barriers at the expense of the property owner is necessary to the full implementation of the legislative design. A number of state legislatures and local authorities have chosen to specifically exclude any duty on the part of the landlord to modify the premises.

NCLH believes that viewing the removal of architectural barriers as an "affirmative duty" misinterprets the nature of such barriers and misapplies well established notions of equality. Architectural barriers are not naturally imposed upon individuals, but are rather an environmental result which, whether intentional or not in their affect of excluding individuals, are attributable to human planning. Such barriers are manmade.

In construing the meaning of discrimination in the context of a proposed amendment to Title VIII, NCLH relies upon the concepts enunciated by the Supreme Court in construing Section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, in *Lau* v. *Nichols*, 414 U.S. 563 (1974). The discriminatory effects of architectural barriers in the housing market are no more justifiable to that subset of handicapped individuals who are excluded from major portions of the market than were the discriminatory effects of providing educational services in the English language to students whose primary language was not English. *Cf.* Appendix A to the final

regulations implementing Section 504 in programs and activities receiving federal financial assistance from the Department of Health, Education, and Welfare, 42 F.R. 22685, 22687 (1977). See also, Lloyd v. *Regional Transportation Authority,* 548 F. 2d 1277 (7th Cir. 1977).

It is in this vein that the three federal agencies charged with the most significant responsibilities for implementing sections 501, 503 and 504 of the Rehabilitation Act of 1973 each respectfully included a concept of "reasonable accommodations" in the sections dealing with nondiscrimination on the basis of handicapping condition. 5 C.F.R. § 713.704, 43 F.R. 12295 (1978) (Civil Service Commission); 41 C.F.R. § 60-741.6(d), 41 F.R. 16151 (1976) (Department of Labor); 45 C.F.R. § 84.12, 42 F.R. 22680 (1977) (Department of Health, Education, and Welfare). Such interpretations start with the presumption that reasonable accommodations are inherent in the concept of nondiscrimination. This result is logically mandated by the recognition that employment environments have traditionally been designed by an able-bodied majority for use by an able-bodied majority, designed by a sighted majority for use by a sighted majority, and designed by a hearing majority for use by a hearing majority. Similarly environmental barriers must be deemed discriminatory.

Despite this reasoning and this view, NCLH recognizes that certain concessions need frequently be made in the legislative process which reflect the views of competing and divergent interests. NCLH recognizes that even the regulations implementing Section 504 with regard to programs and activities receiving federal financial assistance from the Department of Health, Education, and Welfare include provisions which mandate less than the full implementation of nondiscrimination policies. One example is the requirement that only program accessibility, which falls considerably short of a barrier free environment, need ultimately be attained by recipients. 45 C.F.R. §§ 84.21-84.23, 42 F.R. 22681 (1977).

In fulfilling its legislative mission, this Committee, must consider the full implications of any compromises which might be contemplated. The consequence of some of these consequences may not be immediately evident.

In considering whether an appropriate approach might be to require, through federal restrictions on local planning decisions, a "fair share" or parity of accessible units in a community, the Committee must consider the substantial drawbacks to limited accessibility.

Clearly, statutes or regulations which set parities do, by definition, restrict the availability of alternatives. The deep-felt needs of many handicapped individuals to live in integrated communities and integrated housing must be given great weight. "Special housing for the handicapped" is no solution where the goals of segregation are furthered.

Additionally, parities seem to operate from the assumption that the goal of adequate housing has been achieved where handicapped individuals are afforded the opportunity to live in accessible abodes. However, concepts of integration and non-discrimination must thoroughly consider the needs of handicapped individuals to visit with and interact with able-bodied friends and family members. This concern is also frequently shared by individuals who are able-bodied and who desire to live in homes, rather than houses, where their disabled friends and family members are welcome.

Finally, a full sense of security is likely to arise when a "fair share" has been met. The basic trusim that disability crosses all economic, social, religious and racial lines is often stated in words, yet frequently disavowed in actions. The existence of architectural inaccessibility in any housing poses not only barriers to prospective tenants or purchasers, but also poses a significant threat of becoming a barrier to any landlord or tenant currently in possession.

Recognizing the objections in some corners to concepts of universal barrier free design, some advocates of accessibility are beginning to suggest the exploration of the concept of 100 percent access—where physical accessibility insures entrance to homes and to the major rooms, such as bathrooms—with a parity figure established which requires adaptability in a lower percentage of homes.

Analysis of these issues generally discusses costs considerations and the probable economic impact of the various approaches. However, NCLH is aware of no studies which accurately assess the costs of various alternatives. Despite the lack of such studies, it does appear that many of the reactions to Section 504 which predict astronomical costs are exaggerated.

Although the aggregate costs of adapting existing housing will exceed those incurred in new construction which is environmentally sound, we do know that substantial changes to existing buildings can frequently be made with a minimal cost and without any aesthetic loss. *See e.g.* Gentile, *Architectural Affirmative Action: A University with a New Concept,* 2 Amicus 31 (June, 1977).

Existing housing can frequently be made "livable" or more comfortable through such minor modifications as: removing a door; widening a doorway; removing cabinetry under a sink; replacing counters and shelves with adjustable units; installing grab bars in bathrooms; lowering mirrors or medicine chests; replacing existing handles on faucets; or installing ramps where stairs exist.

Any legislation which seeks to protect handicapped individuals from discrimination in rental housing must, at a minimum, insure that where such changes are made at the expense of the tenant or prospective tenant, the landlord must not unreasonably withhold persons to do so. At a minimum, such legislation should proscribe a refusal to rent or lease based upon the need of a prospective occupant to make such modifications where no expense is to be borne by the landlord.

The Center for Independent Living in Berkeley reports that the California Attorney General has refused to pursue a case of housing discrimination against an apartment owner who refused to rent to a wheelchair user. The refusal to rent appears to be based upon the fears of the landlord that the ramp which the prospective tenant intended to place over the existing stairs would not aesthetically blend with the existing environment. The decision of the California Attorney General not to pursue this case is allegedly based upon the California law prohibiting housing discrimination against handicapped individuals which specifically excludes any affirmative duty on the part of the landlord to modify the premises.

Thus, in considering such exclusions in federal legislation, language must be inserted which protects the right of the handicapped individual to make certain modifications. Without such protections, such legislation would become meaningless to many handicapped individuals.

Notably absent from H.R. 3504 is any provision which proscribes refusal to rent to a visually impaired or hearing impaired individual on the grounds that his or her seeing-eye dog or hearing dog would violate a no pets policy. H.R. 3504 should incorporate such a provision to insure that access is not denied to individuals on this basis.

In sum, the removal of existing barriers and the imposition of prohibitions against future barriers are issues which require substantial consideration. The importance of enacting a national policy prohibiting housing discrimination against handicapped individuals cannot be underestimated, and H.R. 3504 is long overdue. It is unlikely that H.R. 3504 will solve all of the problems of architectural barriers in housing which face this generation of handicapped individuals or those which will face future generations. Increased availability of resources through C.E.T.A., vocational rehabilitation organizations and tax incentives (now provided only to business) need to be explored; however, some of the burden must fall upon an amendment to Title VIII which recognizes the inherent discrimination which has occurred and which is occuring.

ISSUES OF LIABILITY AFFECTING SELLERS OR LESSORS

A number of state legislatures and local authorities, in enacting prohibitions against discrimination in housing which protect handicapped individuals, have specifically excluded any possibility that sellers or lessors would be obligated to provide a higher degree of care to handicapped buyers or lessees. Regardless of the basis for the concerns, NCLH believes that it would be contrary to public policy to include such a provision in H.R. 3504. NCLH additionally believes that such a provision is unnecessary.

Handicapped individuals frequently face situations in which a landlord refuses to rent based upon presumptions that the handicapped individual will be an unsafe tenant. Such fears have the same genesis as the erroneous assumption of many employers that disabled workers will experience more frequent accident experience than nondisabled workers. However, such stereotypical fears about handicapped individuals in the work place have been disproved. Comment, *Potluck Protections for Handicapped Discriminatees: The Need to Amend Title VII to Prohibit Discrimination on the Basis of Disability,* 8 Loy.-Chi. 814, 820–21 (1977).

Legislation which specifically sets forth a provision excluding the possibility of a higher degree of care to handicapped individuals carries forward the implicit stereotypes of "accident prone" or "clumsy" individuals. The perpetuation of such images through statutory enactments is an undesirable goal.

In the context of the tort liability of lessors, it is the general rule that there is no obligation to anyone, whether handicapped or not, to look after the premises after possession and control have been transferred and that no tort liability can be imposed. Prosser, Law of Tort 400 (4th ed. 1971). The one common law exception is that both sellors and lessors are under an obligation to disclose concealed dangerous

conditions, of which the sellor or lessor has knowledge, when possession is trans-
ferred. *Id.* at 401.

Exceptions to the reasonable man standards for physically and mentally handi-
capped individuals have developed in common law to insure that all people are
entitled to live in the world and to have allowance made by others for their
disability. *Id.* at 152. However, the law imposes no strict or absolute burdens upon
the community at large or upon particular members of the community, and it
generally recognized that where an individual chooses to live in the community, he
or she must conform to its standards. *Id.* at 153.

Restrictions in contract law which have developed to protect certain individuals,
such as some mentally retarded individuals, are designed to insure that a fair and
honest arms-length bargaining process occurs. Any statutory provisions which could
be interpreted to reduce the common law standards for insuring that mutual under-
standing is reached would adversely impact upon the bargaining process.

The effect, if any, of such language upon present tort liabilities would be minimal;
however, the inclusion of such language would stand as a symbolic continuation of
past stereotypes based upon prejudice and misunderstanding. The federal govern-
ment should reverse the trend which has begun in a number of the states by
excluding any such language from an amendment to Title VIII.

NCLH also wishes to comment on section 206(c) of H.R. 3504 which proposes to
amend Section 804 of the Act by adding Section 804(f) which would prohibit insur-
ance discrimination. Noting that both H.R. 3504 and the Committee Print proposed
revision exclude both sex and handicapping condition from the prohibited basis of
discrimination, we are hopeful that this is merely an oversight.

Handicapped individuals have historically faced high insurance premiums for a
variety of types of policies. Frequently, an individual insurance agent will refuse to
sell insurance to an individual who is handicapped or an insurance company will
require that an individual enter an assigned risk pool or other group which is
required to pay increased premiums merely because of that person's status as a
handicapped individual. Frequently such actions are taken without the benefit of
any actuarial data which would legitimately justify such adverse action. In such
cases, the action taken is directly the result of the prevading misconceptions about
the abilities of an individual which are formed exclusively because of his or her
disability.

The importance of an amendment to Title VIII lies not only in the additional
substantive protections which are granted. The disability rights movement is contin-
ually calling for a recognition by the Congress that the discrimination which handi-
capped individuals face is generically the same. and has the same cause and effect,
as that which is perpetuated towards the traditionally "protected classes." The
failure to include sustantive protections for handicapped individuals from discrimi-
nation in insurance practices would be an unfortunate renunciation of this impor-
tant civil rights principle.

### PROBLEMS OF LOCAL ZONING RESTRICTIONS AGAINST GROUP HOMES

Criticism of the original provisions of Title VIII described as a major failing its
disregard of commonly used methods such as building codes and zoning laws to
effect de facto segregation. *E.g.* Comment, *The Federal Fair Housing Requirements:
Title VIII of the 1968 Civil Rights Act,* 1969 Duke L. J. 733, 762 (1969). Austensibly
for the health and safety of communities, zoning statutes, and especially the defini-
tions of "family" found within zoning statutes, have operated to frustrate the
national policy of deinstitutionalization. *See generally Disabled Citizens in the Com-
munity: Zoning Obstacles and Legal Remedies,* Amicus 30 (March/April 1978) (A
copy is attached hereto as "Attachment B"). (pp. 30–44).

Recognizing the severe obstacles posed by local zoning ordinances to their ex-
pressed policies of providing a continuum of housing opportunities for handicapped
individuals, eleven states have recently passed preemptive legislation insuring that
local governments do not utilize zoning restrictions to frustrate the housing needs of
handicapped individuals. *See A Comparative Table: State Zoning Laws Regulating
Group Living Facilities in the Community,* Amicus 38 (March/April 1978) (Attached
hereto as "Attachment C").

Section 206(c) of H.R. 3504 which would amend Section 804 of the Act by adding
Section 804(g) could provide an opportunity to address the zoning problems which
are restricting the development of community living arrangements in those states
without preemptive legislation. Section 6(c) of the Committee Print proposed revi-
sion of H.R. 3504 modifies the language in the original bill by suggesting the
additon to Section 804 of the act of Section 804(g).

Unfortunately, neither of the suggested provisions appears adequate to meet the problems which are faced by those attempting to establish community living arrangements. We have frequently seen that, where a small, residential establishment is contemplated by a private, non-profit organization or by a state agency, the deep seated fears of members of the community at large stir substantial opposition to the laudable plans. Applications for variances or permitted use exceptions are frequently opposed by large numbers of individuals residing in the neighborhood who feel intimidated by the possible influx of people who they view as different.

This is a problem of national significance and one which can and should be addressed by strong national policy in Title VIII.

CONCLUSION

H.R. 3504 will not eradicate discrimination against handicapped individuals. It will not even solve all of the housing problems which handicapped people face. However, the thrust of H.R. 3504 is a necessary step toward the eventual establishment of full civil rights for individuals with handicapping conditions and toward an ultimate solution of the complex housing needs of individuals who are handicapped.

The need for including individuals with handicapping conditions in the ambit of Title VIII is as compelling as was the need to enact its provisions for the protection of traditional minorities in 1968. As former Attorney General Ramsey Clark testified during hearings on the Fair Housing Act, "Certainly our commitment to this principle is of primary importance, and it will give faith, and renew faith, for millions of Americans." Hearings for the Subcommittee on Housing and Urban Affairs of the Committee on Banking and Currency, United States Senate, 90th Cong., 1st Sess., on S. 1358, S. 2114, and S. 2280 (1967).

The former Attorney General also noted the growing number of black Americans who had lost their faith and the growing number of militant extremist and, in response, then Senator Mondale noted that the continuing dissatisfaction would continue "[u]nless we start doing the things long overdue that decent Americans should have done a long time ago." *Id.*

Dissatisfaction and, in some quarters, even militancy is beginning to grow among handicapped Americans. Federal legislation designed to protect handicapped individuals from the discrimination which they frequently encounter in the housing market is long overdue. As Justice Holmes noted over a half a century ago, "housing is a necessity of life." *Block* v. *Hirsch,* 256 U.S. 135, 156 (1921). H.R. 3504 holds forth the hope of establishing a civil right which is long overdue.

ATTACHMENT A

VENTURES MANAGEMENT CO., INC.,
*Woonsocket, R.I., March 28, 1977.*

MS. PAULINE LAMARCHE,
*Woonsocket, R.I.*

DEAR MS. LAMARCHE: Subsequent to my visit to your home on Monday, March 28, 1977 and based upon our discussion regarding your ability to survive as an independent, I have the unfortunate displeasure of notifying you that your application for housing has been rejected.

Enclosed please find our remittance of $25.00 held in abeyance during the processing period of your application. As I had indicated to you earlier and in my opinion, I find that the restricted limitations of mobility with regard to your condition would put an overwhelming burden on yourself, your neighbors and staff personnel at the Gatewood Apartments.

If you have any questions regarding this matter, please contact the undersigned.
    Sincerely,

ANTHONY A. GERUSO, *President.*

———

ATTACHMENT B

DISABLED CITIZENS IN THE COMMUNITY: ZONING OBSTACLES AND LEGAL REMEDIES

The following article is condensed from the NCLH legal monograph, Community Living: Zoning Obstacles and Legal Remedies, available from the Center upon request.

Historically, the approach to residential services for the mentally retarded and developmentally disabled has been to provide mere custodial supervision in an institutional setting. Today, however, with the dramatic change in the legal, philosophical and political views of the rights of handicapped persons, it is widely felt

that the institutional setting does not provide the optimal residential services for the mentally retarded and other handicapped individuals. Rather, it is thought that the better approach is to integrate these individuals into the mainstream of society through the process of normalization.

The deinstitutionalization of mentally handicapped persons, however, requires that alternative living arrangements be available. The establishment of community-based residential facilities is one recent development which serves as an alternative to institutionalization. These facilities, which include family care and group homes, allow the mentally retarded and mentally ill to live within a natural community setting, while at the same time enabling the individual to receive a broad range of specialized services and available care.

The November 1977 issue of *Amicus* highlighted the landmark cases which paved the way for the right of disabled individuals to live in a setting that is least restrictive to their needs. These cases, as well as the recent decision in *Halderman* v. *Pennhurst* [1] are now the building blocks for the deinstitutionalization movement that is now underway.

OBSTACLES TO COMMUNITY LIVING

Although current thinking in the mental health field now supports community living arrangements, several obstacles impede the achievement of the goal of deinstitutionalization. The unavailability of community facilities is one major obstacle. The governmental practie of zoning, i.e., the control of property use, is another.

Although ostensibly created for the health and safety of communities, zoning statutes, by blocking the establishment of residential alternatives in natural community settings, are often excessively restrictive, thereby depriving individuals of very basic rights.

Zoning statutes vary as to the nature and purpose of restriction, but, typically, residential zones are labeled according to the types of structures permitted within their bounds and the uses to which these structures are put. Two types of zoning ordinances have significantly impeded the development and proper location of community-based group care facilities.

*Single-family dwelling ordinances*

The most prevalent type of zoning restriction is commonly known as the "single-family dwelling ordinance." The purpose and effect of this ordinance is to limit certain residential areas to structures containing only single families, as opposed to multiple families, fraternities, and other groups of individuals. the most restrictive of these ordinances define "family" as a housekeeping unit related by blood, marriage, or adoption.

*Exclusionary zoning ordinances*

The second type of zoning ordinance adversely affecting group care facilities and their proper location specifically excludes categories of individuals with particular characteristics, such as alcoholics, drug addicts, and "insane and feebleminded persons."

*Legal remedies*

Two approaches to correcting or preventing the problem of excessively restrictive zoning ordinances have proved successful in the past: (1) existing zoning ordinances which limit the location of desired facilities have been successfully contested through litigation, and (2) state legislation permitting group-care facilities in desired communities has successfully prevented local municipalities from enacting contrary laws.

CHALLENGING ORDINANCES THROUGH LITIGATION

*Equal protection*

Although zoning ordinances are presumed to be valid if they relate to the public health, safety, morals, or general welfare, successful attacks on ordinances have been made via the principle of equal protection. In *Buckingham* v. *City of Dayton* [2] (1974) single-family zoning requirements were invalidated when the personal interest of the individual affected was weighed against the social interests of the state.

A similar case was *Boraas* v. *Village of Belle Terre,* [3] in which a single-family dwelling ordinance restricted land use in one district to single-family dwellings and defined "family" as follows:

---

[1] *Halderman* v. *Pennhurst.* No. 74–1345 (E.D. Pa. 1977).
[2] No. 4504 (S.D. Ohio, 1974).
[3] 476 F.2d 806 (2d Cir. 1973).

"One or more persons related by blood, adoption, or marriage, living and cooking together or a single housekeeping unit exclusive of household servant. A number of persons but not exceeding two (2) living and cooking together as a single housekeeping unit though not related by blood, adoption, or marriage shall be deemed to constitute a family."

The plaintiffs were charged with violating the ordinance because the six college students renting the house were unrelated by blood, adoption, or marriage. The plaintiffs argued that the ordinance violated equal protection rights and rights of association, travel, and privacy. The U.S. Court of Appeals for the Second Circuit declared the ordinance to be unconstitutional, but the Supreme Court later affirmed its constitutionality.[4]

Zoning regulations directed at a class of mentally handicapped persons, as opposed to "single families," create constitutional problems broader than those resolved in the *Belle Terre* case, however. A state is affirmatively acting under its police powers when it institutionalizes individuals involuntarily and is thereby subject to corresponding obligations such as the right to treatment.

The federal district courts in several jurisdictions have recognized the right of these individuals to be cared for in the least restrictive environment. There is no state justification even under its police powers to institutionalize people who are capable of functioning without institutional supervision. Therefore, restrictions that exclude specific groups of individuals can be challenged as violating the due process protections of the 14th Amendment.

*Due process*

There have been a number of constitutional challenges to restrictive zoning under the due process clause. in *Nectow* v. *City of Cambridge*[5] the Supreme Judicial Court of Massachusetts stated the basic principle of zoning:

"The Governmental power to interfere by zoning regulations with the general rights of the landowners by restricting the character of his use, is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare."

When passing on the validity of zoning ordinances, the courts have consistently deferred to the legislators and upheld most ordinances, finding that they do bear a "substantial" relation to public health, safety, morals, or general welfare. However, in *Nectow* the Court ruled that an otherwise valid ordinance restricting a residential area to single-family dwellings was unconstitutional where the arbitrary placement of the zoning boundary greatly reduced the land value.

*State constitutional approaches*

Arguments can be developed on the basis of provisions contained in state constitutions that are similar to the 14th Amendment of the U.S. Constitution. *Burlington Cty. N.A.A.C.P.* v. *Tp. of Mt. Laurel* (1975),[6] is a case in point.

In their efforts to force the city of Camden to recognize the need for low income housing and to compel the surrounding suburbs to address the problem, the plaintiffs relied in part on state substantive due process and equal protection grounds.

In striking down Mount Laurel's zoning practices, the New Jersey Supreme Court in effect turned the table on Camden's restrictive zoning proponents. It used the requirement that "a zoning regulation, like any power enactment, must promote public health, safety, morals or the general welfare," therefore, a community must, at a minimum, assume its fair share of regional housing needs.

In the context of exclusionary zoning and the handicapped, it can be argued that the impact of zoning on group-care residential facilities significantly affects the general welfare, at least in the sense that viable and potentially productive members of society are prevented from realizing their potentials and contributing to society at large instead of being a burden to it.

In 1976, certain New Jersey zoning ordinances restricting an area to single-family dwellings were declared to violate due process protections in the case of *Berger* v. *State of New Jersey*.[7] Homeowners in the zoned area had contested the establishment of a group home for multihandicapped preschool children on the basis that the structure was, in essence, an institution established in a residential area, and that the residents did not constitute a family as defined by the ordinance.

The court declared that the home conformed to the neighborhood scheme of residential living and that the ordinance definition of family was excessively restrictive:

---

[4] 416 U.S. 1 (1974).
[5] 277 U.S. 183 (1928).
[6] 67 N.J. 151, 336 A.2d 713 (1975), appeal dismissed, 423 U.S. 808 (1975).
[7] 71 N.J. 206, 364 A.2d 993 (1976).

"When the Mantoloking ordinance defining "family" as those persons related by blood, marriage or adoption is measured against the demands of due process, it is clear that the regulations must fall. It so narrowly delimits the persons who may occupy a single-family dwelling as to prohibit numerous potential occupants who pose no threat to the style of family living sought to be preserved. As such, we cannot conclude that the definition of "family" is reasonable."

It can be argued that restrictive zoning ordinances violate due process when their effect is to prevent needy individuals from receiving the advantages of community-based facilities. This argument is strongest when the plaintiff has been under civil commitment and requires this type of facility as opposed to complete institutionalization. Single-family zoning merely inconveniences most individuals, such as the college students in the *Belle Terre* case, who have alternative accommodations available. On the other hand, it can be argued that the individual in need of a group care facility has no alternative. Group care facilities are not merely a convenience; they are a psychological and physical necessity to many individuals.

*Interpretation of "Families"*

Several cases prior to the Berger case have held that group homes for developmentally disabled individuals constitute a "family" for zoning purposes and therefore may not be excluded from single-family residential areas. In 1974, in *City of White Plains* v. *Ferraioli*, [8] the New York Court of Appeals determined that a group home consisting of a married couple, their two children and 10 foster children constituted a single family within the meaning of the ordinance. The ordinance defined "family" as "one or more persons limited to the spouse, parents, grandparents, grandchildren, sons, daughters, brothers or sisters of the owner or the tenant or of the owner's spouse or tenant's spouse living together as a single housekeeping unit with kitchen facilities."

The court reasoned:

"So long as the group home bears the generic character of a family unit as a relatively permanent household, and is not a framework for transients or transient living, it conforms to the purpose of the ordinance. . . . "

The right of a group home to be located in a single-family residential area was also affirmed in the 1976 New York case of *The Little Neck Community Associations* v. *Working Organization for Retarded Children*, [9] and in the Ohio case of *Driscoll* v. *Goldberg*. [10]

The opinion of the New York Supreme Court in *Little Neck* stated:

"We are not persuaded that the proposed group home will, in and of itself, alter the quality of life or the character of the neighborhood which a single-family residential zone is specifically designed to protect and enhanced. . . . It will provide retarded children with a stable environment in a setting in which they will have a real opportunity to develop their full potential."

## STATE LEGISLATION

Although it has been shown that litigation can be used successfully to invalidate restrictive zoning ordinances, preemptive state legislation could be the most viable way of insuring that local governments will not be able to exclude group care facilities from desirable locations.

According to a study by the Wisconsin Council on Developmental Disabilities, made in January 1978, 11 states now have state zoning laws that allow community residential facilities in residential areas, and bills are pending in eight states.

Laws were enactd in California, Colorado, Minnesota, Montana, and New Jersey prior to 1977. In 1977, laws were passed in Michigan, New Mexico, Ohio, Rhode Island, and Virginia. The Wisconsin statute was signed March 1978.

Bills are pending in: Arizona, Florida, Massachusetts, Maryland, New Jersey, New York, Pennsylvania, and South Carolina.

### AN AFFIRMATIVE LEGISLATION AND INFORMATIONAL APPROACH

Although a few successful cases have been litigated that affirm the value of community facilities, exclusionary zoning as it affects the handicapped can best be dealt with through the enactment of federal or state statutes preventing local municipalities from excluding residential facilities at will. This, in turn, can be accomplished only by educating the public and the lawmakers to the dire need for these facilities and, in light of the long-since discredited alternative of warehousing, of the moral obligation of the community to guarantee the right of individuals to live in residential communities in the least restrictive setting possible.

---

[8] 34 N.Y. 2d 300, 357 N.Y.S. 2d 449 (1974).

[9] N.Y. Sup. Ct. App. Div., 2nd Dept., May 3, 1976.

[10] No. 72–C1 1248 (Mahoning Co. Ct. of Comm. Pleas) 73 C.A. (Ohio Ct. of Appeals, 7th D.) 1974.

ATTACHMENT C

Comparative Table:

## State Zoning Laws Regulating
## Group Living Facilities In the Community

| STATE | TYPE OF COMMUNITY FACILITY | RESIDENTS | | ZONE IN WHICH PERMITTED | CONDITIONAL USE PERMITS ALLOWED | STATE LICENSING OF FACILITY | | DISPERSAL OF FACILITIES REQUIRED |
|---|---|---|---|---|---|---|---|---|
| | | No. | Type | | | Required | Licensor | |
| ALIFORNIA Vel. & Inst. Code 5115-5116 Deering Supp. 977) | Family care home Foster home Group home | 6 or less | Mentally disordered or otherwise handicapped persons, or dependent and neglected children | Single family | Yes | Yes | Not specified | Not specified |
| COLORADO Rev. Stat. 127-10.5-133 (Supp. 1976), 10-28-115 (Supp. 1976) | Group home | 8 | Developmentally disabled persons | Single family | Yes | Yes | Dept. of Health | 750 ft. required between facilities |
| MICHIGAN Acts of Jan. 3, 1977, Pub. L. Nos. 394-396 | Residential facility | 6 or less | Persons in need of supervision or care | Single family | Yes | Yes | Director of Dept. of Social Services | 1,500 ft. (3,000 ft. in cities over one million population) required between facilities unless permitted by local ordinance |
| MINNESOTA Stat. Ann. §§252-28 (West Supp. 1977), 462.357 (West Supp. 1977) | Group home Foster home Residential facility | 6 or less / 7-16 | Mentally retarded or physically handicapped persons | Single family / Multiple family | Not specified / Yes | Yes | Commissioner of Public Welfare | 300 ft. required between facilities unless conditional use permit is granted |
| MONTANA Rev. Codes Ann. §§11.2702.1-.2 (Supp. 1977) | Community residential facility: group, foster or other home | 8 or less | Developmentally disabled or handicapped persons | Single family | Yes | Yes | Dept. of Health and Environmental Science; Dept. of Social and Rehabilitative Services | Not specified |
| NEW JERSEY Stat. Ann. §§30:4C-2(m), -26 (West Supp. 1977) | Group home | 12 or less | Children | 1 | Not specified | 2 | 2 | Not specified |
| NEW MEXICO Act of April 7, 1977, ch. 279 §20 (to be codified in Stat. Ann. §14-20-1) | Community residences | 10 or less | Mentally ill or developmentally disabled persons | Single family | Not specified | Yes | Not specified | Not specified |

| STATE | TYPE OF COMMUNITY FACILITY | RESIDENTS | | ZONE IN WHICH PERMITTED | CONDITIONAL USE PERMITS ALLOWED | STATE LICENSING OF FACILITY | | DISPERSAL OF FACILITIES REQUIRED |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | No. | Type | | | Required | Licensor | |
| O of Aug. 1, 7, Amended stitute S.B. No. (to be codified Rev. Code Ann. -23.18 [Page]) | Family home | 8 or less | Developmentally disabled persons | Single family | Where such ordinance in effect prior to 6/15/77 | Yes | Chief of Division of Mental Retardation and Developmental Disabilities | Not specified |
| | Group home | 9-16 | | Multiple family | Yes | | | Limitation on excessive concentration of facilities permitted |
| .ODE ISLAND t of May 13, 77, ch. 257 , be codified in n. Laws 5-24-22) | Any type of residence | 6 or less | Retarded children or adults | 3 | Not specified | No | ———— | Not specified |
| RGINIA ode §15.1-486.2 Supp. 1977) | Family care home, foster home, group home | not speci- fied | Mentally retarded and other developmentally disabled persons | Appro- priate private residential districts | Yes | Not specified | ———— | Yes |
| VISCONSIN signed into law March 21, 1978; Ch. 205, Laws of 1977 | Child welfare agency | 8 or less | All children or adults | All residential zones | None | Yes | Dept. of Health and Social Services | 2,500 ft. distance, and density limit of the greater of 25 or 1% of population in municipality or e' 'ermanic district for class 1-4 cities |
| | Group foster home for children | 9-15 | | | Permit required for 1 or 2 family zones | | | |
| | Adult residential facility | 16 or more | | | Permit required for all residential zones | | | |

¹No municipality shall enact an ordinance governing single-family use of land which discriminates between children who are members of single families and children who are placed in group homes.

²Must be recognized as group home by Department of Institutions and Agencies in accordance with state rules and regulations.

³Residents are considered a family, and all requirements pertaining to local zoning are waived.

*A private, licensed foster home for four or fewer children is permitted, without space or density limits, in all residential areas.

†The municipality may annually review the effect of any community facility and may order it to close unless special zoning permission is obtained. The order is subject to judicial review.

‡The municipality may, at its discretion, agree to increase the density limit or decrease the dispersal distance.

Reprinted with the permission of the
Developmental Disabilities State Legislative Project, American Bar Association, 1800 M Street, N.W., Washington, D.C. 20036.

NCLH Legal Monograph: Community Living: Zoning Obstacles and Legal Remedies

Historically, the approach to residential services for the mentally retarded and developmentally disabled has been to provide mere custodial supervision in an institutional setting. Today, however, with the dramatic change in the legal, philosophical and political views of the rights of handicapped persons, it is widely felt that the institutional setting may not provide the optimum residential services for the mentally retarded and other handicapped individuals. Rather, it is thought that the better approach is to integrate these individuals into the mainstream of society through the process of normalization.

The deinstitutionalization of mentally handicapped persons, however, requires that alternative living arrangements be available. The establishment of community-based residential facilities is one recent development which serves as an alternative to institutionalization. These facilities, which include family care and group homes, allow the mentally retarded and mentally ill to live within a natural community setting, while at the same time enabling the individual to receive a broad range of specialized services and available care.

## MOVEMENT TOWARD DEINSTITUTIONALIZATION

Recent federal legislation and judicial decisions give support to the advocacy movement for the establishment of community residences for the mentally retarded. The Developmentally Disabled Assistance and Bill of Rights Act,[1] which became law in 1975, authorizes grants of federal money for the provision of services and the construction of facilities in settings that are least restrictive to disabled persons. With the establishment on March 1, 1977, of an "Office of Independent Living" within the Department of Housing and Urban Development, the housing needs of the disabled should receive greater attention from the federal level.

The landmark case of *Wyatt* v. *Stickney*[2] paved the way for numerous deinstitutionalization decisions since 1971. The *Wyatt* court held that individuals have a constitutional right to treatment if they are involuntarily confined to mental institutions and that less restrictive placements must be considered prior to hospitalization. The *Dixon* v. *Weinberger*[3] case in 1972 affirmed a right to treatment in facilities or settings suited to each individual's needs and carried the deinstitutionalization movement one step further by decreeing that appropriate facilities and services must be created, regardless of state legislative allotments.

## OBSTACLES TO COMMUNITY LIVING

Although current thinking in the mental health field now supports community living arrangements, several obstacles impede the achievement of the goal of deinstitutionalization. The unavailability of community facilities is one major obstacle. The governmental practice of zoning, i.e., the control of property use, is another.

Although ostensibly created for the health and safety of communities, zoning statutes, by blocking the establishment of residential alternatives in natural community settings, are often excessively restrictive, thereby depriving individuals of very basic rights. Inappropriate placements due to the lack of facilities in locations suited to the well-being of developmentally disabled individuals may deprive them of employment, travel, association with other individuals, needed services, and social activities. Residences within cities may place individuals in high poverty or crime areas; whereas placements in the country may create alienation and lack of opportunity for program activities.

Zoning statutes vary as to the nature and purpose of restriction, but, typically, residential zones are labeled according to the types of structures permitted within their bounds and the uses to which these structures are put. Two types of zoning ordinances have significantly impeded the development and proper location of community-based group care facilities.

### Single-family dwelling ordinances

The most prevalent type of zoning restriction is commonly known as the "single-family dwelling ordinance." The purpose and effect of this ordinance is to limit certain residential areas to structures containing only single families, as opposed to multiple families, fraternities, and other groups of individuals. The most restrictive of these ordinances define "family" as a housekeeping unit related by blood, marriage, or adoption.

---

[1] 42 U.S.C. §§ 6001, *et seq.*

[2] *Wyatt* v. *Stickney*, 344 F. Supp. 373, 387 (M.D. Ala. 1972), *modified sub. nom. Wyatt* v. *Aderholt*, 503 F. 2d 1305 (5th Cir. 1974).

[3] 405 F. Supp. 974 (D.D.C. 1975).

274

*Exclusionary zoning ordinances*

The second type of zoning ordinance adversely affecting group care facilities and their proper location specifically excludes categories of individuals with particular characteristics. For example, the City of Sedalia, Missouri, enacted an ordinance precluding homes for alcoholics, drug addicts, and insane and feebleminded persons in certain residential areas. Sedalia is, therefore, an example of a community moving from the general category of single-family ordinance to a more specific ordinance which focuses on special types of individuals. Each type of ordinance raises unique legal issues.

### LEGAL REMEDIES

Two approaches to correcting or preventing the problem of excessively restrictive zoning ordinances have proved successful in the past. Existing zoning ordinances which limit the location of desired facilities have been successfully contested through litigation, and state legislation permitting group-care facilities in desired communities have successfully prevented local municipalities from enacting contrary laws.

### CHALLENGING ORDINANCES THROUGH LITIGATION

Zoning first appeared in this country in the early 1900's in New York City. Its constitutionality was tested in the Supreme Court in 1926 in *Euclid* v. *Ambler Realty Co.*[4] The Court established that zoning ordinances are presumed to be valid as long as they reasonably relate to the public health, safety, morals, or general welfare.

While it is true that under their police powers states can validly enact restrictive zoning ordinances, they cannot do so in violation of constitutional provisions. A state or its political subdivision, for example, could not establish and enforce an ordinance restricting areas to individuals of a particular race.

*Equal protection*

Although zoning ordinances are presumptively valid, successful attacks on ordinances have been made via the principle of equal protection. A "balance of interests" test was successfully used by the courts in *Buckingham* v. *City of Dayton*[5] to invalidate single-family zoning requirements. In that test, the personal interest of the individual affected is weighed against the social interests the state seeks to provide.

The test was also used by the U.S. Court of Appeals for the Second Circuit in *Boraas* v. *Village of Belle Terre,*[6] in which a single-family dwelling ordinance was declared to be unconstitutional. When *Belle Terre* reached the Supreme Court, however, the constitutionality of the ordinance was affirmed.[7] The Warren Court in that decision used a different equal protection test, called the "two tiered" formula. Briefly, if the personal interest affected by the legislation is "fundamental," or the classification is "suspect," the "strict scrutiny" test is applied; that is, the classification is upheld only if the state can show a compelling interest to justify its legislation. If the statute does not contain a suspect class or infringe upon a fundamental interest, the more relaxed "rational basis" test is applied, and the classification is upheld if "any state of facts reasonably may be conceived to justify it."

The Belle Terre ordinance restricted land use in one district to single-family dwellings and defined "family" as:

"One or more persons related by blood, adoption, or marriage, living and cooking together or a single housekeeping unit exclusive of household servants. A number of persons but not exceeding two (2) living and cooking together as a single housekeeping unit though not related by blood, adoption, or marriage shall be deemed to constitute a family."

The plaintiffs in *Belle Terre* were charged with violating the ordinance because the six college students renting the house were unrelated by blood, adoption, or marriage. The plaintiffs argued that the ordinance violated equal protection rights and rights of association, travel, and privacy.

In the Supreme Court opinion, however, Justice Douglas held that the ordinance violated no fundamental constitutional right, such as the right of association and privacy, and that it bore a rational relationship to a permissible state objective, and thus did not violate equal protection provisions.

---

[4] U.S. 365 (1926).
[5] No. 4504 (S.D. Ohio, 1974).
[6] 476 F.2d 806 (2d Cir. 1973).
[7] 416 U.S. 1 (1974).

While *Belle Terre* is certainly a stumbling block to equal protection challenges of restrictive zoning ordinances, it must not be read too broadly. Factual differences between the *Belle Terre* plaintiffs and handicapped individuals must be stressed. In the case of group care facilities for the handicapped, there is a very significant dimension totally lacking in *Belle Terre*, namely, the whole realm of the state action in institutionalizing individuals and the right-to-treatment concept.

The state's interest in *Belle Terre* was passive, i.e., the state was not an active party in promoting non-single family dwellings. Given the fact that a state is affirmatively acting under its police powers when it institutionalizes individuals involuntarily and is thereby subject to corresponding obligations such as the right to treatment, the rational basis test used in *Belle Terre* must be recast to take into account these added factors.

This distinction becomes particularly acute when the zoning ordinance specifically bars mentally impaired individuals from locating in desirable residential facilities. As previously noted, the federal district courts in several jurisdictions have recognized the right of these individuals to be cared for in the least restrictive environment. There is no state justification even under its police powers to institutionalize people who are capable of functioning without institutional supervision.

Zoning regulations directed at a class of mentally handicapped persons, as opposed to "single families," create constitutional problems broader than those resolved in the *Belle Terre* case. Therefore, restrictions that exclude specific groups of individuals can be challenged as violating the due process protections of the 14th Amendment to the U.S. Constitution.

*Due process*

There have been a number of constitutional challenges to restrictive zoning under the due process clause. In *Nectow* v. *City of Cambridge* [8] the Supreme Judicial Court of Massachusetts stated the basic principle of zoning:

"The Governmental power to interfere by zoning regulations with the general rights of the landowners by restricting the character of his use, is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare."

When passing on the validity of zoning ordinances, the courts have consistently deferred to the legislators and upheld most ordinances, finding that they do bear a "substantial" relation to public health, safety, morals, or general welfare, as stated in the *Euclid* decision. However, in *Nectow* the Court ruled that an otherwise valid ordinance restricting a residential area to single-family dwellings was unconstitutional where the arbitrary placement of the zoning boundary greatly reduced the land value. Prior to the enactment of the city ordinance, the plaintiff's land rested in an area zoned unrestricted, bordering a residential zone. The new zoning boundary placed a portion of the land in the residential zone, resulting in the cancellation of a sale for the entire property, and rendering the small residential tract virtually useless. The serious invasion of property rights involved was found not to be justified by the health, safety, or general welfare of the community.

*State constitutional approaches*

Arguments can be developed on the basis of provisions contained in state constitutions that are similar to the 14th Amendment of the U.S. Constitution. *Burlington Cty. N.A.A.C.P.* v. *Tp. of Mt. Laurel*, [9] is a case in point.

Within the boundaries of Mount Laurel, rapid suburban sprawl, accompanied by restrictive zoning and building regulations, had resulted in an average dwelling unit cost of $32,500 in 1971. The plaintiffs contended that the need for low and moderate income housing was not being met because of exclusionary zoning practices which made the cost of housing prohibitive.

In their efforts to force the city of Camden to recognize the need for low income housing, and to compel the surrounding suburbs to address the problem, the plaintiffs relied in part on state substantive due process and equal protection grounds.

In striking down Mount Laurel's zoning practices, the New Jersey Supreme Court in effect turned the table on Camden's restrictive zoning proponents by using the requirement that "a zoning regulation, like any power enactment, must promote public health, safety, morals or the general welfare." The opinion revolves about the idea that a community must, at a minimum, assume its fair share of regional housing needs. In the words of the *Mount Laurel* Court: "So, when a [zoning] regulation does have substantial external impact, the welfare of the state's citizens beyond the borders of the particular municipality cannot be disregarded and must be recognized and served."

---

[8] 277 U.S. 183 (1928).
[9] 67 N.J. 151, 336 A.2d 713 (1975), *appeal dismissed,* 423 U.S. 808 (1975).

In the context of exclusionary zoning and the handicapped, it can be argued that the impact of zoning on group-care residential facilities significantly affects the general welfare, at least in the sense that viable and potentially productive members of society are prevented from realizing their potentials and contributing to society at large instead of being a burden to it.

In 1976, certain New Jersey zoning ordinances restricting an area to single-family dwellings, were declared to violate due process protections in the case of *Berger* v. *State of New Jersey*.[10] Homeowners in the zoned area had contested the establishment of a group home for multi-handicapped preschool children on the basis that the structure was, in essence, an institution established in a residential area, and that the residents did not constitute a family as defined by the ordinance. The Court declared that the home conformed to the neighborhood scheme of residential living and that the ordinance definition of family was excessively restrictive:

"When the Mantoloking ordinance defining "family" as those persons related by blood, marriage or adoption is measured against the demands of due process, it is clear that the regulations must fall. It so narrowly delimits the persons who may occupy a single-family dwelling as to prohibit numerous potential occupants who pose no threat to the style of family living sought to be preserved. As such, we cannot conclude that the definition of "family" is reasonable."

It can be argued that restrictive zoning ordinances violate due process when their effect is to prevent needy individuals from receiving the advantages of community-based facilities. This argument is strongest when the plaintiff has been under civil commitment and requires this type of facility as opposed to complete institutionalization. Single-family zoning merely inconveniences most individuals, such as the college students in the *Belle Terre* Case, who have alternative accommodations available. On the other hand, it can be argued that the individual in need of a group care facility has no alternative. Group care facilities are not merely a convenience; they are a psychological and physical necessity to many individuals.

The permissible goals mentioned in *Belle Terre*, that is, quiet place where yards are wide, few people, restriction of motor vehicles and clear air, are not inconsistent with the idea of group homes. Group homes are not shelters for screaming maniacs, which is a common ill-founded public attitude toward these facilities, and as far as can be determined, there is no evidence to prove that group homes have a negative impact on their immediate neighbors and the surrounding community. Field research by the California Department of Health found that negative community attitudes toward family and group care facilities is the result of a "lack of knowledge concerning the program and its objectives and fear of the stereotypes of the people being cared for in these facilities."

*Interpretation of "Families"*

Several cases prior to the *Berger* case have held that group homes for developmentally disabled individuals constitute a "family" for zoning purposes and therefore may not be excluded from single-family residential areas. In 1974, in *City of White Plains* v. *Ferraioli*,[11] the New York Court of Appeals determined that a group home consisting of a married couple, their two children and 10 foster children constituted a single-family within the meaning of the ordinance. The zoning ordinance defined "family" as —

"one or more persons limited to the spouse, parents, grandparents, grandchildren, sons, daughters, brothers or sisters of the owner or the tenant or of the owner's spouse or tenant's spouse living together as a single housekeeping unit with kitchen facilities."

The Court reasoned that: "An ordinance may restrict a residential zone to occupancy by stable families occupying single-family homes, but neither by express provision nor construction may it limit the definition of family to exclude a household which in every but a biological sense is a single family.* * *

"So long as the group home bears the generic character of a family unit as a relatively permanent household, and is not a framework for transients or transient living, it conforms to the purpose of the ordinance. . . ."

The right of a group home to be located in a single-family residential area was also affirmed in the 1976 New York case of the *The Little Neck Community Associations, et al.* v. *Working Organization for Retarded Children*,[12] and in the Ohio case of *Driscoll* v. *Goldberg*.[13]

The opinion of the New York Supreme Court in *Little Neck* stated that:

[10] 71 N.J. 206, 364 A.2d 993 (1976).
[11] 34 N.Y. 2d 300, 357 N.Y.S. 2d 449 (1974).
[12] N.Y. Sup. Ct. App. Div., 2nd Dept., May 3, 1976.
[13] No. 72–C1 1248 (Mahoning Co. Ct. of Comm. Pleas) 73 C.A. (Ohio Ct. of Appeals, 7th D.) 1974.

"We are not persuaded that the proposed group home will, in and of itself, alter the quality of life or the character of the neighborhood which a single-family residential zone is specifically designed to protect and enhance. . . . It will provide retarded children with a stable environment in a setting in which they will have a real opportunity to develop their full potential."

The *Berger* court adopted the reasoning of *City of White Plains* that the concept of a one family dwelling should be based upon its character as a single housekeeping unit, rather than on biological relationships. The court rejected the plaintiffs' contention that the group home was, in essence, a state institutional establishment in a residential area. It noted that simply because the children required specialized training and treatment, and their placement in the home was of limited duration, the home did not lose its predominantly residential character.

*State Pre-emption*

A state zoning statute which supersedes a local zoning regulation or ordinance is paramount and controlling. Where the power of the state over the subject of zoning is supreme, local zoning regulations, ordinances or by-laws may not contravene the statutes or general law of the state, and, in the event of conflict between the two, the local regulations must yield.

Where a field of general legislation is wholly taken over by the state, local zoning regulations, ordinances, or local officials may not interfere with its supreme authority in that field. For example, a local ordinance may not defeat the statutory right of public school authorities to acquire school sites, or the statutory right of health authorities to fix the location of hospitals.

A few courts have held that local zoning codes cannot contravene an overriding state policy which explicitly or implicitly supports the establishment of community residences. Unfortunately, such policies exist only in a very small number of states.

Without state statutes specifically providing for such uses, the pre-emption approach to overcoming restrictive local ordinances may be tenuous. *City of Temple Terrace* v. *Hillsborough Association For Retarded Citizens, Inc.,*[14] illustrates this point. That city's action was brought to enjoin the operation of a residential facility for the retarded on grounds that the facility was in violation of a city zoning ordinance. The defendants responded by arguing that the home was performing services that the state was required to perform (a state function) and was, therefore, immune from the local ordinances.

Initially, the *Temple terrace* court noted that any immunity from operation of the local ordinances held by the State Division of retardation would be shared by the operators of the facility because the facility was performing a state function. This finding of a link between the facility and the state is very significant: without it there would not be a pre-emption question at all. In federal pre-emption cases, the party asserting immunity must be able to demonstrate that it is not solely a private concern, but it also has a sufficient governmental connection so as to share in the immunity or sovereignty.

However, by using a balance of interests test, the court went on to hold that the governmental agency itself had no immunity. The agency had the burden of proving that the public interest favoring the land use outweighed the interests of the local government in enforcing its ordinance. The court rejected a test used in other jurisdictions whereby any conflict between local and state law is resolved in favor of the state.

*Temple Terrace,* while ultimately being adverse to proponents of residential facilities, nevertheless, contains some favorable findings. Specifically, the findings of a link between the private facility and a state agency or function is significant. If the Florida appellate court had applied the "supremacy of the superior sovereign" test, the case apparently would have been resolved in favor of the group care facility.

The argument that local zoning ordinances cannot contradict state policy was successfully used in *Abbott House* v. *Village of Tarrytown*[15] (1970) and *Anderson* v. *City of Shoreview*[16] (1975). In the *Abbott* case, a zoning board claimed that a private nonprofit child caring agency violated the single-family residential district in which it was located because it was comprised of more than five unrelated persons, the limit set by the ordinance. The New York Supreme Court held, however, that:

"It is clear that this Zoning Ordinance has the effect of totally thwarting the State's policy as expressed in its Constitutional and Social Service Law, of providing for neglected children. We are, therefore, of the opinion that the Tarrytown Zoning Ordinance, insofar as it conflicts and hinders an overriding State Law and policy

---

[14] 322 So.2d 571 (Fla. App. 1975), *aff'd,* 332 So.2d 610 (Fla. 1976).
[15] 34 A.D. 2d 821, 312 N.Y.S. 2d 841 (1970).
[16] No. 401575 (D. Ct. 2nd Jud. dist. Minn., 1975).

favoring the care of neglected and abandoned children, is void as exceeding the authority vested in the Village of Tarrytown. * * * "

STATE LEGISLATION

Pre-emptive state legislation is the most viable way of insuring that local governments will not be able to exclude group care facilities from desirable locations through restrictive zoning ordinances. Several states have enacted such legislation.

*California*

The California Welfare and Institution Code [17] specifies that a state authorized, certified, or licensed family care home, foster home, or group home serving six or fewer handicapped children shall be considered as residential property for zoning purposes if care is provided on a 24-hour-a-day basis. The homes are permitted in all residential zones, including single-family zones. Use permits may be required, but no conditions may be placed on the homes that are more restrictive than those imposed on similar dwellings in the same zones. An exception to this can be made, however, if additional conditions are necessary to protect the health and safety of the residents.

This statute was upheld by the state appellate court in *City of Los Angeles* v. *California Department of Health*. [18] The court ruled that the city of Los Angeles could not use its zoning power to exclude state-authorized family or group homes serving six or fewer mentally handicapped individuals.

In the complaint, the city sought an injunction prohibiting the State Department of Health and other defendants from licensing community care facilities in areas where such facilities would violate the Los Angeles Planning and Zoning Code.

Los Angeles maintained that as a chartered city, it was not subject to state regulation or control with regard to municipal affairs, and that its regulation of land-use through zoning requirements constituted "municipal affairs." The City thus contended that it was exempt from the California Welfare and Institutions Code.

The California Department of Health argued in its answer that the sections of the state code pertaining to community care facilities "embodied a subject of statewide concern and said provisions must prevail over local ordinances which might otherwise be deemed appropriate municipal action."

In granting the defendants' motion for summary judgment, the court declared that the provisions of the Code were a subject or statewide concern and therefore must prevail over local ordinances.

*Michigan*

The Michigan legislature passed a series of bills [19] in 1977 aimed at facilitating deinstitutionalization within the state. The legislation permits the establishment of community residences of no more than six persons, regardless of zoning ordinances. The facilities must meet certain licensing requirements and must not be located less than 1500 feet apart. The bills provide for improved local government supervision of the facilities by requiring that local governments be informed of the location of new and existing licensed facilities within their boundaries. Local governments are also provided specific criteria for judging the quality of care and are authorized to request that licenses be revoked should a facility violate zoning laws or local ordinances.

*Minnesota*

Minnesota legislation [20] explicitly affirms the state policy that mentally retarded and physically handicapped persons should not be excluded by municipal zoning ordinances from residential areas. It permits state licensed group homes or foster homes serving six or fewer persons to be considered as single family dwellings for zoning purposes. A state licensed facility serving from seven to 16 persons is considered a multi-family use of property. Use permits may be required under conditions similar to the California Code.

*Montana*

Montana law defines a community residential facility as:

"(1) A group, foster, or other home specifically provided as a place of residence for developmentally disabled or handicapped persons who do not require nursing care, (2) a district youth guidance home or (3) a halfway house for the rehabilitation of alcoholics or drug dependent persons, or (4) a licensed adult foster family care home.

[17] Calif. Welfare and Institution Code Section 5116.
[18] No. 116571 (Calif. Super. Ct., 1975).
[19] Michigan Public Acts 394–398, 1976.
[20] Minn. Code Section 462.357.

"A community residential facility serving eight or fewer persons, is considered a residential use of property for purposes of zoning if the home provides care on a twenty-four (24) hour-a-day basis.

"The homes are permitted in all residential zones, including areas zoned for single-family dwellings."[21]

In 1975, the Supreme Court of Montana upheld the state statute in *State ex rel. Thelen* v. *City of Missoula.*[22] The case involved a zoning ordinace in Missoula, Montana, which defined "family" in such a way as to prohibit the owners of the property in question from selling it to a group which intended to use it as a community residential facility. The property was located in an area zoned single-family residential dwellings.

The court held that under Montana law, the power of the legislature over the city was supreme in this area:

"In the instant case, while respondent city may well have acted within the power granted it by the legislature in adopting its 'one-family' criteria for zoning, that power was modified by later legislative language and respondent city should have revised its zoning regulations to meet the legislative requirements • • •. Montana's legislature having determined that the constitutional rights of the developmentally disabled to live and develop within our community structure as a family unit, rather than be segregated in isolated institutions, is paramount to the zoning regulations of any city it becomes our duty to recognize and implement such legislative action."

The Montana court was not persuaded by the City's argument that the case should be controlled by the U.S. Supreme Court decision in *Village of Belle Terre* which held that no fundamental constitutional rights were infringed upon by the local ordinance. The *Thelen* court found that the legislature was implementing a state constitutional mandate to assist disabled persons[23] when it passed the law overriding ordinances such as Missoula's and therefore, the reasoning of *Belle Terre* did not apply.

*Virginia*

The Virginia legislature passed its zoning bill[24] in 1977, which is also designed to protect the housing rights of developmentally disabled persons in the community. It recognizes a state policy of proportionately arranging group homes according to the general dispersement of the population. It instructs localities not to hinder the establishment of community living facilities for the disabled by imposing restrictive zoning regulations.

*Unanswered questions*

There are many questions regarding community residences which remain a matter of judgment. For example, what should be the maximum number of residents allowed in a community residence in a one-family zoned district? In a two-family zoned district? In other residential and nonresidential districts? What should be the required distance between community residences? Should the distance vary according to the nature of the community, e.g., the number of people per square mile? Serious objection could be raised against any provision which limits the number of people that may live in community residences to a percentage of the total population. Questions could be raised not only about the equity and constitutionality of such provisions, but also as to their enforceability from a practical standpoint.

### AN AFFIRMATIVE LEGISLATION AND INFORMATIONAL APPROACH

Although a few successful cases have been litigated that affirm the value of community facilities, exclusionary zoning as it affects the handicapped can best be dealt with through the enactment of federal or state statutes preventing local municipalities from excluding residential facilities at will. This, in turn, can be accomplished only by educating the public and the lawmakers to the dire need for these facilities and, in light of the long-since discredited alternative of warehousing, of the moral obligation of the community to guarantee the right of individuals to live in residential communities in the least restrictive setting possible.

Mr. LINN. While title V of the Rehabilitation Act of 1973 has been lauded as a civil rights act for individuals with handicapping conditions, its limitations are many. Nearly 5 years after the pas-

---

[21] Rev. Code Montana, §§ 11–2702.1, 11–2702.2.
[22] 543 P.2d 173 (Mont. 1975).
[23] Section 3(3), 1972 Montana Constitution.
[24] Va. Acts of Assembly, Chap. 648 (1977).

sage of this important legislation, the Department of Housing and Urban Development has only recently published proposed rules for implementing section 504. Even assuming prompt promulgation of final rules and full and effective enforcement of their mandate, section 504 will not provide substantive legal protection from discrimination in housing to handicapped individuals in the private marketplace.

Unlike members of several of the existing protected classes under title VIII, it does appear that individuals with handicapping conditions will even receive protections under section 1 of the Civil Rights Act of 1866.

In addition to the basic need to expand the coverage of Federal nondiscrimination policy, the concept of including new substantive protections for individuals with handicapping conditions within the framework of existing statutes for other protected classes is highly desirable. Discrimination against handicapped individuals is rooted in the same myths and misconceptions which have traditionally resulted in discrimination against the historically recognized minorities and women who find protection in title VIII.

Where individuals with disabilities or families with one or more disabled child are denied rental housing based upon a landlord's belief that such individuals cannot live independently in the community, the discrimination which occurs is as amenable to judicial or administrative resolution as is similar discrimination against women and minorities.

Where fears and prejudices are the justification for an act of housing discrimination, there must exist a national policy prohibiting such actions.

The lack of knowledge on the part of prospective landlords concerning the abilities of disabled persons can lead to a refusal to rent, an increased security deposit or a higher rent where it is presumed that a handicapped person is more likely to cause damage to an apartment or house. Misguided concerns about fires and other emergencies can lead a landlord to refuse to rent to a handicapped individual who is fully capable of living independently. Stereotypes about the creditworthiness of handicapped persons may lead to discrimination in housing practices.

The same perceived threats to the social status of a particular community and the same fears of lower market values for properties within a community, which formed an important impetus for the original enactment of title VIII, exist in the context of handicapped individuals.

As a Nation, we have recognized the influence of segregation upon the cycle of poverty in many instances, and we have made it our public policy to prohibit those discriminatory acts which support such segregation. However, our official policy does not yet recognize the ingrown tendency to isolate handicapped individuals in a manner which necessarily limits the growth and development of such individuals by the environmental parameters which are drawn by segregation.

Although H.R. 3504 will not be the full realization of all the civil rights to which handicapped people should be entitled, the enactment of an amendment to title VIII is a necessary step toward the eventual acknowledgment of full and complete equality.

NCLH supports the inclusion of the definition of handicapped which is contained in the committee print proposed revision of H.R. 3504. Consistency and uniformity are greatly enhanced by the adoption of a definition which reflects the statutory definition of handicapped individual already enacted for the civil rights provisions of the Rehabilitation Act.

A broad definition of handicapped is necessary in order to fully effectuate the purposes of an amendment to title VIII. The need to provide statutory protection to individuals with a history of impairment and to individuals who are regarded as having an impairment is evidenced by cases filed under the Rehabilitation Act by plaintiffs who did not perceive of themselves as handicapped.

Legislators who consider enacting a civil rights law to protect handicapped individuals from discrimination in housing may question whether the affirmative removal of architectural barriers at the expense of the property owner is necessary to the full implementation of the legislative design. A number of State legislatures and local authorities have chosen to specifically exclude any duty on the part of the landlord to modify the premises.

We believe that viewing the removal of architectural barriers as an affirmative duty misinterprets the nature of such barriers and misapplies well established notions of equality. Architectural barriers are not naturally imposed upon individuals, but are rather an environmental result which, whether intentional or not in its effect of excluding individuals, is attributable to human planning. Such barriers are man made.

In construing the meaning of discrimination, we rely upon the concepts enunciated by the Supreme Court in construing section 601 of the Civil Rights Act of 1964 in *Lau* v. *Nichols*. The discriminatory effects of architectural barriers in the housing market are no more justifiable to that subset of handicapped individuals who are exluded from major portions of the market than were the discriminatory effects of providing educational services in the English language to students whose primary language was not English.

It is in this vein that the three Federal agencies charged with the most significant responsibilities for implementing sections 501, 503, and 504 of the Rehabilitation Act, each respectively included a concept of reasonable accommodations. Such interpretations start with the presumption that reasonable accommodations are inherent in the concept of nondiscrimination.

Despite this reasoning and this view, we recognize that certain concessions need frequently be made in the legislative process which reflect the views of competing and divergent interests. However, in fulfilling its legislative mission, this committee must consider the full implications of any compromises which might be contemplated.

In considering whether an appropriate approach might be to require, through Federal restrictions on local planning decisions, a fair share or parity of accessible units in a community, the committee must consider the substantial drawbacks to limited accessibility.

Clearly, statutes or regulations which set parities do, by definition, restrict the availability of alternatives. The deep-felt needs of

many handicapped individuals to live in integrated communities and integrated housing must be given great weight.

Concepts of integration and nondiscrimination must thoroughly consider the needs of handicapped individuals to visit with and interact with able-bodied friends and family members and the concerns of individuals who are able bodied and who desire to live in homes where their disabled friends and family members are welcome.

Finally, a false sense of security is likely to arise when a fair share has been met. The existence of architectural inaccessibility in any housing poses not only barriers to prospective tenants or purchasers, but also poses a significant threat of becoming a barrier to any landlord or tenant currently in possession who may become disabled.

Analysis of these issues generally discusses cost considerations and the probable economic impact of the various approaches. However, NCLH is aware of no studies which accurately assess the costs of various alternatives. Despite the lack of such studies, it does appear that many of the reactions to section 504 which predict astronomical costs are exaggerated.

Existing housing can frequently be made livable or more comfortable through such minor modifications as: removing a door; widening a doorway; removing cabinetry under a sink; replacing counters and shelves with adjustable units; installing grab bars in bathrooms; lowering mirrors or medicine chests; replacing existing handles on faucets; or installing ramps where stairs exist.

Any legislation which seeks to protect handicapped individuals from discrimination in rental housing must, at a minimum, insure that where such changes are made at the expense of the tenant or prospective tenant, the landlord must not unreasonably withhold persons to do so. Such legislation must proscribe a refusal to rent or lease based upon the need of a prospective occupant to make such modifications where no expense is to be borne by the landlord.

A number of State legislatures and local authorities, in enacting prohibitions against discrimination in housing which protect handicapped individuals, have specifically excluded any possibility that sellers or lessors would be obligated to provide a higher degree of care to handicapped buyers or lessees. Regardless of the basis for the concerns, NCLH believes that it would be contrary to public policy to include such a provision in H.R. 3504. We also believe that such a provision is unnecessary.

Legislation which specifically sets forth a provision excluding the possibility of a higher degree of care to handicapped individuals carries forward the implicit stereotypes of accident prone or clumsy individuals. The perpetuation of such images through statutory enactments is an undesirable goal.

In the context of the tort liability of lessors, it is the general rule that there is no obligation to anyone, whether handicapped or not, to look after the premises after possession and control have been transferred and that no tort liability can be imposed. The one common law exception is that both sellers and lessors are under an obligation to disclose concealed dangerous conditions, of which the seller or lessor has knowledge, when possession is transferred.

Restrictions in contract law which have developed to protect certain individuals, such as some mentally retarded individuals, are designed to insure that a fair and honest arm's-length bargaining process occurs. Any statutory provisions which could be interpreted to reduce the common law standards for insuring that mutual understanding is reached would adversely impact upon the bargaining process.

On the subject of zoning, we have frequently seen that where a small, residential establishment is contemplated by a private, non-profit organization or by a State agency, the deep seated fears of members of the community at large stir substantial opposition to the laudable plans.

Applications for variances or permitted use exceptions are frequently opposed by large numbers of individuals residing in the neighborhood who feel intimidated by the possible influx of people they view as different.

This is a problem of national significance and one which can and should be addressed by strong national policy in title VIII.

H.R. 3504 will not eradicate discrimination against handicapped individuals. It will not even solve all of the housing problems which handicapped people face. However, the thrust of H.R. 3504 is a necessary step toward the eventual establishment of full civil rights for individuals with handicapping conditions and toward an ultimate solution of the complex housing needs of individuals who are handicapped.

Dissatifaction and, is some quarters, even militancy is beginning to grow among handicapped Americans. Federal legislation designed to protect handicapped individuals from the discrimination which they frequently encounter in the housing market is long overdue.

Thank you, Mr. Chairman.

Mr. EDWARDS. Thank you very much, Mr. Linn.

Mr. Drinan?

Mr. DRINAN. Thank you very much.

I am beginning to see the depth of this problem.

Would you feel that the State legislation you have spelled out in the amendments to your document, is a sensible model to follow?

For example, in Michigan they assert a State policy of facilitated deinstitutionalization, and then they say a community residence of no more than six persons shall be protected, and so on.

Would you feel that this legislation is, in fact, going to be adopted in most of the States?

Mr. LINN. It's difficult to say at the present time. The 11 States which have now adopted such zoning legislation have done so within the last 3 years. Currently six State legislatures have bills pending before them, and they are set out in the article which is attached as Appendix B to our testimony.

Mr. DRINAN. I am very pleased that Virginia has been very, very forward looking and has adopted a law. I am chagrined that apparently Massachusetts has not.

Would you tell us about the law that Virginia has adopted?

Mr. LINN. I share your chagrin.

The Virginia Code, applies specifically to family-care homes, foster homes, or group homes and it protects mentally retarded or other developmentally disabled persons.

It would certainly be our position that the definition of handicapped individual should be broader for the purposes of title VIII generally and specifically for the purposes of——

Mr. DRINAN. Would you say the proposed law, as outlined on page 25, which has been enacted in Virginia, is similar or comparable to what Dr. Okin has been proposing?

Mr. LINN. It is.

Mr. DRINAN. So if the gentleman from Virginia has no problems with that then he will just go right along.

Mr. LINN. I would hope he would.

Mr. DRINAN. I will yield equal time to the distinguished gentleman from Virginia.

Mr. BUTLER. I am sorry our speaker does not come from Virginia and our Lieutenant Governor has not taken any position on this. I have to reserve judgment for the moment, but I do appreciate that we have yielded to the legislatures and given time for them to exercise sound judgment in given areas. Perhaps it is a good argument that the Federal Government ought to move slowly, that State legislation can be tailored to State and local problems to a degree that Federal legislation cannot. If we have faith in the Federal system and in the State governments, perhaps they will solve some of these problems.

Mr. LINN. My reaction to that is that in the civil rights area we have traditionally carved a major exception to the hands off policy. In the civil rights area, it is especially important that the Federal Government take a lead in setting policies that affect discrimination which is occurring at the local level.

It is laudable that a number of the States are enacting legislation. Their police power enables them to enact more stringent legislation than that passed by the Federal Government, if they wish, so I do not believe that an amendment to title VIII would necessarily restrict the ability of State legislatures to impose additional or more structured requirements upon local zoning boards and planning boards.

Mr. BUTLER. I am quite sure it would not. At least that would not be our intention. We would not want to preempt further State action of a more aggressive nature.

Mr. DRINAN. Thank you.

Mr. Linn, we do have to avoid, do we not, the full thrust of the Supreme Court decision in the *Village of Belle Terre* case in 1974. Let me just read that language.

In upholding the zoning scheme which excluded college students in that case, the Supreme Court held:

The regimes of boarding houses, fraternity houses and the like present urban problems * * *. A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land use project addressed to family needs.

Now, the thrust of the court decision and also of the statutes seem to suggest that disabled people have a right to live in a familial setting.

Would you, therefore, feel that it might be wise for us to take Dr. Okin's language and add something to the effect that these individ-

uals, where the prospective occupants of such housing are a group of handicapped individuals expected to live in a familial setting? The concept seems to be that they should not be institutionalized. They have a right to live, not necessarily in a nuclear family, but in something approximating the community, that is a family.

Mr. LINN. I would support such an idea. The caveat is that group living facilities for mentally retarded, or physically disabled, or mentally ill individuals exist upon a continuum of successively less restrictive alternatives.

I am sure Dr. Okin could further testify about the wide variety of types of group homes that are necessary. It would be unfortunate to make the mistake of thinking of all group homes as looking exactly alike, having the same numbers of people, and having exactly the same sorts of familial relationships.

Some of these community living arrangements might share common living and cooking facilities, and the residents might operate as a group when they go shopping, and prepare the meals, and clean house. But, as the residents develop new skills, they might then be more appropriately placed in a small group of supervised apartments where they would actually be cooking, perhaps on their own, and generally living a little less structured type of a life.

It is important, when looking at familial relationships, that we not restrict ourselves to narrow views, but that we understand that people exist upon that continuum, and that services must, therefore, necessarily exist upon a continuum.

Mr. DRINAN. On a similar point, I note that several States, which have adopted laws regulating group living facilities in the communities, require that there be a State licensing of the facility. How does your organization feel about that?

It might not necessarily be appropriate in a Federal law, but perhaps it would be appropriate in a report, certainly if this is adopted, in the report to State that our contemplation is that this would be a community licensed by the appropriate local or statewide officials.

Mr. LINN. Unfortunately, such a definition, can operate to exclude certain types of beneficial living arrangements,

Mr. DRINAN. You then mean if we adopted the licensing?

Mr. LINN. Yes.

For example, in Pennsylvania where I practiced law in a large institution for mentally retarded persons, a number of years ago, the deinstitutionalization process that had taken place had resulted in numbers of handicapped individuals who had been deinstitutionalized living together in one apartment which they rented on their own.

Perhaps as many as three or four people essentially were sharing companionship of the same sex, sharing household duties, et cetera. These were people who could live without full-time supervision in the community. Once a week a tutor would come by to help them make out their checks for their bills.

Once a week a social worker would come by to see how they were doing at work; once a week they would be driven, because none had a driver's license, and because there was no public transportation, to the store to do their shopping.

They all held jobs in the community and yet it was necessary for them, or at least it was beneficial for them, to be able to live with each other. They had reached that point on the continuum where they did not need full-time supervision.

However, their living arrangement was not a licensed facility. If a single-family zoning ordinance had been enforced against them, they might well have been required to remove themselves from that living situation and I think that would have produced a negative result.

Mr. DRINAN. Going back to the statute as it exists now, or the bill as it exists now, where we say there shall be no discrimination on the basis of race, color, national origin, or economic status, do you think we would reach these people if we retained the economic status?

Mr. LINN. I think not.

Mr. DRINAN. Would you expand on that?

Mr. LINN. Individuals with handicapping conditions, of course, cross a variety of economic spheres. It is, however, true that a correlation exists between poverty and handicapping condition—a correlation that significantly affects those mentally handicapped people, who have been in institutions for long periods of time.

However, merely including economic condition, with no specific reference to handicapping condition, within the protected bases of title VIII is insufficient, in the absence of extremely strong legislative history to extend the coverage of the act.

I doubt that the courts would be willing to provide a liberal construction to the phrase "economic status" so as to include handicapping conditions. I think we have to be more specific.

Mr. DRINAN. I see your point. And it's a good response. But one last point that I am afraid of the thrust and the language in the *Belle Terre* decision.

Do you feel the Supreme Court has by inference assumed most zoning regulations, which are predicated on the solidarity of the family, are acceptable and that if we want to carve out an exception to them the strong burden is on us?

Mr. LINN. I do not foresee a constitutional problem in carving a legislative exception, regardless of what it might be. In *Belle Terre,* the Supreme Court dealt with the constitutionality of existing zoning practices, hence, the Court applied a rational relationship test to the village of Belle Terre's ordinance.

If the Congress, on the other hand, were to adopt an amendment to title VIII, that amendment would again be viewed by that same standard which does not require strict scrutiny. Because it is within the power of Congress—the due process power, the equal protection power and the commerce power—to enact the provisions of H.R. 3504, any zoning exceptions which might be contemplated should not face serious constitutional difficulties.

A number of States, including California and Montana, have already upheld the constitutionality of the State preemptive zoning legislation.

Mr. DRINAN. Can we build upon the subsequent case in the U.S. Supreme Court, Moore versus the city of East Cleveland, in 1977, where they eroded or qualified the *Belle Terre* decision? It seems to me once again that they are building on the family. There it was

held a grandmother could not be evicted for living with her son and two grandsons who were not brothers, but were cousins.

Do you feel the language or thrust of that decision would, in fact, support what has been proposed here?

Mr. LINN. Certainly I think it would.

Mr. DRINAN. But you don't foresee any great constitutional case?

Mr. LINN. No, I do not. Because the tables would be turned. Had the village of Belle Terre, for example, enacted a local ordinance in which an exception to single family use was made for college dormitories, that exception, which would have been legislatively mandated, would have been reviewed by the Supreme Court to determine whether it had a rational relationship to the governmental interest.

Certainly it would have, and that legislation would have been held to be constitutional. The questions are almost diametrically opposed but, with the same ease with which Justice Douglas wrote the majority opinion in *Belle Terre*, the Supreme Court would uphold zoning restrictions enacted in title VIII.

Mr. DRINAN. Thank you.

Mr. Goldstein, I commend you upon your excellent memo and this matter which I assume will be a part of this record.

[The information follows:]

THE COMMONWEALTH OF MASSACHUSETTS,
DEPARTMENT OF MENTAL HEALTH,
*Boston, Mass., May 12, 1978.*

MEMORANDUM OF LAW SUBMITTED BY MASSACHUSETTS DEPARTMENT OF MENTAL HEALTH

The application of a zoning ordinance by a local government in order to exclude a group home for mentally disabled persons violates the Fourteenth Amendment to the United States Constitution. Therefore, Congress has power to prohibit such activity by appropriate legislation pursuant to section five of that Amendment.

The Supreme Court has not precisely articulated the limitations on the power of local governments to enact zoning ordinances. In *Nectow* v. *City of Cambridge*, 277 U.S. 183, 188 (1928) the Court declared:

"The governmental power to interfere by zoning regulations with the general rights of the landowner by restricting the character of his use, is not unlimited and, other questions aside, such restrictions cannot be imposed if it does not bear a substantial relationship to the public health, safety, morals, or general welfare."

See also *Euclid* v. *Ambler Realty Co.*, 272 U.S. 365 (1926).

Under this standard, an ordinance which excludes community residential alternatives bears no relationship to the "public health, safety, morals, or general welfare"; quite the opposite is true. It is widely held that the most effective manner of delivering services to the mentally ill and mentally retarded is through a community-based system, an important component of which is the community residence.

See, e.g. *Report to the President*, the President's Commission on Mental Health (1978); Glenn, "The Right to the Least Restrictive Alternative", *The Mentally Retarded Citizen and the Law*, 499 (M. Kindred, ed. 1976.) It is clear that restrictive zoning laws frustrate or make impossible the implementation of this policy, which benefits not only the client but also the public at large. Quite simply, the provision of quality mental health and retardation services is in the public's best interests.

*Village of Belle Terre* v. *Boraas*, 416 U.S. 1 (1974), involved an ordinance which excluded in a single-family zoning district groups of more than two persons not related by blood, marriage, or adoption.[1] A group of college students challenged the ordinance on federal constitutional grounds. In upholding the zoning scheme, the Supreme Court held:

"The regimes of boarding houses, fraternity houses, and the like present urban problems * * * A quiet place where yards are wide, people few, and motor vehicles

---

[1] It should be noted that a commonly used method of zoning exclusion is the application of a definition of family which prohibits unrelated persons from living together in other than very small groups, perhaps two or three. See Lauber and Bangs, "Zoning for Family and Group Care Facilities" (American Society of Planning Officials, Report No. 300, 1974), at 11 *et seq.*

restricted are legitimate guidelines in a land use project addressed to family needs. The goal is a permissible one * * * The police power is not confined to elimination of filth, stench, and unhealthy places." *Id.* at 9.

Furthermore, the Court found that the ordinance did not interfere with the right to travel, did not involve any other "fundamental" rights, did not impose any prohibited procedural disparity on these affected, and bore a rational relationship to a reasonable state interest and therefore did not violate the Equal Protection Clause.

However, in a subsequent case, the Supreme Court limited the broad sweep of *Belle Terre.* In *Moore* v. *City of East Cleveland, Ohio* — U.S. —, 97 SCT 1932 (1977), a grandmother was convicted of violating a complicated city ordinance which prohibited her from living with her son, and two grandsons, who were not brothers, but instead were cousins. Basing its decision on Fourteenth Amendment substantive due process grounds, the Court reversed the criminal conviction, holding that, unlike *Belle Terre,* this ordinance sliced too deeply into the family structure. The Court then went on to state, "Ours is by no means a tradition limited to respect for the bonds uniting members of the nuclear family." *Id.* at 1938.

This quotation from *Moore* strongly suggests that the Court would not approve of a definition of family that effectively excluded group homes for the mentally disabled. A community residence is intended to serve as a surrogate family for people who are unable to live, for one reason or another, with their natural family. See *City of White Plains* v. *Ferraioli*, 34 NYS 2d 300, 304; 313 NE 2d 756 (1974). Persons leaving institutions are often unable to live alone and need the homelike environment of a congregate living facility. Yet, in many respects, persons living in such facilities (typically, between eight and twelve) resemble a family; they cook and eat together, share household duties, and give each other love and support. While the residents may change over time, the residence as a whole is generally stable. Regarded in this manner, an ordinance that restricts a group of handicapped persons from living together as a family—albeit a non-nuclear family—could well violate substantive due process under the reasoning in *Moore.*

Several courts have had an opportunity to consider the applicability of *Belle Terre* to a group home situation. In *Stoner* v. *Miller*, 377 F. Supp. 177 (EDNY 1974), the Court considered an ordinance which prevented mental patients leaving institutions, pursuant to a state policy of deinstitutionalization, from registering in hotels within a city. The Court struck down the ordinance on Equal Protection grounds, holding that it was exclusionary and infringed upon the right of citizens to travel, a right deemed by the Supreme Court to be "fundamental" in *Shapiro* v. *Thompson* 394 U.S. 618 (1969). See also *Memorial Hospital* v. *Maricopa County* 415 U.S. 250 (1974); *Edwards* v. *California* 314 U.S. 160 (1941). A mentally disabled person's right to travel is clearly and significantly infringed by restrictive zoning ordinances since a group residence may be the only appropriate place for him or her to live upon discharge from an institution. The *Stoner* Court went on to distinguish *Belle Terre,* stating that the Supreme Court had found explicitly that the ordinance there did not interfere with the right to travel or any other fundamental rights. 377 F. Supp. at 180.

The District Court further stated:

"It is apparent that this ordinance can effectively frustrate the movement towards deinstitutionalization in the treatment of the mentally ill, also, the issues herein bear directly upon the rights of citizens who are mentally ill to be treated in the least restrictive setting appropriate to their needs, and upon the right of such persons to choose their own place of residence without unreasonable governmental interference." *Ibid.*

The Court's recognition that the policy of deinstitutionalization can be frustrated points out very clearly a major factor distinguishing ordinances directed against group homes from ordinances having an impact upon college students, as in *Belle Terre.* Phasing out inappropriate institutional care is in many states, including Massachusetts, an explicit state policy. See *State ex. rel. Thelan* v. *City of Missoula,* 543 P2d. 173 (Mont. 1975). The college students in *Belle Terre* had attempted to live in a large group only for their own convenience or enjoyment, certainly not pursuant to any interest the state may have had. The Supreme Court was legitimately concerned that a small village should be allowed to maintain its quiet streets and clean air. However, where a state has determined, pursuant to its lawful discretion, that the highest quality mental health services should be provided in community settings and where there is no evidence to suggest that the surrounding neighborhood will be adversely affected, a very different situation is presented. A community has no legitimate interest to exercise its police powers to exclude group homes for the mentally disabled (by applying a family definition or by any other means) and

thereby to frustrate a state policy designed to benefit the public health and welfare. Although in *Belle Terre* the Court found no violation of equal protection, where zoning ordinances exclude group homes for the mentally disabled, that constitutional guarantee is offended.

The *Stoner* court also observed that exclusionary zoning undermines the constitutional right of the disabled to be treated in the least restrictive environment appropriate to their needs. 377 F. Supp. at 180. Numerous court decisions have held that under the Fourteenth Amendment, "perhaps the most basic and most fundamental right is the right to be free from unwanted restraint" and that the mentally disabled "cannot be totally deprived of their liberty if there are less drastic means for achieving the same basic goal." *Lessard* v. *Schmidt* 349 F. Supp. 1078, 1096 (E.D. Wis. 1972); on remand, 413 F. Supp. 1318 (E.D. Wis. 1976). See also *Wyatt* v. *Aderholt* 503 F2d 1305 (5th Cir. 1974); *Davis* v. *Watkins* 384 F. Supp. 1196 (N.D. Ohio W.D. 1974); *Welsh* v. *Likins* 373 F. Supp. 487 (D. Minn. 1974). The effect of exclusionary zoning is clearly and dramatically demonstrated: if appropriate community residences are not available, persons remain in institutions, in an overly restrictive environment, long after the time they could have and should have been released. These zoning laws effectively deprive the constitutional right of mentally disabled persons to be treated in the least restrictive alternative.

Other courts have found *Belle Terre* to be inapplicable in the context of group homes for the handicapped. In *City of White Plains* v. *Ferraioli* 34 N.Y. 2d 300, 313 NY 2d 756 (1974), the New York Court of Appeals found that unlike the college students in *Belle Terre,* a proposed group home for foster children shared the essential characteristics of a traditional family and thereby could not be excluded in a single-family district. And in *State ex. rel. Thelan* v. *City of Missoula,* 543 P2d 173 (Mont. 1975), the Montana Supreme Court distinguished *Belle Terre* on the grounds that the group home in question was mandated under a policy adopted by the state legislature.

As has been pointed out, the rights of the mentally disabled, as guaranteed by the Fourteenth Amendment, are abridged in a number of ways by exclusionary zoning ordinances. Such ordinances do not bear any relationship to the public health or welfare, and, in fact, serve to frustrate state policy directed to serve that end. The right to live in a family unit, even though a non-traditional family, the right to travel, and the right to receive treatment in the least restrictive environment are all violated. Congress has discretion to determine what legislation is needed to secure the guarantees of the Fourteenth Amendment. *Katzenbach* v. *Morgan* 384 U.S. 641, 651 (1966). The mentally disabled, who seek only to live a life of dignity in the community, very badly need the protections that only civil rights legislation can provide.

The Massachusetts Department of Mental Health respectfully urges the Subcommittee on Civil and Constitutional Rights to act favorably upon the proposal the Department has submitted that would make it illegal for a local government to exclude, through zoning or other land use powers, occupants of housing because the occupants are a group of handicapped persons. Such legislation is clearly within the authority of Congress and is sorely needed in order to secure the constitutional rights of the handicapped.

RICHARD S. GOLDSTEIN,
*Legal Counsel.*

Mr. DRINAN. Would you have any additional comments on the constitutionality or related topics?

Mr. GOLDSTEIN. I would agree with my brother's analysis on that.

I would add that certainly under section 5 of the 14th amendment, Congress is given authority to determine what legislation is needed to effectuate the guarantees of the 14th amendment. And in several respects we see the 14th amendment rights being eroded by restrictive zoning laws. Particularly the right to travel, which has been determined by the Supreme Court to be a fundamental right, is restricted here by exclusionary zoning.

Very often people living in an institution have no place else to live that is appropriate for them, and if they cannot live in an appropriate community residence, that means they will either wind up staying in the institution much longer than they should or will

wind up in a very unsupervised and very unhealthy situation for them.

Second, there is a growing recognition, particularly among the Federal courts, of a right to be treated in the least restrictive alternative appropriate to the particular person's need. That has been also recognized as a 14th amendment right, and that is also infringed very clearly by this kind of zoning law.

Neither of those situations is addressed in the *Belle Terre* decision in which there was really, no interest of the State.

Here we have an interest which is a State policy. In Masachusetts and in many other States there is an explicit policy of phasing out institutional care.

The situation in *Belle Terre,* was that there was just a group of college students who for their convenience wanted to live together. There was absolutely no State policy that would promote that kind of an activity. So I think the *Belle Terre* decision is certainly one that needs to be addressed. But I don't think it's a complete block. Certainly Congress is not restricted by *Belle Terre.*

I think Congress can certainly find its own appropriate legislation to address 14th amendment problems. It is not absolutely bound by what the Supreme Court has said. I think that is made clear in a number of cases that the Supreme Court does not necessarily restrict the right of Congress to use the discretion.

Mr. DRINAN. But in Federal law, is there any place where we have the principle that people have a right to treatment in the least restrictive atmosphere?

Mr. GOLDSTEIN. That has been deemed to be a 14th amendment right by the courts.

Dr. OKIN. There is a provision in the medicaid law that is further regulated, what is called the ICFMR, regulations intermediate care facilities regulations for the mentally retarded, and I believe in the regulations. I don't think it's in the statute but it's in the regulations.

The regulation prohibits Federal financial participation to institutions for people living in the institutions for whom institutional care is not the least restrictive alternative, so not only has the Federal Government issued a kind of policy statement on the last restrictive alternative, it has gone further than that and said that, furthermore, it will deny to States medicaid funding for people who are not in the last restrictive alternative.

I think that is in a regulation.

Mr. DRINAN. Doctor, if you can furnish that it would be helpful. I would like to see that. Then, Mr. Goldstein, I still don't quite fathom the thrust of the right to travel.

Would you spell that out again how that is compromised by not having a civil right to a familial setting in a group community?

Mr. GOLDSTEIN. If a person living in an institution cannot live in an appropriate community residential alternative, then very often they are not going to be able to leave the institution. Their right of travel outside of an institution appropriately and in a healthy manner is clearly compromised there. In my memo I noted the *Stoner* decision which does deal with that question, and I think very well, by the Federal District Court in New York.

Mr. DRINAN. I want to thank you all, and thank you, Mr. Brian Linn.

Mr. LINN. Excuse me, Congressman Drinan, I also might say in response to your question about a congressional statement on the policy vis-a-vis the least restrictive alternative, there is an explicit statement in the Developmental Disablities Assistance and Bill of Rights Act. Additional, section 504 has been interpreted by the Federal District Court in Philadelphia in *Halderman* v. *Pennhurst* to be a congressional codification of the constitutional right to equal protection—a right which, under *Brown* v. *Board of Education,* holds that separate is not equal. Thus, section 504 is a strong congressional statement on deinstitutionalization and the least restrictive alternative.

Mr. ROBRAHN. I might also say Public Law 94-142, the Education of all Handicapped Children Act, sets forth the same principle in education, that is, the right to be educated in the least restrictive environment.

Mr. DRINAN. The argumentation would be that if we at the Federal level adopt the principle of deinstitutionalization, we assume that people should be treated in the atmosphere least restrictive of their freedom. Consequently, it would seem to follow that they have a right to settle in a family situation, or in a group facility, since that is their way to travel and to develop.

All right. I thank you all.

Mr. EDWARDS. Mr. Butler?

Mr. BUTLER. Thank you, Mr. Chairman.

Getting back to reality for a moment, Mr. Robrahn, I would like to know from this panel what has been the effect of section 2122 of the Tax Reform Act of 1976, which provides a tax incentive for taxpayers to remove architectural and transportation barriers to the handicapped and the elderly.

Is that provision being utilized at all?

Mr. ROBRAHN. I think it is, but I think it is a little too early to really know. It has not been in effect very long.

I think the ultimate results can be evaluated, but at this time it's too soon.

Mr. BUTLER. I would like the rest of the panel to respond to that generally.

Mr. LINN. My understanding is based primarily upon a few discussions with people in the IRS. It does not appear that it is being utilized as much as it could or should be utilized. In my contacts with businessmen and businesswomen throughout the country the visibility seems to have been low.

Mr. BUTLER. What is the responsibility of the American Council of the Blind and the National Center for the Law and the Handicapped to give further publicity to this availability? Is it not a responsibility of theirs to advertise this, and is it being carried out at all?

Mr. ROBRAHN. Yes; we feel it is a responsibility. We advertise it through our publications, and we make speeches before various clubs and organizations, and this is one of the things that is always included in our statements.

Mr. LINN. Certainly that is also true for us. We have publicized the availability in our publication Amicus, which reaches a sizeable

national audience, and we discuss the provision in our numerous presentations.

It takes a long time for word to get out in this country, as I am sure you can well recognize, and one of the unfortunate things about the deduction, of course, is that it is limited in time, and we are now half way or better through the time allotted by Congress.

I certainly feel that Congress needs to consider extensions or modifications, as well as additional concepts that are similar in intent to that important piece of legislation, such as specific funding through vocational rehabilitation agencies or CETA programs.

Mr. BUTLER. Let me turn to another problem that concerns me, as a practical matter.

We have a great deal, in our area particularly, of split level housing. How does accessibility of split level housing fit into this proposed legislation? Can you build split level housing without discriminating against the handicapped?

Mr. LINN. Certainly it is architecturally feasible to build split level houses which would be architecturally accessible. However, they would not look like the split level houses of today. The steps and stairwells in most split level houses are simply too short to adequately ramp the existing steps in a ratio that is usable by many mobility impaired individuals.

However, if we view the house from the front, and we construct a ramping system which would run laterally across the large face of the front, it could be feasibly built in such a way it would be accessible.

Mr. BUTLER. But, in the process, you would pretty much destroy the split level features that have made it attractive and desirable residentially, would you not? I mean, you cannot place ramps inside?

Mr. LINN. I am sorry, I am saying you can ramp it inside. But the ramp would be placed differently than the traditional stairwell. The stairwells generally come off the front of the building and, as you walk in, you go down a short set of steps or up a short set of steps. There is generally not a sufficient length of space in the stairwell to ramp it in a way that is safe for and usable by most wheelchair users.

Mr. BUTLER. How did you say you were going to be able to accomplish it?

Mr. LINN. If you construct the ramp inside of the house along the full length of face, as you came through the door the ramp would go right and left, right perhaps would go up to the top level and left would go to the bottom level.

By making use of a longer length of the face of the house a split level house could be built which is aesthetically acceptable.

Mr. BUTLER. Of course, without arguing the point, I would like to suggest that that would definitely destroy the charm of the split level for many people. Is it appropriate, in effect, if you have to make that radical a change in the architecture for acceptance of a residential structure. Isn't that a big step?

Mr. LINN. I do not disagree it is a big step. Architecture has, of course, changed over the decades and the centuries in the various parts of the world. This would be a major step by the Federal

Government to require some degree of full access in terms of prohibiting self-imposed architectural standards.

On the other hand, this is a moral and ethical issue and also a practical issue. So, while it is a major step, it certainly is one which is worthy of consideration by the Congress.

Mr. BUTLER. I think you have answered my question.

I have no further questions, Mr. Chairman.

Mr. EDWARDS. Thank you.

Mr. Robrahn, it seems to me your testimony is perhaps more conservative than the other two gentlemen.

Do you agree with that, in that you state that you would be. in favor of prohibiting the zoning laws regulation excluding housing to any of the protected groups, but you also recommend that the carrot-stick approach be used where possible? Is that correct generally speaking?

Mr. ROBRAHN. I doubt if it's more conservative, but I could not tell from the good Doctor's testimony what specifically he would require with regard to the matter of the full removal of barriers and total accessibility of all houses. He didn't deal with that directly. But I suspect that my viewpoint in regard to removal of barriers and accessibility of what housing must be made available, what practices would be discriminatory probably pretty much is the same as Mr. Linn's, really, excepting that I did not go into the length of discussing the court cases that are involved and so on in the whole issue.

Mr. EDWARDS. If HUD sets up requirements for local communities to comply with in order to get Federal funds, there are many communities in the United States, especially those who have no housing at all for disadvantaged people or handicapped people who would just say, well, we don't need the Federal funds. There are literally thousands of communities like that. So the carrot and the stick approach breaks down.

Would anybody like to comment on that?

Mr. LINN. That is the very reason why an amendment to title VIII is as necessary as it is at the present time. This parallels the situation with the Education for All Handicapped Children Act, Public Law 94–142, and its interrelationship with the section 504 mandate.

Many school districts originally contemplated and a number of States originally considered withdrawing from the Federal financial participation offered in Public Law 94–142, the Education for All Handicapped Children Act, because the carrot was not large enough or juicy enough. It was argued that the amount of Federal dollars available for education of handicapped children was insufficient to make compliance attractive.

However, when it was realized that the carrot was much larger and juicier under section 504 and that it is virtually impossible to provide minimally adequate educational services in this day and age without some form of Federal financial assistance, great benefit and support was given to 94–142. Similarly, title VIII and its proscriptions would operate in a mandatory fashion, even more so than section 504. This highlights the urgent need for an amendment to title VIII.

Mr. EDWARDS. Thank you.

Whenever civil rights laws are enacted with national coverage and for the first time covers new protected groups or whenever major civil rights acts are enacted or get the necessary support in Congress, there usually has to be a lot of evidence, and it has to be shocking evidence.

If we go back to the 1964 and 1965 acts, people were killed, and the evidence was really overwhelming so far as the black community was concerned, and insofar as the voting rights bill was concerned.

The rights of handicapped people, the discrimination against them is a relatively new thing, although, of course, it has been with us for centuries, and it just last year that the House of Representatives, for example, changed its visitors area so that people in wheelchairs could come in and see the legislative body at work.

Where is Congress going to get the evidence for the zoning in particular? It has to be a nationwide problem, and there has to be loads and loads of evidence, individual cases.

Mr. LINN. Especially with regard to the zoning problem that that evidence can be obtained. I know from my experience both as a practicing attorney representing mentally retarded persons and from my experience at NCLH providing backup support for attorneys nationwide, that the problem is tremendous. In zoning disputes, the group mind takes over, the fears and stereotypes about mentally retarded persons come out, and there is probably not a State in this country which has not experienced some degree of problems.

We would certainly be willing to contact the organized advocates for metally retarded persons in an attempt to spur written documentation of specific examples of what has happened throughout this country.

Mr. EDWARDS. Thank you.

Mr. ROBRAHN. The America Council of the Blind can provide a number of specific cases where landlords have refused tenancies to blind persons because of the necessity to have a guide dog with them. In other words, they had a restriction against all pets, and that included the guide dogs.

Mr. EDWARDS. We have the rather massive study financed by HUD for a million dollars in 40 communities with regard to discrimination in housing against black Americans. We don't have a similar study like that where testing was used as a scientific device to prove the same case of discrimination towards handicapped people.

Mr. LINN. There are two problems in this area:

First is I think that the use of testing in the handicapped area is somewhat more difficult than it was in the race area, for obvious reasons.

It is not apparent to the disabled person actually who faces the landlord that the discrimination happens and, of course, our testimony does have a couple of specific, clear-cut kinds of things that I think are receptive of what is happening.

The second problem is that, outside of the zoning issues, architectural barriers in housing have been the major focus of handicapped groups and their legal advocates. Most of the work in this area has

not had the benefit of a statute declaring architectural barriers to be the denial of a civil right.

As notions of equality move from a base on the continuum of charity to a base of rights, the justification for such a study by advocacy groups will evolve. Because of the lack of protective legislation, people have been attempting to deal with architectual barriers problems in nonlegal ways. There is no Federal agency which has had a national commitment to housing discrimination against handicapped or which has taken the impetus to do the kind of study that was done earlier. To my knowledge, no such study is comtemplated for the near future, and it is unfortunate.

Mr. Edwards. It is unfortunate. It is unfortunate that the authority that we gave Federal agencies more than 10 years ago in the case of housing and in equal opportunity for employment has not worked out particularly well, the situation is not measurably improved, and we always move ahead reluctantly until we resolve one or two problems to open up the civil rights laws to new protected groups.

It is difficult to get the votes for it too.

Mr. Linn. I can certainly empathize with that difficulty. It is not without some reservations that we think about amendments to title VIII or title VII because of the existing problems of effectiveness within the administrative agencies charged with the enforcement of those laws.

On the other hand, it is a moderately simple step conceptually to amend those laws, and disabled people and their advocates are beginning to grow more militant, in a manner which parallels the militancy which was occurring in the mid-1960's with the protected classes that pushed for the original enactment of these laws.

I hope it does not take the same degree of militancy to amend title VIII.

Mr. Edwards. I hope so, too.

Mr. Robrahn. I would like to add this, that even organizations for handicapped individuals have difficulty in accumulating any kind of reliable estimate of the incidence of various kinds of discriminatory practices against disabled individuals, because the exclusion of handicapped persons from many areas of societal living is so pervasive that many handicapped persons or most handicapped persons simply accept it as a way of their life.

I mean, you know they don't even think of it as in terms of a discriminatory practice. It is just something that they have had to live with ever since they can remember, and it is the way things are. So it's a matter of also educating handicapped persons to know what their rights are, and to bring them to the attention of those who can assist them or to take action on their own.

Mr. Edwards. Yes; I agree.

Counsel?

Ms. Cooper?

Ms. Cooper. Just a couple of questions.

How have the State laws in the back of your statement affected the availability of group housing for the handicapped in those States? Has it made a big difference?

Mr. Linn. Yes. There has been a difference. Because zoning disputes frequently require lengthy administrative procedures and

protracted litigation, they tend to unduly delay or completely halt any plans to establish group housing. Where people can just move into a community and establish themselves and where they have an explicit legal right to do so, community living arrangements become a reality. People get tired of attempting to fight the zoning system and they live with it the way it is, and the deinstitutionalization process can result in a disorganized, indiscriminate dumping of people into the community.

Mr. DRINAN. Would counsel yield on that?

In the 11 States where they have the statutes, do they talk about the civil rights of these people or is it just a zoning regulation?

Mr. LINN. To the best of my knowledge these are zoning regulations.

Mr. DRINAN. Have they carefully avoided the civil rights aspect?

Mr. LINN. I don't think they have really thought of issues in terms of a civil rights model; they had been faced with problems wherein local communities had zoned out community living arrangements. Local associations for retarded citizens presented a major thrust by going to the State legislatures and testifying to the immediate problems—the zoning restrictions.

Implicit in the State statutes are a number of valid assumptions on the part of the State legislatures, not necessarily that a civil right is involved, but that the need for such legislation is brought about by the natural evolution in the treatment of handicapped individuals in this country.

Mr. DRINAN. Thank you for yielding.

Ms. COOPER. Thank you.

A number of States also have laws prohibiting discrimination against handicapped in housing per se, not in zoning, but in zoning provisions with certain caveats against requiring the landlord to make modifications. How have those laws been utilized, for example, permitting handicapped tenants to make modifications at their expense despite the protestation of a landlord?

Mr. LINN. This problem is addressed in our written testimony with a specific example from California. An individual in a wheelchair was prepared to rent an apartment which had a series of steps at the entrance. She planned to place a ramp, one that would be esthetically desirable, over those steps, and she was denied the rental by the landlord.

A representative of the center for Independent Living in Berkley indicates that the State Attorney General's office, refused to pursue a discrimination action under State law because of the statutory language rejecting any affirmative duty on the part of a landlord.

I have talked to people in other parts of the country who indicate they also perceive such language as a problem. Therefore, if Congress decides to pass legislation which contains such language, the legislation should, at a minimum, also contain specific language indicating that the types of modifications which we have testified to can be made by handicapped people at no expense to the landlord and that it would, in fact, be discrimination for a landlord to prohibit renting a dwelling because such changes were contemplated.

Ms. Cooper. Would that type of action be a major form of discrimination against handicapped persons, that is, prohibiting modification by the tenant?

Mr. Linn. Again, we lack studies. Is that a significant portion or is it a more significant problem, as it is with protected classes, that handicapped individuals are falsely told there are no available rentals by a landlord who sees that they are blind, notes that they are deaf, or simply perceives that there are going to be more problems with such tenants?

There are really no statistics concerning which are the more prevalent of the kinds of violations. I have certainly been told that by handicapped individuals and particularly by individuals with mobility impairments barrier removal is a serious and substantial problem.

Suggestions that we remove doors or lower cabinets or make other modifications that are necessary to make a home livable for certain people have not fared well with certain landlords, especially in the tight housing markets that many of our urban and rural areas are experiencing.

We find the same problem in employment markets ·where demand is greater than supply. When landlords are in a real landlord market, they simply would rather not bother with those kinds of perceived problems when they can rent to an able-bodied person.

Ms. Cooper. We have mentioned several forms of discrimination, prohibition against modifications, refusing to let seeing eye dogs, exclusionary zoning problems and, of course, there is also just the prejudice of having somebody with a disability reside on the premise.

Are there other forms that discrimination takes that should be considered when considering this legislation?

Mr. Linn. Yes; increased rents and increased security deposits based upon presumptions that disabled people damage apartments because of their disability are, not uncommon acts of discrimination.

One issue I did not deal with in my abbreviated oral shortened testimony is the committee print proposed revision provision which would prohibit insurance discrimination. Unfortunately, this proposal does not include the handicapped or women as a protected class.

Perhaps this is an oversight or perhaps it was thought through. In any event, discrimination in insurance practices is something which handicapped people face on a daily basis. It is a form of discrimination based upon stereotypes and false notions about disabled people that poses a very serious problem in the housing market.

Ms. Cooper. Is it, in fact, a false assumption?

Mr. Linn. It is indeed. Where we find the problem most commonly, and the same principle applies in home insurance, as in automobile insurance. We will have a person with one eye or a person with one arm or a person who is mobility impaired who is licensed to operate a motor vehicle. When that person applies for automobile insurance, the local agent will automatically place him or her in an assigned risk category.

The insurance industry has no actuarial data for people with one eye or one arm or for people who lack the use of legs and who may use adaptive automobile equipment concerning whether they experience any greater incidence of accidents or seriousness of accidents than anyone in the normal population. Yet, discriminatory practices occur, and the same differential treatment can occur with homeowner's or rental policies.

Additionally, landlords who fear a rise in their liability insurance rates may unjustifiably discriminate. The insurance industry does not have the actuarial data to support these practices.

Mr. ROBRAHN. I would add to that that I think most people look upon especially certain kinds of disability conditions as making that person helpless and they, therefore, believe that it would be unsafe to rent to such an individual because they would be afraid that in handling the cooking or whatever, or smoking, that they were going to start a fire. They just look upon them as being an unsafe risk.

To add to the insurance thing, it is common practice, for instance, for insurance companies in disability insurance and life insurance to insist that it is necessary for them to charge a higher premium to blind persons and other handicapped persons, even when there is no actuarial evidence that the disability condition would shorten the life span or make that person more prone to becoming totally disabled, and so on.

It's an attitude that this person is helpless, this person is unsafe, and so on.

Ms. COOPER. Thank you.

Mr. DRINAN. Mr. Chairman?

Mr. EDWARDS. Mr. Drinan?

Mr. DRINAN. One last point.

I came across an instance recently where a man who had one eye had a valid Massachusetts license, but was denied a position as a postmaster or in the post office, and also a position as a civilian in the Army at Fort Devens in Massachusetts. Both of these decisions were justified by regulations of the Post Office and of the Army.

Mr. LINN. This is an area that is of extreme interest to me. I have just finished a manuscript of a Law Review article on Federal employment practices. Between sections 501, 503, and 504, the Federal Government has set a standard under 503 and 504 which it does not live up to in its own hiring practices and procedures.

There is a case which is currently in the Court of Appeals for the Tenth Circuit which involves the refusal of the EEOC to reemploy an individual with a law degree as a paralegal because he is blind, and because their job description specifically excludes anyone who cannot read printed material the size of typewritten characters from employment as a paralegal.

I recently saw a description for an attorney position in the Department of Justice, Immigration Division, which would exclude from employment anyone with a hearing impairment or a visual impairment. The job description says that because it is necessary to travel, no one with a mobility impairment will be considered. Because it is necessary to meet with the public, applicants are required to have a pleasant physical appearance. With one broad sweep, they have disqualified large percentages of the population.

The X–118, from which these practices germinate is an abominable instrument and an embarrassing one.

Mr. EDWARDS. If you will send us your article and any other material on this subject we would look into the matter and try to straighten these departments out, because we consider that a violation of their rights and we would like to be of assistance.

If there are no further questions, we thank you all very much for your testimony.

The committee will next meet on May 27, at which time we will hear testimony from the U.S. Commission on Civil Rights.

Thank you all very much.

[Whereupon, at 11:40 a.m., the Subcommittee on Civil and Constitutional Rights adjourned.]

# FAIR HOUSING ACT

### WEDNESDAY, JUNE 7, 1978

House of Representatives,
Subcommittee on Civil and Constitutional Rights
of the Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met, pursuant to notice, at 9:40 a.m., in room 2237, Rayburn House Office Building, Hon. Don Edwards (chairman of the subcommittee) presiding.

Present: Representatives Edwards, Drinan, Butler, and McClory.

Also present: Thomas P. Breen, counsel; Janice Cooper, assistant counsel; and Roscoe B. Starek III, associate counsel.

Mr. Edwards. The subcommittee will come to order.

Today we continue our hearings on H.R. 3504, with testimony from three very good friends of the civil rights movement. It is a great pleasure to have Bill Taylor here today.

Our first witness is Clarence Mitchell, Chairman of the Leadership Conference on Civil Rights. Mr. Mitchell is, of course, one of the Nation's most respected and forceful leaders in the fight for equality, and we are most honored as always to have you here, Clarence. We are just delighted.

You may proceed.

Would you introduce your other colleagues?

## TESTIMONY OF CLARENCE MITCHELL, CHAIRMAN, LEADERSHIP CONFERENCE ON CIVIL RIGHTS; ACCOMPANIED BY: WILLIAM L. TAYLOR, CHAIRMAN, COMPLIANCE AND ENFORCEMENT COMMITTEE; AND GLENDA G. SLOANE, CHAIRWOMAN, HOUSING TASK FORCE

Mr. Mitchell. Thank you.

In the interests of conserving the subcommittee's time, we have organized this as follows: I am merely to make a brief oral statement. Mr. Taylor, who is the chairman of our compliance and enforcement task force in the Leadership Conference, and Ms. Glenda Sloane, who is our housing authority, will really deal with the substance of our testimony.

Before I yield to Mr. Taylor, I would just like to say that I think it would be unfortunate if the impression is given in the country that the failure of the Government of the United States to successfully combat housing discrimination under the 1968 law is due to defects in the statute. The law is not as good as we would like to have it be and as we propose that it be, but the real trouble has been this law has not been enforced.

I call attention to the *Jones* v. *Mayer* decision in 1968 when the Supreme Court had before it a question of whether a reconstruc-

tion statute, which also dealt with housing, might be in conflict with the 1968 statute of Congress. The Court indicated that the difference was as follows: The reconstruction statute put the burden on the victim of discrimination to carry his case into court, expend his funds, and get a remedy as best he could, whereas the 1968 law, as the Court said, invoked the full panoply of Federal power for the purpose of protecting the individuals. That, of course, is as it should be, but unfortunately the lack of enthusiasm in the enforcing agency, which is the U.S. Justice Department, has really eroded the effectiveness of this statute, the 1968 fair housing law.

The proposal that we will make hopefully will clarify things that need to be clarified, put enforcement where it ought to be, but I hope we will all remember that though you may have the most perfect of law, if you do not have people who are committed to uphold and enforce those laws, they just don't work.

With that I yield to Mr. Taylor.

Mr. EDWARDS. We are delighted to have you here, Mr. Taylor. Bill Taylor has been a champion civil rights national leader for many years and a great friend of this subcommittee. We are pleased to have you here.

Mr. TAYLOR. Thank you very much, Mr. Chairman, Congressman Drinan, and thank you, Clarence.

I am glad that Clarence has called attention to what continues to be a pivotal problem in attaining the goals of civil rights legislation of the 1960's, and, that is, the matter of enforcement.

This committee, under the leadership of its chairman, has provided a very useful prod over the years in the oversight hearings that you have had on major civil rights issues, and I think it is well to say that even with more sympathetic administration of those laws, there is a continuing need for that kind of oversight.

At the same time I think, as one reviews the panoply of civil rights laws that were enacted during the 1960's, there is no part of it that is in more need of strengthening through legislation than the fair housing provisions. Title VIII is in need of revision because it has become abundantly clear that the combination of remedies that is provided, investigation and conciliation by the Department of Housing and Urban Development, pattern and practice of suits by the Department of Justice, private suits by individuals, that combination simply is not adequate to deal with the continued operation of the dual housing market throughout the country. If there was any doubt about the persistence of widespread discrimination in the housing market, the recent NCDH study that was actually sponsored and conducted under the aegis of the Department of Housing and Urban Development should have removed that doubt.

You have had testimony, I understand, about the contents of that report, so I won't belabor that here. It is really only the latest in a series of studies that shows that title VIII has had very limited impact in dealing with practices that have brought about residential separation throughout the country.

Among other things, the best demographic work done by Reynolds Farley and Carl Taueber and their associates has shown that 15 years after the Kerner Commission talked about two societies—that is essentially what we have, despite the operation of the

housing law—that while suburbanization certainly is a trend in this country, blacks are participating in it only to a very limited extent, and that frankly most of it is taking place here in the Washington, D.C., area.

There was a study recently that showed, that over the last 3 years one-sixth of all the movement of black families from cities to suburbs took place right here in the District of Columbia. It is not happening elsewhere to any significant degree.

Now there are two approaches that have been proposed to remedying the deficiencies in the current law, one embodied in H.R. 14508, would give to the Secretary of Housing and Urban Development the right to file civil actions in Federal court, and the other, which is embodied in H.R. 3504, the Edwards-Drinan bill, would establish an administrative enforcement mechanism in HUD.

It is clear to us that the administrative enforcement mechanism is the preferable one. Giving HUD the right to sue would really add little to the litigation authority in pattern or practice cases that the Justice Department already has, and litigation in the courts is simply too cumbersome a way and too costly a way to deal with the many thousands of individual instances of discrimination that require redress.

Mr. EDWARDS. Mr. Taylor, may I interrupt?

What bill were you referring to, the first one, 14508?

Mr. TAYLOR. It was a bill introduced by Congresswoman Spellman and Senator Mathias in the Senate.

What is needed is an expeditious administrative process, with cease and desist authority, and that is what you have in your bill. We think that one significant amendment that we would suggest in the provisions of that bill would be a requirement that HUD conclude its investigations within 90 days after receipt of a complaint.

You will recall, because you worked hard on it, that that would be similar to the provisions that were adopted to improve civil rights enforcement in the general revenue sharing and LEAA extensions in 1976, and we think it is particularly important in giving meaning to another provision that is already in section 3504, the authority of the Secretary to order temporary or preliminary relief after the investigation and after the issuance of an administrative complaint.

One of the major reasons for such relief is to preserve the house or the apartment that the victim of discrimination has sought from being sold while the proceedings are going on. But if an investigation is allowed to drag on, as investigations have in many departments of the Federal Government, that preliminary relief, though it is preliminary, may still come too late.

That is the major change that we would suggest in this portion of the bill.

Now, I neglected to say we submitted a detailed statement on behalf of the housing task force of the Leadership Conference that I would like to have included in the record, and that deals, beginning on page 8, with a number of other aspects of the legislation, the question of the enforcement role of the Attorney General, for example, where we think a distinction needs to be made between the discretion that the Attorney General has when a case is simply referred to him for investigation and suit, and the discretion that

he should not have, if you already had a cease and desist order, and it is a question of enforcing the cease and desist order. So we suggest some changes there.

With respect to legal fees, we believe that the requirement for indigency for legal fees ought to be removed. We think that in referring complaints to the State agencies, that ought to be done only where the State agency not only has the authority but has demonstrated in the past that it has the capacity to use that authority to prevent discrimination. If you put in a 90-day provision for investigation, that may very well take care of the situation because HUD would have the responsibility to complete that investigation in 90 days, whether or not it refers the matter to a State agency. So it is only the best operating State agencies that could handle that problem.

We deal with several other matters here that I won't go into at this time unless you have questions about them. I should mention that the problem of devices that are neutral on their face, or that seemingly have only an economic impact, is a critical factor in the continued operation of segregation in the housing market, and we do feel, as I think you do, that there should be a provision of the bill dealing with exclusionary land use in zoning, and that practices of that kind ought to be outlawed where they have a disproportionate racial impact or an impact on other minorities, and that impact does not meet a test of compelling State interest.

In conclusion, I would just like to say, Mr. Chairman, that I hope that we can all find a way to get this legislation moving in the year 1978. The administration, through Mrs. Harris representing the Department of Housing and Urban Development, has given strong testimony in support of this legislation, but I don't think the administration has really made it a part of its agenda yet.

We have been told, as I am sure you have, that the administration wanted to wait until reorganization went through, and they would then have a better idea about what kind of legislation to seek.

Well, the major part of any reorganization plan has now gone through, I might say, thanks largely to the efforts of Clarence Mitchell, because if he hadn't been fighting that fight, I don't think that the employment reorganization plan would have gone through. But that is done, and the problems in housing and in other areas are really not reorganization problems. So the time, we think, is right now for the administration to say, well, we have dealt with the reorganization problem, and now we must deal with problems in other areas which are not reorganization problems. And in housing there would be nothing more significant, apart from the steps that ought to be taken day to day to improve enforcement than for the administration to get behind this legislation and start the process of helping to move it through to the final process of enactment.

Thank you, Mr. Chairman.

We would all be glad to take any questions that you have.

[The prepared statement of Mr. Taylor follows:]

STATEMENT OF THE HOUSING TASK FORCE OF THE LEADERSHIP CONFERENCE ON CIVIL RIGHTS

We are pleased to submit this statement in support of proposed amendments to Title VIII, the nation's fair housing law. In the ten years since the Act's passage, there has been little progress in eliminating discrimination in housing. It is clear that the objectives of the Act have not been achieved. For this reason we strongly support the fair housing provisions of the Edwards-Drinan bill, H.R. 3504. These provisions would amend Title VIII to grant the Department of Housing and Urban Development the enforcement powers necessary to make the objectives of Title VIII a reality.

The failure to achieve these objectives was recently documented by HUD in a study of housing market practices conducted under its aegis by the National Committee Against Discrimination in Housing. NCDH utilized pairs of black and white testers to answer randomly selected newspaper advertisements in 40 metropolitan areas across the country. In all, over 3,000 real estate sales and rental agents were contacted. Interim findings indicate that blacks responding to rental advertisements were discriminated against in 21.5 percent of their inquiries. Inasmuch as home-seekers usually visit more than one broker, a black person who visits four agents in a homebuying search has a 62 percent chance of being victimized by discrimination. If he visits four agents in a search for rental housing, his chances of encountering discrimination reach 75 percent, or 3 out of 4.

These figures may well understate the prevalence of discrimination. As preliminary figures, they do not take into account racial steering, a method by which brokers deny minority homeseekers the freedom of choice that is protected by the Act. HUD intends to release an analysis of racial steering later this year.

The NCDH study is important because it suggests discriminatory methods that brokers employ. The testing demonstrated that where rental housing is involved there is a likelihood that whites will be favored in terms of apartment availability, the number of apartments volunteered by the broker, the number of apartments inspected, and the placement on waiting lists. The testing also demonstrated a likelihood that, for sales housing, whites will be favored in terms of availability of the housing requested, the number of houses suggested, and the number of houses inspected. In addition, real estate agents inquired more frequently into blacks' financial status.

THE INADEQUACY OF EXISTING ENFORCEMENT POWERS

Clearly, housing discrimination remains an endemic aspect of American life. There is no question that if the objectives of the Act, to eliminate discrimination and promote the national fair housing policy, are to be achieved, Title VIII must be strengthened. The change necessary to achieve these objectives is to provide HUD with administrative enforcement power. The Act presently limits HUD to investigating complaints and seeking voluntary compliance through the process of conciliation. The conciliation process has not proven successful in securing remedies for aggrieved parties. In a recent report, GAO recommended that HUD be given greater authority to enforce Title VIII. Of 332 complaints reviewed by GAO for this report, 36 were resolved by HUD. Of these 36 resolved cases, the complainant obtained the unit in only four instances. HUD Secretary Harris, in her testimony before this committee on February 2, 1978, noted that "respondents frequently ignore HUD's conciliation process because there is no real inducement to cooperate." For complainants who are unrepresented at the conciliation hearing, conciliation has been dramatically unproductive. Under current law, the complainant's only recourse is to file a private civil action.

The present law places the burden on the victim of discrimination, who cannot obtain redress through the HUD administrative process, and must file a time consuming and costly civil action. In addition, the time lapse between the conclusion of the attempt at conciliation and the bringing of suit often results in the housing at issue being rented or sold. Victims of discrimination are thus effectively deprived of the remedy that would come closest to making them whole—the ability to acquire the housing that was wrongfully denied them. As a result of the cost and time lag, relatively few private suits are brought.

Nor does the authority of the Department of Justice to bring "pattern or practice" suits under Title VIII provide an adequate remedy for the many individuals and families who suffer housing discrimination. Several courts have characterized these suits as preventive in nature and have limited relief to equitable remedies rather than award individual damages. In addition, the Justice Department simply cannot file the number of suits required to redress the victims of housing discrimination.

The Department itself has recognized that its authority in this area is not adequate to insure the attainment of the objectives of the Act.

In short, the main inadequacy of Title VIII has been the lack of enforcement authority. Virtually all students of the problem have noted the need for increased and effective methods of enforcement. For example, HUD Secretary Harris, in her testimony previously referred to, called this lack "the most serious obstacle to the development of an effective Fair Housing program within HUD." The Justice Department also supports this position. Assistant Attorney General for Civil Rights Drew Days termed this lack of adequate enforcement power "the principal impediment to the realization of the purposes of the Fair Housing Act."

In the Leadership Conference, we have been (and will continue to be) critical of the failure of HUD and of other agencies to the use fully the authority that Congress has already provided to deal with housing discrimination. But we recognize that major progress will not be made until that authority is expanded.

## CEASE AND DESIST AUTHORITY

There are currently two distinct legislative approaches being considered to provide increased Title VIII enforcement authority. H.R. 3504 contemplates a revised Title VIII, which would include cease and desist authority for HUD, as well as the power to refer a matter to the Attorney General for the filing of a civil suit. In matters handled administratively a hearing would be held and an order granting relief issued. H.R. 14508 has a more limited provision that gives the Secretary of HUD authority only to file a civil action. We strongly favor the administrative enforcement mechanism provided in H.R. 3504 that gives the Secretary the option to either initiate the administrative procedure or to request the Attorney General to file a civil action.

Further, the proposed amendment recognizes the need for investing the Secretary with authority to order temporary or preliminary relief pending the final disposition of complaints, thus assuring, in appropriate circumstances, that a successful plaintiff will be able to secure the unit of his choice.

We would recommend, however, that a provision be added that requires HUD to investigate and make a determination of reasonable cause within 90 days of receipt of a complaint. This is consistent with the provisions of the General Revenue Sharing Statute and is also consistent with fairness and equity in cases in which the Secretary grants temporary relief pending final disposition.

The provisions of H.R. 3504 are preferable to the HUD-litigation approach because experience has taught us that litigation alone is too cumbersome a method to deal with a problem of law enforcement so widespread that violations may affect hundreds of thousands of people.

Certainly, the establishment of an administrative process may itself give rise to litigation. But as the Justice Department noted in its testimony on H.R. 3504 and H.R. 7787, it has the resources necessary to handle any litigation ancillary to the administrative process. And we are in agreement with Assistant Attorney General Days' opinion, expressed in that testimony, that granting HUD administrative remedies would not significantly increase the number of court cases litigated because of the increased negotiating strength cease and desist power would bring to HUD.

Further the alternative of providing HUD with litigating authority would go against the grain of the Administration's current effort to consolidate such authority in the Department of Justice. Attorney General Bell, in an address to the Broward County Bar Association on April 6, 1978, warned against "the balkanization of the litigating capacity of the government". He noted that power in Federal agencies to litigate their own cases presents the danger of "a government of many parts, each part following its own view of the law, with one part in conflict with other parts." H.R. 3504 would provide for all Title VIII litigation to be handled by the Attorney General (H.R. 14508 allows the Secretary to sue in her own name, independent of the Justice Department).

Concern about the increasingly heavy workload of the federal court system is in itself another reason for preferring administrative over judicial enforcement. Under H.R. 3504, judicial review would be necessary only where final administrative orders are resisted or supplemental relief required. As HUD findings would be tested on a "substantial evidence" basis, the court time required for administrative review should be substantially less than that required for a trial de novo.

In short, giving to HUD the authority that the Attorney General already possesses to seek a judicial remedy for Title VIII violations would contribute little to improved enforcement. In contrast, the establishment of the effective administrative

process contemplated by H.R. 3504 would promise relief to many thousands of victims of discrimination whose complaints now go unredressed.

## ENFORCEMENT ROLE OF THE ATTORNEY GENERAL

Proposed section 811(b) requires the Attorney General to bring a civil action (1) to enforce any final order referred for enforcement by the Secretary; (2) to collect any civil penalty assessed by the Secretary; and (3) to remedy any discriminatory housing practice in which the Secretary has made a finding of reasonable cause and referred for civil action.

We recommend that this provision be changed to reflect the distinction between the responsibility of the Justice Department to, one, enforce administrative orders and, two, initiate civil actions in cases in which no administrative order has been issued. The integrity of the Administrative process requires that HUD's orders be enforced and not defied with impunity by those who have been found to have violated Title VIII as a result of a fair hearing and who have the right to appeal to a federal court. At the same time, it is consistent with present governmental practice to vest discretion in the Attorney General to determine whether to bring a civil action in cases in which no administrative order has been issued. We therefore, favor retaining the present mandatory language mandating enforcement by the Attorney General of final administrative orders and penalties, but vesting in the Attorney General discretion in initiating civil suits.

## LEGAL FEES

Under Title VIII, only a plaintiff who is both successful and indigent can be awarded legal fees. This requirement of indigency is inconsistent with other civil rights laws and undermines the rationale of the statutory authorization of the reimbursement of attorney's fees. The successful plantiff in a Title VIII action performs a public service as a private attorney general, by assisting in the enforcement of Title VIII's objective to eliminate discriminatory housing practices. While the poor suffer discrimination, discrimination based on race, sex and nationality finds its victims in all economic classes. By restricting the reimbursement of legal fees exclusively to poor plaintiffs, the statute discourages the bringing of suit by those who are not indigent. This limitation on reimbursement has obviously worked to lessen the effectiveness of the private remedy.

We support the removal of the indigency requirement contained in the proposed legislation. Both H.R. 3504 and H.R. 14508 would accomplish the objective to permit an award of attorney's fees to successful plaintiffs, without regard to their financial status.

In addition, the attorney's fee provision in H.R. 3504 would allow reimbursement to some successful defendants. Proposed new section 813(a) states, "In any action or proceeding under this title, the court, in its discretion, may allow a prevailing party (other than the United States with respect to attorney fees) reasonable attorney fees and expert witness expenses as part of the costs, and the United States shall be liable for such costs the same as a private person." An essentially similar provision of Title VII was recently construed to grant legal fees to prevailing defendants only when the action is frivolous, unreasonable, or totally without foundation. *Christianburg Garment Co.* v. *EEO*, 98 S. Ct. 694 (1978). The Leadership Conference has no objection to the provision of legal fees to prevailing defendants under the narrow standards of *Christianburg*. The provision of any greater right to legal fees for successful defendants might impede the achievement of the purposes of the Act by dissuading both the United States and private litigants from bringing potentially meritorious suits. As judicial interpretation of Title VIII has not always paralleled that of Title VII, inclusion of clear and specific standards in the legislation is desirable. We suggest, therefore, that the bill be changed to include the specific standards enunciated in *Christianburg* for the recovery of legal fees by successful defendants.

## REFERRAL OF COMPLAINTS TO STATE AGENCIES

Present law requires HUD to refer complaints to State or local agencies that administer laws that are substantially equivalent to Title VIII. The deficiencies resulting from this mandatory system have been documented in a report published by the Center for National Policy Review.[1] The Center found that complaints were referred to agencies that did not have the capacity to process them in a timely and effective manner. Referrals only meant delay.

We support, therefore, the changes that make referral discretionary with HUD and that establish rigorous standards that go beyond the existing requirement of

---

[1] State Agencies and the Their Role in Federal Civil Rights Enforcement, 1977.

"substantially equivalent" to include "the procedural effectiveness" of the law, and most important, introduce "past performance."

In combination with a 90 day limit for the disposition of complaints, there would be even greater assurance of timely and effective resolutions.

### STANDING

If the administrative hearing process fails to successfully resolve a case of alleged discrimination, the only legal recourse remaining is in the courts. The Leadership Conference commends the effort by the authors of this bill to clear up the contradictory opinions regarding which private persons have standing to bring an action for violations of the Fair Housing Act.[2] The language proposed for a new section 812(a) states, "An aggrieved person may commence a civil action in an appropriate United States district court or State court . . . ." While this language is an improvement over the existing wording of § 812(a), which does not indicate who may bring a private cause of action, it will still be interpreted in contradictory ways unless a definition of "aggrieved person" is added to Section 802 of the Act. We suggest that an "aggrieved person" under Title VIII be any person as defined in (d) of Section 802 (including unions, corporations, associations and organizations) who is adversely affected by a discriminatory housing practice that has occurred, is occurring, or is about to occur.[3] If a more detailed description of an aggrieved person is needed, it could be supplied by HUD in its regulations for the administrative hearing process proposed under Title VIII.

### STATUTE OF LIMITATIONS

The Leadership Conference strongly supports extending the statute of limitations to three years, as is proposed in the draft amendment of Section 812(a). The existing six month limitation is unrealistically short considering the complexity of these cases. As it stands, the law makes it particularly difficult for private persons to bring suits that deal with patterns of discrimination which may have begun sometime ago but which emerged clearly only in the months immediately preceding the suit.

Why should persons charging a deprivation of their civil rights be subject to a shorter statute of limitations than is customary in other civil action? Extension of the statute of limitations to three years would be equitable and fair and would recognize the importance of the rights involved. No public policy consideration favors a rapid cut-off of remedies for the discriminatory denial of a need so basic as adequate shelter.

### INSURANCE REDLINING

One of the most important amendments to Title VIII is the proposed prohibition of property insurance redlining. H.R. 3504 section 206(c) Stable, integrated neighborhoods and equal access to housing cannot be realized so long as insurance companies and credit institutions can deny whole areas their financial services. Insurance is "the cornerstone of credit," observed the "Hughes" Report in 1968.[4] Without credit, neighborhoods deteriorate and residents leave. The Hughes Commission reported on the widespread denial of insurance to business men and homeowners in riot affected areas, which were almost exclusively occupied by minorities. In the 10 years since that report, FAIR (Fair Access to Insurance Requirements) plans have been instituted in 27 states to make insurance available to all areas through federal guarantees. In 1974 the Federal Insurance Administration observed in its report, Full Insurance Availability: "There appears to be considerable basis for an inference that the [FAIR] plans have unitentionally provided a new vehicle for stepping up the abandonment of urban core areas by individual insurers." [5] Ten years after the "Hughes" Report and four years after the Full Insurance Availability study, insurance redlining is still a major factor in the segregation and deterioration of urban areas, according to a HUD report relased last month.[6] HUD found that "redlining"

---

[2] Cf. *Trafficant v. Metropolitan Life Insurance Co.,* 409 U.S. 205 (1972) (White tenants given standing to sue landlord for denial of housing to non-white applicants.), but see, *Topic v. Circle Realty,* 532 F. 2d 1263 (9th Cir. 1976) (Community group denied standing to challenge discrimination by real estate agents in neighborhood).

[3] Section 802(d) "Person" includes one or more individuals, corporation partnerships, association, labor ogranization, legal representatives, mutual companies, trusts, unincorporated ogranizations, trustees, trustees in bankruptcy, receivers, and fiduciaries.

[4] *Meeting the Insurance Crisis of Our Cities—Report by the President's National Advisior Panel on Insurance in Riot Affected Areas* (1968), p.1.

[5] Federal Insurance Administrator, U.S. Dept. of Housing and Urban Development, *Insurance Crisis in Urban America* 18 (May 24, 1978).

[6] Id at 43.

or what the industry calls "zip-code zoning" is widespread and that this practice of refusal to insure certain areas has definite recial overtones. "Accordingly," says the report, "it would appear that a strong case could be made challenging the legality of such actions under the Civil Rights statutes." [7] HUD summarized other studies documenting the devastating effect of arbitrary insurance redlining in areas such as the South Bronx and Detroit and concluded that the practice is racially linked.

Inclusion of an express prohibition of property insurance redlining would not only clarify the law but would help to unify the housing market and upgrade neighborhoods now denied credit for lack of insurance. Insurance redlining is much too significant an impediment to equal housing opportunity to be omitted from the coverage of the Fair Housing Act. We support the proposed amendment in § 206(c).

SANCTIONS

Discrimination in housing is a grievous wrong because it denies, to many Americans, the freedom to make one of life's most basic decisions, the choice of where to live. Such a serious wrong requires a sanction equal to its gravity. The Leadership Conference therefore supports increasing the ceiling on punitive damages which can be awarded by the courts from $1,000 to at least $10,000. Section 812(c). Allowing the increase in damages will indicate the seriousness with which Congress regards violations of the Fair Housing Act and will provide a deterrent to future acts of discrimination.

EXEMPTIONS

The bill before you proposes the elimination of all exemptions to the 1968 law, except in cases where rooms are rented within a single family dwelling occupied by the landlord. The Leadership Conference opposes all discrimination in housing, even isolated cases. We would support the proposal in Section 205 of the bill to eliminate the exemption to the Fair Housing Act of sales of single family homes by the owner. This law is confusing as it now stands and is inconsistent with the absolute prohibition on racial discrimination in the Civil Rights Act of 1866. The sales exemption has resulted in contradictory interpretations of the law. (The exemption probably does not affect many home sales, since few homes are sold without real estate agents or advertisements.)

EXCLUSIONARY LAND USE AND ZONING

The Leadership Conference supports a prohibition on the exercise of State and local governmental power over land use and development that discriminates on the basis of race and national origin. While these statutes are neutral on their face, they can be and have been used to exclude racial and ethnic minorities from certain jurisdictions. Prohibiting the application of zoning, planning or building codes in a manner which results in discrimination against racial and ethnic groups is a desirable objective.

We recommend that this section be amended to make it clear that state and local practices and policies that may be neutral on their face but that have a discriminatory effect are unlawful. This could include, for example, exclusionary practices that had an adverse impact on prospective occupants of a particular race, color or national origin unless such action is dictated by a compelling state interest.

The proposal in Section 206(c) (with the above recommendation) would buttress the current authority of the Secretary of Housing and Urban Development to insist upon community efforts to promote equal housing opportunity as is required under the Community Development Act of 1974.

CONCLUSION

Thank you for this opportunity to comment on HR 3504. We hope that we have succeeded in communicating our sense of urgency on the need to enact those amendments to Title VIII that will strengthen and add to the enforcement mechanisms essential to the implementation of the National Fair Housing Policy.

Mr. EDWARDS. Thank you very much, Mr. Chairman.

Ms. Sloane, you don't have a statement, but you are here to answer questions. We are glad you are here too.

Thank you for the excellent statement.

We do intend to move as fast as we can on this important legislation. We agree with you that 1978 is the time to do it,

---

[7] Id at 27–28.

especially since we have the enthusiastic support of Secretary Harris. We were delighted when she came and spoke so eloquently in favor of the bill.

Do you think, Mr. Mitchell, that we have the votes for all the bill? I am thinking of that exclusionary zoning, a very difficult part of the bill to get votes on, as you know.

Mr. MITCHELL. Yes. Well, it is difficult to say at this point that we have the votes. I would think we could get the votes. The history of consideration of civil rights legislation always shows that no matter how gloomy it might look at the beginning, that with diligent work we can get it through.

My answer therefore would be while it doesn't appear that the votes are or are not there at this point, it would be my impression that we could get them with a real good fight.

Mr. EDWARDS. In the past, in some of the battles over the last 15 years that I have known you, from time to time we have had to have terrible tragedies to get civil rights bills through.

Mr. MITCHELL. That has been said, but I don't think that could be supported by the record, and I am glad you mentioned it, because it gives me an opportunity to clarify the notion abroad in the country about the passage of the 1968 fair housing law. It has been thought and said that had it not been for the assassination of Dr. Martin Luther King, we would not have gotten that bill out of the Rules Committee, and therefore would not have been able to get it passed.

The fact of life is that we needed one vote in the Rules Committee, which was on the Republican side. That was the vote of Congressman John Anderson of Illinois. That vote was committed to reporting the bill favorably before the assassination of Dr. King, and when we met with President Johnson at the White House on the day following Dr. King's assassination, Whitney Young, who has since died, and was then head of the National Urban League, and I were trying to find out what we might say to the country which would show in some way that the Nation cared, and we suggested to President Johnson that he say that the housing bill would be a memorial to Dr. King.

In the public mind there appeared to be a bit of confusion in that people thought it was necessary to have the assassination of Dr. King in order to get the bill passed, but actually our intention was to have that mentioned as a memorial to him and not as an inducement to get people to vote for it, because we already had the commitments, and it was clear that it would pass.

Mr. EDWARDS. Thank you very much.

One of the great champions of civil rights for many years on the Republican side is the gentleman from Illinois, Mr. McClory.

Mr. MITCHELL. Yes.

Mr. EDWARDS. I am pleased to recognize the gentleman from Illinois.

Mr. McCLORY. Thank you, Mr. Chairman.

Thank you for your testimony this morning, Mr. Mitchell, Mr. Taylor, and Ms. Sloane.

The question that I have relating to this subject deals with the mechanics of trying to develop fair housing in our communities. The bill would specifically outlaw redlining, which is already—

presumably, by court decision—outlawed. The reason for declining mortgage money and for refusing insurance protection is basically economic more than racial, is it not? What I am wondering is this: How are we going to resolve this problem? How are we going to require fairness with regard to providing mortgage funds and providing insurance unless we do it through some kind of a State agency such as we do with regard to unusual automobile risks?

With respect to automobile insurance I think we have programs of assigned risk.

Isn't the problem basically economic and one that we should try to resolve through State programs such as the assigned risk program?

Mr. MITCHELL. I will yield to my colleagues to make whatever comment they want. But I can say all you have got to do, Congressman McClory, is go outside of this biuilding and start at First Street, move east on any of the streets in that neighborhood, and you will see very desirable housing that is considered a good mortgage risk, and on which people are able to get loans, because at some point in the manipulation of the real estate industry here in the District of Columbia, it was decided that those houses which in many cases were rundown shacks occupied by blacks would be desirable as housing for white people. The blacks were forced out because of the gutting process and the increased cost. So that what was thought to be a poor risk neighborhood for loans now is a very desirable risk area.

The same is true in my hometown of Baltimore. Sometime I will have you over there so you can meet my children and grandchildren. But in addition to that, I want to show you a place next to the seminary, the Salsesian Seminary.

Father Drinan, you may remember that. The Salsesian Seminary has moved out of a desirable area but the land is still there. There was one street which was near the place where Mother Seton founded her order there known as Seton Hill in St. Marys Street that was notorious. Every kind of a crime, every kind of a vice that you could think of was just rampant on that street, and needless to say, nobody could get a mortgage on a house to improve it.

Now, that is one of the desirable streets, because it is near a downtown area. The lenders just fall over themselves to extend loans.

In the neighborhood where I live, personally, the same thing is true. We have had for years battles——

Mr. McCLORY. I live on Capitol Hill, and we have seen some houses which have been renovated. While it has changed the occupancy sometimes—of course, some of the black families have moved out to the suburbs, some of the black neighbors have stayed there, and their properties have improved commensurately with the white neighbor's property.

But the point I am making is you cannot do this on a single, one-by-one basis, can you? You want to blanket the industry, and you want to be fair as far as requiring all of the industry to comply.

Mr. MITCHELL. I will just make this brief rejoinder before yielding to Mr. Taylor.

I couldn't imagine you discriminating against anybody, so I wouldn't think of you as possibly discriminating or being a party to any kind of discrimination in the neighborhood where you live.

But my experience with the lending institutions of this country goes back more than 40 years, into the 1930's. I use the analogy of the insurance company's automobile risks. I had to go to the Minnesota Legislature, way up there near the Canadian border, to get passed the law which prohibited discrimination in the sale of automobile insurance. During the consideration of that bill, one of the people representing the insurance industry came in and said, "But we ought to have a right to discriminate against people even if we don't like the color of the neckties they wear."

That is just about the standards by which the lending institutions are guided in making loans, purely arbitrary, capricious and prejudiced, and I would say that there is just no rhyme or reason to it except the old type of racial prejudice. I do not concede that it is economic because I have found that when the lending institutions decide that what they had formerly redlined, or when they decide that what they formerly considered a bad insurance risk area has some money in it, they race in there and get it.

So I yield to Mr. Taylor, but I don't concede that it is economic.

Mr. TAYLOR. I would echo what Clarence Mitchell has said. I think there are instances where there is an element of economic risk involved, and where there is that risk, that might best be met by pool arrangements of the kind that have been enacted in some States, but the places where there are risks are far fewer than the places where lenders and insurance companies have made the judgment that they are simply not going to lend, and they become a part of that self-fulfilling prophecy of the decline of an area. I think there really is no better illustration of that than what has happened in the District of Columbia, because areas that nobody would touch a few years ago suddenly have turned around and have become extraordinarily valuable.

I will just take a minute to add my own personal experience, which is that when I purchased a house in an integrated neighborhood in the District of Columbia some 16 years ago, and needed an FHA loan, the first judgment of the FHA was that the house wasn't worth the price that I was contracting to purchase it for, and therefore I wasn't going to be able to get an FHA loan.

Well, it was my firm conviction that that was because the area was a racially integrated area. So I will have to confess to you I used my position at the Civil Rights Commission in calling the FHA and saying I would like to have a reassessment.

Well, they did reassess and found that they had made an error the first time.

Now, I am a little shocked to read from my current assessment, that the land itself is worth more than what I paid for the house and land together 16 years ago. So these are judgments that are really based on thin air.

Mr. EDWARDS. I am sorry, we are going to have to go for a vote. Incidentally, we took care of the tax matter in California yesterday, Mr. Taylor.

Mr. TAYLOR. Yes; I heard about that, with some regret.

Mr. EDWARDS. We will come back for further questioning.

The committee will recess for 5 minutes.

Mr. MITCHELL. When you don't have firemen to put out the fires, I will help you get some from my State.

[Recess.]

Mr. EDWARDS. The subcommittee will come to order.

The gentleman from Massachusetts, Dr. Drinan, coauthor of the bill and a great champion of civil rights for many years.

Mr. DRINAN. Thank you, Mr. Chairman.

We welcome Clarence Mitchell here as an old friend and a great advocate, and also Mr. Bill Taylor.

Mr. Taylor, I know that you didn't have time to go through the very excellent points that you make. Thank you for the nice words that you say about the bill which the chairman and I have filed.

There are just two points where I would seek a little clarification. One is on the recommendation, with which I agree, on page 16, but I am not certain how it can be done. You mentioned that there are State and local government practices and laws which discriminate de facto on the basis of race and national origin. You suggest that these statutes are neutral on their face, but actually they result in discrimination against racial and ethnic groups. You state:

> We recommend that this section be amended to make it clear that State and local practices and policies that may be neutral on their face but that have a discriminatory effect are unlawful.

How? How can you amend it? What kind of words can you use or policies can you write that will in fact get behind this seemingly neutral and innocent law that keeps the blacks in the ghetto?

Mr. TAYLOR. I think the keystone—we haven't tried our hand at actual drafting—is adverse impact on protected groups under the statute, unless there is a compelling interest.

Now I recognize that those words are not self-revealing in their meaning, but what we are getting at is a standard in title VIII that would be equivalent to the standard that has been adopted, both by the EOC and by the courts with respect to title VII. Get away from this idea that one must show racial intent in the first place, that we examine the motivation of the people who pass the law, or the people who ruled on the zoning variance.

Mr. DRINAN. Has any State enacted a law which would be along the lines which you are recommending? If so, has it been successful?

Mr. TAYLOR. I defer to Mrs. Sloane on that question.

Ms. SLOANE. I think attempts have been made in terms of assisted housing to overcome local resistance to low-income housing. I don't think they have been very successful, because my impression is, certainly in New York, that they have conceded and chosen another location and avoided confrontation with a locality that was exclusionary.

I think the important language that has to be amended in this proposed legislation is the use of the word "because of," that phrase.

Mr. DRINAN. Use of what?

Mr. TAYLOR. "Because of," which is what suggests intent, and has raised the issue in several courts, and that language which would extend that to include where effects is discriminatory would be a

big step forward. The statute and regulations certainly could set standards that would establish whether in fact a practice has a discriminatory effect, with a consideration of those factors which might justify a community in its denial of a particular proposal for a housing project.

For example, we have new legislation now under the Housing and Community Development Act which require communities to formulate housing assistance plans, that must be in accordance with standards that relate to freedom of choice, and the deconcentration of low-income people, and they are supposed to designate the general location in which a low-income project is to be located.

Now if a proposal comes in from a developer, and that location is not consistent with that housing assistance plan, this might be the kind of justification that would stand. In other words, we are not suggesting unreasonable application of the effects test of discrimination. The community would still have that authority and discretion to plan and absorb whatever projects are consistent with these or other plans.

Mr. DRINAN. I thank you for those comments.

Mr. TAYLOR. May I just add a word? I think there are two basic approaches to get at this problem. One would be to try to actually prohibit economic discrimination, and that I think is too sweeping an approach.

The other approach, which is the one we are suggesting, is to try to prohibit these neutral devices where they have an adverse racial impact. It would come down to a judgment of cases.

In almost every case a community will say "Well, to accept this mixed income housing would create serious environmental problems."

If this kind of language that we are proposing were passed, the community would be put to a real test, not just saying it, but proving that serious environmental damage would actually result from this project. In some cases the situation will be relatively clear. The *Arlington Heights* kind of situation, where the land has actually been made available to a nonprofit group, which is going to build integrated housing. The community comes along and says "No, we won't grant a zoning variance." In other cases it will depend on a finer assessment of the facts, but that is essentially what we are proposing.

Mr. DRINAN. I thank you.

In my judgment, from where I sit, that is the basic problem, that is, precluding integrated housing, especially in the suburbs.

You make another point, and I want to commend you, for the definition that you suggest of an aggrieved person in section 802 of the act. I would think that we would want to adopt that recommendation.

One last point on the *Christiansburg* case on legal fees: I am not really certain how you come out in the ultimate analysis on that.

Are you saying that *Christiansburg* is good or bad?

Mr. TAYLOR. We are saying, I suppose, it is possible to take the position that attorneys fees ought to be limited to prevailing plaintiffs, because they are the parties who are serving as private attorney generals to enforce the statute. But what we are saying is that there is a case to be made for authorizing attorneys fees for defend-

ants in very limited circumstances, and that *Christiansburg* enunciates the appropriate, very limited circumstances under which attorneys fees might be made available to a prevailing defendant.

Mr. DRINAN. So you agree with it?

Mr. TAYLOR. So we agree with Christianburg.

Mr. DRINAN. Thank you very much.

Thank you again for the testimony.

Mr. EDWARDS. Ms. Cooper.

Ms. COOPER. You stated that you favor an exclusionary area zoning provision that applies only to race and national origin. Do you view that as a codification of existing case law that has held that certain land use practices that result in excluding minorities from proposed low income projects are discriminatory under title VIII, or do you think this provision creates a higher standard?

Mr. TAYLOR. To some extent it is a codification of existing case law, but I would point out that most of the exclusionary land use cases have proceeded on a 14th amendment theory principally, and in *Arlington Heights,* the Supreme Court cemented in the trend that began with *Washington* v. *Davis,* saying we are going to have a racial intent standard, so it was really only when *Arlington Heights* was remanded for consideration that we began to get into this question of does title VIII presently give authority to prohibit practices that have a discriminatory effect?

We don't really have a large body of case law so far. We think, among other things, that the Department of Housing and Urban Development ought to promulgate regulations which would begin to spell out in effect standards. But there is no question in my mind that if Congress were to speak clearly on this matter, and to say we want, in effect, a standard that would significantly improve the law.

The answer to your question is that it would be a codification of the direction in which things are going right now, but it hasn't really been established, and it does need congressional sanction.

Ms. COOPER. Assuming that a political judgment is made that the votes just aren't there to pass such a provision, do you think that under existing title VIII and cases thereunder, HUD could promulgate regulations that would make it clear just what kinds of exclusionary use practices are illegal?

Mr. TAYLOR. Like Clarence Mitchell, I hate to make these judgments in advance. If you put the hard question to me, I would say that we do need two things. We need a significantly improved enforcement mechanism, and that is cease and desist, and we also need, as Congressman Drinan says, to get at those practices that people think of as economic but that have a real racial impact.

Now if you make the judgment that you can only get one of those things, then I would certainly move ahead with that enforcement mechanism. But I think one of the things that certainly should be done in report language would be to state the belief of the committee that practices which have a racial effect can be dealt with under title VIII, and perhaps exercise some oversight over what happens in the course of the next years.

I wouldn't want to give up on that provision in advance, but, on the other hand, if the judgment were made that you couldn't get a

bill through with that, I would certainly want to have that enforcement mechanism in place.

Ms. COOPER. Another large problem in the housing discrimination is, of course, that many victims don't know they have been discriminated against. That is one of the things the NCDH survey showed: The way people are discriminated against is invisible unless you can compare it to treatment given to members of the other race.

Do you think this bill addresses that problem adequately, and if not, how can the situation be improved?

Mr. TAYLOR. I will defer in a second to Ms. Sloane on that one. I would only say that, yes, there is no way to deal adequately with problems of housing discrimination without the initiation of systemic investigations that don't rely on a single complaint. That is true in this area of the law as it is true in every other area of the law. I understand that the witnesses who will follow us, the Civil Rights Commission, will address that problem too.

I don't think there is any inhibition in the present statute on conducting those investigations, other than limitations on resources, but it may well be that there are provisions that would bolster that.

Ms. SLOANE. No, I suppose the method used by NCDH, testing, is certainly the most effective way in terms of revealing discriminatory practices. HUD has certainly been embarked, if nothing else, on an educational program. I don't know that any specific statutory provision could deal with alerting people to what in fact is discriminatory action other than those that deal with the institutions.

Mr. MITCHELL. I think to a great extent it depends on the integrity of the people who are administering the law.

When Congress amended title VII of the 1964 act in 1972, it was clear that the intent of Congress was not to have anybody put out of court because through lack of information or ignorance the person did not know he was a victim of discrimination, and yet just 2 weeks ago out of the Civil Service Commission came the decision saying that a person who had been grievously discriminated against was not able to press his claim simply because he had not complied with a procedural requirement. He had attempted to comply with it, and it was the fault of the party charged that there hadn't been compliance.

It seems to me that any idiot could have looked at the intent of Congress when it passed that law and concluded that this was a situation that Congress had in mind, and therefore this person should not be nonsuited. But they went ahead and threw the man out on that technicality anyway.

I thought, as I read that, and as I thought for a great part of my life, unless you have people who are committed to decency and justice administering these laws, it doesn't mean a whole lot to have them, because they will join right in with the discriminators and deny people their rights. So I think we need to go as far as we can with the language, but we need to be very vigilant in seeing to it that those who administer these laws are people of integrity and commitment.

Ms. COOPER. Just one more question to follow up on your point about technical barriers.

In the bill, as you know, the statute of limitations is extended to 3 years, but in testimony before the subcommittee, Secretary Harris suggested that, at least with regard to administistative complaints to HUD—rather than court complaints—the statute of limitations be much shorter. She suggested 6 months in order to lessen the burden on HUD to investigate old complaints. The complainant would still have the option of going to court within 3 years. What do you think of that proposal?

Mr. TAYLOR. We haven't fully discussed that among ourselves. Speaking just for myself, I would think there is some merit to a shorter period of limitations for the administrative agency. You now have a 180-day limitation with respect to complaints filed with the EEOC, and we wouldn't want to see an agency so burdened with old complaints that it couldn't do the job of systemic investigations that you were talking about in your last question.

As long as a full right to proceed in the courts with the 3-year statute of limitations under title VIII or under the reconstruction statutes were preserved, I don't think I would see any problem in a shorter administrative time limitation.

Ms. COOPER. Thank you.

Mr. EDWARDS. Mr. Starek.

Mr. STAREK. Thank you, Mr. Chairman.

Mr. Taylor, I would like to follow up on that question from counsel for a moment.

We have had conflicting testimony here concerning when complainants or prospective complainants realize they have been discriminated against.

One witness said that virtually in every case that he was familiar with, the discrimination became evident immediately, and therefore recommended that the statute of limitations not be extended. However, on the other side we had diametrically opposite testimony saying that often a person doesn't realize that discrimination has occured for quite a while.

Mr. STAREK. I am wondering what your feelings are on that and whether you or Mr. Mitchell have an opinion on when prospective complainants realize that they have been discriminated against?

Mr. TAYLOR. That is a problem. I can tell you that it is particularly a problem in the field of lending discrimination, where people go into lending institutions for loans and may be turned down or offered terms that they can't accept, and they have no way of knowing that these terms are more onerous than the terms that somebody else may have been offered who is in exactly the same circumstances. So I do think that the awareness of an individual that he or she has been discriminated against is a problem, and that is certainly one of the major reasons why it is very important to have a period of time, such as provided in the proposed bill for access to the courts.

My only concern in suggesting a shorter limitation with respect to administrative complaints I think is the same one that prompted Secretary Harris, which is that it becomes a tremendous burden on an agency, and EEOC has had that kind of problem in the past, to be dealing with a great many complaints that are older.

Now I don't know, I guess I would like to think about what the appropriate time period is. Having said it should be shorter than 3

years, I am not sure whether it should be 180 days or some other time period, and that is something we might want to consult on and get back to you on.

Mr. MITCHELL. But I think with respect to the general principle, you don't want to make that period too short, because my experience with discriminators is that they are the most persuasive people in the world. They make you think that the only reason why you didn't get that house was because the roof fell in and they haven't had time to repair it. Given time, they will do it, or maybe that once they get the plumbing fixed, you can have that apartment. So that the next time you come back, the place is rented, and it might even have been rented or sold the next day. So I think that we need to protect people who have a simple quality, that is, trust in their fellow human.

Almost everybody who is the unknowing victim of discrimination is in that plight because he just made the mistake of trusting a fellow human. So I feel that we ought to give them ample time to find out what happened and take action.

In addition, many people who know that they have been victims of discrimination but don't know where to go to get redress, or how to get redress, so I would say that ample time, and the 180-day period was thought to be reasonable when we were considering the equal employment amendments in 1972, I would say that gives us at least a figure that might serve as a model.

Mr. STAREK. Thank you.

I want to go on then to the enforcement mechanism in the bill, and ask you whether you think the problems we are experiencing now in enforcement result from the way title VIII is written or may be the result of the lengthy delays and complaint backlog that seem to persist at HUD?

Mr. TAYLOR. I think it is both. There is no question that there are lengthy delays, and that HUD's operations have hardly been a model of good enforcement. That is one of the reasons we suggest that the legislation include a provision that puts a time limit on investigation.

At the same time there needs to be something at the end of that process, and we say cease-and-desist authority, that would give some leverage to HUD when it finds there is discrimination to induce a settlement. Because right now the prospect of litigation is so remote, and it is another agency that is involved, that the conciliation process really isn't very much of an inducement to a developer or a landlord to come into compliance. It can be postponed. "Wait until I am sued and then I will worry about that problem." So you need both. You do need that new leverage in the form of cease and desist, and you do need more discipline to the whole operation of investigating and seeking conciliation.

Mr. STAREK. I agree with you. I think timetables are a wise idea, but I am concerned what the end result would be, should HUD be given cease-and-desist authority. I would like you to elaborate on what would be the problem of prohibiting, for example, private actions until there has been administrative determination, and then permitting complainants to go into court on their own or with HUD.

Mr. TAYLOR. You may accuse me of hedging my bets, but I will have to say that over the long course in civil rights we have found that the basic protections are in the courts, and in no way ought we to cut back on those protections, because there come times when the political winds are blowing in a way that people in politically appointed positions just simply don't do their job, and in those times one has to rely on the courts.

Now what we have really suggested is that the election of remedies ought to belong to the individual. If the individual chooses to go into court, then a person ought to have that right. The one qualificiation is, and I think we have this in our statement, if it does go to an administrative proceeding, and an administrative complaint is issued, at that point the election is made for an administrative remedy, and that remedy would have to run its course. But up until that point, the person should be free to go into court, and at the conclusion of the administrative proceeding, the person should be free to go into court.

Mr. MITCHELL. I think it is important to preserve all the remedies in these cases. If I have learned any one thing over the years, it is that the more remedies available to the victim of an injustice, the better chance there is for that person to succeed. The classic example of that is the situation that arose in Philadelphia with respect to the use of blacks on what were then fixed-wheel street-cars. There were all kinds of Government regulations saying you shouldn't discriminate, but there was an order which had come out from what was then the War Manpower Commission saying that nobody could have additional labor until whoever was asking for additional labor cleared with the U.S. Employment Service to see whether there would be a labor pool available in that agency, and as luck would have it, all the white people were used up. The war manpower order became operative, and the agency, the streetcar company which had refused to employ blacks, had to take them because of that manpower regulation, which really was just designed to have full utilization of the labor supply and did not necessarily come into being because of an effort to prevent discrimination.

We have found that through the years with various kinds of remedies that you have to improvise in order to get a result, and also it is important to be able to put a burr under the saddle with respect to these Government agencies.

You know you get a lot of people in there with nice air-conditioned offices and annual leave and all that kind of stuff who get very comfortable and sort of put these cases aside for another day, and the next thing you know, a case filed in the spring hasn't been handled until Christmas. Then they go on a Christmas vacation. So we want always to be in a position to sort of put a little device in there that will move them along, and there is nothing like having control over the case so that if the Government isn't doing what it ought to do, you can go into court.

Mr. STAREK. Then you would not agree with Mr. Taylor that a complainant, once he elects to seek an administrative remedy, should then be required to pursue that course until of resolution.

Mr. MITCHELL. I didn't understand you to say that the person would be foreclosed. You didn't say that, did you?

Mr. TAYLOR. No, let me be a little clearer.

What I am saying is that the election comes not at the point where someone files a complaint with HUD, but at the point where the Secretary issues an administrative complaint. At that point, where the Secretary issues the administrative complaint, I think it would create problems if a lawsuit was filed while that cease-and-desist proceeding were going on, so the person would have a right to elect to go to court at any point up to that point of the issuance of administrative complaint, and then again, of course, after that proceeding was disposed of.

I think that would preserve the maximum election of remedies without creating this problem of dual proceedings going on at the same time.

Mr. MITCHELL. It is the same thing as with the EEOC. At a given point when things look hopeless, the EEOC can permit an individual to go into court, because nothing is coming of the conciliation process. I assume that is the kind of thing you had in mind.

Mr. STAREK. Thank you very much.

Mr. EDWARDS. Thank you.

Mr. TAYLOR. I wanted to, if I may, Mr. Chairman, just say a couple of other words in response to the question that Mr. McClory raised before the break, and, of course, we would be glad to pursue the question with him if he would like to, but the question concerned redlining.

We have been engaged in a 7-year effort to get the agencies that regulate banks and savings and loans to deal with credit practices that result in discrimination, and red-lining is one of those practices. When we started, they were extremely skeptical that a lot of these practices were really racial practices rather than practices founded on business necessity.

Just about 10 days ago the Federal Home Loan Bank Board did issue a regulation prohibiting redlining, and dealing with the refusal to make loans on a structure simply because of the age of that structure or the characteristics of the surrounding neighborhood. So they have become convinced over the years that that isn't strictly an economic problem, that there are racial practices that underlie that.

Now the reason for the provision in this legislation is that here we are dealing with a different type of transaction, and that is insurance on a loan rather than issuing the mortgage in the first place, and I take it that the effort is to make clear that that is covered by the statute.

Ms. SLOANE. It is property insurance.

Mr. TAYLOR. Property insurance, right.

As we point out in our testimony, there are recent studies, including one that was just concluded, that show that this is a real problem, and this has been acknowledged by some of the insurance companies.

In order not to make one or two insurance companies the pioneers in this area, as in other areas of the law, we have to have the same set of obligations that apply to everybody, and that is really what we are seeking in suggesting that the provision of the Edwards-Drinan bill that deals with this problem of property insurance in redlining be included in the law.

Mr. EDWARDS. Thank you very much, Ms. Sloane, Mr. Taylor, Mr. Mitchell.

We will be talking to you again about this bill, and I assure you that we intend to move ahead with it as rapidly as possible.

Mr. MITCHELL. Thank you.

Mr. TAYLOR. Thank you.

Mr. EDWARDS. We will recess for 10 mintues because there is a vote on the floor, after which time we will have the pleasure and honor of hearing from our friends in the U.S. Commission on Civil Rights.

[Recess.]

Mr. EDWARDS. Our next witnesses are from the U.S. Commission on Civil Rights, Dr. Arthur S. Flemming, the distinguished Chairman; the Acting Staff Director, Louis Nunez; and the Assistant Staff Director of the Office of Federal Civil Rights Evaluation, Cynthia Graae.

Mr. FLEMMING. And Steven Sacks.

Mr. EDWARDS. Yes; we are delighted to have you too.

Without objection, the testimony will be made a part of the record.

STATEMENT OF ARTHUR S. FLEMMING, CHAIRMAN, U.S. COMMISSION ON CIVIL RIGHTS

Mr. Chairman, I am very happy to have the opportunity to apear before you on hehalf of the Commission in connection with H.R. 3504

The problem of discrimination in housing has long been of concern to the Commission on Civil Rights. Several of our major reports have focused on this issue, most specifically, Vol. II of the Commission's Enforcement Effort Series, To Provide . . . For Fair Housing, and Twenty Years After Brown. Commission staff are currently in the process of concluding research for a major report on the Federal Government's fair housing enforcement activities. My testimony will therefore also reflect some of our recent findings with respect to the Government's fair housing efforts.

The Commission views H.R. 3504 as a significant improvement over the current provisions of Title VIII. The bill provides for expanded coverage of prohibited practices, strengthened enforcement, and more comprehensive remedial provisions. Each of these imporvements is needed if fair housing is to become a reality in this country.

PROHIBITED PRACTICES

The bill adds an explicit prohibition against both mortage and insurance redlining. This prohibition is a constructive addition to the Title VIII definition of discriminatory practices. Although there is considerable support for the view that the present Title VIII implicitly covers these practices, congressional action explicitly prohibiting such discrimination will remove any possible doubt as to their illegality. Moreover, such clear language should result in those Federal financial regulatory agencies which have not yet issued interpretive regulations regarding mortgage redlining to do so. I am referring specifically to the Comptroller of the Currency and the Federal Reserve Board.

The Commission believes, however, that the proposed provisions would be strengthened considerably if the law also contained a directive to insurers requiring them to notify all applicants for insurance of the reasons for rejection of their application, just as is now required of lenders under the Equal Credit Opportunity Act. Such a provision would enable applicants for property insurance to evaluate the reasons for their rejection. It would also provide a data base for Federal agency evaluation of insurance lending practices on a systemic basis.

The bill also includes a provision prohibiting exclusionary zoning practices by general or special purpose units of State governments. This also represents a major improvement over the present Title VIII. Although there is some case law under Title VIII which supports the proposition that a practice which has a racially segregative effect may be discriminatory regardless of motive, a clear congressional expression on this subject is obviously needed. It will serve to clarify the law on this point

and avoid conflicting judicial interpretations. The Commission on Civil Rights has long advocated the principle that practices which have a discriminatory net effect ought to be considered as violations of law absent a showing that the practices have a valid nondiscriminatory purpose and that practices having a lesser adverse impact are unavailable. The inclusion in the bill of language prohibiting exclusionary zoning on the basis of economic status especially is to be commended. The enactment into law of such a provision would be a clear signal that the Congress recognizes that economic discrimination, particularly with regard to housing, often effectively discriminates against minorities and female heads of households, since these groups occupy the lowest rung on the economic ladder.

The Commission also favors the bill's elimination of the current exemption for individual homeowners selling or renting not more than three single family houses at one time. The bill would only exempt the renting of rooms in owner occupied single family dwellings. All sales, and rentals in units larger than single family homes, would be covered. This change is clearly consonant with the basic purposes of the fair housing law. There is no justification for permitting individuals to engage in discriminatory activities with regard to housing which they own solely for income generative purposes.

### NEW PROVISIONS FOR INVESTIGATION

The bill would add a provision to Title VIII enabling the Secretary of Housing and Urban Development to file a charge of housing discrimination on his or her own initiative. This would strengthen Title VIII. It would provide a statutory basis for a program of systemic investigation of discrimination in the absence of individual complaints. It would constitute a clear mandate for HUD to undertake the kind of systemic review which this Commission has advocated since 1974. Under Title VII of the Civil Rights Act of 1964, as amended, the Equal Employment Opportunity Commission's Commissioners have had such authority since 1972.

We note, however, that the bill does not provide for the filing of third party complaints, or "charges" as complaints are to be called under the new bill. This, in our view, is an undesirable omission. One of the weaknesses in existing title VIII is that it does not provide for the filing of such complaints by persons or organizations filing "on behalf of" other aggrieved parties. Failure to include such a provision will make it difficult for fair housing organizations and advocacy groups to institute actions on behalf of an aggrieved individual or class of individuals unless a member of that group is also an aggrieved party. We urge the sponsors of H.R. 3504 to modify the title VIII filing provisions by providing for the filing of third party complaints.

Another area in which both existing title VIII and the proposed bill fall short of providing for effective investigation involves the failure to provide for data collection. In the course of the Commission's many years of evaluating Federal civil rights investigative efforts we have found time and again that the existence of adequate data is essential if there is to be an effective investigation into the root causes of discriminatory patterns and practices. We therefore urge most strongly that the bill be modified to include authorization enabling HUD to require record-keeping and record retention and reporting by those subject to the Act's prohibitions. HUD should be empowered to establish specific standards and reporting provisions, by regulation, for builders, brokers, sellers, lenders, and others affected by title VIII. Such a record-keeping and reporting provision should be modeled on Section 709(c) of title VIII, which empowers the Equal Employment Opportunity Commission to require record-keeping and reporting, and specifically grants the agency the authority to issue rules and regulations to effectuate the data collection provision.

The bill, like title VIII, is silent with respect to another investigative tool which the Commission believes is essential to effective investigation of fair housing violations. This is the practice of using "testers" or "checkers" to determine if discrimination is occurring. Simply stated, testing or checking involves the gathering of evidence by placing a majority group and a minority group representative, each with identical credentials, such as income, family size, and preferences for housing, in the same posture vis-a-vis a suspect broker, builder, or lender. If the treatment received by the minority group member differs from that afforded the majority group member, a strong case for housing discrimination can often be established. Similar procedures can be used to identify sex discrimination. Both the Department of Justice and HUD have used the results obtained by independent checking organizations in support of their investigatory findings, and in the case of the Department of Justice, litigation. However, neither Department has been willing to carry on such investigations with its own personnel, or to support outside checking groups with Federal money. Moreover, there continues to be some question in certain

jurisdictions as to the legality of the practice, and absent congressional direction, the use of this most effective investigative device is likely to continue to be circumscribed. Therefore, the Commission urges that consideration be given to including an express provision authorizing and encouraging this practice in the proposed legislation.

TIME FRAMES

Finally, with regard to the investigative process, the Commission notes favorably the extension of the statute of limitations to 3 years. We note that the 3 year time limit for filing a charge with HUD is the same as the statute of limitations for initiating a private suit, although the time period for private suits may be extended by up to one year where a complainant has been awaiting completion of HUD proceedings.

We also favor the bill's elimination of the restrictive 30 day time limit for HUD to complete investigations. We note that 30 days will in many instances not be a sufficient period of time in which to complete an investigation, particularly a systemic investigation into patterns and practices of housing discrimination. However, the Commission recommends that some reasonable time frame for investigation be retained in the law. Where no such time frames exist it is the experience of the Commission that complaint investigations are often unnecessarily protracted. We believe an appropriate time frame, and one which this Commission has previously recommended, is 180 days.

REMEDIAL PROVISIONS

The Commission applauds the creation of administrative enforcement powers at HUD. In our 1974 report on fair housing we recommended that HUD be given administrative cease and desist authority. Currently under title VIII, HUD can only seek to persuade respondents to conciliate if it finds discrimination, while the Department of Justice, which has enforcement power, due to its very limited resources has only been able to initiate a mere 300 lawsuits in the ten years since title VIII was enacted, only 39 of which resulted in final court rulings establishing judicial precedent. We are therefore pleased that the bill's sponsors share our view that HUD needs administrative enforcement capability. At the same time, the Department of Justice's authority to initiate pattern and practice lawsuits is retained, as is the private right of action, both of which currently exist under title VIII.

Unlike existing title VIII, the bill would make it possible for the Secretary of Housing and Urban Development to obtain preliminary relief in the course of an investigation. This is a significant addition to the law, inasmuch as it would enable the Secretary to preserve intact the complainants right to the housing in question, until the complaint investigation is completed. We note, however, that this provision requires that the Secretary can only seek this relief in court, and must use the Attorney General to do so. The Commission feels that this is both burdensome and unnecessary. The essence of injunctive relief in the investigative stage of charge processing is the speed with which it can be obtained, and we thus believe the provision would be far more effective if the Secretary were granted the injunctive power outright, subject to it being in effect for a limited period of time, such as ten days.

Once a complaint has been issued commencing an administrative hearing the Secretary clearly does have independent authority to issue an order for temporary or preliminary relief. Existing provisions of title VIII provide for preliminary relief only in judicial proceedings. We favor granting this authority to the Secretary.

The bill raises the amount of punitive damages which may be awarded from $1,000 to $10,000. It is thus consistent with the Equal Credit Opportunity Act. We would prefer a provision which left such damages up to the discretion of the judge, since even $10,0000 might not represent a deterrent to some very large members of the housing industry.

The Commission also shares the observation of the Assistant Attorney General for Civil Rights, Drew S. Days, that the remedial section of the bill would be strengthened if it were still more explicit as to the awarding of compensatory monetary damages, since current judicial opinion is divided on the subject. In *United States* v. *Long,* the Fourth Circuit Court of Appeals held that in a suit brought by the Attorney General, affirmative relief in the form of monetary damages could not be awarded to the individual victims of discrimination, although equitable relief, such as injunctions or declaratory judgments, could be issued. Subsequently, a number of Federal District Courts have held that such relief could be granted. The bill should make clear that compensatory money damages can be awarded to individual victims

in suits brought by the Attorney General. In the same vein, the Commission would favor a more detailed description of the kinds of equitable and declaratory relief which courts or the HUD Secretary might order, such as, for example, goals and timetables for rectifying past discrimination in the sale and rental practices of large developers and landlords, imposing affirmative marketing plan requirements on builders and developers, and requiring brokers to specifically show properties in the same neighborhood to homeseekers regardless of race or ethnic origin.

The bill also imposes a heavy penalty on respondents who fail to comply with the remedial orders of the HUD Secretary, specifically, a $1,000 per day fine. This is a most encouraging development. Too often the burden of securing compliance with administrative orders has been left to the complaining party and/or the agency, with no penalty to the respondent until ordered by a court to comply. This provision should encourage more respondents to adhere to the Secretary's orders once they become final.

Also, we note favorably the inclusion of attorneys fees regardless of the economic status of the complainant, or whether the action is brought in court or is a HUD administrative proceeding. Title VIII's current limitation on attorneys fees to those complainants "unable to assume" the financial burden of counsel has undoubtedly served to dampen the vigor of private citizens in enforcing the fair housing law.

Finally, the Commission shares the view expressed by the Assistant Attorney General for Civil Rights in his testimony of February 9th of this year to the effect that that portion of the bill which empowers the HUD Secretary to refer cases to the Department of Justice, which must then be litigated by the Department regardless of the Attorney General's view of the case, is an unwise provision. From a purely practical point of view the Commission would recommend that this provision, as well as that portion of the bill which makes it mandatory for the Secretary of HUD to either commence an administrative action or refer to the Department of Justice whenever it has found probable cause on a complaint, be modified. In the best of all possible worlds, and with sufficient levels of funding, it is conceivable that we might support the notion that every case, regardless of its potential impact or public importance, be brought to enforcement by the Federal Government. Given current realities however, it would clearly be a waste of scarce resources to require that every case, no matter how small, receive the same treatment.

The Commission therefore recommends that the requirement in the bill that every finding of probable cause either be brought to an administrative hearing or litigated by the Department of Justice, be changed. The institution of enforcement proceedings by either agency should be discretionary. Where HUD finds cause and neither HUD or the Department of Justice decide to proceed with the case, the complainant should be so informed and reminded of his or her right to bring suit in Federal court.

### COORDINATION WITH STATE AND LOCAL AGENCIES

Cooperation with State and local fair housing agencies under this bill can be far more productive than has been the case in the past. First, and most significantly, the bill explicitly envisions the funding of State and local fair housing agencies by HUD. The current lack of such funding under Title VIII has undoubtedly impeded a better Federal relationship with State and local agencies. The Commission on Civil Rights has consistently supported Federal financial assistance to State and local civil rights agencies. We note with favor that the funding for which this bill would provide is even more encompassing than that currently available to State and local fair employment agencies under Title VII, since the bill would permit HUD to fund private as well as public fair housing groups and agencies. The Equal Employment Opportunity Commission is restricted by Title VII to funding public agencies.

The bill also clarifies the authority of the Secretary to choose which State and local agencies will receive HUD case referrals. Although the Secretary has in fact been selective in the past in this regard, based on actual capabilities of the agencies, a literal reading of Title VIII would seem to require universal referral wherever a State or local law was substantially equivalent to Title VIII. The bill confirms in law the sound past practice of the Secretary in evaluating each State and local agency's operational capability before determining to refer cases to it.

One aspect of the HUD relationship with State and local agencies, however, remains unclear in the bill. The bill states that the Secretary may rely on the "final determination" of State and local agencies in determining whether reasonable cause exist. The question arises, however, as to whether HUD is to treat a reasonable cause investigative finding of a State or local agency as "final" and proceed with HUD enforcement, or whether HUD is to be permitted to wait for and accept the results of a State or local agency administrative or judicial enforcement action.

Clearly, the meaning of "final determination" by a State or local agency is too vague as the bill is currently drafted. It should be noted in this regard that similar ambiguities in Title VII have long impeded EEOC in its charge processing relationships with State and local agencies. The Commission would favor a provision enabling HUD to rely on the entire charge-processing activity of a State or local agency, rather than just the investigation. Where the State or local agency is competent to dispose of a complaint and provide a remedy equivalent to that available under Title VIII, Federal involvement would thus not be necessary, and scarce Federal resources could be utilized where they are more needed. Such a provision would also provide a means of avoiding the duplication of efforts which this Commission has often noted amongst civil rights enforcement agencies.

CONCLUSION

We are very much concerned about the present and projected level of appropriation for fair housing. The best enforcement scheme in the world cannot be effective if it is not funded adequately. In fiscal year 1974, the total combined Title VIII fair housing appropriation for HUD and the Department of Justice was $6.2 million. In fiscal year 1977, this figure was $7.2 million. Today, the projection for fiscal year 1979, notwithstanding the impact of inflation and the unceasing need for greater fair housing enforcement efforts, is still only $11.2 million for both agencies. Even when all other fair housing programs and agencies are included, the figure is only $17.4 million. If we compare this figure with the more than $300 million which we currently spend on the enforcement of equal employment laws, it is clear that the Federal Government has given a very low priority to the enforcement of fair housing programs. The Commission has noted with interest the statements of representatives from both HUD and the Department of Justice to the effect that the new enforcement powers contained in this bill and/or in Senator Mathias' bill, S. 571, will not measurably increase the burden on these two agencies to bring enforcement actions. This may be true if the incidence of Title VIII individual complaints continues to be as low as it has been in the past, and HUD and the Department of Justice continue to rely on such complaints to initiate enforcement proceedings. However, this Commission believes that one of the principal benefits to be derived from this bill is that it would provide a solid foundation for systemic enforcement actions by both HUD and the Department of Justice. The need for such an approach has been demonstrated by our own research, and most recently by the study sponsored by HUD itself. Patricia Harris, Secretary of HUD, in commenting on the study observed that, and I quote: "Our national survey confirmed the appalling fact that black people still encounter unconscionable racial discrimination . . . There is clear probability that discrimination is even more prevalent, especially in view of the fact that the forms it takes have become more extensive and more sophisticated in recent years."

We are disappointed that both HUD and Justice, in the light of these widespread discriminatory practices, have not served notice of their intention, if this bill is enacted into law, of requesting the resources needed to launch an enforcement program of such an order of magnitude as to constitute at long last a frontal assault on discrimination in housing. The longer the nation delays launching such an assault the longer minorities and women will continue to be denied the benefits that flow from the nation's investment in housing programs.

The current budget for HUD programs alone is $33.1 billion. If the Congress chose to set aside even a minute fraction of this figure for Title VIII enforcement, the Federal Government's fair housing effort could be improved radically. Indeed, by setting aside as little as one-third of one percent of all Federal housing monies, the Title VIII appropriation could be increased ten-fold. The Commission believes that the enforcement of Title VIII shoud be regarded as an integral part of all program operations, and we therefore urge that Congress contemplate such an approach to increasing Title VIII resources.

The serious consideration which is being given H.R. 3504 is one of the most encouraging developments that has taken place in dealing with housing discrimination. Its enactment into law, if accompanied by adequate resources for it implementation, could mark the dawn of a new day in translating the rhetoric of the Constitution into action in the field of housing.

Mr. EDWARDS. Dr. Flemming, we welcome you again. We are delighted to have you here. We need help on this bill. We are very interested in getting this legislation enacted in this particular Congress, and I know that your testimony will be of great help to us. You may proceed.

TESTIMONY OF ARTHUR S. FLEMMING, CHAIRMAN, U.S. COMMISSION ON CIVIL RIGHTS; ACCOMPANIED BY: LOUIS NUNEZ, ACTING STAFF DIRECTOR; CYNTHIA GRAAE, ASSISTANT STAFF DIRECTOR, OFFICE OF FEDERAL CIVIL RIGHTS EVALUATION; AND STEVEN SACKS, ASSISTANT DIRECTOR, OFFICE OF FEDERAL CIVIL RIGHTS EVALUATION

Dr. FLEMMING. Thank you very much.

I am very happy to have the opportunity to appear before you on behalf of the Commission in connection with H.R. 3504.

The problem of discrimination in housing has long been of concern to the Commission on Civil Rights. Several of our major reports have focused on this issue, most specifically, volume II of the Commission's Enforcement Efforts Series, To Provide * * * For Fair Housing, and Twenty Years After Brown.

Commission staff are currently in the process of concluding research for a major report on the Federal Government's fair housing enforcement activities. My testimony will therefore also reflect some of our recent findings with respect to the Government's fair housing efforts.

The Commission views H.R. 3504 as a significant improvement over the current provisions of title VIII. The bill provides for expanded coverage of prohibited practices, strengthened enforcement, and more comprehensive remedial provisions. Each of these improvements is needed if fair housing is to become a reality in this country.

### PROHIBITED PRACTICES

The bill adds an explicit prohibition against both mortgage and insurance redlining. This prohibition is a constructive addition to the title VIII definition of discriminatory practices. Although there is considerable support for the view that the present title VIII implicitly covers these practices, congressional action explicitly prohibiting such discrimination will remove any possible doubt as to their illegality.

Moreover, such clear language should encourage those Federal financial regulatory agencies which have not yet issued interpretive regulations regarding mortgage redlining to do so. I am referring specifically to the Comptroller of the Currency and the Federal Reserve Board.

The Commission believes, however, that the proposed provisions would be strengthened considerably if the law also contained a directive to insurers requiring them to notify all applicants for insurance of the reasons for rejection of their application, just as is now required of lenders under the Equal Credit Opportunity Act. Such a provision would enable applicants for property insurance to evaluate the reasons for their rejection. It would also provide a data base for Federal agency evaluation of insurance lending practices on a systemic basis.

The bill also includes a provision prohibiting exclusionary zoning practices by general or special purpose units of State governments. This also represents a major improvement over the present title VIII. Although there is some case law under title VIII which supports the proposition that zoning which has a racially segregative effect may be discriminatory regardless of motive, a clear

congressional expression on this subject is obviously needed. It will serve to clarify the law on this point and avoid conflicting judicial interpretations.

The Commission on Civil Rights has long advocated the principle that practices which have a discriminatory net effect ought to be considered as violations of law absent a showing that the practices have a valid nondiscriminatory purpose and that practices having a lesser adverse impact are unavailable. The inclusion in the bill of language prohibiting exclusionary zoning on the basis of economic status especially is to be commended. The enactment into law of such a provision would be a clear signal that the Congress recognizes that economic discrimination, particularly with regard to housing, often effectively discriminates against minorities and female heads of households, since these groups occupy the lowest rung on the economic ladder.

The commission also favors the bill's elimination of the current exemption for individual homeowners selling or renting not more than three single family houses at one time. The bill would only exempt the renting of rooms in owner occupied single family dwellings. All sales, and rentals in units larger than single family homes, would be covered. This change is clearly consonant with the basic purposes of the Fair Housing law. There is no justification for permitting individuals to engage in discriminatory activities with regard to housing which they own solely for income generative purposes.

### NEW PROVISIONS FOR INVESTIGATION

The bill would add a provision to title VIII enabling the Secretary of Housing and Urban Development to file a charge of housing discrimination on his or her own initiative. This would strengthen title VIII. It would provide a statutory basis for a program of systemic investigation of discrimination in the absence of individual complaints. It would constitute a clear mandate for HUD to undertake the kind of systemic review which this commission has advocated since 1974. Under title VII of the Civil Rights Act of 1964, as amended, the Equal Employment Opportunity Commission's commissioners have had such authority since 1972.

We note, however, that the bill does not provide for the filing of third party complaints, or "charges" as complaints are to be called under the new bill. This, in our view, is an undesirable omission. One of the weaknesses in existing title VIII is that it does not provide for the filing of such complaints by persons or organizations filing "on behalf of" other aggrieved parties. Failure to include such a provision will make it difficult for fair housing organizations and advocacy groups to institute actions on behalf of an aggrieved individual or class of individuals unless a member of that group is also an aggrieved party. We urge the sponsors of H.R. 3504 to modify the title VIII filing provisions by providing for the filing of third party complaints.

Another area in which both existing title VIII and the proposed bill fall short of providing for effective investigation involves the failure to provide for data collection. In the course of the Commission's many years of evaluating Federal civil rights investigative

efforts, we have found time and again that the existence of adequate data is essential if there is to be an effective investigation into the root causes of discriminatory patterns and practices.

We therefore urge most strongly that the bill be modified to include authorization enabling HUD to require recordkeeping and record retention and reporting by those subject to the act's prohibitions. HUD should be empowered to establish specific standards and reporting provisions, by regulation, for builders, brokers, sellers, lenders, and others affected by title VIII.

Such a recordkeeping and reporting provision should be modeled on section 709(c) of title VII, which empowers the Equal Employment Opportunity Commission to require recordkeeping and reporting, and specifically grants the agency the authority to issue rules and regulations to effectuate the data collection provision.

## TIME FRAMES

Finally, with regard to the investigative process, the Commission notes favorably the extension of the statute of limitations to 3 years. We note that the 3-year time limit for filing a charge with HUD is the same as the statute of limitations for initiating a private suit, although the time period for private suits may be extended by up to 1 year where a complainant has been awaiting completion of HUD proceedings.

We also favor the bill's elimination of the restrictive 30-day time limit for HUD to complete investigations. We note that 30 days will in many instances not be a sufficient period of time in which to complete an investigation, particularly a systemic investigation into patterns and practices of housing discrimination.

However, the Commission recommends that some reasonable time frame for investigation be retained in the law. Where no such time frames exist it is the experience of the Commission that complaint investigations are often unnecessarily protracted. We believe an appropriate time frame, and one which this Commission has previously recommended, is 180 days.

## REMEDIAL PROVISIONS

The commission applauds the creation of administrative enforcement powers at HUD. In our 1974 report on fair housing, we recommended that HUD be given administrative cease and desist authority. Currently under title VIII, HUD can only seek to persuade respondents to conciliate if it finds discrimination, while the Department of Justice, which has enforcement power, due to its very limited resources has only been able to initiate a mere 300 lawsuits in the 10 years since title VIII was enacted, only 39 of which resulted in final court rulings establishing judicial precedent.

We are, therefore, pleased that the bill's sponsors share our view that HUD needs administrative enforcement capability. At the same time, the Department of Justice's authority to initiate pattern and practice lawsuits is retained, as is the private right of action, both of which currently exist under title VIII.

Unlike existing title VIII, the bill would make it possible for the Secretary of Housing and Urban Development to obtain prelimi-

nary relief in the course of an investigation. This is a significant addition to the law, inasmuch as it would enable the Secretary to preserve intact the complainant's right to the housing in question, until the complaint investigation is completed.

We note, however, that this provision requires that the Secretary can only seek this relief in court, and must use the Attorney General to do so. The Commission feels that this is both burdensome and unnecessary. The essence of injunctive relief in the investigative stage of charge processing is the speed with which it can be obtained, and we thus believe the provision would be far more effective if the Secretary were granted the injunctive power outright, subject to it being in effect for a limited period of time, such as 10 days.

Once a complaint has been issued commencing an administrative hearing the Secretary under the new title VIII clearly does have independent authority to issue an order for temporary or preliminary relief. Existing provisions of title VIII provide for preliminary relief only in judicial proceedings. We favor granting this authority to the Secretary.

The bill raises the amount of punitive damages which may be awarded from $1,000 to $10,000. It is thus consistent with the Equal Credit Opportunity Act. We would prefer a provision which left such damages up to the discretion of the judge, since even $10,000 might not represent a deterrent to some very large members of the housing industry.

The Commission also shares the observation of the Assistant Attorney General for Civil Rights, Drew S. Days, that the remedial section of the bill would be strengthened if it were still more explicit as to the awarding of compensatory monetary damages, since current judicial opinion is divided on the subject.

In *United States* v. *Long,* the Fourth Circuit Court of Appeals held that in a suit brought by the Attorney General, affirmative relief in the form of monetary damages could not be awarded to the individual victims of discrimination, although equitable relief, such as injunctions or declaratory judgments, could be issued.

Subsequently, a number of Federal district courts have held that such relief could be granted.

The bill should make clear that compensatory money damages can be awarded to individual victims in suits brought by the Attorney General. In the same vein, the Commission would favor a more detailed description of the kinds of equitable and declaratory relief which courts or the HUD Secretary might order, such as, for example, goals and timetables for rectifying past discrimination in the sale and rental practices of large developers and landlords, imposing affirmative marketing plan requirements on builders and developers, and requiring brokers to specifically show properties in the same neighborhood to homeseekers regardless of race or ethnic origin.

The bill also imposes a heavy penalty on respondents who fail to comply with the remedial orders of the HUD Secretary, specifically, a $1,000 per day fine. This is a most encouraging development. Too often the burden of securing compliance with administrative orders has been left to the complaining party and/or the agency, with no penalty to the respondent until ordered by a court to

comply. This provision should encourage more respondents to adhere to the Secretary's orders once they become final.

Also, we note favorably the inclusion of attorneys fees regardless of the economic status of the complainant, or whether the action is brought in court or is a HUD administrative proceeding. Title VIII's current limitation on attorneys fees to those complainants "unable to assume" the financial burden of counsel has undoubtedly served to dampen the vigor of private citizens in enforcing the fair housing law.

Finally, the Commission shares the view expressed by the Assistant Attorney General for Civil Rights in his testimony of February 9 of this year to the effect that that portion of the bill which empowers the HUD Secretary to refer cases to the Department of Justice, which must then be litigated by the Department regardless of the Attorney General's view of the case, is an unwise provision.

From a purely practical point of view, the Commission would recommend that this provision, as well as that portion of the bill which makes it mandatory for the Secretary of HUD to either commence an administrative action or refer to the Department of Justice whenever it has found probable cause on a complaint, be modified.

In the best of all possible worlds, and with sufficient levels of funding, it is conceivable that we might support the notion that every case, regardless of its potential impact or public importance, be brought to enforcement by the Federal Government. Given current realities however, it would clearly be a waste of scarce resources to require that every case, no matter how small, receive the same treatment.

The Commission therefore recommends that the requirement in the bill that every finding of probable cause either be brought to an administrative hearing or litigated by the Department of Justice, be changed. The institution of enforcement proceedings by either agency should be discretionary. Where HUD finds cause and neither HUD or the Department of Justice decide to proceed with the case, the complainant should be so informed and reminded of his or her right to bring suit in Federal court.

### COORDINATION WITH STATE AND LOCAL AGENCIES

Cooperation with State and local fair housing agencies under this bill can be far more productive than has been the case in the past.

First, and most significantly, the bill explicitly envisions the funding of State and local fair housing agencies by HUD. The current lack of such funding under title VIII has undoubtedly impeded a better Federal relationship with State and local agencies. The Commission on Civil Rights has consistently supported Federal financial assistance to State and local civil rights agencies. We note with favor that the funding for which this bill would provide is even more encompassing than that currently available to State and local fair employment agencies under title VII, since the bill would permit HUD to fund private as well as public fair housing groups and agencies. The Equal Employment Opportunity Commission is restricted by title VII to funding public agencies.

The bill also clarifies the authority of the Secretary to choose which State and local agencies will receive HUD case referrals. Although the Secretary has in fact been selective in the past in this regard, based on actual capabilities of the agencies, a literal reading of title VIII would seem to require universal referral wherever a State or local law was substantially equivalent to title VIII. The bill confirms in law the sound past practice of the Secretary in evaluating each State and local agency's operational capability before determining to refer cases to it.

One aspect of the HUD relationship with State and local agencies, however, remains unclear in the bill. The bill states that the Secretary may rely on the "final determination" of State and local agencies in determining whether reasonable cause exists. The question arises, however, as to whether HUD is to treat a reasonable cause investigative finding of a State or local agency as "final" and proceed with HUD enforcement, or whether HUD is to be permitted to wait for and accept the results of a State or local agency administrative or judicial enforcement action.

Clearly, the meaning of "final determination" by a State or local agency is too vague as the bill is currently drafted. It should be noted in this regard that similar ambiguities in title VII have long impeded EEOC in its charge processing relationships with State and local agencies. The Commission would favor a provision enabling HUD to rely on the entire charge-processing activity of a State or local agency, rather than just the investigation. Where the State or local agency is competent to dispose of a complaint and provide a remedy equivalent to that available under title VIII, Federal involvement would thus not be necessary, and scarce Federal resources could be utilized where they are more needed. Such a provision would also provide a means of avoiding the duplication of efforts which this Commission has often noted amongst civil rights enforcement agencies.

Mr. EDWARDS. Dr. Flemming, we will have to postpone for a few moments the remainder of your testimony. There is a vote on the House floor on the rule, and we will be back in 10 minutes.

[Recess.]

Mr. EDWARDS. The subcommittee will come to order.

Dr. Flemming, I believe you were on page 12.

Will you proceed?

Mr. FLEMMING. As a commission, Mr. Chairman, we are very much concerned about the present and projected level of appropriation for fair housing. The best enforcement scheme in the world cannot be effective if it is not funded adequately. In fiscal year 1974, the total combined title VIII fair housing appropriation for HUD and the Department of Justice was $6.2 million. In fiscal year 1977, this figure was $7.2 million. Today, the projection for fiscal year 1979, notwithstanding the impact of inflation and the unceasing need for greater fair housing enforcement efforts, is still only $11.2 million for both agencies.

Even when all other fair housing programs and agencies are included, the figure is only $17.43 million. If we compare this figure with the more than $300 million which we currently spend on the enforcement of equal employment laws, it is clear that the

Federal Government has given a very low priority to the enforcement of fair housing programs.

The Commission has noted with interest the statements of representatives from both HUD and the Department of Justice to the effect that the new enforcement powers contained in this bill and/or in Representative Spellman's bill, H.R. 7877, or Senator Mathias' bill, S. 571, will not measurably increase the burden on these two agencies to bring enforcement actions. This may be true if the incidence of title VIII individual complaints continues to be as low as it has been in the past, and HUD and the Department of Justice continue to rely on such complaints to initiate enforcement proceedings.

However, this Commission believes that one of the principal benefits to be derived from this bill is that it would provide a solid foundation for systemic enforcement actions by both HUD and the Department of Justice. The need for such an approach has been demonstrated by our own research, and most recently by the study sponsored by HUD itself. Patricia Harris, Secretary of HUD, in commenting on the study observed that, and I quote:

Our national survey confirmed the appalling fact that black people still encounter unconscionable racial discrimination . . . There is clear probability that discrimination is even more prevalent, especially in view of the fact that the forms it takes have become more extensive and more sophisticated in recent years.

We are disappointed as a commission that both HUD and Justice, in the light of these widespread discriminatory practices, have not served notice of their intention, if this bill is enacted into law, of requesting the resources needed to launch an enforcement program of such an order of magnitude as to constitute at long last a frontal assault on discrimination in housing. The longer the Nation delays launching such an assault, the longer minorities and women will continue to be denied the benefits that flow from the Nation's investment in housing programs.

The current budget for HUD programs alone is $33.1 billion. If the Congress chose to set aside even a minute fraction of this figure for title VIII enforcement, the Federal Government's fair housing effort could be improved radically. Indeed, by setting aside as little as one-third of 1 percent of all Federal housing moneys, the title VIII appropriation could be increased tenfold. The Commission believes that the enforcement of title VIII should be regarded as an integral part of all program operations, and we therefore urge that Congress contemplate such an approach to increasing title VIII resources.

The serious consideration which is being given H.R. 3504 is one of the most encouraging developments that has taken place in dealing with housing discrimination. Its enactment into law, if accompanied by adequate resources for its implementation, could mark the dawn of a new day in translating the rhetoric of the Constitution into action in the field of housing.

Thank you, Mr. Chairman and members of the committee.

Mr. EDWARDS. Thank you very much, Mr. Chairman, Dr. Flemming, and my compliments to you and to the members of your staff that worked on this particular testimony. It is as helpful and as critical to the work we are doing as any testimony I have ever seen. I am really very pleased with it.

The gentleman from Massachusetts, Mr. Drinan.

Mr. DRINAN. Thank you, Mr. Chairman, and Dr. Flemming.

The chairman actually stole what I was going to say; namely, that is one of the finest statements we have had in our hearings on this bill. I have no quarrel with it. In fact you have added a dimension on the specifics as to the enforcement. I had not realized that we had been so stingy in the enforcement of existing fair housing laws.

My only question or problem would be unclear endorsement on pages 2 and 3 of the inclusion in the bill of language prohibiting exclusionary zoning on the basis of economic status.

You feel that this would be a clear signal that the Congress recognizes that economic discrimination often effectively discriminates against minorities.

I think that you heard the sentiment of Mr. Taylor when he was here. As I recall, he indicated that we couldn't be too sweeping in this because it simply wouldn't get through.

Do you feel that our bill is tight enough, strict enough, meaningful enough? Would you want to comment on that, because obviously it is going to be very difficult to enforce something that presents economic discrimination?

Mr. FLEMMING. Congressman Drinan, we, of course, respect very much the views of Mr. Taylor on a matter of this kind, and I think it is conceivable that this could be tightened up. We had felt that this could be done, by regulation issued by the Secretary of HUD. On the other hand, Congress conceivably could tighten it up by language in the bill or by certain statements that it might include in a committee report.

Mr. DRINAN. I thank you.

Just one other question related to what Mr. Taylor suggested. He expressed disappointment that, in his words, "The administration has not made this a part of its agenda."

That is not in the statement, but he stated that.

You have echoed that when you criticize the administration for not including sums for the enforcement, if in fact this becomes law.

Would you have any thoughts to share with us as to how we can increase the commitment of the administration, or just tell us how you feel the posture of the administration is at this moment in time?

Mr. FLEMMING. The administration, of course, has appeared before the committee, representatives of the administration, and testified, as I understand it, in behalf of the bill.

I am not familiar with what activities they may have engaged in, in support of the bill, or what they may not have done in support of the bill. But as I indicated in my testimony, we are disappointed over the fact that in testifying relative to the bill, they have not indicated to the Congress that if the bill is passed, they intend to present to the Congress a plan for enforcement that would involve considerably more in the way of resources than has been available for this objective up to the present time.

If they are going to move in the direction of a systemic approach to enforcement in this area, it is clear that it is going to require sums of money over and above what have been identified for this purpose.