As I indicated in my testimony, we feel that the Congress would be justified in taking some money that is earmarked for program purposes and earmarking some of that for enforcement, because enforcement should be regarded as a part of program and not something separate and apart.

Mr. DRINAN. Thank you very much, Dr. Flemming, and I thank your colleagues.

I yield back the balance of my time.

Mr. EDWARDS. The gentleman from Virginia, Mr. Butler.

Mr. BUTLER. Thank you, Mr. Chairman.

I too appreciate the fine statement. It is very helpful. I have a few questions, in fact I have a lot of questions, but I will just ask you a few.

Let's turn to page 8 of your statement, about eight lines from the bottom.

The bill should make clear that compensatory money damages can be awarded to individual victims in suits brought by the Attorney General.

It was my view of the legislation that it was quite clear that compensatory money damages could not be awarded.

I would like to yield to the gentleman from Massachusetts.

Is it your intention in this legislation to make clear that compensatory money damages can be awarded to individual victims in suits brought by the Attorney General?

Mr. DRINAN. What page is that?

Mr. BUTLER. Page 8 of the testimony.

Mr. DRINAN. That is Dr. Flemming's suggestion. I think that we had limited it to $10,000, did we not?

Mr. BUTLER. Would counsel please clarify that point.

Ms. COOPER. One of the questions that arose during the hearing was whether or not in the administrative process the administrative law judge could award compensatory damages; there was some opinion from the Department of Justice and from HUD that that would be unconstitutional. But in the proceeding in court, there is no question that in an individual suit brought by a private party or HUD that compensatory damages could be awarded. However, under existing law, where the Attorney General initiates the action in a pattern and practice case, there is at least one case where the court has held, because of the wording of existing title VIII, that you could not get compensatory damages.

Mr. BUTLER. Yes, and that was the case that he cited.

Ms. COOPER. Right.

Mr. BUTLER. My question is this: In the present state of the bill, does it expressly provide that compensatory money damages can be awarded?

Ms. COOPER. Yes.

Mr. BUTLER. It does? That is what I did not understand. Thank you.

Now, if I may turn to another area.

First, you explain quite fully about the lack of funds available.

Mr. FLEMMING. Yes, sir.

Mr. BUTLER. Do you not believe that more funding would be the solution to most of the enforcement problems that HUD has today? Is it fair to say that with repeated delays and a long, drawn out

enforcement problem, most of the problems can be resolved with a more efficient HUD and more funds without changing the enforcement procedure?

Mr. FLEMMING. Congressman Butler, in our judgment, that would not be the answer. We do feel that the Secretary of HUD should be given the additional authority that is contemplated by the proposed new title VIII, but we feel that once that authority is given, it is not going to prove to be very meaningful unless there is an investment of resources in the implementation of that authority.

Mr. BUTLER. Adequate funding is a very important key.

Let's turn to cease and desist authority.

Do you think that the existence of that authority, the mere existence of it, would accelerate enforcement procedures?

Mr. FLEMMING. Yes. Speaking personally now, it seems to me that if a Secretary has that authority, that it would certainly make more meaningful, for example, the efforts at conciliation, because people would know that this was at the end of the road and this authority could be exercised by the Secretary.

Mr. BUTLER. You feel that the mere presence of such authority is very significant?

Mr. FLEMMING. That is right.

Mr. BUTLER. Turning to the question of an awareness of the process itself—and I think that is one of the problems—do you think the existence of cease and desist authority would increase the awareness of minorities to the HUD complaint process itself?

Mr. FLEMMING. Yes; I think it could have that effect. But we feel that the primary emphasis should be placed on the systemic approach to enforcement. We recognize that there have not been a great many complaints filed under the existing title, certainly if you compare it with other civil rights areas. We think that undoubtedly the number of complaints would increase under this new title, but again I would like to stress the fact that, from our point of view, we think the important thing is the systemic approach. As you probably recall, Congressman Butler, we have emphasized that in connection with our oversight reports a number of times. We have been critical of HUD that even under their existing authority they haven't utilized this approach to a greater extent than they have.

Mr. BUTLER. Yes, and I am not quarreling with you. I am simply trying to understand your view.

Mr. FLEMMING. Right.

Mr. BUTLER. On pages 4 and 5, you have a fairly extensive statement about data collection.

Mr. FLEMMING. Right.

Mr. BUTLER. And, of course, we live in an era in which the provision of data by private enterprise in any form is resisted pretty strongly.

Mr. FLEMMING. That is right.

Mr. BUTLER. What I am striving for is the cost-benefit analysis of this.

Is this really justified? Would there be that much advantage derived from the data collection? It is going to be resisted pretty strongly, and it is going to create enforcement problems.

How important is that?

Mr. FLEMMING. For the reasons set forth in my testimony, we feel it is important. On the other hand, we feel that the language should be drafted in such a way that the authority would be used with restraint, namely, in such a manner as not to put unjustifiable burdens on those who are in a position to provide data.

I appreciate the problems involved, having been in the executive branch myself, and yet there isn't any doubt in our minds but that in the civil rights area, time and again if a case is going to be made, it is absolutely essential to have supportable data. We feel that the Secretary should be in a position where she or he can require the supportable data. But I would be sympathetic with that provision being worded in such a way that any Secretary would have to exercise that authority with some degree of restraint.

Mr. BUTLER. I would like to know more about exactly what data would be needed, and how much it would cost, and what the burden would be to the community itself.

Mr. FLEMMING. Congressman Butler, I would be very happy to provide the committee with a communication in which we spell that out a little bit more, in which we might even suggest some language for possible incorporation in the bill that would include some of the restraints that I have identified. I appreciate my response is a generalized response, and I would need some help from some legislative draftspersons in order to be more specific.

Mr. BUTLER. I am not the author of the bill, so I do not know how serious this aspect of it becomes. If it is a serious proposal, I would like to think very seriously about protecting the rights of those people that are about to be integrated.

Mr. FLEMMING. We will be glad to communicate further with you on this point, if that is agreeable to you and the members of the committee.

Mr. BUTLER. Yes, I think if you would expand on that somewhat, I would appreciate it.

One other question, and this is a rather philosophical one. You make the suggestion here of using the investigative tool of testers or checkers.

You are in the civil rights field. What thought do you give when you make a suggestion of this nature to the civil rights of those who are being tested or checked?

Mr. FLEMMING. Congressman Butler, you may have noticed that when I presented my testimony, I did not include that in my testimony.

Mr. BUTLER. No, I did not notice that because you may have noticed I was not present during your entire statement.

Mr. FLEMMING. I didn't notice just when you came in, but I did not include it, and that was deliberate on my part because I have asked the Office of General Counsel to check out certain legal aspects of this which have not been analyzed to my satisfaction. As soon as that has been done, I would like to have the privilege, Mr. Chairman, of communicatIng further with the committee on this particular point.

Mr. BUTLER. I thank you, and I am sure that is satisfactory to the chairman.

Mr. EDWARDS. Thank you, Mr. Butler. That certainly would be most acceptable to the committee.

We are bothered by the fact that it is hard to determine on a national level what the problem is; I am sure that all members of the committee and the staff are shocked at the revelations in the recent HUD-sponsored study made in 40 or 50 different communities throughout the United States that showed that most black applicants are discriminated against in applications for rental and sale of housing. That is certainly an unacceptable situation to have in our country, and we have to do something about it. It is certainly a national problem, not a local problem. If it were a local problem, it would be marvelous if it were taken care of, but obviously it hasn't been.

I was also interested in your suggestion that the proposed provisions regarding mortgage redlining be strengthened to provide that the law also contain "a directive to insurers requiring them to notify all applicants for insurance of the reasons for rejection."

Do you know whether this particular provision was included in the recent regulations of the Federal home loan bank or those of the State of California?

Mr. FLEMMING. As you know, they were just issued recently.

Mr. EDWARDS. Yes.

Mr. FLEMMING. We have not yet had the opportunity of analyzing them, but we will analyze them and provide that information.

Mr. EDWARDS. I might ask the chief author of the legislation, Mr. Drinan, if we contemplated that.

Was that considered in the drafting of the original bill?

Mr. DRINAN. Mr. Chairman, if it was considered, I am very ambiguous about the thrust of it now. I would like counsel to go back and find out what was the thinking on that matter so that we can clarify or maybe modify what we have here.

Mr. EDWARDS. Very good. I think that would be valuable, unless there is something unwise about it that we don't know at the moment.

Mr. FLEMMING. We will take a look at those regulations and give you a memorandum based on our analysis of the regulations.

Mr. EDWARDS. Again I appreciate the fact that you pointed out to us how parsimonious the presently projected level of appropriations for fair housing funding is at the present time.

In doing the budget authorization process for the Department of Justice, the full Judiciary Committee accepted generally what OMB and the White House suggested, and the witnesses came to the House Judiciary Committee apparently under instructions not to ask for any more money.

Insofar as Drew Days' shop is concerned, the Office of Civil Rights, Department of Justice, the Senate gave him 68 more people without their asking for it, but it took a great deal of digging by Senator Bayh's subcommittee to ascertain that the level of funding for the Civil Rights Division of the Department of Justice was actually less or at the same level as it was last year, with a number of additional responsibilities. It is obviously not adequate, so I am glad you brought this to our attention.

Do counsel have questions?

We have no further questions. We thank you very much.

338

Mr. FLEMMING. Thank you. It is a privilege to be here.

Mr. EDWARDS. We will keep in touch with you.

Mr. FLEMMING. Fine.

[Further information supplied by Mr. Flemming follows:]

U.S. COMMISSION ON CIVIL RIGHTS,
*Washington, D.C., August 4, 1978.*

Hon. DON EDWARDS,
*Chairman, Subcommittee on Civil and Constitutional Rights,*
*Washington, D.C. 20515*

DEAR CHAIRMAN EDWARDS: As a follow-up to Commission testimony before the Subcommittee on Civil and Constitutional Rights on June 7, 1978, I am enclosing for the hearing record several items drafted by Commission staff concerning Title II of H.R. 3504. Included in this package is a memorandum prepared by our Office of Federal Civil Rights Enforcement (OFCRE) which responds to questions which you raised along with Representatives Drinan and Butler. This memo covers the issues of data collection, prohibition of property insurance redlining, and a nondiscrimination provision in Section 804(g) pertaining to "economic status".

I am also forwarding to you a copy of a memorandum prepared by our Office of General Counsel on the issue of the use of "testers" in housing enforcement. At the July 31, 1978 meeting, the Commissioners voted to adopt the language contained in the enclosed statement relative to this issue. I request that it be incorporated in the record of the hearing.

In closing, let me say that the Commission is looking forward to aiding the Subcommittee in any way possible in its examination of fair housing. If you have any questions do not hesitate to call Lucy Edwards at 254-6626.

Sincerely,

ARTHUR S. FLEMMING, *Chairman.*

Enclosure.

U.S. COMMISSION ON CIVIL RIGHTS,
*Washington, D.C., July 7, 1978.*

Reply to attention of: OGC.

Subject: Federal use of testing under the Fair Housing Act.

To: Louis Nunez, Acting Staff Director.

Thru: Richard Baca, General Counsel.

Pursuant to a request from the Acting Staff Director, the Office of the General Counsel addressed the question of whether there exist any legal impediments to the use of Federal testers by the Departments of Justice or Housing and Urban Development in their enforcement of Title VIII, the Fair Housing Act. There appear to be no statutes or case law interpretations which would prohibit the Federal agencies involved from using testers in their research or investigations regardless of whether a formal complaint has been filed.

Officials at both agencies indicated that they have no statutory authorization to use testers. However, there is nothing in the language of Title VIII or relevant case law which prohibits those agencies from conducting testing. Section 3611(a) of the Fair Housing Act authorizes the Secretary of HUD to conduct investigations.[1] It is a well established principle of statutory construction that a legislative grant of power carries with it the right to use all means and instrumentalities necessary to the beneficial exercise of the expressly conferred powers.[2] Both agencies have used evidence supplied from independent testers in a number of lawsuits under Title VIII and that use has been upheld as a reasonable investigative device.[3]

It was also suggested by officials at DOJ and HUD that testing may be a form of entrapment[4] but it is clear from the relevant case law in this area that testing is not entrapment. In *Lopez* v. *United States*,[5] the court held that the conduct of a government informer cannot be entrapment simply because he creates a favorable opportunity for the defendant to violate the laws.[6] The court went on to conclude that:

---

[1] 42 U.S.C. § 3611(a) (1970).

[2] *Daly* v. *Stratton*, 326 F. 2d 340 (7th Cir. 1964).

[3] *U.S.* v. *Youritan*, 370 F. Supp. 643 (N.D. CA 1973), modified as to relief and *aff'd*, 509 F.2d 623 (9th Cir. 1975), and *United States* v. *Northside Realty Associates*, P.H.E.O.H. Rptr. para. 15,232 (N.D. GA 1977).

[4] Schwelb interview and Holbert interview.

[5] 373 U.S. 427 (1963).

[6] Id. at 436.

". . . in all types of law enforcement, particularly with respect to matters involving certain types of regulatory statutes, it is often difficult for the government to get evidence, and government agents may properly, and without violating the law, or their duty, take such steps as make it possible to procure evidence even though such steps involve their own participation, provided that their participation is not a deliberate temptation to men of ordinary firmness, provided that they do not cause a crime to be committed by someone who does not have the criminal disposition to commit that crime." [7]

The argument set forth by the agency officials that the conduct of a Federal tester may violate the individual defendant's First Amendment right to privacy is also without merit. A recent Supreme Court discussion defining the constitutional right of privacy, *Whalen* v. *Roe* states in a unanimous decision that the right of privacy embraces an ". . . individual interest in avoiding disclosure of personal matters. . . ." [8] A landlord, realtor, or individual seller who openly invites and solicits individuals to enter into a commercial relationship for rent or sale of housing property, cannot argue that reasonable inquiries made as to the racial composition of his tenants by a bona fide purchaser *or* a tester is an invasion of his privacy.

Such inquiries do not require the landlord to disclose information of a personal nature, but only require information as to the "business" for which he has made a general public offer. In fact, it is the prospective tenant who is most often required to disclose information as to personal matters such as employment, income, credit references, and family composition. It is unlikely that a court would characterize reasonable inquiries made by a prospective tenant or a tester within the protections of the First Amendment right of privacy.

However, neither the Department of Justice nor the Department of Housing and Urban Development have used Federal employees as testers in their enforcement efforts based on the previously discussed arguments of lack of statutory authority, the right of privacy and entrapment.[9] The Department of Justice also stated that its limited staff size has prevented testing from being conducted in the past. The Section Chief indicated that with only 21 attorneys presently in his office, testing could not be adequately conducted.[10] However, this fails as a legal impediment since the decision as to the assignment of personnel is discretionary not mandatory and the decision not to "test" is an agency choice.[11] Testing could, in fact, be conducted within the limits of his present staff.

To reiterate, there are no legal impediments under title VIII or relevant case law which prohibit Federal agencies from authorizing government employees to be used as testers. The use of testers as an investigative tool is believed by many to be the only reliable way of determining instances of housing discrimination. Housing discrimination, by its nature, can be such a subtle form of discrimination that conventional forms of investigation may be useless. Moreover, many of the cases which have been litigated by DOJ and HUD have been based solely on evidence produced by the use of independent testers. Some experts believe that testing is the only investigative tool that will ensure that the fair housing laws are properly enforced.[12]

ALTON E. WOODS,
*Attorney Advisor.*

by: FREDERICK D. DORSEY,
*Assistant General Counsel.*

---

[7] The law with respect to entrapment is this: if a government agent by improper means or over-bearing persuasion or wrongful conduct induces a person of ordinary firmness to commit a crime which he would not otherwise commit, then under those circumstances the defendant is to be acquitted, not because he did not do something wrongful but because he was induced to do a wrongful act which he would not otherwise have done. Id. at 433, n. 4.

[8] 97 S. Ct. 869 (1977).

[9] Frank E. Schwelb, Section Chief, Housing and Credit Section, Civil Rights Division, U.S. Department of Justice, telephone interview, June 15, 1978 (hereafter cited as Schwelb interview) and Kenneth Holbert, Director of Fair Housing Enforcement and Contract Compliance, Department of Housing and Urban Development, telephone interview, June 16, 1978 (hereafter cited as Holbert interview).

[10] Schwelb interview.

[11] The Section Chief Frank Schwelb, in a letter to Cynthia Graae of this agency, indicated that he was against an immediate increase in staff size. He believes that a sudden increase in staff size would create an increase in administrative and supervisory demands. Mr. Schwelb stated that current senior staff could not supervise a large influx of new attorneys, maintain quality control over the Section's current operations, and also investigate and develop new cases. Letter from Frank E. Schwelb, Chief Housing and Credit Section, Civil Rights Division, Department of Justice to Cynthia H. Graae, Assistant Staff Director for Federal Evaluation, U.S. Commission on Civil Rights, Dec. 28, 1977.

[12] Martin Sloane, General Counsel for the National Committee Against Discrimination in Housing, telephone interview, June 5, 1978.

RESPONSE TO QUESTIONS POSED BY CONGRESSMEN BUTLER, DRINAN, AND EDWARDS

*Question. Mr. Drinan.* "My only question or problem would be (your clear) endorsement on pages 2 and 3 of the inclusion in the bill of language prohibiting exclusionary zoning on the basis of economic status. You feel that this would be a clear signal that the Congress recognizes that economic discrimination often effectively discriminates against minorities. I think you heard the sentiment of Mr. Taylor when he was here. As I recall, he indicated that we wouldn't get through. Do you feel that our bill is tight enough, strict enough, meaningful enough? Would you want to comment on that, because obviously it is going to be very difficult to enforce something that (prevents) economic discrimination?"

In his testimony, Chairman Flemming endorsed the "economic status" provision of section 804(g) on the ground that it constituted recognition by Congress of the "effects test" definition of discrimination—practices which are neutral on their face but which have a discriminatory net effect are unlawful, absent a showing by those responsible for the practice that it serves a valid nondiscriminatory purpose and that such purpose cannot be achieved using practices having a lesser adverse impact on protected classes. It is this effects test concept which the Commission on Civil Rights wishes to see explicitly made a part of Title VIII.

There is some sentiment, however, that the "economic status" language may reduce the bill's chances of passage. The Department of Justice has stated that a broad provision dealing with economic status may be unconstitutional. Private fair housing advocacy groups, such as the leadership Conference on Civil Rights, the Center for National Policy Review, and the Potomac Institute, have indicated that this section of the bill is too sweeping and may negatively affect valid regional and areawide community planning efforts.

Thus, after reviewing the comments on that statutory language, we have concluded that it would be preferable to directly incorporate the effects test definition rather than adopt the concept by inference, as the "economic status" provision currently does. The following language provides an alternative means of incorporating the effects test into H.R. 3504 without raising the economic issue *per se* in section 804 of the bill:

"(g) For any general or special purpose unit of government of a State or of a subdivision of a state (or other agency having jurisdiction within a State or States) in the exercise or enforcement of powers with respect to planning, zoning, subdivision controls, building codes or permits, or other matters affecting land use or development, to exclude low- or moderate-income housing *or to exercise any of the aforementioned powers or practices so that they have the effect of excluding prospective occupants on the basis of* [because of] the eligibility of such housing for governmental assistance, or [because of] *based upon* the race, color, or national origin [, or economic status] of the prospective occupants of such housing, *unless said units of State government can demonstrate that the practices have a valid nondiscriminatory purpose, and that practices having a lesser adverse impact are unavailable to achieve the desired purpose.*"[1]

*Question. Mr. Butler.* "On pages 4 and 5 you have a pretty extensive statement about data collection. And, of course, we live in an era, in a time, in which the provision of data by private enterprise in any form is resisted pretty strongly. What I am striving for is the cost-benefit analysis of this. Is this really justified? Would there be that much advantage from the data collection, because it is going to be resisted pretty strongly, and is it going to create enforcement problems. How important is that? . . . I would like to know more about just exactly what data would be needed and how much it would cost, what the burden would be to the community itself."

The Commission believes that collection and analysis of racial, ethnic, and sex data are necessary to effectively monitor and enforce the fair housing law and to show the extent to which fair housing is being furthered or hindered. Such data would also enable the Secretary of HUD to target certain members of the housing industry for review.[2]

---

[1] Proposed new language is italicized. Language to be deleted is in brackets.
[2] For more than a year, the Kentucky Commission on Human Rights has been using data to detect whether there might be potential discrimination. If, from analyzing the data, it finds that the minority occupancy of a development is low or has no minorities at all, field representatives conduct further investigation. If the evidence shows that there is discrimination, then it provides a basis for an administrative complaint. The Kentucky Commission on Human Rights has
Footnotes continued on next page

Specifically, the data which are necessary are data on race, ethnic origin, and sex of applicants and occupants, cross tabulated with information on the location, age, condition, financing, and costs of housing. These data should be submitted to HUD by those covered by Title VIII, including real estate brokers and agents, builders, developers, lenders, and apartment owners. Exact cost of such data collection would depend on such factors as sample size, frequency of data collection, and complexity of the data collection system. However, the Commission believes, based on its own research in recent months and on discussions with officials from HUD, the Equal Employment Opportunity Commission, and a number of State civil rights agencies with fair housing related data collection provisions,[3] that a useful data collection system could be designed which would not result in any unreasonable burdens on the housing industry or the Government.

In some cases, the data to be submitted are already being collected and the only increased costs would be for submitting the data to the Government. The Equal Credit Opportunity Act and the Home Mortgage Disclosure Act require lenders to engage in considerable data collection with respect to fair housing, although lenders are not required to submit these data to the Government.

To ensure against undue hardship for members of the housing industry, the statutory grant of regulatory authority to require data collection and reporting should include a provision enabling individual members of the affected industry to appeal the imposition of specific data collection provisions. The language of section 709(c) of Title VII of the Civil Rights Act of 1964, upon which we have suggested that a Title VIII data collection provision be modeled, contains such a proviso. Further limitations on the imposition of data collection requirements could also be established by regulation so as to exempt individual members of the industry where their level of activity is not sizable enough to merit the application of a data requirement.[4] For example, HUD might exempt renters of less than 25 units, as do the State civil rights agencies in New Jersey and Kentucky, from data collection and reporting requirements.

The Commission suggests the following language as a basis for a data collection provision in H.R. 3504:

"Every builder, developer, broker, appraiser, lender, landlord, owner, seller, or any agent of any of the above, or any other person[5] subject to the prohibitions of this title shall (1) make and keep such records relevant to the determination of whether unlawful housing practices have been or are being committed, (2) preserve such records for such periods, and (3) make such reports therefrom as the Secretary shall prescribe by regulation or order, after public hearing, as are reasonable, necessary, or appropriate for the enforcement of this title or the regulations or orders thereunder. Any person subject to this section who believes that application to it of any regulation or order issued pursuant hereto constitutes or would result in

---

Footnotes continued from last page

been doing this for a year or more and finds it a very effective method for monitoring and enforcement. Interview with Susan Sancomb, Kentucky Commission on Human Rights, June 16, 1978.

The former HUD Assistant Secretary for Equal Opportunity, noted that:

"The Lack of data means that when a Title VIII complaint is filed with HUD, a lengthy fact-finding process may be necessary to determine the patterns of occupancy of the building in question. The Department of Justice faces similar difficulties in identifying projects where the occupancy might justify pattern or practice suits under Section 813 of Title VIII. Gloria E. A. Toote, Assistant Secretary for Equal Opportunity, Department of Housing and Urban Development, memorandum to Rober R. Elliott, Acting General Counsel, HUD, May 3, 1974."

[3] For example, the Kentucky Human Rights Commission and the New Jersey Division on Civil Rights both have regulations requiring owners of rental properties with 25 or more units to report applicant and occupancy data annually. Kentucky Admin. Code 104 KAR 1:060 pursuant to KRS 344.250(2), 13.082; and Rule Promulgated under the New Jersey Admin. Code, Title 13, Subtitle C, respectively. The New Jersey regulation has been upheld in the New Jersey Supreme Court. Representatives from both of these agencies indicated, however, theat absence of more comprehensive HUD data by race, sex, and ethnic origin significantly impedes fair housing efforts nationwide. This sentiment was echoed by the General Counsel of the Connecticut Commission on Human Rights and Opportunities. That agency has no fair housing data collection provisions, and, having recently completed a HUD funded demonstration project dealing with fair housing issues in the areas of zoning to effective evaluation. Telephone interview with Michael Prime, Chief, Bureau of Education and Administration, New Jersey Division on Civil Rights, June 15, 1978; Philip Murphy, General Counsel, Connecticut Commission on Human Rights and Opportunities, June 15, 1978; and Sancomb interview, supra.

[4] EEOC's regulations require every employer, subject to Title VII, with 100 or more employees, to file an "Employer Information Report EEO-1" 29 CFR § 1602.7 (1972).

[5] Title VIII defines a person as: "one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in bankruptcy, receivers, and fiduciaries." 42 U.S.C. § 3602(d) (1970).

an undue hardship may apply to the Secretary for modification of or exemption from such regulation or order, and, if such application is denied, may bring a civil action in the United States district court for the district where such records are kept. If the Secretary or the court, as the case may be, finds that the application of the regulation or order to the party in question would impose an undue hardship, the Secretary or the court, as the case may be, may grant appropriate relief. If any person required to comply with the provisions of this section fails or refuses to do so, the United States district court for the district in which such person is found, resides, or transacts business, shall, upon application of the Secretary, have jurisdiction to issue to such person an order requiring said person to comply, and to award to the Secretary the costs of said proceedings."

*Question. Mr. Edwards.* "I was also interested on page 2, (in) your suggestion . . . that the proposed provisions regarding mortgage red-lining (would) be strengthened if the law also contains a directive to insurers requiring them to notify all applicants for insurance of the reasons for rejection. In the recent regulations by the Federal Home Loan Bank (Board) and also extensive regulations I know have been promulgated in the State of California on this subject, does anyone there at the witness table know if that particular provision was included?"

Commission review of the Federal Home Loan Bank Board's recently enacted fair housing regulation and guideline and of the fair lending regulation issued by California's Commissioner of the Department of Savings and Loan Institutions (August 1976) indicates that neither provision addresses the issue of property insurance redlining. We reaffirm our support for the inclusion of such a prohibition in H.R. 3504, to be accompanied by a provision requiring notification to rejected applicants of the reason for property insurance denials.

Mr. EDWARDS. Our third witness today is our colleague, who was a valued member of this subcommittee until he left us for different pastures, I won't say greener pastures. Congressman Dodd has always been a vigorous and effective advocate for improvement in civil rights laws, and I think that the entire country is indebted to him, and, certainly, we are, on the House Judiciary Committee, for his massive contributions regarding the problems of the handicapped.

When you brought the subject up a number of years ago, most people didn't even talk about discrimination against the handicapped, Mr. Dodd, and it is really chiefly due to your efforts that the civil rights of the handicapped have been developed to the limited extent that they have been.

We welcome you.

## TESTIMONY OF THE HONORABLE CHRISTOPHER J. DODD, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF CONNECTICUT

Mr. DODD. I thank you, Mr. Chairman. I am glad you didn't use the words "greener pastures" to describe my new assignment. I won't even attempt to describe what sort of a movement one might consider when one moves to the Rules Committee, but I would be less than candid with you if I didn't tell you that there is hardly a week that goes by that I don't wish from time to time that I was sitting back with this panel deliberating on the issues that are before you.

Mr. EDWARDS. Well, we always appreciate the reception we get from you when we come to the Rules Committee asking for fair treatment, which you always give us.

Thank you.

Mr. DODD. You are kind to say that, Mr. Chairman.

I will try to keep my remarks brief. I know you have been here a long morning.

It was, as you correctly recalled, Mr. Chairman, as a member of this subcommittee that I first became involved with handicapped issues and problems. In fact it was in my first year as a member of this subcommittee that I introduced legislation which prohibited discrimination against the handicapped in housing and in employment.

The bill on which these hearings are being held, H.R. 3504, has an identical purpose, and I want to compliment the subcommittee on your consideration of this proposal.

The problems of our Nation's 35 million handicapped citizens have only recently received increased attention from the Federal, State, and local governments and the public. In recent years significant steps have been taken to help these people realize their full potential.

For example, the Federal Government has promoted deinstitutionalization of the handicapped for about the last 10 years. Through vocational rehabilitation, prohibitions against discrimination of the handicapped contained in the Rehabilitation Act, and through the Education of All Handicapped Children Act, the Federal Government has sought to better prepare the handicapped to live independent lives.

This goal of independent living, however, can never be fully achieved until statutory protections against the discrimination of the handicapped in employment and in housing are enacted and until adequate support systems are created to provide the transitional and aftercare needed in order for the handicapped to live in a noninstitutional environment.

Very often those of us in open society tend to think of our human and constitutional rights in abstract terms without any real understanding of how they impact on our daily lives. Most of us have never suffered the indignity of being denied a job for which we are qualified, or access to a public place or a home. Yet I regret to say that the principle of equality and fairness which protects the rest of our society from such abuse still does not apply to the handicapped.

Instead, the handicapped must wage battle daily. The physically impaired must fight to gain access to transportation systems and buildings where jobs and residences are found. The mentally handicapped must suffer the prejudice of employers, neighbors and landlords who commonly believe them to be unstable, unreliable and prone to criminal acts.

To think that "deinstitutionalization" can be successful in the context of these obstacles and these public misconceptions is, I think, very unrealistic. Without the protection of the law, the handicapped will be forced to continue waging that lonely, daily battle against deep-seated public fears and environmental barriers. Occasional victories may be won, but they will be isolated and will most likely not be sufficient to change the way the public deals with all handicapped individuals.

In consideration of all of this, the importance of this subcommittee's work becomes very clear. The power of the Federal Government must be brought to bear on the environmental and attitudinal barriers which presently deny the handicapped their equal rights in our society.

344

H.R. 3504 seeks to establish that protection which is needed. However, the problems involved in extending this protection are so complex that in the area of housing alone it will take great perseverance on our part if we are to pass a bill that will be meaningful. What is the duty of the landlord in renting property to the handicapped? What should building codes require? What does reasonable accommodation mean? Should local zoning laws be allowed to prohibit the establishment of group homes for the handicapped?

I do not profess to have all of the answers to these and many other questions involved in this matter; however, I am certain that to insure the protection of handicapped rights, answers must be found and these answers must promote the public welfare of all our citizens, including the handicapped. Furthermore, we must not fail, despite the difficulty of the task, keeping in mind that discrimination is the result of human behavior and that with incentives, restrictions and new definitions human behavior can and must be changed.

Already a kind of revolution has started in the way our Nation treats the handicapped, as a result of the implementation of the section 504 regulations. Although HEW is the only Federal agency that presently has issued its final regulations implementing this section of the Rehabilitation Act, every Federal agency soon will do so. HUD has included in its proposed regulations that owners of property be required to make "reasonable accommodations" to the handicapped. I would think that certainly nothing weaker than this standard should be included in H.R. 3504, and that very probably the handicapped should also be allowed to make at least minor structural changes for which he or she is willing to pay.

Mr. Chairman, an issue which I think deserves indepth investigation and consideration by the subcommittee is the use of local zoning laws to restrict the establishment of group homes for the handicapped. Again, to restate my position, it is my belief that the key to successful deinstitutionalization is the establishment of a system that will provide the handicapped with good transitional and aftercare. Furthermore, I believe that group homes are probably the best mode for providing this care.

What happens when the handicapped are unable to rent adequate housing or refused the right to establish group homes with the support and supervision they need to live in a noninstitutional setting?

For our Nation's more than 1.5 million institutionalized mentally handicapped, the only alternative to the institution is often a local volunteer organization or a local dollar-a-day hotel.

The fact is that many individuals being discharged from mental hospitals and institutions are incapable of living totally independent lives. They need a supervised group home, in order to insure that the stability and control they have achieved continues and to detect at the earliest possible time any regression in their behavior.

It is my belief that if group homes were more available more people currently in institutions could be released and the time that a mentally ill individual is able to function outside an institution would be greatly increased.

Studies have found that the rate of recidivism among discharged mentally ill patients is extremely high. Within 6 months following

discharge, it is estimated that between 30 and 40 percent of the patients are readmitted to the hospital. Within 1 year following discharge, between 40 and 50 percent of the patients are readmitted. And, within 3 to 5 years following discharge, between 65 percent and 75 percent of the patients are readmitted.

I point out that my hometown in Norwich, Conn., is the site of one of our two or three State mental institutions, the Norwich State Hosptial, and it is an old mill town of around 45,000 or 50,000 people, and they are trying there this deinstitutionalization program, and they release a lot of these people, and they end up sitting on park benches and living in just decrepit housing and end up right back out there again. In fact, there was a report recently in our local newspapers about how at Norwich State Hospital they would have parties when someone hit their 100th return as a result of alcoholism in one particular area. They would have a 100th birthday party, in effect, when they would come back. There was such a lack of support in the community for handling these people from the deinstitutionalization program, so it is just one case, but I have a feeling it is repeated all across the country.

Clearly, our Nation's system of transitional and aftercare is not adequate to sustain the discharged mentally ill patient outside the institution.

From what I have been able to ascertain, it would appear that many communities have used their local zoning ordinances to thwart the establishment of group homes for the handicapped. I would like to qualify this by simply saying that clearly the lack of money and other resources rather than zoning restrictions are more responsible for discouraging the proliferation of group homes. But the fact remains that in those instances in which organizations have sought to establish group homes the zoning laws have been the biggest and sometimes only insurmountable obstacle to their creation.

Although supposedly created to protect the health and safety of communities, zoning ordinances are often excessively restrictive. Typically community zoning ordinances limit the habitation of a premises to a family, which is most often defined as a household unit related by blood, marriage, or adoption.

It is this type of zoning restriction which is most often used to prohibit the creation of group homes. Furthermore, since zoning ordinances are designed to protect the welfare of the general public, the fears the general public have about the mentally handicapped also reinforce the strict application of these types or ordinances. One commonly acknowledged fear is that the mentally handicapped are prone to commit acts of violence. To my knowledge the only study that has been conducted on this issue shows that the incidence of crime among discharged mentally ill patients was not that much higher than in the general population. According to a study conducted by the New York State Department of Health in 1968, 93 percent of discharged mentally ill patients had no subsequent arrest, and in 1975, 90.6 percent had no subsequent arrest.

That study showed further that 32.5 individuals out of every 1,000 in the general population were arrested in 1975, and that 98.5 individuals out of a sample of 1,000 discharged mental patients

were arrested. However, the study also showed that of those discharged patients with no prior arrest record (approximately 73 percent of the total sample) only 22.6 percent had subsequent arrests.

Despite these figures and none that contradict them, the public perception persists that the mentally handicapped are somehow unusually dangerous people.

To overcome both the obstacle of the zoning laws and public misconception, 11 States have found it necessary to enact State statutes that exempt group homes for the handicapped from the single-family zoning restriction. While my State of Connecticut is not one of these 11 States, Connecticut has enacted very progressive legislation for the handicapped, including a recent measure which prohibits discrimination against the mentally handicapped. Furthermore, I have been told by people who work in the field that several organizations have been successful in obtaining waivers to establish group homes.

What needs to be determined, however, on a national basis, is whether zoning laws are in fact excessively restrictive, and whether they constitute a large enough barrier to the establishment of group homes that the subcommittee should include in H.R. 3504 language preempting this sort of exclusionary practice. If a careful review of the situation reveals that, as it appears, zoning restrictions do tend to discriminate against the right of the handicapped to reside in a noninstitutional setting, then such language should clearly be added.

Mr. Chairman, in conclusion I would like to say that I believe the protections contained in H.R. 3504 are needed in order for the handicapped to be able to live in open society. Our society has no less an obligation to ensure that the handicapped are able to enjoy their human and constitutional rights than it does to racial, ethnic, and religious minorities. Society has made accommodations for each of these latter groups, and I find the demands being made by the handicapped no less compelling.

Mr. Chairman, I would just add again—and I hesitate to point out parochial issues—but we have had a classic case in my own district in the last year and a half or so. These are small communities. They are not large.

They are rural towns, where an effort was made to put a group home, drug rehabilitation home in Pomfret, Conn., which is a town of maybe 3,000 people. There was strong opposition to it. Finally we were able to get a zoning ordinance through.

The people who were the strongest opponents of that particular proposal are the people who on Thanksgiving and Christmas were the ones bringing the turkeys by and the food and so forth once they saw how well the institution could function.

In London, Conn., just recently a private group that is involved in dealing with the problems of juvenile delinquency and emotional problems there bought a home, refurbished the thing, renovated it as a group home, and it was shot down, the effort to have that group home exist.

The clear indications were fear that somehow these people were going to be a menace to the community, so it is a very complicated problem, one that a tremendous amount of education is needed on.

I am empathetic with the committee's wrestling with this particular issue of zoning, but I point to those two particular cases to highlight how volatile this issue is when it comes to zoning.

Again, I want to thank the committee for giving me these few minutes to express my views on this piece of legislation, and again to state to all of you how much I do miss being a part of this committee, particularly when you are dealing with this legislation.

Thank you, Mr. Chairman.

Mr. EDWARDS. Thank you, Mr. Dodd, for excellent testimony. I can certainly certify that we have exactly the same problems in communities that I represent.

It is almost impossible to get established and permit issued for any kind of a place where women who have been in trouble, for example, battered wives or people who are under treatment for drug problems or alcoholism, it is just almost impossible, and so it results in them all being gathered in one place, one particular area, and that causes some problems, too. It institutionalizes the whole area.

It has been very helpful. I yield to the gentleman from Massachusetts.

Mr. DRINAN. Thank you very much, Mr. Chairman.

Mr. Dodd, you are very helpful on either side of this bench, as a witness or as a member. We do miss you.

Dr. Okin, the Commissioner of Mental Health in Massachusetts, brought this matter to our attention two weeks ago in a hearing. I have been engaged in dialog with him since that time.

Massachusetts, unfortunately, defeated a statute like the 711 that were passed, and I am not certain that it is going to pass. Dr. Okin was talking more about the mentally retarded rather than the mentally ill, but the problem I suppose is the same.

I am trying to have his staff work up language that would be totally consistent with what you are recommending on pages 11 and 12.

In a conversation that I had with Mr. Okin, he seemed to agree with my concept that the statute somehow should say that if these people lived in a familial setting, then they cannot be discriminated against.

The people feel that a large institution is moving into a town. I too have had the experience where they feel furthermore that even if the institution is small, 10 or 12, they will have 10 or 15 of these in the same community.

I am not certain that the bill that we have here, I guess discrimination, can reach all of those problems. But I thank you for your testimony.

As you know, on page 42 of our bill, we say that sections 804, 805, and 806 are amended by inserting "handicapped." Going back to the physically handicapped, would you feel that we should add anything additional to this section in order to cover at least the physically handicapped?

Mr. DODD. No; I think that adequately covers it. I would defer to the testimony and advice of those who are more specifically involved, but I think that adequately covers the situation.

The reasonable accommodation and so forth, there has to be a sense of balance in all of this, and I think you have really done a

348

very good job in reaching and covering most of the serious problems we face in that area with that kind of language.

So I don't have any additional suggestions. I do say I would defer. You might be interested in this. You mentioned this. Congress passed a bill regarding the retarded as well. There is a distinction between the mentally ill and the mentally retarded.

Ironically, the promoter of that legislation, the person solely responsible for the enactment of the bill in the congressional legislature, was a 19- or 20-year-old mentally retarded young man who lobbied day in and day out on this thing, and was eloquent in stating his own case and the case of people that he had been institutionalized with.

Mr. DRINAN. What does the bill say precisely?

Mr. DODD. It prohibits discrimination in housing and employment for the mentally retarded, and it requires that certainly you cannot force an employer to hire someone to do a job which the individual would not be capable of fulfilling.

That cannot be just such a subjective decision, as has happened in the past, where someone who is mentally retarded and they have escaped by just saying the person couldn't do the job.

Mr. DRINAN. But it doesn't reach the question of housing.

Mr. DODD. No; I am sorry I said housing. I didn't mean housing, just employment.

Mr. DRINAN. Would you have any thoughts to supplement what you say on page 12; namely, that you recommend that the bill should include language preempting this sort of exclusionary practice?

How would you do it? I have wrestled with that and I have looked at some of the 11 States that have passed it. I am not certain that the language they have would be appropriate in an antidiscrimination bill.

What are your thoughts on the matter?

Mr. DODD. You are talking about the title on housing? My pages aren't numbered here.

Mr. DRINAN. Yes; on page 12 you state in the second paragraph that "The bill here, H.R. 3504, should include language preempting this sort of exclusionary practice."

I am just asking you to be even more helpful to us, to supply language. Obviously you are an expert in this matter, and we appreciate that.

If you could supply language which you feel would be appropriate in a State statute, and would in fact make this sort of exclusionary practice a Federal offense, I would be grateful.

Mr. DODD. I will wrestle with it. It is one of the hardest things I think to do in this area, to come up with that language.

I was interested to hear the statements you made regarding the Massachusetts situation with regard to defining familial situations, and that may be the best way to approach this.

Mr. DRINAN. That precludes the halfway house and that is the real fear in Massachusetts—criminals, juveniles.

Mr. DODD. Could it be if it were defined in such a way as to describe the type of setting that the individuals have, getting away from that kind of dorm situation and so forth, where you had no more than two living in the same room, where the accommodations

were such that say a family that did not have relations with each other based on blood, adoption, and marriage, and so forth, and try to work with a definition of family in that context and how the institution was used, that would be one way to go, I think.

That is the idea, I think, to broaden that concept of family and come short of the hospital kind of situation or the institution. That is just off the top of my head. I don't have language specifically.

Mr. DRINAN. We have to develop that. We will have problems enough about this law. It would be very good if we could give at least a nudge toward Federal protection of the communities that these people want to build after they have been deinstitutionalized.

Mr. DODD. That is, of course, I think, one of the greatest problems. You know we have mandated a lot of these things. Programs have come up and suggested funding in ways, turning people loose from the institutions, but then we do nothing for the communities to help them accommodate the situation either through financial assistance or whatever.

As I point out our situation in Norwich—and that is being repeated all across the country—we are just complicating the problem, and I suspect it is costing us far more in dollars and cents than what it did before, just because of the added problems we impose upon people who we put back out on the street, don't accommodate for them in any way, and then have to bring them back in and in many cases their problems are far worse when they come back in than when they left.

Mr. DRINAN. Also, even if they are able to live in this family situation, Dr. Okun verified what we are talking about; namely, that it costs the Commonwealth of Massachusetts hundreds of thousands of dollars more because they have to go to a community that won't protest the coming of a home for the retarded. That costs a good deal more. Geographically it is isolated.

There are all types of additional medical expenses, so just on the pragmatic practical financial angle, I think that the States do have an interest.

Mr. DODD. Absolutely.

Mr. DRINAN. I thank you for your very helpful testimony

Mr. DODD. Thank you.

Mr. EDWARDS. Mr. Butler?

Mr. BUTLER. Thank you, Mr. Chairman.

I appreciate the witness' testimony and in joining us once more.

Just briefly, how effective have the State laws been that have prohibited housing discrimination against the handicapped?

Mr. DODD. I really don't know. I don't know how long some of them have been on the books, so I really can't answer that question. I don't know how effective they have been in achieving it.

I indicated merely that some States are trying to deal with it. I don't even know how many States have even tried to enact legislation. I wasn't aware that Massachusetts had a reversal on that effort.

Mr. BUTLER. Thank you. That answers my question.

I have no further questions.

Mr. DRINAN. If the gentleman would yield on that, I am afraid that the 11 States that have enacted statutes have found that they

are too successful because there has been a reverberation and some of them are threatening litigation.

There are relatively recent statutes, but it is difficult to enforce these statutes if the wish of the community is so hostile to a particular establishment.

Frankly, those in this field are not very keen about having such statutes, because that immediately makes the coming of a community of mentally retarded adults almost notorious. It becomes a legal question that polarizes the community.

Mr. DODD. Yes.

Mr. DRINAN. That obviously is very bad for the community if in fact it does move in asserting their right.

Mr. DODD. I would be interested, too, if anyone has ever done an assessment of those communities or neighborhoods where you do have existing group homes that have been in place for some time, and seeing attitudinal change, if there have been any.

Maybe it continued in the same direction that it started out in, or whether or not the example that I cited, the little small town of Pomfret, Conn. example where the strongest critics initially have turned out to be the strongest supporters in literally less than a year.

Mr. EDWARDS. I can certify that a city of 100,000 in my district, the houses of which mostly are in the $100,000 range, that before the city grew to its present boundaries, there was that kind of establishment, and the neighborhood surrounding it is perfectly compatible with it and people going in and assisting the establishment in its recreation.

Mr. DODD. I suspect that may be the case.

Mr. EDWARDS. Do counsel have questions?

Thank you very much.

Mr. DODD. Thank you, Mr. Chairman.

[The prepared statement of Hon. Christopher J. Dodd follows:]

STATEMENT OF HON. CHRISTOPHER J. DODD, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF CONNECTICUT

Mr. Chairman, I want to first thank you for this opportunity to testify before your subcommittee this morning. I have many fond memories from the two years that I had the privilege of working with you and the other distinguished members of the subcommittee.

It was as a member of this subcommittee that I first became involved with handicapped issues and problems. In fact it was in my first year as a member of this subcommittee that I introduced legislation which prohibited discrimination against the handicapped in housing and in employment.

The bill on which these hearings are being held, H.R. 3504, has an identical purpose, and I want to compliment the subcommittee on your consideration of this proposal.

The problems of our nation's 35 million handicapped citizens have only recently received increased attention from the federal, state and local governments and the public. In recent years significant steps have been taken to help these people realize their full potential.

For example, the Federal government has promoted deinstitutionalization of the handicapped for about the last ten years. Through vocational rehabilitation, prohibitions against discrimination of the handicapped contained in the rehabilitation act, and through the education of all handicapped children act, the federal government has sought to better prepare the handicapped to live independent lives.

This goal of independent living, however, can never be fully achieved until statutory protections against the discrimination of the handicapped in employment and in housing are enacted and until adequate support systems are created to provide

the transitional and after care needed in order for the handicapped to live in a non-institutional environment.

Very often those of us in open society tend to think of our human and constitutional rights in abstract terms without any real understanding of how they impact on our daily lives. Most of us have never suffered the indignity of being denied a job for which we are qualified or access to a public place or a home. Yet, I regret to say, that there principle of equality and fairness which protects the rest of our society from such abuse still does not apply to the handicapped.

Instead, the handicapped must wage battle daily. The physically impaired must fight to gain access to transportation systems and buildings where jobs and residences are found. The mentally handicapped must suffer the prejudice of employers, neighbors and landlords who commonly believe them to be unstable, unreliable and prone to criminal acts.

To think that "deinstitutionalization" can be successful in the context of these obstacles and these public misconceptions is, I think, very unrealistic. Without the protection of the law, the handicapped will be forced to continue waging that lonely, daily battle against deep-seated public fears and environmental barriers. Occasional victories may be won, but they will be isolated and will most likely not be sufficient to change the way the public deals with all handicapped individuals.

In consideration of all of this, the importance of this subcommittee's work becomes very clear. The power of the Federal Government must be brought to bear on the environmental and attitudinal barriers which presently deny the handicapped their equal rights in our society.

H.R. 3504 seeks to establish that protection which is needed. However, the problems involved in extending this protection are so complex that in the area of housing alone it will take great perseverance on our part if we are to pass a bill that will be meaningful. What is the duty of the landlord in renting property to the handicapped? What should building codes require? What does reasonable accommodation mean? Should local zoning laws be allowed to prohibit the establishment of group homes for the handicapped?

I do not profess to have all of the answers to these and many other questions involved in this matter; however, I am certain that to ensure the protection of handicapped rights, answers must be found and these answers must promote the public welfare of all our citizens including the handicapped. Furthermore, we must not fail despite the difficulty of the task, keeping in mind that discrimination is the result of human behavior and that with incentives, restrictions and new definitions human behavior can and must be changed.

Already a kind of revolution has started in the way our nation treats the handicapped as a result of the implementation of the section 504 regulations. Although HEW is the only Federal agency that presently has issued its final regulations implementing this section of the Rehabilitation Act, every Federal agency soon will do so. HUD has included in its proposed regulations that owners of property be required to make "reasonable accommodations" to the handicapped. I would think that certainly nothing weaker than this standard should be included in H.R. 3504, and that very probably the handicapped should also be allowed to make at least minor structural changes for which he or she is willing to pay.

Mr. Chairman, an issue which I think deserves in-depth investigation and consideration by the subcommittee is the use of local zoning laws to restrict the establishment of group homes for the handicapped. Again, to re-state my position, it is my belief that the key to successful de-institutionalization is the establishment of a system that will provide the handicapped with good transitional and after care. Furthermore, I believe that group homes are probably the best mode for providing this care.

What happens when the handicapped are unable to rent adequate housing or refused the right to establish group homes with the support and supervision they need to live in a non-institutional setting?

For our Nation's more than 1.5 million institutionalized mentally handicapped, the only alternative to the institution is often a local volunteer organization or a local dollar-a-day hotel.

The fact is that many individuals being discharged from mental hospitals and institutions are incapable of living totally independent lives. They need a supervised group home in order to ensure that the stability and control they have achieved continues and to detect at the earliest possible time any regression in their behavior.

It is my belief that if group homes were more available more people currently in institutions could be released and the time that a mentally ill individual is able to function outside an institution would be greatly increased.

Studies have found that the rate of recidivism among discharged mentally ill patients is extremely high. Within six months following discharge, it is estimated that between 30 and 40 percent of the patients are readmitted to the hospital. Within one year following discharge, between 40 and 50 percent of the patients are readmitted. And, within three to five years following discharge, between 65 percent and 75 percent of the patients are readmitted.

Clearly, our Nation's system of transitional and after care is not adequate to sustain the discharged mentally ill patient outside the institution.

From what I have been able to ascertain, it would appear that many communities have used their local zoning ordinances to thwart the establishment of group homes for the handicapped. I would like to qualify this by simply saying that clearly the lack of money and other resources rather than zoning restrictions are more responsible for discouraging the proliferation of group homes. But, the fact remains that in those instances in which organizations have sought to establish group homes the zoning laws have been the biggest and sometimes only insurmountable obstacle to their creation.

Although supposedly created to protect the health and safety of communities, zoning ordinances are often excessively restrictive. Typically community zoning ordinances limit the habitation of a premises to a family which is most often defined as a household unit related by blood, marriage or adoption.

It is type of zoning restriction which is most often used to prohibit the creation of group homes. Furthermore, since zoning ordinances are designed to protect the welfare of the general public, the fears the general public have about the mentally handicapped also re-inforce the strict application of these types of ordinances. One commonly acknowledged fear is that the mentally handicapped are prone to commit acts of violence. To my knowledge the only study that has been conducted on this issue shows that the incidence of crime among discharged mentally ill patients was not that much higher than in the general population. According to a study conducted by the New York State Department of Health in 1968, 93 percent of discharged mentally ill patients had no subsequent arrest, and in 1975, 90.6 percent had no subsequent arrest.

That study showed further that 32.5 individuals out of every one thousand in the general population were arrested in 1975 and that 98.5 individuals out of a sample of one thousand discharged mental patients were arrested. However, the study also showed that of those discharded patients with no prior arrest record (approximately 73 percent of the total sample) only 22.6 percent had subsequent arrests.

Despite these figures and none that contradicts them, the public perception persists that the mentally handicapped are somehow unusually dangerous people.

To overcome both the obstacle of the zoning laws and public misconception, eleven States have found it necessary to enact State statutes that exempt group homes for the handicapped from the single family zoning restriction. While my State of Connecticut is not one of these eleven States, Connecticut has enacted very progressive legislation for the handicapped including a recent measure which prohibits discrimination against the mentally retarded. Furthermore, I have been told by people who work in the field that several organizations have been successful in obtaining waivers to establish group homes.

What needs to be determined, however, on a national basis is whether zoning laws are in fact excessively restrictive and whether they constitute a large enough barrier to the establishment of group homes that the subcommittee should include in H.R. 3504 language pre-empting this sort of exclusionary practice. If a careful review of the situation reveals that, as it appears, zoning restrictions do tend to discriminate against the right of the handicapped to reside in a non-institutional setting, then such language should clearly be added.

Mr. Chairman, in conclusion I would like to say that I believe the protections contained in H.R. 3504 are needed in order for the handicapped to be able to live in open society. Our society has no less an obligation to ensure that the handicapped are able to enjoy their human and constitutional rights than it does to racial, ethnic and religious minorities. Society has made accommodations for each of these latter groups, and I find the demands being made by the handicapped no less compelling. While we cannot change overnight behavior which has its roots in years and years of fear and prejudice, we can demand that existing institutions and practices be modified and that from this point forward different rules apply.

Mr. Chairman, I will conclude my remarks now, and, again, I would like to thank the subcommittee for this opportunity to appear before you.

[Whereupon, at 1:45 p.m., the subcommittee adjourned.]

# FAIR HOUSING ACT

---

## THURSDAY, JULY 27, 1978

House of Representatives,
Subcommittee on Civil and Constitutional Rights
of the Committee on the Judiciary,
*Washington, D. C.*

The subcommittee met, pursuant to notice, at 9:30 a.m., in room 2226, Rayburn House Office Building, the Honorable Don Edwards [chairman of the subcommittee] presiding.

Present: Representatives Edwards, Drinan, and Volkmer.

Also present: Janice E. Cooper, assistant counsel, and Roscoe B. Starek III, associate counsel.

Mr. Edwards. The subcommittee will come to order.

Today, we continue our series of hearings on title II of H.R. 3504, focusing today on the problem of discrimination in home financing.

The bill would amend section 805 of the existing Fair Housing Act to make explicit the prohibition against mortgage "redlining", the practice of banks and other lenders to deny mortgage loans because of the racial or ethnic composition of the neighborhood in which the dwelling is located.

Although the Federal Home Loan Bank Board and the Department of Justice have taken the view that existing law prohibits such practices, we believe the coverage is sufficiently uncertain to merit this clarifying change. Indeed, I hope this hearing itself will help clarify the scope and meaning of this stricture.

I am therefore most pleased to welcome our first witness this morning, Mrs. Anita Miller, Board member of the Federal Home Loan Bank Board.

Mrs. Miller, we welcome you and you may proceed.

## TESTIMONY OF ANITA MILLER, BOARD MEMBER, FEDERAL HOME LOAN BANK BOARD

Mrs. Miller. Thank you, Mr. Chairman, Mr. Drinan.

I appreciate the opportunity to testify on behalf of the Federal Home Loan Bank Board on title II of H.R. 3504, and I am delighted to be able to present the Bank Board's views on fair housing to you.

Although I am the Bank Board's newest member, I have long had an interest in fair housing.

In the 1960's, as vice president of Citizens United for Fair Housing Law in Rhode Island, I was a member of the team that worked for a 6-year period to achieve the enactment of fair housing legislation in that State. And I think, Mr. Drinan, you may remember me from those days when you came down from Boston to help us out.

(353)

Mr. DRINAN. I remember well, as I recall, eventually after many, many years we were successful.

Mrs. MILLER. That's right, but it was many years and a long struggle.

As part of this effort, I chaired a statewide good neighbor pledge campaign which collected and published some 10,000 signatures in favor of open housing.

After my family moved to Bergen County, N.J., I continued my efforts to promote fair housing by serving on the board of directors of the Bergen County Fair Housing Council.

During this period, I also personally investigated instances of housing discrimination by serving as a tester for the Fair Housing Council. After my term on the board ended, my husband served on the Fair Housing Council for a number of years.

I continued my interest in fair housing at the Ford Foundation where, as a senior program officer in the Department of Urban and Metropolitan Development, I was responsible for the Foundation's national portfolio of grants on the subjects of housing conservation, neighborhood revitalization, and community development, and that is where I was before I came to Washington to become a member of the Bank Board.

These efforts, of course, have exposed me to the problems of discrimination in housing and the need for effective fair housing legislation. As we all know, although this law has been on the books for ten years, there has been enormous frustration with the fact it does not provide all of the tools that are needed to do the job adequately and there continue to be people unjustly denied housing opportunities because of the color of their skin, or their sex, or because of the neighborhood in which they wish to live. The law can be strengthened and it should be strengthened along the lines proposed in your bill.

Before I comment on this bill, though, I would like to tell you what the Bank Board does and how it has been working to address the problems of discrimination in home financing.

The Bank Board is unique among Federal financial regulatory agencies in that it has all the principal regulatory controls and functions under one roof. We have chartered over 2,000 Federal savings and loans and we insure the accounts of an additional 2,000 State chartered savings and loan associations.

We provide a central liquidity fund through the Federal Home Loan Bank system, an insurance fund through the Federal Savings and Loan Insurance Corp. (FSLIC), and we provide a secondary market facility through the Federal Home Loan Mortgage Corporation.

However, no matter how well these institutions work in ensuring an adequate supply of mortgage credit, the job is not complete unless these funds are loaned to the public in the form of home mortgages in a nondiscriminatory manner. Thus, the Bank Board adopted antidiscrimination regulations were amended in 1976. On May 18, 1978, we became the first Federal agency to issue very explicit antiredlining regulations.

These new regulations, which went into effect on July 1, are central to our operation. I think they are central to the theme of my testimony today, and so if you will bear with me I would like to

go through them with you to tell you exactly what they do in as brief a way as possible.

First, they prohibit the arbitrary denial of credit based on the age or location of the property alone, without limiting this prohibition to the racial or ethnic characteristics of the neighborhood. Our previous prohibition against redlining only prohibited redlining based on racial or ethnic reasons, and our new regulations give us considerable extra reach.

Second, the new regulations prohibit the use of discriminatory appraisals.

Third, the new regulations emphasize the applicant's right to file a written application. The regulations require associations to have written loan underwriting standards which must be made available to the public upon request.

Fourth, the regulations require that a revised equal housing lending poster be displayed clearly and simply advises the public of its rights under the Fair Housing Act and the Equal Credit Opportunity Act.

In addition, a new monitoring system has been put in place to enforce the fair lending requirements that have been established. The center piece of this system is a loan application register. This loan application register lays out all of the information relative to each application for a loan. Its purpose is to enable violations of these nondiscrimination regulations and to provide a good management tool for reviewing lending patterns.

This basic monitoring device, the loan application register, will be kept by every federally insured institution in the country. Samples of this register are, by the way, contained in the Appendix which is attached to my prepared remarks.

This register, as well as the data which the Home Mortgage Disclosure Act requires associations to collect and the institution of the Community Reinvestment Act statement which is required by our proposed CRA regulations, will be used to review an association's lending patterns and service to the community. So we really have in place now three basic tools: (1) the loan application register, which will give the examiner an immediate review of all of the loans that have been made and the terms of those loans and the placement of those loans; (2) The Home Mortgage Disclosure Act information which shows us where loans are going, and then, of course; (3) the CRA statement which is a statement to be prepared by each savings and loan institution that will tell us what its lending area is, that is, the communities, it is serving and the kinds of credit it is offering in that community.

The CRA also emphasizes not eliminating low- and moderate-income neighbors. With these three basic tools in place the examiner can go into an institution and get a full picture of the lending that is going on or the lending that is not going on or the different patterns of lending that are going on for different people if, indeed, that is the case.

Our new regulations also contain policy guidelines which indicate what are and are not proper underwriting considerations. Since this is a subject this subcommittee has expressed particular interest in, I will explain our guidelines in some detail.

The key is not which items the lending institution considers, but whether the loan decision is based upon a realistic evaluation of all pertinent facts concerning an applicant's creditworthiness and the value of the secured property, without giving undue weight to any one factor.

For example, when looking at an applicant's creditworthiness, the association should recognize that such factors as the applicant's past credit difficulties, educational level, lack of previous home ownership or history of repeated job or residence changes may have resulted from or have been perpetuated by past discrimination.

Similarly, when looking at the value of the secured property, the association should avoid arbitrarily denying loans because of the age or location of the property or the income level or racial composition of the neighborhood.

In tackling the difficult problem of to what extent a lender may consider geographic factors, our new guidelines require that the loan decision be based on the present market value of the property, the likelihood that the property will retain adequate value over the term of the loan, and then, of course, we do permit consideration of specific factors which may negatively affect the property's short range (3 to 5 year) future value. Permissible considerations include such things as the condition and utility of the improvements, various physical factors such as street conditions, amenities, such as parks and recreation areas, the availability of public utilities and municipal services, and exposure to flooding and land faults. We should not get thrown back at us by S. & L.'s the accusations that we are asking them to make bad loans, that we are asking them to put aside safety and soundness, because this is not the case.

It is our firm conviction and the experience of the industry—those members that actively pursued a community investment strategy—that there are good and sound loans to be made in the older communities, and in racially mixed and in minority neighborhoods, and that this will not conflict with the safety and soundness which we all want to see preserved.

The Bank Board has also approved a general enforcement policy for its new nondiscrimination regulations. This policy outlines three basic types of corrective action: (1) Action to correct the violation to insure it is not repeated; (2) action to inform the public that the unlawful practice has been discontinued; and (3) affirmative action to correct conditions resulting from the violations with respect to identifiable individuals or classes of individuals.

If voluntary correction and compliance are not forthcoming, then we will issue a cease and desist order and, when appropriate refer those cases involving a discriminatory pattern or practice to the Attorney General for suit.

The key to our effort is really the 800 examiners who work for the Federal Home Loan Bank Board. These examiners work out of the 12 district offices situated around the country. In order really to maximize our efforts to combat discrimination and redlining, our examiners have gone through extensive training, so that when they go into an institution for its regular (approximately every 14 months) examination, they are well equipped to spot, and identify instances of discrimination.

I think that the numbers of possible violations of anti-discrimination and fair housing regulations that have been turned up by the examiners since they received training at the end of 1976 and the beginning of 1977 is very indicative of the progress we have made in this field.

The number of fair housing problems and potential problems that our examiners uncovered in 1977 was 2,084. That is two and one half times the number that they uncovered in the previous year—prior to the time that they received the training in nondiscrimination and prior to the time when the Board put a special emphasis on insuring fair housing and nondiscrimination.

These 2,084 complaints resulted in 1,840 supervisory letters being sent to the institutions with violations. In addition, in 1977, there were 52 special examinations responding to individual complaints. In each one of these cases, an examiner went promptly into that association to uncover the facts so that we could give a prompt response to the consumer and take corrective action in the cases where there, indeed, were problems.

In addition, the Bank Board has also recently established a technical assistance office, the office of community investment This office deals specifically with problems of community investment and nondiscrimination. It has a special division to handle consumer and civil rights complaints. This section coordinates the handling of these complaints by our field offices and coordinates with HUD on the handling of fair housing complaints received in Washington and makes every effort to expeditiously resolve them. Those fair housing complaints which fall out of our jurisdiction are referred to HUD for action. This same office represents the Bank Board on the Inter-Agency Fair Housing Task Force, which was established in March 1976.

Turning now to my comments on specific provisions of H.R. 3504, I can tell you that the Bank Board fully supports vigorous efforts to eradicate all forms of discrimination in housing, whether it be against an individual borrower or against the property he or she seeks to buy. We applaud the subcommittee's recognition of the inadequacy of HUD's present limited enforcement powers in fair housing cases.

Let me just say that the Bank Board, as an agency which already has cease and desist authority, is fully aware of the importance of that authority for the enforcement of Fair Housing Act violations. Just having the authority, which we have had to exercise in only one case, facilitates obtaining prompt and responsive compliance. We support the subcommittee's efforts to extend such authority to HUD.

Our first comment concerns the jurisdiction over savings and loan associations for the purposes of Fair Housing Act enforcement.

As I noted, the Bank Board has already established a periodic examination procedure for the over 4,000 savings and loan associations it regulates. And so, our enforcement of the Fair Housing Act does not depend solely on the complaints of individuals; rather it is a function of a systematic effort by our examiners to uncover problems at the association that might not otherwise come to the attention of the public.

As I said, we have found that consumers are very often not aware of the fact that they are being discriminated against. But our examiners, by looking at the loan application register, by dealing with the HMDA data, with the use of new Community Reinvestment Act, will be able to recognize and uncover patterns and practices of discrimination that would otherwise, perhaps, not have been discovered up by the individual consumer.

Looking at our record, it seems clear that trained investigators are able to discover and correct many more fair housing violations than would surface if enforcement was left to the individual complaint process. Futhermore, we are, discovering more subtle kinds of discrimination. Therefore, while we applaud very much the further powers requested for HUD, we feel that rather than duplicating efforts, HUD should concentrate on those lenders who are not as carefully regulated as the S. & L.'s, or which are not regulated at all. We feel that, as far as federally regulated savings and loan associations are concerned, the Federal Home Loan Bank Board should be authorized to continue its enforcement of fair housing legislation, of course, understanding that we would coordinate very closely with HUD.

I would like to comment on the provisions of section 206(e) of the bill. We wrestled with the notion of using the term "neighborhood" and found it had too many different meanings. For this reason, we suggest that the more neutral term "vicinity" or "location" be substituted for the word "neighborhood."

This change would avoid the problem of defining a neighborhood when a particular dwelling was located on what many might consider to be a neighborhood's boundary. By using the word "location" or "vicinity," one would always be looking at the area immediately adjacent to the dwelling. We would also like to suggest that this section be broadened to prohibit discrimination based on the age of property as well as the location of property.

We would also like to suggest that it would be appropriate to amend section 808(d) of title VIII to revise the somewhat inexact directive given all agencies to "administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of this title * * *"

The present wording of this section rather ambiguously lumps program and regulatory agencies together and orders them all to promote fair housing goals. In line with our comments on the need to expressly exempt federally regulated savings and loan associations from the scope of HUD's enforcement authority, we would suggest that this section be clarified by explicitly directing the Bank Board to continue to affirmatively enforce the Fair Housing Act as it concerns Federal home loan bank system members, as defined in section 2 of the Federal Home Loan Bank Act.

I would like to emphasize that our enforcement of fair housing, antidiscrimination, and antiredlining laws is part of a comprehensive strategy at the Bank Board. I have already mentioned that we have a new Office of Community Investment which provides technical assistance and program assistance to lenders. Also, we have recently announced a $10 billion fund of special advances which will be provided savings and loans through the bank system at lowered interest rates—very advantageous interest rates, but

which will generate no cost to the Government in terms of tax dollars—to encourage savings and loans to become more aggressively involved in community lending. These, with our CRA and anti-discrimination regulations, HMDA, and the new training program for our examiners, really give us a very well-rounded package of activities—all aimed at stamping out discrimination and revitalizing our communities.

Thank you very much.

[The prepared statement of Mrs. Miller follows:]

STATEMENT OF ANITA MILLER, BOARD MEMBER, FEDERAL HOME LOAN BANK BOARD

Mr. Chairman and Members of the Subcommittee, I appreciate the opportunity to testify on behalf of the Federal Home Loan Bank Board on Title II of H.R. 3504, the "Fair Housing Amendments Act of 1977." This bill would amend Title VIII of the Civil Rights Act of 1968 by expressly prohibiting the practice described as "redlining" by lenders and by significantly strengthening HUD's power to enforce fair housing legislation. The Bank Board supports these provisions wholeheartedly.

I am very pleased to be able to present the Bank Board's views on fair housing to you. Although I am the Bank Board's newest member, I have long had an interest in fair housing. In the 1960's as Vice President of Citizens United for Fair Housing Law in Rhode Island, I was a member of the team that worked for a six year period to achieve the enactment of fair housing legislation in that state. As part of this effort, I chaired a statewide Good Neighbor Pledge Compaign which collected and and published some 10,000 signatures in favor or open housing.

After my family moved to Bergen County, New Jersey, I continued my efforts to promote fair housing by serving on the board of directors of the Bergen County Fair Housing Council. During this period, I also personally investigated instances of housing discrimination by serving as a tester for the Fair Housing Council. After my term on the board ended, my husband served on the Fair Housing Council for a number of years.

I continued my interest in fair housing at the Ford Foundation where, as a senior program officer in the Department of Urban and Metropolitan Development, I was responsible for the foundation's national portfolio of grants on the subjects of housing conservation, neighborhood revitalization, and community development.

These efforts of course have exposed me to the problems of discrimination in housing and the need for more effective fair housing legislation. As we all know although this law has been on the books for ten years—and during that time strides have been made—the problem remains. There continue to be people unjustly denied housing opportunities because of the color of their skin, or their sex, or because of the neighborhood in which they wish to live. The law can be strengthened and it should be strengthened along the lines proposed in your bill.

Before I comment on this bill, though, I would like to tell you what the Bank Board does and how it has been working to address the problems of discrimination in home financing. The Bank Board is unique among Federal financial regulatory agencies in that it has all the principal regulatory controls and functions under one roof—it both charters and insures the accounts of savings and loan associations and provides a central liquidity fund and secondary market facility for them.

The Bank Board regulates over 4000 savings and loan associations, about half of which are chartered by the Bank Board as Federal savings and loan associations. The remainder are State-chartered associations whose accounts are insured by the Federal Savings and Loan Insurance Corporation (FSLIC), which is operated by the Bank Board. These institutions hold nearly $400 billion in savings deposits and nearly one-half of the nation's outstanding home mortgage debt, about $343 billion. The Bank Board ensures the safety of these deposits, through insurance and examination, and sees that savings and loan associations continue to concentrate their investment efforts on meeting the nation's credit needs for mortgage financing.

In addition, the Bank Board supervises the Federal Home Loan Bank System, which provides a central liquidity fund for member institutions. The Federal Home Loan Bank System is organized much like the Federal Reserve System. It operates through twelve district Federal home loan banks which borrow funds in the capital markets to lend to their members, who must be home financing institutions. Savings and loan association, mutual savings banks, and insurance companies may join the Federal Home Loan Bank System. Bank system loans to members, currently

totalling about $26 billion, are used to make approximately the same amount in home mortgage loans to the public.

The Bank Board also acts as the Board of Directors of the Federal Home Loan Mortgage Corporation which provides a secondary market in conventional home mortgages. When Congress chartered the mortgage corporation in 1970 to provide an additional source of funds for the home mortgage market, there was virtually no nationwide secondary market trading in conventional mortgages. Since its founding, the Mortgage Corporation has issued commitments for more than $19 billion in mortgage purchases and has purchased more than $14 billion in home mortgage loans. These purchases are financed primarily through the sale of mortgage securities, for the most part Mortgage Participation Certificates (PCs). An active market for PCs has developed as investors who previously did not invest in the secondary market join in. Currently, almost 50% of all PCs sold are sold to investors who did not formerly participate in financing housing, thus providing an important new source of mortgage funds.

The ability of the savings and loan associations to meet the demand for mortgage credit is crucially dependent upon the role which the Federal Home Loan Bank System and the Mortgage Corporation play in generating additional funds for the mortgage market. Without the support of these two institutions, the flow of mortgage credit would fall far short of the demand.

However, no matter how well these institutions work in ensuring an adequate supply of mortgage credit, the job is not complete unless these funds are loaned to the public in the form of home mortgages in a nondiscriminatory manner. In its efforts to implement the Fair Housing Act and to assure equal housing lending, the Bank Board adopted its nondiscrimination regulations. These regulations, as originally adopted, closely tracked the Fair Housing Act by prohibiting discrimination in home financing based on race, religion, color, or national origin, and were revised in 1976 to prohibit discrimination based on sex and marital status. On May 18, 1978, we strengthened these regulations by expanding upon the basic prohibitions in the statute on the part of lenders which we believe will further the purposes of the Fair Housing and Equal Credit Opportunity Act. Our new regulations prohibit the arbitrary denial of credit based on the age or location of the property alone, without limiting this prohibition to the racial or ethnic characteristics of the neighborhood. The original regulations expressly prohibited discrimination based on the race, color, religion or national origin of the occupants of dwellings in the vicinity of the property for which the loan was sought, making the Bank Board one of the first agencies to explicitly address the problem of racial redlining.[1]

The new regulations also prohibit the use of discriminatory appraisals. We have recently proposed an additional regulation which would require lenders to provide a copy of the appraisals to applicants who are denied loans because the appraisals would not support the loan amounts requested.

Our new regulations emphasize the applicant's right to file a written application and require associations to have written loan underwriting standards which must be made available to the public upon request. These changes were needed to help eliminate discriminatory pre-screening practices which could discourage some potential applicants from filing a written application, making detection of the violation all the more difficult. The regulations also require that a revised Equal Housing Lender poster be displayed which clearly and simply advises the public of their rights under the Fair Housing Act and the Equal Credit Opportunity Act. In addition, our new regulations establish a monitoring system to enforce fair lending requirements. This system also provides management a tool for reviewing their lending patterns.

We are experimenting with a number of formats for the monitoring system to determine which best detects violations of our nondiscrimination regulations and which provides the best management tool. The basic monitoring device will be a loan application register on which certain information about every application is recorded. The Bank Board is testing three such registers, one requiring 14 items of information about the application, another requiring 23 items of information and the last requiring 48 items.

The shortest register requires that, for each application received, monitoring data—largely that required under the Equal Credit Opportunity Act regulations (i.e., race, sex, marital status, and census tract)—be collected. Association personnel will be required to include information on personal characteristics in the loan application file—based on their own observation if the applicant does not volunteer

---

[1] The Bank Board's authority under the Fair Housing Act to issue that original redlining regulation was upheld by the court in one of the first major redlining cases, *Laufman* v. *Oakley,* 408 F. Supp. 489 (1976).

it. The second register includes the same items plus the loan terms (term, rate, fees) requested and given, if applicable. The longest register will contain almost everything suggested during the public comment period on our regulatory proposal as potentially useful in detecting fair housing violations, for example, information on the borrower's credit history, the type of property involved and the appraisal. The registers, as well as the Home Mortgage Disclosure Act data and the institution's Community Reinvestment Act (CRA) statement,[2] will be used in reviewing the institution's performance. We believe that comparison of the association's CRA statement with the data collected by the monitoring system and under HMDA on where in the institution's lending area loans have been made will provide both our examiners and the association with the most comprehensive analysis to date of lending activity.

Our new regulations also contain policy guidelines which indicate what are and are not proper underwriting considerations. The key is not which items the lending institution considers, but whether the loan decision is "based upon a realistic evaluation of all pertinent facts respecting an individual's creditworthiness, without giving undue weight to any one factor." For example, a lending institution should recognize that any of the following factors may have resulted from, or perpetutate, past discrimination:

    *(a)* past credit difficulties;
    *(b)* educational level attained;
    *(c)* lack of previous home ownership;
    *(d)* history of numerous job or residence changes.

Similarly, refusing to lend, or lending on less favorable terms, in a particular area because of the area's average income level can also discriminate against minorities. As in determining the creditworthiness of the borrower, in determining the value of the secured property, arbitrary decisions based on the age or location of the property must be avoided. In tackling the difficult problem of to what extent geographic factors may be considered, the guidelines state:

Loan decisions should be based on the present market value of the property offered as security (including consideration of specific improvements to be made by the borrower) and the likelihood that the property will retain an adequate value over the term of the loan. Specific factors which may negatively affect short-range future value (up to 3–5 years) should be clearly documented. Factors which in some cases may cause the market value of a property to decline are recent zoning changes or a significant number of abandoned homes in the immediate vicinity of the property. However, not all zoning changes will cause a decline in property values, and proximity to abandoned buildings may not affect the market value of a property because of rehabilitation programs or affirmative lending programs, or because the cause of abandonment is unrelated to high risk.

Proper underwriting considerations include the condition and utility of the improvements, and various physical factors such as street conditions, amenities such as parks and recreation areas, availability of public utilities and municipal services, and exposure to flooding and land faults. However, arbitrary decisions based on age and location are prohibited, since many older, soundly constructed homes provide housing opportunities which may be precluded by an arbitrary lending policy. 12 CFR 531.8(c)(7).

The Bank Board has also approved a general enforcement policy for its new nondiscrimination regulations. It outlines the three basic types of corrective action that we will take when our nondiscrimination regulations are violated. They are:

    1. Action to correct the violation and insure that it is not repeated.
    2. Action to inform the public that the unlawful practice has been discontinued.
    3. Affirmative action to corect conditions resulting from the violation with respect to identifiable individuals or classes of individuals or areas.

If voluntary correction and compliance are not forthcoming, then we will issue a cease and desist order and, when appropriate, refer those cases involving a discriminatory pattern or practice to the Attorney General for suit.

These enforcement guidelines were used as a model by the other Federal financial regulatory agencies for the proposed uniform guidelines for the enforcement of the Equal Credit Opportunity Act, Regulation B, and the Fair Housing Act which were issued on June 27, 1978 for public comment.

I would like to tell you now about our examining staff which reviews each institution for compliance with these regulations. The Bank Board employs almost

---

[2] Proposed regulations under the Community Reinvestment Act would require lenders to delineate the communities which they serve, including low and moderate income areas, and to describe the types of credit the institution is prepared to extend.

800 examiners who examine, approximately every 14 months, the over 4,000 institutions which we regulate. In recent years, their task has expanded beyond its traditional emphasis on the safety and soundness of the institutions examined to include monitoring for compliance with a variety of anti-discrimination and consumer laws and the Bank Board's implementing regulations. These laws include, among others, the Fair Housing Act, the Home Mortgage Disclosure Act, the Equal Credit Opportunity Act, the Truth in Lending Act, Title VII of the Civil Rights Act of 1964, RESPA, and soon, the Community Reinvestment Act.

The examiners have received specialized training in these new monitoring tasks. In 1976 all examiners went through a two and half day seminar on fair housing, lending and employment discrimination. A new program is being developed for implementation this fall which will give examiners an in-depth look at geographic discrimination, pre-screening, consumer complaint procedures, and the other areas covered by the Bank Board's revised nondiscrimination regulations. This program is being developed by OES's Civil Rights Specialist with assistance from the OES civil rights specialists who are located in each of the Federal Home Loan Bank districts. Each of the district civil rights specialists is an experienced examiner who was selected for his or her experience, credibility, and interest in fair housing.

The Bank Board has also recently established a technical assistance office, the Office of Community Investment (OCI). This office deals specifically with the problems of community investment and nondiscrimination. It has a special division to handle consumer and civil rights complaints. This section coordinates the handling of these complaints by our field offices and coordinates with HUD on the handling of fair housing complaints. It also promptly responds to all inquiries and complaints received in Washington and tries to expeditiously resolve them. Those fair housing complaints which fall outside our jurisdiction are referred to HUD for action. This section is also developing a brochure on how to file consumer discrimination complaints which will facilitate use of the complaint process. this brochure should be published by the end of the summer and will be distributed through savings and loan associations and community groups.

OCI also provides technical assistance and training in urban reinvestment and nondiscrimination to the savings and loan industry and, where needed, to community organizations, local officials, and the like. OCI recently completed a two day Forum on community investment and revitalization at which representatives from financial institutions, federal and local government agencies, the insurance industry, the home building industry, community groups, civil rights groups, legal aid groups and labor unions met and discussed ways to solve the problems of redlining, dislocation, and how to create community vitality and investment. We are making efforts of follow-up on this Forum with an on-going cooperative exchange among these groups.

OCI is also working closely with the Community Investment Officers who were recently appointed, at the Vice Presidential level, in each of the district Federal Home Loan Banks to encourage and assist member institutions in developing community investment strategies.

OCI represents the Bank Board on the Inter-Agency Fair Housing Task Force which was established in March of 1976 by the Bank Board, HUD, the Department of Justice, and the other financial regulatory agencies to coordinate their mutual efforts "to affirmatively further the purposes" of Title VIII of the 1968 Civil Rights Act. OES's Civil Rights Specialist also serves on this task force.

Turning now to my comments on specific provisions of H.R. 3504, I can tell you that the Bank Board fully supports vigorous efforts to eradicate all forms of discrimination in housing, whether it be against an individual borrower or against the property he or she seeks to buy. We applaud the Subcommittee's recognition of the inadequacy of HUD's present limited enforcement powers in fair housing cases. Let me just say that the Bank Board, as an agency which has cease and desist authority, is fully aware of the importance of that authority for the enforcement of fair housing act violations. Just having the authority, which we have had to exercise in only one case, facilitates obtaining prompt and responsive compliance. We support the Subcommittee's efforts to extend such authority to HUD.

Our first comment concerns the jurisdiction over savings and loan associations for the purposes of Fair Housing Act enforcement. As I have indicated, we have extensive regulatory authority over the savings and loan industry, we have had over forty years of experience in regulating this industry, we have a comprehensive regulatory approach and a trained staff to ensure fair and equal home lending practices by regulated savings and loans associations. If the energies of the various agencies are to be concentrated where they would be most appropriate and if unnecessary duplication and waste are to be avoided, savings and loan associations

within our jurisdiction should be exempted from HUD's enforcement authority for Fair Housing Act compliance.

As I noted above, the Bank Board has already established a periodic examination procedure for the over 4000 savings and loan associations it regulates. Thus, the Bank Board's enforcement of the Fair Housing Act does not depend solely on isolated complaints coming to it, rather it is also based upon our regular examination program. Since the Bank Board's examiners are experts in looking at the operations of savings and loan associations, they are able to spot an aberration in an association's conduct and catch those nondiscrimination violations which might be overlooked by an investigator unfamiliar with the industry. The loan application registers which are now being tested will give our examiners another tool for spotting potentially discriminatory practices.

Your Subcommittee has asked numerous witnesses why so few complaints are made under Title VIII. Several of the witnesses pinpointed the reason when they noted that many people do not know they have been discriminated against. When one is applying for a loan on a house, which is something most of us do only a few times in a lifetime, we usually have no idea what specific terms are offered other borrowers with like circumstances. Similarly, when applying to rent an apartment, the prospective tenant usually has no idea what the landlord's normal terms are unless he or she happens to know someone in the complex. Add to this the average person's normal reluctance to get involved in legal processes where he or she has little to win and much to lose and you can see why so few complaints are filed. Thus, I think the importance of a regular examination process cannot be over emphasized when considering realistic and systematic enforcement of the Fair Housing Act.

As I indicated, we recognize that fair housing enforcement requires special training. In 1976, all our examiners went through a two and half day seminar on fair housing, lending and employment discrimination. Before the Bank Board conducted this first nondiscrimination training seminar, very few nondiscrimination violations were noted in examination reports. After this first round of training, which ran from October 1976 through early 1977, the number of reported violations of our nondiscrimination regulations increased dramatically. In the six month period covering August 1, 1976 through January 31, 1977, the Bank Board's examiners noted 581 possible violations of our nondiscrimination regulations. During the calendar year 1977, the number of possible fair housing violations identified by examiners jumped two and a half times to 2,804. This number measures individual instances of possible violations so that a single institution may have been found to have several possible violations. Obviously, a number of these possible violations were technical in nature such as not having the proper fair lending poster. Others were substantive in nature such as requiring impermissible data on an application form or enforcing policies which clearly have a discriminatory effect.

In those instances where examiners were not able to convince management to correct the violation when it was brought to their attention during the examination, supervisory letters were sent to the institutions. In 1977, we sent 1,849 supervisory letters concerning possible Fair Housing Act violations. Most of these infractions were corrected after receipt of the letter or after a discussion with the Supervisory Agent who explained the law and the institution's violation to the association's management. I think it is implicit that our success in correcting the violations our examiners have uncovered results from the association's knowledge of our ability to issue a cease and desist order if compliance is not forthcoming.

In addition, during 1977, we conducted 52 special examinations which were limited scope examinations targeted on a particular problem, for example, alleged sex discrimination. These special examinations were often called to investigate individual complaints that had been received. In each case corrective action was taken.

Looking at our record, it seems clear to me that trained investigators are able to discover, and correct, many more Fair Housing Act violations than would ever surface if left to the individual complaint procedure. Furthermore, having trained investigators available and well-developed examination procedures already in place greatly facilitates our resolution of individual complaints.

In addition to discovering more possible violations as their consciousness of, and experience with, fair housing enforcement increases, examiners are now discovering more subtle kinds of discrimination. They are closely scrutinizing associations with potentially discriminatory policies such as: requiring a certain minimum loan amount, or a minimum dwelling size, or prohibiting specified kinds of building construction. All of these policies might appear to be neutral on their face, but they may have a significant discriminatory impact on minorities when applied in a given location. Many of these violations would not be picked up by a process which relied

on complaints or a few selected in-depth surveys which, in turn, probably would not even be conducted unless someone suspected a particular association of wrongdoing.

Thus, as we see it, there are two basic reasons for exempting institutions regulated by the Bank Board from HUD's fair housing enforcement authority: (1) to permit HUD to concentrate its resources on other mortgage lenders, particularly the ones not otherwise Federally regulated, and (2) to avoid the waste and duplication which result from concurrent jurisdiction between two agencies.

By exempting federally regulated savings and loan associations from HUD enforcement, HUD would be able to devote more of its efforts to those lenders which are not regularly examined or regulated at the Federal level, such as the mortgage bankers, the home finance companies, the insurance companies, and the savings and loan associations regulated solely by State agencies. There are over 800 mortgage banking companies in the country which are not subject to any Federal regulation except that which HUD presently exercises over them. They originate about 14 percent of all home mortgage and multi-family loans. Although life insurance companies originate very few mortgage loans themselves, as of the end of 1977, they held $15 billion in home mortgage loans, much of which they acquired from the mortgage bankers. There are also almost 600 savings and loan associations which are regulated solely by state agencies. They hold over $5 billion in home mortgage loans. In addition, there are numerous home finance companies which make home improvement loans, primarily to low and moderate income homeowners. As of May, 1978, finance companies had $160 million in outstanding home improvement loans. If HUD were to concentrate its fair housing enforcement efforts in these areas, the large segment of the population dealing with these institutions would be served.

Our second reason for requesting this exemption is to avoid the duplication and waste which flow from concurrent jurisdiction. Where several agencies share authority over a problem, it is confusing to the public, it creates needless expense to the agencies and it is difficult to pinpoint responsibility. Either no one does the job or, if they do, the agencies end up tripping over one another,—either way, the end result can be chaotic. This all could be avoided by assigning to the appropriate agency the oversight and enforcement powers which most properly belong in its sphere. Since the Bank Board has adopted comprehensive nondiscrimination regulations, already regulates most of the savings and loan industry, has enforcement procedures in place, and has examiners trained to detect nondiscrimination violations, we feel the Bank Board is the logical agency to enforce the Fair Housing Act as it applies to the savings and loan associations we regulate.

I would also like to comment on the provisions of section 206(e) of the bill. The Bank Board is pleased to have the Congress join it in explicitly recognizing that lenders should not deny loans, or grant them on less favorable terms, merely because of the "neighborhood" in which a dwelling is located. We are concerned, though, with the use of the word "neighborhood" without any statutory definition. We wrestled with this issue when the Bank Board drafted its new nondiscrimination regulations. At that time we concluded that "neighborhood" had too many different meanings, some of which related to prohibited bases such as the ethnic or social composition of a given area. For this reason, we suggest that the more neutral terms "vicinity" or "location" be substituted for "neighborhood." This change would also avoid the problem of defining a "neighborhood" when a particular dwelling was located on what many might consider to be a neighborhood's boundary. By using the word "location" or "vicinity", one would always be looking at the areas immediately adjacent to the subject property.

We would also like to suggest that this section be broadened along the lines of our regulation to prohibit discrimination on the basis of a dwelling's age." This would clearly put lenders on notice that they could not adhere to arbitrary policies that because a building was x years old, it was not a fit subject for a mortgage loan. This type of policy all too often discriminates against older, but often sound, parts of our center cities and rural areas. As I pointed out earlier in my testimony, truly fair housing will be achieved only when irrational and arbitrary guidelines are discarded and each prospective borrower and each property on which a loan is sought are evaluated individually on their own merits. The idea is not to require lenders to make bad loans, but to require the lenders to measure objectively the soundness of each application presented to them.

We would also like to suggest that it would be appropriate to amend Section 808(d) of Title VIII to revise the somewhat inexact direction given all agencies to "administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of this title. . . ." The present wording of this section rather ambiguously lumps program and regulatory

agencies together and orders them all to promote fair housing goals. In line with our comments on the need to expressly exempt federally regulated savings and loan associations from the scope of HUD's enforcement authority, we would suggest that this section be clarified by explicitly directing the Bank Board to continue to affirmatively enforce the Fair Housing Act as it concerns Federal Home Loan Bank System members as defined in section 2 of the Federal Home Loan Bank Act.

Before concluding I would like to summarize for you the full panoply of tools the Bank Board has developed to promote fair housing. These tools have been developed to permit us to encourage savings and loan associations to become involved in their communities in a socially responsible way. The tools include our new nondiscrimination regulations and monitoring devices, our recently proposed regulations to implement the Community Reinvestment Act (CRA), our Office of Community Investment (OCI), our legislative proposals to facilitate community investment by associations which we sent to Congress earlier this year, and the $10 billion Community Investment Fund the Bank Board announced last month at the White House.

The Bank Board views the Community Reinvestment Act as one of its major tools to encourage lending institutions to examine themselves and to increase their efforts to meet the credit needs of all members of their communities, including those in low and moderate income neighborhoods. On June 30, 1978, the Bank Board joined the other Federal financial regulatory agencies in announcing proposed regulations to implement this act. These regulations would require lending institutions to describe the communities they are serving and to indicate the types of credit they make available. Our examiners will then annually assess these institutions to determine how well they are meeting their community's credit needs. We agree with Congress that lending institutions have a continuing and affirmative obligation to help meet the credit needs, in a non-discriminatory fashion, of the communities in which they are located. We intend to enforce this law, along with our nondiscrimination regulations, fairly and surely in what we expect to be a comprehensive approach toward fostering fair housing in this country.

In an effort to balance enforcement with an inducement to the industry to be socially responsible, the Bank Board recently announced the establishment of a $10 billion Community Investment Fund (CIF) which will be used as a financial catalyst to encourage savings and loan associations to increase their commitment to the revitalization of their local communities. The Federal Home Loan Banks will make special low priced loans to member institutions which are making a special effort to aid low and moderate income home buyers and which have demonstrated a commitment to participate in programs aimed at community preservation or revitalization. Best of all, the Fund will not use tax dollars. It will be supported entirely by funds raised in the private financial markets using the existing facilities of the Federal Home Loan Banks. The subsidy involved—an estimated $200 million over five years—will be absorbed by the Federal Home Loan Bank System.

The Bank Board is also pursuing passage of its Community Lending Amendments which will make more funds available for financing housing and community development efforts by (1) authorizing savings and loan associations to invest in urban areas participating in the Community Development Block Grant or other Federal urban programs; (2) substantially increasing associations' authority to invest in rehabilitation and home improvement loans; and (3) by granting associations limited authority to invest in State and locally sponsored housing finance obligations. The Bank Board is also working on increasing the authority of savings and loan associations to make cooperative loans—a promising way to help lower income people become homeowners—and on improving the participation of savings and loan associations in HUD's section 8 housing program.

The Neighborhood Housing Services program, which the Bank Board has enthusiastically supported through the Urban Reinvestment Task Force since its founding in 1972, offers extensive assistance to financial institutions, local officials, and neighborhood residents in coordinating their efforts to revitalize selected neighborhoods. This program provides a model on how various interests can work in a socially responsible and nondiscriminatory way to promote community reinvestment and make adequate housing available to the residents of those communities served.

We hope that these initiatives will make it possible for more Americans to be properly housed and properly served by the home financing industry. We believe that the Bank board is firmly on the road to vigorous civil rights and Fair Housing act enforcement. We have made this one of the Bank Board's primary objectives as can be seen by the programs I have just outlined. Our job now is to effectively implement these new programs and regulations so that they achieve the important goals we are all seeking. We commend the Subcommittee for its efforts to improve

the Fair Housing Act and hope that you will adopt the amendments which we have proposed today.

I would be happy to answer any questions which your Subcommittee may have about our programs or our comments on the bill before you.

Thank you.

Mr. EDWARDS. Thank you very much, Mrs. Miller, and certainly the Board should be complimented on the strong actions that it has taken in this important area.

I learned about it first in the discussion and argument you had with the California people when they objected to being preempted by the Board's regulations. California wanted to have State regulation in this area.

Mrs. MILLER. That is right.

Mr. EDWARDS. Before I yield to Mr. Drinan, you have 800 examiners. How many of these are minority examiners? Can that be furnished for the record?

Mrs. MILLER. It could be furnished for the record, yes.

[The information follows:]

As of July 14, 1978, the Bank Board's Office of Examinations and Supervision's professional field (examiners) staff was composed of the following groups:

|  | Male | Female | Total |
|---|---|---|---|
| White | 665 | 65 | 730 |
| Black | 27 | 13 | 40 |
| Hispanic | 11 | 2 | 13 |
| Oriental | 11 | 2 | 13 |
| Other | 1 | 1 | 2 |
| Total | 715 | 83 | 789 |

Mr. EDWARDS. How many are women?

Mrs. MILLER. That too would be furnished for the record.

Mr. EDWARDS. Mostly male?

Mrs. MILLER. I would say in all honesty, sir, that this is something of which that we are cognizant. There is a very strong affirmative action program at the Board itself, and a very strong outreach effort to hire more minority and women examiners. In fact, what we are doing is opening the way through special classifications to identify these people and move them up the ladder as quickly as possible. So while the numbers may not be to your immediate satisfaction, or mine, they are an improvement over what they were, and they are not as good as they will be a year from now.

Mr. EDWARDS. Thank you.

The gentleman from Massachusetts, Mr. Drinan.

Mr. DRINAN. Thank you, Mr. Chairman.

I commend Mrs. Miller, too, and her associates on what they have sought to do.

But I keep asking myself, Mrs. Miller, why I seem to be unpersuaded by your claim for exemption, that while I commend all that you have done, particularly over the last year or so, I am still not persuaded that each unit of the Federal Government should go alone.

The arguments that HUD could then divert its attention to other areas somehow are not persuasive.

As you know better than I, there is a pattern or practice that exists in communities which it seems to me we need a national policy to overcome and reverse. These examiners and these techniques that you have, are they making longitudinal studies of a pattern or practice that, let's face it, prevents black people from moving into white neighborhoods?

Mrs. MILLER. When an examiner goes into an institution——

Mr. DRINAN. You mentioned several techniques here but, as everyone knows, by a variety of legal and extra-legal methods such as zoning laws, the blacks in the city of Boston and the blacks in the city of Providence are locked in the downtown area and simply cannot get out. This is the fact of the matter; it's an acute national problem, and virtually nowhere is there really any integrated housing.

In a few places, yes, but the thrust of the law has not unlocked the people from downtown Providence. What have your examiners sought to do about that?

Mrs. MILLER. The examiners have observed patterns among savings and loans in a given city.

Mr. DRINAN. They what?

Mrs. MILLER. They have noted patterns among savings and loans in a given city.

Mr. DRINAN. Oh, good.

Mrs. MILLER. And I don't know if I brought it with me, but I looked over it last night, and I have actual files that the examiners have prepared and forwarded to the Bank Board in Washington in which they have uncovered discriminatory patterns and practices such as requiring a minimum size loan.

This happened, as a matter of fact, in Albuquerque, where the savings and loans were not making anything less than a $15,000 loan. What happens in a case like that is minority people, who are likely to live in less expensive housing and need a small loan, will not be able to obtain lending. And they have picked up these patterns and practices. Now, as I think about it, there were other cases.

Mr. DRINAN. What do they do about it?

Mrs. MILLER. They send the information to the supervisory agent at the district bank. The supervisory agent will then be in touch immediately with those institutions and they then will go through a process of mediation and conciliation or negotiation to have them stop that process.

Mr. DRINAN. How often have they stopped?

Mrs. MILLER. When they don't stop there is a cease and desist order.

Mr. DRINAN. How often does that happen? Why didn't you incorporate this in your testimony? This is one of the most important things the bill under discussion is intended to do; namely, break the patterns and practices of banks and other lending agencies.

Why didn't you include something in your testimony if you are so proud of the pattern and practice breaking, so to speak?

Mrs. MILLER. It's a good question.

Mr. DRINAN. Well, it's a key question. I am left unpersuaded by our testimony. If you people are not cracking the patterns and practices, if you are not doing anything about it, if you have no

information to put in your statement, how am I supposed to be persuaded you should be exempt?

Mrs. MILLER. I will be happy to follow up. This is exactly what the loan application register will tell us, if you go in and look at an individual complaint and you can say, yes, that institution has perhaps discriminated against one individual and now that one individual is very important.

But, if you look at that whole loan application register in front of you, you can see patterns and practices relative to minorities, relative to not counting the income of the woman, if there is a woman in the family and relative to a particular location where they are requiring a higher downpayment in the case of a certain kind of a neighborhood, or a certain kind of applicant.

You can look at the loan application register and see who has been denied loans and that is where you pick up the patterns and practices.

Mr. DRINAN. When is all of this information going to be available?

Mrs. MILLER. Available to——

Mr. DRINAN. Available to anybody.

Mrs. MILLER. We are talking at two levels now. One is the patterns and practices that have been picked up thus far under the examination procedures through the individual complaints, under existing law and regulation.

The new antidiscrimination law goes into effect July 1, and the register is required as of September 1. We are now setting ourselves up so that we get feedback from the field. The Community Reinvestment Act will also be another tool when that goes into effect in October.

So what I am saying is that it is not the individual complaint that is going to pick up the pattern and practices. It is the examiner going in, looking at that institution where there is a complaint and an examiner going in every 14 months and looking at that loan registry and seeing who is getting loans and who is not.

Mr. DRINAN. All right. But what does he do about it? The whole thrust of the bill under discussion is to have a czar, if you will to have in HUD new machinery saying we are setting a national policy and we are not going to allow patterns or practices of segregated living in America to continue.

You are saying in the future you might pick up enough information by which you can validate what everybody knows. What are you going to do then?

Mrs. MILLER. It is not just in the future. It is going on now. We have many years head start in doing this. Our examiners in those institutions know lending patterns, they know loans, they know practices and, as I said, in 1977, they found over 2,000 instances of discriminatory practices—2,804 to be exact.

Mr. DRINAN. You say this is expected to increase during that time up to 21? Out of how many millions of transactions?

Mrs. MILLER. All right, let's go by examinations because I can't go by transactions. In the first quarter of this year there were 835 regular examinations. Those 835 regular examinations picked up 1,157 possible or actual fair housing violations. There were also 13 special examinations, which means that if a consumer complained

369

that he or she had been discriminated against an examination was immediately held.

There were 464 supervisory letters sent out, which means that through a process of discussion the rest were adjudicated.

Now, I would like to tell you something about our timetable of response, because to me, as a new Board member, this is extremely impressive. I personally sat in as a member of the panel of the National Council of Negro Women when they were conducting hearings on fair housing and the complaint process. And I was one of the people on their panel in St. Louis. One of the things I kept hearing over and over again was the fact there were no timely responses, they could not get anything from anybody, the enormous frustration in terms of timing.

When I served as a tester in New York we would not wait to go to the State of New Jersey to get an apartment or to deal with a problem of discrimination. A minority family would go in, the minority family would not be able to get the apartment. It was suspicious. I, as a tester, would go in that same day, give the same income and same kind of qualifications and if the apartment were available to me, we would go back that night with an attorney and secure that apartment. So, timeliness of response, in this kind of situation, is extremely important.

This morning I asked our staff how are we doing on that, because to me that is critical. When you have a consumer with a problem or a pattern and practice, we should get after it immediately. This is where we are going with this and where we are right now.

A consumer will make a complaint either with the Bank Board directly in Washington or with the supervisory agent out in the district bank. And there is a poster now that must be in the lobby of each institution. There is one there already, but we are going to improve it. There is also going to be a flyer in each savings and loan that is going to tell them where they can register their complaint.

What happens is that within a week of their registering their complaint, they will hear from the Bank Board in Washington or the supervisory agent. Their complaint will be acknowledged, as quickly as 1 or 2 days, but certainly within 2 weeks a special examiner will be sent into that institution to follow up on that complaint.

Mr. DRINAN. But, you are not doing anything about patterns or practices. Your discussion concerns only the individual complaints. And the Massachusetts Commission Against Discrimination started this in 1950 or 1947 and it's still ineffective; the same pattern of segregated housing exists in Boston a generation later.

I would hope under the bill under discussion we would have a new technique to break the pattern and practice, and I don't hear anything coming from your agency about new techniques or machinery to break that pattern or practice.

Mrs. MILLER. Then I have done a very poor job, and I would like the opportunity to submit to you further testimony, because it is my conviction and my firm conviction that it will not be the individual complaint that will be as effective at getting at patterns and practices as trained examiners going in, year in and year out, looking at the loan application registers, looking at CRA state-

ments, looking at HMDA data to understand what the lending practices of a particular institution are.

So, sir, if I may, I would like to submit to you further information along this line, and further arguments which perhaps could be better spelled out to convince you.

[The information follows:]

Mrs. MILLER.As I stressed in my testimony, the Bank Board is convinced that a regular examination system is crucial to effective Fair Housing Act enforcement and, that through such a system as we have instituted, more pattern and practice violations are likely to be uncovered than would surface through a complaint-oriented system such as HUD's.

As I noted, our examiners identified 2,804 possible fair housing violations during calendar year 1977 and 1,157 possible fair housing violations in the first quarter of 1978. These figures should be compared with the number of complaints we have received. Between July 1, 1977, and June 30, 1978, the Bank Board's Washington and field offices received a total of 178 complaints alleging discrimination of some sort. Of those which had been closed as of May 30, 1978 (62 percent or 110), only one was resolved in favor of the complainant. In contrast, very few of the violations noted by our examiners are not sustained.

Our office of Community Investment recently analyzed the violations noted by our examiners during the first six months of 1978 in associations with assets of $25 million or less (numerically about 32 percent of the industry). In the 237 examinations conducted in these associations during the first six months of this year (about 42 percent of which were examined during this period), 449 possible violations of our nondiscrimination regulations, Regulation B (ECOA), and Regulation C (HMDA) were noted by our examiners. Of these 449 violations: 24 percent (107) involved underwriting or lending policies; 19 percent (87) concerned not collecting the monitoring information required by Regulation B; 17 percent (78) involved the lack of or improper equal lending and employment posters; 16 percent (72) concerned the lack of or improper notification of adverse action under Regulation B; 11 percent (48) involved discrimination based on sex or marital status; 5 percent (21) concerned discriminatory or inadequately documented appraisals; and the remainder, 8 percent (41), concerned the inadequate collection of HMDA data, violations of other recordkeeping requirements, race or age discrimination, pre-screening, and employment discrimination.

Almost half of these violations were found in Districts 4 (Atlanta, 14 percent), 5 (Cincinnati, 17 percent), and 7 (Chicago, 16 percent). The rest were fairly evenly distributed throughout the Districts with District 6 (Indianapolis, 9 percent) and 9 (Little Rock, 9 percent) being slightly above average and the remaining districts having between 3 to 8 percent of the total number of violations identified by our examiners.

As was noted, a good number of these violations concerned such things as not having posted the proper equal lending or employment posters or the board of directors not having adopted an adequate nondiscrimination policy. The remedies for such violations include making sure that the proper poster is promptly posted and that the board of directors considers and adopts these actions after the examiner brings the deficiencies to the managing officer's attention. The impact of this sort of corrective action should not be discounted since consumers who might not otherwise have known will now have notice of their rights under the law and association's personnel will be better informed as to what their superiors expect and what the law requires them to do.

Similarly, as was also noted, our examiners found a number of instances of inadequate documentation of loan decisions. When inadequate monitoring data is kept (contrary to Regulation B's requirements) or where the basis of the denial of a loan can't be determined because the reason given, if any, is vague or general, or because the full application has not been kept or is incomplete, our examiner cannot determine whether a discriminatory action has taken place. In these cases, the examiner will note this in his or her report and inform the association's managing officer that its procedures are inadequate and must be corrected immediately.

A good example of this education process is a case in a fairly new and small association in the 11th District (San Francisco). The examiner found a number of serious problems, including, among others, such things as:

    1. Denials of applications because the security property was "substandard," although there were no substantiating appraisals or other date;

2. Instances where the terms requested by the applicant were erased and the terms of the commitment entered instead, obscuring possible discrimination and making monitoring difficult;

3. Numerous instances of under appraisal without any explanation or justification of the difference between the appraised value and the selling price; and

4. No attempt to make a record of telephone inquiries from prospective borrowers, making it difficult to determine the extent of discriminatory denials and/or precreening.

The examination was completed in mid-January of 1978, at which time the examiner discussed his findings with the association's personnel. The association agreed to have its board of directors consider a resolution outlining its nondiscrimination policy at its next meeting. In addition, the association indicated that it would require more comprehensive documentation of loan decisions and develop a policy manual and documentation standards for its loan officers. In Mid-March of 1978, the Supervisory Agent sent a letter reiterating the examiner's findings and requesting prompt corrective action by the association. Because the violations found were so extensive, the Supervisory Agent requested a meeting with the association's board of directors, which was held in mid-April. At that meeting, the board asked for additional detail on the examiner's finding. In early May, the Supervisory Agent sent a letter documenting the examiner's allegations. In early July, the association made its formal reply, rebutting some allegations and agreeing to take the requested corrective action on others. This time lag was due in part to our requirement that a supervisory letter be read into the board's minutes and the fact that the board must take formal action at a formal meeting. Since board meetings are often scheduled for only once a month, this process may take some time. On August 4, 1978, a follow-up letter was sent by the Supervisory Agent. The next examination of this association is scheduled for October.

This association is a small, struggling minority institution which has been trying to cooperate in correcting the problems uncovered by our examiner. As frequently happens, the association's personnel were unaware of the statutory and regulatory requirements they are supposed to meet. Hence, the examiner's and Supervisory Agent's task has involved as much education as enforcement action. As a result of our efforts, the association has developed extensive poloicy statements which they are in the process of incorporating into their loan manual. They have sent several of their officers to a special training seminar on fair housing and nondiscrimination. They are also working to improve their appraisal and documentation processes under the close watch of the Supervisory Agent.

Similar cases can be found in many parts of the country. As I mentioned at the hearing, our examiners have uncovered extensive patterns of discrimination in a number of savings and loan associations in Dallas.

The types of practices uncovered include:

1. A "rule or thumb" rejecting loans on houses with less than 1,000 square feet.

2. An informal policy of rejecting loans in amounts less than $15,000 in one case and $20,000 in another.

3. An informal policy rejecting loans on frame houses.

4. Rejections based upon a property's age (which has since been prohibited by our new nondiscrimination regulations).

5. Denials of loans without first obtaining an appraisal, supposedly because there were no comparable properties, although it is not readily apparent why they were impossible to find.

6. Denials based upon an applicant's age.

7. Improper evaluation of creditworthiness, i.e., not crediting part-time, overtime, or commission income, failure to include a spouse's earnings, and excessive consideration of educational background.

As can be seen from the types of practices listed above, many of these may amount to a subtle kind of redlining in that houses in older inner-city areas are often smaller, older, less expensive, and may have frame construction. Similarly, many minority applicants may depend on their spouse's income, over-time, part-time or commission income or have less education than the average applicant.

All of the offending associations have been informed that these practices may be discriminatory and should be corrected or discontinued, as the case may require. In two of the five associations involved, the associations have informed the Supervisory Agent that they would discontinue these practices and follow-up examinations have already been held which confirm that this has occurred. Examinations are scheduled for September for two more of these associations and the fifth, whose violations

involved inadequate appraisal procedures and inadequate documentation of loan decisions, should be re-examined later this fall.

As in these examples, the overwhelming majority of associations cooperate when the problems are brought to their attention by the examiner or the Supervisory Agent. In the rare case where informal methods are not sufficient, we have recourse to cease and desist relief. The fact that associations know this naturally contributes to their pliable attitude. To date, only one C&D action has been necessary for violations of this sort. The order was issued against a recalcitrant association in the 4th District (Atlanta) which had made no loans at all in the city in which it was located (which has a large minority population) and which we found was actually undergoing a process of self-liquidation.

We are currently preparing responses to an extensive list of questions on ECOA and Fair Housing Act enforcement for oversight hearings to be conducted by Congressman Rosenthal in mid-September. The packet which is being prepared at his request will contain more extensive statistical data on pattern and practice violations and the corrective actions taken than I was able to present to you. We will submit a copy of these materials to your Subcommittee as soon as they are completed.

Mr. DRINAN. Now, if you want the Federal Home Loan Bank Board to be exempted you had better fight very hard, because I am unpersuaded, I am not sure the exemption you are requesting should be given.

Thank you very much.

Mr. EDWARDS. The time of the gentleman has expired.

The gentleman from Missouri, Mr. Volkmer.

Mr. VOLKMER. I just have several questions.

I would agree with the the chairman that further information as to the race and sex of your staffing is needed.

In your opinion, are these 800 auditors basically dedicated to the principle there should be nondiscrimination?

Mrs. MILLER. I think the record shows that we have had a very much more aggressive attitude in this area on the part of our examiners than ever before. I think that the examiners, like everyone else, wait for a signal from the top. When the Bank Board embarked on an aggressive policy at the top, what we found was that the examiners, with their training, became extremely responsive. They are, I think, quite conscientious.

We are now embarking on a new examination program to further integrate this by providing new training in nondiscrimination and fair housing. We are constantly at it all of the time. I cannot tell you that every single examiner is dedicated, but I think that they are doing a good job.

Mr. VOLKMER. Since you are furnishing that statistical information, I would like to know how many of your auditors or examiners and supervisory personnel are in Washington, D.C. area, approximately?

Mrs. MILLER. I am sorry; I didn't understand.

Mr. VOLKMER. Of those auditors and supervisory personnel, how many do you have in the Washington, D.C. area?

Mrs. MILLER. Can someone give me a quick answer?

Mr. VOLKMER. One, five, ten, twenty? I am talking about the Washington area.

Mrs. MILLER. Approximately 100.

Mr. VOLKER. In other words, within a 25-mile radius of where you are sitting right now?

Mrs. MILLER. One hundred, approximately.

Mr. VOLKMER. As long as you are furnishing that information, would it be too difficult to furnish to this subcommittee, without names, the location of their residence?

Mrs. MILLER. I think we can do that.

Mr. VOLKMER. Thank you.

[The information follows:]

Mrs. MILLER. As requested by Mr. Volkmer, the following list shows the number and residence of the Bank Board's Office of Examinations and Supervision's headquarters staff (located at 1700 G Street NW., Washington, D.C.) and of the staff of the Silver Spring field office which is responsible for examing associations in the District of Columbis, Virginia, and Maryland.

### OES Home Office—1700 G Street NW., Washington, D.C.

Professionals:

| | |
|---|---|
| Arlington, Va | 5 |
| Silver Spring, Md | 5 |
| Alexandria, Va | 3 |
| Gaithersburg, Md | 3 |
| Crofton, Md | 3 |
| Springfield, Va | 2 |
| Washington, D.C | 2 |
| Adelphi, Md | 2 |
| Bethesda, Md | 2 |
| Laurel, Md | 2 |
| Oxon Hill, Md | 2 |
| Potomac, Md | 2 |
| Fairfax Station, Va | 1 |
| Hamilton, Va | 1 |
| McLean, Va | 1 |
| Vienna, Va | 1 |
| Woodbridge, Va | 1 |
| Bowie, Md | 1 |
| Camp Springs, Md | 1 |
| Clinton, Md | 1 |
| Columbia, Md | 1 |
| Hillcrest Heights, Md | 1 |
| Owings, Md | 1 |
| Waldorf, Md | 1 |
| **Total professional staff** | **45** |

Clerical:

| | |
|---|---|
| Washington, D.C | 3 |
| Arlington, Va | 3 |
| Hyattsville, Md | 2 |
| Burke, Va | 1 |
| Bladensburg, Md | 1 |
| Bowie, Md | 1 |
| Camp Springs, Md | 1 |
| Columbia, Md | 1 |
| District Heights, Md | 1 |
| Dunkirk, Md | 1 |
| Lanham, Md | 1 |
| Laurel, Md | 1 |
| Silver Spring, Md | 1 |
| Waldorf, Md | 1 |
| **Total clerical staff** | **19** |
| **Total professional and clerical staff** | **64** |

*Silver Spring Office*

Professionals assigned to Silver Spring Office:

| | |
|---|---|
| Richmond, Va | 4 |
| Silver Spring, Md | 3 |
| Virginia Beach, Va | 2 |
| Alexandria, Va | 1 |
| Baltimore, Md | 1 |
| Bowie, Md | 1 |
| College Park, Md | 1 |
| Columbia, Md | 1 |
| Ellicott City, Md | 1 |
| Finksburg, Md | 1 |
| Gaithersburg, Md | 1 |
| Hyattsville, Md | 1 |
| Lutherville, Md | 1 |
| Washington, D.C | 1 |
| **Total professional staff** | **20** |

Clerical:

| | |
|---|---|
| Columbia, Md | 1 |
| Wheaton, Md | 1 |
| **Total clerical staff** | **2** |
| **Total professional and clerical staff** | **22** |

The Silver Spring office is responsible for examining 167 associations located in the District of Columbia, Maryland, and Virginia. Although the staff listed above nominally work out of the Silver Spring office, they may actually be headquartered in other parts of the area served by this office so that they will be closer to the associations they examine. Examiners are stationed in Baltimore to serve that city and northern Maryland, in Richmond and the Norfolk area to serve central and southern Virginia, and in the D.C. metropolitan area to serve the District, northern Virginia and southern Maryland. Only the two clerical employees and two professional employees spend full-time at the Silver Spring office. The other 18 employees are examiners who spend the bulk of their time on the road examining associations.

Mr. VOLKMER. The next question I have concerns the statement on page 10 where you list certain laws, including the Fair Housing Act, the Home Mortgage Disclosure Act, the Equal Credit Opportunity Act, the Truth in Lending Act, title VII of the Civil Rights Act of 1964, RESPA, and soon, the Community Reinvestment Act.

How many of those actually require forms for a savings and loan institution to follow or prepare?

Mrs. MILLER. All of them.

Mr. VOLKMER. All of them do. I count seven. Now, how many of those forms are more than two pages in length? Let's do it this way:

Would you be kind enough to furnish us all of the forms that are necessary and required by these acts?

Mrs. MILLER. I would be happy to.

Mr. VOLKMER. And I would also like to know approximately how often they are changed within a period of a year or two years.

Mrs. MILLER. Updated.

Mr. VOLKMER. You understand what I am saying?

Mrs. MILLER. I understand; yes, sir.

Mr. VOLKMER. Thank you, Mr. Chairman.

[The information follows:]

Savings and loan associations are required to fill out the following forms:

| Form | Statute Implemented | Frequency |
|---|---|---|
| | EEO-1 | |
| HMDA-1 (model form) | Home Mortgage Disclosure Act of 1975; Regulation C | Annually |
| Loan Application Register (Required beginning Sept. 1, 1978; copies found as attachment III-I to prepared remarks) | FHLBB Nondiscrimination Regulations, 12 C.F.R. sec. 528.6 implementing the Fair Housing Act, Equal Credit Opportunity Act, and the Community Reinvestment Act. FHLBB Nondiscrimination | Data collected on a continuing basis from each application received by association |
| Lending Questionnaire and Nondiscrimination Questionnaire (Part of pre-examination packet sent each association before the examiners arrive) | Regulations, 12 C.F.R. sec. 528 implementing the Fair Housing Act, Equal Credit Opportunity Act, and the Community Reinvestment Act; sec. 5(d) of the Home Owners Loan Act of 1933; sec. 407 of the National Housing Act, and sec. 6(i) and 17 of the Federal Home Loan Bank Act. | Prior to each examination by our examiners—usually every 12 to 14 months. |
| Title VII of the Civil Rights Act of 1964 | | Annually |

The other forms which savings and loan associations use are those required by Regulation B (ECOA), Regulation Z (Truth in Lending) and RESPA. These forms, whose content but not exact format is specified by these regulations, are concerned with the application process and the disclosure notices which must be given consumers. Since there is no required format, the U.S. League of Savings Associations has developed standardized forms for its members. We will forward these forms to the Subcommittee as soon as we receive them from the League. We have enclosed copies of the regulations and specimen forms developed by HUD and the Federal Reserve Board who promulgated the regulations concerned.

Mr. EDWARDS. There is a vote in the House of Representatives, so we are going to recess in a few minutes.

When I come back I am going to ask you, in some depth, how this decision to ask for this exemption was made by the Board.

This subcommittee does not want to do anything to discourage your very important devotion to fair housing. This commitment is new in the Board. We understand and appreciate that very much. But I must echo the words of my colleague from Massachusetts: It's very hard to understand why you want this exemption. I think we would like to know why it was made, the background, who suggested it, without names necessarily, and so forth.

We will recess for 10 minutes.

[A short recess was taken.]

Mr. EDWARDS. The subcommittee will come to order.

We don't want to spend our whole time in this dialog with Mrs. Miller regarding that particular suggestion made by the Board to be exempted, because, as I said earlier, the work you are doing in fair housing is very laudatory. The subcommittee has known about it and it's first class.

However, the subcommittee has received testimony in the past few weeks and months to the effect that there really is outrageous discrimination in housing going on in this country on a daily basis against minorities and women.

I am sure you know better than I of the study that was paid for by HUD that showed that something like 60 or 65 percent of the

minority families that apply for housing either to rent or to purchase are discriminated against, lied to.

So we are not very anxious to talk about exempting a huge part of the housing machinery of this country, especially since the new administration over at the Board has made a complete turnaround from previous administrations.

How do we know that another President might not come in 2 years hence, Father Drinan, and I hope not, and completely reverse this? What would stop a new President from reversing this and changing and ordering all of these regulations to be changed, with a return to the bad old days of 10 years ago?

Mrs. MILLER. It is quite clear what we are doing at this Board is extremely aggressive. But, in truth, we are building on the work of the previous Board. I think that what we are doing through the various tools we have amassed is to institutionalize change within this industry. We are not relying on regulations alone. We are relying on technical assistance. We are relying on the Community Investment Fund (CIF), which rewards lenders who get involved in community lending efforts.

Now, when we talk about community lending efforts, we are talking about minorities and women and we are talking underserved neighborhoods and low- and moderate-income areas, and it is our fervent belief that this comprehensive strategy of regulation and technical assistance, and the Community Investment Fund will accomplish that goal of achieving institutional change. I think that is the cornerstone of what we are trying to do.

Further, the exemption is not from coverage. The issue is which agency should enforce the Act as it applies to federally regulated savings and loan associations.

I would like to take a crack at the questions that you raised before you left the room, if I may, because I think they go to the heart of what we are really suggesting here.

We are committed to doing this anyway.

Mr. DRINAN. Who is "we"?

Mrs. MILLER. The Bank Board.

Mr. EDWARDS. How many members are there on the Board?

Mrs. MILLER. There are three members on the Board.

Mr. EDWARDS. Three members?

Mrs. MILLER. That is right.

Mr. EDWARDS. A Mr. McKinney, you, and——

Mrs. MILLER. Mr. Garth Marston.

Mr. EDWARDS. Have you met and had a board of directors meeting or had a public meeting to make this decision?

Mrs. MILLER. No; we did not.

Mr. EDWARDS. Why was it not a public meeting?

Mrs. MILLER. It is not the kind of thing that is usually done at a public meeting. It's done through a consensus process of reviewing the draft testimony individually with each Board member making suggestions.

Mr. EDWARDS. What was the vote?

Mrs. MILLER. There was no formal vote. There was agreement among the Board members that it would be a duplication of effort if more than one Federal agency was going to be involved with the S&L's.

Mr. DRINAN. Excuse me, Mr. Chairman.

Are there any minutes of the meeting?

Mrs. MILLER. No; there was no formal meeting.

Mr. DRINAN. There was no meeting?

Mrs. MILLER. No meeting as such.

Mr. EDWARDS. Did you have witnesses presented for and against to this decision?

Mrs. MILLER. No; it was done more informally than that, with just discussions with various staff persons. But it has——

Mr. EDWARDS. Were there minority staff members, staff people who disagreed with the decision?

Mrs. MILLER. No. We feel and it has been consistent Board policy that where we felt we had a good handle through our own system of regulating in a particular area that it would be a duplication of effort for another Federal agency to become involved.

I myself would not sit here today unless I felt that we had a program and an effort under way that could stand up to public scrutiny and that would be more effective than anything else that could be provided.

I would like to go back over some of the points.

We are going to do it anyway because we are committed to stamping out discrimination. And we have already, without a CRA and without the new antidiscrimination regulations being in force, uncovered and dealt with patterns and practices and I know we will forward to you examples of that. That is what our examiners are looking for and that is what we are dealing with.

I think that to have the authority to enforce the Fair Housing Act explicitly given to the Bank Board strengthens our ability to deal with the S&L's. We can take action that HUD cannot really take because we have more tools. We will have the Community Reinvestment Act, and where we do not have clear cases of discrimination that can be pinned down under fair housing, we can uncover patterns and practices under the mandate the Community Investment office that will enable us to work with that institution and force them to change that pattern.

Furthermore, we have a great many tools to work with beyond that. There are advances through the bank systems. Each time an S&L wants an additional facility or branch, it has to come to the Board for approval. If, indeed, there are violations of our antidiscrimination or CRA regulations, which are, very similar, they will not receive approval of that facility. So, we have clout in a great many other areas than simply through this legislation.

We can get compliance faster, and I think this is proven by the fact that there were 1,800 supervisory letters sent out last year and just one cease-and-desist order was necessary. That was because we were able to get compliance without using a cease-and-desist order and without having to go into litigation, which is costly for everyone. The other thing, of course, is that we examine each association every 14 months.

Now, I would like to refer you to the Appendix Attachment 3–B of the materials that we forwarded with my prepared statement. You will see Attachment 3–B and it's one typeface all the way through. These are the instructions, the manual for our examiners that we have prepared on nondiscrimination and fair housing en-

378

forcement. Now, this is in addition to the training that they have received, and the ongoing training that they will receive. Looking at Attachment 3-B, you can see why I said before that we have a long headstart in this field and a real commitment to it.

If you go the entire appendix you will see the forms that the examiners have to fill out relative to antidiscrimination and the work paper file index, and so on.

Now, I have to be very honest with you. In the past when examiners went in, their thrust, and the thrust of the Board's interest, was in safety and soundness. If an institution ended up in the problem book at the Board, that institution was there because there was a violation of financial safety and soundness.

All of that is in the process of being revised. We will not just look at safety and soundness when an institution is labled a problem institution, which jumps it to the attention of the Board. If an institution is displaying problems in the area of nondiscrimination, if those problems and those issues are not readily resolvable, that institution will come to the attention of the Board as a problem institution.

This is in addition to everything else we have done. We are now redefining what is a problem institution and this I would say, has been done within the last few months and is part of a continuing effort to build and reinforce for the examiners the seriousness of the Board in these matters.

Mr. DRINAN. Mr. Chairman, could I ask, in the last few months, were you "born again" when this bill was filed, and when did you make the decision to testify against the bill? Was it before or after Mrs. Harris testified in favor of the bill?

You are saying in all candor you only looked at safety in the last few months.

Mrs. MILLER. What I am saying to you is that there is a new tenor and a new attitude and that has been growing. Our intent is to stamp out all discrimination. Our intent is to raise the consciousness of the industry that these issues are as important to this Board as are safety and soundness issues.

Mr. DRINAN. That is not responsive. I asked when and why.

Mrs. MILLER. I would say it is a growing process and that I think the big lead came when the Chairman, the present Chairman, came on board and issued the proposed antidiscrimination regulations, developed the Office of Community Investment and developed the Community Investment Fund as a comprehensive strategy.

Why? I think the why is the same reason that you, sir, are probing so diligently as to what our commitment and our effectiveness in all of this is, because our commitment, no less than yours, is to stamp out discrimination in this country. We have been trying too long.

Mr. EDWARDS. Was your commitment also connected with the lawsuits that were filed against the Board? I believe there have been suits brought requesting the Court to order the Board to get involved in fair housing or else.

Did you discuss the lawsuits at your meetings?

Mrs. MILLER. Oh, yes. The lawsuits, as I remember the date, were about 1975 and 1976, and there is no argument about the fact that

the lawsuits did raise the consciousness level of the present Board and of the previous Board.

That previous Board, I must compliment them, made us the first agency to settle with the civil rights organizations outside of court, that settlement, I think both sides would agree, was arrived at fairly.

But I would really like to reiterate that we are not testifying against the bill. We think the bill is an important piece of legislation.

I think also that it's important to say that we feel that we are in a position, a better position, to really break new ground in enforcement through the procedures that we now have in place and through regular examination of these institutions using our antidiscrimination regulations.

Mr. EDWARDS. Do you think the FDIC should be exempted?

Mrs. MILLER. I am not in a position to comment. I don't know what enforcement mechanisms they have in place or how their examiners are trained.

Mr. EDWARDS. In your consultations with HUD regarding this decision, what did HUD advise you to do, or did you consult with HUD?

Mrs. MILLER. I don't know to what extent that we did. I think I do know we informed HUD that we would like to be exempt from their enforcement power. We have a good working relationship with HUD now. We share information. There is a coordinating committee and I think HUD is well aware of the fact that we have been taking a strong leadership role nationally relative to redlining and antidiscrimination and we have been applauded by them for doing so.

Mr. EDWARDS. Have you suggested to your 800 examiners that they might want to do some testing?

Mrs. MILLER. Testing?

Mr. EDWARDS. Yes.

Mrs. MILLER. No. We do not do testing.

Mr. EDWARDS. But you are an advocate of testing yourself.

Mrs. MILLER. I have done it myself.

Mr. EDWARDS. It's a good technique.

Mrs. MILLER. Oh, yes.

Mr. EDWARDS. I have no further questions.

Father Drinan?

Mr. DRINAN. Yes. Thank you, Mr. Chairman.

I take it that you people have consulted with the next witness prior to making testimony this morning because he is cross-referencing his statement, Mr. Arthur H. Courshon is testifying on behalf of the National Savings and Loan League, and he is also the president of an S&L in Miami.

I take it that there was collaboration, so to speak, between the two people.

Mrs. MILLER. No; there was no collaboration.

Mr. DRINAN. But he had access to your testimony.

Mrs. MILLER. Absolutely. Anyone who asks for it may have a copy. In addition, we circulated the final version to interested civil rights groups.

380

Mr. DRINAN. At the meeting that took place several months ago when three of you, without anybody present, said we are going to ask for this exemption, did you consult the S&L's, did you consult Mr. Courshon?

Mrs. MILLER. I would like to correct your belief that three of us in a closet without any sunshine reached this agreement. What happened was that we went through a process of the staff talking to Board members, getting their feelings, getting their input, so that staff could prepare a position, articulate the reasoning behind it, and assemble the kinds of documents that you see.

There was no violation of the Sunshine Act. This is a process that is constantly carried out so that there is input by the Board members into these kinds of decisions and so that the staff can get direction early on in preparing testimony to enable problems to get worked out.

Now, as far as——

Mr. DRINAN. You held the meeting for which there is no record, and there are no minutes, that is what I am saying.

Did you consult with Mr. Courshon or did you consult with the savings and loans before you people took the decision?

Mrs. MILLER. No.

Mr. DRINAN. You just knew their position? Did you anticipate any resistance?

Mrs. MILLER. Excuse me, sir.

The industry does not like our antidiscrimination regulations. The industry does not like CRA. The industry does not like HMDA. We are not at the Board to sound out the industry on issues like this which we have a mandate to enforce because they are Federal policy and law.

Now, when we propose a regulation, the industry has an opportunity to have input at that time, and well they should, because we certainly don't want to put out regulations that are not sensitive to problems that they have.

Consumers also have an opportunity to have input. But I was not appointed to the Board to do what pleased the industry, I was appointed to the Board to carry out the mandates and the policies of the United States of America. The other members see their role the same way.

There are things we will do that the industry will see are positive from their perspective. There are things that the consumers will see as positive from their perspective. There are things we will do that neither side will be satisfied with, and that is the role of a regulator, as defined by this Board.

Mr. DRINAN. The next witness is going to say things to try to rebut all of us in the Congress. He says there are many policymakers, talking about Members of Congress apparently, who seem to be influenced in their thinking by the unusual characteristics of the real estate market in the Washington area. Then he says it has been fashionable in many cities in recent years to attribute to the savings and loans industries and its leading policies a major share of the responsiblity for perceived problems in discrimination in housing finance and against residents of inner cities.

Would you think, from your extensive background, that the savings and loans industry has been one of the prime forces in perpetuating discrimination in housing financing?

Mrs. MILLER. Do I feel that——

Mr. DRINAN. Yes.

Mrs. MILLER. I think that some members of the industry have, indeed, discriminated in the past. If they had not there would be no reason for you to be considering this law. There would be no reason for us to have adopted regulations and to be undertaking all of the efforts we are.

Mr. DRINAN. Very good. So the thrift industry is one of the primary causes of current urban problems.

Mrs. MILLER. I did not say that. I said that some members of the industry have, indeed, discriminated in the past. I would not want to use a broad brush and say all members of this industry have discriminated in the past, because some were out there doing just what they should have been doing before there were regulations or laws or any of us were aware of the fact that there was a problem.

There are other members of the industry who have discriminated in the past, and who are probably, undoubtedly, discriminating today. Today, we have an opportunity, through all of the processes which I described to you, to stamp out such discrimination and to provide technical assistance to those institutions to help them get into affirmative lending programs and to provide advances at lower interest rates to give them the incentive to do that.

May I go back again to this notion of the meeting?

Our procedure at the Board is, on matters such as this, to have the staff prepare position papers——

Mr. DRINAN. Could we have those position papers?

Mrs. MILLER. To prepare testimony, I mean——

Mr. DRINAN. I am sorry. A lot of position papers were prepared prior to this meeting of the Board.

Mrs. MILLER. No; I misspoke. The staff prepares draft testimony which then is circulated to the various Board members. The various Board members have their input and make their comments and that is one of the major ways in which we arrive at a common position of the Board

Mr. DRINAN. Can I ask this: This was obviously a very important decision by the Board to come out against a bill.

Mrs. MILLER. Oh, no, sir. We are not coming out against the bill. We strongly support this bill.

Mr. DRINAN. Yes, except that you don't want 55 percent of the industry to be covered, 55 percent of all housing.

Mrs. MILLER. No. What we are saying——We strongly support the bill, but we feel that HUD involvement would be an unnecessary duplication of effort, for we are absolutely convinced we can better enforce this law against the savings and loan industry than HUD can.

Mr. DRINAN. It's a very important decision; are there any documentary background memos or similar materials the committee could see or that Government Operations could see? I serve on Government Operations, and I know they are going to be very interested in this decision that was made.

Is there any documentation, background material, justifying the decision that was made that the committee could see?

Mrs. MILLER. I will be happy to report to you further on this.

Mr. DRINAN. You must have seen it; you must remember.

Was it all oral? Were there any documents justifying the exemption that you are seeking? Did staff prepare anything? Did you have input?

Mrs. MILLER. Yes, I had much input, and through the drafting of the testimony and through discussions with staff before it was drafted about the position we should take. The other Board members had input as well.

May I forward you further information on this point, and give you further information on the process that we used on arriving at this, because I don't seem to be doing it very well now.

[The information follows:]

Mrs. MILLER. When a Board Member is scheduled to make a speech or to testify before Congress, the office in the Bank Board most familiar with the subject matter is appointed to prepare and outline and draft of the proposed speech or testimony. The outline is circulated to the Board Members for comment as to what points should be covered. There may be an informal meeting between the Board Member giving the speech or testimony and the staff members preparing it as to how that Board Member would like to see it drafted. The first draft of the testimony is then prepared and circulated to all the Board Members and the heads of all interested offices at the Bank Board. They all have the opportunity to make comments which are collected by the office preparing the speech or testimony. This office incorporates these comments into the second draft of the speech or testimony. The second draft is again circulated among the Board Members and interested office directors and staff members who are allowed a further opportunity to comment. At this point a final draft is usually prepared which must be cleared by the individual members of the Bank Board before it is sent to be printed and sent to the appropriate Committee or group before which the speech or testimony will be given.

During this process, we may receive requests from other government agencies or outside groups or individuals for a copy of the speech or testimony. Once it is in a final form, we freely release it to anyone who requests a copy. In this case, we took the initiative to send an advance copy to the various civil rights groups who had been involved in the suit against the four Federal financial regulatory agencies so that they would be appraised of the position we were planning to take on this bill.

As I mentioned before, a meeting between all three Board Members was never held on my testimony. Each Board Member received a copy of the various drafts and submitted comments, if any. The request that the Bank Board be specifically authorized to enforce this act as it applies to federally regulated savings and loan associations and for them to be exempted from HUD's enforcement authority is just another application of the Bank Board's long-standing policy to maintain its authority as the regulator of the savings and loan industry. Another recent application of this policy concerns the Bank Board's insistence that it, rather than the Federal Reserve Board, should be the agency to develop regulations on credit disclosure for the savings and loan industry.

Mr. EDWARDS. The time of the gentleman has expired. Counsel?

Ms. COOPER. Thank you.

Has the Board considered other alternatives to eliminating what you perceive as possible duplication and waste of effort. For example, have you considered negotiating with HUD a memorandum of understanding that would provide that complaints pertaining to institutions regulated by the Board would be deferred to your jurisdiction initially but without totally exempting HUD's responsibility in this area?

Mrs. MILLER. It's my understanding that that is being done now, that there is sometimes some confusion and some duplication of

effort and this kind of clear-cut definition of responsibility would be preferable.

Ms. COOPER. But you have worked out some of these problems of duplication?

Mrs. MILLER. Well, there is a coordinating committee now and there is information that flows back and forth relative to complaints and compliance, but it has been less than fully satisfactory.

Ms. COOPER. Is that because the terms of the understanding are not explicit enough, or because of a lack of cooperation? Isn't it something that could be worked out through further negotiations?

Mrs. MILLER. There still is likely to be that same duplication of effort. That has been our experience in the past when, despite all efforts at trying to have very clear coordination, there are instances where one agency will move, or the other will move or neither will. It would really be better to have the law specifically direct the Federal Home Loan Bank Board to enforce it.

Ms. COOPER. Have you also considered another alternative? As you probably know, under the existing law there is a mandatory referral of complaints where a State agency has jurisdiction in their State under laws comparable to the Federal fair housing law. Have you considered something along those lines, a mandatory referral?

Mrs. MILLER. No, we have not, to my knowledge we had not.

Ms. COOPER. The subcommittee might be interested in your position on that alternative since there seems to be some feeling that to totally exclude HUD from this enforcement area might not be wise.

Mrs. MILLER. Right; we will be glad to come back to you with a position paper as you suggest.

Ms. COOPER. I also would like to get some clarification of just what procedure you had in mind.

Am I correct that what you are suggesting is that if a complaint is made to the Board, you would utilize your own administrative enforcement scheme, but the complainant would also retain his rights under the act to sue individually in court?

Mrs. MILLER. That is right.

Ms. COOPER. And the Attorney General would still retain his jurisdiction?

Mrs. MILLER. That is correct.

Ms. COOPER. How would your adminstrative enforcement scheme, the whole procedure in existing law now, how does that compare with the enforcement scheme that is envisioned in 3504 for HUD in terms of powers of the Board to order specific relief, the role of the complainant in the process, and the kind of appellate review that is mandated?

Mrs. MILLER. Do you mind if Rebecca Laird, who is an attorney, responds?

Mr. EDWARDS. Identify yourself for the record, please.

Ms. LAIRD. I am Rebecca Laird, Associate General Counsel at the Bank Board.

The Board at present could require restitution if that was determined appropriate or could fashion individual remedies for a complainant of whatever nature appeared to be called for by the

Board. We do these things now, so I think the existing procedure is comparable to what you envision in the bill.

Ms. COOPER. Does that include ordering an S&L to make a specific loan on specific terms?

Ms. LAIRD. Exactly, yes.

Mrs. MILLER. But it goes beyond that. Am I correct, Rebecca, in the fact that anyone in that class or group who had been thus injured, could be given the same kind of redress made to them and that there could be public notification of the fact that this pattern and practice has been engaged by this institution? So the grievance would not only cause individual wrongs but it could also redress grievances of all other individuals who had been similarly treated or maltreated by that institution and, furthermore there could be public notification of the fact that the institution had been engaging in a wrongful policy and practice.

Ms. COOPER. But I understand that there is legislation proposed that would strengthen your cease and desist authority in some significant way.

Ms. LAIRD. That is true.

Ms. COOPER. So in what ways do you feel your authority is lacking?

Ms. LAIRD. That is a very different bill. That bill, among other things, would permit the Bank Board to apply a cease and desist order directly against an officer or director of a savings and loan association as opposed to bringing the action against the institution, which is the primary authority we have at the moment.

I think in a case like this you don't find an individual board director discriminating against people. It's the institution that would be the proper party we would sue or bring an action against with regard to Fair Housing Act enforcement, so the strengthening is not relevant in this context. This power is needed for supervisory reasons; there are other reasons such as individual dishonesty, but it would probably not have an effect in this case.

Ms. COOPER. Do you perceive any significant differences, then, in your existing administrative enforcement scheme from what is proposed in 3504?

Ms. LAIRD. No.

Ms. COOPER. Moving on to something else, I have heard it alleged, that S&L's prefer to make larger loans because there is some economic justification for that choice, because it's more profitable.

You stated earlier that the Board has taken a position that it can be discriminatory to make such limits——

Mrs. MILLER. If the effect is discriminatory then it's not permissible.

Ms. COOPER. To what extent then would an economic justification for the practice be a defense to that kind of guideline or rule? At what point does it become unjustifiable discrimination? Does it have to be totally untrue that there is no economic benefit or does it have to be a marginal situation or what?

Mrs. MILLER. In the one situation that I mentioned to you, it was clear. There was a similar case in Texas, I remember the impact of doing this was to affect whole classes of people who, therefore, could not get loans. That is what we are looking for.

If the individual should not get a higher loan or the property does not warrant it, then clearly they have an economic justification for not making the loan. But when you have a pattern that completely negates lending in a whole section of a community or to a whole group of people, then that has a very serious discriminatory effect of that.

Ms. COOPER. What I was referring to was the possible situation where the cost of making a small loan is a larger percentage than with respect to a large loan.

Mrs. MILLER. No. No; we would not accept that. Even members of the industry say it's a question of averaging. You average a portfolio and the costs of doing business so we would not assume that that would be a valid argument—that it is too costly to make a small loan and, therefore, it should not be made.

Ms. COOPER. If they could come up with the proof that it is, would that still be an impermissible factor if the discriminatory effect was substantial?

Mrs. MILLER. I think the likelihood is we would not accept that as an argument and, in fact, I would say we would not. With the Community Reinvestment Act as a further tool, where we will be looking at the types of credit needed by a community and the types of credit being offered, and since that statement will be available to the public in each and every institution, you can be sure that not only the Bank Board, but also the public, will be supervising what they are doing.

In addition, our antidiscrimination regulations require that a lender publish its underwriting policies, so here again, if you make these policies public and a community organization says these lending policies are totally irrelevant to the needs of their low- and moderate-income neighbors, then we have yet another tool for looking at the practices and patterns of that institution. I think that these kinds of disclosures will help.

We have also a proposed regulation that will require each and every institution to give a prospective homeowner a copy of the appraisal on their house. This is one of those ways in which one can get around the kind of lending problem that we are talking about.

So, between publishing the underwriting guidelines and standards of the institution, which will be made public, the Community Reinvestment Act statement, which will be made public, and which will advise consumers that they can write to the supervisory agent of the District Bank with complaints, and the fact that their institution will have to list the types of credit it makes available; and between the publicity and the public nature of the appraisal process and the examination and the loan application register, it seems to me that there is no way that we will not be able to uncover practices and lending patterns that are injurious to certain consumer groups in various parts of our country.

Ms. COOPER. Thank you.

Mr. EDWARDS. Mr. Volkmer?

Mr. VOLKMER. No questions, Mr. Chairman.

Mr. EDWARDS. Mr. Starek?

Mr. STAREK. Thank you, Mr. Chairman.

Mrs. Miller, earlier, in response to a question from Mr. Drinan, you indicated that you knew that the industry opposed the Bank Board's nondiscrimination regulations. I wonder how you know that and what factors are involved?

Mrs. MILLER. I would like to qualify that. I think there are members of the industry who accepted the fact that they were needed, who are lending in a nondiscriminatory fashion right now and did not find them onerous.

However, they do not, I think, one and all feel comfortable with having to have a loan application register which they see as a further paperwork burden. We got protests from the industry during the comment period. Many of them who are doing a very good job did not feel they should suffer because of those who are not, and yet others recognize the fact that it's needed.

Having worked with industry members in the neighborhood housing services program while I was at the Ford Foundation, I would be the last person in the world to paint them all with one brush and say every industry member discriminates, every industry member redlines. I think that there are many who may have been less than sensitive in the past, who are being really positive and aggressive in their community attitudes now. So, we are going through a period of change, and I would not want to paint them all with a broad, negative brush.

Mr. STAREK. Earlier in your perpared statement you outlined a timetable scheme for responding to complaints and insuring that complaints are handled promptly and investigations are made in a timely fashion. However, as I listen to your explanation you indicated everything was in the future.

Mrs. MILLER. No; what I have spoken about is going on right now.

Mr. STAREK. That is going on right now. I wanted to ask, I think I heard 2,104 as the number of complaints received last year. Is there any backlog, or were those all handled within less than 2 weeks?

Mrs. MILLER. Wait. There were 2,804, possible or real problems identified by examiners in institutions that they had examined. There were 52 special examinations that came about as a result of consumer complaints. So what we had is a much more indepth view of the institutions and a much greater volume of complaints coming out of the examination process than we did out of the consumer complaint process.

We are going to take steps to further notify consumers by having pamphlets available in the S. & L.'s describing the fair housing complaint procedure. We have already redesigned and will demand a new fair lending poster to go up along with the new antidiscrimination regulations so we may, indeed, generate more complaints from the consumers.

I think it is very significant that, in the first quarter of 1978, we had 835 regular examinations conducted on S. & L.'s. Those examinations turned up 1,150 possible or actual fair housing violations. There were 13 complaints that came in that required special examinations and, as I said, any complaint of discrimination automatically triggers an examination of that institution.

The examiner goes out within 1 or 2, and no more than 14 days of receipt of the complaint. In the meantime, the consumer will immediately get a letter saying that the complaint is being followed-up. After the examiner has done the special examination, a response is sent to that consumer within 48 hours.

Now, if it is a simple problem, it can get resolved quite quickly. Where it is a more complex case it could take several months, but the consumer is always informed about what is happening and we have a very strict timetable for that.

The District Banks with the largest complaint load and where the workload is largest, interestingly, have perhaps the most sterling records in meeting these timetables. But we are tracking them all very carefully.

Mr. STAREK. Thank you, Mr. Chairman.

Mr. EDWARDS. Incidentally, the subcommittee heard testimony from the from the attorney for the National Association of Real Estate Agents who practically made the same suggestion, specifically suggesting that the real estate agents be exempted. But, he did point out that for decades the real estate profession has been dedicated to eradicating discrimination in housing.

Mrs. MILLER. I think if they were to come up with a comprehensive program like we have, that you might be more sympathetic to their requests. I certainly might look at it twice. I don't know what their program is.

Mr. EDWARDS. I am sure you realize the subcommittee is not critical of your program. We think it's an excellent program. We commend Mr. McKinney and the Board members.

As you also might gleen from our meeting this morning, we have, at least those of us who are here today, we have some problems with the request for exemption and we can communicate with you more on that.

We thank you very much for your testimony, and we are pleased you came.

Mrs. MILLER. You are welcome. And we thank you for the opportunity, and we will be pleased to follow up with the information that you requested.

> FEDERAL HOME LOAN BANK BOARD,
> *Washington, D.C., August 30, 1978.*

Hon. DON EDWARDS,
*Chairman, Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, Washington, D.C.*

DEAR MR. CHAIRMAN: Thank you for your kind letter regarding my testimony before your Subcommittee on July 26, 1978.

I am taking this opportunity to clarify the Federal Home Loan Bank Board's position on some of the issues raised by the Subcommittee at that time.

First, I would like to reconfirm the Bank Board's support for H.R. 3504. Clearly, it is an important and timely bill. Discrimination on the basis of location of the security property, like all other discrimination, should indeed be prohibited. It has, in fact, already been prohibited by the Bank Board in its nondiscrimination regula- .tions adopted on May 18, 1978. Further, I would like to reiterate that we strongly concur that HUD should have effective Fair Housing enforcement powers.

Additionally, Mr. Chairman, I must emphasize that we are not asking for an exemption from the Fair Housing Act for regulated savings and loan institutions. To the contrary, we wish to point out the Bank Board's unique ability to systematically enforce the Fair Housing Act as it applies to Federally chartered and/or insured savings and loan associations. Moreover, as I stated before your Subcommittee, we are now rigorously enforcing federal antidiscrimination laws and the Bank Board's

nondiscrimination regulations and are committed to continuing to do so with respect to the savings and loan industry whatever legislation is enacted.

From this set of facts flows our conviction that it would be both unnecessary and wasteful for two agencies (actually three agencies, counting the Justice Department's present and to-be-expanded authority to take action in pattern and practices cases) to have responsibility for enforcing the same act. Clearly, the duplication of effort and expense that would result from the concurrent jurisdiction and enforcement efforts of HUD and the FHLBB could hardly be justified at a time when all of us are seeking ways in which to tighten budgets.

Our confidence in our ability to enforce the Fair Housing Act, as it applies to the savings and loan associations we regulate, is rooted in our belief in the strength of the comprehensive regulatory system that we already have in place to detect and rapidly correct Fair Housing Act violations. Our revised nondiscrimination regulations, which preceded the legislative changes under consideration in H.R. 3504, are extremely comprehensive. In addition to the basic proscriptions in the law, they also prohibit discrimination based on the age and location of a property and address prescreening and discriminatory appraisal and loan underwriting criteria. Under this regulation, associations are required, for the first time, to make their lending criteria public and to maintain a register which provides critical detail concerning each real estate loan application. Our examiners have received special training to enforce these regulations. The review institutions for compliance every fourteen (14) months. We have, as well, designed a sophisticated monitoring or recordkeeping system on lending to aid them in uncovering both individual problems and discriminatory lending patterns and practices. Finally, we have a good track record relative to promptly redressing the violations uncovered by our examiners, as well as those brought to our attention by individual complaints.

As I stated in our testimony, it is our conviction that the trained and experienced Bank Board personnel who regularly examine lending institutions can readily uncover many more fair housing violations than could HUD employees investigating individual complaints or suspected patterns or practices on a case-by-case basis. Moreover, we are in a position to correct violations properly and expeditiously.

We have a great variety of effective sanctions and tools to apply to regulated savings and loan associations. Our recent enforcement guidelines set a firm, explicit standard for financial regulatory agencies relative to the corrective action required of institutions violating our nondiscrimination regulations. Not only do they require that the institution correct the violations, they also require that the institution advertise its new lending policies and notify applicants wrongfully denied loans and sources of loan referrals, such as real estate brokers and community groups, of such new policies. Violators are required as well to solicit new loan applications from individuals wrongfully denied credit or, where appropriate, to make restitution in the form of refunds of any application, appraisal, and other fees, costs, and prepayment penalties which they may have paid. In addition, violators could be required to offer to correct onerous terms and refund to the borrower any overcharges. Finally, institutions are being required to notify the affected individuals or class of individuals of the unlawful practice and that their rights may have been violated.

Further, the members of the savings and loan industry which we regulate must come to the Bank Board in connection with many major phases of their operations. They must obtain our approval of Federal insurance of their accounts; they must seek our permission to open a branch (for a Federally-chartered association) or other deposit facilities; and our permission is necessary to relocate, merge, consolidate or assume the liabilities of another institution or to set up a holding company. During the first six months of 1978 the Bank Board received over 1,600 branch, merger, deposit facility, permission to organize, etc. applications. The Bank Board reviews each institution's lending record before deciding upon these applications.

Not only does the Bank Board consider compliance with our regulations to be an essential prerequisite to approving such applications, but the Bank Board has been specifically directed by Congress to do so under the Community Reinvestment Act (CRA). Our proposed CRA regulations, which we will certainly not vote to modify on this point, specifically cite an institution's history of prohibited discriminatory or other illegal credit practices, if any, as one of the factors which must be used in reviewing every application. Thus, an institution will not only be subject to prompt supervisory action when it does not comply with our nondiscrimination or Community Reinvestment Act regulations, but it may also be unable to obtain approval from the Board for any deposit facility or other application made to us.

In addition, another very important tool which the Bank Board has is our Federal Home Loan Bank System which makes loans, in the form of advances, to member institutions. The ability to borrow funds is very important to institutions, particu-

389

larly in the present market. But even in more normal years, over half the industry makes use of this system. The Bank Board has recently established within the Bank system a $10 billion fund called the Community Investment Fund from which special low-price (under market) advances will be made to institutions which are making creative efforts to direct mortgage lending into mature communities and for community revitalization and preservation. Clearly, we will make these special advances available to only those associations whose previous record in the area of nondiscrimination is a good one.

In our view, this mixture of enforcement tools and incentives should encourage much greater compliance with the Fair Housing Act than sanctions alone, and this fact underlies the important distinction which must be made between a regulatory agency with its all-encompassing powers to supervise an industry and a program agency that deals only with one aspect of a problem. Our broad sway over the industry creates an environment in which institutions confronted with their non-compliance with Bank Board regulations are generally cooperative about remedying the situation. Our record shows prompt and complete corrective action with regard to the violations we have uncovered. In only one case involving discriminatory conduct have we found it necessary to go to a cease and desist proceeding. With regard to compliance, I would also like to mention that the duty of enforcing the CRA and the Fair Housing Act simultaneously permits the Bank Board greater leeway in dealing with an institution whose practices may not clearly be proven to discriminate in effect but which certainly are inconsistent with the principles of full service to the community enunciated by the CRA.

I would like to add as well that the Bank Board is not relying on the skill of our examiners or the thoroughness of our regulatory procedures alone, but to the extent practical, we seek maximum public scrutiny of everything we do and everything the industry does. In a number of areas, which would probably be outside the scope of HUD's regulatory authority, our regulations require very broad disclosure to the public of an institution's practices and policies:

We require institutions to publish their underwriting standards so that the public will be aware of the criteria on which their applications will be judged.

Pursuant to the Equal Credit Opportunity Act, institutions must provide applicants with a written statement of the reason why they were denied a loan or not offered one on the terms requested.

We have proposed a requirement that lending institutions make the appraisal report available to any applicant who is denied a loan because the appraisal would not support the loan amount requested.

We have revised the fair lending poster which must be displayed in every S&L office, so that is describes to the public in more easily understood terms the Fair Housing and Equal Credit Opportunity Acts and how to proceed if a person believes that he or she has been a victim of discrimination.

We will soon publish a pamphlet on our complaint procedure which will be distributed by all S&Ls and through community groups.

Under the Home Mortgage Disclosure Act, institutions are required to tabulate and make available to the public information on where their home mortgage loans have been made.

Our proposed Community Reinvestment Act regulations require lending institutions to make available to members of the public their delineation of the community or communities which they are serving and to describe the types of credit they are prepared to extend in those communities. Here, the special focus must be on low and moderate income areas and our examiners will look for this as part of their regular examination procedure.

Our proposed CRA regulations also require an institution to prepare a CRA statement indicating that interested persons may submit to the institution or the appropriate regulatory agency written comments pertaining to the statement. And, in the assessment which would be proformed of an institution's record in meeting its community needs, our examiners would consider the extent to which the institution has actually attempted to consult with members of local communities on its plans and policies related to credit services offered in the community. We believe that concerned citizens groups will make very full use of the opportunity to comment on the various institution's community delineations and on the services they provide. We also believe that management will do much more to actively seek out this input. In the final analysis, a concerned community, a concerned management, and a watchful Bank Board must operate together to bring about institutional change.

Before concluding, I would like to mention two other points. You asked whether we had considered an administrative arrangement with HUD permitting the Bank

Board to be the lead enforcement agency with respect to enforcing fair housing for regulated savings and loans. We believe that such an arrangement would be facilitated if the record clearly indicated that the Congress recognizes the Bank Board's vital responsibility in this area and the efforts it is making to assure full compliance with the Fair Housing Act. However, as we testified, we do not believe that a bifurcated assignment of responsibilities, which only invites their diffusion, is in the best interest of the public or of the Congress. The view has also been expressed that having HUD as principal regulator will ensure that the Fair Housing Act is vigorously enforced even after the present Bank Board Members who are comitted to fair housing leave. We do not see any reason to fear personnel changes at the Bank Board any more than personnel changes at HUD. In any event, Congress is ultimately the watchdog over the agencies and could take remedial action if necessary.

Sincerely,

ANITA MILLER

Mr. EDWARDS. Our second witness is also an expert in the matter of home financing, Mr. Harding Williams, General Counsel of the National Savings and Loan League.

Mr. Williams, we are pleased to have you, and we are anxious to hear how the savings and loan industry views this proposal.

Without objection, Mr. Harding Williams' full statement will be made a part of the record.

[The prepared statement of Mr. Courshorn follows:]

STATEMENT OF ARTHUR H. COURSHORN ON BEHALF OF THE NATIONAL SAVINGS & LOAN LEAGUE

Mr. Chairman and members of the Subcommittee, my name is Arthur H. Courshon. I am Chairman of the Board of Washington Federal Savings and Loan Association of Miami Beach, Florida. I am a member of the Executive Committee and a Past President of the National Savings & Loan League, a nationwide trade association for savings and loan associations, and it is on their behalf that I appear here today. We appreciate the opportunity to comment on the "Fair Housing Amendments Act of 1977".

Mr. Chairman, the savings and loan industry is the primary source of funds for the financing of homeownership in this country. Its assets are over $500 billion. Over 80 percent of these assets are invested in single and multi-family housing loans.

As of the end of 1977, 56 percent of non-farm mortgage debt outstanding in this country on one- to four-family houses is held by federally insured S&Ls, and during the past three years over two-thirds of all such loans were made by S&Ls.

This industry serves home buyers of all income levels, all geographic areas, and all ethnic groups.

In 1977 the average single-family conventional loan made by S&Ls in this country was $41,100 for a new house and $35,100 for an existing house. These figures do not include FHA and VA loans, which would make the average even smaller. Assuming that most home buyers have a mortgage loan of from two and a half to three times annual income these figures, derived from the Federal Home Loan Bank Board, demonstrate that we are serving buyers in a broad range of incomes. I might add that there is a great deal of mythology in the discussions in the press about the high price of single-family homes that is exacerbated by the fact that so many policy makers seem to be influenced in their thinking by the unusual characteristics of the real estate market in the Washington area.[1]

As this Subcommittee is well aware, it has been fashionable in many cities in recent years to attribute to the savings and loan industry and its lending policies a major share of the responsibility for perceived problems in discrimination in housing finance and against residents of "inner cities".

Our critics have not made their case that the thrift industry is the primary cause of current urban problems. This industry is actively involved in working with community groups, in neighborhood revitalization projects, and in investing in the inner city. In many instances the industry has been ahead of the regulators.

The two central points of our testimony are:

---

[1] The distortions of national figures are effectively discussed by James A. Coles, president, Federal Home Loan Bank of Little Rock, in "An FHLB President's Point of View," National League Journal, January 1978.

391

(1) Housing and neighborhood preservation problems involve a complex set of interrelated technical, administrative and political problems which require hard work and accurate analysis to solve. Increased legislative and regulatory measures, not to mention litigation, are not going to solve them.

(2) To the extent that additional legislative and regulatory measures are perceived as needed, they are clearly not needed for the savings and loan industry. The Federal Home Loan Bank Board with its comprehensive regulatory and enforcement powers has more than adequate power to enforce standards embodied in the Fair Housing Act. It has also taken strong measures to enforce the Fair Housing and Equal Credit Opportunity Acts as well as to provide technical assistance to the industry on these subjects. We therefore, are opposed to the coverage of federally insured savings and loan associations under enforcement powers which would be granted to the Department of Housing and Urban Development by this bill.

### ENFORCEMENT POWERS OF THE FEDERAL HOME LOAN BANK BOARD

Taking the last point first, it may be helpful to review the regulatory structure of the S&L industry as administered by the Federal Home Loan Bank Board. The FHLBB is charged under the Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. 1461 et seq., with the chartering and regulation and supervision of Federal saving and Loan Insurance Corporation, are also subject to extensive Federal regulation under Title IV of the National Housing Act ("NHA"), 12 U.S.C. 1724 et seq., to insure the safety and soundness of their depositors' funds and are also subject to extensive regulation by State supervisors.

The point here is that the examination process involves a detailed examination of the books and records of an association as well as individual loan files and rejection files. There is little in the operation of an S&L which escapes the examiner's attention.

It has been well established that the Bank Board has taken the leadership among Federal financial regulatory agencies in adopting regulations to implement the Fair Housing Act. In April, 1972, the Bank Board adopted regulations (12 CFR Part 528, Res. No. 72–476) providing that no federally insured S&Ls and certain other members of the federal Home Loan Bank System:

"* * *shall deny a loan or other service rendered by the member institution for the purpose of constructing, improving, repairing, or maintaining a dwelling, or discriminate in the amount, interest rate, duration, application procedures, collection or enforcement procedures, or other terms or conditions of such loan or other service because of race, color, religion or national origin of * * * an applicant * * * any person associated with such applicant * * * the present or prospective owners, lessees, tenants or occupants of the dwelling (to which the loan or service applies) or the present or prospective owners, lessees, tenants, or occupants of other dwellings in the vicinity of the dwelling (to which the loan or service applies)."

In addition, the regulation prohibited the refusal to accept an application or inquiry or to discourage the making of an application or inquiry for a loan or service on the same prohibited bases. The measure also set out requirements for the equal housing advertising logo and poster.

This regulation has been subsequently amended to include a prohibition against discrimination on the basis of sex and to require consideration without prejudice of the joint income of husband and wife when either or both applies for a loan.

In late 1977, the Board issued for comment two sets of proposed regulations (Res. No. 77–636, November 1, 1977, and Res. No. 77–637, November 2, 1977) providing for a sweeping expansion of the regulations dealing with discrimination in lending. The first of these proposed the addition to the existing prohibited bases for loan refusal of race, color, religion, sex and national origin the following:

Age of the applicant (subject to capacity to contract).

Marital status of applicant.

Receipt of income from public assistance.

Good faith exercise of rights under the "Consumer Credit Protection Act".

Age of dwelling.

The physical or economic characteristics of neighborhood.

It also proposed the development of written underwriting standards and review by examiners of advertising and marketing practices that might have a discriminatory effect.

The second proposal dealt with applications themselves and the development of an application register to serve as a monitoring device to provide an indication of how well applicants in the protected classes fared with their applications.

These proposals were issued in final form on May 25, 1978 (Res. No. 78–302, 63 Fed. Reg. 22332). The summary in the FEDERAL REGISTER provides an idea of their scope:

These amendments to the Bank Board's fair lending regulations and policy statement:

(1) Prohibit member institutions from automatically refusing to lend because of the age or location of a dwelling; (2) prohibit loan decisions based on discriminatory appraisals; (3) emphasize that there is a right to file a written loan application; (4) require member institutions to have written loan underwriting standards which are available to the public upon request; (5) revise the Equal Housing Lender poster which member institutions display in their lobbies; and (6) establish a new monitoring system for fair lending enforcement and analysis.

These regulations are not simply promulgated and applied to a few associations on the basis of complaints as they might be in an unregulated industry. Every federally insured S&L is scrutinized at least once every 14 months by a representative of the Board's Office of Examinations and Supervision.

The examiner works from a Manual on Examination Objectives and Procedures containing some 300 pages of detailed instructions and checklists covering every aspect of an association's operation ranging from competence of management, asset and liability management, to loan application procedures and accounting practices.

Over twenty of the 300 pages of the Manual which we have in our office, which does not yet contain the latest regulations, are devoted exclusively to nondiscrimination in lending.

It is interesting to note, for example, that in our copy of the Manual, which is dated July 1, 1976, examiners were instructed that "there is no economic justification for a hard and fast rule that no loan will be made on property over a certain age * * * and the average income level of a neighborhood (is an inappropriate criterion) for approving or denying a loan". Of course, there are also references to racial composition as a prohibited criterion, but the Board's Office of Examinations and Supervision almost two years prior to the Board's issuance of final regulations on age of dwelling and composition of neighborhoods were enforcing these criteria in actual examinations. The legal basis for the utilization of these criteria was undoubtedly an application of the "effects test" to specific prohibitions in the Fair Housing Act. Their utilization, we believe, is a dramatic example of the Bank Board's initiative in the enforcement of that Act for institutions under its jurisdiction.

As to enforcement power to compel compliance with its regulations, the Bank Board in Section 5(d) of the Home Owners' Loan Act and in Section 407 of the National Housing Act for federally insured State-chartered associations has power to issue cease and desist orders against individual directors, officers and employees for removal or suspension in certain instances and against individual institutions in cases where it has, or is about to violate a rule, regulation or order of the Board, or to commit an "unsafe or unsound" practice, or where it is "about to" commit such violation. It also has held that it has the power to require that an association make restitution to individuals who have been damaged by its actions.

As the members of the Subcommittee may know, the well publicized "Safe Banking Act" (now the "Financial Institutions Regulatory Act of 1978", H.R. 13471), which has passed the Senate and has been reported by the House Banking Committee, would broaden the enforcement powers of the Board to extend cease and desist authority to individual officers and directors of associations who violate or are about to violate a rule or order of the Board or to commit an unsafe or unsound practice.

The National League has serious concerns about this increase in enforcement power, on the principal ground that the board's exising enforcement powers are more than adequate to enable it to carry out its responsibilities. By its own interpretation of these powers it has in addition to the traditional cease and desist authority, the power to compel restitution, and to require affirmative action on the part of an association and its directors or employees.

It is not our purpose to utilize this forum to air our views on the Board's enforcement powers, but we do want to make the point that they are tough and more than adequate to handle compliance with the Fair Housing Act.

We are submitting for review of the Subcommittee staff a memorandum on the Bank Board's current enforcement powers prepared by Arthur W. Leibold, Jr., former General Counsel of the Federal Home Loan Bank Board, and a copy of a recent opinion of the Board in a cease and desist action against an S&L which allegedly overcharged its borrowers in computing interest on their mortgage loans.

Having provided this brief summary of the Board's activities and regulations on the subject of nondiscrimination in lending, and referring also to the more detailed

information on this subject provided in the excellent statement of Board Member Anita Miller, we submit that the case has been made for the exclusion of federally insured S&Ls from the proposal in Section 208 of H.R. 3504.

This section would add a new Section 810 to the Fair Housing Act to provide the Department of Housing and Urban Development with authority to enforce the Act by the issuance of cease and desist orders after notice and opportunity for hearings. It would also add a new Section 814 providing for the Secretary to promulgate rules to carry out the purposes of the Act.

The approval of these two sections would with respect to savings and loan associations create an enforcement authority which clearly duplicates that of the Bank Board, and for which no case has been made.

In a similar instance of such duplication of regulation this Congress forcefully indicated that such duplication is contrary to sound public policy. I am referring to the jurisdiction which the Federal Trade Commission has asserted over the savings and loan industry under the Federal Trade Commission Act, particularly its inclusion of S&Ls with several broad trade regulation rules despite the fact that the Bank Board possesses the requisite expertise, which the Commission does not have in the field of residential housing.

In approving H.R. 3816, the "Federal Trade Commission Amendments of 1978", both the House and Senate and the Conference Committee also approved a section of the bill which specifically exempts S&Ls from Sections 5, 6 and 18 of the FTC Act. The House, as you know, rejected the Conference Report because of its disagreement on the Congressional veto provisions. We believe that the reasons for exempting Federally insured S&Ls from the provisions of proposed Section 810 of the Fair Housing Act are equally compelling.

I think it is fair to say that we are moving into a new era of dealing with urban lending and discrimination in housing. I mentioned in the beginning of my testimony that such problems involve some highly technical and difficult practical problems. I believe there is a growing awareness of these problems on the part of community and civil rights organizations. In addition there is a growing awareness and sensitivity in the savings and loan industry to these problems. I personally hope that the era of litigation is passed and that the era of coopperation is beginning.

Mrs. Miller has stated on several occasions, and we agree, that the issuance of a cease and desist order represents failure rather than success. In addition to issuing comprehensive regulations the board is also proceeding to provide the initiative for all organizations interested in urban lending to come together to discuss practical solutions to these problems.

Mrs. Miller's statement outlines the Forum on Community Investment and Revitalization which was held last month at the Bank Board under the sponsorship of the Bank Board's Office of Community Investment. The National League along with 38 organizations was represented and we were impressed with the fact that this meeting provided a free and frank discussion among representatives of groups who, to our knowledge, had never met together for such a discussion. Among those represented were lenders, casualty insurers, home builders, realtors, civil rights groups and groups having an interest in urban affairs and minority rights.

There was a refreshing absence of adversary rhetoric and abstract theories. The Forum identified a number of concrete problems which will be the subject of further work by task forces under the direction of the Office of Community Investment. Among the discussions identified as requiring further action are availability of casualty insurance, neighborhood factors in determining credit worthiness, red tape caused by local codes and permits and other problems in rehabilitation, displacement of low- and moderate-income residents as "inner cities" become more attractive to higher income residents, rural community investment, and commercial revitalization.

There was also considerable discussion of appraisal practices and techniques as they relate to changing neighborhoods. There was also a refreshing recognition that these problems must eventually be solved by local community leadership and not by edicts from Washington.

I mention the Board's current activities to reassure the Subcommittee that as far as the savings and loan industry is concerned, equal housing opportunity and its concomitant issues, discrimination in housing and housing for low- and moderate-income families, is well in hand at the Federal Home Loan Bank Board.

Mr. Chairman, there is one provision in Title II embodying a principle which we wholeheartedly support. Proposed new Section 813 of the Fair Housing Act in Section 207 of the bill would permit the Secretary to allow reasonable attorneys' fees and other costs to prevailing parties in actions under the Act, including admin-

istrative proceedings under proposed amended Section 810(a). At the National League's 1977 Legislative Conference a resolution was adopted as follows:

The National League favors legislation to require that defendants who successfully defend suits, claims, or other investigatory actions by Federal or State agencies, Boards or Commissions, be reimbursed for the costs incurred from appropriated funds of the agency bringing the action.

The adage that "the power to tax is the power to destroy" can be adapted in these days of increasing litigation as "the power to sue is the power to bankrupt". Suits by regulatory agencies pit government lawyers who essentially have nothing to lose against defendants who must either settle or fight the case with their own funds. We believe that a government agency should be made to think twice before initiating suits, particularly against smaller businesses and individuals.

## TESTIMONY OF ARTHUR H. COURSHON, CHAIRMAN OF THE BOARD OF WASHINGTON FEDERAL SAVINGS & LOAN ASSOCIATION OF MIAMI BEACH, FLA., PRESENTED BY HARDING WILLIAMS, GENERAL COUNSEL, NATIONAL SAVINGS & LOAN LEAGUE

Mr. WILLIAMS. Thank you, Mr. Chairman.

My name is Harding Williams, and I am general counsel of the National Savings & Loan League.

I appear in lieu of Mr. Arthur Courshon, who sends his apologies to the subcommittee. He was detained by a last minute emergency in Miami.

I would like to begin by reading you a letter from Mr. Courshon addressed to Mr. McKinney of June 14, 1978.

"Inasmuch as Washington Federal has for many years taken a leadership role in lending to the disadvantaged, the Board of Directors requested that I write to you congratulations upon the national leadership role you are taking in this matter.

It is ironic that in past years when our association was making loans to the disadvantaged, which we consider to be a part of our charter mandate and which loans we considered safe and sound, that we were repeatedly criticized for making loans in the inner city based on the character of the neighbors involved and the type of people who were recipients.

It is encouraging to see our business being led out of the dark ages.

Congratulations again.

Sincerely.

I will summarize my statement briefly.

Mr. EDWARDS. What era was he referring to where the Board, the examiners affirmatively discouraged mortgage loans in disadvantaged areas? Is that what you said or the letter said?

Mr. WILLIAMS. His association was formed right after World War II, so I assume he is referring to the period post-war up to the confirmation of Mr. McKinney.

Mr. EDWARDS. But the previous witness said that the new regulations were the result of many years of working towards these regulations.

Mr. WILLIAMS. That is correct, and we go into that in the testimony.

Mr. EDWARDS. Fine; you may proceed.

Mr. WILLIAMS. I think what he was getting at was that because of the safety and soundness requirements of the savings and loan regulations, many examiners tended to take a very conservative view towards loans in certain parts of communities where they were perceived to be perhaps more risky than was deemed prudent.

The two central points of our testimony are as follows: First, housing and neighborhood preservation problems involve a complex set of interrelated technical, administrative, and practical

problems which require hard work, accurate analysis to solve. Increased legislation and regulatory measures, not to mention litigation, are not going to solve them.

Second, to the extent that additional legislative and regulatory measures are perceived as needed, they are clearly not needed for the savings and loan industry. The Federal Home Loan Bank Board, with its comprehensive regulatory and enforcement powers, has more than adequate powers to enforce standards embodied in the Fair Housing Act and I might also mention the Equal Credit Opportunity Act.

It has also taken strong measures to enforce the Fair Housing and Equal Credit Opportunity Act as well as to provide technical assistance to the industry on these subjects.

We are, therefore, opposed to the coverage of federally insured savings and loan associations under enforcement powers granted to the Department of Housing and Urban Development, and I would like to make it clear what we are referring to are two particular sections of the bill.

First, the cease and desist power on the part of the Secretary of HUD which clearly duplicates what the Bank Board has and, second, rulemaking on the part of the Secretary.

We are not objecting to pattern and practice jurisdiction in the Justice Department.

The next portion of the statement deals with the brief history of the action taken by the Bank Board in the years since the enactment of the Fair Housing Act.

I might mention in another publication, not this one, in an analysis of the regulations we are publishing shortly we have characterized the rules and regulations applicable to savings and loan associations in this area as a patchwork.

This statement is not intended to be critical of the Board. What I am getting at is, as you are all well aware, the law of civil rights and fair housing has been an evolving one. Major court cases have established precedents that have gone beyond what many thought the statutes pertained to originally.

Therefore, as case law developed, these rulings were incorporated into the Examiner's Manual of the Bank Board, and I would just like to underscore something Mrs. Miller pointed out, at the risk of being called in collusion.

We do have copies of the Examiner's Manual and I understand you have the materials in the examination manual dealing with anti-discrimination in the attachment by the Bank Board.

In the copy we have, and I think it's the same one, which is dated July 1, 1976, I would like to read, at the bottom of page 7 of my testimony:

It is interesting to note, for example, that in our copy of the manual, which is dated July 1, 1976, examiners were instructed that:

There is no economic justification for a hard and fast rule that no loan will be made on property over a certain age * * * and the average income level of a neighborhood (is an inappropriate criterion) for approving or denying a loan.

That goes beyond the strict prohibition against discrimination on race in the Fair Housing Act and it is an embodiment of what is

known as the "effects test," of which I am sure you are all aware, as applied to lending practices.

This document was published almost 2 years prior to the Board's issue answer of formal, and final, regulations on age of dwelling and composition of neighborhoods.

Our statement next goes to the cease and desist powers of the Board, about which you have heard a discussion.

I will start with page 10.

Having provided this brief summary of the Board's activities and regulations on the subject of nondiscrimination in lending and referring also to the more detailed information on this subject provided in the excellent statement of Board member Anita Miller, which I should underscore was not written in collusion with the national league nor did we write ours in collusion with her or the Board, we submit that the case has been made for the exclusion of federally insured S. & L.'s from the proposal in section 208 of H.R. 3504.

Again, I am referring and I do so later on in the testimony specifically to the cease and desist powers of HUD and the rule-making. We don't see that there is any guarantee of any greater solutions to what are admittedly complicated and complex housing problems by simply providing another layer of cease and desist power over that which the Board already has.

Mrs. Miller's statement outlines the forum on community investment and revitalization which was held last month at the Bank Board under the sponsorship of the Bank Board's Office of Community Investment.

The national league along with 38 organizations was represented and we were impressed with the fact that this meeting provided a free and frank discussion among representatives of groups who, to our knowledge, had never met together for such a discussion. That is an example of the Board's leadership in nonadversary processes.

Among those represented were lenders, casualty insurers, home builders, realtors, civil rights groups, and groups having an interest in urban affairs and minority rights.

There was a refreshing absence of adversary rhetoric and abstract theories. The forum identified a number of concrete problems which will be the subject of further work by task forces under direction of the Office of Community Investment.

Among the discussions identified as requiring further action are availability of casualty insurance, neighborhood factors in determining creditworthiness, redtape caused by local codes and permits and other problems in rehabilitation, displacement of low-and moderate-income residents as "inner cities" become more attractive to higher income residents, rural community investment, and commercial revitalization.

There was also considerable discussion of appraisal practices and techniques as they relate to changing neighborhoods. There was also a refreshing recognition that these problems must eventually be solved by local community leadership and not by edicts from Washington.

I mention the Board's current activities to reassure the subcommittee that as far as the savings and loan industry is concerned, at least those who are members of the national league, equal housing

opportunity and its concomitant issues, discrimination in housing and housing for low- and moderate-income families, is well in hand at the Federal Home Loan Bank Board.

I would like to comment briefly on section 207 of the bill which would provide a new section 813 of the Fair Housing Act, Reimbursement of Attorneys' Fees.

As you note, on the bottom of page 13 of our statement, we have a resolution in favor of that principle, believing it's only fair that defendants be reimbursed if they are successful in suits by the Government.

That summarizes our statement, Mr. Chairman, and I will be happy to attempt to answer any questions you might have.

Mr. EDWARDS. Thank you very much, Mr. Williams.

The gentleman from Massachusetts, Mr. Drinan.

Mr. DRINAN. Thank you, Mr. Chairman, and thank you, Mr. Williams.

I have here from the press table a press release your organization is sending out today, and that press release constantly quotes the Federal Home Loan Bank Board. That was the basis of my suggestion that there has been prior arrangement. The press release says that the FHLBB has indicated that it agrees with the national league opposition to the particular provision.

Did your organization write or communicate with the national board sometime ago in opposition to the bill under question?

Mr. WILLIAMS. No; we did not. We had no occasion to lobby the Board, so to speak, on this provision.

Mr. DRINAN. Did your organization oppose the regulations of the Board on discrimination?

Mr. WILLIAMS. We endorsed them in part and opposed them in part.

Mr. DRINAN. So what the previous witness said is not entirely accurate. She said, as I recall, she did not recall any formal opposition by your organization to the regulation on discrimination.

Mr. WILLIAMS. That is correct.

Mr. DRINAN. In other words, you came out against some of them.

Mr. WILLIAMS. Yes; we did. Both of the final discrimination regulations we are discussing now, came out in November as two separate resolutions, I think one day apart.

The set dealing with antidiscrimination in lending embodying the prohibitions against discrimination on the basis of age of dwelling or composition of neighborhood, the national league endorsed in principle.

We had a number of comments, and I will be glad to supply our comment letter for the record, one of which was that we felt there should be greater discretion on the part of the lenders to discriminate against speculators, because speculation has a detrimental effect in certain neighborhoods.

It is that kind of a technical comment.

Mr. DRINAN. You are saying, Mr. Williams, that your organization is opposed in part to several of the positions that have been adopted by the Board, and which the Board is seeking to enforce?

Mr. WILLIAMS. Well, these comments that I refer to are comments to the proposed regulations. We endorse the antidiscrimination regulations in principle.

We had some more critical comments of the proposed application loan register, as did most of the industry.

But the point, again, is that opposition was not directed at the thrust of what the Board was doing. It was merely the way they were carrying it out.

I think the application loan register, as proposed, not only had some 42 items that had to be checked, but also that kind of register, coupled with a proposed revision of the definition of application, would have meant, in our view, and I think the board ultimately agreed that it would require a 42-item list to be prepared almost for every casual inquiry about loan terms and rates; and I think that is clearly burdensome.

Mr. DRINAN. What does your organization propose as an alternative to get at a problem which I assume you admit does, in fact, exist?

Mr. WILLIAMS. Yes, we do admit it exists.

Mr. DRINAN. That is right, and what is your solution, if you are opposed to what the Board does?

Mr. WILLIAMS. We are not opposed to what the Board does; we think the Board's regulations are fine. They are an embodiment, to a large extent, of existing law. We are not opposed to the board's antidiscrimination regulations. Our members are committed to carrying them out.

Our solution—well, solution is a broad term—some of our ideas for improving urban neighborhood problems involve, as I said in our statement, a number of things: More local involvement with community action groups, trying to identify the factors that cause the problems. And one of the most effective vehicles for neighborhood preservation which exists today is the so-called neighborhood housing program which the bank board has taken the leadership in; and that program—I am sorry that I didn't provide a more comprehensive analysis of that in our statement—that program recognizes that it takes at least the three elements to work together to involve neighborhood problems: The lending community, the city government and the neighborhood residents themselves; and when those three forces coalesce, the results are quite dramatic.

Baltimore is the closest example. The neighborhood housing program is active across the country; it has had excellent results in California; and I might mention in California and other parts of the country a number of our members are opening or forming consortia and opening storefront home counseling offices in lower income neighborhoods.

It is that kind of thing at the community level which we think is most effective. We are not saying that the Fair Housing Law should not have strong teeth, but we think it does, not only because the bank board has C. & D. authority, but also the Attorney General is sitting up there watching for patterns or practices of discrimination, and, as you know, there is quite a significant lawsuit on appraisal practices.

Mr. DRINAN. If I may ask, how was the decision reached by your organization?

Mr. WILLIAMS. To what?

Mr. DRINAN. To oppose the legislation.

Mr. WILLIAMS. It was reached by a meeting of our executive committee at our last annual meeting in Houston, Tex. I might mention, Mr. Drinan, that it stems from a decision reached 3 years ago with respect to the encroachment of another agency in the savings and loan area, and that is the Federal Trade Commission.

We realized when they issued their first set of trade regulation rules under the Magnuson-Moss amendment of 1975 that we had a clear case of duplciation in which one agency, the Federal Trade Commission, had been granted authority to, in effect, look over the shoulder of the agency that was created to regulate the savings and loan industry, or, putting it another way, that a highly regulated industry is being subjected to the jurisdiction of the Federal Trade Commission; and as I mentioned in my statement, Congress has approved legislation which would exempt savings and loan associations from at least the Federal Trade Commission Act, certain sections of it, on the basis that dual regulation is not going to constitute any greater protection to the consumer.

So our whole thrust in this area of duplicate regulation——

Mr. DRINAN. Sir, with all due respect, that is an entirely different topic, isn't it? Are you telling me 3 years ago you fought and won against the encroachment of the FTC; therefore, 3 years ago you decided you are going to fight against encroachment by HUD?

Mr. WILLIAMS. No; I am saying our present policy with respect to HUD grew out of the same premise.

Mr. DRINAN. The same premise? What is the premise?

Mr. WILLIAMS. The premise is that the bank board was created—well, let me back up. Our premise is that the savings and loan industry is perhaps the most highly regulated industry in this country, with the possible exception of the airlines.

Mr. DRINAN. All of the industries say that. The trucking industry say, that. But go on.

Mr. WILLIAMS. They probably would qualify and there are certain areas in which the Bank Board has jurisdiction in which it makes no sense to vest additional jurisdiction in another Federal agency, the Federal Trade Commission example being one.

We clearly think that the fair housing area is another, and that the bank board has even stronger responsibility for it.

It is ironic that the Bank Board took a lot of heat today because they are way out in front of anybody on this. The Senate Banking Committee, in a report last year, recognized that among the financial regulatory agencies the Bank Board is way ahead of anyone else in enforcing the Fair Housing Act; and I don't think you are going to have another duplicate set of people from HUD running around looking at examining books——

Mr. DRINAN. She didn't take heat because of that. She took heat because she didn't refute the case made by Ms. Harris, saying this is a necessary thing, it should be one step forward, we should have a centralized agency for this. And we commend her and I don't think it is fair to say she took the heat.

We commended her for what she has done, but she did not make the case that the supervisory power of HUD would not help her.

Mr. WILLIAMS. I think under the act as it would be amended by this bill, even with the exemptions we support, a complainant with a complaint against a savings and loan institution, could, in addi-

tion to going to the Bank Board, also go to the Secretary of HUD and, I assume, to the Attorney General as well as, of course, sue in his own right.

Mr. DRINAN. I am sure my time has run out. I thank you for your approbation and approval of the provision of counsel fees for issues in this area, as indicated on pages 13 and 14.

Thank you very much.

Mr. EDWARDS. Mr. Volkmer?

Mr. VOLKMER. I have no questions.

Mr. EDWARDS. Counsel?

Ms. COOPER. No.

Mr. EDWARDS. Mr. Starek?

Mr. STAREK. No questions.

Mr. EDWARDS. Where is your office, Mr. Williams, here in Washington?

Mr. WILLIAMS. Here in Washington, yes.

Mr. EDWARDS. Do you meet with members of the Board and chat with them and have lunch and talk over mutual problems?

Mr. WILLIAMS. There are a number of ways in which we interact, if that is the word, with the Board.

The Board is invited to our annual meetings, as it is to the annual meeting of our sister league, the U.S. League of Savings Associations. There is a Savings and Loan Advisory Committee that meets four times a year with members of the Board and staff. And, by the way, that has industry and public members. Mrs. Miller was a public member, I believe, before she joined the Board.

Our chairmen of our various committees, and the president, occasionally, will meet with the chairman and other members of the Board by appointment; and then there are numerous contacts between the national league staff and the Board staff. It is that kind of an arrangement.

Mr. EDWARDS. Did your staff informally meet with the staff of the Board on the subject of this exemption?

Mr. WILLIAMS. No; I called a person in the legal department and said, "I just was curious about your position on the bill." This was not—I suppose it may be puzzling now—the Board's position on this was not a big point with us. In fact, I was not even sure that the Board was going to testify. This is not a burning issue in the national league.

Let me put it another way: If we met with members of the Board staff, there are a lot of other priority items which would be discussed other than this.

Mr. DRINAN. Mr. Chairman, if I may ask—

Who made the decision to testify?

Mr. WILLIAMS. For us, well, that is done usually in discussions with myself and my immediate superior, and we decided this would be an appropriate bill to testify on, because of our strong feelings on duplication of enforcement; and, unfortunately, our witness, Mr. Courshon, could not make it.

Mr. DRINAN. Did you know that the Board was going to testify?

Mr. WILLIAMS. I knew; yes, I knew the Board was going to testify.

Mr. DRINAN. And you knew on the same day?

Mr. WILLIAMS. I am not sure whether I knew the Board was going to testify when we decided we got the invitation—what,

about six weeks ago—and I think we decided to testify at that time. I didn't know at that time whether or not the Board was going to testify.

Mr. DRINAN. Did you know the position of the Board?

Mr. WILLIAMS. Not at that time.

Mr. EDWARDS. Well, we certainly would not be intersted in requiring that savings and loan associations throughout the country duplicate a lot of forms on anything; that would be ridiculous.

Would this bill require that, filing of forms in two places?

Ms. COOPER. The bill itself speaks in terms of HUD having the power to issue substantive regulations that could require certain forms to be filled out, but there are no regulations now that do so.

Mr. EDWARDS. Well, couldn't HUD and the Board reach an agreement?

Ms. COOPER. Yes.

Mr. VOLKMER. Mr. Chairman, that was one of the concerns I had, because they have already got I don't know how many—I hope they will furnish all—under those seven Acts—the various forms; and it would concern me if they were going to have to do it both places.

Mr. EDWARDS. Yes. I would certainly hope so, and I would hope you would be alert to that possibility. There is no desire of this subcommittee to cause duplication of work by anybody; but we are assured by HUD—I believe—that arrangements can be—in the event of enactment of the legislation—that arrangements could be made for a sharing of the burden, so that the work would get done without any attritional charge being made or responsibilities being placed on the individual savings and loan associations.

Mr. WILLIAMS. That would be much to be desired if the bill goes through as it is now drafted; and we would certainly work with the Board.

Mr. VOLKMER. Mr. Chairman——

Mr. EDWARDS. Mr. Volkmer.

Mr. VOLKMER. When you conclude.

Mr. EDWARDS. I have finishd. Thank you.

Mr. VOLKMER. I would like to ask the gentleman, in the event this language would pass as it is, would it be of any detriment to the savings and loans industry if the actual auditing and investigations or determinations as to the nondiscriminatory or discriminatory practices were done by HUD instead of the Board?

Mr. WILLIAMS. Would it be a detriment to the association?

Mr. VOLKMER. Yes, so the Board now does it, basically, and they say they are embarking on it, and we said, "Instead of you doing it, we are going to have HUD do it."

Mr. WILLIAMS. I think it would be a detriment, not because HUD would find out anything that the examiners wouldn't, but, you see, the examiners go in once every 14 months to conduct a thorough audit of everything——

Mr. VOLKMER. Correct.

Mr. WILLIAMS [continuing] from the competence of the management to how they handle petty cash, and it would just seem to me to be awkward to just say to the examiners, "Well, don't worry about the antidiscrimination stuff, because we are going to have HUD come in." This is a time burden, and an expense burden on

the association, and I would not see any reason for "HUD examiners," in quotes, to have that function.

There seems to be no reason why HUD examiners would be anymore likely to find subtle or overt forms of discrimination than the Board examiner; in fact, quite the contrary, because the Board examiners are pretty savvy about what goes on in these associations, and they, of course, will have the register right there, and they can see patterns or practices right before their eyes.

Mr. VOLKMER. What is the period of time for a normal audit?

Mr. WILLIAMS. How long does it take? I don't know this for sure. Anywhere from a week——

Mr. VOLKMER. Depends on the size of the institution?

Mr. WILLIAMS [continuing] to several months, and, right, depending on what the auditors come across.

I might say this, too, that the Bank Board examiners because of their familiarity with mortgage lending and underwriting and appraisal criteria, and that sort of thing, I think, would be more likely to be sensitive to more subtle information of discrimination through varying of credit terms and size of loan and that kind of thing.

Mr. VOLKMER. Is there any opinion within the Savings and Loan League that redlining basically does exist?

Mr. WILLIAMS. Is there opinion that it does exist?

Mr. VOLKMER. Yes.

Mr. WILLIAMS. I think there is a recognition that certain associations in the past have been less sensitive to the credit needs of certain areas of their communities, I suppose, which is a long way around of saying yes; and as Mrs. Miller testified, of course, these attitudes vary among the 4,000 savings and loan associations; but I think there is increasing evidence that individual S&Ls in their communities are not only simply adopting antidiscrimination policies, but they are also getting out in the neighborhoods and working.

Two of our members serve on the National Commission on Neighborhoods, in which they sit face to face with the community activitist representatives, weekend after weekend all over the country. This kind of activity is in addition to the strict statutory and regulatory provisions, and is making, I think, a difference.

Mr. VOLKMER. Thank you, Mr. Chairman.

Mr. WILLIAMS. I might add, there are in many communities mortgage review committees to which a person can go, who believes that, he or she has been discriminated against for a mortgage loan application. I think that is an excellent and constructive development.

Mr. EDWARDS. Mr. Starek?

Mr. STAREK. Yes, thank you, Mr. Chairman.

Mr. Williams, I want to know if you envision a duplication on the part of both HUD examiners and Home Loan Bank Board examiners working on the very same complaint or the same pattern or practice problem?

Mr. WILLIAMS. Well, if there were a particular complaint, I suppose——

Mr. STAREK. Let's stay with a particular complaint. The way this legislation is drafted, do you envision that both HUD personnel

403

and Federal Home Loan Bank Board personnel would have the responsibility of responding to that complaint if it were, in fact, filed with both organizations?

Mr. WILLIAMS. The way the bill is drafted now, yes, I do.

Mr. STAREK. Thank you.

Ms. COOPER. Mr. Williams, isn't it true that under existing law both HUD and the Bank Board have jurisdiction to investigate complaints about discrimination by a financial institution?

Mr. WILLIAMS. Right, and I think they would maintain that right under the bill, as we would have it amended.

I guess what we are getting at is, when it comes right down to enforcement, it is not because we are afraid of HUD; it is just that it seems, again, there is a duplication, and also with respect to the rules which HUD would be empowered to draft, which was referred to earlier.

Mr. WILLIAMS. I guess another way of putting it is that if the bill were enacted as we suggest it be amended, an individual could go to the Bank Board, which they can do now, could go to HUD and could go to the district attorney, and to a pro bono legal firm in his neighborhood for a civil suit.

So there are those remedies now, and I think they would still exist under the bill as we would have it redrafted.

What we are simply saying is, there is no reason for HUD to develop an examining staff and to have the administrative remedies that the Bank Board already has.

Ms. COOPER. Well, you might also be interested to know, HUD's legal position now is that under existing law they have the authority to issue regulations under title VIII. It won't take the enactment of 3504 to permit HUD to do that with respect to savings and loan institutions.

Mr. WILLIAMS. I think that is probably right, and I think that might be the subject of corrective legislation if this bill should be enacted; although, again, I think that is something that probably could be worked out between the two agencies.

Ms. COOPER. Thank you.

Mr. EDWARDS. Thank you very much, Mr. Williams.

Mr. WILLIAMS. Thank you, Mr. Chairman.

[Whereupon, at 11:45 a.m., the hearing was adjourned.]

# APPENDIXES

APPENDIX 1

JANUARY 23, 1978

(Existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman.)

CIVIL RIGHTS ACT OF 1968

Showing the effects of the amendments proposed in title II of H.R. 3504.

AN ACT To prescribe penalties for certain acts of violence or intimidation, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as the Civil Rights Act of 1968.*

● ● ● ● ● ● ●

## TITLE VIII—FAIR HOUSING

### SHORT TITLE

*SEC. 800. This title may be referred to as the "Fair Housing Act".*

● ● ● ● ● ●

### DEFINITIONS

SEC. 802. As used in this title—

(a) "Secretary" means the Secretary of Housing and Urban Development.

(b) "Dwelling" means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

(c) "Family" includes a single individual.

(d) "Person" includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in bankruptcy, receivers, and fiduciaries.

(e) "To rent" includes to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant.

(f) "Discriminatory housing practice" means an act that is unlawful under [section 804, 805, or 806] *this title*.

(g) "State" means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, or any of the territories and possessions of the United States.

(407)

408

EFFECTIVE DATES OF CERTAIN PROHIBITIONS

Sec. 803. (a) Subject to the provisions of subsection (b) and section 807, the prohibitions against discrimination in the sale or rental of housing set forth in section 804 shall apply:

(1) * * *

\*    \*    \*    \*    \*    \*    \*

(2) After December 31, 1968, *and before the date of the enactment of the Fair Housing Amendments Act of 1977*, to all dwellings covered by paragraph (1) and to all other dwellings except as exempted by subsection (b).

(b) [Nothing] *Before the date of the enactment of the Fair Housing Amendments Act of 1977, nothing* in section 804 (other than subsection (c)) shall apply to—

(1) any single-family house sold or rented by an owner: *Provided,* That such private individual owner does not own more than three such single-family houses at any one time: *Provided further,* That in the case of the sale of any such single-family house by a private individual owner not residing in such house at the time of such sale or who was not the most recent resident of such house prior to such sale, the exemption granted by this subsection shall apply only with respect to one such sale within any twenty-four month period: *Provided further,* That such bona fide private individual owner does not own any interest in, nor is there owned or reserved on his behalf, under any express or voluntary agreement, title to or any right to all or a portion of the proceeds from the sale or rental of, more than three such single-family houses at any one time: *Provided further,* That after December 31, 1969, the sale or rental of any such single-family house shall be excepted from the application of this title only if such house is sold or rented (A) without the use in any manner of the sales or rental facilities or the sales or rental services of any real estate broker, agent, or salesman, or of such facilities or services of any person in the business of selling or renting dwellings, or of any employee or agent of any such broker, agent, salesman, or person and (B) without the publication, posting or mailing, after notice, of any advertisement or written notice in violation of section 804(c) of this title; but nothing in this proviso shall prohibit the use of attorneys, escrow agents, abstractors, title companies, and other such professional assistance as necessary to perfect or transfer the title, or

(2) rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence.

(c) For the purposes of subsection (b), a person shall be deemed to be in the business of selling or renting dwellings if—

(1) he has, within the preceding twelve months, participated as principal in three or more transactions involving the sale or rental of any dwelling or any interest therein, or

(2) he has, within the preceding twelve months, participated as agent, other than in the sale of his own personal residence in providing sales or rental facilities or sales or rental services in two

or more transactions involving the sale or rental of any dwelling or any interest therein, or

(3) he is the owner of any dwelling designed or intended for occupancy by, or occupied by, five or more families.

(*d*) *After the date of the enactment of the Fair Housing Amendments Act of 1977, subject to the provisions of section 807, the prohibitions against discrimination in the sale or rental of housing set forth in section 804 of this title shall apply to all dwellings, except with respect to the renting of space within a single family dwelling unit by the occupant of such unit to any other person or persons.*

### DISCRIMINATION IN THE SALE OR RENTAL OF HOUSING *AND OTHER PROHIBITED PRACTICES*

Sec. 804. As made applicable by section 803 and except as exempted by sections 803 (b), *803 (d)* and 807, it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, *handicap*, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, *handicap*, or national origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, *handicap*, or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, *handicap*, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, *handicap*, or national origin.

(*f*) *For a person in the business of insuring against hazards to refuse to enter into a contract of insurance against hazards to a dwelling because of the race, color, or national origin of persons residing in or near the dwelling.*

(*g*) *For any general or special purpose unit of government of a State or of a subdivision of a State (or other agency having jurisdiction within a State or States) in the exercise or enforcement of powers with respect to planning, zoning, subdivision controls, building codes or permits, or other matters affecting land use or development, to exclude low- or moderate-income housing because of the eligibility of such housing for governmental assistance, or because of the race, color, national origin, or economic status of the prospective occupants of such housing.*

### DISCRIMINATION IN THE FINANCING OF HOUSING

SEC. 805. After December 31, 1968, it shall be unlawful for any bank, building and loan association, insurance company or other corporation, association, firm or enterprise whose business consists in whole or in part in the making of commercial real estate loans, to deny a loan or other financial assistance to a person applying therefor for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate against him in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other financial assistance, because of the race, color, religion, sex, *handicap*, or national origin of such person or of any person associated with him in connection with such loan or other financial assistance or the purposes of such loan or other financial assistance, or of the present or prospective owners, lessees, tenants, or occupants of the dwelling or dwellings in relation to which such loan or other financial assistance is to be made or given, *or of the neighborhood of such dwelling or dwellings: Provided,* That nothing contained in this section shall impair the scope or effectiveness of the exception contained in section 803(b).

### DISCRIMINATION IN THE PROVISION OF BROKERAGE SERVICES

SEC. 806. After December 31, 1968, it shall be unlawful to deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, *handicap*, or national origin.

\*       \*       \*       \*       \*       \*       \*

### ADMINISTRATION

SEC. 808. (a) * * *

\*       \*       \*       \*       \*       \*       \*

(e) The Secretary of Housing and Urban Development shall—

(1) make studies with respect to the nature and extent of discriminatory housing practices in representative communities, urban, suburban, and rural throughout the United States;

(2) publish and disseminate reports, recommendations, and information derived from such studies;

(3) cooperate with and render *financial and* technical assistance to Federal, State, local, and other public or private agencies, organizations, and institutions which are formulating or carrying on programs to prevent or eliminate discriminatory housing practices;

(4) cooperate with and render such technical and other assistance to the Community Relations Service as may be appropriate to further its activities in preventing or eliminating discriminatory housing practices; and

(5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this title.

\*       \*       \*       \*       \*       \*       \*

⟦ENFORCEMENT

⟦Sec. 810. (a) Any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur (hereafter "person aggrieved") may file a complaint with the Secretary. Complaints shall be in writing and shall contain such information and be in such form as the Secretary requires. Upon receipt of such a complaint the Secretary shall furnish a copy of the same to the person or persons who allegedly committed or are about to commit the alleged discriminatory housing practice. Within thirty days after receiving a complaint, or within thirty days after the expiration of any period of reference under subsection (c), the Secretary shall investigate the complaint and give notice in writing to the person aggrieved whether he intends to resolve it. If the Secretary decides to resolve the complaint, he shall proceed to try to eliminate or correct the alleged discriminatory housing practice by informal methods of conference, conciliation, and persuasion. Nothing said or done in the course of such informal endeavors may be made public or used as evidence in a subsequent proceeding under this title without the written consent of the persons concerned. Any employee of the Secretary who shall make public any information in violation of this provision shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $1,000 or imprisoned not more than one year.

⟦(b) A complaint under subsection (a) shall be filed within one hundred and eighty days after the alleged discriminatory housing practice occurred. Complaints shall be in writing and shall state the facts upon which the allegations of a discriminatory housing practice are based. Complaints may be reasonably and fairly amended at any time. A respondent may file an answer to the complaint against him and with the leave of the Secretary, which shall be granted whenever it would be reasonable and fair to do so, may amend his answer at any time. Both complaints and answers shall be verified.

⟦(c) Wherever a State or local fair housing law provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title, the Secretary shall notify the appropriate State or local agency of any complaint filed under this title which appears to constitute a violation of such State or local fair housing law, and the Secretary shall take no further action with respect to such complaint if the appropriate State or local law enforcement official has, within thirty days from the date the alleged offense has been brought to his attention, commenced proceedings in the matter, or, having done so, carries forward such proceedings with reasonable promptness. In no event shall the Secretary take further action unless he certifies that in his judgment, under the circumstances of the particular case, the protection of the rights of the parties or the interests of justice require such action.

⟦(d) If within thirty days after a complaint is filed with the Secretary or within thirty days after expiration of any period of reference under subsection (c), the Secretary has been unable to obtain voluntary compliance with this title, the person aggrieved may, within thirty days thereafter, commence a civil action in any appropriate

United States district court, against the respondent named in the complaint, to enforce the rights granted or protected by this title, insofar as such rights relate to the subject of the complaint: *Provided*, That no such civil action may be brought in any United States district court if the person aggrieved has a judicial remedy under a State or local fair housing law which provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title. Such actions may be brought without regard to the amount in controversy in any United States district court for the district in which the discriminatory housing practice is alleged to have occurred or be about to occur or in which the respondent resides, or transacts business. If the court finds that a discriminatory housing practice has occurred or is about to occur, the court may, subject to the provisions of section 812, enjoin the respondent from engaging in such practice or order such affirmative action as may be appropriate.

⟦(e) In any proceeding brought pursuant to this section, the burden of proof shall be on the complainant.

⟦(f) Whenever an action filed by an individual, in either Federal or State court, pursuant to this section or section 812, shall come to trial the Secretary shall immediately terminate all efforts to obtain voluntary compliance.

### ⟦INVESTIGATION; SUBPENAS; GIVING OF EVIDENCE

⟦SEC. 811. (a) In conducting an investigation the Secretary shall have access at all reasonable times to premises, records, documents, individuals, and other evidence or possible sources of evidence and may examine, record, and copy such materials and take and record the testimony or statements of such persons as are reasonably necessary for the furtherance of the investigation: *Provided, however,* That the Secretary first complies with the provisions of the Fourth Amendment relating to unreasonable searches and seizures. The Secretary may issue subpenas to compel his access to or the production of such materials, or the appearance of such persons, and may issue interrogatories to a respondent, to the same extent and subject to the same limitations as would apply if the subpenas or interrogatories were issued or served in aid of a civil action in the United States district court for the district in which the investigation is taking place. The Secretary may administer oaths.

⟦(b) Upon written application to the Secretary, a respondent shall be entitled to the issuance of a reasonable number of subpenas by and in the name of the Secretary to the same extent and subject to the same limitations as subpenas issued by the Secretary himself. Subpenas issued at the request of a respondent shall show on their face the name and address of such respondent and shall state that they were issued at his request.

⟦(c) Witnesses summoned by subpena of the Secretary shall be entitled to the same witness and mileage fees as are witnesses in proceedings in United States district courts. Fees payable to a witness summoned by a subpena issued at the request of a respondent shall be paid by him.

(d) Within five days after service of a subpena upon any person, such person may petition the Secretary to revoke or modify the subpena. The Secretary shall grant the petition if he finds that the subpena requires appearance or attendance at an unreasonable time or place, that it requires production of evidence which does not relate to any matter under investigation, that it does not describe with sufficient particularity the evidence to be produced, that compliance would be unduly onerous, or for other good reason.

(e) In case of contumacy or refusal to obey a subpena, the Secretary or other person at whose request it was issued may petition for its enforcement in the United States district court for the district in which the person to whom the subpena was addressed resides, was served, or transacts business.

(f) Any person who willfully fails or neglects to attend and testify or to answer any lawful inquiry or to produce records, documents, or other evidence, if in his power to do so, in obedience to the subpena or lawful order of the Secretary, shall be fined not more than $1,000 or imprisoned not more than one year, or both. Any person who, with intent thereby to mislead the Secretary shall make or cause to be made any false entry or statement of fact in any report, account, record, or other document submitted to the Secretary pursuant to his subpena or other order, or shall willfully neglect or fail to make or cause to be made full, true, and correct entries in such reports, accounts, records, or other documents, or shall willfully mutilate, alter, or by any other means falsify any documentary evidence, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

(g) The Attorney General shall conduct all litigation in which the Secretary participates as a party or as amicus pursuant to this Act.

### ENFORCEMENT BY PRIVATE PERSONS

Sec. 812. (a) The rights granted by sections 803, 804, 805, and 806 may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction. A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred: *Provided, however,* That the court shall continue such civil case brought pursuant to this section or section 810(d) from time to time before bringing it to trial if the court believes that the conciliation efforts of the Secretary or a State or local agency are likely to result in satisfactory settlement of the discriminatory housing practice complained of in the complaint made to the Secretary or to the local or State agency and which practice forms the basis for the action in court: *And provided, however,* That any sale, encumbrance, or rental consummated prior to the issuance of any court order issued under the authority of this Act, and involving a bona fide purchaser, encumbrancer, or tenant without actual notice of the existence of the filing of a complaint or civil action under the provisions of this Act shall not be affected.

(b) Upon application by the plaintiff and in such circumstances as the court may deem just, a court of the United States in which a civil action under this section has been brought may appoint an attorney for the plaintiff and may authorize the commencement of a civil

33-264 O - 78 - 27

action upon proper showing without the payment of fees, costs, or security. A court of a State or subdivision thereof may do likewise to the extent not inconsistent with the law or procedures of the State or subdivision.

[(c) The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual damages and not more than $1,000 punitive damages, together wtih court costs and reasonable attorney fees in the case of a prevailing plaintiff: *Provided*, That the said plaintiff in the opinion of the court is not financially able to assume said attorney's fees.

### [ENFORCEMENT BY THE ATTORNEY GENERAL

[SEC. 813. (a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this title, or that any group of persons has been denied any of the rights granted by this title and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court by filing with it a complaint setting forth the facts and requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order, or order against the person or persons responsible for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of the rights granted by this title.

### [EXPEDITION OF PROCEEDINGS

[SEC. 814. Any court in which a proceeding is instituted under section 812 or 813 of this title shall assign the case for hearing at the earliest practicable date and cause the case to be in every way expedited.]

### ENFORCEMENT BY SECRETARY

*SEC. 810. (a) (1) Whenever an aggrieved person, or the Secretary on the Secretary's own initiative, files a charge alleging that a discriminatory housing practice has occurred, is occurring, or is about to occur, the Secretary shall serve a notice of the alleged discriminatory housing practice on the person charged (hereinafter in this title referred to as the "respondent") within ten days after such filing, and shall make an investigation thereof. Such charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Secretary requires. An aggrieved person shall file a charge under this section with the Secretary not later than three years after the alleged discriminatory housing practice occurred or terminated. The Secretary may also investigate housing practices to determine whether charges should be brought under this section or new rules should be made under section 814 of this title.*

*(2) (A) In connection with any investigation of such charge or of a housing practice, the Secretary shall, at reasonable times, have access to, and the right to copy, any information that relates to such charge or housing practice. The Secretary may issue subpenas to compel such access to or the production of such information, or the appearance of*

persons, and may issue interrogatories to a respondent, to the same extent and subject to the same limitations as would apply if the subpenas or interrogatories were issued or served in aid of a civil action in the United States district court for the district in which the investigation is taking place. The Secretary may administer oaths.

(B) Upon written application to the Secretary, a respondent shall be entitled to the issuance of a reasonable number of subpenas by and in the name of the Secretary to the same extent and subject to the same limitations as subpenas issued by the Secretary under clause (A) of this paragraph.

(C) Witnesses summoned by subpena of the Secretary shall be entitled to the same witness and mileage fees as are witnesses in proceedings in United States district courts. Fees to a witness summoned by a subpena requested by the respondent shall be paid by the respondent.

(D) The Secretary (through the Attorney General) or a respondent at whose request a subpena is issued may enforce such subpena in appropriate proceedings in the United States district court for the district in which the person to whom the subpena was addressed resides, was served, or transacts business.

(E) Any person who willfully fails or neglects to attend and testify or to answer any lawful inquiry or to produce records, documents, or other evidence, if in such person's power to do so, in obedience to the subpena or lawful order of the Secretary, shall be fined not more than $1,000 or imprisoned not more than one year, or both. Any person who, with intent thereby to mislead the Secretary, shall make or cause to be made any false entry or statement of fact in any report, account, record, or other document produced pursuant to the Secretary's subpena or other order, or shall willfully neglect or fail to make or cause to be made full, true, and correct entries in such reports, accounts, records, or other documents, or shall willfully mutilate, alter, or by any other means falsify any documentary evidence, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

(3) Whenever a charge alleges a discriminatory housing practice occurring within the jurisdiction of a State or local public agency certified by the Secretary under such regulations as the Secretary may prescribe, the Secretary may, before taking any action with respect to such charge, notify the appropriate State or local officials and, upon request of such officials, afford them a definite period of time, set by the Secretary, to make a final determination on the charge. In certifying or refusing to certify an agency under this paragraph, the Secretary shall take into account the substantive provisions (including scope and availability of remedies) of the law or regulation such agency administers, the procedural effectiveness of such law or regulation and practice thereunder, and the past performance, if any, of such agency.

(b)(1) If the Secretary determines, after such investigation, that insufficient evidence has been found to proceed with the charge, the Secretary shall so advise the aggrieved person and the respondent. If the Secretary determines, after such investigation, that reasonable cause exists to believe the charge is true, the Secretary shall refer the matter to the Attorney General for the filing of an appropriate civil action under subsection (c) of section 811, or file an administrative complaint under paragraph (2)(A) of this subsection. In determining

*whether reasonable cause exists, the Secretary may accord such weight as appropriate under the facts and circumstances of each case to any final determination under a State or local fair housing enforcement procedure.*

*(2) (A) Upon filing an administrative complaint, the Secretary shall cause a copy of such complaint to be served on the respondent, together with a notice of opportunity for a hearing on the record at a place and time (not less than thirty days after the service of such complaint) specified in such notice. If the Secretary concludes that prompt action is necessary to carry out the purposes of this title, the Secretary, after ten days' notice and opportunity to be heard has been given the respondent, may order temporary or preliminary relief pending the final disposition of such complaint. The respondent shall have the right to file an answer to the administrative complaint and to appear in person or otherwise and give testimony at a hearing on the record. In the discretion of the person conducting the hearing, any aggrieved person may be allowed to intervene and to present testimony. After the conclusion of such hearing, the person conducting the hearing shall make findings of fact and conclusions of law, and may issue an order providing such relief as is described in section 812 (c) of this title.*

*(B) The findings of fact and conclusions of law made at such hearing, together with any order of relief, shall be served on each aggrieved person and each respondent in the proceeding.*

*(C) Any petition for judicial review of a final order of the Secretary under this subsection shall be filed in the appropriate court of appeals not later than thirty days after the entry of such final order by the Secretary. Such judicial review of a final order shall be in the manner provided under chapter 158 of title 28 of the United States Code. The findings of the Secretary shall be conclusive if supported by substantial evidence in the record considered as a whole. No objection not urged before the Secretary (or other person holding the hearing) shall be considered by the court unless the failure or neglect to urge such objection should be excused because of extraordinary circumstances.*

*(D) (i) Any person who violates a final order of the Secretary under this section shall be subject to a civil penalty assessed under subparagraph (E) of not more than $1,000 for each day during which such violation continues after the date on which such final order becomes unreviewable.*

*(ii) For the purposes of subclause (i) of this clause, a final order becomes unreviewable—*

*(I) if a petition for review has not been filed in the appropriate reviewing court, on the day thirty days after the entry of such final order, or*

*(II) if such a petition is so filed within such thirty-day limit, on the date on which the last appellate court's decision becomes final and not subject to any further appellate proceeding.*

*(E) The Secretary may assess the civil penalty to which a person becomes liable under subparagraph (D), and such civil penalty may not be compromised or settled without the consent of the Secretary.*

## ENFORCEMENT ROLE OF ATTORNEY GENERAL

SEC. 811. (a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this title, or that any group of persons has been denied any of the rights granted by this title and such denial raises an issue of general public importance, the Attorney General may bring a civil action in an appropriate United States district court.

(b) The Attorney General is directed to bring a civil action in an appropriate United States district court (1) to enforce any final order under section 810 of this title that is referred for enforcement by the Secretary; (2) to collect any civil penalty assessed by the Secretary under section 810 of this title; and (3) to remedy any discriminatory housing practice (A) with respect to which the Secretary has made a finding that reasonable cause exists under this title and (B) which the Secretary refers to the Attorney General for enforcement under this subsection.

(c) The court may award such relief in any civil action under this section as is authorized in section 812(c) of this title in cases brought under this section.

(d) If the Secretary concludes on the basis of a preliminary investigation of a charge that prompt judicial action is necessary to carry out the purposes of this title, the Secretary may refer the matter to the Attorney General and the Attorney General may bring an action for appropriate temporary or preliminary relief pending final disposition of such charge. It shall be the duty of a court having jurisdiction over proceedings under this paragraph to assign such proceedings for hearing at the earliest practical date and to cause such proceedings to be in every way expedited. An application for relief under this paragraph shall not affect the initiation or continuation of administrative proceedings under section 810(b)(2) of this title.

(e) The Attorney General may delegate any function the Attorney General has under this title to a specially designated Assistant Attorney General.

### PRIVATE ENFORCEMENT

SEC. 812. (a) An aggrieved person may commence a civil action in an appropriate United States district court or State court at any time not later than three years after the alleged discriminatory housing practice occurred or terminated, or one year after the Secretary has completed proceedings under section 810 with respect to a charge of such alleged practice, whichever is later. No such civil action may be commenced by an aggrieved person who has filed a charge under section 810(a) of this title after the Secretary files an administrative complaint under section 810(b)(2) of this title or the Attorney General files a complaint under section 811(b)(3) of this title, based on the same charge, until proceedings with respect to such complaint have been concluded. After an aggrieved person has commenced a civil action under this section, the Secretary may not commence proceedings toward the issuance of such a remedial order based on such charge. Upon timely application, the Attorney General may intervene in such civil action, if the Attorney General certifies that the case is of general public importance.

(b) Upon application by an aggrieved person, any trial or appellate

*court may, in such circumstances as it deems just, appoint an attorney for such person and may authorize the commencement or continuation of the action without the payment of fees, costs, or security.*

*(c) If the court finds in a civil action under this section that an alleged discriminatory housing practice has occurred, is occurring, or is about to occur, the court shall award such relief as may be appropriate, which may include money damages, equitable and declaratory relief, and punitive damages not exceeding $10,000 in the case of each willful violation. The court may divide the trial of issues in cases where relief described in this subsection may be granted so that all issues which must be tried by a jury are tried separately from those which may be tried by the court alone.*

### ATTORNEY FEES AND OTHER COSTS

*Sec. 813. (a) In any action or proceeding under this title, the court, in its discretion, may allow a prevailing party (other than the United States with respect to attorney fees) reasonable attorney fees and expert witness expenses as part of the costs, and the United States shall be liable for such costs the same as a private person. Such costs may also be awarded upon the entry of any interlocutory order which determines substantial rights of the parties.*

*(b) In any administrative proceeding based on a charge under section 810(a) of this title, the Secretary may award to any prevailing party (other than the United States with respect to attorney fees) reasonable attorneys fees and expert witness expenses as a part of a final order under section 810(b)(2) of this title.*

### RULEMAKING AUTHORITY

*Sec. 814. The Secretary, in consultation with the Attorney General, may issue rules and regulations to implement the policies, purposes, and provisions of this title.*

    \*      \*      \*      \*      \*      \*      \*

### INTERFERENCE, COERCION, OR INTIMIDATION

Sec. 817. It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [section 803, 804, 805, or 806] *this title.* This section may be enforced by appropriate civil action.

### FAIR HOUSING LOAN FUND

*Sec. 818. (a) The Secretary may make loans from the Fair Housing Loan Fund established under subsection (d) of this section to any aggrieved person alleging a violation of this title for use by such person in paying the costs of a civil action to enforce this title.*

*(b) Any loan made under subsection (a) of this section shall bear interest at a rate per annum on the outstanding principal balance determined by the Secretary and shall, together with such interest, be repayable out of any costs allowed the plaintiff in such civil action.*

*If the total amount of any such costs allowed is inadequate to repay such loan and interest thereon, the Secretary may cancel that portion of the total amount of such loan and interest thereon which is equal to the difference between the total amount of such loan and interest thereon and the total amount of such costs. If no such costs are allowed, the total amount of such loan and interest thereon may be canceled by the Secretary.*

*(c) Repayments of loans made under subsection (a) of this section and of interest thereon and all penalties collected by the Secretary under this title shall be deposited in the Fair Housing Loan Fund.*

*(d) There is hereby established in the Treasury the Fair Housing Loan Fund (hereinafter in this section referred to as the "fund") which shall be available to the Secretary without fiscal year limitation for purposes of making loans under subsection (a) and which shall consist of such amounts as may be appropriated to the fund from time to time. The Secretary may authorize the Secretary of the Treasury to invest and reinvest such portions of the fund as the Secretary of Housing and Urban Development may determine are not needed for current operations in any interest-bearing securities of the United States or in any securities guaranteed as to both principal and interest by the United States or in bonds or other obligations which are lawful investments for fiduciary, trust, and public funds of the United States, and the income therefrom shall constitute a part of the fund.*

*(e)(1) If, in the judgment of the Secretary of Housing and Urban Development, a loan to the fund is required at any time for carrying out the purposes of this section, the Secretary of the Treasury shall make the loan, but loans under this paragraph shall not exceed in the aggregate $1,000,000 outstanding at any one time. Except as otherwise provided in this subsection, each loan under this paragraph shall be made on such terms as may be fixed by agreement between the Secretary and the Secretary of the Treasury.*

*(2) Interest shall accrue to the Treasury on the amount of any outstanding loans made to the fund pursuant to paragraph (1) of this subsection on the basis of the average daily amount of such outstanding loans determined at the close of each fiscal year with respect to such year, and the Secretary shall pay the interest so accruing into the Treasury as miscellaneous receipts annually from the fund. The Secretary of the Treasury shall determine the applicable interest rate in advance by calculating the average yield to maturity (on the basis of daily closing market bid quotations during the month of June of the preceding fiscal year) on outstanding marketable public debt obligations of the United States having a maturity date of five or less years from the first day of such month of June and by adjusting such yield to the nearest one-eighth of 1 per centum.*

*(f) So long as any loans to the fund are outstanding, the Secretary shall from time to time, not less often than annually, determine whether the balance in the fund is in excess of the amount which, in the Secretary's judgment, is needed to meet the requirements of the fund and shall pay such excess to the Secretary of the Treasury, to be credited against the loans to the fund.*

*(g) There is authorized to be appropriated, in addition to any other sums that are authorized to be appropriated for the purposes of this title, the sum of $10,000,000 for the establishment of the fund.*

### APPROPRIATIONS

SEC. [818.] *819.* There are hereby authorized to be appropriated such sums as are necessary to carry out the purposes of this title.

### SEPARABILITY OF PROVISIONS

SEC. [819.] *820.* If any provision of this title or the application thereof to any person or circumstances is held invalid, the remainder of the title and the application of the provision to other persons not similarly situated or to other circumstances shall not be affected thereby.

## TITLE IX

### PREVENTION OF INTIMIDATION IN FAIR HOUSING CASES

SEC. 901. Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

(a) any person because of his race, color, religion, sex, *handicap,* or national origin and because he is or has been selling, purchasing, renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing or occupation of any dwelling, or applying for or participating in any service, organization, or facility relating to the business of selling or renting dwellings; or

(b) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—

(1) participating, without discrimination on account of race, color, religion, sex, *handicap,* or national origin, in any of the activities, services, organizations or facilities described in subsection 901(a); or

(2) affording another person or class of persons opportunity or protection so to participate; or

(c) any citizen because he is or has been, or in order to discourage such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion, sex, *handicap,* or national origin, in any of the activities, services, organizations or facilities described in subsection 901(a), or participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate—

shall be fined not more than $1,000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life.

\*  \*  \*  \*  \*  \*  \*

TITLE 28, UNITED STATES CODE

\* \* \* \* \* \* \*

## Chapter 158.—ORDERS OF FEDERAL AGENCIES; REVIEW

### § 2341. Definitions.

As used in this chapter—

(1) "clerk" means the clerk of the court in which the petition for the review of an order, reviewable under this chapter, is filed;

(2) "petitioner" means the party or parties by whom a petition to review an order, reviewable under this chapter, is filed; and

(3) "agency" means—

(A) the Commission, when the order sought to be reviewed was entered by the Federal Communications Commission, the Federal Maritime Commission, the Interstate Commerce Commission, or the Atomic Energy Commission, as the case may be;

(B) the Secretary, when the order was entered by the Secretary of Agriculture *or the Secretary of Housing and Urban Development, as the case may be*; and

(C) the Administration, when the order was entered by the Maritime Administration.

### § 2342. Jurisdiction of court of appeals.

The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

(1) all final orders of the Federal Communication Commission made reviewable by section 402(a) of title 47;

(2) all final orders of the Secretary of Agriculture made under chapters 9 and 20A of title 7, except orders issued under sections 210(e), 217a, and 499g(a) of title 7;

(3) such final orders of the Federal Maritime Commission or the Maritime Administration entered under chapters 23 and 23A of title 46 as are subject to judicial review under section 830 of title 46;

(4) all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42; [and]

(5) all rules, regulations, or final orders of the Interstate Commerce Commission made reviewable by section 2321 of this title[.]; *and*

(6) *all final orders of the Secretary of Housing and Urban Development under the Fair Housing Act.*

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

\* \* \* \* \* \* \*

O

95TH CONGRESS
1ST SESSION

# H. R. 3504

---

## IN THE HOUSE OF REPRESENTATIVES

FEBRUARY 16, 1977

Mr. EDWARDS of California (for himself and Mr. DRINAN) introduced the following bill; which was referred jointly to the Committees on Education and Labor and the Judiciary

---

# A BILL

To amend title VII of the Civil Rights Act of 1964 and title VIII of the Act commonly called the Civil Rights Act of 1968 to revise the procedures for the enforcement of equal employment opportunity and fair housing, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    That this Act may be cited as the "Civil Rights Amendments

4    Act of 1977".

423

## TITLE II—FAIR HOUSING

### SHORT TITLE FOR TITLE II

17    SEC. 201. This title may be cited as the "Fair Housing

18 Amendments Act of 1977".

### SHORT TITLE FOR 1968 ACT

20    SEC. 202. The Act entitled "An Act to prescribe penalties

21 for certain acts of violence or intimidation, and for other

22 purposes" (Public Law 90–284, approved April 11, 1968)

23 is amended by inserting immediately after the comma at

24 the end of the enacting clause the following: "That this Act

25 may be cited as the Civil Rights Act of 1968.".

SHORT TITLE FOR TITLE VIII

1

2 SEC. 203. Title VIII of the Act entitled "An Act to

3 prescribe penalties for certain acts of violence or intimida-

4 tion, and for other purposes" (Public Law 90-284, ap-

5 proved April 11, 1968) is amended by inserting immedi-

6 ately after the title's catchline the following new section:

7 "SHORT TITLE

8 "SEC. 800. This title may be referred to as the 'Fair

9 Housing Act'.".

10 DEFINITION OF UNFAIR HOUSING PRACTICE

11 SEC. 204. Section 802 (f) of the Act entitled "An Act

12 to prescribe penalties for certain acts of violence or intimi-

13 dation, and for other purposes" (Public Law 90-284, ap-

14 proved April 11, 1968) is amended by striking out "sec-

15 tion 804, 805, or 806" and inserting "this title" in lieu

16 thereof.

17 MODIFICATION OF OWNER-OCCUPIED EXEMPTION

18 SEC. 205. Section 803 of the Act entitled "An Act to

19 prescribe penalties for certain acts of violence or intimi-

20 dation, and for other purposes" (Public Law 90-284, ap-

21 proved April 11, 1968) is amended—

22 (1) by inserting "and before the date of the enact-

23 ment of the Fair Housing Amendments Act of 1977,"

24 immediately after "1968," in subsection (a) (2);

25 (2) by striking out "Nothing" in subsection (b)

1    and inserting in lieu thereof the following: "Before the

2    date of the enactment of the Fair Housing Amendments

3    Act of 1977, nothing"; and

4    (3) by adding at the end the following:

5    "(d) After the date of the enactment of the Fair

6    Housing Amendments Act of 1977, subject to the provi-

7    sions of section 807, the prohibitions against discrimination

8    in the sale or rental of housing set forth in section 804 of

9    this title shall apply to all dwellings, except with respect to

10    the renting of space within a single family dwelling unit by

11    the occupant of such unit to any other person or persons.".

12    DISCRIMINATORY HOUSING PRACTICE AMENDMENTS

13    SEC. 206. (a) The catchline of section 804 of the Act

14    entitled "An Act to prescribe penalties for certain acts of

15    violence or intimidation, and for other purposes" (Public

16    Law 90–284, approved April 11, 1968) is amended by add-

17    ing at the end the following: "AND OTHER PROHIBITED

18    PRACTICES".

19    (b) Section 804 of such Act is amended by inserting

20    ", 803 (d)," immediately after "803 (b)".

21    (c) Section 804 of such Act is amended by adding at

22    the end the following:

23    "(f) For a person in the business of insuring against

24    hazards to refuse to enter into a contract of insurance

1   against hazards to a dwelling because of the race, color, or

2   national origin of persons residing in or near the dwelling.

3      "(g) For any general or special purpose unit of gov-

4   ernment of a State or of a subdivision of a State (or other

5   agency having jurisdiction within a State or States) in the

6   exercise or enforcement of powers with respect to planning,

7   zoning, subdivision controls, building codes or permits, or

8   other matters affecting land use or development, to exclude

9   low- or moderate-income housing because of the eligibility

10   of such housing for governmental assistance, or because of

11   the race, color, national origin, or economic status of the

12   prospective occupants of such housing.".

13      (d) Sections 804, 805, and 806 of such Act are each

14   amended by inserting "handicap," immediately after "sex,"

15   each place it appears.

16      (e) Section 805 of such Act is amended by inserting

17   ", or of the neighborhood of such dwelling or dwellings"

18   immediately after "made or given".

19               FUNCTIONS OF SECRETARY

20      SEC. 207. Section 808 (e) (3) of the Act entitled "An

21   Act to prescribe penalties for certain acts of violence or in-

22   timidation, and for other purposes" (Public Law 90–284,

23   approved April 11, 1968) is amended by inserting "financial

24   and" immediately before "technical".

ENFORCEMENT CHANGES

Sec. 208. The Act entitled "An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes" (Public Law 90–284, approved April 11, 1968) is amended by striking out sections 810 through 814 and inserting in lieu of the matter so stricken the following:

"ENFORCEMENT BY SECRETARY

"Sec. 810. (a) (1) Whenever an aggrieved person, or the Secretary on the Secretary's own initiative, files a charge alleging that a discriminatory housing practice has occurred, is occurring, or is about to occur, the Secretary shall serve a notice of the alleged discriminatory housing practice on the person charged (hereinafter in this title referred to as the 'respondent') within ten days after such filing, and shall make an investigation thereof. Such charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Secretary requires. An aggrieved person shall file a charge under this section with the Secretary not later than three years after the alleged discriminatory housing practice occurred or terminated. The Secretary may also investigate housing practices to determine whether charges should be brought under this section or new rules should be made under section 814 of this title.

1      "(2) (A) In connection with any investigation of such

2   charge or of a housing practice, the Secretary shall, at rea-

3   sonable times, have access to, and the right to copy, any

4   information that relates to such charge or housing practice.

5   The Secretary may issue subpenas to compel such access to

6   or the production of such information, or the appearance of

7   persons, and may issue interrogatories to a respondent, to the

8   same extent and subject to the same limitations as would

9   apply if the subpenas or interrogatories were issued or served

10   in aid of a civil action in the United States district court

11   for the district in which the investigation is taking place. The

12   Secretary may administer oaths.

13      "(B) Upon written application to the Secretary, a

14   respondent shall be entitled to the issuance of a reasonable

15   number of subpenas by and in the name of the Secretary

16   to the same extent and subject to the same limitations as

17   subpenas issued by the Secretary under clause (A) of this

18   paragraph.

19      "(C) Witnesses summoned by subpena of the Secretary

20   shall be entitled to the same witness and mileage fees as are

21   witnesses in proceedings in United States district courts.

22   Fees to a witness summoned by a subpena requested by

23   the respondent shall be paid by the respondent.

24      "(D) The Secretary (through the Attorney General)

25   or a respondent at whose request a subpena is issued may

1    enforce such subpena in appropriate proceedings in the

2    United States district court for the district in which the

3    person to whom the subpena was addressed resides, was

4    served, or transacts business.

5    "(E) Any person who willfully fails or neglects to

6    attend and testify or to answer any lawful inquiry or to

7    produce records, documents, or other evidence, if in such

8    person's power to do so, in obedience to the subpena or

9    lawful order of the Secretary, shall be fined not more than

10    $1,000 or imprisoned not more than one year, or both.

11    Any person who, with intent thereby to mislead the Sec-

12    retary, shall make or cause to be made any false entry or

13    statement of fact in any report, account, record, or other

14    document produced pursuant to the Secretary's subpena

15    or other order, or shall willfully neglect or fail to make

16    or cause to be made full, true, and correct entries in such

17    reports, accounts, records, or other documents, or shall

18    willfully mutilate, alter, or by any other means falsify any

19    documentary evidence, shall be fined not more than $1,000

20    or imprisoned not more than one year, or both.

21    "(3) Whenever a charge alleges a discriminatory

22    housing practice occurring within the jurisdiction of a State

23    or local public agency certified by the Secretary under such

24    regulations as the Secretary may prescribe, the Secretary

25    may, before taking any action with respect to such charge,

1   notify the appropriate State or local officials and, upon

2   request of such officials, afford them a definite period of

3   time, set by the Secretary, to make a final determination

4   on the charge. In certifying or refusing to certify an agency

5   under this paragraph, the Secretary shall take into account

6   the substantive provisions (including scope and availability

7   of remedies) of the law or regulation such agency ad-

8   ministers, the procedural effectiveness of such law or regu-

9   lation and practice thereunder, and the past performance,

10   if any, of such agency.

11   "(b) (1) If the Secretary determines, after such in-

12   vestigation, that insufficient evidence has been found to pro-

13   ceed with the charge, the Secretary shall so advise the ag-

14   grieved person and the respondent. If the Secretary deter-

15   mines, after such investigation, that reasonable cause exists

16   to believe the charge is true, the Secretary shall refer the

17   matter to the Attorney General for the filing of an appro-

18   priate civil action under subsection (c) of section 811, or file

19   an administrative complaint under paragraph (2) (A) of

20   this subsection. In determining whether reasonable cause

21   exists, the Secretary may accord such weight as appropriate

22   under the facts and circumstances of each case to any final

23   determination under a State or local fair housing enforce-

24   ment procedure.

25   "(2) (A) Upon filing an administrative complaint, the

1  Secretary shall cause a copy of such complaint to be served

2  on the respondent, together with a notice of opportunity for

3  a hearing on the record at a place and time (not less than

4  thirty days after the service of such complaint) specified

5  in such notice. If the Secretary concludes that prompt action

6  is necessary to carry out the purposes of this title, the Secre-

7  tary, after ten days' notice and opportunity to be heard

8  has been given the respondent, may order temporary or

9  preliminary relief pending the final disposition of such com-

10  plaint. The respondent shall have the right to file an answer

11  to the administrative complaint and to appear in person or

12  otherwise and give testimony at a hearing on the record. In

13  the discretion of the person conducting the hearing, any

14  aggrieved person may be allowed to intervene and to present

15  testimony. After the conclusion of such hearing, the person

16  conducting the hearing shall make findings of fact and con-

17  clusions of law, and may issue an order providing such relief

18  as is described in section 812 (c) of this title.

19  "(B) The findings of fact and conclusions of law made

20  at such hearing, together with any order of relief, shall

21  be served on each aggrieved person and each respondent

22  in the proceeding.

23  "(C) Any petition for judicial review of a final order

24  of the Secretary under this subsection shall be filed in the

25  appropriate court of appeals not later than thirty days after

1   the entry of such final order by the Secretary. Such judicial

2   review of a final order shall be in the manner provided

3   under chapter 158 of title 28 of the United States Code.

4   The findings of the Secretary shall be conclusive if sup-

5   ported by substantial evidence in the record considered as

6   a whole. No objection not urged before the Secretary (or

7   other person holding the hearing) shall be considered by

8   the court unless the failure or neglect to urge such objection

9   should be excused because of extraordinary circumstances.

10     "(D) (i) Any person who violates a final order of the

11   Secretary under this section shall be subject to a civil pen-

12   alty assessed under subparagraph (E) of not more than

13   $1,000 for each day during which such violation continues

14   after the date on which such final order becomes unreview-

15   able.

16     "(ii) For the purposes of subclause (i) of this clause,

17   a final order becomes unreviewable—

18       "(I) if a petition for review has not been filed in

19       the appropriate reviewing court, on the day thirty days

20       after the entry of such final order, or

21       "(II) if such a petition is so filed within such

22       thirty-day limit, on the date on which the last appellate

23       court's decision becomes final and not subject to any fur-

24       ther appellate proceeding.

25     "(E) The Secretary may assess the civil penalty to

1    which a person becomes liable under subparagraph (D), and

2    such civil penalty may not be compromised or settled without

3    the consent of the Secretary.

4         "ENFORCEMENT ROLE OF ATTORNEY GENERAL

5         "SEC. 811. (a) Whenever the Attorney General has

6    reasonable cause to believe that any person or group of

7    persons is engaged in a pattern or practice of resistance to

8    the full enjoyment of any of the rights granted by this title,

9    or that any group of persons has been denied any of the

10   rights granted by this title and such denial raises an issue

11   of general public importance, the Attorney General may

12   bring a civil action in an appropriate United States district

13   court.

14        "(b) The Attorney General is directed to bring

15   a civil action in an appropriate United States district court

16   (1) to enforce any final order under section 810 of this

17   title that is referred for enforcement by the Secretary; (2)

18   to collect any civil penalty assessed by the Secretary under

19   section 810 of this title; and (3) to remedy any discrimina-

20   tory housing practice (A) with respect to which the Secre-

21   tary has made a finding that reasonable cause exists under

22   this title and (B) which the Secretary refers to the Attor-

23   ney General for enforcement under this subsection.

24        "(c) The court may award such relief in any civil

1  action under this section as is authorized in section 812 (c)

2  of this title in cases brought under that section.

3      "(d) If the Secretary concludes on the basis of a

4  preliminary investigation of a charge that prompt judicial

5  action is necessary to carry out the purposes of this title,

6  the Secretary may refer the matter to the Attorney General

7  and the Attorney General may bring an action for appro-

8  priate temporary or preliminary relief pending final dis-

9  position of such charge. It shall be the duty of a court

10  having jurisdiction over proceedings under this paragraph

11  to assign such proceedings for hearing at the earliest prac-

12  tical date and to cause such proceedings to be in every

13  way expedited. An application for relief under this para-

14  graph shall not affect the initiation or continuation of

15  administrative proceedings under section 810 (b) (2) of

16  this title.

17      "(e) The Attorney General may delegate any func-

18  tion the Attorney General has under this title to a specially

19  designated Assistant Attorney General.

20                  "PRIVATE ENFORCEMENT

21      "SEC. 812. (a) An aggrieved person may commence

22  a civil action in an appropriate United States district court

23  or State court at any time not later than three years after

24  the alleged discriminatory housing practice occurred or ter-

25  minated, or one year after the Secretary has completed

1   proceedings under section 810 with respect to a charge of

2   such alleged practice, whichever is later. No such civil ac-

3   tion may be commenced by an aggrieved person who has

4   filed a charge under section 810 (a) of this title after the Sec-

5   retary files an administrative complaint under section 810

6   (b) (2) of this title or the Attorney General files a complaint

7   under section 811 (b) (3) of this title, based on the same

8   charge, until proceedings with respect to such complaint have

9   been concluded. After an aggrieved person has commenced a

10  civil action under this section, the Secretary may not com-

11  mence proceedings toward the issuance of such a remedial

12  order based on such charge. Upon timely application, the

13  Attorney General may intervene in such civil action, if the

14  Attorney General certifies that the case is of general public

15  importance.

16      "(b) Upon application by an aggrieved person, any

17  trial or appellate court may, in such circumstances as it

18  deems just, appoint an attorney for such person and may

19  authorize the commencement or continuation of the action

20  without the payment of fees, costs, or security.

21      "(c) If the court finds in a civil action under this

22  section that an alleged discriminatory housing practice has

23  occurred, is occurring, or is about to occur, the court shall

24  award such relief as may be appropriate, which may include

25  money damages, equitable and declaratory relief, and puni-

1   tive damages not exceeding $10,000 in the case of each willful

2   ful violation. The court may divide the trial of issues in cases

3   where relief described in this subsection may be granted so

4   that all issues which must be tried by a jury are tried

5   separately from those which may be tried by the court

6   alone.

7         "ATTORNEY FEES AND OTHER COSTS

8     "SEC. 813. (a) In any action or proceeding under this

9   title, the court, in its discretion, may allow a prevailing

10   party (other than the United States with respect to attorney

11   fees) reasonable attorney fees and expert witness expenses

12   as part of the costs, and the United States shall be liable

13   for such costs the same as a private person. Such costs may

14   also be awarded upon the entry of any interlocutory order

15   which determines substantial rights of the parties.

16     "(b) In any administrative proceeding based on a

17   charge under section 810 (a) of this title, the Secretary may

18   award to any prevailing party (other than the United

19   States with respect to attorney fees) reasonable attorneys

20   fees and expert witness expenses as a part of a final order

21   under section 810 (b) (2) of this title.

22         "RULEMAKING AUTHORITY

23     "SEC. 814. The Secretary, in consultation with the

24   Attorney General, may issue rules and regulations to im-

25   plement the policies, purposes, and provisions of this title.".

1         INTERFERENCE, COERCION, OR INTIMIDATION

2      SEC. 209. Section 817 of the Act entitled "An Act to

3 prescribe penalties for certain acts of violence or intimida-

4 tion, and for other purposes" (Public Law 90–284, ap-

5 proved April 11, 1968) is amended by striking out "section

6 803, 804, 805, or 806." and inserting "this title." in lieu

7 thereof.

8            FAIR HOUSING LOAN FUND

9      SEC. 210. (a) The Act entitled "An Act to prescribe

10 penalties for certain acts of violence or intimidation, and for

11 other purposes" (Public Law 90–284, approved April 11,

12 1968) is amended by inserting immediately after section

13 817 the following new section:

14         "FAIR HOUSING LOAN FUND

15      "SEC. 818. (a) The Secretary may make loans from

16 the Fair Housing Loan Fund established under subsection

17 (d) of this section to any aggrieved person alleging

18 a violation of this title for use by such person in paying

19 the costs of a civil action to enforce this title.

20      "(b) Any loan made under subsection (a) of this sec-

21 tion shall bear interest at a rate per annum on the outstand-

22 ing principal balance determined by the Secretary and shall,

23 together with such interest, be repayable out of any costs

24 allowed the plaintiff in such civil action. If the total amount

25 of any such costs allowed is inadequate to repay such loan

1   and interest thereon, the Secretary may cancel that portion

2   of the total amount of such loan and interest thereon which

3   is equal to the difference between the total amount of such

4   loan and interest thereon and the total amount of such costs.

5   If no such costs are allowed, the total amount of such loan

6   and interest thereon may be canceled by the Secretary.

7       "(c) Repayments of loans made under subsection (a)

8   of this section and of interest thereon and all penalties

9   collected by the Secretary under this title shall be deposited

10  in the Fair Housing Loan Fund.

11      "(d) There is hereby established in the Treasury the

12  Fair Housing Loan Fund (hereinafter in this section re-

13  ferred to as the 'fund') which shall be available to the

14  Secretary without fiscal year limitation for purposes of

15  making loans under subsection (a) and which shall con-

16  sist of such amounts as may be appropriated to the fund

17  from time to time. The Secretary may authorize the Secre-

18  tary of the Treasury to invest and reinvest such portions

19  of the fund as the Secretary of Housing and Urban Devel-

20  opment may determine are not needed for current opera-

21  tions in any interest-bearing securities of the United States

22  or in any securities guaranteed as to both principal and

23  interest by the United States or in bonds or other obli-

24  gations which are lawful investments for fiduciary, trust,

1 and public funds of the United States, and the income

2 therefrom shall constitute a part of the fund.

3     "(e) (1) If, in the judgment of the Secretary of Housing

4 and Urban Development, a loan to the fund is required at

5 any time for carrying out the purposes of this section, the

6 Secretary of the Treasury shall make the loan, but loans

7 under this paragraph shall not exceed in the aggregate

8 $1,000,000 outstanding at any one time. Except as other-

9 wise provided in this subsection, each loan under this para-

10 graph shall be made on such terms as may be fixed by agree-

11 ment between the Secretary and the Secretary of the

12 Treasury.

13     "(2) Interest shall accrue to the Treasury on the

14 amount of any outstanding loans made to the fund pursuant

15 to paragraph (1) of this subsection on the basis of the aver-

16 age daily amount of such outstanding loans determined at the

17 close of each fiscal year with respect to such year, and the

18 Secretary shall pay the interest so accruing into the Treasury

19 as miscellaneous receipts annually from the fund. The Sec-

20 retary of the Treasury shall determine the applicable interest

21 rate in advance by calculating the average yield to maturity

22 (on the basis of daily closing market bid quotations during

23 the month of June of the preceding fiscal year) on outstand-

24 ing marketable public debt obligations of the United States

1    having a maturity date of five or less years from the first day

2    of such month of June and by adjusting such yield to the

3    nearest one-eighth of 1 per centum.

4    "(f) So long as any loans to the fund are outstanding,

5    the Secretary shall from time to time, not less often than

6    annually, determine whether the balance in the fund is in

7    excess of the amount which, in the Secretary's judgment, is

8    needed to meet the requirements of the fund and shall pay

9    such excess to the Secretary of the Treasury, to be credited

10    against the loans to the fund.

11    "(g) There is authorized to be appropriated, in addi-

12    tion to any other sums that are authorized to be appropriated

13    for the purposes of this title, the sum of $10,000,000 for the

14    establishment of the fund.".

15    (b) Such Act is further amended by redesignating sec-

16    tions 818 and 819 as 819 and 820, respectively.

17    CONFORMING AMENDMENT TO TITLE IX OF 1968 CIVIL

18                    RIGHTS ACT

19    SEC. 211. Section 901 of the Act entitled "An Act to

20    prescribe penalties for certain acts of violence or intimida-

21    tion, and for other purposes" (Public Law 90–284, approved

22    April 11, 1968) is amended by inserting "handicap," im-

23    mediately after "sex," each place it appears.

1   CONFORMING AMENDMENT TO TITLE 28 OF UNITED STATES

2                 CODE

3     SEC. 212. (a) Section 2341 (3) (B) of title 28 of the

4 United States Code is amended by inserting "or the Secre-

5 tary of Housing and Urban Development, as the case may

6 be" immediately after "the Secretary of Agriculture".

7     (b) Section 2342 of such title 28 is amended—

8         (1) by striking out "and" at the end of paragraph

9     (4);

10         (2) by striking out the period at the end of para-

11     graph (5) and inserting "; and" in lieu thereof; and

12         (3) by adding immediately after paragraph (5)

13 but before the final sentence, the following:

14         "(6) all final orders of the Secretary of Housing

15    and Urban Development under the Fair Housing Act.".

16             EFFECTIVE DATE

17     SEC. 213. This title and the amendments made by this

18 title shall take effect on the date of the enactment of this Act.

95TH CONGRESS
1ST SESSION

# H. R. 7787

---

## IN THE HOUSE OF REPRESENTATIVES

JUNE 14, 1977

Mrs. SPELLMAN (for herself and Ms. HOLTZMAN) introduced the following bill; which was referred to the Committee on the Judiciary

---

# A BILL

To amend title VIII of the Act commonly called the Civil Rights Act of 1968 with respect to the awarding of attorney's fees and the authority of the Department of Housing and Urban Development to initiate a civil action to enforce the provisions of such title.

1   *Be it enacted by the Senate and House of Representa-*

2   *tives of the United States of America in Congress assembled,*

3   That the Act entitled "An Act to prescribe penalties for cer-

4   tain acts of violence or intimidation, and for other purposes",

5   approved April 11, 1968, as amended, is amended—

6           (1) by inserting "or the Secretary" immediately

7       after "compliance with this title, the person aggrieved"

8       in the first sentence of section 810 (d) ; and

I

443

1        (2) by changing "30" to "60" in lines 1, 2, and 5

2    of section 810 (d) ; and

3        (3) by deleting the period and adding "and grant

4    any other relief authorized by section 812." to the last

5    sentence in section 810 (d) ; and

6        (4) by striking out the proviso in section 812 (c).

444

## Appendix 2

### INDEX OF WRITTEN COMMENTS ON H.R. 3504

I. Comptroller General
    1. Comptroller General of the United States
II. Public Interest and Fair Housing Attorneys and Associations
    1. Suburban Action
    2. Advocates for Basic Legal Equality
    3. Puerto Rican Legal Defense and Education Fund, Inc.
    4. David Moskowitz, Esq.
    5. ACLU
    6. Regional Housing Legal Services
    7. Business and Professional People for the Public Interest
    8. National Housing Law Project (UCB)
    9. Leadership Council for Metropolitan Open Communities
    10. The Housing Advocates, Inc.
    11. Potomac Institute
III. State and Local Civil Rights/Fair Housing Agencies
    1. Fair Housing Congress of Southern California
    2. Washington State Human Rights Commission
    3. Ohio Civil Rights Commission
    4. Virginia Real Estate Commission
    5. Kansas Commission on Civil Rights
    6. Hawaii Department of Labor and Industrial Relations
    7. Nevada Equal Rights Commission
    8. Fair Housing Contact Service of Summit County, Ohio
    9. New Jersey Department of Law and Public Safety, Division on Civil
        Rights
    10. Philadelphia Office of Urban Homesteading
    11. State of Wisconsin, Department of Industry, Labor and Human Relations
    12. Michigan Department of Civil Rights
    13. Connecticut Commission on Human Rights and Opportunities
    14. Fair Housing Council of the San Fernando Valley (CA.)
    15. New Jersey Department of the Public Advocate
    16. New York Division of Human Rights
    17. City of Palo Alto
    18. Massachusetts Executive Office of Communities and Development
    19. Fair Housing Congress of Southern California
    20. Midpeninsula Citizens for Fair Housing
IV. Organizations Relating to Rights of Handicapped
    1. Arlington County, Virginia Fair Housing Board
    2. State of Wisconsin, Council on Developmental Disabilities
    3. Connecticut Commission on Human Rights and Opportunities
    4. United Cerebral Palsy Associations, Inc.
    5. National Center for Law and the Handicapped, Inc.
    6. Massachusetts Department of Mental Health, Brockton Area Office
    7. Massachusetts Association for Retarded Citizens
    8. Greater Cape Ann Mental Health and Retardation Area Board
    9. National Federation of the Blind
V. Insurance Organizations
    1. National Association of Insurance Commissioners
    2. American Insurance Association
    3. Crum and Foster Insurance Company
    4. Alliance of American Insurers
VI. Others
    1. National Apartment Association
    2. American Institute of Housing Consultants
    3. American Bankers Association
    4. National Association of Housing and Redevelopment Officials
    5. National League of Cities
    6. Professor Walter Gellhorn
    7. Federal Home Loan Bank Board
    8. Stanford University, Linear Accelerator Center
    9. San Francisco Housing Authority

# I. Comptroller General



COMPTROLLER GENERAL OF THE UNITED STATES
WASHINGTON, D.C. 20548

D-184855
CED7-435

August 16, 1977

The Honorable Don Edwards
Chairman, Subcommittee on Civil and
  Constitutional Rights
House of Representatives

Dear Mr. Chairman:

Your letter of April 12, 1977, requested our comments on
title II of H.R. 3504, 95th Congress.  If enacted, title II
would be cited as the "Fair Housing Amendments Act of 1977."

Section 206(c) would add section 804(f) to the Civil
Rights Act of 1968 (Pub. L. 90-284, 82 stat. 73 (April 11,
1968)) to prohibit a person in the business of insuring against
hazards to refuse to enter into a contract of insurance for a
dwelling because of the race, color, or national origin of per-
sons residing in or near the dwelling.  Section 206(e) would
amend section 805 of that act (42 U.S.C. sec. 3605 (1970)) to
prohibit discrimination by banks, building and loan associa-
tions, insurance companies, or other corporations, associations,
firms, or enterprises in the business of making commercial real
estate loans to deny loans or financial assistance because of
the neighborhood of the dwelling or dwellings.  Both of these
sections appear to prohibit what has been commonly referred to
as redlining.  We believe that these sections would be more
easily understood if the term "redlining" were used and the
term was defined as the denial of insurance, loans, and other
financial assistance solely on the basis of the racial
composition of the neighborhood in which the dwellings are
located.

Section 206(d) would amend sections 804, 805, and 806 of
the act (42 U.S.C. sec. 3604-06 (1970)) by adding handicaps as
a prohibitive basis for discrimination.  To be consistent with
the Equal Credit Opportunity Act of 1974, as amended (15 U.S.C
sec. 1691 et. seq. (Supp. V, 1975)), this section should be
expanded to include marital status, age, and source of
applicant's income.

33-264 O - 78 - 29

B-164855
CED7-435

Section 208 proposes to strike sections 810 through 814
of the 1968 act (42 U.S.C. sec. 3610-14 (1970)) and to insert
in lieu thereof a new section 810. This section would give to
the Secretary of the Department of Housing and Urban Develop-
ment (HUD) the authority to conduct hearings and to issue orders
requiring violators to cease and desist from unlawful practices.
As you know, our Office has reviewed HUD's efforts to resolve
title VIII complaints and has found that its enforcement efforts
generally have not been effective because HUD lacked the author-
ity to ensure compliance when discrimination was found. We,
therefore, believe that administrative enforcement authority
is needed and endorse the intent of the new section 810.

Section 210(a) would amend the act by adding a new section
818 to establish in the Treasury a Fair Housing Loan Fund which
would be available to the Secretary of the Department of Housing
and Urban Development for purposes of making loans to any
aggrieved person alleging a violation of title II for use of
such person in paying the costs of a civil action to enforce
this title. The Treasury would be required to make loans to the
fund not to exceed $1,000,000 outstanding at any one time when
determined necessary to carry out the provisions of this section.
The sum of $10,000,000 would be authorized to be appropriated for
the establishment of the fund.

We believe that the public interest is best served when
congressional control over activities is exercised through annual
reviews and affirmative action on planned programs and financing
requirements through the appropriation processes. Departure
from this standard has been supported by GAO only on a clear
showing that the activity cannot be successfully operated in
the public interest within the regular appropriation process.

We see no necessity for establishing a revolving fund to
make and collect the loans authorized by this section, par-
ticularly since it is questionable whether the fund will be
self-sustaining. The fund would not likely be self-sustaining
because, under provisions of section 818(b), the Secretary
would be authorized to cancel those loans not covered by
amounts allowed plaintiffs in civil actions. We therefore
suggest that all references to the loan fund be deleted. If
this suggestion is followed, a provision should be added to
the bill requiring that loan repayments be deposited as mis-
cellaneous receipts. Without a loan fund the Secretary would
be required to justify to the Congress each year the program
funds authorized by this section.

- 2 -

B-164855
CED7-435


If it is determined that the provision for a loan fund is to be retained, we are concerned that the proposed section 818(d) provides that the amounts in the fund not needed for current operations be invested in interest bearing securities issued or guaranteed by the United States. We do not believe the fund should be permitted to earn interest on amounts which Treasury will derive from general revenues or from borrowings. As far as we know, the Government funds which are permitted to to be invested in Government issued or guaranteed securities are those which are derived in whole or in part from special taxes or contributions such as social security, unemployment insurance, retirement funds, etc.

The bill provides for Treasury loans to the loan fund not to exceed $1 million outstanding at any time. The bill's provision for the payment of interest on such loans seems unduly complicated in providing for the payment of interest on average daily balances at rates which may have no relationship to the maturity of the loans. We suggest that this section be deleted and the following substituted.

"(2) Interest rates on the loans made pursuant to paragraph (1) of this subsection shall be established by the Secretary of the Treasury taking into consideration the market yield on marketable Government securities of comparable maturity. The loans may be repaid fully or partially by the fund prior to maturity without penalty or adjustment of the interest rate."

We also believe that, if the provision for a revolving fund is retained, provisions should be added requiring that (1) loans made from the fund in any fiscal year not exceed limitations specified in appropriation acts, (2) business-type budgets be submitted to the Congress, and (3) all expenses of operating the fund be charged to the fund. Language of the type required is included in the law authorizing the fund for higher education academic facilities loans (20 U.S.C. 1132c-3 and (b)(2)).

The bill provides in the proposed new section 818(b) that the rate of interest on loans to pay the cost of civil actions by persons alleging violations of this title will be determined by the Secretary. However, the bill does not provide any limits or guidelines as to the rates to be charged.


- 3 -

B-164855
CED7-435

We recommend that section 818(b) be revised to provide that the rate of interest on the loans be based on a determination by the Secretary of the Treasury of the average yield to maturity as of June 30 of the preceding fiscal year on all outstanding marketable obligations of the United States. The Subcommittee may also wish to stipulate that the interest rate shall include an estimated factor to recover the Government's expenses of administering the loan fund.

Sincerely yours,

Deputy Comptroller General
of the United States

— 4 —

## II. Public Interest and Fair Housing Attorneys and Associations

### Suburban Action

A nonprofit Institute for
Research and Action in the Suburbs
**257 Park Avenue South, Room 2004**
**New York, N.Y. 10010**
**(212) 777-9119**



April 4, 1977

The Honorable Don Edwards
Chairman
Subcommittee on Civil and Constitutional Rights
Committee on the Judiciary
House of Representatives
Washington, D.C. 20515

Dear Chairman Edwards:

Thank you for the opportunity extended to us to comment on the amendments to Title VII of the 1964 Civil Rights Act and Title VIII of the 1968 Civil Rights Act proposed in H.R. 3504 by you and Congressman Drinan.

First, with respect to Title I of the proposed bill, equal employment opportunity, we offer the following comments. Suburban Action Institute has taken a number of actions in the past several years to challenge moves by corporations of their headquarters and other facilities from major urban downtowns, whose labor markets are characterized by relatively high rates of minority participation, to sub urban and rural sites whose labor markets contain very few minorities because their housing markets are largely closed to minorities through housing discrimination and other circumstances.

We believe that such moves are prohibited under Title VII. Former Chairman of the EEOC, William H. Brown, III, commented at a conference on this subject in 1970 that "It may just be that the physical removal of jobs beyond the reach of minority workers is . . . a violation of Title VII, by bringing about a foreseeable discriminatory effect." In addition, federal contract compliance requirements under Executive Order 11246 may prohibit companies contracting with the Federal Government from engaging in site location discrimination. Former Chairman of the EEOC, John H. Powell, Jr., then General Counsel of the U.S. Commission on Civil Rights, commented in 1970, that "We have found that equal employment opportunity is impossible where employees are denied access to housing."

As a part of the reorganization of the EEOC to make it a more effective agency in support of equal employment opportunity, we believe its mandate should be strengthened to make explicit the prohibition of location employment discrimination. We feel this is imperative in view of the accelerating rate of movement of major employers from downtown areas such as New York City and Newark to suburban locations throughout the Northeast and the damaging effects of these moves on city economics and on minority hiring opportunities.

Chairman Don Edwards
April 4, 1977
page two

We would propose language along the lines of: U.S. Code, Title 42, Section 2000e-2: It shall be deemed a violation of this section if an employer having a substantial number of minority employees relocates his/her plant or facilities to a location having a labor market characterized by a substantially lower proportion of minorities than in the area where said plant or facility is currently located. It may be prudent to include a proviso that allows for affirmative action to correct past practices and to assure housing opportunities for minority employees. We would like to point out that the location of federal facilities was recently covered in a court case involving the preparation of an Environmental Impact Statement under the National Environmental Policy Act. We have enclosed that decision.

Second, our comments with respect to the proposed Title II, Fair Housing, are as follows. As you know, Suburban Action Institute has had extensive experience in litigation on exclusionary zoning. We are extremely pleased that you are moving to strengthen legislation in this area. We welcome your response to the damaging effects of the Arlington Heights decision. We note what is quite obvious, that the Title VIII aspects of the Arlington Heights case have not yet been decided; only the question of the Constitutional issue was resolved in the Supreme Court's decision on the case; Title VIII issues were remanded for hearing.

We believe that language must be inserted in addition to your proposed language at page 42, lines 3-12, to make clear that discriminatory impact or effect which results in excluding "low- or moderate-income housing because of the eligibility of such housing for governmental assistance, or because of the race, color, national origin, or economic status of the prospective occupants of such housing" will be prima facie evidence of violation of the law.

We are also concerned that the limits of "exclusion" are not spelled out. The mere provision of token housing, such as many communities have done with elderly housing (while such housing is needed, it does not represent a suitable response to meeting the total range of housing needs that may exist), must not be regarded as exempting a community from the liability of this provision. Thus we would call for language which would indicate that the exclusion of the _possibility_ for low-and moderate-income housing be the standard applied.

Related to this issue, we believe that the language of the amendments should be far stronger than the prohibition of local government actions which restrict construction of certain housing types. The act should also propose positive obligations under the Civil Rights Law that require local jurisdictions that receive federal aid in the form of revenue sharing, Community Development funds, or other funds, to act affirmatively to further the equal housing opportunity mandates of the act. This positive obligation

Chairman Don Edwards
April 4, 1977
page three

should include the obligation to zone for all types of housing where zoning
is used at all; to provide the appropriate approvals and permissions for
all types of housing; to encourage the development of all types of housing
through the exercise of police powers to regulate development; to partici-
pate in regional fair share housing plans; to participate in or to create a
housing authority or other agency capable of maximum participation in state
and federal subsidy funds for housing.

Finally, we believe that the legal enforceability of the best possi-
ble language on civil rights in housing will remain tenuous, at best, under
the current Supreme Court doctrines unless the Congress strengthens the
ability of complainants to receive favorable court rulings on standing.
We, therefore, believe a section should be added to the bill detailing the
rights of litigants to have standing in a number of situations under the
Fair Housing law. The particular situation we feel needs immediate rectifi-
cation under Arlington Heights is the standing of a person to sue a jurisdic-
tion for violation of the equal protection laws or of specific fair housing/
zoning acts who does not live in such a jurisdiction but who wishes to be
able to do so and complains that he/she is prevented from doing so by the
unavailability of suitable housing created by zoning or other police power
land use controls exercised by the defendant municipality.

Again, we appreciate the opportunity to send these comments. We
would be most pleased to provide testimony on any of the issues discussed
above, particularly corporate relocation and exclusionary zoning, if you
wish us to do so. We commend you on your initiative in moving these amend-
ments.

Sincerely,

Mary E. Brooks
Director of Research and Planning

Linda Davidoff
Associate Planner

Paul Davidoff
Executive Director

MEB/LD/PD:tm
enclosure



*Those who make peaceful revolution*
*impossible make violent revolution inevitable.*
*John F. Kennedy*

**740 spitzer bldg   toledo ohio 43604**

April 21, 1977    *419/255 - 0814*

Congressman Don Edwards, Chairman
Subcommittee on Civil and Constitutional
    Rights
Committee of the Judiciary
House of Representatives
Washington, DC    20515

RE:  Comments on H.R. 3504, Amending Title VIII
     of the 1968 Civil Rights Act

Dear Congressman Edwards:

   We were very pleased to receive your request for comments
on your proposed amendments to Title VIII of the 1968 Civil
Rights Act.  ABLE is a legal services organization which repre-
sents low income persons.  We have been deeply involved in
litigation particularly in the housing area and specifically
as it relates to the provision of low income and minority hous-
ing throughout the Toledo metropolitan area. 1/

   While we wholeheartedly support each of the proposed
amendments, we have written the following comments to indicate
our special concern for the amendment which seeks to prohibit
local governmental units, in exercising their land use regula-
tory powers, from excluding low and moderate income housing
because of its eligibility for governmental assistance or because
of the race or income of the prospective occupants of such
housing.  H.R. 3504, Section 206(g).  Our interest in this pro-
vision is particularly strong due to the very active use of
these prohibited devices by numerous local governmental units
and agencies within the Toledo area.

   In order to show what low income and racial minority
families have faced in the Toledo metropolitan area's treatment
of their housing needs, and to highlight the crucial importance
of this amendment to Title VIII, we include the following brief
history of public housing in Toledo.  Although our personal
experience is naturally limited to the Toledo area, we believe

Congressman Don Edwards, Chairman
April 21, 1977
Page two


that the patterns and practices of housing discrimination re-
lated herein are not unique to northwestern Ohio and can be
found in virtually every part of the United States. 2/

### Early History of Public Housing in
### Toledo

The first attempt to provide public housing was in 1938
when the Toledo Metropolitan Housing Authority (TMHA-renamed
Lucas Metropolitan Housing Authority (LMHA) in 1976) entered
into a Cooperation Agreement with the City of Toledo which
called for the construction of up to 1000 housing units. 3/
The units built pursuant thereto were racially segregated by
official TMHA policy.  Some projects were for "colored occupancy"
and others for "whites." 4/

In 1951 a second Cooperation Agreement was made between
TMHA and the City of Toledo for the provision of 1,500 units
of housing.  This agreement though included a provision banning
racial segregation. 5/  Almost immediately, community opposi-
tion began to organize, and when in 1952, the Toledo Lucas Plan
Commission approved fifteen (15) sites for public housing, the
opposition focused on those sites. 6/

The first site, located in the predominantly white area
of east Toledo, received City Council approval in February, 1952
but in the face of an overflow crowd of angry white citizens,
Council reversed its concurrence five days later. 7/  According
to newspaper accounts, the opposition to the sites was couched
in racial terms.  The City of Toledo's own Board of Community
Relations (B.C.R.) noted its distress because of the "repeated
appeals to racial prejudice. . . by irresponsible persons and
groups in their efforts to oppose public housing in Toledo."
8/  Yielding to those appeals, City Council unilaterally rescinded
the 1952 Cooperation Agreement with TMHA 9/ and as a result no
further public housing was contemplated until 1956 when reloca-
tion housing became a necessity in order to qualify for federal
urban renewal funds.

In the meantime, in 1953, TMHA officially announced its
intent to integrate its housing units. 10/  Despite a B.C.R.
study that favored integration, and the fact that the City had
already rescinded its Cooperation Agreement with TMHA, the City
Council on April 12, 1953 passed a resolution which stated:

Congressman Don Edwards, Chairman
April 21, 1977
Page three

> That this body go on record opposing the
> introduction of colored people in the
> East Side projects.

The councilman sponsoring the resolution stated that he had no
thought of any discrimination against the Negro race, but that
he had worked with many Negroes and found that it was not
their desire to live among white people.  He was quoted as
stating, "principles of racial understanding were not extended
to the point of Negroes and white people living together in
the same building."12/

City Council rescinded its resolution six (6) days later
and East Side Toledo residents responded with a threat to secede
from Toledo as a "last resort to maintain racial segregation
in East Toledo public housing."14/  Meanwhile a private lawsuit
had been brought on behalf of four (4) black applicants for
public housing in Toledo.  On June 23, 1953, the Federal District
Court in Vann v. TMHA gave TMHA until October 1953 to put its
new policy of integration into effect,15/ and that settled
the issue.

In 1956, in order to qualify for federal funds for urban
renewal, a third Cooperation Agreement was made by the City
of Toledo and T.M.H.A., but all housing built pursuant to it
was placed on existing public housing sites or in urban renewal
areas.16/  When in 1967 T.M.H.A. decided to participate in the
Section 23 leased housing program (which could have resulted
in dispersal of public housing units into areas outside
traditional racial minority and low income concentrations)
one Councilman stated that the program would "help spread
slums."17/

Finding itself unable to construct public housing outside
urban renewal areas, T.M.H.A. embarked on a program of purchas-
ing existing apartment buildings and converting them to
public housing.  This led to some opposition by local residents
as well as criticism of the use of "luxury housing" for low
income families.18/  Between 1956 and 1968, no attempt was
made to disperse public housing.

<u>Recent History of Public Housing</u>
<u>in Toledo</u>

In 1968 the fourth and most recent Cooperation Agreement
between the City of Toledo and T.M.H.A. was made for the

Congressman Don Edwards, Chairman
April 21, 1977
Page four


provision of 3,000 housing units. 19/  As in 1956, the City of
Toledo's need for federal funds ($12 million at that time) was
a primary motivation in making any agreement at all.  Pursuant
to the 1968 agreement, TMHA has sought to locate nine (9)
separate family public housing developments outside areas of
traditional racial minority and low income concentration.  See
Exhibits A, B, and C.  In every single instance, the City
Council or the Toledo-Lucas County Plan Commission has voted
to block construction of the proposed developments, to wit:

1970 - Four Official Vetoes of Proposed Dispersed
            Developments

     In 1970, four (4) sites were selected for turnkey projects--
all four were outside areas of minority concentration.  The
authority announced that it was trying to diversify locations
so as not to create more public housing in areas where it was
already concentrated. 20/  Thousands of residents signed a
petition opposing a site on Lehman Avenue in Point Place.
After the chairman of the housing authority wrote a letter to
City Council stating that Council had the authority to veto the
four sites selected, Council did just that.

     On May 26, 1970, HUD announced that $15 million in Federal
funding would be withheld from the City unless 400 units were
under contract by June 30. 21/  Congressman Ashley said that
HUD had no other choice but to withhold the money.  He added:

          "If we're not going to provide relocation
          housing, then we should not be given the
          incentive to engage in actions that require
          such housing. 22/

     ABLE filed suit and on June 7, 1970 the U.S. District Court
ordered the City of Toledo to refrain from any action which would
impede the construction of the housing agreed to in the 1968
Cooperation Agreement or which would jeopardize the receipt of
Federal funds.  Three of the four sites ultimately were developed
pursuant to that court order. 23/

1974 - Three Official Vetoes of Proposed Dispersed
            Developments

     In 1974, TMHA solicited bids from private developers for
three turnkey projects in exclusively white communities.  The

Congressman Don Edwards, Chairman
April 21, 1977
Page five


projects were named Chesterfield Heights, Statlin Terrace and
Denver Terrace.

On January 24, 1974, the Plan Commission unanimously
approved the Chesterfield Heights plat, a 15 acre parcel.
Later, white residents of the area surrounding this site re-
quested that the Plan Commission reconsider its action and
rescind its prior approval of the platting since the full facts--
namely that it was a public housing project--were not known at
the time of the hearing. On March 21, 1974, the Commission re-
scinded its prior approval of the platting. In the entire
history of the Toledo Plan Commission, this was the only occasion
on which a platting approval was rescinded.

On March 7, 1974, the Plan Commission disapproved the
developer's request in platting an 8.7 acre parcel, Statlin
Terrace. The plat was disapproved over the recommendation for
approval by the staff, on the ground that it was not considered
to be in the best interests of the residents of that area. In
a subsequent trial, 24/ William Jacquot, a Plan Commission
staff member, employed by the Plan Commission for more than 12
years, testified that he did not know of any instance in which
a plat had been disapproved for that reason.

In June of 1976 we made a study of platting decisions by
the Plan Commission. We found that from 1969 to the survey date,
the City Plan Commission had considered 140 cases in which plat-
ting was the only issue. Out of those 140 platting cases, seven
(7) were disapproved for zoning reasons. Of the 133 remaining
plats, 119 were approved and 14 were disapproved. Of the 14 that
were disapproved, the staff recommended disapproval nine (9) times
and approval five (5) times. Thus, the Plan Commission had failed
to follow the staff recommendation on only five (5) occasions when
platting was the sole issue in the proceedings. Of those five
(5) cases, four (4) involved the platting of a public housing site
in a predominately white neighborhood.

The most shameful act of all involves Denver Terrance, a
proposed 50 unit development. The developer sought to have
this site rezoned from 20,000 square foot lots to 9,000 square
foot lots to build 50 low income family units. The request for
rezoning was disapproved by the Plan Commission and affirmed by
the City Council on March 26, 1974, after neighborhood residents
complained about the density, overcrowded schools and traffic

Congressman Don Edwards, Chairman
April 21, 1977
Page six


problems.  Nevertheless, on January 25, 1977, Council rezoned
a twenty-four acre parcel, including this site from 20,000
square foot lots to two-family residence lots pursuant to the
request of a private developer who proposed five times the
number of units (268 as opposed to 50) on a parcel less than
twice the size of the original.  This time, no citizens expressed
any fear of density, overcrowded schools or traffic congestion.

We filed suit in Federal Court to overturn these vetoes.
While ruling in our favor, the District Court called the City's
actions one of the saddest displays of bigotry and intolerance
he had ever witnessed. 25/  The United States Court of Appeals
for the Sixth Circuit reversed the lower court. 26/  Recently,
the Supreme Court remanded the case to the Court of Appeals for
reconsideration in light of Arlington Heights and Gautreaux. 27/

1976-1977 - Two More Official Vetoes and then
        Reconsideration

One of the objections to low income housing in Toledo
has been an argument against clustered housing [often 50 or
more units in one development].  Last year TMHA proposed two
developments of 17 and 16 single family homeownership units
each, in an area with few minority or low income persons:
Talmadge Woods and Mellwood Glen  Talmadge Woods, was disap-
proved on January 24, 1976 for platting by the Plan Commission
over staff recommendation.

The second site, Mellwood Glen, received similar action
on June 10, 1976 because it was felt that it would change the
character of the neighborhood and lower property values.

In both instances neighborhood residents raised the stan-
dard objections.  Some claimed the proposed units were too costly,
some said they were too inexpensive.  Others claimed sewer over-
loading (even though hundreds of other homes in the area have
recently been tied into the same sewer without objection) and
some claimed flood plain violations (which even the City Law
and Engineering Departments stated was incorrect).  Nonetheless
when it become clear that the Plan Commission action would
jeopardize millions of dollars of HUD funds, the Plan Commission
begrudgingly  gave platting approval on August 9, 1976.  Then, on
March 1, 1977, City Council through the unique and original
device of withholding approval for sewer extensions to these

Congressman Don Edwards, Chairman
April 21, 1977
Page seven

sites, was able to block both developments. Council too, though,
was convinced to finally grant the sewer extension approval
after HUD threatened the loss of federal funds.

Nevertheless the concerned citizens have taken the follow-
ing actions so that even if they cannot overturn the City's
approvals they can at least delay the developments into extinction:

1). Collection of signatures on petitions for
a referendum on each ordinance.

2). An appeal of Council's action approving
the ordinances under an Ohio statute that
allows an appeal from the action of a
municipal body when made in an "administra-
tive capacity."

3). An original action against each sewer exten-
sion alleging constitutional and equitable
issues, among others.

4). An appeal of the Plan Commission approval
of the plats for each project.

When one reviews the facts as shown in the attached Exhibits
it becomes very clear that segregated housing patterns are not
simply the result of private discrimination. The location by
governmental entities of family public housing (paid for with
federal tax dollars) into traditional areas of racial minority
and low income concentrations has had a very significant effect
on residential patterns of our minority citizens, (who make up
sixty percent (60%)) and low income persons (who make up one
hundred percent (100%)) of the applicants on the housing author-
ity's waiting list. Undoubtedly many of the actions of the City
Council, the Plan Commission and even the housing authority and
the Federal government have been illegal even under existing
law. 28/ These laws are most effective though where the racial
minority population makes up the majority of the low income
population. Where this exists, the protections provided to racial
minorities through civil rights legislation will often be used
to protect the interests of all low income persons in the process.
But often, particularly here in the mid-west, the low income
population is made up of more whites than blacks or other minor-
ities, and the result is that civil rights legislation giving

Congressman Don Edwards, Chairman
April 21, 1977
Page eight


special protection to racial minorities is not as easily
utilized by low income persons in general. The proposed
amendment as it relates to economic status and the limitations
on local government land use and development powers goes a
long way to providing clear notice to these bodies of their
responsibilities in providing fair housing opportunities for
all its citizens. As individuals and governmental bodies be-
come more sophisticated and subtle in the methods used to veil
discriminatory actions against minorities and low income per-
sons, the need for clear direct prohibitions becomes more
apparent.

We hope these comments shall be of some assistance to you
in the passage of these amendments. If we can aid you further,
please do not hesitate to contact us.

Sincerely,

R. Michael Frank
Director

Glenn G. Galbreath
Staff Attorney

RMF;GGG:djs

Encls.

cc: Robert F. Drinan

### FOOTNOTES

1/ Davis v. City of Toledo, 54 F.R.D. 386 (N.D. Ohio 1970);
Skilken v. City of Toledo, 380 F. Supp. 228 (N.D. Ohio
1974) reversed and remanded 528 F2d 867 (6th Cir. 1975)
vacated and remanded ____ U.S. ____ (U.S. Supreme Court,
January 25, 1977); Dotson, et al., v. HUD, et al., No. C74-
531; Jaimes, et al., v. TMHA, et al., Case No. C74-68 (N.D.
Ohio).

2/ Village of Arlington Heights v. Metropolitan Housing Develop-
ment Corporation, 45 U.S.L.W. §4073 (1977); United States v.
City of Black Jack, 508 F2d 1178 (8th Cir. 1974); United Farm-
workers v. City of Delray Beach, 493 F2d 799 (5th Cir. (1974));
Kennedy Park Homeowners Association v. City of Lackawanna, 436
F2d 108 (2d Cir. 1970) cert denied 401 U.S. 1010 (1971).

3/ Toledo Municipal Ordinance No. 246-38, 1938.

4/ The Toledo Blade, April 11, 1958 and November 23, 1939.

5/ Toledo Municipal Ordinance No. 738-51, 1951.

6/ The Toledo Blade, February 23, 1952.

7/ Ibid, February 20, 1952.

8/ Ibid, March 1, 10, 1952 and May 28, 1952.

9/ Toledo Municipal Ordinance No. 436-52, 1952.

10/ The Toledo Blade, February 11, 1953.

11/ Ibid, June 23, 1953.

12/ Id.

13/ City of Toledo Council Meeting transcript, April 23, 1953.

14/ The Toledo Blade, May 1, 1953.

15/ Vann v. TMHA, 113 F. Supp. 210 (N.D. Ohio 1953).

16/ The Toledo Blade, June 22, 1956; January 16, and May 18,
1961; May 4, 1962, and March 7, 1963.

17/ The Toledo Blade, June 19 and 29, and July 17, 1967.

18/ Ibid, January 21 and April 1, 1967

19/ Toledo Municipal Ordinance No. 257-68, 1968

461

20/ The Toledo Blade, March 28, 1970.

21/ Ibid, May 26, 1970.

22/ Id.

23/ Davis v. City of Toledo, supra.

24/ Skilken, supra.

25/ Id.

26/ Id.

27/ Id.

28/ 42 U.S.C. 1441, et seq.; 1981; 1982; 1983; §2000d; §3601, et seq.; §4601, et seq.; §5301, et seq.; and the regulations promulgated pursuant thereto; and the Fifth, Thirteenth and Fourteenth Amendments to the U.S. Constitution.

462

**PUERTO RICAN LEGAL DEFENSE
& EDUCATION FUND, INC.**
95 Madison Avenue
New York, New York 10016
212-532-8470



April 4, 1977

Hon. Donald Edwards
Chairman,
Subcommittee on Civil Rights
   and Constitutional Rights
United States Congress
Committee on the Judiciary
Washington, D. C.  20515

Dear Congressman Edwards:

In response to your request, we have reviewed the Fair
Housing provisions of H.R. 3504.  Our comments and suggestions,
offered in this letter, are limited to those portions of H.R.
3504 which we find particularly commendable or which we think
need amendment.

Section 205 of the bill expands coverage of the Fair
Housing Act to all dwellings except space within a single
family dwelling unit rented by the occupant of the unit.  Its
expansion of the coverage of the Fair Housing Act is desirable,
but it still stops short of fulfilling Congress' aim to bar
all discrimination in the sale or rental of housing.  Title
VIII should sanction no denial of the opportunity to obtain
decent housing on the basis of race, religion, national origin,
or sex.  We would therefore favor deletion of the exemption.

We also support those portions of Section 206 which prohibit
discrimination in writing dwelling hazard insurance on the basis
of the race, color, or national origin of persons residing in
or near the dwelling and which prohibit housing financing
discrimination on the basis of the racial or ethnic composition
of the neighborhood in which the dwelling is located.

A part of Section 206 makes it unlawful for any state
government unit or state agency to use its power over planning,
zoning, subdivision controls, building codes or permits and
other matters affecting land use development so as to exclude
low or moderate income housing because such housing is eligible
for governmental assistance or because of the race, color,

Hon. Donald Edwards
April 4, 1977
Page 2


national origin or economic status of the prospective occupants
of such housing.  This part substantially increases the utility
of Title VIII in combatting discrimination in the provision of
decent housing.

Section 3604 of the Fair Housing Act, however, should be
additionally amended to prohibit discrimination in providing
services which affect the quality of residential life.  Housing
discrimination created the urban ghetto, which is characterized
by, among other things, the failure to provide equal and quality
municipal services.  See Glasser, The Fair Housing Act of 1968,
its successes and its failures, 9 Suffolk University Law Review
1312, 1312-1313 (Summer, 1975), citing D. Bell, Race, Racism
and American Law 722.  To provide a statutory basis for relief
from these effects of unlawful housing discrimination, we suggest
the following additional prohibition:

> For any state or local government, subdivision
> or other state or local agency to discriminate
> in the provision of governmental services and
> facilities, on the basis of the racial or
> ethnic composition of the area or neighborhood
> to which the services and facilities are
> provided.

In the February 17, 1977 Congressional Record, co-sponsor
Cong. Drinan states that the prohibitions against excluding
low and moderate income housing are included "to clarify the
standard of eligibility and the burden of proof in exclusionary
cases arising under Title VIII."  Mr. Drinan remarked that the
Supreme Court's recent decision in Village of Arlington Heights
v. Metropolitan Housing Development Corp. "clouded the issue"
of whether racially discriminatory purpose as well as effect need
be demonstrated in order to establish a Title VIII violation, re-
sulting from exclusionary zoning.  Mr. Drinan implies that after passage of
H.R. 3504, only racially discriminatory effect would need to
be demonstrated.  We think this burden should similarly apply
to all cases arising under Title VIII.  The discriminatory
intent of other prohibited conduct is equally difficult to
prove, yet the other prohibited conduct is as effective as
exclusionary zoning in depriving minority individuals of equal
housing opportunity.

We urge, therefore, the addition of the following specific
provisions:  "A prima facie violation of this title shall be
established by proof of the racially discriminatory impact of
any conduct prohibited by §3604 of the Act."

Hon. Donald Edwards
April 4, 1977
Page 3


We think an order requiring the placement of specified numbers of minority individuals into housing found to be unlawfully segregated is one of the most effective remedies for housing discrimination. To our knowledge, however, the courts have never required affirmative placement goals or quotas to remedy a violation of Title VIII. A clear congressional statement that the courts should require affirmative placement goals or quotas to remedy present effects of past discrimination would significantly assist efforts to redress unlawful discrimination. Section 208 of H.R. 3504 should, therefore, include an additional provision and read:

PRIVATE ENFORCEMENT

Sec. 812...

(c)...the Court shall award such relief as may be appropriate, which may include requiring the placement of specific numbers of minority individuals into housing which is subject to conduct prohibited by this title,.... [The suggested addition is underscored. All other parts of that section would remain the same as they appear in H.R. 3504.]

The amended enforcement powers given to the Secretary of Housing and Urban Development under Section 208 are a significant improvement over the former powers of the Secretary. The considerable backlog of open cases before the Secretary has been attributed, at least in part, to the Secretary's limited powers under the Act. The power given to the Secretary by the amendment (to make binding determinations and issue enforceable orders) should relieve some of these delays. Glasser, supra, at 1327.

We do not support all of the provisions of Section 208 which give the Secretary additional powers. That section which gives the Secretary power to offer local agencies time to investigate a federally filed complaint should be deleted. This provision undermines the complainant's undoubted right to choose a federal forum.

That portion of Section 208 which deletes the limitation on attorneys' fees awards to successful plaintiffs is commendable. The provision allowing reasonable attorneys' fees to prevailing parties regardless of their financial status will better insure that the provision's purpose, to encourage private litigation to redress discrimination, will be effected.

Hon. Donald Edwards
April 4, 1977
Page 4


We are of course available to testify in support of
those provisions of H.R. 3504 which we have endorsed and in
support of our proposed additions.  Please feel free to contact
me or Barbara Schulman, a member of my legal staff who is
familiar with these issues.

Very truly yours,

Oscar Garcia-Rivera
Executive Director

OGR/av

LAW OFFICES

## MOSKOWITZ & ZAMPARELLI
### A PROFESSIONAL CORPORATION

*Suite 414, One Oxford Valley, Langhorne, PA 19047     P.O. Box 445     (215)752-7770*

March 17, 1977

Congressman Don Edwards, Chairman
Subcommittee on Civil and Constitutional Rights
CONGRESS OF THE UNITED STATES
Committee on the Judiciary
House of Representatives
Washington, D.C. 20515

RE: H. R. 3504

Dear Congressman Edwards:

In response to your letter of March 9, 1977, I have read
H. R. 3504 with great interest. The changes it makes in Title VII
and Title VIII are much needed and would be beneficial. Rather
than comment on all the aspects of H. R. 3504, I would like to
address myself solely to the proposed sections regarding ex-
clusionary zoning, which is Section 206(g), amending Section 804
of Title VIII.

First, this proposal expands the typical areas of
discrimination (race, color, creed, religion, national origin)
to include economic discrimination. While it is true that much
of the impetus for exclusionary zoning is based upon the desire
to keep out all low-income persons, be they black or white, and
that many of the important judicial decisions focus on economics
rather than racial discrimination (see, for example, Southern
Burlington County NAACP v Township of Mount Laurel, 119 N.J.
Super. 164, 290 A. 2d 465 [Law Div. 1972] judgment modified, 67
N.J. 151, 336 A. 2d 713 (1975), cert. denied, 423 U.S. 808, 96
S.Ct. 18, 46 L.Ed. 2d 28 (1975).

I doubt if Congress can make economic discrimination a
violation of Title VIII. Title VIII is based upon the Thirteenth
and Fourteenth Amendments. These Amendments probably do not apply
to economic discrimination, and, quite clearly, the equal protec-
tion clause does not. See, Jefferson v Hackney, 406 U.S. 535,
92 S.Ct. 1724, 32 L.Ed. 2d 285 (1973). While many of the national
housing acts are based upon the interstate-commerce clause, I do
not think that Title VIII is. Therefore, inclusion of economic
discrimination raises some risk of ultimate invalidation by the
courts.

Secondly, while there have been hundred of cases decided
concerning exclusionary zoning, and there are many books and law-
review articles on the subject, there is a lack of agreement in
regard to exactly what exclusionary zoning entails.

CONGRESSMAN EDWARDS
PAGE TWO

For example, is a municipality exclusionary if:

    (a) it does not permit apartments;
    (b) it prohibits apartments;
    (c) it permits only 100 new apartment units;
    (d) it permits only 1,000 new apartment units;
    (e) it already has 1,000 apartment units and it will not
        permit anymore;
    (f) it already has 50,000 apartment units and it will not
        permit anymore;
    (g) it is in compliance with a housing assistance plan
        approved by HUD (pursuant to the Housing and Community
        Development Act of 1974), but the plan is inadequate;
    (h) the plan is approved but is not consistent with a
        regional housing allocation plan; and
    (i) the plan is consistent with a regional housing allocation
        plan but is not implemented.

Add to this that the housing assistance plan may be a county plan
with a county applicant (as an urban county), but the munici-
palities which exercise the zoning powers have failed to implement
the county plan.

One of the difficulties is that the municipalities do not
zone for a particular income level of potential occupant or cost
level of housing. Zoning laws control use, bulk and density.
Even if apartments are permitted, they could all be luxury units.
The famous Pennsylvania decisions - Appeal of Girsh, 437 Pa.
237, 263 A.2d 395 (1970), In re Kit-Mar Builders, 439 Pa. 466,
268 A.2d 765 (1970) and National Land and Investment Co v Kohn,
419 Pa. 504, 215 A.2d 597 (1965), all involved luxury housing.
Therefore, the problem of invalidating solely the exclusion of
housing lies in the enormously wide area of discretion left to
the courts in interpreting this section.

Fourthly, there is the problem of identity of the potential
victim. In a typical Title VIII case, the victim is a black
person who sought a particular dwelling unit and was denied it.
However, in the exclusionary-zoning context, the dwelling unit
does not exist. There is quite often, no single ascertainable
individual who went to the farm and sought an apartment. If
some dwelling units are permitted though the number is limited,
as in Construction Industry Assn of Sonoma County v City of
Petaluma, 375 F.Supp. 574 (N.D. Calif. 1974), reversed, 522 F.
2d 897 (9th Cir. 1975), cert. denied, 424 U.S. 934, 96 S.Ct.
1148, 47 L.Ed. 2d 342 (1976), where 500 units per year were
permitted, it is the candidate for the excluded 501st unit who
has been injured.

In the federal courts, it is required that a particular
housing project be involved in order for the courts to hear the
case. See Warth v Seldin, 495 F.2d 1187 (2nd Cir. 1974) affirmed,
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed. 2d, 343 (1975). This is
also true in the Pennsylvania courts, Commonwealth of Pennsylvania v
County of Bucks, 22 Bucks County Law Reporter, 179 (1972), affirmed

CONGRESSMAN EDWARDS
PAGE THREE

8 Pa. Cmwlth. 295, 302 A.2d 897 (1973), cert. denied, 414 U.S.
1130, 94 S.Ct. 869, 38 L.Ed. 2d 754 (1974), but not in the New
Jersey courts, <u>Southern Burlington County NAACP v Township of
Mount Laurel</u>, 119 N.J. Super.164, 290 A.2d 465, (Law Div. 1972)
judgment modified, 67 N.J. 151, 336 A.2d 713 (1975), cert.denied,
423 U.S. 808, 96 S.Ct. 18, 46 L.Ed. 2d 28 (1975). However, the
victim is affected not only when a proposed project is excluded
but also when the land-use practices discourage builders, increase
the price of land, include unreasonable delays and harrassment,
and require cost-generating-amenities which are not essential for
health, safety and general welfare.

Assuming that the federal courts continue to focus on
particular projects (and the bulk of the Title VIII cases will be
filed in federal court), then the proposed amendment would be en-
forceable only by the Attorney General and by potential residents
of projects which were proposed but excluded.  As almost all
would agree, there will be more effective implementation of the
statute if private victims can sue rather than solely the
Attorney General.  The number of potential residents of proposed
but excluded projects will be limited because builders do not go
to the trouble and expense of acquiring sites, preparing plans,
and submitting proposals if the likelihood of success is very small.

Instead, the problem is the general pattern of land-use
controls which inhibit development.  The victims are the potential
residents of a region who are inadequately housed and who will
continue to be inadequately housed unless new units are constructed.
Much of the motivation for prohibiting new construction is the
result of racial prejudice; some is the result of economic dis-
crimination; some is based on genuine environmental concerns.

Therefore, the conceptual problem which I have with
Section 206(g) as it is presently written is that it is designed
to invalidate a broad range of land-use practices which have the
effect of promoting economic and racial discrimination in housing
opportunities.  I agree with the goal, though I am apprehensive
about the potential interpretations of the section once the
courts have the opportunity to define "exclude".  The principal
difficulty with the proposal is the lack of ascertainable victims
in the typical Title VIII context.  My suggestion is that the pro-
hibition must be integrated with Title VI of the Civil Rights Act
of 1964 and with the housing assistance plan provisions of the
Housing and Community Development Act.  Consequently, the penalty
could be the withholding of federal funds.  In doing so, it must
be clear that any person who is inadequately housed in the region
is a potential victim and would have standing to sue.

My suggestion goes beyond H. R. 3504.  If I must accept or
reject H. R. 3504 as presently written, I certainly support it.
There is nothing in the bill which would adversely affect the

CONGRESSMAN EDWARDS
PAGE FOUR

increase in housing opportunities which is needed and there is
much in the bill which is laudatory. I offer the above comments
not in an effort to discourage you but to focus on the potential
problems which the framer of Title VIII litigation will face.
There will be very little litigation under the section unless
more thought is given to the identity of the victims and how
these victimes would frame a lawsuit. They will be persons who
are inadequately housed and who have been excluded because
housing has been excluded. But there will most likely be no
particular project which has been excluded. Unless the section
is rewritten, they will lack standing under Warth v Seldin,
495 F.2d 1187 (2nd Cir. 1974) affirmed, 422 U.S. 490, 95 S.Ct.
2197, 45 L.Ed. 2d, 343 (1975). If you would like additional
information or if I can be of any further help, please feel free
to call on me.

Sincerely,

MOSKOWITZ AND ZAMPARELLI
A Professional Corporation

BY
DAVID H. MOSKOWITZ

DHM/clb

cc: Congressman Drinan
    Congressman Kostmeyer
    Judy Jones

# AMERICAN CIVIL LIBERTIES UNION

22 East 40th Street    New York, New York 10016    (212) 725-1222

April 12, 1977

Rep. Donald Edwards
United States House of Representatives
Washington, D.C. ·20515

Re: H.R. 3504

Dear Rep. Edwards:

Thank you for sending copies of H.R. 3504 and the reprints from
the Congressional Record concerning H.R. 3504 both to John
Shattuck (Director of the ACLU Washington Office) and to me.
Please consider this reply to be on behalf of both of us.

In general, we are favorably impressed by all of the provisions
of H.R. 3504. We are particularly in accord with Title II, and
we would appreciate the opportunity to testify in favor of it.
In any event, we intend to submit a written statement within
several weeks indicating our support of Title II.

Title I

The EEOC has been long criticized because of its administrative
backlog of complaints and on a variety of other grounds. In our
view, there are two primary solutions to the EEOC's problems.
One is that the EEOC should be chaired and staffed by top-flight
administrators. The proposed appointment of Eleanor Holmes Nor-
ton as Chair of the EEOC is an ideal step in the right direction.
If nominated and confirmed, Ms. Norton could and very likely
would do much to bring order and efficiency to the EEOC. The
second solution is that EEOC investigations and conciliations
should be given teeth. H.R. 3504 accomplishes this by providing
cease and desist powers to the EEOC. To date, the only incentive
for discriminatory employers to enter into conciliation agreements
is their own self interest, i.e., to limit class-wide back pay
liability. Most employers, however, do not act upon even their
own self interest and they thus refuse conciliation--because they
know the EEOC cannot enforce its findings and they know that most
complainants cannot obtain legal counsel to file suit. The pro-
vision of cease and desist powers thus would go a long way toward
encouraging effective conciliation and toward truly beginning the
battle to eliminate employment discrimination in this country.
We support such a provision.

Norman Dorsen, Chairperson, Board of Directors • Ramsey Clark, Chairperson, National Advisory Council
Aryeh Neier, Executive Director • Alan Reitman, Associate Director • Joel Gora, Acting Legal Director
Sharon Krager, Membership Director • John H. F. Shattuck, Director, Washington D.C. Office

Although the EEOC has been correctly criticized on administrative grounds, it has not been criticized by civil rights advocates on substantive grounds. The EEOC's regulations, guidelines, and amicus briefs have widely sought the most thorough enforcement of the law against employment discrimination. The same, of course, can be said of no other federal administrative agency. The Civil Service Commission has shown itself incapable or more likely unwilling to enforce nondiscrimination in the federal civil service. The Office of Federal Contract Compliance has sought to undermine its own Executive Order mandates. The Justice Department has been unresponsive to the substantive necessities of civil rights enforcement. And the Equal Employment Coordinating Council, because of its respective constituencies, has been a virtual disaster. There is, of course, a solution. That solution would require the transfer of CSC, OFCC, Justice and EEOCC powers to an agency substantively committed to nondiscrimination enforcement. H.R. 3504 accomplishes this by transferring such powers to and consolidating such powers in the EEOC. We support such a transfer and consolidation.

Although the Department of Labor has done a creditable job in enforcing the Age Discrimination in Employment Act of 1967, the courts unfortunately have been unresponsive particularly in their expansive interpretation of the Bona Fide Occupational Qualification defense. Thus, although the BFOQ defense has been narrowly defined and rarely applied under Title VII, the BFOQ defense has been broadly defined and widely applied under the Age Act. See, e.g., Note, "The Age Discrimination in Employment Act of 1967," 90 Harv.L.Rev. 380 (1976). The addition to Title VII of a prohibition against age discrimination and a concommitant repeal of the Age Act would thus greatly enhance the elimination of age discrimination. Additionally, the enforcement of nondiscrimination on grounds of age by an agency which has cease and desist powers would also enhance the elimination of age discrimination. H.R. 3504 accomplishes these purposes. We are in support.

Title II

While the elimination of employment discrimination has been the subject of some substantive federal action in recent years, the elimination of housing discrimination has received little federal attention and less federal action. This is particularly reprehensible because it has been federal policies, practices and actions which more than any other single cause have encouraged if not created our segregated housing patterns--or, if you will, our metropolitan apartheid.

-2-

It is, of course, the federal government which funded and ap-
proved segregated public housing; which provided mortgage fi-
nancing through the FHA and VA only to persons moving into
"homogeneous" neighborhoods; which thereafter provided mortgage
financing through the FHA and VA disproportionately to white
persons and, of course, disproportionately to middle and upper
income persons; which embarked upon a massive federal highway
program which encouraged whites particularly of middle and higher
socio-economic status to reside in exclusionarily zoned suburbs
with easy automobile access to urban employment; which continues
its refusal to provide substantial mass transit subsidies which
would enhance the residential and employment mobility of minori-
ties particularly of lower middle and lower socio-economic status.
The list is long--longer than the illustrations above. Massive
reversal of these federal policies is necessary.

Title II of H.R. 3504 is a necessary start in the right direction.
To date, the effect of Title VIII on housing discrimination has
been negligible. Few Title VIII lawsuits have been filed either
by Justice or by private parties. Even where they are filed, and
won, their effect on our overall segregated housing patterns is
minimal. Title VIII must be strengthened and it must be broadened.

H.R. 3504's provision of cease and desist powers to HUD would be
immensely helpful toward beginning the enforcement of Title VIII.
More important are the bill's prohibitions against bank redlining
and against discrimination in public and subsidized housing on
grounds of economic status. Equally important, although not yet
explicitly stated in your bill, is a prohibition against policies,
practices and actions which have a discriminatory effect (regard-
less of discriminatory intent).

As you may know, the ACLU has become increasingly involved in
seeking remedies for housing segregation. Our victory in Hills
v. Gautreaux, 425 U.S. 284 (1976), allowing the dispersal of
public housing across municipal boundaries, can only help to
initiate the long struggle to eradicate metropolitan apartheid.
Similarly, our damage award against a local government in the
Black Jack case, the first damage award under Title VIII, may
serve to warn local governments of the considerable consequences
of engaging in housing discrimination.

Because of our involvement and experience in fighting housing
discrimination, we intend to submit to you a written statement
detailing the reasons for our strong support of Title II of H.R.
3504. We would especially appreciate an opportunity to appear
and to testify on behalf of your bill.

-3-

Thank you again for your correspondence. We look forward to hearing from you.

Sincerely,

E. Richard Larson
National Staff Counsel

ERL:ds

−4−

[illegible]
[illegible] Schachtor

TREASURER
Richard Zacks

Mark E. Bane
Jewell Bearish
Alison N. Brown, Jr
Ralph S. Brown, Jr.
Roger J. Campbell
Lynn S. Castner
Ramsey Clark
John W. Cleland
Irving Cohen
Mary Coleman
Kathryn Collard
Patt Derian
Clinton Deveaux
Louisa Dixon
Ronald Elberger
Edward J. Ennis
Richard Y. Feder
Irwin Feinberg
Edgar Feingold
Joyce Fiske
Osmond Fraenkel
Monroe H. Freedman
Thomas Gilmore
Joan Garfinkel Glantz
Donald Hackel
David G. Hanlon
John Hay
Samuel Hendel
Lawrence Herman
Philip Hirschkopf
Stephen Hobart
Jeannette Hopkins
Neil Hulbert
David B. Isbell
Walter F. Kelly

CORPORATE SECRETARY
Franklyn Haiman

Thomas M. Kerr, Jr.
Edward King
Arthur Kinoy
Ralph Knowles
Arthur Kobler
Jim Lawing
Shepard Lee
Emanuel Margolis
Paul R. Meyer
Charles Morgan, Jr.
Phoebe Morse
Jerry Muskrat
Gilda Parella
Harriet F. Pilpel
Franklin Poul
John Reed
William F. Reynard
Joseph Rhodes, Jr.
Suzanne Rhodes
Mark Ritting
Judith Rogers
Catherine Roraback
Ben Roth
Arlie Schardt
Katherine Sebo
Faith Seidenberg
Donald Shack
Richard Siegel
George Slaff
John M. Swomley, Jr.
Nadine Taub
Robert Wagstaff
Hanna Weston
Ann Widditsch
Tasia Young

[illegible]
Frances Farenthold
Lois G. Forer
La Donna Harris
Aaron Henry
Aileen C. Hernandez
M. Maury Maverick
Karl Menninger
Morris Rubin

Sadie Alexander
Charles Ares
Roger N. Baldwin
Robert Bierstedt
Algernon D. Black
Julian Bond
Yvonne Braithwaite Burke
Catherine Cater
Henry Caudill
Stuart Chase
Shirley Chisholm
John Crystal
Henry Steele Commager
Giovanni Costigan
Vern Countryman
Irving Dilliard
James P. Dixon
Melvyn Douglas
Robert F. Drinan
Ronnie Dugger
Mrs. Henry E. I. duPont
Thomas Emerson
Luther H. Evans
Alvin I. Fine
Walter T. Fischer
Jefferson Fordham
Erich Fromm
Lewis Galantiere
Harold Gibbons
Thomas P. Gill
Fannie Lou Hamer
Wilma Scott Heide
John Hersey
Ruth Holmberg
Albert Jenner
Vernon Jordan, Jr.
James Kerney, Jr.
Benjamin H. Kizer
Milton R. Konvitz
William M. Kunstler
Burt Lancaster
Norman Lear
Max Lerner
John Lofton
Carey McWilliams
Wesley H. Maurer
Benjamin E. Mays
Emil Mazey
Mrs. Alexander Meiklejohn
Ariel Melchior
Sylvan Meyer
Maya Miller
Patsy Mink
Frank C. Newman
Louise Noun
Graciela Olivarez
James G. Patton
Channing Phillips
Lillian Roberts
Arthur Schlesinger, Jr.
John Seigenthaler
Stanley Sheinbaum
Edward J. Sparling
Oscar H. Steiner
Dorothy Taylor
Raymond S. Uno
John T. Walker
Howard Whiteside
William Wirtz
Stephen J. Wright

Regional Housing Legal Services
211 N. SYCAMORE STREET
NEWTOWN, PENNSYLVANIA 18940
TELEPHONE 215.968.6754

March 28, 1977

Congressman Don Edwards, Chairman
Subcommitte on Civil and
   Constitutional Rights
Congress of the United States
House of Represenatives
Washington, D. C. 20515

Re:  H. R. 3504

Dear Congressman Edwards:

   Our agency represents low and moderate income persons in
Chester, Bucks, Delaware, Montgomery and Philadelphia Counties,
Pennsylvania in a wide range of housing matters.  This re-
presentation often involves pursuing claims of housing dis-
crimination and unlawful exclusionary zoning.  I am presently
representing class action plaintiffs in Federal District Court
in a Fair Housing Act suit against Easttown Township, Chester
County, Pennsylvania.  We allege that the Township's land use
policies have the racially discriminatory purpose and effect
of excluding the vast majority of the region's minority popu-
lation.  Therefore, I read with great interest your proposed
amendment to the Fair Housing Act, specifically Section 206(g).

   I've enclosed my recently filed brief in the above de-
scribed case for a number of reasons; to fully describe the
workings of an exclusionary land use scheme; to show that the
Act can be interpreted to cover such situations; to show the
difficulties of proof inherent in such a claim, and, most im-
portantly; to help the Committee strengthen the Act in a manner
that will lessen the proof problems of those attempting to
challenge this sophisticated, subtle and effective discriminatory
mechanism.  My main concern is that the language you propose
may result in the same proof problems caused by the present Act.

   The Committee should be cognizant of the legal problems
which imprecise or vague wording causes those trying to prove
the existence of this complex phenomenon known as "exclusionary
zoning".  A definition of "exclude" that would highlight the
types of activities addressed is a necessity.  I further sug-
gest the inclusion of a requirement that the governmental body
provide for its "fair share" of low and moderate income housing.

Ltr to Con Edwards
Page Two

The fair share concept has gained, and continues to gain, wide acceptance in the land use field and has been adopted by the New Jersey Courts in <u>Southern Burlington County NAACP v Township of Mount Laurel</u> 119 NJ Super. 164, 290 A, 2d 465 (Law Div 1972) judgement modified, 67 NJ 151, 336 A. 2d 713 (1975), cert. denied, 423 US 808, (1975).

I fully support your efforts to strengthen Title VII of the 1964 Civil Rights Act and Title VIII of the 1968 Civil Rights Act, but hope that you modify Section 206(g) so as to case the problems of those attacking exclusionary zoning.

Sincerely,

*Mark Elliott Levin*

MARK ELLIOTT LEVIN, Esquire

MEL/tjh

cc: Congressman Drinan



**BPI**

Business and Professional People For the Public Interest
109 North Dearborn Street, Suite 1300 · Chicago, Illinois, 60602 · Telephone: (312) 641-5570

March 21, 1977

The Honorable Don Edwards, Chairman
Subcommittee on Civil & Constitutional
     Rights
Committee on the Judiciary
House of Representatives
Washington, D.C. 20515

Dear Congressman Edwards:

Thank you for your letter of March 9 soliciting my comments on Title II of H.R. 3504. The Title II provisions seem to me thoughtful and well drafted - I have no negative comments - and I look forward to the hearings with interest.

The provisions of Section 206(c), dealing with land use practices, are of course of particular interest, especially the prohibition against the exclusion of low or moderate income housing because of the economic status of the prospective occupants. One wonders whether the language might possibly be interpreted to apply to land use controls that in effect preclude housing for low income persons by increasing its cost, as for example by requiring more interior space than can be justified on health or safety grounds. I assume you have concluded that H.R. 3504 is not an appropriate vehicle for dealing with the Arlington Heights "purpose to discriminate" issue or the standing problems of Warth v. Seldin as each might bear upon Title VIII litigation. (See Falk and Franklin, pp. 162-63.)

I commend your efforts to improve the fair housing law.

                                        Sincerely,

                                        Alexander Polikoff

ALP:eo

**Staff**
Alexander Polikoff
*Executive Director*
Robert J. Vollen
*General Counsel*
Douglass W. Cassel, Jr.
*Attorney*
Mary Galloway James
*Attorney*
June Rosner
*Director of Public Information*
Lois Weisberg
*Director of Development*

**Directors**
Elliot Lehman
*President*
Robert B. Lifton
*Vice President*
Rudolph S. Rasin
*Vice President*
Alan Saks
*Vice President*
Bernard Gordon
*Treasurer*

James W. Ashley
*Secretary*
Julian Berman
Allen D. Choka
David Dinsmore Comey
Donald Dann
Leon M. Despres
Carol Y. Farwell
Leon D. Finney
Jean S. Fuerst

Ronald Grzywinski
Martin Hausman
Jack A. Jaffe
Richard Jaffee
Arnold B. Kanter
Joseph Kellman
Dr. Melvin M. Maclin
Michael D. Maltz
Lewis Manilow
John L. McKnight

Eugene Pekow
Alexander Polikoff
Jeremy Warburg Russo
Sylvia Scheinfeld
James A. Shapiro
Robert L. Tucker
Robert J. Vollen
Matthew J. Whitehead, II
Dora Williams
Richard Wolff

UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY · DAVIS · IRVINE · LOS ANGELES · RIVERSIDE · SAN DIEGO · SAN FRANCISCO          SANTA BARBARA · SANTA CRUZ



NATIONAL HOUSING LAW PROJECT
EARL WARREN LEGAL INSTITUTE
2313 WARRING STREET
BERKELEY, CALIFORNIA  94704
(415) 642-2816

June 9, 1977

Honorable Don Edwards, Chairman
Subcommittee on Civil and
   Constitutional Rights
Committee on the Judiciary
House of Representatives
Washington, D. C.  20515

Dear Mr. Edwards:

   Thank you for inviting the comments of the National
Housing Law Project on H.R. 3504.  The Law Project, a Legal Ser-
vices Corporation-funded support center for legal services
programs across the country, is acutely aware of the many dif-
ficulties faced by lower-income groups, including minorities,
in gaining access to the full range of housing opportunities
due them.  I will confine my comments to Title II of the
proposed legislation, the provisions amending Title VIII of the
1968 Civil Rights Act.

   The most significant aspect of Title II's amendments--
and the one which will most positively impact on our client
group--is the expansion of the definition of discriminatory
housing practices in Section 804 of the Fair Housing Act to
include land use controls which exclude low- and moderate-
income housing either because of the eligibility of the housing
for government assistance or because of the economic status of
the prospective occupants of such housing.  As you noted in
your remarks on the floor of the House on February 17, 1977, if
exclusionary land use controls are to be vulnerable to chal-
lenge, the U.S. Supreme Court has made it clear in Arlington
Heights that Congress must enact statutory prohibitions because
constitutional protections are insufficient.  Without a statu-
tory prohibition with respect to the racial effects of exclu-
sionary land use practices, proof of discriminatory intent must
be shown; adverse impact alone is not enough.  But without a
statutory prohibition with respect to the economic effects of
exclusionary land use practices, even evidence of a discrimi-
natory motive will not carry the burden of proof.  Even before

Honorable Don Edwards
Page Two
June 9, 1977

its narrowing of the Fourteenth Amendment vis à vis racial
minorities in Arlington Heights, the U.S. Supreme Court in ef-
fect denied any relief to victims of economic discrimination
in Rodriguez v. San Antonio Independent School District, 411
U.S. 1 (1973), by refusing to hold that classifications based
on wealth require strict judicial scrutiny. Therefore, if
poor people are to have a choice of affordable residences near
both inner-city and suburban employment centers, a law such
as H.R. 3504 would be the only means of realizing that goal.

In its present form, however, Section 206(c) of H.R. 5304
may not be worded carefully enough to break through the road-
blocks to the construction of government-assisted housing erec-
ted by those jurisdictions where the referendum is available.
Article 34 of the California Constitution, for example, and
similar referendum authority elsewhere, appears to be left un-
touched by the proposed statutory language, leaving the local
unit of government obliged to grant a zoning variance or build-
ing permit for the new construction, but also leaving the citi-
zens the opportunity to vote it down. While the intent of the
drafters may be to preempt state or local referendum authority,
recent Supreme Court decisions will require that the intent be
manifest and the conflict between a federal law and a state or
local law be clear. (See, Note, The Preemption Doctrine:
Shifting Perspectives on Federalism and the Burger Court, 75
Col. L. Rev. 623 (1975).)

A final cautionary word about the wording of Section
206(c): while the Congressional Record for February 17 in-
dicates that you intend the section to make illegal facially
neutral practicies which have a discriminatory effect, in addi-
tion to those practicies which are intentionally or facially
discriminatory, Section 206(c) should be clarified to make
that intent express. This may be an overly-cautious approach,
but one that may be warranted in view of the fact that the
U.S. Supreme Court has not yet explicitly held that the Fair
Housing Act, like Title VII of the 1964 Civil Rights Act, was
intended to cover practices which are "fair in form but dis-
criminatory in operation." Griggs v. Duke Power Co., 401 U.S.
424, 431 (1971). The remand in Arlington Heights to determine
if the plaintiffs had a cause of action under the Fair Housing
Act is a hopeful sign that that Act will be treated by the
Court in the same manner as Title VII. But to guarantee a
similar interpretation of proposed Section 206(c), it may be
advisable to add to the end of line 8 on page 42 the following
phrase: "or have the effect of excluding".

Honorable Don Edwards
Page Three
June 9, 1977


For the same reasons outlined earlier, I would urge expansion of your provision which would make discrimination in the extension of hazard insurance unlawful. Without statutory protection, low-income persons may be denied hazard insurance because of their own economic status or the economic make-up of the neighborhood in which they live. Insurance companies do not limit their arbitrary and discriminatory practices to racial minorities, and I am familiar with the wholesale cancellation of homeowners insurance in a largely white, lower-income section of Detroit where many elderly residents live on fixed incomes.

In addition to expressly prohibiting the discriminatory denial of hazard insurance, H.R. 3504 should be broadened to prohibit the denial, or discriminatory alteration of the terms, of mortgage assistance to anyone because of her/his economic status or because of the economic status of the neighborhood surrounding the security property. As you probably know, Title VIII, 42 U.S.C. Sections 3604 and 3605, have already been interpreted by two district courts to bar racially discriminatory loan practices (Laufman v. Oakley, 408 F. Supp. 489 (S.D. Ohio, 1976) and Harrison v. Heinzeroth, Civil No. C74-390 (Cw. D. Ohio, 1976)). However, as is the case with hazard insurance, loans are denied to lower-income groups for the same irrational and arbitrary reasons they are denied to racial minorities.

In July, 1976, the Housing Law Project prepared a background paper for hearings on redlining held by the U.S. Department of Housing and Urban Development, a copy of which is enclosed. Among other things, that paper summarizes or references the studies which have demonstrated widespread redlining against lower-income persons or neighborhoods. The paper also documents the entrenched recalcitrance of the federal financial regulatory agencies, the Federal Home Loan Bank Board, FDIC, Comptroller of the Currency and Federal Reserve Board, to take adequate steps to regulate against redlining. A recent lawsuit filed by several civil rights groups against those four agencies is resulting in consent decrees with them and it is expected that they will begin to regulate their member institutions more vigorously to prevent redlining. But the allegations of the complaint were focused primarily on racial redlining and the consent orders will not curb redlining on the basis of economic status. Without a statutory prohibition against such discrimination, it is very doubtful that the federal agencies will use their inherent power to regulate against that type of redlining (see background paper, pages

Honorable Don Edwards
Page Four
June 9, 1977

:08-123), and even more doubtful that a lawsuit would be suc-
cessful.

Finally, we applaud your decision to put teeth into the
Fair Housing Act. While I have not read fully all the argu-
ments pro and con the provision of an administrative remedy
versus conferring direct court enforcement powers on an ag-
grieved individual, my experience with the administrative
remedy process currently      imposed   on state anti-dis-
crimination agencies cautions me against it as an exclusive
route. The state agencies have not produced either expeditious
remedies or liberal interpretations of their laws. By contrast,
the Justice Department, private plaintiffs, and now EEOC have
produced a body of Title VII law that has creatively and ef-
fectively interpreted employment discrimination prohibitions.
Thus, it is essential that the private suit be permitted to
act as a safeguard against agency footdragging if the state
experience is not to be repeated at the federal level.

Again, thank you for the opportunity to comment on this
most-important bill. If the Law Project can provide any other
assistance, please do not hesitate to contact either Florence
Roisman of our Washington office (202-452-8050) or me.

Sincerely,

Frances E. Werner

FEW:lm

Enclosure.

cc: Florence Roisman
    National Housing & Economic
      Development Law Project:East
    2000 P Street, N.W.
    Suite 410
    Washington, D. C.  20036

F. WILLIS CARUSO
MARIE V. SANON
HORACE FOX

SUITE 1360
407 SOUTH DEARBORN STREET
CHICAGO, ILLINOIS 60605
341-9345

June 15, 1977

Congressman Donald Edwards
2329 Raburn House Office Building
Washington, D.C.

Re: <u>H.R. 3504– Fair Housing Amendments</u>

Dear Congressman Edwards:

I am writing you regarding H.R. 3504 because I believe
information gained from our experience in litigating fair
housing cases would be helpful to consideration of the bill.
We are presently administering a Lawyers Revolving Fund pur-
suant to a PD & R Contract with the Department of Housing and
Urban Development which is similar to that contemplated by
Title II Fair Housing, Fair Housing Loan Fund Sec. 818 (a)
(page 53 of the Bill). The Lawyers Revolving Fund provides
cash payments to counsel at the outset of the case and upon
completion the money is paid back to the fund.

The Legal Action Program of the Leadership Council in
Chicago started on a referral basis in 1968 with the passage
of the Fair Housing Act and the decision in <u>Jones</u> v. <u>Mayer</u>.
In 1970 the program became a staffed activity of the Leader-
ship Council under the direction of the General Counsel, F.
Willis Caruso with four attorneys during its initial stages
and a total complement of 13 employees. The present program has
three attorneys and a total staff of eight. Experience and
economies developed by the staff have made it possible to in-
crease the activities of the program while cutting staff and
expenses.

Using the knowledge and experience gained since 1968, the
Legal Action Program staff has prepared manuals on Fair Housing,
copies of which are attached in the Exhibit folder as Exhibits
A, B, C and D. Foremost among these, is the nationally used "Red

33-264  1577

Leadership Council for Metropolitan Open Communities



Leadership Council
for
Metropolitan
Open
Communities

Congressman Donald Edwards
2329 Raburn House Office Bldg.
June 14, 1977
Page two

Book"...the <u>Guide To Practice Open Housing Law.</u> Seminars
have been chld by the Leadership Council and staff of the
Legal Action Program have worked with HUD in training
sessions and seminars.  Copies of the recent legal seminar
agenda and others are enclosed as Exhibits E and F.

The Lawyer's Revolving Fund was started in August of
1976.  The contract with HUD provides for $35,000 in a
revolving fund and approximately $29,000 administrative
costs to operate the fund.  It works as follows:

Attorneys who have expressed an interest in working
on fair housing cases are given training either in a formal
seminar or in private sessions with Legal Action Program staff.
Upon completion of this training, they are placed on the
cooperating attorney list.  They sign a contract with the
Leadership Council, Exhibit G, and agree to perform as set
.h therein.

When a complaint of discrimination is received by us, the
process, which has evolved since 1968 is followed.  Dave
Schucker, the Director of Housing Information, takes the com-
plaint or it is taken under his supervision.  The allegations
are reviewed with Kale Williams, the Executive Director, F.
Willis Caruso, the General Counsel and the other members of the
legal action staff, including attorneys Marie Sanon and Horace
Fox.

Upon approval of the Executive Director and the General
Counsel, the complaint is investigated by Jack Woltjen, Chief
Investigator or Joan Elbert, Investigator.  The results of the
investigation are then reviewed by the General Counsel and the
decision whether to litigate the case is made.  If the decision
is to proceed with a lawsuit, an attorney is selected from the
list of revolving fund cooperating lawyers.



Leadership Council
for
Metropolitan
Open
Communities

Congressman Donald Edwards
2329 Raburn House Office Bldg.
June 14, 1977
Page three

After the lawsuit is filed by the referral attorney, he
or she is paid $300 in lieu of a retainer and throughout the
pendency of the case, is provided legal and other technical
assistance from legal action staff on a regular basis. This
assistance includes court appearances by Leadership Council
staff attorneys if needed.

Upon completion of the lawsuit, the cooperating attorney
returns the original $300 fee to the revolving fund, plus 25%
of the legal fee collected which is in excess of the original
$300.

Attached is a list of all cases handled by revolving
fund attorneys, Exhibit H, to date. Although the program is
really just getting off the ground as far as numbers of cases
is concerned, it is successful now and will be more successful
in the future. One of the major accomplishments of the program
that it is sanctioned as an approved bar association program.
Exhibits I and J show our proposal to the Chicago Council of
Lawyers and their approval. In 1976, one of the participating
attorneys raised what he believed to be an ethical problem con-
cerning the handling of the fund.

As a result, we initiated discussions with a local bar
association, the Chicago Council of Lawyers requesting approval
of our referral program. On March 7, 1977 we appeared before
the Chicago Council of Lawyers Board of Directors and presented
our program to them for their sanction. On March 21, 1977 they
approved the only Title VIII private attorney program sanctioned
as an approved bar association referral plan.

The program has been very successful, particularly because
of the bar association approval. This experience will be of more
value as it continues over the next 14 to 24 months. The results


Leadership Council
for
Metropolitan
Open
Communities

Congressman Donald Edwards
2329 Raburn House Office Bldg.
June 14, 1977
page four

of the study will be of value on a national basis. Particu-
larly as to (HR-3504), which contemplates a national revolving
fund, administered by the Secretary.

Sincerely yours,

F. Willis Caruso
General Counsel

FWC/db
encl.

# THE HOUSING ADVOCATES, INC.

701 citizens building

cleveland, ohio 44114

—

(216) 579-0575

April 15, 1977

<u>AIR MAIL - SPECIAL DELIVERY</u>

Don Edwards, Chairman
Subcommittee on Civil and
Constitutional Rights
Committee on the Judiciary
House of Representatives
Congress of the United States
Washington, D.C.        20515

<u>Re: Title II of H.R. 3504</u>

Dear Congressman Edwards:

      Thank you for your recent letter inviting our comments on both the technical and policy aspects of Title II of H.R. 3504, namely the fair housing amendments.

      In addition to representing the views of THE HOUSING ADVOCATES, INC., a Cleveland-based public interest firm, we have been designated by a resolution of the Ohio Fair Housing Congress to speak for the many Ohio fair housing organizations which have coalesced in part to bring about a broader base of fair housing compliance in this section of the United States. I also share with you the perspective of the federal fair housing practitioner with a view toward sensitizing the Subcommittee on the serious constraints which interfere with vigorous enforcement of the Federal Fair Housing Act. In this vein, I hope our comments can serve as a foundation for testimony before the Subcommittee on the realities of fair housing enforcement.

      Our comments are predicated on the experience of litigating or being involved with over fifty (50) federal fair housing actions in recent years. The nature of these cases include conventional Title VIII refusals, class action cases involving racial steering, exclusionary zoning, lending practices and have resulted in a series of opinions which are referred to in the accompanying exhibit outlining the cases.

      The Title II amendments, which will be specifically

Congressman Don Edwards     - 2 -      April 14, 1977

addressed, are of particular importance to metropolitan areas such as Cleveland, where the most severe problems of equal housing opportunities rest. Indeed, Greater Cleveland's racial disparities in housing opportunities are regrettably nationally known. *See Banks v. Perk,* 341 F. Supp. 1175, 1178 (N.D. Ohio 1972); *Mahaley v. CMHA,* 355 F. Supp. 1257 (N.D. Ohio 1973); *Forest City Enterprises v. City of Eastlake,* 41 Ohio St. 2d 187 (1975); *City of Hartford v. Hills,* 408 F. Supp. 889, (D. Conn. 1976). Racial bias in housing in Cleveland has sadly been pointed out by other courts as "aggravated." *Gautreaux v. Chicago Housing Authority,* 503 F. 2d 930, 938 (7th Cir. 19740, *aff'd sub nom. Hills v. Gautreaux,* 425 U.S. 284 (1976). Recent studies suggest that the severity of conditions in communities like Greater Cleveland are unlikely to change without affirmative fair housing enforcement. Cf. THE HOUSING ADVOCATES, *Section 8: Programmed For Failure* (1976); THE HOUSING ADVOCATES, *A Study of Concentrated FHA Activity In Cuyahoga County And Its Impact On Racial Segregation* (March, 1977) (enclosed). While affirmative obligations rest with governmental agencies and have been recognized by the Cleveland and other federal courts, *See Harper v. Union Savings Association,* No. C75-671, N.D. Ohio March 14, 1977, Slip Opinion at 7, enclosed, racial bias in housing is being practiced today with little concern that the Fair Housing Act ("Act") will be vigorously enforced.

FOREWORD

       A primary cause for the continuation of racially discriminatory housing practices is an unstated one: it remains economically and socially advantageous to    practice it. If a management company or real estate broker feels that practicing racial bias is in the best financial interests of the company to do so, he must weigh the "benefits" of maintaining a racially homogeneous cliente with the chance that someone will enforce the Act, if pushed far enough.

       The Act provides those elements of the housing delivery system who wish to discriminate no incentive for compliance when weighed against what they perceive to be their best financial interests. Conversely, it has only been in recent months that judgments in United States District Courts throughout the United States ---both with and without juries---have been substantial enough to deter unlawful conduct.

       Not surprisingly, few members of the practicing bar have expressed interest in federal fair housing practice, even though the Supreme Court has recognized that without the involvement of private lawyers, broad based enforcement is nearly impossible. *Trafficante v. Metropolitan Life Insurance Company,* 409 U.S. 205 (1972). This is attributable to several factors: (a) the perception among lawyers that fair housing is potentially "controversial" (b) the common plight of housing bias victims in securing legal services in timely fashion and the misconception, even among fair housing supporters, that fair housing cases are "poverty" cases (c) low or no perceived expectation of reasonable attorney fees and (d) general lack of familiarity with practice in the United States District Court.

Congressman Don Edwards          - 3 -          April 14, 1977

If the Congress is truly committed to fair housing, the incentives
for lawyers to deter unlawful housing bias must be present in the
law. *See generally* Friedman, *Federal Fair Housing Practice*, 20 A.L.I.
Prac. Lawyer 15 (Dec. 1974), *cited in* 11 Harv. Civ. Rts-Civ. Lib. L.
Rev. at 138 (1974); Friedman, *Damages in Housing Bias Litigation*, 21
N.Y.L.F. 551 (1976).

PROCEDURAL REFORMS

In addition to the factors set forth above which have dis-
couraged lawyers in representing fair housing victims, we note that
both victims and lawyers alike to date have had to fight an up-hill
battle over procedural problems which we are encouraged to see oesten-
sibly resolved in the proposed Title II legislation.

(A) Private Enforcement

As a fair housing lawyer, the amended Section 812 of the
Act, 42 U.S.C. §3612, represents a highly significant dimension to-
ward realistic fair housing enforcement. The "aggrieved person" pro-
vision reads now like the similar provision in the administrative en-
forcement section, 42 U.S.C. §3610, and puts to rest what we be-
lieve to be the incorrect distinctions created by the United States
Court of Appeals for the Ninth Circuit in *TOPIC v. Circle Realty*, ___
F. 2d ___ (9th Cir. 1976), *cert. denied*, ___ U.S. ___ (1976). While
our experience regarding the viability of Section 812 as a vehicle
for fair housing organizations to sue racially discriminatory real
estate brokers, municipalities and lending institutions has not been
a difficult one due to the sensitivity of the Cleveland federal
courts, *see Heights Community Congress v. Rosenblatt Realty, Inc.*,
P-H E.O.H. Rptr. ¶13,702 (N.D. Ohio), the limitations caused out of
fear of *TOPIC* have had an untold effect in discouraging civic-minded
community organizations and perhaps enlightened communities them-
selves in taking discriminating brokers to task in the federal courts.
The amendment should have a highly visible result in ending the
"chill" of challenging biased conduct.

Both from the lawyer's vantage point and from that of
the housing bias victim, the three year statute of limitation from
the time the alleged practice "occurred or terminated" is a realistic
and vital change in the statute. The amendment includes the concept
of the "continuing" violation, a concept of some trouble and confusion
in the federal courts. Likewise, the Subcommittee shows pragmatism
in the proposed legislation by virtue of the three-year period. This
statute goes beyond the simple view of fair housing enforcement. By
and large, the federal courts, like those in Cleveland, have been ex-
cellent as a general rule in providing temporary and emergency relief.
While the courts in this regard, particularly at the early stages of
enforcement, have been receptive, it has been access to the courts---
either by delay due to the victims' ignorance of the avenues for re-
lief, delay by well intented, but ill-informed community groups about
the Federal Fair Housing Act, or by reliance upon quasi-enforcement
agencies such as many state fair housing commissions which have little
or no power to enforce fair housing (for an analysis of all state
fair housing agencies and their respective powers, see Friedman, *Pio-
neering Approaches To Confront Sex Bias in Housing*, 24 Cleve. St. L.

489

Congressman Don Edwards        - 4 -            April 15, 1977

Rev. 79 (1975), *cited in full with footnotes omitted,* 121 Cong.
Rec. 757 (Jan. 23, 1975)---which represents the crux of the problem.

Our experience regarding the difficulties in overcoming
the limitations problem has been that the courts have been pressed
to indulge in creative and sometimes admittedly strained efforts to
secure the right of a housing bias victim to enforce his remedy.
*Warner v. Perrino,* P-H E.O.H. Rptr. ¶13,717 (N.D. Ohio 1975), *appeal
pending* (6th Cir. 1976); *Harper v. Union Savings Association,* Slip
Opinion Enclosed (N.D. Ohio 1977); *Heights Community Congress v.
Rosenblatt Realty, Inc., supra; Tokaji v. Toth,* P-H E.O.H. Rptr.
¶13,679 (N.D. Ohio 1974); *Spencer v. C. Ray Valenti,* C73-691) (N.D.
Ohio 1974). The actual circumstances in fair housing cases have been
that often a victim ultimately discovers a remedy <u>shortly after</u> the
6-month existing statute. Specifically, a victim has gone to the Ohio
Civil Rights Commission, a state governmental agency which cannot
recover damages nor secure emergency relief, and sometime thereafter
learns about the Section 812 remedy. From an enforcement standpoint,
a lawyer in conventional practice has not been generally willing to
brief and argue creative law in an attempt to "expand" on a case-by-
case basis this extremely limited limitations statute. Thus, both
the victims and lawyers have steered away from the federal enforce-
ment mechanism.

We do have some hesitation with respect to line 2-9 on
page 51 of the bill in that we fear it may lead to some confusion
as to what the drafters have intended. We likewise are confused as
to whether or not the Subcommittee proposes an end to the well e-
stablished and valuable concurrent remedy enforcement in fair housing.
See *Marr v. Rife,* 503 F. 2d 735 (6th Cir. 1974); *Johnson v. Decker,*
333 F. Supp. 88 (N.D. Cal. 1971); *Heights Community Congress v. Rosen-
blatt Realty, Inc., supra; Tokaji v. Toth, supra.*

The modification of the damages and attorney fee provisions
is a common sense and equitable change in the law which should ameli-
orate the fears of housing bias victims and their attorneys that ra-
cial denials mean more than simply secure a temporary restraining or-
der and walking away cold. Our experience, particularly with juries
in fair housing cases, is that citizens---black and white---are per-
haps more outraged by racial bias than the most concerned of judges.
See *Harper v. Reap,* ¶19.7, P-H E.O.H. Rptr. Bull. (Mar. 22, 1976);
*Clemons v. Runck,* 402 F. Supp. 863 (S.D. Ohio 1975). Likewise, every
fair housing practitioner, at one time or another, has been confronted
by a federal judge who is constantly reluctant to award attorneys fees
to a fair housing victor if income exceeds $10,000.00. This unreal-
istic standard  loses sight of the fact that the typical victim of
housing discrimination is the middle income mobile minority family
who, often for the first time, seeks to avail itself of the fruits of
the Act. Logic suggests that it is rarely the impoverished ghetto
dweller who seeks to purchase a home in a "non-traditional" area or
rent an apartment in a similar community. Indeed, if middle income
black families cannot be assured that the prohibitive costs of fed-
eral litigation are not part and parcel of their recovery, the law
provides shallow relief. While some courts have recognized this fact,
*Lee v. Minnock,* 417 F. Supp. 436 (W.D. Pa. 1977); *Marr v. Rife,* 503
F. 2d 735 (6th Cir. 1974); *Steele v. Title Realty Co.,* 478 F. 2d 380,
385 (10th Cir. 1973), it is all too common for the prevailing party
and counsel to be denied a central part of what should be an integral

Congressman Don Edwards      - 5 -      April 15, 1977

part of recovery. Finally, the "interim" relief provision inso-
far as damages are concerned, should be a valuable and practical
tool for bias victims to secure that portion of recovery at the
appropriate time, either the first month's rent/security deposit
(rental) or down payment (sale), that is required    to consummate
the transaction subsequent to the institution of the fair housing
action.

     Because of the affirmative fair housing obligations placed
on federal regulatory agencies, it often becomes the responsiblity
of private citizens to institute actions to assure that the agencies
themselves are enforcing fair housing obligations. Likewise pri-
vate organizations continue to remain in the forefront in moni-
toring fair housing activities of federal agencies. See *National Ur-
ban League v. Office of the Comptroller of the Currency,* Civil Ac-
tion No. _____ (D.D.C.1976); THE HOUSING ADVOCATES, *A Study of Con-
centrated FHA Activity in Cuyahoga County And Its Impact On Ra-
cial Segregation,supra.* The provision for recovery of costs and
fees found in the section concerned with conventional Title VIII
enforcement (Section 812) should also be included in Section 808.
Unless there is an assurance that the federal government itself is
in compliance with fair housing mandates, fair housing can only
be a promise with an inadequate mechanism for enforcement. Cf.
*Trafficante v. Metropolitan Life Ins. Co., supra; Resident Advisory
Board v. Rizzo,*425 F. Supp. 987 (E.D. Pa. 1976). In *Rizzo,* Judge
Broderick, in part relying on the severe problems of racial dis-
crimination in housing in Cleveland, graphically portrayed the prob-
lem:

                 The Fair Housing Act of 1968,
                 42 U.S.C. §3601 *et seq.* in establishing
                 a national policy of fair housing through-
                 out the United States carried with it the
                 clear implication that local housing au-
                 thorities in conjunction with Federal a-
                 gencies responsible for housing programs
                 are to affirmatively institute action the
                 direct result of which was to be the im-
                 plementation of the dual and mutual goals
                 of fair housing and the elimination of
                 discrimination in that housing. 341 F.
                 Supp. at 1182.

*Rizzo,* citing *Banks v. Perk,* at 1017. Congress cannot expect to
encourage the private sector to watchdog federal agencies without
the necessary legal support in litigation which often becomes
complex and protracted. Accordingly, we would urge the Subcommittee
to consider providing for the equivalent of Section 812(C) in Sec-
tion 808.

     Proposed Section 818 ("Fair Housing Loan Fund")is a posi-
tive dimension of the proposed legislation in that it reflects
Congress' awareness of the potential costs borne by bias victims.

Congressman Don Edwards         - 6 -         April 14, 1977

The Fund is an important "nuts-and-bolts" segment of realistic private judicial enforcement and is a creative mechanism to ease the burden of bias victims which should have practical results. We believe that the Fund will more likely be used by those most conversant with federal fair housing enforcement. However, the Fund may be somewhat of an inducement in encouraging lawyers to represent bias victims and balance out some of the factors set forth earlier.

Practically speaking, the most common victim of housing discrimination can be found in the $10,000-$20,000 income range in the Greater Cleveland area. It is rare to find a victim able to afford the prohibitive discovery costs in Title VIII suits which, exclusive of legal fees, often exceed $1000.00---the very amount which may have been used as a down payment for the home at issue or the first month's rent and security deposit in a middle income apartment complex found in the suburbs. We feel the Secretary's discretion is likewise an important part of the proposed section.

Proposed Section 206, establishing a new Section 804(g), is, we believe, the most significant and complex segment of the law and an important one. Our experience in land use litigation (*Cornelis v. City of Parma,* 374 F. Supp. 730 (N.D. Ohio 1973), *rev'd* 605 F. 2d 1400 (6th Cir. 1974), *vacated* 96 S. Ct. 2358(1976); *Forest City Enterprises,Inc. v. City of Eastlake,* 41 Ohio St. 2d 187 (1975), and others)has lead us to one clear conclusion: 804(g) should save land use litigators and courts years in the consideration of these controversies and provide the federal courts as a viable forum in challenging racially exclusionary public conduct. See *Village of Arlington Heights v. Metropolitan Housing Development Coporation,* 97 S. Ct. ____ (1977).We think it important to note in passing that the Fair Housing Act has been held by various courts to be predicated on both the 13th and 14th Amendment of the United States Constitution. Thus, we see little significant constitutional question to the justification of establishing this new provision. *Jones v. Alfred H. Mayer Company,* 392 U.S. 409 (1968). At the risk of being simplistic, if the Subcommittee seeks to raise in more detail constitutional questions, we will be prepared to address the questions at that time during testimony.

Finally, with respect to private enforcement, the examples of *Laufman v. Oakley Building and Loan Co.,* 408 F. Supp. 489 (S. D. Ohio 1975) and the enclosed *Harper v. Union Savings Association* evidence the clear need for defining discriminatory lending practices as part and parcel of the protections which the Act should afford. Certainly, the same constraints facing fair housing advocates in exclusionary zoning litigation exist in lending institution litigation. While opinions such as *Harper* contribute much to the limited fair housing case law, it exemplified the breadth and magnitude of meaningful fair housing enforcement obstacles which can be readily removed through proposed legislation.

(B) PUBLIC ENFORCEMENT

Despite the Supreme Court's pronouncement in *Trafficante*

Congressman Don Edwards      - 7 -      April 14, 1977

that the Attorney General's efforts in achieving fair housing
are "minimal," we believe that the Housing Section of the Justice
Department's Civil Rights Division has done as extraordinary and
superlative a job in vigorous fair housing enforcement as the
limited number of lawyers can humanly do. The Housing Section
lawyers have generally been aggressive and creative and have con-
tributed immeasurably to the development of most of the existing
fair housing case law. To suggest that their powers should be
expanded should be basic: the further step, however, should be
the assurance that the Housing Section be increased with the same
quality of lawyers it has maintained in recent years. While the
"pattern and practice" limitation served its purpose as it was
perceived at the drafting of the Act, the realities of fair housing
dictate that the Attorney General have the breadth to prosecute
suits involving significant problems facing equal housing oppor-
tunities, irrespective of the "pattern."

Our belief of the expansion of HUD powers in enforcement
is one of mixed considerations. We firmly believe that broader
administrative powers including ultimate cease and desist orders
will give HUD the appearance of more power. Yet, experience in
fair housing enforcement has shown all too few examples of HUD
being an effective fair housing agency. History may yet show
that federal administrative measures in fair housing may be an
important future mechanism. It is not today and the proposed powers
should not have significant effect in deterring major fair housing
violations <u>unless</u> the powers are tied to other elements in HUD
where a major management company or broker has federal contracts.
In the absence of such circumstances, however, we view the in-
creased powers to HUD as little more than a spiritual boost for
the agency and to those persons at HUD who are concerned about fair
housing.

(C) CONCLUSION

Congress must promote meaingful access to realistic fair
housing enforcement in order to meet its 1968 objective stated
by then-Senator Walter Mondale: "to replace the ghettos with
truly balanced and integrated living patterns." *Trafficante, supra.*
Cleveland's experience, as reflected in the studies and the sig-
nificant federal court battles, is the experience of America's
metropolitan areas. We have deferred in citing specific examples
of the difficulties of victims of racial disparity for presentation
to the Subcommittee. It should be sufficient to say, however, that
the lawyers have a responsibility in assisting this country in
meeting the 1968 goal. They are not and most will not unless the
Act provides them with the incentive. As a fair housing advocate,
we have begged the consciences for too long and we feel statutory
reform can do what moral inducements cannot. On behalf of THE
HOUSING ADVOCATES and the many fair housing groups in Ohio, we
thank the Subcommittee for considering this background information
and we would look forward to providing brief, but specific
examples of how the proposed Title II can contribute greatly to
meeting the national goal of equal housing opportunities.

493

Congressman Don Edwards          - 8 -          April 14, 1977


We will also be prepared to address ourselves to any constitutional questions of the Subcommittee, along with concisely illustrating the practical problems of achieving fair housing in America's midwest.

Thanking the Subcommittee again, I am




Very truly yours,

AVERY S. FRIEDMAN
Chief Counsel


ASF/bms
Encls.

002493

A STUDY OF CONCENTRATED FHA ACTIVITY

IN CUYAHOGA COUNTY AND ITS IMPACT ON RACIAL SEGREGATION

THE HOUSING ADVOCATES, INC.

701 citizens building

cleveland, ohio 44114

THE HOUSING ADVOCATES, INC.

STAFF

Edward G. Kramer, Executive Director

Margaret L. Murphy, Planning Director

Avery S. Friedman, Chief Counsel

David L. Hoehnen, General Counsel

Ellen Krajcovic, Assistant Planner

This paper was prepared by Margaret L. Murphy, Ellen Krajcovic and Catharyn Blumberg, a student intern from Brandeis University.

The Housing Advocates, Inc. provides comprehensive legal services and technical assistance in the areas of housing and community development. The organization is a private non-profit, tax exempt corporation staffed by lawyers and planners. Technical assistance to local and regional governments on fair housing and community development activities is a major thrust of The Housing Advocates. The organization also provides assistance on landlord-tenant relations and low and moderate income housing programs.

AN ANALYSIS OF FHA ACTIVITY
IN CUYAHOGA COUNTY

## I. Introduction

In recent years, mortgage lending practices have come under heavy fire from many neighborhood groups across the country as one issue in neighborhood preservation. Studies have shown that with the withdrawal of conventional home mortgage financing in certain neighborhoods, FHA financing moves in to fill the gap, beginning a process of concentration of government loans, defaults, and foreclosures which often ends with a deteriorated neighborhood. Similarly, in the Cleveland area, individual community groups have documented the decline of conventional mortgages in Buckeye-Woodland, the Near West Side, Cleveland Heights, and other areas in Cuyahoga County. As a result of these findings, neighborhood groups throughout the country lobbied Congress to scrutinize the mortgage lending activities of banks and savings and loans. The Home Mortgage Disclosure Act of 1975 was one result. This Act requires depository institutuions to disclose the number and total dollar amount of mortgage loans by zip code or census tract areas in an attempt to provide citizens and public officials with information to enable them to evaluate these institutions in serving the housing needs of communities and neighborhoods.

### A. Purpose

Mortgage lending studies have documented FHA mortgage activity primarily in neighborhoods where active community groups have raised the issue. One missing component in these studies is an examination of FHA activity as it affects the total community and the impact on specific neighborhoods and communities in relation to the total housing market. With this in mind, the Housing Advocates, Inc. undertook this analysis of FHA mortgage loans in Cuyahoga County for 1975. Specifically, the purposes of this analysis are to:

1. document the geographical distribution of FHA loan activity;
2. compare this distribution with conventional lending patterns;
3. document variability in FHA activity by race for municipalities or neighborhoods;
4. document variability in FHA activity by median monthly mortgage payment and median monthly income of mortgagor for municipalities and neighborhoods; and
5. identify institutions participating in FHA financing programs.

1

2

### B.  Background

The Federal Housing Administration of the Department of
Housing and Urban Development (FHA) was created under the
National Housing Act of 1934.  FHA was organized to encourage
improvement in housing standards and conditions, provide an
adequate system of home financing, and exert a stabilizing
influence on the mortgage market.  Before FHA, the average
home purchase loan involved very short term credit (three to
five years), exceptionally large downpayments, second mortgages,
and high interest rates.  FHA's assumption of risk led to
mortgage loan amortization with regular monthly payments
allowing lenders to extend credit over longer periods of time
at more favorable terms.

Under the original legislation, FHA was authorized to
insure mortgages that were "economically sound."[1]  As a result
of the economic soundness mandate, FHA did not write mortgage
credit insurance on properties in declining inner city
neighborhoods.  Despite the fact that Sections 220 and 221(d)(2)
of the Housing Act of 1954 substituted standards prescribed
by the Secretary for economic soundness considerations,
FHA continued to follow the mortgage practices established
during the first twenty years of operation.

In 1965, however, FHA activity in older city neighborhoods
began to increase.  This change in activity resulted first from
changing administrative directives followed by the institution
of Section 203(1) which authorized mortgage insurance on
properties meeting standards of "acceptable risk."  In 1968,
the replacement of Section 203(1) with Section 223(e) which
authorized a Special Risk Insurance Fund for properties in
"reasonably viable" areas further accelerated increases of FHA
activity in central city areas.  As a result of these provisions,
the volume of insurance written by FHA increased significantly
in 1969 and 1970.

The increase in volume of FHA activity was accompanied
by an increasing default rate.  This development prompted
FHA to tighten standards for both properties and mortgagors.
Since 1971, the level of new mortgage insurance under Section
223(e) has declined.  Nevertheless, FHA has remained active in
central city areas under Sections 203(b) and 221(d)(2).  In
addition, a co-insurance program was incorporated into the
National Housing Act in 1974.  This program allows at least
10 percent of the risk to be transferred to the mortgagee,
if requested, in return for a share of the insurance premium.

---

[1]For a more detailed discussion of the history of the FHA
program and its impact on city neighborhoods, see Peter M.
Greenston, et al., The Effects of FHA Activity in Older, Urban,
Declining Areas:  A Review of Existing, Related Analysis
(Washington, D.C.:  The Urban Institute, 1975), pp. 1-16, 28-46.

498

3

Over the life of FHA, its principal program has been Section 203, a program to finance the acquisition of proposed, under construction, or existing one to four family housing units. Under Section 203 and other programs, FHA has underwritten mortgages on more than 11.4 million single family homes in an amount exceeding $138 billion.[2] By the end of 1975, approximately 15% of all mortgaged single family units carried FHA insurance, although this figure decreased to 6¢ in 1976.[3]

C. Previous Studies

A number of studies have addressed various aspects of the impact of FHA activity in neighborhoods. With respect to patterns of housing segregation, these studies indicate that FHA activity has been a major vehicle for neighborhood racial change.

Nourse (1974) found that FHA has been more heavily involved in areas experiencing racial transition than in other older neighborhoods.[4] In Chicago, the low income, no downpayment program of FHA was identified as a mechanism which has financed white flight and black resegregation in areas undergoing transition.[5] Regardless of the likelihood of transition without the impact of FHA activity, FHA programs appear at least to serve as an important ingredient in extreme racial and economic change in city neighborhoods. Another study, prepared by the Baltimore Department of Housing, Community Development and Planning, points to the large proportion of FHA-insured loans in areas in which conventional financing is absent. [6] The significance here is simply that discrimination based on race/ethnicity is not always merely a matter of

---

[2]"HUD/FHA Single Family Mortgage Insurance," Housing and Development Reporter Reference File (Washington, D.C.: Bureau of National Affairs, 1975), p. 10:011.

[3]Consumer's Primer of Housing and Urban Development (Washington, D.C.: U. S. Department of Housing and Urban Development, 1977), p. 42. See also pp. 41-3, 44, 67 for additional information on mortgage and loan insurance.

[4]J. Little, H. Nourse, D. Phares, "The Neighborhood Succession Process," Institute for Urban and Regional Studies, Washington University, August 1974, Chapter I, pp. 30-1.

[5]F. Lawlor, FHA Report, Chicago City Council, August 1974, p. 1.

[6]Department of Housing and community Development, and Department of Planning, Home Ownership and the Baltimore Mortgage Market (Baltimore: n.d).

4

outright refusal to lend. Often, in fact, it is effected
through the overuse and abuse of the FHA mechanism, character-
ized by high foreclosure rates due more to its complexity and
poor administration than to the negligence of the mortgagor.[7]

In addition, these studies raise broader issues relating
to the impact of high default and foreclosure rates on FHA
mortgages, the effect of abandoned, HUD-owned properties on
neighborhoods, and the supposed benefits to the FHA home
purchaser. When the elements of economic and racial transi-
tion and FHA financing are combined, it is through the
interaction of FHA programs and the anticipations of buyers,
sellers, realtors, and lenders that FHA makes its impact.[8]
A study conducted in the Buckeye-Woodland area of Cleveland
documented the problems associated with fast foreclosure,
mortgage company practices, substandard housing, and vacant
dwellings when FHA activity is concentrated in certain areas.[9]

Previous studies such as these have focused on individual
neighborhoods in their analyses of FHA activity. This analysis
attempts to document the effect of a concentration of FHA
activity from a county-wide perspective.

    D.   <u>Data Sources</u>

Data from several sources were used to assess the impact
of FHA activity in Cuyahoga County. HUD's central office
supplied the information requested for the FHA mortgages granted
in Cuyahoga County in 1975. HUD was only able to supply the
requested information for about 50% of the total number of FHA
insured loans. For each mortgage in the sample, eight variables
were identified: census tract location, sex of mortgagor, number
of dependents, race of mortgagor, holding mortgagee, total monthly
mortgage payment, total monthly income of mortgagor, and section
number of insuring program. HUD also supplied the total number
FHA mortgages insured in Cuyahoga County in 1971, 1972, 1973,
1974, and 1975.

The Marketing Research Department of the Cleveland <u>Plain
Dealer</u> provided information from its 1976 Mortgage Disclosure
Survey on the number of conventional loans granted in zip code
areas of Cuyahoga county. Finally, the 1970 Census of Popula-
tion and Housing provided data on the socioeconomic character-
istics of different municipalities and neighborhoods in
Cuyahoga County.

_____

[7]Naparstek, Arthur J., Cincotta, Gale <u>Urban Disinvestment:
New Implications for Community Organization, Research and Public
Policy</u>, National Center for Urban Ethnic Affairs, Washington, D.C.
& National Training and Information Center, Chicago, Illinois, 1975.

[8]Greenston, p. 47.

[9]<u>Neighborhood Preservation</u>, Hearings before the Committee
on Banking, Housing and Urban Affairs, United States Senate
(Washington, D. C.: U. S. Government Printing Office, 1976),
pp. 105-13.

II. <u>Findings</u>

### 1. Distribution of FHA Loan Activity

Of the 435 mortgages included in the sample, 290 (66%) were located in the city of Cleveland and 145 (34%) were located outside of the city in suburban Cuyahoga County. As Map 1 reveals, the majority of FHA activity in the city of Cleveland was concentrated on the southeast side in the Mount Pleasant, Corlett, and Harvard-Lee areas. The northeast section of the city also experienced some FHA activity, while the southwest area received fewer loans which were more dispersed.

In Cuyahoga County, FHA mortgage activity was also concentrated. As Map 2 reveals, the inner ring eastern suburbs received most of the FHA insured mortgages outside of the city of Cleveland. Five suburbs--East Cleveland, Cleveland Heights, Shaker Heights, Warrensville Heights, and Garfield Heights-- accounted for 113 (80%) of the 145 loans insured by FHA in suburban Cuyahoga. Several western suburbs such as Lakewood, Fairview, and Parma, and several middle ring suburbs on the east side such as South Euclid, University Heights, and Bedford Heights, had some FHA activity although no more than five loans were issued in any one of these municipalities.

### 2. Distribution of Conventional Loan Activity

Using Home Mortgage Disclosure Act of 1975 data obtained from Thomas S. Andrzejewski of the <u>Plain Dealer</u> on conventional mortgage activity in Cuyahoga County, the distributions of FHA and conventional mortgage activity were compared. Map 3 shows the distribution of conventional mortgage activity by zip code area. Admittedly, the quality of the data permitted only a limited comparison of mortgage patterns. The FHA data were recorded for a sample of mortgage activity for 1975. The conventional loan data were recorded by banks and savings and loans (not including mortgage companies) for 1975 and part of 1976 in some cases. Nevertheless, the disclosure data is the only data immediately available which can be used to draw a comparison.

Fifty percent (50%) of FHA mortgage activity occurred in the eastern section of the city of Cleveland while less than ten percent (10%) of the conventional activity occurred there. Less than two percent (2%) of FHA activity took place in the outer suburbs, but close to thirty percent (30%) of conventional activity was located in outer suburban areas. Outside of the inner core of the city, FHA activity generally decreased with distance from the city and conventional activity generally increased. In addition to this variation in lending patterns, there was variation between the east and west side of the county. That is, most FHA activity was concentrated in the eastern city neighborhoods and inner ring suburbs.

6

### 3. FHA Mortgage Activity and Racial Concentration

Analyzing FHA mortgage activity in municipalities and neighborhoods by race indicates that there is significant variability of FHA activity by race. In the western half of Cuyahoga County, as Maps 4, 5, 6, and 7 show, all of the FHA mortgages were granted to whites except for one loan on the Near West Side and two loans in the Puritas-Bellaire area. In the eastern half of the county, more than ninety percent (90%) of the mortgages were granted to blacks. Most of the black residents of Cuyahoga County live in these areas. FHA mortgage activity for 1975 definitely reflects the pattern of racial segregation that exists throughout Cuyahoga County.

The population of Cuyahoga County in 1970 was 1,721,300; 328,419 (19.1%) of whom were black. Eighty-seven percent (87%) of the black population resided in the city of Cleveland. Except for a small group of blacks in the Bellaire section and on the Near West Side, almost all (96%) of Cleveland's black population live on the east side. Of the 40,578 blacks who resided outside of Cleveland but within Cuyahoga County, 88% lived in five eastern suburbs: East Cleveland, Cleveland Heights, Shaker Heights, Warrensville Heights, and Garfield Heights. Since 1970, several of these suburbs such as Cleveland Heights have had a significant increase in the number of black households.

### 4. Median Monthly Mortgage Payments and Median Monthly Incomes of Mortgagors of FHA Loans

Table 1 lists the median monthly FHA mortgage payments and median monthly incomes of FHA mortgagors for each neighborhood in the city of Cleveland and each suburban municipality in Cuyahoga County in which FHA loans were granted. Monthly mortgage payments by FHA mortgagors ranged from $111 to $421 with a median of $203. Total monthly incomes of FHA mortgagors ranged from $732 to $2904 with a median of $1335.

Table 2 shows the median monthly mortgage payments and median monthly incomes for the east and west sides of the city of Cleveland and the east and west suburbs of Cuyahoga County. Although FHA monthly mortgage payments and mortgagor incomes in the suburbs were higher than in the city, there was little variation in the figures between eastern and western suburbs. Within the city of Cleveland, there was little variation in median monthly income from east side to west side although the median monthly mortgage payment on the east side ($165) was substantially lower than on the west side ($214).

7

## 5.  Major Lending Institutions Identified by FHA Data

In identifying major participants in FHA insurance programs in the county, data reveal that three lending institutions-- Citizens Mortgage, Parkview Federal Savings and Loan, and Fulton and Goss--hold about forty-five percent (45%) of the FHA mortgages in Cuyahoga County.  Together, Cardinal Federal, United Savings and Loan, HUB of Columbus, William H. James of Kettering, and Leader Mortgage hold another twenty-five percent (25%) of the loans.

## III.  Legal Perspectives

The effects of past and present practices of the Federal Housing Administration (FHA) have assisted in establishing and maintaining racially segregated housing patterns in Cuyahoga County.  Chief Judge Battisti in his recent Cleveland school desegregation opinion pointed out the past role that FHA played in creating these housing patterns:

> The role of the federal government in the creation and perpetuation of segregated housing is documented in the Federal Housing Administration's (FHA) underwriting manual as it was distributed during the 1930's.  That document contained a blatantly separationist policy as reflected by the admonition to FHA appraisers that they be aware of any "infiltration of inharmonious racial or nationality groups" into a neighborhood.  Such an incursion was deemed to have an adverse effect and neighborhoods were assured of receiving a high FHA rating only if exclusionary devices such as zoning regulations and restrictive covenants with regard to race be included in deeds. Such restrictive covenants were judicially enforced until such practice was declared unconstitutional in Shelley v. Kraemer, 334 U.S. 1 (1948).  Despite the Supreme Court action, the FHA continued to recommend the use of restrictive covenants until 1950.  In that year, the FHA did a complete about-face, and refused to finance properties subject to such restrictive covenants.  It was not until the 1962 Executive Order with regard to equal opportunity in housing that restrictive covenants ceased to be a factor in the public financing of housing.  Nevertheless, restrictive covenants were viewed as a cloud on the title and excepted by title companies in their policies, at least until 1969.  Thus, for a period approaching 20 years, the federal government, through FHA, was "the leading exponent of racial discrimination in housing and residential segregation."  Reed v. Rhodes, 422 F.Supp. 708,788-789 (N.D. Ohio 1976).

More disturbing is that, intentionally or not, the present FHA practices and regulations continue to support

8

racially segregated neighborhoods. The failure by the Department of Housing and Urban Development to prevent segregation violates its affirmative duty under Title VIII of the Civil Rights Act of 1968[10] and Executive Order 11063.[11]

The federal courts have recognized that the duty affirmatively to promote integrated housing patterns rests with HUD. Shannon v. HUD, 436 F.2d 809 (3rd Cir. 1970); Otero v. New York Housing Authority, 484 F.2d 1122 (2nd Cir. 1973); Residents Advisory Board v. Rizzo, P-H E.O.H. Rptr. ¶13,789 (3rd Cir. 1976). It is not necessary under the above decisions to discuss whether HUD has had the intent to cause racial segregation. Under congressional and presidental mandates, HUD is legally obligated to take specific affirmative measure to insure that its housing programs do not cause segregated housing patterns. This it has not done.

IV.  Implications

From the findings of this study several important issues can be raised:

1.  A significant finding is the role of FHA in contributing to racial concentration. This documentation clearly raises the issue of FHA administrative practices for two reasons. First, FHA as an arm of HUD must administer its programs in a manner affirmatively to promote fair housing. However, FHA is not meeting these affirmative action mandates.

Second, HUD policy, as a result of congressional legislation such as the Housing and Community Development Act of 1974, requires the deconcentration of minorities, the promotion of greater choices in housing, and community revitalization. Clearly, there is a conflict between HUD policy and FHA practices because FHA has contributed to minority concentration. HUD must be aware of this because it provided the enclosed data. If HUD was not aware of the socioeconomic characteristics of the neighborhoods in which it was insuring loans, it has failed to obtain and use relevant socioeconomic information necessary for compliance with fair housing requirements.

---

[10]Title VIII directs all federal executive departments and agencies, and specifically the Secretary of HUD, to "administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of this title..." 42 U.S.C. 3608(d) and (e).

[11]Executive Order 11063 provides in part:

I shall hereby direct all departments and agencies in the executive branch of the Federal Government, insofar as their function relates to...housing and related facilities, to take all action necessary and appropriate to prevent discrimination because of race, color, creed or national origin.

9

    2.  In cooperation with the real estate industry, FHA is the governmental agent assisting many families to become homeowners.  The findings show that FHA guaranteed loans are used primarily in east side black neighborhoods and racially-changing inner-ring suburbs.  Such findings raise the issue as to the linkage between the homeowner and FHA.  Who are the real estate interests that operate within this mortgage market area?  What is the role of the real estate industry in light of the HUD-NAR Affirmative Marketing Program?[12]  What is their responsibility in the use of government insured mortgages?  What fair housing responsibilities do the mortgage companies have in the use of government insured mortgages, considering they processed over $3.9 billion worth of FHA mortgages nationally in 1974?  (This represents 74.5% of all institutionally initiated FHA insured mortgages.[13])

    3.  The concentration of FHA insured loans in east side neighborhoods and inner-ring suburbs is not solely the result of income.  The income range of most FHA mortgagors and their monthly mortgage payments indicate that they could afford housing in many other residential market areas on the west side and in adjoining suburbs.  By concentrating FHA activity in certain areas, as previous studies have shown, HUD is contributing to actual or perceived neighborhood decline in Cuyahoga County.

V.  Recommendations

    The Housing Advocates, Inc. recommends that:

    1. The Senate Committee on Banking, Housing and Urban Affairs continue its examination of the impact of existing programs, policies, and laws on neighborhood decline by holding a public hearing specifically on FHA administrative procedures, and the practices of mortgage and real estate firms.

    2. HUD undertake a national study of FHA mortgage loan activity in major metropolitan areas in order to assess the agency's role in furthering racial impaction and segregation. The study should also examine the correlation between FHA mortgages, foreclosures, defaults and neighborhood decline. This information is already on computer tapes at HUD Central; therefore, it should be easily retrieved and processed.

---

  [12]In the fall of 1976, the Cleveland Area Board of Realtors (CABOR) endorsed a "voluntary" plan with HUD to promote fair housing.

  [13]Department of Housing and Community Development, The Supply of Mortgage Credit 1970-1974, Monitor Center for Community Change, August, 1976, p. 7.

10

3.  HUD should reconsider the Ford administration's report which concludes that a new FHA central city lending strategy be adopted.  This report proposes that FHA should not compete with private mortgage insurers and should seek to do business only in geographic locations where such firms do not exist.  The Housing Advocates, Inc. believes that such a policy would be detrimental because it would not only further racial segregation but also concentrate FHA mortgage loans in limited geographical locations.

4.  FHA should be responsible to disclose to the public the number of insured mortgages by census tract, race and other pertinent data.  This would enable citizens and public agencies to determine whether the agency is fulfilling its obligation in serving the housing needs of the communities and neighborhoods.



The Housing Advocates FHA Study, 1977

Map 1

KEY

Top Number = Number of FHA-Insured Loans in Total
Bottom Number = Number of FHA-Insured Loans to Blacks

Distribution of FHA Loans
by Race and Neighborhood
(1975; 50% Sample)

CITY
PLANNING
COMMISSION



The Housing Advocates FHA Study, 1977

Map 2

REGIONAL PLANNING COMMISSION
Cuyahoga County, Ohio

Distribution of FHA Loans
in Cuyahoga County by Municipality
(1975; 50% Sample)

North

The Housing Advocates FHA Study, 1977

Map 3

Distribution of Conventional Loan Activity
by Zip Code Area in Cuyahoga County



Source: 1976 Mortgage Disclosure Study--Marketing Research Department, Cleveland Plain Dealer

Map prepared by C. Blumberg



The Housing Advocates FHA Study, 1977

Map 4

REGIONAL PLANNING COMMISSION
Cuyahoga County, Ohio

Distribution of FHA Loans
in Cuyahoga County by Race by Municipality
(1975; 50% Sample)

KEY

Top Number = Number of Loans to Whites
Bottom Number = Number of Loans to Blacks



The Housing Advocates FHA Study, 1977

Map 5

Distribution of FHA
Loans by Census Tract
(1975, 50% Sample)

CITY
PLANNING
COMMISSION





The Housing Advocates FHA Study, 1977

Map 7

Distribution of FHA Loans
to Blacks by Census Tract
(1975; 50% Sample)

CITY
PLANNING
COMMISSION

Table 1

FHA Mortgage Insured Loans in Cuyahoga County:  Median Monthly Mortgage
  Payments and Median Monthly Incomes of Mortgagors.

| CITY OR NEIGHBORHOOD | MEDIAN MONTHLY PAYMENT | MEDIAN MONTHLY INCOME |
|---|---|---|
| Cleveland | | |
| North Collinwood | $ 201.00 | $1264.50 |
| South Collinwood | 153.00 | 1104.00 |
| Euclid-Green | 234.00 | 1624.00 |
| Forest Hills | 136.00 | 786.00 |
| Glenville | 153.00 | 996.00 |
| Norwood | 136.00 | 1173.50 |
| East Hough | 141.00 | 1248.00 |
| University Circle-Alta | 205.00 | 1310.00 |
| Kinsman | 131.00 | 1304.00 |
| Woodland Hills | 154.00 | 1097.00 |
| Shaker Square | 135.00 | 1226.00 |
| Mount Pleasant | 168.00 | 1372.00 |
| Paul Revere | 155.00 | 1228.00 |
| Miles-Warner | 166.00 | 1602.00 |
| Corlett | 161.00 | 1132.50 |
| Harvard-Lee | 219.00 | 1463.00 |
| Lee-Seville-Miles | 172.50 | 1124.00 |
| South Broadway | 184.00 | 1089.00 |
| Industrial Valley | 218.00 | 1591.00 |
| Downtown | 188.00 | 1091.00 |
| Near West Side | 174.00 | 942.00 |
| Tremont | 141.00 | 1591.00 |
| Denison | 169.00 | 1168.25 |
| Fulton-Train | 279.00 | 1058.00 |
| Clark-Fulton | 166.00 | 1210.50 |
| Memphis-Fulton | 230.00 | 1152.00 |
| Broadway-Schaaf | 228.00 | 1298.50 |
| Edgewater | 185.00 | 920.50 |
| Midwest North | 193.00 | 1519.50 |
| Midwest South | 190.00 | 1162.50 |
| Munn Warren | 286.00 | 1720.00 |
| Jefferson | 222.50 | 1240.25 |
| Puritas-Bellaire | 231.00 | 1302.50 |
| Riverside | 243.00 | 1515.00 |
| Bratenahl | 232.00 | 2335.00 |
| Euclid | 235.00 | 1218.00 |
| East Cleveland | 188.00 | 1301.00 |
| Cleveland Heights | 240.00 | 1298.00 |
| South Euclid | 251.00 | 1144.00 |
| University Heights | 270.00 | 2210.00 |
| Shaker Heights | 295.00 | 1914.00 |
| Warrensville Township | 291.00 | 1202.00 |
| Warrensville Heights | 291.00 | 1734.00 |
| North Randall | 314.00 | 1952.00 |
| Bedford Heights | 321.00 | 1875.00 |
| Oakwood | 248.00 | 1449.00 |

514

| CITY OR NEIGHBORHOOD | MEDIAN MORTGAGE PAYMENT | MEDIAN MONTHLY INCOME |
|---|---|---|
| Maple Heights | $ 400.00 | $2829.00 |
| Garfield Heights | 205.00 | 1079.00 |
| Parma | 265.00 | 1522.00 |
| Lakewood | 267.00 | 1423.00 |
| Fairview Park | 226.00 | 2080.00 |
| Berea | 215.00 | 1441.00 |
| Strongsville | 333.00 | 1517.00 |
| North Olmsted | 228.00 | 1317.00 |
| Olmsted Township | 335.00 | 1665.00 |

Table 2

FHA Loan Activity in Cuyahoga County:  Median Monthly Mortgage
    Payments and Median Monthly Incomes of Mortgagors for
    East and West Sides of Cleveland and East and West Suburbs.

| | WEST | | EAST | |
| | Median Payment | Median Income | Median Payment | Median Income |
|---|---|---|---|---|
| SUBURBS | $ 265.00 | $1516.50 | $ 235.00 | $1530.00 |
| CITY | 214.00 | 1188.00 | 165.00 | 1152.00 |

Table 3

Total Number of FHA Mortgages in Cuyahoga County, 1971-1975.

| YEAR | NUMBER OF MORTGAGES |
|---|---|
| 1971 | 2,137 |
| 1972 | 1,839 |
| 1973 | 1,392 |
| 1974 | 925 |
| 1975 | 902 |

| CITY OR NEIGHBORHOOD | MEDIAN MORTGAGE PAYMENT | MEDIAN MONTHLY INCOME |
|---|---|---|
| Maple Heights | $ 400.00 | $2829.00 |
| Garfield Heights | 205.00 | 1079.00 |
| Parma | 265.00 | 1522.00 |
| Lakewood | 267.00 | 1423.00 |
| Fairview Park | 226.00 | 2080.00 |
| Berea | 215.00 | 1441.00 |
| Strongsville | 333.00 | 1517.00 |
| North Olmsted | 228.00 | 1317.00 |
| Olmsted Township | 335.00 | 1665.00 |

Table 2

FHA Loan Activity in Cuyahoga County:  Median Monthly Mortgage
Payments and Median Monthly Incomes of Mortgagors for
East and West Sides of Cleveland and East and West Suburbs.

| | WEST | | EAST | |
|---|---|---|---|---|
| | Median Payment | Median Income | Median Payment | Median Income |
| SUBURBS | $ 265.00 | $1516.50 | $ 235.00 | $1530.00 |
| CITY | 214.00 | 1188.00 | 165.00 | 1152.00 |

Table 3

Total Number of FHA Mortgages in Cuyahoga County, 1971-1975.

| YEAR | NUMBER OF MORTGAGES |
|---|---|
| 1971 | 2,137 |
| 1972 | 1,839 |
| 1973 | 1,392 |
| 1974 | 925 |
| 1975 | 902 |

516

**THE POTOMAC INSTITUTE, INC.**

1501 Eighteenth Street, N.W. • Washington, D.C. 20036 • 332-5566

May 26, 1977

The Honorable Don Edwards, Chairman
Committee on the Judiciary
Subcommittee on Civil and Constitutional Rights
U. S. House of Representatives
Washington, D.C.   20515

Dear Representative Edwards:

This responds to your request for comments by the Potomac Institute on H.R. 3504, which you and Representative Drinan introduced into Congress on February 15, 1977.  Our observations are limited to Title II of H.R. 3504, which would amend the Fair Housing Act, Title VIII of the Civil Rights Act of 1968.

The Potomac Institute is on record as recognizing the pressing need for amending Title VIII, and we commend you for taking the initiative to begin this process.  In our recent publication, <u>Equal Housing Opportunity</u>, we recommended increasing the enforcement powers of HUD and establishing a statutory basis for the standing of individuals to bring suit in federal court to enforce the Fair Housing Act against local governments and federal agencies.  We were gratified that many of our recommendations, which are enclosed, were embodied in H.R. 3504.

The Institute recently sponsored an informal conference to discuss the issues raised by H.R. 3504.  Attendees included staff members of the relevant Congressional committees, and several attorneys familiar with Title VIII.  Their perceptive comments were of considerable assistance in the refinement of our own views.  The comments that follow, however, remain those of the Potomac Institute.

We support enactment of H.R. 3504 because it will make a substantial contribution to the goal of making housing available for all Americans without regard to race, creed, sex or national origin. There are, however, some features in H.R. 3504 that we believe should be eliminated or revised.  The following comments are limited to our recommendations for changes that could contribute to a more effective, strengthened bill for the Congress to consider.  We have underscored language proposed to be added to H.R. 3504.

The Honorable Don Edwards, Chairman
May 26, 1977
Page Two


1.  Section 206(c) of H.R. 3504, first part -- This first
part of Section 206(c) adds a new subsection 804(f) to the Fair
Housing Act to prohibit "redlining" practices by residential prop-
erty insurers.  While we support the inclusion of the principle
expressed by the amendment, we believe the provision would be more
effective if it clearly placed the major burden of justifying prima
facie redlining conduct on the property insurers.

Under the presently proposed language of H.R. 3504, the
plaintiff in any administrative or judicial proceeding must prove
that the refusal to issue the property insurance was "because of
the race, color, or national origin" of the residents of the dwel-
ling or of the immediate neighborhood.  The amendment does not in-
dicate what would be a sufficient showing to meet this burden of
proof.  There are several alternatives from which a court would
choose, absent guidance from the statutory language.  It is pos-
sible, for example, that a court might require the plaintiff to
establish a pattern or practice by the insurer of refusing to issue
property insurance policies for similarly situated dwellings.  Or
it might require the plaintiff to establish that the denial was
racially motivated, as the Supreme Court did under the 14th Amend-
ment in Washington v. Davis, 426 U.S. 229 (1976).

We believe that the statute should be cleared of any ambiguity
on this important issue.  Under our recommended reformulation, once
it is shown that a property insurance policy was denied to a member
of a minority or ethnic group or to a dwelling located in a minor-
ity or ethnic neighborhood, the burden of proof would shift to the
insurer to establish that its refusal to issue the insurance
policy was not because of race, color, or national origin, but be-
cause of valid business reasons.  This shifting of the burden of
proof to the insurer can be accomplished by revising Section 804(f)
to read as follows:

(f)  For a person in the business of insuring
against hazards to refuse to enter into a contract of
insurance against hazards to a dwelling in which resides
any minority group person or persons or near which re-
side minority group persons unless such insurer can es-
tablish a business justification for such refusal;
Provided,  That the race, color or national origin of
the present or prospective owners, lessees, tenants, or
occupants of such dwelling or dwellings or of the neigh-
borhood of such dwelling or dwellings shall not con-
stitute a business justification.

Section 802 of the Fair Housing Act (the definitional section)
would have to be amended to add the definition of a "minority group
person," as follows:

The Honorable Don Edwards, Chairman
May 26, 1977
Page Three


(h)  "Minority group person" means any individual
who is, or is identified as, a member of a racial mi-
nority or is identified by the nation of his origin.

2.  Section 206(c) of H.R. 3504, second part -- The second
part would add a new Section 804(g) to the Act to make it unlawful
for any state or local governmental unit to exclude any low and
moderate income housing because of such housing's eligibility for
governmental assistance or because of the race, national origin or
economic status of the prospective occupants.

We are concerned with two aspects of this provision:  its
overly broad coverage if a racial motivation is not present and its
failure to recognize any meaningful role for nondiscriminatory
community planning.

The proposed amendment covers many forms of housing.  As we
interpret the language, local governments would be barred from
blocking any proposal to construct moderately-priced garden apart-
ments or mobile home parks on any site within their jurisdictions.
A local government might even be prevented from barring the instal-
lation of mobile homes in single-family residential districts.  The
Act should not in effect give developers a completely free rein in
selecting the locations for such housing, thus placing them in the
position of determining a community's character.  Further, we
believe that the limited enforcement resources of HUD should con-
centrate on state and local actions that are either racially dis-
criminatory, which is the central theme of the Fair Housing Act, or
that unreasonably block housing that is to receive federal subsidies.

The proposed amendment could also override local community
planning efforts.  A community should be permitted and, indeed,
encouraged to engage in comprehensive planning that facilitates
orderly growth and the development of reasonable amounts of sub-
sidized housing consistent with the needs of the community and the
metropolitan area of which it is a part.  This can be accomplished
in the community's zoning ordinance or in its Housing Assistance
Plan prepared to establish eligibility for federal community de-
velopment block grant funds under the Housing and Community De-
velopment Act of 1974.  A community plan so formulated and approved
by HUD should not be easily overturned by an action under the Fair
Housing Act.  Further, communities should be encouraged to join
with others in their metropolitan area to formulate area-wide
housing opportunity plans for the distribution of subsidized hous-
ing throughout the region, such as HUD has recently recognized by
awarding bonus Section 8 and planning funds to areas with approved
plans.

The Honorable Don Edwards, Chairman
May 26, 1977
Page Four


    Communities should also not be required to abandon their
building code and site development requirements as long as they are
not a ruse for keeping out low and moderate income housing.  We
believe that this may be accomplished by narrow language contem-
plating local standards that directly protect the potential oc-
cupants of the proposed housing rather than the more vague stan-
dards that permit localities to exclude needed housing because of
neighborhood protests.

    These problems could be addressed in a revised Section 804(g)
reading as follows:

    (g)  For any general or special-purpose unit of
government of a State or of a subdivision of a State (or
other agency having jurisdiction within a State or States)
in the exercise or enforcement of powers with respect to
planning, zoning, subdivision controls, building codes or
permits, provision of public facilities, or other matters
affecting land use or development, (A) to exclude any hous-
ing because of race, color, religion or national origin,
or (B) to exclude housing intended substantially for per-
sons of low or moderate income that would be otherwise
eligible for governmental financial assistance (other than
programs for governmental mortgage purchase, insurance
or guaranty) or housing that is likely to be occupied by
a substantial number of minority group persons, unless:

    (1)  such exclusion is pursuant to the compre-
hensive plan of such unit of government that
affords a realistic opportunity for reasonable
amounts of such housing to be provided; or

    (2)  such exclusion is based on the lack of
any need for such housing as evidenced by the
applicable current Housing Assistance Plan
prepared pursuant to 42 U.S.C. §5304(a)(4)
and approved by the Secretary or, in the case
of any specific development proposed for such
housing, on the inconsistency of the proposed
housing development with the general locations
designated for such housing in such approved
Housing Assistance Plan; or

    (3)  such exclusion is based on adherence to
a current area-wide housing plan in which the
unit of government is a participant and which
has been approved by the Secretary; or

The Honorable Don Edwards, Chairman
May 26, 1977
Page Five

>    (4)  such exclusion, as it affects any specific
> development proposal for such housing, is based
> on the failure of such proposal to comply, after
> due notice and a reasonable opportunity to com-
> ply, with specific building code, subdivision,
> site planning or site development requirements
> generally applicable to housing of similar
> physical character and that are directly re-
> lated to the health, safety or welfare of the
> likely occupants of such proposed housing
> development.

It should be noted that the language in clause (A) above is intended
to reaffirm and clarify existing law, and that the distinction
between (A) and (B) clarifies that proof of racial motivation is
not required as to (B).

    3.  Section 206(d) of H.R. 3504 -- We do not believe that the
provisions of the Act should be made available to handicapped per-
sons, and we would accordingly recommend deletion of Section 206(d).

    Extending coverage to the handicapped is likely significantly
to increase the costs of constructing and rehabilitating private
housing.  It would also inflate the price of existing housing be-
cause it would appear to require such housing to be altered for
handicapped persons, whether or not they would actually become
occupants.  Further, the Architectural Barriers Act of 1968 and the
Rehabilitation Act of 1973, and particularly the recently issued
regulations of HEW under the latter Act, confer broad rights on
handicapped persons with respect to federally funded activities and
facilities.  HUD is presently considering amendments to its Minimum
Property Standards to make provision for physically handicapped
persons in HUD insured and subsidized housing.  We believe that the
trade-offs between the addition of special facilities for handi-
capped persons and the resulting additional costs to private owners
can be better dealt with, at least initially, through emerging
administrative processes than through private litigation and the
punitive sanctions of Title VIII.  In addition, agencies other than
HUD are charged with assuring attention to the needs of the handi-
capped within federally assisted accommodations, and the issues
involved differ significantly from those raised by racial or
economic discrimination.

    4.  Section 206(e) of H.R. 3504 -- This section is intended
to clarify that Congress always intended Section 805 of the Fair
Housing Act to prohibit "redlining" by mortgage lenders.  We agree
with the principle, but, as stated in paragraph 1 above, it would
be preferable if the burden were unambiguously placed on the mort-

The Honorable Don Edwards, Chairman
May 26, 1977
Page Six


gage lender to prove the business necessity for loan refusals to
members of minority or ethnic groups or to houses in minority
neighborhoods.

We would therefore suggest that Section 805 of the Fair Housing
Act be revised to read as follows:

After December 31, 1968, it shall be unlawful for any
bank, building and loan association, insurance company,
or other corporation, association, firm, or enterprise
whose business consists in whole or in part in making com-
mercial real estate loans, to deny a loan or other fi-
nancial assistance or to differentiate in the fixing of
the amount, interest rate, duration, or other terms or
conditions of such loan or other financial assistance to
any minority group person, to any person associated with
any minority group person, or to any other person on ac-
count of sex or the demographic characteristics of the
neighborhood in which the dwelling or dwellings in re-
lation to which such loan or other financial assistance
is to be made or given, unless such bank, building and
loan association, insurance company, or other corpora-
tion, association, firm, or enterprise can establish a
business justification for such denial or differentia-
tion; Provided, That the race, color, religion, sex or
national origin of the present or prospective owners,
lessees, tenants, or occupants of such dwelling or
dwellings or of the neighborhood of such dwelling or
dwellings shall not constitute a business justification.

5.   Section 208 of H.R. 3504 -- This section rewrites Section
810 through 814 of the Fair Housing Act to give HUD and the Depart-
ment of Justice the enforcement powers they need to make the Act
effective.  We believe that the proposed amendments describe an
effective enforcement system.  Our comments relate to technical and
procedural points:

a.   Section 810(b)(2)(A), as revised -- The last
sentence of this revised section gives the HUD admini-
strative judge the same remedial powers as possessed by a
federal judge in a private litigation under Section 812.
Conferring such powers on an administrative judge, parti-
cularly the power to award punitive damages, raises con-
stitutional questions relating to the respondent's right
to a jury trial, and also confers on the HUD administra-
tive judge powers not possessed by administrative judges
in other federal agencies.  Further, we do not believe it
would be appropriate for any federal administrative judge

522

to award either compensatory or punitive monetary damages against any local government.

In our view, the remedial powers of the HUD administrative judge should be limited to issuing cease and desist orders against proven unlawful conduct and to awarding compensatory damages against non-governmental respondents. A subsequent refusal to comply with HUD's cease and desist order would justify substantial monetary penalties as presently provided in the revised Section 810(b)(2)(D).

We would therefore revise the last sentence of Section 810(b)(2)(A) to read as follows:

> After the conclusion of such hearing, the person conducting the hearing shall make findings of fact and conclusions of law, and may issue an order <u>against the respondent to cease and desist from engaging in the discriminatory housing practice and may make an award of compensatory damages as to any person except a respondent that is a general or special purpose unit of government of a State or of a subdivision of a State (or other agency having jurisdiction within a State or States)</u>.

b.   <u>Section 811(b), as revised</u> -- We understand that there are no other statutes that <u>require</u> the Department of Justice to initiate litigation. While the mandatory direction to the Department seems defensible in connection with suits to enforce final orders of the Secretary of HUD or to collect civil penalties assessed by the Secretary of HUD, the Department of Justice should probably not be deprived of discretion to decline to initiate actions to remedy discriminatory housing practices that HUD has referred to it, particularly when the HUD Secretary has already decided not to process the complaint through HUD's own administrative procedures.

Thus, subsection (3) of Section 811(b) should be made discretionary with the Attorney General. This can be accomplished by revising Section 811(b) to read as follows:

> (b)   The Attorney General <u>(1)</u> is directed to bring a civil action in an appropriate United States district court <u>(A)</u> to enforce any

The Honorable Don Edwards, Chairman
May 26, 1977
Page Eight

final order under section 810 of this title
that is referred for enforcement by the Sec-
retary, and (B) to collect any civil penalty
assessed by the Secretary under section 810 of
this title, and (2) may bring a civil action
in an appropriate United States district court
to remedy any discriminatory housing practice
with respect to which the Secretary had made a
finding that reasonable cause exists under this
title and which the Secretary refers to the
Attorney General for enforcement under this
subsection.

c. Section 811(c), as revised -- As revised by
H.R. 3504, this section would permit a court to award
compensatory and punitive damages against a local govern-
ment in suits brought by the Attorney General. For
reasons explained in paragraph 5(a) above, and to paral-
lel our suggested revisions to Section 810(b)(2)(A), we
recommend that Section 811(c) be similarly revised so
that a court cannot require the payment of money by a
local government found to have engaged in discriminatory
conduct unlawful under the Act except when the local
government has violated a final order of a court or of
the HUD Secretary under this title. In such circum-
stances, where the community continues to act unlawfully
in the face of a final administrative or judicial de-
termination of unlawfulness, the collection of civil
penalties and the award of compensatory damages would be
appropriate. Of course, this would not preclude the
award of damages against public officials under 42 U.S.C.
§1983 or other statutes to the extent such officials are
liable under rulings of the Supreme Court.

We therefore suggest that Section 811(c) be revised
to read as follows:

(c) The court may award such relief in
any civil action under this section as is
authorized in Section 812(c) of this title in
cases brought under that section; Provided,
that the court shall not award any compen-
satory or punitive damages against any gen-
eral or special purpose unit of government
of a State or of a subdivision of a State (or
other agency having jurisdiction within a
State or States), except for compensatory
damages arising out of the violation by such

The Honorable Don Edwards, Chairman
May 26, 1977
Page Nine

> unit of government of any final order of the
> Secretary or of a court entered under this
> title, and except for the award of civil
> penalties assessed by the Secretary pur-
> suant to Section 810(b)(2)(D)(i).

d.    Section 813(a), as revised -- Among other things,
this section would allow a prevailing defendant to col-
lect attorney fees and costs from the Department of
Justice, while denying reciprocal rights to the United
States with respect to attorney fees.

We are advised that there is no precedent for allow-
ing a prevailing party to receive costs from the Depart-
ment of Justice, and that such a possibility might inhibit
the Department from initiating lawsuits.  There is no
reason why private parties should have rights against the
Department in fair housing litigation that are not available
in other types of government litigation.  We therefore
would urge deletion of this provision.

We are also advised that there is precedent for
allowing the Department of Justice to collect attorney
fees and expert witness costs from losing parties in
proceedings brought to enforce final orders of courts and
federal agencies.  This practice should be specifically
carried over to the Act.

To implement these suggestions, we recommend that the
revised Section 813(a) read as follows:

> SEC 813.  (a)  In any action or proceeding
> under this title, the court, in its discretion,
> may allow a prevailing party (other than the
> United States in connection with suits brought
> under Sections 811(a) or 811(b)(3)*) reasonable
> attorney fees and expert witness expenses as
> part of the costs; Provided, That the United
> States shall not be liable for such costs.  Such
> costs may also be awarded upon the entry of any
> interlocutory order which determines substantial
> rights of the parties.

---

\*    If the revision of Section 811(b) suggested in paragraph 5(b)
of this letter is accepted, this section would be section
811(b)(2).

The Honorable Don Edwards, Chairman
May 26, 1977
Page Ten


6.    <u>Section 208 of H.R. 3504</u> -- This section would completely
replace the subject matter of the existing Section 814 of the Act
to give HUD, in consultation with the Attorney General, the authority
to issue rules and regulations to implement the Act.

The rulemaking authority is needed to enable HUD to prepare
enforceable guidelines that describe in more detail than is possible
in any legislation what kinds of conduct are forbidden and permitted
under the Act.  Guidelines can be especially helpful when directed
to real estate brokers, mortgage lenders, and other private groups
in the real estate industry.  With the lines between permissible
and impermissible conduct thus more clearly drawn, there is likely
to be more voluntary compliance with the Act than has heretofore
been observable.

Our only criticism is that the section gives HUD authority to
prepare rules in areas, such as conventional mortgage lending, in
which HUD has somewhat limited expertise compared to other federal
agencies.  It would be helpful to require HUD to consult with these
other agencies before issuing its rules and regulations.

We therefore suggest that Section 814 be revised as follows:

SEC. 814.  The Secretary, in consultation, <u>as may
be appropriate</u>, with the Attorney General, <u>the Federal
Home Loan Bank Board, the Federal Reserve Board, or any
other federal department or agency that may have regu-
latory jurisdiction over or interest in the subject mat-
ter or the parties</u>, may issue rules and regulations to
implement the policies, purposes, and provisions of
this title.

7.    <u>Section 210(a) of H.R. 3504</u> -- We do not favor the
establishment of the proposed Fair Housing Loan Fund.

One of the Fund's apparent purposes is to encourage private
enforcement action by relieving the start-up financial burdens on
individuals who believe they have a meritorious case.  We believe
that other amendments proposed in H.R. 3504, however, establish suf-
ficient incentives for such cases.  Section 812(c) increases the
maximum award of punitive damages from $1,000 to $10,000, and Sec-
tion 813(a) makes it clear that a prevailing party can be awarded
attorney fees and expert witness costs.  With these provisions, in-
dividuals with valid claims have sufficient personal incentives
and should have little difficulty in finding attorneys willing to
press their claims.  If additional incentives are needed, it would
be possible to increase the limit for punitive damages, perhaps
to $20,000 or $30,000, or to make mandatory the award of attorney
fees for prevailing plaintiffs.

The Honorable Don Edwards, Chairman
May 26, 1977
Page Eleven

We also foresee considerable difficulty in HUD's administration of the proposed Fair Housing Loan Fund. If the money in the Fund is to be distributed on a first-come, first-served basis, considerable money will be loaned to persons with bad cases, and many loans may not be repaid. On the other hand, if HUD is to exercise discretion in making loans, which would seem the more logical approach, it will have to engage in a factual investigation of the merits, similar to what is called for in the proposed revised Section 810(a)(1). If that investigation persuades HUD that the case is meritorious, HUD should process the complaint itself through the procedures described in Section 810, thus relieving the individual complainant of the burden of preparing the case.

We also have some problem seeing how HUD would handle an application for a loan from the Fund that alleges a violation by HUD of its affirmative action obligations under the Fair Housing Act or under Title VI of the Civil Rights Act of 1964.

8. <u>Standing to sue</u> -- One prominent issue under the Fair Housing Act, as well as under the Civil Rights Act of 1964, concerns the access to the federal courts by individuals seeking to hold federal agencies and state and local governments accountable for their civil rights obligations. H.R. 3504 addresses this issue only obliquely, in the first sentence of the revised Section 812(a). There, the right to sue in federal court is conferred on "an aggrieved person" with respect to an "alleged discriminatory housing practice." A "discriminatory housing practice" is defined in Section 802(f), as amended by the proposed Section 204 of H.R. 3504, as any "act that is unlawful under this title."

In view of the recent decisions of the Supreme Court that tighten the requirements for standing to sue federal, state and local governments, and the reflection of this trend in decisions by federal courts of appeals, the changes made in H.R. 3504 are not likely to be given the broad reading that is intended. Further, a court might conclude that the failure of HUD under Section 808(e), and of other federal agencies under Section 808(d), to meet their affirmative action obligations does not confer a cause of action on private persons because such governmental failures are not specifically deemed "unlawful" by Section 808.

More affirmative language, clearly declaring a Congressional purpose to expand the class of private persons entitled to initiate judicial action, can perhaps succeed in reversing the conservative rulings on standing by the federal courts. Even the Supreme Court has admitted that Congress has the power to broaden the access of individuals to the federal courts up to the constitutional limits

The Honorable Don Edwards, Chairman
May 26, 1977
Page Twelve


described in Article III of the Constitution.  We believe that such
an attempt should be made in these amendments to the Fair Housing
Act.

Turning first to questions of standing in the context of
private discrimination, H.R. 3504 makes two significant changes.
One is to eliminate the definition of "an aggrieved person" who
can initiate the HUD administrative process under Section 810.
The second is to specify that any "aggrieved person" (now an un-
defined phrase) can initiate a private enforcement action under
Section 812.  This second change makes it clear that the standing
of persons to initiate HUD action is to be equated with the stand-
ing of persons to initiate a private lawsuit, thereby effectively
reversing the restrictive reading of standing under Section 812
recently made by a federal court of appeals (TOPIC v. Circle Realty
Co., 532 F.2d 1273 (9th Cir., 1976)) and more recently disputed
by a district court in another ciruit.  (Wheatley Heights Neighbor-
hood Coalition v. Jenna Resales Co. (D.C. E.D.N.Y., April 5, 1977).)

On the other hand, the elimination of any definition of "an
aggrieved person" leaves so wide a scope to judicial interpretation
that it could achieve a more restrictive result than is desirable.
Section 810(a) of the Fair Housing Act, as it presently exists,
provides an excellent definition of "an aggrieved person," as
follows:

Any person who claims to have been injured by a dis-
criminatory housing practice or who believes that he will
be irrevocably injured by a discriminatory housing prac-
tice that is about to occur (hereinafter "person ag-
grieved")....

The existing definition should be retained in the amended Section
810(a)(l), and not revised as proposed in H.R. 3504.

In addition, the right of individuals to make federal, state
and local governments and agencies answerable in federal court for
their alleged violations of the Fair Housing Act and of the Civil
Rights Act of 1964 needs to be clearly stated in a separate section
of H.R. 3504.  We would confer standing in such cases whether or
not a specific housing development proposal was involved.  It is
only in this way that a federal court can reach local exclusionary
land use practices that have been so successful that developers and
sponsors of low and moderate income housing are deterred from even
trying to put a project together.  Our proposed language would
reverse the impact of Warth v. Seldin, 422 U.S. 490 (1975).

The Honorable Don Edwards, Chairman
May 26, 1977
Page Thirteen


On the other hand, we would not intend that the federal
courts assume the role of having to supervise a community's plan-
ning. Thus, our proposal would limit the remedial powers of a
federal court to a declaratory judgment in a suit not involving a
specific development proposal. The court's decision would put the
community on notice of its unlawful conduct, so that it might
voluntarily initiate remedial measures. Further, and perhaps more
importantly, a declaratory judgment would inform sponsors and
developers of subsidized housing that the community will have to
accept some housing, and they may be encouraged to try to develop
housing proposals. If their development plans are then thwarted by
community action or inaction, the federal court can issue specific
injunctive relief that will assure that the specific projects are
built.

We thus recommend a new section that would read as follows:

### SUITS AGAINST LOCAL GOVERNMENTS
### AND THE UNITED STATES


(a) Any person who is injured or potentially in-
jured by any alleged unlawful act under this title or
under 42 U.S.C. §§2000d, 2000d-1, or by any material
failure to carry out any affirmative action required by
this title or by 42 U.S.C. §§2000d, 2000d-1, may commence
on his own behalf a civil action in an appropriate United
States district court under Section 812(a) against any
general or special purpose unit of government of a State
or of a subsidivion of a State (or other agency having
jurisdiction within a State or States) or against the
United States or any agency or department of the United
States alleged to have committed such unlawful act or
failure to act. For purposes of commencing a civil
action under this Section, any person who is a sponsor,
developer, builder or contractor of housing potentially
eligible for governmental assistance, or who lives in the
metropolitan area in which the alleged unlawful act or
failure to act has occurred and either would meet the
occupancy qualifications of such housing or is a minority
group person, shall be treated as being injured or poten-
tially injured by such alleged unlawful act or failure to
act.

(b) The court may award such relief in any civil
action under this section as is authorized under Section
812(c) except for compensatory or punitive damages; Pro-
vided, that compensatory damages may be awarded for vio-

The Honorable Don Edwards, Chairman
May 26, 1977
Page Fourteen

lations by such unit of government of any final order of
a court entered under this title; and <u>Provided</u>, further,
that in connection with any civil action brought under
this section against any general or special purpose unit
of government of a State or of a subdivision of a State
(or other agency having jurisdiction within a State or
States) that does not involve any specific development
proposal for housing, the court shall order only de-
claratory relief.

We hope you will find these comments useful. We would be
happy to work with you and your staff on any further drafting of
legislative language that may be desirable in the light of these or
other comments you receive.

Sincerely,

Arthur J. Levin
Executive Vice President

# III. State and Local Civil Rights/Fair Housing Agencies



**EQUAL HOUSING OPPORTUNITIES**

## FAIR HOUSING CONGRESS of Southern California

4034 BUCKINGHAM ROAD, SUITE 212, LOS ANGELES, CALIFORNIA 90008 · (213) 295-4424

June 10, 1977

**PRESIDENT**
*Wade Rice*

**VICE PRESIDENT**
*Frances Greene*

**SECRETARY**
*Sylvia Geiselman*

**TREASURER**
*Constance Quinby*

**EXECUTIVE DIRECTOR**
*Lois Moss*

**BOARD OF DIRECTORS**

*Crenshaw Neighbors*
*Hollywood-Wilshire*
*Fair Housing Council*
*Long Beach*
*Fair Housing Foundation*
*Orange County*
*Fair Housing Council*
*San Fernando Valley*
*Fair Housing Council*
*South Bay*
*Fair Housing Coalition*
*Southeast Cities*
*Fair Housing Council*
*W San Gabriel Valley*
*Fair Housing Council*
*Westside*
*Fair Housing Council*

The Honorable Don Edwards
1961 The Alameda
San Jose, California 95126

Dear Mr. Edwards:

This somewhat overdue letter is to express enthusiastic support, on behalf of the Board of Directors of the Fair Housing Congress of Southern California, its member fair housing councils and myself, of the housing bill you introduced to the House of Representatives -- H.R. 3504.

I had hoped to have the opportunity to meet and speak with you last week at the HUD conference in Washington, but an overlong meeting delayed my arrival at the reception.

It has been my thinking for the past several years that existing state and federal fair housing legislation must be strengthened if we are to effect a change in the segregated housing patterns which still predominate in this state and throughout this nation. This year's HUD fair housing conference, its theme of voluntary compliance with the law emphasized so heavily as to mandatory compliance, brought this thinking into even sharper focus.

I agree with the concept of voluntary compliance and that there is a need, through an aggressive program of public education, to change the attitudes and behavior of a large segment of the population, to assist in the accomplishment of equal housing opportunity; however, to assign the lead role to voluntarism is, to me, an attempt to fool the people.

It is imperative that the fair housing laws, regulations and enforcement mechanisms reflect a national determination to reach the goal of equal housing opportunity.

Please call on us for any support and/or assistance we can provide toward passage of this important legislation.

Respectfully yours,

*Lois Moss*

Lois Moss
Executive Director

LM:jb

COMMISSIONERS

WINIFRED M. DUNCAN, Chairperson
LINDA S. HUME
W. H. PAGE
ROY FLORES
KENNETH WEBSTER

BILL W. HILLIARD
EXECUTIVE SECRETARY

402 EVERGREEN PLAZA
7TH & CAPITOL WAY
OLYMPIA, WASHINGTON 98504
(206) 753-6770

1601 SECOND AVENUE BUILDING
FOURTH FLOOR
SEATTLE, WASHINGTON 98101
(206) 464-6500

DIXY LEE RAY GOVERNOR
STATE CAPITOL OLYMPIA



### WASHINGTON STATE HUMAN RIGHTS COMMISSION

SEATTLE DISTRICT OFFICE

May 2, 1977

EAST PASCO NEIGHBORHOOD FA
205 SOUTH WEST
PASCO, WASHINGTON 993
(509) 545-2370

1004 PAULSEN BUILDING
SPOKANE, WASHINGTON 99201
(509) 456-4473

901 TACOMA AVENUE S
SUITE #207
TACOMA, WASHINGTON 98402
(206) 593-2070

YAKIMA COMMUNITY CENTER
1211 SO. 7TH ST.
YAKIMA, WASHINGTON 98901
(509) 575-2772

YWCA
917 Z STREET
VANCOUVER, WASHINGTON 98661
(206) 696-6477

Honorable Don Edwards, Chairperson
Subcommittee on Civil and Constitutional Rights
Committee on the Judiciary
House of Representatives
Washington, D.C. 20515

RE: H.R. 3504 - Civil Rights Amendments Act of 1977

Dear Chairperson Edwards:

It is with pleasure that I respond to your March 31, 1977 request for comments on the Civil Rights Amendment Act of 1977 (H.R. 3504). The introduction of this bill and the public discussion of the issues that it involves are timely. Our nation must assess the record of the federal government in promoting the advancement of civil rights. I will attempt to address, in the following, a few major aspects of the bill.

Coordination of Federal Equal Employment Efforts

The current fragmentation of federal equal employment opportunity enforcement activities is probably the single greatest obstacle to effectiveness. It has created inconsistent approaches to enforcement, conflicting policies, and seemingly endless bureaucracy, all of which has led to a serious lack of public acceptance of the legitimacy of these programs. Many civil rights organizations have attempted to impact the federal civil rights system but have generally found it to be confusing and unresponsive. This is particularly true of the Equal Employment Coordinating Council, which apparently sought to develop a uniform approach to civil rights enforcement by dropping to the lowest common

Honorable Don Edwards
Page Two                                          May 2, 1977

denominator.  The Council's guidelines are a seriously weakened
version of the Equal Employment Opportunity Commission's well-
established and effective policies defining discriminatory con-
duct.  We were glad to see EEOC reject the Council's regressive
action and reaffirm its own guidelines.

Employment discrimination is a complex field of governmental
regulation that requires the kind of special expertise and atten-
tion that only an agency wholly devoted to this purpose can pro-
vide.  History has demonstrated that where civil rights enforcement
has become a part of a federal, state, or local agency that was
established for other purposes, it remains a very low regulatory
priority.  It has also been demonstrated that most progressive
federal civil rights policies are usually initiated by the Equal
Employment Opportunity Commission.  This is so in spite of
EEOC's recurrent administrative turmoil.

It is most essential, in my judgment, that EEOC be given
sole authority to set federal enforcement policies in the area
of equal employment opportunity.  It is also desirable that the
administration of the age discrimination and equal pay acts be
transferred to EEOC, along with authority to act against state and
local governments.  As many state agencies can attest, such a
consolidation would provide increased uniformity, coordination,
and effectiveness in the enforcement of federal civil rights
guarantees.

EEOC Structural Changes

The division of administrative authority within the Equal
Employment Opportunity Commission is confusing to outsiders, and,
as most would agree, a major contributor to the agency's lack of
strong leadership.  Title I of the bill would go far toward im-
bedding a coherent division of responsibility between the policy-
making and a quasi-judicial role of the Commission on one hand
and the administrative responsibilities of the Chief Executive
Officer on the other.

Such a structure is similar to the one that has governed
this agency since its inception in 1949.  It is a time-tested
structure that provides for a needed balance between theory and
practice in governmental regulation: policy-makers are frequently
poor administrators, and administrators are inclined to sacrifice
sound policy in favor of administrative convenience.

There is, however, one possible flaw in the bill, which is
the section providing for Presidential appointment of the Chief
Executive Officer.  Civil rights enforcement efforts need to be

533

Honorable Don Edwards
Page Three                                        May 2, 1977

isolated from partisan politics, which would not occur under
the bill's provision. Presidential appointment of the Chief
Executive Officer may also create competition and dissention
within the Commission, thus continuing some of the problems
that now exist between the Commissioners, the Chairperson, and
the General Counsel.

We would prefer a structure whereby the Chief Executive
Officer is appointed by the Commission. This structure works
well for many state civil rights agencies and would be a likely
improvement over both the existing and proposed systems.

Handicap Discrimination

Employment discrimination against the handicapped should
be made unlawful and incorporated into EEOC's jurisdiction.
In this area, the federal government lags behind many states in
their recognition of a serious social ill. It is time for the
federal government to speak loudly on this issue and commit
additional resources to advance basic civil rights for the handi-
capped.

Expansion of Fair Housing Law

H.R. 3504 would extend the federal fair housing laws into
needed areas of coverage. Racial discrimlnation by insurers is
not only an abhorrent act in and of itself, but there is some
evidence that it has a negative influence on the way that mort-
gage lenders view "financial risk" in ethnic minority neighbor-
hoods. Subsection 206(c) also would address the discriminatory
zoning and land use policies of local governments; such devices
either by design or effect operate to perpetuate racially segre-
gated housing patterns.

I wish to make particular note of Subsection 206(e) of the
measure, which would remove any doubt as to the applicability of
federal fair housing laws to practices of "redlining". As we
know from our own research (copy of the Preliminary Report of
the Redlining Task Force to the Washington State Human Rights
Commission, January 31, 1977, enclosed), redlining contributes
to the decay of our central cities and older neighborhoods, and
has a particularly deleterious impact on areas with high ethnic
minority populations. The bill would be a significant addition
to the federal arsenal of weapons to fight this particularly
destructive lending practice.

I would also like to make brief mention of our hearty
endorsement of Section 207 of the bill, which would enable HUD
to provide financial assistance to civil rights organizations
in combating housing discrimination. This section would foster
innovation in attacking systemic forms of housing discrimination
by providing the resources to ebable the development of innovative
programs, and it would foster the coordination of federal, state
and local fair housing efforts.

Honorable Dan Edwards
Page Four                                    May 2, 1977

Administrative Enforcement Revisions

H.R. 3504 would create administrative enforcement mechanisms
within EEOC and HUD, with the use of administrative law judges or
hearing examiners. Most state civil rights agencies have such
powers and find their potential use to be the backbone of the
enforcement structure. Certainly HUD would be taken more seriously
if it had the ability to pursue complaints beyond the conciliation
phase.

Administrative enforcement mechanisms are frequently less
cumbersome than the courts, and they provide an opportunity within
the agency for a fair hearing with procedural safeguards. Hope-
fully, such a provision would instill a view of fairness in the
eyes of those appearing before the agencies and it would put some
teeth into the enforcement capabilities of two agencies of special
expertise.

                        *    *    *

Thank you for allowing us this opportunity to comment on
these very important issues. Please feel free to call on this
agency for further information or assistance.

                        Respectfully,

                        Bill W. Hilliard
                        Executive Secretary

rl
cc: Members of the Commission
    Washington Congressional Delegation
Enc.

JAMES A. RHODES
Governor



# OHIO CIVIL RIGHTS COMMISSION

CENTRAL OFFICE
220 Parsons Avenue
Columbus, Ohio 43215
Telephone 466-2785

COMMISSIONERS:
Burt Silverman
Robert Bry
Marion R. Sweeney
Ronald C. Morgan, Chairperson
Clingan Jackson

Ellis L. Ross
EXECUTIVE DIRECTOR

REGIONAL OFFICES:
NORTHEAST REGIONAL OFFICE
680 Rockefeller Building
614 West Superior Avenue
Cleveland, Ohio 44113
1-216-579-2800

SOUTH N.E. REGIONAL OFFICE
304 Russell Harp Building
5 East Buchtel Avenue
Akron, Ohio 44308
1-216-253-3167

NORTHWEST REGIONAL OFFICE
510 Gardner Building
506 Madison and Superior
Toledo, Ohio 43604
1-419-241-9164

SOUTHEAST REGIONAL OFFICE
220 Parsons Avenue
Columbus, Ohio 43215
1-614-466-5928

SOUTHWEST REGIONAL OFFICE
Commerce Building
100 East Eighth Street
Cincinnati, Ohio 45202
1-513-852-3344

NORTH S.W. REGIONAL OFFICE
222 Grant-Deneau Building
40 West 4th Street
Dayton, Ohio 45402
1-513-228-3612

May 5, 1977

The Honorable Don Edwards
Chairman
Subcommittee on Civil and
Constitutional Rights
Congress of the United States
House of Representatives
Washington, D.C. 20515

Re:  H.R. 3504

Dear Congressman Edwards:

Thank you for your April 21 letter regarding our experiences
with the Ohio handicap law as they may assist you in revising
Title VIII.

The Ohio handicap law became effective on July 23, 1976 and,
since that time, we have accepted only two charges related to
housing. We are, therefore, unable to use experience as a valid
basis for any comment. We believe that this lack of activity
results not from a lack of interest in or necessity for the law,
but from a lack of publicity and the reluctance of the handicap-
ped to come forward.

Despite our lack of experience, we have developed a comprehensive
set of guidelines covering all facets of the Ohio handicap law
as administered by this Commission. We expect these guidelines
to be included in new rules of the Commission to be adopted some
time this summer. A copy of the current Ohio laws against dis-
crimination and a (rough) copy of the proposed rules are enclosed.
for your review. The substantive section of the rules applying
to the handicap law is the best guide to our current thinking on
interpretation.

Hon. Don Edwards.　　　　　-2-　　　　　May 5, 1977

With respect to your specific questions, our comments are as follows:

1. Has the limitation on the property owner's duty to modify the property been interpreted to permit the owner to forbid reasonable modifications, even if financed by the handicapped tenant? Our view would be that a landlord would be in violation of the law if he/she did not permit a handicapped tenant to make modifications of the same general nature and under the same circumstances as non-handicapped tenants are permitted to make. As an example of the general proposition, if it is the custom of a landlord to permit the installation of additional towel racks in the bathroom of a non-handicapped tenant, we would be inclined to hold his refusal to permit lavatory hand-holds for a handicapped tenant as a violation of law.

2. How has the provision relating to the absence of a duty to "provide a higher degree of care" for the handicapped person been interpreted by your agency and the courts? We believe this provision was inserted to resolve any question with respect to possible increased civil liability on the part of a landlord as a result of accepting a handicapped tenant. As a practical matter, those standards comprising ordinary care will probably come under scrutiny as a result of application of the handicapped law. The existence of this provision, specifically limited to the housing area, has enabled us to infer legislative intent that some higher degree of care and/or special accommodation toward a handicapped person in public accommodations and employment may be required. The rule provisions with respect to these matters have been formulated accordingly.

3. What scope has been attributed to the term "physically handicapped"? The Ohio definition (Sec. 4112.01(M)), Revised Code defines handicap as meaning a (1) medically diagnosable and abnormal condition, (2) which is expected to last for a considerable time and (3) which limits function in any of a number of specified and general ways. The proposed rules expand on this concept to include perceived handicap. Thus, the Ohio definition appears to be at least as broad as that supplied in H.R. 3504, with some possible distinction being drawn with respect to alcoholism, drug addiction and the like. Because of the inclusion of the "medically diagnosable" requirement, there is uncertainty as to whether these are includible under Ohio law. In general, however, we are currently interpreting handicap to include almost any diagnosable abnormality with a functional impact and which is not self-limiting. Naturally, we expect this interpretation to be clarified and narrowed somewhat through litigation.

When we first began to administer the Ohio handicap law, concerns were expressed from all affected sectors including insurance underwriters, employers and groups of handicapped persons themselves, with respect to this breadth of interpretation and the interrelationship between the handicap law and workmens compensation, fringe benefit premiums, Union contract requirements, OSHA requirements, and the like. Our early experience, however, noting that it consists of only about 150 cases, most of which are still in preliminary stages, is that these fears, or most of them, are ungrounded.

Hon. Don Edwards                    -3-                    May 5, 1977

We have reviewed H.R. 3504 with great interest. It appears that considerable thought went into it and that many of the changes, particularly those involving reorganization, are long overdue. We are particularly impressed by the concept of loan funds in aid of private litigation.

With respect to suggestions for improvement, we note the greatly expanded discretion in handling incoming charges set forth in Section 706(a)(2). In July, 1975, we initiated a pre-investigation field adjustment and screening procedure and, as a result, we have been able to properly dispose of over 40% of our cases without the necessity of devoting resources to lengthy investigation. Our suggestion is that a provision be inserted expanding the discretion of the CEO even further to include a discussion of possible adjustment of the matter during preliminary inquiry with the respondent charged and the use of the good offices of the EEOC to secure the same without further proceedings. We have found this process valuable in settling about 20-25% of those matters in which the likelihood of probable cause found after investigation is high.

Full comment on every feature of the bill is, of course, impossible - at this writing, suffice it to say that we are totally in agreement that no legislation to date has fulfilled its promise of eliminating discrimination and that many of the reasons for this failure are those set out in your presentation of February 17. We believe that H.R. 3504, if enacted, will be a most valuable tool to achieve the goal.

Please let us know if we may make any further contribution. Thank you for this opportunity to be of service.

Very truly yours,

ELLIS L. ROSS
Executive Director

ELR/bl

cc: Frank C. Gibb, Chief, Legal Operations

enc.

**538**



RUTH J. HERRINK
Director
WILLIAM W. DENNIS, JR.
Deputy Director
WILLIAM H. FOWLKES, JR.
Executive Director

COMMONWEALTH of VIRGINIA
*VIRGINIA REAL ESTATE COMMISSION*
*2 South Ninth Street, P. O. Box 1-X, Richmond, Virginia 23202*

COMMISSIONERS
CHARLES R. FOXX, SR.
Chairman
GEORGE C. WALKER, JR.
Vice Chairman
NEVILLE C. JOHNSON
HELEN A. KENT
PEYTON KLOPFENSTEIN

April 5, 1977

The Honorable Don Edwards
Member, House of Representatives
Chairman, Subcommittee on Civil
and Constitutional Rights
Washington, D.C. 20515

Re: House Resolution 3504

Dear Congressman Edwards:

The Virginia Real Estate Commission Fair Housing Liaison Committee met on March 31, 1977 to discuss the proposals embodied in H. R. 3504. The Committee functions as a subordinate of the Commission and advises the Commission of fair housing matters. The members of the Committee are appointed by the Commission and represent (1) governing bodies which have enacted ordinances under the authority of § 36-96, Code of Virginia, 1950, as amended and (2) private organizations engaged in promoting equal opportunity in housing.

The comments and suggestions of the Committee concerning the amendments to Title VIII of the 1968 Civil Rights Act are as follows:

1. The modification of the owner-occupied exemption is something that is long overdue. The language of the current Section 803 exempts from coverage by the Act a sizeable source of rental housing utilized by low-income members of minority groups and the Committee feels that discrimination against this group of our citizens is an affront to us all. It has been our experience that such individuals need the greatest amount of encouragement to assert their legal rights when they sense that they have been subjected to discriminatory housing practices, and a law that fails to address their needs in this area of rental housing tends to discourage them from asserting their rights in other, presently non-exempted areas.

The Honorable Don Edwards
April 5, 1977
Page 2

2. The Committee favors the elimination of uncertainty as
to the practice of "redlining" by banks and other lenders
and insurance underwriters. Even though it has been argued
that Title VIII already covers such practices, including
redlining in Title VIII specifically would further discourage
the practice and alert prospective complainants that the
practice is a denial of their rights. These comments apply
as well to the amendment directed against the practice by
municipalities of exclusionary zoning.

3. The amendment proposes adding the handicapped to the
categories of individuals presently covered by the Act. The
Committee believes that some definition of the term "handicap"
should be included in the amended statute, as it is not clear
whether the term "handicap" refers only to physical handicaps
or both physical and mental handicaps. Additionally, concilia-
tion agreements negotiated by HUD in the past have provided
for affirmative action in marketing dwellings to minority in-
dividuals, members of whose groups were allegedly victims of
discrimination. Affirmative marketing efforts directed at the
physically handicapped have no meaning if local building codes
do not require private, non-government financed housing develop-
ments to contain dwellings physically suited for habitation by
handicapped individuals. Attention should be directed to this
matter as well as to the question of whether the fact that a
building doesn't provide proper access to physically handicapped
persons would be prima facie or conclusory evidence of a viola-
tion of Title VIII.

4. Age should be added to the categories of individuals
against whom it is unlawful to discriminate under the amended
Title VIII, since the aged are already included in the coverage
of equal lending statutes and because it is also a questionable
practice to discriminate against responsible young people soley
because of their chronological age.

5. The amendment of Section 808(e)(3) by Section 207 is
especially important to those states to whom the Secretary of
HUD has proposed granting Substantial Equivalency as the added
caseload will require some shifting of funds from the federal
to the state level if the state agencies are to continue and
improve the enforcement procedures provided by state laws. In
connection with this comment, the Committee notes with some
concern that the amended Section 810(a)(3) involves substantial

The Honorable Don Edwards
April 5, 1977
Page 3

changes in the language under which the Secretary may certi-
fy a State or local public agency as having a fair housing law
providing rights and remedies for alleged discriminatory housing
practices which are substantially equivalent to the rights
and remedies provided by Title VIII.  The new section creates
an ambiguity in the statute as to what the Secretary's action
is to be subsequent to notification of a certified State or
local agency of the existence of the complaint.  Under the
present statute the Secretary stays his procedure until the
State or local agency has had thirty days to act.  Does the
new section allow the Secretary to proceed simultaneously with
the State or local agency, thus creating wasteful duplication
of effort?  The new section also makes referral of complaints
to the State/local level discretionary rather than mandatory,
thus making certification an ambiguous state.  Further, due to
the substantial changes in other sections of Title VIII which
would be brought about by the proposed amendments, the Committee
is concerned that the considerable efforts of State and local
fair housing agencies to bring about changes in their respective
laws to make them substantially equivalent to the present
Title VIII provisions might have been an excercise in futility.
If this is the case it seems grossly unfair to those agencies
for whom the Secretary has already proposed substantial equiva-
lency but not finally granted certification apparently owing to
personnel changes resulting from the last presidential election.

Since neither your comments nor those of Congressman Drinan as
recorded in the Congressional Record address the reasons for
the new Section 810(a)(3), the Committee respectfully requests
some comment from your offices.

6.  In amended Section 810, is the language in line 18 on
Page 46 of the proposed amendment in error?  Perhaps the
drafters intended to refer to "Subsection (b) of Section 811,"
rather than "Subsection (c)" thereof.

The Committee feels that the granting to the Secretary of the
power to issue cease and desist orders will go a long way
toward strengthening HUD's ability to provide immediate relief
to an impecunious complainant faced with an especially serious
violation of the Act.  The Committee supports the strengthening
of HUD's enforcement powers and the punitive damages provided by
Section 810.

The Honorable Don Edwards
April 5, 1977
Page 4

      7.  Amended Section 811.  This section is of particular importance to Virginia in light of the decision of the Fourth Circuit Court of Appeals which denies that the Justice Department has monetary damages as a remedy in its pattern or practice litigation.  This would be of great value to low-income complainants who may be discouraged from pursuing the remedy of monetary damages under the current Act.

      8.  The Committee members believe that 180 days was too short a time limitation for the filing of complaints and they therefore concur with the new three-year limit with the exception of one member who believes that the new limit is too long for the filing of complaints in court in view of the creation of the loan fund.

      9.  Section 812.  This section, specifically the language at line 2, Page 51, might be detrimental to a complainant's case if it stops the complainant from commencing a civil action until the proceedings in connection with an administrative complaint have been concluded.  The language of Section 810(b)(2)(A) does not appear to set a maximum period of time starting with completion of an investigation by which a hearing on the administrative complaint must take place.  It might be appropriate to set a six-month limit, starting with completion of the investigation, after which the complainant may commence a civil action.

10.  Sections 813(a) and (b).  Under the present law only prevailing complainants recover attorney's fees, whereas under new §§ 813(a) and (b), whoever prevails can recover attorney's fees.  This may discourage some complainants from commencing an action even where their cause is just.  The Committee was not unanimous in their criticism of these sections, some members believing that the change is only fair.  The Committee members agreed, however, that some explanation should be given as to why this change is being proposed.

We hope that you will find these comments and suggestions useful,

The Honorable Don Edwards
April 5, 1977
Page 5


and we appreciate your having given us this opportunity to add
our input to House Resolution 3504.

                              Sincerely,

                              *Charles R. Foxx*

                              Charles R. Foxx
                              Chairman
                              Virginia Real Estate Commission

CRF:eh

cc:  The Honorable Mills E. Godwin, Jr.
     Governor of Virginia

LAWRENCE C. WILSON, CHAIRPERSON
TOPEKA

H. DEAN MILLER
TOPEKA

DEVNEY MACK, SR.
FT. SCOTT

DON ABLAH
WICHITA

CONSTANCE ACHTERBERG
SALINA

HENRY B. JAMESON
ABILENE

STATE OF KANSAS



COMMISSION ON CIVIL RIGHTS

535 KANSAS AVE., 5TH FLOOR    TOPEKA, KANSAS 66603
PHONE (913) 296.3206

ANTHONY D. LOPEZ
EXECUTIVE DIRECTOR

FRANK L. ROSS
ASSISTANT DIRECTOR

ROGER W. LOVETT
LEGAL COUNSEL

GARY D. JACKSON
PROJECT DIRECTOR

JAMES C. DORSEY
SUPERVISOR OF COMPLIANCE

LESTER E. MOOD
FIELD SUPERVISOR

NORMA JEAN HODISON
OFFICE SECRETARY

March 25, 1977

Representative Don Edwards
Chairman, Subcommittee on Civil Rights
Constitutional Rights Committee on the
Judiciary
House of Representatives
Washington, D.C.  20515

Dear Representative Edwards:

Mr. Lawrence C. Wilson, Chairperson of the Kansas Commission
on Civil Rights requested that I respond to your letter of
request dated March 9, 1977, regarding House Resolution 3504.
After reviewing this proposed legislation, I noted that the
recommendations of the Congressional Black Caucus, the U.S.
Commission on Civil Rights and Congressman Hawkins' Subcom-
mittee Staff Report were utilized in preparing this legisla-
tion.  I do personally agree with the substantive provisions
of HR 3504 in that both Title VII and Title VIII of the 1964
Civil Rights Act will be strengthened to assure the goals of
equal employment and housing opportunity will be achieved.

The amendments granting cease and desist authority, the new
sections which clarify and expand the responsibilities of
the Justice Department along with the Title II amendment
strengthening the private remedies available to charging par-
ties for attorney fees and a fair-housing revolving fund are
very much needed and should prove to be very helpful in future
enforcement efforts.

I note that Title II expands the fair-housing amendments to
include the physically handicapped and I find this new addi-
tion of affected groups to place the Federal statutes equal to
the coverage that a number of state agencies have at this pre-
sent time.  The Mrs. Murphy Owner Occupied Exemption is good
and should eliminate the artificial distinction between owners
and tenants contained in the present language of Title VIII
which is similar to our state statute, the Kansas Act Against
Discrimination.

The remaining provisions which clarified existing ambiguities
under Title VIII should be beneficial to state agencies since
we could encounter similar kinds of situations due to our law
containing a substantial portion of the language found in Title
VIII of the 1964 Civil Rights Act.

-2-

In short, I feel that the majority of the amendments will be
of assistance in preventing and eliminating unlawful discrimi-
natory practices in both employment and housing.  I would also
like to point out that your proposed legislation does not dis-
cuss the addition of Section 4 of the draft proposal submitted
by the Congressional Black Caucus under the date of January 7,
1977.  I would like to propose that the entire text of Section 4
be reviewed by your Committee and given positive consideration.

As you probably know, the state of Kansas is a designated 706
deferral agency and we do receive and process deferred complaints
under Section 706 of the 1964 Civil Rights Act.  In the past
several years, I have personally noted a number of problems sur-
rounding the administration of the 706 program and because of
this experience, I would like to endorse the entire provisions
representing Section 4 of the draft proposal submitted by the
Congressional Black Caucus.  For your information and review,
I have enclosed a verbatim text of that recommendation and it
is as follows:

> 4.  <u>Role of State and Local Agencies</u>
>
>    The Federal Government cannot do the job by itself.
> Rather it requires the full cooperation of all levels
> of government.  Each capable state and local FEPC should
> be funded to undertake research in an area in which it
> has some expertise and should be funded to improve the
> system, to reduce the time invested in performing the
> task, and to improve the quality of the product.
>    Expanded relationships between EEOC and state and
> local FEPC's open important possibilities for the future;
> increased coordination between these agencies, should
> decrease overlap with the resultant elimination of wasted
> time and money, and reduced burdens on employers, unions,
> and employment agencies, who have had to deal with two
> separate agencies with separate and often inconsistant
> demands.  This should also increase available staff and
> produce more efficient procedures.

Thank you for providing the opportunity to the State of Kansas
to submit our comments and recommendations relative to House
Resolution 3504.

                          Sincerely,

                          *Anthony D. Lopez*

                          Anthony D. Lopez
                          Executive Director

ADL:pjd

cc:  Lawrence C. Wilson, Chairperson

GEORGE R. ARIYOSHI
GOVERNOR



JOSHUA C. AGSALUD
DIRECTOR

ROBERT C. OSHIRO
DEPUTY DIRECTOR

**STATE OF HAWAII**
DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS
825 MILILANI STREET
HONOLULU, HAWAII 96813

March 17, 1977

Mr. Don Edwards, Chairman
Subcommittee on Civil and
   Constitutional Rights
Congress of the United States
House of Representatives
Washington, D.C.   20515

Dear Mr. Edwards:

I appreciate the opportunity you have given us to
comment on the proposed amendments to Title VIII of the
1968 Civil Rights Act, more specifically, to Title II
of H.R. 3504.

Please be informed that my department administers
the State's Factory Built Housing Law which contains
no provisions for fair housing enforcement.  Our respon-
sibilities are limited to prescribing and enforcing
rules and regulations which protect the health, safety,
and property of the people of this State by assuring
that all factory built housing is structurally sound and
that the plumbing, heating, electrical, and other
components thereof are reasonably safe.

While I have no comments to make at this time, let
me assure you that I am totally in agreement with your
efforts to improve the enforcement mechanisms in the
Federal statutes forbidding employment and housing
discrimination.

Sincerely,

Joshua C. Agsalud
Director of Labor and
Industrial Relations

MAILGRAM SERVICE CENTER
MIDDLETOWN, VA. 22645

western union Mailgram

2-0582862E062 03/23/77 ICS IPMMTZZ CSP WSHB
7023650104 MGM TDMT LAS VEGAS NV 332 03-23 0813P EST

THE HONORABLE DON EDWARDS, CHAIRMAN
SUBCOMMITTEE ON CIVIL AND CONSTITUTIONAL
RIGHTS
COMMITTEE ON THE JUDICIARY
CONGRESS OF THE UNITED STATES HOUSE OF
REPRESENTATIVES
WASHINGTON DC 20515

REFERENCE TITLE II OF H.R. 3504

DEAR MR EDWARDS:

THE NEVADA EQUAL RIGHTS COMMISSION SUPPORTS AND ENDORSES THE CONCEPT
THAT YOU AND MR DRINAN PROPOSE IN H.R. 3504. IT WAS GRATIFYING TO READ
THAT THE BILL CONTAINED SPECIFIC LANGUAGE THAT AN AGENCY SUCH AS OURS
WILL BE AFFORDED THE OPPORTUNITY TO RESOLVE A CHARGE AT THE STATE LEVEL
AS PROPOSED IN SECTION 208, CONCERNING THAT PORTION OF THE PROPOSAL,
ONE CHANGE TO SECTION 208 IS RECOMMENDED: THE WORD "MAY" WHICH APPEARS
ON PAGE 45, LINE 25, SHOULD BE CHANGED TO READ "SHALL". PRECEDENT
REQUIRING FEDERAL AGENCIES TO NOTIFY AND ACCORD STATE AGENCIES THE
RIGHT TO ATTEMPT A RESOLUTION OF A CHARGE OF DISCRIMINATION HAS BEEN
ESTABLISHED BY: 1. SECTION 706 (C), TITLE VII OF THE 1964 CIVIL RIGHTS
ACT, AS AMENDED, PROVIDES THAT "NO CHARGE MAY BE FILED UNDER
SUB-SECTION (A) BY THE PERSONS AGGRIEVED BEFORE THE EXPIRATION OF 60
DAYS AFTER PROCEEDINGS HAVE BEEN COMMENCED UNDER THE STATE OR LOCAL
LAW, UNLESS SUCH PROCEEDINGS HAVE BEEN EARLIER TERMINATED, ..." 2.
SECTION 706 (D) OF THE CIVIL RIGHTS ACT STATES: "IN THE CASE OF ANY
CHARGE FILED BY A MEMBER OF THE COMMISSION ... THE COMMISSION SHALL
BEFORE TAKING ANY ACTION WITH RESPECT TO SUCH CHARGE, NOTIFY THE
APPROPRIATE STATE OR LOCAL OFFICIALS AND, UPON REQUEST, AFFORD THEM A
REASONABLE TIME ..."

HUD MADE A COMPARISON OF THE FEDERAL HOUSING AND NEVADA'S FAIR HOUSING
LAW AND FOUND THE NEVADA LAW MORE THAN COMPARABLE TO FEDERAL LAW.
THEREFORE, IT IS THIS COMMISSION'S CONTENTION THAT NEVADA'S HOUSING
LAWS CONTAIN SUBSTANTIVE PROVISIONS TO PROVIDE PROTECTION AND RELIEF
FOR PERSONS FILING CHARGES OF HOUSING DISCRIMINATION. WHERE FEDERAL AND
STATE LAWS ARE COMPARABLE, IT IS THE COMMISSION'S BELIEF THAT PERSONS
AFFECTED BY DISCRIMINATORY POLICIES AND PRACTICES IN HOUSING CAN BE
BEST SERVED AT THE STATE LEVEL. THE NEVADA EQUAL RIGHTS COMMISSION
GREATLY APPRECIATES THE OPPORTUNITY TO COMMENT ON THE PROPOSED BILL AND
WILL FOLLOW IT'S PROGRESS TO THE FINAL OUTCOME.

SINCERELY

ROBERT ARCHIE, COMMISSION CHAIRMAN

MAILGRAM SERVICE CENTER
MIDDLETOWN, VA. 22645

2-0171810E4 03/25/77 ICS IPMBNGZ CSP ASRB
2164342131 MGM TDBN AKRON OH 445 03-25 11004 EST

REPRESENTATIVE JOHN F SEIBERLING
HOUSE OF REPRESENTATIVES
WASHINGTON DC 20515

DEAR REPRESENTATIVE SEIBERLING
FAIR HOUSING CONTACT SERVICE OF SUMMIT COUNTY OHIO HAS STUDIED THE FAIR
HOUSING AMENDMENTS ACT (HR3504) AND SHOULD LIKE TO COMMUNICATE OUR
THOUGHTS ON IT TO YOU. FIRST WE APPLAUD THE SECTION WHICH RECOGNIZES
THAT VICTIMS OF HOUSING DISCRIMINATION NEED FINANCIAL ASSISTANCE IN
BRINGING SUIT. HOWEVER WE CANNOT ENDORSE THE PROPOSED LOAN FUND FROM
WHICH POTENTIAL PLAINTIFFS WOULD BORROW. THIS MANDATES REPAYMENT (EVEN
WHERE THE CASE IS LOST) YET THE MAJORITY OF DISCRIMINATION VICTIMS ARE
FINANCIALLY UNEQUIPPED TO BEAR SUCH A BURDEN. THUS THEY ARE
DISCRIMINATED AGAINST A SECOND TIME. MOREOVER THIS ASPECT OF THE
PROPOSAL MANDATES A COMPLEX BUREAUCRACY OF INDIVIDUAL LOAN
APPLICATIONS, REVIEWS, REPORTING, AND EVALUATION.

THEREFORE WE SUGGEST THAT LEGAL FUNDS BE MADE AVAILABLE TO ESTABLISHED
LOCAL FAIR HOUSING ADVOCACY AGENCIES AND DEPARTMENTS. FURTHER THESE
ORGANIZATIONS SHOULD BE ABLE TO MAKE CASE BY CASE DECISIONS TO PROVIDE
FUNDS ON A LOAN OR GRANT BASIS.

SECOND WE ARE VERY CONCERNED THAT THE BILL DOES NOT APPEAR TO ADDRESS
CORRECTION OF ADMINISTRATIVE DEFICIENCIES IN HUD; THE INADEQUATE
PERSONNEL AND MONIES TO IMPLEMENT, MONITOR, AND ADMINISTER THE
PROVISIONS OF THE 1968 FAIR HOUSING LAW ALONG WITH THE LARGER POWERS
AND RESPONSIBILITIES WHICH WOULD ACCRUE WITH THE PASSAGE OF HR3504. THE
THREE PERSONS WHO CURRENTLY STAFF THE OHIO EQUAL OPPORTUNITY DIVISION
OF HUD COLUMBUS CANNOT DO AN ADEQUATE JOB NOW; THERE ARE NOT ENOUGH
OHIO FAIR HOUSING GROUPS TO PROMOTE AND ENFORCE THE LAWS; THE MONIES
AVAILABLE TO FUND FAIR HOUSING EFFORTS ARE DESPERATELY INSUFFICIENT.

THEREFORE WE URGENTLY RECOMMEND HR3504 BE EXTENDED TO INCLUDE
ADMINISTRATIVE SUPPORT FOR HUD AND LOCAL ADVOCATES IN ORDER TO ASSURE
THAT THIS AND PREVIOUS FEDERAL FAIR HOUSING LAWS ARE EFFECTIVE AND
ENFORCEABLE.

THIRD WE BELIEVE IT IS CRUCIAL TO LEGISLATE THAT MANDATORY AFFIRMATIVE
MARKETING/ACTION AGREEMENTS MUST BE DEVELOPED AND DEMONSTRATED BY ALL
COMPONENTS OF THE HOUSING DELIVERY SYSTEM (REAL ESTATE, BUILDERS,
DEVELOPERS, MANAGERS, AGENTS, OWNERS, FINANCIAL AND "SECOND PAPER"
INSTITUTIONS). WITHOUT SUCH LEGISLATION, FAIR HOUSING ADVOCACY
CONTINUES TO BATTLE WITH NON-ACCOUNTABILITY, INDIFFERENCE AND
BUCK-PASSING BY THOSE VERY PEOPLE AND ORGANIZATIONS WHICH REINFORCE AND
CREATE HOUSING BIAS.

PAGE 2

OUR TWELVE YEARS OF AGGRESSIVE ACTIVITY IN EQUAL HOUSING OPPORTUNITY
ADVOCACY HAS SHOWN US OUR BEST EFFORTS OUR ONLY GNATS AGAINST THE
ELEPHANT OF INSTITUTIONAL, GOVERNMENT AND INDIVIDUAL DISCRIMINATION.

FINALLY WE WISH TO EXPRESS OUR STRONG SUPPORT OF HR3504 WITH THE
INCLUSION OF OUR MODIFICATIONS, IT IS ONE MORE ESSENTIAL STEP TOWARD
ELIMINATING THE PRACTICE OF HOUSING DISCRIMINATION IN THE U.S.

WE ASK THAT YOU LEND YOUR SUPPORT TO THIS BILL AND MAKE COPIES OF OUR
COMMENTS AVAILABLE TO THE BILLS CO-SPONSORS, THE COMMITTEE AND ANY
OTHER PARTIES WHO WILL HAVE AN IMPACT ON ITS PASSAGE.

PENNY MACCALLA, EXECUTIVE DIRECTOR
FAIR HOUSING CONTACT SERVICE
LARRY JOHNSON, PRESIDENT
FAIR HOUSING CONTACT SERVICE

MEMBERS OHIO FAIR HOUSING CONGRESS

11:01 EST

MGMCOMP MGM



MAIN OFFICE
1100 RAYMOND BOULEVARD
NEWARK N J 07102
(201) 648-2700

PATERSON OFFICE
370 BROADWAY
PATERSON, N J 07501
(201) 345-1415

TRENTON OFFICE
436 EAST STATE STREET
TRENTON N J 08625
(609) 292-4601

CAMDEN OFFICE
530 COOPER STREET
CAMDEN, N J 08102
(609) 757-2850

## State of New Jersey

### DEPARTMENT OF LAW AND PUBLIC SAFETY
### DIVISION ON CIVIL RIGHTS

WILLIAM F HYLAND
ATTORNEY GENERAL

March 29, 1977

VERNON N. POTTER
DIRECTOR

Don Edwards, Chairman
Subcommittee on Civil and
 Constitutional Rights
House of Representatives
Washington, D. C.  20515

Dear Congressman Edwards:

This will acknowledge receipt of your letter
of March 9, 1977, regarding H.R. 3505.

First of all I should like to compliment you
and Congressman Robert F. Drinan for a very fine job.
The amendments you have introduced are long overdue.
One comment on policy aspects of Title II of H.R.
3504; there is no firm provision in Title VIII as there
is in Title VII, whereby a State with comparable laws
becomes a deferral agency.  The vast majority of
housing complaints are handled at the State and local
levels, but without the fiscal support as is provided
under Title VII.

The bill H.R. 3504, is a significant accomplish-
ment and should impact on discriminatory practices
through the proposed operational procedures which will
create much greater organizational efficiency.

Thank you for sharing the amendments with me
and we look forward to the successful passage of H.R. 3504.

Very truly yours,

Vernon N. Potter
Director

VNP:jj
cc. Congressman Rodino
    Congressman Hughes.



**CITY OF PHILADELPHIA**

OFFICE OF URBAN HOMESTEADING
502 City Hall Annex
Philadelphia, Pa., 19107
(215) MU 6-3670

HON. JOSEPH E. COLEMAN
Chairman

AUBREY J. MYERS
Director

JAN E. JAFFE
Asst. Director

March 11, 1977

The Honorable Don Edwards
House of Representatives
Chairman, Judiciary Civil Rights Subcommittee
2240 Rayburn House Office Building
Washington, D.C.   20515

Dear Congressman Edwards:

I am very interested in HR 3504 that you are sponsoring.
I am especially concerned with availability of home hazard
insurance for low and moderate income neighborhoods.  I
would appreciate it if you would send me a copy of the bill
and more importantly, any additional research your staff may
have done on the above issue.

I am happy to read that someone is indicating concern
with this issue that is as important to neighborhood preserva-
tion as redlining by financial institutions.

Sincerely,

Jan Jaffe
Assistant Director

JJ:nd
cc: FILE

551

 **State of Wisconsin** \ DEPARTMENT OF INDUSTRY, LABOR AND HUMAN RELATIONS

March 29, 1977

201 EAST WASHINGTON AVENUE
BOX 2209
MADISON, WISCONSIN 53701

VIRGINIA B. HART
CHAIRMAN

JOHN C. ZINOS
COMMISSIONER

WILLIAM A. JOHNSON
COMMISSIONER

•

STEPHEN J. REILLY
EXECUTIVE SECRETARY

The Honorable Don Edwards
Chairman
Subcommittee on Civil and
  Constitutional Rights
Committee on the Judiciary
House of Representatives
Washington, D. C.  20515

Dear Congressman Edwards:

Thank you for your letter concerning the proposed amendments
to Title VIII of the Civil Rights Act of 1968.  I appreciate
the opportunity to comment on the proposed legislation.

The deficiencies in existing law which you seek to correct
in Title II of H.R. 3504 are long overdue and, if passed,
will provide a dramatic improvement in the existing
enforcement mechanism.  Discrimination in housing has too
often taken a back seat to employment discrimination.

The Wisconsin Fair Housing Act incorporates an administrative
enforcement procedure somewhat similar to that which you have
included in Section 208.  My observations are in the nature of
comments on provisions of Section 208 which you have included.

Our experience indicates the need for incorporating punitive
damages into the enforcement picture in the housing field.
Too often the actual or compensatory damages which can be
proven are too minimal to serve as a deterrent and do not
reimburse the victim for the emotional pain involved.  I would
urge you to resist efforts to remove this provision from the
bill.

Providing the Secretary with options such as whether or not to
defer a matter to state or local agencies or to enforce through
the Justice Department or administrative hearing are valuable.
Because of the variety of factual situations which can arise
the agency charged with administrative responsibility must have
the flexibility offered by such options.

The Honorable Don Edwards
Page two
March 29, 1977

As a final comment I would urge you, either in the act or upon
implementation, to do whatever is possible to expedite processing
of complaints.  The volume of housing discrimination complaints
is small compared to employment discrimination, however, large
backlogs and their attendant delays must be avoided at all
costs.  Invariably delay operates in favor of respondents and
against complainants and is the major roadblock to enforcement
of anti-discrimination laws in this country.

You have my best wishes for success in your efforts to pass
this most commendable legislation.

Sincerely,

Virginia B. Hart

Virginia B. Hart
Chairman

STATE OF MICHIGAN



WILLIAM G. MILLIKEN, Governor

DETROIT OFFICE
State of Michigan Plaza i.
1200 Sixth Avenu-
Detroit, Michigan 482.
Telephone (313) 256-2570

# DEPARTMENT OF CIVIL RIGHTS

Stoddard Building   125 W. Allegan St.
Lansing. Michigan 48933
**RUTH RASMUSSEN, DIRECTOR**

TELEPHONE (517) 373-7634

March 25, 1977

Honorable Don Edwards
Chairman, Subcommittee
 on Civil and
Constitutional Rights
Committee on the Judiciary
House of Representatives
Washington, D.C. 20515

Dear Congressman Edwards:

Attached is a statement on the Fair Housing Amendments of
H.R. 3504 in response to your request to Commissioner Catherine
Blackwell.

If you would like further testimony from this department please
let me know.

Sincerely yours,

Ruth Rasmussen

Ruth Rasmussen
Director



MICHIGAN The Great Lake State



Statement of the Michigan Department of Civil Rights

Prepared for Congressman Don Edwards in Support of H.R. 3504
Civil Rights Amendments Act of 1977
March 25, 1977.

The Michigan Department of Civil Rights strongly supports H.R. 3504, which would revise and strengthen the Civil Rights Act Titles VII of 1964 and VIII of 1968. This statement addresses the provisions of the Fair Housing Amendments of 1977.

This Department has investigated and resolved 1,100 complaints of illegal discrimination in housing since passage of the Michigan Fair Housing Act of 1968. These comments are based on experience gained from our enforcement and preventive activities in the Housing area. The Department believes it is essential to give the Secretary of HUD the power to issue cease and desist orders and promulgate substantive rules and regulations. The Department is supportive of provisions for payment of court costs for persons and organizations who file and win court cases under the Federal Fair Housing Act. The Department supports a method of providing funds for local court action, but suggests that such funds should be in the form of grants to state and local specially-certified fair housing agencies in order to get maximum benefit from such funds with minimum administrative costs at the federal level.

The provision for HUD to use such specially-certified state and local fair housing agencies to make findings would provide an economic way for HUD to benefit from the many years of experience gained by these organizations through effectively handling housing complaints, using accepted administrative methods. However, specific funds must be earmarked in the HUD budget to reimburse states for the costs of investigating and making findings on complaints referred from the Secretary.

Statement of Michigan Department of Civil Rights on H.R. 3504

The following comments are centered on the significant segments of the proposed amendments:

Section
Number
810

814

(1) The section to enlarge HUD's administrative power to include cease and desist orders and to promulgate substantive rules and regulations, would not only maximize HUD's ability for internal resolution of housing complaints, but would strengthen the position of all enforcement agencies in the fair housing field. Giving HUD the same powers found in agencies, such as the Michigan Department of Civil Rights, will enhance public understanding and acceptance of laws regulating housing rights.

One of HUD's limitations, most often cited by the U.S. Commission on Civil Rights, is its lack of cease and desist powers. Its present powers are limited to informal

-2-

Statement of Michigan Department of Civil Rights on H.R. 3504

methods of conference, conciliation, and persuasion to bring about compliance...a mechanism which Congress found to be inadequate for handling employment complaints when it gave and cease and desist powers to the Equal Employment Opportunity Commission in 1972.

The progressive aspect of the new authority presupposes budget support for adequate HUD staff to implement the new enforcement powers and specifically earmarked funds to allow HUD to use the effective administrative skills of specially-certified state and local fair housing agencies to make findings for HUD in housing complaints in their states. Michigan's housing enforcement and preventive activities should benefit from an administratively strengthened HUD office, with parallel cease and desist powers, since HUD's funding support of housing represents a unique and potent control lever by which an enforcement mechanism can be joined to bring about elimination of Housing discrimination. It is our opinion that HUD will be in a better position to withhold funds when it has cease and desist power. This addition to its administrative strength could move HUD into a position of being part of the solution to housing discrimination.

804    (2) Although the U.S. District Court in Southern Ohio ruled on February 13, 1976 in Laufman v. Oakley Building and Loan Co. that redlining is prohibited by Sections 804 and 805 of Title VIII, the defendant argued that if the intent of Congress had been to protect against redlining, it would have spelled it out in clear language.

It is important that Title VIII speak specifically and clearly to location and racial prohibition in mortgage and insurance practices of some lending and insurance institutions because of the recognized effect redlining has upon cities. Such language as contained in the amendments would strengthen the Federal Home Mortgage Disclosure Act of 1975 and anti-redlining legislation pending in Michigan and other states.

804
805
806    (3) Protection for the handicapped is a recognized necessity and has been recently included in fair housing laws in Michigan and other states. The addition of this class of protected persons to the Federal law will ensure that adequate HUD scrutiny is given to ascertain compliance in all areas of housing affecting the handicapped.

803    (4) The amendment permitting exemption of owner-occupied units to single families will bring the Fair Housing Act into near conformity with the Civil Rights Act of 1866 which prohibits racial discrimination in all property transactions. This

-3-

Statement of Michigan Department of Civil Rights on H.R. 3504

will more nearly parallel Michigan's statute which limits exemptions to two-family units. Whatever the limit, four family units are outside of a reasonable concept of "family need" or involvement and clearly represent a business activity.

(5) One of the criticisms of civil rights legal procedures is the extent to which the financial burden of litigation rests upon the aggrieved party. This burden has acted to discourage or prevent victims of housing discrimination from bringing suits.

The amendments' provisions for private parties to bring suit, to have court appointed attorneys, and to recover money damages, equitable and declarative relief, and punitive damages up to $10,000 as well as attorney fees and expert witness costs will make it possible for aggressive private action by persons who suffer housing discrimination. Under these amendments private parties will now have recourse even if HUD, for some reason or another, fails to act.

(6) The rulemaking authority granted by amendments is consistent with the need for administrative resolution of housing discrimination complaints. Such rules and regulations warn potential discriminators of what's expected of them, provide guidelines for those who seek willingly to obey the law, and provide administrative tools for moving firmly and expeditiously against discriminators.

(7) While this department supports the intent of the new Section 818, it has reservations about whether the loan fund aspect, as visualized, would be the best use of these federal funds. We suggest that a loan fund would be costly to administer; require tough action or universal forgiveness of all organization or individuals unable to repay such loans; and provide weak administrators with an "out" when knotty cases are presented. We suggest, instead, that the section be rewritten to provide that such funds be grants and that such grants go to specially-certified state and local agencies to carry out actions to enforce fair housing laws. We believe that these changes will strengthen this section and result in more significant civil actions at the local level to enforce Title VIII.

In summary, the Michigan Department of Civil Rights strongly supports the Fair Housing Amendment Act of 1977 as proposed in H.R. 3504. We are particularly supportive of provisions which will give HUD administrative power to issue cease and desist orders; to promulgate rules



### STATE OF CONNECTICUT
*COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES*
90 WASHINGTON STREET    HARTFORD, CONNECTICUT 06115

TELEPHONE:
AREA CODE 203
566-4895

March 30, 1977          IN REPLY ADDRESS TO:

The Honorable Don Edwards
 Chairman
Subcommittee on Civil & Constitutional
 Rights
Committee on the Judiciary
House of Representatives
Washington, D.C. 20515

Dear Congressman Edwards:

 We apologize for the delay in our comments on your proposed amendments to Title VII and Title VIII (H.R. 3504). As your letter of March 9, 1977 asks for a review specifically of the proposed fair housing provisions, we have limited ourselves to comments on that section.

 The development of <u>enforcement powers for HUD</u> is long overdue. The method of administrative enforcement you suggest should substantially increase HUD's effectiveness. The addition of cease and desist powers is essential to any adequate enforcement-oriented approach to housing discrimination.

 The increase in the ceiling on <u>punitive damages</u> is vital. Such damages, at a level where they have economic meaning are crucial both as a necessary remedy and as a preventive measure or deterrant. The clarification of the availability of money damages for Justice-initiated suits is important and should avoid continuing, time-consuming litigation on this issue.

 We whole-heartedly support the addition of the class of <u>handicapped</u> persons to those already protected by Title VIII. Such an addition is in our own statute and is definitely needed on the federal level.

The Honorable Don Edwards         March 30, 1977
 Chairman                         Page 2
Subcommittee on Civil & Constitutional
 Rights

     The clarification of Sec. 805 coverage of mortgage and
insurance "red-lining" increases the effective reach of Title
VIII to an area clearly at the center of continued patterns of
segregated housing.  While Sec. 805 arguably covers the issue,
this clarification will quell unnecessary litigation with its
possibility of inconsistent judicial interpretation.

     The only caveat we have applies to your proposed Sec (g)
page 42, lines 3-12, H.R. 3504.  We agree that past history
plus current confusion partially caused by the Arlington
Heights decision, necessitates a new approach.  Our concern is
that this proposal, as it is presently worded, might still require
proof that the exclusion of low-income housing was due to an
intent to discriminate based on race, etc.  Will this reach
zoning exclusions based on seemingly neutral factors such as
"square foot of space per occupant," "square foot of lawn per
building?"  These "neutral" factors may have a "rational basis"
which can only be breached by the nearly impossible task of
proving they are subterfuge for intentional discrimination.

     Other than the above, which is more an issue of clarifica-
tion than criticism, we are in support of both the intent and
the content of your bill.

                      Yours very truly,

                    Arthur L. Green
                    Director

ALG:1s



**EQUAL HOUSING OPPORTUNITIES**

# FAIR HOUSING COUNCIL
*of the San Fernando Valley*

6025 SEPULVEDA BOULEVARD / VAN NUYS, CALIFORNIA 91411
Telephone: 781-6940

*Executive Director*
**CELIA ZAGER**

*President*
**BENNIE SLAYTON**
*Vice Presidents*
**MURRAY HELTZER**
**SANDRA PITMAN**
*Secretary*
**CAROLE DORMAN**
*Treasurer*
**WALTER KORNBLUH**

*Counsel*
**MORT VOGEL**
*Fair Housing Congress Representative*
**LORETTA KELLY**
*Minority Liaison/ Ford Foundation*
**KEN KELLY**
*Past President*
**DAVID COWLES**
*Speakers Bureau*
**NED WERTIMER**
*Ways & Means*
**MILTON SCHNEYER**
*Public Relations*
**MARY LIPMAN**
*Membership*
**TONI GELLER**

April 28, 1977

Mr. Don Edwards, Chairman
Constitutional & Civil Rights Sub-Committee
The Judiciary Co-mittee
Washington, D. C.

Dear Mr. Edwards:

It has come to our attention that HR 3504 is pending before your committee and we urge its immediate consideration and passage. We at the Fair Housing Council of the San Fernando Valley have been working with HUD for many years and feel frustrated at the ineffectiveness of enforcement powers currently authorized to HUD. It is essential that the law be strengthened to give HUD the strength and "teeth" it needs.

The United States has, for years, had an operative Civil Rights Act without enforcement and the time has come for the federal government to show that it is serious in its desire to provide equal opportunity, in housing and in all other civil rights.

Our work for over 16 years has been dedicated to the elimination of discrimination in housing, specifically. While we can turn to HUD for guidelines and advice, we should be able to rely on their enforcement ability and powers to assure that the existing laws are upheld and obeyed. Conference, conciliation and persuasion have limited effect on violators. The enforce-ment mechanisms need strengthening.

Again, we urge your swift deliberation and passage of this essential resolution to insure the reality of equal opportun-ities for all citizens.

Sincerely,

*Celia Zager*

Celia Zager
Executive Director



**STATE OF NEW YORK**
**EXECUTIVE DEPARTMENT**
**DIVISION OF HUMAN RIGHTS**
TWO WORLD TRADE CENTER
NEW YORK, NEW YORK 10047

WERNER H. KRAMARSKY
Commissioner

March 22, 1977

Honorable Don Edwards, Chairman
Subcommittee on Civil and Constitutional Rights
House of Representatives
Washington, D.C. 20515

    Re: Your bill, H.R. 3504 of 95th Cong., 1st Session

Dear Congressman Edwards:

    Thank you for your letter of March 9, 1977, with which you forwarded a copy of your above-numbered bill and an excerpt from the Congressional Record for February 17, 1977, with regard thereto. You have requested my comments with request to Title II of the bill, which deals with housing but not with respect to employment opportunity under Title I and this letter will deal briefly with the latter part of the bill only.

    At the outset you are to be commended for making official the name "Fair Housing Act" for the portions of Public Law 90-284 dealing with this subject. It is also consonant with the importance of this problem to confer enforcement powers on the Secretary of HUD with respect to the efforts of that Department to resolve discrimination issues by providing for a formal hearing and a final order directly subject to judicial review in an appellate court, if the Secretary decides to use an administrative complaint. It is understood that after the order of the Secretary becomes final and "unreviewable" not only may enforcement thereof be sought in the courts (through the Attorney General) but that the Secretary of HUD may assess a civil penalty of not more than $1,000 a day for non-compliance. The New York courts have rejected the view that failure to appeal an order makes the terms thereof "unreviewable", if enforcement thereof is sought (see State Division of Human Rights v. Bystricky, 30 N.Y. 2d 322 (1972)). Moreover, there has been difficulty in proof of non-compliance under the New York Law if enforcement of an order is sought (see State Division of Human Rights v. Union Carbide Corp., 35 A.D. 2d 664, 315 N.Y.S. 2d 401 (1970), app. dis. 28 N.Y. 2d 555 (1971)). Your bill appears to meet this issue by providing for court enforcement at the district level of an order or the penalty assessed by the Secretary.

The original Law Against Discrimination of New York (now the Human
Rights Law) attempted to preclude a party however aggrieved from
repetitious proceedings to vindicate his rights. An election of
remedies must be made between administrative remedies under the Human
Rights Law and court actions with respect to the same "grievance" and
the filing of a complaint under the Human Rights Law constitutes a bar
to a court action unless the complaint is dismissed for "administrative
convenience". As a result of the Federal system, a Federal and a
State remedy may co-exist under the two sets of jurisdiction, but it
might be preferred that after a deferral to the State that the matter be
not completely retried. Your bill only provides that the Secretary of
HUD is to accord "such weight as appropriate" to a State of local
ruling in a case in making his determination of "reasonable cause" under
§810 (b) (1) (42 U.S.C.A. §3610 as amended). The employment provisions
after considerable experience were amended in 1972 to require
"substantial weight" to such rulings (42 U.S.C.A. §2000e-5 (b)).
Multiple proceedings appear to be envisaged by your bill in the Federal
area although there may be a delay in actions by private parties under
§812 (a), i.e. "until the official proceedings have been concluded".
Since you do not permit the person who files a charge to control the
proceeding thereon (i.e. "an aggrieved person may be allowed to
intervene") this opportunity may be needed to press the view of the
aggrieved person, but New York State permits the complainant to use his
own attorney, if he wishes and to appeal matters which the Commissioner
has not stressed (see Matter of Mize v. City of Buffalo, Police
Benevolent Assn., 33 N.Y. 2d 53 (1973)).

While you may, and presumably will, develop important facts in
your proposed hearings, a few technical points might be called to your
attention. The one-year time limitation on filing complaints has been
found adequate in New York and the three years provided in §810 (a) (1)
and §812 (a) of your bill (bill section 208) may permit the filing of
stale complaints, which may be no less so because the area is housing,
since records must be kept by most employers but some persons renting
small dwellings may have virtually none. With reference to insurance
(which is not covered by the Human Rights Law, Executive Law Article 15
but in the Insurance Law, §40, in New York State) it is uncertain
whether "handicap" is meant to be included but the omission of
"religion" (called "creed" in New York) is not insignificant.
Religious organizations may have a broader exemption under the proposed
bill than under New York Law generally, Human Rights Law, §296.11 and
Federal law, §807 (42 U.S.C.A. §3607) not amended by your bill, but
there have been a substantial number of housing complaints based on
alleged discrimination because of "creed". This comment may also apply
to the omission of this term from the additional new subsection (g) on
land use in your bill. Again, you will wish to consider the

difficulty in handling cases involving "handicap" under housing law (see Orlando v. NYC Housing Authority, GCDH-35640-74, attached, appeal pending Appeal No. 3331) and provide adequate funding.

Please advise me of the outcome of your hearings, as it will be of much interest.

Yours very truly,

WERNER H. KRAMARSKY
Commissioner

# City of Palo Alto

250 Hamilton Ave.
CALIFORNIA
94301

OFFICE OF THE MAYOR
(415) 329-2384

June 27, 1978

The Honorable Don Edwards
House Office Building
Washington, D.C.  20510

Dear Congressman Edwards:

The City of Palo Alto supports the concepts of extending the protection of federal
fair housing law and of expanding the effectiveness of federal enforcement of fair
housing laws and regulations.  HR 3504 is designed to foster accomplishment of
those concepts.  The City of Palo Alto is, therefore, supportive of the legislation.

A recent study of housing discrimination practiced by owners and managers of rental
housing in the City of Palo Alto indicates that a real problem of racial dis-
crimination persists.  The City of Palo Alto contracted for the study with Fair
Housing Incorporated which is composed of representatives of Midpeninsula Citizens
for Fair Housing, Tri-County Apartment Association, the Palo Alto Board of Realtors,
The National Association for the Advancement of Colored People, and the Human
Relations Commission.  The study concludes that in 27% of the "audits" of rental
housing there were clear differences in treatment in favor of the white auditors
over the black auditors and that these differences suggest probable discrimination.
In addition, 41% of the black/white "audits" of rented single family homes (in-
cluding townhouses and condominiums) showed probable discriminatory treatment.

According to the report, most minority auditors were treated politely and were
unaware at the time that they were offered different information or different
terms and conditions than their white counterparts.  The discrimination that was
observed was very subtle and only detectable when the experiences of matched
minority and white auditors were compared.

HR 3504 addresses many of the problems identified by the study.  Extending Title
VIII's fair housing protection to all single family housing would make a significant
difference in the housing opportunities available to minorities.  Expanding HUD's
enforcement powers to permit HUD to initiate administrative complaints on the basis
of an audit without an injured homeseeker will improve efforts to confront the
subtlety of current discrimination practices.  Establishment of a fair housing loan

The Honorable Don Edwards
June 27, 1978
Page 2

fund and a fund to make grants to referral agencies will increase the availability
of effective local fair housing investigation and litigation services for those
who suspect they have encountered illegal housing practices.

For the above reasons, I encourage passage of HR 3504 as an improvement in federal
and local capabilities to achieve equal opportunity in housing.

Sincerely,

FRANCES HALLAM BRENNER
Vice Mayor

cc:  Palo Alto City Council



*The Commonwealth of Massachusetts*
*Executive Office of Communities and Development*
*100 Cambridge Street — Room 1404*
*Boston, Massachusetts 02102*

**MICHAEL S. DUKAKIS**
GOVERNOR

**WILLIAM G. FLYNN**
SECRETARY

August 7, 1978

727-7765

The Honorable Robert F. Drinan
2452 Rayburn House   Office Building
Washington, D.C. 20515

Dear Congressman Drinan:

I have read with great interest your comments on the Edwards-Drinan bill (H.R. 3504) in the April issue of "HUD Challenge." I strongly favor the provisions of the bill that revise and strengthen Title VIII of the Civil Rights Act of 1968.

Massachusetts may well be proud of the fact that it has in some respects anticipated some of the reforms incorporated in H.R. 3504.

With respect to handicapped persons, our statutes have provided that they receive priority in placement in no less than five percent of the low income elderly units initiated after January 1, 1971. (Mass. Gen. Laws c. 121B, s. 40(f)). By St. 1974, c. 689, our legislature created a Bureau of Housing for the Handicapped, within the Department of Community Affairs, to coordinate all handicapped housing programs, and in addition, provided for state guarantee for bonding to finance community residences cooperative apartments, congregate housing, and modifications to existing public housing to accomodate the elderly.

Of particular interest to me is your comment with respect to section 206 (c) of the proposed Edwards-Drinan bill, which is directed at suburban jurisdictions which have, for many years, employed land use controls to exclude lower-income persons from their borders. As you know, Chapter 774 was enacted by our legislature in 1969, almost ten years ago, to meet that very problem. My particular interest derives from the fact that the operations of the "774" program – the so-called "Anti-Snob Zoning Law", is under the supervision of this department.

It is significant that in the intervening years, despite the tremendous interest in our statute, particularly in the legal academic community, no other state has enacted a similar statute. Instead, victims of housing discrimination have been left to pursue constitutional remedies through the Federal Courts, with inconclusive and conflicting results. The Edwards-Drinan bill is, to my knowledge, the first attempt at a legislative solution since the enactment of our program in 1969. Since this is taking place at the Congressional level, I find it particularly encouraging.

The Honorable Robert F. Drinan          - 2 -

The thrust of H.R. 3504 is in some respects different from Chapter 774. The federal bill handles suburban housing discrimination from the civil rights point of view, and assigns penalties. Chapter 774 treats it more from the housing point of view and provides a two-pronged solution:

a) a one-shot permit system for applying for the comprehensive permit to eliminate the intentional delays inherent in requiring separate sign-offs from every local board;

b) a provision for over-riding local zoning, building, subdivision, lot size, etc. ordinances and requirements which are restrictive, together with an independent state appeals board to overrule local decisions which do not comply with the statute.

While the program has not fulfilled all the expectations of its earlier advocates, the results have more than justified its existence. For brevity's sake, I discuss only a few aspects of the program.

The earlier cases showed little change in local opposition. Of the first forty cases to be appealed to the Housing Appeals Committee, local boards had denied a comprehensive permit in thirty-two cases, and allowed the permit, with conditions claimed by the appellant to be uneconomic, in eight cases.

In the thirty-two denials, the Housing Appeals Committee upheld the denial in two cases, and overruled the local boards and ordered permits in thirty. In the eight cases where permits were granted with conditions, the Housing Appeals Committee upheld the local boards in all eight cases.

In practically all instances where local boards were reversed by the Housing Appeals Committee, appeals were taken to the Superior Court, the Appeals Court, the Supreme Judicial Court, and even to the U.S. Supreme Court. In all instances the decisions of the Housing Appeals Committee were upheld.

Faced with this record, local boards in more and more instances began to grant comprehensive permits with conditions, which insured a measure of lcoal control, but still permitted the housing to go forward.

The general adversary climate softened. Increasingly, the Housing Appeals Committee was able to use its good offices to bring the parties to agreement by stipulation. Granting permits at the local level, or by stipulation before the Housing Appeals Committee, meant an end to court appeals and the beginning of construction.

Probably the most important aspect of Chapter 774 is not the fact that it is used, but the fact that it is there facilitates the negotiating process.

At the present time, there are several thousands of units built and either occupied or in the planning stage, as a result of comprehensive permits granted under the "774" program. While the program is far from popular with local officials (or with many members of the state legislature), it has come a long way in public acceptance from the hatred with which it was first greeted.

The Honorable Robert F. Drinan          - 3 -

The number of pending applications at any particular period is almost directly a function of the varying availability of subsidy money. It is also a function of the experience and skill of the developer.

A particularly successful developer in the use of this program is the Planning Office for Urban Affairs., the low-income housing arm of the Boston Catholic Archdiocese. In four instances - Beverly, Lexington, Scituate and Andover, they sought comprehensive permits to erect low income housing on the unused portion of cemetaries. In each case, the local board denied the permit, in each case the denial was reversed by the Housing Appeals Committee. Beverly and Lexington were appealed by the towns to the Superior Court, Andover up to the Appeals Court, and Scituate to the U.S. Supreme Court.

As previously indicated, the Housing Appeals Committee was upheld in every appeal. At the present time, beautiful developments are built and occupied in Beverly (104 family units), and Lexington (16 family units). Scituate (40 family units) and Andover (230 family units) are due shortly to go into construction.

A great deal of the success of the program has depended on its administration. The staute mandates that the Housing Appeals Committee conduct adjudicatory hearings. The Committee strives to maintain an even handed judicial, rather than political approach. Respect for the Committee constantly grows.

I trust you will find this brief description of the workings of our Chapter 774 program helpful in your efforts to break down suburban hostility to low income housing.

With kindest personal regards,

                                        Sincerely yours,

                                        /Bill

                                        WILLIAM G. FLYNN
                                        SECRETARY

WGF/kmc



*5*

# FAIR HOUSING CONGRESS
## of Southern California

**4034 BUCKINGHAM ROAD, SUITE 212, LOS ANGELES, CALIFORNIA 90008 · (213) 299-4424**

March 17, 1978

**PRESIDENT**
*David W. Cowles*

**VICE PRESIDENT**
*Frances M. Greene*

**SECRETARY**
*Jerome S. Moore*

**TREASURER**
*Floyd Grant*

**EXECUTIVE DIRECTOR**
*Lois Moss*

**BOARD OF DIRECTORS**

*Crenshaw Neighbors
Hollywood-Wilshire
Fair Housing Council
Orange County
Fair Housing Council
San Fernando Valley
South Bay
Fair Housing Council
Southeast Cities
Fair Housing Council
W. San Gabriel Valley
Fair Housing Council
Westside
Fair Housing Council*

The Honorable Peter S. Rodino, Chairman
Committee on the Judiciary,
 Subcommittee on Civil and Constitutional Rights
House Office Building
Washington, D. C. 20515

Dear Mr. Rodino:

The Fair Housing Congress of Southern California is an umbrella
organization representing all fair housing member organizations
in Southern California.  As such, we have worked cooperatively
with state and federal agencies mandated to administer the laws
protecting equal opportunity in housing.

For years, we have agonized over the ambiguities in the laws;
the too numerous categories of exempt housing accommodations; the
inadequate enforcement powers; the feeble support given to the E.H.O./
Fair Housing Divisions of the Department of Housing and Urban Develop-
ment; the small penalties paid by the few who were caught, which did
little to discourage others from flouting the law; the peculiar
emphasis on voluntary compliance.

We have seen some improvements in California's administrative remedy;
e.g., the state's Fair Housing law now covers all housing except for
one room offered for rent in an owner-occupied home.  But, it has
been almost ten years since the federal Fair Housing Law went into
effect and, except for the ban on discriminatory advertising (1972)
and the tardy recognition of sex discrimination as a problem (1974),
no substantive revisions have come about.

It is most heartening to read the fair housing provisions of H.R. 3504,
introduced by Mr. Edwards and Mr. Drinan, and the comments to the
committee by Secretary Harris and Assistant Attorney General, Drew S.
Days III.  We agree and support most of the points made in their testi-
mony; because I am not a lawyer, I cannot presume to argue the question

33-264  1463



# FAIR HOUSING CONGRESS
## of Southern California

4034 BUCKINGHAM ROAD, SUITE 212, LOS ANGELES, CALIFORNIA 90008 · (213) 299-4424

**EQUAL HOUSING OPPORTUNITIES**

March 17, 1978                                                    Page 2

raised over the constitutionality of monetary damages awarded to complainants by an administrative hearing officer.  It is to be hoped, however, that at least some financial restitution to complainants will be permitted, and that the penalty to those who violate the law will remain at the proposed amount of $10,000.

It is our hope that this important legislation is not weakened; we urge the Committee, respectfully, to accept H.R. 3504 in its present form.

Very truly yours,

*Lois Moss*

Lois Moss
Executive Director

LM:jb

*Serving Redwood City through Sunnyvale*



## Midpeninsula Citizens for Fair Housing

457 KINGSLEY AVENUE
(415) 327-1718          PALO ALTO, CA 94301

May 30, 1978

Congressman Don Edwards
1625 The Alameda
Suite 709
San Jose, California  95126

Dear Congressman Edwards,

Midpeninsula Citizens for Fair Housing enthusiastically supports
HR 3504 because it would do more than any measure considered in the
last ten years to make equal housing opportunity a reality in this
country.  The 1968 Civil Rights Act was passed because some people
had a dream of making housing available on an equal basis.  Unfor-
tunately, time and experience have shown that the 1968 law has given
us little more than a national policy, while the reality of unequal
treatment has continued to haunt many Americans.  Passage of HR 3504
would clarify and expand existing fair housing law and provide HUD
with realistic enforcement powers for combatting violations.

We have given careful consideration to the bill's many provisions
and are very impressed with its basic thrust.  However, in light
of our long experience in the field of fair housing we would like
to recommend a number of changes which are intended to preserve
the bill's strength while meeting some of the concerns expressed
by HUD Secretary Harris at the Subcommittee on Civil and Constitu-
tional Rights hearing on February 2.  We recommend the following
amendments:

- The term "handicapped" be more specifically defined as
  "physically handicapped" before adding it to the class of
  people protected by Title VIII.

- Harassment should be added to the list of prohibited prac-
  tices.

- Instead of authorizing an administrative hearing officer
  to award damages payable to the aggrieved party, allow
  civil penalties to be assessed, payable to the government
  as HUD suggests.  In addition, language should be adopted
  which would allow complainants to receive compensation for
  damages by taking a claim to court <u>after</u> an administrative

-2-

hearing officer has made a determination that illegal discrimination has occurred. With this process, the court would not have to consider whether or not discrimination occurred (unless an appeal of the administrative hearing officer's decision was filed--say within ninety days), but only whether or not to award damages and, if so, what amount.

● Rather than prohibiting local governments from <u>excluding</u> "low or moderate income housing because of the eligibility of such housing for governmental assistance," insert language requiring communities to include a "fair share" of such housing for persons of low and moderate income, as suggested by Secretary Harris. (Ms. Harris objected to the word "exclude" because its meaning would have to be determined by the courts, but similar problems could occur with the "fair share" concept unless a carefully constructed operational definition is included.).

● Add religion, sex, and physical handicap to the protected categories listed in the prohibition against discrimination in insurance, Sec. 206(f).

● Finally, we recognize the importance of the fair housing loan fund, particularly in areas of the country that do not have strong, functioning fair housing groups with trained attorneys willing to litigate fair housing cases on a contingency basis. However, we also understand HUD's resistance to administering this fund directly and so propose that the fund be administered by an agency other than HUD --possibly by fair housing organizations, local human relations commissions or by another federal department with local or regional offices.

We offer these recommended changes with a constructive spirit and hope that we can be of assistance in assuring the passage of this vital fair housing legislation. We have contacted the cities in our service area and those corporations with whom we have fair housing contracts and requested their active support of HR 3504. A copy of this letter is enclosed for your information. Please let us know your response to our suggestions and any additional ways in which we can advocate for the passage of your bill.

Sincerely,

Carol Yanofsky
President

*Serving Redwood City through Sunnyvale*



## Midpeninsula Citizens for Fair Housing

**457 KINGSLEY AVENUE**

(415) 327-1718          **PALO ALTO, CA 94301**

July 27, 1978

Congressman Don Edwards
Committee on the Judiciary
2329 Rayburn Building
Washington, D.C.  20515

Dear Congressman Edwards,

I am writing in response to your June 22 letter questioning MCFH's recommendation to limit the language in HR 3504 to cover only <u>physically</u> handicapped persons.

Our Board of Directors discussed the issue of extending federal fair housing protection to the handicapped at a recent meeting. Several members felt that such protection should be limited to the physically handicapped for reasons of political expediency, while others stated that they could not justify extending the protection to mentally handicapped people because some of these people might have disabilities such as alcoholism or mental retardation--which could limit their ability to be responsible tenants and neighbors.

It is for these reasons that we prefer that the needs of the mentally and perhaps socially handicapped be addressed in separate legislation.

I hope this response adequately explains the basis for our previous recommendation.  MCFH is continuing to explore ways we can promote the passage of HR 3504 and we would be grateful for any direction from your office.

Sincerely,

Carol Yanofsky
President

CY:ma

# IV. Organizations Relating to Rights of Handicapped



**ARLINGTON COUNTY, VIRGINIA**
FAIR HOUSING BOARD
2100 · 14TH STREET, NORTH, ROOM 200
ARLINGTON, VIRGINIA 22201
558-2946



JOAN LINDERMAN
EXECUTIVE DIRECTOR



LUCY DENNEY
CHAIRMAN
WILLIAM ALLEN
~~JOYCE KNIGHT~~
ROBERT D. McGREGOR, JR.
ZANE MASON
JOHN PHOENIX
BOBBY STAFFORD
Paula Johnson

June 14, 1977

The Honorable Don Edwards, Chairman
Subcommittee on Civil and Constitutional Rights
Committee on the Judiciary
Congress of the United States
Washington, D.C.   20515

Dear Congressman Edwards:

I am writing you in answer to your request of May 16, 1977 for information
about Section 63.1-171.4 of the Virginia law which prohibits discrimination in
housing against the blind, visually handicapped or physically disabled persons
(hereinafter referred to as the State "handicapped" law). We have contacted
all members of our Housing Services staff who may have had cases involving the
rental of apartments to blind or physically disabled persons. We have found
that, in the past five years, we have handled about twelve such cases.
Unfortunately, because of the volume of tenant-landlord cases our office handles,
we do not keep written records for every one received. Because of this the
following three cases are the only ones the staff remembers in detail.

The first case involved a blind person wishing to rent a garden-type apartment.
The resident manager did not wish to rent to a blind person because he felt such
a person could not manage by himself. Explaining the State handicapped law to him,
we were able to convince the resident manager to rent to the blind applicant.

The second case involved a call from a resident manager wanting to know if she
must accept an blind applicant who had a dog not trained as a seeing-eye dog but
used in a similar way by the applicant. The dog was used to protect and to warn
the blind man of danger and had been his constant companion for some time. The
landlord did not accept pets but would consider this animal if the law could define
it as a seeing-eye dog. We felt that the term "guide dog" in the handicapped law
covered the dog in question. The resident manager seemed sure that the landlord
would accept the man and his dog on this basis.

The Honorable Don Edwards
June 14, 1977
Page    2


The third case involved an individual 85 years of age who was blind and
disabled.  The landlord wished to evict him, claiming he presented a safety
problem for other tenants.  Both his social worker and his doctor stated that
he was perfectly capable of living in his own apartment alone.  When the landlord
was informed of the handicapped law and these facts, he rescinded the eviction
and the tenant was allowed to remain in his apartment.

The State handicapped law has been very helpful in convincing landlords
and/or resident managers to rent to the handicapped in cases such as these.  When
landlords are informed of the law, we have found that they have complied without
the need for a long and complicated enforcement procedure.

I am hopeful that this information will be of use to your Subcommittee on
Civil and Constitutional Rights.  If I can be of further assistance, please do
not hesitate to contact me.

Sincerely yours,

Joan L. Linderman
Executive Director

JLL:rca

 State of Wisconsin \ COUNCIL ON DEVELOPMENTAL DISABILITIES

ROOM 112C:
1 WEST WILSON STREET
MADISON, WISCONSIN 53?0.

September 1, 1977

U.S. Represenative Don Edwards
2329 Rayburn House Office Bldg.
Independence Avenue and South Capitol St.
Washington, D.C. 20515

Dear Representative Edwards

The Wisconsin Council on Developmental Disabilities is a twelve-member Council
appointed by the Governor with a dual mandate in federal and state law to
develop, monitor, and evaluate a comprehensive statewide plan for services to
developmentally disabled persons.

Equally important are its mandates to serve as an advocate for persons with
developmental disabilities.

The Council, at its August 25, 1977 meeting, voted its strong support for H.R.
3504, introduced by you, which would amend Title VIII of the 1968 Civil Rights
Act to make it unlawful to discriminate against persons with disabilities in the
sale, rental, or financing of private housing.

The Council believed this measure will significantly reinforce the goals of the
least restrictive environment.

Sincerely

June M. Dobbs, M.D., M.P.H.
Chairperson

cc: Sen. Gaylord Nelson                    Rep. Heary Reuss
    221 Russell Senate Office Bldg.        2413 Rayburn House Office Bldg.

    Sen. William Proxmire                  Rep. William A. Steiger
    5241 Dirksen Senate Office Bldg.       1111 Longworth House Office Bldg.

    Rep. Les Aspin                         Rep. David R. Obey
    439 Cannon House Office Bldg.          2349 Rayburn House Office Bldg.

    Rep. Robert W. Kastenmeier             Rep. Robert J. Cornell
    2232 Rayburn House Office Bldg.        1512 Longworth House Office Bldg.

    Rep. Alvin Baldus                      Rep. Robert W. Kasten, Jr.
    1317 Longworth House Office Bldg.      119 Cannon House Office Bldg.

    Rep. Clement J. Zablocki
    2183 Rayburn House Office Bldg.



STATE OF CONNECTICUT

*COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES*

90 WASHINGTON STREET     HARTFORD, CONNECTICUT 06115

TELEPHONE
AREA CODE 203
566-4895

June 3, 1977

IN REPLY ADDRESS TO

The Honorable Don Edwards
 Chairman
Subcommittee on Civil and
 Constitutional Rights
Committee on the Judiciary
House of Representatives
Washington, D.C. 20515

Re: Comment on H.R. Bill 3505:
    Equal Employment Opportunities
    Reorganization Act of 1977

Dear Congressman Edwards:

This correspondence is in response to the April 20, 1977 request by your Committee for information concerning this Commission's experience enforcing 53-35 of the Connecticut General Statutes.

The Commission's experience has been that several complaints have been filed, but there have been no hearing examiners or court decisions. Therefore, our experience with this Statute has been based primarily on administrative determination. In that context, the defenses asserted have been the ones generally asserted in discrimination cases. The Commission had not encountered any unique or novel defenses which are germane to physical disability cases. But in analyzing these defenses, it is the Commission's belief that the way they are applied they may have a disparate impact on physically handicapped individuals. The Commission's belief is supported by government studies which show that the government subsistence level for these individuals is either at the poverty level or below. The Commission believes that this impact can be eradicated, and legislation of this nature will solve this problem. Therefore, the Commission recommends that the proposed legislation include some protection for those physically handicapped persons with limited income.

As mentioned in the second paragraph of this letter, the Commission has no hearing examiner or judicial decisions in this area. Therefore, the administrative interpretation given to the language "provide a higher degree of care", has been that there is no Affirm-

The Honorable Don Edwards                    June 3, 1977
 Chairman                                    Page 2
Subcommittee on Civil and Const. Rts.

ative duty of the landlord to modify or allow such modification
even if the tenants pays the bill.  The Commission's role in this
area has been to refer this issue to the appropriate advocate
group organizations.  The Commission has attempted in the past
and will continue in the future to have this provision removed
from the Statute.  The Commission hopes that the federal legis-
lation will not contain such an unfair provision.

    The scope attributed to physical disability in Connecticut
has been a broad approach rather than a narrow one.  Our legis-
lature has defined physical disability as "an individual is
physically disabled if he has any chronic physical handicap,
infirmity or impairment, whether congenital or resulting from
bodily injury, organic processes or changes or from illness, in-
cluding, but not limited to, epilepsy, deafness or hearing impair-
ment or reliance on a wheelchair or other remedial appliance or
device.  Conn. Gen. Stat. § 1-1(f).  In addition, the Statute
allows the trier to consider other factors when making his/her
decision.  The Commission's experience with this type of definition
has proven to be quite successful and expeditious.  The Commission
would hope that a similar or the same interpretation could be
incorporated into your legislation with the exception of the word
"Chronic".

    Finally, the Commission believes that the interpretations
given in the H.E.W. Regulations relating to physical handicapped
individuals should provide assistance, and clarification to your
committee's bill.

    The Commission hopes that these comments will be of assistance
to your bill.  In addition, we fully support both the intent and
content of the bill.

                              Sincerely yours,

                              Arthur L. Green,
                              Director

ALG:ls



UNITED CEREBRAL PALSY ASSOCIATIONS, INC. • 66 EAST 34th STREET • NEW YORK, NEW YORK 10016

(212) 889-6655

REPLY TO:

UCPA Governmental Activities Office
Chester Arthur Building
Suite 141
425 I Street N.W.                                                    June 24, 1977
Washington, D. C. 20001
   (202) 638-6169

Honorable Don Edwards, Chairman
House Subcommittee on Civil and
 Constitutional Rights
2137 Rayburn House Office Building
Washington, D.C.  20515

Dear Representative Edwards:

On April 28, 1977, United Cerebral Palsy Associations, Inc. wrote you to
support H.R. 3504, a bill to assist disabled persons to obtain adequate private
housing suitable to their needs.  At that time, we stated we would provide more
specific remarks at a later time.  This letter provides this specificity.

The Building Research Advisory Board of the National Academy of Science,
2101 Constitution Avenue, Washington, D.C. 20418 has discussed some of the aspects
of housing impacted on by your bill.  I suggest you write them.  They maintain that
basic accessibility of one story or elevator serviced buildings requires only mar-
ginal costs; however, basic accessibility of certain housing types such as townhouses
and split level houses are determined to be economically infeasible because of the
narrow profit margin permitted.  Though our goal is a totally accessible environment,
we believe that best results can be achieved by not requiring those types of housing
which by nature are economically infeasible to be accessible.  A more realistic approach
would be to require a proportion of all housing in a community to be accessible; this
should not be met by the development of segregated projects for the disabled but by
requiring all building types which can be made accessible at little additional cost
to be accessible.

Given the local zoning authority roles and responsibilities, incentives or
penalties should be directed at governmental units which exercise inappropriate re-
strictions on housing for persons with disabilities rather than the private sector per
se.  The mix of housing types in any community is a planning responsibility of that
community; the role of incentives, rewards, and penalties seems feasible here.

LEONARD H. GOLDENSON     JACK HAUSMAN     GEORGE J. SCHWEIZER, JR., Esq.     WARREN F. BEER     WILLIAM BERENBERG, M.D.     EARL H. CUNERD
CHAIRMAN OF THE BOARD     VICE CHAIRMAN     VICE CHAIRMAN     PRESIDENT     VICE PRESIDENT     EXECUTIVE DIRECTOR
                                                                                MEDICAL AFFAIRS

Honorable Don Edwards
Page 2


        Use of the tax authority, as demonstrated by the "Tax Reform Act of 1976"
(P.L. 94-455) which allows tax deductions for the cost of removing architectural
and transportation barriers for the disabled are reasonable approaches.  These
reductions could take the form of a limited or reduced property tax or a capital
gains reduction income tax.  There are other creative ways to insure such incentives.
Additionally, an interest subsidy at some appropriate fraction of a percentage on
capitalization seems attractive.

        Regarding the definition of disability, we would refer you to the definition con-
tained in the "Housing and Community Development Act of 1974" (P.L. 93-383) as appro-
priate; this definition emphasizes a disability "expected to be of long-continued and
indefinite duration", a disability which "substantially impedes" one's ability to live
independently, and a disability of a nature that functional ability "could be improved
by more suitable housing conditions."  We recommend a functional approach to the de-
finition which avoids laundry listing various disability categories.

        We appreciate your interest and involvement in this issue and we hope our comments
are helpful.

                                        Sincerely,

                                        E. Clarke Ross

                                        E. Clarke Ross
                                        Director
                                        UCPA Governmental Activities Office

ECR/er



March 22, 1977


Honorable Don Edwards
Chairman
Subcommittee on Civil and
  Constitutional Rights
Committee on the Judiciary
House of Representatives
Washington, D.C. 20515

Dear Chairman Edwards:

I am writing in response to your request for our comments on H.R.
3504, the Bill amending Title VII of the Civil Rights Act of 1964
and Title VIII of the Civil Rights Act of 1968.  These brief com-
ments are submitted to indicate our support in principle of those
aspects of the legislation pertaining to handicapped persons; we
would appreciate the opportunity to make more detailed comments
later as the legislation proceeds through Congress.  We would
further appreciate the opportunity to testify at any hearings
conducted on these provisions by the Subcommittee.

The inclusion of handicapped persons within the coverage of exist-
ing civil rights legislation is important for several reasons.
First, in a symbolic sense, the legislation enlarges the federal
government's established commitment to equal rights to include
greater legal rights for handicapped persons.  Second, the symbolic
aspect has a concrete result in that the legislation brings to
bear upon the needs of handicapped people existing enforcement
powers of the federal government (including the Justice Department).
With the federal government as a more active and powerful advocate
for handicapped people, the specific benefits to handicapped
people will increase.  The third reason that the legislation
deserves support is that it addresses the problem previously
raised in earlier congressional efforts to expand the coverage
of the Civil Rights Act - the difficulties with the operation of
the EEOC and the fear that, if EEOC had jurisdiction over employ-
ment discrimination against handicapped persons, the statutory
rights would not be enforced effectively.  The proposed

**The National Center for Law and the Handicapped, Inc.**
1235 North Eddy Street, South Bend, Indiana 46617 • Phone (219) 288-4751

Co-Sponsors

| American Bar Association/ Family Law Section | Council for the Retarded of St. Joseph County, Inc.  (Indiana) | National Association for Retarded Citizens | University of Notre Dame/ Notre Dame Law School |

Board of Directors

H. Gilbert Johnson        Lawrence A. Kane, Jr., LL.B.      Dennis E. Haggerty, LL.B.      Ervin A. Derda
President                 Vice President                   Secretary                      Treasurer
Curtis Brewer, J.D.    Richard Cleary    John Durant Cooke    Effie Ellis, M.D.    Philip J. Faccenda, J.D.
Joseph Goldstein, LL.B., Ph.D.    Tom Joe    Robert Kugel, M.D.    David T. Link, J.D.    Brian M. McCann, Ph.D.

Honorable Don Edwards       - Page 2 -         March 22, 1977


reorganization of EEOC is an attempt to meet that concern.

Finally, and perhaps most importantly, the legislation deserves
support because it expands the substantive legal rights of handi-
capped persons. The legislation reaches deeply into the private
sector of American society. Existing federal legislation pertain-
ing to equal rights for handicapped persons applies primarily to
such limited areas as federally-assisted activities (§504 of the
Rehabilitation Act of 1973, 29 U.S.C. §794, prohibits discrimina-
tion against otherwise qualified handicapped persons in federally-
assisted activities); the obligation of federal contractors holding
contracts in excess of $2500 to employ and advance qualified handi-
capped workers, imposed by §503 of the Rehabilitation Act, 29 U.S.C.
§793; and the obligation imposed on the Civil Service Commission to
develop policies of affirmative action in the hiring, placement,
and advancement of handicapped persons in federal departments and
agencies (§501 of the Rehabilitation Act, 29 U.S.C. §791). While
some state legislation could be the basis for preventing discrimina-
tion against private employers, such laws are just beginning to be
used. The proposed amendment to Title VII would be essential in
ending employment discrimination in areas not now effectively
regulated.

There are questions raised by the proposed legislation which will
deserve more extensive comment. Among these are whether the broad
definition of "handicap" might result in employers' being able to
hire minimally handicapped workers to meet their responsibility
under the law, with the result of exclusion of more severely handi-
capped persons. Additionally, the powers given to the EEOC to
develop substantive standards for compliance with the equal oppor-
tunity mandate should be examined in light of the experiences of
such agencies as the Department of Labor in implementing §503 and
of the Department of Health, Education and Welfare in implementing
§504. The effort to expand equal rights for handicapped persons in
employment and housing should be studied in light of the developing
federal and state law pertaining to education, employment, trans-
portation, and barrier-free environment. Additionally, the legis-
lative history of the legislation should be written so as to clarify
the intent of Congress for vigorous government and private enforce-
ment of the legislation. There are other points we wish to raise
and present to the Subcommittee after more extensive study.

The Title VIII legislation deserves support in principle because
discrimination in housing is a serious problem faced by handicapped
persons. At hearings conducted by the Architectural and Trans-
portation Barriers Compliance Board in 1975 at Chicago, handicapped
persons expressed their desires to live in integrated settings
and to participate in the life of their communities. They want
freedom of choice in life styles, and availability of housing is

Honorable Don Edwards     - Page 3 -       March 22, 1977

essential to achievement of that goal. Too often the housing needs
of disabled people are viewed in terms of nursing homes, high-rise
projects and apartment living, but not in terms of single dwelling
units. Disabled people want both the privacy and the proximity to
family and friends which a single dwelling unit can provide.
Architectural and Transportation Barriers Compliance Board, <u>Freedom
of Choice: Report to the President and Congress on Housing Needs of
Handicapped Individuals</u> (1975).

The proposed legislation's prohibitions of discrimination in the
sale and rental of housing, the financing of housing and the pro-
vision of brokerage services would be a significant improvement
in existing law for handicapped persons. While some existing federal
legislation (such as §504) may address <u>some</u> housing problems of
disabled persons, there are needs, similar to those expressed above
with respect to Title VII, for aggressive federal enforcement of
such rights. The proposed legislation enlarges the substance of
rights of handicapped persons, although some state legislation may
arguably have applicability to some problems in housing. We would
like to comment further on this provision of the proposed legislation
in the future. While the problem will never be solved until archi-
tectural barriers are eliminated in the construction of housing
units, this legislation will be significant in making housing
available to handicapped persons. The Subcommittee should consider
working with the Architectural and Transportation Barriers Compliance
Board to benefit from that agency's experience in implementation of
barrier-free design laws.

We commend you and Congressman Drinan for sponsoring this legis-
lation, and we will appreciate the opportunity to take part in
hearings and in further work on the development of the legislation.

Sincerely,

Kent Hull
Senior Staff Attorney

KH:mh

cc: Congressman Robert F. Drinan



*The Commonwealth of Massachusetts*
*Department of Mental Health*

BROCKTON AREA OFFICE

165 Quincy Street
Brockton, Massachusetts 02402

May 30, 1978

John P. Sullivan
Area Director

Rae A. O'Leary
Associate Area Director

(617) 580-0800

JUN 6 1978

The Honorable Donald Edwards
U.S. House of Representatives
Room 2329
Washington, D.C. 20515

Re: HR3504 Federal Zoning Legislation

Dear Mr. Edwards:

At the suggestion of Robert F. Drinan, I am writing to you to submit a statement for the record concerning an amendment to extend civil rights legislation to the handicapped for protection against certain forms of housing discrimination. I was pleased to hear that administration witnesses supported the measure at the initial hearings of the Judiciary Subcommittee on Civil and Constitutional Rights, and that Robert Okin, M.D., Commissioner of the Massachusetts Department of Mental Health recently testified at the hearings held for public witnesses.

In addition, I would like to submit the following statement for the record in support of that Testimony:

"As Brockton Area Director for the Massachusetts Department of Mental Health, I, John P. Sullivan, would like to be recorded in support of HR3504, an Amendment to the Civil Rights Acts of 1964 and 1968, which will enable the handicapped, specifically the mentally ill and the mentally retarded, make the transition from institutional living to a more normal environment in community based residential facilities.

In our efforts to provide more humane living opportunities for clients, we have found local communities resist the implementation of such residences by relying on very restrictive zoning ordinances and court action suits. Resistance also appears in more subtle forms such as a lack of cooperation in granting permits for house repairs - electrical work, plumbing and general renovations. Delaying tactics persist even though our Area Plan has developed a Community Support System which provides responsible residential care as well as day treatment and day activity programs and sheltered workshops, with the latter preparing the client for community employment.

Unfortunately these delays have had a very negative effect on patients who are ready and eager to leave Taunton State Hospital. Patients are regressing to their earlier forms of behavior for which they were originally hospitalized. They are depressed, disappointed and dejected by their continued confinement and by the attitude of the community towards their release. Even more disturbing is the fact that patients on voluntary commitment are leaving the hospital for seedy boarding houses and uncertain job opportunities without benefit of the transitional residence necessary for their rehabilitiation.

Page 2

Considering the above facts, I ask that the bill be amended in the Section dealing with zoning exclusion so as to protect handicapped persons who live in community residences.  This could be accomplished by adding the following clause at the end of Section 206(c) (page 42, line 12):  'or because the prospective occupants of such housing are a group of handicapped persons.'

The amendment would greatly enhance the impetus in Massachusetts and in other states to provide quality housing for the handicapped, especially for those on short term commitment who can benefit the most from a Community Support System."

I hope that this statement will contribute further support for the passages of this amendment.  I would also appreciate receiving a copy of the revisions and draft at your convenience.

Sincerely,

John P. Sullivan

JPS:cp
cc:  Robert L. Okin
     Robert F. Drinan
     Michael Benjamin, NIMH
     Angelita Garcia

In Reply Refer to: #78-L88



MASSACHUSETTS ASSOCIATION for RETARDED CITIZENS, Inc. 381 Elliot Street, Newton Upper Falls, Mass. 02164   Phone 965-6320

PETER LINKOW
Executive Director

**OFFICERS**

RAYMOND S. NICKERSON, Ph.D.
President
Bedford
DAVID C. SULLIVAN
Vice President
Wellesley
JAMES F. FERNANDES
Vice President
Somerset
MRS. MARY A. MC GOVERN
Vice President
Lawrence
THOMAS H. O'CONNOR, Ph.D.
Recording Secretary
Braintree
HERMAN L. SAMICK
Treasurer
Randolph

**BOARD OF DIRECTORS**

JOSEPH A. BUONOMO
Past President
Arlington
CHARLOTTE D. ALADJEM
Boston
NORMAN W. ALMEIDA
Swansea
ARTHUR M. CONNELLY
Yarmouth Port
MRS. BEVERLY GRAHAM
Haverhill
PAUL JAMESON, ESQ.
Wellesley
REV. HENRY A. MARQUARDT
Waverley
MARGARET PYNE
Brookline
MELVIN M. RITTER
Brookline
JOHN L. SULLIVAN, JR.
Dedham
DANIEL HARVEY
Youth MARC
Waltham

May 11, 1978

The Honorable Don Edwards
House Subcommittee on Civil
 and Constitutional Rights
2329 Rayburn Building
Washington, DC 20515

Dear Representative Edwards:

I am writing to you on behalf of the Massachusetts Association for Retarded Citizens concerning H.R. 3504, a bill to amend the Civil Rights Acts of 1964 and 1968. We are extremely pleased with your attempts to extend the civil rights laws to include handicapped citizens.

Our Association has been quite supportive of efforts to develop community alternatives to large scale institutionalization of retarded citizens. We are deeply committed to a policy of providing care in normalizing environments that provide retarded citizens with the same opportunities to live productive lives to which we are all entitled. Integration in residential communities is an important component of such care, yet the history of the development of such programs in Massachusetts, and the country has been marred by vocal resistance from communities unwilling to accept mentally retarded citizens. The resistance has in many cases, taken the form of restrictive local zoning ordinances which have led to many lengthy and expensive court battles. No one suffers more than the handicapped citizens in cases like this.

While H.R. 3504 deals with many crucial issues relating to the civil rights of handicapped citizens, it does not specifically address the problem of exclusionary zoning practices. We urge you therefore, to support an amendment to Section 206(c) which deals with zoning exclusions, so that handicapped persons would be afforded the opportunity to live in community settings. This could be done simply by adding "or because the prospective occupants of such housing are a group of handicapped persons" at the end of Section 206(c) page 42 line 12. Such an amendment could be extremely helpful in facilitating the integration of handicapped citizens into community settings.

33-264   1480

\ccredited member   N A R C   National Association for Retarded Citizens

The Honorable Don Edwards          -2-              May 11, 1978

Commissioner Robert Okin of the Massachusetts Department of Mental
Health will be offering testimony on H.R. 3504 on Monday, May 15 in
support of such an amendment.  We hope you will give his testimony
and our suggestion careful consideration as you review H.R. 3504.

Thank you for your continued efforts on behalf of handicapped citizens.

                              Sincerely,

                              Ray Nickerson

                              Raymond S. Nickerson
                              President

RSN:lam
cc: Robert Okin
    Rick Goldstein, DMH
    Paul Marchand

587

GREATER CAPE ANN
MENTAL HEALTH AND RETARDATION
AREA BOARD

---

New England Divers Building - 16 Tozer Road, Beverly, Mass.

---

March 27, 1978

Congressman Robert F. Drinan of Massachusetts
House of Representatives
Washington, D. C.

Re: HR3504          MAR 30 1978

Dear Congressman Drinan:

The Cape Ann Area Board, a citizens advisory board to the Massachusetts Department of Mental Health, enthusiastically supports your efforts in attempting to develop a fair zoning practice that would impact on local government. HR3504 makes it unlawful for local government to exclude low, moderate income housing because of race, color, national origin or economic status of prospective residents.

The intent of the bill we find laudable; however, we would like to support an amendment suggested by Robert L. Okin, M.D., Commissioner of the Department of Mental Health, that would allow for the inclusion of a clause at the end of Section 206(c) p. 42, line 12 of HR3504.

Dr. Okin has suggested the following inclusion:

"or because the prospective occupants of such housing are handicapped persons".

The object of such an amendment would provide an effective tool for the creation and further growth of community residences and other alternatives for the handicapped, including the mentally handicapped, which up until this time have been at the mercy of local government.

We would like to again emphasize our support as well as our appreciation in regards to the formulation of HR3504 and the humanistic intent implicit within the bill itself.

Sincerely,

John D. Patterson, Jr.,
President

cc: Cong. Edward of California
    House of Representatives
    Washington, D. C.

    Robert L. Okin, M.D.

588

SUITE 212, DUPONT CIRCLE BUILDING    PHONE
1346 CONNECTICUT AVENUE, N. W.    (202) 785-2974
WASHINGTON, D. C. 20036    FAX (202) 785-2975

September 27, 1977

The Hon. Don Edwards
Chairman, Subcommittee on Civil and
    Constitutional Rights
Committee on the Judiciary
2329 Rayburn House Office Building
Washington, D.C. 20515

Dear Mr. Edwards:

The National Federation of the Blind held its annual convention this summer in New Orleans. More than 2,500 people attended, representing the blind of every state and most localities in America.

The convention unanimously adopted a resolution (copy enclosed) expressing strong support for your bill, H.R. 3504, which would include the disabled under the protection of the Civil Rights Act. This resolution (77-08) urges early scheduling of hearings on H.R. 3504. In this connection, we would appreciate notification when such hearings are scheduled so that a representative of the National Federation of the Blind could appear and present the views of our organization.

The National Federation of the Blind has been in the forefront of the struggle to achieve broad protection of the civil rights of blind and disabled persons. We applaud your introduction of H.R. 3504. In the months ahead we pledge to work closely with you toward its enactment into law.

Cordially yours,

James Gashel, Chief
Washington Office

JG/dm

cc: John Seiberling    Anthony Beilenson
    Robert Drinan    M. Caldwell Butler
    Harold Volkmer    Robert McClory

RESOLUTIONS ADOPTED BY
THE THIRTY-SEVENTH ANNUAL CONVENTION OF
THE NATIONAL FEDERATION OF THE BLIND
*New Orleans, Louisiana, July 1977*

### RESOLUTION 77-08

*Whereas* the Honorable Don Edwards of California has introduced a bill, H.R. 3504, in the 95th Congress, which would amend title VII of the Civil Rights Act of 1964 and title VIII of the act commonly called the Civil Rights Act of 1968; and

*Whereas,* among its other provisions, this bill would include handicapped persons as a protected class under the basic civil rights law, with specific protections in equal employment opportunity and fair housing; and

*Whereas* passage of this legislation by the Congress would constitute recognition that the employment problems and housing discrimination faced by the blind should be classed with discrimination encountered by other minorities and should be dealt with by the same enforcement authorities; and

*Whereas* affirmative action and nondiscrimination legislation protecting the rights of blind persons is limited both in the scope of the legislation and the strength of enforcement efforts: Now, therefore,

*Be it resolved* by the National Federation of the Blind in Convention assembled this seventh day of July 1977 in the City of New Orleans, Louisiana, that this organization expresses its strong support for H.R. 3504 and urges the House Committee on the Judiciary and its Subcommittee on Civil and Constitutional Rights to which this bill has been referred to hold early hearings and otherwise take action to approve it; and

*Be it further resolved* that this support for H.R. 3504 be made known through presentation of testimony and that our interest in positive action on this legislation be communicated by sending copies of this resolution to appropriate Members of the 95th Congress.

590

# V. Insurance Organizations

STATEMENT ON BEHALF OF THE
NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS

On Title II of H. R. 3504

Before the Subcommittee on Civil and
Constitutional Rights of the
House Judiciary Committee

Submitted by
Harold B. McGuffey
Commissioner of Insurance
of the Commonwealth of Kentucky
and President of the NAIC

And
H. P. Hudson
Commissioner of Insurance of the State of Indiana
and Vice President - Chairman of the
Executive Committee of the NAIC

And
Harold R. Wilde, Jr.
Commissioner of Insurance of the State of
Wisconsin and Chairman of the NAIC Task Force
on Insurance Redlining

July 28, 1978

Mr. Chairman and members of the Subcommittee. This statement is submitted to you on behalf of the National Association of Insurance Commissioners, commonly known as the NAIC. The NAIC is the oldest voluntary association of state officials in the nation, having its inception in 1871. The membership of the NAIC includes the chief insurance regulatory official of each of the 50 states, the District of Columbia, Guam, Puerto Rico, and the Virgin Islands.

The objectives of the NAIC are (1) to promote uniformity in legislation affecting insurance, (2) to encourage uniformity in departmental rulings under the insurance laws of the several states, (3) to disseminate information of value to insurance supervisory officials in the performance of their duties, (4) to establish means to fully protect the interest of policyholders, and (5) to preserve to the several states and United States possessions the regulation of the business of insurance. To achieve these purposes, the NAIC utilizes an extensive committee system and has permanent staff located in two offices.

We wish to express our appreciation for the opportunity to provide you with some of the information we have gathered concerning insurance redlining and thank you for bringing further visibility to this important public policy concern. This statement will describe the NAIC's assessment of insurance redlining and outline some of the remedial approaches we are taking to alleviate its adverse consequences. We will also review title II of H.R. 3504 and give our opinion of the portion of that bill dealing with racial discrimination in the business of insurance. This opinion is largely reflective of our strong belief in the soundness of a state-directed system of insurance regulation. Our comments must be understood in this context, since we share the concerns of the drafters of this proposal that no insurance practice should unfairly penalize the members of a particular class or race. Finally, we have attached to this statement some background material on residential property insurance to assist the Subcommittee in developing an awareness of basic insurance terminology and practices.[1]

---

1.   See Appendix A.

-1-

NAIC ACTIVITY REGARDING INSURANCE REDLINING

More than ten years ago the President's National Advisory Panel on Insurance in Riot-Affected Areas (Hughes Panel) found that insurance companies were restricting the supply of insurance in urban core areas by "redlining" certain neighborhoods and territories. These redlined areas were avoided by insurance companies because the companies regarded any business in such areas to be relatively unprofitable. The Hughes Panel found that, given a limited capacity to accept risks, companies naturally sought to choose the "least hazardous risk in relation to the amount of premium charged."[2] The Panel believed that adoption of its recommendations for "Fair Access to Insurance Requirements Plans" would "end the practice of 'red-lining' neighborhoods and eliminate other restrictive activities."[3] Unfortunately, the Panel's hopes are still largely illusory. Although FAIR plan legislation in 28 states[4] has had an impact on the availability of insurance in inner city neighborhoods, there is evidence that insurance redlining, albeit more subtle, continues to be a significant problem.[5] The work of the NAIC Redlining Task Force in assessing the extent of insurance redlining activities and searching for appropriate legislative and regulatory responses will now be described to give the Subcommittee a sense of our commitment to ending insurance redlining abuses.

The NAIC began an intensive examination of alleged insurance redlining practices following a report from the New York Public Interest Research Group (NYPIRG) in June, 1977 that widespread refusals to write insurance were occuring in inner-city areas. The NAIC Availability of Essential Insurance (D2) Subcommittee subsequently adopted a resolution that the NAIC study such redlining allegations, develop a definition of insurance redlining and appoint a task force to examine the need for NAIC action.

After initial information-gathering efforts the NAIC Redlining Task Force formulated a statement of principles and objectives on insurance redlining which was subsequently adopted by the NAIC. That statement of principles and objectives reads as follows:

> There is recent evidence indicating that some insurers are refusing to insure, refusing to renew, or limiting the amount or type of property and automobile insurance coverage available to individuals because of the geographic location of a particular risk.
>
> Such practices, commonly known as insurance "redlining," restrict the availability of insurance coverage to the insurance-buying public.
>
> The availability of insurance coverage should not be dependent on the geographic location of a particular risk.
>
> It is apparent that the insurance-buying public and the insurance industry attach different meanings to the term "redlining".
>
> The solution to insurance availability problems arising from the practice of redlining depends in part on the restructuring of traditional practices employed in the voluntary market by insurers, agents and brokers.

2.  PRESIDENT'S NATIONAL ADVISORY PANEL ON INSURANCE IN RIOT-AFFECTED AREAS, MEETING THE INSURANCE CRISES OF OUR INNER CITIES 6 (1968) [hereinafter cited as HUGHES PANEL REPORT].

3.  Id.

4.  These states are California, Connecticut, Delaware, the District of Columbia, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Pennsylvania, Puerto Rico, Rhode Island, Virginia, Washington and Wisconsin.

5.  See B. MELEWSKI & M. LAMPI, WHERE DO YOU DRAW THE LINE? (New York Public Interest Research Group, Inc. 1978) [hereinafter cited as MELEWSKI & LAMPI]; S. REP NO. 95-737, 95th Cong., 2d Sess. 5 (1978); U.S. DEP'T. HOUSING & URBAN DEVELOPMENT, FEDERAL INSURANCE ADMINISTRATION, INSURANCE CRISES IN URBAN AMERICA 43 (1978) [hereinafter cited as INSURANCE CRISES].

Until and unless this restructuring of traditional practices is undertaken by the voluntary market, the public interest requires that state regulatory authorities implement appropriate actions to assure equitable and necessary insurance availability.

It is therefore the position of the NAIC that:

A.    The insurance industry should acknowledge that whatever the practice of insurance companies, the insurance-buying public perceives the existence of what it believes to be redlining in the marketplace, and to the extent this perception is inaccurate, it can only be altered by implementing such practices as:

    (1)    Stating, in all cases, the exact reasons for company rejections, cancellations or nonrenewals, and

    (2)    Educating policyholders about potential problem areas before issuing a notice of rejection, cancellation or nonrenewal -- through a regular program of notifications and warnings -- so that corrective action can be taken to continue insurance coverage; and

B.    The insurance industry should develop, as rapidly as possible, alternative forms of property and automobile insurance coverages for individuals which can be made available through the voluntary market to meet the currently perceived needs of the insurance-buying public; and

C.    As alternative forms of property and automobile insurance coverages for individuals are developed, consideration should be given to such coverages as:

    (1)    An actual cash value (ACV) homeowners insurance policy which would include basic coverages of fire, extended coverage, vandalism and malicious mischief, burglary or crime coverage, and liability coverage.

    (2)    Homeowners insurance policies providing replacement cost coverage on partial losses up to the actual cash value of the real property, and

    (3)    An automobile insurance policy providing in addition to the minimum liability and medical coverages required by law, such otherwise standard additional provisions as comprehensive and collision coverages and expanded options for coverage limits and deductibles; and

D.    The insurance industry should either abandon underwriting "short-cuts" such as refusing to accept an application solely because the applicant was refused coverage by another carrier or failing to verify the accuracy of inspection reports in order to avoid review of each application on its individual merits, or demonstrate conclusively that the impact of such practices is not unfairly discriminatory; and

E.    An advisory committee be appointed by the Redlining Task Force Chairman, who shall require the advisory committee to report in 90 days on steps the insurance industry must take to address the concerns outlined by the Redlining Task Force; and

F.    In the absence of a conclusive demonstration that the insurance industry has taken steps to assure that no homeowner is finding his or her reasonable needs for insurance unmet in the voluntary market, that states, particularly states having Fair Access to Insurance Requirements (FAIR) Plans, consider making available, where necessary, through appropriate legislation or otherwise, a form of homeowners insurance to individuals who are unable to obtain such insurance from the voluntary marketplace and that in those states with FAIR Plans such homeowners insurance coverages extending to owner-occupied dwellings be bound immediately upon receipt of an application by the FAIR Plan or its authorized agent; and

-3-

G.  In the absence of a conclusive demonstration by the insurance industry that steps are being taken to assure that no otherwise qualified driver is unable to obtain automobile insurance from the voluntary marketplace, residual market plans for individual automobile insurance now operating in the several states consider offering such coverages and optional limits as are available in the voluntary marketplace; and

H.  States having FAIR Access to Insurance Requirements (FAIR) Plans or automobile insurance placement facilities should examine the utility of alternative residual market mechanisms, such as joint reinsurance associations or reinsurance facilities, as a way of providing, where necessary, broader access and fairer prices for automobile and property insurance to all members of the insurance-buying public.

We will now try and elaborate on some of the points contained in this statement of principles and objectives. First of all, it is important to recognize a distinction between fair and unfair discrimination. Fair discrimination is central to the function and operation of insurance rating and underwriting. As the Hughes Panel observed more than ten years ago, "a risk must bear an appropriate rate; if a property is significantly more hazardous than average, it must yield a commensurately higher premium."[6] In other words, "each class of insureds should pay its share of losses and expenses."[7] Unfair discrimination occurs in insurance rating when individual property risks are assigned to rating classes which do not properly reflect their particular loss potential. Similarly, unfair discrimination occurs in insurance underwriting when an individual risk is refused insurance coverage for reasons which have no verifiable relationship to its particular loss potential.

This leads to an important observation about the insurance redlining phenomenon. It is critical to recognize the distinction between territorial rating factors and underwriting refusals based on location of risk. Under fire insurance and homeowners insurance rating plans it is common to charge different rates for insurance coverage because of the different loss experiences associated with rating territories or zip code areas. So long as such rate differentials are based on sound statistical data there appears to be no reason to prohibit their continued existence from the standpoint of regulatory equity, although there may be other reasons militating against their use such as the political representation of rural versus urban interests in state legislatures. On the other hand, refusals to underwrite particular dwelling risks solely because the risk is located in an inner city area appear to have little justification. In fact, underwriting refusals of this nature lie at the core of the insurance redlining problem. Even though insurance companies may have competitive reasons for avoiding risks in certain geographic locations, these reasons do not outweigh the public policy concern of treating individual risks according to their particular circumstances and loss potential.

Another facet of the insurance redlining phenomenon is the question of insurance availability. Strictly speaking, the insurance redlining problem is not one of insurance availability per se. Rather, insurance redlining in the voluntary market, or refusals to insure on the basis of risk location, lead to the "dumping" of risks into the surplus lines market or FAIR plans where insurance coverage is often more constricted and higher rates are prevalent.[8] The consequence of insurance redlining, then, is less desirable and higher-priced insurance, not a lack of insurance; the redlining problem is therefore a problem of basic unfairness to individual risks and not merely a problem of insurance unavailability.

It should also be pointed out that the term "redlining" has become a symbol for all types of real and perceived inequities. It is unfortunate that a great amount of public confusion has developed around the term "redlining" so that it is often difficult to discuss the complex questions of insurance rating and underwriting in a proper context. As public officials we at the NAIC believe we have a responsibility to avoid the oversimplification of insurance redlining issues so that responsible action can be taken in the best interests of the insurance-buying public.

The NAIC recognizes that insurance redlining practices result in arbitrary and unfair treatment to many insurance applicants and policyholders. To eliminate the unfair discrimination resulting from refusals to insure on the basis of risk

---

6.  HUGHES PANEL REPORT, supra note 2, at 11.

7.  Id. at 35.

8.  See INSURANCE CRISES at 18-19, 37; Note, Property Insurance and the American Ghetto: A Study in Social Irresponsibility, 44 S. CAL. L. REV. 218, 243-46 (1970).

-4-

594

location the NAIC has undertaken a three-fold approach: collection of information, encouragement of voluntary industry action and development of model legislation. Let us now briefly describe the work of the NAIC Redlining Task Force in each of these three areas.

At the outset, the NAIC Redlining Task Force sought to gather primary source materials on insurance redlining. These materials have been extremely helpful in providing a background to the insurance redlining problem; we will be happy to make them available to the Subcommittee if it so desires. In addition to this collection of materials the NAIC Redlining Task Force has developed a suggested hearing format for those commissioners who desire to conduct administrative hearings to obtain further information about insurance redlining practices in their states.[9] The Task Force has also taken action to assist states in developing zip code data from companies writing personal lines insurance in metropolitan areas to obtain a clearer picture of alleged redlining activities.[10] Furthermore, the Task Force has appointed an Advisory Committee to assist it in its work on insurance redlining. The membership of the Advisory Committee reflects the interests of consumers, industry and government[11] and should be of valuable assistance in opening a dialogue between insurance consumers and insurance companies. Finally, the NAIC Redlining Task Force has taken initiatives to begin a comprehensive study of insurance redlining in one state. We are working with the Federal Insurance Administrator to develop standards for conducting such a study so that a thorough analysis can be given to the many complex issues associated with the term "redlining".

A second approach we have taken to address the insurance redlining problem is to encourage the insurance industry to develop private remedies to the problems of unfair discrimination, full insurance availability and insurance affordability for residential property insurance in urban areas. More specifically, the NAIC Redlining Task Force has issued 12 "challenges" to the insurance industry to develop remedial measures which will alleviate many of the adverse consequences of insurance redlining. These 12 challenges include:

1.  Development of detailed industry-wide and individual company programs to take risks out of FAIR Plans and assigned risk plans and put them back into the voluntary market.

2.  Development of model programs for the marketing of new forms of homeowners insurance in inner city areas (e.g., model promotional materials for individual companies; industry-wide resource kits).

3.  Development of (and specific industry commitment to) outreach programs in major urban areas, using community centers, special outreach telephone numbers, or other appropriate means.

4.  Development of model cancellation and declination forms, which outline in clear English the reasons for a turn-downs, and what the risk may do to make itself acceptable in the future.

5.  Development of a model program for companies, and/or industry-wide programs, to "teach" individual loss prevention, to provide incentives for individual loss prevention (e.g., in rating structures), and to work with community groups in pursuing neighborhood loss prevention.

6.  Development of an acceptable approach to identifying the cost of "environmental hazard" in FAIR Plans and auto assigned risk plans and equitably allocating that cost throughout the voluntary insurance market.

7.  Development of a model approach to the offering of homeowners insurance for those FAIR Plans which feel the need to provide such insurance.

8.  Development of a resource list of inner city investments and projects which insurers can commit themselves to, and suggested guidelines as to what kind of investment commitment to the inner city insurers of various sizes and markets might appropriately consider.

---

9.  See Appendix B.

10. See Appendix C.

11. See Appendix D.

-5-

9. Assistance to the Redlining Task Force in the development of new amendments to the Model Unfair Trade Practices Act outlawing redlining, and the development of a model law or regulation on cancellation and declination.

10. Development of approaches to the monitoring of inner city markets, which can be used by individual companies or by the industry as a whole, as "trip-wires" for more aggressive marketing initiatives, and as benchmarks for a skeptical public.

11. Development and/or demonstration of model underwriting approaches to a skeptical insurance industry which make no use of the various underwriting shortcuts which have been identified.

12. Exploration of innovative ideas such as a company or a FAIR Plan insuring an entire neighborhood, on a blanket demonstration basis, and working with community groups, lending institutions, etc., in a careful program of revitalization.

Although there may be some reason to question the appropriateness of urging "voluntary" remedies by the insurance industry, we have already witnessed a willingness on the part of some segments of the insurance industry to experiment with new initiatives aimed at the problems of inner city insurance need, (e.g., new forms of homeowners policies. At the present time we are cautiously optimistic that these initiatives will lead to significant improvements in inner city property insurance market conditions.

The third approach we have taken to address redlining problems is to develop model legislation prohibiting certain business practices of insurance companies which contribute to the redlining problem. The language of the proposed model legislation would define as an unfair insurance trade practice the "refusing to insure, or refusing to continue to insure, or limiting the amount of coverage available to a risk because of the geographic location of the risk." This proposed model legislation is supplemented by a proposed model regulation which further specifies the types of "refusals to insure" which fall under the broad category of unfair discrimination and requires insurers to disclose the reasons for all refusals, nonrenewals and cancellations.[12] The Redlining Task Force has scheduled a public hearing on the foregoing model law and regulation this October and expects that final action will be taken by the NAIC in December, 1978.

In sum, Mr. Chairman, the NAIC is deeply concerned about the problems associated with insurance redlining. The NAIC is addressing these problems on a number of fronts through information gathering efforts, voluntary encouragement of remedial action by insurance companies and development of model legislation prohibiting unfair discrimination. We are hopeful that our efforts will lead to greater fairness in insurance rating and underwriting in inner city areas so that individuals are able to obtain the insurance they need at a fair price.

### NAIC COMMENTS REGARDING TITLE II OF H.R. 3504

Mr. Chairman, you have asked for the NAIC's assessment of title II of H.R. 3504. Section 206(c) of that title II specifically provides that it shall be an unfair housing practice "for a person in the business of insuring against hazards to refuse to enter into a contract of insurance against hazards to a dwelling because of the race, color, or national origin of persons residing in or near the dwelling." This prohibition is enforced by granting to the Secretary of Housing and Urban Development administrative supervision over violations, as well as by granting to aggrieved persons a private enforcement remedy in federal district court. We would now like to share with you some observations we have about this proposed legislation as insurance commissioners responsible for enforcing state insurance laws.

It should be pointed out that race is presently excluded as an explicit business consideration in residential property insurance rating or underwriting. The only factors relevant to a class rating plan for residential property insurance are the construction of the building, its occupancy characteristics and the quality of available fire protection.[13] Race is not a

---

12. See Appendix E.

13. R. SYRON, AN ANALYSIS OF THE COLLAPSE OF THE NORMAL MARKET FOR FIRE INSURANCE IN SUBSTANDARD URBAN CORE AREAS 56 (1972).

-6-

factor utilized by insurance companies in the class rating plans used to determine appropriate rates for residential property insurance. Similarly, race is not explicitly considered in residential property insurance underwriting; although such personal characteristics of insurance applicants as occupation, previous loss experience and marital status are requested on insurance application forms, these items give no indication of the insurance applicant's race.[14] While it is possible that some underwriters learn of an insurance applicant's race through informal sources, such as conversations with insurance agents, and subsequently refuse to insure a risk because of the race of the applicant, such practices are not the result of industry-wide business procedures. Thus, any racial discrimination which presently exists in residential property insurance rating or underwriting is indirect discrimination resulting from second-hand information or as the by-product of associated, nonracial classifications.

A second observation we wish to make is that virtually all states prohibit racial discrimination in residential property insurance rating and underwriting. There are basically two types of state laws which address the racial discrimination question: laws which specifically prohibit insurance discrimination based on race[15] and laws which generally prohibit discrimination between individuals of the same class.[16] California's statute is an example of a state law specifically prohibiting racial discrimination:

> No admitted insurer, licensed to issue any policy of insurance covered by this chapter, shall fail or refuse to accept an application for, or to issue a policy to an applicant for, such insurance (unless such insurance is to be issued to the applicant by another insurer under the same management and control), or cancel such insurance, under conditions less favorable to the insured than in other comparable cases, except for reasons applicable alike to persons of every marital status, sex, race, color, religion, national origin, or ancestry; nor shall sex, race, color, religion, national origin, or ancestry of itself constitute a condition or risk for which a higher rate, premium, or charge may be required of the insured for such insurance.[17]

Connecticut's statute governing discrimination between classes of insureds is an example of the second category of state laws which generally prohibit discrimination in residential property insurance based on race:

> discrimination between individuals of the same class in the amount of premiums or rates charged for any policy of insurance . . . or in the benefit payable thereon, or in any of the terms or conditions of such policy, or in any other manner, is prohibited.[18]

---

14. G. GLENDENNING & R. HOLTOM, PERSONAL LINES UNDERWRITING 250, 260-63 (1977).

15. Refusals to insure on the basis of race, are specifically prohibited in 12 states. ARK. STAT. ANN §66-3005(11) (1966); CAL. INS. CODE §679.71 (West 1972); FLA. STAT. §626.9541(24) (Supp. 1977); KY. REV. STAT. ANN. §304.12-085 (Baldwin 1971); MD. ANN. CODE art. 48A, §234A (Supp. 1977); MICH. COMP. LAWS ANN. § 500.2027 (Supp. 1978); MO. ANN. STAT. § 375.007 (Vernon Supp. 1978); MONT. REV. CODES ANN. § 40-3512(3) (1961); N.H. REV. STAT. ANN. §417:4 (VIII)(e) (Supp. 1975); N.J. STAT. ANN. §17:29B-4(c) (1970); N.Y. INS. LAW §40(10) (McKinney 1966); N.D. CENT. CODE §26-30-04(11) (1977).

16. There are 26 states which generally prohibit unfair discrimination between classes of risks: ALASKA STAT. ANN. § 21.36.090 (1966); ARIZ. REV. STAT. ANN. §20-448 (1975); COLO. REV. STAT. §10-3-1104 (1974); CONN. GEN. STAT. ANN. §38-172 (West 1969); HAWAII REV. STAT. §431-643(7) (1968); ILL. ANN. STAT. ch. 73, § 755.21 (Supp. 1977); IND. STAT. ANN. § 27-1-4(7) (c) (Burns 1975); IOWA CODE §507B.4(7) (1977); LA. REV. STAT. ANN. tit.22, §652 (Supp. 1977); ME. REV. STAT. ANN. tit. 24-A, §2162 (West 1974); NEB. REV. STAT. §44-1525(7)(c) (Supp. 1978); NEV. REV. STAT. §686A.130 (1975); N.C. GEN. STAT. §58-44.3 (1975); OHIO REV. STAT. §3901.21(M) (Page 1971); OKLA. STAT. ANN. tit. 36, §1204(7)(c) (West 1976); ORE. REV. STAT. §746.015 (1977); PA. STAT. ANN. tit. 40, §761 (Purdon 1971); S.C. CODE ANN. §38-9-80 (Supp. 1975); S.D. COMP. LAWS ANN. §58-33-26 (1969); TENN. CODE ANN. §56-1223 (Supp. 1976); TEX. INS. CODE art. 5.09 (Vernon 1963); UTAH CODE ANN. §31-27-22 (1974); VT. STAT. ANN. tit. 8, §4724(7) (1971); WASH. REV. CODE ANN. §48.18.480 (Supp. 1976); W.VA. CODE ANN. §33-11-4(c) (1975); WYO. STAT. §26-13-112 (1967).

17. CAL. INS. CODE §679.71 (West 1972).

18. CONN. GEN. STAT. ANN. §38-172 (West 1969).

It is fair to say, then, that most state insurance codes not only prohibit racial discrimination in a manner similar to section 206(c) of H.R. 3504, but are in fact broader in scope.

Section 206(c) of H.R. 3504, like many state laws, addresses an indirect effect of the insurance redlining problem, not the specific practice which leads to this effect. We feel that the most effective response to insurance redlining abuses lies not in additional general prohibitions, but rather in specific amendments, corrections or prohibitions to the existing industry practices which produce "redlined" neighborhoods or territories. This is the reason the NAIC Redlining Task Force has focused on very specific "remedies" to insurance redlining problems. We think it would be unfortunate to assume that the "answer" to insurance redlining problems lies in the area of new prohibitions against racial discrimination; insurance redlining is a problem much deeper and more complex than racial discrimination.

We realize that recent studies have found that insurance redlining "has clear racial implications."[19] These findings must nevertheless be recognized as the product of a correlation between geographic location of risks and racial composition of neighborhoods.[20] But just as the correlation between location of risks and racial composition of neighborhoods may lead to the conclusion that territorial considerations are improper factors in insurance rating and underwriting, it is equally valid to conclude that the correlation between location of risks and actual insurance losses provides a justification for territorial rating and underwriting. Because of the density of urban dwellings, the congestion of urban streets and the age and upkeep of many urban properties, statistical variations exist between actual property insurance losses in urban and nonurban territories. Moreover, there are at least some circumstances where underwriting refusals are justified because of the location of residential property risks -- dwellings located on hillsides, for example, present better-than-average probabilities for loss in areas where mudslides are common. The real issue in the insurance redlining debate is not whether territorial factors should be banned from consideration but when and how they should be taken into account to assure fair treatment to individual risks.

Finally, we would simply like to point out that title II of H.R. 3504 establishes a federal administrative scheme for handling unfair housing practices, including those which are defined as refusals to insure dwelling risks on the basis of race. The NAIC, like the Justice Department,[21] sees little need for a new regulatory enforcement process to combat refusals to insure on the basis of race. Whether or not section 206(c) is a necessary statutory expansion of existing civil rights legislation, we find no merit in its accompanying administrative apparatus. We believe that state regulators, working with existing tools and with proposed improvements to these tools, can meet the diverse regulatory challenges presented by insurance redlining activities. We hope you would not feel it necessary to duplicate these efforts.

We thank you again for the opportunity of presenting this statement and offer our continued assistance in whatever capacity is most helpful to your deliberations on this subject.

---

19. MELEWSKI & LAMPI at 34; INSURANCE CRISES at 27.

20. See U.S. DEP'T JUSTICE, THE PRICING AND MARKETING OF INSURANCE 332 (1977) ("racial discrimination is most often encountered as a product of a more subtle classification, that of geographic location.").

21. See id. at 337.

-8-

APPENDIX A:
PERSONAL LINES RESIDENTIAL PROPERTY INSURANCE
CHARACTERISTICS AND REGULATION

Title II of H. R. 3504 focuses on the type of insurance coverage which insures against "hazards to a dwelling." This specific type of insurance belongs to the general category of personal lines insurance -- "coverages designed in whole or in part to handle loss exposures arising out of the nonbusiness property and activities of individual and families."[1] There are a number of distinguishing features of personal lines insurance:

> The personal lines market (as compared to commercial lines) is characterized by a large number of buyers and sellers, the relative similarity of loss exposures, the lack of alternatives to insurance, the relatively inelastic demand, a heavy regulation of products and prices, relatively uninformed buyers, and a politically popular and sensitive market. Personal lines products designed to meet the needs of most insureds are characterized by standardization of policies, a high degree of packaging, and class rating. They also are more rigid in form and rate and involve a smaller average unit premium than most personal lines products.[2]

A brief review of the basic characteristics of personal lines residential property insurance in the context of the inner city market should help to clarify the basic insurance principles involved in the present redlining debate.

I. TYPES OF COVERAGE

Because contracts covering "hazards to a dwelling" are designed to insure large numbers of homogeneous risks their terms and conditions have become highly standardized. Although the contracts of residential property insurers may not be identical, "they often follow a pattern because the needs of buyers are often similar and competition among insurers tends to lead to imitation by a great number of insurers serving the same market."[3] The two most common policies in the residential property insurance market are the fire and extended coverage policy and the homeowners policy.

Because fire represents "the greatest single cause of physical loss to property,"[4] the fire insurance policy "is considered the basic form of protection for buildings and their contents."[5] Fire insurance serves as the foundation for other coverages that are added to the basic fire policy through amendments, or endorsements.[6] Standard endorsements to fire insurance policies include the extended coverage endorsement and the vandalism and malicious mischief endorsement. For a separate premium the extended coverage endorsement provides protection against damages to residential property arising from windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles, and smoke.[7] Likewise, for a separate premium a vandalism and malicious mischief endorsement can be added to a basic fire policy which offers protection against willfull acts in defiance of authority. Together the extended coverage and vandalism and malicious mischief endorsements are called "allied lines" of fire insurance coverage.[8]

1.    G. GLENDENNING & R. HOLTOM, PERSONAL LINES UNDERWRITING 1 (1977) [hereinafter cited as PERSONAL LINES].

2.    Id. at 34.

3.    Id. at 12.

4.    PRESIDENT'S NATIONAL ADVISORY PANEL ON INSURANCE IN RIOT-AFFECTED AREAS, MEETING THE INSURANCE CRISES OF OUR INNER CITIES 19 (1968) [hereinafter cited as HUGHES PANEL REPORT].

5.    Id.

6.    Id.

7.    Id.

8.    Id.

-9-

Unlike the basic fire insurance policy and its allied lines endorsements, the homeowners insurance policy offers a combination of property and liability coverages. Each homeowners policy contains two sections: section I deals with property insurance and section II with liability insurance.[9] Included under the section I property coverages are a basic fire insurance coverage and five optional coverages commonly labeled the "basic form", the "broad form", the "special form", the "contents broad form" and the "comprehensive form."[10] Except for the "contents broad form", each homeowners policy covers perils to the dwelling itself, perils to appurtenant private structures, perils to unscheduled personal property, additional living expenses, comprehensive personal liability, medical payments, and physical damage to property of others.[11] Minimum amounts of coverage are required for each of these perils with additional coverage available for an added premium. Because the homeowners policy is put together as a "package policy" there is a single indivisible premium charged for all of the perils listed in the policy.

Historically, the homeowners policy was designed to insure residential properties in suburban settings.[12] Because these properties presented more attractive risks to insurance companies, the homeowners concept was developed to provide broader coverages at reduced rates. In comparison with the basic fire insurance policy and its allied lines endorsements, it is widely recognized that the homeowners package insures against more perils, offers reduced rates, provides greater indemnity and requires more stringent standards for risk acceptability.[13]

All insurance policy forms are regulated by state insurance commissioners through state laws which require the commissioner's approval of insurance policy forms. The policy language of the standard fire policy is mandated by statute in New York and followed verbatim in 35 states, the District of Columbia and Puerto Rico, and followed with some variation in all other states except New Hampshire.[14] There is less rigidity in the policy language required for homeowners package policies although standardization is the rule rather than the exception.[15]

## II. THE RISK ASSESSMENT PROCESS

The fundamental purpose of residential property insurance is to substitute "a small, definite cost (the premium) for a large but uncertain loss."[16] The process of determining the amount of premium to cover probable losses is known as the risk assessment process. Traditionally, risk assessment in insurance theory has been accomplished through two separate, but related, procedures: rating and underwriting.

### A. Residential Property Insurance Rating

The rate for residential property insurance is generally described as

> the price for a certain dollar amount of insurance coverage for a certain period of time. This rate is usually stated as so many dollars and cents per one hundred dollars worth of insurance for a one year period on a

---

9.    PERSONAL LINES, supra note 1, at 247.

10.   R. MEHR & E. CAMMACK, PRINCIPLES OF INSURANCE 376 (5th ed., 1972) [hereinafter cited as PRINCIPLES OF INSURANCE].

11.   Id.

12.   See U.S. DEP'T HOUSING & URBAN DEVELOPMENT, FEDERAL INSURANCE ADMINISTRATION, INSURANCE CRISES IN URBAN AMERICA 4 (1978) [hereinafter cited as INSURANCE CRISES].

13.   PERSONAL LINES at 336-37.

14.   PRINCIPLES OF INSURANCE at 812.

15.   PERSONAL LINES at 247.

16.   See PRINCIPLES OF INSURANCE at 32.

particular risk. The premium is the total amount of paid for insurance. It is the rate times the amount of coverage purchased.[17]

Residential property insurance rates are expected to generate sufficient premium income to pay for the losses and expenses of insuring residential property as well as a profit to the insurance company for the risk it assumes.[18] Rates for basic fire insurance coverage serve as the foundation for the total premium charge for fire and allied lines coverage. Rates for homeowners package policies, while covering perils beyond basic fire coverage, are computed in a manner very similar to fire and allied lines rates.

Fire insurance rates fall into two separate groups: class rates and schedule rates.[19] Class rating is used primarily for residential property risks, while schedule rating applies primarily to commercial risks.

In class rating, one rate is set for a particular group of risks that are considered homogeneous in terms of hazard. No inspection of the risk is required . . . . The theory of class rating is that it is possible to construct a class according to a few basic characteristics and that all risks in this class will be homogeneous enough to make the probability of loss relatively equal. Once the class in which a particular risk belongs has been determined, the rate for that risk is the same as the rate for every other risk in that class.[20]

Thus, by dealing with categories of risks instead of individual risks class rating substitutes workable group equity for individual risk equity.[21] Since a classification system which treats every risk on an individual basis would lack credibility and require heavy administrative expenses, the treatment of risks by classes becomes the only practical answer to modern risk assessment.[22]

The major factors considered in a class rating plan for fire insurance are "construction, occupancy and type of municipal fire protection."[23] There are four basic types of resident construction: frame, masonry, fire resistive, and noncombustible.[24] The occupancy factor in fire insurance rating plans focuses on the number of dwelling units within a particular residential building.[25] The fire protection factor is obtained through a grading system established by the American Insurance Association which considers, among other characteristics, a municipality's water supply, fire department, fire alarm system, building code and local weather patterns.[26]

---

17. R. SYRON, AN ANALYSIS OF THE COLLAPSE OF THE NORMAL MARKET FOR FIRE INSURANCE IN SUBSTANDARD URBAN CORE AREAS 50 (1972) [hereinafter cited as FIRE INSURANCE].

18. Id. at 55.

19. Id.

20. Id. at 55-56.

21. PERSONAL LINES, supra note 1, at 13.

22. See id. at 14.

23. FIRE INSURANCE at 56.

24. PERSONAL LINES at 229.

25. FIRE INSURANCE at 56.

26. Id. at 57.

-11-

Rates for particular residential dwellings are determined by cross- referencing the construction of the dwelling with the occupancy factor and the fire protection factor.[27] In the urban residential property context surcharges may be added to a given class rate for substandard conditions indigenous to urban areas.[28] These surcharges may be based on such conditions as block congestion, unsafe arrangement of heating devices, unsafe wiring, conversion of original living spaces into multiple living units or unsafe housekeeping practices.[29] Since the underlying conditions giving rise to surcharges "may or may not be more appropriate for the risk than the standard rate," there is a potential unfairness in attempting to assign numerical rating values to so-called substandard conditions.[30]

State insurance commissioners regulate residential property insurance rates and rating plans in virtually all states and the District of Columbia.[31] Although state rating laws follow at least nine different models or formats,[32] such laws can be divided into two general categories: "prior approval" and "open competition" rating laws.[33] Under a "prior approval" rating law insurers are required to submit their rate proposals to the insurance department in advance subject to the department's approval or disapproval. Under an "open competition" rating law, on the other hand, insurers are not required to seek advance approval of their rates by the commissioner; rates may be established at whatever level insurance companies determine is a competitive rate. However, residential property rates under either a "prior approval" or "open competition" rating law must not be "excessive, inadequate, or unfairly discriminatory."[34] In addition to this substantive statutory standard insurance commissioners have authority to review rating plans and license rating organizations.[35]

B. Underwriting Residential Property Insurance

The second element of the risk assessment process is insurance underwriting. Underwriting has been defined as a process of selecting risks

> in order to determine which of those within a given class offers a probability of loss below that for the average of the class.[36]

---

27. Id. at 58.

28. HUGHES PANEL REPORT, supra note 4, at 33.

29. Such factors are considered in rating surcharges rather than underwriting only when the rating plan in use is a "Schedule ER" (Excess Rates) plan. Id.

30. Id. at 34.

31. J. HANSON, R. DINEEN & M. JOHNSON, MONITORING COMPETITION: A MEANS OF REGULATING THE PROPERTY AND LIABILITY INSURANCE BUSINESS 58 (1974) [hereinafter cited as MONITORING COMPETITION].

32. See id. at 54-57.

33. See id. at 57. See also PRINCIPLES OF INSURANCE, supra note 10, at 793 ("mandatory" versus "permissive" rating laws).

34. MONITORING COMPETITION at 54-55, 401.

35. See id. at 30-31.

36. R. HOLTOM, UNDERWRITING PRINCIPLES AND PRACTICES 123 (1973).

-12-

Even though a particular risk may be eligible for insurance coverage because it fits within a particular rating class of an insurance company, the risk may not be acceptable to the company's underwriter.[37] In the case of residential property insurance, the "acceptability" of residential dwelling risks "is based primarily on three factors: a description of the risk to be insured, the appropriate rate to be charged for a described category of risk, and the contractual provisions of the policy to be written."[38]

In analyzing the type of risk which presents less than average probability of loss underwriters will take into consideration the physical features of residential property and certain characteristics of the insurance applicant.[39] Those physical features of the dwelling which may lead to a refusal of insurance include such factors as a building's vacancy, seasonal occupancy and the value of the property.[40] Those characteristics of insurance applicants which may lead an underwriter to refuse to insure a particular residential dwelling may include such factors as the applicant's previous claims record and marital status.[41] As noted earlier, rating plans for residential property insurance usually allow surcharges to be levied in instances where substandard conditions are found to exist. Where such surcharges are not allowed underwriters will simply decline a particular risk if in their judgment the class rate for a risk is not adequate to cover the probability of loss.[42] Finally, underwriters take into account the policy terms of the coverage requested by the insurance applicant before accepting or rejecting residential property risks. For example, a risk which fails to meet the owner-occupied or minimum value requirements of homeowners policies may be offered coverage under a standard fire policy with allied lines endorsements.[43]

Similarly, an underwriter may suggest that a given residential dwelling risk take a higher deductible under a particular homeowners policy to make the risk more acceptable to the insurer and the premium more acceptable to the insured.

State regulation of insurance company underwriting varies from state to state. Some states specifically prohibit refusals to insure particular classes of risks under state unfair trade practices laws. Other states generally prohibit unfair discrimination between classes of risks having similar characteristics. At the present time individual states and the NAIC are giving close attention to existing underwriting practices of insurers for the purpose of determining whether greater governmental oversight of underwriting decisions is needed.

---

37.  PERSONAL LINES at 244.

38.  HUGHES PANEL REPORT, supra note 4, at 32.

39.  Id. at 28.

40.  PERSONAL LINES at 245.

41.  Id. at 251.

42.  HUGHES PANEL REPORT at 32.

43.  PERSONAL LINES at 334-36.

APPENDIX B

Suggested Hearing Format For Those Commissioners Who May Wish To
Conduct Hearings On Redlining

I.    To assure representative attendance and meaningful imput, the Commissioner should hold a hearing(s) in or as close
      to the suspected problem area(s) if at all possible. In addition to normal notification to insurers and insurance trade
      associations, special efforts must be made to reach the following groups or persons:

      A.    Consumer associations or groups;

      B.    Individual residents of the suspected problem area(s);

      C.    Representatives of lending institutions operating in the suspected problem area(s);

      D.    Insurance agents or brokers with offices in the suspected problem area(s);

      E.    Representatives of neighborhood associations (or minority groups -- if applicable);

      F.    Interested state legislators and local government officials; and

      G.    Any other interested persons or groups.

II.   At the hearing(s), the information obtained from all persons testifying (either by written statements or hearing
      transcript) should be categorized into two general areas of concern – i.e. insurance availability and insurance
      affordability.

      A.    Insurance Availability: Information on the availability of insurance should be further subdivided by line of
            personal insurance (i.e. automobile liability, automobile physical damage, replacement cost homeowners,
            actual cash value homeowners, other residential property insurance, etc.). The kind of information obtained
            will vary, depending upon the witness, and should therefore be summarized -- pro and con – to answer, at
            least, the following questions:

            1.    How can the area(s) best be defined and described (i.e. central city, certain zip codes, older homes,
                  populated by minorities, elderly residents, families, high crime, high vandalism, significant traffic
                  congestion.)?

            2.    Which insurance companies are writing business in the area(s) and how competitive are the rate levels?
                  (The latter part of this question will be dealt with later in this format in greater detail.)

            3.    What kinds of policies are being issued by insurers in each area (e.g. replacement cost to homeowners,
                  ACV homeowners, family auto, basic auto.)?

            4.    How much business is voluntarily written by insurers in each area as compared to other areas of the
                  state?

            5.    How many agents have offices in the area(s) and how many companies do they represent?

            6.    What underwriting restrictions exist in each area and for which specific insurers?

            7.    What specific availability problems exist or are alleged to exist as seen through the eyes of the various
                  types of witnesses?

-14-

8.     What has been the incidence of termination or rejection of risks? What grounds?

9.     What can be done to alleviate the availability problems in the area(s)?

B.     Insurance Affordability: In addition to information gathered in II. A., by line of insurance, further information is needed in regard to costs for those persons that are able to obtain insurance. It would seem that, as a minimum, the following questions should be answered about each area:

1.     How many people in each area have insurance in the voluntary market as opposed to residual market mechanisms?

2.     What rate variances, by kind or line and sub-line of coverage, exist between the voluntary and the residual market mechanisms in each area?

3.     How much have area rates, relative to state or other area rates, increased over the last five years, by kind or line and sub-line of coverage, in both the voluntary market and the residual market mechanisms? (Specific premium examples would be helpful.)

4.     What has been the state and/or area loss experience of (a) voluntary insurers; (b) the residual market mechanism; (c) individual policyholders, etc.? (It would probably be helpful to get as much detail as possible about losses – i.e. by type of policy, coverage, classification, etc.)

5.     What do consumers in each area feel is a "fair price" for insurance as compared to what they are paying?

6.     Would individual consumers be willing to accept larger deductibles, or more limited coverage in return for lower premiums? Are such options available from voluntary insurers or the residual market mechanism?

7.     Do consumers generally accept or disagree with the current classification and territorial rating system used by insurers? If not, how would they suggest it be changed? If this change was made, would other persons in the state be unfairly discriminated against as a result of the change?

III.     The summary of findings or copy of hearing transcript should be forwarded to the Chairman of the NAIC Redlining Task Force (H. R. Wilde, Commissioner of Insurance, State of Wisconsin, 123 West Washington Avenue, Madison, WI, 53702) as soon as possible following the conclusion of the hearing. The task force itself will ultimately review the results of all hearings to determine "common countrywide problems and attitudes" as well as those "problems and attitudes" that seem to be confined to a particular geographic area. Based on this information, the task force will then be in a better position to attempt to define "redlining," and prepare courses of action to deal with redlining.

## APPENDIX C

To:     Technical Subcommittee on Statistics of the NAIC Redlining Task Force

From:    Robert A. Bailey (Chairman), NAIC Central Office
         Philipp K. Stern, New Jersey Insurance Department

Date:    March 8, 1978

Re:      Zip Code Reporting

A meeting of the above committee and the Industry Liaison Committee was held in the ISO New York offices on February 21, 1978. Those in attendance were as follows:

Robert Bailey, NAIC; Phil Stern, New Jersey; Robert Gossrow, Illinois; R. L. Jewell, Jr., NAII; Carole Banfield, ISO; Robert Waldman, ISO; F. B. Esan, Jr., Pawtucket Mutual; Richard Munro, Nationwide; Dale Nelson, State Farm; Betty Pawlak, Chubb & Son; Gary Knobb, Hartford.

A considerable amount of time was devoted to first defining the term redlining. There didn't seem to be concise wording which encompassed all forms that redlining might take. It might be done through geographical underwriting, rate level, or coverage variance. In order to resolve this fundamental issue, the following was agreed upon for purposes of our subcommittee:

> Redlining is defined as the refusal to insure or renew at standard rates or at standard coverage on the basis of geographical boundaries.

Our assignment then is to develop a format for the reporting of statistics which would be used to detect such redlining activities. The first question raised was the extent to which reporting would be required. On the voluntary side, the subcommittee recommends requiring all groups writing more than 1% of the market to report voluntary business excluding risks insured via AIPSO or FAIR Plan. In addition, the individual Insurance Departments would retain the right to add specific substandard insurers not included in the previous groups, whose market share is less than 1%.

Secondly, the involuntary market should be analyzed in detail. Each Insurance Department should go directly to the state FAIR Plan and AIPSO and obtain a count of applications or policies in force by zip code. This should be done as soon as possible by the states in order to determine where insureds are resorting to residual markets for insurance because they have found the traditional voluntary markets to be unavailable. Phil Stern will contact PIPSO and AIPSO in order to determine to what extent this information is currently available.

Third, in order to provide a proper basis of comparison and measurement it will be necessary to measure the total market in each zip code. For Private Passenger Automobile Insurance this would mean total passenger vehicle registrations by zip code. The subcommittee recommends that each state obtain a list of such registrations from the state's motor vehicle department. For personal property insurance, house counts, people counts, and automobile counts by zip code are available from census data. Dale Nelson has researched the zip code information available through census data and his letter explaining what is to be had is attached.

Companies should be given the choice of determining whether they report exposures or policy counts to be used in measuring market penetration. Because of the variety of computer systems used by the companies they should be given freedom in this area because of cost considerations. The same holds true for the data base to be used. Either counts in force as of a given date or written during a given twelve month period should be acceptable. Earlier it was mentioned that groups with more than a 1% market share would report. This report should be done on a per company basis in order to detect shifts from the standard members to substandard members. One exception, however, should be made. If a group can

-16-

isolate which members of the group use the same rates and forms, these sub-groups can report on a combined basis. The primary interest lies in seeing movement from a low rate company to a high rate company or vice versa. All data should be reported by each company in each state directly to ISO.

The subcommittee does not support changing existing statistical plans to include zip codes for the following reasons:

1. ISO estimates that on an average there are about 60 zip codes for each rating territory. Zip codes would thus multiply the data to be processed and the handling time by a factor of 60.

2. Since about 85% of all policies are renewals, the new coding would have to be incorporated for a significant number of policies on an individual basis.

3. ISO is considering the possibility of phasing in zip code detail for certain major carriers gradually starting July 1, 1978.

At the same time the subcommittee sees no need for loss experience. Our purpose is solely the detection of possible redlining activity. In earlier correspondence the subcommittee was requested to obtain both exposure and premium data by zip code. We recommend against requesting premium data for the following reasons:

1. Differences in coverage will occur. There are a number of variables such as limits, deductibles, etc. which can distort premium making comparison from zip code to zip code and company to company impossible.

2. The majority of companies record data by individual coverage. Bringing these together in order to construct the total premium per policy or per car would be time consuming, costly, and error prone.

3. Variation in policy terms (six month, annual, etc.) would cause distortions.

4. Single versus Split Limits.

5. The key to detecting redlining lies in exposures, not premiums.

The use of the data collected will be undertaken by the individual state Insurance Departments. We can, however, suggest the following procedures to be used when attempts are made to detect possible redlining. First, the AIPSO and PIPSO statistics should be compared to census data and registration data. This would give an indication as to where redlining is being done by the insurance industry as a whole. Secondly, the activity of nonstandard companies should be observed as compared to the activity of standard companies. This will tell us if certain groups are using higher rate affiliate companies in order to accomplish redlining. This will also indicate the penetration of nonaffiliated nonstandard writers. Also, after collecting two comparable periods of data, we can detect market shifts by a simple comparison of prior exposure counts versus the more current exposure counts.

After detecting the possible existence of redlining, it has been suggested that a study of agent location be undertaken in order to further establish the existence of such. Data on the location of agents by zip code should be available from each state's records of agent licenses. We see two problems that occur when you look at agent location. First, the addresses of agents on file with the state Insurance Departments are generally their home addresses. The location of the home has little bearing on where they write. Secondly, even if you can establish that a given agent has a business location in a given area, it doesn't necessarily follow that he writes insurance in this area. The same can be said of the lack of agents in a certain area. Even if they are physically located elsewhere, the agents may still be writing in certain zip codes. We feel the final test for redlining lies in exposure distribution by zip code. However, once redlining is detected possible remedies may be facilitated by information on location of agents. If a state's records for agent licenses are not readily available by zip code, equivalent data should also be available from the insurers.

In conclusion, the subcommittee recommends adoption of the attached format when investigating alleged redlining. The Line of Business labeled 1 and 2 Family Dwelling Building Fire is intended to exclude all related Allied Lines. Also, when deciding which companies are to be canvassed, Insurance Departments should consider including any surplus lines writers which might warrant zip code reporting.

-17-

**ZIP CODE DATA**

STATE _____

COMPANY NAME_____

LINE OF BUSINESS   ☐  Voluntary Private Passenger Automobile

                    ☐  Homeowners

                           ☐  Forms 1, 2, 3, 5 and 8 - Buildings

                           ☐  Forms 4 and 6 - Tenants and Condominium Owners

                    ☐  1 and 2 Family Dwelling Building Fire

DATA BASE           ☐  In Force As Of  _____

                    ☐  Written During Twelve Months Ending _____

TYPE OF COUNTS   ☐  Exposures

                         ☐  Liability Car-Years

                         ☐  House-Years

                  ☐  Policy Counts

| **ZIP CODE** | **NUMBER OF COUNTS** |
| --- | --- |
| | |

"It is recommended that the collection of zip code data be utilized only when there is a perceived redlining problem in your state. If it is thought there is a problem, the suggested format may be utilized but is recommended that it be limited to those metropolitan areas where the problem or potential problem exists. Indiscriminate use of this format on a blanket basis for all zip codes in all states could lead to implementation problems."

-18-

608

APPENDIX D

ADVISORY COMMITTEE TO
NAIC REDLINING TASK FORCE

January 4, 1978

Ms. Laura Sullivan, Chairperson
State Farm Insurance
One State Farm Plaza
Bloomington, IL 61701
309/662-6463

Mr. Patrick Casey
American Insurance Association
230 W. Monroe St.
Chicago, IL 60606
312/372-8123

Mr. Robert Doucette
Milwaukee Insurance
803 W. Michigan St.
Milwaukee, WI 53233
414/271-0525

Mr. Ralph J. Marlatt
V. P. - Government and
  Industry Affairs
Professional Insurance Agents
640 Investment Building
Washington, DC 20005
202/628-1300

Mr. Bernard Melewski
New York Public Interest
  Research Group, Inc.
1004 E. Adams St.
Syracuse, NY 13210
315/476-8381

Mr. David S. Murphy
Allstate Insurance Company
Allstate Plaza
Northbrook, IL 60062
312/291-5633

Mr. Gregory D. Squires
U.S. Commission on Civil Rights
Midwestern Regional Office
230 S. Dearborn St., 32nd Floor
Chicago, IL 60604
312/353-7371

Mr. R. L. Jewell
National Association of Independent Insurers
2600 River Rd.
Des Plaines, IL 60018
312/297-7800

Mr. Malcolm Robinson
Alliance of American Insurers
20 N. Wacker Dr.
Room 2140
Chicago, IL 60606
312/346-5190

Mr. Stanley O. McNaughton
Pemco Insurance Company
325 Eastlake Ave., East
Seattle, WA 98109
206/628-4000

-19-

APPENDIX E

**PROPOSED MODEL REGULATION INTERPRETING THE PROPOSED AMENDMENT TO SECTION 4(7) OF THE NAIC UNFAIR TRADE PRACTICES ACT**

TABLE OF CONTENTS .

Section 1. Authority
Section 2. Purpose
Section 3. Scope
Section 4. Definitions
Section 5. Specific Examples of Unfair Trade Practices Under
          Section 4(7)(c) of the Act.
Section 6. Severability Clause
Section 7. Effective Date

Section 1. Authority.

These regulations are promulgated pursuant to the authority granted by Sections (insert applicable sections) of the Insurance Laws.

Section 2. Purpose.

The purpose of this regulation is to interpret and state specific examples of the types of practices which shall be deemed to be Unfair Trade Practices under section 4(7)(c) of the NAIC Unfair Trade Practices Act.

Section 3. Scope.

This regulation states certain practices, which if they occur with such frequency as to indicate a general business practice, will be deemed to constitute unfair trade practices. This regulation applies to all persons and to all personal lines automobile and property insurance contracts. This regulation is not exclusive and other acts, not herein specified, may also be deemed to be violations of section 4(7)(c) of the Act.

Section 4. Definitions.

The definitions of "person" and of "insurance policy or insurance contract" contained in section 2 of the Unfair Trade Practice Act shall apply to this regulation and, in addition, where used in this regulation:

(a) "Insurer" means a person licensed to issue or who issues any insurance policy or insurance contract in this state.

(b) "Geographic location" means the principal place of residence or the place where an automobile is principally garaged.

Section 5. Specific examples of unfair trade practices under section 4(7)(c).

Examples of unfair trade practices included within the meaning of the NAIC Unfair Trade Practices Act. In addition to the direct refusal of an insurer to insure a risk on account of the geographic location of that risk, it is an unfair trade practice if an insurer:

(a) Refuses to insure a risk solely because of the age of the property.

(b) Refuses to enter into a relationship with an agent solely because of the location of the agent's business.

-20-

(c) Refuses to insure a risk solely because the applicant was previously denied coverage or terminated by another insurer.

(d) Asks on an application whether the applicant was previously denied coverage or terminated by another insurer.

(e) Does not make available the exact reason for insurer's rejection, cancellation or nonrenewal of an insurance contract.

(f) Does not state, before issuing a notice of rejection, cancellation or nonrenewal what corrective actions must be taken to obtain or continue coverage.

(g) Does not have a system for verifying the accuracy of inspection reports.

(h) Ends a relationship with an agent because of the location of the agent's business, through the application of underwriting or loss ratio standards not generally applicable to all agents of the company.

Section 7. Effective Date.

This regulation shall take effect (insert date).

-21-

STATEMENT OF THE


AMERICAN INSURANCE  ASSOCIATION


BEFORE  THE


COMMITTEE ON THE JUDICIARY


SUBCOMMITTEE ON CIVIL AND CONSTITUTIONAL RIGHTS


UNITED STATES HOUSE OF REPRESENTATIVES


on


H. R. 3504

This statement is offered on behalf of the American Insurance Association, a trade association representing 147 insurers writing property and casualty insurance in all 50 states.

§206 (c) of H.R. 3505 would amend §804 of the Fair Housing Act (Title VIII of the Civil Rights Act of 1968). A new subsection (f) would make it unlawful for an insurer to refuse to enter into a contract of insurance against hazards to a dwelling because of the race, color, or national origin of persons residing in or near the dwelling. AIA and its members endorse this principle. However, we do not believe this principle need be embodied in the Fair Housing Act.

The business of insurance is regulated by the states and at present 46 states have anti-discriminatory statutes which accomplish the goals of §206(c). Thus it is evident that the states have the will and the means to prohibit discrimination on the basis of race or national origin by insurers. Adding §206 (c) to a statute concerned with racial discrimination in real estate transactions is unnecessary and adds an additional regulatory layer. The states are already actively safeguarding the rights of their minority member citizens in the purchase of dwelling insurance.

Page 2

We would further note that the property insurance business
is a highly competitive business, both from the standpoint of
price and risk selection. The underwriting process is one of
selection based on objective criteria and AIA is aware of no
company which selects property risks based on the race, color,
or national origin of the owner or residents of the surrounding
properties.

AIA is concerned by the May 26, 1977 letter to Representative
Edwards from the Potomac Institute suggesting that in a Title VIII
action brought by a member of a minority alleging discrimination by
an insurer the burden of proof be upon the insurer to establish
that its refusal to provide coverage was not because of the race,
color, or national origin of the applicant, but rather because of
a valid business reason.

We recognize the existing divergence of opinion among the
circuits respecting the issue of whom the burden of proof is upon
in Title VIII claims. This would seem to result from a less than
clear Congressional intent when enacting the Civil Rights Act of 1968.
What is clear is that the courts have not consistently applied an
effect test in racial discrimination cases.

The Supreme Court in <u>Washington v. Davis</u>, 426 US 229 (1976),
distinguishes in 14th amendment cases between effect and intent by
holding that a showing of disproportionate impact (effect) is not
sufficient to make out a constitutional claim of racial discrimination.
The claimant is required to establish discriminatory purpose (intent).

002613

Page 3

In a Title VIII action, the Second Circuit in Boyd v. Lefrak Organization, 509 F2d 1110 (1975), anticipated the holding in Washington v. Davis by setting forth an intent test in a purely private action. The court stated that "...we will not impose an affirmative duty on the private landlord to accept low income tenants absent evidence that his motivation is racial rather than economic in nature."

A middle ground test between effect and intent is found in the Seventh Circuit case of Metropolitan Housing Development Corporation v. Village of Arlington Heights, 558 F2d 1283 (1977). On remand, the court stated that in some circumstances a violation of the Fair Housing Act can be established by a showing of discriminatory effect without a showing of discriminatory intent. The court declined to agree that once a racially discriminatory effect is shown a violation is established. Discriminatory effect is only illegal absent a finding of intent where the courts four critical factors lead to such a finding. These factors weighed on a case by case basis are:

1) how strong is the plaintiff's showing of discriminatory effect;

2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of Washington v. Davis;

3) what is the defendant's interest in taking the action complained of; and

4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing?

Page 4

The Third Circuit in <u>Resident Advisory Board v. Rizzo</u>, 564 F2d 126 (1977) and the Eighth Circuit in <u>Smith v. Anchor Building Corporation</u>, 536 F2d 231 (1977), adopt an effects test and place the burden of proof on defendant once a prima facie case of racial discrimination is established.

In New York, the state Court of Appeals addressed the question of racial discrimination in the underwriting of insurance in the case of <u>British and Foreign Marine Insurance Co., Ltd. v. Stewart</u>, 30 N. Y. 2d 53 (1970). The New York Insurance Department cited and fined the named insurance companies for racial discrimination for systemically effecting cancellations of commercial fire insurance coverage in predominantly black areas of New York. The insurers appealed and defended their actions on the basis that they were generally overcommitted on commercial coverages in urban centers and that these areas posed special problems of exposure to excess loss from the riot hazard.

In reversing the Insurance Department, the Court held that geographical discrimination, regardless of the racial makeup of the geographical area, did not constitute racial discrimination. As Justice Brietel states in his concurring opinion "... the reason ...the Superintendent has failed to sustain his determination is that it has been fundamental and legally acceptable in the insurance industry to classify risks on a territorial basis if supported by actuarial data."

It is our opinion that the standard set forth by the Second Circuit in <u>Boyd</u> is consistent with the American system of civil justice which places on plaintiff the burden of proof by a preponderance of the evidence that defendant has done plaintiff an injury. Relieving the plaintiff of the burden of proof serves only to encourage specious litigation which is both time-consuming and expensive. Awarding attorney's fees to a successful defendant is a weak deterrent to making the claim of racial discrimination.

Should the legislative history of H.R. 3504 indicate a preference by Congress for an effects test in Title VIII claims rather than one of intent, it would be near impossible for an insurer to successfully defend itself given the fact that many minority members reside in dwellings uninsurable by ordinary underwriting standards. The property insurance business is highly competitive and it is inevitable that some applicants, regardless of race, color, or national origin, will be denied coverage by an insurer. A presumption that in every such instance denial was based upon color--or any subjective consideration--would be highly unfair and discriminatory itself.

For the reasons set forth, AIA believes §206 (c) should be deleted from H.R. 3504. We do not believe this additional layer

Page 6

of federal regulatory controls is necessary.  However, should

§206 (c) remain a part of the bill and in light of the Potomac

Institute's suggestion, it is our hope that the legislative

history of §206 (c) will clearly reflect that the burden of

proving racial discrimination remains with the party alleging

such discrimination.

                                    Respectfully submitted,
                                    Charles E. Hunt
                                    Secretary-Property Insurance Committee
                                    American Insurance Association


CEH:gc

CRUM & FORSTER INSURANCE COMPANIES

**LESLIE CHEEK**
VICE PRESIDENT
FEDERAL AFFAIRS

May 12, 1978

The Honorable Don Edwards, Chairman
Subcommittee on Civil & Constitutional Rights
Committee on the Judiciary
U.S. House of Representatives
2137 Rayburn House Office Building
Washington, D.C.   20515

Dear Mr. Chairman:

Re:  H.R. 3504, Section 206(c)

The Crum & Forster Insurance Companies are the 13th
largest group of property-casualty insurers in the United
States, writing over $1.3 billion in premium and providing
coverage for more than 460,000 homes and businesses across
the country each year.

We are concerned about the potential impact of section
206(c) of the captioned legislation on the property insurance
business.  Section 206(c) would add a new subsection (f) to
section 804 of the Fair Housing Act, making it an unfair
housing practice "for a person in the business of insuring
against hazards to refuse to enter into a contract of
insurance against hazards to a dwelling because of the race,
color, or national origin of persons residing in or near
the dwelling."

As we understand section 206(c), any plaintiff in
an administrative or judicial proceeding would have to
establish that an insurer's refusal to write property
insurance was "because of the race, color, or national
origin" of the residents of the dwelling or of the immediate
neighborhood.  This approach is consistent with the require-
ments the Supreme Court has imposed in 14th Amendment cases.
See Washington v. Davis, 426 U.S. 229 (1976).  See also
Franklin Quincy Corporation v. Public Service Mutual Insurance
Co., Civil Action #76C-1543, U.S. District Court, Eastern
District of New York, in which Judge Mishler stated, in
dicta, that an insurer's cancellation of policies in a racial
minority neighborhood could be held to be a violation of the
Fair Housing Act if it could be established that the can-
cellations were in fact based on race.

1120 CONNECTICUT AVENUE. N. W., SUITE 1142, WASHINGTON. D.C. 20036 · TELEPHONE (202) 296-5850 ·

The Honorable Don Edwards
May 12, 1978
Page Two

We feel confident that section 206(c) in its current form does not seek to reverse the fundamental principle of our civil and criminal law that a person is presumed innocent until proven guilty, and that a plaintiff or complainant would be required to establish that a refusal to insure was in fact racially motivated.

We also feel certain that section 206(c) does not seek to supplant the requirement of a showing of discriminatory intent with a requirement of a showing of discriminatory effect as the basis for an insurer's liability. It is central to our civil and criminal law that after-the-fact effect is relevant only in establishing the original intent of an action.

However, the Potomac Institute has suggested to you that the prevailing standard in discrimination cases should be turned on its head, and that insurers should be required to prove that their denial of coverage was not "because of the race, color, or national origin" of the applicant. In its letter of May 26, 1977, the Institute proposed that section 206(c) be rewritten to provide that "once it is shown that a property insurance policy was denied to a member of a minority or ethnic group or to a dwelling located in a minority or ethnic neighborhood, the burden of proof would shift to the insurer to establish that its refusal to issue the insurance policy was not because of race, color, or national origin, but because of valid business reasons."

Because of the suggestion made by the Potomac Institute, we hope that the legislative history of section 206(c) will make it clear that the provision is not intended to alter time-honored concepts of burden of proof, and that a plaintiff or complainant must show that the insurer's refusal to insure was racially motivated in fact, rather than racially discriminatory in effect.

In the absence of such clarification, litigation under section 206(c) could impose serious and costly burdens on the property insurance business.

There are nearly 2,000 American property insurance companies, and they compete with each other in two ways -- on the basis of price, and on the basis of risk selection. An insurer enhances its ability to compete on the basis of price by selecting out from a homogeneous class of potential insureds those whose loss exposure it believes is materially worse than the average of the class as a whole. This risk selection process is called underwriting.

The Honorable Don Edwards
May 12, 1978
Page Three


It is inevitable, in the competitive underwriting process, that some applicants, whether black, yellow or white, will be rejected by one or more insurers. If the test of racial discrimination in section 206(c) is one of effect, rather than intent, and the burden is placed on the insurer to show that the refusal to insure was not "because of the race, color, or national origin of persons residing in or near the dwelling," the potential for harassing suits by disgruntled applicants will be enormous, as will the cost and difficulty of defending a highly technical and objective process against highly emotional and subjective charges.

The laws of most of the States (see, e. g., New York Insurance Law §§ 40, subd. 10; 273; 651 et seq.; 652, subd. 1; and 653, subd. 1(a) and (b)), prohibit racial considerations in underwriting, and we know of no insurer that permits risk selection in whole or in part on the basis of race, color, or national origin. But because many of the external physical and societal factors that adversely affect property insurance risks are concentrated in areas with high concentrations of minority residents, it would be extremely difficult for an insurer to show that refusal to insure a property in these areas was based on adverse factors, rather than the race of the applicant, if an "effect" test applied under section 206(c). And to make such a showing would require insurers to keep underwriting records containing racial information, something they do not now do and do not want to do.

We firmly believe that there should be no racial discrimination in the sale of property or any other kind of insurance. Assuming adequacy of premium in the light of the cost of making individual risk inspections and other expense factors, it is our policy, and, we believe, that of all other insurers, to consider any individual risk meeting objective criteria with respect to internal and external factors, and to accept or reject such risks on the basis of these characteristics, none of which have anything to do with race, color, or national origin.

Accordingly, we think it would be unreasonable to impose on insurers the burden of establishing that their individual risk selection decisions are not racially motivated, and we strongly recommend that the legislative history of section 206(c) make it clear that the section is not intended to relieve a complaining party of the obligation of establishing that an insurer's decision to decline coverage was in fact racially motivated.

Sincerely yours,

*Leslie Cheek*

Leslie Cheek, III
Vice President-Federal Affairs

LC/kor



Washington Office:

Alliance of American Insurers
1776 F Street, N.W.
Washington, D.C. 20006
202·331·0313

August 8, 1978

The Honorable Don Edwards, Chairman
Subcommittee on Civil and
    Constitution Rights
House Committee on the Judiciary
2137 Rayburn House Office Building
Washington, D. C.  20515

Dear Mr. Chairman:

    On behalf of the Alliance of American Insurers, I would
like to express concern about Section 206(c) of H.R. 3504,
the Civil Rights Amendments Act of 1977, and its effect on
the property and casualty insurance industry.

    The Alliance is a major association of over 100 property
and casualty insurance companies.  Our members write personal
and commercial coverage in all fifty states and the District
of Columbia.

    Section 206(c) of the bill would add a new subsection (f)
to Section 804 of a newly entitled Fair Housing Act.  This
would make it an unfair housing practice for insurers to refuse
to enter into a contract of insurance against hazards to a
dwelling "because of the race, color or national origin of
persons residing in or near the dwelling."  The bill would also
provide new provisions to enforce the Fair Housing Act includ-
ing 804(f).

    We think that Section 206(c) of the bill is unnecessary
and urge that it be deleted.

    We are unaware of any insurer that permits race, color or
national origin to be given any consideration in determining
whether to issue a policy.  Apart from the moral question, to
do so would be contrary to sound business principles, and in a
highly competitive business would pointlessly deprive the
insurer of a potentially large share of a lucrative market.

The Honorable Don Edwards                                    Page 2

Moreover, a number of states have enacted statutes pro-
hibiting racial considerations in underwriting.  In these
circumstances, the prohibition provided in this bill would
duplicate the state laws and the power of the federal govern-
ment would be superimposed upon that of the states with
resulting confusion and uncertainty.

It should be noted also that the National Association of
Insurance Commissioners' Model Act relating to Unfair Methods
of Competition and Unfair and Deceptive Acts and Practices in
the business of insurance prohibits the "making or permitting
any unfair discrimination individuals of the same class and
of essentially the same hazard in the amount of premium, policy
fees or rates charged for any policy or contract of accident
or health insurance or in the benefits payable thereunder, or
in any of the terms or conditions of such contract or in any
manner whatever."

We submit that the administration and enforcement of anti-
discrimination laws are properly the responsibility of the
State Insurance Commissioners who are familiar with the intri-
cacies and complexities of the insurance industry.  These Com-
missioners, by reason of their duties, background and expertise,
are in a position to assess and determine whether there has
been any improper discrimination, and to police the industry
in this and other matters.

Given the nature of the insurance industry and the limited
capital available, there will doubtless be cases where appli-
cants for insurance will be denied coverage by an insurer.
These denials will not, however, be based on considerations
relating to race, color or national origin but rather on the
availability of funds and sound business principles.

For the foregoing reasons, we urge the Committee to delete
Section 206(c) from the bill.  We do not believe that there
exist any racial discriminations in the issuance of insurance
policies.  If there are any, there are state laws and regula-
tions dealing with any violations which may exist.

The Honorable Don Edwards                          Page 3

    It will be appreciated if this letter and the views
contained therein can be made a part of the hearing record
on this proposal.  I am enclosing a copy of a statement sub-
mitted to the Senate Committee on Banking, Housing and Urban
Affairs which deals generally with the subject of discrimina-
tion.  It would be appreciated if this statement could also
be made a part of the record.

    Thank you very much for your consideration of these
views.

                    Very truly yours,

                    John D. Stringer
                    Counsel

Enclosure

# VI. Others

 NATIONAL APARTMENT ASSOCIATION

Donald B. Lawrence
President

William Henry Shane, Jr.
First Vice-President

Robert Ross
Secretary

James Stygall
Treasurer

June 7, 1977

Honorable Don Edwards, Chairman
Subcommittee on Civil and Constitutional Rights
House of Representatives
Washington, D.C. 20515

National Vice Presidents
William J. Ash III
J. A. Brown
Roland Freeman
Barbara MacManus
Thomas Mahaffey
J. D. Nichols
Steven Nordstrom
Timothy Schaefer

Denise Benson
Executive Director

Re: H.R. 3504

Dear Mr. Chairman:

This will acknowledge receipt of your letter of May 3, 1977 with which you enclosed a copy of H.R. 3504, a bill to amend title VII of the 1964 Civil Rights Act and title VIII of the 1968 Civil Rights Act. You requested the opinion of this Association on the fair housing provisions of the bill (title II, H.R. 3504).

Title II of the bill was discussed at a recent meeting of the NAA Steering Committee. The Committee was primarily concerned with two provisions: (1) granting HUD "cease and desist" powers, and (2) the creation of a Fair Housing Loan Fund from which private litigators may borrow money for housing discrimination cases. The NAA takes no position, at this time, on the other housing provisions of the bill.

Sec. 208 of the bill would give HUD the authority to issue cease and desist orders through administrative proceedings. This would be substituted for existing provisions which limit HUD's enforcement powers to conference, conciliation, and persuasion. The rationale for this provision is an "indication" by former HUD Secretary, Carla Hills, that HUD's conciliatory powers have proved inadequate to secure compliance with the substantive provisions of the Act.

It has been the experience of the National Apartment Association and its seventy affiliates, that HUD's conciliatory powers have been effective, particularly because the Department of Justice has interpreted, very broadly, its powers to initiate "pattern or practice" discrimination cases. It has also been the experience of our Association that blatant cases of discrimination

Name GPA     •     1825 K St., N.W.     •     Washington, D.C. 20006     •     (202) 785 5111

Page 2
Honorable Don Edwards, Chairman                          June 7, 1977

are rare, and generally, property owners are disposed to conciliatory efforts.
We believe that it is incumbent upon HUD, which apparently sponsored this
change in the Fair Housing Act to recite the details of allegations of discri-
mination which were substantiated and concerning which conciliatory efforts
were fruitless. Such instances should also recite the subsequent involvement
of the Department of Justice and, if not, the reasons why the incidents were not
referred to the Department of Justice.

With respect to the Fair Housing Loan Fund, we believe that this would
establish a costly burdensome precedent which might well extend to relief for
low income litigants contemplating actions in many other regulatory areas. Cer-
tainly, a litigant seeking relief in alleged housing discrimination cases has no
greater claim on the taxpayers than a moderate income citizen challenging a
decision of the Internal Revenue Service, HUD in approving an increase in rents
on an FHA project, the FCC in denying a license for a publicly sponsored TV
station, or the decision of any government agency which affects his personal
life and finances.

Sincerely,

John C. Williamson
General Counsel

JCW/mk

## AMERICAN INSTITUTE OF HOUSING CONSULTANTS
### INCORPORATED
#### AN ASSOCIATION OF PROFESSIONALS IN DEVELOPMENT AND PROPERTY MANAGEMENT

President
ENOCH WILLIAMS, NEW YORK, N. Y.
Vice Presidents
BILL BROKAW, BETHANY, OKLA.
ALVIN GERSHEN, TRENTON, N. J.
Secretary
JAMES J. HURLEY, NEW YORK, N. Y.
Treasurer
CLARENCE WHITE, DETROIT, MICH.

ENOCH WILLIAMS, PRES.
SUITE 1703
853 BROADWAY
NEW YORK, N. Y. 10003

JAMES J. HURLEY, SEC'Y
162 WEST 54TH STREET
NEW YORK, N. Y. 10019

May 25th, 1977

Hon. Don Edwards, Chairman,
Sub-committee on Civil Rights,
House of Representatives,
Washington D.C. 20515

Dear Mr Edwards,

Mr Enoch Williams, president of our Institute, has asked
me to reply to your letter, addressed to him, of May 3rd, 1977.

After reviewing the text of Title II of Bill 3504, we find
no objection to the civil rights provisions found in it.

One comment by many of our members, who are experienced
housing professionals, relates to the interminable delays
between the enactment of legislation and the issuance of
"regulations" by H.U.D. for the administration of the new
laws.   The mere fact of new legislation affecting housing
often produces a delay in processing by as much as a year,
whilst regulations are being promulgated at the administrative
level.

On behalf of our members, we thank you for your interest
in our activities and will be pleased to cooperate in any
way with your committee.

Yours very truly,

James J. Hurley, Secretary

AMERICAN
BANKERS
ASSOCIATION

1120 Connecticut Ave. N.W.
Washington, D.C.
20036

EXECUTIVE DIRECTOR
GOVERNMENT RELATIONS

Gerald M. Lowrie
202/467-4097

September 12, 1977

The Honorable Don Edwards
Chairman
Subcommittee on Civil and Constitutional Rights
Committee on the Judiciary
U. S. House of Representatives
Washington, D. C. 20515

Dear Mr. Chairman:

The American Bankers Association would like to take the opportunity
to comment on those provisions of H.R. 3504 of greatest interest to
us. We hope our observations are helpful to you and Congressman
Drinan in shaping the proposed legislation. We have addressed
most of our comments to the general thrust, rather than the specifics,
of the proposals. However, we would be happy to discuss any other
aspects with you or members of your staff.

Our initial reaction to Part I of Title II -- which extends HUD's
enforcement powers -- is that there are a number of technical
problems which could be solved by re-drafting. For example, the
term "aggrieved person" is not defined, although it was under prior
law. The bill also provides that HUD may file a charge on its own
initiative, but is unclear as to with whom. This could easily be
corrected by re-drafting the first two lines of this section to read:
     "Whenever an aggrieved person files, or the Secretary on
     the Secretary's own initiative brings, a charge ..."

We also see the potential for privacy-related problems. For in-
stance, while investigative powers granted to HUD are substantially
similar to those contained in current law, the proposed change
speaks in vague terms of "any information" that relates to " a charge,"
rather than the specific items discoverable under present law which
must be "reasonably necessary for the furtherance of the investigation."
Under present law, HUD probably could subpoena bank records in connection
with an investigation of a housing discrimination complaint. However,
the more relaxed standards of H.R. 3504 could be conducive to "fishing
expeditions" already discouraged in other areas of law.

Serious privacy questions are also raised because the present pro-
hibition against making public or using as evidence anything uncovered

AMERICAN
BANKERS
ASSOCIATION

CONTINUING OUR LETTER

The Honorable Don

SHEET NO. 2



in an informal proceeding without the consent of the person involved
has been deleted from the bill.

The bill provides that a person conducting an on-the-record adminis-
trative hearing "may issue an order providing such relief as is
described in Section 812(c)" -- which refers to money damages,
equitable and declaratory relief, and punitive damages of up to
$10,000. We question whether the grant to HUD of such broad relief
powers was intended by H.R. 3504's sponsors. Both you and Congressman
Drinan, in your introductory remarks, speak only of giving HUD the
power to issue "cease and desist orders requiring that the discrim-
inatory practices be terminated." Likewise, Falk and Franklin
("Equal Housing Opportunity: The Unfinished Federal Agenda") recom-
mended only that HUD's administrative processes be equivalent to those
in other agencies, viz. cease and desist orders. Further, it is
possible that granting an agency the power to levy punitive damages
might present constitutional problems. Additional research is
certainly needed on this issue.

The bill re-drafts Section 813 to permit a court to grant reasonable
attorney fees and costs to a "prevailing party" in any civil action.
It also would permit HUD to grant similar costs in any administrative
proceeding. It is unclear, however, just who will pay these costs
where a plaintiff/aggrieved party loses. This provision should be
retained in order to discourage frivolous lawsuits, but needs to be
clarified.

Our primary concern with Section I, however, is subsection 206(e),
which explicitly prohibits "redlining". As Representative Drinan
has himself noted, discrimination in mortgage lending is apparently
already covered by Section 805 of the Fair Housing Act. In addition,
the whole so-called "redlining" issue has been the subject of much
debate and study -- with no conclusive evidence presented. Banks
have nothing to gain by turning away sound loans, for such loans
made to customers in their business area enhance the prospects for
profitable, expanding bank operations. If an institution has
relatively few loans in such an area, the reason is most likely
credit evaluation -- e.g., a reflection of borrowers' long-term
ability to repay the loan and/or the soundness of the particular
dwelling as security for the loan.

Rather than adding additional restrictive language to deal with
housing problems, we suggest a more positive approach of promoting
voluntary programs which encourage urban investment. An excellent
example is the proposed Neighborhood Reinvestment Corporation and
its predecessor Urban Reinvestment Task Force. Such a program, which





involves efficient utilization of capital and other resources on a
voluntary basis, has proved to be successful, not only for the people
and neighborhoods involved, but for the participating financial insti-
tutions as well.

The ABA certainly supports the concept of Part 2, which makes it
illegal to discriminate against the handicapped in housing sales or
rental, financing of housing, or provision of brokerage services.
Our only concern is that compliance procedures be simple and work-
able.  This is, as you have noted, a relatively new legislative
area, and there is a need to uncover just exactly what barriers
exist and how they can realistically be overcome.

However, Part 5 of H.R. 3504 has the potential of setting what we must
regard as a questionable precedent -- government funding of private law-
suits.  In establishing a "Fair Housing Loan Fund" from which private
litigators can borrow to bring housing discrimination cases before the
regulatory agencies or courts, Congress would apparently give HUD the
discretion to fund such lawsuits under any circumstances.  This would
certainly encourage frivolous law suits.  Also, the new section 818(b)
provides that any loans to a plaintiff are repayable out of any costs
allowed to him in such civil actions, but gives the Secretary discretion
to cancel any amount of the loan (presumably if plaintiff loses).  This
section provides no guidance as to under what circumstances the Secretary
may make or forgive loans.  Also, standards should be set to ensure loan
repayment, of course.

We wonder what the cost will be to the Treasury and the taxpayers vis-
a-vis the benefits derived.

In summary, we believe most of the problem areas of this legislation
can be eliminated through re-drafting of the proposed language.  If
you would like some specific suggestions, William H. Smith, ABA
General Counsel, would be happy to cooperate.

I hope our comments will be of help to you and Congressman Drinan.

Sincerely,

Gerald Lowrie

Gerald M. Lowrie

**Serving the Nation's Housing and Community Development Needs**

The Honorable Don Edwards
Chairman
Subcommittee on Civil and
 Constitutional Rights
Committee on the Judiciary
U.S. House of Representatives
2137 Rayburn House Office Building
Washington, D.C. 20515

Dear Mr. Chairman:

I am pleased to transmit for your consideration the attached resolution of the NAHRO Board of Governors in support of extending cease and desist authority to the Department of Housing and Urban Development in order to effect compliance with Title VIII of the Civil Rights Act of 1968. As you may be aware, NAHRO is the national professional association which represents over 7,000 officials and 2,000 agencies commited to the effective and equal implementation of local housing and community development programs.

We are pleased to endorse the provision in legislation now under consideration by the Subcommittee (Title II, HR 3504) which would provide authority for cease and desists actions. It is universally recognized that the lack of such an enforcement mechanism has seriously constrained the fair housing and equal opportunity objectives of Title VIII. In addition to this strengthened enforcement authority the pending bill contains other worthy provisions designed to expand or clarify the coverage of the Fair Housing Law. In this regard, we would like to add our specific endorsement to the provision which would bring discrimination based on handicapped status within the purview of Title VIII. We trust the Subcommittee will act expeditiously on this legislation. It is our hope that final congressional enactment will be possible during the current session.

A priority policy goal of our asssociation is the conservation and rebuilding of American communities based on the full achievement of equal opportunity for all Americans in employment, education, and housing. Your vigorous attention to these same concerns is both well recognized and appreciated. I would ask that a copy of this letter and the attached resolution be included in the record of the current hearing.

Sincerely yours,

Robert W. Maffin
Executive Director

Enclosure

RWM/sam

**National Association of Housing and Redevelopment Officials**
2600 Virginia Avenue, Northwest Suite 404 Washington, D.C. 20037 (202) 333-2020



**Jerving the Nation's Housing and Community Development Needs**

<u>RESOLUTION</u>

of the NAHRO Minority Affairs Committee adopted at its February 15, 1976 meeting in New Orleans, La.

The NAHRO Minority Affairs Committee calls upon the Board of Governors to support the following resolution seeking cease and desist powers for the Office of Fair Housing and Equal Opportunity U. S. Department of Housing and Urban Development and that this endorsement be conveyed to the Congress and the Secretary of HUD.

WHEREAS: The purpose of Title VIII of the Civil Rights Act of 1968 is to assure Equal Opportunity in Housing for minorities and women

WHEREAS: The Department of Housing and Urban Development has primary responsibility for the enforcement of said Title VIII in the processing of complaints of discrimination, and

WHEREAS: The Department of Housing and Urban Development is severely limited in its enforcement efforts as it is confined to methods of conference, conciliation and persuasion and is not authorized to issue Cease and Desist Orders.

Now therefore, be it resolved, that Title VIII of the Civil Rights Act of 1968 be amended to give the Department of Housing and Urban Development the power to issue Cease and Desist Orders to effect compliance with the substantive provisions of the law and be it further resolved, that the Board of Governors of NAHRO request the Congress of the United States of America to take immediate action to amend Title VIII of the Civil Rights Act of 1968 by giving the Department of Housing and Urban Development the right to correct substantive violations of the law.

Approved by NAHRO Board of Governors
April 22, 1976

**National Association of Housing and Redevelopment Officials**
2600 Virginia Avenue, Northwest  Suite 404  Washington, D.C. 20037  (202) 333-2020

| National | 1620 Eye Street, N.W. | OFFICERS: |
| League | Washington, D. C. | |
| of | 20006 | |
| Cities | (202) 293-7310 | |
| | Cable: NLCITIES | |

May 10, 1978

The Honorable Don Edwards
Rayburn House Office Building
Room 2329
Washington, D.C.    20515

Dear Congressman Edwards:

This is in reply to your recent letter requesting comments
by the National League of Cities on proposed amendments to the
fair housing provisions of the Civil Rights Act of 1968.

The first amendment (contained in Section 205 of H.R. 3504)
would make it unlawful for any locality in the exercise or enforce-
ment of its powers with respect to planning, zoning, subdivision
controls, building codes or permits, or other matters affecting
land use or development, "to exclude low or moderate income
housing because of the eligibility of such housing for governmental
assistance, or because of the race, color, national origin, or
economic status of the prospective residents of such housing."

The second amendment, offered as an alternative, would make
it unlawful for a locality, in the exercise of the same powers
as mentioned above, "to fail or refuse to afford a reasonable
opportunity for the development of its fair share of the regional
need for low and moderate income housing."

The National League of Cities strongly supports efforts
to promote fair share plans.  Our national policy for 1978 states:

> "To achieve rational housing planning, some
> regional approaches are necessary.  The
> federal government should expand incentives
> for such regional approaches as in the
> existing Housing Opportunities Programs.

PAST PRESIDENTS  Tom Bradley, Mayor, Los Angeles, California • Henry W. Maier, Mayor, Milwaukee, Wisconsin • Hans G. Tanzler Jr., Mayor, Jacksonville, Florida  DIRECTORS  Nathaniel Bates, Mayor, Richmond, California • William Bosser, Councilman, Anchorage, Alaska • Maureen Bye, Mayor, Meriden, Connecticut • Nicholas R. Carbone, Council member, Hartford, Connecticut • Richard E. Carver, Mayor, Peoria, Illinois (David L. Chambers), Councilman, Kansas City, Missouri • Henry Cisneros, Councilman, San Antonio, Texas • Richard L. DeCair, Councilman, Virginia Beach, Virginia • Floyd A. Decker, Councilman, Denver, Colorado • Arthur M. Doan, Mayor, Saginaw, Michigan • Margaret T. Hance, Mayor, Phoenix, Arizona • William L. Hanna Jr., Mayor, Homestead, Maryland • Ford Hannson, Mayor, Scottsbluff, Nebraska • Scott Sandner, Mayor, Max M. Heller, Mayor, Greenville, South Carolina • Erma Henderson, Councilwoman, Detroit, Michigan • Charles F. Horn, Mayor, Kettering, Ohio • William H. Hudnut III, Mayor, Indianapolis, Indiana • Maynard Jackson, Mayor, Atlanta, Georgia • Carl T. Langford, Mayor, Orlando, Florida • Patience Latting, Mayor, Oklahoma City, Oklahoma • Don K. Munoz, Executive Director, Montana League of Cities and Towns • Charles J. Pasqua, Executive Director, Louisiana Municipal Association • Cathy Reynolds, Councilwoman, Denver, Colorado • Kennedy Shaw, Executive Director, Georgia Municipal Association, League of Cities and Towns • Jack O. Smith, Mayor, Auburn, Maine • Kent E. Swisher, Executive Director, Alaska Municipal League • Sterling Tucker, Chairperson, District of Columbia Council, Washington, D.C. • David J. Vann, Mayor, Birmingham, Alabama • Joel Wachs, Councilmember, Los Angeles, California • Erik Angsion, Councilman • William L. Waldmeier, Mayor, Peoria, Illinois

The Honorable Don Edwards
May 10, 1978
Page two

> NLC supports efforts to enforce reasonable
> "fair share" requirements, including
> denials of federal program funds to
> communities that refuse to provide adequate
> low and moderate-income housing. Special
> attention is needed to insure that dis-
> persal of low and moderate-income families
> does not result in their renewed isolation
> nor in a lack of related supportive services."

We believe, however, that enactment of the "fair share"
amendment as a requirement in a national civil rights law is
premature. There are only a handful of regional fair share
housing arrangements now in existence, covering not more than
a dozen metropolitan areas. Furthermore, even when a locality
participates in such an arrangement, its participation is purely
voluntary; it may withdraw at any time from the arrangement. And,
most important, there is very little agreement, even within a
particular region, on what constitutes a community's "fair share"
of the region's housing need.

Rather than asking courts to decide a community's "fair share"
of regional housing needs on a case-by-case basis, we believe it
would be far preferable for the Congress to encourage the formation
of, and provide incentives to, fair share housing plans through
national housing and community development laws. A consistent
national approach in this area, combined with the availability of
adequate housing subsidy programs, would much more effectively
achieve the objectives of the alternative proposal without costly
and time-consuming litigation.

The NLC strongly endorses the provision contained in H.R.
3504, which in large part codifies recent case law with respect
to exclusionary land use controls. This provision also extends
the law, however, to reach exclusionary land use controls aimed
at the "economic status" of prospective occupants of housing.
We support this extension of existing law as a logical and
necessary component of a national policy designed to end the
use of discriminatory land use controls; such controls, while
often neutral on their face, often have the effect of excluding
those of low and moderate income.

Sincerely yours,

George Gross
Director, Federal Relations

GG:bn

Columbia University in the City of New York | *New York, N. Y.  10027*

SCHOOL OF LAW                                                                    435 West 116th Street

May 10, 1978

Janice Cooper, Esq.
Committee on the Judiciary
United States House of Representatives
Washington, D.C.  20515

Dear Ms. Cooper:

         Representative Edwards and you have asked me to comment on
the provisions of H.R. 3504, which would empower the Secretary of
Housing and Urban Development to enter orders akin to those of the
courts in proceedings initiated by individuals who believed themselves
to have been damaged by unfair housing practices.

         In that connection you have been kind enough to send me a
memorandum by Larry A. Hammond of the Office of Legal Counsel, dated
January 25.

         I have read Mr. Hammond's analysis carefully, and I find
myself largely in accord with what he has had to say concerning the
civil damages provisions of H.R. 3504.  As the bill is now drafted,
I fear that it would evoke strong constitutional challenges, and I
think the likelihood of successful challenge is significantly large.

         I do not conclude, however, that the purposes of this branch
of H.R. 3504 cannot be served by other enforcement devices.  Mr. Hammond's
memorandum suggests some different routes to the same goal.  You may also
wish to consider the reparation proceedings that are now available
in the Interstate Commerce Commission, to permit recovery of excessive
or discriminatory charges; the judgment of the Interstate Commerce
Commission can be challenged in subsequent court proceedings, but
in those proceedings, the ICC order is given very substantial force.

         The fact that the Secretary's order can be couched in terms
of dollars and cents is not, in my opinion, constitutionally hurtful
in this day and age.  What must be avoided, however, is too naked a
transfer of power from the judiciary to the executive, which is what
I think is wrong with the present proposal.  A determination in an
enforcement proceeding might well inure to the benefit of identified
individuals (as happens, for example, when the National Labor Relations
Board orders reinstatement, with payment of back wages, upon a finding
that an employee has been discharged for a forbidden reason).  That is

– 2 –

different, however, from stirring judicial resentment by simply moving conventional <u>inter</u> <u>partes</u> litigation from one forum (a court) to another (an executive department).

Sincerely yours,

Walter Gellhorn
University Professor Emeritus

WG/dl

**Federal Home Loan Bank Board**



1700 G Street, N.W.
Washington, D.C. 20552

Federal Home Loan Bank System
Federal Home Loan Mortgage Corporation
Federal Savings and Loan Insurance Corporation

May 12, 1978

The Honorable Don Edwards
Chairman
Subcommittee on Civil and
   Constitutional Rights
Committee on the Judiciary
House of Representatives
Washington, D.C.  20575

Dear Mr. Chairman:

This is in response to your request for the Bank Board's
comments on H.R. 3504, the Civil Rights Amendments Act of 1977.
I will confine my comments to Title II of the bill concerning
Fair Housing Act Amendments.

The bill would enact six changes to the Fair Housing Act.
First, it would expressly prohibit discrimination on the
basis of the neighborhoood in which a dwelling is located.
Second, it would prohibit "redlining" by insurance companies.
Third, it would prohibit exclusionary zoning policies.  Fourth,
it would strengthen HUD's enforcement role.  Fifth, it would
establish a Fair Housing Loan Fund.  Sixth, it would prohibit
discrimination against the handicapped under the Act.

You have expressed your particular interest in our comments on
the mortgage redlining provision.  The Bank Board is pleased
to have Congressional recognition that lenders should not
establish policies regarding the unavailability of credit based
on the "neighborhood" in which a dwelling is located. As
you may know, the Bank Board has recently proposed regulations
containing an almost identical prohibition against discrimination
based on the location of the dwelling. We are concerned,
however, about the use of the word "neighborhood" without
any statutory definition.

The Honorable Don Edwards
Page Two ·

We have wrestled with this issue in the proposed non-discrimi-
nation regulations and have concluded that "neighborhood"
has too many different meanings, some of which relate to
prohibited bases such as the ethnic or social composition
in a given area.  Therefore we suggest that "vicinity" or
"location" be substituted for "neighborhood."

Second, the Bank Board believes that all impediments to sound
urban investment should be removed.  To the extent that "red-
lining" by insurance companies is a problem for urban residents,
the Bank Board believes that it should be addressed.  Certainly,
insurance is a necessary component of home ownership and a pro-
per area of concern under the Fair Housing Act.

Further, the Bank Board supports strengthening HUD's enforcement
authority over Fair Housing Act violations.  Conciliatory powers
are not sufficient to ensure compliance with the Act.  However,
the Bank Board is concerned about the overlap of jurisdiction
which the bill would create with regard to regulated financial
institutions.

As you may know the Bank Board has extensive supervisory
authority over institutions insured by the Federal Savings
and Loan Insurance Corporation.  These powers include the
ability to issue cease and desist orders against an institution
which has violated, or the agency has reasonable cause to
believe is about to violate, any law or regulation of the
Bank Board.  In addition, the Bank Board regularly examines
all insured institutions reviewing their compliance with
applicable laws and Bank Board regulations.

The Bank Board has extensive nondiscrimination regulations
implementing the Fair Housing Act.  As indicated above, our
proposed regulations explicitly prohibit discrimination on the
basis of the location of the property and we have interpreted
our existing regulations as prohibiting discrimination against
borrowers whose security property is located within a predeter-
mined geographic area, because of the location of the property,
if such practices have a discriminatory effect against members
of a racial, ethnic or religious group.  Both our existing
and proposed regulations are generally considered to be far-
reaching regulations prohibiting discriminatory home lending
practices.  Since the Bank Board's regulations are very thorough,
and in light of our annual examination procedure, it is our view
that the Bank Board's present enforcement mechanism is stronger
than the proposed HUD enforcement.  In any event, there is no

The Honorable Don Edwards
Page Three

need to duplicate an existing system.  We would suggest there-
fore that there be an express exemption for insured institutions
as defined in section 401 of the National Housing Act.  We
further suggest that the affirmative action language of the
existing section 808(d) of the Fair Housing Act, concerning
administration by agencies other than HUD, be clarified to
indicate express direction by Congress for enforcement by
the Federal financial regulatory agencies.

When you resume hearings the Bank Board would be anxious to
testify concerning our role in the federal effort to eliminate
discrimination in mortgage lending.

Sincerely,

Chairman

STANFORD UNIVERSITY

STANFORD LINEAR ACCELERATOR CENTER

Mail Address
SLAC, P. O. Box 4349
Stanford, California 94305

June 20, 1978

The Honorable Don Edwards
House of Representatives
Washington, D. C. 20515

Dear Congressman Edwards:

I am writing to you in support of Title II of HR 3504 which you
introduced jointly with Mr. Drinan in order to improve the enforcement
and other provisions of the 1968 Civil Rights Act in the area of fair
housing.

I am writing as a private citizen reflecting, however, the experi-
ence gathered as the Head of a major institution employing more than
1,000 individuals in the San Francisco Bay Area.

The lack of available housing at moderate cost is becoming increasingly
the most critical problem facing our employees. In turn this is aggravated
by the discriminatory pattern which your bill is attempting to remedy. As
you know, a series of audits performed by HUD, local citizens' groups,
and newspaper reporters continue to confirm that close to one-half of all
managers in charge of rental units on the San Francisco Peninsula are guilty
of racially discriminatory practices which range all the way from the most
blatant to a more subtle pattern.

The combination of racial discrimination and outright absence of low
and moderate income housing has made it impossible for a substantial fraction
of the lower paid staff members of the Stanford Linear Accelerator Center to
find housing close to our laboratory. This results in increased commuting
distances and consequent energy waste and pollution. We have carried out a
statistical analysis of how the distance between the place of employment
and home correlates with the compensation level of our employees. We find,
not surprisingly, that the less affluent, a disproportionate fraction of
whom are minorities, are being forced to commute longer distances. This in
turn has led us to the conclusion that, if reasonable cost of commuting is
taken into account, the gap in compensation between the lower and higher
paid employees is widened by about 30% due to this effect alone.

All of the above is persuasive that discrimination in housing is a
major impediment to proper economic development of this area, quite apart
from being a grave social injustice. I am also persuaded that the lack of

The Hon. Don Edwards      -2-     June 20, 1978

enforcement locally by HUD is a substantial reason why this situation, as exhibited by successive audits, has not improved significantly over the years. It makes no sense to restrict the authority of a government agency to "conference, conciliation, and persuasion" when that agency discovers violation of law.

For the above reason I strongly support the provisions of your bill which enables HUD to either require the Attorney General to institute legal proceedings, or, alternatively, start an administrative process leading to enforceable remedies or penalties. I am pleased that your bill provides for this increased enforcement power without interfering with the present authority of the Attorney General to engage in prosecution of "patterns and practices" cases; these, however, rarely result in remedies or compensation for individual injustices.

I also strongly support the provisions in your bill broadening its application to all but single family dwellings and making insurance companies and lending institutions liable for unfair and racially discriminatory acts and practices. This more comprehensive coverage of the proposed Civil Rights Amendments Act of 1977 will both simplify administration and at the same time widen enforcement.

Although I support fully the intent of your bill and the large majority of its provisions, I have some difficulties with the Fair Housing Loan Fund it proposes. This fund is intended to provide financial assistance to potential litigants in fair housing cases. Just because your bill strengthens HUD in conducting administrative proceedings and in making determinations of fact and law similar to those usually reserved to a Court of Law, HUD should be totally even-handed between plaintiffs and respondents in exercising this duty. In fair housing cases neither the plaintiffs nor necessarily all respondents are people of means, and although all discrimination complaints have the "ring" of injustice, they are at times frivolous and without merit. Therefore responsible administration of such a loan fund is difficult at best, and would complicate unduly HUD's procedures in accepting responsibility for action. Accordingly I would recommend that the matter of easing the financial burden of fair housing litigation be left to local private organizations or legal aid societies. I believe that the increased enforcement provisions of your bill will go a long way on their own toward securing action in support of Fair Housing.

I very much appreciate your initiative in this matter and hope that your efforts will be successful.

Sincerely yours,

Wolfgang K. H. Panofsky
Director

cc: Rep. Paul McCloskey



**SAN FRANCISCO
HOUSING AUTHORITY**
440 TURK STREET • SAN FRANCISCO, CALIFORNIA 94102 • TELEPHONE (415) 673-5800

DATE ▮▮ 2 7 1978  DOC. #_____

STAFF _Su.o_____ REC. #_____

CODES _____

PARAGRAPHS _____

SPECIAL _____

July 19, 1978  SUBJECT _____

The Honorable Don Edwards, Chairman
Subcommittee on Civil and Constitutional Rights
Committee on the Judiciary
United States House of Representatives
House Office Building
Washington, D. C. 20515

Dear Congressman Edwards:

Housing discrimination based on race remains
an omnipresent reality in the United States. I congratulate you and
Congressman Drinan for offering to the Congress a bill that would take
significant steps to counter that discrimination.

I would like to comment briefly on Title II
of H. R. 3504 in my dual position as Western Regional Chairperson of
the National Tenants Organization and as Chairperson of the San Fran-
cisco Housing Authority.

In both positions, I am daily made aware of
the inability of many people to find adequate housing because of con-
tinuing discrimination. Many say that a great deal has changed in the
past few years and that real discrimination is a thing of the past.
One only has to look at the clearly segregated housing patterns in
this country to know that the previous statement is fallacious.

Strong steps and a major commitment is needed
to fight housing discrimination. The key element of Title II which I
strongly support would be the granting to HUD of the powers of admin-
istrative review and cease and desist powers. This would put some
real teeth into HUD's enforcement capability. To date, HUD has been
only a paper tiger. Now it could begin to affect the practices of
many realtors and multi-family housing owners. The power of HUD to
levy monetary penalties which could be enforced by the Justice Depart-
ment through court action is also a very significant step forward.

Congressman Drinan has spoken of the relation-
ship between employment and fair housing. Many jobs are created in
suburban communities. Yet, those of low income have no access to
those jobs because there are no housing opportunities for them in the
suburbs.

- 1 -

002641

Letter to Chairman Don Edwards,
Subcommittee on Civil and Constitutional Rights,
Committee on the Judiciary from Chairperson Cleo F. Wallace,
San Francisco Housing Authority Commission - July 19, 1978

(Continued)

Title II of H. R. 3504 would certainly
be a significant boon to economic dispersion in that it would prevent
localities (read "suburban") from enforcing zoning powers to prevent
subsidized developments in their community.  As a spokesperson on
behalf of those of low income, I would like to lend my voice in sup-
port of that provision and urge its adoption in full by the Congress.

Another significant feature of the bill in
question would prevent racial discrimination in the issuing of insur-
ance policies.  Insurance red-lining is indeed a reality and in this
instance, I speak from personal knowledge.

I sincerely hope that the points I have
addressed in the above paragraphs are acted on positively by the Sub-
committee on Civil and Constitutional Rights and later by the entire
Congress.  A people who have been excluded from the mainstream of
American life for over 300 years await your verdict.

Very truly yours,

Cleo F. Wallace
Chairperson
San Francisco Housing Authority Commission

CFW/gg

CC: SFHA COMMISSIONERS

## APPENDIX 3

CONGRESSIONAL RESEARCH MEMORANDA RELATING TO TITLE II OF
H.R. 3504

1. Constitutionality of administrative (HUD) power to assess actual and punitive damages.

2. Constitutional analysis of § 206(g), prohibiting economic status discrimination by State governments in housing.

3. Constitutionality of new § 812(c), providing for separation of issues to be tried by court and jury.

4. Examples of statute of limitations for contract and tort actions in the 50 States (relevant to expansion of title VIII statute of limitations).

5. Federal Administrative Authority to issue cease-and-desist orders—a survey of select statutes and agency procedures.



The Library of Congress

*Congressional Research Service*

Washington, D.C. 20540

June 17, 1977

TO : House Subcommittee on Civil and Constitutional Rights
Attention: Janice Cooper

FROM : American Law Division

SUBJECT: Questions Concerning HUD's Enforcement Powers Under H R. 3504

The following memorandum has been prepared at your request
for a written statement in response to the questions and issues we
have discussed regarding Title II of H.R. 3504, the Fair Housing
Amendment Act of 1977.

You have asked whether there might be constitutional problems
with the provision in 3504 giving HUD (as well as the courts) power
to assess actual and punitive damages against a respondent and in
favor of a complainant.

Section 812(c) (when read in conjunction with section 810)
gives HUD the authority to award a civil penalty (including punitive
damages) to an aggrieved individual not exceeding $10,000 for each
willful violation. The nature of the penalty, while 3504 designates
it, in part, as punitive, appears to be much like many other ad-
ministratively imposed penalties (such as those found in OSHA, 29
U.S.C. 658, 659) except for one significant difference — the penalty
under 3504 is to be paid to an individual rather than to the enforcing

CRS-2

agency. We do not know of any administrative agency that presently

has the power to issue similar penalty orders. The one analogous

instance we discovered is the authority of the Interstate Commerce

Commission, when it finds a rate unreasonable or discriminatory, to

ascertain damage to the shipper and award reparation. According to

the authors of a casebook on Administrative law,

> [T]he Commission has not been, on the whole,
> enthusiastic about the exercise of this
> power. In its first report in explaining
> its reluctance to award reparations
> it stated that the parties were undoubtedly
> entitled to a trial by jury. Interstate
> Commerce Commission, Annual Report 26 (1887).
> Congress amended the act to provide that if
> a carrier did not pay the Commission's award
> the shipper could bring a common law action
> in which the Commission's findings would
> be no more than prima facie evidence
> subject to rebuttal. 25 Stat. 855, 861.
> Jaffee and Nathanson, Administrative Law-
> Cases and Materials (Boston: 1976), p. 140.

Clearly though, as evidenced by several recent court decisions,

the trend is to delegate to federal administrative agencies increasing

powers to impose on offending individuals fines that sometimes are

referred to as "quasi-criminal." (For a discussion of the development

see "Administratively Imposed Civil Money Penalties: Current Practice

and Legal Challenges," prepared by Kent Ronhovde on March 29, 1977

for your office.) The recent decision in Atlas Roofing Company v.

Occupational Safety and Health Review Commission, No. 75-746 (March

23, 1977) confirms the trend. The Supreme Court affirmed a Fifth Circuit

decision holding that the Seventh Amendment does not prevent Congress

from assigning to an agency the task of adjudicating agency violations

CRS-3

without violating the Seventh Amendment's requirement that jury trials
are to be "preserved" in "suits at common law." Under OSHA (29 U.S.C.
658, 659) civil penalties may range from nothing to a maximum of $10,000
for a willful violation. (The Court's holding and rationale are discussed
in a report enclosed with this memorandum.)

The OSHA civil penalties being regulatory rather than punitive
are not subject to the due process procedures for criminal prosecutions
required by the Sixth Amendment. Furthermore, the procedures used in
assessing such civil penalties involving statutorily created public
rights do not deny the defendant employer his or her Seventh Amendment
right to trial by jury. Congressional delegation of such a function
to an agency may come close to violating Article III of the United
States Constitution which vests judicial powers in the federal courts.
In Irey v. OSHRC, 519 F. 2d 1200 (3rd Cir. 1975), affirmed by the
Supreme Court along with Atlas Roofing, the Third Circuit expressed
concern over that fact:

> It may be that Congress, by giving broad enforcement
> roles to OSHA and granting it the power to assess
> heavy penalties while at the same time limiting the
> scope of judicial review, has come close to the line
> which separates executive and judicial powers.
> However, we do not think that the line has
> been crossed. The legislation is still in the area
> where congressional discretion may be exercised, and
> the question is one of the wisdom of a course of
> action -- not its constitutionality. In that context,
> of course, we must defer to the legislative judgment.
> Id , at 1205.

One of the difficulties with the HUD power to impose punitive
damages under 3504 is whether it is intended, like the OSHA civil

CKS-4

penalties, to be a regulatory measure with its primary intended result
being future compliance with the Act rather than punishment of the
offender. The answer to this question may help to determine whether
the rights involved under 3504 are public statutory rights which
do not require a jury trial or if they are legal rights of the kind
"enforceable in an action for damages in the ordinary courts of law."
Curtis v. Loether, 415 U.S. 189, 194 (1974).

      In Atlas Roofing, the Court recognized that Congress certainly
may commit "some new types of litigation to administrative agencies
with special competence in the field." (Emphasis added) The Court
pointedly remarked that "[t]his is the case even if the Seventh Amendment
would have required a jury where the adjudication of those rights is
assigned to a federal court of law instead of an administrative agency."
Slip Opinion at 12. Thus it is clear on the basis of Atlas Roofing
that the adjudication of new, statutorily created public rights may be
assigned to an administrative agency, and thereby avoid the Seventh
Amendment's jury requirement. On the other hand, if the rights involved
come under the ambiguous concept of private or legal rights, the issue
is more complicated.

      The distinction between rights which may be described as
public and those which are recognized as private is not at all clear.
Several Supreme Court opinions have grappled with the problem, as
have many authors of scholarly articles. Perhaps the earliest, as
well as the most cited attempt to distinguish the two, was that
of Justice Story in Parsons v. Bedford, 28 U.S. (3 Pet.) 433, 447 (1830):

        By common law, [the amendment's framers] meant...
        not merely suits which the common law recognized

CRS-5

> among its old and settled proceedings, but
> suits in which legal rights were to be
> ascertained and determined, in contra-
> distinction to those where equitable
> rights alone were recognized, and equitable
> remedies were administered....In a just
> sense, the amendment then may well be construed
> to embrace all suits which are not of equity
> and admiralty jurisdiction, whatever might
> be the peculiar form which they may assume
> to settle legal rights.

The several cases decided since Parsons, which in one way or another have

dealt with this issue, have done little if anything to clarify the

problem. A few of the relevant cases will be discussed to illustrate

the complexity of the problem.

One of the issues before the Court in NLRB v. Jones & Laughlin

Steel Corp., 301 U.S. 1 (1937), was the corporation's assertion of its

Seventh Amendment right to a jury trial on the ground that a back pay

award was analogous to a common law award of damages. The Court did

not agree -- the Seventh Amendment, stated the Court, "has no application

to cases where recovery of money damages is an incident to equitable

relief even though damages might have been recovered in an action at law."

Id. at 48. Furthermore, the Court explained its decision in this way:

> The instant case is not a suit at common law
> or in the nature of such a suit. The proceeding
> is one unknown at the common law. It is a
> statutory proceeding. Reinstatement of the
> employee and payment for time lost are
> requirements imposed for violation of the
> statute and are remedies appropriate to its
> enforcement. Id. at 48-49.

A recent case, Curtis v Loether, 415 U.S. 189 (1974), dis-

tinguished Jones & Laughlin as a case involving an administrative

proceeding "where jury trials would be incompatible with the whole

CRS-6

concept of administrative adjudication and would substantially interfere

with the NLRB's role in the statutory scheme.  Id. at 194.  Curtis held

that the Seventh Amendment does entitle either party to a jury trial

in an action for damages brought in the federal courts under §812 of the

1968 Civil Rights Act, which authorizes private plaintiffs to bring

civil actions to redress a violation of the Act's fair housing provisions.

This case quite obviously involved the same kind of enforcement action

with which we are concerned in H.R. 3504.  The Court in Curtis elaborated

on the problem:

> These cases [reference made to Katchen v. Landy, 382 U.S. 323
> (1966), and Jones & Laughlin] uphold Congressional power to
> entrust enforcement of statutory rights to an administrative
> process or specialized court of equity free from the
> strictures of the Seventh Amendment.  But when Congress
> provides for enforcement of statutory rights in an
> ordinary civil action in the district courts where
> there is obviously no functional justification for
> denying the jury trial right, a jury trial must be
> available if the action involves rights and remedies of
> the sort typically enforced in an action at law.
>     We think it is clear that a damages action
> under §812 is an action to enforce  legal rights
> within the meaning of our Seventh Amendment
> decisions...A damage action under the statute
> sounds basically in tort – the statute merely defines
> a new legal duty, and authorizes the courts to
> compensate a plaintiff for the injury caused by
> the defendant's wrongful breach.  As the Court of
> Appeals noted, this course of action is analogous
> to a number of tort actions recognized at common
> law.  More important, the relief sought here – actual
> and punitive damages – is the traditional form of relief
> offered in the courts of law.  (footnotes and citations
> omitted)  Id. at 195-196.  (Also see, Albemarle Paper
> Co. v. Moody, 422 U.S. 405 (1974), which discusses briefly
> what kinds of relief may be characterized as equitable.)

The dilemma created by reading Jones & Laughlin together with

Curtis was simply stated in Atlas Roofing, but Atlas did little to

CRS-7

solve the problem:

> Thus, history and our cases support
> the proposition that the right to a jury
> trial turns not solely on the nature of
> the issue to be resolved, but also on
> the forum in which it is to be resolved.
> (footnote omitted)  Slip Opinion at pp. 17-18.

On the basis of the Court's decision, we hesitate to give

you a more definitive answer than our attempt to point out the essential

problem involved.  A recent law review article had this to say about

administrative proceedings and jury trials:

> Jones & Laughlin was relied upon by petitioner
> in Curtis v. Loether to support the proposition that
> there was no constitutional right to jury trial in
> actions brought pursuant to title VIII of the Civil
> Rights Act of 1968.  In distinguishing Jones & Laughlin,
> the Court referred to the case as one involving admin-
> istrative proceedings, "where jury trials would be
> incompatible with the whole concept of administrative
> adjudication and would substantially interfere with
> the NLRB's role in the statutory scheme."  Such a
> reading of Jones & Laughlin effectively turns that
> case into a balancing test:  there will be no
> constitutional right to jury trial where such a right
> would interfere with legislative schemes.  If this
> is what Jones & Laughlin stands for, and it has been
> approved by the Supreme Court as recently as 1974,
> does this not signal the death of the rational
> approach?  Has the Court adopted a pure balancing
> test, with all its attendant practical and
> conceptual difficulties?  In light of the remainder
> of the Court's opinion in Curtis, the anwer seems
> to be no.  While admitting that it was not
> oblivious to the force of petitioner's policy
> arguments concerning the harm that delay and
> potential juror prejudice might cause to the
> effectiveness of congressional civil rights
> legislation, the Court nevertheless replied that
> these considerations are insufficient to
> overcome the clear command of the Seventh Amendment.
> This statement seems to imply that, regardless of how
> strong the competing policy considerations might be,

CRS-8

> they could not defeat a right to jury trial
> when the constitutional command is clear. But
> if that is the case, what possible difference
> could it make that a jury trial might undermine
> a congressional administrative scheme, the reason
> the Curtis Court gave for justifying its holding in
> Jones & Laughlin? Thus, in one opinion, the
> Court seems at best unclear, and at worst ,
> contradictory, as to the relevance of policy
> considerations surrounding the use of jury trial
> in the interpretation of the constitutional right.
> Redish, Seventh Amendment Right to Jury Trial:
> A Study in the Irrationality of Rational Decision
> Making, 70 Northwestern U. L. Rev. 486, 520-521 (1975).

Perhaps the clearest indication we have of how the Court

would decide if asked to pass on the issue 3504 presents is the language

we already mentioned from Atlas Roofing. It may be well worth re-

stating:

> Congress is not required by the Seventh Amendment
> to choke the already crowded federal courts
> with new types of litigation nor prevented from
> committing some new types of litigation to
> administrative agencies with special competence in
> the field. This is the case even if the Seventh
> Amendment would have required a jury where the
> adjudication of those rights is assigned instead
> to a federal court of law instead of an administration
> agency. (emphasis added) Slip opinion at p. 12.

We can not be sure how the nature of an administratively

imposed civil penalty or fine may be interpreted by the courts in light

of the fact that it goes to an aggrieved individual rather than an

agency. We would suggest though that the language in sections 812(c)

and 810(b)(2)(A) be clarified to specify the powers of the courts

and HUD hearing officers. We would also suggest that any report(s)

published as a result of hearings on this bill be made clear as to

congressional intent regarding the nature of these penalties. As

CRS-9

you will note from pages 2-3 of the enclosed report, the Courts will look to Congressional intent in determining the nature of a penalty where it is ambiguous.

You have also asked for information relative to the OSHA discovery provisions and similar provisions under 3504. As you know, the warrantless entry and search of work premises pursuant to section 8(a) of OSHA (29 U.S.C. 657(a)) has been held unconstitutional as violative of the Fourth Amendment. Barlow v. Usery (U.S.D.C. Idaho) Civ. No. 1-76-3. December 30, 1976. The court enjoined all further warrantless inspections, but Justice Rehnquist has lifted the lower court order halting all job-safety inspections pending a Supreme Court decision on the merits. The Justice noted that an act of Congress is "presumptively constitutional" and should remain in effect pending a contrary decision. The Supreme Court has noted probable jurisdiction and the case is docketed as Marshall v. Barlow s, No. 76-1143.

Pursuant to the challenged OSHA provision the inspections are to be made at a reasonable time and in a reasonable manner. However, they are to be unannounced visits (29 U.S.C. 651(10)) as Congress believed that "advance notice to an employer has been a prime cause of the break-down...in enforcement under other statutes." (See, H.R. Rep. No 91-1291, 91st Cong., 2d sess. (1970).

As far as we can tell, the other discovery procedures under OSHA, such as the subpena power, have not been challenged in the courts.

CRS-10

They are typical of administrative agency investigatory powers. Many, if not most, agencies have the authority to issue subpenas for the attendance of witnesses and the production of documents.

The discovery provisions in section 810(a) of 3504 seem to be fairly standard agency investigatory procedures. We anticipate no serious difficulty with the 3504 provisions unless there is a warrant-less search such as that conducted under OSHA, but that seems unlikely as there would be no apparent purpose in inspecting premises. In fact 810(a)(2)(A) refers only to access to and copying of 'information.' The only foreseeable problem we can predict might be with an attempt by HUD to enforce a subpena. We know of no administrative agency authorized to find a person in 'contempt' of an agency order. Unlike courts, administrative agencies have no inherent judicial powers to find persons in contempt. Under section 810(a)(2)(D) however, subpena enforcement specifically requires resort to the courts.

We hope this will answer your questions, but should you need additional information or analysis please feel free to call on us.

**Donna C. Parrett**
**Legislative Attorney**



THE LIBRARY OF CONGRESS

Congressional Research Service

WASHINGTON, D.C. 20540

May 11, 1977

To:      Senate Subcommittee on Civil and Constitutional Rights
              Attn:   Janice Cooper

From:   American Law Division

Subject:  Constitutional Analysis of Section 206(g) of H.R. 3504, the Fair Housing
               Amendments of 1977, Prohibiting Economic Status Discrimination by State
               Governments in Housing

This responds to your request for an analysis of the possible constitutional issues involved in the enactment of Section 206(g) of H.R. 3504, the Fair Housing Amendments of 1977. We have prepared the attached report which specifically focuses upon the power of Congress to prohibit state land use practices which exclude low-or moderate-income housing because of either the eligibility of such housing for governmental assistance or because of the economic status of the prospective occupants.

In addition, we have found several other provisions in federal laws which prohibit discrimination on the basis of economic status. We have not been able to locate any such provisions in state statutes relating to land use practices. See, however, the New Jersey Supreme Court's interpretation of that state's constitution in Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel, 67 N.J. 151 (1975). The federal provisions are as follows:

Jury Act:

28 U.S.C. §1862. Discrimination Prohibited.

> No citizen shall be excluded from service as a grand or petit juror
> in the district courts of the United States on account of race, color,
> religion, sex, national origin, or economic status.

CRS-2

Disaster Relief:

42 U.S.C. 5151. Nondiscrimination in Disaster Assistance.

> (a)... Such regulations shall include provisions for insuring that the distribution of supplies, the processing of applications, and other relief and assistance activities shall be accomplished in an equitable and impartial manner, without discrimination on the grounds of race, color, religion, nationality, sex, or economic status.

Equal Credit Opportunity:

15 U.S.C. 1691.

> (a) It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—

> ...

> (2) because all or part of the applicant's income derives from any public assistance program;

Energy Conservation in Existing Building Act of 1976 – Weatherization Assistance Program:

42 U.S.C. 6870. Prohibition Against Discrimination.

> (a) No person in the United States shall, on the ground of race, color, national origin, or sex, or on the ground of any other factor specified in any Federal law prohibiting discrimination, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program, project, or activity supported in whole or in part with financial assistance under this Act.

We hope you will find the above information and attached report helpful

for your needs. If further information is desired, please let us know.

*Kathleen E. Shea*

Kathleen E. Shea
Legislative Attorney



THE LIBRARY OF CONGRESS

*Congressional Research Service*

WASHINGTON, D.C. 20540

CONSTITUTIONAL ANALYSIS OF SECTION 206(g) of H.R. 3504,
THE FAIR HOUSING AMENDMENTS OF 1977,
PROHIBITING ECONOMIC STATUS
DISCRIMINATION IN HOUSING
BY STATE GOVERNMENTS

This report will provide an analysis of constitutional issues

which may be raised by congressional enactment of section 206(g) of

H.R. 3504, the Fair Housing Amendments of 1977. This section would

amend Title VIII of the Civil Rights Act of 1968, adding to the list

of prohibited housing practices the following language:

> (g) For any general or special purpose unit
> of government of a State or of a subdivision of
> a State (or other agency having jurisdiction
> within a State or States) in the exercise or
> enforcement of powers with respect to planning,
> zoning, subdivision controls, building codes or
> permits, or other matters affecting land use
> development, to exclude low- or moderate-income
> housing because of the eligibility of such
> housing for governmental assistance, or because
> of the race, color, national origin, or eco-
> nomic status of the prospective occupants of
> such housing.

Specifically, we will focus upon the power of Congress to

prohibit state land use practices which exclude low- or moderate-

income housing because of either the eligibility of such housing for

governmental assistance or because of the economic status of the pro-

spective occupants.

CRS-2

Fourteenth Amendment Considerations

One possible basis for enactment of a federal law prohibiting discrimination in housing because of economic status would be section 5 of the Fourteenth Amendment to the United States Constitution. In that section Congress is expressly granted the authority to "enforce, by appropriate legislation" the broad guarantees of freedom contained in the due process and equal protection clauses of section 1. Congress' reasoning for enacting such a law could proceed as follows: It is a finding of fact by the Congress that land use practices which exclude lower-income housing inherently discriminate against the poor by creating a classification of people on the basis of wealth who are not afforded the same treatment under the law as other citizens. Such economic status discrimination denies equal protection of the laws as guaranteed by the Fourteenth Amendment. A national law prohibiting the States from excluding in their land use practices low-or moderate-income housing because of the economic status of the prospective occupants is a reasonable means for eliminating such discrimination against the poor in housing.

Constitutional difficulties inherent in the above-reasoned use of congressional power stem from the fact that the Supreme Court has not held discrimination in housing because of economic status to come under the protection of the Fourteenth Amendment. Congress' finding that the Fourteenth Amendment does indeed afford such protection constitutes a legislative expansion of the guarantees of the

CRS-3

Amendment.  Whether or not Congress has the power to do so in this
case is an open question.

Historically, state actions such as zoning ordinances are
entitled to a presumption of validity.  However, no presumption of
validity is inferred if the ordinance impacts adversely on some con-
stitutionally protected group (i.e., if it embodies a "suspect
classification") or if it deprives persons of some service, benefit,
or right to which they are constitutionally entitled (i.e., if a
"fundamental interest" is affected).  If the ordinance either involves
a suspect classification or affects a fundamental interest, the State
has the burden of showing that the ordinance furthers a "compelling
state interest."  In Re Griffiths, 413 U.S. 717 (1973).  Then the ordi-
nance is subject to strict scrutiny and the court must determine that the
ordinance was "necessary" to further that interest.

Although race has been held to be a suspect classification,
the status of wealth as a suspect classification or housing as a fun-
damental interest is doubtful at best.  In James v. Valtierra, 402 U.S.
137 (1971), the Supreme Court sustained a California constitutional
provision requiring the local electorate to approve construction of
low-rent public housing before it could begin.  In so doing, it
applied traditional equal protection standards, finding, in effect,
that the distinction in the law was based on wealth and did not con-
stitute race discrimination despite its asserted adverse impact on
housing opportunities for racial minorities.  The more rigorous

CRS-4

compelling state interest test was inappropriate since it was not shown that the referendum requirement "was aimed at a racial minority." The Court stated: "The Article requires referendum approval for any low rent public housing project, not only for projects which will be occupied by a racial minority. And the record here would not support any claim that a law neutral on its face is in fact aimed at a racial minority." Id. at 141. In other words, neither the fact that the state law affected the poor generally nor that housing interests were involved, was sufficient to invoke strict judicial scrutiny. The Court noted in another decision, San Antonio School District v. Rodriguez, 411 U.S. 1 (1973), that wealth would constitute a suspect classification only if the individuals in the class "because of their impecunity...were completely unable to pay for some desired benefit, and as a consequence they sustained an absolute deprivation of a meaningful opportunity to enjoy that bene- fit." Id. at 20. Thus, under Valtierra and other High Court rulings, wealth has not been held to be a suspect classification unless perhaps the plaintiff sustains an absolute deprivation of low income housing.

In addition, the Supreme Court's holding in Village of Belle Terre v. Boraas, 416 U.S. 1 (1974) suggests that personal interests in housing do not rise to the level of a fundamental constitutional right. And, in Lindsey v. Normet, 405 U.S. 56 (1972), the Court declared that there was no fundamental right or constitutional guarantee of access to housing of a particular quality.

CRS-5

Since the Supreme Court has not held discrimination in housing on the basis of income to violate the Fourteenth Amendment, the validity of a congressional finding of such a violation hinges upon the extent of Congress' authority to legislatively interpret the scope of the guarantees contained in section 1 of that Amendment. This power of Congress to give substantive meaning to the due process and equal protection clauses of section 1 has been the subject of several Supreme Court decisions and much commentary. [1] While the scope of the power is not clearly defined, it is at least clear that Congress in the use of its power to "enforce, by appropriate legislation" the provisions of section 1, has special legislative expertise in some instances to determine whether particular state actions violate the Amendment.

The Supreme Court's holding in Katzenbach v. Morgan, 384 U.S. 641 (1966) indicated that congressional authority to legislate under section 5 of the Fourteenth Amendment may be independent of a judicial finding that the state's actions have denied equal protection of the laws. In that decision the Court upheld under section 5 a congressional prohibition of New York's English literacy requirements for voters educated in Spanish-speaking schools in Puerto Rico, without finding it

---

[1]  See, e.g., Cohen, "Congressional Power to Interpret Due Process and Equal Protection," 27 Stan. L. Rev. 603 (1975); Orloski, "The Enforcement Clauses of the Civil War Amendments: A Repository of Legislative Power," 49 St. John's L. Rev. 493 (1975); Emerson, "Congress' Power to Enhance the Civil War Amendments," 49 Notre Dame Lawyer 544 (1974).

CRS-6

necessary to decide whether, independent of the federal legislation,

the Court would have held that the literacy requirements were for-

bidden by the Equal Protection Clause. Id. at 656. The Court noted

that Congress' prohibition of the denial to Spanish-speaking Puerto

Ricans of the right to vote was enacted "in the context of a general

appraisal of literacy requirements for voting, see South Carolina v.

Katzenbach, [383 U.S. 301 (1966)], to which [Congress] brought a

specially informed legislative competence...." Id. at 655-56.

Justice Brennan further observed for the majority in the Morgan

decision that:

> A construction of §5 that would require a
> judicial determination that the enforcement
> of the state law precluded by Congress vio-
> lated the Amendment, as a condition of
> sustaining the congressional enactment would
> depreciate both congressional resourcefulness
> and congressional responsibility for imple-
> menting the Amendment. It would confine the
> legislative power in this context to the
> insignificant role of abrogating only those
> state laws that the judicial branch was pre-
> pared to adjudge unconstitutional, or of
> merely informing the judgment of the judiciary
> by particularizing the "majestic generalities"
> of §1 of the Amendment.
>
> Id. at 648-49, (footnotes
> omitted)

However, the implications of the Court's holding in Morgan

are somewhat limited by the Court's later holding in Oregon v.

Mitchell, 400 U.S. 112 (1970). In that case the Court split sharply

on the question of the validity of a section of the 1970 Voting Rights

CRS-7

Act in which Congress lowered the voting age to eighteen in state elections. A majority, however, agreed that such a provision could not be upheld as a proper exercise of the Congress' power under section 5 of the Fourteenth Amendment. Although Congress had determined that such a provision was necessary to remedy denials of equal protection of the laws, the majority of the Court ruled that Congress' authority to enact such remedial legislation under section 5 had to yield to the constitutional principle that the States retain the power to regulate their own local elections. Justices Stewart, Burger and Blackmun distinguished the Court's prior holding in Morgan:

> But it is necessary to go much further [than the Court did in Morgan] to sustain §302. The state laws that it invalidates do not invidiously discriminate against any discrete and insular minority. Unlike the statute considered in Morgan, §302 is valid only if Congress has the power not only to provide the means of eradicating situations that amount to a violation of the Equal Protection Clause, but also to determine as a matter of substantive constitutional law what situations fall within the ambit of the clause, and what state interests are "compelling." 2/

Thus while the Court may defer to findings of fact by Congress as to whether a particular kind of discrimination exists, it will not necessarily accept a congressional decision which legislatively defines the scope of substantive protections afforded by the Fourteenth Amendment.

---

2/ Id. at 296. See also Justice Harlan's opinion which stated that Congress should not have the final say on matters of substantive constitutional interpretation. Id. at 204-09.

CRS-8

The most recent decision of the Supreme Court concerning Congress' authority under section 5 is that of <u>Fitzpatrick</u> v. <u>Bitzer</u>, 427 U.S. 445 (1976). The Court in that case held that the Eleventh Amendment does not bar a back pay award against a state agency under Title VII of the Civil Rights Act of 1964 since the Eleventh Amendment, and the principle of state sovereignty that it embodies, is limited by the enforcement provisions of section 5 of the Fourteenth Amendment. Justice Rehnquist writing for the Court stated:

> ... In that section [section 5] Congress is expressly granted authority to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority. When Congress acts pursuant to §5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority. We think that Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts. <u>Id</u>. at 456.

The Supreme Court will have a further opportunity to define the scope of Congress' power to substantively interpret the provisions of the Fourteenth Amendment when it decides two cases before it this term. One of these cases is <u>Hazelwood School District</u> v. <u>United States</u>,

No. 76-255, to which the Court granted certiorari on January 10, 1977.
This case involves issues of employment discrimination under Title VII
of the Civil Rights Act.  In deciding whether Title VII may be consti-
tutionally applied to a state agency absent the usually required proof
of "purposeful" or "intentional" discrimination, the High Court may
address the question of whether a statute is "appropriate" legislation
under section 5 of the Fourteenth Amendment if it, in effect, expands
on the protection of the Equal Protection Clause rather than simply
enforcing it.  Oral arguments have been heard by the Court in this
case and a decision is pending.

The other case presently before the Supreme Court relative
to Congress' power under section 5 of the Fourteenth Amendment is
Dothard v. Mieth, No. 76-422, involving the constitutionality of the
application of certain prohibitions against sex discrimination in Title VII
to state and local government employers.  In Bitzer, supra, the Court
upheld the application of the remedial back pay provisions to state
governments under the Fourteenth Amendment; in Dothard, the Court may
address the question of whether substantive provisions relating to
sex discrimination may also properly be applied to state governmental
employers under the Fourteenth Amendment.  Congress' power to give
substantive meaning to section 1 is again at issue because a violation
of the sex discrimination provisions of Title VII do not in each
instance constitute a judicially recognized violation of the Fourteenth
Amendment.

CRS-10

Because the power of Congress to substantively interpret the Due Process and Equal Protection Clauses is not clearly defined, constitutional difficulties may be encountered in the enactment of section 206(g) of H.R. 3504 under the enforcement power granted to Congress in section 5 of the Fourteenth Amendment.

CRS-11

## Commerce Clause Considerations

Another possible jurisdictional basis for federal legislation prohibiting discrimination in housing because of economic status, as contained in section 206(g) of H.R. 3504, may be found in Article I, Section 8, Clause 3 of the United States Constitution, which grants Congress the power "to regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes."[3/]

The power of Congress to regulate interstate commerce is undeniably broad. In Gibbons v. Ogden, 9 Wheat. (22 U.S.) 1 (1824), Chief Justice Marshall wrote, "What is this power? It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution." Id. at 196. The commerce clause has been held to apply to three main categories of problems: (1) the use of channels of interstate or foreign commerce which Congress feels are being misused; (2) the protection of the instrumentalities of interstate commerce; and, (3) those activities affecting commerce. Perez v. United States, 402 U.S. 146 (1971). Of particular interest to the subject matter of this report is the use of the commerce clause in the area of civil rights. In such cases Congress has found instances of discrimination

---

3/It is noted that the "open housing" provision of the 1968 Civil Rights Act, Title VIII, 42 U.S.C. §3601, was based on the commerce clause, but in Jones v. Alfred H. Mayer Co., 392 U.S. 409 (1968), the Court held that antidiscrimination-in-housing legislation could be based on the Thirteenth Amendment and made operative against private parties.

CRS-12

to have an adverse impact upon interstate commerce. For example, Congress relied on its power to regulate interstate commerce when it enacted a provision of the Civil Rights Act of 1964 prohibiting racial discrimination in places of public accomodation. Hotels and motels were declared covered, that is, declared to "affect commerce", if they provided lodging to transient guests. [4/] This provision was upheld by the Supreme Court in Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964) as a proper exercise of the commerce power. The Court outlined the scope of the inquiry which could be made into such findings by the judiciary: "The commerce power invoked here by the Congress is a specific and plenary one authorized by the Constitution itself. The only questions are (1) whether Congress had a rational basis for finding that racial discrimination by motels affected commerce and (2) if it had such a basis, whether the means it selected to eliminate that evil are reasonable and appropriate." Id. at 258 (emphasis supplied). And, the fact that Congress was also legislating against moral wrongs did not render the enactment less valid. "In framing Title II of this Act Congress was also dealing with what it considered a moral problem. But that fact does not detract from the overwhelming evidence of the disruptive effect that racial discrimination has had on commercial intercourse." Id. at 257. The evidence supported Congress' conclusion that racial discrimination impeded interstate travel by more than 20 million black citizens, which was an impairment Congress could properly legislate to remove. Id. at 252-53.

---

4/Civil Rights Act of 1964, 42 U.S.C. 2000a et seq. See Hearings Before the Senate Committee on Commerce on S. 1732, 88th Cong., 1st Sess., parts 1 & 2 (1963).

CRS-13

In <u>Katzenbach</u> v. <u>McClung</u>, 379 U.S. 294 (1964), the same Act was upheld as it related to restaurants. The Court in that case recognized that, viewed as an isolated instance, the effect on interstate commerce of a single restaurant was insignificant. However, when such activity occurs on a nationwide scale, its cumulative impact is great and therefore it becomes unnecessary to prove that a single instance had an effect by itself.

Discrimination of the kind prohibited by section 206(g) of H.R. 3504 would in all probability have some effect upon interstate commerce, especially in view of the mobility of persons in this country. Persons are constantly moving to and from States and most families live in several different localities during their lifetimes. State and local land use and housing controls which discriminate against persons because of economic status keep lower income persons from living in particular areas and prevent lower income housing from being built, thus obstructing the flow of housing materials as well as persons across state lines. Specific acts of such economic discrimination, when magnified to a general trend, affect commercial dealings, practices and opportunities in interstate commerce.

Once it has been determined that Congress has a rational basis for finding an effect on commerce by the concerned activity, and in this case it appears that such an effect may exist, it is then necessary to examine the limits of congressional power to regulate such activity. In other words, the means selected to eliminate the evil must be determined to be reasonable and appropriate. On this point the Supreme Court in <u>Heart of Atlanta Motel</u>, <u>supra</u> at 261-62, stated:

> It may be argued that Congress could have pursued
> other methods to eliminate the obstructions it found

CRS-14

> in interstate commerce caused by racial discrimination. But this is a matter of policy that rests entirely with the Congress not with the Courts. How obstructions in commerce may be removed -- what means are to be employed -- is within the sound and exclusive discretion of Congress. It is subject to only one caveat -- that the means chosen by it must be reasonably adapted to the end permitted by the Constitution. We cannot say that its choice here was not so adapted.

While one cannot necessarily say that the Supreme Court will find a congressional enactment prohibiting discrimination in housing on the basis of economic status a reasonable exercise of its commerce power, an observation may be made concerning the possibility of such a finding. That is, a conclusion by the Supreme Court that a particular exercise of the commerce power is both "reasonable" and "appropriate" will more likely be reached if it can be demonstrated that prior efforts to deal with the problem have been ineffective. The extent of the problem of providing lower-income housing and the lack of responsiveness of state and local land use practices to the need for such housing is well documented. [5/] Judicial efforts in the area of open-housing have been extensive but successes have been qualified, and even where rulings have been obtained favorable to the poor, they are of a limited geographical applicability. Thus, arguments can certainly be advanced to the effect that legislation on a national scale would be a reasonable means for combatting such a pervasive problem, one not being effectively dealt with on the state, local or judicial levels.

---

5/Danielson, "Opening the Suburbs to the Poor," 3 New York Affairs 83 (Fall 1976
Shields and Spector, "Opening Up the Suburbs: Notes on a Movement for
Social Change," 2 Yale Review of Law and Social Action 302 (Summer 1972).

CRS-15

Since the prohibition against discrimination in housing on the basis of economic status as contained in section 206(g) of H.R. 3504 is directed at instrumentalities of state and local governments, an analysis of the effect, if any, of the Supreme Court's decision in National League of Cities v. Usury, 47 L. Ed. 2d 245 (1976) is appropriate. This decision constitutes the first major limitation enunciated by the High Court in forty years upon Congress' power to regulate interstate commerce.[6] It squarely overruled the Court's previous, widely cited, holding in Maryland v. Wirtz, 392 U.S. 183 (1968), which had upheld the extension of the Fair Labor Standards Act to employees of state hospitals, schools and other institutions. Justice Rehnquist, writing for the majority in the 5-4 decision, held unconstitutional those provisions of the 1966 and 1974 amendments to the Fair Labor Standards Act that had brought certain employees of state and local governmental entities under coverage of the Act. The fact that Congress was attempting to regulate a state activity was held to impose a limitation on its power under the Commerce Clause. A State is considered to have a separate and independent existence under the federalist structure of our nation, and it possesses a constitutional right to protect that existence from unduly intrusive federal regulations. Congress may not displace the freedom of the States to structure their own operations, particularly in traditional areas of state governmental concerns,

---

[6]/Since 1937 the Supreme Court has not held unconstitutional a federal statute regulating private activity on the ground that it exceeded the limits set by the Commerce Clause, although in some cases individual justices would have held otherwise. See, eg., Justice Stewart in Perez v. United States, 402 U.S. 146 (1971).

CRS-16

such as education, medical care and police and fire protection. As
Justice Rehnquist stated, "...We have repeatedly recognized that there
are attributes of sovereignty attaching to every state government
which may not be impaired by Congress, not because Congress may lack
an affirmative grant of legislative authority to reach the matter,
but because the Constitution prohibits it from exercising the authority
in that manner. Id. at 253. To permit the kind of regulation attempted
in the Fair Labor Standards Act Amendments, said the Court, would
endanger and perhaps impair the separate and independent existence of
the States as States.

Under this view it is not enough to determine whether the
congressional regulation of a particular state activity affects inter-
state commerce. One must then go on to determine whether such a regulation
interferes unduly with the traditional and integral functions which a
State performs in its sovereign capacity. If the federal regulation,
though valid in other respects, nevertheless intrudes into state legislative
processes, it may be struck down.

However, one may find a limiting aspect to the implications of
the Court's holding in National League of Cities in the division of the
Court. In the majority of five the deciding vote was cast by Justice
Blackmun, who in his concurring opinion, said that he was "not untroubled
by certain possible implications of the Court's opinion." Id. at 260.

Justice Blackmun interprets the majority's holding as a kind
of "balancing approach." Ibid. He envisions a case-by-case balancing
of interests whenever the Congress' power under the Commerce Clause
conflicts with state sovereignty. For instance he indicates that the

CRS-17

majority decision would not necessarily "outlaw federal power in areas
such as environmental protection where the federal interest is demon-
strably greater and where state facility compliance with imposed federal
standards would be essential." Ibid. This uncertainty as to exactly
where the line between permissible and impermissible regulation may
be drawn limits to some extent the scope of the case's holding. The
Supreme Court was expected to clarify its application of this "integral
governmental functions" limitation on the Commerce Clause this term
when it decided several cases involving the EPA's power to force state
and local governments to establish certain programs and to use the
states' police power to implement transportation control programs designed
to decrease air pollution.[7] But these cases were remanded to lower courts
with no decisions on the merits.

While the possibility of undue federal intrusion into state
functions under the holding of National League of Cities must be considered
in any analysis of a direct federal regulation of state activities, it
is conceivable in this case that section 206(g) may constitute per-
missible federal commerce clause regulation. Two distinguishing features
of this proposed legislation are noted. First of all, under Justice
Blackmun's balancing approach, the interest of the Federal Government
in the area of eliminating discrimination against the poor in housing
may out-weigh state zoning or fiscal interests. And, secondly the kind

---

[7] Brown v. E.P.A., 521 F. 2d 827 (9th Cir. 1975), D.C. v. Train, 521
F. 2d 971 (D.C. Cir. 1975), Maryland v. E.P.A., 530 F. 2d 215 (4th Cir.
1975), Virginia v. Train, 521 F. 2d 971 (D.C. Cir. 1975).

CRS-18

of activity to be regulated, while traditionally state and local in
scope, is not activity directly related to the sovereign status of
the states themselves, but rather concerns private economic enterprises
in the area of housing and land use development.  Under this rationale
section 206(g) may constitute a reasonable exercise of the power of
Congress to regulate commerce among the States.

CRS-19

Conclusion

      Constitutional difficulties may be encountered in the use
of the Fourteenth Amendment by Congress as authority for enacting
section 206(g) of H.R. 3504, at least in so far as that section pro-
hibits economic discrimination in housing by state and local govern-
ments. The U.S. Supreme Court has not specifically held either
wealth to be a suspect class or housing to be a fundamental interest
under the Equal Protection Clause. A congressional declaration that
discrimination on the basis of economic status may be prohibited
constitutes a legislative expansion of the guarantees of section 1
of the Fourteenth Amendment. While it is clear that Congress has
special legislative expertise to determine whether a particular kind
of discrimination exists, the High Court may not accept a congres-
sional finding which expands the substantive protections afforded
by the Fourteenth Amendment. Cases presently before the Supreme
Court may serve to define more precisely the limits of congressional
interpretation of the Due Process and Equal Protection Clauses within
the context of Congress' power to enforce such guarantees.

      The use by Congress of its power under the Commerce Clause
as a jurisdictional basis for enactment of section 206(g) of H.R. 3504
would be more likely to be sustained by the courts. So long as Con-
gress has a rational basis for finding that a particular kind of

CRS-20

discrimination adversely affects interstate commerce and so long as the means chosen by Congress to eliminate the discrimination are reasonable and appropriate the enactment may be found valid. In addition, where the federal regulation directly affects state governmental activities, it will nevertheless likely be sustained as a proper exercise of the commerce power if it does not unduely intrude upon "integral state functions" so that the sovereignty of the States is preserved within the federalist structure of our government.

Kathleen E. Shea
Legislative Attorney
American Law Division
May 11, 1977



The Library of Congress

*Congressional Research Service*

Washington, D.C.  20540

March 23, 1977

TO      :  House Judiciary Committee
             Attention:  Janet McNair

FROM    :  American Law Division

SUBJECT:  Order of Trial of Cases Under the Civil Rights Act as
             Amended by H.R. 3504 (Civil Rights Amendments Act of 1977)
             Separating Legal and Equitable Issues to Avoid Seventh
             Amendment Problems


        This is in response to your request for a memorandum as to

whether the provisions of the Civil Rights Amendments Act of 1977

(H.R. 3504) calling for separation of issues where a jury is

constitutionally required and equitable issues avoid Seventh

Amendment problems that might otherwise arise.  H.R. 3504 would

generally amend the 1964 and 1968 Civil Rights Acts with respect to

discrimination in employment and housing.  Both legal and equitable

remedies are available for certain violations.  In connection with

the granting of relief, the bill would amend section 706 of title

VII of the Civil Rights Act of 1964 to provide, "706(g)(4)(D)  The

court may divide the trial of issues in cases where relief described

in this paragraph (4) may be granted so that all issues which must

be tried by a jury are tried separately from those which may be tried

by the court alone."  The bill would also add a new section 812 to the

1968 Act providing, "812(c)  If the court finds in a civil action

under this section an alleged discriminatory housing practice has

occurred, is occurring, or is about to occur, the court shall award

CRS-2

such relief as may be appropriate, which may include money damages, equitable and declaratory relief, and punitive damages not exceeding $10,000 in the case of each willful violation. The court may divide the trial of issues in cases where relief described in this subsection may be granted so that all issues which must be tried by a jury are tried separately from those which may be tried by the court alone." This language was obviously drafted out of a concern for Seventh Amendment problems associated with the mixture of legal and equitable issues within a single case.

The Seventh Amendment provides, "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of common law." In cases where legal and equitable issues are interwoven the application of this requirement particularly after the merger of law and equity in the Federal Rules of Civil Procedure has frequently proved difficult. One commentator has summarized the applicable rules in such instances as follows:

> (1) If legal and equitable issues are completely independent, so that the resolution of one will not control the resolution of the other, the trial court has discretion to decide the order of trial as a matter of administrative convenience. (2) If, however, issues of fact are common to both the legal and equitable claims and a jury has been demanded on the issues material to the legal claim, a jury must be permitted to determine these issues prior to decision on the equitable claim. 9 Wright & Miller, Federal Practice and Procedure 134 (1971) citing inter alia, Beacon Threatres, Inc. v. Westover, 359 U.S. 500 (1959): Dairy Queen, Inc. v. Wood, 369 U.S. 469 (1962).

CRS-3

Of course, Curtis v. Loether, 415 U.S. 189 (1974), is more directly on point. There the Supreme Court held that the defendant in case brought under section 812 of the Civil Rights Act of 1968 for injunctive relief and compensatory and punitive damages was entitled to a jury trial in a damage action to enforce legal rights such as provided in section 812.

The provisions of H.R. 3504 establishing sections 706(g) (4)(d) and 812(c) would seem to codify or could be reasonably interpreted as codifying existing law with respect to the Seventh Amendment right to jury trial. That is, the sections permit the separate resolution of legal and equitable issues where the two are independent and do not require the prior resolution of equitable issues where the legal and equitable issues are interwoven. If the drafters of the sections intend to permit the courts to resolve equitable issues before related legal issues have been resolved at a jury trial, it might be advisable to make that clear either in the statute or the legislative history. The question of whether Congress might enact such statute, i.e., whether it has the constitutional authority under section 2 of the Thirteenth and section 5 of the Fourteenth Amendments to enact legislation that would otherwise be contrary to the Seventh Amendment, has apparently not been determined, see Curtis v. Loether, 415 U.S. at 198n. 15.

Charles Doyle
Legislative Attorney



# THE LIBRARY OF CONGRESS

*Congressional Research Service*

WASHINGTON, D.C.  20540

April 7, 1977

To:         House Judiciary Committee
            Attention:  Janet McNair

From:       American Law Division

Subject:    Examples of Statute of Limitations for Contract and Tort Actions
            in the 50 States

This is in response to your inquiry concerning the above subject.

In our survey of the statutes of the fifty states we selected what we considered to be the main statute of limitation in the area of tort and contract. For example, in Connecticut if a contract is under seal the limitation on the action is seventeen years (Conn. Gen. Stat. Ann. §52-573), but if the action is brought on a simple or implied contract the statute of limitations is six years (Conn. Gen. Stat. Ann. §52-576). We listed §52-576 as the main Connecticut statute because many more suits would be brought under this section than would be brought under § 52-573.

We proceeded in the same fashion with our selection of the statute of limitations in torts as we did with contracts. However, our search indicates that in the area of tort the limitations on action more ofter appear in one statute than is the case with contracts.

CRS-2

With regard to your request for samples of federal statutes of limitations we are enclosing copies of the following statutes: 29 U.S.C. §626 (Age discrimination in employment); 7 U.S.C. §1508(c) (Crop insurance claim) and 5 U.S.C. §8122 (Employees' compensation for work injuries).

Robert J. DeGostin
Legislative Attorney



The Library of Congress

*Congressional Research Service*

Washington, D.C.  20540

| STATE | CONTRACT | TORT |
|---|---|---|
| Alabama | six years (Ala. Code tit. 7, §21) | six years (Ala. Code tit. 7, §21) |
| Alaska | six years (Alaska Stat. §09.10. 070 & §45.05.242) | two years (Alaska Stat. §09.10.070) |
| Arizona | four years (Ariz. Rev. Stat. §44-2404) | one year (Ariz. Rev. Stat. §12-541) |
| Arkansas | three years (contracts not in writing Ark. Stat. Ann. §37.206) | one year (Ark. Stat. Ann. §37.201) |
| California | four years (Cal. Civ. Proc. Code §§337 & 339 (West)) | one year (Cal. Civ. Proc. Code §340.5 (West)) |
| Colorado | six years (Colo. Rev. Stat. §13-80-110) | one year (Colo. Rev. Stat. §13-80 102) |
| Connecticut | six years (Conn. Gen Stat. Ann. §52-576 (West)) | three years (Conn. Gen Stat. Ann. §52-577 (West)) |
| Delaware | four years (Del. Code tit. 6 §2-725) | two years (Del. Code §§ tit. 10 §8107 and 8119) |
| District of Columbia | three years (D.C. Code §12-301) | one year (D.C. Code §12-301) |
| Florida | five years (Fla. Stat. Ann. §95.11 (West)) | four years (Fla. Stat. Ann. §95.11 (West)) |
| Georgia | six years (Ga. Code Ann. §3-705) | two years (Ga. Code Ann. §3-1004) |
| Hawaii | six years (Haw. Rev. Stat. §657-1) | two years (Haw. Rev. Stat. §657-4) |

CRS-2

| STATE | CONTRACT | TORT |
|-------|----------|------|
| Idaho | five years (Idaho Code §5-216) | two years (Idaho Code §5-219-6) |
| Illinois | ten years (Ill. Ann. Stat. ch. 87 §17) | one year (Ill. Ann. Stat. ch. 83 §14) |
| Indiana | six years (Ind. Code Ann. §34-1-2-1 (Burns)) | two years (Ind. Code Ann. §34-19-1 (Burns)) |
| Iowa | 10 years (for written contract) 5 years (for unwritten contract) (Iowa Code Ann. § ch. 614) | two years (Iowa Code Ann. §ch. 614) |
| Kansas | five years (for written contracts) three years (for unwritten contracts) (Kan. Stat. §§ 60-511 & 512) | one year (Kan. Stat. §60-514) |
| Kentucky | fifteen years (for written contracts) five years (for unwritten contracts) (Ky. Rev. Stat. Ann. §§413.010, 413.090 and 413.230) | one year (Ky. Rev. Stat. Ann. §413.200) |
| Louisiana | ten years (La. Code Civ. Pro art 9 §5682) | one year (La. Code Civ Pro art 9 §5628) |
| Maine | six years (Me. Rev. Stat tit 14, §752) | two years (Me. Rev. Stat. tit. 14, §753 & tit. 18, §2552) |
| Maryland | twelve years (for contract under seal) (Md. Ann. Code art 5, §102) | one year (Md. Ann. Code art 5, §105) |
| Massachusetts | twenty years (for contracts under seal) (Mass. Ann. Laws ch. 260, §20) | three years (Mass. Ann. Laws ch. 260, §2A) |
| Michigan | six years (Mich. Comp. Laws Ann. §600.5807) | two years (Mich. Comp. Laws Ann. §600.5805) |

CRS-3

| STATE | CONTRACT | TORT |
|-------|----------|------|
| Minnesota | six years (Minn. Stat. Ann. §541.05 (West)) | two years (Minn Stat. Ann. §541.07 (West)) |
| Mississippi | six years (Miss Code Ann. §75-2-725) | one year (Miss. Code Ann. §15-1-35) |
| Missouri | five years (Mo. Ann. Stat. §378.320) | two years (Mo. Ann. Stat. §516.140) |
| Montana | eight years (for written contract) (Mont. Rev. Codes Ann. §93-2603) | two years (Mont. Rev. Codes Ann § 93-2607) |
| Nebraska | five years (for written contract) four years (for written contract) (Neb. Rev. Stat. §§25-204 & 25-206) | one year (Neb. Rev. Stat. §25-208) |
| Nevada | six years Nev. Rev. Stat. §11.190) | two years (Nev. Rev. Stat. §11.190) |
| New Hampshire | six years (N.H. Rev. Stat. Ann. §508, 4-b) | six years (N.H. Rev. Stat. Ann. §508, 4-b) |
| New Jersey | six years (N.J. Stat. Ann. §725 of tit. 12A) | one year (N.J. Stat. Ann. §3 of tit. 2A) |
| New Mexico | six years (contract in writing) (N.M. Stat. Ann. §23-1-3) | three years (N.M. Stat. Ann. §23-1-8) |
| New York | six years (N.Y. Civ. Prac. Law (McKinney) §213) | one year (N.Y. Civ. Prac. Law (McKinney) §51) |
| North Carolina | three years (N.C. Gen. Stat §1-52) | one year (N.C. Gen. Stat. §1-54) |
| North Dakota | six years (N.D. Cent. Code §28-01-16) | two years (N.D. Cent. Code §28-01-18) |

CRS-4

| STATE | CONTRACT | TORT |
|---|---|---|
| Ohio | six years (Ohio Rev. Code Ann. §2305.26 (Page)) | one year (Ohio. Rev. Code Ann. §2305.11) |
| Oklahoma | five years (Okla. Stat. Ann. §§ 12-93 & 12-95) | one year (Okla. Stat. Ann. §12-95) |
| Oregon | six years (Or. Rev. Stat. §12.070) | one year (Or. Rev. Stat. §12.120) |
| Pennsylvania | six years (Pa. Stat. Ann. §12-31 (Purdon)) | one year (Pa. Stat. Ann. §12-31 (Purdon)) |
| Rhode Island | six years (R.I. Gen. Laws. §9-1-13) | six years (R.I. Gen. Laws §9-1-13) (except for slander - 1 year §9-1-14) |
| South Carolina | six years (S.C. Code §10-1951) | two years (S.C. Code §10-145) |
| South Dakota | six years (S.D. Compiled Laws Ann. §15-2-13) | two years (S.D. Compiled Laws Ann. §15-2-15) |
| Tennessee | six years (Tenn. Code Ann. §28-309) | one year (Tenn. Code Ann. §28-304) (except for slander - six months §28-303) |
| Texas | four-years (contracts in writing) (Tex. Code Ann. §5527) | two years (Tex. Code Ann. §5526) |
| Utah | six years (Utah Code Ann. §78-12-23) | one year (Utah Code Ann. §78-12-29) |
| Vermont | six years (Vt. Stat. Ann. tit. 12, §511) | three years (Vt. Stat. Ann. tit. 12, §512) |
| Virginia | five years (Va. Code §8-13) | |
| Washington | six years (Wash. Rev. Code Ann. §4.16.040) | two years (Wash. Rev. Code Ann. §4.16. 100) |

CRS-5

| STATE | CONTRACT | TORT |
|---|---|---|
| West Virginia | ten years (contract in writing) (W. Va. Code, c 55, art 2, §14) | two years (W. Va. Code, c. 55, art 2, §14) |
| Wisconsin | six years (Wis. Stat. Ann. §893.19 (West)) | two years (Wis. Stat. Ann. §893.21 (West)) |
| Wyoming | ten years (contract in writing) (Wyo. Stat. §1-16) | four years (Wyo. Stat. §1-18) |

Robert J. DeGostin
Legislative Attorney



### THE LIBRARY OF CONGRESS

*Congressional Research Service*

WASHINGTON, D.C. 20540

April 15, 1977

TO    :  Subcommittee on Civil and Constitutional Rights
             Attention: Pat Villareal

FROM  :  American Law Division

SUBJECT: Federal Administrative Authority to Issue Cease and Desist
         Orders -- A Survey of Select Statutes and Agency Procedures

        Reference is made to your request in connection with Committee consideration of H R. 3504, the "Civil Rights Amendments Act of 1977," for information concerning the above. Specifically, you ask for a list of federal departments and agencies with cease and desist authority, together with a summary of relevant administrative enforcement procedures, indicating for each who performs the investigative, prosecuting, and appeal functions. In addition, you ask us to identify which of those agencies and departments have a Presidentially appointed General Counsel.

        At the outset, it should be observed that the following does not purport to be exhaustive but identifies only those statutory authorities we have been able to locate which employ the terms "cease" and "desist" on their face. All cease and desist orders may not be authorized, as such, by express statutory language. There are, for example, a number of other statutory provisions which authorize an agency to issue "an appropriate order" under defined circumstances.

CRS-2

In many cases, an appropriate order may include a cease and desist order. See, e.g. 49 U.S.C. §§304(c), 312, 904(e), 1011(d), 1003(f), and 1010(f) (Interstate Commerce Commission); 49 U.S.C. §§1371(g), 1378(e), 1482(f), 1483(d) and (e) (Civil Aeronautics Board). To the extent that agency regulations provide for cease and desist orders under these and other statutory provisions, we have not undertaken thoroughly to examine all the possibilities. Furthermore, there may be additional provisions which specifically mention cease and desist orders that our search has failed to disclose.

In any event, the following list describes the methods of enforcement under those acts we were able to locate.

CRS-3

    1.  Persons and associations recognized as commission merchants and brokers by the Commodities Futures Trading Commission may be ordered to cease and desist from trade practices prohibited by the Commodities Exchange Act. 7 U.S.C. 13a, 13b.

    Investigation/Prosecution:  The Commission is authorized, generally, "to make such investigations as it may deem necessary to ascertain the facts regarding the operations of boards of trade and other persons" subject to the Act.  7 U.S.C. 12.  To this end, it is empowered "to employ such investigators, special experts, Administrative Law Judges, clerks, and other employees" as it deems necessary for proper performance of its duties.  7 U.S.C. 16(b).  Proceedings are commenced with the issuance of a complaint and notice of hearing by the Commission and service of same by the Hearing Clerk on the respondent.  17 C.F.R. 10.21, 10.22.  Commission investigations are conducted by its Division of Enforcement which is also chiefly responsible for prosecuting the Commission's case in formal adjudicatory hearings.  17 C.F.R. 10.2(g), 10.31.  The hearing is held before an Administrative Law Judge appointed by the Commission pursuant to the Administrative Procedures Act.  17 C.F.R. 10.8.  The regulations specifically require a separation of administrative functions, providing:

    §10.9  Separation of functions.

    (a)  An Administrative Law Judge will not be responsible or subject to the supervision or direction of any officer, employee, or agent of the Commission engaged in the performance of investigative or prosecutorial functions for the Commission.

CRS-4

(b)  No officer, employee, or agent of the
Federal Government engaged in the performance
of investigative or prosecutorial functions in
connection with any proceeding shall, in that
proceeding or a factually related proceeding,
participate or advise in the decision of the
Administrative Law Judge, except as a witness
or counsel in the proceedings, without the
express written consent of the respondents in
the proceeding.  This provision shall not apply
to the Commission or a member of members of the
Commission.

The initial decision of the Administrative Law Judge shall become the

final decision of the Commission unless the Commission within 30 days

agrees to review or stay the decision. 17 C.F.R. 10.84.

Enforcement:  The Commission may assess a civil penalty of not

more than $100,000 for each violation and maintain an action in federal

district court to enforce its order and penalty.  Alternatively, the

Commission may request the Attorney General to bring suit.  7 U.S.C. 13a-1.

Appeal:  The respondent may appeal to the U.S. Court of

Appeals for the Circuit in which it has its principal place of business.

7 U.S.C. 8(a).

General Counsel:  The Commission General Counsel is appointed

and serves at the pleasure of the Commission. 7 U.S.C. 4(a).

CRS-5

2. Under the Packers and Stockyards Act, the Secretary of
Agriculture is authorized to order packers to stop committing certain
violations and to order stockyards, live poultry dealers, and certain
other parties to cease and desist from rates and charges which are not
"just, reasonable, and nondiscriminatory" and from "unfair, unjust,
discriminatory, or deceptive practices." 7 U.S.C. 193, 211, 213, 218c.

Investigation/Prosecution: The Secretary "in person or by
such agents as he may designate, may prosecute any inquiry necessary
to his duties" under the Act. 7 U.S.C. 222. The Administrator of the
Packers and Stockyards Administration within the Department, or any
officer thereof, has by regulation been charged with responsibility for
investigating complaints filed with the Department. 9 C.F.R. 202.3(b).
If the Administrator is unable to resolve the matter through informal
means, he shall cause a formal complaint to be served on the respondent.
9 C.F.R. 202.6. Formal proceedings may also be instituted on the
Administrator's own motion. Hearings are to be held before an Adminis-
trative Law Judge appointed pursuant to the Administrative Procedures
Act, but no judge may serve in any proceeding who "has participated
in the investigation preceding the institution of the proceeding or
in the determination that it should be instituted or in the
preparation of the moving paper or in the development of the evidence
to be introduced therein." 9 C.F.R. 202.8. The Secretary, if appearing
by counsel, shall be represented by an attorney assigned by the General
Counsel of the department. 9 C.F.R. 202.11(c). The Administrative
Law Judge's decision becomes the final decision of the agency unless
appealed to Secretary within 35 days of issuance. 9 C.F.R. 202.16(c), (d).

CRS–6

Enforcement:  The Secretary, or the United States by the Attorney General, may apply to the district court for the district in which the respondent has his principal place of business for enforcement of his order. 7 U.S.C. 216.

Appeal:  The respondent may appeal the final order of the Secretary to the U.S. Court of Appeals for the circuit in which he has his principal place of business. 7 U.S.C. 194, 217.

General Counsel:  The General Counsel for the Department of Agriculture is appointed by the President with the advice and consent of the Senate. 7 U.S.C. 2214.

CRS-7

3.  Violators under the Federal Seed Act may be ordered to cease and desist by the Secretary of Agriculture. 7 U.S.C. 1599(a).

Investigation/Prosecution:  The Secretary is authorized upon application or his own motion to institute proceedings under this section. 7 U.S.C. 1599(a).  Administrative responsibility for investigations and prosecutions has been delegated to the Director of the Grain Division, Agricultural Marketing Service, within the Department.  7 C.F.R. 202.3. If, after investigation, the Director believes a violation has occurred, he is to file a complaint with the hearing clerk of the Department who is to serve a copy on the respondent and set the matter for hearing. 7 C.F.R. 202.12.  A hearing examiner assigned from the Department's Office of Administrative Judges presides at the hearing except that no examiner may serve "if he has participated in the investigation preceding the institution of the proceeding or in the determination that it should be instituted or in the preparation of the complaint or in the development of the evidence to be introduced therein."  7 C.F.R. 202.14(a).  Exceptions to the hearing examiner's  recommended decision may be filed with the hearing clerk within 30 days and the Secretary is to issue his final order "as soon as practicable" thereafter. 7 C.F.R. 202.19(g), (h), (i).

Enforcement:  The Secretary of Agriculture or Attorney General may apply to the U.S. Court of Appeals for the circuit within which the respondent resides or has his principal place of business for enforcement of his order.  7 U.S.C. 1601.

Appeal:  The respondent may appeal to the U.S. Court of Appeals to set aside or modify the order.  7 U.S.C. 1600.

General Counsel:  See (2) above.

CRS-8

4.  The Secretary of Agriculture is authorized by the Laboratory
Animal Welfare Act to order dealers, research facilities, and exhibitors
to cease and desist from inhumane transportation and handling of animals
used for research, testing, experimentation, or exhibition purposes.
7 U.S.C. 2149.

Investigation/Prosecution:  The Secretary is empowered to "make
such investigations or inspections as he deems necessary" for ascertaining
violations of the Act. 7 U.S.C. 2146(a), 2149(a).  The Administrator
of the Animal and Plant Health Inspection Service has been delegated
principal responsibility for investigating and prosecuting complaints
under the Act.  9 C.F.R. 4.2(g).  Proceedings are instituted by the filing
of a moving paper by the Administrator with the Department's Hearing Clerk
who shall promptly serve a copy on the respondent.  9 C.F.R. 4.10, 4.11-1.
Formal adjudicatory hearings are conducted by an Administrative Law
Judge and the regulations contain the standard provision requiring separation of administrative functions. 9 C.F.R. 4.18-1(c). The Department
is represented by the Administrator or other officer or employee of
the Animal and Plant Health Inspection Service. 9 C.F.R. 4.19-4(a).
The Administrative Law Judge's decision shall be the final agency
decision unless appealed to the Secretary within 35 days of issuance.
9 C.F.R. 4.19-9.

Enforcement:  The Act provides a civil penalty for each day
the respondent knowingly fails to comply with the order. 7 U.S.C.
2149(b), 2150(a). Fine or imprisonment may be imposed by the federal
district court upon conviction under a criminal penalty provision.
7 U.S.C. 2149(c).

CRS-9

Appeal: The respondent may appeal the final order of the Secretary to the U.S. Court of Appeals for the circuit within which he has his principal place of business or the U.S. Court of Appeals for the District of Columbia. 7 U.S.C. 2149(b), 2150(b).

General Counsel: See (2) above.

CRS-10

5.  The Federal Home Loan Bank board may order a federal savings and loan association to cease violating applicable laws and regulations in those cases where the Board does not deem it adviseable to impose the harsher sanction of appointment of a conservator or receiver. 12 U.S.C. 1464(d).

Investigation/Prosecution: Authority to investigate, issue subpoenas, and prosecute charges is vested, generally, with "the Board or any member thereof or a designated representative of the Board, including any person designated to conduct any hearing authorized [by this section]." 12 U.S.C. 1464 (d)(9). Board regulations indicate that investigative functions for the Board are conducted by the Director of the Office of Examinations and Supervision and that the Office of General Counsel is responsible for the prosecution of administrative proceedings for the Board. See, 12 C.F.R. 500.17, 500.18, 509 et seq. All hearings are to be presided over by an official designated by the Board in accordance with the Administrative Procedures Act. 12 C.F.R. 509.6. Recommended decisions of the presiding officer may be reviewed by the Board, or one or more of its members, upon any party's filing exceptions with the Board Secretary within 30 days of issuance. 12 C.F.R. 509.12, 509.14.

Enforcement: Orders of the Board may be enforced by application to U.S. District Court within the jurisdiction that the home office of the association is located. 12 U.S.C. 1464(d)(8). Criminal penalties may be imposed on any director, officer, or employee of the association convicted for violating a Board order. 12 U.S.C. 1464 (d)(12)(a). The Board may also appoint a conservator or receiver

CRS-11

for the association where there is "willful violation of a cease and desist order which has become final." 12 U.S.C. 1464 (d)(6)(a).

Appeal: The association may appeal the final order of the Board to the U.S. Court of Appeals for the circuit where the home office of the association is located or the U.S. Court of Appeals for the District of Columbia. 12 U.S.C. 1439.

General Counsel: No specific statutory provision; the Board has power to select and employ "such officers, employees, attorneys, and agents as shall be necessary for the performance of its duties." 12 U.S.C. 1439.

CRS-12

6. The Federal Savings and Loan Insurance Corporation may order insured financial institutions to cease and desist from unsound or unsafe practices or other violations of the applicable banking laws, rules, or regulations. 12 U.S.C. 1730(e).

Investigation/Prosecution: Activities related to investigations and adjudicatory proceedings are to be conducted by "the Corporation, or its designated representatives." 12 U.S.C. 1730(m)(2). The procedures governing the investigation, prosecution, and adjudication of matters under this section are the same as those described in (5) above. 12 C.F.R. 509, 566.1.

Enforcement: The Corporation may apply to the U.S. District Court for the jurisdiction where the principal office of the financial institution is located for an injunction to enforce its orders. 12 U.S.C. 1730 (k)(2).

Appeal: The financial institution may appeal the final order of the Corporation to the U.S. Court of Appeals for the circuit where the institution has its principal office or the U.S. Court of Appeals for the District of Columbia. 12 U.S.C. 1730 (j)(2).

General Counsel: No specific statutory provision; the Corporation is authorized "to appoint and fix the compensation... of such officers, employees, attorneys, or agents, as shall be necessary for the performance of its duties." 12 U.S.C. 1725(c)(5).

CRS-13

7. If the Department of Housing and Urban development deter-
mines that multifamily housing insured under the National Housing Act
is being used by particular persons for "transient or hotel purposes"
contrary to the Act, he is to order them to cease such usage.

Investigation/Prosecution: On written notice of violation,
"the Secretary shall investigate the existence of the facts alleged."
12 U.S.C. 1731b(f). There appear to be no published regulations govern-
ing procedures for administrative enforcement of this section.

Enforcement: In cases of noncompliance with the order, the
Secretary is to refer the matter to the Attorney General who may seek
injunctive relief from the U.S. District court where acts constituting
the violation occur. 12 U.S.C. 1731 b(h).

Appeal: No specific statutory provision.

General Counsel: General Counsel for the Department is appointed
by the President with the advice and consent of the Senate. 42 U.S.C.
3533(a).

CRS-14

8. The National Credit Union Administration may order federally insured credit unions to cease and desist from unsafe or unsound practices and other violations of the laws, rules, and regulations governing their operation. 12 U.S.C. 1786(e)(1).

Investigation/Prosecution: Activities related to investigation and adjudicatory proceedings are to be conducted by "the Administrator or any designated representative thereof..." 12 U.S.C. 1786(o). Hearings are to be held before a trial examiner selected by the Civil Service Commission and designated by the Administrator in accordance with the Administrative Procedures Act. 12 C.F.R. 747.6. The Administration is represented by counsel assigned for that purpose, but "no officer, employee, or agent engaged in the performance of investigating or prosecuting functions in any case shall, in that case or a factually related case, participate or advise in the decision of the trial examiner except as a witness or counsel in the proceedings." 12 C.F.R. 747.6 (c)(4). On its own initiative or upon request of a party within 15 days of issuance, the Administrator may review the recommended decision and order of the trial examiner. 12 C.F.R. 747.13.

Enforcement: The Administrator may apply to the U.S. District Court for the jurisdiction where the credit union has its principal office for an injunction to enforce its order. 12 U.S.C. 1786(j).

Appeal: The respondent may appeal the final order of the Administrator to the U.S. Court of Appeals for the circuit where it has its principal office or the U.S. Court of Appeals for the District of Columbia. 12 U.S.C. 1786(i)(2).

CRS-15

General Counsel: No specific statutory provision; the Adminis-
trator is authorized "to appoint such personnel as may be necessary
to enable the Administration to carry out its functions." 12 U.S.C.
1767(i)(1).

CRS-16

9. The Comptroller of Currency and Federal Reserve Board each have authority to order federally insured banks to cease and desist from unsafe or unsound financial practices and other violations of the banking laws. 12 U.S.C. 1818(b)(1).

Investigation/Prosecution: Activities related to investigations and adjudicatory proceedings are to be conducted by "the agency...or any member or designated representative thereof..." 12 U.S.C. 1818(n). The regulations provide that a hearing examiner appointed by the agency is to preside at the hearing and those of the Federal Reserve Board specify that the Board, one or more of its members, or other official may sit as presiding officer. All adjudicatory hearings are to be conducted in accordance with the Administrative Procedures Act. 12 C.F.R. 19.11; 12 C.F.R. 263.6. Accordingly, officials engaged in any investigative or prosecuting function are barred from participation in the hearings except as witness or counsel for the agency. 12 C.F.R. 19.11 (b)(4); 12 C.F.R. 263.6(a). The government is represented by counsel appointed by the agency. The recommended decision of the hearing examiner may be reviewed by the agency on its own motion or on petition of any party filed within 15 days of issuance of that decision. 12 C.F.R. 19.15, 19.16; 12 C.F.R. 263.11, 263.12.

Enforcement: The agency may apply to the U.S. District Court for the jurisdiction where the home office of the bank is located for an injunction to enforce its order. 12 U.S.C. 1818(n).

CRS-17

Appeal:  The insured bank may appeal the final order of the agency to the U.S. Court of Appeals for the circuit where the home office of the bank is located or the U.S. Court of Appeals for the District of Columbia.  12 U.S.C. 1818(h)(2).

General Counsel:  Statutes governing the activities of neither the Comptroller nor Federal Reserve Board contain specific provision regarding General Counsel.  Both agencies are authorized in general terms to employ such employees, including attorneys, as is necessary for performance of its duties.  12 U.S.C. 9; 12 U.S.C. 248(1).

CRS-18

10. The Clayton Act forbids certain kinds of business prac-
tices that reduce competition or promote monopoly. Some types of
practices, such as illegal price discrimination and interlocking
directorates, may be restrained by cease and desist orders issued,
within their respective jurisdictions, by the Interstate Commerce
Commission, Federal Trade Commission, Civil Aeronautics Board, and
the Board of Governors of the Federal Reserve System. 15 U.S.C. 13,
14, 18, 19, 21.

Investigation/Prosecution: Activities related to investiga-
tion and prosecution of violators are conducted by the Commission or
Board and this responsibility has by regulation been lodged with desig-
nated offices or bureaus within the agency. The regulations of the
Board of Governors of the Federal Reserve are typical in their provi-
sion that "when evidence is to be taken in a hearing, either the
Board or, when duly designated for that purpose, one or more of its
members, a hearing examiner, or other lawfully appointed hearing offi-
cer may preside at the hearing." 12 C.F.R. 236.6(a). See, also
Regulations of the FCC, 47 C.F.R. 1.91. Also, the regulations, like
those of the Federal Reserve Board, generally require a separation
of investigatory/prosecutorial from adjudicatory functions by provid-
ing that "neither Board counsel nor any officer or employee of the
Board who has engaged in the performance of any investigative or
prosecuting function in that case, or a factually related case, may

CRS-19

participate in or advise as to the presiding officer's recommended decision or the Board's decision, except as witness or counsel in such hearing or related proceeding." 12 C.F.R. 263.6(d); also, 47 U.S.C. 155 (Separation of functions within the ICC).

Enforcement: The Board or Commission may seek an injunction to enforce its orders from the U.S. Court of Appeals for the circuit where the violation occurred or within which the respondent resides or does business. 15 U.S.C. 21(d).

Appeal: Respondent may seek review of an agency order by filing, within 60 days, a petition with U.S. Court of Appeals. 15 U.S.C. 21(c).

General Counsel: None of these agencies have a Presidentially appointed General Counsel.

CRS-20

11.  The Federal Trade Commission is authorized to enter
cease and desist orders against any person, partnership, or corpora-
tion engaged in unfair competition or deceptive trade practices.
15 U.S.C. 45(b).

Investigation/Prosecution:  The Commission is empowered to
investigate and prosecute anticompetitive or deceptive practices, con-
duct adjudicatory proceedings, and appoint hearing examiners and staff.
15 U.S.C. 45(b).  Commission investigations may originate upon request
of the President, Congress, governmental agencies, or the Attorney
General; upon referrals by the courts, upon complaint by members of
the public; or by the Commission on its own initiative.  16 C.F.R. 2.1.
Investigations are conducted by the "Commission representatives desig-
nated and duly authorized for that purpose," specifically including
the Bureaus of Competition, Consumer Protection, and Economics and
officials in the Commission's regional offices.  16 C.F.R. 2.5, 2.7.
These "examiners" may issue subpoenas and hold informal investigational
hearings for the purpose of taking testimony and receiving documents
and other data relevant to the matter under investigation.  16 C.F.R.
2.8.  In cases of apparent violation and failure to achieve voluntary
compliance, the matter is set for formal adjudicatory hearing.
16 C.F.R. 2.14.

Hearings are presided over by the Commission, one or more of
its members, or an Administrative Law Judge assigned by the Director

CRS-21

of Administrative Law Judges within the Commission. 16 C.F.R. 3.42(b).
The hearing examiner shall not be subject to the supervision or
direction of any person performing investigative or prosecuting func-
tions for the agency. 16 C.F.R. 3.42(f). The Commission is represented
by counsel appointed by it. 16 C.F.R. 3.43. The initial decision of
the hearing examiner shall become the final Commission decision unless,
within 30 days, a party to the proceeding files an appeal with the
Commission, or the Commission, on its own initiative, agrees to review
the matter. 16 C.F.R. 3.51.

     Enforcement: Commission orders become final upon expiration
of 60 days following entry of the order, action by a court of appeals,
or immediately upon denial of a petition of certiorari. 15 U.S.C. 45(g).
Thereafter, the Attorney General may bring a civil action in federal
district court for an injunction to enforce the Commission order and
to recover a civil penalty not to exceed $10,000 per violation.
15 U.S.C. 45(1). The Commission may itself bring a similar action for
knowing violation of its rules or orders. 15 U.S.C. 45(m).

     Appeal: A person, partnership, or corporation subject to a
Commission order may seek review in the U.S. Court of Appeals for the
circuit where the violation occurred or where it resides or does
business. 15 U.S.C. 45(c).

     General Counsel: No specific statutory provision; the Com-
mission is authorized to appoint attorneys "necessary for proper
performance of its duties." 15 U.S.C. 42.

CRS-22

12. The Secretary of Interior is authorized to order associations of producers of acquatic products to cease and desist from monopolizing or restraining trade in interstate commerce or foreign commerce to such an extent that the price of any product is unduly enhanced. 15 U.S.C. 522.

Investigation/Prosecution: The Secretary, upon complaint or on his own motion, may make investigation and institute proceedings to enforce this section. 15 U.S.C. 522; 50 C.F.R. 290.2. Hearings are to be conducted by an official designated by the Secretary, but no person may be assigned as hearing examiner who "has participated in the investigation preceding the institution of the proceeding, in the preparation of the complaint, or in the development of the evidence to be introduced in the proceeding." 50 C.F.R. 290.6. The Bureau of Commercial Fisheries within the Department is responsible for prosecuting the case against the association which is to be presented by departmental counsel appointed for that purpose. 50 C.F.R. 290.8. The hearing official--appointed from the Department's Office of Administrative Law Judges--is to make the preliminary decision which may be appealed to the Secretary. 50 C.F.R. 290.9.

Enforcement: The Secretary may seek to have his order enforced by filing the hearing record in the U.S. District Court for the district where the association has its principal place of business. 15 U.S.C. 522.

CRS-23

Appeal: The association may request that the record be filed for review in the U.S. District Court for the district in which it has its principal place of business. 15 U.S.C. 522.

General Counsel: The legal work of the Department is to be performed by a Solicitor appointed by the President. 43 U.S.C. 1455.

CRS-24

13.  Under the Small Business Investment Act, as amended, the
Small Business Administration, which licenses small business investment
companies, may order a licensee to cease its failure to comply with the
Act and agency regulations thereunder.  15 U.S.C. 687a(b).

Investigation/Prosecution:  The Administration is empowered
to undertake investigations in response to formal complaints or on its
own initiative and to authorize institution of adjudicative proceedings.
15 U.S.C. 687b(a); 13 C.F.R. 110.1.  All adjudicative hearings are
presided over by an examiner appointed by the Administrator who is to
make proposed findings and conclusions and issue an initial decision.
13 C.F.R. 109.18.  The examiner's decision becomes  the final decision
of the Administration unless, within 30 days, a petition of review is
filed with the Administrator.  13 C.F.R. 109.20, 109.21.  Thereafter,
the Administrator's determination on review is the final agency deci-
sion.  13 C.F.R. 109.23.

Enforcement:  The Administration decision is final and con-
clusive unless the respondent appeals, within 30 days, to the U.S.
Court of Appeals for the circuit in which it has its principal place
of business.  15 U.S.C. 687a(e).  The Administrator may revoke the
license of a small business investment company for failure to comply
with its order or may apply to the U.S. Court of Appeals for injunc-
tive relief.  15 U.S.C. 687a(a)(5), 687a(f).

CRS-25

Appeal: The company may appeal the Administration order to the U.S. Court of Appeals for the circuit in which it has its principal place of business. 15 U.S.C. 687a(e).

General Counsel: Appointed by the Administrator. 15 U.S.C. 634(e).

CRS-26

14.  Employers, employees, and unions may be ordered by the National Labor Relations Board to cease and desist from unfair labor practices as defined in the Labor-Management Relations Act.  The Act provides that if the NLRB finds that a person has engaged in an unfair employment practice, "then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without backpay, as will effectuate the policies of this Act."  29 U.S.C. 160(c).

Investigation/Prosecution:  The General Counsel, a Presidential appointee and subject to Senate confirmation, is given "final authority" to investigate and prosecute unfair labor practice cases and "general supervision" over all attorneys and other officers employed in the regional offices.  29 U.S.C. 154.  Proceedings are initiated with filing of a charge with the regional director who then assigns a member of the field staff for investigation.  29 U.S.C. 160(b); 29 C.F.R. 101.4.  If found lacking in merit, the regional director is to dismiss or recommend withdrawal of the charges, subject to the complainant's right to appeal to the General Counsel in Washington, D. C. 29 C.F.R. 101.6.  Alternatively, the regional director may institute formal action by issuing a complaint and notice of hearing.  29 C.F.R. 101.8.

CRS-27

The Board is vested with authority to adjudicate cases prosecuted by the General Counsel. Hearings are to be conducted by the Board, or any "member, agent, or agency" of the Board. 29 U.S.C. 160(c). In practice, an administrative law judge is appointed and the government's case is presented by an attorney attached to the Board's regional office. Counsel from the General Counsel's Office may also participate in the hearing. 29 C.F.R. 101.10. The administrative law judge's decision and recommended order, if no exceptions are filed by the parties or counsel for the Board, becomes the order of the Board. 29 C.F.R. 101.11. If exceptions are filed, the Board is to refrain from consulting the trial examining staff or with any agent of the General Counsel in its deliberation. 29 C.F.R. 101.12.

Enforcement: The Board may seek judicial enforcement of its order by filing a petition with "any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice occurred or wherein such person resides or transacts business." 29 U.S.C. 160(e).

Appeal: Any person aggrieved by a final order of the Board may obtain a review of such order in a court of appeals in similar proceedings. 29 U.S.C. 160(f).

General Counsel: Appointed by the President, by and with advice and consent of the Senate, for a term of four years. 29 U.S.C. 153(d).

CRS-28

15. The Federal Maritime Commission may order a water carrier to cease and desist from violations of the Shipping Act of 1916, and may order a non-citizen water carrier to cease rebates, discrimination, and certain other unfair practices. 46 U.S.C. 813, 821.

Investigation/Prosecution: Any person may file a sworn complaint with the Commission which is to investigate the matter "in such manner and by such means, and make such order as it deems proper." The Commission may take similar action on its own initiative. 416 U.S.C. 813, 821. The Commission, one or more of its members, or an examiner assigned from the Commission's Office of Administrative Law Judges is to preside at all adjudicatory hearings. 46 U.S.C. 822; 46 C.F.R. 502.145, 502.146. Where the Commission is a party, the Director of the Office of Hearing Counsel, or an attorney designated by him, is to participate as Hearing Counsel, but the separation of functions required by section 5(c) of the Administrative Procedures Act must be observed in all proceedings. 46 C.F.R. 502.42, 502.224. The examiner makes an initial or recommended decision which, unless exceptions are filed within 30 days, becomes the final decision of the Commission. 46 C.F.R. 502.225, 502.227.

Enforcement: The Commission may apply to the U.S. District Court having jurisdiction of the parties for an injunction to enforce its order. 46 U.S.C. 828. A civil penalty of $1,000 for each day of continued violation is recoverable in the federal court action. 46 U.S.C. 837.

CRS-29

Appeal:  Suits to suspend or set aside Commission orders may be brought in U.S. District Court having jurisdiction of the parties. 46 U.S.C. 830.

General Counsel:  General Counsel appointed jointly by the Commission and the Secretary of Commerce.  46 U.S.C. 1111(e).

CRS-30

16. The Federal Communications Commission may order a carrier to cease and desist from "any change, classification, regulation, or practice" which violates the Communications Act of 1934. 47 U.S.C. 205. If a radio or television broadcasting licensee does not comply substantially by the terms of his license, or violates the Communications Act of 1934 or a Commission rule under the Act or a treaty, the Commission may order cessation of such conduct. Subject to Commission orders also are persons who violate the laws against fraud by wire or broadcast, use of obscenities or profanity in broadcasts, or the carrying of lottery information in broadcasts. 47 U.S.C. 312.

Investigation/Prosecution: The Commission, upon complaint or on its own initiative, may undertake investigations and institute adjudicatory proceedings to enforce these sections. The Administrative Procedures Act applies to proceedings for issuance of cease and desist orders. 47 U.S.C. 312(e); 5 U.S.C. 558(c)(1), (2). Thus, the Commission, one or more of its members, or a hearing examiner are to preside at adjudicatory hearings. 5 U.S.C. 556. Also, as noted above, the Administrative Procedures Act specifically requires separation of administrative functions, providing that "an employee or agent engaged in the performance of investigative or prosecuting functions for the agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review." 5 U.S.C. 584(d).

CRS-31

Principal responsibility for coordinating investigations
is lodged with the Enforcement Division of the Field Operations Bureau
within the Commission. 47 C.F.R. 0.114. If it appears that the
holder of a radio or television broadcast license is in violation of
the Act, the Commission, through the Complaints and Compliance Divi-
sion of the Broadcast Bureau, will issue a show cause order. 47 C.F.R.
0.81, 1.9(a). Thereafter, the matter will be set for hearing, partici-
pated in by the Bureau's Hearing Division. 47 C.F.R. 0.76, 1.9(b).
Hearings may be conducted by the Commission, one or more Commissioners,
or a law judge appointed from the Commission's Office of Administrative
Law Judges in conformity with the Administrative Procedures Act.
47 C.F.R. 1.241, 1.243. The Commission may assign counsel, from the
Office of General Counsel or otherwise, to represent it in the course
of the proceeding. 47 C.F.R. 0.44. The hearing examiner's recommended
decision may be appealed to the Commission within 30 days of issuance,
or the Commission, on its own motion, may agree to review the matter.
47 C.F.R. 1.276. This latter review function may be performed by a
Commissioner, a panel of Commissioners, or by the Commission Review
Board. 41 C.F.R. 1.271.

Enforcement: The Commission is empowered to revoke any
station license or construction permit for violation of its order.
47 U.S.C. 312(a)(5).

CRS-32

Appeal:  Appeals may be taken from the orders of the Commission to the U.S. Court of Appeals for the District of Columbia. 47 U.S.C. 402(b)(7).

General Counsel:  No specific statutory provision; the Commission is authorized to organize its staff into such organizational divisions, including legal, as may be necessary to perform its functions.  47 U.S.C. 155(b).

We are also enclosing a report previously prepared by this Division examining various policy arguments, pro and con, with respect to granting cease and desist authority to civil right enforcement agencies. It is hoped that this will assist in your consideration of this matter.

Charles V. Dale
Legislative Attorney

Case: 1:13-cv-08564 Document #: 134-4 Filed: 08/11/17 Page 386 of 446 PageID #:4188

# Insurance Redlining: Fact Not Fiction

February 1979



A report of the Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin Advisory Committees to the United States Commission on Civil Rights prepared for the information and consideration of the Commission. This report will be considered by the Commission, and the Commission will make public its reaction. In the meantime, the findings and recommendations of this report should not be attributed to the Commission but only to these Advisory Committees.

# Insurance Redlining: Fact Not Fiction

—A report prepared by the Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin Advisory Committees to the United States Commission on Civil Rights

**ATTRIBUTION:**

The findings and recommendations contained in this report are those of the Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin Advisory Committees to the United States Commission on Civil Rights and, as such, are not attributable to the Commission. This report has been prepared by the State Advisory Committees for submission to the Commission, and will be considered by the Commission in formulating its recommendations to the President and the Congress.

**RIGHT OF RESPONSE:**

Prior to the publication of a report, the State Advisory Committees afford to all individuals or organizations that may be defamed, degraded, or incriminated by any material contained in the report an opportunity to respond in writing to such material. All responses have been incorporated, appended, or otherwise reflected in the publication.

## LETTER OF TRANSMITTAL

Illinois, Indiana, Michigan, Minnesota,
Ohio, and Wisconsin Advisory Committees
to the U.S. Commission on Civil Rights
February 1979

MEMBERS OF THE COMMISSION
Arthur S. Flemming, *Chairman*
Stephen Horn, *Vice Chairman*
Frankie M. Freeman
Manuel Ruiz, Jr.
Murray Saltzman

Louis Nuñez, *Acting Staff Director*

Sirs and Madam:

The Midwestern Region Advisory Committees submit this report on insurance redlining (refusing to insure or varying the terms of insurance because of geographic location) as part of their responsibility to advise the Commission about civil rights problems within the region.

This report examines the structure of the property-casualty insurance industry, the controversies surrounding the issue of insurance redlining, and current practices of insurers within the city of Chicago. In the course of this examination, Committee members and Commission staff interviewed representatives of the insurance industry; local, State, and Federal officials with regulatory responsibility in the area of insurance; and leaders of community groups which have raised the issue of insurance redlining in their respective cities.

Insurance redlining is a national issue and related events in communities throughout the country have been surveyed. Particular attention has been given to proposed solutions that have emerged in various locations both inside and outside the Midwest region. The major findings of this investigation are that property insurance is more difficult to obtain in neighborhoods with a concentration of minority or lower income residents or older homes than in other communities, and that these insurance availability problems contribute to the decline of many older urban communities—with racial minorities again suffering an undue share of the burden. A number of recommendations are offered for actions by the insurance industry and government officials to eliminate this form of disinvestment.

Specifically, the Midwestern Region Advisory Committees find that, although property insurance is essential for individuals to own homes or operate businesses in today's society, it is frequently unavailable at affordable rates for many residents of older urban neighborhoods. Despite industry claims that its underwriting practices are based on loss experience and other objective, empirical data, the Committees find that marketing decisions are frequently made on the basis of subjective and unfairly discriminatory factors. In its examination of underwriting practices within the city of Chicago, the Committees find that communities containing a concentration of minority or low-income residents or older homes face insurance availability problems that cannot be explained by the two major causes of

iii

compensable loss: fire and theft. (These two factors account for almost 75 percent of the dollars paid out in losses by homeowners insurers in Chicago.) Government efforts to solve availability problems, particularly FAIR Plans, have not adequately met the insurance needs of urban residents. In recent years, however, several States have enacted insurance redlining legislation, many Federal agencies have begun examining the issue of insurance redlining, some insurance companies have launched voluntary efforts to increase insurance availability in urban areas, and public policy researchers have developed innovative models for the delivery of insurance services.

A variety of recommendations are offered to resolve insurance availability problems and to eliminate redlining. The Committees advise insurance companies to disclose to the public current marketing practices (i.e., geographic location of policies written, renewed, cancelled, nonrenewed, and in force) and the empirical basis for underwriting decisions; and to work voluntarily with other segments of urban communities (e.g., neighborhood organizations, public officials, banks) to develop strategies for maintaining and revitalizing those areas, thus enhancing their insurability and increasing insurance availability. Recommendations for State legislation are offered along with model amendments to State unfair trade practices acts. The Committees also recommend that the Illinois Department of Insurance and the U.S. Department of Justice investigate to determine which companies are responsible for the discriminatory marketing patterns found and whether such practices violate State and Federal law. Among the recommendations directed to the Federal Insurance Administration is a recommendation to provide support for demonstration projects to explore the feasibility of some of the innovative insurance models which have been proposed. The Committees also advise Congress to amend the Fair Housing Act of 1968 to reach practices of the property-casualty insurance industry.

The findings of this investigation answer many of the controversial questions that have been raised by the insurance redlining debate. With the support of the Commission, the above recommendations can be implemented and, if implemented, would contribute substantially to ending this one critical form of urban disinvestment.

Respectfully,

Theresa F. Cummings, Chairperson
  Illinois Advisory Committee

Lupe Lopez, Chairperson
  Minnesota Advisory Committee

Harriette B. Conn, Chairperson
  Indiana Advisory Committee

Henrietta H. Looman, Chairperson
  Ohio Advisory Committee

Jo-Ann W. Terry, Chairperson
  Michigan Advisory Committee

Percy L. Julian, Jr., Chairperson
  Wisconsin Advisory Committee

iv

## ILLINOIS ADVISORY COMMITTEE TO THE UNITED STATES COMMISSION ON CIVIL RIGHTS

Theresa F. Cummings, Chairperson
Springfield

Philip Ayala
Chicago

Ruben I. Cruz
Chicago

Maria T. Davilla
Chicago

Preston E. Ewing, Jr.
Cairo

Sophia H. Hall
Chicago

Iona D. Hendricks
Galesburg

Myron D. MacLean
Decatur

J. Thomas Pugh
Peoria

Henry Rubin
Chicago

Carl G. Uchtmann
Sparta

Harry W. Sephus
Peoria

William R. Ireland
Chicago

## INDIANA ADVISORY COMMITEE TO THE UNITED STATES COMMISSION ON CIVIL RIGHTS

Harriette B. Conn, Chairperson
Indianapolis

Thomas W. Binford
Indianapolis

Donna Bucove
Indianapolis

Jeanne F. Mays
Indianapolis

Lotte Meyerson
Gary

Ricardo Parra
Notre Dame

v

## MICHIGAN ADVISORY COMMITTEE TO THE UNITED STATES COMMISSION ON CIVIL RIGHTS

Jo-Ann W. Terry, Chairperson
Detroit

Olive R. Beasley
Flint

M. Howard Rienstra
Grand Rapids

Wilma Bledsoe
Highland Park

Nathan Edward Eustace
Lansing

Yolanda Flores
Pontiac

Richard H. Lobenthal
Detroit

Frank Merriman
Deckerville

Leslie Myles
University Center

Clifford Schrupp
Detroit

Donald R. Scott
Saginaw

Kathryn L. Tierney
Brimley

## MINNESOTA ADVISORY COMMITTEE TO THE UNITED STATES COMMISSION ON CIVIL RIGHTS

Lupe Lopez, Chairperson
White Bear Lake

Greg Barron
St. Paul

Jeanne Cooper
St. Paul

Robert Dodor
Eagan

Eugene E. Jacobsen
Richfield

Gloria Kumagai
Minneapolis

Ruth Myers
Duluth

John Taborn
Golden Valley

vi

## OHIO ADVISORY COMMITTEE TO
## THE UNITED STATES COMMISSION
## ON CIVIL RIGHTS

Henrietta H. Looman, Chairperson
Canton

Alfredo Aguilar
Defiance

Georgia Allen
Lima

Samuel T. Britton
Cincinnati

Martin D. Cassidy
Cincinnati

Henry Guzman
Youngstown

Gwendolyn L. Hall
Cleveland

Larry K. Hardesty
Bluffton

Thelma Lawrence
Cleveland

Joseph Lersky
Celina

Lyman W. Liggins
Toledo

Marilyn J. Reid
Dayton

Barbara O. Rodemeyer
North Canton

Narciso Rodriguez
Fremont

Eldrige T. Sharpp, Jr.
Akron

Odella T. Welch
Columbus

William E. Wilson
Canton

Linda C. Cloud
Columbus

vii

## WISCONSIN ADVISORY COMMITTEE
## TO THE UNITED STATES
## COMMISSION ON CIVIL RIGHTS

Percy L. Julian, Jr., Chairperson
Madison

Byford M. Baker
Milwaukee

Sara J. Bales
Green Bay

George W. Bray
Racine

Ricardo R. Fernandez
Milwaukee

Gloria Gilmer
Milwaukee

Patricia Gorence
Milwaukee

Daniel H. Naviaser
Madison

Juanita Renteria
Milwaukee

Ruth E. Salzmann
Stevens Point

Paul T. Spraggins
Waukesha

Michael J. Stolee
Milwaukee

Julian Thomas
Racine

viii

## THE UNITED STATES COMMISSION ON CIVIL RIGHTS

The United States Commission on Civil Rights, created by the Civil Rights Act of 1957, is an independent, bipartisan agency of the executive branch of the Federal Government. By the terms of the act, as amended, the Commission is charged with the following duties pertaining to discrimination or denials of the equal protection of the laws based on race, color, religion, sex, age, handicap, or national origin, or in the administration of justice: investigation of individual discriminatory denials of the right to vote; study of legal developments with respect to discrimination or denials of the equal protection of the law; appraisal of the laws and policies of the United States with respect to discrimination or denials of equal protection of the law; maintenance of a national clearinghouse for information respecting discrimination or denials of equal protection of the law; and investigation of patterns or practices of fraud or discrimination in the conduct of Federal elections. The Commission is also required to submit reports to the President and the Congress at such times as the Commission, the Congress, or the President shall deem desirable.

## THE STATE ADVISORY COMMITTEES

An Advisory Committee to the United States Commission on Civil Rights has been established in each of the 50 States and the District of Columbia pursuant to section 105(c) of the Civil Rights Act of 1957 as amended. The Advisory Committees are made up of responsible persons who serve without compensation. Their functions under their mandate from the Commission are to: advise the Commission of all relevant information concerning their respective States on matters within the jurisdiction of the Commission; advise the Commission on matters of mutual concern in the preparation of reports of the Commission to the President and the Congress; receive reports, suggestions, and recommendations from individuals, public and private organizations, and public officials upon matters pertinent to inquiries conducted by the State Advisory Committee; initiate and forward advice and recommendations to the Commission upon matters in which the Commission shall request the assistance of the State Advisory Committee; and attend, as observers, any open hearing or conference which the Commission may hold within the State.

ix

## ACKNOWLEDGMENTS

This report was written by Gregory D. Squires, research-writer, and Ruthanne DeWolfe, regional attorney of the Midwestern Regional Office (MWRO). The principal investigation was conducted by Squires and DeWolfe. This study represents a joint effort of the six State Advisory Committees in the Midwestern region (Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin), each of which contributed substantially to the final report. The statistical analysis was aided considerably by the guidance of Allan DeWolfe, professor of psychology at Loyola University. Valuable assistance was also provided by Ada L. Williams, clerk-stenographer. Other staff members who contributed to the final product were: Delores Miller, Michelle Vallier, Tony Williams, Carmelo Melendez, Valeska S. Hinton, and Frank J. Alford.

This project was carried out under the supervision of Clark G. Roberts, Regional Director.

The Advisory Committees thank the Chicago Fire and Police Departments for the information and assistance they provided.

Final production of the report was the responsibility of Deborah A. Harrison, Vivian Hauser, and Audree Holton, under the supervision of Vivian Washington, Publications Support Center, Office of Management.

x

# CONTENTS

**Introduction** ................................................................................. 1

Chapter 1
**The Problem: Essentiality but Unavailability of Insurance** ................................................. 3

Chapter 2
**The Insurance Industry: Its Function and Structure** ............................................... 12

Chapter 3
**The Role of Government** ................................................................. 23

Chapter 4
**Redlining or Underwriting: The Marketing of Insurance in Chicago** ................................................. 31

Chapter 5
**Proposed Solutions to the Problems of Insurance Unavailability** ................................................. 40

Chapter 6
**Findings and Recommendations** ................................................................. 58

xi

# Introduction

A Lake Shore Drive area resident in Chicago was informed by his insurance company that his homeowners insurance policy would cost him 140 percent more in 1977 than it did in 1976. The company had made no inspection of the property which the resident had maintained. Another homeowner in an older north side community was informed by his company that after paying premiums for 30 years, his policy would not be renewed even though the only claim he ever filed was for a $25 roof repair in 1958. A 21-year-old Boston area machinist received a $2,800 automobile insurance bill for 1977, up from $1,400 in 1976, although he had experienced no accidents. WBBM–TV (CBS) recently surveyed Chicago area residents and found: three-fourths of the people claim property insurance is too costly; more than half the people said they think auto insurance is unreasonably expensive; one-fifth said they had been cancelled by their insurance company or could not obtain coverage; almost half answered the following true or false questions incorrectly: A "premium" is the money you get if you have an accident. "Deductible" is a discount on the cost of your insurance for not having any accidents; and, 90 percent did not know there is a State office they can go to for help in resolving insurance problems.

An increasing number of people are angry about the way they are being treated by their insurance companies. At the same time, consumers reveal a disturbing lack of knowledge about the insurance industry. What many people do know is that they are facing increasing difficulty in obtaining protection for the largest investments most make: their homes and their automobiles.

The problem of insurance unavailability is not one which randomly affects isolated individuals but rather strikes at residents of older urban communities. Insurance unavailability threatens the viability of entire communities. Mounting concern has been expressed in recent years in all levels of private and public life. Community organizations have protested the practices of insurance companies, petitioned government officials to take action, and in some cases attempted to negotiate directly with the industry. Representatives of the industry have participated in joint efforts with citizens and public officials and have unilaterally initiated various programs in attempts to resolve availability problems. In Chicago, the city council is debating an ordinance that would prohibit the city from purchasing insurance from companies found guilty of redlining under Illinois State law. Several laws have been passed and others are currently being debated in State legislatures across the country. Some call for substantial restructuring of the insurance industry and, not surprisingly, have met sharp criticism from industry representatives.

A variety of Federal agencies and officials have begun examining various aspects of the insurance industry. The Federal Insurance Administration of the U.S. Department of Housing and Urban Development recently completed an analysis of availability problems. In 1977 the U.S. Department of Justice conducted an examination of the pricing and marketing of insurance and offered a series of recommendations for changing the regulatory mechanism under which the industry operates. In 1978 three congressional subcommittees held hearings on the propriety of industry classification and underwriting practices. Congresswoman Elizabeth Holtzman, Senator Edward Brooke, and others have introduced proposals to resolve availability problems. In its July 1977 report the White House Privacy Protection Study Commission offered a series of recommendations to improve the accuracy of information the insurance industry uses in making underwriting decisions and to protect the rights of individuals on whom information is collected and shared. The Federal Trade Commission has begun a study of loss experience and underwriting classifications to determine the extent of unjust discrimination involved in underwriting procedures. The General

1

Accounting Office is currently reviewing the effectiveness of State insurance commissioners. Clearly, the insurance industry has been and will continue to be the subject of close scrutiny from a variety of perspectives.

This study examines the problem of insurance availability in older urban communities, focusing on the underwriting practices for homeowners property insurance in the city of Chicago. The following three chapters review the structure and function of the insurance industry, the regulatory mechanism that currently governs the industry, and the various perspectives surrounding the "redlining" debate. In chapter 4 a variety of data pertaining to crime, fire, race, age of housing, and other demographic variables are examined to determine which factors explain the variation from neighborhood to neighborhood in insurance underwriting practices in Chicago. Chapter 5 reviews some of the approaches which have been taken or are proposed for resolving availability problems. The final chapter contains the major findings and recommendations of the Midwestern Regional Office.

Many consumers are uninformed about the complexities of the insurance industry. Efforts are being made by the industry and by others to open up communication between the industry and consumers. Such communication and subsequent education no doubt will contribute towards the resolution of some of the problems facing older urban communities. But the problems of insurance unavailability and the decline of urban neighborhoods are not simply public relations matters. As both industry and nonindustry representatives have argued, there is a need for structural changes in the industry itself and for greater cooperation among the industry, public officials, and consumers. Hopefully, this report will contribute towards these ends.

2

Chapter 1

# The Problem: Essentiality but Unavailability of Insurance

Insurance is an essential commodity in today's world. The President's 1968 National Advisory Panel on Insurance in Riot Affected Areas stressed this basic fact when it stated:

> Insurance is essential to revitalize our cities. It is a cornerstone of credit. Without insurance, banks and other financial institutions will not—and cannot—make loans. New housing cannot be constructed, and existing housing cannot be repaired. New businesses cannot expand, or even survive.
>
> Without insurance, buildings are left to deteriorate; services, goods and jobs diminish. Efforts to rebuild our nation's inner cities cannot move forward. Communities without insurance are communities without hope.[1]

The essential nature of insurance, at least homeowners and automobile coverage, is one point on which politicians, the insurance industry, and regulators all agree. Senator Howard M. Metzenbaum (D–Ohio) stated, "Insurance has become a necessity of our daily lives."[2] The president of INA Corporation, Charles K. Cox, referred to insurance as "one of the cornerstones of our society, an essential and irreplaceable service."[3] And the Commissioner of Insurance in Michigan, Thomas C. Jones, wrote:

> In short, for both society and the individual, automobile and homeowners insurance is essential. Society's stability and growth depend upon it and the financial equilibrium and sense of well-being of individual citizens demand it.[4]

The heightened awareness of the importance of property insurance has caused many observers to question whether insurance should continue to be marketed as a consumer good by private industry on a profitmaking basis, or whether government should take steps to guarantee insurance to all members of society without regard to profit or loss. The Federal Insurance Administration, for example, has argued:

> The keystone in the arch of deficiencies. . .within the total property and liability insurance market—is continuation of the absolute right of insurer underwriters to deny essential insurance to applicants without reason or for arbitrary and capricious reasons which are entirely subjective in nature and which may have much more to do with the insurers' competitive moods, modes and postures than with the objectively determined loss-potential characteristics of the risks. So long as the exercise of untrammeled underwriting selection remains the right of insurers, the insurance regulator has little, if any, means of assisting the disadvantaged insurance consumer.[5]

That the insurance industry is aware of these concerns was indicated when Cox posed the question, "Is insurance a product of interstate commerce, as the courts finally ruled, or is it a birthright which

---

[1] President's National Advisory Panel on Insurance in Riot Affected Areas, *Meeting the Insurance Crisis of Our Cities*, (1968), p. 1 (hereafter cited as *Insurance Crisis*).
[2] Senator Howard M. Metzenbaum (statement at hearings before the Senate Subcommittee on Citizens and Shareholders Rights and Remedies, Jan. 17, 1978).
[3] Charles K. Cox, "The Insurance Industry," *Vital Speeches*, Jan. 15, 1975, pp. 208, 211 (hereafter cited as "The Insurance Industry").

[4] Thomas C. Jones, *Essential Insurance in Michigan: An Avoidable Crisis* (Lansing: Insurance Bureau, Michigan Department of Commerce, 1977), p. 4 (hereafter cited as *An Avoidable Crisis*).
[5] Federal Insurance Administration, *Full-Insurance Availability* (1974), p. 29 (hereafter cited as *Full Insurance Availability*).

3

society owes to all its members whether they can afford it or not?"[6]

While property insurance is generally recognized as essential, recent studies have documented the fact that residents and those in business within the urban centers of major metropolitan areas have been experiencing increasing difficulty in obtaining adequate insurance since the urban unrest of the 1960s. When insurance is available to inner-city residents at all, it frequently provides only limited protection at unfairly discriminatory rates.[7] The withdrawal of insurance companies from inner cities subsequent to the urban upheavals of the 1960s has given rise to the charge that the insurance industry discriminates on the basis of geographical location. Such geographic discrimination is called "redlining."

Insurance unavailability, however, plagued several cities for many years, even before the 1960s.[8] While no precise quantitative data are available on how widespread the availability problem has been, some suggestive data were reported by the National Advisory Panel on Insurance. A study of 3,000 residents and businessmen in the poverty areas of six cities revealed that in 1967 almost 30 percent of the residents and over 40 percent of the businessmen had serious property insurance problems. Six percent of the homeowners and 20 percent of the businessmen did not have basic fire insurance coverage. Among those who were uninsured, over 50 percent of the homeowners and 35 percent of the businessmen said insurance was unavailable. Thirty percent of each group said available insurance cost too much. In addition, 15 percent of the homeowners and 14 percent of the businessmen said they had less insurance than they desired.[9]

State Farm Insurance recently reported that, in the State of Michigan, less than 5 percent of the people have had difficulty obtaining insurance in the normal markets. The company concluded, therefore, that there was no crisis in insurance marketing in Michigan.[10] However, when those who cannot obtain insurance are concentrated in specific sections of the cities, as indicated by the data on poverty areas reported by the National Advisory Panel, entire neighborhoods suffer. Indeed, insurance availability is a serious and growing problem, particularly in the inner cities of this Nation. Racial minorities, because of their concentration in central cities, once again are forced to endure a disproportionate share of the burden.[11]

## Availability or Redlining?

Clearly, insurance unavailability is a function of several factors. For example, some risks simply represent such a high loss potential that they are uninsurable. In addition, the industry's capacity to write new insurance policies is affected by surplus requirements (assets over and above loss reserves) which, in turn, are affected by the general health of the economy since a substantial portion of the industry's profits are derived from investments. Another factor contributing to insurance unavailability, and the one on which this study focuses, is redlining.

For the purpose of this study, insurance redlining is defined as cancelling, refusing to insure or to renew, or varying the terms under which insurance is available to individuals because of the geographic location of a risk. "Varying the terms" includes but is not limited to differentials in the price, type of coverages, application procedures, inspections, and rules governing payments.

Among the redlining practices which have been documented are the following:

1. Placing agents selectively in order to reduce the opportunity to secure business in certain areas;
2. Terminating "unprofitable" agents and nonrenewing terminated agents' books of business;
3. Requiring insurance to replacement cost value and refusing to insure dwellings with a substantial disparity between replacement cost and market value (if such property were insured it would

---

[6] "The Insurance Industry," p. 210.
[7] Washington State Commission on the Causes and Prevention of Civil Disorders, *Race and Violence in Washington State* (1969). Carl Levin, *Homeowners' Insurance in Detroit: A Study of Redlining Practices and Discriminatory Rates* (1976) (hereafter cited as *Homeowners' Insurance in Detroit*). Alice Paul and Ken Baker, *Economic Investment and the Future of Neighborhoods* (New York: New York City Commission on Human Rights, 1977) (hereafter cited as *Economic Investment*). Sheilah Thorn, *Property Insurance Availability in New Haven: Preliminary Findings* (1978). Robert Abrams, *The Insurance Industry: It Redlines Too* (1978). *Insurance Crisis in Urban America*, a report prepared by the office of the Federal Insurance Administrator, U.S. Department of Housing and Urban Development (May 1978) (hereafter cited as *Insurance in Urban America*).

[8] Report of the National Advisory Commission on Civil Disorders (1968), p. 198–99. *Insurance Crisis*, p. 1. *Report of the Chicago Riot Study Committee to the Hon. Richard J. Daley* (Aug. 1, 1968), p. 79.
[9] *Insurance Crisis*, as cited in Gelvin Stevenson, *Fire Insurance: Its Nature and Dynamics* (Fire Research Group, School of Architecture and Planning, Princeton University, 1977), p. 36 (hereafter cited as *Fire Insurance*).
[10] State Farm Insurance Companies, *A Report to the People: A Response to the Insurance Bureau's Proposal to Disrupt the Regular Insurance Market in Michigan* (Nov. 28, 1978), p. 4.
[11] John F. Kain and John M. Quigley, *Housing Markets and Racial Discrimination: A Microeconomic Analysis* (New York: National Bureau of Economic Research and Harvard University, 1975) (hereafter cited as *Housing Markets*).

4

create what is referred to as a "moral hazard" since the insured would presumably have an incentive to burn his or her own house down or commit "arson for profit");

4. Refusing, limiting, or varying insurance availability solely because of age of structure;

5. Refusing, limiting, or varying insurance availability due to subjective evaluations by agents or by inspectors that certain areas are "deteriorating" or "changing";

6. Refusing, limiting, or varying insurance availability due to subjective perceptions of "adverse factors" such as the race or sex of an applicant or the racial composition of the geographic area in which the risk is located;

7. Requiring inspections in certain locations within a State but not within other locations;

8. Applying territorial classifications in certain locations of a State but not in others;

9. Pricing insurance at such high levels that for all practical purposes it is unavailable;

10. Informally instructing or formally requiring agents to avoid certain areas;

11. Varying underwriting practices solely by ZIP code;

12. Refusing to accept an application because it was previously rejected by another company or because the risk was previously insured under a FAIR Plan.[12]

The use of geographic classifications by insurers is not new. When the President's National Advisory Panel investigated the insurance industry in the late 1960s, it found geographic location to be a crucial factor in underwriting decisions. One insurer's manual reviewed by the panel contained the following advice on how to collect and catalogue information on neighborhoods:

> This knowledge can be gathered by drives through the areas, by talking to and visiting agents, and by following local newspapers as to incidents of crimes and fires. A good way to keep information available and up to date is by the use of a red line around the questionable areas on territorial maps centrally located in the Underwriting Division for ease of reference by all Underwriting personnel.[13]

Redlining practices have been documented in the following cities: St. Louis, Kansas City (Missouri), Philadelphia, Providence, Boston, Dorchester (Massachusetts), Chicago, Detroit, New York, Buffalo, Syracuse, Hartford, Milwaukee, and Seattle.[14] Consumers from various regions of the country have testified before local, State, and Federal authorities that they were victims of redlining,[15] insurance regulators acknowledge that redlining occurs,[16] and representatives of the industry admit redlining is practiced.[17] The underwriting manager of one of Michigan's leading homeowners insurers recently stated, "Anyone who thinks this industry isn't redlining has his head in the sand."[18]

Below are some examples of specific practices that have resulted in a reduction of insurance availability, or restrictions on the terms under which insurance is available, in certain geographic areas. Some of these practices may arguably be based on loss experience but some clearly constitute redlining. What follows is a sampling of the practices which have been uncovered in some of the available studies.

Barbara Pertz, a resident of the Buckeye-Woodland community in Cleveland, Ohio, asked an insurance agent why companies were refusing to

---

[12] Anton R. Valukas, *An Investigation of Discrimination in the Sale of Homeowners Insurance in Illinois* (Illinois Department of Insurance, 1977), pp. 4–5 (hereafter cited as *Homeowners Insurance in Illinois*). *Homeowners' Insurance in Detroit*, pp. l, 9–11, 17. *An Avoidable Crisis*, p. 6. Karen Kollias, U.S. Department of Housing and Urban Development, memorandum to Insurance Redlining Sub-Group, Oct. 4, 1977, pp. 4–5. Kollias, memorandum to Insurance Redlining Sub-Group, Jan. 27, 1978, p. 2. Richard D. Rogers and Kim Brunner, *Redlining: The Illinois Experience* (Illinois Department of Insurance, 1977), pp. 4–5. Bernard Malewski and Mollie Lamp, *Where Do You Draw The Line?* (New York Public Interest Research Group, 1978). Public Technology, Inc., "Presentation to the D–2 Subcommittee Task Force on Redlining," Oct. 11, 1977. *Selective Placement of Homeowner's Insurance Agents in Chicago—1967–1978* (The Lake View Citizens' Council, 1978). *Insurance in Urban America*, pp. 43–44. Gerald M. Keenan, *Insurance Redlining: Profits vs. Policyholders* (Chicago: National Training and Information Center, 1978). John Bushemi, Indiana State Senator, "Impact of the Dual Housing Market on Taxes and Insurance, " *Proceedings of Northwest Indiana Open Housing Conference*, Sept. 30, 1977–Oct. 7, 1977, pp. 37–39.

[13] *An Avoidable Crisis*, p. 6.

[14] Karen Kollias, memorandum to Insurance Redlining Sub-Group, Sept.

30, 1977, p. 2. "Senate Committee Told of Redlining Abuses," *St. Louis Globe-Democrat*, Feb. 15, 1977. *Homeowners' Insurance in Detroit*. *Homeowners Insurance in Illinois. Report of Examination: Assignments to the Motor Vehicle Insurance Facility* (Boston: Division of Insurance, The Commonwealth of Massachusetts, 1977), pp. 4–5 (see references in footnote 12).

[15] *An Avoidable Crisis*, p. 6. *Economic Investment*, p. 52. Minutes, House Insurance Subcommittee on Insurance Availability, State of Washington, Aug. 31, 1977. Bill Soldwisch, testimony presented before the finance committee, city council of Chicago, Jan. 12, 1978. Grace Evans (St. Louis), Barbara Pertz (Cleveland), Joseph Ciampa (Boston), James McBride (Chicago), testimonies presented before U.S. Senate Subcommittee on Citizens and Shareholders Rights and Remedies, Jan. 17, 1978.

[16] James M. Stone, Massachusetts Insurance Commissioner, testimony presented before U.S. Senate Subcommittee on Citizens and Shareholders Rights, Jan. 17, 1978. "NAIC Statement of Principles and Objectives on Insurance Redlining" (adopted in Miami at the December 1977 meeting of the National Association of Insurance Commissioners).

[17] Arthur Wang, research analyst, memorandum to members, House Committee on Insurance, State of Washington, Aug. 10, 1977.

[18] *An Avoidable Crisis*, p. 6.

5

write new policies, were nonrenewing old policies, and were raising the rates at an alarming rate in her community. The answer was "It's the neighborhood you live in."[19] A New York real estate broker was unable to obtain a renewal on an insurance policy for a building he intended to rehabilitate. When he asked why, the insurance agent responded, "Quite frankly, we are getting out of Washington Heights."[20] Insurance company files that were examined in the process of conducting the Detroit and Chicago studies cited above included dozens of nonrenewal notices and intraoffice memos which indicated geographic area as the reason for the adverse decision. The following response from Fireman's Fund to an applicant is all too common: "Thank you for the submission. However, at this time coverage is declined due to area."[21]

Several agents in Baltimore, Maryland, whose agency contracts had been terminated by the American Mutual Insurance Company, filed a complaint with the insurance commissioner claiming that their termination constituted a violation of Maryland laws. The agents claimed the company had given them a map of Baltimore with certain ZIP codes outlined in red where more stringent underwriting standards were to be applied to automobile and homeowners insurance than in other ZIP codes. For example, no risks within the outlined areas could be bound by the agent. Other restrictions were also placed on risks in some areas of the city that were not applied in others. One agent claimed the company instructed him to "get out of the city."

Following an evidentiary hearing, the insurance commissioner ruled that the company had in fact established stricter underwriting standards for certain Baltimore neighborhoods than it applied elsewhere in the State, that the company had effectively denied residents of these areas insurance products because of geographic location, and therefore, that the company had violated three sections of article 48A of the Annotated Code of Maryland.

First, the commissioner found the company had violated section 61A which states:

> No insurer shall decline to issue or renew contracts of motor vehicle, property or casualty insurance solely on account of the geographic area within this State wherein is located the

subject of the risk or the applicant's or insured's address, unless such insurer not less than sixty (60) days previously shall have filed with the Commissioner a written statement designating such geographic area, which statement shall be an open filing with the Commissioner as a matter of public record; provided, that the designated geographic area shall have an objective basis and shall not be arbitrary or unreasonable.

The commissioner also found that the company had violated section 234A(b):

> No insurer shall require the existence of special conditions, facts, or situations as a condition to its acceptance or renewal of, a particular insurance risk or class of risks in an arbitrary, capricious, unfair, or discriminatory manner based in whole or part upon the race, creed, color, sex, religion, national origin, or place of residency. Actuarial justification may be considered with respect to sex.

In addition, the commissioner found the company had violated section 234B(d) which states:

> Notwithstanding any other provision of this section, no insurer may cancel or amend a written agreement with an agent, or broker, or refuse to accept business from such agent or broker if the cancellation or amendment is arbitrary, capricious, unfair, discriminatory, or based in whole or in part upon the race, creed, color, religion, national origin, place of residency of the agent or broker, his applicants or policyholders.

The commissioner proceeded to fine the company $150,000 for these violations.[22] The decision has been appealed and oral argument before the Baltimore City Court was scheduled for December 18, 1978.[23]

According to two former employees of Home Federal Savings and Loan in Chicago, the W.W. Vincent & Co. insurance agency provided Home Federal with a list of "acceptable" and "unacceptable" ZIP codes where that agency would and where it would not write insurance. One of the former employees stated that the agency refused to write 95

---

[19] Pertz testimony, p. 2.
[20] *Economic Investment*, p. 53.
[21] *Homeowners Insurance in Illinois*, p. 35.
[22] In re American Mutual Insurance Co. of Boston and American Mutual

Liability Insurance Co., order of the Maryland Insurance Commissioner (July 27, 1978).
[23] Richard Brooks, assistant attorney general, insurance division, State of Maryland, telephone interview, Oct. 12, 1978.

6

percent of the applications for insurance on properties in the "unacceptable" ZIP codes.[24]

While some industry spokesmen are quite frank about their use of geographic location, others deny the practice, even though they utilize it. A representative of Travelers denied that the company refused to write on a ZIP code basis or imposed restrictions on that basis. Yet an unsigned interoffice memorandum written to one of the Travelers agents listed five Detroit area ZIP codes in which homeowners policies should include a $250 deductible.[25]

Age of structure is another factor which is used, often arbitrarily, as a reason for rejection. The following rejection notice from Fireman's bluntly states: "The application indicates the dwelling was built in 1935 and as we do not accept any submissions for dwellings built prior to 1940, I cannot issue a policy.[26]

Frequently, insurance companies acknowledge that individual buildings are structurally sound, but cannot be insured simply because of the neighborhood in which they are located. A letter from Lumbermens Mutual Insurance Company to one of its agents illustrates the point:

> We are in receipt of information which indicates that this is an older dwelling in very favorable condition. However, our information indicates the location of the risk itself is in a deteriorating area, and therefore, unacceptable to us.[27]

In other words, individuals who maintain their property are unable to obtain insurance for reasons that are beyond their ability to control.

Sometimes a company refuses an application following its determination that an area is deteriorating, and refuses applications as a result even though the company's own agent may have a totally different evaluation. After United States Fidelity & Guaranty Company (USF&G) rejected an application because of "deteriorating neighborhood," the agent wrote the company back stating:

> I drove to the site this morning. I found this house, along with the other houses on either side of the street showing signs of good maintenance and good housekeeping. I discovered no signs of trash on the streets particularly found in fair

planned business areas. As a past fire underwriter and field man serving the companies for some 30 years, I think I was in a position to objectively judge this particular risk from all other aspects. In no stretch of the imagination would I place this risk in either a deteriorating neighborhood or in an area eligible for fair plan treatment.[28]

That arbitrary underwriting decisions (i.e., decisions not based on objective, statistically valid criteria), such as rejecting a policy because it had been rejected by another company, are often made is indicated by the following statement included in an Allstate underwriting account:

> $30,000 HO in DPZ. Aetna—nonrenewing pol—because of location. We will not write business in DPZ which has been non-renewed by another company.[29]

Aetna has a similar policy. The general manager of the Chicago branch office and vice president of the Aetna Casualty & Surety Company of Illinois acknowledged that underwriters are instructed to decline a risk which has been nonrenewed by another company due to termination of an agent. When asked if the company would automatically decline every individual piece of business from an agent who had been terminated, the branch manager responded, "Yes. The individual underwriter would decline until he had been told otherwise by the personal accounts manager."[30]

James R. Faulstich, vice president-industry relations, and C. Robert Hall, vice president, National Association of Independent Insurers, recently testified that:

> the insurance industry refrain[s] from moral pronouncements about its customers. We measure risk as accurately as we can, applying experience and objective criteria refined for more than two centuries. We leave it to others to speak of discrimination and other such moral terms.[31]

Yet when one reads the following statements from underwriting manuals, it becomes clear that the industry has not always been as objective or morally neutral as the above statement implies. A recent

---

[24] "Insurance Firm Accused of Redlining by Zip Codes," *Chicago Tribune*, Oct. 6, 1978.
[25] *Homeowners' Insurance in Detroit*, p. 21.
[26] *Homeowners' Insurance in Illinois*, p. 33.
[27] *Homeowners' Insurance in Detroit*, appendix 12.
[28] *Homeowners' Insurance in Illinois*, p. 53.

[29] Ibid., p. 65.
[30] Ibid., p. 105.
[31] James R. Faulstich and C. Robert Hall, "Statement Before the Subcommittee on Citizens and Shareholders Rights and Remedies," Jan. 18, 1978.

7

Continental Insurance Homeowners Underwriting manual asserted, for example:

> There is also the type who has never lived anywhere but in a rural area. He commutes to an industrial plant, does odd jobs, lives on relief or lets his wife make the living. You can usually spot his place. Sometimes in the summer he can be seen sitting on his front porch without his shirt. He is not a good risk.

According to American States Underwriting Rules, "physically or morally objectionable neighborhoods should not be written." A Citizens Insurance Underwriting Manual states, "divorced persons may feel the effect of strained finances and consequent failure to maintain property. Occasionally the new-found freedom from family responsibility produces a change in life-style which may be productive of poor experience." And, according to Reliance Insurance Underwriting Guidelines, "persons who are not married should be closely underwritten."[32]

Former Detroit City Council President Carl Levin stated, "it is becoming increasingly difficult to purchase homeowners insurance in the private market in Detroit."[33] Unfortunately, Detroit is not unique. Geographic area, age of structure, previous underwriters' decisions, and other criteria are frequently used in an arbitrary manner. This does not mean that such factors should never be employed in developing classifications of risk. However, this cannot justify the arbitrary practices that do occur. The increasing difficulty in obtaining adequate property insurance, caused at least in part by redlining, portends serious consequences for the future of American cities.

## Insurance Redlining and Urban Disinvestment

Insurance redlining constitutes one form of urban disinvestment (the practice of withdrawing financial resources from a community) which has contributed towards the decline of many central city neighborhoods, often for the benefit of suburban neighborhoods.[34] Once an area starts to deteriorate, or is perceived as deteriorating, a self-fulfilling prophecy occurs. A healthy community begins to deteriorate and one which may have had only marginal

problems soon finds it has major ones. Whether the initial withdrawal or limitation of insurance is based on "sound business practices" or amounts to blatant arbitrary discrimination and redlining matters little after a trend is established. As the Federal Insurance Administration (FIA) stated:

> With the flight of insurance to suburbia in pursuit of the better risks which had first fled there, the deterioration of the inner city fed upon itself. As insurance became increasingly difficult to obtain or became more difficult to afford through the high-risk or surplus lines market where, alone, coverage, such as it was, could be found, vacated properties remained vacant since willing buyers could not obtain loans for want of insurance to secure such loans; properties urgently in need of repair or restoration declined further as credit for such purposes could not be obtained in the absence of insurance availability.[35]

More recently FIA concluded:

> Without question, insurance availability and insurance affordability in urban areas are crises of monstrous proportions. The tentacles of these crises reach into diverse areas of mortgage financing and property appraisals thereby denying credit and sealing the doom of today's vital urban neighborhoods.[36]

The insurance industry, of course, is not solely responsible for the development of urban ghettos within metropolitan areas throughout the United States. The decline of municipal services including education, the movement of upper- and middle-income families from cities to suburbs, increasing crimes rates, and many other factors are also both causes and effects of urban decline. But the increasing difficulty in obtaining insurance through the voluntary market in certain areas and the overt redlining which does occur do serve as catalysts for neighborhood deterioration. At least some representatives of the industry agree on this point. Leo J. Jordan, associate general counsel for State Farm Insurance Companies, recently stated:

> . . .(1)  there is an urban insurance availability problem which is contributing to and aggravating the overall urban problem; and (2) regar-

---

[32] Carl Levin, testimony before U.S. Senate Subcommittee on Citizens and Shareholders Rights, Jan. 18, 1978, p. 8-9.
[33] *Homeowners' Insurance in Detroit*, p. 9.
[34] *Fire Insurance*, p. 2. David A. Spencer, Redlining Report, Cincinnati Human Relations Commission, 1976, Appendix F–4. Erma Henderson,

chairwoman, Statewide (Michigan) Coalition on Redlining, "A Summary of Recommendations on Redlining, Disinvestment, Reinvestment" (undated).
[35] *Full Insurance Availability*, p. 24.
[36] *Insurance in Urban America*, p. 44.

8

dless of whether out of social or moral obligation or enlightened self-interest, insurers must develop an efficient response.[37]

And individual victims can do nothing to reverse the trend. As Michigan Insurance Commissioner Thomas C. Jones pointed out:

> No amount of home repair or improvement will make the resident of a redlined neighborhood eligible for homeowners insurance. Even in the absence of clear-cut redlining, consumers have encountered additional underwriting barriers which have the effect of excluding an increasing proportion of urban residents. In addition, these same difficult barriers are imposed upon consumers who seek renewal of existing policies. Whether subtle or explicit, redlining not only exposes individuals to financial ruin, it also inflicts severe damage upon the entire neighborhood or city involved.[38]

The involvement of major insurance institutions regarding the phenomenon of neighborhood deterioration is a six-step process in which many residents suffer and major financial institutions profit.

The first stage is defined as that of a healthy community. The housing stock is in excellent condition, property values are stable or rising, there is a strong demand for housing, and conventional mortgages and home improvement loans are readily available. Homeowners property insurance is also available through the voluntary market.

During the second stage lending institutions and insuring companies perceive some risk in the neighborhood and indicate a preference for investing in newer suburban communities. Although mortgage loans are still granted, stricter terms are required such as higher downpayments or interest rates.

In the third stage, explicit disinvestment becomes more widespread. Insurance and lending institutions act more aggressively to channel money to other areas or refuse to invest in the neighborhood. Home improvement loans become more difficult to obtain, needed repairs and improvements are not made, and property begins to deteriorate. Potential buyers are steered to other communities and some businesses and residents begin to relocate.

The fourth stage is characterized by a preponderance of FHA-insured mortgages and FAIR Plan insurance policies (see chapter 3 for description of FAIR Plans). Since FHA mortgages are guaranteed, investors hold virtually no risk. With substantial "upfront" profits made through service charges, commissions, and other fees, early foreclosure can be a lucrative source of income for real estate and financial interests as property is turned over several times in a relatively short period. Homeowners are left with deteriorated housing at inflated prices, and they are unable to finance both mortgages and home improvement loans (if any are available). As borrowers default on loans, more and more property is abandoned.

In the fifth stage the growing number of FHA mortgages and absentee landlords further reduces the incentive to maintain property. Unable to refinance and improve property, landlords resort to overcrowding and higher rents to maximize short-term profits. As maintenance declines, deterioration increases. Business and property owners leave what has become a "blighted" area. City services decline, building code enforcement becomes virtually nonexistent, real estate taxes are unpaid, and crime accelerates. And no conventional insurance policies are available.

The sixth stage, urban renewal, results in a tearing down of blighted areas and the relocation of remaining residents. The same financial institutions that denied financing to what was previously a redlined neighborhood now profit from the financing of housing projects for higher income families and new commercial ventures.[39]

## Disinvestment and Racial Minorities

Owing to their concentration within the urban centers of major metropolitan areas, racial minorities suffer a disproportionate share of the disinvestment burden.[40] In recent years that concentration has increased. Between 1960 and 1970 the number of black Americans living in central cities increased by 33.2 percent compared to just 0.1 percent for whites. Central cities were 16.4 percent black in 1960

---

[37] Leo J. Jordan (speech delivered to American Insurance Association, New York, May 23, 1978), p. 6.
[38] *An Avoidable Crisis*, pp. 5, 6.
[39] Frances E. Werner, William F. Frej, and David M. Madway, "Redlining and Disinvestment Causes, Consequences, and Proposed Remedies,"

*Clearinghouse Review*, October 1976, pp. 502, 503. Deborah Washington, *Existing Housing and Neighborhoods: Conservation or Decline?* Northeastern Illinois Planning Commission (Preliminary Draft, 1976), pp. 7–10.
[40] *Housing Markets.*

9

compared to 20.5 percent in 1970 and 22.3 percent in 1974.[41] Therefore, even assuming a total absence of intentional racial discrimination, the location of the minority population alone indicates that urban disinvestment has had a discriminatory effect.

But intentional discrimination has long permeated the real estate industry. Until 1950, for example, the official Code of Ethics of the National Association of Real Estate Boards included the following statement:

> A realtor should never be instrumental in introducing into a neighborhood a character of property or occupancy, members of any race, nationality or any individuals whose presence will clearly be detrimental to property values in that neighborhood.[42]

This position was taken subsequent to the adoption by the Chicago Real Estate Board of a committee report recommending residential segregation, reading in part:

> The Committee recognizes that a great immigration of negroes have [sic] arrived and are arriving in Chicago, and that some feasible, practicable and humane method must be devised to house and school them. . . .

> The Committee is dealing with a financial business proposition and not with racial prejudice, and asks the cooperation of the influential colored citizens. Inasmuch as more territory must be provided, it is desired in the interest of all, that each block shall be filled solidly and that further expansion shall be confined to continuous blocks, and that the present method of obtaining a single building in scattered blocks, be discontinued. . . .

> In the face of existing conditions the Committee has in an unprejudiced spirit reached the above conclusions, and hope [sic] for active cooperation from all civic bodies, and the Committee further desires to meet a representative Committee of colored citizens for the purpose of solving the problem.[43]

The private sector was not alone in the conduct of such overt discriminatory policies. In the 1940s the Federal Housing Authority's (FHA) underwriting manual warned of the infiltration of "inharmonious racial groups" and stated, "If a neighborhood is to retain stability, it is necessary that properties shall continue to be occupied by the same racial classes."[44]

While such overt official sanction for racial discrimination may no longer exist, prevailing insurance redlining and urban disinvestment practices still have the effect, if not the intent, of racial discrimination. What the U.S. Department of Justice said regarding automobile insurance holds equally for homeowner insurance:

> racial discrimination is most often encountered as a product of a more subtle classification, that of geographic location. Frequently major American cities are divided into a number of territories, with the inner city, an area most often populated by minorities, classified as a high risk area and thus subject to significantly higher rates. Although the insurer is using the facially neutral geographic classification, the effect is that minorities citizens [sic] (and most often those with the lowest incomes) are paying a great deal more for auto insurance than white citizens.[45]

The major financial industries (banking and insurance) exercise a powerful influence on cities in particular and American society in general. That influence reaches beyond the immediate business concerns of the industries themselves, frequently to the detriment of urban communities. As Ron Shiffman, director of the Pratt Center for Community and Environmental Development in New York City, stated:

> banks have determined that some areas shall succeed and others shall not. Banks have determined that racial change portends decline, that integration cannot succeed, that women heads-of-households are risks, that certain geographic areas of the city are undesirable. They have set in motion and reinforced by their actions a self-fulfilling prophecy which, because of the withdrawal of mortgage money, actually causes decline.[46]

---

[41] U.S., Bureau of the Census, Current Population Reports, Special Studies, Series P–23, No. 54, *The Social and Economic Status of the Black Population in the United States*, pp. 14, 15.
[42] *Economic Investment*, p. 34.
[43] *The Chicago Real Estate Board Bulletin*, vol. XXV, no. 4 (April 1977) cited in Rose Helper, "The Racial Practices of Real Estate Institutions in Selected Areas of Chicago"(doctoral dissertation, University of Chicago, 1958), pp. 587–88.

[44] U.S., Commission on Civil Rights, *Understanding Fair Housing* (February 1973), p. 5.
[45] U.S., Department of Justice, *The Pricing and Marketing of Insurance* (January 1977), pp. 352, 353.
[46] *Economic Investment*, p. 44.

10

Similarly, the insurance industry has been described by the U.S. Department of Housing and Urban Development as:

> a quasi-public good which is essential in today's urban environment; and yet with a few exceptions, it is in total control of an industry whose goals may differ substantially from those of central city officials and residents and whose actions may negatively impact on central cities.[47]

Automobile and homeowners property insurance is generally recognized as essential in today's world. At the same time such protection is increasingly more difficult to obtain within many urban communities. Problems of insurance availability and insurance redlining contribute towards urban disinvestment, thus furthering the deterioration of central city neighborhoods. While local residents and businesses frequently suffer, the financial industry often profits. But the insurance industry is by no means a totally unregulated industry. The following chapters explore the structure of the insurance industry, the regulatory mechanism which it operates under, and the legal tools that currently exist for dealing with insurance redlining and discrimination.

[47] U.S., Department of Housing and Urban Development, Community and Economic Development Task Force, *Impact of Insurance Program Policies on Central Cities*, Information Bulletin (Draft), September 1977, p. 4.

11

Chapter 2

# The Insurance Industry: Its Function and Structure

## What Is Insurance?

Insurance is a social mechanism through which people obtain financial security, peace of mind, and freedom. Technically, insurance is a contract governed by general principles of contract law in which one party (the insurer) promises to compensate another party (the insured) for specific losses in return for a certain payment. Michigan Insurance Commissioner Thomas C. Jones defined insurance in the following terms:

> Insurance is a device through which individuals and businesses join together to protect themselves against potential serious losses. By paying a comparatively small amount regularly, an individual can avoid the cost of occasional catastrophes. In effect, an insurance company administers a large pool of money, into which many people pay and from which each person is entitled to draw when he or she has been damaged. Insurance enables people to plan their economic lives. People know that by periodically paying a predictable amount, they will not be subjected to unpredictable demands on their funds. This kind of planning capability and protection is in society's best interest as well as the best interest of individuals.[1]

State Farm Insurance acknowledged that, "This is a reasonably succinct statement of one of those truths which we would hold to be self evident, that insurance is the pooling of the risk of loss."[2]

The concept of property insurance has been traced as far back as 3000 B.C. In Babylon merchants and shipowners were charged interest on loans for which the sailing vessel was pledged as security. The interest on the loan covered the "insurance risk." If the ship did not reach its destination, the debt would be cancelled.[3] Chinese shipowners in the fourth century B.C. recognized the value of risk spreading when they divided their cargo among several ships so that if one were lost, only a partial loss would be suffered.[4] More than 600 years ago one English guild rule stated, "If the house of any brother or sister is burnt by mishap, every brother and sister shall give a half-penny towards a new house."[5]

The first fire insurance company in the United States was started in Charleston, South Carolina, in 1732 but operated only until 1741. A most successful company, The Philadelphia Contributorship for the Insurance of Houses from Losses by Fire, was started in 1752 by several businessmen including Benjamin Franklin.[6] Since that time the industry has grown to the point where in 1976 over $5 billion in premiums for homeowners insurance were generated.[7]

When an insurer issues a policy to an insured, the insurer is making an agreement to indemnify the insured for subsequent specific actual losses which may occur in return for a present ascertained premium or fee. To indemnify means to provide compensation for an actual loss. The insurance mechanism is designed to protect the insured only

---

[1] Thomas C. Jones, *Essential Insurance in Michigan: An Avoidable Crisis* (Lansing: Insurance Bureau, Michigan Department of Commerce, 1977), p. 3 (hereafter cited as *An Avoidable Crisis*).
[2] State Farm Insurance Companies, *A Report to the People: A Response to the Insurance Bureau's Proposal to Disrupt the Regular Insurance Market in Michigan* (1977), p. 19 (hereafter cited as *A Report to the People*).
[3] *Municipal Fire Insurance: An Alternative to Private Fire Indemnity at Public Expense in Fire Prevention and Suppression* (Berkeley: Institute for Local Self Government, 1977), p. 4 (hereafter cited as *Municipal Fire Insurance*).

[4] "What the Insurance Dollar Buys For You," *Journal of American Insurance*, Spring 1977, p. 7.
[5] Gelvin Stevenson, *Fire Insurance: Its Nature and Dynamics* (Fire Research Group, School of Architecture and Planning, Princeton University), 1977, p. 59 (hereafter cited as *Fire Insurance*).
[6] *Municipal Fire Insurance*, p. 7.
[7] *NAIC Report on Profitability By Line and By State For The Year 1976* (Milwaukee: National Association of Insurance Commissioners, 1977) (hereafter cited as *Profitability Results*).

12

against an actual personal loss. Therefore, to obtain insurance the insured must have an insurable interest in the property at risk.

Property insurance premiums are based on the amount of insurance purchased which, in turn, is generally determined by the replacement value of the home. Few homes, however, are totally destroyed by fire or other insurable perils. Most losses are partial. A kitchen may be seriously damaged by a fire or a wall may collapse destroying one or two rooms. The amount of damage resulting from a partial loss is the same no matter how much insurance has been purchased by the homeowner. Therefore, in order to generate adequate premium dollars to enable insurers to fully indemnify insureds for partial and total losses, insurers generally require homeowners to purchase insurance at least to 80 percent of replacement value. In those instances where a home is underinsured (insured to less than 80 percent of replacement value) the homeowner is generally not fully indemnified (on a complete replacement cost basis) for partial losses. However, compensation for partial losses in such cases is not reduced proportionate to the reduction in premium dollars received by an insurer on underinsured property. To protect itself from excess liability for partial losses, it is a general industry practice to require homeowners to purchase property insurance to 80 percent of replacement value.

Overinsuring property also creates potential problems. Traditionally, such overinsurance has been assumed to represent a "moral hazard." A "moral hazard" is any condition that increases the likelihood that the insured will cause a compensable loss. When the replacement value is substantially greater than the current market value, which is frequently the case in older urban communities, it is sometimes assumed that the insured will deliberately destroy his property for profit. If the building is insured for its replacement value, it is assumed the owner has less incentive for maintaining the property, or may even be motivated to burn the building down ("arson for profit") since the insurance payment would be greater than the price the owner could obtain by selling the property. In such situations, insurance is frequently unavailable through the conventional market.[8]

The insurance industry has been accused of contributing to the "arson for profit" problem by being too lax in its underwriting. Various State and Federal authorities have recommended that insurance companies obtain more complete information about property and applicants prior to issuing policies, that companies develop more cooperative working relations with arson investigators and other public officials, that companies not pay claims in cases of suspected arson until the investigation has been completed, and that companies in general be more selective in their underwriting activities.[9]

There are six basic types of homeowners policies (numbered HO-1 through HO-6) and one basic fire insurance policy available in the conventional market. Table 2.1 indicates the specific coverage available under these policies.

# Rating Classifications—How Risks Are Spread

While the spread of risk is a central concept in insurance, this does not mean that all individuals who purchase a given type of insurance will pay the same premium or receive the exact same coverage. Rather, each policyholder is expected to pay a premium commensurate with the level of risk exposure he or she represents. The particular premium charged to an individual, if the insurance mechanism is functioning properly, is based on an objective evaluation of his or her risk exposure.[10] The term underwriting refers to the decisionmaking procedure used by the industry to determine whether an individual is eligible for a certain type of insurance policy and, if so, the conditions under which it will be made available.

It is virtually impossible, however, to predict what losses will occur, how large those losses will be, and who will suffer them. To some extent losses are simply random occurrences. Some predictability can be achieved if groups of people, rather than just individuals, are evaluated in terms of loss history. In its attempt to charge premiums that are related to risk exposure, the industry groups large numbers of similar risks within groups or classifications and utilizes the group characteristics in determining the coverage and the price that will be offered to

---

[8] *Fire Insurance*, pp. 7–21; Dempsey J. Travis, "Assure Your Insurables," *Dollars & Sense*, 4th Quarter, 1977, p. 37.
[9] Illinois Legislative Investigating Commission, *Arsons* (May 1978). General Accounting Office, *Arson for Profit: More Could Be Done To Reduce It* (May 1978). U.S., Department of Justice, Law Enforcement Assistance Administration, *Arson and Arson Investigation* (June 1978).

[10] "How Your Insurance Premium is Determined," *Journal of American Insurance*, Fall 1976, pp. 10–14. James R. Faulstich and C. Robert Hall, "Statement Before the Subcommittee on Citizens and Shareholders' Rights and Remedies," Jan. 18, 1978, p. 3.

13

**Table 2.1**
**Insurance Policy**

| HO–5 | HO–3 | HO–4 & HO–6 | HO–2 | HO–1 | Fire | Perils |
|---|---|---|---|---|---|---|
| contents & building | contents (1–18) building— | contents only (1–18) | contents & building (1–18) | contents & building (1–11) | contents & building (1–8) | 1. fire or lightning<br>2. loss of property removed from premises endangered by fire or other perils |
| all perils except:<br>flood<br>earthquake<br>war<br>nuclear attack<br>others specified in individual policies | all perils except:<br>flood<br>earthquake<br>war<br>nuclear attack<br>others specified in individual policies | (HO–4: renters)<br>(HO–6: condominium owners) | | | | 3. windstorm or hail<br>4. explosion<br>5. riot or civil commotion<br>6. aircraft<br>7. vehicles<br>8. smoke<br>9. vandalism and malicious mischief<br>10. theft<br>11. breakage of glass constituting a part of the building<br>12. falling objects<br>13. weight of ice, snow, sleet<br>14. collapse of building(s) or any part thereof<br>15. sudden and accidental tearing asunder, cracking, burning, or bulging of a steam or hot water heating system or of appliances for heating water<br>16. accidental discharge, leakage or overflow of water or steam from within a plumbing, heating or air-conditioning system or domestic appliance<br>17. freezing of plumbing, heating and air-conditioning systems and domestic appliances<br>18. sudden and accidental injury from artificially generated currents to electrical appliances, devices, fixtures and wiring (TV and radio tubes not included) |

*With some minor exceptions in selected States, this chart describes the coverages available in these policies throughout the United States.*
Sources: Gelvin Stevenson, *Fire Insurance: Its Nature and Dynamics*
(Fire Research Group, School of Architecture and Planning, Princeton University, 1977); Robert W. Gossrow, Property and Casualty Actuary, Illinois Department of Insurance, telephone interview, July 18, 1978.

14

individuals. One consequence of this approach is that the availability of insurance and the conditions under which it is available for an individual is determined in part by factors over which he or she has direct control and by others over which he or she may have little control. For example, while an individual's personal driving record can affect insurance premiums, the average loss experience for individuals of the same sex and age group in most States also has an effect. Or an individual may properly maintain his or her house, and such care can reduce insurance costs. But if the home happens to stand on a flood plain, flood insurance may be difficult to obtain. Risk exposures that are beyond the control of an individual are referred to as environmental hazards. For underwriting purposes, the insurance industry is primarily concerned with determining risk exposure and loss potential and not with the particular reason for that exposure or who is responsible. As a Stanford Research Institute study stated, "The purpose of classification systems is to assess risk; that is, to estimate the uncertain costs to an insurer arising from an insurance policy."[11]

In developing classification systems, the industry attempts to pool risks having similar characteristics in such a way that the pool is large enough to be credible, yet small enough to be homogeneous.[12] The objective is to separate out or discriminate among various types of risks so that each risk pays his or her fair share of anticipated losses.[13] As the Illinois Department of Insurance pointed out, "The business of insurance is, in fact, predicated on the process of differentiating between risks—in other words discrimination."[14] And, according to one industry spokesman:

> Equality is achieved, not when everyone pays the same amount, but when each pays for the cost of his or her fair share of the risk. It is as unfair to charge people with differing risks the same price as it is to charge different prices to people with the same risk. Essential equality is not in the price, which is only the end result of something else, but the equality which results

from equal distribution of cost in relation to risk.[15]

The Alliance of American Insurers stated that a properly organized and effectively operated classification system would accomplish the following objectives:

1. Determine those risk characteristics which can be used as a valid predicate for estimating exposure to loss.
2. Promote effective risk assessment to enable the pricing of insurance to correlate closely to expected costs.
3. Establish a degree of class refinement that is readily comprehensible and can be practically applied without ambiguity.
4. Be actuarily and statistically sound with respect to the homogeneity of each major class, the distribution of expected losses and the class relativities established.
5. Provide useful incentives for loss prevention to the extent practicable.
6. Be equitable and not unfairly discriminatory.[16]

While fair discrimination (i.e., differentiating dissimilar risks according to objective evaluation of loss potential) constitutes sound insurance business practice, unfair discrimination does not. The distinction between fair and unfair discrimination was clearly expressed in recent testimony of three insurance commissioners:

> The insurance business, naturally, concerns itself with actuarial fairness—that is, conforming the rate structure and its classifications to statistically fair discrimination. A rate structure providing for actuarial fairness would require the various insured risks to pay their share of anticipated losses and expenses. Actuarial fairness among insureds should, ideally, call for a separately determined rate for each individual insured since no two insureds present the identical hazard or expense characteristics. There is, however, little practical utility in rating separately most individual insureds. The expense of such individual determinations would far outweigh the advantages of fairness thereby

[11] Barbara Casey, Jacques Pezzier, and Carl Spetzler, "The Role of Risk Classifications in Property and Casualty Insurance: A Study of the Risk Assessment Process," Executive Summary Report (Menlo Park: Stanford Research Institute, 1976), p. 3 (hereafter cited as "Risk Classification").

[12] *Report to the People*, p. 20.

[13] Harold B. McGuffey, H.P. Hudson, and Harold R. Wilde, Jr., "Statement on Behalf of the National Association of Insurance Commissioners," testimony presented before U.S. Senate Subcommittee on Citizens and Shareholders Rights and Remedies, Jan. 17, 1978 (hereafter cited as "Commissioners Statement").

[14] Richard D. Rogers and Kim Brunner, *Redlining: The Illinois Experience* (Illinois Department of Insurance, 1977) p. 7. (hereafter cited as *The Illinois Experience*).

[15] William B. Pugh, Jr., assistant general counsel, INA Corporation, testimony presented at Unfair Discrimination Hearing, Pennsylvania Insurance Department, Feb. 20, 1975, pp. 3–4.

[16] "Classification and Underwriting in the Property and Casualty Insurance Business," testimony of the Alliance of American Insurers before U.S. Senate Subcommittee on Citizens and Shareholders Rights and Remedies, Jan. 18, 1978, p. 19.

15

realized. Rather, insureds are grouped into classes to reflect essential differences in their actual or probable losses and expenses. An actuarially fair share is determined by reference to loss and expense experience of different classes (or individuals) and by the expected effect of the insured's risk characteristics and underwriting factors upon the insurer's cost. It would be unfair discrimination from a statistical standpoint if the classes thus identified were not rated accordingly.[17]

These three commissioners went on to note that even if the classification structure is statistically valid and actuarially sound, the different treatment various groups receive is often perceived as socially unfair. To the extent that actuarial fairness and social fairness conflict, the general posture of the industry is that it must follow the dictates of sound business practices by basing its underwriting decisions primarily on risk exposure and loss potential. In fact, it is argued, to do otherwise would result in low risks (e.g., good drivers, suburban residents) unfairly subsidizing high risks (e.g., bad drivers, central city residents). If insurance unavailability is caused by social unfairness, then society in general and State legislatures in particular must develop and pay for solutions.[18] As the Stanford Research Institute study stated, "Determination of public policy is not the responsibility of the insurance industry."[19]

The validity of this general industry posture depends in part on the accuracy with which existing classifications measure actual loss experience. In other words, is there a credible empirical base on which distinctions made between individuals and groups can be justified? In reference to automobile insurance, the Stanford Research Institute study maintained:

> Insurers should be free to make full use of classification information. . . .The present effectiveness of the risk assessment process is still far from the theoretical limit, although it may be close to a practical limit. . . .The addition of new variables or classification refinements lead to diminishing returns, i.e., little incremental improvement in risk assessment.[20]

And in reference to the use of geographical classifications in particular, an American Insurance Association spokesman concluded, "In sum, territorial rating is supported by a body of credible statistical data and is an equitable and sound principle for predicting future losses."[21]

Some experts have seriously questioned industry classification and underwriting policies and practices. Michigan Insurance Commissioner Thomas C. Jones maintains:

> First, many of the underwriting "rules" are not rules at all, but are a conglomeration of myths, notions, perceptions, and beliefs. They are often subjective, not based upon scientific, empirical fact. Second, many of the "rules" are not put into writing and are therefore subject to inconsistent application. Third, an underwriting rule may be unduly simplistic. It is more difficult, though more equitable, to find the true reasons for variations in loss characteristics, and to make individualized judgments based upon those factors.[22]

Senator Howard M. Metzenbaum, who chaired the hearings of the U.S. Senate Subcommittee on Citizens and Shareholders Rights and Remedies on insurance redlining, concluded:

> The evidence produced at those hearings revealed that such companies use a variety of categories—such as age, sex, race, marital status, occupation and territory—for making underwriting and rate decisions that disadvantage consumers with those characteristics. These categories are based on personal characteristics that consumers cannot control, that are not causally related to losses, and that cannot be statistically justified in many cases. . . .

> Further, occupational categories—both for underwriting and rating purposes—often operate to the particular disadvantage of minority groups. For example, some insurance companies consider unskilled manual laborers high risks for auto insurance, despite the lack of objective data showing that consumers practicing occupations in these categories have greater losses.

> Female insureds who are either widowed or divorced are specially scrutinized by property and casualty insurance companies. As a result, they may be subjected to higher rates than males with similar driving records and the same

---

[17] "Commissioners Statement," pp. 4–5.
[18] *A Report to the People*, p. 26.
[19] "Risk Classification," p. 4.
[20] Ibid., p. 3.

[21] Statement of American Insurance Association before U.S. Senate Subcommittee on Citizens and Shareholders Rights and Remedies, Jan. 18, 1978, p. 3.
[22] *An Avoidable Crisis*, p. 10.

16

marital status or they may be denied insurance coverage altogether.[23]

Finding that insurance companies frequently refuse certain risks arbitrarily because of their geographic location (i.e., redlining), the Federal Insurance Administration of the U.S. Department of Housing and Urban Development found that this underwriting practice:

> is not based on any sound underwriting standards but rather on highly subjective criteria that would appear to result from unfounded generalizations or perceptions about urban property risks.[24]

More specifically, it is argued that the profit interests of the insurance industry conflict with the basic tenet of risk spreading; that is, companies seek to gain a competitive advantage by identifying and insuring smaller subgroups of the population who represent the better risks, while shunning other risks. The proliferation of classifications, particularly in automobile insurance and also in homeowners property insurance, has created smaller and smaller classifications which has not increased the accuracy of loss prediction. As the classifications are refined, and the population of each classification is reduced, it becomes difficult to apportion the risk of loss each member represents in a sound manner. Large numbers of insureds are necessary to achieve accurate predictability of losses. Ultimately, refinement of classifications becomes self-insurance: instead of spreading risk, everyone would pay the cost of his or her loss. As classification refinement moved toward this end, some individuals would be at a greater disadvantage than if they insured themselves. All insureds pay for administrative costs in addition to their share of predicted losses while self-insured individuals pay only for their losses.[25]

The use of geographic location has been singled out as a particularly arbitrary and unfair underwriting classification, one that fails to predict loss in a statistically meaningful way. In Michigan, for exam-ple, several companies rate Detroit and/or Wayne County in which Detroit is located differently from the rest of the State. Thus, a resident in Detroit may pay a higher premium for the same coverage than a resident in Flint since Flint is rated with the rest of the State and Detroit is not.[26] Carl Levin, former Detroit City Council President, testified that available data demonstrate: 1) residential burglary rates for principal cities in countries other than Wayne are different from the remainder of the county in which they are located, although Detroit is the only one in the State which is treated separately from its county; and 2) there are similarities in burglary and fire rates between parts of Detroit and several suburbs although the city is treated as a separate entity from the suburbs which are grouped together.[27]

The existing insurance mechanism has also been severely criticized for failing to provide an adequate incentive to reduce losses. Determining premiums strictly on the basis of group averages of characteristics beyond an individual policyholder's control creates little incentive to reduce losses, and encourages resentment and fraud. This is particularly true when policyholders perceive no causal relationship between a particular group characteristic, like age or sex, and losses.[28]

When geographical location is utilized as the basis for underwriting classifications, not only does this reduce the incentive for individuals in that geographic area to reduce loss, but the practice also leads to the deterioration of entire neighborhoods. As the Massachusetts Division of Insurance stated:

> To the extent that environmental theft or vandalism hazards cannot fairly be traced to the control and responsibility of a particular policyholder, it is a form of unfair discrimination to set premiums by allocating environmental costs to those who happen to be closest at hand. Such practices simply accelerate the current trend

---

[23] Senator Howard M. Metzenbaum, letter to Arthur S. Flemming, Chairman, U.S. Commission on Civil Rights, Feb. 23, 1978.
[24] U.S., Department of Housing and Urban Development, *Insurance Crisis in Urban America*, a report prepared by the Office of the Federal Insurance Administrator (May 1978), pp. 27 and 44.
[25] "Insurance Redlining," Neighborhood Revitalization Project, Center for Community Change, p. 5. Massachusetts Insurance Commissioner James M. Stone, testimony before U.S. Senate Subcommittee on Citizens and Shareholders Rights and Remedies, Jan. 17, 1978, p. 2. Federal Insurance Administration, *Full Insurance Availability* (1974), p. 54 (hereafter cited as *Full Insurance Availability*).

[26] Howard B. Clark, Special Assistant to the Administrator of the Federal Insurance Administration, "Statement in connection with certain rating matters pertaining to homeowners insurance," July 15, 1977, p. 2.
[27] Carl Levin, testimony before the U.S. Senate Subcommittee on Citizens and Shareholders Rights and Remedies, Jan. 18, 1978, pp. 3–4.
[28] James M. Stone, *Opinion, Findings and Decision on 1978 Automobile Insurance Rates* (Massachusetts Division of Insurance, 1977) (hereafter cited as *Decision on Insurance Rates*). Tom C. Allen and Richard M. Duvall, *Property Insurance Rating: A Plea for Change* (New York: The Journal of Commerce, 1973) (hereafter cited as *A Plea for Change*).

17

toward the deterioration of urban neighbor-hoods.[29]

Similarly, the Advisory Committee to the Redlining Task Force of the NAIC maintained:

> to the extent that exposure to risk is a function of factors beyond the control of an individual, consideration should be given to developing more equitable, in a social sense, and fair, in an actuarial sense, ways for sharing risk. . .the Committee believes that at all times the industry should attempt to improve the social equity and actuarial fairness of rating plans.[30]

A more appropriate mechanism in terms of both social justice and loss reduction, it is argued, would be a merit system based on those characteristics which an individual insured can control. As Massachusetts Insurance Commissioner James Stone testified:

> Until insurers abandon the notion that rating must be based on immutable group statistics, beyond any individual's control, the insurance mechanism cannot perform its proper role in modern society. Insurance must be used to spread the risks of natural and environmental hazards, not to narrow them. Insurance must be used to encourage responsible behavior, not to generate profits from the cost-plus servicing of an ever-increasing claims load.[31]

While the insurance industry generally explains its underwriting practices in terms of loss experience based on statistically valid empirical data, critics dispute this claim. First, the critics claim that the data on which classification and rating decisions are based are difficult to obtain and are often unavailable to appropriate regulators and the general public.[32] A more fundamental challenge to industry practices is that decisions are made on subjective rather than objective criteria. In his study of insurance availablity in Chicago, Anton Valukas found that:

> None of the agents interviewed were able to pinpoint any statistical basis by which they or their companies made the determination that a

particular area was "bad" or "undesirable. . . ."

> The subjective evaluation of neighborhoods by inspection companies or agents as "changing" or "deteriorating" frequently results in a blanket refusal to write insurance in those neighborhoods. No company or agent who was interviewed was able to provide an objective standard used to determine that a neighborhood was "deteriorating." One agent described it as a "gut feeling." None of the companies provided any statistical information or studies that showed which particular factors identified with "deteriorating" neighborhoods contributed to increased risks.[33]

And another report by the Illinois Department of Insurance concluded:

> In the absence of significant unavailability problems, the insurance industry has not justified, nor has it been asked to justify, its marketplace practices. In general, it has not provided adequate statistics on which to base an evaluation of its premise that the practice of establishing geographical differentials has its foundation in economics: e.g., that the loss experience on the Chicago north side differs from the loss experience in Peoria. Without such statistics the industry can argue that the practices are legitimate; it cannot, however, illustrate to the satisfaction of the public that the practices are legitimate.[34]

When asked by the Metropolitan Area Housing Alliance (a coalition of community organizations in Chicago) to explain its policy of selling only basic fire policies to residents of homes where the replacement value exceeds market value by 150 percent or more, Allstate responded:

> Allstate will not change its underwriting guidelines on the "150 percent rule." That figure is our best judgment of the break between those properties that have an average number of losses and those that have a higher-than-average number of losses. Our experience and statistics back this up, though we have made a business

---

[29] Massachusetts Division of Insurance, "Automobile Insurance Rates and Social Policy," *Research Papers Prepared by the Division of Insurance on Classification Systems in Automobile Insurance* (1977), p. 17 (hereafter cited as *Research Papers*).

[30] *Ninety Day Report of the Advisory Committee to the NAIC Redlining Task Force* (Mar. 31, 1978), p. 4.

[31] Stone testimony, p. 5.

[32] U.S., Department of Housing and Urban Development, Community and Economic Development Task Force, *Impact of Insurance Program Policies on Central Cities*, Information Bulletin (Draft) (September 1977), p. 12.

[33] Anton R. Valukas, *An Investigation of Discrimination in the Sale of Homeowners Insurance in Illinois* (Illinois Department of Insurance, 1977), pp. 16, 22.

[34] *The Illinois Experience*, p. 19.

18

judgment and cannot offer statistics that point to 150 precent as the precise number.[35]

The data which have been made available and the empirical studies which have examined the relationship between existing classification systems and actual losses have raised further questions. In its study of risk assessment in automobile insurance, the Stanford Research Institute found that 30 percent of the variance in the expected loss distribution among drivers could be explained by current risk assessment methods.[36] In other words, 70 percent of the variance is either a result of random occurrences, variables which were not studied, or more likely, a combination of these two factors. Commissioner Stone concluded that this "is not an accurate system," which in the State of Massachusetts means that approximately half the population is overcharged and half is undercharged.[37]

A further challenge to the validity of the statistical base of underwriting practices was presented by a study of automobile insurance in the State of New York.

> If no underwriting selectivity had been exercised by any insurer, the entire industry in New York would have had, during the 1968–1970 period, 95.9 risks without loss for every 100 risks insured for private passenger automobile bodily injury liability insurance. In fact, for that period, after fully utilizing all of its selectivity tools, the industry was able to produce in the voluntary business written in that State only 96.6 clean risks for every 100 risks. As regards auto property damage liability risks, complete elimination of selection would have produced 91.0 clean risks for every 100 insured, whereas the selection process actually produced only 91.6 clean risks for every 100 insured.[38]

Although the Stanford Research Institute study basically defended existing risk assessment methods as being close to the practical limit for effectiveness and concluded that determination of public policy is not the responsibility of the insurance industry, it also concluded:

> The actuarial models should be improved to become more "causal" and to be more thoroughly verified. . . . The social acceptability of

classification variables should be considered in revising the risk assessment process. It is likely that this can be achieved without loss of accuracy.[39]

No similar analysis of homeowners property insurance has been conducted. But a study of loss experience in retail establishments found that existing classification systems could only explain 12.5 percent of actual losses.[40] The variables examined in this study were geographic location, fire protection, exposure, and type of construction. If one replaces geographic location with occupancy, then this list would include the principal variables used to determine homeowners property insurance. "Construction" refers primarily to whether a home is of brick or frame construction. "Occupancy" refers to common hazards such as heating and electrical equipment or any special hazard involving combustible material. "Fire protection" refers to both public and private firefighting services which are available. "Exposure" refers to the location of other buildings in the area which affect potential loss.[41] In reference to the small amount of the variance in losses that could be explained in the study of retail stores, Gelvin Stevenson concluded, "This implies that the rate setting system is based on hypotheses that are not substantiated by empirical testing."[42]

While most critics acknowledge that loss experience does enter into the rating and underwriting processes, they claim that noneconomic, unfairly discriminatory factors operate as well. Certain areas may contain a disproportionate number of high risks but, it is argued, insurance companies frequently draw rough generalizations about communities and proceed to write off entire areas, thus penalizing individuals within those areas who in fact represent good risks. As Robert Jaspan argued:

> While the industry-wide refusal to insure ghetto residents on equal terms is asserted to be economically justifiable. . .racially oriented discrimination plays a significant role. . . .

> It therefore seems clear that more than economics motivates the scarce insurance coverage available to the ghetto resident. This conclusion is supported by the Hughes Panel findings:

---

[35] L.H. Williford, vice-president, Allstate Insurance Company, letter to Joseph Simmons, Metropolitan Area Housing Alliance, Aug. 9, 1978.
[36] "Risk Classification," pp. 14–15.
[37] *Decision on Insurance Rates*, pp. 137–39.
[38] *Full Insurance Availability*, p. 41.
[39] "Risk Assessment," p. 25.
[40] *A Plea for Change*, p. 160.
[41] *The Pricing of Insurance*, p. 189.
[42] *Fire Insurance*, p. 111.

19

"The underwriting function has taken place in general without careful verification of the actual extent of particular inner city hazards."

In effect, the industry had made vague generalizations on the condition of decrepitude in the area and has refused to underwrite any risk there regardless of specific condition.[43]

Much controversy has been generated regarding the role of the insurance industry and insurance regulators in public policy matters. The basic industry posture has been that to make a classification, underwriting, or pricing decision on other than actuarial grounds constitutes entering the realm of public policy, a responsibility of legislators, not the insurance industry nor State insurance commissioners. In the words of Ohio Insurance Commissioner Harry Jump, "Insurance companies should not be expected to make social policy"[44] Massachusetts Insurance Commissioner James Stone disagrees and argues that this position implies "that present classification techniques are socially neutral and objectively based. . . .The classification system for automobile insurance is not socially netural in its choice of variables. It is not socially neutral in its economic impact. To pretend that it is such is blindness."[45]

The apparent conflict between the insurance industry's fiscal responsibilities and public policy is sparked primarily by the notion that any disregard for actuarial soundness in the marketing of insurance constitutes a subsidy of bad risks by good risks. The Massachusetts Division of Insurance maintains, however, that at least in the case of automobile insurance the existing classification mechanism results in an unfair subsidization of commuting suburban drivers by city drivers which the regulatory body has an obligation to rectify. In response to the industry's position that since accidents are charged to the location of where cars are parked rather than where accidents occur, costs are fairly spread over both urban and suburban drivers, the division stated:

The obvious fallacy in this explanation is that. . .any car that enters the central city contributes to the city's congestion and increases the probability of an accident to any car operating there.[46]

Quoting Dr. Michael Etgar, professor of operations management at the State University of New York at Buffalo, the division went on:

City residents. . .consequently face higher costs of insurance, while suburban residents do not pay the full price for their commuting habits. . . .Such a result directly negates the statutory requirements that insurance rates will not be unfairly discriminatory.[47]

Commissioner Stone also asserted:

Our social consciences certainly tell us that, other considerations being equal, a program which takes a disproportionate share of its costs from the economically deprived is less tolerable than one which exhibits the reverse effect. Our tolerance should be further reduced if the program is one which, in many instances, is mistakenly taking from the economically poor because of inherent inaccuracies in its assessment of costs.[48]

Recognizing that the existing automobile insurance risk assessment process has precisely this effect, and the widespread public policy implications of the insurance industry in general, Commissioner Stone does not agree that insurance regulators can avoid issues of public policy.

The key word in this debate is "fair." To the industry, a fair rating structure is one in which those who represent greater risk exposure and loss potential are charged higher premiums, even though certain factors which contribute to risk exposure and loss potential are beyond the control of individuals. The industry also maintains that it currently operates according to such a structure and that it should be permitted to continue doing so. Its critics argue that the existing rating structure in fact does not accurately match premiums with risk exposure, and therefore is not fair even according to the industry's definition. In addition, it is argued, the rating structure must be socially as well as actuarially fair; that is, even if certain characteristics like age, sex, and geographic location are statistically useful in predicting loss, the use of such factors constitutes unjust discrimination and should not be permitted.

Clearly, there is widespread disagreement on basic insurance industry policy and practice among industry representatives, regulators, public officials, and

---

[43] Robert Yaspan, "Property Insurance and the American Ghetto: A Study in Social Irresponsibility," *Southern California Law Review*, vol. 44 (1970), pp. 219, 252.
[44] Harry Jump, interview in Columbus, Ohio, May 17, 1978.
[45] *Decision on Insurance Rates*, p. 153–54.
[46] *Research Papers*, p. 19.
[47] Ibid., p. 20.
[48] *Decision on Insurance Rates*, p. 164.

20

citizens in general. An understanding of how the industry is structured and regulated may provide some insight as to how these issues will be resolved.

## The Structure of the Insurance Industry

Along with banks and savings and loans institutions, the insurance industry is one of the largest and most powerful financial industries in the United States. In 1976 the industry generated approximately $130 billion in premium volume and administered about $434 billion in assets.[49] In the area of property and liability insurance, more than 2,800 companies collected almost $60 billion in premiums in 1976 alone, earning approximately $1.3 billion (2.4 percent of premiums earned) in profits (these figures are after taxes).[50] The industry did experience losses on its underwriting operations for 3 consecutive years beginning in 1974, reaching a total of $780 million in losses in 1976. It is important to note, however, that only $66 were paid out in losses for every $100 of premiums earned in 1976. The net underwriting loss also includes commissions, administrative expenses, and other costs incurred by the industry as part of its underwriting operations. Despite these underwriting losses, the industry still showed a net profit, resulting primarily from a $2.8 billion return on its investments.[51] And in 1977 the industry reported a record profit of 21 percent on its underwriting activities, which *Business Week* described as "windfall profits. . .reminiscent of the embarrassment of riches that faced the giants of the oil industry four years ago when the Arabs quadrupled the world price of oil."[52]

The traditional measure of underwriting profitability is the "combined ratio," which is the sum of the ratios between losses to premiums earned and expenses incurred to premiums written. "Losses" equals payments on claims filed by policyholders. This came to 66.0 percent of premiums earned in 1976. "Expenses" equals costs involved in settling claims (9.5 percent in 1976), sales commissions (20.3 percent in 1976), and other general administrative expenses (5.8 percent for 1976).[53] If the combined ratio is 100, the company breaks even on its underwriting operations. If the combined ratio is less than 100, the company has earned a profit on its

underwriting operations. If the combined ratio is some number higher than 100, a loss has occurred.[54] During the years 1974–76 in which the insurance industry showed losses on its underwriting operations, the combined ratios were 105.0, 107.5 and 102.0.[55]

Two types of property-liability insurance companies dominate the market. Stock companies are those owned by stockholders who have invested capital in the companies. These companies own more than 70 percent of industry assets and write almost 70 percent of total industry premiums. Mutual companies, on the other hand, are owned by their current policyholders. Dividends are paid to policyholders which, in effect, lower their premiums. Though greater in number than stock companies, mutuals control less than 25 percent of industry assets and write just over 25 percent of total premiums.[56]

Insurance is marketed in several different ways. The four principal types of retailers are brokers, independent agents, exclusive agents, and direct writers. Brokers do not represent particular companies but rather serve their clients through a variety of companies. Independent agents have a contractual relationship with two or more companies. Services and commissions are limited by the terms of the contracts. Exclusive agents are employees of a specific company and place all insurance with their employer. Other insurers employ mass merchandising techniques and do not utilize sales representatives or local agencies.[57]

Before an insurance company can issue a new insurance policy, it must have adequate reserves to cover losses it may be required to pay under that insurance contract. The term "surplus" refers to company funds available to meet such obligations. When new policies are sold, surplus must be increased to meet the potential liability. An insurance company is considered to be operating at an acceptable level if the written premium dollars to surplus ratio is three to one. To write more insurance, a company must increase surplus either from its underwriting activities or its investments. During the late 1960s and early 1970s, underwriting losses and a declining equities market resulted in some companies' dollar-at-risk to surplus ratios reaching four to

---

[49] *Insurance Facts 1977 Edition* (New York: Insurance Information Institute, 1977), pp. 3, 11.
[50] INA Corporation, *1976 Annual Report*, p. 5. *Profitablity Results.*
[51] *Profitability Results.*
[52] "Sudden Riches for the Casualty Insurers," *Business Week*, May 1, 1978, p. 66–67.
[53] *Profitability Results.*
[54] *Fire Insurance*, p. 131.
[55] "Insurance: Current Analysis," *Standard & Poor's Survey* (Jan. 19, 1978), p. 1.
[56] *Fire Insurance*, pp. 64–65.
[57] Ibid., pp. 70–75.

21

one, and others going even higher. The resulting "capacity crunch" forced the industry in general to limit underwriting activity at a time when consumer demand continued to grow.[58] One important implication of the current structure of the insurance industry, therefore, is that insurance availability has recently been determined as much by the health of the stock market as by consumer demand or the quality of risks represented by that demand.

The increasing tendency of insurance companies to merge with companies in other industries is another factor that has served to limit the extent to which consumer demand and the qualifications of potential consumers determine whether or not insurance is available. In other words, "the insurance part of the insurance business" (as *Fortune* recently referred to insurance underwriting and marketing practices)[59] may be assuming less and less importance within the industry to the detriment of insurance consumers, particularly those in older urban communities.

Mergers have occurred in which insurance companies became the parent corporation of other companies and also when insurance companies have been absorbed by other companies. The only clear trend from recent mergers is the further integration of the property-liability insurance industry with industry in general. What frequently happens when an insurance company becomes a subsidiary of a larger concern is that some of the surplus of the insurance company is used to pay a dividend to stockholders and for other purposes. For example, when National General acquired the Great American Insurance Company in 1969, it paid a $174 million dividend from the insurance company's surplus. Soon after INA formed its own holding company, INA Corporation, it used $175 million in surplus to acquire a bank, three manufacturers of fire prevention equipment, an interest in a nursing home development, real estate, and other assets. Between 1969 and 1973, $2.25 billion moved upstream from insurance companies to their parent organizations. When larger profits can be made elsewhere, companies can and have taken insurance company capital and invested it in a variety of places ranging from the Eurodollar market to a new manufacturing plant in Brazil or Taiwan.[60]

One obvious effect of this capital outflow and the drain on insurance company surplus is that underwriting capacity is diminished and the problem of insurance unavailability is exacerbated. If the rate of return on other investments declines, money could, of course, flow into the property-casualty stock companies potentially expanding capacity. The key issue, however, is whether it is in the overall best interests of society for the availability of an essential product like homeowners insurance to be a function of the varying moods of the Nation's major investors.

The insurance industry, however, is not an unregulated industry. The following chapter provides a brief overview of existing regulatory mechanisms, with particular attention paid to current civil rights protections.

[58] Charles K. Cox, "The Insurance Industry," *Vital Speeches*, Jan. 15, 1975, p. 210. "The Insurance Industry's 'Capital Crunch'," *Journal of American Insurance*, Fall 1977, p. 20.

[59] Carol J. Loomis, "An Accident Report on Geico," *Fortune*, June 1976, p. 128.

[60] *Fire Insurance*, pp. 166–74. Gelvin Stevenson, testimony before the House Subcommittee on Housing and Community Development, Nov. 2, 1977, p. 166.

22

Chapter 3

# The Role of Government

State and Federal Government agencies are involved in insurance activities both as providers of insurance services and as regulators of the private insurance industry. Federal activity has increased in recent years, in part as a result of growing availability problems in urban areas. Regulation of the insurance industry, however, is vested primarily at the State level. Prohibitions against overt racial discrimination have long been incorporated into the regulatory mechanism. More subtle racial implications of various trade practices, however, have raised new challenges in recent years and created important changes in the activities of at least some regulatory authorities. The following pages provide a brief summary of current and potential government activity in the areas of insurance, focusing primarily on the regulatory functions.

## State Statutory Regulation and the McCarran-Ferguson Act

Until 1944 the business of insurance had been considered a matter of intrastate commerce exclusively.[1] Regulation of the insurance industry rested solely with the States. Federal antitrust laws applicable to interstate commerce did not extend to insurance transactions. Price-fixing of premium rates was common despite the Supreme Court's recognition in 1914 of the power of State insurance regulatory officers to control insurance rates.[2] In that year, the Court determined that because insurance companies are uniquely important as depositories of vast sums of money and as vehicles of risk distribution protecting a large part of the country's wealth, public interest required public control of the industry for the common good.[3] For the next 30 years, regulation of insurance industry practices, including premium rate schedules, existed at the State but not at the Federal level.

In the 1944 case of *United States v. South-Eastern Underwriters,* the Supreme Court reversed its traditional position that insurance is not interstate commerce.[4] Because the chain of events leading to the ultimate contract of insurance represents an interrelated, interdependent, and integrated transaction, insurance companies that conducted their activities across State lines were held to be engaged in interstate commerce. Therefore, such insurance companies would be subject to Federal regulation including Federal antitrust statutes.[5] However, the Court in *South-Eastern Underwriters* invited the Congress to create an exemption for the insurance industry from the existing antitrust regulations.[6] Congress responded in 1945 with the McCarran-Ferguson Act.[7] The act does not provide total exemption from the Federal antitrust statutes but does provide exemption "to the extent that business is. ... regulated by State law."[8] While retaining Federal control over abuses uncovered in the *South-Eastern Underwriters* case, Congress was clearly relegating routine regulation of the "business of" insurance to the States.[9] However, whether regulated by the States or not, the McCarran-Ferguson exemption specifically prohibits acts or agreements by insurance companies to boycott, coerce, or intimidate in accordance with the Sherman Act.[10] Traditionally, the proscriptions against boycotts, coercion, and intimidation have been interpreted to protect insurance companies from the concerted action of competitors. Recently, however, in the case of *St. Paul Fire and Marine Ins. Co. v. Barry* the Supreme Court determined that Federal protection against boycotts protects policyholders as well as insurers.[11] While the consequences of the express inclusion of insureds within the ambit of this Federal protection are as yet undetermined, it is reasonable to suggest that agreements among insurance compa-

[1] Paul v. Virginia, 75 U.S. (8 Wall.) 168, 183 (1869).
[2] German Alliance Ins. Co. v. Kansas, 233 U.S. 389 (1914).
[3] Ibid. pp. 414–15.
[4] United States v. South-Eastern Underwriters Ass'n. 322 U.S. 533, 553 (1944).
[5] United States v. South-Eastern Underwriters Ass'n. 322 U.S. 533, 541, 457 (1944).
[6] United States v. South-Eastern Underwriters Ass'n. 322 U.S. 533, 561 (1944).

[7] 15 U.S.C. §§1011–1015 (1976).
[8] 15 U.S.C. §1012 (1976).
[9] 15 U.S.C. §1012(a) 1976).
[10] 15 U.S.C. §1013(b) (1976).
[11] St. Paul Fire and Marine Ins. Co. v. Barry, 46 U.S.L.W. 4971 (June 27, 1978).

23

nies and with others to "redline" geographic areas by refusing to write insurance or unreasonably restricting coverage represent boycotts forbidden by the Sherman Act, which is enforced by the Department of Justice.[12]

In response to the limited exemption of the industry from Federal antitrust legislation, the States enacted regulatory legislation. The focus of most regulatory action, at least until recently, has been on rate structures. Most States, including Minnesota, Wisconsin, Michigan, Illinois, Indiana, and Ohio, followed the recommendations of the National Association of Insurance Commissioners (NAIC) and adopted "regulatory approval" regulations.[13] Under a "regulatory approval" system, an insurer or a private rate bureau to which an insurer subscribes files rates with the chief insurance regulatory officer which are generally subject to his or her prior approval but which may become automatically effective unless expressly disapproved within a fixed period. The NAIC intended that rates filed with the State insurance commissioners by private rating organizations would be mandatory although subscription to the organization itself would be voluntary. Insurers and rating organizations were encouraged to cooperate unless such cooperation created unfair or unreasonable rates. A few States chose "open competition" laws which precluded an insurer from being required to adhere to the rates set by the rate service bureau and permitted it to develop its own rate structure without the prior approval of the chief insurance regulatory officer.[14] Other States developed a system of State-mandated rates.[15]

Both the "regulatory approval" and the "open competition" laws expressly prohibited excessive, inadequate, or unfairly discriminatory rates and permitted joint rate making.[16] Some States either retained the system of State-made rates or required rating bureau membership as a condition of writing insurance within the State.[17] Courts have upheld each of the three patterns of rate regulation as satisfying the requirements of the McCarran-Ferguson exemption.[18] Nonetheless, the last decade has seen a significant shift within the industry from reliance on rigid "regulatory approval" laws to a system of "open competition."[19] At the present time, Minnesota, Wisconsin, and Illinois have shifted to some type of "open competition" rating system. Ohio, Michigan, and, with significant modification, Indiana continue to rely on "regulatory approval" systems.[20] Illinois is the only State which, since 1971, has had no rating law.[21] By regulation, insurers file rates with the insurance commissioner for informational purposes only.[22]

Business practices of the insurance industry in addition to those strictly related to rate structures are heavily regulated by the States through statute and insurance department regulation. States have adopted unfair trade practices acts to deal with a variety of unfairly discriminatory industry practices. The States' initial unfair trade practices legislation was based on a 1947 NAIC Model Regulation (An Act Relating to Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance) and represented industry response to the McCarran-Ferguson exemption requirements.[23] Subsequently, many States amended their unfair trade practices sections to include "unfair discrimination" based on one or another specific classification of individuals. For example, Wisconsin treats unfair discrimination based on sex as an unfair trade practice. By "unfair," Wisconsin means discrimination not based on "sound actuarial

---

[12] 15 U.S.C. §4(1976).

[13] *Proceedings of the NAIC* (1946) pp. 410–22. Model regulations promulgated by the NAIC have been adopted by many States on a variety of subjects. The stated objectives of the NAIC include promoting uniformity in insurance legislation and regulation and preserving to the several States the regulation of the business of insurance. NAIC constitution, art. 2 (1978). Now composed of the chief regulatory officers of the 50 States, the District of Columbia, Puerto Rico, and the Virgin Islands, the NAIC was organized in 1871 to strengthen the ability of regulators to protect the interests of policyholders through unified solutions to common problems.

[14] California, Missouri, Idaho. John G. Day, *Economic Regulation of Insurance in the United States,* a report of the U.S. Department of Transportation (1970), p. 28 (hereafter cited as *Economic Regulation*).

[15] E.g., Texas, *Economic Regulation,* p. 28.

[16] National Association of Insurance Commissioners, *Monitoring Competition: A Means of Regulating the Property and Liability Insurance Business* (NAIC Staff Study, 1974), pp. 396, 409, 425 (hereafter cited as *Monitoring*).

[17] Louisiana, Mississippi, North Carolina, Virginia, Texas, District of Columbia. *Economic Regulation,* p. 28.

[18] Regulatory approval laws; North Little Rock Trans. Co. v. Casualty Reciprocal Exchange, 181 F.2d 174 (8th Cir.), *cert. denied,* 340 U.S. 823 (1950): Mandatory adherence to rating bureau rates; Allstate Ins. Co. v Lanier, 361 F.2d 870 (4th Cir.), *cert. denied,* 385 U.S. 930 (1966): Open competition laws; California League of Indep. Ins. Producers v. Aetna Casualty and Surety Co., 175 F. Supp. 857 (N.D. Calif. 1959), as reported in U.S., Department of Justice, *The Pricing and Marketing of Insurance* (1977), p. 25 (hereafter cited as *Pricing and Marketing*).

[19] *Pricing and Marketing,* pp. 27, 372.

[20] *Monitoring,* p. 58. Michigan Insurance Bureau of the Department of Commerce, *Essential Insurance in Michigan* (1977), pp. 7, 48; Ill. Ins. Regs. 7A.04 (1972); Ind. Code §27–1–22–4(d)–5(a),–7(b) (1976); Mich. Comp. Laws §500.2430, .2628, .2608 (Mich. Stat. Ann. §§24.12430, .12628, .12408, .12608 (Callahan 1974)); Minn. Stat. §§70A.06(1), .08(1) (1976); Ohio Rev. Code Ann. §§3935.04(D), 3937.03(C) (Page 1975); Wis. Stat. §625.21 (1975).

[21] Ill. Rev. Stat. ch. 73, §1065.18–34 (1971).

[22] Ill. Ins. Regs. 7A.04 (1972).

[23] *Proceedings of the NAIC* (1947), pp. 392–400.

principles, a valid classification system and actual experience statistics."[24]

Michigan now treats unfair discrimination as an unfair trade practice.[25] Such discrimination includes refusing to insure, refusing to renew, or limiting the amount of coverage on the basis of a previous denial of insurance, or of race, creed, color, marital status, sex, or national origin. In addition, such discrimination based on handicap, lawful occupation, or age is prohibited unless there is a reasonable relationship between these factors and the extent of the risk involved. With property insurance, location of risk may be differentially considered in Michigan only if there exists a statistically significant relationship between the location of the risk and a risk due to fire within the area (ZIP code) in which the risk is located. It is also an unfair trade practice to charge a different rate based on sex, marital status, age, residence, location of risk, handicap, or lawful occupation unless the rate differential is based on sound actuarial principles, a reasonable classification system, and credible actual or anticipated loss experience.

In Illinois unfair discrimination between individuals in the sale of fire and casualty insurance based on the race, color, religion, or national origin of the applicant or risk is an unfair trade practice. Discrimination which merely reflects differences in loss and expense elements is apparently considered fair discrimination and is not prohibited even where such discrimination indirectly creates classifications coextensive with the prohibited categories. Illinois has recently amended its unfair trade practice section to include the refusal of an insurer to provide homeowners or renters insurance solely on the basis of the geographic location of the real or personal property risk.[26] In Ohio, it is an unfair trade practice to refuse to issue or renew or to cancel any insurance policy because of the insured's sex or martial status, or to discriminate between individuals of the same class and hazard in rates and underwriting standards and practices.[27]

States have statutorily prohibited discriminatory practices other than through their unfair trade practices acts. For example, Minnesota and Wisconsin prohibit classification of risks based on race (color), creed, or national origin.[28] Indiana prohibits unfair discrimination between persons of the same class and essentially the same hazard in insurance rates.[29] Ohio, along with most States, requires that rates shall not be unfairly discriminatory and, since 1965, has proscribed establishing criteria by area (postal zone) including "type of neighborhood" which will be used in a discriminatory manner against racial or ethnic groups.[30] Illinois now precludes the nonrenewal of fire and extended coverage policies for reasons of age or location of property or age, sex, race, color, ancestry, or occupation of occupants.[31]

When an unfairly discriminatory practice is legislatively prohibited by amendment of the unfair trade practices act, the preexisting enforcement mechanism specific to that act automatically extends to the amendment. The existing enforcement sections of the respective State unfair trade practices acts are quite specific in regard to procedures for determining and sanctioning violations. Where the State insurance code is amended generally to prohibit a practice, the general statutory enforcement powers of the chief insurance regulatory officer alone apply. Frequently these powers are vaguely defined. For example, the chief insurance regulator may have only the general mandate to "administer and enforce the insurance laws. He shall act as promptly as possible under the circumstance on all matters placed before him."[32] Under the unfair trade practices sections, the chief insurance regulatory officer is generally empowered to hold a hearing whenever he has reason to believe a violation has occurred and, after a fair hearing resulting in a finding of unlawful conduct, may impose sanctions, including a cease and desist order, seek judicial remedies (both civil and criminal), revoke or suspend an insurer's State license, order the suspension of a culpable employee or consultant, and impose fines and forfeitures.[33]

The importance of the distinction between the power of the chief regulatory officer to enforce the insurance laws generally and his specific powers

[24] Wis. Adm. Code Ins. §6.55 (1976).

[25] Mich. Comp. Laws §500.2027 (Mich. Stat. Ann. §24.12027 (Callahan Supp. 1978)).

[26] Ill. Rev. Stat. ch. 73, §1031(3) (1977); Ill. Rev Stat. ch. 73, §767.22 (1977); P.A. 80-1369, 80th Ill. Gen. Assembly, 1978 Reg. Sess. (Aug. 14, 1978).

[27] Ohio Rev. Code Ann. §3901.21 (L),(M) (Page Supp. 1977).

[28] Minn. Stat. §70A.05(2) (1976); Wis. Stat. §625.12 (1975).

[29] Ind. Code, §27-4-1-4(7)(c) (1976).

[30] Ohio Rev. Code. Ann. §3935.03 (Page 1975); Ohio Ins. Bull. No. 45 (May 14, 1965).

[31] Ill. Rev. Stat. ch. 73, §755.21a (1977).

[32] See e.g., Wis. Stat. §601.41 (1975).

[33] Ill. Rev. Stat. ch 73, §§1021–1041 (1977); Ind. Code §§27–1–3–8, 27–4–1–5—27–4–1–14 (1976); Mich. Comp. Laws §§500.2028–.2050 (Mich. Stat. Ann. §§24.12028–.12050 (Callahan Supp. 1978)); Minn. Stat. §§59A.05, 60A.031, 72A.23 (2976); Ohio Rev. Code Ann. §§3901.22–.25(Page Supp. 1977); Wis. Stat. §§601.61–601.73(1975).

25

under the unfair trade practices section varies by State according to the general powers delegated to the insurance commissioner by the State legislature. For example, under his general powers the chief insurance regulatory officer in Illinois began requiring major insurers to submit data by ZIP code in March of 1977 although the specific statutory authorization for such data collection was not effective until October 1, 1977.[34] Nonetheless, the respective State statutes appear to place on the chief regulatory officer an affirmative duty to inquire into the affairs of insurers to ascertain whether unfair trade practices are being committed.[35] With discriminatory practices not specifically defined as unfair trade practices, the legal burden would seem to be on an aggrieved insured to inform the chief insurance regulatory officer that he or she had been subjected to unfair discrimination. What the insurance regulatory officer should do under his or her general powers to investigate individual complaints of unfair discrimination—the procedures for determining whether a violation has occurred and the range of sanctions to be applied—remains largely undefined.

## State Constitutional Limitations

The United States Constitution represents the supreme law of the land binding on the several States.[36] A State may afford more but not less protection to those within its jurisdiction than is required by the Federal Constitution. That State constitutional and statutory law must accord with the minimum standards of Federal constitutional law is well settled.[37] All judges, State and Federal, are constitutionally bound to accept the United States Constitution as supreme over State constitutions and statutes.[38] Where conflicts between State and Federal constitutional law arise at the State level, State judges must and do interpret matters of Federal constitutional law.[39]

With due regard to these fundamental principles of Federal constitutional law, States have adopted portions of the Federal Bill of Rights in their respective State constitutions.[40] For example, some State constitutions expressly guarantee equal protection and due process of the law, provisions that echo the 14th amendment.[41] A few States have moved even further in constitutionally protecting civil rights. The 1970 Constitution of Illinois, for example, prohibits discrimination on the basis of race, color, creed, national ancestry, and sex in employment and in the sale or rental of property.[42] Both private and public (State) action is prohibited.

An insurance contract creates a limited property right.[43] Thus, in States such as Illinois, where private discrimination in the sale of property is prohibited by State constitutional law, insurance industry practices which discriminate against members of expressly protected classifications, e.g., race, color, or national ancestry, may be fairly interpreted as violating State constitutional law.[44] The States vary considerably, however, in the extent to which they afford protections against unfair discrimination by the insurance industry as a matter of State constitutional law.

## Federal Civil Rights Constraints

### The Thirteenth Amendment

The 13th amendment states:

> Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

The Civil Rights Acts of 1866 and 1870 and that part of the Act of 1871 sustained by the 13th amendment provide a number of fundamental protections of individual rights.[45] "All persons" are guaranteed equal rights to make and enforce con-

---

[34] Ill. Rev. Stat. ch. 73, ¶755.25 (1977); Ill. Ins. Adm. Order, Mar. 21, 1977.

[35] Insurers are required to file annual reports with the chief regulatory officer concerning their financial affairs. In addition, the chief regulatory officers are required to conduct triannual audits of each insurer licensed to do business in the State to determine if an unfair or deceptive act or practice has been committed. The regulatory officer may also conduct periodic market reviews of insurance company practices.

[36] U.S. Const. art. VI, §2.

[37] Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803).

[38] U.S. Const. art. VI, §2.

[39] Martin v. Hunter's Lessee, 14 U.S. (1 Wheat) 304 (1816).

[40] See e.g., Mich Const. art. I; Ill. Const. art. I, U.S. Const. amends. I—X.

[41] U.S. Const. amend. XIV, §1.

[42] Ill. Const. art. I, §17.

[43] See Sims v. Order of United Commercial Travelers of American, 343 F.

Supp. 112, 115 (D. Mass. 1972); Margolis v. St. Paul Fire and Marine Ins. Co., 125 A.2d 768, 771 (N.H. 1956); Tonini v. Thurman, 136 P.2d 909, 912 (Okla. 1943). In addition, as discussed in chapter 2, policyholders insured by mutual insurance companies (e.g., State Farm Insurance) are also "owners" of the company, "insurers" as well as insureds, for the life of their insurance contracts.

[44] See R. Helman and W. Whalen, *Constitutional Commentary*, Ill. Rev. Stat Ann., Ill. Const. art. I, §17, p. 674 (1971) for a discussion of the clear legislative intent to include all forms of property, real and personal, within the purview of Ill. Const. art. I, §17; Gertz, *The Unrealized Expectations of Article I, Section 17*, 11 J. Mar. J. Prac. & Proc. 283, 309–311 (1978).

[45] Act of Apr. 9, 1866, ch. 31, §1, 14 Stat. 27 (codified at 42 U.S.C. §1982 (1976)); Act of May 31, 1870, ch. 114, §16, 16 Stat. 144 (codified at 42 U.S.C. §1981 (1976)); Act of Apr. 20, 1871, ch. 22, §2, 17 Stat. 13 (codified at 42 U.S.C. §1985)); Griffin v. Breckenridge, 403 U.S. 88, 105 (1971).

26

tracts (42 US.C. §1981). Similarly, "all persons" possess equal rights to buy and sell real and personal property (42 U.S.C. §1982). Finally, "all persons" are protected by Federal law from conspiracies to interfere with their civil rights (42 U.S.C. § 1985). The conduct of private individuals as well as of public officers and employees falls within the scope of the foregoing laws.[46] For example, racial discrimination by private persons in the purchase and sale of property or in the making and enforcement of contracts is prohibited.[47] Furthermore, purely private conspiracies, i.e., agreements between private individuals to deprive a member of a racial minority of his or her civil rights, are proscribed.[48]

Insurance is both a contract within the scope of §1981 and a personal property right within the purview of §1982.[49] Thus, insurance practices which adversely affect property and contract rights of members of racial minorities lie within the scope of protections afforded by Federal civil rights laws. An insurance company's refusal to ensure the property of a person because of his or her race, for example, would be prohibited by these statutes. Furthermore, the use of nonracial insurance classifications for the purpose of discriminating against members of a racial minority would represent an unlawful practice.[50] Finally, collusive underwriting practices between insurers and others which discriminate against racial minorities would be similarly precluded by these laws.[51] It is important to note that the McCarran-Ferguson Act, which leaves regulation of the "business of insurance" to the States, does not prohibit "access to the Federal Courts for redress for violations of a person's civil rights guaranteed by the Federal Constitution" and protected by Federal civil rights statutes.[52]

The Fair Housing Act of 1968 mandates nondiscrimination in housing transactions.[53] Although promulgated under the authority of the 13th amendment, the Fair Housing Act prohibits discrimination not merely on the basis of race but also on the basis of color, religion, sex, or national origin in the sale, rental, or financing of housing.[54] Mortgage lenders customarily require property insurance as a condition for obtaining a mortgage.[55] A potential home purchaser who cannot obtain property insurance at least to the value of the mortgage lender's investment will not be able to obtain a mortgage loan. Without a mortgage loan, few persons can afford the cost of homeownership. Therefore, the refusal of an insurance company to issue property insurance to a mortgage applicant may effectively make housing unavailable, at least in States where the applicant cannot obtain insurance through an involuntary residual insurance program such as the FAIR Plan.[56] If the refusal to issue insurance is based on reasons of race, color, religion, sex, or national origin, and that refusal makes a particular dwelling unavailable to a willing purchaser, it is possible that the practice is prohibited under the existing Fair Housing Act.[57] However, the indirect and independent nature of property insurance as it affects housing availability and the availability of property insurance in many States through the involuntary residual insurance market suggest that the underwriting practices of the insurance industry may be outside the current scope of the Fair Housing Act.[58] At the present time a bill is pending before the Subcommittee on Civil and Constitutional Rights of the Judiciary Committee, House of Representatives, which would expand Title VIII to prohibit, among other things, an insurer from refusing to enter into an insurance contract because of the race, color, or national origin of persons living in or near the dwelling.[59]

## The Fourteenth Amendment

The 14th amendment states in pertinent part of section 1:

---

[46] Jones v. Alfred H. Mayer Co., 392 U.S. 409, 413 (1968).

[47] Runyon v. McCrary, 427 U.S. 160, 168 (1976); Clark v. Universal Builders, 501 F.2d 324, 329 (7th Cir.), *cert denied* 419 U.S. 1070 (1974).

[48] Griffin v. Breckenridge, 403 U.S. 88, 105 (1971).

[49] Ben v. General Motors Acceptance Corp., 374 F. Supp. 1199 (D. Colo. 1974). (See also Sims v. Order of United Commercial Travelers of America, 343 F. Supp. 112, 114 (D. Mass. 1972).

[50] Clark v. Universal Builders, 501 F.2d 324, 329 (7th Cir.), *cert. denied*, 419 U.S. 1070 (1974). *See also* Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264–66 (1977), a case arising under the 14th amendment which discusses the prohibition against creating apparently neutral classifications with the purpose and effect of discriminating against racial minorities.

[51] 42 U.S.C. §1985 (1970).

[52] Ben v. General Motors Acceptance Corp., 374 F. Supp. 1199, 1202 (D. Colo. 1974) and citations therein.

[53] Fair Housing Act, 42 U.S.C. §§3601–3631 (1970).

[54] 42 U.S.C. §§3604, 3605 (1976).

[55] See discussion in chapter 1.

[56] At the present time, 26 States, Puerto Rico, and the District of Columbia provide a residual insurance market under the FAIR Plan for insurable risks which have been rejected by the voluntary insurance market. See discussion in this chapter.

[57] 42 U.S.C. §3604 (a),(b)(1976).

[58] According to the Department of Justice, the present Fair Housing Act probably does not prohibit racially discriminatory insurance practices. Drew S. Days III, Assistant Attorney General, Civil Rights Division, Department of Justice, letter to Sen. Howard M. Metzenbaum, undated. Congress has the power to amend the Fair Housing Act to preclude insurance practices based on race, color, religion, sex, or national origin which effectively make housing unavailable. Such a recommendation was made by Mr. Days in his letter.

[59] H.R. 3504, 95th Cong., 2d sess. (1978).

27

nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person the equal protection of the law.

In 1871, 3 years after the 14th amendment became the law of the land, Congress enacted legislation principally to enforce the amendment in what is now 42 U.S.C. §1983. The equal protection clause through §1983 forbids action by a State or its subdivisions causing "invidious discrimination." Invidious discrimination is any classification of individuals which stigmatizes the group with the badge of inferiority or is so irrational, arbitrary, and capricious that it bears no reasonable relation to a legitimate purpose of the State.[60] If a member of a "suspect" classification— i.e., one based on race, religion, or ancestry—is adversly affected by State action, the State must demonstrate that the classification is essential to accomplish a an essential State purpose. Otherwise, such classification would represent prohibited invidious discrimination.[61] If other than a "suspect" category is involved—e.g., sex or economic level—or if the contested State action merely affects members of a suspect classification disproportionately, the action must bear only a reasonable relationship to any legitimate State purpose to accord with the requirements of the 14th amendment.[62]

Section §1983 permits individuals to sue (for redress of their rights to the equal protection of the laws) only those persons acting under "color of State law"; i.e., under the authority of the State. However, where discriminatory practices are committed by private persons, an action under §1983 is not appropriate.[63] Even where a private industry, such as a public utility, is heavily regulated and controlled by the State, the State's mere passive acquiescence to that industry's discriminatory practices has not been held to constitute State involvement or State action within the scope of §1983.[64] Under this section, "State action" requires a "sufficiently close nexus between the State and the *challenged action of the regulated entity* so that the action of the latter may be fairly treated as that of

the State itself" (emphasis added).[65] State statutes generally prohibit "unfair discrimination" in rates and expressly preclude classifications based on race, color, or creed.[66] Therefore, if an insurance company practices discrimination against racial minorities, such practices occur without the express affirmative involvement of the State. Consequently, the requisite nexus for a finding of State action under §1983 between the conduct of the State and such discriminatory practices is absent.

Based upon the reasoning and decisions of the Supreme Court concerning the limits of "State action," it seems unlikely that §1983 is directly applicable to insurance industry practices, even when racially discriminatory practices are passively tolerated by State regulators. Despite heavy State involvement through regulation of the insurance industry by statute and administrative regulation, insurance company decisions probably remain beyond the scope of the 14th amendment as currently interpreted by the Supreme Court.[67]

## Government Participation in the Insurance Market

The Federal Government participates in the property-casualty insurance market through a variety of programs. Most of these programs involve the cooperative efforts of the private insurance industry and the Federal Government.

Federal reinsurance of primary insurers against property losses resulting from riots and civil disorders and the federally-mandated FAIR (Fair Access to Insurance Requirements) Plan were established by Title XII of the 1968 Housing and Urban Development Act.[68] These programs complement each other. Riot reinsurance covering property losses resulting from riots or civil disorders is available only to those insurers who are directly participating in a State-authorized FAIR Plan meeting the minimum standard prescribed by Federal law.[69] The FAIR Plan was designed to ensure that property owners with insurable risks would be able to obtain essential property insurance against loss from fire and

[60] Reed v. Reed, 404 U.S. 71, 76 (1971); Brown v. Board of Education, 347 U.S. 483, 495 (1954); Skinner v. Oklahoma, 316 U.S. 535, 541 (1942); Strauder v. West Virginia, 100 U.S. 303, 310 (1879).

[61] Graham v. Richardson, 403 U.S. 365, 376 (1971); Oyama v. California, 332 U.S. 633, 646–47 (1948).

[62] Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 269 (1977); Washington v. Davis, 426 U.S. 229, 242 (1976). Kahn v. Sh·vin, 416 U.S. 351, 355(1974); San Antonio Indep. School District v. Rodriguez, 411 U.S. I, 40 (1973);

[63] Civil Rights cases, 109 U.S. 3, 11 (1883).

[64] Jackson v. Metropolitan Edison, 419 U.S. 345 (1974).

[65] Id. at 350–51; See, Moore Lodge No. 107 v. Irvis, 407 U.S. 163, 177 (1972).

[66] E.g, Ill. Rev. Stat. ch 73, §1031 (1977); Mich. Comp. Laws §500.2403 (Mich. Stat. Ann. §24.12403(d) (Callahan 1974)); Wis. Stat. §625.12(2)(1975).

[67] See generally "State Action After Jackson v. Metropolitan Edison Co.: Analytical Framework for a Restrictive Doctrine," 81 Dick. L. Rev. 315 (1977).

[68] 12 U.S.C. §§1749bbb–bbb-10 (1976).

[69] 12 U.S.C. §1749bbb–7(c) (1976).

28

extended coverage without regard to "environmental hazards," those risks which are beyond the control of individuals.[70] The Secretary of Housing and Urban Development is empowered to prescribe additional coverage for vandalism, malicious mischief, burglary, or theft.[71] By rule, the Secretary has authorized vandalism and malicious mischief protection. Liability, theft, robbery, and burglary insurance are not available except separately and with deductibles.[72] A broad "homeowners" policy is available under the plan only in four States, including Illinois and Wisconsin.[73]

The FAIR Plan requires that a State create an insurance pool consisting of all insurers in the State who want reinsurance for riot and civil disorder damage. The pool operates through an industry placement facility which distributes the risks equitably among the participating insurers.[74] While the individual State FAIR Plans may vary from State to State, minimum requirements are prescribed for all States.[75] These requirements include the right of an applicant for insurance under the FAIR Plan to have his or her property individually inspected at no cost. Following the inspection, a report is sent to the placement facility or participating insurer. On the basis of the report, a determination is made as to whether the property meets reasonable underwriting standards and will be insured. If coverage is to be limited or the risk is to be surcharged or declined, the insurer must give specific reasons for its action, including what improvements are necessary to bring the property up to standard. Such a report is sent both to the individual property owner and to the State insurance authority. All policyholders in the voluntary insurance market must be given reasonable time before their policies are cancelled or nonrenewed to seek insurance under the plan.

Each insurer participating in the inspection facility must submit to the State insurance authority the number of risks accepted and conditionally accepted, reinspections made, risks declined, and other information requested by that authority. For effective monitoring and control, all policies written under the aegis of the FAIR Plan must be separately coded.

At the present time, only 26 States in addition to the District of Columbia and Puerto Rico have passed legislation creating FAIR Plans.[76] Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin have enacted a plan. In all States but Indiana the plan is mandatory and requires all insurers writing property insurance in the State to participate. Indiana relies on a voluntary FAIR Plan.[77]

Since 1970 the FAIR Plans have been periodically reviewed through the Office of Review and Compliance under the Federal Insurance Administration (FIA).[78] Serious criticisms have been made by FIA concerning the operation of the plans, including inequitable treatment of insureds, inferior management, excessive underwriting expenses, and upward rate revisions based on subjective factors rather than credible statistical data.[79] FIA also found that the FAIR Plan has contributed to the abandonment of central cities by insurers. Others who have monitored the operation of FAIR Plans have expressed concern about the cost of the limited coverage available and the creation of a dumping ground not only for objectively determined substandard risks but also for clean risks.[80] Of the approximately 1 million FAIR Plan policies in force, less than 5 percent of the owners have ever made claims, suggesting that most FAIR Plan insureds are indeed good risks.[81]

Several recent arson studies have also criticized FAIR plans for encouraging "arson for profit" through careless underwriting.[82] Critics of these arson studies have noted, however, that "arson for profit" is a manifestation of the insurance mechanism itself, not of FAIR Plans alone. As FIA Administrator Gloria M. Jimenez has stated, only

---

[70] "Environmental hazard" is defined as "any hazardous condition that might give rise to loss under an insurance contract, but which is beyond the control of the property owner." 12 U.S.C. 1749bbb–2(a)(5) 1976.

[71] 12 U.S.C. §1749 bbb–2(a)(4) (1976).

[72] 24 C.F.R. §1905.3(a) (1977).

[73] A "homeowners" policy typically includes such coverage as personal liability, burglary, robbery and theft, breakage of glass, sudden tearing asunder of heating systems, and other protections, in addition to fire and extended coverage. Wisconsin, Rhode Island, Massachusetts, and Illinois currently provide for homeowners policies in the FAIR plans. See, for example, P.A. 80–1365, 80th. Ill. Gen. Assembly, 1978 reg. sess. (Aug. 14, 1978).

[74] 12 U.S.C. §1749 bbb–4 (1976).

[75] 12 U.S.C. §1749 bbb–3 (1976).

[76] David J. Brummond, NAIC counsel, letter to Ruthanne DeWolfe, Midwestern Regional Office, U.S. Commission on Civil Rights, Jan. 23, 1978.

[77] The Indiana commissioner is empowered to require all insurers writing property insurance in the State to participate in the FAIR Plan. Sen. Conc. Res. No. 5 (Jan. 31, 1977).

[78] 12 U.S.C. §1749bbb–6a (1976) sets forth the responsibilities of the Office of Review and Compliance.

[79] U.S., Department of Housing and Urban Development, Federal Insurance Administration, *Full Insurance Availability* (1974), pp. 26–32 (hereafter cited as *Full Insurance Availability*).

[80] 124 Cong. Rec. H.7,124 (daily ed. July 21, 1978) (remarks of Rep. Frank Annunzio).

[81] Gloria M. Jimenez, Federal Insurance Administrator, letter to Elmer B. Staats, June 15, 1978 (hereafter cited as Jimenez letter).

[82] Illinois Legislative Investigation Commission, *Arson* (May 1978); General Accounting Office, *Arson for Profit: More Could Be Done to Reduce It* (May 1978); Law Enforcement Assistance Administration, *Arson and Arson Investigation* (June 1978).

29

one-half of 1 percent of Illinois fire insurance claims under the FAIR plan have represented arson for profit. Jimenez concluded that, at least in Illinois, arson for profit is about 10 times more likely in the voluntary market than in the FAIR Plan.[83] The manager of the Metropolitan Chicago Loss Bureau has concluded that in Chicago the proportion of fires intentionally set by homeowners holding conventional policies is twice that of FAIR plan policyholders and the proportion of dollars lost through fires intentionally set by homeowners is five times as high among conventional policyholders. Thus, "the FAIR Plan has not contributed to the arson problem in any way, shape, or form."[84]

The National Flood Insurance Program, established by Title XIII of the 1968 Housing and Urban Development Act.[85] provides protection against financial loss due to floods, mudslides, and wave-wash shoreline damage. The program involves the reinsurance of private insurers who, operating as a pool, write the actual flood insurance policies. The Secretary of the Department of Housing and Urban Development through the Federal Insurance Administration regulates rates, terms, and conditions.[86] The pool contracts with the Secretary to reinsure for losses in excess of the losses assumed and retained by the pool.[87] Part of the purpose of the program is to encourage appropriate land use by State and local governments by limiting the availability of the Flood Insurance Program to States that meet Federal requirements for adequate land development and flood control measures.[88]

The Crime Insurance Program was established through Title VI of the 1970 Housing and Urban Development Act which amended Title XII of the 1968 act.[89] The program offers direct insurance protection rather than serving as a reinsurance facility for the private voluntary insurance market. The Secretary of Housing and Urban Development reviews the States periodically to determine whether "crime insurance" is available in the voluntary market at affordable rates.[90] The Secretary determines whether Federal insurance should be offered in a particular State or subdivision. Twenty-two States, including Illinois, Minnesota, and Ohio, and the District of Columbia, Puerto Rico, and the Virgin Islands have been denominated as meeting the criteria.[91] Indiana, Michigan, and, Wisconsin are not currently eligible. Although the program is one of direct insurance, the Secretary may and usually does work through private insurers who are selected through competitive bidding to service the insureds. In both the FAIR Plan and the Crime Insurance Program, personal and commercial property is insurable although automobile and certain manufacturing risks are expressly excluded.[92] The Crime Insurance Program is operated by the Department of Housing and Urban Development through the FIA. Since its inception, modifications have been introduced by the FIA both in expansion of risks covered and in rates charged.[93] Continuing review of the program is the responsibility of the FIA.

Despite extensive regulatory and participatory involvement of government in the insurance industry (or perhaps because of it), individual consumers and community organizations have expressed increasing discontent over insurance practices in recent years. Nowhere has concern over insurance unavailability and redlining been expressed more intensively than in Chicago. Illinois is one of the few States which has recently enacted insurance redlining legislation and the city of Chicago is the only major metropolitan jurisdiction where a local insurance redlining ordinance has been formally introduced. The following chapter examines how underwriting practices vary within the city of Chicago and what factors appear to account for current practices.

[83] Jimenez letter.
[84] Chicago Metropolitan Loss Bureau, "Analysis of incendiary fires—Chicago Metropolitan area," June 9, 1978. Donald H. Mershon, manager, Chicago Metropolitan Loss Bureau, telephone interview, July 31, 1978.
[85] 42 U.S.C. §§4011–4127 (1970), *as amended* by 42 U.S.C. §§ 4011–4128 (1976).
[86] 42 U.S.C. §4015 (1976).
[87] 42 U.S.C. §4055 (1976).
[88] 42 U.S.C. §4012(c) (1976).
[89] 12 U.S.C. §§1749 bbb–10a,–21 (1976).
[90] 12 U.S.C. §§1749 bbb–2(a)(2), –10a(1976).
[91] 43 Fed. Reg. 50,428 (1978) *revising* 24 C.F.R. §1931.1(b)).
[92] 12 U.S.C. §§1749 bbb–2(a)(2),-2(a)(5) (1976).
[93] *Full Insurance Availability*, pp. 32–34.

30

**Chapter 4**

# Redlining or Underwriting: The Marketing of Insurance in Chicago

In Chicago, problems with insurance availability have recently been receiving increased attention from diverse groups. Several community organizations have charged insurance companies with redlining their neighborhoods. A group of black State legislators from Chicago has filed a lawsuit charging 10 companies (and the department of insurance) with redlining and racial discrimination. The department of insurance claims to be actively investigating consumer complaints and working on further legislation to resolve redlining problems. On the other hand, segments of the industry have publicly recognized that unavailability problems do exist and are working to resolve those problems. (The activities of these groups are described in the following chapter.)

One fact upon which there is general agreement is that the availability and cost of homeowners insurance varies from community to community. What the parties to the debate do not agree on is why. The industry argues that it follows the dictates of sound actuarial principles in its underwriting activities. As the National Association of Insurance Commissioners (NAIC) recently stated, "Under fire insurance and homeowners insurance rating plans it is common to charge different rates for insurance coverage because of the different loss experiences associated with rating territories or zip code areas."[1] Others charge that the industry's underwriting criteria are subjective and arbitrary and result in discrimination

against racial minorities and residents of older communities. Studies of Chicago and other cities across the country have concluded that homeowners property insurance is more difficult to obtain in older urban areas. These studies report many cases of individuals who have apparently been unfairly discriminated against as a result of subjective and arbitrary underwriting practices.[2] What remains unknown is the extent to which variations in insurance availability, cost, and services from neighborhood to neighborhood are functions of objective loss-related underwriting practices and the extent to which those variations result from subjective, unfairly discriminatory decisionmaking on the part of the industry. The following pages attempt to answer this question for the city of Chicago.

Insurers pay the property claims of their insureds when insured property is damaged (principally because of fire) and when property is lost or stolen (principally the result of theft). According to the Insurance Services Office, a rating service which serves 40 percent of the companies selling homeowners insurance in Illinois, losses due to fire and theft accounted for over 74 percent of the dollars paid out by insurance companies to Chicago policy-

---

[1] Statement on Behalf of the National Association of Insurance Commissioners on Title II of H.R. 3504, July 28, 1978, p. 4 (hereafter cited as NAIC Statement).

[2] Thomas C. Jones, *Essential Insurance in Michigan: An Avoidable Crisis* (Lansing: Insurance Bureau, Michigan Department of Commerce, 1977). Anton R. Valukas, *An Investigation of Discrimination in the Sale of Homeowners Insurance in Illinois* (Illinois Department of Insurance, 1977). Richard D. Rogers and Kim Brunner, *Redlining: The Illinois Experience* (Illinois Department of Insurance, 1977). U.S. Department of Housing and Urban Development, *Insurance Crisis in Urban America*, a report prepared by the Office of the Federal Insurance Administrator, U.S. Department of Housing and Urban Development (May 1978). Carl Levin, *Homeowner's Insurance in Detroit: A Study of Redlining Practices and Discriminatory Rates* (1976). Alice Paul and Ken Baker, *Economic Investment and the Future of Neighborhoods* (New York: New York City Commission on Human Rights, 1977). Washington State Commission on the Causes and Prevention of Civil Disorders, *Race and Violence in Washington State* (1969). Robert Abrams, *The Insurance Industry: It Redlines Too, Report of the Borough President of The Bronx* (1978). Sheilah Thorn, *Property Insurance Availability in New Haven: Preliminary Findings* (1978).

31

holders of homeowners insurance between July 1972 and June 1977.[3] It is reasonable to expect, therefore, that differences in underwriting activities from one community to another will reflect the underlying disparities in fire and theft. The minority composition, the economic level of a community, and the age of buildings, independent of loss experience, should not affect underwriting decisions unless those decisions are based on unfairly discriminatory considerations. The NAIC acknowledges that availability problems have racial implications but denies that the industry bases underwriting decisions on racial composition *per se.* Rather, such problems are "the product of a correlation between geographic location of risks and racial composition of neighborhoods."[4] In other words, according to the NAIC, minorities tend to be located in areas experiencing high losses and thus they have greater insurance availability and affordability problems. To the extent that racial composition, age of buildings, or economic level of a community, independent of loss experience, influence underwriting decisions, underwriting is based on subjective and unfairly discriminatory factors. In the following analysis several variables are examined to identify which factors best explain the variance in insurance marketing activities among neighborhoods in Chicago, to examine the extent to which redlining is a reality in that city, and finally, to determine whether or not industry practices violate State or Federal law.

## Data and Methodology

Data were obtained from a variety of sources. First, the Illinois Department of Insurance provided the number of cancellations, nonrenewals, new policies, and renewals of homeowners and residential fire insurance policies by ZIP code for the months of December 1977 through February 1978. The companies that provided this information to the department account for more than 70 percent of the homeowners insurance written in the city of Chicago.[5] The department also supplied the number of FAIR Plan policies written and renewed in Chicago, by ZIP code, for the months of December 1977 through May 1978. Since most FAIR Plan policyholders secure such coverage only after they have been rejected by the voluntary market, rather than as a result of a preference for that type of insurance, the distribution of FAIR plan policies is another measure of insurance availability in the voluntary market.[6]

The loss data from which most insurance companies develop their rates are approximately 2 years old, with homeowners insurance loss data ordinarily collected over a 5-year span going back from 2 to 7 years.[7] Therefore, other data including incidence of fire, theft, and minority composition were analyzed for years within this period rather than for the year which the actual insurance underwriting practices being analyzed occurred. The Chicago Police Department provided data on all index and non-index crimes by police beat for the year of 1975.[8] The bomb and arson squad of the Chicago Police Department provided the specific street location of each arson incident occurring in 1975.[9] The Chicago Fire Department provided the address of each building fire which occurred in that year.[10] The U.S. Bureau of the Census supplied data on racial

---

[3] Carole J. Banfield, vice-president, Insurance Services Office, letter to Gregory D. Squires, Midwestern Regional Office, U.S. Commission on Civil Rights, Aug. 7, 1978.

[4] NAIC Statement, p. 8.

[5] Robert Gossrow, Property and Casualty Actuary, Illinois Department of Insurance, letter to Gregory D. Squires, Midwestern Regional Office, U.S. Commission on Civil Rights, July 11, 1978.

[6] Robert Gossrow, telephone interview, Oct. 2, 1978. Philip R. O'Conner, Illinois Department of Insurance, telephone interview, Oct. 2, 1978. Gossrow stated that if any redlining has been going on, most of it probably occurred in the late 1960s and early 1970s. With the advent of the FAIR Plan, he suggested that several companies may have stopped writing insurance in Chicago. The current distribution of FAIR Plan policyholders, therefore, reflects the underwriting activity of the industry over the past few years. O'Conner stated that the department of insurance views the distribution of FAIR Plan policies as a measure of unavailability in the voluntary market.

[7] Carole Banfield, Insurance Services Office, telephone interview, June 5, 1978.

[8] The index and non-index crime data provided by the Chicago Police Department are those which the department reported to the FBI for its uniform crime statistics reports. The data reported are the number of arrests. It should be noted that if one incident represents several chargeable crimes,

only the most serious crime is reported. If, for example, a person broke into a home, stole a string of pearls, and killed one of the residents (thus committing burglary, robbery, and homicide), this incident would be recorded as a homicide for the purposes of the uniform crime statistics, although the individual would be charged with more than the single offense.

[9] The arson data provide the number of incidents, not the number of arrests. Only those arson incidents occurring in a private residence or residential garage are included in this analysis. There is some overlap between arson incidents and arrests for non-index crimes, since arson is categorized by the FBI and the Chicago Police Department as a non-index crime. However, Deo Dantes of the Chicago Police Department informed Commission staff on July 21, 1978, that there were only 232 arson arrests in 1975 out of a total of 347,550 arrests for non-index crimes. The overlap, therefore, represents less than one-tenth of 1 percent of all non-index crimes, causing little, if any, distortion in the analysis.

[10] Whether or not a given fire occurred in a residential or commercial property is unknown. However, David Ciszik of the Chicago Fire Department informed Commission staff on June 7, 1978, that only 18 percent of structural fires in the city of Chicago in 1975 occurred in commercial buildings. Given that this analysis focuses on residential neighborhoods, and excludes several predominantly commercial ZIP codes, the proportion of commercial fires included in this analysis is undoubtedly smaller than 18 percent.

32

composition, income, and the age and value of residential units for each ZIP code in Chicago.[11] To eliminate the bias that would result from the differences in the population of different ZIP code areas, the insurance, fire, and arson variables are expressed in ratios as incidents per housing unit and the remaining crime variables are expressed in ratios as incidents per 1,000 population.

The basic objective of the analysis is to determine the extent to which such loss-related factors as fire and theft account for the variance in underwriting activity among Chicago neighborhoods, and the extent to which factors as minority composition of neighborhoods, income, and age of housing account for that variance. All predominantly residential ZIP codes in the city of Chicago were included in the analysis.[12]

Of particular interest is the extent to which the racial composition, income, and age of housing of a community affect current underwriting practices after controlling for those factors which directly cause compensable losses (e.g., fire, theft). Second, underwriting activity is compared between neighborhoods containing a high proportion of minority residents and those which are predominantly white.[13] Third, communities with similar theft and fire rates but which differ in minority composition, age of housing, and income level are identified and insurance practices between these areas are compared.

Several qualifications must be kept in mind in reading the following analysis. First, the analysis does not indicate how many people are having availability or affordability problems. Rather, it focuses on the variance from ZIP code to ZIP code in current underwriting activity and those factors which are associated with that activity. Second, the insurance data come from companies that are writing at least some property insurance in the city of Chicago. Part of the unavailability problem results from the fact that some companies have stopped writing insurance altogether within the city. Frequently those companies that remain receive severe criticism for redlining while those who have stopped writing any insurance in the city go blameless. Third, this analysis does not take into consideration a number of factors identified earlier which contribute to the unavailability problem. These factors include limited capacity, upstreaming of company surplus, and the uninsurability of certain risks. Redlining and unfair discrimination, which this analysis focuses on, account for only a portion of the unavailability problem. Fourth, this study does not examine such subtle, though important, forms of redlining like variation in costs, coverage, or terms under which insurance is available in the voluntary market. Fifth, it is recognized that no company claims to base its underwriting decisions on the specific variables examined here. As indicated in chapter 2, the principal variables utilized in developing rating classifications for homeowners property insurance are construction (brick or frame), fire protection ratings of municipalities, occupancy (hazards involv-

---

[11] Racial composition is represented by the percentage of minorities in the ZIP code. The percentage of minorities living in each ZIP code is the sum of the percentage of nonwhites plus 0.94 times the percentage of the Spanish language population, as reported by the U.S. Bureau of the Census, 1970 Census of Housing and Population, Fifth Count, Selected Social and Economic Characteristics of Metropolitan Chicago ZIP Code Areas. The Census Bureau does not report the Spanish language population as a racial minority even though this particular group shares many of the problems facing racial minorities and the general community perceives this group more as a minority than as part of the majority white population. The Census Bureau does report the racial composition of the Spanish language population, some of whom are reported as members of racial minority groups. Therefore, adding the Spanish language and nonwhite population would result in some double counting and inflation of the actual minority population. Leaving out the Spanish language population from the minority group altogether would result in a serious undercount of minorities in several Chicago ZIP codes. Since 94 percent of the Spanish language population in urbanized areas in Illinois are reported as white, and since most of Illinois' Spanish language population resides in Chicago, the formula indicated above was utilized to determine the minority population. (The racial composition of the Spanish language population was taken from: PC(D)-C15 *General Social and Economic Characteristics, 1970 Census of Population,* Illinois, table 49.)

For purposes of this analysis, ZIP codes with a minority population of 10 percent or less are considered predominantly white; those with a minority population larger than 10 percent but less than 50 percent are considered mixed; while those with a minority population larger than 50 percent are considered predominantly minority. This configuration approximates the categorization scheme utilized by the Chicago Urban League in its 1978 report, "Where Blacks Live: Race and Residence in Chicago in the 1970's." In addition, limits of 10 percent and 50 percent divide Chicago ZIP codes out into three approximately equal groups: 18 predominantly white, 14 mixed, and 15 predominantly minority.

Income refers to the median family income in each ZIP code. The age variable is simply the percentage of housing units built in a ZIP code in 1939 or earlier. Housing value is the median value of all housing units in the ZIP code.

[12] The unit of analysis is individual ZIP codes for the city of Chicago. Downtown (Loop area 60601–60606) business ZIP codes were deleted since the total population of these six ZIP codes is less than 7,000. Those ZIP codes with 10,000 or more residents were included. Some manipulations of the ZIP code data were necessary because ZIP codes 59 and 60 did not exist in 1970, and the census data utilized in this study are for 1970. In 1970 ZIP code 26 contained the area now included in both 26 and 60; therefore, these two ZIP codes were combined into one for the purposes of this analysis. Similarly, in 1970 ZIP code 45 contained the area now included in both 45 and 59, so these two ZIP codes were combined.

[13] A similar analysis comparing ZIP codes containing predominantly new housing with those containing predominantly older homes proved unworkable since there are too few ZIP codes that could be considered "new" within the city to permit a statistically valid analysis. In all but 13 ZIP codes more than half the residential units were built before 1940. In all but six ZIP codes more than 60 percent of the residential units were built before 1940. If the sample of 47 ZIP codes had been dichotomized into "older" and "newer" categories, several ZIP codes in which over half the housing was built before 1940 would have been included in the "newer" category.

33

ing heating, electrical, or other combustible material), and exposure (location of other buildings which may affect losses). However, given the perils for which homeowners insurance provides protection and the functions that rating classifications and underwriting practices are supposed to perform, it is reasonable to expect that differences in insurance underwriting activity from one neighborhood to the next would reflect differences in fire and theft rates. Another reasonable assumption is that racial composition, income, and age of housing, independent of loss experience, should be irrelevant.

Finally, it is recognized that many companies do not use ZIP code classifications. Some do,[14] however, and many underwriting decisions are made on the basis of factors that are not included in company classification systems,[15] such as perceived neighborhood characteristics. Sometimes, the use of a combination of factors results in geographic variations in marketing practices. As the Illinois Legislative Investigating Commission stated:

> It is entirely possible that many insurance companies are no longer considering geographic location in their assignments to risk categories. Yet it is also entirely possible that these companies have found some other variable or combination of variables which are equally unjust and the use of which has the same or similar effect.[16]

The industry is charged with discrimination on the basis of geographic location, particularly against older urban communities within major metropolitan areas. To understand the extent to which these charges have merit, it is vital to examine, on a neighborhood level, how industry practices vary. The ZIP code data available through the Illinois Department of Insurance provide an opportunity to conduct this kind of examination.

## Results

Insurance underwriting activity varies markedly among ZIP codes within the city of Chicago. The number of homeowners policies written and renewed between December 1977 and February 1978 by those companies included in the data provided by the Illinois Department of Insurance ranged from 170

(0.6 per 100 housing units) in ZIP code 60653 (a predominantly black community on Chicago's south side) to 3,713 (10.3 per 100 housing units) in ZIP code 60634 (a predominantly white community in the northwest side of Chicago). The number of FAIR Plan policies written and renewed ranged from 2 (virtually 0 per 100 housing units) in ZIP 60652 (a predominantly white community in the southwest side) to 735 (1.9 per 100 housing units) in ZIP code 60623 (a predominantly black community with a substantial Hispanic population in the west side).

Both the voluntary and involuntary markets are examined in order to analyze the variation from ZIP code to ZIP code in current underwriting activity. Voluntary market activity is represented by the following ratio: new and renewed homeowners policies minus cancellations and nonrenewals per 100 housing units. Involuntary market activity is represented by the following: new and renewed FAIR Plan policies per 100 housing units.

The variable which correlates most strongly with current voluntary market activity is minority composition of the ZIP code ($r = -.78$) (see table 4.1). The negative correlation indicates that as minority concentration increases, the amount of voluntary market insurance currently being written in the ZIP code decreases. More than 60 percent of the variance in current voluntary market activity can be explained by minority composition. (Variance is determined by squaring the simple correlation.) Median income (.75), fire ($r = -.69$), age of housing ($r = -.61$), and theft ($r = -.31$) are also associated with current voluntary market activity.

Similar relationships are found in current involuntary market activity (FAIR Plan). The strongest correlation with this variable, again, is minority composition. As the minority composition of a ZIP code increases, so does the concentration of involuntary market activity ($r = .72$). Fire ($r = .70$), median income (-.66), and age of housing ($r = .48$) are also significantly related to involuntary market activity.

Of particular interest are the correlations between minority composition, age of housing, and current underwriting activity after the effects of fire and the effects of theft have been eliminated. Even with fire and theft removed from the effect of minority composition, the correlation between minority com-

---

[14] For example, Allstate Insurance Company's *Homeowners Mannual* for 1977 lists six territorial zones for the city of Chicago, each consisting of from 5 to 17 specific ZIP codes. State Farm Mutual Automobile Insurance Company uses ZIP codes to define the boundaries of two of its four Chicago rating territories, according to 1976 rating sheets provided by the Illinois Department of Insurance.

[15] See footnote 2.

[16] Illinois Legislative Investigating Commission, *Redlining—Homeowners' Insurance (Interim Report)*, A Report to the Illinois General Assembly (June 1978), p. 8.

34

## Table 4.1

**Correlation**                                         **Matrix**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| 1. Voluntary Market Activity (new and renewed homeowners policies minus cancellations and nonrenewals per 100 housing units) | | −.75 ($p<.001$) | −.69 ($p<.001$) | −.31 ($p<.05$) | −.78 ($p<.001$) | −.61 ($p<.001$) | .75 ($p<.001$) |
| 2. Involuntary Market Activity (new and renewed FAIR Plan policies per 100 housing units) | | | .70 ($p<.001$) | .15 (NS) | .72 ($p<.001$) | .48 ($p<.001$) | −.66 ($p<.001$) |
| 3. Fire (fires per 100 housing units) | | | | .56 ($p<.001$) | .60 ($p<.001$) | .41 ($p<.01$) | −.61 ($p<.001$) |
| 4. Theft (thefts per 1,000 population) | | | | | .26 (NS) | .32 ($p<.05$) | −.17 (NS) |
| 5. Minority Composition (percent minority in population) | | | | | | .26 (NS) | −.70 ($p<.001$) |
| 6. Age of Housing (percent of residential units built before 1940) | | | | | | | −.53 ($p<.001$) |
| 7. Income (median family income) | | | | | | | |

35

position and voluntary market activity remains statistically significant ($r = -.36$).[17] The correlation between age of housing and voluntary market activity also remains statistically significant ($r = -.46$). In other words, there is a statistically significant relationship between minority composition and current voluntary market activity, as well as between age of housing and current voluntary market activity which cannot be attributed to the two major causes of loss—fire and theft. The greater the minority concentration of an area and the older the housing, independent of fire and theft, the less voluntary insurance is currently being written.

Minority composition and age of buildings are also associated with involuntary market activity, again even after the effects of fire and theft have been removed. Whereas these variables are negatively associated with the voluntary market activity (i.e., as the minority composition or age of housing increases, the number of voluntary market policies decreases), these factors are positively associated with involuntary market activity (i.e., as the minority composition or age of housing increases, the number of FAIR Plan policies increases).

With fire and theft controlled, there is a statistically significant positive relationship between minority composition and involuntary market activity ($r = .41$) and between age of housing and involuntary market activity ($r = .31$). The greater the minority concentration and median age of housing, independent of the effects of fire and theft, the greater is current involuntary insurance market activity. Again, part of the variance in current involuntary market activity explained by minority composition and age of housing cannot be accounted for by fire or theft.

Given the relationship between minority composition and income ($r = -.70$), a question arises as to whether the relationship between minority composition and current market activity reflects the lower economic status of minorities rather than minority status per se. The relationship between income and current voluntary market activity ($r = .44$) is somewhat stronger than the relationship between minority composition and current voluntary market activity ($r = -.36$), after controlling for fire and theft in both cases. But the relationship between minority composition and current voluntary market activity is still statistically significant ($r = -.39$), even after the relationship between income and minority status is eliminated. The correlation between income and current voluntary market activity, controlling for minority composition, is also significant ($r = .33$). That is, both income and minority status are independently related to current underwriting activity in the voluntary market.

The significant relationship that exists between income and current voluntary market activity cannot be accounted for by the interrelatedness of income and fire and theft. And while income independent of the effect of fire and theft may be a slightly better predictor of current voluntary market activity than minority composition, the relationship between minority composition and current voluntary market activity is independent of the lower economic status of minorities.

The relationship between income and current involuntary market activity, after controlling for the relationship of fire and theft, proved to be not statistically significant. Similarly, the relationship between income and involuntary market activity, after controlling for the relationship of minority composition with income, is not statistically significant. The relationship between minority composition and current involuntary market activity, controlling

---

[17] Part correlations were calculated to measure the relationship between a predictor or independent variable (e.g., minority composition) and a criterion or dependent variable (e.g., voluntary market activity) after removing that part of the predictor variable associated with another predictor variable (e.g., fire).

Both first order part correlations (which remove the effects of one predictor variable) and second order part correlations (which remove the effects of two predictor variables) were calculated.

The formula used to calculate first order part correlations between a predictor variable (e.g., minority composition) and a criterion variable (e.g., voluntary market activity) after removing that part of another predictor variable (e.g., fire) which is associated with the first predictor variable (minority composition) is:

$$r_{1,2 \cdot 3} = \frac{r_{1,2} - (r_{1,3})(r_{2,3})}{\sqrt{1 - (r_{2,3})^2}}$$

Where
variable 1 = minority composition
variable 2 = voluntary market activity
variable 3 = fire

The formula used to calculate second order part correlations in which the effects of two predictor variables (e.g., fire and theft) are removed is:

$$r_{1,2 \cdot 3,4} = \frac{r_{1,2 \cdot 4} - (r_{1,3 \cdot 4})(r_{2,3 \cdot 4})}{\sqrt{1 - (r_{2,3 \cdot 4})^2}}$$

Where
variable 1 = minority composition
variable 2 = voluntary market activity
variable 3 = fire
variable 4 = theft

36

for income, is significant (r = .34). As indicated above, the relationship between minority composition and current involuntary market activity, after removing that part of the minority composition variable related to fire and theft rates, is significant (r = .41). Whereas income explained part of the variance among ZIP codes in current voluntary market activity, and even part of the relationship between minority composition and current voluntary market activity, income is not a statistically significant predictor of the variance among ZIP codes in current involuntary market activity independent of these other factors. The relatively high proportion of FAIR Plan policies in minority areas, therefore, cannot be explained in terms of fire, theft, or economic status of those areas.

When the effects of fire and theft were examined in predominantly white and predominantly minority areas separately, no significant differences were found. In other words, fire and theft generally account for the same proportion of the variance in white and minority communities.

The fact that minority composition, age, and income explain a portion of the variance in current underwriting activity which cannot be accounted for by fire or theft is illustrated by the varying levels of underwriting activity which exist in ZIP codes having similar fire and theft rates, but differing in their minority composition, age of housing, or median family income. For example, ZIP code 60637 with a minority population of 90.6 percent and ZIP code 60651 with a minority population of 13.4 percent had similar fire rates (11.3 and 13.4 per 1,000 housing units, respectively) and similar theft rates (34 and 30 per 1,000 population, respectively), yet the current voluntary market activity differed widely. The voluntary market ratio in the mixed ZIP code (5.2) was more than two and one-half times the ratio in the predominantly minority area (1.9) despite the fact that fire and theft rates were approximately the same. The involuntary market ratios were the same in these two ZIP codes, both being .8 (see figure 4.1).

The fact that age is related to current market activity, independent of fire and theft, is illustrated in a comparison of two predominantly white ZIP codes, 60625 and 60655. These areas have similar fire rates (6.9 and 4.8 per 1,000 housing units, respectively), similar theft rates (18 and 19 per 1,000 population, respectively), but differ in terms of the age of housing. In 60625, 78.5 percent of the housing units were built before 1940 compared to 15.2 percent in 60655. The voluntary market ratios, however, were 6.9 in the older community and 13.0 in the newer one. Despite similar fire and theft rates, the voluntary market ratio was almost twice as high in the newer ZIP code than in the older area. Again, the involuntary market ratios were equal, both being 0.

The effect of income, independent of fire and theft, is illustrated by ZIP codes 60609 and 60636, two racially mixed areas southwest of the Loop. These two areas differ in median family income ($8,330 and $9,742, respectively). ZIP code 60609 had the smaller fire rate (21.8 compared to 28.6) and a substantially smaller theft rate (4 compared to 27), and would thus be expected to have a higher voluntary market ratio, yet the voluntary market ratio was only 2.6 in 60609 compared with 4.0 in 60636.

In the city of Chicago the variation from community to community in current insurance underwriting practices is related to the minority composition, age of housing units, and family income of residents in those communities. These relationships are statistically significant and they hold even when that portion of these variables associated with fire and theft rates is removed. While the relationship between minority composition and current voluntary market activity is accounted for in part by the lower economic status of minorities, such is not the case regarding current involuntary market activity. The current concentration of FAIR plan policies in minority areas reflects historical constriction of the voluntary market in these areas. These patterns cannot be explained in terms of fire, theft, or income. In Chicago, the disparate impact of industry practices on older, poorer, and minority communities exists independently of the two major causes of loss, fire and theft.

37



38

002767



**Key**
1. Racial Composition—Percent Minority
2. Fire—Fires per 1000 Housing Units
3. Theft—Thefts per 1000 Population
4. Age—Percent of Housing Units Built in 1939 or Before
5. Voluntary Market Activity—New Homeowners Policies plus Renewals, Minus Cancellations and Non-Renewals per 100 Housing Units
6. Involuntary Market Activity—New Fair Plan Policies and Renewals per 100 Housing Units
7. Income—Median Family Income

Zip codes indicated in light numbers

Chapter 5

# Proposed Solutions to the Problem of Insurance Unavailability

A number of proposals have been suggested, and in some cases implemented, to alleviate the problem of insurance unavailability. Several States have enacted antiredlining laws. In other States, antiredlining bills are currently being debated. The possibility of greater Federal regulation of the insurance industry is also being considered. Voluntary joint efforts on the part of insurance companies and consumers (often with the assistance of insurance departments) have been initiated. New insurance products have been developed and major structural changes in the insurance mechanism (e.g., reinsurance facilities, public insurance programs) have been advocated. More proposals, undoubtedly, will be offered in the near future. Following is a review of some of the programs that have been implemented or proposed.

## Industry Response

Representatives of the insurance industry have offered a variety of responses to the problem of insurance unavailability. As indicated in chapter 2, one company has stated that, at least in the State of Michigan, there is no crisis and that the vast majority of policyholders have been well served. At the same time, an underwriting manager for a homeowners insurer in that State said, "Anyone who thinks this industry isn't redlining has his head in the sand." Some members of the industry claim that since insurance is a competitive business, the forces of the market will assure that all qualified risks will be able to obtain insurance. For those unable to obtain insurance in the voluntary market, it is argued, some kind of subsidy is required. If insurance is to be

considered essential and available to all members of society, that is a public policy issue which must be settled by public officials. Any costs involved in providing such a subsidy should be paid for by the public sector, not by private industry. Industry representatives have also maintained that the key to increased insurance availability is adequate rates. Without profits a company cannot stay in business and serve the market. Therefore, it is argued, "profit is the necessary cornerstone upon which social responsibility can be built."[1]

Other insurers have acknowledged insurance unavailability is a problem and have taken concrete steps to alleviate the problem. Ralph J. Marlatt, vice president of government and industry affairs of the Professional Insurance Agents, has stated:

> we cannot continue to justify the current practice. The time has come for a basic restructuring of the insurance principles coupled with innovative marketing techniques.[2]

One approach has been the development of new property insurance policies which provide less coverage than standard homeowners policies but still provide essential coverage. Three new forms of insurance policies have been filed with insurance commissioners throughout the country and will be available to consumers in those States which approve them.

One form, referred to as an actual cash value (ACV) homeowners policy, provides coverage similar to that included in the traditional homeowners package (fire, extended coverage, vandalism and malicious mischief, personal theft, and liability). The

[1] *Ninety Day Report of the Advisory Committee to the NAIC Redlining Task Force,* Mar. 31, 1978, p. 5.

[2] Ibid., p. 60.

primary difference is that losses will be adjusted on an actual market value rather than replacement cost basis. That is, a policyholder will be compensated for loss equivalent to the replacement cost of his or her home minus depreciation. Further, insureds will not be required to insure to 80 percent of replacement cost as is required under the traditional homeowners policy for full recovery on partial losses, but will be able to purchase the amount of coverage they deem appropriate. The amount of recovery for loss is limited by the amount of insurance purchased.

A second form, "variable percentage replacement loss settlement endorsement," also permits consumers to insure at less than 80 percent of replacement cost and still receive loss adjustments equivalent to replacement cost for partial losses up to the limits of the policy. This type of coverage will appeal to those who want partial losses to be adjusted on a replacement cost basis, where the replacement cost is greater than the market value of property.

The third form is a "repair cost" program, designed primarily for owners of older homes which contain construction or decorative detail that would be extremely expensive to replace in case of loss. For example, a home may contain elaborate sculpturing on a wall or ceiling, or may be constructed with rare and expensive materials. Again, because the replacement cost of the home far exceeds the market value, conventional homeowners insurance may not be available. But under a "repair cost" policy, the homeowner can have the costs of conventional repairs covered. The elaborate sculpturing may not be replaced, but the insurance will cover the costs of repairing or rebuilding a functional wall or ceiling using contemporary materials and workmanship.

The effectiveness of these new products in alleviating the unavailability problem depends in part on how actively different companies market them. A company may resist becoming the only one offering an innovative product to avoid overexposure in that particular kind of risk. There may be some hesitancy, at least in the early stages, on the part of any particular company to market these new products vigorously until others are also marketing in those areas.

Other companies have stated publicly their opposition to redlining practices. The St. Paul Fire and Marine Insurance Company, for example, recently issued a statement reaffirming "its policy of not refusing to write insurance on the basis of geographic location."[3] According to Robert J. Haugh, "We have never intended to redline but we want to make sure that all of our people understand and properly interpret that policy."[4] The major principles set forth in that statement are:

> The St. Paul will *not* refuse to insure, refuse to renew or otherwise limit property or automobile insurance on the basis of location within a geogephic area (such as a section of a city). . . .

> Assuming property is adequately maintained, The St. Paul will not refuse to write property coverage because of the age of a building. The Company will not take underwriting shortcuts such as declining a risk because of similar action by another insurer. Nor will we decline a risk for poor maintenance or unsafe conditions without verification by a physical inspection.

> We will not terminate or refuse to appoint agents on the basis of their office location or the location of their customers.

> The Company will provide to present and prospective insureds, upon their request, the reasons for adverse underwriting decisions. . . .

> We believe we have an obligation to inform insureds and the public about elements of insurance that affect them directly or indirectly. In the case of policyholders and prospective policyholders, we should tell them how they can prevent losses and control insurance costs. If they are uninsurable, there must be a reason they are uninsurable and we must provide this information. In turn, if they take steps to become insurable, we have an obligation to reconsider their application and provide the insurance. . . .[5]

In some metropolitan areas, members of the insurance industry have participated in voluntary joint efforts with consumers and regulators to resolve the unavailability problems in their communities. Examples of such programs are reviewed below.

## Federal Proposals and Recommendations

The business of insurance has received considerable Federal attention over the last several years. Established policies such as the McCarran-Ferguson exemption of insurance companies from Federal

---

[3] The St. Paul Issues Formal Policy on Geographic Underwriting, News Release, May 26, 1978.

[4] Ibid.

[5] Ibid.

41

antitrust laws (1945), the FAIR Plan (1968), and rating classifications have been scrutinized with particular care by both the executive and legislative branches.[6] As a result of these appraisals, alternative programs and modifications of existing programs are being suggested.

## HUD Assessment of FAIR Plan

In 1974 the Federal Insurance Administration (FIA) issued a report entitled "Full Insurance Availability," which was highly critical of the operation of the FAIR Plan. This plan represents an involuntary residual insurance program. Pointing out, at the time of the report, that only 4.8 percent of the 3 million policies written in the FAIR Plan had annually sustained losses and that 95 percent of those policies had been loss free, the FIA concluded that "the vast majority of insureds in the plans should have been written voluntarily."[7] These individuals, according to the report, have been unfairly relegated to the FAIR Plan. Consequently, they are paying premiums far in excess of what would be a reasonable reflection of the risks they represent as well as subsidizing other genuinely poor risks.

To alleviate the problems created by the residual involuntary insurance market which the FAIR Plan represents, FIA proposed instead a two-level program of full insurance availability through a single voluntary market. The basic premise of the proposal is that every person seeking coverage for an insurable risk will choose his or her own insurer and select the type and extent of coverage from that which the insurer currently offers for other similar risks.[8]

The FIA report points out that two conditions are necessary to meet the goal of full insurance availability. First, every insurer must accept all risks which meet the objective qualifications of the insurer's risk classification plan. Second, sufficient insurer outlets must be developed to ensure that consumers will have ready access to a number of insurers. The insurance lines that insurers would be required to offer would include coverage for essential personal and business requirements.[9] Objectively determined

uninsurable risks—i.e., risks that cannot meet "minimal safeguards against loss"—would not be able to obtain coverage at all.[10]

The second level of the FIA proposal concerns the ultimate disposition of those risks which insurers have accepted and for which policies have been written. To ensure that losses and expenses will be fairly distributed over the entire insurance industry, the FIA plan proposes that a reinsurance exchange be established.[11] Under the FIA plan, any insurer who determines that he has written an amount or type of insurance which impairs his business integrity will be able to cede a share to such a reinsurance exchange.[12] The exchange would consist of all insurers licensed to do business in a particular State. While the individual policy would be serviced exclusively by the primary insurer who would pay all losses on the ceded risk, that insurer would receive from the reinsurer reimbursement to the extent of the ceded risk. Part of the original premium obtained by the insurer from the insured would also be ceded to the exchange in proportion to the extent of the ceded risk. Use of the exchange by primary insurers would be carefully monitored to prohibit them from misusing the facility by retaining only preferred risks.

The full insurance availability proposal anticipates broadened State responsibility and diminished involvement of the Federal Government which would work actively to remove itself from insurance industry regulation and "intrusion."[13] Indeed, the report indicates that federally-controlled programs to solve insurance availability problems would be "inappropriate if not impossible."[14]

## Justice Proposal for Regulatory Reform

The Department of Justice, in response to a request of the Task Force on Antitrust Immunities, completed an 18-month survey of the insurance industry in January 1977 in which it recommended substantial changes in the regulation of the business of insurance, including an expanded Federal role.[15]

---

[6] The McCarran-Ferguson exemption is set forth in 15 U.S.C. §§1011–1015 (1976). The FAIR Plan is set forth in 12 U.S.C. §§1749bbb–bbb-10. (1976) and 24 C.F.R. 1905 (1977).
[7] U.S., Department of Housing and Urban Development, Federal Insurance Administration, *Full Insurance Availability* (1974), p. 2 (hereafter cited as *Full Insurance Availability*).
[8] Ibid., p. 73.
[9] Ibid., p. 74.
[10] Ibid., p. 75.
[11] Ibid., p. 78ff.

[12] Reinsurance is an established medium through which insurers have traditionally ceded to other insurers part or all of a particular risk. The relationship between insurer and reinsurer has no effect upon the contractual relationship between the insured and his primary insurer. Appleman, *Insurance Law and Practice* (1976), §7694, vol. 13A, p. 528.
[13] *Full Insurance Availability*, p. 91.
[14] Ibid., p. 92.
[15] U.S., Department of Justice, *The Pricing and Marketing of Insurance* (1977)(hereafter cited as *The Pricing and Marketing of Insurance*).

42

The Justice study centered on the pricing and distribution of insurance under the State regulatory system authorized by the McCarran-Ferguson Act of 1945.[16] Justice concluded that rigid State rate regulation effectively stifled competition, created unreasonable insurance rates, and aggravated the present problem of insurance unavailability in the voluntary market.[17] Finally, Justice concluded that the insurance industry does not need the current McCarran-Ferguson antitrust exemption in order to conduct business profitably for itself and safely for the consumer.

In place of the current system of potentially exclusive State regulation of the business of insurance authorized by the McCarran-Ferguson antitrust exemption, Justice recommended an alternative system of Federal chartering analogous to federally-chartered financial institutions. Under this system, insurers would have the option of seeking a Federal charter and relinquishing their antitrust exemption or retaining that exemption under a State charter.

Those insurers electing to operate under a Federal charter would participate in a Federal guaranty system. The guaranty fund, like that of the Federal Deposit Insurance Corporation (FDIC) and the Federal Savings and Loan Corporation (FSLIC), would provide consumer protection against defaults by insolvent insurance companies whose financial problems had not been detected by a Federal solvency regulatory agency in advance of the default. These companies would be subject to various Federal controls, including Federal solvency and investment standards, Federal laws against invidious discrimination of risks based on race, age, and sex, and Federal standards on the disclosure of price and underwriting information.[18] Federal antitrust laws would be fully applicable to the insurers electing a Federal charter. Those insurance companies electing to retain their exemption from the antitrust laws under the McCarran-Ferguson exemption would remain State chartered and subject exclusively to State regulation.

Even under this dual system of regulation, however, State law would continue to control all insurers licensed to do business within a particular State to the extent that State law was not preempted by Federal law or in conflict with it.[19] In addition, State law would continue to govern the basic insurance contract itself as well as reinsurance facilities located in that State. States would continue to tax insurers doing business within their jurisdiction.

The Justice proposal recommends a considerably expanded Federal regulatory role over the insurance industry. Part of that regulatory role would involve specific Federal legislative prohibitions against invidious discrimination in the business of insurance. Classifications based on age, sex, and race would be closely scrutinized to ensure that such classifications have been objectively validated and do not reflect arbitrary and illogical criteria.[20]

In June 1977, Senator Edward W. Brooke (Massachusetts) submitted a bill to the Senate which embodied the basic ideas of the Justice proposal.[21] Hearings were held on that bill before the Banking, Housing, and Urban Affairs Committee in September 1977. At that time, Senator Brooke indicated that he would not proceed with the bill but would instead submit a revised version containing the same basic principles at a later date.[22] At the time of this report, no such action had been taken.

## Legislative Amendment of the FAIR Plan

Concern about the cost of insurance under the FAIR Plan prompted Representative Elizabeth Holtzman (16th District, New York) to offer an amendment to the Housing and Community Development Amendments of 1977 which would have required that rates under a State FAIR Plan could be no higher than those applicable to property insured through that State's voluntary market.[23] At the time the amendment was offered (May 1977), the FAIR Plan rates in New York, for example, were four times those of the voluntary market.[24] However, the House amendment was deleted during the House-Senate conference.[25] As a result, the provision suggested by Representative Holtzman did not become part of the

16 See discussion of the McCarran-Ferguson exemption in chapter 3.
17 *The Pricing and Marketing of Insurance,* p. 340.
18 Ibid., pp. 360–61.
19 Ibid., p. 369.
20 Ibid., p. 366.
21 S. 1710, 95th Cong., 1st sess. (1977).
22 *Hearings on S. 1710 Before the Committee on Banking, Housing, and Urban Affairs,* 95th Cong., 1st sess., p. 780 (1977).

23 H.R. 6655, 95th Cong., 1st sess. (1977).
24 123 Cong. Rec. 4290 (daily ed. May 11, 1977) (remarks of Rep. Thomas Ashley). In July 1978, the cost of FAIR Plan insurance in New York was between four and five times higher than that of comparable insurance available through the voluntary market. 124 Cong. Rec. 7124 (daily ed. July 21, 1978) (remarks of Rep. Frank Annunzio).
25 U.S. Code Cong. & Ad. News, 95th Cong. 1st sess., vol. 3, p. 2994 (1977).

43

Housing and Community Development Amendments of 1977.[26]

The Housing and Community Development Amendments of 1978, which were enacted into law on October 31, 1978, contain the basic proposal of the 1977 Holtzman amendment[27] Effective January 31, 1979, the cost of insurance under a State's FAIR Plan must be essentially the same as the cost of coverage available through that State's voluntary market.

Two additional amendments to the 1978 Housing and Community Development Amendments were also proposed by Representative Holtzman. The first of these amendments, which requires that one-third of the voting members of the State FAIR Plan boards be composed of members drawn from the public and without insurance industry ties, was enacted into law effective October 31, 1978.[28] The second amendment would have required that standard homeowners insurance coverage be made available to consumers through the FAIR Plan.[29] This amendment was defeated in committee in the House and was not included in the Senate version of the 1978 amendments.[30]

### Executive Oversight of Current Antitrust Law

On December 1, 1977, President Carter established the National Commission for the Review of Antitrust Laws and Procedures.[31] Part of the commission mandate was to report to the President within 6 months upon the desirability of retaining Federal antitrust exemptions for State-regulated industries, such as insurance companies. The 15-member commission includes the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice and the Chairman of the Federal Trade Commission (FTC).

In a speech before the National Association of Insurance Commissioners, on April 3, 1978, Michael Pertschuk, Chairman of the FTC and a commission member, suggested that insurance company mergers require close monitoring of their impact on competition. Stressing that the FTC fully supports a system of free competition as being in the best interests of consumers, Mr. Pertschuk suggested that Federal antitrust laws must be utilized to prevent those insurance company mergers which effectively restrict competition.[32]

### Privacy Commission Recommendations

The 1977 report of the White House Privacy Protection Study Commission[33] focused primarily on abuses in the collection of personal information. Its chapter on insurance, however, contained some recommendations relevant to the problem of insurance unavailability.

Recognizing the variety of sources used by the insurance industry to gather information (e.g., statistical research organizations, investigative agencies, insurance support services), the subjective nature of underwriting practices (e.g., concern for morality, lifestyle, values), and the abuse that does occur in the collection and utilization of personal information, the Commission offered a series of recommendations to resolve an uneasy tension between the industry's need for information and the privacy rights of individuals.

In its 17 recommendations directed to the insurance industry, the Commission maintained that the industry can obtain the information it needs to continue "providing needed insurance protection, properly pricing it, and in servicing insurance contracts,"[34] and at the same time individuals may obtain "the reasons for the adverse action (when such actions are taken) and the specific items of information that support the reasons."[35] The Commission proposed using existing regulatory and legislative mechanisms to keep administrative costs to a minimum, providing incentives for voluntary compliance, and providing protection against liability for unintentional failure to comply. The State insurance departments and the Federal Trade Commission under the Federal Fair Credit Reporting Act would be primarily responsible for implementing the recommendations. The key recommendations as they relate to the problems of insurance unavailability offered by the Commission are:

26 Act of Oct. 12, 1977, P.L. No. 95–128, Title VII, 91 Stat. 1144.
27 Act of Oct. 31, 1978, Pub. L. No. 95–557.
28 Ibid.
29 H.R. 11969, 95th Cong., 2d sess. (1978); S. 3084, 95th Cong., 2d sess. (1978).
30 H.R. 12433 and S. 3084, 95th Cong., 2d sess. (1978).
31 Exec. Order No. 12,022, 42 Fed. Reg. 61,441 (1977).

32 Michael Pertschuk, Chairman, Federal Trade Commission (remarks before the National Association of Insurance Commissioner, Zone II Conference, Richmond, Va., Apr. 3, 1978), p. 8.
33 *Personal Privacy in an Information Society, Report of the Privacy Protection Study Commission* (July 1977), chapter 5.
34 Ibid., p. 220.
35 Ibid., p. 178.

44

● Before collecting any information about an applicant or a third party, an insurer must inform the person about the types of information that will be collected; how and from what sources it will be collected, who the information may be shared with, how the individual can receive a copy of any record made on him/her self with the information, and how the person can dispute or change any incorrect information;

● An insurer must provide any individual, upon request, with copies of any recorded information that the insurer has obtained regarding that person;

● Insurers must provide an individual the opportunity to request corrections, amendments, or deletions in any record of information obtained by that institution on the individual. Any organization with which the insurer has shared the information must be notified of any changes which are made. If the insurer refuses to make requested changes, the individual must be provided with the reason(s) for that refusal. The individual must also be provided the opportunity to add a concise statement to the record indicating his or her disagreement and that statement must be shared with those organizations with whom the insurer has shared the contested information.

● When an adverse underwriting decision is made, the insurer must provide the applicant with the specific reason(s) for the decision, the item(s) of information on which that decision was based, the name and address of the institution(s) which provided that information, and upon request a copy of all recorded information concerning the individual used to make the adverse decision. The individual must also be informed of the procedures he or she can initiate to change or dispute any of that information.

● No insurance company can make an adverse decision based in whole or in part on the mere fact that another insurer had made an adverse decision or that an individual had previously obtained insurance through the substandard (residual) market. Such decisions can be affected, however, by the reasons given for previous underwriting decisions.

## State Actions

Several States have recently enacted antiredlining laws and others are currently considering a variety of proposals. Most proposals call for reforming the criteria used by insurance companies in their underwriting practices, disclosing the basis of industry decisions to consumers, and increasing "lead time" before a decision to nonrenew or cancel becomes effective. Some proposals, however, call for fundamental alterations in the structure of the insurance industry.

The State of Missouri enacted one of the earliest antiredlining laws.[36] In its act, Missouri prohibited insurance companies from cancelling, refusing to write, or refusing to renew insurance policies solely because of age or place of residence, race, sex, color, creed, national origin, ancestry, or lawful occupation of an individual, or because an applicant had been previously cancelled or nonrenewed by another company. These provisions do not apply where either place of residence or occupation is the sole cause of increased risk of loss. The law also provides that insurance policies may be cancelled only for the following reasons: nonpayment of premium; fraud or misrepresentation; criminal acts increasing the risks insured against; or physical damage to property which increases risk exposure. In addition, when a policy is cancelled the insured must be provided with the precise reason for the decision and the notice of cancellation must be delivered 30 days prior to cancellation.

The State of Illinois enacted a number of laws in 1977 which prohibit insurance companies from refusing to provide homeowners insurance solely on the basis of geographic location and discriminating against similar risks on the basis of race, color, religion, or national origin.[37] Other legislation provides that fire and extended coverage policies that have been in effect for 5 years cannot be nonrenewed except for nonpayment of premium, fraud, or increase in risk.[38] In addition, companies issuing automobile or fire and extended coverage are required to disclose, by ZIP code, the number of policies issued, cancelled, and nonrenewed.[39] Further legislation was enacted in the summer of 1978. Companies are prohibited from cancelling or refusing to write or renew automobile, homeowners, or renters insurance because no agent or broker is

---

[36] Mo. Rev. Stat., §§375.001 -.008 (Supp. 1977)
[37] Ill. Rev. Stat. ch 73, §767.22, 1031 (1977).
[38] Ill. Rev. Stat. ch 73, §755.13, 755.21a (1977), *amending* Ill. Rev. Stat. ch 73, §755 (1976).

[39] Ill. Rev. Stat., ch 73, §755.25 (Supp. 1977), *amending* Ill. Rev. Stat. ch. 73, §755 (1976).

45

located in geographic proximity to the residence of the applicant.[40] Companies are also prohibited from cancelling, terminating, or refusing to renew a policy on the ground that the company's contract with the agent who obtained the policy was cancelled, and from cancelling or refusing to write or renew a policy because that person had previously been denied coverage by another insurer. When an application for a fire and extended coverage policy is denied or a policy is cancelled or nonrenewed, the person can obtain the complete file the company has regarding the person's application or policy.[41] The FAIR Plan has also been revised to include availability of a homeowners policy, to provide for immediate "binding" upon application for insurance, to provide for installment payments, and to add four public members (not affiliated with the insurance industry) to the board of directors.[42]

A report prepared for the Illinois Department of Insurance by Anton Valukas included the following recommendations: 1) that the department determine the feasibility of requiring all companies writing homeowners business in Illionis to write a percentage of their business in areas found to be victimized by discriminatory action; 2) that any company found to have engaged in discriminatory activity in violation of Illinois law make insurance available to those areas victimized by such practices. (In California financial institutions found guilty of discrimination in their lending practices on the basis of race, color, religion, sex, marital status, national origin, or ancestry, or due to the racial, ethnic, religious, or national origin composition of the neighborhood or geographic area surrounding a housing accommodation, can be ordered by the State to make the disputed loan)[43]; 3) that an individual have the right to examine the complete file of an insurance company in those cases where a person believes he or she has been declined a policy, cancelled, or nonrenewed for improper reasons; and 4) that ZIP code reporting be expanded to include loss information.[44]

In July 1978, Illinois Insurance Director Richard Mathias appointed a Citizens Task Force on Homeowners Insurance Availability to:

- examine the extent to which fire and extended coverage and homeowners insurance are available to urban residents in Illinois and to determine the primary causes of availability problems which may be found;
- inquire into those factors which are related to increased risk for homeowners and to identify underwriting criteria which are demonstrably unrelated to risk and which result in reduced availability;
- explore alternatives to insurance coverage based solely on estimated home replacement costs;
- examine the Illinois FAIR Plan in light of recent legislation prohibiting geographic discrimination in the sale of fire and extended coverage and homeowners insurance;
- recommend specific legislative and regulatory measures which would alleviate the problem of insurance availability for urban residents.

The Task Force consists of agents and brokers, representatives of insurance companies, members of community organizations and civic groups, and officials of savings and loan institutions. Mathias has instructed the group to report its findings by January 1, 1979.[45]

The State of Washington is currently considering a proposal that would prohibit insurers from refusing to issue or renew, or cancelling policies, or varying the price for similar coverage because of the age or location of property, occupation of applicant, or because another insurer refused to issue or renew a policy or cancelled a policy in which that person was the insured. These strictures would not apply where there is a statistically significant relationship between the hazard insured against and exposure to loss which is attributable solely to location of residence or occupation of applicant. The bill would also prohibit insurers from requiring applicants to divulge information on whether another insurer has previously cancelled or refused to issue or renew a policy. Insurers must notify the insured at least 20 days in advance of cancellation or nonrenewal and must give clear reasons for that action.[46]

---

[40] P.A. 80-1369, 80th Ill. Gen. Assembly, 1978 Reg. Sess. (Aug. 14, 1978), amending Ill. Rev. Stat. ch 73, §§755.26, 767.22 (1977).

[41] P.A. 80-1374, 80th Ill. Gen. Assembly, 1978 Reg. Sess. (Aug. 14, 1978), amending Ill. Rev. Stat. ch 73, §§753.01, 755.10, 755.23a (1977).

[42] P.A. 80-1363, 80th Ill. Gen. Assembly, 1978 Reg. Sess., (Aug. 14, 1978), amending Ill. Rev. Stat. ch 73, §§755.11, 1031, 1065.69, 1065.70, 1065.71, 1065.72, 1065.77 (1977).

[43] Cal. Health and Safety Code §35800-803. (West Supp. 1978).

[44] Anton Valukas, An Investigation of Discrimination in the Sale of Homeowners Insurance in Illinois (Illinois Department of Insurance, 1977), pp. 130-31.

[45] Order of Richard Mathias, director of insurance, July 24, 1978.

[46] Code Revisor draft H 2429/78 (fourth draft), State of Washington (1977).

A bill introduced in the Wisconsin Legislature in 1977[47] (but which eventually died in committee[48]) would have prohibited insurers from denying a policy or approving one on terms less favorable than are usually offered because of neighborhood factors other than those conditions affecting present or future property values in the area surrounding the property to be insured. In addition, the Wisconsin proposal would have required all insurance companies to disclose annually the number and dollar amount of all property insurance policies issued and the number of applications denied by census tract. The insurance commissioner would have been required to make a public report on the marketing practices of insurance companies and to identify those tracts which may be deficient in terms of property insurance. If the commissioner found that property insurance is not available in the voluntary market in any part of the State on terms as favorable as those usually offered, he would provide such insurance or require the industry to prepare plans to do so.

In August 1978 the Office of the Commissioner of Insurance launched a ZIP code disclosure program involving companies writing homeowners and residential fire insurance in selected cities within the State of Wisconsin. Companies which wrote more than $500,000 of homeowners insurance in 1977 will be required to report by ZIP code the number of cancellations and nonrenewals beginning with the fourth quarter of 1978. In 1979 this requirement will apply to residential fire policies as well. In addition, companies will be required to report new business and renewal business as well as cancellations and nonrenewals on a quarterly basis.[49]

Two bills introduced in the Minnesota Legislature in 1977 would have prohibited insurance companies from refusing to sell homeowners fire or liability insurance in any area of a town or city in which it sells such insurance. Companies would not be prohibited, however, from varying premiums from one area to another if geographic area is relevant to the assessment of risk.[50] Although neither bill was enacted into law, an amended version of the house bill will be introduced in the 71st legislative session,

beginning in January 1979.[51] Under this proposal all companies offering homeowners insurance in metropolitan areas would be required to file annually the following information by census tract: number of policies written, total dollar amount of homeowners coverage written, total dollar amount of homeowners premiums written, number and total dollar amount of claims paid, and the number of claims incurred but not closed or paid. No homeowners policy could be cancelled for any reason except for the following: nonpayment of premiums, policy was obtained through a material misrepresentation, policyholder filed a fraudulent claim, or the premises were substantially changed. Insureds must be given 30 days notice prior to the effective date of the cancellation, 15 days notice if nonpayment of premium is the reason for cancellation. In the case of nonrenewals, insureds must be given 60 days notice, except in the case where nonpayment of premiums is the reason for nonrenewal. Any applicant who has an insurable interest shall be entitled, upon request, to a clearly written statement explaining precisely what type of coverage will be provided and under what terms or the reason why the application is denied. This proposal will also prohibit insurers offering homeowners coverage in any city from refusing to sell or renew or from charging different rates for similar coverage on other properties in that city solely because of geographic location.

The State of Indiana has debated insurance redlining legislation for several years but no antiredlining laws have yet been enacted.[52] A bill recently introduced in the house by Representative Jule G. Harris would have prohibited an insurer from refusing an application, nonrenewing a policy, or setting unfairly discriminatory rates primarily on the basis of the age or geographic location of the property or the age, sex, race, color, ancestry, or occupation of the occupants. In addition, companies offering a type of insurance in one part of the State would be required to offer that type in every geographic location.[53] This particular bill died in committee.

Another bill drafted for but never filed by Senator Katie Hall would have prohibited insurers from

[47] Assembly B 13, Wis. Gen. Assembly (introduced Jan. 6, 1977) (1977).
[48] Marsha Coggs, State Representative, testimony before the Wisconsin Advisory Committee, June 1, 1978, p. 37.
[49] Bulletin from Harold Wilde, commissioner of insurance, to all insurers writing homeowners and residential fire premiums in Wisconsin, Aug. 31, 1978.
[50] H.F. No. 189, 70th Minn. Leg. Sess. (1977). S.F. No. 588, 70th Minn. Leg. Sess. (1977).

[51] Marge Lane, administration assistant, Financial Institutions and Insurance Committee, Minnesota House of Representatives, telephone interview, July 8, 1978.
[52] Steve Rahn, Legislative Council of the General Assembly, telephone interview, June 8, 1978 (hereafter cited as Rahn Interview).
[53] H.B. 1285, 100th Ind. Leg. Sess. (1978).

47

refusing to provide or nonrenewing insurance because of the age, sex, race, ancestry, or occupation of the applicant, the age of the property, or the racial composition of the neighborhood in which the property or applicant is located. That bill also would have required insurers to file annually with the insurance commissioner the following information by neighborhood: number of policies applied for, number of policies issued or renewed, number of applications rejected, and number of policies cancelled.[54]

Michigan considers the refusal to insure or renew, or limiting the coverage on the basis of race, creed, color, handicap, occupation, sex, age, or marital status of an applicant, or on the basis of the location of the risk, or because of a previous cancellation, or nonrenewal by another insurer to be an unfair trade practice. With property insurance, location may be taken into consideration only if there is a statistically significant relationship between location and risk.[55]

State Senator Jack Faxon has introduced seven bills to accomplish the following: prohibit cancellation of homeowners policies in mid-term except for grounds of fraud; require companies to inform homeowners of specific reasons for nonrenewal of policies; allow homeowners to purchase insurance equal to the market value of their homes and to receive full cost of repairs in the event of partial loss and market value plus 15 percent in the event of total loss; prohibit discrimination on the basis of geographic location even if there is a statistically significant relationship between location and extent of risk; require companies to justify geographical rating territories; and establish a Joint Underwriting Association from which homeowners could obtain policies at rates comparable to those charged in the private market.[56]

The insurance commissioner in Michigan has proposed a major restructuring of the insurance industry in that State. Under the Essential Insurance Reform Act of 1977,[57] a reinsurance facility, the Michigan Indemnity Association, would be created in Michigan. The association would be similar to HUD's proposed full insurance availability system. Each insurer with more than one-half percent of the homeowners property and automobile insurance market would be required to sell automobile or property insurance to all qualified risks according to the insurance company's class and territory rating plan through normal marketing channels. A company could subsequently cede some of its book of business to the Michigan Indemnity Association. The profits or losses of the association would be shared among all participating companies according to the exposure units written by each company. The act also calls for open competitition to establish rates. The insurance bureau would have responsibility for monitoring the market to assure that rates are not inadequate, or excessive, or unfairly discriminatory. Where open competition does not provide for appropriate rates, the commissioner of insurance would require prior approval of rate filings. Companies would be required to submit documentation to justify their rating plans. Criteria for class and territory plans would have to be objectively defined, with a reasonable relationship between those criteria and the probability of loss. The act also calls for a mandatory merit rating plan which requires a surcharge upon the basic premium. This surcharge is based on criteria that are under the direct control of the individual insured. This plan is designed to eliminate unfair subsidies of bad risks by good risks and to encourage insureds to contain losses.

State insurance regulators have taken actions in addition to writing, sponsoring, and encouraging new legislation and regulations within individual States. The National Association of Insurance Commissioners (NAIC) created a Redlining Task Force, chaired by Wisconsin Insurance Commissioner Harold Wilde. Recognizing that "some insurers are refusing to insure, refusing to renew, or limiting the amount or type of property and automobile coverage available to individuals because of the geographic location of a particular risk,"[58] the NAIC intends to define redlining and propose model legislation to solve redlining problems by the end of 1978. As a first step, the Redlining Task Force appointed an industry advisory committee. The advisory committee was asked to report to the task force by April 1, 1978, on the kinds of steps the industry should take to address the problems of insurance unavailability. The NAIC intends to hold public hearings and gather other relevant information throughout the year in order to develop its recommendations.[59]

---

[54] Rahn Interview.
[55] Mich. Stat. Ann. §24.12027 (1977).
[56] "Insurance Redlining," statement prepared by State Senator Jack Faxon.
[57] Originally H.B. §196, Mich. 79th Leg. Sess. (1977) now H.B. 6322, Mich. 80th Leg. Sess. (1978).
[58] "NAIC Statement of Principles and Objectives on Insurance Redlining," Appendix B of *Report to the NAIC Redlining Task Force,* Apr. 1, 1978.
[59] Three nonindustry representatives were appointed to the advisory

48

The Redlining Task Force is currently considering the following amendment to the NAIC Unfair Trade Practices Act which would declare the following to be unfair trade practices:

> Refusing to insure or refusing to continue to insure, or limiting the amount of coverage available to a risk because of the geographic location of the risk.

In proposed implementing regulations, the following practices are examples of those actions which would violate this amendment:

1. refusing to insure a risk solely because of the age of the property;
2. refusing to enter into a relationship with an agent solely because of the location of the agent's business;
3. refusing to insure a risk solely because the applicant was previously denied coverage or terminated by another insurer;
4. asking on an application whether the applicant was previously denied coverage or terminated by another insurer;
5. not making available the exact reason for insurer's rejection, cancellation, or nonrenewal of an insurance contract;
6. not stating, before issuing a notice of rejection, cancellation or nonrenewal, what corrective actions must be taken to obtain or continue coverage;
7. not having a system for verifying the accuracy of inspection reports;
8. ending a relationship with an agent because of the location of the agent's business or through the application of underwriting or loss ratio standards not generally applicable to all agents of the company.[60]

Recognizing the vast capital assets of the industry, Commissioner Wilde has suggested a "Marshall Plan for the cities—where the insurance industry would use its economic and human resources as part of a major effort by the private sector to revitalize declining neighborhoods (thereby making them better risks)."[61] Available research on industry investment practices indicates that precisely the

opposite phenomenon is occuring; that is, companies have demonstrated a strong suburban bias that cannot be explained simply in economic terms.[62]

## Local Initiatives

Efforts at the local level include both legal and voluntary activities. The city of Chicago has been extensively involved on both fronts.

### Redlining Ordinance

The Chicago City Council is currently considering an antiredlining ordinance. Under this ordinance, any insurance company requesting to share in the $2.8 million of insurance annually purchased by the city must agree to write insurance without discriminating on the basis of location or age of property, or on the basis of the race, religion, color, national origin, sex, or marital status of applicant. The ordinance requires insurance companies seeking city business to submit by ZIP code and by type of insurance a list of all policies in force, all policies that were cancelled or nonrenewed in the previous fiscal year, and all applications that were rejected. Companies found to be in violation of State redlining laws would be ineligible for city business for 2 years. If a company is found guilty of redlining after a bid has been accepted, the city would be required to cancel that insurance policy and to advertise for new bids. When the city's purchasing agent reviews bids, he or she would be required to take into consideration the proportion of a company's Illinois business which is written in Chicago and to give preference to those companies writing a high percentage of their business in the city. Recommendations made to the city council by the purchasing agent must be based on an evaluation of those considerations.[63]

### Petitioning the State

Several community organizations in Chicago have attempted to use the leverage of recent State legislation and the authority of the Illinois Department of Insurance to increase availability of conventional insurance within the city. Among the organizations involved are: United Neighbors in Action, Lake View Citizens Council, Southwest Community

committee, including Gregory D. Squires (Research/Writer, Midwestern Regional Office of the U.S. Commission on Civil Rights). Participation on that committee provided Commission staff with an excellent opportunity to learn about the insurance industry.
[60] Proposed Amendment to NAIC Unfair Trade Practices Act and Proposed Implementing Regulations, NAIC Redlining Task Force Meeting, June 11, 1978.

[61] Harold R. Wilde, memorandum to Laura Sullivan, chairperson of Advisory Committee to NAIC Redlining Task Force, Apr. 26, 1978.
[62] Karen Orren, *Corporate Power & Social Change: The Politics of the Life Insurance Industry* (Baltimore: The John Hopkins Univeristy Press, 1974), pp. 97–144.
[63] City of Chicago, "Code Amendment to Intensify Regulations for Insurance Companies Doing Business With City."

49

Congress, and Metropolitan Area Alliance (MAHA).[64] MAHA accused Allstate of redlining 12 neighborhoods in Chicago after the organization found that more than 2,600 homeowners policies in those communities had been cancelled by that company in a 9-month period in 1977. Allstate responded that the charges were false since it writes 15 percent of the homeowners business in Chicago, including a large proportion of those policies in the areas where it is accused of redlining.[65]

MAHA has continued its organizing drive utilizing a number of tactics, including sending 200 members to Sears, Roebuck and Company's annual stockholders meeting in Chicago in June 1978. (Allstate is a wholly-owned subsidiary of Sears). Allstate President Robert B. Shepard agreed to meet with representatives of MAHA to resolve their differences. At a June meeting the insurance company agreed to eliminate the higher advance premium payment and the requirement of a submission of a signed policy prior to coverage in 12 ZIP code territories where such marketing policies had previously been followed.[66] The company also agreed to provide MAHA with a quarterly listing of the number and types of homeowners policies it sells by ZIP code within the city of Chicago. The reporting will begin on October 1, 1978, and will continue for 1 year.[67]

## The Organization of the Northwest

At least one community group on Chicago's northwest side, The Organization of the Northwest (TON), has chosen to negotiate directly with insurance companies. TON recently negotiated a joint urban homeowners plan with CNA which will be put into effect in February 1979.[68] Under this program homeowners insurance will be available to qualified risks on Chicago's northwest side who will participate in a safety group program. A safety and review committee staffed by TON representatives working with CNA will conduct a variety of safety measures including: annual fire prevention interviews with 20 percent of the insureds, an annual spring cleanup campaign to be conducted with the city of Chicago, safety training meetings for insureds with public agencies such as the Chicago Crime Prevention

Bureau and the Fire Prevention Bureau, and quarterly meetings to review loss experience and prepare appropriate corrective action plans. After the first 18 months loss experience will be evaluated to determine whether premiums should be adjusted upward or downward.

TON representative Rev. Greg Olson said this program will make insurance available at affordable rates and should contribute to TON's overall strategy for neighborhood improvement. He also expressed hope that this program would be a model for other cooperative efforts involving community groups and insurance companies.

## Cleveland Action Committee

The Cleveland Action Committee (CAC) was created by members of the insurance industry to respond to complaints of redlining in that Ohio city. Participants include the Insurance Board of Cleveland, Ohio Insurance Institute, Ohio FAIR Plan, and Allstate, State Farm, Hartford, Nationwide, and several other insurance companies. Between November 1977, when the committee was founded, and February 1978, 101 complaints were received. Each complaint was answered and in 23 cases coverage was reinstated or secured elsewhere. One participant concluded that, "Although every one of the 101 complaints was important, it is also important to emphasize that 101 complaints from several hundred thousand property owners in Cleveland is an indication that there is *not* [emphasis in original] a major redlining problem in Cleveland."[69] Ohio Insurance Commissioner Harry Jump maintains that most complaints are due to the fact that insurance premiums in general have been increasing and that many people believe they have been discriminated against unfairly when in fact no such discrimination has been practiced.[70] As a result of what these industry participants perceive as a successful program in Cleveland, similar committees have been established in Youngstown and Dayton.

[64] "Essential Insurance and the Public Interest," testimony presented to Finance Committee of Chicago City Council by Midwestern Regional Office, U.S. Commission on Civil Rights, Jan. 12, 1978.
[65] "Logan Square Unit Assured of Redlining Probe," *Chicago Sun Times*, Feb. 22, 1978; "MAHA Hits Allstate, Claims Redlining in City Neighborhoods," *Chicago Sun-Times*, Feb. 28, 1978; "Allstate Rips 'False' Charge of Redlining," *Chicago Sun-Times*, Apr. 7, 1978.
[66] "Allstate to Drop 'Zone' Practice," *Chicago Sun-Times*, June 17, 1978.

[67] "Allstate to Check on Redlining," *Chicago Tribune*, Aug. 11, 1978.
[68] TON news release, Mar. 8, 1978, Commission files.
[69] John C. Winchell, executive director, Ohio Insurance Institute, letter to James R. Faulstich, vice president, Industry Relations, National Association of Independent Insurers, Feb. 28, 1978. Also see *OI Newsletter*, Feb. 10, 1978.
[70] Harry Jump, interview in Columbus, Ohio, May 17, 1978.