## Buckeye-Woodland Community Congress

According to George Barany, a member of the Buckeye-Woodland Community Congress (BWCC) in Cleveland, Ohio, the Cleveland Action Committee amounts to the proverbial finger which is used to plug up a broken dam.[71] At an April 21, 1978, hearing on insurance redlining conducted by BWCC, the organization released a 10-point legislative program to protect insurance consumers. The specific points were:

1. Requiring insurance companies and the Ohio FAIR plan to disclose the number of cancellations and nonrenewals by ZIP code on a quarterly basis and to file such information with the insurance commissioner;

2. Requiring insurance companies and the Ohio FAIR plan to disclose the number and dollar amount of new policies written and renewals and to file such information with the insurance commissioner;

3. Requiring the State insurance commissioner to compile a report on a quarterly basis and to make that report available to the public;

4. Prohibiting cancellation or nonrenewal of policies because of: geographic location, cancellation of an agent within a territory, previous cancellation, previous rejection by another company, age of dwelling, previous filing of a claim;

5. Prohibiting rate increases based on the fact that a claim had been filed;

6. Requiring that a written explanation and a notice of the right to appeal to the insurance commissioner be supplied with each cancellation and nonrenewal;

7. Requiring any insurance company licensed to sell within the State of Ohio to sell in all areas and prohibiting such companies from refusing to sell in certain areas;

8. Making homeowners insurance available on a market value basis and prohibiting companies from requiring insurance to replacement value;

9. Prohibiting discrimination on the basis of age and sex in the sale of automobile insurance;

10. Requiring the insurance commissioner to establish an office in Cleveland and to be in that office at least once each week.[72]

## Voluntary Residential Insurance Placement Committee

In November 1977, Johnnie L. Caldwell, Georgia Insurance Commissioner, asked all companies selling residential property insurance in the State to develop voluntary plans to eliminate geographic discrimination in the marketing of insurance. If the industry failed to act, he said, he would create a Joint Underwriting Association (a risk pooling reinsurance facility similar to the mechanism proposed by the Michigan Insurance Commissioner), provide homeowners coverage in the FAIR plan, or "take other such drastic measures as are necessary to solve the problem."[73]

As a result, the Voluntary Residential Insurance Placement Committee was formed. Members include Allstate, State Farm, Safeco, and several other companies as well as two members of the Georgia Underwriting Association. The committee's responsibility is to study each case of allegedly unjust denial of coverage because of geographic location of the risk and to assist in securing coverage in the voluntary market for those individuals who were in fact unfairly denied coverage. As of January 9, 1978, several complaints were received, 20 of which related to the responsibilities of the committee. Only 13 required further action, 3 of which were found to be legitimate complaints upon committee investigation. Coverage was found for those three complaints.[74]

## The Milwaukee Experience

Members of the insurance industry in Milwaukee launched a 3-year effort (1969–72) at the request of the Wisconsin Insurance Commissioner to resolve the unavailability problem in that city. A committee consisting of consumers, public officials, and industry representatives held weekly meetings in the central city to discuss insurance problems with residents. Local media were used to publicize the existence of the committee. Efforts were also made to recruit and train minority agents.

These efforts demonstrated the complexity of the problems and the difficulties in generating solutions. Few minorities were brought into the industry. Many of those who obtained jobs as agents soon left for government positions or other jobs outside the insurance industry. One insurance industry represen-

---

[71] George Barany, Buckeye-Woodland Community Congress, telephone interview, Mar. 22, 1978.
[72] BWCC Legislative Packet, Laws Needed to Protect Insurance Consumers, presented at Apr. 21, 1978, hearing on insurance redlining conducted by BWCC in Cleveland, Ohio.

[73] Johnnie L. Caldwell, Georgia Insurance Commissioner, memorandum to all insurers authorized to transact residential insurance in the State of Georgia, Nov. 7, 1977.
[74] J.R. Alexander, Voluntary Residential Insurance Placement Committee, letter to Johnnie L. Caldwell, Jan. 9, 1978.

51

tative, Bob Docuette of Milwaukee Insurance, who was centrally involved in the program, drew the following conclusions:

> Although excellent in concept, the entire program brought to the front the tremendous problem of education, communication, and orientation that could not be solved by any short range two or three-year program. What theoretically looked to be an answer to many of the concerns of the people of the inner city turned out to be the obvious recognition that for a program of this type to succeed, a much longer commitment to a stronger emphasis on education and communication would be necessary.

> Today in 1978, we are looking at the same problem. The problem must not seek short-range answers or it will be faced with the same disappointments that we experienced in the early 1970's. There are no easy answers and no easy programs and the insurance industry cannot solve some of the problems that were made obvious during the time of our inner-city program.[75]

Another program was launched in Milwaukee in June 1978 which Doucette believes will prove to be more successful.[76] The Community Insurance Information Center has been created by the insurance industry as a nonprofit service to aid insurance consumers. The center sells no insurance. It provides free information on purchasing automobile and home insurance and assistance to those who are having difficulty obtaining insurance. Consumers are referred to agents within the areas who are able to provide the type of insurance requested. Agency referrals will be made on a rotating basis although attempts will be made to refer individuals to agents who are conveniently located. In those cases where the individual still is unable to purchase the type of insurance he or she wants, staff members of the center will contact the agent for an explanation. If the adverse decision was legitimate, staff will attempt to explain it to the potential buyer. If the decision was not, the center will attempt to encourage the agent to reconsider.

According to Doucette, this program has the full support of more than 50 community groups in Milwaukee. As of November 1978, 12 insurance companies provided financial and staff support for the center.[77] The two principal reasons why Doucette is confident this program will work is that there will be a followup mechanism (which was not included in the previous program) and that the center will be open 5 days each week instead of 1 day as was the case before.

## Neighborhood Housing Services

Neighborhood Housing Services of America, Inc. (NHS), was established in 1974 to stimulate reinvestment in urban neighborhoods. NHS programs are locally controlled, locally funded, nonprofit tax-exempt organizations which offer comprehensive housing rehabilitation and financial services to residents of urban communities. Initial support for these programs came from the Urban Reinvestment Task Force composed of the heads of the following Federal agencies: Federal Home Loan Bank Board, Federal Reserve System, Comptroller of the Currency, Federal Deposit Insurance Corporation, and Department of Housing and Urban Development.

While seed money is provided by the Urban Reinvestment Task Force, the key to these programs is the development of a working relationship among local financial institutions, public officials, and residents. Lenders are asked to make loans at market rates to all homeowners who meet normal underwriting criteria. Local government officials are expected to demonstrate their commitment by making necessary capital improvements and providing appropriate city services, including systematic inspections of housing to encourage maintenance of the housing stock and property value. Residents must want and be prepared to work for the improvement of their neighborhood. A revolving loan fund, operated by the NHS, is maintained for those homeowners who are unable to qualify for conventional loans but who want to make needed home repairs. Such partnerships are operating in 47 cities. In six of those cities more than one NHS program is in operation. Four Chicago neighborhoods are operating an NHS program.

A pilot program will soon be launched in Chicago to bring the insurance industry into the partnership. Recognizing the importance of the availability of adequate insurance, representatives of the insurance industry will work with the other partners to assist

---

[75] Bob Doucette, Milwaukee Insurance, letter to Laura Sullivan, State Farm Insurance, Feb. 28, 1978.
[76] Bob Doucette, presentation to Advisory Committee to NAIC Redlining Task Force, June 29, 1978.

[77] Terri McKinnon, program coordinator, community insurance information center, interview in Milwaukee, Wis., Nov. 29, 1978.

52

homeowners in obtaining coverage through the voluntary market.[78]

## Municipal Insurance Programs

In virtually every discussion of insurance availability, the problem and potential remedies are discussed within the framework of balancing the social needs of the community with the profit needs of the industry. John R. Groves, an attorney for State Farm Insurance Companies, succinctly made this point when he wrote about "the need to maintain a balance between an insurer's business interest, i.e., his incentive to operate on a profitable basis, and the call for social responsibility."[79]

Public officials and consumer groups have also adopted a similar approach. As the New York City Commission on Human Rights maintained, "Effective strategies must be grounded in the realities of our economic system. Attempts to mandate business investment in socially desirable programs must be predicated on the factor of profit if they are to succeed."[80] And in the words of Public Technology Inc.:

> Insurance has become a good necessary for everyday life by most citizens. This is similar to a public good, such as electricity. As such, it must be available to anyone who wants it, and is able to pay for it, at a fair price.
>
> At the same time, the insurance industry must be allowed to make reasonable profits.[81]

While it may be true that the only remedies which the insurance industry and public officials will seriously entertain are those that are firmly rooted within this framework, it also places serious limitations on the entire debate. Generally, such limitations are not recognized: what frequently passes for open, objective problemsolving is in fact an ideological justification for the existing insurance mechanism.

The assumption that an industry's profit needs must be balanced against the services provided to the larger community implies that there are two competing needs, both of which have equal value and both of which must be protected by appropriate public policy. If a conflict arises between the needs of the community and the profit needs of industry, however, it should not be assumed, as is often the case, that the former must be compromised in the interest of the latter. For example, automobile and homeowners property insurance are generally recognized as essential needs of the community. Yet the short-range profit requirements of the insurance industry have sometimes dictated that the genuine insurance needs of the community would not be met. The statement that "profit is the necessary cornerstone upon which social responsibility can be built" only makes sense within the framework of a particular kind of economic system; this statement is by no means an absolute truth. If within the framework of a free enterprise system, the problem of insurance unavailability cannot be resolved, then perhaps a different framework should be explored.

The central problem discussed in this and in many other reports is the unavailability of insurance, not the correct balance between this social concern and the insurance industry's profit margin. When the problem of unavailability is confronted directly rather than as part of a socially constructed economic balancing act, a different set of questions are suggested and a different set of remedies can be considered. For example, rather than asking how two competing interests can be balanced, a more appropriate question might be: are there alternative ways that a group of people can pool their money, spread the financial burdens of loss, and provide more adequate protection and peace of mind for the individuals involved. Such alternatives have been proposed which, if implemented, might well meet these objectives more efficiently and effectively while reducing the number and dollar value of losses.

## Municipal Fire Insurance

Public insurance programs have been considered by several State and local governments; many have been successfully implemented. One alternative to the conventional, private sector insurance delivery system is a municipal fire insurance program which

---

[78] Information packet distributed by Neighborhood Housing Services of America at the 1978 annual meeting of the National Association of Insurance Commissioners, Washington, D.C., June 11–16, 1978.
[79] John R. Groves, letter to Louis Hannes, Office of the Commissioner of Insurance, State of Wisconsin, Oct. 25, 1977.
[80] Alice Paul and Ken Baker, *Economic Investment and the Future of*

*Neighborhoods* (New York: New York City Commission on Human Rights, 1977), pp. 98–99.
[81] Presentation to the D–2 Subcommittee Task Force on Redlining, National Association of Insurance Commissioners, Public Technology Inc., Oct. 11, 1977, p. 4.

53

has been proposed by the Institute for Local Self Government in Berkeley, California.[82] Basically, this proposal calls for combining fire prevention, suppression, and insurance activities into one integrated system for the purposes of reducing fire losses and all related costs. Currently, fire prevention and suppression functions are generally carried out by local municipalities while fire insurance is provided by private industry. The primary interest of the industry is to generate adequate premium dollars to cover costs and generate a profit. Loss reduction is not a crucial concern. What is crucial is that premiums exceed losses and other expenses. Since territorial rating classifications frequently consist of several cities, the loss experience and prevention activities of an individual municipality may not affect insurance rates in that municipality. Therefore, there is little incentive for individuals to take steps to reduce fires. If the prevention, suppression, and insurance functions were carried out as part of one integrated system, however, such an incentive would exist.

One of the major fire protection costs is insurance. Among the factors which contribute to the cost of fire insurance is the percentage of the premium dollar that goes towards commissions, generally in excess of 20 percent. By eliminating those costs, devoting more resources to fire prevention, and creating appropriate incentives to reduce fire loss, a municipal fire insurance program represents a viable alternative.

By creating a mutually beneficial partnership between the insurer and the insured, the municipal insurance program provides the proper incentive. While insureds will continue to pay premiums, funds which are collected above and beyond those necessary to pay claims can be used for a variety of fire prevention and cost reduction activities. Instead of going to stockholders as dividends on invesments, "profits" can be used to purchase and install smoke detectors in buildings, to increase fire safety inspections, to purchase new equipment or to add personnel to the fire department, to reduce insurance premiums, or for whatever purpose deemed appropriate for the municipality. Eventually, enough surplus revenues could be generated to pay all fire service costs, thus eliminating a majo. line item from the general fund. The key, however, is that the insureds can tangibly benefit from efforts they make to reduce fire losses while the insurance dollar they

do spend also contributes more directly to reduction and, ultimately, lower premiums.

There are problems that would have to be solved before a community could implement such a program. Since fire insurance is generally purchased as part of a package, the municipality would have to provide the other coverages or the fire insurance would have to be properly priced and an agreement with private insurers worked out so that remaining coverages could be purchased separately. To set reasonable premiums and to operate a program effectively, insurance experts might have to be consulted to assist the municipality. It might not be possible to maintain large enough reserves to cover random catastrophic losses, requiring creation of a reinsurance mechanism to which some risks could be ceded. In addition, market penetration must be large enough to establish an economically viable program, perhaps requiring mandatory participation of local citizens or a tax of some kind. Problems exist; however, they are not insurmountable. As the California proposal states, "utilizing what would ordinarily be insurance industry 'profits' to provide better local fire protection at reduced cost to citizens can hardly be a bad idea."

A theoretical case study of the costs and benefits involved in creating a municipal fire insurance program in Mountain View, California (a town of 60,000), illustrates the possible savings. After analyzing the actual fire department budget, estimated fire insurance premiums, and reported dollar value of fire losses over a 5-year period, and estimating future costs, assuming implementation of a municipal fire insurance program beginning in 1976, the Institute for Local Self Government estimated that the following would be accomplished by the end of 1982.

1. All single family (9,308) residences and apartment units (18,764) would have had products of combustion detectors installed at a cost of $2,680,000 provided out of the excess fire premiums;

2. All apartment houses would have detectors installed in stairways and over exits;

3. A major catastrophe fund of $2,680,800 would be established through excess premiums, earning at least $160,845 in annual interest;

4. 65 percent of the fire department budget would be covered by excess premiums.

---

[82] The discussion of the municipal fire insurance program is based on: *Alternatives to Traditional Public Safety Delivery Systems: Municipal Fire Insurance* (Berkeley: Institutte for Local Self Government, 1977) (hereafter cited as *Municipal Insurance*).

In the spring of 1978 the National Fire Prevention and Control Administration provided the Institute for Local Self Government with a 2-year grant to explore the feasibility of this concept, with the ultimate objective to be demonstration projects in several cities.[83] The institute will determine the fiscal, legal, and political feasibility of five basic municipal insurance models. Utilizing the expertise of individuals from the insurance industry, public administration, fire prevention, law and related areas, the institute will develop a set of guidelines for implementation of a municipal insurance program. These guidelines will then be examined in conjunction with the fiscal, legal, and political characteristics of selected cities to determine whether or not they can be followed to implement a viable program. A number of cities have indicated an interest in the municipal fire insurance concept and 11, including Madison, Wisconsin, have been selected as resource cities to provide data bases for the feasibility analysis. Whether a program is implemented depends on the results of the feasibility study and the willingness of a municipality to launch such an experiment.

Publicly operated insurance programs which cover public property have been operated successfully in many States and in several foreign countries. Twenty-five States currently insure at least a portion of their own State property risks while also purchasing some commercial insurance protection. A State self-insurance program in Alabama, for example, provides fire and extended coverage for State and school buildings and contents at 40 percent of prevailing commercial rates. Operating expenses have been limited to less than 6 percent of earned premiums and as of 1967 the fund had a surplus of $8 million which, along with investment income, covered all operating costs. The State purchases reinsurance to cover losses over $500,000. In Wisconsin, all State and some municipal property is insured under a State program. Insurance premiums were 50 percent of commercial rates between 1934 and 1973 and no premiums on State property were collected between 1961 and 1971, yet the program accumulated a surplus that enabled the legislature to divert $11,500,000 to the general fund between 1955 and 1967.[84]

Historically, groups have responded to what they perceived as unfairly high commercial insurance rates by forming mutual companies to meet their own needs. The Municipal Mutual Insurance Ltd. was established in England in 1903 and currently 410 of 422 local governments insure at least part of their risks with the fund. In Germany there are approximately 20 mutual insurance companies composed of local governments. Seven Chicago suburbs (Midlothian, Crestwood, Robbins, Markham, Country Club Hills, Oak Forest, and Posen) are currently studying the feasibility of forming a mutual insurance program to cover a portion of their risks.[85] Apparently, the private commercial insurance market is not the only viable mechanism for meeting at least some insurance needs.

## Nonprofit Automobile Insurance

In 1970 the Canadian Province of Manitoba passed the Automobile Insurance Act which provided that all automobile insurance be written by a nonprofit public corporation entitled the Manitoba Public Insurance Corporation.[86] This program has reduced insurance rates for 90 percent of all policyholders, increased the coverage for most policyholders, introduced no-fault auto insurance to the Province, and provided faster claims service. The program is based on the premise that whenever the private sector cannot or will not provide a service that is regarded as a necessity at an affordable price, the public sector must step in and provide that service.

The Canadian experience appears to be successful.[87] Expenses have been held down to 17 percent of all premium dollars, leaving 83 percent to cover

---

[83] "Proposed Feasibility Analysis and National Demonstration Project for Municipal Fire Insurance Protection," prepared for the National Fire Prevention and Control Administration by the Institute for Self Government (undated). Charles H. Boehe, National Fire Prevention and Control Administration, telephone interview, Aug. 18, 1978. William Hanna, Mission Research Corporation, telephone interview, Sept. 15, 1978.

[84] *Municipal Insurance,* p. 25. Werner Pfennigstorf, "Governmental Risk Management in Public Policy and Legislation: Problems and Options," *American Bar Foundation Research Journal,* Spring 1977, pp. 285–90, 306 (hereafter cited as "Governmental Risk").

[85] Arthur J. Watson, *The First Fifty Years: Municipal Mutual Insurance Limited* (London: Walter Pearce & Co., 1953). "Governmental Risk," pp. 308–15.

[86] Except where otherwise noted, the discussion of the Canadian experience is based on: *The Manitoba Auto Insurance Plan* (Washington, D.C.: Conference on Alternative State and Local Public Policies, 1976).

[87] The private insurance industry frequently points to government run programs which it perceives as having failed, thus concluding that government cannot do a better job. A popular target is the Maryland Automobile Insurance Fund established in 1972 to allow high risk drivers to obtain insurance at standard rates. That program has since lost millions of dollars. ("Could the Government Do a Better Job?" *Journal of American Insurance,* Fall 1976, p. 9.) The fallacy in this argument, however, is that the Maryland program was established specifically for high risk drivers which private industry would not insure, not as an alternative to compete with private industry. How well government might fare if it ran a program that included both the profitable good risks as well as those in residual markets cannot be evaluated on the basis of the Maryland experience.

55

## Table 5.1

### Automobile: 1971 Chevrolet Impala
### No Chargeable Accidents—Comparable Coverage

| Classification | Autopac 1973 | Pre-Autopac 1971 | Baton Rouge 1973 |
|---|---|---|---|
| Husband and Wife–over 25 Pleasure Use Only | $ 78.00 | $125.00 | $193.00 |
| Husband and Wife–over 25 Driving To and From Work | 111.00 | 161.00 | 217.00 |
| Husband and Wife with Underaged Son and Daughter | 140.00 | 375.00 | 422.00 |
| Single Male–20 Years Principal Operator | 123.00 | 391.00 | 494.00 |

claims. This compares, for example, with 70 percent of premium dollars that went to cover losses incurred on private automobile policies (resulting in a 2.8 percent underwriting loss) in the United States in 1976.[88] Since in Canada there are no underwriting restrictions, other than the possession of a valid driver's license, and most billing procedures are automated, agents do not have to write policies and they do little more than receive payments from insureds and transmit them to the corporation. A major savings, therefore, is that since agents do considerably less work per policy, they receive a 5 percent commission, compared to approximately 20 percent in the United States.[89] Agents who fought introduction of this program are now reported to be satisfied with it.

Like private insurance companies, the Manitoba Public Insurance Corporation generates funds which are invested. Investment decisions are made by the director of finance and the government's Ministry of Finance. The corporation also pays regular insurance company taxes.

Table 5.1 illustrates the effect of this program on automobile insurance rates in Winnipeg and provides a comparison with a similar city in the United

States. Baton Rouge, Louisiana, was selected because in 1970 per capita income, number of bodily injury and property damage claims per 100 insured cars, and cost per claim were similar in Manitoba and Louisiana. One difference is that cost per claim has been increasing faster in Louisiana than Manitoba.

## Litigation

In recent years some groups have turned to the courts in attempts to resolve problems of insurance availability. Undoubtedly, more will seek judicial remedies in the near future.

In April 1978, 13 Illinois State legislators filed a class action suit in U.S. district court charging 10 insurance companies, the Illinois Department of Insurance, and the Director of Insurance for the State of Illinois with racial discrimination.[90] The plaintiffs claim that by "redlining" or by dividing "the area of the city of Chicago into differential geographical areas or territories based upon the racial composition of the inhabitants of those areas or territories," the defendants have discriminated against some black residents in Chicago by "denying them the opportunity to purchase insurance or by imposing upon them, higher financial rates or more

[88] NAIC Report on Profitability by Line and by State for the Year 1976 (Milwaukee: National Association of Insurance Commissioners, 1977).
[89] Ibid.

[90] Civil Action No. 78C 1599, U.S. District Court, Northern District of Illinois, Apr. 25, 1978.

56

onerous conditions than those generally imposed upon similarly situated White residents living elsewhere in the City of Chicago." Among the specific redlining practices cited in the complaint are: charging different rates for insurance in different geographical areas, varying the price of insurance according to the age of structures, and placing fewer agents in selected areas, all of which serve to limit insurance availability to black residents. By acquiescing in these practices, the director of insurance and the Illinois Department of Insurance were charged with having "advanced and furthered such 'redlining' practices."

[91] "Sue Insurance Firms," *Chicago Defender,* Apr. 25, 1978, p. 1. "13 Black Legislators Sue Over 'Redlining'," *Chicago Sun-Times,* Apr. 25, 1978, p. 4.

The legislators who filed the suit claimed that such insurance redlining practices have contributed to the destruction of the economic viability of several neighborhoods.[91] In the suit they seek $2 million in damages for 100,000 black residents who constitute the class for whom the action was taken.

A number of individuals and groups at various levels of public and private life have offered a wide-ranging set of proposals for solving the problem of insurance availability. Some have already been implemented, with varying degrees of success. The following chapter contains a series of recommendations which, if implemented, would substantially alleviate availability problems.

57

Chapter 6

# Findings and Recommendations

## Findings

### I. The Role of Property Insurance in the United States

1. Property insurance is essential for individuals owning homes or operating businesses in today's society.

2. In older urbanized sections of many major metropolitan areas, essential insurance is difficult to obtain and is frequently unavailable through the voluntary insurance market. The unavailability of property insurance has had, and continues to have, serious consequences for the social and economic development of such neighborhoods.

3. Insurance company rating classifications and the marketing practices of brokers and agents are frequently arbitrary and unfairly discriminatory despite proclamations by industry representatives that such practices reflect loss experience based on empirical data available to the industry.

4. Availability of property insurance is frequently determined by personal characteristics (e.g., age, sex, occupation) and factors beyond the control of individuals—so-called environmental hazards (e.g., geographic location)—rather than by factors over which individuals have immediate control. To the extent that the insurance mechanism is not based on individually controllable factors, the incentive to reduce loss (and ultimately insurance premiums) is decreased.

5. Given the economic interdependence of residents within a metropolitan area and the diversity of neighborhoods within urban and suburban communities, territorial rating classifications which separate cities from their suburban rings penalize many city residents.

6. The utilization of underwriting criteria not related to actual or anticipated loss experience violates two basic industry principles: 1) developing homogeneous risk classifications, and 2) spreading risks over large classes.

7. Although the property-casualty insurance industry experienced 3 consecutive years of losses associated with underwriting activities between 1974 and 1976, the industry did enjoy healthy profits primarily as a result of its investment activity. In 1976, for example, the industry earned a $2.8 billion profit from investments. In 1977 underwriting-related activities produced a 21 percent industrywide profit.

8. A company's capacity to write insurance is limited in part by its surplus requirements (assets over and above loss reserves). The amount of insurance a company can make available, therefore, is partially dependent on its ability to generate an underwriting and/or investment profit. When profits decline, underwriting must be restricted.

9. In recent years the declining stock market has limited insurance industry investment profits, thus restricting the amount of property insurance available for reasons unrelated to the degree of risk represented by potential insureds or the demand for such insurance.

10. In recent years there have been several mergers involving insurance companies where available surplus has been utilized for a variety of investment purposes, thus constricting the company's capacity to write insurance. While such practices may be in the best interest of the corporations and their stockholders, they often have detrimental effects on many residents of urban communities.

11. Availability of essential insurance and insurance practices in general are inextricably intertwined with matters of public policy. The Supreme Court ruled in 1914 that because insurance companies are uniquely important as depositories of vast sums of money (the industry currently controls over $400

58

billion in assets) and as vehicles of risk distribution protecting a large part of the country's wealth, public interest requires public control of the industry for the common good.

12. While arson is a growing problem in the United States and the existence of an insurance mechanism allows some individuals to profit from this crime, there is much debate over whether or not access to property insurance in fact encourages owners of buildings to destroy the homes in which they reside. While the so-called moral hazard (i.e., a home insured to its replacement cost where replacement cost is far in excess of market value) is often cited as a reason for not insuring older homes in urban areas, no systematic objective data have been presented to demonstrate the extent to which this phenomenon occurs among owner occupants.

13. Congress established the FAIR Plan in 1968 in order to make essential property insurance available in urban areas. A number of problems have been identified in the administration of the FAIR Plan programs. In addition, FAIR Plan policies in several States provide less protection at greater cost than homeowners policies available in the voluntary market. Four States, however, now offer homeowners policies in the FAIR Plan.

14. Despite recent reports claiming that the FAIR Plan contributes to the "arson for profit" problem, available evidence indicates that, at least in Chicago, a much more serious problem exists in the voluntary insurance market. It is the insurance mechanism itself, not the FAIR Plan or any other particular type of insurance program, which provides the "arson for profit" incentive.

15. Because mortgage lenders require purchase of property insurance as a condition for qualifying for a home loan, insurance unavailability restricts homeownership opportunities for many urban residents. Racial minorities suffer a disproportionate share of this burden.

## II. Insurance Availability in Chicago

1. Availability of homeowners insurance and the concentration of FAIR Plan policyholders varies markedly among communities within the city of Chicago.

2. Fire and theft account for almost three-quarters of the dollars paid out by insurance companies to indemnify Chicago residents insured under homeowners policies.

3. There is a statistically significant correlation between the minority composition of a ZIP code area and current underwriting practices, between the age of housing in a ZIP code area and current underwriting practices, and between the median income of a ZIP code area and current underwriting practices. These relationships hold even after the effects of differential fire and theft rates have been eliminated. In other words, the relationship between minority composition and current practices, between age of buildings and current practices, and between income and current practices cannot be explained by the differences in fire or theft among communities.

4. Minority groups, residents of older homes, and poor people have greater difficulty obtaining insurance in the voluntary market and are more likely to be insured by the FAIR Plan than are other segments of the Chicago population for reasons not related to the principal causes of loss; i.e., fire and theft.

## III. Legal Findings

1. Discrimination in the sale of insurance based on race, color, creed, national ancestry, or sex violates the Illinois constitution.

2. Unfair discrimination in the sale of fire and theft insurance based on race, color, or national origin and the refusal to provide homeowners or renters insurance solely on the basis of the specific geographic location of the property violates the Illinois unfair trade practices act. Discrimination between individuals which represents differences in loss and expense elements is not prohibited even where such discrimination effectively creates classifications based on race, color, or national origin.

3. The Illinois Commissioner of Insurance is obligated by law to determine whether insurers are violating the unfair trade practices act. Whenever he has reason to believe that such violations are occurring, he is mandated to hold a hearing to determine the facts. Upon a finding that an insurer is violating the act, the commissioner is authorized to issue a cease and desist order. For violations of such a cease and desist order a civil penalty of $500 for each violation may be imposed. In addition, the director may revoke, refuse to renew, or suspend the certificate or license of a company or person for intentionally violating a cease and desist order or intentionally failing to comply with the unfair trade practices act.

4. Discrimination in the sale of insurance based on race and conspiracies between insurers and others to

59

discriminate in the sale of insurance based on race violate Federal civil rights law.

5. There is no express Federal statutory prohibition against discrimination in the sale of insurance based on geographic location.

6. Drew S. Days III, Assistant Attorney General, Civil Rights Division of the Justice Department, has stated that the Fair Housing Act of 1968 may reach insurance practices, but he has recommended that the act be amended to prohibit unequivocably discriminatory insurance practices based on minority status or sex.

7. Agreements between insurers and others to refuse to sell insurance in a particular geographic area or to limit the coverage available may represent boycotts which would be violations of the Sherman Act.

8. When a violation of the Sherman Act is suspected, the Department of Justice is empowered to investigate and to institute legal proceedings to restrain the violation.

9. There is reason to believe that certain practices of insurers transacting business in Illinois violate the Illinois constitution, the Illinois unfair trade practices act, Federal civil rights law, and the Sherman Act.

## IV. Proposed Remedies

1. Several local, State, and Federal officials as well as private organizations and individuals (within and outside of the insurance industry) have examined the problem of insurance unavailablity and have proposed a variety of remedies. Such proposals range from better communication between the industry and the public, to legislative and regulatory restrictions, to major structural changes in the industry itself. Examples include the following:

   a. The city of Chicago is considering an ordinance that would prohibit that city from purchasing insurance from companies found to be in violation of State antiredlining laws;

   b. Illinois has enacted, and all Midwestern States have debated, legislation that would prohibit insurance companies from discriminating in the sale of property insurance on the basis of geographic location;

   c. In the Essential Insurance Reform Act of 1977, Michigan has proposed a program that would require most insurance companies to provide property insurance to all qualified risks who apply. A company could cede some risks to a reinsurance facility whose profits and losses would

be shared by all companies writing property insurance in the State.

d. Neighborhood Housing Services (NHS), partnerships involving financial institutions, city officials, and residents, have been developed in more than 40 cities to maintain and revitalize urban communities. Such partnerships may include representatives of the insurance industry in the near future.

e. The Institute for Local Self Government has proposed a municipal insurance plan where surplus revenues which currently accrue as profits for insurance companies and their stockholders would be utilized instead for a variety of loss reduction (and ultimately premium reduction) activities. Under a grant from the National Fire Prevention and Control Administration, the feasibility of municipal insurance programs is currently under examination in selected communities.

2. Representatives of the insurance industry have acknowledged the need for basic restructuring of insurance practices. While better communication and more consumer education are positive steps, fundamental and creative actions beyond improved public relations are called for.

# Recommendations

## I. To the Insurance Industry

1. Each company writing homeowners insurance should disclose to the insurance commissioner in each State, and should make available to the public, its loss experience and all other data on which it develops classifications for eligibility and rating purposes. This information should be provided in a format that can be readily understood by most people.

2. To increase incentives to reduce losses, companies should develop rating systems that reward the individual for factors within his or her control and deemphasize those that are generally beyond the control of individuals.

3. Companies, agents, and brokers should recognize that the use of unfounded generalizations in underwriting procedures unfairly penalizes many homeowners and causes the industry to reject some profitable business. By acting on more rational bases, steps can and should be taken to increase market penetration in urban communities.

4. Companies should issue and act on a policy statement, similar to that released by the St. Paul

60

Fire and Marine Insurance Company, indicating that they will not limit coverage on the basis of geographic location, that they will inform applicants of the reasons for all adverse decisions, and that they will reconsider applicants when steps are taken by previously rejected applicants to become insurable.

5. Companies should join Neighborhood Housing Services partnerships and work with other voluntary organizations and activities whose objectives are to maintain or revitalize urban communities.

## II. To the city of Chicago

1. The city should immediately adopt an antiredlining ordinance, similar to the one it has debated for more than 6 months, that would prohibit the city from purchasing insurance from companies found to be in violation of State antiredlining laws. The mayor should state publicly his full support for the ordinance and for vigorous enforcement and the city council should provide adequate resources for an effective enforcement program.

## III. To State insurance commissioners and State legislators

1. Since there is reason to believe that insurers transacting business in Chicago have been and are violating Illinois insurance laws, the Illinois Department of Insurance should determine whether and which companies are responsible for these violations. An investigation and any necessary enforcement proceedings should begin immediately.

2. The State of Michigan should enact the Essential Insurance Reform Act of 1977, thus permitting any qualified risk to purchase essential insurance and creating a reinsurance mechanism to which companies can cede those risks they do not want to carry.

3. Commissioners in each Midwestern State should collect the following information on homeowners insurance policies by ZIP code for the major urbanized areas in their States: written applications, cancellations, nonrenewals, renewals, new policies written, and total policies in force. Such information should be analyzed in conjunction with loss experience, racial composition, age of housing units, and other demographic variables to determine what factors account for the variance in underwriting activity within metropolitan areas. Where such underwriting patterns cannot be justified by rational, loss-related factors, and where they result in discrimination against minorities or residents of older communities, appropriate sanctions should be im-

posed to increase market penetration in those areas not adequately served.

4. Each State should amend its unfair trade practices act to prohibit the following:

a. refusing to insure, refusing to renew, or cancelling insurance policies, limiting coverage, varying the terms under which coverage is available, or in any way varying insurance products and services because of the location of a risk within a metropolitan area.

b. varying availability of insurance products or services because of the age of the property;

c. asking on an application if an applicant was previously denied coverage by another insurer or if an applicant previously was insured under a residual market mechanism;

d. varying availability of insurance products or services because an applicant was denied coverage by another insurer or previously participated in a residual market mechanism;

e. refusing to enter into a contractual relationship with an agent because of the location of the agent's customers or the agent's business;

f. requiring inspections in certain locations of a State but not in other locations of that State;

g. classifications based directly on race, creed, color, and national origin, or a combination of other factors, the purpose of which is to create indirectly such classifications, whether or not such classifications can be supported by loss and expense experience.

Each State should amend its unfair trade practices act to require the following:

a. Before an application is denied or a policy is cancelled or nonrenewed, the applicant or policyholder must be informed of the precise reason for that adverse decision and must be informed what must be done for him or her to become insurable. If steps are taken to become insurable, the company must reconsider the application;

b. Whenever a company terminates a contractual relationship with an agent or broker, the company will continue servicing the policies the agent or broker placed with the company, and will locate another agent or broker to continue to provide insurance service;

c. Upon request of an applicant or insured, a company must provide copies of any information the company received on that individual, the source of the information, the names of all organizations and individuals with whom the

61

company has shared that information, and an opportunity for the individual to correct or delete any incorrect information or to add a statement to the record indicating his or her disagreement with any information. (See appendix for recommended model amendments to unfair trade practices acts.)

5. Each State should enact legislation that would prohibit all geographic rating territories smaller than standard metropolitan statistical areas or cities where a city is not part of a standard metropolitan statistical area.

6. Insurance commissioners should determine the level of staff necessary to conduct adequate monitoring and enforcement programs and should request the money necessary to maintain such staff from the legislatures. State legislators should cooperate with insurance commissioners and support their efforts to conduct such a program.

## IV. To the U.S. Department of Justice

1. The U.S. Department of Justice should immediately investigate insurers doing business in Illinois to determine the extent to which any insurer may be violating the Sherman Act.

## V. To the Federal Insurance Administration (FIA)

1. FIA should launch or sponsor a major investigation of insurance industry investment practices. That investigation should examine where investment capital is derived and where it is invested, the effect of such multibillion dollar investments on cities (and in determining what are good and bad risks), and how investments and other financial concerns of insurance companies (and the companies with which they have merged) affect the availability of essential insurance.

2. FIA should work with the National Fire Prevention and Control Administration in exploring the feasibility of the municipal insurance concept (in which surplus revenues are utilized for loss prevention activities rather than as profits for private companies or investors) as a mechanism for increasing insurance availability, at affordable rates, to residents of urban communities.

If the study currently being conducted by the Institute for Local Self Government concludes that the program is feasible, these two Federal agencies should provide funding for a demonstration project in those municipalities that have expressed an interest in the concept and where the feasibility has been demonstrated.

3. FIA should conduct or sponsor a study of the "arson for profit" phenomenon to determine the extent to which owner occupants, compared to absentee landlords and owners of other commercial property, are burning down their property for money, and ultimately to determine whether or not providing insurance for homeowners residing in structures where replacement cost exceeds market value in fact creates a "moral hazard."

## VI. To Congress

1. As the Assistant Attorney General of the Civil Rights Division of the Justice Department recommended, the Fair Housing Act of 1968 should be amended to reach practices of the property-casualty insurance industry. The amendment should include the protections provided in recommendation III-4 above.

2. Recognizing the economic interdependence of residents within a metropolitan area and the diversity of neighborhoods within urban and suburban communities, Congress should prohibit all geographic rating territories smaller than standard metropolitan statistical areas or cities where a city is not part of a standard metropolitan statistical area.

62

**Appendix**

# Recommended Model Unfair Trade Practices Amendments

## Section 1

1. It is an unfair trade practice for an insurer of residential property (i.e., one to four family dwellings) and, unless otherwise stated, of personal lines auto to:

   (a) vary the availability of insurance products or services because of the age of the residential property risk;

   (b) refuse to insure a risk because an individual was previously denied insurance by another insurer;

   (c) ask in an insurance application whether or not an applicant was previously insured in an involuntary market plan. This subsection shall not be interpreted to preclude an insurer from asking the name of the previous insurer in an insurance application;

   (d) refuse to insure a risk because an individual was previously insured in an involuntary market plan;

   (e) fail to state the precise reason for an insurer's decision to decline, nonrenew, or terminate an insurance policy;

   (f) fail to state prior to issuing a notice of termination or nonrenewal or at the time of issuing a notice of declination what corrective action, if any, the applicant or insured must take in order to obtain insurance;

   (g) fail to reinspect a risk, upon request of the applicant or insured, where an inspection report has been used in part or in whole to decline, nonrenew, or terminate a residential property insurance policy;

   (h) refuse to renew policies placed by an agent or broker if the insurer terminates its contract with the agent or borker for 1 year from the date of termination of the insurer's contract with the agent or broker;

   (i) fail to provide an applicant or insured, upon request, with any information the insurer has received on that individual, the source of the information, the names of all organizations and individuals with whom the insurer has shared the information, and the opportunity for the applicant or insured to correct or delete any incorrect information or to add a statement indicating his or her disagreement with any information;

   (j) fail to correct or delete any incorrect information of which the insurer has knowledge and which the insurer is maintaining in the applicant's or insured's records or on which the insurer has in part or in whole based an adverse underwriting decision.

## Section 2

2. It is an unfair trade practice for an insurer of residential property (i.e., one to four family dwellings) and of personal lines auto to refuse to insure or refuse to continue to insure, or to limit the amount or type of coverage available to a risk, or to require special facts as a condition to acceptance or renewal of such insurance because of the geographic location of the risk, unless

   (a) such insurer not less than sixty (60) days previous to such refusal or limitations shall have filed with the Commissioner:

   1) a written concentration of risk plan which the risk exceeds. Such a plan shall be applied by the insurer uniformly across all geographic areas in the State;

   2) a written statement limiting its business to specific counties in which the risk is not located;

63

3) a written statement that, with respect to the geographic location, a natural hazard exists which would subject the insurer to an extraordinary loss exposure;
*provided,* that such filings shall be based on credible data and the standards and practices shall not be arbitrary or unreasonable: or

(b) the risk is located close to a particular and immediate hazard. The insurer's standards and practices in regard to such hazard shall be applied uniformly throughout the State;
*provided,* that such standards and practices shall not be arbitrary or unreasonable.

64

# Regulations Under Section 2 of the Recommended Unfair Trade Practices Amendments

Conduct which constitutes unfair trade practices under Section 2 of the Unfair Trade Practices Amendments and is prohibited by these regulations*

1. Varying the application of any or all of the following standards and practices because of geographic location:

   a. Age of the risk;

   b. Previous denial of coverage or termination by another insurer;

   c. Use of insurance application questions concerning whether the applicant was previously denied coverage or was terminated by another insurer;

   d. Previous coverage under an involuntary insurance plan;

   e. Use of insurance application questions concerning whether the applicant was previously covered in an involuntary insurance plan;

   f. Statement to applicants and insureds of the reasons for insurer's declination, termination, or nonrenewal of an insurance contract;

   g. Statement to applicants and insureds before issuing notices of declination, termination, or nonrenewal what corrective action, if any, the applicant or insured must take to obtain or continue coverage;

   h. Requiring inspections or ascertaining the accuracy of inspection reports on which a decision to decline, terminate, or nonrenew an insurance contract is based;

   i. Services including but not limited to the speed with which claims are settled, access to information about insurance availability, inspections where required for obtaining or continuing insurance, terms of premium payment;

   j. The use of deductibles;

   k. Appointing or terminating a contractual relationship with an agent or broker.

2. Refusing to enter into or continue a relationship with an agent or broker because of the geographic location of the agent or broker or because of the geographic location of agent's or broker's business.

---

\* These regulations are intended to supplement Section 2 of the Unfair Trade Practices Amendments. If Section 1 is also enacted into law, Regulations 1a through h, above, become redundant and should, therefore, not be promulgated.

☆ U. S. GOVERNMENT PRINTING OFFICE : 1979 627-780/1910

65

**U. S. COMMISSION ON CIVIL RIGHTS**

WASHINGTON, D C 20425

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

FOURTH CLASS MAIL
POSTAGE AND FEES PAID
U S COMMISSION ON CIVIL RIGHTS
PERMIT NO G 73



002795

# FAIR HOUSING AMENDMENTS ACT OF 1979

## HEARINGS

**BEFORE THE**

### SUBCOMMITTEE ON
### CIVIL AND CONSTITUTIONAL RIGHTS

**OF THE**

### COMMITTEE ON THE JUDICIARY
### HOUSE OF REPRESENTATIVES

NINETY-SIXTH CONGRESS

**FIRST SESSION**

**ON**

## H.R. 2540

FAIR HOUSING AMENDMENTS ACT OF 1979

APRIL 6, 25, 26, MAY 3, 16, 23, 31, AND JUNE 14, 1979

## Serial No. 12



Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE

47-614 O          WASHINGTON : 1979

## COMMITTEE ON THE JUDICIARY

PETER W. RODINO, JR., New Jersey, *Chairman*

JACK BROOKS, Texas
ROBERT W. KASTENMEIER, Wisconsin
DON EDWARDS, California
JOHN CONYERS, JR., Michigan
JOHN F. SEIBERLING, Ohio
GEORGE E. DANIELSON, California
ROBERT F. DRINAN, Massachusetts
ELIZABETH HOLTZMAN, New York
ROMANO L. MAZZOLI, Kentucky
WILLIAM J. HUGHES, New Jersey
SAM B. HALL, JR., Texas
LAMAR GUDGER, North Carolina
HAROLD L. VOLKMER, Missouri
HERBERT E. HARRIS II, Virginia
MICHAEL LYNN SYNAR, Oklahoma
ROBERT T. MATSUI, California
ABNER J. MIKVA, Illinois
MICHAEL D. BARNES, Maryland
RICHARD C. SHELBY, Alabama

ROBERT McCLORY, Illinois
TOM RAILSBACK, Illinois
HAMILTON FISH, JR., New York
M. CALDWELL BUTLER, Virginia
CARLOS J. MOORHEAD, California
JOHN M. ASHBROOK, Ohio
HNERY J. HYDE, Illinois
THOMAS N. KINDNESS, Ohio
HAROLD S. SAWYER, Michigan
DAN LUNGREN, California
F. JAMES SENSENBRENNER, JR., Wisconsin

ALAN A. PARKER, *General Counsel*
GARNER J. CLINE, *Staff Director*
FRANKLIN G. POLK, *Associate Counsel*

SUBCOMMITTEE ON CIVIL AND CONSTITUTIONAL RIGHTS

DON EDWARDS, California, *Chairman*

JOHN F. SEIBERLING, Ohio
ROBERT F. DRINAN, Massachusetts
ELIZABETH HOLTZMAN, New York
HAROLD L. VOLKMER, Missouri
ROBERT T. MATSUI, California

HENRY J. HYDE, Illinois
JOHN M. ASHBROOK, Ohio
F. JAMES SENSENBRENNER, JR., Wisconsin

THOMAS P. BREEN, *Counsel*
JANICE COOPER, *Assistant Counsel*
IVY DAVIS, *Assistant Counsel*
ROSCOE B. STAREK III, *Associate Counsel*

(II)

# CONTENTS

---

## HEARINGS HELD

|  | Page |
|---|---|
| April 6, 1979 | 1 |
| April 25, 1979 | 103 |
| April 26, 1979 | 233 |
| May 3, 1979 | 305 |
| May 16, 1979 | 469 |
| May 23, 1979 | 515 |
| May 31, 1979 | 549 |
| June 14, 1979 | 617 |

## WITNESSES

Chisholm, Hon. Shirley, a Representative in Congress from the State of New York ................................................................................................................ 469

Days, Drew S., III, Assistant Attorney General, Civil Rights Division, Department of Justice ......................................................................................................... 3
    Prepared statement ................................................................................................. 3
    Statement on H.R. 3504, 95th Congress ............................................................. 14

Dolbeare, Cushing N., National Low Income Housing Coalition .......................... 496
    Prepared statement ................................................................................................. 500

Dystel, Jay, director of advocacy, American Coalition of Citizens with Disabilities ...................................................................................................................... 625
    Prepared statement ................................................................................................. 634

Flemming, Dr. Arthur, Chairman, U.S. Commission on Civil Rights .................. 441

Francy, Robert, American Society of Appraisers ..................................................... 554

Frank, R. James, Jr., R. J. Frank & Associates, Portland, Oreg ......................... 306

Greenberg, Jack, NAACP Legal Defense and Educational Fund, Inc ................. 435
    Prepared statement ................................................................................................. 432

Gross, George, National League of Cities ................................................................ 523

Harris, Hon. Patricia Roberts, Secretary, Department of Housing and Urban Development ................................................................................................................ 73
    Prepared statement ................................................................................................. 70

Holman, M. Carl, National Urban Coalition .......................................................... 482
    Prepared statement ................................................................................................. 485

Hudnut, Hon. William H., III, mayor of Indianapolis, Ind., on behalf of National League of Cities .................................................................................................... 523

Kast, Richard C., Director, Fair Housing Division, Virginia Real Estate Commission ...................................................................................................................... 294
    Prepared statement ................................................................................................. 294

Knighton, Willia, Consortium Concerned With the Developmentally Disabled.. 515
    Prepared statement ................................................................................................. 519

Larson, E. Richard, American Civil Liberties Union ............................................. 251
    Prepared statement ................................................................................................. 234

MacBride, Dexter D., American Society of Appraisers ......................................... 554
    Prepared statement ................................................................................................. 590

Mensch, Stephanie, National Association of State Mental Retardation Program Directors, Inc ........................................................................................................... 515

Miller, Anita, Federal Home Loan Bank Board ..................................................... 103

Mitchell, Clarence, chairman, Leadership Conference on Civil Rights................ 279

Morris, William R., executive director, National Association of Real Estate Brokers, Inc ............................................................................................................. 617
    Prepared statement ................................................................................................. 617

(III)

IV

| | Page |
|---|---|
| Norton, Edward W., Acting General Counsel, HUD | 73 |
| Opelka, F. Gregory, Fairfield Savings & Loan Association, Chicago, Ill | 306 |
| Osenbaugh, Charles L., Society of Real Estate Appraisers | 306 |
| Prepared statement | 306 |
| Ridings, Dot, League of Women Voters of the United States | 487 |
| Prepared statement | 492 |
| Schechter, Henry B., Department of Urban Affairs, AFL–CIO | 549 |
| Simmons, Althea T. L., Washington Bureau, National Association for the Advancement of Colored People | 476 |
| Prepared statement | 479 |
| Sloane, Glenda, Leadership Conference on Civil Rights | 279 |
| Prepared statement | 260 |
| Solomon, Sandra, National Urban Coalition | 482 |
| Taylor, William L., Leadership Conference on Civil Rights | 279 |
| Prepared statement | 260 |
| Thompson, Ronald S., Thompson Appraisal Co., Roanoke, Va | 306 |
| Tucker, Sterling, Assistant Secretary for Fair Housing and Equal Opportunity, HUD | 73 |
| Weaver, Robert C., President, National Committee Against Discrimination in Housing | 113 |
| Prepared statement | 164 |

ADDITIONAL MATERIAL

| | |
|---|---|
| Commission on Human Rights of Indianapolis and Marion County (Ind.) Housing Discrimination Guidelines | 531 |
| Complaints referred (to HUD) and recalled to State agencies by region | 82 |
| Days, Drew, III, letter to Hon. Don. Edwards | 420 |
| Edwards, Hon. Don, letter dated May 14, 1979, to Robert H. McKinney, Chairman, Federal Home Loan Board | 578 |
| Galchus, Kenneth "Property Values in an Integrated Neighborhood" | 450 |
| "Some Further Evidence" | 455 |
| Harris, Hon. Patricia R., letter to Dr. Arthur Flemming, Chairman of the U.S. Commission on Civil Rights | 89 |
| MacBride, Dexter D., letter to Edwin M. Thierry, Chief, Appraisal Division, District of Columbia Department of Housing and Community Development | 573 |
| McKinney, Robert H., letter dated May 30, 1979, to Hon. Don Edwards, chairman, Subcommittee on Civil and Constitutional Rights | 409 |
| National Committee Against Discrimination in Housing, Analysis of Administrative Enforcement Procedures Under Proposed Fair Housing Amendments Act of 1979 | 197 |
| National Committee Against Discrimination in Housing, Memorandum, "Constitutionality of HUD Administrative Enforcement of Title VIII Through Provision of Monetary Relief to Complaints" | 38 |
| National Committee Against Discrimination in Housing, Memorandum dated March 20, 1979, "Section 6(e)(3) of the Fair Housing Amendments Act of 1979: Coverage of the Secondary Mortgage Market" | 114 |
| Perito, Paul, letter to Hon. Don Edwards | 413 |
| United States of America v. The American Institute of Real Estate Appraisers, in the U.S. District Court for the Northern District of Illinois, Eastern Division | 344 |

APPENDIXES

| | |
|---|---|
| Appendix 1.—Legal memoranda prepared by the Congressional Research Service on H.R. 2540 | 645 |
| Appendix 2.—Submitted statements on H.R. 2540 | 697 |

# FAIR HOUSING AMENDMENTS ACT OF 1979

————

### FRIDAY, APRIL 6, 1979

HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON CIVIL AND CONSTITUTIONAL RIGHTS,
COMMITTEE ON THE JUDICIARY,
*Washington, D.C.*

The subcommittee met, pursuant to notice, at 9:30 a.m., in room 2237, Rayburn House Office Building, Hon. Don Edwards (chairman of the subcommittee) presiding.

Present: Representatives Edwards, Seiberling, Drinan, Volkmer, and Matsui.

Also present: Janice Cooper, assistant counsel, and Thomas Boyd, associate counsel.

Mr. EDWARDS. The subcommittee will come to order.

Today we begin hearings on H.R. 2540, the Fair Housing Amendments Act of 1979. This bill promises to be a major legislative initiative and a vast improvement over existing law. I am most heartened by the strong support that has been lent to it by the President, organizations concerned with housing, and the Federal agencies that will be most affected by these changes.

It is appropriate that we begin our hearings with testimony from Federal agencies with lead responsibility for enforcement of title VIII, the Department of Housing and Urban Development, and the Department of Justice. I am particularly honored that Secretary Patricia Harris and Associate Attorney General Drew Days have agreed to personally present their views on this bill.

I am also delighted to see the coauthor of the bill, our good friend from Massachusetts, the distinguished Father Drinan, here today, and thank him again for the immense contribution that he has made. We also have the gentleman from Ohio, Mr. Seiberling, who has been extremely helpful in all of civil rights. We are delighted to have you both here.

Mr. Days, speaking personally on another subject, I know that the three of us here today are pleased that you have sent a representative to the district court in Raleigh this morning for the hearing on the application for a writ of habeas corpus by the Wilmington 10. We think it is a proud moment for the Department of Justice history to have filed that brief and we wish you great success.

Mr. DAYS. Thank you, Mr. Chairman.

Mr. EDWARDS. The gentleman from Massachusetts.

Mr. DRINAN. Thank you, Mr. Chairman.

I, too, want to commend Mr. Days for what he has done in the matter referred to by the chairman. Mr. Chairman, I think we should note that in just 4 days from now when we will be marking

(1)

2

the 11th anniversary of the enactment of title VIII of the Civil Rights Act—the Fair Housing Act of 1968. That was landmark legislation. It was a vital part of the civil rights agenda of the 1960's and it heralded a new day for equal housing opportunity.

The sad truth, however, Mr. Chairman, is that the promise has never been fulfilled and the hope was never realized. Eleven years later, housing discrimination remains widespread. In the 1977 survey, for example, the National Committee Against Discrimination in Housing found equal treatment was accorded whites and blacks in only 30 percent of the responses in the rental market and only 10 percent of the sales market. Title VIII has been, in the President's words, "an empty promise," because unlike, for example, the Voting Rights Act, the Congress did not provide an adequate enforcement mechanism. There is no basic tool in title VIII to compel change. Eleven years is a long time to wait. With the commencement of these hearings my hope is renewed.

H.R. 2540 is a refinement of H.R. 3504 of the last Congress, which Mr. Edwards and I introduced. It represents the fruits of our comprehensive hearings and discussions, and it it embodies excellent suggestions made by the executive branch of our Government and by a number of diverse interest groups.

I would like to say a few words about the inclusion of the handicapped, Mr. Chairman, as a protective category under title VIII. In recent years Congress has focused on the need to assure the basic rights of handicapped citizens. Chief among the accomplishments have been directives brought forth under section 504 of the Rehabilitation Act. Those efforts must continue. Discrimination based upon handicap is no less offensive, no less invidious than discrimination based upon race, religion, and sex.

I commend the chairman for his attention to this legislation and for his perseverance and persistence, and I look forward to our two witnesses today. Secretary Harris and Assistant Attorney General Days have been enormously helpful to us during the past year. They have worked together with us, and I am confident that with their assistance we can bring about the fulfillment of a promise made by the Congress 11 years ago.

Mr. EDWARDS. Thank you very much.

Mr. Seiberling.

Mr. SEIBERLING. Thank you. I don't want to prolong this and I will just join my colleagues in welcoming you, Mr. Days, and I sincerely share the views they have expressed. Thank you.

Mr. EDWARDS. Our first witness today is the Assistant Attorney General for the Civil Rights Division, Drew Days, long a friend of this committee. Mr. Days personally has been in the forefront of the enforcement of title VIII. We are pleased to have you here, Mr. Days. Will you introduce your colleagues and proceed.

3

TESTIMONY OF DREW S. DAYS III, ASSISTANT ATTORNEY GEN-
ERAL, CIVIL RIGHTS DIVISION, ACCOMPANIED BY FRANK
SCHWELB, CHIEF, HOUSING AND CREDIT SECTION, CIVIL
RIGHTS DIVISION, U.S. DEPARTMENT OF JUSTICE; AND
FRANK ALLEN, SENIOR TRIAL ATTORNEY, APPELLATE SEC-
TION, CIVIL RIGHTS DIVISION, U.S. DEPARTMENT OF JUS-
TICE

Mr. DAYS. Thank you, Mr. Chairman.

With me today are Frank Allen of my staff, and Frank Schwelb.
Mr. Schwelb is probably particularly known to you in connection
with housing discrimination since he was in the Justice Depart-
ment at the time the Fair Housing Act was passed by the Congress,
and has been in the forefront himself of bringing to realism many
of the provisions in that act.

Frank Allen, who is in the appellate section, has worked very
much on housing matters and is responsible for the preparation of
my testimony.

Again in this Congress, as in the last, it is my privilege to testify
on behalf of the Department of Justice in support of a measure to
speed the realization of the broad fair housing policy adopted by
Congress in 1968.

I will not repeat the remarks made in prior testimony before this
subcommittee about the activities of the Department of Justice to
enforce the Fair Housing Act. I only note that our efforts have
continued, and we continue to see a need for improving other
remedies and enforcement procedures which S. 506 and H.R. 3504
represent. Although our testimony from last year may be available
to you, I would like to submit copies of it for the record.

Mr. EDWARDS. Without objection, it may be a part of the record.

[The prepared statement of Mr. Days follows:]

STATEMENT OF DREW S. DAYS III, ASSISTANT ATTORNEY GENERAL, CIVIL RIGHTS
DIVISION, DEPARTMENT OF JUSTICE

I am pleased to appear before the Subcommittee to testify on Title II of H.R. 3504
and H.R. 7787, which would amend Title VIII of the Civil Rights Act of 1968 by
revising the procedures for enforcing the right to equal housing opportunity and
clarifying the relief available to victims of housing discrimination.

Ever since the enactment of the Fair Housing Act almost ten years ago, the
Department of Justice has been in the vanguard of its enforcement, and has helped
to develop many of the major judicial precedents interpreting it. We have brought
some 300 suits against perhaps three times as many defendants in virtually every
metropolitan area in the country. Our litigation has covered every possible phase of
fair housing law, including not only discrimination in sales, rental and advertising,
but also racially exclusionary zoning, discrimination in real estate appraisal, dis-
criminatory recruitment of prospective purchases and exclusionary practices of real
estate organizations. While a majority of our cases have involved racial discrimina-
tion against blacks, we have also developed important litigation relating to denials
of equal housing opportunity to women, Hispanics, American Indians, Asians, Jews,
and several other groups. We have developed a number of innovative remedies
designed to correct the effects of past discrimination, and we have participated in
much of the important private fair housing litigation and attempted to improve the
opportunity of individual litigants, with meritorious cases to promote the public
interest as private attorneys general. To date, our litigation record has been unusu-
ally successful, with only two losses on the merits in our 300 cases. We have also
accorded high priority to the enforcement of existing court orders, and have brought
36 proceedings for civil contempt or supplemental relief, of which all except those
still pending have been successfully concluded through renegotiation or contested
litigation.

Based on our experience over almost a decade, we believe that we have been able
to identify the weakness of the Fair Housing Act as presently written, and we

4

welcome the opportunity to comment on the corrective proposals presently before the Congress.

As the Subcommittee is, no doubt, aware, the present fair housing law was the product almost entirely of action taken on the Senate floor in 1968, in which the House of Representative subsequently concurred. While the original amendment sponsored by Senators Mondale and Brooke was, in essence, the same as the bill passed by the House in 1966, the measure which was finally adopted (known as the "Dirksen compromise") was a provision informally compiled and amended several times on the Senate floor.

The result of this effort, though laudable at the time, was an act which had never received the kind of detailed scrutiny that can be given to important legislation in committee and which contained what the Department of Justice, in light of experience, now views as shortcomings.

### ADDITIONAL HOUSING COVERAGE

As a result of the compromise and floor amendments in 1968, the law does not cover all the housing which should be covered. See 114 Cong. Rec. 4568, 90th Cong., 2d Sess. (1968). Under Section 803(b), the owner of three or fewer houses may lawfully be exempted from the non-discrimination provisions of the Fair Housing Act if such owner does not use the services of a real estate broker and does not engage in discriminatory advertising prohibited by the Act.[1]

H.R. 3504 would remove this exemption of such housing, and, instead, would exempt only the renting of space in a single family home occupied by the owner—the "Mrs. Murphy's boarding house" exception. this change is a useful one, and would make the scope of the federal law more in accord with the scope of 43 U.S.C. 1982 which provides redress for racial discrimination in any real property transaction. See *Jones* v. *Alfred H. Mayer Co.*, 392 U.S. 409 (1968).

### INADEQUATE ENFORCEMENT POWERS

The present law, while giving the Department of Housing and Urban Development the responsibility to investigate complaints of housing discrimination, and while giving the agency adequate powers to investigate, gives HUD no real power to remedy housing violations which its investigations reveal. If HUD fails to remedy the violation through conciliation, aggrieved individuals are left to seek redress through private civil actions.

We believe that the principal impediment to realization of the purposes of the Fair Housing Act has been the lack of adequate enforcement authority. In *Traffi- cante* v. *Metropolitan Life Insurance Co.*, 409 U.S. 205 (1972), the Supreme Court commented on the "enormity" of the task of implementing fair housing in the light of the limited authority and resources of the Department of Justice and the lack of enforcement power on the part of HUD. Comparatively few suits have been brought by "aggrieved persons," in large part because lawsuits may be time-consuming and expensive. Few victims of discrimination actually sue when HUD conciliation efforts fail, and conciliation frequently fails because the Secretary has no authority to institute actions to support positions taken in conciliation efforts.

H.R. 3504 would provide one way of remedying this lack of authority by giving HUD authority when the Secretary has determined ". . . that reasonable cause exists to believe the charge [of housing discrimination] is true [to] refer the matter to the Attorney General for the filing of an appropriate civil action . . . or [to] file an administrative complaint . . ."

H.R. 7787 would amend Title VIII by authorizing the Secretary of Housing and Urban Development to bring civil actions to enforce the rights secured by Title VIII. H.R. 3504 would authorize either civil actions or administrative enforcement proceedings. We do not believe that the litigation which would be filed under these proposals would increase the number of suits brought in federal courts. Conceivably, it could, over time, reduce the number of housing discrimination complaints by increasing the Secretary's credibility and effectiveness in negotiation. Most assuredly, it would give HUD the bargaining power it needs to carry out the intent of the Act.

Our experience, to date, in the federal system has been with enforcement of fair housing by courts; but administrative remedies would probably add an extra dimension to fair housing enforcement. We defer to the Secretary of HUD as to whether this would be something that her Department should undertake, and as to what resources would be necessary to carry it out. I can say that I believe we have the

---

[1] The discriminatory advertising provision states: "*Provided further*, [the exemption shall apply if the sale or rental is] . . . (B) without the publication, posting or mailing, *after notice* [emphasis added], of any advertisement or written notice in violation of section 804(c) . . ."

organization and the capability in the Department of Justice to handle any court litigation ancillary to administrative proceedings, and the increased attorney strength necessary, while depending on the volume of matters referred, would probably be slight.

I do have two suggestions, however, if the Congress decides to create this new procedure.

First, the procedure should recognize that informal methods of resolving violations, where appropriate, should be used. In this regard, we agree with the statement of the Secretary of HUD that H.R. 3504 should be amended in some way to recognize some latitude in HUD's authority so that conciliation and persuasion may be used to bring about compliance with the law when it can be accomplished in that way.

Second, some distinction should be made between the nature of the administrative proceedings and the private "legal" remedies available through lawsuits. Since the Supreme Court has held that rights currently conferred under the Act are in the nature of individual "legal" rights, and actions for damages for violations of those rights are triable by jury, *Curtis* v. *Loether,* 415 U.S. 189 (1974), it would risk unconstitutionality to provide for damages in both courts and administrative forums. Perhaps the best use of administrative procedures would be in issuing "cease and desist" type orders to obtain prospective relief or to prohibit the sale or rental of housing except to a person who has been unlawfully refused the sale or rental on a discriminatory basis. Additionally, administrative procedures could assess civil penalties payable to the United States for specific violations of the law. Such procedures would be new ones which meets special needs not adequately served by existing remedies. See *Atlas Roofing Co.* v. *Occupational Safety Commission,* 430 U.S. 442, 461 (1976).

Civil actions brought under the authority proposed in H.R. 7787 would be instituted and tried by the Department of Justice as required by present Section 811(g) of the Act, and H.R. 3504 describes a procedure for referring cases to the Attorney General for suit. In that regard, there is an aspect of H.R. 3504 about which we have serious reservations. On page 49, line 14, is the language:

"(b) The Attorney General *is directed* [emphasis added] to bring a civil action . . . (1) to enforce any final order under section 810 of this title that is referred for enforcement by the Secretary; (2) to collect any civil penalty assessed by the Secretary . . .; and (3) to remedy any discriminatory housing practice [referred for suit by HUD]."

We do not believe that it is consistent with the duties of the Attorney General's office for a statute to give such direction. Where suits by the Attorney General are authorized, it has uniformly been the law that the Attorney General has the discretion to decide whether the suit should be filed. See, *e.g., Powell* v. *Katzenbach,* 359, F.2d 234 (D.C. Cir. 1965). See also 28 U.S.C. 516-519 and Rule 11, F.R. Civ. P., which provides that an attorney's signature on a complaint constitutes certification that to the best of his belief, there is good ground to support the complaint. We believe that the Attorney General, and those attorneys acting under his authority should, at least, have the discretion to decide in consultation with HUD whether a case has merit before making an allegation in court, and we expect to reach understandings with HUD on suit referral procedures and standards for filing suit should these procedures be created.

We do, however, strongly endorse the concept of providing power in the government to back the negotiating positions of HUD.

PROCEDURAL AMBIGUITIES

Based upon our experience over the past ten years, we have found that the fair housing law as it now reads has a number of procedural ambiguities. Any new legislation in this field should correct these problems. Conciliation and negotiation, for example, can be a very useful and inexpensive way of achieving compliance with the Act, if use of conciliation does not impair the rights of the individual to sue when conciliation fails, and if sanctions are available when conciliation fails. I have already mentioned HUD's lack of real power. Let me illustrate how the present Act discourages the use of HUD procedures.

The Fair Housing Act currently provides two direct ways in which allegedly aggrieved individuals may seek relief under the Act: (1) through utilization of HUD's administrative procedures under section 810, followed by suit under that section if administrative conciliation is unsuccessful; and (2) through suits brought directly in federal court under section 812, without initial use of the administrative process. In addition, an aggrieved individual may provide information to the Attorney General, who may bring a pattern or practice suit Section 813. But there is uncertainty about the time allowed to individuals to file suit after HUD conciliation

6

attempts have been unsuccessful. The time within which suit may be brought under section 810 has been the subject of litigation under the Act, because the various subsections of section 810 are not consistent with each other.

Under Section 810(a), the Secretary has thirty days just to decide whether he will attempt to resolve the complaint.[2] However, section 810(d) contemplates that the Secretary will complete his conciliation efforts within that same thirty-day period.[3]

Thus, the literal language of section 810(d) would seem to require that HUD complete its conciliation efforts within thirty days after a complaint has been filed with the Secretary. Then if those efforts fail, the complainant has an additional thirty days in which to file suit. On its face, this language cannot be reconciled with section 810(a).

HUD has, by regulation, construed section 810 so as to provide some consistency.[4] Despite HUD's attempts to eliminate the ambiguities, federal district courts have reached varying conclusions on when suits under section 810 may be brought. One group of courts has held that a complainant may bring a section 810 suit within thirty days of receiving notification of HUD's failure to conciliate.[5] Other courts have held that a section 810 suit must be filed within sixty days after a complaint is filed with HUD, regardless of whether conciliation has been completed, or even begun.[6] One district court has even held that a section 810 suit must be brought within 180 days of the alleged act of discrimination—the same 180-day period in which a complaint must first be filed with HUD.[7]

It is incongruous and contrary to the intent of Congress to require that suits be initiated before conciliation efforts have been exhausted. Yet, this is how some courts have read section 810(d). Accordingly, new legislation should clarify the rights of aggrieved persons to file suits and adequate time periods allowed to fulfill the purpose of the Act.

One way of accomplishing this objective is that employed by H.R. 3504 which addresses private civil actions in one section and provides that such actions may be filed at any time up to three years after the alleged violation or one year after the completion of any government initiated procedure, whichever is later; this approach greatly simplifies the suit process and has the added advantage of not discouraging the use of HUD processes by fears that rights would be lost if an attempt is made to avail oneself on HUD resources.

In addition, the H.R. 3504 procedure would clarify the varying interpretations of the remedies available to aggrieved individuals under the present law.

Section 810(d) of the current Act provides that if the district court finds a violation of the Act, "the court may, subject to the provisions of section 812, enjoin the respondent from engaging in such practice or order such affirmative action as may be appropriate." Although one district court has held that damages are recoverable in a section 810 suit,[8] another court has held that a plaintiff may *not* obtain damages under that section.[9] This holding is inconsistent with the basic structure of

[2] Section 810(a) provides: "Any person who claims to have been injured by a discriminatory housing practice . . . may file a complaint with the Secretary. . . . Within thirty days after receiving a complaint, . . . the Secretary shall investigate the complaint and give notice in writing to the person aggrieved whether he intends to resolve it. If the Secretary decides to resolve the complaint he shall proceed to try to eliminate or correct the alleged discriminatory housing practice by informal methods of conference, conciliation, and persuasion. . . ."

[3] "If within thirty days after a complaint is filed with the Secretary . . . the Secretary has been unable to obtain voluntary compliance with this title, the person aggrieved may, within thirty days thereafter, commence a civil action in any appropriate United States district court, against the respondent named in the complaint. . . ."

[4] Upon receipt of a complaint, the complainant is notified that if the complaint is unresolved in thirty days, he or she may demand a right to sue letter, and within thirty days thereafter, may bring suit. See Fair Housing form Letter No. 1, *Title VIII Field Operations Handbook*, Appendix 4. Section 810(d) is construed as prescribing a limitation period of thirty days after HUD conciliation efforts have terminated. See 24 C.F.R. 105.16, 105.34. The complainant is notified when HUD believes it is unable to conciliate.

[5] See *James v. Stratford Hills General Partnership*, No. C-74-215-D, P.H. E.O.H. Rptr. ¶13,701 (M.D. N.C. 1975); *Taylor v. Fletcher Properties*, No. 74-H-850 (S.D. Tex. 1975); *Logan v. Richard E. Carmack & Associates*, 368 F. Supp. 121 (E. D. Tenn. 1973); *Brown v. Ballas*, 331 F. Supp. 1033 (N.D. Tex. 1971).

[6] See *Tatum v. Myrick*, 425 F. Supp. 809 (M.D. Fla. 1977); *Brown v. Blake and Bane, Inc.*, 402 F. Supp. 621 (E.D. Va. 1975) *Sanford v. Corbin Realty, P.H. E.O.H. Rptr. ¶13,740 (W.D. N.C. 1975) O Young v. AAA Realty Co.*, 350 F. Supp. 1382 (M.D. N.C. 1972) Judge Gordon, who decided *AAA Realty*, subsequently reconsidered his decision, and in *James v. Stratford Hills General Partnership*, supra, held that a section 810 suit is timely if brought within thirty days after receiving notification of HUD's failure to conciliate.

[7] *Hodge v. Seiler*, No. 73-2556 (E.D. La. 1975), *vacated*, 558 2d 284 (5th Cir. 1977).

[8] *Metropolitan Washington Planning and Housing Assoc., Inc. v. Oriental Building Assoc. Federal*, No. 76-0498 (D. D.C. April 26, 1977).

[9] *Brown v. Ballas, supra.*

7

the Fair Housing Act.[10] An aggrieved person should not have to sacrifice the recoverability of damages in order to use the investigation and conciliation procedure of present section 810. Section 3 of H.R. 7787 would avoid this result, as would section 208 of H.R. 3504 which authorizes monetary relief in suits brought by individuals, regardless of whether the suit followed the filing of a HUD complaint. We believe that an aggrieved individual who utilizes HUD's administrative conciliation machinery should not be penalized for doing so. Rather, if he brings suit after conciliation fails, he should be entitled to the same relief, including damages, attorney's fees and costs, as a plaintiff who sues under section 812 without recourse to HUD procedures.

### ATTORNEY'S FEES

Another feature of the present law which inhibits private enforcement of fair housing is the proviso in section 812(c) of the current law limiting the awarding of attorney's fees to plaintiffs who are financially unable to assume such fees. As with other aspects of the current law, this proviso was added as a Senate floor amendment by voice vote, see 114 Cong. Rec. 5514-15, 90th Cong., 2d Sess., and it is the only civil rights attorneys fee provision which contains such a limitation. Section 4 of H.R. 7787 would strike this proviso and section 208 of H.R. 3504 contains no such limitation. We support these provisions. As the Supreme Court noted in *Trafficante* v. *Metropolitan Life Insurance Co., supra,* 409 U.S. at 211, complainants who bring suits under the Fair Housing Act "act not only on their own behalf but also as private attorneys general in vindicating a policy that Congress considered to be of the highest priority." The pending bills, if enacted, will enable private litigants to carry out that function far more effectively. As in other civil rights statutes, attorney's fees would thus be recoverable in the absence of special circumstances that would render such an award unjust.[11]

We note that the attorney's fees provision of H.R. 3504 would make two other changes: (1) it would make the United States liable for attorney's fees the same as a private party, and (2) it would allow prevailing defendants—as well as prevailing plaintiffs—to recover fees. The bill does not prescribe the standards to be used in applying these provisions, but we assume that the standards would be the same as those applicable to the Civil Rights Attorneys Fees Awards Act of 1976—that prevailing plaintiffs (other than the United States) could recover fees in the absence of special circumstances and by virtue of their having acted in the public interest, and that a prevailing defendant could recover fees only in cases in which the "plaintiff's action was frivolous, unreasonable or without foundation. . . ." *Christiansburg Garment Co.* v. *EEOC,* No. 76-1383, ——— U.S. ———, January 23, 1978. See S. Rpt. No. 94-1011, 94th Cong. 2d Sess., pp. 4-5. If this is the way this section is to be read, then we also support these changes in the law.

### PUNITIVE DAMAGES

Sec. 812(c) allows a district court, in a private suit to enforce Title VIII, to award "to the plaintiff—not more than $1,000 punitive damages. . . ." In a class action or a multiple plaintiff action the defendant may be required to pay up to $1,000 to each prevailing plaintiff or each member of the plaintiff class who has been a victim of the defendant's discrimination. While punitive damages in excess of $1,000 have been awarded in some cases brought under 42 U.S.C. § 1982, we are not aware of multiple awards of punitive damages against one defendant under § 812(c).

The two bills before the Committee differ in their treatment of punitive damages. H.R. 3504 would raise the present ceiling from $1,000 to $10,000 for each violation, while H.R. 7787 would make no change in § 812(c)'s $1,000 ceiling.

Although we have found no legislative history on this point, we believe that the intent of providing for punitive damages was to build into the statute a deterrent against wrongdoing; the overall scheme of the statute is remedial rather than penal. The question thus arises whether § 812(c), as presently constituted, is an adequately strong deterrent. The kinds of relief § 812(c) allows are as follows:

(a) injunctive relief: threat of injunctive relief is a weak deterrent:

---

[10] For example, section 810(d) provides that section 810 suits are to be brought in state courts if the state or locality has a fair housing law "which provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided *in this title*" (emphasis added). Since Title VII provides for damages and attorney's fees in section 812(c), deferral under section 812(d) is required only if damages and attorney's fees are available under state or local law. It would make little sense to require deferral only if local law authorizes damages and attorney's fees but to construe section 810, itself, as authorizing no such relief.

[11] See *Northcross* v. *Board of Education of the Memphis City Schools,* 412 U.S. 427, 428 (1937) (*per curiam*); *Newman* v. *Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402 (1968) (per curiam).

8

(b) out-of-pocket damages or restitution: where there could be sizeable out-of-pocket losses to the plaintiff, this is a significant deterrent; however, in some instances there are no out-of-pocket losses;

(c) monetary compensation for humiliation and for loss of statutory rights: the courts are beginning to recognize this as an element of actual damages, and large recoveries are theoretically available;

(d) punitive damages.

In deciding whether the ceiling for punitive damages should be raised the Congress should develop evidence as to the relative efficacy of the above elements of relief. We do not regard punitive damages as central to Title VIII, but they do have a role to play, and it is possible that the upper limit should be increased. No matter what the upper limit may be, the courts, in assessing punitive damages should apply conventional factors and considerations, as is other suits in which this remedy is available, such as the wealth of the wrongdoer, the degree of willfulness involved in the wrong, the extent of harm done to society in the general and the amount which will be a deterrent to the defendant and to other similar wrongdoers. See *Parker* v. *Shonfeld*, 409 F. Supp. 876 (N.D. Cal. 1976). (Punitive damages of $10,000 awarded in a housing discrimination case under 42 U.S.C. 1982). See also the equal Credit Opportunity Act, 15 U.S.C. 1691e which limits punitive damages to $10,000 except in class actions where the limit is $500,000 or one percent of the defendant's net worth whichever is less.

### RELIEF IN PATTERN OR PRACTICE SUITS

In addition to the private enforcement difficulties which I have been discussing, there are ambiguities in the remedies available through suits brought under current section 813, which authorizes the Attorney General to bring suit "whenever [he] has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by [the Act], or that any group of persons has been denied any of the rights granted by [the Act] and such denial raises an issue of general public importance." Section 813 provides in pertinent part that the Attorney General may request "preventive relief . . . or other order . . . as he deems necessary to insure the full enjoyment of the rights granted by this title."

Federal courts have been divided on the question of whether the Attorney General may recover money for victims of discrimination in pattern or practice suits.[12] It is well settled that in pattern or practice suits brought by the Attorney General to enforce the right to equal employment opportunity under Title VII of the Civil Rights Act of 1964, individual monetary relief is obtainable.[13] We believe that such relief should also be available under the Fair Housing Act, and that the statute should contain explicit language authorizing this relief. Section 208 of H.R. 3504 provides that the Attorney General may obtain the same relief as is authorized in private enforcement suits, and we support this change. The addition of explicit authority to award damages in section 813 suits would significantly increase the Attorney General's enforcement powers by allowing him to recover damages for wrongs that might otherwise go uncompensated, because individual victims of discrimination are often unaware of their statutory rights and because the uncertainties and expense of ligation may make individual suits impracticable.

### SUBSTANTIVE PROTECTIONS

Section 206(e) of H.R. 3504 would prohibit the practice of denying a loan for the purchase of a house because of the racial or ethnic compostiion of the neigborhood in which the house is located. The present language of Section 804, 805 and 817 has been construed by courts[14] and the federal agencies charged with administering the

---

[12] Compare *United States* v. *J. C. Long*, 537 F.2d 1151 (4th Cir. 1975), cert. den. 429 U.S. 871 (1976); *United States* v. *Mitchell*, No. 3–7887–G (N.D. Tex 1976) appeal pending. No. 76–3880 (5th Cir.); *United States* v. *Dittmar*, P.H.E.O.H. Rptr. para 13, 730 (E.D. Va. 1975); *United States* v. *Northside Realty Associates, Inc.*, No. 13932 (N.D. Ga. 1976) holding damages are not recoverable) with *United States* v. *Berg Enterprises, Inc.*, No. WPS–75–139–CIV–CF (S.D. Fla 1975); *United States* v. *Chatham*, No. 75–127A (N.D. Ga. 1975); *United States* v. *Hilton Sykes Rental Agency, Inc.*, P.H.E.O.H. Rptr § 13,727, No. 74–322–Civ T–H (M.D. Fla. 1975); *United States* v. *West Suburban Board of Realtors*, P.H.E.O.H. Rptr. § 13,641, No. 69–C–1460 (N.D. Ill. 1974) (holding damages are recoverable).

[13] See, *e.g.*, *United States* v. *Georgia Power Co.*, 474 F.2d 906 (5th Cir. 1973); *United States* v. *Wood, Wire & Metal Lathers Int'l Union No. 46*, 328 F. Supp. 429 (S.D. N.Y. 1971), aff'd 471 F.2d 408 (2d Cir., 1973) cert. denied, 412 U.S. 939 (1973).

[14] See, *Laufman* v. *Oakley Building & Loan Co.*, 408 F. Supp. 489 (S.D. Ohio 1976); *Harrison* v. *Otto G. Heinzeroth Mortgage Co.*, 414 F. Supp. 66 (N.D. Ohio 1976).

9

Fair Housing Act [15] as prohibiting such "redlining" and we support the proposed amendment as a clarification of the existing law. Congress has elicited extensive evidence on the contribution of redlining to the phenomenon of "white flight" and decay of the cities and to the inability of many minority homeseekers to obtain financing. [16]

Similarly, Section 206(c) of H.R. 3504 would prohibit redlining in the making of hazard insurance contracts, and we support this provision as a clarification of existing law. We note in this regard that although the McCarran-Ferguson Act, 15 U.S.C. 1012, exempts certain activities of insurance companies to the extent that the are subject to state regulation, insurance companies are not exempt from federal civil rights legislation even in the absence of an express provision regarding insurance. [17] Certainly they may be made the subject of this Act explicitly.

In addition, H.R. 3504 would prohibit governmental units responsible for regulating land uses from discriminating against low or moderate income housing because that housing may be governmentally assisted or because of the race, color or economic status of the prospective occupants of the housing.

We believe that one positive aspect of a provision of this nature could be in the codification of judicial interpretations about the reach of the present fair housing law. In *Arlington Heights* v. *Metropolitan Housing Corp.*, 429 U.S. 252 (1976), the Supreme Court held that refusal to grant a zoning variance for a low income governmentally assisted housing project which would have been utilized by a substantially integrated resident population did not violate the equal protection clause shown. However, the Court remanded the case for consideration of whether the exclusion violated Title VIII of the 1968 Civil Rights Act—the present fair housing law. Upon remand, the Court of Appeals for the Seventh Circuit found, as have other lower courts, [18] that action which has a racially segregative effect could violate Title VIII if the plaintiff's interest is not outweighed by other non-racial interests of the community. *Metropolitan Housing Development Corp.* v. *Arlington Heights*, 558 F. 2d 1283, 1290–1293 (7th Cir. 1977).

We suggest that Congress might identify other practices of local governmental units which have a racially segregative effect, or which impede the construction of governmentally assisted housing, and include a section in this bill which would prohibit them when there is a less segregative alternative to achieve the community purpose which such practices are claimed to serve.

The bill, as presently drafted, appears to go beyond the clarification of prohibited practices, and the protection of federal housing efforts. Depending on how broadly the bill is intended to be read, it may prohibit a variety governmental land use practices which may have an economically discriminatory effect. This presents both policy and constitutional issues. In *James* v. *Valtierra*, 402 U.S. 137 (1971), the Supreme Court rejected the argument that every economic distinction in land use is, *per se*, a racial distinction, and held that a California requirement that there be a community referendum before building low income housing when such a referendum was not required for other land uses did not violate the equal protection clause of the Fourteenth Amendment. While there may be Fourteenth Amendment protection against some economic discrimination, apart from racially linked economic discrimination, Congress' power to regulate in this area, when such regulation would impinge upon local zoning or land use authority is far from clear. I am submitting a memorandum prepared in the Department of Justice which discusses these difficult issues in some detail. I would only suggest here, that the need for prohibitions against housing discrimination on account of economic status, which is not racially linked, and which does not impinge upon the provision of federally financed housing, be carefully assessed.

---

[15] See, *e.g.*, Hearings before the Senate Committee on Banking, Housing and Urban Afairs, 94th Cong., 2d Sess (1976) at 126 (statement of James H. Blair, Assistant Secretary for Fair Housing and Urban Development), 485–489 (brief of Federal Home Loan Bank Board in *Laufman* v. *Oakley Building & Loan Co., supra*). This consistent administrative construction of the Act is entitled to great weight. *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U.S. 205, 210 (1972).

[16] See, *e.g.*, Hearings before the Senate Committee on Banking, Housing and Urban Affairs, 94th Cong., 2d Sess. (1976), at 17 (statement of John E. Shockey, Deputy Chief Counsel, Office of The Comptroller of the Currency), 127 (statement of James H. Blair, Assistant Secretary for Fair Housing and Equal Opportunity, Department of Housing and Urban Development), 241, *et seq.* ("Report on Savings & Loan Democracy by the Association of Concerned Depositors") 494 (brief for the Federal Home Loan Bank Board in *Laufman* v. *Oakley Building and Loan Co., supra*). See also *Laufman* v. *Oakley Building and Loan Co., supra*, 408 F. Supp. at 497.

[17] See *Ben* v. *General Motors Acceptance Corp.*, 374 F. Supp. (D. Colo. 1974) 1199. See also *Reichardt* v. *Payne*, 396 F. Supp. 1010 (N.D. Cal. 1975); *Stern* v. *Massachusetts Indemnity and Life Insurance Co.*, 365 F. Supp. 433 (E.D. Pa. 1973).

[18] See, e.g., *United States* v. *City of Black Jack*, 508 F. 2d 1179 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975); *Resident Advisory Board* v. *Rizzo*, 564 F. 2d 126 (3rd Cir. 1977).

10

H.R. 3504 would also add "handicap" to the protected classes under the Fair Housing Act. We think that protection of handicapped persons is an important federal function. However, simply adding the word "handicap" in a series with race, color, national origin, religion and sex does not provide any guidance about what is to be protected, and what changes, if any, should be made in current practices. As you know, the problems of handicapped people are generally different from the problems of racial discrimination.

### COERCION AND INTIMIDATION

Section 209 of H.R. 3504 would amend present section 817 to protect the exercise of any rights under the entire Fair Housing title from coercion and intimidation. We hope that it will be made clear that this protects the right to file administrative or judicial complaints or to give information to the Attorney General, the FBI or HUD. Presently, the coverage of this provision is limited to the exercise of the substantive rights enumerated in certain sections, and, inexplicably, one of the sections included is section 803 which is concerned only with exemptions from the coverage of the Act.

### FAIR HOUSING LOAN FUND

The Department has some reservations about that aspect of H.R. 3504 which would create a new loan fund to finance the filing of private lawsuits. There is a fine line between helping individuals protect their rights and stirring up litigation. We should recognize that the way the provisions is drafted, it is likely that in many instances it will be a subsidy of lawsuits rather than a loan because of the provisions that loans may be forgiven to the extent that cost awards do not equal the amount of the loan.

I believe that plaintiffs should be aided in enforcing their rights through the ways which I have discussed—liberalized attorney's fees, damage awards and reinforced conciliation measures. If this is insufficient, then increased assistance from legal aid agencies might be considered. The proposed fund, I fear, will require more in administration than it would be worth.

### CONCLUSION

As now stated in section 801 of the Fair Housing Act, "[i]t is the policy of the United States to provide within constitutional limitations, for fair housing throughout the United States." By clarifying and streamlining the enforcement of the Act by private individuals and the federal government, and by strengthening the relief obtainable in suits under the Act, this policy may one day receive the full measure of enforcement that our society requires. For these reasons, I hope that the Congress will act favorably upon legislation like that which is before this subcommittee.

Mr. Days. The bill which the subcommittee is considering, I understand, represents a great deal of dedicated staff work, and it is a much improved, more precise and more useful tool for achieving fair housing than were the bills considered in the last Congress. A number of suggestions made in testimony by administration witnesses last year have been incorporated into the pending bills.

We previously noted that the present law's emphasis on investigation and conciliation by HUD has merit in concept, but in practice, conciliation often fails because HUD must bargain without any real enforcement powers to back its position. Section 8 of the pending bill, which we believe contains its most important provisions, would correct this deficiency by providing the Secretary with two mechanisms which can be used if efforts to achieve voluntary compliance fail: First, the Secretary is authorized to institute administrative procedures which could lead, after appropriate due process, to corrective orders and civil penalties. Second, the Secretary has the option to refer a matter to the Attorney General for suit in an appropriate district court after a determination has been made that reasonable cause exists to believe a charge is true.

We support both of these procedures. The administrative procedures should prove to be a reasonable prompt and effective method of achieving compliance without undue expense to the parties, and,

11

in many cases, the availability of the procedures alone will promote resolution and settlement. Their existence may well relieve the district courts of cases which can be as well handled administratively.

We also support proposed section 810(b), which would permit prompt preliminary relief to preserve the status quo pending final resolution of a charge. This provision is needed to insure that the ability to grant effective relief is not thwarted by the respondent's actions during proceedings and subsequent judicial review. The bill is silent, however, on whether such orders are judicially reviewable. The bill is silent, however, on whether such orders are judicially reviewable, and if so, what the review standard should be.

Since they would not be final orders under section 811(c), they would not be reviewable under chapter 158, title 28, United States Code by direct filings in the courts of appeals. They would be final under general principles of judicial review, however, if they would impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process. *Chicago & Southern Air Lines* v. *Waterman Steamship Corp.,* 333 U.S. 103, 113 (1948).

An argument could then be made that, absent a clear expression to the contrary by Congress, any affected person could obtain review of such orders at least as to their compliance with due process standards. See title 5, United States Code, section 701–704; *Gonzelez* v. *Freeman,* 334 F. 2d 570, 575–576 (D.C. Cir. 1964); *Garvey* v. *Freeman,* 397 F. 2d 600 (10th Cir. 1968). They may also be reviewable as interim, that is, not final, orders if they invade some constitutional rights. *Fay* v. *Douds,* 172 F. 2d 720 (2d Cir. 1949); *Stanard* v. *Olesen,* opinion of Mr. Justice Douglas, 74 S. Ct. 768, 772 (1954); *Coca-Cola Co.* v. *FTC,* 475 F. 2d 299, 303–304 (5th Cir. 1973), cert. denied 414 U.S. 877 (1973).

However, it is preferable to be explicit as to what review is permitted, and I suggest that the bill specifically provide for interlocutory district court review for respondents limited to whether the order was issued in accordance with due process and whether there was an abuse of discretion by the Secretary. This would be more limited review than would be available after a final order under section 811. During such review, the outstanding order should be fully operative.

There is another aspect of the administrative proceedings which should prove to be of significant benefit to fair housing enforcement. Under section 8 of the bill, the Secretary can act on her own initiative. HUD is well situated to identify discriminatory housing practices on a broad scale because of its expertise and its direct relationship with consumers and the housing industry and local bodies having housing responsibilities.

When these practices become known to one of the HUD components, the Secretary will have the authority to investigate such practices and, if reasonable cause exists to believe a discriminatory practice has occurred, or is occurring, either to refer to matter to the Attorney General for suit or to file an administrative complaint, as appropriate.

I just noticed that the Secretary has arrived, and if the committee has no objection I would like to just summarize the remainder

12

of my testimony so the Secretary can have an opportunity to testify.

Mr. EDWARDS. Yes, would you please. Thank you.

Mr. DAYS. One of the provisions that we think is extremely appropriate is to have orders in the administrative proceeding and civil penalties up to $10,000 for each violation and, of course, there are situations where it would make more sense to refer the matter to the Attorney General to achieve remedies, including damages, for the person who has been aggrieved.

We think it is also a great improvement that this bill makes a distinction with the administrative process and resort to the courts setting out alternative routes that an aggrieved party might follow, but making certain that there are no confusions in that process, by permitting a person to go through the administrative procedure up to a certain point and decide whether to proceed with that process or go into court, and vice versa. If the issue is raised in court, then the administrative process would be delayed.

We think that the statute of limitations for filing suits is much more reasonable under the act as it presently exists and we think that the provisions that relate to private cause of action meets very well the need to have vigorous private enforcement of the fair housing law through what have been referred to as private attorneys general.

On the matter of attorney's fees, we think the change with respect to that matter is an appropriate one. The Fair Housing Act is one of the few civil rights statutes that provides counsel fees only upon a showing that the person is unable to carry the burden of paying for an attorney to bring these cases, and certainly it is consistent insofar as awards might be made to defendants with the Supreme Court decisions and the 1976 act.

We are particularly pleased that this bill makes clear the power of the Attorney General to obtain damages for people who have been harmed by discrimination in the housing market. We have been engaged in a great deal of litigation on that score and we think in order for us to be effective in courts we have to have that remedy available to us.

I discuss in my testimony the changes in definition and simply raise questions about whether the change in definition might go beyond what is necessary and include a failure to act affirmatively on the part of some Federal agents that really is adequately covered under existing law.

Insofar as there is an attempt to describe aggrieved persons, in a way different from the present act, we would simply suggest to the subcommittee that the Supreme Court has already construed the language in the existing bill to reach to the outer limits of constitutional authority, and if there is a determination that new language should be included the report should make clear that it is not the congressional intent to change the interpretation that the Supreme Court has already made with respect to the power of Congress under these circumstances.

Insofar as the exemptions are concerned, our experience has not led us to think that for our purposes a change in the exemptions is necessary, but we defer to HUD and some other persons familiar with this area to provide further guidance to you on that issue.

13

Under the area of redlining, we are very pleased to see that this bill goes into more detail with respect to redlining in the primary mortgage market and also with respect to hazard insurance, and insofar as secondary mortgages are concerned, that, too, is a salutary change, althnough we think that insofar as your activities are concerned we will be very well occupied dealing with the primary mortgage market and hazard insurance. That is where we think we can make our greatest contribution.

There is also an inclusion of the handicapped, as Mr. Drinan indicated. There is a concern that the Fair Housing Acts protect the handicapped from certain types of discrimination that really are inconsistent with the overall objective of the Fair Housing Act of making these opportunities open to people without invidious discrimination.

In my testimony I make two points I would like to stress here. First, we are completely behind the Congress in its desire to reach certain types of discrimination based upon handicapped status. However, we do believe there are some significant and weighty questions raised by this inclusion and we simply offer our assistance in trying to address some of the questions that may be caused by the inclusion of the handicapped status in the bill.

We would simply urge the subcommittee and Congress to be mindful of the fact that to the extent that these handicapped issues prove to be unduly intractable, that their resolution need not and should not delay some of the other changes in the act that are needed very much by not only the Department of Justice but by HUD and private attorneys general in this area.

I want to thank the subcommittee very much for providing me with the opportunity to testify.

Mr. EDWARDS. Thank you very much, Mr. Days.

Without objection, the entire statement will be included in the record.

[The information follows:]

14

STATEMENT OF DREW S. DAYS III

Again in this Congress, as in the last, it is my
privilege to testify on behalf of the Department of Justice
in support of a measure to speed the realization of the
broad fair housing policy adopted by Congress in 1968.

I will not repeat the remarks made in prior testimony
before this subcommittee about the activities of the Department
of Justice to enforce the Fair Housing Act. I only note that
our efforts have continued, and we continue to see a need for
improving the remedies and enforcement procedures which S. 506
and H.R. 3504 represent. Although our testimony from last
year may be available to you, I would like to submit copies of
it for the record. (¹)

The bill which the subcommittee is considering, I under-
stand, represents a great deal of dedicated staff work, and it is
a much improved, more precise and more useful tool for achiev-
ing fair housing than were the bills considered in the last
Congress. A number of suggestions made in testimony by
administration witnesses last year have been incorporated
into the pending bills.

IMPROVED ENFORCEMENT

We previously noted that the present law's emphasis on
investigation and conciliation by HUD has merit in concept,
but in practice, conciliation often fails because HUD must

15

bargain without any real enforcement powers to back its
position. Section 8 of the pending bill, which we believe
contains its most important provisions, would correct this
deficiency by providing the Secretary with two mechanisms
which can be used if efforts to achieve voluntary compliance
fail: first, the Secretary is authorized to institute admin-
istrative procedures which could lead, after appropriate due
process, to corrective orders and civil penalties. Second,
the Secretary has the option to refer a matter to the Attorney
General for suit in an appropriate district court after a deter-
mination has been made that reasonable cause exists to believe
a charge is true.

We support both of these procedures. The administrative
procedures should prove to be a reasonably prompt and effective
method of achieving compliance without undue expense to the parties,
and, in many cases, the availability of the procedures alone will
promote resolution and settlement. Their existence may well
relieve the district courts of cases which can be as well handled
administratively.

We also support proposed Section 810(b), which would permit
prompt preliminary relief to preserve the status quo pending final
resolution of a charge. This provision is needed to ensure that
the ability to grant effective relief is not thwarted by the
respondent's actions during proceedings and subsequent judicial
review. The bill is silent, however, on whether such orders are
judicially reviewable, and if so, what the review standard should be.

002814

16

Since they would not be "final" orders under Section 811(c), they would not be reviewable under Chapter 158, Title 28, United States Codes by direct filings in the courts of appeals. They would be "final" under general principles of judicial review, however, if they would "impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process." Chicago & Southern Air Lines v. Waterman Steamship Corp., 333 U.S. 103, 113 (1948).

An argument could then be made, that, absent a clear expression to the contrary by Congress, any affected person could obtain review of such orders at least as to their compliance with due process standards. See 5 U.S.C. 701-704; Gonzalez v. Freeman, 334 F.2d 570, 575-576 (D.C. Cir. 1964); Garvey v. Freeman, 397 F.2d 600 (10th Cir. 1968). They may also be reviewable as interim, i.e., not final, orders if they invade some constitutional rights. Fay v. Douds, 172 F.2d 720 (2d Cir. 1949); Stanard v. Olesen, opinion of Mr. Justice Douglas, 74 S. Ct. 768, 772 (1954); cf. Coca-Cola Co. v. FTC., 475 F.2d 299, 303-304 (5th Cir. 1973), cert. denied 414 U.S. 877 (1973).

However, it is preferable to be explicit as to what review is permitted, and I suggest that the bill specifically provide for interlocutory district court review for respondents limited to whether the order was issued in accordance with due process and whether there was an abuse of discretion by the Secretary. This would be more limited review than would be available after a "final" order under Section 811. During such review, the outstanding order should be fully operative.

17

There is another aspect of the administrative proceedings which should prove to be of significant benefit to fair housing enforcement. Under Section 8 of the bill, the Secretary can act on her own initiative. HUD is well situated to identify discriminatory housing practices on a broad scale because of its expertise and its direct relationship with consumers and the housing industry and local bodies having housing responsibilities. When these practices become known to one of the HUD components, the Secretary will have the authority to investigate such practices and, if reasonable cause exists to believe a discriminatory practice has occurred, or is occurring, either to refer the matter to the Attorney General for suit or to file an administrative complaint, as appropriate.

The final remedies available in the administrative proceeding are appropriate orders and/or civil penalties up to $10,000 for each violation. As with other civil rights statutes, the remedies to be made available to the Secretary should be broadly construed so that violations and their effects can be fully and effectively corrected.

There will be cases, however, where relief would not be complete without an award of damages to the aggrieved person; these cases may be referred to the Attorney General for civil suit if informal conciliation fails. In such suits, the full range of equitable remedies would also be available to avoid the necessity of going to different forums for different types of relief.

18

The bill provides aggrieved persons the option to pursue either an administrative procedure or a civil action for vindication of their Title VIII rights, and the bill would preserve those options up through the point that a reasonable cause finding is made by the Secretary and until an administrative hearing on the record begins. The aggrieved individual could then intervene in the administrative proceeding. I believe it is important to keep the right to file Title VIII suits available at least to this stage for two reasons: (1) it is at this point that an intelligent assessment of the various remedies available, the strength of the case, and the possibility of satisfactory settlement can be made, and (2) these important rights should not be left to government agencies alone for their vindication. Of course, the right to file a suit under 42 U.S.C. 1982 is unaffected by these provisions.

The new Section 812 authorizing private suits is a marked improvement over current law. We noted last year the inconsistencies in lower court opinions resulting from having two separate provisions controlling private civil suits - one for suits after HUD conciliation fails, and one for suits without the prior use of HUD resources. The pending bill makes it clear that all appropriate legal and equitable remedies are available in any Fair Housing Act civil action.

Suits may be filed up to three years after the dis-
criminatory housing practice "occurred or terminated"⎯/
regardless of whether the plaintiff has filed an administrative
complaint with HUD, except that whenever an administrative hearing
on the record is begun by either HUD or by a state or local agency
based upon a charge filed by an individual, a suit may not
be filed based upon the same charge.  The three year period
is a more realistic provision than the 180 day limit under
current law, and is more consistent with time bars on civil
claims generally.

I agree with the drafters that it is necessary to
ensure that the same case not be tried in different forums
at the same time.  But it is extremely important to preserve,
and strengthen, the enforcement mechanisms which have been
effectively used in the past by "private attorneys general"
to help implement the national fair housing policy.

After an aggrieved person has filed a civil action,
the bill would prohibit the Secretary from continuing or
commencing proceedings based upon that same charge, but the
Attorney General could intervene in private actions if he
certifies that the case is of general public importance.  I

⎯/ The present act uses the word "occurred" to set the time
running for filings by aggrieved persons.  Presumably, the
addition of "or terminated" is to account for continuing
violations.

believe the bill is intended to prohibit HUD from proceeding on the same charge filed with it, but does not bar the Secretary from exercising her powers to initiate broader actions which might incidentally encompass such a change.

No civil rights statute other than the current Fair Housing Act limits an award of attorneys fees to those prevailing private plaintiffs who can show that they are unable to pay the fee. When private citizens bring meritorious fair housing suits, they act in the public interest and help perform an enforcement function that government agencies could not adequately perform alone. Absent special circumstances, a prevailing plaintiff should receive reasonable attorneys' fees. On the other hand, prevailing defendants cannot now receive attorneys' fees in Fair Housing Act cases. If they are subjected to suits that are "frivolous, unreasonable or without foundation," they also should be permitted such a recovery. These standards for awarding attorneys' fees are consistent with the Civil Rights Attorneys' Fees Awards Act of 1976 / and are standards recognized by the Supreme Court. Christiansburg Garment Co. v. EEOC, 434 U.S. 412 (1978). As I read the pending bill, it would incorporate the standards of the

___/  Pub. L. No. 94-559, 90 Stat. 2641

21

1976 Act with regard to litigation in both courts and in
administrative proceedings. Providing for such awards in both
forums is consistent with recent developments affecting
application of other civil rights statutes. <u>Parker</u> v. <u>Califano</u>,
561 F.2d 320, 332–333 (D.C. Cir. 1977).

We would expect that the authority of the Attorney General
to bring cases involving patterns or practices of discrimination
and cases where denials of rights raise issues of general public
importance will continue to play a vital role in the enforcement
scheme. In such suits the full range of remedies should be
available, including both damages for victims of discrimination
and equitable remedies. However, the courts have divided on
whether the present law permits an award of such damages in
suits brought by the Attorney General. The bill makes the
availability of this remedy to the Attorney General clear by
providing that all remedies are available to the Attorney
General that are available in private suits.

The bill would make a number of other changes in the
present Act and I want to comment on some of them.

22

CHANGES IN DEFINITION

Section 4(a) amends the definition of "discriminatory housing practice" in Section 802(f) to include any act which is unlawful under the entire act. This amendment would make clear that interference, coercion or intimidation in the exercise of housing rights which is unlawful under Section 817 of the Act is a discriminatory housing practice; this is a salutary amendment to that extent. However, the effect of this amendment may also be to provide a cause of action to any person claiming injury from any act of any federal employee which might be unlawful. The issue raised by this proposed revision of current law is the extent to which the liability to civil suit of federal agencies under Section 808(d) and (e) is increased. If a federal agency fails institutionally to act affirmatively to carry out the purposes of the Fair Housing Act in administering its programs as required by that section, it is liable to equitable relief, Shannon v. HUD, 436 F.2d 809, 816-817 (3rd Cir. 1970), or if federal employees commit acts which Sections 804-806 make unlawful, a discriminatory housing practice is committed under the Act as presently written.

002821

However, if it is intended that federal agencies or their employees should be liable in both law and equity for failing to take affirmative action, which might be deemed "unlawful" under Section 808(d) or (e) of the Act, then the proposed change may generate litigation beyond what is necessary to carry out the purposes of the Act.

The bill would also change the definition of "aggrieved person." I understand that the intent of the drafters is to clarify some standing issues which it is believed to have arisen or may arise. The Act as presently worded defines "person aggrieved" in Section 810(a) as "any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur." The Supreme Court has held that this language makes standing under the Act as broad as Congress can constitutionally make it. Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205 (1972). Any change in the definition risks a construction that standing has been narrowed, and, conceivably, a change from "claims to have been injured" to "adversely affected" could receive such a narrowing construction. Whatever wording is used, we recommend that legislative history make clear that Congress intends to exercise its full power under Article III of the Constitution in accordance with the Supreme Court's construction of current law in Trafficante.

24

Recently, we filed an _amicus_ _curiae_ brief in the Supreme
Court in a case involving a standing question under the Act,
_Gladstone Realtors_ v. _Village of Bellwood_, No. 77-1493.  I
would like to submit a copy of that brief for whatever
assistance it may be to you on this issue.

                              EXEMPTIONS

The proposed bill would also change current law per-
taining to property which is exempt under the Act.  Currently,
sales or rentals of single family dwellings where brokerage
services are not used, and buildings containing four units
or less where the owner actually resides in one of the units
are exempt.  The exemptions do not apply to discriminatory
advertising, and have no relevance to "blockbusting."
_United States_ v. _Mintzes_, 304 F. Supp. 1305 (D. Md. 1969).
Because they protect only owners of exempt housing from
liability, they have no significance in cases of discrimina-
tory land use practices.  Nor do they exempt even owners of
exempt housing from liability under 42 U.S.C. 1982 which
prohibits racial discrimination in any transfer of interest
in real estate.

We have found that the exemptions now in the Act
have not been an impediment for us in the kinds of major
cases on which we concentrate our resources.  However, we
see no legal or constitutional restriction on the change in
exemptions proposed by the bill.

002823

25

"REDLINING"

There are three provisions of the proposed bill deal-
ing with what has come to be called "redlining." First, the
bill would amend present Section 805 to make explicit the
present prohibition against refusing mortgages on the basis of
protected characteristics of persons residing in the neighborhood
where a dwelling is located. See, e.g., Laufman v. Oakley Building
& Loan Co., 404 F. Supp. 791 (S.D. Ohio 1975). Second, the bill
would amend Section 804 of the act to make unlawful discrimination
in providing hazard insurance. We have written several amicus curiae
briefs taking the position that this too is now covered by the Act,
and I am submitting a copy of our latest one in Dunn v. Midwestern
Indemnity Co., C.A. No. C-3-78-105 (S.D. Ohio), so that you may
see our reasoning in more detail. Third, the bill would amend
Section 805 to prohibit discrimination in secondary financing.
Such discrimination would now be covered if it could be demonstrated
that such a practice has the effect of making housing unavailable
because of a prohibited reason, or if it interferes with the
exercise of housing rights. The proposed addition would, in effect,
make it unnecessary to show, or to infer, a connection between
the practice and the unavailability of housing.

We are unable to predict what the effect of the proposed amendment would be on the secondary mortgage market. However, as a litigator, I believe that the primary mortgage and the insurance amendments, if passed, would afford useful tools for us, and for private plaintiffs, in bringing about the realization of the national fair housing policy as enunciated when Congress first enacted the Fair Housing Act.

### HANDICAP PROTECTION

The last topic which I wish to address is the proposed amendment which would prohibit discrimination in housing based upon handicap. The definition of handicap in the bill is substantially the same as that in the Rehabilitation Act Amendments of 1974. It includes persons with mental or physical infirmities which substantially limit life activities as well as persons who are regarded as having such infirmities, or who have a record of having such infirmities. Examples of disabilities which may be included are hearing, speech or sight impairment, physical abnormalities which limit mobility and physical functions, mental retardation, most forms of mental illness, alcoholism and drug addiction.

The use of this definition reflects the fact that a great many people in our society suffer from a handicap, and I believe that many of them have been disadvantaged in securing the benefits of our society. Therefore, the Congressional

effort to insure for these people the full enjoyment of the
advantages of our society is a worthy endeavor. However, the
breadth of this definition necessarily raises a question of
whether there is a need for the same kind of protections from
housing discrimination based upon such a wide range of
characteristics in the same way we seek to protect against
racial, religious, sex and national origina discrimination.
Nor can we be confident that the technique used in the bill
of putting handicap on a parallel with race, sex, etc., will
reach many of the problems of discrimination which handicapped
persons face in seeking suitable housing.

However, I can endorse the efforts of the sponsors of
this bill to protect handicapped persons from discrimination
in housing. Although the approach used by the drafters is
one which may not extensively delineate the responsibilities
of landlords or sellers to make accommodations for the special
needs of handicapped persons, it can be a workable one. As
Chairman Edwards explained this coverage, the bill would not
"require retrofitting to remove architectural barriers, although
reasonable accommodations (at the expense of the buyer or lessee)
would have to be permitted." 125 Cong. Rec. H1036 (daily
Ed. Mar. 1, 1979). And he also noted that "this provision
will permit handicapped individuals to have the same protection
as that afforded to the other protected classes in title VIII."
Id.

These statements suggest that the amendment incorporates
a rule of reason which must be developed through case by case
adjudications and through regulations promulgated by the Secretary.
Under this rule expenditures by a landlord to modify a dwelling
would not be required under the Fair Housing Act, but the reason-
ableness of requiring landlords to permit tenants to remove
barriers, or of requiring landlords to make other accommodations
not involving architectural changes, would rest on a number
of factors which might include the availability of other suitable
housing, the size of the dwelling involved, the nature of the
accommodation required, the adverse affect, if any, on other
affected persons and the financial burdens on the home-seeker
and housing provider respectively. For example, a "no pets" rule
might have to exempt seeing-eye dogs.

While this may not completely alleviate the burdens placed
upon handicapped persons seeking suitable housing, it is a
useful first step, and it would clearly prohibit housing dis-
crimination which arises from any number of mistaken beliefs
about differences between handicapped and non-handicapped persons,
and from simple refusals to afford handicapped persons opportunities
equal to those of non-handicapped persons. The question raised
by making handicap the equivalent of race is what would be the
application of the "effects" test for proof of discrimination
in handicap cases, and what would be its impact.

In the course of our litigation we have learned of serious impediments to the establishment of group homes for handicapped persons who are being de-institutionalized.  These impediments are raised through the use of land use or occupancy laws. This amendment could be used to attack discriminatory exclusion of handicapped persons in the same way that the present Act is used to attack racially discriminatory land use actions.

For example, zoning to fence out group homes because of the handicap of the prospective occupants would be prohibited just as zoning to fence out a housing project "because of" the race of its prospective tenants is banned.  United States v. City of Black Jack, 508 F.2d 1179 (8th Cir. 1974) cert. denied 422 U.S. 1042 (1975).  Establishing what constitutes action by a governmental body "because of" handicap could follow the same patterns as in similar race cases, i.e., actions which have the effect of segregating handicapped persons would violate the act if the plaintiffs' interests are not outweighed by other legitimate interests of the community.  Cf. Metropolitan Housing Development Corp. v. Arlington Heights, 558 F.2d 1283, 1290-1293 (7th Cir. 1977).

Under the Fair Housing Act, governmental action need not be solely because of race to be unlawful.  Smith v. Sol D. Adler Realty Co., 436 F.2d 344 (7th Cir. 1970); United States v. Pelzer Realty Co., 484 F.2d 438 (5th Cir. 1973) cert. denied 416 U.S. 936 (1974); see also Resident Advisory Board v. Rizzo, 564 F.2d 126 (3d Cir. 1977) cert denied 435 U.S. 908 (1978).  By analogy,

30

discrimination need not be solely because of handicap to be unlawful under the proposed amendment.

On the other hand, under this same reading of the amendment, municipalities may not be required to make any special accommodations for handicapped persons. Thus, it probably would not be a violation of the amendment to enforce valid occupancy laws against mentally retarded persons attempting to live in groups, if the law is applied uniformly to groups of non-handicapped persons. The subcommittee may wish to consider whether some limited modification of usually applied land use considerations should be required to remove barriers to the now well-established federal policy of encouraging de-institutionalization of mentally handicapped persons. See 42 U.S.C. 6010 (Congressional findings respecting rights of developmentally disabled).

.    In this regard, the "identical treatment" approach is not the only one which has been followed in the law pertaining to handicap discrimination. Under Section 504 of the Rehabilitation Act, discrimination against handicapped persons is viewed, under some circumstances, as not making necessary accommodations for handicap, and treatment of handicapped persons identically to non-handicapped persons is itself unlawful if it results in unequal benefits. See generally 45 C.F.R., Parts 80-84.

31

I recognize that in my discussion of the "handicap"
amendment I may have raised a number of questions in the
minds of some members of Congress on this most important
issue.  The fact that questions are raised should not be
deemed to suggest an opposition to coverage of handicapped
persons by the Fair Housing Act.  As one proponent of the
Rehabilitation Act stated, accessibility for the handicapped
is a matter of civil and human rights.  However, the sub-
committee may find that expeditious handling of this bill
would require addressing these questions separately from
the other provisions of the bill.

CONCLUSION

Thank you for permitting me to testify here today.
It is the hope of the Department of Justice that any
difficulties which may be encountered in devising a sound
national housing policy for handicapped citizens should not be
permitted to delay the passage of the vital provisions of the
bills before the Congress revising and improving the enforcement
mechanisms of the present Act.  The improvements these provisions
of the bill would make in existing law would represent a
committment by the Congress to have a fair housing law in this
nation which is truly effective.

32

Mr. EDWARDS. The Secretary has thoughtfully suggested that we question you, Mr. Days, and your colleagues, before she testifies.

Mr. DAYS. That is certainly fine.

Mr. EDWARDS. Mr. Seiberling.

Mr. SEIBERLING. Thank you.

Mr. Days, I just would like to ask a couple of questions with respect to the technical drafting of this bill.

On page 2 we have a provision that defines handicapped as including physical or mental impairment which substantially limits one or more such person's major life activities.

It seems to me that somehow or other we have got to make it clear that this does not mean that people cannot refuse to rent, for example, to someone who is mentally impaired to the point of being a serious risk from the standpoint of safety of other tenants, or complete inability to maintain their premises properly, or something like that.

How do we make that distinction, since the bill does not propose to make such a distinction?

Mr. DAYS. Well, as I indicated——

Mr. SEIBERLING. You are our legal expert, that is why I am raising it at this time.

Mr. DAYS. As I indicated in my testimony, we understand the bill to include a rule of reason, and certainly following through on a rule of reason there would be considerations with respect to the safety and well being of persons who would occupy these dwellings, but I think that either in the report or perhaps through some alteration of the language we can get at problems such as the type you described.

Mr. SEIBERLING. Well, if the language were ambiguous the report might help, but the language is quite clear and explicit. I would think it would help this committee if you could have your legal experts give us some advice on how to clarify that language.

Mr. DAYS. Well, this definition comes also in other handicapped legislation and it talks about solely on the basis of handicapped status. Certainly if there were these other characteristics that posed a threat to life and limb of other tenants it seems to me that would not be solely on the basis of handicapped.

Mr. SEIBERLING. Is the word "solely" in the act as amended by this bill?

Mr. DAYS. I don't believe solely is in this legislation.

Mr. SEIBERLING. We don't need to try to rewrite it now, but it would be helpful if you could give us your thoughts on that after you have had a chance to think about it.

Mr. DAYS. I would be happy to do so.

Mr. SEIBERLING. Secondly, at the top of page 3, instead of saying an aggrieved person includes any person who is injured and who is adversely affected, maybe that is a word of art, adversely affected, but I would have thought the word injured would be more precise and one that has a much longer record of judicial interpretation. I am not sure what adversely affected means in the legal sense but enlighten me.

Mr. DAYS. I do not think that the courts have had much difficulty interpreting aggrieved person in light of congressional intent, but what I was suggesting in my testimony is that since we already

33

have a Supreme Court construction of the langue in the Fair Housing Act, to the extent that the Congress decides to move to another definition, it should be careful to point out that it meant in no way to cut back on the very broad interpretation the Supreme Court has already given to that term. Aggrieved party or person has to be really construed on almost a statute-by-statute basis, it seems to me.

Mr. SEIBERLING. Well, I think if you could give us specific suggestions with respect to the drafting of that it would be helpful, including some more detailed references to Supreme Court decisions.

Mr. DAYS. Yes.

Mr. SEIBERLING. Thank you very much, Mr. Chairman.

Mr. EDWARDS. Mr. Drinan.

Mr. DRINAN. Thank you, Mr. Chairman.

Mr. Days, I commend you upon the way in which you and your colleagues are collaborating with the subcommittee in the development of a piece of legislation which I hope, shortly, is going to be approaching the monumental.

I am particularly pleased at your reference on pages 16 and 17 to the removal of legal barriers for handicapped persons who are being institutionalized. You did not have the opportunity to state this in full. Could you add anything to what is on page 17, when you suggest the subcommittee may wish to consider whether some limited modifications of usually applied considerations should be required to remove barriers? In other words, fill out, if you will, for the record, your thoughts on this matter, which is of particular interest to me.

Mr. DAYS. Well, as I indicated on page 17, Congress has already expressed its desire that institutionalized persons be moved into the community and it is our feeling, although it is not expanded on here, that perhaps with respect to state action Congress would have the authority to direct that local ordinances be overridden in order to make certain that the congressional policy of providing community-based treatment is in fact realized, and we do have some suggestions in that regard and we have been discussing with the staff ways in which that can be made more explicit in the legislation.

Mr. DRINAN. All right, fine. Well, I welcome your collaboration.

On another point related to an administrative law judge awarding damages, you are much more familiar than I with the brief that the National Committee Against Discrimination in Housing filed and it was their conclusion, as I understand it, that it would not be unconstitutional, it would not violate the seventh amendment, it would not negate the trial by jury if, in fact, the administrative law judge could give monetary damages.

Would you want to comment on that?

Mr. DAYS. Yes, we have studied the National Committee's document and think it is an excellent piece of work but continue to believe that there are substantial constitutional problems with the awarding of damages in the administrative process.

Mr. DRINAN. Would you just elaborate a bit, please.

Mr. DAYS. Well, it just has to do with the question of the application of the seventh amendment to the process and whether in

34

providing something that is other than equitable relief we are not entering into an analog to a trial at law, and if indeed it is a trial at law then the seventh amendment would apply. There would have to be some protection for persons who were going before this administrative process and certainly the Supreme Court has shown a reluctance to move away from these seventh amendment protections, simply looking at the substance of what is going on, not so much what the characterization of what is going on, to determine whether it is an analog as to an action at law and to the common law.

Mr. DRINAN. Is there any way to accommodate these two views? I would assume that you would agree that the deletion of damages would create an important remedial gap in the administrative scheme. I wonder if there is some way of bridging the views that your department holds which are, as I understand it, contrary to the National Committee Against Discrimination in Housing?

Mr. DAYS. Well, my feeling is that it does not provide a significant gap in the enforcement mechanism. If we look at it as a whole in context, certainly the administrative process will not be available to get damages, but referrals to the Attorney General will allow a person who really is in need of damages and deserves damages to obtain them, and there is the private right of action.

We see the administrative process as being a quick and effective means of getting people into housing and not so much situations where people have been substantially harmed to the extent that they require or deserve to receive damages. We think that is the genius of this mechanism, and to unduly incumber it with what we think are significant constructional questions may not be a wise course of action.

Mr. DRINAN. All right, I thank you for your response and again I thank you for all of the assistance that you are giving to this committee and to the Congress in this very important matter.

I yield back the balance of my time.

Mr. EDWARDS. Mr.Volkmer.

Mr. VOLKMER. Thank you very much, Mr. Chairman. I have several questions.

One, approximately how many staff would you have to add, if any, if we do enact this law?

Mr. DAYS. Well, my present expectation is that we would not require any significant increase in our staff. I think the thrust of this legislation is more toward beefed up enforcement at HUD——

Mr. VOLKMER. Right.

Mr. DAYS. But to the extent that we would be allowed to obtain damages in our litigation, I think we would be even more effective because at the present time we have been litigating what are essentially procedural questions where we really should not have to do that. We should be allowed to get adequate relief for the people we represent and we move on to the next problem. So I think, if anything, this is going to improve our effectiveness and make our use of our resources more efficient and more tailored to our responsibilities.

Mr. VOLKMER. Now, as I understand there is a provision for both plaintiff's attorney fees and defendant's attorney fees; is that correct?

35

Mr. DAYS. That is correct.

Mr. VOLKMER. I agree with you that this is a valid idea. Do you see any problem with liability by any administrative personel within HUD in exercising the duties and responsibilities that are assigned to them within the act?

Mr. DAYS. You mean could individuals be held liable?

Mr. VOLKMER. Yes.

Mr. DAYS. I think that is the law right now. But what we were suggesting in the testimony is that a failure to take affirmative action on the part of a Federal agency might be under the bill as it presently stands a basis for some type of action that we think would be unwarranted.

Certainly if a Federal employee or an agency acts in a way that discriminates and violates the fair housing law by making housing unavailable or taking some other action that is delineated, then liability should attach, but we are concerned about the failure to act in the affirmative sense as triggering some type of liability. We think that would be unwise.

Mr. VOLKMER. What about an overzealous action?

Mr. DAYS. Would you repeat that?

Mr. VOLKMER. What about being a little overzealous in action?

Mr. DAYS. And what about that?

Mr. VOLKMER. What about a liability?

Mr. DAYS. Well, I think that certainly to the extent that there is vexatious or harassing conduct on the part of a Federal agency, there might be a justification for the Government having to pay attorneys fees.

Mr. VOLKMER. So we are putting quite a burden on that person that is exercising the responsibility, are we not?

Mr. DAYS. I do not believe so. I think that we are putting the type of burden that they deserve to carry.

Mr. VOLKMER. Thank you, Mr. Chairman.

Mr. EDWARDS. Mr. Days, on page 3 you suggest that an amendment to the bill be drawn that would specifically provide for interlocutory district court review for respondents. Do you think that is an important change that should be made in the bill?

Mr. DAYS. Excuse me, Mr. Chaireman, I missed your question.

Mr. EDWARDS. On page 3, you suggest that the bill specifically provide for interlocutory district court review for respondents limited to whether the order was issued in a court and with due process and whether there is abuse of discretion by the Secretary. Do you have a suggested text for that amendment?

Mr. DAYS. We can provide language. We think that would be a helpful improvement.

Mr. EDWARDS. We would appreciate receiving that.

If the bill comes under attack, and I am sure that it will, we are going to have to prove and be confident in our assertion that there are sufficient procedural safeguards to protect the rights of both sides, because you have an agency here in HUD acting as an investigator, prosecutor, and judge, that is going to be criticized severely.

Do you think that that bill has sufficient procedural safeguards?

Mr. DAYS. I do and I am confident that HUD will set up a mechanism in a way that will not unduly prejudice the decision-

36

maker, ultimately the Secretary in this case, with respect to complaints that are filed.

Mr. EDWARDS. Is this scheme stronger or weaker than that which has been authorized for other Federal agencies to utilize?

Mr. DAYS. That is a very hard question to answer, Mr. Chairman. I think that it is a very strong statutory scheme for HUD. I understand, and I have not done as much research as I ought to have done with respect to the FTC and NLRB, but one of the questions that we have been asking is the extent to which the Secretary's order is self-enforcing and failure to comply with that order would then authorize the Secretary to go into court to seek some type of contempt or other sanction, or whether the order is not self-enforcing and requires the Secretary to go to court to make certain that that order becomes an enforceable order.

We certainly would like to urge the subcommittee and the Congress as a whole to interpret the Secretary's authority to be the former, that is, constituting a self-enforcing order that can subsequently be the basis for seeking contempt citations or other sanctions in a court if that order is not obeyed, insofar as the respondent is concerned.

Mr. EDWARDS. Do other agencies' enforcement schemes have that?

Mr. DAYS. Yes, it is my understanding the National Labor Relations Board has that scheme.

Mr. EDWARDS. I have no further questions. Counsel.

Mr. DAYS. I guess Mr. Volkmer has left, but my staff suggested to me perhaps he was talking about personal liability apart from just liability to abide by the act and take remedial action if there is a finding of a violation. I would simply say that to the extent that he was concerned about personal liability it would be necessary to look at the very statutes that allow suits against Government officials and they would apply in this context as well as any other, the Tort Claims Act and other provisions.

Mr. BOYD. Mr. Days, the minority membership of this subcommittee is regrettably absent and extends its apologies both to you and to Secretary Harris, Mr. Chairman, and has asked me to ask a few questions in their behalf, if I may.

Mr. DAYS. Yes.

Mr. BOYD. Relating to the chairman's questions on the civil penalties and the three-pronged role which the Secretary will play, how would you react if the final adjudicator, that is the modifier, currently the Secretary in the bill, was shifted to the Attorney General?

Mr. DAYS. I would be opposed to that.

Mr. BOYD. Why?

Mr. DAYS. Because I think that it is important for the Department of Housing and Urban Development to have this administrative remedy. I do not know of any other scheme where the ultimate decision is shifted to the Attorney General. I do not see anything inappropriate about the scheme that is under the bill and there are all kinds of ways in which the decisionmaking process can be maintained. Certainly the Secretary is not going to go out and conduct the original investigation and will not be in a position to prejudge the facts. She will be presented with a case and hear the

37

respondent's views on whether there has been a violation and make a decision.

Mr. BOYD. The Secretary files the administrative complaint?

Mr. DAYS. That is right, but it is based on an investigation that we would assume is done in a manner that protects the due process rights of the respondent.

Mr. BOYD. But that investigation is conducted by the Secretary, is it not?

Mr. DAYS. Well, I think one has to make a distinction with the so-called official role of the Secretary——

Mr. BOYD. I understand.

Mr. DAYS [continuing]. And the personal role she would play in the scheme.

Mr. BOYD. I am not suggesting she personally would do the investigation, but her agents would, HUD lawyers would.

Mr. DAYS. I still do not see any problem. I think that there are administrative procedures that are well established to make certain that the ultimate decisionmaker is not placed in a compromising position. Having made a final determination on the merits and then being asked to act in some type of quasi-judicial fashion, I think that this bill envisions secretaries acting in that manner and in a quasi-judicial role.

Mr. BOYD. Thank you. One additional question.

I take it that your position relative to the civil penalties, that is your opposition to it on sixth and seventh amendment grounds, is consistent with the Attorney General's stated opposition to civil penalties being pursued by anyone other than the Department of Justice; is that correct?

Mr. DAYS. No, I believe it is a different question. It is a close question. We do not have all the truth on this matter but we think it is a significant problem to have damages in an administrative procedure without the availability of trial protections, if you will. That is a different issue from the one that you just raised.

Mr. BOYD. Well, on January 27 of last year, the Attorney General wrote a letter to a Member of Congress in which he stated civil penalty actions are purely law enforcement matters and the Department of Justice has traditionally prosecuted Federal criminal and civil cases seeking money damages for penalties.

Can I infer from that he would oppose civil penalties in this instance in addition to the sixth and seventh amendment question?

Mr. DAYS. No, absolutely not. I do not know the context of that communication.

Mr. BOYD. It was on the litigating authority of the Department of Justice?

Mr. DAYS. No, I think the department's position and the Attorney General's position is that civil penalties under this circumstance would be perfectly appropriate.

Mr. BOYD. Thank you.

Thank you, Mr. Chairman.

Mr. EDWARDS. Mr. Drinan.

Mr. DRINAN. One last point. Mr. Days said very candidly that he and his department do not have the whole truth on this question of monetary relief by complainants, and I would suggest that the other half of the truth, that the National Committee Against Discrimination in Housing brief be made a part of the record.

Mr. EDWARDS. Without objection, so ordered.

[The information follows:]

February 14, 1979

NATIONAL COMMITTEE AGAINST DISCRIMINATION IN HOUSING

M E M O R A N D U M

Martin E. Sloane
Christine L. Owens

CONSTITUTIONALITY OF HUD
ADMINISTRATIVE ENFORCEMENT
OF TITLE VIII THROUGH
PROVISION OF MONETARY RELIEF
TO COMPLAINANTS

Introduction

The draft bill to amend Title VIII of the Civil Rights
Act of 1968 would make a number of significant changes in
the existing law. These proposed changes are in response to
the failure of the Federal Fair Housing Act, which embodies
a policy to which Congress has accorded "the highest priority,"
Trafficante v. Metropolitan Life Ins. Co. 409 U.S. 205, 211
(1972), to fulfill its great promise of equal housing opportunity.
Ten years after enactment of the Fair Housing Act and over
one hundred years after ratification of the Thirteenth
Amendment, discrimination in housing is still commonplace.
Thus, the Housing Marketing Practices Survey, recently
conducted by NCDH for HUD, found that, black homeseekers who
participated in the study encountered discrimination in
rentals 75 percent of the time, and in sales, 62 percent of
the time.

Without question, the most serious impediment to
fulfillment of Title VIII's goal to "provide...for fair
housing throughout the United States," 42 U.S.C. 3601, has
been the lack of adequate enforcement mechanisms. Title
VIII presently provides for three means of enforcement:
Suits by the Attorney General (42 U.S.C. 3613); suits by
private parties (42 U.S.C. 3612); and administrative complaints
to HUD (42 U.S.C. 3610). Each of these enforcement mechanisms
has serious weaknesses. In combination, they have proved
inadequate.

First, suits by the Attorney General are limited to those involving a "pattern or practice" or "an issue of general public importance." They do not provide redress for most individual complainants. Further, the entire responsibility for carrying out the Attorney General's role under Title VIII is assigned to a handful of attorneys constituting one section (Housing and Credit) of one division (Civil Rights) of the Department of Justice. As the Supreme Court realistically acknowledged in Trafficante, supra at 211, "the enormity of the task of assuring fair housing makes the role of the Attorney General in the matter minimal." */

Second, suits by private parties are often time-consuming, unwieldy, and extremely burdensome. This tends to discourage all but those most persistent and steadfast in their determination to exercise rights guaranteed by the statute. In addition, litigation is expensive. This effectively precludes private parties from pursuing this avenue of fair housing enforcement unless they can afford the often high cost of litigation or are able to secure the services of pro bono attorneys experienced in fair housing litigation willing to pursue those cases. **/

As Secretary Harris has concluded: "[A]s a practical matter, many complainants are unable to utilize the right to seek a remedy through the courts, and, therefore, must rely solely on the administrative process...." Proposed Amendments to the Fair Housing Act: Hearings on H.R. 3504 and H.R. 7787 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 95th Cong., 2d Sess., Ser. 46, at 31 (1978). (Statement of Patricia Roberts Harris)

---

*/ At the time of the Trafficante decision, the then Housing Section was concerned only with enforcement of fair housing rights under Title VIII. Since then, its responsibilities (and name) have been expanded to include credit as well as housing, but the staff and other resources available to it have remained virtually the same. Accordingly, the role of the Attorney General in Title VIII enforcement necessarily has become even more "minimal."

**/ The limited number of such attorneys can be appreciated by the fact that the NCDH Legal Program, with four staff attorneys, constitutes the largest single resource devoted exclusively to private fair housing litigation.

Third, enforcement through administrative complaints to
HUD suffers from the obvious, and often fatal, weakness that
HUD has no authority to provide any relief to the complain-
ing party, no matter how flagrant the violation nor how
egregious the injury to the complainant. Thus, although
Congress assigned responsibility for "Enforcement" to HUD,
42 U.S.C. 3610, the only authority HUD has is the authority
to meet with the parties, discuss the problem, and seek to
conciliate a solution. This enforcement mechanism in-
evitably has been unsuccessful. Indeed, as Secretary Harris
acknowledged at the February 1978 Hearings of the House
Judiciary Committee's Subcommittee on Civil and Constitutional
Rights, there have been relatively few housing discrimination
complaints under the administrative procedure authorized
under 42 U.S.C. 3610. Asked for an explanation, the
Secretary responded:

> I would venture a curbstone judgment
> that people don't usually undertake
> useless acts, and if it is apparent
> that there is not much point in bring-
> ing a complaint because one may have
> lots of meetings and lots of discussions,
> but there will be no remedy and certainly
> no quick remedy, the average complainant
> is not likely to come into the process.
> That is why I feel very strongly that
> we need enforcement potential.

Hearings, at 27.

The draft bill seeks to meet the problem of inadequate
administrative enforcement directly and, by and large, does
so successfully. The bill would provide for an administra-
tive procedure similar to that utilized by other enforce-
ment agencies, including full-scale investigations, find-
ings of "reasonable cause," opportunity for hearings, and

appropriate judicial review of a "final order." */ Significantly,
the draft bill would authorize issuance of an administrative
order "providing such relief as may be appropriate, and
[imposition] of a civil penalty not to exceed $10,000."
This provision would constitute a vast improvement over the
toothless conciliation process to which HUD is now limited
under existing Title VIII.  It contemplates issuance of
"cease and desist" orders, which can bring a halt to the
continuation of discriminatory practices by individual
respondents.  It also contemplates orders that can provide
access to the housing, if still available, by successful
complainants.  Further, it affords a strong deterrent to
future discrimination by providing for civil penalties in
amounts up to $10,000.

Although this new authority unquestionably would improve
and strengthen HUD's role in enforcing Title VIII, it falls
short of providing reasonable assurance to complainants
that, if successful, they will secure full relief.

---

*/ The draft bill differs in several respects from H.R.
3504, concerning which the Subcommittee on Civil and Constitutional
Rights held extensive hearings in 1978.  One significant
procedural difference is that, under section 810 of H.R.
3504, aggrieved persons would have been permitted to commence
civil actions after the conclusion of the HUD administrative
process.  The Office of Legal Counsel of the Department of
Justice, in commenting on the constitutionality of section
810 of H.R. 3504, expressed special concern over this.

> [T]he bill as presently drafted seems to
> invite money-minded plaintiffs to bring
> charges in the administrative forum, then
> to return to the district court if their
> initial efforts prove unsuccessful.

Hearings at 19, n. 5.

That concern has now been eliminated.  Under the new draft
bill, once the administrative hearing commences, complainants
would be precluded from instituting litigation.

42

Issuance of a cease and desist order, while it may eliminate future discrimination by the individual respondent, is of little practical value to complainants who are seeking relief from discriminatory acts already committed against them. By the same token, while the assessment of substantial civil penalties against individual respondents may deter future discrimination, it does not remedy the injury which the complainant has already sustained. And while an order that secures the housing for successful complainants may well remedy most of the injury they have suffered, as a practical matter, this relief frequently will not be available since by the time the lengthy administrative process has been completed, the housing will have been sold or rented.

What is missing from the draft bill is authority for HUD to order monetary relief for the complainant, such as expenses and other out-of-pocket loss resulting from the respondent's discriminatory conduct. */ In many cases, this will be the only relief that, as a practical matter, is available to the complainants. Even in those cases where, after the administrative process is concluded, the housing unit can be secured, failure to award monetary relief means that the successful complainant cannot be made entirely whole.

The importance of this remedial gap is, most obviously, that individual complainants who avail themselves of the administrative enforcement process will rarely be able to obtain all the relief to which they are legitimately entitled. In many cases, they are unlikely to secure relief that is of any practical and personal benefit to them.

The remedial gap is of great public importance in that it threatens to undermine the integrity and utility of the administrative process as an enforcement mechanism. It will be recalled that Secretary Harris explained the relatively small number of housing discrimination complaints filed with HUD under existing Title VIII by reference to the

---

*/ The term "appropriate," as used in the draft bill apparently is not presently intended to include monetary relief for the complainant.

43

lack of HUD authority to provide an adequate remedy. The
draft bill, in providing HUD with enforcement and other
remedial authority, clearly relies on an increased flow of
individual complaints as the source generating a vigorous
administrative enforcement program. But unless victims of
housing discrimination can be assured of the prospect of
securing full, make-whole relief, they will become increasingly
reluctant to avail themselves of the administrative process
and the flow of individual complaints, upon which the process
of administrative enforcement so heavily depends, will
inevitably dwindle into a relative trickle. Thus, authority
for HUD to order make-whole relief is essential to the
success of the administrative enforcement process. Without
it, complainants are likely to view use of this process as,
in Secretary Harris' phrase, "useless acts" and, accordingly,
avoid or abandon it.

Authority to provide such monetary relief through
administrative enforcement raises a question of compliance
with the requirements of the Seventh Amendment to the
United States Constitution. The Office of Legal Counsel and
the Congressional Reference Service, in considering this
issue in relation to the administrative procedure under H.R.
3504, both acknowledged that there was no clear-cut answer.
The Office of Legal Counsel suggested that, in light of the
apparent constitutional problem, other remedial approaches,
such as civil penalties, should be explored. */ NCDH is in
accord with the view that no definitive answer to the Seventh
Amendment problem can be given. Our examination of the
relevant case law, however, strongly suggests that there is
full judicial support for the proposition that there is no
constitutional impediment to Congress' delegation to HUD of
the authority both to adjudicate disputes arising under
Title VIII, and to award make-whole relief to complainants,
including monetary relief. A number of federal court decisions,

---

*/ The Office of Legal Counsel also acknowledged its lack of
expertise and sensitivity to the policy and administrative
considerations that are inevitably involved. Hearings at
18.

44

including those of the Supreme Court, while not specifically concerned with the precise issue involved here, have stressed the broad discretion of Congress to delegate to administrative agencies full authority to adjudicate matters of public interest within their special competence and to provide full, make-whole relief to complainants. Indeed, we are aware of no federal court decision that has ruled to the contrary. Further, the experience of other administrative agencies--federal and state--to which the respective legislatures have delegated such authority, also strongly suggests that Congress may provide for such full enforcement of public statutory rights through the use of administrative procedures, without in any way contravening the requirements of the Seventh Amendment. In the process, HUD will vindicate the larger public interests embodied in the Act, while at the same time providing significant deterrents to future violations.

Discussion

> I.  CONGRESS MAY ASSIGN AUTHORITY TO STATUTORY
> RIGHTS PRINCIPALLY INVOLVING PUBLIC, AS
> OPPOSED TO PURELY PRIVATE, INTERESTS TO
> EXPERT ADMINISTRATIVE AGENCIES, INCLUDING
> AUTHORITY TO ORDER MONETARY MAKE-WHOLE
> RELIEF FOR COMPLAINANTS.

The Seventh Amendment provides that "in Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend VII. In no case have the federal courts held that this provision is a bar to vesting enforcement powers in an administrative agency, including the authority to award monetary, make-whole relief to victims of practices made unlawful by valid acts of Congress. Indeed, the federal courts uniformly have upheld the constitutionality of administrative proceedings designed to effectuate the Congressional intent in enacting "public" statutes. By their nature, these administrative enforcement proceedings serve a variety of functions, only one of which is the provision of individual monetary relief. Proceedings of the type contemplated by the proposed Title VIII amendments are intended to vindicate the greater public interest of eliminating housing discrimination, while safeguarding the due process rights of alleged violators and providing adequate deterrence to future violations. Similar

45

proceedings have been upheld, both where the monetary relief
runs primarily to the individual who has been injured by
the complained-of practice, NLRB v. Jones & Laughlin Steel
Corp., 301 U.S. 1 (1937), and where the relief ordered
takes the form of a civil penalty to be paid to the United
States Government.  Atlas Roofing Co., Inc. v. Occupational
Safety and Health Review Commission et al., 97 S.Ct. 1261
(1977).

47-614 O - 79 -- 4

46

Atlas Roofing is the most recent Supreme Court decision dealing with the enforcement powers of administrative agencies and is thereby deserving of careful analysis. There, the Court upheld an administrative scheme for enforcement of the provisions of OSHA which provided for the assessment of a civil penalty against a violator, "without the employer ever being entitled to a jury determination of the facts constituting the violation." 97 S.Ct. at 1265. The Court noted that Congress, after conducting extensive investigations into the problems of workers' health and safety, had concluded that a "drastic 'national' problem" existed, and that existing statutory and common law remedies were inadequate to resolve the crisis. On that basis, the Court held that the Seventh Amendment does not operate as a bar to Congressional action entrusting enforcement of statutory rights to administrative agencies.

The Court said:

> At least in cases in which 'public rights' are being litigated--e.g., cases in which the Government sues in its sovereig.. capacity to enforce public rights created by statutes within the power of Congress to enact--the Seventh Amendment does not prohibit Congress from assigning the fact-finding function and initial ad- judication to an administrative forum with which the jury would be incompatible.

97 S.Ct. at 1266

Thus, as the Atlas Roofing Court made clear, Congress is vested with a great deal of discretion in determining the forum to which protection of public rights will be assigned. The Court emphasized: "[T]he right to a jury trial turns not solely on the nature of the issue to be resolved, but also on the forum in which it is to be resolved." Id. at 1272. Accordingly, where the right involved is a public right, and where an administrative agency is an appropriate forum for adjudication of that right, the Seventh Amendment guarantees do not come into play. The specific nature of the remedy involved in a particular proceeding is by no means the sole consideration. In Atlas Roofing, the Court specifically upheld Congress' authority to empower administrative agencies to order monetary relief--there in the form of civil penalties--

47

without contravening the Seventh Amendment.  The fact that
the remedy was imposition of civil penalties was virtually
ignored by the Supreme Court and played no apparent part in
its decision.

The Court in Atlas Roofing did not, in any real sense,
break new ground or enunciate new legal principles regarding
the Seventh Amendment that differed sharply from those
followed in previous cases.  Thus a substantial number of
labor law cases, starting with National Labor Relations Board
v. Jones & Laughlin Steel Corp., supra, had already been
decided in accordance with the principles affirmed in Atlas Roofing.
In Jones & Laughlin, the Court upheld the constitutionality
of the National Labor Relations Act's provisions which
empowered the Board to conduct adminstrative hearings based
on charges of unfair labor practices and to order appropriate
monetary relief to complaining parties, as well as reinstatement.
As in Atlas Roofing, the Jones & Laughlin Court stressed the
significant "public" interest concerns which motivated
Congress in enacting the legislation.  The Court noted that
"the right of employees to self-organization and to have
representatives of their own choosing for the purposes of
collective bargaining is often an essential condition of
industrial peace." 301 U.S. at 42.  The fact that individual
monetary relief was awarded in unfair labor practice proceedings
was deemed incidental to the Board's larger role of enforcing
public policy as enunciated by the Act.  Against claims of
constitutional infirmity, the Court found no constitutional
impediment to the scheme enacted by Congress.

Of special importance is that the Court found the
Board's order awarding monetary relief in the form of backpay
to complaining parties to be a proper exercise of constitutionally
permissible authority.  To the claim that the Seventh Amendment
barred such awards without a trial by jury, the Court stated
that the Amendment has "no application to cases where recovery
of money damages is an incident to equitable relief even

48

though damages might have been recovered in an action at
law." 301 U.S. at 48. The Court added:

> Reinstatement of the employee and payment
> for time lost are requirements imposed
> for violation of the statute and are
> remedies appropriate to its enforcement.

Id.

Cases subsequent to Jones & Laughlin have also made it clear
that the NLRB's authority to award backpay is not limited to
situations in which hiring or reinstatement are ordered.
Thus, the Supreme Court has affirmed Board orders of backpay
alone, Phelps Dodge Corp. v. National Labor Relations Board,
313 U.S. 177 (1941), and Radio Officers' Union v. National Labor
Relations Board, 347 U.S. 17 (1954). In each case, the
Court stressed that the remedy of backpay is designed to
make the employee whole for the losses suffered as a result
of the unfair labor practice. Indeed, the Court in Phelps Dodge
stated:

> Making the workers whole for losses suffered
> on account of an unfair labor practice is
> part of the vindication of the public
> policy which the Board enforces.
313 U.S. 197.

The Office of Legal Counsel memorandum notes that
Jones & Laughlin may not be dispositive of the constitutional
issue of providing monetary relief under Title VIII because
in that case the monetary relief consisted of backpay, which
"was basically equitable in nature...." Hearings at 17. To
be sure, the monetary relief that HUD would be authorized to
provide under Title VIII could not be characterized as
backpay. Rather, HUD would be authorized to order make-
whole relief, in the form of out-of-pocket loss to the
complainant resulting from a respondent's unlawful discrimination.
The distinction, however, is hardly one of constitutional
dimension; rather, it reflects the differences between the
nature of the injuries resulting

49

from housing discrimination and those resulting from unfair
labor practices. To characterize monetary relief for loss
of backpay as "equitable" and similar relief for out-of-
pocket loss as "legal" has little or no relevance to the
question of whether a jury trial is required in order that
a victim of housing discrimination be accorded full relief
for the injury suffered as a result of the unlawful act.

Indeed, the Supreme Court, in Atlas Roofing, specifically
rejected the contention that its earlier decision in Jones &
Laughlin had turned on whether the administrative proceeding
was equitable in nature. 97 S.Ct. at 1269. In so doing,
the Court pointed to its earlier decision in Block v. Hirsh,
256 U.S. 135 (1921), in which it had upheld the constitutionality
of the establishment of an administrative tribunal with authority
to determine reasonable hold-over rents. In that case, the
Atlas Court noted, it had "squarely rejected a challenge to
the statute based on the Seventh Amendment." 97 S.Ct. at 1267.
Moreover, In Curtis v. Loether, 415 U.S. 189 (1974), */ a case
involving the right to trial by jury in Title VIII proceedings
brought in federal district courts, the Court expressly stated
that it "need not, and [did] not go so far as to say that any
award of monetary relief must necessarily be 'legal' relief,"
[and thereby subject to the Seventh Amendment's jury trial
guarantee].

A recent decision by the Supreme Court further demonstrates
that its decision in Jones and Laughlin was not based on the
mere characterization of backpay as incidental to "equitable"
relief. In Lorillard v. Pons, 98 S.Ct. 866 (1978), the Court
held that a trial by jury was required in civil actions
brought either by the Secretary of Labor or a private com-
plainant to enforce the provisions of the Age Discrimination
in Employment Act. **/ In support of its holding, the Court
looked to Congressional intent in enacting the ADEA, as well
as to its enforcement sections, which provide that in actions

---

*/ For further discussion of Curtis v. Loether, see infra at 17.

**/ The ADEA provides only for enforcement through a civil
action in federal district court, filed either by the Secretary
of Labor or by private complainants 29 U.S.C. 621, 626(b) & (c).

50

brought either by the Secretary or by a private complainant, courts are empowered to award appropriate "legal or equitable relief." 98 S.Ct. 871. (emphasis in original). The Court concluded that since "the word 'legal' is a term of art" which calls into play the protections of the Seventh Amendment, "Congress knew the significance of the term...and intended that there would be jury trial on demand." Id. The Court pointed out that Congress had not specified which relief was equitable and which was legal; however, it was clear to the Court that Congress intended "'legal relief' to refer to judgments 'enforcing... liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation'." Id. n. 11.

Manifestly, there is no discernible distinction, in law or in logic, between unpaid minimum wages or unpaid overtime awards, as in Lorillard, and backpay awards, as in Jones & Laughlin. Nor was this the basis for Court's decision in Lorillard that a jury trial was required. Rather, the decision was based on the fact that Congress had assigned enforcement of the ADEA to the federal courts and that Congress, by use of the term of art, "legal," had expressed its intent that the Seventh Amendment's jury trial requirement was to apply.

Moreover, the argument that there exists a distinction between "backpay" and other "make-whole" relief, which somehow justifies the award of the former by an administrative agency, but not the latter, is further contradicted by consistent judicial affirmance of NLRB orders which extend beyond the traditional backpay remedy. Courts have not deemed the Board to be restricted in the exercise of its remedial authority by the express authorization to award backpay. Rather, they have looked to the language of the statute which orders the Board to take "affirmative action" to effectuate the purposes of the Act and granted the Board wide discretion in the shaping of appropriate remedies. Thus, the Second Circuit in National Labor Relations Board v. Cadillac Wire Corp., 290 F.2d 261 (2d Cir. 1961), upheld a Board order requiring the employer and union to reimburse

employees for union dues wrongfully withheld from their
paychecks during their first 30 days of work.  The Court
said:

> Such a 'reimbursement' is not 'punitive'....
> Reimbursement is therefore 'remedial' within the
> language of... Local, 60 v. N.L.R.B., since it
> enables the Board to take measures designed
> to recreate the conditions and relationships
> that would have been had there been no unfair
> labor practice.  By hypothesis the unlawful
> payment of the due was coerced, and the
> repayment of the whole amount merely put the
> employee in the same position he would have
> been in had the statute been obeyed.

290 F.2d at 263.

In short, the relief, though not backpay, was necessary
for make-whole purposes and was held to be in accordance
with constitutional requirements.

Similarly, the District of Columbia Circuit, in an
opinion by then Judge, now Chief Justice Burger, affirmed a
Board award which included interest on backpay.  In
International Brotherhood of Operative Potters AFL-CIO
v. National Labor Relations Board, 320 F.2d 757 (D.C. Cir.
1963), the court noted that the Board's "longstanding policy"
had been to deny interest on backpay awards, but rejected
the defendant's argument that, absent express authorization,
the Board was without authority to change its policy and
make such awards.  Rather, the court stated:

> In the evolution of the law of remedies
> some things are bound to happen for the
> 'first time.'  As a supplement to exist-
> ing remedies long approved we cannot say
> that the allowance of interest is other
> than a factor which effectuates the
> policies of the Act for it is plainly
> in the direction of making the employee
> whole.... We cannot regard changes in
> remedial mechanisms as beyond the
> Board's powers so long as they
> reasonably effectuate the congressional
> policies underlying the statutory scheme.

320 F.2d at 761

See also National Labor Relations Board v. Mooney Aircraft,
Inc., 375 F.2d 402 (5th Cir. 1967), in which the court
affirmed an award of backpay which was computed on the basis
of what the unlawfully discharged employee would have been
paid had he been promoted on a date certain after his dis-
charge, rather than on the basis of his salary at the time
of his unlawful termination.  In addition, the court upheld
that portion of the Board's order which required the defendant
to continue paying the employee this differential, even after
reinstatement, until such time as he was actually promoted.

52

The Supreme Court has also upheld orders of the Board which required employers to pay fringe benefits promised under the terms of collective bargaining agreements. In National Labor Relations Board v. Strong, 393 U.S. 357 (1969), the Supreme Court, after finding that the refusal of an employer to sign a collective bargaining agreement which had been negotiated between the union and an employers' association constituted a violation of section 8(a)(5), of the Act 29, U.S.C. 158(a)(5), held:

> Once adjudicated, [the unfair labor practice] could be remedied by a Board order requiring payment of those fringe benefits which would have been paid had the employer signed and acknowledge [sic] the contract which had been duly negotiated....

393 U.S. at 362.

It is not clear just how far the Board's authority to remedy violations of the National Labor Relations Act extends. Again, however, the courts have consistently evinced an intent to give the Board wide discretion in fashioning relief. Thus, in affirming the NLRB's refusal to award compensatory damages or backpay to independent contractors whom the Board had ordered reinstated, the Court of Appeals for the Ninth Circuit relied, not on any Seventh Amendment considerations, but on the broad discretionary authority of the NLRB. The Court said:

> When, and to what extent, damages may serve the policy of the National Labor Relations Act in a given case, is a complex problem for the Board to decide in light of its administrative experience and knowledge. The Board draws on a unique fund of expertise, and its choice of remedy must be given special respect by the reviewing courts.

Newspaper & Periodical Drivers & Helpers Union, Local No. 921 v. National Labor Relations Board, 509 F.2d at 99, 100, cert. denied 423 U.S. 831 (1975).

53

Moreover, the District of Columbia Court of Appeals has remanded cases to the Board for failure to provide an adequate remedy under the circumstances. In International Union of Electrical, Radio and Machine Workers, AFL-CIO, v. Tiidee Products, Inc. (Tiidee I), 426 F.2d 1243 (D.C. Cir.), cert. denied 400 U.S. 950 (1970), the court found that the Company's refusal to bargain, after a valid election, was a "clear and flagrant violation of the law," which necessitated the entry of an order providing a remedy other than the "traditional" cease and desist order. 426 F.2d at 1248.

Tiidee III finally disposed of the disputes in this case. In International Union of Electrical, Radio and Machine Workers, AFL-CIO v. National Labor Relations Board, 502 F.2d 249 (D.C. Cir.), 417 U.S. 921 (1974), the court, after the original remand and an intermediate enforcement hearing, 440 F.2d 298 (1970), affirmed the Board's order awarding attorneys' fees and litigation expenses to the plaintiff union. In Ex-Cell-O-Corp. v. NLRB, 440 F.2d 1046, (D.C. Cir. 1971), the court specifically upheld the Board's authority to order monetary relief, in the form of "make-whole" compensation. The court said:

> The clear import of Tiidee Products--I is that an employer's refusal to bargain based on a frivolous challenge to an election is of itself a serious and manifestly unjustified repudiation of the employer's statutory duties and denial of employees' statutory rights to collective bargaining, and that 'make-whole' compensation is a proper remedy.... (emphasis added) */

449 F.2d at 1049

---

*/ The court granted the Union's motion for summary reversal, and remanded with explicit directions for the Board to consider the propriety of awarding "make-whole" relief under the circumstances of the case. On subsequent review, Ex-Cell-O-Corp. v. NLRB, 449 F.2d 1058 (D.C. Cir. 1971), the court affirmed the denial of "make-whole" compensation on the ground that the company's action had not been "frivolous." The court emphasized, again, that the original remand was because "the Board, explicitly refusing to adhere to Tiidee Products--I, erroneously concluded that it had no statutory authority to award 'make-whole' compensation," 449 F.2d 1064, and that it (the court) "believed[d] the Board erred in its analysis of the applicable legal rules...." Id., at 1065.

54

Thus, as the preceding discussion demonstrates, neither the nature of the relief which an administrative agency is empowered to award nor the characterization of that relief-- equitable or legal--is decisive in determining the applicability of the Seventh Amendment trial by jury guarantees. Rather, the type of interests asserted--public vs. purely private--, the forum in which those interests are to be addressed-- administrative vs. judicial--and the intent of Congress, determine the constitutionality and propriety of vesting en- forcement powers in an administrative agency.

Under the proposed Title VIII amendments, the interests served by providing more effective enforcement through the administrative process are unquestionably public, not private. As the Supreme Court has emphasized, Title VIII represents a policy to which Congress has accorded "the highest priority." Trafficante, supra at 211. The monetary relief for complainants is only incidental to the larger public interest in eliminating housing discrimination as a fact of American life. The forum chosen by Congress would be an administrative one, "where jury trials would be incompatible with the whole concept of administrative adjudication." Curtis v. Loether, supra at 194. And Congress clearly intends, through the proposed amendments, that adjudication and relief be a matter for administrative determination, with appropriate judicial review. Thus, it would be entirely proper for Congress to vest full enforcement powers, including the authority to award make-whole monetary relief to victims of housing discrimination, in HUD, the expert housing agency.

**55**

Curtis v. Loether, 415 U.S. 189 (1974) is the only case
in which the Supreme Court has had the opportunity to determine
the application of the Seventh Amendment's jury trial requirement
to Title VIII.  There, the Supreme Court held that, under
the circumstances of that case--a civil action in federal
district court, involving a private plaintiff and a private
defendant, in which money damages as well as injunctive
relief were sought--the jury trial requirement was applicable.
Curtis, however, cannot reasonably be read as barring administrative
awards by HUD of monetary, make-whole relief to complainants.
Indeed, the Court's opinion provides support for the constitutionality
of such administrative awards.

In Curtis, the Court was careful to limit its decision
to the specific facts of the case before it, spelling out
not only what it was deciding, but what it was not deciding.
Further, the Court indicated that under circumstances other
than those specifically presented in Curtis, the decision on
the jury trial requirement might well be different.

First, while noting that "the relief sought here--
actual and punitive damages--is the traditional form of
relief offered in the courts of law," 415 U.S. at 196, the
Court stressed:  "We need not, and do not, go so far as to
say that any award of monetary relief must necessarily be
'legal' relief," [and thereby subject to the Seventh Amendment's
jury trial requirement].  Id.

Second, the Court made clear that the result of its
decision was "only to direct that a certain form of pro-
cedure be employed in federal court actions under § 812."
Id. at 192, n. 6 (emphasis added).  Thus the Court left un-
decided whether the same procedure must be followed in
judicial forums other than the federal courts */ or when
enforcement mechanisms other than the judicial ones provided
under section 812 are employed.

---

*/ Indeed, the Court recognized that actions under section
812 may be instituted in state, as well as federal court,
but declined to "express [any] view as to whether jury
trials must be afforded § 812 actions in the state courts."
Id. at 192, n. 6.

56

Third, the Court said:

> [W]hen Congress provides for enforce-
> ment of statutory rights in an ordinary
> civil action in the district courts,
> where there is obviously no functional
> justification for denying the jury
> trial right a jury trial must be avail-
> able if the action involves rights and
> remedies of the sort typically en-
> forced in an action at law (emphasis
> added).

Id. at 195.

Thus the Court, by negative implication, strongly suggested
that if there is a functional justification for denying a
jury trial it need not constitutionally be provided. As the
prime example of a case involving such a functional justification,
the Court cited NLRB v. Jones & Laughlin Steel Corp., supra,
where the Supreme Court had upheld the award of backpay by
the NLRB without a jury trial. The Curtis Court emphasized:

> Jones & Laughlin merely stands for the
> proposition that the Seventh Amendment
> is generally inapplicable in administra-
> tive proceedings where jury trials would
> be incompatible with the whole concept
> of administrative adjudication and would
> substantially interfere with the NLRB's
> role in the statutory scheme.

415 U.S. at 194.

Thus Curtis does not hold, nor does it suggest, that
the Seventh Amendment operates as a bar to vesting enforce-
ment powers in an administrative agency, including authority
to award monetary, make-whole relief to individual com-
plainants. NCDH submits that the role of HUD in protecting
against housing discrimination would be functionally identical
to the role of the NLRB in protecting against unfair labor
practices and that, just as the NLRB's authority to award
backpay and other monetary relief to private complainants
has been upheld, so too would similar authority accorded to
HUD.

57

The Court's later ruling in <u>Atlas Roofing</u> underscores the limited nature of the <u>Curtis</u> holding and reaffirms, as did <u>Curtis</u>, the constitutional authority of Congress to assign enforcement of statutory rights to an administrative agency. Further, the <u>Atlas Roofing</u> Court enunciated principles of general applicability concerning the circumstances under which Congress may assign such enforcement authority to an administrative agency.

First, in upholding the authority of OSHA to order monetary relief--there, civil penalties--the Court pointed to the already heavy burden on the federal courts and expressed concern over imposing new burdens on them regarding areas in which they have no special competence. The Court said:

> Congress is not required by the Seventh
> Amendment to choke the already crowded
> federal courts with new types of
> litigation nor prevented from committing
> some new types of litigation to administra-
> tive agencies with special competence in
> the relevant field. */

<u>Id</u>. at 1269.

The Court emphatically added on this point:

> This is the case even if the Seventh
> Amendment would have required a jury
> where the adjudication of those rights
> is assigned instead to a federal court
> of law instead of an administrative
> agency.

<u>Id</u>.

Second, the Court quoted with approval its earlier statement in <u>Curtis</u> upholding "'congressional power to entrust enforcement of statutory rights to an administrative process...free from the strictures of the Seventh Amendment.'" <u>Id</u>. at 1268.

Third, as noted earlier, the Court rejected the contention that its decision in <u>Jones & Laughlin</u> had turned on the fact that the proceeding there had really been equitable in nature. <u>Id</u>. at 1269.

---

*/ The Office of Legal Counsel notes that Title VIII is not new legislation, having been enacted more than 10 years ago, and that <u>Curtis</u> v. <u>Loether</u> was decided more than four years ago. Hearings at 18. But provision for administrative en- forcement can hardly be viewed as "cosmetic," nor as a subterfuge to evade the right to a jury trial. The proposed Title VIII amendments are in response to 10 years of experience demonstrating that sole reliance on the courts for enforce- ment is inadequate. Certainly, it cannot be argued that, once Congress assigns enforcement of a statutory right, it may never provide for any other means of enforcement.

58

Fourth, the Court discussed the history of the Seventh

Amendment, concluding that it was "never intended to establish

the jury as the exclusive mechanism for fact-finding in

civil cases." Id. at 1271.

The Court said:

> We cannot conclude that the Amendment
> rendered Congress powerless--when it
> concluded that remedies available in
> courts of law were inadequate to
> cope with a problem within Congress'
> power to regulate--to create new
> public rights and remedies by statute
> and commit enforcement, if it chose,
> to a tribunal other than a court of
> law--such as an administrative agency--
> in which facts are not found by juries.

Id. (emphasis added).

In upholding the enforcement authority of OSHA, the Court

stressed:

> [The] right to a jury trial turns
> not solely on the nature of the
> issue to be resolved, but also on the
> forum in which it is to be resolved.

Id. at 1272.

Fifth, the Court reaffirmed, in carefully qualified

terms, the circumstances under which the Seventh Amendment's

jury trial requirement applies. "The Seventh Amendment

prevents Congress from depriving a litigant of a jury trial

in a 'legal' action before a tribunal customarily utilizing

a jury as its fact-finding arm...." Id. at 1272, n. 16.

This statement echoes precisely the similarly qualified

holding of Curtis v. Loether, supra, a holding which manifestly

does not present any constitutional impediment to vesting in

HUD the authority to award make-whole relief.

Finally, while Atlas Roofing involved the imposition of

civil penalties, payable to the Government, rather than

damages for out-of-pocket loss, payable to the complainant,

the Court placed no importance on this distinction, nor did

it play any apparent part in the decision.

II. OTHER FEDERAL AND STATE AGENCIES
ARE EMPOWERED TO AWARD MAKE-WHOLE RELIEF,
INCLUDING MONETARY RELIEF TO COMPLAINANTS
PARTICIPATING IN THE AGENCY'S ENFORCEMENT PROCEEDINGS

The constitutionality and propriety of the administra-

tive enforcement mechanisms which the proposed Title VIII

amendments would vest in HUD finds further support in the

fact that similar mechanisms are already available to other

agencies. Indeed, they are patterned after administrative

procedures currently employed by other federal agencies.

59

Similarly, a number of states have empowered appropriate
agencies to enforce the requirements of public legislation,
including fair housing legislation. In each instance, the
enforcement powers of the agencies extend well beyond issuance
of cease and desist orders and the assessment of civil
penalties. Congress and the states have authorized these
agencies to award full and appropriate monetary relief to
compensate complainants for the injuries suffered as a
result of the discriminatory and/or unfair practices.

As noted earlier, the National Labor Relations Board
has long been authorized to award backpay, with or without
reinstatement, to employees who have been victimized by
unfair labor practices. The Board's proceedings, like those
contemplated for HUD, provide for the filing of a charge, a
hearing with appropriate notice and opportunity to be heard,
and appeal to the Court of Appeals for review of the Board's
decision. Moreover, the Supreme Court has upheld this
authority of the Board to order monetary, make-whole relief,
even in situations where there is a parallel remedy in
federal district court. The Court in N.L.R.B. v. Strong,
supra, affirmed a Board order requiring the employer to pay
fringe benefits to his employees, in the face of the employer's
argument that "ordering the payment...of benefits reserved
in the contract inserts the Board into the enforcement of
the collective bargaining agreement, contrary to the policy
and scheme of the statute." 393 U.S. at 360.

The Interstate Commerce Commission, too, has long been
authorized to award damages, i.e., reparations, to individual
or other specified complainants alleging violations of Title
49 of the United States Code. Section 13 empowers the Commission
to receive complaints and conduct investigations and hearings.
49 U.S.C. 13. Section 16(1) provides:

> (1) If, after hearing...as provided in
> section 13 of this title, the commission
> shall determine that any party complainant
> is entitled to an award of damages under
> the provisions of this chapter...the
> commission shall make an order directing
> the carrier to pay to the complainant
> the sum to which he is entitled on or
> before a day named. 49 U.S.C. 16(1)
> (emphasis added).

60

Section 16(2) details the procedures available for enforcement of the Commission's order. The Court, in Meeker v. Lehigh Valley Railroad Company, 236 U.S. 412 (1914), upheld the constitutionality of that portion of section 16(2) which renders the findings of the Commission "prima facie evidence of the facts stated therein," 49 U.S.C. 16(2), against an argument that the right to fact-finding by a jury was deprived. There have been no reported challenges to the Commission's authority to award damages to complaining parties.

More recently, Congress has explicitly authorized an administrative commission to hear complaints of discrimination made by miners and to award appropriate relief to remedy the injuries suffered as a result of the discriminatory action. Thus, in the Federal Coal Mine and Safety Act of 1969, as amended in 1977, 30 U.S.C. 801 et seq., Congress provided that miners or applicants for employment who believe that they have been discriminated against by their employers because of their assertion of rights protected by the Act can file complaints with the Secretary. If after preliminary investigation, the Secretary determines that the anti-discrimination provisions of the Act have been violated, the Secretary must immediately file a complaint with the Federal Mine Safety and Health Review Commission, which in turn conducts a hearing, makes findings, and awards appropriate relief. The Commission is authorized to order the employer "to take such affirmative action to abate the violation as ... appropriate, including, but not limited to, the rehiring or reinstatement of the miner to his former position with backpay and interest." 30 U.S.C. 815(c)(3) Review of the Commission's orders by appeal to the appropriate Court of Appeals is identical to that proposed in the Title VIII amendments.

In enacting amendments to the Act in 1977, Congress
made clear that the Commission was to provide full relief to
complainants, including monetary relief.   Thus the Senate
Committee emphasized:

> It is the Committee's intention that the
> Secretary propose, and that the Commission
> require, all relief that is necessary to make
> the complaining party whole and to remove
> the deleterious effects of the discriminatory
> conduct including but not limited to
> reinstatement with full seniority rights, backpay
> with interest, and recompense for any special
> damages sustained as a result of the discrimination.
> The specified relief is only illustrative.

S. REP NO. 181, 95th Cong., 2nd Sess. 37 (1977).
[emphasis added]

Here , as in the case of the proposed Title VIII amendments,

Congress was concerned with vindicating the public interest

in eliminating the "deleterious effects of the discriminatory

conduct."  Here, as under the Title VIII amendments, Congress

designated an administrative body to adjudicate the complaints.

And here, as under the Title VIII amendments, Congress

expressed the intention that the agency provide full relief,

including "backpay with interest, and recompense for any

special damages sustained as a result of the discrimination."

In addition to federal agencies, a variety of state

agencies have been empowered to administer and enforce

various state laws, including specifically fair housing

laws.  */   Generally, the proceedings established by state

fair housing laws provide for the filing of complaints

alleging a discriminatory housing practice; investigation by

the appropriate agency or commission; attempts, after a

finding of probable cause, to conciliate the discriminatory

practice; upon failure of conciliation, the filing of a

certified complaint or notice by the agency; a hearing on

the record, conducted by the agency; and a final order,

which includes both a cease and desist order and individualized

relief.  The individualized relief most often takes the form

of money "damages" for the victims of housing discrimination.

In fact, such relief is frequently specifically authorized.

---

*/ The discussion which follows regarding the procedures and
powers of several state fair housing agencies is not intended
to be exhaustive.  We have not attempted to review the
statutes of every state; rather, we have selected a few with
which we have some familiarity, and which we feel are illustrative
of administrative bodies possessing meaningful enforcement
mechanisms.

62

Thus, California's Fair Employment Practices Commission
is authorized to order the sale or rental of a contested
housing unit, or a like unit, or to require respondent to
pay "damages," not to exceed $1,000, to the aggrieved party
if the former remedy is unavailable.  California Health and
Safety Code, § 35700, 35738(3).  Similarly, the Massachusetts
Commission Against Discrimination is empowered to award
"damages," not to exceed $1,000.  Annotated Laws of Massachusetts,
Chapter 6 § 33(5).  Such damages, by statute, include expenses
incurred for obtaining alternate housing, storage, moving
and any other expenses. Other state commissions authorized
to award "damages" include the District of Columbia ("compensatory
damages"), Human Rights Act of 1977, Sec. 301, 313; Kentucky
("damages"....including "compensation for humiliation and
embarrassment" and expenses incurred), KRS, Ch. 344, Sec.
230; Missouri ("an award of actual damages"), Mo. Human
Rights Law, 213.120; and New York ("compensatory damages"),
NY Human Rights Law, Art. 15, 297(4)(c).  In addition,
Minnesota law authorizes the award of "compensatory damages,
except damages for mental anguish or suffering," as well as
"punitive damages in an amount not less than $25 nor more
than $500,"  Minnesota State Act Against Discrimination,
363.071, subd.2.  And the Michigan Commission on Civil
Rights is empowered to issue a final order requiring the
respondent to pay the complainant "damages for an injury or
loss caused by "violation of the Act, including attorneys'
fees."  Michigan Civil Rights Act, Act No. 453, Public Acts
of 1976, Sec. 602.

Even where damage awards are not specifically authorized
by statute, they have nonetheless been upheld. Thus, the New
Jersey Supreme Court upheld an award of damages to a victim
of housing discrimination, pursuant to a statutory scheme
which authorized the Director of the Division of Civil
Rights to conduct hearings, make findings, and order such
"affirmative action... as, in the judgment of the director,...will
effectuate the purpose of the act."  Jackson v. Concord Company

54 N.J. 113, 253 A.2d 793, 799 (1969). The <u>Jackson</u> court
spoke emphatically of the public interest in protecting the
rights guaranteed by the administrative scheme:

> From all of this it is patently clear
> that the Legislature intended to create
> an effective enforcement agency in order
> to eradicate the cancer of discrimination.
> Even in the case of an individual
> complainant, it is plain that the public
> is involved. Discrimination, by its
> very nature, is directed against an
> entire class in the particular
> circumstances and wrongful conduct against
> a complaining individual is indicative of
> such a state of mind in the wrongdoer
> against the class.

253 A. 2d 799.

The Court found no constitutional objection to "legislative
authorization to an administrative agency to award, as
incidental relief in connection with a subject delegable to
it, money damages." <u>Id</u>. at 800. Rather, the only question
was whether the Legislature had intended to give such authority
to the Director, a question which the Court answered in the
affirmative. The Court reasoned that since backpay had been
specifically authorized in employment discrimination cases,
make-whole monetary damages were the obvious analogous
remedy in housing discrimination cases. Significantly, the
Court emphasized the exclusivity of the administrative
remedy, noting that the "final determination...shall exclude
any other action." <u>Id</u>. at 801. In the Court's mind, the
foreclosure of other remedial actions necessitated the con-
clusion that the Director was authorized to award monetary
damages for losses incurred.

1:13-cv-08564 Document #: 134-5 Filed: 08/11/17 Page 84 of 473 PageID

Thus the administrative enforcement procedure provided under the proposed Title VIII amendments is not unique. Virtually identical procedures have been authorized and utilized by a variety of federal and state agencies, including a number of fair housing agencies. In many cases, the remedial powers assigned to these agencies have included the power to order make-whole, monetary relief. These have presented no insuperable Seventh Amendment problems to the respective legislatures that have enacted them, nor to the courts on those occasions when they have been called upon to determine their validity and propriety.

Conclusion

The necessity for amending Title VIII to provide for administrative enforcement has been established by more than 10 years of experience demonstrating the ineffectiveness of reliance on the combination of litigation and HUD conciliation. The proposed amendments to Title VIII would provide HUD with extensive enforcement authority, but not the authority to award monetary relief, in the form of out-of-pocket loss, to complainants. The unavailability of complete relief serves as a disincentive to complainants who would otherwise pursue administrative remedies. Since effective administrative enforcement would depend so heavily on the willingness of aggrieved persons to complain to HUD and pursue the administrative process, the lack of HUD authority to order full relief to complainants, including monetary relief, threatens to undermine the integrity and viability of the administrative enforcement procedure that is necessary to achieve the national policy of providing "for fair housing throughout the United States."

The issue addressed in this memorandum is whether monetary relief, in the form of an administrative order by HUD providing for recovery of expenses and other out-of-pocket loss to a complainant resulting from acts of unlawful housing discrimination by a respondent, would be consistent with the jury trial requirement of the Seventh Amendment. There is little authoritative case law generally on this subject, and none dealing with the precise issue. Consequently,

it is impossible to provide a definitive answer. Nonetheless, key decisions by the Supreme Court of the United States, setting forth the basic principles under which the constitutionality of administrative enforcement of statutory rights is to be determined, strongly suggest that inclusion of monetary relief in the administrative enforcement of housing discrimination complaints would not contravene Seventh Amendment requirements. These key Supreme Court decisions--Jones & Laughlin, Curtis v. Loether, and Atlas Roofing--establish the following relevant principles:

1. When enforcement of statutory rights, through money damages, is assigned by Congress to federal district courts, a jury trial generally must be available unless there is a functional justification for denying it.

2. Congress generally may assign enforcement of statutory rights principally involving the public, as opposed to private, interest to administrative agencies possessing special expertise, without violating the constitutional right to a jury trial.

3. Administrative agencies to which Congress has assigned responsibility for enforcing statutory right may, consistent with the intent of Congress, order full relief-- monetary as well as injunctive--where necessary to make the complainant whole.

Under these basic principles there would appear to be no constitutional impediment to Congress' authorizing HUD to provide successful complainants with make-whole relief, including, in appropriate cases, recovery of expenses and other out-of-pocket loss resulting from the respondent's unlawful discriminatory acts.

First, the proposed Title VIII amendments would specifically assign enforcement authority to HUD, to be carried out through administrative proceedings, "where j . . . . . . . be incompatible with the whole concept of administrative adjudication...." Curtis v. Loether, supra at 194. Thus the context in which the jury trial issue would be determined would be an administrative proceeding, not "an ordinary

66

civil action [for damages] in the [federal] district courts...."
Id. at 195. As the Supreme Court emphasized in Atlas Roofing,
Congress may, without violating the Seventh Amendment,
assign enforcement of statutory rights "to administrative
agencies with special competence in the relevant field."
Atlas Roofing, supra at 1269. As the Court also emphasized,
Congress is constitutionally authorized to do so, "even if
the Seventh Amendment would have required a jury where the
adjudication of those rights is assigned instead to a federal
court of law instead of an administrative agency." Id.
Thus the forum--administrative vs. judicial--in which enforcement
of statutory rights is to be adjudicated is an important
element in determining whether there is a right to a jury
trial. */ As the Supreme Court has stressed:

> [T]he right to a jury trial turns not
> solely on the nature of the issue to
> be resolved, but also on the forum in
> which it is to be resolved.

Atlas Roofing, supra at 1271-1272

Second, the statutory right--fair housing--involves not
merely private disputes between complainants and respondents,
but matters of national policy. As Congress, expressed it,
in the very first section of Title VIII:

> It is the policy of the United States
> to provide, within constitutional
> limitations, for fair housing through-
> out the United States.

42 U.S.C. 3601.

The Supreme Court has noted, that this policy is one to
which Congress has accorded "the highest priority." Trafficante,
supra at 211.

It is because this national policy has not been achieved
through existing enforcement mechanisms that Congress would
now provide for administrative enforcment procedures as
well. The fact that private complainants would secure
make-whole relief, including out-of-pocket loss, would be
only incidental to the greater public purpose of providing
"for fair housing throughout the United States." Indeed,

---

*/ The Supreme Court also intimated that even when statutory en-
forcement is assigned to the federal courts, the right to a jury
trial may not be absolute. That right exists only "where there
is no functional justification for denying the jury trial
right." Curtis v. Loether, supra at 195.

1:13-cv-08564 Document #: 134-5 Filed: 08/11/17 Page 87 of 473 PageID

unless private complainants have reasonable assurance that
the administrative process can make them whole, they may
abandon it, frustrating Congress' intent that, Title VIII
enforcement be made more effective.

Third, the fact that HUD would be authorized, in appropriate
cases, to award monetary relief to complainants, does not
contravene the requirements of the Seventh Amendment, so
long as such authority is consistent with the intent of
Congress and calculated to make complainants whole.

In this connection, NCDH can see no basis for a
constitutional distinction between administrative awards
of monetary relief in the form of backpay, as in Jones &
Laughlin and other NLRB cases, and administrative awards of
monetary relief in the form of out-of-pocket loss, as pro-
vided under the proposed Title VIII amendments. Characteriza-
tion of the former kind of monetary relief as "equitable"
and the latter as "legal" provides little help in analyzing
the considerations underlying the jury trial requirement.
Awards of backpay in employment cases and out-of-pocket loss
in housing cases both constitute monetary, make-whole relief
and cannot realistically be distinguished by reference to
legal jargon. Indeed, in Atlas Roofing, supra at 1269, the
Supreme Court specifically rejected the contention that
Jones & Laughlin had turned on the "equitable" nature of the
proceeding. Moreover, the Supreme Court and federal courts
of appeals have consistently approved administrative awards
of monetary relief in employment cases that extended well
beyond backpay alone. See, e.g., NLRB v. Strong, supra
(fringe benefits); International Brotherhood of Operative
Potters, AFL-CIO v. NLRB, supra (interest on backpay);
International Union of Electrical Radio and Machine
Workers, AFL-CIO v. NLRB (Tiidee III), supra (attorneys' fees
and litigation expenses).

In Atlas Roofing, the Supreme Court upheld the
constitutionality of an administrative order imposing a
civil penalty. The Court's decision, however, did not turn
on the specific nature of the monetary relief. Indeed, the
Court barely acknowledged the fact that civil penalties were

involved and it was totally ignored in the Court's analysis.
Thus there is no legal basis for distinguishing, on constitutional

68

grounds, between monetary relief in the form of civil penalties and similar relief in the form of out-of-pocket loss. Rather, as the Supreme Court has noted, administrative awards of monetary relief are constitutionally permissible if they serve to make the complainant whole. Thus in Phelps Dodge Corp. v. National Labor Relations Board, supra, where the Court upheld monetary relief (there, backpay), it explained the basis for its decision:

> Making the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces.

313 U.S. at 197.

Certainly, that rationale applies with equal force to monetary relief that would make whole the victims of housing discrimination.

In addition, a number of federal and state agencies have been assigned authority to award monetary relief as part of their administrative enforcement power. Thus, at the federal level, in addition to the NLRB, agencies such as the Interstate Commerce Commission and the Federal Mine Safety and Health REview Commission have been assigned such authority by Congress. Indeed, in connection with the 1977 amendments to the Mine Safety law, the Senate Report emphasized that the Commission was empowered to order "all relief that is necessary to make the complaining party whole," including "special damages sustained as a result of the discrimination."

At the state level, a number of fair housing agencies have been established, with specific authority to order monetary relief in the form of expenses and other out-of-pocket loss to the complainant. Indeed, in one state where monetary relief was not specifically authorized, the state Supreme Court nonetheless upheld the authority of the state fair housing agency to order such relief on grounds that it was necessary "to eradicate the cancer of discrimination." Jackson v. Concord Company, supra.

For these reasons, NCDH submits that authorizing HUD to award monetary relief to victims of housing discrimination, pursuant to its proposed enforcement powers, does not violate the Seventh Amendment.

69

Ms. Cooper. It has been suggested that the bill make explicit the authority of courts to include in awards to the prevailing party the expenses of expert witnesses. Do you think this is really necessary? Isn't it already an awardable cost? The corollary question is, if it was made explicit, would that confuse the interpretation of statutes that do not explicitly include expert witnesses as awardable costs?

Mr. Days. Well, I think it would confuse and I am not certain there is a great need to deal with this question. I am familiar with a recent decision, I think it is the *Wheeler* case, in which the court held that expert witnesses' fees would not be awardable as costs. But I would simply suggest before the Congress gets into this area it ought to be satisfied that it really is a problem in terms of effective enforcement of the fair housing law.

Ms. Cooper. In what sense? That courts are not awarding expert witness fees as a cost?

Mr. Days. That they represent substantial costs to parties who are trying to carry out the Fair Housing Act, and in order for them to be effective, some type of award of costs for those expenses are to be available.

I must say that we have not had any great exposure to that problem and I would defer to private practitioners, people on the outside, who litigate these cases.

Ms. Cooper. The Justice Department does not rely on expert testimony?

Mr. Days. Well, we do, but getting reimbursed for their cost is not something that represents a significant concern to us.

Mr. Edwards. Are there further questions of Mr. Days?

Mr. Volkmer. I would like to continue. You do not worry about the cost of that because you usually contract with them as expert witnesses and provide for their expenses?

Mr. Days. Yes, sir.

Mr. Volkmer. So——

Mr. Days. The department has a fund that is set aside for witnesses in other litigation.

Mr. Volkmer. But, here as I see it, we are also considering the possibility of private lawsuits where on either side you may not have the financial means to acquire these type of people.

Mr. Days. That is right. But, of course, in the vast majority I would think of fair housing cases experts are not necessary, only when we are talking about the complex land-use cases or the redlining cases might it be a problem. I would simply urge the subcommittee to look into this very closely. I am not in a position to really advise you as to the facts.

Mr. Volkmer. What about the possibility—if I may, Mr. Chairman, continue on—the possibility of specifically including such things?

Mr. Days. That is what we were discussing. It is really difficult for me to take a position. There has been some recent litigation over that and a recent decision that held that expert witnesses' fees were not awardable as costs, and I do not know whether that represents a trend, whether it poses——

Mr. Volkmer. Without statutory language, though?

Mr. Days. Yes, that is correct.

70

Mr. VOLKMER. The question is if you have statutory language.

Mr. DAYS. Well, if you have statutory language there would be no problem, it seems to me.

Mr. VOLKMER. Thank you.

Mr. EDWARDS. If there are no further questions, we thank you very much, Mr. Days, for your most helpful testimony. We will be in communication with you.

Our next witness is the distinguished Secretary of Housing and Urban Development, Patricia Harris. This bill will provide significant new responsibilities and authority to the Department of Housing and Urban Development, and I must say that I am personally very glad that if this bill is enacted and we certainly intend to enact it, that you, Secretary Harris, will be there to implement it. We are delighted to have you here.

Without objection, your full testimony will be made part of the record and you may proceed. We apologize for keeping you waiting.

[The prepared statement of the Hon. Patricia Roberts Harris follows:]

STATEMENT OF PATRICIA ROBERTS HARRIS

I am pleased to have the opportunity to testify in support of H.R. 2540, the "Fair Housing Amendments Act of 1979." Like its predecessor, the original Edwards-Drinan Bill, this legislation will strengthen significantly the impact of the Federal Fair Housing Law enacted eleven years ago.

It has been a little over a year since I appeared before this committee in support of the Edwards-Drinan Bill, which I correctly described as a "Fair Housing Law worthy of its name." The extensive work and long hearings which this subcommittee devoted to that bill did not produce enactment. However, this was not a case of labors lost and efforts wasted. last year's investment in this legislation set the stage for a united Congressional effort this year on a single piece of legislation which is in many ways an improvement over its predecessor. Seven days of hearings held by this Committee documented beyond a doubt the persistence of housing discrimination in this country and the inadequacy of the present law in addressing the problem.

The tenacity of the problem was documented most recently by a HUD sponsored Fair Housing Marketing Survey. That study indicated that Blacks were discriminated against in 30 percent of the rental transactions and 22 percent of the sales transactions which were monitored.

The President has recognized the inadequacy of the current law. In his State of the Union message, he referred to the Law's "weakness" and characterized Title VIII as "largely an empty promise because of the lack of an adequate enforcement mechanism." He expressed his commitment to work with the Congress for the enactment of legislation to provide more effective enforcement.

I am here to repeat that commitment. As I indicated to this Subcommittee last year, the Fair Housing Law of 1968 was less than half a loaf. It identified the problems but supplied only the most pallid of solutions. It defined and prohibited discriminatory housing practices but failed to include the enforcement tools necessary to prevent such practices and provide relief to victims of discrimination.

It provided HUD no cease and desist authority.

It limited the enforcement authority of the Attorney General to pattern or practice suits and precluded civil actions on behalf of single individuals.

As an inadequate substitute for HUD or Justice Department enforcement authority, it provided limited and confusing private litigation rights and negligible monetary damages.

In short, the Fair Housing Law of 1968 is a truncated Law. It gave HUD authority to investigate complaints, but no authority to resolve those complaints except through "conference, conciliation, and persuasion." It failed to supply judicial or administrative remedies taken for granted in the enforcement of wage and hour laws, consumer legislation, environmental requirements, health and safety laws and the National Labor Relations Act. In the absence of such remedies, conciliation has become more a symbol of impotence than a constructive tool to redress housing discrimination complaints.

71

The Edwards-Drinan Bill constitutes the other part of the loaf. It provides the comprehensive enforcement machinery which was omitted from the Fair Housing Law. I stated last year that the Edwards-Drinan Bill might well be captioned "A Bill to fulfill the original promise of the Federal Fair Housing Act to Provide, Within Constitutional Limitations, for Fair Housing Throughout the United States." While this year's Bill embodies a number of important changes and improvements, the caption continues to be appropriate.

The Bill Provides HUD comprehensive and flexible enforcement authority through two distinct enforcement mechanisms. The Department would be granted full administrative enforcement authority including the power to award temporary relief, issue cease and desist orders, and to assess substantial penalties. Alternatively, upon a finding of probable cause, the Secretary could refer complaints to the Department of Justice for Civil suit even in cases which may not constitute a "pattern of practice" of discrimination. This would enable the Secretary to choose the most appropriate avenue of enforcement in accordance with the seriousness of the complaint, the remedies available and the probable damages involved. Charges could be brought on the Secretary's own initiative as well as by an aggrieved person.

The proposed Bill would also provide the aggrieved person significantly greater flexibility in seeking remedies. A complainant could decide to seek administrative relief through HUD or to pursue civil remedies through private enforcement. He or she would have three years—instead of the six months currently provided—to pursue a private remedy. The $1,000 limitation on punitive damages available to the individual would be removed. In addition, in either an administrative or a judicial proceeding, fees and court costs could be awarded to the prevailing party—plaintiff or respondent—regardless of his or her financial status.

The Department of Justice would be provided with broad authority to seek remedies on behalf of individuals as well as in "pattern or practice" suits. The Attorney General would be authorized not only to file suits on HUD-referred complaints, but also could intervene in private suits. In either instance, the available remedies would be substantial.

This carefully formulated network of complementary enforcement provisions is the most compelling feature of H.R. 2540. I urge the members of the Subcommittee to look upon the basic elements of this network as unexpendable provisions of this Bill. They provide the enforcement machinery which will translate the stated purpose of the Fair Housing Law into a workable tool to combat housing discrimination.

While this enforcement mechanism is essentially parallel to that provided in last year's Bill, there are significant improvements and refinements. I have already indicated that, under the present law, conciliation is frequently more ornamental than useful. When backed by comprehensive enforcement authority, however, conciliation can be highly effective in bringing respondents to the table, resolving complaints speedily, and providing access to disputed housing.

I support the authority provided in H.R. 2540 to grant preliminary relief. In this Bill such relief can be ordered at any time after a charge is filed, provided notice and opportunity for hearing have been given the respondent. This is a carefully balanced protection for aggrieved and respondent. For the complainant, a temporary restraining order can make the difference between loss or availability of the housing in dispute. Let me assure you that I am highly sensitive to the importance of responsible exercise of this authority. Preliminary action should be taken only when warranted by the fact situation and when no other course of action will suffice to preserve the *status quo* pending completion of the investigation or hearing.

I was pleased to note several other changes in the provisions of Section 8 of the bill which troubled me last year. The right of the HUD hearing officer to order civil penalties—as opposed to awarding damages—removes serious legal issues while providing necessary sanctions.

There is one major expansion in coverage incorporated in H.R. 2540. The bill would amend existing law to prohibit discrimination in secondary financing. Such discrimination would now be covered if it could be demonstrated that such a practice has the effect of making housing unavailable because of a prohibited reason, or if it interferes with the exercise of housing rights. The proposed addition would, in effect, make it unnecessary to show, or to infer, a connection between the practice and the unavailability of housing.

My reaction to this provision is positive. However, the Administration needs additional time to study the provision and its potential impact before an Administration position is stated. I support, without reservation, the clarifying amendments

72

in the bill which make explicit the law's coverage of insurance and lender redlining practices.

In contrast to its predecessor, the proposed Bill explicitly recognizes the role of other Federal Agencies with authority in the area of housing discrimination. Specifically, the Bill requires cooperation between HUD and such agencies in eliminating duplication and notifying each other of instances of concurrent jurisdiction. The value of such cooperative arrangements is clear. Additionally, the provision is useful in underscoring HUD's responsibility to ensure that Federal housing programs are implemented in a manner consistent with the provisions of Title VIII.

Like its predecessor, H.R. 2540 grants the Secretary authority to certify state agencies for the referral of complaints. I continue to support this provision. I am troubled, however, by two new requirements incorporated in the Bill which would circumscribe the Secretary's ability to achieve the goals of the proposed legislation. The first would require the consent of the complainant before referral could be made. I view this requirement as a procedural deterrent which could delay the processing of complaints by state agencies. The second would restrict the Secretary in the recalling of complaints referred to state agencies. Such a restriction impinges on HUD's ultimate control over the enforcement process—a process which remains the responsibility of HUD, regardless of referral.

I have limited my comments so far to significant provisions in which H.R. 2540 differs from last year's Edwards-Drinan Bill. Both Bills expand the coverage of the Fair Housing Law by expanding the definition of a "discriminatory housing practice" to include "any act that is unlawful under Title VIII." One positive effect is to extend the jurisdiction of the law to persons using coercion or intimidation against individuals exercising their rights under the law.

I applaud this expansion in coverage. I am troubled, however, by the possible impact of extension of the sanctions of the law to Sections 808(d) and 808(e) of Title VIII. These sanctions mandate all executive departments and the Secretary of HUD to "administer their programs" in a "manner affirmatively to further" the purposes and policies of the Title. Extension of coverage to these sections raises the issue of possible liability by the Secretary and Federal agencies to civil suits generated by alleged failure of employees to apply their individual conceptions of affirmative action. Let me emphasize that there is no question, under existing case law, that HUD and other Federal agencies are liable to civil suit for institutional failure to act affirmatively in implementing the Fair Housing Law. The proposed definition of discriminatory practices raises the issue of possible liability to wholesale civil suits by persons claiming injuries as the result of the failure of individual employees to act affirmatively. This is a serious area of ambiguity in the proposed legislation. I propose that the definition of "Discriminatory Housing Practice" be broadened only to the extent of incorporating Section 817 of the Act.

I expressed last year, and repeat this year, my support for the effort to protect handicapped persons from housing discrimination. At that time I identified a number of complicated issues raised by the inclusion of handicapped in Title VIII. While the subcommittee has recognized and addressed some of these issues in introducing H.R. 2540, I urge their fullest exploration during consideration of the Bill.

In testifying last year, I voiced concern about the lack of definition of handicapped in the Bill and the difficulty of arriving at a workable definition for the purposes of Title VIII. While I was pleased to note the inclusion of a definition in H.R. 2540, the issue still troubles me. The definition chosen closely parallels that employed in the Rehabilitation Act Amendments. In that law, it is entirely fitting that these amendments define handicap in the broadest terms. In this Bill, however, I believe adjustments reflecting its specific purpose and impact should be carefully considered.

I am pleased also that the sponsors of the Bill—in both the House and the Senate—have begun the process of clarifying intent regarding implementation of the handicapped provision. As stated in the Section-by-Section analysis prepared by the Subcommittee, "it is not intended that this Bill require retrofitting to remove architectural barriers, although reasonable accommodations (at the expense of the buyer or lessee) would have to be permitted."

Another issue which I raised last year relates to the standard of care required of landlords with handicapped tenants. I recommend that it be made explicit in the Bill, or in its supporting history, that landlords ought not be held to a higher "degree of care" for handicapped tenants that it would be their legal duty to provide for all tenants.

The complexity of these and related issues, which the subcommittee has been addressing diligently, argues for the most precise definition of the purpose and intent of the Bill with respect to coverage of handicapped. To achieve such preci-

sion, the subcommittee may want to incorporate the new protections for the handi-
capped in a separate self-contained prohibitions section.

I support the effort to extend the protections against housing discrimination to
handicapped persons. I would hope, however, that the Committee will not allow the
complexity of this issue to deter or delay consideration of the Bill. Its enforcement
provisions are its pivotal features and the need for them is urgent.

In the course of this testimony I have raised a number of questions and issues.
They are not intended to detract from my wholehearted support for the Fair
Housing Amendments of 1979. I consider these amendments essential to realization
of the basic right to housing for many Americans. I am here to offer every assist-
ance in making these rights a reality.

This concludes my prepared remarks. I will be happy to answer any questions you
may have.

## TESTIMONY OF HON. PATRICIA ROBERTS HARRIS, SECRETARY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, ACCOMPANIED BY EDWARD NORTON, ACTING GENERAL COUNSEL; AND STERLING TUCKER, ASSISTANT SECRETARY FOR FAIR HOUSING AND EQUAL OPPORTUNITY

Secretary HARRIS. I am delighted to have with me the Assistant
Secretary for Fair Housing and Equal Opportunity of the Depart-
ment of Housing and Urban Development, Sterling Tucker; also
accompanying me is the Acting General Counsel, Mr. Ed Norton,
and the Assistant Secretary for Legislation and Intergovernmental
Relations, William Welsh.

I apologize for not being here at the opening. I must say that as I
was about to turn with some heat to my colleagues I was informed
that we did not know that the time had been changed to 9:30 and I
apologize. I tend to err on the side of being too early rather than
late.

Mr. EDWARDS. You missed some very importanmt statements by
me and Mr. Drinan and Mr. Seiberling and Mr Volkmer.

Mr. DRINAN. May I say I just want to reiterate the praise that I
gave at that time to the Secretary and to say that her help has
been enormously beneficial to this subcommittee and to myself and
with her we are going to make this bill law.

Secretary HARRIS. Thank you, very much.

Mr. Chairman, it is a pleasure to be here with you, Mr. Seiber-
ling, Mr. Volkmer, and this distinguished subcommittee.

Mr. SEIBERLING. Before you proceed, Madam Secretary, may I
also express my pleasure at your being here and the fact that you
are bringing my longstanding friend Sterling Tucker, who is a
native of my hometown, and I am very, very proud to see him
sitting there beside you in this important capacity.

Secretary HARRIS. Well, we have great things cut out for him,
and he has hit the ground running.

I am pleased to have the opportunity to testify in support of H.R.
2540, the Fair Housing Amendments Act of 1979. Like its predeces-
sor, the original Edwards-Drinan bill, this legislation will strength-
en significantly the impact of the Federal fair housing law enacted
11 years ago.

It has been a little over a year since I appeared before this
committee in support of the Edwards-Drinan bill, which I correctly
described as a fair housing law worthy of its name. The extensive
work and long hearings which this subcommittee devoted to that
bill did not produce enactment. However, this was not a case of
labors lost and efforts wasted. Last year's investment in this legis-

74

lation set the stage for a united congressional effort this year on a single piece of legislation which is in many ways an improvement over its predecessor. Seven days of hearings held by this committee documented beyond a doubt the persistence of housing discrimination in this country and the inadequacy of the present law in addressing the problem.

The tenacity of the problem was documented most recently by a HUD sponsored Fair Housing Marketing Survey. That study indicated that blacks were discriminated against in 30 percent of the rental transactions and 22 percent of the sales transactions which were monitored.

The President has recognized the inadequacy of the current law. In his State of the Union message, he referred to the law's weakness and characterized title VIII as largely an empty promise because of the lack of an adequate enforcement mechanism. He expressed his commitment to work with the Congress for the enactment of legislation to provide more effective enforcement.

I am here to repeat that commitment. As I indicated to this subcommittee last year, the fair housing law of 1968 was less than half a loaf. It identified the problems but supplied only the most pallid of solutions. It defined and prohibited discriminatory housing practices but failed to include the enforcement tools necessary to prevent such practices and provide relief to victims of discrimination.

It provided HUD no cease-and-desist authority.

It limited the enforcement authority of the Attorney General to pattern or practice suits and precluded civil actions on behalf of single individuals.

As an inadequate substitute for HUD or Justice Department enforcement authority, it provided limited and confusing private litigation rights and negligible monetary damages.

In short, the fair housing law of 1968 is a truncated law. It gave HUD authority to investigate complaints, but no authority to resolve those complaints except through conference, conciliation, and persuasion. It failed to supply judicial or administrative remedies taken for granted in the enforcement of wage and hour laws, consumer legislation, environmental requirements, health and safety laws and the National Labor Relations Act. In the absence of such remedies, conciliation has become more a symbol of impotence than a constructive tool to redress housing discrimination complaints.

The Edwards-Drinan bill constitutes the other part of the loaf. It provides the comprehensive enforcement machinery which was omitted from the fair housing law. I stated last year that the Edwards-Drinan bill might well be captioned "A bill to fulfill the original promise of the Federal Fair Housing Act to provide, within constitutional limitations, for fair housing throughout the United States." While this year's bill embodies a number of important changes and improvements, the caption continues to be appropriate.

The bill provides HUD comprehensive and flexible enforcement authority through two distinct enforcement mechanisms. The Department would be granted full administrative enforcement au-

75

thority including the power to award temporary relief, issue cease and desist orders, and to assess substantial penalties.

Alternatively, upon a finding of probable cause, the Secretary could refer complaints to the Department of Justice for civil suit even in cases which may not constitute a pattern or pratice of discrimination. This would enable the Secretary to choose the most appropriate avenue of enforcement in accordance with the seriousness of the complaint, the remedies available and the probable damages involved. Charges could be brought on the Secretary's own initiative as well as by an aggrieved person.

The proposed bill would also provide the aggrieved person significantly greater flexibility in seeking remedies. A complainant could decide to seek administrative relief through HUD or to pursue civil remedies through private enforcement. He or she would have three years—instead of the 6 months currently provided—to pursue a private remedy. The $1,000 limitation on punitive damages available to the individual would be removed. In addition, in either an administrative or a judicial proceeding, fees and court costs could be awarded to the prevailing party—plaintiff or respondent—regardless of his or her financial status.

The Department of Justice would be provided with broad authority to seek remedies on behalf of individuals as well as in pattern or practice suits. The Attorney General would be authorized not only to file suits on HUD-referred complaints, but also could intervene in private suits. In either instance, the available remedies would be substantial.

This carefully formulated network of complementary enforcement provisions is the most compelling feature of H.R. 2540. I urge the members of the subcommittee to look upon the basic elements of this network as indispensable provisions of this bill. They provide the enforcement machinery which will translate the stated purpose of the fair housing law into a workable tool to combat housing discrimination.

While this enforcement mechanism is essentially parallel to that provided in last year's bill, there are significant improvements and refinements. I have already indicated that, under the present law, conciliation is frequently more ornamental than useful. When backed by comprehensive enforcement authority, however, conciliation can be highly effective in bringing respondents to the table, resolving complaints speedily, and providing access to disputed housing.

I support the authority provided in H.R. 2540 to grant preliminary relief. In this bill such relief can be ordered at any time after a charge is filed, provided notice and opportunity for hearing have been given the respondent. This is a carefully balanced protection for aggrieved and respondent. For the complainant, a temporary restraining order can make the difference between loss or availability of the housing in dispute.

Let me assure you that I am highly sensitive to the importance of responsible exercise of this authority. Preliminary action should be taken only when warranted by the fact situation and when no other course of action will suffice to preserve the status quo pending completion of the investigation or hearing.

76

I was pleased to note several other changes in the provisions of section 8 of the bill which troubled me last year. The right of the HUD hearing officer to order civil penalties—as opposed to awarding damages—removes serious legal issues while providing necessary sanctions.

There is one major expansion in coverage incorporated in H.R. 2540. The bill would amend existing law to prohibit discrimination in secondary financing. Such discrimination would now be covered if it could be demonstrated that such a practice has the effect of making housing available because of the prohibited reason, or if it interferes with the exercise of housing rights. The proposed addition would, in effect, make it unnecessary to show, or to infer, a connection between the practice and the unavailability of housing.

My reaction to this provision is positive. However, the administration needs additional time to study the provision and its potential impact before an administration position is stated. I support, without reservation, the clarifying amendments in the bill which make explicit the law's coverage of insurance and lender redlining practices.

In contrast to its predecessor, the proposed bill explicitly recognizes the role of other Federal agencies with authority in the area of housing discrimination. Specifically, the bill requires cooperation between HUD and such agencies in eliminating duplication and notifying each other of instances of concurrent jurisdiction. The value of such cooperative arrangements is clear. Additionally, the provision is useful in underscoring HUD's responsibility to insure that Federal housing programs are implemented in a manner consistent with the provisions of title VIII.

Like its predecessor, H.R. 2540 grants the Secretary authority to certify State agencies for the referral of complaints. I continue to support this provision. I am troubled, however, by two new requirements incorporated in the bill which would circumscribe the Secretary's ability to achieve the goals of the proposed legislation.

The first would require the consent of the complainant before referral could be made. I view this requirement as a procedural deterrent which could delay the processing of complaints by State agencies.

The second would restrict the Secretary in the recalling of complaints referred to State agencies. Such a restriction impinges on HUD's ultimate control over the enforcement process—a process which remains the responsibility of HUD, regardless of referral.

I have limited my comments so far to significant provisions in which H.R. 2540 differs from last year's Edwards-Drinan bill. Both bills expand the coverage of the fair housing law by expanding the definition of a discriminatory housing practice to include any act that is unlawful under title VIII. One positive effect is to extend the jurisdiction of the law to persons using coercion or intimidation against individuals exercising their rights under the law.

I applaud this expansion in coverage. I am troubled, however, by the possible impact on extension of the sanctions of the law to sections 808(d) and 808(e) of title VIII. These sanctions mandate all executive departments and the Secretary of HUD to administer their programs in a manner affirmatively to further the purposes and policies of the title. Extension of coverage to these sections

77

raises the issue of possible liability by the Secretary and Federal agencies to civil suits generated by alleged failure of employees to apply their individual conceptions of affirmative action.

Let me emphasize that there is no question, under existing case law, that HUD and other Federal agencies are liable to civil suit for institutional failure to act affirmatively in implementing the fair housing law.

The proposed definition of discriminatory practices raises the issue of possible liability to wholesale civil suits by persons claiming injuries as the result of the failure of individual employees to act affirmatively. This is a serious area of ambiguity in the proposed legislation. I propose that the definition of discriminatory housing practice be broadened only to the extent of incorporating section 817 of the act.

I expressed last year, and repeat this year, my support for the effort to protect handicapped persons from housing discrimination. At that time I identified a number of complicated issues raised by the inclusion of handicapped in title VIII. While the subcommittee has recognized and addressed some of these issues in introducing H.R. 2540, I urge their fullest exploration during consideration of the bill.

In testifying last year, I voiced concern about the lack of a definition of handicapped in the bill and the difficulty of arriving at a workable definition for the purposes of title VIII. While I was pleased to note the inclusion of a definition in H.R. 2540, the issue still troubles me. The definition chosen closely parallels that employed in the Rehabilitation Act Amendments. In that law, it is entirely fitting that handicap be defined in the broadest terms. In this bill, however, I believe adjustments reflecting its specific purpose and impact should be carefully considered.

I am pleased also that the sponsors of the bill—in both the House and the Senate—have begun the process of clarifying intent regarding implementation of the handicapped provision. As stated in the section-by-section analysis prepared by the subcommittee, it is not intended that this bill require retrofitting to remove architectural barriers, although reasonable accommodations (at the expense of the buyer or lessee) would have to be permitted.

Another issue which I raised last year relates to the standard of care required of landlords with handicapped tenants. I recommended that it be made explicit in the bill, or in its supporting history, that landlords ought not be held to a higher degree of care for handicapped tenants that it would be their legal duty to provide for all tenants.

The complexity of these and related issues, which the subcommittee has been addressing diligently, argues for the most precise definition of the purpose and intent of the bill with respect to coverage of handicapped. To achieve such precision, the subcommittee may want to incorporate the new protections for the handicapped in a separate self-contained prohibitions section.

I support the effort to extend the protections against housing discrimination to handicapped persons. I would hope, however, that the committee will not allow the complexity of this issue to deter or delay consideration of the bill. Its enforcement provisions are its pivotal features and the need for them is urgent.

78

In the course of this testimony, I have raised a number of questions and issues. They are not intended to detract from my wholehearted support for the Fair Housing Amendments of 1979. I consider these amendments essential to realization of the basic right to housing for many Americans. I am here to offer every assistance in making these rights a reality.

This concludes my prepared remarks. I will be happy to answer any questions you may have.

Mr. EDWARDS. Thank you very much, Madam Secretary. It is splendid testimony, and it will be an inspiration to all of us. We thank you very much.

The gentleman from Ohio, Mr. Seiberling.

Mr. SEIBERLING. Thank you, Mr. Chairman.

Madam Secretary, I think that is a most impressive piece of testimony, and I am particularly pleased with the care with which you have gone over this, and the further analysis that you are prepared to make of some of the matters which still need to be thought through.

One of those that I think we need to think through in the Congress relates to the cease-and-desist authority that would be granted to the Secretary by this bill. We had a rather unhappy experience when we tried to give the EEOC this authority years ago, and it went down in flames.

I wonder if you could give us some thoughts or ammunition, to use the more precise word, that we might use in distinguishing why this is important in this instance, and why the previous action of the Congress did not apply here?

Secretary HARRIS. Let me say that there are so many consequences of our failing to solve our housing problem in this country, that failure to make a major effort now, with sufficient enforcement powers, may lead us to racial problems into the generation of the grandchildren of, certainly, not mine but of my relatives. We must have the ability in our lifetimes or in the foreseeable future to bring this commodity of shelter within the purview of people who are able to purchase it. It is the only market in which the color of the money is less important than the color of the purchaser or the race or national origin of the purchaser.

Certainly, the protections that exist in the bill as it now is, the opportunity for judicial review of cease-and-desist orders, provides that kind of protection that any respondent should want. It also provides societal protection in case there is a failure of due process in this long procedure.

I do not think that, given the number of real estate transactions that take place every day, we can expect to burden the courts with the resolution and the solution of this issue through the use of the normal judicial process.

Here in the field of housing, where there are hundreds of transactions probably every few hours in almost every State, it is imperative to have an effective remedy and to permit through one generation the passage of housing from one owner to another without the intervention of race.

I have some difficulty in distinguishing the merits of the decision of the Congress, on a matter with which I might not have agreed with the Congress at the time. I might well have taken the position

79

that perhaps there was good reason for cease and desist there, but certainly we know enough now about what happens to the housing market if we utilize a policy of laissez faire, the continuing restriction based on racial prejudice, to know that we will have more busing orders if we do not deal with housing discrimination, we will have more separation of blacks and whites, Chicanos and people who live in the communities with them. We will have an exacerbation of all of the tensions which some of us had hoped 10 years ago we were about to eliminate, and this is a process which is fair, which will work, and which will solve it. We only have to solve it through one generation.

Mr. SEIBERLING. I think that the same reasoning applies to employment.

Secretary HARRIS. That is right.

Mr. SEIBERLING. Maybe even more so, but I think perhaps the fact that this would be administered by your department is also an important difference from the practical political standpoint. EEOC was a relatively new and untried experiment at the time, and I think that that is an important difference, from the standpoint of getting support for this, even though logically I don't see any real reason why we shouldn't have a maximum enforcement of equal employment opportunity.

I just have a couple of other questions. The provision for cooperation between Federal agencies you have already touched upon.

I wonder if you feel that it is sufficiently clear to permit subsequent HUD regulations to clarify appropriate action or actions by other Federal agencies?

Secretary HARRIS. Yes, we believe that this is workable, and as a matter of fact we are, even now, in the absence of this desirable provision, seeking ways to have more effective cooperation among the several agencies. This will simply make it clearer, make it possible for us to deal with the regulation.

Mr. SEIBERLING. Turning to dealing with the problem of insurance red lining, the AIA in its testimony before us last year said that if the effect test applies to the provisions affecting insurance redlining, it would be nearly impossible for an insurer to successfully defend himself.

I wonder if you have any comment on that.

Secretary HARRIS. I did not agree with that. It seems to me that the effects test—permitting prima facie judgment about a result, which certainly can always be rebutted by facts showing that the prima facie finding is inaccurate, makes good sense in the redlining context. It has been our experience that despite the disclaimers, one of which I think may have been in the morning newspaper, of the existence of redlining in various fields, that whenever we go look, we find that there is a redlining that relates not to the value of the potential collateral with respect to mortgage redlining or to the acceptability of the risk, in terms of insurance, but to other considerations prohibited by this bill. It seems to me that the position taken by the industry is not one which merits a change in the goals of this statute.

Mr. SEIBERLING. Thank you.

I was pleased by your willingness to take a further look at the provisions about handicapped, because as you probably gathered

from my questions of Mr. Days, it seems to me we need to think through that language very carefully, because we may create more problems than it solves.

Thank you, Mr. Chairman.

Mr. EDWARDS. The gentleman from Massachusetts, Mr. Drinan.

Mr. DRINAN. Thank you, Mr. Chairman.

I want to commend you, Madam Secretary, once again for your encouragement and for your very perceptive statement. I think it is fair to say that our minds on the subcommittee, at least speaking for myself, go back and forth with regard to the handicapped. We obviously want to be very sensitive to this acute problem, but I welcome your thoughts that conceivably we could work out some separate self-contained prohibition section, but the matter is more complicated than we had anticipated I think.

I just have one question, Mr. Chairman, because the testimony was so good. I wonder if Madam Secretary would expand a bit on her point on page 6, about the one major expansion in the coverage of this bill, namely, its attempt to prohibit discrimination in secondary financing.

I appreciate how the administration could think about that a bit. But do you think that the inclusion of that, if we could get it enacted, do you think it is important, or do you think it is marginal?

Secretary HARRIS. Congressman Drinan, I would urge you not to eliminate it at this time. The administration is looking at the provision, as I said. I am very positively inclined to it. I think moving this very important segment of the industry—liquidity providers—into compliance with the goals of this bill, is something we should look at very carefully. And if there are no prohibitions, constitutional prohibitions—which I do not see—if there are no technical problems with respect to the language, then obviously I think that it would provide a benefit to the national housing markets, which the secondary market affects perhaps more than some of the others who will be affected by this. And while, as I have said in my statement, the Administration has not had an opportunity to do the detailed analysis of the problems, if there are problems, and the consequences of this, I believe that the sponsors have been right to include this as an area of serious consideration for coverage by this legislation.

Mr. DRINAN. I thank you very much for that encouraging statement, and again I commend you for your testimony.

I yield back the balance of my time.

Mr. EDWARDS. The gentleman from Missouri, Mr. Volkmer.

Mr. VOLKMER. Thank you very much, Mr. Chairman.

Madam Secretary, I have very high regard, for your testimony. I would like to ask for facts and figures rather than philosophy and policy right now.

Could you give me approximately—I know you may not have it, and if you don't maybe you can give it to us later on—how many complaints would you say we now have throughout the United States on discriminatory housing practices because on race, sex, or whatever?

Secretary HARRIS. With your indulgence, after a preliminary comment, I would like to ask the Assistant Secretary to respond to that.

May I say that, given our limited enforcement capacity, I doubt that any outside inferences can be drawn from the No. 1 way or the other. I am of the opinion that people seldom undertake useless acts, and that they think all they will have is some jolly meetings with the staff of HUD and——

Mr. VOLKMER. I am not saying that these are the only ones that exist. I would like to know where we are under our present law.

Secretary HARRIS. Yes, as I said preliminarily I wanted to make that comment. We do have some figures on complaints presently in house.

Mr. Tucker, if I may.

Mr. TUCKER. In 1978 there were 3,169; in 1979, we anticipate 3,680; in 1980 we anticipate 4,050. As indicated by the Secretary, this by no means represents the extent of the problem. Lack of enforcement tools as indicated is indeed significant.

Mr. VOLKMER. Then your projection is based on the present law continuing without any change.

Secretary HARRIS. Yes.

Mr. VOLKMER. Do you have any idea of the estimated increase that you will have to have in administrative law judges, et cetera, if we would anticipate even a doubling, let's say, just a doubling of the figures you have just given?

Secretary HARRIS. This is not based upon a doubling. It is based upon a best estimate of what the level of complaints would be. We would expect an additional 7 person years for administrative law judges, with 4 supporting clerical staff years.

Mr. VOLKMER. Do you feel that would be sufficient?

Secretary HARRIS. That would be the administrative law judges. Now in addition to that——

Mr. VOLKMER. You are going to have that clerical staff——

Secretary HARRIS. But in addition to that, we would expect an increase in the Office of General Counsel of 12 attorneys, 8 paralegals and 7 clericals. We would expect to have an additional 50 field investigators, with 22 supporting field clerical staff. That is our estimate for the first year of the application of the amendments.

Mr. VOLKMER. Do you have some idea of the approximate cost of this?

Secretary HARRIS. Yes, I can give you that too. For the field investigators——

Mr. VOLKMER. Just the total.

Secretary HARRIS. The total would be $2,613,167. I consider that——

Mr. VOLKMER. I agree with you.

Now the next step I would like to ask is this: On these complaints that we have had, can you give me a geographical breakdown of those, if not now, at a later time?

Secretary HARRIS. We will submit that for the record.

Mr. VOLKMER. I would like to have that if I may.

Secretary HARRIS. Yes.

[The information follows:]

82

## COMPLAINTS REFERRED AND RECALLED TO STATE AGENCIES BY REGION

| | Referred | Recalled |
|---|---|---|
| **Region I:** | | |
| Connecticut—Memorandum of Understanding, Apr. 27, 1978: | | |
| 1977 | 0 | 0 |
| 1978 | 0 | 0 |
| 1979 | 11 | 0 |
| Rhode Island—Apr. 30, 1979: | | |
| 1977 | 0 | 0 |
| 1978 | 0 | 0 |
| 1979 | 0 | 0 |
| **Region III:** | | |
| West Virginia—No memorandum signed: | | |
| 1977 | 0 | .......... |
| 1978 | 18 | .......... |
| 1979 | 3 | 2 |
| District of Columbia—No memorandum signed: | | |
| 1977 | 0 | 0 |
| 1978 | 6 | 0 |
| 1979 | 2 | 1 |
| Pennsylvania—May 16, 1978: | | |
| 1977 | 8 | 6 |
| 1978 | 116 | 80 |
| 1979 | 32 | 16 |
| Virginia—June 1978: | | |
| 1977 | 13 | 2 |
| 1978 | 51 | 8 |
| 1979 | 45 | 4 |
| **Region V:** | | |
| Michigan—Apr. 7, 1978: | | |
| 1977 | 0 | 0 |
| 1978 | 0 | 0 |
| 1979 | 10 | 1 |
| Wisconsin—Apr. 7, 1978: | | |
| 1977 | 0 | .......... |
| 1978 | 0 | .......... |
| 1979 | 17 | 3 |
| **Region VI:** | | |
| New Mexico—Mar. 23, 1978: | | |
| 1977 | 0 | .......... |
| 1978 | 0 | .......... |
| 1979 | 0 | .......... |
| **Region VII:** | | |
| Nebraska—Aug. 17, 1978: | | |
| 1977 | 0 | .......... |
| 1978 | 0 | .......... |
| 1979 | 13 | 1 |
| **Region IX:** | | |
| Nevada—Aug. 10, 1978: | | |
| 1977 | 0 | .......... |
| 1978 | 0 | .......... |
| 1979 | 6 | 1 |
| **Region X:** | | |
| Alaska—Jan. 16, 1979: | | |
| 1977 | 0 | .......... |
| 1978 | 0 | .......... |
| 1979 | 0 | .......... |

83

Mr. VOLKMER. On the proceedings that would be held under the provisions of this act before an administrative law judge, do you envision that basically it would be very similar, if not the same, as appearing before a district judge?

Secretary HARRIS. Let me say that the rules would depend upon the nature of the proceeding. If we are talking about temporary or preliminary——

Mr. VOLKMER. Let's say you got by that. I am talking about such things as discovery and speed and these types of things. I notice here, unless I am wrong, and I may be, if there is an appeal, it goes to the court of appeals.

Secretary HARRIS. Yes.

Mr. VOLKMER. It doesn't go to the district court for review?

Secretary HARRIS. That is correct.

Mr. VOLKMER. It is going to the court of appeals. I am wondering if we are not tying our courts up again.

Secretary HARRIS. May I say that there is a long history of administrative procedure, development and process, a constitutional requirement with respect to the level of evidence required. The reason I hedge is that there is a difference in the adducing of evidence in an administrative proceeding.

Mr. VOLKMER. Hearsay, et cetera?

Secretary HARRIS. That is correct. So I do not want to answer you specifically, yes, that it would be the same as before a district court judge. There would be the difference between the proceedings before an administrative law judge that presently exists in similar administrative proceedings that are held in a variety of agencies across the width and breadth of this Nation. But the law as it applies to cognate administrative proceedings developed over the last 30 or 40 years, really back to the institution of the ICC, would apply to these proceedings with all of the due process requirements that the courts and this body have imposed upon the administrative process.

Mr. VOLKMER. You are going to give this one $10,000 also.

Secretary HARRIS. But this is not unique. It has been some 10 years since I spent time looking at specific cases and precedent. Neither the appellate process, which takes the decision of the administrative body directly to the court of appeals, nor the ability to impose certain sanctions, including money damages, is, if my memory serves me, in any way unique here.

Mr. VOLKMER. You don't believe that it in itself, those two things, should require any differences in the administrative procedure that is being used?

Secretary HARRIS. No, sir. We have a 40-year history of very close and careful development of the law applicable to administrative proceedings under the legislation of this body. It seems to me our concern should be to make certain that the courts are not overcrowded with activity for which expertise can be provided in due process-controlled, administrative hearings. As I said, there is developmental process in this country that has worked extraordinarily well to leave the courts for the more serious adjudication of matters that this body cannot commend to the administrative expertise of the particular agencies.

Mr. SEIBERLING. Will the gentleman yield?

Mr. VOLKMER. Yes.

Mr. SEIBERLING. You are saying there is no question but that the Administrative Procedures Act would apply under this bill?

Secretary HARRIS. That is correct.

Mr. VOLKMER. Thank you very much, Mr. Chairman.

Mr. EDWARDS. Madam Secretary, if the 1968 bill had contained effective enforcement provisions, do you think that in some areas court-ordered busing would not have been required?

Secretary HARRIS. I suspect that the speed with which persons were able to move to areas of personal choice would have been much greater. While I cannot specify places where school segregation exists as a result of a restricted housing market, I am convinced that there are places where that is the case, and that 10 years of the ability to open housing markets without regard to race would have led to a national movement of persons who are black to different choices of housing.

I cannot say specifically that there would have been an equal movement in all places in 10 years, which is a very short time as far as the elimination of discrimination is concerned, but I suspect that the short answer to your question is yes, there would have been fewer.

Mr. EDWARDS. I certainly agree with you. In my home area of northern California, a survey was made the other day similar to the survey you mentioned in your testimony, with testers being used, black testers and white testers, and the figures were much worse than in the national survey, approaching 50 percent in instances of discrimination, both in renting and in purchasing. The newspaper that conducted the survey was shocked. It did not expect that kind of discrimination.

Mr. VOLKMER. Will the chairman yield?

Mr. EDWARDS. Yes.

Mr. VOLKMER. I will give you a little experience I myself had, to show you. I have an old apartment house back in Missouri with several units. One of the units is occupied by a black. I have it for sale because I cannot keep it up and watch over it, et cetera, while I am out here, so I have listed it for sale. My realtor has advised me that one prospective buyer looked at it and decided not to buy because of the blacks, because that person thought they would not be able to rent the apartment as easily, since there has been a black living there. It does not make sense.

Mr. EDWARDS. I would agree. The sooner we are able to move toward desegregated housing patterns, we automatically desegregate our schools. I think it is a strong argument that can be made for the enactment of this bill.

I have no further questions at this time.

The gentleman from California, Mr. Matsui.

Mr. MATSUI. I have no questions at this time, Mr. Chairman. I apologize to the Secretary for having come in late.

Mr. VOLKMER. I live out in Arlington, and my young son, who is a paper boy, was coming home one morning. We have a black that lives two houses up, and one morning coming back from the paper route here a big sign appeared on the telephone pole with a word we do not use, "——go home."

That was just last winter. He pulled it down. So it does exist. I hear about it. I know of one specific area in our county, and I hear this about blacks moving there, from very well-educated professional people.

I have another question in passing on this whole thing. As I look at it, the people should be free to move wherever they wish to, but can they do that if they cannot afford it?

Secretary HARRIS. That brings up a second issue, obviously, which goes to other policies. As you know, we are the main provider of decent, safe, and sanitary housing for low- and moderate-income people, and while we are talking today about our title VIII responsibilities, the Department has responsibilities under title VI to make certain that there is that availability of housing that we provide to as broad a segment of the community in as wide an area of residential choice as possible, and as you know, there are communities that not only accept discrimination against those who are able to compete on the open market, but also are making strong efforts to prevent the Federal Government from closing that gap in income which the subsidized housing program is meant to close, and are doing so by attempted rejections of the assisted housing that my Department has, I must say far too little of, but apparently more than some people are willing to accept if it means helping black people and Chicanos. That is a major activity and thrust of this administration, to see that there is equal access in as many parts of this country as possible to housing assistance which this body has provided and financed. Whether it is adequate to the need is another matter of debate, but such as there is, we intend to try to distribute it to meet that problem.

Ms. COOPER. This year's bill specifically as you know permits HUD to engage in conciliation. First of all, do you interpret that provision as bestowing the authority on HUD to engage in conciliation efforts all along the way throughout the process?

Secretary HARRIS. Well, it seems to me that the Department would expect to try to resolve those matters that are amenable to conciliation by conciliation. It was my concern that the bill may appear to permit a complainant to say, "I do not want to go into the conciliation process." I think that we in the Government ought to be able to say, "Come sit down. Let us reason together. Let us discuss this issue." And I would think that we would pursue that as far as we could pursue it.

Now I understand that some have interpreted my concern that the approval of the complainant not be required to enter into conciliation to mean that at some point in the conciliation process I would wish to drop the conciliation notion and impose a solution. I must say that I tend to take language very seriously, and if either party remains unconciliated at the end, that party is unconciliated, and to force agreement to which one party does not agree is not conciliation, as I understand it. I would seek to achieve conciliation. But as long as one person, one party, complainant or respondent, says "I am not going to accept it," there is no conciliation that has taken place.

Ms. COOPER. When conciliation is made after the point when reasonable cause has been found, and an administrative complaint

has been filed, the approval of the Secretary is required under this bill. Do you agree with that provision?

Secretary HARRIS. Yes, I think that it is important not to have duplication of process, unless the Secretary has agreed to it. What you have then is again parallel processes, and while I can see there being some merit in going ahead with both, I do not have any problem with that provision.

Ms. COOPER. Last year the American Bankers' Association raised some questions about the provisions dealing with HUD's ability to obtain information in its investigatory role in this process, and suggested that privacy-related problems are raised, first of all because fishing expeditions would be possible, and secondly because information that you do obtain in this discovery process could be made public or at least admitted as evidence over the objection of the subject of those documents.

Secretary HARRIS. There is an element of déjà vu in that kind of argument. It is the argument that is always made when resort to process of discovery is sought. There is no doubt that with confidential materials, confidential business materials of various kinds that the Government has historically been very careful not to reveal any such matters that will redound to the detriment of any of the parties. I have no reason to believe, nor does anybody else, given the fact that we frequently deal with such material today, that there would be any difference in the administration of the provisions of this law.

You understand it was suggested by Mr. Seiberling that the fact that HUD is administering this bill is important. We are the FHA that has been dealing with housing and property and bankers and lenders and mortgage bankers for 40 years. They were not unhappy when we were creating the problem that we are now seeking to solve, and I would say that we know enough about how to protect them in the future, as we seek to correct the problems that in some way we had a part in making.

Ms. COOPER. With respect to referrals of complaints to State and local agencies, I understand that at present approximately 22 States are certified as having substantially equivalent laws, but that only 8 of those States now actually get any referrals of specific complaints. Why is this the case?

Secretary HARRIS. Well, we look at not only substantial equivalency, but also willingness to accept. Also, Mr. Tucker to comment in detail on what we are doing? We have some experience on this.

Mr. TUCKER. Our experience has been that in 1975, for example, 52 percent of the complaints we referred we had to recall, because for one reason or another they were not being processed. Under the law, in 30 days we must notify complainant as to whether or not the Government will proceed. Under the law, we should within 180 days seek to close the case.

Now what we have had to do is to recall, therefore, from States these complaints, in order that we can carry them out and the complainant can get consideration as required under the law. There are nine such States that we have entered into agreements with, in an effort to strengthen that relationship, to assure that they do carry out the requirements of the law.

87

We feel that with this bill, with legislation we are seeking also in connection with our budget, that we can assist States more efficiently to carry out the law, those who have laws roughly comparable to the Federal law.

We believe that with this bill, the passage of Edwards-Drinan, that we will be able therefore to have more effective relationships with States, that they themselves will understand there is a strong national law, and that they themselves will complete more cases and we will have a relationship with these 22 and the District of Columbia, and our expectation is there will be another 9 or 10 States which will also strengthen their laws and make them roughly comparable to Federal law.

Secretary HARRIS. You understand that we do not have any money to help them. When we give them the burden we do not give them any money, and we hope to remedy that with the budget in 1980.

Mr. SEIBERLING. I am glad something is going into the budget on the plus side.

Ms. COOPER. You indicated that you objected to the provision giving the complainant the right to consent to a State referral because of problems of delay. Could your regulations not provide that the complainant have a specific time limit for deciding whether or not to consent to a referral to a State agency? Could you deal with the problem that way?

Secretary HARRIS. Time is part of the problem, but I did not say time alone. I said a procedural requirement, which does permit the complainant to determine the forum even though there has been a finding of substantial equivalency, and even though there is a pattern and history of resolution of complaints is not a good requirement. At the same time you should note that we also request that the Secretary be able to pull back a case, which is the other part of the protection of the complainant whose case has been referred to the State. In what we would assume under this process, would be the unlikely event that the State did not follow through appropriately, the Secretary, for the protection of the complainant and for the protection of the pattern of enforcement of the statute, ought to have the ability to remove the proceeding from the State agency.

I believe that this is an administrative pattern established here that is not consistent with the apparent goals of the rest of the statute to place full responsibility in the Secretary for the administration of the fair housing laws in a way best calculated to protect both the individual complainants and the interest of the Federal Government in the full and effective enforcement of fair housing standards.

Mr. VOLKMER. Would you yield for just a minute.

Then you do object to language not being able to handle it, once you have certified. Rather the language should be reversed, that you would have the right to recall from the certified agency?

Secretary HARRIS. Absolutely.

Mr. VOLKMER. Without cause, really. Otherwise you get into the question of whether you can or cannot and that type of thing; is that correct?

Secretary HARRIS. That is correct.

88

Mr. VOLKMER. Do you mind having a provision that the certified agency consents to accepting it?

Secretary HARRIS. You mean the individual case?

Mr. VOLKMER. No, not on an individual case.

Secretary HARRIS. That is right. That is the sine qua non of the referral process.

Mr. VOLKMER. You do not need to mention that at all?

Secretary HARRIS. That is correct.

Mr. VOLKMER. Thank you.

Ms. COOPER. Just one final point on this. If the State agency fails to act on the referred case, would it be a viable alternative in that situation for the Secretary to investigate and proceed with that complaint on your own initiative, that is dealing with the factual situation in the complaint initiated by the Secretary.

Secretary HARRIS. We do not believe so. Again the legislative approach that we have strongly urged upon you is the ability to pull it back. Presumably before the referral there has been a decision by the Secretary, and the determination to refer. It seems to me that we are establishing here, in the language of these amendments, a process that is orderly and is not duplicative, that there is choice, which I happen to think is excellent, but once we start down one road——

Mr. VOLKMER. We have two.

Secretary HARRIS. We have choice but we break off the choice and we complete one process and then go to the next, and I would urge against encapsulating the notion that we can have both Federal action and State action in the same matter going on at the same time.

Ms. COOPER. Thank you.

Mr. EDWARDS. Are there any further questions? If not, we thank the Secretary and staff for excellent work and we look forward to working with you.

Mr. VOLKMER. Mr. Chairman.

Mr. EDWARDS. I yield to the gentleman.

Mr. VOLKMER. I would like to say as far as the geographical area for the complaint, as far as I am concerned just State by State, and not any breakdown after that.

Secretary HARRIS. Thank you.

Mr. EDWARDS. Without objection, I would like to insert in the record a letter from the Secretary to the Civil Rights Commission which describes HUD present fair housing enforcement efforts and plans for improvement. Thank you again.

[The information follows:]

89



THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D. C. 20410

MAR - 2 1979

Dr. Arthur S. Flemming
Chairman
U. S. Commission on Civil Rights
1121 Vermont Avenue, N. W.
Washington, D. C. 20425

Dear Dr. Flemming:

I have reviewed the draft of the findings and recommendations of
the U. S. Commission on Civil Rights. As we agreed, I am pleased to
provide both my reactions to the Commission's draft update of the 1974
report and a summary description of major actions already planned or
underway at HUD since the field work on your study was done.

I find myself in agreement with much of the report but somewhat at
odds with its overall implications. My reaction is, in large part,
based on the fact that the period of review reflects
the state of HUD's civil rights program as of January 1977 and so little
of the results of our efforts since that time.

As accurately described in the Commission's 1974 report, HUD's Fair
Housing and Equal Opportunity responsibilities received very little
support from previous Administrations and were allowed to languish. The
record is clear that little in the way of program advocacy, regulatory
authority, financial or other resource support was given to HUD's civil
rights programs.

Upon becoming Secretary of HUD, I determined to arrest this decline
and begin the process of rebuilding the Fair Housing program. In so
doing, I recognized many of the deficiencies your report cites and began
the steps necessary to correct them. I believe the Department has made
significant progress toward the goals we share, although the pace has
not equalled my original hopes or expectations. Progress has been
affected by the limited resources which have been available and by the
fact that HUD is still only beginning to recover from the devastating
effect of the 1973 moratorium, which impacted housing and community
development programs across the board, as well as the fight against
discrimination.

90

Taken together, the findings and deficiencies described in the report represent a glaring failure to give fair and equal housing the national priority and support promised by the Civil Rights Act of 1968. I can assure you personally that the Fair Housing and Equal Opportunity program is one of the most immediate priorities before me at HUD. I consider the steps necessary to accomplish a truly effective civil rights program in housing a personal commitment which I intend to pursue with all my energy and ability.

A key element of my comprehensive strategy to strengthen Title VIII enforcement is amendment of Title VIII to correct substantial enforcement deficiencies which severely impede HUD's ability to provide remedies for victims of discrimination. My efforts to achieve these legislative changes and other significant initiatives to improve Title VIII compliance and enforcement are described below.

- Cease and Desist Authority

    HUD staff has been working with the relevant committees of the Congress for almost two years to develop the necessary remedial legislation. Last year I testified in full support of the Edwards-Drinan Bill and similar measures which would have corrected current legal inadequacies which substantially restrict HUD's enforcement powers. In advance of the current session, my staff has worked closely with the House and Senate to develop legislation which would bring to fruition the promises of 1968—including cease and desist authority and the ability to secure injunctive relief. The President has stated this Administration's full support for this legislation in his State of the Union message.

- HUD's Fair Housing Leadership and Organization

    Key among the steps I have taken is the total reorganization of the leadership and structure of the Fair Housing function, both at Headquarters and in the field. I have selected new and effective leadership with the appointment of Sterling Tucker who is already at work developing a comprehensive and cohesive strategy for Fair Housing enforcement. Among his first steps was the reorganization of the central operation by the appointment of two new Deputy Assistant Secretaries—one to focus upon the management of the Fair Housing Program and the other on enforcement and compliance. As I see it, this structure achieves the objectives of the report, by providing leadership with a specific focus upon fair housing.

It should be noted that the Regional Administrators are presently accountable directly to the Assistant Secretary for Fair Housing and Equal Opportunity for FH&EO performance in their respective regions. I have recently re-emphasized this accountability to each Regional Administrator.

Additional organizational adjustments are underway to further reassert Headquarters control of field activities and assure that enforcement efforts are given appropriate priority under more effective management. This has occurred in two stages. First, last October I reorganized the entire Department's field structure. Regional Administrators were removed from day-to-day operations to enable them to focus better their management and oversight efforts upon their programmatic and broader responsibilities, including civil rights activities. As political appointees these administrators report directly to me and are accountable for Title VIII activities.

In a few months, a second phase of reorganization will reassert Central Office control of fair housing programs in the field by a strengthened and augmented field management and coordination function under the new Deputy Assistant Secretary.

Also included in this phase will be the creation of separate branches in the Regional Offices focusing upon Title VI/Section 109 compliance.

- ### Substantive Title VIII Regulations

Aside from amendment of the legislation itself, the promulgation of regulations under Title VIII is the single most important vehicle to put teeth into the law. After languishing for ten years, this effort is well underway. I am committed to completion of development of these regulations by the end of the summer. These regulations will define the acts which constitute discrimination, including sophisticated practices in redlining, broker conduct, financing, advertising and related areas. In addition, the regulations will re-establish HUD's primacy and leadership of Fair Housing enforcement in Government and provide a basis for renewed efforts by other agencies.

- ### New Rapid Response Complaint Processing

In January 1978, I launched a comprehensive attack upon HUD's current system for processing discrimination complaints. The first phase of this new program was to clean up the backlog of

92

over-age complaints. By the end of Fiscal Year 1978, we had
reduced the number of such complaints from 817 to 48 while
tightening our over-age definition from 120 to 90 days.
Further, in Fiscal Year 1979, we reduced the number of days a
complaint may remain open without being classified as over-age
from 90 days to 60 days.

Phase two of this process was the establishment of an expert
Task Force including representatives of HUD, EEOC, Department
of Justice and the New York City Civil Rights Commission, to
develop streamlined complaint processing procedures. The Task
Force has recommended a new Rapid Response Complaint
Processing System keyed to identification of complaints
susceptible to early, informal conciliation prior to
investigation and aimed at providing immediately the housing
sought by the complainant.

Phase three of this program will implement the final
recommendations of the Task Force, first in a few selected
cities (FY 1979) and ultimately in all regions (FY 1980).

–   Systemic Discrimination Units

Planning is underway to implement a focused attack upon
patterns and practices of discrimination simultaneously with
the implementation of the new rapid response complaint
processing system. This initiative is intended to set in
place specially trained units of attorneys and investigators
who will focus solely upon cases where systemic discrimination
appears to exist. These units will be set up on an
experimental basis in many of the regions which will test the
new complaint processing system.

In addition to their potential impact as a deterrent to a
large-scale discrimination, these units will help to develop a
comprehensive data base for sharing complaint information with
state and local agencies, and provide the Department of
Justice data and investigative techniques which will lead to
effective legal action and will develop data which can form
the basis of community-wide compliance reviews.

–   Relationships With Other Agencies

Steps are already underway to strengthen relationships with
other Federal agencies which carry Title VIII responsibility.
HUD has a system to notify the appropriate financial
regulatory agency of discrimination complaints against
regulated institutions as well as to notify those agencies of
the outcome of HUD investigations and conciliations.
Furthermore, HUD recently met with the Federal Home Loan Bank
Board (FHLBB) to discuss cooperative arrangements for

.

.

002892

program will last two years and involves approximately 7-10
such groups selected by HUD with the assistance of the
National Committee Against Discrimination in Housing (NCDH).
NCDH will develop a manual of Title VIII strategies and
techniques for such groups and provide training and
assistance. HUD will then contract with those selected to
provide monitoring services, complaint intake, testing and
similar services. In addition, local groups will learn to
develop data systems compatible with HUD's, to identify large
scale discrimination, to educate the public, to combat
steering, etc. Should this model be effective, HUD intends to
seek funds in the 1981 Budget to support a broadened program
involving such agencies and groups.

The actions I have outlined are a partial inventory of measures
planned and underway to strengthen civil rights enforcement at HUD.
They do not include the many measures we are taking to enforce Title VI
of the Civil Rights Act of 1964 and Section 109 of the Housing and
Community Development Act of 1974. Nor do they reflect the increased
effectiveness of Fair Housing and Equal Opportunity programs when tied
to viable housing and community development programs. The effectiveness
of HUD's fair housing and equal opportunity incentives and disincentives
depend in large part on whether there are attractive housing and
community development programs available for HUD's clientele and
beneficiaries. To cite a few examples:

-   The affirmative fair housing marketing plan provisions
    developed under Title VIII are most effective if the Section 8
    program is working to produce real starts at a high level.

-   Tenant selection and assignment policies are of little avail
    if public housing management and operating subsidy programs
    leave those projects in poor condition. Further, without
    production of additional units, opportunities for those on
    tenant waiting lists will be severely diminished, no matter
    how effective an assignment and selection system we have.

-   Large and small cities alike are feeling the pressure of
    intensified monitoring and compliance reviews of entitlement
    and grant applications. A significant number are experiencing
    sanctions such as declarations of ineligibility, reduced grant
    amounts, or the imposition of specific grant conditions.

-   HUD's newest program, the Urban Development Action Grant
    program, has established as a condition of eligibility that
    applicants show demonstrated accomplishment in fair housing
    and equal employment opportunity.

I appreciate the opportunity you provided to discuss the report
with you prior to its publication. I hope this description of HUD
initiatives provides sufficient information to allow us to work together
to strengthen our fair housing enforcement efforts.

Sincerely yours.

Patricia Roberts Harris

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

FAIR HOUSING AND EQUAL OPPORTUNITY

FAIR HOUSING ASSISTANCE PROGRAM

PROGRAM HIGHLIGHTS

| | ACTUAL 1978 | BUDGET ESTIMATE 1979 | CURRENT ESTIMATE 1979 | ESTIMATE 1980 | INCREASE + DECREASE - 1980 vs. 1979 |
|---|---|---|---|---|---|
| | | | (Dollars in Thousands) | | |
| Program Level: | | | | | |
| Number of Agencies Assisted............. | ... | ... | ... | 31 | +31 |
| Obligations............. | ... | ... | ... | $3,700 | +$3,700 |
| Appropriation............. | ... | ... | ... | 3,700 | +3,700 |
| Budget Outlays............. | ... | ... | ... | 3,700 | +3,700 |

SUMMARY OF BUDGET ESTIMATES

1.  SUMMARY OF BUDGET REQUEST

    The Budget requests $3.7 million in fiscal year 1980 for the Fair Housing
Assistance Program.  No authorizing legislation is required to support the proposed
appropriation.

2.  CHANGES FROM ORIGINAL 1979 BUDGET ESTIMATES

    This is a new initiative in 1980.

EXPLANATION OF INCREASES AND DECREASES

    All increases reflect the implementation of the new program in 1980.

PROGRAM DESCRIPTION

1.  LEGISLATIVE AUTHORITY

    Title VIII of the Civil Rights Act of 1968 (the Fair Housing Act) prohibits
discrimination in the sale, rental, and financing of housing and in the provision of
brokerage services. Section 810(c) of Title VIII provides that wherever a State or
local fair.housing law provides rights and remedies substantially equivalent to
those in Title VIII, the Secretary is required to refer to the appropriate State or
local agency any complaint filed under Title VIII that appears to constitute a
violation of such State or local agency's fair housing laws.  Section 816 of Title
VIII provides that the Secretary may assist State and local agencies in administer-
ing the Fair Housing Law by providing them with financial assistance.

2.  PROGRAM BACKGROUND

    The Fair.Housing Assistance Program represents one element of HUD's new
comprehensive strategy to strengthen the Title VIII program.  A recently completed
research study conducted for HUD by the National Committee Against Discrimination
in Housing concludes that housing discrimination remains an appallingly serious
problem in this country.  It is clear that only a small portion of the instances
of discrimination which are occurring daily are being filed with HUD in the form

The following table, based upon the projected number of complaints expected to be referred to each State and local agency in FY 1980, illustrates the estimated amount of the contribution to be provided to each State and local agency in the initial years of the program.

| Number of Complaints | Payment |
|---|---|
| 10 or less...................... | $20,000 |
| 11-20........................... | 30,000 |
| 21-35........................... | 40,000 |
| 36-55........................... | 50,000 |
| 56-75........................... | 60,000 |
| 76-95........................... | 70,000 |
| 96-115.......................... | 80,000 |
| 116-150......................... | 90,000 |
| For each additional 50 or portion thereof............... | 25,000 |

In later years, the amount is expected to remain substantially the same in total but the contribution for each State and local agency will be calculated on a strict per complaint performance basis with the recognition that the number of complaints each State and local agency will receive is likely to increase.

2. Training and Technical Assistance to assure that State and local agencies have the skills and technical knowledge required. An essential element in adminis- tering an effective State and local fair housing program is the training of personnel. The law of fair housing is a quickly changing area and, based upon empirical evidence, the Department recognizes that intermittent formal training is unlikely to provide the assistance and support necessary for State and local agencies to process housing discrimination complaints effectively. In order to assure consistency in administration and approaches to fair housing enforcement, the training and technical assistance component of the Fair Housing Assistance Program would be used by the Department for the expenses associated with providing training for State and local agency personnel with that training to be administered from Headquarters. The Department will develop training modules, including texts, visual aids, and case and exercise notebooks as part of this responsibility. The training will be administered on a regular basis throughout the program year at specific on-site locations convenient to State and local agency staff. The funds would also be used to contract for training to be provided under the Department's direction. In addition, some portion of the monies will be used for travel and expenses associated with the training program.

3. Data Systems to support the development of comprehensive and compatible systems for monitoring complaint processing and for capturing the extent and nature of discrimination in housing within the jurisdiction. This program component involves support for the development of various kinds of data and management systems necessary for effective program management and information. Support will be provided for those State and local agencies who do not already have own systems to develop automated complaint monitoring management and information systems which would enable them to be aware of the status of all complaints in their inventory referred to them by the Department. In addition, this program component would be used to fund computerized word processing systems to assist State and local agencies in assessing procedure, concepts, investigation models, previous existing case authority, and successful approaches for securing appropri- ate remedies as part of their investigation, association, and/or administrative hearing activities. This capacity will increase significantly the ability of State and local agency enforcement personnel to have available to them expert technical assistance in solving individual complaint investigation problems and issues.

4. _Innovative Projects_ to be utilized by State and local agencies to increase their capacity and broaden their enforcement efforts is proposed as part of the Fair Housing Assistance Program. At the Department's discretion, a portion of this set-aside would be used to fund model projects proposed to HUD by State and local agencies which could be replicated, if successful, by other agencies. Examples of projects which might fall within this category would include a stand-by testing unit as an alternative mechanism to streamline the investigation process; a monitoring system and unit for following the extent to which there is compliance with executed conciliation agreements; a model rapid complaint intake and processing system which could be used by State and local agencies generally; and other similar examples.

Secondly, this fund would involve small amounts of no more than $15,000 provided to selected State or local agencies already recognized by the Department but who wish to strengthen their legal capability and broaden their enforcement efforts. These funds would be used to develop improved administrative processes or legal authorities to strengthen that agency's overall enforcement capacity.

A third use would be a discretionary amount to assist those State and local agencies who have proposed innovative projects aimed at systemic discrimination within their jurisdiction. After the first program year, any money allocated for financial contributions to State and local agencies but not utilized by the 10th month of the fiscal year could revert to the innovative project's set-aside to allow additional appropriate grants to be made prior to the end of the fiscal year in question.

IMPLEMENTATION OF PROGRAM

The provision of fair housing assistance to State and local agencies will be contingent upon demonstrated improvement by those agencies in complaint processing and will involve mandatory training of State and local fair housing agency personnel and on-site review and evaluation by HUD of States' and local agencies' progress. The program will be phased in during 1980, and would be fully active for approximately one half of a year. The estimated increase in the number of State and local agencies deemed to be substantially equivalent by the close of 1980 is nine (9) with the number of State and local agencies growing from 23 to 32. We estimate that, by the end of fiscal year 1980, 31 of the agencies will have formally agreed to sign a Memorandum of Understanding with HUD to accept and process HUD referred complaints if the Fair Housing Assistance Program has been implemented.

HUD currently has a nation-wide complaint intake of approximately 3,700 complaints. We estimate that the complaint intake in fiscal year 1980 will be 4,050. The increase will come from the impact of the comprehensive strategy the Department intends to implement prior to that time. It will also be caused in part by the traditional increase in complaints that occurs following efforts by HUD to reduce the backlog of overage complaints present in its Title VIII complaint handling system. Such an effort was completed during FY 1978.

It is estimated that, by the beginning of FY 1980, approximately 1,500 complaints will originate in States and localities where fair housing agencies have already been recognized or will be recognized as having substantially equivalent laws. States currently have not allocated the expertise or the resources to process all of those HUD complaints originating in their jurisdictions and subject to referral under Title VIII. The first years of this program will provide funds for those agencies, based upon the projected number of complaints which they could ultimately

002900

# FAIR HOUSING AMENDMENTS ACT OF 1979

————

**WEDNESDAY, APRIL 25, 1979**

U.S. House of Representatives,
Committee on the Judiciary,
Subcommittee on Civil and Constitutional Rights,
*Washington, D.C.*

The subcommittee met at 9 a.m., in room 2226 of the Rayburn House Office Building; the Honorable Don Edwards (chairman of the subcommittee), presiding.

Present: Representatives Edwards, Volkmer, Drinan, Hyde, Ashbrook, and Sensenbrenner.

Staff present: Janice Cooper, assistant counsel; and Thomas Boyd, associate counsel.

Edwards. Good morning. The subcommittee will come to order.

Today's witnesses on H.R. 2540 bring with them enormous experience and credibility on the subject of fair housing enforcement. Our first witness is the distinguished Board Member of the Federal Home Loan Bank Board, Anita Miller.

Thanks to the enlightened approach of the Federal Home Loan Bank Board, savings and loans institutions are now being aggressively regulated to insure compliance with fair housing requirements. This is a most gratifying change in policy. Last year Ms. Miller suggested certain changes in the bill before the subcommittee at that time, and I am pleased that accommodations were worked out in H.R. 2540 that will foster the important fair housing role of the Federal financial regulatory agencies.

Ms. Miller, we are very pleased to hear from you today. You may proceed.

## TESTIMONY OF ANITA MILLER, MEMBER, FEDERAL HOME LOAN BANK BOARD

Ms. Miller. Thank you, Mr. Chairman.

I'm pleased to be able to testify before you today on behalf of the Federal Home Loan Bank Board in support of H.R. 2540, the Fair Housing Amendments Act of 1979.

Equal access to decent housing for all Americans is a goal which this Board is actively pursuing, as I discussed in my testimony on the earlier version of this bill last summer, and one to which I have personally devoted many years of effort.

The Bank Board believes that the changes in the existing law prposed by this bill are essential if this goal is to be achieved and we are prepared to devote our full resources to insuring that discrimination in housing finance is eliminated.

106

tion by the secondary market in the purchase or establishment of criteria for the purchase of mortgages, and have these other changes incorporated in other more appropriate sections of the act. For example, brokers would be covered more logically and clearly by an amendment to section 806, discrimination in the provision of brokerage services.

In addition, we would suggest that the secondary market section use descriptive nouns for various types of institutions covered, which is the format of the existing section 805, rather than the word "person" so that it would be clear that the intent of this section is to cover institutional investors which regularly deal in the secondary market.

As to clarification of the Bank Board's authority under the Fair Housing Act, the Bank Board fully supports, as well, the bill's amendment here. This is a case where there is truly a lack of clarity as to whether Federal financial regulatory agencies such as the Bank Board are covered by title VIII. Since the act concentrates primarily on HUD's, and secondarily on the Department of Justice's, powers, this is the only section which recognizes other Federal agencies' authority—but, more importantly, responsibility—to enforce the Fair Housing Act.

The present section requires executive departments and agencies with "programs and activities relating to housing and urban development * * * affirmatively to further the purposes" of the act. This very general statement has made it difficult for Federal agencies to determine the extent of their responsibilities under the act.

While the Bank Board has always considered that it had the responsibility to further the purposes of the act, our interpretation of the extent of our responsibility differs from that of other Federal financial regulatory agencies.

It should be noted that all the Federal financial regulatory agencies are required to enforce the Equal Credit Opportunity Act whose coverage overlaps much of that of the Fair Housing Act. However, although the ECOA gives the Bank Board and the other Federal financial regulatory agencies explicit authority to prevent discrimination by creditors, there are several areas which the Fair Housing Act covers which the EOCA does not. Most important of these are the provisions of section 805 which we have interpreted, and this bill reinforces, as prohibiting redlining. It is this section, in conjunction with our enabling statutes, which forms the basis of our redlining regulation. Thus, although the Bank Board and other Federal financial regulatory agencies have independent authority to prohibit many of the actions covered by the Fair Housing Act, clear authority under the act is needed to authorize action on some of the most critical aspects of housing discrimination.

For these reasons, we welcome H.R. 2540's addition of the phrase "including any Federal agency having regulatory authority over financial institutions" to section 808(d). This amendment clearly states Congress intent to authorize and require these agencies to enforce the Fair Housing Act as it affects the financial institutions they regulate.

We would like to request that the committee include some language in the report accompanying this bill which, much like sec-

tion 704 of the ECOA, would state that in enforcing this act the Federal financial regulatory agencies are authorized to use those enforcement powers they may have under their individual enabling acts. In our case, this would include our enforcement powers under the Home Owners' Loan Act, the National Housing Act, and the Federal Home Loan Bank Act, the National Housing Act, and the Federal Home Loan Bank Act. Such language would make it clear that we are authorized to use our cease-and-desist authority and related powers in fair housing enforcement.

As to expansion of the definition of discriminatory housing practice, we share the concern expressed by Secretary Harris and Assistant Attorney General Days about the possible impact of section 4(a)'s expansion of the definition of "discriminatory housing practice" to include any act which is unlawful under the entire act. It is possible that Federal employees would be liable to civil suits for their failure affirmatively to further the purposes of the act as a result of this definitional change. Since there is no question that Federal agencies as institutions would be liable for failure to act affirmatively in implementation of the act, we see no need for such an expansive approach.

We support Secretary Harris' suggestion to avoid this problem by expanding the definition of "discriminatory housing practice" to incorporate only section 817's prohibition of interference, coercion, and intimidation in the exercise of rights protected by this act.

As to cooperation in enforcement, we support the addition of section 810(a)(4) which formalizes and clarifies the informal efforts we have made in the past to cooperate with HUD, the Justice Department, and the other Federal financial regulatory agencies to coordinate our mutual fair housing enforcement efforts.

Section 810(a)(4) strengthens the current law's requirement to cooperate by establishing that HUD and the other Federal agencies with authority to prevent housing discrimination shall notify each other of allegations of housing discrimination which may be within their respective responsibilities and that, upon notification, they shall take appropriate action. In addition, this section also requires the various Federal agencies to seek to avoid duplication of effort in the exercise of this authority.

Recognizing that the Government's resources are scarce and they can best be used if the various agencies concerned coordinate their efforts, we have worked closely with HUD on a number of projects. I have personally had a series of meetings with HUD Under Secretary Jay Janis and Assistant Secretary Sterling Tucker to explore how our agencies can best work together to enforce this act.

HUD, the Department of Justice, the Bank Board, the Federal Reserve Board, the Federal Deposit Insurance Corporation and the Comptroller of the Currency have developed an administrative notification and coordination system through the Inter-Agency Fair Housing Task Force. The agreement between the various agencies is a limited one.

We believe that providing a statutory basis for these efforts as section 810(a)(4) does will result in better cooperation and coordination. The addition of this section also promises to give us the ability to continue this cooperation without the unnecessary paper-

110

Mr. DRINAN. Being evaluated by whom?

Ms. MILLER. The Community Reinvestment Act, requires that we examine all financial institutions to make sure that they're meeting the credit needs of their community. And this whole process has been opened up to the public. Institutions have to delineate their community, and then our examiners go in and see if, in fact, loans are being made in that community. I think there's a little bit more competition out there, and a——

Mr. DRINAN. A little bit, yes.

Ms. MILLER. And a little bit more aggressive action. But that doesn't substitute for a prohibition in the law.

Mr. DRINAN. Well, I'm glad to hear that. I haven't observed it, myself. But thank you for your testimony, and I yield back the balance of my time.

Mr. EDWARDS. We will submit some written questions to you.

Ms. MILLER. Certainly.

Mr. EDWARDS. The Gentleman from Wisconsin.

Mr. SENSENBRENNER. As one who is in the process of buying a house, and as a Member of Congress, I have become familiar with some of the practices of real estate agents and real estate brokers; specifically, once a contract is signed, assistance in getting the prospective buyer put together with a lending agency is offered so that the appropriate financing can be arranged.

Do you believe that the legislation that is before us would prevent a real estate broker from using this tool, or the tool of arranging financing, for steering purposes and for racial steering purposes?

Ms. MILLER. At first blush I believe that, but, as I said, I'm not an attorney and I'd have to further examine the bill, it's not an area that we would be most immediately concerned with as the regulator of the savings and loan industry. But I would be very pleased to get back to you in writing with further thoughts on the matter.

Mr. SENSENBRENNER. Now, carrying that one step further, if it is the real estate agent or broker who is the culpable party and who is deliberately engaging in the pattern or practice of racial steering, and he takes a client to a specific savings and loan institution to get a loan knowing full well that perhaps his client is not qualified, or knowing full well that he is qualified, and all of a sudden it turns out that the savings and loan has been brought in as an unwitting participant in the practice of racial steering, what remedies are available under this Bill, and what would your agency do?

Ms. MILLER. Well, in the first instance our agency has the ability to make sure that that buyer is receiving mortgage credit on a nondiscriminatory basis, even if there is a practice of steering to a particular financial agency.

Our nondiscrimination regulation and our new examination procedures will make it apparent to us whether or not that individual is being treated equally with other people who are applying for mortgage credit.

Mr. SENSENBRENNER. If the real estate firm is the one who is responsible for illegal racial steering is there any way under this bill, as you see it, that the savings and loan could be charged with

111

that kind of a violation, if they acted completely on the facts of the application?

Ms. MILLER. Again, I'm not an attorney, and I've not had this question posed to me before. But I would think not, as long as the association were offering the credit on a nondiscriminatory basis. I think that that's where it stops as far as our responsibility or theirs would be concerned.

Mr. SENSENBRENNER. Thank you.

I yield back the balance of my time.

Mr. EDWARDS. I just have one question here. It's about the Bank Board's own administrative powers.

This bill provides for the utilization of administrative law judges in the cease-and-desist process. Now, do you use administrative law judges in your cease-and-desist process?

Ms. MILLER. Yes, that's correct. It would go to an administrative law judge in those cases where it was not possible to negotiate a cease-and-desist order with an association.

Mr. EDWARDS. Are you talking about a case where a savings and loan is doing something the Bank Board doesn't want them to do, and you can't just order them to cease and desist, you have to——

Ms. MILLER. The first thing that we'd do is seek a consent cease-and-desist order with the board of directors of the association. Failing to achieve a consent order, we would then go to an administrative law judge. His decision, then, would be appealable to the U.S. Court of Appeals.

Mr. EDWARDS. Now, is this administrative law judge a part of the Bank Board?

Ms. MILLER. No.

Mr. EDWARDS. Do you think that the savings and loan that you are attempting to have change its course of conduct is getting due process, is getting a fair shake in this process?

Ms. MILLER. I do believe so. There are a number of steps. We start first with supervisory action. If that's not successful, it comes back to the Bank Board to our compliance division. They, then, in many cases will ask for a new examination to ascertain further facts. They then will work towards a consent cease-and-desist order, which is a very open process, with the board of directors of the association. And it is only after failing to achievement of that consent order that we would then go to the administrative law judge, where there is a full hearing. Thereafter, they have a right of appeal, as well.

I do believe that this is a prudent balance between our need to achieve compliance with regulations and their due-process needs as well.

Mr. EDWARDS. In some of these cases would the savings and loan institution be dissatisfied with the decision of the administrative law judge and then go on to the Federal District Court on appeal? Is that where they go?

Ms. MILLER. We recently had one case where the decision of an administrative law judge was appealed to the Board itself when there was a difference of opinion between the association and our legal counsel. The Board had to sit, then, as an appeal board. And we're in the process of that now in one case. Thereafter they could go on and appeal to the courts if they so chose.

002910

114

March 20, 1979

NATIONAL COMMITTEE AGAINST DISCRIMINATION IN HOUSING

M E M O R A N D U M

Martin E. Sloane
Bruce S. Gelber

SECTION 6(e)(3) OF THE FAIR HOUSING AMENDMENTS
ACT OF 1979:  COVERAGE OF THE SECONDARY MORTGAGE MARKET

This memorandum sets forth our views on the proposed
amendment to section 805 of the Civil Rights Act of 1968,
which proscribes discrimination in the purchase of home
mortgages.  NCDH fully supports the substance of the proposed
amendment as an important clarification of the Fair Housing
Act.  This amendment would remove all doubt that the Act
prohibits discrimination in home finance decisions, whether
perpetrated by primary lenders or by the secondary market. */
In this memorandum, we also address some of the principal
objections which have been raised to the proposed amendment.

Discrimination in the Secondary Mortgage Market

While there have been no major empirical studies on the
subject, it is widely acknowledged that secondary market
operations can and do have a direct impact on whether housing
and home finance are made available on an equal and nondiscriminatory
basis.  For example, standards set by the secondary mortgage
market can contribute to and encourage discrimination in
mortgage lending.  Victor H. Indiek, former President of
FHLMC, has candidly described this relationship as follows:

---
*/
    The "secondary mortgage market" refers to the purchase and
sale of mortgage loans for investment purposes.  There is no
organized trading exchange in which these transactions take place.
Rather, the secondary market for each mortgage lender consists of
an informal network of trading relationships developed over the
years with other financial institutions and investors.  The secondary
mortgage market is composed of both purely private "investors,"
such as banks, savings and loan associations, insurance companies,
and pension funds, and public or quasi-public investors, namely,
the Federal Home Loan Mortgage Corporation (FHLMC), the Federal
National Mortgage Association (FNMA), and the Government National
Mortgage Association (GNMA).

> I realize that it is possible to say that a secondary
> market organization cannot discriminate because of the
> distance between the primary and secondary markets. . . .
>
> The Mortgage Corporation, however, realistically
> realizes that because of the interactions of the two
> markets, the secondary market can become involved in
> the primary lender's discrimination. . . . A primary
> lender intending to sell loans to the secondary market
> will not normally make such loans, unless it is reason-
> ably confident that the secondary market will purchase
> the loans. Thus, if the underwriting standards, forms
> and procedures of the secondary market organization are
> discriminatory, either by their terms or in their
> application, then those standards, forms and procedures
> will help to produce discriminatory actions on the part
> of the primary lender. . . .

Hearings on Secondary Market Operations Before the Senate Committee

on Banking, Housing, and Urban Affairs, 94th Cong., 2d Sess.

(December 13, 1976).

In addition, discriminatory practices by investors in particular

cases can encourage or cause lenders to discriminate, especially where

the investor's relationship to the lender is sufficiently close

or its control over the lender is sufficiently great that it

plays a major role in the lender's decision of whether or not to

approve the mortgage loan. Indeed, the Federal Reserve Board has

already sought to address this problem by providing that the

Equal Credit Opportunity Act's prohibition against credit discri-

mination applies to any "assignee, transferee, subrogee, or

other creditor" who "participates" in the credit decision or

"knew or had reasonable notice of the [lender's discriminatory]

act, policy, or practice." 12 C.F.R. 202.2(l) (1978).

The impact of investors' policies and practices on

mortgage lending is especially great in credit poor areas of

the country. For example, as the D.C. Commission on Residential

Mortgage Investment has pointed out: "In an area such as

Washington, D.C., which traditionally has not generated

enough deposits locally to provide funds for mortgage loans,

local financial institutions are particularly vulnerable to

the appraisal and loan standards established by these secondary

118

Banking Committee criticized FNMA for employing underwriting standards which, in effect, carry forward racial and anti-urban biases which discourage investment by conventional lenders in predominately black, inner-city areas. The memorandum discussed the origin and perpetuation of these underwriting and appraisal practices in some detail:

> We fully share the position of FNMA and others that home lending institutions--primary lenders, investors like FNMA, and mortgage insurers--must have prudent underwriting standards to screen out unsound loans . . . .

> This does not mean, however, that the appraisal standards in use today are necessarily accurate indicators of risk in urban areas. On the contrary, it has been argued that many of these standards are still interlaced with concepts which evolved out of a strong history of bias against the central city and its residents. It was, unfortunately, not many years ago that FHA and most of the mortgage lending community ended their practice of explicit racial redlining in the City. FHA, the professional appraisal organizations and other institutions using their general standards (such as FNMA in buying FHA loans), operated under written rules which codified this prejudice. In addition to direct racial discrimination, the standards contained a great many concepts which were related to or derived from it. These include biases against areas with older houses, areas which were socially, economically or in other ways heterogeneous, areas with mixed land uses, areas undergoing economic or social transition, and so forth.

> When civil rights legislation led to the outlawing of racial discrimination in lending, underwriting standards were revised to delete direct references to race. The related antiurban concepts, however, were generally retained and other concepts were often added to act as surrogates for the prohibited criteria. . . .

> . . . Many observers believe that this history of bias is so long-standing and so recent that it still exerts a major influence on appraisal practices. . . .

<u>Memorandum Regarding FNMA</u>, quoted in Dennis, <u>Discrimination in Real Estate Finance: The Role of FTC Enforcement, A Report to the Federal Trade Commission</u> 72-73 (1978).

**119**

The memorandum then examined the critical role played by FNMA in this area:

> The role of FNMA is critical, for two reasons. First, FNMA has done its own under-writing of the conventional loans it buys, which has assured that the originating lender does, in fact, meet the required criteria. Second, the joint FNMA/FHLMC appraisal form is very widely used in the housing market as a whole, even by lenders who may not plan to sell their mortgages.

> When tested against the need to overcome a tradition of antiurban practices in the appraisal field, the current FNMA standards raise serious questions and concern. The criteria appear to be weighted, unnecessarily and arbitrarily, toward a conservative approach which screens out many sound loans along with the unacceptable ones.

Id. at 74-75. Just recently, in fact, HUD, in promulgating regulations governing FMNA's operations, likewise concluded that FNMA's underwriting guidelines have served to per-petuate the division of this country's housing credit market into a disproportionately black and urban, government-insured market and a disproportionately white and non-urban, conventional market. 43 Fed. Reg. 36204-05 (August 15, 1978). See generally Dennis Report, supra. Moreover, there is little reason to believe that the private sector is any less likely to apply these standards and practices than quasi-public participants in the secondary market.

Therefore, while there have been recent improvements in this area, (see p.11 infra), there still exists a need to ensure that the secondary mortgage market does not operate to foster or promote discrimination in home financing.

Coverage of the Secondary Mortgage Market

In addressing the prohibition against discrimination in secondary market operations, opponents have presented what appear to be contradictory arguments. On the one hand, they contend that existing laws already protect homebuyers

.

.

.,

122

is defined to include, not only persons who regularly extend, renew, or continue credit, but also "any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. 1691a(e). Regulation B elaborates on the statutory reference to "assignee" by defining "creditor" to include

> . . . an assignee, transferee, or subrogee of an original creditor who so participates [in the transaction]; but an assignee, transferee, subrogee, or other creditor is not a creditor regarding any violation of the Act or this Part committed by the original or another creditor unless the assignee, transferee, subrogee, or other creditor knew or had reasonable notice of the act, policy, or practice that constituted the violation before its involvement with the credit transaction.

12 C.F.R. 202.2(1) (1978). Thus, the Equal Credit Opportunity Act appears to prohibit discrimination by investors to the extent that their relationship to the primary lender is such that they are deemed to be "participants" in the initial loan transaction. This coverage, however, in no way limits or precludes coverage of investors by the Fair Housing Act. Indeed, Congress already has indicated that the Fair Housing Act and the Equal Credit Opportunity Act reach many of the same actors and practices, and represent co-extensive and alternative avenues of relief. See, e.g., 15 U.S.C. 1691e(i).

In short, while it appears that existing law already prohibits discrimination in home financing by the secondary mortgage market, this coverage is not without ambiguity. Therefore, clarification in this regard, through an appropriate amendment to Title VIII, would be helpful in removing all doubt about this coverage. There is no question that individuals who have been denied housing on a prohibited basis because of standards set, or actions taken, by secondary market investors, are entitled to the same protection afforded by

123

the Act to individuals who are denied housing because of the discriminatory conduct of primary lenders.

Response to Criticisms of Proposed Amendment

Opponents have raised a number of objections to the proposed amendment to section 805 of the Act. The most significant of these objections are discussed below.

First, opponents have criticized the proposed amendment on the ground that it will be extremely difficult to enforce. This criticism is not persuasive. With respect to investors whose conduct encourages or causes lenders to deny home mortgages on a prohibited basis, the proposed amendment should not be substantially more difficult to enforce than provisions relating to discrimination by brokers, sellers, or primary lenders. As in these cases, a prima facie case of discrimination can be made by demonstrating that the investor, after consistently purchasing loans from the lender, has refused to purchase substantially similar loans whose only differences relate to the race of the borrowers or the racial composition of the area in which the secured properties are located. Although the investor may then contend that its investment decision was based on other, nondiscriminatory factors, as in other cases under the Act, the court may conclude, on the basis of available evidence, that these proffered reasons were mere pretexts for the investor's discriminatory conduct. Thus, problems of proof and enforcement would not be different in kind from similar problems in other areas of fair housing enforcement.

With respect to promulgation of discriminatory standards by secondary market operators, the federal government already has taken steps to secure more effective enforcement in this

to virtually every civil rights law.  This argument has been
uniformly proved groundless in the past.  This objection ,made
without any new factual support, would place Congress in the
untenable position of having to choose between permitting a
continuation of discrimination in the secondary mortgage market
or risking an end to all secondary market activities.  We
submit that Congress need not make that "Hobson's choice."
Moreover, the contention is inconsistent with the assertion
that discrimination by secondary market investors is already
prohibited under existing law.

Third, the fear expressed by some investors, that the
proposed amendment will result in burdensome and unreasonable
recordkeeping, is likewise unfounded.  The proposed amendment
to section 805 would impose no new recordkeeping requirements.
To the extent that additional recordkeeping may be inappropriate
or unduly burdensome to investors, that question need be
addressed only if regulations are promulgated which impose
such requirements.  In that event, investors will have ample
opportunity to make their views known.

Finally, it has been argued that there is no need
for the proposed amendment because, even where investors
discriminate  on a prohibited basis, (a) in nearly all cases
the homebuyer has already received the loan; (b) it is unlikely
that the lender will want to sue an investor with which it
deals on a regular basis; and (c) where the lender claims that
it denied the expected loan because the investor would not
buy it, the homebuyer can sue the lender directly.

With respect to the first contention, it is simply not
true that in "nearly all cases" the homebuyer has already
received the loan.  Our experience has shown that lenders
frequently condition their decisions on receipt of either a

126

formal or informal commitment from the investor that it
will purchase the proposed loan. Moreover, some homebuyers
are unable to secure a loan precisely because the lender
has adhered to discriminatory standards which were imposed
by the investor.

With respect to the second point, it cannot be said
that a lender who will or has been held liable for discrimi-
natory conduct will not want to recover against an investor
with whom it regularly does business, even if such action
means losing a future source of investment. In addition,
this dilemma does not arise at all in suits by homebuyers or
the government.

As to the final point, we agree that in most cases
the homebuyer could sue the lender under existing law. Never-
theless, this does not justify exempting a culpable investor
from liability. Indeed, in cases where the originator is
capital poor, as in the case of many mortgage brokers, or
is simply judgment proof, a suit against the secondary market
purchaser may represent the only realistic avenue of relief
for the victim.

Conclusion

For the foregoing reasons, we do not believe that the
objections which have been raised to the proposed amendment
constitute valid grounds for failing to make clear that the
Fair Housing Act prohibits conduct or practices by secondary
market investors which discriminate in home financing. Never-
theless, there is some question whether the specific amendatory
language proposed by section 6(e)(3) of the Fair Housing
Amendments Act of 1979 removes the existing ambiguities, and
eliminates questions, with regard to the intended scope of

127

section 805. For example, the language making it unlawful
"for any person or other entity to refuse to buy a debt, . . .
secured by real property" could be interpreted too narrowly as not
clearly prohibiting investors from imposing discriminatory
underwriting and appraisal standards on primary lenders.
On the other hand, the above-quoted language could be con-
strued too broadly to apply to noninstitutional investors,
whose investment decisions, at most, have only a remote and
incidental impact on the availability of home financing.

For these reasons, we suggest that Congress consider
modifying the proposed language to address these concerns.
For instance, Congress might accomplish the intended clarifi-
cation of section 805 by revising it to read: "It shall be
unlawful for any bank, building and loan association, firm
or enterprise whose business consists in whole or in part
in the making or purchasing of real estate loans, to deny
or cause the denial of a loan or other financial assistance"
on a prohibited basis (proposed new language underlined).
Alternatively, Congress might simply revise section 6(e)(3)
of the proposed amendments by expressly authorizing the
Secretary of Housing and Urban Development to promulgate rules
and regulations, including appropriate exemptions, to effectuate
the purposes of the section.

In any event, we believe that the Fair Housing Act, in
its present form, prohibits discriminatory lending practices
which are perpetrated by secondary market investors, as well
as by primary lenders. Because some uncertainty continues to
exist, however, we also believe that it is important for
Congress to remove all doubt as to whether secondary market
operations are covered by the statutory requirements of non-
discrimination in housing and home finance.

128

March 20, 1979


NATIONAL COMMITTEE AGAINST DISCRIMINATION IN HOUSING

MEMORANDUM

Martin E. Sloane
Christine L. Owens

LEGAL ANALYSIS OF
PROPOSED AMENDMENTS TO
THE FAIR HOUSING ACT


On March 1, 1979, identical bills containing proposed
amendments to Title VIII of the Civil Rights Act of 1968, 42
U.S.C. 3601 et seq. (the Fair Housing Act), were introduced
in both the Senate (S. 506) and the House (H.R. 2540 ). These
amendments are substantive and procedural in nature. Mainly,
they reflect an effort to address problems which have inhibited
effective enforcement of the Fair Housing Act over the past ten
years. In addition, the coverage of the Act would be expanded
in certain respects upon enactment of these amendments. Again,
this expansion will result from procedural as well as substantive
changes.

This memorandum is designed to provide a legal analysis of
the proposed amendments, for purposes of defining and clarifying
the effect of these changes. The Congressional Record of
March 1, 1979, contains a section-by-section analysis submitted
by the bill's sponsors in introducing H.R. 2540 and S. 506.
Congressional Record, H. 1033 - 1037; S. 1937 - 1943. This
memorandum proceeds principally on the same section-by-section
basis. Because the proposed amendments contemplate four distinct
kinds of changes in the Fair Housing Act, however, there is over-
lap among sections. Accordingly, the memorandum is organized
according to the nature of the proposed changes.

I.  EXPANSION OF COVERAGE:  PERSONS AND BASES.

The proposed amendments would extend coverage of the Fair
Housing Act's proscriptions by clarifying the definitions of the
terms "discriminatory housing practices" and "aggrieved persons".
In addition, "handicap" discrimination would be added as a

prohibited basis. Finally, the amendments tighten the current exemptions under section 803 of the Act.

A. "Discriminatory Housing Practice"

A "discriminatory housing practice" would be redefined in section 802(f) of the Act as any "act which is unlawful under 'this title'". This definition, providing that violation of any provision of Title VIII constitues a discriminatory housing practice, would confirm and clarify the current state of the law. Thus, the amendment would make clear that violations by Federal agencies of the responsibilities imposed under section 808 of the Act, to administer their programs affirmatively to further the purposes of fair housing, are actionable under Title VIII. Several circuits have already held that violation of section 808 gives rise to a claim for relief on the part of aggrieved persons. See, e.g., Shannon v. United States Dep't. of Housing and Urban Dev., 436 F.2d 809 (3rd Cir. 1970) and Otero v. New York City Housing Authority, 484 F.2d 1122, 1133 (2d Cir. 1973). But see, Evans v. Lynn, 537 F.2d 571 (2d Cir. 1975), (Mansfield, J., concurring). In addition, this amendment under-scores the availability of section 817 as a distinct cause of action for violation of any provision of Title VIII. Again, section 817 has been held to give rise to such a cause of action without a demonstrated violation of any other substantive pro-vision. See, Laufmann v. Oakley Building and Loan Co., 408 F. Supp. 489 (S.D. Ohio, W.D. 1976), Smith v. Stechel, 510 F.2d 1162 (9th Cir. 1975), and Crumble v. Blumthal, 549 F.2d 462 (7th Cir. 1977).

B. "Aggrieved Person"

The amendments propose a definition of "aggrieved person" which essentially tracks the current language of section 810. This definition, which includes "any person" who is, has been, or will be, adversely affected by a discriminatory housing practice, adopts the Supreme Court's formulation in Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205 (1972). The major impact of this

130

of this amendment is to make clear that the same standard is
to be utilized to determine the standing of persons authorized
to seek relief for violations of the Fair Housing Act, whether
those persons pursue administrative or judicial remedies.  One
court has held that the standard under existing section 810, the
section on which the Trafficante Court relied, differs from that
under current section 812.  Topic v. Circle Realty Co., 532
F.2d 1273 (9th Cir.), cert. denied, 429 U.S. 859 (1976).  All
other courts faced with this issue have held that the standard
is the same under both section 810 and 812.  */  The Supreme
Court heard argument this term in Gladstone Realtors v.
Village of Bellwood, No. 77 1493 (1978).

Bellwood involves precisely this issue of standing under the
different enforcement sections of Title VIII.  NCDH participated
as amicus in Bellwood, arguing that the Trafficante decision is
applicable to lawsuits brought under section 812, as well as 810.
As noted, this is the prevailing interpretation of most courts
that have decided the issue.  The proposed amendment, then, serves
to clarify this important point.

    C.  "Handicap"

Finally, the proposed amendments add a new definition, section
810(h), which defines "Handicap", and revises each substantive
provision to include "Handicap" as a prohibited basis of dis-
crimination.  The proposed definition of "Handicap" is the same
as that in the Rehabilitation Act of 1973.  NCDH does not profess
to possess special expertise with regard to discrimination
against the handicapped.  It is important to note, however, that
the legislative history already reflects that the amendment would
not be designed to require retrofitting of currently existing
housing.

---

*/  See, e.g., Wheatley Heights Neighborhood Coalition v. Jenna
Resales Co., 429 F. Supp. 486 (E.D.N.Y. 1977); Fair Housing
Council of Eastern Bergen County v. Eastern Bergen County Multiple
Listing Services  Inc., 422 F. Supp. 1071 (D.N.J. 1976); Village
of Park Forest v. Fairfax Realty, P.H.E.O.H. Rptr., para. 13,699
(N.D. Ill. 1976).

131

D. Exemptions

In addition to expanding the scope of coverage through
definitional changes, the proposed amendments would tighten
existing exemptions to the Act's provisions. All existing
exemptions would be preserved until date of enactment of the
Fair Housing Amendments. After passage, however, the exemptions for
sale or rental of three or fewer single family residences
and the exemption applicable to dwelling units which contain living quarters
for four or fewer families, in one of which the owner resides, would be
eliminated. The only remaining exemption is embodied in proposed section
803(d). That provision would continue to exempt from coverage the rental
of living space within a single family unit in which the occupant resides.
The elimination of the existing exemptions is, in our view, a salutary change.
They have little basis in logic or in law. Legally, aggrieved persons who
are the victims of discrimination based on race can obtain relief under
42 U.S.C. 1981 and 1982, neither of which contains the exemptions under the
existing Fair Housing Law. See, Morris v. Cizek, 503 F.2d 1303 (7th Cir. 1974);
Warren v. Norman Realty Co., 513 F.2d 530 (8th Cir. 1975). Moreover, it is
theoretically possible under the current exemptions for an owner of eight
rental units to be exempt from coverage of Title VIII with regard to all except
one unit, while the owner of two units is subject to the Act's prohibitions,
the distinction turning merely on the type of unit owned. Thus, for example,
in Lamb v. Sallee, 417 F. Supp. 282 (E.D.Ky. 1976), the court held that
since a duplex is not a single family unit, the owner of 5 units, i.e., the
home at which he resided, three single family units, and one duplex was entitled
to the exemption afforded by this section. The proposed amendment remedies
these distorted results. The exemption under 804(d) would apply only to the
renting of space within a single family unit in which the occupant currently
resides. This exemption reflects the concern of the Act's sponsors to preserve
necessary privacy and personal housing choice. And, it would expand this
exemption to "occupants" of the unit, in contrast to the current exemption,
which applies to "owners" alone. Thus, the holding of the Ninth Circuit in

132

Singleton v. Gendason, 545 F.2d 1224 (9th Cir. 1976), that
the exemption under existing law is applicable only to
owners, would be broadened by enactment of the proposed
exemption.

Importantly, the exemption established by the proposed
amendments would continue to apply only if the occupant does
not utilize advertising prohibited by section 804(c) for
purposes of renting the space in his/her residence. This
continued prohibition on publication of discriminatory pre-
ferences underscores the very limited nature of the exemption.
It is not clear, however, whether the proposed exemption would
continue to apply if the occupant utilizes the services of a
broker, agent, or other person engaged in the business of
selling or renting housing. There is no specific mention of
this in the proposed exemption, as there is in the current
provision.

Contrary to the language of the current exemption, the
proposed amendment does not specifically state that reliance
on the services or facilities of a person engaged in the
business of real estate would remove the exemption. It is
clear, however, that the broker, agent, or other person so
consulted, would be prohibited from discriminating, and thus
would be subject to the provisions of section 804(a) if she/he
honored the discriminatory preference of the occupant. There
does not appear to be any reason to allow the occupant to
utilize the services of such individuals for purposes of
discrimination. Nor does NCDH have any information suggesting
that the existing exemption, limited to sales or rentals with-
out use of a real estate broker, has caused any particular
hardship. Thus, while the interests of the individual in
privacy and housing may justify the limited exemption provided
under the amendment, the protection of those interests can
be assured without insinuating other actors into the discriminatory

002931

practice. Accordingly, NCDH believes that Congress should make clear the language of the current exemption, which removes the protection for discriminatory practices if the individual owner or occupant relies on the services of a person engaged in the real estate business, is retained in the proposed exemption.

II.  CLARIFICATION AND EXPANSION OF SUBSTANTIVE COVERAGE

The proposed amendments call for several changes in the language of sections 804, 805, 808, and 817.  As noted, most of these changes merely serve to clarify existing law. They are essential clarifications, however, since plaintiffs seeking to vindicate rights protected by the Fair Housing Act have sometimes in the past been hampered in this process by the ambiguous language of the statute.  Moreover, ingenious defendants in tent on evading the law continue to attempt to convince courts to place a very narrow and limited construction on the provisions of the Act, thereby impeding plaintiffs'--private or governmental--efforts to effectuate the purposes of the Act.  The clarification by Congress that certain practices which have the effect of rendering housing unavailable, or available  only on less favorable terms and conditions, are unequivocally violations of Title VIII would lay to rest once and for all these restrictive arguments.

A.  Section 804

Proposed amendments to section 804 contemplate two significant clarifications.  The first is that the catch-line to the section would be amended to read:  "Discrimination in the Sale or Rental of Housing AND OTHER PROHIBITED PRACTICES".  This change underscores the intent of Congress that all discriminatory housing practices which render housing unavailable are proscribed

by Title VIII. Equally important, a new provision, 804(f), would specify
that insurance redlining by any person in the business of insuring against
hazards to property violates this section. This proposed amendment covers
both the refusal to enter into a contract of insurance, as well as
discrimination in the terms and conditions of coverage. Discriminatory
termination of insurance is not specifically mentioned. It is clear, however,
that such termination operates to make housing unavailable in violation of
section 804(a). Moreover, such termination would constitute a discriminatory
"term or condition" of coverage in violation of section 804(b). This
accords with the holding in Harper v. Union Savings Association, 429 F. Supp.
1254 (N.D. Ohio 1977), that discriminatory foreclosure of a mortgage
violates section 805 of Title VIII. It would be helpful, however, for
Congress to make abundantly clear, through additional language or through
legislative history, that discriminatory termination of insurance is fully
contemplated by the prohibitions contained in 804(f).*

We stress, again, that specific inclusion of insurance redlining is
merely a clarification of existing law, though an important and salutary one.
We are aware of only one case which addresses the issue of Title VIII's coverage
of insurance redlining. Dunn v. Midwestern Indemnity Mid-American Fire and
Casualty Company, C.A. No. C-3-78-105 (pending, S.D. Ohio). In that case, the
court preliminarily accepted the argument of plaintiffs, joined by
amici NCDH and the Department of Justice, that redlining by insurance companies
violates sections 804(a) and (b). This position accords with that of the
Department of Housing and Urban Development. See, Insurance Crisis in Urban

*One other omission in the wording of the proposed amendment is that it is
unclear whether the prohibitions apply equally to the prospective purchaser.
Congress should clarify its intent that purchasers are included within the
scope of protection.

America, Department of Housing and Urban Development, May 1978. These
arguments find further support in holdings that mortgage redlining violates
the provisions of Title VIII. Laufmann v. Oakley Building and Loan Association,
supra; Harrison v. Heinzeroth, 430 F. Supp. 893 (N.D. Ohio 1977).

B. Section 805

The proposed amendments to section 805 are, again, largely for purposes
of clarification only. Thus, section 805 would be amended to state explicitly
that the prohibition against discrimination in financing extends to
discriminatory practices based on the race, sex, etc., of "persons residing
in the vicinity of such dwelling". This amendment is designed to clarify
that mortgage redlining is prohibited by Title VIII. As noted, case law
fully supports the proposition that mortgage redlining is prohibited under
existing law. Thus, in Laufmann v. Oakley Building and Loan, supra, the
court held that redlining by mortgage lenders violates three separate provisions
of the Act: Sections 804, 805, and 817. Similarly, the court in Harrison
v. Heinzeroth, supra, held redlining to be a violation of Title VIII. Importantly,
the Harrison court awarded both compensatory and punitive damages to the
plaintiff, even absent showing of actual out-of-pocket loss. Moreover, both
HUD, through its interpretative opinions, and the Federal Home Loan
Bank Board, in its regulations (12 CFR 528.2) issued pursuant to its
808(d) affirmative action obligations, have taken the position that
redlining by mortgage lenders constitues a clear violation of the
Fair Housing Act.

An additional proposed amendment to section 805 would extend coverage
to the secondary financing market. This amendment also serves to clarify
existing law. Thus, to the extent that refusal by a secondary purchaser to

136

buy a loan operates to make housing unavailable on a prohibited basis,
such purchasers are already subject to the Act's provisions. Moreover,
if underwriting or purchasing guidelines promulgated by secondary financiers
are discriminatory, hence resulting in the refusal of a lender to make
loans, those practices are already reached through existing law. For a
more detailed discussion of the necessity and effect of this proposed
amendment, see Appendix II.

C.   Section 80$.

There are two proposed amendments to section 808.  One (808(e)(3))
would specify that the Secretary may provide "financial", as well as
technical, assistance to Federal, State, local, and other public or private
agencies or organizations involved in fair housing programs.  The other
amendment would clarify that the Federal financial regulatory agencies are
responsible for administering their programs relating to housing and urban
development in a manner affirmatively designed to further the purposes of the
Act.  These responsibilities were the subject of a suit brought by NCDH and
other civil rights organizations, against the Comptroller of the Currency,
the Federal Deposit Insurance Corporation, the Federal Reserve Board, and
the Federal Home Loan Bank Board.  National Urban League v. Comptroller of
the Currency, C.A. #76-0718 (D.D.C. 1978).  That suit,
which ended in settlement agreements with three of the agencies and subsequent
agreement on the part of the fourth, resulted in the promulgation by those
agencies of regulations and procedures relating to civil rights enforcement
and compliance on the part of member mortgage lending institutions.  Thus,
the Federal regulatory agencies already accept their responsibilities under

existing 808(d) and the proposed amendment would make those responsibilities explicit.

As noted, the amendments to the definition of discriminatory housing practice would clarify that violations of section 808 are now actionable by aggrieved persons. While this position has not been uniformly accepted under existing law, see e.g., Evans v. Lynn, 537 F.2d 571 (2d Cir. (en banc) 1975) (Mansfield, J., concurring), the vast weight of judicial authority supports the proposition that aggrieved persons may challenge the failure on the part of Federal agencies to honor the requirements of 808. Shannon v. HUD, supra; Otero v. New York City Housing Authority, supra.

D.   Section 817

Finally, section 817 would be amended to clarify that interference with the exercise of rights protected under "this title" or with the efforts of fair housing advocates to aid or encourage the exercise of fair housing rights constitutes a separate and distinct violation of the Act. While the existing language of 817 states that its protection is applicable to violations of rights protected under 803 through 806, the section has not been so narrowly interpreted. Thus, the courts in decisions such as Smith v. Stechel and Laufmann v. Oakley, supra, have held that plaintiffs stated a cause of action under 817 without the necessity of showing a violation of one of the specifically enumerated provisions. The proposed amendment clarifies Congressional intent that any act which interferes with the furtherance of the purposes of this title  constitutes a violation of section 817.

138

E.    Exlusionary Land Use Practices

Proposed amendments introduced last session included prohibitions on exclusionary land use practices by municipalities. Neither H.R. 2540 nor S. 506 contains a similar section dealing with exclusionary land use practices. In our view, this omission is of little substantive importance.

It is already clear  under existing case law that discriminatory exercises of municipal land use authority constitute a violation of Title VIII. See, e.g., Village of Arlington Heights v. Metropolitan Development Housing Corp. 558 F.2d 1283, cert. denied 98 S.Ct. 752 (1978); United States v. City of Black Jack, 508 F.2d 1179 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975). Indeed, the only question with which courts are now grappling regarding the exclusionary land use issue is what constitutes sufficient proof of a discriminatory practice. Here, the courts have uniformly held, in cases challenging municipal land use practices, that a showing of discriminatory effect is sufficient to sustain the plaintiff's burden of proof under Title VIII. See, e.g., United States v. City of Black Jack, supra, at 1184; Village of Arlington Heights v. Metropolitan Development Housing Corp., supra, at 1289 - 1290; Resident Advisory Board v. Rizzo, 564 F.2d 126 (3rd Cir. 1977), cert. denied 98 S.Ct. 1457 (1978). The elements necessary to prove a discriminatory effect are still in the process of judicial definition.

III. <u>CHANGES IN ENFORCEMENT PROCEDURES OF THE FAIR HOUSING ACT</u>

By far, the most significant and far-reaching changes that would result from enactment of the Fair Housing Amendments are in the enforcement procedures under the Act. The amendments are in response to more than ten years of inadequate enforcement resulting in large part, from limits imposed on HUD's authority under existing law. But inadequate enforcement is not solely a result of HUD's limited powers. Rather, the problem has been exacerbated by the very real limitations on the ability of individuals to enforce their rights to fair housing through private litigation. The high cost, as well as the extensive amounts of time and energy required, make litigation a difficult enforcement mechanism for most victims of discrimination.

The proposed amendments would operate to rectify the most serious shortcomings of the enforcement proceedings under Title VIII.

The administrative procedures contemplated by the amendments are patterned after those which have been utilized successfully by other Federal agencies, such as the National Labor Relations Board, and state and local fair housing commissions. The constitutionality of such administrative forums and the powers they exercise have been upheld repeatedly. The procedures called for by proposed sections 810 and 811 would operate to strengthen HUD's authority, thereby rendering utilization of the administrative process a more realistic and fruitful mechanism for securing individual relief. Moreover, the Secretary would be authorized to remedy discriminatory housing practices which are subject to administrative proceedings based on charges that HUD, itself, has filed. Thus, HUD would be in a position of pursuing both individual and classwide claims of discrimination, and providing effective

140

remedies upon a proven violation of the Act.

Similarly, proposed changes in judicial enforcement mechanisms would make civil actions by aggrieved persons, as well as by the government, a more effective avenue of redress. Thus, an extended statute of limitations for filing civil actions, as well as the more ready availability of attorneys' fees, even in suits against the government, would facilitate the filing of individual court actions. The proposed authority for the Attorney General to file civil actions pursuant to referrals from HUD, combined with the pattern and practice authority under existing law, would more completely involve the government in the process of firm enforcement of statutory and constitutional rights relating to fair housing. Further, the express authorization for the Attorney General to re-cover the same    relief authorized under proposed section 812 (Privace Enforcement) strengthens governmental enforce-ment as a means of assuring full individual compensation for injuries resulting from discriminatory housing practices. And, finally, the right of intervention, which the Attorney General could exercise in private actions, and which aggrieved persons could exercise in suits filed by the Government, serves to assure that both the interests of the public at large, as well as the private complainant, could be served in a single action in the appropriate judicial forum.

A.   Private Enforcement:

The proposed amendments to the enforcement sections of Title VIII would eliminate existing sections 810 - 814 and establish new procedures. While the individual complainant could still pursue either administrative or

judicial avenues of relief, the proceedings, including
remedies, available under each would differ from those under
existing law. We shall discuss these mechanisms separately.

1.   Administrative Enforcement:

a.   Who May File on Administrative Charge

"Aggrieved persons", as defined in proposed 802(i),
would be authorized to file charges relating to discrimina-
tory housing practices within one year from the date the
practice occurred or terminated. As noted, the "aggrieved
person" standard incorporates the provisions of existing
810, held by the Trafficante Court to provide for very broad
standing to challenge discriminatory practices.

In addition, proposed section 810 authorizes the
Secretary, on her own initiative, to file charges relating
to discriminatory housing practices. This authority is
similar to that now exercised by the EEOC under Title VII
(The Equal Employment Opportunity Act), 42 U.S.C. 2000-e(5).
Such "Commissioner's charges" have been utilized by the EEOC
in investigating and challenging broad-based patterns and
practices of discrimination. Presumably, the Secretary
would similarly use her charge-initiating authority to
pursue cases of class-wide discrimination or general
public importance. In this context, it is entirely con-
ceivable that an individual charge would prompt a sub-
sequent charge by the Secretary, based on information which
she uncovers during the investigation of the original
charge. In addition, proposed 810(a)(1) contains express
authorization for the Secretary to investigate housing
practices to determine whether charges should be filed.
Thus, it is clear that the Secretary is not limited to
filing charges which stem from investigations of

housing practices already the subject of a charge.

### b.  Statute of Limitations

The statute of limitations for filing individual
charges under 810 would be extended from the current 180
days to one year from the date when the practice occurred or
terminated. The terminology employed by the proposed amendment
implicitly adopts the concept of continuing violations--i.e.,
one year from the date of occurrence or "termination". This
is in accord with relevant civil rights case law, which
defines continuing violations in terms of continuing wrongful
acts, not continuing injury. See, e.g., Fair Housing Council
of Eastern Bergen County v. Eastern Bergen County Multiple
Listing Services, Inc., 422 F. Supp. 1071 (D.N.J. 1976)  No
time period would be specified within which the Secretary
must file a charge.  Nor is there a statutorily prescribed
time period within which the Secretary would have to conduct
or complete her investigation.  Existing 810 requires, on
its face, that the Secretary complete an investigation and
make a determination within a totally unrealistic 30 days
after the filing of a charge. This time period is virtually
never met.  Nor have most courts held the Secretary to this
unrealistically short period.

More importantly, under the proposed amendments an
aggrieved person who chooses to pursue administrative
remedies under section 810 would not be required to file a
lawsuit within an equally unrealistic 60 days of the charge
(30 days from date of notice of Secretary's action).  Again,
while most courts have held that the 30-day statute of
limitations for filing a civil action under 810 does not
begin to run until the aggrieved person receives notice that
the Secretary has determined not to resolve the complaint
or that conciliation efforts have failed, (Brown v. Ballas, 331
F. Supp. 1033 (N.D. Tex. 1971) Logan v. Richard E. Cormack
and Associates, 368 F. Supp. 121 (E.D. Tenn. 1973); and

<u>James</u> v. <u>Stratford Hills General Partnership, Inc.</u>, P.H.E.O.H.
Rptr., para. 13,701 (M.D.N.C. 1975)), some have held that
the time periods under 810 are absolute. <u>Young</u> v. <u>AAA Realty
of Greensboro</u>, 350 F. Supp. 1382 (M.D.N.C. 1972). Under
the proposed amendments, however, the only applicable time
period which would prevent filing of a suit is the three-
year period specified in proposed 812(a)(1).

        c.   <u>Subpenas</u>

Proposed amendments 810(a)(2)(B) (issuance of subpenas
on behalf of respondents), 810(a)(2)(C) (payment of fees),
810(a)(2)(D) (enforcement), and 810(a)(2)(E) (fines for
violations of subpenas) are identical to existing law.
Omitted from the proposed amendments, however, is a provision
(existing 811(d)) which allows recipients of subpenas,
within five days of service, to petition the Secretary for
modification or dissolution of the subpena, for good cause
shown.

Under the proposed amendments, the burden is on the
recipient of the subpena to go into court to quash the
subpena. This can be an enormous burden on aggrieved
persons , many of whom have chosen to pursue administrative
remedies precisely because of the expense of litigation
or their own lack of resources or expertise necessary to
secure their rights through the judicial process. We
recommend that the provision in existing 811(d) be reinstated.

d.   Temporary Relief

A salutary amendment is embodied in the provisions of
proposed 810(b).  That section would authorize the Secretary,
any time after the filing of a charge, to order temporary or
preliminary relief if she determines that such relief is
necessary to carry out the purposes of the Act.  Notice and
opportunity to be heard must first be provided the respondent.
This proposed amendment, however, contains several
ambiguities and possible deficiencies which may threaten to
undermine its effective operation.  The requirement that the
Secretary provide notice and opportunity to be heard may
entail significant delay in and of itself.  It is conceiv-
able that the immediacy of a threatened action is so great
than any notice and hearing will undermine the ability of
the Secretary to act promptly to preserve the status quo.
Moreover, the problems inherent in the preliminary delay
which results from the notice and hearing requirement may
be exacerbated by the burden imposed on the Secretary
to seek judicial enforcement of her order, should the
respondent not comply voluntarily.  Again, the delay en-
tailed in judicial enforcement may well render the
Secretary's initial order and the proceedings prerequisite
to its issuance futile gestures.  While the Secretary is
involved in the process of enforcement, the respondent
may be in a position to act in a way--e.g. dispose of the
housing unit--that would render the Secretary's temporary
order a nullity.  The amendment does not specify that the
respondent would be subject to contempt for violation of
the Secretary's order, when such violation occurs prior to
court enforcement.

Possible remedies for these deficiencies include
placing on the respondent the burden of having the order
dissolved. Thus, the Secretary's order would become self-
enforcing if the respondent had not, within a specified
time period, moved the appropriate court for dissolution
of the order. Alternatively, the Secretary could be
authorized to issue a self-enforcing temporary order of
limited duration, which would be extended only by sub-
sequent court order. Another alternative is one patterned
after the procedure utilized by the NLRB under the National
Labor Relations Act, 20 U.S.C. 160 (j). Under that section,
the Board may petition an appropriate United States district
court for temporary relief or restraining order after it has
issued a complaint (i.e., notice of a charge, stating the
allegations of the charge, and setting a date for hearing).
The statute specifies that "upon the filing of any such
petition the court shall cause notice thereof to be served
upon such person, and thereupon shall have jurisdiction to
_ grant to the Board such temporary relief or restraining
order as it deems just and proper." 29 U.S.C. 160 (j)
[emphasis added] Any noncompliance with the court's order
automatically subjects the respondent to contempt proceed-
ings. The obvious advantage of this proceeding is that it
shortens the time between the Secretary's determination that
preliminary relief is necessary and the respondent's being
brought under court order. There is no requirement that the
agency issue a notice; rather, the court immediately
assumes this responsibility and sets the matter for hearing
on an expedited basis. The proof required of the Board at

146

a 10(j) hearing parallels that contemplated by the proposed
amendment to Title VIII: that the Board demonstrate that
there is reasonable cause to believe that the elements of an
unfair labor practice are present, and that the purposes of
the Act will be frustrated absent the provision of temporary
relief.

      e.   Administrative Complaint and Proceedings

   After completing her investigation, the Secretary, if
she finds reasonable cause to believe that the charge is
true, may either file an administrative complaint, pursuant
to proposed section 811(a), or refer the matter to the
Attorney General for the institution of suit under 813(b).
Filing an administrative complaint triggers full-scale
administrative proceedings and, as discussed below, fore-
closes the aggrieved person from thereafter pursuing judicial
remedies. The "reasonable cause" finding is a prerequisite
for any further agency action or action by the Attorney
General. This parallels jurisdictional requirements under
Title VII, which foreclose the Commission's involvement in
any matter as to which there is no reasonable cause finding.

   Filing of an administrative complaint under proposed
section 811(a) would trigger an administrative hearing, the
procedures for which would parallel those of other state and
federal agencies. Thus, notice and hearing would be required.
The respondent would have the right to appear in person and
to testify. Further, "any aggrieved person" could
intervene, appear personally and present testimony. */

---

*/ It is not clear on the face of the proposed amendments
(section 811(a)) whether respondents and intervenors may
present additional documentary and testimonial evidence.

002945

147

At the conclusion of the hearing, the person conducting
the proceeding would make findings of fact and conclusions
of law, and issue a final order, which would be subject
to review and modification by the Secretary. The pro-
posed amendments also provide for judicial review of
the final order. This review would result from the filing
of a petition for review with the appropriate court of
appeals, within 60 days of the final order, by any party
to the proceeding. Review of the decision would be on a
substantial evidence basis. Failure to comply with a
final order at any time after it becomes unreviewable
would be penalized by a daily fine.

As noted, the procedures contemplated by proposed
section 811 comport with other well-established administrative
proceedings. The major concern of NCDH turns primarily on
the types of remedies which would be available to aggrieved
persons who pursue administrative avenues of relief. It
is our belief that in order for the administrative procedures
proposed in the Fair Housing Amendments to realize their
full potential as an effective remedy for discriminatory
housing practices, they must assure full relief
to the victims of such practices. Thus, it is important
that HUD be empowered to award monetary, as well as other,
relief to aggrieved persons in proceedings before it. For
an extensive discussion of the constitutionality of monetary
relief, refer to Appendix III.

2.  Judicial Enforcement (by Private Plaintiffs)
Proposed section 812 essentially consolidates the
judicial enforcement procedures currently available to

individual plaintiffs under sections 810 and 812 of the Fair
Housing Act. In so doing, the proposed amendment eliminates
continuing confusion surrounding issues of statutes of
limitations, standing, and other procedural and substantive
considerations governing suits under each of the existing
sections.

        a.   Statute of Limitations

    The proposed amendments embodied in section 812 provide
that any aggrieved person may commence a civil action within
three years of the date that the discriminatory housing
practice occurred or terminated. Proposed section 812,
then, adopts the standard of standing made applicable to
administrative proceedings under proposed 810. Both, as
noted, rely on the Trafficante decision, in interpreting
standing very broadly. Under proposed section 812 of the
bill, an aggrieved person may be, but does not have to be,
an individual who has previously filed an administrative
charge under section 810. Thus, there would be no exhaustion
requirement under proposed section 812. Moreover, with
regard to a person who has in fact filed a charge with HUD
under section 810, a reasonable cause finding by the Secretary
is not a prerequisite to suit under section 812. This
accords with case law developed under Title VII. McDonnell Douglas
Corp. v. Green, 411 U.S. 792, 798 (1975). */

---

*/   Jurisdiction over fair housing cases under section 812
would be vested in either state or federal courts. Under
existing 810, an individual is required to pursue judicial
enforcement in state court "if the person aggrieved has a
judicial remedy under a State or local fair housing law
which provides rights and remedies... which are substantially
equivalent to the rights and remedies provided in this
Title." Section 812, however, provides parallel jurisdiction,
and does not require that the aggrieved person resort to a
State forum. The proposed section 812 would adopt the
language and practice under existing 812.

**149**

Proposed section 812 would extend the statute of limitations for filing civil actions to three years from the date of the discriminatory occurrence or termination. Under existing section 812, there is an unreasonably short period for filing a civil action.  Persons filing under that provision must do so within 180 days of the occurrence of the discriminatory housing practice.  The proposed amendment would institute instead the reasonble time period of three years for securing rights protected by the Act. Moreover, the three year statute of limitations more closely accords with that under 42 U.S.C. 1981 and 1982.  While the applicable statutes of limitations under these two provisions is governed by appropriate state law, in almost all cases they exceed the unrealistically short period under existing Title VIII.  Finally, it is significant that the proposed statute of limitations under section 812 adopts the concept of continuing violations, by stating that the three year period runs from the date of occurrence or termination of the discriminatory practice.

        b.    Breadth of Protection and Scope of Relief

Under proposed 812, the Secretary would be precluded from commencing or continuing administrative proceedings based on a charge filed by an aggrieved person after that person institutes a civil action under the section.

150

The Secretary, however, would not specifically be barred from proceeding on the basis of other charges, whether filed by other aggrieved persons or agency-initiated, even if those charges arose, in part, from the original charge filed by the plaintiff.

The individual suit under proposed section 812 would be available for purposes of challenging any action which constituted a discriminatory housing practice. Thus, the plaintiff would not be limited to pursuing a violation of sections 803 - 806, as under existing sections 810 and 812. Proposed section 812 also provides for the appointment of attorneys and the commencement of actions without the payment of costs. This provision is identical to that under existing 812.

The relief available under proposed 812 would be somewhat broader than that available under existing law, in that the amendment contains no restriction on the amount of punitive damages available upon a finding of willful violation. This accords with the availability of punitive damages under 42 U.S.C. 1981 and 1982. Moreover, the award of appropriate relief would be mandatory upon the finding of a violation under proposed 812. Thus, the amendment specifies that the court "shall" provide an appropriate remedy. The language of existing 810 and 812, on the other hand, provides only that the court "may" order appropriate relief.

There is a need to make it clear that affirmative relief will be available under proposed 812. The amendment, while it would not preclude it, does not specify that such

002949

relief may be awarded.  Under existing 810, by contrast, "the court may ... enjoin the respondent from engaging in such practice or order such <u>affirmative action</u> as may be appropriate."  Existing 812 contains no such language regarding affirmative relief.  Proposed 812 provides, <u>inter alia</u>, that the court may award "equitable" relief. Arguably, affirmative relief would be subsumed under this category of equitable relief.  In other statutes designed to safeguard the protection of "civil" rights, however, Congress has frequently specified the availability of affirmative relief.  Thus, under Title VII, 42 U.S.C. 2000e-5(g), the court may award "affirmative" relief it deems appropriate.  Similarly, under the NLRA, 20 U.S.C. 160(c), Congress has specifically empowered the Board to award affirmative relief.  Accordingly, similar expressions of Congressional intent would help eliminate all doubt that affirmative relief is contemplated under proposed section 812.

     3.  <u>Enforcement by the Attorney General</u>

The proposed amendment, section 813, which sets out the authority of the Attorney General, would authorize judicial action by him/her in three separate instances:

First, the proposed amendments preserve the Attorney General's authority to institute civil actions where s/he alleges a pattern or practice of discrimination.  Second, the Attorney General would be authorized to sue for purposes of enforcing any final orders issued by the Secretary under proposed 811(a) or to collect any civil penalties assessed under proposed 811.  This includes penalties assessed as a part of the Secretary's final order, as well as fines for

152

noncompliance with that order. Finally, the Attorney General
would be authorized to file suit based on charges referred
to him/her by the Secretary, pursuant to proposed 810. The
Attorney General would also be authorized to intervene in
private suits brought by aggrieved persons under proposed
812, where s/he certifies that the matter is one of general
public importance. This is the same standard for intervention
by the EEOC under Title VII. Similarly, aggrieved persons
would be authorized to intervene in suits brought by the
Attorney General.

The proposed amendments to section 813 do more than
expand the Attorney General's authority to file suit. Of
major significance is the fact that under proposed 813(c),
the Attorney General would be eligible to secure <u>any</u> relief
authorized under proposed 812. Thus, this amendment goes
beyond the language of existing 813 which, on its face,
authorizes the Attorney General to sue only for preventive
relief. Existing law has been interpreted by both the
Fourth and the Fifth Circuits to bar a recovery of damages
by the Attorney General. <u>United States</u> v. <u>Long</u>, 531 F.2d
1151 (4th Cir. 1975) and <u>United States</u> v. <u>Mitchell, et al.</u>,
P.H.E.O.H. Rptr. para. 15,265 (5th Cir. 1978). This amendment
would effectively over-rule those restrictive decisions.

IV. <u>CHANGES PRINCIPALLY PROCEDURAL IN NATURE</u>

A number of the proposed amendments to Title VIII are
procedural in nature. Several are of substantial importance,
designed to strengthen enforcement of Title VIII and enhance

153

the ability of private individuals as well as the Government to safeguard rights protected by the Act. The major procedural changes are highlighted below.

### A. Statute of Limitations

We have already discussed at length the extended periods for filing administrative complaints which the proposed amendments would provide. We note, again, for purposes of summary, the major revisions in this regard proposed by the bill:

(1) The time for an aggrieved person to file an administrative charge is extended from 180 days from the date of the occurrence to one year from the date of the occurrence or termination;

(2) The statute of limitations for filing a lawsuit would be extended from 180 days from date of occurrence (existing 812) or 30 days from date of receipt of notice from HUD (existing 810) to three years from date of occurrence or termination.

### B. Referral to State and Local Agencies

Section 810 currently makes referrals to state and local agencies mandatory where those agencies operate under laws providing rights and remedies substantially equivalent to those protected by Title VIII. After a charge is referred, the Secretary can take no further action unless

154

the State or local agency fails to act within 30 days
of receipt of charge. In addition, the Secretary must
certify that in her judgment, protection of the rights
of an aggrieved person, as well as the interest of
justice, require that she assume jurisdiction over the
referred charge.

The proposed amendments to the referral procedure
would establish that referral is discretionary with the
Secretary. Thus, under proposed 810(a)(3), the Secretary
may, but is not required to refer charges to a
certified state or local agency. Further, such referrals
would be only with the consent of the aggrieved person.
Moreover, a State or local agency would not be certified
under this title unless it not only operated under a
law providing rights and remedies substantially equivalent
to those protected by the Fair Housing Act, but also
demonstrated a history of prior performance that warranted
certification. The Secretary would be required to consider
this history of past performance as well as current practices
prior to certifying any agency.

The major drawback in the proposed referral procedures
is that once a charge is referred, the Secretary would be
barred from taking any further action with regard to that
charge without the consent of the referral agency. Such a
procedure would unnecessarily tie the Secretary's hands, in
effect subjecting the Secretary to the control of state
agencies.

Under the analogous Equal Employment Opportunity Act,
EEOC is also authorized under Title VII to refer charges

155

·to state and local·certified agencies. EEOC is not,
however, subject to such rigid restraints on its ability
to act in the face of state or local agency inaction.
We suggest that the Secretary should be authorized to
resume jurisdiction of fair housíng charges at the
expiration of 30 days if the State agency has failed to
act, as specified in existing section 810, or upon the
Secretary's certification that such resumption is necessary
to protect the interests of the charging party or otherwise·
to effectuate the purposes if the Act.

C.    Coordination of Federal Agencies' Efforts
      under Proposed 810(a)(4)

This proposed amendment would require the Secretary
and other federal agencies having authority to prevent
"housing discrimination" */ to cooperate in order to
avoid duplication of effort. The provision would require
agencies to notify each other of cases arising before them
as to which the notified agency would have jurisdiction.
It would further require that agency, upon notification,
to take appropriate action.

The language in this proposed amendment is far from
clear. Presumably it contemplates for HUD the type of
authority which the Federal Trade Commission already possesses
in its enforcement of the Equal Credit Opportunity Act, i.e.,
to coordinate and monitor enforcement of the Act by other
federal agencies. We believe this provision should
specifically authorize HUD to assume this function with

_____
*/ Housing discrimination is not a term of art. It is used
here, presumably, to refer to discriminatory housing practices.
See section 802(f).

156

regard to enforcement of the Fair Housing Act. We suggest
the adoption of language which would authorize HUD to
issue rules and regulations designed to clarify the
responsibilities of other federal agencies with regard to
enforcement of the Act.

D.    Expedition of Proceedings

Proposed 814(c) provides that any court in
which proceedings are instituted under Title VIII would be
required to set them for expedited hearings. This pro-
vision is substantively identical to existing section 814
of Title VIII.

E.    Attorney Fees

The final major change proposed by the Fair
Housing Amendments is the authorization under section 814(a)
to award attorney   fees to a prevailing party. Thus, the
proposed amendment would remove the requirement of indigency
under existing section 812. This proposed amendment merely
would bring Title VIII into line with the attorney fees
provision of the Civil Rights Attorney Fee Awards Act of
1976, 42 U.S.C. 1988, as well as Title VII. Beyond this,
the amendment would also specify that attorney   fees
can be awarded against the government.

Under prevailing case law, attorney fees awards, as
proposed under 814(a), would be made to prevailing plaintiffs
except where assessment of a fee against the defendant is
unjust. Newman v. Piggie Park, 390 U.S. 400 (1968). In
addition, attorney fees would be awarded to prevailing
defendants only where the plaintiffs' lawsuit was "frivolous,
unreasonable, or without foundation." Christiansburg
Garment Co. v. EEOC, 98 S.Ct. 694 (1978).

The amendment also proposes that attorney fees would
be available to parties who prevail in the administrative
proceedings, as well as to individuals prevailing at
interlocutory states of proceedings which determine substantial
rights of parties. This latter provision is in accord with
existing case law. <u>Van Hoomissen</u> v. <u>Xerox</u>, 503 F.2d 1131
(9th Cir. 1974); <u>U.S.</u> v. <u>Allegheny-Ludlum</u>, 558 F.2d 742
(5th Cir. 1976).

Omitted from the proposed amendment dealing with
costs and attorney fees is any mention of
expert witness fees. Use of experts is often essential
in any fair housing, as well as other civil rights, cases,
and experts tend to be expensive. Courts frequently have
been unwilling to award expert witness fees to prevailing
plaintiffs in such cases in the absence of statutory language
specifically authorizing such awards. See, e.g., <u>Wheeler</u> v.
<u>Durham City Bd. of Ed.</u>, 585 F.2d 618 (4th Cir. 1978). Thus,
NCDH suggests that Congress insert express language authorizing
the award of expert witness fees as a part of costs.

V. <u>SUMMARY</u>

Proposed amendments to the Fair Housing Act, introduced
in both the House and Senate, would, if enacted, result
in salutary changes in both the procedure and substance of
Title VIII. Of special importance are those provisions,
proposed sections 3610 - 3614, which would strengthen the
Secretary's enforcement powers, at the same time facilitating
the institution of individual and government lawsuits, designed
to remedy violations of the Act and effectuate the national

158

interest in fair housing. Procedural changes, such as the extension of the statute of limitations and discretionary referral to state and local agencies, would help assure that rights protected by the Act can in fact be safeguarded, rather than undermined by the application of arbitrary and unreasonable requirements. Moreover, important clarifications, such as the definitions of "aggrieved person" and "discriminatory housing practices", and specific inclusion of a prohibition against insurance redlining, remove some of the ambiguity which has developed under the current case law, and, again, help provide meaningful assurances that the Act can and will be enforced. Finally, expansion of substantive coverage to prohibit discrimination based on handicapped status and eliminate current exemptions will further the goal of all housing and fair housing statutes, first expressed in the National Housing Act of 1949, of "a decent home and a suitable living enviornment for every American family."

159

Dr. WEAVER. Title VIII was enacted more than 11 years ago. I was privileged to serve as Secretary of Housing and Urban Development at the time this important legislation was enacted. No event gave me more satisfaction during my years of service with the Federal Government than the enactment of title VIII.

Mr. Chairman, we who worked closely in the effort to secure enactment of the Federal fair housing law were well aware at the time of its imperfections. We were aware of substantive gaps in coverage which were neither logical nor realistically defensible, gaps such as the arbitrary exemption from coverage of all those who sell or rent three or fewer housing units.

We were also aware of certain procedural restrictions, such as the 180-day statute of limitations, that made it more difficult for victims of discrimination to secure redress of their just grievances.

Further, we were aware of certain ambiguities in title VIII, ambiguities which the courts, despite generally favorable treatment and liberal interpretation of the fair housing law, have been struggling to resolve.

Above all, we were well aware of the severe enforcement weaknesses inherent in that statute.

Title VIII charges the Department of Housing and Urban Development with the responsibility for enforcement of its provisions, but gives HUD no real enforcement authority. Instead, the statute restricts enforcement of the important rights protected under the fair housing law to litigation by private parties or, in selected cases, by the Department of Justice. Thus, we have saddled the already overburdened courts—and particularly the Federal courts—with an additional burden, and in an area—housing—in which they possess little experience or expertise.

These weaknesses have served to undermine the effectiveness of title VIII. The plain truth, Mr. Chairman, is that housing discrimination remains a major problem today, eleven years after Congress resolved that it is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.

The Housing Marketing Practices Survey, which NCDH recently conducted under contract with HUD, demonstrated the extent and persistence of the housing discrimination problem that remain. Other studies and surveys have shown that many Americans, black and white alike, are not even aware that housing discrimination is against the law.

It is time for Congress to act to transform title VIII into the true charter of equal housing opportunity that was its original promise. This, in our view, is what H.R. 2540 accomplishes and we at NCDH fully support this legislation.

I would like to go through some of what we consider to be the more important amendments contained in H.R. 2540, pointing out the ways in which they would meet specific problems demonstrated through experience. In some cases we have suggestions to offer which we believe would add strength to the bill and help resolve continuing ambiguities in title VIII.

I have attached to my statement a detailed analysis of the provisions of H.R. 2540, which, with the committee's permission, will be

160

made a part of the record. I will not attempt to go into that much detail here.

Let me begin with the substantive coverage under the bill.

Most of the amendments here are for purposes of clarifying the scope of protection afforded under existing title VIII, rather than providing new protections against housing discrimination previously exempted under the fair housing law. Thus, the legislation would reaffirm existing court decisions such as *Laufman* v. *Oakley Building & Loan Association, and Harrison* v. *Heinzeroth,* both of which are cases where NCDH attorneys served as counsel, holding that racial redlining by mortgage lending institutions is prohibited by title VIII.

By the same token, the bill would make clear that racial discrimination in property insurance is prohibited also by title VIII. This, too, would merely confirm existing interpretations of the fair housing law.

In addition, the bill would reaffirm that Federal departments and agencies may be held judicially accountable for failure to honor their obligations contained in section 808 of the act to administer their programs and activities in a manner affirmatively to carry out the purpose of title VIII.

I might add that we at NCDH consider this provision of special importance. Our own lawyers have had to institute litigation against a number of Federal agencies which have ignored their fair housing obligations under title VIII. This amendment would remove all doubt that Federal agencies are indeed subject to the affirmative action mandate of the fair housing law, and strengthen the efforts of NCDH and other fair housing organizations to persuade Federal agencies to join as full participants in achieving the goals of title VIII.

Other important substantive provisions of H.R. 2540 include explicit coverage of secondary mortgage market operations and a limitation on the exemption of coverage, reducing the so-called Mrs. Murphy's exemption to realistic terms.

The bill would also make important procedural changes in title VIII. We have discussed those more fully in my statement for the record and in considerable detail in our legal analysis of the legislation, which I also am submitting for the record. These procedural changes include clarification of standing to seek redress for violation of title VIII; a liberalization of the statute of limitations; and needed clarification and broadening regarding the relief that can be secured in court actions under title VIII.

There is no question, Mr. Chairman, that the most important feature of H.R. 2540 has to do with enforcement of rights secured by title VIII, specifically the establishment of enforcement through administrative mechanisms. The members of this committee are well aware of the wholly inadequate enforcement machinery currently provided under the fair housing law. The only alternative to litigation is conciliation by HUD.

As the General Accounting Office report of February 1978 demonstrated, conciliation represents little more than a futile effort to resolve housing discrimination complaints. Of the 332 complaints reviewed by GAO over a 40-month period, only 36—little more

002959

than 10 percent—were resolved by HUD. Of the 36 resolved, the complainant secured the housing unit in only four instances.

H.R. 2540 would totally transform the title VIII administrative process by providing HUD with realistic authority to bring about satisfactory resolutions of individual complaints, and, indeed, to bring about large-scale institutional reforms through the administrative process. The bill contains a number of provisions that would make salutary changes in the existing administrative enforcement procedure.

First, HUD would be authorized to institute administrative action on its own initiative, as well as through a charge by an aggrieved person. Thus, HUD would be authorized not only to provide relief in individual cases of housing discrimination, but also to attack institutional or systemic problems of discrimination uncovered through its own studies and investigations.

Second, HUD would be authorized, in instances where prompt action is necessary, to act expeditiously by ordering temporary or preliminary relief pending final disposition of the charge. The main point here is that HUD could assure, under appropriate circumstances, that the housing unit that is the subject of the charge would be available in the event the charging party prevails. this would afford the realistic possibility that the charging party can secure the basic relief in the event he or she is successful.

Third, although HUD would still refer charges to State or local fair housing agencies, this referral would no longer be mandatory. Moreover, such referrals would be only with the consent of the aggrieved person.

Of special importance is that the criteria for such referrals would not be limited to paper equivalency. Rather, the Secretary would be required to take into account the past performance of the state and local agencies.

As the members of this committee are undoubtedly aware, quite frequently State and local fair housing agencies operate under laws that appear on paper to be almost ideal. Through a combination of factors, however, such as lack of sufficient funding, lack of sufficiently trained staff, and administrative ineptitude, their performance has often fallen far short of the promise of the statutes under which they operate.

Through this amendment Congress recognizes that paper equivalency is not sufficient and, accordingly, would require HUD to consider past performance as one of the criteria that determines whether referrals may be made.

Fourth, the bill would also provide for an eminently fair administrative process by which HUD would determine the factual validity of the complaint. This includes a finding of reasonable cause, a full-scale hearing on the merits, and appropriate judicial review of HUD's decision.

Fifth, HUD would no longer be limited to the velvet glove of conciliation alone. Rather, under H.R. 2540 HUD could order realistic relief, including issuance of cease-and-desist orders and imposition of civil penalties of up to $10,000. These represent powerful sanctions which would constitute strong deterrents to the continuation of housing discrimination.

162

Sixth, the legislation would expressly mandate cooperation between HUD and other Federal agencies having fair housing responsibilities for purposes of avoiding duplication of effort. Thus, the various Federal agencies whose programs and activities bear importantly on fair housing would not be operating in a vacuum, or in isolation from each other.

Mr. Chairman, the administrative enforcement provisions that I have referred to above are of overriding importance if the effort to secure fair housing in fact as well as in legal theory is to succeed. NCDH fully supports these provisions. Our legal staff is in the process of preparing an analysis of these administrative enforcement provisions in relation to similar provisions that govern the enforcement activities of other Federal agencies. We would be happy to provide the committee with this memorandum as soon as it is complete.

We have also several suggestions for ways in which the legislation may be strengthened.

First, the provision relating to referrals to State and local agencies would prohibit HUD from taking any further actions with respect to any charge, once it is referred, without the consent of the agency. Despite the tightened criteria that would govern certification of State and local fair housing agencies, we have reservations over tying HUD's hands in this way. Under existing title VIII, HUD is permitted to take further action on a complaint if the State or local agency fails to act within 30 days. This makes sense to us, and we recommend that the 30-day provision be reinstated. In our view this provision, combined with the tightened certification criteria, would serve both to facilitate expeditious remedial action in individual cases and improve the performance of strengthened State and local fair housing agencies.

Second, the provision concerning cooperation between HUD and other Federal agencies having fair housing responsibilities, while commendable in purpose, appears uncertain. Indeed, this provision, which fails to provide for any overall supervision of the enforcement actions of the various relevant Federal agencies, could well impede the very cooperation it calls for. We suggest that HUD, the principal fair housing enforcement agency, be given overall responsibility for coordinating the government-wide cooperation effort.

Third, the provisions authorizing administrative remedies, while they represent a giant step in advance of existing law, still fall somewhat short of assuring full relief to aggrieved persons. The relief contemplated by H.R. 2540 includes temporary orders pending final disposition of a charge, issuance of cease-and-desist orders to prevent future discrimination, and the imposition of substantial civil penalties payable to the U.S. Treasury.

It is our understanding, however, that monetary relief to aggrieved persons, to recover out-of-pocket financial loss, is not contemplated by the bill. This, we think, is a very serious omission. The heart of H.R. 2540 lies in its provision for administrative enforcement. By the same token, it assumes that once it becomes known that the administrative enforcement procedures have teeth, the number of complaints will increase substantially over the relatively meager 3,500 or so per year that HUD now receives. Indeed, the success of the new administrative enforcement mechanism

would depend largely on the willingness of complainants to utilize it.

Our concern is that if complainants cannot secure full relief through the administrative process, they may tend to abandon it, and the basic premise upon which the new enforcement mechanism is based would be proved invalid.

As the members of the committee are aware, victims of housing discrimination, in addition to suffering from the denial of particular housing units, frequently incur substantial financial loss as a direct result. While the provisions for temporary orders contained in the bill could well preserve the housing unit so that the successful charging party may actually secure it after final disposition of the charge, this will not always be the case.

By the same token, while cease-and-desist orders can be an effective instrument to prevent future discrimination, they frequently will provide no specific relief to the aggrieved person. Similarly, while the imposition of substantial civil penalties also serves as a strong deterrent to the practice of housing discrimination, these penalties would serve to fill the coffers of the U.S. Treasury but would afford the aggrieved person no tangible relief.

In short, often the only relief available to victims of discrimination will be recovery for out-of-pocket loss resulting from the act of discrimination. In most cases, the victims of discrimination cannot be made entirely whole unless relief includes recovery for out-of-pocket loss.

We are aware that the question whether Congress should authorize HUD to order such monetary relief raises constitutional questions under the seventh amendment. We consider this matter so important that our legal staff has done a thorough review of the issues involved and prepared a memorandum on the subject. Their conclusion is that such authorization is well within the constitutional authority of Congress. With the committee's permission, I would like to submit this memorandum for the record.

Mr. Chairman, I wish to emphasize that the suggested amendments to which I have just referred should not be viewed as any reservation to NCDH's enthusiastic support for H.R. 2540. We believe the bill reflects careful draftsmanship and extraordinary sensitivity to the problems inherent in title VIII that have been demonstrated over 11 years of experience.

We also believe that the amendments contained in H.R. 2540 are capable of transforming the Fair Housing Act into the charter of equal housing opportunity that we all envisioned in 1968. We are proud to support this legislation.

[The complete statement follows:]

164

STATEMENT OF ROBERT C. WEAVER, PRESIDENT, NATIONAL COMMITTEE AGAINST DISCRIMINATION IN HOUSING

Mr. Chairman and members of the Committee:

I appreciate your invitation to testify on H.R. 2540, the proposed Fair Housing Amendments Act of 1979. Let me say at the outset that we at NCDH fully support this bill. It represents a needed response to inadequacies in existing law that have been demonstrated over 11 years of experience under Title VIII. We congratulate the sponsors in both houses of Congress, and their respective staffs, for the painstaking and exacting work they have done in developing and drafting this superb bill. As you might imagine, Mr. Chairman, we have several suggestions and recommendations for strengthening the bill even more. These, however, are largely technical in nature and in no way lessen the enthusiasm of our support for the legislation nor our admiration for the splendid work that went into bringing it into being.

The testimony I am presenting today is from the perspective of more than 45 years of experience in various aspects of housing and home finance, both as a government official and as a private practitioner. My experience dates back to service in the Housing Division of the

**165**

Federal Public Works Administration during the early
1930's when the federal government first became actively
and, as it turned out, permanently involved in housing.
I continued to serve in the federal government during the
1930's and early 1940's, a period when the federal
government's involvement grew to become a dominant
force in the housing and home finance industry. This was the
period when such key federal agencies as the
Federal Housing Administration, the Federal Home Loan
Bank Board, the Public Housing Administration, and the
Home Owners Loan Corporation, were established--all
with the commendable purpose of helping to meet
the economic crisis of the Depression and assisting
the American people to retain, acquire, and maintain decent
housing.

This also was the period when the federal government acquiesced
to racial discrimination and encouraged segregation in
housing. The plain fact is that these new federal agencies,
created and dedicated to the noble purpose of advancing the
social welfare of all Americans, operated on the basis of
principles reflecting nothing less than rigid racial apartheid.
Thus FHA, from its inception, operated on the express
assumption, communicated in no uncertain terms to its
underwriters, that racial discrimination and segregation
in housing were necessary to the effective administra-
tion of FHA mortgage insurance programs. The Federal

166

Home Loan Bank Board, established for the salutary
purpose of providing stability to the troubled savings and
loan industry, and the Home Owners Loan Corporation, created
to assist the millions of American families whose homes were
threatened by foreclosure, reflected precisely the same set
of operating principles. My old friend and colleague, the
late Charles Abrams, characterized federal housing policy at
that time as one of "separate for whites and nothing for
blacks".

As you can appreciate, Mr. Chairman, it was an extremely
frustrating time for me, working in a cause I knew to be
just and good--assisting American families in securing
decent shelter in good living environments--yet knowing that,
with the exception of public housing, neither I nor any
other racial minority could expect equal benefits from these
federal programs.

For well over 20 years these conditions prevailed.
In 1949, Congress established as the national housing
objective, "a decent home and a suitable living environment
for every American family". For black Americans, however,
those splendid words were often meaningless in the face of
continued federal insistence on housing segregation and con-
tinuance of housing discrimination. The impetus for change
came from the least likely branch of the federal government, the

judiciary. In May 1948, the Supreme Court of the United States, in <u>Shelley</u> v. <u>Kraemer</u>, 334 U.S. 1 (1948) ruled that judicial enforcement of racially restrictive covenants was unconstitutional. The <u>Shelley</u> decision, however, had little immediate impact. For more than a decade, federal housing policy and practice continued on a business-as-usual basis, with only a few changes, and those largely of a cosmetic, rather than substantive, nature.

I returned to Washington early in 1961, when President John F. Kennedy appointed me to the position of Housing and Home Financial Administrator. In that capacity, I was considerably less powerless in implementing my efforts to bring about changes in the racial policies of federal housing agencies than I had been in my earlier tour of duty. What is more, I had assurance, when I accepted President Kennedy's offer, that I would have full Presidential support in effecting changes. President Kennedy had promised during his campaign in 1960 to issue an Executive Order barring racial discrimination in federally assisting housing. He delivered on that promise. In November 1962, President Kennedy issued Executive Order 11063, on Equal Opportunity in Housing, ordering federal departments and agencies having functions relating to housing and urban development to prevent

discrimination in the operation of those programs and activities.

To be sure, the Kennedy Executive Order represented only a small first step in ending the previously pervasive policy and practice of discrimination and segregation in housing, in which the private housing industry and the government had been co-equal and reinforcing partners. Its coverage was limited to no more than 25 percent of the new housing market, barely one percent of the Nation's housing inventory. Nevertheless, its importance was enormous, extending well beyond the meager coverage it provided. For the first time, official federal housing policy was firmly opposed to housing discrimination. What is more, this policy had been expressed by the President of the United States in execution of his authority under the Constitution and the laws of the United States. Needless to say, Presidential support, reflected by the Executive Order, helped me enormously as Housing and Home Finance Administrator in carrying out my resolve to challenge and change federal policies and practices of racial discrimination in housing.

The Congress, through enactment of Title VI of the Civil Rights Act of 1964, expressed its determination to end discrimination and segregation in programs or activities receiving federal financial assistance. Title VI, however, excluded from its mandatory provisions contracts of insurance and gurantee, thus exempting FHA and VA programs,

as well as federally insured mortgage lending institutions, from its coverage. Here, too, however, the impact was far greater than the technical limits of its prohibitory language. Its real importance rested on the fact that our national legislature had joined with its co-equal branches of the federal government--the judiciary and the Executive Branch-- to establish a firm and uniform federal policy against racial discrimination.

In 1965, Congress established the Department of Housing and Urban Development to succeed the Housing and Home Finance Agency. By this Act, Congress elevated concerns about decent shelter and good living environments to the highest councils of government. President Lyndon Johnson appointed me to serve as first Secretary of Housing and Urban Development. It was during my term as Secretary of HUD that Title VIII was enacted. Mr. Chairman, no event gave me greater pleasure and satisfaction during my entire service with the federal government. Again, however, its importance lay not so much in its technical provisions, but in the fact that it had been enacted, that fair housing had been explicitly and definitively established as an integral part of the nation's organic law.

Mr. Chairman, we who worked closely in the effort to secure enactment of Title VIII were well aware of the fact that it was imperfect legislation. We were aware of the

170

substantive gaps in coverage that were neither logically nor realistically defensible--gaps such as the arbitrary exemption from coverage of those who sell or rent three or fewer housing units. We were also aware of certain procedural restrictions--such as the 180-day statute of limitations.-- that made it more difficult for victims of discrimination to secure redress for their just grievances. Further, we were aware of certain ambiguities in Title VIII--ambiguities in the nature and scope of protection afforded under the fair housing law and ambiguities even in the meaning of the term "fair housing", which Congress stressed, in the opening section of Title VIII, was "the policy of the United States". Above all, we were well aware of the severe enforcement weaknesses inherent in that statute. Title VIII charged the Department of Housing and Urban Development with the responsibility for "Enforcement" of its provisions, but gave HUD no real enforcement authority. Instead, the statute restricted enforcement of the important rights protected under the fair housing law to litigation, by private parties or, in selected cases, by the Department of Justice. Thus we saddled the already overburdened courts-- and particularly the federal courts--with an additional burden, and in an area--housing--in which they possessed little experience or expertise.

Surprisingly, however, the courts, though ill equipped, have served Title VIII well, almost invariably resolving ambiguities on the side of broad interpretation of the

171

substantive and procedural provisions of the Act. Thus the
Supreme Court of the United States, in <u>Trafficante</u> v.
<u>Metropolitan Life Insurance Co.</u>, 409 U.S. 205 (1972), and again,
just recently, in <u>Gladstone Realtors</u> v. <u>Village of Bellwood</u>,
_____U.S._____ (1979), has held that those entitled to the
protections of Title VIII are not limited solely to persons
who are the direct objects of discrimination. Included also
are those who, while not directly subjected to discrimination,
are nonetheless injured by discriminatory acts against
others by virtue of the denial of the various benefits
of interracial association. In so ruling, the Supreme
Court in <u>Trafficante</u> noted that Title VIII reflects a
policy to which Congress has accorded the "highest priority"
and that the federal fair housing law is to be given a
"generous construction". Further, the Supreme Court stressed
that the objective of the fair housing law is not only to
end housing discrimination, but to "replace the ghettos with
integrated residential patterns".

The lower federal courts have been at least equally
constructive and generous in their interpretation of Title
VIII. For example, in an important racial redlining suit,
which NCDH brought against a savings and loan association,
the court, in construing the somewhat ambiguous language of
Title VIII, held that racial redlining was prohibited by
three separate sections of that statute. <u>Laufman</u> v. <u>Oakley</u>
<u>Building and Loan Association</u>, 408 F. Supp. 488 (S.D. Ohio
1976). The courts also have interpreted language in section
804 of the statute--a section which carries the

"catchline", "Discrimination in the Sale or Rental
of Housing"--to prohibit discrimination in a variety of
conduct having nothing to do specifically with the sale or
rental of housing. Thus the language in section 804(a)--
"otherwise make unavailable or deny, a dwelling. . . because
of race . . ."--has been interpreted by the federal courts
to prohibit discrimination in the exercise of land use
authority by municipalities (United States v.
City of Black Jack, 508 F.2d 1179 [8th Cir. 1974]), racial
steering by real estate brokers, (Zuch v. Hussey, 366
F. Supp. 553 [E.D. Mich. 1973]), and discriminatory admissions
policies of orphanages. (United States v. Hughes Memorial Home,
P.H.E.O.H. ¶13,708 [W.D. Va. 1975]).

Of special importance is that the courts have viewed
the burden of proof in Title VIII cases in a realistic
manner, and with a view toward facilitating achievement of
the objectives of the fair housing law. Thus, although
the Supreme Court has held, in Village of Arlington Heights
v. Metropolitan Housing Development Corp., that plaintiffs,
in lawsuits charging housing discrimination under the Fourteenth
Amendment to the United States Constitution, must prove that
the purpose or intent of the challenged conduct is discriminatory,
the courts, in similar cases brought under Title VIII,
have uniformly held that plaintiffs' burden is only to show
that the effect of the challenged conduct is discriminatory. As the

173

United States Court of Appeals for the Seventh Circuit expressed it:  "effect, and not motivation, is the touchstone [under Title VIII]".  United States v. City of Black Jack, 508 F.2d at 1185.

Despite the favorable treatment the courts have afforded to Title VIII enforcement efforts, they have necessarily been struggling with this imperfect statute. Moreover, the hopes of racial minorities and others subjected to housing discrimination, whose expectations for an end to the dual housing market were raised by passage of Title VIII, have been frustrated.  The experience of the last 11 years has demonstrated the weaknesses and impediments inherent in the statute itself, which the courts are powerless to correct.

The plain truth, Mr. Chairman, is that housing discrimination remains a very serious problem today, 11 years after Congress resolved that:  "It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."  The Housing Marketing Practices Survey, (HMPS), which NCDH recently conducted under contract with HUD, dramatically demonstrated the extent and persistence of the problems that remain with housing discrimination.  That Survey conducted by 600  white and black auditors, examined the practices of nearly 3,200 real estate sales firms and rental agents in 40 metropolitan areas across the country.  The Survey found that blacks responding to newspaper advertisements of rental vacanies

002972

·174

were discriminated against in 21.5% of their inquiries.  If a black
person's response to advertised units led him or her to inquire
with four rental offices or four brokers, as is often the case
in shopping for housing, the probability of encountering discrimina-
tion would be 75% in the rental market and 62% in the sales market.

It should be noted that these striking findings released
by HUD are preliminary and might possibly result in an under-
estimation of the true extent of discrimination.  In particular,
these findings do not account for discrimination caused by
"steering", i.e., the selective showing of housing to whites or
blacks or other groups identified by race, religion, national
origin or sex, in a manner designed to perpetuate and extend
residential concentration by such groups.  "Steering" is
probably the single most widely practiced form of racial dis-
crimination in the sales market.  While our survey for HUD is,
perhaps, the most thorough recording of information on steering
ever undertaken, the data on steering have not yet been analyzed
by HUD and, therefore, are not reflected in the previously
cited percentages.  Notwithstanding further evidence of dis-
crimination which this analysis might show, it is absolutely
shocking that, 10 years after enactment  of Title VIII, HUD's
analysts have reported that equal treatment was accorded whites
and blacks participating in the HMPS Survey only 30% of the
time in the rental market and only 10% in the sales market.

175

While substantial gains have been made, Title VIII, in its present, imperfect form, has been unable to respond effectively to eliminate this large residue of housing discrimination, which has become deeply entrenched in the practices of the housing and home finance industry through decades and generations in which such practices were considered nothing less than prudent business procedure. Without question, the most serious impediment to fulfillment of Title VIII's goal to "provide... for fair housing throughout the United States" has been the lack of adequate enforcement mechanisms.

Suits by the Attorney General alone have been insufficient to meet that goal since they are limited to cases involving a "pattern or practice" or "an issue of general public importance;" and are handled by only a handful of attorneys constituting one section of one division of the Department of Justice.

Suits by private parties have also been unable to carry the entire burden of securing enforcement of Title VIII. Private suits are often time-consuming, unwieldy, and extremely expensive. This effectively precludes private parties from pursuing this avenue of enforcement unless they can afford the often high cost of litigation or are able to secure the services of pro bono attorneys who are experienced in fair housing litigation and willing to pursue those cases. As Secretary Harris has stated: "[A]s a practical matter, many complainants are unable to utilize the right to seek a remedy through the courts, and, therefore, must rely solely on the administrative

process...." Proposed Amendments to the Fair Housing Act:
Hearings on H.R. 3504 and H.R. 7787 Before the Subcomm. on
Civil and Constitutional Rights of the House Comm. on the
Judiciary, 95th Cong., 2d Sess., Ser. 46, at 31 (1978).
Statement of Patricia Roberts Harris)

Finally, enforcement through administrative complaints
to HUD suffers from the obvious, and often fatal, weakness
that HUD has no authority to provide any relief to the complain-
ing party, no matter how flagrant the violation nor how
egregious the injury to the complainant. Thus, although
Congress assigned responsibility for "Enforcement" to HUD,
the only authority HUD has is the authority to meet the
parties, discuss the problem, and seek to conciliate a solution.
In a comprehensive report entitled The Federal Fair Housing
Enforcement Effort, issued just last month, the U.S. Commission
on Civil Rights pointed to this lack of real enforcement power
as the principal reason for the lack of progress made in securing
equal opportunity in housing. In its letter of transmittal to
the President and Congress, the Commission stated:

> Title VIII of the Civil Rights Act of 1968, the
> primary fair housing law, is a weak law. Most
> significantly, although the Department of Housing
> and Urban Development (HUD) is charged with the
> overall administration of that law, HUD lacks
> enforcement power. HUD's Secretary is merely
> empowered to seek redress of Title VIII violations
> through conciliation.

Indeed, as Secretary Harris acknowledged at hearings before
this subcommittee in February 1978, there have been relatively

177

few housing discrimination complaints under the administrative

procedure authorized by section 810 of Title VIII.  Asked

for an explanation, the Secretary responded.

> I would venture a curbstone judgment
> that people don't ususally undertake
> useless acts, and if it is apparent
> that there is not much point in bring-
> ing a complaint because one may have
> lots of meetings and lots of discussions,
> but there will be no remedy and certainly
> no quick remedy, the average complainant
> is not likely to come into the process.
> That is why I feel very strongly that we
> need enforcement potential.

These facts demonstrate that Title VIII has proven to

be considerably less than the charter of equal housing

opportunity that was its promise in 1968.  It is time for

the Congress to act to transform Title VIII into that promised

charter of equal housing opportunity.  This, in our view, is

what H.R. 2540 would accomplish and we at NCDH fully support

this legislation.

I would like to go through some of what we consider to

be the more important amendments contained in H.R. 2540, pointing

out the ways in which they would meet specific problems

demonstrated through experience. In some cases, we have

suggestions to offer which, we believe, would add strength

to the bill and help resolve continuing ambiguities in Title

VIII.

I have attached to my statement a detailed analysis of

the provisions of H.R. 2540 which, with the Committee's

permission, can be made a part of the record.  I will not

attempt to go into that much detail here.  Rather, I would

like to highlight some of the more important changes and

178

clarifications the bill would make in existing Title VIII
and explain, on the basis of NCDH's own research and ex-
perience and the experience of other organizations and
agencies, why these changes and clarifications are important.

Substantive Coverage and Clarification

Let me begin with the substantive coverage under the
bill. Most of the amendments here are for the purpose of
clarifying the scope of protection afforded under existing
Title VIII, not providing new protections against discrimina-
tory conduct previously exempted under the Fair Housing Law.

Racial Redlining

The bill would make it clear that the practice of
racial redlining by mortgage lending institutions is
prohibited by Title VIII. As the members of this Committee
are aware, decisions by the federal courts have emphatically
held that such practices are already prohibited by
Title VIII. In Laufman v. Oakley Building & Loan
Association, 408 F. Supp. 489 (S.D. Ohio 1976), and
Harrison v. Heinzeroth, 414 F. Supp. 66 (N.D. Ohio 1977),
both cases in which NCDH attorneys served as counsel, the
respective courts so held. In Laufman, Judge Porter, in an
opinion noteworthy for its realistic and sensitive
analysis of the nature of redlining and its disastrous
consequences, held that this practice is prohibited by three

179

separate provisions of Title VIII (sections 804, 805, and 817). In Harrison, the only redlining case that has reached a decision on the merits, Judge Young ruled in favor of the plaintiffs. Harrison v. Heinzeroth, 430 F. Supp. 893 (N.D. Ohio 1977). The judge also awarded $5,000 in compensatory damages to the plaintiff, on the basis of the pain and humiliation he had suffered, without reference to any out-of-pocket financial loss.

We at NCDH firmly believe these judicial interpretations of Title VIII are well founded. We recognize, however, that the language of the statute is not free from ambiguity. Therefore, we agree that the clarifying amendment on racial redlining, reaffirming these judicial decisions, would be helpful.

Property Insurance

By the same token, the bill would amend Title VIII to make it clear that racial discrimination in property insurance is prohibited by Title VIII. In the only case of which we are aware that has dealt with this issue, a federal court in Ohio has held, at least preliminarily, that a charge of discrimination in property insurance constitutes a valid claim under Title VIII. Dunn v. Midwestern Indemnity Company, C.A. #C-3-78-105 (S.D. Ohio, Aug. 25, 1978). Here, too however, reaffirmation by Congress, through this amendment, would provide clarity and certainty.

### Definition of "Discriminatory Housing Practice"

A third clarifying amendment of special importance appears to be highly technical in nature, but is nonetheless of considerable potential significance. This amendment, contained in section 4 of the bill, would make it clear that the term, "discriminatory housing practice," extends to any act made unlawful under Title VIII. The significance of this technical amendment is that it would remove all doubt that federal departments and agencies may be held judicially accountable for failure to honor their obligations, contained in section 808 of the Act, to administer their programs and activities in a manner "affirmatively" to carry out the purpose of Title VIII.

The unfortunate truth is that a number of federal agencies that play key roles in housing and home finance have largely ignored this "affirmative" fair housing responsibility. NCDH, alone, has had to expend an inordinate amount of its energies and resources in various efforts to bring those agencies into compliance with this important Congressional mandate. In some cases, NCDH efforts have had to take the form of litigation. Our lawyers have thus far instituted such litigation against HUD, the Veterans Administration, and the federal financial regulatory agencies, based in large part on their failure to honor their Title VIII "affirmative" obligations under section 808. I might add that some of these lawsuits have had considerable success.

181

Nonetheless, some courts, while recognizing that federal agencies are subject to the "affirmative" action mandate of section 808, have raised questions whether court complaints based on that provision are judicially cognizable. This amendment would remove all doubt and strengthen the efforts of NCDH and other fair housing organizations in persuading federal agencies to join as full participants in achieving the goals of Title VIII.

In this connection, I note that the bill specifies that the "affirmative action" mandate of section 808 would apply to federal agencies having regulatory authority over financial institutions, as well as all other departments and agencies that administer programs and activities relating to housing and urban development. These agencies--the Federal Home Loan Bank Board, Comptroller of the Currency, Federal Reserve Board, and Federal Deposit Insurance Corp.--were defendants in a lawsuit in which NCDH served as counsel. Indeed, that lawsuit was initiated by the plaintiffs--virtually every major national civil rights organization, including NCDH--because of the agencies' failure to carry out their responsibilities under section 808. It was gratifying to us that the litigation ended with successful settlement agreements in 1977 and that each of these agencies has now undertaken affirmative programs of enforcement under Title VIII and related fair housing requirements. Further, it is my

understanding that these agencies do not dispute the
applicability of section 808 to their programs and
activities.  Nonetheless, it is useful for Congress to
reaffirm this point.

Secondary Market Operations

Still another clarifying provision would remove
any doubt that the prohibitions against mortgage lending
discrimination apply equally to secondary market operations.
Although we are not aware of any judicial decisions on
this point, it seems clear to us that at the least, the
language of sections 804(a) and 804(b) of existing
Title VIII already covers secondary market operations.
Further, to the extent that the institutions involved are
government agencies, the affirmative action mandate
of section 808 imposes obligations on these agencies
that extend beyond mere nondiscrimination.  In addition,
in view of the significant, often controlling, influence
that secondary market institutions exert in the mortgage
market, it is important that Title VIII remove all doubt
that these institutions are subject to fair housing
requirements.  Our legal staff has prepared a memorandum
dealing with various issues involved in the role of
secondary market institutions.  With the Committee's
permission, I would like to submit this memorandum for
the record.

183

Exemption Under Title VIII

The bill also would make an important substantive
change in coverage under Title VIII, by reducing the current
exemption of owners of fewer than four single familiy houses
to the renting of space in a single family unit by the
occupant.  I have always had some difficulty in justifying
this exemption and  I so testified in May 1966 at the
time of initial hearings on the Fair Housing Law.  Further,
this exemption is legally inconsistent with the coverage
provided under another important fair housing law, section
1982 of Title 42, United States Code, which the Supreme
Court of the United States held, in Jones v. Mayer & Co.,
392 U.S. 409 (1968), bars racial discrimination in all housing,
with no exceptions.  The amendment contained in  H.R. 2540, by
drastically reducing the existing exemption, makes legal,
logical, and practical sense.

Procedural Changes and Clarification

By far the most important changes the proposed Title
VIII amendments would make are procedural in nature.  Again,
most of these procedural amendments are not for the purpose
of changing the law, but rather, clarifying issues with
which the courts have been uncertainly struggling.

Standing

For example, the bill would make it clear that the
criteria for standing are identical, whether the complainant
seeks judicial redress for his or her grievance or files an
administrative charge with HUD. In Trafficante v. Metropolitan
Life Insurance Co, the Supreme Court made it clear

184

that liberal standing criteria were to be applied under
Title VIII. Subsequently, some lower federal courts had suggested
that those liberal criteria apply only to cases that begin
with an administrative complaint to HUD and that stricter
standing criteria should be applied in cases filed in court.
On April 19, 1979, the Supreme Court rendered its opinion in
<u>Gladstone Realtors</u> v. <u>Village of Bellwood</u>, in which it firmly
rejected this view.  The proposed amendment would simply codify
these Supreme Court decisions and make it clear that the
same liberal standing criteria apply regardless of whether
administrative or judicial relief is sought.

> <u>Statute of Limitations</u>

The legislation would also liberalize the statute of
limitations beyond the current, unrealistic 180 days
provided in existing Title VIII.  Under H.R. 2540, aggrieved
persons would be permitted one year after the alleged
discriminatory housing practice occurred to file a charge
with HUD, and three years to bring a court action.  Further,
the bill would make it clear that the statute of limitations
does not begin to run until the challenged practice
terminates.  As the members of this Committee are aware, in
a number of cases housing discrimination practices do
not consist of an event which occurs and terminates
in a single instant.  Often, they consist of continuing
discriminatory conduct.  Existing Title VIII is ambiguous
as to whether the concept of "continuing violations"
applies to the fair housing law for statute of limitation
purposes, and the courts have had difficulty in interpreting

the statute for this purpose.     H.R. 2540 would remove
all doubt, by making it clear that the statute of
limitations applies only after the alleged discriminatory
conduct has terminated.

### Judicial Relief

The bill would provide needed clarification and
make certain salutary changes in the relief that can be
secured in court actions under Title VIII.

First, the bill would make it clear that the
Department of Justice, in pursuing its "pattern or
practice" jurisdiction under Title VIII, would be
empowered to secure relief as broad as that authorized
in private litigation.  This would include money damages
for victims of housing discrimination and other aggrieved
persons.  Curently there is considerable doubt whether
courts may award such relief in government cases.  The bill
clears up that ambiguity.

Second, the bill would remove the $1,000 restriction on
punitive damages currently provided Under Title VIII
and permit the courts to award such punitive damages as
they, in the excercise of their discretion, believe are
warranted according to the facts in particular cases.

In this connection, we note that the bill does not
expressly authorize courts to order affirmative relief.
As you are aware, in many cases, particularly those
involving governmental entities or large institutions,
affirmative relief is necessary if the past effects of housing
discrimination are to be eliminated.  To be sure, the bill
in no way restricts the courts in their authority to order

186

such affirmative relief. In our view, however, it would be advantageous if the courts were made aware, either through appropriate language in the legislation itself or through the legislative history, that affirmative relief is contemplated and, in appropriate cases, required.

Third, the bill would remove certain restrictions on the ability of prevailing plaintiffs to recover attorney fees as part of their costs. Thus the bill would no longer restrict such recovery to prevailing plaintiffs who are indigent. Further, the bill would specify that in suits against the government the United States shall also be liable for attorney fees, as well as other costs.

In this connection, I might note that this latter provision will not only be of considerable help to victims of discrimination, but to NCDH and other private fair housing litigation organizations that offer their services on a pro bono basis. In the past, NCDH has found it necessary to institute fair housing litigation against a number of federal agencies. Most of these cases have inevitably been complex, requiring an enormous amount of time and effort on the part of NCDH attorneys and considerable expense to the organization, all of which we have absorbed. Under existing Title VIII, it is at best unclear whether attorney fees and other costs may be recovered by prevailing parties in suits against the government. This amendment would make it clear that such costs may be re-covered. It is our hope that neither NCDH nor any other fair housing organization will find it necessary in the

future to bring litigation against federal agencies.
It is nonetheless reassuring to know that under this
amendment, in the event we have to institute such litiga-
tion, we have considerable hope of recovering our costs.

I would also suggest that the bill should specify that
expert witness fees would also be recoverable by prevailing
plaintiffs. In many fair housing cases, particularly those
involving complex issues, use of expert witnesses is
essential to success. As you can appreciate, expert witnesses
tend to be expensive. There is some question whether, in
the absence of express authorization for the recovery of
expert witness fees, such fees will be included as part of
costs. Thus we suggest that the bill expressly authorize
recovery of such fees.

Administrative Enforcement

There is no question, Mr. Chairman, that the most
important features of H.R. 2540 have to do with enforcement of
rights secured by Title VIII--specifically, the establish-
ment of enforcement through administrative mechanisms. The
members of this Committee are well aware of the wholly
inadequate enforcement machinery currently provided under
the fair housing law. The only alternative to litigation is
conciliation by HUD. As the General Accounting Office report
of February 1978 demonstrated, conciliation represents
little more than a futile effort to resolve housing discrimination
complaints. Of the 332 complaints reviewed by GAO over a 40-
month period, only 36--little more than 10 percent--were resolved
by HUD.

188

Of those 36 resolved cases, the complainant secured
the housing unit in only four instances.

Perhaps the most striking example of the
severe restrictions inherent in reliance on
conciliation is a case in which NCDH was directly
involved. Several years ago, we represented an
individual and a fair housing organization in a complaint
against a development company that was a wholly owned
subsidiary of a large conglomerate corporation. The
complaint was initially filed with HUD. I would stress
that this case presented optimum conditions under which
the integrity of the HUD conciliation process could be
tested. The individual complainant was a sophisticated
person, experienced in civil rights work, and with
extensive legal training. The fair housing organization
is one of the most experienced, knowledgeable, and
tenacious fair housing advocacy groups in the country.
And they were represented by NCDH attorneys, equally
experienced, knowledgeable, and tenacious. Conciliation
proceeded at a glacier-like pace for three years; virtually
no progress was made. Finally, we were forced to abandon the
conciliation process. Instead, we filed a lawsuit. Within
three months, the development company submitted to a
judicially approved consent order which provided us even more
in the way of relief than we had requested in the HUD con-
ciliation action. My point here, Mr. Chairman, is not that
judicial action under Title VIII is superior to administrative

action, but that administrative action, limited
to conciliation, is unlikely to be successful.

H.R. 2540 would totally transform the Title VIII ad-
ministrative process by providing HUD with realistic authority
to bring about satisfactory resolutions of individual
complaints, and, indeed, to bring about large-scale
institutional reforms through the administrative process.
The bill contains a number or provisions that would
make salutary changes in the existing administrative en-
forcement procedure.

First, HUD would be authorized to institute administra-
tive action on its own initiative, as well as through a
charge by an "aggrieved person". Thus HUD would be authorized,
not only to provide relief in individual cases of housing
discrimination, but also to attack institutional or systemic
problems of discrimination uncovered through its own studies
and investigations.

Second, HUD would be authorized, in instances where
"prompt action is necessary", to act expeditiously by ordering
temporary or preliminary relief pending final disposition of
the charge. The main point here is that HUD could assure,
under appropriate circumstances, that the housing unit that
is the subject of the charge would be available in the event
the charging party prevails. This would afford the realistic
possibility that the charging party can secure the basic
relief in the event he or she is successful.

190

**Third,** although HUD would still refer charges to state or local fair housing agencies, this referral would no longer be mandatory. Moreover, such referrals would be only with consent of the aggrieved person. Of special importance is that the criteria for such referrals would not be limited to "paper" equivalency. Rather, the Secretary would be required to take into account the "past performance" of the state and local agencies. As the members of this Committee are undoubtedly aware, quite frequently state and local fair housing agencies operate under laws that appear on paper to be almost ideal. Through a combination of factors, however, such as lack of sufficient funding, lack of sufficiently trained staff, and plain administrative ineptitude, their performance has fallen far short of the promise of the statutes under which they operate.

The 1978 GAO Report on Fair Housing Enforcement documented the lack of success by state and local agencies in resolving housing discrimination complaints referred by HUD. For example, in the three regions surveyed in the GAO Report, HUD had referred 97 complaints to 10 state agencies. But HUD only could accept state actions on 15 of the complaints. Data available on 60 of the remaining 82 complaints showed that 42 were returned to HUD for investigation, either because the states were unable to contact the complainants, waived jursidiction, or did not investigate to HUD's satisfaction.

Through this amendment, Congress recognizes that "paper" equivalency is not sufficient and, accordingly, would require HUD to consider past performance as one of the criteria that determine whether referrals may be made.

Fourth, the bill would also provide for an eminently fair administrative process by which HUD would determine the factual validity of the complaint. This includes a finding of reasonable cause, a full-scale hearing on the merits, and appropriate judicial review of HUD's decision.

In this connection, there is a significant change from H.R. 3504, which was introduced in the last Congress, and upon which H.R. 2540 is based. Under the current bill, as under H.R. 3504, an aggrieved person could choose either to institute litigation or to pursue the administrative process. Under H.R. 3504, however, the aggrieved person could institute litigation even after HUD had found no discrimination through the administrative process. Under S. 506, by contrast, once the hearing process begins under HUD's administrative procedure the charging party may no longer institute judicial action. This, it seems to NCDH, is a change for the better. The charging party would be free at the outset to choose between the judicial and administrative forums. Once having chosen, however, he or she would be bound by that choice and would not be permitted to challenge the respondent by a second action for the same alleged discriminatory housing practice.

Fifth, HUD would no longer be limited to the velvet glove of conciliation, alone. Rather, under H.R. 2540 HUD could order realistic relief, including issuance of cease and desist orders and imposition of civil penalties of up to $10,000. These represent powerful sanctions which would constitute strong deterrents to the continuation of housing discrimination.

Sixth, the legislation would expressly mandate cooperation between HUD and other federal agencies having fair housing responsibilities for purposes of avoiding duplication of effort. Thus the various federal agencies whose programs and activities bear importantly on fair housing would not be operating in a vacuum, or in isolation from each other.

Mr. Chairman, the administrative enforcement provisions that I have referred to above are of overriding importance if the effort to secure fair housing in fact as well as in legal theory is to succeed. NCDH fully supports these provisions. We have several suggestions, however, for ways in which they may be strengthened.

First, the provision relating to referrals to state and local agencies would prohibit HUD from taking any further action with respect to any charge, once it is referred, without the consent of the agency. Despite the tightened criteria that would govern certification of state and local fair housing agencies, we have reservations over tying HUD's hands in this way. Under existing Title VIII, HUD is permitted to take further action on a complaint if the state or local

193

agency fails to act within 30 days. This makes sense to us
and we recommend that the 30-day provision be reinstated.
In our view, this provision, combined with the tightened
certification criteria, would serve both to facilitate
expeditious remedial action in individual cases and improve
the performance of strengthened state and local fair housing
agencies.

Second, the provision concerning cooperation between
HUD and other federal agencies having fair housing
responsibilities, while commendable in purpose, appears
unclear. Indeed, this provision, which fails to provide
for any overall supervision of the enforcement actions of
the various relevant federal agencies, could well impede the
very cooperation it calls for. We suggest that HUD, the
principal fair housing enforcement agency, be given
overall responsibility for coordinating the government-wide
cooperation effort.

Third, the provisions authorizing administrative
remedies, while they represent a giant step in
advance of existing law, still fall somewhat short of
assuring full relief to aggrieved persons. The relief

contemplated by H.R. 2540 includes temporary orders pending
final disposition of a charge, issuance of cease and
desist orders to prevent future discrimination, and the
imposition of substantial civil penalties payable to
the U.S. Treasury. It is our understanding, however, that
monetary relief to aggrieved persons, to recover out-of-
pocket financial loss, is not contemplated by the bill.
This, we think, is a very serious omission. The heart of
S. 506 lies in its provision for administrative enforcement.
By the same token, it assumes that once it becomes known
that the administrative enforcement procedures have teeth,
the number of complaints will increase substantially over
the relatively meager 3,500 or so per year that HUD now
receives.  Indeed, the success of the new administrative
enforcement mechanism would depend largely on the willingness
of complainants to utilize it.

Our concern is that if complainants cannot secure full
relief through the administrative process, they may
tend to abandon it and the basic premise upon which  the new
enforcement mechanism is based would be proved invalid.
As the members of the Committee are aware, victims of housing
discrimination, in addition to suffering from the denial
of particular housing units, frequently incur substantial
financial loss as a direct result.  While the provisions
for temporary orders contained in the bill could well preserve
the housing unit so that the successful charging party

195

may actually secure it after final disposition of the
charge, this will not always be the case. By the same
token, while cease and desist orders can be an effective
instrument to prevent future discrimination, they frequently
will provide no specific relief to the aggrieved person.
Similarly, while the imposition of substantial civil penalties
also serves as a strong deterrent to the practice of housing
discrimination, these penalties would serve to fill the
coffers of the U.S. Treasury but would afford the
aggrieved person no tangible relief. In short, often the
only relief available to victims of discrimination will be
recovery for out-of-pocket loss resulting from the act of
discrimination. In most cases, the victims of discrimina-
tion cannot be made entirely whole unless relief includes
recovery for out-of-pocket loss.

We are aware that the question whether Congress should
authorize HUD to order such monetary relief raises constitutional
questions under the Seventh Amendment. We consider this
matter so important that our legal staff has done a thorough
review of the issues involved and prepared a memorandum on
the subject. Their conclusion is that such authorization is
well within the constitutional authority of Congress. With
the Committees' permission, I would like to submit this
memorandum for the record.

Mr. Chairman, I wish to emphasize that the suggested
amendments to which I have just referred should not be
viewed as any reservation to NCDH's enthusiastic support for
S. 506. We believe the bill reflects careful draftsmanship
and extraordinary sensitivity to the problems inherent in
Title VIII that have been demonstrated over 11 years of
experience. We also believe that the amendments contained
in H.R. 2540 are capable of transforming the Fair Housing
Act into the charter of equal housing opportunity that we
all envisioned in 1968. We are proud to support this
legislation.

196

Mr. EDWARDS. Thank you very much, Mr. Weaver.

We'll now have questions under the 5-minute rule, and I first recognize the gentleman from Illinois.

Mr. HYDE. Thank you, Mr. Chairman.

Dr. Weaver, so many times Congress, in its desire to do something useful and salutary, rushes forward—I don't mean that in this area there's been any great rush—but other concepts sometimes get bruised in the urge to do good.

Now, I'm concerned here that the Secretary has the authority to file a complaint and then the Secretary has the authority to modify any findings by an administrative law judge, whether its a penalty—although it doesn't say penalty—but an order.

Now, do you feel that's due process?

Dr. WEAVER. I'm not a lawyer, and I have learned from many years of experience that when a layman answers legal questions it's the same as when he's his own attorney. So I'm going to ask my legal counsel to handle the legal questions.

Mr. EDWARDS. Would you identify yourself?

Mr. SLOANE. I'm Martin Sloane, general counsel of the National Committee Against Discrimination in Housing.

Mr. EDWARDS. Thank you very much, Mr. Sloane.

Mr. SLOANE. As Dr. Weaver said, we are in the process of preparing a memorandum on the various administrative enforcement features of this bill, and comparing them with similar features that govern the operation of other agencies some of which have been in existence for 40 years or more—agencies such as the NLRB.

Pending completion of that memorandum, however, I can give you a preliminary reaction. First of all, according to our research under established procedures there are ample protections afforded under the Administrative Procedure Act which, of course, would govern this legislation as well.

The Secretary would not be free simply at her whim to modify any findings or determinations of the administrative law judge. What's more, there is provision for judicial review in the event either that there is not substantial evidence in the record to support the findings, or the Secretary's action is otherwise arbitrary and capricious.

[The information follows:]

197

**National Committee Against Discrimination In Housing**

**M E M O R A N D U M**

**Martin E. Sloane**
**Bruce S. Gelber**

**ANALYSIS OF ADMINISTRATIVE**
**ENFORCEMENT PROCEDURES**
**UNDER PROPOSED FAIR HOUSING**
**AMENDMENTS ACT OF 1979**

198

## S U M M A R Y

S. 506 and H.R. 2450, entitled the Fair Housing
Amendments Act of 1979, address, among other things, the need
for a more effective means of enforcing the right to equal
opportunity in housing. These bills would amend Title VIII of
the Civil Rights Act of 1968 to empower the Department of
Housing and Urban Development to issue cease and desist orders
enjoining parties from engaging in discriminatory housing
practices. The bills would also establish an administrative
procedure that would provide for preliminary investigation of
alleged discriminatory housing practices, a formal adjudicatory
hearing, and judicial review of final orders of the Department.

Some questions have been raised about the fairness of
these proposed administrative enforcement procedures. In
particular, there has been concern about the following four
aspects of the proposed Amendments:

1. Do the Amendments provide for a proper
division of investigative, prosecutorial, and
adjudicative functions?

2. Is it proper for agency orders to be subject to
final review and modification by the Secretary?

3. Do the procedures authorizing HUD to obtain
temporary or preliminary relief pending final
disposition of a charge comply with principles
of fairness and due process?

4. Is the scope of judicial review established by
the proposed Amendments proper and fair?

To answer these inquries, we have undertaken a review
of the relevant case law and principal treatises dealing with
administrative practice and procedures. We have also analyzed
the administrative procedures employed by other federal departments,
agencies, boards, or commissions vested with administrative
enforcement powers similar to those which would be vested in HUD
under the proposed legislation. This review has led us to the
following conclusions:

199

(1) <u>Separation of Administrative Functions</u>

The proposed Fair Housing Amendments Act would delegate to HUD the responsibility for investigating, prosecuting, and adjudicating claims of discriminatory housing practices. Careful examination of the relevant case law, principles of administrative practice, and the authority of other federal agencies reveals that there is nothing improper or unusual about this delegation of authority. Courts have consistently held that, absent evidence of bias in particular cases, the combination of investigative and adjudicative functions in the same agency or department head does not constitute a per se violation of due process.

Our research shows that there are two fundamental approaches to ensuring against the potential bias that can result from certain combinations of administrative functions. While some statutes provide for separation of functions by delegating responsibility for investigation/prosecution and adjudication to two separate administrative entities, the over-whelming majority of statutes simply delegate all three functions to the same administrative agency. In these situations, the department or agency provides for the separation of functions through regulation or internal organization by delegating different functions to different offices or divisions within the agency. Courts have upheld both of these approaches to administrative enforcement.

In addition, departments and agencies which render adjudications on a record after an opportunity for a hearing are subject to the separation of functions provisions of the Administrative Procedure Act, 5 U.S.C. 551 <u>et seq</u>.("APA"). These provisions require that (1) the employee who presides at the hearing must not be directly responsible to or subject to the direction of any employee who engages in investigative or prosecutorial functions for the agency, and (2) an employee who engages in investigative or prosecutorial functions for the agency in a case may not, in that or a factually similar case, participate or advise in the decision of the agency, except as a witness or counsel in public proceedings.

5 U.S.C. 554(d). Since the proposed Fair Housing
Amendments Act would provide for adjudications based on a record
after opportunity for a hearing, HUD's administrative procedures
would be subject to these separation of functions requirements
of the APA.

      (2) <u>Final Review of Agency Decisions by the Secretary</u>

      The proposed Fair Housing Amendments Act of 1979 would
provide that "[a]ny order issued under [section 811(a)] is subject
to review and modification by the Secretary." This section of
the proposed Amendments would have the same effect as section 557(b)
of the APA, which has been held to authorize, although not require,
agency review of initial decisions prior to appellate review by
the courts. Internal reviews of initial decisions, where they
are available, usually are afforded for the benefit of respondents
who have been adversely affected by the initial decision and
order of the administrative law judge. Thus, these reviews
represent an important safeguard for respondents against whom
charges of discrimination or other unlawful conduct have been
made. These reviews have also been deemed important for the
additional reason that, since the agency bears ultimate responsi-
bility for the final decision, it has the right to review the
decison made by the administrative law judge (ALJ). No court
or other authority has ever questioned either the legality or
propriety of authorizing the head of a department or agency to
review and, if appropriate, modify orders or decisions of the
agency's ALJs.

      This is not to say, however, that the proposed Fair
Housing Amendments Act would allow the Secretary to set aside or
modify an ALJ's decision based on whim or conjecture. To the
contrary, while agencies may reject or modify an ALJ's findings
and conclusions, they may not ignore them. Relevant case law
requires that, where an agency or department director rejects

the findings or conclusions of an ALJ, he or she
must state the reasons for doing so.  Moreover, if the director's
final decision is not supported by substantial evidence, it will
be set aside by the reviewing court.  Accordingly, there is
little likelihood that final agency review of agency decisions
will be a source of abuse.

(3)  Scope of Judicial Review

The proposed Fair Housing Amendments Act would provide
that "[f]or purposes of judicial review of [an order entered under
section 811(a)] . . . [t]he findings of the Secretary shall be
conclusive if supported by substantial evidence in the record
considered as a whole."  This provision embodies the "substantial
evidence" test which for more than four decades has been the
prevailing standard for judicial review of agency decisions.
Indeed, our research shows that nearly every federal administrative
enforcement agency has been accorded this standard of judicial
review, either by statute, judicial interpretation, or reference
to the APA.

Moreover, courts and commentators have consistently
recognized that this standard is not only lawful and proper,
but also represents a widely accepted compromise between more
and less restrictive standards.  Thus, while this
scope of judicial review frees reviewing courts of the time-
consuming and difficult task of weighing evidence and gives
proper deference to the expertise of administrative tribunals,
it also requires the reviewing court to set aside findings "when
it cannot conscientiously find that the evidence supporting that
decision is substantial."  Universal Camera Corp. v. National
Labor Relations Board, 340 U.S. 474, 488 (1951).

(4)  Temporary Relief Pending Completion of
Administrative Procedure

Finally, there has been some concern about the propriety
of authorizing HUD to issue temporary or preliminary orders
pending final disposition of housing discrimination complaints.
Our review of the statutes and case law demonstrates that a

202

large number of federal departments and agencies have similar
authority to order or secure temporary relief to preserve the
status quo and ensure that meaningful relief can be awarded
upon completion of the administrative process. Our research also
shows that the procedures proposed by the Fair Housing
Amendments Act are consistent with principles of due process.

I.  INTRODUCTION

It is now widely recognized that, more than ten years
after its enactment, Title VIII of the Civil Rights Act of
1968 has fallen short of fulfilling its promise "to provide,
within constitutional limitations, for fair housing throughout
the United States." 42 U.S.C. 3601. This failure stems, in
large part, from the fact that the statute does not match
its broad purpose of outlawing all forms of invidious housing
discrimination with an equally broad grant of power to
enforce the law. Although Title VIII assigns responsibility
for "Enforcement" to HUD, 42 U.S.C. 3610, it only empowers
HUD to meet with parties and attempt seek to settle complaints
through conciliation. As the United States Supreme Court
has concluded, HUD quite simply "has no enforcement powers."
Trafficante v. Metropolitan Life Insurance Co., 409 U.S.
205, 211 (1972).

It is therefore not surprising that HUD has received
relatively few housing discrimination complaints, even
though, according to Secretary Harris, "as a practical
matter, many complainants are unable to utilize the right to
seek a remedy through the courts, and therefore, must rely
solely on the administrative process." Proposed Amendments
to the Fair Housing Act: Hearings on H.R. 3504 and H.R.
7787 Before the Subcomm. on Civil and Constitutional Rights
of the House Comm. on Judiciary, 95th Cong., 2d Sess., Ser.
46, at 31 (1978). In explaining the paucity of administrative
complaints, Secretary Harris has noted:

> I would venture a curbstone judgment that people don't
> usually undertake useless acts, and if it is apparent
> that there is not much point in bringing a complaint
> because one may have lots of meetings and lots of
> discussions, but there will be no remedy and certainly
> no quick remedy, the average complainant is not likely
> to come into the process. That is why I feel very
> strongly that we need enforcement potential.

In March 1979, the United States Commission on Civil
Rights issued a comprehensive report on the government's

203

decade-long effort to enforce the right to equal opportunity in housing. That report, entitled <u>The Federal Fair Housing Enforcement Effort</u>, confirms Secretary Harris' view that there is a critical need for a more effective method of enforcing Title VIII. Concluding that "Title VIII of the Civil Rights Act of 1968, the primary Federal fair housing law, does not provide effective enforcement mechanisms for ensuring fair housing," (<u>id.</u>, at 230), the Commission's report recommends, among other things, that:

> Section 810 of the Civil Rights Act of 1968 should be amended to provide HUD with the following powers:
>
> 1. Authority for the Secretary to initiate complaints where HUD has reason to believe Title VIII has been or is being violated but no complaint has been filed with HUD.
>
> 2. Authority to accept complaints from third party individuals or organizations on behalf of injured parties.
>
> 3. Authority to issue, after a hearing on the merits, cease and desist orders, reviewable in Federal courts of appeals according to the Administrative Procedures Act. Such authority should include the power to order all equitable relief, including affirmative action, goals and timetables, and such other remedial steps as are necessary for affectuation of the Act.

<u>Id.</u>, at 234-35.

For the most part, H.R. 2540 and S. 506, entitled the Fair Housing Amendments Act of 1979, would implement these recommendations and, through adoption of a viable and

effective method of administrative enforcement, would address deficiencies in the current law. Section 8 of the Amendments proposes a new section 810 and 811, which would authorize HUD to investigate charges of housing discrimination, conduct hearings, and issue cease and desist orders upon finding that there has been a violation of the Act. NCDH fully supports these provisions of the two bills as absolutely crucial to achieving more effective enforcement of the Fair Housing Act.

Questions have been raised, however, concerning the essential fairness of the administrative procedure proposed

by the Amendments. In particular, some legislators have asked whether the proposed procedures afford adequate protection to all the parties involved in the administrative process, and also whether these procedures conform generally with other federal enforcement mechanisms currently in use.

This memorandum addresses these concerns. After a brief description of the administrative process prescribed by S.506 and H.R. 2540, the memorandum will examine the salient features of that process in light of applicable concepts of due process and administrative law. It also will compare these features to those contained in administrative enforcement procedures utilized by a variety of other federal agencies. */

II. ADMINISTRATIVE ENFORCEMENT UNDER THE PROPOSED FAIR HOUSING AMENDMENTS ACT OF 1979

Under the procedures proposed by the Fair Housing Amendments Act, the administrative process would commence whenever an aggrieved person, or HUD on its own initiative, files a charge alleging a discriminatory housing practice. (Section 810(a)(1)). Within ten days after the charge is filed, HUD would serve notice on the party against whom the charge was made (hereinafter "the respondent") and commence its investigation. Id. An aggrieved person would have one year after the alleged discriminatory practice occurs or terminates in which to file its charge with HUD. Id.

Proposed section 810(a)(2)(A) would authorize HUD to issue subpoenas, compel production of documents, and serve interrogatories in connection with its investigation. Subsections (a)(2)(C)-(E) would govern the procedures for enforcing these requests for discovery. The proposed Fair Housing Amendments also would allow respondents, upon application to the Secretary, to have a reasonable number of

---

*/
    While this memorandum does not purport to be an exhaustive treatment of all federal regulatory agencies, we have attempted to analyze all departments, agencies, commissions, and boards which, to our knowledge, have cease and desist authority similar to that proposed by the S.506 and H.R. 2540.

subpoenas issued on their behalf. (Section 810(a)(2)(B)). */

If, at any time during the course of its investigation, HUD determines that prompt action is necessary to carry out the purposes of the Act, the Secretary could, after notice and opportunity for a hearing, order temporary relief pending final disposition of the charge. (Section 810(b)). The proposed Amendments would authorize the Secretary to enforce such orders "in appropriate proceedings in the United States district court." Id.

If, after its investigation, the Department determines that there is reasonable cause to believe that the Act has been violated, HUD would commence the second phase of the administrative process by filing a formal administrative complaint. **/ (Section 810(c)). Upon filing the complaint, the Department would serve a copy on the respondent, along with a 30-day notice informing the respondent of the opportunity for, and the time and place of, a formal hearing. (Section 811(a)). The respondent would have the right to file an answer to the complaint and to appear, in person or otherwise, and give testimony at the hearing. In addition, any aggrieved person would be allowed to intervene in the proceeding and testify at the hearing. ***/

Because the Fair Housing Amendments Act would require that administrative adjudications be determined on the record after opportunity for a hearing, such proceedings

---

*/
Under proposed section 810(a)(3), HUD would be permitted, with the consent of the aggrieved person, to refer charges to state or local agencies certified as enforcing substantive rights, and as offering procedures and remedies that are substantially equivalent to those afforded by the Act. Proposed section 810(a)(4) would require cooperation between federal agencies in the enforcement of Title VIII.
**/
Alternatively, the Secretary could refer the matter to the Attorney General for the filing of an appropriate civil action under section 813(b). (Section 810(c)).
***/
Under proposed section 811(a) any resolution of the complaint by conciliation would require the approval of both the Secretary and the person who filed the charge.

206

would be subject to the requirements of the Administrative
Procedure Act, 5 U.S.C. 551 et seq. (hereinafter "APA"). */
See 5 U.S.C. 554(a). Section 554(b) of the APA requires
that notice of the hearing include, not only the time, place,
and nature of the hearing, but also the legal authority
under which it is held and the issues of fact and law which
it will consider. Section 554 also provides that, in fixing
the time and place of the hearing, due regard be given to
the convenience of the parties and their representatives;
that all parties be given an opportunity to submit facts,
arguments, and offers of settlement; that ex parte communications
with the person conducting the hearing (i.e., the administrative
law judge or "ALJ") be prohibited; and that the investigative
and prosecuting functions of the agency be separated from
the adjudicative function of the ALJ. 5 U.S.C. 554(b)-(d).
See also 5 U.S.C. 557(c) and (d)(1). Sections 555 and 556
guarantee that parties appearing at the hearing may be
accompanied by counsel, may obtain copies of the transcript,
and must receive prompt notice of the denial of any application
or request made in connection with the proceeding. 5 U.S.C.
555(b), (c), (e) and 556(e).

With respect to the hearing itself, the APA provides
that the proponent of an order (in this case, the Department)
bears the burden of proof. It also states that no sanction
may be imposed except on consideration of the whole record;
that the record shall consist exclusively of testimony and
exhibits made available to the parties; and that all parties shall
be allowed to present oral or documentary evidence, submit
rebuttal evidence, and conduct cross-examination. 5 U.S.C.
556(d) and (e). Finally, the APA requires that hearings be
conducted in an impartial manner. 5 U.S.C. 556(b).

---

*/    Since the APA was codified in 1966, references to provisions
of the Act shall be to the appropriate sections of Title 5 of
the United States Code.

Under the proposed Fair Housing Amendments Act, the
ALJ, upon completion of the hearing, would issue findings of
fact and conclusions of law, and render an appropriate
order, which, among other things, could require the respondent
to cease and desist from engaging in discriminatory practices
and to pay up to $10,000 in civil penalties. Id. The
Amendments also would provide that, after the hearing examiner
had rendered his or her decision, that decision would be
"subject to [final] review and modification by the Secretary."
(Section 811(a)). With respect to agency reviews, section 557(b)
of the APA requires that:

> . . . When the presiding employee makes an initial
> decision, that decision then becomes the decision of
> the agency without further proceedings unless there is
> an appeal to, or review on motion of, the agency within
> time provided by rule. On appeal from or review of the
> initial decision, the agency has all the powers which
> it would have in making the initial decision except as
> it may limit the issues on notice or by rule.

Both the initial decision and final decision would be part
of the record and would include the findings of fact, conclusions
of law, and reasons for the order. 5 U.S.C. 557(c). A copy
of the findings and conclusions, along with a copy of the
order, would be served on all parties. (Section 811(b)).

Under the procedures proposed by the Fair Housing
Amendments, any party aggrieved by a final order could
petition for judicial review, within 60 days after entry of
the order, pursuant to the provisions of chapter 158 of
Title 28 of the U.S. Code, 28 U.S.C. 2341 et seq. (Section
811(c)). Under these provisions, any party to the proceeding
could ask the court of appeals to require the agency to take
additional evidence. 28 U.S.C. 2347(c). In addition, the
court of appeals would have jurisdiction to enjoin or stay,
in whole or in part, operation of the agency order pending
final determination of the appeal. 28 U.S.C. 2349(b). For
purposes of judicial review, the Fair Housing Amendments
would provide that "the findings of the Secretary shall be

208

conclusive if supported by substantial evidence in the record considered as a whole." (Section 811(c)). This standard of review is identical to that commonly applied by courts in reviewing adjudications by federal agencies. See discussion at pp. 22-23 infra. The Amendments also would prevent consideration of any objection not raised before the agency, unless the failure to raise the objection was the result of extraordinary circumstances. (Section 811(c)).

Finally, the Fair Housing Amendments would provide that respondents who violate any final order of the Department after that order has become unreviewable would be subject to civil penalties assessed by the Secretary. (Section 811(d)(1)).

III. DISCUSSION

Several questions have been raised about the overall fairness of this proposed enforcement mechanism and whether it conforms with administrative procedures employed by other federal agencies. These concerns focus on the following issues:

1. Do the Fair Housing Amendments provide for a proper division of investigative, prosecutorial, and adjudicative functions?

2. Is it proper for agency orders to be subject to final review and modification by the Secretary?

3. Do the procedures authorizing HUD to obtain temporary or preliminary relief pending final disposition of a charge comply with principles of fairness and due process?

4. Is the scope of judicial review established by the Fair Housing Amendments fair and proper?

These concerns will be examined in order.

A. Separation of Administrative Functions

A question has been raised whether the proposed Fair Housing Amendments Act, in providing for more effective enforcement of the right to fair housing, would improperly authorize the Secretary to act simultaneously as investigator, prosecutor, and judge in adjudicating charges of housing discrimination.

003007

Careful examination of relevant case law, principles of
administrative procedure, and other federal administrative
enforcement schemes, reveals that there is nothing unique or
improper about the enforcement mechanism proposed by S. 506
and H.R. 2540. Indeed, that procedure does nothing more
than incorporate the approach and standards traditionally
employed by federal agencies in exercising their cease and
desist authority.

The issue of the extent to which investigative and
prosecutorial functions should be separated from adjudicative
functions is one of the most thoroughly debated issues in
administrative law. Professor Kenneth Culp Davis, perhaps
the leading authority on administrative law, defines the
contours of this problem as follows:

> What the Administrative Procedure Act calls "separation
> of functions" has to do with the problem of preventing
> contamination of judging by the performance of inconsistent
> functions, including primarily prosecuting and investigating
> . . . . Many agencies, either through agency heads or
> their staffs or both, perform all of these various
> functions. The problem is to separate inconsistent
> functions in such a way as to protect the judging
> function . . . .

2 Davis, <u>Administrative Law Treatise</u>, § 13.01 at 171 (1958).

Professor Davis further states:

> For an individual to serve as both advocate and
> judge in the same case is obviously improper, because
> "A man who has buried himself in one side of an issue
> is disabled from bringing to its decision that dispassionate
> judgment which Anglo-American tradition demands of
> officials who decide questions." . . . But it is not
> improper even in a criminal case for a large institution
> . . . to prosecute through one officer . . . and to
> decide through another.

<u>Id.</u> § 13.01 at 172-73 (citation omitted). Thus, the question
is what standards and procedures are ordinarily required to
ensure the impartiality of administrative proceedings.

One of the Supreme Court's most recent statements on
this issue is found in <u>Withrow</u> v. <u>Larkin</u>, 421 U.S. 35 (1975),
a case in which a physician sought to enjoin a state medical
examining board from conducting a formal adjudicatory hearing

after it had completed its own preliminary investigation and had determined that there was cause to believe that the physician had violated the law.  The Court in that case rejected the notion that, absent special circumstances, [*/] the combination of investigative and adjudicative functions in the same person or body of persons necessarily creates an unconstitutional risk of denial of due process.  In so holding, the Court noted that claims of unfairness or agency bias due to merger of administrative functions must overcome a presumption of honesty and integrity on the part of the decisionmaker.  Mr. Justice White, speaking for a unanimous Court, said:

> It is not surprising, therefore, to find that "[t]he case law, both federal and state, generally rejects the idea that the combination [of] judging [and] investigating functions is a denial of the due process."  . . . Similarly, our cases, although they reflect the substance of the problem, offer no support for the bald proposition applied in this case by the District Court that agency members who participate in an investigation are disqualified from adjudicating . . . .

> Of course, we should be alert to the possibilities of bias that may lurk in the way particular procedures actually work in practice.  The processes utilized by the Board, however, do not in themselves contain an unacceptable risk of bias.  The investigative proceeding had been closed to the public, but appellee and his counsel were permitted to be present throughout; counsel actually attended the hearings and knew the facts presented to the Board . . . .  The mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the Board members in a later adversary hearing . . . .

421 U.S. at 52, 54-55, quoting from Davis, supra, § 13.02 at 175.  In a footnote, the Court added that the Board "had organized itself internally to minimize the risks arising from combining investigation and adjudication," by assigning different functions to different members of its staff.  421 U.S. at 54 n.20.  Thus, so long as the procedures used in

---

[*/] One such special circumstance exists where the judge or tribunal has a substantial pecuniary interest in the outcome of the proceeding.  See, e.g., Gibson v. Berryhill, 411 U.S. 564, 579 (1973).

practice serve to minimize the possibility of bias in the
judging function, and bias is not shown in fact, those
procedures will withstand judicial scrutiny.

Section 554(b) of the APA embodies Congress' policy
with respect to the proper separation of administrative
functions within federal agencies.  That section provides,
in pertinent part, that:

> The employee who presides at the reception of evidence
> . . . may not . . . be responsible to or subject to the
> supervision or direction of an employee or agent engaged
> in the performance of investigative or prosecuting
> functions for an agency.

The section further provides that:

> an employee or agent engaged in the performance of
> investigative or prosecuting functions for an agency in
> a case may not, in that or a factually related case,
> participate or advise in the decision, recommended
> decision, or agency review pursuant to section 557 of
> this title, except as witness or counsel in public
> proceedings.

These provisions apply whenever a statute, such as the
proposed Fair Housing Amendments Act of 1979, requires that
an adjudication "be determined on the record after opportunity
for an agency hearing."  5 U.S.C. 554(a). */  While there
may be cases in which a particular agency's procedures do
not provide for an adequate separation of administrative
functions, see, e.g., <u>Twigger</u> v. <u>Schultz</u>, 484 F.2d 856 (3d
Cir. 1973), most enforcement procedures currently in use
have been found to be both fair and in compliance with due
process and the APA.

A review of federal law shows that very few statutes
that grant federal departments or agencies cease and desist
authority expressly provide for the separation of administrative
functions.  In fact, most such legislation  is identical to
the proposed Fair Housing Amendments in that it vests ultimate
authority for the exercise of enforcement powers in the

---

*/    Section 554(d) exempts from its coverage "the agency or
a member or members of the body comprising the agency,"
for the very practical reason that all employees of the agency
are ultimately responsible to, or subject to the direction
of, the head of the agency.  Courts have consistently recognized
the legitimacy and necessity of this exception.

212

head of the agency, or its governing body, without specifically distinguishing between the agency's investigative, prosecutorial, and adjudicative functions. As the U.S. Court of Appeals for the District of Columbia has observed:

> Congress has, as a general practice, vested administrative agencies with both the specified power to act in an accusatory capacity through the initiation of an action designed to enforce compliance with or prevent further violation of a statutory provision and with the responsibility of ultimately determining the merits of the charges so presented.

Federal Trade Commission v. Cinderella Career and Finishing Schools, Inc. 404 F.2d 1308, 1315 (D.C. Cir. 1968). Among these statutes are the following: Packers and Stockyard Act, 1921, 7 U.S.C. 181, 193, 210, 213 (power vested in the Secretary of Agriculture); Animal Welfare Act, 7 U.S.C. 2131, 2149(a)-(b) (Secretary of Agriculture); Commodity Exchange Act, 7 U.S.C. 1, 13a, 13b (Commodity Futures Exchange Commission); Clayton Act, 15 U.S.C. 12, 21(a)-(b) (Federal Trade Commission, Interstate Commerce Commission, Federal Communications Commission, Civil Aeronautics Board, and Federal Reserve System); Federal Trade Commission Act, 15 U.S.C. 41, 45(b) (Federal Trade Commission); Small Business Investment Act, 15 U.S.C. 661, 678a(b)-(c) (Small Business Administration); Plant Variety Protection Act, 7 U.S.C. 2321, 2568(a) (Secretary of Agriculture); Federal Seed Act, 7 U.S.C. 1551, 1599(a) (Secretary of Agriculture); Shipping Act of 1916, 46 U.S.C. 801, 813, 821 (Federal Maritime Commission); Communications Act of 1934, 47 U.S.C. 151, 205, 208, 209, 312(b) (Federal Communications Commission); Atomic Energy Act of 1954, 42 U.S.C. 2011, 2239(a) (Nuclear Regulatory Commission); Revised Interstate Commerce Act, 49 U.S.C. 10101, 11701(a) (Interstate Commerce Commission); Federal Aviation Act of 1958, 49 U.S.C. 1301 et seq. (Civil Aeronautics Board and Administrator of the Federal Aviation Administration); antitrust laws with respect to the fishing industry, 15 U.S.C. 522 (Secretary of Commerce); Home Owners'

Loan Act of 1933, 12 U.S.C. 1461, 1464(d) (Federal Home Loan

Bank Board); National Housing Act, as amended, 12 U.S.C.

1701, 1730(e) (Federal Savings and Loan Insurance Corporation);

Federal Deposit Insurance Act, 12 U.S.C. 1811, 1818(b)

(Comptroller of the Currency and Federal Reserve Board);

Federal Credit Union Act, 12 U.S.C. 1751, 1786(e) (National

Credit Union Administration Board). */

Under most of these statutes, the requisite separation

of administrative functions is usually afforded either by

regulation or by reference to the APA. Many of these

agencies have regulations that expressly require ALJs (selected

pursuant to 5 U.S.C. 3105), or other appropriate officials,

to preside over adjudicatory hearings, while delegating

investigative and prosecutorial duties to other divisions or

offices within the agency. The Federal Home Loan Bank Board

regulations, for example, provide that the Director of the

Office of Examinations and Supervision shall conduct all

investigations (12 C.F.R. 500.17), the Office of the General

Counsel shall prosecute charges brought pursuant to 12

U.S.C. 1464(d)    (12 C.F.R. 500.18, 509), and an "official

designated by the Board" under the APA shall preside over

the proceedings. 12 C.F.R. 509.6. Similarly, the U.S.

Department of Agriculture, in implementing the Federal Seed

Act, 7 U.S.C. 151 et seq., has prescribed that, while the

---

*/    A few statutes granting cease and desist authority
do expressly provide for the separation of administrative
functions. Most notably, the Labor-Management Relations
Act, 29 U.S.C. 141 et seq., vests authority in the National
Labor Relations Board to adjudicate charges of unfair labor
practices (29 U.S.C. 160(a)-(c)), but delegates to the
General Counsel, a presidential appointee, overall responsibility
for investigating and prosecuting charges before the Board.
29 U.S.C. 154 . The Act further specifies that members of
the Board may not consult with the General Counsel or the
trial examining staff with respect to cases on which they
must render a decision. 29 U.S.C. 154. See also Federal
Coal Mine Health and Safety Act of 1969, 30 U.S.C. 801 et
seq., which delegates investigative functions to the Secretary
of the Interior and adjudicative functions to the Federal
Mine Safety and Health Review Commission, (30 U.S.C. 815(c)-
(d)), and the Occupational Safety and Health Act of 1970, 29
U.S.C. 651 et seq., which divides these functions between
the Secretary of Labor and the Occupational Safety and
Health Review Commission. 29 U.S.C. 659(c). See also
Brennan v. Occupational Safety and Health Review Commission,
487 F.2d 438 (8th Cir. 1973). As can be seen from the above
discussion, these statutes represent an exception to the
general rule.

214

Director of the Grain Division of the Agricultural Marketing
Service shall investigate and prosecute alleged violations
of the Act, a hearing examiner selected from the Department's
Office of Administrative Judges shall conduct the hearing.
See 7 C.F.R. 202.3, 202.14(a). Departments and agencies
which have similar regulations include: Department of
Commerce (50 C.F.R. pt. 290); Federal Trade Commission (16
C.F.R. 3.42(a)); Small Business Administration (13 C.F.R.
pt. 109); Federal Maritime Commission (46 C.F.R. 502.145-
146); Federal Communications Commission (47 C.F.R.
1.241, 1.243); Federal Savings and Loan Insurance Corporation
(12 C.F.R. 509,566.1) National Credit Union Administration
(12 C.F.R. 747.6); Commodity Futures Trading Commission (17
C.F.R. pt. 10).

Many of these agencies also have explicit "separation
of functions" rules which, by and large, adopt the language
of section 554(d) of the APA. One representative example is
the regulation promulgated by the Commodity Futures Trading
Commission, which states:

Separation of functions

(a) An Administrative Law Judge will not be
responsible or subject to the supervision or direction
of any officer, employee, or agent of the Commission
engaged in the performance of investigative or prosecu-
torial functions for the Commission.

(b) No officer, employee, or agent of the Federal
Government engaged in the performance of investigative
or prosecutorial functions in connection with any
proceeding shall, in that proceeding or a factually
related proceeding, participate or advise in the decision
of the Administrative Law Judge, except as a witness or
counsel in the proceedings, without the express written
consent of the respondents in the proceeding. This
provision shall not apply to the Commission or a
member or members of the Commission.

17 C.F.R. 110.9. See also 7 C.F.R. 202.14(a)-(c) (Department
of Agriculture); 12 C.F.R. 747.6(c)(4) (National Credit
Union Administration); 12 C.F.R. 19.11(b)(4) (Comptroller
of the Currency); 12 C.F.R. 263.6(a), (d) (Federal Reserve
System); 16 C.F.R. 3.42(f) (Federal Trade Commission); 50
C.F.R. 290.6 (Department of Commerce). Other agencies have

incorporated the APA rules on separation of functions by reference. See, e.g., 12 C.F.R. 509.6 and 566.1 (Federal Home Loan Bank Board and Federal Savings and Loan Insurance Corp); 46 C.F.R. 502.42 and 502.224 (Federal Maritime Commission); 47 U.S.C. 554(d) (Federal Communications Commission); 42 U.S.C. 2231 (Nuclear Regulatory Commission); 49 U.S.C. 1481 (Civil Aeronautics Board and Federal Aviation Administration).

Thus, there is little question about Congress' authority to delegate adjudicative responsibilities, such as those contemplated under S.506 and H.R. 2540, to federal agencies, nor about the fairness of the exercise of those responsibilities. See National Labor Relations Board v. Jones and Laughlin Steel Corp., 301 U.S. 1, 46-47 (1937). Courts have repeatedly upheld such statutes against claims that they violate due process, and have consistently rejected the notion that combining the functions of investigator, prosecutor, and judge in a single agency is inherently unfair. See, e.g., Ash Grove Cement Co. v. Federal Trade Commission, 577 F.2d 1368 (8th Cir.), cert. denied, 99 S. Ct. 571 (1978); Pacific Coast European Conference v. Federal Maritime Commission, 537 F.2d 333 (9th Cir. 1976); Kennecott Copper Corp. v. Federal Trade Commission, 467 F.2d 67, 79 (10th Cir. 1972), cert. denied, 416 U.S. 909 (1974); Pangburn v. Civil Aeronautics Board, 311 F.2d 349, 356 (1st Cir. 1962); Swift & Co. v. United States, 308 F.2d 849, 851-52 (7th Cir. 1962). See also 2 Davis, supra, §13.02 at 179-81. As long as the procedural rules adopted by HUD in implementing the proposed Fair Housing Amendments conform to the APA and to the principles outlined above, the proposed Amendments will be fully consistent with rules and procedures traditionally used by federal enforcement agencies.

B.  Final Review Of Agency Decisions By The Secretary

The proposed Fair Housing Amendments would provide that "any order issued under [section 811(a)] is subject to review and modication by the Secretary." (Section 811(a)).

This provision would permit the Secretary to provide for review of initial decisions prior to entry of a final order. While some have questioned the propriety of this procedure, it is essentially no different from that found in most regulatory enforcement mechanisms.

Section 557(b) of the APA provides, in part, that:

> When the presiding employee makes an initial decision, that decision then becomes the decision of the agency without further proceedings unless there is an appeal to, or review on motion of, the agency within time provided by rule.

This provision has been construed as permitting agency review of administrative orders, but not requiring them. Proposed Section 811(a) of the Fair Housing Amendments would essentially have the same effect.

Most federal agencies vested with cease and desist authority have provided for such agency reviews either by statute or regulation, or both. */ Many of these agencies have prescribed, by rule, that the decision of the hearing examiner or ALJ becomes final, if it is not appealed to the agency or its governing body within a specified number of days, and the agency decides not to hear the appeal on its own motion. See, e.g., 24 C.F.R. 2.104(b) (Department of Housing and Urban Development - Title VI regulations); 16 C.F.R. 3.51-3.52 (Federal Trade Commission); 13 C.F.R. 109.23 (Small Business Administration); 47 C.F.R. 1.271, 1.276 (Federal Communications Commission); 10 C.F.R. 2.785-2.786 (Nuclear Regulatory Commission); 7 C.F.R. 202.16(c)-(d), 202.19(g)-(i ) (Department of Agriculture); 17 C.F.R. 10.84 (Commodity Futures Trading Commission); 46 C.F.R. 502.227(a) (Federal Maritime Commission); 49 C.F.R. 1100.97(a) (Interstate Commerce Commission). Most of these regulations also provide that the reviewing body will consider all evidence adduced at the hearing, may exercise any power it could have exercised had it made the initial

---

*/ Some agencies provide for a review as of right, while others allow for reviews in the sole discretion of the reviewing authority.

decision, and will render its final decision in writing, along with a statement of reasons.    In some cases, such as under the proposed Fair Housing Amendments, the statute itself authorizes final review by the agency.  The banking laws, for example, require the various federal financial regulatory agencies to render a final decision within 90 days after the case has been submitted to it, following issuance of the ALJ's initial decision.  See, e.g., 12 U.S.C. 1464(d)(7)(A) (Federal Home Loan Bank Board); 12 U.S.C. 1730(j)(1) (Federal Savings and Loan Insurance Corporation); 12 U.S.C. 1818 (h)(1) (Comptroller of the Currency and Federal Reserve System); and 12 U.S.C. 1786(i)(1) (National Credit Union Administration).  Similarly, the Labor-Management Relations Act provides that, after the hearing examiner has issued his or her proposed report and recommended decision, the Board, in its discretion, may take further testimony, hear oral argument, and render a "final decision."  29 U.S.C. 160(c).  Likewise, the Shipping Act of 1916 authorizes the Federal Maritime Commission, on notice, to modify orders and/or grant rehearings.  46 U.S.C. 824. See also Revised Interstate Commerce Act, 49 U.S.C. 10322(a)-(b).

    There is nothing inherently impermissible or unfair about allowing the agency or its governing body to review decisions rendered by its hearing examiners.  */  As demonstrated in the preceding pages, most statutes which confer cease and desist authority place ultimate responsibility for the exercise of that authority in the hands of the agency's head or governing body.  In recognition of this delegation of authority, section 557(b) of the APA expressly provides that: "On appeal from or review of the initial decision [of the ALJ], the agency has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule."  5 U.S.C. 557(b).

---

*/    Indeed, such reviews, where they are available, are ordinarily provided for the benefit of a respondent who has been adversely affected by an ALJ's initial ruling.

Accordingly, the agency, in reviewing an initial decision, is not bound by the same standard of review as an appellate court which ordinarily may not set aside an agency's findings unless they are contrary to law or are unsupported by the evidence. In the context of agency reviews, the findings and conclusions of the ALJ are not sacrosanct, and the agency director or governing authority may reach a different conclusion if it is supported by substantial evidence. */

Federal Communications Commissions v. Allentown Broadcasting Corp., 349 U.S. 358, 364 (1955); Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 492 (1951); National Labor Relations Board v. W.R. Grace Co., 571 F.2d 279 (5th Cir. 1978); Adolph Coors Co. v. Federal Trade Commission, 497 F.2d 1178, 1184 (10th Cir. 1974), cert. denied, 419 U.S. 1105 (1975); OKC Corp. v. Federal Trade Commission, 455 F.2d 1159, 1162 (10th Cir. 1972); Greater Boston Television Corp. v. Federal Communications Commission, 444 F.2d 841 (D.C. Cir. 1970), cert. denied, 403 U.S. 923 (1971). As one recent work on administrative law explains: "Since the agency bears responsibility for the final decision, it may overrule the decision made by the administrative law judge." 5 Mezines, Stein & Gruff, Administrative Law, § 39.04 at 39-15 (1978).

Agency reviews, however, are still subject to principles of due process and may not venture into the realm of undisciplined

---

*/
   There are some exceptions to this rule. For example, in Atlantic & Gulf Stevedores, Inc. v. Director, Office of Workers' Compensation Programs, 542 F.2d 602 (3d Cir. 1976), the court noted that, contrary to most federal administrative agencies, the Department of Labor's Benefits Review Board is limited, by statute, to the substantial evidence test in reviewing factual determinations of its ALJs. Id. at 608. In so holding the court noted that this standard was an exception to the normal procedure:

> Unless the organic agency act is to the contrary, the review of initial decisions of administrative law judges by the administrative agencies is governed by § 8 of the Administrative Procedure Act, 5 U.S.C. § 557. Section 557(b) provides: "On appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision . . . ."

Id. at 608 n.3.

discretion or whim. Thus, the agency's final order must be in writing and must be supported by appropriate findings of fact and conslusions of law. 5 U.S.C. 557(c). If the agency's director chooses to modify or set aside the findings of the ALJ, he or she must state the reasons for doing so. Teamsters Local Union 679 v. National Labor Relations Board, 532 F.2d 1385, 1392 (D.C. Cir. 1976); Greater Boston Television Corp. v. Federal Communications Commission, 444 F.2d at 851; Cinderella Career and Finishing Schools, Inc. v. Federal Trade Commission, 425 F.2d 583, 589 (D.C. Cir. 1970). While the agency may modify or reject an ALJ's findings and conclusions, it may not ignore them. The examiner's decision is part of the record and the agency must consider the record as a whole in reaching its final determination. Universal Camera Corp. v. National Labor Relations Board, supra. Accordingly, where an agency rejects a hearing examiner's findings in an arbitrary manner or without having independent support for its own conclusions, courts will intervene to set aside the agency's determination. See, e.g., Universal Camera Corp. v. National Labor Relations Board, supra.; Cinderella Career and Finishing Schools, Inc. v. Federal Trade Commission, supra. In conducting their reviews, courts are careful to strike a proper balance. As the court in Greater Boston Television Corp. v. Federal Communications Commission observed:

> The agency's departures from the Examiner's findings
> are vulnerable if they fail to reflect attentive considera-
> tion to the Examiner's decision. Yet in the last
> analysis it is the agency's function, not the Examiner's,
> to make the findings of fact and select the ultimate
> decision, and where there is substantial evidence
> supporting each result it is the agency's choice that
> governs.

444 F.2d at 853 (footnote omitted).

Finally, as an additional safeguard, courts require that administrative orders "be reasonably related to the findings upon which they rest and . . . avoid undue breadth." 1 Davis, supra, § 8.19 at 603. See also National Labor Relations Board v. Express Publishing Co., 312 U.S. 426

(1941); <u>Adolph Coors Co.</u> v. <u>Federal Trade Commission</u>, 497
F.2d at 1189.

 In sum, as the U.S. Court of Appeals for the District of
Columbia has noted, reviewing courts insist that agencies
take a "hard look" at the relevant evidence and engage in
"reasoned decision-making." <u>Greater Boston Television</u> v.
<u>Federal Communications Commission</u>, 444 F.2d at 851-52. Once
the agency has done so, however, and the court is satisfied
that the conclusions are supported by substantial evidence,
it will not disturb the agency's final decision even if it
might have reached a different result. <u>Id.</u> at 850-53. See
also <u>Adolph Coors Co.</u> v. <u>Federal Trade Commission</u>, 497 F.2d
at 1184. The procedures contained in the proposed Fair
Housing Amendments Act are entirely consistent with these
principles and standards.

 C. <u>Scope Of Judicial Review</u>

 A question has also been raised whether the standard of
appellate review contained in the proposed Amendments is
proper and fair. The Fair Housing Amendments would provide:
"For purposes of judicial review of [an administrative order
entered under section 811(a)] . . . [t]he findings of the
Secretary shall be conclusive if supported by substantial
evidence in the record considered as a whole." (Section
811(c)). This provision embodies the so-called "substantial
evidence" test, which for more than four decades has been
the prevailing standard for appellate review of agency
decisions.

 The United States Supreme Court has defined "substantial
evidence" as "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." <u>Consolidated
Edison Co. of New York</u> v. <u>National Labor Relations Board</u>,
305 U.S. 197, 229 (1938). "Substantial evidence" also "must
be enough to justify, if the trial were to a jury, a refusal

to direct a verdict where the conclusion sought to be drawn
from it is one of fact for the jury." National Labor Relations Board
v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300
(1939).

In Consolo v. Federal Maritime Commission, 383 U.S. 606,
619 (1966) and Universal Camera Corp. v. National Labor Relations
Board, supra., the Supreme Court held that this standard was
incorporated into the provisions of the APA governing appellate
review. Section 706 of the APA gives a reviewing court
authority to "set aside agency action, findings, and conclusions
found to be (1) arbitrary, capricious, an abuse of discretion,
or otherwise not in accordance with law . . . [or] (5)
unsupported by substantial evidence . . . reviewed on the
record of an agency hearing provided by statute." As Judge
Harold Leventhal of the U.S. Court of Appeals for the District
of Columbia has observed, it is clear that "[t]he APA adoption
of the substantial evidence rule . . . resolves conflicts
between those seeking broader and narrower judicial review."
Leventhal, "Nature and Scope of Judicial Review," in Christensen
& Kauf, Federal Administrative Law: Practice and Procedure
300 (1977). This standard is essentially a compromise
between the more restrictive "arbitrary and capricious" or
"clearly erroneous" tests and the less restrictive "weight
or preponderance of the evidence" test applied in de novo
reviews. Leventhal, supra. at 301-02. As the Supreme Court
stated in Consolo v. Federal Maritime Commission, this
intermediate standard

> . . . frees the reviewing courts of the timeconsuming
> and difficult task of weighing the evidence, . . .
> gives proper respect to the expertise of the administrative
> tribunal and helps promote the uniform application of
> the statute.

383 U.S. at 620 (footnote omitted). At the same time, it
enables and, indeed, requires the reviewing court to set
aside findings "when it cannot conscientiously find that the

evidence supporting that decision is substantial, when
viewed in the light that the record in its entirety furnishes
. . . . " <u>Universal Camera Corp.</u> v. <u>National Labor Relations Board</u>,
340 U.S. at 488. This does not mean, however, that the
reviewing court may supplant the agency's choice between two
fairly supportable views, "even though the court would
justifiably have made a different choice had the matter been
before it <u>de novo</u>." <u>Id.</u>

   With only a few exceptions [*]/ most regulatory enforcement
procedures that provide for cease and desist authority have
adopted some form of the "substantial evidence" rule. For
example, the following statutes contain provisions that are
virtually identical to those included in the proposed Fair
Housing Amendments: 15 U.S.C. 21(c) (Clayton Act); 15
U.S.C. 45(c) (Federal Trade Commission Act); [**]/ 29 U.S.C.
160(e) (Labor-Management Relations Act); 19 U.S.C. 1641(b)
(Tariff Act of 1930); 49 U.S.C. 1486(e) (Federal Aviation
Act of 1958); 30 U.S.C. 816(a)(1) (Federal Coal Mine Health
and Safety Act of 1969); 29 U.S.C. 660(a) (Occupational
Safety and Health Act of 1970). Several other statutes
adopt this language by reference to the APA. See, e.g., 47
U.S.C. 402(g) (Communications Act of 1934); 28 U.S.C. 2239(b)
(Atomic Energy Act of 1954); 12 U.S.C. 1464(d)(7)(B), 1730(j)(2),
1786(i)(2), and 1818(h)(2) (federal banking laws). See also
<u>First</u> <u>National Bank of Eden</u> v. <u>Department of the</u> <u>Treasury</u>
568 F.2d 610, 612 (8th Cir. 1978), holding that "[o]ur
review under the Administrative Procedure Act [of a cease

_____

[*]/    See, e.g., 7 U.S.C. 8(a) (Commodity Futures Trading Commission);
15 U.S.C. 522 (Secretary of Commerce).

[**]/    While this section states that the Commission's findings
of fact are conclusive if supported by "evidence," rather
than "substantial evidence," courts have interpreted the
section as incorporating the "substantial evidence" test set
forth in <u>Universal Camera Corp.</u> v. <u>NLRB</u>, <u>supra</u>. See <u>Ash Grove</u>
<u>Cement Co.</u> v. <u>F.T.C.</u>, 577 F.2d at 1377-78; <u>Warner-Lambert Co.</u>
<u>v. F.T.C.</u>, 562 F.2d 749, 753 (D.C. Cir. 1977), <u>cert.</u>
<u>denied</u>, 435 U.S. 950 (1978).

and desist order issued by the Comptroller of the Currency]
is limited to a determination of whether the Comptroller's
findings are supported by substantial evidence on the record
as a whole." Still others utilize this standard of review
as a result of judicial interpretation. See, e.g., Lewis v.
Butz, 512 F.2d 681, 683 (8th Cir. 1975) (Packers and Stockyard
Act); Electronic Systems Investment Corp. v. Small Business
Administration, 405 F.2d 188 (4th Cir. 1968), cert. denied
394 U.S. 1014 (1969) (Small Business Investment Act); Pangburn
v. Civil Aeronautics Board, 311 F.2d at 354 (Federal Aviation
Act); cf. Universal Camera Corp. v. National Labor Relations
Board supra.

It is therefore apparent that the standard of judicial
review incorporated into the proposed Fair Housing Amendments
Act is not only fair and reasonable, but also reflects the
considered judgment of both Congress and the courts as to
the proper scope of review in the context of administrative
enforcement. */

### D. Temporary Relief Pending Completion of Administrative Proceeding

Finally, a question has been raised concerning the
propriety of authorizing the Secretary to issue temporary or
preliminary orders pending final disposition of housing
discrimination complaints. It is beyond doubt that the
availability of some form of temporary relief is essential
to effective enforcement of the Fair Housing Act, especially
in those cases where preservation of the status quo is

---

*/ The proposed Amendments also provide that "[n]o objection
not raised before the Secretary . . . shall be considered by
the court unless the failure or neglect to urge such objection
should be excused because of extraordinary circumstances.
(Section 811(c)). This provision is also a standard feature
of legislation that provides for administrative enforcement
of the law. See, e.g., 15 U.S.C. 687a(e) (Small Business
Investment Act); 30 U.S.C. 816(a)(1) (Federal Coal Mine
Health and Safety Act of 1969); 29 U.S.C. 160(e) (Labor-
Management Relations Act); 29 U.S.C. 660(a) (Occupational
Safety and Health Act of 1970); 49 U.S.C. 1486(e) (Federal
Aviation Act of 1958). See also Moog Industries v. F.T.C.,
355 U.S. 411, 414 (1958); Adolph Coors Co. v. F.T.C., 497
F.2d at 1189.

needed to ensure that the agency is able to enter a meaningful order after the administrative process has been completed. Issuance of a cease and desist order, while it may discourage future discrimination by the individual respondent, may in fact be of little value to victims of the alleged discrimination, if the housing which they are seeking is sold or rented while the administrative process is pending. */

The courts have repeatedly recognized the need to issue temporary orders to ensure the viability of administrative proceedings. A leading case on this issue is the Supreme Court's decision in Federal Trade Commission v. Dean Foods Co., 384 U.S. 579 (1966). In that case, the Federal Trade Commission sought an order from the court of appeals, enjoining consummation of a merger which was being challenged in proceedings pending before the agency. In support of its application, the Commission argued that one of the companies was planning to dispose of the assets of the other and that

> . . . if the merger were allowed to be completed, "Bowman as an entity will no longer exist," and that it "will be 'extremely difficult and very probably impossible'" to restore Bowman as "a viable independent" company if the merger were subsequently ruled illegal. In other words, consummation of the agreement would "prevent the Commission from devising, or render it extremely difficult for the Commission to devise, any effective remedy after its decision on the merits."

384 U.S. at 599-600. The Supreme Court reversed the court of appeals' dismissal of the Commission's application, and held that, under The All Writs Act, 28 U.S.C. 1651(a), the court had jurisdiction to "issue injunctions to preserve the status quo while administrative proceedings are in progress [to] prevent impairment of the effective exercise of appellate jurisdiction." Id. at 604. Similarly, in United States v.

---

*/ Some form of temporary relief will be particularly important in the event that the agency is unable to award monetary "make whole" relief, since, for many victims of housing discrimination the only other meaningful form of relief would be an order requiring the respondent to rent or sell the property to them without regard to their race, sex, etc. See NCDH Memorandum on Constitutionality of HUD Enforcement of Title VIII Through Provision of Monetary Relief to Complainants (February 14, 1979).

Southwestern Cable Co., 392 U.S. 157 (1968), the Court held
that the Federal Communications Commission was empowered
under a "general powers" provision to issue a temporary
order preserving an existing situation, pending final determination
by the Commission as to whether the respondent's proposed
operations were in violation of law. Id. at 178-81. See
also Delaware River Port Authority v. United States Lines, Inc.
331 F. Supp. 441, 447-48 (E.D. Pa. 1971).

Many of the statutes cited in the preceding sections
expressly empower the agency to obtain various kinds of
temporary relief. Under the Animal Welfare Act, for example,
the Secretary of Agriculture may order a temporary suspension
of a license without a hearing for up to 21 days. 7 U.S.C.
2149(a). In addition, the federal banking laws authorize
the various financial regulatory agencies to issue temporary
cease and desist orders whenever they determine that an
alleged violation of law is likely to cause insolvency or
otherwise jeopardize the financial condition of the institution.
These provisions then allow the institutions, within ten days
after entry of the temporary order, to apply to the United
States district court for an order setting aside, limiting,
or modifying the agency's temporary order. See 12 U.S.C.
1464(d)(3), 1730(f), 1786(f), 1818(c)(1)-(2) and (d). In
contrast to these procedures, the Federal Trade Commission
Act and the Labor-Management Relations Act both contain
provisions authorizing the agency to petition the United
States district court directly for a restraining order or
other temporary relief pending completion of the administrative
process. See 15 U.S.C. 53(a)-(b); 29 U.S.C. 160(j). Regardless
of their precise format, the purpose of these provisions is
to "preserve the status quo [while the agency] performs its
function." Federal Trade Commission v. Food Town Stores, Inc.,

539 F.2d 1339, 1342 (4th Cir. 1976). See also <u>Federal Trade Commission</u> v. <u>Dean Foods Co.</u>, 384 U.S. at 604. [*/]

    While these provisions occasionally have been challenged on due process grounds, the issue usually is at what stage of the proceeding must the respondent be afforded a hearing. <u>Compare</u> <u>Feinberg</u> v. <u>Federal Deposit Insurance Corp.</u>, 420 F. Supp. 109 (D.D.C. 1976) (invalidating section 8(g)(1) of the Federal Deposit Insurance Corporation Act, in part, for its failure to provide for any hearing) <u>with</u> <u>Air East, Inc.</u> v. <u>National Transportation Safety Board</u>, 512 F.2d 1227 (3d Cir. 1975) (holding that the agency's procedure for revoking pilot and aircraft licenses does not violate due process since the statute guarantees prompt adjudication after revocation.) There is no question that the proposed Fair Housing Amendments would provide ample opportunity for a hearing prior to imposition of a temporary order. In fact, not only would HUD be required to conduct a hearing prior to issuance of a temporary order, but when it seeks to enforce the order in a proceeding in district court, the respondent would be afforded a second hearing.

    NCDH has suggested several alternative procedures designed to avoid this unnecessary duplication in preliminary relief proceedings. One alternative is to amend proposed section 811(b) to authorize the Secretary to petition the United States district court directly for temporary or preliminary injunctive relief. See NCDH Memorandum on Legal Analysis of Proposed Amendments to the Fair Housing Act, p. 18 (March 10, 1979). This is the procedure employed by both the National Labor Relations Board and the Federal Trade Commission in seeking temporary relief pending final disposition

---

[*/]     For some additional examples of statutorily created forms of temporary relief, see Federal Aviation Act of 1958, 49 U.S.C. 1485; Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. 814; Occupational Safety and Health Act of 1970, 29 U.S.C. 658.

of their adjudicative proceedings. See 29 U.S.C. 160(j) and
15 U.S.C. 53(a)-(b). In addition to eliminating the need
for a second hearing, this procedure would enable the Secretary,
when necessary, to obtain a temporary restraining order in
cases where such expeditious relief is necessary.

A second alternative is to amend proposed section
811(b) to provide that the Secretary's temporary orders
would become self-executing and subject to contempt proceedings,
but that the respondent could, within a specified period of
time, petition the district court for an order setting aside
or modifying the Secretary's order. As noted above, this
procedure parallels that available under the federal banking
laws. See, e.g., 12 U.S.C. 1464(d)(3), 1730(f), 1786(f),
1818(c) and (d).

### IV. CONCLUSION

In sum, the preceding analysis demonstrates that there
is nothing unique or improper about the administrative
procedures proposed in the Fair Housing Amendments Act when
analyzed in light of applicable concepts of due process and
principles of administrative law. Indeed, the salient
features of the proposed Title VIII enforcement scheme are
virtually identical to those currently employed by a wide
variety of federal regulatory agencies.

Mr. HYDE. I look forward to that. Do you know of another agency where the Director is empowered to modify the—for instance, here we have the Secretary having the power. Now, there are political overtones to the Secretary, who is a person of visibility, doing this. And I just have always had problems with this whole field, where the accuser is the trier, is the prosecutor and is the judge. And that has never struck me as being terribly fair.

Now, I know it's done, and——

Mr. SLOANE. Mr. Hyde, just one point on that, the hearing itself will, or course, not be conducted by the Secretary but by a duly appointed administrative law judge.

Mr. HYDE. Whose order is subject to review and modification by the Secretary.

Mr. SLOANE. But the modification would have to be within certain limits of reasonableness. The Secretary could not say, "I'm sorry, I don't like the color of your eyes or skin, and therefore I'm just going to change the order at my whim."

If she dared to do that, of course, the court of appeals would reverse her.

Mr. HYDE. I understand that. Let me ask you this:

There's a 3-year statute of limitations in here for the alleged discriminatory housing practice. Now, if you lost both of your legs in an intersection accident, and both of your eyes, you have 2 years to file. Is that not so?

Mr. SLOANE. Well, from my experience, the statute of limitations for torts in many jurisdictions is 3 years.

Mr. VOLKMER. If the gentleman would yield——

Mr. HYDE. I'm happy to yield.

Mr. VOLKMER. It's 5 years in Missouri.

Mr. HYDE. It's 2 years in Illinois.

Mr. SENSENBRENNER. It's 2 years in Wisconsin.

Mr. VOLKMER. We're more liberal.

Mr. HYDE. Well, OK. I just think there is a question here. But if it is 5 years in Missouri, we all ought to move to Missouri.

Now, one more point, and this is kind of—I see where the Secretary may award to any prevailing party reasonable attorney's fees. Is that customary in administrative proceedings where the agency awards the fees, rather than the courts?

Mr. SLOANE. In an administrative proceeding, yes. If it's court action, then of course it's up to the court.

Mr. HYDE. I don't see that that's reviewable. Can counsel tell me? That is, the award by the Secretary of attorney's fees, which can be a substantial penalty to somebody, is that reviewable?

Ms. COOPER. I would think that as part of the order, it would be reviewable.

Mr. SLOANE. That's our assumption, too, Mr. Hyde.

Mr. HYDE. All right. I have nothing further.

Mr. EDWARDS. The gentleman from Wisconsin?

Mr. SENSENBRENNER. Dr. Weaver, I'm concerned over the repeal of what has been called Mrs. Murphy's exemption. I'm new in Congress, and I guess that term was coined at the time the Act was originally passed, but it is my understanding that fair housing laws were designed to apply the business of providing housing and shelters to the American public.

229

Now, I know that throughout the country there are many people, including a large number of widows, who live in a part of a housing unit and rent out other parts of the housing unit to people who wish to pay something in the way of supplementing their income.

Now, assuming that one of these widows is charged with a violation of a fair housing law and goes through a substantial administrative procedure, and the complainant has retained a high-powered counsel, and at the end of the administrative procedure the widow is determined not have discriminated on the basis of race, color, creed, national origin, et cetera, don't you think this is kind of hitting Mrs. Murphy over the head with a hammer?

Dr. WEAVER. Well, I think historically we should point out that Mrs. Murphy was a misnomer from the start. The Mrs. Murphy that you are now describing is not the Mrs. Murphy that was provided for in the original Act.

I happen to have been one who opposed it ver actively in the hearings, certainly in the Senate and I think in the House, also, and I still feel that way.

The present Act, you know, does exclude Mrs. Murphy, because it says it shall not apply with respect to the renting of space within a single-family dwelling unit by the occupant of such unit to any person or persons.

Now, that is the classic Mrs. Murphy. That's the people we're talking about when we say Mrs. Murphy, but when they wrote the Act they got Mrs. Murphy and expanded her to a group which includes, in many small communities, a tremendous amount of housing in 2, 3 and 4 units.

One-unit housing occupied by the owner is excluded under this Act. That is Mrs. Murphy. The others are not even first cousins.

Mr. SENSENBRENNER. How about in the case of a duplex, where Mrs. Murphy lives in one half of it and rents out the other half?

Dr. WEAVER. The theory was at that time that a person who lived in a housing unit—and they used as an example a widowed woman, since that made for the most appealing image—and using a common entrance with another unit should be exempt in that the two units are integral parts of a single dwelling unit. That was what was the philosophy, and that's the justification for Mrs. Murphy. But she was expanded way beyond her true confines. And Mrs. Murphy is still preserved in this law. Her expansion would be cut out by this legislation.

Mr. SENSENBRENNER. Now, just so that I'm clear on what you're saying, say Mrs. Murphy owns and lives in a duplex which has got a unit on the top and a unit on the bottom. There is a common entry into the duplex which Mrs. Murphy and her tenants use.

Dr. WEAVER. Well, there's a common entrance into the apartment building which I share with 700 other families, but that certainly doesn't make it a Mrs. Murphy type of housing.

It's not a common entrance into the building, it's a common entrance into the dwelling unit, which is the determining factor.

Mr. SENSENBRENNER. Oh. So it is your position, then, that an owner-occupied dwelling of four units or less should not continue to enjoy the exemption that has existed for 11 years?

Dr. WEAVER. No, I don't say four units or less, but between two and four, which have been excluded, in addition to the one. I say

003028

230

that a person with one unit—I don't think really it makes much sense to do this, but I think that it's one of these things that you'll have to make a compromise on. I think when you go beyond that point you exempt unnecessarily tremendous amount of housing in which the owner is not the classic Mrs. Murphy that you're supposed to be protecting. Therefore, I can see no reason for this——

Mr. SENSENBRENNER. Isn't there a difference, however, sir, between an owner-occupied dwelling and a dwelling that is owned and managed by an absentee landlord?

Dr. WEAVER. It doesn't make much difference to the person who is going out and trying to rent a house, and if you get a large universe of such dwellings not covered by this law then you are restricting the possibility of this person to have equal opportunity in the field of housing, which was the purpose of this particular statute.

I think the exception is made for the privacy of a unique and distinct universe which is inhabited by Mrs. Murphy. What I'm trying to say is that Mrs. Murphy has been so expanded that not only is Mrs. Murphy exempted, but a lot of Mrs. Joneses and other people, many of whom are in the professional business of real estate investment.

Mr. SENSENBRENNER. No further questions.

Mr. EDWARDS. The gentleman from Ohio?

Mr. ASHBROOK. No, thank you.

Mr. EDWARDS. I have a question. In the proposed changes, you would recommend strengthening the bill by reinstating the recall provision whereby HUD could take the charge back from the State after 30 days. Under the present law, does the State agency have the power to continue on with it after the recall, or not?

Dr. WEAVER. I don't think so. I think the jurisdiction over the case is taken away. I doubt if it would be covered. As I recall, the way this would operate would be the State agency would be asked to come in and would be offered to take over the case. I would assume that after it was taken away from it there would be no purpose in the State agency pursuing it.

But Marty has the law here, and maybe he can——

Mr. SLOANE. Once HUD makes a judgment that the State has been inactive and takes the case back, the State would take no further action.

Mr. EDWARDS. Then why restrict it to 30 days?

Mr. SLOANE. Thirty days seems a reasonable and traditional time period. We are not locked into 30 days, but we believe——

Mr. EDWARDS. Well, why not just put no time limit in it?

Dr. WEAVER. Well, I would think this was meant to soften it a little bit. In other words, I think, first, to keep from being arbitrary and capricious, which no administrative agency is supposed to be, but secondly, to soften it a little.

If you give it to a State agency and they have some difficulty, some technical difficulty, and then you take it right back from them, it seems to me this is very disruptive to them, very unfair to them.

On the other hand, if they sit down on it and do nothing for a reasonable period—let's say 30 days, which has more or less become the conventional period—then there's evidence that they're

231

not going to do very much about it in the future, so you take it away from them.

I think that's the reasoning behind it, but I don't recall the legislative history. It's been 11 years ago. So I couldn't be sure. But this has been my conjecture. Mr. EDWARDS. In other words, though, if you're approaching the 30-day limit, under existing law, and the State agencies did start doing something and then just let it ride, is HUD then precluded from doing any thing further on it?

Dr. WEAVER. I don't know. I'd have to read the statute, and then I'd know what I'm going to do, and then I'd ask my lawyer.

Mr. EDWARDS. Unless they no longer certified the State agency as meeting all the requirements.

Mr. SLOANE. Under the existing law the State agencies not only must begin action, but must carry forward on the action. They can't just begin and then laugh up their sleeves at HUD, and sit on it again. They have to carry forward with reasonable promptness under the existing law, or else HUD can retrieve the case.

Mr. EDWARDS. Even after the 30 days?

Mr. SLOANE. Yes. But under the proposed amendments HUD would be powerless to retrieve the case from even the most invidious State or local agency once it was referred to that agency, without a——

Mr. EDWARDS. Unless it were to be certified.

Mr. SLOANE. Unless the agency consented.

Mr. EDWARDS. You mean under the proposed bill?

Mr. SLOANE. Yes, under the proposed.

Mr. EDWARDS. Which I disagree with also. I agree with the 30 days.

Now, do either of you know—I asked the same question of the previous witness, Anita Miller—do either of you know whether in the secondary mortgage system there is any pervasive discrimination in the buying of paper, based on race, sex, what have you?

Dr. WEAVER. It is my judgment that nobody——

Mr. EDWARDS. Without naming any names, I mean.

Dr. WEAVER. Yes; that nobody can answer that question definitely.

I think that, as Ms. Miller indicated, one can assume that this could occur, and she outlined how it could occur. And I'm sure that, having been experienced to some degree with both the secondary and the primary market, that it probably does occur.

But as to how great the incidence is, I don't know. My own feeling about this is that there is no reason why we shouldn't put in this proviso. I would not want to imply that this is a rampant abuse in the secondary market, but I would assert that it is a possible abuse, and I think it's well to close the barn door just in case the horse might get out.

Mr. EDWARDS. In other words, it's an unknown——

Dr. WEAVER. Yes, sir.

Mr. EDWARDS [continuing]. But it doesn't hurt to have the language.

Dr. WEAVER. Right. And if the abuse doesn't exist, it doesn't do any harm. If it does exist, it might do some good.

Mr. SLOANE. I might add that this is another provision which does not create new law, but merely codifies existing law. I don't

232

know of anyone who disagrees that the secondary market is already covered under existing title VIII.

Mr. EDWARDS. As far as Federal agencies are concerned.

Mr. SLOANE. More than that.

Mr. EDWARDS. You believe that even the private investors buying up the paper are also covered?

Mr. SLOANE. Yes.

Mr. EDWARDS. There's been no court decisions on that?

Mr. SLOANE. No, there have not.

Mr. EDWARDS. So this would clarify it, then.

I have no further questions. Does any other member of the subcommittee have any further questions?

[No response.]

Mr. EDWARDS. Thank you very much, Mr. Weaver, for your very informative and helpful testimony.

We will now adjourn the hearing, until tomorrow morning at 9:30.

[Whereupon, at 10:25 a.m., the hearing was adjourned.]

# FAIR HOUSING AMENDMENTS ACT OF 1979

————

## THURSDAY, APRIL 26, 1979

House of Representatives,
Subcommittee on Civil and Constitutional Rights,
Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met at 9:30 a.m. in room 2226, Rayburn House Office Building; the Honorable Don Edwards (chairman of the subcommittee) presiding.

Present: Representatives Edwards, Drinan, and Volkmer.

Staff present: Janice Cooper, assistant counsel, and Thomas Boyd, associate counsel.

Mr. Edwards. The subcommittee will come to order.

Our first witness today on H.R. 2540 is the distinguished National Staff Counsel for the American Civil Liberties Union, E. Richard Larson. There are a number of isues raised in this bill which the ACLU is particularly qualified to address, and we are very pleased, Mr. Larson, to have you here today.

Without objection, your statement will be made a part of the record. You may proceed at your own pace.

[The prepared statement of Mr. Larson follows:]

(233)

# AMERICAN CIVIL LIBERTIES UNION

22 East 40th Street    New York, New York 10016    (212) 725-1222

TESTIMONY OF E. RICHARD LARSON
ON BEHALF OF THE
AMERICAN CIVIL LIBERTIES UNION

H.R. 2540
FAIR HOUSING AMENDMENTS ACT OF 1979

SUBCOMMITTEE ON CIVIL AND CONSTITUTIONAL RIGHTS
COMMITTEE ON THE JUDICIARY
U.S. HOUSE OF REPRESENTATIVES

APRIL 26, 1979

I am E. Richard Larson, a National Staff Counsel with
the American Civil Liberties Union.  I thank you for the
opportunity to present the views of the ACLU on H.R. 2540.

The ACLU fully endorses the thrust of H.R. 2540.  We
commend Rep. Edwards, Rep. Drinan and the entire Subcommittee
not only for recognizing the need to amend the Fair Housing
Act but primarily for acting in response to that need.

The sections of H.R. 2540 which we believe to be most
important are those which strengthen the enforcement
mechanisms of the Fair Housing Act.  As Rep. Edwards observed
last month in introducing H.R. 2540, last year's Subcommittee
hearings evidenced "a clear and strong consensus in favor of
...[1] improved access to the federal courts and [2] a
complementary and powerful administrative enforcement scheme."

For the most part, H.R. 2540 accomplishes these objec-
tives.  Accordingly, we support H.R. 2540 although we also

Norman Dorsen, Chairperson, Board of Directors. Ira Glasser, Executive Director.
Ramsey Clark, Chairperson, Harriet F. Pilpel, First Vice Chairperson, National Advisory Council.
Alan Reitman, Associate Director. Bruce J. Ennis, Legal Director.
John H.F. Shattuck, Director, Washington D.C. Office. Trudi Schutz, Public Information Director.

235

urge consideration of several refinements which we believe
would make H.R. 2540 even more effective.

The need for H.R. 2540 is apparent from three perspectives.
First, despite the issuance in 1962 of Executive Order 11063
and despite enactment of the Fair Housing Act of 1968, housing
discrimination is a continuing and widespread phenomenon.  In
fact, simply by looking at our increasingly segregated resi-
dential patterns, there is reason to believe that housing
discrimination is as widespread as it was in 1962 and 1968.
This conclusion is confirmed by the Housing Marketing Practices
Survey recently conducted by the National Committee Against
Discrimination in Housing--which indicates that black home-
seekers encounter discrimination in rentals 75% of the time,
and in sales 62% of the time.  This continuing discrimination
has an obviously devastating impact upon racial minorities.
We thus are confronted not so much with a legacy from our
past as we are with a continuing reality of widespread and
vicious discrimination today.

Second, aside from the devastating effect upon individual
blacks and other racial minorities, discrimination in housing
has created the foundation for segregated and inferior educa-
tion which in turn has led to widespread discrimination in
employment.  Because of housing discrimination, the residential
patterns in our cities/suburbs reflect a virtual apartheid.
Segregated neighborhoods in turn have led to segregated and
inferior public education for racial minorities, a condition
which imposes badges of inferiority upon generation after

236

generation of minority school children. This vicious cycle needs to be broken by focusing on the heart of the problem: housing discrimination.

Third, despite the central role that housing discrimination plays in fomenting other forms of discrimination, the legal machinery and remedies pertaining to housing discrimination have been weaker than in any other area of discrimination. With regard to attacking discrimination in education and employment, for example, both private enforcement and federal administrative enforcement have been aided tremendously by the availability of powerful monetary remedies. In education, Title VI of the Civil Rights Act of 1964 has allowed HEW to withhold valued and necessary federal grants from any discriminatory school district. In employment, Title VII of the Civil Rights Act of 1964 has allowed the EEOC and private litigants to win class-wide awards of back pay. The power behind these monetary remedies is self-evident. As the Supreme Court stated with regard to back pay: "It is the reasonably certain prospect of a backpay award that 'provides the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history." Albemarle Paper Co. v. Moody, 422 U.S. 405, 417-418 (1975) (citation omitted). In contrast, the legal machinery and remedies for challenging housing discrimination are virtually nonexistent. Particularly problematic

under the current Fair Housing Act is the absence of any
effective administrative enforcement procedure.

Like other groups, the ACLU has been challenging the
massive discrimination caused by housing discrimination.  In
some instances, we have been notably successful.  In our
lengthy Black Jack litigation in Missouri, we have established
the availability of at least some monetary remedies under the
current Fair Housing Act.  In our decade-long Gautreaux liti-
gation in Chicago, highlighted by our Supreme Court victory
in Hills v. Gautreaux, 425 U.S. 284 (1976), we have helped
to open white suburbs to low-income housing.  In our school
desegregation litigation in Los Angeles, culminating in our
California Supreme Court victory in Crawford v. Board of
Education of the City of Los Angeles, 17 Cal.3d 280 (1976),
we have established under the California Constitution that a
current state of school segregation resulting from residential
segregation is unconstitutional and must be remedied through
system-wide school desegregation.  Similarly, in our inter-
district school desegregation litigation in metropolitan
Wilmington, Delaware, Evans v. Buchanan, 393 F.Supp. 428
(D.Del. 1975) (three-judge court), aff'd, 423 U.S. 973 (1975),
reh. denied, 423 U.S. 1080 (1976), remedy imposed on remand,
416 F.Supp. 328 (D.Del. 1976), appeal dismissed, 429 U.S.
973 (1976), aff'd, 555 F.2d 373 (3d Cir. 1977), cert. denied,
434 U.S. 880 (1977), reh. denied, 434 U.S. 944 (1977), we have
established that state constributions to segregated housing
resulting in urban vs. suburban school segregation is uncon-

238

stitutional and must be remedies through inter-district school
desegregation.

In short, our efforts to break the discriminatory cycle
caused by housing discrimination have not been insubstantial.
But, in the short run as well as the long run, the focus
should be on strengthening the Fair Housing Act by increasing
its enforcement and by giving it "teeth" primarily through
the provision of cease and desist powers to HUD.  For the
most part, as I have noted, H.R. 2540 accomplishes these
objectives (1) by providing an administrative enforcement
procedure with teeth, and (2) by facilitating private liti-
gation to enforce the rights guaranteed by the Act.  It is
these two two subjects to which I shall now turn.

I.   ADMINISTRATIVE ENFORCEMENT

The statutory procedures for administrative enforcement
of the current Act by HUD have been widely and uniformly
criticized as wholly ineffective.  Administrative charges of
discrimination, under the current Act, were described last
year in the testimony given by HUD Secretary Patricia Harris
before this Subcommittee as: "useless acts."  The reason why
such charges are useless acts has been described quite simply by
the Supreme Court: "HUD has no power of enforcement."  Traffi-
cante v. Metropolitan Life Ins. Co., 409 U.S. 205, 210 (1972).

H.R. 2540, by giving cease and desist enforcement powers to
HUD, properly corrects in many respects the absence of adminis-
trative enforcement under the current Act.  Cease and desist

enforcement power, as Rep. Edwards stated last month, is the "heart of the revised enforcement scheme."

### A.   HUD Administrative Charges

Amended §810(a)(1) authorizes HUD to file an administrative charge on its own initiative.  This provides HUD with an independent and affirmative role of initiating investigations when an aggrieved individual is reluctant to file a charge or especially when HUD simply becomes aware through its own ears and eyes of probable discrimination.  This authorization is most useful and must be retained.

### B.   Timing for Filing Individual Charges

Amended §810(a)(1) authorizes the filing of an administrative charge of discrimination within one year of the discriminatory actions.  This doubles the length of the filing period under the current Act.  Lengthening that period is especially important because the Act does not require potential discriminators to post notices advising potential aggrieved individuals of their rights.  In contrast, civil rights and labor legislation does require most employers to post notices advising employees and applicants of their rights.  To compensate for this lack of notice under the Fair Housing Act, aggrieved individuals must be allowed at least one year to file administrative charges.

240

C.   Referral to State and Local Agencies

Amended §810(a)(3) makes any referral of a charge from HUD to a certified state or local agency discretionary with HUD, and also conditions that referral upon the consent of the aggrieved individual who filed the charge with HUD. Rather than requiring automatic referrals to state and local agencies, amended §810(a)(3) adopts the preferred approach of allowing the federal rights created by the federal Fair Housing Act to be investigated and resolved in a federal forum.   The propriety of this approach is self-evident, especially since improved federal administrative enforcement is one of the obvious goals of H.R. 2540.

This preferred approach for federal administrative enforcement is for some reason abandoned by the second sentence of amended §810(a)(3), which requires HUD after a referral to "take no further action" with regard to a charge except with the "consent" of the certified state or local agency. If a state or local agency is moving too slowly, why should HUD's hands be tied with regard to a federal administrative charge?  Granted, there should be cooperation and deference flowing between HUD on the one hand and state and local agencies on the other.  But that is no reason to immobilize HUD through one-way deference after a referral.  The ACLU accordingly urges that  the second sentence of amended §810(a)(3) be deleted.

### D. Temporary Relief

Amended §810(b) addresses the many situations where "prompt" administrative action is necessary. Specifically, §810(b) allows HUD, after notice and an opportunity to be heard, to order temporary or preliminary relief pending final disposition of a charge. This statutory authorization is essential to effective enforcement of the Act.

One of the major difficulties with enforcement of the Act is the speed with which housing transactions occur. Black families often spend months trying to find the right house, they find that house, they are discriminatorily denied the right to buy that house, and within a week the seller is negotiating with a white purchaser. Without temporary or preliminary relief in this situation, there virtually can be no effective remedy for aggrieved individuals. The temporary or preliminary relief authorized by §810(b) provides the possibility of an effective remedy. This authorization must be retained in H.R. 2540.

### E. Cease & Desist Administrative Remedies

Amended §811(a) requires the hearing officer, at the conclusion of the full administrative hearing, to render findings of fact and conclusions of law, and allows the hearing officer to order "such relief as may be appropriate" including a civil penalty not to exceed $10,000.

The problem with this authorization is that it does not specify the monetary remedies which may be awarded to

242

aggrieved individuals. It of course is possible that
equitable "make whole" monetary remedies may be authorized
by the blanket authorization in §811(a) allowing the hearing
officer to order "such relief as may be appropriate." The
ACLU believes, however, that a better course would be for
§811(a) to include a specific authorization allowing the
hearing officer to order "such relief as may be appropriate
including a civil penalty not to exceed $10,000 and monetary
relief to make whole any aggrieved individual."

The ACLU is aware that any administrative awards of
monetary relief may raise an arguable conflict with the
right to a jury trial guaranteed by the Seventh Amendment.
It is our view, however, that administrative awards of
monetary relief to make whole an aggrieved individual do not
conflict with the Seventh Amendment.

As revealed in the NCDH Memorandum inserted in the
record yesterday as a part of Robert C. Weaver's
testimony before this Subcommittee, the applica-
bility of the Seventh Amendment depends upon both the type
of monetary relief and the forum within which it is awarded.
Where the relief is "make whole" monetary relief, and where
the forum is a federal administrative forum authorized to
implement national policy objectives, the Seventh Amendment
does not require a jury trial. Just as the NLRB, for example,
may award "make whole" monetary relief to aggrieved individuals,
so may HUD--without implicating the Seventh Amendment.

Our independent analysis both of the Seventh Amendment

and of the need for "make whole" administrative remedies to further the national policy objectives of the Act, leads us to conclude that §811(a) should be amended by this Subcommittee to include a specific authorization for awards of monetary relief to make whole any aggrieved individual.

### F. Attorneys Fees

Amended §814(b) authorizes HUD to award attorneys fees to the "prevailing party" in the administrative forum. For the reasons stated later, the ACLU would prefer that this language be amended to authorize fees only for a "prevailing aggrieved individual." If, however, the "prevailing party" language is retained, the ACLU supports it to the extent that it contains the dual standard reflected in the legislative history of the Civil Rights Attorneys Fees Awards Act of 1976, 42 U.S.C. §1988.

An authorization for fees to an aggrieved individual who prevails in the administrative forum is an important step. It obviously encourages full use by aggrieved individuals of the administrative enforcement procedures established in H.R. 2540 Accordingly, the ACLU supports an authorization of fees for prevailing aggrieved individuals.


### II. PRIVATE ENFORCEMENT THROUGH PRIVATE LITIGATION

Under the current Act, the provisions pertaining to private enforcement not only are unduly complicated but also actually hinder efforts at private enforcement. H.R. 2540,

244

by rewriting the enforcement sections of the current Act, goes a long way toward making private enforcement an actual deterrent to unlawful housing discrimination.

### A.    Filing Periods

The two methods of private enforcement under the current Act contain unnecessarily complicated and short filing periods. Under the current §810, an aggrieved individual must file a charge within 180 days of the discriminatory actions; HUD, however, can do nothing if a state or local deferral agency has commenced proceedings under an equivalent law; and ordinarily no lawsuit may be filed by the individual if there is an equivalent state or local law.  Under the current §810, an aggrieved individual may bypass the administrative route but he/she must file a lawsuit, if at all, within 180 days of the discriminatory actions.

H.R. 2540 properly eliminates most of the confusion and short filing periods under the current Act.

Amended §810 enhances the administrative enforcement alternative, as I indicated earlier, by extending the period for the  filing of an administrative charge to one year after the  discriminatory actions occur.  This lengthened filing period is necessary and must be retained.

Amended §812, entitled "Private Enforcement," authorizes an aggrieved individual to file suit within three years.  This lengthened time period, without any exhaustion requirement, also is absolutely necessary.  It gives an individual time to

fully consider whether to file a lawsuit, and it allows an
individual time to find an attorney. Most important, it allows
an individual time to file an administrative charge, and to
await the investigation and informal attempts at resolution
of that charge without losing the right to sue. The three-year
limitation period very nicely complements the administrative
enforcement scheme--at least up to the point that HUD actually
commences an administrative hearing.

### B.   Judicial Remedies

The judicial remedies available under the current §810
and §812 are wholly inadequate to compensate victims of
housing discrimination much less to deter violations of the
law.  Current §810 authorizes only injunctive relief,
although a few courts also have awarded damages.  Current
§812 authorizes injunctive relief and damages but limits
punitive damages to a maximum of $1000.  This limitation is
the equivalent of saying that Congress has given its approval
to willful violations of the Act.

H.R. 2540 correctly eliminates these problems.  Amended
§812(c) directs the courts to "award such relief as may be
appropriate, which may include money damages, equitable and
declaratory relief, and, in the case of a willful violation,
punitive damages."  This authorization, coupled with the
removal of the punitive damage limitation, will help to
fully compensate victims of housing discrimination and--
especially given the availability of punitive damages--may

246

provide the necessary catalyst to cause housing discriminators to mend their ways.

### C.   Attorneys Fees

Attorneys fees technically are not authorized for an aggrieved individual who prevails in a lawsuit under the current §810.  They are authorized for an aggrieved individual to a limited extent under the current §812 but only for an aggrieved individual who prevails and who also is an indigent. This latter limitation is inconsistent with the fee authorizations in nearly every other civil rights law including, of course, the authorization in the Civil Rights Attorneys Fees Awards Act of 1976, 42 U.S.C. §1988.

H.R. 2540 properly corrects this inconsistency.  Amended §814 authorizes attorneys fees for a "prevailing party." Rather than the prevailing party language, however, the ACLU would prefer language authorizing attorneys fees only to the "prevailing plaintiff"--language which is used, for example, in §518(c)(4)(B) of the Crime Control Act, 42 U.S.C. §3766(c)(4)(B).  If, however, the "prevailing party" language is retained, the ACLU supports it to the extent that it contains the dual standard reflected in the legislative history of the Civil Rights Attorneys Fees Awards Act of 1976; see also, Christiansburg Garment Co. v. EEOC, 434 U.S. 412 (1978).

003045

247

### D.   Expert Fees as Taxable Costs

The current Act does not explicitly authorize a prevailing plaintiff to recover his/her expert witness fees as a part of costs.  Neither, unfortunately, does H.R. 2540.

When introducing S.506, the Senate companion to H.R. 2540, Senator Bayh addressed the question of attorneys fees by stating that a nonindigent aggrieved individual who sues to obtain his rights "must pay to have his rights upheld."  That individual, however, has had to pay not only his attorneys fees but also any expert witness fees.  While amended §814(a) appears to correct the attorneys fees problem, it does nothing about the expert witness fees problem.  Accordingly, the ACLU urges that §814(a) be amended by this Subcommittee to authorize "reasonable attorneys fees and out of pocket costs as part of the costs."

The ability to recover expert witness fees is becoming increasingly important.  This is because fair housing litigation, like all civil rights litigation, is becoming increasingly complex, because the resulting complexity often necessitates the use of expert witnesses, and because expert witnesses ordinarily charge litigation plaintiffs their regular   and usually high expert witness fees.

The problem with this is that expert witness fees, as a general rule, are not recoverable as taxable costs.  Costs which are recoverable are defined and circumscribed by two federal statutes.  The first is 28 U.S.C. §1920 which (in addition to allowing recovery of such costs as docket fees,

necessary transcriptions by court reporters, and necessary copying of papers) permits taxation of "[f]ees and disbursements for printing and witnesses." Although this language appears to be broad enough to allow taxation of expert witness fees, it generally has been viewed by the courts as limited by the second applicable federal statute. That statute, 28 U.S.C. §1821, authorizes maximum payments to witnesses, for court testimony and for depositions, as follows: $20 for each day's attendance and travel; $16 for each day's subsistence expenses; and 10¢ per mile for travel expenses.

Viewing §1821 as a limitation on §1920, the courts in hundreds of cases with only several exceptions have held that costs such as expert witness fees which are not specifically mentioned in the foregoing statutes or in other statutes are not recoverable as taxable costs. The two treatises on court procedures emphasize this general rule. According to one of the treatises:

> "[I]t is a generally held view that the compensation paid to an expert witness in excess of the statutory attendance per diem fee, mileage and subsistence allowance when warranted, is not taxable." 6 Moore, Federal Practice, ¶54.77[5.-3], at 1734 (2d ed. 1976).

The other treatise makes the same point:

> "[I]t seems well settled that a party's expert witnesses are entitled only to the regular statutory witness fees alowed by Section 1821 and that no costs will be allowed for any extra tests that the prevailing party might conduct in the hope of circumventing this restriction." 10 Wright & Miller, Federal Practice and Procedure, §2678, at 236-237 (1973).

The effect of this general, well settled rule on success-
ful civil rights plaintiffs can be devastating.  Expert
witness often are necessary to prepare a successful lawsuit
--not to mention their necessity in rebutting defendants'
expert witnesses.  But the expert witness fees can quickly
eat up any award of attorneys fees or monetary relief to a
successful plaintiff.

The devastating effect which the denial of expert witness
fees can have on a successful fair housing lawsuit is represented
by the lengthy, eminently successful, but costly employment
discrimination litigation filed against a Mississippi state
agency.  In that litigation, as in so many employment and
housing discrimination lawsuits, expert evaluation of statis-
tical evidence was deemed necessary to the presentation of
plaintiffs' case.  But, although plaintiffs prevailed in
their lawsuit, the court woodenly applied the general rule
by denying plaintiffs any recovery of the thousands of
dollars in expert witness fees which they had incurred,
and by denying recovery of the experts' considerable costs
of obtaining computer time.  Wade v. Mississippi Cooperative
Extension Service, 64 F.R.D. 102, 104-104 (N.D. Miss. 1974).
Only infrequently--very, very infrequently--does a court
depart from this general rule and award expert witness
fees to a successful civil rights plaintiff.  See, e.g.,
Pennsylvania v. O'Neill, 431 F.Supp. 700, 712-715 (E.D. Pa.
1977), aff'd without opinion, 573 F.2d 1301 (3d Cir. 1978);
Bradley v. School Board of City of Richmond, 53 F.R.D. 28,
43-44 (E.D. Va. 1971).

The hundreds of courts which have applied the general
rule by denying expert witness fees and other out of pocket
costs as taxable costs quite plainly need some congressional
guidance.  The best guidance would be a Civil Rights Out of
Pocket Costs Act.  Short of such a step, at a minimum §814(a)
should be amended by this Subcommittee.

250

Plaintiffs who are successful in vindicating the rights guaranteed by the Fair Housing Act should not be penalized by having to pay from their own pockets the expert witness fees and attendant costs incurred in vindicating those rights. Rather, expert witness fees and attendant costs should be recoverable against those persons responsible for obstructing the important guarantees of the Fair Housing Act.

III. CONCLUSION

The ACLU obviously is in agreement with most aspects of H.R. 2540. Although I did not comment on every section of the bill, I do not want to leave any negative implication. We do support the narrowing of the "Mrs. Murphy" owner-occupied exemption in the current Act; we do support the broadened definition of "aggrieved person" for standing purposes; and we do support the inclusion of handicapped status as a prohibited ground of discrimination.

As set forth herein, we especially support the thrust of the enforcement provisions of H.R. 2540. The current enforcement scheme is a virtual nullity. Recognition of this fact led President Carter, in his 1979 State of the Union Message, to characterize the current Fair Housing Act as "largely an empty promise" and to urge Congress to amend the Fair Housing Act by easing private enforcement and by providing HUD with cease and desist powers. H.R. 2540 is the vehicle to accomplish these necessary changes.

"A major goal" of H.R. 2540, as stated by Rep. Edwards when introducing the bill, "is to provide a fair, speedy, and inexpensive remedy for the victims of housing discrimination." H.R. 2540 will accomplish that goal. With the minor modifications that we have suggested, the ACLU urges the speedy enactment of H.R. 2540.

251

## TESTIMONY OF E. RICHARD LARSON, NATIONAL STAFF COUNSEL FOR THE AMERICAN CIVIL LIBERTIES UNION

Mr. LARSON. Thank you, Mr. Chairman.

The ACLU appreciates the opportunity to appear at this hearing and to speak in favor of H.R. 2540.

At the outset, I wish to thank you, Mr. Chairman, for the tremendous leadership role that you have played in this area of fair housing, particularly with regard to the drafting of H.R. 2540, with regard to these hearings, and with regard to the extensive hearings that you held last session. They have helped to provide the groundwork for this bill, and we appreciate it.

Mr. Chairman, in my prepared statement I have commented on the need for cease-and-desist administrative enforcement authority to be provided to HUD and for improved access to the federal courts for private enforcement.

In my prepared statement in some detail I have discussed some of the specifics of H.R. 2540. We support basically all aspects of H.R. 2540. Here I don't want to go through the specifics of my prepared statement. Instead, I'd rather depart briefly from my prepared statement and simply focus on some of the reasons why cease-and-desist powers are so necessary.

The Fair Housing Act of 1968 declares it as the policy of the United States to provide fair housing throughout the United States, yet the act provides for virtually no administrative enforcement authority whatsoever. This tremendous anomaly exists because the law was stripped of any real enforcement powers in 1968.

If our national policy against housing discrimination means anything, HUD simply must be given cease-and-desist enforcement powers. Cease-and-desist enforcement powers are hardly unique in our Federal regulatory system. When Congress deems enforcement of Federal policy to be sufficiently important, it has in the past almost always provided for cease-and-desist orders. For example, Congress has authorized the National Labor Relations Board to issue orders requiring employers and unions to cease-and-desist from engaging in unfair labor practices. Moreover, cease-and-desist powers have been deemed necessary and authorized in numerous contexts involving business regulation. For example, the Commodity Futures Trading Commission may order commodity merchants and brokers to cease and to desist from engaging in trade practices prohibited by the Commodity Exchang Act. The Department of Agriculture has cease-and-desist authority under the Packers and Stockyards Act, under the Federal Seed Act and indeed also under the Laboratory Animal Welfare Act. The Federal Home Loan Bank Board has cease-and-desist authority. The Federal Savings and Loan Insurance Corporation has cease-and-desist authority. The National Credit Union Administration has cease-and-desist authority. So too does the Interstate Commerce Commission, the Federal Trade Commission, the Civil Aeronautics Board and the Federal Reserve Board, the Secretary of the Interior, the Small Business Administration, the Federal Maritime Commission, and other agencies, all pursuant to laws enacted by Congress where Congress had determined that it was sufficiently important to enforce a national policy.

003050

252

In these situations Congress has given regulatory cease-and-desist authority. Now, these examples are illustrative of when Congress has been willing to do so. Unfortunately, Congress has not yet deemed enforcement of our Federal policy against housing discrimination to be sufficiently important to require cease-and-desist authority.

We believe that it is very important that Congress enforce the national policy that it declared in 1968 by giving cease-and-desist authority to HUD.

Opponents of cease-and-desist authority may think that discrimination is not sufficiently widespread or that there are other reasons for not giving cease-and-desist authority. We think there are three major reasons in addition to the national policy that Congress has already declared for giving cease-and-desist authority.

First, housing discrimination, especially against racial minorities, is an incredibly widespread, pervasive phenomenon. Report after report continues to show the widespread existence of housing discrimination. Indeed, if we look at our residential patterns in this country, we find that they are incredibly segregated and increasingly segregated.

There is a second reason: The resulting housing segregation is significantly intertwined with school segregation and employment discrimination. By attacking housing discrimination we may be able to get at some of these other problems.

The third reason is that housing discrimination, more so than other forms of discrimination, can be effectively remedied only through the availability of fast and efficient remedies. Speed is of the essence in obtaining housing.

I would like to speak to this third reason very, very briefly. Unlike many other forms of racial discrimination, housing discrimination involves as a remedy, a house, which can easily escape and leave the market. The remedy is a single house or apartment. Usually, it's both the goal and it's the remedy. Once that housing goal is gone, once it is sold or rented to a white family rather than to a discriminated against black family, that remedy is also gone. It often takes months to find the appropriate home an individual is looking for, and once that is found, once it is taken away, the remedy is gone.

Cease-and-desist authority is the way to get an effective remedy to keep that house briefly on the market.

Now, although cease-and-desist authority would be appropriate in most areas of civil rights more—indeed, we would encourage it in other areas—it is particularly appropriate in housing.

This is illustrated by comparison with employment discrimination. When an individual is discriminated against in employment, it is not very often one specific job that an individual is seeking; it's a job category. So, when the individual ultimately wins under the fair employment legislation, the individual will be able to get that job. It's not like a single home in housing discrimination; instead, it's a job category, and under the fair employment legislation, particularly title VII, back pay is available. Consequently, the individual is made whole by current laws covering employment, but the individual is not made whole under the current Fair Hous-

ing Act, if indeed that house has already been sold or rented to another individual.

Basically, for this reason we believe that cease and desist enforcement power for HUD is more important in housing than any other area of civil rights law and we support H.R. 2540 especially to the extent that it gives cease and desist authority to HUD.

Thank you.

Mr. EDWARDS. Thank you very much, Mr. Larson. Your prepared statement also has some very important suggestions in it, as well as being very useful throughout.

Can you suggest to the subcommittee how cease-and-desist authority will actually work in a practical sense? Can you give us a hypothetical situation where the power given to HUD would be triggered?

Mr. LARSON. I think probably the best example is the refusal to sell or rent. The survey that was conducted by NCDH for HUD indicated the continuing widespread existence of discrimination in this country and indicated that there were a number of discriminatory practices. Of course, steering continues, and there is block busting in some instances. Very often there are such practices as higher down payments required for blacks than for whites. But the most frequent situation is just that there is a lie that the house or the apartment has already been sold or already rented. Very often through the use of testers or through other means the individual may learn that indeed that house or apartment has not been sold or rented. But the individual who showed the house or apartment, usually a broker, may then try to arrange to have that house or apartment sold or rented as fast as possible. In that situation, when that individual complains to HUD, or when HUD uses its own investigative powers which have been given under the bill to HUD, then, in that instance HUD could issue temporary relief, keeping, say, the apartment on the market or the home on the market for a brief period of time so that the individual as part of the remedy could receive the house or apartment that was discriminatorily denied.

Mr. EDWARDS. How would the person—well, say it's a black family—find out that they were being discriminated against?

Mr. LARSON. It's a very obvious suspicion that occurs when you have an ad in the paper saying that this house is on the market, or this apartment is available, or there is a vacancy sign hanging out in front of an apartment building, and the individual on the phone is told, oh, yes, come, we'd like to show you the apartment, and the person arrives and suddenly when the color of his or her skin is seen, suddenly the home or the apartment becomes unavailable.

Mr. EDWARDS. When the word got around throughout the country that this was a law and that there was a remedy and that there were severe penalties attached to violations, don't you think that it would result in the change of habit insofar as discrimination is concerned?

Mr. LARSON. Oh, I certainly think so, Mr. Edwards.

Mr. EDWARDS. Right now they know that nothing can be done except conciliation.

Mr. LARSON. That's right. There's no deterrent whatsoever to housing discrimination. There is some litigation, but the litigation

is so seldom brought and it's not commensurate with the scope of discrimination. There must be a much stronger remedy that would help turn around the practices in this area.

Mr. EDWARDS. It probably shouldn't cause too much disruption if just by the enactment of the law, favorable results will come about; is that right?

Mr. LARSON. That's absolutely correct, and that of course is one of the best aspects of giving cease-and-desist authority to HUD: the change that it may bring about in practices, without costing HUD too much.

Mr. EDWARDS. Is that what has happened in some of these other federal agencies that have cease-and-desist power? Or do they have to use it very often? I'm not privy to how long or often the National Labor Relations Board has used its cease-and-desist power, or the Federal Home Loan Bank.

Mr. LARSON. Usually agencies will use it in emergency situations. Those are not necessarily all emergency situations, although the agencies do have the emergency powers such as to keep a house on the market. With regard to unfair labor practices, sometimes a cease-and-desist order will be necessary in an emergency situation say in a lockout. But most often it is not similar to the emergencies which occur in the housing area to keep a house on the market.

Mr. EDWARDS. Well, I thank you very much, Mr. Larson, I appreciate your testimony. The coauthor of this legislation is the distinguished gentleman from Massachusetts, Mr. Drinan.

Mr. DRINAN. Thank you, Mr. Chairman. And I want to thank you Mr. Larson for your very helpful comments. I think that you made several suggestions here which would strengthen the bill. I'm chagrined about one particular thing on page 13. You note that there is an inconsistency in the bill with regard to the Civil Rights Attorneys Fees Award Act of 1976, and as floor manager of that bill, I should have picked that up. Would you elaborate on another point? On page 9, you state the view that the civil penalties should be set forth specifically as, for example, a penalty not to exceed $10,000 or monetary relief to make whole any aggrieved individual. Is there some art to the $10,000 or would it be better to have $100 a day, or would you spell it out how we should put in some specific monetary relief?

Mr. LARSON. What I'm referring to Representative Drinan, in the monetary relief section is compensation of a make-whole sort for the individual. In other words, in addition to the civil penalties, whatever the civil penalty is, I believe that out of pocket expenses should be able to be available. For example, a very famous case in Atlanta involves a Detroit professor, black professor, who was looking for housing in Atlanta. With regard to the job that he had been offered, I believe with Emory University, his acceptance of that job to a certain extent was contingent upon his finding the right housing. He was discriminatorily denied housing. He had to make several airplane trips from Detroit down to Atlanta, looking for the housing, and was consistently denied housing by one particular realtor and steered to areas that he did not want to be steered into. When he eventually received a remedy through a lawsuit, he never received his out of pocket losses that were incurred as a result of his having been discriminated against. So the type of monetary

relief which I think the act should include is the out-of-pocket expenses.

Mr. DRINAN. Well, on page 9 again, the civil penalty not to exceed $10,000, is that in addition to the out-of-pocket expenses?

Mr. LARSON. Yes. The bill currently has a civil penalty in it.

Mr. DRINAN. Of $10,000 now?

Mr. LARSON. Yes.

Mr. DRINAN. I see. So you would add the monetary relief of the out of pocket expenses.

Mr. LARSON. Yes.

Mr. DRINAN. And that's not provided by the law now?

Mr. LARSON. Well it's not specifically provided. The language of the bill is "such relief as may be appropriate." Now, within that quotation of "such relief as may be appropriate" it may be that monetary damages are intended to be authorized—monetary out of pocket damages. In my experience with the way the law is interpreted in the courts, for example under title VII of the Civil Rights Act of 1964, the courts have held that monetary damages other than back pay are not available, although the language of the act authorizes such relief as may be deemed appropriate. Basically, the courts have construed the act to include only equitable remedies and not any monetary damages other than back pay.

So, my guess would be that this language as currently stated, such relief as may be appropriate, is not sufficient to authorize HUD to give out of pocket monetary expenses to aggrieved individuals.

Mr. DRINAN. So then the fee for experts, that's different?

Mr. LARSON. That's different, yes.

Mr. DRINAN. And in addition.

Mr. LARSON. Yes.

Mr. DRINAN. Well, you have made some very excellent points, and I'm inclined to think that we can incorporate them in the revised bill. I'm afraid of weighting down the bill with too many difficulties that would cause people to react to a pervasive sentiment around here—keep Government out of our lives and out of our pocketbooks. But you have made a very fine presentation, and I am grateful.

I yield the balance of my time.

Mr. EDWARDS. Thank you. The gentleman from Missouri, Mr. Volkmer.

Mr. VOLKMER. In your presentation you recommended that the second sentence of the proposal for referring be deleted—the one that says you can't get it back from the State without the State agency's consent.

Mr. LARSON. Right.

Mr. VOLKMER. I agree that needs correcting. by saying "deleted," are you then in favor of retaining the present law?

Mr. LARSON. Well, I am in favor of not having a referral which occurs by mandatorily required to stay at a state or local agency. I mean, under the example——

Mr. VOLKMER. Without their consent.

Mr. LARSON. Right.

Mr. VOLKMER. I wouldn't argue with that. What then do you want to do? Would you agree with Secretary Harris' testimony to

256

the extent she would like to provide HUD with the discretion to haul it back without the state's consent?

Mr. LARSON. Yes, that is what I would prefer.

Mr. VOLKMER. Yesterday we heard, if that is so, that the present law provides it be done within 30 days of the referral.

Mr. LARSON. Well, the present law in some instances is so mixed up that when there is a reference to the present law on the——

Mr. VOLKMER. Well, let's eliminate the present law. Let's just consider a provision that would say that the drawing back of that referral——

Mr. LARSON. It must be within 30 days?

Mr. VOLKMER. It would have to be done within 30 days.

Mr. LARSON. I don't see why there should be a time limit one way or another. It may be that on the 35th day something additional occurs, or that some information comes to HUD's attention and HUD should move on that where the state or local agency is not moving at all. Since we are talking about the enforcement of the Federal rights, I think HUD should always have the discretion to move ahead with regard to its enforcement of those Federal rights.

Mr. VOLKMER. You see no difficulties arising from a provision that we make discretionary with the Secretary the authority to withdraw charges from certified State agencies—no difficulty with cooperation between the State agencies and the Secretary—HUD—in enforcement?

Mr. LARSON. No.

Mr. VOLKMER. The State agency is not going to say, look we don't know what you're going to do; we're certified as equivalent; you're sending these to us, but we don't know when you're going to take them back. You don't see anything wrong with that?

Mr. LARSON. No. I assume there would be a very strong and good working relationship between HUD and the State agencies; that HUD for example could put together a set of criteria which would determine whether or not it would step back into the picture, so the State agencies could be on very fair notice of exactly how HUD is going to use its administrative powers.

Mr. VOLKMER. Thank you.

Mr. EDWARDS. Counsel have any questions?

Ms. COOPER. Thank you, Mr. Chairman. Just a few clarifying questions. You use the term "make-whole remedies" I think that was the term with respect to monetary damage to complainants in the administrative process, and the term "out-of-pocket costs" when you were referring to expert witnesses, and I wonder whether that's some sort of term of art that's been used before, whether it's self-explanatory. If not, could you explain exactly what you mean? For example, the make-whole remedy, is that somehow different from actual damages?

Mr. LARSON. No. I use "make whole" and "actual damages" in the same sense that it's whatever remedy is necessary to make whole the individual and that should include monetary damages, out-of-pocket expenses and very possibly you could include pain and suffering, humiliation damages within the make-whole phrase.

Ms. COOPER. Well, it's my understanding, although I haven't looked at it for a few years, that there are a lot of cases under title

VII that prohibit the awarding of compensatory damages without a jury trial.

Mr. LARSON. Yes.

Ms. COOPER. Wouldn't that be relevant here in deciding whether or not you could award compensatory damages in the administrative process?

Mr. LARSON. It certainly would be, and maybe my "make-whole" then is an inappropriate choice of words; that it simply should say monetary relief for the individual and not necessarily specify the make-whole.

Ms. COOPER. Of the expert witness fees, would that include the expenses that are incurred by the experts?

Mr. LARSON. Yes. That is the reason I use out of pocket costs, rather than simply the expert witness fees' language, because for example one of the examples that I gave in the testimony includes in addition to the expert witness fee, the computer time, which an expert had to pay for in order to do the study that he testified about. That was several hundred dollars worth of computer time. Now, if the bill said expert witness fees only, that may be the extent of the authorization, and that may not include the additional aspect of computer time. So I think the out-of-pocket costs that an attorney has to pay in order to present a case is the appropriate language that should be used.

Ms. COOPER. Are you aware of any other statutory schemes, including civil rights laws, that contain specific authorization for expert witness fees?

Mr. LARSON. No, I'm not.

Ms. COOPER. Finally, just one question on the so-called Mrs. Murphy's exemption. It was suggested yesterday by Mr. Sensenbrenner that perhaps a duplex is similar to a single family dwelling in that notions of privacy are involved that may be countervailing to the expanded coverage of the bill.

Mr. LARSON. The ACLU prides itself as being a strong supporter of the rights of privacy and we have very often internally debated the issue of a privacy exemption such as the Mrs. Murphy exemption in the Fair Housing Act and how broad that should be. The ACLU policy is almost identical with the narrowing of the Mrs. Murphy exemption as is undertaken in this bill. In a duplex situation we would consider that two different living premises. Our policy, if I might read it into the record, is really quite narrow, and it might be useful to members of the committee.

Our policy starts out by saying that discrimination in housing "is a denial of a basic civil rights" and that legislation should be enacted to prohibit discrimination. And we face the privacy issue. Our policy says,

Individuals shall be exempt from this provision only in relation to their intimately shared private living arrangements. Such living arrangements shall consist of the household of which the individual is actually a member, and shall not extend, for example, to two-family dwellings where separate living units are maintained. This exception is intended to provide for the essential requirement of the rights of privacy and free association, without infringing unnecessarily upon the important right of all individuals to gain access to housing without being hampered by the application of improper discrimination criteria.

So we adopted the approach of the bill.

Ms. COOPER. Thank you.

Mr. EDWARDS. Mr. Boyd.

Mr. BOYD. Thank you, Mr. Chairman.

Mr. Larson, existing law provides that "Any person may file the initial complaint with the Secretary of HUD." H.R. 2540, interposed section (h)(10), (a)(1) adds "Well, the Secretary, on the Secretary's own initiative" do you feel there is a need for such a potentially political addition, and, if so, why?

Mr. LARSON. I believe there certainly is. For example, the EEOC under title VII has the authority to file a commissioner's charge, or any individual can file a charge. There are a tremendous number of discriminatory practices that may come to the attention of a regulatory agency and yet an aggrieved individual may not know about it, or may be unwilling for some reason to do something about it.

Some surveys have indicated that a tremendous percentage of the population does not even know about the Fair Housing Act, much less where to file a charge if something were to be filed. Under employment discrimination laws and labor laws, there are notice requirements in that title VII and the labor laws must be advertised on the employer's premises.

Well, there is no requirement in the Fair Housing Act of such posting of notices and because individuals actually do not know about the Fair Housing Act, it is very important that the administrative enforcement agency be able to act for individuals who do not know about it.

Mr. BOYD. Thank you. On page 10 of your statement and again on page 13 you indicated that the language which authorizes attorneys' fees to the prevailing party should be narrowed to apply only to the prevailing plaintiff. Why shouldn't the defendant, who has incurred some substantial legal costs in proving himself innocent of alleged discrimination, be allowed to retrieve some of those costs in the proposed section (814)(b)?

Mr. LARSON. I think the answer is similar to what the Supreme Court gave in the *Christiansburg Garment Co.* case last year under title VII. Basically, when an individual is seeking to enforce the law and the individual wins, it is an extension of national policy: that person is providing something good for the United States. It is enforcing national policy. When a defendant wins, the defendant is not necessarily advancing the national policy. That is the reason— one of the reasons for the dual standard under the Attorneys Fees Award Act of 1976 and it's also the reason for legislation that has awarded fees or authorized fees only for prevailing plaintiffs.

Mr. BOYD. On page 11 of your statement you support the extension of private enforcement statute of limitations to 3 years from the current 180 days. Of course, witnesses do become stale in time and I wonder if there's any magic to 3 years as opposed to perhaps 2 years?

Mr. LARSON. I don't think there's any magic to 2 years, 3 years or maybe even 4 years.

Mr. BOYD. As long as it's a substantial extension?

Mr. LARSON. It certainly must be extended. In State statutes of limitations, for example, usually there are general catch-all statutes, with limitations periods as long as 6 years. Contract statutes of limitations very often are 10 years. There are statute of limita-

259

tions, of course, that are shorter than that, but a general review of the State statutes of limitations reveals that they are rarely as short as 1 year or 2 years or 180 days, and they certainly should not be that short through Federal legislation.

Mr. BOYD. Personal injury cases are quite frequently 2 years in a great many States.

Mr. LARSON. In personal injury, that may be.

Mr. BOYD. And contractual situations are far easier to prove on a trial basis than discrimination cases.

Mr. LARSON. That's true.

Mr. BOYD. Thank you. I have no further questions.

Mr. EDWARDS. One last quick question. If this law had been in effect since 1968, is it your opinion that housing patterns today would be less segregated, thus relieving pressures for busing?

Mr. LARSON. I certainly believe that housing patterns would be less segregated if this law had been passed in 1968 and that it had been enforced. Initially, there has to be some enforcement in order to start changing the practices.

Mr. EDWARDS. Thank you very much, Mr. Larson.

Are there any further questions?

[No response.]

Mr. LARSON. Thank you.

Mr. EDWARDS. Our next witnesses have been valuable friends to this committee for many years: Clarence Mitchell and William Taylor of the Leadership Conference for Civil Rights. Mr. Taylor and Mr. Mitchell, your valuable counsel has helped us immensely in the past, both on the predecessor to this bill, H.R. 3504, and on many other civil rights problems and proposals. We are delighted to welcome you here today. Mr. Drinan.

Mr. DRINAN. I echo the sentiments. There are very familiar faces here—of people who have helped not merely this subcommittee but other subcommittees and the full House Judiciary Committee, and we have the hope that this will be the last time we will have to impose upon you to testify about this bill, and we hope that in the very near future, with your help, this bill will become the law of the land.

Thank you very much.

Mr. EDWARDS. Will you identify your colleague and proceed, and without objection your full statement will be made part of the record.

[The prepared statements follow:]

260

STATEMENTS OF WILLIAM L. TAYLOR AND GLENDA G. SLOANE

Introduction

I am pleased to join with Clarence Mitchell in testifying on behalf of the Leadership Conference on Civil Rights in support of H.R. 2540.

The legislation you are now considering is a critical part of the unfinished civil rights agenda. When Congress a decade ago enacted Title VIII of the Civil Rights Act of 1968, as the last major building block of the great legislation of the 60's, it declared a strong national policy in favor of equal treatment in housing, but it did not provide enforcement tools to match.

Today, in contrast to the Voting Rights Act where strong enforcement machinery has produced major change, there is still widespread noncompliance with the national policy against discrimination in the housing market. Violations of the law were documented last year in a nationwide study of housing practices conducted under the aegis of the Department of Housing and Urban Development which found, among other things, that a black person who visits four real estate agents in a homebuying search has a 62 percent chance of encountering discrimination and that in a search for rental housing his chances of being discriminated against reach 75 percent.

I. IMPROVEMENTS IN REMEDY

Enforcement by the Secretary

The failure to make measurable progress in eliminating housing discrimination and segregation in this country is largely attributable to the omission from the Fair Housing Law of 1968 of

enforcement authority lodged in the agency charged with admin-

istering and enforcing the law.

The President in his 1979 State of the Union message stated:

> We need to correct a weakness in an
> existing civil rights law.  Title
> VIII of the Civil Rights Act of 1968,
> which prohibits discrimination in
> housing remains largely an empty pro-
> mise because of the lack of an adequate
> enforcement mechanism.
>
> I will soon propose to the Congress that
> this problem be alleviated by providing
> the Department of Housing and Urban
> Development with cease and desist pow-
> ers...My administration will work with
> the Congress to see that this proposal
> is given prompt and favorable consider-
> ation.

Last year, in the hearings on H.R. 3504 before the House Subcom-

mittee on Civil and Constitutional Rights, witnesses consistently

gave highest priority to the adoption of an amendment that would

provide such enforcement authority.  Almost everyone agreed that

the present scheme for implementing the national fair housing ob-

jective has proved ineffective and that the operative weakness

was the failure to provide enforcement authority in the agency

charged with administering the law.

The three avenues--conciliation, Justice Department liti-

gation and private lawsuits--now available under Title VIII for

securing relief from housing discrimination have not proved suc-

cessful in correcting discriminatory practices against individ-

uals and families or in eliminating broader institutional dis-

criminatory practices.

First, GAO recently reported that the conciliation process--
HUD's only method for resolving complaints--has not been effective
in securing remedies for aggrieved persons.  For those complain-
ants who are unrepresented at the conciliaiton hearing, concili-
ation has been dramatically unproductive.  As Secretary Harris
testified, "Respondents frequently ignore HUD's conciliation
process because there is no real inducement to cooperate."

An additional burden is placed on the victim of discrimi-
nation who cannot obtain relief through the conciliation process
when the time lapse between the failure to conciliate and the
bringing of a private suit results in the housing at issue being
rented or sold.  When that happens people are deprived of the
very relief that the law is intended to provide--access to the
house or apartment of their choice.

Second, the Justice Department through its "pattern or
practice" suits cannot provide an adequate remedy for the many
individuals and families who are victims of discrimination.  In
a fragmented housing industry, Justice simply cannot bring the
volume of suits required to redress the victims of housing dis-
crimination.  Further, several courts have refused to award
individual damages on the grounds that the responsibility of the
Justice Department is to secure preventive relief.  In testimony
on H.R. 3504, Assistant Attorney General Drew Days supported the
need for enforcement authority citing the Supreme Court's ob-
servation on the "'enormity' of the task of implementing fair
housing in the light of the limited authority and resources of

263

the Department of Justice."

Third, while the right to bring a private civil action is essential to protecting persons against discrimination, it is neither fair nor realistic to rely on it as the major enforcement mechanism either for redressing individual grievances or for eliminating housing discrimination and segregation. Litigation is costly and time-consuming and the small number of cases filed reflects the limitations of this approach.

Enactment of H.R. 2540 will substantially relieve the victims of discrimination of the burden of seeking their own relief and will permit HUD to challenge and eliminate discriminatory practices that have widespread adverse impact.

The Act establishes an administrative enforcement mechanism in HUD that includes authority to issue cease and desist orders, and to impose a civil penalty not to exceed $10,000. In addition to providing relief on the basis of a charge filed by an aggrieved person, the Secretary may, on her own initiative, file a charge alleging a discriminatory housing practice. HUD is also expressly authorized to investigate housing practices to determine whether "charges should be brought or new rules should be made."

This latter provision recognizes that discrimination in the market place will not be eliminated by relying on the submission of random individual complaints of discrimination. The lack of authority to investigate practices, file charges and take administrative action with respect to discrimination that reaches

beyond one individual or one family has been a major gap in the existing enforcement scheme. This authorization to HUD to initiate its own charges complements and supports the right of private action and the Justice Department's "pattern and practices" litigation.

Where the Secretary determines there is reasonable cause to believe the charge is true, she has the option to refer the matter to the Attorney General for the filing of an appropriate civil action. This affords flexibility in seeking the most appropriate means to correct a particular discriminatory practice based on resources, authority, remedy available. We anticipate that cases referred to the Attorney General will be the exception rather than the rule; otherwise the advantages of the new administrative enforcement process would be lost.

The administrative process mandated by H.R. 2540 also assures fairness to all parties--respondents and complainants--from investigation to findings of probable cause, to filing of the administrative complaint through the hearings, orders and the provision for judicial review. We are pleased that the bill allows for the intervention by the aggrieved person at the hearing. This will afford protection to the interests of complainants without unduly impeding the completion of the process.

Another essential protection for complainants is the provision authorizing the Secretary, after the filing of a charge, to order temporary or preliminary relief--such as prohibiting the disposition of the unit in question--where such prompt action is necessary to carry out the purposes of the Act. Under this provision, the procedural rights of defendants are fully protected. If any clarification is required, however, we would support the suggestions made by Assistant Attorney General Days in his testimony before this subcommittee.

What are the objections to establishing an administrative enforcement process? One that I am sure you have heard is that what is proposed is a new scheme of regulation whose implementation is likely to prove costly.

I will say candidly to the Committee that I do not know what it will cost to carry out H.R. 2540. Secretary Harris has said that HUD's best estimate is that enforcement would involve 69 professionals and 41 clerical and paraprofessionals with an annual dollar cost of $2.3 million. Assistant Attorney General Drew Days said last year that the "increased attorney strength necessary" to handle any court litigation which results from administrative proceedings "would probably be slight." No one can say with any certainty whether these assessments will prove accurate. Once people victimized by discrimination have reason to believe that a fair and speedy remedial process is available, complaints may be filed in far greater numbers than currently anticipated, with a concomitant increase in the appropriation needed.

But I do submit to the Committee that, even if the Administration's cost estimates prove to be extremely low, on any public cost-benefit analysis, this legislation is well worth the investment. On such an analysis, the costs of implementation would be weighed against the current costs of maintaining a racially dual housing market which inflates prices for all housing consumers and works especially severe hardships on minorities forced to compete for fewer units in circumscribed communities

266.

across the nation. Included in any such analysis also should be such incalculable but severe costs as the social costs of continuing racial divisions, the loss to an individual who is deprived of an employment opportunity because he cannot find housing accessible to the job and the loss to the nation of the productive work potential of people so discriminated against. When these factors are taken into account, I cannot believe that the Congress will take seriously the suggestions that implementation of H.R. 2540 may prove too costly.

Referral of Complaints to State Agencies

As you know, Title VIII provided for the referral of complaints by HUD to state and local agencies on the theory that states that are prepared to act effectively against housing discrimination should have the just opportunity to do so. S. 506 does not tamper with this principle, but it does correct serious weaknesses which experience has shown to exist in the referral procedure. First, the Secretary would be given discretion in deciding whether to refer complaints to state and local agencies. This would enable HUD to retain complaints that require rapid action.

Second, the standards for determining whether an agency may be certified for referrals are expanded beyond "paper equivalency" to a practical evaluation of "current practices" and "past performance."

003065

267

This change responds to findings in a survey of state agencies by the Center for National Policy Review [1]/, which revealed a pattern of delay and lack of capacity to give timely relief even in some agencies with strong statutes. More recently, GAO has reported on the failure of state and local agencies to conduct investigations and resolve complaints referred by HUD.

Third, an additional safeguard to assuring that a complaint is not improperly referred is the requirement that the aggrieved party must consent to the referral. A party who chooses to file a complaint with HUD because he does not have confidence that the state or local agency will afford him timely or adequate relief should not be shunted back to that agency.

While these added protections afford greater assurance that complaints will be referred only to agencies that meet basic standards of effectiveness, there is still the potential that in some cases, even if they are few in number, agencies will delay or otherwise jeopardize an aggrieved person's rights. We urge, therefore, retention of the current provision of Title VIII that permits HUD to recall a complaint after a specific period of time is allowed for disposition. We would suggest, however, that the existing 30 day period be extended to 90 days to give agencies a more realistic time period to act on complaints.

---

[1]. State Agencies and Their Role in Federal Civil Rights Enforcement, 1977.

Enforcement by the Attorney General

H.R. 2504 contains amendments to the enforcement role of the Attorney General that would substantially enhance his capacity to carry out his Title VIII responsibilities.

1. Section 813 removes any question about the Attorney General's authority to seek money damages for aggrieved persons and in the case of wilful violation the $1,000 limit on punitive damages is deleted for aggrieved persons. This extends the relief available to private plaintiffs to suits brought by the Attorney General.

2. The amendment authorizes the Attorney General to bring a civil action to enforce any final order referred by the Secretary for enforcement and, as previously noted, to institute litigation when the Secretary finds reasonable cause and refers the case to the Attorney General.

3. In addition, an aggrieved person is given the right to intervene in any civil action brought by the Attorney General.

These changes give the Attorney General the flexibility needed to challenge discriminatory practices and to secure for the victims of those practices relief commensurate with the wrong.

## II. EXTENSION OF RIGHTS

While the core of H.R. 2504 is the enactment of more effective remedies for rights previously declared by Congress in the 1968 Act, the bill also contains several needed provisions extending rights.

Fair Housing for Handicapped Persons

As you know, the Leadership Conference includes among its members, organizations committed to protecting and promoting the interests of handicapped persons and the Conference itself is committed to this goal. An essential part of the goal is assuring handicapped people access to decent, standard housing in locations of their choice. We recognize that eliminating discrimination against handicapped persons involves issues that may differ to some degree from those involved in race and sex discrimination. But, at bottom, discrimination against the handicapped is based on the same kinds of false assumptions, stereotypes and myths that perpetuate race and sex discrimination. The obligation is no less, therefore, to seek the means and remedies to assure handicapped persons choice and access to housing.

H.R. 2540 establishes a federal policy to protect persons from discrimination based on physical or mental impairment. As in the case of discrimination based on race or sex, the enactment of such legislation is a major first step in eliminating the stereotyping and myths that undergird and perpetuate discriminatory practices. Ignorance and prejudice result in landlords and rental agents denying units to disabled persons and families with a disabled member or in assessing prohibitive terms such as higher rents and security deposits. In addition to barriers to residence for individuals or families, some

270

communitites take steps through zoning and other exclusionary devices to bar congregate living arrangements for handicapped persons. In either case, the effect is to isolate handicapped persons by denying them the opportunity to live in the community and to move into the mainstream of community life.

The concerns expressed about inclusion of this provision in H.R. 2540 revolve around the costs related to making housing accessible to handicapped persons. Recognizing this, Reese Robrahn, representing the American Coalition of Citizens with Disabilities testified last year: "To require at the outset that all housing shall be fully accessible to handicapped persons we believe would be unacceptable because of the adverse economic impact." He went on to say that "handicapped persons as members of our society should have available to them in each community a 'fair share' of all available kinds of housing so that there is guaranteed a rea-freedom of choice."

Assessment of costs is very difficult due to the lack of experience and information on either retrofitting existing housing or in construction of new units for use by handicapped persons. 2/ Although 21 states including New York City and the District of Columbia prohibit housing discrimination against handicapped persons, these laws are too new to provide much assistance in this area. Just this year, HUD issued regulations governing accessibility for the handicapped in federally-assisted housing and the application of these standards should begin to provide much needed information on costs. Notwithstanding the

---

2. As explained by Chairman Edwards, however, this bill would not require "retrofitting to remove architectural barriers, although reasonable accommodations (at the expense of the buyer or lessee) would have to be permitted." 125 Cong. Rec. H.1036 (Daily Ed. March 1979.)

271

unavailability of reliable data, it is possible to modify exist-
ing structures and to construct new units with minimal expend-
itures or with the cost carried by the tenant or buyer. While
we do not have specialized knowledge in this area, we are con-
vinced that a broad spectrum of discriminatory housing practices
against handicapped persons can be eliminated now without incur-
ring costs to the public or the private landlord.

In extending the protections of Title VIII to handicapped
persons, Congress would be following the lead of 21 states. It
would also be following well-established precedent in establish-
ing a fundamental principle of fair treatment while entrusting
the responsible executive agency to give substantive content to
the principles and to assure implementation in a manner that is
equitable to all concerned.

Removing Exemptions

The Leadership Conference opposes all discrimination in
housing and fully supports the lifting of the exemptions of sales
of single family homes by the owner as well as the four or fewer
unit structure that is owner-occupied. These exemptions have
resulted in contradictory decisions and they are inconsistent
with the complete prohibition against racial discrimination in
the Civil Rights Act of 1866. Coverage under this proposed
amendment will eliminate the complicated analyses presently re-
quired to establish if the property is exempt, e.g., advertising,
publication, sales per year, qualifications, etc.

272

### III. Refinement and Clarification
of Existing Law

#### Statute of Limitations

Under existing law--Title VIII--an aggrieved person must
file his or her complaint within 180 days of the date the al-
leged discriminatory practice occurred.  Courts have given
this six month limitation a variety of interpretations--some
a broad view because of the hardship resulting from the appli-
cation of the six month limitation; others a narrow construc-
tion that does not recognize the fact that many discriminatory
practices do not occur at an isolated moment but continue over
a period of time.

The proposed statute of limitations--one year for filing
a charge with the Secretary and three years for filing a civil
action--is reasonable and fair.

Further, the amendment deals with discriminatory practices
that are of a continuing nature by requiring filing "not later
than three years after the alleged discriminatory housing prac-
tice occurred or terminated." We strongly support this provi-
sion.

#### Attorneys' Fees

Under Title VIII, a successful plaintiff cannot be awarded
legal fees unless he is indigent.  This requirement applies only
to housing discrimination and is, in fact, inconsistent with
other civil rights statutes.  One of the rationales for permit-
ting private suits is that the institution of such litigation

273

furthers the public interest in rooting out and eliminating
practices that are inimical to the community good. Because
housing discrimination is not unique to a particular economic
group, all aggrieved persons should have access to the courts
and relief from violations. The costs of retaining lawyers
are not insignificant and, the unavailability of attorneys'
fees does in fact discourage persons from asserting their rights
under the law, thereby undermining the effectiveness of the law
for both the individual and the community.

H.R. 2540 also places the United States government in the
same category as a private person with respect to paying costs
to a prevailing party.

As we commented in our testimony on H.R. 3504, the award
of costs to prevailing defendants should be circumscribed as
it was in the Supreme Court's decision in Christianburg Garment
Co. v. EEOC, 98 S.Ct. 694 (1978). In that decision the Court
set the standard for the recovery of costs by prevailing defend-
ants to cases where the action is frivolous, unreasonable or
totally without foundation. Any broader rule would, in our
opinion, discourage the bringing of meritorious cases thereby
undermining the achievement of the Act's objectives.

One additional allowable cost that was included in H.R. 3504
but does not appear in H.R. 2540 is for reasonable expert witnesses'
expenses. Some housing suits are very complex and require the
assistance of experts in such areas as economics, demography,
planning and mortgage finance. Although nothing in H.R. 2540

274

prohibits the allowance of such costs, consistent with the efforts
to remove ambiguities from the Act, it would be helpful to express-
ly provide for the payments of such costs.

Discriminatory Housing Practices

The definition of discriminatory housing practices under
Title VIII refers to acts that are unlawful under Sections 804,
805 and 806 which relate respectively to the sale or rental of
housing, financing of housing and provision of brokerage serv-
ices. It omits from this definition Section 808 which mandates
federal agencies to administer programs and activities relating
to housing and urban development in an affirmative manner. As
a result, a question has arisen whether this violation of obli-
gation by federal agencies is an unlawful practice under Title
VIII that is subject to enforcement through a civil action in
an appropriate United States District Court.

Federal agencies are responsible for extensive programs
extending aid to individuals and organizations, and state and
local governments and agencies that provide housing and related
facilities. The past role of the federal government in supporting
and perpetuating discrimination and segregation in housing has
been fully documented. While federal policy has been reversed
and is now directed toward promoting fair housing, vestiges of
discriminatory practices and policies persist. Most difficult
has been the effort to assure that federal assistance is a pos-
itive force in expanding housing opportunities to minorities
and women. The failure of federal agencies to implement Section

275

808 is documented by civil actions that have been instituted
since the enactment of Title VIII. Adoption of this amendment
would assure that individuals will have redress if federal
agencies fail to perform their obligations under Title VIII.
We strongly support it.

Another clarification we heartily endorse is the amend-
ment expressly "including in its coverage under Section 808(d)
any federal agency having regulatory authority over financial
institutions." These regulatory agencies (the Federal Home
Loan Bank Board, the Federal Deposit Insurance Corporation, the
Comptroller of the Currency and the Federal Reserve Board) did
not recognize their obligations under Title VIII until a civil
action was filed asserting the applicability of Title VIII to
their operations that relate to housing and urban development.
Agreement was reached with three agencies and all now acknow-
ledge their duties and responsibilities under Title VIII.
S. 506 removes any lingering doubt.

Mortgage Redlining

Although courts and federal agencies have interpreted
Title VIII to cover mortgage redlining, the lack of an express
prohibition has required extensive analysis of the legislative
language. H.R. 2540 provides still-needed clarification. Inasmuch
as mortgage lenders continue to use race and national origin as
well as other factors which effectively limit equal opportunity
in housing choice, a clear statement is called for that the con-
sideration of such factors in making mortgage loans is prohibited.

003074

276

H.R. 2540 provides that clarification and we strongly support its inclusion.

Property Insurance Discrimination

Denial of property insurance can be tantamount to the denial of home ownership. "Insurance is the cornerstone of credit." Where the building owned is a multi-family rental structure, refusal or termination of insurance can mean the removal of a substantial number of habitable units from the housing market.

Several reports, most recently a HUD report 3/, have documented the prevalence of insurance redlining and its causal relationship to segregation and deterioration of urban areas, such as the South Bronx and Detroit.

A Federal District Court in August, 1978 4/ concluded that such a denial was a violation of Title VIII. We welcome the ratification of this decision in H.R. 2540. An express statutory prohibition of property insurance redlining can also bring positive results in upgrading neighborhoods and protecting the individual's right to purchase and continue to live in a home of his or her choice.

3.  Federal Insurance Administrator, U. S. Dept. of Housing and Urban Development, Insurance Crisis in Urban America 18 (May 24, 1978).

4.  Dunn v. Midwestern Indemnity Company, CA #C-3-78-105 (S.C.Ohio, Aug. 25, 1978).

277

Discrimination in the Secondary Market

The role of those who are in the business of purchasing mortgages secured by residential and commercial property has not been the subject of litigation to our knowledge. Nonetheless, in recent months, HUD and FNMA have examined the impact of the secondary mortgage market on equal opportunity and central cities. It is apparent that the refusal to purchase mortgages from primary lenders such as savings and loans because of the race, national origin or sex of the borrower will affect the way those lenders who rely on the secondary market do business. Certainly where the purchasers of mortgage loans do their appraisals as a condition of purchase, consideration of race or ethnic character of the neighborhood is prohibited.

H.R. 2540 would assure that discriminatory practices in the secondary market would be prohibited as they are for primary mortgage lenders. As in the case of racial redlining, it is essential that secondary market operations be expressly and unequivocally included in the coverage, particularly because of its significant influence on the flow of mortgage money. Discrimination in the secondary market is not easy to uncover. People who are unable to obtain credit are mot likely to be aware of the impact of the secondary market on such a denial and therefore may not be in a position to complain. Awareness of the role of the secondary market in determining who can own a home and which neighborhoods are viable is a recent development. As more information and documentation on discriminatory practices in the secondary market is revealed it is essential that the mechanisms provided under Title VIII be available. We strongly support this provision.

003076

278

Standing

The question of who has standing to bring an action under Title VIII has been troublesome. Although the Supreme Court in Trafficante v. Metropolitan Life Insurance Co.[5] broadly construed standing to include white persons who are denied an opportunity to live in an integrated environment because minorities are excluded, other courts have continued to limit standing to those who have been directly discriminated against.

The amendment defining "aggrieved person" (applicable to all proceedings--administrative and judicial) resolves the issue by including "any person who is adversely affected by a discriminatory housing practice that has occurred, is occurring, or is about to occur."

We strongly support this amendment.

Conclusion

Mr. Chairman, the progress made since 1964 in eliminating racial discrimination from many aspects of American life provides proof that where the federal government acts directly and forthrightly it can make a real difference in the lives of people long denied an opportunity to achieve their full potential. This progress is a direct refutation to those apostles of national self-doubt who say that government cannot use its regulatory processes to do anything right and that it shouldn't even try.

The legislation you are considering simply extends the laws of the 1960's by providing more effective procedures for securing equal housing opportunity to people who continue to suffer discrimination. We appreciate the leadership that you and other members of the House and Senate have exercised in introducing H.R. 2540 and we are gratified by the support that President Carter and his Administration have given to the legislation. With that kind of backing we hope for and urge its speedy enactment.

_____

5.  409 U.S. 205 (1972).

003077

279

TESTIMONY OF CLARENCE MITCHELL, CHAIRMAN, LEADER-
SHIP CONFERENCE ON CIVIL RIGHTS, ACCOMPANIED BY
WILLIAM TAYLOR AND GLENDA SLOANE, LEADERSHIP CON-
FERENCE ON CIVIL RIGHTS

Mr. MITCHELL. Thank you very much, Mr. Chairman and Con-
gressman Drinan. I am here as Clarence Mitchell, the chairman of
the Leadership Conference on Civil Rights. Accompanying me are
the people who really will present the testimony; Mr. William
Taylor and Ms. Glenda Sloane, who represent the Leadership Con-
ference on Civil Rights in compliance and enforcement activities.
They are very excellent architects of the law, having had long
experience in civil rights and housing matters.

Before Mr. Taylor begins, I would just like to say that the Lead-
ership Conference, as I'm sure you know, Mr. Chairman, and I'm
sure you know, Mr. Drinan, is an organization of organizations. It
came into being 29 years ago with the mission of trying to promote
constructive civil rights activity in this country. We now have over
144 organizations in the Leadership Conference.

I am pleased to say that we have broadened our concept of civil
rights and did that not only to give attention to the problems of
persons of Hispanic origin, as we did at the beginning, and other
Asiatic or Indian groups, but now we have added to our conference
the problems of the handicapped, the problems of various women's
groups, which of course we had at the beginning, but are now
giving greater emphasis to.

I am pleased to say that in my judgment this has strengthened
the thrust of civil rights in this country. I do not share the view of
some who feel that civil rights' interest is at a low ebb. I think the
complexion of it has changed and some of the expressions of need
have changed, so that some of the sensations that affected atten-
tion before are not there and for that reason many people assume
that the interest has changed.

There's evidence of the continued interest, for example Mr.
Taylor told me on the telephone yesterday that the American
Jewish Committee, which is a part of the Leadership Conference,
and would, therefore, be included in this presentation, had called
to make certain that their position in support of the legislation is
registered by Mr. Taylor.

I will desist, after saying just this little personal note. I retired
from the NAACP in December of 1978 and I am now engaged in
the practice of law with my wife and son in the city of Baltimore. I
think that this legislation, just judging from my observation of how
our community is changing with the neighborhoods that were for-
merly thought of as the abandoned black neighborhoods, now are
becoming very desirable residential areas and, of course, we would
hope that as these areas become desirable they would not be segre-
gated areas. I think if we leave it to some of the people that I know
who are engaged in the process of planning our cities for the
better, they would want it to be on a desegregated basis. I think
particularly James Rouse, who developed Columbia, who came with
us when we were trying to get the 1968 law passed and as a
mortgage banker testified about the importance of this law. There-
fore, I think we need this legislation not only to protect the person
who are customarily discriminated against, but I think we want to

protect the people in the industry who want to do the right thing. And there are many people like that. I have also known that they existed and I've also known what their problems were. For example, when the Southwest development once was being built, one of our mutual friends was a person who had the primary control of it and that of course was before the days of the 1968 law. Now, he took a position this had to be desegregated and he did in fact have it operate on a desegregated basis, but against great resistance, not from the tenants but from the real estate people who felt that they didn't want to be a party, even though they were agents for the owner, to a program of desegregation.

So having said that, Mr. Chairman and members of the committee and counsel, I yield to Mr. Taylor and Ms. Sloane.

Mr. EDWARDS. Mr. Taylor.

Mr. TAYLOR. Thank you, Mr. Chairman. Ms. Sloane and I have a prepared statement which with your permission we will just enter into the record, and I would just like to summarize what we regard as the more important points with respect to this legislation.

What the committee is dealing with here in H.R. 2540 is really, in our judgment, a basic part of the unfinished civil rights agenda. We have had as you know for 11 years now a declared national policy in favor of equal treatment in housing. The problem is that that policy has simply not been matched by appropriate enforcement tools and, as you know, the evidence of that is in the continuation of a variety of housing discriminatory practices ranging from steering to redlining to outright denial of credit, which means that the dual housing market continues to operate.

Now, the heart of H.R. 2540 is the establishment of a method of administrative enforcement in the form of cease-and-desist authority that will make the policy expressed in the 1968 act effective. It's very clear that the existing enforcement tools, though certainly they could be better used than they are right now, the existing tools of HUD conciliation, of Justice Department lawsuits, and private litigation are not themselves sufficient to deal with widespread violations in a fragmented housing market. And Mr. Larson, I think gave some very useful testimony in showing that cease-and-desist authority is really a very standard tool of enforcement of Government policy. You asked, Mr Chairman, how often that policy needs to be used. We have been dealing as I think you know with some of the banking regulatory agencies about their policies over the years, and it has been a long effort to get them to recognize that they have some responsibility to deal with discrimination in the housing credit field.

One of the things we learned when we were dealing with them is that once they recognized that responsibility—they had the tools. The Federal Home Loan Bank Board has the tools to deal with discrimination—as well as other violations of banking laws—through cease-and-desist authority. It's also very clear that they rarely need to use those tools by actually issuing the order. Once they have conducted an investigation and identified the practice that violates the law and notified the lending institution, that lending institution recognizing that the authority is there, will quite commonly come into compliance with the law without the

281

need for actually invoking the cease-and-desist authority. So it has a very stong deterrent effect.

There are several important provisions that are designed to assure that administrative remedy will be effective. One that we regard as particularly important is the provision for temporary relief, permitting the Secretary, for example, to bar a landlord or developer from disposing of a unit until the proceedings are completed. The reason for this provision is quite obvious, it seems to me. People are frustrated when they have a right but really don't have a remedy because the specific thing that they're after—a particular house or apartment—may be gone by the time that the proceedings are completed. So temporary relief preserving the unit I think is really a key to making the law effective.

A second provision we would like to call attention to is that which enables the Secretary to initiate her own investigation and proceedings. And here I want to echo what Mr. Larson said in response to a question of counsel about the need for that kind of provision. I would also add that it is a very standard kind of provision in Federal laws. It is true under title VII, that charges can be initiated by the Equal Employment Opportunity Commission. Under title VII, Federal agencies without exception so far as I know, rely not simply on complaints but on the initiation of their own investigations to deter discrimination. It is true of the more recent provisions, such as the revenue sharing law, that investigations can be initiated by the agency. I think every agency has come to the conclusion that you simply cannot have an effective law if you rely on complaint. You must identify potential matters of discrimination that may come to you from other sources. And this becomes a very important means of enforcing the law in an equitable and fair manner.

The third provision or third point that I would like to make about the bill is the need for an assurance tha the enforcement process will work expeditiously. That is something I think this committee is very familiar with—the delay problem in connection with enforcement. One potential impediment to expeditious enforcement is the process that was established in the 1968 act of referring cases to State and local agencies on the theory that the States are prepared to act effectively and they should have the first opportunity to deal with housing discrimination.

The difficulty is that this can delay the remedy. Now, H.R. 2540 doesn't tamper with the referral principle, but it does correct weaknesses that have become apparent in that provision. It does that by giving the Secretary discretion in referring complaints and by making the standard for referral not simply whether a State has a stong law on paper but whether it has an effective law in practice. There are laws which look good on the books but there are no effective resources available to carry out those laws. Cases in my judgment should not go to those agencies.

The bill also provides the complaining party with an option not to consent to the referral. One additional provision that we suggest in our testimony would be to allow the Secretary to recall a complaint if the State agency delays in processing the complaint. So we believe that the law should continue to encourage States to adopt effective provisions for enforcing the right to fair housing treat-

ment. But we think there should be some assurances, and the bill does contain some assurances, that deferral will not delay the process of enforcing rights.

I might say that we are also concerned with delays that can arise elsewhere in the process and we have considered suggesting time limits for the completion of investigations by the Department of Housing and Urban Development itself, as was done, you know, because you helped to initiate this process, in the revenue sharing amendments.

But we have not come to the conclusion that perhaps some experience under the law ought to be gathered first because it is difficult for Congress to impose precise time limits and the agency ought to be given a chance to perform without having that requirement fastened on it.

We also think that the cease-and-desist procedure in the bill has provisions which make it fair to everybody concerned. The question is, What are the real objections to it? One of course is the question of cost. And I would have to say to the committee that I don't know precisely what it will cost you to carry out this legislation. Secretary Harris has provided a best estimate of something on the order of 69 additional professional staff positions and 41 clerical and paraprofessional positions, at a total cost of about $2.3 million.

Assistant Attorney General Days has said that the increased attorney strength necessary to handle any litigation which results from administrative proceedings would probably be slight.

I think those are probably the best estimates available, but I should acknowledge that no one can ascertain whether they will prove accurate. Once people who are victimized by discrimination have reason to believe there is a fair and impartial process available to them, complaints may be filed in far greater numbers than is now anticipated, and there may be an increase in the appropriations needed. But I do submit to the committee that even if those estimates prove to be low on any kind of a public cost-benefit analysis this legislation is well worth the investment.

On such an analysis, the cost of implementation would be weighed against the current cost of maintaining a racially dual market, which inflates the price of housing for everyone and works especially severe hardships on minorities who are forced to compete for fewer units and in fewer communities around the Nation.

Also included in such an analysis would be such incalculable but severe costs as the social costs of continuing racial division, of the loss to an individual and the loss to the Nation when an individual is deprived of an employment opportunity because he can't find housing that is accessible to the job, and the loss to the Nation, as I said, of the productive work potential of such individuals.

So, I think, when those factors are taken into account, I don't believe Congress will take seriously the objections that this legislation would be too costly.

Now, while the core of the bill is more effective remedies for existing rights, it does contain some provisions for extending rights, and the most important thing in our judgment is adding handicapped people to the classes of people protected by the law. While I recognize that questions have been raised about just how the rights of handicapped people will be defined under this law, the

first initial step is to establish the right to fair treatment. This is necessary to eliminate the stereotyping and the myths that underlie discriminatory practices in this area, just as they underlie discriminatory practices in other areas.

Ignorance and fear and prejudice result in a landlord or rental agent denying a unit to a disabled person or in assessing prohibitive terms, such as higher rents and security deposits. In addition, some communities take steps, through zoning and other exclusionary laws, to bar congregate living arrangements for handicapped people. In either case, the result is to isolate people by denying them an opportunity to live in communities of their choice and to move into the mainstream of community life.

Questions have been raised about costs. Last year, Reese Robrahn, who is an active member of the leadership conference—and who represented the American Coalition of Citizens with Disabilities—testified that his group was not seeking to impose a great cost on landlords or developers; that all they were seeking was access to a fair share of the housing that is available in the community. And I think Congressman Drinan has said that he is not seeking through this provision to require extremely costly retrofitting or other factors.

There are 21 States and New York City and the District of Columbia which do prohibit discrimination upon the basis of handicap. HUD has now just issued regulations governing accessibility for the handicapped in federally assisted housing, and the application of these standards should begin to provide some of the information that we need on costs. What we think is that Congress should act on this legislation, as it has acted on other legislation, to establish a basic principle with appropriate legislative history which will set the outer boundaries. And the outer boundaries are that practices that are discriminatory on their face, on their impact, must be ended, unless there is some compelling business necessity.

Now, an extraordinary cost might be a compelling business necessity; but that really has to be left to the agency which you would entrust with responsibility for enforcing this law and to the adjudicative processes.

The fact that we don't know every answer to every question now should not be a deterrent to making the start that you have made in many other laws.

I would just make brief mention of the fact that there are other refinements and clarifications in H.R. 2540 that we alluded to in the last portion of our testimony: That they have to do with clarifying the statute of limitations, allowing attorney's fees for all prevailing parties and not simply those who are indigent, explicitly permitting suits against Federal Government agencies that fail to carry out their duties—which we hope won't be necessary in the future, but it has been necessary in the past and in some cases turned out to be the only way in which one gets the law enforced—and clarify provisions against mortgage lending, property insurance discrimination, and discrimination in the secondary market.

We endose all of those provisions. We have, in addition, called for amendments to the bill to permit costs for expert witnesses.

We think in conclusion, Mr. Chairman, that the progress that has been made since the 1964 act in eliminating racial discrimination from many aspects of American life provides proof that where the Federal Government acts directly and forthrightly, it can make a real difference in the lives of people who have been denied an opportunity to achieve their full potential, and that this progress really refutes the folks who say, as Congressman Drinan mentioned a few minutes ago, that Government cannot use its regulatory processes to do anything right and that we really shouldn't even try.

What you're dealing with here is legislation to extend the laws of the 1960's by providing effective procedures for securing equal housing opportunities for people who continue to suffer discrimination. We all appreciate the leadership that you have exerted year after year in introducing and developing the record and the case for this legislation. We are gratified by the support that President Carter and his administration have given to the legislation and with that kind of backing we think that, we hope for, and we urge its speedy enactment.

Thank you.

Mr. EDWARDS. Thank you, Mr. Taylor, and our thanks and compliments to Mrs. Sloane for her contribution in the preparation of this excellent statement. Do you have a statement today?

Ms. SLOANE. No; I do not.

Mr. EDWARDS. The gentleman from Massachusetts, Mr. Drinan?

Mr. DRINAN. Thank you, Mr. Chairman, and thank you, Mrs. Sloane and Mr. Taylor, and, of course, our good friend, Clarence Mitchell. I have only a few points to raise, but first I'd say that the wise comment that Mr. Taylor mentioned was actually a quotation from Mr. Edwards, rather than myself, about the fact that we are not requiring retrofitting for all existing houses.

But one small point where in my mind the situation is not clear is on page 8 of the testimony, toward the bottom, where you say, for example:

Retention of the current provision of title VIII and that permits HUD to recall a complaint after a specific period of time is allowed for this position. But we would suggest, however, that the existing 30-day period be extended to 90—

I don't follow the logic of that—

to give agencies a more realistic time to act on complaints.

If they want to stall and delay, would they have 90 days to do so, rather than 30? It's my understanding that the 30-day period requires them to flag the case—to bring the case, take some action. And if they take no action, then HUD can recall the case. Would you explain a bit why you suggest 90 rather than 30?

Mr. TAYLOR. Well, my understanding—I may be wrong about this—is that the 30 is to do something more than an acknowledgment of the complaint. It must be to commence proceedings. The 30 has simply not proved very realistic in practice and while HUD has recalled a number of complaints, it has recalled them in most cases long after the expiration of the 30-day period. I guess our thought was only that realistically to complete an investigation and initiate a proceeding—and the way we view it, it's only after the agency has completed the investigation and initiated a proceeding or conciliation that you can say that they have done something substan-

tial—and probably you need 90 days. A 90-day provision would be consonant for example with the 90-day investigatory time limit under the revenue sharing law.

I should say something else, now on this score. I think I'm a little bit worried about relying—I think we need that provision, but I would hope we do not have to rely on that provision and have a lot of complaints recalled, because that just sets up the possibility for a whole other step in the process where Federal officials are dealing with State officials. I think the key step is the earlier part of it that says that agencies will be certified only if they have laws that are substantially equivalent—and that means enforcement powers; that means staff; that means money. And those complaints ought not to go to the States unless there is some prospect that there will be an effective enforcement. After this bill passes, they should go only to agencies that have cease-and-desist authority to obtain temporary relief and adequate resources to carry that out.

Mr. DRINAN. About how many States would qualify right now?

Mr. TAYLOR. Well, I haven't calculated that completely.

Mr. DRINAN. Half the States?

Mr. TAYLOR. Probably not more than 20 or 21, and maybe less than that. I think there are 22 or 25 agencies that presently are certified.

Ms. SLOANE. Twenty-two, and the addition of the District of Columbia, now certified by HUD.

Mr. DRINAN. So, in the light of that, the 90-day period would apply only to 22 or 25 States that would, in fact, be in the ballpark.

Mr. TAYLOR. And I think right now it would be a lesser number, because the number will be somewhat reduced once substantial equivalency means cease and desist and temporary relief, and it also is measured by a test of practical capacity. In other words, not all the 22 States that now qualify will meet that test.

Now, some of them I hope will again amend their laws so that they can receive deferral so we may get back up to 22 or to a higher number. But the key thing, and the reason for this provision is that if a State establishes a process that a citizen can have confidence in, then that citizen will want to go to that State, and to the extent that they do that then complaints should be referred and we will have expanded remedies. To the extent they don't do that, they shouldn't be referred in the first place.

Mr. DRINAN. Thank you. On another rather small point about the reasonable expert witnesses' expenses, that was dropped from the bill, as you know, and you call for its reinsertion. Would you elaborate a bit on that and say how important is this? I know it's important, but I assume that the subcommittee along the way said that we don't want to weigh too much baggage on the bill and too many expenses. Would you feel that this is something essential in the process; something that really we should reinsert into H.R. 2540?

Mr. TAYLOR. I think it's quite important. As we have all come to learn, as the more blatant practices of discrimination are abandoned, they are often replaced by very sophisticated practices of discrimination that are hard to get at and often in order to establish those practices one does need to call on the talents of expert

witnesses who can spend some time examining patterns and examining the purported rationale for the patterns. For example, in the redlining field people will still say they are not discriminating; they are just exercising sound business judgment.

Well, in order to examine that claim you often need an expert witness, and expert witnesses come high. The research comes high; the daily fees come high, and as Mr. Larson pointed out, in his testimony, as matters stand now the ordinary witness' fees that are available for court proceedings simply will not cover the cost of expert witnesses. So, to make the law meaningful and to be able to examine the patterns that I think we need to examine and to deal with, I think we do need this provision.

Mr. DRINAN. In the original bill, H.R. 3504, it just provided for reasonable expenses, without any costing. I wonder if we could establish some type of a ceiling: no more than $1,000 or $5,000. I know that would be difficult, but any wisdom that you and your associates might have on that would—I know it would be helpful to me personally. Now, going on to one other question about the handicapped, are you satisfied that the revised version, so to speak, H.R. 2540, has adequate protection that we could begin to protect the handicapped?

Mr. TAYLOR. Yes, I am. I think the——

Mr. DRINAN. It hasn't been cut back too much?

Mr. TAYLOR. I think not. It established the basic principle of nondiscrimination and of equal opportunity, and if there are practices which adversely affect the handicapped, then those practices as a rule will need to be justified. In other words, I suggest that the test that applies to discrimination against the handicapped will be the same test that applies to discrimination on the basis of race. One will not have to prove malice. Handicapped people will have to prove that they are adversely affected and that there is not a compelling business reason for treating them differently from treating everybody else. I think that provides the basis that is needed.

Certainly, one would like to go further—and some people would not like to go as far—but I think once the principle is established we can then begin to confront these problems through rulemaking and through individual adjudication.

Mr. DRINAN. Well, I thank you again for this testimony, and I echo what I said to Mr. Mitchell: That I hope that this is the last time that we have to impose on you and your expert colleagues, and I hope that with the leadership conference and with the President behind us that we can soon make it the law of the land.

Thank you very much.

Mr. EDWARDS. Mr. Taylor, how would you respond to comments from a previous witness that this bill would interfere with the proper exercise of the first amendment rights of real estate appraisers in giving appropriate appraisals of the value of real estate?

Mr. TAYLOR. I would respond by saying that appraisers as a group ought not to be treated differently from any other operator in the housing market. What is being prohibited is not an exercise of their first amendment rights, but a practice which they may engage in which discriminates against people on the basis of their

:13-cv-08564 Document #: 134-5 Filed: 08/11/17 Page 307 of 473 PageID

race, sex, handicap, or other prohibited categories. I don't know in detail what the appraisers are saying, but I do know that a part of the whole web of housing discrimination has been use of the appraisal process. It has been so serious that it occasioned a lawsuit by the Department of Justice against both the institute—I don't know the name of the two institutions—but the institute or society of appraisers which in one case has resulted in a consent judgment to desist from these practices. So it's on the record that there are problems of discrimination that need to be dealt with.

I might add that I ran up against those practices myself some years ago when I was seeking to buy a house in the District of Columbia in a desegregated neighborhood. The house was appraised at a value so low—so below the selling price, that I could not obtain an FHA mortgage for it, and there was only one reason for it; it was because it was a desegregated neighborhood. When I forcefully said that I thought race was the reason for the low appraisal it was reappraised at the higher value and I was able to get the FHA mortgage.

I'd like to think that these kinds of practices have disappeared. But every evidence is that they still continue.

Mr. Edwards. Well, that's very helpful. I am going to ask by letter Mr. Larson the same questions but I'm sure we're going to run into this objection more and more as the debate continues. These people are going to say well, they're prevented from giving their candid opinion and that's their first amendment right—their right of free speech. I agree with your response but I think it is going to be something we are going to deal with. Other comments these same critics have made on H.R. 2540 is that the proposal creates an alarming commingling of investigative, prosecutive, and judicial functions all neatly fitted into HUD—one Government agency with all of those powers. How would you respond to that?

Mr. Taylor. I would respond to it first of all by reiterating what I said and what I think Richard Larson said earlier: That this is a standard procedure for remedying violations of statutes and of national policy that is embodied in a whole host of statutes and while I haven't examined these statutes in detail, they all observe and are subject to the provisions of the Administrative Procedures Act. And that means that the prosecutive and adjudicative functions within the agency must be kept separate. One section—if I'm not mistaken—554(d) of the Administrative Procedure Act, says specifically that an employee or an agent who is engaged in the performance of an investigative or prosecuting function may not participate in the decision.

Now, I don't know whether it's been raised here but somebody has said, that the bill refers to the Secretary both in the investigative and adjudication section. Well, the Administrative Procedures Act says that the bar against vesting both functions in the same employee does not apply to the agency or a member of the body comprising the agency. And I think we know that when it says the Secretary shall initiate and the Secretary shall decide, we are not talking about the Secretary in person, at least, not in the first case. It is the agency initiating the investigation and the Secretary will not prosecute the case. The Secretary will review the findings of an administrative law judge once they have been made and will not be

003086

prejudiced by any prior role in the case. So I think it is inaccurate to say it's an improper of commingling of responsibilities. And the answers are found in the administrative procedures and in the standard practice of other agencies.

Mr. EDWARDS. So you think they're being provided due process?

Mr. TAYLOR. Yes, I would say they are provided with every element, and care has obviously been taken by the drafters of this bill to be fair to respondents at every stage of the proceedings.

Mr. EDWARDS. Thank you. Ms. Cooper.

Ms. COOPER. I have no questions.

Mr. EDWARDS. Mr. Boyd.

Mr. BOYD. Thank you, Mr. Chairman.

Mr. Taylor, do you know of any other situations in which a cabinet-level officer, in this instance the Secretary, consistent with the remarks you just made, has the ultimate power to file and to finally modify the decision of an ALJ? I know it exists in other agencies specifically designed for particular areas of concern, but does it apply to cabinet level officers?

Mr. TAYLOR. Under title VI, to cite one instance, after an administrative law judge makes a decision about whether Federal funds have been used in a discriminatory manner, that judge is then reviewed by a reviewing authority and then personally by the Secretary—the head of the agency.

Mr. BOYD. Does the Secretary also file in that instance?

Mr. TAYLOR. Does the Secretary file?

Mr. BOYD. File the initial complaint.

Mr. TAYLOR. The initial complaint is filed in the name of the Secretary. For example, just about 2 weeks ago Secretary Califano sent a letter to a large northern city saying that it was not eligible for school—for funds under the Emergency School Aid Act, because it had engaged in practices that violated title VI, or there was probable cause to believe that.

Now, as this proceeding goes all the way through, it will ultimately be decided by the Secretary, but what it really amounts to is steps taken in the name of the Secretary and in the name of the agency, not that there's a commingling of functions.

But anyway, in answer to your question, there is a precedent there and I believe elsewhere and I would like to furnish some other instances to the committee. I know for a fact it's the practice.

Mr. BOYD. If you have any now, I think it will be helpful.

Mr. EDWARDS. Yes, I think it will be helpful. That's something we're going to have to resolve: the allegation that there is a lack of due process here because the the Secretary could just overrule the administrative law judge.

Mr. TAYLOR. I must say that I think the provision is a safeguard for the respondent to have the Secretary reviewing the decisions of the administrative law judge. I think that would be protection that people would want and, as I say, as to the prosecutive aspect of function, I think it is action being taken in the name of the Secretary or the name of the agency rather than the Secretary actually prosecuting.

Mr. BOYD. But we are dealing with possibilities and not necessarily probabilities.

289

Mr. TAYLOR. Well, OK. But I think the Administrative Procedure Act which says you shall not mingle those two functions—I think if you wanted to clarify, you could say "the department," where you're talking about the initiation of the proceeding, rather than to say "the Secretary," if that would clarify matters. We will try to provide further information.

Mr. EDWARDS. If the gentleman would yield. That is very important, because it seems on its face that you are mingling the responsibility when the Secretary files the action and the Secretary can veto or change the decision after the proceedings. At least on its face it appears so.

Ms. SLOANE. There is the additional protection in the statute that her decision is subject to judicial review, so that it isn't——

Mr. BOYD. That's true. But nevertheless the decision made has an effect.

Mr. TAYLOR. One interim suggestion that I would like to make right now for consideration. Just for purposes of clarification, one might consider changing the word "Secretary" to "department" and that will obviously refer to the prosecutive branch of the department. But we will try to provide you with further explanation.

Mr. BOYD. One or two more questions. Mr. Taylor, based on your experience, to what extent have State housing discrimination enforcement agencies been effective? You mentioned 21 which you considered to effective in law enforcement responsibilities. How effective have they been in implementing those responsibilities?

Mr. TAYLOR. I think I mentioned—the reference is really to the 22 that are certified by HUD as being——

Mr. BOYD. But that certification is not based on effectiveness?

Mr. TAYLOR. That's correct. I think it's a much more limited number that have been effective, and we haven't conducted any recent study of the effectiveness of the agencies in terms of—I mean, we have conducted a study of their practical capacity to carry out the laws, without actually having reviewed individual cases. My judgment is that there are probably half a dozen that have been substantially effective in carrying out fair employment and fair housing laws: Michigan, Pennsylvania, New York—although New York is going up and down—Massachusetts—those are some of the major ones. What characterizes those agencies is the existence of ample enforcement authority, including cease and desist and the authority to give temporary relief; substantial funding; some real independence so they're not subject to changes that come about just because a Governor decides he doesn't like the agency. So I think we have some favorable experience but not nearly as much as we would like.

Mr. BOYD. Mr. Mitchell, do you believe that, based on your comment at the beginning of your remarks, racial steering as described in the *Gladstone* v. *Bellwood* case, recently handed down by the Supreme Court, is a major obstacle in the way of nondiscrimination in housing?

Mr. MITCHELL. I do think it is a major obstacle. I anticipated that a question would arise on that and I did discuss it with Mr. Taylor yesterday. I think that one there is absolutely no doubt that this practice of steering people to designated areas is very widespread

003088

290

and very destructive, I do not want to give Mr. Taylor an additional obligation, since we are all working on this as volunteers. But if he is agreeable, I would appreciate an opportunity for us to submit a written statement on our views about the impact of that case.

Mr. BOYD. Would you agree though that in many instances the racial steering which was dealt with in the *Gladstone* case may be unilateral in the sense it may be initiated by the realtor himself, based on the likelihood of prospective buyers and not necessarily participated in personally by the owner of the housing?

Mr. MITCHELL. I think it is often true that the owners may not want to have that kind of policy follow. As a matter of fact, that is the kind of thing I was referring to when I spoke about this Southwest housing development when it was first built. As a practical matter, the owner of it has asked me if I would assist in getting blacks to apply, but Shannon & Luchs, the company that was the agent for it when we sent people over there just did the thing that the owner did not want done. So I would say that it is quite true there are some high-minded people who would like to see these things operate on an integrated basis, and others who just don't care one way or the other. But I believe it is necessary to fix the responsibility somewhere, and for that reason I think it is necessary to hold all parties responsible and of course if the owner is sufficiently diligent and sufficiently certain in his admonition to the agent, the agent will do whatever the owner wants done.

Mr. BOYD. Thank you.

Mr. EDWARDS. Thank you very much, Mr. Mitchell, Mr. Taylor, Ms. Sloane.

Mr. MITCHELL. Mr. Chairman, before we leave, I would just like to make one little observation. I have a kind of a heavy heart, as I guess some of the rest of us have this morning, because, as you know, the sponsor of this legislation over in the Senate, Senator Bayh has lost his gallant and inspirational wife. She has fallen victim to cancer. It has been my experience in the years that I have been in Congress, or rather associated with Members of Congress, that you inevitably build up personal affections. You share problems of private lives as well as the things that come to public attention.

I have followed the course of Mrs. Bayh's illness. I heard her on that great program coming from California—Reverend Schuller's program—and along with millions of other citizens I was inspired by her. During her illness the period Senator Bayh had held hearings on this legislation. He did not dodge his responsibility I talked with him afterwards about Mrs. Bayh's condition. He was, like most of us, very hopeful and yet realistic. I just would like to have this record show that while we are here for a cause that has broad application, we are not unmindful of the problems that beset our friends in this House and in the Senate. We share their grief. We offer them from our hearts all of the sympathy that we can give.

Thank you.

Mr. EDWARDS. Thank you, Mr. Mitchell, and, speaking for the members of the staff of this committee, we join in those sentiments and we thank you for them.

[The information follows:]



# Leadership Conference on Civil Rights

2027 Massachusetts Ave., N.W.
Washington, D.C. 20036
202 667-1780

June 8, 1979

JUN 1 2 1979

**OFFICERS**
HONORARY CHAIRMEN
A. Philip Randolph
Roy Wilkins
CHAIRMAN
Clarence M. Mitchell
SECRETARY
Arnold Aronson
LEGISLATIVE CHAIRMAN
Ronald H. Brown
COUNSEL
Joseph L. Rauh, Jr.

EXECUTIVE COMMITTEE
Bayard Rustin, *Chairman*
*A. Philip Randolph Institute*
Dr. Edward Braynon
*Omega Psi Phi Fraternity*
David Brody
*Anti-Defamation League of B'nai B'rith*
Sen. Edward W. Brooke
*National Low Income Housing Coalition*
Douglas A. Fraser
*International Union of*
*United Automobile Workers*
Dorothy Height
*National Council of Negro Women*
Msgr. George Higgins
*U.S. Catholic Conference—*
*Division of Urban Affairs*
Ruth J. Hinerfeld
*League of Women Voters of the U.S.*
Benjamin L. Hooks
*National Association for the*
*Advancement of Colored People*
Vernon Jordan
*National Urban League*
Bettye Kehrer
*National Legal Aid and Defender Association*
Hayden Lee
*Organization of Chinese Americans, Inc.*
Judith Lichtman
*Women's Equity Action League*
S. Garry Oniki
*United Church of Christ—*
*Office for Church in Society*
Reese Robrahn
*American Coalition of Citizens*
*with Disabilities*
Eleanor Smeal
*National Organization for Women*
Rev. Leon Sullivan
*Opportunities Industrialization Centers*
Lynette Taylor
*Delta Sigma Theta Sorority, Inc.*
J. C. Turner
*International Union of Operating Engineers*
Kenneth Young
*AFL-CIO*
Raul Yzaguirre
*National Council of La Raza*

COMPLIANCE/ENFORCEMENT
COMMITTEE
William Taylor, *Chairman*
*Center for National Policy Review*

STAFF
DIRECTOR
Marvin Caplan
EXECUTIVE ASSISTANT
Yvonne Price
SPECIAL CONSULTANT
J. Francis Pohlhaus
PUBLIC AFFAIRS DIRECTOR
Natalie P. Shear
OFFICE MANAGER
Pamela Y. Wheaton

Donald Edwards
Chairman
House Subcommittee on
Civil and Constitutional
Rights
2329 Rayburn House Office
Building
Washington, D. C. 20515

Dear Mr. Chairman:

During the course of our testimony on April 26, 1979 on H.R. 2540, several questions were raised by the Subcommittee on the propriety and fairness of the procedures specified in the bill for the issuance of cease and desist orders. We were asked to provide a further response, particularly on the issue of whether combining prosecution and adjudicative functions in a single executive agency is a customary and supportable practice.

Similar questions were posed to the National Committee Against Discrimination (NCDH) which responded with a memorandum forwarded to the Subcommittee on May 31, 1979. We have received the memo which we find to be comprehensive and responsive to the issues posed. We fully adopt the views expressed by NCDH.

We call particular attention to the discussion on Pages 10-12 of federal agencies whose statutes vest adjudicative authority in the agency head despite the fact that the agency is also responsible for carrying out investigative and prosecutorial functions. For example, the Packers and Stock Yard Act, Animal Welfare Act, Plant Variety Protection Act and Federal Seed Act vest the Secretary of Agriculture with authority to investigate, initiate and adjudicate complaints under the acts, and antitrust laws with respect to the fishing industry vest the same authority in the Secretary of Interior.1/ This has not created a problem because

*"Equality In A Free, Plural, Democratic Society"*

**30th ANNUAL MEETING  •  JANUARY 28, 1980  •  WASHINGTON, D.C.**



it is clear that the agency head is referred to in a corporate
rather than a personal sense and that he or she does not person-
ally perform both functions.  As we said in our testimony, and
as NCDH notes on Page 10, Section 554(d) of the Administrative
Procedures Act specifically exempts agency heads or members of
the agency from the prohibition against combining dual functions
in a single employee, in recognition of the fact that all employ-
ees are ultimately responsible to the head of the agency.

While it is clear that the procedures set out in H.R. 2540
are well grounded in practice and law and do not contain any
element of unfairness, we would have no objection to a substi-
tution of the word "department" for "Secretary" in all references
to the investigative and prosecutorial functions authorized by
the bill.  For example, the Subcommittee could if it desires
change §810(a)(1) on Pages 5 and 6 to read:  "Whenever an
aggrieved person or the Department on its own initiative, files
a charge alleging a discriminatory housing practice, the Depart-
ment shall serve a notice..."  We do not believe such a change
is necessary, but it would do no violence to the intent of the
sponsors.

Another question  raised at the hearings concerned the im-
plications of the case of Gladstone v. The Village of Bellwood 2/
decided by the Supreme Court on April 17, 1979.  The petitioners,
Gladstone Realtors, claimed that the respondents did not have
standing to bring suit under §812.  Their argument was founded
on the omission of the term "aggrieved person" from §812 which
authorizes enforcement by private persons while it is contained
in §810 which provides for enforcement by HUD.  Thus, they main-
tained, §810 was intended to cover plaintiffs, whether directly
or indirectly injured by housing discrimination under Title VIII
in contrast to §812 which was only intended to provide a right of
private action to those who are direct victims of housing dis-
crimination.

The respondents in Bellwood, individual homeowners and the
Village of Bellwood, were not direct victims of discrimination.
They were not denied the right to rent or purchase a home.
Rather, they were indirect victims of racial steering that denied
them the benefits of an integrated society and further caused
property values to decrease.  Therefore, petitioners contended,
§812 was not intended to provide a remedy to plaintiffs.

The court rejected this interpretation of Title VIII and
found that §812 was not less inclusive than §810.  To the con-
trary, the sections were found to be alternative remedies to be
used by anyone directly or indirectly injured by a Title VIII vi-
olation.  The court found the omission of the term "aggrieved
person" in §812 to be inconsequential and not indicative that

§812 was available to a more limited class of plaintiffs. Instead, it concluded that the statute and the legislative history supported the interpretation that Sections 810 and 812 are alternative remedies for all injured by a Title VIII violation.

Further, the court said that "Congress may, by legislation, expand standing to the full extent permitted by Article III, thus permitting litigation by one who otherwise would be barred by the prudential standing rules.' Warth v. Seldin, [422 U.S. 490, 501 (1975)]."

Thus, the Supreme Court has resolved the questions of standing under §812 making it clear that the same broad criteria for standing apply to §812 as well as §810. Moreover, in according standing to the Village of Bellwood the court has made clear that the question of injury should be determined through a realistic analysis of the adverse impact of housing discrimination. In light of the Bellwood decision, we would not object to the deletion of §4(i) which defines "aggrieved person."

The Fair Housing Amendments of 1979 merely provide Congressional reaffirmation of the Supreme Court's holding in Bellwood.

Sincerely,

Bill Taylor

William L. Taylor
Chairman
Compliance and Enforcement
Committee

Footnotes

1. Packers and Stock Yard Act, 1921, 7 U.S.C. 181, 193, 210, 213; Animal Welfare Act, 7 U.S.C. 2131, 2149(a)-(b); Plant Variety Protection Act, 7 U.S.C. 2321, 2568(a); Federal Seed Act, 7 U.S.C. 1551, 1599(a); Fishing Industry Antitrust Laws, 15 U.S.C. 522.

2. U.S. Sup. Ct. No. 77-1493.

Mr. EDWARDS. Our last witness is the director of the Fair Housing Division of the Virginia Real Estate Commission, Mr. Richard Kast. It is that agency which is charged with enforcing the Virginia fair housing law, which has been certified as a substantial equivalent to the Federal law. HUD has been referring charges filed with them to the Virginia Real Estate Commission when they pertain to acts occurring in Virginia. Accordingly, we have asked Mr. Kast to address in particular the question of how referrals to state agencies should be handled in this bill.

Mr. Kast, we welcome you and you may proceed with your testimony.

## TESTIMONY OF RICHARD C. KAST, DIRECTOR, FAIR HOUSING DIVISION, VIRGINIA REAL ESTATE COMMISSION

Mr. KAST. Because I haven't had the pleasure of testifying before this subcommittee previously, a brief introduction: My name is Richard Kast. I am an attorney with the Attorney General's Office in Virginia. One of my jobs as an assistant in that office is working with the administration of Virginia's fair housing law, and in the capacity working closely with the HUD regional office in Philadelphia, from which we receive a majority of our fair housing complaints.

The Virginia Real Estate Commission is the agency which is entrusted with the administration and enforcement of the Virginia fair housing law. I serve as fair housing administrator with the commission in the administration of that law.

I have submitted prepared comments which I hope you have received. If not, I have other copies.

Mr. EDWARDS. We have received them and, Mr. Kast, without objection they will be made a part of the record.

### STATEMENT OF RICHARD C. KAST

I am pleased to have this opportunity to testify on behalf of the Virginia Real Estate Commission in support of House Resolution 2540, "The Fair Housing Amendment Act of 1979." My comments will be limited to § 810(a)(3) of the bill, dealing with the mechanism whereby the Secretary of the Department of Housing and Urban Development can refer complaints to agencies with substantially equivalent laws. I will, however, be happy to address any questions members of the Subcommittee may feel relevant regarding Virginia's experience in fair housing.

Virginia's Fair Housing Law [1] was adopted in 1972. In 1978, by a Memorandum of Understanding effective July 22 of that year, the Virginia Real Estate Commission, the agency entrusted with investigative and enforcement authority of the Virginia Fair Housing Law, entered into an agreement with HUD providing for cooperation and coordination between the agencies in processing fair housing complaints. This Memorandum of Understanding was entered into pursuant to Title VIII, § 810(c) of the Civil Rights Act of 1968, the section of the present law which § 810(a)(3) of the bill would amend. It may be instructive to look at exactly how the referral process works under the present law, and how the suggested amendment would change that procedure.

Presently the Commission receives referrals of all fair housing complaints originating in Virginia from the HUD Regional Office in Philadelphia. I receive these complaints, acknowledge their receipt by return mail, and forward the complaint forms and such other material as may be enclosed to the Enforcement Section for investigation. The thirty-day period for commencement of investigation required by § 810(c) commences with my acknowledgement of receipt of these complaints.

On a thirty-day basis the Commission reports to HUD, by means of forms mailed by that agency to the Commission, on the status of the referred complaints. This

---

[1] Code of Virginia, § 36–86 through 36–96 (1950) as amended.

reporting of status is in compliance with Chapter 7, "State/Local Referral Agency Reporting Requirements," of HUD Handbook 8000.1, Fair Housing and Equal Opportunity Complaint and Compliance Review Reporting and Control Procedures, as well as with Section III.D of the Memorandum of Understanding.

It has been the policy of the HUD Regional Office to recall referred complaints that the Commission has not been able to close after ninety days. These complaints are almost always cases in which a probable violation has been found, and conciliation attempts have achieved no resolution, and they form a distinct minority of the complaints the Commission handles. The Regional Office will then request the Commission's investigative file, initiate any further investigation that it feels mandated and attempt conciliation itself. If HUD too is unsuccessful in conciliation attempts, the complainant will be informed of his right to initiate civil litigation; if HUD is successful, the Commission will, unless the parties object, be furnished with a copy of the concilation agreement.

The proposed change in the current law would necessitate a number of changes in the present procedures in effect between the Commission and HUD. First of all, the mandatory language of present § 810(c) regarding referral to state agencies with substantially equivalent laws has been removed, and in its place is language which not only gives the Secretary discretion to refer, but also makes the complainant consent prerequisite to any referral.

Although I realize that the Secretary has previously stated her intent "to make every effort to refer cases wherever local agencies have equivalent fair housing laws and appropriate enforcement capabilities," I believe that making referral discretionary is unnecessary where the laws of a State have been found to be substantially equivalent. It seems that the proper procedure, in cases in which State procedures have proved inadequate, would be to revoke that State's certification as a jurisdiction possessing substantially equivalent laws and procedures. Making referral discretionary would merely create a potential hurdle to the rapid processing of complaints needed to assure that complainants' rights be protected.

I also have difficulty with the concept of complainants needing to approve referral of their complaints. Again, this would seem another potential hurdle to expeditious referral for the simple reason that some explanation of the reasons for referral, and the manner in which it would affect the complainant's rights, would probably be necessary for the complainant to make an informed decision. If any less than an informed decision is contemplated by the proposed amendment, the provision is largely meaningless.

An aspect of the proposed amendment which I strongly support is its removal of the thirty-day complaint processing provision contained in present § 810(c). I believe that investigations are almost inevitably commenced by the Commission within the thirty-day period contemplated, but with complaints alleging substantial issues it may be impossible to do more than make a beginning within this time limit. This problem is augmented by the fact that the investigators who investigate fair housing complaints for the Commission also investigate complaints of over twenty other boards under the Virginia Department of Commerce. Consequently, they are extremely busy and if initial attempts to interview a complainant, or other key witness to an act of discrimination, fail, it may of necessity be more than thirty days before further steps can be taken.

As an aside, I might mention that I feel that far more significant than the deletion of this thirty-day complaint processing time limit is the substantial extension of the present 180-day period within which a complainant can proceed in court. The proposed three-year statute of limitations is much more realistic, both from the standpoint of bringing it into focus with analogous statutes for other causes of action, and also from that of giving procedures designed to preclude litigation sufficient breathing space to succeed. I also feel that it is only the adoption of this proposed three-year statute of limitations that makes deletion of the thirty-day complaint processing period viable. With the present 180-day time frame, even State agencies like the Commission which are committed to a zealous enforcement of fair housing may occasionally not be able to conclude the investigations and conciliation process within the time allowed. With this in mind, it is doubly important for investigation to have commenced within thirty days.

Finally, I would like to address myself to the recall provision. Present § 810(c) provides that the Secretary shall have the right to recall a referred case where in "the circumstances of the particular case, the protection of the rights of the parties or the interests of justice require such action." The proposed amendment would remove this provision, and instead states that unless the State agency consents, the Secretary shall take no further action.

I believe that if the Secretary has discretion whether to refer a complaint in the first place, no recall should be needed if that discretion is exercised in favor of

referral. But as I have noted, I do not favor the discretionary aspect of the referral and if this is removed, I believe a recall possibility makes sense. There are several reasons for this.

First of all, even though the Commission's powers are substantially the same as HUD's with reference to fair housing violations, and even more extensive with reference to the real estate licensees it regulates, there have been complaints which the Commission has not been able to conciliate which HUD has. This does not happen frequently, but it does happen and the fact that it happens at all is, in my opinion, sufficient reason for a recall capability. There is also an intangible factor here that a respondent who realizes that another administrative agency is waiting in the wings is probably more likely to settle with the first agency rather than have to go through it all again with another. I have seen this happen.

I also feel that a recall provision could be significant if H.R. 2540 passes substantially in its present form because the Secretary would then possess more substantial powers to serve as an incentive for conciliation at the State level. Obviously this incentive would exist only if there was a possibility of recall.

In summary, I feel that the discretionary aspect of proposed § 810(a)(3) is ill-advised, for the reasons I've given; that the thirty-day complaint processing period in the present law is unnecessary if the proposed three-year statute of limitations is approved; and that retention of the present recall provision is preferable to making the initial referral discretionary.

The Commission's relations with the HUD Regional Office in Philadelphia have been amiable and productive over the period of the Memorandum of Understanding. The two agencies have been primarily concerned with the rights of individuals, not with competing for statistics. I hope this relationship will continue and be enhanced by the passage of H.R. 2540 which, despite my reservations regarding § 810(a)(3), I think is a sound and needed bill.

Mr. KAST. First I would like to make a general comment. Then I will proceed to deal specifically with the section of the bill that deals with referrals and substantial equivalency, which is the section where my comments will probably be most relevant.

I would like first to note there is a typographical error on page 1, line 3 of the comments that I have submitted. It refers to House Resolution 2540. It should, of course, be House bill or H.R. 2540.

Generally, I am very much in favor of the bill. I feel, working as I have now for slightly more than a year with the Virginia fair housing law, that the problems that we have seen with Virginia's law, which is of course substantially the same as federal law in its present form, are basically problems of enforcement. I think that H.R. 2540 will be very significant in correcting a lot of those problems, and making the administration of fair housing generally a process with much more credibility.

As the law presently reads the sanction which is to be applied, and which is first to be resorted to in all cases, is conciliation. The problem that we have, which I understand exists at the federal level as well, is that when there is a limited amount of clout behind the conciliation process, conciliation can become an extremely difficult sanction to employ.

That's the problem we have generally seen and I feel H.R. 2540 would largely remedy that.

Having said that, I would like to go through my prepared comments briefly, and then as I note in those comments, I would be happy to answer any questions that members of the subcommittee or counsel for the subcommittee might have.

The Virginia fair housing law was passed back in 1972. In 1978, July 22d of that year, the Virginia Real Estate Commission entered into an agreement with HUD providing for cooperation and coordination between the agencies in processing fair housing complaints. This had been something that Virginia had been working for for

297

some time. There had been some opposition, but we finally succeeded in getting substantial equivalency, as I said, July 22d of last year. Since that time I think that the process has worked smoothly. There have been critics, as there were prior to the substantial equivalency being granted, but I believe—and I think that the people with the HUD regional office in Philadelphia would back this up—that the cooperation between the two offices has been smooth, and that we have worked together pretty well in seeking to implement the fair housing laws.

Presently the commission receives referrals, as I noted, from the HUD regional office. I receive these referred complaints, acknowledge their receipt as quickly as I can, and forward the complaint forms to the enforcement section of the Virginia Department of Commerce, the overall agency under which the Virginia Real Estate Commission is located in the system of State government. The 30-day period for commencement of investigation that is required by the present section 810(c) of the Federal fair housing law commences with my acknowledgement of the receipt of these complaints.

After that, on a 30-day basis, the commission reports to HUD on the status of these referred complaints. The reporting status is carried out in compliance with a substantial equivalency agreement and other relevant sections of the law.

It has been the policy of the HUD regional office to recall referred complaints that the commission has not been able to close after 90 days. These complaints are almost always, to my knowledge, complaints in which there has been a probable cause finding, or reasonable cause finding, and in which there is a conciliation process underway which has gotten bogged down.

In most cases we are able to conciliate cases in which we find reasonable cause. In some case, however, we aren't or the process becomes so attenuated that the successful outcome is sufficiently in doubt that the regional office recalls after the 90-day period has passed. HUD will then typically undertake conciliation of its own if it concurs in our factfinding, which to my knowledge it has in all recalled cases to date. In some cases HUD is successful where we have been unseccessful. In some cases, also, they themselves are unsuccessful and have to inform the complainants of their remedies in court.

The proposed change in the current law would necessitate a number of changes in the manner in which the referral process presently works. First of all, the new language of the bill would change the present referral mechanism by, changing the present language of section 810(c), which is mandatory, to make the referral process discretionary on the part of the Secretary.

I realize that the Secretary has previously stated her intent "to make every effort to refer cases wherever local agencies have equivalent fair housing laws and appropriate enforcement copabilities." But I still believe that making referrals discretionary is unnessessary where the laws of the State have been found substantially equivalent, and that State's enforcement of those substantially equivalent laws is unquestioned, which I believe is the case in Virginia. It seems to me that the proper procedure in cases in which these factors exist would be to refer the cases as they pres-

ently are, on a pro forma basis, without bringing into more play any possibility of discretion.

In the case in which State laws were not being effectively enforced, it would seem to me the proper procedure would be to revoke that State's certification as a jurisdiction possessing a substantially equivalent law and procedure. Making referral discretionary would create a potential hurdle to the efficient processing of complaints needed to assure that complainants' rights be protected.

The new law also would make the complainant's consent prerequisite to any referral. Again, this seems to me another potential hurdle to expeditious referral for the simple reason that some explanation of the reasons for referral, and the manner in which it would affect the complainant's rights, would probably be necessary for the complainant to make an informed decision as to whether or not he wanted his complaint referred. If any less than an informed decision is contemplated by the proposed amendment, the provision is largely meaningless. For this reason, I oppose the consent of the complainant being prerequisite to referral.

An aspect of the proposed amendment which I strongly support is its removal of the 30-day complaint processing provision. My comments here may seem more stringent than they need to be with reference to the wording of the Federal law, which states basically that an investigation of a fair housing complaint should be commenced within 30 days. This is because the Virginia Real Estate Commission has a regulation based upon this requirement of the Federal law which is perhaps not as clear as the Federal law and which has led some to claim, and to have their interpretation granted some credence in Virginia, that the 30-day requirement requires that an investigation not only be commenced but concluded within 30 days.

I think that there are cases in which more than commencing an investigation within 30 days is very difficult. It is certainly unlikely in cases of any complexity that those can be concluded within 30 days. I think the removal of the 30-day provision would be very helpful in alleviating some of these problems.

I do believe, and I want to be sure to mention this that far more significant than arguments pro or con on the 30-day period is the proposed expansion of the present 180-day period within which a complainant can proceed in court. The bill in question would extend this to a 3-year statute of limitations, which I feel is much more realistic both from the standpoint of bringing it into focus with analogous statutes for other causes of action, and also from that of giving procedures designed to preclude litigation sufficient breathing space to succeed. I also feel that it is only the adoption of this proposed 3-year statute of limitations that makes deletion of the 30-day complaint processing period a viable option. With the present 180-day time frame, even State agencies like the Virginia Real Estate Commission which are committed to fair housing may occasionally not be able to conclude the investigation and conciliation process within the time allowed.

Finally, I would like to address myself to the aspect of the proposed amendment which would delete the ability of the Secretary to recall a referred complaint and have a substantial impact

299

on the present manner of implementation of the substantial equivalency agreement between HUD and the real estate commission. As I noted earlier, I do not believe that the discretionary aspect of the referral is needed or would be productive. With that in mind, if the discretionary aspect is deleted from the present bill, I would favor a recall provision. I think it's far preferable to refer the case initially, with no questions asked, to States which have substantially equivalent laws, than it is to make that a discretionary referral. But, this having been done, I think this recall provision makes sense.

My experience with working with the HUD regional office has been a very cooperative one in which, as I noted earlier, some cases which the commission is not able to conciliate, HUD is. This does not happen frequently, but it does happen.

More significant perhaps is the potential for another administrative agency waiting in the wings. I think it's a very productive intangible factor to have in negotiating and attempting to conciliate, to be able to tell a respondent in a fair housing case that HUD will recall the case, that there will be another investigation, that there will be a further conciliation procedure—all of which will be time consuming and expensive, et cetera.

I have seen this have, I believe, a very productive effect on our ability to obtain conciliation at the State level.

For these reasons I would favor a recall provision, but only in conjunction with a deletion of the discretionary aspect of the initial referral.

In summary, I feel, as I have noted, that the discretionary aspect is ill-advised; that the 30-day processing period in the present law is unnecessary if the proposed 3-year statute of limitations is approved; that retention of the present recall provision is preferable to making the initial referral discretionary.

Having said that, I would like to state that I believe, as I believe I said earlier, that the commission's relations with the HUD regional office in Philadelphia have been amiable and productive and I hope they will continue to be so. I further hope that the relationship will be enhanced by passage of the present bill, I hope substantially in its present form.

Thank you.

Mr. EDWARDS. Thank you very much, Mr. Kast. You have made some very good suggestions, and I think that we would agree with many of them, and your experience has been very valuable to us also.

Now, what are we going to say to people who might say that Mr. Kast testified that conciliation works pretty well in Virginia. His own testimony is that conciliation attempts received no resolution form a distinct minority of the complaints the commission handles.

I know that people might say that.,

Mr. KAST. Perhaps I was being too optimistic. We do have cases we can't settle. We do have cases in which conciliation fails. We do have cases in which persons competently advised by counsel tell us, you can't do a thing to me and I'm not going to talk to you. This is a problem that perhaps I wasn't sufficiently clear in expressing. But it is a problem that I feel is derivative from the present Federal law, which in turn has led to the generation of the present

300

Virginia law in emulation of it, both of which have insufficient teeth. One aspect of the Virginia law which is different from the Federal law and which I think perhaps helps the commission in its attempt to conciliate is that the Virginia Real Estate Commission, in any case in which a licensed real estate salesman or broker is concerned does have a certain amount of credibility and clout based on the realization of the respondent that unsuccessful conciliation will lead to a license revocation or suspension hearing by the commission.

Having said that, I do believe that a minority of the complaints that we receive concern licensees, but with licensees we have the additonal bit of enforcement authority to give us more credibility.

But I do feel that the main problem with the Federal law in its present from is that it doesn't have sufficient enforcement authority written into it, and that the substantial changes that would be implemented by bill 2540 would have a very beneficial effect on that.

Mr. EDWARDS. About how many fair housing complaints has your commission received in the last year?

Mr. KAST. It's hard to say. I could give you a pretty good idea of the referrals that we had from HUD. We also do receive a substantial number, although I would say a lower number than referrals, of direct filing from people who complain directly to the commission. I would imagine over the year that we would probably have 15 to 20 active cases on going at all times on a monthly basis. Now, that's possibly confusing because those cases aren't always new cases. Some of them may be more than a month old, so it's hard for me to give you a real figure on how many the commission does have. But I would say 15 to 20 cases each month that are still active files and that are being investigated or some action has been taken in would be an accurate figure.

Mr. EDWARDS. Counsel.

Ms. COOPER. Mr. Chairman, I have some figures that HUD has supplied. They indicate in 1977 Virginia received approximately 107 complaints and in 1978, 72 complaints. But, no I'm not sure whether that refers just to referrals.

Mr. KAST. That would be just referrals, because the only statistics they can generate would be what they had referred to us. As I said, we also received direct filings, although I'm sure a lesser number.

Mr. EDWARDS. If this bill is enacted by Congress then in order to obtain substantial equivalency Virginia will have to amend its fair housing law in several respects, broadening both coverage and enforcement rights. Do you think legislation like that could pass the Legislature of Virginia?

Mr. KAST. That's a very difficult question for me to respond to. I have in the past session of the general assembly suggested changes in the present Virginia law which would have made some changes in the Virginia law comparable to what this bill would achieve at the Federal level. Those suggestions didn't get through. As I'm sure you are aware, the legislative process is not something that is generally a one-shot job, and we will keep pushing for those, and I think the passage of this bill would certainly give the Virginia Legislature and added reason for wanting to enhance its laws.

301

Mr. EDWARDS. Thank you, Counsel.

Ms. COOPER. Thank you. Does the Virginia fair housing law cover the particular class of the handicapped?

Mr. KAST. It doesn't. It conforms to the present Federal law in the categories of persons protected from discrimination.

Ms. COOPER. What do you think is the purpose of referrals? Why not just have the Federal Government enforce the law?

Mr. KAST. Well, I don't think there is less resentment of local enforcement than there is of Federal enforcement, but it's possible that that would be an argument for it. But when we go out from Richmond, I think we get as much static as the people do coming from Philadelphia. But I do feel, simply from the standpoint of making the wisest use of your time and resources, it makes more sense to keep enforcement and administration of Virginia's laws in Virginia, rather than having people have to come, as they would have to in this instance, from Philadelphia. Enforcement of the fair housing law is not something you do from behind a desk. It's a matter of setting up conciliation meetings, getting people together, going all over the State in a lot of instances. It's rare that conciliation is achieved on a first meeting. It's usually more like two or three meetings that have to be held over a long period of time, and simply from the standpoint of having your resources most conveniently located for administration, it makes more sense to have it run from the capital of the State that you're talking about enforcing the law in, than from outside the State.

Ms. COOPER. Do you have your own investigators?

Mr. KAST. Yes.

Ms. COOPER. How many do you employ?

Mr. KAST. I think that there probably are about—I can't give you an exact figure—but about 30 investigators. These are investigators for the entire Department of Commerce, and the Department of Commerce contains some 25 or 26 different administrative boards, one of which is the Real Estate Commission. So they aren't investigating just fair housing complaints by any means. However, they have been instructed to give fair housing priority and they are, I think, responding to the best of their ability. They have been so instructed because in most cases the issues are more pressing and there are often rights that are irretrievably lost in a short period of time if they don't conclude those investigations quickly.

Ms. COOPER. In the course of their investigations, do they act as testers on occasion?

Mr. KAST. They do, in some instances. They also, in cases in which a substantial amount of testing would seem to be called for, and for which they just don't have the time or resources, request cooperation from "Housing Opportunities Made Equal," which is, as you probably know, a nonprofit organization in Richmond and in a number of other major metropolitan areas which is committed to fair housing. I guess I should say as an aside that the commission's relationship with HOME has been one of peaks and valleys. We are, I hope, getting a little bit closer together on our priorities at the moment. But we have requested and gotten cooperation from them for large-scale testing where it seemed called for.

Ms. COOPER. Thank you, Mr. Kast.

Mr. BOYD. Thank you, Mr. Chairman.

003100

302

As Virginia born and raised, I'm proud to learn that Virginia is one of the 21 States the Leadership Conference referenced earlier as being certified, and I presume also confident in its effectiveness.

Having said that, I assume from your remarks that you would favor referral be made mandatory so long as there was a recall provision of sufficient length. Is that accurate?

Mr. KAST. Right. I would favor that option.

Mr. BOYD. How long would that referral period be?

Mr. KAST. Well, I guess it would have to be extended to conform to some extent to the extended statutes of limitations.

Mr. BOYD. Well, you mentioned earlier 90 days.

Mr. KAST. Right. Ninety days is the period we're working with with the regional office now, and I have no particular difficulty with that in most cases. In cases where we seem to be getting a handle on a complaint, or have made a reasonable cause determination and are proceeding to conciliation, I have had no problems in dealing with the people at HUD, explaining to them the situation and getting them to say, OK, you go ahead with it because obviously you're far enough along that for us to recall it now would be counterproductive. As long as relationships of this nature can be maintained, I have no difficulty with the 90-day provision and I think it makes a lot of sense.

If the present 180-day statute of limitations were extended to 3 years, you wouldn't have the problem of rights being irretrievably lost, as you presently do. But I still think that a 90-day provision or a provision along those lines would be appropriate. There are very practical reasons if a person is going to be commencing a civil action in court. The sooner the better as far as getting your witnesses together, making sure their stories are straight, and all the other practicalities of litigation that lawyers are aware of.

Mr. BOYD. Current law provides that at the time of recall, after 30 days the Secretary must have certified that under the circumstances of a particular case the protection of the rights of the parties or the interest of justice require recall. Would you prefer that language remain in or do you think it ought to be automatic?

Mr. KAST. I really have no strong feeling on that language. I have seen it many times because the letter we get in cases that they do recall after 90 days is typically so worded. We haven't had any problem with the 30-day provision in my tenure working with the fair housing law, and I think that the regional office has been interpreting that to mean that if some action has been taken, the investigation has been commenced within 30 days and there is no need to recall. We have had some recall after 90 days, as I said, but as to that specific language, I have no strong feelings about it, really. Retaining it is fine with me.

Mr. BOYD. If you extend the statute of limitations from 180 days, what time period would you favor? The bill provides for 3 years. Previous witnesses have stated there is no particular magic to 3 years; it could just as easily be 2 years from the standpoint of inevitable staleness of witnesses. How would you feel about that?

Mr. KAST. I would agree. I think that in Virginia, for instance, the most closely analogous statue of limitations would be the 2-year statute on commencement of civil actions generally, and that the 3-year statute in this bill was probably patterned upon a State which

has a 3-year statute for commencement of civil action. I don't know. I think that two would serve the purpose equally well. I do feel that it is appropriate to extend it to at least 2 years. I was reading a case not too long ago, which I believe was from Ohio, in which the court was faced with the problem of the most closely analogous statute of limitations governing an action under the Old Civil Rights Act of 1866 and picked up the 180-day statute of limitations out of the Federal Fair Housing Act and used that even though Ohio's statute was 4-years. I would hate to see that sort of thing happen widely in a case where there was any question about a statute of limitations.

Mr. BOYD. Thank you. No more questions.

Mr. EDWARDS. Thank you very much, Mr. Kast, for your excellent testimony.

Mr. KAST. Thank you very much, Mr. Chairman.

Mr. EDWARDS. That winds up our hearing for today. We're going to move ahead on this bill as fast as we can, and we thank all of you.

[Whereupon, at 11:30 a.m., the hearing was adjourned.]

003103

# THE FAIR HOUSING AMENDMENTS ACT OF 1979

---

## THURSDAY, MAY 3, 1979

House of Representatives,
Subcommittee on Civil and Constitutional Rights,
Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met at 9:30 a.m. in room 2226 of the Rayburn House Office Building; the Honorable Don Edwards (chairman of the subcommittee) presiding.

Present: Representatives Edwards, Volkmer, Hyde, Sensenbrenner, and Butler.

Staff present: Janice Cooper, assistant counsel; and Thomas Boyd, associate counsel.

Mr. Edwards. The subcommittee will come to order.

We are going to continue today with witnesses regarding H.R. 2540 and today's witnesses are going to present markedly different viewpoints and experiences and their testimony will certainly enliven the debate on this important proposal.

Our first witness is Mr. Charles Osenbaugh, international president of the Society of Real Estate Appraisers. The society is one of the major sources of training for appraisers in this country, and the content of that training material has come under scrutiny in recent years.

This arises because of the important impact appraisal decisions can have on the lending process.

In the not so distant past, appraisal decisions were often openly based upon adverse assumptions about racial minorities. Racial integration and racial change were universally taught to have a negative effect on property values, but as the documented studies you have submitted show, this not only unfounded, but often, the opposite of the truth.

We are pleased to see that responsible organizations are now disclaiming the factual inaccuracies that in the past had caused undervaluation of property in black and integrated neighborhoods.

However, I understand that the society objects to the thrust of this bill, and I am therefore anxious to hear your views.

Congressman Butler, would you introduce the panel?

Mr. Butler. Thank you, Mr. Chairman.

I appreciate the chance to spend a few minutes with you this morning. I have moved to another subcommittee, but I haven't lost interest in what you are doing here.

My reason for being present today is to call your attention to the fact that one of your panel of real estate appraisers this morning is Ron Thompson from the city of Roanoke, one of the outstanding appraisers in our area.

(305)

306

Back in the days when I worked for a living I had an opportunity to work with him and I would suggest to you that his professional qualifications are the very highest. You can have complete confidence in what he tells you.

I am pleased that a person of this caliber would take the time to share his views with this committee.

I do appreciate the chance to participate a few moments with you today. I will be moving on to other subcommittees, but I appreciate the chance and look forward to the testimony.

Mr. EDWARDS. Thank you very much, Mr. Butler.

I guess our first witness is Mr. Charles Osenbaugh, international president of the society of Real Estate Appraisers.

Mr. Osenbaugh, we would request that you introduce your colleagues, and without objection your full statement may be made a part of the record and you may proceed as you wish.

## TESTIMONY OF CHARLES L. OSENBAUGH, INTERNATIONAL PRESIDENT OF THE SOCIETY OF REAL ESTATE APPRAISERS; R. JAMES FRANK, JR., PRESIDENT OF R. J. FRANK AND ASSOCIATES, PORTLAND, OREG.; F. GREGORY OPELKA, SENIOR VICE PRESIDENT OF THE SOCIETY AND EXECUTIVE VICE PRESIDENT AND SENIOR APPRAISER OF FAIRFIELD SAVINGS AND LOAN ASSOCIATION, CHICAGO, ILL.; AND RONALD S. THOMPSON, PRESIDENT OF THOMPSON APPRAISAL CO., ROANOKE, VA.

Mr. OSENBAUGH. Thank you, Mr. Chairman.
[Prepared statement follows:]

### SUMMARY OF TESTIMONY

Mr. Chairman: My name is Charles L. Osenbaugh, and I am International President of the Society of Real Estate Appraisers and President of Osenbaugh and Associates Houston and Dallas, Texas, a commercial and residential appraisal company which has done thousands of appraisals over the past few years. With me this morning at the table are R. James Frank, Jr., President of R. J. Frank and Associates, Portland, Oregon, and past International President of the Society; F. Gregory Opelka, Senior Vice President of the Society and Executive Vice President, and Senior Appraiser of Fairfield Savings and Loan Association, Chicago, Illinois; and Ronald S. Thompson, President of Thompson Appraisal Company, Roanoke, Virginia, and Chairman of the Society's Public Affairs Committee. Also present is the Society's General Counsel, Paul L. Perito.

We appreciate the opportunity to appear before you this morning to discuss with you and the other members of the Subcommittee our views and concerns with H.R. 2540, the Fair Housing Amendments Act of 1979.

In accordance with the Rules of the Judiciary Committee we have provided you Subcommittee with a copy of our complete statement along with numerous attachments which we hope will be of assistance to the Committee. We would respectfully request that our entire statement be included in the record. In the interest of time, and with your permission, I would like to present a summary of that statement.

Mr. Chariman, the Society is the largest independent real estate appraisal organization in the United States with more than 18,000 independent, institutional and governmental appraisers. We are the largest recognized body of residential appraisers in the United States. As such we feel that we are uniquely qualified to discuss various aspects of this proposed legislation. The Society is a teaching entity, a certifying and designating entity and a disciplining entity.

It is important to understand that the Society is an independent organization of appraisers and is not affiliated with the National Association of Realtors. We are not here speaking for realtors, brokers, rental agents or lenders; nor can we speak for them. We are here speaking only on behalf of appraisers.

We wish to emphasize that the Society has, for many years, been a strong supporter of federal and state fair housing laws. As an example, I refer you to the 1975 Equal Opportunity Resolution of the Society's Board of Governors, which

Resolution reaffirmed the Society's abhorrence of discriminatory practices which have always been prohibited by the Society's Code of Ethics and Standards of Professional Practice and Conduct. Even though appraisers and the appraisal practice were not mentioned in the action or in the legislative history, we began working with HUD's Office of Voluntary Compliance in 1973 in an effort to eliminate discrimination in housing to the extent that we, as appraisers, could help. We informed HUD that we would work with them to correct any problems in the area of appraisal practice in our mutual interest of effecting fair housing practices. We have also always supported the underlying purposes of the various state and federal non-discriminatory rules and regulations relating to the lending practices of financial institutions. Steering, redlining and similar actions find no support among our membership and such practices have always been opposed by the Society and have always been in violation of our Code of Ethics and Standards of Professional Practice and Conduct. Let me emphasize that, unlike brokers and realtors, there is no financial gain for appraisers, no economic advantages for appraisers, to be involved in steering or redlining practices.

The Society is gravely concerned that this proposed legislation, as drafted, will have a substantial, adverse and unwarranted impact on appraisers and the appraisal profession throughout the United States. Primarily we fear that this legislation will affect our members' ability to practice their profession by limiting their First Amendment rights to consider the factors or report the facts as they exist in the marketplace in an objective opinion of market value. Most troublesome are the enforcement powers, especially the "injunctive" type of relief and the "cease and desist" power, which this legislation proposes to grant to the Secretary of HUD. When viewed in the context of the proposed internal HUD hearing procedures which combine investigative, prosecutive, adjudicative and appellate functions within the Secretary of HUD, we are convinced that such broad enforcement authority will inevitably lead to a hammerlock on any single appraiser or other individual or professional group accused of alleged discriminatory activity. Such potentially unbridled authority may preclude a fair hearing on the charge and could effectively intimidate appraisers or groups from exercising their First Amendment rights to consider and report in a responsible and non-prejudicial manner all relevant factors impinging upon or affecting market value. Without question, Mr. Chairman, the mere threat of an investigation involving alleged discriminatory conduct, not to mention a protracted hearing, would most likely result in the bankruptcy and ruin of an individual appraiser vis-a-vis his client base.

In addition, we fail to find sufficient support in the hearings on this bill or on the bill in the last session of Congress, to warrant the radical departure from the Congressional intent of voluntary compliance embodied in the 1968 Fair Housing Act. Unfortunately, we think the record demonstrates, tragically, the inadequate and insufficient effort on the part of HUD to make the 1968 Act succeed, as Congress originally intended.

We are aware, Mr. Chairman, that it is never popular to testify in opposition to a piece of Civil Rights legislation having underlying laudatory purposes. We sincerely hope that our opposition to this legislation, as written, will not be misinterpreted. We do not question the sincere desire by this Subcommittee, the sponsors of the bill and responsible HUD officials to properly police violations of the Fair Housing Act. Yet, we have counterbalancing concerns that this proposed enforcement mechanism will have a "chilling" effect, as well as actual, adverse impact, upon our members who responsibly attempt to practice their profession consistent with the teachings of the Society, with the realities of the marketplace and with their First Amendment right to report the truth.

We feel we are confronted in this legislation with a clash between two constitutional principles, the right of every American to secure equal housing opportunity and the right and responsibility of professional appraisers to consider and report factually oriented information affecting market value in a manner consistent with their First Amendment rights. You must realize, Mr. Chairman, that if we fail to properly reflect market value of a subject property, then we expose ourselves to malpractice actions from our clients.

The Society has had no small involvement with Title VIII and the various federal agencies and departments responsible for enforcing Title VIII. In order to understand our concerns with this legislation, we feel that it is necessary that you understand some of this history. Between April 1976 and July 1978 the Society was engaged in litigation with the Department of Justice for alleged violations of Title VIII of the Fair Housing Act. Without going into the details of that litigation, which are discussed in our prepared statement, it is enough to say that after two years of extensive and costly discovery, the Department of Justice dismissed the Society, with prejudice, from the lawsuit. Subsequent to the dismissal of the Society by the

308

Government, the Society published a brief policy statement concerning neighborhood analysis. This policy statement would galdly have been issued by the Society prior to the filing of the lawsuit if either the Department of Justice or HUD had asked it to do so.

While we maintain in the lawsuit that Title VIII did not cover appraisers, we are convinced that even if Congress did intend for Title VIII to cover appraisers, Congress would not intend it to be used to prevent them from exercising their First Amendment rights to report those relevant factors that impact upon market value or to cause appraisers to produce fictitious or directed market values.

Because of its size, the Society was able to survive that lawsuit. However, Mr. Chairman, we would like you to envision the effect on an individual appraiser of the enforcement machinery that this legislation proposes to establish. Mistakes caused by excessive but well intended zeal in the name of fair housing could cause the initiation of an investigation and enforcement procedure which has the potential of destroying the reputation of an appraiser and bankrupting that individual long before there can be a resolution of the allegations in the complaint. Frankly, the Society is concerned that HUD may choose to exploit the financial weaknesses of individual appraisers and use this weakness to force capitulation by that individual, whether culpable or not, solely for its deterrent effect. Moreover, since there is no definition of what constitutes a discriminatory appraisal or what constitutes discrimination in housing due to HUD's failure to publish Title VIII regulations and the Federal Home Loan Bank Board's failure to define "discrimination" in appraisal practice in its regulations, there is great danger that appraisers may face conflicting interpretations and charges.

The Society's Policy Statement reiterates the Society's position that sound appraisal practice requires that all relevant factors, including race, religion and ethnic factors, which exist in the marketplace and which impact upon market value, must be considered in a dispassionate, unbiased, non-prejudicial and objective manner by the appraiser in reaching an opinion of value. *The exclusion of any relevant factor from consideration may result in an incomplete appraisal and a fictitious or directed "market value".*

The Society's current communications with HUD and the Federal Home Loan Bank Board lead the Society to believe that this expansive enforcement authority will most likely result in the opening of investigations or the filing of complaints against appraisers for reporting the realities of the marketplace, thereby effectively prohibiting them from using, or even considering, facts or factors which, in their professional judgment, may affect market value in a neighborhood setting. As such, this would infringe upon appraisers' First Amendment rights and their professional responsibility to report and reflect relevant market facts and factors in their opinion of value. For example, on September 5, without consulting with any professional appraisal organization, HUD issued a Policy Statement regarding appraisal practices. It states in relevant part that the use of any racial, religious or ethnic factors is not only unlawful but irrelevant as a predicator or indicator of market value. HUD has deemed not only that the use of such factors is an alleged violation of federal law, but that such factors hereinafter are no longer relevant and therefore cannot be used in connection with appraisals of residential property.

In a similar vein, various examiners of the Federal Home Loan Bank Board have been interpreting the Bank Board's non-discrimination regulations as forbidding the use of certain words or phrases in appraisal reports. These include "church," "synagogue," "pride of ownership," "prestigious neighborhood," "poor schools," "declining neighborhood," and "homogeneous."

If HUD were to use these proposed enforcement powers, either directly or indirectly through intimidations and threats of hearings, to force appraisers not to consider certain factors and/or not to use certain words or phrases in appraisal reports, the appraisers would have to disregard not only sound appraisal practice and the Society's Policy Statement relating to neighborhood analysis, but would have to forego their First Amendment rights. In addition, such a requirement would force appraisers to ignore the realities of the marketplace and to produce appraisals with fictitious "market values." We believe that directed or fictitious market values affect most severely low and moderate income home buyers.

The continuing conflict between what well intentioned social planners believe our society should be and what, in fact, it is a particular stage in its development poses a dilemma for the ethical appraiser, as well as the ethical legislator, when confronted by the realities of a piece of property located within a neighborhood undergoing rapid change, be it ethnic, racial, religious, sexual or architectural. An appraiser must reflect what is happening to market value concerning the subject property within that neighborhood dynamic rather than what should be happening to market value given the best possible instincts of civilized man. The dialogue between

Senator Proxmire and a witness at a December Senate hearing, which is quoted at length in our written statement, well summarizes this conflict.

Our concern with the First Amendment rights of Appraisers is very real. Any enforcement action that would forbid appraisers from ever considering factors such as race, religion and national origin in preparing an appraisal report would appear to create substantial problems. It would undermine the rights of appraisers to consider and report, and consumers to receive and consider, truthful and factually oriented information as to the relevant facts existing in the marketplace which may or may not impinge upon market value. The "chilling effect" upon the free flow of factually oriented and truthful information between appraisers and consumers is too obvious to belabor.

Rather than run the risk of a future violation of the constitutional rights of appraisers, it would be better, and the Society would respectfully urge, that this legislation and any congressional reports accompanying it state that whenever factors such as race, religion and national origin impact upon market value and are considered in an opinion of value, they be used in an objective, unbiased, non-stereotyped fashion and that the articulation of these factors be supported by reasonably documented data in the appraisal report or the appraiser's files.

Mr. Chairman, the importance of having the appraiser estimate market value for property and not be intimidated from reporting or forbidden from considering the relevant factors which may impinge upon market value cannot be overemphasized. None of you, I know, would want to purchase a house on the basis of a fictitious or directed "market value". Nor would you want to purchase a house whose apparent worth does not reflect the factors which may impinge upon its market value. This would be especially true if, like many citizens today, you were investing your retirement savings in a piece of realty. Yet, a failure to consider all relevant factors, including race, religion and national origin, which may impinge upon market value will result in the creation of a fictitious or directed "market value". Historical experience with HUD programs has demonstrated, without question, that certain programs, no matter how well intentioned, have suffered badly when HUD's policies and practices result in the creation of fictitious or directed "market values". Monumental problems resulted for the very people the policies were intended to help; and the thousands of abandoned homes caused substantial embarrassment to the government.

The research that the Society did in preparing its "Inner City Valuation Study" which examined the considerations and techniques which FHA had applied to the estimation of value of inner city properties, revealed that the effect and attitude of policy directives of FHA management was to cause appraisers to be overly optimistic about the future of the areas in which they were appraising and to ignore any adverse influences which would have a negative effect upon value trends. Age of the property, zoning and building code compliance, certification and enforcement, adverse conditions existing in the neighborhood in which the property was located and remaining economic life of the subject property and its neighborhood were the factors which we found were being ignored by the FHA's appraisers with the encouragement of their superiors. We now know the result of that well-intended but ill-fated effort to ignore economic reality, i.e., inflated estimates of market value and an inordinate number of foreclosures and abandonments. The only joyful recipients of this myopic policy were the speculators. They gained at the great economic loss to the taxpayers and to those people intended to be assisted by the worthy objectives of that program.

It is the Society's firmly held opinion that prohibiting appraisers from considering and where appropriate, using all relevant factors which can affect an opinion of value will result in fictitious "market values" and substantial injuries to those very people who can least afford to be adversely affected financially. In the hearings before this Subcommittee last year, an incident of racial steering was described in which a black tester was offered a home at a price $2,500 lower than a white tester. This same example, however, can be used to draw an additional inference. Assume that the people involved were not testors but, rather, were persons genuinely interested in purchasing a home. It is obvious that significant manipulation of the sales price was going on. The only way in which a buyer and/or a lending institution can be protected from this type of unscrupulous manipulation of sales price is through an objective opinion of market value set forth in the appraisal. If the buyer pays an inflated price for a piece of property and then, for whatever reason, decides to sell that property within a relatively short period of time, that uninformed buyer will most likely lose his investment to the extent of the inflated sales price. For low- and moderate-income home buyers, this loss may well be the family's life savings. From the standpoint of the lending institution, if the property goes to foreclosure, the institution will only be able to recoup the actual market value of the property

310

and will lose that portion of the loan that they made based upon the inflated fictitious value.

If Congress, for reasons of social policy, decides that racial, religious or ethnic factors cannot be used in an estimate of market value, then Congress ought to amend federal statutes and alert the appropriate agencies which have issued regulations pursuant to those statutes, because the possibility exists that values reported are not in fact market values.

It is respectfully submitted that complaints by HUD as to the ineffectiveness of the 1968 Act are due primarily to HUD's inadequate staffing and insufficient funding of their Title VIII activities. Thus, it is the Society's contention that HUD, throughout the past ten years, has been understaffed and inadequately funded in its Fair Housing and Equal Opportunity effort, especially its Office of Voluntary Compliance. HUD's argument that it now needs this vast enforcement authority because it is unable to be succesful in its compliance and conciliation programs is, in large measure, a self-fulfilling prophecy-type of argument. Prior to obtaining such authority, HUD should be required to properly fund and staff its compliance efforts to determine if they will be effective as Congress originally intended in the 1968 Act. Only if that attempt fails should consideration be given to granting HUD enforcement authority.

Another serious omission, one which the Society thinks strongly argues against granting HUD, at this time, the enforcement authority sought in H.R. 2540, is the failure of HUD for over ten years to issue any substantive regulations dealing with what constitutes discrimination under Title VIII. There have been no regulations that go to the heart of Title VIII issues such as what actions constitute discrimination in appraising. We would urge that HUD first promulgate substantive regulations dealing with discriminatory actions under Title VIII which would provide due process protection (to all affected parties) and, if it is determined that these regulations are not effective, then come back to Congress to seek appropriate remedial enforcement powers.

Mr. Chairman, in our statement we have attempted to analyze sections of the proposed legislation that cause the Society problems. Rather than take your valuable time to recite these objections, we would like to refer you to our statement and make one final concluding point. In this area of budget constraints, spiralling inflation and efforts to hold down the costs of government regulations, we think it would be incumbent upon HUD to furnish this Subcommittee with their estimate as to the cost of the proposed enforcement procedures. This estimate should not only include the government's expenses but also the monetary impact on the delivery of housing to the consumer. In testimony before the Senate on this bill, the Assistant Secretary for Fair Housing and Equal Opportunity, the Honorable Sterling Tucker, indicated that the enforcement mechanism in terms of his office would involve approximately fifty additional field investigators and twelve attorneys, plus clerical staff, and would cost in excess of $2.5 million. It was not clear from his testimony, however, whether this figure included the administrative hearing costs. However, no estimates have been given as to the cost to the public or how this cost would affect people who are attempting to buy homes or rent apartments.

We greatly appreciate this opportunity which you have provided us to express our views, and we stand ready to respond to any questions which you and/or your colleagues might have concerning our statement and the Society's position in opposition to this legislation as presently drafted.

Thank you, Mr. Chairman.

Mr. OSENBAUGH. My name is Charles L. Osenbaugh, and I am international president of the Society of Real Estate Appraisers— Society. More than 30 years of my life have been devoted to the appraisal profession. A substantial portion of my professional life has been spent as a teacher of appraisal students and as a lecturer of professional appraisers who seek higher designations. I have been fortunate to receive the highest designations in the United States, namely the SREA designation from the Society of Real Estate Appraisers, and the MAI designation from the American Institute of Real Estate Appraisers.

With me this morning is R. James Frank, Jr.—SREA president of R. J. Frank and Associates, Portland, Ore., and past international president of the society; F. Gregory Opelka—SREA, MAI—senior vice president of the society and executive vice president, and

003109

senior appraiser of Fairfield Savings and Loan Association, Chicago, Ill.; and Ronald S. Thompson—SREA, MAI—president of Thompson Appraisal Co., Roanoke, Va., and chairman of the society's public affairs committee.

The society appreciates the opportunity which you, Mr. Chairman, and the other members of the subcommittee have provided us to appear at this hearing to present our views on H.R. 2540, the Fair Housing Amendments Act of 1979, introduced by you and Congressman Drinan.

Perhaps some brief background concerning the society would be helpful to your subcommittee in understanding the context of our concerns if H.R. 2540 is enacted, as written. The society is the largest independent real estate appraisal organization in the United States. Our diverse nationwide membership is comprised of more than 18,000 independent, institutional and governmental appraisers. Our membership is unique in that we have the largest recognized body of residential appraisers in the United States. The society is a teaching entity with a vast array of educational courses, seminars and publications. The society is also a certifying and designating entity in that we award special designations upon completion of required educational courses, demonstration appraisals and appropriate professionally oriented experience. In addition, the society is also a disciplining entity. Members must subscribe to what we believe to be a professionally compelling but enlightened set of ethical constraints contained in our code of ethics and standards of professional practice and conduct.

At the outset, the society wants to emphasize its long standing support of Federal and State fair housing laws as set forth, for example, in the 1975 equal opportunity resolution of the society's board of governors. This resolution reaffirmed the society's abhorrence of discriminatory practices which have always been prohibited by the society's code of ethics and standards of professional practice and conduct. A copy of this resolution is attached to this statement as attachment A. As background to this resolution, Mr. Chairman, you should be aware that the society began working with HUD's Office of Voluntary Compliance in 1973, even though appraisers and the appraisal process were not mentioned in the 1968 Fair Housing Act or in any of the legislative history of that act. We expressed a desire to cooperate with the Office of Voluntary Compliance in assessing discrimination in housing. We informed HUD that if staff would advise us of any problem or potential problem in the area of appraisal practice, we would work with them to correct the problems in the mutual interest of effecting fair housing practices. We published the resolution referred to above voluntarily and in the interest of furthering the aims of equal housing opportunities for all Americans.

In addition, the society has always supported the underlying purposes of the various State and Federal nondiscriminatory rules and regulations relating to the lending practices of financial institutions. At the same time, the society has, on occasion, offered constructive criticism as to the impact that some of these rules and regulations may have on appraisal practices and the costs associated therewith.

312

Mr. Chairman, the society requested the opportunity to appear before this subcommittee because we are gravely concerned that this proposed legislation, as drafted, will have a substantial, adverse and unwarranted impact on appraisers and the appraisal profession throughout the United States. Let me emphasize again the society's unalterable opposition to all discriminatory housing practices. Steering, redlining, and similar actions find no support among our members. However, because we fear that this legislation will affect our members' ability to practice their profession by limiting their first amendment rights to consider the factors or report the facts as they exist in the marketplace in an objective opinion of market value, we believe we must oppose certain aspects of this bill. Most troublesome are the enforcement powers, especially the injunctive type of relief and the cease and desist power, which this legislation proposes to grant to the Secretary of HUD. When viewed in the context of the proposed internal HUD hearing procedures which combine investigative, prosecutive, adjudicative and appellate functions within the Secretary of HUD, we are convinced that such broad enforcement authority will inevitably lead to a hammerlock on any single appraiser or other individual or professional group accused of alleged discriminatory activity. Further, such potentially unbridled authority may preclude a fair hearing on the charge and could effectively intimidate appraisers or groups from exercising their first amendment rights to consider and report in a responsible and nonprejudicial manner all relevant factors impinging upon or affecting market value. Without question, the mere threat of an investigation involving alleged discriminatory conduct, not to mention a protracted hearing, would most likely result in the bankruptcy and ruin of an individual appraiser vis-a-vis his client base.

In addition, we fail to find in the hearings on this bill or in the hearings on its predecessor in the last session of Congress, H.R. 3504, sufficient support to warrant the radical departure from the congressional intent of voluntary compliance embodied in the 1968 fair housing act. In our considered judgment, this bill substantially changes the thrust of the 1968 act by placing emphasis on enforcement authority rather than on voluntary complaint and conciliation. Unfortunately, we think the record demonstrates, tragically, the inadequate and insufficient effort on the part of HUD to make the 1968 act succeed, as Congress originally intended.

The members of the society's public affairs committee and executive subcommittee have attempted to seriously consider and responsibly evaluate this proposed legislation. We were initially concerned that our opposition to the legislation, as written, might be misinterpreted. It is clearly never popular to testify in opposition to a piece of civil rights legislation having underlying laudatory purposes. We do not question the sincere desire by this subcommittee and responsible HUD officials to properly police violations of the Fair Housing Act. Yet, at the same time, we have counterbalancing concerns that this proposed enforcement mechanism will have a chilling effect, as well as actual, adverse impact, upon our members who responsibly attempt to practice their profession consistent with the teachings of the society, with the realities of the

313

marketplace and with their first amendment right to report the truth.

In short, we are confronted with a clash between two substantial constitutional principles, that is, due process property rights and the parallel interest of every American to secure equal housing opportunity and the concommitant right and responsibility of professional appraisers to consider and report factually oriented information affecting market value in a manner consistent with their first amendment rights. In a parallel vein, we are concerned that if we fail to properly reflect market value of subject property, then we expose ourselves to subsequent malpractice actions from our clients. Mr. Chairman, we believe that you will not consider our opposition in any context other than a sincere desire to advise this subcommittee of our concerns as to the possible ramifications of this legislation and to hopefully assist this subcommittee in effecting appropriate change, thereby responding to competing constitutional demands in an exceedingly complex area.

The society's concerns with certain aspects of this proposed legislation are due, in no small part, to our past and ongoing experiences with title VIII and HUD, the Federal Home Loan Bank Board and the Department of Justice. It is necessary, Mr. Chairman, that you understand this background in order to appreciate our concerns with the potential impact of this legislation on appraisers and the appraisal profession.

Between 1973 and 1976, the society was engaged in an ongoing working relationship with HUD's Office of Voluntary Compliance. In response to questions by society officials, the Director of the Office of Enforcement at HUD informed us that no discrimination cases had been brought by HUD against appraisers and that no discrimination complaints had been filed against appraisers.

During the last summer of 1975, society officials met with a trial attorney in the Civil Rights Division of the Department of Justice and were told that Justice had active investigations concerning complaints of discrimination underway against 12 to 15 individual appraisers. Society officials were also told that Justice had an investigation of the industry in progress and that, in the event that problems were found to exist, the society would be informed about them and given an opportunity to correct them prior to litigation. Subsequent to that meeting and at the request of the Department of Justice, the society published an article explaining to its members the Justice Department's concern that appraisers comply with the underlying purposes of title VIII of the Civil Rights Act of 1968. A copy of that article is attached to this statement as attachment B. It should be noted that the society was not informed by the Justice Department of any evidence that either a member of the society or the organization itself was involved in alleged violations of title VIII. Nor was the society informed what activity by an appraiser would constitute a violation under the act. In fact, the Department of Justice indicated that an honest and noninflammatory appraisal report would almost certainly not result in a violation of the Fair Housing Act. The report of the Justice Department's information is attached to this statement at attachment C.

Then, suddenly, in April 1976, the Department of Justice sued the society and three other defendants alleging that the society had

314

violated title VIII by requiring or encouraging its members to treat race and national origin as negative factors in determining the value of dwellings and by instructing their members that dwellings in racially integrated areas have a substantially lower value than similarly located dwellings in racially homogeneous areas and, further, that the society taught that infiltration of blacks and other minorities into a geographic area was an important factor in lowering the value of homes in that area. *United States* v. *American* Institute of Real Estate Appraisers, et al., Civil Action No. 76–C–1448 (N.D. Ill.)

More than 2 years after the case was filed and after reviewing thousands of documents, the Department of Justice dismissed the society, with prejudice, from the lawsuit. Subsequent to the dismissal by the Government, the society published a brief policy statement concerning neighborhood analysis. In the Government's memorandum in support of the motion to dismiss the society as a defendant, a copy of which is attached to this statement as attachment D, the Department of Justice stated:

While the Government neither endorses the Policy Statement nor represents it as a proper and legal definitive interpretation of Title VIII, the Plantiff is satisfied that, given good faith application, the policies described in this Statement make it clear that SREA does not require or encourage its member to engage in the conduct alleged in the complaint.

What is most disturbing to the society in this experience is that, after the more than 2 years of litigation and the hundreds of thousands of dollars in legal fees, the Government decided that the society was not engaged in the discriminatory actions alleged in the complaint and agreed to dismis the lawsuit. The policy statement which the society issued subsequent to the dismissal by the Government was a policy statement which the society would have issued prior to the filing of the lawsuit had it been asked to do so by HUD or the Department of Justice.

Furthermore, the threshold question of whether appraisers are covered by the Civil Rights Act of 1968 was never satisfactorily resolved. Nowhere in the act or in the legislative history are appraisers mentioned by name. In fact, we think it is clear from the debates in the Senate that appraisers were not meant to be covered by this act. The district court in *United States* v. *American Institute of Real Estate Appraisers,* 442 F. Supp. 1072 (N.D. Ill., 1977) ruled otherwise holding that appraisers were covered by the act by including them under the language "or otherwise make unavailable" of section 3604 of title 42. Because the Justice Department dismissed the society from the lawsuit, with prejudice, prior to any adjudication on the merits, this opinion was never tested at the appellate level. However, even if Congress did intend for title VII to cover appraisers, we do not believe that Congress intended title VIII to be used to prevent appraisers from exercising their first amendment rights to report those relevant factors that impact upon market value or to cause appraisers to produce fictitious or directed market values.

Despite the financial drain on the society and the personal strain on its officers and members who suffered through the demands of litigation and the allegations of racism for more than 2 years, the society was a large enough organization to survive this lawsuit. However, we are asking you, Mr. Chairman, and the other mem-

bers of this subcommittee to envision the effect on an individual appraiser of the enforcement machinery that this legislation proposes to establish. Mistakes caused by excessive but well intended zeal in the name of fair housing could cause the initiation of an investigation and enforcement procedure which has the potential of destroying the reputation of an appraiser and bankrupt that individual long before there can be a resolution of the allegations in the complaint. HUD in its justification for 1980 estimates stated that it intends to choose cases to prosecute which will have a deterrent effect. The society is concerned that HUD may choose to exploit the financial weaknesses of individual appraisers and use this weakness to force capitulation by that individual, whether ultimately culpable or not, solely for its deterrent effect. Moreover, since there is no definition of what constitutes a discriminatory appraisal or what constitutes discrimination in housing due to HUD's failure to publish title VIII regulations and the Federal Home Loan Bank Board's failure to define discrimination in appraisal practice in its regulations, there is great danger that appraisers may face conflicting interpretation and charges. The society cannot believe that the subcommittee members wish this to occur.

The society's policy statement, a copy of which is attached to this statement as attachment E, reiterates the society's position that sound appraisal practice requires that all relevant factors, including race, religion, and ethnic factors, which exist in the marketplace and which impact upon market value, must be considered in a dispassionate, unbiased, nonprejudicial and objective manner by the appraiser in reaching an opinion of value. The exclusion of any relevant factor from consideration may result in an incomplete appraisal and a fictitious or directed market value.

As the society's policy statement explains:

An appraisal is an objective, dispassionate report of market facts. An appraiser must not focus upon any single factor or force to the exclusion of others. Neither can the appraiser overlook any single factor that observation demonstrates can and does affect value.—An appraiser must consider all observable factors and forces impinging upon market value within a neighborhood.

The society's policy statement further points out that neighborhood stability or value is not necessarily affected, positively or negatively, by the movement into or out of a neighborhood of a different racial, religious, or ethnic group. The weight, if any, given neighborhood stability depends upon its market significance and the appraiser's ability to properly and responsibly evaluate that market significance. The policy statement concludes that:

Neighborhood factors and forces being in a constant state of change, must be observed, recorded and analyzed with the recognition that some of those factors and forces are not readily susceptible to quantitative analysis. Extreme care must be taken in articulating and considering any factor or force which is not easily measured. The responsible appraiser must recognize that the dynamic interplay of neighborhood forces and factors directly affects the opinions and hense the behavior of the buyers and sellers of property within a neighborhood setting. These opinions, like the neighborhood dynamic, are constantly changing.

The society's current communications with HUD and the Federal Home Loan Bank Board, in which both entities are purportedly acting in a manner consistent with title VIII, lead the society to believe that this expansive enforcement authority, placed in the

hands of the Secretary of HUD, will most likely result in the opening of investigations and/or the filing of complaints against appraisers for reporting the realities of the marketplace, thereby effectively prohibiting them from using, or even considering, facts or factors which, in their judgment, may affect market value in a neighborhood setting. As such, this would infringe upon appraisers' first amendment rights and their professional responsibility to report and reflect relevant market facts and factors in their opinion of value.

For example, the Secretary of HUD issued a HUD policy statement on September 5, 1978, which stated that "(r)acial, ethnic and religious factors are unreliable predictors of value trends and mortgage risk, and the use of such factors in appraisal and underwriting determinations is unlawful under the Federal Fair Housing Law" and that "(f)actors relating to race, color, religion, sex or national origin or to racial, religious and ethnic identification of neighborhoods are not relevant to the estimation of value and should not be considered in connection with appraisals of residential real property." A copy of the HUD policy statement is attached to this statement as attachment F. In a similar vein, district examiners of the Federal Home Loan Bank System, apparently without the knowledge of the Bank Board, have been interpreting the Bank Board's nondiscrimination regulations as forbidding the use of certain words or phrases in appraisal reports. They have been telling appraisers that appraisal reports cannot contain words such as church, synagogue, pride of ownership, prestigious neighborhood, poor schools, declining neighborhood, and homogeneous. These regulations were intended to prohibit the use of appraisals that are discriminatory per se or in effect but they do not define which appraisal practices constitute discrimination per se or in effect. Such prohibitions directly infringe upon appraisers' first amendment rights.

As the society's policy statement explains, sound appraisal practice requires that the appraiser consider all relevant factors in the marketplace and report those which may impinge upon market value. If HUD were to use these proposed enforcement powers, either directly or indirectly through intimidations and threats of hearings, to force appraisers not to consider certain factors and/or not to use certain words or phrases in appraisal reports, the appraisers would have to disregard not only sound appraisal practice and the society's policy statement relating to neighborhood analysis, but would have to forego their first amendment rights. In addition, such a requirement would force appraisers to ignore the realities of the marketplace and to produce appraisals with fictitious market values. As described below, directed or fictitious appraisals affect most severely low and moderate income home buyers.

Numerous professional studies have shown that race, religion and ethnic considerations are very real factors which may or may not affect the value of residential property. These are factors which often influence homeowners in their choice of location and cannot be ignored or wished away by executive fiat. See, for example, "Race and Residence: An Analysis of Property Values in Transitional Areas, Atlanta, Georgia, 1960–71", Howard Openshaw,

School of Urban Life, Georgia State University, Atlanta, Georgia, 1975 (attachment G); "The Dynamics of Neighborhood Change", U.S. Department of Housing and Urban Development, 1976 (attachment H); "Property Values in an Integrated Neighborhood, Dr. Kennety Galchus, *The Real Estate Appraiser,* November–December, 1972 (attachment I); "Race and Housing Value: A Review of Their Interrelationship", Professor Richard L. Haney, Jr., "The Appraisal Journal," July 1977 (attachment J.)

The continuing conflict between what well intentioned social planners believe our society should be and what, in fact, it is at a particular state in its development poses a dilemma for the ethical appraiser, as well as the ethical legislator, when confronted by the realities of a piece of property located within a neighborhood undergoing rapid change, be it ethnic, racial, religious, sexual, or architectural. An appraiser must reflect what is happening to market value concerning the subject property within that neighborhood dynamic rather than what should be happening to market value given the best possible instincts of civilized man. This conflict was focused upon at a recent Senate hearing when Senator Proxmire asked a witness about how he would handle the concept of homogeneous use as opposed to heterogeneous use and how such issues relate to the appraiser's ultimate professional judgment.

Mr. MACBRIDE. Yes. That is my opinion. I think the principle of conformity, which started out with the homogeneous use and physical characteristics and race, had to be revised when race became a dangerous part of the statement.

And I think the two remaining aspects—for example, architectural homogeneity—there are planners, city planners, social planners, people looking into the future and watching their own past, who say it is the heterogenous that is strongest; it is the heterogenous that is the viable.

Given, if you will, your tavern incidence per block in the State of Wisconsin, there is a strength about difference. It is difference which has made this country rich and strong, and the principle of conformity, I think, has been a facade thing. It was useable for a while. I think it is now—and it was—dangerous, and is no longer right to use.

The CHAIRMAN. I want to stand up and applaud because I think that is right. At the same time, I have a hunch that an awful lot of people like to live in a neighborhood which they think conforms to the style of their life.

For instance, if you have a neighborhood where well-to-do people live and high-income people live, and you have a change in which you have some kind of government program come in and low-income people move into it, it is an ugly fact that some people move out, and then the neighborhood values may fall.

Do you think that is an unrealistic statement? I know that shouldn't be the case, but we are all human beings and that is the way many people, or perhaps most people, react.

Mr. MACBRIDE. It should not be the case; I agree with you. It is the case in many areas; I agree with you.

Nevertheless, it is a fact of the American process that this is an educative society trying to become mature, and in so doing—just as the people came here seeking some kind of an ability to be different and to live together and to find out about things, I think we have to fight for this daily.

The CHAIRMAN. At the same time, as you are an appraiser, you have to—you have to—you can't let your desires and wishes bias your judgment. Your judgment has to based on hard, cold, cruel facts.

Mr. MACBRIDE. That is correct. And when you see this, you report it, what you are trying to do.

The CHAIRMAN. What I am trying to say, however, is: It would seem to me that you can make an argument that heterogenous neighborhoods, under some circumstances, would have less appeal, less value, less ability perhaps than homogeneous ones.

Mr. MACBRIDE. You can make that argument, but that is not the strength of this country.

The CHAIRMAN. That is not the strengths of the country, I agree. And I am not trying to talk about the strength of the country; I am trying to talk about making realistic appraisals that have to be objective.

Mr. MACBRIDE. Then if you make the realistic appraisal, that has to be objective and we certainly concur in this. There is no disagreement on that point. . . . See Draft of Oversight Committee Hearings of the Housing Subcommittee of the Senate Committee on Housing, Banking and Urban Affairs relating to the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, December 1978 at 60.

Any enforcement action by HUD that would forbid appraisers from ever considering factors such as race, religion, and national origin in preparing an appraisal report would appear to create substantial first amendment problems. It would undermine the right of appraisers to consider and report, and consumers to receive and consider, truthful and factually oriented information as to the relevant facts existing in the marketplace which impinge upon market value. This, Mr. Chairman, is one of the society's greatest concerns with the potential thrust of this proposed legislation. The chilling effect upon the free flow of factually oriented and truthful information between appraisers and consumers is too obvious to belabor.

Recent Supreme Court decision, particularly in this area of informational communication, clearly indicate that the free speech rights of individuals in that context are protected by the first amendment. See, *Linmark Associates* v. *Township of Willingboro,* 431 U.S. 85 (1977); *National Society of Professional Engineers* v. *United States,* 435 U.S. 679 (1978); *First National Bank of Boston* v. *Bellotti,* 435 U.S. 765 (1978); *Bates* v. *State Bar of Arizona,* 433 U.S. 350 (1977); *Virginia State Board of Pharmacy* v. *Virginia Citizens Consumer Council,* 425 U.S. 748 (1976.) The Supreme Court, in these cases, was considering attempts to completely suppress particular expressions solely on the basis of their content. Any enforcement actions which HUD would undertake against appraisers would, we feel confident, eventually end up precluding appraisers from expressing their honest professional judgment concerning factors which may impact on property valuations. It is precisely this type of speech that has been held by the Supreme Court to be protected in *Virginia Pharmacy, supra,* and its progency, even in the face of very substantial counterbalancing State interests.

In *Linmark, supra,* the Supreme Court held unconstitutional a municipal ordinance which prohibited the posting of "For Sale" signs. The Court stated:

The Township Council here, like the Virginia Assembly in *Virginia Pharmacy Board,* acted to prevent its residents from obtaining certain information. That information, which pertains to sales activity in Willingboro, is of vital interest to Willingboro residents, since it may bear on one of the most important decisions they have a right to make: where to live and raise their families. The Council has sought to restrict the free flow of this data because it fears that otherwise, homeowners will make decisions inimical to what the Council view's as the homeowner's self-interest and the corporate interest of the township: they will choose to leave town. The Council's concern, then, was not with any commercial aspect of "For Sale" signs—which offerors communicating offers to offerees—but with the substance of the information communicated to Willingboro citizens. If dissemination of this information can be restricted, then every locality in the country can suppress any facts that reflect poorly on the locality, so long as a plausible claim can be make that disclosure would cause the recipients of the information to act "irrationally." *Linmark, supra,* at 96.

The Court in holding that this ordinance violated the first amendment cited Justice Brandeis' now famous words in *Whitney* v. *California,* 274 U.S. 357, 377 (1927):

> If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the process of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify expression. (Emphasis added.)

Rather than run the rise of a future violation of the constitutional rights of appraisers, it would be better, and the society would respectfully urge, that this legislation and any congressional reports accompanying it state that whether factors such as race, religion, and national origin impact upon market value and are considered in an opinion of value, they be used in an objective, unbiassed, nonstereotyped fashion and that the articulation of these factors be supported by reasonably documented data in the appraisal report or the appraiser's files.

Mr. Chairman, the importance of having the appraiser estimate market value for property and not be intimidated from reporting or forbidded from considering the relevant factors which may impinge upon market value cannot be overemphasized. None of you, I know, would want to purchase a house on the basis of a fictitious or directed market value. Nor would you want to purchase a house whose apparent worth does not reflect the factors which may impinge upon its market value. This would be especially true if, like many citizens today, you were investing your retirements savings in a piece of realty. Yet, a failure to consider all relevant factors, including race, religion and national origin, which may impinge upon market value will result in the creation of a fictitious or directed market value. Historical experience with HUD programs has demonstrated, without question, that certain programs, no matter how well intentioned, have suffered badly when HUS's policies and practices result in the creation of fictitious or directed market values. Monumental problems resulted for the very people the policies were intended to help, and the thousands of abandoned houses in cities such as Detroit, Philadelphia, and Newark caused sustantial embarrassment to the Government.

After Congress passed the 1968 Fair Housing Act, new programs such as the 235 home ownership assistance program were developed for the purpose of providing homeownership to individuals with moderate and low incomes. The Federal Housing Administration staff was urged by the Congress and HUD leadership to make these new programs successful. To some, success was interpreted as the nondeclination of a loan application regardless of the circumstances of the collateral or the creditworthiness of the borrower. Unfortunately, this interpretation by the majority of the FHA staff proved to have disastrous fiscal consequences for which the taxpayers have had and are continuing to pay an enormous price. As set out in the HUD report entitled "Housing in the Seventies", the effects of this program will cost the taxpayers in excess of $85 billion by the year 2000.

In early 1975 the society published its Inner City Valuation Study which was prepared with the cooperation of HUD and had as its purpose an examination of the considerations and techniques which FHA had applied to the estimation of value of inner city properties for its housing programs. The study delineated some of

320

the factors which have affected the difficult problem of property valuation of older urban areas and have created problems for low- and moderate-income home buyers from those areas. A copy of the study is attached to this statement as attachment K.

The research that the society did in preparing this Inner City Valuation Study revealed that the effect and attitude of policy directives of FHA management was to cause appraisers to be overly optimistic about the future of the areas in which they were appraising and to ignore any adverse influences which would have a negative effect upon value trends. Age of the property, zoning and building code compliance, certification and enforcement, adverse conditions existing in the neighborhood in which the property was located and remaining economic life of the subject property and its neighborhood were the factors which we found were being ignored by the FHA's appraisers with the acquiescent encouragement of their superiors. We now know the result of that well-intended but ill-fated effort to ignore economic reality, that is, inflated estimates of market value and an inordiate number of foreclosures and abandonments. The only joyful recipients of this myopic policy were the speculators. They gained at the great economic loss to the taxpayers and to those people intended to be assisted by the worthy objectives of that program.

It is the society's firmly held opinion that prohibiting appraisers from considering and, where appropriate, using all relevant factors which can affect an opinion of value will result in fictitious market values and substantial injuries to those very people who can least afford to be adversely affected financially. In the hearings before this subcommittee last year, an incident of racial steering was described in which a black tester was offered a home at a price $2,500 lower than a white tester. This same example, however, can be used to draw an additional inference. Assume that the people involved were not testers but, rather, were persons genuinely interested in purchasing a home. It is obvious that significant manipulation of the sales price was going on. The only way in which a buyer and/or a lending institution can be protected from this type of unscrupulous manipulation of sales price is through an objective opinion of market value set forth in the appraisal. If the buyer pays an inflated price for a piece of property and then, for whatever reason, decides to sell that property within a relatively short period of time, that buyer will most likely lose his investment to the extent of the inflated sales price. For low and moderate income home buyers, this loss may well be the family's life savings. From the standpoint of the lending institution, if the property goes to foreclosure, the institution will only be able to recoup the actual market value of the property and will lose that portion of the loan that they made based upon the inflated fictitious value.

If Congress, for reasons of social policy, decides that racial, religious, or ethnic factors cannot be used in a determination of market value, then Congress ought to amend Federal statutes and alert the appropriate agencies which have issued regulations pursuant to those statutes, that is, 12 United States Code 1464, 12 CFR 563.17–1 which, among other things, regulates the dollar amount limitation that a savings and loan association may invest as a percentage of appraised market value of the property. As Charles

003119

321

Akerson, MAI, president of the American Institute of Real Estate Appraisers, stated in testimony before the Housing Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs in December 1978:

The appraisal process is an opinion-forming process that simply cannot be legislated . . . If we appraisers ever allow government to tell us how to form an opinion of market value, the term "market value" will become a misnomer, and the appraisal process will become a fraud.

A copy of the article reporting his testimony is attached to this statement as attachment L.

It is necessary, Mr. Chairman, in considering this proposed legislation, that you have a clear understanding of what an appraisal is and how the appraisal process differs from the underwriting process. An appraisal is requested becuase the client has a decision to make. In the context of a savings and loan mortgage, the appraisal protects the depositor-investors and the management of the savings association from offering a mortgage quotation to a potential borrwer on a collateral property not worth the value, as represented. The appraiser cannot properly perform an appraisal without an understanding of the nature of the ultimate lending decision. However, it should be emphasized that the appraiser is not and should not be a participant in the ultimate decision, that is, whether or not a particular mortgage loan should be made to a particular potential borrower. That decision resides solely in the hands of the lending entity of institution. The appraiser is not an advocate. A proper appraisal is a supported estimate of market value. The appraiser merely reports his value conclusions accompanied by the necessary supporting data and analysis.

An appraisal is an objective, dispassionate report reflecting relevant market factors. The value conclusion is based upon an appraiser's objective, as well as his subjective, professional judgment. The appraisal process itself is an orderly process consisting of the acquisition, classification, analysis, and interpretation of the data accumulated. Using this procedure, the indications of value are developed and are then reconciled into a final conclusion or opinion of value. This final conclusion of value is the basis upon which the appraisal is written.

The appraiser estimates the market value; the appraiser does not determine the value of the property. The appraiser does not participate in the lender's underwriting decision. In fact, the appraiser often does not learn whether the loan in question was ever granted. Once the appraiser has set out in a didactic, dispassionate, and nonprejudicial fashion the relevant factors relating to what has happened in the marketplace, and has submitted a report to the lending institution, the appraiser's involvement is terminated.

As you know, Mr. Chairman, the thrust of this proposed legislation constitutes a radical departure from the intent of the 1968 Fair Housing Act. The underlying basis of that legislative mandate and the clear intent of Congress was to emphasize voluntary compliance as the primary mechanism to effect the objectives of the Act. HUD was authorized to undertake conciliation and compliance efforts to settle disputes voluntarily. Not even HUD seriously disputes the fact that its Title VIII activities over the past 10 years have not been what Congress obviously intended them to be when

322

they passed the 1968 Act. In March of this year, the Secretary of HUD stated that:

HUD's Fair Housing and Equal Opportunity reponsibilities received very little support from pervious Administrations and were allowed to languish. The record is clear that little in the way of program advocacy, regulatory authority, financial or other resource support was given to HUD's civil rights programs." Letter to Dr. Arthur S. Flemming, Chairman, U.S. Commission on Civil Rights, March 2, 1979.

It is respectfully submitted that complaints by HUD as to the ineffectiveness of the 1968 act are due primarily to HUD's inadequate staffing and insufficient funding of their title VIII activities. The recent report of the U.S. Commission on Civil Rights entitled "The Federal Fair Housing Enforcement Effort" documents this fact. The report on pages 16 and 17 states that HUD's small staff size has had a crippling effect on its fair housing program and that because limited staff time has been allocated to fair housing and related activities, HUD's potential for fair housing accomplishments has been severely curtailed. With regard to HUD's expenditures in this area, the report pointed out the small percentage of HUD's Fair Housing and Equal Opportunity budget which is spent on title VIII activities. For fiscal years 1974 through 1978, HUD's title VIII budget was sufficient only to cover a program which would have cost approximately $3 million in 1969 dollars. See, exhibit 1.2 at 18. Testimony last year before this subcommittee pointed out the small monetary efforts which have been made by HUD in title VIII activities. It was stated that, if the Government set aside one-third of 1 percent of all Federal housing moneys for title VIII enforcement, the title VIII appropriation would be increased tenfold.

Various witnesses testifying before this subcommittee have referred to a GAO Report compiled by the Comptroller General entitled "Stronger Federal Enforcement Needed to Uphold Fair Housing Laws," dated February 2, 1978, and cited as support for their contentions that the voluntary compliance and conciliation mechanisms are ineffective by the fact that fewer than 10 percent of HUD fair housing complaints were resolved. The actual report, however, gives a different picture. It states that, of 332 complaints received between January 1, 1973, and April 30, 1976, there was lack of clear evidence of discrimination of 247 of the complaints. In only 57 cases did HUD determine that a discriminatory act had taken place, and 36 of these were resolved. HUD concurred in actions taken by State and local agencies on 18 other complaints, and 10 cases were still open or the files were missing. Of the 247 complaints for which HUD was unable to determine whether discrimination had occurred, HUD terminated its efforts on 119 cases before investigation began and failed to complete the investigation on 13 others. The remaining 115 were investigated but dropped for lack of conclusive evidence. Of these 115 complaints investigated but dropped, 17 complaints were dropped due to complainants withdrawing their complaint or failing to furnish information, and 98 were dropped because the investigations failed to show that discrimination had occurred. Of 95 complaints reviewed by GAO that HUD failed to investigate because the complainant could not be located or had withdrawn the complaint, data was only available on 58, and GAO found that HUD took an average of 92 days from the time it received the complaint to the time it began the investi-

gation. Of the 115 complaints HUD investigated and dropped for lack of evidence, the report determined that an average of 94 days elapsed between the time the acts occurred and the time HUD started the investigation. Almost two-thirds of that time elapsed between the time the complaint was filed and the time HUD began the investigation.

It is the society's contention that HUD has, throughout the past 10 years, understaffed and inadequately funded its Fair Housing and Equal Opportunity effort, especially its Office of Voluntary Compliance. HUD's argument that it now needs this vast enforcement authority because it is unable to be successful in its compliance and conciliation programs is, in large measure, a self-fulfilling prophecy-type of argument. Prior to obtaining such authority, HUD should be required to properly fund and staff its compliance efforts to determine if they will be successful as Congress originally intended in the 1968 act. Only if that attempt fails should consideration be given to granting HUD enforcement authority.

Another serious omission, one which the society think strongly militates against granting HUD at this time the enforcement authority sought in H.R. 2540, is the failure of HUD for over 10 years to issue any substantive regulations dealing with what constitutes discrimination under title VIII. The only few regulations issued to date have dealt with procedural matters. There are no regulations that go to the heart of title VIII issues such as what actions constitute discrimination in housing. We are aware that a December 7, 1977, memorandum from the HUD general counsel held that the Department had authority to issue substantive regulations under title VIII of the Civil Rights Act of 1968. This apparently was a new opinion, and previous general counsels had been of the opinion that HUD could not issue substantive regulations. This new opinion was based on the 1972 Supreme Court decision in *Trafficante* v. *Metropolitan Life Insurance Company,* 409 U.S. 205 (1972). However, since December 1977 to date, no regulations have been issued, nor obviously was any action taken after the Supreme Court's 1972 decision. In addition, it should be noted that the memorandum explained that the Department was not staffed to undertake the task of issuing regulations. We would urge that HUD first promulgate substantive regulations dealing with discriminatory actions under title VIII which would provide due process protection, to all affected parties, and, if it is determined that these regulations are not effective then come back to Congress to seek appropriate remedial enforcement powers.

The society's most serious problems with this proposed legislation evolve around sections 810 and 811. The society is most troubled by the combination of investigative, prosecutive, adjudicative and appellate procedures under the single authority of the Secretary of HUD. We are concerned with whether an appraiser or any other respondent can obtain a fair hearing under these conditions. In addition, the appearance of unfairness is so overwhelming that it would inevitably permeate any administrative hearing.

Specifically, we have serious problems with the injunctive powers given to the Secretary in section 810(b). Under this section, once the Secretary makes a determination that prompt action is necessary, the respondent is given notice and an opportunity to be

324

heard, and the Secretary may then issue preliminary relief pending final disposition of the charge. Nowhere is it set out what an opportunity to be heard is to consist of. Does it mean a hearing? Can the respondent testify? Can he subpena document and witnesses and engage in cross-examination of the proponents of the charge? Furthermore, there does not appear to be any judicial review of the Secretary's action. We would suggest that this section would not meet the minimum due process requirement mandated by the Constitution.

While our research has not been exhaustive on this point, we think that section 810(b) clearly offers less protection to a respondent against agency action than other regulatory schemes of agencies and departments which have some type of injunctive power. For example, the Federal Home Loan Bank Board's authority to issue temporary cease and desist orders, as set out in 12 CFR 550.2, requires that there must first be a determination by the Board that a practice is likely to cause insolvency or a substantial dissipation of assets or that there will be serious prejudice to the interest of savings account holders. In contract 810(b) of the proposed bill would permit the Secretary to order preliminary or temporary relief upon a determination that prompt action is required to carry out the purposes of this title. In addition, the Federal Home Loan Bank Board regulations provide that the party upon whom the order is served may apply in district court for an injunction staying the order. H.R. 2540 contains no similar provision for judicial review of the Secretary's temporary order. The provisions of this bill clearly represent a broader grant of authority to HUD than presently exist under other banking regulations.

The Occupational Safety and Health Act, 29 U.S.C. 662, the Labor Management Relations Act, 29 U.S.C. 160, and the Consumer Product Safety Act, 15 U.S.C. 2064, and the agency regulations promulgated pursuant to these statutes, do not permit the agency or departments to order injunctive relief themselves. In each case the agency or department must petition the district court to grant injunctive relief. Thus, it appears that the injunctive authority proposed to be granted to HUD by this section goes far beyond that granted to other agencies and departments.

Section 811 of the proposed bill appears to have a number of serious problems. First, the legislation proposes to have the entire hearing procedure under the control of the Secretary. As discussed previously, the society has substantial problems with this approach. We feel very strongly that this entire enforcement authority should not remain within HUD under the authority of the Secretary. However, if Congress determines that additional enforcement authority is needed in order to effectively reach the goals of title VIII, then the society would urge that any additional enforcement authority be placed in the Justice Department rather than within HUD. The society makes this recommendation, Mr. Chairman, even though, as you know, the society has already engaged in one lawsuit brought against it by the Justice Department alleging violation of title VIII. The society thinks it would be much better, not only in terms of actual due process fairness, but also in the appearance of fairness, to have an impartial tribunal, the Department of Justive and then a district court, examine the charges,

make findings and conclusions and issue whatever relief is necessary and appropriate.

Second, it is unclear if the order which is subject to review and modification by the Secretary includes only the administrative law judge's order providing equitable relief on whether it also includes the administrative law judge's imposition of civil penalties. If it concludes the imposition of civil penalties, we are faced with another example of the overwhelming and frightening authority being granted to the Secretary, authority which could result in the economic ruin of a respondent if the Secretary so chose.

Third, in subsection (c) of section 811, a petition for judicial review has to be filed no later than 60 days after the entry of the final order. However, subsection (b) does not set out a time within which the final order has to be served on the respondent. Either the bill should state that the final order must be served on the respondent within so many days of entry of the order or the appeal process should not begin to run until after the respondent has been served.

Fourth, we are also greatly troubled in this subsection with the scope of review by the appellate court of the findings of the Secretary. We believe that the findings of the Secretary should be supported by a preponderance of the evidence and not simply by substantial evidence on the record considered as a whole. As long as the entire hearing procedure is left under the authority of the Secretary, we feel that the scope of appellate review should be substantially broader than in other administrative proceedings in order to afford due process fairness to respondents involved in proceedings before the Secretary.

The Society is concerned with the statue of limitations provision of section 82 which has extended the time from which a private suit may be brought from 18 months to 3 years. Any injury attributable to a discriminatory act should be almost immediately known or knowable. A 3-year wait in such a situation would undoubtedly result in stale witnesses, state records, and very little justice. We feel that this is much too long of a time period and that there is no justification of reason for allowing a 3-year delay in an effort to resolve an injury.

There is one additional point which the society would like to make. In this era of budget contraints, spiraling inflation and efforts to hold down the costs of Government regulations, we think it would be incumbent upon HUD to furnish this subcommittee with their estimate as to the cost of the proposed enforcement procedures. This estimate should not only include the Government's expenses but also the monetary impact on the delivery of housing to the consumer. In testimony before the Senate on this bill, the Assistant Secretary for Fair Housing and Equal Opportunity, the Honorable Sterling Tucker, indicated that the enforcement mechanism in terms of his office would involve approximately 50 additional field investigators and 12 attorneys, plus clerical staff, and would cost in excess of $2.5 million. It was not clear from his testimony, however, whether this figure included the administrative hearing costs. However, no estimates have been given as to the cost to the public or how this cost would affect people who are attempting to buy homes or rent apartments. With regard to the

cost of regulation, we respectfully refer the subcommittee to the report entitled "Regulation of Mortgage Lending in the Inner City," by Profs. Jack Guttentag and Susan Wachter from the University of Pennsylvania's Wharton School and attached to this statement as attachment M.

We greatly appreciate this opportunity which you have provided us to express our views, and we stand ready to respond to any questions which you and/or your colleagues might have concerning our statement and the society's position in opposition to this legislation as presently drafted.

Thank you, Mr. Chairman.

Mr. EDWARDS. Thank you very much.

The gentleman from Missouri, Mr. Volkmer.

Mr. VOLKMER. Thank you very much, Mr. Chairman.

Are the appraisers that do appraisals on behalf of mortgage companies given forms to use?

Mr. OSENBAUGH. Yes, sir. In the majority of cases throughout the United States the FNMA/FHLMC form is accepted.

Mr. VOLKMER. Do those forms provide for the description of the racial, ethnic, or religious composition of the area?

Mr. OSENBAUGH. I'm going to have to ask one of my colleagues.

Mr. VOLKMER. That's fine. Go ahead, ask.

Mr. OPELKA. The FHLMC form that you make reference to, Congressman, does not provide for that description and goes further, to the extent that there is a caveat in the form, that the Federal Home Loan Mortgage Corporation does not consider race, religion or ethnicity a factor in neighborhood analysis. And similarly FHLMC qualifies their definition of market value accordingly and directs this stipulation in their appraisal certification.

There are other forms that provide for the reporting of all factors, including race, religion, and ethnicity.

Mr. VOLKMER. What other forms would those be?

Mr. OPELKA. There are several private forms in existence and have been for years that attempt to totally describe the demographics at work in a neighborhood.

Mr. VOLKMER. When an appraiser would use the ones from the—what did you call it, Freddie Mac?

Mr. OPELKA. Frequently the Federal Home Loan Mortgage Corporation has been called Freddie Mac.

Mr. VOLKMER. OK. When you use their form, what does the appraiser do then?

Mr. OPELKA. The appraiser might very well consider that fact, but not report it. This particular caveat has given us, as a professional organization, difficulty in the fact that we are unable to monitor, review, and consider—in some cases this is not a total reporting of all relevant facts. It may only affect about 2 or 3 percent of our neighborhoods in the country but when that is a consideration appraisers should be free to analyze and report market value accordingly.

Many other times it's not even a relevant factor. So it may or it may not affect value.

Mr. OSENBAUGH. Mr. Congressman, if I could expand on that a little, I would agree with Mr. Opelka and I would say in some cases

appraisers would have to eliminate themselves from making certain appraisals if they were not able to address the matter.

Again, I would think that this would be a very small percentage of the problems.

Mr. EDWARDS. Would the gentleman yield to me for a moment?

I'm confused. Where in the new or old law does it say that racial, religious, or ethnic factors cannot be used in the determination of market values?

Mr. OSENBAUGH. It does not. That's in the statement issued by the Secretary of HUD.

Mr. PERITO. May I expand on that, Mr. Chairman?

The essence of the problem is that there is no articulation in the revelant Federal statute as such. The prohibition against consideration of racial, religious, or ethnic factors comes as a result of an alleged interpretation of title VIII. The HUD September 5 policy statement, which Mr. Osenbaugh referred to, was promulgated by HUD, but not by way of regulation.

There are regulations, however, involving the Federal Home Loan Bank Board wherein that agency attempted purportedly to interpret title VIII. However, there is an ongoing dialog between myself, on behalf of the society, and the FHLBB, as to whether their interpretation is fair and has a proper statutory basis.

Insofar as court-made law is concerned, there is only one Federal judge in the United States, George Leighton in the Northern District of Illinois, that's ever considered this point and this is in that case that we were before him.

Unfortunately, there is a dearth of learning and that's, frankly, one of the reasons we are before your committee, to lay forth this dilemma: That there has been by Federal agencies, we believe, an articulation of rules and regulations which we don't believe was intended by Congress when it passed the 1968 Fair Housing Act. Certainly there was extent in the legislative history during the Senate debates the myth that a racial inroad in the neighborhood allegedly had an adverse effect on value, although the society never believed that myth, and Congress did not deal with that issue in the legislation which finally emerged as law.

Mr. VOLKMER. Mr. Chairman, the FNMA appraisal forms do not contain any restriction.

Mr. OPELKA. Yes, they do. We are addressing that in this particular case, Mr. Congressman. There is a joint form that both FHLMC and FNMA use, so while we refer to FHLMC, it's a combination form used by both agencies.

Mr. VOLKMER. But you are able to make appraisals in spite of that language?

Mr. OPELKA. In some cases, yes. IN other cases we have been deprived of our rights to freely communicate information in certain areas, and I am aware personally of people who have withdrawn from assignments or who are intimidated by such direct apprasial language. It denies appraisers their first amendment rights to consider and communicate. Most important, indirectly, directly these restrictions really deny us the right to consider and share with the consumer all of the factors that may or may not impinge on value.

The Federal Home Loan Bank Board has also issued a legal opinion that ethnic composition of an area shall not be considered

in the green hornet appraisal form, another form used in the business. We have been directed.

Mr. VOLKMER. And are you saying that's causing you difficulty?

Mr. OPELKA. Absolutely.

Mr. OSENBAUGH. If I could give a personal example, recently our office had an appraisal turned back because the savings and loan thought we'd used discriminatory phrases in this appraisal. We said, "the strength of a particular condominium project located across the street from the Jewish Community Center had allowed the senior citizens who lived in that project to avail themselves of opportunities."

The savings and loan, because of their instructions from FHLBB examiners said that we couldn't say Jewish and senior citizens, even though they were used in a very positive statement and very relevant to market value.

Mr. VOLKMER. They critized the word "synagogue"?

Mr. OSENBAUGH. Yes. I can say house of worship. I couldn't say synagogue, nor could I say church. It was the Jewish Community Center.

Mr. VOLKMER. You could say religious affiliate? I think you could say that.

Mr. OSENBAUGH. Yes. I could have said a religious facility.

This particular neighborhood was a neighborhood that had a lot of Jewish citizens living there. In fact, when the group originally acquired the property—I worked with them then also—they wanted to acquire this particular location. Most of the people living in this project were grandparents who wanted to be around their children and they had marvelous facilities to use and this was a strength of this particular project.

Mr. VOLKMER. What if that had been a Mormon church?

Mr. OSENBAUGH. I think it would have had the same positive effect on it. If there were a limited number of Mormon churches in this community, I think there'd be a great number of people want to live near their particular church or send their children to that particular school for whatever reasons they chose.

Mr. VOLKMER. Thank you, Mr. Chairman.

Mr. EDWARDS. The gentleman from Illinois, Mr. Hyde.

Mr. HYDE. Thank you, Mr. Chairman.

Now, you gentlemen are professional appraisers. It's your career, your vocation, your expertise to evaluate property and to determine what all the relevant factors are in evaluating its market price and what it may be in the future.

Appraising a risk, right?

Mr. OSENBAUGH. That's right.

Mr. HYDE. And you are being told by the bureaucrats that there are certain things you have got to keep out of your report because they insist they are not relevant; is that right?

Mr. OSENBAUGH. Yes, sir.

Mr. HYDE. Now, if a Latino who speaks Spanish wants to live in a Latino neighborhood with others of his fellow citizens who are Latino and who are familiar with the Spanish language, that's not a relevant consideration in evaluating property for him, according to this dictum; is that correct?

329

Mr. OSENBAUGH. That's not relevant according to the FHLBB and HUD, yes, sir.

Mr. HYDE. Have you found in your experience in the world that people like to live in certain kinds of neighborhoods, that Catholics like to live near a Catholic church, not a religious facility which could be a Unitarian building? Have you found that Jews, Orthodox Jews, like to live near walking distance of the synagogue? Is that your life experience?

Mr. OSENBAUGH. Yes, sir. Again, if I could give an example, when I was growing up in Houston, Tex., there was only one Catholic school and that area remained a very stable neighborhood because the people of that religious persuasion wanted their children to go to that all-boys Catholic school and it had to be within a distance where their children could get there easily.

At this time it wouldn't make a difference because there are Catholic schools througout the city, but at that time this fact had a positive effect on the value of properties in that neighborhood.

Mr. HYDE. Now, you work in Chicago, don't you?

Mr. OPELKA. Yes, sir.

Mr. HYDE. Tell me where the Greeks live, where the Poles live, where the Lithuanians live, and how un-American it is for them to want to live among their own people.

Mr. OPELKA. The city of Chicago has produced in the last 2 years a book called, "Historic Chicago," which has color coded maps that identify over 25 different ethnic groups and the concentration of those groups, the trending of them from 1920, 1940, 1960, 1975, and the pattern of behavior, the collection of these people divided by their religious persuasion, culture, language they speak, places where they worship, all identified demands that are timely from time to time, nothing cast in stone, but the patterns are there, the movements of the people are there, and they are further colored by the income levels and the equity patterns of these various people within their own little systems. So in a city like Chicago, in my experience, its strength, its dynamics are the variations.

Mr. HYDE. If you were of Arab extraction, would you think it important to know that Albany Park is an almost totally Jewish community? If you want to move in somewhere, do you think that would be important or relevant? Just is it relevant?

Mr. OPELKA. Sometimes it is and sometimes it isn't.

Mr. HYDE. I'm asking you if you were an Arab, of Arab extraction, then the fact that a community is almost totally Jewish would be relevant in evaluating the value of that property to you?

Mr. OPELKA. Yes, it would.

Mr. HYDE. OK.

Mr. OPELKA. To that person.

Mr. HYDE. And maybe to his neighbors, too.

Let me ask you this: In appraising real estate, agents of the society are to be absolutely blind to ethnicity, blind to religion, and blind to color, but in employment and in admission to schools you dare not be color blind. Is that the direction in which you see us moving?

Mr. OPELKA. We have been directed now in the last year or two to ignore the quality of schools. Quality is a consideration to many

003128

a buyer, and quality is a broadly defined thing. But as a parent, we ought to be able to qualify what parents——

Mr. HYDE. If some Irish family with six kids wants to know if there is a Catholic church and Catholic school in the neighborhood, you take the fifth, don't you?

Mr. OPELKA. Unfortunately, people would like us to, but the society is here because we choose not to take the fifth. We believe in the first, for everybody.

Mr. HYDE. No matter how unpalatable it may seem to some bureaucrat, you think that the clinical facts are as they are, is that correct. You think that's an assertion of your first amendment right to put down in print all the factors that you think relate to the marketability and the appraisal value of a given piece of property?

Mr. OPELKA. Yes, sir.

Mr. HYDE. Are there such things in Chicago as high crime areas?

Mr. OPELKA. There certainly are.

Mr. HYDE. Would you think it would be relevant to the risk? Let's say vandalism. I just read in a Chicago paper about a school in Skokie, in a very affluent neighborhood, which had $1,400 worth of vandalism—or maybe it was $14,000—over the weekend. Do you think it's important if a piece of property is in, let's say, the Calabrini-Green area? Would you think that's a relevant factor in appraising the value of property?

Mr. OPELKA. It's a consideration that motivates people to buy housing or not to buy housing in certain areas and is certainly a relevant factor.

Mr. HYDE. Have they forbidden you to put it in your appraisals yet?

Mr. OPELKA. The Federal Home Loan Bank has had the Mortgage Corporation strike quality of schools from the form, the previous form. The current one has now only convenience of schools. In our judgment they have directed us not to consider and report such facts in the appraisal report.

Now, they do invite a comment, if it's significant, but the line of thinking is that it's been taken out of the form by direction. Quality of schools is now absent and in its place is convenience of schools. It says comment on it if you want to, but you see, there's a significant change there. We object to things that direct an appraisal.

Mr. HYDE. Well, I'd just like to say that in my district I have many ethnic communities. The Italian community is the largest single ethnic group. Somehow they like Italian restaurants and Italian churches and old people's homes in the neighborhood, the Villa Calabrini.

I have Lithuanian neighborhoods that are proud of their ethnic churches and churches that speak Lithuanian, the Greek community, the Bohemian community in Cicero, Ill., and to me, it's just know nothing, given classic dimensions, not to give this information in an appraisal of the value of property.

I have no further questions.

Mr. FRANK. I would like, if I may, Mr. Chairman, to comment on the question of Congressman Hyde.

331

We are talking about what is relevant and what isn't relevant. First of all, we have yet to find any documentation that these factors are not relevant. It's just been stated that they are not relevant. We have never found any study, survey, or report that proves that they are not relevant.

Contrary to this, we have found, in fact, in most studies that have been done—they have been attached to our statement—that they are considered to be very real and very relevant factors.

Let me give an example of how this might work in reverse.

Let's taken an example in Chicago of an ethnic neighborhood. Let's assume it's Chinese. Let's assume, because there is competition to get into that neighborhood, that the prices are bid up, which is typical.

Therefore, consequently, as a result, the prices peak in that neighborhood. Typically they are 20 to 25 percent higher than they would be in a nonethnic neighborhood adjacent to that neighborhood.

Let's assume that the appraiser is out in the market and checks sales from within the ethnic neighborhood. He's placing those sales in the direct sales comparison approach to give an indication of value of the resident in the nonethnic neighborhood.

He has a judgment decision to make, basically, in support of the fact that there were ethnic considerations within that one neighborhood. If he doesn't use this factor and he says the home sold for $60,000 in the ethnic neighborhood and concludes that a home should sell for $60,000 in a nonethnic neighborhood, he has done a disservice to the buyer, the lender and the depositors.

We are not saying ethnic factors are a consideration in every appraisal assignment, but they may be. If they are relevant, we want the right to report them.

Mr. EDWARDS. I don't quite follow the example you gave. It seems to me that the appraiser would have described it in a much more factual way than to say it's a Chinese neighborhood. There are economic aspects. it's a stable neighborhood because people are making money, the incomes are good, the houses are well kept, construction is pretty good, transportation is pretty good. Why would the appraiser say it's a Chinese neighborhood?

Mr. FRANK. Well, the facts of life are that there are neighborhoods like that in Chicago, ethnic groups, and they do want to live next to each other. Consequently, if in fact that were the case, there would be a bidding up of the prices because there would not be that many homes on the market. Consequently, the prices may be higher there than were paid in another neighborhood. The values are inherently higher just because those people want to live in the same neighborhood together.

Mr. VOLKMER. Mr. Chairman, let me see if I can help.

I think you are saying that there are Chinese that are outside of this ethnic area who want to get into the ethnic area.

Mr. FRANK. That's correct.

Mr. VOLKMER. Is that what you are saying? That's what creates your demand?

Mr. FRANK. That's correct.

Mr. VOLKMER. And as somebody dies or moves out of that area, maybe to New York or San Francisco, that house becomes availa-

ble for sale as a result and instead of having 1 or 2 prospective buyers, you may have 10 or 12 bidding it up. Is that what you are telling us?

Mr. FRANK. That's correct.

Mr. THOMPSON. There is a continuous market for this area that we are considering as a result of incoming and outgoing of its Chinese occupants.

Mr. OSENBAUGH. If I may make a statement, Mr. Chairman, I agree that all these factors have to be in the appraisal. To say that this is a Chinese neighborhood and stopping there, would be an improper appraisal. I would assume when you have neighborhoods that a particular group wants to move into, it's a fact of life that those houses are going to be well kept because there is a great demand for them. Those people obviously want to get in that area because they have a pride of getting in that neighborhood, and it's going to reflect on the value of the property.

So all we are saying is if we can say this is a Chinese neighborhood, or it's near a Catholic school, or near a Jewish synagogue, that may be a plus for the neighborhood and if it is relevant it should be reported. These and other factors are important and the appraisal would be meaningless unless we went into other factors like those that you are suggesting.

Mr. EDWARDS. Then you are suggesting in all appraisals, I suppose, the real estate broker would be allowed to do the same thing. They would say, black people live in this part of town up to this particular street, and Mexican Americans live in this part of town, and that's part of your free speech; is that correct?

Mr. OSENBAUGH. No, sir. If I can refer to one of the attachments we have given you, there is an article that I wrote in 1967 which was a study of neighborhoods in Houston, Tex. I found in these neighborhoods that where you have minorities moving in, some decreased in value, some stayed the same, some increased in value.

Probably when you read that article, you will note my conclusion in 1967 that it doesn't make any difference the color of a man's skin. It's the economics of it.

Mr. EDWARDS. I agree. That's what I have been trying to say. But your colleagues keep saying that it's the Chinese part of it that is important and has to be brought out and would sell houses easier if the appraisal stated, Chinese neighborhood.

Mr. OSENBAUGH. Oh, no. It may have come across that way, but I know my colleagues. We have discussed this and I know that isn't it. It's just one of the factors, and Congressman Hyde's example of pointing out a Jewish neighborhood with an Arab moving in, I think, would be relevant to that buyer.

Mr. Chairman, we are not interested in redlining. We are against it. We have always been, It's always been our policy. Our feeling is that if we give the buyers all the facts, if we don't have inflated high prices in there, that's going to help nondiscrimination in neighborhoods because it's going to provide housing at a fair price open to everybody. We are definitely against redlining and steering.

Mr. HYDE. Mr. Osenbaugh, what you said before strikes me as somewhat unclear.

333

Let me ask you if you are saying that it isn't the ethnicity, it isn't the race, it's the economics, but aren't the economics affected by the character of the community?

Mr. OSENBAUGH. Yes, sir.

Mr. HYDE. In other words, a house is more valuable to a Chinese family at 22d and Wentworth, which is the Chinese community in Chicago, than it would be to a Polish family, and the economics may well be affected significantly by the ethnicity of the community. Is that not a fact?

Mr. OSENBAUGH. That is a fact.

Mr. HYDE. So it is a factor, maybe not determinative, maybe not overwhelming, but it's a relevant factor, which, in the honest, professional performance of your duty, ought to be communicated to somebody who's evaluating that property.

Mr. OSENBAUGH. Exactly. It's one of the relevant factors. It's not the only relevant factor, which I thought was the Chairman's question.

Mr. VOLKMER. Mr. Chairman.

Mr. EDWARDS. Mr. Volkmer.

Mr. VOLKMER. I'd like to first tell you where I am from and why some of this is very hard for me to understand.

Being a boy from a small country town, we don't have all these problems and conflicts. In other words, we don't have the areas and that multiplicity and everybody lives next to each other and a lot of times you don't know what their religions are, so those things are rarely ever taken into consideration.

So now we are talking mostly about larger cities.

Mr. OSENBAUGH. Yes, sir.

Mr. VOLKMER. We are not talking about small communities. This is just completely foreign. I can see that a real estate agent showing the property may want to communicate that fact, but I don't see how you can establish the value of a piece of property based on that information. Let's go back to the example of the Jewish community and the Arab moving into it.

Now, why would that have an effect on the value of that piece of property itself? Because when we talk about property and the value of it, we are looking at the potential resale value of it at a later date. Is that not correct?

Mr. OSENBAUGH. That's correct.

Mr. VOLKMER. Then what difference does it make if I'm an Arab living there when I want to sell it, or a Jew?

Mr. OSENBAUGH. It doesn't.

Mr. VOLKMER. So what difference does it make when I buy it?

Mr. OSENBAUGH. That was in answer to a direct question from the Congressman which was, would that disturb an Arab coming into a Jewish neighborhood. That was my understanding.

When we make appraisals and we are directed not to take certain factors into consideration, many problems are created. For instance, if there were an area where, whether it's right or wrong, there is a great deal of white flight going on and they tell us that we cannot take this into consideration because there's going to be more for sale signs and values would tend to go down, this is something that a purchaser, be he black or white, ought to know.

334

I think if we bring all the facts out and say, OK, this is the problem there, then the speculator that's trying to buy cheap and sell high to a black family will not be able to steer, will not be able to redline. I think giving light on the situation would be a protection.

Mr. EDWARDS. Would the gentleman yield?

Appraisers don't fit into the picture when somebody is buying a house, residential house. The appraiser comes into the act after the house has been purchased and the financing has been applied for——

Mr. VOLKMER. No, no, no, not always. I have used appraisers before I buy a house.

Mr. EDWARDS. I have been in the title insurance business for 45 years and I have never yet seen, except for big buildings and things like that, appraisers hired by little families looking for houses.

Mr. OSENBAUGH. If I could answer that, I think that you are right in the majority of cases.

Mr. EDWARDS. The great majority, sir.

Mr. VOLKMER. That's true.

Mr. OSENBAUGH. Well, normally, the sophisticated home buyer that's transferred around by major companies will hire an appraiser before he signs the contract because he knows he's going to be transferred out and he wants to know what he can do when he sells his house. But the vast majority of the work is after the contract has been signed.

Mr. OPELKA. We use that information relating to the religion and ethnicity in continuing analyses of markets so that we can quantify and qualify, in either order of sequence, the number of people that tend to make a market. In some cases when we deal in a city of 3 to 5 million people, there are many submarkets. By virtue of proximity to those markets, whether the markets have limitations by requiring people to live in a city, by requiring people through a religious culture to live in a given parish, or by virtue of their religious persuasion people must walk to church on their Sabbath, all these things identify the size of markets and cultural attractions for different people. In some cases in a community of 3 to 5 million people those neighborhoods are 30 miles apart and yet there is a continuous grouping of people and we continue to monitor those markets.

We talk in terms of—the subject today was a Chinese community in an inner city. This doesn't go to say that there are not Chinese families interspersed across the whole metropolitan area, but in certain parts of this community they choose to live together in large numbers.

Similarly, as we add new communities, new suburban growth to this metro area, we study the size of the growth, quality, quantity, it's culturally identified and incomewise identified. Chairman Edwards has referred to income as one of the considerations of people in an area, I'd be quick to tell you we have been told by the Federal Home Loan Bank Board that we can't consider the income level of the people in a neighborhood.

We are flabbergasted when we get responses from FHLBB people and HUD officials as to what we may or may not consider.

003133

335

We really depend on sharing with government, sharing with the consumer, our profession.

Mr. VOLKMER. Let me ask you a question, just out of curiosity. Let's say I was looking for a house, all right?

Mr. OPELKA. Yes, sir.

Mr. VOLKMER. And I have a certain religion that I belong to, and that I like to have my children go to school, and I would like to be located near a good school with that religion. OK? And I find a place and I ask you to do an appraisal on it.

If we have what HUD wants, would you be able to include that in the presentation?

Mr. OPELKA. Probably not. At best I'd run a risk. The most dangerous word you can give me is "Thou shalt not consider."

Mr. VOLKMER. Would it be wrong for you to also find within that community or area around that school that there are also, say, one-fourth of the people that belong to that same religion and send their children to that school and that's a good school and probably other people would want to send them to that school in the event I moved out?

Mr. OPELKA. I think I could do what you are asking me to do on a consulting basis—and that's slightly different than appraisal per se, because we are comingling two professional services. We give you the impersonal appraisal of the property irrespective of who you are and this is a valuation of the property in consideration of all of the neighborhood dynamics in that neighborhood. Under government rules and regulations I could not include that information in the appraisal report even though it may be very relevant.

Mr. VOLKMER. Would that have an effect if, say, 25 or 30 percent of the people in that area went to that church?

Mr. OPELKA. Sure. That's what makes the neighborhood what it is. The people are zeroing in on that community because it's got a church, a school, and everyone knows it's the in thing.

Back home, for years it was Newtrier High School. It meant a big thing to get into Newtrier district and people, for whatever reasons, were paying higher prices than they were on the other side of the line within a different district. It was a desirable area to be in.

Mr. VOLKMER. I'd like to say maybe I'm worse than I guess I thought I was because, Mr. Chairman, honestly, that's the way I bought my house when I moved up here.

Mr. EDWARDS. The time of the gentleman has expired.

Do you approve of the 1968 act, Fair Housing Act?

Mr. PERITO. Mr. Chairman, we have taken a position—in the litigation I was chief trial counsel for the Society. We did not question the 1968 act as such. We questioned, however, its applicability to appraisers.

Mr. EDWARDS. But the court has held and has not been overruled that it applies to appraisers.

Mr. PERITO. Yes, the one Federal district judge in the United States who considered this case has held in——

Mr. EDWARDS. But none has overruled this particular judge, so it is the law.

Mr. PERITO. Well, Mr. Chairman I guess if one determines that one Federal district court judge in the United States, and not upon

003134

an adjudication on the merits of this issue since this case was resolved short of the merits.

As a matter of fact, when I negotiated the termination under a rule 41(b) voluntary dismissal, I was very clear to put in language that it wasn't a determination on the merits because we wanted to question, at some subsequent time, if necessary whether appraisers were covered under the 1968 act.

The thrust of the society's concern is that, if in fact Congress determines that appraisers are covered under the act appraisers want the ability to articulate the truth and report the relevant facts as they see it. That's the essence of the society's opposition to the bill; as presently drafted.

Mr. EDWARDS. Well, then you are opposed to the 1968 bill too, because under the 1968 bill you have been interpreted as being covered.

Mr. PERITO. By one Federal judge in one case, yes, that was his holding.

Mr. EDWARDS. But your chief objection to the new bill is the enforcement, is that correct, the new enforcement power?

Mr. PERITO. Yes, the enforcement powers are one of the society's chief concerns. Another concern, is assuming appraisers are covered, it means that they can't ever consider racial, religious or ethnic compositions of a neighborhood when relevant and reflect such considerations in appraisal reports.

Mr. EDWARDS. Where does it say that in the 1968 law or the new bill?

Mr. PERITO. That's the essence of our concern, Mr. Chairman. It doesn't say anything on this issue.

Mr. HYDE. But it says so in regulations, guidelines, pronouncements——

Mr. PERITO. Precisely, that's one of our problems.

Mr. HYDE [continuing]. From the HUD of Mount Olympus, doesn't it, so you are just confused and bewildered as to where to go, like everybody else.

Mr. PERITO. Mr. Hyde, any counsel representing appraisers has a monumental problem. We resolved a massive piece of litigation after 2 years of extensive discovery, thousands of dollars in fees, without any resolution of the ultimate issue whether appraisers were or were not covered by the act. In a policy statement, which is attached to our statement, we articulated that which we have always articulated, namely, that we want to and continue to be committed to the consideration of all factors, racial, religious, or ethnic, where relevant, in a nonstereotype, dispassionate, nonprejudicial fashion.

And now we are back with the agencies. We are in communication with the Federal Home Loan Bank Board, we are in communication with HUD, we are in communication with Justice, and it's not clear what the law is in reference to appraisers.

We come here, in part, as a court of final resort saying that if Congress intended appraisers to be covered, then cover appraisers, but allow appraisers the right to articulate the truth as they see it. I think that the recent Supreme Court decision in *Lindmark* totally supports our position in this regard.

Mr. VOLKMER. Mr. Chairman.

337

Mr. EDWARDS. The time now belongs to the gentleman from Wisconsin, Mr. Sensenbrenner.

Mr. SENSENBRENNER. Mr. Chairman, I just have two brief questions.

I noticed that the society is concerned about the potential for malpractice suits. To your knowledge, has there ever been a malpractice suit filed against an appraiser anywhere in the country relative to the advice that he gave vis-a-vis either the national or State fair housing law?

Mr. OSENBAUGH. Not to my knowledge, no. We are concerned with future malpractice suits which we feel will arise under current regulations.

Mr. SENSENBRENNER. Isn't there a way that you could have an appropriate disclaimer placed upon whatever appraisal report you submitted to your client saying that this appraisal report is submitted in compliance with such and such a law? Wouldn't that get you out of it?

Mr. OSENBAUGH. Our attorneys have told us that there is a chance that such a disclaimer would not be able to protect us. I'm not a lawyer. I don't know if that's correct. But we have had that opinion.

Mr. OPELKA. I believe our disclaimer should be the first amendment of the United States and that's the one we are talking about.

Mr. EDWARDS. Would the gentleman yield at that point?

Mr. SENSENBRENNER. Yes.

Mr. EDWARDS. This subcommittee is very much concerned with the first amendment. We are supposed to be sort of in charge of seeing that the Government complies with the first amendment.

The first amendment in part has to do with freedom of speech, isn't that correct?

Mr. OPELKA. My right to communicate.

Mr. EDWARDS. The right to communicate. Well, most of steering is communication. Isn't it verbal? Are you saying that you ought to have the right to use words, that free speech ought to be involved in steering?

Mr. OPELKA. I abhor the steering concept. I'm not the broker. I deal with the reporting of facts and the sharing of my opinions as to the value of property, as we measure it in the marketplace. Our statements go to that point, sir. We are not brokers. We are not speaking for brokers. We are an independent professional appraisal organization. We designate no brokers. We represent no brokers.

Mr. OSENBAUGH. Mr. Chairman.

Mr. EDWARDS. Yes.

Mr. OSENBAUGH. I would say in my opinion that if steering was going on, illegal steering in an area, and the appraiser knew about it and he did not mention it in his appraisal report, he would be in violation of our code of ethics. If steering is going on, it's incumbent on us to put it in the report.

Mr. EDWARDS. But the verbal part of steering is not protected by the first amendment.

Mr. OPELKA. Since steering is illegal, it would not be protected. However, I am afraid that you don't understand the relationship of the appraiser in this process. Mr. Chairman.

Mr. SENSENBRENNER. I yield back.

Mr. EDWARDS. Mr. Hyde.

Mr. HYDE. I would like to offer for the record the memorandum signed by Patricia Roberts Harris, dated September 5, 1978:

For principal staff, subject: Policy statement on HUD appraisal and mortgage loan underwriting practices, to promote fair housing and equal opportunity, which includes in it the proscriptions as to what should not be considered, factors relating to race, color, religion, sex, national origin, et cetera.

I'd like to offer that for the record so that some of the confusion that these gentlemen are laboring under could be documented.

Mr. EDWARDS. Without objection, it will be received for the record.

[The document referred to follows:]

Memorandum for: Principal staff

Subject: Policy statement on HUD appraisal and mortgage loan underwriting practices promote fair housing and equal opportunity.

I recently approved the convening of a HUD Task Force under the direction of the Assistant Secretary for Fair Housing and Equal Opportunity to examine our appraisal and mortgage loan underwriting practices. Members of the task force have already identified some specific activities we can undertake to eliminate unfair lending and appraisal practices. I want to inform all HUD staff of the policy changes the task force will implement.

The responsibilities of this Department in the development of viable urban neighborhoods are manifold, and principal among them is the responsibility delegated by Congress through Title VIII of the 1968 Civil Rights Act, the Federal Fair Housing Law, to administer all of our programs and activities relating to Housing and Urban Development in a manner which affirmatively furthers the goal of fair housing.

Title VIII states that "It is the policy of the United States to provide within constitutional limitations for fair housing throughout the United States." Title VIII provides that it is unlawful to discriminate against any person "in the fixing of the amount, interest rate, duration, or other terms or conditions" of a loan or in the setting of "terms, conditions or privileges" of the sale or rental of a dwelling or to "otherwise make unavailable or deny" a dwelling because of race, color, religion, sex or national origin. The Supreme Court, citing the remarks of Vice President Mondale, when he was one of the Senate's principal proponents of the Fair Housing Act, has observed that the reach of the law was to "replace the ghettos by truly integrated and balanced living patterns."

Many stable and improving neighborhoods are comprised of home owners and tenants of diverse racial, ethnic and religious backgrounds, living in pleasant and desirable environments. Racial, ethnic and religious factors are unreliable predictors of value trends and mortgage risk, and the use of such factors in appraisal and underwriting determinations is unlawful under the Federal Fair Housing Law.

As a part of President Carter's Urban and Regional Policy Group, HUD co-chaired a task force which was responsible for identifying and examining issues which affect the availability of mortgage credit in urban areas of this country. Among its findings, that task force noted that appraisal and mortgage loan underwriting practices have a major impact on the availability of credit.

A constant supply of capital for the purchase and rehabilitation of homes in our older, urban neighborhoods is one critical factor in determining whether those neighborhoods will deteriorate. The practice of discriminating against certain neighborhoods and homes in the provision of mortgages and rehabilitation loans simply because they are old, without regard to the creditworthiness of the borrower or the structural condition of the property, leads to the decline of otherwise sound neighborhoods and particularly affects racial and ethnic minorities who are often a substantial component of these neighborhoods.

Renewed interest in inner-city living and the stable character of many older neighborhoods have shown that old notions about neighborhood life cycles and the inevitability of decline in mature neighborhoods are no longer pertinent. The efforts of local community organizations and governments at all levels can preserve neighborhoods and even reverse downward trends.

We here at HUD must assure that Departmental appraisal and underwriting standards and practices used in mortgage insurance and secondary market transactions are nondiscriminatory not only in purpose but in effect. I have directed all offices within the Department with responsibility for overseeing or implementing loans, loan insurance, appraising activity and policy documents on neighborhoods to review and revise as necessary their standards and practices, and their handbooks,

339

forms and other issuances, to assure compliance with the Federal Fair Housing Law and HUD policy. These revisions must reflect the following major policies:

1. Factors relating to race, color, religion, sex or national origin, or to racial, religious and ethnic identification of neighborhoods are not relevant to the estimation of value and should not be considered in connection with appraisals of residential real property.

2. Factors relating to race, color, religion, sex or national origin, or to racial, religious, or ethnic identification of neighborhoods are not relevant to the assessment or measurement of risk and should not be considered in the underwriting of residential loans or the underwriting of mortgage insurance.

3. The age of a property or neighborhood is rarely the determinative factor in estimating remaining economic life or effective age or the degree of mortgage risk present, and many older urban areas provide viable, stable living environments for persons of varied income levels. Underwriting and appraisal policies and practices should avoid reliance on the concept of a predetermined neighborhood life cycle.

The Assistant Secretary for Fair Housing and Equal Opportunity will continue to coordinate HUD's efforts in this area with the other offices of the Department. He has full authority to undertake activities that will assure the implementation of the above policies. The review and revisions I have requested are to be completed by September 30, 1978.

PATRICIA ROBERTS HARRIS.

Mr. EDWARDS. In addition, I ask unanimous consent that the opinion of the ACLU be inserted in the record at this point.

As chairman of the Subcommittee on Civil and Constitutional Rights, I consider myself particularly sensitive to claims that first amendment rights are being infringed upon by Federal law. Thus, when I saw the society's statement, I determined that the matter should be investigated further.

I requested the ACLU to render an opinion on this, and I would like to insert that comment into the record at this time.

[The document referred to follows:]

AMERICAN CIVIL LIBERTIES UNION,
*New York, N.Y., May 1, 1979.*

Re H.R. 2540: The Fair Housing Act Amendments of 1979.
Hon. DON EDWARDS,
*Chairman, Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, U.S. House of Representatives, Washington, D.C.*

DEAR REP. EDWARDS: It has come to the attention of the ACLU that the Society of Real Estate Appraisers objects to H.R. 2540 on the grounds that the bill would inhibit the First Amendment rights of the Society and its members. The ACLU does not agree with the Society. In this letter, I shall set forth the position of the ACLU. I would appreciate your including this letter in the hearing record as an attachment to my testimony and written statement submitted to your Subcommittee on April 26, 1979.

The Society appears to object to H.R. 2540 on the grounds that their use of race as a depreciating factor in real estate appraisals would be prohibited by Section 6(e)(2) of the bill—which would amend § 805 of the current Act, 42 U.S.C. § 3605, by prohibiting discrimination because of the race, color, etc., of "persons residing in the vicinity of such dwelling."

Amended § 805, however, does not materially alter current law as it applies to the practices of appraisers. Under the current § 804(a), 42 U.S.C. § 3604(a), and under the current § 817, 42 U.S.C. § 3617, real estate appraisers are prohibited, respectively, from engaging in practices which "otherwise make unavailable" fair housing, and which "interfere with" the rights guaranteed by the Act. Thus, under the current Act, the use of race as a depreciating factor in a real estate appraisal is unlawful. *United States* v. *American Institue of Real Estate Appraisers,* 442 F.Supp. 1072 (N.D. Ill. 1977).

The Society's stated objection thus is not to H.R. 2540 but to the current Act. The Society's objection, in essence, is that the current Act restricts the First Amendment rights of the Society and its members by prohibiting them from using the racial composition of a neighborhood as a depreciating factor in performing real estate appraisals for their commercial customers. It is the position of the ACLU that the Act's prohibition against such private, commercial activity does not violate the First Amendment.

The heart of the First Amendment is its protection of public expression of ideas. For generations, this protection was applied only to political expression and not to commercial activity. In recent years, however, often based upon arguments made by the ACLU, The Supreme Court has applied First Amendment protection to "commercial speech." For the most part, this protection has been extended to protect the commercial activity of communicating ideas or advertising to the public through the mass media. See, e.g., *First National Bank of Boston* v. *Bellotti,* 435 U.S. 765 (1978) (corporation may not be barred from advertising its views to the public on a political referendum); *Bates* v. *State Bar of Arizona,* 433 U.S. 350 (1977) (individual attorneys may not be subjected to a blanket suppression on public advertising); *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U.S. 748 (1976) (pharmacists may not be prohibited from advertising prescription drug prices to the public); *Bigelow* v. *Virginia,* 421 U.S. 809 (1975) (newspaper cannot be punished for printing an abortion referral agency's paid advertisement concerning the availability of abortions). This extension of First Amendment protection to commercial speech is not, however, unlimited. In each of the foregoing cases, the Supreme Court recognized that commercial advertising to the public can be limited where the advertising is false, deceptive, misleading, or unlawfully discriminatory.

Limitations on speech involving issues of discrimination were raised in two recent Supreme Court decisions: *Linmark Associates, Inc.* v. *Willingboro,* 431 U.S. 85 (1977); and *Pittsburgh Press Co.* v. *Human Relations Commission,* 413 U.S. 376 (1973). Both need to be analyzed briefly here.

In Linmark, the Supreme Court struck down an ordinance prohibiting homeowners from public posting of "For Sale" signs on the lawns of homeowners. The Willingboro ordinance had been premised upon alleged fears that panic selling by white homeowners, encouraged by real estate agents, would cause residentially integrated Willingboro to become a predominantly black community. These allegations, however, were substantially in dispute. As Justice Marshall pointed out in his decision for the Court, there was no evidence that panic selling or unlawful housing practices in fact were taking place.

Given the attenuated nature of the alleged discrimination, Justice Marshall held that there were no substantial grounds for barring the basic means by which homeowners communicate the proposed sale of their homes to the public.

Pittsburgh Press involved not attenuated discrimination but discrimination in the very form of expression. There, a Human Relations ordinance prohibited newspapers from carrying help-wanted advertisements in sex-designated columns, e.g., Male Help Wanted or Female Help Wanted. Upholding the ordinance under First Amendment attack, the Court noted that the underlying employment discrimination was itself illegal. Since a newspaper could not advertise narcotics for sale, neither could it advertise discrimination. As the Court concluded: "Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal." 413 U.S. 389.

The distinctions between Linmark and Pittsburgh Press are apparent. In Linmark, First Amendment protection was recognized for individual speech in a context where unlawful discrimination was not present. In Pittsburgh Press, First Amendment protection was denied to commercial speech in a context where the underlying activity of discrimination was itself illegal.

The foregoing distinctions are necessary to First Amendment analysis. They also are the precise distinctions advanced by the ACLU. In Linmark, the ACLU submitted an amicus brief arguing that individual expression had been unconstitutionally denied. We prevailed. In Pittsburgh Press, the ACLU submitted an amicus brief arguing that the First Amendment had not been violated. Again we prevailed.

In our view, neither the current Fair Housing Act nor H.R. 2540 inhibit the First Amendment rights or real estate appraisers or of the Society of Real Estate Appraisers. Real estate appraisal transactions for the most part are private commercial transcations. Since no public commercial advertising is involved, appraisals do not even rise to the level of commercial speech. Even if it did, housing discrimination is unlawful. Since the underlying commercial activity of depreciating housing because of the racial composition of the neighborhood itself is illegal, no First Amendment protections are implicated.

If I can be of further assistance to you on this matter, please let me know.
    Sincerely,

E. RICHARD LARSON,
*National Staff Counsel.*

341

Mr. HYDE. Very good. If I may briefly and somewhat irrelevantly comment on the ACLU and free speech, they are proponents of the proposition that you can tell your teacher to go blank blank and they will protect you for that, but, God, don't say, "Our Father who art in heaven," or you are against the law. I have often been amused by that.

I usually use the language, but I don't want to do it here.

Would you put in the record the Federal Home Loan Bank Board's list of proscribed, forbidden words? Do you have that?

Mr. OSENBAUGH. Yes. I believe that's part of our statement. That's already in the statement.

Mr. HYDE. It is in your statement.

Mr. OPELKA. We have been unable to get that list in writing from the FHLBB officials and our people have been challenged in the field for using these terms.

They had a written list of words on yellow legal paper when we met with them on this issue approximately 2 months ago.

We were very much upset that these words were being used by examiners and in a hit-and-miss fashion in different districts, but we don't have a copy of the list per se.

We have reported what our members have been told by FHLBB in the areas. One of the phrases that we focus on is pride of ownership, alleges this term is a proxy for race. There is no support for this position. We are proud to talk about our cultures. We use them when they are relevant, we omit them and don't report them when they are not necessary in the description of valuation analysis.

Mr. HYDE. OK. Speaking of the ACLU, have you ever known them to take a labor union to court when they strike a newspaper and shut the newspaper down, thus denying the right of free speech or right of the public to know?

Oh, well, that's beyond your knowledge.

Thank you, Mr. Chairman.

Mr. EDWARDS. Mr. Volkmer.

Mr. VOLKMER. Well, the only thing I can add is perhaps there are some, and I have some of this concern myself, who are concerned about the possible abuses that could occur in the event that race, ethnicity, religion were taken into consideration, because it is a subjective rather than objective viewpoint and that should be prevented.

How do you distinguish, and how does anyone looking at it after the fact, distinguish whether this appraisal was made on a subjective or objective viewpoint?

Mr. OSENBAUGH. We have asked both Justice and HUD—I personally asked as far back as 1975—that if they have any cases where they feel that our members have used race, national origin or religion in a biased manner to submit it to us so that we can bring ethics charges against that appraiser. To date we have not received one such report.

We stand ready to handle this through our ethics procedures in an educational and then in a punitive manner.

Mr. VOLKMER. Mr. Chairman, I have one more question.

And that is your membership. You have how many?

Mr. OSENBAUGH. 18,000.

342

Mr. VOLKMER. How many of them would you consider percentagewise are white, how many black, how many Mexican or how many minorities, how many Caucasians?

Mr. OSENBAUGH. Well, I think both of us would like to comment on that. Mr. Frank first.

Mr. FRANK. Congressman Volkmer, it's rather interesting that you'd ask that question.

The Society of Real Estate Appraisers was formed in 1937. From that date forward we have never had on our application form the sex of the individual or the color of the individual and, as a matter of fact, we really don't know the answer to your question.

This is one question that has been asked of us and we honestly don't know because we really never have cared. It's a matter of what the person can do. We do work very closely with the National Society of Real Estate Appraisers, which is a black appraisal organization. As a matter of fact, we supplied them with their basic course material and we have offered to include them within our organization.

We really don't think that that is an important fact nor have we ever known because we have no records.

Mr. VOLKMER. In other words, you do not have anything on record, you have no way of knowing without polling your members. You have of way of knowing by sex then either, do you?

Mr. FRANK. No, we do not.

Mr. VOLKMER. In other words, you have never since your origin made that a point in your application.

Mr. FRANK. It's never been in our application from day one.

Mr. VOLKMER. That's interesting. Thank you.

Mr. EDWARDS. Counsel?

Ms. COOPER. In your testimony you suggest that the Department of Justice had improperly filed a suit against the society in that the Government decided that the society was not engaged in the discriminatory actions alleged in the complaint.

Since you argue that the policy statement issued subsequent to the dismissal—the information you submit in exhibit E did not reflect a change of policy—you imply that there never was a basis for the filing of the suit. Is that your position?

Mr. OSENBAUGH. Yes, it is.

Ms. COOPER. Is it your position that the dismissal was not conditioned upon the issuance of the policy statement and a good faith adherence to the terms of that statement?

Mr. OSENBAUGH. I would like to turn that over to general counsel.

Mr. PERITO. The dismissal was pursuant to a stipulation and I think, counsel, that you have probably read the Government's motion and closing papers. It's obvious that the policy statement was part of the dismissal. It was a rule 41(a)(2) dismissal and I think the papers speak for themselves.

Ms. COOPER. Well, the policy statement includes the assertions that the society supports and teachers the following concepts:

That maximum value in a neighborhood is not dependent on racial or ethnic or religious homogeneity, that lack of such homogeneity need not result in a diminution of value with a neighbor-

343

hood; that such homogeneity is not required for social compatability or neighborhood stability.

Were these concepts part of the tenents taught by the society prior to the institution of the suit by the Department of Justice?

Mr. OSENBAUGH. Those are in my article that I wrote in 1967.

Ms. COOPER. But aren't there materials in your teaching texts and other materials that are contrary to this position to the effect that race should be considered a negative factor in evaluating a property?

Mr. OSENBAUGH. I don't think so.

Ms. COOPER. Let me refer you then to the definition of depreciation which was used as late as 1975 in your materials which referred to depreciation as occurring when there is an infiltration in the neighborhood of, quote, inharmonious groups.

In earlier editions of your text, isn't it true that inharmonious groups were explicitly described in racial terms?

Mr. OSENBAUGH. We never had that.

Ms. COOPER. Well, materials, then, that you used?

Mr. FRANK. Counsel, I wonder if you are not confusing it with the textbook of the American Real Estate Appraisers.

Ms. COOPER. Didn't you use that?

Mr. FRANK. No.

Ms. COOPER. I would ask that answers submitted by the plaintiff in *U.S.* v. *AIREA et. al.* be made part of the record because there is information in those answers to the effect that those two appraisal organizations gave mutual credit for their courses and utilized some of the same material, including the material I have just referred to, and that material included racially biased assumptions.

Mr. OSENBAUGH. If I may address that, we do give mutual credit for some courses. We don't adopt their teachings. We also are given mutual credit, for some of our courses. We also give credits to people that have taken these courses at various universities throughout the United States.

Mr. EDWARDS. Without objection, the request is granted.

[The document referred to follows:]

344

IN THE UNITED STATES DISTRICT COURT FOR THE *N7*

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | Civil Action No. 76C 1448 |
| v. | ) | |
| THE AMERICAN INSTITUTE OF REAL ESTATE APPRAISERS OF THE NATIONAL ASSOCIATION OF REALTORS, THE SOCIETY OF REAL ESTATE APPRAISERS, THE UNITED STATES LEAGUE OF SAVINGS ASSOCIATIONS, and THE MORTGAGE BANKERS ASSOCIATION OF AMERICA, | ) ) ) ) ) ) ) | PLAINTIFF'S RESPONSE TO THE FIRST SET OF INTERRO-GATORIES OF THE DEFENDANT AMERICAN INSTITUTE OF REAL ESTATE APPRAISERS |
| Defendants. | ) | |

The United States of America, plaintiff herein, by its undersigned attorneys, hereby answers the First Set of Interrogatories served on it by the defendant American Institute of Real Estate Appraisers.

### INTRODUCTORY STATEMENT

As we will describe in greater detail in later portions of these answers, each of the defendants herein is a nationwide organization with thousands of members who are engaged in the business of appraising real estate for home loan purposes and/or making commercial home loans. Each defendant conducts technical training programs for members and for the lending and appraising

employees of members. These programs constitute a major vehicle in the private sector for the setting of appraising and underwriting standards and for assuring that the persons who engage in the day to day business of lending and appraising, are familiar with and rely upon these standards in their practices.

The United States contends that each defendant, has promulgated standards, criteria and practices pursuant to which the ethnic homogeneity of neighborhoods has been established as an important consideration in measuring the values of homes in an area. That is, that they have instructed the lending and appraising personnel of their members that the value of real property will be highest in areas which are racially, ethnically or "socially" homogeneous and will be lower in areas which are not. This has been accomplished not only through direct statements to that effect in the course of technical training and instruction programs but also by the development and application of appraisal methodologies and techniques which necessarily, by the very definitions they employ, rely upon a presumed relationship between homogeneity and value, in working through the three traditional approaches to value.

The American Institute of Real Estate Appraisers (hereafter the Institute) and the Society of Real Estate Appraisers (hereafter

346

the Society) each train real estate appraisers and award certi-
fications and designations to members who successfully complete
the appraisal courses offered by the respective organizations.
In order to obtain these designations, members must learn
appraisal technique and methodology as it is presented in the
materials and technical instructions of the defendant and then
pass examinations based upon their knowledge of the materials.
Members are bound by a code of ethics to conduct their appraisal
practice in accordance with the "professional standards" as
set forth in the training programs, and failure to do so can
subject a member to professional censure and potential loss of
standing as a designated member. Designation and continued
good standing in the two organizations carry with them important
economic benefits to members, inasmuch as designation permits
them to hold themselves out to the public, and, to employers
and to Courts as "experts".

Accordingly, the loss or threatened loss of designation,
or the threat of censure as well as the members' simple good
faith reliance on the organization's expertise, effectively
motivates members to observe the organization's standards.

The Society and the Institute have collaborated in the
establishment of standard appraisal definitions and methodologies

by jointly sponsoring and promulgating appraisal lexicons and
by awarding reciprocal credit toward their own designations
for training courses taken and successfully completed by members
of the other organization. The two groups have also considered
merging into one organization because of an officially sanctioned
similarity in their concepts about appraising and because of
the overlap in membership and the extent to which officers and
trainers in the two organizations hold "dual designations".

    \*      \*      \*      \*      \*      \*      \*

## Interrogatory No. 1.

1.  Describe each and every purported adopted standard for the appraisal and valuation of dwellings for home loan purposes referred to in Paragraph 7 of the Complaint, and identify the organization or entity which so adopted each such standard.

## Answer to Interrogatory No. 1. */

This interrogatory is answered separately for each defendant.

## The American Institute of Real Estate Appraisers

The Institute offers two designation programs. They are the "RM" (Residential Member) and "MAI" (Member American Institute). In order to be a candidate in either program, an individual must first have received a passing grade in the Institute's course No. 1 or No. 1A. **/ With respect to the RM designation, the Institute will accept, alternatively, completion and a passing grade in its course No. 8 (Residential Appraising). To actually obtain a designation, an individual among other things must demonstrate proficiency in methodology by passing exams and by submitting demonstration appraisal reports. An individual must also hold "some form of membership" in the National Association of Realtors (source of the above

---

*/ These answers are made by the plaintiff without the benefit of discovery. As of the time of this writing only one defendant has produced documents for inspection by plaintiff (the League). Because of this lack of discovery, the plaintiff is, to some extent, limited in its knowledge of facts such as the exact dates that particular defendants began or ended a practice, or the number and identities of persons involved in certain practices. These answers will be supplemented as the plaintiff obtains additional facts through discovery.

**/ Reciprocal credit is given for satisfactory completion of Course 101 offered by the Society of Real Estate Appraisers.

data: 'AIREA pamphlets available for inspection at offices
of plaintiff).

The Institute describes Course No. 1-A as "comprehensive
instruction in the basic principles and methods of real estate
appraisal". */ Course No. 8 is described as presenting "a
complete foundation of applied principles and techniques for
the valuation of single family homes". **/

The required textbook for Course 1-A is The Appraisal
of Real Estate (6th Ed., 1973) which is published by the Institute.
The required text for Course No. 8 is the Single Family
Residential Appraisal Manual, also published by the Institute.
In addition, trainees use an appraisal lexicon called Real
Estate Appraisal Terminology which is "sponsored jointly by
the American Institute of Real Estate Appraisers and the Society
of Real Estate Appraisers" (published by Ballinger Publishing
Co., Cambridge, Mass., 1975).

Students are also given materials in loose leaf form.
The Institute also uses various pamphlets which it publishes and

---

*/ The AIREA continuing Education Course Catalogue 1975, page 6.
**/ Ibid, at 21.

350

distributes to organizations and individuals interested in appraising.

The Institute's training programs and written standards have undergone changes, including refinements in language since their inception. */ We set forth below the data which we have at the present time, without having conducted discovery of the Institute. We have divided this data into what we believe are five logical time periods from 1935 until the present.

A. 1935-1950

The initial training manual of the Institute regarded as the first edition of The Appraisal of Real Estate was explicit in its treatment of racial factors.

The first version of The Appraisal of Real Estate contained the following guidelines: **/

---

*/ For instance, the word "social" has sometimes been substituted for the word "racial" in definitions or descriptions, with no explanation to indicate that the historical meaning of the definition is to be changed, and in circumstances where the context of the language frequently indicates that it is not.

**/ This information is taken from a document called Real Estate Appraisal, Copyright 1935 by the American Institute of Real Estate Appraisers of the National Association of Real Estate Boards.

003149

Text No. 9, Page No. 6 - Subject P-15:

<u>Private Restrictions</u>

To have the attributes of a good
residential area, it is essential that
protection be afforded against the
infiltration of inharmonious racial
groups and the encroachment of non-
conforming property uses. Such pro-
tection can be provided by deed
restrictions or private restrictions.

The text lists 13 types of restrictions. No. 9 is

Limitations as to ownership, use and
occupancy by certain racial groups.

With respect to these 13 types of restrictions

it is stated:

The effects of future utility pro-
duced by all of these matters are of
great importance and must be considered
by the appraiser. Detailed discussion
is not necessary here as the nature of
the effects are quite obvious or easily
detected. (Text No. 9, Page 7)

Text No. 1, Page 8, Subject A-1 of this guide instructs

the appraiser with respect to the relevant information to be

gathered when conducting an appraisal. Included among relevant

"data regarding the environment" is the following:

Nature of adverse or favorable value
factors - zoning regulations; deed
restrictions; nuisances; conveniences;
encroachment by non-conforming uses;
<u>infiltration of inharmonious racial groups;</u>
danger of flood, conflagration, subsidence;
climatic influences; increasing or decreasing
population; imminence of special assessment
levies. (emphasis added)

352

On the same page, the appraiser is instructed to gather data about the city, including the "nationality" of the population.

One section instructs the appraiser on how to calculate value by the "comparative approach" (Text No. 22, Subject P-1), and directs the appraiser when comparing properties to compare the "environments" as well.

> The environment of a property consists of a great many individual factors. Amongst these are the following, each of which contributes its bit toward building up or destroying desirability, utility and value:

> \* \* \*

> (7) Types of residents in the district - nationality, color, race, wealth, living standards, earning capacity or incomes.

In a section on "conformity", the manual presents a theory of human behavior which, it is stated, has a direct influence on value and "must be included in the considerations of the appraiser" (Text No. 16, Page 1, Subject P-20) (emphasis added)

> It is characteristic of human beings that they like usually to associate with others of like social standing, of similar living standards and sometimes, of like race or nationality. The family which must live upon a small income is not found living in a district of larger incomes. The Anglo-Saxon family does not wish to live in the same neighborhood with blacks or orientals.

> Because of this universal characteristic,
> individuals will not erect homes or live
> in them unless the costs are within their
> means and unless they are satisfied with the
> conditions which prevail in the chosen neigh-
> borhood. (emphasis added)

The theory is amplified in another section of the
early guide. Text No. 12, Page 1, Subject P-17 treats the
important "social" aspects of the neighborhood. */ The
Institute begins with the disclaimer that "the subject is a
touchy one" and that if the comments in this section "by some
peculiar twist" are offensive, it should be "accepted in the
spirit in which it is given". The Institute then directs
appraisers to catalog and analyze the ethnic composition of the
neighborhood, and states that drawing "from our general
knowledge, we may tabulate the characteristics and the effect
on the value of real estate in the neighborhood".

The Institute then presents a list of eighteen char-
acteristics with which the appraiser is directed to evaluate
the racial or ethnic groups in the area; and their "effect"
on value. These include:

---

*/ It should be noted that the word "social" is used in this
1935 section to apply directly to racial and ethnic
considerations.

354

2. Do they characteristically have large families?

5. Are their peculiar habits of living repulsive to other nationalities?

7. Are they shiftless and untrustworthy?

12. Are they peculiarly clannish?

13. What percentage are foreign born?

18. Are they particularly gregarious and are they by nature lovers of home?

This concept that race can be used as a proxy to determine aspects of value because of "our general knowledge" about people appears to draw from Homer Hoyt's book One hundred years of Land Values in Chicago, */ and , the Institute text refers the student to Hoyt's work approvingly. (Text No. 4, Page 7, Subject P-13).

Hoyt presented a ranking of races and nationalities with respect to their beneficial effect on land values. He averred that this ranking registers an opinion or prejudice that is reflected in land values. Stanley McMichael, who was a designated "MAI", reprinted the list in his widely distributed book McMichael's Appraising Manual (Prentice-Hall, 1951 through 1975), **/ (also lamenting the Supreme Court's ruling in Shelley v. Kraemer which made racially restrictive comments unenforceable.)

---

*/ University of Chicago Press, 1933.

**/ McMichael's book was endorsed by Arthur J. Mertzke, Director of the Department of Education and Research of the Realtors.

355

The hierarchial listing of races, in order of their "beneficial" effect on values is:

1. English, German, Scotch, Irish, Scandinavian;
2. North Italians;
3. Bohemenians or Czechs;
4. Poles;
5. Lithuanians;
6. Greeks;
7. Russian, Jews (lower class);
8. South Italians;
9. Negroes;
10. Mexicans.

The Institute did not reprint the above list in its 1935-1951 training material. However, the equation of the

racial characteristics of people with a purported effect on land values is clearly present."Germans" for instance, are perceived as beneficial, whereas others are less so, and the age of a neighborhood is pointed to as providing a good indication of the likelihood of "undesirable elements" entering an area.

### Text No. 7, Page 2, Subject P-15

#### Age of the Neighborhood

One usually inquires into the age of the neighborhood, and, from the age, comes to some conclusions as to what the future may hold. An old neighborhood which has not, in general, been re-built is susceptible to a great many influences -- most of which may be evil. The general tendency of such a neighborhood is to attract a different class of tenants and property owners with the accompanying lack of pride in the physical condition of the general surroundings. If not thoroughly restricted by deed, ordinance, or special agreement, there is a tendency for undesirable elements to enter. As such a movement develops, it gains momentum and in a very short period of time the entire neighborhood is blighted. Obviously, there are exceptions to this general rule. These exceptions, however, are the result of characteristics of certain types of people. In certain parts of this city, several generations of Germans have occupied a certain neighborhood, and, even though the area is extremely old, it has remained fairly stable. It is conspicuous that other racial types have particular characteristics which tend to

> make them attempt to imitate people in a
> higher social strata, even moving to places
> where they are not wanted. Old neighborhoods
> are particularly susceptible to this type of
> mutation.

Similar criteria are set forth in the section of the

text dealing with the "social" characteristics of neighborhoods

affecting investment property. (Text No. 34, Page 1, Subject P-25)

Here, the manual reviews the "fundamentals" of human

behavior described earlier and explains that it, therefore,

"becomes an important part of the inquiry in connection with

the social data of a business district to inquire into the habits,

traits and characteristics of the population making up the

supporting area". Three paragraphs later:

> In general, northern Europeans are a thrifty
> type of people, and assimilate more readily
> than southern Europeans and Asiatics. For
> illustration, if we had a hinterland populated
> by people of German ancestry, we should expect
> a frugal, home-loving type of citizen interested
> in the development of the district. The
> chances are that they would not buy beyond
> their means; and that they would promptly
> meet their obligations. For the most part,
> they would not become very wealthy, but would
> live within their means and become comfortably
> situated.
>
> This type of people also would have a tendency
> to stay in the district, and consequently make
> for stability. Therefore, a business district
> having a back country largely made up of this type
> of citizen is assured of permanence and stability.
> On the other hand, there are nationalities whose
> people are prone to purchase beyond their means
> and keep on the move to other parts of the city.
> People of this type do not make for stability in
> the local business district.

358

> Again, there may be another race of people
> coming into the district, one which has a
> very low standard of living, and a shiftless,
> irresponsible nature. These people harm,
> rather than help, the business district. Still
> another type may be ignorant and without pride
> or interest in the business district which is
> intended to serve it . . .
>
> Our inquiry, then, is to ascertain how many
> of each nationality we have in the area.

 *  *  *  *  *  *  *

On October 10, 1972 Mr. Alfred H. Mayer testified on deposition in connection with a lawsuit entitled United States v. City of Black Jack. */ Mr. Mayer is a builder and a former member of the St. Louis Realtor organization, and his company was the defendant in Jones v. Alfred H. Mayer Co., 392 U.S. 409 (1968). Mr. Mayer testified that among Realtor members in St. Louis this "ethical concept" regarding sales to Negroes did not actually change in practice until "the late 60's".

On August 23, 1967, Mr. Eliot Couden, a realtor and appraiser from Seattle, Washington testified before Congress that, although the official Realtor Code of Ethics had changed with respect to sales to Negroes, in his experience "the melody lingers on" for many practitioners. **/

B. 1950-1950

The Institute retained its overtly racial guidelines during this period. In 1951 the Institute published the first bound version of The Appraisal of Real Estate (referred to as

---

*/ At the time of deposition Mr. Mayer's address was 18039 Ella Blvd., Houston, Texas.

**/ Hearings before the Subcommittee on Housing and Urban Affairs of the Committee on Banking and Currency. United States Senate, 90th Cong. First Session, on S. 1358, S.2114 and S.2280.

the "Second Edition"). It was the standard outline for Institute training programs.

The first paragraph of the first page of the text sets forth the underlying concept that supports the appraisal methodology with which Institute members are trained. Significantly, this language is repeated almost unchanged in each successive edition of the text, including the version in present use. The 1951 edition states:

> The value of real estate is created, maintained, modified and destroyed by the interplay of the three great forces that motivate and characterize the activities of mankind. These forces are (1) social ideals and standards, (2) economic adjustments and (3) political or governmental regulations.

Among the "social forces" listed on this first page are

religious distribution

racial distribution

Referring to the "social significance of real property" the manual states:

> Population factors: Of no less importance than density, many other characteristics of population influence the use and value of real estate. These include size of family; <u>racial composition</u>; age groups; birth; marriage, divorce, death rates. (emphasis added)

An illustration of how racial composition affects value appears on p. 398, as an example of the "turnover factor"

361

> It is found that recent sales have been
> to purchasers in a markedly lower economic
> bracket than the present owners, and that
> the neighborhood has begun to disintegrate
> because of racial pressures and rapid changes
> in the pattern of city growth and development.
> When such a situation arises within an area,
> the usual result is a higher price level for
> a limited period. This is followed by a down-
> ward readjustment as present owners who are
> left to scramble to move elsewhere. (emphasis
> added)

On pages 83-84 there is a section entitled "Data

Necessary to All Approaches". This refers to the data the

appraiser needs to work through all three of the approaches

to value. It says:

> These may include such factors as the
> encroachment of undesirable racial elements
> or the introduction of commercial or industrial
> uses into a residential area. The presence of
> any one or all of these detrimental factors
> will have a tendency to reduce values.
> (emphasis added)

Chapter 6 deals with "Neighborhood Trends" and begins

with the principle "A property cannot be dissociated from its

neighborhood because it is a part of the neighborhood". It

is stated that "the neighborhood will reflect the characteristics

of the individuals comprising it". (p. 102)

362

> Sometimes neighborhoods having these similar
> group characteristics are more sharply marked
> by one characteristic. As, for example,
> neighborhoods which are composed primarily
> of one religious group, or stem from one
> racial stock. A neighborhood is a segment
> within a larger unit, the community. It is
> shaped and molded by social, economic and civic
> factors. Any fluctuation in these broad
> factors will modify the character of a neigh-
> borhood and if sufficiently powerful will
> change the character of the whole - the
> community. (pp. 102-103)

Based upon the above considerations the Institute

provides a definition of "neighborhood" which it retained for

more than twenty-five years, up to and including the present

> As the appraiser will view it, then, a
> neighborhood includes a more or less unified
> area with somewhat definite boundaries and
> a <u>fairly homogeneous population in which</u>
> inhabitants have a more than casual community
> of interests. In such an area the character
> of one property affects the character of all
> others as though they were all cogs in a
> machine. (emphasis added)

At this point follows the manual's principal discussion

of "social factors" in the neighborhood and their effect on

value. (P. 105):

ANALYZING THE NEIGHBORHOOD . . .

> How may the appraiser best organize his
> study of this basic organism which is a
> neighborhood? How can he isolate and chart
> for study those trends which are constantly
> moving within it to shape its destiny and
> the destiny of its properties? Launching
> out from a broad understanding of the nature
> of the problem, he can weigh and measure data
> under three general heads: (1) social,
> (2) physical, and (3) economic and governmental.
> Let us suppose that we are developing such a
> three-part study for a residential neighborhood.

363

**Social Data**

The value levels in a residential
neighborhood will be influenced more by
the social characteristics of the people
occupying or in prospect of occupying the
area than by any other factor. Therefore,
too much importance cannot be attached to the
social data which the appraiser must consider.
(emphasis added)

Homogeneity. No matter how attractive
a particular neighborhood may be from every
other angle, it will not possess maximum
desirability unless it is occupied by people
who will be happy in one another's company
and unless it provides the right setting for
the rearing of children. Above all else,
home purchasers want the best advantages they
can afford for their children and this includes
desirable neighbors and their children. Thus
a wide tolerance or mutuality is involved in
matters of race, religion, income, cultural
standards, and ways of living.

Thus the appraiser must understand fully
the social structure of the neighborhood. He
must study its trends in terms of race,
religion, income, numbers of people, numbers
of families, family sizes, age groups, vocation,
transiency, thriftiness, attitude toward law
and order, and gregariousness (club and recre-
ational trends).

In summarizing, the guidelines continue (P. 115):

Now examine those trends, in brief, that
tend to depreciate the value of a neighborhood.
Factors that contribute to the destruction of
value are as follows:

1. The clash of nationalities with dis-
similar cultures. When a new class of people
of different race, color, nationality, and
culture moves into a neighborhood, there is
a tendency on the part of the old inhabitants to
think that the neighborhood is losing desirability;
and thereafter they tend to move to other
districts.

364

In discussing apartment house districts, the manual repeats some of the above cautionary words:

> To recognize when an apartment project is
> well located and likely to have enduring
> value, give considerations to the answers
> to such questions as these:
>
> &ast;  &ast;  &ast;
>
> Has the neighborhood a good reputation with
> no objectionable racial or cultural conflicts?
> Has it a residential atmosphere, an attractive
> appearance, with adequate protection against
> industrial or commercial instrusion?

Later, in the chapter on depreciation, this process is defined as "A loss in capital value. An effect caused by deterioration or obsolesence or both." The same paragraph defining depreciation provides that "Economic obsolesence is caused by changes external to the property such as neighborhood infiltrations of inharmonious people . . . ." (P. 207) (emphasis added).

This type of depreciation (caused by economic obsolesence) is "rarely, if ever curable."

Chapter 23 concerns what should be included in the "appraisal report". Under "neighborhood data" the trainee is referred to the discussion in the earlier chapters, which we have discussed. Then 12 items are listed for inclusion in the report. These include:

> 10. Social characteristics of inhabitants
>
> **and**
>
> 12. Prospects of infiltration of inharmonious groups.

003163

. It is important to note this interchangeable use of the words "social" and "inharmonious" for racial and ethnic consideration. In fact, the term "infiltration" has been defined by the Institute as follows:

> 1935 - Appraisal Terminology Handbook. P. 31
>
> Act or process of penetrating; e.g. colored people into a white residential district
>
> 1938 - Appraisal Terminology Handbook:
>
> Act or process of gradually entering, e.g. immigration of an inharmonious racial group into a neighborhood . . .

C. 1960-1964

The third edition of The Appraisal of Real Estate was published by the Institute in 1960 and served as its major text until 1964, when the fourth edition was published.

For the most part, the considerations of neighborhood factors are set forth in the same language as in the previous version.

Paragraph 1 of page 1 repeats the basic principle that "The Value of real property is created, maintained, modified or destroyed by the interplay of the great forces which motivate the activities of human beings". Among the seven "social forces" listed on this first page is

    4. Geographical distribution of racial groups.

With respect to neighborhood analysis the manual states again:

366

## Social Considerations in Neighborhood Analysis

The value levels in a residential neighborhood will be influenced more by the social characteristics of the people occupying or in prospect of occupying the area than by any other factor. Therefore, too much importance cannot be attached to the social data which the appraiser must consider.

No matter how attractive a particular neighborhood may be from every other angle, it will not possess maximum desirability unless it is occupied by people who will be happy in one another's company and unless it provides the right setting for the rearing of children. Above all else, home purchasers want the best advantages they can afford for their children and this includes desirable neighbors and their children. Thus a wide tolerance or mutuality is involved in matters of race, religion, income, cultural standards, and ways of living.

Race and religion are both touchy subjects. The reasons that this is so are not the appraiser's responsibility. However, he must recognize the fact that values are likely to change whenever people different from those presently occupying the area, advance into and infiltrate a neighborhood.

In the 1960 edition there are a number of examples of substitution of the word "social" for the word racial, in circumstances where the context of the language apparently means racial, and where the word racial previously appeared.

For instance, on P. 100 the text refers to factors which "depreciate value" and states that these include:

1.. A tendency on the part of a neighborhood's present inhabitants to think it is losing desirability because of an influx of people of a different economic, social or cultural status.

On page 101, in analyzing the Apartment Neighborhood
the appraiser is told to determine

> Has the neighborhood a good reputation?
> Is it free from objectionable social or
> cultural conflicts? (emphasis added)

"Infiltration" became defined as "the displacement of the
present residents by people of a lower economic status, and
different social and cultural background. (emphasis added)

However, it appears that the words "social and
cultural" are synonyms for race in the definition of "infiltration"
inasmuch as, on P. 387 of the text, under factors to be
included in the appraisal report, number 12 is

> Prevailing Nationalities, infiltration */

This appearance is further illustrated by reference
to a Demonstration Appraisal Report of A Single Family Residence.
This document was copyrighted by the Institute in 1963 and
begins with the observation that

> The purpose of this demonstration
> appraisal of a single family property is
> to illustrate as many of the principles
> and techniques of single family appraising
> as practicable in the allotted time.

Apparently, the Institute interpreted its own discussion
of "social aspects" of a neighborhood to include racial aspects
because, in this 1963 model appraisal which it prepared, in
the neighborhood analysis section it is stated

---

*/ The identical language was retained and included in the most
   recent and current edition of this appraising guide.

368

> The neighborhood is entirely Caucasion.
> It appears that there is no adverse effect
> by minority groups.

**D.**  **1964-1967 and 1967-1973**

The fourth and fifth editions of The Appraisal of
Real Estate (1964 and 1967 respectively) retain the opening
statement which explains that, in the Institute's view the
"social forces" by which property value is "created, maintained,
modified or destroyed" include the "geographical distribution
of racial groups" (Page 1).

Again, the relevant considerations in an appraisal
report include "Prevailing nationalities, infiltration" (4th
Ed. at 386; 5th Ed. at 389).

The discussion of neighborhood factors in the fourth
edition is exactly the same as it is in the third edition.
It is virtually identical in the fifth edition, used from
1967-1973 and the fifth edition (1967) repeats the example
cited in the 1960 edition which traces neighborhood "disinte-
gration" to "racial pressures", as a causative factor (5th
ed. p. 340).

It is significant to note the close similarity between
Institute texts and the language in a 1970 publication by a
prominent member of the Institute. In Valuation of Real Estate */
Alfred A. Ring, M.A.I., S.R.A. states:

---

*/ Prentice Hall, 1970 (Second Ed.)

### Social Forces Influencing Neighborhood Values

People create value - hence the compatibility and congeniality of people in an area are important to sustain and enhance neighborhood desirability and property values. A quality neighborhood will disclose homogeneity as to kind of residents in regard to race, creed, and national origin. Despite educational and legal efforts to bring about the acceptance of true democratic doctrines, enforced - even when inadvertent - mixing of residents with diverse historical backgrounds within a neighborhood has immediate and depressing influences on value. Often just the threat of infiltration-like rumors within a stock market - causes market values of real properties in the area to be adversely affected. Therefore the necessity and importance of inventorying and reporting the background characteristics of neighborhood residents appears obvious. It must be kept in mind, however, that it is not the opinion or personal preferences of the appraiser that are to be reflected, but rather an objective prediction of the anticipated action or reaction of typical buyers who may purchase properties for use and occupancy in the subject area.

Ring's guidelines are almost a paraphrase of the Institute's and are relevant to the reasonable interpretation of Institute criteria.

#### E.  1973 to Present

The sixth edition of The Appraisal of Real Estate is in current use in the programs which lead to designation as an MAI and RM. Again, on the first page, are listed several

370

of the important "social forces" which affect value. This edition refers not to the "geographical distribution of racial groups", but to the "geographical distribution of compatible groups" (page 1). The distinction may be lost, however, because the appraiser is still instructed in overt terms that a relevant factor to be considered in neighborhood analysis is:

Prevailing Nationalities/Infiltration (P. 492)

Much of the other discussion in this text is unchanged from previous versions and the concept of "social homogeneity" is central to the techniques and methodologies set forth in the current courses.

The section on "Social Considerations in Neighborhood Analysis" is only slightly different from earlier versions and from the more overt interpretation of Alfred Ring:

Social Considerations in Neighborhood Analysis

The value levels in a residential neighborhood are influenced more by the social characteristics of its present and prospective occupants than by any other factor. Hence, social data is a major consideration in residential appraising.

No matter how attractive a particular neighborhood may be, it does not possess maximum desirability unless it is occupied by people who are reasonably congenial. This implies a community of interest based upon common social or cultural backgrounds. Above all home purchasers with children usually desire the best advantages that they can afford; and this includes compatible families as neighbors.

003169

Any analysis of value must take into account the fact that basic changes in the character of the residents of a neighborhood may favorably or adversely affect the value of properties located therein. Neighborhoods tend to be composed of residents having similar vocations or professions. However, the margin of social difference between the skilled factory worker, the supervisory employee, and the clerical office worker is steadily diminishing.

Facts about the age distribution of the residents are useful in judging the life stage of a neighborhood. Long bound together by vocational, social, racial or religious ties, a neighborhood may nevertheless tend to change its character or to develop into a tenant-occupied district, as children mature, marry, and move away. This development tends to change the neighborhood's social structure and may alter values.

A neighborhood is, by definition, "a homogeneous

grouping of individuals, buildings or business enterprises"

(P. 88). In language identical to that of earlier editions

it is stated

Residential neighborhoods assume many of the characteristics of the individuals who live in them - these neighborhoods express the mutual desires of people with comparable interests, related traditions and similar social and economic status (P. 88).

\* \* \*

In defining neighborhood boundaries, a unified area is identified with a fairly homogeneous population in which the inhabitants have a more than casual community of interest. In such an area, the character of one property effects the character of all others, as though

all were cogs in a machine. (p. 89)
(emphasis added)

**and**

A real property is an integral part
of its neighborhood. It cannot be treated
as an entity apart from its environment
created by the interplay of a multitude of
economic, social, physical, and governmental
forces. The value of real property is not
intrinsic, resulting exclusively from the
physical characteristics of the property.
Therefore an analysis of the forces currently
influencing the neighborhood identity is
necessary to comprehend their effect upon
probable trends in value. As all properties
share the future of the neighborhood with
which they are identified, their values may
fluctuate, owing to the action of environing
forces. (p. 87)

It is stated that:

"Among the principal factors which
improve value in private residential neigh-
borhoods are these:

2. A homogeneous population with
a sense of civic responsibility (p. 99)

In the next paragraph the following guideline is

expressed:

It is the appraiser's minimal task to
analyze the neighborhood in accordance with
these advantageous factors as well as those
which depreciated value. Among the latter
are:

1. A tendency among a neighborhood's
inhabitants to think it is losing desirability·
because of an influx of people of a different
economic, social or cultural status.

(This language is unchanged from previous editions in which the words racial and social were used almost interchangeably.)

Again, in connection with apartment districts, the same concepts are set forth as were present in earlier, overtly racial outlines.

> In an apartment area, desirability and value are influenced by the following:
>
> 5. Reputation of Neighborhood and its freedom from objectionable social or cultural conflicts. (emphasis added) (p. 100)

Institute trainees are also provided a "Student Outline" which accompanies the textbook and other materials. In 1973, in a course given by the Institute in Chicago */ this outline and other course material contained overtly racial guidelines which indicate that references to "homogeneity" and "social" factors in current materials do actually relate to ethnic factors. For instance the 1973 Student Outline in the section on "Community Economic Base" (P. 166) says:

> Ethnological information also is significant to real estate analysis. As a general rule, homogeneity of the population contributes to stability of real estate values. Information on the percentage of native born whites, foreign whites, and non-white population is important, and the changes in this composition has a significance. As a general rule, minority groups are found at the bottom of the socio-economic ladder, and problems associated with minority group segments of the population can hinder community growth. Similar comments are appropriate for occupational types in a community.

---

*/ Course 1-A, offered at Appraisal Institute Education Center, 850 North Lake Shore Dr., Chicago, Illinois 60611, November 5-16, 1973.

374

The Institute's 1973 course also included a slide show on the appraisal of single family homes. The accompanying sound track said of neighborhood analysis ". . . exceptional factor which may affect value is the influx of inharmonious social or racial groups." The slide on the screen showed a burned out store. */ One lecturer, a Mr. Coulton, mentioned some positive aspects of "non-heterogeneous, non-conflicting, integrated neighborhoods". He indicated that he lives in an integrated neighborhood and that the "black kids are super athletes". He began and ended his lecture with the admonition "as the neighborhood goes, so goes your subject property".

In its section on the "basic principles of Real Property Value" the Institute's 1973 text states:

> The principle of conformity holds that maximum value is realized when a reasonable degree of sociological and economic homogeneity is present (P. 40) (emphasis added)

**and**

> The highest and best use is generally realized under circumstances of conformity (which) . . . is the result of a reasonable degree of architectual, social and economic homogeneity.

------------------------------------------------

*/ Taken from interview with and notes of Professor Calvin Bradford, Associate Director of the Center for Urban Studies at the Chicago Circle Campus. Professor Bradford attended the course as an observer.

375

Another training manual of the Institute */ places
equal emphasis on neighborhood conformity, and provides a list
of characteristics of such conformity. The manual discusses
the importance of appraisers estimating potential changes in
housing value when residents have different economic, social
and cultural backgrounds:

> If the families in a neighborhood are con-
> genial, the neighborhood generally has
> strong appeal and stability. When the
> residents are of varied economic, social
> and cultural backgrounds, the appraiser
> must determine whether this lack of homo-
> geneity reduces the neighborhood's desir-
> ability to present and prospective occupants. **/

The manual also teaches appraisers to estimate changes
in value which occur because the neighborhood is changing
or likely to change, i.e., people with one set of social,
economic and cultural characteristics are moving out and those
with different characteristics are moving in:

> If the occupancy is changing from one user
> group to another, or if adjacent areas are
> occupied by a group dissimilar to the typical
> occupants of the subject neighborhood (in
> short, if any change of occupancy is imminent
> or probable), this change should be reflected
> in the valuation. Usually when occupancy is
> changing from one user group to another, the
> successor group is of a lower income level. ***/

---

*/ Single Family Residential Appraisal Manual, Jerome Knowles Jr.,
American Institute of Real Estate Appraisers, 1974.

**/ Ibid, pp. 8, 31.

***/ Id.

In 1975 the Institute, in conjunction with its co-defendant, the Society of Real Estate Appraisers, sponsored a lexicon of appraisal definitions that is in standard use in the courses required by both organizations. It is called Real Estate Appraisal Terminology. In it, the concept of "Depreciation", central to appraisal methodology, is defined as follows:

> A loss of utility and hence value from any cause. An effect caused by deterioration and/or obsolescence ... Economic obsolescence is caused by changes external to the property such as neighborhood infiltrations of inharmonious groups or property uses, legislation, etc. (emphasis added)

This definition of depreciation is almost identical to that promulgated by the Institute in 1948 and repeated in 1950 and 1954. */ That definition was

> A loss in capital value. An effect caused by deterioration or obsolescence or both . . . Economic obsolescence is caused by change external to the property such as neighborhood infiltrations of inharmonious people or property uses, legislation etc. (emphasis added)

In the period from 1948 to 1954, the phrase "inharmonious people" referred unambiguously to inharmonious races.

The Institute's 1975 definition of "infiltration" is:

---

*/ AIREA Handbook for Appraisers. Library of Congress No. HD 1387, A 58 (1948), (1950), (1954).

> The gradual displacement of the
> present uses or residents by shifts in
> the economic, social and physical forces
> creating the environment.

To understand its proper context this should be compared with

the Institute's 1938 definition of "infiltration":

> Act or process of gradually entering
> e.g. immigration of an inharmonious racial
> group into a neighborhood . . . */

In the pamphlet distributed in 1975 to bankers and

appraisal students it is indicated that relevant information

for the appraisal report is

> "Infiltration/transition"

The 1975 definition of "transition" is:

> District or neighborhood use changes,
> such as farm to residential, residential
> to business.  Also, ethnic or economic
> changes (emphasis added)

The 1975 definition of "Homogeneous" is also important:

> Homogeneous:  In real estate, used to
> describe an area or neighborhood in which
> the property types and uses are similar and
> harmonious and the inhabitants have similar
> cultural, social and economic backgrounds.
> Antonym: heterogeneous.

This official 1975 lexicon then defines the concept of

"neighborhood" in terms of this homogeneity:

---

*/ 1938 Appraisal Terminology, published by Institute (P. 43)
   Library of Congress No. H.D. 1387 - A 58 (1938).

> Neighborhood: A portion of a larger
> community or an entire community, in which
> there is a homogeneous grouping of inhabitants,
> buildings or business enterprises. Inhabitants
> of a neighborhood usually have a more than
> casual community of interests and a similarity
> of economic level or cultural background.
> Neighborhood boundaries may consist of
> well-defined natural or man made barriers
> or they may be more or less well-defined by
> a distinct change in land use or in the
> character of the inhabitants (emphasis added)

All of the above described guidelines and criteria
are woven into an integrated appraisal methodology and technique,
where concepts about homogeneity and economic obsolescence are
translated into dollar calculations.

For instance, Chapters 15 and 16 of the Sixth Edition
of The Appraisal of Real Estate instruct the appraiser in how
to use the Market Data Approach to value. It stresses the need
(1) to chose comparables with a view toward locational comparability
and (2) to adjust comparables for locational factors (pp. 280, 281,
284, 288, 294). Since ethnic (or "social") factors are, by
definition intrinsic in considerations of location, this bias
is programed into the appraisal process.

Likewise, in the Cost and Income Approaches to value, the
concept of "economic obsolescence" requires the appraiser to
compare the "affected" property with some "ideal neighborhood"
without this adverse feature: the Institute's Residential Appraisal

<u>Manual</u> puts it  .s way, at p. 75:

> In measuring economic obsolescence by
> rental loss, comparison is made of the subject
> property with reasonably comparable properties
> in an ideal neighborhood where there is no
> indication of economic obsolescence, to estimate
> how much of the subject property suffers in loss
> of rental because of its location in a less
> desirable neighborhood. In this instance, it
> is necessary to allocate the loss in rental
> attributable to the land as well as to the
> building because rent is paid for use of both.
> This allocation is made by estimating a ratio
> of land to building value in the ideal neighbor-
> hood, and deducting the estimated loss of income
> to land to arrive at the estimated loss of
> income to the subject building. (Manual, p. 75).

This manual, in current use, lists under important
social influences on the value of real property "ethnic and
age groupings" (P. 10). It also states "To achieve its
maximum value, land must be utilized in such a way as to conform
to existing neighborhood standards . . . and should house
families of similar economic and social status." (at 8)

In the summer of 1976, the American Institute of Real
Estate Appraisers sponsored an appraising course in Memphis,
Tennessee. The course was taught by Lewis Pipkin, R.M., SRA
and televised. On June 22, 1976 in the course dealing with
neighborhood factors. */ The lecturer, referring to Chapter 6
of <u>The Appraisal of Real Estate</u> pointed out that the three most
important things about a property are "location, location and
location", and that "A property is the victim of its neighborhood"
and "As the neighborhood goes, so goes the subject property".

---

*/ Plaintiff has not yet analyzed the dozen or so later lessons.

380

He stated that the neighborhood sets the "upper limit" of
value of the property. He also indicated that the appraiser
should be concerned with the "social factors" in a neighborhood.
One of these is the "social prestige" of the area. Another is
the "homogeneity of the social characteristics of the people
who live in the neighborhood."

He indicated that "if there is some reasonable homogeneity"
this will "improve the value".

He also stated that one factor to be considered is the
willingness of lenders to make loans in the area. He referred
to recent publicity about redlining and indicated that the
appraiser should take into account the reluctance of lenders to
make loans in an area because of the "life stage" of the
neighborhood.

He stated that it is important to know "where the
children will play" and again, having a "homogeneous population
with a sense of civic responsibility is an advantage" in an area.

He stated that value will decrease if the people living
in the area begin to think it is "losing desirability" and
cautioned the appraiser to look for the presence of "inharmonious"
factors.

The Society of Real Estate Appr<u>....</u> */

    As indicated earlier, the Society and the Institute
have jointly sponsored the Real Estate Appraisal Terminology
text and it is a required text in Society courses. Consequently,
the answers provided at pp. 39-41 *supra*, are applicable here
and incorporated by reference.

    Also, since the Society grants reciprocal credit for
completion of the Institute's basic courses, much of the dis-
cussion with respect to the Institute is applicable here. The
Society has indicated that at least 70% of designated appraisers
hold membership in more than one professional organization
(SRA Pamphlet: SRPA - a designation that denotesa professional
appraiser). Individuals who prepared Institute courses are also
designated in the Society (Mr. Walther, Mr. Kuehnle) and individuals
who prepare Society courses are also designated in the Institute
(Mr. Stebbins, Dr. Kinnard, Mr. Carmichael, Mr. Hagood, Mr. Church,
Mr. Geary and Mr. Deisher).

----

*/ Pursuant to a stipulation of counsel for the Society and for the
United States, discovery between those parties has been delayed
pending the court's ruling on certain pretrial motions.
Accordingly, the United States is not presently in possession
of all of the information relevant to the defendant's alleged
practices.

47-614 O - 79 -- 25

In its 1975 directory, the Society states:

> The Society of Real Estate Appraisers
> was founded in 1935 to elevate the standards
> of the appraisal profession; to aid in the
> solution of many of the problems in the
> profession in appraising and analyzing real
> estate and to designate certain members as
> having attained superior skills and knowledge.

> \*   \*   \*

> Technical training in the valuation and
> analysis of real estate is provided through
> formal education courses, seminars,
> and conferences.

> \*   \*   \*

> Our SRA designation is the foundation on
> which the entire real estate appraisal profession
> is based. The appraisal of residential property
> is still the basis upon which most mortgages are
> based, and one which requires knowledge and
> expertise available only through the Society's
> educational and professional training programs.

> \*   \*   \*

> The Society's 18,000 members include full-
> time professional real estate appraisers and
> analysts, and those who are participating in a
> professional training program. The Society is
> the largest independent association of professional
> real estate appraisers and valuation specialists
> in North America.

Successful completion of Course 101 is a prerequisite

for all of the Society's designations. Course 101 "is an intensive

course covering all real property appraising concepts and the

technical skills employed in their applications to residential

property. It is described as an "authoritative introduction
to the field of real property valuation designed for the
beginner appraiser, real estate broker, lender, builder and
assessor". */

The texts for the course include the lexicon Real
Estate Appraisal Terminology discussed at pp. 39-41 supra.
and the Society's Guide to Appraising Residences by
Grady Stebbins. Also used is the Society's Guide to Narrative
Appraisal Reporting . There are also course outlines and other
non-published materials.

The 1969 version of the Guide to Appraising Residences
was obtained in the summer of 1975 from the Society, as the
"current" version.

On page six the Society, in language similar to that
used by the Institute:

> A third and most important influence
> level is that of the local community. Here,
> the appraiser must analyze the market factors
> in terms of their relevance to the appraisal
> problem at hand.

The Society sets out "four major" forces which shape
the local community

    1.  Physical

    2.  Economic - Financial

    3.  Political - Government

    4.  Sociological.

---

*/ SREA Pamphlet "Discover Society of Real Estate Appraisers
Intensive Courses 1975".

The appraiser is instructed to obtain the following data "representative of the major types of information required for an effective analysis of the economic and market environment affecting the property under appraisal":

> 1. Population: Size, household plus
> family size, age distribution, sex dis-
> tribution, natural increase (is it
> increasing, static or decreasing),
> education level, ethnic or racial back-
> ground, labor force participation,
> geographic density or distribution
> (emphasis added)

In November of 1974 the Society published the fourth edition of its "Guide to Appraising Apartments.

On page fifteen there are nine relevant factors listed under "Factors of Neighborhood Analysis" these include:

> Population: typical income spread,
> ethnic characteristics, area density,
> transiency, family size and make-up.
> (emphasis added)

Also it is cautioned that among the "basic forces affecting value in an apartment property are . . . (3) the existence (or absence) of such nuisances as noise, smoke, odors or inharmonious land uses or users. (P. 9)

The 1975 version of the Society's manual, An Introduction to Appraising Real Property, prepared by William Kinnard, SRA, MAI presents eight aspects of the principle of neighborhood conformity and these include the similarity of residents' cultural, education, social and ethnic backgrounds. (pp. 6-11)

385

The traditional warnings are made in the Society's criteria against the "infiltration" of "inharmonious" elements:

> Barriers that protect an area against blight, undesirable uses of property and the infiltration of inharmonious influences are of primary importance to the stability of values in a neighborhood (Guide to Appraising Residences) (P. 12)

> \* \* \*

> Stability comes from a long-range interest in the character of a community. Also, its character is less likely to change as there are fewer opportunities for inharmonious occupants to replace departing owners (id. at 12)

The Guide to Narrative Appraisal Reporting instructs the appraiser to document in his report important "neighborhood data" including the:

> 10. Adverse influence of inharmonious groups of people (p. 6)

In November of 1974 the Society gave its Course 101 at the campus of the University of Wisconsin. The student outline contained a section on Causes of Diminished Utility (Accrued Depreciation). These included "Physical", "Functional" and "Locational" causes; the "locational" depreciation factors included (in addition to "unpleasant odors and physical hazards):

> Intrusion of inharmonious uses, infiltration of inharmonious occupants or users.

One of the participants who attended this course was a realtor, Jay A.C. Hart of Rockford, Illinois. */ Mr. Hart regarded the reference in Society courses to "inharmonious occupants" to include inharmonious "racial" groups and on that basis defended his use of a "Real Estate Buyers and Sellers Guide" which he prepared in which he indicated that "the neighborhood should not contain inharmonious racial groups".

The Society's Guide to Appraising Residences contain a section on the "Direct Sales Comparison Approach". The appraiser is instructed on how to select aspects of comparability, central to this value approach. Among items of location which must be considered are the "social and economic compatibility of the residents". Locational analysis is also cited as central to the "Gross Rent Multipler Analysis" (P. 37) and the "Cost Approach" (P. 43).

The Society maintains a network of computerized data sources under the auspices of the "SREA Market Data Center". This facility collects data on "comparables" by having members or others complete computer readable data forms on sold property in their areas. These forms are then correlated and the Society distributes, on a locality basis, lists of "comparables" which can be used by the appraiser. These lists contain brief

---

*/ 2623 East State St., Rockford, Illinois 61108.

387

descriptions of the characteristics of the property and area so
that the appraiser can determine "comparability". One of the
factors reported is the presence of "economic obsolescence". Since
"economic obsolescence" is defined by the Society as including
the "infiltration of inharmonious groups", (1975 Appraisal Termino-
logy) appraisers who reasonably interpret this term as having a
racial meaning, may indicate its presence as part of "economic
obsolescence" when submitting the computer forms on properties
in integrated areas. Appraisers who then use this data in
selecting comparables for the market approach to value make
"adjustments" on the basis of this factor. Plaintiff is aware of at

least one study which indicates that SREA data contains a built in "systematic bias" which, for one thing "greatly over estimates the extent of FHA activity" and is "not a random and representative sample of all sales. */ This is of great significance inasmuch as the SREA's own widely distributed "Inner City Valuation Study" equates heavy FHA lending with neighborhood decline and the majority of FHA loans are made to minorities, or in minority communities.

        *      *      *      *      *      *      *

389

Mr. EDWARDS. Also without objection there will be inserted in the record a portion of the memorandum of the United States submitted in opposition of the motion of the Society of Real Estate Appraisers in the case of *U.S.* v. *AIREA* 442 F Supp. 1072. This excerpt specifically puts forth the position of the U.S. Department of Justice with respect to the first amendment issues raised by the society.

[The document referred to follows:]

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 76 C 1448 |
| | ) |
| | ) MEMORANDUM OF THE UNITED STATES IN |
| | ) OPPOSITION TO THE MOTION OF THE |
| THE AMERICAN INSTITUTE OF | ) DEFENDANT SOCIETY OF REAL ESTATE |
| REAL ESTATE APPRAISERS OF | ) APPRAISERS TO DISMISS THE COMPLAINT |
| THE NATIONAL ASSOCIATION | ) FOR FAILURE TO STATE A CLAIM UPON |
| OF REALTORS, THE SOCIETY | ) WHICH RELIEF CAN BE GRANTED |
| OF REAL ESTATE APPRAISERS, | ) |
| THE UNITED STATES LEAGUE | ) |
| OF SAVINGS ASSOCIATIONS, | ) |
| and THE MORTGAGE BANKERS | ) |
| ASSOCIATION OF AMERICA, | ) |
| | ) |
| Defendants. | ) |

003188

290

### III. The Complaint Seeks to Enjoin Conduct, Not Speech, and Does Not Contravene the First Amendment

The defendant, raising the specter of a "chilling effect on the free exchange of professional ideas and opinions" (DM 4), contends that the Complaint seeks to suppress "commercial speech" protected by the First Amendment. However, defendant's sweeping references to itself as "a marketplace for the exchange of ... ideas" (DM 2) and to its members' "honest professional judgments" (DM 4) cannot change the allegations of the Complaint which, of course, are accepted as true on this motion. The Complaint alleges only that the defendants have engaged in unlawful conduct, and requests as relief a declaration that the conduct is unlawful and an injunction which both prohibits the continuation of the conduct and requires steps to undo the discriminatory effects of past violations. There is no prayer whatsoever that free speech be suppressed, and a motion to dismiss cannot be granted on the basis of a defendant's speculative suppositions and fears of what relief a court of equity might grant, or the United States might seek.

While we believe that the bare allegations of the Complaint are sufficient to defeat this motion, we address what we understand to be the two First Amendment grounds raised by defendant's motion.

391

**A.** The Appraisal is an Important Part of the Lending
Process and may Constitutionally be Regulated.

The appraisal of a home is an essential part of the
commercial transaction involving the financing of its sale. (See
discussion pp.14 and Appendix A). While the appraisal does,
in a sense, express an opinion of the value of the home, we
propose to show at the appropriate evidentary hearing that the
appraisal in fact, creates that value for the purposes of the
lending decision. No doubt the defendant disputes this factual
allegation but, it is well within the ambit of the Complaint
herein and must be accepted as true on this motion.

When an appraiser "devalues" a home for lending purposes
because of race or the racial composition of the neighborhood,
and submits a negative appraisal report because of these
factors, he engages in commercial conduct, albeit conduct
accomplished with words and writing. Congress has made that
conduct illegal, and the First Amendment affords it no
shelter. Incidental restrictions on speech which is part
of unlawful conduct have been repeatedly upheld by the
courts and are not inconsistent with, but, indeed, expressly
permitted by, the recent Supreme Court decisions on which
defendant relies.

The basic distinction between protected speech on the
one hand and unlawful conduct effected by speech on the other
was formulated by Mr. Justice Black, perhaps the most
articulate defender of the First Amendment in the Court's

003190

history, speaking for a unanimous Court in Giboney v.

Empire Storage Company, 336 U.S. 490 (1949):

> It is true that the agreement and course
> of conduct here were as in most instances
> brought about through speaking or writing.
> But it has never been deemed an abridgement
> of freedom of speech or press to make a course
> of conduct illegal merely because the conduct
> was in part initiated, evidenced, or carried
> out by means of language, either spoken,
> written, or printed.

336 U.S. at 502. Accord: Cox v. Louisiana, 379 U.S. 559

(1964).

In enacting the Fair Housing Act, Congress prohibited

many types of conduct which can only be accomplished with

words. For example, 42 U.S.C. §3604(a) has been consistently

held to prohibit the practice or racial "steering" which has

been defined as including any words or conduct by a real

estate agent which influence residential choice because of

race. Zuch v. Hussey 366 F. Supp. 553, 556 (E.D. Mich. 1975).

See also Moore v. Townsend, 525 F.2d 482, 486 (7th Cir. 1975).

42 U.S.C. §3604(c) makes it unlawful to make, print or

publish or cause to be made, printed, or published any notice,

statement, or advertisement with respect to the sale or rental

of a dwelling that indicates a preference, limitation, or dis-

crimination based on race. 42 U.S.C. §3604(e) makes it unlawful

to attempt, for profit, to induce a homeowner to sell his home by

representations (even if they are true) that black persons
are moving into his neighborhood. The constitutionality of
these provisions has consistently been upheld against First
Amendment attack. United States v. Hunter, 459 F.2d 205
(4th Cir. 1972) cert. den. 409 U.S. 934 (1972) (§3604(c)
constitutional as applied to newspaper publisher);
Holmgren v. Little Village Community Reporter, 342 F. Supp.
510 (N.D. Ill. 1971) (same); United States v. Bob Lawrence
Realty, Inc., 474 F.2d 115 (5th Cir. 1973); cert. den.
414 U.S. 826 (1973) (§3604(e) constitutional despite defense
that statements were true.) As the Court observed in Bob
Lawrence, supra.,

> "any informational value in a statement
> violative of §3604(e) is clearly outweighed
> by the government's overriding interest in
> preventing blockbusting." 474 F.2d at 123. */

Bigelow v. Virginia, 421 U.S. 809 (1975) and Virginia
State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,
U.S.   , 44 U.S.L.W. 4686 (May 24, 1976), the two
cases on which defendant places its sole reliance,

---

*/ In Bob Lawrence, the Court defined blockbusting, which it
condemned as a "pernicious example of a capitalistic ethic gone
astray," 474 F.2d at 119, as the practice of initiating and
spreading rumors that "Negroes are moving in and that the
market values of properties will fall," with residence in the
area becoming undesirable and unsafe for non-Negroes. The
complaint in this action alleges that these defendants'
practices have the same resegregative effect, with the qualification
that they go further and cause their members actually to
assign a lower value to homes in integrated areas, whereas
blockbusters merely talk about such reduced value.

394

affirm, rather than undermine, the validity of the foregoing
principles. In Bigelow, the Court reversed a conviction
for violation of a Virginia statute which made it unlawful
to circulate any publication which encourages or promotes
an abortion. The Court rejected the idea that commercial
speech had no First Amendment protection, but took pains
not to appear to be overruling a number of decisions in which
particular commercial speech had been enjoined as unlawful
conduct, and specifically mentioned, by name, two Fair
Housing Act cases in which First Amendment defenses had been
rejected, United States v. Bob Lawrence Realty, Inc., supra,
and United States v. Hunter, supra. The Court said:

> We have no occasion, therefore, to
> comment on decisions of lower courts
> concerning regulation of advertising in
> readily distinguishable fact situations.
> Wholly apart from the respective rationales
> that may have been developed by the courts
> in these cases, their results are not incon-
> sistent with our holding here. In these
> cases there usually existed a clear relationship
> between the advertising in question and an
> activity that the government was legitimately
> regulating.
> Bigelow, supra 421 U.S. at 825 fn. 10

In Virginia Board of Pharmacy, the Court struck down
a state ban on the advertisement of prescription drug prices.
In so doing, the Court held that commercial speech is protected
to some degree by the First Amendment. Again, however, the
Court was careful to limit its holding:

> In concluding that commercial speech,
> like other varieties, is protected, we of
> course do not hold that it can never be
> regulated in any way. Some forms of commercial
> speech regulation are surely permissible. We
> mention a few only to make clear that they
> are not before us and therefore are not fore-
> closed by this case.
> Virginia Board of Pharmacy, supra. 44 U.S.L.W.
> at 4692.

In stating what was not foreclosed by its holding,

the Court said:

> Also, there is no claim that the
> transactions proposed in the forbidden
> advertisements are themselves illegal
> in any way. Cf. Pittsburgh Press Co. v.
> Pittsburgh Commission on Human Relations,
> supra; United States v. Hunter, 459 F.2d
> 205 (CA 4), cert denied 409 U.S. 934
> (1972).
> Id. 44 U.S.L.W. at 4693

In short, the Court has held that the fact that ex-

pression appears in a commercial context does not automatically

strip it of First Amendment protection. However, it has

recognized the continued viability of the cases sustaining

regulation of speech which is part of unlawful conduct, i.e.

those cases where "there usually existed a clear relationship

between the advertising in question and an activity that the

government was legitimately regulating." Bigelow, supra.

421 U.S. at 825. The Court also recognized the propriety of a

prohibition of commercial speech which proposes illegal

transactions, <u>Virginia Board of Pharmacy</u>, <u>supra</u>.

Defendant does not contend, nor could it, that the
Supreme Court has overruled the earlier decisions sustaining
the constitutionality of provisions of the Fair Housing Act.
Instead, the defendant attempts to distinguish those decisions
from this case by the following argument:

> The instant case is distinguishable from
> the so-called illegal transaction exemption.
> In both the newspaper advertisement of 'white
> home' housing and in the blockbusting case,
> (i) the purpose and intent of the speaker
> was obviously discriminatory and (ii) he knew
> or should have known it would have that effect.
> <u>See</u>, <u>e.g.</u> <u>United States</u> v. <u>Bob Lawrence Realty,
> Inc</u>. [citation omitted]. Here there is no such
> intent and purpose alleged, nor is it claimed
> the Society knew or should have known its standards
> would have the effect of causing discrimination.

This distinction is wrong for several reasons. <u>United
States</u> v. <u>Hunter</u> supra., cannot be distinguished as defendant
contends, for there was no evidence of discriminatory intent
on the defendant's part. While a property owner who places
a discriminatory advertisement obviously intends to discriminate,
it was the newspaper publisher - the sole defendant in <u>Hunter</u> -
who was held to have engaged in unlawful conduct, despite the district
court's finding, not found to be clearly erroneous, that,

> Defendant is not a racist and does not advocate
> or wish to countenance racial discrimination.
> <u>United States</u> v. <u>Hunter</u>,      324 F. Supp.
> 529, 535, (D. Md. 1972).

In addition, the distinction is meaningless since, as we discuss more fully at pp. 47 - 47 supra, it is not necessary to plead, in so many words, that a defendant intended to discriminate or that he knew he was discriminating. Finally, this purported distinction finds support nowhere except in defendant's memorandum, and is conspicuously absent from any of the decisions to which the Society refers this Court. The Court in Virginia Board of Pharmacy did not make any such distinction; it merely said that expression which promotes an illegal transaction was one example of speech which may constitutionally be prohibited.

It may fairly be said that discriminatory appraisal standards propose an illegal transaction, Virginia Board of Pharmacy, supra., when they require or encourage use of race as a factor in valuation or underwriting. Indeed the Complaint goes even further and alleges that an appraisal following these standards is itself part of illegal conduct, since it brings about the racially discriminatory denials of loans. Since there can be no question that the United States may legitimately regulate lending transactions, Laufman v. Oakley, supra., whatever "expression" is contained in an appraisal or in the defendant's alleged standards has a "clear relationship" to "an activity that the government was legitimately regulating," and may constitutionally be regulated. Bigelow v. Virginia, supra. 421 U.S. at 825, fn. 10.

47-614 O - 79 -- 26

In Bigelow, supra, 421 U.S. at 826, the Court held that when commercial speech is affected by a statute, "a court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation." A similar balancing test was applied by the Court in Virginia Board of Pharmacy, supra. */

We believe that a balancing test, as required by the Court, cannot be meaningfully applied on a motion to dismiss, and should await the development of a full factual record. However, we note that exactly such a balancing test was applied by the Court of Appeals for this circuit to sustain some restriction on expression in support of the same "state interest" which the United States seeks to protect here, namely, the prevention of segregation and resegregation.

In Barrick Realty, Inc. v. City of Gary Indiana, 491 F.2d 161 (7th Cir. 1974) the Court sustained the validity of a local ordinance forbidding the use of "For Sale" signs in residential zones of the city of Gary. The evidence showed that

---

*/ Defendant's assertion that Virginia Board of Pharmacy holds speech to be protected "rather than permit suppression even in furtherance of a 'very substantial state interest'" is puzzling since the Court's opinion does not appear to have used the phrase which defendant appears to quote. In fact, the Court was unimpressed with the public interests asserted by the state, terming them "highly paternalistic" and "greatly undermined," a judgment of which Mr. Justice Rehnquist's dissenting opinion strenuously complains. 44 U.S.L.W. at 4697.

399

the City of Gary had experienced rapid racial change and that the

ordinance was aimed at curbing "panic selling" in order to halt

the racial resegregation of Gary. In considering whether the

ordinance violated the First Amendment, the Court, relying on

Pittsburgh Press Company v. Pittsburgh Commission on Human

Relations, 413 U.S. 376 (1973), stated:

> Plaintiff's signs proposed a commercial
> transaction that is part of a pattern of
> transactions, all of which, taken together
> lead to a result that the City of Gary can
> properly try to prevent. Accordingly, it can
> be said here, as in Pittsburgh Press, that
> "the restriction on advertising is incidental
> to a valid limitation on economic activity.

491 F.2d at 164.

The Court then held that the ordinance could not be attacked

on the ground that it violated the First Amendment rights of

those who would read the signs (as opposed to the plaintiffs -

a realty company, its president, and a homeowner - who were

asserting a right to use signs). It noted that the signs, which

"convey[ed] a commercial message", were not "pure speech" but

a mixture of speech and conduct subject to regulation to protect

valid state interests including "[t]he city's interest in attempting

to encourage and maintain stable integrated neighborhoods ..."

Id. 491 F.2d at 164. Accord. Linmark Associates v. Town of

Willingboro, 535 F.2d 786 (3rd Cir. 1976) (decided after Bigelow).

400

If the allegations of the complaint are proved, then this is a stronger case for relief than Barrick. If simple "for sale" signs, which have no intrinsic racial significance and do no more on their face than "communicate a message" as to availability for purchase, may be prohibited consistently with the First Amendment, in order to prevent resegregation, then surely racially oriented appraisal standards which lower the value of property in integrated areas are not entitled to constitutional protection.

B.  The Discriminatory Standards of Trade Associations,
    Including the Society, May Constitutionally be Enjoined.

If, as we contend, it is unlawful for an appraiser or lender to appraise homes or to refuse to make home loans, on the basis of racially discriminatory criteria, then the Society's standards and practices, which, according to the Complaint, cause him to do so, may also properly be enjoined. The courts have held that proof that a defendant gave instructions which were reasonably calculated to cause subordinates to discriminate is sufficient to establish a "pattern or practice" of unlawful conduct within the meaning of 42 U.S.C. §3613. United States v. Youritan Construction Corp., 370 F. Supp. 643, 650 (N.D. Cal. 1973), modified as to relief and aff'd per curiam 509 F.2d 623 (9th Cir. 1975) see also United States v. Reddoch, P.H.E.O.H. Rptr. Para. 13,569 (S.D. la. 1972) aff'd per curiam 467 F.2d 897 (5th Cir. 1972).

401

The Complaint alleges that the Society maintains discriminatory standards and practices which its members are required or encouraged to observe, and do observe. Put simply, the Fair Housing Act requires appraisers and lenders to act in one way and the defendant's standards allegedly require them to do the opposite. The Fair Housing Act must prevail, for defendant has no First Amendment right to require or encourage its members to violate the law. Giboney v. Empire Storage Co., supra. 336 U.S. at 504. Indeed, in the antitrust context, the Supreme Court has consistently held that an organization's unlawful conduct may "clearly" be established by proof of the contents of its code of ethics or its bylaws, standing alone, United States v. National Association of Real Estate Boards, 339 U.S. 485, 495 (1949); Associated Press v. United States, 326 U.S. 1, 12 (1945).

In Paragraph 3 of its Motion, the defendant characterizes the Complaint as ". . . attempting to suppress the expression of ideas and educational communication between and among professionals." This characterization takes considerable liberties with the language of the complaint. Our prayer for relief seeks only to enjoin the defendant from requiring or encouraging its members to engage in unlawful conduct, and the fact that the standards and procedures which constitute that conduct are written in

402

words does not insulate them from the reach of the Act, since

there is no First Amendment right to promote illegal activity,

Virginia Board of Pharmacy, supra. In New York State Broadcasters

Assn. v. United States, 414 F.2d 990 (2d Cir. 1969) cert. den.

396 U.S. 1061 (1969) a decision upholding a ban on the dissemina-

tion of lottery information by the broadcast media, the court

stated:

> . . . Moreover invoking the specter of an
> official government view does not dispose of
> the real issues before us. There is an "official
> government view" as to the sale of narcotics
> . . . offering of fraudulent securities . . . .
> and the coercion of employees by employers to
> name only a few. And the view extends to
> communications which are designed to - and do -
> directly effectuate these unwarranted results . . .
>
> The real point here is that we are not
> primarily in the realm of ideas at all but are
> chiefly concerned with speech closely allied
> with the putting into effect of prohibited conduct.

414 F.2d 996-997.

If the United States proves that defendants violated

the Act, then, in fashioning relief, the Court will undoubtedly

need to frame the remedy carefully so as to prohibit only

unlawful conduct, and to permit the continued exercise of rights

secured by the First Amendment. But the prayer for relief is

not, on its face, violative of the First Amendment, and it cannot

reasonably be argued that if defendants violated the Fair Housing

Act, as we contend, there is nothing a federal court can constitu-

403

tionally do about it. Accordingly, the Society's First Amendment concerns are premature, and the motion must be denied. */

---

' Examination of the "model decree" ordered in a rental discrimina-
tion case, United States v. West Peachtree Tenth Corp., 437 F.2d
221, 229 et seq. (5th Cir. 1971) includes numerous provisions as
to what defendant shall and shall not say. The defendant must
write to certain blacks, communicate his policy to any referral
agency it uses, and include fair housing statements in advertising.
It may not refuse with words, to rent to people because of race
or quote higher rental prices to blacks, or make racially dis-
criminatory statements with respect to rental, or misrepresent
availability because of race. Since that decree, despite its
effect on "spoken" conduct, is consistent with the First
Amendment, there is no reason why a proper decree could not be
formulated in this case.

404

Mr. OSENBAUGH. Excuse me. I'm getting a little confused about the legal implications. Would it be all right if we would submit some clarification of these questions that are being asked?

Mr. PERITO. Wait a second. Mr. Chairman, these are not our answers. Are you referring——

Ms. COOPER. They are the Government's answer.

Mr. PERITO. They are the Government's answers. That's why my client is confused. And they are not our interrogatories, are they?

Ms. COOPER. No.

Mr. PERITO. Thank you for completing the record.

Ms. COOPER. Now, you have attached appendices to your statement which support the conclusion that race need not be a negative factor and, in fact, rarely is. Do you agree with the conclusions of those studies?

Mr. OSENBAUGH. Again, if I can refer back to 1967, I have agreed with that all along. I don't think that race necessarily affects value all the time, but it can. I think it is something to be considered. You have to look at the neighborhood. I have no argument with that statement.

Ms. COOPER. Well, historically, was there ever a time when the society taught the concept that integration led to a diminution of value?

Mr. OSENBAUGH. Not to my knowledge. I have been teaching for the society since the mid-60's and it's never been in any material that I have ever been given or that I have seen.

As to discriminatory material, preliminarily, I think HUD had the most discriminatory material up to a few years ago.

Mr. FRANK. I'd like to add to that. I have been teaching since 1948.

Ms. COOPER. Well, some of the studies show values tend to go up with integration, some stay the same, some go down.

If that's the case, how can you quantify the effect of race on property value? You have to come up with a dollar figure.

Given the variety of ways that race and integration can affect a property value as the study showed, how can you arrive at a factor?

Mr. OSENBAUGH. I think it can be a reliable factor as far as proving the exact dollar amount of any portion of appraisal. We can't appraise the cost, we can't appraise the schools, but we can say that these are considerations taken into the marketplace to be examined, take all this into consideration and fine what our estimate is of value—and I emphasize estimate of value—in the marketplace.

Ms. COOPER. Do you have some sort of formula that you can utilize?

Mr. OSENBAUGH. I'd be happy to submit—not a formula per se, no. I don't think you have formula on any portion of appraising, but we can submit some of our material to you along this line.

Ms. COOPER. I have no further questions.

Mr. OPELKA. We really qualify the size of markets and attempt to qualify them as they relate ethnically. I think that in demonstrating size and relative proximity to these markets, I have used the example, and I share the same form with these gentlemen over the years. We have taught personally thousands of students and I

425 of 473 PageID

submit to you the consideration of trying to place a synagogue in the middle of Harlem and consider the feasibility, the impact of the proximity, the likelihood of something like that to attract from what we know. We have to study in depth, then, the demand for religious, a house of religious worship, as it relates to the Jewish persuasion in a community that is basically, historically, not really been oriented in that way.

Now, those are extremes of a culture, but we are looking at the cities in our country that deal with millions of people in micromarkets. We have to take every one of these things on an individual assisgnment basis, whether we are dealing with houses, places of worship, schools, and as they all relate together.

Mr. OSENBAUGH. If I may make one more point, a few years ago in Baltimore the problem was brought to the society of appraising in a primarily black neighborhood that was being integrated, where there were no sales and consumers were not able to get appraisals and they were not able to get loans.

Mr. Jim Hunter, who was then one of our vice presidents, devised a system of appraisal where he could go in and test the intent of minority buyers with relation to income, and work it up as to what this market could pay in the form of payments to revitalize this neighborhood. And it worked.

We tied it into the earnings of the minority buyers, what they could pay, and we said, okay, this is the value, that they can take care of this much loan. A market was established, the neighborhood is revitalized, and now you can get sales through what the value is, and that, I think, is where it all is.

We are not up here being negative. We are being positive. How can we help this program, and that's one way we can help.

Mr. EDWARDS. All you gentlemen, I am sure, are aware of the frightening aspects of discrimination in rentals and sales that have been written up recently.

There was a national study made, the U.S. Commission on Civil Rights made another study, newspapers all over the country have sent out testers and found that black families are seriously discriminated against in rentals and in purchases. Isn't that correct? You know how serious it is.

Mr. OSENBAUGH. As an appraiser we don't get into that, but I would say that it's a horrible situation and I am sure that it does exist.

I just know about it from reading the papers because we usually don't get into appraising what property rents for.

Mr. EDWARDS. And I'm sure, sir, in your testimony with regard to the disasters of the 235 programs and that unfortunate experience, that you are not saying that the 1968 housing law had really very much to do with it.

I notice you didn't mention the problems that we had with appraisers—certainly none of your members, I'm sure—who were on the take.

Mr. OSENBAUGH. Well, none of them were our members. We were just concerned. We made the study after the fact. But we found a lot of these houses were bought by speculators, painted, given a high cosmetic—high appraisal, sold to a minority owner who lived there for a little while and was foreclosed, and the same investor

came back and bought at a low price, cosmetically improved it again and sold it to another minority.

Mr. EDWARDS. Well, thank you very much.

Mr. HYDE. Mr. Chairman, I'd like to clarify something.

Mr. EDWARDS. Mr. Hyde.

Mr. HYDE. Wouldn't you say it not helpful in appraising the value of real estate to shut your eyes to the real world?

In my district we have Oak Park, which is an integrated community and one of the assets, one of the selling points for Oak Park, is that it is being quietly, effectively and economically advantaged by the sort of integration that's going on. It's a jewel really. People point to it with pride, and that ought to be, point it out to people. If you want to live in a progressive, clean, good, integrated community, there's Oak Park.

Now, you go a few blocks east and you come to Austin, which used to be a pretty nice place. Now it isn't. It's a slum. In my opinion large parts of it are slums. You just can't shut your eyes to the real world and curing discrimination maybe has to be done by the clergy or somebody. Maybe Congress can do it.

But to have you people not talk about factors that are economically, professionally, clinically relevant, really isn't the way.

Now, would you be willing to accept a dictum from HUD or from Congress or somebody that all of these factors, race, color, creed, ethnicity, et cetera, are not relevant and are not to be considered unless in your professional opinion in this situation they are relevant?

Mr. OSENBAUGH. Definitely.

Mr. FRANK. That's what we said.

Mr. OPELKA. We only report and consider it when it is relevant.

Mr. HYDE. And would you be willing to support that by data?

Mr. OSENBAUGH. Yes.

Mr. OPELKA. Yes.

Mr. FRANK. Sure.

Mr. OSENBAUGH. If I can say one more thing——

Mr. EDWARDS. While you are at it, would you also answer this question: Would you be in favor of the bill if appraisers were excluded?

Mr. OSENBAUGH. I'd like to hear it again. That's getting over my head, Mr. Chairman. I will say that we certainly will support—OK.

Mr. FRANK. Yes. Absolutely.

Mr. OSENBAUGH. OK. Yes. I would like to say that the same problems that we are discussing here of being able to report all factors that are relevant is shared by other appraisers.

Mr. Charles A. Kerson of the American Institute of Real Estate Appraisers is going to submit a statement to this effect. I think the Society of Governmental Appraisals is also going to, and I believe possibly the Association of Federal Appraisers' incoming president, Mr. Kahn, is also going to be entering a statement as to the thrust of our arguments that appraisers should be able to tell the facts as we see them.

Mr. EDWARDS. Thank you very much.

Mr. VOLKMER. I just want to make sure you are saying, one, that your teaching materials never said to say that integration or

407

blacks moving into or out of neighborhoods had an effect on appraisals per se.

Mr. FRANK. That's correct.

Mr. OSENBAUGH. I believe that is exactly correct. I can personally say from the mid-60's——

Mr. PERITO. Could I respond as counsel?

Mr. VOLKMER. Yes.

Mr. PERITO. Mr. Volkmer, one of the problems is that the teaching materials of the society also had reference to teaching materials of other groups that sometimes included that information. When you talk about the teaching materials——

Mr. VOLKMER. I'm saying the teaching materials——

Mr. PERITO. We could never find them in discovery.

Mr. VOLKMER [continuing.] That you prepared, your society prepared, and used. That's the first question.

Mr. OSENBAUGH. No.

Mr. VOLKMER. That was never taught with your materials that you prepared?

Mr. PERITO. That we know of, that's correct.

Mr. VOLKMER. OK. Now, did you use material in your teaching that was prepared by others that did contain such——

Mr. OSENBAUGH. Let me address that.

Back when I started teaching I used the textbook written by a man named McMichaels. I used his textbook, mainly because it was in the only area of appraising, forest appraising, trees, that I could find and I used this in my teaching and limited it to that portion.

In that textbook he had a section in there that listed the 10 races that hurt neighborhoods, blacks somewhere in the middle, Italians at the end, southern Italians at the very end.

This was listed——

Mr. VOLKMER. Sicilian maybe?

Mr. PERITO. I obviously took umbrage at that being introduced during the case.

Mr. OSENBAUGH. But I used this textbook for, as I recall, it had the 4, 3, 2, 1 rule on appraising land.

Mr. VOLKMER. But that part of the text was not taught?

Mr. OSENBAUGH. As far as I know, it's never been taught by us anywhere at any time. Never.

Mr. VOLKMER. And the only thing that you have taught is that these matters are to be taken into consideration as far as objectivity is concerned where, like you say, where it does have a relevance.

Mr. OSENBAUGH. Yes, I stand on my 1967 statement, which is the way that I taught, and the oath I took many years prior to that.

Mr. VOLKMER. And the same answers as far as religion, sex, or anything else?

Mr. OSENBAUGH. Yes.

Mr. VOLKMER. You have never taught those things, per se, either deteriorated or appreciated the property?

Mr. OSENBAUGH. Never.

Mr. EDWARDS. Mr. Boyd.

Mr. BOYD. Consistent with the remarks that the chairman made relative to the decision on the part of one Federal judge that

003206

408

appraisers are included under the 1968 act, and your earlier asser-
tion that you would prefer to be exempted from the act, would you
permit yourself to be included in any future amendments to the act
if that legislation would permit reference by you in your appraisal
to ethnicity, religion, and race, so long as it is supported by rele-
vant data?

Mr. OSENBAUGH. I think so. I cannot commit the society, any
more than Mr. Opelka.

Mr. BOYD. I understand that.

Mr. OSENBAUGH. But I, as an individual, would support that.

Mr. BOYD. I have no further questions.

Mr. EDWARDS. Gentlemen, thank you very much. You really were
very cooperative witnesses in a very difficult area and I think you
appreciate the problems we have and we appreciate the problems
you have.

Mr. OSENBAUGH. Thank you very much.

409

ADDITIONAL MATERIAL

**Federal Home Loan Bank Board**

1700 G Street, N.W.
Washington, D.C. 20552

Federal Home Loan Bank System
Federal Home Loan Mortgage Corporation
Federal Savings and Loan Insurance Corporation

ROBERT H. McKINNEY, Chairman

May 30, 1979

The Honorable Don Edwards
Chairman
Subcommittee on Civil and
  Constitutional Rights
Committee on the Judiciary
U.S. House of Representatives
Washington, D.C.  20515

Dear Mr. Chairman:

This is in response to your letter of May 14, 1979 in which
you request our clarification of several points raised by the
Society of Real Estate Appraisers in their testimony before
the Subcommittee on H.R. 2540. The Society objected to the
interpretation by Bank Board employees of our nondiscrimination
regulations forbidding the use in appraisal reports of such
phrases as "pride of ownership", "prestigious" or "declining"
neighborhood, and "homogeneous."

The questions you have raised followed by our responses are
set forth below.

(1)  What is the FHLBB policy with respect to barring
the use of certain words in appraisal reports? Is there a
special significance historically attached to the use of those
particular terms?  May the same concepts be expressed in the
reports in a less objectionable manner?

Our nondiscrimination regulations state in §528.2a(a)

"No member institution may <u>use</u> or <u>rely upon</u> an appraisal of
a dwelling which the institution knows, or reasonably should
know, is discriminatory . . . <u>per se</u> or in effect . . . "

Our examiners have objected to the terms cited above because
they are vague, represent the imposition of personal value
judgments, and are often used as a substitute for detailed
analysis. It is the Bank Board's position that appraisers should
be factual reporters describing, for example, sales in the
neighborhood, rising or declining home prices, actual neighborhood
maintenance, and proximity to religion and education facilities,
public transportation, and shopping services. We do not believe

003208

410

that the use of subjective phrases such as "pride of ownership"
provide underwriters with the necessary specific market information.
They do not meet the requirements of factual reporting and
they may carry discriminatory connotations.

It is our belief that historically such terms have carried
discriminatory connotations. The Department of Justice contended
in their case against the Society and other appraisal and trade
organizations that:

> Prior to the effective date of the Fair Housing
> Act, defendants maintained overtly racially discriminatory
> standards and practices, and instructed their members that
> dwellings in racially integrated areas have a substantially
> lower value than similarly situated dwellings in racially
> homogeneous areas and that loans on homes located in such areas
> were less secure than loans on homes in racially homogeneous
> areas. The "infiltration" of blacks and of other "inharmonious"
> groups into a geographic area was treated as an important factor
> lowering the actual and prospective value of all homes in that
> geographic area. As a result of the authority and influence
> of the defendants on the practices of appraisers and lenders,
> the appraised value of homes throughout the United States was
> predicted on criteria which were racially discriminatory and
> discriminatory on the basis of national origin.

We believe that appropriate indicia of neighborhood value include
facts related to supply and demand, actual maintenance of properties,
and proximity to services. All of the factors should be described
in precise terms without reference to vague "catchall" phrases.

(2) Upon what evidence does the FHLBB rely in interpreting
the Fair Housing Act as barring the reliance on racial, and
ethnic factors in the appraisal process?  That is, what evidence
is there that discrimination against the protected classes
occurs when appraisal reports rely on racial etc. information?
Historically, was there a negative value attributed by appraisers
to the influx of racial and religious minorities into a neighborhood?

As indicated in response to your first question, the Justice
Department has found that negative values have been attributed
historically by appraisers to the influx of racial and religious
minorities into a neighborhood.  It is noteworthy that the Society
agreed in their settlement agreement with the Justice Department
not to teach "that the achievement of maximum value within a
neighborhood is somehow dependent upon the homogeneity of racial,
religious or ethnic factors," or "that the lack of homogeneity
of racial, religious or ethnic factors must result in a diminution
of value within a neighborhood."

003209

(3) Prior to the utilization of forms by the PHLMC and PNMA, which prohibit references to racial, ethnic composition, how prevalent in appraisal reports were such references? What is the practice now?

Prior to the prohibitions of routine referencing of these factors in the FHLMC and PNMA standardized forms, the majority of appraisers did routinely comment on such factors. However, few appraisers in fact objectively analyzed the impact of such factors on value or the consequences of such recitations on the overall underwriting process. The clear implication was that these factors routinely affect value. This attitude appears to be reflected still by the Society of Real Estate Appraisers as evidenced by the following excerpt from their official statement:

"It is the Society's position that the racial, ethnic or religious composition of neighborhood is a relevant appraisal factor."

We find this simplistic position untenable with the goals of Fair Housing and unsupported by the host of empirical analyses prepared on this subject. The majority of the race/value factor studies do not base their conclusions on a superficial race/value correlation but rather are able to explain noted value changes in terms of observable and measurable economic realities.

Currently, most appraisers do not recite these factors in their reports, however, given the limited amount of analytical support and detail provided by standardized forms it is difficult to discern presently whether such factors are being considered. Given the ramifications of such routine considerations, however, the Bank Board has been considering the adoption of a more comprehensive report format for appraisals in this area so that all market data and supporting analysis can be evaluated.

Before closing I would like to elaborate on one aspect of the Bank Board's written testimony. In her statement, Board Member Miller expressed the Bank Board's approval of §808(d) of the bill which clarifies the Bank Board's existing authority to enforce Title VIII. We wish to explain that in expressing support for this clarification, we did not intend to suggest that the Bank Board currently lacks authority under the Home Owners' Loan Act to remedy fair lending violations. As you know, the Bank Board has adopted comprehensive fair lending regulations to insure that savings and loan associations do not engage in any unlawful

412

discriminatory lending practices.  These regulations were
adopted in large measure pursuant to the statutory grant of
authority contained in section 5(a) of the Home Owners' Loan
Act, 12 U.S.C. §1464(a), under which the Bank Board has
exclusive regulatory responsibility for all aspects of the
operations of Federal savings and loan associations, including
fair lending and nondiscrimination matters. Our statement was
made in support of the proposed clarification of responsibility
of the Federal financial regulatory agencies to carry out the
mandate of the Fair Housing Act.

It is my hope that the above will be of use to you in your
proceeding; however, should further explanation prove necessary,
please call upon me.

Sincerely,

Chairman

*Perito, Duerk and Carlson, P. C.*
*Attorneys at Law*

PAUL L. PERITO
WILLIAM A. DUERK, III
GLENN H. CARLSON
ROBERT G. PINCO
NATHANIEL E. KOSSACK
———
JOHN P. WINTROL
ROBERT M. ROSS
C FREDERICK RYLAND
ELLIOTT B. ADLER
VICTORIA S. MILES +
EDWARD JOHN ALLERA

+ ADMITTED IN VA. ONLY

1001 CONNECTICUT AVENUE, N. W.
SUITE 1200
WASHINGTON, D. C. 20036
(202) 659-8300-CABLE VERITAS
TELEX 440346 VTAS

NEW YORK COUNSEL

GODFREY P. SCHMIDT
654 MADISON AVE.
NEW YORK, N. Y. 10021
(212) 371-7290

July 3, 1979

The Honorable Don Edwards
Chairman, Subcommittee on Civil and
 Constitutional Rights
U.S. House of Representatives
Washington, D.C.  20515

Re:  H.R. 2540, Fair Housing
 Amendments Act of 1979

Dear Mr. Chairman:

The Society of Real Estate Appraisers ("Society")
has received a copy of a letter which Robert H. McKinney,
Chairman of the Federal Home Loan Bank Board, sent to you
on May 30, 1979 in response to questions which you posed to
the Bank Board in a letter dated May 14, 1979.  This letter
on behalf of the Society is in reply to the Bank Board's
response to your thoughtful and searching questions.

At the outset we must express our deep concern at the
inaccuracies and misstatements which are contained in the Bank
Board's letter.  It is difficult for us to comprehend how a
Federal agency like the Federal Home Loan Bank Board, with the
opportunity to easily secure advice from a large legal staff,
could misconceive and/or misunderstand so many basic facts which
even a modicum of research or investigation could have clarified.
What is even more disturbing is that a Federal agency in response
to carefully drafted questions from a House Subcommittee Chairman
would so blatantly ignore the facts or deliberately misinterpret
them for some inexplicable or unknown purpose.

The Bank Board's letter implies in its opening paragraph

that the Bank Board's nondiscrimination regulations forbid "the use in appraisal reports of such words and phrases as 'pride of ownership', 'prestigious' or 'declining' neighborhood and 'homogeneous'." This is not correct. As the Society pointed out in its testimony before your Subcommittee, nowhere do the Bank Board's regulations forbid the use of such words and phrases. Rather, the Bank Board's regulations state that appraisals which are "discriminatory per se or in effect" cannot be used or relied upon by lending institutions.

However, what constitutes an appraisal that would be "discriminatory per se or in effect" has never been defined by the Bank Board's regulations. Thus, Bank Board district examiners, pursuant to instructions received at nondiscrimination seminars, have begun to interpret the "discriminatory per se or in effect" regulation to exclude certain words or phrases. The excludable words and phrases vary from district to district and are based generally, as a senior Bank Board official told us, on a "gut feeling" that the word or phrase may be discriminatory. Some terms are acceptable in one district and not acceptable in another. There is no uniform interpretation of what words or phrases are considered by examiners to violate the Bank Board's nondiscrimination regulations.

The Society maintains that, even if this action by the Bank Board in prohibiting the use of certain words or phrases was done pursuant to regulation, it would violate appraisers' First Amendment rights. Moreover, as we pointed out in our testimony, there is no basis for the exclusion of these terms, no reports, surveys, studies, or other type of evidence known to the Society which would support the Bank Board's peremptory actions. If such evidence did exist, we assume the Bank Board Chairman would have brought it to your attention in his letter, which he did not. The Society's prepared statement also listed other words such as "church" and "synagogue" which some Bank Board examiners have forbidden appraisers from using. The Bank Board's letter ignores these words, perhaps because it is politically more difficult to explain their exclusion.

You should be aware, Mr. Chairman, that based on partial responses to FOIA requests it appears that the materials used in the Bank Board's nondiscrimination seminars, at which Bank Board examiners were instructed on discriminatory appraisals, were organized and prepared in large measure not by professional appraisers but by an attorney, Warren L. Dennis, Esquire, who was acting as a consultant to the Bank Board on this matter. Mr. Dennis

also lectured at the first seminar on the issue of what con-
stitutes a discriminatory appraisal. It should be pointed out
that Mr. Dennis, while an employee of the Department of Justice,
Civil Rights Division, was the primary architect of the complaint
which the Justice Department filed against the Society and others
for violations of Title VIII. As the Society testified before
your Subcommittee, the Justice Department, after Mr. Dennis' de-
parture from government, dismissed the Society, with prejudice,
from the law suit stating in its Memorandum to the Court that
based on the Society's Policy Statement it was "clear that SREA
does not require or encourage its members to engage in the con-
duct alleged in the complaint." It appears that Mr. Dennis has
taken his theories on appraisal practice, which apparently the
government determined after extensive discovery were not support-
able, and used them to train examiners at the Federal Home Loan
Bank Board and other banking institutions on what constitutes
a discriminatory appraisal. This so-called "training" has been
done outside the regulatory process so that there has been no
chance to make a record on this issue or to attempt to correct,
modify or even question Mr. Dennis' unsupported theories on
appraisal practice.

The first question raised in your letter, Mr. Chairman,
dealt with the Bank Board's policy barring the use of certain
words in appraisal reports. The Bank Board Chairman totally
failed to answer this question. His letter states that Bank
Board examiners have objected to the terms cited above because
they are vague, represent the imposition of personal value judg-
ments and are often used as a substitute for detailed analysis.
This contention by the Bank Board as to these words and phrases
is simply not true. Furthermore, Bank Board examiners apparently
never considered such words and phrases to be vague and subjective
until they were so informed at the nondiscrimination seminars.

Not a scintilla of evidence has been presented by the
Bank Board that terms such as "pride of ownership" are vague,
subjective or code words or proxies for racial discrimination.
"Pride of ownership" is not any more of a subjective or vague
phrase than other terms used in appraisal reports which have
not yet been outlawed by the Bank Board. This phrase is a de-
scription of whether properties in the neighborhood show signs
of maintenance and care, or conversely whether they are poorly
maintained. If "pride of ownership" can be forbidden by bureau-
cratic whim today, then "properly maintained and cared for"
can be forbidden tomorrow and other terms such as "size and
utility of building" the day after. The Bank Board argues not
that the prohibited words and phrases always carry discrimina-
tory connotations but only that they may carry such connotations.
The Bank Board, however, cites no evidence that such words and
phrases are discriminatory or that they may carry discriminatory
connotations.

416

Although the Bank Board contends that such words and phrases have carried discriminatory connotations in the past, they again offer no proof to support this argument. They cite only the Justice Department's complaint against the Society and others, which complaint was dismissed against the Society with prejudice when the government apparently determined that the Society was not engaged in the activities alleged in the complaint, including those allegations cited on page two of the Bank Board's letter. This reliance by the Bank on the allegations in a complaint as support for the Bank Board's actions is an example of McCarthyism at its worst and totally unbecoming a Federal agency of the stature of the Federal Home Loan Bank Board. To use allegations in a complaint, which allegations were never proven and which complaint was dismissed with the statement by the government that the Society was not engaged in the conduct alleged, as support for the Bank Board's position is an outrage and a disgrace. The Society takes great exception to the Bank Board's statement in this regard.

As to those prohibited terms, it should be pointed out that this letter marks the first time that the Bank Board has admitted that there is a "list" of prohibited words and phrases. Previously, senior Bank Board officials had always reported to the Society that there was no official "list" of prohibited words and phrases. They informed us that the examples which the Society brought to their attention were due to individual examiners' questions and that there was no "official policy" regarding prohibited words and phrases.

The second question which you, Mr. Chairman, posed to the Bank Board was what evidence does the Bank Board rely upon in interpreting the Fair Housing Act as barring the reliance on racial and ethnic factors in the appraisal process. The Board in its response cites no studies, surveys, reports or other documentary support for its position. This is not surprising since the Society knows of no such support. Instead, the Bank Board simply refers to the Justice Department's complaint against the Society and others, which complaint, as we have pointed out numerous times, was dismissed with prejudice as to the Society after two years of extensive discovery. It should not have to be emphasized that a "finding" by the Justice Department in setting forth allegations in a complaint which was subsequently dismissed is no "finding" at all and can offer no support for the Bank Board's position. To suggest that a complaint is a finding of illegality on the merits is an insult to your legal abilities and a total perversion of the litigation process. This conclusion by the Bank Board is insidious in its implications.

417

More disturbing than the failure to cite evidence in support of its position is the Bank Board's misstatement of the Society's Policy Statement and apparently deliberate misinterpretation of the Justice Department's dismissal of its complaint against the Society. There was no "settlement agreement" between the Society and the Justice Department. The Justice Department's Motion to Dismiss and its accompanying Memorandum, both of which were attached to our prepared statement, make this fact abundantly clear. The Justice Department dismissed the Society with prejudice from the lawsuit pursuant to a stipulation between counsel. The Society subsequently published a Policy Statement which was a rearticulation of its educational philosophy on neighborhood analysis and the formation of an opinion of value of properties located in residential settings. The Society did not "agree" with the Justice Department not to teach certain things. In fact, the Society had never taught the things alleged in the complaint and the Justice Department's Memorandum to the Court indicated that this was so. The government's Memorandum also clearly shows that there was no "agreement" that the Society would not teach certain things

As explained in its Policy Statement, the Society does not now teach and has never taught that "the achievement of maximum value within a neighborhood is somehow dependent upon the homogeneity of racial, religious or ethnic factors" and "that the lack of homogeneity of racial, religious and ethnic factors must result in a diminution of value within a neighborhood." This principle of appraisal practice and educational philosophy has been one of long standing in the Society. However, the Society has an equally long standing principle of appraisal practice and educational philosophy, as set forth in its Policy Statement, which was not cited in the Bank Board's letter, to wit:

> "(A)n appraiser must observe and be cognizant of
> a range of factors and forces operating within
> a neighborhood setting and any change in that
> setting must be recorded and evaluated...."
> "(A)n appraiser has an obligation to investigate
> and consider any factor or force which might
> signal a changing pattern of rents and/or sales
> prices within a neighborhood setting...."
> "The appraisal process requires the orderly obser-
> vation, acquisition and analysis of all relevant
> factors and forces which may affect value...."
> "Neighborhood factors and forces being in a con-
> stant state of change must be observed, recorded

and analyzed with the recognition that some of
these factors and forces are not readily suscep-
tible to quantitative analysis...."

In response to your third question, the Bank Board's
letter has deliberately misquoted the Society's position and
labels the misquoted statement as an official statement.
Neither in our Policy Statement nor in our testimony before
your Subcommittee nor in any official or unofficial pro-
nouncement has the Society ever made the statement quoted
on page three of the Bank Board's letter.  It is the Socie-
ty's position, as we have articulated many times, that racial,
religious and ethnic factors may be relevant and may have an
impact on market value and that if such a factor is relevant
it should be considered and if it impacts on market value it
should be reported.  It is not the Society's position that
these factors are always relevant and must always be
used in appraisal reports as the Bank Board's misstatement
of our position would imply.

The Bank Board contends that the Society's posi-
tion, which it has misquoted, is "untennable with the goals
of fair housing and unsupportive by the host of empirical
analysis prepared on the subject".  Neither of these points
is correct.  As our prepared statement explained in some
detail, only if all relevant factors that may impact on
market value are considered and reported upon in an apprai-
sal report is the buyer truly protected and can fair housing
goals be attained.  No buyer wants to pay more for a pro-
perty than it is worth.  The record is replete with examples
of HUD programs which have required appraisals to omit cer-
tain facts or factors resulting in artificial values wherein
low and moderate income buyers paid more for a home than it
was worth and later were unable to recover their investment.
The only protection which the buyer and the lending institu-
tion have is a fair, objective appraisal which considers and
reports on all relevant factors that may impact on market
value.  To require appraisers to ignore certain factors is
to require them to ignore the reality of the market place.
Moreover, it is intellectually dishonest for the Bank Board
to state that the Society's position is unsupported by any
empirical studies but then not to cite examples of studies
which contradict the Society's position and support the
Bank Board's position.  As we have stated on numerous
occasions, the Bank Board cannot do so because no such
studies exist.

419

Mr. Chairman, if the Bank Board's letter in response to your questions is made a part of the record, we would respectfully request that, in fairness to our position, the Society's letter also be included as part of the record. Thank you for your consideration in this matter.

Respectfully yours,

PERITO, DUERK AND CARLSON, P.C.

Paul L. Perito
General Counsel
Society of Real Estate Appraisers

cc:  Robert H. McKinney, Chairman,
     Federal Home Loan Bank Board
     Members of the Society of Real
       Estate Appraisers

PLP/mks

420

A-SISTANT ATTORNEY GENERAL

Department of Justice

Washington, D.C. 20530

. 25 1979

Honorable Don Edwards
Chairman, Subcommittee on Civil
  and Constitutional Rights
House of Representatives
Washington, D. C.  20515

Dear Congressman Edwards:

     On July 3, 1979 Mr. Paul Perito, General Counsel, Society
of Real Estate Appraisers, sent a letter to you commenting
on a letter of May 30, 1979 to you from the Federal Home
Loan Bank Board.  The SREA letter to you made a number of
comments and assertions about the effect of a settlement
between SREA and the government in <u>United States</u> v. <u>AIREA,
et al.</u> (C.A. No. 76-C-1448, N.D. Ill.):

     1.  On page 3, the SREA letter, by using
an incomplete quote from the government's Memorandum
In Support of Its Motion for Voluntary Dismissal,
concludes that the government conceded that SREA
has never required its members to engage in the
conduct alleged in the complaint and suggests
that the government had determined that the allegations
of the complaint were not supportable.

     2.  On page 4, the SREA letter again in two
separate places states that the dismissal was
based on the government's determination that SREA
was not engaged in the activities alleged in the
complaint.

     3.  On page 5, the SREA letter again asserts
that "the Justice Department's Memorandum to the
Court indicated that [SREA had never taught the
things alleged in the complaint] . . ."

Each of the above contentions in the SREA letter is erroneous
and is inconsistent with the terms of the settlement between
the parties.

421

Since Mr. Perito has requested that his letter be included as part of the record of the hearings on H.R. 2540, I am sending this letter to inform you of our position on the above contentions. If any letters on this subject are included in the record, I request that this letter also be included.

First, a brief statement of the nature of our suit and the terms of the settlement with SREA will be a helpful background to my comments on the specific contentions noted above. Our complaint (copy attached) was premised, _inter alia_, on the allegation that the defendants required or encouraged their members to engage in "practices based on the theory that race and national origin, as such, adversely affect property values." (See Complaint, ¶10; see also, ¶¶ 7 and 8). The defendants, including SREA, denied that allegation. Prior to completion of even the initial stage of discovery against SREA, however, it became clear to counsel that there was possible ground for settling the case.

Negotiations between counsel produced a carefully drafted settlement package which included: (1) a Policy Statement by SREA, which counsel for the United States had seen and found acceptable prior to the signing and filing of the dismissal papers; (2) an order of voluntary dismissal, approved by all relevant counsel; (3) a stipulation between counsel for SREA and counsel for the government; and (4) a motion for voluntary dismissal and memorandum in support filed by counsel for the government. (Copies attached). Only the last three documents were filed with the Clerk, but the whole package constituted the settlement.

The Policy Statement consisted of a number of propositions which constituted "SREA Educational and Professional Concepts Relating to Neighborhood Analysis and the Formation of an Opinion of Value of Properties Located in Residential Settings." Among the propositions set out in the Policy Statement were:

1. "SREA does not teach that the achievement of maximum value within a neighborhood is somehow dependent upon the homogeneity of racial, religious or ethnic factors."

422

2.   "SREA does not teach that the lack of homogeneity of racial, religious or ethnic factors must result in diminution of value within a neighborhood."

3.   ". . . SREA does not teach that racial, religious or ethnic homogeneity is required for social compatibility or neighborhood stability to exist.  An appraiser should, therefore, carefully avoid any conclusory references to any factors in the neighborhood dynamic which are premised upon stereotyped, biased or prejudiced conclusions of market value."

4.   "Automatic downgrading or upgrading of value in a changing neighborhood because of the influx of any non-homogeneous groups within a homogeneous neighborhood setting is contrary to sound, rational judgment.   Moreover, it contravenes a basic tenet of SREA's professional directives to its members . . . ."

The Policy Statement included other propositions along the same line and still others of a more general nature concerning an appraiser's obligation to consider and report all market facts.

The stipulation between SREA and the government recites that "<u>SREA</u> <u>states</u> [that the concepts in the Policy Statement] have been applied as part of and will continue to be applied as a part of its educational and professional policies." (emphasis added) (Stipulation, ¶2).  To our knowledge, however, publication of the Policy Statement would be the first occasion that SREA had ever informed its members that the above propositions were its policies, and the stipulation nowhere suggests that the government agrees with or concedes SREA's contention that the concepts have been applied in the past.  The order of dismissal specifically provides that it is entered "without resolution of any factual or legal claims and defenses . . . ."

423

The full quote from the Memorandum of the government, only part of which is cited by SREA, states: "While the government neither endorses the policy statement nor represents it as a proper or definitive legal interpretation of Title VIII, the plaintiff is satisfied that, given good faith application, the policies described in the statement make it clear that SREA does not require or encourage its members to engage in the conduct alleged in the complaint." (Memorandum, p. 2). In other words, the government stated that, without regard to what occurred in the past, good faith application of the policies and concepts described above would make it clear that SREA does not now require its members to engage in "practices based on the theory that race or national origin, as such, adversely affect property values." (Complaint, ¶10). Even a cursory perusal of the Policy Statement shows that if SREA applies the concepts in good faith the members are forbidden to use stereotyped or biased presumptions relating to race, color, religion, sex or national origin in reaching a conclusion or opinion of value.

By the terms of the Stipulation, SREA commits itself to applying the above concepts "as a part of its educational and professional policies" in the future (Stipulation, ¶2). The parties agreed that any order of dismissal would be conditioned upon "good faith execution of the terms and conditions of this stipulation by SREA." (Stipulation, ¶7). The order of dismissal specifically states that it is "subject to the terms of the Stipulation . . . ."

One can readily see that, if SREA teaches appraisers to follow the above concepts in its courses and if members are required to conform their practice to those concepts through appropriate professional disciplinary or other proceedings, much of the discriminatory appraisal problem will be eliminated without the need of expensive case by case law enforcement proceedings by this Department or other federal agencies. It was because of the above described committment, which was made by SREA as part of the settlement, that the government agreed to dismissal of the case. The dismissal was not based upon a determination by the government that the allegations of the complaint were not supportable or that SREA had not engaged in the conduct alleged in the complaint nor was the dismissal based on any of the similar contentions made in the SREA letter to you.

424

At the time of the settlement we had no indication that SREA would, under any circumstances, apply the more general concepts of the Policy Statement to require members to consider racial factors in reaching an opinion of value, and we have no evidence that any such application of the Policy Statement or Canons has been made by SREA to date since the settlement. Mr. Perito's letter does indicate that SREA believes that racial factors may influence market value under some circumstances. Whether SREA will ever interpret its Policy Statement or Canons as requiring a member to use racial factors under some circumstances is thus unclear, and whether any such interpretation would be contrary to our settlement or otherwise violate Title VIII can only be determined if and when such an event occurs.

Thank you for the opportunity to express our position on this matter. If any other questions arise concerning the above case, please do not hesitate to contact me.

Sincerely,

DREW S. DAYS III
Assistant Attorney General
Civil Rights Division

cc: Chairman, Federal Home
    Loan Bank Board

    Mr. Paul L. Perito

003223

**UNITED STATES COMMISSION ON CIVIL RIGHTS**
WASHINGTON, D. C. 20425



**JUL** 2 3 1979

STAFF DIRECTOR

Ms. Janice Cooper
Counsel
Subcommittee on Civil & Constitutional
  Rights
407 House Annex #1
Washington, D.C.   20515

Dear Ms. Cooper:

During the course of Dr. Flemming's testimony on S. 506, the Senate
counterpart to H.R. 2540, a question arose concerning real estate
appraisals.  In light of the discussion of this issue by witnesses
before the Subcommittee on Civil & Constitutional Rights, I thought
it might be worthwhile for purposes of the House hearing record on
H.R. 2540 if I sent you Dr. Flemming's subsequent answer on this
subject.  I trust you will find this information useful.  If I can
be of any further assistance, do not hesitate to contact me or Lucy
Edwards, Director of our Congressional Liaision Division, at 254-6626.

Sincerely,

WILLIAM WHITE, JR.
Assistant Staff Director of the
 Office of Congressional and Public
 Affairs

Enclosure

426

Question:     What effect would S. 506 and H.R. 2540 have on
real estate appraisers who must base their appraisals on the exist-
ing circumstances in the neighborhood? Would a correct statement
of neighborhood conditions which might discourage someone from
buying in that neighborhood be a discriminatory act under the bill?

The short answer to    this question is that a "correct"

appraisal, by definition, does not violate the Fair Housing Act (Title

VIII), nor would it be a violation were the amending language of S. 506

added to the act.  We do believe, however, that any inquiry into race or

ethnicity in establishing appraisal values does constitute a violation

of Title VIII and that this practice would continue to violate the act

if S. 506 were enacted.

Notwithstanding industry arguments to the contrary,_/   any question

as to the applicability of Title VIII to appraisers was settled in

United States v. The American Institute of Real Estate Appraisers (AIREA)._/

---

_/ In recent testimony before the House Subcommittee on Civil and
Constitutional Rights, which is holding hearings on H.R. 2540,
the House counterpart to S. 506, representatives of the Society
of Real Estate Appraisers, asserted their belief that Title VIII
does not now apply to appraisers because the act does not mention
them by name.  The same point was also argued with respect to H.R.
2540/S. 506.

_/ 442 F. Supp. 1072 (N.D. Ill., E.D. 1977).

427

In this case the district court declared that the language of Sections 804(a) and 817 of the Fair Housing Act clearly reached the activities of the appraisal industry. _/

In its settlement of the AIREA litigation _/ the Department of Justice obtained an affirmative commitment from the defendant to the following statement of policy:

> 1. It is improper to base a conclusion or opinion of value upon the premise that the racial, ethnic or religious homo-geneity of the inhabitants of an area or of a property is necessary for maximum value.

_____

_/ Id. at 1079. The district court noted:

> It is clear from the plain language of the provisions that appraisers are not exempted from their coverage; both sections are unrestricted with respect to the class of persons subject to their prohibition. The "otherwise make unavailable or deny" language of section 804(a) has been applied to a variety of con-duct to prohibit all practices which have the effect of denying dwellings on prohibited grounds....

> The "or interferes with" language of section 817 has been similarly broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the Act....The Act requires a liberal construction if the statute is to prohibit effectively "all forms of discrimination, sophisticated as well as simple-minded."

_/ United States v. American Institute of Real Estate Appraisers, et al., No. 76-C1448 (N.D. Ill., Nov. 23, 1977) (settlement agreement).

428

> 2. Racial, religious and ethnic factors are
>    deemed unreliable predictors of value
>    trends or price variance.
>
> 3. It is improper to base a conclusion or
>    opinion of value, or a conclusion with
>    respect to neighborhood trends, upon
>    stereotyped or biased presumptions re-
>    lating to race, color, religion, sex
>    or national origin or upon unsupported
>    presumptions relating to the effective
>    age or remaining life of the property
>    being appraised or the life expectancy
>    of the neighborhood in which it is located.

In addition, AIREA agreed to modify substantially the primary textbook

used in training appraisers. The modifications remove all references

to the use of racial and ethnic factors in arriving at appraisal

decisions. AIREA further agreed to, in essence, retrain its member-

ship by conducting extensive seminars designed to impart its new

policy and philosophy. AIREA also agreed to modify its own code of

professional ethics to reflect its new policy. Included in those

changes is the following language:

> Continuing changes and developments in the real
> estate field have a substantial impact upon the
> real estate appraisal profession. Important
> changes and developments in the design, the cost
> and the manner of constructing improvements to
> real estate, in the marketing of commercial,
> industrial and residential real estate, and the
> legal framework by which real property rights
> and interests are created, conveyed and mortgaged
> have resulted in corresponding changes in appraisal
> theory and practice. Social change can also result
> in a change in appraisal theory and practice. For
> example, it was once common practice to examine the
> racial, religious or ethnic composition of a neighbor-
> hood in an effort to detect any sign of non-conformity

003227

> or change. Such an approach is now regarded
> as misdirected and the use of factors relating
> to the racial, religious or ethnic composition
> of a neighborhood in arriving at a conclusion
> of value or in projecting value trends is now
> deemed an unreliable practice.

In the Commission's view the above cited language, as well as the

other terms of the AIREA settlement, accurately reflect the appropriate

posture of the Federal Government with regard to fair housing and

real estate appraisals.

The Department of Housing and Urban Development clearly shares the

view of the Department of Justice that racial considerations are an

improper tool in establishing appraisals for real property. In a

recent departmental policy statement Secretary Harris enunciated the

Department's position on this subject:

> Many stable and improving neighborhoods are
> comprised of home owners and tenants of diverse
> racial, ethnic and religious backgrounds, living
> in pleasant and desirable environments. Racial,
> ethnic and religious factors are unreliable predictors
> of value trends and mortgage risk, and the use of such
> factors in appraisal and underwriting determinations
> is unlawful under the Federal Fair Housing Law. _/

_/ Patricia R. Harris, Secretary of Housing and Urban Development,
  Memorandum to Principal Staff, Policy Statement on HUD Appraisal
  and Mortgage Loan Underwriting Practices to Promote Fair Housing
  and Equal Opportunity, Sept. 5, 1978, at 1.

47-614 O - 79 -- 28

430

The Commission's research reveals that appraisals based in whole or in part on race or ethnicity have a negative and discriminatory impact on minorities. In a June 1974 Commission study of mortgage practices in the Hartford, Connecticut area we noted:

> One traditional way of discriminating against minority homeseekers is through under-appraisal of the houses they wish to purchase....Officials of one lending institution and three brokers...reported that appraisal value was lower than the sales price in a substantial number of cases. In their view, this happened most often when the purchaser was a minority group member or when the house was located in an area of minority concentration. Transitional neighborhoods--those in the process of integrating--very likely fall into this category. They added that often the under-appraisal was made without discriminatory intent, but rather on the basis of the traditional appraiser view that property values decline in minority and transitional neighborhoods.__/

---

__/ U.S. Commission on Civil Rights, Mortgage Money: Who Gets It? A Case Study in Mortgage Lending Discrimination in Hartford, Connecticut, June 1974, pp. 16-17. The report further noted, at p. 17, a Federal Home Loan Bank Board survey indicating that:

> ...only 4 percent of the savings and loans use minority appraisers. Thus, the appraisers are overwhelmingly white and undoubtedly reflect the views of the associations: 30 percent of the associations "disqualify some neighborhoods from lending because they are low-income or minority-group areas" and 78 percent feel loans in such neighborhoods are "more risky than other loans." Additionally, 11 percent of the associations' appraisers use "different methods or factors" for such neighborhoods. For purchases in such areas, over a quarter of the associations require higher down-payments; 11 percent levy interest rates one-half of one percent higher, and almost a third give terms 7-1/2 years shorter than loans for homes in other areas.

431

The Commission has consistently sought to have greater Federal enforcement activity directed against discriminatory appraisal practices. Thus, in our most recent report on Federal civil rights enforcement, The Federal Fair Housing Enforcement Effort, we noted favorably the inclusion in Federal Home Loan Bank Board regulations of a provision prohibiting lender reliance on appraisals which are discriminatory per se or in effect under Title VIII or the Equal Credit Opportunity Act.[/] The Commission has also supported the Veterans Administration's (VA) requirement that appraisers certify that they will not "be influenced" by race or ethnicity in estimating the value of dwellings.[/] Indeed, one of our serious criticisms of VA is that it does not adequately monitor compliance with such certifications.[/]

---

[/] U.S. Commission on Civil Rights, The Federal Fair Housing Enforcement Effort, March 1979, p. 86. We observed further:

> This provision, which was not included in the proposed regulation, is especially important in combatting redlining. It has been alleged that appraisal and underwriting practices are the primary devices by which redlining is accomplished. See, for example, National Clearinghouse for Legal Services, Clearinghouse Review, vol. 10, no. 7, October 1976, p. 514.

[/] Id. at 111.

[/] Id. at 118.

432

Mr. Edwards. Our second witness is the distinguished director-counsel of the NAACP Legal and Education Defense Fund, Inc., Mr. Jack Greenberg.

Mr. Greenberg has been a pioneer in civil rights litigation and his wisdom and counsel are most welcome here.

Without objection, your full statement will be put in the record and you may proceed as you wish.

[The prepared statement of Mr. Greenberg follows:]

STATEMENT OF JACK GREENBERG, DIRECTOR-COUNSEL, NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.

*Introduction and summary*

Thank you, Mr. Chairman and members of the Subcommittee, for inviting the NAACP Legal Defense and Educational Fund, Inc. to present its views on H.R. 2540, the "Fair Housing Amendments Act of 1979."

For many years, lawyers associated with the Legal Defense Fund have represented black homeowners and homeseekers as well as interracial fair housing groups in housing discrimination actions throughout the country. These cases include *Stevens* v. *Dobs*, 483 F.2d 82 (4th Cir. 1973), *Dillion* v. *Bay City Construction Co., Inc.*, 512 F.2d 801 (5th Cir. 1975), *Williams* v. *Matthews*, 499 F.2d 819 (8th Cir. 1974), *Smith* v. *Stechel*, 510 F.2d 1162 (9th Cir. 1974) *Singleton* v. *Gendeson*, 545 F.2d 1224 (9th Cir. 1976), and *Fontilla* v. *Carter*, 571 F.2d 487 (9th Cir. 1978). The Legal Defense Fund has also been counsel in cases challenging federal regulatory agencies for their failure to honor their affirmative obligations under Section 808 of Title VIII, and is most recently involved in litigating racial steering cases in four major metropolitan areas, as well as supporting state government efforts to prohibit discrimination in leanding.

On behalf of the Legal Defense Fund, I wish to congratulate the sponsors of the bill before us today and their respective staffs for the admirable work they have done in preparing the proposed amendments. While the Legal Defense Fund has several suggestions, we believe that on the whole the bill is worthy of support as a needed clarification and improvement of Title VIII.

We also wish to congratulate Secretary Patricia Harris on the fine job she is accomplishing and attempting to accomplish. Eradication of discrimination in housing is an ambitious goal that has as yet eluded us. Nevertheless, the genuine efforts of Secretary Harris and her staff have done much to emphasize that equal opportunity in housing is more than a slogan, but a requirement of the United States Constitution and federal statutes. Prior to assuming her present position, Secretary Harris was a member of the Board of Directors of the Legal Defense Fund, and was familiar with our work. Since beginning her position as Secretary, she has pursued the same goals which we and other civil rights advocates share.

*Administrative enforcement of title VIII*

As I stated, the Legal Defense Fund believes that on the whole the changes and clarifications H.R. 2540 would make to Title VIII are good. We support the preservation of the two-pronged approach to Title VIII enforcement which permits an aggrieved person either to go immediately to federal court or to use the administrative process for resolving a complaint. What concerns us primarily is the interrelationship between the alternative proceedings.

With respect to the new enforcement authority given to the Secretary by the amendment to § 810, we agree that the changes are necessary and appropriate. The present mechanism for enforcing compliance with Title VIII through individual lawsuits has not been as successful as hoped for, and there is an obvious need for a greater involvement in the compliance activity of the Secretary as is contemplated under the amendments.

However, it seems equally important to preserve the "make-whole" principle which is served under the present version of Title VIII, and which permits a complainant to obtain injunctive relief and relief in damages for harm suffered due to a violation of the Act. While relief in that form is preserved under § 812 it is absent from the alternative administrative enforcement proceedings under § 810. In the latter proceeding, in other words, no relief by way of damages is available. The absence of relief by way of damages in the administrative forum to make a complainant "whole" is an obvious disincentive to employment of that remedy.

For these reasons we urge the Committee to amend § 810 to permit a prevailing complainant after the administrative process has been concluded to institute a de novo proceeding in a U.S. District Court to obtain individual relief as may be

433

appropriate, which would include compensatory and punitive damages, and any other equitable relief.

In addition, we urge the Committee to adopt an amendment which would permit a complainant who has not participated as an intervenor in the administrative proceeding, and conducted discovery and put on witnesses to his or her satisfaction or otherwise had control over the proceeding, to institute a de novo proceeding in a U.S. District Court to obtain full relief, as is appropriate.

Our reason for urging this change is grounded in our lack of confidence in the ability of the bureaucracy to handle adequately the high volume of complaints with which we believe it will be faced. To say this is not to express a criticism of Secretary Harris. The fact is that there are no successful models in terms of organization and expertise among our civil rights agencies in the federal bureaucracy charged with similar enforcement responsibility. Given the relative importance of the rights with which Congress is concerned and our experience with the other agencies, it is more appropriate to err on the side of caution.

All of these changes serve the make-whole purpose of the statute and increase the incentive to use the administrative remedy, without undercutting its speed and efficacy.

*Referral of complaints to State agencies*

Section 810(c) now provides that when an individual files an administrative complaint, the Secretary refers that complaint to a state or local fair housing agency and defers action for 39 days in instances where the local fair housing laws and practices are "substantially equivalent" to rights and remedies under Title VIII.

Several changes to this section are proposed. The statutory definition of "substantially equivalent" is expanded to provide that a local agency's laws and practices must in fact be equivalent. We caution the committee to emphasize in its report that the Secretary not recognize local agencies as substantially equivalent unless and until she has enough information to determine that the criteria set forth in Section 810 are met. Although the present statutory language contains no reference to the actual practices of a local agency, regulations at 24 C.F.R. 115 now establish practical criteria similar to that in the H.R. 2504. Despite such criteria, the Legal Defense Fund firmly believes that many agencies which are now recognized are in fact far from substantially equivalent. In 1976, HUD expended $60,000 to train 25 individuals to analyze local and state laws and to investigate the actual performance of agencies responsible for their enforcement. In many cases, despite the HUD investigators' own recommendation that states not be recognized until certain additional information was gathered or certain deficiencies corrected, the Department approved these states as substantially equivalent.

The bill wisely affords the Secretary discretion in deciding whether to refer complaints to state agencies and further prevents against potential abuses by the requirement that an aggrieved party must consent to the referral.

Despite these two safeguards, we believe it unwise to remove HUD's ability to recall complaints from state agencies. Our experience in dealing with local agencies as well as our review in 1976 of HUD's recognition of state agencies convinces us that the bill's scheme has the potential for unnecessary delays or other abuses. We therefore strongly urge that HUD continue to have the ability to recall cases where no action or unsatisfactory action has occurred at the local level. We agree with the suggestion of the Leadership Conference on Civil Rights that the existing 30 day period be extended to 60 or 90 days to give agenices a more realistic time period to act on complaints.

*Expansion and clarification of title VIII coverage*

Section 4(a) of the bill extends the term "discriminatory housing practice" to include any acts prohibited by Title VIII. The practical importance of this clarification is to make absolutely clear that federal departments and agencies are liable for failure to carry out their affirmative obligations under the Fair Housing Act. The increased powers accorded HUD in this bill, as well as the affirmative obligations imposed by the present Title VIII on all relevant federal agencies are a recognition that individual lawsuits are not a satisfactory mechanism for eradicating housing discrimination or effecting nationwide changes in housing markets. Only federal arsenal is capable of achieving these ends. Given these facts, it is only proper that agencies be judicially called to task for failure to fulfill their obligations under the Act. Unfortunately, not all federal agencies have consistently lived up to their statutory duties in the past. In the area of education desegregation, the Legal Defense Fund successfully challenged the department of Health, Education and Welfare's failure to enforce Title VI, *Adams* v. *Califano*. Along with the National Council Against Discrimination in Housing, we brought suit against the federal agencies which regulate financial institutions for their failure to carry out their

434

affirmative obligations under Section 808 of Title VIII. While most of these agencies now recognize their responsibilities, the Fund endorses the inclusion of the provision as a confirmation that federal, as well as private, obligations under Title VIII are judicially enforceable.

The bill confirms that the practice of discrimination in lending, or racial redlining, by mortgage lending institutions is prohibited by Title VIII. Decisions by federal courts in *Laufman* v. *Oakley Building & Loan Association,* 408 F. Supp. 489 (S.D. Ohio 1974) and *Harrison* v. *Hewinzeroth,* 414 F. Supp. 66 (N.D. Ohio 1977) have correctly held that Title VIII prohibits such practices. The inability to obtain financing is as effective a hurdle to equal opportunity in housing as an outright refusal to sell. The amendment reaffirms these interpretations and is a helpful clarification. Similarly, the Legal Defense Fund supports the explicit prohibition of racial discrimination in property insurance, and recognizes that it, too, clarifies the present coverage of Title VIII.

The current exemption in Title VIII for "Mrs. Murphy" housing units is an unjustifiable loophole that is inconsistent with the coverage of other fair housing laws which apply to all housing, 42 U.S.C. §§ 1981 and 1982, see *Jones* v. *Mayer,* 303 U.S. 409 (1968) and *Runyon* v. *McCrary,* 427 U.S. 160 (1976), and has been disfavored and narrowly construed by federal courts, e.g., *Singleton* v. *Henderson, supra.* The proposed tightening of this exemption to the renting of space in a single family unit eliminates these illogical inconsistencies.

*Procedural and remedial provisions*

With respect to the amended definition of "person aggrieved" in Section 4(i), we do not view the new language as curtailing or abridging the standing to sue under Title VIII of those recognized in the decisions of the Supreme Court of the United States in *Trafficante* v. *Metropolitan Life Insurance Co.,* 409 U.S. 205 (1972) and *Village of Bellwood* v. *Galston Realty* U.S. ---, 47 L.W. 4377 (April 17, 1979). In these cases the standing to sue under the Act was recognized of residents of segregated communities who, because of practices of landlords and realty companies forbidden by Title VII, were being deprived of the social and economic benefits of living in integrated communities.

While the new language may not be intended to affect any substantive change in the standing to sue under the Act of such persons, we think some litigation to establish that fact is unavoidable, simple because the definition of a "person aggrieved" has been changed. For that reason we urge the Committee to include in the legislative history a clear statement to the effect that no substantive change was intended. The better alternative, of course, would be not to change the existing language defining an aggrieved person in the Act.

The 180 day statute of limitations now applicable to Title VIII complaints is an unrealistically short period which all too often has unwittingly cut off the rights of housing discrimination victims. The proposed three-year time period for judicial actions and one-year period for the filing of administrative complaints is a needed modification.

The removal of the limitation in punitive damages is also long overdue. The present artificial ceiling of $1,000 has no relationship to wrongs committed under Title VIII and is absent from other fair housing statutes. Courts in general have attempted to avoid its restriction where the plaintiff has pleaded causes of action under 42 U.S.C. §§ 1981 and 1982, but there is no reason why this should be necessary.

Similarly, the removal of restrictions on the ability to collect attorneys fees will bring Title VIII into conformity with other civil rights acts covered by the Civil Rights Attorneys Fees Act of 1976, 42 U.S.C. § 1988. Litigation of housing discrimination cases, particularly where class-wide relief is sought, is time-consuming and expensive. Civil Rights organizations like the Legal Defense Fund, which have restricted budgets, look to attorneys fees award to support their litigation dockets. But, unlike the Fund, attorneys in private practice are simply unable to represent plaintiffs in civil rights cases without the prospect of recovering fees. Although the bill recognizes the need to bolster administrative enforcement of Title VIII, private litigation remains a crucial vehicle to vindicate private rights under Title VIII. The proposed attorneys fee provision will in practice enhance the ability of victims to secure counsel. We also urge that the committee report explicitly state that the recovery of fees for travel time and expert witness fees are contemplated by this provision. Several federal courts have held that such costs are included as part of plaintiff's recovery under the Civil Rights Attorney Fees Act, but the holdings are not uniform. Housing discrimination cases are often complex matters and the Legal Defense Fund has, more often than not, found it necessary to hear expert witnesses whose fees escalate the cost of litigation. Recovery of such fees is clearly appropriate.

435

*Enforcement by the attorney general*

The bill includes needed clarifications as to suits brought by the Attorney General under Section 813. The right of an aggrieved person to intervene in such actions affords victims the ability to participate directly in cases which determine their rights. Equally important, is the provision which explicitly allows the Attorney General to recover damages for housing discrimination victims. Injunctive relief alone is often insufficient to make victims "whole", and it is judicially inefficient to prosecute cases where only partial relief is possible.

*Preservation of existing remedies under other statutes*

Finally we urge the Committee to include in the legislative history an affirmation stating that the amendments to Title VIII are not intended to abrogate alternative remedies available in the Civil Rights Act of 1866, 42 U.S.C §§ 1981 & 1982, or other statutes. *Jones* v. *Alfred H. Mayer Co.,* 392 U.S. 409 (1968).

CONCLUSION

I thank the Committee for this opportunity to testify on behalf of the Legal Defense Fund and would be happy to answer any questions you may have.

Mr. EDWARDS. We apologize for taking so long with the other witnesses.

## TESTIMONY OF JACK GREENBERG, DIRECTOR-COUNSEL, NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.

Mr. GREENBERG. Thank you, Mr. Chairman.

As you have indicated, I have submitted a prepared statement and I will only briefly summarize what is contained in it.

The NAACP Legal Defense and Educational Fund wholeheartedly supports, with some minor suggestions, the bill H.R. 2540.

It is our position that it is impossible to address so pervasive a national problem as housing discrimination without Federal enforcement which we have effectively lacked until this time. Private resources simply are not adequate to the task. We have come to recognize that in other cases, other areas of civil rights as in employment and in schools, for example.

And it's widely recognized with regard to other social problems outside of the civil area. For example antitrust, securities law, food and drug laws, and so forth and so on.

Housing discrimination, which many see as the principal factor in maintaining second-class citizenship, should be treated no differently. We do have a few minor suggestions which are set forth in my prepared statement which I will not refer to, and one somewhat more substantial one.

The principal thrust of my remarks will be directed to the relationship between private suit and administrative enforcement.

We believe that while Government enforcement is essential for broad coverage, private suit remains important also as a cutting edge, to assure that Government does its job effectively and to give confidence to the minority community that, if necessary, it can rely on its own resources private lawyers.

Before the school desegregation cases 25 years ago, the Government did not undertake to end school segregation, Private lawyers did. Even after the Civil Rights Acts of 1964–65 were passed and Government had the authority to bring school cases, private lawyers brough *Alexander* v. *Holmes County Board of Education,* which ended the deliberate speed doctrine in 1970.

Private lawyers brought the principal *Fair Employment* cases—and I won't go into all of them.

436

And if the administration of title VIII, we submit, were to be forever in the hands of Secretary Harris, we might not be so strongly in favor of the position which I am urging today. But I have seen Government act indifferently to civil rights and in some of the cases mentioned earlier we have seen Government act in a hostile fashion to civil rights.

When I argued *Alexandar,* the Government opposed us in that case. Therefore, we propose two changes in the legislation: One is, if Government brings a proceeding and the complainant does not participate, he or she should retain the option to bring his or her own private action de novo when the Government proceeding is over if the outcome of the proceeding is not satisfactory to the plaintiff. Otherwise, there could be a bad settlement, there could be a poorly litigated result. We have seen this in other areas. It has been necessary in other areas of the law for private action to obtain full relief for a complainant.

Second, under the proposed bill the Secretary cannot secure damages to make whole a complainant who has suffered monetary loss because of housing discrimination. Damages are a deterrent.

If damages are not available a realtor or a real estate board or developer can discriminate and sit back and wait to be sued, knowing that the worst thing that might happen to him is that there might be a Government cease-and-desist order against him. Then he'll have to comply with the law.

But if he knew that the meters were ticking and he'd have to be paying damages to someone injured, then he might have a greater incentive to comply with the law.

So a private person should be able to secure damages if the Government brings a proceeding and obtains relief without damages.

This is not an innovation. It's done in connection with antitrust laws. It can be done in connection with the equal employment opportunities law.

With these changes we think—and a few others I'm not going to take the committee's time with—we think the new legislation will serve a highly important purpose. It will bring about the possibility of pervasive enforcement. It will have the backup of private suit giving us confidence that the job can and will be done, and it should help bring about much earlier the day when the cancer of racial segregation in housing is eliminated from our society.

Thank you.

Mr. EDWARDS. Thank you very much, Mr. Greenberg.

The gentleman from Missouri.

Mr. VOLKMER. Mr. Greenberg, you obviously heard the testimony or most of the testimony, of the appraisers?

Mr. GREENBERG. I did, yes.

Mr. VOLKMER. During your work on housing discrimination, have you found discrimination in appraising?

Mr. GREENBERG. Have I personally or has our organization?

Mr. VOLKMER. Has it been reported to you?

Mr. GREENBERG. I have heard about it. I have seen it in the literature, I have seen it in the reports. I have never been personally involved and neither has our organization been involved as far as I can recall, in a case involving the use of appraisals as a

003235

437

discriminary device, though I am aware that that has occurred, yes.

Mr. VOLKMER. Is it a sufficient occurrence, or do you know of any groups or could you provide us with the information as to any groups that may be or have in the past utilized discrimination in appraising?

Mr. GREENBERG. Well, Mr. Volkmer, discrimination in housing, like discrimination of other sorts, can be a very highly complex and subtle thing made up of many components.

Mr. VOLKMER. I agree.

Mr. GREENBERG. Made up of what realtors do and what mortgage lenders do, what newspaper advertisements say and what individual sellers do and what developers do.

It's very complex, and so to just winnow out the issue of appraisal, which I said I have no particular contact with, is something I am not really capable of doing, but if we are dealing with something that that is so highly interrelated, I think the statute and the Secretary ought to have the capacity to go after all the various components.

In some situation it's conceivable appraising can be a very important part of the picture. In others, it's insignificant.

Mr. VOLKMER. But it hasn't been a predominant part of the problem as far as legal defense.

Mr. GREENBERG. Not to my knowledge. I must say I was rather astonished by the testimony this morning. When I read the bill in preparation for my testimony I saw no mention of appraisal and had not come prepared to discuss the issue.

Mr. VOLKMER. Well, there isn't any in this bill and that is a sidelight.

Let me ask you on the bill itself about the referral of cases. I haven't had time to read your statement.

Mr. GREENBERG. Referral to State agencies, you mean?

Mr. VOLKMER. Yes, withdrawal of those referrals. You see nothing wrong with that?

Mr. GREENBERG. We approve of that—you will see that referred to in my prepared statement—because referral may be made to a State agency if the State agency and its administration is substantially equivalent to the Federal statute.

Now, in our experience we believe that many State agencies have been certified a substantial equivalent when, in fact, they are not. HUD made a study to ascertain which State agencies were substantially equivalent and over the findings of its own, over its own findings, it nevertheless then certified a number of State agencies, I think as many as 35—I'm not sure—as substantially equivalent.

We think the Secretary should have the power to take another look at that.

Mr. VOLKMER. Other than decertification, you feel the Secretary should have the power to, on her own when she determines that the State agency, let's say, is not proceeding with the matters or matter sufficiently——

Mr. GREENBERG. To take it back.

Mr. VOLKMER. Yes. Without the consent of the State agency?

Mr. GREENBERG. Well, I would think so.

003236

438

Mr. VOLKMER. I agree with you.

Mr. GREENBERG. Yes. Certainly I think so. Sure.

I think the important thing is the effect of enforcement of the law.

Mr. VOLKMER. The present law, as I understand it, provides that those in States where the State agency has been approved are automatically referred to that State agency.

Mr. GREENBERG. Yes.

Mr. VOLKMER. The bill provides for a discretationary referral and with the consent of the complainant. Do you agree with that part of the change in the law?

Mr. GREENBERG. Yes. In fact, you will see in my prepared statement we think that's an improvement, yes.

Mr. VOLKMER. Do you find anything in disagreement with or any constitutional question as to the $10,000 civil penalty——

Mr. GREENBERG. No.

Mr. VOLKMER [continuing]. By the administrator?

Mr. GREENBERG. No, I don't think so.

Mr. VOLKMER. Thank you very much.

Mr. EDWARDS. Mr. Hyde.

Mr. HYDE. On page 5, Mr. Greenberg, you support the Secretary's discretion to refer cases to State agencies as contained in proposed section 810(c). If the certification procedure is refined, as required on lines 16 to 23 of this section, why shouldn't the State agency first be able to handle complaints within its jurisdiction?

Mr. GREENBERG. I'm not quite sure I follow. If the State agency is not certified as equivalent, why——

Mr. HYDE. Why shouldn't we mandate a referral to a State agency first?

Mr. GREENBERG. Well, Mr. Hyde, my preference is all instances of civil rights enforcement would be that the State should have the first crack at it. I think, however, our experiences teaches us that for a variety of reasons—either underfunding, lack of expertise, or no commitment to the principle of the statute or opposition to the principles of the statute—sometimes that's not a workable way to enforce it.

Mr. HYDE. I just want to refer to the statute, the bill, which says:

No agency may be certified under this paragraph unless the Secretary determines that the susbstantive rights protected by that agency, procedures followed by that agency, and the remedies available to that agency, are substantially equivalent to those, and under this title before making such certification, and past performances if any of such agency.

That's page 8, lines 16 through 23.

Now, with all of those protections can we make a gesture toward letting the States do some of this?

Mr. GREENBERG. Let me give you several examples of State fair housing statutes that are recognized as substantially equivalent but in fact are not.

In the State of Oregon, for example, the coverage of the statute is substantially equivalent, but the Oregon Bureau of Labor and Civil Rights Division has a backlog of 1,000 cases.

Now, whatever led the Secretary to certify Oregon at that point, either the backlog was not as great or this was not taken into account, was, I think, not an adequate, is not an adequate justification as of now.

003237

439

In Pennsylvania, for example, the exemptions of the Pennsylvania law are much broader than in title VIII. Personal residence and educational, religious exemptions, many more activities. Nevertheless, it was certified. We would think that a careful look at that reconsideration would bring about a change.

In Colorado—and I could go on and on. So far whatever the reason they have been certified, perhaps a different policy at an earlier time, we think we shouldn't be stuck with those mistakes.

Mr. HYDE. OK. Philosophically I'm kind of inclined toward diversity in these things rather than one Federal standard. Oregon has Oregonians living out there, but this is the law and as long as there is a recall, it seems to me procedurally appropriate to let the States handle these things where they could, but I understand your point.

Let me just ask you one more question. You support the extension of the private statute of limitation from our present existing 180 days to 3 years.

Mr. GREENBERG. Yes.

Mr. HYDE. The philosophy behind it, the rationale behind the statutes of limitations is pretty sound actually. It's tough when you are the case that's 2 days after the statute has run or 1 day, but availability of witnesses and things like that, in 3 years wouldn't you think somebody who has been aggrieved—I agree with you, 180 days is too short—but you don't think 3 years could be too long?

Mr. GREENBERG. Well, I think the problem with so many of these cases is that you get people who are not aware of their rights. Particularly if one is a victim of discrimination, one frequently is harrased in coping with a lot of problems, not merely the housing problem. Counsel are not always easy to find.

Government will now have some power that people may not be aware of. People are sort of intimidated going to a Government office and getting something done. I know I am. I always put it off until I absolutely must.

So I think that a very substantial period of time should be allowed.

Mr. HYDE. Can't you balance that—now try and think like a defense lawyer—3 years have gone by and you are running a residential place. Is that fair?

Mr. GREENBERG. Well, I don't want to be, you know, insistent on any particular fixed period of time. I think it should be substantial and 3 years is the direction I like to see.

Mr. HYDE. Would you accept 2 years.

Mr. GREENBERG. Would I—well, I would really have to do some sort of empirical examination of the situation. Certainly, as an abstraction it doesn't offend me.

Mr. HYDE. Well, OK. I'm just trying to see it from both sides and fair is fair. I didn't want to foreclose somebody from not being able to assert his or her rights, but you sure don't want to foreclose somebody from defending because——

Mr. GREENBERG. I think that would go to credibility. If a fellow came in and said, "Three years ago I was discriminated against," and then the defendant said, "Well, you know, I really can't—the man who was working for me then can't be found any longer," and

003238

440

so forth, I think that would be entirely unreasonable. I mean, to some extent you have to be arbitrary.

Mr. HYDE. Okay. I have no further questions.

Ms. COOPER. Just one question on the point of how to recover and have an award for damages when the complainant has chosen to go to HUD, or a State agency.

You suggested de novo proceeding in court. Is that because you concur in the opinion of the Justice Department that constitutionally, the administrative law judge would not be empowered to award damages?

Mr. GREENBERG. I don't necessarily concur in it, but I think the path of prudence would be to follow that course.

Ms. COOPER. Well, let me ask you to consider another possibility and that is that after a hearing has been had and an order has been made in the administrative process favorable to the complainant, that the complainant could then institute an action in court solely for the purpose of determining the extent of damages and that all other facts and conclusions of law woiuld be conclusive on that proceeding, so it's kind of a modified de novo proceeding.

Mr. GREENBERG. Almost like a Clayton Act proceeding. You take the previous judgment and just sue on that in the Federal court. I think that would greatly simplify things for everybody, yes.

Ms. COOPER. Thank you.

Mr. EDWARDS. Mr. Boyd. Consistent with that line of questioning, Mr. Greenberg, when an individual, an aggrieved party, determines how he is going to go about attacking a discrimination situation, he has the choice under this bill of beginning an action himself under the 180 days, or 3 years, or 2-year statute of limitation which provides ultimately for money damages, or he makes the independent choice of going through the Secretary of HUD.

Now, your testimony suggests that after having gone through the administrative process, and since there is a question as to whether money damages could be awarded in that process, you would permit, and counsel would suggest, that the individual be permitted to use the administrative record as a basis for going into Federal court and getting money damages; is that correct?

Mr. GREENBERG. Yes.

Mr. BOYD. Why should that proceeding, if there is an alternative through the court system for money damages and an aggrieved party opts for the administrative procedure, why isn't there sufficient protection now and sufficient opportunity now to achieve money damages if that's what the party wants?

Mr. GREENBERG. Well, if the party decides to go in the court in the first place, but lawyers are not easy to find.

Mr. BOYD. This bill provides for attorneys' fees.

Mr. GREENBERG. Yes, but as an organization that is qualified to obtain attorneys' fees and occasionally does, I'm going to tell you that it's a lot easier said than done. Defendants fight back hard, courts are not always fair, and certainly rarely generous.

For a lawyer to take a case involving a relatively modest amount in which the interests at stake are modest in financial terms, essentially on speculation that he get an attorney's fee, is not commonplace. I'm not saying lawyers don't do it, but you may not be able to come by them readily.

441

So the simplest course, I think, and I recommend that people go down to HUD and have them bring the proceeding.

On the other hand, that does present the problem that the fellow who is discriminating says, "Ha, ha. We'll just sit here and continue discriminating. One of these days they'll bring an action against me, so I'll give complainant the apartment."

Well, he ought to know that he may have to pay damages also. That's the way we accommodate both those considerations.

Mr. BOYD. On page 3 of your statement you made reference to the obvious need for greater involvement in the compliance activity of the Secretary as is contemplated under the amendments.

What specific involvement are you talking about by the Secretary personally?

Mr. GREENBERG. I don't mean personally. You mean the Secretary personally? I don't know. I was not speaking of the Secretary personally. I am——

Mr. BOYD. You are speaking of HUD then?

Mr. GREENBERG. Yes, speaking of HUD, yes.

Mr. BOYD. Thank you. I have no further questions.

Mr. EDWARDS. I have no questions, Mr. Greenberg, but I thank you for an excellent statement and the suggestions that you have in your statement for improving the bill will be taken very seriously and I personally like them a lot.

Thanks very much.

Our last witness today is the distinguished Chairman of the U.S. Commission on Civil Rights, Dr. Arthur Flemming. Under Dr. Flemming's direction, the Commission has completed a most useful study of "The Federal Fair Housing Enforcement Effort."

This careful study provides the crucial information we need to make an intelligent choice as to how to improve enforcement of the major Federal fair housing law, title VIII. Therefore, we are most pleased to have you here today.

## TESTIMONY OF DR. ARTHUR FLEMMING, CHAIRMAN, U.S. COMMISSION ON CIVIL RIGHTS, ACCOMPANIED BY CYNTHIA GRAY AND JOHN WHITE

Dr. FLEMMING. I am very happy to be here.

On my left is Cynthia Gray and on my right is John White.

Mr. EDWARDS. You may read your prepared statement or we will insert it in the record and you may proceed as you wish.

Dr. FLEMMING. Thank you, Mr. Chairman.

Mr. Chairman, I am pleased to have the opportunity to appear before you on behalf of the Commission in connection with H.R. 2540. In April this Commission released a major report assessing the activities of Federal executive agencies to insure fair housing. This report, entitled "The Federal Fair Housing Enforcement Effort," reviews the efforts of the Departments of Housing and Urban Development and Justice, as well as the activities of other agencies with programs or regulatory responsibilities that potentially affect equal housing opportunities.

In our report, which covered the period from January 1975 through August 1978, we concluded that the Federal Government's fair housing enforcement effort suffers from three principal interrelated deficiencies:

442

Title VIII of the Civil Rights Act of 1968, the primary fair housing law, is a weak law. Most significantly, although the Department of Housing and Urban Development—HUD—is charged with the overall administration of that law, HUD lacks enforcement power. HUD's Secretary is merely empowered to seek redress of title VIII violations through conciliation.

Those Federal agencies charged with insuring equal housing opportunity have not adequately carried out this duty. Although title VIII assigned HUD a leadership role in the implementation of that title, HUD has not been given the necessary assistance and has not been organized to exercise this role effectively.

The Government's appropriations in support of fair housing have been inadequate.

Since the research for the report was completed, we have been heartened by some very significant signs of progress. As you know, the President in his message to Congress accompanying his State of the Union address made a commitment to support legislation to provide HUD with enforcement powers. H.R. 2540 which would accomplish such an objective, is a very important step toward the creation of a viable Federal program to combat housing discrimination.

Indeed, the most important provision of this bill is that it would provide HUD with administrative enforcement authority, while preserving the authority of the Department of Justice to file suit where patterns and practices of discrimination exist. A major stumbling block in HUD's effort to administer title VIII has been the necessity for it to rely solely upon the process of conciliation to correct title VIII violations. Thus, even when HUD has proof of discrimination, respondents may be unlikely to agree to the remedies HUD suggests because they realize that if they reject the remedies, the probability of further action against them is slight.

The inadequacy of the conciliation process, when it is unaccompanied by stronger enforcement mechanisms, is emphasized by the small number of complaints HUD has successfully conciliated as a percentage of all title VIII violations it has uncovered. For example, in fiscal year 1977, HUD was able to conciliate successfully only 53 percent of all title VIII complaints it attempted to conciliate, little more than half of all complaints in which HUD found title VIII violations.

H.R. 2540 represents a very significant improvement over title VIII in many other respects as well, and I would like to take this opportunity to provide you with our comments on a number of the bill's provisions.

This bill would enable the Secretary of Housing and Urban Development to file a charge of discrimination on her or his initiative. We consider this one of the most critical positive additions to title VIII. It provides a statutory basis for a program of systemic investigation in the absence of individual complaints and thus constitutes a mandate for HUD to undertake the kind of pattern and practice reviews which the Commission has called for since 1974.

The Commission recognized the role that private fair housing agencies have played in identifying instances of housing discrimination. We believe that an effective fair housing law should provide a mechanism for insuring that the Government acts upon all

443

information regarding possible violations of title VIII. We, therefore, recommend that H.R. 2540 be amended so as to require the investigation of any written charge meeting the general requirements set forth in section 810(a)(1) regardless of whether such charge is filed by or on behalf of an aggrieved person.

The bill would require the approval of the Secretary and the charging party for a conciliation offer to take effect once an investigation has resulted in a finding of reasonable cause and a HUD administrative complaint has been issued. Conciliation of charges prior to the completion of investigation are subject only to the charging party's approval. We concur that aggrieved parties should be permitted to accept settlement offers prior to a determination on the merits of the charge. This will promote speedy resolution of many charges and thus will help avoid or alleviate a backlog of charges.

As we stated earlier, we believe that the enforcement provisions incorporated in H.R. 2540 constitute a very important part of the bill and a significant improvement over existing law. We also note favorably that H.R. 2540 expands the potential enforcement capability of the Attorney General. It provides for intervention by the Attorney General in civil actions brought by private parties where the Attorney General certifies that the case is one of general public importance. This is also a significant improvement over title VII.

In addition, we have two recommendations for strengthening the enforcement provisions of H.R. 2540. First, H.R. 2540 should be amended to require that charging parties and respondents be provided with a copy of the investigative findings. We believe that such information is necessary if parties are to make an informed judgment as to how to proceed.

Second, pursuant to section 813(a) of the present title VIII, the Attorney General currently has independent authority to litigate in the absence of a pattern or practice of discrimination when "* * * any group of persons has been denied any of the rights granted by this title, and such denial raises an issue of general public importance * * *." We suggest that H.R. 2540 be modified to read "* * * any person or group of persons * * *." If a case raises issues of general public importance, it should not matter whether it is an individual or a group which is adversely affected.

We strongly endorse the thrust of the bill's provision with regard to State and local agencies. This Commission has long held that State and local governments should be given a significant role in the processing of complaints and the elimination of illegal discrimination. We have one recommendation for strengthening proposed section 810(a)(3), which provides that if HUD refers a complaint to a certified State or local agency, HUD will take no further action with respect to the charge. We suggest that this provision be modified to permit the Secretary, with the approval of the complainant, to recall a charge from a State or local agency if, for any reason, the agency has not commenced action on the charge within a fixed time frame.

H.R. 2540 does not contain a clear grant of authority to HUD for the issuance of either substantive or procedural regulations. While the Commission has always believed that HUD has full regulatory authority pursuant to title VIII, we observe that for more than a

444

decade HUD has failed to meet its responsibilities in this regard. Therefore, we urge that H.R. 2540 contain not only a specific grant of regulatory and rulemaking authority, but also a direction to the Secretary to issue both substantive and procedural guidance on the act.

Proposed new section 810(a)(4) would require cooperation and the elimination of duplicative activity by all the agencies of the Federal Government which have responsibilities under the act. We strongly support this provision in principle. Our recent research indicates continued overlap, duplication, and inconsistencies between Federal agencies action under title VIII. We are concerned, however, that this provision appears to undercut the clear authority of the Secretary of Housing and Urban Development to administer the act. We believe that section 810(a)(4) of H.R. 2540 should incorporate the language, found in section 808 (a), (c), and (d) of title VIII, which established the primacy of the Secretary as the overall administrator of title VIII.

We are also pleased that the bill proposes to amend section 808(d) of the act, which requires all executive departments and agencies to administer their programs and activities relating to housing and urban development in a manner designed to affirmatively further the purposes of title VIII. The bill would charge ". . . any Federal agency having regulatory authority over financial institutions" with responsibilities under the title. As the Senate Committee on Banking, Housing, and Urban Development observed in a 1976 report, none of the Federal financial regulatory agencies has ever required a lender to adopt an affirmative program to redress a past pattern of discrimination. Indeed, as noted in "The Federal Fair Housing Enforcement Effort", the Federal Reserve Board disputes its title VIII responsibilities altogether.

We note that H.R. 2540 adds handicap as a protected classification under title VIII. The Commission's jurisdication has only very recently been expanded to include discrimination on this basis, and thus we are just now beginning to study civil rights issues affecting the handicapped. As a matter of principle the Commission certainly is in favor or extending fair housing protection to handicapped individuals. Unlawful discrimination against the handicapped is as odious and unwarranted as are other forms of discrimination.

However, having had the opportunity to read the testimony on this bill presented by HUD Secretary Harris and Assistant Attorney General Days regarding the handicapped, and in light of our own limited experience, we must conclude that developing a workable definition of handicap and of what constitutes discrimination against this group, is very complex. We understand that the Department of Justice is in the process of drafting language to clarify this section. We look forward to reviewing that language when it is made available.

There is every indication that the housing opportunities of this country's minorities and female-headed households continue to be circumscribed by unlawful discrimination. Our most recent Commission report documents the Government's failure to eliminate this chronic national dilemma, and it recommends steps which must be taken if we are to begin to remedy the problems identified. Legislation to improve the title VIII enforcement mechanism con-

003243

stitutes one of our most important recommendations. We, therefore, urge this committee to act swifty to bring this bill to the Senate floor. President Carter recently stated that title VIII remains largely an empty promise. This situation must be addressed forthwith if we are to have any hope of reversing the Nation's segregated and disparate housing conditions.

Mr. EDWARDS. Thank you very much, Dr. Flemming.

My compliments to you and your colleagues for this statement. It's very good.

Dr. FLEMMING. Thank you, sir.

Mr. EDWARDS. Mr. Volkmer.

Mr. VOLKMER. I have no questions, Mr. Chairman.

Mr. EDWARDS. Mr. Hyde?

Mr. HYDE. Thank you, Mr. Chairman.

What is your opinion, Dr. Flemming, about the proscription of information about churches in appraisals? We were told by some appraisers earlier today that the Federal Home Loan Bank Board, not HUD, has suggested that houses of worship, I guess, or a house of worship, be used, that is, a religious facility, rather than a statement that a synagogue is in the neighborhood or Catholic church and Catholic school.

Are you at all familiar with that? I don't want to ask you a question of something you are not familiar with.

Dr. FLEMMING. I am not familiar with it, but I would be very happy to become familiar with it and to provide the committee with a statement relative to the regulation and our comment on it.

Mr. HYDE. Let me suggest that I don't know that it is a regulation. I think it was informal.

Mr. EDWARDS. I know a little about it. If you would respond at your convenience to the question, and I think this might be a help as to the answer.

It might have to do with code words that churches do not include a Jewish house of worship, and you know in the real estate business code words are used here and there, and it's proper that the regulations refer to that.

Mr. HYDE. Are there regulations?

Mr. EDWARDS. I don't know.

Mr. VOLKMER. Just the forms that FNMA and FHLMA use.

Mr. HYDE. The forms do not provide for a place listing the availability of churches?

Mr. VOLKMER. Well, you are not supposed to use those words by definition.

Mr. HYDE. What do you think about that, Doctor?

You want to think about it. All right.

Dr. FLEMMING. I happened to come into the hearing room at just about the time that discussion was taking place and I just hadn't run across it before and I would be very happy to submit a statement on it.

Mr. HYDE. I'm trying to track down the forms and ask Federal Home Loan Bank Board for some comment.

Dr. FLEMMING. We could run it down.

Mr. HYDE. Would you do that? That would be fine.

Dr. FLEMMING. Yes, because they are one of the agencies for which we have oversight responsibility and we'll be very happy to

do that. It just hadn't been called to our attention in connection with our report.

On the question of appraisals, we did get into it just briefly in connection with the Veterans' Administration. We have a comment in our report which says that the Veterans' Administration continues to require appraisers to certify that they will not be influenced by the race, color, religion, or national orgin of occupants or neighborhoods in estimating the value of a dwelling. This certification was also amended to add a section of occupant or neighbors as a factor which may not be considered in making an appraisal.

We took note of that in our report. That is the policy followed by the Veterans' Administration. I think that's our only reference to appraisals in this particular report.

Pardon me. Maybe they've got one here.

We do make some reference to a few complaints regarding this. For example, quoting from 123 of our report:

Two complaints, both alleging racial considerations in an appraisal, appeared to be mishandled. This also was under the Veterans Administration. In one case complainant alleged that the appraisers had taken the racial composition of the neighborhood into account. Therefore, the appraisal was too low. The Veterans Administration raised it by $1700.

In response to our observation, the Veterans Administration made the comment that one of seven appraised values are appealed. Appraisals are appealed because they are lower than the price. Upon review appraisal, the Veterans Administration may increase the value if the property merits it or it would be in the best interests of the veteran.

Whether an appraisal is increased and how much it is increased, depends on the particular circumstances of each case. Inasmuch as appraisals are estimates of market values, the Veterans Administration does not reprimand an appraiser because an appraisal is appealed or an estimate is raised.

We also said:

It is also imperative that the Veterans Administration take appropriate action to insure that racial considerations do not influence the appraiser's estimate.

Mr. HYDE. Would that include ethnic?

Dr. FLEMMING. Yes.

Mr. HYDE. We heard testimony a little earlier when we were talking about a Chinese community, which is certainly prominent in Chicago where I am from, and San Francisco. Some people of Chinse ancestry want to move into that community and if a vacancy occurs, that property might have several bidders and the property might have a higher value than perhaps a similar value out in the fringes.

Don't you think that the ethnic composition of that neighborhood in that situation—and we could transpose it to the Bohemian neighborhood or Lithuanian, where Lithuanian people want to move in—is a factor, clinically speaking, when talking about social implications in the value of that property?

Dr. FLEMMING. It seems to me that there are no factors that can be legitimately be taken into consideraion which will result in a fair appraisal without considering either racial or ethnic factors.

Mr. HYDE. Then in your opinion, it never should be a factor in appraising property, the value of property, the fact that it is a Jewish community near a synagogue or not, that, really, you just look at the land and the size of the lot and the type of building.

Dr. FLEMMING. I think that there are other factors which obviously have an effect on appraising, and I think those factors should

447

be taken into consideration, but I do not personally see any justification for taking into consideration racial, ethnic factors and religious factors.

Mr. HYDE. You do recognize that there are a lot of ethnic neighborhoods in big cities and people are very proud of them and they like to cluster together, and that has an impact on the value of a particular parcel within that community, but we shouldn't write about it, speak about it, but we recognize it.

Dr. FLEMMING. I think we are getting on very dangerous ground if we use it as a factor. One step leads to the next step.

Mr. HYDE. If it's supported by data, what if there is data to support that this particular property has an enhanced value? It doesn't always have to go down. It could be enhanced. Chicago has the largest Polish community outside of Warsaw and people like to live in Polish communities if they are of Polish ancestry and that is a factor to add to property rather than detract.

Dr. FLEMMING. Congressman Hyde, I appreciate those considerations, but the factors of race and creed and religion, have worked their way in such an insidious manner into this whole housing area that I just feel we should draw a sharp line and not cross it. I don't think we are working any hardship in doing so. If we draw that line sharply and don't cross over it, than we are helping to make sure of the fact that determinations and judgments are not being made on the basis of race, color, and national origin and creed.

Mr. HYDE. I don't mean to prolong this, but those factors are important to those human beings out there. Now, maybe they ought not to be, but a Catholic family wants to live near a Catholic church, where grandma can go to Mass, where the kids can go to school. Even though, perhaps you might feel the neighborhood school isn't all that great, people do. People do. Or they want to live in a Lithuanian community.

Dr. FLEMMING. They should have that freedom of choice.

Mr. HYDE. Yes, but you won't let these appraisers recognize those factors.

Dr. FLEMMING. I recognize that people do want to live in that type of a neighborhood and they certainly should have that freedom of choice, the opportunity of making that choice and that kind of a selection. But I just think it would be wrong to say to appraisers that you can take into consideration under certain circumstances the question of race, ethnicity, and religion.

Mr. HYDE. OK.

Mr. EDWARDS. I think you described it very well, Dr. Flemming. There was a long history in America of appraisers and real estate brokers describing properties racially and the result being that automatically the values went down, even though they should not have gone down.

When an appraiser appraises a piece of property, he actually creates, it's a creative act that creates a price, and so if appraisers go around saying that is a Mexican neighborhood, that is a black neighborhood, automatically it has historically been negative and people can't get mortgages in that neighborhood, they can't buy in that neighborhood, and usually they might be disadvantaged

448

people. So that's why if you start to cross the line, you get into deep, deep trouble.

Dr. FLEMMING. Mr. Chairman, you undoubtedly recall before I became a member of the Commission that the Commission did issue a report in which it cited a section of the FHA insurance guarantee manual, which required or suggested that race be taken into account in appraisals.

Now, that was a Government document. And I guess their rationale for it was that they said that they were following the general practice of appraisers. That's how insidious this whole thing can become.

Mr. HYDE. I can be, no question, but insidious or advantageous? It can be advantageous, I can assure you, and why throw out reality because something can be used in a negative way? I represent Cicero, Ill., and Berwyn, Ill. There are more savings and loans, you can't walk down the street without bumping into them.

They are ethnic, they are Bohemian, Lithuanian. That's what people want to know.

Now, Oak Park is in my district, a modern, integrated community. It is an asset to say it is integrated. That helps move property, enchances the value. Cross the street to Austen and it goes the other way. But aren't we just shutting our eyes to reality in saying how we wish things are rather than what the way they are, dealing with people's life savings in buying a home?

Dr. FLEMMING. I appreciate that point of view, but I still think it would be very dangerous for us to cross the line.

Mr. EDWARDS. Yes. I would suggest that we have a record of where it has worked out to the disadvantage of great numbers of Americans because, historically, the appraisals using that criteria have been negative. Thsy say, they live there, so therefore the propety is not worth that much.

Well, that creates a value and these people are dispossessed of a certain amount of value.

Counsel.

Ms. COOPER. I just have one technical question.

You recommend that the department be given the authority to investigate any written charge meeting the general requirements set forth in section 810(a)(1) regardless of whether such charge is filed by or on behalf of an aggrieved person.

Are you talking just about investigation or are you also talking about the authority of HUD to hold enforcement hearings on that charge?

Dr. FLEMMING. We are talking about both.

Ms. COOPER. So you would be creating then a different standard for administrative charges than for court suits, or would you clarify that?

I'm concerned that that would be the effect of that kind of an approach.

Dr. FLEMMING. I get your point. I hadn't considered that particular point before.

What we are driving at here is that we feel the third-party citizen organizations have played a very important role in dealing with housing discrimination, and we feel that the bill should be written in such a way as to recognize that and to make it possible

449

for them to file a charge. In order to accomplish our objective we probably don't need to go beyond giving them the right to file a charge and have that charge prosecuted.

Ms. COOPER. But that would be a different standard than what was being required to have standing to challenge a discriminatory act in court.

Dr. FLEMMING. That's corrective, and I think that can be defended because it is an administrative proceeding, and here's a third-party citizen organization which oftentimes has done a very good job, very thorough job, of developing information relative to discrimination, and it seems to me that that ought to be recognized.

Now, I appreciate the fact that there is a remedy for them. They could go to court. I also recognize that probably in a large number of instances the Secretary, or the persons who are representing the Secretary, would accept that charge and use it as a basis for investigation.

So maybe we are being just doubly cautious. But we have the feeling that the door should be open to them, that they should be encouraged rather than discouraged.

Ms. COOPER. Is it correct that the EEOC has similar authority to investigate charges that are filed by organizations and other agencies?

Dr. FLEMMING. That I'd have to check on. I will be glad to do it and supply it for the record.

Ms. COOPER. Thank you.

Mr. HYDE. Mr. Chairman.

Mr. EDWARDS. Yes.

Mr. HYDE. May I ask leave that an article by Prof. Kenneth Galchus from the Real Estate Appraiser of November–December 1972, entitled, "Property Values in an Integrated Neighborhood," and then a second document by the same person, dated January 1977, further studies in these neighborhoods in Virginia, in Norfolk, I believe, "Property Values in an Integrated Neighborhood, Some Further Evidence," be admitted into the record inasmuch as they support his thesis that his research indicates higher prices are more often associated with integration than lower.

Mr. EDWARDS. Those are good articles.

Without objection, they should be entered in the record.

[The documents referred to follow:]

003248

450

# Property Values in an Integrated Neighborhood

## By KENNETH GALCHUS

RECENT RESEARCH has provided little evidence to support the claim that housing prices decline once black families begin moving into a neighborhood.[1] If anything, this research indicates that *higher* prices are more often associated with integration.

### Review of Literature

One of the most extensive investigations of the effect of integration on the prices of single family dwelling units was done by Laurenti and summarized in his book, *Property Values and Race*.[2] The three cities studied were San Francisco and Oakland, California and Philadelphia, Pennsylvania.

Laurenti's methodology involved the selection of a series of neighborhoods in each of the three cities, which had experienced some degree of recent integration. These were designated as the test areas, and paired with neighborhoods that had remained all-white over the whole period. The latter neighborhoods, referred to as control areas by Laurenti, were chosen in such a way so as to be as comparable as possible (in terms of the age of the homes, general topography, pattern of land use, etc.) to the particular test areas involved. In this way, Laurenti argued, the only real difference between the two neighborhoods would be in degree of integration. Laurenti thus was able to compare property values for test and control areas both before and after the initial period of integration. (It must also be pointed out that the selling price of a house was taken to be a good measure of its value.)

Laurenti found that 41 percent of the comparisons, selling prices in the test area, over the period of observation, were within 5 percent of the prices in the control area. In 44 percent of the comparisons, test areas ended the period with relatively higher property values by

margins of from 5 percent to 26 percent. Control area prices were higher than those in the test area by margins of from 5 percent to 9 percent in 15 percent of the comparisons.[4] These results indicate that the direction in the trend of property values during the initial stages of integration is not at all predictable. Thus, depending upon the demand for and the supply of suitable housing both inside and outside of the newly integrated area, either an upward or downward trend in housing prices might be anticipated.

Earlier studies investigated this problem for Chicago, Kansas City and Detroit.[4] Although the methods used in some of these earlier studies differed substantially from those employed later by Laurenti, the results were generally the same. In all three studies, the researchers concluded that no evidence supported the claim that property values inevitably decline in areas undergoing racial transition.

More recently, the work done by Dobson and Phares, working independently, for the University City area of St. Louis has supported the results of the previous studies.[5] Dobson, using an index based on repeat sales (thereby hoping to have a much greater control over quality differences) found that, "integration does not seem to affect the sales prices of houses that have been adjusted for quality differences. . . ."[6] Unlike Dobson, Phares used a sales price index formed by combining

1. In other parts of the United States, fear and uncertainty are most likely connected with a movement of Spanish speaking or Oriental families into a previously "homogeneous" neighborhood.

2. Luigi Laurenti, *Property Values and Race* (Berkeley: University of California Press, 1960).

3. Ibid., pp. 51-52.

4. E. F. Schietinger, "Race and Residential Market Values in Chicago," *Land Economics*, Vol. 30 (November, 1954), pp. 301-08; Thomas L. Gillette, "Santa Fe: A Study of the Effects of Negro Invasion on Property Values" (unpublished Master's thesis, Department of Sociology, University of Kansas City, 1954); Richard Marks, "The Impact of Negro Population Movement on Property Values in a Selected Area in Detroit," City of Detroit, Mayor's Interracial Committee, January 16, 1950 (mimeographed).

5. Allen Dobson, "Price Changes of Single Family Dwelling Units in Racially Changing Neighborhoods" (unpublished Ph.D. dissertation, Department of Economics, Washington University, 1970); Donald Phares, "Racial Change and Housing Values: Transition in an Inner Suburb," *Social Science Quarterly*, Vol. 52 (December, 1971). pp. 560-73.

6. Ibid., p. 54.

selling prices of homes with a multiple of their 1970 assessed values. This last computation was used in order to correct for differentials in the quantity and quality of housing.

Phares' findings generally support those of Dobson. That is, Phares found no long-term decline of the sales price index in those areas experiencing varying degrees of integration. It must be pointed out that Phares did find a relatively short period of declining prices in the year preceding actual integration—most likely due to an anticipatory type of effect. After this relatively short period, however, the index in those areas with substantial integration rose faster than the index in the areas of "non-," "slight" and "moderate" integration.

### Methodology

To investigate the effect of integration on prices of single family homes, it was decided to compute a yearly sales price index, for the period of 1960 to 1971, for both a recently integrated (test) neighborhood and an area that had remained all-white over the whole period. The sales price index was computed for the control area for purposes of comparison, thereby taking into account variations in such factors as inflationary pressures and interest rates.

Ideally, the only difference between a test and control area should be in the degree of integration experienced by each. Unfortunately, it was almost impossible to find two neighborhoods which were similar in every respect. It was possible, however, to find two areas whose differences were minimal. Moreover, in selecting the test and control areas, it was important for them to be close enough geographically so that housing prices in both neighborhoods would be influenced to the same extent by changes in those factors which would normally be expected to affect real estate values (e.g., a new superhighway). On the other hand, it was important for the two areas to be far enough apart so that the process of integration in the test neighborhood would have as little effect as possible on property values in the control area.

The test area chosen, Colonial Place, was an all-white neighborhood until the summer of 1967. Previously, the edge of the black community (Park Place) had been 35th Street. In 1966, black families moved across this boundary and a year later were in Colonial Place. Integration proceeded swiftly so that by 1970, black residents represented nearly 20 percent of the total population.[7]

Larchmont, primarily a residential area as is Colonial Place, was chosen as the control area. Although Larchmont was developed a little later than Colonial Place, both areas were seen to be similar except for the degree of integration. That is, Larchmont retained its all-white

character over the period, 1960 to 1971.[9] In addition, Larchmont was considered far enough away from the test area so as not to be affected by the process of integration. Yet, both neighborhoods are close enough so that housing values in the two areas would most likely be affected to the same extent by such physical changes as a new highway or an enlarged shopping center.[9]

The majority of the homes within both Colonial Place and Larchmont are located approximately two to three miles from each other. In addition, the homes in each area are diverse with respect to size, quality and selling price. For example, in 1971, selling prices of homes in Colonial Place ranged roughly from $15,000 to $35,000, while those in Larchmont sold anywhere from $18,000 to $60,000. In general, the average value of a home is higher for Larchmont than for Colonial Place. Specifically in 1960 (1970), the average value of a home in Colonial Place was approximately $14,000 ($17,000) while for Larchmont the average value was $19,000 ($27,000).[10] In addition, homes are generally older in Colonial Place than in Larchmont. According to 1960 census data, 85 percent of the homes in Colonial Place were built before 1939, whereas only 66 percent of the homes in Larchmont were built before this date.[11] Differences in the average age and value of housing were not viewed as significant factors, however, since the sales price index to be used would, for the most part, eliminate any differences due to the quantity and quality of housing.

Both the test and the control areas have easy access to the downtown area and the relatively newer suburban shopping centers. In addition, both are serviced equally well by major thoroughfares and bus lines. With one exception, there were no significant changes, during the twelve-year period under review, in or near either of the

---

8. According to 1960 census data there were actually six housing units occupied by non-whites in Larchmont. However, according to a few sources, one or more members of these six families were most likely employed as servants and were, thus, living in quarters furnished by their employers. See U.S. Bureau of the Census, *U.S. Census of Housing: 1960 Block Statistics Series HC (3), No. 401* (Washington: U.S. Government Printing Office, 1961).

9. These unique locational characteristics result from the fact that both areas are separated by a branch of the Lafayette River.

10. U.S. Bureau of the Census, *Block Statistics*, 1960 and 1970, loc. cit.

11. Because of the relatively small number of homes built in these two areas between 1960 and 1971, the percentages cited above remained approximately constant over the twelve year period. Moreover, the two percentages were calculated from data representing the entire census tracts (23, 24 and 28). Since the test and control areas comprise a major part of the census tracts concerned, the same conclusion would most likely have emerged had data for Larchmont and Colonial Place alone been available. In addition, the 300 housing units for the Bolling Square Apartment house complex have been excluded from the percentage as calculated for Larchmont. See U.S. Bureau of the Census, *U.S. Census of Population and Housing: 1960. Final Report PHC (1), 107* (Washington: U.S. Government Printing Office, 1961).

---

7. U.S. Bureau of the Census. *U.S. Census of Housing: 1970. Block Statistics. Final Report, HC (3), 256* (Washington: U.S. Government Printing Office, 1971).

452

two areas which would have produced a differential effect on property values. The one exception was the expansion of Old Dominion University. A segment of Larchmont is contiguous to the University and the school's expansion may have to some extent increased the desirability of owning property in the area. The impact of this factor, in terms of a differential effect on property values, was seen to be somewhat reduced, since although it does not adjoin the University, most sections of Colonial Place are within a mile and half of the school. Moreover, many parts of both Larchmont and Colonial Place are equidistant from the University.

Both the test and control neighborhoods were similar with respect to the number of housing units and the number of residents in each area. For example, in 1960, Larchmont and Colonial Place contained 3,616 and 3,094 residents respectively. In addition, there were 1,325 occupied housing units for the control area and 1,114 units in the test area. Owner-occupancy rates did not differ markedly between the two areas. The rate was approximately 70 percent for Colonial Place and 80 percent for Larchmont.[12]

In sum, the test and control areas for all practical purposes were seen to be the same except for differences in the average age and value of housing, and in the degree of integration. As was noted before, however, the effects of differences in the average age and value of housing can be minimized through the use of the sales price index.

Information on each piece of property that changed hands in Norfolk for the last 30 years was available in the Real Estate Section of the Office of the Commissioner of Revenue. Thus, after the selection of the test and control areas, all sales involving single family dwelling units in Larchmont and Colonial Place were examined for the period, 1960 to 1971. It was decided that the following information would be recorded for each sale: selling price, buyer's name, seller's name, address of the home being sold, and the date of sale.[13] In addition to excluding multi-family unit sales, certain other transactions were excluded since their very nature cast doubt as to the validity of the stated selling price. A transaction was excluded if it was found that the sale involved either of the following: a transfer of equity, a grantee and grantor who were obviously related in some way, or a sale between a private individual and a com-

pany or corporation.[14] In general, a transaction was included in the analysis if the recorded selling price was thought to be arrived at through a bargaining process by free and willing buyers and sellers.

In order to observe the differential impact of integration on property values, a sales price index (as a proxy for the general movement of prices) was calculated, by year, for each of the neighborhoods. Specifically, the construction of the index amounted to dividing the selling price of each home sold by a factor of two times the 1960 assessed value of the property. Multiplying the value by a factor of two converted the assessed value into a measure of what the city had determined was a fair market value of the property. A multiple of the assessed value was used as part of the sales price index both as a base against which to measure price changes and to adjust for differences in the quality of housing between the test and control areas. After the index for each price of property sold was found, an average sales price index was calculated by year for each of the two areas. These two series were then compared both before and after 1967 in order to observe the impact of integration.

Results

For the twelve-year period under review, there were 476 and 613 homes sold in Larchmont and Colonial Place respectively. The number of sales by year, for both neighborhoods, is presented in Figure 1.

From Figure 1, it can be seen that the number of sales in Larchmont, except for minor fluctuations, has been approximately constant over the whole twelve-year period. Moreover, the number of transactions in Larchmont over the period of 1967-71 was not affected to any significant extent by the fact that Colonial Place had become integrated during this time. This justified, to a certain extent, the use of Larchmont as a control area. As in the control area, the number of sales in Colonial Place was approximately constant throughout the period of 1960 to 1971.

With integration, however, the supply of available housing increased markedly. This was not an unexpected result, since Colonial Place entered what might be termed a panic period when the first black families began moving into the area. From the number of sales in 1971, it is apparent that Colonial Place may still be in a possibly unstable period. It is interesting to note, however, that of the homes sold in 1971, approximately 50 percent were sold to white families.[15] Thus, even though the area may be in a highly transitional stage, it

12. U.S. Bureau of the Census, loc. cit.
13. Selling prices are computed, by Corporation Court, from the amount of the state tax paid at the time of the sale of a piece of property. Since the tax rate is $.15 per $100, the seller of a $10,000 home would, for example, have to pay a state tax amounting to $15.00. Evidence tends to show that selling prices estimated in this way are generally a good estimate of actual selling prices. See, for example, Robert L. Tontz et al., "Reliability of Deed Samples as Indicators of Land Market Activity," *Land Economics*, Vol. 30 (February, 1954), pp. 44-51.

14. This last type was excluded since it was found in a few obvious instances, the sale involved nothing more than a transfer of equity from an individual to his company or corporation (e.g. a sale involving Joe Smith and the Smith Development Corporation).
15. This estimate was provided by Dr. Norman Pollock, Chairman of the Colonial Place Civic League's Stabilization Committee.

453



Figure 1

Number of Homes Sold, by Year, for Larchmont and Colonial Place, 1960-1971

is by no means clear that Colonial Place will eventually have to give up its status as an integrated neighborhood.

Table 1 presents data for the mean sales price index, standard deviation, and the number of transactions by year, for both Larchmont and Colonial Place. In order to observe trends in the sales price index more clearly, these values are plotted and presented in Figure 2. From Figure 2, it can be seen that although the values of the index were consistently higher for Larchmont than for Colonial Place, the differential remained approximately constant throughout the period, 1960-64. In addition, the values of the index for Colonial Place exhibited some degree of instability during these years. This was most likely due to periods of "pre-integration jitters" on the part of some area residents. What must have intensified the fear during these years was the fact that the edge of the black community was within blocks

of Colonial Place. It is interesting to observe that the lack of stability in the sales price index disappeared once integration took place.

The differential between the mean index values grew considerably wider in the years 1965 and 1966. Part of the increase in the differential in 1965 may be attributable to the expansion of Old Dominion University. In addition to a rapid increase in enrollment, 1965 was the year in which the University released its ten-year master plan for expansion.[16] This may have affected property values in Larchmont in two ways. First, the expansion of the University may have increased the need for housing in the area. Second, since Old Dominion University separates Larchmont from yet another black commu-

---

16. The size of the enrollment for the University, by year, was as follows: 1962—4,943; 1963—5,275; 1964—6,563; 1965—7,335; 1966—8,780.