Table 1
Mean Sales Price Index, Standard
Deviation, and Number of
Sales for Larchmont
and Colonial Place.
1960–71

| | Larchmont | | | Colonial Place | | |
|---|---|---|---|---|---|---|
| | $\mu$ | $\sigma$ | N | $\mu$ | $\sigma$ | N |
| 1960 | 1.33 | .23 | 42 | 1.23 | .23 | 33 |
| 1961 | 1.37 | .29 | 46 | 1.21 | .23 | 30 |
| 1962 | 1.39 | .24 | 44 | 1.27 | .27 | 45 |
| 1963 | 1.45 | .35 | 34 | 1.24 | .26 | 34 |
| 1964 | 1.49 | .35 | 35 | 1.34 | .24 | 47 |
| 1965 | 1.63 | .33 | 47 | 1.42 | .21 | 43 |
| 1966 | 1.74 | .36 | 45 | 1.40 | .23 | 37 |
| 1967 | 1.70 | .31 | 31 | 1.41 | .22 | 38 |
| 1968 | 1.80 | .42 | 33 | 1.46 | .25 | 67 |
| 1969 | 1.84 | .40 | 38 | 1.55 | .30 | 83 |
| 1970 | 1.93 | .42 | 32 | 1.63 | .22 | 59 |
| 1971 | 2.00 | .40 | 49 | 1.68 | .32 | 97 |

Source: see text

nity, the area commonly referred to as Lambert's Point, a larger University may have meant to many a stronger bulwark against a possible black invasion. Thus, Larchmont may have become a relatively more desirable neighborhood in which to live for this last reason alone.

Another possible factor explaining the appearance of a wider differential between the mean indexes is that this was the period (1965-66) in which black families began moving across 35th Street, a former boundary line of the black community. Thus, for many, what had been feared for such a long time was about to occur. This event alone most likely had a large enough impact to produce both a decline in the white demand for housing in Colonial Place and a corresponding increase in demand in Larchmont.

As a result of the shift in demand, prices of single family homes generally declined in Colonial Place and rose in Larchmont. Thus, the problem that Colonial Place faced was that although white demand for housing fell, this decline could not be offset by a corresponding increase in black demand since the area had not yet become integrated.

Colonial Place found itself integrated in the summer of 1967. From Figure 2, it can be seen that despite what many residents thought would occur, there was no decline in the sales price index for Colonial Place for any year after 1967. Moreover, the relatively wider differential between the mean sales price indexes, which had developed during the two-year period immediately preceding integration, did not exhibit any tendency to increase

over the period 1967-71. In fact, the average annual percentage rate of growth of the index, for 1967-71, was slightly higher for Colonial Place than for Larchmont (4.7 percent as opposed to 4.4 percent).

For many years before Colonial Place was integrated, black families in looking for good housing in a decent neighborhood, were for the most part, restricted to areas that were as bad as the ones from which they were attempting to flee. For example, the residents of Park Place, the black community bordering the test area, were before 1967, bordered by slum areas on the south and west, a branch of the Lafayette River, on the east, and by the white-only community of Colonial Place on the north. When integration finally became a reality in Colonial Place, the black demand for decent housing in a low-crime area suddenly had an outlet.

The increase in the demand for housing in Colonial Place offset most of the decline in white demand that occurred in the years immediately preceding integration. As a result of the increased demand for housing and contrary to what most people thought would occur, property values rose. Ironically, the integration of Colonial Place helped to support its housing market.

Summary

The purpose of this paper was to study the effect of integration on prices of single family dwelling units in Colonial Place. Using a yearly sales price index as a basis of comparison, it was concluded that no supportive evidence existed for the claim that integration lowers

455



Figure 2

Mean Sales Price Index for Colonial Place and Larchmont, 1960-71

property values. It was found, however, that housing values did decline somewhat under the *threat* of integration. Although white demand fell in the two years preceding integration and although the supply of housing increased significantly after integration, black demand for housing in Colonial Place was seen to be large enough to produce yearly increases in the sales price index. Had the demand on the part of black families not been quite as strong as it was, property values in Colonial Place would most likely have fallen.

The fact that integration need not have a harmful effect on property values was seen to be an important result for its stabilizing effect on community attitudes. That is, if white residents are convinced that property values need not inevitably decline when black families purchase homes in an area, much of the fear and uncertainty connected with integration can be reduced. In this way, both large declines in demand and large increases in the supply of housing may, to at least some extent, be avoided. The policy implication is also clear. Since a decline in housing prices is not the inevitable result of integration, local authorities can take a more active role in promoting stability in a transitional area.

Kenneth Galchus is Assistant Professor at Old Dominion University, Norfolk, Virginia. He received his Ph.D. from Washington University (St. Louis) and is a member of the American Economic Association, Virginia Social Science Association and Omicron Delta Epsilon, and honorary economic society.

456

## PROPERTY VALUES IN AN INTEGRATED NEIGHBORHOOD: SOME FURTHER EVIDENCE

### JANUARY, 1977

Kenneth E. Gaichus - Associate Professor
Department of Economics and Finance
University of Arkansas at Little Rock
Little Rock, Arkansas  72204
(501)  569-3354

Evidence was presented in the November/December, 1972 issue of The Real Estate Appraiser ("Property Values in an Integrated Neighborhood," pp. 15-20) concerning the effects of integration on property values.  The results for the years  1960-71 showed that the average annual percentage rate of growth of a home sales-price index for 1967-71 was slightly higher for Colonial Place - a neighborhood in Norfolk, Virginia which was integrated in 1967 - than for Larchmont, a comparable all-white area.  This was true despite the fact that the number of homes sold in Colonial Place increased dramatically after integration.  The reason for the slightly faster rate of growth of the sales index for the integrated area was attributed to the fact that the black demand for decent housing was probably large enough to more than offset any decline in the demand for housing on the part of whites. Recently, three more years worth of data became available with which to study the effects of integration on property values in Colonial Place. This article analyzes these new data.

Table I presents data for the mean sales - price index, standard deviation, and the number of transactions by year for both Larchmont and Colonial Place.  Data for 1960-71 are as originally presented, while data for 1972-74 are those recently obtained.  The number of sales by year for both neighborhoods is  graphed in Figure 1.  The vertical line for 1967 represents the year of integration, while the broken portion of the line graphs represents the new data.  As can be seen from Figure 1, the number of sales in Larchmont has been approximately constant over the fifteen-year period.  This was also generally true for Colonial Place for the period, 1960-67.  With integration, however, the supply of housing increased markedly.  In the four-year panic period after integration, there were, on the average, 76 homes sold each year in Colonial Place and 38 sold each

457

TABLE 1

Mean Sales Price Index ($\mu$), Standard
Deviation ($\sigma$), and Number of
Sales (N) for Larchmont and
Colonial Place, 1960-1974

| | Larchmont | | | Colonial Place | | |
|---|---|---|---|---|---|---|
| | $\mu$ | $\sigma$ | N | $\mu$ | $\sigma$ | N |
| 1960 | 1.33 | .23 | 42 | 1.23 | .23 | 33 |
| 1961 | 1.37 | .29 | 46 | 1.21 | .23 | 30 |
| 1962 | 1.39 | .24 | 44 | 1.27 | .27 | 45 |
| 1963 | 1.45 | .35 | 34 | 1.24 | .26 | 34 |
| 1964 | 1.49 | .35 | 35 | 1.34 | .24 | 47 |
| 1965 | 1.63 | .33 | 47 | 1.42 | .21 | 43 |
| 1966 | 1.74 | .36 | 45 | 1.40 | .23 | 37 |
| 1967 | 1.70 | .31 | 31 | 1.41 | .22 | 38 |
| 1968 | 1.80 | .42 | 33 | 1.46 | .25 | 67 |
| 1969 | 1.84 | .40 | 38 | 1.55 | .30 | 83 |
| 1970 | 1.93 | .42 | 32 | 1.63 | .22 | 59 |
| 1971 | 2.00 | .40 | 49 | 1.68 | .32 | 97 |
| 1972 | 2.12 | .39 | 46 | 1.83 | .37 | 52 |
| 1973 | 2.56 | .53 | 49 | 1.97 | .46 | 59 |
| 1974 | 3.11 | .70 | 48 | 2.23 | .61 | 44 |

Source:  see text

458



Figure 1

Number of houses sold, by year, for
Larchmont and Colonial Place, 1960-1974

459

year In Larchmont. By comparison, the averages were 38 and 40 homes sold each year in the period preceding integration. The new data show that the number of transactions declined from the high levels reached during the postintegration period. Although the number of transactions for 1972 and 1973 was still higher than what it had been before integration, data for the last three years indicate a definite downward trend in sales. It would thus appear that after 1971, Colonial Place had again entered a period of relative stability. It should be pointed out that Colonial Place was approximately only 40 percent black at the end of 1974, which indicates that the downward trend in sales was not due to the fact that there were few whites left in Colonial Place.

There were two forces at work which may have had some influence on the neighborhood's return to normality. One is the influence of the Colonial Place-Riverview Civic League which has done much to stabilize the area.[1] The Civic League was instrumental in convincing the Norfolk City Council to change the zoning ordinance in Colonial Place to prevent single-family houses from being converted to multi-family units. The Civic League also played an active role in having the neighborhood declared a conservation project area which means that there is now a coordinated effort to upgrade housing in the area by means of a concentrated inspection program, low-interest rehabilitation loans, an occupancy-permit program, and a vigorous set of housing standards. Although the immediate objective of the program is to improve housing in the area, its long-run effect will be to increase confidence in the area on the part of Colonial Place residents and prospective home buyers.

[1] Riverview, a neighborhood adjacent to Colonial Place, joined Colonial Place to form a civic league representing both areas.

460

Another possible factor making for fewer transactions in Colonial Place after 1971 is that it was in this period that interest rates began climbing to their almost record levels. It is difficult to determine whether it was greater confidence in the area or a tight money market (or a combination of both factors) that reduced the number of transactions in Colonial Place. However, the number of transactions did not noticeably decline in Larchmont in this period, which would indicate that it was greater confidence in the area rather than high interest rates that decreased the number of transactions in the test area. One could, of course, argue that in a tight money market lending institutions will discriminate against those attempting to buy houses in transition areas. One could also argue that the typical person willing to buy in Colonial Place during a period of rising prices and high interest rates will be less able to do so than a person willing to buy in Larchmont. Although these hypotheses seem less probable than that which advocates a renewed confidence in Colonial Place, there is unfortunately no clear-cut evidence to prove or disprove any of these arguments. Therefore, the question of what factor or factors caused the dramatic decline in transactions in Colonial Place after 1971 must be left unanswered.

The sales-price index is plotted in Figure 2. As the graph shows, there was no decline in the sales-price index in Colonial Place for any year after 1967. Moreover, the relatively wide differential between the mean sales-price indexes that developed just prior to integration did not show any tendency to increase over the period 1967-71. As the new data show, the differential observed in the period 1967-71 remained the same for 1972. In fact, the average annual percentage rate of growth of the index for this period (1967-72) was slightly higher for Colonial Place than for Larchmont(6 percent as opposed to 5 percent). Thus,

003259

461



Figure 2

Mean Sales Price Index for Colonial Place and Larchmont,
1960-1974

462

during this time property values in Larchmont fell relative to those in
Colonial Place. However, the years 1973 and 1974 saw a dramatic increase in
the differential. The sales-price index in Larchmont experienced a 21 percent
annual rate of growth for the periods 1972-73 and 1973-74, while the corres-
ponding growth rates in Colonial Place were 8 and 13 percent respectively.
Although the index increased faster in Larchmont than in Colonial Place for
the period 1972-74, it should be noted that during this time the sales-price
index in Colonial Place progressed faster than it had at any time since the
beginning of the period of observation (1960). In addition, while the growth
rate of the index in Larchmont remained constant between 1972-73 and 1973-74,
the growth rate of the index in Colonial Place showed a marked increase.
Nevertheless, for the period 1972-74, because the index grew more slowly
in Colonial Place, property values in Colonial Place declined relative to
those in Larchmont. Whether the relative decline in property values in
Colonial Place will persist or will be reversed is uncertain.

There were two outside forces at work during the years 1973 and 1974,
both of which had a tendency to produce the relatively large growth rates
in the index in Colonial Place and Larchmont. First, construction costs of
new housing rose rapidly during this period, and this probably had a positive
effect on the price of older housing. Second, it was in this period that the
nation experienced a gasoline shortage, along with higher prices for gasoline,
and this may have prompted many to purchase houses in the more centrally
located areas of Norfolk (such as Larchmont and Colonial Place) rather than
in the more remote areas of Virginia Beach.

The relative decline in the sales-price index in Colonial Place for the
period 1972-74 may be due to the fact that it was during this time that the

463

conservation program was implemented in the neighborhood. Although the conservation program is designed to improve the condition of housing in the area, its immediate effect may have been to scare prospective buyers away. This may have been especially true for those seeking to purchase rental property (duplexes). A rigorous occupancy-permit program no doubt increases maintenance costs and so lowers the return on an investment. Part of the increased maintenance costs can probably be recovered in the form of higher rents but one cannot always be certain of this. From the point of view of the investor comparing alternative investments, city interference and the uncertainty surrounding the return on investment property in Colonial Place may have been enough to reduce the demand for rental housing in the area. A reduction in demand for this type of housing may have been one of the factors that led to the relatively small growth rate in the sales-price index in Colonial Place during this period.

Under the conservation program in Colonial Place, every house sold must first be inspected and then brought up to meet minimum code requirements. In many cases, the buyer and seller come to an agreement whereby the price of the house is lowered by the amount of the repairs in exchange for the understanding that the buyer will have the work done. Since the conservation program operates under a rigorous housing code and since experienced inspectors probably discover more defects in a house than the average buyer does, it seems likely that the number of repairs necessary for houses being sold in Colonial Place has risen relative to the number of repairs necessary for houses in other areas, such as Larchmont. Because the cost of repairs is at times subtracted from the selling price of a house, the relative increase in the number of necessary repairs in Colonial Place may have been a factor

464

leading to the relatively small growth rate in the index in the area during the period 1972-74.

Except for a few specific years, the sales-price index in Colonial Place has generally followed that of Larchmont very closely over the fifteen year period. The following regression was estimated in order to examine the relation and degree of association between the index for Colonial Place ($I_{CP}$) and that for Larchmont ($I_L$):

$$I_{CP} = .419 + .604\ I_L$$
$$(.031)$$

$$\overline{R}^2 = .97$$

The corrected (for degrees of freedom) coefficient of determination shows that the two indexes are highly related ($\overline{R}^2 = .97$). The estimated regression coefficient (.604), which is significantly different from zero (the standard error listed under the coefficient), indicates that a one-unit increase in the Index for Larchmont translates roughly into a six-tenths of a unit increase in the index for Colonial Place. What this means is that on the average and over the period 1960-74, the index for Larchmont has risen faster than the index for Colonial Place. Larchmont's abnormally high increase in the index for 1973 and 1974 probably produced this relatively low coefficient. That is, the estimated regression coefficient would have been closer to one had these last two years been excluded from the analysis.

A binary variable (I), defined to be a series of ones and zeros, was included in the regression in order to determine whether integration had any effect on the sales-price index in Colonial Place. In this instance, a one denotes a year in the neighborhood's postintegration period, 1967-74, while zero indicates a year in the area's preintegration period, 1960-66. If this

465

new variable's coefficient is both negative and significantly different from zero, it would mean that the integration of Colonial Place had a negative influence on its housing prices. The new regression equation, when estimated, was found to be:

$$I_{CP} = .463 + .564 \, I_L + .054 \, I$$
$$\quad\quad\quad (.041) \quad\quad (.039)$$

$$\overline{R}^2 \doteq .97$$

As the results show, the coefficient of I is not significantly different from zero and does not have the negative coefficient that one would have expected if the presence of blacks in Colonial Place had had a negative influence on its sales-price index. Deleting the years in which the United States economy experienced a relatively rapid increase in prices (1972-74) left the regression results unchanged. The coefficient of I, although smaller in value (.0074) after the three observations were removed, is still positive and not signifi-cantly different from zero. In addition, $\overline{R}^2$ is .94 in the revised regression and the coefficient of $I_L$ is still important statistically.

From the additional evidence that has been added to that which has already been amassed regarding the effect of integration on property values, it would appear that integration, as of 1974, has had no adverse effect on the price index in Colonial Place. Although Colonial Place experienced a relative decline in its index during the years 1973 and 1974, there is no evidence to indicate that integration was the cause, and there is no reason to believe that this trend will not reverse itself in the future.

466

Mr. EDWARDS. Mr. Boyd.

Mr. BOYD. Thank you, Mr. Chairman.

Your reference during your testimony and in the content of your statement was to referrals to State agencies.

Dr. FLEMMING. Right.

Mr. BOYD. How would you feel about mandated referral, subject to a recall provision if an agency—this is a State agency—were qualified for certification under the terms of lines 16 to 23 of the proposed bill?

Dr. FLEMMING. Our feeling is that the Secretary should have discretion in this area because we think it is very difficult to evaluate, especially in advance, the question of whether or not the State agency is in a position to provide the citizens with the same kind of protection as is provided under Federal law.

Consequently, I feel that the Secretary should be provided with the discretion of determining whether or not the equivalency test has been met.

Mr. BOYD. But how do you make that determination if the State agency doesn't have the opportunity through mandated procedure to implement its own authority?

Dr. FLEMMING. You mean doesn't have——

Mr. BOYD. If the Secretary has discretion to refer, then the Secretary can hypothetically retain authorization.

Dr. FLEMMING. Wait a minute. Maybe I'm not tracking your question.

As I understand the provisions of the bill, the Secretary would have the right to make a determination on equivalency grounds as to whether or not she is going to utilize a State agency.

Mr. BOYD. That's correct.

Dr. FLEMMING. And the bill also provides that if the case is going to be referred to the State agency——

Mr. BOYD. Which is at the discretion of the Secretary.

Dr. FLEMMING. At the discretion of the Secretary and the aggrieved person. There's got to be a meeting of minds on the part of both of them. In other words, there's got to be a waiver on the part of the aggrieved person.

Mr. BOYD. As to referral?

Dr. FLEMMING. As to his or her rights to pursue the remedy under Federal procedures. We feel that is sound.

Mr. BOYD. Thank you.

Since you feel also on page 6 of your statement, that your research has indicated that there is consistent overlap, duplication and inconsistency in Federal agencies acting under title VIII, how would you respond to legislation which centralizes all law and civil rights enforcement in one agency?

Dr. FLEMMING. We, on the basis of the study that we made, would much prefer a situation where the Secretary of HUD is put in a position in the housing area comparable to the position of the Equal Employment Opportunity Commission, and the chairperson of that Commission in the area of equal employment. As incorporated in the reorganization plan that the President submitted to the Congress and which the Congress approved, in our report we included such a recommendation.

467

Personally, growing out of my own experience in Government, I prefer identifying a lead agency, a focal point with coordinating responsibilities, I don't react favorably to taking away from a program agency its responsibilities, its obligations, in the area of civil rights.

On the other hand, I recognize the fact that there are interlocking relationships between agencies in the various civil rights areas. Consequently, it seems to me that you do need a lead agency. I feel that the Equal Employment Opportunity Commission has been made a lead agency in the equal enforcement areas by the Congress. I believe that the same thing can be done and should be done as far as the Secretary of Housing and Urban Development is concerned in the area of fair housing.

Mr. Boyd. So you wouldn't favor one centralized agency.

Dr. Flemming. That's right, for the reasons I have just stated.

Mr. Boyd. Thank you. No further questions.

Mr. Edwards. No further questions. Thank you very much.

Dr. Flemming. You're welcome. I appreciate being here.

Mr. Edwards. I guess that's it then.

[Whereupon, at 12:10 p.m., the hearing was adjourned.]

003267

# FAIR HOUSING AMENDMENTS ACT OF 1979

---

## WEDNESDAY, MAY 16, 1979

House of Representatives,
Subcommittee on Civil and Constitutional Rights,
Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met, pursuant to notice, at 9:40 a.m., in room 2226, Rayburn House Office Building, the Honorable Don Edwards (chairman of the subcommittee) presiding.

Present: Representatives Edwards, Drinan, Volkmer, Hyde, and Sensenbrenner.

Also present: Janice Cooper, assistant counsel; and Thomas Boyd, associate counsel.

Mr. Edwards. The subcommittee will come to order.

We are going to proceed today with testimony on the fair housing bill, H.R. 2540.

I want to particularly welcome our colleague, Ms. Chisholm. It is a pleasure and honor to be able to turn over the gavel to the distinguished Member from Missouri, Mr. Volkmer.

Mr. Volkmer. Today we will hear from some of our most distinguished leaders in the civil rights movement.

We are very pleased, of course, to begin with our colleague and friend, Congresswoman Shirley Chisholm, whose dedicated efforts in areas affecting minorities and disadvantaged are well known.

I think she is quite accomplished in this area. So at this time we will be glad to hear from you.

## TESTIMONY OF HON. SHIRLEY CHISHOLM, A MEMBER OF CONGRESS FROM THE STATE OF NEW YORK

Ms. Chisholm. Mr. Chairman and members of the committee, I am pleased to be here today to forward my full support for H.R. 2540, the Fair Housing Amendments Act of 1979.

The legislation before you carries with it the potential for the ultimate realization of the Nation's objective, set down in title VIII of the Civil Rights Act of 1968, to insure that all Americans have an equal opportunity to get decent housing and reside in the neighborhood they choose.

Although there have been improvements in the area of housing discrimination through the fair housing law, for the past 11 years title VIII has remained a statement of goals rather than an active force against discrimination in the housing market.

Housing discrimination continues to be an all-pervading factor against the evolution of an equal and integrated American society. All Americans suffer from the ills of segregated housing, which deny to all of us the opportunity to break down prevailing racial

(469)

003268

470

barriers and impacts upon the educational and employment opportunities of the victims of discrimination.

I believe it is important to begin to assess in human terms the real impact of the legacy of generations of discriminatory treatment against certain groups in our society. As a professional educator, I know only too well that discrimination in our public schools is closely intertwined with the evils of bias in the housing market.

Housing discrimination lies at the root of our segregated educational system. When we survey the patterns of segregated housing in this country, it is no wonder that much of the Nation's public school system continues to suffer the ills of racial segregation, 25 years after its unconstitutionality was declared.

I am heartened by the care and dedication which has obviously guided the drafting of H.R. 2540, and I am proud to be a cosponsor, along with all my colleagues in the Congressional Black Caucus and other Members committed to alleviating injustices in the housing market. As the bill is now drafted, the major inadequacies and ambiguities of current law have been addressed and substantially corrected.

In the 11 years since passage of title VIII, the absence of administrative powers to enforce fair housing laws has surfaced as the critical factor obstructing elimination of housing discrimination.

The Department of Housing and Urban Development, although charged with responsibility for enforcing title VIII, has been limited to the process of conciliation and persuasion as their only available enforcement mechanisms.

The extremely small percentage of complaints that have been resolved through the conciliation method is evidence enough that enforcement powers of HUD must be strengthened.

Since the Federal Government is entrusted with major responsibility for securing compliance with housing discrimination laws, enforcement should be relegated to Federal agencies that are equipped with adequate administrative tools to carry out this mission.

The most important provisions of H.R. 2540 involve the administrative mechanisms available to HUD to enforce the fair housing law. The Secretary will be granted the authority to investigate and file a charge of housing discrimination on her own initiative, which will greatly aid in the identification of patterns and practices of such discrimination.

The bill will empower HUD to issue appropriate orders, including cease and desist orders, through administrative proceedings, and authorize the Secretary to impose substantial civil penalties as a sanction against continued discriminatory activities.

Thus, HUD could order realistic relief in the event of a finding of discrimination and no longer be hindered by the inadequacies of conciliation.

Clearly this legislation has the potential to loosen the grip of discriminatory practices that now engulf the housing market. This new authority for HUD can impact substantially on the incidence of housing discrimination and the remedies available to its victims.

The availability of authority to issue such rapid administrative relief would undoubtedly reduce the incidence of discriminatory practices and provide an important incentive for the voluntary

471

conciliation of grievances. Currently, there exists little disincentive for a respondent to agree to a remedy, or even enter into the conciliation process.

For the most part, these parties can be assured that they run little risk of further proceedings; hence, they are encouraged, rather than discouraged, from continuing their discriminatory actions.

The availability of quick and decisive administrative remedies would also relieve the burden on our court system which now serves as the most consistent arena in which housing discrimination cases are resolved.

The courts have, by and large, been true to the objectives of title VIII and, indeed, much of the clarification of law that this legislation achieves is a result of prior judicial rulings. However, judicial relief has not been readily available to great numbers of Americans who suffer from housing discrimination.

In addition, judicial proceedings can be lengthy due to technical and cumbersome court procedures which create a greater opportunity for delays in proceedings for reasons totally unrelated to the merits of a case. It is obvious that housing cases, more than in any other area, demand a speedy forum for relief.

In many instances, a complainant may eventually receive a favorable judicial ruling, but in the meantime the unit in question may have already changed hands. Thus, the question of relief is rendered moot.

Cease and desist authority for HUD would streamline the injunctive process and assure that meaningful relief for the prevailing party is secured.

Adequate administrative enforcement powers would ease the burden of cases in the courts, increase the likelihood of speedy remedies, insure greater uniformity and predictability of decisions, and focus relief from housing discrimination on the entity that is responsible for alleviation of the problem—the Department of Housing and Urban Development.

It can be safely assumed that critics of broadening administrative powers for HUD, many of whom are critics because they foresee increased compliance activity, will voice their concerns couched in arguments about the growth of bureaucracy and taxpayer burdens.

I would point out to these critics that American society is presently paying for the costs of housing segregation and its impact on the real estate market through racial steering and block busting.

We must ask ourselves why, in view of the fact that some 16 Federal agencies presently have cease and desist authority, that the Secretary of HUD has been without such powers for the 11 years since the passage of title VIII?

In effect, we have been indicating during all that time that housing discrimination is a matter of secondary national importance.

In addition to increased administrative enforcement authority, I would also like to highlight and applaud several other provisions of this legislation.

The inclusion of "handicap" as another prohibited ground for discrimination in housing is of great importance to the many

003270

472

Americans who find themselves denied their rightful choice of residence. I fully support this provision.

This inclusion will carry no financial burden on an owner of property, but will insure that an individual is not discriminated against in housing activities on the basis of a handicap. It will also allow the individual to make reasonable accommodations at his or her own expense.

I am also pleased to see that the legislation will clarify the fair housing law by emphasizing that the practice of redlining by mortgage lending institutions is prohibited. Redlining by the primary and secondary mortgage market has had disastrous effects on individuals, and as a result neighborhoods desiring to upgrade their living environments.

I hope that this clarification and the similar language prohibiting discrimination in property insurance will put an end to such practices.

Other provisions in this legislation which will further the objectives of the fair housing law and which I fully support include:

One, the clarification and enhancement of the Attorney General's power to intervene in cases that raise an issue of general public importance;

Two, a liberalization of the current unrealistic statute of limitations, to permit an aggrieved person to commence civil action at any time up to 3 years after the alleged discriminatory housing practice occurred;

Three, allowing the prevailing party reasonable attorney fees in either judicial or administrative proceedings, and;

Four, removal of the $1,000 restriction on punitive damages currently under title VIII.

Tomorrow marks the 25th anniversary of the Supreme Court's decision in *Brown* v. *Board of Education,* which declared that separate is inherently unequal and that racial segregation is a detriment to all Americans.

Yet, a quarter of a century later we are still struggling with rampant segregation and discrimination.

There have been too many false promises and symbolic gestures that have done little or nothing to move this country toward racial equality and eradication of segregation.

It is my sincere hope that passage of this legislation in the 96th Congress will lead us away from the recalcitrance that we have witnessed in achieving an equal society, and mark a firm new commitment to the goal of equality.

Thank you for this opportunity to present my views.

Mr. VOLKMER. Thank you very much, Congresswoman Chisholm. I appreciate your remarks.

The gentleman from Illinois, Mr. Hyde?

Mr. HYDE. Thank you.

I, too, appreciate the opportunity to hear our good colleague from New York who has, as usual, been right on the point and says what she means and is very instructive.

I have some problems, more of a conceptual nature concerning the enforcement proceedings. I have always been troubled whether it's in this area or any other area where an agency has the power to investigate, file a complaint, adjudicate and impose the penalty.

473

I was trained in the law and practiced law and I believe in an adversary proceeding which, I think, is the way the truth comes out. I also like to have some impartial jurist hear both sides and then let the chips fall where they may.

But where the same agency is prosecutor, investigator, judge, jury, and executioner, I have trouble reconciling that with the concept of due process.

Now, I concede that the delays through the courts are interminable, and that is a major problem. But that is what the courts are set up for, and that is what we are set up for, to try and see that justice can be attained.

Now, I have looked at your statement and I listened to you, and you talk about technical and cumbersome court procedures leading to lengthy court proceedings.

Well, isn't that the price that we pay for due process of law? The Ayatollah's courts are not bothered with technicalities, like rules of evidence and presumption of innocence. They make their minds up, give you a fair trial and then shoot you. And in our zeal to get to a goal quickly and effectively sometimes I wonder if we don't trample on principles of due process that in the long run may be as important, if not more important, than quick and decisive relief.

Ms. CHISHOLM. May I respond?

Mr. HYDE. I wish you would.

Ms. CHISHOLM. I think if we took that position on the basis of some kind of impulsivity in our own nature, we would and should be greatly concerned. But we are talking about the fact, that in this country for a number of years there has been a consistent and persistent pattern of behavior that continues to deny many Americans the opportunities to move completely and forthwith into the midstream of our society.

We have to move in this direction, because we can no longer depend on the morality or the conscience of those who have the power to bring about change. We are thereby obligated to design and employ effective mechanisms and instruments to further equality in this country.

For example, in this democracy and this representative government of ours, it's a terrible thing that we have to be constantly coming up with what I would term artificial instruments, different kinds of mechanisms in order to make sure that we move as quickly as we possibly can toward our goals.

It is true that minority persons in this country do have recourse to the courts like everyone else. But we also know that during their own lives and throughout generations before them, they have been denied opportunities and that the hour is growing late in America to recoup those losses.

Since we have granted to some 16 agencies in this Government the powers to enforce legislative mandates, why is it that we cannot grant HUD some of the same powers? Why are we talking about HUD as if the agency were in a vacuum?

Housing is so terribly important in this country; it's so important because, in my opinion, it's the basic root of the discrimination that is very pervasive in this country. If we had integrated neighborhoods, black and white children could grow up together and relate to each other. Only when this begins to occur will the generations

474

of discrimination and the generations of discrimination and bias against people because of their race or color begin to be minimized. Americans of all races must have this opportunity to grow together and to live together.

So although I can understand your viewpoint from a legal perspective, I have to look at the practical implications of this issue, because of who I am and what I am in America.

Mr. Hyde. Well, I can sure understand that, and there is a problem certainly of access to the courts, costs and time. My hangup is I want an impartial adjudicator, that is all I want. I don't want someone who is employed or paid by HUD who is going to make a decision that is reviewable and changeable by the Secretary of HUD, who has the same goal in mind, because I just don't think that is due process.

What I wish we could do, not only in this bill but in all of these administrative enforcement things, is perhaps create an echelon of administrative law judges that would be trained in the rules of evidence. You know, every technicality can save somebody, these rules are built up over centuries of experience that guarantee due process, fair play, and surely in our zeal to reach this goal we want to be fair about it.

But I would like to have administrative law judges that are accessible, who would provide sufficient speedy relief, but who are not directly accountable to the agency whose problem they are hearing.

I think that would really help, in my judgment, and assure some degree of fair play and maybe be a compromise between going into the Federal court and waiting behind railroad reorganization cases and criminal cases which, by the way, are awfully important too, and housing and employment cases too, but have some modicum of independence from the agencies so both approach as adversaries and not an in-house, star-chamber situation.

Ms. Chisholm. Your basic philosophy then I gather would run counter to what is happening in the executive branch of government, because in just about every other department you find such administrative powers.

Mr. Hyde. My idea is I don't like the prosecutor to be the judge and the executioner and the undertaker. That really just does not reconcile, in my judgment, with due process, and I would suggest if somebody else were Secretary of HUD other than Patricia Harris, somebody not sympathetic to the goals you and I aspire to, you would also want someone to be a little more impartial on the hearing.

But I agree with you, this is the trend, this is what we have in the agencies, and I hope we can find a solution to instilling a little more due process in the procedure.

Thank you.

Ms. Chisholm. Thank you.

Mr. Volkmer. I would just like to make a little comment on what the gentleman from Illinois has said. It must be remembered that whatever occurred before the administrative law judge is reviewable, and I don't worry too much that it would be arbitrary or capricious; I think he or she realizes that the order is going to be

475

subject to review, and I don't worry too much about the worries of the gentleman from Illinois because of that.

Would you like to comment on that?

Ms. CHISHOLM. The only thing I would like to say is that our country from time to time has to come up with different types of solutions to persistent problems that continue to gnaw at the fabric of this Nation. There are many things I think many of us on both sides of any particular issue would rather not have to engage in.

But because of a whole set of circumstances that have a direct bearing on the lives and the happiness of millions of people we have to try and use all kinds of solutions.

We would hope that our courts and we would hope that our executive agencies and we would hope that our legislative bodies would do all that is necessary to bring about ultimate equity of opportunities in employment, education, housing, and everything else.

But we know it's not going to happen and so we have to do things that perhaps are not perceived as being the traditional way.

Mr. HYDE. Even if our Constitution says no person shall be deprived of due process of law, equal protection of the law?

Ms. CHISHOLM. Whenever the Constitution is involved, I think that the courts ultimately do make the determination. Anything that has a Constitutional bearing or where there is a question of Constitutionality involved, always has to be ultimately decided in a court of law. We have seen that.

Mr. HYDE. Yes, except we don't have hearings de novo, as you know. The appeal to the court is very limited, abuse of discrimination, capriciousness, but the facts are vitually conclusive as found by HUD and we can argue that this is not a simple problem and it's one that has gone on before you and I were here and maybe long after we are gone.

Mr. VOLKMER. But neither is it a procedure that is brand new; it's been used in other areas of the Goverment.

Mr. HYDE. Of course. That does not make it right and it does not make it fair.

Mr. VOLKMER. Does counsel have any questions?

Ms. COOPER. No.

Mr. VOLKMER. Any questions?

Mr. BOYD. No.

Mr. VOLKMER. Thank you very much, Ms. Chisholm.

Ms. CHISHOLM. You are quite welcome.

Mr. VOLKMER. We have now a panel of representatives from civil rights organizations, consisting of Althea Simmons, director, National Association for the Advancement of Colored People; Cushing Dolbeare, president, National Low Income Housing Coalition; Dot Ridings, human resources coordinator, League of Women Voters; M. Carl Holman, president, National Urban Coalition, and Sandra Solomon, director of Government affairs, National Urban Coalition.

Mr. HYDE. Mr. Chairman, I guess we are in session; we have to go vote at which point I must go to the Banking Committee to attend another hearing on another piece of legislation.

It's just incredible the way we double up on things. I hope you will understand and forgive me, but I shall read your statements very carefully.

476

Thank you very much.

Mr. VOLKMER. We will recess briefly rather than start and have to break, and I will come right back.

[A short recess was taken.]

Mr. VOLKMER. Before we start I would like to say that the statements you have submitted will be made a part of the record, and if you wish, you may summarize those in your opening remarks, or, if you wish, you are permitted to read the full statement.

As I understand it, Ms. Simmons has to leave soon, so we will first hear from Althea Simmons, director of the National Association for Advancement of Colored People.

Then we will hear from Mr. Holman, and from then on so we will let the other two of you decide which one goes next. Flip a coin or whatever you want to do.

I would now like to turn the hearing over to Congressman Drinan.

You may proceed.

## TESTIMONY OF ALTHEA T. L. SIMMONS, DIRECTOR, WASHING-TON BUREAU, NATIONAL ASSOCIATION FOR THE ADVANCE-MENT OF COLORED PEOPLE

Ms. SIMMONS. Mr. Chairman and members of the committee, I am Althea T. L. Simmons, director of the Washington Bureau of the National Association for the Advancement of Colored People.

As you know, the NAACP is a national civil rights organization with 1,800 branches and youth units in the 50 States and the District of Columbia.

The NAACP appreciates this opportunity to present its views on this important piece of legislation. I think it's very significant that these amendments are being considered at this time in that this is the 25th Anniversary of *Brown* v. *Board of Education,* and we know the broad impact of housing on school desegregation and employment.

We learned long ago that reliance on individual lawsuits in the field of civil rights does not produce the desired results. The Congress, of course, is well aware of that and addressed this by including provisions in the historic Civil Rights Act of 1964 and the Voting Rights Act of 1965 which makes the Federal Government the primary enforcer of the laws.

This was not the case in the 1968 Fair Housing Act, although a giant step forward in civil rights; it left the 1969 Housing Act without the kind of enforcement authority to provide relief for persons who feel they have been discriminated against. Because 9 times out of 10 if they follow the route of litigation, by the time the litigation is completed the house they sought or the apartment they sought is already gone.

Of course, a large number of persons just don't have the finances to enter into litigation.

This bill addressed this problem, because it authorizes the Secretary of HUD to proceed administratively or to refer the matter to the Attorney General for action in the courts.

White occupants of apartment complexes would, without doubt, be favorably affected by this bill. They are often willing to supply

003275

information in confidence concerning racially discriminatory practices by landlords, but are unwilling to become complainants themselves.

If such proof is presented to the Secretary, she would be in a position to initiate an investigation and to proceed on her own authority under H.R. 2540. The same would be true with respect to black employees who are usually fearful of job reprisals if they become directly involved in a housing complaint.

We believe that there is adequate precedents for cease and desist authority for Federal agencies and since the Congress has declared fair housing to be the policy of the United States, the Congress is obligated to provide the mechanism to enforce the policy.

The NAACP has consistently adopted resolutions at its annual conventions calling for cease and desist authority for HUD because we are convinced that this is the most effective enforcement procedure.

Mr. Chairman and members of the committee, I would like to address myself at this time to the scope of authority by the Secretary.

During the course of the hearings on this legislation, there has been considerable questioning on and criticism of the role of the Secretary of HUD and the scope of her authority under the bill. This has concentrated on the multiple roles of the Secretary in the investigative, prosecutive and adjudicative functions under the Fair Housing Act.

To those of us who have worked over the last several decades for the enactment of strong civil rights legislation, the language of many who raise this issue has a familiar ring. We recognize it as a not so subtle effort to portray the Secretary as an all powerful bureaucrat who will override justice in her zeal to bring about forced integration against the will of the persons affected.

We have noted this approach whenever an effort is made to secure provisions of law that will make civil rights statutes enforceable. At the same time, we recognize that there are some, especially members of this subcommittee, who raise questions in an effort to assure that there will be fairness and justice in the administration of the law.

To these we say that they should consider that the enforcement procedures of this bill do not depart from long-established practice nor do they operate in a vacuum.

The Supreme Court has decided on various occasions that placing investigative, prosecutive and adjudicative functions under the same agency head or governmental body does not deny due process.

As a matter of fact, Congress normally enacts this method of enforcement when it grants an agency cease and desist authority. It is only in rare cases, such as that of the National Labor Relations Board, that it has decreed a separation of functions and/or established a separate general counsel's office.

Congress has also taken another road to establish fair hearings in cease and desist procedures. It has enacted the Administrative Procedure Act that regulates Federal agencies in their enforcement activities.

Since in H.R. 2540 you have provided for an administrative hearing and a decision based on the record, the Secretary and her

478

associates acting under the bill's provisions will be subject to the terms of that Act.

Since that has been found adequate to control the hearing processes of numerous Federal agencies, including such powerful ones as the Federal Trade Commission, the Federal Communications Commission and the Federal Reserve Board, to mention only a few, we see no need to make an exception when the statute relates to enforcement of basic civil and constitutional rights.

The NAACP, like this subcommittee, believes in equity and fairness in administrative procedures. Therefore, it would have no objection if the subcommittee, either in the law or its legislative history, would make clear that the Secretary's conduct in enforcing H.R. 2540 is subject to the Administrative Procedure Act.

We hope this would fully dispose of this issue and put the Department of Housing and Urban Development in the mainstream of administrative enforcement procedures.

Also, Mr. Chairman, we feel that the provision in this bill that would expand the role of the Attorney General is good, because under the present law the Attorney General is limited to practice and pattern suits that raise issues of general importance, and we feel that that restriction has had a chilling effect on the civil rights of aggrieved persons.

Here again the NAACP has long sought an expansion of the enforcement role of the Attorney General.

I would like to speak just a few minutes about discriminatory housing practice amendments dealing with redlining.

In yesterday's paper, as a matter of fact, there was an account regarding redlining in New York State. So it's something that is not here today and gone tomorrow. We have numerous instances of blacks and other minorities who are frequently the victims of redlining.

We believe that the Federal Government has a special obligation here, because the Government itself is responsible for fostering such a practice in FHA's developing years by allowing that agency to consider racial homogeneity as a factor in reaching a decision on insurability.

We are pleased that the sponsors of that legislation recognize that responsibility and included provisions that would clarify and strengthen the protections against insuring and financing redlining.

There are some things we feel might strengthen the bill. Just as you have acted to assure that the secondary mortgage market is covered, we ask that you do the same with the secondary insurance market. It is our understanding that there is such a market in insurance contracts, so we urge that discrimination in re-insuring as well as insuring be prohibited.

We also feel that the redlining prohibitions could be strengthened by inclusion of specific language prohibiting discrimination on the basis of geographic location.

We feel, in addition, there ought to be some time limitation on other agencies that handle housing discrimination complaints, and we note that the bill carries no stipulation for time of action on housing discrimination complaints.

003277

479

We feel if there were time limitations on appropriate action that all Federal agencies with authority to prevent housing discrimination are directed to take in cooperation with the Secretary of HUD, that that would be good.

We strongly recommend any such Federal agency, in exercising its authority, should commence proceedings to dispose of any allegation of housing discrimination within a period of say the 90 days from the date it assumes jurisdiction and should finally dispose of same within 190 days.

We, of course, are pleased to note that there will be some limitation on the Mrs. Murphy exemption. We would suggest in the consideration of the Fair Housing Amendments that we should recognize the problems of the handicapped persons.

It is our understanding provision of this bill relating to this do not require modifications of the structures to comply with the law.

When you take a look at the problems the elderly are having, we feel that many older blacks who own or who rent property in the center city are now subject to real estate speculation, rising prices, increased taxes, and because of the economic circumstances of those senior citizens they are being displaced and other housing is not available to them.

We would ask you to seriously consider whether or not you could extend the bill's coverage to include prohibitions against discrimination on the basis of age.

Mr. Chairman, we appreciate the opportunity to appear before this subcommittee, and we certainly urge that you take speedy action to move H.R. 2540 toward enactment.

Thank you very much.

[The prepared statement of Ms. Simmons follows:]

STATEMENT OF ALTHEA T. L. SIMMONS, DIRECTOR, WASHINGTON BUREAU, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE

Mr. Chairman and members of the Subcommittee, I am Althea T. L. Simmons, Director of the Washington Bureau of the National Association for the Advancement of Colored People. As you know, the NAACP is a National civil rights organization with 1,800 branches and youth units in the 50 states and the District of Columbia.

The NAACP appreciates this opportunity to present its views on this important piece of legislation.

We learned long ago that reliance on individual lawsuits in the field of civil rights does not produce the desired results. The Congress addressed this by including provisions in the historic Civil Rights Act of 1964 and the Voting Right Act of 1965 which makes the Federal Government the primary enforcer of the laws.

This was not the case in the 1968 Fair Housing Act, although a giant step forward in civil rights, which was stripped of key provisions regarding enforcement powers.

The Secretary of the Department of Housing and Urban Development, under the present law is virtually powerless to act against private discriminators. Although the Secretary is authorized to conduct an investigation upon receipt of a complaint of housing discrimination she is limited to a conciliatory role between the violator and the complainant even when she finds a flagrant violation of the law.

Many complainants lack the financial resources to initiate litigation once a decision is made to pursue that route rather than an administrative remedy. Another problem faced by the housing consumer is the relatively short statute of limitations in which to pursue relief.

H.R. 2540 addresses this problem by authorizing the Secretary of HUD to proceed administratively or to refer the matter to the Attorney General for action in the courts.

White occupants of apartment complexes would, without doubt, be favorably affected by this bill. They are often willing to supply information in confidence concerning racially discriminatory practices by landlords, but are unwilling to

480

become conplainants themselves. If such proof is presented to the Secretary, she would be in a position to initiate an investigation and to proceed on her own authority under H.R. 2540. The same would be true with respect to Black employees who are usually fearful of job reprisals if they become directly involved in a housing complaint.

There is adequate documentation to prove that one of the chief difficulties confronting an apartment or home seeker who has been the victim of discrimination is the unavailability of the housing after he or she has successfully pursued a lawsuit. The sought after property, by the termination of the litigation has been sold or leased, so that even in winning, the complainant loses. The more speedy cease and desist authority and particularly the provision for the Secretary to grant preliminary or temporary relief will go a long way toward solving this problem.

We believe that there is adequate precedents for cease and desist authority for Federal agencies and since the Congress has declared fair housing to be the policy of the United States, the Congress is obligated to provide the mechanism to enforce the policy.

The NAACP has consistently adopted resolutions at its Annual Conventions calling for cease and desist authority for HUD because we are convinced that this is the most effective enforcement procedure.

During the course of the hearings on this legislation, there has been considerable questioning on, and criticism of, the role of the Secretary of HUD and the scope of her authority under the bill. This has concentrated on the multiple roles of the Secretary in the investigative, prosecutive and adjudicative functions under the Fair Housing Act.

To those of us who have worked over the last several decades for the enactment of strong civil rights legislation, the language of many who raise this issue has a familiar ring. We recognize it as a not so subtle effort to portray the Secretary as an all powerful bureaucrat who will override justice in her zeal to bring about "forced integration" against the will of the persons affected. We have noted this approach whenever an effort is made to secure provisions of law that will make civil rights statutes enforceable. At the same time, we recognize that there are some, especially members of this Subcommittee, who raise questions in an effort to assure that there will be fairness and justice in the administration of the law. To these we say that they should consider that the enforcement procedures of this bill do not depart from long-established practice nor do they operate in a vacuum.

The Supreme Court has decided on various occasions that placing investigative, prosecutive and adjudicative functions under the same agency head or governmental body does not deny due process. As a matter of fact, Congress normally enacts this method of enforcement when it grants an agency cease and desist authority. It is only in rare cases, such as that of the National Labor Relations Board, that it has decreed a separation of functions and/or established a separate general counsel's office.

Congress has taken another road to establish fair hearings in cease and desist procedures. It has enacted the Administrative Procedure Act that regulates federal agencies in their enforcement activities. Since in H.R. 2540 you have provided for an administrative hearing and a decision based on the record, the Secretary and her associates acting under the bill's provisions will be subject to the terms of that Act. Since that has been found adequate to control the hearing processes of numerous federal agencies, including such powerful ones as the Federal Trade Commission, the Federal Communications Commission and the Federal Reserve Board, to mention only a few, we see no need to make an exception when the statute relates to enforcement of basic civil and constitutional rights.

The NAACP, like this Subcommittee, believes in equity and fairness in administrative procedures. Therefore, it would have no objection if the Subcommittee, either in the law or its legislative history, would make clear that the Secretary's conduct in enforcing H.R. 2540 is subject to the Administrative Procedure Act. We hope this would fully dispose of this issue and put the Department of Housing and Urban Development in the mainstream of administrative enforcement procedures.

### ENFORCEMENT ROLE OF THE ATTORNEY GENERAL

Our experience leads us to believe that many persons lack confidence in the present enforcement procedures. Some of them, upon finding the administrative procedure does not guarantee a sure remedy, even if discrimination is proved, and lacking financial resources necessary to seek legal redress in the courts, abandon their complaint. They will gain confidence if they discover that, if discrimination does exist, the Secretary of HUD or the Attorney General is in a position to render assistance.

481

Under the present law, the Attorney General is limited to pattern and practice suits that raise issues of general public importance. This restriction has had a chilling effect on the civil rights of aggrieved persons.

The NAACP has historically called for broadening of the role of the Attorney General in the enforcement of civil rights statutes. As a matter of record, we were one of the few organizations supporting the so-called Part III authority for the Attorney General to file civil actions to protect civil rights in the 1957 Civil Rights Bill. Unfortunately, that portion of the bill was deleted before its passage. Therefore, although delayed, we welcome and wholeheartedly support the inclusion of broader authority for the Attorney General in H.R. 2540.

### DISCRIMINATORY HOUSING PRACTICE AMENDMENTS

Blacks and other minorities are frequently the victims of the horrendous practice of redlining that categorizes neighborhoods on the basis of racial occupancy and declare some "off limits" for financing, insurance and other purposes.

We believe that the Federal Government has a special obligation here, because the government itself is responsible for fostering such a practice in FHA's developing years by allowing that agency to consider racial homogeneity as a factor in reaching a decision on insurability. It is reassuring to know that the sponsors of H.R. 2540 have recognized that responsibility by including provisions that clarify and strengthen the protections against insuring and financing redlining.

Mr. Chairman and members of the Committee, if we may, we would suggest a few more changes we believe would improve the bill. Just as you have acted to assure that the secondary mortgage market is covered, we ask that you do the same with the secondary insurance market. It is our understanding that there is such a market in insurance contracts, so we urge that discrimination in re-insuring as well as insuring be prohibited. We also feel that the redlining prohibitions could be strengthened by inclusion of specific language prohibiting discrimination on the basis of geographic location.

### TIME LIMITATIONS ON OTHER AGENCIES THAT HANDLE HOUSING DISCRIMINATION COMPLAINTS

H.R. 2540 mandates cooperation among the Secretary and other Federal agencies to avoid duplication of effort in the exercise of their several authority. However, the bill carries no stipulation of time for action on housing discrimination complaints. The NAACP believes that the bill would be strengthened through the placing of time limitations on the "appropriate action" that all Federal agencies, with authority to prevent housing discrimination, are directed to take in cooperation with the Secretary of HUD. Therefore, the NAACP strongly recommends that any such federal agency, in exercising its authority, should commence proceedings to dispose of any allegation of housing discrimination within a period of ninety days from the date it assumes jurisdiction over same and should finally dispose of same within one hundred and eighty days.

### MRS. MURPHY'S EXEMPTION

We previously alluded to our concern over the short statute of limitations in the present law, and you are aware of our opposition to the "Mrs. Murphy's" exemption written into the 1968 Act. Both of these concerns are addressed in the bill before you, and we are pleased to support the proposed longer period for filing suit and the narrowing of the exemption given to homeowners.

### THE HANDICAPPED AND THE ELDERLY

Mr. Chairman, in recent years the NAACP has had occasion to cooperate with organizations representing handicapped persons in the attainment of their objectives. We have recognized the problems of handicapped persons in convention resolutions and we join with them in supporting extension of the coverage of the law to prohibit discrimination on the basis of handicap. It is our understanding that the provisions of the bill relating to this do not require modification of structures to comply with the law.

Our other concern arises from the plight of the elderly, especially in our urban centers. Many older Blacks own or rent property in the inner city which is the subject of real estate speculation, rising prices and increased taxes. Because of economic circumstances, large numbers of senior citizens are being displaced, with other housing unavailable to them. We ask you to seriously consider whether the bill's coverage should be extended to include prohibitions against discrimination on the basis of age.

Mr. Chairman, we appreciate the opportunity to testify on this bill and urge the Subcommittee, the Full Committee, and the House of Representatives, to take speedy action to move H.R. 2540 toward enactment.

Mr. DRINAN. Thank you very much, Ms. Simmons. That is very helpful testimony, and we welcome particularly the specific recommendations you have made.

I do hope that the bill with those recommendations will be able to move forward. With your help I think that might happen.

By previous agreement, Mr. M. Carl Holman, president of the National Urban Coalition, will now present his testimony in any way he sees fit.

Mr. Holman?

## TESTIMONY OF M. CARL HOLMAN, PRESIDENT, NATIONAL URBAN COALITION, ACCOMPANIED BY SANDRA SOLOMON, DIRECTOR OF GOVERNMENT AFFAIRS, NATIONAL URBAN CO-ALITION

Mr. HOLMAN. Thank you, Mr. Chairman.

I am pleased to appear before you today on behalf of the National Urban Coalition, an organization which, as you may know, combines the energies of business, labor, city government, community, and minority leaders in maintaining and improving the quality of urban life in this country.

I appear before you, as Ms. Simmons said, as we mark the 25th anniversary of *Brown* v. *Board of Education*. The young girl who in 1950 lived five blocks from the school to which she was denied access because of race is now grown and her generation has children of its own in the schools.

As we look to see what we have won in the intervening years, we see some victories and we also see we have very far to go, and I can think of no area where we have further to go than in the area of housing.

As a matter of fact, discrimination in the housing market represents the nearest thing to apartheid that we have in this country. Blacks are very seriously aware of this, perhaps more aware than other people, who see greater distances between the United States and South Africa day in and day out.

Not only does this discrimination operate to limit opportunities in terms of housing, it ramifies into education, employment, and other areas. Consider, for example, the recent school desegregation suit in which the court ruled that the plaintiffs may have no recourse since it is not a school board that is responsible for segregated schools but housing patterns; housing patterns which are left very much to the arbitrary and capricious behavior of the private housing market, because that housing market is often supported covertly and overtly by those whose job it is to carry out the law.

We have been defining and prohibiting discriminatory housing practices for more than a decade. I served as you may recall with the U.S. Commission on Civil Rights for a long time. We had hearing after hearing in which it was clear again and again that the key to seeing that this is not a divided society is housing.

The same government which one of our colleagues thinks now may be going too far is the government which decades ago created the situation we now have. It was the Federal Government which once used tax money to tell people how to write restrictive cov-

enants, but now all of a sudden we are afraid that the Federal Government will be getting too strong or the Secretary of HUD will exercise too much authority.

It was the Federal Government which built the segregated suburbs and it is the law which looks the other way as steering takes place in community after community.

It's a well known fact in some of our suburban areas. One of the Coalition's local affiliates did a study which showed that newcomers coming to a certain city and seeking jobs with big corporations were steered to one suburban enclave if they were black and to three others if they were white.

That makes it possible for foreigners when they come to this country to know very well that it's nonsense to talk about class being the only thing which is important and race being almost not important at all. If, indeed, this were true, we would have communities in this country in which middle class whites and middle class blacks were living together, low income whites and low income blacks living together. Suburbanization has taken place and there is no such pattern as that. What we have is white enclaves and black enclaves, and this law attempts to do something finally about it.

Most people do not know what fair housing laws are, or whether one exists in their State. What is a complainant to do, say, in States like Florida where there is no fair housing law? To what judge, jury, or court do you have recourse?

It's very clear further that this law is moving in the right direction because it recognizes the importance of activist citizens and public interest groups in enforcing fair housing legislation, and we are pleased to note that HUD will have the authority under these amendments to provide financial as well as technical assistance to public and private civil rights organizations.

I would like to give an example from one of our affiliates of how this kind of assistance works and why it is so important.

We have in Stanford—whenever we say we have a Stanford urban coalition, people say what on earth can anybody need with a coalition in Stanford?—the midpeninsula coalition which is made up of people from two sides of the highway. On one side there are Stanford University, the electronic companies, and the middle class and upper class people who live on that side.

On the other side is an unincorporated area called East Palo Alto, mainly black and Hispanic, where our coalition has been running a fair housing program called Operation Sentinel, which is now 8 years old. It is active in six counties in the bay area of northern California. Operation Sentinel receives more than 400 calls each month from victims of housing discrimination.

Of those 400, roughly 25 are referred to an attorney for litigation; 95 percent of these cases are either won or settled in favor of the plaintiff. So they are not frivolous cases and they are not cases for which there is no basis.

In 1971 violation of the fair housing law was seen as a minor offense worthy of no more than $200 in damages. Recently courts have begun to ask what is a civil right worth and to decide on damages of $10,000 to $20,000. The threat of a costly fine is making

484

those who would discriminate more sophisticated in their methods and this law, I hope, is going to do something about that.

It's interesting to see what people do in order to get around fair housing laws. An applicant comes to some of these places and the manager has a two-way mirror; so he is able to tell whether or not the person coming is black or white, except in such cases as he is fooled because he cannot actually tell that difference.

Others have coded applications, and that is not unusual for some of us. Years ago in Atlanta I saw this working when I wondered why a man got fired for punching out on the wrong clock and I found out, with the help of Ruby Hurley of NAACP, it was because those cards were coded. Some people still go to great trouble to see to it that discrimination continues.

In San Leandro, a security camera aimed at the front gate makes it possible for you to deny a black applicant who comes in right after you have said there is housing available for a white applicant.

This legislation will give HUD the means with which to respond quickly and strongly to discrimination complaints, and thus the stick with which to bring opposing parties to settlement. The cease and desist powers granted under this legislation are similar to those exercised by many Federal agencies and would permit HUD to protect the housing opportunity at issue until the investigation or hearing is resolved.

We have seen over and over again court cases brought and by the time one can work one's way through without what this law would provide, the whole thing is moot because the apartment or the house is no longer available.

We think that HUD administrative enforcement can be quick, fair, and inexpensive, and we support the expansion of HUD's enforcement powers and the referral of an individual case to the Attorney General where reasonable case of discrimination is found or an administrative order has been violated or a civil penalty is to be collected.

Among the members of our coalition board who have been working at this kind of problem is one named Gale Cincotta from Chicago. When we talk about the importance of redlining and what this bill seeks to do with redlining, I just would like to cite what Gale and her colleagues are coming up against in the Auburn-Gresham Community Action Coalition in Chicago.

This coalition has recently charged an insurance company with redlining, noting that there is a discriminatory practice or pattern in the location of insurance agents and in the homeowners' policies they place. The company had 90 agents on the predominantly white north side, 32 agents on the predominantly white southwest side and only 12 agents on the west and south sides which are 95 percent black.

This is being negotiated by the coalition, but it would be extremely important if we had more explicit prohibition of redlining and the support of the agencies which now have to say, in many cases, to people who bring these kinds of complaints, "We cannot do anything for you."

There are a number of elements in this legislation which we strongly support, not the least being the welcome addition of the

485

handicapped to the group protected by the law. And there are elements for which we would suggest some modification.

We are concerned, for example, that provision for referral of cases by HUD to State agencies would unnecessarily restrict HUD's control of the enforcement process by allowing HUD no authority to recall referred cases.

In the case of the EEOC, it has been proven again and again that it's very important to have the power to recall a case if a reluctant State agency is not moving on it rapidly enough.

Finally, I would say it seems that this law is a law which, if passed in this year, the 25th year after *Brown,* would begin to make the costs of housing discrimination much greater than its illusory benefits, and through this legislation we would begin moving a little closer to what we thought *Brown* was going to bring us 25 years ago.

And perhaps 25 years from now my children and their children would be able to count this law among the more positive achievements of the 1970's.

I thank you.

[The full statement follows:]

STATEMENT BY M. CARL HOLMAN, THE NATIONAL URBAN COALITION

Mr. Chairman, member of the subcommittee, I am pleased to appear before you today on behalf of the National Urban Coalition, an organization which, as you may know, combines the energies of business, labor, city government, community and minority leaders in maintaining and improving the quality of urban life in this country.

I appear before you as Ms. Simmons said today as we mark the 25th anniversary of *Brown* v. *Board of Education.* The young girl who, in 1950, lived five blocks from the school to which she was denied access because of race is now grown and her generation has children of its own in the schools. As we look to see what we have won in the intervening years, our real victories against injustice are tempered by the realization of how far we have yet to go.

In no area have we further to go than in the provision of equal housing opportunites for all Americans. If today the schools of Topeka, Kansas are desegregated, the school five blocks from a young black child in that city is most likely a predominantly black school because of racially segregated housing patterns. In this, Topeka is no different from any other American urban area.

Study after study shows it; local experience confirms it—discrimination in the housing market, both rental and sales market presists. The discrinimation takes its toll on individuals; it takes its toll on the social fabric of the communities in which they live; it takes its toll on whole metropolitan areas. Finally, this kind of discrimination—which breeds other kinds of discrimination and which feeds prejudice by holding different racial and ethnic groups apart—takes its toll on the national spirit. So long as we tolerate it, we tolerate an unhealthy society, divided cities, and a narrow-visioned, closed-minded citizenry.

For this reason I welcome the Fair Housing Amendments Act of 1979 as legislation which I believe will bring a significant improvement in the ability of the Federal Government to enforce Title VIII of the Civil Rights of 1968. For more than a decade we have defined and prohibited discriminatory housing practices but we have not provided Government authority sufficient to defend the rights of those who are subject to that discrimination. We have put the burden of litigation on the complainant and we have denied the successful plaintiff award of attorneys' fees unless he or she is destitute. HUD has been given no more stringent enforcement powers than the rule of conciliator between opposing parties; its understaffed, underfunded fair housing enforcement effort for the current year is approximately one-seventeenth that of the equal employment opportunity office.

Secretary Harris has already placed a strong emphasis on fair housing. With this legislation, her department will have the tools to begin enforcing the law of the land. The victim of discrimination will be able to choose either an administrative or a judicial remedy, and, in either forum, court costs and attorneys' fees may be awarded to the prevailing party. The victim of discrimination will have three years instead of the current six months, to seek remedy in the courts and the limitation

486

on punitive damages will be removed. With this legislation we will begin to recognize that, as Drew Days so aptly observed before this subcommittee last month, "When private citizens bring meritorious fair housing suits, they act in the public interest and help perform an enforcement function that government agencies could not adequately perform alone."

We are long overdue in recognizing the importance of activist citizens and public interest groups in enforcing fair housing legislation. I was pleased to note that HUD will have the authority under these amendments to provide financial as well as technical assistance to public and private civil rights organizations seeking to remedy housing discrimination. Housing discrimination is so pervasive—as I think testimony before this subcommittee has conclusively shown—that most citizens do not complain about it and, of those who do, few pursue their complaints because of lack of information and legal resources, or because of a justifiable lack of confidence in the current HUD conciliation system. States vary in the sophistication of their fair housing laws—Florida has no fair housing law at all, for example. Where public interest groups are active in this field they represent an invaluable resource for victims of discrimination, combining information on Federal, State, and local laws and on local legal services. Let me give you one example from the coalition's network of affiliates, because I feel it illustrates the change in discriminatory housing practices, the change in attitudes towards this kind of discrimination where it occurs, and the need for this legislation.

Our Stanford Mid-peninsula Urban Coalition runs a fair housing program called "Operation Sentinel" which is now eight years old. Active in six counties in the Bay Area of Northern California, Operation Sentinel receives more than four hundred phone calls every month from victims of housing discrimination. Of these 400, roughly 25 are referred to an attorney for litigation. Ninety-five per cent of these cases are either won or settled in favor of the plaintiff. The program staff report that whereas in 1971 violation of the fair housing law was seen as a minor offense, worthy of no more than $200 in damages, recently courts have begun to ask "What is a civil right worth?" and to decide on damages of $10,000 to $20,000. The threat of a costly fine is making those who would discriminate more sophisticated in their methods. Operation Sentinel found that whereas in 1971 landlords would simply say "We don't rent to blacks", recently landlords have devised systems to discriminate more covertly. The program staff report two-way mirrors in managers' offices so that they can see the applicant first and decide whether to answer an inquiry and coded application forms so that prospective white and minority tenants can be distinguished when an apartment becomes available. In San Leandro a security camera aimed at the front gate was sufficient to deny access to a black applicant when a white test applicant had just gained admittance. In cases like these, victims of discriminatory housing practices often call for help after they have tried unsuccessfully to get help from HUD.

This legislation will given HUD the means with which to respond quickly and strongly to discrimination complaints and thus the stick with which to bring opposing parties to settlement. As Secretary Harris noted in her testimony to you last month, in the absence of the kind of judicial and administrative remedies included in this legislation, "conciliation has become more a symbol of impotence than a constructive tool to redress housing discrimination complaints." With these remedies, HUD will be able to make conciliation work effectively, and it will be able to act rapidly to protect the interests of the discrimination victim should that become necessary.

The cease and desist powers granted under this legislation are similar to those exercised by many Federal agencies. They would permit HUD to protect the housing opportunity at issue until the investigation or hearing is resolved. Without this kind of protection for the complainant, the house may be sold or the apartment rented.

As Congressman Edwards noted in his submission of this bill, while litigation may be ill-suited to respond to the limited factual and legal issues or small financial losses at issue in a fair housing violation, HUD administrative enforcement can be quick, fair, and inexpensive. We agree, and we support the expansion of HUD's enforcement powers. Further, we support provisions to allow referral of an individual case to the Attorney General where reasonable cause of discrimination is found, an administrative order has been violated, or a civil penalty is to be collected. We feel that the remedies which this legislation provides are, by and large, sufficiently reasonable and flexible that both the parties involved and the intent of the law will be protected.

The National Urban Coalition has been working on behalf of this Nation's cities since 1967. Over this period we have observed with some sorrow the continuing patterns of residential segregation in our metropolitan areas. The divided society predicted by the Kerner Commission is created in part by the kind of housing

discrimination I have been discussing here—in which blacks who seek housing encounter racial discrimination 75 percent of the time as tenants and 62 percent of the time as buyers—in which racial steering is used to artificially and wrongfully manipulate the local housing market and, in the language of the *Bellwood* case, to deprive residents of the benefits of living in an integrated community. It is also created by redlining in the provision of mortgages, secondary financing, and insurance. We applaud provisions of this bill which would clarify prohibitions already implicit under title VIII and which would make it unnecessary to demonstrate a connection between the practice of discrimination and the unavailability of housing.

Let me give you an example of a case for which a clarification of the prohibition against insurance redlining would be very useful. The Auburn-Gresham Community Action Coalition in Chicago of which National Urban Coalition Steering Committee member Gale Cincotta is a member, recently charged an insurance company with redlining, noting that there was a discriminatory pattern in the location of insurance agents and in the homeowners' policies they placed. The company had 89 agents on the predominantly white north side, 32 agents on the predominantly white southwest side, and only 12 agents on the west and south sides which are 95 percent black. National People's Action is currently negotiating with the firm about its record in Chicago and in seven other communities around the country. With the explicit prohibition of redlining, more local groups will be encouraged to question discriminatory lending or insurance practices, and under this kind of scrutiny the prejudices of a few will no longer hold hostage the vitality of whole communities.

There are other elements of this legislation which we strongly support—not the least of which is the welcome addition of the handicapped to the group protected by law—and there are elements for which we would suggest minor modification. We are concerned, for example, that provision for referral of cases by HUD to State agencies would unnecessarily restrict HUD's control of the enforcement process by allowing HUD no authority to recall referred cases. But time will not permit a more lengthy exposition today.

Suffice it to say that reaction to this legislation by groups around the country with which the National Urban Coalition has been in contact—groups concerned on a day-to-day basis with promoting equal housing opportunity and with protecting the rights of those subject to housing discrimination—has been positive. They say the changes proposed here are long overdue. As I visit cities around the country and I observe the social, economic and political costs associated with residentially segregated neighborhoods and with resulting segregated schools and commercial areas I could not agree more. We must begin to make the costs of housing discrimination much greater than its illusory benefits, and with this legislation we will make substantial progress towards that goal. Twenty-five years from now I want my children to be able to count this law among the positive achievements of the 1970's.

Mr. DRINAN. Thank you very much, Mr. Holman.

That is an excellent statement and it's very, very helpful in support of this bill.

Our next witness, by previous agreement, is Ms. Dot Ridings, the Human Resources Coordinator of the League of Women Voters.

We have your statement, and it will be made a part of the record, and you may proceed as you see fit.

## TESTIMONY OF DOT RIDINGS, HUMAN RESOURCES COORDINATOR, LEAGUE OF WOMEN VOTERS OF THE UNITED STATES

Ms. RIDINGS. Thank you.

I am Dot Ridings, the Human Resources Coordinator of the League of Women Voters of the United States.

The LWVUS is pleased to have this opportunity to show our strong support for H.R. 2540, the Fair Housing Amendments Act of 1979.

The league is a volunteer citizen education and political action organization of 1,400 leagues from 50 States, Puerto Rico, the Virgin Islands, and the District of Columbia.

488

Equal access to housing has been a major concern of the league since 1968. Since then, leagues all over the country have been actively working in their communities to promote fair housing.

I would like to interject, because of the previous statements, that the league at the national level and certainly at the local levels has quite often and usually combined the attacks upon discriminatory practices in education and those in housing.

Mr. Holman referred to the child of the 1950's whose children are now grown. I heard myself being described. I was in junior high school in a segregated situation in 1954, and now my children are in the public schools in Louisville, Ky.

Louisville, of course, has a rather infamous name in the life of the school desegregation. We hope it's on its way to being more famous in showing what great strides can be made. But I want to interject this here because leagues all over the country have been working with housing and equal access to education in tandem, and certainly they are in tandem.

We have had interesting events happen in Louisville in connection with both school desegregation and desegregation of the housing residential patterns. As you perhaps will recall, when Louisville underwent court ordered desegregation in 1975, we at that time were found to have a majority of racially identifiable neighborhood schools

Under court order those schools that met the racial guidelines set down by the Federal courts were exempted from our busing plan. An interesting development that was tracked by our Commission on Human Rights was within the year or two following this court order, where the residents of the area school districts where the segregation patterns did exist, there were several turnovers within the next 2 years.

Neighborhood schools became nationally racially integrated, and were then exempted from the court order because of the impetus that this gave to residential segregation patterns. It's quite unfortunate that it took the desires perhaps of some people living in these areas to want their children bused less than they wanted mixed neighborhoods to achieve this goal. But that is exactly what happened.

Also, we do know from discussions with other landlords and persons selling their homes in the neighborhoods where they are certainly still strongly racially identifiable, that they have decided the other way. That, indeed, they would rather maintain the sanctity of their neighborhoods more than they want to have the children exempted from a busing plan.

So it presents us with a rather interesting quandry and dilemma; it certainly does point out the fact we have a great need, Louisville simply being an example of where we do have the strong residential segregation patterns that need to be addressed by strong Federal legislation.

Over a decade has passed since title VIII of the Civil Rights Act of 1968 was enacted, yet little progress has been made toward eliminating housing discrimination. I have certainly seen this in my community and leagues all over the country have seen it in their own. In fact, in some areas continued discrimination in the housing market has contributed to an increase in the number of

489

racially segregated communities over the number that existed 10 years ago.

This lack of progress in achieving equal housing opportunity is largely attributable to the absence of enforcement tools necessary to carry out title VIII. Therefore, we support H.R. 2540 because we believe that its passage will provide the long overdue changes in the law that are necessary to achieve fair housing in the United States.

I would like to speak mostly to what we consider the most important component of the fair housing amendments, and that is the creation of the administrative powers within HUD to enforce title VIII.

Certainly the small percentage of complaints that have been resolved through the conciliation process under present law is proof that this method does not work. Certainly one example and only one of many, occurred several years ago when two local leagues in Cook County, Ill., filed an administrative complaint with HUD against a real estate broker from the suburban area south of Chicago. There was documented proof that this broker, who carried the largest volume of sales in the area, including FHA commitments, engaged in racially discriminatory housing practices.

Conciliation was not achieved; in fact, the league never even got the chance to sit down and talk to the broker with HUD. Finally, the Justice Department filed a pattern and practice suit against the broker and was successful in obtaining a consent order.

According to our league member in Cook County who was involved in the case which lasted over a period of time, "Citizens who believe they have been discriminated against become less and less inclined to go to HUD with their complaints because they believe it will be a waste of time."

H.R. 2540 would set up an administrative enforcement process in HUD with the teeth necessary to more satisfactorily resolve complaints of discrimination, both individual complaints filed with HUD and, in addition, those filed by the Secretary following an investigation of housing practices.

We support this new authority for HUD because it would enable the Secretary to attack discrimination through the Secretary's own investigation instead of relying solely on individual complaints brought to the Department.

We support the provisions that authorize HUD to investigate charges of discrimination in order to determine if there is reasonable cause.

During this investigation HUD could order temporary or preliminary relief pending the final disposition of such charge if the Secretary determines that prompt action is necessary to carry out the purpose of the act. Such an order could cause a housing unit to be taken off the market.

This provision, we believe, is essential to protect the complainant by assuring that the unit in question remains available.

If the Secretary determines on the basis of investigation findings that reasonable cause exists, she or he may file an administrative complaint and begin the hearing process or refer the matter to the Attorney General. This process would remove the burden from the

490

individual in resolving a discrimination complaint, and would allow the flexibility needed to most appropriately resolve the case.

If the administrative route is chosen and the hearing process has been initiated, an aggrieved person shall not commence a civil action. We support this provision since it will protect the respondent from being challenged twice for the same alleged discriminatory housing practice.

We also support the measure permitting the aggrieved person to intervene in the administrative proceeding. This would protect the interests of the complainant without unnecessarily restricting the administrative process. Both of these measures would assure that the administrative process provides maximum fairness to all parties, both the complainants and the respondents.

H.R. 2540 further strengthens the administrative process by giving HUD authority, after findings of fact and conclusions of law, to order appropriate relief, including the authority to issue cease and desist orders, and to impose a civil penalty of up to $10,000.

We strongly support these provisions which correct major weaknesses in the present law by providing HUD with the sanctions to significantly inhibit discriminatory housing practices.

We know most complainants want housing, and without the powerful sanctions provided in H.R. 2540 housing discrimination will remain as prevalent as it is today.

We support the measure too that would provide HUD with the authority to levy fines of up to $1,000 a day for every day a person violates the Secretary's orders. It is the experience of our leagues involved in fair housing that defendants often ignored the requirements of past orders because they had no real sanctions to fear. Under this act, HUD will take seriously its monitoring responsibility, which will more adequately insure compliance.

We support section 4 of H.R. 2540, which would change the definition of discriminatory housing practices to cover any act that is unlawful under title VIII, including section 808.

Thus, adoption of this amendment would make it clear that Federal departments and agencies may be held accountable in court for failure to carry out their obligations under title VIII.

Although we believe the Federal Government has begun to improve its tract record in promoting fair housing in its programs and activities, discriminatory practices continue.

For example, public housing in Boston is still segregated despite a court order. To discourage the continuation of discriminatory policies and practices, we strongly endorse the clarifying amendment concerning Federal responsibility, in this case, of course, concerning public housing authority.

Further, we support the amendment specifically stating that the Federal financial regulatory agencies, as well as the other Federal departments and agencies, are subject to the affirmative action mandate.

The league is familiar with this area because we were a plaintiff in a lawsuit, although we were dropped for lack of standing, against these agencies, Federal Home Loan Bank Board, Office of the Comptroller of the Currency, Federal Reserve Board, Federal Deposit Insurance Corporation, for failure to carry out their responsibilities under title VIII.

491

Successful agreements were reached with three agencies and now we are pleased all have undertaken affirmative enforcement programs under title VIII. We are pleased that H.R. 2540 clarifies the responsibility of these Federal agencies.

We also support that the amendments express prohibition of mortgage redlining.

We support the section in H.R. 2540 that expressly prohibits discrimination in property insurance, including the terms, conditions, or privileges of an insurance contract. Since denial of property insurance is essentially denial of homeownership, its coverage under title VIII is important to assure equal housing opportunity.

Another clarifying provision that we support states that discriminatory practices in the secondary mortgage market be prohibited just as they are for primary lenders. This amendment is essential because of the far-reaching effects the secondary market has on the mortgage market. Again, you have heard that before. That is, refusal to purchase mortgages from lenders on the basis of race, sex or national origin may affect the business decisions of lenders who rely on the secondary market.

We strongly support the amendment prohibiting discriminatory practices in the secondary mortgage market.

H.R. 2540 would make an important change in coverage under title VIII by changing the current provisions on exemption. Certainly it would set a standard for us to attempt to achieve.

Owners with fewer than four single-family houses are now exempted but coverage would be extended to the renting of space within a single family dwelling unit by the occupant of such unit.

The amendment would, we believe, further integration at the community level. It clearly states to owners of single-family dwellings, and to owners in the rental units of owner-occupied dwellings with four or fewer independent units, that discrimination is illegal.

We also support the section in H.R. 2540 that would extend coverage under title VIII to protect handicapped persons. According to a local league that conducted a housing needs education project: One of the major difficulties the handicapped have experienced is the reluctance on the part of realtors, homeowners, rental agents, et cetera, to treat them on an equal basis and their tendency to prejudge their handicaps as a barrier to housing they are attempting to rent or purchase.

The bill would not require retrofitting of the entire housing stock in order to make units fully accessible to against handicapped persons. The bill would not require retrofitting of the entire housing stock in order to make units fully accessible to handicapped persons. We recognize the financial impact of such a requirement. However, we believe that a large part of the housing discrimination handicapped persons face could be eliminated by enforcing the proposed act. Certainly it would set a standard for us to attempt to achieve.

The act clarifies which persons can bring an administrative or judicial action under title VIII. For the first time, the law not only would define standing for cases involving private action but also would apply the same criteria for standing to those filing administrative complaints and to those taking charges to court. We support this clarifying amendment.

492

We support the amendment broadening the court's discretion in the awarding of attorney's fees.

In judicial relief, the damage done by discrimination is often caused by the systematic practices of a broker or landlord who discriminates in a thorough and willful manner. The ceiling under the old act was $1,000 punitive damage, which league members working toward fair housing have observed, was not high enough to aid in the prevention of such actions.

Real estate firms, developers, builders, and landlords could and would write off the fine as a business expense, a small price to pay. We support the provision removing the limit on punitive damages and the section specifically authorizing the Attorney General to seek relief through the courts in pattern and practice cases similar to those in private litigation.

We support the provision under this act that would enable HUD to give financial assistance as well as technical assistance to private fair housing programs. Again, this has been discussed before.

In conclusion, there are numerous times that the Congress has the opportunity to make a substantial impact on citizen rights under our democracy. When we consider some of our cherished rights as citizens, surely one that is held most dear is the protection from discrimination granted under the Constitution.

Unfortunately, despite passage of the 14th amendment prohibiting discrimination based on race, and despite subsequent civil rights statutes, we know for a fact that wide-scale discrimination exists.

As an example, we know for a fact that rampant discriminatory practices in housing thrive. League members participated in the Housing Marketing Practice Survey recently conducted by the National Committee Against Discrimination in Housing. The survey, as you know, revealed that blacks looking for rental housing encountered discriminatory treatment up to 75 percent of the time.

Part of this continued discrimination is due to lack of enforcement of title VIII and inadequate enforcement tools in the act. You now have an opportunity to remedy the lack of adequate enforcement tools.

The Fair Housing Amendments Act is a large step forward remedying the injustices that many of our citizens face when they attempt to choose a place of residence, a home.

We urge your support in the passage of this important piece of legislation.

Thank you.

[The full statement follows:]

STATEMENT BY DOT RIDINGS, HUMAN RESOURCES COORDINATOR, LEAGUE OF WOMEN VOTERS OF THE UNITED STATES

I am Dot Ridings, Human Resources Coordinator of the League of Women Voters of the United States. The LWVUS is pleased to have this opportunity to show our strong support for H.R. 2540, the Fair Housing Amendments Act of 1979. The League is a volunteer citizen education and political action organization of 1400 Leagues from 50 states, Puerto Rico, the Virgin Islands and the District of Columbia. Equal access to housing has been a major concern of the League since 1968. Since then, Leagues all over the country have been actively working in their communities to promote fair housing.

Over a decade has passed since Title VIII of the Civil Rights Act of 1968 was enacted, yet little progress has been made toward eliminating housing discrimination. In fact, in some areas continued discrimination in the housing market has

contributed to an increase in the number of racially segregated communities over the number that existed 10 years ago. This lack of progress in achieving equal housing opportunity is largely attributable to the absence of enforcement tools necessary to carry out Title VIII. Therefore we support H.R. 2540 because we believe that its passage will provide the long overdue changes in the law that are necessary to achieve fair housing in the United States.

### I. ENFORCEMENT POWERS

The most important component of the Fair Housing Amendments is the creation of administrative powers within HUD to enforce Title VIII. Under the present law, the Secretary of HUD is charged with responsiblity for administering the Fair Housing Act, yet is limited to conciliation and persuasion in trying to resolve housing discrimination complaints. This process is inadequate at best, and the extremely small percentage of complaints that have been resolved through this method is proof that conciliation does not work.

For instance, several years ago, two local Leagues in Cook County, Illinois filed an administrative complaint with HUD against a real estate broker from the surburban area south of Chicago. There was documented proof that this broker, who carried the largest volume of sales in the area, including FHA commitments, engaged in racially discriminatory housing practices. Conciliation was not achieved; in fact, the League never even got the chance to sit down and talk to the broker with HUD. Finally, the Justice Department filed a "pattern and practice" suit against the broker and was successful in obtaining a consent order. According to our league member in Cook County who was involved in the case, which lasted over a period of time, "citizens who believe they have been discriminated against become less and less inclined to go the HUD with their complaint because they believe it will be a waste of time."

H.R. 2540 would set up an administrative enforcement process in HUD with the teeth necessary to more satifactorily resolve complaints filed with HUD and, in addition, those filed by the Secretary following an investigation of housing practices. We support this new authority for HUD because it would enable the Secretary to attack discrimination through the Secretary's own investigation instead of relying solely on individual complaints brought to the Department.

We support the provisions that authorize HUD to investigate charges of discrimination in order to determine if there is reasonable cause. During this investigation HUD could "order temporary or preliminary relief pending the final disposition of such charge" if the Secretary determines "that prompt action is necessary to carry out the purposes of" the Act. Such an order could cause a housing unit to be taken off the market. This provision we believe is essential to protect the complainant by assuring that the unit in question remains available.

The bill would still enable the Secretary to refer a complaint to a certified local or state fair housing agency, however, this action would no longer be mandatory. If HUD believes that immediate attention is necessary to carry out the purposes of the Act, HUD will have the option of retaining the complaint. Further, a complaint cannot be referred to a local or state agency without the consent of the aggrieved person. This will assure that the complainant has more control over the disposition of the case.

We also support a related provision in the bill specifying that before HUD can certify an agency for referral, "the Secretary shall take into account the current practices and past performances" of the agency. This would assure that referrals are not made to fair housing agencies with poor performance records.

Further, even though the criteria for certifying agencies would be tightened, we believe that HUD should maintain the present authority to take further action on a charge once a referral is made. This would be necessary in the event that the local or state agency failed to take action on a complaint.

If the Secretary determines on the basis of investigation findings that reasonable cause exists, she or he may file an administrative complaint and begin the hearing process or "refer the matter to the Attorney General." This process would remove the burden from the individual; in resolving a discrimination complaint and would allow the flexibility needed to most appropriately resolve the case.

If the administrative route is chosen and the hearing process has been initiated, an aggrieved person "shall not commence a civil action." We support this provision since it will protect the respondent from being challenged twice for the same alleged discriminatory housing practice. We also support the measure permitting the aggrieved person to intervene in the administrative proceeding. This would protect the interests of the complainant without unnecessarily restricting the administrative process. Both of these measures would assure that the administrative process provides maximum fairness to all parties—both the complainants and the respondents.

494

H.R. 2540 further strengthens the administrative process by giving HUD authority, after findings of fact and conclusions of law, to order appropriate relief, including the authority to issue cease and desist orders, and to impose a civil penalty of up to $10,000. We strongly support these provisions which correct major weaknesses in the present law by providing HUD with he sanctions to significantly inhibit discriminatory housing practices. We know most complainants want housing and without the powerful sanctions provided in H.R. 2540, housing discrimination will remain as prevalent as it is today.

We support the measure too that would provide HUD with the authority to levy fines of up to $1,000 a day for every day a person violates the Secretary's orders. It is the experience of our Leagues involved in fair housing that defendants often ignored the requirements of past orders because they had no real sanctions to fear. Under this act, HUD will take seriously its monitoring responsibility, which will more adequately insure compliance.

## II. CLARIFICATION OF COVERAGE

Because of ambiguities in the existing law, there has been confusion in the past concerning coverage under Title VIII. The League supports the amendments in H.R. 2540 that clarify the scope of protection offered under the law.

*Discriminatory Housing Practices*

Under the present law, discrimination in the sale, rental or financing of housing and in the provision of brokerage services is clearly defined as discriminatory housing practices. Omitted from this definition is Section 808 of the current law, which specifies that Federal departments and agencies "shall administer their programs and activities in a manner affirmatively to further the purposes" of Title VIII.

We support Section 4 of H.R. 2540 which would change the definition of discriminatory housing practices to cover any act that is unlawful under Title VIII including Section 808. Thus, adoption of this amendment would make it clear that federal departments and agencies may be held accountable in court for failure to carry out their obligations under Title VIII.

Although we believe the federal government has begun to improve its track record in promoting fair housing in its programs and activities, discriminatory practices continue. For example, public housing in Boston is stilll segregated despite a court order. To discourage the continuation of discriminatory policies and practices we strongly endorse the clarifying amendment concerning federal responsibility. In this case, of course, concerning public housing authority.

Further, we support the amendment specifically stating that the federal financial regulatory agencies, as well as the other federal-departments and agencies are subject to the affirmative action mandate. The League is familiar with this area because we were a plaintiff in a lawsuit, although we were dropped for lack of standing, we were a co-plaintiff against these agencies (Federal Home Loan Bank Board, Office of the Comptroller of the Currency, Federal Reserve Board, Federal Deposit Insurance Corporation) for failure to carry out their responsibilities under Title VIII. Successful agreements were reached with three agencies and now we are pleased all have undertaken affirmative enforcement programs under Title VIII. We are pleased that H.R. 2540 clarifies the responsibility of these federal agencies.

We are also pleased that the amendments expressly prohibit mortgage redlining and we support that. Although Title VIII has been interpreted to cover mortgage redlining, lenders continue to use discriminatory criteria such as race or national origin, in their lending decisions. We therefore welcome the clarifying language.

We support the section in H.R. 2540 that expressly prohibits discrimination in property insurance, including "the terms, conditions, or privileges" of an insurance contract. Since denial of property insurance is essentially denial of home ownership, its coverage under Title VIII is important to assure equal housing opportunity.

Another clarifying provision that we support states that discriminatory practices in the secondary mortgage market be prohibited just as they are for primary lenders. This amendment is essential because of the far-reaching effects the secondary market has on the mortgage market. That is, refusal to purchase mortgages from lenders on the basis of race, sex or national origin may affect the business decisions of leaders who rely on the secondary market. We strongly support the amendment prohibiting discriminatory practices in the secondary mortgage market.

## III. EXPANDED COVERAGE

H.R. 2540 would make an important change in coverage under Title VIII by changing the current provisions on exemption. Owners with fewer than four single-

495

family houses are now exempted but coverage would be extended "to the renting of space within a single family dwelling unit by the occupant of such unit." The amendment would, we believe, further integration at the community level. It clearly states to owners of single-family dwellings, and to owners in the rental units of owner-occupied dwellings with four or fewer independent units, that discrimination is illegal.

The experience of our League working with the Fair Housing Council in Bergen County, New Jersey illustrates that there is a heavy demand by many minorities— blacks, female heads-of-households, as well as singles and young couples—for housing in two-family house situations. Today's high cost of housing makes these units especially appealing for purchase or rental, yet many minorities experience difficulty in obtaining them. According to the Housing Director for the New Jersey League, the amendment "would give us the legal help we need to provide equal opportunity in housing, in this type of housing." The shortage of affordable housing and the large number of communities that have a very low percentage of minorities make this aspect of the act extremely important. In order to allow minorities "equal opportunity in housing in a more affordable range, and with a broader choice of communities, this narrowing of owner-occupied exemptions is necessary."

We also support the section in H.R. 2540 that would extend coverage under Title VIII to protect handicapped persons. According to a local League that conducted a housing needs education project, "One of the major difficulties the handicapped have experienced is the reluctance on the part of realtors, homeowners, rental agents, etc. to treat them on an equal basis and (their tendency) to prejudge their handicaps as a barrier to housing they are attempting to rent or purchase."

The bill would not require retrofitting of the entire housing stock in order to make units fully accessible to handicapped persons. We recognize the financial impact of such a requirement. However, we believe that a large part of the housing discrimination handicapped persons face could be eliminated by enforcing the proposed act.

#### IV. REFINEMENT OF THE LAW

Some of the amendments proposed in H.R. 2540 provide important procedural changes or clarifiction of existing procedures.

*Statute of limitations*

The proposed amendment provides a more reasonable time period for filing a charge. It would increase the statute of limitations for filing civil action from 180 days to three years, and to one year for filing a charge with the Secretary. This change is extremely important, since we have found in many cases that six months is simply not enough time to take action. Delays in taking action often occur because a complainant may lack knowledge as to his or her rights; a person may get the "agency runaround" in trying to obtain the correct advice; a complainant has been hesitant about getting legal advice and the consequences to him or to her.

*Standing*

The act clarifies which persons can being an administrative or judicial action under Title VIII. For the first time, the law not only would define standing for cases involving private action but also would apply the same criteria for standing to those filing administrative complaints and to those taking charges to court. We support this clarifying amendment.

*Attorney's Fees*

We support the amendment broadening the court's discretion in the awarding of attorney's fees. Under the existing law, the court has discretion only when the prevailing plaintiff lacks the financial capability to absorb the cost of asserting his or her civil rights. A great deal of discrimination occurs against non-indigent minority families seeking housing in the suburbs. We believe that no family should have to pay attorney's fees to exercise its constitutional right.

*In Judicial Relief*

The damage done by discrimination is often caused by the systematic practices of a broker or landlord, who discriminates in a thorough and willful manner. The ceiling under the old act was $1,000 punitive damage, which League members working toward fair housing have observed was not high enough to aid in the prevention of such actions. Real estate firms, developers, builders, and landlords could and would write off the fine as a business expense—a small price to pay. We support the provision removing the limit on punitive damages and the section specifically authorizing the Attorney General to seek relief through the courts in "pattern and practice" cases similar to those in private litigation.

496

*We Support Financial Assistance*

Under this act HUD would be able to give financial assistance as well as technical assistance to private fair housing groups. It is the experience of many of our Leagues working with private fair housing agencies that the cost of research, time, photocopying, etc., have all placed a heavy burden on the agencies. This assistance, in turn, would help HUD to ensure better enforcement of the law.

### CONCLUSION

There are few times that the Congress has the opportunity to make a substantial impact on citizen rights under our democracy. When we consider some of our cherished rights as citizens, surely one that is held most dear is the protection from discrimination granted under the Constitution. Unfortunately, despite passage of the fourteenth amendment prohibiting discrimination based on race, and despite subsequent civil rights statutes, we know for a fact that wide-scale discrimination exists.

As an example: we know for a fact that rampant discriminatory practices in housing thrive. League members participated in the Housing Marketing Practices Survey recently conducted by the National Committee Against Discrimination in Housing. The survey as you know revealed that blacks looking for rental housing encountered discriminatory treatment up to 75 percent of the time.

Part of this continued discrimination is due to lack of enforcement of Title VIII and inadequate enforcement tools in the Act. You now have an opportunity to remedy the lack of adequate enforcement tools.

The Fair Housing Amendments Act is a large step forward remedying the injustices that many of our citizens face when they attempt to choose a place of residence—a home. We urge your support in the passage of this important piece of legislation.

Mr. DRINAN. Thank you very much, Miss Ridings.

It's extremely helpful, and I am certain that the 1,400 units of the League of Women Voters will be very, very effective, as usual, in helping us to get this thing through the Congress.

We want now to welcome Ms. Cushing N. Dolbeare, the president of the National Low Income Housing Coalition, and we thank you for your patience and we thank you also for your friendship and assistance to this subcommittee on prior occasions.

We have your testimony and, Ms. Dolbeare, you may proceed as you wish.

## TESTIMONY OF CUSHING N. DOLBEARE, PRESIDENT, NATIONAL LOW INCOME HOUSING COALITION

Ms. DOLBEARE. Thank you very much.

First of all, I would like to say that we very much appreciate the work which you have been doing, Father Drinan, and the other members of this committee, in raising this issue and introducing and sponsoring this bill.

I would like just briefly to mention, before I get into my prepared statement, that I am not only the president of the National Low Income Housing Coalition, I am also a consultant in housing policies and programs, and I have been active since 1952 in analysis of housing policies, particularly—focusing on the problems of low income and minority people. I am a former cochairperson of the Housing Task Force of the Leadership Conference on Civil Rights. I spent 15 years in Philadelphia working with local citizen organizations in housing. The last 6 of those years were focusing as a major priority on what could be done to deal with the problem of housing segregation and housing discrimination in the Philadelphia area. So I have some personal experience in this field.

The National Low Income Housing Coalition, as you may know, is a relatively new organization, concerned, as our name implies,

003295

497

with the housing problems of low-income people. The coalition's membership includes both individuals and local, State, and national public interest organizations.

I would like, if I may, to have included in the record, along with my statement, a list of the board of directors which contains representatives of over 40 national public interest organizations involved in the coalition.

Mr. DRINAN. Without objection.

Ms. DOLBEARE. I will not repeat the same points which the previous witnesses have made. We fully support, the provisions of the bill, and we have some local groups involved with us who could report similar experiences, I think it will be more helpful to the committee to focus on the nature of the problem as we see it and the reasons why this approach is necessary in the legislation.

An absolutely essential element in adequate housing for low-income people is freedom of housing choice. Housing choice is now denied by lack of an adequate supply of housing within the means of lower-income people. Unfortunately, there is nothing in this bill that addresses the desparate need for more low-income units. There are 7 million more very low-income families than there are housing units in the combined public and private stock of housing that are available to them at costs they can afford.

The second factor which this bill does address, is pervasive discrimination, which limits the access to housing that is available or may become available.

Federal housing policies and practices must bear a large share of the blame for the segregation which exists and persists in our society.

For the better part of two decades after the end of World War II, thanks in large part to the mortgage insurance programs of the Federal Housing Administration and the Veterans' Administration and to relatively low—by today's standards—housing costs and interest rates, almost any white family where the husband was steadily employed could purchase a new suburban house. Millions did so.

This is something which is so foreign to our current experience with high housing prices that it's worth a reminder. What happened was that millions and millions of white families were able to purchase housing.

In Philadelphia, the average income of housing purchasers in the 1960's was between $4,000 and $6,000 a year. And these families purchased new suburban housing, moved out, left behind the minority people who were excluded from the housing market. For a large part of the 1950's and into the 1960's, housing segregation was not only not prohibited by the law, it was actually encouraged by the FHA, which was financing this movement. One of the factors that FHA underwriters were supposed to consider when they evaluated a house was the racial composition of the neighborhood and whether or not the buyer fit into that racial composition.

So it's really no exaggeration, in our view, to say FHA and other comparable Federal practices created the white suburbs and were prime movers in bringing about the two societies, one white and one black, which were identified by the Kerner Commission in 1968. And segregation has intensified since then.

003296

498

It's these Federal policies which were responsible for many of the difficulties of our present distressed urban areas, because it's not just housing that moved out. Jobs moved to the suburbs and black and other minorities were left behind without access to those jobs.

Thus, the economic base of the inner cities was eroded. This is the result of not having had effective fair housing legislation during that period.

This history is worth noting, because the responsibility of remedying the effects of past discrimination has been a basic element of compliance with title VI, which prohibits discrimination in Federal programs.

Despite the fact that we have had fair housing legislation on the books since 1968, we have made very little progress in addressing present discrimination, let alone remedying the effects of past discrimination. Unfortunately, there is nothing in this bill that.I can find that does anything more than move us up now to a level where we should have been in 1968.

We still have not figured out how to address past discrimination. I am not saying that critically, because I think we ought to pass this bill and then decide, after 3 or 4 years, how well it is working and what additional measures might be taken.

There are three tables attached to my testimony.

The first shows the fact that discrimination is still pervasive. The proportion of black households living in new housing, housing built within the last decade, in 1970, was 4.5 percent for owners and 9.4 percent for renters, far below the proportion of blacks in the population as a whole.

All right; you say, there was no fair housing legislation then. Well, there has been very little improvement since the enactment of title VIII. Between 1970 and 1976 only 3.3 percent of new suburban owner-occupied homes and only 7 percent of renter-occupied homes were occupied by blacks.

The fact is that there is no perception on the part of blacks or many real estate people that the fair housing provisions are real. They are like parking tickets. People ignore them. If you want to park somewhere and you know that the fine is going to be $2 if you get a ticket and your car won't be towed, you park there. Now that we have cars being towed away people don't park quite so casually in "No Parking" zones.

The same thing is true with fair housing enforcement.

There has been a substantial increase in blacks moving to suburbs, which I think is a statistical abberation. Blacks are moving to the suburbs at an increasing rate. But, unfortunately, it's not an indication of open housing. It's simply the fact that neighborhood change from white to black has crossed city boundaries. So we have suburban neighborhoods changing, but we don't have much more open housing opportunities.

Moreover, the rate of black movement from central cities to suburbs is still substantially below that of whites. From 1970-76, 14.7 percent of all whites moving within the same metropolitan area moved from central cities to the suburbs, but only 10 percent of black movers did.

People say this may be just the result of income. It may not be housing discrimination. The fact is that black incomes are lower

and, therefore, they cannot afford the same kind of housing. Well, that may be part of it, but income alone cannot explain the disparities between black and white occupancy of new housing.

Again, between 1970 and 1976, 20 percent of those purchasing new housing had incomes below $7,000, but only 4 percent of black home buyers were in this income range. Well, it should not matter whether they are white or black if your income is below $7,000; it's difficult to purchase a house. But it should be no more difficult for blacks than it is for others.

For rental housing, the picture is very different, and this is largely a result of the number of assisted housing units which became available in the 6 years between 1970 and 1976: 40 percent of blacks moving into new rental housing but only 30 percent of whites, had incomes below $7,000.

The explanation here lies in a selective and discriminatory housing market. A sales market which is not really open to blacks and other minorities compared to a rental market which, because of the substantial amounts of federally assisted housing, was, in fact, open to minorities to an unprecedented degree.

I think the task before us is to see that there is no difference, in fact or in perception, between publicly assisted housing and private housing in availability to people without regard to their race, their religion their sex, their age, or their family composition. That is what we see as the thrust of this bill.

There is some additional material in the testimony which points out another consequence of discrimination and segregation. That is the confinement of minority people to older substandard neighborhoods, and that is the explanation of the much higher incidence of substandard housing for minorities, particularly blacks, and also for households headed by women.

This is the reason we need this legislation, because discrimination is pervasive. We have not only the experience of the League of Women Voters, the NAACP, and the local chapters of the National Urban Coalition, but we have the statistics from the Federal Government that analyze housing conditions of blacks and other minorities.

We support this legislation as a major step in dealing with discrimination, and I would like in closing to quote very briefly from the statement of a former Secretary of HUD, Carla Hills. She also made civil rights a high priority in the 20 months she was at HUD. I think she stated the need for this legislation as cogently as anybody can.

Ms. Hills said, in testimony before this committee a couple of years ago, that the present title VIII enforcement provisions are an invitation to intransigence on the part of the people owning or operating housing.

In the vast majority of cases, the burden of obtaining enforceable relief falls upon the individual complainant. The current right of the person aggrieved to initiate private action is virtually meaningless, since relatively few victims of discrimination have the resources and ability to sustain the burden of Federal court litigation.

Not only are we finding it increasingly difficult to provide meaningful relief to persons injured in discriminatory housing practices, but we are also finding it equally difficult to maintain adequate administrative controls in the timely processing of HUD complaints.

Respondents know all too well that HUD has no meaningful enforcement power. Many have virtually ignored our conciliation efforts because they have no induce-

500

ment to cooperate. In effect, the present law, in relying upon conciliation, is an invitation to intransigence.

In our view, the presence of effective enforcement machinery would go far toward expediting the processing and the resolution of complaints and would, accordingly, substantially assist the Department in carrying out its fair housing responsibilities.

The enforcement provisions of the amendments before you effectively address these problems. I quoted Ms. Hills because I think it should be emphasized that this is not a question of which party is responsible for administering title VIII. It's not a partisan question. It's a question of basic human rights and basic equity.

Finally, I would like to refer just briefly to the comments or question asked earlier by Mr. Hyde about the appropriateness of cease and desist power, and whether we should go to the courts instead.

It seems to me we are dealing here with a question basically of law enforcement, and I think to draw the analogy of where you go to court is wrong.

HUD is going to play the role of the policeman, and I don't think anyone would say that a policeman charged with maintaining law and order should not stop a robbery, for example, which is taking place because first he should go to court.

It seems to me that the analogy here is that HUD should be responsible and is made responsible and given the power to carry out its responsibility under this legislation with provision later for judicial review if the occasion for judicial review arises.

Thank you very much. We urge the prompt enactment of the bill and we offer you our full support.

[The full statement follows:]

STATEMENT OF CUSHING N. DOLBEARE, PRESIDENT, NATIONAL LOW INCOME HOUSING COALITION

STATEMENT ON THE FAIR HOUSING AMENDMENTS OF 1979

The National Low Income Housing Coalition is pleased to support S. 506 and H.R. 2540, the Fair Housing Amendments of 1979. Enactment of the legislation will add substance to the promise and responsibilities of Title VIII of the 1968 Civil Rights Act.

The National Low Income Housing Coalition is a relatively new organization, concerned, as our name implies, with the housing problems of low income people. The Coalition's membership includes both individuals and local, state, and national public interest organizations. Our Board of Directors is composed of representatives of more than 40 such organizations. Our predecessor organization, the Ad Hoc Low Income Housing Coalition, has been active since 1974 in pressing for legislation to deal adequately with the housing problems of low income people.

An essential element of adequate housing for low income people is freedom of housing choice. Housing choice is now denied both by lack of an adequate supply of housing within the means of lower income people and by pervasive discrimination which limits access to the housing that is or may become available.

Federal housing policies and practices must bear a large share of the blame for the segregation which exists and persists in our society. For the better part of two decades after the end of World War II, thanks in large part to the mortgage insurance programs of the Federal Housing Administration and the Veterans Administration and to relatively low—by today's standards—housing costs and interest rates, almost any white family where the husband was steadily employed could purchase a new suburban house. Millions did so. Left behind were the minority people excluded from the new housing market. For most of this period, racial segregation was encouraged by the FHA: the race of the purchaser was explicitly considered in determining eligibility for FHA insurance.

Thus, it is no exaggeration to say that FHA created the white suburbs—that it was a prime mover in bringing about the two societies, one white and one black, that was decried by the Kerner Commission in 1968 and that it is these federal

501

policies which were responsible for many of the difficulties of our distressed urban areas.

This history is worth noting because the responsibility to remedy the effects of past discrimination has been a basic element of compliance with Title VI, prohibiting discrimination in federal programs.

We have made little progress in fair housing in addressing present discrimination, let alone remedying the effects of past discrimination. As Table 1 shows, the proportion of black households living in new housing (built within the last decade) in 1970 was 4.5 percent for owners and 9.4 percent for renters—far below the proportion of blacks in the population as a whole. There was some improvement between 1970 and 1976, when the proportion of blacks living in new units rose to 6.6 percent for owners and 11.0 percent for renters. Only 3.3 percent of new suburban owner-occupied homes and 7.2 percent of renter-occupied homes built during this period were occupied by blacks.

There has, during this decade, been a substantial increase in movement of blacks from central cities to suburbs. However, this phenomenon is not necessarily an indication of increasing desegregation and housing opportunity. Rather, in many instances, it represents a statistical aberration, as neighborhood change has crossed city boundaries. Moreover, the rate of black movement from central cities to suburbs is still substantially below that of whites. From 1975 to 1978, 14.7 percent of all whites moving within the same metropolitan area moved from central cities to suburbs, while only 10.1 percent of black movers did so. (Current Population Reports, Geographical Mobility: March 1975 to March 1978, Table 1.)

Income is obviously a factor, both in moves from city to suburb and in moves into new housing. But income alone cannot explain the disparities between black and white occupancy of new housing. Again, between 1970 and 1976, 21.1 percent of whites purchasing new housing had incomes below $7,000, but only 3.6 percent of black home buyers were in this income range. For rental housing, largely as a result of the assisted housing units which became available between 1970 and 1976, the picture was different: 40.1 percent of blacks, and only 29.7 percent of whites, occupying new rental housing had incomes below $7,000.

The explanation must lie in a selective and discriminatory housing market: a sales market which is not freely open to blacks and a rental market which, because of substantial numbers of federally assisted units which are in fact open to minorities, does not discriminate to the same degree.

In other words, fair housing legislation has not had the kind of impact on the housing market and on housing opportunities which is needed.

One consequence of discrimination, just discussed, is the limitation on freedom of mobility and continued segregation. A second consequence, more immediate to many low income people, is confinement to older neighborhoods of poorer housing quality. Minority people, by and large, pay higher percentages of their incomes for shelter which is inadequate.

Table 2 compares the incidence of inadequate housing for black, Hispanic, and female-headed households with that for the total population. The incidence of substandard housing for blacks is more than double that of the entire population; for Hispanics, it is almost double; for female-headed households, regardless of race, it is substantially higher. Households headed by black or Hispanic women are far worse off. Again, income has some role to play in this situation, but, after adjusting for income, minority and female-headed households are far more likely to live in inadequate housing than are whites. And, they are likely to pay more. In 1976, 46.1 percent of black households with incomes below $3,000 per year paid more than 35 percent of their incomes for shelter; 35.1 percent of Hispanic households and 32.9 percent of white households were in this income range.

Table 3 cites an analysis, prepared by the Urban Institute, of characteristics of households living in inadequate housing in 1977. Eighty percent are income-eligible for Section 8—that is, with incomes below 80 percent of the median. One-third are home owners—a population group whose problems are insufficiently addressed by housing programs. Thirty-four percent are minorities.

Households headed by a woman, with children, with no spouse present have the most critical housing problems of any group. There are an estimated 5 million such households and 15 percent, or 700,000 are in inadequate housing. Renter households headed by a woman comprised 26.4 percent of all renter households with two or more people in 1976, but they were 38.5 percent of all households involuntarily displaced by public or private action.

Adequate enforcement of fair housing legislation will not, in and of itself, solve the houing problems of low income minority and female-headed households. But, without adequate enforcement, their already difficult problems are exacerbated.

502

Former HUD Secretary Carla A. Hills has described the present Title VIII enforcement provisions as "an invitation to intransigence."

In the vast majority of cases, the burden of obtaining enforceable relief falls upon the individual complainant. The current right of the person aggrieved to initiate private action is virtually meaningless, since relatively few victims of discrimination have the resources and ability to sustain the burden of Federal court litigation. Authorizing suits for individual relief in the name of the Secretary of HUD would help to assure that acts of discrimination are redressed and, equally important, deterred.

Not only are we finding it increasingly difficult to provide meaningful relief to persons injured in discriminatory housing practices, but we are also finding it equally difficult to maintain adequate administrative controls in the timely processing of HUD complaints. Respondents know all to well that HUD has no meaningful enforcement power. Many have virtually ignored our conciliation efforts because they have no inducement to cooperate. In effect, the present law, in relying upon conciliation, is an invitation to intransigence. In our view, the presence of effective enforcement machinery would go far toward expediting the processing and the resolution of complaints and would, accordingly, substantially assist the Department in carrying out its fair housing responsibilities.

The enforcement provisions of the Fair Housing Amendments of 1979 effectively address the problems cited by Secretary Hills, and other HUD Secretaries concerned with the inadequacy of the present law. By providing HUD with both "cease and desist" powers and standing to undertake court action, the bill would give HUD the power it needs to be taken seriously. By providing individuals with the alternative of direct court action, and provision of attorney's fees, the bill guards against the consequences of any dereliction on the part of HUD.

We also support the provisions of the bill addressed to "redlining". Insurance redlining has been a major problem in many low income areas and has contributed to displacement of low income and minority people, as owners of rental property have been unable to obtain insurance or unwilling to pay the rates involved. This has contributed to the housing abandonment which is still a major cause of displacement. In this connection, we strongly support the inclusion of an affirmative obligation to enforce fair housing laws on federal agencies regulating financial institutions.

We urge the prompt enactment of the bill.

TABLE 1.—BLACK OCCUPANCY OF EXISTING AND NEW HOUSING, U.S. AND SUBURBS (INSIDE METRO AREAS, NOT IN CENTRAL CITIES)

| | Total | Black | Percent black |
|---|---|---|---|
| Total U.S.: | | | |
| 1970, units existing in 1960: | | | |
| Owner-occupied | 29,366,000 | 2,021,000 | 6.9 |
| Renter-occupied | 16,797,000 | 2,914,000 | 17.3 |
| 1970, units built since 1960: | | | |
| Owner-occupied | 10,478,000 | 476,000 | 4.5 |
| Renter-occupied | 5,288,000 | 497,000 | 9.4 |
| 1976, units built since 1970: | | | |
| Owner-occupied | 7,786,000 | 414,000 | 6.6 |
| Renter-occupied | 3,734,000 | 411,000 | 11.0 |
| Suburbs: | | | |
| 1970, units existing since 1960: | | | |
| Owner-occupied | 10,814,000 | 348,000 | 3.2 |
| Renter-occupied | 4,064,000 | 342,000 | 8.4 |
| 1970, units built since 1960: | | | |
| Owner-occupied | 5,031,000 | 127,000 | 2.5 |
| Renter-occupied | 2,210,000 | 91,000 | 4.1 |
| 1976, units built since 1970: | | | |
| Owner-occupied | 3,527,000 | 116,000 | 3.3 |
| Renter-occupied | 1,685,000 | 121,000 | 7.2 |

Source: U.S. Census of Housing, 1970, Components of Inventory Change, United States and Regions, HC(4)-1, Table 2; 1976 Annual Housing Survey, Part A, General Housing Characteristics, Tables A-1 and A-6.

503

TABLE 2.—INCIDENCE OF INADEQUATE HOUSING, 1976

[Units in thousands]

| | | Household head | | |
|---|---|---|---|---|
| | Total | Black | Hispanic | Female |
| Total units | 74,080 | 7,640 | 3,298 | 17,854 |
| Without major flaws | 66,906 | 6,008 | 2,689 | 15,705 |
| With major flaws | 7,174 | 1,632 | 609 | 2,149 |
| Plumbing | 1,946 | 614 | 109 | 603 |
| Kitchen | 1,342 | 442 | 91 | 381 |
| Maintenance | 3,046 | 849 | 254 | 1,088 |
| Public hall problem | 303 | 108 | 39 | 121 |
| Heating | 1,156 | 51 | 164 | 235 |
| Electrical | 68 | 26 | 6 | 17 |
| Sewage | 945 | 348 | 37 | 261 |
| Toilet access | 1,352 | 268 | 148 | 286 |
| | Percent of all units | | | |
| Total units | 100.0 | 100.0 | 100.0 | 100.0 |
| Without major flaws | 90.3 | 78.6 | 81.5 | 82.0 |
| With major flaws | 9.7 | 21.4 | 18.5 | 12.0 |
| Plumbing | 2.6 | 8.0 | 3.3 | 3.4 |
| Kitchen | 1.8 | 5.8 | 2.8 | 2.1 |
| Maintenance | 4.1 | 11.1 | 7.7 | 6.1 |
| Public hall problem | 0.4 | 1.4 | 1.2 | 0.7 |
| Heating | 1.6 | 0.7 | 5.0 | 1.3 |
| Electrical | 0.1 | 0.3 | 0.2 | 0.1 |
| Sewage | 1.3 | 4.6 | 1.1 | 1.5 |
| Toilet access | 1.8 | 3.5 | 4.5 | 1.6 |

Source: HUD, How Well Are We Housed? No. 1, Hispanics; No. 2, Female-headed households; No. 3, Blacks.

Note.—Many units have more than 1 major flaw. HUD defines defects as follows: Plumbing: Unit lacks or shares complete plumbing (hot and cold water, flush toilet, and bathtub or shower inside the structure); Kitchen: Unit lacks or shares a complete kitchen (installed sink with piped water, a range or cookstove, and mechanical refrigerator); Sewage: Absence of a public sewer, tank, cesspool, or chemical toilet; Heating: there are no means of heating or unit is heated by unvented room heaters burning gas, oil, or kerosene, or unit is heated by fireplace, stove, or portable room heater; Maintenance: any two of leaking roof, open cracks or holes in interior walls or ceiling, holes in floor, large areas (over 1 sq. ft.) of broken plaster or peeling paint; Public hall: Any 2 of no light fixtures, loose, broken, or missing steps, loose or missing stair rails; Toilet access: Access to sole toilet is through 1 of 2 or more bedrooms used for sleeping (children under 18 in household); Electrical: Unit has exposed wiring and fuses blew or circuit breakers tripped 3 or more times in last 90 days and unit lacks working wall outlet in 1 or more rooms.

504

TABLE 3.—CHARACTERISTICS OF HOUSEHOLDS LIVING IN INADEQUATE HOUSING, 1977

| Household group | Number of households (millions) | Number in inadequate dwellings (millions) | Percent of group in inadequate dwellings | Percent in inadequate dwellings— | | | |
|---|---|---|---|---|---|---|---|
| | | | | Income-eligible for sec. 8 | Minorities | Homeowners | Metropolitan areas |
| Husband-wife, no children .. | 13.9 | 0.6 | 4 | 45 | 25 | 39 | 60 |
| Husband-wife, under 30 with children ................. | 5.5 | .5 | 9 | 62 | 30 | 28 | 60 |
| Husband-wife between 30 and 61 years, with children ............................. | 19.2 | 1.0 | 5 | 48 | 31 | 52 | 57 |
| Female (or male)-headed, with children, nonelderly | 5.0 | .7 | 15 | 85 | 58 | 19 | 72 |
| Nonelderly individuals or households of single persons............................... | 11.6 | 1.5 | 13 | 69 | 33 | 15 | 69 |
| Husband-wife, elderly ........ | 9.0 | .5 | 5 | 74 | 28 | 56 | 43 |
| Other elderly households .... | 9.1 | 1.0 | 11 | 87 | 29 | 42 | 52 |
| Total ..................... | 73.3 | 5.7 | 8 | 80 | 34 | 33 | 61 |

Source: Urban Institute, cited in hearings of Task Force on Assisted Housing, Subcommittee on Housing and Community Development, House Committee on Banking, Finance and Urban Affairs, 1978, pt. 2, p. 1533.

Mr. DRINAN. Thank you very much for your encouraging and very helpful statement.

I will yield in a minute to my colleague, the gentleman from Missouri, but let me just ask a factual question of Ms. Ridings about the statement that she has about Boston, and it's a good statement, at the bottom of page 5.

"For example, public housing in Boston is still segregated despite court order."

Either now or later, I think that it would be very helpful to expand, because to the best of my knowledge that particular point has not been brought out in testimony before. And I think that it re-enforces everything we have been saying.

[Ms. Ridings response follows:]

Public housing in Boston represents approximately 10 percent of Boston's housing stock. In 1975, a coalition of Boston Housing Authority tenants (Perez et. al.) sued the Boston Housing Authority for poor management and maintenance. As the judge reviewed the case, he made a finding of discriminatory housing practices on the part of the Housing Authority. The judge issued an order requiring the Housing Authority to desegregate. The court-appointed master has reported that the Housing Authority is not in compliance with the order. Public Housing remains segregated in Boston.

The situation in Boston is not unique, but serves as an example of federal departments' and agencies' failure to carry out their obligations under Title VIII. For instance, over the past 9 years, HUD has provided the Boston Housing Authority with $52 million for public housing modernization despite the segregation pattern. That is why we support the amendment clarifying federal responsibility under Title VIII.

Mr. DRINAN. Mr. Volkmer?

Mr. VOLKMER. I wish to commend each of you on your statements. I don't have specific questions.

I would like first to ask one general question that has been brought out by Ms. Dolbeare. This bill cannot correct this, but I am

wondering if any of you have any opinion as to the economics of the situation causing racial imbalance in housing.

As I read your statistics, if you don't have the money, it does not make any difference if housing is open, does it? I am not saying we should not pass it, but still, the problem is the Congress is going to have to address the problem of how to get the money in order to get the house that is available.

Ms. DOLBEARE. I think, Mr. Volkmer, there are two related questions. Obviously, without an adequate supply of housing it's more difficult for everyone.

On the other hand, I think the information in my statement makes it very clear that if you have a black household and a white household with exactly the same income, the chances are much greater that the white household will be able to purchase a new house, or move into rental housing, than, the black household will be able to. It seems to me that that is what this bill can address and does address.

Now, that in itself would be a major step toward enabling minority people to improve their housing conditions and that would in my view, enable us to right the inequity. I didn't cite the statistics but they are in my statement, that blacks are more than three times as likely as whites to live in substandard housing; Hispanics are almost twice as likely as whites to live in substandard housing.

I think when you equalize housing opportunities, even if you don't do anything more to add to the supply of housing, you eliminate a major problem.

Mr. VOLKMER. What about the cost?

Ms. DOLBEARE. There is no cost involved. I am assuming we continue to be as inadequate as we currently are in dealing with the problem of housing supply.

By permitting continued discrimination, we are loading the impact of our failure to provide a decent supply of housing onto minority people, blacks, Hispanics, and also onto households who are headed by women. Just in the name of justice we ought to address this problem and now.

Mr. VOLKMER. I won't argue that.

Ms. DOLBEARE. But in addition we will clearly not make it possible for everybody to obtain a decent house at costs they can afford unless we find ways to substantially expand the stock of assisted housing in this country.

The coalition is not only supporting expanded programs, but we are also actively involved in a search for some new ideas and proposals which will make it possible, in our view, to meet the housing needs of low income families more adequately and at less cost than our current programs.

Mr. VOLKMER. Would you like to say something on that?

Ms. SIMMONS. No.

Mr. VOLKMER. The other thing I would like to address, Mr. Holman is not here, and Congressman Drinan——

Mr. DRINAN. If the gentleman will yield, would the woman replacing Mr. Holman identify herself?

Ms. SOLOMON. I am Sandra Solomon, director of Government Affairs at the National Urban Coalition.

Mr. VOLKMER. This is directed to the same issue.

When you look at the question of the retrieval of referrals from the State agencies, the issue is whether it should be discretionary. I don't believe it should have to remain there unless they consent to sending it back.

My question is, How long should that be permitted? Should it be unlimited time, or what? To me, that is more of a problem.

Present law says 30 days, you have to do it within 30 days, and if you don't you don't get it back. I think personally it should be longer than 30 days, but I don't know if it should be indefinite either.

Ms. SOLOMON. I think there should be some time limitation, although I think it could be written in a flexible way, and perhaps we could give you some opinions on that for your use.

Mr. VOLKMER. We have had various witnesses testify on this. And I think the preponderance of the testimony, other than the witness from the Virginia agency, including the Secretary, thought HUD should have some authority to be able to retrieve that referral.

Ms. SOLOMON. I agree with you. What I was saying on the question of time limitation is I think there should be one. As to what time limitation would be most workable, I have not put a lot of thought to that, and would want to get back to you with a written statement.

Mr. VOLKMER. I would appreciate that.

Mr. DRINAN. Thank you, Mr. Volkmer.

During the hearings we have had a good deal of evidence about providing expenses for expert witnesses. Would any of the witnesses here want to contribute to that dialog? How important are expert witnesses?

Some people say that it's essential and that if we don't provide for reimbursement for essential witnesses then we are really denying an essential right to the people who have grievances about housing discrimination.

Ms. SIMMONS. Mr. Chairman, I think we certainly would support that and, as a matter of fact, I would like to, if I may, provide the committee in writing with a suggestion on the use of testers and on time limitations on other agencies handling housing discrimination complaints.

Mr. DRINAN. That would be most welcome.

[The information follows:]

### TIME LIMITATIONS ON OTHER AGENCIES THAT HANDLE HOUSING DISCRIMINATION COMPLAINTS

We believe the ultimate responsibility for the enforcement of laws relating to housing should be with the Secretary of HUD; therefore, there should be a time limitation placed on referrals to other agencies. We suggest amending Section 810(a)(4) by adding the following language thereto:

"Any such Federal Agency, in exercising its authority shall commence proceedings to dispose of any allegation of housing discrimination within a period of ninety days from the date it assumes jurisdiction over same and shall finally dispose of same within one hundred and eighty days."

### HOW IMPORTANT ARE EXPERT WITNESSES?

Expert witnesses are important inasmuch as they bring a breadth of knowledge about an issue that can be extremely helpful in problem analysis and/or decision making. Such witnesses are essential in the class action and pattern and practice cases, in order to obtain data on financial, insurance and reinsurance practices,

507

statistics, historical housing practices, etc., and they are certainly helpful in all cases because of the subtle nature of housing discrimination. If the perceived trend toward allowing regular witness fees for those subpoenaed by either side is extended to include expert witness fees, it is possible that respondents could call numerous expensive expert witnesses at government expense, while complainants who are often unrepresented, would be without the benefit of even knowing whom to call. The Secretary will most likely be able to call her own witnesses from within the government. Therefore, we suggest limiting the payment of fees of expert witnesses to parties who are unable to call them without unduly burdening themselves financially and the number of such experts.

Mr. DRINAN. Mrs. Dolbeare?

Ms. DOLBEARE. In many cases it perhaps would not be critical to have expert witnesses, but where it is necessary it's so likely that the plaintiffs will not have the resources themselves, that I certainly think there ought to be a provision in the bill.

One of the problems that I have run into over the years is that very frequently people who are being discriminated against, because discrimination now has become rather sophisticated, don't realize they are being discriminated against. If they find out that they have been discriminated against, they hesitate, thinking they don't have the capacity and it's going to be their word against somebody else's. So they really need to have access to attorneys and access to expert witnesses, in order to be able to make a fair case.

Mr. DRINAN. We do, as you know, provide for counsel fees.

Ms. DOLBEARE. Right.

Mr. DRINAN. But the case law, as I understand it, on expert witnesses, goes both ways. We have the problem if we insert that, obviously, we have to make some estimate of the costs, and in the spirit of the day, that might be difficult to set forth in a bill.

We will have enough burdens on the bill.

Did anybody else want to respond to that?

Ms. RIDINGS. Are we talking now specifically about the question that was raised earlier like when the subpenas are issued by the Secretary and by the respondent?

Mr. DRINAN. Yes.

Ms. RIDINGS. I probably should respond in writing on this, but I would like to raise a question that I ran into, a difference in legal judgment on the way the bill is worded, and I don't know if this will clarify things or maybe it will make it more confusing.

I had asked for some legal interpretation of this particular section 810 where the witnesses:

Upon written application to the Secretary, a respondent shall be entitled to the issuance of a reasonable number of subpoenas by and in the name of the Secretary to the same extent and subject to the same limitations as subpenas issued by the Secretary under clause (A) of this paragraph.

(C) Witnesses summoned by subpoena of the Secretary under this title shall be entitled to the same witness and mileage fees as are witnesses in proceedings in United States district courts. Fees to a witness summoned by a subpoena requested by the respondent shall be paid by the respondent.

The way I initially read this, and didn't realize there was a question until it was raised at the Senate hearing, the way I had read it was that the expert witnesses subpenaed by the Secretary as well as those requested by the respondent in the name of the Secretary were covered under the fee portion.

Mr. DRINAN. Your question is too difficult for a Member of Congress.

Counsel?

Ms. COOPER. I think what this is trying to say is that witnesses that are subpenaed are entitled to a witness fee the same way they would be if they were subpenaed to court, and that consists of a standard fee of something like $20 or $25 a day.

Whether that includes the additional cost of an expert witness is unclear under the case law and that is what is at issue.

Ms. RIDINGS. The people I asked also said it was unclear. That is why I was not sure.

Ms. COOPER. The last sentence refers to the $20 or $25.

Ms. RIDINGS. And the extra witnesses that have responded, right.

Mr. VOLKMER. May I interject?

Mr. DRINAN. Yes.

Mr. VOLKMER. What I think we are getting at is the expert witness who wants another $250 to come and testify.

Ms. RIDINGS. I will certainly pass that back then.

Ms. DOLBEARE. Could I make one more comment? This is a personal comment, because I have been an expert witness from time to time. I think that it would be appropriate, if the provision is included, that there be some limit on the amount of compensation and perhaps on the number of expert witnesses.

Mr. VOLKMER. If we included that, that would be part; that is a good idea.

Mr. DRINAN. May I ask the witnesses for their wisdom and another question that has come up, the use of testers and, according to knowledgeable people, testing is an essential device to know whether unlawful acts have occurred.

HUD is very reluctant to spend appropriated money for this purpose, but I wonder if you would have any comments on how your organizations react to the use of testers?

Ms. SIMMONS. Mr. Chairman, my organization has used testers, as a matter of fact, over the years because that is the only way you can find out whether or not there was discrimination and we have called it by different names, testers, sandwich technique, or whatever you want to call it.

I think because in some places, and I would say particularly in the Northern and Western States and cities where discrimination may be a little bit more subtle, that this use is especially helpful.

I recall, for example, on the west coast when we were trying to find out whether or not there was discrimination based on complaints we had received, we found out in a lot of instances financial institutions were discriminating because if a black person wanted to purchase a home in a predominantly white neighborhood they could not get the same kind of loan commitment.

They could get an 80 percent commitment, let's say, if they were going to purchase in a black neighborhood, and less loan commitment other places, and by using testing we found persons with the same kind of profile in terms of financing that if they were white they got a different loan commitment and if they were black they did not.

So I definitely think that it is essential that you use it, and would like to present to you something in writing on that.

Mr. DRINAN. We would be very, very grateful.

[The information follows:]

We strongly favor the use of the testing or "sandwich" technique inasmuch as it is a very practical forthright and essential device used to ascertain discriminatory practices in the sale and/or rental of housing.

Absent the use of this technique, the only way to demonstrate discrimination is to find homeseekers of different races who are willing to cooperate. We know of cases across the country, reported to us by our branches and youth units, where Blacks could not buy into some neighborhoods directly. they would have to find a cooperating white person to buy the house, then transfer ownership to them. Persons seeking homes are most likely to be interested in finding housing rather than pursuing their right to housing through participation in a fair housing case. Additionally, so many victims of discrimination are unaware that they have been victimized or they lack the proof to demonstrate such discrimination. Testing, therefore, is essential to combat massive discrimination.

We can see no problem with HUD's indirect support of the testing practice and would support Mr. Volkmer's comment re training of volunteers to serve as testers. There is a good bit of legislative history of H.R. 2540 built on the HUD-financed testing program conducted by NCDH. Since H.R. 2540 allows federal financial assistance to private fair housing groups, it may be preferable to create a legislative history showing such assistance may be used for testing programs. If that is done, no change would be needed in the text of the bill.

Mr. VOLKMER. Mr. Chairman?

Mr. DRINAN. Yes.

Mr. VOLKMER. May I interrupt? Were those staff people or volunteers or both?

Ms. SIMMONS. Volunteers. The association has a very small staff, and we work through volunteers.

Mr. DRINAN. Yes.

Ms. DOLBEARE. I think that the use of testers is absolutely critical. I think otherwise you are likely to find only the most flagrant kinds of violations. I can cite some experiences from Philadelphia in support of that.

Mr. DRINAN. Would you speak to the second question, should HUD be given the authority in the bill to use testing?

Ms. DOLBEARE. Absolutely.

Mr. DRINAN. With Federal funds?

Ms. DOLBEARE. With Federal funds.

Mr. DRINAN. Can you understand their difficulties with this?

Ms. DOLBEARE. Well, I can understand their difficulties in obtaining the appropriations they need to carry out the responsibilities that they have. I cannot understand why they would have difficulty with the concept and the need to do this. They manage to get OMB to approve an appropriation in next year's budget, of $3.7 million for fair housing enforcement.

Mr. DRINAN. But above and beyond that?

Ms. DOLBEARE. Above and beyond——

Mr. DRINAN. They don't want to have Federal officials really misguiding citizens of this country, and they feel that there would be an adverse reaction to that.

Ms. DOLBEARE. I just have to totally disagree. What is needed is an understanding on the part of the public of the importance of testing. Testing is different from entrapment. I can understand and I share a reluctance about entrapment.

But I have seen sophisticated staff people who have been involved in fair housing for years go into real estate offices and ask questions and think they were not being discriminated against. The only way to identify the actuality of discrimination was when somebody else went in shortly after and asked about the same unit

47-614 O - 79 -- 33

or the same questions. Only then would you find discriminatory treatment.

So, in my view, it's absolutely impossible to get effective enforcement without the use of testing. Therefore, I think it's a Federal responsibility and should be a responsibility for HUD to implement a testing program. I have worked with volunteers. This is a very difficult thing for volunteers to do. You need Federal funds to support the volunteer effort as well, probably.

That is the pattern which would be used.

Mr. DRINAN. Ms. Ridings?

Ms. RIDINGS. The league would certainly agree with that. Without just simply repeating what they had said, I would just like to add we would see the testing process as simply an expansion of very esssential monitoring processes that are quite obvious in some other Federal programs and that are conducted with Federal funds.

Ms. SOLOMON. This litigation allows expanded assistance to local civil rights groups which could be used for this purpose. It would be possible to deliver the programs through these groups where they exist.

Mr. VOLKMER. Mr. Chairman?

Mr. DRINAN. Yes.

Mr. VOLKMER. May I suggest that rather than employ the number of testers that may be needed to do an adequate job—although you may want to do that—why not train volunteers to do it so you end up with a work force of many who live in the locality? That can bring the problem to the attention of the media and other people. And it's not the Government telling them, which some people would suspect.

To be honest with you, HUD does not have the best name in certain areas of the country, and not that I agree with that, but I am recognizing something. But I believe the League of Women Voters and civil rights groups could participate and be trained to do it, and then they can tell the local people, "Hey, this is really going on, you see, right in the neighborhoods."

Ms. RIDINGS. That is an excellent suggestion. Although it would not mean that this would be entirely free.

Mr. VOLKMER. No, of course not.

Ms. RIDINGS. Of course, it would have to be backed up with a commitment of the Federal dollars, too.

Mr. VOLKMER. Yes.

Mr. DRINAN. Let me move onto another point that has come up from time to time, that in title VII of the Civil Rights Act of 1974 all persons and groups, they are not victims of discrimination, are allowed to file suits with the EEOC regarding discriminatory employment practices they observe.

The bill before us limits access to HUD to aggrieved persons.

What do members of the panel think about access to the administrative process? Should it be opened further by allowing individuals and groups who are not aggrieved parties to file complaints with HUD?

Ms. SIMMONS. May we address that in writing, please?

Mr. DRINAN. Yes; we will be happy to have you furnish that. [The information follows:]

511

We believe that the necessity for broadening the access to the administrative process has been considerably lessened by the Supreme Court's decision in *Gladstone* v. *Village of Bellwood* granting standing to sue to individuals and entities not immediately the victims of the discriminatory action. Additionally, the language of H.R. 2540 (drafted prior to the Supreme Court's decision) intended the same result. We recommend that rather than broadening the language of the bill, that the Secretary in her rule making capacity issue rules that would allow organizations to petition her to issue an administrative complaint.

Ms. DOLBEARE. I am not a lawyer, but it seems to me it turns a little bit on the definition of "aggrieved." I would regard myself as aggrieved if I happened to be living in a community and that community excluded other people whom I would prefer to have as neighbors. And so that I think either the definition of aggrieved should be sufficiently broad so that it's inclusive or it should not be limited.

Mr. DRINAN. I thank you. You certainly talk like a lawyer even though you are not formally.

Ms. SOLOMON. We would agree with that position.

Mr. DRINAN. Let us ask, if we may, about your best judgment on the inclusion of the elderly or, on the other side, should we begin to offer protection against discrimination against children or families with children?

Obviously, we don't want to weight the bill down too much, but at the same time, what is your feeling about the exclusion of the elderly because they are elderly from adequate housing?

Ms. SIMMONS. Mr. Chairman, I think you will find in our testimony we asked if you would include the elderly because we find that a large number of elderly people are without adequate food, housing, and shelter, and it appears to us that once our citizens become elderly we forget about them.

And I would think that particularly since now there are great moves being made to try and rehabilitate the central city with persons moving from the suburbs back into the central city and being placed in housing that the elderly or low-income people cannot afford, that it's going to be absolutely necessary for us to give some consideration to them, and I do hope we can expand the provisions to include them because they are the have-nots right now.

Mr. DRINAN. Thank you.

Ms. DOLBEARE. I would have no objection to including them, but I really tend to feel that discrimination is not the major problem there, that it gets back to the question Mr. Volkmer raised of the lack of adequate supply, and in looking at categories of people who are discriminated against, I would certainly urge, this is not the coalition's opinion because we have not taken a formal position on this, but I would certainly urge families with children be excluded because there are documented instances of discrimination, that people with children go to rent two-bedroom apartments and they are told, sorry, no children allowed.

I am not aware of very many instances where people say, sorry, no elderly allowed. Generally, owners are very glad to rent to elderly tenants for a variety of reasons.

Ms. RIDINGS. The league's position basically states equal access to education, employment, and housing, period; so it means equal access. However, we have targeted our programs and our advocacy position primarily to those who have believed over a period of

512

years to be those that are the most discriminated against, which are primarly the poor and those who are in racial minorities.

Mr. DRINAN. I think the fear of some people would be that if we include age as a new basis for discrimination or include the family structure, we would inadvertently be delaying further effective enforcement of the Housing Act of 1969, which was designed primariliy, obviously, for blacks and minorities, and that we would not want to do.

Mr. VOLKMER. Mr. Chairman, just a passing thought, if you included age, period, and said no discrimination because of age, what do you do to those communities that are going up all over the country that are for the elderly only?

Mr. DRINAN. We will allow the Supreme Court to decide that issue.

Counsel reminded me of a decision that came down from the U.S. Supreme Court just the other day, on April 17, and I hope it resolves the question of standing, because in this case *Gladstone* v. *Village of Bellwood*, they did say that a city or municipality has standing to challenge the use of steering, and I would think this would give us an effective way to include something in our bill which would clarify the law and extend or at least implement this ruling on standing.

Ms. DOLBEARE. I can try to provide something for the record later. My recollection is there was a case, rather different case, where somebody sued their local community because of a discriminatory action and the case was dismissed for lack of standing, and I will try to get that.

Mr. DRINAN. That would be very helpful.

One other question that has arisen during the past several weeks and months of hearings is this: An earlier version of this bill which Congressman Edwards and I had last year gave HUD the authority to award damages at the administrative level. This year's bill is silent on that issue.

I wonder how the witness would feel about this question. Should HUD have the authority to award damages at the conclusion of the administrative process, assuming, of course, that discrimination has been established?

Mr. VOLKMER. That would be in the administrative hearing. I want to make sure they understand that.

Mr. DRINAN. Yes.

Ms. DOLBEARE. I would have some concern that that would weight down the bill a little bit and make it harder to get through.

Mr. DRINAN. I think that is one reason that it's not in this year's bill, but when we have beautiful people like yourself, we want to go back and get the perfect bill. But if either of you thinks this would sink the bill, I think we better not bring it up any more.

Ms. RIDINGS. I would like to react to the question you ask before this regarding the *Bellwood* case. The League of Women Voters had a national conference here 2 days last week.

It was primarily concerned with the use of housing and community development funds but, of course, we spent 90 percent of the time talking about housing and fair housing came into its share. We were talking about court cases being brought on discriminatory housing practices.

I can tell you there was a sense of elation among both the lawyers and non-lawyers in our group that, indeed, the *Bellwood* case would make a substantial difference in the standing.

The league groups that were represented there, indeed, felt that their own cases that were now proceeding through the court would have a better chance because that would entitle them to have the same kind of standing to bring those kinds of complaints that you were referring to.

Mr. DRINAN. Thank you. It's one of the few decisions from the Supreme Court we have welcomed in some time.

I wonder if we could have a response from Ms. Ridings about this: The bill expressly makes the Federal agencies liable to suit for failure to affirmatively administer their housing programs.

Would you concur with the HUD Secretary's concern that this will create liability for employees for the individual acts of the employee?

In other words, are we opening up in this bill possible actions against individuals at HUD and that would be a serious problem for HUD itself?

Ms. RIDINGS. It had not occurred to me that that might indeed be the case. I think we were more impressed by the fact that what we saw was the lack of this type of commitment on the part of the Federal agency. We referred to this in our statement. I don't know if I skipped over that portion or not.

We referred, for example, to I think perhaps public housing authorities and I referred to Boston. Boston is certainly not alone. In my own communities there have been great problems with this, and we have not seen HUD taking an aggressive enough position in cleaning up its own house, and we feel that is certainly a critical part of this bill.

It did not occur to me and I had not heard the fear that individual members of the HUD staff, or their area offices or whatever might be held liable for maliciousness; was this their point?

Mr. VOLKMER. Just nonenforcement; in other words, you are not going along with it and providing for enforcement of the law like it should be and, therefore, I sue you because I think you are derelict in your duty or not doing it.

Mr. DRINAN. I think we could probably cure it by another provision of law which would establish the individual liability of any Government employee.

Ms. RIDINGS. I think I see.

Mr. DRINAN. One last point.

Mr. VOLKMER. If any of the others would like to comment in writing, we would appreciate it.

Ms. DOLBEARE. I would like to comment because I think we focus to much on HUD and if you look at the record of the Farmers Home Administration in its housing programs, there are clear patterns of discrimination there, and it just seems to me it's important as a basic right that people be able to sue for nonfeasance and I can supply some material for the record.

Mr. DRINAN. Well, one last point and I guess it's self-evident— that the realtors who have testified before us and others are opposed to this bill because I assume they feel it would be economically disadvantageous to them, and I am not certain if there is any

realistic way by which we can persuade the realtors that this bill will give them the same income they have now or even more.

But would members of the panel have any reflections upon this central difficulty with the entire bill in the estimation of the housing community?

Ms. DOLBEARE. I think many realtors, individual realtors, would be rather relieved by the passage of this bill because there are a great many realtors who feel that they cannot afford to be the only realtors or one of the few realtors among a few realtors who are complying, so that if everyone were able to comply, I think realtors would ultimately find it was to their advantage.

One of the things we found in Philadelphia was frequently realtors assume purchasers wanted them to discriminate, whereas, in fact, the purchasers didn't. If the realtors made the suggestion, then sometimes other realtors would sort of try to read them out of the club, as it were.

So I would think the vast majority of the realtors would welcome effective enforcement of the law, because they would be protected and it would be to their advantage.

Mr. DRINAN. It would be to our advantage if you can produce some of those vast majority and have them come and testify before us.

Mr. Volkmer, any further questions?

Counsel, questions?

We thank you all for a very helpful morning.

You have given us a good foundation for continuation of the work on this bill.

The subcommittee stands adjourned.

[Whereupon, at 11:45 a.m. the Subcommittee on Civil and Constitutional Rights adjourned.]

# FAIR HOUSING AMENDMENTS ACT OF 1979

## WEDNESDAY, MAY 23, 1979

House of Representatives,
Subcommittee on Civil and Constitutional Rights,
Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met at 9:35 a.m. in room 2226 of the Rayburn House Office Building, the Honorable Don Edwards, (chairman of the subcommittee) presiding.

Present: Representatives Edwards, Drinan, and Sensenbrenner.

Staff present: Janice Cooper, assistant counsel; and Thomas Boyd, associate counsel.

Mr. Edwards. The subcommittee will come to order.

Our first witness today on H.R. 2540, the housing bill, is Ms. Willia Knighton representing the Consortium Concerned with Developmentally Disabled Task Force on Housing.

H.R. 2540 includes the handicapped as a protected class under title VIII. Some clarification appears to be needed as to what scope of coverage is intended. However, I think it's fair to say the sponsors of this legislation wish to create a Federal statutory basis for challenging certain land use controls that unduly restrict the location of housing for the handicapped.

I understand that the consortium is particularly interested in this aspect of the bill, and I am pleased to welcome you here today.

Ms. Knighton, you may come to the witness table and introduce your colleague and proceed with your statement.

## TESTIMONY OF WILLIA KNIGHTON, CONSORTIUM CONCERNED WITH THE DEVELOPMENTALLY DISABLED, ACCOMPANIED BY STEPHANIE MENSCH

Ms. Knighton. Mr. Chairman, members of the committee, my name is Willia Knighton. I am the former president of the District of Columbia Society for Retarded Citizens. With me I have Ms. Stephanie Mensch who is the legislative assistant for the National Association of State Mental Retardation Program Directors, Inc.

I am the former president of the District of Columbia Association for Retarded Citizens. I have served on the Governmental Affairs Committee of the National Association for Retarded Citizens and have served on a special advisory committee to the President's Committee on Mental Retardation. I have a 27-year-old daughter who is mentally retarded. Today I address this committee on behalf of the Consortium Concerned with the Developmentally Disabled's Task Force on Housing.

The CCDD Housing Task Force is composed of the following national organizations: The National Association for Retarded Citi-

516

zens, the National Association of Private Residential Facilities for the Mentally Retarded, the National Association of State Mental Retardation Program Directors, and the United Cerebral Palsy Associations. The National Association of State Mental Health Program Directors has also endorsed this statement.

The Consortium Concerned with the Developmentally Disabled supports H.R. 2540, especially those provisions that would add handicapped persons to the list of classes specifically protected by the Fair Housing Act of 1968. This legislation is needed because handicapped persons are a minority in America who suffer the same blatant and subtle forms of housing discrimination as other minorities.

Handicapped persons must be assured the opportunity to live in the neighborhood of their choice. It is well known that mentally and physically disabled persons benefit greatly from living in the mainstream of society in a home that is as normal as their needs permit. In many cases, community opposition has later turned into community acceptance of the handicapped when the fears of odd or threatening behavior or worries of a decline in property values have just not materialized.

The handicapped have special housing needs and, as a result, are subjected to special discriminatory actions, different in some respects from those faced by racial or ethnic minorities or women. In the past 10 years, Congress has shown an increasing awareness of the special problems of handicapped persons and has passed a number of laws that begin to solve these problems. H.R. 2540 is one more step along this path.

The protection of the Fair Housing Act, extended by H.R. 2540, could be as important to handicapped persons as it is to racial and ethnic minorities and women, because handicapped persons are encountering the same types of discrimination.

As others have learned, the process of making neighborhoods welcome, or even tolerate residents who are different, is a very arduous task. Landlords and neighbors say, "No," first. Protests against the establishment of small group homes for mentally or physically disabled persons have often escalated into fierce political battles with local or State officials. Neighbors have been known to use all sorts of tactics to prevent the handicapped from moving in, ranging from buying the land out from under the intended group home to threatening and actually damaging property.

Prejudice against handicapped persons is rooted in fear and archaic stereotypes. For so long mentally and physically disabled persons have been swept out of the conscience of the community and segregated into cloistered institutions far away from home and family. It is not surprising that there is fear and confusion about the way mentally retarded or other disabled persons will look or act or fit into the community. And it is not unusual to find the greatest resistance to group homes from middle and upper-middle class neighborhoods populated by a large number of well educated, enlightened professionals.

For example, a doctor in Connecticut was recently quoted as saying:

I'm not against retarded people. I work with them all the time, but * ° * in my leisure time, I really don't want to associate with patients, particularly abnormal

003315

517

patients. And I really don't care to have patients peeking over my fence. This is going to lower the standards of the particular neighborhood.

A Connecticut newsletter tells another story of community resistance that had a happy ending. I quote:

> Gary Shaw did everything he could to prevent the opening of a community residence for the retarded next door to his parents' home in Valley Stream, Long Island. He spearheaded petition drives, wrote newspaper advertisements exhorting the community to mobilize against the supposed threat, and even tapemeasured the building that was to be used for the residence to see if it might be in technical violation of local zoning ordinances. The group home was opened anyway, with the promise of polling the neighborhood a year later to see if the opposition was still vehement. It wasn't. Gary Shaw, for example, is now giving speeches in other communities urging acceptance of group homes.

One superintendent of a Connecticut center for retarded persons hit the nail on the head when he said that, "The negative individual, community and neighboring attitudes" toward group homes represents, "1915 thinking in Connecticut." H.R. 2540 is needed to help bring people's thinking into the 1970's.

Adding handicapped persons to the list of protected classes will also be useful from the perspective of applying the legal precedents pioneered by other minorities testing the Fair Housing Act.

H.R. 2540 is also needed to open channels for handicapped persons to tap the resources and expertise of the Department of Housing and Urban Development's fair housing officials. These officials will be able to guide handicapped persons to the realization of their rights as Americans to "set up house" in the neighborhood of their choice. Hopefully, the lessons learned in the past 10 years by other minorities will not have to be repeated by the handicapped.

Our written statement summarizes cases of the success of community placement.

The success of treating handicapped persons in community residences has also resulted in the alleviation of two major fears neighbors have harbored: (1) Studies show that property values have not declined when a group home is established nearby, indeed, there is evidence that the property in those neighborhoods increases at the same rate as property in other similar neighborhoods; and (2) the clients have not demonstrated the feared deviant behavior; they have been good neighbors.

The fear of declining property values is not to be taken lightly. It has been the prime motivation behind many community uprisings that have effectively blocked the opening of group homes.

Let me emphasize that we do not advocate the violation of the constitutional right to property and the protection from activities that might affect a person's property in order to establish group homes. We assert that handicapped persons living in a community do not affect property values. This assertion is supported by at least two recent studies.

Mentally and physically disabled persons face serious attitudinal barriers to securing housing in the community. Landlords refuse to rent to handicapped persons simply because they are handicapped. A study by the State University of New York at New Paltz revealed that out of a test sample of 100 landlords, only 1 indicated willingness to consider a retarded applicant for an available apartment. When told that the prospective rentee was retarded, 52 subjects stated that the apartment was no longer available. The

other 47 subjects attempted to make their buildings seem unattractive to rent. The study concluded that the "fact that the client was labeled handicapped or mentally retarded seemed to be enough to immediately discourage" the majority of landlords.

Handicapped persons seeking to live in a certain neighborhood encounter two barriers that other minorities do not. One is restrictive zoning. Another is the presence of architectural barriers that prevent those individuals in wheelchairs or unable to climb steps to physically enter the house or maneuver through hallways, reach cabinets, et cetera.

Restrictive zoning poses a problem to handicapped persons in zoning ordinance definitions of family for purposes of living in R–1 zoned single-family dwellings. Residents of a group home often do not meet such definitions. Besides the family problem, zoning officials may classify community residences as commercial enterprises, health facilities, or other special use that is prohibited in a particular zone.

For example, in the past year in the District of Columbia, local public officials and concerned neighborhood residents have discussed changes in the local zoning ordinances to prevent the growing concentration of group homes in a small number of residential areas. Currently, facilities housing an estimated 400 handicapped persons are situated in these neighborhoods. present District of Columbia law allows group homes only in areas zoned for rowhouses and apartments. Proponents of the new zoning plan would abolish this restriction.

At least 17 States have passed laws prohibiting discriminatory land use practices, including California, Ohio, and Wisconsin. We feel that Congress should act to make this a joint Federal-State effort, to support the States that have taken this initiative and to encourage other State and local governments to follow.

A second issue facing some handicapped individuals is physical access to buildings. This problem is complex, yet not insolvable. Many concerned persons have raised the specter of mammoth reform in the housing construction industry if H.R. 2540 is passed. We feel that this is an unfounded fear. For one, builders, landlords, and homeowners make frequent renovations for energy savings, upgrading of property, replacing old fixtures, et cetera. Most physical alterations needed by handicapped persons would be no more costly than such other repairs. A recent study by HUD indicated that providing full accessibility in new construction requires an addition of only 1 percent of the total cost of construction.

Further, the construction industry is already evolving toward the concept of universal design. Many experts in architecture have recognized that the traditional notions of physical barriers to accessibility need to be re-examined and broadened. Building designs should take into account not only those members of society who are considered physically and mentally disabled, but all individuals who experience temporary or permanent mobility limitations, including infants and young children, pregnant women, the elderly, and persons suffering from arthritis, heart and respiratory conditions, auditory, visual and orthopedic problems, and a variety of temporary disabilities, such as broken limbs.

519

H.R. 2540 is further evidence of Congress continuing efforts to encourage Americans to embrace their handicapped brothers and sisters in the community, in all aspects of normal living, in all rights under the Constitution. The need is still great to increase community awareness, to translate ideals into practical living arrangements, to overcome irrational neighborhood resistance through understanding and education. These objectives can only be accomplished through the concerted action of Government to protect the rights of all citizens.

Thank you.

[The prepared statement of Ms. Knighton follows:]

STATEMENT OF WILLIA KNIGHTON, FORMER PRESIDENT, DISTRICT OF COLUMBIA ASSOCIATION FOR RETARDED CITIZENS

My name is Willia Knighton. I am the former president of the District of Columbia's Association for Retarded Citizens. I have served on the Governmental Affairs Committee of the National Association for Retarded Citizens, and have served on a special advisory committee to the President's Committee on Mental Retardation. I have a twenty-seven year old daughter who is mentally retarded. Today, I address this Committee on behalf of the Consortium Concerned with the Developmentally Disabled's (CCDD) Task Force on Housing.

The CCDD Housing Task Force is composed of the following national organizations: the National Association for Retarded Citizens (a voluntary health agency representing 1950 state and local chapters), the National Association of Private Residential Facilities for the Mentally Retarded (an association of providers representing 467 residential programs), the National Association of State Mental Retardaton Program Directors (an association of state government directors), and the United Cerebral Palsy Associations (a voluntary health agency representing 260 state and local chapters). The National Association of State Mental Health Program Directors has also endorsed this statement.

The Consortium Concerned with the Developmentally Disabled supports H.R. 2540, especially those provisions that would add handicapped persons to the list of classes specifically protected by the Fair Housing Act of 1968. This legislation is needed because handicapped persons are a minority in America who suffer the same blatant and subtle forms of housing discrimination as other minorities. Handicapped persons must be assured the opportunity to live in the neighborhood of their choice. It is well known that mentally and phsically disabled persons benefit greatly from living in the mainstream of society in a home that is as "normal" as their needs permit. In many cases, community opposition has later turned into community acceptance of the handicapped when the fears of odd or threatening behavior or worries of a decline in property values have just not materialized. The handicapped have special housing needs, and as a result, are subjected to special discriminatory actions, different in some respects from those faced by racial or ethnic minorities or women. In the past ten years, Congress has shown an increasing awareness of the special problems of handicapped persons and has passed a number of laws that begin to solve these problems. H.R. 2540 is one more step along this path.

*The need for this legislation*

The protection of the Fair Housing Act, extended by H.R. 2540, could be as important to handicapped persons as it is to racial and ethnic minorities and women because handicapped persons are encountering the same types of discrimination. As others have learned, the process of making neighborhoods welcome, or even tolerate residents who are "different," is a very arduous task. Landlords and neighbors say "no" first. Protests against the establishment of small group homes for mentally or physically disabled persons have often escalated into fierce political battles with local or state officials. Neighbors have been known to use all sorts of tactics to prevent the handicapped from moving in, ranging from buying the land out from under the intended group home, to threatening and actually damaging property.

Prejudice against handicapped persons is rooted in fear and archaic stereotypes. For so long, mentally and physically disabled persons have been swept out of the conscience of the community and segregated into cloistered institutions far away from home and family. It is not surprising that there is fear and confusion about the way mentally retarded or other disabled persons will look or act or "fit" into the community. And it is not unusual to find the greatest resistance to group homes

520

from middle and upper-middle class neighborhoods populated by a large number of well-educated, "enlightened" professionals.

For example, a doctor in Connecticut was recently quoted as saying: "I'm not against retarded people. I work with them all the time, but * * * in my leisure time, I really don't want to associate with patientis, particularly abnormal patients. And I really don't care to have patients peeking over my fence. This is going to lower the standards of this particular neighborhool."

A Connecticut newsletter tells another story of community resistance that had a happy ending. I quote: "Gary Shaw did everything he could to prevent the opening of a community residence for the retarded next door to his parents' home in Valley Stream, Long Island. He spearheaded petition drives, wrote newpaper advertisements exhorting the community to mobilize against the supposed threat, and even tape-measured the building that was to be used for the residence to see if it might be in tenchical violation of local zoning ordinances. The group home was opened anyway, with the promise of polling the neighborhood a year later to see if the opposition was still vehement. It wasn't. Gary Shaw, for example, is now giving speeches in other communities urging acceptance of the group homes."

One superintendent of a Connecticut center for retarded persons hit the nail on the head when he said that "the negative individual, community and neighboring attitudes" toward group homes represent "1915 thinking in Connecticut." H.R. 2540 is needed to help bring people's thinking into the 1970's.

Adding handicapped persons to the list of protected classes will also be useful from the perspective of applying the legal precedents pioneered by other minorities testing the Fair Housing Act. Minority fair housing case law has established a number of principles that will benefit handicapped persons:

Promoting the concept of open housing and equal opportunity to live in the community of a persons's choice;

Recognizing discriminatory practices such as (1) outright refusal to rent or sell to specific persons or groups, (2) exclusionary zoning ordinances, and (3) restrictive covenants, as being illegal; and,

Recognizing the need for affirmative action to (1) increase the supply of suitable housing, (2) assure the fair dispersal of housing outside of poverty areas, and (3) prevent the concentration or formation of ghettos of specific groups of persons.

H.R. 2540 is also needed to open channels for handicapped persons to tap the resources and expertise of the Department of Housing and Urban Development's fair housing officials. These officials will be able to guide handicapped persons to the realization of their rights as Americans to "set up house" in the neighborhood of their choice. Hopefully, the lessons learned in the past ten years by other minorities will not have to be repeated by the handicapped.

*The success of community placement*

Let us digress a moment to discuss just what kind of housing mentally and physically disabled persons are seeking and why. The foundation of community living for the handicapped is the principle of "normalization." Briefly, normalization is a theory developed in the 1960's that asserts that living in a large institution reinforces abnormal behavior and causes individuals to regress rather than develop. No matter what a person's potential may be, normalization theory proposes that he or she will grow toward that potential better in the most "normal" environment in which the person is capable of living. For many individuals, the most normal environment would be a house or apartment similar to their family home.

To operationalize this theory, professionals in the field of developmental disabilities and related disciplines have devised a number of living arrangements that approximate "normal" home life while providing the special care, supervision, therapy and training disabled persons need in order to lead as independent lives as their abilities will allow. Perhaps the most "popular" of these alternatives are: (1) apartments rented by disabled persons or by agencies and "sublet" to their retarded or disabled clients with appropriate staff living nearby to assist them in their household chores and in getting to work; and (2) group homes consisting of four to sixteen handicapped individuals and staff living together in a typical house, like a family, sharing housekeeping duties and helping each other learn to take care of themselves.

According to a survey conducted by the Developmental Disabilities Project on Residential Services and Community Adjustment at the University of Minnesota, the number of community-based residential facilities serving mentally retarded persons has more than doubled over the four year period from 1973 to 1977. As of June 30, 1977, the study showed that a total of 62,397 retarded persons were residing in community residential facilities. California, Pennsylvania, Illinois and Michigan led all the states in the number of community residential facilities established. While this seems like a sizable number of persons served, the Committee

003319

521

must note that there are an estimated six million Americans who are mentally retarded out of the 30 million who are considered to suffer some form of handicapped condition.

The success of treating handicapped persons in community residences has also resulted in the alleviation of two major fears neighbors have harbored: (1) Studies show that property values have not declined when a group home is established nearby, indeed, there is evidence that the property in those neighborhoods increases at the same rate as property in other similar neighborhoods; and (2) the clients have not demonstrated the feared deviant behavior; they have been good neighbors.

The fear of declining property values is not to be taken lightly. It has been the prime motivation behind many community uprisings that have effectively blocked the opening of group homes. Let me emphasize that we do not advocate the violation of the Constitutional right to property and the protection from activities that might affect a person's property in order to establish group homes. We assert that handicapped persons living in a community do not affect property values. This assertion is supported by at least two recent studies.

The first study was conducted by the School of Architecture and Urban Planning of Princeton University in 1976, on community facilities established in the White Plains area of New York. The Princeton study concluded that the establishment of a residential facility in a neighborhood "does not tend to depress surrounding property values, and, in some cases, may even cause an appreciation in property value." This conclusion is backed by the following data:

The Battle Hill housing development showed a steady increase in property values even though three facilities had opened within a fourteen month period. A rough estimate of property values for the area (in about 1967) would be about $25,000 per dwelling with a forecast of a steady increase. Property values did increase, unimpeded by the facilities, to the point that in mid-1975 they were worth roughly $49,000. The pattern of property value increase paralleled that of the general trend in the equivalent "control" area surveyed in the study.

Fisher Hill exhibited similar tendencies, though over a wider range of values. The first facility was a veterans home opened in early 1965. Property values, immediately after the facility opened, showed a marked increase, though this leveled off in the following years. In September 1973, an agency-operated boarding home opened, followed by a group home thirteen months later. With but a few exceptions, the property values continued their upward climb. A rough estimate of property values in Fisher Hill would be about $25,000 in 1965 and about $40,000 to $45,000 in 1975.

The Longview area yielded interesting and suprising results. Though the basic upward trend of property values was similar to that of the other two sample areas, as well as that of the control areas, there was a significant positive variation. While the area had the most residential facilities in its midst—nine—property values still showed a major increase.

A further point the Princeton study makes is that all of the 31 facilities reviewed were in the same or better condition as their surrounding neighbors, and that on the whole, the facilities were inconspicuous—not readily identifiable as different from their neighbors by the unknowing observor.

A second study was conducted by the Regional Science Research Institute of Philadelphia, Pennsylvania, under a grant from the National Institute of Mental Health. After examining the impact of 12 community mental health facilities on neighboring property values in Philadelphia and its environs, the Institute likewise concluded that "the anticipated decline" in property values "has not materialized."

While these studies do not claim to be conclusive, we feel that they represent hard facts that should allay the fears of property owners.

*Special problems of housing discrimination suffered by handicapped persons*

Mentally and phsically disabled persons face serious attitudinal barriers to securing housing in the community. Landlords refuse to rent to handicapped persons simply because they are handicapped. A study by the State University of New York at New Paltz revealed that out of a test sample of 100 landlords, only one indicated willingness to consider a retarded applicant for an available apartment. When told that the prospective rentee was retarded, 52 subjects stated that the apartment was no longer available. The other 47 subjects attempted to make their facility seem unattractive to rent. The study concluded that the "fact that the client was labeled handicapped or mentally retarded seemed to be enough to immediately discourage" the majority of landlords.

Handicapped persons seeking to live in a certain neighborhood encounter two barriers that other minorities do not. One is restrictive zoning. Another is the presence of architectural barriers that prevent those individuals in wheelchairs or unable to climb steps to physically enter the house or maneuver through hallways, reach cabinets, etc.

522

Restrictive zoning poses a problem to handicapped persons in zoning ordinance definitions of "family" for purposes of living in r-1 zoned single-family dwellings. Residents of a group home often do not meet such definitions. Besides the "family" problem, zoning officials may classify community residences as commercial enterprises, health facilities or other special use that is prohibited in a particular zone.

A study by the American Society of Planning Officials (ASPO) indicates that requests for zoning variances to establish group homes are frequently denied. The study found that the leading cause for denial by zoning boards was opposition from nearby landowners that could take the form of political pressure on local officials, harrassment, property damage or court action.

For example, in the past year in the District of Columbia, local public officials and concerned neighborhood residents have discussed changes in the local zoning ordinances to prevent the growing concentration of group homes in a small number of residential areas. Currently, facilties housing an estimated 400 handicapped person are situated in these neighborhoods. Present D.C. law allows group homes only in areas zoned for row-houses and apartments. Proponents of the new zoning plan would abolish this restriction.

A substantial body of case law is beginning the develop around the issue of preventing the establishment of group homes through discriminatory zoning practices. (To name a few cases: *Michigan Association for Retarded Children* v. *The Village of Romeo, Driscoll* v. *Goldberg, Village of Belle Terre* v. *Boraas, City of White Plains* v. *Ferraioli, and Little Neck Community Association* v. *Working Organization for Retarded Citizens.*) Although the decisions have not been uniform, the courts have decided in favor of the group home in a number of cases. The provisions of H.R. 2450 will allow advocates for the handicapped to draw on the litigative principles established by cases brought by other minorities against exclusionary zoning practices.

At least 17 states have passed laws prohibiting discriminatory land use practices, including California, Ohio and Wisconsin. We feel that Congress should act to make this a joint Federal-State effort, to support the states that have taken this initiative and to encourage other state and local governments to follow.

A second issue facing some handicapped individuals is physical access to buildings. This problem is complex, yet not insolvable. Many concerned persons have raised the spector of mammoth reform in the housing construction industry if H.R. 2450 is passed. We feel that this is an unfounded fear. For one, builders, landlords and homeowners make frequent renovations for energy savings, up-grading of property, replacing old fixtures, etc. Most physical alterations needed by handicapped persons would be no more costly than such other repairs. A recent study by HUD indicated that providing full accessibility in new construction requires an addition of only one percent of the total cost of construction.

Further, the construction industry is already evolving toward the concept of "universal" design. Many experts in architecture have recognized that the traditional notions of physical barriers to accessibility need to be re-examined and broadened. Building designs should take into account not only those members of society who are considered physically and mentally disabled, but all individuals who experience temporary or permanent mobility limitations, including infants and young children, pregnant women, the elderly, and persons suffering from arthritis, heart and respiratory conditions, auditory, visual and orthopedic problems, and a variety of temporary disabilities (e.g., broken limbs). Interface Architectural Consultants, a firm specializing in the design of accessible buildings, has estimated that at least 56 percent of the U.S. population needs barrier-free design at any given time.

*Congressional action toward equal rights for handicapped persons*

Including handicapped persons under the protection of the Fair Housing Act is one more step in the direction of insuring the rights of mentally and physically disabled persons. Examples of other actions Congress has taken to further the enjoyment of equal rights for the handicapped include:

The passage of the Architectural Barriers Act, as amended, and the creation of an independent Federal regulatory agency, the Architectural and Transportation Barriers Compliance Board, which recognizes and seeks to ameliorate architectural, transportation, and communication barriers in federally-funded activities;

The inclusion of a statement of equal rights and affirmative action for handicapped individuals in Sections 501, 503 and 504 of the Rehabilitation Act of 1973. HUD has developed proposed regulations for the implementation of Section 504 in federally-funded housing projects. While these rules address some of the housing issues discussed today, their application is limited to certain federally-funded public housing;

The extension of the Civil Rights Commission's activities to cover protecting the rights of handicapped persons;

523

The mandate for a free, appropriate education for all children, regardless of their handicap, in the least restrictive setting appropriate to their needs, under the Education for All Handicapped Children Act. This is another example of the normalization theory put into practice;

The convening of a White House Conference on the Handicapped which brought together handicapped citizens and their advocates from around the nation to air their problems and to plan for their future. One of the Conference's recommendations was that all Civil Rights Acts Titles be amended to include handicapped persons; and,

A provisions in the Tax Reform Act of 1976 granting private landowners a tax deduction of up to $25,000 per year for costs incurred in making housing accessible to the handicapped. The Internal Revenue Service could give us no figures on the utilization of this tax break.

*Conclusion*

H.R. 2540 is further evidence of Congress' continuing efforts to encourage Americans to embrace their handicapped brothers and sisters in the community, in all aspects of "normal" living, in all rights under the Constitution. The need is still great to increase community awareness, to translate ideals into practical living arrangements, to overcome irrational neighborhood resistance through understanding and education. These objectives can only be accomplished through the concerted action of government to protect the rights of all citizens.

Mr. SENSENBRENNER. Thank you, Ms. Knighton.

Since Mayor Hudnut has arrived and since he is on a schedule I wonder if we could defer our questions over until after the mayor gives his testimony. Would that be possible?

Ms. KNIGHTON. I think so.

Mr. SENSENBRENNER. Thank you very much.

The next witness will be Mayor William Hudnut, III, from Indianapolis, Ind., who is a former colleague of ours in the House of Representatives and is representing the National League of Cities today.

## TESTIMONY OF HON. WILLIAM H. HUDNUT III, MAYOR, INDIANAPOLIS, IND., ON BEHALF OF THE NATIONAL LEAGUE OF CITIES, ACCOMPANIED BY GEORGE GROSS, DIRECTOR OF FEDERAL RELATIONS, NLC

Mayor HUDNUT. Thank you very much, Mr. Chairman.

Mr. Chairman and members of the committee, my name is William Hudnut. I am mayor of Indianapolis, Ind., and second vice president of the National League of Cities. NLC, as you know, represents approximately 800 cities directly and 15,000 cities indirectly through their membership in 48 State municipal leagues.

We appreciate the opportunity to testify before you on the Fair Housing Amendments of 1979, H.R. 2540, introduced by Chairman Edwards and Congressman Drinan. Although this bill has not as yet attracted the attention it deserves, it is an extremely important one.

For individuals whose civil rights are not being adequately secured, the need for additional remedial legislation to strengthen the Fair Housing Act of 1968 is long overdue. Despite substantial progress in assuring equal access to housing since enactment of the Fair Housing Act of 1968, the national goal of eliminating discriminatory housing activities has yet to be realized.

The bill is also important, however, for the Nation's cities. As the Supreme Court said in a 1977 case, "(t)here can be no question about the importance to a community of promoting stable, racially integrated housing." Yet housing discrimination remains one of the principal causes of the problems of numerous central cities.

524

The inability of individuals with adequate incomes to escape the racial ghettos of our cities contributes significantly to the social isolation and alienation that many of our citizens rightly feel. And, as a result, cities have a much more formidable task in promoting the economically and racially integrated neighborhoods that are a principal goal of Federal housing and community development programs.

The interest of cities in protecting themselves from discriminatory housing practices was recognized by the Supreme Court in its recent decision in *Gladstone Realtors* v. *Village of Bellwood*. In a 7 to 2 decision, the Court ruled that the Village of Bellwood, Ill., had standing under the Fair Housing Act of 1968 to challenge racial steering practices in the community. The National League of Cities participated in this important suit through the filing of an amicus brief supporting Bellwood's complaint.

H.R. 2540 would strengthen both the coverage of the Fair Housing Act of 1968 and the act's administrative enforcement mechanisms. It does so through reasonable and appropriate amendments to existing law that deserve the support of the Congress.

First, coverage of the Fair Housing Act.

NLC supports provisions of the bill which would make clear that racial redlining, the discriminatory denial of property insurance, and discrimination in the lending activities of secondary market operations are prohibited by the Fair Housing Act.

We particularly urge your support of the provisions of the bill explicitly covering racial redlining. This practice, which remains widespread and was specifically involved in the *Bellwood* case, continues to be a major obstacle to our efforts to promote economically and racially balanced communities.

H.R. 2540 expands coverage of the act in two respects: first, by reducing the current exemption from the act of owners of fewer than four single family homes to the renting of space in a single family unit by the occupant; and

Second, by extending the protections of the act to handicapped persons.

NLC supports both provisions. We would emphasize, however, the importance of the language in the subcommittee's analysis to the effect that the bill would not require retrofitting or the removal of architectural barriers by sellers of housing. This is an important qualification that should be retained throughout consideration of the bill.

Second, enforcement procedures.

NLC strongly supports the bill's new and strengthened enforcement procedures, which we regard as the most important provisions of H.R. 2540.

Under existing law, a person who complains of racial discrimination in housing is given primarily a judicial remedy. The complainant may seek administrative relief through the Department of Housing and Urban Development; however, HUD's administrative powers are so weak that, in fact, little is to be gained by seeking HUD's aid.

HUD is empowered only to use informal conference, conciliation, and persuasion methods, and to refer complaints to State and local fair housing agencies. If these informal techniques fail, HUD is

525

powerless to do more, leaving the complainant to resort to what is bound to be an expensive and time-consuming lawsuit.

The inadequacy of HUD's power is clear. As the General Accounting Office's 1978 report to you demonstrated, conciliation, without backup enforcement activity, can result in only minimal success. According to the report, of 332 fair housing complaints reviewed by GAO over a 3-year period, only 36 were resolved by HUD. And, more importantly, in only four cases did the complainant obtain the housing unit involved.

There are weaknesses also in the judicial remedies provided by the act. Private litigation is ordinarily too expensive and time-consuming for victims of housing discrimination. And no help is available from governmental agencies. The Department of Justice is authorized under the act to bring suits only where it can establish a pattern or practice of discrimination, and not on behalf of an individual who charges discrimination.

H.R. 2540 would strengthen both the HUD Secretary's administrative authority to seek redress for violation of the Fair Housing Act, and the act's judicial remedies as well. It would establish an enforcement system that is at once effective and fair to all parties, and appropriate for the constitutional violations involved.

HUD would be granted two enforcement mechanisms:

First, it would have full administrative authority to investigate complaints brought to it or initiated on its own behalf; and it could act on them by providing temporary relief, issuing cease and desist orders, and assessing penalties; and

Second, it could, upon a finding of reasonable cause, refer complainants to the Justice Department for litigation even where no pattern or practice of discrimination exists.

A complainant would have a choice of remedies. He or she could seek administrative relief from HUD or initiate litigation. And, in either an administrative or judicial proceeding, fees and court costs could be awarded. Under existing law, such costs may be awarded only to indigents.

Finally, the Department of Justice would be authorized to bring suits on behalf of individuals, as well as in pattern or practice cases. The Attorney General could file suits on behalf of complainants referred by HUD, and also intervene in private suits.

The most critical provisions are those related to HUD's enforcement authority. We cannot expect housing discrimination to be ended by random lawsuits brought by individuals. The administrative enforcement procedures authorized by the bill are patterned after those used by many Federal agencies, such as the National Labor Relations Board, and State and local fair housing agencies. We believe they are fair and reasonable and should be given an opportunity to work.

We would point out, however, that this stronger enforcement role for HUD ought not to absolve State and local fair housing agencies of their responsibilities in this area. A greater Federal role here is justified to protect an important constitutional right.

But we cannot keep adding to the size of the Federal Government. In approving the bill, the subcommittee should urge more vigorous enforcement efforts by States and local fair housing agencies.

003324

Mr. Chairman, in closing I wish to emphasize the importance of this bill to the Nation's cities. Housing discrimination remains one of our gravest urban, as well as human, problems. NLC policy opposes all discrimination that denies people equal access to housing opportunities. We urge you to act favorably on H.R. 2540, which is essential to the effective enforcement of the Fair Housing Act.

Mr. Chairman, let me take just a few moments to relate to you some of our activities on this area.

The city of Indianapolis began its initial negotiations on the Department of HUD's Affirmative Fair Housing Marketing Program in November 1977. The program is aimed at promoting fair housing practices by both builders of new housing units and sellers of existing homes. Through their voluntary participation, these two groups indicated their commitment to the fair housing provisions of title VIII.

I was present at the signing ceremony on June 28, 1978, when the Builders Association of Greater Indianapolis and the Metropolitan Indianapolis Board of Realtors signed an agreement merging portions of their organizations to produce uniform guidelines which members of both groups follow to insure free and open access in housing.

Called the Community Housing Leadership Board, this group works closely with HUD to promote its affirmative marketing goals. Indianapolis is one of only three such jointly merged housing leadership boards in the country. The other two are Clark County, Nev., and San Diego, Calif.

The Indianapolis Community Housing Leadership Board is a completely balanced one in terms of race and political affiliation. We have received good national evaluations from HUD. In fact, our builders agreement received one of the highest ratings in the country at its last evaluation in 1978. We will be celebrating the end of our first year next month, and we expect that analysis will reveal the plan to be a very successful one.

We in Indianapolis are proud of our efforts through the affirmative marketing agreements. Our community leaders have displayed a sense of community spririt and fairness through their voluntary participation and promotion of the Affirmative Fair Housing Marketing Program.

I also believe they would support the effort to go beyond voluntarism and conciliation to the elimination of discriminating housing practices and the establishment of enforcement through administrative mechanisms of rights secured by title VIII.

In Indianapolis, we have a set of housing discrimination guidelines which prohibit discriminatory practices relating to the acquisition of real estate. We provide, through our Commission on Human Rights, a realtor training program to introduce the housing discrimination guidelines to newly licensed realtors. This training program is available to all real estate agencies upon request.

We are in the process of adoptng an equal housing opportunity program. This program is designed to improve open housing opportunities in neighborhoods, as well as to stabilize neighborhoods already in a desegregated condition. It will assist minority group persons in acquiring safe, decent, and sanitary housing that is

527

available throughout the community which they desire and can afford.

Its purpose is to eliminate discrimination and promote equality of opportunity in housing through concerted efforts to create a truly open market. The funding for this program is being requested through a community development block grant.

The Community Action Against Poverty Organization is currently preparing a study of mortgage lending practices in the eight-county metropolitan area, and will prepare a slide presentation to be shown before neighborhood associations. Local neighborhood organizations are using the Community Reinvestment Act to create a dialog between neighborhood residents and lending institutions.

Additionally, the Commission on Human Rights has taken an informative stance on the issue of redlining through a series of articles appearing in a local minority newspaper.

Indianapolis, as other cities, will benefit greatly from the Fair Housing Amendments of 1979. Unfortunately, racial steering and redlining are practiced in spite of the fair housing act. That is why we hope that you will approve the Fair Housing Amendments, in order to help eliminate these practices, so that we finally can achieve the national housing objective established by Congress in 1949: "a decent home and a suitable living environment for every American family."

Mr. EDWARDS. Thank you very much, Mayor Hudnut.

We welcome also, of course, Mr. George Gross, director of Federal Relations, National League of Cities.

I thank you very much for that very encouraging testimony, too, because this bill, if enacted, would be a giant step forward and we need all the help we can get. There hasn't been a really strong civil rights bill passed since 1965. I think the Voting Rights Act was the last major and effective civil rights bill enacted by Congress. Both the 1964 and 1965 bills have been tremendously successful. We have high hopes for this one, too.

I think that both our own city and your organization, the National League of Cities, should be complimented on their forward thinking. That is very encouraging and very helpful.

How many cities are members of the league?

Mayor HUDNUT. About 800 direct member cites, about 15,000 indirect members through 48 State municipal leagues affiliated with the NLC.

Mr. EDWARDS. Can your testimony be considered endorsement generally of the legislation—of the thrust of the legislation—by the league?

Mayor HUDNUT. I believe so, certainly insofar as our board of directors is concerned.

Mr. EDWARDS. Do you think the Real Estate Board of Indianapolis would approve of this legislation? I know you can't answer for them.

Mayor HUDNUT. I would hope so. They signed the voluntary agreement I spoke of in my comments on Indianapolis and I believe they would support this, knowing them as I do.

John Hart, a local realtor, signed the original agreement with Secretary Carla Hills—3 years ago.

528

Mr. EDWARDS. Do you have either busing under court order or by school district decision in Indianapolis?

Mayor HUDNUT. Yes. The issue has been in litigation for 10 years.

Mr. EDWARDS. Secretary Harris, when testifying, pointed out this legislation has been in effect with its enforcement proceedings since 1968 and that very probably a lot of the busing that takes place in the country wouldn't have been necessary because minorities would have had better access to housing of their choice. Would you agree?

Mayor HUDNUT. I would. I think there are many Americans who feel that if we can stabilize housing throughout the communities we live in and effectively combat discrimination and segregation through the adoption of nondiscriminatory housing practices and financing practices, then the necessity for busing, would be greatly reduced, if not eliminated.

In Indianapolis there is a great deal of instability right now because nobody knows what the situation is with regard to the effort to achieve a desegregated school system. It is causing a great deal of unrest. Frankly, because of the lack of clarity as to what will happen, a lot of people are moving out of the city and compounding the problem of urban disinvestment and abandonment, which is a problem we don't need to have increased. It is bad enough as it is, although we think we are doing some things in our city to promote urban reinvestment and develop an ethic of urban conservation.

Mr. EDWARDS. Very good.

Counsel?

Ms. COOPER. I understand Indiana has included in its antidiscrimination law on housing the handicapped as a group. Are you aware of how that law has made an effect on the problems of the handicapped?

Mayor HUDNUT. I'm sorry, I don't feel qualified to answer that question.

Ms. COOPER. OK.

In your experience, what are the most prevalent forms of housing discrimination against minorities in your city?

Mayor HUDNUT. Well, I would have to say that the whole question of property insurance is probably No 1. I talk to many bankers who deny redlining in terms of lending practices, whether it's a first mortgage or in the secondary market. But I have also talked to a number of citizens, many from minority groups, who are distressed by their inability to get insurance.

It is hard to attribute that to a deliberate redlining practice by the insurance companies, but the correlation inevitably is made in people's minds. That would be probably the first and foremost point I would make.

Second, we encounter the same kind of subtle discrimination that any community encounters. Our Human Rights Commission does not have staff adequate to the task of tracking some of these complaints. I hear about people who in the real estate business are steering. They say, "You don't want to live down there. You don't want to be involved in those problems."

529

It is something I think that is systemic in American society. That is why we support these amendments. They will help to give HUD the clout that is necessary to go beyond conciliation to some kind of administrative and judicial mechanism that has teeth in it.

Ms. COOPER. Related to the problem of mortgage redlining and steering is the role of the appraiser in the process. We had some testimony a few weeks ago about whether or not racial stereotyping plays a part in the value of property. What is your experience on that issue in Indianapolis?

Mayor HUDNUT. That is so hard to say because it is so hard to prove. It is an inference that you might draw if you look at appraisals in different sections of the city as to the marketability of a house. But certainly, in my conversations with appraisers, they steadfastly deny that this occurs.

Ms. COOPER. Thank you very much.

Mr. BOYD. During your testimony you indicated that it was your belief that State agencies ought to share in enforcement responsibility. Would you then recommend that State agencies which qualify as certified agencies under proposed section 810(a)(3) of the bill be given a mandatory referral subject to recall by the Secretary after an appropriate period of time?

Mayor HUDNUT. I read the Secretary's testimony before appearing before the committee. I can't recollect whether or not she had a reservation about making it mandatory or not. To me, it would make sense that the people closest to the problem at the local level or at the State level can have probably better oversight than at the Federal level.

So the answer to your question—this is my own personal opinion—is: Yes.

Mr. BOYD. Thank you.

You also indicated that you felt the enforcement mechanism and administrative procedure which was established by this bill was effective and fair to all parties. That has been an issue as yet unresolved during these hearings. I wonder if you could share your authority for that opinion with us.

Mayor HUDNUT. The authority is my own reading of the bill and my own assessment of the situation. I don't have any authority for that other than my own conviction.

Mr. BOYD. Thank you very much.

No further questions.

Mr. EDWARDS. Some of the witnesses, Mayor Hudnut, have objected to what you describe as the heart of the bill—that is, the power to issue after a hearing, a cease and desist order, or they objected to certain procedures established in the bill for the protection of the parties. Some of these witnesses—there are very few—have objected to that power being in HUD, that it is big government in Washington telling the local people what to do, that matters like this should be handled locally and that is too much power for HUD and perhaps even a lack of due process because it is not an actual court but rather a proceeding before an administrative agency.

The fact that this power is there in HUD in the bill, does that disturb you?

003328

530

Mayor HUDNUT. No. It is true that there is a widespread concern across the country about big government. Somebody said to me yesterday half facetiously when they found out I was coming to testify here, "Are you in favor of giving HUD these Gestapo-like powers?"

That's a quote. I said:

I am concerned, as you are, about the insensitivity of the bureaucracies and the tyranny, if you please, of the bureaucracies sometimes, but, by the same token, we are talking here about the fundamental human and civil rights of people. We have a moral as well as a legal obligation to establish mechanisms in government that can assure people of those rights when they are trampled upon or when they are denied.

I think that this overriding issue is the fundamental question here. I would imagine that most of the people who would be given their enforcement powers if this legislation becomes law would have the kind of sensitivity and decent regard for other people that would prevent abuse. People should not conjure up in their minds a specter of "Gestapo-like" bureaucrats coming in and denying them their rights in the free enterprise system.

Mr. EDWARDS. And you would agree the bill does provide due process so that the cease and desist powers and the remedies provided are subject to the safeguards of due process?

Mayor HUDNUT. Yes, sir, through judicial review and resort to the courts.

Mr. EDWARDS. Certainly the 1964 and 1965 civil rights bills gave the Federal Government considerable power, and yet we haven't heard any complaints about the severity, the impact, of these laws on the 50 States, and certainly no demands whatsoever that they should be repealed.

Mayor HUDNUT. That's correct. There may be an individual person here and there who feels there is excessive severity but, by and large, there is no groundswell.

Mr. EDWARDS. Well, I have no further questions. I understand that you have another engagement. We thank you very much for giving us your valuable testimony.

Mayor HUDNUT. I thank you for pushing ahead with this and I wish you success.

May I leave for the record a copy of the Housing Discrimination Guidelines of the Commission on Human Rights of Indianapolis?

Mr. EDWARDS. Yes. Without objection, that will be made part of the record.

Mayor HUDNUT. Thank you.

[The document follows:]

531

COMMISSION ON HUMAN RIGHTS OF INDIANAPOLIS AND MARION COUNTY

HOUSING DISCRIMINATION GUIDELINES

200  Discriminatory Housing Practices

Sec.
200.1 – General Principles
200.2 – Definitions
200.3 – Prohibited Discriminatory Housing Practices

201  Blockbusting/Panic Selling Guidelines

Sec.
201.1 – General Principles
201.2 – Institutional Advertising as a Bona Fide Form of
        "Solicitation for Business"
201.3 – Other Discriminatory Forms of Solicitation
201.4 – Limited Solicitation Areas
201.5 – Referral to the Real Estate Commission of the State of
        Indiana

532

200   Discriminatory Housing Practices

Sec.
      200.1 – General Principles
      200.2 – Definitions
      200.3 – Prohibited Discriminatory Housing Practices

      By virtue of the authority vested in it by City–County General
Ordinance No. 1, 1970, as amended December 4, 1972, the Commission
on Human Rights of Indianapolis and Marion County hereby issues the
following interpretive guidelines.

      These guidelines on discriminatory housing practices clarify
Sec. 2–451, Prohibited Acts, of City–County General Ordinance No. 1,
1970, as amended December 4, 1972, which reads:

            "Every discriminatory practice relating to the
            acquisition of real estate, education, public
            accommodations, public facilities or employ-
            ment shall be considered unlawful unless it is
            specifically exempted by this chapter."

      The guidelines herein are interpretive in nature and shall be
applicable to complaints presently pending or hereafter filed with
the Commission.


Sec. 200.1  General Principles

(a)  Sec. 2–451 of City–County General Ordinance No. 1, 1970, as
amended December 4, 1972, states, in part:

            "Every discriminatory practice relating to the
            acquisition of real estate. . .shall be prohibited
            unless it is specifically exempted. . ."

(b)  The Commission will continue to consider particular problems
relating to housing discrimination on a case by case basis.

(c)  To the extent that views expressed in prior Commission pro-
nouncements are inconsistent with views expressed herein, such prior
views are overruled.


Sec. 200.2  Definitions

(a)  "Blockbusting" means any solicitation, promotion or attempt to
influence or induce any owner to sell, lease or list for sale or

003331

533

lease any real property through initiation, instigation or participation in any representation, advertisement or contact within a block, neighborhood or area designed to promote real estate transactions in the block, neighborhood or area based on the implication, directly or indirectly, that changes have occurred or will or may occur in the composition with respect to race, sex, religion, color, national origin or ancestry of the owners or occupants in the block, neighborhood or area in which the real property is located, or that the changes will or may result in the lowering of property values, or an increase in criminal or antisocial behavior or a decline of the quality of the schools in the block, neighborhood or area in which the real property is located.

(b) "Limited Solicitation Area" means any area so designated by the Commission on Human Rights of Indianapolis and Marion County, in which the level of real estate activity is strictly limited as provided in Sec. 201.4.

(c) "Ongoing Referral Contact" means an individual, who, through prior arrangement, has agreed to perform as an ongoing source of referral for any real estate broker, salesperson or agent or who in fact has performed such a service for a real estate broker, salesperson or agent.

(d) "Panic Selling" means the succumbing of a resident who is otherwise, disposed to remain in a neighborhood to any one or more of a number of pressures to move out when it appears that the neighborhood is undergoing a change in composition with respect to race, sex, religion, color, national origin or ancestry.

(e) "Prior Customer Contacts" includes any oral or written contacts by a real estate agent or salesperson with an individual whom that agent or salesperson represented in a previous real estate transaction.

(f) "Real Estate" means "real property" for the purposes of these guidelines.

(g) "Real Estate Broker, Salesperson or Agent" means any person licensed or unlicensed, compensated or uncompensated, who participates in any transaction in connection with the sale or leasing or real properties or in the furnishing of any services or privileges or advantages in connection with said sale, leasing or transfer of said properties.

(h) "Real Estate Signs" means any structure, and all parts composing the same, together with the frame, background or supports therefore which are used for advertising or display purposes, or any statuary sculpture, molding, or casting used for advertising or display purposes, or any flags, bunting or material used for display or advertising purposes, including, but not limited to, placards, cards,

534

structures or areas carrying the following or similar words: "For Sale", "Sold", "Open House", "New House", "Home Inspection", "Visitors Invited", or "Built By". Exempted from this definition are "For Rent" signs.

(i) "Real Estate Transaction" includes the sale, exchange, rental, transfer or lease of real property as well as the furnishing of all services in connection therewith.

(j) "Real Property" includes, but is not limited to, buildings, structures, real estate lands, tenements, leaseholds, interests in real estate cooperatives, condominiums, and hereditaments, corporal and incorporal, or any interest therein.

(k) "Solicitation" means any contact in connection with real property including, but not limited to, printed or written matter, mailed or delivered to the owner or occupant of real property by any person, real estate broker, salesperson, agent or representative of any such real estate broker, salesperson or agent, or any oral communication made either in person or by telephone to the owner or occupant of real property by any person, real estate broker, salesperson, or agent, which advertises the accomplishments and/or abilities of the real estate broker, salesperson or agent to sell or rent real property or furnish services in connection therewith or requests or suggests that the owner list his/her real property for sale or rent with the real estate broker, salesperson or agent which offers to purchase or rent the owner's real property or which offers to furnish services in connection therewith.

Sec. 200.3  Prohibited Discriminatory Housing Practices

(a) The following are discriminatory housing practices prohibited by City-County General Ordinance No. 1, 1970, as amended December 4, 1972:

1) To refuse to negotiate for a real estate transaction with a person because of race, sex, religion, color, national origin or ancestry.

2) To refuse to engage in a real estate transaction with a person because of race, sex, religion, color, national origin or ancestry.

3) To discriminate against a person in the terms, conditions or privileges of a real estate transaction, or in the furnishing of services in connection therewith because of race, sex, religion, color, national origin or ancestry.

4) To refuse to receive from, or to refuse to transmit to a person a bona fide offer to engage in a real estate transaction because of race, sex, religion, color, national origin or ancestry.

535

5) To represent to a person that real property is not available for inspection, sale, rental or lease when in fact it is so available, or to fail to bring a property listing to his/her attention or to refuse to permit him/her to inspect real property under reasonable conditions because of race, sex, religion, color, national origin or ancestry.

6) To make, print, or publish or cause to be made, printed or published any notice, statement, or advertisement, with respect to the sale or rental of real property that indicates any preference, limitation or discrimination based on race, sex, religion, color, national origin or ancestry, or an intention to make any such preference limitation or discrimination.

7) To make a record or inquiry in connection with a prospective real estate transaction which indicates the race, sex, religion, color, national origin or ancestry of a person, except in those instances where such recordation or inquiry is mandated by a consent decree, agency of government, or an affirmative action program approved by the Commission on Human Rights of Indianapolis and Marion County.

8) To engage in any blockbusting or panic selling activity which includes, but is not limited to, inducing or attempting to induce any person to sell or rent any real property by representation regarding entry or prospective entry into any neighborhood of a person or persons of a particular race, sex, religion, color, national origin or ancestry.

9) To offer, solicit, accept, use or retain a listing of real property with the understanding that a person may be discriminated against in a real estate transaction or in the furnishing of facilities or services in connection therewith with respect to race, sex, religion, color, national origin or ancestry.

10) To deny any person access to or membership or participation in any multiple listing service, organization or facility relating to the business of selling or renting real property or to discriminate against him/her in the terms or conditions of such access, membership or participation, on account of race, sex, religion, color, national origin or ancestry.

11) For any lending institution to deny a loan or other financial assistance to a person applying therefor for the purpose of purchasing, constructing, improving, repairing or maintaining a real property, or to discriminate against him/her in the fixing of the amount, interest rate, duration, or terms or conditions of such loan or other financial assistance, because of the race, sex, religion, color, national origin or ancestry of such person or of any person associated with him/her in connection with such loan or other financial assistance, or of the present or prospective owners, lessees, tenants, or occupants of the real property or real properties in relation to which such loan or other financial assistance is to be made or given.

003334

536

12) To engage in any practice which has the effect of steering or channeling prospective home purchasers of renters to engage in a real estate transaction to purchase or rent real property in a geographic area, by which the entry of the purchaser or renter into the area will have the effect of increasing or perpetuating segregation in the community.

13) For any publicly assisted housing to deny to persons equal opportunity because of race, sex, religion, color, national origin or ancestry, or to operate publicly assisted housing in any fashion which may have the effect of increasing or perpetuating the level of segregation within such housing or within the community at large.

(b) Any other practices which have the effect of discriminating against any person or persons because of race, sex, religion, color, national origin or ancestry, are also prohibited.

537

201    Blockbusting/Panic Selling Guidelines

Sec.

201.1 - General Principles
201.2 - Institutional Advertising as a Bona Fide Form of
         "Solicitation for Business"
201.3 - Other Discriminatory Forms of Solicitation
201.4 - Limited Solicitation Areas
201.5 - Referral to Real Estate Commission of the State of
         Indiana

By virtue of the authority vested in it by City-County General
Ordinance No. 1, 1970, as amended December 4, 1972, the Commission
on Human Rights of Indianapolis and Marion County hereby issues the
following interpretive guidelines.

These guidelines on Blockbusting/Panic Selling enlarge and clarify
Sec. 200.3 (a) (8) of the Commission's guidelines, Sec. 2-451,
Sec. 2-447 (g) (B), and Sec. 2-448 (ii) of City-County General Ordinance
No. 1, 1970, as amended December 4, 1972, which reads:

> (ii)   "to eliminate segregation or separation based
> solely on race, sex, color, religion or national
> origin, since such segregation is an impediment to
> equal opportunity;"

Sec.  201.1   General Principles

(a)    Sec. 2-451 of City-County General Ordinance No. 1, 1970, as amended
December 4, 1972, states in part:

> "Every discriminatory practice relating to the
> acquisition of real estate...shall be prohibited
> unless it is specifically exempted..."

(b)    The Commission will continue to consider particular problems
relating to housing discrimination on a case by case basis.

(c)    To the extent that views expressed in prior Commission pronounce-
ments are inconsistent with views expressed herein, such prior views
are overruled.

d)    References to real estate brokers, salespersons and agents in
Sec. 201 are applicable not only to real estate brokers, salespersons,
or agents, but also to any other person involved in a real estate
transaction.

003336

538

Sec. 201.2    Institutional Advertising as a Bona Fide Form of
              "Solicitation for Business"

(a)    The Commission believes that the publication of institutional
advertisements in newspapers, radio, television and other mass media,
the exhibiting of institutional advertising material on public signs,
billboards, and the like, and the publication of institutional ad-
vertising in newsletters, circulars, and other such publications
published by neighborhood organizations to be a bona fide form of
solicitation for business by a real estate broker, salesperson or
agent provided that:

       1)    Such advertising methods are not disproportionally directed
at limited solicitation areas.

       2)    Such advertising methods conform to the guidelines outlined in
paragraph (b) of this section.

(b)    Conformance with the following guidelines will be considered in
evaluating compliance with Sec. 2-451 of City-County General
Ordinance No. 1, 1970, as amended December 4, 1972.

       1)    The use of words, phrases, sentences and visual aids which
have a discriminatory effect.  The following words, phrases, symbols
and forms typify those most often used in residential real estate ad-
vertising to convey either overt or tacit discriminatory intent.  Their
use should therefore be avoided in order to eliminate their discriminatory
effect.

              (A)    Words descriptive of dwelling, landlord, and tenant,
              such as:  "White private home", "Colored home", "Jewish
              home".

              (B)    Words indicative of race, sex, religion, color,
              national origin or ancestry, such as:  "Negro", "Hispano",
              "Caucasion", "Chicano", "Indian", "Mexican", "Oriental",
              "Black", "White", "WASP", "Male", "Female", "Hebrew",
              "Catholic", "Italian", "Irish", "African", "European", etc.

              (C)    Catch words, such as:  "Restricted", "ghetto", "dis-
              advantaged".  Also words such as "private", "integrated",
              "transitional", "board approved" or "membership approved"
              if used in a discriminatory context.

              (D)    Symbols or logotypes which imply or suggest race, sex,
              religion, color, national origin or ancestry.

              (E)    Colloquialisms:  Locally accepted words or phrases which
              imply or suggest race, sex, religion, color, national origin
              or ancestry to include references to "school busing."

(F) Directions to the real estate for sale or rent (use of maps or written instructions): Maps or written directions to real estate for sale or rent which reference locations in terms of racially, religiously or ethnically significant landmarks or areas.

(G) Area (location) description: In advertising, use of religious, ethnic, or racial facilities to describe an area, neighborhood, or location.

2) Selective use of advertising media or content with discriminatory effect. The selective use of advertising in various media and with respect to various housing developments or sites can lead to discriminatory results and may indicate a violation of Sec. 2-451 of City-County General Ordinance No. 1, 1970, as amended December 4, 1972.

(A) Selective geographic impact. Such selective use may involve the strategic placement of billboards, brochure advertisements distributed within a limited geographic area, or advertising in particular geographic coverage editions of newspapers, or in local newspapers which are mainly advertising vehicles for reaching a particular segment of the community, or in displays or announcements only in selected sales offices. It is not the intent that the advertising must be placed in all community papers or none, or that billboards must be placed all over the city or none used, or that brochures must be mailed throughout the city or none used.

(B) Selective use of equal opportunity slogans or logos. Such selective use may involve using an equal opportunity slogan or logo in advertising reaching some geographic area, but not others, or with respect to some properties but not others.

(C) Selective use of human models. Such selective advertising may involve the use of human models primarily in media that cater to one racial or ethnic segment of the population that is not balanced by a complementary advertising campaign that is directed at other groups, or by use of racially mixed models to advertise some real properties but not others.

Sec. 201.3 Other Discriminatory Forms of Solicitation

(a) Many forms of solicitation by real estate brokers, salespersons or agents which are intended to be, and on the surface appear to be,

540

nondiscriminatory often have a discriminatory effect. The Commission must base its decisions upon the effect of an action, not upon the intent. Therefore any solicitation which produces a discriminatory effect will be considered evidence of a discriminatory practice in violation of Sec. 2-451 of General Ordinance No. 1, 1970, as amended December 4, 1972. Solicitations which indicate the number and/or identity of properties in the immediate area recently listed for sale or rent or sold or rented, statements regarding a large number of prospective purchasers for property in an area or urging the property owner to "sell now while values are high", and inducements such as "free appraisals" have often resulted in civil rights complaints. Members of the real estate industry should therefore closely scrutinize both the quality and quantity of their solicitations to guard against solicitations which might have a discriminatory effect. The examples listed above are merely examples and by no means should they be considered an exhaustive list of the forms of solicitation which have resulted or may result in civil rights complaints. On a case by case basis the Commission shall continue to consider complaints of solicitation and determine whether such solicitations are discriminatory based upon their effect.

(b) Use of "pick your neighbor" cards or other similar solicitation which attempts to involve a resident of an area in assisting in finding a buyer for real property which a real estate broker, salesperson or agent may have listed in the area will be considered evidence of a discriminatory practice in violation of Sec. 2-451, of General Ordinance No. 1, 1970, as amended December 4, 1972.

Sec. 201.4  Limited Solicitation Areas

Sec. 2-448 (ii) of General Ordinance No. 1, 1970, as amended December 4, 1972, states it is the purpose of this section "to eliminate segregation or separation based solely on race, sex, color, religion, or national origin, since such segregation is an impediment to equal opportunity."

In an attempt to eliminate those factors which serve to perpetuate racial segregation, the Commission believes that it must act to eliminate real estate practices which cause or contribute to panic selling. Solicitation, as defined in Sec. 200.2 (k), by real estate brokers, salespersons, and agents and the erection or display of real estate signs can and does, under some circumstances, contribute to panic selling. The Commission will therefore, from time to time, after consideration of factors including, but not limited to, racial composition, level of real estate activity, and the level of citizen unrest, designate areas as "limited solicitation areas." After an area has been designated a "limited solicitation area" any or all of the following may be applied.

(a) If any person shall construct, place, maintain, install, or permit or cause to be constructed, placed, maintained, or installed,

003339

any real estate sign of any shape, size, or form on any premises located in any "limited solicitation area" designated by the Commission on Human Rights of Indianapolis and Marion County, it shall be considered evidence of a discriminatory practice in violation of Sec. 2-451, of General Ordinance No. 1, 1970, as amended December 4, 1972.

(b)  Any solicitation, as defined in Sec. 200.2 (k), within a limited solicitation area will be considered evidence of a discriminatory practice in violation of Sec. 2-451 of General Ordinance No. 1, 1970, as amended December 4, 1972, unless said solicitation conforms to one of the following:

1)  Distribution of "meet your neighbor" cards or other such announcement of a real estate transaction involving real property located within a limited solicitation area shall be permitted only if said distribution is:

> (A)  Limited to property owners/occupants of properties physically contiguous to the real property involved in the real estate transaction; and

> (B)  That the content of such announcement does not exceed the name, address and telephone number of the listing and/or selling broker/agent, the address of the real property involved in the transaction, the purchaser's full name, and a general "welcome your new neighbor" statement. Specifically prohibited is any solicitation for business present or future.

2)  Prior customer contacts in the form of anniversary reminders or holiday greetings shall be permitted but limited to no more than two such contacts in any 12 month period.

3)  Contacts with prior customers or personal acquaintances who perform as ongoing referral contacts shall not be limited as to frequency provided that such contact in no way circumvents or violates these guidelines or otherwise conflicts with the intent of existing civil rights law.

(c)  Procedure for consideration as a limited solicitation area shall conform to the following:

1)  Request for consideration for limited soliciation area status may be made by any person or any group of persons residing within the area to be considered or by any Commissioner of the Commission on Human Rights of Indianapolis and Marion County, by filing a written request with the Executive Director of the Commission, who shall verify all requests. All requests shall include name, address and telephone number of person or persons making request, description of the boundaries of areas to be considered, and a statement as to the reason for Commission consideration .

47-614 O - 79 -- 35

542

2) All requests for consideration for limited solicitation area status will be referred to the Chairperson of the Housing Committee of the Commission. All requests for consideration for limited solicitation area status shall be considered by the full Commission within ninety (90) days from receipt of the request by the Executive Director.

3) The Housing Committee Chairperson upon receipt of the request from the Executive Director shall schedule a public hearing at which the Housing Committee will serve as hearing panel to be held within sixty (60) days from the date of filing of the request unless such request is disposed of earlier through efforts at conciliation or persuasion. Public notice of such hearing shall be placed in a newspaper of general circulation in Indianapolis-Marion County at least ten days prior to the date scheduled for such hearing. Said notice shall include the time, date, and place of such hearing as well as the geographical boundaries of the area under consideration. Like notice shall be given directly to the person or persons requesting consideration as a limited solicitation area, neighborhood organizations within the area under consideration, real estate trade associations with local membership, and local civil rights organizations. Additionally, the Housing Committee Chairperson may direct the Human Rights Commission staff to gather any specific data or information pertinent to such consideration.

4) The Housing Committee Chairperson or in his/her absence a member of the Housing Committee appointed by the Commission Chairperson shall preside at the public hearing. The hearing panel may consist of no less than five members of the Housing Committee. The hearing panel shall hear all testimony pertinent to the consideration for limited solicitation area status. Human Rights Commission staff may submit pertinent data and information as well as any recommendations the staff may deem appropriate to such consideration.

5) After consideration of the public hearing testimony, the hearing panel shall prepare a recommendation for or against designation as a limited solicitation area to be submitted to the Commission at its next regular meeting. Panel recommendations for designation as a limited solicitation area shall include the committee's specific recommendations regarding application of paragraphs (a) and/or (b) of this section.

6) The Commission, after consideration of the hearing panel recommendations, may by majority vote of the Commissioners present designate a limited solicitation area. Such designation shall be reviewed at two years. Additionally application of paragraph (a) of section 201.4 shall be reviewed at six month intervals.

7) Notification of the Commission decision shall be given to all persons previously notified pursuant to section 201.4 (c)(3) and to all other persons presenting testimony at the public hearing. The effective date of any limited solicitation area designation shall be the tenth (10th) day of the month following the Commission designation.

543

8) The Commission may of its own volition or upon request of any person or group of persons affected by a limited solicitation area designation previously made, conduct an optional review of such designation at a time equal to one-half the intervals specified in section 201.4 (c)(6).

9) All reviews of a limited solicitation area designation shall conform to the procedures outlined herein for consideration as a limited solicitation area.

Sec. 201.5   Referral to the Real Estate Commission of the State of Indiana

The Commission on Human Rights of Indianapolis and Marion County as provided for by Sec. 2-450 (o) of City-County General Ordinance No. 1, 1970, as amended December 4, 1972, may as it deems appropriate, refer any complaint which it may receive involving a real estate broker, salesperson or agent to the Real Estate Commission of the State of Indiana for such disciplinary action as may seem appropriate and may make any records available to the Real Estate Commission as may relate to such complaint, notwithstanding any other action which the Commission on Human Rights may take or has already taken.

Mr. EDWARDS. Now we will recall Ms. Knighton.

Disabilities are of varying degrees. Most mentally ill or retarded persons, for example, may be capable of caring for themselves alone or in a group home but others may not. Should the bill attempt to make this distinction?

## TESTIMONY OF WILLIA KNIGHTON AND STEPHANIE MENSCH—Resumed

Ms. KNIGHTON. I think not. I think that in a group home where you are going to have several handicapped persons, usually there are house parents there who meet the needs of the severely handicapped person. They are not totally limited so there are some things they can do for themselves. The house parents, the house residents, take care of the others. I don't think it's required to be a part of the law.

Mr. EDWARDS. Do you think the bill should provide that a handicapped person is not entitled to the protections of title VIII if the disability is so severe so as to constitute a direct threat to the property or safety of others?

Ms. MENSCH. May I answer that?

We don't believe that this subcommitee could legislate the degree of severity. For one thing, putting a person in a normalized environment, their potentials develop.

For example, in the State of Tennessee, there are four or five levels of developmental programing. Individuals are graduated to the level that they can meet. So perhaps a person begins in an institution. They may eventually be independent, live alone in the apartment, hold a job, and be taxpaying members of society.

I don't think it would be fair to limit the law to a certain type of handicap; it would be arbitrary. With the rapid advance of technology and medicine, disabilities you might legislate this year could be aided in the future.

Another thing, too, is that Congress has been going the other way. Recently in the Rehabilitation Act amendments, and amend-

544

ments to the Developmental Disabilities Act, Congress provided a new definition of developmental disabilities that didn't mention specific handicapping conditions but basically described disability in terms of functional abilities.

Based on those kinds of definitions and that kind of thinking, to try and specify at what level a handicapped person could seek housing I don't think would be fair.

Mr. EDWARDS. Would the definition be susceptible to people using the defining process to suit their own prejudices?

Ms. MENSCH. Yes; that is a good possibility.

Mr. EDWARDS. Some State laws protecting the rights of the handicapped in housing specifically state that a "higher standard of care" is not required. I take this to mean that if the handicapped tenant is more susceptible to accident and injury than a nondisabled person, then the otherwise responsible landlord would not be liable.

What do you think of that kind of provision?

Ms. KNIGHTON. That is one of the falsehoods in the perception of handicapped individuals.

The handicapped, for the most part, the mentally retarded and mentally ill, learn by rote. They learn to do things a certain way a certain time and they try to do it to perfection. They are less susceptible to accidents, to incidents of falling, incidents of fire, than a normal person because of the way they have been trained to conduct themselves. So that is not at all a problem.

Mr. EDWARDS. We have in Haywood, Calif., a most remarkable center where mentally handicapped people come to work on their own and do work for United Airlines. It is immensely valuable to United Airlines because they have to tear down their airplanes completely after every 100,000 miles or hours and these people clean and polish the parts and throw out the damaged parts.

I have never seen a better adjusted group of people. They enjoy coming to work, enjoy the companionship of meeting together. This really was an eye opener to me.

With planning and good will and some money, something like this can be done. They make good money, too.

As you know, the sponsors of this bill didn't intend to require retrofitting by virtue of this bill. Is it your testimony that considerable discrimination exists against the handicapped that is not related to architectural barriers?

Ms. KNIGHTON. Yes; I would think so.

Ms. MENSCH. To elaborate, there is a major problem of discrimination because the handicapped often look different and because people harbor archaic stereotypes that make them reluctant at first to accept disabled persons simply because of appearance handicap.

We do quote a study in our testimony where a group of students made some random phone calls. They looked up ads for apartments renting under $200 in their local newspaper and called the first 100 landlords, the first 100 of such ads, and asked them if they would rent their apartment, if an apartment was available.

They called a second time and said, "We are calling to rent this apartment on behalf of a retarded person who has a job and in

545

order to hold this job will have to get an apartment in the community."

The study shows that the landlords had two responses.

The first response was: "The apartment is no longer available." The second response was: "Well, I don't think our building would suit him."

Only 1 out of those 100 called was willing to consider a retarded person.

This isn't seeing them. Not a question from the landlord about the severity of disability or what sort of training they had or what sort of previous living experience they had had. That seems to me to be very blatant discrimination.

The words "mentally retarded" was mentioned and they said No.

Mr. EDWARDS. So there was more discrimination in that survey than the survey that involved black families seeking to rent or purchase homes or apartments.

Ms. MENSCH. I would think so. This is just one survey.

I guess, to amplify that, a number of directors of programs for the retarded in certain States, such as New York, are under a court order to deinstitutionalize their institutions, to put these people in the communities. they are in violation of the court order because they can't establish community homes because the communities won't take them.

So you have a real conflict. They want to do good but they don't want to do good in their neighborhood.

Mr. EDWARDS. That is a problem all over America today.

Counsel?

Ms. COOPER. Thank you.

There are a number of States, as I am sure you are aware, that do have protection against discrimination against the handicapped in housing. Those laws are of varying coverage, however, and definition of handicapped.

What is your assessment of the impact of those laws? Have they made a difference in the availability of housing for the mentally disabled?

Ms. KNIGHTON. Not in sufficient numers. For instance, there are 6 million handicapped persons—that includes the mentally retarded—that need to be housed or need housing of some kind, yet you find that in most States the citizenry is still resistant to having the handicapped live next door, just as they were to having the black or Chicano live next door, but the impact has not been as tremendous.

Ms. COOPER. To what would you attribute that? Is that a lack of enforcement power?

Ms. KNIGHTON. A lack of knowledge of what the handicapped person needs, who he is and what he is. Basically you find many people who consider the mentally retarded mentally ill. It is not the same at all. Or you have a person who says the mentally retarded are grotesque and have large heads. Not all do.

Some people can sit right next to you and you won't know they are mentally retarded because there is no physical difference. It is a lack of knowledge and understanding of the mentally retarded, sick, physically handicapped, mentally ill. A lack of knowledge.

003344

Ms. COOPER. This bill would include persons with all sorts of disabilities including those with mental disorder that some might consider severe whether or not we put a definition in the bill itself.

The bill also narrows the exemptions as to what kind of units are covered, the so-called Mrs. Murphy exemption.

I wonder if you would think there should be any leeway given to persons who would be sharing common areas of a building or in close proximity to the handicapped tenant as to any kind of defense that might be raised that this person really is so disabled that they can't cope with the responsibilities of the tennancy and the person is not with someone taking care of those problems.

I am trying to anticipate the arguments that will be used against this kind of provision.

Ms. MENSCH. You can have rowdy tenants. You can have tenants who get drunk and tear up an apartment building or have fights with their spouses. You know, you can find handicapped in general—the mentally ill as well—who are good neighbors.

The stereotype of a mentally ill person as a raving lunatic is a problem. There is a need to raise the awareness of the community that these people are trying to live among the rest of us in as normal a situation as they can. Being around normal people teaches them normal social behavior. There have been studies that show that institutionalizing persons reinforces deviant behavior.

This is the problem. I think it is just a fear, an unfounded fear, and the same kind of question neighbors brought up about blacks moving into the neighborhood. What will happen if a black person moves next door? They don't live like us. They are different.

It is the same with the handicapped person. It is the same unfounded fear. I think the proof of people who have moved into the communities and the community acceptance of group homes and of handicapped people who live among us is testimony to the fact that they can live as good neighbors, that they can be hard-working, they can be productive taxpayers and live like normal people.

Ms. COOPER. Thank you.

Mr. EDWARDS. We welcome the coauthor of the bill, the gentleman form Massachusetts, Mr. Drinan.

Mr. Drinan.

Mr. DRINAN. Thank you, Mr. Chairman. I apologize for my unavoidable tardiness with three other commitments.

I want to commend Ms. Knighton on her testimony and welcome her support and I like particularly the term "normalization" on page 5. We have been calling it deinstitutionalization but I know of no one against normalization of anything. So I welcome that. My vocabulary, as of this morning, has been changed.

I never saw the statistic before that there are 62,000-plus mentally retarded persons in community residential facilities. It says that this has increased a great deal but is it still increasing? Is there a momentum that is growing all the time?

Ms. KNIGHTON. The trend now is to deinstitutionalize or, as you say, to normalize handicapped persons by getting them out of institutions. We call the institutions "warehousing." We are not for warehousing anybody.

547

Everybody, including the severely retarded, the severely mentally ill person, is being brought out as quickly as we can get them out.

Ms. MENSCH. May I elaborate?

There are two things that will increase the efforts to house handicapped people in the communities. One of them is money. This is very tight. Without support, social services funding and housing funding and support from the State and communities, this process is impeded. It is a slow process and houses have to be paid for.

The other problem is the attitude of the community. You can plan a house. You can get things started. You can have your money put up. You can have the program begin and you can have the community block it and block it and block it. So it will slow down the process.

Mr. DRINAN. I thank you for your contribution. I am aware of that.

Last year this subcommittee had the Commissioner of Mental Health for Massachusetts here who gave very effective testimony and documented precisely what you are saying. I in my own congressional district am intensely familiar with it because there is a large institution for mentally retarded which is deinstitutionalizing or normalizing and it is not an easy task.

I regret that Massachusetts is not among the leaders. In your testimony you say California, Pennsylvania, Illinois, and Michigan lead all the States in the number of communities established. If we had a section in this bill, I think the situation in Massachusetts and elsewhere would be improved.

Could I ask this:

Do you know of any resistance in the community of retarded citizens—do you know of any people who feel this might be a little bit premature or a bit far out?

Ms. KNIGHTON. Yes. Right in the District of Columbia we are finding that they say yes, bring them out, but don't bring them here.

Mr. DRINAN. I didn't mean that. I meant in the people sophisticated like yourself who work for retarded citizens, would any of them feel this bill is too progressive?

Ms. KNIGHTON. No. Indeed not.

Mr. DRINAN. I thank you again for your testimony. I am sure this will add very significantly to the record.

Thank you very much, Mr. Chairman.

Mr. BOYD. Ms. Knighton, in your statement you indicated there were two studies, I think one at Princeton University and the other at the Regional Science Research Institute in Philadelphia which had indicated that the presence of handicapped persons in neighborhoods didn't adversely affect housing values.

First—I guess the question is in two parts.

One, how long a period of time did those studies cover?

Two, did those studies also reflect a positive attitudinal change in those communities?

Ms. MENSCH. I don't think they studied attitudinal changes.

I believe that Princeton study was about a 3- to 5-year study. We have submitted both studies to the subcommittee. I think there is a

003346

548

full copy detailing their methodology. Their conclusions are very guarded. We feel that these are facts that prove such fears don't really materialize.

Although further study is needed, they definitely show that property values don't go down, they don't stay still. They are going up with the rest of the market.

Mr. BOYD. Are there any studies you know of which do indicate a positive or negative attitudinal change as a result of——

Ms. MENSCH. I don't know of any.

Mr. BOYD. Thank you.

Mr. EDWARDS. Are there further questions?

[No response.]

Mr. EDWARDS. We thank the witnesses for very valuable testimony.

The subcommittee is adjourned.

[Whereupon, at 10:40 a.m., the subcommittee was adjourned.]

# FAIR HOUSING AMENDMENTS ACT OF 1979

### THURSDAY, MAY 31, 1979

House of Representatives,
Subcommittee on Civil and Constitutional Rights,
Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met at 9:30 a.m. in room 2226, Rayburn House Office Building, the Honorable Don Edwards (chairman of the subcommittee) presiding.

Present: Representatives Edwards, Drinan, Volkmer, Hyde, and Sensenbrenner.

Also present: Janice Cooper, assistant counsel; Thomas Boyd, associate counsel.

Mr. Edwards. The subcommittee will come to order.

Our first witness today is the Director of Urban Affairs for the AFL–CIO, Henry Schechter. The AFL–CIO has distinguished itself for many years by its vigorous support of controversial civil rights issues that go beyond the immediate interest of its membership. In the larger sense, of course, civil rights reforms benefit all Americans, including the working man and woman, as the AFL–CIO has long recognized. It's our hope that other organizations, especially those associated with the housing industry, will come to agree with this.

We are happy to welcome you, Mr. Schechter. It's a pleasure having you here and you may proceed with your testimony.

### TESTIMONY OF HENRY B. SCHECHTER, DIRECTOR, DEPARTMENT OF URBAN AFFAIRS, AFL–CIO

Mr. Schechter. Mr. Chairman, I am pleased to have the opportunity to present the views of the AFL–CIO on H.R. 2540, the Fair Housing Amendments Act of 1979.

The AFL–CIO recognizes the importance of this legislation, and commends Representatives Edwards and Drinan for their sponsorship of this bill.

Fair housing is a major civil rights issue of the 1970's. The social legislation of the 1960's was not considered complete until the passage of title VIII of the Civil Rights Act of 1968—also known as the Fair Housing Act. As you know, this significant piece of legislation made it illegal to discriminate on the basis of race, color, religion, sex, and national origin in the selling or renting of housing. Title VIII represented an important step in the Nation's quest for equal opportunity and freedom of choice in housing for all Americans.

However, the legislation did not provide the agency responsible for administering the law—the Department of Housing and Urban

(549)

550

Development—with real enforcement powers. HUD was only given the authority to conciliate violations and, therefore, was unable to offer remedies.

Not surprisingly, HUD's attempt at enforcement through conciliation instead of through litigation proved ineffective. A February 1978 General Accounting Office report showed that of 332 discrimination complaints handled by HUD during a period of 40 months, a mere 36 complaints were resolved. Further, in only 4 of the 36 resolved complaints was the housing unit in question secured.

Under title VIII authority to litigate was, however, given to the Justice Department but was restricted to suits where there was a pattern or practice of discrimination or to suits of general public importance. Furthermore, the Justice Department has only one section of one division, of 25 attorneys, to handle fair housing litigation for the entire country. With such limited authority and inadequate resources, the Justice Department's efforts to enforce the Fair Housing Act is necessarily limited.

HUD's inability to litigate, therefore, has proven to be a major flaw in the law and, in large part, is responsible for the lack of significant progress in the elimination of discrimination in housing.

Similar concerns were stated earlier this year by President Carter in his State of the Union address where he said,

Title VIII of the Civil Rights Act of 1968, which prohibits discrimination in housing remains largely an empty promise because of the lack of an adequate enforcement mechanism.

H.R. 2540 would rectify the weaknesses in the existing fair housing law. And recent evidence shows that this bill cannot be enacted too soon.

In June and July of 1977, the National Committee Against Discrimination in Housing undertook a Housing Marketing Practices Survey, in 40 metropolitan areas across the Nation. The HUD-funded survey sent 300 blacks and 300 whites, in pairs, to shop for housing through advertisements in local newspapers. Approximately 3,200 real estate sales firms and rental agents were contacted. The results were shocking.

When responding to newspaper advertisements for rental vacancies, it was found that 29 percent of the rental agents discriminated against blacks making inquiries. In the case of homes for sale, 21 percent of the real estate agents were found discriminating against blacks making inquiries.

Moreover, the study found that when blacks in the pursuit of housing visited four rental offices or four real estate brokers in response to advertisements, the probability of encountering discrimination was an astounding 75 percent in the rental market and 62 percent in the home sales market.

The figures suggest that agents practicing discrimination handle a disproportionately large part of the market.

And as dismaying as these estimates of discrimination are, they are conservative estimates and, as such, do not show the true extent of the problem. For example, the study does not take into account the discriminatory effect of racial steering. Steering occurs when people are shown houses in a selective manner for the purpose of concentrating them in certain areas as determined by their race, religion, national origin, or sex.

551

Particularly in the sales market, steering is a commonly used way of engaging in racial discrimination.

In addition, estimates for the level of discrimination are understated because of the exclusive use of newspaper advertisements as the basis for the sample. By so doing, testing could not be undertaken for those housing units that for purposes of discrimination were deliberately not advertised.

The implications of such unequal treatment in the housing market are far reaching.

Maintaining a housing market that limits the choice of a select group of Americans is costly—both economically and socially. Housing generally has been in short supply and prices and rents have been inflating. It particularly burdens the targeted groups for example, minorities, by forcing them to compete for a limited number of housing units in certain prescribed areas, thereby bidding up the prices of such units.

Further, there is the critical impact of discrimination in housing on employment opportunity. If, because of housing discrimination, a person is prevented from securing housing that is in the vicinity of an employment facility, and is therefore unable to obtain a job, there is a loss to the Nation in foregone income and productivity—a loss that can never be regained. There is also the emergence of socially deviant behavior caused by the frustration and despair associated with sustained unemployment.

In part, the recent experience of young blacks can be explained by discrimination in the housing market. Traditionally, young blacks have held jobs that were in urban centers. In recent years, however, employers have been migrating toward the suburbs, leaving black youths behind—unemployed and isolated in the central cities, unable to obtain housing in suburban areas.

For all of the aforementioned reasons, the AFL–CIO strongly supports H.R. 2540.

We are pleased to see that the very serious omission in the current Fair Housing Act—lack of HUD administrative enforcement powers—is realistically addressed in H.R. 2540.

HUD would be permitted to issue a "cease and desist" order upon holding an administrative hearing that establishes violation of the law. Additionally, the bill gives HUD the authority to impose a civil penalty of no more than $10,000.

There is also a provision that would allow HUD to investigate housing practices and, on its own initiative, institute administrative action. This is in addition to HUD's basic authority to grant a hearing and relief based on complaints filed by a private "aggrieved party."

Thus, HUD for the first time would have the authority to initiate action against institutional or systemic discrimination in housing, as well as to deal with individual cases.

H.R 2540 also makes it possible for HUD to seek temporary or preliminary relief from the courts pending a final decision on the charge, including orders preventing the housing unit in question from being sold or rented pending a final decision on the merits. This provision is of central importance in providing effective relief.

The AFL–CIO was pleased to note that this legislation narrows the exemption of small dwelling units. No longer will owner-occu-

003350

552

pants of a dwelling of four units or less be exempted from the Fair Housing Act's prohibition against discrimination in housing. This accords with our view that fair housing legislation should prohibit discrimination with respect to all housing structures. The bill allows the exemption to cover only rooms rented in an owner-occupied single-family unit.

Under this new legislation, it will no longer be mandatory for HUD to refer complaints to State and local fair housing agencies. HUD would have the discretionary power to refer to such agencies, with the consent of the aggrieved party.

This would be a significant improvement in the law, in that the record of HUD referrals to State and local housing agencies in resolving housing discrimination complaints has, according to a 1978 GAO report, been dismal. This study on fair housing enforcement, undertaken by GAO, found that in the three regions surveyed, 97 complaints had been referred by HUD to 10 State agencies. Of the 97 complaints, HUD was able to accept agency action on only 15 complaints.

H.R. 2540 would also provide an aggrieved party a choice between filing a complaint—either with HUD, thereby opting for the administrative hearing process, or bringing a private action in Federal court. The bill also permits an aggrieved party to intervene in any proceeding initiated by HUD or the Justice Department.

The proposed legislation will make it possible for a complaint to be filed within 1 year, after the alleged discriminatory practices occurred when pursuing a HUD administrative complaint; and within 3 years after the alleged act when filing a civil action.

Finally, the legislation provides the courts with discretionary power to award reasonable attorney fees to the prevailing aggrieved party. We believe that these provisions create a flexible and sensible remedial scheme and we support them.

This legislation extends the powers of the Attorney General's office by authorizing the Justice Department to bring civil actions at the request of HUD and to seek money damages. We also support this grant of added authority.

The national goal of equal housing opportunity for all Americans has not been met. The Fair Housing Amendments of 1979 are, unfortunately, as needed today as the enactment of title VIII of the Civil Rights Act was needed in 1968.

We feel that this legislation is necessary to remedy a problem of national significance and would, therefore, urge approval of H.R. 2540.

Thank you.

Mr. EDWARDS. Well, thank you, Mr. Schechter, for your excellent testimony and a fine summing up of the problem that we face in this country. I especially compliment you on pointing out for the first time in these hearings, on page 3, that housing discrimination can prevent a person from securing housing in the vicinity of an employment facility and therefore we lose income and productivity. It's very serious today, especially with the transportation problem resulting from the energy shortage. It's very important that we make it as easy as possible to get to work and to live in the vicinity of your employment and you sure can't do it if there's discrimination, can you?

553

Mr. SCHECHTER. And it's not only discrimination on the part of individual agents selling and renting homes, but also discrimination which arises from land use regulation through exclusionary zoning which has been a continuing matter of concern and pursued in the courts.

Mr. EDWARDS. Now one organization that commented on this bill, the Open Housing Center, noted that their experience shows that any minority person, no matter what his or her level of income, usually is the victim of discrimination when seeking housing outside the traditional area of minority concentration.

In your experience, is this true?

Mr. SCHECHTER. We do have some of our members who have to commute great distances because they cannot get housing close to the places where they work, and this is one disadvantage which arises probably because of the limitation of available housing to them. Because of steering and other processes, very often a person will pay a higher price because his choice is limited.

Mr. EDWARDS. It was distressing to read in the morning paper that blacks in Washington, D.C. once again are being discriminated against in nighclubs and discotheques and clubs. We thought that at least in Washington that was a thing of the past. So this discrimination still pervades our Nation and it's just wonderful having the AFL–CIO in support of this bill because we do need lots of help.

Mr. SCHECHTER. Thank you. We, of course, have a long history of supporting legislation for civil rights, going back to 1964, even earlier, but certainly in the 1964 act the organization played a role in getting the enactment of that act.

Mr. EDWARDS. A key role also, in the 1965 Voting Act and in the 1968 housing bill more than 10 years ago.

Ms. Cooper?

Ms. COOPER. Thank you. The current law has a number of barriers to using the court system as the enforcement forum and this bill makes some changes in that regard, such as making it easier to get attorney fees and lengthening the statute of limitations. Some people have commented on the bill that with those kinds of changes we really should be thinking solely in terms of judicial enforcement of title VIII, that administrative enforcement is not necessary.

In light of this viewpoint, would you comment on the ability of workers, such as the members of the unions which are part of the AFL–CIO, to hire attorneys and to pursue their claims in court if that were the sole avenue of redress?

Mr. SCHECHTER. Well, most of our members—and I believe this is true of other working people too—are not familiar with legal procedures. They don't have too much to do with hiring attorneys as business people do, and there would be a reluctance to pursue that avenue. Certainly I doubt whether our members, even if we adivse them that attorney fees can be collected if the case is won, that there would be much knowledge or faith in this process, and I think it is highly desirable to have the availability of the administrative process through an agency of the Government.

Mr. EDWARDS. Mr. Boyd?

Mr. BOYD. I have no questions.

554

Mr. Edwards. Mr. Schechter, we thank you very much for your testimony.

Our next witness today is Mr. Dexter MacBride, executive vice president of the American Society of Appraisers. Mr. MacBride, we apologize for delaying your testimony, but we certainly are pleased to have you. The previous witnesses from the Society of Real Estate Appraisers have told this subcommittee that the present inclusion of the appraisal process in existing title VIII coverage is unwarranted and interferes with the appraiser's exercise of first amendment rights. Further, that professional organizatin denied that there is any historical record of racially discriminatory decision-making by appraisers that justifies their inclusion in the law.

Like most professionals, however, there's no uniformity of opinion on issues of mutual interest. I understand that the American Society of Appraisers has its own views on these issues. We are therefore most interested in hearing your testimony.

Without objection, your full statement will be made a part of the record and you may proceed as you see fit, sir. We are glad to have you here.

**TESTIMONY OF DEXTER MacBRIDE, EXECUTIVE VICE PRESIDENT, AMERICAN SOCIETY OF APPRAISERS, ACCOMPANIED BY ROBERT FRANCY, SENIOR VICE PRESIDENT, AMERICAN SOCIETY OF APPRAISERS**

Mr. MacBride. Thank you, Mr. Chairman.

I am delighted that you were so kind as to arrange events so that time would pass a bit and if you would permit, I would hope that you would let me take credit for it rather than having it as an extended courtesy from you. The senior vice president of our society, Mr. Robert Francy, coming from Arizona, fully intended to be here promptly and early as is his usual custom, but the American Airlines saw fit to leave him stranded in Chicago last night and so he's coming in desperately this morning and hoping that he will be at the National Airport at 9:28 and hope that a cab will get him here in time to permit him to be seated and to add his comments.

Mr. Edwards. We will be very pleased to welcome him when he comes and in the event he comes in too late, I hope that you will later come to my office so we can have a chat.

Mr. MacBride. That would be very nice and he would be most appreciative.

Now let's see if I can get about the task of attempting to assist you and your committee in what I think all hands in the appraisal profession consider to be a most important and most significant and most desirable objective—somehow together—it isn't just your committee's responsibility; it is ours too—and the appraisal profession—either as citizens or professionals, we want to assist in the fair housing concepts, fair housing implementation, fair housing achievement. I do not think there's any question and there should be no question in your mind—of course, I'm not speaking for the Society of Real Estate Appraisers, but their organization, like ours, is fully committed to the essence of fair housing and the achievement of fair housing in this country. It would be singularly inappropriate if we were not. The Nations' housing stock is our single greatest capital investment in this country, as you so well know.

555

We are its guardians in a sense. We are it's evaluators. For us not to want to encourage and strengthen and protect and to make available this treasure to all of our citizens would be an absurdity.

Therefore, I think there is not a significant element of the appraisal profession but would not wish you and your committee well, that would for a moment hesitate to join in with the fair housing objectives and fair housing for all people.

Now to try to do my task in cooperation with you and your committee. If you will, rather than read the record which is here before you and which we have worked on extensively—and we treasure every word and we hope you will too—perhaps if I were to try to briefly categorize and summarize the thrust of these, with your permission, that's what I would like to do rather than read this in extenso.

Mr. EDWARDS. Yes, please do, and I certainly appreciate your opening remarks. They were very graceful and we understand the issue here and we are most interested in having a mutuality of interest with the American community of appraisers.

Mr. MACBRIDE. Well, we are delighted. If I remember well, you were in California and connected with the title industry.

Mr. EDWARDS. That's right.

Mr. MACBRIDE. And as I see it, the title industry is as much a part of the so-called great real estate industry as are appraisers, as are attorneys, as are realtors, as are salesmen, as are the various kinds of bureaucratic representatives—the representatives of bureaucracy—involved in the laws, the regulations, and the protective devices.

So this is a partnership and I'm trying to speak with you and your committee as a partner in this whole process.

First, just for the sake of identificaiton, the American Society of Appraisers is, I think it's fair to say, one of five major nationwide testing and certifying appraisal societies in the United States. You have already heard from another, the Society of Real Estate Appraisers.

Good morning, Father Drinan.

Mr. EDWARDS. We welcome the coauthor of the bill, the gentleman from Massachusetts, Mr. Drinan.

Mr. MACBRIDE. Our society has about 5,000 members. We are international in scope, but primarily here in the United States, with the great majority of our membership. The society is education and research oriented. We are different from the four major societies in only two aspects and I cite this solely so you will understand our perspective. Our society, whether for good or for ill, is multidisciplinary in concept. The majority of our professional practitioners, men and women, are in the real estate discipline, but we have many who are in the discipline of the appraisal of fine arts, antiques, collectibles, utility appraisals, te discipline of intangibles such as patents and copyrights, the discipline of machinery and equipment appraising. So you see, we have what we call a multi-disciplinary or interdisciplinary approach to the appraisal problem in the United States. That's our society.

Solely for the sake of the record and to, I hope, assist Father Drinan, my name is Dexter MacBride. I represent the American Society of Appraisers and it is a pleasure so to do and I am

speaking I think as a copartner in what we all want—fair housing for this country.

Now I speak from perhaps a different perspective than you would expect. It is true that I am the chief executive officer of the American Society of Appraisers, but I have about 33 or 35 years in appraisal and appraisal-related fields. I'm a member of the American and Virginia Bar Associations. I don't know whether you will hold that against me or not. I am a certified right-of-way expert. I am certified by the American Society of Association Executives. So I feel I bring a multidisciplinary look. I started out in Norfolk, Va., practicing in eminent domain. So I believe that I see real property in many of its aspects and the administration when I was chief appraiser for the State of California public works appraisal program and so on.

Now let me see. Perhaps it would be helpful for us to let you know and for me to say briefly again that we are aware of the reasons why you and your committee feel this legislation is necessary, and just to strengthen that so we achieve some kind of communication between us: We are aware of the concepts described by the President of the United States when he said that the existing Fair Housing Act of 1968 has a weakness; we understand that. We understand his comments that:

Title VIII of the Civil Rights Act of 1968 which prohibits discrimination in housing remains largely an empty promise because of the lack of an adequate enforcement mechanism.

So we are aware of the context from which you all are working.

Second, Chairman Edwards, we are aware of your comments about the National Committee Against Discrimination factual data which caused you to say: "The problem of housing discrimination is even worse than is apparent." We understand why you said that and therefore we understand better the reasons for this bill.

Further, we have made, as we know you have, as evidenced in the things that you're doing, intensive studies. We have tried to be empathetic with and discriminating in trying to focus upon the problem. We know some of he studies that support your position and the President's position. "Mortgage Lending Decisions, Criteria and Constraints," a publication issued by the Joint Center for Urban Studies of the MIT and Harvard University, for example, is very much to the point. True, it's two volumes and it's hard wading through, but it is most comprehensive and it does come to a conclusion that the race of the applicant—as opposed to the racial composition of the neighborhood surrounding the property—is a crucial factor in lending decisions in all but one of the metropolitan areas which they studied. They came to that conclusion after much intensive research.

We are equally aware—and we note that you are too—in "The Federal Fair Housing Enforcement Effort," a publication issued by the U.S. Commission on Civil Rights in 1979. They came to several conclusions which are amply evidenced in your bill. For example, they feel the 1968 act does not provide adequate enforcement mechanisms. That study also indicates that the Federal departments responsible for insuring equal housing opportunity have not adequately carried out this duty. And third, they have noted—and you are attempting also to provide a remedy for this—they have noted

557

that the provisions for implementing the act of 1968 would require greater staffing and greater budget allocations, and you have addressed yourself to this problem.

We are aware of the study that's entitled "Perceptions of Risk—The Bankers' Myth: An Eight City Survey of Mortgage Disclosure Data."

We are aware of the study—and I don't know if your committee might have had the benefit of the just-issued study from the city of Tampa, Fla. I was down there about 2 weeks ago and there's a study entitled "Redlining," and I would be so happy to share my copy with counsel and for your benefit it's a most unique study. It's the only one that's been conducted in the State of Florida as far as I know, and in the seminar held there about 2 weeks ago they noted with pride that they were exploring this matter which seems to be so new and so difficult for the citizens of the State of Florida, and their study provides 10 general recommendations to suggest ways to inhibit the proliferation of redlining, and then they make this most delicate suggestion which I think is indicative of the care with which the study was conducted:

Redlining is a complex problem. Although it is not as apparent in the City of Tampa, the effect of national media on local residents could surface the issue as matter of public concern.

It's a very thoughtful study and I will be so happy to share my copy with you.

Mr. EDWARDS. We will accept it and thank you.

Mr. MACBRIDE. The position of the American Society of Appraisers in essence, without running this too long—we adopted January 26, 1975, the first policy statement issued by an appraisal society in this country affirming fair housing support, concern, desire to see it implemented, desire to see it encouraged. Ours was the first policy resolution issued. It is attached, a copy of it, to the data which appear as a matter of record.

Second, our society decided that we had a responsibility to do something with our members. Our members are important to us and so we constructed the first redlining/urban disinvestment orientation seminar ever prepared by appraisers in this country and it was first introduced at Hofstra University in April of 1977. Then we worked with the city of St. Petersburg, Fla., and the city of Saginaw, Mich., in 1977 in conducting that seminar.

It's our feeling that our appraisers should become aware of the semantics, the psychological problems, the political problems, the economic problems, and we feel that this orientation seminar would be a sensitizing device to achieve that. We are very proud of that seminar.

In March of 1978, our society was concerned about an issue which is of deep concern to you and that is their members' rights in conducting appraisals, so they passed a resolution and it was a matter of grave urgency to them, and I would like to just read one sentence from it which conduces to a focusing of the concern. The resolution stated the position of the Society that:

All appraisers should report and should be free to report factually and with total candor each and every significant factor which may affect the value of residential, commercial, or industrial property in consonance with the accepted professional "Principles of Appraisal Practice and Code of Ethics" of the American Society of Appraisers.

003356

558

We have attached that as an exhibit.

Now it's of great moment—and I appreciate your dilemma—it's of great moment for you to note that we said in consonance with the principles of appraisal practice of our society. We have a very extensive and explicit statement of how to conduct appraising, how to achieve it, with what comportment, with what are the professional criteria, and we want to continue on that basis.

It is my considered opinion that in just a few moments the development of this theme will be most important to the thing that you're trying to achieve.

Let me see if I can move a little bit further. In summary, then, we understand that your concern that voluntary compliance, from just reading the studies objectively, should come to the decision, it seems beyond doubt—the massive studies, the data before you, the concern of the President of the United States, the concern of your committee—I think any fair-minded person would say something has been going wrong and it may well be that voluntary compliance may not achieve what we are all after. So I think we are at that point.

Now you have heard from one segment of the appraisal community.

Mr. EDWARDS. Mr. MacBride, I believe Mr. Francy is here.

Mr. MACBRIDE. Mr. Bob Francy, would you come and join me here in my moments of solitude and trauma? If I may, Chairman Edwards, this gentleman is Mr. Robert Francy. He's the senior vice president of the American Society of Appraisers.

I have told them that the American Airlines dumped you in Chicago and therefore you have been in extremis all night long and we are glad to have you here.

Mr. FRANCY. It's been a struggle and I'm very happy to be here however.

Mr. MACBRIDE. Can we do this, Bob, if you would agree—somehow, I feel like I'm rolling and in another 3 or 4 minutes I can unburden our position here with the committee and then it would seem to me that you might have comments that would lend effectiveness, if that would be permissible, Mr. Chairman.

Mr. EDWARDS. Yes, that would be acceptable and we welcome you, Mr. Francy. We are sorry you had trouble getting here, but it's nice to have you here.

Mr. FRANCY. Thank you very much.

Mr. MACBRIDE. All right. I think I want to do this so you will know that we are attending to your problems. We understand the difficulty of coming to the decisions that you must come to. It is your responsibility to.

You have heard three objections from another segment of the appraisal profession to the bill before you. One of the objections has been the first amendment constitutional rights. "Please don't interfere with those," was the burden of that objection.

The second, if I may summarize—I quoted them exactly in the report and I'm now trying to do a quick summary. The second is that sound appraisal practice requires that all relevant factors, including race, religion, and ethnic factors, which exist in the marketplace and which impact upon market value, must be consid-

559

ered in a dispassionate, unbiased, nonprejudicial, and objective manner by the appraiser in reaching an opinion of value.

The third, which they have told you is the most troublesome issue—and as I see it, these are the three major issues that they have discussed—are the enforcement powers, especially the injunctive type of relief and the cease-and-desist power, especially placing it in the hands of HUD.

Now this briefing is not fair to them, but at least it's my reaction in a summary way to their three important objections. They're stated more carefully on page 7 of my report.

Now as to the first objection—ASA now is talking to you about their objections. As to their first objection, the first amendment constitutional rights, nobody wants their first amendment constitutional rights interfered with. We know that and we know you share this concern and we know you don't want to interfere with them either. I don't think we need to belabor the point much, Mr. Chairman.

It seems to us that the first amendment constitutional rights is an issue which we can share with you because that's your fundamental responsibility and we will back you up in the protection of those rights.

The second issue is a rather involved one and maybe you would rather get at us in questions and answers a little later, which has to do with this business of, "Should you discuss race and ethnicity and race?" and so on. The thing I want to say to you is our extensive and explicit Principles of Appraisal Practice and Code of Ethics nowhere describe race and ethnicity or nationality or marital status or sex as being a mandated area of discussion. I just want to make that very clear to be helpful to you. We have most explicit and careful instructions to our appraisers and the thing that is important for you to know about this is that we do have a thrust on what they should be talking about. This thrust is summarized on page 9 at the top in three little steps. We say appraisers and the appraisal process—page 9 at the top—appraisal should be (1) estimating the cost of producing or replacing physical property; (2) the forecasting of the monetary earning power of certain classes of property; (3) the valuation or determination of the worth of property.

Now let me, because I think this is so key an issue and it will be helpful to you—let me use my own personal phraseology to hammer home the point so I hope you and we are together in this.

What I'm trying to say to you, and I coined a completely different way of saying it, ASA sees the appraiser's problem as one of calculus and demographics. By calculus I mean the most rudimentary sense of that word, semantically, which means the symbolism of numbers, figures. We believe that calculus and demographics are appropriate tools for the appraiser in determining market value of properties. We are not interested in adjectival flights into ethnicity or undocumented theories or assumptions or anything else about race or religion or ethnicity.

If I could just therefore pound this home, the appraiser's world is one of mathematics, of calculus, of demographic exactitude in the task which our society says is one of estimating costs, forecasting monetary earnings and determining the value of property. So we

560

see this as a matter of numbers, not as a matter of adjectives. I hope this is helpful to you because this is a very key issue.

Mr. EDWARDS. I certainly is.

Mr. MACBRIDE. The matter of placing responsibility in HUD— there are several pages devoted there to our disappointments with HUD. They are perhaps overly acerbitive and acid as I thought about them. HUD has disappointed us. For example, when we issued our resolution supporting fair housing, we were the first society to do it. I couldn't get a response from HUD saying thank you for doing this. I pled that they'd just let us know that they received it. I finally had to write to the then Secretary of HUD begging and alternately demanding that that response be indicated so our society would be protected that such a resolution had been received. This was most disappointing to us.

Let me phrase this in another way. A year or so ago HUD had its ninth anniversary and wanted to celebrate out on their proper- ty by having people come together and publicly affix their signa- tures to a declaration on fair housing. Unfortunately, because I'm a lawyer and because I represent a society that cares very much, I didn't have a copy of the declaration and the days were pressing for us to go publicly and do this, so I called and asked for a copy and was told, "We don't have a copy yet," and I said, "Well, you're not asking us to come down and sign something publicly before we have even seen it, are you?" At which point I got a pretty stiff statement from the Secretary—and it's documented here—that it was very exasperating and dismaying to her that I would insist on seeing the document. This was almost like I was breaching the faith. Of course, I knew they would be fair. All I was asking was our society not affix its signature to something sight unseen. This kind of conduct has disappointed us.

I notice, in thinking about it—and Father Drinan, I see you looking at me a little bit hard on this point—I perhaps am too harsh in this documentation about this. Those are just small inci- dents. perhaps the staff was harried. Undoubtedly they were un- derstaffed and undoubtedly underbudgeted. My disappointment was that they had never knocked on the door with a single request for participation or encouragement. Perhaps these are all the things you're trying to cure, but I hope you understand our lack of enthusiasm because of our experience with HUD.

Now let me see if I can move on. We would now like to ask your committee three questions in order to assure communications and partnership between us.

The first question we would like to ask you is: Have adequate enforcement mechanisms to assure fair housing already been achieved somewhere? Could these mechanisms be employed? In other words, let's see if I can sum this up. Do you want to pass a law if there's already a law there getting a job done? I know you don't. Nobody wants that. So the first question we'd like to ask— and we have asked in this record—are these powers already exist- ing in another agency which may be experienced? And we were led to believe by a study in the Urban Law Journal—and it's noted here—that perhaps the powers already exist in the Federal Home Loan Bank Board.

003359

561

Well, I've thought about this since our gathering of these data and I can see that perhaps the answer is that the Federal Home Loan Bank Board does have extensive powers and I think you have a letter on record indicating these. I guess we did not foresee correctly that those powers would not cover all situations and therefore you would have to enact something more extensive. So I think our first question is partially answered by our own reflection of the facts as we have had time to assimilate them.

We have a second question. Part of the second question is: Has the full potential for effectiveness of voluntary compliance been tested? Have we really had voluntary compliance mechanisms since 1968?

Now obviously the medium, the structure, the morphology has been there in the act, but we say it hasn't been tried and that, I guess, again, is a little bit of an acerbitous position on our part. We don't think HUD has been able to give voluntary compliance a very good go. I guess that's very simply put.

Our third question—and this is the question we would like to come to grips with you and if you will face this with us we will feel this has been time well spent, and I think, given the temperament of this committee, you will face it with us. Our third question is, if new enforcement measures are required, what areas should be covered? What steps should be taken to assure achievement of fair housing goals?

Now I know you all are well experienced in this and your act reflects it. So what we are trying to do is be creative and add something to what you're trying to do. We are deeply concerned. Appraisers, we think, are an integral part of a chain—the lending, transferring, buying, selling, improving, mortgaging—all of the aspects—the vast symbiotic and synergistic flow that is the real estate industry. It's very complex and here's the Government doing its part and the public with its needs and its impacts and the agents of production such as attorneys and appraisers and title people and all the rest—we are all involved in this. Forgive us if we tend to see the key in all of these agents of production to be the appraiser. We see the appraiser preparing a piece of paper which is fundamental to the entire process and it is the objective of the data on that piece of paper which is the absolute key to the entire process—urban disinvestment if you will, redlining if you will, the success of the industry functioning at optimum, the assurance therefore of fair housing for all of our people—we see this as a big chain and the appraiser is the key, astonishingly, very little known.

The lender needs that piece of paper. The buyer is impacted by it whether he or she sees it or not, and the public's housing stock is affected in terms of disinvestment or redlining if it's poorly achieved. Therefore, in this vast symbiotic chain, you cannot afford, and we will not tolerate if we can help it, ignorant, unsophisticated, inexperienced or unprofessional appraisers. This is our job, to see we do the best we can with it.

Now these appraisers, we beseech you to understand, are a group trying to function, and if there are forces impacting upon appraisers to massage them, to manipulate them or control them unfairly

562

and unreasonably, you're not going to get a fair housing product. If you don't have fair appraisers, you're not going to get fair housing.

We see this as so "key" that we beg you to share our preoccupation with this thought for a moment and therefore we have documented, in order to shove at you the kinds of controlling mechanisms that are attempted to be achieved in this—we want to shove at you and would like to direct your attention to three or four examples.

No. 1, appraisers should not be selected because of their color. I have documented here on May 3, 1979, in the District of Columbia, the District of Columbia government has decided that appraisers—and here's the little litany if you will—the way you choose appraisers now in the District of Columbia—independent fee appraisers will be hired only if they live or work within the District of Columbia's boundaries.

Mr. EDWARDS. Where did this information come from in illustration No. 1?

Mr. MACBRIDE. From the chief appraiser of the District of Columbia.

Mr. EDWARDS. Did he put it in writing?

Mr. MACBRIDE. Yes. I have his signature.

Mr. EDWARDS. Would your furnish a copy?

Mr. MACBRIDE. Yes, I will be happy to, sir.

Appraisers will be selected only from minority groups and in this instance that means black. If all minority appraisers are busy, then white appraisers may be employed provided their office is in the District and no questions are to be asked regarding fees; this is not important.

Mr. EDWARDS. That's against the law.

Mr. MACBRIDE. That is against the law and it's shocking, but we want to tell you here's an example of the way appraisers are manipulated. This happens to be a colorful—forgive the semantic byplay—but this is a shocking but specific illustration of manipulation.

Mr. EDWARDS. Can we have it before you're through with your opening remarks so we can glance at it before the questions?

Mr. MACBRIDE. Yes. Forgive me with this mass of papers. Yes, I have a copy here and we will be happy to leave it with your very final legal counsel.

Now let me give another. That's a dramatic example and you can easily say that's unfair and that's illegal.

Mr. EDWARDS. It's an outrage.

Mr. MACBRIDE. It is an outrage. Now will you look with us at several other outrages? It's the chief appraiser and the names of the superior officers, and I think he's indicated that that is OK on the second page.

Now we want to do something about this and we hope you share our outrage, but there are other outrages more significant because they are geographically more extensive and much more sophisticated.

Please look at example 2. The States have been manipulating appraisers for years. It's a field day for the manipulation of appraisers, and I use the Florida example because it's a present scandal and the FBI is investigating and there's a Federal grand

003361

563

jury in progress and they have been runnning a little ad hoc game of an unwritten policy, until I forced them out in writing, that only appraisers with red hair would be hired by the Department of Natural Resources in Florida. They didn't use the words "red hair." They used two appraisal definitions. Their way of manipulating was to name two appraisal societies and the other appraisal societies could not be hired. This is obviously illegal and 2 years ago we forced them to change legislation about parimutual appraisers, and now we are going to force them to change this.

Notice on the bottom of page 18 that the State of Florida is not unique in this device. I think I have named 17 other States that our society has had to combat roughly and alone in order to get fair hiring of appraisers as long as these appraisers had integrity and were professionally competent. The appraisers should be selected for their competence and not their color.

The third is the most outragious of all and it's the most difficult for us to get at—the controlling of appraisers by groups within the industry. We found out that a little—I don't know whether it's little or not—the Federal savings and loan organization in St. Louis, Mo., was hiring only MAI, SRA, or SREA appraisers and we asked them to please open it up to other societies—have an open and competitive situation. They wrote back and said, "What we're doing is fair and consistent with the policies established in the lending industry." What's the lending industry? So we wrote to the group they belonged to, which is the U.S. League of Savings Association, and immediately got a reply from the executive vice president:

The U.S. League of Savings Association is a trade organization. We have no control over the lending practices of our member institutions. We do not establish or even recommend policies with respect to qualifications of appraisers.

Then we looked at their underwriting standards and you will see on page 20 the documentation that they specifically control and operate appraisers and they mandate the selection of a certain kind.

Now this is a very sophisticated way of doing business and it's hard for us to get a hold on it. What we are saying is vast institutional infractures can manipulate the things they want and can do so by impacting upon appraisers and this is an outrage and should not continue and we shouldn't have to be fighting it alone.

Now illustration No. 4 is a different kind of thing. It isn't an outrage but it certainly is an anomaly. Illustration No. 4 indicates another way to manipulate appraisers is by forcing them to become involved in the brokerage aspect of an industry. You all know an appraiser is supposed to be objective. An appraiser is not supposed to be closely associated with the buying/selling mechanism insofar as involvement is concerned. He's supposed to look from a distance. Yet there are about 15 States which are mandating that professional appraisers must secure brokers' licenses before they can practice appraising, and yet the brokers' or salesman's exams require no examination into appraisal practice or procedure. It's a simple device to force the apprasier to be closely related, as if with an umbilical cord, to the trade associations affecting this arrangement.

564

I guess I should wind this up. In view of our outrage about this and our desperate need for help, and in view of your concern to get fair housing, you must have fair appraisers. We beg you to incorporate in your act or in acts separately or to assist us in some way, and at the bottom of page 21 is a crudely crafted sentence to this effect—or several sentences, which your legal counsel may find horrible to contemplate in terms of the language, but, boy, the intent is clear!

We believe to achieve fair housing goals: no ruling, policy, guideline, law, practices or procedure shall be published, undertaken, effected, or implemented, which specifies or implies that color, race, religion, ethnic origin, sex, marital status, or professional designation shall be used as a control device or criterion in the selection or employment of appraisers.

Now if you want teeth and you want a club in order to assure that fair housing has a fair chance, you've got to let appraisers have a fair chance, and that means all of the appraisers in the United States who are competent and who have professional experience. Some may not even belong to the professional appraisal societies that I have implied and indicated.

So summarizing therefore, it seems to me I can sit before you and say that we are a member of the same community with you and we share your same concerns. We have passed resolutions indicating these concerns and our support of what you are trying to do. We have even—because we are deeply concerned about the educational status of our members—we have within the last 2 years at considerable cost to the American Society of Appraisers, initiated and now sponsor a nationwide Valuation Sciences Degree Program. We are trying to get appraisers an opportunity to be trained academically in the colleges and universities of this country. Prior to 1977, there was not a single institution in the United States that could award a valuation sciences degree or give an appraiser that kind of opportunity to have the input so necessary to the comprehension and functioning of being a good appraiser. This requires relevant present knowledge in statistics, in economics, in demographic construction, in the analysis of planning laws, in all of these things, and our campuses have these current things and some of our appraisers need them desperately. Our valuation sciences degree program is the largest earnest or faith mechanism that we could achieve to help assure you that we are trying to educate our appraisers to live up to their current relevant responsibilities.

Our society will do anything in the world to assist you in your objectives. Where we have expressed concern, please understand that it's a concern that comes out of the fact that we live with this every day and we are appraisers and we want to get about our job fairly and squarely; but we do need help. If you want to put some teeth in, put something in that stops the manipulation of appraisers around the United States. Help us remove the shackles of restraint and we will give you in return what you want most desperately—people working objectively, helping you will with fair housing. We have got the same goals. I guess I got a little enthused, Mr. Chairman, but it means a great deal to us. We are deeply involved in this.

565

Perhaps Mr. Bob Francy, who's a real estate expert who's had more than 10 years in present experience in the State of Arizona—he knows the buying/selling function and he's worked for the Department of Transportation in Arizona. He's an expert and he does share the same concerns. Bob, do you have any comments?

Mr. EDWARDS. Mr. Francy, you are recognized.

Mr. FRANCY. Thank you, Mr. Chairman.

Just to restate, my name is Robert Francy. I'm an independent appraiser and the senior vice president of the American Society of Appraisers.

I'm sure that you are all aware of the basic facts regarding the American Society of Appraisers. Mr. MacBride has given you a full rundown as to our education programs and other facets. We are proud of our organization and many of the accomplishments which we have done, not the least of which is our support of fair housing dating back as early as January 1975. Fair housing is a goal which we should all help meet. The position we have taken in the past, however, is historical and have little to do with the present problems faced by Congress and by appraisers in seeking ways and means to resolve conflicts and difficulties in the provision of opportunity for fair housing to all citizens of this country.

As I see it, this program is in two parts. One is the furnishing of adequate and complete data to loan officers and underwriting agencies by appraisers; and two, the application of the appraisal report in the decisionmaking process as to the amount, term and other matters in the granting of mortgage loans.

As to the second part of this process, I'm not qualified by training or experience to evaluate the underwriting process in part or in whole. If desirable social objectives can be attained by changes in criteria for the granting of loans in any particular area, then these changes must be implemented in underwriting methods and standards, not in the artificial figures of restriction of data to be included in appraisal reports. The common good is never served by evasion of, or refusing to consider, facts which may have a bearing on a particular problem.

This brings us to the thrust of my pitiful remarks today; the right and duty of appraisers to report such facts in a candid, factual, responsible, and forthright manner. The use to be made of the appraisal report and the interpretation of the facts are a matter of underwriting policy and are thankfully out of the purview of the appraiser.

Now to restate a basic fact, an appraisal report is an opinion of value based on judgment, research, and factual data. The value or worth of the report is proportional to the amount of research, factual information and analysis by the appraiser. Appraisals in order to be realistic must be based on facts. All relevant information must be used by the appraiser in forming his opinion of value. To eliminate or place restraints on the use of relevant data gathered by the appraiser is not in the short or the long run going to serve any public purpose of policy but will create additional problems, perhaps some of which are not even foreseeable at this time.

Now there are many examples which could be given of the signs available to a trained observer in a neighborhood or an area inspection. If, for example, an appraiser notes in his inspection that

566

25 percent of the homes in an area have high chain link fencing, a guard dog, and barred windows, he might well be justified in concluding that the area is a high crime area. This information should be included in an appraisal since it might well have a major effect on the security for a proposed mortgage loan.

Other signs might be the changing use of an area to industrial rather than residential and the observation that most of the new developments are for some other use than residential. Thse facts should be included in an appraisal since they have an effect on the underwriting decision.

No two neighborhoods, areas, cities or regions are alike and as a consequence, what creates or diminishes value in one area may not and probably does not have the same effect in another. The effect of any factor then must be analyzed and applied as it relates to the particular area in which the property is located. To make blanket statements that in every case the presence of an ethnic group or racial group or religious denomination, et cetera has a particular effect is patently absurd. The effect, positive or negative, must be analyzed as to an individual area, be it a block, a street, a neighborhood or city.

The point is that the appraiser should be free to report his findings and conclusions without restraints or being subject to undue regulatory pressures. Now many approaches have been tried to solve these problems. A block by block analysis rather than an area or neighborhood approach is no doubt, in many cities, a very valid method, but it cannot be applied in every case. What works in Denver or Chicago won't necessarily work in San Diego or Dallas. Each area must be analyzed and the manner selected which is appropriate for that block, area, neighborhood, or city.

The main point is that the appraiser should be free to report his findings factually.

Now I think I have maybe gone astray from the remarks made by our executive vice president, Mr. MacBride. You're really dealing with two areas on mortgate lending which is one of the problems here as I understand it, and one is the underwriting of loans and the second is the provision of facts on which a loan decision can be based.

Now the regulations that are proposed are harsh and they would have a stifling effect on the free reporting of facts by appraisers for one reason or another.

Mr. DRINAN. Excuse me, Mr Francy. Which regulations?

Mr. FRANCY. The ones in the proposed legislation.

Mr. DRINAN. In the law; not the regulations?

Mr. FRANCY. The proposed law. I'm not familiar with many of the terms here and I hope that——

Mr. EDWARDS. I don't know what part of the bill you're referring to. Does anybody know?

Ms. COOPER. No. There's nothing in the bill that specifically deals with the appraisal process. Perhaps you're referring to the regulations that have been issued by the Home Loan Bank Board based on present law.

Mr. FRANCY. Well, maybe I can clarify this by saying——

Ms. COOPER. The regulation is very brief: "No member institution may use or rely upon an appraisal of a dwelling which the institu-

567

tion knows or reasonably should know is discriminatory per se or in fact."

Mr. FRANCY. Certainly we couldn't object to that. There's no objection to that. I think the objection that I'm trying to express, rather poorly admittedly, is the application of these—what would you call it—the penalties by decree from an agency which does not have an exceptionally good track record in applying the existing regulations.

It seems to me that they are placing powers to literally ruin an individual appraiser who may have done nothing wrong in the hands of an agency that has not necessarily proven to be terribly responsive.

The point that I'm trying to make is: An appraiser, we feel, should be free to report facts. An underwriting decision as to the making of a loan may accomplish a very worthwhile objective, and if that's true, it's just beyond the function of the appraiser. It seems to me that much of what we are hearing tends to put the appraiser in the same place as the old messengers in medieval times that bear bad tidings who were automatically killed. It didn't change the bad news. It just reduced the quality of the messengers. And I'm making these few remarks in order to back up what vice president MacBride has said regarding the right to freely and factually report what we find in the market.

And it works both ways. You can't make blanket statements that the presence of a church in an area of a particular kind is going to decrease values. That's ludicrous. You should have facts and be able to document and prove these assertions. That's rank discrimination, to just make a blanket statement that a particular kind of church in an area affects values. If you have facts to back them up, you should be able to report them without being afraid to say church.

I have nothing further, Mr. Chairman. I have not had an opportunity to coordinate our presentation with Mr. MacBride and I apologize for that, but our people feel very strongly on this issue.

Mr. EDWARDS. Well, thank you, Mr. Francy and Mr. MacBride for your testimony.

One of the problems in the committee's dealing with the community of appraisers is that the surveys that have been made on a nationwide basis generally dealt with discrimination by real estate brokers, by home builders, and individual sellers and lessors. We have not received any testimony from witnesses who specifically said a large part of the problem or a part of the problem is in the community of appraisers. And so we're having some difficulty in coming to grips with it and you're being helpful.

I recognize the gentleman from Massachusetts, Mr. Drinan.

Mr. DRINAN. Thank you, Mr. Chairman, and I thank Mr. MacBride and Mr. Francy; but I gather you're not as opposed to the bill as the other group, the Society of Real Estate Appraisers, yet I'm not certain that you would want any part of the bill to become law. And the one thing that seems to be affirmative as to the necessity for action comes on page 21 at the bottom in the proposed amendment.

I wonder, Mr. MacBride, does your organization have any position on the proposed law?

003366

568

Mr. FRANCY. If I may repond for Mr. MacBride, we have not had the adequate exposure to the entire membership, but we have talked to members of our board of governors and the executive committee and we are, in fact, opposed for the reasons that we have rather badly tried to state to you here. In effect, differing only in detail, we would join with the Society of Real Estate Appraisers in opposition.

Mr. EDWARDS. Will you yield to me at that point, Mr. Drinan?

Mr. DRINAN. Yes.

Mr. EDWARDS. Another question fits in at this point, sir, which was asked of the witnesses from the Society of Real Estate Appraiser who testified in opposition to the bill. When asked the question: If appraisers are not included—and they are included, I suppose, by court interpretation of existing title VIII—if appraisers were not covered by the bill, would they be in favor of the bill? And all of the appraisers testified, yes, we think the bill is necessary and our organization would approve the bill were appraisers not included.

How do you feel about that?

Mr. FRANCY. I think our position would probably be the same. We are certainly not against ending discrimination. We just feel that we are not the place to start.

Mr. EDWARDS. Thank you.

Mr. MACBRIDE. Chairman Edwards, may I also make a remark? Mr. Francy has indicated the position for the society. We are also— life being what it is, we are also individuals and we are also individual citizens. As an individual, not speaking for the society, and in terms of my experience, I would not want to be categorized as a person who would be in favor of the bill if we were excluded. That bill has a responsibility and that bill has a goal, and if it's going to work for everybody else, appraisers are as important and as professional and as sincere in attaining those goals as anybody else. And as an individual, I would want to be included in that bill. I want my first amendment rights, but I am also willing to be responsible for them. I do not believe that appraisers now are involved in the redlining syndrome, that they have been so carelessly tarring themselves with before, and I have indicated two such examples and I would report, yes, appraisers have been segregationists in the past, as has the entire Nation.

I was raised in a section of the country and I am of an age where I know this entire country was segregationist and there were legal covenants by law to that effect. This is no longer the case. Times have changed. Mores have changed. The needs have changed and fair housing is one of the elements of that change.

I think appraisers can live—I, as an individual, feel as an appraiser that I could live with this bill because, first, I'm not a redliner; second, I will be resposible for all of my acts and statements because every act and statement in this country that's conducted under the first amendment rights also bears correlative responsibilities to be accurate and all are subject to libel and slander or penalties.

May I extend this a bit further, because there is an important essence here about the business of how an appraiser does his job, and I feel upon reflection—and Mr. Francy and I have worried about this aspect—of how an appraiser does his job. If you would

003367

569

not mind, I'm not at all sure but what we cannot bridge the gap, which seems to be a gap, that I have with the statement that he made and there seems to be a gap with other appraiser societies.

Our society has a definite mechanism for getting the job done. If you would permit me the kindness of reading about seven statements into the record, this mechanism may be so important that the Society of Real Estate Appraisers would find a congruity also, and this therefore might be a much more palatable situation for all of us.

There's a statement in the College of Fellows' opinion that's entitled "Definitions, Concepts and Prinicples of Appraisal Practice." The College of Fellows of the ASA is I think one of the most prestigious appraisal bodies in the United States. It's composed of people who are highly honored because of their expertise, integrity, stature, and so forth.

In an opinion which they issued they attempted to describe how an appraiser does his or her job and I think this is so fundamental, and if this is in the record it will be very helpful.

In making the kind of appraisal called a Valuation, the subject property should first be classified as Investment Property, Marketable Non-investment Property, or Service Property. An Investment Property can be valued only by the Investment Analysis Method, a Marketable Non-investment Property can be valued only by the Sales Analysis Method, and a Service Property (if it can be valued at all) can be valued only by the Cost Summation Method.

Now in discussing how the appraiser does that, there are these words, and these are the best in my 33 years of experience I have ever heard about how one does this job, and it's very important and Mr. Francy and I are one on this. It's important to know how one does one's job.

Principle of Comparison as Used in Sales Analysis. Marketable Non-investment Properties which are not sold in identical units in an open market at advertised or published prices, but which are unique and sold at negotiated prices, are valued by the Sales Analysis Method. This method is based on an analysis of the prices at which comparable properties have sold. The market value of the subject property is the most probable price which it would bring if offered for sale. A comparable property is one which has the same value elements as the subject property (but not necessarily, or even generally, in the same proportions). The Sales Analysis Method assumes that the price at which a comparable property sold was the result of the particular weighted-combination of value elements comprised in that property. The existence of the value elements, in certain proportions, is assumed to be the cause which produced the sales price as an effect. This is an example of the Causal Postulate. The amount which each value element contributes to the price is ascertained by analyzing a suffcient number of sales of comparable properties and correlating, mathematically the numerical magnitudes of the value elements with the sales prices to give an equation, or "model." The numerical magnitudes of the value elements of the subject property are then inserted in the equation and its probable sale price calculated. There is another assumption here, namely, that if the value elements were the "causes" of the sales prices of the comparable properties, these causes will have the same effects on the sale price of the subject property.

Now while that may sound like esoterica in extenso, what that is saying is that the appraiser goes to the market, gets the data, puts it in the model, erects these on a numerical and magnitude scale, and achieves the value analysis.

Mr. HYDE. I would say esoterica ab initio.

Mr. MACBRIDE. Well, again, nonetheless, in our trade, Mr. Hyde, this is so important to us, and while that may sound like a philosophical flight, I think it may bridge a gap between the two societies on this problem of: "Do you use race, ethnicity and so on?"

003368

570

This is very important in resolving an issue which is in confrontation with the objective you all are trying to achieve. If we can come to a handle on how we are doing our job, it will help you in determining whether this law will achieve its objective. Therefore, I'm really speaking for our counterparts. I'm hopeful they would see this mechanism as a mechanical calculus of the demographic structure whereby appraisers get their job done.

Mr. DRINAN. Did your organization agree to the settlement made with the Justice Department with the other group? Do you concur with the settlement they made that they will not mention racial and religious factors? In other words, do you go along with what the Justice Department required them to sign or which they signed?

Mr. MACBRIDE. I go along with the concept.

Mr. DRINAN. Your organization says the Justice Department was justified in bringing suit?

Mr. MACBRIDE. No, I did not say that.

Mr. DRINAN. You say the appraisers have been segregationist, racist, but this is no longer the case. Well, if it's no longer the case, you have nothing to lose and you would bring appraisers into the sunlight and say that you want to comply with fair housing laws. So why are you afraid of the bill?

Mr. MACBRIDE. I'm not afraid of the bill.

Mr. DRINAN. You are afraid of the bill. You are opposed to the bill and you just differ in detail from the other organization which is vehemently opposed to the bill. So you're against the bill, sir. You can't change that. You work for an organization that's opposed to the bill. I'm just trying to find out why you're opposed.

Mr. MACBRIDE. Mr. Francy would have to answer that.

Mr. FRANCY. We are opposed because of the limitations which can be forced upon an appraiser. In other words, under the terms of this, as we understand the implementation, he can be forced literally at the point of a gun to report unrealistic and not factual conclusions in his appraisal report.

Mr. DRINAN. Mr. Francy, may I just ask some simple questions?

Mr. FRANCY. Certainly.

Mr. DRINAN. Your organization and the other group have already been required by the Justice Department—and they have done it in the settlement agreement—they have agreed to not make negative evaluations based upon racial, religious, and ethnic factors. So you have to live within that and as I understand this bill, it would not change the law with respect to appraisers, and not change the effect of the agreements that were reached by the Justice Department and the Society of Real Estate Appraisers. So nobody is forcing you with a gun to your head, to use your language. This is simply arriving at a settlement as to what fair housing should mean under the law.

Mr. FRANCY. First, I might respectfully point out that we were not party to the action taken by the Justice Department and we are not required to consent to any settlement of the action. We were, I suppose, the major society which was not involved. I think that speaks well of our record in support of fair housing.

Mr. DRINAN. That's another reason, sir, why I had hoped that your organization would give at least some limited support to what

003369

we are seeking to do. You and the executive vice president have said what the other groups said, that you want fair housing to come about. You recognize there are very serious problems. You recognize that the Fair Housing Act of 1968 is not working and your colleague has said that voluntary compliance hasn't been tried. We are trying to set forth a statutory framework so the people of this country can get fair housing. You people are in the eye of the storm. You recognize the problem and you're not giving us one bit of support and I'm very disappointed.

Mr. FRANCY. We are certainly giving you the support we can in a practical manner.

Mr. DRINAN. You're not giving any support, sir. Don't say you're giving support. You're coming here and testifying against the bill. You're saying you don't want what the President wants, you don't want what Secretary Harris wants. You don't want what all the civil rights groups want. You're not giving any support.

Mr. FRANCY. No, you're not reporting my reflections accurately. I'm sorry. No one is more in support of fair housing than our executive committee. We have consistently and over the years been in support of fair housing. What we object to is making us, as you put it, the eye of the storm. We should be observers. We don't grant mortgage loans. We don't underwrite these things and we don't represent properties for that matter, nor do we by and sell properties. We merely report values.

Our position is that we should be free to report those values as long as they are responsible, sound, and documented.

Mr. DRINAN. You take the position that the racial, ethnic, and religious composition of neighborhoods is a relevant appraisal factor?

Mr. FRANCY. Not necessarily, but it may be; and if it is, we should be free to report it.

Mr. SENSENBRENNER. Would the gentleman yield for a question?

Mr. DRINAN. Yes.

Mr. SENSENBRENNER. I think we all know the quality of school districts has something to do with the value of a piece of residential property. Let me pose this hypothetical to you. There are two Roman Catholic parishes side by side in a neighborhood. One of them has a parochial school with an excellent reputation. The other has a parochial school with a poor reputation. Now under this bill, do you think that you would be allowed to write an appraisal report that showed a higher value in the parochial school district that had the excellent reputation contrasted to a comparable property in the parochial school district with a poor reputation?

Mr. FRANCY. I don't think it spells out whether I would, but certainly the interpretation could be made by somebody in the housing and urban development property that I couldn't, and I could be called up on a subpena. I could be fined. I understand that I could be jailed if I didn't do certain things for just reporting that fact, that the excellent parochial school caused values to be 10 percent higher in this particular neighborhood; and I should also be free to report that the Charles Manson Memorial Chapel depresses values in another neighborhood without fear of being attacked by the proposed regulation.

572

Mr. SENSENBRENNER. Now taking this analogy one step further, say the two school districts involved were not parochial school districts but were public school districts. So we're not talking about any religious implications whatsoever. Say there was a public school district that had good schools and next door there was a public school district that had poor schools and this was reflected in the value of houses for sale. Do you think you would get in trouble if you put a higher price tag on the public school district that had good schools in contrast to the public school district that had poor schools?

Mr. FRANCY. As I read it, probably not, but the situation is the same.

Mr. SENSENBRENNER. Precisely.

Mr. DRINAN. One last question, Mr. Chairman.

The other group has recommended that existing title VIII should be amended to delete coverage of the appraisal process and I assume that they said that years ago. What does youe organization say about that?

Mr. FRANCY. I'm not familiar with it enough to comment, Mr. Drinan.

Mr. DRINAN. Thank you very much. I yield back the balance of my time.

Mr. EDWARDS. Mr. Hyde.

Mr. HYDE. Thank you, Mr. Chairman.

It's really sad, though, to see you two gentlemen sitting here laboring under the delusion that free speech is still alive and well. You really are out of it. You're old fashioned. It's OK in some areas, such as pornography, but it sure isn't OK when it comes to doing your job clinically.

Now this Congress decided that members of a single language minority should have ballots printed in their language whether they are Aleut Indians or Eskimos or Hispanic or whatever. We recognize that for purposes of election, but God help you if you mention that a house is in a single language minority community, of which this country has many. God help you if you mention that in this neighborhood the church has services in Polish and that the storekeepers as well as the school are bilingual; because you're not implementing a social policy that some people here have decided is good for America. So it's a shame that your really don't know that free speech does not extend to reporting the clinical mechanical facts as to the value of a neighborhood and you're not to take into consideration that some of these neighborhoods, the character of the neighborhood, ethnicity of the neighborhood, really doesn't exist for political or social purposes. It's "Alice in Wonderland," but that's the way it is.

Now you're supposed to be colorblind, but as I gather it, the District of Columbia Department of Housing and Community Development, when it comes to hiring appraisers, is not colorblind. Is that correct?

Mr. FRANCY. That's apparently the case, yes.

Mr. HYDE. This letter of May 23, 1979, signed by Dexter Mac-Bride and initialed by Mr. Edwin M. Thiery, Chief Appraiser, District of Columbia Department of Housing and Comunity Development confirms the fact that there's a practice, a verbal man-

date—they don't reduce it to writing—that only appraisers will be selected from minority groups, in this instance, minority means black. Is that the practice of the District of Columbia in selecting appraisers for real estate functions as you understand them?

Mr. MacBride. In that particular aspect, yes.

Mr. Hyde. Well, let's get to an ancillary problem of manipulating appraisals and appraisers. Do you think that HUD is capable of even seeks to manipulate these appraisals so they really don't reflect all of the relevant economic factors in the value of this property?

Mr. Francy. I would like to respond to your question. I think the machinery is there for coercion, for manipulation. I'm not suggesting for an instant that the present administration, the present head of the department, the Secretary or anybody else, would be capable of manipulation. But certainly the machinery is there that could be applied and it could be applied at some time in the future, at some indefinite time, to the great detriment of people who have their money invested in savings and loans when unsound loans are made because they don't have the facts to operate on more sound underwriting. People could lose their homes because they have been granted a loan which was not realistic and which they are not capable of handling when it should have been on some other basis—a longer term or something.

Mr. Hyde. Are you adverting to the FHA experience where areas of abandoned homes exist in communities simply because It was inappropriate that the transactions be completed but somebody decided the social policy would override these economic conditions? Is that what you're talking about?

Mr. Francy. That's in part what I'm talking about. Your specific question was do you think there's a mechanism for abuse or manipulation of appraisers in this proposed legislation and, yes, I do. It's a possibility, without suggesting that it would be accomplished in the next 30 days or any other time.

Mr. Hyde. It's your testimony, backed up by this letter initialed by the Chief of the Appraisal Division, that it is the policy of the District of Columbia to hire only black appraisers; is that what you're saying? And I want to ask leave to put the letter in the record with unanimous consent.

Mr. Edwards. Yes. So ordered.

[The information follows:]

<div align="right">

American Society of Appraisers,
*Washington D.C., May 23, 1979.*

</div>

Edwin M. Thierry,
*Chief, Appraisal Division District of Columbia Department of Housing and Community Development, Washington, D.C.*

Dear Edwin: You were kind enough to respond to my questions yesterday regarding the new policy of the District in selecting appraisers for the Real Estate functions in your department.

If I understand correctly, the new policy is to this effect:

(a) Independent fee (non-staff) appraisers will be hired only if they live/work within D.C. boundaries;

(b) appraisers will be selected only form minority groups (in this instance, minority means "black");

(c) if all minority appraisers are busy, then white appraisers may be employed (providing their office is in the District);

(d) no questions are to be asked regarding fees; this is not important.

574

Further, if I understand correctly, this new policy went into effect about May 3rd, 1979; it is verbal only; you were informed of it by your supervisor, the Chief of the Real Estate Division (Beatrice Solimine), who was informed via her supervisor, the Administrator of Housing and Business Resources (James L. Woolfork) who was informed by the newly-appointed Director of the Department of Housing and Community Development (Robert L. Moore).

Additionally, as I understand it, you have had the responsibility (in consequence of the new policy) to inform 4 appraisers that their pending contracts to appraise properties for the D.C. Government are terminated.

You told me yesterday that, several years ago, in an effort to achieve a reasonable procedure in hiring "minority" persons, the Department had asked you to try to achieve about a 25%-hiring-of-minorities program; that actually, you have been able, through careful selection and planning, to achieve abut a 35%-hiring-of-minority-members; that this was made somewhat easy by the number of rehabilitiation (residential) appraisals required; that this has been a sound—almost "ideal"—program; that a considerable sum of money is involved, i.e., at $75.00 per re-hab appraisal, letting contracts in groups of say 40 hours would run assignments to $3,000.00, and that these appraisal assignments total many thousands of dollars.

You also told me that this new policy (exclusive hiring of minorities) is verbal, and you were refused when asked to have it expressed in writing, and that, after more then 21 years as a government employee (Corps of Engineers, HUD, D.C. Government), it is your "first brush with this type of thing, and that you can't work under these kinds of limitation".

If these summary comments fairly reflect our conversation of May 22nd, I would appreciate your putting an OK or some similar expression on the enclosed copy of this letter. This is not done for idle curiosity; as a professional appraiser and an official representative of a major appraisal society, I intend to take whatever steps I can to discuss, explore, and bring this problem to light.

Sincerely,

DEXTER D. MACBRIDE, CAE, FASA,
*Executive Vice President.*

Mr. HYDE. Well, the letter speaks for itself and it will be in the record and on page 17 of your statement where you discuss that.

Let me ask you this question. Your objections to this bill, are they directed toward the substantive changes in the law or are you more concerned about the enforcement authority within HUD?

Mr. FRANCY. Much more concerned about the enforcement authority being shifted in HUD. We don't think—certainly we have no quarrel with adding the handicapped to the criteria. Obviously we have no objection to that.

Mr. HYDE. If the Justice Department had the enforcement authority or if there were some administrative procedure which was not in-house, which was objective and not an arm or part of HUD, where you could at least not have the appearance of incest in terms of deciding these things, would you then support the bill?

Mr. FRANCY. We would much rather—we think there's adequate safeguards and enforcement now. That's our basis position. There adequate safeguards now. If we were forced to swallow the bitter pill, we would much rather see it with Justice or the Federal Home Loan Bank Board than with HUD.

Mr. HYDE. All right. Let me just ask this last question. As professional people, do you believe that race, religion, and ethnic factors may or can be a significant factor in determining market value in some instances—not in every instance, but it can occur, can it not?

Mr. FRANCY. Absolutely, sir. Absolutely.

Mr. HYDE. And by being precluded from even adverting to these you're not doing your job, are you?

Mr. FRANCY. You're exactly right, sir.

575

Mr. Hyde. It's intellectually dishonest not to report any factor that has a direct causal relationship to the value of this property?

Mr. Francy. That's exactly right, sir, as long as you can prove it.

Mr. Hyde. If supportable by data?

Mr. Francy. You have hit on it exactly, sir.

Mr. Hyde. OK. Thank you.

Mr. Edwards. Mr. Volkmer.

Mr. Volkmer. I have no questions.

Mr. Edwards. I suppose that if that lawsuit had never taken place the appraisers might have had a different view. Isn't it correct that what you really fear is harassment by HUD of individual appraisers?

Mr. Francy. That's the bottom line, yes, sir; it is. Coercion, if you will, manipulation and harassment.

Mr. Edwards. You agree that these studies that have been made nationwide and in many different cities by reputable organizations—not HUD itself—have found widespread discrimination in the renting and sale of homes to minorities?

Mr. Francy. I think that goes without question, sir.

Mr. Edwards. And I repeat that none of the studies had anything to do with appraisers.

Mr. Francy. For which we are very thankful.

Mr. Edwards. But somehow or other, you feel you have been caught in the dragnet? You don't seriously believe, however, that the remedies suggested in this bill are unneeded insofar as people who discriminate other than appraisers? I'm talking about people that were tested in the various reports. Do you think in those cases, if wer're going to get anywhere in this country, we need stronger medicine than the weak provisions of the 1968 act?

Mr. Francy. Yes, I do. They, of course, are rank cases of discrimination. There's no question about it in many areas. Again, I would perhaps like to see some enforcement procedure outside of an agency that's so intimately invovled, a third agency, an ombudsman perhaps for the aggrieved and for the person complained against. I'm not wise enough, of course, to suggest how, but certainly these things must be taken care of.

Mr. Volkmer. Mr. Chairman, I do have a point. I have been sitting here thinking and trying to figure a way out. You would not object, however, if HUD were able to take administrative action in the event that appraisers did report devaluation or increase in valuation, either way, becasuse of race, religion, or sex, but which was not supported by data.

Mr. Francy. No. I think there's adequate safeguards under present legitslation without allocating these additional powers to HUD. It seems to me—and perhaps that shoud be beefed up—that the powers already in the hands of the Federal Home Loan Bank Board could be applied better. We're going to try, of course, to educate appraisers.

Mr. Volkmer. Let me ask you this. The appraisals that you make, besides being furnished to the Federal Home Loan Bank Board, who else are they furnished to, besides the private individuals? I mean, I can ask for an appraisal on my home and get an appraisal by paying a fee.

Mr. FRANCY. Appraisals are done for many lending institutions, including those conventional loans for savings and loans, for commercial banks, for mortgage companies, for mortgage company brokers who put packages together and sell these. They are done for attorneys for estate purposes. They are done for municipalities for condemnation or eminent domain partial takings of property for streets, highways, bridges, dams, and so on. They are done for many, many purposes besides residential.

Mr. VOLKMER. Thank you, Mr. Chairman.

Mr. EDWARDS. I think we ought to clear the record insofar as appraisers putting into their report such things as proximity to churches, education facilities, public transportation, shopping services. That's all appropriate for your appraisal; is that correct?

Mr. FRANCY. Yes, sir, absolutely.

Mr. EDWARDS. Regardless of whether there's the 1968 act or anything else, this bill has nothing to do with that whatsoever.

Mr. FRANCY. No, those items I don't think are specifically covered.

Mr. EDWARDS. Mr. Drinan?

Mr. DRINAN. Well, I hesitate to come back to the central question, but they opposed, I take it, even the 1968 act and not just opposed to this one. They are opposed to what is on the books now.

Mr. FRANCY. No, sir, we are not opposed——

Mr. DRINAN. What is on the books is not working and you admit the severe problems and your colleague has said that voluntary compliance hasn't worked, but did you testify against the 1968 act?

Mr. FRANCY. No, sir.

Mr. DRINAN. You didn't?

Mr. FRANCY. No, sir.

Mr. DRINAN. I yield back the balance of my time.

Mr. EDWARDS. Mr. Hyde?

Mr. HYDE. I have nothing further.

Mr. EDWARDS. Counsel?

Ms. COOPER. If I might just correct a misunderstanding that might be forming a basis for some of the things you have been saying: Appraisers are now thought to be included within title VIII by virtue not only of the Department of Justice suit and settlements that followed but by the case law that was established in the case of *United States* v. *The American Institute of Real Estate Appraisers and the Society of Real Estate Brokers,* 442 F. Supp. 1072 (1977). That case held that appraisers were part of the process of financing and making dwellings available, and therefore, were covered by existing law. There's nothing in H.R. 2540 which changes that. The word appraiser is never used. That is not to say that it is intended to change it one way or another.

So when you speak in terms of opposition to your inclusion in the law, you're really speaking in terms of the 1968 act as interpreted by the Department of Justice and the Federal district court.

Mr. FRANCY. Well, let me say that we are not speaking here in opposition to the 1968 act in any way, shape, or form.

Ms. COOPER. But you have testified that you wish that appraisers were not included within the coverage of the Fair Housing Act because you feel that your role is totally outside those parts of the

577

decisionmaking process where discrimination can enter in any form; is that correct?

Mr. FRANCY. That is substantially correct, yes.

Ms. COOPER. All right. Earlier testimony was to the effect that appraisers make the judgments that are relied upon by the financial institutions which in turn make the decision as to whether or not to make a loan on a piece of property; is that correct?

Mr. FRANCY. They are relied on in part. I mean, it's not automatic that an appraisal report establishes the amount, terms, duration, or anything else—interest rate—of a loan.

Ms. COOPER. No, but the appraisal report does set the value on a piece of property which is an essential ingredient for determining whether or not the bank wishes to assume the risk of making a loan on that piece of property.

Mr. FRANCY. Yes, that is correct.

Ms. COOPER. So assuming for the sake of argument, although I'm sure you disagree with this—assuming for the sake of argument that discriminatory judgments do enter into the appraisal process—that is, that an appraiser looks at a piece of property in a predominantly black neighborhood and on the basis of that decides the property is not worth as much as a comparable piece of property in a white neighborhood—just assuming for the sake of argument that occasionally happens, wouldn't that be the kind of practice that it is essential for the Fair Housing Act to reach?

Mr. FRANCY. Yes; you're asking me to make assumptions and under those conditions that is an abhorrent practice, no question about it. The recourse, of course—the bottom line has got to be the loan officer. He's got to recognize when in fact this is not true; that this is not factual. His experience, judgment, and training are going to, we hope lead him to a correct conclusion whether the appraiser's opinion is either high or low and influenced by some factors.

Ms. COOPER. So you're assuming the financial institutions would correct any discriminatory act or decision that was made by such an appraiser?

Mr. FRANCY. Well, in the first place, I would hesitate to concede that even a small percentage of appraisers would have that attitude. I certainly would hope not. And if they did, charges could be brought with their professional organization and they should darn well be censured or drummed out of the corps.

Mr. HYDE. Would counsel yield?

Ms. COOPER. Yes.

Mr. HYDE. Let's be very candid. Appraisals can be used for discriminatory purposes. Every appraiser is a human being, like other people, suffering from the same faults and virtues, and so there's nothing sacred or sanctimonious or holy about somebody because they're an appraiser.

Mr. FRANCY. No, sir.

Mr. HYDE. Their appraisals can hint at racial, ethnic, religious problems or the fact that this is an element in the community, knowing that some people don't want to live within 30 miles of a Jewish community or of a black community or of a Polish community. So we know that can be done.

578

Now it isn't enough to take action with some of these professional associations. You know it and I know it. I'm a lawyer and, believe me, we in the legal profession are not the most zealous in hounding out of our ranks those who don't belong there, and I dare say appraisers are the same way and doctors are the same way.

Now would you accept a specific proviso in the law, maybe this law, that says you shall not in your appraisals mention or advert, or however it should be phrased, to racial or religious or ethnic characteristics unless (a) such a fact has a significant—not an insignificant, but a significant impact on the value; and (b) it is supported by data, that you can prove that it does?

Now that's a compromise between giving you carte blanche and having the lingering suspicion that there still are instances where these appraisals can be used to create discrimination. You surely are in the chain of financing. There's nothing more important than the appraisal.

Mr. FRANCY. That's true.

Mr. HYDE. So you're in the chain as a matter of fact. There is a possibility of abuse, and I'm not pointing my finger at all, but if you said let's leave all of this stuff out except where it's significant and where it's supported by data, would that resolve your dilemma?

Mr. FRANCY. Yes; I would like to be able to tell you that no appraiser is ever going to make a discriminatory judgment or statement. That obviously is not true. There are prejudiced appraisers, as there are prejudiced lawyers and doctors.

Mr. HYDE. And clergymen.

Mr. FRANCY. Yes, even clergymen.

You're entirely correct. Certainly the appraisal is an important part of the process and it can be subject to abuses. I wish I could suggest to you some way to magically eliminate the problem. We have a problem. We don't happen to consider it to be the major problem. I think underwriting is where the major problem was, but if in fact something needs to be done, we don't want to see it done the way it's proposed in this legislation because we think then you have swung the pendulum too far the other way and you have put the appraiser in the position where he can be manipulated, coerced, and driven.

Mr. MACBRIDE. Mr. Hyde, your suggestion seems to be very pertinent with the position of the words you indicated.

Mr. HYDE. Then you're not working in the dark. Dare I mention this? I really think it has an effect on this value of the property. At 22d and Windworth, which is Chinatown in Chicago, property which would be valuable to a Chinese family would not be so valuable to a non-Chinese. Am I violating the law? This would protect the appraiser and give some assurances that it is illegal to mention these things—that it's a changing community or something like that—which has no direct impact and not supported by data.

Mr. FRANCY. I think you have to examine everything in the light of its relevance. If any ethnic factor is a relevant thing in the market——

Mr. HYDE. But you need objective standards to do that not the objective standard of the appraiser who has his biases like every-

579

body else. It's just an idea and if the chairman and counsel think there's some merit to it maybe we could work on that. Thank you for yielding.

Mr. FRANCY. I think there's a great deal of merit to it because it tends to resolve the loggerheads.

Mr. HYDE. It gives you guidelines so you know what to do.

Mr. FRANCY. Certainly.

Ms. COOPER. Yes. And following up on that, Mr. Hyde, the chairman just received yesterday a response from the Federal Home Loan Bank Board to some of the issues that were raised at the hearing where the other appraisal group testified. The gist of their remarks is to the effect that the problem with using those buzz words that the examiners of the Bank Board have objected to, were not so much the words themselves but that there was no data supporting those conclusions. The Bank Board wants the appraisers to describe in some detail the reasons for the conclusions and not resort to words that may have racial discriminatory connotations without explaining what data supports those conclusions.

[The information follows:]

580

NINETY-SIXTH CONGRESS

PETER W. RODINO, JR. (N.J.), CHAIRMAN

JACK BROOKS, TEX.
ROBERT W. KASTENMEIER, WIS.
DON EDWARDS, CALIF.
JOHN CONYERS, JR., MICH.
JOHN F. SEIBERLING, OHIO
GEORGE E. DANIELSON, CALIF.
ROBERT F. DRINAN, MASS.
ELIZABETH HOLTZMAN, N.Y.
ROMANO L. MAZZOLI, KY.
WILLIAM J. HUGHES, N.J.
SAM B. HALL, JR., TEX.
LAMAR GUDGER, N.C.
HAROLD L. VOLKMER, MO.
HERBERT E. HARRIS II, VA.
MICHAEL LYNN SYNAR, OKLA.
ROBERT T. MATSUI, CALIF.
ABNER J. MIKVA, ILL.
MICHAEL D. BARNES, MD.
RICHARD C. SHELBY, ALA.

ROBERT McCLORY, ILL.
TOM RAILSBACK, ILL.
HAMILTON FISH, JR., N.Y.
M. CALDWELL BUTLER, VA.
CARLOS J. MOORHEAD, CALIF.
JOHN M. ASHBROOK, OHIO
HENRY J. HYDE, ILL.
THOMAS N. KINDNESS, OHIO
HAROLD S. SAWYER, MICH.
DAN LUNGREN, CALIF.
F. JAMES SENSENBRENNER, JR., WIS.

GENERAL COUNSEL
ALAN A. PARKER

STAFF DIRECTOR,
GARNER J. CLINE

ASSOCIATE COUNSEL
FRANKLIN G. PO

## Congress of the United States
### Committee on the Judiciary
#### House of Representatives
#### Washington, D.C. 20515
##### Telephone: 202-225-3951

May 14, 1979

Robert H. McKinney
Chairman
Federal Home Loan Bank Board
1700 G Street, N.W.
Washington, D.C. 20552

Dear Mr. Chairman:

As you know, this Subcommittee is now considering H.R. 2540,
the "Fair Housing Amendments Act of 1979." The testimony
recently given by Board member Anita Miller assisted us signifi-
cantly in this endeavor. Since that time, however, an issue
has been raised which requires further illumination by the FHLBB

In testimony presented by the Society of Real Estate Appraisers,
it was asserted that the Department of Housing and Urban Develop
ment and the FHLBB have interpreted Title VIII in a manner
inconsistent with the "realities of the marketplace" and the
exercise of First Amendment rights. Specifically, the Society
takes issue with the HUD policy statement that factors relating
to "racial, religious and ethnic identification of neighborhoods
are not relevant to the estimation of value and should not be
considered in connection with appraisals or residential real
property."

Further, the Society objected to the action of

> ...district examiners of the Federal i.          ...ik:
> System, apparently without the knowledge of the
> Bank, [who] have been interpreting the Bank Board's
> non-discrimination regulations as forbidding the
> use of certain words or phrases in appraisal reports.
> They have been telling appraisers that appraisal
> reports cannot contain words such as "church", "syn-
> agogue", "pride of ownership", "prestigious neighbor-
> hood", "poor school", "declining neighborhood",and
> "homogeneous". These regulations were intended to
> prohibit the use of appraisals that are discrimina-
> tory per se or in effect but they do not define
> which appraisal practices constitute discrimination
> per se or in effect. Such prohibitions directly
> infringe upon appraisers" First Amendment rights.


It is the Society's position that the racial, ethnic or religious composition of neighborhood is a relevant appraisal factor, and, to substantiate that position, they cite recent studies to the effect that racial integration tends to enhance property value.

To help resolve this conflict, the Subcommittee would appreciate your assistance in clarifying several points:

(1) What is the FHLBB policy with respect to barring the use of certain words in appraisal reports? Is there a special significance historically attached to the use of those particular terms? May the same concepts be expressed in the reports in a less objectionable manner?

(2) Upon what evidence does the FHLBB rely in interpreting the Fair Housing Act as barring the reliance on racial and ethnic factors in the appraisal process? That is, what evidence is there that discrimination against the protected classes occurs when appraisal reports rely on racial, etc. information? Historically, was there a negative value attributed by appraisers to the influx of racial and religious minorities into a neighborhood?

(3) Prior to the utilization of forms by the Federal Home Loan Mortgage Corp. and the Federal National Mortgage Association, which prohibit references to racial, ethnic composition, how prevalent in appraisal reports were such references? What is the practice now?

In view of the fact that the Subcommittee intends to complete consideration of this bill within the next month, I would be most grateful for an expeditious response to this inquiry.

Sincerely,

Don Edwards
Chairman
Subcommittee on Civil and
Constitutional Rights

DE:jcg

582

**Federal Home Loan Bank Board**



1700 G Street, N.W.
Washington, D.C. 20552

Federal Home Loan Bank System
Federal Home Loan Mortgage Corporation
Federal Savings and Loan Insurance Corporation

ROBERT H. McKINNEY, Chairman

May 30, 1979

The Honorable Don Edwards
Chairman
Subcommittee on Civil and
    Constitutional Rights
Committee on the Judiciary
U.S. House of Representatives
Washington, D.C.  20515

Dear Mr. Chairman:

This is in response to your letter of May 14, 1979 in which
you request our clarification of several points raised by the
Society of Real Estate Appraisers in their testimony before
the Subcommittee on H.R. 2540. The Society objected to the
interpretation by Bank Board employees of our nondiscrimination
regulations forbidding the use in appraisal reports of such
phrases as "pride of ownership", "prestigious" or "declining"
neighborhood, and "homogeneous."

The questions you have raised followed by our responses are
set forth below.

(1)  What is the FHLBB policy with respect to barring
the use of certain words in appraisal reports?  Is there a
special significance historically attached to the use of those
particular terms?  May the same concepts be expressed in the
reports in a less objectionable manner?

Our nondiscrimination regulations state in §528.2a(a)

"No member institution may <u>use</u> or <u>rely upon</u> an appraisal of
a dwelling which the institution knows, or reasonably should
know, is discriminatory . . . <u>per se</u> or in effect . . . "

Our examiners have objected to the terms cited above because
they are vague, represent the imposition of personal value
judgments, and are often used as a substitute for detailed
analysis. It is the Bank Board's position that appraisers should
be factual reporters describing, for example, sales in the
neighborhood, rising or declining home prices, actual neighborhood
maintenance, and proximity to religion and education facilities,
public transportation, and shopping services. We do not believe

003381

that the use of subjective phrases such as "pride of ownership"
provide underwriters with the necessary specific market information.
They do not meet the requirements of factual reporting and
they may carry discriminatory connotations.

It is our belief that historically such terms have carried
discriminatory connotations. The Department of Justice contended
in their case against the Society and other appraisal and trade
organizations that:

> Prior to the effective date of the Fair Housing
> Act, defendants maintained overtly racially discriminatory
> standards and practices, and instructed their members that
> dwellings in racially integrated areas have a substantially
> lower value than similarly situated dwellings in racially
> homogeneous areas and that loans on homes located in such areas
> were less secure than loans on homes in racially homogeneous
> areas. The "infiltration" of blacks and of other "inharmonious"
> groups into a geographic area was treated as an important factor
> lowering the actual and prospective value of all homes in that
> geographic area. As a result of the authority and influence
> of the defendants on the practices of appraisers and lenders,
> the appraised value of homes throughout the United States was
> predicted on criteria which were racially discriminatory and
> discriminatory on the basis of national origin.

We believe that appropriate indicia of neighborhood value include
facts related to supply and demand, actual maintenance of properties,
and proximity to services. All of the factors should be described
in precise terms without reference to vague "catchall" phrases.

(2) Upon what evidence does the FHLBB rely in interpreting
the Fair Housing Act as barring the reliance on racial, and
ethnic factors in the appraisal process? That is, what evidence
is there that discrimination against the protected classes
occurs when appraisal reports rely on racial etc. information?
Historically, was there a negative value attributed by appraisers
to the influx of racial and religious minorities into a neighborhood?

As indicated in response to your first question, the Justice
Department has found that negative values have been attributed
historically by appraisers to the influx of racial and religious
minorities into a neighborhood. It is noteworthy that the Society
agreed in their settlement agreement with the Justice Department
not to teach "that the achievement of maximum value within a
neighborhood is somehow dependent upon the homogeneity of racial,
religious or ethnic factors," or "that the lack of homogeneity
of racial, religious or ethnic factors must result in a diminution
of value within a neighborhood."

(3) Prior to the utilization of forms by the FHLMC and FNMA, which prohibit references to racial, ethnic composition, how prevalent in appraisal reports were such references? What is the practice now?

Prior to the prohibitions of routine referencing of these factors in the FHLMC and FNMA standardized forms, the majority of appraisers did routinely comment on such factors. However, few appraisers in fact objectively analyzed the impact of such factors on value or the consequences of such recitations on the overall underwriting process. The clear implication was that these factors routinely affect value. This attitude appears to be reflected still by the Society of Real Estate Appraisers as evidenced by the following excerpt from their official statement:

"It is the Society's position that the racial, ethnic or religious composition of neighborhood is a relevant appraisal factor."

We find this simplistic position untenable with the goals of Fair Housing and unsupported by the host of empirical analyses prepared on this subject. The majority of the race/value factor studies do not base their conclusions on a superficial race/value correlation but rather are able to explain noted value changes in terms of observable and measurable economic realities.

Currently, most appraisers do not recite these factors in their reports, however, given the limited amount of analytical support and detail provided by standardized forms it is difficult to discern presently whether such factors are being considered. Given the ramifications of such routine considerations, however, the Bank Board has been considering the adoption of a more comprehensive report format for appraisals in this area so that all market data and supporting analysis can be evaluated.

Before closing I would like to elaborate on one aspect of the Bank Board's written testimony. In her statement, Board Member Miller expressed the Bank Board's approval of §808(d) of the bill which clarifies the Bank Board's existing authority to enforce Title VIII. We wish to explain that in expressing support for this clarification, we did not intend to suggest that the Bank Board currently lacks authority under the Home Owners' Loan Act to remedy fair lending violations. As you know, the Bank Board has adopted comprehensive fair lending regulations to insure that savings and loan associations do not engage in any unlawful

585

discriminatory lending practices. These regulations were
adopted in large measure pursuant to the statutory grant of
authority contained in section 5(a) of the Home Owners' Loan
Act, 12 U.S.C. §1464(a), under which the Bank Board has
exclusive regulatory responsibility for all aspects of the
operations of Federal savings and loan associations, including
fair lending and nondiscrimination matters. Our statement was
made in support of the proposed clarification of responsibility
of the Federal financial regulatory agencies to carry out the
mandate of the Fair Housing Act.

It is my hope that the above will be of use to you in your
proceeding; however, should further explanation prove necessary,
please call upon me.

Sincerely,

Chairman

Following up on that, I'd like to ask you, when racial and ethnic
factors are believed to have had an effect on property value, can
that effect be gleaned from other empirical and more reliable data?
For example, assume an ethnic neighborhood may be more attrac-
tive to prospective buyers because of its special ethnic characteris-
tics. Wouldn't that attractiveness be reflected in hard economic
data which could be included in the appraiser's report? Wouldn't
the comparable sales prices be an indication of that factor without
resorting to describing that phenomenona in racial or ethnic
terms?

Mr. FRANCY. That is, of course, usually the case. Without getting
too technical, let me just give you an example where you might not
be able to do that—a closely held neighborhood in an area where
there's a very fine parochnial school that is pretty rigidly defined.
Many times we find neighborhoods like that where very few sales
ever take place.

Ms. COOPER. Well, if you have no comparables, how do you know
it is increasing in property value?

Mr. FRANCY. That's where you have to go out of the area and
that's when you get into the question of what caused this increase
in value for a 2,000 square foot home next to the parochial school
as opposed to the same 2,000 square foot home away from the
parochial school.

Ms. COOPER. How do you decide it's increased $2,000?

Mr. FRANCY. I said 2,000 square foot home to compare apples and
apples.

Ms. COOPER. How do you know the value has increased if you
don't have comparable sales prices?

Mr. FRANCY. Then you have to use the analytical judg-
ment of an appraiser. Maybe you have a sale 5 years ago in the
parochial school neighborhood for $50,000 when the very same
homes in the public school neighborhood were selling for $40,000. If
you don't have any new sales and you want current values in the
parochial school neighborhood, by the process of judgment and
reasoning you can go to the public school neighborhood and see
what those houses are selling for and apply the judgment factor.

586

Ms. COOPER. My point is, you're still relying on comparable prices rather than the ethnicity of the neighborhood.

Mr. FRANCY. Yes, that's correct. Certainly there's got to be an explanation. If you see identical homes in various parts of the city—and I'm going to assume they are identical although they never are—but in various parts of the city selling at different prices, there's always a reason why they are selling at different prices. It may be that in one area you have a new highway that causes prices to be higher. It may be in another area there's a manufacturing plant that emits odors and that causes prices to be lower; and it may be that prices may be higher or lower because of an ethnic situation, a religious situation, a sexual situation or whatever. Our point is we should be free to report these.

Mr. DRINAN. Counsel, if I might intervene, you're just missing the point, sir. We want to shape a law so that appraisers will not inadvertently exaggerate the desires of people to have an all-white school. We want to get rid of those ethnic and religious factors you mentioned. We want to help people to obey the law. And appraisers inadvertently, be every testimony we have had here and before—inadvertently, unconsciously are aiding and abetting the implementing of the prejudices of the people and we, by law, are seeking to give blacks a break. I yield back my time.

Ms. COOPER. I believe, that the two largest appraisal organizations, the society of Real Estate Appraisers and the American Institute of Real Estate Appraisers were founded or at least their origins were derived from the savings and loan industry and the realtors. Is that correct?

Mr. FRANCY. That's my understanding of the founding. AIREA, if you will, is an arm of the National Association of Real Estate Boards and my understanding, although I don't know all their history, is that the SREA was in effect encouraged or seeded or whatever term you want to use by the savings and loan industry.

Ms. COOPER. Do you think that that link has affected the way in which the functions of the appraising are performed, their objectivity?

Mr. FRANCY. No, I don't think so, by and large. Of course, you can't make a blanket statement that's good for everything, but by and large, I think most of the people that are tested and designated are objective and are not swayed by the fact that their parent organization or their founding father was a savings and loan organization.

Ms. COOPER. Mr. MacBride, would you like to comment?

Mr. MACBRIDE. The AIREA is substantially the same size as the American Society of Appraisers. There are about 5,000 members in each of these associations. The SREA is a large organization, as you indicate. It may be helpful to all of the committee to know we have been discussing the appraisal profession and the appraisal trade or whatever. The appraisal "universe," if you will, probably has about 120,000 representatives. Of this universe, the five major societies that I told you about have about 30,000 to 33,000 members, if it will be helpful to you, in the United States. One may speculate from the studies that I have concluded after about a 2-year research that I have just concluded at Hofstra University with my Master's thesis—one may safely indicate a universe of 20,000

587

practitioners, men and women. Of these, the five major societies comprise somewhere between 32,000 and 33,000 persons. Of the 32,000 to 33,000, about half of these, about 15,000 have been tested and designated by the five societies as being sufficiently experienced, knowledgeable and professional to wear the initials of the respective societies. So you have approximately 15,000 designated appraisers in the United States, if that's helpful to you, in just knowing the universe you're talking about, the number of people that are doing this thing that we are considering.

Ms. COOPER. So with respect to the ones that aren't tested and certified, you can't speak for their qualifications to make these kinds of judgment calls?

Mr. MACBRIDE. We could not make a judgment that outside the 15,000 or 16,000 or 17,000 that have been tested and designated that they are sufficiently experienced or knowledgeable or professionally motivated that they would be able to conduct the business we're talking about in a satisfactory manner. There's no way of knowing their capacities.

Ms. COOPER. That goes for SREA too?

Mr. MACBRIDE. Of course.

Ms. COOPER. The membership of the major professional organizations, then, does not include a lot of individual appraisers, and title VIII covers all appraisers.

Mr. MACBRIDE. You could belong to one of the five major societies and not be tested or designated by them. You may not have the requisite experience to sit for their exams.

The appraisal profession is not like the legal profession. For example, when you and I got our sheepskin and then passed the bar, it was unlawful for us to practice prior to that event or at least it certainly was a Virginia where I was cloaked. The appraisal profession is exactly the reverse. You must have 5 years of practice before our society, for example, will permit you to sit for our senior exam—the complete reverse of the legal procedure—one would think that one of the two would be unprofessional and you never know which—in the same way the legal profession and the appraisal profession are clearly in reverse. Goodness knows which is the reciprocal to each other. Percentage fees are anathema to appraisers. We would cut your buttons off if you hung the amount of fee on the amount of the appraisal, whereas in the legal profession percentage fees are accepted. So you're examining at least a very curious or different universe when you look at the appraisal universe. There's about 15,000 or 16,000 tested and designated appraisers; that say those persons have the capacity to do the very sensitive job that you people are concerned about and we are concerned about.

Mr. FRANCY. And that brings up another point, if I might add to Mr. MacBride's comments. Very briefly, we have taken the position for some years that some form of a testing certification, licensing, at some level of government should be accomplished to assure the people when somebody says, "I am an appraiser," that they are going to get at least some minimum qualifications. Today, as soon as you can spell appraiser you're one.

Mr. EDWARDS. That would be up to the State governments.

Mr. FRANCY. Certainly.

588

Mr. MacBride. We have recommended since 1971 that State governments understand this key function and that they either license, certify, or register appraisers to provide a fulcrum for the public to find an appraiser and find one in utilities or real estate, or personal property.

Second, of late, we have became very suspicious about licensing. If licensing is to be achieved, one of the things you have to do is grandfather in those presently practicing and we are not at all sure that we are happy with the notion that you're going to grandfather in perhaps some incompetents in that procedure in the grandfathering. We are looking much more favorably toward certification and registration. You need not have grandfathering. You could have maximum rather than minimum criteria. You could serve the public by placing the names in a repository and getting all the appraisers that do a, b, or c. These are key issues with us.

Mr. Edwards. Mr. Boyd.

Mr. Boyd. Thank you, Mr. Chairman.

Gentlemen, there are two portions of this bill, one which we have discussed extensively. The other one we really haven't. That's the procedure relative to the substantive sections of the bill. This bill does a great deal more than simply place enforcement authority in HUD. It includes the handicapped and it involves personal right of action which are expanded, a right of action by the Attorney General, his right to intervene in civil cases brought by individuals or on the part of the Government. I take it you have no opposition to any of those substantive changes.

Mr. Francy. Of course, it's tough for me to talk for our executive committee and say this is it. It's several pages. As you put that, I don't think those would be in the slightest objectionable.

Mr. MacBride. I think those are fair statements and needed.

Mr. Boyd. So your problems, which we have discussed revolve around the potential enforcement mechanism and the potential for manipulation as you see it?

Mr. Francy. I think you have hit the nut of it, sir.

Mr. Boyd. Thank you. Now there are two different stages as you well know, of appraisal. There's the stage of appraisal which takes place at the time that the loan is being considered by the lending institution. That is the appraisal review which the lending institution undertakes to see that the collateral is sufficient to be granted for 30 years or 20 years. There's also another level of appraisal and that takes place on the part of the real estate broker who appraises the house for the seller and generally sets the price and ultimately brings and delivers buyers to the seller.

How large a role do you think the real estate broker plays in the problems which we see in housing?

Mr. MacBride. In the informal mechanism, of course, a very large role because most of us when seeking housing go somewhere and say, "I want to live over in that neighborhood. I saw a very pretty house and I understand maybe I could get located in that block." I do not doubt that a majority wind up in a real estate office saying, "How much do you think I should pay for that?" That's a normal thing that happens.

Mr. Francy. That happens many times and many times sellers don't have any idea of what their property is worth and instead of

589

hiring a competent appraiser they go to their real estate broker which gives a generally good appraisal if he's reasonably honest. We have seen people who give a low appraisal because he knows he can sell it in 30 minutes.

Mr. Hyde. But his commission depends on the price, so he has an inducement to get his appraisal up.

Mr. MacBride. Brokerage, when involved in the appraisal process, whether the formal one of the appraiser or the informal one of the real estate broker, is highly suspect and should be suspect. Just as we don't believe in percentage fees, for a suspect situation, brokerage is dynamite.

Mr. Boyd. Thank you. Recently the Supreme Court in the last month of May decided *Gladstone* v. *Bellwood,* which as you know involved the standing of a municipality to question racial steering. How large a role do you think, or how big a problem do you perceive racial steering to be in the appraisal business as far as brokerage is concerned?

Mr. Francy. I couldn't hazard a guess. I really couldn't. I'm only familiar with one small area where we have in fact I think very little of any kind of racial overtones or steering or anything else, and I know that there are more areas where the problem is huge, but I couldn't give you a guess. I couldn't hazard a guess as to what sort of percentage of transactions would be suspect of having steering as you put it or other factors.

Mr. MacBride. And I cannot give that answer. I'm an expert in the redlining function as it involves the appraisal process, but I have not made myself expert in the steering issue. These are very difficult and complex issues.

Mr. Francy. Those almost defy analysis because it's so clandestine and so subtle it seems to me.

Mr. Boyd. And so effective.

Mr. MacBride. Just as the manipulation of appraisers is generally vast, subterranean, wonderfully sophisticated and effective and totally dangerous to the appraisal profession. Appraisers should not be dominated by specific groups which have vested interests in achieving ends.

Mr. Boyd. Thank you, Mr. Chairman. I have no further questions.

Mr. Edwards. Are there further questions?

[No response.]

Mr. Edwards. Thank you very much. I appreciate your testimony.

Mr. MacBride. Mr. Chairman, we appreciate the opportunity of coming here and we agonize with you. We are not achieving an easy function. My heart goes out to you and I listened with deep appreciation to the suggestion of a compromise that might effect reasonable solutions.

Mr. Edwards. Yes. We are going to examine that with great care.

Mr. MacBride. We hope you add to it our crying need for an enforcement mechanism to keep us from being manipulated.

Mr. Francy. If there's anything you need, Mr. Chairman, we would be more than happy to furnish additional testimony, witnesses, or whatever you like.

[The prepared statement of Mr. MacBride follows:]

003388

590

### STATEMENT OF DEXTER D. MACBRIDE, EXECUTIVE VICE PRESIDENT, AMERICAN SOCIETY OF APPRAISERS

Mr. Chairman:

This statement is made on behalf of the American Society of Appraisers; it is a pleasure to express appreciation to you and your Committee for the invitation to participate in your Hearings.

Brief introductory comments may assist in orientation.

The American Society of Appraisers is an education/research-oriented professional appraisal Society, international in scope, structure and membership; it is composed of approximately 5000 valuation counsellors who are related to communities and cities by virtue of public service in the disciplines of appraising. Similar to the other major nationwide testing/certifying appraisal societies in its Code of Ethics structure, educational programs, examinations, certification procedures and monitored professional comportment criteria, ASA is especially recognized in two respects: (1) it is the only nationwide multi-discipline testing/certifying appraisal group in the U.S., (2) it is the initiator/sponsor of the Valuation Sciences Degree program which offers appraisers, for the first time in this country, the opportunity to receive instruction (and academic degree documentation at Baccalaureate and Masters levels) in all disciplines of Appraising.

My name is Dexter D. MacBride. I am the Executive Vice President of the American Society of Appraisers. My knowledge of appraisal practice stems from some 33 years experience in the practice of law (member, American and Virginia Bar Associations), right of way (Registered SR/WA), and public administration (Certified, CAE). The last 7 years of my service in government was as head of the California State Public Works Appraisal Program.

*        *        *

The Committee's attention is focussed today upon H.R. 2540 (Edwards; Drinan), which proposes to amend the Civil Rights Act of 1968, Title VIII (often referred to as "The Fair Housing Act").

591

The "Fair Housing Amendments Act of 1979" therefore
constitutes the issue which is our mutual concern. The
Act, and its amendatory provisions, deal with the problems
of discrimination in the nation's housing transactions
(sale, rental, leasing, mortgaging, lending, insuring, etc.).
Major proposals of the 1979 Act are designed to (a) define
certain prohibited practices, (b) identify certain parties
especially subject to discrimination, e.g., handicapped
persons, (c) provide new enforcement measures (available
to HUD, Department of Justice and aggrieved parties).

The existence of discriminatory practices in the nation's
housing procedures has been variously identified, analyzed,
described, documented.

The President of the United States has noted the need
"to correct a weakness" in the existing law; in his supple-
mental State of the Union message, he stated: "Title VIII
of the Civil Rights Act of 1968, which prohibits discrimination
in housing, remains largely an empty promise because of the
lack of an adequate enforcement mechanism."

In your own review of this matter, Chairman Edwards,
(Fair Housing Amendments Act of 1979; Congressional Record,
Vol. 125, No. 24, Thursday, March 1, 1979) you cited the
findings of the National Committee Against Discrimination
to substantiate your conclusion that "The problem of housing
discrimination is even worse than is apparent." Your colleague
and co-sponsor of H. R. #2540, Representative Drinan, notes
that ". . . extensive hearings and studies have made it clear
that the problem of housing discrimination is a national
disgrace, and the existing means to cure that problem are
wholly inadequate."

Among the recent studies which conduce to the conclusions
above-noted:

(1) Mortgage Lending Decisions, Criteria and Constraints
     (Joint Center for Urban Studies of the Massachusetts
     Institute of Technology and Harvard University;

592

2 volumes; Robert Schafer; December 7, 1978).
Described as "the most comprehensive analysis of
urban mortgage lending to date", this study add-
resses the mortgage lending problem in five of the
largest metropolitan areas of the State of New York
(Albany-Schenectady-Troy, Buffalo, New York and
Nassau-Suffolk, Rochester, Syracuse.  One of the
major conclusions:  "The race of the applicant, as
opposed to the racial composition of the neighbor-
hood surrounding the property, is a crucial factor
in lending decisions in all but one of the metro-
politan areas (the Albany-Schenectady-Troy area).
The results are consistent with allegations of
discrimination against black applicants in the
Buffalo, New York/Nassau-Suffolk, Rochester and
Syracuse metropolitan areas."

(2)  The Federal Fair Housing Enforcement Effort
     (Report of the U.S. Commission on Civil Rights;
     March 1979).  The Findings and Conclusions describe
     "three principal inter-related deficiencies" in the
     efforts to assure nationwide Fair Housing opportunities:
     (a) "Title VIII of the Civil Rights Act of 1968, the
     primary fair housing law, does not provide effective
     enforcement mechanisms for ensuring fair housing."
     (b) "Those Federal departments and agencies charged
     with ensuring equal housing opportunity have not
     adequately carried out this duty." (c) "The
     Government's appropriations in support of fair
     housing have been inadequate to meet the nation's
     needs in this critical area of civil rights
     enforcement."

(c)  Perceptions of Risk - The Bankers' Myth:  An
     Eight City Survey of Mortgage Disclosure Data
     (National Training and Information Center, Chicago,
     Illinois; 1978).  A Review of research conducted
     in Chicago, Cleveland, Columbus, Ohio, Hartford,

Salt Lake City, Oklahoma City, Waterloo, Iowa,
Wilmington, Delaware; its Conclusions segment
notes that "NTIC's analysis of disclosure data has
documented wide-scale disinvestment of neighborhoods
in eight cities by private sector financial institu-
tions. Clearly, the demand for conventional mortgage
credit in those disinvested areas is not being
met. . . . Arguments about lack of demand for
conventional mortgages dissolve into risk arguments
as it becomes clear that lenders virtually determine
'demand' themselves through control of marketing
and application procedures."

(4)　Redlining

(City of Tampa, Florida, Bureau of Planning; October
1978). In providing ten "General Recommendations"
to suggest ways to inhibit the proliferation of
redlining, the study notes: "Redlining is a complex
problem. Although it is not as apparent in the
City of Tampa, the effect of National Media on local
residents could surface the issue as a matter of
public concern."

The Position of the American Society of Appraisers

Just as your Committee has exhibited concern about legal,
financial, planning and regulatory practices which impact
upon the transfer, sale, lease, rental, improvement of the
country's housing units and which ultimately impact upon
the health of all of our communities and citizens, the
American Society of Appraisers has shared and expressed
correlative concerns about Fair Housing, Equal Opportunity
in Appraising, and the Reporting of Factual Residential
Data in Appraisal Reports and related communications.

The following formal Actions undertaken by ASA are
illustrative of this concern:

(1)　To state its Basic Policy Position regarding
Fair Housing, ASA adopted a Resolution dated
January 26, 1975 expressing its "support of all

programs which strive to make Fair Housing a
reality of 'choice and opportunity for all
Americans to occupy housing anywhere based on
ability to pay for such housing'."
This resolution was achieved in cooperation with
HUD's Office of Equal Opportunity.  It was the
first related to Fair Housing and Minority
Opportunities to be publicly stated by an appraisal
society in the U.S.   Copy of the Resolution is
appended (Exhibit 1).

(2)  The Resolution above-noted describes efforts of
ASA in 1972, 1973 and 1974 to make known its
Minority Position Statement and states ASA "concern
and whole-hearted support in all efforts to eliminate
bias, discrimination, 'panic selling', and to
equally express our support to continue 'affirmative
training and recruitment of minorities into the
appraisal field'."
To give practical foundation to these policy
concepts, the ASA established a series of educational
programs, e.g.,

(a)  Public Service Orientation Seminars presented on
"Residential Appraising, Redlining and Urban
Disinvestment" (the first such valuation-oriented
seminars in the country dealing with urban
disinvestment problems).  Initial sessions
were held at Hofstra University (4-30-77),
City of St. Petersburg, Florida (8-3-77), City
of Saginaw, Michigan (9-16-77).

(b)  Presentations on "Minorities Opportunities
in Appraising" and "'Redlining' and Appraisers"
have been incorporated in the nationally-
recognized ASA Audio-Library of "Valutapes".

(3)  In March 1978, the International Board of Governors
of ASA adopted a Resolution emphasizing its
dedication to concepts of Total Objectivity and

595

Professionalism in the practice of Appraising.
The Resolution stated the position of the Society
that

"all appraisers should report, and should be free
to report, factually and with total candor each
and every significant factor which may affect the
value of residential, commercial, or industrial
property in consonance with the accepted professional
'Principles of Appraisal Practice and Code of Ethics'
of the American Society of Appraisers". Copy of
the Resolution is appended (Exhibit 2).

The Fair Housing Amendments Act of 1979

Title VIII, the "Fair Housing Law" created in the 1968
Civil Rights Act, is based upon the concept of voluntary
compliance.

Voluntary compliance has not succeeded in accomplishing
the removal of unfair, inequitable housing practices in the
U.S., according to the general consensus of published studies,
research projects, etc., and according to the majority testimony
presented before your Committee (as of March 1, 1979, "over
17 witnesses, and . . . from over 60 organizations"; Congressional
Record, Vol. 125, No. 24, House of Representatives, "Fair
Housing Amendments Acts of 1979").

Your 1979 Act (H.R. 2540) proposes to cure the deficiencies
in the 1968 Act, Title VIII, by providing revised enforcement
procedures. That is to say, you propose to put "teeth" into
the law, to get the results sought.

Additionally, the 1979 Act is designed to reach "redlining"
practices: (a) it is intended to specifically bring the
secondary mortgage market into the full operation of the law;
(b) it is intended to prohibit "redlining" as related to its
impact on the protected categories, including religion, race,
sex, handicap.

   *    *    *

Objection to the Fair Housing Amendments Act of 1979
has been placed before you by representatives of a portion

of the appraisal profession (May 3, 1979; <u>Statement</u>, Society
of Real Estate Appraisers).

The objection has been based upon several issues, including:

(a) ". . . fear that this legislation will affect our
(SREA) members' ability to practice their profession
by limiting their First Amendment rights to consider
the factors or report the facts as they exist in
the marketplace in an objective opinion of market
value. . ."

(b) ". . . sound appraisal practice requires that all
relevant factors, including race, religion and
ethnic factors, which exist in the marketplace
and which impact upon market value, must be
considered in a dispassionate, unbiased, non-
prejudicial and objective manner by the appraiser
in reaching an opinion of value."

(c) "Most troublesome are the enforcement powers,
especially the 'injunctive' type of relief and the
'cease and desist' power, which this legislation
proposes to grant to the Secretary of HUD. When
viewed in the context of the proposed internal
HUD hearing procedures which combine investigative,
prosecutive, adjudicative and appellate functions
within the Secretary of HUD, we are convinced that
such broad enforcement authority will inevitably
lead to a hammerlock on any single appraiser or
other individual or professional group accused
of alleged discriminatory activity. Further,
<u>such potentially unbridled authority may preclude
a fair hearing</u> on the charge and could effectively
intimidate appraisers or groups from exercising
their First Amendment rights . . . . Without
question, the mere threat of an investigation
involving alleged discriminatory conduct, not
to mention a protracted hearing, would most likely
result in the bankruptcy and ruin of an individual
appraiser vis-a-vis his client base".

597

I am confident these three objections have been thoughtfully noted by your Committee, and will be carefully evaluated.

(a) As to the first objection described above:
No person, no group, should be deprived of First Amendment Constitutional rights. It is the special province of your Committee to assure that the subject legislation does not infringe upon these rights. Specifically, appraisers must have the freedom to report, factually, every significant factor which may affect the value of properties appraised.

It is acknowledged that the possibility of such infringement, or deprivation of rights, can only be determined, in penultimate step, by the actions of those intrusted with the enforcement powers, and that the ultimate decision would have to be tested in Court proceedings.

We expect your Committee, and the Congress, to share this concern and to take every precaution to assure that First Amendment Rights are neither restrained nor jeopardized.

(b) The second objection above-described has to do with the assumption that "sound appraisal practice" requires an appraiser to consider ". . . all relevant factors, including, race, religion and ethnic factors. . . .".

Such practice may be mandated in some appraisal groups. It is not mandated by the American Society of Appraisers. Nowhere in our organization's "Principles of Appraisal Practice and Code of Ethics" (one of the most extensive, explicit Codes among the appraisal groups) is there a mandate to consider race, religion, ethnic factors, sex, handicap, nationality.

Our Code envisions Appraisal practice in three operations:

003396

**598**

(1) The estimation of the <u>cost</u> of producing
or replacing physical property.

(2) The forecasting of the <u>monetary earning
power</u> of certain classes of property.

(3) The valuation or determination of the <u>worth
of property</u>.

Indeed, the ASA Ethics Code, in discussing the
"Objectives of Appraisal Work", states in part
that the objective character of the results of
an appraisal undertaking lies in
". . . the determination of a numerical result,
either as a range or most probable point magnitude --
the dollar amount of a value, the dollar amount of
an estimated cost, the dollar amount of an estimated
earning power. This numerical result is objective
and unrelated to the desires, wishes, or needs of
the client who engages the appraiser to perform
the work. The amount of this figure is as
independent of what someone desires it to be as
a physicist's measurement of the melting point
of lead or an accountant's statement of the
amount of net profits of a corporation. All the
principles of appraisal ethics stem from this
central fact.

The objection voiced in (b) above, which appears to
assume an appraiser must extend his survey of facts to
include observations and statements on matters of race,
nationality, ethnicity poses a serious problem in terms of
quantifying these issues into numerical results and reporting
these in dollar amounts.

In years past, when appraisers ventured into the realms
of sociological research, the results which appeared in
appraisal reports were often undocumented and fragmentary.
An illustration appears immediately below excerpted from a
1974 appraisal report:

<u>"Trend</u>: The subject area: although changing with the
infiltration of inharmonious elements, is considered

599

stable - along the lakefront and Sheridan Road."

Again, in a 1975 Appraisal Report, the following appears:

"Trend: Area has been a well established manufacturing center for many years and however the influx of inharmonious ethnic groups may change this in a few years."

The "infiltration of inharmonious elements" statement displays the problems faced by appraisers who move from facts and figures into the world of sociology and adjectives. The appraiser certainly has First Amendment rights to speak and write; he has correlative responsibilities for accuracy, fact, documentation.

    (c)  The third objection voiced -- noted as the "most troublesome" -- has much merit. The enforcement process, proposed to be concentrated in the position of the Secretary of HUD, might indeed "lead to a hammerlock" on appraisers, and might "intimidate appraisers or groups" from exercising their rights to report factually on those matters having to do with property values.

Essentially, it has to do with the skill, experience, maturity, empathy, discernment of those wielding the (new) enforcement powers.

Representatives of HUD (Office of Voluntary Compliance) have not exhibited to this Society the characteristics above-listed. Indeed, contacts with HUD representatives on vital appraisal matters have displayed, on the part of the Office of Equal Opportunity, patterns of indifference, inaction, and abrasiveness conjoined with a complete lack of understanding of appraisal practice and procedure.

To illustrate: as noted previously, the American Society of Appraisers was the first appraisal group in the country to adopt a Fair Housing Resolution. The Resolution resulted from an August 28th, 1974

600

request by HUD (directed to the major appraisal
societies) urging the societies to cooperate with
the HUD Voluntary Compliance program. In response,
ASA adopted its Fair Housing Resolution January 21,
1975; copies were immediately sent to HUD, and
published by ASA.

Inexplicably, HUD officials refused to acknowledge
receipt of the Resolution. Finally, ASA was
forced (in order to protect its position vis-a-vis-
HUD) to write to HUD Secretary Carla Hills, virtually
pleading for action and acknowledgement. Copy of
the Society's letter, dated May 5, 1976, is attached;
it is fully explanatory (Exhibit 3).

"Attitude" has much to do with probable use of
power. Representatives of HUD have exhibited
characteristics which do not bode well for thought-
ful, perceptive, judicious exercise of authority.
An example: On March 15, 1977, ASA received a
letter from HUD (G.M. Putnam, Deputy Assistant
Secretary For Fair Housing and Equal Opportunity),
noting the ninth anniversary of the Fair Housing
Law, and a planned ceremony to be held at HUD
Headquarters Building on April 5. "Those
attending the ceremony", the Asst. Secretary
wrote, "will reaffirm the policy, practice and
spirit of fair housing by affixing their signature
to a declaration that embodies the principles of
fair housing and the Fair Housing Law" (emphasis
added). ASA asked for a copy of the "declaration",
so that its Executive Board might be apprized of its
contents and be certain it would be appropriate
for our Society to endorse by signature. Secretary
Putnam expressed indignation at the request,
stating this implied distrust of HUD. The
"declaration" was never sent, nor made available,
to ASA. In consequence, ASA felt it could not
participate in the ceremonial "signing".

If HUD, at that point in time, had been invested
with plenary enforcement powers (as H.R. 2540
suggests HUD should have), I can picture the
pressure that would have been applied on ASA to
sign the "declaration" despite our inability to
study the statement or even know its contents,
and the harassment our society and membership
would have experienced thereafter.

ASA is persuaded from these and related experiences,
that HUD representatives have neither the in-depth
know-how, nor the requisite understanding of
community relationships, to be relied upon to
exercise new powers in a fair and equity-oriented
manner.

### Fair Housing, Voluntary Compliance, Enforcement: Brief Commentary Focussed Upon Four Questions

The achievement of Fair Housing provisions for our
citizenry is a rightful, necessary and attainable goal.  Such
achievement depends, in a synergistic way, upon Government
(laws, regulations, guidelines), upon the Public (needs,
expectations, demands) and upon "the Real Estate Industry"
(realtors, money lenders, building constructors, developers,
title/excrow agents, insurors, attorneys, appraisers).  All
of these elements are inextricably involved in the buying,
selling, renting, leasing, mortgaging, lending, insuring,
transferring, appraising of the nation's housing stock.

It is absolutely imperative that this complex mechanism
"work", and that it work, nationwide, in a "Fair" manner,
substantially as adumbrated in Title VIII, the "Fair Housing
Act".

To assure that "it works", and that equitable Fair
Housing measures are achieved, is the concern of your
Committee -- and the concern of all of us.

Factually, it would appear from the substantial evidence
before you (described partially and briefly in the introductory
portions of this Statement) that the system is not working as

it should.  Hence, the response from both House and Senate, in the form of legislative proposal H.R. #2540 and its companion Bill in the Senate.

Every witness before your Committee has a responsibility to face the problem with you; a responsibility to try to be objectively critical where that is perceived to be necessary, and to propose the best solutions possible.  In that context, the American Society of Appraisers proposes the following four questions for your consideration and evaluation; brief discussion follows each, in order to suggest creative action parameters.

    I.    <u>Have adequate enforcement mechanisms (to assure</u>
        <u>substantial fair housing procedures/practices)</u>
        <u>already been achieved; could these mechanisms be</u>
        <u>employed to achieve desired compliance</u>?

There is substantive evidence to suggest an affirmative answer to this question.  Your attention is directed to research results published in the <u>Journal of Urban Law</u> (Vol. 354, pp. 367-407; 1977) under the title "Mortgage Redlining (Disinvestment): the Parameters of Federal, State and Municipal Regulation" by Robert E. Wisniewski.

One of the conclusions of the study is germane to this discussion:

"Redlining, the denial of mortgage loans in a particular geographic area for home purchase, expansion, or remodeling without regard to the credit of the applicant or the quality of the property, contributes to urban decay.  State, municipal, and federal governments are attempting to regulate this practice and control the deterioration of our nation's cities.  Intersecting lines of authority have produced conflicting public and private policies, demonstrated by the various regulatory methods developed by federal, state, and municipal governments.  Duplication, conflicting claims, and several levels of regulatory bodies frustrate attempts to meaningfully control redlining."

"One by-product of this confusion has been agency reluctance in promulgating and enforcing regulations, no clear standards having been articulated. Given the intrusion of the federal government via the Home Mortgage Disclosure Act, some states and subdivisions will yield to federal authority and abandon their proposed regulation. On the other hand, vigorous states and subdivisions will supplement the federal rules. <u>The current and proposed efforts are superfluous when one notes that the pre-existing Federal Home Loan Bank Board had both the power and supervisory capability to limit redlining</u>. The FHLBB, already possessing the requisite expertise, could have directly influenced the lending policies of financial institutions. Through regulation by this agency, simple operational rules could have been provided, concomitantly avoiding the multiplicity of rules and confusing jurisdictional issues now impeding efforts to control redlining." (emphasis added)

A similar conclusion can be drawn from a review of the pending "Underwriting Guidelines - Home Mortgages" (4-11-79 Draft; circulated to interested members of the industry for constructive criticism) proposed by the Federal Home Loan Mortgage Corporation. Two statements contained in the FHLMC's letter of transmittal (Leady W. Seale, Jr., Vice President, Appraisal and Underwriting) are of moment:

(a) "These guidelines have been written in an attempt to use language which could not in any way be construed as fostering discrimination against any class of mortgage borrower, residential property, or location".

(b) "The Mortgage Corporation has long been an influence for sound and fair lending practices. We are no longer satisfied, however, merely to write our underwriting guidelines so they can be understood. <u>We are seeking now to write them so that they cannot be misunderstood.</u>" (emphasis added)

The possibility of the existence of a potentially-sufficient enforcement structure should be considered in the light of another facet of the problem, which is illustrated by the following question.

II. <u>Has the Full Potential for Effectiveness of Voluntary Compliance been Tested</u>?

It is submitted that the experience of major segments of the appraisal profession leads to a conclusion that Voluntary Compliance has been relatively untried and, where tried, ineffectively applied.

Even rudimentary familiarity with "the Real Estate Industry" would suggest that the buying/selling/rental/leasing/mortgage/improving/transfering of residential real estate has as its "key", its least-common-denominator, the dollar unit. Money is Means and End of "the Industry"; money is the nexus, catalyst and solvent. Integral to the vast majority of residential property transactions

is a dollar determination of "how much"; an appraisal of "how much" (market value) is an ineluctable "link" in the real estate "chain". Indeed, this link is the key to most transactions: the lender relies in great measure upon it; the potential buyer is subject to its decision-inpact; the community patterns of investment/disinvestment depend from this link; the health of our nation's greatest capital investment, the homes of our citizens, is quantified and (to a great extent) determined by the impact of the appraisal process.

Given the importance of the Appraisal "link" in the real estate "chain", it is our conviction that the agency (HUD) entrusted with the Voluntary Compliance mechanisms of the Fair Housing Act did not -- does not -- correctly perceive or understand the key element in the total process (Real Property Appraisals).

To further illustrate ASA experience with HUD in this regard (see a preceeding section, "The Fair Housing Amendments Act of 1979, pp. 10 et seq.):

Other than the 1974 request for ASA to adopt a "Fair Housing Resolution", and the summary March 15, 1977 statement that those participating in the ninth anniversary ceremony of the Fair Housing Law "will reaffirm the policy, practice and spirit of fair housing by affixing their signature to a declaration" (sight unseen), HUD has never initiated a formal contact with the American Society of Appraisers to monitor, encourage, stimulate, volunteer input of ideas, or otherwise reveal a leadership role in implementing the concepts of Volunteerism and Compliance with the Fair Housing law.

Simply put: Voluntary Compliance has not been given a fair trial. For whatever reason (inadequate or ineffective staff, insufficient budget, intransigence, want of comprehension of the interlocking and symbiotic relationship of the links in the chain, etc.), the appraisal profession has not been able to discern creative action

exhibited by, or gain benefit from, the HUD structure
entrusted with the Fair Housing/Voluntary Compliance
program.

Despite the accuracy of these conclusions (within
the parameters and perspective of the American Society
of Appraisers experience), it cannot be denied that
(even if Voluntary Compliance measures were "working")
something is lacking, something is "wrong" with the
"real estate industry" process; one of the "links" is
not operating at optimum effectiveness. Thus, it is
time to raise the 3rd question, which follows.

III.    If New Enforcement Measures Are Required, What
        Area(s) Should be Covered; What Steps Taken to
        Assure Achievement of Fair Housing Goals?

Broad granting of powers, without specificity as
to exact areas of application and methods of use, can
create a shambles of a complex mechanism like the real
estate "chain", or process, which involves so many
agents of production.  A "bull in a china shop" is an
apt verbal picture of the concept of unfettered power.

It is submitted, for your thoughtful consideration
and hoped-for action, that there is an area in need of
regulation and enforcement.  There is a "link", in the
"chain" of the buying/selling/leasing/renting/improving/
mortgaging/insuring/lending/appraising process, which
cries out for responsible overview, strengthening and
correction.  This area goes to the heart of the matter --
to urban disinvestment, to redlining, to the least-
common-denominator (the dollar), to the entire practice
of the Appraisal Profession (whose work in determining
the Market Value of Properties is the key in the
real estate chain).

It is patently clear:  the Appraiser is the major
point of vulnerability in the entire process; whether
he likes it or not, he is cast as a key actor in the

dramatis personae of the real estate "act". If the
appraiser is inept, or ignorant, or inexperienced or
unprofessional -- or if those who employ appraisers
select only those who reflect a particular viewpoint,
or who respond subjectively to the wishes of the client
(generally the lender) -- then the objectivity of the
process is vitiated, the worth of the value determination
of Market Value destroyed, and the doors are open for
redlining and urban disinvestment in whatever fashion the
manipulators desire.

Herewith be advised that such manipulation is a
commonplace; that appraisers are subject to the most
open discrimination in their employment, that government
and private enterprise are having a "field day" in
effecting whatever ends they seek. Perhaps an illustration
or two will give you a window "view" of this seldom-
discussed subterranean world (much like a view of a
Sea-World shark's tank).

Illustration #1:  The Color of An Appraiser

The District of Columbia government, according to
our information, has just introduced (May 3, 1979) a
new policy in the hiring of appraisers for its Housing
and Development Department. The basics of this new
policy:

 (a) Independent fee (non-staff) appraisers will
 be hired only if they live/work within D.C.
 boundaries;

 (b) Appraisers will be selected only from
 minority groups (in this instance, minority means
 "black");

 (c) If all minority appraisers are busy, then
 "white" appraisers may be employed providing
 their office is in the District;

 (d) No questions are to be asked regarding fees;
  this is not important.

We are informed the policy is "verbal", and that the Chief
Appraiser, responsible for its implementation, was

608

refused his request that it be put in writing. Further, the Chief Appraiser, in consequence of the "policy" has informed 4 appraisers that their pending contracts to appraise properties for the D.C. government are terminated.

The policy has been instituted in a Department which has prided itself upon skillful and effective management of an extensive (number of parcels and dollar amounts) appraisal program, in which a 35%-hiring-of-minority-members process has been achieved for years!

One method for controlling appraisers (for other than objective Market Value determinations): choose by color.

<u>Illustration #2: State Manipulation of Private Appraisal Groups by Ad Hoc Procedures</u>

The State of Florida, Department of Natural Resources, currently operates under a "non-published" policy that it employ, as its appraisers, only designated members of the American Institute of Real Estate Appraisers or the Society of Real Estate Appraisers; they will not hire professional appraisers from the other 3 major nationwide appraisal Societies, nor will they hire non-designated appraisers.

The procedure has been part of a series of activities which has led to a "scandal": newspapers headline the millions of dollars of overpayments in the Department's program; the Director Harmon Shields, has departed his State Office; an investigation is under way by the FBI; the questioning of governmental employees, appraisers, legislators, real estate brokers by a Federal Grand Jury in Tampa is in progress.

Another method for controlling appraisers: create "policy"which restrains open, competitive professional practice.

(Variations on this manipulative theme are nationwide. ASA has combated smilar manipulative influences with the State Governments of Alabama, Arizona, California, Connecticut, Florida, Illinois, Louisiana, Maryland, Missouri, Nebraska, New Jersey, New York, Tennessee,

609

Texas, Virginia, Washington, West Virginia.  Similarly,
our Society has been forced to address the identical
Restraint of Professional Practice issue with agencies
of Counties, Cities, as well as with a variety of
Federal Agencies).

### Illustration #3:   Control of Appraisers
### by Groups Within "the Industry"

Savings and Loan institutions select appraisers, to
assist in Market Value decisions.  The selection process
can be open and equitably-conducted, or can be operated
as a "closed shop".  The St. Louis, Missouri, Home
Federal Savings and Loan is of this latter type.  By
letter dated December 10, 1975 (R.W. Fassel, President)
the following was conveyed to ASA;

"It is the opinion of the Board that the long
standing policy requiring an approved appraiser for
Home Federal Loans to hold a M.A.I., S.R.A. or S.R.E.A.
designation is fair and consistent with the policies
established in the lending industry."  (emphasis added).

Unable to come to an accord with the Home Federal
Savings and Loan, ASA wrote to the United State League
of Savings Associations, asking for a clarification
of "policies established in the lending industry" (Home Federal
Savings and Loan is a member of the U.S. League).  A
reply from the League (Norman Strunk, Ex. V.P.; August
4, 1976) was received; the last paragraph is pertinent:

"The U.S. League of Savings Association is a trade
organization.  We have no control over the lending
practices of our member institutions.  We do not
establish or even recommend policies with respect to
qualifications of appraisers.  (emphasis added)
Each individual institution sets its own policies with
respect to the designation of appraisers".

The U.S. League of Savings Associations presently
exerts great influence over its member institutions.
Policy is established, recommended, via such instruments

610

as "Underwriting Standards". Reference is made to the
USL Special Management Bulletin, S#178(a) (Chicago, Ill.
July 14, 1978, p. 19) for the following <u>mandate</u> to its
members:

> "B. Appraisers - Each loan application shall
> contain an appraisal made by an employee of this
> association . . . . <u>All independent appraisals for</u>
> <u>apartments of eight (8) units or larger</u> and
> commercial loans <u>will require an independent</u>
> <u>appraisal by an MAI</u>". (emphasis added)

<u>Illustration #4: Control of Appraisers by</u>
<u>Mandating Affiliation with the Brokerage Aspect</u>
<u>of the Real Estate Industry</u>

Objectivity is the heart of the appraisal concept.
The very essence of the value function is an unbiased,
fact-oriented reporting of the appraiser's conclusion
of value. Appraisal practice and procedure are
predicated upon objectivity; this establishes a base
for integrity.

Association and affinity, if too "close", can
intrude upon objectivity, can raise questions of propriety.
This is particularly true of the Appraiser's role as
related to the "brokerage" aspect of the buy/sell
involvement of the market place.

One in-depth study of professional appraising contains
a commentary on this issue which is relevant to Control
of Appraisers; it was written by Hinds, Hewitt and Kapplin;
entitled "Strategy for Achieving Professionalism for
Real Estate Appraisal" (<u>The Real Estate Appraiser</u>, SREA;
Chicago, Illinois, May-June, 1972) and the following
comment is in point:

"Appraisers should gradually disassociate themselves
from brokerage. In the minds of the public, the buying
and selling of a commodity historically has been
considered non-professional. Although real estate
brokers technically are selling their services rather
than the real estate, most people associate brokerage
with property sales and advertising. Appraisal loses in

611

imagery through such an association. <u>Furthermore,</u> <u>conflict of interest often is suspected, whether</u> <u>justified or not</u>. However convenient such an association may be, it is incompatible in the long run with professional status".

The crux of this issue: at the present time, at lease a dozen states <u>mandate</u> that appraisers be associated with brokerage, by requiring appraisals in that juris- diction to be made <u>only</u> by those persons holding a real estate broker's license. (Among the states: Delaware, Florida, Indiana, Michigan, Mississippi, Nebraska, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, West Virginia).

       *            *            *

This portion of the Statement is devoted to the question: If new enforcement measures are required, what area(s) should be covered; what steps should be taken to assure achievement of Fair Housing Goals.

In light of the materials briefly reviewed, it is suggested that your Committee consider the advisability of focussing upon the area of Appraisal Procedure; that you consider taking legislative action to free the nation's appraisers from undue manipulation and vested-interest control.

It is further suggested that you consider an enforcement measure, to be added to H.R. 2540 or enacted separately, to this effect:

To achieve Fair Housing goals, no ruling, policy, guideline, law, practice or procedure shall be published, undertaken, effected or implemented, which specifies or implies that color, race, religion, ethnic origin, sex, marital status or professional designation shall be used as a control device or criterion in the selection or employment of appraisers.

003410

612

### Concluding Commentary

The appraisal profession should assume responsibility in effectuating Fair Housing goals. It has done so and will continue to do so.

Major appraisal societies, such as ASA, have adopted Fair Housing Resolutions, supportive of the efforts to achieve equitable, open, fair real estate appraisal practices.

ASA has, additionally, created an educational program (available to all major organizations, government and private) on "Urban Disinvestment, Redlining and Residential Valuation"; ten videotaped presentations present views of the Department of Justice, HUD, Hofstra University, Small Business Administration, City of Seattle, Washington, D.C. Neighborhood Residential Commission, together with commentary on the related appraisal aspects of the issues involved.

Another major achievement: creation of an educational vehicle for appraisers, whereby they may, for the first time in the history of the U.S. appraisal profession, obtain training and documentation in all appraisal disciplines via Baccalaureate and Masters Degrees in Valuation Sciences. This program, initiated formally in 1976, by ASA, is currently in progress; it is available to appraisers at Hofstra University (Hempstead, NY); Loretto Heights College (Denver); The Lindenwood Colleges-Lindenwood IV (St. Louis, MO); University of Redlands-Johnston College (California); University of Minnesota-U.W.W. (Minneapolis); Southwest Texas State University (San Marcos); Skidmore College (Saratoga Springs, NY).

The Appraisal Profession is demonstrating it can educate its members, and maintain high criteria of professionalism, based upon experience, education, expertise and integrity.

If the constrictive devices which attempt to control and manipulate appraisers can be removed, so that appraisers can openly and freely offer their services to government and private industry, there is every reason to believe that objectivity in determining Market Value can be achieved, and that such value determinations will be supportive of, and will assist in achieving, Fair Housing practices for the citizens of this country.

613

# ASA Equal Opportunity Resolution



### (Adopted 1-26-75)

WHEREAS, the American Society of Appraisers has for years pursued an active program of assuring Equal Opportunity in Appraising for all persons; and

WHEREAS, the ASA program has involved clarification of its Constitution, By-Laws and Administrative Rules to assure fair, equal opportunity; and has been characterized by presentation of educational programs in appraising in Mexico, The Philippines, Puerto Rico, as well as special equal opportunity seminars in the U.S.; and has produced a Minorities Position Statement (placed before the Federal Highway Administration in 1972; the White House in 1973; the Department of Housing and Urban Development in 1974); and

WHEREAS, ASA is presently working to achieve long-range Equal Opportunity in Appraising by sponsoring programs in Appraisal Aid, in Career Counselling, and in a formal College/University degree program; and

WHEREAS, HUD (through its Office of Equal Opportunity, by letter dated August 28) has recognized the significance of the work of the U.S. appraiser in the special area of Housing and has requested that this Appraisal Society adopt a Resolution reflecting our concern and whole-hearted support in all efforts to eliminate bias, discrimination, "panic selling", and to equally express our support to continue "affirmative training and recruitment of minorities into the appraisal field";

THEREFORE BE IT RESOLVED: That this Society reaffirm its position that Equal Opportunity in Appraising is an important element in the fabric of the American Community and its social, cultural and business life; that ASA will continue its efforts to implement its Appraisal Aid, Career Counselling and College/University Degree Programs in order to fully and practically express our Policy of Equal Opportunity; that ASA will continue to ask other groups, such as HUD, to encourage, stimulate and support such programs; and that ASA express its support of all programs which strive to make Fair Housing a reality of "choice and opportunity for all Americans to occupy housing anywhere based on ability to pay for such housing".

AND BE IT FURTHER RESOLVED that ASA, sharing the HUD concern that "fair housing and equal opportunity in the appraisal field" is of paramount importance to the American citizenry, shall cause a copy of this Resolution to be sent to the Secretary of HUD and to the Office of the Assistant Secretary for Equal Opportunity.

THE AMERICAN SOCIETY OF APPRAISERS

by _George D. Sinclair_
George D. Sinclair, ASA
International President

_Dexter D. MacBride_
Dexter D. MacBride, FASA
Executive Vice President

EXHIBIT 3412

614

## Resolution of Board of Governors of the American Society of Appraisers

*WHEREAS (1) the Society seeks to foster and maintain the exemplary relationship between the members of the Society and the general public which its members serve through objective and unbiased appraisal services; and*

*WHEREAS (2) the Society recognizes that the principal cornerstones of appraisal practice require total objectivity and professionalism; and*

*WHEREAS (3) the Society has stated its position by formal Resolution dated January 26, 1975 and herewith reaffirms its resolve to support all legitimate programs striving to make fair housing a reality for all Americans; and*

*WHEREAS (4) the Society is concerned with any attempt by government agencies or regulatory bodies which might reasonably be construed as interference or restriction with responsible appraisal standards and practice of the American Society of Appraisers and the Appraisal Profession, with particular regard to the reporting of factual residential data in appraisal reports and related communications, which might undermine or jeopardize, in whole or in part, professional appraisal practices.*

*THEREFORE, we, the American Society of Appraisers, reiterate our position that all appraisers should report, and should be free to report, factually and with total candor each and every significant factor which may affect the value of residential, commercial, or industrial property in consonance with the accepted professional "Principles of Appraisal Practice and Code of Ethics" of the American Society of Appraisers.*

*from Resolution adopted by the International Board of Governors, March, 1978*

## EXHIBIT 2





May 5, 1976

**DEXTER D. MacBRIDE, F.A.S.A.**
Executive Vice President

PERSONAL.

Mrs. Carla A. Hills, Secretary
Department of Housing and Urban Development
451 Seventh St., S.W.
Washington, D.C. 20410

Re: HUD Policy
Dear Secretary Hills:                        Equal Opportunity

Your Office of Equal Opportunity requested cooperation from U.S.
Appraisal Societies by August 28, 1974 letter.

In response, this Society passed the nation's first appraisal practitioner's
Resolution, dated January 21, 1975 (supportive of the Fair Housing and
equal opportunity concepts).

Problem: HUD will not respond, acknowledging the ASA Resolution (copy
attached, taken from "Valuation" Journal published October/November 1975).

I've talked with Office of Equal Opportunity representatives. They cannot
explain why an acknowledgement has not been issued.

I've asked for help from Assistant Secretary Blair. No reply. (see 3-31-76
letter enclosed).

It may be naive to expect appreciation for our leadership in the field of
Equal Rights.. But, we do expect formal courtesy from the office of Equal
Opportunity -- and from HUD.

Will you cause an acknowledgement of receipt of ASA Resolution dated 1-26-75
to be issued by a HUD representative? ASA members throughout the country,
who do not understand HUD's "silence", will at least know that the Office of
Equal Opportunity exists and responds.

Sincerely,


Dexter D. MacBride, CAE, FASA
Executive Vice President


EXHIBIT 5

# FAIR HOUSING AMENDMENTS ACT OF 1979

---

### THURSDAY, JUNE 14, 1979

House of Representatives,
Subcommittee on Civil and Constitutional Rights,
Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met at 9:30 a.m., in room 2237 of the Rayburn House Office Building, Hon. Don Edwards (chairman of the subcommittee) presiding.

Present: Representatives Edwards, Drinan, Matsui, and Sensenbrenner.

Staff present: Janice Cooper, counsel; and Thomas Boyd, associate counsel.

Mr. Edwards. Good morning. The subcommittee will come to order.

Our first witness today on H.R. 2540 is the executive director of the National Association of Real Estate Brokers, Inc., Mr. William R. Morris. That association has long distinguished itself for its support of fair housing principles in theory and in practice. Your support of this legislation is most welcome. Your expertise in the area of brokering, appraising, managing, and related subjects lends a special credibility to your support of the various provisions of this bill that will affect those businesses.

We are very pleased to have you with us today, Mr. Morris.

Mr. Morris has been a friend of the House Judiciary Committee for a long time and is well known to the gentleman from Massachusetts, Mr. Drinan, and to me.

We are delighted to have you here, and you may proceed.

## TESTIMONY OF WILLIAM R. MORRIS, EXECUTIVE DIRECTOR, NATIONAL ASSOCIATION OF REAL ESTATE BROKERS, INC.

Mr. Morris. Thank you, Mr. Chairman, and Congressman Drinan.

I do not plan to read my statement, it is too lengthy.

Mr. Edwards. Without objection, the entire statement is made a part of the record, and you may proceed.

[The complete statement follows:]

Statement of William R. Morris, Executive Director, National Association of Real Estate Brokers, Inc.

Mr. Chairman and members of the subcommittee, I am pleased to have this opportunity to testify on behalf of the National Association of Real Estate Brokers (NAREB) in support of the Fair Housing Amendments Act of 1979, H.R. 2540.

The National Association of Real Estate Brokers, Inc. is the nations oldest and largest minority trade association in the housing industry. Through its state associations and local boards, NAREB's activities extends into the major public and

(617)

618

private housing institutions in the Nation's Capital and throughout the urban centers in the nation.

Organized in 1947 to promote the rights and opportunities of minorities in real estate, NAREB today stresses preparedness of its members through educational and certification programs. This year alone, NAREB and its affiliates will conduct over 30 seminars and courses in all regions of the nation.

The affiliates of NAREB are the (1) National Society of Real Estate Appraisers, (2) Real Estate Management Brokers Institute and (3) United Developers Council. These affiliates provide opportunities for minorities to pursue productive careers through specialized courses and meeting rigid professional standards in appraising, property management and housing development.

NAREB's members are known as Realtist. Realtist subscribe to a strict code of ethics to promote and maintain high standards of conduct in the real estate business and are pledged to uphold and promote the principles of "Democracy in Housing," a slogan coined by our Association at its inception.

My own qualifications in the housing industry include eighteen years as a real estate business owner and licensed broker; a Certified Real Estate appraiser (G.R.M.) since 1959; nine years as National Housing Director of the National Association for the Advancement of Colored People; nearly two years as Director of Urban Liaison for the Federal National Mortgage Association; and, since January of this year, Executive Director of NAREB.

The passage of the proposed amendments proposed to the Federal Fair Housing Law is timely and essential to the elimination of illegal discrimination in the sale, rental and financing of housing. Overall, H.R. 2540 recognizes shortcomings in the existing Law and will, in our view, provide the Secretary of HUD with necessary enforcement authority to more promptly address illegal discrimination in housing. The U.S. Department of Housing and Urban Development will be more able to combat housing discrimination through its own procedures or refer necessary cases to the Attorney General of the United States, who will also have a greater involvement in obtaining broad public compliance with nondiscrimination statutes through the judicial system (Sec. 813(a)).

The Realtist which is the name by which our organization is known support the proposed provisions that clarify and strengthen (1) the protections against insurance and financing redlining, (2) the extended period for complainants to file suite, and (3) the narrowing of the exemptions now given to homeowners. We ask that you favorably consider extending the Bill's coverage in these areas.

To better assure that appropriate action is taken by all Federal Agencies with authority to prevent housing discrimination, we urge that realistic time limits be included to prevent unreasonable delays in providing needed information to HUD (Sec. 810(a)(4)).

There are those who have opposed H.R. 2540 because it provides one or more of following remedies:

(1) Either a private individual or the HUD Secretary may file charges alleging discriminatory housing practice.

(2) The Secretary of HUD is granted subpoena power to compel access to or production of such information or appearance of persons in connection with any investigation of charges of discriminatory housing practices.

(3) The HUD Secretary and other Federal agencies which have authority to prevent housing discrimination shall notify each other of any allegation of housing discrimination.

(4) The HUD Secretary will have the authority to issue cease and desist orders pending the outcome of the investigation.

(5) The prevailing party (except for the United States) in an administrative proceeding initiated by the HUD secretary may recover, at the Secretary's discretion, its reasonable attorney's fees.

It is our belief that these particular provisions are necessary to provide a fair and equitable remedy to blacks and other racial minorities who continue to face personal humiliation, intimidation, and demeaning treatment by owners and landlords—in fact, a denial of legal rights in their quest for decent housing of their own choice, and which they can afford.

If we may, we would like to suggest at this time some changes that we believe will improve the Bill's effectiveness. We ask that geographical discrimination in the provision of Homeowner's insurance by insurors and by reinsurors be also prohibited (Sec. 804(f)). The bills coverage should also be extended to prohibit discrimination because of age since housing choices for our elderly is extremely limited. This change is recommended to make the Fair Housing Law consistent with other statutes (Equal Credit Opportunity Act) that prohibits discrimination because of age.

619

The present Federal Fair Housing Law was enacted by the Congress of the United States, with support from many of its current members. It has now been ten years since minority groups of this nation were promised equal rights in housing. That promise by our government, has not yet become a reality for a substantial majority of blacks and other minorities in America. To assure full equality under the law in housing and related industries, the full authority of the executive branch of the government will be required.

In conclusion, NAREB views the lack of an adequate enforcement mechanism as the chief defect in the present law. The Secretary of HUD is virtually powerless to act against private discrimination. Even in the face of flagrant violations of the law, HUD can now only seek to conciliate between the victims of discrimination and those who have violated the law.

Mr. Chairman, we thank you and members of the subcommittee for this opportunity to prevent our views and recommendations on this most important legislation.

NOTE.—Attached is a copy of the resolutions adopted by the Board of Directors of the National Association of Real Estate Brokers on February 9, 1979.

NATIONAL ASSOCIATION OF
REAL ESTATE BROKERS, INC.,
*Washington, D.C., February 12, 1979.*

RESOLUTIONS ADOPTED BY THE BOARD OF DIRECTORS, ON FEBRUARY 9, 1979, AT ITS ANNUAL MID-WINTER CONFERENCE, PHOENIX, ARIZ.

EMERGENCY RESOLUTION NO. 2—THE FEDERAL FAIR HOUSING ACT

Whereas, the National Association of Real Estate Brokers, Inc., (NAREB), also known as Realtist, is the nation's largest and oldest minority-oriented trade association in the housing industry and, since its founding in 1947, has subscribed to and promoted the principles of "Democracy In Housing"; and

Whereas over the last ten years, since passage of the Federal Fair Housing Act, the achievement of equal rights and opportunities in housing has not yet become a reality for a substantial majority of minorities in America; and

Whereas the executive branch of the government has fully committed itself to full enforcement of equal opportunity laws in housing and in other fields; and

Whereas amendments to Title VIII of the Civil Rights Act of 1968, commonly referred to as The Fair Housing Law, have been introduced in the Congress in 1977 and 1978, and is being introduced again in the present Congress, to revise and strengthen the procedures for enforcement of equal housing; and

Whereas passage of this legislation is considered timely and essential to eliminate discrimination in the sale, rental, and financing of housing; and

Whereas the General Accounting Office, in a report issued in February 1978, supports granting to the Secretary of Housing and Urban Development (HUD) greater enforcement authority in housing discrimination cases,

Be it therefore resolved, That the NAREB calls upon both Houses of the Congress to take such action as is required to secure prompt passage of legislation granting increased enforcement authority to the Secretary of Housing and Urban Development, and to the Attorney General of the United States; and

Be it further resolved, That a copy of this resolution be sent to the Majority Leader's of both Houses of Congress, to the appropriate committees of both Houses, the Congressional Black Caucus, the President of the United States, and to the Secretary of HUD.

Mr. MORRIS. I would like to preface my remarks with reference to the racial information that we have taken into account in presenting our views.

The most recent data that I could identify was a 1974 census study which revealed that two out every three black families in this country are living in predominantly black census tracts in the United States. Outside of the South, 93 percent of all blacks live in urban areas and 53 percent of the black population of this country is concentrated in just 50 urban centers.

I mention this because I am unconvinced that we are making good progress in bringing about an integrated society in this country. My personal commitment is to the national policy that I be-

620

lieve we should follow and not deviate from, and that is integration should continue to be the goal of our country.

Our organization is committed to such a policy, and we believe that fair housing must be more than a policy pronouncement. It is now the law of the land, but it must have important enforcement power to achieve our stated goal, and to assure the rights, under law, for over 40 million racial minorities in this country.

I might add to the description of the National Association of Real Estate Brokers that we have three subsidiaries. One is the National Society of Real Estate Appraisers. We have certified qualified professional appraisers who must go through a long period of experience and education to meet professional standards.

We have the Real Estate Management Brokers Institute, that also has a certification program, and sets high standards for its members.

Our third and most recent affiliate is the United Developers Council. Our organization we feel represents a very broad cross section of the housing industry in the Nation.

And being predominantly a minority organization, most minorities are affiliated in one way or another with our operations.

I would like to quote directly from my statement, a few paragraphs:

The passage of the proposed amendments proposed to the Federal Fair Housing Law is timely and essential to the elimination of illegal discrimination in the sale, rental and financing of housing. Overall, H.R. 2540 recognizes shortcomings in the existing Law and will, in our view, provide the Secretary of HUD with necessary enforcement authority to more promptly address illegal discrimination in housing. The U.S. Department of Housing and Urban Development will be more able to combat housing discrimination through its own procedures or refer necessary cases to the Attorney General of the United States, who will also have a greater involvement in obtaining broad public compliance with nondiscrimination statutes through the judicial system (Sec. 813(a)).

Realtist which is the name by which our organization is known supports the proposed provisions that clarify and strengthen: (1) The protections against insurance and financing redlining, (2) the extended period for complainants to file suit, and (3) the narrowing of the exemptions now given to homeowners. We ask that you favorably consider extending the bill's coverage in these areas.

To better assure that appropriate action is taken by all Federal agencies with authority to prevent housing discrimination, we urge that realistic time limits be included to prevent unreasonable delays in providing needed information to HUD (Sec. 810(a)(4)). We suggest semiannual reporting period might be considered by the committee.

If we may, I would like to suggest at this time some changes that we believe will improve the bill's effectiveness. We ask that geographical discrimination in the provision of homeowner's insurance by insurors and reinsurors be also prohibited (Sec. 804(f)).

In reference to both primary and secondary insurance carriers, it is our view that all major insurance companies, writing homeowners and fire insurance rely upon reinsurance to conduct their business, which is very much a secondary market, similar to the secondary market in housing finance. Their policies, the type of insurance policies and coverage they will buy from companies through reinsurance, and also intercompany agreements, have a great impact upon the geographical areas in which insurance coverage can be provided at fair and reasonable rates.

We hope that the committee might wish to consider some prohibition of treaties and practices by primary and secondary carriers, based upon discrimatory policies and practices toward neighbor-

003419

621

hoods. We believe there should be a required disclosure that redlining of neighborhoods is based upon abnormal loss ratios experienced in their normal operations, and that decisions should not be based upon the racial characteristics of a neighborhood.

We think that the primary and secondary insurance carriers should provide applicants with a written reason for rejection of coverage at regular rates.

Our recommendation recognizes that many practices are based solely upon economics. Our recommendation is aimed at redlining, due to the racial characteristics of neighborhoods.

The bill's coverage should also be extended to prohibit discrimination because of age since housing choices for our elderly is extremely limited. This change is recommended to make the fair housing law consistent with other statutes—Equal Credit Opportunity Act—that prohibits discrimination because of age.

I wish to offer some personal suggestions for the committee to consider areas that I believe would make the fair housing law much more effective, and broader in its scope and coverage.

First, there is a problem of State real estate licensing laws. I understand the feelings the committee may hold in terms of a Federal override of State law, but we believe that if the Secretary of HUD had the authority in this bill to attempt to secure the cooperation of State governments, it may have some productive results. In regard to State licensing law examinations, we believe that questions should be included, on the Federal Housing Law. Any person that is licensed by a state to sell real estate, or engage in other activities of the real estate business, they should, be as familiar with the fair housing law as with practices in the trade itself.

The revocation of brokers and salespersons licenses should be considered, where they are controlled by a State commission, for violations of the Federal fair housing law, and there should be consideration given to this in the bill. I believe New York State has taken some action to revoke the licenses of brokers who are found guilty of violating the State's fair housing law.

Second, we would suggest that an annual plan be shown, in an affirmative manner, on how various institutions plan to further the purposes of the Fair Housing Law. Annual reports should be submitted to the Secertary of HUD, and public disclosure of those reports should be made available. this would cover private and semipublic institutions that specifically do business across State lines including real estate brokerage firms and companies. We see a trend developing where major corporations in the Nation are acquiring local real estate companies, and there are extensive operations nationally—the franchised real estate operations, mortgage banking, real estate appraisal activities corporate relocation operations, as well as property management.

We also think that such annual reports should be required of Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, insurance companies that do business across State lines, bond houses who are now handling, to a large extent, tax exempt mortgage revenue bonds, and State housing financing agencies.

003420

622

In conclusion, NAREB view the lack of adequate enforcement mechanism as the chief defect in the present law. The Secretary of HUD is virtually powerless to act against private discrimination. Even in the face of flagrant violations of the law, HUD can now only seek to conciliate between the victims of discrimination and those who have violated the law.

Mr. Chairman, we thank you and members of the subcommittee for this opportunity to present our views and recommendations on this most important legislation.

Attached to our formal statement is a copy of the resolution that was adopted by our board of directors February 9, 1979, in support of the proposed legislation.

Mr. EDWARDS. Without objection, the resolution will be made a part of the record, Mr. Morris.

We thank you very much for your excellent testimony.

The gentleman from Massachusetts, Mr. Drinan?

Mr. DRINAN. I concur in your sentiments, Mr. Chairman. It is excellent testimony, and it adds strong support for the things that we are seeking to do. I hope, Mr. Morris, that other real estate brokers and groups of real estate brokers will be born again, so to speak.

Would you have any wisdom to share with the committee as to how we can persuade other realtors and real estate groups to see the logic and the force of your arguments?

Mr. MORRIS. Well, we have argued, sir, for many years that education is the best way. And I think we have been going through an educating process, even prior to 1968, when the Fair Housing Law was passed, and certainly since that time.

I am of the opinion however that there is a need to have very clear enforcement powers and required standards set forth in these amendments if we are going to make the necessary progress.

Discrimination in housing is perhaps the most subtle, evasive, and pervasive type of discrimination. Quite often people do not realize they are being discriminated against. They are steered to a particular lending institution, or they are not steered to those that should be serving their particular area. And I think it should be spelled out clearly in the law. The type of procedures and the enforcement authority that has been proposed here is the most effective way, I think, that we can promise and insure against housing discrimination in this country.

Mr. DRINAN. I thank you very much for your testimony. It is very clear and persuasive.

Mr. Chairman, I have no additional questions. I yield back the balance of my time.

Mr. EDWARDS. The gentleman from Wisconsin.

Mr. SENSENBRENNER. No questions, Mr. Chairman, today.

Mr. EDWARDS. Mr. Morris, are the headquarters of the National Association of Real Estate Brokers, Inc. located in Washington, D.C.?

Mr. MORRIS. Yes; the headquarters are here.

Mr. EDWARDS. And in how many States do you have chapters?

Mr. MORRIS. We have 50 local boards and 6 State associations. They are located in, let us see—about 36 States where we have active members.

623

Mr. EDWARDS. Counsel?

Ms. COOPER. Mr. Chairman, thank you.

Mr. Morris, I see that you are qualified as an appraiser, and we have had testimony before the subcommittee on the issue of possible race discrimination in the appraisal process. I would like to ask you a few questions about that.

In your experience, historically, what has been the effect of using factors relating to race or ethnicity in appraising real property? Was the presence of minorities equated with diminition of value? What was the practice?

Mr. MORRIS. My answer is that it is a very difficult problem or question to get to the bottom of. In many instances I think race is important in the—perception—of the appraiser, in the perception of the resident, lenders, and the purchasers. Many feel that minority occupancy in a neighborhood will have a depressing effect upon the value of property.

In fact, I do not believe that it does. And it should not be considered. I think it is going to be long haul, and when appraisal practices are revised, to not take race into account. It will take some time. But I do not see race beign a factor. We are making it so because we perceive it to be a negative factor.

Ms. COOPER. One of your affiliate organizations is an association of appraisers. Is it in within their standards of ethnics to avoid references to race? What are their operating standards?

Mr. MORRIS. Race shall not be taken into account. It is included in the course materials used at seminars they conduct throughout the country.

Mr. COOPER. Why does steering take place, in your opinion? Is it merely a reflection of the sellers' and owners' desires or is there some other force at work?

Mr. MORRIS. I have found, from my own experience, that in many cases it is the desire or request of the property owner—who has listed their property—to indicate to the broker who the would not like have it sold to. I have seen sales people and brokers take it upon themselves to simply offer housing in areas where they think a person may want to live, or say, you might be more comfortable in a particluar neighborhood because more of your own kind are living in this area.

I have also seen them—agents—refuse to make available their complete portfolio of listings, particularly in neighborhoods of differential racial makeup than that of the potential buyer. That is done arbitrarily.

Steering is definitely taking place and it continues. I have however seen a lessening in various parts of the country of this practice. I think it is something we must continue to give serious attention to, and address in the proposed amendments.

Ms. COOPER. Do you think that this bill, if enacted, and effective enforcement mechanisms are created, would lead to a diminishing of steering on a voluntary basis?

Mr. MORRIS. I think it will go a long ways towards bringing an end to steering. It is a practice that has historically been used by the industry, and it will not end overnight. But I think over a period of time, with this legislation, the Nation will know that you

624

are serious about enforcing the Federal fair housing law and over a period of time, I believe it will eventually fade away.

Mr. COOPER. On the issues of age discrimination, are you speaking solely in terms of discrimination against the elderly?

Mr. MORRIS. Primarily, but not exclusively. There have been problems in areas where younger persons that are capable of making payments on a home, that they have not been permitted to, or have been required to have a cosigner—a parent—someone else that would vouch for them.

Mr. COOPER. Young adults?

Mr. MORRIS. Yes.

Mr. COOPER. With respect to the elderly, does the discrimination which is associated with financial discrimination such as refusal to lend to the elderly because of their shortened life expectancy or earning potential?

Mr. MORRIS. Yes; I would say that would be the predominant area. And it is a matter, of disclosure by the lender, of what their lending policies are.

We have come a long ways, I think, with the recently enacted Community Reinvestment Act, which requires a written statement of underwriting policies. Persons, generally 55, 60, or 65 years of age, do not believe they can obtain a 20- or 25-year, or even a 30-year loan, when in fact lenders are more interested in the collateral or the property as security, than in the age of the individual, and the elderly feel it is not worth applying for a loan because of their age. And that simply is not the case.

Ms. COOPER. Since the Equal Credit Opportunity Act does cover that, is there some other dimension of discrimination against the elderly in housing that requires inclusion in this bill so that there will be full coverage?

Mr. MORRIS. Well, you do have practices, particularly in rental housing, generally occupied by a younger-aged group, in which landlords and owners tend to discriminate against people because of their age.

My particular concern—and our organization views it from a racial standpoint—is that our cities are populated by many minority elderly who are facing displacement, and they can no longer continue to pay the increasing taxes on a property or maintain the upkeep of the property; and that is the kind of transition now taking place.

We feel that some attention is necessary, outside of getting the financing, to assure there is no discrimination in meeting elderly housing needs.

Ms. COOPER. Thank you, Mr. Morris.

Mr. EDWARDS. One last question, Mr. Morris: Segregated housing patterns in this country are the chief cause of segregated schools; is that not correct?

Mr. MORRIS. Residential segregation is a contributor, I would say very much so to the racial makeup of local schools, certainly.

Mr. EDWARDS. So there would be no necessity for busing if we had true integration of housing in this country?

Mr. MORRIS. I have believed this for sometime, that if more attention were given to assuring integrated housing, and integrated

625

neighborhoods, we would not be into the controversy to the extent that we are, in all of the busing and school desegregation efforts.

Mr. EDWARDS. So you are suggesting that this type of legislation we are considering here today would have an affirmative effect on making additional court orders and plans in this country unnecessary for busing?

Mr. MORRIS. Very much so. I strongly believe that.

The more progress, the faster progress we make in providing for a single racial society, by integrating neighborhoods in this country, the sooner we will be able to deal with the problems that we face today in our schools.

Mr. EDWARDS. Well, thank you very much.

## TESTIMONY OF JOHN JAY DYSTEL, DIRECTOR OF ADVOCACY AT THE AMERICAN COALITION OF CITIZENS WITH DISABILITIES

Mr. EDWARDS. Our second witness today is John Jay Dystel, director of advocacy at the American Coalition of Citizens with Disabilities.

The provision in H.R. 2540, expanding the Fair Housing Act to include the handicapped, has received much support from previous witnesses. However, many questions have been raised which have yet to be resolved. In response to the subcommittee's desire to clarify the meaning and scope of coverage with respect to the handicapped, the Department of Justice, in conjunction with HUD and other affected Federal agencies, has submitted suggested language for inclusion in the bill. Unfortunately, I have just received that information, so I was not able to present it to our witness prior to this hearing. It is rather lengthy and complicated, so I would like to ask you, Mr. Dystel, to submit the coalition's written comments on this specific proposal to the subcommittee as soon as possible in the next few weeks.

Issues of a more general nature also need to be addressed, such as the extent and nature of the problem of housing discrimination against the handicapped in private housing and the role that title VIII can play in attempting to alleviate that problem. Therefore, I am most pleased to welcome you here today.

And you may proceed, Mr. Dystel, with your statement.

Mr. DYSTEL. Thank you, Mr. Chairman.

Members of the subcommittee, I appreciate this opportunity to testify before you.

The American Coalition of Citizens with Disabilities is an organization comprised of 84 national, State, and local organizations which serve approximately 7 million of this country's 36 million disabled Americans. Our interest in this legislation is quite keen at this moment because the disabled in this country are beginning to move from isolation into integration into the society.

For many, many years the disabled in America have been people living outside of the mainstream of America, principally because they did not believe that they could live within the mainstream, nor did the nondisabled population believe that they should live within the mainstream.

003424

That day, we believe, is gone. And the disabled are now beginning to demand rights, to be integrated into the mainstream of society.

One of the principal ways of ridding themselves of isolation and making themselves part of the mainstream is for them to have the right to rent or purchase housing without the discrimination that has subtly been, but nevertheless steadfastly plaguing them for years and years, in housing.

We believe that this legislation can go far toward ending that circle, that rather vicious circle of discrimination against disabled people in housing.

As the previous witness testified, housing discrimination can be subtle, and certainly it can be when it comes to disabled people whose disabilities may not be as obvious. But there are many in the nondisabled population that believe that disabled people should remain isolated for their own good, but principally for the good of the nondisabled who, for a variety of reasons, would rather look the other way, rather not be reminded that tomorrow they might be in the same position as somebody who is deaf or blind or in a wheelchair.

This legislation then goes far toward ending this pattern of very subtle but nevertheless rather trenchant discrimination against disabled people.

In my written statement I have mentioned that as an individual who is mobility-disabled, and as an individual working for an institution that represents millions of people who are mobility-disabled, we do have one principal problem with this legislation, and that is that—as I understand it, at least, and you can clarify this and correct me if I am wrong—there has been some legislative history to this bill indicating that persons who rent housing, who lease housing, would not be discriminating against disabled if that housing were inaccessible. I think almost by definition that an individual who is unable to obtain access to a particular residence, that that person is being denied access and is being discriminated against for that reason, just as if the landlord had a policy of not renting to disabled people, at least to mobility-disabled people.

This group includes more than people who are just in wheelchairs. It includes many of the elderly. It includes people who use crutches. It includes people who have difficulty walking, in general. There are many areas that have simply not been accessible to those people, and therefore those people are being excluded from those areas.

We would urge that this legislation make clear—either in its legislative history or in its text—that any new construction that is not accessible is necessarily in violation of this particular legislation because it discriminates against a large category of disabled Americans.

But second of all, we would urge that changes be made so that discrimination against the disabled, in its existing housing would be found it the housing were, first of all, inaccessible, and second of all, the finder of the fact—either the Department of Housing and Urban Development or a trial court, depending on where the case is—if the finder of the fact found that through some formula that could be devised, by this committee—and it could be devised right

627

here today—but through some formula that it was economically feasible for the landlord to make the premises accessible to the mobility-disabled—with that single exception this legislation does not provide any requirement that changes be made in existing housing.

We fully support the legislation and think it is a step in the right direction, at least for the disabled in this country.

Thank you.

Mr. EDWARDS. Thank you very much, Mr. Dystel.

Mr. Drinan?

Mr. DRINAN. Thank you, Mr. Chairman.

I want to thank the witness for his testimony. Would you elaborate a bit more on the guidelines for what "reasonable physical accommodation" would be, and what the financial position of the landlord would be?

You understand the severe difficulties we would have if we put that into the bill and said that they have to retrofit. Has your organization thought of any guidelines as to what would be reasonable in that area?

Mr. DYSTEL. Well, the organization has not come up with any, but I have been thinking about it. In my testimony before the Senate, unfortunately I was not asked about it. Here I have been.

Let us assume that an individual, who is in a wheelchair, wants to rent an apartment in a particular place, and the apartment is not accessible to that individual, but the apartment itself—once in it—it would accommodate a wheelchair quite easily. That is a consideration.

There are apartments that are not accessible, but once you do get into them, they would not be that easy to function in, anyway. But assuming the apartment is functional, but simply not accessible, the individual wanting to rent it could bring a complaint, either in an administrative process or in court, and if the landlord could show, for example, that it costs more than 1 percent or, say, 2 percent—I am picking numbers arbitrarily. I do not know what the just number would be. Let us assume 2 percent for the time being—of that landlord's anticipated annual income, if it would cost more than 2 percent of the landlord's anticipated annual income to make his—one of his, or more than one—depending on how many apartments he had—accessible, then he would not be discriminating in not making them accessible.

But if it were a relatively minor cost to that landlord to make his premises accessible, then we believe—I believe—that it would be, it would constitute discrimination, under this bill, for a landlord not to make that expense to make his premises accessible.

Otherwise, Congressman Drinan, otherwise there is a danger that landlords of existing premises, at least, will maintain them as they are, and primarily they are inaccessible, and that will make this legislation—at least for a large group of those the organization with which I am associated represents—will make this legislation more words than anything with meaning.

I recognize that it is expensive in some cases. But in many cases it is not. And those are the cases that we are interested in, the cases where it is not expensive, relatively speaking.

003426

628

Mr. Drinan. I suppose your organization has thought of the possibility of low-interest loans, aided by the Federal Government, as a carrot and inducement to these people?

Mr. Dystel. That would be ideal. Or possibly—and I believe there are already tax incentives for making the changes that would be necessary to make a building accessible. But tax incentives would be an ideal solution to this problem.

Low-interest loans are good, but tax incentives are probably better.

Mr. Drinan. Would you have any comment on the *Davis* case that came down June 11, which was decided unanimously? Do you think it will have any impact on the issues we are discussing?

Mr. Dystel. No; I do not. I think that case is a very narrow one. I think it turned in large part on its facts, and there was a saying in law school that hard cases make bad law.

I do not believe that the decision will have any impact on any of the legislation currently being considered on behalf of handicapped, or for that matter, on the resolutions that are being promulgated by the various Federal agencies.

I think that the decision is unfortunate for Mrs. Davis, and it certainly is unfortunate as a case of first impression involving section 504 of the Rehabilitation Act. But I think it will have no impact on this particular piece of legislation.

Mr. Drinan. On another point: Would you have any comment on what the bill might be able to achieve with respect to public transportation?

I was very interested the other day, in visiting a think tank in my district, to find out that they have money from UMTA to explore ways by which an escalator in a public way could in fact accommodate a wheelchair. And they have worked out a system that is still experimental, but which would stop for 90 seconds until a person in a wheelchair could get on the escalator, and go on up.

Has your organization thought about ways about which such things can be mandated for those who build public facilities for transportation?

Mr. Dystel. Yes, we have, particularly in view of the recent Department of Transportation regulations that have recently been issued by the Secretary of the Department of Transportation. Principally, those regulations announced to the mobility-disabled that any municipal authority, transit authority, that receives Federal funds must make its transportation accessible to the disabled, but they have to wait in many cases up to 30 years.

Many of the people that have not been able to use public transportation in this country for years will not be alive 30 years from now when these authorities are supposed to comply. We feel that those requirements are, at best, inadequate, and that certainly if there are going to be changes make, for example, in busing, in public transportation, buses, that a bus known as transbus should be mandated and produced and purchased by local authorities.

The transbus is designed in such a way that it can accommodate, naturally, people who can walk, but it also easily accommodates people in wheelchairs. Subways are difficult because they are much more expensive to—the word I believe the Congressman used was

003427

629

"retrofit." I think that is almost a code word. I would rather use "renovate."

But, in any event, they are more expensive. In a State like, for example, New York, to renovate all the subways would be unreasonable at this point.

Key stations is the notion that the Department of Transportation uses, and it is a rather elaborately defined term.

But the most important thing to our organization is the time it will take to make the changes. And if the Department of Transportation's regulations are not changed by legislation, as I have said, many people who are supposed to be benefited by those regulations will not be alive when transportation is finally made accessible.

Mr. DRINAN. Well, I thank you for your testimony and for your support.

One last question, Mr. Chairman.

The 1 or 2 percent that you were talking about—is that in the recommendations of your organization, or is that just your own feeling?

Mr. DYSTEL. That was just my feeling here at the table this morning. It has not been discussed with the board of directors or the board of delegates of the American Coalition.

Mr. DRINAN. If I may suggest something that would be very useful to us, I know that any further refinements that you people could make on how this could be put into law would be very, very useful to the subcommittee. Thank you very much.

Mr. EDWARDS. Mr. Sensenbrenner.

Mr. SENSENBRENNER. I have a question of economic feasibility. Let me just toss out an example for you.

My residence in Wisconsin is a two-family house. My wife, who, incidentally, is a paraplegic, and I live on the bottom floor, and we rent the top floor out as a rental unit. The house was constructed about 20 years ago—not by me. I was a subsequent purchaser. And the top floor was not very accessible to a person with handicaps.

Now, when I have to rent the top floor out to get a new tenant, under your new formula for economic feasibility—because the top floor is not accessible, would I be discriminating against someone who does have a handicap, because the top floor is not accessible?

Mr. DYSTEL. That is very doubtful, Congressman, Almost under any formula that could be devised, when you have your own single house and you rent one of the floors, you cannot be expected to earn enough return on the rental of that particular floor to meet any formula that could be devised that would require that you make changes so that the floor would be accessible to a disabled person.

There could even be—if the bill were changed or the legislative history indicated that change should be made in an apartment—the legislative history could go on to have a cutoff, cutoff point. For example, a single house would not be subject to any changes. It could be broader than that. Single houses could be included. It could be—the change might only be required of landlords who own up to, say, $x$ number of apartments that were for rent.

Mr. SENSENBRENNER. Well, the existing Federal statute does not cover the top floor in the case I explained. However, the amendment to the law, with broadened coverage, does.

630

Now, say, instead of an owner that just rents out one unit—which I am—would change this into a commercial owner, and the commercial owner has many units, all but one of which is in compliance, but there is one that is not in compliance, and the handicapped individual wanted to rent that out.

Would he then be in violation of the law, under this economic feasibility formula that you have outlined?

Mr. DYSTEL. Not if the economic feasibility formula were modified so that in the case of multiunit owners some of the units would have to be accessible, but not all. And that seems to make a lot of sense also because many apartment complexes have a number of floors. If they are existing complexes and if they do not have elevators, do not have stairs, if the bottom floors were accessible, then that would indicate that at least some of the apartments were accessible and that there was not discrimination by the landlord against people because of their disabilities.

Mr. SENSENBRENNER. Perhaps I am getting a little bit confused. You said that when a landlord only rents out one unit—and that is not economically feasible—then he would not be discriminating. If a landlord has many units, he would not be discriminating if some of the units were accessible, but if all of the units of a multiunit landlord were not accessible, would it not also be economically unfeasible for the landlord to fix all the units up?

Mr. DYSTEL. What I am suggesting is that the formula could be such that in the case of a multiunit dwelling where there is, say, 20 apartments in an apartment complex, if it is economically feasible to make some of them accessible to the mobility-disabled and those are not made accessible to the mobility-disabled, or the landlord refuses to rent to the mobility-disabled, for whatever reason, that would constitute discrimination.

But if the ground floors were made accessible to the disabled and that were found to be economically feasible to do that, might not require any changes at all, the fact that the upper floors were not accessible would not—under the formula that I envision—would not constitute discrimination.

I do not know if I am making myself clear.

Mr. SENSENBRENNER. I have one question on another hypothetical that I would like to toss out to you.

Under your testimony, you said that accessibility standards should be made applicable to new construction. Now, say a developer constructs a new building, following the effective date of this act, which is in violation of the accessibility standard and that it is subsequently sold to an innocent purchaser in good faith, who rents the building out, and a handicapped person would not be able to rent the inaccessible unit because of his handicap.

Who does the discrimination charge lie against? The builder that constructed the building—which was not in accordance with accessibility standards—or the subsequent purchase in good faith who was in the business of renting it?

Mr. DYSTEL. I have a feeling, Congressman, that I am in a law school class.

But I think my answer to that question would be that the action would lie against the current owner who would then have an

003429

631

action against the person from whom that owner purchased the premises.

Ignorance of the law, of course, is no excuse. And if the secondary purchaser did not know that the premises were out of conformance with the law, I believe that he would be stuck with that lack of knowledge.

Mr. SENSENBRENNER. One further question——

Mr. MATSUI. Would the gentleman yield? I would just like to make a response to your comment.

Mr. SENSENBRENNER. Let me ask one further question, please. We all know that making buildings accessible to handicapped people costs money.

Mr. DYSTEL. Yes.

Mr. SENSENBRENNER. And if there is no new construction, it is obvious that the builder who is in conformity with these standards would charge his purchaser a higher price, which all would be reflected in the rents.

How do we get around the economic discrimination that would occur when the landlord would have to charge a higher rent to a tenant, handicapped or not, who lives in the building that is accessible?

Mr. DYSTEL. I am not sure you can get around that, Congressman.

Mr. SENSENBRENNER. I yield to the gentleman from California.

Mr. MATSUI. I would only comment, regarding your response to the gentleman, regarding the building code requirements and who would be responsible, I would think that the governmental unit that would have given the building permit would have been responsible ultimately for that kind of situation, because building codes would undoubtedly have to be changed in order to make sure they comply with whatever directives we give them in terms of legislation. So, I think that from that perspective those kinds of cases would be very few.

Mr. SENSENBRENNER. There are 1,826 separate jurisdictions, each of which have building codes, in my State. So it is very hard for a uniform building code.

Mr. MATSUI. Unless we hold the money back, in terms of Federal grants.

Mr. SENSENBRENNER. I have no further questions. I yield back the balance of my time.

Mr. EDWARDS. Thank you.

Mr. Dystel, is your office here in town?

Mr. DYSTEL. Yes.

Mr. EDWARDS. And how many members did you say you have, and where are they?

Mr. DYSTEL. They are across the Nation. We have 84 national, State, and local groups, as members. Some individual members, but, principally, we are comprised of other organizations who, in turn, have millions of individual members.

Mr. EDWARDS. You have a connection with them, such as a newsletter and national conventions?

Mr. DYSTEL. Yes.

Mr. EDWARDS. Regional meetings?

Mr. DYSTEL. Yes.

632

Mr. EDWARDS. Tell us a little bit about what handicapped people run into, what kind of discrimination.

Mr. DYSTEL. Well, it varies generally from handicapped to handicap, and it is very subtle. I am not personally aware of too much of it because I have not been disabled that long. But I am told by a number of other people that the major form of discrimination that they encounter is a desire on the part of the other people simply not to have anything to do with them, which may be premised on guilt. I do not know. I am not a psychoanalyst.

But the kind of discrimination you would run into in housing is the same kind of subtle discrimination that any other minority would run into. And I think it is fair to say that the disabled are a minority in this country, though a rather huge minority, still a minority.

Depending on how diplomatic the landlord is, the landlord could say: "We simply have no place here for rent." If they have a "for rent" sign out front, then they are in trouble, because they have opened themselves up. And I do not know what form the discrimination would take in that particular setting, whether they would simply say, "We just do not rent to disabled people," or whether they just slam the door. It is going to vary from individual to individual.

I just had a call yesterday from a woman in the West—I think it was in Portland, Oreg.—who said that she had been denied the right to rent an apartment expressly because she was disabled. She is blind. And I do not understand that. I do not know if it is because the landlord is afraid that she might hurt herself and hold the landlord responsible. I do not know what the legal standards would be there. I am sure that if it is just based on fear, the fear is probably unwarranted.

I guess my point is that discrimination in this area takes a variety of different forms, and I do not think you can generalize it.

Mr. EDWARDS. Well, are handicapped persons greater liability risks for property owners?

Mr. DYSTEL. I do not personally think so, no. In fact, they are probably less of a risk because they probably take fewer chances than do nondisabled people.

Mr. EDWARDS. We have testimony to that effect, that it is not true that they are a greater liability risk for property owners. We had testimony last year to that effect.

Mr. DYSTEL. Well, I am glad that there is some support for what I just said.

I know that I take a lot fewer chances than I used to take when I was not disabled. It is safer.

Mr. EDWARDS. The gentleman from California.

Mr. MATSUI. Thank you, Mr. Chairman.

Do you happen to know how many States have laws currently that would protect physically disabled individuals regarding housing at this particular time?

Mr. DYSTEL. No, I do not, Congressman.

Mr. MATSUI. That is all I have. Thank you.

Mr. EDWARDS. Counsel.

Ms. COOPER. Thank you.

633

I do not know if you can provide to us at this time, but I think it would be useful for the subcommittee to have some better idea of the statistics on those 36 million Americans that are disabled.

For example, how many of those are mobility-disabled?

Mr. DYSTEL. I can tell you that. I believe that the figure is that approximately 5 million people are mobility-disabled to the extent that they are in wheelchairs.

When you include people who have difficulty walking, and the elderly who have difficulty walking, the numbers, I am sure, get much greater. But it is approximately 5 million that are in wheelchairs.

Ms. COOPER. Of those 36 million, is a significant portion of those the elderly?

Mr. DYSTEL. I cannot tell you that. I do not think so.

Surprisingly, when you have gotten beyond 65, I believe, which qualifies you as a senior citizen under most local group standards, you are pretty healthy. But I do not think that the—although the problems are very similar with the elderly and the disabled, I do not believe that the greatest group of disabled people is elderly.

Ms. COOPER. Would it improve the housing opportunities of the mobility-disabled persons to require that the property owners could not refuse to permit the tenants, or prospective tenants, to make modifications which would render the dwelling unit accessible, at that tenant's expense? The change would have to be reasonable in the sense that it would not interfere with the use of the building by other tenants and would not decrease the property value of the building, at least on a permanent basis.

Would that improve housing opportunities?

Mr. DYSTEL. That would help in certain situations. It would also possibly be discriminatory in favor of wealthier disabled people that would be—if you put the burden on the actual tenant to make the changes that were necessary to obtain accessibility to the building.

There are, obviously, poor disabled people who could not afford to make those kinds of expenditures for those kinds of changes. But it would help. It would be better.

Ms. COOPER. I guess our concern here is who is going to pay. If the tenant himself can afford it, fine. If not, maybe the Federal Government should step in at this point.

But to ask a landlord to assume that cost may not be fair or politically feasible, at this point, at least.

Mr. DYSTEL. I also suppose that even if the landlord did assume it, it would be passed on. But it would be spread around a greater number of people.

The question, I realize, arises: Should it be? And I cannot answer that, I am biased.

Ms. COOPER. But it is your testimony, then, that there is a problem of the landlord refusing to permit tenants to make their own accommodations, such as putting in a ramp?

Mr. DYSTEL. Oh, yes, I am sure there are problems like that. Landlords do not like changes of that nature made in their premises.

Ms. COOPER. I have no further questions. Thank you.

634

Mr. Edwards. Well, you do not see anything in this bill, Mr. Dystel, that would require landlords to spend extra money?

Mr. Dystel. No, not as it is now. As it is now, as the amendment is, that is, says that the landlord cannot discriminate against the disabled in leasing the premises which, as I said before, in the case of the mobility-disabled, in many situations is little more than words, unless something can be done where it is economically feasible to enable a person to obtain access to the premises.

Mr. Edwards. But there is considerable discrimination against the disabled just because they are disabled?

Mr. Dystel. Yes.

Mr. Edwards. That has nothing to do with whether or not the building shall be changed to make it accessible. Is that not correct?

Mr. Dystel. That is correct.

Mr. Edwards. And it would be quite a large step in the right direction, as far as you are concerned, if that were made illegal?

Mr. Dystel. That is true.

Mr. Edwards. If that were made illegal?

Mr. Dystel. Yes.

Mr. Edwards. Without any consideration whatsoever for requiring improvements or changes in the structure by landlords, which you have correctly indicated is the most difficult thing, from a Federal level?

Mr. Dystel. Yes. We would still—our organization would strongly support the bill if it did not require changes, because it would be a step in the direction of preventing, getting rid of the kind of discrimination that has plagued disabled people for a long, long time in this country.

My testimony this morning is only that we would favor the bill much more strongly if it made some accommodation for the mobility disabled.

Mr. Edwards. Well, where HUD finances or federally assists the construction of housing for older people or for low-income people, is it not true that those laws require appropriate accommodations in new construction?

Mr. Dystel. I think new construction would probably be covered where HUD financing is involved. And my guess would be that after the enactment of this amendment, anybody building new construction would be careful not to have it totally inaccessible to the disabled. I am talking now, I think, about existing buildings.

Mr. Edwards. Are there any further questions?

[No response.]

Mr. Edwards. Well, thank you very much, Mr. Dystel, for your most helpful testimony.

Mr. Dystel. Thank you.

[The prepared statement of Mr. Dystel follows:]

STATEMENT BY JOHN JAY DYSTEL, DIRECTOR OF ADVOCACY, AMERICAN COALITION OF CITIZENS WITH DISABILITIES

Chariman Edwards, members of the subcommittee, I am John Jay Dystel, Director of Advocacy for the American Coalition of Citizens with Disabilities (ACCD). ACCD is a national umbrella association comprised of 84 national, state, and local organizations which serve and represent over 7,000,000 of America's 36,000,000 disabled citizens. ACCD was founded and is governed by disabled people themselves.

I am pleased to have been afforded this opportunity to testify before your subcommittee today in support of H.R. 2540, the bill which would amend the Fair Housing

635

Act of 1968 to protect disabled Americans from discrimination in the sale and rental of housing. ACCD strongly believes that if the 36,000,000 members of America's disabled community are truly to be integrated into the mainstream of American life, these citizens must first have the opportunity to live independent lives. ACCD further believes that in order to achieve such independence, disabled Americans must have the right to purchase and lease residential housing, free from the discrimination that has plagued members of America's disabled community for decades.

The vast majority of America's disabled population has long been isolated from the mainstream of American life, has been unable to secure employment, and has been denied the opportunity to live independently by purchasing or leasing residential housing. Among other things, this segregation of disabled Americans has resulted in a massive lack of understanding on the part of America's non-disabled population. Moreover, such misunderstanding has, in turn, served to perpetuate both the isolation of disabled people in this country and the large governmental expenditures which result when American citizens are forced to lead lives of dependence rather than independence.

If enacted, H.R. 2540 and its companion bill in the Senate, S. 506, could go far towards correcting this situation.

The right to be free from discrimination in the purchase and rental of housing, and the concommitant right to be free from discrimination in obtaining financing and insurance for such housing, are rights enjoyed by most Americans. For decades, however, disabled Americans have not enjoyed such rights, primarily because America's disabled and non-disabled citizens have been isolated from one another. The circle is a vicious one and must stop soon because it has increasingly prevented disabled Americans from leading productive and fulfilled lives.

This circle of isolation has also made it difficult for America's disabled citizens to become taxpayers rather than welfare recipients. Because H.R. 2540 would prevent discrimination in the sale or rental of housing solely on the basis of an individual's physical or mental disability, that bill could go far toward breaking this vicious circle.

However, in order truly to accomplish this result, ACCD believes that the bill should not provide—either in its text or in its legislative history—that landlords of residential housing have no obligation to make that housing accessible to the mobility disabled, It an individual cannot obtain access to an apartment because of physical barriers, such as steps, that individual is being denied access to such apartment in the same manner as if the landlord simply had a policy against renting to disabled individuals. ACCD believes that where a potential tenant can establish that a landlord is in a financial position to make reasonable physical accommodation which would enable the mobility disabled to obtain access to the landlord's premises, that landlord should be required to make the necessary renovations. If the Fair Housing Act Amendments of 1979 did not so provide, then those amendments would effectively permit de facto discrimination while ostensibly prohibiting de jure discrimination.

At a minimum, ACCD believes that all new construction should be accessible in order to avoid running afoul of the Fair Housing Act as amended by H.R. 2540. Were this problem in the bill corrected, ACCD could support it without reservation. For the present, ACCD certainly supports the spirit of the bill.

Indeed, with this single exception, ACCD believes that H.R. 2540 constitutes a major step toward liberating disabled Americans from lives of isolation and dependence—from what are, in effect, lives of bondage.

[Whereupon, at 10:30 a.m., the hearing was adjourned.]
[Additional material follows:]

THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT,
*Washington, D.C., June 26, 1979.*

Hon. PETER W. RODINO,
*Chairman, Judiciary Committee,*
*House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: As a Subcommittee on Civil and Constitutional Rights approaches markup on H.R. 2540, the "Fair Housing Amendments Act of 1979", I want to restate the Administration's strong support for this legislation and continuing commitment to the effective enforcement of Title VIII of the Civil Rights Act of 1968.

During my testimony before the subcommittee on April 6, I offered to work with you closely in the development of this important legislative proposal, and suggested three areas in which the bill could be improved, including the bill's treatment of the

636

"handicap" issue, the definition of "discriminatory housing practice", and the system for referral of complaints to State agencies. The Department of Housing and Urban Development and the Department of Justice have drafted amendments to address these issues, as well as other concerns of the Administration. We believe that the adoption of these amendments would enhance the overall effectiveness of H.R. 2540.

### I. HANDICAPPED DEFINITION

The Administration strongly supports the extension of coverage under the Fair Housing Act to handicapped persons. However, during our testimony, Assistant Attorney General Drew S. Days and I both indicated that the subcommittee should further explore the subject, including the proper approach to protection of handicapped persons, before final committee action is taken. During the past several weeks, HUD and the Department of Justice have had discussions with organizations representing the handicapped, and with subcommittee staff, in an attempt to develop language that would meet the special needs of handicapped homebuyers and renters.

The amendments relating to the handicapped (Numbers 1–3) were drafted in cooperation with the Department of Justice and have the concurrence of this Department. While not proposing to change the definition of "handicap", as provided in H.R. 2540, these amendments would prohibit discrimination in the sale and rental of real estate, as well as in the terms and conditions of such transactions. The amendments also would prohibit discrimination in the provision of brokerage services. While not requiring retrofitting, the amendments would make it unlawful to prevent a handicapped person from making reasonable modifications to premises. Landlords would be required to make reasonable accommodations in rules, policies, and practices that have the effect of arbitrarily excluding the handicapped. In addition, the amendments describe the kinds of acts that do not constitute discrimination, including a landlord's refusal to retrofit, or to accept conduct on the part of handicapped persons that would cause an unreasonable inconvenience to others. We also have drafted a separate amendment (Number 4), calling for a study to be conducted within one year of the Act's passage, addressing the extent of the need for "retrofitting" of some portion of the private housing market, and seeking expert advice concerning whether private housing suppliers, or the Federal Government, should bear the costs of any such effort.

A more detailed description of the amendments relating to the expansion of the protected classes under Title VIII to include handicapped individuals is enclosed for your information.

### II. REFERRAL TO STATE AGENCIES

A second concern of the Department is the change that H.R. 2540 makes to existing law by altering HUD's present authority to recall fair housing complaints referred to State and local agencies for processing. The bill requires that the State agency consent to HUD's recall of any complaint, and also requires the consent of the charging party in order for HUD to make the initial referral.

The Department's amendment (Number 5) retains the certification process set out in H.R. 2540, but eliminates the requirement that the charging party consent to the referral of his or her charge to a certified agency. It also adds a provision allowing the Secretary to recall a charge previously referred to a certified agency, but only when the Secretary has determined that "the protection of the rights of the parties or the interests of justice" required additional HUD action. This recall standard closely resembles the standard set out in the present law's referral provision—section 810(c) of Title VIII.

While we are confident that, as a rule, States certified as having laws substantially equivalent to the Federal statute will process complaints on a timely basis, there always remains the possibility that some cases will require special attention. The Committee is aware that almost half of the cases now referred by the Department are recalled because of the failure of the States to process the complaints in a timely fashion.

These changes reflect our belief that HUD's responbility for Fair Housing enforcement should carry with it adequate authority to assure control over the disposition of charges, both at the time of initial receipt and following referral to a certified agency. Otherwise, HUD would have no continuing control over referred cases, short of decertification of a referral agency. The need to process swiftly an individual complaint (wherein HUD perhaps would see a need to expedite investigation, or to take corrective action in a manner unlike that being undertaken by the State or local agency) frequently would not call for outright revocation of the

Secretary's previously-granted certification. Even if a State agency were decertified, it is unclear under the provisions of the bill that HUD could reassert jurisdiction over cases previously referred.

### III. DEFINITION OF DISCRIMINATORY HOUSING PRACTICE

The Administration strongly supports the expansion of the term "discriminatory housing practice" to include Section 817 (Interference, Coercion, or Intimidation). However, H.R. 2540's application of the definition to the entire "title" would sweep too broadly and interfere substantially with HUD's ability to carry out the Act from an administrative and fiscal perspective in addition, this authority would duplicate existing safeguards built into the Administrative Procedure Act.

The amendment we are proposing (Number 6) would broaden the present definition of "discriminatory housing practice" to include violations of Section 817 of the Act, thus clarifying HUD's authority to accept charges alleging interference or intimidation involving persons attempting to exercise rights protected by the Fair Housing Act, but would not extend the definition to include the entire title. Amendment 7 is a related conforming amendment.

The actions of the Secretary associated with her obligation to administer the Fair Housing Act's enforcement procedures are already subject to judicial review under the Administrative Procedure Act. As I have previously indicated, expending HUD resources in the defense of a multiplicity of suits charging the Secretary with discriminatory housing practices, based on a perceived failure of the Department to process a charge in the manner a complainant prefers, seems hardly the most effective means of focusing HUD's limited resources on solutions for aggrieved individuals. Insofar as this redefinition provision in the bill is directed at speeding HUD's handling of Title VIII matters, I have already expressed my own concern about delays in the investigative process, and we are already doing everything possible within our resources to speed up the handling of individual charges.

Another problem with the expanded definition proposed in H.R. 2540 is that it would subject the Secretary to innumerable lawsuits alleging that individual employees' administration of non-Title VIII programs violated that Title's affirmative obligation to further fair housing. Thus, for example, an employee reviewing an application in a housing or community development program could be accused of violating Title VIII, even if he or she carefully followed a regulatory scheme already incorporating the Secretary's determinations regarding the policies of the Fair Housing Law.

### IV. DEFINITION OF AGGRIEVED PERSON

Our amendment number 8 would, in effect, retain the present law's description, set out in Section 810, of "person aggrieved". In light of the Trafficante and Bellwood decisions in the United States Supreme Court, we are convinced that no need exists to alter the definition of this term. On the contrary, it is our view that the "standing" problems this redefinition attempts to resolve do not currently exist as to Title VIII, and that the best course is to preserve the present law's provision intact.

After you have had an opportunity to review the Department's legislative proposals, I would be pleased to discuss them with you and with Congressman Don Edwards, the subcommittee chairperson. I wish to commend Congressman Edwards for the deliberate and careful hearings that he has conducted on this very important proposal to give meaning to the term fair housing. But more importantly, the strong and effective leadership that you and he, as well as Congressman Robert Drinan—a principal sponsor of the bill—have demonstrated on civil rights matters will, I am sure, help to make the promise of H.R. 2540 a reality this year.

The Office of Management and Budget has advised that there is no objection to the presentation of this report from the standpoint of the Administration's program.

Sincerely yours,

PATRICIA ROBERTS HARRIS.

Enclosures.

### AMENDMENT NO. 1

Intended to be proposed by M———————— to H.R. 2540, a bill to amend title VIII of the Act commonly called the Civil Rights Act of 1968 to revise the procedures for the enforcement of fair housing, and for other purposes, viz: On page 4, after line 17, insert the following:

"(g)(1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, a dwelling to any person because of a handicap

003436

of a prospective buyer or renter or of a person or persons associated with such buyer or renter unless such handicap would prevent a prospective dwelling occupant from conforming to such rules, policies and practices as are permitted by clause (2); or

"(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of handicap. For purposes of this subsection, (A) discrimination shall include: (i) refusal to permit reasonable modifications of premises occupied, or to be occupied, by persons with a handicap which are necessary to afford such handicapped persons access to premises substantially equal to that of non-handicapped persons, or (ii) refusal to make reasonable accommodations in policies, practices, rules, services or facilities when such accommodations are necessary to afford handicapped persons enjoyment of dwellings substantially equally to that of non-handicapped persons; but (B) discrimination shall not include (i) refusal to make alterations in premises at the expense of sellers, landlords, owners, brokers, building managers or persons acting on their behalf, (ii) refusal to make modification of generally applicable rules, policies, practices, services or facilities where such modification would result in unreasonable inconvenience to other affected persons, or (iii) refusal to allow architectural changes to, or modifications of, buildings which would materially alter the manner in which a building or its environs has been, or is intended to be, used.

"(h) For any employee or agency of a State or local government to take any action, or to deny any privilege, license or permit, which would impede the establishment of any dwelling specifically intended for handicapped persons, unless:

"(1) Such dwelling or its proposed use would not meet established Federal, State or local standards regulating health and safety or the quality·of the type of facility which is proposed; or

"(2) Such dwelling or its proposed use would not meet established Federal or State program standards for services for the handicapped; or

"(3) Such dwelling or its proposed use violates, or would violate, a comprehensive land use plan for the geographical area for which the employee or agency has jurisdiction and such land use plan would permit the establishment of such dwelling in other equally suitable locations. The granting or denial of variances in the past shall be deemed a part of such plan.

"(i) To prohibit or interfere with any occupancy protected by subsections (g) or (h) pursuant to any State or local law regulating the relationship or number of persons living in a single dwelling unit."

### AMENDMENT No. 2

Intended to be proposed by M————— to H.R. 2540, a bill to amend title VIII of the Act commonly called the Civil Rights Act of 1968 to revise the procedures for the enforcement of fair housing, and for other purposes, viz: On page 4, strike out lines 18 through 20 and insert in lieu thereof the following:

"Subsections (c), (d), and (e) of section 804, and sections 805 and 806 are each amended by inserting "handicap," immediately after "sex," each place it appears.

### AMENDMENT No. 3

Intended to be proposed by M————— to H.R. 2540, a bill to amend title VIII of the Act commonly called the Civil Rights Act of 1968 to revise the procedures for the enforcement of fair housing, and for other purposes, viz: On page 5, line 21, strike out "814" and insert in lieu thereof "815", and on page 15, after line 4, add the following:

### "EFFECT ON OTHER LAWS

"Sec. 815. (a) Nothing in this title shall be construed to invalidate or limit any law of a State or political subdivision of a State, or of any other jurisdiction in which this title shall be effective, that grants, guarantees, or protects the same rights as are granted by this title; but any such law that purports to require or permit any action that would be a discriminatory housing practice under this title shall to that extent be invalid.

"(b) Nothing in this title shall be construed to repeal, supersede or diminish the protection provided to handicapped persons by any other Federal law."

#### Explanatory Memorandum for Handicap Amendments to S. 506 and H.R. 2504

##### HANDICAP DEFINITION

No new definition of handicap is proposed. It is the drafters' view that it is desirable to use a standard definition for handicapped persons in all areas of federal law. Otherwise, understanding the various federal laws will be more difficult and confusion will occur. Where particular kinds of handicapped persons present special drafting needs in the housing area, those special needs should be identified, and provisos, exclusions, defenses, etc., should be put into the sections which describe the prohibited practices.

##### AMENDMENT NO. 1

This is a description of the discriminatory practices relating to transfer of real estate interests, access to dwellings, and estalishment of special housing for handicapped persons. It has four parts prohibiting: (1) refusing to rent or sell or to negotiate for rentals or sales; (2) discrimination in the terms and conditions of rentals or sales (this clause would regulate, inter alia, necessary adjustments required to make dwellings equally accessible, but would not require "retrofitting"); (3) action which impairs the establishment of special living arrangements for handicapped persons, and (4) the use of occupancy laws to justify practices which are made unlawful by the other three parts. Parts (1), and (2) and (4) (subsections (g) and (1)) prohibit discriminatory actions by anyone whose actions are within their terms. Part (3) (subsection (h)) prohibits only discriminatory actions by state or by local agencies or employees.

1. Subsection (g), clause (1) would prohibit any practice which is intended to, or which has the effect of refusing to rent or sell because of a handicap, real or perceived, past or present. However, the handicap which occasions the refusal must be possessed by someone who is either a prospective buyer or renter or who is associated with a buyer or renter, e.g., family member, roommate, agent, etc. The primary difference between this clause and the existing law's subsection 804(a) is that it does not apply to actions which "otherwise make unavailable or deny, a dwelling * * *." Thus, exclusionary zoning against handicapped persons is not included here, but is addressed separately in subsection (h). Nor would this clause apply to "redlining" or to any practice related to the handicaps of persons who are not dwelling seekers or their associates. The existing bill does, of course have a provision which would explicitly prohibit redlining on the basis of any protected characteristic, including handicap.

While a developer who builds houses or apartment buildings could not be required to make wholesale modifications of standard building plans by use of the theory that failure to do so is refusal to rent or sell to handicapped persons generally, he could not refuse to negotiate for sales or rentals with handicapped individuals or their agents, and, having entered into negotiations, he could not discriminate in the terms or conditions of sales or rentals as prohibited by clause (2).

Refusals to rent or sell would be permitted, however, where the handicap is of such a nature that its behavioral manifestations would prevent a prospective occupant from conforming to the reasonable rules, policies, or practices permitted by clause (2). (This is intended to be a defense in litigation which the landlord must sustain.)

2. Subsection (g), clause (2) prohibits discrimination against handicapped persons in terms and conditions of sales and rentals. For handicapped persons, treatment indentical to nonhandicapped persons will not always be equal treatment. Allowance is made in the amendment for this divergency by the use of general descriptions of what is and is not included in "discrimination." Some interpretations of the amendment will require judgments about what is "reasonable." What is or is not reasonable will depend upon examination of relevant facts. For example, there are a large number of row houses for rent in Washington which are convenient to transportation suitable for handicapped persons. However, the front entrances to many are four or five feet above ground level allowing for "English basements," and on the "streets" (numbered or lettered) the entrance is so close to the street that a suitable ramp would block the sidewalk. Since this would "materially alter the manner in which a building or its environs has been * * * used * * *," a landlord, or the city, may refuse to permit such a ramp.

On the other hand, houses on the "avenues" are set back from the street far enough so that such ramps would not interfere with existing uses. It would be unlawful, under the amendment, for either a landlord or the city to refuse to permit a handicapped occupant to erect such a ramp.

640

In these row houses, where an entire house is rented, in most instances, it would not cause inconvenience to permit the installation of devices which move wheelchairs up and down interior stairs. Under similar reasoning, it would be unlawful in an apartment complex which has off-street parking to refuse to reserve a parking space near a building entrance used by a physically handicapped person.

While the amendment would not require "alterations in premises at the expense of sellers, landlords * * * etc., it is the intent of the drafter to focus on real needs. When a handicapped buyer negotiates for the purchase of a house under construction, it would be a violation of subsection (g)(2) to refuse to make alterations in construction which would not add to construction costs, or which could be added to the price of the house. Similarly, a handicapped renter would have to be permitted to make changes in fixtures, electrical outlets, etc., if such changes would not make a house or apartment unsuitable for subsequent, non-handicapped renters.

Similar reasoning would apply to changes in policies and practices unrelated to building structure. If a handicap manifests itself in behavior which would violate reasonable rules, policies or practices and would result in "unreasonable inconvenience to other persons," accommodation need not be made. Examples of behavior which need not be accommodated are: mentally disturbed persons whose behavior is threatening to safety; active alcohol or drug abusers whose habits would cause behavior which make them a nuisance to other tenants.

The amendment addresses the problem raised in hearings in the last Congress by landlords who refuse to rent to handicapped persons because they fear increased liability for accidents, by removing this as an excuse for refusing to rent. One suggested approach has been to specifically prohibit liability for landlords for lack of care due handicapped persons greater than that due non-handicapped persons. This approach was not used for two reasons:

(1) Tort liability, the legal relationship between landlord and tenant and between buyer and seller and related questions are matters of state law which vary from state to state and which we should not attempt to modify without justification and careful study.

(2) The record to date contains no information that handicapped people are more "accident prone" than non-handicapped persons and there is testimony to the contrary. Hearings, House of Representatives, 95th Cong., on H.R. 3504 and H.R. 7789, serial No. 46, pp. 265–266.

3. Subsection (h) prohibits certain state actions and is intended to address the problem suggested in hearings last year of the use of land use policies to block establishment of group homes for handicapped persons who are being "deinstitutionalized." This is intended to be Fourteenth Amendment legislation and is proposed as being analogous, in operation, to the "effects" test of Title VII of the 1964 Civil Rights Act, which shifts the burden of proof to a defendant to justify a practice which has a discriminatory effect. See *Griggs* v. *Duke Power Co.*, 401 U.S. 424 (1971). The state may justify an exclusion if its action is related to the advancement of legitimate state objectives. However, the legitimate state objectives are described in the statute and none others may be defenses.

There are three ways in which a state can justify an action which would prohibit establishment of special housing. The first two are designed to protect both handicapped persons and the states' legitimate interests in regulating the quality of special homes such as group homes, nursing homes, and various institutions, and the program services required to be provided for such facilities. The state agency could justify its exclusion by showing that the housing would violate established state standards relating specifically to such homes, or health and safety codes, building codes, fire codes, or applicable federal regulations.[1] Since the standards must be "established"—an ad hoc decision that police protection is inadequate, for example, will not suffice. This defense would have these effects:

(1) It would not permit building inspectors, or licensing agencies to act without the guidance of a generally applicable set of standards, but would permit the freedom to enforce such rules to protect health and safety.

(2) It would permit states to act against profiteering at the expense of handicapped persons if they choose to adopt appropriate laws; and

(3) Any dispute about the efficacy of a group home project would be resolved by examination of published regulations.

Similarly, unavailability of established state or Federal "program services"—government-required special services for the handicapped—at a particular location would be a defense to a claim of discrimination under subsection (h).

---

[1] The subsection does not prohibit action by federal agencies. Section 808, which requires "affirmative action," for federal agencies would, however, by virtue of the amendments, require action to further the purposes of the title with regard to handicap in addition to the other protected characteristics.

003439

The third defense allows some deference to state land use policies.[2] To be a valid defense, however, the land use decision must meet at least three tests:

(1) It must be part of a comprehensive plan;

(2) The plan must allow another "equally suitable location" for the home which is excluded. (Other locations in slum areas or in areas where property is appreciably more expensive or more inconvenient for prospective residents would not be "equally suitable.")

(3) Denial of a zoning variance must be consistent, i.e., if variances have been liberally granted for other nonconforming uses such as commercial establishments, schools, day care centers, etc., a zoning board could not claim that the proposed use is an inconsistent one unless it could show that the proposed use violates some interests which the previous uses do not violate.

There is no attempt to set up a "scattering" or "proportional" requirement for handicap housing, although the "equally suitable location" would permit local jurisdictions to adopt such an approach if state law permits it. Locations for group homes and special housing would continue to be controlled by a variety of factors. The amendment does limit the application of land use laws such as "single family zoning" as one of those factors which inhibits deinstitutionalization.

4. Finally, proposed subsection (h) establishes that occupancy laws cannot be a justification for any practice which would be unlawful under the subsection. This is a limited abrogation of such laws because they weigh unfairly on handicapped persons, such as mentally retarded persons, who will benefit from special living arrangements.

### AMENDMENT NO. 2

Under this amendment, handicap protection would be added to present prohibitions on discrimination in advertising, blockbusting, mortgage and home improvement loans and brokerage services. Because of the effects test, denial of loans could be only on the basis of sound economic or financial reasons, and not on the basis of a general policy against making loans to particular classes of handicapped persons. Thus, a financial institution would be required to make credit judgments on individual bases, and could not simply deny credit to a person because of generalized attitudes about the ability of particular classes of handicapped persons to sustain loan payments. Similar analyses should be used for the "redlining" provisions of the bill which are not affected by these amendments, and which include handicap.

### AMENDMENT NO. 3

This amendment adds a new subsection (b) to section 815 of the present law, to clarify that protections extended to the handicapped in title VIII are not intended to repeal, supersede or diminish the protections provided to handicapped persons by other Federal statutes.

### AMENDMENT NO. 4

Intended to be proposed by M———— to H.R. 2540, a bill to amend title VIII of the Act commonly called the Civil Rights Act of 1968 to revise the procedures for the enforcement of fair housing, and for other purposes, viz: On page 16, after line 9, add the following additional section:

### "RETROFITTING COST AND NEED STUDY

"Sec. 12. (a) One year following the date of enactment of this Act, the Architectural and Transportation Barriers Compliance Board shall provide a report to the Congress concerning:

"(1) the extent to which architectural barriers and other obstacles to accessibility of housing are operating to deny handicapped persons access to a reasonable housing choice in the private market;

"(2) the extent to which public, private or cooperative public and private efforts have been undertaken to increase housing choice for the handicapped in the private market;

"(3) the projected cost of retrofitting an adequate supply of existing housing units to make such units suitable for occupancy by handicapped persons.

---

[2] Eleven states have enacted statutes which override local zoning laws with regard to homes for varying categories of persons, see Hearings, House of Representatives, 95th Congress, on H.R. 3504 and H.R. 7789, Serial No. 46, pp. 271-272. The amendment does not alter those statutes. However, where such statutes exist, they are part of the state "policy" for purposes of ascertaining whether a state plan is a valid defense.

"(b) The Board shall include in its report recommendations concerning further legislative or other action necessary to provide an adequate private market housing supply for handicapped persons, including the Board's recommendations regarding whether costs associated with such actions should be borne by private housing suppliers or by the Federal government.".

Explanation of amendment relating to a study of retrofitting.

It is our veiw that private housing suppliers should not, as a part of an anti-discrimination bill, be called upon to bear the expense of structural modification of dwellings in order to make them livable and accessible to handicapped persons.

However, the question of how important structural modification of private dwelling units is—to how many people—is an open one deserving of examination. Related questions of very great concern include the potential cost of retrofitting activity in private housing, and who should bear such costs.

This amendment would authorize and require a "cost and need study", to be undertaken by the Architectural and Transportation Barriers Compliance Board, followed by a report to the Congress providing advice and recommendations for action.

The study would be completed within one year of the date of the bill's enactment.

## AMENDMENT NO. 5

Intended to be proposed by M           to H.R. 2540, a bill to amend title VIII of the Act commonly called the Civil Rights Act of 1968 to revise the procedures for the enforcement of fair housing, and for other purposes, viz: On page 8, strike out line 8 through 16, and insert in lieu therof the following:

"(3) Whenever a charge alleges a discriminatory housing practice within the jurisdiction of a State or local public agency certified by the Secretary under this paragraph, the Secretary may, before taking any action with respect to such charge, refer such charge to that certified agency. Except with the consent of such certified agency, the Secretary shall, after that referral is made, take no further action with respect to such charge unless the Secretary determines that the protection of the rights of the parties or the interests of justice require additional action. No agency may be certified under this paragraph."

Explanation of amendment relating to State and local referrals.

This amendment retains the certification process set out in the introduced bills, but eliminates the requirement that the charging party consent to the referral of his or her charge to a certified agency.

The amendment also adds a provision allowing the Secretary to recall a charge previously referred to a certified agency, but only when the Secretary has determined that "the protection of the rights of the parties or the interests of justice" require additional HUD action. This recall standard closely resembles the standard set out in the present referral provision—section 810(c) of Title VIII.

These changes reflect our belief that the Secretary's responsibility for Fair Housing enforcement should carry with it adequate authority to assure control over the disposition of charges, both at the time of initial receipt and following referral to a certified agency.

## AMENDMENT NO. 6

Intended to be proposed by M           to H.R. 2540, a bill to amend title VIII of the Act commonly called the Civil Rights Act of 1968 to revise the procedures for the enforcement of fair housing, and for other purposes viz: On page 2, strike out line 14 through 18, and insert in lieu thereof the following:

"Sec. 4(a) Section 802(f) of the Act entitled 'An Act to prescribe penalties for certain acts of violence or intimidation, and for other purposes' (Public Law 90-284, approved April 11, 1968) is amended by striking out 'or 806' and inserting '806, or 817' in lieu thereof."

## AMENDMENT NO. 7

Intended to be proposed by M           to H.R. 2540, a bill to amend title VIII of the Act commonly called the Civil Rights Act of 1968 to revise the procedures for the enforcement of fair housing, and for other purposes viz: On page 15, strike out lines 5 through 10 and redesignate Sections 10 and 11 of the bill as Sections 9 and 10, respectively.

Explanation of amendments relating to the definition of "discriminatory housing practice".

643

### AMENDMENT NO. 6

This amendment broadens the present law's definition of discriminatory housing practice to include violations of section 817 of the Act, thus clarifying HUD's authority to accept charges alleging interference or intimidation involving persons attempting to exercise rights protected by the Fair Housing Act.

The amendment, however, is narrower than that proposed in the introduced bills. S. 506 and H.R. 2540 propose to define discriminatory housing practice as any act that is unlawful under "this Act." This definition would raise uncertainty concerning the extent to which the liability of the Secretary and other Federal officers with responsibilities under the Fair Housing Act would be increased.

The actions of the Secretary associated with her obligation to administer the Fair Housing Act are already subject to judicial review under the Administrative Procedure Act. It is feared that the expanded definition proposed in the introduced bills would subject the Secretary and other Federal officers to innumerable lawsuits alleging failure, by individual employees, to administer a program affirmatively according to their individual conceptions, no matter how insignificant their roles. Thus, for example, an employee reviewing an application in a housing or community development program of the Department could be accused of violating Title VIII, even if he or she carefully followed a regulatory scheme already incorporating the Secretary's determinations regarding the policies of the Fair Housing Law.

It is also possible that the proposed redefinition of discriminatory housing practice would effectuate de novo judicial review of every HUD action taken pursuant to its Title VIII administrative enforcement responsibility. The resources necessary to defend HUD's actions on a case-by-case basis could significantly detract from the Department's capacity to carry out its law enforcement responsibilities under the Act.

### AMENDMENT NO. 7

This amendment deletes proposed section 9 of the introduced bills. Section 9 is a conforming amendment to section 817 of the present law which would be unnecessary if amendment No. 6 is accepted.

### AMENDMENT NO. 8

Intended to be proposed by M————— to H.R. 2540, a bill to amend title VIII of the Act commonly called the Civil Rights Act of 1968 to revise the procedures for the enforcement of fair housing, and for other purposes, viz: On page 3, strike out lines 1 through 3, and insert in lieu thereof the following:

"(i) 'Aggrieved person' includes any person who claims to have been injured by a discriminatory housing practice or who believes that he or she will be irrevocably injured by a discriminatory housing practice that is about to occur.".

Explanation of amendment relating to the definition of "aggrieved person".

This amendment would, in effect, restore the present Fair Housing Act's definition of "person aggrieved", as set out in section 810(a) of the Act.

In our view the present law's definition is firmly established by case law as being the broadest possible means of conferring standing. Redefinition of the term cannot further broaden its reach, and conceivably could lead to new and narrower construction.

AMERICAN COALITION OF
CITIZENS WITH DISABILITIES, INC.,
*Washington, D.C., July 9, 1979.*

Congressman DON EDWARDS,
*Rayburn Building,*
*Washington, D.C.*

DEAR CONGRESSMAN EDWARDS: I appreciate your sending me a copy of the Justice Department's proposed language for H.R. 2540, the bill which would amend the Fair Housing Act of 1968 to, among other things, protect disabled Americans from discrimination in the sale and rental of housing. As I stated in my testimony before your subcommittee on June 14, 1979, the American Coalition of Citizens with Disabilities Inc., strongly supports your subcommittee's proposed legislation. As I also indicated in that testimony, however, our support is not given wholly without reservation.

The Justice Department's proposed language highlights our problems with this legislation. The Justice Department has proposed language providing: "discrimination (in the rental of housing) shall not include (i) refusal to make alterations in premises at the expense of . . . landlords . . ." As I earlier testified before your subcommittee, the American Coalition believes that where it is financially feasible

644

for a landlord to do so, this legislation should require that landlord to make his or her premises accessible to the mobility disabled. For example, where a landlord leases more than 5 apartments and could make those apartments accessible to the mobility disabled at a cost of up to 5 percent of the landlord's previous year's gross income, we believe that your subcommittee's proposed legislation should require that the landlord make his or her apartments accessible.

In most cases, making all, or at least some, of a landlord's apartments accessible to the mobility disabled will not pose an undue financial burden upon that landlord. Moreover, the vast majority of the expenses involved in removing achitectural barriers to make a landlord's apartments accessible will, under current tax law, be deductible expenses. This being so, we at the American Coalition beleive that your subcommittee's proposed legislation should, in order to truly protect all disabled Americans from discrimination in the rental of housing, require that landlords make their apartments accessible where it is financially feasible to do so.

We, therefore, urge your subcommittee not to include in H.R. 2540 the above-quoted language proposed by the Justice Department. Instead, we propose the H.R. 2540 provide—either in its text or in its legislative history—that landlords must make their apartments accessible to the mobility disabled where it is financially feasible to do so. With this single exception, however, the American Coalition has no problem with the Justic Department's proposed amendatory language to H.R. 2540. Indeed, as I indicated in my testimony before your subcommittee, the American Coalition strongly believes that this bill is a very important step in the direction of helping to integrate disabled citizens into the mainstream of American life.

Thank you very much, Congressman Edwards, for affording me this opportunity to comment upon the Justic Department's proposed amendatory language to H.R. 2540. If I can be of further assistance to your subcommittee in its consideration of this or any other matter pertaining to this legislation, please advise me. I would be delighted to assist you where I can.

Sincerely yours,

JOHN JAY DYSTEL,
*Director of Advocacy.*

# APPENDIXES

---

## APPENDIX 1

Legal Memoranda Prepared by the Congressional Research Service on H.R. 2540

1. Arguments for and against granting HUD cease and desist authority in the area of Fair Housing.

2. Questions submitted regarding...Handicap Discrimination under Federal Fair Housing Law.

3. Legal analysis of issues relating to legislation amending the Fair Housing Act to prohibit discrimination against handicapped persons.

(645)

646



THE LIBRARY OF CONGRESS

*Congressional Research Service*

WASHINGTON, D.C.  20540

May 4, 1979

TO      :  House Judiciary Committee
           Subcommittee on Civil and
              Constitutional Rights
                 Attention:  Janice Cooper

FROM    :  American Law Division

SUBJECT:  Arguments For and Against Granting DHUD Cease and Desist
          Authority in Area of Fair Housing

Enclosed, in response to your request, is a report sum-
marizing the arguments that have been adduced over the past decade
for and against granting the Department of Housing and Urban De-
velopment cease and desist authority in the area of fair housing.
If we may be of additional assistance, please call on us.

David M. Ackerman
Legislative Attorney



## THE LIBRARY OF CONGRESS

*Congressional Research Service*

WASHINGTON, D.C. 20540

ARGUMENTS FOR AND AGAINST GRANTING CEASE
AND DESIST POWER TO THE DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT FOR USE IN ENFORCING
THE FAIR HOUSING ACT OF 1968

The possibility of providing cease and desist authority
to an administrative agency charged with enforcing nondiscrimination
in housing has been raised on earlier occasions in Congress. In
1966 the House Judiciary Committee reported,[1] and the House adopted,[2]
a bill that would have created a five-member Fair Housing Board with
authority to hold hearings on complaints of housing discrimination
and issue judicially enforceable cease and desist orders. Again
in 1968 Senators Mondale and Brooke proposed an open housing amend-
ment to the then-pending civil rights bill that would have granted
the Department of Housing and Urban Development (DHUD) cease and
desist authority,[3] but this provision was eliminated prior to pas-
sage of the amendment.[4] Since then both the Civil Rights Commission[5]

---

1/ H. Rept. No. 1678, 89th Congress, 2d Session (June 29, 1966).

2/ Congressional Quarterly, Inc., Congress and the Nation 1965-
1968 (Vol. II), p. 370.

3/ 114 Cong. Rec. 2270, 2271 (Feb. 6, 1968).

4/ Congress and the Nation 1965-1968, supra, at 381-82.

5/ U.S. Commission on Civil Rights, The Federal Civil Rights En-
forcement Effort--1974: To Provide...for Fair Housing (Decem-
ber, 1974), p. 347.

and the General Accounting Office [6/] have recommended that cease and desist authority be granted to DHUD, but no further Congressional action has been forthcoming.

This report summarizes the arguments that have been adduced for and against providing an administrative agency (and particularly DHUD) with cease and desist authority with respect to discrimination in housing.

## Arguments in Support of Cease and Desist Authority

(1) <u>Would make DHUD's present powers to remedy housing discrimination more credible</u>: A basic argument in support of granting DHUD cease and desist authority is that it is necessary in order to make DHUD's present powers of investigation and conciliation effective in resolving complaints of discrimination. It is asserted that conciliation is at present ineffectual because it is not supported by any credible threat of stricter enforcement. That is, respondents can ignore DHUD's conciliation efforts with impunity. Patricia Harris, Secretary of DHUD, has said:

> The lack of adequate enforcement power has been the most serious obstacle to the development of an effective fair housing program within HUD...Simply put, "conciliation" all too often has proved an inadequate means of securing compliance with the substantive provisions of title VIII. Respondents

6/ General Accounting Office, Stronger Federal Enforcement Needed To Uphold Fair Housing Laws (Feb. 2, 1978), p. 28.

> frequently ignore HUD's conciliation
> process because there is no real in-
> ducement to cooperate...(W)here the
> victim of discrimination meets with
> the HUD conciliator and with the
> respondent, and it is evident that
> the complainant is unrepresented by
> counsel, concilation often collapses.
> There is no credible threat of "con-
> sequences" should the respondent re-
> fuse to cooperate. **Fair Housing Act:**
> **Hearings before the Subcommittee on**
> **Civil and Constitutional Rights of**
> **the House Committee on the Judiciary,**
> 95th Congress, 2nd Session (1978)
> (statement of Patricia Roberts Harris,
> Secretary of DHUD), pp. 4-5.

Similarly, two independent observers have commented:

> The continuation of racially discrimina-
> tory practices in the private housing
> market is explainable in part by the in-
> effective implementation of the existing
> civil rights acts. Although HUD, under
> Title VIII, has been receiving over 2,000
> complaints each year through 1974, and
> anticipates growing numbers in future years,
> its processing of these complaints has been
> ineffectual. The U.S. Civil Rights Com-
> mission studied 1,601 complaints handled
> by HUD during a nine-month period in 1972
> and 1973. Little more than one-fifth of
> the complaints handled by HUD, 262 in all,
> went to conciliation, and just over half
> of these (one-tenth of the total) were
> conciliated successfully. HUD referred
> 387 cases to state and local agencies,
> which also reported approximately one-
> fifth going to conciliation with, how-
> ever, a near 90% successful conciliation
> rate. Approximately four-fifths of the
> sample, or 1,339 complaints, were dropped
> without any relief to the alleged injured
> persons.

650

> The Civil Rights Commission did not conclude
> that the lack of successful conciliations of
> complaints resulted from their lack of merit.
> Rather, the Commission attributes the problem
> to an understaffed agency that cannot process
> complaints with sufficient speed and, more
> importantly, to a cumbersome conciliation
> process that lacks enforcement teeth.  Since
> HUD cannot issue cease and desist orders, the
> process poses little risk to violators and
> thus the deterrent effect of Title VIII is
> inconsequential.  David Falk & Herbert M.
> Franklin, Equal Housing Opportunity:  The
> Unfinished Federal Agenda (1976), p. 60.

This lack of effectiveness in the conciliation process persists

notwithstanding that complainants can institute civil suits when

conciliation fails, it is said, because practical obstacles of time

and money frequently bar complainants from pursuing that remedy.  To

quote Secretary Harris again:

> The most significant deterrent to litigation
> remains its high cost.  Many complainants
> do not have the necessary funds to initiate
> litigation, even with the prospect of having
> attorney's fees awarded should the complain-
> ant's position prevail.  Thus, as a practical
> matter, many complainants are unable to
> utilize their right to seek a remedy through
> the courts, and therefore, must rely solely
> on the administrative process.  Fair Housing
> Act:  Hearings before..., supra, at 5.

Assistant Attorney General Drew Days has similarly commented:

> Comparatively few suits have been brought by
> "aggrieved persons," in large part because
> lawsuits may be time-consuming and expensive.
> Few victims of discrimination actually sue
> when HUD conciliation efforts fail...Fair
> Housing Act:  Hearings before..., supra
> (statement of Drew S. Days, III), p. 37.

Thus, it is argued, cease and desist authority is necessary in order to make DHUD credible in its efforts to resolve complaints of discrimination.

(2) Would provide a more expeditious remedy: An argument related to the above is that vesting DHUD with cease and desist authority would lead to quicker settlements of complaints of discrimination. The absence of any credible enforcement powers in DHUD, it is said, invites respondents to interpose delays in the conciliation process and avoid prompt settlement of just claims. Assistant Attorney General Days has commented:

> There is a tendency, in our estimation, for violators of the Housing Act to test out HUD in every instance, because there are no sanctions attached. Essentially, saying "Well, this is a wonderful way to spend time, but we know that we're not going to be bound in any way by this process," and we will go through the whole process, and at the end say, "No, we're not going to conciliate, we are not going to make any changes," and wait to be sued. So that the whole administrative process is often just a formality and period in which the ultimate resolution is delayed. Fair Housing Act: Hearings before..., supra (statement of Drew Days, III), p. 66.

(3) Would be a more effective remedy: A serious problem in the present enforcement scheme, according to some, is that the conplainant may be unable to obtain the relief most desired, i.e., the particular housing unit which he sought to purchase or rent. Delays incident to the conciliation process and the inability of an agency without cease and desist powers to freeze the status quo

652

pending the resolution of a complaint, it is said, often result in

the particular housing unit sought being sold or rented to another

before the complaint can be resolved.  The Urban League has com-

mented on this lack of an effective remedial power as follows:

> Now when the local commissions have both
> cease and desist powers and direct en-
> forcement powers, we are able to recommend
> to the family that they have a chance at
> that unit and that, if they really like
> that unit, the complaint process is a
> viable thing for them.  If not, we really
> have to recommend to the family that it
> is likely to be a long and tedious process
> and there may be some legal expenses in-
> volved and the unit itself is not likely
> to be attainable by them...In other words,
> most of the families caught in the HUD
> backlog know they are not going to get the
> unit.  Equal Opportunity in Housing:  Hear-
> ings before the Subcommittee on Civil and
> Constitutional Rights of the House Com-
> mittee on the Judiciary, 94th Congress, 2nd
> Session (1976) (testimony by Thomas Gale,
> Housing Director of the National Urban
> League), p. 97.

Similarly, the Housing Task Force of the Leadership Conference on

Civil Rights summarized the findings of a recent General Accounting

Office report on Title VIII enforcement at follows:

> Of 332 complaints reviewed by GAO for this
> report, 36 were resolved by HUD.  Of these
> 36 resolved cases, the complainant obtained
> the unit in only four instances.  Fair
> Housing Act:  Hearing before..., supra, at 305.

The Task Force concluded:

> The present law places the burden on the
> victim of discrimination, who cannot obtain
> redress through the HUD administrative
> process, and must file a time consuming

and costly civil action. In addition,
the time lapse between the conclusion
of the attempt at conciliation and the
bringing of suit often results in the
housing at issue being rented or sold.
Victims of discrimination are thus
effectively deprived of the remedy
that would come closest to making them
whole--the ability to acquire the hous-
ing that was wrongfully denied them. Id.

(4) Would lead to more housing discrimination complaints

being filed with DHUD: The absence of effective remedial powers in

DHUD for housing discrimination leads victims of discrimination, it

is said, to forego seeking any relief. More particularly, it is

suggested, apparent victims avoid filing complaints with DHUD because

of the likely futility of the process. The National Committee Against

Discrimination in Housing has testified, for instance, as follows:

The widespread discrimination in the sale
and rental of housing throughout the Nation
appears, at first glance, to be contradicted
by the relatively small number of complaints
filed with HUD, never exceeding 4,000 per
year. NCDH's close observation of the admin-
istration of fair housing laws by municipal
and State agencies, as well as in the case
of Federal fair housing law, has led us,
and others familiar with the phenomenon, to
the conclusion that effective enforcement
results in an increased volume of complaints,
while ineffective enforcement results in just
the opposite.

When the victims of discrimination who file
complaints experience repeated delays and
long drawn out and often repetitive con-
ciliation hearings which terminate with
little or no satisfaction to the complainant,
the filing of complaints is perceived by an
increasing proportion of the minority popu-
lation as an act of futility.

654

> As a consequence, even as an increasing
> number of minority persons discover the
> existence of fair housing law and its
> complaint process, a decreasing percen-
> tage of minority persons continue to
> consider the complaint process as a
> procedure likely to give them satis-
> factory redress. Fair Housing Act:
> Hearings before..., supra (testimony
> by Edward Holmgren, Executive Director,
> National Committee Against Discrimina-
> tion in Housing), pp. 140-41.

Thus, it is aruged, by granting cease and desist authority to DHUD,

the fair housing enforcement process would be more effective, and

as a consequence complainants would be more likely to pursue their

remedies.

(5) Would shift the costs of pursing a remedy to housing

discrimination from frequently poor complainants to a publicly fund-

ed agency: One of the limitations of the present enforcement process,

it is said, is that it imposes its initial costs of pursuing an

effective remedy largely on the complainant, who often is too poor

to assume the costs of instituting litigation. In other words, it

is argued, private litigation is not an effective remedy because its

initial costs impose a substantial obstacle to many potential com-

plainants. Thus, DHUD testified in 1976:

> The majority of the cases filed with our
> Department are poor people who feel they
> have been discriminated against. They
> do not secure an attorney to take their
> matter into court. The statute is in-
> adequate in that it does not make a
> provision for that. We have investi-
> gated a case; found reason to believe
> there was discrimination; we have

655

> indicated that they may take it into the
> court; then we have no authority to go
> beyond that. That is one of the weak-
> nesses. Equal Opportunity in Housing:
> Hearings before..., supra (testimony of
> James H. Blair, DHUD Assistant Secretary
> for Equal Opportunity), p. 208.

Similarly, two independent observers offered this as one justifi-

cation for extending cease and desist authority to DHUD:

> A further major benefit of having HUD
> prepare a case and make appropriate
> findings and orders is that the burden
> of time and cost normally imposed on
> the complainant in a court action is
> shifted to a governmental agency that
> has greater resources. Falk & Franklin,
> supra, at 61.

(6) Would confer on DHUD the same enforcement powers as

are already possessed by numerous other federal agencies with re-

spect to other important national rights: A further argument is

that numerous other federal agencies already possess cease and

desist powers, and thus to grant similar powers to DHUD with respect

to housing discrimination is far from unprecedented. A 1977 report

by the Congressional Research Service, for instance, identified

sixteen federal agencies as possessing cease and desist powers.[7]

In a related context, it has been argued that to deny an agency

cease and desist authority when that authority has been granted

---

7/ CRS, "Federal Administrative Authority to Issue Cease and Desist
   Orders--A Survey of Selected Statutes and Agency Procedures"
   (April, 1977), reprinted in Fair Housing Act:  Hearings before...,
   supra, at 686-717.

656

to numerous other federal agencies signals that the elimination of
discrimination is a matter of only secondary national importance:

> I would certainly feel on cease and desist
> that if the country has determined that the
> right of investors is worthy of protection
> through the cease and desist powers of the
> SEC, then certainly the right of American
> citizens, women, blacks, Spanish-surnamed,
> should be protected by the enforcement
> power of cease and desist being granted
> EEOC. Hearings on H.R. 1746, S.2515, and
> S. 2617 before the Senate Labor and Public
> Welfare Committee, 92nd Congress, 1st
> Session (Oct. 6, 1971) (statement of Rep.
> Fauntroy), p. 208.

Arguments Against Cease and Desist Authority

    .    (1)  Would violate due process by combining investigative,
prosecutorial, and judicial functions in a single agency:  One ar-
gument frequently made in opposition to granting DHUD cease and
desist authority is that by combining investigative, prosecutorial,
and judicial functions in a single agency, it violates the separa-
tion of powers doctrine and denies respondents one of the essential
attributes of due process, namely, an impartial forum for hearing
and resolving a complaint.  In opposing a floor amendment that
would have granted DHUD cease and desist authority in 1968, Sen-
ator Ervin argued, for instance:

> The Mondale amendment would make a Cabinet
> officer or his designee the enforcer of the
> law;  it would give him the power to in-
> vestigate the complaints;  it would give
> him the power to find the facts as a jury,
> and the power to act as judge and enter a
> decree.  Moreover, it would make all the

> courts in the land powerless to interfere
> with any finding of fact that he makes,
> if that finding of fact is supported by
> any testimony, no matter how contrary to
> the overwhelming mass of the testimony
> the finding of fact may be.

> The amendment would establish a procedure
> which prostitutes the judicial process,
> and is alien to any land which reveres
> the due process of law.  114 Cong. Rec.
> S3424 (Feb. 20, 1968).

In the same debate Senator Ervin elaborated on this by arguing that

such an arrangement "creates pressures for conviction which give

justice short shrift":[8/]

> It would be a denial of due process of
> law to place all these powers in a per-
> son who has a motive to rule a certain
> way.  It is undoubtedly true that the
> Secretary of Housing and Urban Develop-
> ment would have a strong motive to rule
> in favor of the persons who make the
> charges or in whose behalf the charges
> are preferred.  This is true because,
> in the first place, the Secretary is
> charged with the responsibility of
> administering the provisions of the
> amendement.  He is also charged with
> the duty of investigating the complaints
> and of holding hearings on the complaints.

> Certainly a man who is charged with the
> investigation of complaints before he
> tries a proceeding based on those com-
> plaints will reach the conclusion that
> he was right in the investigation, and
> will proceed to frame his opinion in
> harmony with the findings of the in-
> vestigation.  Any person who acts in

---

8/ Fair Housing Act:  Hearings before..., supra (statement of Na-
tional Association of Realtors), p. 173.

658

> the capacity of prosecutor should
> never be the judge; it is contrary
> to American jurisprudence. 114 <u>Cong</u>.
> Rec. S3249 (Feb. 16, 1968).

(2) <u>Would usurp a function that is within the special</u>

<u>competence of the judiciary</u>: An argument related to the above

is that the adjudicatory function that would be entrusted to an

agency granted cease and desist authority with respect to housing

discrimination does not require any special agency expertise but

is within the traditional domain of the courts. That is, an argu-

ment sometimes advanced for granting an administrative agency cease

and desist authority in other contexts is that the subject matter

is so complex that courts of general jurisdiction lack the expertise

to resolve disputes: Special agency expertise is needed. In the

area of housing discrimination, it is argued, that is not true:

> The fact of the matter is the committee has
> created another administrative agency
> charged with carrying out policy rather
> than objectively finding facts. The
> justification for any agency is that is
> has special expertise in the field. The
> special expertise necessary in this field
> is the determination of intent to dis-
> criminate. Determination of intent, how-
> ever, is the special competence of the
> judiciary. H. Rept. No. 1678, 89th
> Congress, 2nd Session (June 30, 1966)
> (minority views of Rep. Basil L. Whitener),
> p. 59.

(3) <u>Would substitute coercion for the voluntary coopera-</u>

<u>tion that is essential if fair housing is ever to be a social reality</u>:

Another argument raised in opposition to DHUD cease and desist author-

ity is that would undercut efforts to obtain voluntary compliance.

003457

Rather than enhance the credibility of the conciliation process, it

is suggested, cease and desist authority would more likely be used

as a substitute for conciliation:

> This Section (granting DHUD cease and desist
> authority)...appears to be categorical repu-
> diation of the philosophical concept of
> Affirmative Action in support of Equal Oppor-
> tunity in Housing.
>
> It substitutes a bludgeon for persuasion.
> It sanctions coercion in lieu of voluntary
> action.
>
> ...
> The National Association believes that it
> is premature for HUD to abandon its effort
> to achieve equal opportunity in housing
> through voluntary compliance. Therefore,
> the National Association believes that it
> is unwise for Congress to tempt HUD to
> abandon this effort by providing it with
> the tools of coercion afforded by Section
> 208. Fair Housing Act: Hearings before...,
> (statement of William D. North on behalf of
> the National Association of Realtors), p. 172
>
> I do not see that the authority you have
> proposed to grant to HUD is what you do
> when conciliation fails. What I see it
> as is something that you do instead of
> conciliation. Id., at 209.

The corollary to this argument is that government cannot obtain

nondiscrimination in housing by its own efforts, that the support

and cooperation of the private sector is essential, and that

government coercion is antithetical to that voluntary activity:

> ...we believe that a voluntary compliance
> program is a vital component of our total
> "Fair Housing" effort. We will never have
> fair housing if we depend only on Federal
> and State enforcement activities. The

resources will always be too few and
the task too great, We must have the
cooperation and assistance of the
private sector. <u>Equal Opportunity in
Housing: Hearings before..., supra</u>
(statement of John B. Rhinelander,
Under Secretary of Housing and Urban
Development), p. 115.

(4) <u>Would not address the excessive backlog of cases
which is the real crux of the conciliation problem</u>: It is also

argued that the shortcomings of the conciliation process stem not

from the absence of further enforcement remedies if cooperation is

not forthcoming but from DHUD's excessive backlog of cases. Cease

and desist authority would do nothing, it is suggested, to remedy

this fundamental fault:

> The fact of the matter is that to the best
> of our knowledge conciliation, to the ex-
> tent it has failed, has failed not because
> people ignore the results of the concilia-
> tion but because there is a tremendous
> backlog of conciliation problems to be
> resolved.

> In other words, all you are doing is
> shifting an existing backlog of an
> administrative agency into certain court
> backlog or from one division of HUD into
> another. I hate to see this sort of
> thing happen. If somebody ignores a
> conciliation agreement, I think there
> are many ways of taking care of that--
> very effective ways, not the least of
> which is a suit for breach of\contract.
> I would support, for example, a program
> which permitted HUD in the event of a
> breach of conciliation contract (to)
> finance the litigation required to ob-
> tain specific performance. I think
> that such a program would be vastly
> simpler, cheaper, and much more effective

administratively than what is pro-
posed here. It is not the concilia-
tion procedure which is at fault but
the fact that the backlog is so large
that justice is delayed, and justice
delayed is justice denied. <u>Fair</u>
<u>Housing Act: Hearings before...</u>,
<u>supra</u> (testimony of William D. North
on behalf of the National Association
of Realtors), p. 209-210.

(5) <u>Would accomplish little because of DHUD's fundamental</u>

<u>indifference to fair housing</u>: A final argument not against providing

·cease and desist authority to some agency in the area of housing dis-

crimination but against providing such authority to DHUD is that DHUD

has not shown the necessary commitment to make good use of such

authority:

...our views in this matter are impelled
significantly by the gross failures of
HUD. To call on HUD to work affirmatively
for equal housing opportunities is to deny
past and present history. HUD's history
of indifference to the problems of racial
and economic segregation in the develop-
ment of communities has been well docu-
mented in studies by the U.S. Commission
on Civil Rights and by the National Com-
mittee Against Discrimination in Housing.

If the nation were serious about making
affirmative action for fair housing the
policy of the nation, what could lead
us to believe that HUD was capable of
competent or desirous of achieving such
a policy and such practices. What
indications have there been in the past
years that affirmative action is the
keystone, or is a highly valued policy
of HUD. How much of the time and re-
sources of that agency are directed
toward the implementation of the command
of the 1968 legislation? <u>Fair Housing</u>
<u>Act: Hearings before...</u>, <u>supra</u>
(statement of Paul Davidoff and Mary E.
Brooks, Suburban Action Institute), p.
249.

David M. Ackerman
Legislative Attorney
American Law Division
May 4, 1979

662



# THE LIBRARY OF CONGRESS

*Congressional Research Service*

WASHINGTON, D.C.   20540

LEGAL ANALYSIS OF ISSUES RELATING TO DRAFT LEGISLATION
AMENDING THE FAIR HOUSING ACT TO PROHIBIT
DISCRIMINATION AGAINST HANDICAPPED PERSONS

BY

Kathleen S. Swendiman
Nancy Lee Jones
Legislative Attorneys
American Law Division
February 12, 1979

663



THE LIBRARY OF CONGRESS

*Congressional Research Service*

WASHINGTON, D.C.  20540

LEGAL ANALYSIS OF ISSUES RELATING TO DRAFT LEGISLATION
AMENDING THE FAIR HOUSING ACT TO PROHIBIT
DISCRIMINATION.AGAINST HANDICAPPED PERSONS


This report provides an analysis of various legal issues which

may be raised by congressional enactment of a proposed bill, which would

be entitled the Fair Housing Amendments Act of 1979. This proposed bill

would amend Title VIII of the Civil Rights Act of 1968, also known as the

Fair Housing Act, by prohibiting discrimination in the sale or rental of

housing because of the fact that a person is handicapped. "Handicapped"

is defined in section 4(b) of the draft legislation as follows:

> "Handicapped" means, with respect to a person,
> (1) a physical or mental impairment which sub-
> stantially limits one or more of such person's
> major life activities, (2) a record of such an
> impairment, or (3) being regarded as having such
> an impairment.

Section 5 of the proposed bill provides that the word "handicap" be inserted

immediately after the word "sex" each place it appears in section 804, 805

and 806 of the Fair Housing Act.  Pub. L. No. 90-284, as amended; 42 U.S.C.

§3601 et seq.

This report is divided into three sections.  The first analyzes the

power of Congress to prohibit discrimination in housing practices against

handicapped persons under the Fourteenth Amendment to the United States Con-

stitution.  The second part discusses Congress' power to prohibit such discrim-

inatory practices under the Commerce Clause of the United States Constitution.

664

And, the third part summarizes and analyzes the law with respect to de-institutionalization of handicapped persons and the doctrines of least restrictive alternative and right to treatment. These judicially en-nunciated principles tend to encourage community facilities as opposed to large institutions and thus impact upon housing and land use practices.

Fourteenth Amendment Considerations

One possible basis for enactment of a federal law prohibiting discrimination against handicapped persons in housing would be section 5 of the Fourteenth Amendment to the United States Constitution. In that section Congress is expressly granted the authority to "enforce, by appro-priate legislation" the broad guarantees of freedom contained in the due process and equal protection clauses of section 1. Congress' reasoning for enacting such a law could proceed as follows: It is a finding of fact by the Congress that various housing practices serve to exclude or discriminate against handicapped persons by creating a classification of people who are not afforded the same treatment under the law as other citizens. Such discrimination against handicapped persons denies due process and equal protection of the laws as guaranteed by the Fourteenth Amendment. A national law prohibiting discrimination in housing practices is a reasonable means for eliminating such discrimination.

Constitutional difficulties inherent in the above-reasoned use of congressional power would stem from the fact that a broad legislative prohibition against discrimination in housing practices because a person

665

is handicapped, would mandate greater protection than that presently afforded by the courts under the Fourteenth Amendment. Thus Congress' declaration that the Fourteenth Amendment does indeed afford such protection would constitute a legislative expansion of the substantive guarantees of that Amendment. Whether or not Congress has the power to do so in this case is an open question, although recent lower court rulings in the area of age discrimination point to a judicial rationale which, if accepted by the United States Supreme Court, would tend to support congressional legislation protecting handicapped persons against discrimination in housing.

The Fourteenth Amendment provides that no State shall deny to any person within its jurisdiction due process or the equal protection of the laws. U.S. CONST. amend. XIV, §1. State activity which is alleged to arbitrarily deny handicapped persons basic rights may be judicially challenged as denying due process under the Fourteenth Amendment. In areas such as right to a hearing and counsel for persons who are involuntarily committed to institutions, right to treatment, and application of the doctrine of least restrictive alternative, cases have been brought under the Due Process Clause. As summarized in the third part of this report, judicial rulings in these areas and especially in the emerging area of deinstitutionalization of handicapped persons have applied due process considerations to the rights of handicapped persons. See, for example, <u>Halderman</u> v. <u>Pennhurst</u>, 446 F. Supp. 1295 (E.D. Pa. 1977). However, these issues have been addressed

only by lower courts, and a decision by the United States Supreme Court will be necessary to define the exact scope of due process protection to be afforded handicapped persons.

State activity which treats one group of citizens differently from others similarly situated may be judicially challenged as violative of the Equal Protection Clause of the Fourteenth Amendment. However, since nearly all statutes and regulations employ classifications of one sort or another, the results of a challenge to a particular state activity will depend in large part upon the standard of a review used by the court.

The United States Supreme Court has not, to date, held "handicapped person" to constitute a "suspect class" so as to trigger the strict scrutiny standard of review of governmental classifications. [1] Thus, state actions discriminating against handicapped persons have been judicially scrutinized under the traditional standard of review, requiring simply a rational basis for the state action. Significantly, some lower courts have struck down certain state activities which were perceived to deny handicapped persons equal protection of the laws. For example, the court in Beager v. New York City Transit Authority, 399 F. Supp. 1032 (S.D.N.Y. 1975), aff'd., 558 F.2d 97 (2d Cir. 1977)

---

[1] For arguments to the effect that handicapped persons as a group should be considered a "suspect class" under the Fourteenth Amendment see Burgdorf, "A History of Unequal Treatments: the Qualifications of Handicapped Persons as a 'Suspect Class' Under the Equal Protection Clause," 15 Santa Clara Lawyer 855 (1975).

struck down a blanket exclusion from employment of former heroin addicts participating in methodone maintenance programs as violative of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. And the court in <u>Mills</u> v. <u>Board of Education of the District of Columbia</u>, 348 F. Supp. 866 (D.D.C. 1972) held that based on the Equal Protection Clause as applied to public school education the plaintiffs (handicapped children of school age in D.C.) had a constitutional right to "equal educational opportunity". <u>Id</u>. at 875. See also <u>Pennsylvania Association for Retarded Children</u> v. <u>Pennsylvania</u>, 334 F. Supp. 1257 (E.D. Pa. 1971).

Thus, while there exists a trend on the part of lower courts to strike down certain discriminatory practices as violative of due process or equal protection, judicial protection has been sporadic and limited. Likewise, the United States Supreme Court has not yet addressed the issue of the degree of protection to be afforded handicapped persons, as a class, under the Equal Protection Clause. The inclusion of handicapped persons among the groups protected by the broad provisions of Title VIII of the Civil Rights Act (which presently covers race, color, religion, sex and national origin) would constitute an expansion by the Congress of the degree of protection judicially afforded at present. The validity of such a congressional expansion of civil rights hinges upon the extent of Congress' authority to legislatively interpret the scope of the guarantees contained in section 1 of that Amendment. This power of Congress to give substantive meaning to the due process and equal protection clauses of section 1 has been the subject of several

Supreme Court decisions and much commentary. [2/]  While the scope of the

power is not clearly defined, it is at least clear that Congress in the

use of its power to "enforce, by appropriate legislation" the provisions

of section 1, has special legislative expertise in some instances to

determine whether particular state actions violate the Amendment.

The Supreme Court's holding in Katzenbach v. Morgan, 384 U.S.

641 (1966) indicated that congressional authority to legislate under

section 5 of the Fourteenth Amendment may be independent of a judicial

finding that the state's actions have denied equal protection of the

laws. In that decision the Court upheld under section 5 a congress-

ional prohibition of New York's English literacy requirements for voters

educated in Spanish-speaking schools in Puerto Rico, without finding it

necessary to decide whether, independent of the federal legislation,

the Court would have held that the literacy requirements were forbidden

by the Equal Protection Clause. Id. at 656. The Court noted that

Congress' prohibition of the denial to Spanish-speaking Puerto Ricans

of the right to vote was enacted "in the context of a general appraisal

of literacy requirements for voting, see South Carolina v. Katzenbach ,

[383 U.S. 301 (1966)], to which [Congress] brought a specially informed

---

2/ See, e.g., Dean "Title VII and Public Employees: Did Congress Exceed its
Powers?", 78 Col. L. Rev. 372 (1978); Cohen, "Congressional Power to Inter-
pret Due Process and Equal Protection," 27 Stan. L. Rev. 603 (1975); Orloski,
"The Enforcement Clauses of the Civil War Amendments: A Repository of
Legislative Power," 49 St. John's L. Rev. 493 (1975); Emerson, "Congress'
Power to Enhance the Civil War Amendments," 49 Notre Dame Lawyer 544
(1974).

legislative competence..." Id. at 655-56. Justice Brennan further
observed for the majority in the Morgan decision that:

> A construction of §5 that would require a
> judicial determination that the enforcement
> of the state law precluded by congress vio-
> lated the Amendment, as a congressional enact-
> ment would depreciate both congressional re-
> sourcefulness and congressional responsibility
> for implementing the Amendment. It would con-
> fine the legislative power in this context to
> the insignificant role of abrogating only those
> state laws that the judicial branch was pre-
> pared to adjudge unconstitutional, or of merely
> informing the judgment of the judiciary by
> particularizing the "majestic generalities"
> of §1 of the Amendment.
>
> Id. at 648-49, (footnotes
> omitted)

However, the implications of the Court's holding in Morgan are
somewhat limited by the Court's later holding in Oregon v. Mitchell,
400 U.S. 112 (1970). In that case the Court split sharply on the question
of the validity of a section of the 1970 Voting Rights Act in which Congress
lowered the voting age to eighteen in state elections. A majority,
however, agreed that such a provision could not be upheld as a proper
exercise of the Congress' power under section 5 of the Fourteenth
Amendment. Although Congress had determined that such a provision was
necessary to remedy denials of equal protection of the laws, the majority
of the Court ruled that Congress' authority to enact such remedial legis-
lation under section 5 had to yield to the constitutional principle that
the States retain the power to regulate their own local elections.

Justices Stewart, Burger and Blackmun distinguished the Court's

prior holding in <u>Morgan</u>:

> But it is necessary to go much further [than the
> Court did in <u>Morgan</u>] to sustain §302. The state
> laws that it invalidates do not invidiously dis-
> criminate against any discrete and insular mi-
> nority. Unlike the statute considered in <u>Morgan</u>
> §302 is valid only if Congress has the power not
> only to provide the means of eradicating situations
> that amount to a violation of the Equal Protection
> Clause, but also to determine as a matter of sub-
> stantive constitutional law what situations fall
> within the ambit of the clause, and what state
> interests are "compelling,". <u>3</u>/

Thus while the Court may defer to findings of fact by Congress as

to whether a particular kind of discrimination exists, it will not neces-

sarily accept a congressional decision which legislatively defines the scope

of substantive protections afforded by the Fourteenth Amendment.

One of the most recent decisions of the Supreme Court concern-

ing Congress' authority under section 5 is that of <u>Fitzpatrick</u> v. <u>Bitzer,</u>

427 U.S. 445 (1976). The Court in that case held that the Eleventh

Amendment does not bar a back pay award against a state agency under

Title VII of the Civil Rights Act of 1964 since the Eleventh Amendment,

and the principle of state sovereignty that it embodies, is limited by

the enforcement provisions of section 5 of the Fourteenth Amendment.

---

<u>3</u>/ <u>Id</u>. at 296. See also Justice Harlan's opinions which stated that
Congress should not have the final say on matters of substantive
constitutional interpretation. <u>Id</u>. at 204-09.

671

Justice Rehnquist writing for the Court states:

> ... In that section [section 5] Congress is
> expressly granted authority to enforce "by
> appropriate legislation" the substantive
> provisions of the Fourteenth Amendment, which
> themselves embody significant limitations on
> state authority. When Congress acts pur-
> suant to §5, not only is it exercising
> legislative authority that is plenary within
> the terms of the constitutional grant, it is
> exercising that authority under one section
> of a constitutional Amendment whose other
> sections by their own terms embody limitations
> on state authority. We think that Congress
> may, in determining what is "appropriate legis-
> lation" for the purpose of enforcing the pro-
> visions of the Fourteenth Amendment, provide
> for private suits against States or state
> officials which are constitutionally imper-
> missible in other contexts. Id. at 456.

In other, recent lower court decisions, extension of the Age Dis-
crimination in Employment Act (ADEA) to state and local government
employees has been upheld as a proper exercise of Congress' power under
section 5 of the Fourteenth Amendment. See Arritt v. Grisell 17 FEP Cases
753 (4th Cir. 1977); Aaron v. Davis, 424 F. Supp. 1238 (Z.D. Ark. 1976);
Usury v. Board of Education of Salt Lake City, 13 FEP Cases 717 (D. Utah
1976); and Remmick v. Barres County, 46 U.S.L.W. 2130 (D.N.D. 1977). While
the United States Supreme Court has not addressed this issue, it is at
least noteworthy that several lower courts have found the ADEA's appli-
cation to States and their political subdivisions to be a constitutional
exercise of congressional enforcement authority under section 5 of the
Fourteenth Amendment. This conclusion has been reached by the lower
courts despite the fact that in Massachusetts Board of Retirement v.

Murgia, 427 U.S. 307 (1976), the United States Supreme Court did not hold
"age" to be a suspect class for purposes of equal protection analysis.
Thus, the provisions of the ADEA as applied to state and local governments
may constitute a congressional expansion of the protection presently afforded
age by judicial interpretation of the Fourteenth Amendment.

Also significant as precedent relating to the issue at hand is
the fact that in 1974 Congress added "sex" to the protected groups under
Title VIII of the Civil Rights Act. Pub. L. No. 93-383. Here again a
violation of the sex discrimination provisions of Title VIII do not in
each instance constitute a judicially recognized violation of the
Fourteenth Amendment. It does not appear that this particular legislative
expansion of the substantive guarantees of the Fourteenth Amendment has
been judicially challenged.

In summary, it is difficult to say what exactly is the scope
of Congress' power to enforce the Fourteenth Amendment. Some elements
of this power are reasonably clear. That is, Congress has the power to
provide civil and criminal remedies for judicially determined violations
of section 1 of the Amendment. And, Congress is authorized to prohibit
any act or practice, even though that act or practice is itself con-
sistent with the Fourteenth Amendment, if its prohibition is a means of
effectuating the substantive guarantees of the Amendment itself.
Similarly, instead of prohibiting Congress may require something which
it otherwise could not require, so long as it does so as a means to
implement the substantive provisions of the Amendment. D. Engdahl,

Constitutional Power - Federal and State (1974), 241.  See Katzenbach
v. Morgan, 384 U.S. 641, 650-653 (1960).

However, what is less clear is to what extent the High Court
would sanction a congressional finding which expands the substantive
protections afforded by the Fourteenth Amendment.  It may at least be
said that the Court has previously, and shows no sign of falling back,
accepted congressional determinations of constitutional questions
different from the resolution the Court itself had or would reach.  Thus,
the question which remains is not whether Congress' power in this area
exists, but rather to what degree that power may be exercised.  It is
suggested in this regard that if "handicap" is added to the protected
classes of the Fair Housing Act that such an addition be accompanied by
clear and strong legislative findings as to the need, in the judgment of
Congress, for such legislation.

Commerce Clause Considerations

Another possible jurisdictional basis for federal legislation
prohibiting discrimination in housing because a person is handicapped
may be found in Article I, Section 8, Clause 3 of the United States
Constitution, which grants Congress the power "to regulate commerce with
foreign Nations, and among the several States, and with the Indian
Tribes." [4]

---

[4] It is noted that the "open housing" provision of the 1968 Civil
Rights Act, Title VIII, 42 U.S.C. §3601, was based on the commerce
clause, but in Jones v. Alfred H. Mayer Co., 392 U.S. 409 (1968),
the Court held that the antisdiscrimination-in-housing legislation
could be based on the Thirteenth Amendment and made operative
against private parties.

The power of Congress to regulate interstate commerce is undeniably broad. In Gibbons v. Ogden, 9 Wheat. (22 U.S.) 1 (1924), Chief Justice Marshall wrote, "What is this power? It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution." Id. at 196. The commerce clause has been held to apply to three main categories of problems: (1) the use of channels of interstate or foreign commerce which Congress feels are being misused; (2) the protection of the instrumentalities of interstate commerce; and, (3) those activities affecting commerce. Perez v. United States, 402 U.S. 146 (1971). Of particular interest to the subject matter of this report is the use of the commerce clause in the area of civil rights. In such cases Congress has found instances of discrimination to have an adverse impact upon interstate commerce. For example, Congress relied on its power to regulate interstate commerce when it enacted a provision of the Civil Rights Act of 1964 prohibiting racial discrimination in places of public accommodation. Hotels and motels were declared covered, that is, declared to "affect commerce", if they provided lodging to transient guests. [5] This provision was upheld by the Supreme Court in Heart of Atlanta Motel, Inc. v. United States,

---

[5] Civil Rights Act of 1964, 42 U.S.C. 2000a et seq. See Hearings Before the Senate Committee on Commerce on S. 1732, 88th Cong., 1st Sess., part 1 & 2 (1963).

675

379 U.S. 241 (1964) as a proper exercise of the Commerce power. The Court outlined the scope of the inquiry which could be made into such findings by the judiciary: "The commerce power invoked here by the Congress is a specific and plenary one authorized by the Constitution itself. The only questions are (1) whether Congress had a rational basis for finding that racial discrimination by motels affected commerce and (2) if it had such a basis, whether the means it selected to eliminate that evil are reasonable and appropriate." Id. at 258 (emphasis supplied). And, the fact that Congress was also legislating against moral wrongs did not render the enactment less valid. "In framing Title II of this Act Congress was also dealing with what it considered a moral problem. But that fact does not detract from the overwhelming evidence of the disruptive effect that racial discrimination has had on commercial intercourse." Id. at 257. The evidence supported Congress' con- clusion that racial discrimination impeded interstate travel by more than 20 million black citizens, which was an impairment Congress could properly legislate to remove. Id. at 252-53.

    In Katzenbach v. McClung, 379 U.S. 294 (1964), the same Act was upheld as it related to restaurants. The Court in that case recognized that, viewed as an isolated instance, the effect on interstate commerce of a single restaurant was insignificant. However, when such activity occurs on a nationwide scale, its cumulative impact is great and there- fore it becomes unnecessary to prove that a single instance had an effect by itself.

Discrimination against the handicapped as prohibited by the proposed Fair Housing Amendments of 1979 (draft legislation) would in all probability have some effect upon interstate commerce, especially in view of the mobility of persons in this country. Persons are constantly moving to and from States and most families live in several different localities during their lifetimes. State and local land use and housing controls which discriminate against handicapped persons keep such persons from living in particular areas or cause them to reside in discrete, undesirable areas thus obstructing the flow of housing materials as well as persons across state lines. Specific acts of such discrimination, when magnified to a general trend, affect commercial dealings, practices and opportunities in interstate commerce.

Once it has been determined that Congress has a rational basis for finding an effect on commerce by the concerned activity, and in this case it appears that such an effect may exist, it is then necessary to examine the limits of congressional power to regulate such activity. In other words, the means selected to eliminate the evil must be determined to be reasonable and appropriate. On this point the Supreme Court in Heart of Atlanta Motel, supra at 261-62, stated:

> It may be argued that Congress could have
> pursued other methods to eliminate the
> obstructions it found in interstate com-
> merce caused by racial discrimination.
> But this is a matter of policy that rests
> entirely with the Congress not with the

> Courts. How obstructions in commerce may
> be removed -- what means are to be employ-
> ed -- is within the sound and exclusive
> discretion of Congress. It is subject to
> only one cavet -- that the means chosen by
> it must be reasonably adapted to the end
> permitted by the Constitution. We cannot
> say that its choice here was not so adapted.

While one cannot necessarily say that the Supreme Court

will find a congressional enactment prohibiting discrimination

against handicapped persons in housing a reasonable exercise of its

commerce power, an observation may be made concerning the possibility

of such a finding. That is, a conclusion by the Supreme Court that a

particular exercise of the commerce power is both "reasonable" and

"apppropriate" will more likely be reached if it can be demonstrated

that prior efforts to deal with the problem have been ineffective. The

extent of the problem of providing handicapped persons with housing, and

the lack of responsiveness of state and local land use practices to the

need for residential housing for handicapped persons in community settings

is documented.[6]   Judicial efforts have been fairly extensive but successes

have been qualified, and even where rulings have been obtained favorable

to handicapped persons, they are of a limited geographical applicability.

Thus, arguments can certainly be advanced to the effect that legislation

on a national scale would be a reasonable means for combatting

------

6/ National Center for the Law and Handicapped, "Disabled Citizens in
   the Community: Zoning Obstacles and Legal Remedies," 3 Amicus 30
   (March/April 1978); Hong, "Exclusion of the Mentally Handicapped:
   Housing the Non-Traditional Family," 7 v. Cal. Davis L.Rev. 150
   (1974).

such a problem, one not being effectively dealt with on the state, local or judicial levels.

Since prohibiting discrimination against handicapped persons under Title VIII of the Civil Rights Act would also reach instrumentalities of state and local governments, an analysis of the effect, if any, of the Supreme Court's decision in National League of Cities v. Usury, 47 L. Ed. 2d 245 (1976) is appropriate This decision constitutes the first major limitation enunciated by the High Court in forty years upon Congress' power to regulate interstate commerce.[6] It squarely overruled the Court's previous, widely cited, holding in Maryland v. Wirtz, 392 U.S. 183 (1968), which had upheld the extension of the Fair Labor Standards Act to employees of state hospitals, schools and other institutions. Justice Rehnquist, writing for the majority in the 5-4 decision, held unconstitutional those provisions of the 1966 and 1974 amendments to the Fair Labor Standards Act that had brought certain employees of state and local governmental entities under coverage of the Act. The fact that Congress was attempting to regulate a state activity was held to impose a limitation on its power under the Commerce Clause. A State is considered to have a separate and

---

[6] Since 1937 the Supreme Court has not held unconstitutional a federal statute regulating private activity on the ground that it exceeded the limits set by the Commerce Clause, although in so     indi-
vidual justices would have held otherwise. See, eg., Justice Stewart in Perez v. United States 402 U.S. 146 (1971).

679

independent existence under the federalist structure of our nation,
and it possesses a constitutional right to protect that existence
from unduly intrusive federal regulations. Congress may not displace
the freedom of the States to structure their own operations, particul-
arly in traditional areas of state governmental concerns, such as
education, medical care and police and fire protection. As Justice
Rehnquist stated, "...We have repeatedly recognized that there are
attributes of sovereignty attaching to every state government which
may not be impaired by Congress, not because Congress may lack an
affirmative grant of legislative authority to reach the matter, but
because the Constitution prohibits it from exercising the authority
in that manner." Id. at 253. To permit the kind of regulation attempt-
ed in the Fair Labor Standards Act Amendments, said the Court, would en-
danger and perhaps impair the separate and independent existence of the
States as States.

Under this view it is not enough to determine whether the con-
gressional regulation of a particular state activity affects interstate
commerce. One must then go on to determine whether such a regulation
interferes unduly with the traditional and integral functions which a
State performs in its sovereign capacity. If the federal regulation,
though valid in other respects, nevertheless intrudes into state leg-
islative processes, it may be struck down.

However, one may find a limiting aspect to the implications
of the Court's holding in National League of Cities in the division of

680

the Court. In the majority of five the deciding vote was cast by Justice Blackmun, who in his concurring opinion, said that he was "not untroubled by certain possible implications of the Court's opinion." _Id._ at 260.

Justice Blackmun interprets the majority's holding as a kind of "balancing approach." _Ibid._ He envisions a case-by-case balancing of interests whenever the Congress' power under the Commerce Clause conflicts with state sovereignty. For instance he indicates that the majority decision would not necessarily "outlaw federal power in areas such as environmental protection where the federal interest is demonstrably greater and where state facility compliance with imposed federal standards would be essential." _Ibid._ This uncertainty as to exactly where the line between permissible and impermissible regulation may be drawn limits to some extent the scope of the case's holding. [8/]

While the possibility of undue federal intrusion into state functions under the holding of _National League of Cities_ must be considered in any analysis of a direct federal regulation of state activities, it is conceivable in this case that adding "handicap" to the provisions of the Fair Housing Act may constitute permissible federal commerce clause regulation. Two distinguishing features of this proposed legislation are noted. First of all, under Justice Blackmun's balancing approach, the

---

[8/]  It is noted that at least one district court has held that the extension of the ADEA to state and local government employees was a valid exercise of Congress' power under the Commerce Clause, utilizing Justice Blackmun's "balancing approach" from _National League of Cities_ . _Usery_ v. _Board of Education_ of _Salt Lake City_, 13 FEP Cases 717, 718 (1976).

interest of the Federal Government in the area of eliminating discrimi-
nation against handicapped persons in housing may out-weigh state zoning or
fiscal interests. And, secondly, the kind of activity to be regulated,
while traditionally state and local in scope, is not activity directly
related to the sovereign status of the States themselves, but rather
concerns private economic enterprises in the area of housing and land use
development. Under this rationale the proposed legislation analyzed herein
may constitute a reasonable exercise of the power of Congress to regulate
commerce among the States.

682

Legal Theories and Cases Encouraging Deinstitutionalization

The traditional approach to services for many handicapped persons, such as the mentally retarded, has been to put them into large institutions; however, this practice has been strongly challenged in recent years. As one commentator has observed: "(t)oday...with the dramatic change in the legal, philosophical and political views of the rights of handicapped persons, it is widely felt that the institutional setting does not provide the optimal services for the mentally retarded and other handicapped individuals."[9] Community or group homes have been seen by many people as the most beneficial method for caring for handicapped persons who need certain specialized assistance. Difficulties are also presented by this approach -- the main difficulty being that many of these alternative living arrangements are often simply not available due to various problems such as restrictive zoning ordinances. Despite these difficulties, the movement for dealing with handicapped persons outside of institutions, which is often referred to as deinstitutionalization or mainstreaming, has gained impetus from both Federal statutes and court decisions.

I. Federal Statutes Involving Deinstitutionalization

The Mental Retardation Facilities and Community Mental Health Center Construction Act of 1963, P.L. 88-164 as amended, is perhaps the major federal statute which encourages deinstitutionalization. This act provides

---

[9] "Disabled Citizens in the Community: Zoning Obstacles and Legal Remedies", 3 Amicus 30 (March/April 1978).

003481

683

in part for grant programs for developing community facilities for the mentally disabled. The House Report, H. Rep. No. 88-694, 88th Cong., 1st Sess. (1963), discussed the necessity for this action and stated:

> The evidence seems clear. Either we must develop the quantity and quality of community services which will ultimately replace these institutions or we will have to undertake a massive program to strengthen the state mental hospitals. The committee believes that the development of new methods of treatment, the impressive evidence of the possibilities for rehabilitating the mentally ill, and a lessening of our disposition to reject and isolate the sufferers, all argue strongly for the treatment of mental illness in the community. 10/

The Developmentally Disabled Assistance and Bill of Rights Act also contains provisions encouraging deinstitutionalization. This Act provides for financial assistance to the States and requires that any State which desires to receive these Federal funds must have a State plan approved by the Secretary of Health, Education and Welfare. This State plan must contain a plan "...designed (A) to eliminate inappropriate placement in institutions of persons with developmental disabilities, and (B) to improve the quality of care and the state of surroundings of persons for whom institutional care is appropriate." 11/ Furthermore, the State plan must

> ...support the establishment of community programs as alternatives to institutionalization and support such programs which are designed to provide services for the

---

10/ H. Rep. No. 88-694, 88th Cong., 1st Sess. (1963), reprinted in 1 U.S. Code Congressional and Administrative News 1054, 1965 (1963).

11/ 42 U.S.C. §6063(b)(20).

684

> care and habilitation of persons with developmental
> disabilities, and which utilize, to the maximum ex-
> tent feasible, the resources and personnel in related
> community programs to assure full coordination with
> such programs and to assure the provision of appro-
> priate supplemental health, educational, or social
> services for persons with developmental disabilities... 12/

In addition to these acts, other Federal programs may also serve
to encourage deinstitutionalization. As a General Accounting Office report
on community facilities for the mentally disabled stated: "...Federal programs,
such as Medicaid, Supplemental Security Income (SSI), Vocational Rehabilitation,
and Developmental Disabilities, have been initiated or changed to make it pos-
sible for more mentally disabled persons to live and be treated in their com-
munities." 13/

II. Court Cases Involving Deinstitutionalization

The area of constitutional rights and protections for mentally
disabled and other persons who are involuntarily committed to institutions
has received a great deal of attention from courts in recent years. Numerous
issues have been involved in these cases including questions concerning pro-
cedural safeguards such as rights to a hearing and counsel, the right to

---

12/ 42 U.S.C. §6063(b)(23).

13/ Report to the Congress by the Comptroller General of the United States,
"Returning the Mentally Disabled to the Community: Government Needs to
Do More", 3 (January 7, 1977). It should also be noted that one case
has interpreted §504 of the Rehabilitation Act of 1973 which prohibits
discrimination based on handicap in programs or activities receiving
Federal financial assistance to prohibit the "..segregation of the re-
tarded in an isolated institution." Halderman v. Pennhurst State School
and Hospital, 446 F. Supp. 1295, 1323-1324 (1974).

treatment when a person is committed to an institution and the right to the
least restrictive alternative. The issues which are the most relevant to
deinstitutionalization are those concerning the right to treatment and the
right to the least restrictive alternative. First, the caselaw discussing
the least restrictive alternative will be analyzed and this will be followed
by a similar analysis of the cases discussing the right to treatment or
habilitation. After this analysis, there will be a discussion of <u>Halderman</u>
v. <u>Pennhurst</u>, 446 F. Supp. 1295 (E.D. Pa. 1977), where a U.S. district court
used the least restrictive alternative and right to treatment theories to
order community living arrangements for all the institutionalized persons in
a Pennsylvania institution.

A.  The Least Restrictive Alternative

The Supreme Court first enunciated the doctrine of the least
restrictive alternative in <u>Shelton</u> v. <u>Tucker</u>, 364 U.S. 479 (1960), which held
an Arkansas law unconstitutional in part because "less drastic means to
achieving the same basic purpose were available". Although <u>Shelton</u> dealt
with the first amendment rights of teachers and not institutional commit-
ments, its formulation of the least restrictive alternative argument has been
applied by some courts to the civil commitment process. In addition some state
statutes authorize or compel their courts to use alternatives to commitment
in certain cases. [14]

---

14/ One commentator has stated that seventeen jurisdictions have statutes
"resembling least restrictive alternative mandates." These jurisdictions

686

One of the first cases which discussed the general constitutional issues of the least restrictive alternative principle in relation to civil commitment was <u>Lynch</u> v. <u>Baxley</u>, 386 F. Supp. 378 (M.D.Ala. 1974). The district court held in <u>Lynch</u> that commitment proceedings must comply with certain minimum standards including that the proposed commitment is the least restrictive alternative necessary and available for the person's illness and that the state shall have the burden of demonstrating that the commitment is the least restrictive alternative. The court further noted that

> ...due process does not preclude, and indeed
> may require, commitment of a person suffering
> from a mental illness to an environment other
> than full-time confinement in Bryce or Searcy
> Hospital. At 392.

Other courts have been more explicit regarding the requirements of due process. The court in <u>Welsch</u> v. <u>Likins</u>, 373 F. Supp. 487 (D. Minn. 1977), discussed other cases concerning the principle of the least restrictive alternative and found that they demonstrated "...the widespread acceptance by the courts of a constitutional duty on the part of State officials to explore the least stringent practicable alternatives to confinement of noncriminals" At 502. More specifically the court stated:

---

Footnote <u>14</u>/ cont'd

are California, Colorado, Connecticut, District of Columbia, Idaho, Illinois, Kansas, Massachusetts, Missouri, Nevada, New Mexico, New York, North Carolina, North Dakota, Ohio, Pennsylvania and West Virginia. P. Hoffman and L. Foust, "Least Restrictive Treatment of the Mentally Ill: A Doctrine in Search of Its Sense", 14 San Diego L. Rev. 1100, 1112 (1977).

> (t)he due process clause does no more than require
> that State officials charged with obligations for
> the care and custody of civilly committed persons
> make good faith attempts to place such persons in
> settings that will be suitable and appropriate to
> their mental and physical conditions while least
> restrictive of their liberties. At 502.

Similarly, in Stamus v. Leonhardt, 414 F. Supp. 439 (S.D. Iowa (1976), and Eu-

banks v. Clarke, 434 F. Supp. 1022 (E.D.Pa. 1977), district courts held that

due process required consideration of the least restrictive alternative.[15/]

The court in Eubanks specifically rejected the argument of the state authorities

that the plaintiff had no constitutional right to be institutionalized in the

setting which least intrudes on his rights and liberties and stated:

> Fundamental rights are implicated where the state
> civilly commits an incompetent person to a mental
> hospital which is substantially more restrictive
> than other state mental hospitals to which one
> could be sent.
> ....We hold that, at a minimum, where a state has
> varying available facilities for the mentally ill
> which differ significantly in the amount of re-
> strictions on the rights and liberties of the
> patients, due process requires that the state place
> individuals in the least restrictive setting con-
> sistent with legitimate safety, care and treatment
> objectives. At 1027-1028.

> J.L. v. Parham, 412 F. Supp. 112 (M.D. Ga 1976), prob. jur. noted

431 U.S. 396 (1977), similarly held in part that children who had been commit-

ted to state mental hospitals could be cared for in a less drastic environment

---

15/ The Hawaii district court also stated in dicta that procedural due process
requires the consideration of less restrictive alternatives. Suzuki v.
Quisenberry, 411 F. Supp. 113 (D. Hawaii 1976).

688

and this must occur as soon as possible. The district court quoted language from Jackson v. Indiana, 406 U.S. 716, 738 (1972), stating: "at the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." The court specifically provided that:

> It is not for this court of three lay judges to choose the appropriate, less drastic form of care for each of these children; that decision we leave to the professional judgment of the defendant psychiatrists. It is, however, for this court to order the defendants to proceed as expeditiously as is reasonably possible (1) to provide necessary physical resources and personnel for whatever non-hospital facilities are deemed by them to be most appropriate for these children, and (2) to place these children in such non-hospital facilities as soon as reasonably appropriate. At 139.

J.L. v. Parham may well be of crucial importance to the legal development of the least restrictive alternative doctrine if the Superme Court decides the case on the merits. One of the questions which has been presented to the Supreme Court in Parham is "Assuming that more than one treatment setting would benefit mentally ill persons under eighteen years of age, does (the) Fourteenth Amendment mandate that a state must, if it is to provide services at all, provide (the) needed mental health services in the most optimally appropriate treatment settings commensurate with the minor's condition." 45 U.S.L.W. 3063 (July 27, 1976). Although a decision was expected in the 1977-1978 Supreme Court term, the case was scheduled for reargument in the 1978-1979 term and was argued on October 10, 1978. No decision has been handed down as of the first week of February 1979.

However, despite the line of cases holding that the least re-
strictive alternative doctrine is applicable to civil commitment, there is some
uncertainty regarding its application. In State v. Sanchez, 457 P. 2d 370
(1969), the New Mexico Supreme Court held that the State did not need to consid-
er less drastic alternatives to commitment. This case went to the U.S. Supreme
Court and was dismissed for want of a substantial Federal question.[16] Al-
though technically this dismissal constitutes a decision on the merits, its
value as precedent has been questioned.[17]

    B. The Right to Treatment

The term "right to treatment" has as its rationale that when the
reason for committing an individual to an institution is the individual's need
for treatment, then treatment must be provided. Some State statutes specifical-
ly provide that treatment is the rationale for commitment and arguments for
a right to treatment could be based on these statutes.[18] However, it has
also been suggested by some courts and commentators that the right to treatment
has a constitutional basis.

---

16/ State v. Sanchez, 396 U.S. 276 (1970).

17/ See Note, "Civil Commitment of the Mentally Ill" 87 Harvard L. Rev. 1190,
1247-1248 (1974); Welsch v. Likins, 373 F. Supp. 487 (D.Minn. 1974), Hal-
derman v. Pennhurst, 446 F. Supp. 1295 (E.D.Pa. 1977). But see Patton v.
Dumpson, 425 F. Supp. 621 (S.D.N.Y. 1977) which held that there was no
right to the least restrictive alternative in civil commitment and cited
State v. Sanchez.

18/ See Comment, "Development in the Law -- Civil Commitment of the Mentally
Ill", 87 Harvard L. Rev. 1190, 1319-1323 (1974).

Wyatt v. Stickney,[19] a class action by the guardians of patients
at Bryce Hospital in Alabama, was the first case to specifically hold that the
failure to provide adequate treatment to an institutionalized person is a vio-
lation of due process. The district court determined that the treatment pro-
vided residents at Bryce Hospital was constitutionally inadequate and stated:

> The patients at Bryce Hospital were involuntarily
> committed through noncriminal procedures and without
> the constitutional protections that are afforded de-
> fendants in criminal proceedings. When patients are
> so committed for treatment purposes they unquestion-
> ably have a constitutional right to receive such
> individual treatment as will give each of them a
> realistic opportunity to be cured or to improve his
> or her mental condition. (at 784).

In addition, the court observed

> The purpose of involuntary hospitalization for treat-
> ment is treatment and not mere custodial care or
> punishment. This is the only justification, from a
> constitutional standpoint, that allows civil commit-
> ments to mental institutions such as Bryce.... To
> deprive any citizen of his or her liberty upon the
> altruistic theory that the confinement is for humane
> therapeutic reasons and then fail to provide adequate
> treatment violates the very fundamentals of due process.
> (at 784-785). [20]

---

[19] 325 F. Supp. 781 (M.D. Ala. 1971), hearing on standards ordered, 334 F.
Supp. 1341 (M.D. Ala. 1971), enforced, 344 F. Supp. 373 (M.D. Ala. 1972),
aff'd sub. nom. Wyatt v. Aderholt, 503 F. 2d 1305 (5th Cir. 1974).

[20] For a more detailed discussion of the right to treatment including com-
ments on the implications this theory raises, see A. Stone, Mental Health
and Law: A System in Transition 83-96 (National Institute of Mental Health
1975).

691

The right to treatment issue was presented to the Supreme Court
in O'Connor v. Donaldson, 422 U.S. 563 (1975), where the Court held that a
State "... cannot constitutionally confine, without more, a nondangerous
individual who is capable of surviving safely in freedom ..." However, the
Court's majority did not hold that there was a right to treatment and stated

> ....there is no reason now to decide whether mentally
> ill persons dangerous to themselves or to others have
> a right to treatment upon compulsory confinement by
> the State, or whether the State may compulsorily con-
> fine a nondangerous, mentally ill individual for the
> purpose of treatment. At 573.

The concurring opinion of Chief Justice Burger discussed the issue
of the right to treatment in more detail and concluded that

> ...I cannot accept the reasoning of the Court of Appeals
> and can discern no basis for equating an involuntarily
> committed mental patient's unquestioned constitutional
> right not to be confined without due process of law with
> a constitutional right to treatment. Given the present
> state of medical knowledge regarding abnormal human be-
> havior and its treatment, few things would be more
> fraught with peril than to irrevocably condition a state's
> power to protect the mentally ill upon the providing of
> "such treatment as will give (them) a realistic opport-
> unity to be cured." At 588-589. 21/

---

21/ Other cases have held that there is a right to treatment for individuals
confined in nonpenal institutions. See Welsch v. Likins, 373 F. Supp.
487 (D. Minn. 1974), aff'd 550 F.2d 422 (8th Cir. 1977); Nelson v. Heyne,
355 F. Supp. 451 (N.D. Ind. 1972), aff'd 491 F.2d 352 (7th Cir. 1974),
cert denied, 417 U.S. 976 (1976); Inmates of Boys Training School v.
Affleck, 346 F. Supp. 1354 (D.R.I. 1972); Davy v. Sullivan, 354 F. Supp.
1320 (1st Cir. 1973). It should be noted that the positing of a constitu-
tional right to treatment or rehabilitation raises other constitutional
issues, mainly whether the state can constitutionally require that a per-
son accept such treatment or rehabilitation. Several courts have found

003490

C. Halderman v. Pennhurst

The general theories of the right to treatment and the right to
the least restrictive alternative both tend to encourage deinstitutionalization.
However, in Halderman v. Pennhurst, 446 F. Supp. 1295 (E.D. Pa. 1977), the Penn-
sylvania district court went further than either of these theories have gone
and in effect ordered the closing of a state institution after finding that the
constitutional rights of the inmates could not be met in such an institution.
Due to the far-reaching implications of the Pennhurst decision, this case will
be described in some detail.

In its decision the district court in Pennhurst first discussed
the general history of treatment of the mentally retarded and then discussed
the factual situation at Pennhurst, a State run institution for the mentally
retarded in Pennsylvania. The court stated that Pennhurst "...is typical of
large residential state institutions for the retarded." At 1303. The court
further described Pennhurst as "...almost totally impersonal...", as being
understaffed and lacking the facilities and programs for the habilitation of
of the retarded. In addition the court found that restraints, both physical

---

Footnote 21/ cont'd

certain limited rights for institutionalized persons to refuse treatment.
See Winters v. Miller, 446 F.2d 65 (2d Cir. 1971); Kaimowitz v. Michigan
Department of Mental Health, Civil Action No. 73-19434-AW (Cir. Ct. Wayne
County, Mich. 1973). A copy of Kaimowitz may be found in Staff of the
Subcommittee on Constitutional Rights of the Senate Committee on the Judi-
ciary, 93d Cong., 2d Sess., Individual Rights and the Federal Role in
Behavior Modification 510 (Comm. Print 1974).

693

and chemical, have been used "...as control measures in lieu of adequate staffing" and also found that "(t)he physical environment at Pennhurst is hazardous to the residents, both physically and psychologically." Finally, the court discussed the alternatives which were available to mentally retarded persons in the area.

In its discussion of the merits of the case the court used the term "habilitation" frequently. This term was defined in the case as "...the term of art used to refer to that education, training and care required by retarded individuals to reach their maximum development." At 1298. The court first found that there was a constitutional right to minimally adequate habilitation and that the due process rights of the plaintiffs were violated by a failure to provide this habilitation. This holding was arrived at after a discussion of cases such as O'Connor v. Donaldson and others which have more strongly supported the right to treatment. The court specifically stated:

> We hold that when a state involuntarily commits re-
> tarded persons, it must provide them with such habili-
> tation as will afford them a reasonable opportunity to
> acquire and maintain those life skills necessary to
> cope as effectively as their capacities permits...On
> the basis of the evidence presented in these proceed-
> ings, we find that the retarded residents of Pennhurst
> have not received, and are not receiving, minimally
> adequate habilitation. Furthermore, on the basis of
> this record we find that minimally adequate habilitation
> cannot be provided in an institution such as Pennhurst.
> At 1318.

The court further noted that this holding was not only limited to those individuals who have been involuntarily committed to Pennhurst but also included persons who have been voluntarily admitted.

003492

694

The next issue the court discussed was that of the least re-
strictive alternative. The court held that "(o)nce admitted to a state facil-
ity, the residents have a constitutional right to be provided with minimally
adequate habilitation under the least restrictive conditions consistent with
the purpose of the commitment." At 1319. After stating this holding, it was
observed that "(t)he Commonwealth and its subdivisions have a constitutional
duty to explore and provide the least stringent practicable alternatives to
confinement of retarded individuals at Pennhurst" and that this duty had not
been fullfilled. At 1320.

The Pennhurst decision also found that there was a constitutional
right for persons who have been committed to State institutions to be free
from harm and that there was a constitutional right for such persons to "non-
discriminatory habilitation." In arriving at this non-discriminatory habili-
tation right the court relied upon the decision in Pennsylvania Association
for Retarded Children (PARC) v. Pennsylvania, 343 F. Supp. 279 (E.D. Pa. 1972),
and applied the equal protection principles enunciated there. The Pennhurst
court specifically held that the retarded persons at Pennhurst were being
denied their equal protection rights and further cited with approval the state-
ment that the theory presented by the PARC decision "...should mean that any
state program that segregates mentally retarded citizens as such from others
is highly suspect and that courts will require states to treat mentally re-
tarded persons indistinguishably from others, except in ways that are both
very limited and very clearly beneficial to the individual." At 1321.

003493

695

Due to its far-reaching implications, the <u>Pennhurst</u> decision has
attracted much attention and one commentator has noted that "(t)he decision
has been greeted with approval, condemnation and fear."[22] Although the deci-
sion in <u>Pennhurst</u> drew upon principles enunciated in other cases, it elaborated
and expanded upon these principles and was the first case to specifically find
that constitutional requirements could not be met in an institution like Penn-
hurst State School and Hospital.

The effect of this decision in <u>Pennhurst</u> is uncertain, particu-
lar in light of the fact that an appeal has been taken to the 3rd Circuit Court
of Appeals. However, the opinion raises questions concerning the future of
large institutions and the future of the type of community systems proposed by
<u>Pennhurst</u>.[23] Even if large institutions are found to be violative of due pro-
cess and equal protection, there is still a problem of what alternatives are
available in the community. A General Accounting Office Report has determined
that although the care and treatment of mentally disabled persons in communi-
ties can be an effective alternative to institutional care, many mentally dis-
abled persons have been released from institutions before there were sufficient
community facilities available. The report also noted that federal agencies

---

22/ D. Ferleger, "The Future of Institutions for Retarded Citizens", <u>Mental</u>
<u>Retardation and the Law</u> 28 (DHEW July 1978).

23/ For a more detailed discussion of the implications of <u>Pennhurst</u> see D.
Ferleger, "The Future of Institutions for Retarded Citizens", <u>Mental</u>
<u>Retardation and the Law</u> 28 DHEW July 1978).

696

that can aid deinstitutionalization have not yet developed comprehensive plans for management systems. [24/]

### III.    Conclusion

Although the doctrines of the least restrictive alternative and the right to treatment have not yet been applied by the Supreme Court to institutions for handicapped persons, several lower courts have held that due process is violated when the doctrines are not applied to these institutions. These theories tend to encourage deinstitutionalization, especially when they are applied as they were by the district court in Pennhurst. The encouragement of deinstitutionalization of handicapped persons by these doctrines and by some Federal statutes tends to encourage the creation of community facilities and thus impacts on housing and land use practices.

Kathleen S. Swendiman

Nancy Lee Jones
Legislative Attorneys
American Law Division
February 12, 1979

---

[24/] Report to the Congress by the Comptroller General of the United States, "Returning the Mentally Disabled to the Community: Government Needs to Do More", January 7, 1977.

697

APPENDIX 2

Submitted statements on H.R. 2540.

1. Administrative Conference on the United States, Office
   of the Chairman.

2. American Insurance Association.

3. Open Housing Center, Inc.

4. National Association of Housing and Redevelopment Officials.

5. Housing Information Center.

6. Suburban Maryland Fair Housing.

7. Alliance of American Insurers.

8. Bedford Heights Civic Coalition.

9. Public Advocate of the State of New Jersey

10. City of Palo Alto

11. Suburban Action

12. National Hispanic Coalition for Better Housing

13. Leadership Council for Metropolitan Open Communities
    (Chicago, Illinois)

14. United States Conference of Mayors

15. National Association of Insurance Commissioners
16. National Association of Independent Insurers
17. Comptroller of the Currency
18. American Institute of Real Estate Appraisers
19. Crum & Foster Insurance Companies
20. National Council of La Raza
21. National Housing Conference, Inc.
22. Board of Supervisors, County of Los Angeles

698

ADMINISTRATIVE CONFERENCE OF THE UNITED STATES

2120 L STREET, N.W., SUITE 500
WASHINGTON, D.C. 20037
(202) 254-7020

OFFICE OF
THE CHAIRMAN

. May 25, 1979

MAY 29 1979

Honorable Don Edwards
Chairman
Subcommittee on Civil and
Constitutional Rights
Committee on the Judiciary
House of Representatives
Washington, D.C. 20515

Dear Chairman Edwards:

This is in response to your letter of April 30, enclosing a copy of H.R. 2540, the "Fair Housing Amendments Act of 1979." You ask us to review section 8 of the bill and to provide our views on certain procedural questions which you raise. I must emphasize that the views expressed herein are those of this Office. The Administrative Conference, as a body, has not had an opportunity to consider this bill.

Section 8 of the bill would amend the Fair Housing law, P.L. 90-284, title VIII, 42 U.S.C. ch. 45, to provide a system of administrative adjudication and enforcement for disputes involving claims of discriminatory housing practices. Revised section 810 would provide when the Secretary of Housing and Urban Development receives, or files on his own initiative, a charge of discrimination, he shall conduct an investigation of the charge. Under section 810(b) the Secretary would be empowered to order temporary or preliminary relief pending the final disposition of the charge. Section 810(c) provides that if after the investigation the Secretary finds reasonable cause to believe the charge is true, he shall file an administrative complaint under section 811 or refer the matter to the Attorney General for the institution of a civil action under section 813 to remedy the discriminatory housing practice.

Section 811 provides for "a hearing on the record" on an administrative complaint. "After the conclusion of such hearing, the person conducting the hearing shall make findings of fact and conclusions of law, and may issue an order providing such relief as may be appropriate, and may impose a civil penalty of not to exceed $10,000." Any such order is subject to review and modification by the Secretary. Judicial review of the final order is available in the courts of appeals.

Section 812 would provide for enforcement suits by aggrieved persons. Such a suit would be available as an alternative to filing a charge with the Secretary or where the Secretary, after investigation, determines not to file an administrative complaint. Section 813 provides for suits by the Attorney General to enforce orders issued after section 811 proceedings and to obtain relief in cases referred by the Secretary under section 810. Section 814 would provide for attorney fee awards

003497

to prevailing parties in the judicial and administrative proceedings described above.

You ask a number of questions regarding the legal consequences of various provisions in the bill. We will attempt to answer these questions in terms of general principles of administrative law. However, we must emphasize that we have not had the benefit of any legislative history regarding this bill and must deduce the intentions of the drafters simply from the text of the provisions. We will state and address your questions in order:

> 1. Q.  To what extent do the requirements of the Administrative
>        Procedure Act pertaining to the conduct of hearings and
>        ancillary matters, (5 U.S.C. §§554,555, and 556) apply?
>        To what extent, if any, does the administrative procedure
>        in H.R. 2540, depart or supplement those requirements?

A. The administrative proceeding provided in sections 810 and 811 consists of two phases, the informal investigative phase described in section 810, which terminates in a determination by the Secretary whether reasonable cause exists to believe the charge is true, and the formal adjudicative phase described in section 811, which involves an evidentiary hearing, findings of fact, and an order. The provisions of the Administrative Procedure Act governing formal proceedings, §§554, 556 and 557, would not apply to the informal, section 810 phase of the proceeding. However, section 555, which is not limited to formal proceedings, would be applicable in accordance with its terms.

Section 811, however, provides for "a hearing on the record," and since the proceeding is clearly adjudication and not rulemaking within the APA definitions, 5 U.S.C. §551(5),(7), we read this language as triggering the application of sections 554, 556, and 557. See 5 U.S.C. §554(a).

We do not find any significant departure from the requirements of §§554, 556, and 557 in section 811, except for some ambiguity as to the scope of the Secretary's authority to modify the decision of the presiding officer. The last sentence of section 811(a) might be read to limit review to the contents of the order and thus to exclude review of the findings of fact and conclusions of law. Section 557 (b) of the APA provides plenary agency review authority: "On appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule." We believe the bill should make clear that section 557 governs agency review of presiding officer decisions. Section 811(a) supplements the APA requirments by providing specifically for the right of the aggrieved person to participate as a party in the proceeding. The status of the complaining party in such administrative proceedings varies from agency to agency. See Davis, _Administrative Law Treatise_ §8.11; Davis, _Administrative Law of the Seventies_ §8.11.

700

We might note that the provision in section 810(a)(2) for issuance of subpenas on behalf of the respondent during the investigative stage of the proceeding is very unusual. At the formal hearing stage all parties would have access to agency subpena power (where such power exists) by virtue of APA §555(d), so that no special provision is necessary. At the investigative stage, however, it is not clear how the respondent's subpena power would be used, since there would be no adversarial hearing at which witnesses would be heard. To provide the respondent with the right to subpena witnesses at the investigative stage risks two rounds of evidentiary hearings, with consequent delay, disruption, and duplication of effort. See, e.g., Genuine Parts Co. v. F.T.C., 445 F.2d 1382, 1387-88 (5th Cir. 1971).

Another feature of the bill worth noting is the provision in section 810(b) for the Secretary to grant "temporary or preliminary relief" pending the final disposition of the charge. While the bill does guarantee to the respondent the right to notice and opportunity to be heard prior to the grant of such relief, the bill is silent as to the circumstances which might justify such relief, whether there must be a showing of probable violation, and what officer must make the determination. Nor is it clear who has the burden of proof in a proceeding for judicial enforcement of the order. It should be recognized that in disputes over the disposal of housing the grant or denial of temporary relief is, in many cases, likely to make a subsequent hearing moot. Accordingly, careful thought should be given to the procedures by which such relief is granted and the evidentiary showing needed to justify it. See, generally, Freedman, Summary Action by Administrative Agencies, 40 U.Chi.L.R. 1, 41-65 (1972).

      2. Q.  To what extent would the requirements of 5 U.S.C. §557 apply?

A. Section 557 would be applicable in accordance with its terms to an adjudication subject to section 554 of the APA, except where there is a specific conflict with a provision of the bill.

      3. Q.  How would the APA ensure the independence of the person designated by the Secretary to conduct hearings and issue orders? Does the bill permit the Secretary to personally conduct such hearings, and, if so, how is the separation of functions maintained?

A. Section 557(b) of the APA provides that there shall preside at the taking of evidence the "agency", i.e., the agency head, or one or more members of the body comprising the agency (where the agency is a collegial body), or one or more administrative law judges appointed under 5 U.S.C. §3105. Thus the Secretary could preside personally, but if he did not, an ALJ would have to preside. (If, as is likely, the Secretary were to delegate his final decisional authority to a subordinate, it is arguable that the subordinate would become the "agency", see §551(1), and, therefore, be authorized to preside. However, the only judicial authority we are aware of is to the contrary, Borg-Johnson Electronics Inc., v. Christenberry, 169 F. Supp. 746, 752-54 (S.D.N.Y. 1959); see 39 U.S.C. §204.)

If an ALJ conducts the hearing, his independence is ensured by the statutory provisions regarding his appointment and grounds for removal. See, e.g., 5 U.S.C. §§3105, 5372, 7521. In addition, section 554(d)(2) provides in essence that the ALJ's in an agency must be organizationally separate from and not responsible to the investigatory or prosecuting arm of the agency.

701

If the Secretary were personally to preside, the APA's separation of functions requirements would not be applicable since section 554(d) does not apply to the agency or a member of the body comprising the agency. See F.T.C. v. Cinderella Career and Finishing Schools Inc., 404 F. 2d. 1308, 1315 (D.C. Cir. 1968); Withrow v. Larkin, 421 U.S. 35, 51-52, 95 S. Ct. 1456, 1467 (1975).

> 4. Q. Does H.R. 2540 differ significantly from other administrative
> enforcement schemes in the degree to which the Secretary may
> modify the initial decision of the Administrative Law Judge?

A. As we have indicated in our response to Question #1, there is a suggestion in section 811 that the Secretary's power to modify an ALJ decision is somewhat less than it would be under the APA.

> 5. Q. What kinds of relief would be deemed "appropriate"?
> (new §8.11(a)).

A. The forms of relief deemed appropriate would depend to a considerable extent on the substantive statutory scheme. Presumably, relief would include whatever would be necessary to make the injured party whole. Additional relief to protect the group or class discriminated against might be appropriate. You may find relevant analogs in the remedial orders of the National Labor Relations Board and the Federal Trade Commission and in judicial orders in civil rights litigation. Obviously, Congress is free to specify in the bill in greater detail what it means by "appropriate" relief.

> 6. Q. What other agencies are authorized to impose civil penalties?
> In such cases, to what extent are initial orders of civil
> penalties modifiable by the head of that agency?

A. A recent Administrative Conference study indicates that there are 348 statutory provisions for civil penalties enforced by 27 federal departments and independent agencies. These provisions take various forms. In most cases the penalty is imposed by a court after a de novo trial, although there may be an informal administrative proceeding to "assess" the penalty prior to litigation. An increasing number of statutes, however, provide for administrative imposition in an adjudication subject to APA §554, with only a limited opportunity to the respondent to contest the penalty on judicial review. Examples of such provisions include the Commodity Exchange Act, 7 U.S.C. §9; Packers and Stockyards Act, 7 U.S.C. §193; Toxic Substances Control Act, 15 U.S.C. §2615; and the Occupational Safety and Health Act, 29 U.S.C. §666. The first three statutes cited are administered by the Commodity Futures Trading Commission, the Department of Agriculture, and the Environmental Protection Agency, respectively. Under OSHA responsibility for investigation and initial assessment is lodged in the Department of Labor and the formal adjudication is conducted by an independent agency, the Occupational Safety and Health Review Commission. We have not investigated to what extent modification of penalties by the head of the agency is permissible, but we assume that most, if not all, statutes follow APA §557 in permitting the agency reviewing authority plenary authority to review the initial decision, subject only to the requirement, 5 U.S.C. §706, that his decision must be supported by the administrative record considered as a whole, and that that record includes the findings and conclusions of the presiding officer. See Universal Camera v. NLRB, 340 U.S. 474, 492-94, 71 S. Ct. 456, 466067 (1951).

003500

702

The Administrative Conference, in its Recommendation 72-6 (enclosed) has, urged agencies to consider requesting legislative authority for administrative imposition of civil penalties. The recommendation suggests several factors which would influence the choice between administrative and jucicial imposition.

For your information we also enclose a recent report to the Administrative Conference, The Assessment and Mitigation of Civil Money Penalties by Federal Agencies, by Professor Colin S. Diver, of Boston University School of Law. A proposed recommendation based on this report will be considered by the Assembly of the Conference at its Plenary Session next month.

I hope this information is responsive to your questions.

Sincerely yours,

Robert A. Anthony
Chairman

Enclosures

703

ADMINISTRATIVE CONFERENCE OF THE UNITED STATES
NEW EXECUTIVE OFFICE BUILDING
WASHINGTON, D.C. 20506

OFFICE OF
THE CHAIRMAN

RECOMMENDATION 72-6:  Civil Money Penalties
as a Sanction

Adopted December 14, 1972

Federal administrative agencies enforce many statutory provisions
and administrative regulations for violation of which fixed or variable
civil money penalties may be imposed. 1/ During Fiscal 1971, seven
executive departments and thirteen independent agencies collected well
in excess of $10 million, in over 15,000 cases; all evidence points to
a doubling or tripling dollar magnitude and substantially increasing
caseload within the next few years.

Increased use of civil money penalties is an important and salu-
tary trend.  When civil money penalties are not available, agency
administrators often voice frustration at having to render harsh
"all-or-nothing decisions" (e.g., in license revocation proceedings),
sometimes adversely affecting innocent third parties, in cases in
which enforcement purposes could better be served by a more precise
measurement of culpability and a more flexible response.  In many areas
of increased concern (e.g., health and safety, the environment, consumer
protection) availability of civil money penalties might significantly
enhance an agency's ability to achieve its statutory goals.

In developing a range of sanctions adequate to meet enforcement
needs, Congress and agencies must often determine whether a "criminal
fine" or a "civil money penalty," or both, should be applied to a
given regulatory offense.  The choice they make has large consequences.
Criminal penalties expose an offender to the disgrace and disabilities
associated with "convictions"; they require special procedural and
other protections; and they can not be imposed administratively.  These
factors make it appropriate to consider whether criminal sanctions should
not be supplemented or replaced by civil money penalties.

---

1/ For purposes of this recommendation, no distinction has been drawn
between sanctions denominated "money penalties" and sanctions denominated
"forfeitures" (e.g., in FCC legislation) and "fines" (e.g., in Postal
Service legislation) so long as (i) the sanction is classified as
civil and (ii) money is, in fact, subject to collection by an agency or
a court.  Excluded are situations involving penalties or liquidated
damages assessed pursuant to the terms of a government contract or sums
withheld or recovered for failure to comply with the terms of a govern-
ment grant.

704

Under most money penalty statutes, the penalty cannot be imposed until the agency has succeeded in a de novo adjudication in federal district court, whether or not an administrative proceeding has been held previously. The already critical overburdening of the courts argues against flooding them with controversies of this type which generally have small precedential significance.

Because of such factors as considerations of equity, mitigating circumstances, and the substantial time, effort and expertise such litigation often requires in cases usually involving relatively small sums (an average of less than $1,000 per case), agencies settle well over 90% of their cases by means of compromise, remission, or mitigation. Settlements are not wrong per se, but the quality of the settlements under the present system is a matter of concern. Regulatory needs are sometimes sacrificed for what is collectible. On the other hand, those accused sometimes charge that they are being denied procedural protections and an impartial forum and that they are often forced to acquiesce in unfair settlements because of the lack of a prompt and economical procedure for judicial resolution. Moreover, several agency administrators warn that some of the worst offenders, who will not settle and cannot feasibly be brought to trial, are escaping penalties altogether.

This recommendation is intended to meet the problems posed above.

### Recommendation

A. Desirability of Civil Money Penalties as a Sanction

1. Federal administrative agencies should evaluate the benefits which may be derived from the use (or increased use) of civil money penalties as a sanction. Such penalties should not be adopted as a means of supplanting or curtailing other private or public civil remedies.

2. Civil money penalties are often particularly valuable, and generally should be sought, to supplement those more potent sanctions already available to an agency -- such as license suspension or revocation -- whose use may prove (a) unduly harsh for relatively minor offenses; or (b) infeasible because, for example, the offender provides services which cannot be disrupted without serious harm to the public.

3. Each federal agency which administers laws that provide for criminal sanctions should review its experience with such sanctions to determine whether authorizing civil money penalties as another or substitute sanction would be in the public interest. Such authority for civil money penalties would be particularly appropriate, and generally should be sought, where offending behavior is not of a type readily recognizable as likely to warrant imprisonment.

B. Adjudication of Civil Money Penalty Cases in an Administrative Imposition System

1. In some circumstances it is desirable to commit the imposition of civil money penalties to agencies themselves, without subjecting agency determinations to de novo judicial review. Agencies should consider asking Congress to grant them such authority. 2/

Factors whose presence tends to commend such a course with respect to a particular penalty provision include the following:

(a) a large volume of cases likely to be processed annually;

(b) the availability to the agency of more potent sanctions with the resulting likelihood that civil money penalties will be used to moderate an otherwise too harsh response;

(c) the importance to the enforcement scheme of speedy adjudications;

(d) the need for specialized knowledge and agency expertise in the resolution of disputed issues;

(e) the relative rarity of issues of law (e.g., statutory interpretation) which require judicial resolution;

(f) the importance of greater consistency of outcome (particularly as to the penalties imposed) which could result from agency, as opposed to district court, adjudications; and

(g) the likelihood that an agency (or a group of agencies in combination) will establish an impartial forum in which cases can be efficiently and fairly decided.

---

2/ Due to the special procedures and status of the United States Tax Court, the rationale for administrative imposition may have only limited applicability to civil money penalties administered by the Internal Revenue Service.

Considerations such as those set forth above should be weighed heavily in favor of administrative imposition when the usual monetary penalty for an offense or a related series of offenses would be relatively small, and should normally be decisive when the penalty would be unlikely to exceed $5,000. However, the benefits to be derived from civil money penalties, and the administrative imposition thereof, should also be considered when the penalties may be relatively large.

   2. An administrative imposition system should provide:

       (a) for an adjudication on the record pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 554-57 (1970) at the option of the alleged offender or the agency;

       (b) for finality of an agency's decision unless appealed within a specified period of time;

       (c) that, if the person on whom the penalty is imposed appeals, an agency's decision will be reviewed in United States Courts of Appeals under the substantial evidence rule in accordance with the Administrative Procedure Act, 5 U.S.C. § 706(e);

       (d) that issues made final by reason of (b) above and issues which were raised, or might have been raised, in a proceeding for review under (c) above may not be raised as a defense to a suit by the United States for collection of the penalty.

Agencies should adopt rules of practice which will enable just, inexpensive and speedy determinations. They should provide procedures for settlement by means of remission, mitigation or compromise.

707

STATEMENT OF THE

AMERICAN INSURANCE ASSOCIATION

BEFORE THE

COMMITTEE ON THE JUDICIARY

SUBCOMMITTEE ON CIVIL AND CONSTITUTIONAL RIGHTS

UNITED STATES HOUSE OF REPRESENTATIVES

ON

H. R. 2540

708

This statement is offered on behalf of the American Insurance Association, a trade association representing 149 insurers writing property and casualty insurance in all 50 states.

§6(c) of H.R. 2540 would amend §804 of the Fair Housing Act (Title VIII of the Civil Rights Act of 1968). A new subsection (f) would make it unlawful for an insurer to refuse to enter into, or discriminate in the terms, conditions or privileges of, a contract of insurance against hazards to a dwelling because of the race, color, religion, sex, handicap, or national origin of persons owning or residing in or near the dwelling. AIA and its members endorse this principle. However, we do not believe this principle need be embodied in the Fair Housing Act.

The business of insurance is regulated by the states and at present 46 states have anti-discriminatory statutes which accomplish the goals of §6(c). Thus it is evident that the states have the will and the means to prohibit discrimination on the basis of race, color, religion, sex, handicap or national origin by insurers. Adding §6(c) to a statute concerned with discrimination in real estate transactions is unnecessary and creates an undue burden by duplicating the already existing state prohibitions. The states have accepted the responsibility for actively safeguarding the rights of their citizens in the purchase of dwelling insurance.

We would further note that the property insurance business is a highly competitive business, both from the standpoint of price and risk

709

selection. The underwriting process is one of selection based on objective criteria and AIA is aware of no company which selects or rates property risks based on the race, color, sex, religion, handicap or national origin of the owner or residents of the surrounding properties.

AIA is concerned by suggestions that in a Title VIII action brought by a member of a minority alleging discrimination by an insurer the burden of proof be upon the insurer to establish that its refusal to provide coverage was not because of the race, color, sex, religion, handicap or national origin of the applicant, but rather because of a valid business reason.

There is a divergence of opinion among the circuit courts respecting the issue of whom the burden of proof is upon in Title VIII claims. This would seem to result from a less than clear Congressional intent when enacting the Civil Rights Act of 1968. What is clear is that the courts have not consistently applied an effects test in discrimination cases.

The Supreme Court in <u>Washington v. Davis</u>, 426 US 229 (1976), distinguishes in 14th amendment cases between effect and intent by holding that a showing of disproportionate impact (effect) is not sufficient to make out a constitutional claim of racial discrimination. The claimant is required to establish discriminatory purpose (intent).

In a Title VIII action, the Second Circuit in <u>Boyd v. Lefrak Organization</u>, 509 F2d 1110 (1975), anticipated the holding in <u>Washington v. Davis</u> by setting forth an intent test in a purely private action. The

710

court stated that "...we will not impose an affirmative duty on the private landlord to accept low income tenants absent evidence that his motivation is racial rather than economic in nature."

A middle ground test between effect and intent is found in the Seventh Circuit case of <u>Metropolitan Housing Development Corporation v. Village of Arlington Heights</u>, 558 F2d 1283 (1977). On remand, the court stated that in some circumstances, a violation of the Fair Housing Act can be established by a showing of discriminatory effect without a showing of discriminatory intent. The court declined to agree that once a racially discriminatory effect is shown a violation is established. Discriminatory effect is only illegal absent a finding of intent where the court's four critical factors lead to such a finding. These factors weighed on a case by case basis are:

> 1) how strong is the plaintiff's showing of discriminatory effect;
>
> 2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of <u>Washington v. Davis</u>;
>
> 3) what is the defendant's interest in taking the action complained of; and
>
> 4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing?

The Third Circuit in <u>Resident Advisory Board v. Rizzo</u>, 564 F2d 126 (1977), and the Eighth Circuit in <u>Smith v. Anchor Building Corporation</u>, 536 F2d 231 (1977), adopt an effects test and place the burden of proof on defendant once a prima facie case of racial discrimination is established.

003509

711

In New York, the state Court of Appeals addressed the question of racial discrimination in the underwriting of insurance in the case of British and Foreign Marine Insurance Co., Ltd. v. Stewart, 30 N.Y. 2d 53 (1970). The New York Insurance Department cited and fined the named insurance companies for racial discrimination for systematically effecting cancellations of commercial fire insurance coverage in predominantly black areas of New York. The insurers appealed and defended their actions on the basis that they were generally overcommitted on commercial coverages in urban centers and that these areas posed special problems of exposure to excess loss from the riot hazard.

In reversing the Insurance Department, the Court rejected an effects test and held that the insurer's cancellations were "motivated by underwriting and business reasons..." and were "not based on any desire to discriminate."

It is our opinion that the standard set forth by the Second Circuit in Boyd is consistent with the American system of civil justice which places on plaintiff the burden of proof by a preponderance of the evidence that defendant has done plaintiff an injury. Relieving the plaintiff of the burden of proof serves only to encourage specious litigation which is both time-consuming and expensive. Awarding attorney's fees to a successful defendant is a weak deterrent to making the claim of racial discrimination.

Should the legislative history of H.R. 2540 indicate a preference by Congress for an effects test in Title VIII claims rather than one of intent, it would be impossible for an insurer to successfully defend itself given the fact that many minority members reside in dwellings uninsurable by ordinary underwriting standards. The property insurance

712

business is highly competitive and it is inevitable that some applicants, regardless of race, color, religion, sex, handicap or national origin, will be denied coverage by an insurer. A presumption that in every such instance denial was based upon color--or any subjective consideration-- would be highly unfair and discriminatory itself.

Congress, the states and the insurance industry recognized the difficulty of providing insurance for many inner-city properties and, in 1968, Congress enacted the Urban Property Protection and Reinsurance Act (Public Law 90-448, 12 USCA 1749bbb et seq.) which encouraged states to establish FAIR Plans (Fair Access to Insurance Requirements). These Plans consist of all property insurers who transact business in a state and provide essential insurance satisfying mortgage lending requirements for properties which do not meet ordinary underwriting standards.

For the reasons set forth, AIA believes §6(c) should be deleted from H.R. 2540. We do not believe this additional layer of federal regulatory controls is necessary. However, should §6(c) remain a part of the bill, it is our hope that the legislative history of §6(c) will clearly reflect that the burden of proving discrimination remains with the party alleging such discrimination.

Respectfully submitted,

Charles E. Hunt
Counsel
American Insurance Association

CEH:mwh

003511



# OPEN HOUSING CENTER, INC.

*150 Fifth Avenue, New York, N.Y. 10011*     **(212) 989-7346**

*Betty Hoeber, Director*

*Housing Consultation - Sandra Parrish, Director*
*Fair Housing Project - Phyllis Spiro, Director*     **(212) 989-6200**

April 17, 1979

*APR 23 1979*

*Sub*

**PRESIDENT**
Betty Hoeber
*Director*
*Open Housing Center, Inc.*

**SECRETARY**
Marcus N. Larrier
*Director, Housing Unit*
*U.S. Postal Service*

**TREASURER**
Daniel L. Kurtz
*N.Y. Lawyers for the*
*Public Interest*

**BOARD OF DIRECTORS**

Richard Bellman
*Attorney*

Frank Bermudez
*Tri-State Regional*
*Planning Commission*

Myrtle Braithwaite
*Social Services Director*
*Concord Nursing Home*

Barbara Burwell
*Corporate Responsibility*
*Bankers Trust Company*

Candace Caruthers
*Editorial Director*
*WABC-TV*

Thomas Gale
*Housing Director*
*National Urban League*

Alexander A. Kolben
*Attorney*

Kathleen W. Lane
*Marketing Manager*
*Xerox Corporation*

Julia Prettyman
*Director, E.E.O.*
*GAF Corporation*

Marva Stith
*Personnel Director*
*Lever Brothers Company*

Judiciary Committee
Subcommittee on Civil &
 Constitutional Rights
A407·House Office Building,
 Annex #1
Washington, D.C.  20516

Dear Congresspersons:

The Open Housing Center of New York would like to add the weight of its 15 years' experience in fighting housing discrimination to this Committee's deliberations on the proposed 1979 amendments to the Fair Housing Act.

Ours is one of the oldest fair housing programs in the country.  Established in 1964 to help minority persons make use of the State and City Fair Housing laws, we have helped thousands of families and individuals move to better housing in all areas of the city.  Funds for this work have come from a succession of sources, including private contributions, foundations and government grants.  For the last eight years major New York employers have supported the Center because they want to assure equal housing opportunity for all their employees. Recently we have received a $230,000 Community Development grant from New York City to conduct a broad outreach program to low and moderate-income persons meeting housing discrimination.

Since the passage of the federal Fair Housing Act in 1968 we have developed three broad Pattern and Practice suits against major New York landlords and management firms which were brought by the Department of Justice.  The U. S. Attorney for the Southern District in New York has just reached a consent judgment in one such suit which is reported in the attached reprint from the

Wall Street Journal of March 21, 1979.

    This history of our Center, which we hope you will forgive, is to indicate to you the basis from which we present our testimony.

### Extent of Discrimination

    We wish to testify first to the extent of discrimination in the New York area. Our experience shows that virtually any minority person who seeks housing outside the traditional area of minority concentration, knowingly or unknowingly, meets discrimination in the rental or sale of housing.

    The locations from which the hundreds of housing complaints come to our Center each year are in dozens of predominantly white neighborhoods in every borough of the city, where minority apartment and homeseekers have gone to seek housing.

    Demographic maps of New York show large areas of each borough which are 90% white; and in Staten Island this is true of almost the whole borough.

    There can be no doubt that eleven years after the passage of Title VIII, in a city and state which passed the earliest Fair Housing laws in the country, the real estate industry still maintains an exclusionary housing market, operating protective rings around large areas of the city.

    Our daily experience is borne out by careful surveys, two of which we want to point out to you:

    1. The Housing Marketing Practices Survey of 1977, funded by HUD, under contract with the National Committee Against Discrimination in Housing, was conducted in the New York area by our Center. Random sampling of the practices of the real estate industry, in this carefully designed study, revealed that two-thirds of all brokers and landlords tested discriminated against Blacks. The study covered the five boroughs of New York and four large suburban counties surrounding the city.

    2. The New York Times survey of June 1976 made in cooperation with our Center showed total discrimination against a Black reporter seeking an apartment through Manhattan real estate brokers in a month-long test. Reprint of the Times front-page article reporting on this study is attached.

### Income Ranges

Our experience shows that ability to pay is no protection against discrimination. The two surveys cited above were based on high-priced housing. Many of the persons seeking this Center's services are upper-income professional and business people who have met discrimination in trying to rent an apartment or buy a house.

Our records for the year 1978 show that the complainants seeking help from the Center ranged from a $5,000 a year clerk to a $45,000 bank executive.

The complainants in general reflect a true cross-section of the working families of New York; nurses, teachers, factory workers, postal workers, employees from many government agencies, hospital workers, secretaries, bus drivers, air-line stewardesses, as well as lawyers, college professors, accountants and even a regional director of HUD---who came to us because his own agency had no power to enforce the law in his behalf.

### Low-Income Families

Of all the people who are damaged by this widespread discrimination we want to point out to the Committee the serious damage which is done to low-income minority families.

The cost of housing in New York City, as the Committee members are probably aware, is staggering, and continually rising. Moderately priced and well-maintained housing, whether rental or sales, which low income persons can afford is an increasingly rare commodity. Yet a considerable amount of such housing does exist within many of the predominantly white sections of the city we referred to above. Here, affordable housing stock, in good condition, is available to white residents of New York—but effectively barred to Blacks and Hispanics.

Vacancies are most often advertised in the white ethnic and local community newspapers. Minority persons answering these ads are greeted with hostility and often outright discrimination, so the "checkers" and filing complaints are inevitably required to pursue this housing.

As a result, most low-income minority families are not able to move of the substandard housing they are in, and are forced to pay more while they are restricted to areas of minority concentration, lacking the services, schools and quality of life they seek. They are the least able to bear the expense of litigating a Title VIII claim and are the persons who would benefit most from the proposed HUD enforcement authority.

716

We wish to emphasize to the Committee that these low-income minority families and individuals in New York, as in other cities, are most harshly affected by the exclusionary housing market. They are in critical need of help in securing their rights.

The promise held out by Title VIII will never be a reality for these city residents until the federal government makes a strong commitment to enforce the federal law. The first step is to provide HUD with the enforcement powers to do so.

### Need for Amendments

Victims of housing discrimination now have the following options under Title VIII:

1. To engage in expensive litigation.

2. To make use of HUD's conciliation process.

3. To file a complaint with the local anti-discrimination agency.

None of these alternatives provides a satisfactory recourse, in our experience. Litigation is beyond the means of most people, particularly low-income persons as stated above.

HUD's conciliation efforts have proven to be woefully inadequate, as shown in the General Accounting Office Report of February, 1978, with only a small percentage of complaints being resolved, and an even smaller percentage of those resulting in the complainant securing the housing. The proposed authorization for HUD to act expeditously by ordering temporary or preliminary relief pending final disposition of the charge is most needed to insure the complainant securing the housing he or she seeks.

The third alternative, the utilization of the local enforcement agency, leaves unsolved the problem that not every locality has such an entity; and where they do exist there is wide variatition in the staffing, resources and support they receive.

Even in New York which is fortunate in having two such entities, the City Commission on Human Rights and the State Division of Human Rights, the extent of discrimination far exceeds the resources of these two agencies to handle. Complainants experience frustrating delays and disappointments and often don't think it worth while to file a complaint. Understaffed and overburdened, the agencies are by no means equal to the entrenched practices of the real estate industry which continues to discriminate freely, openly

disregarding both federal and local laws.

The Center works closely with the City Commission, in particular, and can testify that the local agencies alone, cannot provide the protection which the minority residents of the city require. Only a strong federal presence, working with the local agencies, can secure the rights of this city's minorities at all income levels to available housing.

Therefore, we earnestly recommend to this Committee that it act favorably on the proposed amendments expanding HUD's enforcement authority under Title VIII. It is needed in New York and all over the country.

### Necessary Funding

In these years of fiscal austerity, it is not popular to speak of increased funding. It is, however, with great urgency that we point out that granting of enforcement authoruty to HUD is merely a step in providing an open housing market. Without the adequate funds for staffing and training of persons to handle these cases, the enforcement provisions will not succeed.

### Redlining

The proposed prohibition against the "redlining" of neighborhoods based on the racial make up of the area is essential for the survival of our cities.

While disinvestment has become a problem for most neighborhoods in older cities, it is clear that the pernicious practice affects first and most severely minority and integrated communities.

A New York State Department of Banking study of mortgage investment in the borough of Brooklyn issued in 1978 showed that once a community obtained a 10% minority population the availability of conventional mortgages dropped severely. The level of investment in the marginally integrated communities (10%) and the level of investment in the predominally Black communities (90%) was almost the same.

Similarly a study of the availability of insurance in the Borough of the Bronx conducted by the then Borough President Robert Abrams, showed that home insurance was virtually unavailable in many of the minority neighborhoods in the Bronx. Indeed the Fair Plan had become the primary insurer in many middle-class neighborhoods.

47-614 O - 79 -- 46

718

There can be no doubt that such practices on the part of the banks and insurance companies contribute both to the resegragation and deterioration of integrated communities and to the deterioration of minority communities.

While two federal district courts in Ohio have held that the practice of racial redlining on the part of the banks is already prohibited under section 804 of the federal Fair Housing Act, <u>Laufman vs. Oakley Building and Loan Association</u> 408 F: Supp. 489 (S.D. Ohio 1976), and <u>Harrison vs. Heinzroth</u> 414 F: Supp. 66 (N.D. Ohio 1977), express language prohibiting the practice is needed to prevent the possibility of conflicting decisions in the districts.

Similarly, language prohibiting racial redlining by insurance companies is needed to avoid conflicting decisions.

While we have focused on the aspects of HUD's enforcement authority and redlining the Center wholeheartedly supports the other aspects of HR2540 and joins fair housing groups across the country in supporting the proposed strengthening of the provisions of the Fair Housing Act.

Sincerely,

Betty Hoeber
Director
Open Housing Center

BH:dmc

719



**Jerving the Nation's Housing and Community Development Needs**

April 16, 1979

Honorable Don Edwards
Chairman
Subcommittee on Civil and
    Constitutional Rights
House Committee on the Judiciary
2137 Rayburn House Office Building
Washington, D.C.  20515

Dear Mr. Chairman:

   I am pleased to reaffirm NAHRO's support for the fair housing
legislation (HR 2540) that you and Congressman Drinan have again
introduced and which the Subcommittee is currently considering.
NAHRO, as the national professional association representing over
7,000 officials and 2,000 agencies in housing and community develop-
ment, is committed to the effective and equal implementation of
local programs in these areas, and we believe passage of your bill
is necessary to provide HUD the authority it needs to help meet
these important objectives.

   HUD Secretary Harris has made clear her commitment to improv-
ing HUD's effectiveness in the enforcement of the fair housing and
equal opportunity objectives of Title VIII of the Civil Rights Act
of 1968, and this legislation would help insure the success of her
efforts.

   We commend you for your leadership in the fair housing area,
and stand ready to assist you in the passage of this bill.  I would
ask that a copy of this letter be included in the record of the
Subcommittee hearings on HR 2540.

                              Sincerely yours,

                              Robert W. Maffin
                              Executive Director


c.c. Congressman Robert Drinan


National Association of Housing and Redevelopment Officials
2600 Virginia Avenue, Northwest  Suite 404  Washington, D.C. 20037  (202) 333-2020

STATEMENT OF STEPHEN P. TARASON, REPRESENTING SUBURBAN MARYLAND FAIR
HOUSING, BEFORE THE HOUSE SUBCOMMITTEE ON CIVIL AND CONSTITUTIONAL
RIGHTS - IN SUPPORT OF BILL HR 2540.                 April 3, 1979

My name is Stephen P. Tarason, Chairperson, Testing Committee,
Suburban Maryland Fair Housing (SMFH), a non-profit, tax exempt,
voluntary organization formed in 1962 by a group of Montgomery County
residents with a commitment to non-discrimination in housing.  SMFH
is governed by a 21 member board of directors with a membership of
500 families.  SMFH is financially supported by membership dues,
contributions and special events.

SMFH strongly supports Bill HR 2540 and urges the committee to
pass the Bill.  We recognize the need for enforcement powers if a
compliance agency is to reach its goal of ending housing discrimination
in the United States.  We also recognize the need for national leader-
ship setting an example for state and local agencies.  In addition
a national model will set the tone for more conciliations and
settlements resulting in a lighter load for our courts and less
heartache and disappointment among our citizens who continue to be
discriminated against on a daily basis as they seek housing.  There
is no doubt in the minds of our organization's leaders and members
that a compliance agency is only as strong and effective as its
enforcement powers, thus the need for HR 2540.

As we analyzed the Bill before you, we constantly felt relief
that teeth were finally being placed in the gaps that existed in the
original law (Title VIII of the 1964 Civil Rights Act).  We especially
liked the one year filing time, the punitive damages clause, the
cease and desist section, the section protecting the handicapped, and
the general no nonsense tone of the document.  Only one area raised
some concerns and questions: the section dealing with attorney's fees.

721

We are curious about the interpretation of the awarding of attorney fees to the prevailing party. Would this mean that a complainant who sincerely files a complaint with the courts risks having to pay for the respondent's legal fees? If so, we fear this would have the effect of discouraging complaints, especially from economically disadvantaged people.

SMFH wishes to reinforce its overall favorable feelings for this Bill and strongly urge you to vote for HR 2540.

722



Washington Office

Headquarters Office
20 North Walker Drive
Chicago Illinois 60606

Alliance of American Insurers
1776 F Street, N.W.
Washington, D.C. 20006
202-331-0313

May 24 , 1979

The Honorable Don Edwards, Chairman
Subcommittee on Civil and
  Constitution Rights
House Committee on the Judiciary
2137 Rayburn House Office Building
Washington, DC 20515

Dear Mr. Chairman:

This statement is offered on behalf of the Alliance of American
Insurers, a national trade association composed of over 100 prop-
erty and casualty insurers doing business throughout the United
States.

Section 6(c) of HR2540 would amend Section 804 of the Fair Housing
Act (Title VIII of the Civil Rights Act of 1968). A new subsection
(f) would make it unlawful for an insurer to refuse to enter into,
or discriminate in the terms, conditions or privileges of, a con-
tract of insurance against hazards to a dwelling because of the
race, color, religion, sex, handicap, or national origin of persons
owning or residing in or near the dwelling. The Alliance and its
members endorse this principle. <u>However, we do not believe this
principle should be embodied in the Fair Housing Act. We think
that section 6(f) of the bill is unnecessary and urge that it be</u>
deleted.

We are unaware of any insurer that permits race, color, religion,
sex, handicap or national origin to be given any consideration in
determining whether to issue a policy. Apart from the moral ques-
tion, to do so would be contrary to sound business principles, and
in a highly competitive business would pointlessly deprive the in-
surer of a potentially large share of a lucrative market.

The property insurance business is a highly competitive business,
both from the standpoint of price and risk selection. The under-
writing process is one of selection based on objective criteria
and the Alliance is aware of no company which selects or rates
property risks based on the race, color, sex, religion, handicap
or national origin of the owner or residents of the surrounding
properties.

723

The business of insurance is regulated by the states and all states have laws which generally accomplish the goals of Section 6(f). Moreover, many states have specific insurance statutes which grants insurance commissioners the authority to remedy this problem if it were to occur.

Congress, the states and the insurance industry recognized the difficulty of providing insurance for many inner-city properties and, in 1968, Congress enacted the Urban Property Protection and Reinsurance Act (Public Law 90-448, 12 USCA 174bbb et seq.) which encouraged states to establish FAIR Plans (Fair Access to Insurance Requirements). FAIR Plans consist of all property insurers who transact business in a state and provide essential insurance satisfying mortgage lending requirements for properties which do not meet ordinary underwriting standards.

The insurance industry has made available the FAIR Plan market, for high risk property, at a considerable dollar loss since the inception of the Plans.

We submit that the administration and enforcement of anti-discrimination laws are properly the responsibility of the State Insurance Commissioners who are familiar with the intricacies and complexities of the insurance industry. These Commissioners, by reason of their duties, background and expertise, are in a position to assess and determine whether there has been any improper discrimination, and to police the industry in this and other matters.

Given the nature of the insurance industry and the limited capital available, there will doubtless be a few cases where applicants for insurance will be denied coverage by an insurer. These denials will not, however, be based on considerations relating to race, color, religion, sex, handicap or national origin but rather on the availability of funds and sound business principles. However, these denials will be most likely covered by another company or the state's FAIR Plan.

In our opinion, Section 6(f), as we stated previously, is not necessary and in effect brings about dual regulation. Today, when insurance departments and the insurance companies are attempting to reduce and control insurance costs, this section would ultimately result in increased cost to the consumer.

724

For the foregoing reasons, we urge the Committee to delete Section 6(f) from the bill. We do not believe that there exist any unfair discrimination in the issuance of insurance policies because of an individual's race, color, religion, sex, physical handicap or national origin. If there are any, there are state laws and regulations dealing with any violations which may exist.

It will be appreciated if this letter and the views contained therein can be made a part of the hearing record on this proposal.

Thank you very much for your consideration of these views.

Very truly yours,

James E. Jones, Jr.
Government Affairs Representative

JEJ:lbd
Copy to: Subcommittee Members

725



**BHCC**

BEDFORD HEIGHTS CIVIC COALITION

CHARLES H. BROMLEY
Executive Director

APR 12 1979

5333 NORTHFIELD ROAD
BEDFORD HTS., OHIO 44146
PHONE: 581-8926

Rep. Don Edwards
2329 Rayburn House Office Bldg.
Washington, DC 20515

April 10, 1979

Dear Rep. Edwards:

As a private, non-profit fair housing organization, our attention has been drawn to H2540, The Fair Housing Amendments Act of 1979. Utilyzing HUD guidelines, 93% of our completed audits indicated discriminatory housing practices; Specifically, 27 out of 29 audits demonstrated discrimination. Additionally, this type of behavior was preceeded by an educational forum to all real estate brokers and managers. Therefore, we hope that the following comments on the proposed amendments will be considered during your deliberations on this important issue.

The Bedford Heights Civic Coalition supports:

1) Extending the statute of limitation on filing a complaint to 1 year for filing with HUD, and 3 years for commencing a civil action.
2) Extending the prohibition of the Fair Housing act to the secondary mortgage market.
3) Authorizing HUD to provide financial assistance as well as the previously provided technical assistance to Federal, State local public or private agencies or organizations concerned with fair housing. Our experiences have demonstrated that private foundations and local governments are often hesitant to provide adequate funds for private fiar housing organizations, because of the sensitivity of the issue.
4) Providing cease and desist powers in order to maintain the status quo, insuring the availability of the housing unit in question, until the alleded discriminatory act is investigated. Specifically, the phrase "... after notice and opportunity to be heard has been given the respondent...", should be amended to call for prompt action, preferably within 24 hours to accomplish the purpose of this amendment.
5) The removal of the $1000 limit on punative damages, especially in relation to sex discrimination.
6) Removing the discretion from the court in the awarding of attorney's fees only if the prevailing plantiff lacks the financial capability to absorb the cost

of asserting his civil rights. Fair housing is not a question of indigency and those seeking housing in untraditional neighborhoods are rarely the poor. But no family should have to pay attorney's fees for the exercise of his right to secure a home.

7) Defining substantial equivalency so that state and local agencies will not receive that designation until there is a determination that an individual's right to relief will not be jeopardized as a result of the referral.

8) Awarding monetary damages so that violators suffer a mandatory penalty will reverse the thrust of the original Fair Housing Act whose reliance on conciliation failed to significantly inhibit discriminatory housing practices.

The following are sections of the proposed amendments to the Fair Housing Act that should be questioned because they fail to extend rights as fully as would be desireable:

1) Actions allowed under the provisions of the Fair Housing Act are for the provision of relief to "an aggrieved person" defined in Section 802(i) as including any person who is adversely affected by a discriminatory housing practice. This will narrow standing from the present wording. The present wording, "any person who claims to have been injured" can provide a broader construction to the issue of standing in a fair housing case. The NCDH audit verified the pervasiveness of discriminatory practice while the paucity of filings reflects, among many factors, the reluctance of victims to engage the perpetrators in legal or administrative processes. Others affected, whether checkers, fair housing organizations, municipalities, or white persons must be allowed to file complaints against those discriminating.

2) The awarding of reasonable attorney's fees should not be an option of the court but should be mandatory. If able attorneys are going to be encouraged to undertake fair housing litigation there must be an incentive. Our experience is that awards of damages are seldom substantial, in a very recent case a jury awarded one dollar to the prevailing plaintiff, so that attorney's fees may be the major penalty levied.

3) A serious defect in the section dealing with attorney's fees is allowing the award to prevailing party instead of the prevailing plaintiff as the law now reads. Fair housing litigation can be very arbitrary. You can have the strongest possible case of liability but, because the issues are emotional and controversial and may inhibit a jury, particularly an all-white jury, the evidence may fail to produce the expected results. In this case a realtor can impose a severe penalty on the aggrieved person. This provision will not induce victims to seek remedies and will have a chilling effect on the utilization of the Fair Housing Act to eliminate discriminatory practices. In order to avoid abuse it may be appropriate to qualify the limitation of awards to defendants by allowing them when the plaintiff acts in bad faith.

4) The sanction dealing with discrimination in the provision of insurance should be expanded to include some subtler practices that have discriminatory effect. The cancelling of contracts, closing offices, termination of agents in less profitable locations, or denying policies on the basis of age of dwelling are actions that belie discriminatory intent.

5) In order to insure discrimination on the basis of sex will be prohibited, both age and marital status will be prohibited, both age and marital status would be welcome inclusions under the Fair Housing Act. Both of these tend to work a disproportionate disadvantage to women.

Thank you for your attention to this important matter.

Yours truly,

*Charles H Bromley*

Charles H. Bromley

727

STATEMENT

OF

STANLEY C. VAN NESS

PUBLIC ADVOCATE OF THE STATE OF NEW JERSEY

ON

FAIR HOUSING AMENDMENTS OF 1979

MAY 14, 1979

003526

The New Jersey Department of the Public Advocate wishes
to go on record as endorsing the Fair Housing Amendments Act of
1979. We believe that it provides an excellent improvement over
existing law in many ways. We particularly support what we
regard to be the key feature of the bill -- the establishment of
an administrative mechanism for adjudicating housing disputes.
We are also very pleased that the bill allows both individual
complainant and HUD to choose either an administrative remedy or
a judicial remedy through the courts. Finally, as we describe in
more detail below, we support the bill's protections for handi-
capped individuals who have frequently suffered from housing
discrimination in the past.

We do have some comments on the legislation, however, which
we believe should be addressed as it precedes through the Congres-
sional process. First, as initially drafted in 1977, the bill
contained an explicit prohibition of exclusionary zoning; that
prohibition has since been dropped. We are concerned that the
alteration of the bill could be taken by the courts to mean that
the Fair Housing Act does not prohibit exclusionary zoning. The
opportunity for such a judicial construction should be obviated
by appropriate legislative history. Congress should go on record
as approving previous court decisions, in particular <u>Village of
Arlington Heights vs. Metropolitan Housing Development Corporation</u>,
558 F.2d, 1283 (7th Cir. 1977), <u>cert</u>. <u>denied</u>, 98 S.Ct. 752 (1978),
which have held that exclusionary zoning can violate the Fair
Housing Act where it has the effect of discriminating against

729

minorities. We believe that such decisions should be specifically endorsed in the legislative history just as the redlining decision, Lofman vs. Oakly Federal Savings & Loan, was endorsed in Congressman Edwards' remarks when he introduced the Fair Housing Amendments Act of 1979 in the House. See March 1, 1979 Congressional Record at page H 1036. This bill's admirable effort to strengthen the administrative procedures for housing discrimination cases need not and should not incur the danger of an implied judicial restriction on the substantive reach of the law as to zoning.

Second, while we support the explicit language making racial insurance and bank redlining illegal, we believe that serious consideration should be given to outlawing geographical discrimination in both of these industries. Much evidence has been compiled concerning the extent of disinvestment in lower income white as well as black areas. The statute would be improved if it were amended to protect against non-racially motivated discrimination.

Third, we suggested that the provisions concerning attorneys' fees be augmented by specifically requiring state courts to award attorneys' fees and actions brought under the federal fair housing statute. An attorney who chooses state court rather than federal court for the prosecution of federal claims, should not thereby lose his opportunity for collecting attorneys' fees if his client prevails.

In addition, the Department of the Public Advocate strongly endorses those sections of the Fair Housing Amendments Act (Section 4(b)) -- amending Section 802(f) of P.L. 90-284, by adding a new

730

Section 802(h) -- of S.506 and H.R. 2540, which include the
handicapped as a protected class within the meaning of the law.
It is our position that this amendment (which defines "handicap"
in the same manner as does the Rehabilitation Act of 1973, 29
U.S.C.A. §706(6)) represents a significant milestone in the
development of fair housing law, and we urge its adoption.

In preparing its report to the President's Commission on
Mental Health, the Task Force Panel on Legal and Ethical Issues
noted the importance of this issue:

> If community alternatives to institutional
> care are to be achieved, legislative action
> is required to protect mentally handicapped
> persons against housing discrimination.
> . . . A simple amendment to include mentally
> handicapped persons in Title VIII, Fair
> Housing of the Civil Rights Act of 1968
> would constitute a major legal protection
> for this group of citizens.

4 App., Task Panel Reports Submitted to the President's Commis-
sion on Mental Health 1359, 1391 (1978) (footnote omitted).
The section of S.506 and H.R. 2540 in question would provide pre-
cisely that protection.

Historically, there is a well-documented relationship
between our overreliance on institutionalization and the lack of
available adequate housing for the mentally handicapped.  See
generally, Rothman, The Discovery of the Asylum (1971).  The
mental institution has, in Rothman's words, traditionally been
"the province of the lower class."  Id. at 284.  See also,
Hollingshead and Redlich, Social Class and Mental Illness 171-219
(1958).

731

We know now the most important issue and most immediate problem in the whole area of dehospitalization is the securing of adequate housing for former patients. Kirk and Therrien, "Community Mental Health Myths and the Fate of Former Hospitalized Patients," 38 Psych. 209, 211 (1975). The availability of such housing is seen as "primary prevention for those at risk," i.e., those in danger of rehospitalization. Goldmeier, "New Directions in Aftercare: Cooperative Apartment Living," 6 (N.I.M.H. Mental Health Study Center Monograph 1975). When such housing is unavailable, "little initiative is displayed by the institutions toward the discharge of chronic patients." Kittrie, The Right to Be Different 95 (Pelican ed. 1973), citing Strauss et al., Psychiatric Ideologies and Institutions 116 (1964).

Further, empirical studies have shown that the availability of accessible apartment living "offers the greatest promise for returning the chronic hospitalized patient to the community," Weinman, Kleiner, Yu and Tillson, "Social Treatment of the Chronic Psychotic Patient in the Community," 2 J. Commun. Psychol. 358, 365 (1974), and that "nonsheltered" facilities "may often be more effective than designated sheltered arrangements" for long-term patients, in that nonsheltered facilities will likely include other non-patient tenants from whom ex-patients may "learn appropriate behavior" and will likely be managed by landlords who "often maintain greater expectancies for responsible behavior," Test and Stein, "Practical Guidelines for the Community Treatment of Markedly Impaired Patients," 12 Commun. Mental Health J. 72, 76 (1976). Also, since it is unrealistic to expect that many

732

ex-patients can return to a previous living arrangement or to a
relative's home (only one in ten patients studied in a recent
sample could return to such settings), the availability of decent
housing outside the hospital is an absolute prerequisite if any
deinstitutionalization program is going to work. Deasy and Steele,
"An Analysis of a State Hospital Population Subject to Release
Under Florida Law," 27 Hosp. & Commun. Psych. 42, 44 (1976).

Finally, it is also clear that ex-patients living in the
community in such housing are least likely to be socially segre-
gated, to be stigmatized, or to be labeled as deviants, Lamb and
Goertzel, "Discharged Mental Patients -- Are They Really in the
Community?" 24 Arch. Gen. Psych. 29, 33 (1971), and that, in
the long run, such ex-patients -- virtually unanimously -- prefer
such housing in the community, Bardach, The Implementation Game
296 (1977) (99 of 100 ex-patients interviewed in one sample
preferred community living to hospitalization). See generally,
for an overview of all issues, Ensminger and Reilly, "The Legal
and Social Significance of Aftercare Systems: A Review and
Analysis," 5 J. Psych. & L. 229 (1977).

New Jersey recently amended its law against discrimination
to include handicapped persons as a protected class. N.J.S.A.
10:5-4.1; N.J.S.A. 10:5-5(g) (amended November 2, 1978). A
similar amendment to 42 U.S.C.A. §3601 et seq. -- as embodied in
S.506 and H.R. 2540 -- will go a long way towards insuring the
full measures of citizenship for handicapped persons.

**733**



STATE OF NEW JERSEY
STANLEY C. VAN NESS
PUBLIC ADVOCATE

May 14, 1979

The Honorable Donald Edwards, Chairman
Subcommittee on Civil & Constitutional Rights
U.S. House of Representatives
Room 407 House Office Bldg., Annex 1
Washington, DC    20515

Dear Congressman Edwards:

Please find enclosed a statement by our Department
in support of the Fair Housing Amendments Act of 1979
(H.R. 2540).  We would appreciate these comments being
included in the transcript of hearings on this legisla-
tion.

As you can see from the statement, there are some
concerns which we hope will be addressed during the
Subcommittee's deliberations.

Sincerely,

Stanley C. Van Ness
Public Advocate

SCVN:sal

Enclosure

003532

734

# City of Palo Alto

CALIFORNIA
94301

OFFICE OF CITY MANAGER
(415) 329-2208

May 10, 1979

Don Edwards, Chairman
Subcommittee on Civil and Constitutional Rights
House Judiciary Committee
2329 Rayburn Building
Washington, DC 20515

Dear Mr. Edwards:

The City of Palo Alto supports the Federal Fair Housing Amendments Act
of 1979 (H.R. 2540 and S. 506). Passage of this bill would add much
needed strength to Title VIII of the 1968 Civil Rights Act by establishing
an enforcement mechanism in the Department of Housing and Urban Develop-
ment that would include the authority to issue cease and desist orders
and to impose a civil penalty not to exceed $10,000; expressly prohibiting
mortgage redlining; and prohibiting discrimination in the sale and rental
of housing against anyone on the basis of physical or mental handicap.

The City of Palo Alto believes it is essential to correct these deficiencies
in the existing Federal Fair Housing Law and strongly urges support of
this measure in Congress.

Sincerely,

GEORGE A. SIPEL
City Manager

GAS/Deb

cc: The Honorable Paul McCloskey
    The Honorable Birch Bayh
    The Honorable Charles Mathias

# Suburban Action

A nonprofit institute for
Research and Action in the Suburbs

**257 Park Avenue South, Room 2004**
**New York, N.Y. 10010**
**(212) 777-9119**

APR 26 1979

*Sub*

April 23, 1979

The Honorable Don Edwards, Chairman
House of Representatives Subcommittee on
    Civil and Constitutional Rights
2329 Rayburn Building
Washington, D.C.

Dear Congressman Edwards:

Suburban Action Institute is a non-profit organization with
a ten year history of dedication to the protection of rights
and opportunities for economic and social minorities. We have
two primary directions:

    1.  The achievement of equality of opportunity which neces-
        sitates the eradication of racism and poverty, and
    2.  The improvement of urban conditions and the quality of
        life offered both in the cities and the suburban areas.

Our purpose herein is to inform you of our general support
for the Fair Housing Amendments Act of 1979. (HR3504) Pre-
sently, there is a deficiency in the existing federal fair hous-
ing legislation. If it is to truly be the policy of the United
States to promote and protect the right of fair housing for all,
then this deficiency must be corrected. Enactment of the Fair
Housing Amendment Act of 1979 will correct this deficiency.

At present there is no branch of the federal Executive De-
partment charged with actual powers to provide firm remedies for
violations of federal fair housing laws. The Department of Hous-
ing and Urban Development (HUD) has been charged with responsi-
bility to administer federal fair housing legislation, however,
HUD has not been given effective enforcement power. HUD's en-
forcement tools currently consists of conferences, conciliation
and persuasion. These alone do not enable HUD to adequately
administer the laws. HR 3504 will grant HUD the power to ef-
fectively enforce fair housing legislation.

We believe that fair housing for all can become more of a
reality with the enactment of the Fair Housing Amendments Act
of 1979. HUD can more strenuously enforce fair housing when it
is fully empowered to:

736

1. adjudicate complaints and punish violators by assigning penalties.
2. issue cease and desist orders and temporary injunctions so that a dwelling could not be sold or rented while a complaint is being judged.
3. serve administrative complaints against violators of fair housing laws.
4. order preliminary relief pending final disposition of complaints.

We support each of the above provisions and the increase in HUD's enforcement powers that each will bring.

In addition to our support of those provisions expanding HUD's enforcement powers, we also strongly support the following other provisions of the bill:

1. Prohibition of the use of local land use controls that have the effect of excluding low and moderate income housing, either because the housing is eligible for public assistance or because of the race or income of the prospective occupants.

2. Inclusion of mortgage anti-redlining provisions.

3. Prohibition of insurance companies refusing to sell insurance for racial reasons.

4. Subjecting owner - occupants of one-to-four unit dwellings to the provisions of Title VIII.

5. Expansion of the protection of Title VIII coverage to include handicapped persons.

Although we support the extension of Title VIII coverage to the handicapped, we believe the definition of handicapped should be clarified. Further the legislation should make clear whether existing housing suppliers must rehabilitate existing units to accommodate the handicapped or if the law is to only apply to units yet to be built.

In addition,while we endorse the concept of a Fair Housing Loan Fund as a sound idea we believe that the legislation should provide strict guidelines for its applicability coverage and usage. In this way public abuse of the fund can be avoided.

Finally, we support the enactment of the Fair Housing Amendments Act of 1979 and request your voting support for this legislation.

We appreciate this opportunity to be heard.

Very truly yours,

Ronni Whitaker
Senior Planner

003535

737

## NATIONAL HISPANIC COALITION
## FOR BETTER HOUSING
810 EIGHTEENTH STREET, N.W. SUITE 705
WASHINGTON, D. C. 20006
(202) 783-1478

OFFICERS,
AUREO CARDONA - CHAIRMAN OF THE BOARD
JOSE S. GARZA - PRESIDENT
MARIA B. BERON - TREASURER
RICHARD MARTINEZ - SECRETARY

June 1, 1979

The Honorable Peter W. Rodino
Chairman
Committee on the Judiciary
U.S. House of Representatives
2137 Rayburn Building
Washington, D.C. 20515

Dear Mr. Chairman:

We at the National Hispanic Coalition For Better Housing, Inc. are great-
ly concerned about the passage of the Fair Housing Act Amendments of 1979
(H.R. 2540), which the Subcommittee on Civil and Constitutional Rights is
presently reviewing. These amendments will give the Department of Housing
and Urban Development (HUD) more power in dealing with housing discrimina-
tion. We urge you to support this bill as it stands.

Under the current Fair Housing Act, HUD lacks the enforcement authority
with housing discrimination. It is limited to conciliation and persua-
sion to secure compliance.

If the bill is passed, "aggrieved" individuals would no longer be limited
to seeking remedies through a lengthy judicial process, but would seek a
more speedy remedy through the administrative process. It would also ex-
tend protection to handicapped persons.

When a violation of the act is established through an administrative
hearing, HUD would be able to issue a "cease and desist" order and also
appropriate relief. A civil penalty could be extended up to a maximum
of $10,000. An investigation by HUD of housing practices would be ini-
tiated on its own against discrimination.

Under provisions of the proposed legislation HUD would be able to issue
a temporary injunction to prevent the sale or rental of dwellings until
a final decision is made. They would in addition to this have the op-
tion to send the complaint to the Department of Justice for further ac-
tion.

003536

738

Individual rights will also be extended. The "aggrieved" parties would have the option to seek private remedies in civil court as well as file a complaint with HUD. In addition to this the "aggrieved" individuals would be able to intervene in any proceeding initiated by HUD or the Department of Justice. This is not possible under the current law.

Under the proposed legislation, clarifications of the existing law would permit individuals to bring action against Federal agencies which fail to perform under the Fair Housing Act.

The bill would give the power to the courts which would enable them to award reasonable attorney fees to the "aggrieved" parties in any proceeding brought pursuant to the Act. Furthermore, $1,000 would be removed in private fair housing litigation.

Mortgage and insurance "redlining", including the operation of the secondary mortgage market would be prohibited. No person can be denied, under the law, mortgage loans and property insurance because of racial, ethnic, or religious composition of the neighborhood surrounding the dwelling.

The proposed legislation would enable HUD to provide financial and technical assistance to public and private civil rights organizations seeking to remedy housing discrimination.

We hope that you will give this bill serious consideration. We urge you to support the Fair Housing Act Amendments of 1979.

Respectfully,

Jose S. Garza
President

JSG/MR:ctp

003537

739



Leadership Council
for
Metropolitan
Open
Communities   407 SOUTH DEARBORN STREET CHICAGO, ILLINOIS 60605 (312) 341-1470

Statement of

LEADERSHIP COUNCIL FOR METROPOLITAN
OPEN COMMUNITIES

Chicago, Illinois

to

COMMITTEE ON THE JUDICIARY
SUB-COMMITTEE ON CIVIL AND CONSTITUTIONAL RIGHTS
House of Representatives

Concerning Fair Housing

June 5, 1979

740

STATEMENT OF
CHARLIE A. THURSTON
MEMBER, BOARD OF DIRECTORS
LEADERSHIP COUNCIL FOR METROPOLITAN
OPEN COMMUNITIES

Chicago, Illinois

Thank you, Mr. Chairman and members of the Sub-Committee for inviting the Leadership Council for Metropolitan Open Communities to present its views on Senate Bill 506, the "Fair Housing Amendments Act of 1979".

First, I would like to tell you about the Leadership Council. We are a non-profit, citizens fair housing agency formed in 1966. In that year, Dr. Martin Luther King, Jr. led a series of demonstrations against housing segregation in Chicago. At the close of a tense and difficult summer, Chicago's civic, religious, business and governmental leadership pledged, to themselves and to Dr. King, that they would open the housing market in Chicago and suburbs to all, without discrimination. The Leadership Council was formed to carry out that commitment.

Although the task has proved far more difficult and time-consuming than most predicted, Chicago's leadership has remained faithful to that pledge. The Leadership Council has been maintained as a strong, effective force working to end the dual, discriminatory housing market. Our Board of Directors includes the heads of major civic organizations and religious groups, of civil rights agencies and local governments. It also includes the chief executive officers of other top officials of 12 Chicago corporations, including Commonwealth Edison, Inland Steel, First National Bank of Chicago, International Harvester, and my own Northern Illinois Gas Company.

Chicago's business community has given solid, sustained support to fair housing efforts because we recognize that discrimination and segregation in

741

housing must be ended if we are to have a healthy community. We have learned, with Dr. King's help, that the degradation of the individual by housing discrimination is compounded at the societal level and is a key factor in the threatened deterioration vs. urban areas into two societies – one white and affluent, one poor and black. Housing segregation of the past has left a terrible legacy in blighted neighborhoods, segregated schools, and an unemployment crisis among minorities.

Because we understand how important fair housing is, and how much firm enforcement is required to change the patterns of the past, our Board of Directors has endorsed the major provisions of S. 506, and urges its prompt passage and full implementation, with some minor modifications which I will cover later.

Our programs have included large-scale educational programs, builder and manager of low and moderate income housing, planning with suburban officials for more and better distribution of such housing, a pioneering program under contract to the Department of Housing and Urban Development to place public housing families in private housing using the Sec. 8 subsidy, a part of the remedy in the Gautreaux litigation, and fostering of a network of independent fair housing centers throughout the suburbs.

However, we have concentrated our efforts on enforcing the 1968 and 1866 Fair Housing Laws and, we think, have more experience than any other agency in such enforcement. Beginning in 1969, through 1978, attorneys on the staff of our Legal Action Program have filed 468 suits, most of them in U.S. District Court under the private civil suit provisions of the 1968 Act. (Sec. 812), seeking enforcement of the Fair Housing Laws. Overall, we have

742

been successful in 85% of those cases, and in recent years, in 92%. Our cases have established many of the judicial precedents relied on throughout the country. Two of them, MHDC v. Arlington Heights, 72 C 1453 and Village of Bellwood v. Gladstone, 75 C 3587, were decided by the U.S. Supreme Court. We like to think that we have developed the private suit method of enforcement to a fine art, moving quickly into court, while the housing unit in question is still available, obtaining temporary restraining orders to hold the unit off the market while the issue of discrimination is being heard, providing full evidence based on careful investigation, and availing the person suffering the discrimination of the full powers of the court to remedy the wrong and to make the injured party whole again. We have found that strong enforcement is a powerful incentive to institutional change.

The Department of Housing and Urban Development supported the beginnings of our Legal Action Program and we have worked closely with the Department's Fair Housing and Equal Opportunity section in its administrative enforcement efforts (Sec. 810). Both the Department and we have recognized however, that the lengthy time involved in the administrative process and the lack of any final authority or sanction to correct the practice of an uncooperative respondent, has critically limited the effectiveness of enforcement under this section.

For these reasons, we support strongly these amendments which give the Secretary of the Department of Housing and Urban Development additional investigative and initiatory powers, authority to issue cease and desist orders, to assess civil penalties, and which allow additional time for filing complaints. These changes will serve to make the administrative enforcement

743

process more nearly equivalent to the judicial process and thus will greatly strengthen the total enforcement effort. This, of course, assumes that the Congress will provide adequate staff and budget to HUD to fulfil its new responsibilities. Failure to do so would be another example of promises denied.

The existing bill provides for assignment of a case to a state agency. We believe that provisions for HUD to send complaints to state agencies should be amended to allow the Secretary to "call back" any complaint that is not effectively prosecuted by the state. This "call back" provision will make it possible for HUD to push the state agency and, if they do not do a good job, take a complaint back from them.

While we support the amendments to strengthen the administrative process, (Sec. 810) we are concerned that the judicial alternative (Sec. 812) not be inadvertently weakened. The existence of this strong alternative is, in our view, essential for the time before a new administrative procedure is fully tested and implemented, and as a safeguard against a future time when a different administration might be less committed to effective enforcement. For this reason we urge that the present bill be amended to allow a pre-vailing complainant in the administrative process to institute a new proceeding in U.S. District Court to obtain individual relief for compen-satory and punitive damages and attorney's fees which would not be available to him or her in the administrative process. The proposed legislation would leave the complainant who chose the administrative route at a severe dis-advantage in recovering from the injury and insult of housing discrimination. Our staff will propose specific language on this point to the Sub-Committee

744

staff. We also urge that the proposed changes in Sec. 4(i) in the definition of "persons aggrieved" be dropped and that the language of the existing Act be retained. The Courts have substantially clarified the importance of the present definition, most particularly in <u>Bellwood</u> v. <u>Gladstone</u> and it would be prudent to avoid litigation to similarly clarify any changes.

We want further to commend those amendments which extend and clarify the affirmative responsibilities of federal agencies and departments to carry out the purposes of the Fair Housing Act. We have urged that federal agencies take into account the discriminatory and segregated housing market in some municipalities to which they make grants, and condition their grants on steps to end those practices. We believe this is a clear responsibility under the present Act, but we feel passage of these Amendments will further clarify this responsibility and provide for a judicial review.

Without going into detail, we believe the extension of coverage to insurance and lending and the reduction in the exemptions for owner-occupied units are sound and necessary measures, justified by the experience of the past 10 years.

For all these reasons, we support the passage of S. 506 with the modifications suggested. We appreciate the opportunity to present our views. I will be pleased to answer any questions you may have.

/ab



TELEPHONE: 293-7330
(AREA CODE 202)

# UNITED STATES CONFERENCE OF MAYORS

### 1620 EYE STREET, NORTHWEST
### WASHINGTON, D. C. 20006

*President:*
WILLIAM H. McNICHOLS, JR.
Mayor of Denver

*Vice President:*
RICHARD E. CARVER
Mayor of Peoria

*Past Presidents:*
LEE ALEXANDER
Mayor of Syracuse
KENNETH A. GIBSON
Mayor of Newark
HENRY W. MAIER
Mayor of Milwaukee

*Trustees:*
HELEN G. BOOSALIS
Mayor of Lincoln
NEIL GOLDSCHMIDT
Mayor of Portland
MARGARET T. HANCE
Mayor of Phoenix
JANET GRAY HAYES
Mayor of San Jose
MAYNARD JACKSON
Mayor of Atlanta
PATIENCE S. LATTING
Mayor of Oklahoma City
LEWIS C. MURPHY
Mayor of Tucson
HERMAN PADILLA
Mayor of San Juan
GEORGE M SULLIVAN
Mayor of Anchorage
KEVIN H. WHITE
Mayor of Boston
COLEMAN A. YOUNG
Mayor of Detroit

*Advisory Board:*
RICHARD G. HATCHER, *Chairman*
Mayor of Gary
MICHAEL A. BILANDIC
Mayor of Chicago
THOMAS BRADLEY
Mayor of Los Angeles
WYETH CHANDLER
Mayor of Memphis
STANLEY A. CMICH
Mayor of Canton
LILA COCKRELL
Mayor of San Antonio
RICHARD H. FULTON
Mayor of Nashville
WILLIAM E. HANNA
Mayor of Rockville
ARTHUR J. HOLLAND
Mayor of Trenton
FRANK LOGUE
Mayor of New Haven
ANGELO R. MARTINELLI
Mayor of Yonkers
CAROLE N. McCLELLAN
Mayor of Austin
JAMES H. McGEE
Mayor of Dayton
TOM MOODY
Mayor of Columbus, Ohio
GEORGE R. MOSCONE
Mayor of San Francisco
JOHN P. ROUSAKIS
Mayor of Savannah
E. CLAY SHAW, JR.
Mayor of Fort Lauderdale
IRVING M. STERN
Mayor of St. Louis Park, Minn.
HANS G. TANZLER, JR.
Mayor of Jacksonville
LOUIS J. TULLIO
Mayor of Erie
DAVID J. VANN
Mayor of Birmingham
WARREN WIDENER
Mayor of Berkeley
PETE WILSON
Mayor of San Diego
TED L. WILSON
Mayor of Salt Lake City

*Executive Director:*
JOHN J. GUNTHER

June 18, 1979

The Honorable Don Edwards
Chairman of Subcommittee on
  Civil & Constitutional Rights
2329 Rayburn House Office Building
Washington, D. C. 20515

Dear Mr. Edwards:

The United States Conference of Mayors would
like to submit for the record testimony in support
of HR 2540.  We are sorry that we could not testify
in person, but we hope that the committee will take
our comments into consideration as they deliberate
on this legislation.

If you would like additional information, please
do not hesitate to contact us.

Sincerely,

John J. Gunther
Executive Director

Enclosure

746

It has been a decade since the Kerner Commission on
Civil Disorders wrote about America moving toward two societies,
separate but unequal. The Riot Commission report was published
in 1967, the following year one of its recommendations--the
creation of a National Fair Housing Law--became a reality.
Ten years later we're still faced with growing concentrations
of minorities and increased racial isolation. However, housing
discrimination does not confine itself to racial minorities.
Women, particularly single women, the elderly, and families of
small children are victims of housing discrimination. Even
when the physical structure is available it is difficult to
find housing to rent or purchase.

In order to divert attention from the problem, it has
been said that housing discrimination complaints are not filed
with frequency or in great numbers. This may be true on the
surface, but there are reasons that many people do not file a
complaint even when they feel sure that they have been dis-
criminated against. Among the reasons are a lack of information,
some misinformation, and slow processing.

Many people do not know where or how to file a complaint.
If the HUD area office is not in their community it may even be
difficult to file a complaint. In addition, many people feel
that if they file a complaint and are successful, they will have
to live in that particular housing unit. Obviously, it would not
be pleasant circumstances either dealing with the landlord or the
neighbors where controversy had surrounded the acquisition of the

747

house or apartment.

Once a housing discrimination complaint is filed, it may take a year or more for the complaint to be processed. More than one federal agency is involved and, under the best of circumstances, information can be lost or slowed up when it has to go back and forth between agencies.

Unfortunately, Title 8 of the Civil Rights Act of 1968 was too weak to deal effectively with the prevasive problems of housing discrimination. The Department of Housing and Urban Development authority is limited to persuasion and conciliation. The Department of Justice could pursue litigation in cases where a pattern or practice of housing discrimination was found. The main burden of the compliance rested on individuals who were victims of discrimination. Most of these victims have had neither the time nor the money to pursue adequate remedies for the acts of discrimination directed against them.

Failure to make significant strides toward ending housing discrimination has been especially damaging to local governments. Minorities tend to be concentrated in cities and within those cities are frequently trapped in low income ghettos. In many ways, therefore, HR2540, which is an urban bill, would provide an effective framework of law in which the federal government could begin to play an important role in ending housing discrimination. It is apparent that many of the problems of cities, including the fiscal condition of local government, segregation in public schools, stability within neighborhoods, and even the attractiveness of cities as places for private investment, are related to the existence of discriminatory housing markets.

748

The Fair Housing Amendments Act of 1979, HR2540, puts some teeth into Title 8 of the Civil Rights Act. Based on the experience of organizations such as the National Labor Relations Board, the Department of Housing and Urban Development is given signficant enforcement powers. Most important is the authority granted to HUD to issue cease and desist orders and to impose civil penalties up to $10,000. In addition, HUD is authorized to refer individual complaints to the Justice Department in cases where damages of a significant size may be indicated.

The amendments also clarify and strengthen procedures open to an individual victim of discrimination. A person who has been the victim of housing discrimination can make a choice between pursuing an effective administrative channel through the Housing and Urban Development Department or through pursuing legal action directly with the Department of Justice. The law also makes it clear that any aggrieved party, not necessarily the one who has been directly affected by discrimination, has standing in the courts and with HUD to pursue the remedies provided for in the law. In other words, a white person denied an opportunity to live in an integrated neighborhood because minorities have been discriminated against can legally

749 ·

be a plaintiff in a law suit under the provisions of the
Fair Housing Act if it's amended as proposed.  Coverage
is expanded by the proposed amendments by lifting the
exemption of one to four family housing.  The revised
law would fairly balance the right of privacy of the people
living in a single family or small housing unit with the
objectives of providing fair housing.

Approval of HR2540 would add an important new dimension
to local efforts to deal with housing and community develop-
ment problems.  With the passage of the Housing and Community
Development Act of 1974 "the reduction of the isolation of
income groups within communities and the promotion of an
increase of the diversity and vitality of neighborhoods
through the spatial deconcentration of housing opportunities
for low income people" became an objective of national
policy.  There are a number of localities in which efforts
are being made to blend efforts to eliminate housing dis-
crimination with programs to expand opportunities for lower
income people outside areas of poverty and minority group
concentration.  Insuring that the location of lower income
housing within cities and throughout metropolitan areas
promote an expansion of economic and racial opportunities

750

requires that the housing market operate without discrimina-
tion. The approval of HR2540 would provide important and
essential boost to these now fledging efforts to insure
that the subtleties that exist between economic and racial
discrimination are addressed adequately at the local level.

An important part of HR2540 is the discretion given to
the Secretary of HUD in deciding whether to refer complaints
to state and local agencies. The standards for certification
certainly provide a new tool for use at the federal and
local levels to improve performance in the area of housing
discrimination. The Committee might consider providing
financial incentives to local governments to assist them in
meeting standards and also to experiment with techniques for
dealing with economic and racial discrimination. It is
clear that strong efforts must be made to expand opportunities

with the lower income, mostly people living in large ghettos
in many cities throughout the country. HR2540 can be an
important new ingredient in addressing this critical
problem. It must be linked, however, with affirmative efforts
to expand housing opportunities for lower income people.

HR2540 clarifies and updates Title 8 of the Civil Rights
Act based on numerous court decisions which have in effect
clarified the coverage of the fair housing legislation. It

751

is very desirable to include in the law, with clarity,
that mortgage redlining, property insurance, secondary
market operations, are all within the purview of the Fair
Housing Act. As local governments have become more deeply
involved in housing and community development it has become
apparent that underwriting principles, decisions about where
to provide property insurance, and which mortgages should be
purchased by a secondary market institution have a powerful
influence on the ability of minorities and lower income
people to find adequate housing. The Community Reinvestment
Act and Home Mortgage Disclosure legislation are producing
information which can be of significant influence in identify-
ing patterns and practices which in effect limit opportunities
for minority people within specific communities or within
particular service areas which are the responsibility of
federally regulated financial institutions. This information
and these tools are becoming a part of local government
efforts to develop and implement overall community improve-
ment programs. HR2540 is needed in order to ensure that
there is an ability on the part of the government to free-up
the housing market by eliminating discriminatory practices.

It would be desirable in light of the efforts to
make local fair housing programs an intregal part of local

housing and community development improvement programs to strengthen Section 8 of HR2540. It is becoming increasingly clear to local government officials that many different federal agencies are involved in activities which have an important influence on fair housing. The present language in Section 8 concerning cooperation between HUD and other federal agencies is general and does not clearly set forth responsibilities for achieving coordination. The Committee should give careful attention to ways of strengthening this language so that, for example, lead agencies would be designated with reasonably specific responsibilities for coordinating a government-wide effort to achieve fair housing objectives. It might be desirable to give the Department of Housing and Urban Development this lead responsibility on the administrative side. The Department of Justice might have lead responsibility for fair housing litigation. Some have suggested the need for a staff person in the Executive Office of the President to achieve coordination. There may be a number of different specific techniques. It is our hope that the Congress will work with the Administration to strengthen Section 8. The law should detail specific responsibilities for achieving coordination to enable localities to develop and implement managerially sound programs of activities which achieve the dual goals of expanding opportunities for lower income people while eliminating housing discrimination.

[Whereupon, at 11:40 a.m., the hearing was adjourned.]

753

STATEMENT ON BEHALF OF THE
NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS

On H.R. 2540

Before the Subcommittee on Civil and Constitutional Rights
of the House Judiciary Committee

Submitted by
H. P. Hudson
Commissioner of Insurance of the State of Indiana
and President of the NAIC

And
Wesley J. Kinder
Commissioner of Insurance of the State of California
and Vice President — Chairman of the
Executive Committee of the NAIC

June 29, 1979

Mr. Chairman and members of the Subcommittee, this statement is submitted to you on behalf of the National Association of Insurance Commissioners, commonly known as the NAIC. The NAIC is the oldest voluntary association of state officials in the nation, having its inception in 1871. The membership of the NAIC includes the chief insurance regulatory official of each of the 50 states, the District of Columbia, Guam, Puerto Rico and the Virgin Islands.

The objectives of the NAIC are (1) to promote uniformity in legislation affecting insurance, (2) to encourage uniformity in departmental rulings under the insurance laws of the several states, (3) to disseminate information of value to insurance supervisory officials in the performance of their duties, (4) to establish means to fully protect the interest of policy-holders and (5) to preserve to the several states and United States possessions the regulation of the business of insurance. To achieve these purposes, the NAIC utilizes an extensive committee system and has permanent staff located in two offices.

We wish to express our appreciation for the opportunity to describe some of the property insurance problems of racial and other minorities and to outline what the NAIC and individual states are doing to alleviate their adverse consequences. We will specifically review H.R. 2540 and give our opinion of the portion of that bill dealing with discrimination in property insurance underwriting. This opinion is largely reflective of our strong belief in the soundness of a state-directed system of insurance regulation. Our comments must be understood in this context, since we share the concerns of the drafters of this proposal that no insurance practice should unfairly penalize the members of a particular race or minority. Finally, we have attached to this statement some background material on residential property insurance to assist the Subcommittee in developing an awareness of basic property insurance terminology and practices.[1]

PERSONAL LINES INSURANCE PROBLEMS OF
INNER-CITY RESIDENTS AND OTHER MINORITIES.

More than ten years ago the President's National Advisory Panel on Insurance in Riot-Affected Areas (Hughes Panel) found that insurance companies were restricting the supply of insurance in urban core areas by "redlining" certain neighborhoods and territories. These redlined areas were avoided by insurance companies because the companies regarded business in such areas to be relatively unprofitable. The Hughes Panel found that, given a limited capacity to accept risks, companies naturally sought to choose the "least hazardous risk in relation to the amount of premium charged."[2] The Panel believed

---

1. See Appendix A.

2. PRESIDENT'S NATIONAL ADVISORY PANEL ON INSURANCE IN RIOT-AFFECTED AREAS, MEETING THE INSURANCE CRISES OF OUR INNER CITIES 6 (1968).

that adoption of its recommendations for "Fair Access to Insurance Requirements Plans" would "end the practice of 'red-lining' neighborhoods and eliminate other restrictive activities."[3] Although FAIR Plan legislation in 28 states[4] has had a positive impact on the availability of property insurance since the publication of the Hughes Panel report, there is evidence that insurance redlining and other forms of unfair underwriting discrimination continue to pose problems for racial and other minorities today.

Several recent studies by governmental and private groups have concluded that insurance redlining — "the arbitrary refusal by the industry to insure certain risks because of their location"[5] — is widely practiced by the insurance industry.[6] Although these studies focus on one particular form of unfair discrimination — refusals to insure because of the location of risks — they epitomize a broader problem in the property/casualty insurance industry. This broader problem is the lack of sensitivity on the part of the insurance industry to the fate of individuals who have been relegated to an "undesireable" status in the risk selection process. Because these "undesireable" individuals usually are able to obtain "essential" property/casualty insurance from residual market mechanisms such as FAIR Plans and automobile assigned risk plans, the insurance industry has taken few voluntary steps to cushion the adverse consequences of insurance declinations or terminations in the voluntary market. Moreover, industry success in defining certain classes or categories of property/casualty risks as "undesireable," i.e. "unprofitable," has reinforced the view that individual hardships wrought by successful underwriting are unfortunate but unavoidable by-products of a free enterprise insurance system. Although there is evidence that significant segments of the industry are becoming increasingly aware of the plight of individuals who have been refused insurance coverage in the voluntary market, a majority of the industry still strongly supports the underwriting prerogative of individual companies to refuse or terminate insurance coverage as necessary to produce favorable underwriting results.

There are two specific adverse consequences of broad underwriting discretion in the personal lines insurance market which are the subject of growing public discontent. First, broad underwriting discretion can lead to the "dumping" of risks into the surplus lines market or residual market mechanisms where insurance coverage is often less favorable and more expensive than in the voluntary market.[7] Second, broad underwriting discretion can result in the mistaken categorization of individuals or properties as "undesireable" risks when such individuals or properties are, in fact, "good" risks. These two consequences of broad underwriting discretion are the primary impetus behind neighborhood, civil rights and equal rights groups who are seeking stronger prohibitions against unfair discrimination in property/casualty insurance marketing and underwriting.

### NAIC RESPONSE TO UNFAIR DISCRIMINATION IN
### PROPERTY INSURANCE MARKETING AND UNDERWRITING

The NAIC has recently taken bold action to identify and prohibit unfair discrimination in property insurance marketing and underwriting. To assist individual insurance applicants and policyholders in obtaining insurance when they have been the target of unfairly discriminatory practices, the NAIC recently adopted a Property Insurance Declination, Termination and Disclosure Model Act.[8] In addition, the NAIC recently added several amendments to its Model Unfair Trade Practices

---

3.  Id.

4.  These states are California, Connecticut, Delaware, the District of Columbia, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Pennsylvania, Puerto Rico, Rhode Island, Virginia, Washington and Wisconsin.

5.  U.S. DEP'T. HOUSING & URBAN DEVELOPMENT, FEDERAL INSURANCE ADMINISTRATION, INSURANCE CRISES IN URBAN AMERICA 27 (1978).

6.  E.g., id. at 43; B. MELEWSKI & M. LAMPI, WHERE DO YOU DRAW THE LINE? (New York Public Interest Research Group, Inc. 1978); MIDWESTERN REGIONAL STATE ADVISORY COMMITTEES TO THE U.S. COMMISSION ON CIVIL RIGHTS, INSURANCE REDLINING: FACT NOT FICTION (1979).

7.  See INSURANCE CRISES, supra note 5 at 18-19, 37; Note, Property Insurance and the American Ghetto: A Study in Social Irresponsibility, 44 S. CAL. L. REV. 218, 243-46 (1970).

8.  See Appendix B.

755

Act which generally prohibit insurance companies from engaging in business practices which result in unfair discrimination to certain individuals or risks.[9] The NAIC believes this two-pronged attack against unfair discrimination will lead to greater fairness in the treatment afforded individuals and risks by the property insurance industry.

The NAIC Property Insurance Declination, Termination and Disclosure Model Act was developed by the NAIC Redlining Task Force and adopted by the NAIC at its Chicago meeting on June 8, 1979. The Act applies to personal lines property insurance policies which insure dwellings of not more than four residential units or the personal property contained in any residential dwelling. Insurance companies are prohibited from cancelling property insurance policies under the Act unless the cancellation is based upon one of seven permissible reasons. In addition, no insurance company, agent or broker can decline to issue or terminate a policy of property insurance if the declination or termination is based upon an impermissible reason such as the race, religion, nationality, ethnic group, age, sex, or marital status of the insurance applicant or policyholder. To monitor compliance with the restrictions on cancellations, declinations and terminations the Act requires insurance companies, agents and brokers to provide the insurance applicant or policyholder with a written explanation of the reasons for any cancellation, declination or termination. The Insurance Commissioner in the enacting state is empowered to enforce the Act by requiring insurers to accept insurance applicants or reinstate policyholders who have been denied insurance and/or levying a monetary penalty for each violation of the Act.

To complement the individual remedies granted by the Model Property Insurance Delination, Termination and Disclosure Act, the NAIC recently adopted several amendments to the NAIC Model Act Relating to Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance which address unfair discrimination in a broader context. Four specific prohibitions were added to the existing provisions of the Act to further identify impermissible forms of unfair discrimination. The first amendment adds as an unfair trade practice refusals to insure, cancellations or limitations of the amount of property or casualty insurance coverage because of the geographic location of a risk. The second amendment defines as an unfair trade practice refusals to insure, cancellations or limitations of the amount of insurance on a residential property risk because of the age of the residential property. The third amendment to the Act prohibits insurers from refusing to insure, refusing to continue to insure or limiting the amount of coverage available to an individual because of the sex or marital status of the individual. Finally, the Act was amended to include as an unfair trade practice the termination, modification or declination of any property or casualty insurance policy solely because an applicant or policyholder is mentally or physically impaired. The result of these four amendments is to place identifiable boundaries on the underwriting discretion of insurance companies so that certain individuals will not be denied insurance for socially impermissible reasons. Hopefully, their implementation will foster greater reliance on objective underwriting criteria by the property/casualty insurance industry.

It is important to note that both the Model Property Insurance Declination Act and the amendments to the Unfair Trade Practices Act have been endorsed by industry and consumer representatives alike. The Model Property Insurance Declination Act, for example, is supported by a broad coalition of industry, consumer and government groups, including the Alliance of American Insurers, an industry trade association; the National Planning and Training Center of Chicago, a consumer-oriented neighborhood group ;and the United States Commission on Civil Rights. Similarly, the amendment to the Unfair Trade Practices Act dealing with unfair discrimination against individuals with a mental or physical impairment is supported by the American Insurance Association, an industry trade group; the Center for Public Representation, a Wisconsin consumer group; and the National Federation of the Blind. The NAIC is confident that such broad-based support for its model laws will lead to their swift enactment by state legislatures in the months ahead.

NAIC ASSESSMENT OF H.R. 2540

As insurance commissioners responsible for enforcing state insurance laws, members of the NAIC have a deep interest in H.R. 2540. Section 6(c) of that bill would include as an unfair housing practice under title VIII of the Civil Rights Act of 1968 the following:

> For a person in the business of insuring against hazards to refuse to enter into, or discriminate in the terms, conditions, or privileges of, a contract of insurance against hazards to a dwelling because of the race, color, religion, sex, handicap, or national origin of persons owning, or residing in or near, the dwelling.

---

9.   See Appendix C.

Enforcement of this new prohibition is accomplished at two levels. The Secretary of Housing and Urban Development is authorized under section 8 of the bill to conduct administrative proceedings and impose civil penalties upon finding a violation of the Act. In addition, H.R. 2540 grants to aggrieved persons under the Act a civil cause of action in both federal and state courts.

Although the NAIC supports the major provisions of H.R. 2540 dealing with housing practices, it strongly opposes the section of that bill pertaining to property insurance underwriting practices. The reasons for opposing this provision are threefold. First, the NAIC believes that it is inappropriate to address the complex problems of unfair discrimination in the business of insurance in a single sentence amendment to title VIII of the Civil Rights Act of 1968. As Mr. Justice Powell recently observed in Regents of University of California v. Bakke:

> the concept of 'discrimination,' like the phrase 'equal protection of the laws,' is susceptible to varying interpretations, for as Mr. Justice Holmes declared, '[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.'[10]

The concept of discrimination has a much different meaning when applied to the housing practices of the real estate industry than it does in the context of property insurance marketing and underwriting.

The word "discrimination" has a very negative meaning when used in the context of the real estate industry. In normal parlance it connotates the arbitrary and prejudicial refusal to sell or rent housing units to members of particular minorities. The word "discrimination" in the insurance industry, on the other hand, is often used in a positive sense to describe the risk assessment process. Insurance companies universally "discriminate" between individuals or risks when they offer insurance coverage at higher prices and/or on more limited terms to individuals or risks with higher loss potential. As the Hughes Panel observed, "a risk must bear an appropriate rate; if a property is significantly more hazardous than average, it must yield a commensurately higher premium."[11] In other words, "each class of insurers should pay its share of losses and expenses."[12] Discrimination is therefore essential to the proper pricing and structuring of property insurance coverages. It is unfair discrimination which must be prohibited in the insurance industry, not discrimination per se. The NAIC is fearful that this critical distinction will be lost if the Civil Rights Act of 1968 is amended to encompass property insurance underwriting practices.

The second reason for NAIC opposition to section 6(c) of H.R. 2540 is the fact that state legislatures and the NAIC have adequately addressed the problems of unfair discrimination in property insurance underwriting. The states and the NAIC have already promulgated strong remedial legislation to address the same problems addressed by the drafters of section 6(c). Some 38 states have enacted insurance legislation which deals with the problem of unfair discrimination in property insurance underwriting; 16 states specifically prohibit unfair discrimination based on factors or characteristics similar to those enumerated in section 6(c),[13] while 22 additional states generally prohibit unfair discrimination in such a manner as

---

10.    ── U.S. ── (1978); 57 L. Ed. 2d 750, 767 (1978).

11.    HUGHES PANEL REPORT, supra note 2, at 11.

12.    Id. at 35.

13.    ARK. STAT. ANN ½

13.    ARK. STAT. ANN §66-3006 (1966); CAL. INS. CODE §679.71 (West 1972); FLA. STAT. §626.9541(24) (Supp. 1977); ILL. ANN. STAT. §755.21a (Supp. 1979); KY. REV. STAT. ANN. §304.12-085 (Baldwin 1971); MD. ANN. CODE art. 48A, §234A (Supp. 1977); MICH. COMP. LAWS ANN. §500.2027 (Supp. 1978); MO. ANN. STAT. §375.007 (Vernon Supp. 1978); MONT. REV. CODES ANN. §33-18-212(3) (1961); N.H. REV. STAT. ANN. §417:4(VIII)(c) (Supp. 1975); N.J. STAT. ANN. §17:29B-4(c) (1970); N.Y. INS. LAW §40(10) (McKinney 1966); N.D. CENT. CODE §26-30-04(11) (1977); PA. STAT. ANN. tit. 40 §1171.5 (Purdon 1971); WASH. REV. CODE ANN. §49.60.176 (Supp. 1978). All fifteen states prohibit unfair discrimination based on race, fourteen states prohibit unfair discrimination based on color or creed, twelve states prohibit unfair discrimination based on sex or national origin and three states prohibit unfair discrimination based on a physical or mental handicap.

to encompass those same individual factors or characteristics.[14] Moreover, the recently-adopted NAIC Model Property Insurance Declination, Termination and Disclosure Act, as well as the four recent amendments to the NAIC Unfair Trade Practices Act, represent a commitment on the part of insurance commissioners to improve existing state laws governing unfair discrimination in property insurance underwriting. The combination of existing state legislation and proposed NAIC model legislation governing unfair discrimination in property insurance underwriting clearly renders the section 6(c) proposal in H.R. 2540 unnecessary.

A third and final reason behind NAIC opposition to section 6(c) is the fact that the provision would be enforced administratively by the Secretary of Housing and Urban Development. The NAIC strongly opposes the granting of administrative jurisdiction over property insurance underwriting practices to federal agencies or departments. The resulting dual regulation of the property insurance industry would surely increase insurance costs and generate a plethora of federal-state jurisdictional conflicts to the detriment of the public interest. Moreover, the NAIC does not believe that H.R. 2540 provides the Secretary of HUD with sufficient statutory guidance to properly enforce a prohibition against unfair discrimination in property insurance underwriting. Even if the "effects" of insurance industry practices are sufficient to constitute a violation of title VIII -- as is the case under current civil rights law[15] -- the Secretary of HUD will have difficulties proving a violation of title VIII in most cases. As the National Fire Prevention and Control Administration recently noted, it is extremely difficult "to accurately separate racial or ethnic discrimination from income and geographic discrimination" in the property insurance industry.[16] This difficulty is accentuated in the case of H.R. 2540 since that bill contains no formal statutory notice requirement such as that found in the NAIC Model Property Insurance Declination Law. These and other enforcement problems confirm the strong belief of the NAIC that prohibitions against unfair discrimination in the business of insurance are best handled in the context of insurance regulation, not in the context of civil rights legislation.

CONCLUSION

The NAIC applauds the thrust of H.R. 2540 and hopes that favorable action is taken to bolster existing prohibitions against discrimination in real estate sales and rentals. We strongly urge that section 6(c) of the bill dealing with discrimination in property insurance underwriting be omitted from the final version of the bill, however. That section represents an inappropriate statutory response to an extremely complex insurance problem; it is unnecessary in light of state and NAIC model legislation and would lead to dual regulation of the property insurance industry by the Secretary of HUD and state insurance commissioners. We thank you again for the opportunity of presenting this statement and hope that it has provided you with useful information about state and NAIC efforts to eliminate unfair discrimination in the property/casualty insurance business.

---

14. Eight states broadly prohibit unfair discrimination between individuals or risks of the same class and of essentially the same hazards: COLO. REV. STAT. §10-3-1104 (1974); CONN. GEN. STAT. ANN. §38-172 (West 1969); D.C. CODE ANN. §35-1332 (1979); IOWA CODE §507B.4(7) (1977); NEB. REV. STAT. §44-1525(7)(c) (Supp. 1978); N.C. GEN. STAT. §58-44.3 (1977); OHIO REV. STAT. §3901.21(L) (Page 1971); TENN. CODE ANN. §56-1223 (Supp. 1976).

   Fourteen additional states prohibit unfair discrimination between individuals or risks of the same class and of essentially the same hazards but limit such prohibition to the terms and conditions of the insurance contract: ALASKA STAT. ANN. §21.36.120 (1966); ARIZ. REV. STAT. ANN. §20-450 (1975); DEL. CODE ANN. tit. 18 §2304 (1975); LA. REV. STAT. ANN. tit. 22 §652 (Supp. 1977); ME. REV. STAT. ANN. tit. 24-A, §2162 (West 1974); NEV. REV. STAT. §686A.130 (1975); OKLA. STAT. ANN. tit. 36, §1204(7)(c) (West 1976); P.R. LAWS ANN. tit. 26 §2708 (1977); S.C. CODE ANN. §38-9-80 (Supp. 1975); S.D. COMP. LAWS ANN. §58-33-26 (1969); UTAH CODE ANN. §31-27-22 (1974); W. VA. CODE ANN. §33-11-4(c) (1975); WYO. STAT. §26-13-112 (1967).

15. Under the "effects" doctrine it is not necessary to show that the person charged with a violation of title VIII intended to deprive minority citizens of rights granted under the title; a violation can be shown if the "effects" of a course of conduct by the person charged result in a deprivation of statutory rights. See United States v. Pelzer Realty Co., Inc., 484 F. 2d. 438 (5th Cir. 1973), cert. denied, 416 U.S. 936 (1974); Banks v. Perk, 341 F. Supp. 1175 (D.C. Ohio 1972).

16. U.S. DEP'T. COMMERCE, NATIONAL FIRE PREVENTION & CONTROL ADMINISTRATION, NATIONAL FIRE SAFETY & RESEARCH OFFICE, FIRE INSURANCE: ITS NATURE AND DYNAMICS 30 (1978). Cf. British & Foreign Insurance Company v. Stewart, 30 N.Y. 2d 53, 330 N.Y.S. 2d 340 (1972).

APPENDIX A:
PERSONAL LINES RESIDENTIAL PROPERTY INSURANCE
CHARACTERISTICS AND REGULATION

Title II of H. R. 3504 focuses on the type of insurance coverage which insures against "hazards to a dwelling." This specific type of insurance belongs to the general category of personal lines insurance -- "coverages designed in whole or in part to handle loss exposures arising out of the nonbusiness property and activities of individual and families."[1] There are a number of distinguishing features of personal lines insurance:

> The personal lines market (as compared to commercial lines) is characterized by a large number of buyers and sellers, the relative similarity of loss exposures, the lack of alternatives to insurance, the relatively inelastic demand, a heavy regulation of products and prices, relatively uninformed buyers, and a politically popular and sensitive market. Personal lines products designed to meet the needs of most insureds are characterized by standardization of policies, a high degree of packaging, and class rating. They also are more rigid in form and rate and involve a smaller average unit premium than most personal lines products.[2]

A brief review of the basic characteristics of personal lines residential property insurance in the context of the inner city market should help to clarify the basic insurance principles involved in the present redlining debate.

## I. TYPES OF COVERAGE

Because contracts covering "hazards to a dwelling" are designed to insure large numbers of homogeneous risks their terms and conditions have become highly standardized. Although the contracts of residential property insurers may not be identical, "they often follow a pattern because the needs of buyers are often similar and competition among insurers tends to lead to imitation by a great number of insurers serving the same market."[3] The two most common policies in the residential property insurance market are the fire and extended coverage policy and the homeowners policy.

Because fire represents "the greatest single cause of physical loss to property,"[4] the fire insurance policy "is considered the basic form of protection for buildings and their contents."[5] Fire insurance serves as the foundation for other coverages that are added to the basic fire policy through amendments, or endorsements.[6] Standard endorsements to fire insurance policies include the extended coverage endorsement and the vandalism and malicious mischief endorsement. For a separate premium the extended coverage endorsement provides protection against damages to residential property arising from windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles, and smoke.[7] Likewise, for a separate premium a vandalism and malicious mischief endorsement can be added to a basic fire policy which offers protection against willfull acts in defiance of authority. Together the extended coverage and vandalism and malicious mischief endorsements are called "allied lines" of fire insurance coverage.[8]

---

1.  G. GLENDENNING & R. HOLTOM, PERSONAL LINES UNDERWRITING 1 (1977) [hereinafter cited as PERSONAL LINES].

2.  Id. at 34.

3.  Id. at 12.

4.  PRESIDENT'S NATIONAL ADVISORY PANEL ON INSURANCE IN RIOT-AFFECTED AREAS, MEETING THE INSURANCE CRISES OF OUR INNER CITIES 19 (1968) [hereinafter cited as HUGHES PANEL REPORT].

5.  Id.

6.  Id.

7.  Id.

8.  Id.

759

Unlike the basic fire insurance policy and its allied lines endorsements, the homeowners insurance policy offers a combination of property and liability coverages. Each homeowners policy contains two sections: section I deals with property insurance and section II with liability insurance.[9] Included under the section I property coverages are a basic fire insurance coverage and five optional coverages commonly labeled the "basic form", the "broad form", the "special form", the "contents broad form" and the "comprehensive form."[10] Except for the "contents broad form", each homeowners policy covers perils to the dwelling itself, perils to appurtenant private structures, perils to unscheduled personal property, additional living expenses, comprehensive personal liability, medical payments, and physical damage to property of others.[11] Minimum amounts of coverage are required for each of these perils with additional coverage available for an added premium. Because the homeowners policy is put together as a "package policy" there is a single indivisible premium charged for all of the perils listed in the policy.

Historically, the homeowners policy was designed to insure residential properties in suburban settings.[12] Because these properties presented more attractive risks to insurance companies, the homeowners concept was developed to provide broader coverages at reduced rates. In comparison with the basic fire insurance policy and its allied lines endorsements, it is widely recognized that the homeowners package insures against more perils, offers reduced rates, provides greater indemnity and requires more stringent standards for risk acceptability.[13]

All insurance policy forms are regulated by state insurance commissioners through state laws which require the commissioner's approval of insurance policy forms. The policy language of the standard fire policy is mandated by statute in New York and followed verbatim in 35 states, the District of Columbia and Puerto Rico, and followed with some variation in all other states except New Hampshire.[14] There is less rigidity in the policy language required for homeowners package policies although standardization is the rule rather than the exception.[15]

## II. THE RISK ASSESSMENT PROCESS

The fundamental purpose of residential property insurance is to substitute "a small, definite cost (the premium) for a large but uncertain loss."[16] The process of determining the amount of premium to cover probable losses is known as the risk assessment process. Traditionally, risk assessment in insurance theory has been accomplished through two separate, but related, procedures: rating and underwriting.

### A. Residential Property Insurance Rating

The rate for residential property insurance is generally described as

the price for a certain dollar amount of insurance coverage for a certain period of time. This rate is usually stated as so many dollars and cents per one hundred dollars worth of insurance for a one year period on a

---

9.   PERSONAL LINES, supra note 1, at 247.

10.  R. MEHR & E. CAMMACK, PRINCIPLES OF INSURANCE 376 (5th ed., 1972) [hereinafter cited as PRINCIPLES OF INSURANCE].

11.  Id.

12.  See U.S. DEP'T HOUSING & URBAN DEVELOPMENT, FEDERAL INSURANCE ADMINISTRATION, INSURANCE CRISES IN URBAN AMERICA 4 (1978) [hereinafter cited as INSURANCE CRISES].

13.  PERSONAL LINES at 336-37.

14.  PRINCIPLES OF INSURANCE at 812.

15.  PERSONAL LINES at 247.

16.  See PRINCIPLES OF INSURANCE at 32.

760

particular risk. The premium is the total amount of paid for insurance. It is the rate times the amount of coverage purchased.[17]

Residential property insurance rates are expected to generate sufficient premium income to pay for the losses and expenses of insuring residential property as well as a profit to the insurance company for the risk it assumes.[18] Rates for basic fire insurance coverage serve as the foundation for the total premium charge for fire and allied lines coverage. Rates for homeowners package policies, while covering perils beyond basic fire coverage, are computed in a manner very similar to fire and allied lines rates.

Fire insurance rates fall into two separate groups: class rates and schedule rates.[19] Class rating is used primarily for residential property risks, while schedule rating applies primarily to commercial risks.

> In class rating, one rate is set for a particular group of risks that are considered homogeneous in terms of hazard. No inspection of the risk is required . . . . The theory of class rating is that it is possible to construct a class according to a few basic characteristics and that all risks in this class will be homogeneous enough to make the probability of loss relatively equal. Once the class in which a particular risk belongs has been determined, the rate for that risk is the same as the rate for every other risk in that class.[20]

Thus, by dealing with categories of risks instead of individual risks class rating substitutes workable group equity for individual risk equity.[21] Since a classification system which treats every risk on an individual basis would lack credibility and require heavy administrative expenses, the treatment of risks by classes becomes the only practical answer to modern risk assessment.[22]

The major factors considered in a class rating plan for fire insurance are "construction, occupancy and type of municipal fire protection."[23] There are four basic types of resident construction: frame, masonry, fire resistive, and noncombustible.[24] The occupancy factor in fire insurance rating plans focuses on the number of dwelling units within a particular residential building.[25] The fire protection factor is obtained through a grading system established by the American Insurance Association which considers, among other characteristics, a municipality's water supply, fire department, fire alarm system, building code and local weather patterns.[26]

---

17. R. SYRON, AN ANALYSIS OF THE COLLAPSE OF THE NORMAL MARKET FOR FIRE INSURANCE IN SUBSTANDARD URBAN CORE AREAS 50 (1972) [hereinafter cited as FIRE INSURANCE].

18. Id. at 55.

19. Id.

20. Id. at 55-56.

21. PERSONAL LINES, supra note 1, at 13.

22. See id. at 14.

23. FIRE INSURANCE at 56.

24. PERSONAL LINES at 229.

25. FIRE INSURANCE at 56.

26. Id. at 57.

761

Rates for particular residential dwellings are determined by cross- referencing the construction of the dwelling with the occupancy factor and the fire protection factor.[27] In the urban residential property context surcharges may be added to a given class rate for substandard conditions indigenous to urban areas.[28] These surcharges may be based on such conditions as block congestion, unsafe arrangement of heating devices, unsafe wiring, conversion of original living spaces into multiple living units or unsafe housekeeping practices.[29] Since the underlying conditions giving rise to surcharges "may or may not be more appropriate for the risk than the standard rate," there is a potential unfairness in attempting to assign numerical rating values to so-called substandard conditions.[30]

State insurance commissioners regulate residential property insurance rates and rating plans in virtually all states and the District of Columbia.[31] Although state rating laws follow at least nine different models or formats,[32] such laws can be divided into two general categories: "prior approval" and "open competition" rating laws.[33] Under a "prior approval" rating law insurers are required to submit their rate proposals to the insurance department in advance subject to the department's approval or disapproval. Under an "open competition" rating law, on the other hand, insurers are not required to seek advance approval of their rates by the commissioner; rates may be established at whatever level insurance companies determine is a competitive rate. However, residential property rates under either a "prior approval" or "open competition" rating law must not be "excessive, inadequate, or unfairly discriminatory."[34] In addition to this substantive statutory standard insurance commissioners have authority to review rating plans and license rating organizations.[35]

### B.  Underwriting Residential Property Insurance

The second element of the risk assessment process is insurance underwriting. Underwriting has been defined as a process of selecting risks

in order to determine which of those within a given class offers a probability of loss below that for the average of the class.[36]

---

27.  Id. at 58.

28.  HUGHES PANEL REPORT, supra note 4, at 33.

29.  Such factors are considered in rating surcharges rather than underwriting only when the rating plan in use is a "Schedule ER" (Excess Rates) plan. Id.

30.  Id. at 34.

31.  J. HANSON, R. DINEEN & M. JOHNSON, MONITORING COMPETITION: A MEANS OF REGULATING THE PROPERTY AND LIABILITY INSURANCE BUSINESS 58 (1974) [hereinafter cited as MONITORING COMPETITION].

32.  See id. at 54-57.

33.  See id. at 57. See also PRINCIPLES OF INSURANCE, supra note 10, at 793 ("mandatory" versus "permissive" rating laws).

34.  MONITORING COMPETITION at 54-55, 401.

35.  See id. at 30-31.

36.  R. HOLTOM, UNDERWRITING PRINCIPLES AND PRACTICES 123 (1973).

Even though a particular risk may be eligible for insurance coverage because it fits within a particular rating class of an insurance company, the risk may not be acceptable to the company's underwriter.[37] In the case of residential property insurance, the "acceptability" of residential dwelling risks "is based primarily on three factors: a description of the risk to be insured, the appropriate rate to be charged for a described category of risk, and the contractual provisions of the policy to be written."[38]

In analyzing the type of risk which presents less than average probability of loss underwriters will take into consideration the physical features of residential property and certain characteristics of the insurance applicant.[39] Those physical features of the dwelling which may lead to a refusal of insurance include such factors as a building's vacancy, seasonal occupancy and the value of the property.[40] Those characteristics of insurance applicants which may lead an underwriter to refuse to insure a particular residential dwelling may include such factors as the applicant's previous claims record and marital status.[41] As noted earlier, rating plans for residential property insurance usually allow surcharges to be levied in instances where substandard conditions are found to exist. Where such surcharges are not allowed underwriters will simply decline a particular risk if in their judgment the class rate for a risk is not adequate to cover the probability of loss.[42] Finally, underwriters take into account the policy terms of the coverage requested by the insurance applicant before accepting or rejecting residential property risks. For example, a risk which fails to meet the owner-occupied or minimum value requirements of homeowners policies may be offered coverage under a standard fire policy with allied lines endorsements.[43]

Similarly, an underwriter may suggest that a given residential dwelling risk take a higher deductible under a particular homeowners policy to make the risk more acceptable to the insurer and the premium more acceptable to the insured.

State regulation of insurance company underwriting varies from state to state. Some states specifically prohibit refusals to insure particular classes of risks under state unfair trade practices laws. Other states generally prohibit unfair discrimination between classes of risks having similar characteristics. At the present time individual states and the NAIC are giving close attention to existing underwriting practices of insurers for the purpose of determining whether greater governmental oversight of underwriting decisions is needed.

---

37. PERSONAL LINES at 244.

38. HUGHES PANEL REPORT, supra note 4, at 32.

39. Id. at 28.

40. PERSONAL LINES at 245.

41. Id. at 251.

42. HUGHES PANEL REPORT at 32.

43. PERSONAL LINES at 334-36.

763

APPENDIX B:
NAIC PROPERTY INSURANCE DECLINATION,
TERMINATION AND DISCLOSURE MODEL ACT

PREAMBLE: The purpose of this Act shall be to regulate declinations, cancellations and refusals to renew certain policies of property insurance and for providing specific reasons for such action.

SECTION I: SCOPE. This Act shall apply to policies of property insurance, other than policies of inland marine insurance and policies of property insurance issued through a residual market mechanism, covering risks to property located in this state which take effect or are renewed after the effective date of this Act and which insure any of the following contingencies:

A.  Loss of or damage to real property which consists of not more than four residential units, one of which is the principal place of residence of the named insured, or

B.  Loss of or damage to personal property in which the named insured has an insurable interest where:

1.  the personal property is used for personal, family or household purposes, and

2.  the personal property is within a residential dwelling.

DRAFTING NOTE: Property insurance policies issued through a state FAIR Plan or other residual market mechanism are excluded from this Act because of the special underwriting considerations and regulatory treatment afforded such policies under state law. While the application of many of the substantive principles of this Act to such policies would be desireable and should be encouraged, the mechanism for implementing these principles should be the plan of operation of the state FAIR Plan or residual market mechanism, not a state law governing property insurance declinations and terminations in the voluntary market.

SECTION II: DEFINITIONS.

A.  "Renewal" or "to renew" means the issuance and delivery by an insurer at the end of a policy period of a policy superceding a policy previously issued and delivered by the same insurer, or the issuance and delivery of a certificate or notice extending the term of an existing policy beyond its policy period or term. For the purposes of this Act, any policy period or term of less than six months shall be considered a policy period or term of six months and any policy period or term of more than one year or any policy with no fixed expiration date shall be considered a policy period or term of one year.

B.  "Nonpayment of premium" means the failure of the named insured to discharge any obligation in connection with the payment of premiums on policies of property insurance subject to this Act, whether such payments are directly payable to the insurer or its agent or indirectly payable under a premium finance plan or extension of credit. "Nonpayment of premium" shall include the failure to pay dues or fees where payment of such dues or fees is a prerequisite to obtaining or continuing property insurance coverage.

C.  "Termination" means either a cancellation or nonrenewal of property insurance coverage in whole or in part. A cancellation occurs during the policy term. A nonrenewal occurs at the end of the policy term as set forth in subsection A. For purposes of this Act, the transfer of a policyholder between companies within the same insurance group shall be considered a termination, but requiring a reasonable deductible, reasonable changes in the amount of insurance or reasonable reductions in policy limits or coverage shall not be considered a termination if such requirements are directly related to the hazard involved and are made on the renewal date of the policy.

D.  "Declination" is the refusal of an insurer, an agent or a broker to issue a property insurance policy on a written nonbinding application or written request for coverage. For the purposes of this Act, the offering of insurance coverage with a company within an insurance group which is different from the company requested on the nonbinding application or written request for coverage or the offering of insurance upon different terms than requested in the nonbinding application or written request for coverage shall be considered a declination.

003562

764

### SECTION III. NOTIFICATION AND REASONS FOR A DECLINATION OR TERMINATION.

A. Upon declining to insure any real or personal property subject to this Act the insurer, agent or broker making such declination shall either provide the insurance applicant with a written explanation of the specific reason(s) for the declination at the time of the declination or advise the applicant that a written explanation of the specific reasons for the declination will be provided within twenty-one (21) days of the timely receipt of the applicant's written request for such an explanation. An applicant's written request shall be timely under this subsection if received within 90 days of the date of notice of the declination. In the event of a declination by an insurer of a risk submitted by an agent or broker on behalf of the applicant, the insurer shall provide the agent or broker with a written explanation of the reasons for the declination. In the event the agent or broker is unable to effect insurance for the applicant through an admitted insurer other than a residual market mechanism, the agent or broker shall submit an explanation in writing to the applicant of all insurer declinations. No agent, broker or insurer not represented by an agent or broker shall decline to provide an insurance application form or other means of making a written request for insurance to a prospective applicant who requests insurance coverage from the agent, broker or insurer.

B. A notice of cancellation of property insurance coverage by an insurer shall be in writing, shall be delivered to the named insured or mailed to the named insured at the last known address of the named insured, shall state the effective data of the cancellation and shall be accompanied by a written explanation of the specific reason(s) for the cancellation.

DRAFTING NOTE: No time period for the effective date of a cancellation is included in this subsection because states may already have time periods specified in their insurance codes. In addition, a legislatively-mandated time period for the effective date of a cancellation would encourage fraud if too long or place undue burdens on policyholders if too short. Finding an appropriate balance between these competing considerations is extremely complex. For those states which may desire a specified time period, however, such states may wish to consider that the cancellation of a property insurance policy which occurs within 60 days of the date of issuance be effective 14 days from the receipt of notice of cancellation, while the cancellation of a property insurance policy which occurs more than 60 days after the date of issuance be effective 30 days from the receipt of notice of cancellation.

C. At least 30 days before the end of a policy period, as described in subsection II(A) of this Act, an insurer shall deliver or mail to the named insured, at the last known address of the named insured, either of the following:

1. Written notice of the insurer's offer to renew the policy if the applicable premium for the policy is received within a specified billing period, or

2. Written notice of the insurer's intention not to renew the policy upon expiration of the current policy period. The notice of intention not to renew shall include or be accompanied by a written explanation of the insurer's specific reason or reasons for the nonrenewal.

Proof of mailing of either notice shall be retained by the insurer for a period of not less than one year. If the insurer fails to comply with either (1) or (2) above, coverage shall be deemed renewed under the same terms and conditions until the named insured has accepted replacement coverage with another insurer or until the named insured has agreed to the nonrenewal.

### SECTION IV: PERMISSIBLE CANCELLATIONS.
After coverage has been in effect for more than 60 days or after the effective date of a renewal policy a notice of cancellation shall not be issued unless it is based upon at least one of the following reasons:

A. Nonpayment of premium.

B. Discovery of fraud or material misrepresentation made by or with the knowledge of the named insured in obtaining the policy, continuing the policy, or in presenting a claim under the policy.

C. Discovery of willful or reckless acts or omissions on the part of the named insured which increase any hazard insured against.

003563

D. The occurrence of a change in the risk which substantially increases any hazard insured against after insurance coverage has been issued or renewed.

E. A violation of any local fire, health, safety, building or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increases any hazard insured against.

F. A determination by the Commissioner of Insurance that the continuation of the policy would place the insurer in violation of the insurance laws of this state.

G. Real property taxes owing on the insured property have been delinquent for two or more years and continue delinquent at the time notice of cancellation is issued.

SECTION V: TERMINATIONS/DECLINATIONS: DISCRIMINATORY PRACTICES PROHIBITED. The declination or termination of a policy of property insurance subject to this Act by an insurer, agent or broker is prohibited if the declination or termination is:

A. Based upon the race, religion, nationality, ethnic group, age, sex, or marital status of the applicant or named insured.

B. Based solely upon the lawful occupation or profession of the applicant or named insured, except that this provision shall not apply to an insurer, agent or broker which limits its market to one lawful occupation or profession or to several related lawful occupations or professions.

C. Based upon the age or location of the residence of the applicant or named insured unless such decision is for a business purpose which is not a mere pretext for unfair discrimination.

D. Based upon the fact that another insurer previously declined to insure the applicant or terminated an existing policy in which the applicant was the named insured.

E. Based upon the fact that the applicant or named insured previously obtained insurance coverage through a residual market insurance mechanism.

SECTION VI: ENFORCEMENT PROVISIONS.

A. COMPLAINT AND HEARING. Upon a complaint of a person filed within 90 days of any violation of this Act, the Commissioner shall determine whether such complaint is reasonably founded. If the Commissioner determines that such complaint is reasonably founded, or if the Commissioner otherwise has reason to believe that an insurer, agent or broker has engaged in practices which violate this Act and that a proceeding in respect thereto would be in the public interest, the Commissioner shall set a date for a public hearing to determine whether a violation of this Act has in fact occurred. Such hearing shall be held upon no less than 10 days notice to the person charged and the complainant, if any. Such notice shall set forth the specific grounds upon which the complaint is based. If a hearing is based upon a complaint, the hearing shall be set no later than 30 days from the date the complaint was filed. The hearing shall take place before a hearing examiner who shall make a record of the evidence and set forth findings and conclusions. Once a prima facie violation of this Act has been established, the person charged in the complaint shall have the burden of showing that such violation was based on a reason not prohibited by this Act. The findings of fact determined by the hearing examiner shall be reviewed by the Commissioner who shall issue a final order. A petition for rehearing may be filed within 30 days of the final order of the Commissioner.

B. SANCTIONS. If the Commissioner determines in a final order that :

1. An insurer has violated sections IV or V of this Act, the Commissioner may require the insurer to :

a. Accept the application or written request for insurance coverage at a rate and on the same terms and conditions as are available to other risks similarly situated, or

b. Reinstate insurance coverage to the end of the policy period, or

766

    c.    Continue insurance coverage at a rate and on the same terms and conditions as are available to other risks similarly situated;

    2.    Any person has violated any provision of this Act, the Commissioner may:

        a.    Issue a cease and desist order to restrain such person from engaging in practices which violate this Act, or

        b.    Assess a penalty against such person of up to $500 for each violation of this Act, or

        c.    Assess a penalty against such person of up to $5,000 for each willful and knowing violation of this Act.

**C.**    **CIVIL LIABILITY AND ACTIONS.**

    1.    If the Commissioner determines in a final order that an insurer has violated sections IV or V of this Act, the applicant or named insured aggrieved by the violation may bring an action in a court of competent jurisdiction in this State to recover from such insurer any loss, not otherwise recovered through insurance, which would have been paid under the insurance coverage that was declined or terminated in violation of this Act.

    2.    Any amount recovered under subsection (1) above shall not be duplicative of any recovery obtained through the exercise of any other statutory or common law cause of action arising out of the same occurrence. No action under this section shall be brought two years after the date of a final order of the Commissioner finding a violation of section IV or V of this Act.

**D.**    **JUDICIAL REVIEW.** Any person aggrieved by any determination or order of the Commissioner under this Act may seek judicial review in the _____ court. Failure of the Commissioner to act upon a complaint under this Act within 30 days of the filing of such complaint shall constitute a determination that the complaint was not reasonably founded.

**SECTION VII: IMMUNITY.**

**A.**    There shall be no liability on the part of and no cause of action shall arise against:

    1.    The Commissioner of Insurance,

    2.    Any insurer or its authorized representatives, agents, or employees,

    3.    Any licensed insurance agent or broker, or

    4.    Any person furnishing information to an insurer as to reasons for a termination or declination,

for any communication giving notice of or specifying the reasons for a declination or termination or for any statement made in connection with an attempt to discover or verify the existence of conditions which would be a reason for a declination or termination under this Act.

**B.**    Subsection (A) above shall not apply to statements made in bad faith with malice in fact.

**SECTION VIII: EFFECTIVE DATE.** This Act shall take effect on _____,

767

**APPENDIX C:**
**RECENT AMENDMENTS TO THE NAIC MODEL ACT RELATING TO**
**UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE**
**ACTS AND PRACTICES IN THE BUSINESS OF INSURANCE**

Section 4. Unfair Methods of Competition and Unfair or Deceptive Acts or Practices Defined.

The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:

•••••

(7)     Unfair Discrimination.

•••••

(c)     making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazards by refusing to issue, refusing to renew, cancelling or limiting the amount of insurance coverage on a property or casualty risk because of the geographic location of the risk, unless:

(1)     The refusal, cancellation or limitation is for a business purpose which is not a mere pretext for unfair discrimination, or

(2)     The refusal, cancellation or limitation is required by law or regulatory mandate.

(d)     making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazards by refusing to issue, refusing to renew, cancelling or limiting the amount of insurance coverage on a residential property risk, or the personal property contained therein, because of the age of the residential property, unless:

(1)     The refusal, cancellation or limitation is for a business purpose which is not a mere pretext for unfair discrimination, or

(2)     The refusal, cancellation or limitation is required by law or regulatory mandate.

(e)     refusing to insure, refusing to continue to insure, or limiting the amount of coverage available to an individual because of the sex or marital status of the individual; however, nothing in this subsection shall prohibit an insurer from taking marital status into account for the purpose of defining persons eligible for dependents benefits.

(f)     to terminate, or to modify coverage or to refuse to issue or refuse to renew any property or casualty policy or contract of insurance solely because the applicant or insured or any employee of either is mentally or physically impaired; Provided that this subsection shall not apply to accident and health insurance sold by a casualty insurer and, Provided further, that this subsection shall not be interpreted to modify any other provision of law relating to the termination, modification, issuance or renewal of any insurance policy or contract.

768

*National Association* [NAII logo] *of Independent Insurers*

2600 RIVER ROAD, DES PLAINES, ILLINOIS 60018

312/297-7800

Arthur C. Mertz, President

July 11, 1979

The Honorable Don Edwards, Chairman
Subcommittee on Civil and Constitutional Rights
Committee on the Judiciary
2137 Rayburn House Office Building
Washington, D. C. 20515

Dear Mr. Chairman:

This statement is presented on behalf of the National
Association of Independent Insurers (N.A.I.I.), a property
and casualty insurance trade association comprised of over
435 companies.

Our members write a significant amount of home fire
insurance in the country. The implications of H.R. 2540 —
the Fair Housing Act Amendments — cause our companies grave
concern. Therefore, N.A.I.I. urges the exclusion of
Section 6(c)(f) from the bill, and we ask that this statement
be inserted into the record of those hearings.

Our companies represent a cross-section of the property
and casualty insurance business in the United States. They
range in size from the smallest one-state companies to the
very largest national writers. They comprise both stock and
non-stock corporations and reflect all forms of merchandising:
independent agency, exclusive agency, and direct writers.
They include insurers which serve the general market and those
which specialize in serving particular consumer groups such as
farmers, teachers, government employees and military personnel.

The enactment of this legislation would have a far-
reaching impact on the regulation of the entire property
insurance industry, an impact which will adversely affect
the interests of both insurers and insureds alike. NAII has
a strong commitment to the continued viability of the state
regulatory system, a system which has been responsive to the
issues of insurance availability and affordability.

003567

H.R. 2540 would amend Title VIII of the Civil Rights Act of 1968 (P.L. 90-284, 42 USC 3601 et seq.), also known as the Fair Housing Act. Section 6 of the bill would make it unlawful:

> "For a person in the business of insuring against hazards to refuse to enter into, or discriminate in the terms, conditions, or privileges of, a contract of insurance against hazards to a dwelling because of the race, color, religion, sex, handicap, or national origin of persons owning, or residing in or near the dwelling."

The effect of the bill, and obviously among its purposes, is to bring property insurers within the scope of the Fair Housing Act and within the regulatory jurisdiction of the Department of Housing and Urban Development (HUD). In furtherance of its objectives, H.R. 2540 substantially increases the enforcement, administrative and rule-making authority of HUD under the Fair Housing Act. The assumption by HUD of a regulatory role over the business practices of the property insurance industry would be the end result of the bill.

If H.R. 2540 is enacted, serious problems would occur in the current regulatory structure of the property and casualty insurance industry. In its present form, H.R. 2540, by adding the insurance business as a suspect industry under the Fair Housing Act, would subject property insurers throughout the country to federal as well as state regulation with respect to alleged discriminatory practices in the marketing of dwelling insurance.

NAII firmly believes that such a dual regulatory scheme directly contravenes the well established legal principles governing regulation of the insurance industry as embodied in the McCarran Act since its enactment in 1945. The core provision of the McCarran Act, insofar as the federal vs. state dichotomy in regulation of the insurance industry is concerned, section 2(b), declares that:

> "No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates* to the business of insurance:

---

*underscoring added

003568

770

> "Provided, that after June 30, 1948, the...
> Sherman Act, as amended, and the...Clayton
> Act, as amended, and the...Federal Trade
> Commission Act, as amended, shall be
> applicable to the business of insurance to
> the extent that such business is not
> regulated by State law." Section 2(b),
> Public Law 15, 79th Congress.

By reason of this section in the McCarran Act, it is quite apparent that the States have been authorized to regulate and tax insurers without federal interference unless there has been or until there is Congressional action specifically relating to insurance. Similarly, there is no indication in the McCarran Act that Congress had contemplated that in future years federal legislation on unrelated subjects only tangentially related to insurance could become the pretext for a duplicative layer of regulation over the insurance industry to be administered by a federal agency. Rather, it would appear that where state law already regulates the insurance industry, federal legislation cannot extend, contradict or overrule state law in the regulated area, unless Congress passes an Act which specifically, and not indirectly, or as a mere afterthought, addresses the business of insurance. The legislative intent expressed in the McCarran Act, as just articulated, has in NAII's opinion withstood the test of time.

At this date, the Insurance Codes in 42 states either specifically prohibit discriminatory business practices in the marketing of property and casualty insurance or grant the Insurance Commissioner ample authority by which to investigate and eradicate, if necessary, any suspected unfair or deceptive trade practice of an insurance company operating within the state. Many of the Unfair Trade Practice Acts in these states proscribe "any unfair discrimination between individuals or risks of the same class or of essentially the same hazard and expense element." Some of these anti-discrimination provisions expressly designate "race, color, religion or national origin" as a prohibited basis for risk selection or underwriting purposes. A number of State Unfair Trade Practice Acts, although not having a specific anti-discrimination prohibition applicable to property or casualty lines of insurance, do have omnibus provisions empowering the Insurance Commissioner, after hearing, to report to the State Attorney General for prosecution any unfair method of competition or unfair or deceptive act or practice undefined but violative nonetheless of the Unfair Trade Practice Act.

771

In addition to the regulatory authority to control and eliminate discriminatory insurance marketing practices available to most states through their present Unfair Trade Practice Acts, other state legislative approaches to the issue of unfair insurance marketing practices are now being finalized. Through the joint cooperation of an advisory committee consisting of consumer and civil rights advocates, insurance industry representatives, and state insurance regulators themselves, two model legislative measures have recently been adopted by the National Association of Insurance Commissioners (NAIC). The first measure is a specific amendment to section 4(7) of the NAIC Model Unfair Trade Practices Act which would prohibit unfair discrimination in the marketing of dwelling or property insurance due to geographic location of risks or the age of the residential property being insured. The second approach is a Property Insurance Declination, Termination and Disclosure Model Act which as model state legislation would regulate declinations or insurance rejections, cancellations, and refusals to renew residential policies of property insurance and require formal explanations to accompany notice of an underwriting decision on the part of an insurer. In addition, the NAIC Property Insurance Declination, Termination and Disclosure Model Act prohibits the declination or termination of a policy of residential property insurance if such action is "based upon the race, religion, nationality, ethnic group, age, sex, or marital status of the applicant or named insured." Other restricted grounds for a declination or termination would include the occupation or profession of the applicant or named insured, the age or location of the residence, and the past underwriting history attributable to the applicant or named insured.

In addition to providing technical assistance to the advisory group in the development of these anti-discrimination or "anti-redlining" measures, NAII pledged its unequivocal support for their adoption by the National Association of Insurance Commissioners at their recent Annual Meeting in Chicago. Our association has endorsed the propriety of anti-discrimination provisions in State Unfair Trade Practice Acts and similarly will advocate the strengthening of such anti-discrimination sanctions through the legislative enactment of the two model property insurance reform measures described above. We believe the affirmative steps undertaken by the NAIC, the individual state legislatures and the insurance industry with regard to the issue of discrimination reflect not only the responsibility of the state regulatory system but also a continuing commitment to improve the efficiency of that regulatory system.

772

In short, statutory and administrative remedies are already available to a "discriminated" property insurance applicant or policyholder by reason of present general powers of the Commissioner's office and the State Unfair Trade Practice Acts. The "anti-redlining" amendment to the NAIC Model Unfair Trade Practices Act and the NAIC Property Insurance Declination, Termination and Disclosure Model Act promise even greater regulatory control by the states over discriminatory insurance marketing practices, if such were found to exist. NAII believes that the states, in accor-dance with the directive of the McCarran Act, have taken the initiative and are "regulating" the insurance industry in this area quite capably without federal intervention. Furthermore, the McCarran Act also states that unless the legislation specifically relates to the business of insurance, no Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance. We cannot accept the contention that the Fair Housing Act of 1968 was intended to govern insurance industry practices. The mere existence of H.R. 2540 is an admission of that fact. Neither the 1968 Act nor the Fair Housing Amendments Act of 1979 (H.R. 2504) specifically relates to insurance. The enactment of either of these bills by Congress would by implication lead us to conclude that the McCarran Act has been amended.

Apart from the legal objections already raised, however, NAII must express strong reservations with one of the objectives of the Fair Housing Amendments Act of 1979, that is, bringing the insurance industry under the umbrella of what literally may be described as a Civil Rights Act. To assume that property insurers conduct their business with the intent to discriminate against minorities or other segments of society would be simplistic reasoning at best. The primary responsibility of the property insurance underwriter is to evaluate specific characteristics of the property being insured. Underwriting standards do not take into consideration an insurance applicant's nationality, skin color or religion. These factors do not inform the underwriter about the risk of loss.

Some property risks, by reason of their hazardous nature, cannot be written under the competitive market conditions prevailing today. They are insured by State Fair Plans established to underwrite such high risk properties. In effect, the entire property insurance industry shares in the exposure presented by the high risk property. There is no discriminatory motive of the insurance industry behind a property insurance

003571

applicant being placed in a FAIR Plan. H.R. 2540 would pose substantial hardship on a property insurance company which as a matter of sound business principle restricts its writing of "high risk" properties. The insurer, underwriting risks in good faith, could be accused of discriminating against the insurance applicant, when actually the condition of the property precluded it from being underwritten by a company outside the FAIR Plan. Discriminatory intent or purpose implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker, in this case a property insurance underwriter, selected or reaffirmed a particular course of action at least in part "because of", not merely "in spite of", its adverse effects upon an identifiable group. Sound underwriting requires selectivity and, consequently, some risks will be rejected. Requiring underwriters to evaluate business decisions in the light of their potential discriminatory impact on certain segments of the society would result in the insurance industry becoming merely a social agency.

NAII recognizes that property insurance has become even more essential to our country's citizens' ability to obtain adequate housing. With the rest of the insurance industry in this country, we share in the responsibility of keeping property insurance both available and affordable to all citizens. Discrimination in the marketing of hazard or dwelling insurance would obviously be unacceptable if found to exist, but we do not view H.R. 2540 as the proper manner in which to safeguard insurance consumers. On the contrary, NAII urges Congress to avoid creating an overlapping and dual scheme of regulation over the insurance industry which would result if insurers were brought within the parameters of the Fair Housing Act. An excess in regulation can only guarantee greater expense to the American insurance consumer as well as to our insurance industry. We are certain that each state, through its Insurance Commissioner, has the power and is regulating and investigating any charges of discrimination that may arise within that jurisdiction. NAII is also convinced that model legislative reform measures being finalized by the National Association of Insurance Commissioners will assure the insurance consumer even greater legal recourse in the event there is a suspicion of discrimination by an insurance company.

Accordingly, NAII strongly recommends that Congress disapprove Section 6(c) of H.R. 2540.

Yours very truly,

Arthur C. Mertz
President

774



**Comptroller of the Currency**
**Administrator of National Banks**

Washington, D. C. 20219

July 10, 1979

Honorable Don Edwards
Chairman
Subcommittee on Civil and
   Constitutional Rights
House Committee on the Judiciary
A407 House Office Building
Annex #1
Washington, D.C.  20515

Dear Mr. Chairman:

In recent hearings by the House Subcommittee on Civil and
Constitutional Rights, on the Fair Housing Amendments Act of
1979, representatives of the Society of Real Estate Appraisers
urged the Subcommittee and Congress to adopt statutory language
which would explicitly exempt race-specific comments in ap-
praisal reports from coverage by the provisions of the federal
Fair Housing Act, Title VIII of the Civil Rights Act of 1968.

The Society has argued that the right of appraisers to refer
to the racial (or religious or ethnic) composition of the neigh-
borhoods of properties they appraise is necessary to fulfilling
their obligation to make full and accurate disclosure of all
factors that bear on the "true" market value of a particular
property.

The prohibitions against racial discrimination in mortgage
lending contained in the federal Fair Housing Act currently
reach the practices of appraisers in assessing the value of
homes for which financing is being sought.  See, United States
v. American Institute of Real Estate Appraisers, 442 F. Supp. 1072,
1078-79 (N.D.Ill. 1979).  Pursuant to our enforcement authority
under the federal Fair Housing Act, OCC examiners review the
mortgage loan policies, procedures and practices of national banks
to ensure that such institutions do not use appraisal reports
which include references to the racial composition of the neighbor-
hood in which the property is situated.  Both explicit racial com-
ments and such well-known proxies for race, such as "incompatible
groups", are forbidden in appraisal reports used by banks under
OCC supervision.  (Copy of OCC civil rights examination procedures,
enclosed.)

The unequivocal intent of Congress in enacting the federal Fair Housing Act was "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Any assertion that race-specific comments in appraisal reports are necessary to assess true market value of homes must be care- fully evaluated in light of this clear Congressional policy. We are not aware of any persuasive evidence that race can be a re- levant factor in mortgage lending, including appraisals. Further- more, financial institutions subject to our regulatory supervision have not suggested that their ability to underwrite safe and sound mortgage loans has been impaired by OCC's examination procedures which forbid consideration of race in judging the market value of houses financed by such institutions.

We believe that permitting the use of racial comments in appraisal reports would significantly impede OCC's efforts to assure that national banks do not discriminate against potential or actual mortgage loan applicants on a prohibited basis. For that reason, we strongly believe that the present statutory provisions, as they relate to this matter, should be preserved.

Sincerely,

Jo Ann S. Barefoot
Deputy Comptroller
Customer and Community Programs


Enclosure

776

# Fair Housing Act
## Table of Contents

12 1 Introduction
- Lending Practices
  - Sound Practices
  - Possible Discriminatory Practices
- Penalties and Liabilities

12.2 Examination Objectives

12 3 Examination Procedures

12.4 Verification Procedures

12 5 Supplementary Examination Procedures

Comptroller's Handbook for Consumer Examinations
Apr. 1979

777

# Fair Housing Act
## Introduction

Section 12.1

The Fair Housing Act is Title VIII of the Civil Rights Act of 1968 (42 USC 3605). It is viewed as legislation intended not only to prevent discrimination, but also to overcome longstanding past discrimination in the housing markets of the nation. Section 805 of the Act prohibits national banks from denying a mortgage or home improvement loan to anyone for reasons of race, color, religion, sex or national origin. This includes loans for the purpose of purchasing, constructing, improving, repairing or maintaining a dwelling. Discrimination in the fixing of the amount, interest rate, duration or other terms, such as application and collection procedures, is illegal. "Discrimination" is generally considered as treating one person or group less favorably than another.

Discriminatory patterns and individual instances of discrimination are often hard to find and even more difficult to prove. The examiner must realize that fair housing lending practices involve using objective criteria in an objective manner.

This portion of the examination is concerned primarily with a bank's internal controls. Has the bank established procedures to prevent discriminatory actions? Have policies been adopted that if followed consistently, would achieve nondiscriminatory lending? Are those procedures and policies being consistently followed?

NOTE: Violations of the Equal Credit Opportunity Act (15 USC 1691), pertaining to housing, may also be violations of the Fair Housing Act.

## Lending Practices
### Sound Practices

Nondiscriminatory lending does not require that applicants who appear to be similarly qualified according to an objective criterion will receive loans on identical terms. However, denying loans, or granting loans on more stringent terms and conditions, must be justified on the basis of such factors as the following, provided they are applied equally to all applicants:

- An applicant's income.
- An applicant's credit history.
- Length of employment.
- Length of local residence.
- The conditions or design of the proposed security property (or of nearby properties which clearly affect the value of that property), provided such determinants are strictly economic or physical in nature.
- The availability of neighborhood amenities or city services.

- The need of the bank to hold a balanced real estate loan portfolio, with a reasonable distribution of loans in various neighborhoods, types of property and loan amounts
- Other banking factors which also affect the availability and allocation of bank credit. For example, tight money conditions may dictate that only existing customers receive credit.

## Possible Discriminatory Practices

Certain lending practices suggest unlawful discrimination. The following list of practices is not meant to be all inclusive but to provide guidelines for the examiner.

- Racial notation or code on appraisal forms or loan forms, except as required by regulatory agencies.
- Any of the following if imposed because of race, religion, color, sex or national origin
    - Low appraisals
    - More onerous interest rates, terms, conditions or requirements, e.g., FHA insurance.
    - Differing standards, procedures, penalties foreclosures, reinstatements or other collection procedures
    - Use of excessively stringent credit standards
- Failure to make housing loans in certain neighborhoods in the bank's service area because of the race, color, religion, sex or national origin of the residents
- The making of loans to speculators, developers or other persons who are known to exploit minority groups through the sale or other transfer of real estate at inflated prices or on other unreasonable terms and conditions
- The failure to display and maintain the Equal Housing Lending poster in the lobby of each office, in a prominent place readily apparent to all applicants seeking home loans.

## Penalties and Liabilities

Aggrieved parties may file a complaint with the Department of Housing and Urban Development (HUD) within 180 days after a discriminatory housing practice.

The party may file suit in U.S. district court for actual damages and up to $1,000 in punitive damages, as well as court costs and attorney's fees

The penalties and liabilities for violations of the Equal Credit Opportunity Act are available for violations of the Fair Housing Act, if the applicant files suit under the ECOA.

003576

778

## Fair Housing Act
Examination Objectives                                   Section 12.2

1. To determine that the bank is complying with non-discriminatory lending statutes

2. To verify that the bank's board of directors is aware of its responsibilities under the relevant provisions of the statutes and that it has adopted loan underwriting standards, appraisal policies, marketing practices, and procedures that promote nondiscriminatory lending.

3. To ensure that the board of directors has provided for the periodic review of policies, practices and loan underwriting standards and that the bank administers, without bias, application procedures, collection or enforcement procedures and all other lending practices.

4. To determine that decisions on rejected loan applications were based on economic factors and were uniformly applied to all applications.

003577

## Fair Housing Act
Examination Procedures                                        Section 12.3

1. Test for compliance and adequacy of written policy and internal controls while performing the examination procedures.

2. Perform appropriate verification procedures

3. Ensure the bank displays the Equal Housing Lending poster where required under Banking Circular No 13. Supplements 1 to 4 (24 CFR 110).

4. Perform applicable work programs and review home mortgage disclosure information for indications of discriminatory policies or practices.

5. If the information obtained above indicates that the bank is in compliance, continue with step 6. If certain of the above practices or policies are not adequately explained or justified by bank management, contact the regional office for additional procedures to be performed. The regional office may instruct you to complete the Supplementary Examination Procedures Section. 12.5

6. Review the following with management:

   a Adequacy of written policy and internal controls

   b. Deficiencies or discrepancies in loan application criteria.

   c. Credit extensions or denials that conflict with established credit standards, to determine their level of propriety

   d Deficiencies in personnel's knowledge of the Act

   e Violations of law in policy and practices

   f All loan exceptions noted during the examination, and request explanations or justifications

   g Suggestions for correction of policies and practices

   Note Loan policies should clearly define the bank's primary lending area and delineate credit standards for determining creditworthiness If such a policy neither exists nor specifically defines bank credit standards, indicate that the omission could impair the objectivity of bank lending personnel. Should subjectivity be introduced into the credit decision process there can be no assurance that all credit extensions are evaluated on a non-prohibited basis. Additionally, lack of written credit standards makes it virtually impossible to determine the propriety of previous credit decisions

   • Emphasize that internal control procedures are the primary means for monitoring lending practices of bank personnel.

   • If procedures have not been instituted to ensure lending decisions conform to established policy, stipulate that their absence hinders management's ability to assess continually the conformance of daily lending to established policies

   h. Adequacy of current training programs to familiarize lending personnel in the REM and home improvement loan departments with fair lending requirements

7. Prepare comments for inclusion in the report of examination.

   a Describe all violations of law internal control exceptions and questionable banking practices which appear to conflict with provisions of the Fair Housing Act.

   b Discuss in the open section of the report questionable bank practices that are fully documented in the work papers

   c Describe in the closed section of the report under Discriminatory Practices/Policies those practices and policies which imply discrimination but in which discrimination cannot be substantiated.

   • If the bank appears to be in substantial compliance, indicate under Discriminatory Practices/Policies that the bank does not prescreen or redline.

8 Update work program with any information which will facilitate future examinations.

003578

## Fair Housing Act
### Verification Procedures

1. In reviewing the bank's lending policies, the examiner should concentrate on the following:

   a. For overall lending criteria, review:
      - The bank's emphasis on mortgage and home improvement lending.
      - The bank's primary service area. Review community delineation(s) from the Community Reinvestment Act Statement and lending patterns indicated by the Home Mortgage Disclosure Act Statement.
      - Indications of areas in which the bank prefers to lend and areas in which the bank prefers not to lend
      - Minimum income standards, downpayment requirements and other articulated standards which must be met to qualify for a mortgage loan.
      - Basis for applying interest rates and terms

   b. For appraisal policies:
      - Determine whether appraisals are done by independent appraisers, bank personnel or a combination of both.
      - If appraisals are done by bank personnel, determine how the appraisers are trained, the adequacy of the training and indications of discriminatory policy in training material.
      - If done by outside appraisers, ensure that the bank is familiar with the appraiser's standards and review them for discriminatory policies.
      - Report as an internal controls exception instances where the bank is not familiar with the standards used by the appraiser.

   c. For appraisal standards, review the following for discriminatory practices.
      - Assigning a lower value to a neighborhood because of a mix of races and national origins .
      - Equating a racially mixed or substantially minority neighborhood with a deteriorating neighborhood.
      - Incorporating the idea that deterioration of a neighborhood is inevitable.
      - Equating age of the property with the value of the property.

   d. Ensure that bank policies are based on a knowledge of the requirements of the act.
      - Analyze submitted internal and external audit reports that relate to that area.

2. Interview bank personnel using EPB 2 and 3, to determine the objective criteria used in the evaluation of credit, and their knowledge of the prohibitions and requirements of the act and adherence to policy.

   a. Determine if the bank appears to prescreen credit applicants and that there are procedures to ensure that all credit applicants that are denied credit are so notified according to provisions of Section 202.9 of Regulation B, 12 CFR 202.

   b. Verify that lending officers apply the bank's objective criteria.

   c. During interviews and discussions, be alert to the possibility of "unwritten" discriminatory lending policies

3. If the bank meets reporting requirements of Regulation C, 12 CFR 203, review all information disclosed on previous Home Mortgage Disclosure Statements to identify possible discriminatory policies or practices

   (At a minimum, this should include a comparison of those census tracts which comprise the bank's designated lending area with those appearing on the Home Mortgage Disclosure Statement.)

   a. Investigate any appearance of demographic credit concentrations or shortages and request that they be justified by bank management.

   b. When the bank has failed to meet the reporting requirements imposed by the regulation, plot a representative number of REM's and home improvement loans by property address.

4. Review the open and declined loan files for indications of the following discriminatory policies and detail pertinent information on appropriate line sheets.

   Note: For loans made after March 23, 1977, to purchase residential property of one-to-four family dwellings and secured by a lien on this property, Regulation B (12 CFR 202.13) requires the bank to request information on race, national origin, sex, marital status and age. Where the customer has chosen to provide this information, it will be available in your sample to help in making this determination.

   a. Check the application to determine that there are no racial or sexual codes, except as required by the enforcing agency.

   b. Review appraisal for information relating to the racial makeup of the neighborhood and for racial coding.

   c. Be alert for and investigate further any nonobjective comments and euphemisms contained in appraisal policies or documents such as:

003579

---

## Fair Housing Act
### Verification Procedures

Section 12.4

---

- Adverse balance of socio-economic factors.
- Incompatible groups
- Undesirable elements nearby.
- Lack of homogeneity.
- Adverse external factors noted.
- Detrimental influences nearby.
- Lack of consistent pride of ownership.

d. Examine the documents for loan officer comments that indicate the applicant's race, sex, color, national origin or religion.

e. Compare individual creditworthiness exhibited by at least five accepted/rejected REM loan files.

f. Request the management to explain deviations from the established credit standard and defined lending area.

g. Plot property location for both accepted and rejected loans on a census tract map

h. Once information is detailed, review for overall inconsistencies, such as:
  - Income of one group not given the same consideration as that of another group.
  - More onerous terms required of one group than of another.
  - Variances in applying criteria, including minimum incomes, amount of loans, ratios, etc.

782

## Fair Housing Act
### Supplementary Examination Procedures

Section 12.5

### Lending Criteria
#### REM and Home Improvement Emphasis

1. Determine by reviewing lending policies, advertising discussions with management, etc., the degree of emphasis placed on REM and home improvement lending. Information obtained should indicate realistically the bank's commitment to lend in those departments and should be reflected accordingly by the degree of competitiveness in credit terms offered and efforts exerted to solicit loan business.

2. Concentrate on promotional plans to attract new loan customers.

   a. Ensure the method(s) used is contained in general circulation newspapers and magazines throughout the bank's trade area or distributed to all residents within the primary trade area.

   b. Ensure that all advertisements for home improvement and REM loans contain a facsimile of the equal housing lending logotype.

   c. Discuss exceptions with bank management.

### Creditworthiness

3. Ascertain by reviewing the bank's loan policy and/or interviews with bank management the criteria established for determining:

   a. When the applicant is qualified.

   b. When the property is eligible.

   c. The specific terms and conditions of each loan.

4. To aid in those determinations, review:

   a. The bank's guidelines or standards for sufficiency of income.

      • What loan-to-income or debt-to-income ratios or formulas are used?

      • Under what circumstances would those ratios be varied and a loan made even though the income does not meet the ratio?

   b. Any guidelines or standards for judging stability or reliability of income and income sources.

      • Consider if they vary according to the applicant's profession or social status.

      • Determine if any types or sources of income are discounted or not counted (part-time income, bonuses, commissions, income from jobs held less than two years)

   c. Policy of giving preference to loans based on only one as opposed to two incomes.

      • Is the total qualified income calculated on the basis of one spouse's income or both spouses' incomes?

      • If only one income is used, determine whose and why.

5. Obtain a description of the bank's policy for

   a. The income of working women. (Are there any circumstances under which it might be discounted or disregarded?)

   b. Loans to single women with or without children.

   c. Inclusion of alimony or child support as income.

   d. The income of women in child-bearing years.

   e. The ability of a woman to obtain a loan in her own name, whether married, single, separated or divorced. (Is a co-signor required?)

6. Obtain a description of those factors considered for the eligibility or ineligibility of property for a loan

   a. Does the appraiser include comments on the future predictable value of property, or of an area?

7. Determine the standards used to set the loan-to-value ratio (LTV) if the LTV applied for by the customer is considered too high.

8. If a loan contains more than normal risk, determine if it will be rejected or will be made under certain circumstances, but on terms which reflect higher risk.

9. If so, who so decides and how is risk objectively measured?

10. Determine what following factors go into that decision:

    a. How is the LTV set?

    b. How is the loan term arrived at (on the basis of what standards)?

    c. How is the interest rate arrived at? How are points arrived at?

11. In a loan which is not considered to contain greater than normal risk, how are rate, down payment, term, LTV and points decided? Who fixes them? What standards are followed (i.e., under what circumstances will the interest rate be raised or lowered on a particular loan as opposed to a change in the going rate)? What factors would require a term of less than 25 years?

### Credit Terms

12. Determine what factors influence credit terms offered to bank customers, considering a general description of the bank's policy for the following:

    a. Maximum and minimum loan amounts and how they are arrived at (by federal law or regulation or by lender policy or both) and what circumstances would justify a deviation from those limitations.

    b. Maximum and minimum loan terms (duration), how they are arrived at and what circumstances would justify a deviation from those limits.

Comptroller's Handbook for Consumer Examinations
April 1979

Fair Housing Act
Supplementary Examination Procedures                    Section 12.5

c  Maximum and minimum interest rates.
   (Note interest rates vary according to market
   conditions Determine how the bank arrives at its
   'going rate", what benchmarks it uses and how
   it uses them.)

d  Determine which persons or group officially sets
   the maximum, minimum, or the "going rate" for
   interest rates

## Loan Application Procedures

13  Determine how an application is made, how it is
    processed and what records are maintained by
    considering

    a  Where applications are obtained and where
       they are submitted

    b  Is there an application fee or appraisal fee? How
       much is it? When is it paid? Is it always paid?
       Under what conditions is it refunded?

    c  Is anyone authorized to review the applicant's
       financial data or property characteristics, prior
       to formally submitting an application to deter-
       mine eligibility? (If so, how does this operate.
       who is so authorized and is any record kept of
       applications not ultimately submitted? Does
       that practice occur even though not formally au-
       thorized?)

    d  What information is available to applicants by
       phone? Is any prequalification or prescreening
       done by phone?

    e  What information is an inquirer asked to give, if
       he or she calls on the telephone for information?
       Is the property address asked? Why?

    f  If persons are ever told on the phone that loans
       are not being made in certain areas? Under what
       circumstances would this occur?

    g  After an application is submitted, where is it sent
       (i e , forwarded to a central loan department or
       processed by the branch)?

    h  When is the appraisal ordered and when is it
       not?

    i  What happens after all the verifications are
       made and the appraisal is returned? Who then
       reviews the file? If any information is unfavor-
       able, or does not check, can the application be
       rejected and if so, is any record kept? Who has
       authority to make such a rejection? Are rejected
       applicants notified according to Section 202.9
       of Regulation B, 12 CFR 202?

    j  If the information on the application is verified,
       and the appraisal supports the loan sought, how
       is it decided whether or not to make the loan?
       Who decides? Is there a loan committee? Loan
       Officer? Board of Directors? What record is kept

of decisions and reasons for decisions?

    k  If an application is rejected is it retained and for
       how long?

    l  Does the applicant fill out his or her own applica-
       tion or is the information taken by the bank's
       employee?

## Delinquency and Foreclosure

14. Ascertain the rate of delinquency (slow pay) and
    default in loans held by the bank, the predominant
    reasons for delinquencies, if known by the bank,
    and where applicable, the procedures used in col-
    lection

15. Determine if different collection procedures are
    used due to race, sex, etc , and review the follow-
    ing

    a  The borrower's name and property address of
       every home loan account which has been fore-
       closed upon or resulted in legal proceedings in
       the past year

    b. The bank's policy for collection, including all
       steps taken in the chain of collection, such as:

       • Actions by the borrower considered default or
         delinquency requiring attention (e.g. one-
         month nonpayment, two-months nonpayment,
         etc.).

       • Steps initially taken in those circumstances

       • Follow up steps taken, and when.

       • Circumstances for foreclosure.

       • Circumstances causing the institution to re-
         frain from foreclosure

       • Factors which would cause the foreclosure
         schedule to be accelerated  Decelerated

       • All factors causing a variation in the collection
         process (e g , does it vary on the basis of the
         neighborhood where the home is located?)

    c. Examine a representative sample of collection
       files and collection cards to determine if any
       bear a racial notation or code

    d  Determine whether the race or sex or other pro-
       hibited basis of the borrower is a factor in decid-
       ing on collection steps or whether to foreclose

## Appraisal Policies

16. Identify who conducts appraisals for the bank and
    that person's background and qualifications in-
    cluding training and what he or she considers via-
    ble factors affecting the appraisal decision pro-
    cess

    a  Does the bank have written appraisal stan-
       dards?

    b. Do they reflect the new, non-discriminatory ap-

Comptroller's Handbook for Consumer Examination
Apr 1979

2

## Fair Housing Act
### Supplementary Examination Procedures

Section 12.5

praisal standards of the American Institute of Real Estate Appraisers and FHA?

c. If the bank uses fee appraisers, are they aware of and do they follow the new, non-discriminatory standards?

d. Are appraisals made available, upon request, to the customers?

### Appraisal Standards

17. To ensure that the bank's appraisal standards meet the lending provisions of the Fair Housing Act, review appraisals for the following discriminatory practices

   a. Assessing a lower value to a neighborhood because it is integrated or predominantly minority

   b. Equating a racially mixed neighborhood with social non-conformity or neighborhood decline.

   c. A prevailing attitude that deterioration of a neighborhood is inevitable

   d. Equating age of property with value of property.

   e. Reporting neighborhood trends without providing substantiating financial data.

Techniques for those determinations:

   * Comparison of credit terms granted on properties located in integrated areas versus those located in non-integrated areas during similar time periods.

   * Real estate value determined by bank's appraisals versus seller's asking price as evidenced by multiple real estate listings. Although differences will exist when such comparisons are made, their magnitude should be proportional, given the same appraiser, to those in non-integrated areas.

   * Results obtained by reviewing information contained on Home Mortgage Disclosure Statements and property location of accepted/rejected sample loans versus the census tract composition of the bank's primary lending area.

   * Information obtained from interviews with banking personnel which indicate they are not familiar with the requirements imposed by the Fair Housing Act.

   * Tract data for Standard Metropolitan Statistical Areas available through the regional office.

### Interviewing Techniques

18. Determine from the interviewee whether the racial composition or ethnic or nationality composition of an area is a factor in

   a. Determining fair market value

   b. Future value of a parcel of property

   c. Soundness of a loan

   If so, obtain all details of how those factors are affected by race or nationality

19. Determine whether the interviewee has had any discussions, correspondence, or instructions from superiors about a particular appraisal or appraising generally in areas which are considered to be integrated or predominantly minority

20. Obtain all details of such communication including what was said, by whom, when and how any directives were implemented

21. Determine whether the interviewee is aware of any map or list presently used by the bank or by appraisers for the bank which demarcates geographical areas on any of the following bases.

   a. Racial, nationality or ethnic composition

   b. Income level of residents

   c. Rising or declining value levels

   d. Age range of properties.

   e. Value range of properties

   f. Loan or no-loan areas.

   g. High or low risk.

   h. Crime rate

   i. Other similar category.

   (If so, obtain all details, including how the map or list is used, who maintains it and how areas are determined to belong to one or the other category Determine where the map or list is kept and a description of each area demarcated )

22. Determine whether, in the interviewee's professional judgment, economic obsolescence can be caused by the infiltration of inharmonious groups

23. Determine what is meant by "inharmonious groups" and whether this includes racial groups.

24. Determine how the economic obsolescence from such infiltration is measured or measurable

25. Determine whether the interviewee uses the concept of "infiltration" in his or her own appraisal practices, and if so, how

26. Determine whether in the interviewee's professional judgement, the presence of black persons or Spanish persons, etc., is an "adverse influence" in a neighborhood.

   (If so, obtain all details.)

### Interviews

27. Interview lending personnel in both the instalment

3

003583

loan and real estate mortgage departments to determine the criteria for credit decisions.

The interview should be conducted with questions outlined in EPB 2 and 3, and structured to determine the individual's familiarity with the bank's established credit policy and prohibitions imposed by the Fair Housing Act.

28  Concentrate on, during the interview, comments which tend to indicate the individual may engage in unwritten discriminatory lending practices and policies.

29. Should this occur, review a representative sample of loans made by that person and ascertain their propriety in light of the requirements imposed by the Fair Housing Act, especially for property location, applicant creditworthiness and credit terms arranged by this individual

30  Verify that:

a  The initial contact person does not "prescreen" applicants by asking:

   • Have you received any training in how to process applicants for housing loans?

   • Must applicants complete an application before meeting with the loan officer?

   • How is it determined which applicants see a loan officer?

   • Are you instructed to ascertain any information before referring the applicant to a loan officer?

   • How is it determined which officer sees the applicant?

   • Are applicants referred to the bank by others, e g , brokers, builders?

   • Do walk-in applicants receive the same consideration as referrals?

b  Lending officers apply the bank's objective criteria (i.e., lending officers determine applicant creditworthiness based upon established credit standards)

### Loan Review

33. Review accepted and rejected real estate mortgage loan files made in the three calendar months preceding the date of the examination

32. Outline the following information on the loan review sheets for both accepted and rejected REM's:

a  Name, address, race and sex of applicants (and address of property if different from address of applicants)

b  Date of application

c  Amount applied for, term and interest applied for, whether FHA, VA or conventional applied for

d  Appraised value

e  Purchase price

f.  Amount of loan made

g.  Amount of downpayment term of loan in year interest rate, points and whether FHA, VA conventional

33. Review loan review sheets for the following inconsistencies:

a.  Income of one group not given the same consideration as another group

b.  More onerous terms required of one group than another, i.e., downpayment requirements, interest rates, amount of prepaid finance charge imposed at loan closing etc.

c  Variances in applying criteria, including minimum incomes, amount of loans, ratios, etc

4

786

 AMERICAN INSTITUTE OF REAL ESTATE APPRAISERS 

OF THE NATIONAL ASSOCIATION OF REALTORS·

430 NORTH MICHIGAN AVENUE · CHICAGO ILLINOIS 60611 · (312) 440-8141

June 29, 1979

Honorable Don Edwards
Chairman
Subcommittee on Civil and Constitutional Rights of the
  Judiciary Committee of the House of Representatives
House of Representatives
Washington, DC 20515

Re:  H.R.2540

Dear Mr. Chairman:

    John R. Remick, MAI, President of the American Institute of
Real Estate Appraisers of the National Association of Realtors,
has asked me to represent the Institute in matters relating to
the bill entitled "Fair Housing Amendments Act of 1979" (H.R.2540).
Although no spokesman for the Institute has testified before your
committee on H.R.2540, the record indicates that the Institute's
position has been misrepresented and misunderstood.  We wish to
correct any false impressions that may have been left by the
testimony of others.

    In April 1979 Mr. William L. Taylor testified on behalf of
the Leadership Conference on Civil Rights.  In a reference to
alleged discriminatory practices in the appraisal process, Mr.
Taylor testified that a lawsuit brought by the Department of
Justice against an appraisal organization "has resulted in a
consent judgment to desist from these practices."  Although the
Institute was not correctly named in the testimony, it was under-
stood that Mr. Taylor was referring to a settlement agreement
between the government and the American Institute of Real Estate
Appraisers of the National Association of Realtors and to a settle-
ment order approving that agreement.  The Institute respectfully
reminds your committee that there was no such consent judgment, no
adjudication, no determination of any issue of law or fact and no
admission of any violation of law whatsoever.  Any characterization
of this solemn agreement as evidence of wrongdoing is unwarranted
and contrary to the purpose and spirit of the agreement.

    On May 31, 1979 Mr. Dexter MacBride and a Mr. Francy testi-
fied on behalf of the American Society of Appraisers.  The record
indicates that, in the discussion that followed, Congressman Drinan
made reference to a settlement between the Department of Justice and

another appraisal group. It was not clear whether Mr. Drinan was referring to the settlement agreement involving the Institute or a stipulation involving the Society of Real Estate Appraisers. Because of the possibility that the intent was to interpret the effect of the agreement involving the Institute, I will quote Mr. Drinan and offer the Institute's response.

Mr. Drinan reportedly raised the question, "Do you concur with the settlement they made that they will not mention racial and religious factors?", and also stated, "Your organization and the other group have already been required by the Justice Department -- and they have done it in the settlement agreement -- they have agreed to not make negative evaluations based upon racial, religious and ethnic factors." Your committee is hereby informed that the Institute's agreement does not prevent appraisers from mentioning racial and religious factors and does not prevent appraisers from making negative evaluations based upon racial, religious and ethnic factors. The purpose of the agreement was not to legislate the appraisal process, but, rather, to continue and expand an affirmative action program and to resolve the Institute's part in a complex lawsuit.

The basis of the settlement was the Institute's affirmative action program which had been undertaken before the lawsuit was filed and the government's acceptance of the Institute's appraisal policies. These policies promote the objective analysis of market evidence and discourage the use of unreliable presumptions. In particular, the stated policies discourage the use of stereotyped or biased presumptions relating to race, color, religion, sex or national origin and unsupported presumptions relating to neighborhood life cycles in the appraisal process. At the same time, the Institute holds that the professional appraiser must be free to investigate and report facts and to examine any of the social factors for possible relevancy.

Please let me know if further explanations are desired.

Sincerely,

Charles B. Akerson, MAI

788

CRUM & FORSTER INSURANCE COMPANIES

LESLIE CHEEK
VICE PRESIDENT
FEDERAL AFFAIRS

June 22, 1979

The Honorable Don Edwards
U.S. House of Representatives
Washington, D. C.    20515

Dear Congressman Edwards:

Re:  H.R. 2540, Fair Housing Act Amendments
     -- Insurance Redlining Provisions

The Crum & Forster Insurance Companies are the Nation's 14th-ranked group of property-casualty insurers, with 1978 premiums of $1.4 billion.  We insure more than 500,000 homes across the country through the services of our 9,000 independent agents and 9,200 employees.

We are writing to express our concern about the inclusion in the captioned legislation of section 6(c), which would make it a discriminatory housing practice for an insurer "to refuse to enter into, or discriminate in the terms, conditions, or privileges of, a contract of insurance against hazards to a dwelling because of the race, color, religion, sex, handicap, or national origin of persons owning, or residing in or near, the dwelling."

Our quarrel is not with the intent of the section, which we wholeheartedly support, but rather with its necessity and the duplicative effect it will have on the state regulatory framework within which we operate.

In 1945, the Congress enacted the McCarran-Ferguson Act (15 U.S.C. §§ 1011 et seq.), which declared that "the business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business."  Since that time, all of the States have enacted pervasive insurance regulatory codes, each of which generally prohibits any kind of unfair or invidious discrimination and arms regulatory officials with ample authority to punish those found guilty of such discrimination.

003587

789

More recently, the Federally-chartered National Association of Insurance Commissioners (NAIC), the organization of state insurance regulatory officials, has adopted a model Property Insurance Declination, Termination and Disclosure Act which specifically prohibits any declination or termination "based upon the race, religion, nationality, ethnic group, age, sex, or marital status of the applicant or named insured."

None of the witnesses testifying in support of section 6(c) has suggested that State regulators have not responded to unfair insurance discrimination or are incapable of preventing or punishing it. In the absence of a showing of need for Federal intervention in this area, we think it would be wasteful to establish a new Federal bureaucracy to duplicate or supplant State regulation of insurer conduct.

Because the States are in a better position to respond to localized problems of unfair insurance discrimination, we recommend that section 6(c) be deleted from H.R. 2540.

Sincerely yours,

Leslie Cheek, III
Vice President-Federal Affairs

LC/kor

790

# National Council of La Raza

Raul Yzaguirre
*President*

*National Office*
172⁵ Eye Street, N.W.
Suite 210
Washington, D.C. 20006
(202) 659-1251



June 28, 1979

The Honorable Don Edwards
Subcommittee on Civil and
    Constitutional Rights
407 House Office Building
Annex No. 1
Washington, D.C. 20515

Dear Mr. Edwards:

The National Council of La Raza wishes to call your at-
tention to H.R. 2540, a bill to improve the enforcement of
national fair housing policy.

As you know, the Department of Housing and Urban Develop-
ment has very weak powers to enforce the fair housing law
under Title VIII of the Civil Rights Act of 1968. HUD's
powers are confined to documenting instances of discrimination
and attempting to bring the two parties together for concili-
ation. HUD lacks the adequate enforcement powers which could
serve as an incentive to the disputing parties to reach a
mutually acceptable settlement.

The promise of decent shelter has been an enduring dream
for all Americans, but the reality for too many citizens has
been otherwise. Despite the committment of this nation under
the Housing Act of 1979 to provide every American family a
decent home and suitable living environment as soon as feasi-
ble, many of our fellow citizens, particularly minorities have
encountered hatred rather than a decent shelter. The Hispanic
population of the United States is a heavily urbanized group
that lives in older, less adequate housing than the total
population. And only 71 percent of Hispanics can afford
adequate housing without spending more than a quarter of their
income for it.

H.R. 2540 would provide remedies to end this inequality.
The National Council of La Raza supports this bill for the
following reasons:

791

    (1)  It would provide HUD with "cease-and-desist"
         power and standing to go to court through
         the Attorney General to enforce the fair
         housing laws;

    (2)  It would give Justice the power to intervene
         in individual court actions;

    (3)  It would retain Justice's present authority
         to bring "pattern and practice" suits;

    (4)  It would provide an aggrieved person with
         two enforcement routes --one, administrative,
         through HUD, and the other judicial, through
         the Federal courts.

We therefore vigorously support H.R. 2540.  This bill
demonstrates a national concern for discriminatory housing and
marks the beginning of what we hope will be a significant
improvement in housing for our Spanish citizens.  We implore
you to support this bill and to act promptly on a significant,
positive, and fair measure.

                        Sincerely,

                        Raul Yzaguirre
                        President

RY/lo

792



# NATIONAL HOUSING CONFERENCE, INC. ⚖ ᵂᴬ

**1126 SIXTEENTH ST., N.W.        WASHINGTON, D.C.  20036        (202) 223-4844**

**KENNETH N. HYLTON**
Chairman of the Board

**LEON N. WEINER**
President

July 11, 1979

The Honorable Don Edwards
Chairman
Subcommittee on Civil and
 Constitutional Rights
Judiciary Committee
U.S. House of Representatives
Washington, D.C.  20515

Dear Mr. Chairman:

On behalf of the members of the National Housing Conference
I would like to express its support for H.R.2540, the Fair
Housing Act Amendments, and ask that this letter be included
as part of the hearing record.  The National Housing Conference,
founded in 1931, is the nation's oldest organization concerned
with meeting America's housing and community development needs.

We believe this legislation will create an effective and
efficient enforcement mechanism for the Fair Housing Act that
is long overdue.  It has been difficult to make substantial
progress in achieving the goals of the Fair Housing Act without
such an enforcement mechanism.

The creation of an administrative adjudication process
within the Department of Housing and Urban Development should
help to bring about faster and more equitable resolution of
housing discrimination charges.  We think the legislation will
accomplish this in two ways.  One will be by providing a
forum for complaints to be heard and resolved that will be
less formal and less time consuming than a court proceeding.
Secondly, the mere fact of its existence will serve to spur
settlement of cases before they reach the hearing stage.

We also applaud the provision in the legislation to grant
the Secretary of HUD the authority to file, on her own initiative,
charges alleging discriminatory housing practices.  We believe
this authority will bring about more vigorous enforcement of
the Fair Housing Act, because the Department whose business is
housing will be able to take direct action against those who
would deny equal housing opportunity to minorities.  Persons
who suffer discrimination often lack the means to protect their
rights.  Permitting the HUD Secretary to initiate discrimination
actions will insure that the rights of these citizens do not
go undefended.

793

We strongly support the provisions in the bill which would expand the coverage of the Act to include certain practices which go under the general label of "redlining." These vicious practices, which serve to discriminate against persons because of the areas in which they live, have destroyed countless urban neighborhoods throughout America. By prohibiting discrimination in hazard insurance, mortgage lending and the secondary mortgage market activity, based solely on the neighborhood in which a residence is located, the Congress will add an important and invaluable tool to the fight to eradicate this particularly ugly form of discrimination.

Equally laudatory is the provision to prohibit discrimination against handicapped persons. Solely because a person has a physical or mental impairment should not be reason to deny that person equal housing opportunity.

While we generally support H.R.2540 as written, we would like to voice our concern about the wording of several provisions in the bill and urge that the Subcommittee carefully review these provisions. Two provisions which we would like to call the Subcommittee's attention to are Section 810(b), which grants the Secretary authority to order temporary or preliminary relief, and Section 811(a) which grants HUD the authority to "issue an order providing such relief as may be appropriate," after a case has been decided.

We believe that administrative agencies should be granted carefully delineated cease and desist powers in matters of highly important public policy such as equal housing opportunity. Our concern with these sections is that the cease and desist powers which would be granted to HUD are extremely broad. We urge the Subcommittee to define more precisely the types of relief which may be ordered by HUD. We believe this would secure the co-operation of those sectors of private industry who obey the law, but are apprehensive about broad grants of administrative authority, by giving them a very clear indication that this powerful authority being granted HUD will be exercised within well defined boundaries.

We also urge the Subcommittee to place a time limit on the duration of a temporary order issued by the Secretary pursuant to Section 811(b). We can appreciate the need for authority to preserve the status quo until a case can be decided. However, we believe that the authority to issue temporary orders should be limited to that purpose only and should expire at the end of a certain period of time.

003592

794

The last concern we would like to share with the Subcommittee deals with the extent to which landlords and sellers will have to accommodate handicapped persons.  We noted in the section-by-section analysis which you inserted in the March 1st Congressional Record the prohibition of discrimination against handicapped persons is not intended to require retrofitting to remove architectural barriers, although reasonable accommodations (at the expense of the buyer or lessee) would have to be permitted.  This appears to us to be a very reasonable interpretation of this provision. We strongly urge the Subcommittee to include this interpretation in the language of the bill to eliminate the possibility of a contrary court interpretation after the legislation has passed. We also urge the Subcommittee to specify that this intent extends to newly constructed buildings as well and is not intended to supplant existing building code requirements.

We strongly support H.R.2540 as a means of achieving equal housing opportunity in this country.  Much has been done to eliminate discriminatory housing practices since the passage of the Fair Housing Act, but much remains to be done. Passage of H.R.2540 will be an invaluable aid in accomplishing the work that lies ahead.

Sincerely,

Leon N. Weiner
President

003593

795



MEMBERS OF THE BOARD
PETER F. SCHABARUM
KENNETH HAHN
EDMUND D. EDELMAN
YVONNE BRATHWAITE BURKE
BAXTER WARD

CHIEF ADMINISTRATIVE
OFFICER
HARRY L. HUFFORD

**BOARD OF SUPERVISORS**
**COUNTY OF LOS ANGELES**

1735 NEW YORK AVENUE, N W  SUITE 500
WASHINGTON, D C 20006
(202) 783-0471

500 W TEMPLE STREET, ROOM 726
LOS ANGELES CALIFORNIA 90012
(213) 974-1303

JOSEPH M. POLLARD
WASHINGTON REPRESENTATIVE - LEGISLATIVE COORDINATOR

July 17, 1979

Honorable Don Edwards
2329 Rayburn House Office Bldg.
Washington, D.C. 20515

Dear Congressman:

The Los Angeles County Board of Supervisors urgently requests your support for the "Fair Housing Amendments Act of 1979"( H.R. 2540 and S. 506).

Attached is an analysis of this legislation prepared by our Commission on Human Relations.

Sincerely yours,

Joseph M. Pollard
Legislative Coordinator

JMP:adk
Attachment



**LOS ANGELES COUNTY**

# COMMISSION ON HUMAN RELATIONS

*1184 Hall of Records, 320 West Temple Street*
*Los Angeles, California 90012*                    *974-7611*

---

Analysis of S.506 (Mathias) 96th Congress, 1979

This bill, called the "Fair Housing Amendments Act of 1979" is designed to strengthen enforcement of Title VIII of the Civil Rights Act of 1968.

S.506 (and its companion bill H.R.2540) would:

(a) give HUD the authority to issue cease-and-desist orders, impose civil penalties of not over $10,000, file complaints on the initiative of the Secretary (in addition to complaints filed by aggrieved parties), investigate housing practices to determine if "charges should be brought or new rules should be made";

(b) extend coverage to persons who are physically or mentally handicapped;

(c) end the exclusion from coverage of sales by owners of single family homes and rentals in owner occupied building with four or fewer units;

(d) permit successful plaintiffs to be awarded attorneys' fees;

(e) make subject to the full prohibition of the law the operations of federal agencies that regulate financial institutions in the field of housing;

(f) expressly prohibit mortgage redlining and discrimination or redlining in insurance;

(g) provide the Secretary with the alternative of filing an administrative complaint with full enforcement powers, or referring a case to the Attorney General for filing a civil action;

(h) broaden the powers of the Attorney General to initiate civil action in pattern-of-practice cases or denial of rights under the Act to any group of persons when such denial "raises an issue of general public importance."

(i) provide an aggrieved person an opportunity for private enforcement action in civil court and authorize the Attorney General to intervene if able to certify that such a case is "of general public importance."

(j) authorize the Secretary to refer complaints to a state enforcement agency if the powers of the state agency are equivalent to those of the federal act.



## LOS ANGELES COUNTY
# COMMISSION ON HUMAN RELATIONS

*1184 Hall of Records, 320 West Temple Street*
*Los Angeles, California 90012*                    *974-7611*

Analysis of S.506....
Page 2

### Impact on the County of Los Angeles

Population mobility and other aspects of the interdependence of the people of Los Angeles County and the population of other counties and states are such that it is to the advantage of the County when civil rights laws are enforced uniformly and effectively throughout the United States.

California has a comprehensive Fair Housing Law which is comparable to the proposed "Fair Housing Amendments Act of 1979." However, as evidenced by monthly communications from citizen fair housing councils in the 5 major areas where such councils are effectively organized (Long Beach, Westside, Hollywood-Wilshire, San Fernando Valley, and West San Gabriel Valley), housing discrimination is still a serious human relations problem. The California FEPC - the State fair housing enforcement agency, lacks sufficient personnel and operating funds to effectively enforce the law statewide. This is particularly serious where enforcement is needed the most, namely, in suburban areas where citizen fair housing councils are lacking or are not effective.

Ethnic minorities in the county are increasing rapidly, while the "majority" group is declining. This trend is toward a county in which minorities will constitute a majority of the population in only a few years.* In fact, this is the state population trend.

Unless strong federal action is taken toward the goal of complete freedom of residential mobility for all ethnic groups without discrimination to move anywhere they choose within the U. S., counties and regions with substantial minority populations ghettoized by racially restrictive practices will experience increasing intergroup tensions, conflict, and other social problems and inequalities costly to taxpayers.

This is the status of Los Angeles County. This is why it is in the County's interest that the Fair Housing Amendments Act of 1979 be enacted by the 96th Congress.

Existing law does not authorize HUD to take the strong actions described above. It is quite comprehensive in its coverage but lacks effective remedies. The Secretary may not now initiate action. In processing complaints, HUD has only conciliation and persuasive powers. Pattern of practive suits by the Attorney General are authorized by the 1968 Act, but the gathering of evidence by aggrieved and interested parties is complex and costly and falls principally upon local citizens who are alert, concerned, and informed. Aggrieved citizens

798



# LOS ANGELES COUNTY
# COMMISSION ON HUMAN RELATIONS

*1184 Hall of Records, 320 West Temple Street*
*Los Angeles, California 90012*

*974-7611*

Analysis of S.506....
Page 3

may sue in court, but the process is costly and must be born by the complainant.

Redlining in home insurance and mortgage lending is covered in general terms by the 1968 Fair Housing Act, but costly and time-consuming action independent of the Act has been necessary to get action. The Board of Supervisors, on recommendation by this Commission, has taken strong action against mortgage redlining.

The Commission assisted the Federal Insurance Administrator to hold hearing on insurance redlining in Los Angeles Feb. 15-16, 1979. Testimony revealed the needs for HUD to take stronger action to alleviate the problem in Los Angeles County.

*See An Ethnic Trend Analysis of Los Angeles County - 1950-1980, by the Community Development Department, Los Angeles City, December, 1977.

O

# INSURANCE REDLINING:
# FACT OR FICTION?

# HEARING

BEFORE THE

## SUBCOMMITTEE ON
## CONSUMER CREDIT AND INSURANCE

OF THE

# COMMITTEE ON BANKING, FINANCE AND
# URBAN AFFAIRS
# HOUSE OF REPRESENTATIVES

## ONE HUNDRED THIRD CONGRESS

FIRST SESSION

FEBRUARY 24, 1993

Printed for the use of the Committee on Banking, Finance and Urban Affairs

## Serial No. 103–12



U.S. GOVERNMENT PRINTING OFFICE

64–974 CC         WASHINGTON : 1994

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-046187-1

## HOUSE COMMITTEE ON BANKING, FINANCE AND URBAN AFFAIRS

HENRY B. GONZALEZ, Texas, *Chairman*

STEPHEN L. NEAL, North Carolina
JOHN J. LaFALCE, New York
BRUCE F. VENTO, Minnesota
CHARLES E. SCHUMER, New York
BARNEY FRANK, Massachusetts
PAUL E. KANJORSKI, Pennsylvania
JOSEPH P. KENNEDY II, Massachusetts
FLOYD H. FLAKE, New York
KWEISI MFUME, Maryland
MAXINE WATERS, California
LARRY LaROCCO, Idaho
BILL ORTON, Utah
JIM BACCHUS, Florida
HERBERT C. KLEIN, New Jersey
CAROLYN B. MALONEY, New York
PETER DEUTSCH, Florida
LUIS V. GUTIERREZ, Illinois
BOBBY L. RUSH, Illinois
LUCILLE ROYBAL-ALLARD, California
THOMAS M. BARRETT, Wisconsin
ELIZABETH FURSE, Oregon
NYDIA M. VELAZQUEZ, New York
ALBERT R. WYNN, Maryland
CLEO FIELDS, Louisiana
MELVIN WATT, North Carolina
MAURICE HINCHEY, New York
CALVIN M. DOOLEY, California
RON KLINK, Pennsylvania
ERIC FINGERHUT, Ohio

JAMES A. LEACH, Iowa
BILL McCOLLUM, Florida
MARGE ROUKEMA, New Jersey
DOUG BEREUTER, Nebraska
THOMAS J. RIDGE, Pennsylvania
TOBY ROTH, Wisconsin
ALFRED A. (AL) McCANDLESS, California
RICHARD H. BAKER, Louisiana
JIM NUSSLE, Iowa
CRAIG THOMAS, Wyoming
SAM JOHNSON, Texas
DEBORAH PRYCE, Ohio
JOHN LINDER, Georgia
JOE KNOLLENBERG, Michigan
RICK LAZIO, New York
ROD GRAMS, Minnesota
SPENCER BACHUS, Alabama
MIKE HUFFINGTON, California
MICHAEL CASTLE, Delaware
PETER KING, New York

BERNARD SANDERS, Vermont

---

## SUBCOMMITTEE ON CONSUMER CREDIT AND INSURANCE

JOSEPH P. KENNEDY II, Massachusetts, *Chairman*

HENRY B. GONZALEZ, Texas
LARRY LaROCCO, Idaho
LUIS V. GUTIERREZ, Illinois
BOBBY L. RUSH, Illinois
LUCILLE ROYBAL-ALLARD, California
THOMAS M. BARRETT, Wisconsin
ELIZABETH FURSE, Oregon
NYDIA M. VELAZQUEZ, New York
ALBERT R. WYNN, Maryland
CLEO FIELDS, Louisiana
MELVIN WATT, North Carolina
MAURICE HINCHEY, New York
PAUL E. KANJORSKI, Pennsylvania
FLOYD H. FLAKE, New York
MAXINE WATERS, California
CAROLYN B. MALONEY, New York
PETER DEUTSCH, Florida

ALFRED A. (AL) McCANDLESS, California
MICHAEL CASTLE, Delaware
PETER KING, New York
DEBORAH PRYCE, Ohio
JOHN LINDER, Georgia
JOE KNOLLENBERG, Michigan
DOUG BEREUTER, Nebraska
CRAIG THOMAS, Wyoming
RICK LAZIO, New York
ROD GRAMS, Minnesota
SPENCER BACHUS, Alabama
RICHARD H. BAKER, Louisiana

BERNARD SANDERS, Vermont

(II)

003599

# CONTENTS

|  | Page |
|---|---|
| Hearing held on: | |
| February 24, 1993 ........................................................... | 1 |
| Appendix: | |
| February 24, 1993 ........................................................... | 41 |

## WITNESSES

### WEDNESDAY, FEBRUARY 24, 1993

| | |
|---|---|
| Carbajal, Michael, Jr., C.P.C.U., Michael Carbajal Financial Services, Inc. ...... | 11 |
| Cummings, Rev. Charles, Jr., Treasurer, DC Chapter, ACORN; accompanied by Deepak Bhargava, Legislative Director, ACORN ........................................ | 15 |
| Farmer, David M., Vice President, Alliance of American Insurers .................... | 21 |
| Garamendi, John, Insurance Commissioner, State of California ........................ | 6 |
| Rice, Lisa, Executive Director, Fair Housing Center ........................................ | 23 |
| Squires, Gregory D., Professor, University of Wisconsin-Milwaukee .................. | 17 |

## APPENDIX

| | |
|---|---|
| Prepared statements: | |
| Gutierrez, Hon. Luis V. .................................................................. | 42 |
| Roybal-Allard, Hon. Lucille ............................................................. | 46 |
| Rush, Hon. Bobby L. ...................................................................... | 44 |
| Carbajal, Michael, Jr. ..................................................................... | 51 |
| Cummings, Rev. Charles, Jr. ............................................................ | 55 |
| Farmer, David M. .......................................................................... | 173 |
| Garamendi, John ........................................................................... | 47 |
| Rice, Lisa .................................................................................... | 187 |
| Squires, Gregory D. ....................................................................... | 68 |

### ADDITIONAL MATERIAL SUBMITTED FOR THE RECORD

| | |
|---|---|
| Squires, Gregory D.: | |
| Selected References on Insurance Redlining ................................................ | 77 |
| "Urban Decline Or Disinvestment: Uneven Development, Redlining and the Role of the Insurance Industry", *Social Problems*, Vol. 27, No. 1, pp. 79–95, October 1979 ........................................................ | 78 |
| "Community self-insurance", *The Progressive*, pp. 47–49, December 1979 . | 95 |
| "Insurance Redlining and the Process of Discrimination," *The Review of Black Political Economy*, Winter 1988—Vol. 16, No. 3, pp. 63–75 ....... | 98 |
| "Civil Rights Implications of Insurance Redlining," R. DeWolfe, G.D. Squires, and A. DeWolfe, *DePaul Law Review*, Winter 1980, Volume 29, Number 2, pp. 315–351 ........................................................ | 113 |
| "Insurance Redlining, Agency Location, and the Process of Urban Disinvestment," Gregory D. Squires, William Velez, and Karl E. Taeuber, *Urban Affairs Quarterly*, June 1991, pp. 567–588 ..................... | 151 |

(III)

# INSURANCE REDLINING: FACT OR FICTION?

———————

## WEDNESDAY, FEBRUARY 24, 1993

House of Representatives,
Subcommittee on Consumer Credit and Insurance,
Committee on Banking, Finance and Urban Affairs,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 2 p.m., in room 2237, Rayburn House Office Building, Hon. Joseph P. Kennedy [chairman of the subcommittee] presiding.

Present: Chairman Kennedy, Representatives Gutierrez, Rush, Roybal-Allard, Barrett, Velazquez, Hinchey, Flake, McCandless, King, Pryce, Knollenberg, Baker, and Sanders.

Chairman KENNEDY. The subcommittee will please come to order.

Today the subcommittee holds the fourth in a series of hearings on the credit crisis for American consumers and small businesses.

This afternoon's hearing poses a simple question: Is insurance redlining taking place in our country? Today's witnesses, save one, state unequivocally that it is. In fact, despite studies and surveys reaching back 2½ decades, redlining by insurance companies continues to be an unrelenting fact of American life.

Insurance is the invisible key to economic advancement in our society. Without it, consumers cannot obtain the credit that they need from banks and thrifts to achieve a decent level of financial security and prosperity. Homes cannot be bought. Businesses are unable to start and grow. Inevitably, redlined communities decay and citizens trapped within them are condemned to lives of poverty and despair.

Yet, despite knowing the importance of this key, the industry has used it to lock tight the door of economic opportunity for millions of consumers. The evidence presented to this subcommittee clearly suggests that a pattern of massive nationwide discrimination against low-income and minority Americans exists.

Our first witness, California Insurance Commissioner Garamendi, who I might add has done more to document and remedy insurance redlining than any public official in the history of our country, will show us a map of San Francisco. This map, purportedly used by an insurer, marks off huge sections of the city where agents are forbidden to sell policies.

Another witness, with over 40 years experience as a broker and industry analyst, tells of seeing maps of New York City literally redlined by insurance companies to show agents where not to write policies. And in case he had any doubt about the meaning of those

(1)

red lines, he was told by a company underwriter that the company does not "write Blacks or Hispanics."

The industry has found other ways to discriminate that may be less blatant but are just as effective in weeding out the poor and minorities from the pool of insurable risks. Underwriting guidelines, the bible of the industry, are models of double speak and innuendo. Fair on their face, they can be discriminatory in effect.

The subcommittee has obtained portions of several of these usually confidential guidelines, or manuals, as they are called in the trade, used to underwrite auto insurance in Texas. One company, Metropolitan Life, requires people seeking car insurance to own a home. We called Met Life and asked them to explain how on earth owning a home makes someone a better driver. Their answer: Homeowners make better drivers.

The bottom line is that a requirement like this wipes out the possibility of insurance for lots of hard-working Americans who may have excellent driving records.

Another Dallas-based insurance company, Trinity Universal, is apparently not universal about its willingness to insure inner-city minority applicants. Trinity flatly refused to provide auto insurance to consumers who lived in six Texas counties. It so happens that those six Texas counties are overwhelmingly urban and Hispanic, including Dallas/Fort Worth, Corpus Christi, El Paso, and the Rio Grande Valley, which is the single poorest area in the United States.

Their guidelines do not explain why someone is a bad driver just because of where they live. They also do not insure anyone who has been in the country less than 5 years or drives cars with "excessive stereo systems." Standards such as these are ridiculous on their face, bearing no relation to driving ability but having much to do with race, income, and residence of consumers.

Some low-risk inner-city residents are able to find insurance; however, they are paying more in premiums for less in coverage. A study just completed by the consumer group ACORN shows that urban and minority consumers are paying as much as 270 percent more for State-sanctioned insurance than for private insurance. Yet, they cannot get insurance to cover the cost of rebuilding their homes if they are destroyed by fire or other disasters. They can only receive coverage up to the value of their homes, which in the inner city may not be much.

The message that insurers are sending to low-income and minority consumers is crystal clear: You are irresponsible; you are dangerous; you don't deserve insurance. Solely because of the color of their skin, the size of their paycheck, and the address of their home, millions of Americans must pay more in premiums for less coverage, take their chance on some shadowy, unregulated, or unfunded insurance company, or go without insurance at all.

So when it comes to getting decent insurance, Nationwide may not be on your side, you could be in no hands at all with Allstate, and unlike the good neighbor, State Farm might not be there.

The presence of discrimination in the insurance industry is no more surprising than its existence in the banking industry or other sectors of our society. What is surprising, however, is that so little has been done to effect a remedy.

This hearing is just the beginning of the subcommittee's examination of the problem. I hope that our outstanding panel of witnesses will help us focus on what we can do to rid this Nation of this scourge.

I, for one, believe that we need to see more data from insurance companies on where they do and do not write policies, much like the Home Mortgage Disclosure Act. It requires banks to have data on mortgage loans. It will put to the test the contention that discrimination does not exist.

We should also consider giving consumers the right to know why they have been turned down for insurance, much like the right they have to know why they have been turned down for credit. Such a requirement would strongly discourage insurers from using underwriting standards unrelated to risk.

I hope today's hearing will be another step toward ending the system of economic apartheid that continues to hold so many Americans back from achieving their full human potential.

That said, let me now turn to the ranking Member of our subcommittee, Mr. McCandless, for an opening statement.

Mr. MCCANDLESS. Thank you, Mr. Chairman.

Let me begin by making the point that discrimination on the basis of race, gender, or ethnic origin is not only completely irrational, but illegal. Such discrimination should not and cannot be tolerated.

There are remedies we all support to eliminate discrimination. If discrimination is taking place within the insurance industry, then those responsible should be held fully accountable for their actions under existing civil rights laws.

If they are not being held accountable, then we should direct our attention toward the State insurance commissioners and attorneys general, and ask them why they are not doing their jobs.

Our focus today, however, should be on what steps we might consider to increase the availability and affordability of insurance in inner city, low-income, and other underserved areas.

As a general rule, when the government is trying to encourage an activity, it has two options. It can mandate the activity and punish those who fail to comply, or it can provide incentives to those who engage in that activity. The better the incentive, the more the activity. This is the proverbial carrot or stick debate.

In reviewing the testimony for this afternoon's hearing, it became obvious that the suggestions of most of our witnesses are long on sticks and short on carrots.

I have a very fundamental disagreement with those that advocate that the insurance industry should be treated like a public utility or that regulation of insurance should be taken away from the States and given to the Federal Government.

I believe in the free enterprise system. If a person can expect a reasonable return, then there is virtually no limit to the ingenuity used to provide goods and services. If the perceived risks are greater than the expected return, then there will be a shortage of goods and services. To address the shortages, we can either decrease the risk or increase the return. That is true of all goods and services, including insurance.

4

I make these comments for the purpose of encouraging a broad debate from a variety of perspectives. I look forward to the witnesses' comments and thank them for being with us this afternoon.

I want to congratulate you and the staff, Mr. Chairman. All of the statements were submitted in the timeline we talked about last time. It made it much easier for us.

Chairman KENNEDY. We are always happy to take your suggestions.

Mr. Hinchey.

Mr. HINCHEY. Thank you very much, Mr. Chairman, for holding this hearing and the series of hearings that have been held on this subject.

It is clear that numerous communities across the country, your State and mine and other places across the country, have been denied as a result of redlining that has been taking place. Those people have been depriving Americans of their rights.

Those people who have held the hearings have taken a leadership role in defining those problems, casting appropriate light on them, and also offering suggestions on how best to deal with them.

So I am grateful to you, Mr. Chairman, for shedding light on this problem and for my ability to take part in it.

Chairman KENNEDY. We want to thank you, Mr. Hinchey. Your questioning has really been perceptive in terms of the concerns that you have, not only for the people in your district, but I think people around the country who are dependent on our largest companies to obtain credit. So we are really delighted with your participation on this subcommittee.

Chairman Flake. Always good to hear that "Chairman," isn't it?

Mr. FLAKE. I like that, yes. Thank you. Thank you, Mr. Chairman. It is certainly good to be here, primarily because of the nature of this particular hearing, as you have done and continue to do to lift issues of concern to help all America be involved in the process of not only economic recovery, but some degree of fairness.

I think it is almost impossible in many of our urban communities to find insurance companies still doing business there, in spite of the fact that it represents a potentially good market for the availability of them to have customers. It is a sad situation when you are trying to do community development, both for housing and more particularly for commercial development, to suddenly find insurance companies are either unwilling or charge rates that are so onerous that persons who would choose to have insurance cannot afford to do so. And then to find another instance, when there has been a tragedy, the insurance is not of sufficient nature to cover, in spite of the fact that the person who considers themselves having been insured has in fact paid more than they would have paid if they were in other communities.

I think we all must agree you cannot possibly hope to bring urban America back to stability, to a place where you can do business and have a functional community, without having the full cooperation of the banking community, the corporate community, and the insurance industry.

So I think the hearing is important if we are going to continue to discuss ways of getting capital into those communities. Yet, it does no good if the cost is driven up for persons trying to do busi-

003605

5

ness, or those persons find it impossible to have the same benefits as other businesses that function outside of those communities.

So I commend you for the hearing. I look forward to hearing the witnesses. I just hope as we continue to work together to try to rebuild America, that we are talking about all of America, not just a portion of it, and understand that a part of the rebuilding process has to do with elimination of this what I consider a sin called redlining.

Thank you very much, Mr. Chairman.

Chairman KENNEDY. Thank you, Chairman Flake.

Mr. Knollenberg was here next. I am sorry I missed you there in the corner.

Mr. KNOLLENBERG. I snuck in, Mr. Chairman, but I am here in the body and flesh.

Mr. Chairman, I want to thank you for your confession of overlooking me, number one, but number two, for holding this hearing to examine the allegations of insurance redlining. I want to welcome our witnesses.

This whole idea concerns me a great deal. Prior to coming to Congress, I was in the insurance business, and so this hearing is of particular interest to me.

I know that in Michigan, as in a number of States, we have a FAIR plan. It stands for Fair Access to Insurance Requirements. It is something that I think is part of the handout, but we have information here if anyone would like to relate to it or has a question about it.

Under this program, policies of last resort are offered through the Michigan Basic Property Insurance Association. This program offers homeowner's, which includes liability, fire and theft and commercial insurance. They also provide fire coverage for people who want to rent property who are in a landlord category. My sense is in talking with the Michigan Insurance Department, the insurance commissioner, that this program has been successful.

As a champion of economic empowerment, I have always been concerned about charges that urban areas are redlined for purposes of insurance—small business loans included, mortgages, other types of credit.

But I do have to say that I am concerned that some of the studies and the data that we are reviewing may not offer full and balanced perspective on this issue. Nonetheless, we look forward to hearing our witnesses, and to hear the address on the free market situation, and also the fact that I want to ensure that this issue is not something that becomes just more of a government dictate.

So I do welcome, of course, our folks who are here today, and look forward to their testimony.

Thank you, Mr. Chairman.

Chairman KENNEDY. Thank you very much. I am delighted to hear your previous experience. I think it would be helpful to us in these hearings.

I think we are going to hear some of our witnesses discuss the FAIR plans. We have a FAIR plan in Massachusetts. There are some benefits from them, but some problems as well. But we will hear from our witnesses.

Peter King was here next.

Mr. KING. Thank you, Mr. Chairman. Actually, I already gave a speech today on the floor so I am going to sit back today and listen.

This is a very serious topic. The whole question of redlining is something that has to be resolved if our inner cities are going to rebound.

I want to thank the chairman again for setting up this agenda. Chairman KENNEDY. Bernie Sanders.

Mr. SANDERS. I am just here primarily to listen. We have an important issue. I am glad you are dealing with it.

Chairman KENNEDY. Thank you, Bernie.

I would now like to ask the witnesses to please come forward and be seated at the table. I would like to thank all the witnesses on this panel for being with us this afternoon. I am looking forward to, as I am sure everyone else is, your testimony.

We will have your entire written statements submitted for the record, and I would just ask, in consideration of other witnesses and the ability of the members to ask questions, that you please try to limit your opening statements to 5 minutes.

I also understand that certain people might have to catch airplanes, and if that is true, please don't hesitate to let us know when the time is at the moment you must leave.

I now take great pleasure in introducing John Garamendi, the insurance commissioner of the State of California, who has served in both the California Assembly and the State Senate. Mr. Garamendi more than any other is really responsible for putting the issue of fair insurance on the political map in this country.

I am very honored, as the whole Congress is, for his presence here this afternoon.

As California's first elected commissioner. Mr. Garamendi has been a vigorous defender of the interests of consumers. Commissioner Garamendi has proposed antidiscrimination regulations for insurance companies in California that would link insurers' profits to their service in underserved communities.

We are very pleased to have you with us today. Please proceed.

### STATEMENT OF JOHN GARAMENDI, INSURANCE COMMISSIONER, STATE OF CALIFORNIA

Mr. GARAMENDI. Mr. Chairman, it is a great pleasure to be here. Congratulations on your chairmanship, Mr. Chairman.

You have asked me to testify about discrimination in insurance, specifically redlining. The practice of redlining is a system wherein insurers carve out an area; that is, put a red line around it or some other line around it, and refuse to serve in that area. They don't put agents there, they don't sell insurance there. They have got a million and one excuses. And as a result, people can't insure their cars, their homes, they can't start businesses.

There may be some people that deny that redlining exists. They are not telling you the truth, or they just don't know what they are talking about. It is real, it does exist, and it is a very serious socioeconomic problem. I am here to tell you it is real and I am here to describe to you its effect in the State of California.

I want to make three brief points and then offer some background.

From time to time my department receives unsolicited information about redlining and other issues. Three weeks ago we received from an agent who represents a significant insurance company in the State of California a map and a letter. The map was of the city of San Francisco, and the letter alleged that the company had specifically drawn on this map areas that he was not to serve. This is the map that was presented to us by this agent.

We are now undertaking an investigation of the situation, and should his allegations prove to be true, it would be a blatant violation of the laws of the State of California, and quite possibly the laws of the Federal Government also.

It is, plain and simple, a yellow line, not a red line. They used a marking pen, a highlighter pen to accomplish the redlining purpose.

This is one of many examples that we have had presented to us about redlining. This one is specifically from the industry itself, or from an agent who represented a part of the industry.

Unfortunately, I am not going to leave the map here with you. I will send you a copy for your records. This may become evidence in a future action that my department will take.

We began to look at the issue of redlining originally from a statistical point of view. We gathered statistics and did the analysis. The numbers told us what is happening. They told us where the policies are being sold, they told us where the agents are. It is very clear that the distribution of agents from major companies is skewed away from the inner city and the minority communities of California.

For example, one major company, this is testimony presented at an earlier hearing in California, State Farm, had more agents in Sacramento than they did in all of Los Angeles. You can know the population difference is actually about tenfold.

My department has moved in the intervening months since we began receiving this information, to provide strict regulations where none existed previously in order to encourage good insurance practices and to toss out the bad and discriminatory practices.

These regulations are now approaching their final stages, and they will penalize the discriminating insurer where it hurts, in their wallet, in the bottom line. This affects their profits, and the insurer who redlines is penalized on the profit side, and the insurer who plays by the rules gets a bonus.

Mr. McCandless, there ought to be incentives, carrots and sticks, and we provide both in these regulations. Also in these regulations we gather additional statistical information such as exactly where the agents are located, where they serve, also information about the ethnic background of employers. That is the managers of insurance companies.

I had the opportunity to sit down with many managers of many insurance companies, and the ethnic and sex background of those people does not represent the State of California. It is, therefore, very little wonder in my mind that the people who run these companies are scared to death of the inner cities. They don't look like the inner city, they have never been to the inner city, and they may feel more comfortable selling insurance in Bosnia than in the inner cities.

It is also a practice that exists—let me just do some background here, as I described the practices. In California in 1988, the voters enacted Proposition 103 which obligates the insurers to insure all good drivers, yet many insurance companies still refuse to do so, or those insurers claim the risks are too high in low-income and minority communities and inner-city neighborhoods. In fact, some insurers place unfair restrictions on agents' ability to bring insurance into the very areas that most need those services.

Mostly, you will see this with independent agents as they attempt to get assignments or get contracts to sell the insurance of major companies. They simply cannot obtain the opportunity to sell insurance in those inner-city areas.

Proposition 103 also prohibits any rate that is unfairly discriminatory and violates California law in other ways. We are once again continuing our efforts to stop this continuing injustice.

Because Proposition 103 subjects insurers doing business in the State of California to the State civil rights and antitrust laws as well as other unfair practices, a coalition of consumer advocates has proposed—including the insurance commission—that all insurers be required to serve all people on reasonable terms without discrimination.

That coalition of consumer advocates alleges insurers have abandoned the inner cities. We will provide that to you if you care to see it.

Their petition to me asked for establishment of a system of bonuses and penalties. I described that earlier. That is part of our regulations. And should we be able to adopt those, there will be a reward for good service; that is, more profit, and there will be a penalization for substandard or no service at all; that is, less profit. These regulations propose that the allowable rate of return be varied.

Now, as all of you know, we had some civil disturbances in Los Angeles last year. Shortly after those disturbances, we held hearings. The hearings furthered the information that we needed on these regulations. And we also pointed out an additional serious problem that I want to bring to your attention.

Like banks, insurance companies are a source of funding for economic activities. Unlike banks, insurance companies do not have any requirement to invest in our communities, and they don't. There is very, very little evidence that the insurance industry invests in any meaningful way in the inner cities and in our minority communities.

It, therefore, is imperative for us to address that, and we have conducted hearings, we have conducted other activities, and we will have some coming up in the next month or so, to find ways of encouraging the insurance industry to invest in the inner city.

The issue of the FAIR plan was raised in the opening statements of the members. The FAIR plan in California prior to the riots was in effect. However, it did not provide us with the kind of coverages that were needed. It was expensive and did not include such things as business interruption and other kinds of basic insurance that is needed by a person who wanted to open a business.

We asked the FAIR plan to change their coverage. They have now done so. They now allow for periodic monthly payments rather

than an up-front payment, and they have expanded their coverage to include the full line of coverage most businesses would need. That is a good sign.

However, the FAIR plan cannot be a rationale for insurance companies abandoning the inner city. It simply is not the way the laws are written, nor is it a reasonable mechanism.

While I am on the subject of riots, the Federal Riot Reinsurance Program was terminated in the early 1980's. It was a successful program. The government ran it for about 20 years, and it actually provided a bit of profit for the Federal Government. The termination of that program is likely to be a problem for many inner cities. It certainly is for Los Angeles today, as riot reinsurance is not available, and hence the cost and the availability of insurance is diminished.

We asked last year that Congress reinstate that. A bill was introduced; no action was taken. We draw your attention to this in the hopes that you would deal with that.

There is another problem that occurs in the inner cities, and these are the minority communities, particularly the immigrants. They do not have ready access to insurance. There are numerous barriers, including language and custom, as well as the availability of agents, brokers, and companies that understand both their language and custom.

We have seen serious problems in the inner city with unlicensed, unscrupulous ripoffs from insurance companies that often are offshore; they are not even located in America. We anticipate that some $70 million of losses have occurred in Los Angeles from these unlicensed companies that preyed upon minority communities, typically the immigrant community.

We need help with a Federal law on insurance, specifically the unlicensed offshore insurers. We had a bill before Congress for that. I draw your attention to that also.

My department will continue to enforce laws against discrimination. We will try to and will prosecute the few wrongdoers we can get our hands on. We do not have the resources to do all of this. We look forward to more action with a more vigilant Federal Government, which is now in place.

And also our incentives will deal with the people who are employed. Hopefully, we will see more diversity in the background, the racial makeup, and the sex of the people employed in the insurance industry.

There are many, many issues that you will be covering during this hearing. My department and I stand ready to provide you with whatever information we can.

We hope that you will be successful in highlighting this problem and assisting us, where appropriate, in dealing with it.

Thank you, Mr. Chairman.

[The prepared statement of Mr. Garamendi can be found in the appendix.]

Chairman KENNEDY. Thank you very much.

I might ask the members of the subcommittee if it might be worthwhile our taking Mr. Garamendi's questions out of turn here, simply because he is going to have to catch a plane back to California at 3:20. Because of the bells, none of us will get an opportunity

to ask him questions. I would suggest that we can keep our questions short. We can then go back and forth.

Those of you who want to come back swiftly after the bell——

Mr. FLAKE. Unanimous consent, Mr. Chairman.

Chairman KENNEDY. Thank you very much.

Any objections?

Mr. GUTIERREZ. Mr. Chairman, I just ask unanimous consent to have my opening remarks that I wasn't able to give earlier inserted into the record.

Chairman KENNEDY. Absolutely.

Anyone else want to add opening remarks into the record?

[The prepared statement of Mr. Gutierrez can be found in the appendix.]

Chairman KENNEDY. Commissioner, I want to thank you for the tremendous work you have done on behalf of people all across the country. I think your leadership on this issue has inspired others to begin to deal with the issue of fair insurance rates and make sure that insurance is provided to all people who have an opportunity to pay their premiums.

The map that you brought with you is just incredible. I wonder if you could explain to us a little bit more about where you got the map, what the implications of the map are, and what is your sense of what we might do about the problem it depicts.

Mr. GARAMENDI. Mr. Chairman, this map was sent to us by an insurance agent who was instructed by his company to avoid certain areas, and the areas he was told to avoid were highlighted in this yellow highlighter. If any of you are familiar with San Francisco, it is the South of Market area. It is the Mission District. It is Hunters Point. These are minority and low-income areas of San Francisco. Anybody that doesn't live in Pacific Heights or Knob Hill, Russian Hill, out in the Western Sunset District is out of luck as far as this company is concerned.

It is blatant yellowlining, and we have an investigation under way to follow up on the whole situation.

Chairman KENNEDY. Let's presume that that isn't a unique circumstance.

Mr. GARAMENDI. It is not unique.

Chairman KENNEDY. Is there, in fact, in your opinion, a role for the Federal Government to play with regard to antiredlining issues that could provide the carrots and the sticks that you and Mr. McCandless referred to?

Mr. GARAMENDI. Well, heretofore we had not thought that the Federal Government would be interested in assisting us, except perhaps in the passage of new laws which we had some doubt would be signed. So we have tried to use our resources that were available to us in the State.

However, there are certainly antidiscrimination laws that are on the books that the Federal Government enforces. For example, HUD and the Department of Justice and the like are certainly capable of enforcing that.

Where we see patterns of racial discrimination, certainly I think those laws are probably applicable. So for starters, the enforcement of the civil rights laws of the Federal Government would be helpful.

Beyond that, I think that there is clearly a need for the Federal Government to assist us in the area of regulating unlicensed insurance companies who are not even located in America. They are located offshore. And I mentioned that in my testimony.

With regard to rate regulation and market conduct, which is the sale of insurance, it probably is not wise or necessary for the Federal Government to get into that. The States vary with their enforcement activity. California has very stringent laws, and now I hope very active enforcement of those laws.

So I don't think there is a need in that area. There are concerns about the guarantee funds. These are the insurance programs that insure insurers when they go belly up. The guarantee funds step in, and those guarantee funds are not uniform across the Nation, and because of the lack of uniformity, that creates certain problems.

We think it wise to have uniformity. There may be a role for the Federal Government in that regard also.

Chairman KENNEDY. I appreciate your comments very much, Mr. Garamendi.

Mr. GARAMENDI. Did somebody leave?

Chairman KENNEDY. There is a reason for that, which is that the bells have gone off. Mr. Hinchey and I will scoot across. We will hustle back and continue with questions.

Thank you very much. The subcommittee stands in recess.

[Recess.]

Chairman KENNEDY. The subcommittee will come to order.

I want to apologize for the way the subcommittee's work this afternoon has been disrupted, but the fact is that the work continues on the House floor.

I want to introduce Michael Carbajal. He was an insurance broker in New York for 29 years. As a broker, he primarily sold auto insurance. He is currently a columnist for the *Insurance Advocate*, a weekly insurance magazine.

Thank you for being with us today. Please proceed with your testimony.

### STATEMENT OF MICHAEL CARBAJAL, JR., C.P.C.U., MICHAEL CARBAJAL FINANCIAL SERVICES, INC.

Mr. CARBAJAL. First of all, I want to say how grateful I am and how grateful all brokers from the inner city are that this hearing is being held. We have been clamoring for something like this for over 20 years. Because there is no question, no doubt of any kind, that there is redlining.

They call it different names. Some insurance companies call it the racial factor in insurance. So there is no doubt about this.

The superintendent of insurance of California brought in a map. Well, I have seen a map like this, and I will even say the company, Nationwide, where they redlined, it was in red crayon, areas that they didn't want their agents to write. This happened many years ago, but the situation hasn't changed.

There are companies, many companies, that will not write certain areas. Now, our superintendent of insurance, Salvador Curiella, who is a scholar and an excellent superintendent of insurance, has tried to get statistics from the companies to show where

12

they do right, and he wanted from them a listing by ZIP Code of where their insureds are.

That was 3 years ago. It is still not forthcoming. And the latest excuse I heard was, they couldn't get their computers adjusted in such a manner that they would print out this type of information. So perhaps in a few years we might be able to get it.

There are many ways in which the insurance companies discriminate. They claim they don't discriminate because of race or anything else, because it is not a matter of bigotry, it is a matter of profitability. They have found that in certain areas, they are not as profitable writing automobile insurance as they are in others.

The truth of the matter is, they don't even try. There are a few small companies that have made very successful plunges into this, into writing in certain areas such as in Brooklyn, Red Hook, Bedford-Stuyvesant, and so on, and made a lot of money doing it because they knew exactly what they were doing. Some of the larger companies have not made any effort and they don't appoint any agents in these areas.

You see, if you don't appoint an agent where the market is, then nobody is going to buy, because someone who lives in Brooklyn is not going to go up to Hyde Park to buy insurance. If the guy closest to them cannot sell them insurance, there is no way there is going to be insurance sold.

And the old excuse that all the companies give you now is, we are not discriminating, we are writing, but they are writing throughout residual markets, what they call the assigned risk markets. In New York, it is called the New York Automobile Insurance Plan.

For those of you that may not be entirely familiar with what happens in New York, this is an organization that is subscribed to by all the insurance companies that do business in the State of New York, that sell automobile insurance. According to how much voluntary business they do, that is the number of assignments they get from this residual market.

In other words, if I wanted insurance and can't find the place to buy it because they won't sell to me, even though my record is perfect, I apply to the New York Automobile Insurance Plan. They will marry me with one of the companies, and I will be doing business through them. However, the rates will be sometimes two and three times more than they would be if that company had written me voluntarily.

There are a few companies in New York that write voluntarily. They are local companies, Empire being one of them, and the other one is the Executive Insurance Co., which is part of what is called the Robert plan. They have had great success, and they have proven that selling insurance to minorities can be profitable, and there is no reason why the major companies can't do it.

Actually, these two companies are very pleased that the major companies can't do it, because they are writing as much as they can.

Now, Mr. Kennedy, Congressman Kennedy mentioned about an underwriting guide. Well, some years ago, I happened to be president of the Storefront Brokers Association, and I got a lot of feedback from a lot of my brokers. Some years ago, one of the field reps

from one of the insurance companies went to visit one of his agents. He left his briefcase there and he went away. After the fellow left, they saw the briefcase there and he didn't know who it was and he opened it, and inside there was an underwriting guide. And it said there, "not to be distributed."

I published it, by the way, in my column in the *Insurance Advocate*. That went over well. And listen to some of these ridiculous things they had there.

They told the agent, "Try to see the man's home, where he lives. If he has a neat house, the chances are that he is a good driver. If he has got a messy house, don't write him because he will probably be a bad risk. Don't write any musicians, even classical musicians. They turn out to be bad."

They went with a whole list of occupations, including policemen. They didn't like those either because they might rush to the scene of an emergency and have an accident, or something to that effect.

Anyhow, when it appeared in the *Advocate*, the insurance company denied it until I made a photocopy of it and published it again on their stationery, so there was no denial of that.

There is one part of that that I am most anxious to bring out, which is, how the New York Automobile Insurance Plan works. And I want to get into the business of the carrot and the stick and show you that it will not work. It has not worked. They have tried it. It hasn't worked. It will not work. And I will show you the reasons why.

The New York Automobile Insurance Plan is run just like a private men's club. There are 15 members. Eight of them are insurance company members, in other words, representatives from the insurance company. This is proper, because they should have a majority. They are putting up the money, and the rest are supposed to be what is called public members who are there to advise and cast a vote representing the public.

Out of those seven members, five of them are elected. Two are appointed by the superintendent of insurance. Of the elected five, in order to be elected you have to be nominated.

The only ones that can nominate you are the eight members that are on there, that are from the insurance companies. And in order to get voted in, you have to be voted in by them.

So this is a great thing for politics. I mean, can you imagine running for office and saying, "You nominate me and then you vote for me, too"? And no one else can nominate you and no one else can vote for you. So they are absolutely guaranteed. So when they have a vote on some crucial issue, it is always 15 to zero, because it is totally rigged.

Now, I have spoken to some people that are in the insurance companies and I tell them, "Don't you feel ashamed? This is disgraceful." They say, "We feel ashamed but we are very happy with this arrangement."

Chairman KENNEDY. Some politicians up here might like that system.

Mr. MCCANDLESS. It is an east coast activity.

Mr. CARBAJAL. For some reason the insurance companies completely abandon these so-called ghetto areas. They don't want to have any part of it. So they don't care what they do.

14

The insurance department, in order to make it an incentive for them to write business in some of these areas, tells them, Look, you write one voluntarily; we will subtract two from your assignments at the New York Automobile Insurance Plan. The superintendent thought this was going to be the panacea, this was going to be great, we are going to depopulate the plan.

By the way, the plan in New York has over 1 million, 1 million automobiles. And it is growing.

There were no takers in this plan, no takers. So they figured something has to be done. So they came up with this idea, because the service that some of these carriers give the insurers is absolutely awful. You can't get through on the phone.

Can you imagine companies where you can't get through on the phone? What they did was they said, "We are going to form a thing called the lead plan." The lead plan means that a company that has given many assignments can sell those assignments to somebody else. The going rate was 125 percent of the premium. In other words, they were willing to accept a 25-percent loss on every one just to get rid of it.

And there was a company that bought them. Two companies that bought them, in fact. One of them is the Robert plan, who is eminently successful doing this, and the other one was Empire. They bought them, they handled them, they are making money and everybody is very happy, and these other major carriers are not involved in any way. They are turning it over.

The Robert plan has now 70 companies that they have taken all their assignments. So these companies have completely washed their hands of all the assigned risk business.

Now, the carriers, the insurance companies, will tell you that they don't discriminate, it is a matter of profitability. They want to make a profit. They are in business to make a profit. It just so happens that in black and Hispanic areas, they are losing money. That is accidental. But it just happens that way.

Now, I believe that the top of these companies, they actually believe this. I really think they believe it. But as it goes down to the underwriters, I don't think it goes that way. I think there is really true discrimination.

I have been told, not once but many, many times in my 30 years in this business that we prefer not to write blacks and Hispanics. Now, in some companies this carries over not only to the ghetto areas, but to some of the so-called better areas. They just don't want them. They want no part of it.

Let me touch quickly on the FAIR plan. We have a FAIR plan in New York that is absolutely great. They make money constantly.

Chairman KENNEDY. I really want to hear from you. You are a wonderful witness. I feel badly because I think we have already cut our other witnesses off. I have asked people to try to limit their comments to 5 minutes. Why don't you just try to wrap it up.

Mr. CARBAJAL. I just want to tell you we have a great FAIR plan, it works, because they have the proper people running it, and that all the major carriers do not sell off as the others have. For example, the major carriers, some of the real big ones, the Aetnas and the All States, State Farm, and so on, they handle their own. However, they give this to their worst people. In other words, the worst

003615

15

employees that they have, those are the ones they give. Any time they find a good employee that is working for the New York Automobile Insurance Plan, they promote him out.

So we are on the losing end. This hearing can do a great deal to change all this, because just the mere publicity is likely to embarrass these people into doing something about it.

[The prepared statement of Mr. Carbajal can be found in the appendix.]

Chairman KENNEDY. Let's hope you are right. We really appreciate your testimony today.

I would like to now introduce Rev. Charles Cummings, the treasurer of the District of Columbia chapter of ACORN, and an active member of ACORN for over 5 years.

ACORN, the Association for Community Organizations for Reform Now, has chapters in 35 cities and has a long history of promoting bank reinvestment in neighborhoods. He will testify on the results of a new study today.

Reverend Cummings is accompanied by Deepak Bhargava, the legislative director for ACORN.

Please proceed, Reverend Cummings, and try to keep in mind the 5-minute limitation. Thank you very much.

## STATEMENT OF REV. CHARLES CUMMINGS, JR., TREASURER, DC CHAPTER, ACORN, ACCOMPANIED BY DEEPAK BHARGAVA, LEGISLATIVE DIRECTOR, ACORN

Reverend CUMMINGS. Thank you.

Good afternoon, Mr. Chairman, and members of the subcommittee. I am Rev. Charles Cummings, Jr., treasurer of the Washington, DC chapter of ACORN. I appreciate the opportunity to present testimony before you today on the important subject of insurance redlining.

ACORN has just recently completed a study of insurance redlining in 14 cities. The study reveals severe problems in the extent, quality, and price of coverage in low-income and minority communities.

I appreciate your prompt response to the recent release of this study, and commend you for holding these hearings. I would also like to commend Chairman Kennedy for your consistent record of leadership on behalf of working families.

The results of our study are alarming. The four principal findings of our study were that low-income minority areas were significantly underinsured by conventional and residual markets by as much as 48 to 50 percent in Chicago, and St. Louis, Missouri, for example, and minority areas were underinsured compared to the white areas of comparable income.

A wide range of obstacles were used by agents to avoid doing business in low-income and minority areas. Testers from these neighborhoods were not even offered quotes on policies in 38 percent of the tests conducted.

Testers were often simply told that "we don't write policies in that neighborhood" or that "we don't cover houses worth less than a certain value."

The policies that were offered and written in low-income and minority areas were often of a substandard quality. Residents of these

neighborhoods were more likely to be offered FAIR plans or offered limited market value coverage.

On average, in our study, callers from low-income areas were quoted premiums 2.5 times higher per $1,000 of coverage than were testers from upper income areas.

Twenty-five years after the Hughes Presidential Commission identified insurance availability as a central obstacle to urban economic development, insurance redlining remains a pervasive problem in low-income and minority communities.

Various studies by academics and government have found patterns similar to those revealed in ACORN's study. They have demonstrated that there is a major problem of insurance availability and affordability in minority and low-income areas.

Unfortunately, FAIR plans, shared risk pools for high-risk policyholders created in the 1970's, have not solved the problem. Numerous studies have argued that FAIR plans have in fact become dumping grounds for whole neighborhoods.

Our preliminary analysis of the claim data suggests that people on FAIR plans may not be more likely to have claims than other policyholders, offering less coverage at higher rates. FAIR plans have become a form of institutionalized redlining.

The heart of the problem, however, lies in the conventional market, and with the practice of insurance companies. These problems appear to have resisted change for a quarter of a century.

Insurance redlining is both blatant and subtle. Blatant forms are fairly straightforward, despite State antiredlining statutes.

An insurer can still usually refuse to insure someone based on area in which they live. An insurer can also redline by offering prohibitory rates; that is, offer an unreasonable quote that is well beyond the ability of a policy seeker to afford.

Finally, an insurer can use underwriting criteria that clearly redline whole areas of classes of people.

For example, if a company refused to insure based on the age or value of the dwelling, that may have the effect of excluding all minority neighborhoods in a city. Redlining may also take the form of higher prices or a lower level of coverage; differences that may not be based on any concrete risk analysis.

While individuals who are not redlined out of the conventional or residual market may remain without insurance, others turn to scavenger companies, surplus line carriers. These unregulated offshore companies also offer high rates and are not covered by State guarantee funds. When the time comes for a big claim, these companies may turn out to be nothing more than a P.O. Box, and leave the policyholder high and dry.

This, I am sure, is familiar to you, Mr. Chairman. After your recent investigation into the problem of second mortgage scams, insurance redlining has a devastating cost for individuals, neighborhoods, and society. The development of thriving neighborhoods with the expanding opportunities for home ownership and entrepreneurship hinge on the availability of credit and insurance.

Mortgage lenders will often not make loans without insurance. No insurance means no loans. And inner city small business cannot hope to compete with its suburban counterparts if its insurance costs twice as much.

Without adequate and competitive insurance, enterprise zones will not alone lead to increased job opportunities in our communities. The problem of insurance redlining is compounded by an ineffective State regulatory apparatus. that is unwilling or unable adequately to protect consumers.

The Federal Government can and must take a protective role to end insurance redlining. For decades bankers denied charges of redlining until Congress passed the Home Mortgage Disclosure Act, HMDA, and improved it with amendments which you sponsored, Mr. Chairman.

Congress should pass similar disclosure legislation for insurance companies. That disclosure should include disclosure of homeowners' policies written by. companies on a census tract basis, and by the race of the applicant.

The Justice Department and HUD should also apply the Fair Housing Acts to insurance companies and investigate for discrimination.

Community groups have an obligation to contribute to the solutions. ACORN is trying to work directly with the insurance companies to underwrite the risk fairly, and to educate consumers. ACORN hopes to develop a neighborhood home safety program to reduce risk in our neighborhoods and thereby to improve the affordability of insurance in our communities.

The crisis of insurance availability is too important for the Federal Government to continue to ignore. Insurance is a necessity for urban economic development. In the words of the Hughes Commission, a quarter century ago, "Communities without insurance are communities without hope."

Thank you, Mr. Chairman. That concludes my testimony.

[The prepared statement of Reverend Cummings can be found in the appendix.]

Chairman KENNEDY. Thank you, Reverend Cummings. We appreciate your testimony and the hard work that ACORN has done, which has brought to light a lot of the problems that exist for poor communities with regard to insurance. I thank you and all the hard-working folks associated with your organization.

I would now like to introduce Prof. Gregory Squires, who is a professor of sociology and a member of the Urban Studies Program and faculty at the University of Wisconsin-Milwaukee. Prior to joining the faculty, he served as a research analyst for the U.S. Commission on Civil Rights.

His main research interests are the racial effects of urban development, focusing on economic development policy. He has written a number of articles on insurance redlining.

Please proceed with your testimony.

## STATEMENT OF GREGORY SQUIRES, PROFESSOR, UNIVERSITY OF WISCONSIN-MILWAUKEE

Mr. SQUIRES. Thank you. I appreciate the invitation to be able to participate in this discussion today.

I want to pick up on the comment that Reverend Cummings has made that 25 years ago a Federal panel concluded that communities without insurance are communities without hope. That statement could be just as easily written today as 25 years ago.

Neighborhoods containing large numbers of minority residents are discriminated against in the provision of insurance. This is a systematic reality. It is not just anecdotal experience. Intentional racial discrimination has continued. The fact is that industry practices have an adverse effect on minorities and perpetuate discrimination.

In research that I conducted with the U.S. Commission on Civil Rights in Chicago and I have done in the city of Milwaukee as a faculty member at the University of Wisconsin-Milwaukee, we have found that racial composition of neighborhoods is more highly associated with the number of insurance policies written in neighborhoods than the number of owner-occupied housing units, the income of residents, the poverty rate, the age or condition of housing, the population turnover, the crime rate, the incidence of fire, and other factors presumably associated with risk.

More importantly, the association between race and insurance provision remains even after you control for all these other risk-related factors.

There is a racial gap in the provision of insurance in the United States that cannot be explained away by income, economics, or risk. The question is why.

Part of the answer may be profitability. Insurance agents will say that they can make more money writing highly valued properties or homes which happen to be located in predominantly white suburban communities. To me this simply begs the question of whether profit maximization for some should be used as a justification for the devastation of the neighborhoods of many.

I don't accept the concept that insurance cannot be profitably written in these neighborhoods, but we have to consider alternative mechanisms for delivering this essential service, whether it be municipal insurance programs, publicly regulated utilities, or some other approach. It seems to me if it cannot be profitably written, we have to think of ways of making the service available.

But unfortunately, the issue is even more complex. The perpetuation of racial stereotypes continues to affect the provision of services.

Let me read you one statement from 1988, by the sales manager of an insurance company. They very conveniently put it in writing in a memo. This is from the manager to several agents. I quote: "Your persistency went down the shitter. Very honestly, I think you write too many Blacks. You have got to sell good, solid, premium-paying white people. They own their homes. The white works. Very honestly, black people will buy anything that looks good right now but when it comes to pay for it next time, you are not going to get your money out of them. The only way you are going to correct your persistency is to get away from Blacks."

This has led some of us in the State of Wisconsin to think that maybe race has something to do with the provision of insurance in this country.

There are some practices that may have some legitimate business purposes that are not intentionally discriminatory but have that effect nevertheless. Many companies will not provide coverage on homes valued at less than $25,000 or $30,000. Given the realities of residential discrimination in the United States, we know

that minorities are far more likely to be screened out by these kinds of underwriting criteria.

There are also many underwriting rules still in place, some of which you have already heard today, that clearly have no rational basis. Let me read you a couple of observations from underwriting managers.

"The following occupations are not to be approved for preferred policies: janitors, stewardesses, traveling salesmen, auto salesmen (particularly those associated with used cars), musicians, and athletes."

Another manual has a section headed "Red flags for Agents and Claims Personnel." One of the sections here is called Declining Property Values, and under that one of the indicator is "Population or racial changes."

I read a book about underwriting 5 or 6 years ago that said clergymen were not good risks for automobile insurance and the rationale——

Chairman KENNEDY. Mr. Flake, Reverend, what do you say about that?

Mr. FLAKE. We will pray for ourselves.

Mr. SQUIRES. The rationale was that clergymen feel they are protected by the Lord and feel they don't need to be protected.

Mr. McCANDLESS. Being a reformed used car salesman turned politician, how do you respond to that?

Mr. SQUIRES. No comment. But the problem is less what is in the underwriting manuals and the way these rules are interpreted, but the subjective and arbitrary way decisions are being made. There have been test audits, like the ACORN test, where people calling from predominantly white neighborhoods are offered a quote over the phone; they are told the policy can be bound over the phone and they are eagerly pursued as customers, whereas customers from minority areas with the same financial capacity are told by the agent that they will call you back, and the call is never returned; they are referred to the FAIR plan, and there are many other techniques used to evade doing business in these neighborhoods.

Again, this is found in systematic studies of what is going on in cities, but it is also something I have been told personally by several agents, black and white, as something they know is going on because they have been told to practice these kinds of things.

Another factor is the location of agencies. It has been mentioned that people don't provide insurance in certain areas because they don't open up insurance agencies there.

We found in Milwaukee that in 1970, 1980, and 1990, the distribution of agents was clearly associated with the racial composition of the neighborhood and that did not disappear when we controlled for income, occupation, condition of homes, and other factors. In other words, it wasn't just that the agents were following the people and the money, they were following the racial composition of the neighborhood.

The neighborhood of Sherman Park, a very stable middle-income community—a member of this subcommittee lives in Sherman Park—that neighborhood changed between 1970 and 1980 from 1 percent nonwhite to 24 percent nonwhite. The number of people

that live there, the number of owner-occupied dwellings, the income has stayed about the same, but the number of insurance agents declined from 22 to 9.

So what do we do about this? It seems to me the first step is comprehensive disclosure. Each property insurer should be required to disclose the following information for each application: The race, gender, and income of the applicant, the census tract, age, structure, and value of the property, the disposition of the application (whether it was approved or not, and if not, why, and what the person can do to make the application approvable), the type of policy, the value, the premium, the deductible, exclusions, and other terms of the policy. This information should be publicly available in a user-friendly format for community groups, researchers, and others.

This, of course, does not reflect the question of what happens to people before they even file an application, the prescreening that goes on. Here you simply need to test. You need more test audits like ACORN's and others to find out what is going on at this level.

The Federal Government can be far more aggressive in enforcing statutes that prohibit unfair treatment here. A community reinvestment act for insurers might be a creative way of assuring that this essential service is provided to low- and moderate-income neighborhoods. And here you can structure in the kind of carrots and sticks that have been talked about earlier.

There are other issues that have to be brought into the debate. We need to disclose the underwriting rules as well as where property insurance is being written. We need to bring investment practices into this discussion. The insurance industry generally controls $2 trillion and makes much, if not most, of its profits from investment rather than insurance-selling activities. That investment needs to be brought in as part of the debate.

Employment practices need to be brought in. According to the EEOC, in 1990, 23 percent of the total private sector work force was nonwhite compared to less than 17 percent among property casualty insurance companies. I am not aware of any systematic research that shows a linkage between racial composition of the work force and underwriting activity, but from what I am told by insurance agents I have to believe that more minority agents would mean more service to currently distressed areas.

There is no question that redlining undermines redevelopment efforts. It locks people out of critical markets simply because of skin color, and contributes to the concentration of poverty and the rise of underclass behavior in the United States.

One small but important part of any viable urban policy must be a vigorous response to the continuing fact of insurance redlining.

I thank you.

[The prepared statement of Mr. Squires can be found in the appendix.]

Chairman KENNEDY. Thank you very much, Mr. Squires.

David Farmer is the vice president of Federal affairs for the Alliance for American Insurers. The alliance is a national trade association representing 180 property and casualty insurance companies.

Mr. Farmer, the subcommittee appreciates your willingness to testify today, particularly in light of the fact that another industry group, the American Insurance Association, refused the subcommittee's request to appear today. The AIA's refusal to testify suggests a troubling lack of concern about the very serious charges leveled against this industry by some of our witnesses.

So, Mr. Farmer, I want you to know how much we appreciate your willingness to testify and give us your perspective. Please proceed.

## STATEMENT OF DAVE FARMER, VICE PRESIDENT, ALLIANCE OF AMERICAN INSURERS

Mr. FARMER. Thank you, Mr. Chairman.

My name is David Farmer. I am the vice president of Federal affairs for the Alliance of American Insurers. We are committed to servicing the insurance needs of all Americans.

We believe better understanding of the insurance system is important for this subcommittee and for people who believe the system is discriminatory. Redlining is against the law. Racial discrimination is against the law. Report them, fine them, investigate them, and take the appropriate action that is necessary.

Mr. Garamendi, in proffering the evidence, is going to conduct an investigation, and that is the process, and that is as it should be. The industry does not condone racial discrimination at all. I want to make that point perfectly clear.

Let me briefly describe to you how the property insurance mechanism has responded to the specific needs of the urban marketplace. In the wake of the civil disturbances of the 1960's, President Johnson created a Federal advisory panel on insurance in riot-affected areas. In that report and recommendation, the panel conducted interviews, surveys, and obtained written information from State and local officials, several days of formal hearings featuring scores of witnesses were held. The panel conducted 3,000 interviews during a scientific study. Questionnaires were sent to insurance regulators, companies, agents, real estate brokers, fire and police officials.

In response to the panel's recommendations, Congress enacted the Urban Property Protection Reinsurance Act of 1968 which provided for the creation of FAIR plans. And FAIR plans, which stand for Fair Access to Insurance Requirements, subsequently were created in 29 States.

Any occupied property that is not in poor physical condition, is built in accordance with local codes, is used in a lawful manner, is eligible for basic property coverage through FAIR plans.

As with all insurance products, FAIR plans are tailored to meet different needs of local markets. Pricing of these coverages generally are the same as the standard market. Some plans have surcharges related to specific risk factors.

It should be emphasized that even with the surcharges, FAIR plans over the 25-some years of their existence in the aggregate have lost money. And I would direct the subcommittee to exhibits 3, 4, and 6 at the back of my prepared testimony.

These exhibits are taken from a just published Alliance study of residual markets. I have a copy of that for all the members of the subcommittee.

The 1967 Federal insurance panel's methodology, defining key issues, vigorous investigation, and recommendations based on hard data, contrast, unfortunately sharply, with ACORN's study on homeowners insurance. The ACORN document is a series of unsubstantiated conclusions based on flawed research. Certainly, this document cannot support the serious charges ACORN has leveled at the insurance industry.

The ACORN study is fatally flawed for the following basic reasons. The sample size is too small to act as the base for such a grand conclusion, and the study fails to consider several valid explanations for apparent coverage disparities among properties.

ACORN also has ignored the fact that unfortunately arson, theft, and vandalism occur with much greater frequency in economically disadvantaged urban areas. This fact explains why insurance coverage varies from place to place.

The report also fails to consider the role income plays in the decision to buy insurance. ACORN attributes the lack of insurance in poor neighborhoods to redlining, without investigating whether residents of those neighborhoods would buy insurance at any price.

In addition, the number of renters usually is higher than the number of owners in these areas. ACORN does not account for this. As a result, their findings with respect to the breadth of coverage in various neighborhoods are skewed.

In conclusion, let me reaffirm that no individuals are denied property coverage based on race or simply because of the geographic location of their property. Basic property insurance is available to virtually anyone who wants to buy it, either on the voluntary market or through the FAIR plan.

State insurance commissioners—and I think Commissioner Garamendi in his earlier testimony validated that when he said there was a problem in the California FAIR plan, and trying to make those changes and the industry has agreed to make those changes. I think that testimony of the commissioner is very important. But State insurance commissioners currently are examining urban property issues. We support their efforts and look forward to the findings of the NAIC's new urban issues subgroup.

Urban property insurance presents unique coverage situations. In April 1992, the Los Angeles riots caused an estimated $775 million in insured property losses. These losses marked the beginning of a record year of catastrophic losses. Hurricane Andrew will cost the insurance industry nearly $20 billion, the Niki almost $2 billion.

Even in the face of such extraordinary losses, insurers still continue to meet their commitment to urban America in the area of insurance. Nevertheless, there is a belief that insurers don't treat everyone fairly.

I can tell you the Alliance is committed and your member companies are committed to do everything we can to correct this misperception. And as I said before, in terms of redlining and in terms of racial discrimination, members of the Alliance and the members of the industry condemn that practice.

Thank you, Mr. Chairman.

[The prepared statement of Mr. Farmer can be found in the appendix.]

Chairman KENNEDY. Thank you for your testimony, Mr. Farmer.

Now, our final witness today will be Lisa Rice, who is the executive director of the Toledo Fair Housing Center in Toledo, Ohio. The center provides services in all areas of fair housing, including fair housing and mortgage lending issues.

Please try to remember the 5-limit limit.

## STATEMENT OF LISA RICE, EXECUTIVE DIRECTOR, FAIR HOUSING CENTER

Ms. RICE. The Toledo Fair Housing Center is not a research organization. We are a private nonprofit organization. We are an enforcement organization. We investigate bona fide complaints of discrimination.

So as I am talking today, I am not just dealing with statistics or with numbers. I am dealing with real people and real incidents.

Based on the complaints that we receive—and we receive roughly 20 complaints of insurance discrimination per year—based on the complaints that we have received from victims of homeowners insurance, we have been able to identify discriminatory practices levied by the insurance industry. We have conducted testing in response to these bona fide complaints of discrimination. We found several things.

Most of the complaints in which we find that discrimination is occurring, they are based on the racial composition of the neighborhoods. Persons are being denied coverage because of the racial composition of their neighborhood. Persons are not being courted by insurance agencies. They are being dropped by insurance agencies because of the racial composition of the neighborhood in which they want to purchase a home.

Persons are being canceled by companies. We have even had persons who have been with companies for years and years and have never filed a claim, and they are being canceled by companies because of the racial composition of the neighborhood.

They are being referred to the Ohio FAIR plan as the only avenue for coverage, and again, as one of the subcommittee members pointed out earlier, the Ohio FAIR plan, the FAIR plan insurance is not insurance that the average buyer wants to procure. It is insurance of the last resort.

Persons are being charged higher rates for less or the same coverage as their white counterparts. They are being offered inferior policies. They are being offered policies not in the elite company, but in the secondary company, or again, as I said earlier, being referred to the Ohio FAIR plan.

They don't have local agencies to which they can go for business. There are no insurance offices in central city neighborhoods in Toledo, Ohio.

Also, persons who live in minority neighborhoods are being inspected more frequently than their white counterparts. As I have stated, all of these allegations have been supported and substantiated by testing evidence.

Now, let me explain testing; what we do when we receive a complaint and how we test.

We match two properties, one in a caucasian neighborhood and one in an African-American neighborhood. They are matched in terms of structure, the age of the housing, the value of the housing, and other things, such as their closeness to a fire hydrant and things of this nature.

We set up the testing in some situations so that the condition of the property in the African-American neighborhood is better than the condition of the property in the caucasian neighborhood. And let me just cite for you some of the things that occurred in our testing.

We had one instance where we had a rental dwelling, a duplex dwelling in a white neighborhood, a duplex dwelling in an African-American neighborhood. Clearly, the one in the white neighborhood was in not as good condition as the duplex dwelling in the African-American neighborhood. In more than one test, we have used these two properties in more than—in testing against more than one insurance company.

The property in the white neighborhood always receives the better policy. They are either offered a replacement coverage or market value policy. The cost for the insurance is lower. But what happens frequently to the property in the African-American neighborhood is that although it is in better condition, the insurance agent often drops the caller or refers that caller to the FAIR plan.

One of the other things that we have found, and this is very easy to ascertain, is that insurance companies have minimum insurance amounts. Now, in Toledo, and I can cite you the information for Toledo, a lot of insurance companies have minimum insurance policies of $30,000. Some have $40,000, some have $50,000. That is if your property is valued under $30,000, they will not write you, period.

That type of a policy has a devastating effect on the minority neighborhoods in Toledo. A policy with a minimum value of $30,000 has a disparate effect on 78 percent of the African-American community, 74 percent of the Hispanic community; and 30 percent of the caucasian community in Toledo.

In the MSA, this policy has a disparate effect on 71 percent of the African-American community, 40 percent of the Hispanic community, and only 12 percent of the caucasian community. What we have found is that these numbers will deviate a little bit more because we found in testing where we have had callers call on properties that are valued under $30,000 in all white neighborhoods, and the insurance agent will artificially inflate the value of the property in the caucasian neighborhood so that he can write the insurance.

Let me just very quickly speak to the issue of profitability. Also, let me say that in no—we have conducted about 150 tests—in no test where we had a caller calling and the caucasian neighborhood was the tester referred to the Ohio FAIR plan.

Chairman KENNEDY. I am going to have to ask you to please wrap it up.

Ms. RICE. Let me briefly speak to the issue of profitability. The argument the industry has made was to secure these higher profits

with less risk. However, the industry's own records in Ohio show that the owners of higher priced suburban properties file more claims at higher cost per claim than owners of moderately priced property.

In a document prepared by the Ohio Department of Insurance, for the period of 1983 to 1987, the incurred ratio of properties valued at $126,000 and greater was 58 percent. Properties valued at——

Chairman KENNEDY. Ma'am, I am afraid—I don't know if people are taking in all those numbers in any event, but your entire statement can be submitted for the record. And I would urge all of you to submit your entire statements for the record. But in the interests of trying to provide opportunity for members to ask questions, which is after all how we get the most out of a lot of the information that you have, I would like to move on.

[The prepared statement of Ms. Lisa Rice can be found in the appendix.]

Chairman KENNEDY. My first question really has to do with the FAIR plan. In my home at the moment in Boston I am insured under our FAIR plan, and in times past, in other sections of the city of Boston, I have been insured by the FAIR plan. It seems to me that your criticism of the FAIR plan is that it is attracting too many bad risk people. As a result of that, it penalizes people that are better risks.

The difficulty, of course, is that if you take out of the FAIR plan people that are better risks, don't you then increase the premiums for people that are bad risks?

So I don't know. It seems in some sense it is sort of a zero-sum game where in the end you end up actually making it more difficult for the most vulnerable people to get insurance.

Now, I am sure I am missing something, because it is too obvious. But Mr. Squires, why don't you take a crack at answering that, please.

Mr. SQUIRES. Part of the problem is the FAIR plan was designed to provide coverage for good risks who happened to live in riot-prone areas. It was not meant to cover bad risks. But it has been treated as a dumping ground for all kinds of risks.

Chairman KENNEDY. If that is true, then who is supposed to get the bad risks?

Mr. SQUIRES. Well, presumably people if they were bad risks could be advised as to what they had to do to their properties to make them insurable.

Chairman KENNEDY. In some cases——

Mr. SQUIRES. Nobody is suggesting——

Chairman KENNEDY. Excuse me, but in some cases it isn't just the fact of where you live. Everyone in certain sections of the city of Boston is in the FAIR plan. You can't get any other insurance other than the FAIR plan. There are whole neighborhoods in the city of Boston with access to the FAIR plan only. In two neighborhoods I have lived in the only insurance available was the FAIR plan.

Mr. SQUIRES. That is an abuse of the FAIR plan. That is not how it is supposed to be used. When you report all these figures that show the FAIR plan is losing money, you separate out certain peo-

ple, and instead of spreading their risk or their loss along with the rest of the market, it is spread among a much smaller group of people, including perhaps some bad risks, and the end result is that it loses money. But for every 100 people in the FAIR plan, if 5 or 10 of them have losses, the 90 or 95 percent of the people who were good risks and never belonged in there in the first place are punished because they have been grouped and labeled and dumped in there by the voluntary market.

The FAIR plan is not in any way, shape, or form a response to the problem of insurance availability. There are all kinds of coverage that are essential, that is not provided from State to State. Some States are better than others——

Chairman KENNEDY. These are not necessarily riot-prone neighborhoods that I am talking about. One of the neighborhoods is the Back Bay section of Boston. It is essentially an upper income section of the city that has a fairly high crime rate.

Now, if the truth is that there is simply no other insurance available there, what is the answer to the problem?

Mr. SQUIRES. It seems to me what you are describing there is improper underwriting where people who should be picked up by the voluntary market are improperly labeled, either because they live in an older home, in a minority neighborhood, or whatever. Those people should be covered if the competitive market is working properly.

Chairman KENNEDY. But the fact that they should be covered, and they are not covered, doesn't really solve the problem. So how do you get insurance companies to offer insurance in those circumstances?

Mr. SQUIRES. You don't start by improving the FAIR plan. I think part of what you do is the disclosure we talked about, the greater scrutiny. By providing more effective enforcement you will get companies that will take a second look at their own policies.

Chairman KENNEDY. But is there, in fact, any mandate today that allows a State government to force insurance companies to insure, or is it the kind of situation where there is simply no regulation, so if I am an insurance company I can say, for instance, I don't want to sell to green-eyed midgets?

Mr. SQUIRES. There is no effective mandate. State insurance regulation is very weak. The State insurance commissioner of California is one of the exceptional figures in this issue. But, no, there is no mandate.

Chairman KENNEDY. It is very different from what we see in regard to banks where they are given a geographical jurisdiction through which they are supposed to then provide certain services.

Mr. SQUIRES. It is entirely different. And that is only one of the reasons why it is so different.

Chairman KENNEDY. If that be the case, then under the guidelines, would you suggest that we can in fact have any authority to say to the insurance industry that they should insure people of color or that they should insure others? These people are being discriminated against because they are black. It is not because they are bad insurance risks.

Mr. SQUIRES. It is difficult under the current structure of the law to devise an authority that the Federal Government can do that.

27

Chairman KENNEDY. Any government. It doesn't have to be Federal.

Mr. SQUIRES. You are raising the possibility of reconsidering the McCarran-Ferguson provision. Or you are talking about something that would provide a positive mandate on insurers so if they wanted to get new policies approved or new rates approved or they wanted to open up a new agency somewhere in the city, they would have to be meeting a set of responsibilities similar to what lenders are doing under the Community Redevelopment Act.

It seems to me under State regulatory schemes it is technically feasible to do that. Whether it is politically feasible given the unequal relationships and power between consumer groups and the insurance industry, I don't know if that is a realistic solution.

Chairman KENNEDY. That is a different question.

Mr. Carbajal, do you have a thought on this issue?

Mr. CARBAJAL. I have a lot of thoughts on the FAIR plan. In New York, we have, I guess, a unique situation as far as the rest of the country is concerned. The FAIR plan is beautifully run. It is the cream of the crop. All the insurance executives have a place on the board of directors. Because there is a lot of money at stake there.

In automobile insurance you have got 10 and 20 as the basic rates, 10,000 to 20,000. With the FAIR plan they go up to the hundreds of thousands of dollars. So the insurance companies are very—look at all the risks very, very carefully. They know exactly what they are doing. And a lot of very good risks are placed in the FAIR plan in New York because it is cheaper and better than the regular market, especially when they are in tight markets that the insurance companies don't want to write for some reason, they go to the FAIR plan.

There is a lot of business in the FAIR plan that doesn't belong there, but I as a broker have put a lot of business in there that I shouldn't have. The rates are not much, and sometimes it is even less.

That explains why the FAIR plan in New York, very often, many, many years, makes money, and they are embarrassed over it, because it was not made to make money. It was assumed from the beginning they were going to take a loss. And that is not the case at all.

The only difference within New York, the only disadvantage is that in the homeowners, they don't supply theft coverage or liability. But they provide just about everything else. They provide riot.

Chairman KENNEDY. Thank you.

Reverend Cummings, or Mr. Bhargava.

Mr. BHARGAVA. Just a couple of quick comments. Whatever data there is out there publicly available, FAIR plans may in fact work differently than we think they do.

We took a look at the claims data for Missouri, for example. Six percent of the folks who are on FAIR plans in St. Louis and Kansas City made claims in 1991. That compares to 12 percent in the conventional market. That was 1 year.

I suspect if you looked at other places you would find different things. But all I am saying is that clearly there are large numbers of people out there no more likely to be a risk than anybody else who are put there, and they are bearing the cost of folks who are

28

on FAIR plans because they are arsonists or whatever, who are in fact higher risks.

The question is, for those individuals who are higher risks, who is going to bear the cost of that? Currently, it is those who are least able to pay who are bearing those costs.

The second thing in terms of what the government can do, I think there are two options. The State of Michigan has a law which hasn't actually worked very well, but I think conceptually is very good, where companies are required to insure anyone who has a building that is up to code and who doesn't have a claims history. So a company must give the homeowner the presumption that they are insurable and write that policy.

The other option I think is to restrict the kinds of criteria companies can use to design you a policy. So under the Fair Housing Act, for example, I would argue that we should make it illegal to use underwriting criteria that discriminate against certain neighborhoods, things like age of dwelling, things like neighborhood, things like race. That is one way to go. But there are a couple of things I think the Federal Government can do.

Chairman KENNEDY. Thank you.

Al McCandless.

Mr. MCCANDLESS. Thank you, Mr. Chairman.

I listened with a great deal of interest. I want to apologize from my side of the aisle for the inconveniences you have been put through today. Not being in charge of the House, we have to go along with the system.

Chairman KENNEDY. Our fault?

Mr. MCCANDLESS. When I opened my remarks I said that we are here to consider the increased availability and affordability of insurance. For some 20-odd years I held all the insurance licenses available in California. So a little knowledge is dangerous. But let me go through something very quickly here to start the foundation.

I look at a building or a home, for example, a single-family dwelling. The first thing is, how far is that from a response station for fire purposes? What is the water flow pressure in that area? What is the location of the nearest hydrant? What is the age of the residents? Is there street lighting? What are the building codes? Does it meet the building codes?

How about the electrical wiring? If it is a commercial building, does it have sprinklers? What type of roof does it have? What kind of condition is the building in? Has it been maintained? And then in the neighborhood, of one or another types, is there a long list of theft and vandalism responses on the part of law enforcement?

All of this becomes one thing, exposure, which translates into underwriting a policy for that particular building.

Now, this is basic to the insurance industry. But I use this to illustrate the point. The same thing would apply to automobiles. If you have got 6 kids under 25 in the family, obviously, there is more risk than if there is none. So we have all of these various underwriting elements.

We are talking here about lower income inner-city areas, which was brought out in the testimony that, by and large, are older buildings, which then fall into some of these categories, and if we are talking about the Mission District of San Francisco, very few

29

of those buildings have structures that would withstand any kind of earthquake. What do we do about that? Is that going to be something that we would consider?

So my question to the panel—I would like to start with you, Mr. Squires—is, with all of this as basic underwriting, irrespective of where the house may or may not be, how do we address the issue for which we have brought this panel together and you so kindly are testifying?

Mr. SQUIRES. First, it sounds to me like what you are describing is a rather thorough, conscientious underwriting process that unfortunately probably doesn't occur as often as we would like. But in terms of the issue of racial discrimination, which to some extent may be different from disinvestment of older areas, what frustrates me is, when we take those things as an assumption and we look at the impact of income or age of structure, and you systematically research this, you find that those factors don't explain away the racial disparity, or when you do test and you have blacks and whites or people from black or white neighborhoods that are otherwise the same——

Mr. MCCANDLESS. Let me intervene, because that is not a function. It is already there as a part of law.

Mr. SQUIRES. What is there?

Mr. MCCANDLESS. The racial discrimination.

Mr. SQUIRES. But for whatever reason, clearly the nondiscrimination is not being enforced.

Mr. MCCANDLESS. We can't write a policy that says there should be no racial discrimination, because it is already in law in both the State and Federal Government.

Mr. SQUIRES. Twenty-five years ago we could have said the same thing in reference to mortgage lending. There is a lot that can be done to bring to light new information that will develop new policies that will enable us to get at the issue of discrimination.

I agree you can only say you can't discriminate once. There is no need to pass another law that says you can't discriminate.

Mr. MCCANDLESS. I would like to set aside the racial discrimination aspect of it because we are talking about lower income, inner-city type activities. Obviously, there are different kinds of racial mixes in these areas than there would be in the suburbs. But we are talking here now about the ability to insure these dwellings as an underwriting aspect of the insurance business at what would be available and affordable insurance rates.

Now, how do we do this?

Mr. SQUIRES. There are several ways. First of all, instead of simply turning down an application because they are not qualified, the agent could work with the person and let them know what they need to do to become qualified and offer to reinspect. I know sometimes that happens. It doesn't always happen.

We could restructure the compensation system within some companies. Some have done this, where agents could be paid a salary plus commission rather than a straight commission so there is less of an incentive to ignore the city and go to high-priced homes in the suburbs.

There are a number of things that can be done within the structure of the industry to make these properties more attractive.

003630

But first there has to be a recognition there is profitable business to be written in these neighborhoods. We don't need FAIR plans. We don't need an insurance market of last resort for most of these people.

With a little bit of creativity, we can come up with products and marketing efforts that will make these people insurable, where we can take the risk out of presumably high-risk properties and bring them into the market. But right now that is not the mentality. The notion is, let's figure out how we can avoid certain areas and not get caught and go back to the areas we are writing vanilla policies for.

Mr. MCCANDLESS. My time is beginning to wane here. Mr. Cummings, if I interpret your testimony—and this is why I am asking you—you are saying that the insurance business should become a public utility. Did I understand your 10-point comment correctly?

Reverend CUMMINGS. Exactly. What I am saying is that it should be fair. We speak about the FAIR plan. It should be fair, and use the "fair" in FAIR plan.

The problem is a thin line between proper underwriting and discrimination. So, therefore, there is a thin line between the proper order of doing things and discrimination. So, therefore, if you do things, underwrite insurance policies, you are very close to discrimination. Therefore, we need stronger regulations to improve this problem.

Mr. MCCANDLESS. In California—I will wind up very quickly—we have what we refer to as assigned risk. This means that there is a law in the books on the State of California that you must have auto insurance. If there is a law you must have auto insurance, then insurance must be available to those who can legally drive.

If you have a very poor driving record, whatever that might be, normally a regular insurance company will not accept you at regular rates. You may have premium policies to pay, but if you are still not able to do that, you are given an assigned risk policy that qualifies you to continue to drive as long as you have the legal requirements to do so.

Is that what we are talking about here when we talk about also these inner cities, that we should have a legal requirement that because you are in a neighborhood that may have a high rate of theft and vandalism, and so forth, that there should be something available to you—you call it the FAIR plan—that would be underwritten by the policies and premiums of other areas, and therefore we would simply charge a little bit more over here to this risk and that would overshadow the lesser rate in the lower income in the city type of policy?

Mr. BHARGAVA. In response to that, you are really talking about two different kinds of underwriting criteria. I just heard you speak of two different kinds. You are speaking of driving records on the one hand, which is something that is directly under someone's——

Mr. MCCANDLESS. I changed to dwellings.

Mr. BHARGAVA. But I meant, there are things under people's direct control. Your driving records, whether you have a fire alarm in your house, whether you have a burglar alarm, whether you maintain your property correctly, whether you have good locks or

bad locks on your doors. There are other things not under your control.

We have very segregated cities in this country. A lot of those cities, minorities tend to live in older housing stock. I think it is a question of social policy whether it is fair or not fair to underwrite based on things that people cannot in fact control.

What the industry has been doing is underwriting in broad strokes based on very general things, and there are ways of underwriting risk on a much more specific basis that would be much fairer to individuals, especially to individuals who are in fact good risks in particular neighborhoods.

Mr. McCANDLESS. If we were to reduce what has been testified to here, that part of the equation which deals with discrimination, as it has been outlined by key witnesses, how far are we from what we are trying to accomplish?

Reverend CUMMINGS. I would say that we are not asking for a special incentive. We find that under the FAIR plan you are overpriced and you have insurance at substandard levels. And then we also have instances when someone calls in for a quote. The FAIR plan isn't even explained as an option.

So therefore, in the instance of discrimination, when we call in, when they hear the community and they hear your race or your gender, they simply say, We don't insure in that area.

Mr. McCANDLESS. The chairman uses yellow slips here rather than pink slips. My time has expired.

Thank you.

Chairman KENNEDY. Thank you.

Reverend Flake.

Mr. FLAKE. Thank you very much.

Mr. Chairman, this has been a most enlightening hearing. It seems, being both a preacher and a politician, I guess the liability on me is great, and that is the reason I have so much trouble dealing with insurance. And then we discovered that Al is an insurance man. I always wondered what the deal was.

My question, there is a problem here just in terms of the overall sense of perception that one gives to making a determination for whether a community, and we are not talking individuals, sadly, but whether a community is really worthy of having its citizens, the persons who live there, insured.

It seems to me that there are assumptions that are made, assumptions that properties will be maintained poorly, the assumptions that drivers act differently, and assumptions in general during the insurance appraisals, and I would say to you I have some idea of how it works. I develop properties through the church in what is called an urban community. And the reality is that those are not substandard properties, nor is it a substandard community.

Income ranges in the community, the larger part of the community I serve, which is Queens, New York, is representative of a home ownership population. That home ownership population pays more on a per capita basis for insurance than people living a few miles away.

As a matter of fact, I live 7 miles from Ray McGrath. I live inside the city line. He lives inside the county line. He was the Congressperson for Nassau County. I lived three blocks from the

32

county line. The difference between what I pay, living three blocks from the county line, on a home that is worth about $300,000, and what somebody across the county line pays for a home that is worth much more, is less in insurance. And I pay much more than they do.

Now the reality, then, is that there has to be some determination made about why I pay more insurance. It is certainly not because of my community. It is a strong community. As a matter of fact, I would suggest to you that in the part of the community I live in, the homes are probably better than they are across the county line. They are. They are not probably. They are. Yet the insurance rates are different.

I have a difficult time. I have a church that is valued at about $3.8 million. We have to farm around regularly for insurance, because every time something happens in the community, the church is not taken as an individual entity, but it is viewed within the context of the community in which it is found, even though it sits next door to the fire house. So the question is not about whether or not can you get fire services soon enough. The reality is that somebody made a determination that it shouldn't be.

Mr. Farmer, I will shape a question and then I will stop. Seventeen years ago when I moved to Queens, we had almost on every block where there were businesses, insurance agencies. Allstate, you name it. Seventeen years later, in the most recent analysis by my staff, we have very, very few agencies left in that community. Is there a reason for that?

Now, let me just say, this community started changing about 22 years ago. So 17 years ago the change from a predominantly white to a predominantly black community had not taken place fully. And over that time, as there was white flight, there was also insurance agency flight. And I would like to know if you can tell me if there might be some other reason than what I presume to be the problem.

Mr. FARMER. Congressman, I am not familiar with the neighborhood——

Mr. FLAKE. You don't have to be. It is the same thing whether you go to Pittsburgh, Philadelphia, Atlanta, Chicago, Dayton, Ohio, Milwaukee. It doesn't change.

Mr. FARMER. But I would say in general that insurers, in terms of appointment of minority agents, can do better. The question is, in terms of other types of businesses within the urban area, there is and can be fairly well documented in urban areas across the country a variety of services that are not available in certain communities.

What is the reason for that? Presumably, the reason is that businesses underestimated or were not aware of the economic opportunity that exists in those communities.

Should that happen, should the people in these communities have to travel long distances to find services that they need? No. Can we do better? Yes. I am trying to be responsive to your question.

Mr. FLAKE. You said that there is a shortage of minority agents. What would make those agents who were in that community—and you are right, in most instances they were white agents, who in-

sured those same properties before, who closed shop and left. The question then is, are you not suggesting white agents cannot sell to African-American constituents or Hispanic constituents?

Mr. FARMER. I am not suggesting that, sir.

Mr. FLAKE. Nor can they do business in those communities. Or does it become a problem that their assumptions and presumptions of risk are so great that they don't even take the chance or take advantage of what I consider to be the opportunity?

Mr. FARMER. I think that 25 years ago, after—and in particular, after civil disturbances in Washington, DC and other communities, that the insurance industry as an industry canceled policies and left those areas. We created the FAIR plans then to meet that insurance need.

It is our testimony that the FAIR plans have met the need of basic property insurance as a cornerstone of the ability to obtain credit to have businesses. And so businesses can get basic property insurance.

Mr. FLAKE. So that relieves the $2 trillion industry from any responsibility or obligation to try and do its part in those communities? Is that what you are telling me?

Mr. FARMER. In terms of urban investment, the life insurance industry has participated, the casualty industry has participated in varying degrees with the Neighborhood Reinvestment Corp., and other groups in terms of lending.

Can we do more? Yes.

Mr. FLAKE. I ask unanimous consent for 1 minute so Mr. Squires can answer the question.

Thank you.

Mr. SQUIRES. A couple of responses. I have had agents come to me and say that they can make money in the inner city of Chicago and in Milwaukee and they can't get a company contract. And these are agents who are profitable, they have a profitable book of business, and they are the frontline underwriters. They are out there on the streets and they know the neighborhood. And these are guys who are out there to make a profit. These are not card-carrying members of the NAACP. They want to make a profit. They can't get a company contract.

The insurance industry is quite capable of being quite creative when it wants to be. When the MGM Hotel burnt down in Los Angeles, several companies came forward to offer retroactive insurance. I called my agent to see if I could get retroactive automobile insurance; she thought I was crazy.

When it comes to other situations, for some reason, we just can't do it.

Mr. FLAKE. Thank you.

My time is up. You will have to respond to the Chair for additional time.

Chairman KENNEDY. We will try to come back at the end, because we are just keeping other members waiting and it is just not fair to the people who have been waiting.

Peter King.

Mr. KING. Thank you, Mr. Chairman.

Congressman Flake, the next time I see Ray McGrath I will tell him you what you said about his neighborhood.

Mr. Carbajal, you described some vivid instances of clear-cut racial discrimination. In New York State, who investigates discrimination complaints, the attorney general or the insurance department?

Mr. CARBAJAL. The insurance department investigates fraud more than anything else. I don't know of anyone that investigates discrimination except the commissioner of human rights or something like that.

But as far as insurance is concerned, no one has ever bothered to look into that, that I know of.

Mr. KING. Congressman Flake, do you know if the State insurance department has jurisdiction over discrimination?

Mr. FLAKE. I don't know for sure.

Mr. CARBAJAL. They may have jurisdiction, but they don't do it. They have only a few agents to cover the whole State. Unless it is major fraud they can't even look at it.

Mr. KING. You have never heard of anybody filing a complaint with the State insurance department alleging racial discrimination?

Mr. CARBAJAL. Once. And this was a Hispanic woman who wanted to buy insurance in Long Island, and I am going to tell it like it is. The underwriter, she was on a speaker phone. The underwriter told the broker when he called in, because sometimes you call in the line and tell them, I have a white female, whatever it is, and this woman's name was Perez, and he said, "You know, Ms. Perez," so on and so forth, the guy says, "Look, no spicks, please. We told you before, no spicks." So the woman heard it.

This woman happened to be the secretary to the State prosecutor or something like that, some type of prosecutor from Albany, and that case was looked into. That is the only one that I know of.

Mr. KING. Mr. Squires, in Wisconsin, have you forwarded any cases on to the attorney general or the State insurance commission?

Mr. SQUIRES. Some complaints—we have an antiredlining law in Wisconsin. We are one of the few States that have one.

Mr. KING. Who enforces it?

Mr. SQUIRES. Nobody. The insurance commissioner has authority.

Also, we have the Department of Industry, Human and Labor Relations which has an equal rights commission which does enforce a housing prohibition. So I think in our State, in most States, there are unfair trade practices acts which would exclude racial discrimination, that I guess every insurance commissioner's office could enforce. That is slightly different than a redlining geographic issue.

Mr. KING. I know with real estate,—you are saying that as a practical matter the insurance industry in New York State has no concern at all about being reported or being investigated for racial discrimination?

Mr. CARBAJAL. I have to say yes to that. I have to say yes to that.

Mr. KING. Out of curiosity, you are at 140 Smith Street. What neighborhood is that?

Mr. CARBAJAL. Caroll Gardens, Boerum Hill. It is two blocks in from Atlantic Avenue.

Mr. KING. Do you do business with—obviously you are in the inner city. Do you have blacks and Hispanics? Do you write policies for them?

Mr. CARBAJAL. In my career, I spent about 20 years of that in Red Hook, and this is why I graduated to Boerum Hill.

Mr. KING. You said before that the Empire and one other company have had profitable experiences working in the inner cities. Why wouldn't the other companies do it? Is it just blind discrimination? To me, if a buck is to be made, you would think they would make it.

Mr. CARBAJAL. This is an interesting subject that is always on my mind.

Mr. KING. You seem to have a lot on your mind.

Mr. CARBAJAL. Quite a bit. I have never done anything else except insurance all my life. That is my first job, and I will die an insurance broker.

Several companies are making good money on this thing, and the reason is that they know what they are doing. They know how to underwrite these areas. Some of the larger companies don't care. They don't want it, they are not interested, don't bother me. That is the attitude that they have.

The Robert plan is making a fortune. They are doing very, very well. So is Empire. They know what they are doing.

Mr. KING. Have you ever thought of filing any complaints or forwarding any recommendations on to the State insurance department?

Mr. CARBAJAL. No, I never thought of it.

Mr. KING. Is it ever brought up at industry meetings, this issue?

Mr. CARBAJAL. Redlining is brought up all the time. I write for a magazine, the *Insurance Advocate*, and in the last 20 years I don't think an issue has gone through where redlining hasn't been one of the stories in there, either from New York, California, Pennsylvania, or New Jersey. Those are the main redlining States. Occasionally, Connecticut.

Mr. KING. Obviously, you have come down here today and testified, which I commend you for, but did you ever feel an obligation to file a complaint? Did you ever feel an obligation to report this to the State attorney general or the State insurance department or the city commission on human rights?

Mr. CARBAJAL. I have been a speaker many, many times at different hearings that have been held, and I brought it up maybe a 100, 200 times. That is all that happens. You just bring it up and then it dies. That is why I am so pleased with this hearing, because this, I think, will give it the push that it needs to have something done.

Mr. KING. Thank you very much.

Thank you, Mr. Chairman.

Chairman KENNEDY. Thank you very much.

Tom Barrett.

Mr. BARRETT. Thank you very much. This is an issue that burns deeply in my soul coming from Milwaukee, Wisconsin. Wisconsin is a perfect example of the State that you have talked about a lot.

I live 100 yards from a suburb, and my auto insurance rates are between 80 and 90 percent higher than they would be if I lived 100

yards to the south. Identical driving records can generate 80 percent difference in rates from one of the major companies in this Nation.

I did an analysis as a State legislator, which showed that identical driving records from drivers living 3 miles apart generate a 94-percent difference in rates. Identical driving records.

I think that the questions that Congressman King were referring to are the race questions. How you get to these issues is the most difficult part.

I find in Wisconsin at least you have a situation where the very poorest people in the State are being charged the highest amount for a product. And I find that unconscionable.

Insurance is unlike many other products, because of that very factor. At least with other products, they are being offered at the same price, and if minorities can't purchase them, it is because they don't have the money, not because there is what I believe to be a deliberate attempt not to sell in those areas.

What I am asking you is, what should we do? I realize you have been here. Community reinvestment type approach for insurance companies, is that something we should be looking at? What obligations, what moral obligations do insurance companies have to make sure that the poorest people in the State are not charged the highest amount for a product?

Mr. CARBAJAL. Are you asking me, sir?

Mr. BARRETT. If there is someone from industry, I would like a response from industry and from some of the others also.

Mr. FARMER. Let me respond, first off, by saying that redlining is against the law in 50 States, not just in Wisconsin.

On the issue of paying the fair amount of premium, it is a very, very difficult question because it involves a situation where we can demonstrate, talking about auto insurance, that density is a factor in automobile accidents; that in urban areas theft is a greater——

Mr. BARRETT. Drop theft. Take auto insurance all the way. Let us focus on driving records.

Mr. FARMER. I want to focus on loss, things that drive loss cost. And so the question is, if we can demonstrate that Milwaukee has a greater problem with theft, has greater density and that there are more accidents in the city of Milwaukee than in rural Wisconsin——

Mr. BARRETT. No, no, suburban Wisconsin. Keep it in the metropolitan area.

Mr. FARMER. Then, suburban Wisconsin. The question is, should you have, in effect, community rating in Milwaukee. That is really a public policy question.

Mr. BARRETT. What is your opinion on that?

Mr. FARMER. And my opinion, I am going to give you an opinion, an opinion poll that was done about a month ago.

Mr. BARRETT. No, no what is your opinion, sir. I would like your opinion, not an opinion poll.

Mr. FARMER. It is my opinion that the losses should be attributed to where they are produced. Now, there is certain capping, because otherwise, in terms of the economic activity, Massachusetts, Boston and Pittsfield, Massachussets, the question is in the Commonwealth of Massachusetts; they made that choice. And in terms of

that, there is a subsidy of urban drivers in Boston, to the expense of people in Pittsfield.

Mr. BARRETT. Let me ask you a question. I want to zero you in. You are giving a nice discourse. Let me give an example in my neighborhood.

A janitorial aide who lives in my neighborhood, works in the suburban hospital, pays 90 percent more than the physician who lives in the suburb, drives the exact same road to work, but works in the hospital in my neighborhood. Is that fair?

Mr. FARMER. You have to allocate losses within a system——

Mr. BARRETT. The physician drives——

Mr. FARMER. To the area that causes the losses, the——

Mr. BARRETT. That is true, and the physician works in this neighborhood where there are a lot of accidents, but he lives in the suburbs.

Mr. FARMER. There is inequity in any kind of a system, yes, but, frankly, in terms of internalizing loss, it is the basis of the system. And when you decide to ignore causes of loss and spread it, in effect, have a flat rate for all Wisconsin.

Mr. BARRETT. Not all Wisconsin. You are the one that keeps saying that. I am not saying that.

Mr. FARMER. The principle is the same. The economic principle is the same. So the issue is a subsidy. You want to have a subsidy for one group over another group, and is that fair or not fair? That is really a public policy question for the legislature. That is not— we have to operate within the system that you create as a State legislature.

Mr. BARRETT. Let me just continue, because I understand how you can draw different zones. What I would argue is rather than to draw the zones, which is being done now, to have the most disproportionate impact on poor people, draw them even tighter. Draw them based on a home, an individual's home. And if you do that, you are looking at driving records, but that is not what ought to be done.

The impact, and I don't think you can disagree with this, the impact in auto insurance and, in many cases, in homeowners insurance, is you cannot name a product. I would defy you to name a product where you have a more disproportionate impact on poor people in this country.

Ms. RICE. Let me address that issue very quickly. We have requested from the State of Ohio underwriting documents so that we can try to figure out how rates are ascertained, and from what we have been able to uncover, there is one single rate. There is supposed to be one single rate for the whole city of Toledo; however, when we conduct testing and we receive estimate documents back that is not true, because clients in the central city pay higher for less coverage than clients who are not in the central city, and just to kind of piggyback on that, I want to make another comment about a lot of assumptions that I think are being made, and one is that there is more crime and more arson in the central city. That is not true. In the city of Toledo, the higher crime rates are in the suburban, all-white communities, not in the central city. So that is an assumption that I think we are applying across the board and it is an inaccurate assumption.

38

There has also been a statement made about the FAIR plans and that they are overall not profitable but we don't have any evidence as to why they are not profitable overall. I mean, we don't know if it is because of the risk of the loss or if it is because of poor management or administrative costs or overhead costs.

But I do think that there needs to be some type of accountability on the part of the insurance agent so that we know exactly how you are assessing this rate factor. We have identified something that we call a fudge factor, an anonymous thing out there that insurance companies are using to assess rates and it is not something that they are making public in their underwriting guidelines.

Insurance, as Mr. Squires has said, insurance companies need to document that information and make it available to the public. Where are you writing policies; what type of policies are you writing; how much are the policies; where are you canceling policies; where are you opening up new offices, and so forth?

Chairman KENNEDY. Thank you, Tom.

First of all, I would like to say how impressed I am with the testimony that all of you have provided. The work that ACORN has done to try to bring this issue to the attention of policymakers has been critical and is triggering a response by the government.

I think people like Mr. Carbajal—who spoke eloquently and with a great deal of knowledge about what has occurred in your industry and your personal struggles to try to provide insurance to all people of this country and your community—are to be admired; and Professor Squires and Ms. Rice's efforts on behalf of consumers are, again, something that we all very much admire and appreciate. Mr. Farmer, you are kind to come and share with us your testimony today.

My sense of what we have heard is very much that the Federal Government has to be involved in a response to the kinds of discriminatory insurance practices that we are hearing about. Very competent State regulators, such as Mr. Garamendi, are perhaps the exception versus the rule. I think there ought to be at least some base minimum standard where, at a bare minimum, we gain the same kind of information that we currently have from the HMDA data with regard to banks and at least get a full assessment of the extent of redlining detailed by the anecdotal evidence, as well as by the studies that have been conducted thus far.

We would hope that we could do this on a cooperative basis with the industry, and look forward to working with all of you toward developing a structure under which we begin to make sure that everybody that needs insurance, and can afford to pay for insurance, gets an opportunity to get insurance.

Thank you all very much for your testimony.

Mr. BHARGAVA. Mr. Chairman, I would like to introduce some material for the record.

Chairman KENNEDY. Yes, I will just read a brief statement. Being there are no further questions, on behalf of the subcommittee, I want to express appreciation to all the witnesses who shared their views with us today. I would like to ask unanimous consent that the record be kept open for a period of 2 weeks so that additional views may be submitted. Hearing no objections, so ordered.

Any additional views can be submitted for the official record.

Mr. BHARGAVA. Thank you.

Chairman KENNEDY. And other members may submit questions as well. The panel is excused and the subcommittee is in recess.

[Whereupon, at 5:05 p.m., the hearing was adjourned.]

# A P P E N D I X

February 24, 1993

LUIS GUTIERREZ
4TH DISTRICT, ILLINOIS

# Congress of the United States
## House of Representatives
### Washington, DC 20515-1304

OPENING STATEMENT
CONGRESSMAN LUIS V. GUTIERREZ
FEBRUARY 24, 1993

Mr. Chairman, I want to thank you again for holding this important meeting.

While I cannot speak for the rest of the members of this committee, I have to say that as I look back on our four previous meetings, and look ahead to testimony today about abuses from some segments of the insurance industry, I have two reactions.

I am both saddened and angered.

Why?

Because week after week we have had to listen to examples of discrimination that is widespread throughout our financial services sector.

This week, it is the insurance industry. I hate to see what it will be next week. My own city of Chicago was spotlighted in ACORN's insurance redlining study as having nearly a 40 percent difference between low-income and high-income areas in the number of homes insured.

I want to learn more about what we can do to prevent this practice. We have plenty of laws already on the books to discourage discrimination against minorities and low-income Americans. They don't appear to be

PRINTED ON RECYCLED PAPER

working. I hope to hear some suggestions about what will work today.

I must add that after three weeks of testimony, I am more concerned than ever about the plight of minority and low-income residents of our inner cities. We have already learned that it is difficult for people in my community to find a place to deposit their money or to successfully secure a loan. Today we will hear that even if they can get a home loan, it might be jeopardized because of their inability to get the insurance they deserve, the insurance they have earned.

I hope these hearings will be only the beginning of every member of this committees efforts to solve these problems.

Thank you, Mr. Chairman.

BOBBY L. RUSH
1st District, Illinois

### Congress of the United States
#### House of Representatives
#### Washington, DC 20515-1301

**OPENING STATEMENT OF CONGRESSMAN BOBBY RUSH FOR CONSUMER CREDIT AND INSURANCE SUBCOMMITTEE HEARING "INSURANCE REDLINING: FACT OR FICTION?" (2/24/93):**

Thank you, Mr. Chairman. I am very interested in today's hearing because I view the various forms of redlining that we will be looking at today as some of the most serious impediments to the kind of community development that I am seeking to generate on behalf of my district and others like it all across the country. Without insurance, businesses cannot be started and maintained; homeowners are in constant danger of losing their largest, and sometimes only, asset; and auto owners, if they can find a policy, must often spend large amounts of money for even the most minimal policies that they may or may not ever be able to collect on if they do have an accident. I would offer a word of caution to those who would come before this committee and deny that such redlining exists. I sit here today fresh from nine years of weekly open meetings with those in my Chicago ward whom I welcomed to come to me with their problems. Whether admitted or not,

PRINTED ON RECYCLED PAPER

redlining is alive and well in Chicago and cities like it. Rather, I would exhort those who might deny the existence of redlining to redirect their attention and efforts toward an immediate reversal of past patterns, and toward demonstrating to this committee specifically how and when this goal will be accomplished. There can be no real renewal of this nation -- cities, suburban and rural areas alike -- as long as these practices continue, and there is too much at stake in the lives of all Americans to delay beginning the work that must be done any longer. Thank you.

## STATEMENT

**Banking Subcommittee on Consumer Credit Hearing**

**on Insurance Redlining**

**February 24, 1993**

*Lucille Roybal-Allard*

I would like to thank Chairman Kennedy for his leadership and vision in identifying issues in this subcommittee that are of major importance to communities like the one I represent. Insurance Redlining is an issue that I and some of my colleagues from California such as Ms. Waters have dealt with for a number of years. It is a very serious problem in many parts of the state, particularly in the South Central and South East portions of Los Angeles County. Unattainable insurance was of such critical importance that in California, voters approved a statewide Insurance Commissioner position to regulate the escalating costs of insurance. This is as you know a position now held by Commissioner Garamendi.

The problems we are experiencing in California range from lack of insurance, to the high price of insurance, to poor quality of insurance sold in impoverished neighborhoods.

I would like to thank today's witness, particularly Mr. Garamendi from my home state for assisting us and providing information on insurance redlining. I look forward to working with the chairman and interested parties to find solutions to this difficult issue.

.

Testimony of California Insurance Commissioner

John Garamendi

Before the Committee on Banking, Finance & Urban Affairs,

Subcommittee on Consumer Credit & Insurance

Honorable Joseph P. Kennedy II

February 24, 1993

Good morning, Mr. Chairman and Members of the Committee.  I am
California Insurance Commissioner John Garamendi.

You have asked me to testify about discrimination in insurance:
insurers that refuse to solicit, sell, or service insurance
business in inner city, minority, and low income communities,
while profitably providing full service to other parts of a
community or state.  This is called redlining, because insurers
carve out an area (put a red line around it on the map) and
refuse to service it.  They don't put agents there; they don't
sell insurance there.  And as a result, people can't insure their
cars or homes and can't start businesses.

It may surprise you that there are people who deny redlining
exists.  They apparently chalk up the whole idea to hyper-active
imagination on the part of overzealous consumer advocates.  I'm
here to assure you that redlining is real, and it is practiced
day in and day out in California's urban areas.  We have taken
significant steps to find it and end it.

Let me make three brief points, then offer some background and
take any questions.

1.    From time to time we receive information about redlining and
      other issues.  As a matter of fact, we received in the past
      few weeks allegations against a company.  If these
      allegations prove to be true, the map I have here was used
      in a calculated and determined fashion to exclude from
      insurance coverage substantial portions of the City of San
      Francisco.  I would like to share this map with the
      subcommittee.  If these allegations are true, people living
      in the areas highlighted in yellow -- the majority of the
      city -- would be excluded from insurance coverage by this
      company.  This would be redlining -- the real thing.

      I am showing the subcommittee the map as it was received by
      my Department.  Since it may become evidence in a possible
      subsequent proceeding, I will need to take the map with me
      at the conclusion of my testimony, but I will provide the
      subcommittee with copies.

003648

2.  My Department has begun to look at the redlining problem from a statistical vantage point. What do the numbers tell us about agents operating in a given city? Or policies sold? We have begun to identify disturbing trends that show that residents of Oakland and Los Angeles, for example, both cities with strong minority communities, have significantly fewer agents to serve them and, not surprisingly, are much less able to buy insurance than people who live in other, more "desirable" cities and towns, such as Fresno. I can provide you with the evidence we have uncovered.

3.  My Department has moved to provide strict regulation where none has existed in order to encourage good insurance practices and toss out the bad and the discriminatory. The regulations which we are about to move into final stages will penalize the discriminating insurer where it hurts: in the wallet. An insurer who redlines is penalized on the profit side. An insurer who plays by the rules gets a bonus. After all, it's already against the law to discriminate. If the possibility of being pointed out as a lawbreaker would discourage these bad companies, they would have stopped redlining. They have not stopped. We have simply decided it's time to make it too costly to discriminate; it's time to take away the profit from comfortable, illegal underwriting.

SOME BACKGROUND

Although California voters enacted the Insurance Reform Initiative ("Proposition 103") in 1988, which obliges insurers to insure all good drivers, many insurance companies still refuse to do so. These insurers claim the risks are too high in low income and minority communities and inner city neighborhoods. In fact, some insurers place unfair restrictions on agents' ability to bring insurance into the very areas that most need the service.

Proposition 103 prohibits any rate that is unfairly discriminatory or violates California law, and I have renewed my pledge to stop this continuing injustice. Because Proposition 103 subjects insurers doing business in the state to the state civil rights and antitrust law, as well as the unfair practices

act, a coalition of consumer advocates has proposed that all insurers should be required to serve all persons, on reasonable terms, without discrimination.[1]

The coalition alleged that insurers have abandoned inner-cities, and that when they do write policies in low-income and minority communities, they provide services inferior to those provided to other communities. Their petition asked for the establishment of a system of bonuses and penalties, to reward good service and penalize service that is substandard or lacking altogether. They proposed that rules be written to regulate insurer rates of return: The allowable rate of return for insurers that write policies in certain communities should be increased as an incentive to provide responsive and non-discriminatory service. On the other side of the coin, mandate a lower rate of return for insurers that fail to serve those communities.

Riots ravaged Los Angeles last year. The city burned for days, though one could say it smoldered for years before. Local, statewide, and federal leaders alike were handed an unmistakable message: The inner city has immediate, enormous needs, and its communities have borne discrimination for years. We moved to hold hearings there to set regulations to eliminate insurance discrimination in the inner city and other low-income and minority communities throughout California.

We reached out to the African American entrepreneur who despite having capital, cannot open a business because no insurance company will provide business insurance because of race. And as the riots showed, insurance discrimination in certain communities makes it impossible for the citizens to be served by the types and varieties of businesses available in other areas of town. We must ensure that an entrepreneur of any race who wishes to open a business within a low-income, inner-city, or minority community is able to get adequate business insurance.

We addressed the needs of the inner-city Asian immigrant, forced to break the law and drive without auto insurance, putting at risk all she has, because she cannot find an agent who speaks her language or a local agent who has an appointment to sell insurance. We sought to help the Latino insurance broker who wants desperately to serve the community where he grew up, but finds there is no product available to sell to his community.

---

[1] A coalition of 15 minority and low income consumer groups, represented by the San Francisco-based law firm Public Advocates, Inc., petitioned the California Department of Insurance to write regulations to prohibit redlining. We believe Public Advocates' proposal can be a starting point to develop incentives for insurers to better serve areas that are currently underserved or ignored.

Discrimination in insurance is wrong, and we will not allow it to continue.

I can and will continue to enforce laws against discrimination. But prosecution of a few wrongdoers will not solve the problem. We should restructure the system to offer incentives to insurers that aggressively seek business in all markets. I appreciate this opportunity to work with you to make discrimination in the insurance industry a thing of the past, because it's illegal and no longer profitable. Good insurers will remain welcome and will reap a real benefit, if they offer services and products that meet the needs of all communities, all people, regardless of race, income, or geographic location. If we do it right, we can make a real difference.

MICHAEL CARBAJAL JR.
140 Smith St.
Brooklyn, N.Y. 11201
(718) 522-1200

February 23, 1993

There is no question that there are certain areas that insurance companies would prefer not to write automobile insurance. Since these are predominately minority areas, the companies are accused of redlining because of ethnic or racial prejudice. This discrimination, which some call, "the racial factor". This came about because these companies have consistently lost money in ghetto areas. The companies would have us believe that the fact that they do not write business in black and hispanic neighborhoods is not because they are bigots, but because there are no profits in Red Hook, Harlem and East New York. This is probably true but the fact still remains that racial minorities from certain areas do have access to many insurance companies that write automobile insurance. These individuals are forced into residual markets at far greater premium costs.

I have seen maps of the Greater New York Metropolitan area that have been literally redlined to indicate to agents the neighborhoods from which no business will be accepted. Some years ago I was told by a company auto underwriter that they do not write blacks or Hispanics. Other companies solve the "Problem" by not appointing agents in troubled areas. Those agents that write in the non approved sections of New York are sanctioned and if they persist, their agency contract will be in jeopardy.

Since New York State law mandates that all motorists carry

003652

liability insurance and the companies will not sell it voluntarily, the only alternative is the residual market or the assigned risk plan. New York euphemistically calls it The New York Auto Insurance Plan. All insurance companies that write auto insurance in the state must participate and are assigned a quota based on their voluntary business. The population of the New York Auto Insurance Plan has grown to over one million vehicles. Most of the major carriers show a loss with this type of business. However there are a few that profit with these insureds that no one else wants.

The NYAIP is run like a private club. The Board of Governors consists of fifteen members, eight of which are insurance company representatives and the other seven are called public members. Of these public members, two are appointed by the Superintendent of Insurance, and five are elected by the insurance company representatives. These five can not run for office unless they are nominated and they can only be nominated by the insurance companies. The same individuals that make the nominations also vote for them.

The purpose of having "Public Members" is to allow the consumers and their agents have some input to the operation of the NYAIP. Not only are the elections openly rigged, but none of the public members do any substantial business with the NYAIP. Not a single member of the Governing Committee has a store front office nor are they located in areas where most of the clients of the Plan reside.

Many of the companies that subscribe to the Plan have

written it off as an bad investment. There is rampant fraud that receives less than a cursory glance. Premiums continue to rise because of bad underwriting experience.

There are several companies that do business almost exclusively in the redlined areas and are very successful, provide excellent service, and are the only markets available to a large portion of New York drivers. Allcity Insurance Company and the Executive Insurance Co. are but two of the carriers that offer alternatives to the NYAIP. They are successful because they have developed an expertise that is foreign to the major carriers.

Many companies treat NYAIP business as if it did not exist. They allow the losses to go uninvestigated, pay little or no attention to their policyholders and abandoned sound underwriting practices. Several companies are impossible to reach by phone. Their lines are always busy. Others relegate their worse employees to residual market business.

The abuses to the public were so rampant that even the Governing Committee was forced to take some action. A plan was devised whereby one company would be able to buy another's assignments. One of the companies with the expertise in this business has been incredibly successful. The Robert Plan has become a major force in the auto insurance industry. They know how to underwrite and service NYAIP business. Over seventy companies have chosen to allow Billy Wallach and his Robert Plan take over all their AIP accounts. Mr. Wallach's secret is hard work and an intimate knowledge of the this type of business.

Why haven't the major carriers come over to the Robert Plan? The main reason is that they don't want to admit that they need outside help to run their business.

The ultimate question is, "Is there discrimination and redlining in the automobile insurance industry?" The answer is an undeniable "yes". "Is there a racial factor?" Again the answer is "yes". Some insurance companies insist that there is no racial bias, but the facts speak for themselves.

I am personally convinced that official company policy is biased only because of profit motives but as one goes down the corporate ladder there is evidence of blatant discrimination. I have had an underwriter tell me that, "We don't insure Spicks or Niggers."

The New York State Insurance Department has made every effort to depopulate the NYAIP by offering incentives to the companies to write in certain inner city areas. There have been few takers. With the exception of the Robert Plan, Empire and a few others, insurance companies stay away from the ghettos and minority motorists.

Testimony Submitted
By


Reverend Charles Cummings, Jr.
Treasurer



Association of Community Organizations for Reform Now
(ACORN)
Washington, D.C. Chapter



On


Insurance Redlining



Before


The Subcommittee on Consumer Credit and Insurance
Honorable Joseph P. Kennedy II, Chairman


of the


Committee on Banking, Finance, and Urban Affairs
U.S. House of Representatives



February 24, 1993


1

Good Morning, Mr. Chairman, and members of the Subcommittee. I am Reverend Charles Cummings, Jr. treasurer of the Washington, D.C. chapter of the Association of Community Organizations for Reform Now (ACORN). ACORN sincerely appreciates the opportunity to present testimony before you today on the important subject of insurance redlining. ACORN has just recently completed a study of residential insurance availability in fourteen cities, which underscores the urgency of the problem, particularly for low and moderate income and minority families.

We appreciate your prompt response to the recent release of this study, and commend you for holding these hearings.

## ACORN

ACORN, the Association of Community Organizations for Reform Now, is the country's largest grassroots organization of low- and moderate-income families. Founded in Little Rock, Arkansas in 1970, ACORN has grown to include chapters in 26 states in the nation. ACORN members work on a broad range of issues that affect their everyday quality of life, including affordable housing, neighborhood safety, unemployment and environmental degradation.

In 1978, Missouri ACORN released a study similar to the one which prompted this hearing, and helped pass one of the first anti-redlining statutes in the country. Fifteen years later, ACORN has come back to this problem in an indirect fashion. ACORN has a long history of working to promote bank reinvestment in historically redlined neighborhoods, and has secured over two dozen agreements with lenders that have resulted in commitments for billions of dollars in loans to underserved communities. ACORN has also initiated a very successful community loan counseling program in a dozen cities, and has helped thousands of low- and moderate- income families become homeowners.

But these successes brought us face to face with new obstacles. After successfully developing loan programs tailored to the needs of low-income people, we heard from our members that the monthly premiums for homeowners insurance were often the final impediment to an affordable mortgage. We heard from our members that when they began to shop around for homeowners insurance they were told it was "unavailable in that area." Or we heard that our members were unable to get full homeowners insurance, or were unable to get coverage for the full replacement cost of any damage their property might incur -- hardly an encouraging sign to someone about to sign a thirty year mortgage.

The problems associated with insurance redlining, as history has shown, are a problem no one area of town or of the country can avoid. Insurance is vital to all sectors of the economy. Without insurance, banks will not originate loans, businesses cannot risk expansion, homes are abandoned, and services and jobs disappear. The costs of this will eventually have to be shared by everyone.

### Summary of Testimony & Recommendations

My testimony today has five principal points:

1. Insurance redlining remains a pervasive problem in low-income and minority communities, twenty-five years after a Presidential Commission identified insurance availability as a central obstacle to urban economic development.

Problems of insurance availability in low-income and minority communities have been repeatedly documented by successive studies by the government, academics and community groups, and persist despite the creation of FAIR plans in the 1970's. Studies have consistently identified several problems in low-income and minority neighborhoods: large numbers of properties and individuals altogether without coverage; lower quality and higher priced policies than in high-income and white areas; and large numbers of policies written by unregulated, fly-by-night "surplus line" carriers. The racial composition of a

2

neighborhood appears to play a significant and independent role in determining insurance availability, quality, and price.

2. Insurance redlining has a devastating cost for individuals, neighborhoods, and society, and any urban initiative requires intervention by the federal government to end insurance redlining.

Insurance redlining undermines economic development in urban, low-income, and minority communities. Without affordable insurance, access to mortgages is made more difficult, urban businesses cannot remain competitive with their suburban counterparts, housing stock deteriorates or is abandoned, and residents who can afford to do so leave their neighborhood. The success of any urban initiative --including enterprise zones-- depends in large part on solving problems of insurance redlining.

3. A variety of obstacles --some legal, others illegal-- are employed by insurance companies to redline low-income and minority neighborhoods.

Companies may use a variety of techniques to avoid business in low-income and minority communities. Agents are frequently located exclusively in the suburbs, or in high-income areas. Agents frequently discourage or effectively pre-screen potential customers in low-income and minority areas. These customers also tend to be offered policies only at substantially higher prices than their counterparts in high-income and white neighborhoods, are more likely to have their claims contested and to have their policies canceled or non-renewed by a carrier.

4. The problem of insurance redlining is compounded by an ineffective state regulatory apparatus that is unwilling or unable adequately to protect consumers.

State insurance departments are generally understaffed and underfunded, and frequently are "captured" by industry interests.

5. The federal government can and must take a proactive role to end insurance redlining.

The Congress and the new Administration can take several affirmative steps to end insurance redlining, including: requiring enhanced disclosures of insurance companies; strengthening the enforcement of anti-discrimination laws; and subjecting insurance companies to community support reviews to monitor industry activities.

## 1. Introduction: A History of Insurance Redlining

The first Federal investigation of the urban insurance crisis was conducted by the Hughes panel in 1968. Concerned that the outbreak of the now historic urban riots would lead to a mass flight of insurers from the inner city, the panel was appointed to study the cause and effect of the availability crisis, and make recommendations for its remedy.

What the panel concluded, however, was that "[r]iots [were] only one aspect" of the availability crisis. In the words of David Badain, "[t]he panel in fact found that the industry was one which 'exaggerated its urban loss experience' and manifested its view in underwriting manuals warning of excessive inner city risks. As these views were accepted by underwriters and agents, insurance in these areas became less readily available, and the cycle of deterioration continued."

The results of this exodus by the insurers, as the panel predicted, has been to encourage those inner city residents who can afford to relocate in the suburbs to do so. This prediction I even saw reflected on my way to this hearing room -- an ad on a congressional bulletin board for a sublet in Virginia which cited lower insurance rates as a principal advantage of leaving the city.

3

The result for those people who can not afford this emigration has been to further erode the incentive to maintain their property. The panel predicted this as well, and warned the country that "[i]nsurance must be available now."

Unfortunately, what was made available were the FAIR plans. For those states in which the industry voluntarily set up shared risk pools for "high risk" insureds, the option of Federal Riot Reinsurance was made available. This reinsurance, which is literally the insurance of insurance, was offered at a lower rate than was available on the open market, to companies which participated in the FAIR plans.

But problems with the FAIR plans rapidly made themselves apparent. In New York, for example, they were required to be made self sufficient, thereby essentially nullifying their goal and begging the question of what purpose the discounted Federal reinsurance fulfilled. In most states, FAIR plans were also substantially more expensive than the conventional market-- 300% more in New York, according to 1979 Aetna study. Also, FAIR plans often only offer limited coverage as opposed to full homeowners coverage.

It also became apparent that the FAIR plans had become a dumping ground for whole areas, as opposed to identifiably high-risk individuals -- areas that the underwriters just don't want to spend the time evaluating independently. Thus rather than being used for riot stricken areas, or high risk individuals, FAIR plans were used by companies to avoid any policy-seeker perceived to be high-risk, simply by virtue of his or her zip code. A 1977 study by Robert Abrams revealed that 45% of Bronx residents and businesses were covered by FAIR plans or "surplus line carriers". ACORN found this in its analysis as well, with low income minority areas accounting for almost 70% of the FAIR plans written in St. Louis Missouri. In Detroit, all our test callers who sought insurance *anywhere* in the city were solely offered FAIR plan policies.

The claim that many low risk families were being burdened with the FAIR plan has been supported by statistical analysis. In New York, only 4.8% of FAIR plan policy holders reported any claims, according to testimony before the Judiciary committee in 1978. ACORN's preliminary analysis of 1991 zip code data in St. Louis and Kansas City, Missouri, found that only 6% of FAIR plan policy holders reported claims, compared to 12% of conventional policy-holders. Similarly, NY PIRG found in 1978 that only 1/3 of the FAIR plans in New York had any surcharges -- implying that upon inspections they turned out to be well maintained properties.

FAIR plan policy holders were thus being offered inferior coverage at a greater price -- and those policy holders who were unfairly grouped in these programs were alone in bearing the cost of higher risk properties, while the conventional market made even more money. It is in this sense that FAIR plans are only one of the many subtle mechanisms for redlining. People are redlined out of the conventional market, only to find themselves rated out of the residual market.

Clearly, FAIR plans did not solve the insurance availability crisis predicted by the Hughes panel, but it would be a mistake to blame this failure on the FAIR plans themselves. Rather, these problems suggest a problem with the functioning of the conventional market that has changed very little since the investigation by the Hughes panel. Indeed, it might be argued that the creation of FAIR plans served to deflect attention from gross abuses within the industry, and to defer much needed reforms.

Studies from the mid- 1970's onwards have consistently found patterns of bias in the industry. In Insurance Redlining. Fact not Fiction, a report of the Illinois, Indiana, Michigan, Minnesota, Ohio and Wisconsin Advisory Committees to the US Commission on Civil Rights, in 1979, the same problems with availability, quality and affordability were documented. The study's zip code analysis in Chicago revealed very similar results: a strong correlation between the racial and income composition of neighborhoods and their relative level of coverage.

4

In 1974, the Federal Insurance Administration issued a report entitled "Full Insurance Availability" which was highly critical of the FAIR plans. Indeed, it found that only 4.8 percent of the 3 million FAIR policies then in effect had actually reported losses, indicating that the "the vast majority of the insureds in the plans should have been written voluntarily."

In 1976, a report by the Detroit city council President, Carl Levin, found that in many instances "Detroiters cannot obtain insurance in the private market at all and must purchase insurance in the property pool. Insurance purchased from the pool is more expensive and provides less coverage that in the private market."

Professor Gregory Squires, of the University of Milwaukee, Wisconsin, has also recently performed similar studies on the availability and cost of insurance, both through statistical analysis of zip code data in Milwaukee, through phone testing and through analyses of agent locations. Squires has found that "homeowners insurance is clearly more readily available in predominantly white areas than in non-white areas after controlling for median income, poverty, age of the housing stock and population turnover . . . A lot of the discrepancy cannot be explained away."

A report from the Illinois Public Action Council (IPAC) found that both State Farm and Allstate, in their auto insurance practices, had "redlined by not placing agents in all city neighborhoods and not providing phone quotes to callers from certain areas." In fact, neither of these companies had any agents in the west and mid south areas of Chicago. The total area redlined by these companies covers over 85 square miles of the city.

The Pennsylvania Public Interest Coalition found similar results for auto insurance. Agent locations and the likelihood of being offered coverage or a quote over the phone differed significantly based on the race and income of neighborhood.

Recently, the NAACP scored a major victory in a class action suit charging a Wisconsin insurer with discrimination. The NAACP case is the first time a federal appeals court has ruled that the Fair Housing Act also bans bias in the underwriting of homeowners insurance. The suit charged that American Family, the largest underwriter in Wisconsin, was redlining parts of Milwaukee. It also alleged that the company was charging higher premiums to non-whites for properties of comparable value and risk, instructing agents to avoid selling policies to blacks and failing to locate offices in black neighborhoods.

The suit has now been sent back to a lower court to determine whether the discriminatory practices did occur as defined by the federal Fair Housing Act and state law. It must also be noted that the appeal court's ruling only applied to rates shown to be based on race, rather than actuarial classifications. The ruling did not make a judgment as to whether risk classifications having a disparate impact on members of a racial or ethnic group are illegal under the Fair Housing Act.

Finally, reporting by Peter Kerr of the New York Times in the wake of the Los Angeles riots found that a large portion of policies written in south-central L.A. were written by "surplus line" carriers, or "scavenger companies". These insurers, who offer policies at a much higher cost than mainstream carriers, are often located offshore and avoid state regulations almost entirely. Often, when huge payments become due, their address may turn out to be little more than a post office box, and the policy holder is left holding a worthless piece of paper. The parallels with the second mortgage scams recently investigated by this Subcommittee are clear.

Despite the lack of readily available data on the subject, scores of investigations by academics, interest groups and governmental agencies have unerringly come to the same conclusion: Insurance redlining is indeed "fact - not fiction." The insurance companies methodological arguments with these findings only underscore the need for systematic disclosure of data by the insurance industry.

5

**2. A Policy of Discrimination: Findings of ACORN Research**

On February 5, ACORN released a study on the availability, quality and cost of residential insurance in fourteen major cities. The study, the first of its kind, combined a statistical analysis of insurance company filings by zip code in 5 cities with the results of extensive testing in 13 cities. I would like to submit a copy for the record, as well as assorted press clippings.

The statistical analysis was performed in four states currently requiring such disclosure of property and casualty insurance companies - disclosure similar in kind to the HMDA (Home Mortgage Disclosure Act) filings required of banks. It compared the number of homeowners or other personal dwelling policies written by the industry in various urban and suburban zip codes to demographic data on race and income of neighborhoods. The study also looked at the quality of coverage in neighborhoods of different racial and income compositions.

The second part of the study consisted of the results of extensive testing of various insurance agents and underwriters in thirteen cities. Testers attempted to obtain quotes for insurance from both captive and independent agents for properties in different neighborhoods -- including low income urban areas, upper income predominantly white urban areas, and suburban areas. Information on disparities in the ability of callers to get quotes and to get the premium policy, and differences in prices of policies and the frequency of required inspections was then compiled.

Among the key findings of the study are that:

- Minority and low-income neighborhoods where data was available were underinsured -- by as much as 48% in low-income neighborhoods in Chicago.

This figure of "relative coverage" was arrived at by comparing the number of single family units in a zip code with the total number of residential policies written by all insurers in that zip code. Similar results were found in St. Louis and Kansas City Missouri, with these areas underinsured by 50% and 30% respectively. For Wisconsin and Minnesota data was only collected for the largest companies, but the discrepancies between low income areas and upper income areas was significant.

Discrepancies remained significant when comparing the coverage of neighborhoods of similar income, bud different racial composition.

- Test callers from low-income neighborhoods were refused a quote on a policy 38% of the time, compared to 7% of the time for callers from high-income areas.

Callers from low-income areas were often plainly told by agents that "we don't write policies in that area", or "we don't write policies for properties of that value." In some cases, testers were told they would have their call returned at a later time with a quote -- promises that were rarely kept.

- Insurance policies written in low-income and minority neighborhoods tend to be of substandard quality.

Callers from low-income neighborhoods were offered "market value" policies -- policies which do not cover the property for the full replacement costs in case of damage. They were also offered FAIR plan policies more frequently than callers from high-income areas. FAIR plan policies are often of substandard quality and usually cost substantially more than conventional policies --270% more in Missouri, for example.

- Test callers from low-income neighborhoods were quoted rates averaging 2.5 higher, relative to their level of coverage, as test callers from upper-income neighborhoods.

6

These figures were based on quotes given by agents to testers, and are based on policies offering similar levels of coverage.

The results of this study seem to indicate problems as serious in its dimensions as those identified by the Hughes panel in 1968. The causes of this problem are, however, varied, and can perhaps best be introduced through some examples of the barriers ACORN members have faced in trying to obtain homeowners insurance.

### 3. Obstacles to Obtaining Homeowners Insurance: Examples

The following are examples of the obstacles facing low-income and minority consumers in obtaining coverage.

In Minnesota, an ACORN member in the Philips neighborhood of Minneapolis, who had recently bought her home through the ACORN loan counseling program, wanted to switch her homeowners insurance to the same carrier as her auto insurance carrier. She was refused insurance for the bizarre reason that "her house was too big."

In Chicago, several members in the same area of town, had their premiums doubled, or in some cases were outright canceled, without the insurer offering any reason. In some cases these members owned their homes for up to twenty years, and had no abnormal claims history.

Many members have reported they were either unable to get insurance, were canceled or had their premiums raised because an abandoned property appeared on their block. At the same time, however, members who have considered buying and rehabbing abandoned properties were also refused insurance.

Another member in Minnesota, who had been a policy-holder for twenty years with the same company had her policy canceled after two small claims --one for a dog bite and the other for vandalism.

In addition many members across the country reported the identical problems we discovered in our phone surveys. They were told "Nobody will insure you there", "Only the FAIR plan will cover you there", "We don't write policies for houses that old", "We don't write policies for houses which are only worth that much."

And the final barrier, of course, is the high price of coverage. As our survey showed, even for conventional policies the cost for residents of low income areas was as much as 250% more than for suburban areas. Another member is currently paying $92.50 a month for her insurance -- over $1,000 a year for a low-income homeowner!.

Perhaps the most tragic case we have encountered was that of an ACORN member in St. Louis whose house recently burned down. The man's principal asset -- with which he might have started a business or sent a child to school -- was unprotected. He had in fact been canceled only a month earlier for an unrelated reason. A tragic story, but one which would perhaps be seen by an underwriter as optimum risk management. The logic here is akin to the cartoon of the homeowner opening a letter in his mailbox reading "Dear policy-holder, we have canceled your policy because our records have shown that you have not had a claim for over five years, so we figure you're due for one."

### 4. Modes of Redlining: Causes of Problems of Insurance Availability, Affordability and Quality

There seem to be two problems with insurance availability. The structure of the industry is such that there is an enormous potential for discriminatory redlining -- that is, in industry terms, unfair, or "irrational", discrimination. This problem is aggravated by inadequate state level regulation and oversight,

7

as well as the complete lack of any federal regulation, or concerted efforts to prosecute insurance redlining where it is discovered.

There is also, as we are all aware, a problem with our inner cities. The problem is not just abandoned houses in our neighborhood, but neighborhoods that have themselves been abandoned: by the banks, the insurance companies and even its residents. The effect of this abandonment was made clear in the L.A. riots, but is made no less clear on a daily basis to anyone who lives in these neighborhoods.

The insurance industry is not exclusively to blame for these problems, but it is certainly not exempt from responsibility. Addressing this problem requires more far reaching solutions than insurance reform alone, but we may be certain that urban aid packages and enterprise zones will all be wasted if adequate and affordable insurance are not made available.

Currently, however, the structure of the insurance industry is such that it continues to perpetuate the problem. The industry's response is often that problems in availability are actually caused by rate regulation. According to a State Farm report, "It is axiomatic that whenever the actuary is prevented from adjusting prices to fit the book of business, the underwriter is forced to adjust the book of business to fit the price permitted." It is also axiomatic, however, that if an insurer wishes to adjust the book of business to avoid certain area, they can do so by adjusting the price.

There are in fact a variety of ways in which insurers are responsible for low levels of coverage in urban areas, and a variety of ways in which an insurer can effectually redline.

Techniques for redlining can be broken down into two categories: blatant and subtle.

The blatant forms are fairly straightforward. Despite several state attempts at "anti-redlining" statutes, an insurer can still usually flat out refuse to insure someone based on the area in which they live. An insurer can also blatantly redline by offering prohibitory rates, that is, offer an unreasonable quote that is well beyond the ability of a policy-seeker to afford. Finally, an insurer can use underwriting criteria which clearly redline whole areas or classes of people, such as the age of the dwelling, the construction of the dwelling or the value of the dwelling. As you know, the use of criteria that have the effect of discrimination is illegal in employment --and should be prohibited for insurance as well under the Fair Housing Act.

Subtle redlining is really endemic to the structure of the system. There are many ways in which the price, quality and coverage of a policy can be varied, often based on short cuts and generalizations, rather than the individual analysis of risk. Higher prices may often lead to the unwillingness to buy a home, while inferior levels of coverage take away the incentive to renovate or upgrade them.

Other subtle forms of discrimination include requirements for detailed inspections applied in low-income and minority areas, but not in high-income neighborhoods. This means that, on the whole, people in these neighborhoods are more likely to pay surcharges or to be refused coverage for reasons that go undetected in other neighborhoods.

Another common complaint is the disparate treatment of claims. Inspections of claims may be more common in certain neighborhoods than in others, an inspection which the insurer will avoid inflicting on its more select customers for fear of losing their business. Cancellations, based on one or two claims are also more likely to be inflicted on policy-holders on the wrong side of the tracks.

Finally there is the issue of agent location and marketing. Agents who do not live or work in the neighborhood they insure not only cannot offer equal service, they are also more prone to view intuitively the inner-city as uniformly high risk. This is no surprise when all they see of the neighborhoods they insure is the latest crime segment on the nightly news. The comparison can be drawn here to the same problem we have had with banks. Lenders that have large portfolios of loans in low-income areas often

8

find that those loans perform better than their conventional portfolio -- while lenders without outposts in minority neighborhoods often use the grossest stereotypes.

There are also, however, numerous tactics companies can use to explicitly redline neighborhoods, or cancel policy holders they already have in certain neighborhoods.

For example, in Minnesota, one agent anonymously described the following scheme. The insurance company cancels an agent, and redistributes the policies they held to another agent. The original agent would be earning a 10% commission on policies they had solicited, while the new agent would only receive 2%. The new agent is then informed by the company that the properties must be re inspected, with the goal of dumping whole areas. However, the agent will subsequently receive a 4% commission on those policies he or she retains after reinspection, covering any loss caused by cancellations.

Another agent was flat out told to reinspect all properties over fifty years old in a certain territory, because actuarial analysis showed a higher risk level for properties over fifty years old. However, an Aetna study from earlier years claimed that the only significant difference in loss patterns for differently aged properties was at the five year age barrier. If this difference is significant, then it is clear there would still be a difference between properties over 50 years old and under 50 years old, on average. The fifty year threshold, however, may be largely arbitrary, and may therefore be used to dump the older areas of town, which are generally in the inner city.

The effect of the system of establishing rates based on geographic territories has also been substantially higher prices for low-income and minority families, who account for the bulk of inhabitants in high rate areas.

## 5. State Regulation: Inadequate and Ineffective

A few states have passed anti-redlining statutes. However, these are usually fairly ineffective, and poorly enforced. The NAIC model laws language for anti-redlining statutes relates only to "refusing to insure" someone based *solely* on their geographic location. Some states also make cancellations subject to the restriction.

However such language does not prohibit the use of underwriting criteria which have the effect of redlining or discriminating. The most comprehensive legislation addressing redlining problems was enacted in Michigan. This statute requires that the owner of any building meeting property code may obtain premium coverage with the insurer of his or her choice. FAIR plans are also available, and offer full coverage at a price which reflects the average price of similar conventional policies. Michigan also has a cap on the difference in territorial rates any company may set, and limits the number of territories to three.

Nevertheless, a member from Detroit was repeatedly refused coverage by one insurer, and referred to the FAIR plan -- she was never asked whether her property was up to code. When she asked to speak to the agents supervisor, he informed her that coverage could be made available, but it would cost three times as much as the FAIR plan. Clearly, then, such laws make little difference if they are not enforced.

The current system of state level regulation is insufficient and inadequate. According to a 1988 report by the Consumer Insurance Information Group (CIIG) and the Association of Professional Independent Agents (PIA National), insurance departments have inadequate resources to regulate carriers. Four states, New York, California, Florida and Texas, control more than half of all funds and staff dedicated to insurance regulation in the country.

The report also showed that the average department has less than four actuaries -- the individuals charged with assessing risk and evaluating company rate filings. This pales in comparison to the number of actuaries analyzing and filing the rates for the insurance companies. In Chicago, the rate filing manual

9

for one company may be as long as 1500 pages! It the insurers' risk analysis is faulty or based on prejudice, it is unlikely that the insurance department would ever discover it.

Years earlier a similar criticism was made by then Detroit city council president Carl Levin, regarding the time constraints facing the department when evaluating rate hikes. "These rigid time constraints are a substantial problem in the rate making process. The insurance bureau receives approximately 7500 filings each year, about 1500 of which request rate increases, and has five staff people available to review them. The time pressures and the sheer volume work against an adequate review of all rate increase requests."

And the departments do seem to be a little too close to the industry. Another PIA study showed that at least 38% of insurance commissioners had worked for the industry prior to serving the state, while almost half would work for the industry after serving an average of only 3.3 years. Also, less than a fourth of the states have elected officials who are directly responsible to consumers of insurance.

To summarize, the current insurance system, in attempting to pool similar risk, has the effect of placing an excessive burden on urban residents -- who are usually low income and minority. The problems, if not endemic to the system itself, are aggravated by an industry that may still "exaggerate its urban losses"; an industry that, because of the lack of federal regulation, inconsistent and inadequate legislation, little judicial enforcement and inadequate state regulation is given too much opportunity to underwrite based on poor or unsubstantiated conventional wisdom, intuition and shortcuts.

And we should keep in mind that blatant discrimination and redlining are still a fact of life. The NAACP case currently under appeal is over a case, where an agent was allegedly instructed by an insurer to stop writing so many policies in black neighborhoods.

## 6. Insurance Redlining and Economic Development

Overpriced and substandard quality insurance contributes to abandonment and urban decline, and leaves urban businesses and residents poorly situated to compete with their suburban counterparts. This dilemma is illustrated by the response of one of the trade groups to our recent study. A spokesperson for the group argued that "[o]f course insurance is more expensive in inner cities. But so are groceries." Unfortunately she had it reversed -- it is groceries that are made more expensive because insurance is more costly in urban areas.

The state of America's low- and moderate-income and minority neighborhoods requires swift and decisive leadership by the new Administration and the new Congress to stop the downward spiral of poverty, violence and urban flight that threatens the viability of thousands of communities nationwide.

The President pledged in his campaign to articulate a "third way" to address intractable problems confronting the nation. Nowhere is such a break from liberal and conservative orthodoxies more necessary than in the area of neighborhood revitalization.

The President articulated a vision for new solutions to problems of inner-city decline, focusing on the creation of partnerships between the government, private industry and non-profit community groups as the best hope for change. In particular, he returned repeatedly to the question of the availability of credit and financial services as the central question underlying the imperative of recreating our inner cities.

Indeed, the development of thriving neighborhoods with expanding opportunities for homeownership and entrepreneurship hinges on the availability of credit and insurance. Mortgage lenders will often not make loans without insurance -- no insurance means no home. In addition, the success of any urban aid or enterprise zone legislation will be a foregone failure without affordable insurance. A small business cannot remain competitive with its suburban counterparts if its insurance costs twice as

10

003665

much, and without adequate insurance, a small business cannot risk expansion. And the jobs that do exist are made inaccessible by over-priced auto insurance.

The first presidential commission on insurance availability put it simply: "communities without insurance are communities without hope."

### Recommendations: A Ten-Point Plan to End Insurance Redlining

Congress and the Administration can take several affirmative steps to end insurance redlining, including:

1. Requiring disclosure of homeowners policies written by carriers, on a census tract basis

Insurance companies should be required to publicly disclose policies written, denied, and canceled by census tract, as well as the race, income and gender of applicants. In addition, companies should report the value and other characteristics of the property being insured, as well as the level of coverage and premiums charged. Such disclosure is essential in order to assess the extent, quality, and price of coverage in neighborhoods of different income and racial compositions, as well as to monitor compliance with non-discrimination laws.

2. Requiring disclosure of underwriting criteria

Companies should be required to disclose publicly their underwriting criteria. This is essential in order to be able to evaluate whether or not underwriting criteria or reasons for rejection or reinspection are being selectively applied to certain neighborhoods or groups, and whether standards employed may have a discriminatory effect.

3. Requiring disclosure of agent location

Companies should be required to disclose the location of agents who sell their policies, on a zip code basis. The absence of agent representation in low-income or minority neighborhoods not only indicates an unwillingness to do business, but also makes it impossible to accurately underwrite risk.

4. Requiring disclosure of investments of policy-holder premiums

Companies should be required to disclose publicly their investments of policy-holder premiums, with particular emphasis on investments that support affordable housing and job-creation in areas in which the carriers collect premiums.

5. Requiring disclosure of reasons for termination of policies, or increases in rates.

Policy-holders today can be left stranded by the whim of a company, despite having held a policy for many years without making significant claims. The least that consumers deserve is advance notice of termination or of increases in rates.

6. Expanding the Fair Housing Initiatives Program for testing of insurance companies

Testers should be used to monitor compliance with anti-discrimination laws and regulations, including those governing underwriting, inspection and claims policies and practices. Given the apparent prevalence of pre-screening of applicants based on the racial characteristics of neighborhoods, testing is an essential compliance tool.

7. Investigating and prosecuting insurance redlining under the Fair Housing Act

11

The Department of Justice and HUD should aggressively investigate and prosecute insurance companies for discrimination under the Fair Housing Act. HUD should also prohibit the use of underwriting criteria which have the effect of denying coverage disproportionately to members of a protected class under the fair housing act.

8.  Prohibiting the use of discriminatory underwriting criteria, including geography

Minimum standards should be established which restrict the use of "environmental" underwriting criteria, and emphasize risk factors over which the individual has control. Standards should also be established to restrict the termination of agents based on where they write policies.

9.  Establishing minimum standards to govern the operation of FAIR plans

Minimum standards should be established to govern the price and quality of policies offered through FAIR plans. FAIR plan rates should be based on an average of companies' rates in the conventional market, and should offer equivalent policies and levels of coverage. FAIR plan referrals by agents should be based on objective criteria, rather than on "environmental" or uncontrollable risk factors.

10.  Subjecting insurance companies to community support requirements

Insurance companies should be required to undergo community support reviews to evaluate their level of service to low- and moderate-income and minority neighborhoods, compliance with anti-discrimination laws and regulations, and their record of reinvestment in communities in which they collect premiums. Companies should be graded on their community support performance, and applications by companies for rate increases should be subject to an assessment of their performance as well as public comments.

**Conclusion**

Insurance, the industry will tell us, is all about evaluating risk. But risk is a difficult thing not only to evaluate quantitatively, but also qualitatively. There are certain factors over which homeowners, auto owners and business entrepreneurs have no control. The realities of the urban crisis that faces us is such that we can no longer ignore the link between race, poverty, and the geography of the urban landscape. Geographic redlining, as well as discriminatory practices in general, must be stopped.

But these practices are not only a matter of policy. For years, low-income people and minorities were told that they were higher risks in mortgage lending -- yet no study has ever supported the claim that African-Americans constitute a higher risk for loan default. The problem was rather with an industry which only marketed its loans to and developed products for a middle class, suburban and largely white clientele. Mortgage evaluation, as well as insurance underwriting is more art than science, and requires a practical and hands on knowledge of the neighborhood and people being served. I have to admit, I certainly would not rely on my judgment to evaluate the solvency of a bank, insurance company, or of a company whose junk bonds I was considering buying -- but people still claim even the latter are profitable if properly managed. When it comes to mortgages, the same holds true -- the community knows best. And after years of waffling, some banks are finally realizing that serving low-income neighborhoods is not charity, but simply good business. Hopefully, insurance companies will come to the same realization.

And ACORN is working directly with insurance companies to underwrite risk fairly, and to educate consumers. The goal of the ACORN neighborhood safety program, which we hope to implement with companies, is to reduce risk in our neighborhoods. This should result in a direct reduction in premiums for low-income families that take steps to reduce risk, people who have proven they are

12

003667

committed to their homes and neighborhoods, and have a track record showing what can be accomplished with an organized neighborhood.

But the crisis of insurance availability is too important for the federal government to continue to ignore. Insurance not a luxury. It is an essential need, and we cannot continue to deprive a large part of America this need. In the words of the Hughes panel:

"Insurance is essential to revitalize our cities. It is the cornerstone of credit. Without insurance, banks and other financial institutions will not -- cannot -- make loans. New housing cannot be constructed, and existing housing cannot be repaired. New businesses cannot be opened, and existing businesses cannot expand, or even survive. Without insurance, buildings are left to deteriorate; services, goods and jobs diminish. Efforts to rebuild our nation's inner-cities cannot move forward. *Communities without insurance are communities without hope.*"

13

Insurance Redlining:  Still Fact, Not Fiction

Gregory D. Squires
Professor, Department of Sociology and Member
 of the Urban Studies Program Faculty
University of Wisconsin-Milwaukee

Testimony presented before the House Subcommittee on Consumer Credit and
Insurance.  February 24, 1993. Washington, D.C.

Insurance Redlining:   Still Fact, Not Fiction

Twenty-five years ago the National Advisory Panel on Insurance in Riot Affected Areas made the critical observation that:

Insurance is essential to revitalize our cities.  It is a cornerstone of credit.  Without insurance, banks and other financial institutions will not - and cannot - make loans.  New housing cannot be repaired. New businesses cannot expand, or even survive.

Without insurance, buildings are left to deteriorate; services, goods and jobs diminish.  Efforts to rebuild our nation's inner cities cannot move forward.  Communities without insurance are communities without hope.   ·

This statement probably more accurately describes cities in 1993 than in 1968 when it was written.  Obviously there are many reasons for the desperate conditions so many urban communities find themselves in today.  One of them is the practice of insurance redlining.

Racial minorities and neighborhoods containing large numbers of minority residents are discriminated against in the provision of property insurance. This is a systematic reality, not an anecdotal occurrence.  If intentional racial discrimination is not widespread, traditional industry practices adversely affect racial minorities and minority neighborhoods and undermine redevelopment of urban communities throughout the United States.

In my own research on Chicago with the U.S. Commission on Civil Rights and on Milwaukee as a faculty member with the University of Wisconsin-Milwaukee, we found that voluntary market insurance policies were far more likely to be written in predominantly white than non-white areas.  Racial composition was

1

associated with the number of policies written per owner-occupied dwelling more highly than income, poverty rate, age or condition of housing, population turnover, crime rate, incidents of fire, and other factors presumably associated with risk. More importantly, racial composition remained statistically significantly associated with the distribution of insurance policies even after these other variables were controlled.

In testing programs we have carried out in Milwaukee with the Metropolitan Milwaukee Fair Housing Council and others have done in cities throughout the United States, residents of minority communities have been discouraged while residents of predominantly white neighborhoods have been encouraged to do business with insurance agents. Despite limitations in available data and the methodologies often employed, the overwhelming conclusion of existing research is that there is a racial gap in the availability of property insurance. While some of this gap can be accounted for by financial considerations of insureds, conditions of properties, and risk related factors generally, the racial gap remains substantial even after these factors are taken into consideration.

A logical question is, why? Part of the answer is profitability. From the perspective of the agent, it is often more profitable to do business in neighborhoods with higher-valued properties, which are generally suburban and white, than in areas with lower-valued properties, which are generally urban and non-white. This, in turn, begs the question of whether profit maximization for some should be accepted as a final justification for the devastation of neighborhoods for many. If, in fact, urban communities cannot be profitably served given the current structure of the market, perhaps this essential service should be restructured as a publicly regulated utility, a municipally run service, or some other mechanism. Unfortunately, the problem is even more

2

complex.

Another contributing factor is the perpetuation of racial stereotypes that dominates much of the thinking and subsequent behavior within the industry. As a sales manager for the American Family Insurance Company advised several agents in 1988:

> Your persistency went down the shitter... Very honestly, I think you write too many blacks...You gotta sell good, solid premium paying white people...they own their homes, the white works...Very honestly, black people will buy anything that looks good right now...but when it comes to pay for it next time...you're not going to get your money out of them...the only way you're going to correct your persistency is get away from the blacks.

Many traditional industry underwriting practices which may have some legitimate business purposes also adversely affect racial minorities and minority neighborhoods. Many companies have minimum value and maximum age requirements for properties to qualify for their homeowners policies. Often, for example, a home would be disqualified if it was valued at $25,000 or $35,000 or less or was constructed before 1950. Given the realities of residential segregation, racial minorities are far more likely to live in such homes and, therefore, to be excluded by these rules.

But there are many underwriting rules and guidelines which are clearly subjective and for which it is unlikely that there is any systematic research to justify their use. Examples include the following statements that were taken from company underwriting manuals and guides:

> Coverage may not be bound on the following classifications without prior approval...professional athletes, musicians, or entertainers.

3

003672

Following occupations not to be approved for preferred policies: janitors, stewardesses, traveling salesmen, auto salemen (particlarly those associated with used cars sales), musicians, athletes, etc.

RED FLAGS FOR AGENTS AND CLAIMS PERSONNEL...

4. Declining property values...

b. Population or racial changes

More significant than the written rules is the subjective manner in which they are implemented, as the evidence from tests or audits frequently indicates. By tests or audits I am referring to studies where matched pairs of callers (individuals who report the same income, credit history, and other financial considerations and are shopping for the same insurance coverage for the same type of home in terms of market value, structure, and condition but who differ only in their race or the racial composition of the neighborhood in which the home is located) contact insurance agents posing as insurance consumers. As the recent report by ACORN and other similar studies have found, the caller from the white community is generally quoted a price and offered a policy over the phone with the agent enthusiastically trying to sell the policy. But the caller from the minority neighborhood is often told an agent is not available but will call back (with the calls frequently not returned), not provided a quote over the phone, told that an inspection will be necessary, referred to the FAIR Plan, and in many other ways discouraged from pursuing the policy. Not only do existing studies confirm these patterns, but sympathetic agents (usually racial minorities) anecdotally confirm these practices as common with their white colleagues.

4

003673

A critical factor in the marketing of insurance is the location of agents. Most of the property insurance policies sold by most agents are to insureds within the neighborhood in which the agent is located. In our study of agent location in Milwaukee we found that in 1970, 1980, and 1990 the distribution of agent locations was clearly associated with racial composition of neighborhoods and, again, that relationship remained after taking into consideration the number of owner occupied housing units, age and condition of homes, and income of residents. To illustrate, the racially integrated neighborhood of Sherman Park on Milwaukee's west side changed from 1 percent non-white to 24 percent non-white between 1970 and 1980 and the number of insurance agents changed from 22 to 9.

This raises the question of what can be done. Several actions can be taken to ameliorate the problems of insurance redlining. First, more comprehensive disclosure requirements are essential. Only a few states require geographic disclosure of policies at all, and those rules only require aggregate zip code level disclosure. Current reporting requirements under the Home Mortgage Disclosure Act can provide guidance. Each property insurer should be required to disclose the following information for each application: race, gender, and income of the applicant; census tract, age, structure (e.g. brick or frame), and value of property; disposition (whether the application was approved or denied), and type (e.g. fire insurance, HO-3), value, premium, deductible, exclusions, and other terms of the policy. This information should be publicly available in a user friendly format for community groups, researchers, and others, and widely utilized by enforcement agencies.

This information does not address the prescreening that occurs prior to submission of an application where most of the discrimination may actually be

5

taking place. Far more comprehensive testing programs should be initiated to continually monitor such practices and any changes that may be occurring.

The U.S. Department of Housing and Urban Development and the Civil Rights Division of the Department of Justice could be far more active in prosecuting insurance redlining under the federal fair housing act, other statutes that prohibit unfair trade practices and Constitutional guarantees for equal rights to make and enforce contracts and to buy and sell real property. The federal role could take several forms. The agencies themselves could initiate investigations and file suits where appropriate. And they could provide additional funding for local non-profit fair housing groups to expand the work they are already doing in this area.

A Community Reinvestment Act for insurance would also be effective. Currently, insurance is regulated by the states. State insurance commissioners often approve rates, underwriting changes, and new products, and perform several regulatory functions primarily to assure the solvency of insurance companies. Approvals requested by insurers along with other actions - like the addition of new agents - could be conditioned on adequately serving all parts of their "service areas."

State regulation of insurance is notoriously weak, however, on consumer issues. This raises the question of whether or not the federal government should begin to develop a regulatory structure similar to what currently exists for lenders. Debates over the proposed repeal of the McCarran-Ferguson Act, which virtually exempts insurers from federal regulation, have a long history. Short of repeal, perhaps insurers could be licensed at the federal level, with one condition of maintaining the license being service to low- and moderate-income areas similar to the requirements of the CRA. The primary value of such

6

an approach would be to empower community groups to begin leveling the insurance playing field as has begun in the case of mortgage lending.

There are other issues that need to be addressed. The underwriting rules and guidelines should be subject to public disclosure requirements and closer scrutiny by law enforcement agencies. Investment practices must be brought into the redlining debate. The insurance industry controls approximately two trillion dollars and much of its profits are derived from investments. Some insurers have entered into partnerships with community groups in which company investments in low-income housing, small business loans, and other urban development projects were as significant as commitments to provide insurance in previously redlined communities. And employment practices by insurers should be examined. In 1990, according to the U.S. Equal Employment Opportunity Commission, 23 percent of the total private sector workforce was non-white compared to just 17 percent among property/casualty insurance companies. While no systematic research has been conducted on the link between racial composition of the work force and service to minority communities, anecdotal evidence from discussions with many agents strongly suggests that bringing more racial minorities into the work force will be conducive to better service in currently distressed areas.

Redlining undermines urban redevelopment efforts, it locks people out of critical markets simply because of skin color, and it contributes to the concentration of poverty and rise of underclass behavior in urban America. The policy and practice of insurance redlining further confirm the fact of institutional discrimination and the centrality of structural causes of urban poverty rather than the culture of poverty theories so popular in recent years which simply blame the victims for their plight.

7

003676

In 1978 the Federal Insurance Administration concluded:
Without question, insurance availability and insurance affordability
in urban areas are crises of monstrous proportions. The tentacles of
these crises reach into diverse areas of mortgage and financing and
property appraisals thereby denying credit and sealing the doom of
today's urban neighborhoods.

This is the same message issued by the National Advisory Panel in 1968.
Both statements apply today. One small but important part of any viable urban
policy must be a vigorous response to the continuing fact of insurance redlin-
ing.

8

003677

Selected References on Insurance Redlining

ACORN (1993) A Policy of Discrimination? Homeowners Insurance Redlining in 14 Cities Washington, D.C.: Association of Community Organizations for Reform Now.

Badain, David I. (1980) "Insurance Redlining and the Future of the Urban Core," Columbia Journal of Law and Social Problems 16 (1): 1-83.

Byrne, Kevin J. (1980) "Application of Title VIII to Insurance Redlining," Northwestern University Law Review 75 (3): 472-505.

DeWolfe, Ruthanne, Gregory D. Squires, and Alan S. DeWolfe, "Civil Rights Implications of Insurance Redlining" DePaul Law Review 29 (2): 315-351.

Hoyt, Josh and Maria Choca (1989) The Silent Partner: The Insurance Industry's Potential for Community Reinvestment Chicago: Woodstock Institute.

Keenan, Gerald (1979) Insurance Redlining: Profits vs. Policyholders Chicago: National Training and Information Center.

Nader, Ralph and Wesley J. Smith (1990) Winning the Insurance Game: The Complete Consumers Guide for Saving Money Los Angeles: Knightsbridge Press.

Schachter, Rob (1981) Insurance Redlining: Organizing to Win Chicago: National Training and Information Center.

Squires, Gregory D. (1979) "Community Self Insurance: An Answer for the Victims of 'Redlining'" The Progressive 43 (12): 47-49.

Squires, Gregory D. and Ruthanne DeWolfe (1979) Insurance Redlining: Fact, Not Fiction Washington, D.C.: U.S. Commission on Civil Rights.

Squires, Gregory D., Ruthanne DeWolfe, and Alan S. DeWolfe (1979) "Urban Decline or Disinvestment: Uneven Development, Redlining, and the Role of the Insurance Industry" Social Problems 27 (1): 79-95.

Squires, Gregory D. and William Velez (1987) "Insurance Redlining and the Transformation of an Urban Metropolis" Urban Affairs Quarterly 23 (1): 63-83.

_____(1988) "Insurance Redlining and the Process of Discrimination" The Review of Black Political Economy 16 (3): 63-75.

Squires, Gregory D., William Velez, and Karl Taeuber (1991) "Insurance Redlining, Agency Location, and the Process of Urban Disinvestment" Urban Affairs Quarterly 26 (4): 567-588.

Tobias, Andrew (1982) The Invisible Bankers: Everything the Insurance Indus- try Never Wanted You to Know New York: Simon and Schuster.

9

*SOCIAL PROBLEMS, Vol. 27, No. 1, October 1979*

# URBAN DECLINE OR DISINVESTMENT: UNEVEN DEVELOPMENT, REDLINING AND THE ROLE OF THE INSURANCE INDUSTRY

GREGORY D. SQUIRES
RUTHANNE DEWOLFE
U.S. Commission on Civil Rights

ALAN S. DEWOLFE
Loyola University

The insurance redlining debate poses challenging policy issues for public officials and theoretical concerns for urban sociologists. Using disclosure laws recently enacted in a few states, researchers can now begin examining the underwriting practices of insurers by neighborhoods in selected cities. In this initial exploratory study, we review the controversy and some pertinent conditions in the property casualty insurance industry. Then we examine the activity of property insurers in Chicago. We find that residents of neighborhoods having a high concentration of minority or low income families, or older homes, are experiencing difficulty in obtaining insurance, and for reasons that cannot be explained by those factors accounting for most insurance company losses, i.e., incidence of fire and of theft. These findings suggest—as its critics have charged and the insurance industry has generally denied—that redlining of many urban communities and discrimination against the poor and minorities are facts of insurance life, and contribute to the deterioration of those communities. We offer some policy recommendations for eliminating redlining and for stimulating reinvestment in urban neighborhoods. We also suggest that future research on issues pertaining to the uneven development of metropolitan areas will be more informative if based on the structural/disinvestment approach than on the individualistic/natural evolutionary one which has long dominated the study of urban sociology.

The deterioration of older neighborhoods within major metropolitan areas has long concerned residents, social scientists and public officials alike. Explanations for that phenomenon, however, vary considerably. Some U.S. observers attribute the existence and persistence of poverty and urban slums to psychological and cultural defects of those inner city residents themselves (Lewis, 1966; Banfield, 1970). Others acknowledge that many larger forces are involved but emphasize that cities still contain "natural" communities (Suttles, 1972:7–18), or that since buildings ultimately deteriorate and people move as they move up the socioeconomic ladder, communities inevitably go through transitional phases (Myers, 1975; cf. Harvey, 1973). In recent years, however, more social scientists have been analyzing the "urban problem" from a structural perspective, emphasizing how the interaction of a variety of exploitative institutional forces accounts for the uneven development of metropolitan areas (Tabb, 1970; Blauner, 1972; Alcaly and Mermelstein, 1977). In particular, banks and savings and loan institutions' disinvestment practices (often summarized as "redlining"—the avoidance and/or withdrawal of financial investments in some urban areas and the concentration in other urban, or in suburban areas) has become the subject of much policy research (Shearer, 1976; Werner *et al.*, 1976), the rallying point of many community groups (Dorfman, 1975; Naparstek and Cincotta, 1975), and the focus of much legislative activity.[1]

However, banks and savings and loans are no longer the only financial institutions charged with redlining. In recent years the insurance industry has also become a target for community organizations and public officials. The charge of insurance redlining, e.g., using location in a particular urban area as a general basis for refusing to insure (or to continue to insure) or for varying

---

1. At the federal level two principal pieces of legislation which have been passed to make banks and savings and loans more sensitive to the credit needs of urban communities are the Home Mortgage Disclosure Act of 1975 and the Community Reinvestment Act of 1977. Several states have also enacted legislation, and North Dakota chartered a state-owned bank to serve those credit needs not being met by conventional institutions (Shearer, 1976).

the terms under which insurance is available, has become a major political controversy in the late 1970's.

The arguments in the insurance redlining debate generally utilize one of two broader perspectives on urban development. The insurance industry adopts an individualistic/natural evolutionary approach when it asserts that underwriting practices are based on the economic loss potential of individual risks, and that its activities merely *reflect* ongoing societal changes. Industry critics take a structural/disinvestment position when they charge insurers with refusing to make their products and services available in urban neighborhoods while readily serving suburban markets.

While the public controversy has raged, there has been virtually no empirical research directed to resolving the underlying issues. In this study we first consider the critical importance of property insurance in U.S. urban areas. Then we contrast the perspectives of the insurance industry and its critics in the "redlining" debate in more detail. Next we analyze actual underwriting activity using the current case of Chicago. Because of recent Illinois disclosure requirements, the issue of whether or not underwriting activities reflect loss-related factors or are unfairly discriminatory can be examined empirically for the first time. Finally, we discuss some policy implications for urban residents, and brief theoretical implications for sociology.

### INSURANCE AVAILABILITY AND UNEVEN DEVELOPMENT

For decades U.S. central city residents, particularly in minority areas, have often been unable to obtain property insurance at affordable rates (Kain and Quigley, 1975; Federal Insurance Administration, 1978; President's National Advisory Panel on Insurance in Riot Affected Areas, 1968). But property insurance is often seen as essential, and vitally linked to the rise and fall of housing conditions and community development. As the President's Advisory Panel on Insurance concluded:

> Insurance is essential to revitalize our cities. It is a cornerstone of credit. Without insurance, banks and other financial institutions will not—and cannot make loans. New housing cannot be constructed, and existing housing cannot be repaired. New businesses cannot expand, or even survive.
> Without insurance, buildings are left to deteriorate; services, goods, and jobs diminish. Efforts to rebuild our nation's inner cities cannot move forward. Comunities without insurance are communities without hope (1968:1).

The coexistence of insurance unavailability and urban decline was well-documented in that Panel's report, and reaffirmed in the Federal Insurance Administration's study of property insurance ten years later (1978). Nonetheless, the importance of property insurance in efforts to meet the growing demand for housing, to make that housing available on an equal opportunity basis, and to maintain the vitality of older urban communities has been ignored by most researchers. Some still maintain that "housing is still for the most part a matter of free choice, limited by economic capacity and tastes" (Glazer, 1975:159–9). But it is becoming increasingly evident that a variety of institutional forces, including the insurance industry, are shaping housing and development patterns.

To explain the exclusion of minorities from predominantly white suburbs, for example, it is no longer sufficient (if it ever was) to concentrate on such factors as income differences, the housing preferences of minorities, or white attitudes towards integration (Hermalin and Farley, 1973; Pettigrew, 1973). Most minority homeseekers still encounter racial steering practices when they seek assistance of realtors (Pearce, 1979; U.S. Department of Housing and Urban Development, 1978). Lending institutions frequently reject applications for mortgages and home improvement loans for subjective reasons, i.e., ones having little to do with the credit-worthiness of the risk, to the detriment of urban communities—particularly those with low income and minority residents (U.S. Department of Housing and Urban Development, 1977). At least to some extent the behavior of the real estate and lending industries has been shaped by constraints placed on them by the

insurance industry. Lenders will not extend mortgages or home improvement loans if there is no insurance to secure the loans. Realtors are not anxious to show homes to potential buyers if they suspect that insurance (and, therefore, a mortgage) will not be available. Also, the insurance companies themselves are often major investors, e.g., in apartment or office complexes or shopping centers, not simply sellers of insurance policies. Frequently their *investment* practices discriminate against urban and minority communities, for reasons other than the "strictly economic" ones emphasized in their political activities (Orren, 1974).

Much has been learned about the institutional web of housing discrimination and the uneven development of metropolitan areas, but much less has been discovered about the role of the insurance industry in such discrimination and uneven development. A major reason heretofore has been that researchers have not gained access to crucial evidence. Data recently made available by the Illinois Department of Insurance, however, now enables researchers to begin serious analyses of insurance underwriting practices, at least in one state. To understand fully the significance of the empirical findings pertaining to underwriting practices even in one city, however, it is necessary to consider some aspects of the structure of the insurance industry even more specifically, especially to identify various factors contributing to the unavailability of essential insurance. Risk assessment in the underwriting process represents only one such factor.

### THE PROPERTY CASUALTY INSURANCE INDUSTRY: SOME GENERAL FACTORS AFFECTING INSURANCE UNAVAILABILITY

Like many banks and savings and loan companies, many contemporary insurance companies are very powerful financial institutions. In 1976 the insurance industry generated approximately $130 billion in premiums and administered approximately $434 billion in assets (Insurance Information Institute, 1977:3, 11). Just in property casualty insurance, over 2,800 companies collected almost $60 billion in premiums in 1976 and earned approximately $1.3 billion (aftertax) profits from their underwriting and from their investment activities combined (National Association of Insurance Commissioners, 1977; INA Corporation, 1976:5).

In 1914 the U.S. Supreme Court ruled that because insurance companies are uniquely important as depositories of vast sums of money and as vehicles of risk distribution protecting a large part of the nation's wealth, public interest required public control of the industry (*German Alliance Insurance Co. v. Kansas*, 233 U.S. 389, 1914). Regulation was, however, placed at the state level,[2] and this process itself deserves more critical study because in many communities in the United States today residents are still unable to purchase adequate insurance at affordable rates.

Certainly the availability and affordability of property insurance are affected by a number of factors, some obvious. Some risks are simply too great to be insured at any cost. Also, as construction costs rise, so do insurance premiums. Inadequate enforcement of building codes and insufficient police protection also add to compensable losses, and, therefore, to cost of insurance. But other factors limiting the amount of insurance available are frequently overlooked or simply not understood.

*Meeting Financial Surplus Requirements*

Insurance companies are required to meet specified surplus requirements, i.e., to maintain assets over and above loss reserves and keep them available to meet potential liability obligations. Such requirements operate like bank reserve requirements, restricting the amount of insurance the companies can write. When profits from underwriting or investment activities decline, as was

---

2. In 1945 Congress passed the McCarran-Ferguson Act which exempts the insurance industry from federal antitrust statutes "to the extent that such business is regulated by State law" (15 U.S.C. §012 (1976)).

the case in the early 1970's, companies must restrict their underwriting so that they are not, in effect, financially overextended (Alliance of American Insurers, 1977).

### Mergers and Moving Capital "Upstream"

Another limiting factor on the amount of insurance available is merger activity in which an insurance company's surplus is utilized to meet other financial obligations of a parent corporation. For example, when National General acquired the Great American Insurance Company in 1969, it paid a $174 million dividend from Great American's surplus. Similarly, soon after Insurance Company of North America formed its own holding company, INA Corporation used $175 million in surplus to acquire a bank, three manufacturers of fire prevention equipment, an interest in a nursing home development, real estate and other assets. As Stevenson has shown, between 1969 and 1973 two and a quarter billion dollars moved upstream from insurance companies to their parent organizations. The overall condition of the stock market, the investment whims of a handful of major capital accumulators, and other highly complex factors having little or nothing to do with the insurability of risks or the demand for insurance all actually restrict the availability of essential property insurance (Stevenson, 1977a:166–174; 1977b:166).

### CONTRASTING PERSPECTIVES IN THE REDLINING CONTROVERSY

The main focus of the redlining debate, however, and the one of most interest in our eventual analysis of recent Chicago data has been on the underwriting process itself and its effects on insurance availability, at least in certain markets. The underwriting process is the procedure through which an insurer decides if an applicant (or a class of applicants) is eligible for insurance, and if so, under what terms. The effects of such decisions are most evident in the marketing practices of insurers. Studies conducted by community organizations and state and federal officials have identified a variety of industry marketing practices which directly and indirectly restrict insurance availability within older neighborhoods in Chicago, Detroit, New York, New Haven, Cleveland, Philadelphia, Boston, Buffalo, Seattle, Milwaukee, St. Louis, Hartford and other cities. Such practices include: selectively placing agents' offices and "territories," and selectively refusing to insure property (or varying the availability of insurance) on the basis of age of a building, or the fact that the applicant has been rejected by another insurer, or had previously been insured through a FAIR Plan. [The FAIR—Fair Access to Insurance Requirements—Plan was established by Congress in 1968 as an "insurer of last resort" for those risks unable to obtain property insurance from a private insurance company (Federal Insurance Administration, 1974: 25; U.S. Commission on Civil Rights, 1979: Chapter III).] They also include: requiring inspections in certain communities but not in others, varying the price of insurance by area in such a way as to make coverage unaffordable, terminating agents and not renewing policies placed by those agents, and simply refusing to insure within designated geographic locations.

Because it is the marketing activities of insurers that are the most visible and most directly touch consumers, it is not surprising that they are at the center of the public controversy over insurance unavailability and redlining. The industry and its critics alike acknowledge the legitimacy of charging some people more than others for insurance and agree that geographic location is a key factor in current underwriting activities. They differ considerably, however, in their understanding of how underwriting decisions are currently made and in their interpretations of the public policy implications of those decisions for urban communities.

### The Industry Viewpoint

Industry representatives don't all agree about what redlining means, how extensive it is, and what the industry's responsibilities are; but they do have a consensus on certain key concepts. First, it is recognized that insurance is a mechanism for sharing risks (Jones, 1977:3; State Farm

Companies, 1977:19); in essence, everybody pays a little so nobody is forced to pay much. However, not everybody pays the same. Individuals are expected to pay premiums commensurate with the level of risk each represents. While impossible to predict losses for an individual, it is possible to estimate general losses certain types of individuals will suffer. Risk classifications are developed to determine which types are insurable and which are not, and to determine the premium to be charged those who are insurable risks. Insurers assert that by developing risk classifications large enough to be credible yet small enough to be homogeneous, companies do discriminate among various types of risks but only so that individuals pay their fair share of anticipated losses (Casey *et al.*, 1976; McGuffey *et al.*, 1978; Rogers and Brunner, 1977).

In emphasizing the difference between fair and unfair discrimination, industry people argue that fair discrimination (e.g., varying insurance premiums according to the objectively determined differentials in risk exposure represented by the various classes of risks) is a sound business practice. At present, to develop rating classifications on any basis other than objectively determined loss exposure constitutes unfair discrimination and violates basic insurance principles, and many state laws (Pugh, 1975:3, 4; Alliance of American Insurers, 1978:19). So, they argue, a decision, e.g., not to write insurance in a particular region of a city or a decision to charge a higher rate in that region, may be unfair from some *social policy* standpoint. But it would be fair in an insurance sense because "territorial rating is supported by a body of credible statistical data and is an equitable and sound principle for predicting future losses" (American Insurance Association, 1978:3).

Industry representatives acknowledge that, in order to be credible, risk classifications must be based on objective data. They assert that it is evidence on actual loss experience and similar empirical data that is used for determining risk classifications. As two officers of the National Association of Independent Insurers recently stated:

> . . . the insurance industry refrains from moral pronouncements about its customers. We measure risk as accurately as we can, applying experience and objective criteria refined for more than two centuries (Faulstich and Hall, 1978:7).

Industry representatives do acknowledge that there is an insurance availability problem in older, urban communities and that racial minorities are more severely affected than the majority population (National Association of Insurance Commissioner 1978:4). But they stress that the industry is in business to make a profit and that decisions to write a policy or to charge a given price are based on sound actuarial principles and objectively determined loss experience. To make more insurance available to communities that critics see as underserved would require the industry to write relatively unprofitable policies and thus increase premiums generally—forcing "good risks" to subsidize "bad risks." Such subsidization would involve the industry in the development of social policy, an activity industry claims is not its responsibility. If "society" deems that actuarially unsound risks should be written, then it—through its government—should subsidize those risks, rather than having private industry do so (State Farm Insurance Companies, 1977:26; Casey *et al.*, 1976:4).

A crucial point of ideological consensus within the industry is that insurance services can be most effectively provided to the public by private industry in a competitive market. Publicly operated programs are deemed less efficient and governmental regulations in general are seen as encroachments on the market, which do little more than raise the price of the product for the consumer (American Mutual Insurance Alliance, 1976). Adequate rates, therefore, are the real key to making more insurance available. Unless insurance providers can earn adequate profits, insurance consumers will suffer. In general, the industry's representatives argue, "profit is the necessary cornerstone upon which social responsibility can be built" (Advisory Committee to the NAIC Redlining Task Force, 1978:5); and they frequently emphasize that the industry did experi-

SQUIRES, DeWOLFE AND DeWOLFE

ence underwriting losses from 1974 through 1976 (Business Week, 1978:66–67). They also tend to assume that if consumers understood the nature of the insurance business better, particularly the underwriting function, then they would realize that what they misinterpret and criticize as redlining is simply sound business practice in their own interest. In other words, insurers maintain that the charge of redlining is basically a misperception on the part of uninformed citizens.

### The Industry's Critics

Some observers have raised serious challenges to industry claims that its policies are based on objective evidence, statistical credibility and social neutrality. One criticism is that as companies compete by identifying the smaller subgroups of the population representing better risks (and shunning other risks), they actually create rating classifications too small to be statistically credible. Such practices, most common in automobile insurance, also obviously vitiate the concept of risk spreading (Federal Insurance Administration, 1974:54; Stone, 1978:2). So some critics label what the industry tries to represent as underwriting *rules* as "myths" or as "perceptions" based on "gut feelings" rather than objective, empirical data (Jones, 1977:10; Valukas, 1977:16, 22). An example is the following statement from the underwriting manual of one insurance company:

> There is also the type who has never lived anywhere but in a rural area. He commutes to an industrial plant, does odd jobs, lives on relief or lets his wife make the living. You can usually spot his place. Sometimes in the summer he can be seen sitting on his front porch without his shirt. He is not a good risk (Levin, 1978:8, 9).

The practice of establishing general rates for particular geographic regions within cities has come under special attack. It is argued that an agent or company may draw vague conclusions about a particular neighborhood, community or other region, and then refuse to provide any service there regardless of the actual risk exposure represented by individual risks (Yaspan, 1970:219, 252). As a Michigan Insurance Commissioner stated, "no amount of home repair or improvement will make the resident of a redlined neighborhood eligible for homeowners insurance" (Jones, 1977:5–6). One investigator concluded that agents frequently acknowledge there is no statistical basis on which communities are labeled as good or bad, but still utilize territorial classifications in their sales activities (Valukas, 1977:16, 22). One clear negative consequence of using territorial classifications (and such criteria as an applicant's age, sex or occupation—utilized by the industry but ordinarily beyond the control of the individual) is that such a practice provides no incentives for customers to try to reduce losses. Instead of being an economical mechanism for encouraging responsible behavior, then, the critics maintain that such insurance becomes an expensive "cost-plus" way of "servicing" a continually increasing claims load—to the detriment primarily of inner city residents, who are either priced out of the market or can't find insurance for sale at any price (Stone, 1978:5).

Further emphasizing what they see as subjective, arbitrary practices common in the insurance industry, critics argue that the industry is in fact deeply involved in matters of public policy and is involved in such a way as to discriminate unfairly, from both actuarial and social policy viewpoints, against residents of older urban communities. One result is the further deterioration of central cities (Stone, 1977:153, 154; Stone, 1978:5; Etgar, 1977:19, 20).

In response to the industry's concern for adequate rates and the fact that underwriting activities recently lost money for three straight years, critics note that the industry still earned a profit —from its investment activities—and that rates should be based on total earnings, not just those from underwriting activities (Sharp, 1975). For example, in 1976 the property casualty insurance industry lost $780 million in its underwriting activities but earned $2.8 billion from investments, while paying out only 66 cents in losses for each premium dollar earned. The underwriting losses reported included approximately 20 cents in commissions and 15 cents in other administrative ex-

penses for each dollar earned (National Association of Insurance Commissioners, 1977). The critics conclude, then, that redlining by insurance companies is a real phenomenon, rather than a subjective misperception by misinformed consumers.

In summary: the industry contends that its underwriting activities are based on objectively determined loss related characteristics of individual risks. In the process, insurers claim, they are forced to respond to uneven societal conditions which already exist, and what their critics perceive as unfair discrimination is simply a response to market conditions: as losses increase in certain areas insurance premiums must rise commensurately. Better communication with consumers, therefore, should defuse much of the redlining controversy. The critics contend, however, that those in the industry actually rely on very subjective perceptions of group (e.g., neighborhood) characteristics, and that their underwriting decisions make them shapers of—not just reactors to—societal conditions. Solutions to the controversy, therefore, will require changes in institutional practices, not better public relations.

• • • • •

Several studies and public hearings have documented instances where individuals have in fact been subjected to arbitrary and unfair treatment by the insurance industry (Valukas, 1977; Levin, 1976). Others have demonstrated that there is a relationship between the age of housing and insurance underwriting practices as well as between the racial composition of a community and insurance underwriting practices (Federal Insurance Administration, 1978). As indicated above, the industry acknowledges such relationships but maintains they evidence higher losses in areas containing older homes and minority populations rather than redlining or unfair discrimination. No previous study has attempted to determine whether or not these relationships hold after the effects of loss experience have been removed from the correlations. That is our objective in the following section.

### THE MARKETING OF INSURANCE IN CHICAGO: UNDERWRITING OR REDLINING?

There have been scores of demonstrations and protests by various community organizations in Chicago about insurance redlining,[3] and the State of Illinois has been quite active in passing relevant legislation.[4] Also, Chicago is the only U.S. major city currently considering a redlining ordi-

---

3. The following newspaper articles provide an indication of the kinds of activities that have taken place over the past two years:

   "Redlining Charges Confusing," *Chicago Defender*, May 17, 1978.

   "Charge Insurance Brokers in Redlined Area Snubbed," *Chicago Sun Times*, July 19, 1978.

   "Insurance Firm Accused of Redlining by Zip Code," *Chicago Tribune*, October 6, 1978.

   "State Farm Accused of Redlining Coverage," *Chicago Tribune*, August 10, 1978.

   "Allstate to Drop 'Zone' Practice," *Chicago Sun-Times*, June 17, 1978.

   "Ald. Simpson Urges Job Ban on Biased Insurance Firms," *Chicago Sun-Times*, December 8, 1977.

It is interesting to note that while minority communities in general suffer more than white neighborhoods as a result of insurance redlining, lower and middle income white neighborhoods in older areas of cities have also been victimized. In fact, it is the predominantly white community organizations which have been primarily responsible for making the insurance redlining issue one of public controversy.

4. In Illinois, insurers are prohibited from refusing to provide homeowners insurance solely on the basis of geographic location; from cancelling or refusing to write or renew automobile, homeowners or renters insurance because no agent or broker is located in geographic proximity to the risk; from cancelling, terminating or refusing to renew a policy because the company's contract with the agent who placed the policy was cancelled; and from cancelling or refusing to write or renew a policy because a person had previously been denied coverage by another insurer. When an application for a fire and extended coverage

85

86                              SQUIRES, DeWOLFE AND DeWOLFE

nance prohibiting the city itself from purchasing insurance from companies found to have vio-
lated state redlining laws. All parties to the extensive debates agree that insurance availability
does vary from neighborhood to neighborhood in Chicago, but they disagree on why.

*Method*

In order to try to answer that question, the following data were obtained and correlated for
each of the 47 predominantly residential postal Zip Code regions within Chicago: the number of
homeowners policies and FAIR Plan policies written, renewed, cancelled, and nonrenewed for
selected months in 1977 and 1978 (provided by the Illinois Department of Insurance, covering ap-
proximately 70 percent of all homeowners insurance activity in Chicago and all the FAIR Plan ac-
tivity for this time period); the number of crimes (provided by the Chicago Police Department);
and the number of fires (from the Chicago Fire Department). For the same Zip Code regions, we
obtained data for: median income, total population, minority composition of population,
number of housing units and age of housing (from the U.S. Bureau of the Census). Data on ac-
tual loss experience in each Zip Code region by the many property casualty insurers in Chicago is
unavailable to the public. But according to the Insurance Services Office (a principal statistical
and rating service serving over 40 percent of the property casualty insurers writing in Chicago),
approximately 74 percent of the dollars paid out by insurance companies to homeowners'
policyholders in that city are accounted for by losses due to fire and theft (Banfield, 1978a).[1] It
would be reasonable to expect, therefore, that differences in underwriting activity from one
Chicago community to the next would reflect the underlying disparities in fire and theft rates. If
we were to find relationships between the minority composition of a Zip Code region, the age of
its housing, or its median income level and insurance companies underwriting activities *indepen-
dent of their loss experience*, this would indicate the presence of unfairly discriminatory insurance
marketing practices. If we were also to find any such relationships independent of *fire* and *theft
rates*, this too would imply that redlining is a reality.

The two variables to be "explained" in our approach are voluntary market activity (indicated
by the distribution of homeowners policies) and involuntary market activity (indicated by the dis-
tribution of FAIR Plan policies.) Because the FAIR Plan is basically an "insurer of last resort"
the distribution of such policies is an indication of availability in the voluntary insurance market.
In addition, given the fact that many individuals are unable to obtain voluntary market policies
once they have been covered by the FAIR Plan, the distribution of FAIR Plan policies is also a
rough indication of historical marketing practices on the part of the insurance industry.

Several caveats must be kept in mind in interpreting the results we will present below. First, it

policy is denied or a policy is cancelled or nonrenewed, the person can obtain the complete file the company
has regarding the application or policy. In addition Illinois is the only state that requires insurers to disclose
by Zip Code (within major metropolitan areas) the number of homeowners policies written, renewed,
cancelled and nonrenewed. Such disclosure is required quarterly (U.S. Commission on Civil Rights, 1979;
Chapters III and V).

5. The crime and fire data are for 1975. Since most companies develop their rates on data which are collected
over a five-year time span and are generally two to seven years old (Banfield, 1978b), the fact that the crime
and fire data used in this study are three years older than the insurance data is a strength rather than a
weakness. Ideally, data would have been obtained over a five year span but such information was
unavailable. The census data are taken from the 1970 Census of Housing and Population, Fifth Count,
Selected Social and Economic Characteristics of Metropolitan Chicago Zip Code Areas. Only residential Zip
Codes, defined for this study as those having a population of 10,000 or more, were included in this analysis.
To avoid biases that might result from the different sizes of the Zip Codes the insurance and fire variables are
operationalized as ratios of housing units while theft is treated as a ratio of total population. Minority
composition is simply the percent minority. Age of housing refers to the percentage of housing units built
prior to 1940. Income is the median family income. For a more detailed explanation of the data and
methodology see U.S. Commission on Civil Rights, 1979, Chapter IV.

should be acknowledged that the only companies for which data were obtained were ones that are still writing at least some insurance in the city of Chicago: such companies are frequently criticized while those which stopped writing any insurance in the city go unscathed. Second, our analysis does not examine such subtle, but important, forms of redlining as variations in the costs, the coverage, or the terms under which insurance is available. Charging a prohibitive price, requiring full payment at the beginning of a year rather than quarterly or monthly, varying the deductibles available, and limiting the types of protection that are offered, are all examples of marketing techniques used differentially by geographic area—usually to the detriment of older urban communities. Finally, it is recognized that not every company has explicit Zip Code rating territories.

The basic issue, however, is alleged unfair discrimination against specific geographic areas within major metropolitan areas in both direct and indirect insurance company practices. In order to address this issue, variations in industry marketing practices by neighborhood must be examined. The only insurance underwriting data available on a basis that even approximates neighborhoods are the Zip Code data which the Illinois Department of Insurance began collecting in 1977. At the time this analysis was conducted (summer 1978), Illinois was the only state which had enacted a disclosure law requiring companies to report their underwriting activity on any geographic basis approximating neighborhoods. Under Illinois law all insurers writing homeowners insurance must report—by Zip Code, and quarterly—the number of policies they have written, renewed, cancelled and nonrenewed. (Wisconsin, Missouri and Minnesota have since enacted similar legislation and several other states are considering such action.) With the Illinois data it is possible for the first time to begin answering the key issues that have been raised in the insurance redlining debate.

### Results

Insurance underwriting activity does vary markedly among Zip Code regions within the city of Chicago. For example, the number of homeowners policies written or renewed ranged from 170 (0.6 per 100 housing units) in a predominantly black Zip Code region on the southwest side to 3,713 (10.3 per 100 housing units) in a predominantly white Zip Code region on the northwest side. The correlation matrix in Table 1 indicates that minority composition is the variable which correlates most highly with both the voluntary market activity ($r = -.78$, so as the minority composition of a Zip Code region increases, the voluntary insurance market activity decreases) and with the involuntary market activity ($r = +.72$, so as the minority composition increases, the involuntary market activity increases). Both correlations are significant at the .001 level.[6] The other variables also correlate significantly with current marketing activity, except for theft and involuntary market activity, but none are as strongly associated with industry practices as is minority composition.

Even more revealing, however, are the relationships that exist once the relationships fire and theft rates have with regions' minority composition, age of housing, and income, have been re-

---

6. There is still debate over the meaning of tests of statistical significance when the data base is not a selected sample from an explicitly defined universe. When the total universe is included, of course, statistical significance becomes irrelevant. The data on which this study is based falls somewhere in between a total universe and a typically small representative sample. As indicated in the text, the companies included in this analysis accounted for 70 percent of the homeowners policies written in the city of Chicago over a specified time period. An interpretation of this data base as constituting the total universe would preclude attaching any meaning to the significance levels reported or the fact that a given relationship is, or is not, statistically significant. However, an interpretation of this data base as a sample of a larger universe would view the reports of statistical significance as rough measures of the reliability of the relationships and the likelihood that they were chance occurences. To acknowledge such possible differences of interpretation, we include the results of the significance tests which were calculated, as well as the correlation coefficients.

88              SQUIRES, DeWOLFE AND DeWOLFE

TABLE 1

*Correlation Matrix of Insurance Underwriting and Selected Demographic Variables*

|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| 1. Voluntary Market Activity (new and renewed homeowners policies minus cancellations and non-renewals per 100 housing units) |  | $-.75$ ($p < .001$) | $-.69$ ($p < .001$) | $-.31$ ($p < .05$) | $-.78$ ($p < .001$) | $-.81$ ($p < .001$) | .75 ($p < .001$) |
| 2. Involuntary Market Activity (new and renewed FAIR Plan policies per 100 housing units) |  |  | .70 ($p < .001$) | .15 (NS) | .72 ($p < .001$) | .48 ($p < .001$) | $-.66$ ($p < .001$) |
| 3. Fire (fires per 100 housing units) |  |  |  | .56 ($p < .001$) | .60 ($p < .001$) | .41 ($p < .01$) | $-.61$ ($p < .001$) |
| 4. Theft (thefts per 1,000 population) |  |  |  |  | .26 (NS) | .32 ($p < .05$) | $-.17$ (NS) |
| 5. Minority Composition (percent minority in population) |  |  |  |  |  | .26 (NS) | $-.70$ ($p < .001$) |
| 6. Age of Housing (percent of residential units built before 1940 |  |  |  |  |  |  | $-.53$ ($p < .001$) |
| 7. Income (median family income) |  |  |  |  |  |  |  |

moved.[7] The correlation between minority composition and voluntary market activity remains statistically significant ($r = -.36$, $p < .05$) as does the correlation between minority composition and involuntary market activity ($r = .41$, $p < .05$). Similarly, the relationship between age of housing and voluntary market activity is significant ($r = -.46$ $p < .05$) as is the relationship between age of housing and involuntary market activity ($r = .31 < .05$). Income is significantly associated with voluntary market activity ($r = .44$ $p < .05$) but the relationship between income and involuntary market activity ($r = -.18$) is not statistically significant.

---

7. Part correlations were calculated to measure the relationship between a predictor or independent variable (e.g., minority composition) and a criterion or dependent variable (e.g., voluntary market activity) after removing that part of the predictor variable associated with another predictor variable (e.g., fire).

Both first order part correlations (which remove the effects of one predictor variable) and second order part correlations (which remove the effects of two predictor variables) were calculated.

The formula used to calculate first order part correlations between a predictor variable (e.g., minority composition) and a criterion variable (e.g., voluntary market activity) after removing that part of another predictor variable (e.g., fire) which is associated with the first predictor variable (minority composition) is:

$$r_{1,2\cdot3} = \frac{r_{1,2} - (r_{1,3})(r_{2,3})}{\sqrt{1 - (r_{2,3})^2}}$$

Where variable 1 = minority composition; variable 2 = voluntary market activity; and variable 3 = fire.

The formula used to calculate second order part correlations in which the effects of two predictor variables (e.g., fire and theft) are removed is:

$$r_{1,2\cdot3,4} = \frac{r_{1,2\cdot4} - (r_{1,3\cdot4})(r_{2,3\cdot4})}{\sqrt{1 - (r_{2,3\cdot4})^2}}$$

Where variable 1 = minority composition; variable 2 = voluntary market activity; variable 3 = fire; and variable 4 = theft.

Due to the high intercorrelation among these variables, multiple regression analysis did not answer the key question under examination, that being whether minority status, income, or age of housing, independent of

Given the relationship between minority composition and income (r = −.70 p < .001), a question arises as to whether or not the relationship between minority composition and current marketing activity simply reflects the lower economic status of minorities rather than minority status *per se*. But the correlation between minority composition and voluntary market activity remains significant (r = −.39 p < .05) even after the relationship between minority composition and income is taken into account. Similarly, the relationship between income and voluntary market activity, controlling for minority composition, remains significant (r = .33 p < .05); that is, both income and minority composition are related to current voluntary market activity, independent of each other. That is not the case, however, with involuntary market activity. While minority composition is significantly related to involuntary market activity (r = .34 p < .05) controlling for income, income is not significantly related to involuntary market activity (r = −.22) after the relationship between income and minority composition is removed. In other words, the concentration of FAIR Plan policies in minority communities (and therefore historical voluntary marketing practices) cannot be accounted for by their association either with fire or theft rates or with the income levels of those communities.

In the city of Chicago, then, the variation from community to community in current insurance underwriting practices *is* related to the minority composition, age of housing units, and family income of residents in those (Zip Code region) communities. These relationships are statistically significant and they hold even when that portion of these variables associated with fire and theft rates is removed. While the relationship between minority composition and current voluntary market activity is accounted for in part by the lower economic status of minorities, that is not the case with current involuntary market activity. The current concentration of FAIR Plan policies in minority areas reflects historical constriction of the voluntary market in these areas. These patterns cannot be explained by their association with rates of fire, theft, or with income levels. In Chicago, the disparate impact of industry practices on older, poorer, and minority communities, exists independent of the two major causes of loss—fire and theft.

These findings confirm technically what many urban dwellers have personally experienced. Property insurance is more difficult to obtain in older urban communities, particularly those with a high concentration of minority or lower income residents: insurance redlining is an objective reality in the city of Chicago. Undoubtedly there are problems of perception and communication, as the industry generally contends. But there is also an objective problem of unfair discrimination which the industry generally does not recognize. The historical systematic, institutional denial of vital insurance services has contributed to the deterioration of many neighborhoods, and threatens to continue doing so if appropriate action is not taken.

*Policy Implications*

A number of steps have already been taken in attempts to alleviate insurance availability problems. Several states including Missouri, Maryland, Michigan, Minnesota and Illinois have enacted antiredlining legislation. Many others, including Washington, Indiana and Ohio are currently considering such action. Several federal agencies have launched investigations into insurance industry practices, congressional hearings have been held in these matters, and legislation has been introduced to curtail abusive practices (Hearings Before the Subcommittee on Citizens and Shareholders Rights and Remedies of the Committee of the Judiciary, 1978: U.S. Commission on Civil Rights, 1979). The industry has not stood idly by. Most public statements by industry representatives defend current policies and practices, but many voluntary efforts have been

---

the loss related factors, accounted for any of the variance in underwriting activity, or whether the implications of these factors could be accounted for in terms of the disparate fire and theft rates. In the regression equations, the first variable, no matter which one was selected, accounted for most of the variance, with little left to be accounted for by the remaining variables.

SQUIRES, DeWOLFE AND DeWOLFE

started to improve communication with consumers and to satisfy individual consumer complaints brought to their attention (Advisory Committee to the NAIC Redlining Task Force, 1978).

In most states experiencing insurance availability and redlining problems, additional legislation would be productive. To eliminate some of the more odious practices, states should adopt amendments to their unfair trade practices acts which would prohibit insurers from: using geographic area as a basis for refusing to insure or for varying the terms under which insurance is offered; using age of the property as a basis for varying the availability of insurance; asking applicants if they were ever denied coverage by another insurer or been insured through a FAIR Plan (or varying insurance availability on these grounds); and refusing to enter into a contractual relationship with an insurance agent because of the geographic location of the agent or the agent's customers. Other amendments that would also have a favorable impact would be ones requiring insurers to: provide explicit reasons for decisions to decline an application or to cancel or to not renew a policy, and information on what the applicant or insured must do to become insurable; continue to service the policies placed by an agent with a company for at least one year after it terminates any agency's contract with it; and provide all applicants and insureds with copies of any information the company has received regarding that individual (including the source of the information and the names of those with whom the information has been shared), and an opportunity for the individual to correct any inaccurate information.

One barrier to resolving insurance availability and redlining problems is the assumption that there must be a trade-off between the profit interests of the industry and the insurance needs of consumers. This is an assumption shared by industry and most critics alike. Few consumers question the right of the industry to make a reasonable profit, and most community organizations which have been fighting the insurance redlining battle explicitly acknowledge that any solution must provide for adequate industry profits (Paul and Baker, 1977: 98–99; Public Technology Inc., 1977: 4). More innovative solutions can become apparent if the issue is posed as one of the developing alternative ways for a group of people to pool their money, to spread the financial burdens of their losses and to provide more adequate protection and peace of mind, rather than as one of striking some appropriate balance between the competing profit interests of the industry and the insurance needs of communities and the society.

One possibility is the concept of a municipal insurance program developed by the Institute for Local Self Government (1977) in Berkeley. Under a municipal insurance program, fire prevention, suppression and insurance activities would all be carried out as part of one integrated system. Presently fire prevention and suppression are generally carried out by local municipalities while insurance is provided by private industry, whose major interest is not loss reduction but assuring that premium dollars exceed losses and other expenses. When all three functions are combined within one system, insurance costs can be directly reduced through fire reduction activities, thus increasing the incentive for individuals to take greater precautions. Further loss reductions would be achieved by savings in funds now going to stockholders as dividends or to agents as commissions, which could be used instead for a variety of fire reduction activities. Money that normally is accounted for as company profits would be used, for example, to purchase fire alarms for apartments, to increase inspections of homes, or for other purposes deemed appropriate by the municipality. Such actions would reduce fire losses and, eventually, fire insurance costs. Funds collected above and beyond those necessary to pay claims could be used to reduce insurance premiums or perhaps to cover all fire suppression activities, thus eliminating a major line item from the general fund.

Various kinds of public insurance programs have already been successfully operated in the United States and Europe (Institute for Local Self Government, 1977:25; Pfennigstorf, 1977: 285–290, 306; Bernard, 1976). With a grant from the Commerce Department, the Institute for Local Self Government is currently developing detailed guidelines for implementing a municipal

003690

insurance program, with the intention of establishing a demonstration project in at least one of ten cities which have expressed an interest in the concept.

Nonprofit, community based insurance services, outside the jurisdiction of any municipality, are also being considered in some cities. Following the lead of some private corporations and government agencies which have found it more efficient to self-insure or establish their own nonprofit insurance company than to pay increasingly escalating insurance premiums (if insurance is available at all), a few community leaders are seeking alternatives to the private insurance industry for property insurance. Again, the basic difference between these proposals and the programs of a traditional insurance company is that surplus revenues would be reinvested back into the community in part for specific safety and loss reduction activities rather than paid out to sales agents and stockholders (Burack *et al.*, 1979).

•   •   •   •   •

These findings demonstrate that insurance redlining is a very real problem and one with critical implications for central city communities, particularly for minority residents in those areas. The problem will not go away simply by better educating and communicating with consumers. Progressive action can and should be taken by public officials at all levels of government, by the insurers themselves, and by community organizations. There is a need for new legislation, more effective enforcement of the law, and for creative alteratives to traditional industry practices.

### RESEARCH IMPLICATIONS

The insurance industry is not a passive or neutral force in society. In both its underwriting and investment capacities and activities, it exercises considerable influence on the development (or deterioration) of communities. By making essential insurance more difficult to obtain in central city neighborhoods, particularly minority neighborhoods, the industry creates barriers to equal housing and business opportunities for the nonwhite population. When a company uses its considerable financial resources to invest, for example, in a suburban shopping mall as opposed to a central city housing development, that decision certainly has considerable ramifications for the growth and decline of neighborhoods within that metropolitan area—not just influence on the profit margin of that particular company. Whether the net effect of insurance industry practices is positive or negative may be a debatable issue; but the industry does shape societal conditions, not just respond to them.

We strongly suspect that as the role of the insurance industry becomes better understood, particularly in its relationships with other institutional forces such as the lending and real estate industries, the structural/disinvestment perspective will be seen as offering a much more comprehensive and accurate way of understanding the uneven urban development than will the individualistic/natural evolutionary models. The accumulation of social science research is chipping away at the latter approach, and the foremost reason is that it is more and more evident that the uneven development of metropolitan areas is clearly a social phenomenon (Willhelm's work here, e.g., 1962, deserves much more attention than it has usually received from urban sociologists).

The idea that the quite evidently uneven development of urban areas is the result of the formation of natural communities or of inevitable market transitions denies the reality of social processes. Buildings do not naturally deteriorate simply because of age, and there is obviously no natural reason why buildings of a given age deteriorate more rapidly in one neighborhood than another. There are many well-maintained (and extremely expensive) homes in suburban Winnetka as old, or older, than many which have crumbled in Chicago's west side, yet present and future residents of Winnetka will have little difficulty obtaining mortgage or home