improvement loans. More importantly, there are older homes in the city which are in excellent shape today but may well not be in the near future if the owners and potential buyers continue having difficulty obtaining credit simply because of the neighborhood in which they are located. Some may argue, in response to the charge of redlining, that individuals can move if they do not like their neighborhood. But, minorities, of course, still do not have full freedom of choice in the housing market, and—more generally—even the movement of some disgruntled urban dwellers will not change the overall patterns of development. There is little that random individuals can do to alter what is at base a social phenomenon.

We believe that future research on questions of uneven development, equal opportunity, and related issues will have both the most theoretical significance and the most effective public policy implications if it is based on a structural disinvestment model. Much remains to be learned about the internal structure and dynamics of such powerful institutions as insurance companies, banks (see Ratcliff, 1979), savings and loan companies, and real estate companies and real estate firms. Each of these sectors, separately and in its relations with each other and with public officials at all levels, exercises a profound influence on the development (or underdevelopment) of metropolitan areas. The life chances of urban dwellers, particularly the opportunities available to racial minorities, are to a great extent a function of decisions made (or avoided) and actions taken (or not taken) by such powerful segments of the United States social system. Our analysis here was limited to one city. If comparable data are made available outside of Illinois, as seems likely, replications of this study in other cities would be highly desirable.

This study was also limited to the issue of the general availability of property insurance. We did not examine locational variations in the types of insurance policies that are available, their price, their terms of payment, or other aspects of insurance costs and services. If data on actual loss experience could be included, as well as fire and theft data, future research would be even more conclusive. State departments of insurance are one logical place for the conduct of some of the research needed, but budget and staff limitations can often restrict their activities. Most cities, however, have many individuals and organizations that would gladly conduct such research if the appropriate data were provided by public agencies with the authority to collect the necessary information. The Federal Insurance Administration and the National Association of Insurance Commissioners have indicated an interest in conducting further research on insurance redlining and they represent possible sources of funding and data for researchers interested in pursuing this issue.

Another virtually untouched realm of research is the investment practices of insurance companies. Because of the vast sums controlled by the industry, its investment decisions clearly play a major role in shaping the economic, political and social life of communities. Among other things, investment policies can determine whether or not an area will contain good or bad insurance risks. One study of real estate investments in Chicago by life insurance companies revealed prosuburban, antiminority biases that could not be accounted for using economic or profitability criteria (Orren, 1974: 97–144). Such findings suggest that disinvestment practices on the part of the insurance industry are not restricted to the insurance side of the business.

Obviously, many important questions about insurance and urban development remain unanswered, and there is a critical need for researchers outside of the insurance industry to begin answering them. Otherwise, once again the only information public officials will have to use in formulating policy will be that provided by the industry itself.

### SUMMARY AND CONCLUSIONS

Insurance is a regulated industry because of the vital public interest in insurance services. Yet in many communities essential insurance needs go unmet. The constricting effects of surplus requirements and upstreaming practices, the biases which influence investment decisions, and the

redlining practices by agents and companies highlighted in this study clearly constitute strong institutional forces that contribute to the deterioration of many older urban communities and the uneven development of metropolitan areas.

Insurance is a complex business and there are problems of communication and education. But the refusal to make essential insurance services available in certain neighborhoods is an objective problem that will not be resolved with more effective public relations. There is nothing natural about the processes of redlining and deterioration. They cannot be explained in terms of cultural or psychological deficiencies or of "impersonal" market forces. When the role of the insurance industry is examined in conjunction with that of lenders, realtors, public officials, and other powerful segments of society, it is evident that what we are witnessing is a conscious process of disinvestment, not a natural process of decline.

The urban situation will not inevitably get better, as some contend (Banfield, 1970). The social reality of uneven development requires a conscious response. That response should include more effective law enforcement, experimentation with innovative insurance and other service delivery systems, and more incisive research that will illuminate current practices and suggest directions for the future.

## REFERENCES

Advisory Committee to the NAIC Redlining Task Force
    1978      Ninety Day Report of the Advisory Committee to the NAIC Redlining Task Force. Report on
              file at NAIC offices, Milwaukee.
Alcaly, Roger E. and David Mermelstein (eds.)
    1977      The Fiscal Crisis of American Cities New York: Vintage Books.
Alliance of American Insurers
    1977      "The insurance industry's 'capital crunch,'" Journal of American Insurance (Fall).
    1978      "Classification and underwriting in the property and casualty insurance business." Statement of
              the Alliance of American Insurers before U.S. Senate Subcommittee on Citizens and
              Shareholders Rights and Remedies.
American Insurance Association
    1978      Statement of American Insurance Association before U.S. Senate Subcommittee on Citizens and
              Shareholders Rights and Remedies.
American Mutual Insurance Alliance (Now Alliance of American Insurers)
    1976      "Could the government do a better job?" Journal of American Insurance (Fall).
Banfield, Carol
    1978a     Personal correspondence to Gregory D. Squires.
    1978b     Telephone interview with Gregory D. Squires.
Banfield, Edward C.
    1970      The Unheavenly City: The Nature and Future of Our Urban Crisis. Boston: Little, Brown &
              Company.
Bernard, Sherman
    1976      The Manitoba Auto Insurance Plan. Washington, D C  Conference on Alternative State and
              Local Public Policies.
Blauner, Robert
    1972      Racial Oppression in America. New York: Harper & Row
Burack, Michael, Gerald M. Keenan and Gregory D. Squires
    1979      "Insurance redlining: A community based response   (Draft proposal.)
*Business Week*
    1978      "Sudden riches for the casualty insurers," (May 1)
Casey, Barbara, Jacques Pezzier and Carl Spetzler
    1976      "The role of risk classifications in property and casualty insurance: A study of the risk assess-
              ment process." Menlo Park: Stanford Research Institute
Dorfman, Ron
    1975      "Greenlining Chicago." Working Papers (Summer)
Etgar, Michael
    1977      Cited in "Automobile rates and social policy," Research Papers Prepared by the Division of In-
              surance on Classification Systems in Automobile Insurance Boston: Massachusetts Division of
              Insurance.

Faulstich, James R. and C. Robert Hall
    1978    Statement Presented Before the Senate Subcommittee on Citizens and Shareholders Rights and Remedies.
Federal Insurance Administration
    1974    Full Insurance Availability. Washington D.C.: U.S. Government Printing Office.
    1978    Insurance Crisis in Urban America. Washington D.C.: U.S. Government Printing Office.
Glazer, Nathan
    1975    Affirmative Discrimination. New York: Basic Books, Inc.
Harvey, David
    1973    Social Justice and the City. Baltimore: Johns Hopkins University Press.
Hearings  Before the Subcommittee on Citizens and Shareholders Rights and Remedies of the Committee on the Judiciary
    1978    Rights and Remedies of Insurance Policyholders. Washington D.C.: U.S. Government Printing Office.
Hermalin, Albert I. and Reynolds Farley
    1973    "The potential for residential integration in cities and suburbs: Implications for the busing controversy." American Sociology Review (October).
INA Corporation
    1976    1976 Annual Report. Philadelphia: Insurance Company of North America.
Institute for Local Self Government
    1977    Alternatives to Traditional Public Safety Delivery Systems: Municipal Fire Insurance. Berkeley: Institute for Local Self Government.
Insurance Information Institute
    1977    Insurance Facts 1977 Edition. New York: Insurance Information Institute.
Jones, Thomas C.
    1977    Essential Insurance in Michigan: An Avoidable Crisis. Lansing: Insurance Bureau, Michigan Department of Commerce.
Kain, John F. and John M. Quigley
    1975    Housing Markets and Racial Discrimination: A Microeconomic Analysis. New York: National Bureau of Economic Research and Harvard University.
Levin, Carl
    1976    Homeowners Insurance in Detroit: A Study of Redlining Pratices and Discriminatory Rates. Study prepared by the office of the Detroit city council president.
    1978    Testimony before U.S. Senate Subcommittee on Citizens and Shareholders Rights and Remedies.
Lewis, Oscar
    1966    "The Culture of Poverty." Scientific American (October).
McGuffey, Harold B., H.P. Hudson and Harold R. Wilde, Jr.
    1978    "Statement on behalf of the National Association of Insurance Commissioners." Statement presented before U.S. Senate Subcommittee on Citizens and Shareholders Rights and Remedies.
Myers, Dowell
    1975    "Housing allowances, submarket relationships and the filtering process." Urban Affairs Quarterly (December).
Naparstek, Arthur J. and Gale Cincotta
    1975    Urban Disinvestment: New Implications for Community Organization, Research, and Public Policy. Washington D.C.: National Center for Urban Ethnic Affairs.
National Association of Insurance Commissioners
    1977    NAIC Report on Profitability by Line and by State for the Year 1976. Milwaukee: National Association of Insurance Commissioners.
    1978    "Statement on behalf of the National Association of Insurance Commissioners on Title II of H.R. 3504." Statement presented before Subcommittee on Civil and Constitutional Rights of the House Judiciary Committee.
Orren, Karen
    1974    Corporate Power and Social Change: The Politics of the Life Insurance Industry. Baltimore: The Johns Hopkins University Press.
Paul, Alice and Ken Baker
    1977    Economic Investment and the Future of Neighborhoods. New York: New York City Commission on Human Rights.
Pearce, Diana
    1979    "Gatekeepers and homeseekers: Institutional factors in racial steering." Social Problems 26 (3):325-342.
Pettigrew, Thomas F.
    1973    "Attitudes on race and housing: A social psychological view." In Amos Hawley and Vincent P.

Rock (eds.), Segregation in Residential Areas. Washington, D.C.: National Academy of Sciences.

Pfennigstorf, Werner
1977    "Governmental risk management in public policy and legislation: Problems and options." American Bar Foundation Research Journal (Spring).

President's National Advisory Panel on Insurance in Riot Affected Areas
1968    Meeting the Insurance Crisis of Our Cities. Washington D.C.: U.S. Government Printing Office.

Public Technology, Inc.
1977    Presentation to the D-2 Subcommittee Task Force on Redlining, National Association of Insurance Commissioners, Madison, Wisconsin.

Pugh, William B.
1975    Testimony presented at Unfair Discrimination Hearing, Pennsylvania Insurance Department.

Ratcliff, Richard E., Mary Elizabeth Gallagher and Kathryn Strother Ratcliff
1979    "The civic involvement of bankers: An analysis of the influence of economic power and social prominence in the command of civic policy positions." Social Problems 26 (3):298–313.

Rogers, Richard D. and Kim Brunner
1977    Redlining: The Illinois Experience. Springfield, Ill.: Illinois Department of Insurance.

Sharp, Dean
1975    "Insurance industry costs consumers billions yearly." Capitol Hill Forum (June).

Shearer, Derek
1976    Public Control of Public Money. Washington, D.C.: Conference on Alternative State and Local Public Policies.

State Farm Insurance Companies
1977    A Report to the People: A Response to the Insurance Bureau's Proposal to Disrupt the Regular Insurance Market in Michigan, Illinois.

Stevenson, Gelvin
1977a   Fire Insurance: Its Nature and Dynamics. Princeton: Fire Research Group, School of Architecture and Planning, Princeton University.
1977b   Testimony Before the House Subcommittee on Housing and Community Development.

Stone, James M.
1977    Opinion Findings and Decision on 1978 Automobile Insurance Rates. Boston: Massachusetts Division of Insurance.
1978    Testimony before U.S. Senate Subcommittee on Citizens and Shareholders Rights and Remedies, Jan. 17.

Suttles, Gerald D.
1972    The Social Construction of Communities. Chicago: University of Chicago Press.

Tabb, William K.
1970    The Political Economy of the Black Ghetto, New York: W.W. Norton.

U.S. Commission on Civil Rights
1979    Insurance Redlining: Fact, Not Fiction. Washington D.C.: U.S. Government Printing Office.

U.S. Department of Housing and Urban Development
1977    Redlining and Disinvestment as a Discriminatory Practice in Residential Mortgage Loans. Washington, D.C.: U.S.G.P.O.
1978    Preliminary Findings of the 1977 Housing Market Practices Survey of Forty Cities. Washington D.C.: U.S.G.P.O.

Valukas, Anton R.
1977    An Investigation of Discrimination in the Sale of Homeowners Insurance in Illinois. Springfield: Illinois Department of Insurance.

Werner, Frances E., William M. Frej and David M. Madway
1976    "Redlining and disinvestment: Causes, consequences, and proposed remedies." Clearinghouse Review (October).

Willhelm, Sidney
1962    Urban Zoning and Land-use Theory. Glencoe, Illinois: The Free Press.

Yaspan, Robert
1970    "Property insurance and the American ghetto: A study in social irresponsibility." Southern California Law Review Vol. 44.

# Community self-insurance

## An answer for the victims of 'redlining'

### Gregory D. Squires

Communities without insurance are communities without hope.

— *Report of the President's National Advisory Panel on Insurance in Riot-Affected Areas (1968)*

The Illinois Department of Insurance made a big splash not long ago when it fined the Insurance Company of Illinois (ICI) and its managing agent, W.W. Vincent & Co., $104,000 for "redlining" older, predominantly minority neighborhoods in the city of Chicago. It was the most serious step yet taken by what is generally considered the most progressive insurance department in the country to discourage insurers from redlining — refusing to sell insurance to individuals because of the neighborhood in which they live.

The company and the agency plan to appeal the decision. But even if the department's decision should be upheld, the impact on redlined communities will be negligible. The pervasiveness of insurance redlining and disinvestment in Chicago and other metropolitan areas throughout the United States demonstrates the inadequacy of the traditional case-by-case regulatory approach when it comes to securing socially responsible behavior on the part of major financial institutions.

The insurance redlining debate has been a major controversy in recent

*Gregory D. Squires is with the Midwest Regional Office of the U.S. Commission on Civil Rights, but the views expressed are his own.*

years. (See "Insurance Redlining," by Gelvin Stevenson, in the March 1979 issue.) Community groups are protesting insurance company practices and successfully negotiating concessions from some to open up new agencies in urban neighborhoods, to develop new insurance policies for urban markets, and even to invest some money in various housing and development projects. Legislation has been adopted in Illinois, Missouri, Minnesota, Wisconsin, and other states prohibiting insurers from refusing to sell insurance to individuals because of geographic location and requiring disclosure of

> **'. . .the damage . . . is . . . irrelevant to the industry . . .'**

where policies are being written. Congress is threatening to intervene in the regulatory process. (Under the McCarran-Ferguson Act passed in 1945, Congress relegated insurance regulation responsibilities to the states.) Some companies are taking voluntary actions to improve communications with consumers and resolve individual complaints. The problem persists, however, and is unlikely to be solved by any of the steps now being taken.

The current debate over insurance redlining focuses on the underwriting practices of insurers, but it fails to address the underlying causes of insurance unavailability, redlining, and discrimination. The industry generally contends that its underwriting practices are based on the anticipated loss experience of individuals as determined from its analysis of objective data collected over the years. People who are less likely to have their houses damaged or to be robbed pay lower premiums, while those who are more careless (or who live in a "bad" neighborhood) pay more. — if insurance is available to them at all. The industry acknowledges that older communities and particularly those with large minority populations are experiencing insurance availability problems. The reason is not age or race per se, but simply the fact that such areas have higher losses.

Community organizations, on the other hand, charge that the industry makes subjective decisions about people based on such factors as age, sex, and geographic location — factors which have little to do with actual or anticipated loss or with the personal behavior of individual risks. Among the critics are several insurance commissioners whose departmental studies have revealed that many agents do, in fact, write off some neighborhoods for reasons based on no empirical evidence whatsoever. Anton Valukas concluded in his investigation for the Illinois Department of Insurance that "none of the agents interviewed were able to pinpoint any statistical basis by which they or their companies made the determination that a particular area was 'bad' or 'uninsurable.'"

The following statement, which up until a few years ago was included in

003696

the Continental Insurance *Homeowners Underwriting Manual*, demonstrates the subjective nature of much insurance underwriting: "There is also the type who has never lived anywhere but in a rural area. He commutes to an industrial plant, does odd jobs, lives on relief or lets his wife make the living. You can usually spot his place. Sometimes in the summer he can be seen sitting on his front porch without his shirt. He is not a good risk." A recent study by the Midwestern Regional Office of the U.S. Commission on Civil Rights found that in Chicago insurance is less available in neighborhoods containing significant minority or low-income populations or older homes, and that the relationships between race, poverty, and age of buildings to insurance underwriting practices held even after the effects of fire and theft — two factors which account for 75 per cent of all losses — are removed.

Loss experience undoubtedly plays a part in an insurer's decision to write a policy and how much to charge for it. Equally evident is the fact that such decision-making is often subjective, discriminates against urban neighborhoods and minority residents, and is a major cause of urban decline. But the solution to insurance availability and disinvestment does not rest in developing fairer underwriting criteria. The underlying cause of insurance redlining is a fundamental conflict between the profit interests of private insurance companies and the insurance needs of urban communities.

The primary objective of any insurance company (or of any other business) is to make a profit. Basically, this means taking in more dollars in premiums and returns on investments than are paid out in losses and administrative expenses. The industry does fairly well. Even in such a "bad" year as 1976, when property casualty insurers lost money on their underwriting operations, the investment profit amounted to $2.8 billion. Underwriting losses are not as serious as the "bottom line" would indicate. In 1976, for example, only sixty-six cents were paid out in losses for every premium dollar earned. Administrative expenses accounted for fifteen cents and agents took twenty cents in commissions.

The amount of damage done to the buildings and the people in a community is virtually irrelevant to the industry, so long as there is an adequate (positive) spread between the number of dollars received and those paid out. Loss reduction is, at best, a secondary consideration. Reliance by the industry on such underwriting criteria as age, sex, and geographic location, rather than on individually controllable factors also discourages loss reduction on the part of those factors which they cannot influence. Recently James Stone, the controversial former Massachusetts Insurance Commissioner, described the operation of the industry as "the cost-plus servicing of an ever-increasing claims load."

Another factor which limits insurance availability is industry surplus requirements. Companies are generally restricted to writing three dollars of insurance for every dollar of surplus available to meet potential liabilities. When profits decline from poor underwriting or investment experiences, as was the case for most insurers in the early 1970s, the amount of insurance to be written must be restricted.

Corporate mergers have also affected company surplus. Frequently, the parent corporation will use the surplus of the insurance company to pay a dividend to its stockholders or for a variety of other investment purposes. This may prove profitable for the stockholders, but it limits the amount of insurance available to the public. A.M. Best estimated that $2.25 billion was moved upstream from insurers to parent companies between 1969 and 1973. So the amount of insurance available to homeowners is frequently determined by the investment whims of a few elite financiers, and by events taking place in distant parts of the globe. The insurability of a risk and the demand for insurance are often totally irrelevant. As Gelvin Stevenson concluded, "Suddenly, when the survival of Hartford's North End or Chicago's Logan Square depends on what is best for ITT, Chile does not seem so far away."

Insurers often argue that higher losses, and therefore higher premiums or even unavailability in certain markets, are caused by inadequate police protection and building inspections (resulting in higher crime rates, particularly arson), increasing costs of construction, and inflation in general. This argument might be persuasive if it were not for the fact that the insurance mechanism itself provides inadequate incentives for loss reduction activities. Through its redlining practices, in fact, the industry contributes to the decline of neighborhoods and to those conditions which create compensable losses. The industry does not simply respond to changing social conditions, it is a major force in shaping those conditions. What is required is an alternative insurance mechanism which encourages responsible behavior and is not grounded in the dictates of private profit.

**M**any major corporations have faced escalating insurance costs in recent years, and have developed some interesting responses. Ford Motor Company, Honeywell, and 3M are just some of the corporations which have established non-profit self-insurance mechanisms to protect some of their assets. In doing so they have kept insurance costs down and retained funds that formerly were allocated to insurance companies. This is one area where community groups should follow the lead of private industry.

What the redlining dilemma calls for is the creation of an insurance mecha-

## 'What is required is an alternative . . . which . . . is not grounded in the dictates of private profit'

nism geared toward loss reduction rather than profit maximization. If those dollars which currently go to agents as commissions (approximately 20 per cent of homeowners' premiums) and as dividends to company stockholders (the 21 per cent underwriting profit achieved by the industry in 1977 was described by *Business Week* as "windfall profits reminiscent of the embarrassment of riches that faced the giants of the oil industry... when the Arabs quadrupled the world price of oil") were reinvested in communities in part for various safety activities, this would substantially reduce insurance costs and contribute to the development rather than the decline of those neighborhoods.

Such an insurance mechanism is currently being examined. Under a grant from the National Fire Prevention and Control Administration of the U.S. Department of Commerce, a California-based research group, the Institute for Local Self-Government, is exploring the feasibility of establishing a municipal fire insurance program. The basic concept underlying this model is that surplus revenues generated by a municipality in the sale of fire insurance would be used to increase building inspections, install smoke alarms, update fire fighting equipment, and take any other safety initiatives deemed appropriate by that community. The objective, of course, would be to reduce fire losses in the community, along with insurance costs.

In Wisconsin and Alabama, state-owned property is self-insured by the state itself. Both programs have proved successful and have resulted in millions of dollars being returned to the general fund which formerly went to pay for insurance premiums. It is possible for the public sector to operate a successful insurance program, despite the industry's propaganda about the greater efficiency of the private sector.

In Chicago, representatives of one government agency, a private business, and a community organization are beginning to explore the feasibility of a private, community-based nonprofit insurance service. Again, the basic distinction between this approach and that taken by a conventional insurance company would be the utiliza-

tion of surplus revenues for safety and loss-reduction activities, and other local investment projects, rather than for the payment of dividends to anonymous and distant investors. In addition, funds collected to meet reserve requirements would be deposited in local banks for purposes of local investment.

Policyholders in such a company would rightly believe that the company would be responsive to local needs. They would recognize a more direct link between their personal actions and their insurance costs, and therefore would have a greater incentive to act in

market results in the most efficient creation and delivery of goods and services, the solution to availability problems rests in fostering a healthy competitive business environment. Most regulators take the same line. As Illinois Commissioner Richard Mathias stated, "Competition is the ultimate solution to problems of availability."

A key aspect of the competitive environment is adequate rates. If companies cannot generate a profit in certain markets, those markets will not be served. Therefore, as the industry advisory committee to the Redlining

## 'It is possible for the public sector to operate a successful insurance program....'

a responsible manner. In addition to increasing insurance availability, such a program would allow urban residents to exercise greater control over their resources, to benefit more from those resources, and to have more influence on the development of their local neighborhoods.

Building alternative institutions is never an easy task. Many problems will have to be resolved in the process of creating successful alternative insurance mechanisms. Funds to capitalize the company will have to be found. Professional risk-management experts will be needed. Legal and marketing assistance will be essential. No doubt the private insurance industry will not stand idly by. Attorneys for State Farm are already studying the legality of the municipal insurance concept in California because of fears that it could draw a substantial amount of business away from conventional insurers. The task will not be easy, but it is necessary.

**I**nsurers like to characterize the redlining controversy as little more than a misunderstanding on the part of an ill-informed citizenry. Since, according to the industry, the pursuit of private profit by individuals in a free

Task Force of the National Association of Insurance Commissioners (the organization of the highest ranking insurance regulator in each state) concluded, "Profit is the necessary cornerstone upon which social responsibility can be built." If consumers understood these economic facts of life as well as the specific inner workings of an insurance company, most insurers believe, the redlining controversy would be defused.

The insurance industry is well aware of its overriding interests, and how those interests conflict with the provision of insurance to inner-city neighborhoods. Public relations efforts and legislation which prohibits geographic underwriting or requires disclosure of where companies are selling insurance will have little more than symbolic effects. As long as the redlining debate is carried out at this level, and as long as essential insurance services are provided primarily by publicly regulated but privately owned profit-making corporations, little will change. Actions like the one taken by the Illinois Department of Insurance against ICI and W.W. Vincent & Co. will continue to serve up the delusion that things will change, though they actually remain the same. ∎

Winter 1988—Vol. 16, No. 3

$7

# The Review of Black Political Economy



A Publication of the National Economic Association and the
Southern Center for Studies in Public Policy of Clark College

TRANSACTION PERIODICALS
CONSORTIUM
Rutgers University

# INSURANCE REDLINING AND
# THE PROCESS OF DISCRIMINATION

*Gregory D. Squires and William Velez*

Insurance redlining and the racially discriminatory consequences
of the sale of property insurance have been documented in several
cities throughout the United States. In this study teams of "test-
ers"—comparably qualified insurance consumers who differed
only in the racial composition of the neighborhood of the homes
they sought to insure—contacted three Milwaukee area insurance
companies regarding the possibility of purchasing insurance for
their homes. Though no blatantly discriminatory behavior was ex-
hibited, agents representing these companies expressed a clear pref-
erence to pursue business in white communities and placed
additional barriers in the way of testers from nonwhite neigh-
borhoods. These findings parallel changes in other institutional sec-
tors of the housing industry where blatantly discriminatory
behavior has generally given way to more subtle forms of bias.
Policy recommendations are offered to reduce existing racial dis-
parities in the availability of insurance and to open up housing
markets in general for minorities.

When Congress passed the federal fair housing act in 1968 it stated its
intention "to replace the ghettos with truly integrated and balanced living
patterns."[1] This sweeping legislation was enacted in part because Congress
recognized that the reality of housing discrimination had become less a
matter of explicit racial prejudice and more the result of subtle biases in
various institutional sectors of the nation's housing industry. While overt
bigotry has certainly not disappeared, subsequent research has confirmed
the prevalence of diverse institutional practices which, though not neces-
sarily racially motivated, have served to reinforce dual housing markets in
cities across the United States. Redlining by insurance companies con-
stitutes one set of such practices. Though the term "redlining" is most

003700

64                    The Review of Black Political Economy / Winter 1988

commonly associated with certain discriminatory practices by lending institutions, property/casualty insurance companies have exhibited similar behavior in their underwriting activities.[2] This study examines the process of insurance redlining in one major midwestern city.

In each of the key sectors of the housing industry, explicit, intentional racially discriminatory practices have gradually given way to subtle forms of bias. Compliance with racially restricted covenants by realtors[3] has given way to racial steering.[4] Explicit utilization of race in mortgage lending and appraisal practices has given way to underwriting decisions based on neighborhood characteristics such as the age and value of housing, which have similarly adverse effects on minority communities.[5] Whereas insurers formerly used racial classifications to evaluate potential consumers, they too now use neighborhood characteristics in a manner that adversely affects minority communities.[6]

## INSURANCE REDLINING, URBAN DISINVESTMENT, AND RACIAL DISCRIMINATION

At least since the mid-1960s, when several urban areas experienced race riots, revolts, and other forms of civil disobedience, many insurers have concluded that urban communities are uninsurable. Underwriting manuals have frequently included maps with red lines drawn on them to indicate areas where policies should not be written, or should be written only after careful examination, and frequently at higher cost or with special exclusions. The racial composition of the neighborhoods within the red lines was frequently cited as the justification for such policies.[7]

Growing awareness of the problems associated with insurance redlining generated protest activity and other forms of direct action by community groups against the practices of insurers, regulators, and elected officials around the nation.[8] In response to this pressure, government agencies at all levels launched their own investigations.[9] Lawsuits charging insurers with unlawful racial discrimination in violation of the federal fair housing act have been won (*Dunn v. Midwestern* 427 F. Supp. 1106 (S.D. Ohio 1979). Several states passed anti-redlining laws, community groups negotiated reinvestment commitments with some insurers, and many urban residents formerly denied coverage have been able to obtain insurance.[10] The industry itself responded with its own analyses of the problems and voluntary programs aimed at better informing the public about the nature of the insurance industry.[11] And all parties to the debate have utilized available academic research on redlining and related issues.[12]

The substantive focus of most research has been on the outcome of insurance industry practices and the range of social costs associated with insurance redlining. Biases in the industry's perception and treatment of urban communities, particularly those with large minority populations, have been widely documented.[13] The high price or unavailability of adequate insurance has been linked with greater difficulties in purchasing and maintaining homes or businesses, exacerbating disinvestment and contributing to the decline of urban communities.[14] And insurance redlining has often been found to constitute a violation of federal and state fair housing laws and other civil rights and unfair trade practices acts.[15]

Much has been learned, though much debate remains, regarding the conditions that give rise to redlining and the effects of such practices. The focus of this research is on the immediate practice of redlining; the communication that occurs when residents call agents and ask for an insurance policy. This study examines the process of discrimination on the part of property/casualty insurance companies.

## TESTING FOR RACIAL DISCRIMINATION—DATA AND METHODOLOGY

A recent study of the distribution of homeowners' policies written by major insurers in Milwaukee County found a strong and statistically significant bias against inner city minority communities and for white suburban areas. In that study the number of homeowners' policies written in Milwaukee neighborhoods was associated with the racial composition of those communities even after the effects of family income, poverty level, age of housing, and rate of residential turnover were taken into consideration.[16] In recent years the Metropolitan Milwaukee Fair Housing Council has received several complaints from residents charging insurance companies with racial discrimination when their policies were not renewed, despite good claims records.[17] In light of these developments the fair housing council conducted a test of three large insurance companies between the months of March and May, 1986.[18]

Eight teams of testers, individuals who would pose as homeowners interested in purchasing homeowners' insurance, were trained. Four teams had two members and four teams had three members. Within each team one member represented a predominantly white neighborhhood and one or two people represented an integrated or predominantly minority area. (Responses on virtually all items to callers from integrated or predominantly minority areas were not significantly different. Therefore,

they will be treated as one category.) Within each team all members were matched in terms of income, occupational status, construction and value of home, claims experience, and other personal, property, and neighborhood characteristics that affect an individual's insurability. The only difference among team members was the racial composition of the neighborhood in which they purported to reside. Obviously, identical matches in terms of the insurability of testers were virtually impossible to secure. Where differences did occur, however, the member from the predominantly white neighborhood would have the slightly less attractive objective characteristics. For example, where differences in the age of the home occurred, it would be the caller from the predominantly white neighborhood who lived in the relatively older home. Or if incomes differed, the tester from the white neighborhood would report the lower income. Such a procedure, of course, provides a built-in bias against a finding of discrimination on the basis of the racial composition of the neighborhood. Any finding of such discrimination, therefore, would constitute an underestimate of the actual extent of discrimination that may prevail.

Each team member contacted the three insurance companies to request information on how to obtain a homeowners insurance policy. A total of 60 tests, 24 from white communities and 36 from nonwhite or integrated areas, were completed. During each test call, testers took detailed notes and then completed a questionnaire on the contents of the phone call. The objective was to determine whether or not insurers treat individuals differently on the basis of the racial composition of the neighborhood in which they reside.

## FINDINGS

The major conclusion to be drawn from these tests is that agents exhibited more eagerness to sell insurance policies to testers representing white neighborhoods and placed more hurdles in the paths of callers from integrated or minority areas. Equally significant, however, was the absence of blatant discrimination or outright refusal to offer policies in neighborhoods of any particular racial composition.

The most consistent finding of these tests was the agents' interest in geographic location. Each agent obtained the street location of testers and in 93.3 percent of the tests the first, or one of the first, questions asked by the agent was the specific address or zip code of the caller. Neighborhood clearly remains a central consideration in the sale of property insurance.

Agents frequently asked testers for information on the age, value, con-

**TABLE 1**
**Agent Request of Name By Area Racial Composition**

|  | Not Requested | Requested | Total |
|---|---|---|---|
| **White** | 8.4% | 91.6% | 100% |
|  | (2) | (22) | (24) |
| **Nonwhite** | 22.2% | 77.8% | 100% |
|  | (8) | (28) | (36) |

T-test = 1.41
One tailed probability: .10
Degrees of Freedom = 58
Effect Size Index = .40
Power Value at .05 significance: 57

Note: Number of observations are shown in parentheses

---

struction, size, and other characteristics of the home. They also asked some questions about the employment and income of family members and previous claims history of the homeowner. The solicitation of such information, however, was not associated with the racial composition of the neighborhoods represented by the callers.

But there were significant differences in the frequency with which certain questions were asked among callers from white and nonwhite areas that indicated a preference to pursue the former as customers and to place additional barriers before the latter. First, agents requested the names of the callers from white areas in 91.6 percent of the cases but in only 77.8 percent of the cases of callers from nonwhite areas (see Table 1). The simple act of asking for the potential customer's name has been found to be a significant factor in sales agents' efforts to create a warm sales climate, particularly by real estate agents, in fair housing research.[19] Soliciting a person's name is frequently an indication of a desire to develop a friendly, trusting relationship for the purpose of ultimately closing the sale. Not asking a name is certainly no confirmation that the agent would not sell the product. But the association between racial composition of neighborhood and the frequency with which the name was requested reveals a preference for where this group of insurance agents would like to do business.

This preference is revealed further by the frequency with which agents asked callers for information about their current policies. Callers from

TABLE 2
Agent Request of Current Policy Information By Area Racial Composition

|          | Not Requested | Requested | Total |
|----------|---------------|-----------|-------|
| White    | 8.3%          | 91.7%     | 100%  |
|          | (2)           | (22)      | (24)  |
| Nonwhite | 33.3%         | 66.7%     | 100%  |
|          | (12)          | (24)      | (36)  |

T-test=2.3
One tailed probability: .025
Degrees of Freedom= 58
Effect Size Index = .80
Power Value at .05 significance: 99

Note:  Number of Observations are shown in parentheses

---

white areas were asked detailed information about their current home-
owners' policies in 91.7 percent of their conversations with agents com-
pared to 66.7 percent for testers in nonwhite neighborhoods (see Table 2).
Knowledge of the current policy (e.g. its price, coverage, terms) helps
agents know what they have to offer to increase their chances of getting
the business. Again, failure to solicit such information does not mean the
agent would refuse to sell a policy. But the racial disparity on this item
reinforces the notion that agents more actively pursued and were more
eager to sell policies in white areas.

Another indication of the racial preferences of these agents is their
utilization of inspections. A majority (58.3 percent) of testers representing
white neighborhoods were offered policies without any inspection. Only
47.2 percent of testers from nonwhite communities were offered a similar
option. While the relationship between area racial composition and in-
spection requirement was in the anticipated direction, it was not statis-
tically significant. What proved to be significant, however, was the
difference in the type of inspection required of testers in white and non-
white areas when the agent indicated that an inspection would be neces-
sary.

The most frequent type of inspection involves a drive by the house and
a photograph of the exterior, often referred to in the industry as a "drive
by and Polaroid." The basic objectives of such an inspection are to verify
that the house exists on the property identified by the applicant during the

TABLE 3
**Type of Inspection Required By Area Racial Composition**

|          | Drive-by | Detailed | Total |
|----------|----------|----------|-------|
| White    | 44.4%    | 55.6%    | 100%  |
|          | (4)      | (5)      | (9)   |
| Nonwhite | 15.8%    | 84.2%    | 100%  |
|          | (3)      | (16)     | (19)  |

T-test=1.67
One tailed probability: .10
Degrees of Freedom = 26
Effect Size Index = .70
Power Value at .05 significance: 80

Note:  Number of observations are shown in parentheses

---

initial phone conversation and to confirm its value. According to William Sirola, Chicago regional manager of the Insurance Information Institute, such an inspection might cause the agent to change the coverage, price, or terms of a policy but would not result in the denial of a policy previously offered over the phone.[20] In some cases, however, a more detailed inspection of the exterior and occasionally even the interior of a home was required of the Milwaukee testers. That examination as well as a photograph would become part of the inspection report. Among those testers for whom an inspection was required by the agents, 44.4 percent of those representing white communities received the "drive by and Polaroid." Only 15.8 percent of the properties that needed to be inspected in the nonwhite areas received such a light inspection. Conversely, 84.2 percent of the testers in the nonwhite areas requiring an inspection were told that application for insurance of their properties would have to include the more rigorous inspection along with the photograph. Just 55.6 percent of the testers in white areas whose properties needed to be inspected were required to undergo the heavier inspection (see Table 3).

Once again, requiring an inspection, or a more rigorous inspection, is not tantamount to a refusal to insure. But given the association between inspection policies and neighborhood racial composition, it is clear that testers from nonwhite communities had at least some additional hurdles to overcome in order to be insured. These inspections were not completed as part of this test. Therefore it cannot be determined whether such in-

spection·practices would have led to any rejections of applications. Two Milwaukee insurance agents who attempt to serve the central city informed us, in confidential interviews, that it is common for insurance companies to offer on the telephone to inspect inner city properties and then issue the appropriate policy, only to never show up for the inspection. When Mr. Sirola was asked what the likelihood would be of the more rigorous inspection leading to a rejection of the application, he said such an inspection (one requiring an examination of the exterior or any inspection of the interior) was "unheard of." Consequently, he could not say what the likely outcome of such an inspection would be. If such inspections were unknown to Sirola, they represent a very real factor for many Milwaukee insurance consumers. And it is clear the consequences of such inspection policies could only be adverse for nonwhite communities compared with similar white areas.

These tests revealed no outright refusal to write insurance in, or intentional discrimination against, Milwaukee's minority communities. In only three of these 60 tests did agents not offer to provide coverage. Two involved testers from nonwhite areas and one represented a white community. A critical issue that could not be examined was the price. Unfortunately, testers simply indicated a desire to puchase insurance without providing sufficient details about the protections they wanted, to assure that agents would be quoting prices on comparable policies. So when agents offered insurance the deductibles, exclusions, coverage, and other terms were so varied that even though the properties and financial circumstances among team members were comparable, it was difficult to interpret the price differences that were quoted.

At the same time, these tests did reveal an expressed preference on the part of these insurance agents to solicit business in white neighborhoods and a systematic tendency to place additional barriers in the way of homeowners in nonwhite communities who are seeking property insurance.[21] If the overt racially discriminatory practices of earlier years have become the exception, subtle practices that still have a discriminatory effect remain imbedded in the process by which property insurance is marketed in Milwaukee. Such developments within the insurance industry parallel changes in other institutional sectors of the housing industry where blatant forms of discrimination have given way to more subtle forms of bias.

**POLICY IMPLICATIONS**

Milwaukee, like many communities around the nation, has responded to the insurance redlining problems that have been documented in that

Case: 1:13-cv-08564 Document #: 134-7 Filed: 08/11/17 Page 17 of 500 PageID #:5...

107

community for at least 20 years.[22] The state has declared insurance redlining to be a violation of its insurance laws, and racially-based redlining to be a violation of its fair housing law. The Office of the Insurance Commissioner instituted a disclosure program requiring major insurers to report, on a quarterly basis, the number of policies they write by zip code in the state's major metropolitan areas. Local insurers have collaborated in the establishment of a Consumer Insurance Information Center to help people with any insurance problems, including redlining. These steps, along with the actions taken at the federal level discussed earlier, have undoubtedly contributed to the reduction of the most blatantly discriminatory behavior, including the absence of any findings in these tests of widespread refusal to write insurance in particular neighborhoods.

Yet disparities remain in the availability of insurance that are associated with the racial composition of Milwaukee neighborhoods.[23] Many steps could be taken to reduce those disparities. The Metropolitan Milwaukee Fair Housing Center frequently receives complaints of insurance redlining. The insurance commissioner's office should more effectively follow up these complaints and should use its own disclosure reports to target selected companies for more rigorous investigations.

In Milwaukee several community organizations have formed a community reinvestment coalition in an effort to increase lending in the city. With the leverage provided by the federal Community Reinvestment Act, which requires lenders to be responsive to the credit needs of their communities, the coalition has negotiated lending agreements totalling over $75 million with two major local lenders.[24] The coalition should expand its focus and attempt to bring local insurers into these "partnerships" for the purposes of increasing the pool of investment dollars and the availability of property insurance.

Insurance commissioners in most states, including Wisconsin, regularly carry out market conduct examinations in which they explore all phases of selected companies' marketing behavior (e.g. types of products, prices, underwriting practices). Inspection policies should be examined more carefully and regulations should be developed so that consumers are not subjected to variant inspection practices because of the racial composition of their communities.

It would be impractical and undesirable to try to regulate every aspect of the communication between insurers and consumers. Yet the subtle dimensions of such communication can be quite costly, particularly for residents of minority communities. Formal training of insurance agents, underwriters, and others involved in the marketing of insurance, however,

would alert them to the unintended racially discriminatory consequences of certain practices. Across the country, including Milwaukee, real estate agents receive fair housing training from public and private fair housing organizations. Similar arrangements between fair housing centers and the insurance industry could help reduce the disparate treatment residents in nonwhite communities frequently receive.

If the nation's ghettos have not been replaced with truly integrated and balanced living patterns, progress has been made towards the goal of fair housing. At least part of this progress can be explained by successful efforts to reduce the extent to which key actors in the housing industry, including property/casualty insurance companies, have counted by race. At the same time it is evident serious problems remain. Equally evident is the fact that tools are available to attack those remaining problems.

## RACIAL DISCRIMINATION: AN EVOLVING PROCESS

Overt and intentional racial discriminatior has faded from the official realms of the housing industry. Real estate agents no longer list homes as either "white" or "black" properties. Race is no longer used as an explicit category by appraisers and lenders. Fair housing is required by federal law and by state law in Wisconsin and many other states. Hundreds of municipalities have issued their own fair housing ordinances. And the red lines have disappeared from most insurance company underwriting manuals.

But fair housing is not a reality in Milwaukee or in virtually any other metropolitan area in the United States today. Explicit utilization of racial categories has given way to more subtle forms of discrimination. Racial steering, though sometimes done for benign purposes, remains a common practice and restricts housing opportunities for minorities (and for non-minorities, as well). Lenders and appraisers utilize a range of neighborhood factors in their underwriting practices that deny minorities equal access to credit and adversely affect minority communities. Fair housing laws often go unenforced.

This examination of the process by which insurance is sold reveals similarly subtle forms of discrimination in the insurance market. While rarely saying "no" to anyone, insurance agents subtly pursue policies in the "preferred" (white) markets and discourage business in the "standard" (minority) markets.

## NOTES

We greatly acknowledge the research assistance of Judy Treskow in the collection and preparation of the data. We also want to thank the Metropolitan Milwaukee Fair

Housing Council for its assistance in collecting the data. Professor Karl Taeuber of the Center for Demography and Ecology at the University of Wisconsin provided valuable guidance in the analysis. And we want to thank the Urban Research Center and the Graduate School at the University of Wisconsin-Milwaukee for their support of this research.

1. John O. Calmore, "National Housing Policies and Black America: Trends, Issues, and Implications," in *The State of Black America 1986*, (New York: National Urban League, Inc., 1986).

2. The definition of redlining has proven to be a controversial issue. By insurance redlining we are referring to an insurer's practice or policy of refusing to sell an insurance product or varying the terms (e.g. price, coverage, terms of payment, inspection policy) under which a product will be sold because of the geographic location of a risk. While it is generally conceded by the industry and critics alike that residents in inner city, minority communities have greater difficulties obtaining insurance, there is much debate over the reason. The industry contends that its underwriting patterns reflect losses and risk exposure of different communities and, therefore, sound business practices. Critics argue that the industry operates on the basis of inaccurate perceptions of urban communities and, therefore, its practices constitute unfair discrimination against those areas.

3. Martin E. Sloane, "Federal Housing Policy and Equal Opportunity," in U.S. Commission on Civil Rights, *A Sheltered Crisis: The State of Fair Housing in the Eighties* (Washington, D.C.: U.S. Government Printing Office, 1983) pp. 133-142.

4. Rose Helper, *Racial Policies and Practices of Real Estate Brokers*, (Minneapolis: University of Minnesota Press, 1969); Diana Pearce, "Gatekeepers and Homeseekers: Institutional Patterns in Racial Steering," *Social Problems* 26: (Feb. 1979): 325-42; Diana Pearce, "A Sheltered Crisis: The State of Fair Housing Opportunity in the Eighties," in U.S. Commission on Civil Rights, *A Sheltered Crisis*, pp. 143-155; William R. Tisdale, "Housing Discrimination: A New Technology," in U.S. Commission on Civil Rights, *A Sheltered Crisis*, pp. 156-161.

5. Ann Shlay, *Where the Money Flows: Lending Patterns in the Washington, D.C., Maryland, Virginia SMSA*, (Chicago: The Woodstock Institute, 1985); Calvin Bradford, "Financing Home Ownership: The Federal Role in Neighborhood Decline," *Urban Affairs Quarterly* 14 (March 1979): 313-36; Glenda Sloane, "Discrimination in Home Mortgage Financing," in U.S. Commission on Civil Rights, *A Sheltered Crisis*, pp. 83-89.

6. Carol Heimer, "The Racial and Organizational Origins of Insurance Redlining," *The Journal of Intergroup Relations* 10 (Fall 1982): 42-60; Federal Insurance Administration, *Full Insurance Availability*, (Washington, D.C.: U.S. Government Printing Office, 1974).

7. President's National Advisory Panel on Insurance in Riot Affected Areas, *Meeting the Insurance Crisis of Our Cities*, (Washington, D.C.: U.S. Government Printing Office, 1968); Midwestern Regional Advisory Committees to the U.S. Commission on Civil Rights, *Insurance Redlining: Fact, Not Fiction*, (Washington, D.C.: U.S. Government Printing Office, 1979).

8. Gerald M. Keenan, *Insurance Redlining: Profits vs. Policyholders*, (Chicago: National Training and Information Center, 1979). Rob Schachter, *Insurance Redlining: Organizing to Win*, (Chicago: National Training and Information Center, 1981).

9. Midwestern Regional Advisory Committees to the U.S. Commission on Civil Rights, *Insurance Redlining: Fact, Not Fiction*, pp. 3-22.

10. National Association of Insurance Commissioners Task Force and Advisory Committee on Urban Reinvestment, *Final Report*, (Milwaukee: National Association of Insurance Commissioners, 1982).

11. State Farm Insurance Companies, *A Report to the People: A Response to the Insurance Bureau's Proposal to Disrupt the Regular Insurance Market in Michigan*, (Bloomington, IL: State Farm Insurance Companies, 1977); Advisory Committee to the NAIC Redlining Task Force, *Ninety Day Report of the Advisory Committee to the NAIC Redlining Task Force*, (Milwaukee: National Association of Insurance Commissioners, 1978); American Insurance Association, *Insurance in Urban Areas: The American Insurance Association Addresses Property Insurance & Redlining*, (New York: American Insurance Association, 1979).

12. Barbara Casey, Jacques Pezzier, and Carl Spetzler, *The Role of Risk Classification in Property and Casualty Insurance: A Study of the Risk Assessment Process*, (Menlo Park: Stanford Research Institute, 1976); Gelvin Stevenson, *Fire Insurance: Its Nature and Dynamics*, (Princeton: Fire Research Group, School of Architecture and Planning, Princeton University, 1978); Gregory D. Squires and William Velez, "Insurance Redlining and the Transformation of an Urban Metropolis," *Urban Affairs Quarterly*, 23 (September 1987): 63-83.

13. Carol Heimer, "The Racial and Organizational Origins of Insurance Redlining,"; Thomas C. Jones, *Essential Insurance in Michigan: An Avoidable Crisis*, (Lansing: Insurance Bureau, Michigan Department of Commerce, 1977); Carl Levin, *Homeowners Insurance in Detroit: A Study of Redlining Practices and Discriminatory Rates*, (Detroit: Office of the Detroit City Council President, 1976).

14. Robert Yaspan, "Property Insurance and the American Ghetto: A Study in Social Irresponsibility," *Southern California Law Review* 44 (Fall 1970): 218-274; David I. Badain, "Insurance Redlining and the Future of the Urban Core," *Columbia Journal of Law and Social Problems* 16, no. 1 (1980): 313-336.

15. Kevin J. Byrne, "Application of Title VIII to Insurance Redlining," *Northwestern University Law Review* 75, no. 3 (1980): 472-505; Ruthanne DeWolfe, Gregory D. Squires, and Alan DeWolfe, "Civil Rights Implications of Insurance Redlining," *DePaul Law Review* 29, no. 2 (1980): 315-351.

16. Gregory D. Squires and William Velez, "Insurance Redlining and the Transformation of an Urban Metropolis."

17. Carla Wertheim, Milwaukee Metropolitan Fair Housing Council, personal interview, November 5, 1985.

18. Resource constraints limited the testing to three insurance companies. The companies selected were the three largest, in terms of the number of homeowners' policies sold in the Milwaukee area where the companies sell their products through their own sales representatives. They are also among the four largest in the community. Several major insurers sell their products through independent agents who represent several companies. Only companies using exclusive agents were selected, to insure that when teams contacted an agency, each tester would be soliciting information from the same company.

19. Diana Pearce, "A Sheltered Crisis: The State of Fair Housing Opportunity in the Eighties," p. 418.

20. William Sirola, Insurance Information Institute, personal interview, April 9, 1987.

21. Since this study was designed to provide a conservative measurement of discrimination by assigning testers from white areas with slightly less attractive characteristics in terms of their insurability, we have chosen a significance level of .10. Under this criterion all three comparisons are significant. In addition, we calculated and provided two additional measures: an index for size effect and a corresponding power value. In two of the comparisons, information on current policy and type of inspection requested, we obtained large scores for size effect (.80 and .70 respectively) as well as power values (99 and 80 respectively). These results strongly indicate that the racial

biases detected in the communication between agents and testers are unlikely to be caused by sampling error. In the third comparison, request of tester name by agent, moderate estimates of size effect and power value were obtained (.40 and 57 respectively).

22. David Hoeh, *Access to Residential Property Insurance in Milwaukee County*, (Milwaukee: Milwaukee Community Housing Resource Board, 1983).

23. Gregory D. Squires and William Velez, "Insurance Redlining and the Transformation of an Urban Metropolis."

24. Judy Wenzel, "Banks Find Social Conscience," *Milwaukee Journal*, November 16, 1986, page 1D.

# THE QUARTERLY REVIEW OF ECONOMICS AND BUSINESS
## Journal of the Midwest Economics Association

| Vol. 28 | Spring 1988 | No. 1 |

**ARTICLES**

Contracts and the Provision of Durability ............................................ *George French*

Taxes and Financial Leasing ................... *Mark A. Loewenstein* and *James E. McClure*

The Structural Determinants of Corporate
    Campaign Activity ..................................................................... *John S. Heywood*

Price Discrimination in Medicine:
    The Case of Medicare ............................................. *Lynn Paringer* and *Vincy Fon*

Environmental Regulation: A Financial
    Market Test ......................... *Myles S. Wallace, Sharon B. Watson*, and *Bruce Yandle*

On the Existence of a Dividend Clientele in the Market for
    Electric Utility Stocks ......................... *William L. Sartoris* and *William T. Moore*

Modeling the Ratings Game: Publication Performance, Departmental
    Characteristics, and Graduate Faculty Ratings
    in Economics ............ *John Golden, Fred V. Carstensen, Paul Weiner* and *Steve Kane*

THE QUARTERLY REVIEW OF ECONOMICS AND BUSINESS is published by the Bureau of Economic and Business Research, College of Commerce and Business Administration, University of Illinois. Subscription rates are $18.00 a year for individuals and $29.70 a year for organizations, associations, etc,; single-copy price, $10.50. Foreign subscription rates are $20.00 a year for individuals and $32.40 a year for organizations, associations, etc.; single-copy price for a non-US address is $12.50. Manuscripts and communications for the editors and business correspondence should be addressed to the QUARTERLY REVIEW OF ECONOMICS AND BUSINESS, University of Illinois, 428 Commerce West, 1206 South Sixth Street, Champaign, IL 61820.



# FROM
# REDLINING
# TO
# REINVESTMENT

Community Responses to Urban Disinvestmer

## Edited by Gregory D. Squires

**CONTENTS:**

**FOREWORD:** *Community Reinvestment Is Good for Cities, Good for Lenders;* Edward McDonald **1.** *Community Reinvestment: An Emerging Social Movement;* Gregory D. Squires **2.** *The Struggle for Community Investment in Boston, 1989-1991;* James T. Campen **3.** *Reinvestment and Revitalization in Pittsburgh;* John T. Metzger **4.** *Confrontation, Negotiation, and Collaboration: Detroit's Multi-Billion-Dollar Deal;* David Everett **5.** *Reinvestment in Chicago Neighborhoods: A Twenty-Year Struggle;* Jean Pogge **6.** *Milwaukee: A Tale of Three Cities;* Michael L. Glabere **7.** *Reluctant Response to Community Pressure in Atlanta;* Larry E. Keating, Lynn M. Brazen, and Stan F. Fitterman **8.** *California: Melding Statewide Advocacy, Local Government, and Private Industry Initiatives;* David Paul Rosen **9.** *The Legacy, the Promise, and the Unfinished Agenda;* Calvin Bradford and Gale Cincotta

Gregory D. Squires is Professor of Sociology and a member of the Urban Studies Program faculty at the University of Wisconsin-Milwaukee. He is co-author of *Chicago: Race, Class, and the Response to Urban Decline* (Temple).

Conflicts in Urban and Regional Development Series
6 x 9" 288 pp.
ISBN 0-87722-984-8 $39.95

*Available in November 1992*

"Greg Squires has assembled America's leading experts on community reinvestment—not just academic experts but neighborhood veterans of combat, negotiation, and agreement with lenders."

> —Bill Dedman, author of the Pulitzer Prize-winning series, "The Color of Money," published by the Atlanta Journal/Constitution

"... makes an important and valuable contribution to filling important gaps in the literature.... I recommend it to everyone with an interest in the field; community activists seeking to learn how to put together a reinvestment strategy; lenders looking for insight into what community groups want; and, researchers and reporters attempting to learn more about origins of the neighborhood reinvestment movement."

> —Allen Fishbein, general counsel for the Center for Community Change, Washington, D.C.

.............................. **TEMPLE UNIVERSITY PRESS** ..............................
BROAD & OXFORD STREETS ● PHILADELPHIA, PA 19122

| Type or print | Please send me _____ copies of *From Redlining-Reinvestment* |
|---|---|
| Name _____ | Send your order(s) to the address above or call toll-free @ 1-800-447-1656. *Payments for orders from outside the U.S. and Canada must be in U.S. funds drawn on a U.S. bank.* **INDIVIDUAL ORDERS MUST BE PREPAID** |
| Address _____ | |
| _____ | TOTAL amount of order _____ |
| Phone: Day _____ Evening _____ | PA residents add 6% sales tax (Phila. residents add 7%) _____ |
| Check ____ Money Order ____ MASTERCARD ____ VISA ____ | Shipping charge **$3.00** |
| _____ Account # _____ Exp. Date ____ | TOTAL AMOUNT ENCLOSED _____ |
| Signature | |

# DePaul Law Review



## DEVELOPMENTS IN ILLINOIS LAW

### ARTICLES

FOREWORD TO THE ILLINOIS LAW ISSUE     The Honorable Daniel P. Ward

CIVIL RIGHTS IMPLICATIONS OF
INSURANCE REDLINING                    Ruthanne DeWolfe, Gregory
                                       Squires & Alan DeWolfe

PUBLIC RECREATIONAL RIGHTS IN
ILLINOIS RIVERS AND STREAMS            Margit Livingston

ILLINOIS COAL MINE SUBSIDENCE LAW     Robert E. Beck & Sharon Sigwerth

THE ILLINOIS LAW REVISION COMMISSION   Harry G. Fins

THE CREATION OF AN OMBUDSMAN:
THE GUARDIANSHIP AND ADVOCACY COMMISSION   Donald Paull

CAVEAT AMATOR: "THE STATE OF AFFAIRS"
IN ILLINOIS AFTER HEWITT V. HEWITT     Burton F. Grant & Benjamin P. Hyink

COMMENT                                NOTES

Volume 29          Winter 1980          Number 2

# CIVIL RIGHTS IMPLICATIONS OF
# INSURANCE REDLINING

*Ruthanne DeWolfe,\* Gregory Squires,\*\**
*and Alan DeWolfe\*\*\**

*In a recent study of insurance redlining the Midwestern State Advisory Committees to the United States Commission on Civil Rights determined that Chicago communities with predominantly minority populations were the principal victims of adverse underwriting decisions. In this article, the authors, focusing on Illinois, discuss various theories of liability for insurance redlining.*

With increasing frequency, residents of urban areas are complaining that they cannot obtain essential property insurance at affordable rates through the voluntary market. These complaints are being registered with community organizations,[1] state insurance regulatory officers,[2] and city,[3] state,[4] and federal[5] legislative committees. In many cases, the complaints go beyond individual grievances and charge that entire neighborhoods are unable to obtain property insurance.[6] This practice of denying insurance to residents of a particular geographic area has come to be known as insurance "redlining."[7]

---

\* Regional Counsel, U.S. Commission on Civil Rights, Midwestern Regional Office. B.A., Heidelberg College; M.S., Ph.D., Northwestern University; J.D., DePaul University College of Law.

\*\* Research/Writer, U.S. Commission on Civil Rights, Midwestern Regional Office. B.S., Northwestern University; M.A., Ph.D., Michigan State University.

\*\*\* Professor of Psychology, Loyola University, Chicago, Illinois. B.A., Oberlin College; M.S., Ph.D., Northwestern University.

1. Address by G. Cincotta, National Training and Information Center, Insurance Redlining and Reinvestment: Directions for Change Conference (Chicago, Ill., March 23, 1979).

2. A. Valukas & R. Bollow, An Investigation of Discrimination in the Sale of Homeowners Insurance in Illinois 8 (Sept. 6, 1977) [hereinafter cited as Valukas & Bollow]; ILLINOIS DEP'T OF INSURANCE, REDLINING: THE ILLINOIS EXPERIENCE 1 (Oct. 1977).

3. B. Soldwisch, testimony presented before the Finance Committee of the City Council, Chicago, Ill. (Jan. 12, 1978).

4. Insurance Bureau, Michigan Dep't of Commerce, Essential Insurance in Michigan: An Avoidable Crisis 6 (Mar. 14, 1977) [hereinafter cited as Essential Insurance].

5. *Rights and Remedies of Insurance Policyholders: Hearings Before the Subcomm. on Citizens and Shareholders Rights and Remedies of the Senate Comm. on the Judiciary,* 95th Cong., 2d Sess., pts. 1, 31, 53, 61, 67 (1978) (testimonies of Barbara Pertz (Cleveland), Morton Olshan (real estate investor), Grace Evans (St. Louis), and James McBride (Chicago)) [hereinafter cited as *Rights and Remedies Hearings*].

6. *See* Valukas & Bollow, *supra* note 2, at 20.

7. Insurance redlining, for purposes of this article, is defined as refusing, because of the geographic area within which property is located, to insure or refusing to continue to insure, or varying the amount or type of insurance coverage, or varying the terms or conditions under which insurance coverage is available to homeowners or tenants.

315

This article discusses insurance redlining within the framework of federal antitrust and selected federal and state constitutional and statutory civil rights laws that afford an aggrieved person a cause of action.[8] State statutes regulating insurance companies[9] are not reviewed except to the extent that state regulatory law is germane to federal law.[10] Further, this article examines the potential impact of state constitutions on redlining abuses. Particular emphasis is placed on the Illinois Constitution because of its unique provision concerning the rights of "all persons" to buy and sell property,[11] a provision that echoes federal civil rights law[12] and that must surely include insurance. It should be noted that no civil rights statutes have been enacted, at least in Illinois, that specifically prohibit racial discrimination in the sale of property, including insurance.

## THE PROBLEM

Insurance companies generally have responded to redlining complaints by denying that they use factors associated with a geographic area, such as neighborhood racial or ethnic composition, as determinants of insurability.[13] Insurers typically have maintained that geographic redlining is

---

8. Administrative remedies with judicial review are available for redress of violations of the Illinois Insurance Code. ILL. REV. STAT. ch. 73, §§ 1013-1019.2, 1028-1040 (1977).

9. *See id.* §§ 204.1-1153 (1977).

10. Under the McCarran-Ferguson Act, insurers are exempt from federal antitrust laws to the extent they are regulated by state law. 15 U.S.C. § 1012 (1976). *See* notes 50-53 and accompanying text *infra.*

11. ILL. CONST. art. I, § 17. This provision states:

   All persons shall have the right to be free from discrimination on the basis of race, color, creed, national ancestry and sex in the hiring and promotion practices of any employer or in the sale or rental of property.

   These rights are enforceable without action by the General Assembly, but the General Assembly by law may establish reasonable exemptions relating to these rights and provide additional remedies for their violation.

Also, an insurance policy generally is itself personal property. 12 J. APPLEMAN, INSURANCE LAW AND PRACTICE §§ 7007, 7016 (1968); Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654 (3d Cir. 1974); Gurnett v. Mutual Life Ins. Co., 356 Ill. 612, 191 N.E. 250 (1934); Oldham's Trustee v. Boston Ins. Co., 189 Ky. 844, 226 S.W. 106 (1920); *In re* Helpert's Estate, 300 N.Y.S. 886, 165 Misc. 430 (1938).

12. 42 U.S.C. § 1982 (1976) provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

13. *Rights and Remedies Hearings, supra* note 5, at 200, 202 (testimony of Stephen I. Morton, Vice President, The Hartford Group). Martin stated that the automobile insurance industry does not discriminate on basis of race, color, creed, national origin, or religion but rather uses a rating system composed of objective criteria such as territory, place of garaging, age of driver, sex, martial status, use of motor vehicle, driver education completion, age, make and model of vehicle, and traffic violations. He further stated that the objective of such an underwriting system is to limit loss, which the Hartford Group placed at $162.3 million over the period 1972-76 for personal automobile underwriting. Finally, since many legislative acts in the various states (unspecified) inhibit underwriting practices, his company discourages new business in those areas.

merely a misperception of misinformed insurance consumers, and that underwriting decisions are based strictly on objective, reliable, loss-related rating classifications. [14] Such classifications, it is maintained, include the factors of construction, occupancy, fire protection and exposure [15] but not, for example, whether a neighborhood is racially changing or is principally composed of ethnic minorities. [16]

Nonetheless, geographic redlining by property insurers has been documented by many investigators. Their reports reveal that insurers' techniques have included: selectively placing agents only in certain areas; formally or informally instructing agents to refuse to accept applications from residents of certain neighborhoods; and varying underwriting standards and requirements or selectively pricing property insurance according to geographic area. [17]

Areas that allegedly have been redlined are principally older urban areas. [18] Occasionally, these areas are already in economic decline when the apparent decision to redline is made. [19] In other cases, the areas are not yet declining but instead represent racially or ethnically changing neighborhoods or stable but principally minority areas. [20] The unavailability of essential

---

14. Allstate Insurance Company, for example, claims to have identified 12 Chicago postal zones with adverse loss ratios in which it applies more stringent underwriting procedures and six Chicago rating territories based upon loss experience. Valukas & Bollow, *supra*, note 2, at 59, 67; Address by L. Jordan, General Counsel, State Farm Insurance Company, Insurance Redlining and Reinvestment: Directions for Change Conference (Chicago, Ill., Mar. 23, 1979)

15. U.S. DEP'T OF JUSTICE, THE PRICING AND MARKETING OF INSURANCE 189 (1977) [hereinafter cited as PRICING AND MARKETING].

16. *See Rights and Remedies Hearings, supra* note 5, at 174-77 (statement of James R. Faulstich, Vice President, Industry Relations, and C. Robert Hall, Vice President, National Association of Independent Insurers). This was a joint statement in which they indicated that the objective of risk classification is to reflect the degree of risk posed. Their remarks dealt with real property insurance where the effect of inflation is that replacement cost far exceeds worth in some areas and, consequently, insurers do not want to, and in many instances have stopped, insuring in those areas. They stated that risk assessment should not be restricted. They also noted that the insurance industry makes no moral judgments; it merely seeks to equate risk with degree of loss and to make a profit.

17. *See* B. Malewski & M. Lampi, Where Do You Draw the Line?—Insurance Redlining in New York (May, 1978) U.S. DEP'T OF HOUS. AND URBAN DEV., INSURANCE CRISIS IN URBAN AMERICA (May 24, 1978); [hereinafter cited as INSURANCE CRISIS]; G. KEENAN, INSURANCE REDLINING: PROFITS VS. POLICYHOLDERS (2d ed. 1979); The Lakeview Citizens' Council, Selective Placement of Homeowners Insurance Agents in Chicago—1967-1978 (1978); Public Technology, Inc., Presentation to the D-2 Subcomm. Task Force on Redlining (Madison, Wis., Oct. 11, 1977).

18. Essential Insurance, *supra* note 4, at 5-7.

19. *Rights and Remedies Hearings, supra* note 5, at 98-99 (testimony of Richard D. Rodgers, Deputy Director, Consumer Division, Illinois Department of Insurance); C. Levin, Homeowners' Insurance in Detroit: A Study of Redlining Practices and Discriminatory Rates app. 12 (1976).

20. U.S. COMM'N ON CIVIL RIGHTS, INSURANCE REDLINING: FACT NOT FICTION 10 (Feb. 1979) [hereinafter cited as INSURANCE REDLINING]; Note, *Property Insurance and the American*

insurance to an area, of course, almost certainly guarantees that economic decline will follow.[21] Furthermore, the impact of insurance redlining on those least able to afford the consequences, those who for economic or other reasons are restricted to certain neighborhoods,[22] is patently unfair and economically destructive.

In a recent study of the availability of property insurance to risks located in urban areas, in particular the availability to those risks located in urban areas with large minority populations, the Midwestern State Advisory Committees to the United States Commission on Civil Rights (MSAC), focusing on Chicago, analyzed the underwriting practices of insurers writing residential property insurance.[23] According to the report, Chicago was targeted because it was the only Midwestern state in which the data essential to a statistical analysis were available. Further, at the time of the study, only Illinois had enacted legislation requiring property/casualty insurers to disclose routinely to the chief state regulatory officer the number of new policies written, policies renewed, policies cancelled, and policies non-renewed.[24] These data were available from the Illinois Department of Insurance.[25] Thus, the study did not depend on obtaining the necessary data from individual insurers.

Not only did the study analyze activity in the voluntary insurance market, but it also looked at the involuntary or residual insurance market—the Fair Access to Insurance Requirements (FAIR) plan.[26] That plan was selected

---

*Ghetto: A Study in Social Irresponsibility*, 44 S. CAL. L. REV. 218, 229 (1971). The note sets forth the proposition that the problem of availability of property insurance in the ghetto areas of American cities (1) discriminates against ghetto owned and operated businesses, (2) contributes to the overall physical decay of ghetto areas, (3) impedes the flow of new capital into ghetto areas and (4) leads to a general unavailability of property insurance in the ghetto. *Id.* at 218-19.

The author includes empirical data which show that, contrary to the insurance industry's claim that the unavailability of property insurance in the ghetto is the result of risk/loss experience, race is the real factor that insurance companies use to set rates and terms or to deny insurance protection altogether. *Id.* at 233-36. This is, of course, in violation of the fourteenth amendment, the Civil Rights Act of 1866, and the antitrust laws. *Id.* at 219, 247-68.

The author also stated that the Fair Access to Insurance Requirements (FAIR) plan, established by 12 U.S.C. § 1749bbb-3 to -10 (1976) is not an adequate remedy and that legislation to bring the insurance industry in line with the law, is required. *Id.* at 237.

21. Essential Insurance, *supra* note 4, at 5-6.

22. J. KAIN & J. QUIGLEY, HOUSING MARKETS AND RACIAL DISCRIMINATION: A MICRO-ECONOMIC ANALYSIS (1975); INSURANCE REDLINING, *supra* note 20, at 8-9.

23. *See* INSURANCE REDLINING, *supra* note 20.

24. *See* ILL. REV. STAT. ch. 73, § 755.25 (1977); ILL. ADM. ORDER, Mar. 21, 1977; Insurance Redlining, *supra* note 20, at 26, 46-50.

25. INSURANCE REDLINING, *supra* note 20, at 32.

26. The FAIR plan was established by the Housing and Urban Development Act of 1968, 12 U.S.C., tit. XII §§ 1749bbb-3 to -10 (1976). The purpose of the Act was to ensure that essential property insurance would continue to be available to prevent the abandonment of urban areas by insurers *and* mortgagees. Only fire and extended coverage along with vandalism and malicious mischief are mandated. 24 C.F.R. § 1905.3(a) (1979). Four states—Illinois, Massachusetts, Rhode Island, and Wisconsin—offer full coverage through a homeowners' policy. Participating insurers in states that create a FAIR plan in accord with the minimum requirements of federal

for study as a measure of the past adverse underwriting decisions of insurers that had forced insurance consumers into the involuntary, residual market.[27] The decision to analyze FAIR plan data was based in part on a 1977 report prepared for the Illinois Department of Insurance.[28] That work indicated that certain areas of Chicago and in some cases the entire city had been written-off by insurers in the recent past. Thus, the availability of insurance through the voluntary market was limited. To study only current underwriting activity in the voluntary market would not have revealed whether certain areas of the city with older housing, lower incomes, and higher minority compositions were continuing to suffer from these past adverse underwriting practices. By looking at the FAIR plan, as well as the voluntary market, the impact of past underwriting decisions as well as current underwriting activity could be evaluated. Furthermore, at the time the MSAC data were collected, coverage available in the Illinois FAIR plan, limited to fire and extended coverage,[29] still was far less comprehensive than property insurance available through the voluntary market. Thus, it was reasonable to assume that individuals would not voluntarily seek coverage in the FAIR plan but rather would accept coverage under that plan only when they had been unable to purchase insurance through the voluntary market or had found such insurance priced beyond their reach.

Analysis of the data revealed that in the voluntary market and in the FAIR plan, minority composition of the Zip code was the factor correlated most highly with underwriting activity.[30] In the voluntary market, the lower the minority composition of a Zip code, greater was the availability of insurance.[31] In the FAIR plan, the opposite relationship prevailed; the higher the minority composition of a Zip code, greater was the concentration of FAIR plan policyholders.[32]

Further, the data were analyzed to determine if, when differences in fire and theft rates between Zip codes were held constant, minority composition remained a significant predictor of underwriting activity. In both the volun-

---

law are eligible for federal riot reinsurance. Twenty-eight states have enacted a FAIR plan. Insurance Crisis, *supra* note 17, at 6.

27. Telephone interview with R. Gossrow, Property and Casualty Actuary, Illinois Dep't of Insurance (Oct. 2, 1978).

28. Valukas & Bollow, *supra* note 2, at 2.

29. Homeowners insurance did not become available under the Illinois FAIR plan until August 1978. *See* ILL. REV. STAT. ch. 73, § 1065.70 (Smith-Hurd) (West Supp. 1979).

30. In other words, minority composition was the single most important factor in explaining underwriting activity. The correlation between minority composition (percent minority in population) and voluntary market activity (new and renewed homeowners policies minus cancellations and nonrenewals per 100 housing units) was -.78 (probability (p) < .001). The correlation between minority composition and involuntary market activity (new and renewed FAIR plan policies per 100 housing units) was + .72 (p < .001). INSURANCE REDLINING, *supra* note 20, at 35-36.

31. *Id.*

32. *Id.*

119

tary and involuntary insurance markets, even with the effect of differences in fire and theft eliminated, minority composition remained a significant predictor of underwriting practices.[33]  When the intercorrelation between minority composition and income was controlled, minority composition still was found to be a significant predictor of underwriting activity in both the voluntary and involuntary property insurance markets.[34]  Thus, the effect of minority composition on underwriting activity was not solely the inadvertent result of individual economic factors but rather was a significant predictor of underwriting activity independent of income.

The MSAC report concluded that minority composition of an area is a significant predictor of whether residential property located in that area will be insured through the voluntary insurance market or whether the property owner will be forced to seek coverage in the residual, involuntary market.[35]  The study stopped short of concluding that insurers *intentionally* use either the minority status of the applicant or the neighborhood as a basis for determining eligibility for property insurance. Thus, the report leaves unanswered the crucial inquiry: have insurers deliberately refused to insure residential property because of the minority status of the owner or neighborhood or have insurers used racially and ethnically neutral underwriting criteria that have had the effect of denying essential property insurance to members of those racial and ethnic minorities? Because liability under several of the laws to be discussed in the subsequent sections of this article requires proof of intentional racial discrimination, the difference is significant[36]  Appropriate private litigation appears justified, as the gross

---

33. The part correlation between minority composition and involuntary market activity after removing the effects of fire and theft was .16 (p < .05). The part correlation between minority composition and involuntary market activity after removing the effects of fire and theft was -.41 (p < .01). Part correlations permit calculation of the relationship between a predictor variable (e.g., minority composition) and a criterion variable (e.g., voluntary or involuntary market activity) after eliminating the interrelationship between a predictor variable and another predictor variable (e.g., minority composition with fire or theft). Second order part correlations in which the interrelationship between minority composition and both fire *and* theft were eliminated were calculated. INSURANCE REDLINING, *supra* note 20, at 36.

34. The correlation between minority composition and voluntary market activity after eliminating the relationship between minority composition and income was -.39 (p < .01). The correlation between minority composition and involuntary market activity after eliminating the relationship between minority composition and income was .34 (p < .05). INSURANCE REDLINING, *supra* note 20, at 36-37.

35. *Id.* at 60.

36. Both 42 U.S.C. § 1985 and 15 U.S.C. § 1013(b) clearly require an element of intent because both are based on conspiratorial agreement. 42 U.S.C. § 1985(c) provides:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat,

statistical disparities revealed by the MSAC study are sufficiently suggestive of intentional policies and practices that, whether by design or effect, are foreseeably racially discriminatory.[37]

### The McCarran-Ferguson Act

The business of insurance initially was considered to be a contractual concern that involved only insurer and insured.[38]  By the nineteenth century, states had become actively involved in monitoring and regulating the practices of insurers in order to protect insureds from insolvent companies.[39]  In 1914, the German Alliance Insurance Company challenged the right of the Kansas Insurance Commissioner to regulate and control rates and premiums.[40]  The company argued that the business of insurance was like any other commercial enterprise.[41]  The cost of insurance was, according to the company, a matter to be determined solely by the parties to the transaction, the insurer, and the insured.[42]  The United States Supreme Court dis-

---

any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

15 U.S.C. § 1013(b) renders the Sherman Act, not an antidiscrimination statute, applicable to agreements to boycott and provides: "Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."

37. The significant statistical disparities revealed by the Insurance Redlining report, *supra* note 20, should be sufficient to create a prima facie case of racial discrimination and thus shift the burden to the defendant-insurers to prove that race was not even one reason among many for adverse underwriting decisions in minority areas. *See* Williams v. Matthews Co., 499 F.2d 819, 826 (8th Cir. 1974) (prima facie inference that housing developer discriminated on basis of race shifted burden to developer to explain practice). *See also* Arlington Heights v. Metropolitan Hous. Corp., 429 U.S. 252, 256-66 (1976) (discriminatory purpose, not merely a racially disproportionate impact, must be shown to be a motivating factor in defendant's decision); Riley v. Adirondack S. School for Girls, 541 F.2d 1124, 1126 (5th Cir. 1976) (private school cannot deny admission to student if race is one of motivating factors behind denial); Smith v. Sol D. Adler Realty Co., 436 F.2d 344, 349-50 (7th Cir. 1970) (use of race as a factor in rental decisions impermissible regardless of whether it was the sole or even one of a series of motivating factors). *See* notes 110-115 and accompanying text *infra*.

38. *See* Paul v. Virginia, 75 U.S. (8 Wall.) 168, 183 (1869) (insurance company incorporated in one state is subject to regulation by other state in which company does business).

39. *See id.* at 168.

40. German Alliance Ins. Co. v. Lewis, 233 U.S. 389 (1914).

41. *Id.* at 400.

42. *Id.*

agreed with the company's arguments and indicated that the business of in-
surance has "a reach of influence and consequences beyond and different
from that of ordinary businesses in the commercial world."[43]  Stressing the
unique importance of insurance to the public interest, the Court inferred
that the business of insurance must be regulated for the common good.[44]
Therefore, liberty of contract was held not to preclude state regulation.[45]

Subsequent to 1914, the insurance industry became subject to increasing
state regulation. Simultaneous federal regulation did not occur, however,
because n .:ance transactions were considered to be solely matters of in-
trastate commerce.[46]  In 1944, a revolutionary decision by the Supreme
Court brought the federal government into the business of insurance for the
first time. In *United States v. South-Eastern Underwriters Association*,[47] a
case in which a number of insurance companies were found to have con-
spired to fix rates to drive other insurers out of business, the Court deter-
mined that insurance is interstate commerce subject to federal regulation,
including federal antitrust laws.[48]  The Court implied that Congress might
exempt insurance from the antitrust laws, however, if it deemed such action
to be appropriate.[49]  The following year, Congress, in response to *South-
Eastern Underwriters*, passed what is popularly known as the McCarran-
Ferguson Act.[50]  Under that Act, insurance companies are exempt from
federal antitrust laws to the extent that they are regulated by state law.[51]

43. *Id.* at 414.

44. *Id.* at 413.

45. *Id.*

46. H.R. REP. No. 143, 79th Cong., 1st Sess. 1, *reprinted in* [1945] U.S. CODE CONG.
SERV. 670, 670-71.

47. 322 U.S. 533 (1944). Appellees, which consisted of over 200 fire insurance companies
and 27 individuals, were indicted for violation of the Sherman Act in that they conspired to fix
rates, monopolize trade, and used boycotts, force, and coercion to compel non-member insur-
ance companies to become members of their association in certain southeastern states. *Id.* at
534. Appellees' demurrer was sustained by the district court on the ground that the fire insur-
ance business did not constitute interstate commerce and was, therefore, exempt from federal
regulation. *Id.* at 536. The Supreme Court held: (1) the Sherman Act *was* intended to apply to
fire insurance companies; and (2) the business of fire insurance did cross state lines so as to
bring it within the definition of interstate commerce. *Id.* at 553. The Court distinguished *Paul
v. Virginia* and subsequent cases relying on it because in those cases the Court was not con-
fronted with a situation where there was a federal statute passed by Congress and intended to
apply to fire insurance. *Id.* at 545. In the earlier cases, had the Court accepted the argument
that, because there was no applicable state law, the federal government and not the states
should regulate insurers, the insurers would have been virtually unregulated. The Court in
*South-Eastern* adopted the position that state and federal regulation of fire insurers was concur-
rent, with federal law applying to those aspects of the business that are interstate in character,
e.g., conspiracies across lines in restraint of trade. *Id.* at 553.

48. *Id.*

49. *Id.* at 561.

50. 15 U.S.C. § 1011-1015 (1976).

51. *Id.* § 1012 (1976) provides,

    a. The business of insurance, and every person engaged therein, shall be subject
    to the laws of the several States which relate to the regulation or taxation of such
    business.

Whether regulated by state law or not, however, insurers are subject to federal antitrust laws prohibiting boycotts, coercion, or intimidation.[52] Thus, even if state law prohibits an insurer from engaging in a boycott, such conduct also is actionable at the federal level under the Sherman Act.[53]

Historically, the proscription against boycotts, coercion, or intimidation in the McCarran-Ferguson Act generally had been interpreted to protect insurers from the actions of other insurers;[54] individual policyholders and applicants for insurance were beyond the scope of the Act. In the spring of 1978, however, the Supreme Court was confronted with *St. Paul Fire & Marine Insurance Co. v. Barry*,[55] in which an individual applicant for medical malpractice insurance, denied insurance by several companies, alleged that the denials constituted a boycott.[56] The insurers argued that the prohibition against boycotts, coercion, and intimidation protected only other insurers and did not provide a cause of action for individuals.[57] The Court disagreed. In a seven to two decision, the Court held that the concerted refusal of insurers to deal with individuals constituted a boycott prohibited under the Sherman Act.[58] The Court was careful to qualify its decision, however, by indicating, on the one hand, that conduct by a single actor cannot constitute a boycott and, on the other hand, that not all concerted activity between insurers violates the Sherman Act.[59] How far the Court intends to extend the reach of the Sherman Act to insurance company practices awaits

---

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended [15 U.S.C. 41 *et seq.*], shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

52. *Id.* § 1013(b). For text of § 1013(b), see note 36 *supra*.

53. 15 U.S.C. §§ 1-7 (1976).

54. *See* St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 536 n.5 (1978).

55. 438 U.S. 531 (1978). Respondents, licensed physicians, sued, on a class action basis, four Rhode Island insurance companies, alleging that three of the companies refused to deal with them as a means of compelling the doctors to deal with the fourth on terms unfavorable to them. *Id.* at 533. The district court dismissed the complaint, which alleged Sherman Act violations, on the ground that the antitrust claim was barred by the McCarran-Ferguson Act. *Id.* The court of appeals reversed, *id.* at 534, and the Supreme Court affirmed. The Court stated that the provision of the Sherman Act that prohibits boycotts, coercion, or intimidation was applicable unless specifically exempted and the McCarran-Ferguson Act provided no such exemption. *Id.* at 550-51. The Court found that the type of conduct alleged by respondents constituted a boycott under the Sherman Act. *Id.* at 552-55.

56. *Id.* at 535.

57. *Id.* at 536.

58. *Id.* at 552-55.

59. *Id.* at 555. In regard to the agency relationship between agents and insurers, see notes 105 and 125 *infra*.

future litigation. Nonetheless, the *Barry* decision represents a significant shift in traditional interpretation; at least some joint action by insurers that denies insurance coverage to individual applicants is now violative of the Sherman Act.

Does insurance redlining constitute a violation of the Sherman Act under the *Barry* rationale? It is clear that a decision by a single insurer or agent to redline an area or deny insurance to a single applicant does not constitute a violation of the Act. If two insurers agree to decline insurance applications or limit the amount or type of coverage available to applicants in a specific geographic area, however, such agreements probably would violate the Act as currently interpreted by the Supreme Court. A more likely situation to trigger insurer liability would arise when an insurer and an independent agent or broker agree to avoid a given geographic area. In fact, many complaints have been registered addressing the refusal of Chicago agents, on instructions from the company, to attempt to place insurance with a particular company because it no longer writes in a given neighborhood.[60]  If these agreements between insurer and independent agent are tantamount to a concerted "refusal to deal" arrangement, they are prohibited by the Sherman Act.[61]

In *Barry*, however, the Court indicated that its boycott discussion did not apply to concerted activity between insurers, or between insurers and others, that is "compelled or specifically authorized by state regulatory policy."[62]  In recognizing the legitimacy of such state action, the Court followed the rationale set forth in *Parker v. Brown*.[63]  In that case, the Court held that anticompetitive conduct becomes insulated from antitrust laws, even where competition is displaced by regulation or monopoly, when the conduct occurs as a result of state action.[64]  For purposes of the McCarran-Ferguson Act, federal courts repeatedly have held that the state's power to control rates constitutes such insulating state action under the prevailing *Parker* doctrine. The power to regulate rates both directly and indirectly through adversary proceedings provides this antitrust insulation.[65]  For example, under the *Parker* doctrine an agreement between an insurer and independent agent or between two insurers to accept only preferred risks or to limit coverage to repair cost would be exempt from federal antitrust laws when the insurer has filed those policies with the chief insurance regulatory officer and received necessary authorization.

---

60. *See* Valukas & Bollow, *supra* note 2, at 12-23.

61. 15 U.S.C. § 1 (1976).

62. St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 555 (1978).

63. 317 U.S. 341, 350-52 (1943) (state agricultural marketing program that operated to restrict competition and to regulate sale and distribution of agricultural commodities held not within the scope of, and thus not a violation of, the Sherman Act).

64. *Id.* at 350-52.

65. ILLINOIS DEP'T OF INSURANCE, INSURANCE REGULATION AND ANTITRUST: THE EFFECT OF THE REPEAL OF THE MCCARRAN-FERGUSON ACT 12-13 (1979).

*Parker* leaves open the question whether state action would insulate an insurer if it were alleged that the chief regulatory officer was a joint participant with the insurer in a "concerted refusal to deal," *i.e.*, a boycott, rather than exercising his or her proper governmental function. If the state is not carrying out a legitimate governmental function but instead is a culpable joint participant, the insurer could be stripped of its exemption from antitrust law.[66] The congressional intent behind the Sherman Act should determine whether the state itself would be liable in such a situation. The legislative history of the Act indicates that the Congress did not intend that law to apply to such acts by a state.[67]

The allegation often is made that there is a revolving door between the insurance industry and the office of the chief state insurance regulatory officer.[68] The implication, of course, is that the latter's decisions are made in the self-interest of the officer and insurer, not in the public interest. The *Parker* doctrine is premised on the state's exercising a proper governmental role.[69] Thus, if a regulatory officer's decision could be shown to exceed the bounds of his or her statutory authority, and to be in his or her limited pecuniary or other interest or that of an insurer, such misuse of discretion could be sufficient to remove the shield of antitrust protection, at least from the insurer.[70] Such a situation might exist where it could be proved that the chief regulatory officer agreed with an insurer's decision to remove its business from a geographic area in return for a promise of future employment. Problems of proof, of course, abound. Nonetheless, those problems should not obscure the potential for liability when the regulatory officer permits an insurer to withdraw its business totally or permits the insurer to withdraw more desirable or comprehensive forms of coverage from an urban community.

Because a boycott requires an agreement between at least two parties, the applicability of the Sherman Act to decisions of the state regulatory officer will be crucial when the challenged activity is an agreement between a single insurer and the regulatory officer. It is not necessary, however, to

---

66. *See* notes 51-53 and accompanying text *supra*.

67. *See* 21 CONG. REC. 2457, 2459, 2461, 2562 (1889). *See also* Parker v. Brown, 317 U.S. 341, 351 (1943) (legislative history suggests that Congress did not intend to include states within reach of the Sherman Act); Apex Hosiery Co. v. Leader, 310 U.S. 469, 493-95 n.15 (1940) (Sherman Act covers only business combinations).

68. Address by Eleanor Lewis, Ass't Insurance Commissioner, New Jersey, Discrimination Against Minorities and Women in Pensions and Health, Life and Disability Insurance Consultation, U.S. Comm'n on Civil Rights (Wash., D.C., April 26, 1978).

69. 317 U.S. at 351-52 (reliance on state as sovereign entity).

70. Whether the chief regulatory officer will enjoy sovereign immunity from personal liability for acts not entered into in good faith or for acts not representing a proper governmental function is beyond the scope of this article. The Supreme Court, however, in Scheuer v Rhodes, 416 U.S. 232, 247-49 (1974), determined that government officers are entitled only to a qualified immunity, not an absolute immunity for discretionary acts. Further, the Court recently upheld *Scheuer* in Butz v. Economou, 438 U.S. 478 (1978) (executive officials charged with constitutional violations enjoy a qualified immunity, although there are some officials whose special functions require absolute immunity).

prove a racial or ethnic basis for the agreement.[71] Thus, the hurdle of proving intentionality or foreseeability of racially adverse consequences is eliminated under this statutory vehicle.

### The Impact of the McCarran-Ferguson Act
### Upon Access to the Courts for Civil Rights Violations

Alternative state and federal courts were not always available to individuals aggrieved by racial or ethnic discrimination. Prior to the Civil War, Congress relied solely on the states to vindicate individual rights to personal security.[72] When the Civil Rights Acts were enacted following that war,[73] Congress altered its established policy and placed primary responsibility for protecting individual civil rights on the federal level. Thus, until enactment of the McCarran-Ferguson Act of 1945,[74] there would have been no question that federal courts were open to complaints of civil rights violations in regard to insurance.

Since 1945, however, the McCarran-Ferguson Act has exempted the business of insurance from federal law to the extent that state law regulates the subject.[75] The Act, however, does not define the "business of insurance." Recently, in *St. Paul Fire & Marine Insurance Co. v. Barry*,[76] the Supreme Court distinguished between the "business of insurance," which is exempt under the Act, and the "business of insurance companies," which lies within the scope of the federal antitrust laws. The "business of insurance," according to the Court, refers to the essence of insurance itself, that is, the spreading and distribution of risk.[77] Ultimately, this function is manifest in the contract between insurer and insured. Thus, the "business of insurance" is only that part of the insurer's activities that is related to risk assessment and marketing. Clearly, basic underwriting decisions represent the "business of insurance."

---

71. The McCarran-Ferguson Act does not distinguish between a boycott grounded in commercial as against racial or other invidious discrimination. *See* 15 U.S.C. § 1013(b) (1976). For the text of § 1013(b), see note 36 *supra*.

72. T. EMERSON, D. HABER, & N. DORSEN, POLITICAL AND CIVIL RIGHTS IN THE UNITED STATES 1375-76 (3d ed. 1967). Prior to the enactment of the thirteenth, fourteenth, and fifteenth amendments, individual civil rights were virtually the exclusive concern of state law. Since 1833, the Bill of Rights had been held to constrain the federal government but not state, municipal, or private conduct. Barron v. Mayor of Baltimore, 32 U.S. (7 Pet.) 242, 248 (1833). Furthermore, blacks were not considered "persons" entitled to such federal constitutional protections as did exist until the passage of the Civil Rights Acts. Scott v. Sandford, 60 U.S. (19 How.) 393, 404 (1856).

73. The thirteenth, fourteenth, and fifteenth amendments to the U.S. Constitution and the statutes passed to enforce them form the core of federal protection against racial and ethnic discrimination in the public (state and municipal) and private spheres. 42 U.S.C. §§ 1981-1983, 1985 (1976). *See* notes 96-125 and accompanying text *infra*.

74. 15 U.S.C. §§ 1011-1015 (1976).

75. *Id.* § 1012 (unless a federal law relates specifically to business of insurance).

76. St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531 (1978).

77. *Id.* at 551. The Court did not define the "business of insurance companies."

Further, it would seem, on the basis of the McCarran-Ferguson Act, that even if individuals are denied insurance because of their race or ethnicity, they will be denied redress in the federal courts because (1) the "business of insurance" is reserved to state regulation,[78] and, (2) virtually all states forbid by statute or regulation unfair discrimination in the issuance or termination of insurance.[79] The McCarran-Ferguson Act cannot deprive individuals of their rights to complain to the federal courts that their federally guaranteed rights in regard to insurance have been violated. Access to the federal courts is available even where state law provides a remedy for the very acts upon which the civil rights violation is grounded.[80] Thus, an insurer's decision not to insure an individual because of his or her race or national origin or that of neighbors, while constituting an underwriting decision—part of the "business of insurance," remains subject to federal civil rights laws.

Moreover, were the McCarran-Ferguson Act to be interpreted as depriving an individual of a federal forum, the Act would represent a unique withdrawal of protection in favor of a single industry. There is nothing in the legislative history of the Act to indicate that Congress intended such a result.[81] In addition, the Civil Rights Acts of the nineteenth century created new federal civil rights.[82] Because Congress does not create hypothetical rights or substantive rights with hypothetical remedies, it is unlikely that Congress would have enacted these civil rights statutes without ensuring continuing federal remedies for their violation.[83]

---

78. 15 U.S.C. § 1012 (1976). For the text of § 1012, see note 51 *supra*.

79. *E.g.*, ILL. REV. STAT. ch. 73, § 1031(3) (1977) provides:

The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:

. . . .

(3) Making or permitting, in the case of insurance of the types enumerated in Classes 2 and 3 of Section 4, any unfair discrimination between individuals or risks of the same class or of essentially the same hazard and expense element because of the race, color, religion or national origin of such insurance risks or applicants. [citation omitted].

MICH. COMP. LAWS ANN. § 500.2027(a)(i) (1977); WIS. STAT. § 625.12(2) (1977); PRICING AND MARKETING, *supra* note 15, at 331.

80. *See* Ben v. General Motors Acceptance Corp., 374 F. Supp. 1199, 1202 (D. Colo. 1974) (action for redress of alleged civil rights violation arising out of purchase of required casualty insurance for new automobile). *See* Zwickler v. Koota, 389 U.S. 241 (1967) (where first amendment rights involved, the delay of a state court proceeding may result in impermissible chilling of constitutional right sought to be protected); McNeese v. Board of Educ., 373 U.S. 668 (1963) (prior resort to state proceeding not required in a federal action under the Civil Rights Acts).

81. H.R. REP. No. 143, 79th Cong., 1st Sess. 3 (1945), *reprinted in* [1945] U.S. CODE CONG. SERV. 670, 672. This report indicates that the purpose of the McCarran-Ferguson Act is to permit the continued regulation and taxation of insurers by the states. The authority of the states to regulate and tax had been drawn into question by the *South-Eastern Underwriters Ass'n* case. 322 U.S. 533 (1944).

82. Of the rights that were created, 42 U.S.C. §§ 1981-1982 are particularly germane to this discussion. For text of § 1981, see note 87 *infra*. For text of § 1982, see note 12 *supra*.

83. *See, e.g.*, Cannon v. University of Chicago, 99 S. Ct. 1946 (1979) (private right of action maintainable for alleged sex discrimination in medical school admission under Title IX although

*DEPAUL LAW REVIEW*

The McCarran-Ferguson Act should be interpreted to exempt only the "business of insurance" *qua* "business of insurance" from federal law. Those aspects of such business that represent civil rights violations should remain subject to federal scrutiny. Such an interpretation permits the Act and relevant civil rights law to exist in harmony while each retains its distinct purpose and authority.

### FEDERAL CIVIL RIGHTS LAW

Those engaging in insurance redlining could be found liable under the several federal civil rights laws. The thirteenth amendment states: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."[84] The Civil Rights Acts of 1866 and 1870,[85] and a portion of the Act of 1871,[86] were passed to enforce the provisions of the thirteenth amendment and thereby to provide a number of fundamental protections of individual rights. Under section 1981, "all persons" are guaranteed equal rights to make and enforce contracts.[87] Under section 1982, "all persons" possess equal rights to buy and sell real and personal property.[88] Finally, under section 1985, "all persons" are protected by federal law from conspiracies to interfere with their civil rights.[89]

---

that Act provides only an administrative remedy); J.I. Case Co. v. Borak, 377 U.S. 426 (1964) (stockholders' action for redress of corporation's alleged violation of the Securities Exchange Act of 1934 maintainable although the Act provided no private cause of action); Lloyd v. Regional Transp. Auth., 548 F.2d 1277 (7th Cir. 1977) (class action brought by mobility-disabled persons who were unable to use public transportation system established a private cause of action to vindicate rights).

94. U.S. CONST. amend. XIII, § 1.

85. Act of Apr. 9, 1866, ch. 31, § 1, 14 Stat. 27 (codified at 42 U.S.C. § 1982 (1976)); Act of May 31, 1870, ch. 114, § 16, 16 Stat. 144 (codified at 42 U.S.C. § 1981 (1976)).

86. Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13 (codified at 42 U.S.C. § 1985 (1976)).

87. 42 U.S.C. § 1981 (1976) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

88. 42 U.S.C. § 1982 (1976). For the text of § 1982, see note 12 *supra.*

89. 42 U.S.C. § 1985(a)-(b) (1976) provides:

If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

These statutes provide the causes of action through which a private citizen may seek redress for a violation of protected rights in the federal courts.[90] The persons to whom the protections extend, however, are limited to members of racial minorities. Unlike section 1983,[91] these statutes enacted under the thirteenth amendment have been construed to retain their essential initial purpose to protect blacks from invidious discrimination.[92], Where a classification based on membership in an ethnic minority, such as Mexican or Hispanic, is tantamount to classification on the basis of race, the courts have expanded the ambit of these laws to include members of such ethnic groups.[93]

Unlike section 1983, which was promulgated to enforce the commands of the fourteenth amendment, the foregoing civil rights statutes enacted under

---

(b) Obstructing justice; intimidating party, witness or juror

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attending or testified, or to influence the verdict, presentment, or indictment or any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

For the text of 42 U.S.C. § 1985(c), stating the sanction for violations of subsections (a) and (b), see note 36 *supra.*

90. 28 U.S.C. §§ 1343(1), (2), & (4) provide the jurisdictional bses for these actions.
91. 42 U.S.C. § 1983 (1976) provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

While the fourteenth amendment was originally enacted to protect blacks, by 1866 the equal protection clause was being applied not only to other racial groups but also to such economic institutions as corporations. *See, e.g., Developments in the Law—Equal Protection,* 82 HARV. L. REV. 1065 (1969).

92. Only racial or quasi-racial discrimination lies within the purview of these civil rights laws based on the thirteenth amendment. *See, e.g.,* Runyon v. McCrary, 427 U.S. 160 (1976) (private school may not discriminate in admissions on basis of race); Johnson v. Railway Express Agency, Inc., 421 U.S. 454 (1975) (employer may not discriminate with respect to seniority rules and job assignments on basis of race); Slaughter-House Cases, 83 U.S. (16 Wall.) 36 (1873) (object of thirteenth amendment to free blacks from slavery and not to impede the states in the proper exercise of their police power).

93. *See, e.g.,* Ortega v. Merit Ins. Co., 433 F. Supp. 135 (N.D. Ill. 1977) (persons of Hispanic origin have standing to bring an action alleging racial discrimination in the sale of installment credit property insurance).

the thirteenth amendment are applicable to the conduct of private persons.[94] Thus, an individual acting solely on his or her private capacity is potentially liable under sections 1981, 1982, and 1985. Consequently, the conduct of private insurance companies, agents, and brokers is cognizable under these statutes.[95]

### Section 1981

Section 1981 forbids private persons from refusing to enter into contracts with individuals because of their race. Insurance contracts have been held to be contract within the purview of section 1981.[96] Thus, under that section, a member of a racial minority may not be denied insurance, that is, a contract of insurance, or offered only limited insurance coverage, because of his or her race. In addition, because section 1981 protects both members or racial minorities and whites from discrimination against the former,[97] a white who is denied insurance because of the minority composition of his or her neighborhood also has a cause of action.

The coverage provided under an insurance contract varies according to the type of policy. A homeowners policy, for example, may cover all perils or it may exclude certain perils such as the collapse of a building due to the weight of snow.[98] A fire policy only on building and contents severely limits coverage by excluding theft, vandalism, and malicious mischief.[99]

---

94. Section 1983 requires state action and is not appropriate where the defendant is a private citizen. Civil Rights Cases, 109 U.S. 3, 11 (1883). Under §§ 1981, 1982, and 1985, however, the conduct of private citizens is actionable and state action is not required. Runyon v. McCrary, 427 U.S. at 168; Johnson v. Railway Express Agency, Inc., 421 U.S. 454 (1975); Griffin v. Breckenridge, 403 U.S. 88 (1971) (action by Negro citizens against white citizens alleging conspiracy, through force and violence, to deprive them of their constitutional rights to speech, assembly, association, and movement); Jones v. Alfred H Mayer Co., 392 U.S. 409 (1968) (action by Negro citizen alleging racial discrimination in the private sale of real estate); Clark v. Universal Builders, Inc., 501 F.2d 324 (7th Cir.), *cert. denied*, 419 U.S. 1070 (1974) (action by blacks alleging discriminatory pricing and terms between black and white citizens in the sale of private housing).

95. Section 1983 requires a threshold finding of "state action" in the challenged conduct. Sections 1981, 1982, and 1985 do not demand that the defendant have acted under color of state law. *See* 42 U.S.C. §§ 1981-1983, 1985(b) (1976).

96. Sims v. Order of United Commercial Travelers of America, 343 F. Supp. 112 (D. Mass. 1972) (action by blacks alleging racial discrimination in rejection of their applications for accident insurance).

97. McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273 (1976) (white employees brought action alleging racial discrimination in that they were discharged for misappropriating goods but a Negro employee, charged with the same offense, was not discharged); Tillman v. Wheaton-Haven Ass'n, Inc., 410 U.S. 431 (1973) (preference rights to use of recreational facilities within a designated geographic area may not be denied a resident of that area on the basis of race); Sullivan v. Little Hunting Park, Inc., 396 U.S. 229 (1969) (transferability of a membership share in a private recreational facility may not be impeded on account of race where such share is an integral part of a real property lease or sale).

98. G. STEVENSON, FIRE INSURANCE: ITS NATURE AND DYNAMICS 16 (1978).

99. *Id.* at 13

130

Also, some personal lines, and property/casualty insurance policies offer coverage only to the cost of repair rather than full replacement cost.[100]  To the extent that any of these limitations are imposed on an applicant for racial reasons, they, along with the outright refusal to insure, are prohibited by section 1981.

Further, exclusive or "captive" agents are employees of a particular insurance company.[101]  If such an agent refuses to accept an application for insurance because of the applicant's race, the agent subjects both the agent and the principal company to potential liability under section 1981. In such a case, the act of the agent is the act of the principal.[102]  Many companies operate through independent agents who are not employees of the company but instead have contractual arrangements with a number of companies for placing insurance.[103]  Their function is to accept (or reject) applications for insurance and decide which of a number of insurers with whom they have a contractual arrangement will best serve the client's insurance needs. An insurance broker is even more removed from the insurer. He or she operates without a contract and merely places applications for insurance with one or another insurer.

An independent agent or broker is, however, no less than the exclusive agent an integral part of the sequence of events culminating in an insurance contract. An application for insurance constitutes an offer.[104]  If a broker or independent agent refuses to accept an application for insurance, he or she effectively interferes with contract formation. If the refusal to accept the application is based on race, such refusal would be actionable under section 1981.

With the independent agents and brokers, however, the question of the liability of the insurer itself is not as straightforward as it is with exclusive

---

100. Repair cost policies are being developed particularly for dwellings where replacement cost exceeds market value of the property by 150%, although there are certain limitations. For example, to determine the policy coverage, the market value of the property is reduced by 20% to account for land value. After this reduction, the remaining market value of the dwelling is increased by 150%, thereby reflecting the actual maximum replacement cost covered by the policy. A policyholder, however, should be aware that the actual replacement cost of the dwelling may exceed the coverage of the policy. This anomaly can occur if the product of the dwelling's square footage and the replacement cost per square foot (current replacement costs are $40 to $45 per square foot) exceeds the maximum policy coverage using the 150% formula. Allstate Insurance Company pioneered the development of this type of coverage. Conversation with Joseph Bellissimo, Senior Account Agent, Allstate Insurance Company (March 17, 1980).

101. State Farm Insurance Company, Allstate Insurance Company, and Aetna Casualty & Surety Company conduct their business through exclusive agents.

102. Oridinary agency principles apply to the exclusive agent-company relationship. Thus, an agent acting in the scope of his or her employment subjects the principal, in this case the employing insurer, to liability under the well-established doctrine of respondeat superior. *See* RESTATEMENT (SECOND) OF AGENCY §§ 216, 219(1) (1958).

103. Fireman's Fund Insurance Companies and United States Fidelity and Guaranty Company both utilize independent agents.

104. R. RIEGEL, J. MILLER, & C. WILLIAMS, JR., INSURANCE PRINCIPLES & PRACTICES 36 (6th ed. 1976).

agents. Nonetheless, independent agents are agents of the insurer and subject it to liability to the same extent as do exclusive agents.[105] With brokers, however, it would probably be necessary to find that the racial discrimination underlying the denial of insurance occurred as the direct result of insurer authorization. In that case, the insurer would be liable directly for its express refusal to accept offers from applicants because of the applicant's race. In appropriate circumstances, the link between insurer and broker should not be difficult to find. There has been considerable testimony, for example, that some insurers have instructed brokers and agents not to accept insurance applications on property located in certain areas of the city.[106] As discussed in the first section of this article, certain areas within Chicago are readily identifiable as areas with high and low minority compositions. Also, the MSAC study reported that residents of high minority areas are far less likely to find property insurance available in the voluntary market than residents of predominantly white areas.[107] Thus, to the extent that geographic area is a subterfuge for race, the refusal to accept the application for insurance because of area of residence would be prohibited under section 1981.[108]

The question of the potential liability of insurers operating through agents and brokers may turn on findings that insurers instructed the brokers to restrict their activity in certain areas and that such restriction was racially motivated. As to the latter determination, the statistical disparities in voluntary and involuntary market activity in the white and minority Zip codes reported by the MSAC study[109] should be sufficient to establish a prima facie case of racial discrimination.[110] The burden then would shift to the insurer

---

105. Independent agents and brokers for insurance purposes are considered agents of the insurer. 16 J. APPLEMAN, INSURANCE LAW AND PRACTICE § 8672, at 137-38 (1968). Agency principles hold that a principal is liable for the consequences of an agent's conduct resulting from the former's direction. RESTATEMENT (SECOND) OF AGENCY § 212 (1958). *But see* discussion, note 125 *infra*.

106. INSURANCE REDLINING, *supra* note 20, at 6.

107. *Id.* at 8.

108. 42 U.S.C. § 1981 protects both whites and blacks from the consequences of racial discrimination against blacks. Therefore, white residents of areas with large minority populations are protected against discrimination in the sale of insurance where such discrimination is based on the minority composition of the area. McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 295 (1976); Sullivan v. Little Hunting Park, 396 U.S. 229, 237 (1969); Clark v. Universal Builders, Inc., 501 F.2d 324, 331-32 (7th Cir.), *cert. denied*, 419 U.S. 1070 (1974); Winston v. Lear-Siegler, Inc., 558 F.2d 1266, 1268 (6th Cir. 1977).

109. INSURANCE REDLINING, *supra* note 20, at 9.

110. Disparate impact has been sufficient to establish a prima facie case of racial discrimination in several areas. *See, e.g.,* the discussions in regard to Title VII in Griggs v. Duke Power Co., 401 U.S. 424, 432 (1971) and in regard to Title VI in Lau v. Nichols, 414 U.S. 563, 568 (1974).

Two federal appellate courts have adopted the discriminatory effect standard for plaintiff cases arising under Title VIII. See Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights, 558 F.2d 1283 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025 (1978); Resident Advisory Bd. v. Rizzo, 564 F.2d 126 (3d Cir. 1977), *cert. denied*, 435 U.S. 908 (1978). In *Arlington Heights*, the

132

to prove that some loss-related factor, *e.g.*, arson rates or a ratio of replacement value to market value above 150%,[111] and not race, was the basis for its action.

Support for the finding of a prima facie case is found in *Clark v. Universal Builders* and *Ortega v. Merit Insurance Co.*[112]  In both of those cases, the defendants were exploiting the consequences of racially segregated neighborhoods. In *Clark*, the Seventh Circuit decision which became' the basis of *Ortega*, the court stated that a prima facie case was established upon showing that prior racial segregation created a dual housing market and that defendants had taken advantage of that market by demanding prices and terms for blacks in excess of what was being required of whites.[113]  Having

---

Court of Appeals for the Seventh Circuit held that a Title VIII violation may be proved by showing a disproportionate effect on minorities of a government housing policy. 558 F.2d at 1289. The *Arlington Heights* court reasoned that the result of the defendant's action in refusing to zone for low- and middle-income housing in a virtually all-white area, regardless of its motive, would be to discriminate upon the basis of race. *Id.* This result frustrated the national goal of integrated housing, and thus it perpetuated segregation. *Id.*

The Court of Appeals for the Third Circuit also adopted the discriminatory effect standard for the prima facie case in the *Rizzo* decision. The *Rizzo* court held that the Philadelphia Housing Authority and the Redevelopment Authority of Philadelphia violated Title VIII because their actions, in converting an integrated area into an all-white area, had a discriminatory effect on minorities by denying them housing on the basis of race. 564 F.2d at 149-50. *Rizzo* and *Arlington Heights* demonstrate that the discriminatory effect standard is appropriate under Title VIII and that the prima facie case is a powerful evidentiary weapon in situations where the defendant has all the information and the plaintiff lacks access to the information, which is the case in insurance redlining.

In addition, statistics often have been used with judicial approval to establish a prima facie case of discrimination. *See, e.g.,* International Bhd. of Teamsters v. United States, 431 U.S. 324, 339, (1977) (employment discrimination); Turner v. Fouche, 396 U.S. 346, 360 (1970) (jury selection). Recently, the Supreme Court granted certiorari only to dismiss subsequently for mootness a case that would have decided whether § 1981 requires strict proof of intent to discriminate or whether proof of disparate impact will suffice to establish liability. The court of appeals had held that Title VII and § 1981 standards with regard to proof of racial discrimination are the same; both require proof of disparate impact only. Davis v. County of Los Angeles, 566 F.2d 1334 (9th Cir. 1977), *cert. granted,* 437 U.S. 903 (1978), *vacated as moot,* 99 S. Ct. 1379 (1979) (action by black and Mexican-American fire department applicants alleging discrimination in hiring by use of a height requirement not shown to be job related. Furthermore, race need not be shown to be the sole or even the primary factor underlying a refusal to issue a contract (in this case of insurance) to establish liability under § 1981. The use of race even as one among many other factors is impermissible. *See* note 37 *supra.* For an excellent discussion of the prima facie case, see Schwemm, *Discriminatory Effect and the Fair Housing Act,* 54 NOTRE DAME L. REV. 199 (1978); Comment, *Applying the Title VII Prima-Facie Case to Title VIII Litigation,* 11 HARV. C.R.-C.L. L. REV. 128, 157 (1976).

111. The "business necessity" defense is discussed at note 207 *infra.*

112. Clark v. Universal Builders, Inc., 501 F.2d at 334; Ortega v. Merit Ins. Co., 433 F. Supp. at 140. *See* notes 93-94 *supra.*

113. 501 F.2d at 334. *See* note 94 *supra.* The court appears to have assumed that the racial segregation underlying the dual housing market occurred as a result of intent rather than sheer happenstance. However, the *Clark* defendants did not themselves create the segregated residential pattern but merely used that pattern to their own pecuniary advantage.

established those two factors, the burden of persuasion then shifted to the defendants to articulate some legitimate, non-discriminatory reason for their conduct.

With insurance redlining, it seems reasonable to suggest that a prima facie case is established upon a showing that geographic areas have a disproportionate concentration of minority residents caused by prior racial segregation[114] and that insurers are restricting their general business in predominantly black areas, are charging excessive premiums, are requiring special terms and conditions, are limiting the extent of individual coverage, or are engaging in other discriminatory conduct.

### Section 1982

A contract of insurance also creates a property right. A contract of property insurance is a chose in action and is in itself a personal property right distinct from the building or contents that are insured.[115] The property right thus created is protected under section 1982.[116] An insurer's refusal to issue property insurance for reasons of race would unlawfully deny an individual the right to purchase personal property and thus would be actionable under section 1982.

Further, the historical relationship between section 1981 and section 1982 suggests that the two sections reasonably may be similarly construed.[117] To reiterate a similar discussion of section 1981 earlier, the data analyzed by the MSAC report revealed that residents of high minority communities had been denied insurance for reasons either based directly on race or associated with race.[118] Thus, it seems likely that the statistical disparities set forth in the study would sustain a prima facie case of racial discrimination under section 1982 where an applicant has been denied an insurance contract and alleges a racial basis for the denial.[119]

### Section 1985(c)

Section 1985 prohibits conspiracies between private persons to deprive a member of a racial minority of his or her civil rights.[120] The right of con-

---

114. The MSAC study merely confirmed what has been demonstrated in all large northern urban-suburban areas. Segregated housing patterns are the norm. *See, e.g.*, G. ORFIELD, MUST WE BUS? 77-85 (1978). The author discusses the development of urban racial ghettos and affirmative government support of segregated housing patterns.

115. 12 J. APPLEMAN, INSURANCE LAW & PRACTICE § 7016 (1968).

116. 42 U.S.C. § 1982 (1976). For the text of § 1982, see note 12 *supra.*

117. Tillman v. Wheaton-Haven Recreation Ass'n, 410 U.S. at 440. Thus, whites along with members of racial minorities are protected from racial discrimination.

118. INSURANCE REDLINING, *supra* note 20, at 29-30.

119. *Id.* at 30-32.

120. 42 U.S.C. § 1985 (1976). For the text of § 1985, see notes 89 and 36 *supra.* The specific language of the statute mandates "equal privileges and immunities under the laws." In *Griffin v. Breckenridge*, the Supreme Court indicated that "[t]he conspiracy . . . must aim at a depriva-

tract and the right to purchase property are both protected civil rights.[121] Therefore, this section prohibits agreements between insurers or with others to deny insurance on account of race.

Insurers customarily meet to discuss insurance practices only under the direction of the National Association of Insurance Commissioners (NAIC) or under the direction of their individual state insurance commissioners.[122] This policy is not in response to section 1985 but rather to avoid liability under that part of the Sherman Act from which insurers are not exempt under the McCarran-Ferguson Act.[123] Nonetheless, insurers are careful to avoid even the perception that they act in concert without state authorization.

As stated earlier, insurers regularly conduct their affairs through agents and brokers. Independent agents and brokers are not employees of a particular insurer while exclusive agents are. An insurer who agrees with an exclusive agent to refuse insurance to individuals for racial reasons cannot be held liable for a conspiracy because one cannot conspire with oneself.[124] An independent agent or broker, however, legally may be capable of participating in a conspiracy with an insurer where both agree to refuse insurance because of the race of the applicant.[125] Such agreements are precisely what is prohibited by section 1985.

In line with earlier discussions, the MSAC report[126] indicates that racial factors may be contributing significantly to the unavailability of insurance in the voluntary market. To the extent that insurers have agreed with independent agents or brokers or with each other to restrict insurance availability in areas with large minority population through the voluntary market, those agreements are unlawful under section 1985.

---

tion of the equal enjoyment of *rights secured by the law to all.*" 403 U.S. at 102 (emphasis added).

121. Because all persons have an equal right to buy property (§ 1982) and make contracts (§ 1981) and these are federally protected rights, a conspiracy to deprive an individual of these rights for reason of race constitutes an offense under § 1985.

122. The NAIC was founded in 1871. It is composed of the chief insurance regulatory officers of the 50 states, the District of Columbia, Puerto Rico, and the Virgin Islands. The organization meets twice a year to discuss matters of common interest including proposed legislation. The purposes of the NAIC include promoting uniformity in insurance law and regulation and preserving "to the several states the regulation of the business of insurance." NAIC CONST. art. 2.

123. *See* notes 60-61 and accompanying text *supra.*

124. Section 1985 embodies the well-established principle that a conspiracy requires at least two persons: "If two or more persons . . . . " For the text of § 1985, see notes 89 and 36 *supra. See* United States v. Santa Rita Store Co., 16 N.M. 3, 9-10, 113 P. 620, 621 (1911), for an early discussion of agency issues in prosecutions for conspiracies in violation of federal antitrust laws.

125. *See* note 105 *supra.* However, the insurance agent is considered an agent of the insurer to protect the applicant. That is, because the insurance agent is the agent of the insurer as opposed to the agent of the applicant, the latter is able to rely on the agent's representations in regard to the insurer. For purposes of § 1985, however, it would be reasonable to consider the insurance agent an independent contractor acting as agent of the applicant instead of insurer in order to carry out the underlying purpose of the principles relevant here, *i.e.,* protection of the applicant.

126. INSURANCE REDLINING, *supra* note 20, at 60.

336     *DEPAUL LAW REVIEW*   [Vol. 29:315]

### Title VIII

The Fair Housing Act of 1968 also was promulgated under the authority of the thirteenth amendment. [127] In addition to prohibiting racial discrimination in the sale and rental of housing or in associated services, the Act prohibits such discrimination based upon other factors, including national origin. [128] The Act also expressly prohibits discrimination in the issuance of real estate and home improvement loans, but does not expressly protect insurance transactions. Insurance is a prerequisite to obtaining a mortgage, however, and no mortgagee would be willing to lend money to a potential home buyer without having his or her interest in the property protected. [129]

Further, some financial companies maintain subsidiary property/casualty insurance businesses. [130] It undoubtedly would be unlawful for a financial company to deny an application for a real estate loan because of the applicant's failure to obtain insurance after the subsidiary had denied that insurance based on racial or ethnic considerations. Most insurers, however, are not directly affiliated with lending institutions and are not operating under express agreement with such institutions. In this case, denying an application for a real estate loan because the applicant could not obtain insurance is probably an activity too indirect to be reached by the present Act.

---

127. Fair Housing Act, 42 U.S.C. §§ 3601-3631 (1976). The Fair Housing Act was enacted as Title VIII of the Civil Rights Act of 1968. Act of Apr. 11, 1968, Pub. L. No. 90-254, 82 Stat. 81.

128. 42 U.S.C. § 3604 (1976) provides:

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, or national origin.

129. *See, e.g.*, U.S. PRESIDENT'S NAT'L ADVISORY PANEL ON INSURANCE IN RIOT-AFFECTED AREAS, MEETING THE INSURANCE CRISIS OF OUR CITIES 1 (1968).

130. Talman Federal Savings and Loan Association of Chicago, Illinois, is one such company that maintains a subsidiary property insurance business through the Talman Services Corporation General Insurance Division.

The more important question, however, is whether the Fair Housing Act as it now stands is broad enough to reach the practices of insurers themselves by prohibiting *insurance* redlining based on the minority composition of the neighborhood or minority status of the insurance applicant. Sections 3604(a), 3604(b), and 3617 of the Act[131] do not refer to insurance at all but rather limit their prohibitions to certain discriminatory acts that make dwellings "unavailable," to discrimination in the provision of "services and facilities" in connection with the sale or rental of dwellings, or to interferences with rights protected under, *inter alia*, section 3604.[132]

Insurance could be considered beyond the scope of the present Act for two reasons. First, the denial of insurance in the voluntary market does not make *dwellings* as such unavailable. Such redlining may render *mortgages* unavailable, although in twenty-eight states essential property insurance is available to all objectively insurable risks through the FAIR plan.[133] In fact, the FAIR plan was enacted independently of the Fair Housing Act to ensure that mortgages would not become unavailable to inner city residents because of their inability to secure essential property insurance.[134] Denial of residential property insurance through the voluntary market in these states does not render even mortgages unavailable.[135] Secondly, insurance is not a "service or facility" in connection with the *sale* or *rental* of the dwelling.[136] Furthermore, the sketchy legislative history of the Act is too inadequate to sustain a clear determination that Congress intended to reach such independent ancillary services as insurances.[137]

131. 42 U.S.C. §§ 3604(a), (b), 3617 (1976). Section 3617 provides:
   Interference, coercion, or intimidation; enforcement by civil action
      It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise of enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title. This section may be enforced by appropriate civil action.
   132. *Id.*
   133. 12 U.S.C. §§ 1749bbb-3 to -10 (1976). The FAIR plan was established by Title XII of the Housing and Urban Development Act of 1968. *Id. See* note 26 *supra.*
   134. INSURANCE CRISIS, *supra* note 17, at 4-5.
   135. In a recent case, however, a federal district court held that denial of insurance for racial reasons constituted a violation of § 3604(a) by making housing unavailable. Having determined a claim under § 3604(a), the court declined to reach the issue of services under § 3604(b). Dunn v. Midwestern Indem. Mid-Am. Fire & Cas. Co., 472 F. Supp. 1106 (S.D. Ohio 1979).
   136. 42 U.S.C. § 3604 (1976). Prohibited practices include, *inter alia*, real estate appraisal, steering, denial of multiple listing services, discriminatory application procedures, refusal of representation by a real estate broker, and imposing disparate appraisal values. *Id.*
   137. *See Prosposed Amendments to the Fair Housing Act: Hearings on H.R. 3504 and H.R. 7787 Before the Subcomm. on Civil and Constitutional Rights of the Comm. on the Judiciary of the House of Representatives,* 95th Cong., 2d Sess. 36-37 (1978) (statement of Drew S. Days III) [hereinafter cited as *Proposed Amendments*]; Dubofsky, *Fair Housing: A Legislative History and a Perspective,* 8 WASHBURN L.J. 149 (1969).

*DEPAUL LAW REVIEW* [Vol. 29:315

Nonetheless, by administrative decision[138] and by developing case law,[139] it is being determined that the Fair Housing Act is indeed broad enough to bring insurance companies within its ambit. Whether these decisions will be supported by higher courts remains unresolved. Assuming that the Fair Housing Act as it is presently written does prohibit insurance redlining based upon racial factors, the same section 1981 arguments would apply to ban discrimination against whites as well as racial and ethnic minorities who live in a particular area.[140]

Furthermore, it would not be necessary to demonstrate that race was the only factor underlying the denial of insurance. Rather, it would be sufficient to establish liability if race, an impermissible factor under Title VIII, was shown to be merely *one* factor underlying the denial of insurance.[141] Such proof that race was a basis for denying insurance, would, of course, satisfy any intent requirement imposed upon Title VIII.

With regard to the question of intent, the Seventh Circuit, on the remand of the *Arlington Heights* case, indicated that "at least under some circumstances a violation of section 3604(a) can be established by a showing of discriminatory effect without a showing of discriminatory intent."[142] These circumstances would seem to include conduct whose "natural, probable and foreseeable" consequences result in racial discrimination.[143] Thus, (assuming that the present Fair Housing Act does reach insurance company practices) an insurance company that redlines an area with a high concentration

---

138. *Proposed Amendments, supra* note 137, at 2, Memorandum of the General Counsel of Housing and Urban Development to Chester McGuire, Assistant Secretary for Equal Opportunity (Aug. 15, 1978).

139. Dunn v. Midwestern Indem. Mid-Am. Fire & Cas. Co., 472 F. Supp. 1106 (S.D. Ohio 1979).

140. *See* Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205 (1972) (tenants alleged landlord had denied them the rights derived from living in an integrated apartment complex by refusing to rent to minorities); Laufman v. Oakley Bldg. & Loan Co., 408 F. Supp. 489 (S.D. Ohio 1976) (plaintiffs' allegation that they were denied a home mortgage because of defendants' redlining practice stated a cause of action under the Fair Housing Act of 1968).

The meaning of the term "minority" is now reasonably consistent in federal legislation. *See,* e.g., 42 U.S.C. § 6705 (Supp. I 1977) (Negroes, Spanish-speaking persons, Orientals, Indians, Eskimos, and Aleuts); 41 C.F.R. § 60-211(a) (1979) (Blacks, Spanish-surnamed Americans, American Indians, and Orientals).

141. Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. at 265-66; Williams v. Matthews Co., 499 F.2d 819, 826 (8th Cir. 1974); Smith v. Sol D. Adler Realty Co., 436 F.2d 344, 349-50 (7th Cir. 1970). *See* note 37 *supra.*

142. 558 F.2d at 1290.

143. *E.g.,* Brinkman v. Gilligan, 583 F.2d 243 (6th Cir. 1978), *cert. granted sub nom.* Dayton Bd. of Educ. v. Brinkman, 439 U.S. 1060 (1979) (constitutional violation found where school district's actions led naturally, probably, and foreseeably to the creation and maintenance of a dual school system); Oliver v. Michigan State Bd. of Educ., 508 F.2d 178 (6th Cir.), *cert. denied,* 421 U.S. 963 (1974) (attendance zoning policy of school board indicated purposeful pattern of segregation).

003738

of minority residents, either through the outright refusal to sell insurance or by imposing special terms or conditions, could be held to violate Title VIII.

Congress may, of course, expressly amend the Fair Housing Act to include insurance company practices within the ambit of the Act's protections. Denial of property insurance does make the possibility of obtaining ownership of real property more difficult, particularly in states without a FAIR plan. To the extent that discrimination in the sale of insurance frustrates the purpose of the Fair Housing Act, those practices should be expressly prohibited. At the present time, a bill to amend the Fair Housing Act[144] pending before a House subcommittee would prohibit, *inter alia*, an insurer from refusing to enter into an insurance contract because of the race, color, or national origin of persons living in or near the dwelling at risk.[145] No final action has been taken although hearings before the subcommittee concluded in June of 1979.[146]

### The Federal Insurance Administration [147]

Apart from these statutory remedies, the federal government is not without current authority to initiate studies of insurance industry practices. As part of its responsibilities under the National Insurance Development Program,[148] the recently created Federal Emergency Management Agency (FEMA) is empowered to study a variety of insurance company practices through the Federal Insurance Administration.[149]   At the present time, the Federal Insurance Administration is authorized to investigate underwriting techniques, insurance and marketing methods, and practices of private insurers that affect the availability of essential property insurance in urban areas.[150]   For example, an insurer's return on its investments contrib-

---

144. H.R. 5200, 96th Cong., 2d Sess. (1980). Another bill, H.R. 100, 96th Cong., 1st Sess. (1979), pending before the Subcommittee on Consumer Protection and Finance of the Committee on Interstate and Foreign Commerce, House of Representatives, would prohibit any discrimination in insurance based on race, color, religion, sex, or national origin.

145. Section 804 of the Fair Housing Act would be amended by adding a new section (f). Thus, 42 U.S.C. § 3604 would be amended by making it unlawful for "a person in the business of insuring against hazards to refuse to enter into or discriminate in the terms, conditions or privileges of a contract of insurance against hazards to a dwelling because of race, color, religion, sex, handicap, or national origin of persons owning or residing in or near the dwelling." H.R. 5200, 96th Cong., 1st Sess. § 804(f) 1980).

146. Originally, H.R. 5200 was proposed during the 95th Congress as H.R. 3504. Hearings on H.R. 3504 were concluded in July, 1978.

147. The Federal Insurance Administration was transferred to the Federal Emergency Management Agency from the Department of Housing and Urban Development on April 1, 1979

148. 12 U.S.C. § 1749bbb-21 (1976).

149. Under the President's Reorganization Plan No. 3, 3 C.F.R. 329 (1979), *reprinted in* 5 U.S.C.A. app. II, at 155 (1979 Supp.), the Federal Insurance Administration (FIA) Department of Housing and Urban Development (HUD), was transferred to the newly created Federal Emergency Management Agency (FEMA).

150. The statutory responsibilities of FIA, HUD, have been transferred in toto to FEMA. Those duties relevant to this discussion are set forth in 12 U.S.C. § 1749bbb-16 (1976).

*DEPAUL LAW REVIEW* [Vol. 29:315

utes to that company's surplus. That surplus in turn determines in signifi-
cant part the amount of insurance an insurer legitimately may write (with due
regard to solvency concerns).[151] To the extent that investments control un-
derwriting, therefore, the Federal Insurance Administration would seem to
have the present authority to investigate practices.

The authority of the Federal Insurance Administration to initiate studies of
practices to determine the availability of property insurance in urban areas is
part of its authority to carry out the purposes of the federal FAIR plan and
the federal crime insurance program.[152] Such studies, however, are not
authorized under the Fair Housing responsibilities of the Department of
Housing and Urban Development. Thus, any sanctions available under the
Fair Housing Act are not available to the Federal Insurance Administration
even if a study of insurer practices concludes that insurers are engaging in
investment practices the effect of which is to disproportionately deny insur-
ance to members of racial minorities unless the Fair Housing Act itself can
be legitimately construed to include insurance practices.[153]

The FAIR plan does not require any certification of nondiscrimination by
participating insurers in their *voluntary* market practice.[154] Under the
FAIR plan, of course, no risk may be refused essential property insurance
unless the property itself fails to meet reasonable underwriting standards as
determined by inspection.[155] Violation of the federal requirements for a
state fair housing program would subject the entire FAIR plan to withdrawal
of the approval of the Federal Insurance Administration and, consequently,
render participating insurers ineligible for riot reinsurance.[156] There appear
to be no sanctions directly available to the Federal Insurance Administration
under its present authority to investigate insurer practices in the *voluntary*
market, however, even where such investigations reveal either intentional or
effective racially discriminatory practices.

### The Fourteenth Amendment

The fourteenth amendment states in the pertinent part of section 1: "nor
shall any State deprive any person of life, liberty, or property, without due
process of law; nor deny to any person within its jurisdiction the equal pro-

---

151. INSURANCE REDLINING, *supra* note 20, at 21-22.

152. 12 U.S.C. § 1749bbb-16 (1976).

153. The present Fair Housing Act permits private litigation by an aggrieved party as well as
pattern and practice suits by the Attorney General. 42 U.S.C. §§ 3612, 3613 (1976). The pro-
posed amendments to the Fair Housing Act provide for administrative relief including cease and
desist orders. H.R. 5200, 96th Cong., 2d Sess. § 804 (1980).

154. Telephone interview with Frank Reilly, Assistant Administrator, Office of FIA, FEMA
(July 19 1979)

155. 12 U S C. § 1749bbb-3 (1979).

156. *Id.* § 1749bbb-7 -9

140

tection of the laws."[157] Thus, both the due process and equal protection clauses protect individuals against the misuse of power by the states. That protection does not extend, however, to the actions of private persons.[158] It consistently has been held that to find ostensibly private conduct to be violative of either clause, a threshold finding of "state action" must be made.[159]

Where the challenged action is the positive act of the state itself, the presence of state action is clear. Thus, in *Skinner v. Oklahoma*,[160] for example, where the state enacted legislation authorizing "habitual criminals" to be sterilized, the conduct that allegedly violated the equal protection clause of the fourteenth amendment was unequivocally "state action."[161] In other cases, the acts complained of were not those of the state but rather those of individuals bearing some special relationship to the state. It was in this area of private conduct that the Supreme Court first expanded and subsequently constricted the scope of "state action."

Prior to the early 1970's, the Court developed several theories under which, to varying degrees, it held the conduct of private individuals to be tantamount to "state action" under the fourteenth amendment. In *Marsh v. Alabama*,[162] the Court determined that the activities of a privately owned company town were "functionally equivalent" to those of a municipality.[163] Therefore, those acts were held to constitute "state action" under the fourteenth amendment.[164] Subsequently, in *Shelley v. Kraemer*,[165] the Court found that restrictive covenants in real estate contracts between private persons, upheld by a state court, constituted private action backed up or enforced by "state action."[166]

The parameters of "state action" were expanded further in *Burton v. Wilmington Parking Authority*,[167] when the Supreme Court found "state action"

---

157. U.S. CONST. amend. XIV, § 1.

158. Civil Rights Cases, 109 U.S. 3, 11 (1883).

159. *E.g.*, Skinner v. Oklahoma, 316 U.S. 535 (1942).

160. *Id.* (struck down Oklahoma sterilization statute covering habitual felons as violative of the equal protection clause).

161. *Id.* at 541.

162. 326 U.S. 501 (1946). This case involved an action for violation of first amendment free speech rights caused by the management of a company town. The Court found state action to be present as a result of its comparison of the town services to those of municipality.

163. *Id.* at 508.

164. *Id.* at 506.

165. 334 U.S. 1 (1948). In *Shelley*, the petitioners claimed judicial enforcement of restrictive covenants denied them access to housing in violation of the fourteenth amendment. *Id.* at 7. The Court held: "That the action of state courts and judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court." *Id.* at 14.

166. *Id.* at 13-14.

167. 365 U.S. 715 (1961). In this case, the plaintiff was denied service because of his race by a restaurant located in a publicly owned parking facility. He claimed that the denial violated the equal protection clause. *Id.* at 716. The Court held:

in a "symbiotic relationship" between a private business and a publicly-owned service.[168] This case involved racial discrimination by a private restaurant that leased space from a public parking garage.[169]

Another theory on which the Supreme Court based its expansion of "state action" was set forth in *Reitman v. Mulkey*.[170] There, California had amended its constitution to bar the state and local municipalities from legislatively prohibiting racial discrimination in housing.[171] The Supreme Court held that this state constitutional provision violated the federal Constitution because it "encouraged and supported" private racial discrimination,[172] and as such was "state action."

The development of situations in which the "nonobvious involvement of the State in private conduct"[173] was sufficient to become cognizable state action ended abruptly in 1972 with the *Moose Lodge No. 107 v. Irvis*[174] decision. Justice Rehnquist, writing for the six-man majority, emphasized that the Moose Lodge was a genuinely private club and that such clubs could discriminate in the selection of members with impunity.[175] The Court held that the granting of a state liquor license to a private club did not constitute "state action" under the fourteenth amendment.[176] Accordingly, the state was found not to be jointly participating in the racially discriminatory practices, nor encouraging them, nor existing in a symbiotic relationship with the club through its issuing of the liquor license.[177] Therefore, the club's racially discriminatory practices were held not to be those of the state.[178]

Finally, in 1974, in *Jackson v. Metropolitan Edison Co.*,[179] the Court further restricted the circumstances in which it would find state action. The

---

Addition of all these activities, obligations, and responsibilities of the Authority, the benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service, indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn.

*Id.* at 724.

168. *Id.* at 723-26.

169. *Id.* at 716. The mutual benefit theory developed in *Burton* recently was applied by the Michigan Supreme Court to that state's no-fault insurance act. Shavers v. Kelley, 402 Mich. 554, 267 N.W.2d 72 (1978), *cert. denied sub. nom* Allstate Insurance Company v. Kelley, 99 S. Ct. 2869 (1979). The court determined that the state was carrying out a general welfare scheme through insurance companies with the legislative no-fault plan and found state action in the challenged policies of the insurer. *Id.* at 597, 267 N.W.2d at 86.

170. 387 U.S. 369 (1967).

171. *Id.* at 371.

172. *Id.* at 376-81.

173. Burton v. Wilmington Parking Auth., 365 U.S. at 722.

174. 407 U.S. 163 (1972).

175. *Id.* at 171, 175.

176. *Id.* at 177.

177. *Id.* at 175-77.

178. *Id.*

179. 419 U.S. 345 (1974).

defendant utility company had discontinued service to an individual for alleged nonpayment of bills without prior notice, even though the company's tariff filed with the state provided that service could be discontinued only on reasonable notice.[180] Thus, the company had violated its own procedures and the state had failed to bring the company into conformance with its own tariff approved by the state regulatory agency. Justice Rehnquist, again writing for a six-man majority, determined that the state must be significantly involved in the *particular* actions under attack.[181] There must be, in the language of the Court, "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself."[182] Extensive state regulation, according to the Court, even a state grant of monopoly status to a company, does not, standing alone, constitute such a sufficiently close nexus.[183]

In the earlier cases—in *Burton*, for example—the Court had required a less direct connection between the alleged state involvement and the challenged conduct. In the *Jackson* opinion, the Court held that the state's conduct must be, in effect, the challenged conduct. Furthermore, with *Jackson*, the state's passive acquiescence to the challenged conduct is insufficient to constitute encouragement of that conduct by the state for purposes of finding "state action." Thus, the Court has made it considerably more difficult for a litigant to pass beyond the threshold issue of the presence of state action.

The *Jackson* case also limited the reach of the fourteenth amendment by declaring that providing essential public services is not equivalent to state action.[184] According to *Jackson*, grocers, physicians, and many others provide essential services.[185] To hold that the acts of such providers become those of the state would effectively destroy the important and well-established dichotomy between state and private action. In addition, the *Jackson* opinion pointed out that all corporations are creatures of state law and subject to varying degrees of state regulation.[186] To hold that state regulation itself involves the state in allegedly prohibited conduct also would destroy the public-private distinction. Thus, *Moose Lodge* and *Jackson* clearly suggest that the scales are not likely to shift in favor of a threshold finding of "state action" in private conduct in the near future.

In analyzing whether challenged conduct violates the due process or equal protection clauses of the fourteenth amendment, the Court first will look at the threshold issue of state action. Only when state action has been found in the substantive challenged conduct itself will that conduct be scrutinized under the various due process or equal protection tests. Therefore, in con-

---

180. *Id.* at 346-47.
181. *Id.* at 350-51.
182. *Id.*
183. *Id* at 352.
184. *Id.* at 353-54.
185. *Id.* at 354.
186. *Id.* at 350.

003743

*DEPAUL LAW REVIEW* [Vol. 29:315

sidering whether insurance company practices may be challenged as violative of the fourteenth amendment, it is necessary first to look at the involvement of the state in those practices. Only if the state is significantly involved in the discriminatory or unfair practices themselves would the Court be likely to judge those practices against the traditional fourteenth amendment standards. This threshold question requires an analysis of the relationship between the private insurance industry and the state within the currently applicable theoretical framework being utilized by the Supreme Court.

*Equal protection constraints on insurance redlining*

Insurance companies are subject to heavy regulation by the states in which they are licensed to do business.[187] The Supreme Court, in 1869, expressly recognized the power of the states to so regulate in the crucial case of *Paul v. Virginia*.[188] Since that time, federal and state regulators, insurers, and insurance-related organizations all have pushed for a continuation of state control.[189]

By contrast, as noted earlier, the federal government consistently has backed away from regulation of the insurance industry. In 1944, however, the Supreme Court determined for the first time that the business of insurance was a matter of interstate as opposed to exclusively intrastate commerce.[190] As a result, insurance company practices necessarily became subject to federal antitrust laws. The following year, Congress accepted the judicial invitation to exempt insurance companies from federal antitrust laws and enacted the McCarran-Ferguson Insurance Regulation Act.[191] Under this Act, insurance companies became exempt from antitrust laws to the extent of state regulation. Thus, the federal government through an act of positive law expressly relegated the regulation of the insurance industry to the states.

State regulators also have acted to keep the power of regulation over the insurance industry in their hands. For example, the constitution of the National Association of Insurance Commissioners (NAIC) lists as one of the organization's purposes: preserving to the "States the regulations of the business of insurance."[192] Also, the NAIC routinely promulgates model uniform insurance provisions that are submitted to state legislators across the country for enactment.

---

187. *E.g.*, ILL. REV. STAT. ch. 73 (1977).

188. 75 U.S. (8 Wall.) 168 (1869). *See* note 38 *supra*.

189. Article 2 of the NAIC Constitution states that one of its principal purposes is to promote national uniformity in insurance law and regulation.

190. United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533 (1944). *See* notes 46-53 and accompanying text *supra*.

191. 15 U.S.C. §§ 1011-1015 (1976).

192. NAIC CONST. art 2.

Thus, almost every aspect of the insurance business, from rates and investments through policy forms, is regulated at the state level.[193] Further, many states have legislatively created a residual insurance organization such as the FAIR plan.[194] In addition, the states have enacted unfair trade practices acts that make certain discriminatory conduct such as discrimination based on race, national origin, sex, or marital status unlawful.[195]

In Illinois, for example, the refusal to provide homeowners insurance solely on the basis of geographic location now is a prohibited trade practice.[196] In addition, the refusal to renew a fire and extended coverage property insurance policy in effect for five years or more is prohibited unless the refusal is based upon misrepresentation or fraud in securing the contract, a measurable increase in the risk originally accepted by the insurer, or at least sixty days prior notice of the insurer's intent not to renew.[197] Discrimination between individuals or between similar risks based on race, color, religion, or national origin also is barred.[198]

A review of state insurance and public utility codes reveals many similarities between the respective practices that are regulated by the states.[199] In both cases, there is extensive statutory and administrative regulation of the conduct of the companies, both of their internal financial policies and of their practices in regard to consumers. Of the two types of industries, however, the insurance industry is probably subject to more express state prohibitions against racial discrimination than are the public utilities. State action, therefore, has not created, through legislative or regulatory enactment, racially discriminatory conduct of the kind prohibited by the fourteenth amendment.[200]

---

193. Illinois is the only state that is currently lacking a rating law. *See* ILL. REV. STAT. ch. 73, § 1065.18-1 to .34 (1971); ILL. INS. REGS. 7A. 04 (1972).

194. In Illinois, *see* ILL. REV. STAT. ch. 73, §§ 1065.69-77 (1977). The purpose of the plan is:
> to make basic property insurance available in urban areas and to public educational institutions through the establishment of an Industry Placement Facility for administering a FAIR plan (Fair Access to Insurance Requirements), and a Joint Reinsurance Association for the equitable distribution and placement of risks among companies transacting property insurance business in the State of Illinois.

*Id.* § 1065.69.

195. In Illinois, *see id.* § 1031(3). For the text of § 1031(3), see note 79 *supra*.

196. *Id.* § 767.22 (Supp. 1978). In addition, a policy of fire and extended coverage may not be nonrenewed, *inter alia*, because of the location of the property. *Id.* § 755.21a(b) (1977).

197. *Id.* § 755.21.1 (Supp. 1978). A complementary provision provides that nonpayment of premiums, fraud and misrepresentation, or any act that measurably increases the risk initially accepted are the only bases for cancellation of fire and extended coverage policies in effect for one year. *Id.* § 755.21 (1977).

198. *Id.* § 1031(3). In addition, a policy of fire and extended coverage may not be nonrenewed, *inter alia*, for reasons of race, color or national ancestry. *Id.* § 755.21a(c).

199. *E.g., id.* chs. 73, 111 2/3.

200. *Rights and Remedies Hearings, supra* note 5, at 201 (testimony of Stephen I. Martin, Vice President, The Hartford Group). Michigan, for example, expressly prohibits refusing to insure, refusing to renew or limiting the amount of coverage based on race. MICH. COMP. LAWS § 500.2027 (MICH. STAT. ANN. § 24.12027 (Callaghan Supp. 1979)). Minnesota and Wis-

*DEPAUL LAW REVIEW* [Vol. 29:315

Further, according to the analysis set forth in *Jackson*, in order to implicate a state in allegedly unconstitutional private conduct, a significant "nexus" must be demonstrated between the precise conduct attacked and the actions of the state. [201] The state's involvement in the private sector through general regulation is insufficient to meet the "nexus" test. Thus, if a private insurance company is discriminating against applicants for insurance on the basis of race, the state will be involved for the purpose of finding "state action" only if the state can be shown to be involved in the racially discriminatory practices themselves, either directly through positive order or indirectly through support and encouragement.

In the majority of jurisdictions, it would be possible to show only the state's acquiescence to racially discriminatory practices. Whether the failure of state regulatory officers to overturn discriminatory actions of insurers qualifies as "state action" is a delicate question. In *Jackson*, the Supreme Court determined that a state's passive acceptance did not constitute "state action." [202] That holding was premised, however, on a finding that the acceptance "amounted to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired." [203]

In most states, racial discrimination is unlawful and in some states, including Illinois, geographic redlining is illegal. [204] Therefore, if the state regulator permits such prohibited discriminatory practices to continue without taking proper action to restrain such insurers acting outside the law, it could be argued that the state is encouraging and authorizing this conduct. [205]

The theory may in fact be difficult to sustain. First, insurers do not maintain express racial classifications. Instead, they classify property risks on such bases as age of structure, type of construction, and other factors allegedly associated with loss experience. [206] Thus, it is possible for insurers to dis-

---

consin prohibit classification of risks based on race. MINN. STAT. § 70A. 05(2) (1976); WIS. STAT. § 625.12(2) (1977). In almost all states, unfair discrimination, *i.e.*, discrimination based on other than loss related factors, is prohibited.

201. 419 U.S. at 350-51.

202. *Id.*

203. *Id.* at 357.

204. *See* note 196 *supra*.

205. *See* Reitman v. Mulkey, 387 U.S. 369 (1967). This case involved a constitutional referendum in California in which an amendment to the state constitution was ratified. The amendment stated:

Neither the State nor any subdivision or agency thereof shall deny, limit or abridge, directly or indirectly, the right of any person who is willing or desires to sell, lease or rent any part or all of his real property, to decline to sell, lease or rent such property to such person or persons as he, in his absolute discretion, chooses.

*Id.* at 371. The United States Supreme Court affirmed the California Supreme Court's judgment that this amendment violated the fourteenth amendment equal protection clause because the provision would make the right to discriminate a basic policy of the state. Thus the state would be involved in the encouragement of private discrimination. *Id.* at 381.

206. PRICING AND MARKETING, *supra* note 15, at 189. In addition, Illinois prohibits geographic redlining only to the extent that location of risk may not be the *sole* basis for refusing to insure. ILL. REV. STAT. ch. 73, § 767.22 (1977). This section provides:

*INSURANCE REDLINING*

guise racial or geographic redlining that itself masks racial discrimination by developing classifications that bear a direct relationship to loss experience[207] and an indirect relationship to racial or ethnic factors. Thus, as in *Jackson*, a regulator's failure to restrain the practices culminating in discrimination against minorities would at most be a determination that he or she found the conduct permissible under state law.[208]

After *Jackson*, the state's failure to overturn indirectly discriminatory practices, except where the regulator knows the insurer is violating state law and fails to restrain the violation, probably will be insufficient to implicate the state in those practices for purposes of the "state action" doctrine.[209] Furthermore, even the essential nature of insurance, the unique relationship between the insurance industry and the public interest recognized in *German Alliance Insurance Co. v. Lewis*[210] will not sustain a "state action" requisite. As stated in *Jackson*, "affected with the public interest" means only that an industry is subject to state control. The phrase does not mean that such businesses are "state actors."[211]

---

> No company authorized to transact in this State the kinds of business described in Classes 2 and 3 of Section 4 shall upon proper application refuse to provide homeowners insurance solely on the basis of the specific geographic location of the real property or building sought to be insured. "Homeowners insurance," for purposes of this Section, means the personal multi-peril property coverage commonly known as homeowners insurance.

In addition, location, age of property, and race or ethnicity may not be the bases of a decision to nonrenew a contract of property insurance. *Id.* § 755.21a. The section provides:

> Nonrenewal of fire and extended coverage policy—Grounds. A policy of fire and extended coverage insurance, as defined in Section 143.13(b), may not be non-renewed for any of the following reasons:
>   (a) age of property,
>   (b) location of property,
>   (c) age, sex, race, color, ancestry or occupation of occupants.

Varying terms and conditions on the basis of location, however, is not prohibited.

207. Address by L. Jordan, General Counsel, State Farm Insurance Company, Insurance Redlining and Reinvestment: Directions for Change Conference (Chicago, Ill., Mar. 23, 1979). The "business necessity" defense that underlies this argument, of course, is valid only where racial discrimination is an inadvertent effect and not the purpose of the challenged conduct and where the challenged conduct is itself essential to accomplish a compelling business purpose. *E.g.*, Griggs v. Duke Power, 401 U.S. at 431; United States v. St. Louis-S. F. Ry., 464 F 2d 301, 308 (8th Cir. 1972), *cert. denied*, 409 U.S. 1107 (1973); Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir.), *cert. dismissed*, 404 U.S. 1006 (1971). The "business necessity" issue would, of course, also arise under §§ 1981, 1982, and Title VIII.

208. The fourteenth amendment would not prohibit discrimination based on age of housing, or loss experience where there is no purposeful discrimination against a protected group. *E.g.*, Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. at 265-66; Washington v. Davis, 426 U.S. 229, 240-42 (1976).

209. For a comprehensive analysis of the impact of the *Jackson* case on the "state action" doctrine, *see* Nolte, *State Action After Jackson v. Metropolitan Edison Co.: Analytical Framework for a Restrictive Doctrine*, 81 DICK. L. REV. 315 (1977).

210. 233 U.S. 389, 415 (1914).

211. Jackson v. Metropolitan Edison Co., 419 U.S. at 353, *quoting* Nebbia v. New York, 291 U.S. 502, 536 (1934).

348          *DEPAUL LAW REVIEW*          [Vol. 29:315

Because private insurers practicing overt racial or ethnic discrimination have not been ordered or permitted by the state to do so, and because states expressly prohibit invidious racial discrimination, the requisite element of "state action" would seem to be absent from a claim that the equal protection clause has been violated. Therefore, the substantive question of whether racial discrimination in the sale of insurance violates that clause will not be reached. It seems likely that as long as the theoretical underpinnings of *Jackson* prevail, an equal protection claim of racial discrimination in cases of geographic redlining by insurers will fail.

A different conclusion, however, was reached in *Stern v. Massachusetts Indemnity & Life Insurance Co.*,[212] where the plaintiff alleged sex discrimination in violation of the fourteenth amendment. In that situation state law specifically authorized discrimination between insureds based on sex.[213] Unlike the use of race as a basis for underwriting decisions in property insurance at issue here, the sex discrimination in *Stern* occurred directly as a result of legislation. Clearly the initiative for the challenged sex discrimination came from the state, who had "put its own weight on the side of the proposed practice by ordering it."[214] That is the level of state involvement that is likely to pass the *Jackson* hurdle.

### Due process constraints on declinations and terminations of property insurance

The threshold question of "state action" is the same under the due process clause as under the equal protection clause. The *Jackson*[215] case was in fact a challenge to the procedures employed by the public utility in terminating service, while *Moose Lodge*[216] was grounded in the equal protection clause. In both cases, by addressing the "state action" question first, the Court never reached the question whether a property right to which constitutional due process protections attached had been violated.

Were it not for the *Jackson* rationale, it would seem reasonable to argue that when a state such as Illinois mandates that insurance cannot be declined, terminated, or nonrenewed except for limited reasons, the state has created a "legitimate claim of entitlement" to property insurance.[217] That is, the state by positive act of law created a constitutionally cognizable property interest. Given such a property interest, the procedures enacted or pur-

---

212. 365 F. Supp. 433 (E.D. Pa. 1973) (allegation that insurance company refused to sell disability insurance to women under the same terms and conditions available to men, solely on the basis of sex, was sufficient to state a cause of action based on a violation of equal protection).
213. *Id.* at 438.
214. Jackson v. Metropolitan Edison Co., 419 U.S. at 357.
215. *Id.* at 348.
216. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 165 (1972).
217. Perry v. Sindenmann, 408 U.S. 593, 602 (1973) (state college instructor who was dismissed without an explanation or hearing was entitled to show he had "a legitimate claim of entitlement to job tenure").

sued by the state to protect that interest would be entitled to review by the courts to determine their adequacy for purposes of the due process clause. However, as in *Jackson*, it is unlikely that "state action" would be found in cancellation and nonrenewal procedures by insurers sufficient to meet the threshold requirement.

Recently, however, in a suit against, *inter alia*, private insurers challenging the Michigan no-fault automobile insurance law, the Michigan Supreme Court held that the Act violated federal due process protections. In *Shavers v. Kelly*,[218] the court determined, first, that "state action" was present because the state was carrying out a general welfare scheme through private insurance companies under the no-fault insurance act. Second, the court found that the total absence of procedures whereby an individual could complain about placement in the Act's mandated, involuntary "Automobile Placement Facility" violated the due process clause of the fourteenth amendment.[219] That is, under the Michigan no-fault provision, no legal remedy whatsoever had been established for an individual to grieve the refusal of a private insurer to provide insurance coverage. The *Shavers* case, because of its unique facts, apparently skirted the *Jackson* hurdle.

### STATE CONSTITUTIONAL LIMITATIONS

State constitutions should not be overlooked as potential bases on which to ground an action challenging the racially discriminatory practices of property insurers. Each state constitution approaches issues of racial discrimination uniquely. There is, however, enough uniformity among the states to permit at least a brief discussion here.

A number of state constitutions echo the language of the Declaration of Independence concerning the inalienable rights of persons, including the right to acquire, possess, and protect property.[220] More importantly, several states guarantee that no person shall be deprived of the equal protection of the law and/or that no person shall be deprived of property without due process of law.[221] As discussed earlier, insurance contracts are personal

---

218. 402 Mich. 554, 267 N.W.2d 72 (1978), *cert. denied sub. nom* Allstate Ins. Co. Kelley, 99 S. Ct. 2869 (1979) (where one may not be licensed to drive unless a participant in state's no-fault insurance program, all persons are entitled to such insurance protection because the operation of an automobile is crucial to an individual's day-to-day living).

219. *Id.* at 604-05, 267 N.W.2d at 89-90.

220. *See, e.g.*, ARK. CONST. art. 2, § 2; CAL. CONST. art. I, § 1; COLO. CONST. art. 2, § 3; HAWAII CONST. art. I, § 2; IDAHO CONST. art. 1, § 1; KY. CONST. § 1; LA. CONST. art. 1, § 4; ME. CONST. art. I, § 1; MASS. CONST. pt. 1, art. 1; MONT. CONST. art. 3, § 3; NEV. CONST. art. 1, § 1; N.H. CONST. pt. 1, art. 1; N.J. CONST. art. 1, § 1; N.M. CONST. art. 2, § 4; N.D. CONST. art. 1, § 1; OHIO CONST. art. 1, § 1; PA. CONST. art. 1, § 1; S.D. CONST. art. 6, § 1; UTAH CONST. art. 1, § 1; VT. CONST. ch. 1, art. 1; VA. CONST. art. 1, § 1; W. VA. CONST. art. 3, § 1.

221. *See, e.g.*, ALA. CONST. art. 1, §§ 1, 7; ALASKA CONST. art. 1, §§ 1, 7; ARIZ. CONST. art. 2, §§ 4, 13; ARK. CONST. art. 2, §§ 3, 21; CAL. CONST. art. 1, § 1 (equal protection and due process clauses); COLO. CONST. art. 2, §§ 6, 25; CONN. CONST. art. 1, §§ 10, 20; FLA.

property.[222] · Therefore, ·the ·right to purchase a contract of property·insur-
ance is a property right·that should be within the scope of state constitu-
tional due process protections·

The likelihood that the conduct of private insurers lies outside·the sphere
of activity protected by the fourteenth amendment as currently·interpreted
by the Supreme Court already has been reviewed.[223]  It is the necessity for
finding active ·state·involvement in· the· challenged ·conduct itself that has
recently defeated claims against private persons and businesses based upon
federal civil rights law enacted under· the fourteenth amendment.[224] , The
federal and state parameters of due·process and equal protection, however,
are not necessarily· the same.·One·significant difference lies ·in the ·absence
of express language in· most· state· constitutions prohibiting only ·state· ac-
tion.[225] ·

It is entirely possible under·state constitutional interpretation that racially
discriminatory conduct by private·insurers left uncorrected by state·law vio-
lates state guarantees of due·process·and/or equal protection. This is so be-
cause courts interpreting state·strict·liability·constraints ·are not· limited by
the *Jackson* rationale requiring·active·state involvement in the allegedly vio-
lative private conduct itself. Thus, racially discriminatory conduct by private
insurers that is either prohibited·by state law· and uncorrected by the insur-
ance regulatory officer, or permitted by state law·in its failure to prohibit the
conduct, may be violative of state· equal protection and/or due process
guarantees based on general state legislative ·and ·regulatory responsibility
regarding insurers.

Illinois recently has moved even further than other states in protecting the
right to property. Since 1970, Illinois has constitutionally forbidden discrimi-

---

CONST. art. 1, §§ 2, 9; GA. CONST. art, 1, § 1, ¶ 1, & § 2, ¶ 3; HAW. CONST. art. 1, § 4 (equal
protection and due process clauses); ILL. CONST. art. 1, § 2 (equal protection and due process
clauses); IND. CONST. art. 1, §§ 12, 23; IA. CONST. art. 1, §§ 1, 9; KY. CONST. amend. 14, § 1
(equal protection and due·process clauses); LA. CONST. art. 1, §§ 2, 3; ME. CONST. art. 1, §
6-A (equal protection and due process clauses); MD. CONST. art. 23 (due process clause); MASS.
CONST. pt. 1, arts. 1, 10; MICH. CONST. art. 1, §§ 2, 17; MINN. CONST. art. 1, §§ 2, 7; MISS.
CONST. art. 3; § 14 (due process clause); MO. CONST. art. 1, §§ 2, 10; MONT. CONST. art. 3, §§
3, 27; NEB. CONST. art. 1, §§ 1, 3; NEV. CONST. art. 1, §§ 1, 8; N.H. CONST. pt. 1, arts. 1, 15;
N.J. CONST. art. 1, § 1 (equal protection and due process clauses); N.M. CONST. art. 2, § 18
(equal protection and due process clauses); N.Y. CONST. art. 1, §§ 6, 11; N.D. CONST. art. 1,
§§ 1, 13, OKLA. CONST. art. 2, § 7 (due process clause); ORE. CONST. art. 1, §§ 10, 20, PA.
CONST. art. 1, § 1 (due process and equal protection clauses); S.C. CONST. art. 1, § 3 (due
process and equal protection clauses); S.D. CONST. art. 4, §§ 2, 18; TENN. CONST. art. 1, § 8
(due process clause); TEX. CONST. art. 1, §§ 3, 19; UTAH CONST. art. 1, §§ 7, 24; VA. CONST.
art. 1, § 11 (due process clause); WASH. CONST. art. 1, §§ 3, 12; W. VA. CONST. art. 3, § 10
(due process clause); WYO. CONST. art. 1, §§ 3, 6.

222. *See* notes 115-16 and accompanying text *supra*.
223. *See* notes 187-219 and accompanying text *supra*.
224. *See* notes 182-83 and accompanying text *supra*. ·
225. *See* R. Helman & W. Whalen, "Constitutional Commentary,".ILL. ANN. STAT.
Smith-Hurd). *See, e.g.*, ILL. CONST. art. 1, § 2, 109.

nation on the basis of race, color, creed, national ancestry, and sex in the sale of property. [226] The legislative history of the Illinois provision indicates that all property, real and personal, lies within the ambit of the constitutional protection. [227] Refusal to sell an item of personalty to an individual, for example, because the individual is black or Hispanic clearly violates the Illinois Constitution. The constitution thus would appear to prohibit racial discrimination in the sale of property insurance. There is no Illinois case law whatsoever determining whether for purposes of the Illinois Constitution a contract of property insurance lies within its ambit. [228] However, the sweep of the Illinois constitutional provision as indicated by its legislative history does suggest that all property rights will be afforded protection. It seems reasonable to conclude, therefore, that property rights created by contracts of property insurance will receive constitutional protection in Illinois. [229]

## CONCLUSION

Insurance redlining has clear racial and ethnic overtones. The practice exists in urban communities with large minority populations. Because of the relationship between geographic redlining and minority composition of that area, the practice is prohibited indirectly by a number of federal laws as well as state constitutions. No federal law and no state constitution, however, expressly prohibits the practice of geographic redlining. Instead, federal civil rights laws and some state constitutions prohibit invidious racial and ethnic discrimination in contract formation and in the sale of property. Because an insurance policy is both a contract and property, invidious discrimination in the sale of property insurance is prohibited by these laws. In addition, federal antitrust laws probably prohibit geographic redlining, at least where the redlining decision involves an insurer and at least one other person independent of the insurer.

That the consequences of redlining are serious cannot be realistically underestimated. Even where residential property insurance is available through the FAIR plan, economic decline is likely to follow. Placement in the FAIR plan is a stigma, a badge of inferiority that can be a signal for disinvestment by other organizations. Therefore, the practice of geographic redlining must be stopped, either voluntarily by cooperation of insurers or involuntarily by litigation when insurance regulators fail to exercise their administrative powers to stop the practice. This article has discussed several of the more significant theories of liability in the hope of contributing to the end of urban insurance redlining.

---

226. ILL. CONST. art. 1, § 17. *See* text accompanying note 11 *supra*.

227. Gertz, *The Unrealized Expectations of Article I, Section 17,* 11 J. MAR. J. PRAC. & PROC. 283, 292 (1978).

228. *Id.* at 306.

229. It should be noted that there are no Illinois statutes prohibiting racial or ethnic discrimination in the sale of property. *Id.* at 296.

# INSURANCE REDLINING, AGENCY LOCATION, AND THE PROCESS OF URBAN DISINVESTMENT

GREGORY D. SQUIRES

WILLIAM VELEZ

University of Wisconsin-Milwaukee

KARL E. TAEUBER

University of Wisconsin-Madison

Insurance redlining exacerbates economic decline and impedes revitalization of urban neigh-
borhoods throughout the United States. One significant barrier to the availability of insurance
is the movement of sales representatives from inner-city to suburban locations. In examining the
changing pattern of insurance agency locations within the Milwaukee metropolitan area, the
authors find that racial composition of neighborhood is associated with agency location even
after the effects of family income, condition of housing, and number of dwellings are controlled.
Policy recommendations are offered to mitigate the practice and effects of insurance redlining
and to stimulate reinvestment in urban communities.

**Racial discrimination** in the sale of homeowner's insurance has been
documented as a fact of life in the nation's housing markets and as a barrier
to economic redevelopment of urban communities nationwide (Yaspan 1970;
Federal Insurance Administration 1978; Badain 1980). Problems with the
availability of homeowner's insurance in cities throughout the United States

AUTHORS' NOTE: *We gratefully acknowledge the financial support provided by the Urban
Corridor Consortium of the University of Wisconsin, the Institute on Race and Ethnicity at the
University of Wisconsin, the Department of City Development of the city of Milwaukee, and the
Milwaukee Foundation. We also want to thank our research assistant, Brilton Rodriguez, a
graduate student in the Department of Geography at the University of Wisconsin-Milwaukee,
for his many contributions. Robert Haase, the insurance commissioner of the state of Wisconsin,
also provided valuable assistance in our research. Finally, we want to express our appreciation
for the assistance of Jean Zamorski and Donna Schenstrom of the Cartographic Services
Laboratory at the University of Wisconsin-Milwaukee and of Janice Deneen of the Center for
Demography and Ecology at the University of Wisconsin-Madison.*

URBAN AFFAIRS QUARTERLY, Vol. 26 No. 4, June 1991 567-588
© 1991 Sage Publications, Inc.

567

have been documented in academic research (Byrne 1980; Steger and Biersack n.d.), government studies (Midwestern Regional Advisory Committees to the U.S. Commission on Civil Rights 1979), and in industry studies (Advisory Committee to the NAIC Redlining Task Force 1978). The distribution of homeowners insurance policies has been found to be biased in favor of predominantly white suburban communities (Squires and Velez 1987), in part — in one city — because agents more eagerly seek out business in white communities than they do in nonwhite communities (Squires and Velez 1988).

Racial discrimination and uneven development have long been sources of concern to scholars, public officials, and residents of cities throughout the United States. These issues are particularly salient in Milwaukee; a report by the Action 2000 Committee (1989, 1, 4), which was composed of prominent business, government, and other civic leaders in Milwaukee, concluded that

> until the effects and sources of racism are acknowledged, addressed, and overcome, the metropolitan region will be unable to make substantial progress in achieving its desirable goals. . . . Many factors contribute to the widening gap between the "haves" and "havenots" here, but racist practices are something each of us, individually and institutionally, can address.

Racial segregation has been documented on several fronts in Milwaukee in recent years. Noting that 97.5% of all blacks in the Milwaukee metropolitan area live within the city of Milwaukee, which is the highest proportion among the 50 metropolitan areas with the largest black populations, researchers for the Milwaukee Urban League concluded that "Milwaukee leads the nation in racial segregation" (McNeely and Kinlow 1987, 41). More recently, Milwaukee was found to be one of the nation's 10 *hypersegregated* cities because of the high degree of segregation in housing patterns on a range of indices (Massey and Denton 1989). The ratio of black to white rejection rates for mortgage loans recently was found to be higher in Milwaukee than in any other of the nation's 50 largest cities (Dedman 1989). Black unemployment and the ratio of black to white unemployment rates in Milwaukee are consistently among the two or three highest in U.S. cities (Norman 1989). City officials have acknowledged the links between increasing housing costs for the community's minority population, the loss of manufacturing jobs, and rising poverty while downtown redevelopment and suburban growth are taking place (Department of City Development 1987). Unavailability of, and inequitable access to, homeowners insurance exacerbate these trends and create problems for many individual families. These problems clearly are linked to the chain of forces contributing to uneven development and racial inequality in Milwaukee and throughout urban America.

Insurance availability problems in urban communities arise from several factors. The perception — if not the reality — of greater risk discourages some property/casualty insurance companies from pursuing any business in such neighborhoods. Some companies will not provide insurance for older homes or will only do so on more onerous terms, which is a practice that adversely affects many urban communities, particularly those with large concentrations of minority residents. For example, in the Milwaukee neighborhoods where racial minorities account for 24% or more of the population, over 49% of the housing units were built before 1940, but less than 35% of housing units were built before 1940 in areas where the minority population was less than 24% (U.S. Bureau of the Census 1980; City of Milwaukee 1985).

Minimum policy requirements under which some insurers will not provide coverage for homes valued at less than $35,000, $45,000, or some similar threshold discourage the sale of homeowners insurance to residents of less expensive homes, which also adversely affects city residents, particularly those in minority communities (Schachter 1981; Midwestern Regional Advisory Committees to the U.S. Commission on Civil Rights 1979). Again, Milwaukee is illustrative. In 1988, 21% of all single-family housing units in Milwaukee were valued at $35,000 or less, but in those community areas where the minority population exceeded the citywide proportion of 26%, more than 78% of the single-family homes were valued at $35,000 or less.[1]

Blatant racial discrimination remains a factor in the sale of homeowners insurance. The sales manager of a major insurance company in Milwaukee told several agents, "I think you write too many blacks. . . . You gotta sell good, solid premium-paying white people" (*Ziehlsdorf et al.* v. *American Family Insurance Group,* 88CV1082, Waukesha County Circuit Court, 1988).

Another critical factor is "selective placement of agents" (Office of the Commissioner of Insurance of the State of Wisconsin 1978, 11). Insurance agents generally locate in those areas where they intend to write most of their business. To document the strength of this business practice, we surveyed a random sample of property/casualty insurance agents in the Milwaukee metropolitan area.[2] Approximately 32% of the homeowners policies sold by survey respondents in 1988 were bought by residents located within the same zip code area in which the agent's office was located, and 64% were either in the same zip code area or in a zip code area immediately bordering that of the office. Suburban agents proved to be more locality focused, writing 36% of their homeowners policies within the zip code area of their offices and 68% in the same or neighboring zip code area. For city agents, the figures are 25% and 54%. There are 49 zip code areas in the metropolitan area; therefore, an equal distribution of policies would result in about 2% being

written in each area. But policies are not randomly sold throughout the community. Property/casualty insurance agents are licensed to write anywhere in the state, but they clearly concentrate their business in the areas where they locate their offices.

A primary consideration of agents is the availability of potential customers: people with property to insure and the financial means to purchase the insurance. Specifically, agents want to maximize their premiums (the cost of insurance policies), minimize their loss ratios (the relationship between amounts paid in losses to premiums earned), and reduce the work involved in selling policies. Gregory Krohm, an administrator in the Division of Regulation and Enforcement of the Office of the Commissioner of Insurance of the State of Wisconsin, suggested that agents may solicit business more actively in suburban communities where homes have higher value and inspections generally are not required rather than in urban neighborhoods where homes have lower value and inspections are more likely to be required (Krohm 1989b).

The agent survey revealed that 29% of homeowners policies sold in the Milwaukee area in 1988 were bought to cover homes valued at $100,000 or more. In the city of Milwaukee fewer than 2% of single-family dwellings were valued at this level.[3] The majority of single-family dwellings (54%) were assessed by the tax commissioner's office at between $35,000 and $60,000 — a price range that accounted for fewer than 20% of homeowners policies sold by agents located in the city. Agents locate where they intend to do business, and they intend to do business in higher-valued neighborhoods.

When agencies close down, or agents choose not to move into a neighborhood, insurers are signaling that they do not intend to serve that community (Schachter 1981). Inaccessibility to agents contributes to unavailability of insurance, even for many good risks.[4] The Harambee Ombudsman Project, a community organization in Milwaukee that has been fighting insurance redlining of its predominantly black north-side community, obtained a grant in 1987 to provide neighborhood office space and facilities for an insurance agent. Charles Newman, the insurance agent who took advantage of this opportunity, was able to provide insurance to many neighborhood residents who previously had experienced difficulty obtaining adequate protection (Newman 1988).

Location and relocation of insurance agencies affects the accessibility and availability of homeowners insurance and thus influences patterns of urban investment and disinvestment. To examine this process, we conducted the first comprehensive study of the geographic location and movement of insurers in any metropolitan area. Previous redlining research has focused

on the distribution of insurance policies and has documented the relative unavailability of insurance in urban communities. In this study we focus on one component of the redlining process. We trace the movements of agents into and out of neighborhood areas over two decades. We then examine the changing demographics of those areas and delineate consequences of redlining for the uneven economic development of cities. As a practical matter, identification of areas currently underserved or that have been losing the services of insurance agencies would enable community groups and public officials to target their efforts more effectively for preserving neighborhood housing stocks. This information can strengthen the negotiating position of neighborhood groups attempting to secure reinvestment commitments from private insurers. In addition, as indicated by James Williams, president of the board of the Cooperation West Side Association, insurers would be aided in identifying marketing opportunities (Williams 1988).

## DATA AND METHODOLOGY

Two data sets are used in this analysis, one on insurance agencies and one on neighborhood characteristics. From the Insurance Commissioner's Office we obtained the names of the 20 largest insurers in terms of the value of homeowners insurance premiums written for 1960, 1970, and 1980 (Office of the Commissioner of Insurance of the State of Wisconsin, 1961, 1971, 1981). In all, 32 different companies were among the top 20 in one or more of the three years. Collectively, the top 20 companies account for approximately two-thirds of the Milwaukee market. Addresses of agents representing all 32 companies were obtained from the *Yellow Pages* for each of these years. Frequently, a single agency location was the office address of several agents representing one or several companies. If more than one agent shared an office, whether they represented the same company or different companies, that location still represented just one agency location. Locations are classified by community area within the city of Milwaukee and by suburb within the balance of the four-county metropolitan area (see Figures 1 and 2).

From the U.S. Bureau of the Census the following demographic characteristics were obtained for each community area within the city of Milwaukee and for each municipality in the balance of the four-county metropolitan area for 1960, 1970, and 1980: total population, percentage nonwhite, number of owner-occupied dwellings, number of housing units lacking complete plumbing, percentage of homes built prior to 1940, median value of housing, and median family income.

572   URBAN AFFAIRS QUARTERLY / June 1991



Figure 1:  Community Areas in the City of Milwaukee



**Figure 2:  City of Milwaukee and Suburbs in the Milwaukee Metropolitan Area**

Two basic issues are addressed. The first issue is whether there is a prosuburban (or antiurban) bias in the location and relocation of agents. The location of agencies and the ratio of agent locations to owner-occupied housing units for 1960, 1970, and 1980 are traced throughout the metropolitan area to identify geographic patterns in the location and relocation of these offices. The second issue is whether the location of agents is associated with the racial composition of neighborhoods. Regression analysis is performed to determine whether racial composition of neighborhoods is associated with the number of agent locations in each year, after taking into account the effects of factors associated with the risk exposure of property and financial

capacity of consumers, including owner occupancy, age of housing, condition of housing (as measured by the availability of complete plumbing facilities), and family income.[5]

## FINDINGS

### COMMUNITY LOCATION

In tracking the changing number of homeowners insurance agency office locations in Milwaukee-area communities since 1960, one trend quickly becomes evident. Suburban areas experienced consistent and substantial growth in the number of agencies, from 32 in 1960 to 197 in 1980 (see Table 1). The number of agent locations in the city increased from 113 in 1960 to 157 in 1970 but declined to 125 in 1980. Within the city, older communities in or near the center experienced dramatic declines while outlying city neighborhoods bordering the suburban ring witnessed continued growth.

During these years the suburbs were gaining and the city was losing housing units, but this does not account entirely for the overall trend. The suburbs exhibit consistent growth in the ratio of agency locations per 1,000 owner-occupied housing units, from 0.34 in 1960 to 1.25 in 1980 (see Table 1). The city experienced a gain in the 1960s but a decline in the 1970s (see Figure 3).

More important than the aggregate city-suburb comparison is the uneven pattern of growth and decline in the city juxtaposed to the consistent growth throughout the suburbs (see Figure 3). Only one suburban community — West Milwaukee — experienced a decline in the number of agency locations between 1960 and 1980, and that was a drop from two locations to one. Between 1970 and 1980, two suburbs — Shorewood and Whitefish Bay — did not gain any agency locations.

The pattern in the city was much different. Between 1960 and 1980, 9 of Milwaukee's 23 community areas lost agency locations, and in each of those cases, the ratio of locations to housing units declined. Between 1970 and 1980, 13 Milwaukee community areas lost 1 or more agency locations and experienced a decline in their locations/housing units ratio. The Midtown area experienced no decline because no agencies were located there in any year. In 1960, 22 of the 23 city areas had at least 1 agency location

*(text continues on page 580)*

Table 1: Number of Agency Locations, Ratio per 1,000 Owner-Occupied Housing Units, and Percentage Nonwhite, by Community and Year

| | 1960 | | | 1970 | | | 1980 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Ratio | Percentage Nonwhite | Number | Ratio | Percentage Nonwhite | Number | Ratio | Percentage Nonwhite |
| **Milwaukee County** | | | | | | | | | |
| **A. City of Milwaukee** | | | | | | | | | |
| Bay View | 02 | 0.37 | 0.0 | 06 | 1.08 | 1.7 | 05 | 0.88 | 2.2 |
| Garfield Ave. | 01 | 0.18 | 48.7 | 00 | – | 86.5 | 00 | – | 94.2 |
| Grand Ave. | 12 | 5.48 | 4.2 | 11 | 8.57 | 10.9 | 01 | 0.94 | 29.4 |
| Granville | 01 | 0.31 | 0.3 | 06 | 0.97 | 2.6 | 09 | 0.89 | 9.5 |
| Halyard | 02 | 0.69 | 74.7 | 01 | 0.69 | 89.0 | 00 | – | 93.6 |
| Jackson Park | 05 | 0.57 | 0.1 | 12 | 1.19 | 0.7 | 12 | 1.20 | 1.2 |
| Johnson's Woods | 04 | 0.99 | 0.5 | 02 | 0.50 | 1.0 | 02 | 0.50 | 2.6 |
| Juneau Town | 09 | 8.33 | 0.4 | 20 | 25.87 | 4.4 | 17 | 20.30 | 8.5 |
| Kosciusko | 01 | 0.31 | 0.0 | 02 | 0.68 | 3.9 | 03 | 1.07 | 9.0 |
| Lake | 03 | 0.62 | 0.0 | 07 | 1.02 | 1.2 | 14 | 1.80 | 2.3 |
| Lakeside | 02 | 0.68 | 0.1 | 02 | 0.80 | 2.7 | 00 | – | 5.2 |
| Layton Park | 04 | 0.98 | 0.1 | 06 | 1.49 | 1.2 | 04 | 1.02 | 2.6 |
| Lincoln Creek | 06 | 0.92 | 1.3 | 01 | 0.15 | 45.7 | 02 | 0.32 | 81.5 |
| Midtown | 00 | – | 3.4 | 00 | – | 48.0 | 00 | – | 83.7 |
| Muskego Ave. | 14 | 2.75 | 0.0 | 08 | 1.65 | 2.8 | 04 | 0.86 | 10.2 |
| North Milwaukee | 10 | 0.95 | 0.7 | 13 | 1.21 | 2.5 | 10 | 0.90 | 23.9 |

*(continued)*

003760

Case: 1:13-cv-08564 Document #: 134-7 Filed: 08/11/17 Page 70 of 500 PageID #:52...

160

**TABLE 1 Continued**

| | 1960 | | | 1970 | | | 1980 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Ratio | Percentage Nonwhite | Number | Ratio | Percentage Nonwhite | Number | Ratio | Percentage Nonwhite |
| Riverside West | 02 | 0.75 | 0.5 | 01 | 0.39 | 16.4 | 00 | – | 31.8 |
| Sherman Park | 15 | 1.55 | 0.0 | 22 | 2.40 | 1.2 | 09 | 1.00 | 23.7 |
| Silver Spring | 05 | 0.76 | 1.4 | 08 | 1.12 | 4.2 | 06 | 0.80 | 16.4 |
| Tippecanoe | 01 | 0.24 | 0.0 | 03 | 0.77 | 0.0 | 03 | 0.78 | 2.8 |
| Valley | 01 | 7.69 | 1.6 | 02 | 20.20 | 6.1 | 04 | 36.04 | 16.7 |
| Walker's Point | 04 | 1.15 | 0.0 | 06 | 2.27 | 16.4 | 04 | 1.71 | 35.2 |
| Wauwatosa Ave. | 09 | 1.03 | 0.1 | 18 | 1.93 | 0.9 | 16 | 1.70 | 2.4 |
| Totals | 113 | 1.01 | 6.0 | 157 | 1.40 | 15.3 | 125 | 1.09 | 25.6 |
| B. Suburbs (Milwaukee County Suburbs) | | | | | | | | | |
| Bayside | 00 | – | 0.1 | 00 | – | 0.5 | 00 | – | 2.9 |
| Brown Deer | 00 | – | 0.0 | 02 | 0.77 | 0.9 | 11 | 3.52 | 6.4 |
| Cudahy | 00 | – | 0.1 | 05 | 1.20 | 1.8 | 08 | 1.83 | 1.4 |
| Fox Point | 00 | – | 0.3 | 01 | 0.45 | 0.6 | 04 | 1.69 | 1.5 |
| Franklin | 00 | – | 1.8 | 00 | – | 2.8 | 01 | 0.25 | 2.6 |
| Glendale | 02 | 0.86 | 0.0 | 03 | 0.93 | 1.0 | 10 | 2.50 | 4.0 |
| Greendale | 00 | – | 0.0 | 02 | 0.67 | 0.1 | 05 | 1.30 | 1.1 |
| Greenfield | 02 | 0.50 | 0.1 | 04 | 0.75 | 0.8 | 07 | 0.96 | 1.3 |
| Hales Corners | 02 | 1.53 | 0.0 | 04 | 2.35 | 0.2 | 06 | 3.36 | 0.9 |
| Oak Creek | 00 | – | 0.2 | 00 | – | 2.0 | 01 | 0.26 | 3.1 |

003761

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| River Hills | 00 | — | 0.6 | 00 | — | 5.2 | 00 | — | 2.2 |
| St. Francis | 00 | — | 0.0 | 00 | — | 1.0 | 00 | — | 1.9 |
| Shorewood | 02 | 0.67 | 0.1 | 07 | 2.48 | 1.3 | 05 | 1.78 | 2.3 |
| South Milwaukee | 00 | — | 0.1 | 00 | — | 0.6 | 00 | — | 1.4 |
| Wauwatosa | 10 | 0.81 | 0.5 | 23 | 1.7 | 1.3 | 35 | 2.60 | 1.3 |
| West Allis | 11 | 0.75 | 0.1 | 24 | 1.55 | 0.4 | 27 | 1.70 | 0.9 |
| West Milwaukee | 02 | 2.31 | 0.0 | 00 | — | 0.8 | 01 | 1.44 | 1.2 |
| Whitefish Bay | 00 | — | 0.1 | 05 | 1.13 | 0.7 | 05 | 1.12 | 0.9 |
| Totals | 31 | 0.49 | 0.2 | 80 | 1.10 | 1.2 | 126 | 1.04 | 2.1 |
| Washington and Ozaukee Counties | | | | | | | | | |
| Cedarburg | 00 | — | 2.0 | 00 | — | 0.3 | 07 | 1.90 | 1.0 |
| Grafton | 00 | — | 1.8 | 00 | — | 0.4 | 01 | 0.41 | 0.8 |
| Mequon | 00 | — | 0.0 | 00 | — | 1.6 | 02 | 0.45 | 3.0 |
| Port Washington | 00 | — | 0.2 | 00 | — | 0.3 | 00 | — | 0.8 |
| Saukville | 00 | — | 0.1 | 00 | — | 0.4 | 00 | — | 0.5 |
| Thiensville area | 00 | — | 0.0 | 01 | 0.31 | 0.1 | 02 | 2.50 | 0.3 |
| Germantown area | 00 | — | 0.0 | 00 | — | 0.6 | 03 | 1.08 | 0.8 |
| Hartford area | 00 | — | 0.0 | 00 | — | 0.6 | 00 | — | 0.9 |
| West Bend area | 00 | — | 0.0 | 01 | 0.31 | 0.4 | 01 | 0.17 | 0.7 |
| Totals | 00 | — | 0.5 | 02 | 0.04 | 0.5 | 16 | 0.66 | 1.0 |

*(continued)*

577

003762

TABLE 1 Continued

| | 1960 | | | 1970 | | | 1980 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Ratio | Percentage Nonwhite | Number | Ratio | Percentage Nonwhite | Number | Ratio | Percentage Nonwhite |
| Waukesha County | | | | | | | | | |
| Brookfield | 01 | 0.21 | 0.0 | 09 | 1.17 | 0.2 | 16 | 1.54 | 1.0 |
| Elm Grove | 00 | – | 0.0 | 02 | 1.24 | 0.3 | 07 | 3.73 | 0.4 |
| Menominee Falls | 00 | – | 0.1 | 02 | 0.30 | 0.4 | 08 | 1.08 | 0.6 |
| Muskego | 00 | – | 0.1 | 02 | 0.76 | 0.4 | 03 | 0.78 | 0.7 |
| New Berlin | 00 | – | 0.0 | 05 | 0.84 | 1.2 | 10 | 1.22 | 0.6 |
| Oconomowoc | 00 | – | 0.0 | 00 | – | 0.1 | 00 | – | 0.6 |
| Pewaukee | 00 | – | 0.2 | 00 | – | 0.5 | 03 | 3.42 | 0.6 |
| Sussex | 00 | – | 0.5 | 00 | – | 0.3 | 00 | – | 0.6 |
| Waukesha | 00 | – | 0.8 | 04 | 0.54 | 5.5 | 08 | .59 | 5.0 |
| Totals | 01 | 0.04 | 0.2 | 24 | .51 | 1.0 | 55 | 1.05 | 1.1 |
| Totals, all suburbs | 32 | 0.34 | 0.3 | 106 | 0.64 | 1.0 | 197 | 1.25 | 1.6 |
| Totals, four counties | 145 | 0.70 | 2.5 | 263 | 0.95 | 6.5 | 322 | 1.18 | 10.9 |

578



**Figure 3: Ratio of Insurance Agency Locations per 1,000 Owner-Occupied Housing Units, by City Neighborhood and County (Milwaukee Metropolitan Area, 1960, 1970, 1980)**

579

003764

580    URBAN AFFAIRS QUARTERLY / June 1991

representing 1 of these 32 insurers. By 1980 this number was down to 18; 5 areas had no agency location representing any of these firms. In 1960, 28 of the 36 suburban communities had no agency locations representing these firms. In 1980 only 7 had no such representation.

Consistent growth in number of locations or ratio of locations to housing units was experienced in six Milwaukee communities from 1960 to 1970 and again from 1970 to 1980. These communities — Granville, Jackson Park, Kosciusko, Lake, Tippecanoe, and Valley — are mainly at the city's periphery bordering the suburbs. Neither the number of locations nor the ratio increased in seven community areas that are concentrated near the central part of the city — Garfield, Grand Avenue, Halyard, Lakeside, Midtown, Muskego Avenue, and Riverside West. Other areas within the city experienced an inconsistent pattern during the two decades, but most of these lost agencies between 1970 and 1980.

RACIAL IMPLICATIONS

As previously discussed, one evident trend in the changing location of insurance agencies is growth in the suburbs juxtaposed to decline in the city. Another feature of recent change is growth in predominantly white areas juxtaposed to decline in minority areas. Insurance companies display a preference for predominantly white communities as locations for their agencies. The racial effect is in part a result of the concentration of the metropolitan area's minority population in the city coupled with the industry's emerging preference for suburban locations. But even within the city, racial composition of neighborhoods is associated with agent location. Like the prosuburban bias, the racial bias cannot be explained strictly in terms of other population or housing characteristics.

A striking feature of the 15 community areas in the city of Milwaukee that lost agency locations during either decade is that their populations in 1980 were 31% nonwhite compared to 16% for the remaining 8 areas. Sherman Park is illustrative. Many community organizations in this neighborhood have worked hard to retain its identity as one of the few racially integrated areas in the city. Residents frequently have charged local realtors, lenders, and insurers with redlining the neighborhood and undermining their efforts to stabilize their community (Saltman 1990). Between 1970 and 1980 Sherman Park's minority population increased from 1% to 24%. The number of insurance agency locations dropped from 22 to 9 during these same years.

The racial effects of agency location appear to differ between the city of Milwaukee and its suburban ring. In the suburbs, the range in percentage

nonwhite is only from 0.3 to 6.4, and the correlation between the number of agency locations and race is statistically insignificant for 1980. Among the 23 city community areas, the correlation between agency locations and race for 1980 is −.50 and is statistically significant. This relationship also was negative and significant (−.46) for 1970; the correlation (−.23) for 1960 was not significant.

The number of agency locations within the city of Milwaukee is associated with the age and condition of housing, the number of owner-occupied housing units, and median family income. The most consistent predictor of agency location across time in both the city and suburbs is the number of owner-occupied dwellings. A question that arises is whether the association between race and agency location is an artifact of income, housing condition, or related demographic characteristics of the city's neighborhoods. Multiple-regression equations incorporating these variables and race were calculated for each year, separately for city community areas and suburbs (see Table 2).

The equations show that race indeed had an independent effect in the city in 1980 (beta = −.673) and in 1970 (beta = −1.09). In 1960, however, the racial effect was not statistically significant.

There is evidence that the racial disturbances that Milwaukee and many other large cities experienced in the 1960s discouraged insurers from selling policies in inner-city markets (President's National Advisory Panel on Insurance in Riot Affected Areas 1968). It appears these disturbances (or other racial factors) also influenced the agency location decisions of the property/casualty industry in Milwaukee, and the effects continued to be felt in subsequent years.

In the city of Milwaukee, the nonwhite population increased from 6.0% of the total in 1960 to 25.6% in 1980; for the metropolitan area, the increase was from 2.5% to 10.9%. The rapid increase in the minority population could have assisted insurers attempting to serve the minority market. Instead, that growth was apparently perceived as a threat to the stability of the market in the inner city, thus further discouraging service to minority areas. Since 1960 race has become a significant factor in explaining insurance agency location in the city.

Race clearly is associated with agency location, and the effect of race remains significant even after accounting for the effects of income, housing condition, owner-occupancy, and related neighborhood characteristics that presumably influence the location of insurance agencies. In the city of Milwaukee, racial composition of neighborhoods is significantly associated with the pattern of insurance agency location.

003766

se: 1:13-cv-08564 Document #: 134-7 Filed: 08/11/17 Page 76 of 500 PageID #:52
166

**TABLE 2:** Modeling the Location of Insurance Agencies in the Milwaukee Metropolitan Area (City and Suburbs Regression Results, 1960-1980)

| Variables | 1960 | | 1970 | | 1980 | |
|---|---|---|---|---|---|---|
| | B | Beta | B | Beta | B | Beta |
| **City** | | | | | | |
| Owner occupied | .0001 (.00004) | .626[a] | .0002 (.00007) | 1.05[b] | .00008 (.00004) | .537[a] |
| Age of housing | −.014 | −.090 (.042) | −.041 | −.194 (.051) | −.0007 | −.338 (.0004) |
| Percentage nonwhite | −.129 (.070) | −.520[c] | −.268 (.070) | −1.09[b] | −.144 (.037) | −.673[b] |
| Median income | −.0003 (.0001) | −.609 | −.0004 (.0001) | −1.23[b] | −.00008 (.00004) | −.689[a] |
| Lack plumbing | NA | NA | −.048 (.034) | −.322 | −.056 (.062) | −.206 |
| Constant | 22.76 (14.25) | | 48.52 (15.16) | | 22.86 (8.58) | |
| $R^2$ | .305 | | .571 | | .604 | |
| N of classes | | 23 | | 23 | | 23 |
| **Suburbs** | | | | | | |
| Owner occupied | .00007 (.000008) | .851[b] | .00006 (.00002) | .343[a] | .0001 (.00002) | .761[b] |
| Age of housing | −.015 (.017) | .080 | .097 (.033) | .294[b] | .0009 (.0006) | .169 |
| Percentage nonwhite | .016 (.423) | .000 | −1.12 (.464) | −.246[a] | −.177 (.588) | −.032 |
| Median income | .000004 (.000009) | .043 | .00005 (.00001) | .334[b] | .00001 (.00001) | .113 |
| Lack plumbing | NA | NA | .090 (.022) | −.604[b] | −.463 (.309) | −.182 |
| Constant | −1.74 (1.07) | | −11.30 (2.68) | | −4.50 (4.80) | |
| $R^2$ | .760 | | .782 | | .679 | |
| N of classes | | 36 | | 36 | | 36 |

NOTE: Standard errors of B coefficients are shown in parentheses. NA = not available.
a. Significant at .05 level.
b. Significant at .01 level.
c. Significant at .10 level.

## POLICY RECOMMENDATIONS

Insurance agency locations mirror the distribution of homeowners insurance policies and the general allocation of financial resources and capital among communities in the Milwaukee area. In Milwaukee, as in so many other cities around the country, downtown has experienced a rebirth in recent years, and the suburbs continue to prosper, but industrial and residential neighborhoods near the center of the city suffer from disinvestment (Norman 1989).

The relative inaccessibility of insurance agents and unavailability of homeowners insurance in inner-city neighborhoods constitute a critical form of disinvestment. The adverse racial effects of insurance underwriting practices contribute to the dual housing market that is prevalent in Milwaukee and other metropolitan areas. As a vehicle of disinvestment and racial discrimination, the property/casualty insurance industry is a central actor in the process of uneven development of urban communities in the United States.

The insurance industry's behavior is shaped by traditions within the industry itself as well as by external factors impinging on its options. Internal practices include underwriting guidelines that limit availability of insurance for older or lower-valued homes, relocation of insurance agencies away from minority and low-income communities, and tolerance of the expression of racial prejudice by some employees. External factors include the risk exposure of diverse properties, income of potential customers, and regulations established by state legislatures and insurance commissioners.

The urban insurance availability problem, redlining, may appear to be a classic chicken-and-egg dilemma. Insurers claim that their decisions are based on risk, which they measure objectively as they encounter it in the marketplace. Unavailability of insurance, therefore, simply reflects market reality. Clearly, such economic factors do influence agency location and other insurance industry sales practices. Yet the refusal to provide coverage, for whatever reason, increases the likelihood that risk exposure will increase, further reducing the likelihood that insurance can be obtained. When economic factors (e.g., age of housing and neighborhood crime rates) are the sole considerations, underwriting decisions based on those criteria adversely affect urban communities, particularly those with concentrations of minority residents, often unfairly punishing the many residents that are good risks who are living in neighborhoods with aggregate profiles that are somewhat less favorable when compared with those of most suburban communities. Independent of any conscious consideration of race, many traditional industry

584    URBAN AFFAIRS QUARTERLY / June 1991

practices—including those with an economic rationale—serve as self-fulfilling prophecies of urban disinvestment and decay.

However, as is indicated by a growing body of evidence, including the research cited at the beginning of this article and the results of this study, the allocation of homeowners insurance policies and the changing location of insurance agents cannot be explained entirely by risk exposure, income, or related demographic factors that insurers traditionally claim as the basis for underwriting decisions. Racial bias also must be recognized. Agents on the record (e.g., Newman 1988) and off have testified their belief that profitable business is being missed in the nation's inner cities primarily because of inaccurate images of urban neighborhoods held by underwriters and other company executives in distant (suburban as well as out-of-town) central offices. In fact, in segments of the industry, insurers are discovering that subjective biases have entered into, and altered the objectivity of, some business decisions, at substantial cost to themselves. The story recounted earlier of Harambee's success in recruiting an agent to service its community is illustrative. More recently, the company with the sales manager who warned agents that they "write too many blacks" hired three black agents to market policies in a predominantly black area on Milwaukee's north side. Company representatives commented about how surprised they were to see the good condition of so many homes, despite their values in the $20,000 range, and agents were instructed to reduce minimum dwelling requirements. Although this initiative followed the filing of one lawsuit and the possibility of more and was encouraged by a statewide insurance trade organization (Krohm 1989a), it indicates that redlining and racial biases cost insurers business and unfairly punish older urban communities. A combination of market factors and nonmarket factors has contributed to an insurance availability problem in urban communities that has adversely affected racial minorities in particular and has undermined redevelopment efforts in general.

Agent location alone, of course, cannot account entirely for insurance availability problems, but agent location is identified by community organizations, regulators, and some members of the industry itself as a significant contributor to the redlining phenomenon. Consideration of agent location trends suggests some important policies that could be implemented to address the problems. Community organizations negotiating reinvestment agreements with insurers frequently include among their demands the location of agents in their neighborhoods. Trade associations could work with their members to increase the number of inner-city agents. Milwaukee, like many cities around the country, looks to public-private partnerships as the key to redevelopment, and insurers often are major actors in such partnerships

(Squires 1989). More agents for inner-city residential neighborhoods can be a vital part of comprehensive economic development programs. State legislatures and insurance commissioners, through their licensing and related regulatory functions, could encourage more insurers to open offices to serve inner-city markets. Insurers themselves may begin to recognize entrepreneurial opportunities they have forgone because of their own subjective prejudices and traditional business practices.

More ambitious efforts could be launched to address the general problem of insurance redlining. Effective enforcement of fair housing laws, particularly those that explicitly prohibit discrimination in the sale of homeowners insurance, would assist many individual consumers and would facilitate institutional change in underwriting and marketing practices on the part of the industry. Insurance commissioners carry out periodic market conduct examinations, primarily to confirm that insurers comply with fair-trade-practices acts and to assure consumers that providers are solvent, in part so that the companies will be able to pay legitimate claims. Equity and reinvestment criteria could be incorporated as part of those examinations. A community reinvestment act for insurers often has been proposed, but no serious consideration of such legislation has ever been debated. Under the Federal Community Reinvestment Act passed in 1977, federally chartered banks and savings and loans have a continuing and affirmative obligation to assess and respond to the credit needs of their entire service areas. This has led to over $4 billion in urban reinvestment around the nation (Guskind 1989). Several states have enacted their own comparable reinvestment rules. Similar requirements for insurers could address their underwriting guidelines, investment activity (in 1987 alone the insurance industry made $134 billion in new investments; see Hoyt and Choca 1989), agent location, and other industry practices.

Like urban communities around the nation, the city of Milwaukee — particularly its minority communities — has been provided with systematically decreasing levels of service by the property/casualty insurance industry. The changing location of insurance agents both reflects and reinforces a broader dynamic of uneven development. Available evidence reveals that agent location cannot be explained away in terms of shifting population or housing patterns, income, or risk exposure. There is at least some common ground among the commercial interests of insurers, the community development interests of public officials, and the needs of minority and low-income residents. Levers exist to tap and exploit those mutual interests. How effectively these mechanisms are in fact used remains to be determined.

## NOTES

1. The Department of City Development in Milwaukee, Wisconsin, provided unpublished data on the number and assessed value of single-family homes in the city of Milwaukee for 1988.

2. The Office of the Commissioner of Insurance of the State of Wisconsin provided the names and mailing addresses of all 5,800 licensed property/casualty insurance agents listed with a licensed company in the four-county Milwaukee metropolitan area in the spring of 1989. A random sample of 1,000 agents was surveyed with 447 responding, 127 of whom actively sold homeowners insurance policies. (Those who sold more than 25 homeowners policies in 1988 were defined as actively selling this line of insurance.) There are several reasons why a licensed agent would not be actively engaged in selling homeowners insurance or any particular line of property/casualty insurance. The cost of maintaining a license is approximately $5 annually, so some licenses may be renewed even if the agents are semiretired or do not plan, for whatever reason, to sell insurance in a given year. Many agents focus on commercial lines and never intend to enter personal lines, including homeowners insurance. Other agents were licensed only recently and therefore were not engaged in the business in 1988. Finally, some insurance industry employees with licenses to sell are employed full-time in other professional or administrative positions; this is particularly true in metropolitan areas, which is where national, regional, and statewide offices tend to be located.

3. The Department of City Development in Milwaukee, Wisconsin, provided unpublished data on the assessed value of single-family homes by range of property value for 1988.

4. Insurance agents generally select their office locations. Companies rarely determine where their agents' offices will be located. This is particularly true for independent agents who represent several different companies, but it is also the general case for agents who represent one company exclusively (Krohm 1989b).

5. Among the principal causes of insurable loss are crime and fire. No neighborhood-based data were available in Milwaukee on incidents of crime or fire that could be used in conjunction with census data. In a study of the distribution of homeowners insurance policies within the city of Chicago, however, the Midwestern Regional Advisory Committees to the U.S. Commission on Civil Rights (1979) did incorporate fire and theft, along with age of housing and median family income. The results revealed that even after controlling on all these variables, racial composition remained significantly associated with the availability of insurance.

## REFERENCES

Action 2000 Committee. 1989. *Actions for goals 2000*. Milwaukee, WI: Public Policy Forum.

Advisory Committee to the NAIC Redlining Task Force. 1978. *Ninety day report of the Advisory Committee to the NAIC Redlining Task Force*. Milwaukee, WI: National Association of Insurance Commissioners.

Badain, D. 1980. Insurance redlining and the future of the urban core. *Columbia Journal of Law and Social Problems* 16:1-83.

Byrne, K. J. 1980. Application of Title VIII to insurance redlining. *Northwestern University Law Review* 75:472-505.

City of Milwaukee. 1985. Racial data from special census. Unpublished data.

Dedman, B. 1989. Blacks turned down for home loans from S&Ls twice as often as whites. *The Atlanta Journal—The Atlanta Constitution*, 22 January.

Department of City Development. 1987. *Toward preservation partnerships.* Milwaukee, WI: Author.

Federal Insurance Administration. 1978. *Insurance crisis in urban America.* Washington, DC: Government Printing Office.

Guskind, R. 1989. Thin red line. *National Journal* 21:2639-43.

Hoyt, J., and M. Choca. 1989. *The silent partner: The insurance industry's potential for community reinvestment.* Chicago: Woodstock Institute.

Krohm, G. 1989a. Telephone interview with G. D. Squires. 9 May.

———. 1989b. Telephone interview with G. D. Squires. 2 December.

Massey, D. S., and N. A. Denton. 1989. Hypersegregation in U.S. metropolitan areas: Black and Hispanic segregation along five dimensions. *Demography* 26:373-91.

McNeely, R. L., and M. R. Kinlow. 1987. *Milwaukee today: A racial gap study.* Milwaukee, WI: Milwaukee Urban League.

Midwestern Regional Advisory Committees to the U.S. Commission on Civil Rights. 1979. *Insurance redlining: Fact, not fiction.* Washington, DC: Government Printing Office.

Newman, C. 1988. Interview with G. D. Squires. Milwaukee, WI, 23 April.

Norman, J. 1989. Congenial Milwaukee: A segregated city. In *Unequal partnerships: The political economy of urban redevelopment in postwar America,* edited by G. D. Squires, 178-201. New Brunswick, NJ: Rutgers Univ. Press.

Office of the Commissioner of Insurance of the State of Wisconsin. 1961. *Wisconsin insurance report.* Madison: Author.

———. 1971. *Wisconsin insurance report.* Madison: Author.

———. 1978. *Wisconsin insurance report.* Madison: Author.

———. 1981. *Wisconsin insurance report.* Madison: Author.

President's National Advisory Panel on Insurance in Riot Affected Areas. 1968. *Meeting the insurance crisis of our cities.* Washington, DC: Government Printing Office.

Saltman, J. 1990. *A fragile movement: The struggle for neighborhood stabilization.* New York: Greenwood.

Schachter, R. 1981. *Insurance redlining: Organizing to win.* Chicago: National Training and Information Center.

Squires, G. D., ed. 1989. *Unequal partnerships: The political economy of urban redevelopment in postwar America.* New Brunswick, NJ: Rutgers Univ. Press.

Squires, G. D., and W. Velez. 1987. Insurance redlining and the transformation of an urban metropolis. *Urban Affairs Quarterly* 23:63-83.

———. 1988. Insurance redlining and the process of discrimination. *Review of Black Political Economy* 16:63-75.

Steger M., and R. Biersack. n.d. Property insurance availability and the neighborhood change process: An analysis of the Milwaukee experience. Milwaukee: University of Wisconsin-Milwaukee Urban Observatory.

U.S. Bureau of the Census. 1980. *Census of Wisconsin, Milwaukee County, structural equipment and household characteristics of housing units.* Washington, DC: Government Printing Office.

Williams, E. J. 1988. Letter to David Huntington, Executive Director of the Milwaukee Foundation. 22 June.

Yaspan, R. 1970. Property insurance and the American ghetto: A study in social irresponsibility. *Southern California Law Review* 44:218-74.

588    URBAN AFFAIRS QUARTERLY / June 1991

*Gregory D. Squires is a professor of sociology and a member of the Urban Studies Program Faculty at the University of Wisconsin-Milwaukee. His research has been focused on the process of urban development and the consequences for minority communities. Recent publications include the coauthored book* Chicago: Race, Class, and the Response to Urban Decline *(Temple University Press, 1987) and an edited book on public-private partnership,* Unequal Partnerships: The Political Economy of Urban Redevelopment in Postwar America *(Rutgers University Press, 1989).*

*William Velez is an associate professor of sociology at the University of Wisconsin-Milwaukee. He is currently studying the school performance of Latino ninth graders in predominantly minority high schools. Among his publications is "High School Attrition Among Hispanic and non-Hispanic White Youths"* (Sociology of Education 62:119-33, 1989).

*Karl E. Taeuber is a professor of sociology at the University of Wisconsin-Madison, a member of the Center for Demography and Ecology, and an affiliate of the Institute for Research on Poverty. He is studying change in patterns of racial residential segregation by social class and the implications for spatial isolation of the poor. In another project, he is analyzing trends in school segregation during the 1980s. Recent papers include "Residence and Race: 1619-2019" in Winston A. Van Horne and Thomas V. Tonnesen (eds.)* Race: Twentieth Century Dilemmas — Twenty-First Century Prognoses *(Milwaukee: Institute on Race and Ethnicity, University of Wisconsin, 1989) and "The Contemporary Context of Housing Discrimination"* (Yale Law and Policy Review 6:339-47, 1988).

003773

# STATEMENT

## from the



**of American Insurers**

**TESTIMONY OF DAVID M. FARMER**
**BEFORE THE**

**HOUSE BANKING, FINANCE AND URBAN**
**AFFAIRS COMMITTEE**
**SUBCOMMITTEE ON**
**CONSUMER CREDIT AND INSURANCE**

**CONCERNING**
**URBAN INSURANCE AVAILABILITY**

**FEBRUARY 24, 1993**

Mr. Chairman, members of the Subcommittee, ladies and gentlemen, my name is David M. Farmer. I am vice president of federal affairs for the Alliance of American Insurers, a national trade association representing approximately 180 property/ casualty insurance companies. We at the Alliance appreciate the opportunity to express our views on the subject of urban property insurance before this panel.

At the outset, let me say that the members of the Alliance and the rest of the industry are committed to serving the proper- ty insurance needs of all Americans, regardless of race, ethnici- ty or economic class. We are committed to addressing, in a positive way, any real or perceived problems in this area. We believe that better understanding of the property insurance system is necessary both for this subcommittee, and, for people who believe that the system unfairly discriminates against them.

I understand that urban auto insurance and its availability also may be the subject of inquiry by this panel. Although not a formal part of my testimony here today, we would be happy to respond to any questions that the subcommittee may have on automobile insurance as well.

Let me begin by briefly describing how the property insur- ance mechanism has changed and responded to the specific needs of the urban marketplace. In the wake of the civil disturbances and riots which afflicted many of our nation's major cities

175

- 2 -

during the 1960s, there were some property insurance market failures. Property losses in Watts, Detroit, Newark and the District of Columbia, combined with the prospect of further disturbances and losses to come, created severe property insurance availability problems.

At that time, President Johnson created a federal advisory panel on insurance in riot-affected areas. Among the many distinguished members of this panel was the first mayor of the District of Columbia, Walter E. Washington. In the foreword to their 1968 report, the advisory panel made the following statement:

"We gathered information from across the country. We conducted interviews in various cities, systematically surveyed urban homeowners and businessmen, and requested written information from a variety of interested parties: state regulators, insurers, reinsurers, city officials, police and fire departments, and others."

After several days of formal hearings, the panel decided they would attempt to measure the nature and extent of the problem. The advisory panel itself held seven separate meetings at which scores of witnesses presented their views. The panel interviewed witnesses in 20 cities and attempted to verify their findings by a scientific study of six cities which involved 3,000 interviews. In a separate project, the staff mailed question-

- 3 -

naires to insurance commissioners, companies, agents, real estate
brokers, police and numerous other groups. Based on this exhaus-
tive research, the group then made a series of recommendations.

In response to the panel's recommendations, Congress enacted
the Urban Property Protection and Reinsurance Act of 1968. This
Act provided riot reinsurance conditioned on state participation
in pooling mechanisms known as "FAIR Plans." FAIR Plans, which
stand for Fair Access to Insurance Requirements, subsequently
were created in 29 states.

FAIR Plans do have basic prerequisites for building safety
-- like proper wiring -- and the property is subject to inspec-
tion, with each state having different requirements. Available
coverage limits on dwellings run from $75,000 in West Virginia to
$1,000,000 in Massachusetts, and from $100,000 to $1 million for
commercial property. In summary, any property that is occupied,
not in poor physical condition, built in accordance with local
codes, and used in a lawful manner, is eligible for basic proper-
ty coverage through the FAIR Plans.

As with all insurance products, there are some variations in
these coverage plans, in order to respond to differing needs of
local markets. The pricing of these coverages are generally the
same as the standard market. However, some plans have surcharges
related to specific risk factors, such as the condition of the

- 4 -

property. In some states, the entire plan has an experience modification charge as well. It should be emphasized that, even with the surcharges, FAIR plans lose money. For specific information on FAIR plan losses, I would direct the subcommittee to exhibits 3, 4 and 6 at the back of my written testimony.

The 1967 federal insurance panel's methodology -- defining several key issues, vigorously investigating each issue and any attendant problems, and then recommending solutions based on reams of data -- contrasts sharply with the recent Association of Community Organizations for Reform Now (ACORN) Report, "A Policy of Discrimination? Homeowner's Insurance Redlining in 14 Cities." We maintain that the ACORN document is simply a series of unsubstantiated conclusions based on flawed research and pre-conceived opinions. Certainly this document does not contain enough facts to support the serious charges ACORN has leveled at the insurance industry.

I should note that we would be willing to sit down with the leadership of ACORN and explain the operations of FAIR Plans and the property insurance markets in general if they would like to undertake a scientific study of urban insurance issues. For now, however, let me comment on the group's recently produced document.

- 5 -

Clearly, ACORN missed one key fact with respect to FAIR
Plans -- declining enrollment is a <u>favorable</u> sign for urban
markets. FAIR Plan enrollment increases when insurance is un-
available in the traditional market. As I mentioned previously,
that is the very reason for these plans' existence. Decreasing
numbers of FAIR Plan policyholders would indicate that insurance
is becoming more readily available in the voluntary market.

In fact, of total property insurance premiums written, only
a very small percentage (1.2 percent) currently is held by FAIR
Plans. This figure is down from 3.7 percent in 1972. It is also
interesting to note that, for the last five years, FAIR Plans
across the country have been de-populating. In Illinois, in
1986, residential FAIR plan premiums were $4.3 million; by 1990,
that figure had decreased to $3.6 million. In the District of
Columbia during 1986, residential FAIR plan premiums amounted to
$504,000; in 1990, they were only $398,000.

In other words, the overwhelming majority of property
insurance written in the U.S. is written in the voluntary insur-
ance marketplace. As evidence of this fact, I would refer the
panel to exhibit 8 at the end of this text.

Bearing in mind the thoughtful, thorough work that formed
the basis of the 1968 governmental report on urban insurance,

- 6 -

let's examine the ACORN document.

The ACORN study is fatally flawed for the following basic reasons: 1) the sample size is extremely small -- too small to act as the base for such grand conclusions; and, 2) the study fails to consider several perfectly valid explanations for apparent coverage disparities among properties.

First, the sample itself: the entire ACORN study relied upon phone surveys of a mere 48 insurance agents in 13 states, combined with an examination of zip-code based data in four states. The phone surveys were conducted by ACORN members looking to support their conclusions about redlining, rather than unbiased researchers. All of the ACORN callers were working from prepared scripts, which may not have provided sufficient information for agents to work up a reliable quote. Many agents simply will not quote prices to anyone without first inspecting the property in question.

Second, ACORN chose to ignore the fact that, unfortunately, arson, theft and vandalism occur with much greater frequency in economically disadvantaged urban areas than in more affluent suburban areas. These actuarially sound risk factors drive the price of homeowners insurance. This is but one explanation of why insurance coverage and prices vary from place to place.

- 7 -

The report also fails to take into consideration the role that income plays in the decision to buy insurance. ACORN attributes low percentages of insurance ownership in poor neighborhoods to redlining, without investigating whether residents of those neighborhoods would buy insurance at any price. In addition, the number of property renters generally is higher than property owners in low-income urban areas. ACORN's methodology did not account for this fact. As a result, their results with respect to breadth of coverage within various neighborhoods are skewed.

Rather than take up the subcommittee's time with a lengthy critique of the ACORN study, I would recommend that the members examine the Insurance Information Institute's detailed response to the report. Their analysis and specific questions about ACORN's methodology and findings are both thoughtful and very much on target.

In conclusion, I would like to reaffirm that no individual is denied property insurance based on their race, ethnicity, or simply because of the geographic location of their property. Basic property insurance is available to virtually anyone and everyone in the United States who wants to buy it, either in the voluntary market, or through FAIR plans.

- 8 -

State insurance commissioners, through the National Associa-
tion of Insurance Commissioners (NAIC) currently are in the
process of examining urban property insurance issues. We appre-
ciate and support this work, and look forward to the findings of
the NAIC's new Urban Insurance Issues Subgroup.

We know that this subcommittee will carefully review all the
evidence presented here today. For further information on urban
insurance issues, we can suggest a variety of sources. A good
starting point would be with the NAIC and the National Committee
on Property Insurance.

Urban property presents many unique and interesting coverage
situations. For example, in April 1992, the Los Angeles riots
caused an estimated $775 million in insured property losses. The
1992 indexed dollar losses for previous civil disorders would be:
$195 million for the 1965 Los Angeles riots; $174 million for the
1967 Detroit riot; and, losses of $98 million during the 1968
Washington, D.C., disturbances.

It should be noted that the 1992 losses came in a record
year of catastrophic property losses for insurers and their
reinsurers. Hurricane Andrew will cost the industry nearly $20
billion; Hurricane Iniki, almost $2 billion; and, the 1991

- 9 -

Oakland fire, over $1 billion. Even in the face of such extraor-
dinary losses, the insurance industry has met and will continue
to meet, its commitment to urban America in the area of property
insurance. Our industry will do all we can to meet the dual
challenges of making insurance available and affordable, without
sacrificing actuarial standards.

This is not to say that there is not a perception within
some communities in America today that insurers do not treat
everyone fairly. The Alliance and its member companies want to
do all that we can to correct this misperception.

We appreciate the opportunity to present our views here
today. I would be happy to answer any questions you may have.

Thank you.

- 0 -

183

EXHIBIT 1
PROPERTY INSURANCE RESIDUAL MARKETS
IMPACT ON PROPERTY INSURANCE* PROFITABILITY
1982-1991
(IN THOUSANDS)

| YEAR | FAIR PLANS UNDERWRITING GAIN (LOSS) | WINDSTORM UNDERWRITING GAIN (LOSS) | TOTAL PROPERTY RESIDUAL MARKET UNDERWRITING GAIN (LOSS) | VOLUNTARY MARKET UNDERWRITING GAIN (LOSS) | PROPERTY INSURANCE INDUSTRY UNDERWRITING GAIN (LOSS) |
|---|---|---|---|---|---|
| 1982 | (61,962) | 15,172 | (46,790) | (1,633,837) | (1,680,627) |
| 1983 | (45,368) | (147,223) | (192,591) | (2,238,665) | (2,431,256) |
| 1984 | (47,536) | 3,432 | (44,104) | (4,300,969) | (4,345,073) |
| 1985 | (44,549) | (45,067) | (89,616) | (4,587,721) | (4,677,337) |
| 1986 | (7,996) | 12,777 | 4,781 | 168,726 | 173,507 |
| 1987 | 744 | 22,924 | 23,668 | 3,111,082 | 3,134,750 |
| 1988 | (31,642) | 21,056 | (10,586) | 1,840,056 | 1,829,470 |
| 1989 | (35,523) | (147,978) | (183,501) | (4,081,071) | (4,264,572) |
| 1990 | (54,407) | 75,864 | 21,457 | (655,441) | (633,984) |
| 1991 | (66,165) | 15,353 | (50,812) | (5,058,244) | (5,109,056) |
| TOTAL 1982-1991 | ($394,404) | ($173,690) | ($568,094) | ($17,436,085) | ($18,004,179) |

**PROPERTY INSURANCE* INCLUDES: FIRE, ALLIED LINES, EARTHQUAKE, FARMOWNERS, HOMEOWNERS, AND COMMERCIAL MULTI-PERIL.

SOURCES: A. M. BEST'S AGGREGATES AND AVERAGES, 1983-1992 EDITIONS PIPSO REPORTS, 1983-1992 EDITIONS;
PROPERTY INSURANCE PLANS SERVICES OFFICE

EXHIBIT 2
PROPERTY INSURANCE RESIDUAL MARKETS
RESIDUAL MARKET UNDERWRITING LOSS
IMPACT ON INDUSTRY LOSS RATIO

| YEAR | FAIR PLAN COMBINED RATIO | WINDSTORM COMBINED RATIO | TOTAL RESIDUAL MARKET COMBINED RATIO | VOLUNTARY MARKET COMBINED RATIO | RESIDUAL MARKET IMPACT ON INDUSTRY COMBINED RATIO | INDUSTRY TOTAL PROPERTY COMBINED RATIO |
|---|---|---|---|---|---|---|
| 1982 | 136.6% | 43.2% | 124.5% | 106.8% | 0.2% | 107.0% |
| 1983 | 129.1% | 697.0% | 204.4% | 109.3% | 0.8% | 110.1% |
| 1984 | 131.9% | 73.3% | 124.7% | 115.8% | 0.2% | 116.0% |
| 1985 | 118.7% | 295.8% | 136.7% | 112.4% | 0.3% | 112.7% |
| 1986 | 99.0% | 51.6% | 93.2% | 98.0% | 0.0% | 98.0% |
| 1987 | 100.0% | 39.8% | 92.5% | 92.2% | -0.1% | 92.1% |
| 1988 | 111.1% | 44.5% | 102.9% | 96.0% | 0.0% | 96.0% |
| 1989 | 113.9% | 508.2% | 157.1% | 109.8% | 0.4% | 110.2% |
| 1990 | 122.6% | 39.0% | 93.8% | 108.5% | 0.0% | 108.5% |
| 1991 | 128.5% | 43.6% | 116.7% | 111.5% | 0.1% | 111.6% |
| TOTAL | 116.3% | 140.7% | 119.3% | 105.4% | 0.2% | 105.6% |

SOURCES: A. M. BEST'S AGGREGATES AND AVERAGES, 1983-1992 EDITIONS PIPSO REPORTS, 1983-1992 EDITIONS; PROPERTY
INSURANCE PLANS SERVICES OFFICE

EXHIBIT 3
PROPERTY INSURANCE RESIDUAL MARKETS
1991 FAIR PLANS OPERATING LOSSES

| STATE | OPERATING LOSSES (000) | PERCENT OF TOTAL | CUMULATIVE PERCENT |
|---|---|---|---|
| MICHIGAN | (37,040) | 47.7% | 47.7% |
| MASSACHUSETTS | (18,734) | 24.1% | 71.8% |
| NEW JERSEY | (9,752) | 12.5% | 84.3% |
| ILLINOIS | (2,562) | 3.3% | 87.6% |
| RHODE ISLAND | (1,823) | 2.3% | 90.0% |
| NORTH CAROLINA | (1,171) | 1.5% | 91.5% |
| GEORGIA | (1,169) | 1.5% | 93.0% |
| CONNECTICUT | (869) | 1.1% | 94.1% |
| MINNESOTA | (807) | 1.0% | 95.1% |
| KANSAS | (621) | 0.8% | 95.9% |
| WISCONSIN | (554) | 0.7% | 96.6% |
| DIST OF COL | (491) | 0.6% | 97.3% |
| INDIANA | (429) | 0.6% | 97.8% |
| MARYLAND | (421) | 0.5% | 98.4% |
| NEW MEXICO | (407) | 0.5% | 98.9% |
| MISSOURI | (315) | 0.4% | 99.3% |
| KENTUCKY | (296) | 0.4% | 99.7% |
| WASHINGTON | (232) | 0.3% | 100.0% |
| OHIO | (19) | * | 100.0% |
| TOTAL | (77,712) | 100.0% | 100.0% |

* LESS THAN .05%

SOURCE: PIPSO REPORTS, SEPTEMBER 1992; PROPERTY INSURANCE PLANS SERVICE OFFICE

EXHIBIT 4
PROPERTY INSURANCE RESIDUAL MARKETS
1991 FAIR PLANS OPERATING GAINS

| STATE | OPERATING GAINS (000) | PERCENT OF TOTAL | CUMULATIVE PERCENT |
|---|---|---|---|
| CALIFORNIA | 17,706 | 69.2% | 69.2% |
| NEW YORK | 6,434 | 25.1% | 94.3% |
| PENNSYLVANIA | 529 | 2.1% | 96.4% |
| VIRGINIA | 271 | 1.1% | 97.4% |
| OREGON | 182 | 0.7% | 98.1% |
| DELAWARE | 178 | 0.7% | 98.8% |
| WEST VIRGINIA | 155 | 0.6% | 99.4% |
| IOWA | 108 | 0.4% | 99.9% |
| LOUISIANA | 34 | 0.1% | 100.0% |
| TOTAL | $25,597 | 100.0% | NA |

SOURCE: PIPSO REPORTS, SEPTEMBER 1992; PROPERTY INSURANCE PLANS SERVICE OFFICE

185

**EXHIBIT 5**
**PROPERTY INSURANCE RESIDUAL MARKETS**
**1991 WINDSTORM PLANS UNDERWRITING RESULTS**

| STATE | UNDERWRITING GAIN (LOSS) (000) |
|---|---|
| ALABAMA | 1,773 |
| FLORIDA | 1,511 |
| LOUISIANA | 1,077 |
| MISSISSIPPI | 243 |
| NORTH CAROLINA | 9,898 |
| SOUTH CAROLINA | (191) |
| TEXAS | 1,042 |
| TOTAL | $15,353 |

SOURCE: PIPSO REPORTS, SEPTEMBER 1992; PROPERTY INSURANCE PLANS SERVICE OFFICE

**EXHIBIT 6**
**PROPERTY INSURANCE RESIDUAL MARKETS**
**1991 BURDEN PER $100 VOLUNTARY MARKET PREMIUM**

| STATE | BURDEN PER $100 VOLUNTARY MARKET PREMIUM |
|---|---|
| MICHIGAN | ($2.41) |
| MASSACHUSETTS | ($1.34) |
| RHODE ISLAND | ($0.82) |
| NEW JERSEY | ($0.54) |
| DIST OF COL | ($0.36) |
| NEW MEXICO | ($0.18) |
| KANSAS | ($0.12) |
| ILLINOIS | ($0.12) |
| GEORGIA | ($0.11) |
| CONNECTICUT | ($0.10) |
| MINNESOTA | ($0.10) |
| WISCONSIN | ($0.08) |
| KENTUCKY | ($0.05) |
| MARYLAND | ($0.05) |
| INDIANA | ($0.04) |
| MISSOURI | ($0.03) |
| SOUTH CAROLINA | ($0.03) |
| WASHINGTON | ($0.03) |
| OHIO | $0.00 |
| IOWA | $0.02 |
| PENNSYLVANIA | $0.03 |
| VIRGINIA | $0.03 |
| TEXAS | $0.03 |
| OREGON | $0.04 |
| MISSISSIPPI | $0.05 |
| FLORIDA | $0.06 |
| WEST VIRGINIA | $0.06 |
| DELAWARE | $0.14 |
| LOUISIANA | $0.14 |
| NEW YORK | $0.16 |
| ALABAMA | $0.25 |
| CALIFORNIA | $0.27 |
| NORTH CAROLINA | $0.86 |
| TOTAL | ($0.09) |

**EXHIBIT 7**
**PROPERTY INSURANCE RESIDUAL MARKETS**
**POLICY COUNTS 1982-1991**

| YEAR | FAIR PLANS | WINDSTORM PLANS |
|------|-----------|-----------------|
| 1982 | 860,440 | 101,246 |
| 1983 | 779,387 | 102,213 |
| 1984 | 710,696 | 107,685 |
| 1985 | 733,100 | 116,211 |
| 1986 | 858,166 | 133,046 |
| 1987 | 913,041 | 147,762 |
| 1988 | 884,100 | 140,488 |
| 1989 | 823,578 | 141,851 |
| 1990 | 779,675 | 150,344 |
| 1991 | 781,941 | 140,712 |

SOURCE: PIPSO REPORTS, SEPTEMBER 1992; PROPERTY INSURANCE PLANS SERVICE OFFICE

**EXHIBIT 8**
**PROPERTY INSURANCE RESIDUAL MARKETS**
**1991 POLICY COUNTS AND DISTRIBUTION**

**FAIR PLANS**

| STATE | TOTAL POLICIES | PERCENT DISTRIBUTION OF POLICIES |
|-------|----------------|----------------------------------|
| CALIFORNIA | 119,422 | 15.3% |
| CONNECTICUT | 4,310 | 0.6% |
| DELAWARE | 2,014 | 0.3% |
| DIST OF COL | 2,965 | 0.4% |
| GEORGIA | 9,925 | 1.3% |
| ILLINOIS | 15,708 | 2.0% |
| INDIANA | 2,906 | 0.4% |
| IOWA | 1,092 | 0.1% |
| KANSAS | 5,606 | 0.7% |
| KENTUCKY | 40,692 | 5.2% |
| LOUISIANA | 4,023 | 0.5% |
| MARYLAND | 7,325 | 0.9% |
| MASSACHUSETTS | 49,877 | 6.4% |
| MICHIGAN | 184,044 | 23.5% |
| MINNESOTA | 3,479 | 0.4% |
| MISSOURI | 22,534 | 2.9% |
| NEW JERSEY | 52,804 | 6.8% |
| NEW MEXICO | 12,774 | 1.6% |
| NEW YORK | 68,450 | 8.8% |
| NORTH CAROLINA | 46,532 | 6.0% |
| OHIO | 14,919 | 1.9% |
| OREGON | 6,959 | 0.9% |
| PENNSYLVANIA | 75,364 | 9.6% |
| RHODE ISLAND | 6,448 | 0.8% |
| VIRGINIA | 14,265 | 1.8% |
| WASHINGTON | 714 | 0.1% |
| WEST VIRGINIA | 1,355 | 0.2% |
| WISCONSIN | 5,326 | 0.7% |
| TOTAL | 781,941 | 100.0% |

**WINDSTORM PLANS**

| STATE | TOTAL POLICIES | PERCENT DISTRIBUTION OF POLICIES |
|-------|----------------|----------------------------------|
| ALABAMA | 2,908 | 2.2% |
| FLORIDA | 57,305 | 43.0% |
| LOUISIANA | 8,233 | 5.1% |
| MISSISSIPPI | 5,184 | 3.7% |
| NORTH CAROLINA | 14,268 | 10.9% |
| SOUTH CAROLINA | 7,700 | 4.4% |
| TEXAS | 45,114 | 30.8% |
| TOTAL | 140,712 | 100.0% |

SOURCE: PIPSO REPORTS, SEPTEMBER 1992; PROPERTY INSURANCE PLANS SERVICE OFFICE

**TESTIMONY**

**OF**

**LISA RICE**
**Executive Director**
**Toledo Fair Housing Center**
**Toledo, Ohio**

**before the**

**Subcommittee of Consumer Credit and Insurance**

**of the**

**Committee on Banking, Finance and Urban Affairs**

**Joseph P. Kennedy II, Subcommittee Chairman**

**February 24, 1993**

003788

Testimony of Lisa Rice

My name is Lisa Rice and I am the Executive Director of the Toledo Fair Housing Center which serves the greater metropolitan area. I began working at the Center when I was sixteen years old as a volunteer. After graduating from the Bowling Green State University, I returned to the Center and held positions including Fair Housing Specialist, Research Assistant then Research Coordinator for Mortgage Lending. I was appointed the Interim Executive Director in September 1991. The Fair Housing Center opened in August 1975 to provide fair housing services and received Community Development Block Grant funds to provide education, enforcement and research services in all areas of fair housing. The Center first began providing assistance in the areas of rental and sales discrimination. In 1978, we focused on mortgage lending discrimination issues and in that same year we began receiving our first complaints about discriminatory practices by homeowners insurance companies. We tried to investigate these claims, but found ourselves overwhelmed with rental, sales and lending complaints and unable to adequately address the insurance issues. We filed complaints with HUD on behalf of victims, but prior to the 1988 Fair Housing Amendments Act, HUD no power for enforcement and these cases languished at HUD. In the mid 1980's the Center applied for and received funding from the Needmor Foundation to develop insurance testing and investigation procedures. The Center has also received some support under the HUD Fair Housing Initiative Program (FHIP) to investigate homeowners insurance complaints and supplemental funds under the CDBG. However, these funds only provide for one and half staff persons to investigate these claims.

Therefore, we remain inadequately funded to challenge the powerful and wealthy insurance industry, but we have faith that with the assistance of private legal counsel, HUD and the Department of Justice, we will be able to successfully challenge the discriminatory practices our testing program has uncovered.

**Communities without insurance are communities without hope.**

HOMEOWNERS INSURANCE

Insurers are redlining Toledo's urban and low/moderate income neighborhoods. Everyday these discriminatory practices go unchecked allows the industry to directly and intentionally contribute to the deterioration and devaluation of homes in minority and integrated. It is extremely important that these practices are addressed and stopped because homeowners insurance is not only a benefit, but a necessity in our society.

Lately, much emphasis has been placed on homeownership and its link to neighborhood stabilization. Congress, local governments, lenders, developers, and Community Development Corporations are geared to creating affordable housing and improving the quality of life in America's minority and integrated neighborhoods.

While lenders play a crucial role in this effort and also have been responsible for much of the disinvestment that created the situation, the role of the insurance industry in creating the problem and the role they should play in eliminating the problem are too often overlooked. In order for one to purchase a home, lenders require proof that the property is insured for at least the value of the mortgage. If such protection cannot be obtained, the loan is not granted. Therefore, the denial of homeowners insurance will result in the denial of the mortgage loan.

The importance of homeowners insurance was stressed by the President's National Advisory Panel on Insurance in Riot Affected Areas when it stated "Insurance is essential to revitalize our cities. It is a cornerstone of credit. Without insurance, banks and other financial institutions will not - and cannot - make loans...Efforts to rebuild our Nation's inner cities cannot move forward. _Communities without insurance are communities without hope_."[1]

Homeowners insurance is not only an important key to homeownership but to neighborhood value. When neighborhoods are redlined by insurers and residents cannot obtain market value or replacement cost policies, the effect is debilitating.

The inability of some homeowners living in certain neighborhoods to acquire insurance in the voluntary market is underplayed because insurance can be purchased in the residual market or under a FAIR Plan. In neighborhoods where insurance companies will not write market value or replacement cost policies, consumers are referred to FAIR plans. Unfortunately, in many inner-city neighborhoods, this is the only type of insurance

---

[1] _Meeting the Insurance Crisis of Our Cities - A Report by the President's National Advisory Panel on Insurance in Riot Affected Areas_ (1968), p. 1.

available to homeowners.

The problem is that when a community is relegated to this inferior insurance, the community becomes stigmatized and considered a less desirable place to live. Owners will leave their homes to purchase other housing in neighborhoods where they receive equal treatment in the protection of their most valuable asset - their home. If they cannot sell their property, they will rent it out, but there is little incentive to maintain a property when you cannot secure insurance for liability or comprehensive coverage in case of an injury or accident. What business person would maintain an investment without this most basic protection?

Anytime there are limitations put on the services and amenities available in any given community, when the treatment of the residents in that community is second class, both housing professionals and consumers view the community as being inferior. Real estate agents advise clients not to look at certain communities because their investment will not reach its full potential. Residents recognize the inferior treatment and want to get "out" of the neighborhood. Residential flight causes further decline, deterioration, and of course abandonment.

Since FAIR plans offer the most basic coverage, in case there is a loss, only a portion of the homeowner's investment will be protected. Because FAIR plans are so inferior and costly, the Center has found that more than a few homeowners do not even bother with insurance.

Some homeowners purchasing their homes by land contract or cash deals (which are common in central city neighborhoods because of mortgage redlining practices) , or who own their homes and are canceled by their insurance carriers, simply opt not to have any coverage at all.

The residual risk market, or FAIR plans, were created as a result of the Urban Property Protection and Reinsurance Act of 1968. The Act was passed by Congress when the National Advisory Commission on Civil Disorders, investigating the civil unrest in communities like Detroit, concluded that the lack of insurance was a prevailing factor in common in the rioting. Communities, and residents, who had been **redlined**, or excluded by the insurance industry from access to property protection felt abandoned, rejected, and cut off from mainstream society. They saw their property values deteriorating and witnessed the devastation caused when a property owner experienced a loss and could not rehabilitate his/her property.

The passage of the Urban Property Protection and Reinsurance Act created Fair Access to Insurance Requirements (FAIR plans) for property owners. FAIR plans, at minimum, must include fire, extended coverage, vandalism and malicious mischiefs coverage.

They are perceived as the insurance of "last report".[2] Because properties are not insured at their market value cost or replacement cost, properties insured under FAIR plans are underinsured. In addition, coverage is minimal. Protection for desired perils such as falling objects, inclement weather, or plumbing and heating mishaps are not offered.

When communities, which are locked out of the voluntary insurance market, have access to only the FAIR plan, the neighborhoods are perceived as being less valuable and therefore unmarketable. The sales and lending industries withdraw and the insurance companies follow suit. They all fail to realize that they are directly responsible for the decline of these neighborhoods.

Not only do Fair Plan insurance products place a stigma on the property and neighborhood, but they are considerably more expensive than non-Fair Plan products. In some states, the Fair Plan policies are 2 to 3 times higher than market or replacement policies. This is true in Toledo as well.

Redlining communities, in terms of the type of insurance offered, is only one type of discrimination minority, integrated, and low income neighborhoods experience. Other forms of discrimination are levied against these communities which are equally debilitating.

Many insurance companies in Toledo have policies which prohibit them from insuring properties valued under $30,000, $40,000, or $50,000. These minimum insurance policies have a negative and disparate impact on minority neighborhoods and, obviously, low income neighborhoods.

Because African-American and Hispanic households earn less income than Caucasian households, it stands to reason that these two groups will purchase lower price housing. When an insurance company establishes minimum thresholds for coverage based on housing price more African-Americans and Hispanics will be turned down for insurance.

This is an excellent example of how policies, which seem innocent on their face, have a devastating disparate impact on minority applicants and minority and integrated neighborhoods.

**In Toledo, a policy which rejects all properties valued under $30,000 has a disparate effect on 78% of the African-American community, 74% of the Hispanic community, and 30% of the Caucasian community. In the MSA, this policy has a disparate effect on 71% of the African-American community, 40% of the Hispanic community, and only 12% of the Caucasian community.**

---

[2]<u>Insurance Crisis in Urban America</u>, Department of Housing and Urban Development, 1978.

While minimum value policies of $30,000 are destructive enough, more frequently, the value limit is $40,000 or $50,000. Clearly, these policies have an even greater devastating effect on minority and low income neighborhoods.

Not only do insurance agents discriminate in terms of their policies and procedures, but they also engage in discriminatory practices. For several years, the Fair Housing Center has conducted in-depth investigations into the nature and practices of the insurance industry. These investigations have not been publicized because of their highly sensitive nature and for fear of jeopardizing the investigations.

These investigations consisted largely of testing insurance companies and agents in response to complaints from bona fide homeowners. What the Center discovered was shocking. Under one project, discrimination was found in 95% of the investigations conducted.

Under a different investigation, the Center conducted 30 tests on six insurance companies. In this study, discriminatory conduct was established against all 6 companies. The number one basis for discrimination was the racial composition of the neighborhood. Discriminatory practices were found in the insurance companies' policies, terms and conditions offered, rates offered and customers service. In fact, in several instances, prices for lower valued properties located in Caucasian neighborhoods were inflated so that insurance could be offered without violating the minimum insurance policy.

Less favorable terms and conditions for insurance were offered to minority testers seeking insurance on homes in racially identifiable neighborhoods. Often testers calling on homes in minority neighborhoods were **not offered market rate or replacement value policies**, or if requested, were not offered market rate or replacement value policies. In the majority of tests, those calling on properties in minority neighborhoods were offered inferior market value policies or were referred to the Ohio Fair Plan which is the State's pooled insurance program. Again, only a fire policy with slight extended coverage is available with this program and the insurance rates are much higher. No tester calling on a property in a Caucasian neighborhood was referred to the Ohio Fair Plan. Testers used homes of comparable value and condition, age, etc when conducting the tests.

Testers calling on properties in minority neighborhoods were **offered policies at higher rates** than their counterparts calling on properties in white neighborhoods. Callers in minority and low income neighborhoods were consistently quoted **higher premiums for less coverage** than callers in Caucasian neighborhoods. It is not unusual for the Center to see variances in rates in minority communities that are 40% higher than rates offered in Caucasian communities for inferior policies.

The Center's investigations show patterns of **differential treatment in customer service.** It is not uncommon for testers calling on properties in minority neighborhoods to be referred to the Ohio Fair Plan or altogether dropped by the agent.

It may sound surprising to you that insurance companies are so blatant in their practices until you look at the mentality of the industry. For decades, the industry has asserted that it was **not** subject to the Fair Housing Act. The Act prohibits housing practices and policies that are intentionally discriminatory or that have the **effect** of being discriminatory.

Recently a complaint was filed against Nationwide Insurance Company and investigated by Dayton Human Relations Council. Nationwide sued the City of Dayton and HUD to try to stop the investigation by alleging that the Fair Housing Act does not cover them. The Toledo Fair Housing Center also filed HUD administrative complaints against Nationwide and Nationwide joined the Fair Housing Center and one of its complainants in the suit pending in Dayton. The company alleges that insurance is not covered by the Act.

Despite the company's claim, the U.S. Seventh Circuit Court of Appeals (Chicago) upheld the NAACP's contention that the federal Fair Housing Act prohibits discrimination by insurance companies. [3]

Its argument that insurance is not a covered under the Fair Housing Act has not been the industry's only excuse for its redlining practices. The insurance industry is largely unregulated. It is the failure to adequately regulate this industry perpetuates the redlining. One of the Center's investigators was told by an insurance agent that insurance companies are not regulated and therefore, are free to redline. With this attitude why should we be surprised that the industry feels free to sue HUD and fair housing practitioners to stop enforcement of the Fair Housing Act!

What the industry says it wants is to maximize its profits. Businesses ought to make profits - that is what free enterprise is all about. However, businesses cannot fail to provide insurance protection to individuals or neighborhoods because or race, national origin, sex, familial status, disability, religion, or color or because of the racial composition of the neighborhood. By denying insurance to individuals and neighborhood simply because of the racial or economic makeup of the neighborhood, the insurance

---

[3] Seventh Circuit Holds Fair Housing Act Bans Insurance Redlining, Fair Housing Advocate, Vol. 2, No. 3, November 1992. Also see <u>NAACP v American Mutual Life Insurance Company</u>

industry becomes a major contributor to the destruction of America's inner cities, integrated neighborhoods and low and moderate income neighborhoods.

HUD's report, <u>Insurance Crisis in Urban America</u>, states that the suburbanization of America and the flight of middle and upper class residents from urban communities caused insurance companies to focus their attention on suburbia. But we must understand who fled . . . It was white families leaving the cities and white owned companies followed them. So while the industry used the excuse that suburban properties were better fire risks than homes in the cities, the real reason to abandon the city was because the complexion of the city changed from white to black and brown. How many older white neighborhoods with attached townhomes or row house can you think of that are in white neighborhoods. Do suspect that the families living in Georgetown in Washington, D.C. have trouble securing homeowners insurance?

Misconceptions regarding the devaluation of property values in minority and integrated neighborhoods and general racial biases were used to "justify" the abandonment of these neighborhoods by insurance companies. The industry **chose** not to do business in inner cities because of racial bias and the desire to serve "better" markets in suburbia.

The argument the industry made for fleeing minority and integrated neighborhoods was to secure these higher profits with less risk. However, the industry's own records in Ohio show that the owners of higher prices suburban properties file more claims at higher costs per claim than owners of moderately priced property.[4] In spite of this information from the industry itself, they still refuse to write policies or provide inferior policies to owners in minority and integrated neighborhoods.

The industry's biases have driven its redlining practices. Despite efforts to negotiate with insurers by such groups as the National Training Institute Corporation discriminatory practices continue.

---

[4] According to documents filed by Ohio insurance companies with the Ohio Department of Insurance and in a document prepared by the Ohio Department of Insurance, the Property & Casualty Division, over a five year period from 1983 - 1987. The Incurred Loss Ratio of properties valued at $126.000 and greater was 58%. The Incurred Loss Ratio of properties valued at $42,000 and less was 49%, less than the average for all groups.

## COMPLAIN INVESTIGATION

In an effort to address discriminatory practices in the industry, the Fair Housing Center has investigated complaints of insurance discrimination. The Center typically receives complaints from persons alleging discrimination based on their race or the racial composition of the neighborhood.

An African-American woman was alerted by her insurance carrier that her policy would be cancelled because of the condition of her property. She had been insured by this carrier for two years with no claims. The insurance company sent out an investigator who told her she needed to have the property painted and a porch board secured. There is serious doubt that her property needed painting at all. Although she was on sick leave and disability due to an injury, she began the work to repaint the house and secured the porch boards. She contacted the company to let them know that she only needed to complete the trim work on the house and requested an extension. She requested an extension due to her disability. The insurance company declined. She asked for a binder for two months and then a reinspection. The insurance company declined.

What is interesting about this case is that under the Fair Housing Act if a client needs a reasonable accommodation made due to a disability, the company must allow that accommodation. Additionally, testing of this company revealed that they were willing to write insurance on property a property located in a predominately Caucasian neighborhood that clearly needed painting and repairs made to the front steps.

In another complaint the Center recently received, an African-American woman living in a predominately African-American neighborhood, purchased insurance from the same company that gave her life and car insurance coverage. After having the homeowners' insurance policy for two months, she was contacted by her agent who said that the company was going to cancel her homeowners insurance policy because of her credit rating. However, her life policy and car policy were not cancelled. It is clear, the company does not want to insure properties in this neighborhood.

The Center currently has a complaint from an African-American woman who cannot close on her loan because she cannot find homeowner's insurance. One carrier told her that her property could not be insured because of the "area".

Several clients' policies have been cancelled simply because their property is valued under $30,000 or $40,000 or $50,000. I have already discussed how this has a disparate impact on minority neighborhoods.

## DO CURRENT LAWS REMEDY THIS PROBLEM AND RECOMMENDATIONS

Presently, the only laws that address insurance redlining are fair housing laws. While fair housing laws are broad in coverage they do not adequately address all segments of this problem.

As with the case in the rental, sales, and lending industries, discriminatory practices may be illegal, but establishing a law alone is not going to abolish illegal practices. **Strict and vigorous enforcement of the law is the only proven deterrent against discriminatory practices.** In this instance, it is not so much a question of whether present fair housing laws include all the necessary requirements to address insurance redlining; the question is will the government stand behind its stated commitment and adequately fund both public and private enforcement endeavors?

Although fair housing laws offer a mechanism for recourse for victims of insurance discrimination, additional assistance is needed to help fair housing practitioners and consumers assure compliance. That mechanism includes reporting requirements. Insurance companies should be subject to the same type of reporting requirements as lenders are under the Home Mortgage Disclosure Act and the Community Reinvestment Act.

A law that would require insurance companies to commit to investing in low and moderate income neighborhoods and to report their insuring activities is a must. This way, the public can easily tract, as they now do with lenders, where policies are being written, what type of policies are being written, where cancellations are being made and why cancellations are being made. This will offer consumers and fair housing practitioners a system of checks and balances. Neighborhoods and consumers can deal with insurance companies in terms of what their needs are. If a company is not writing in a certain community, it will be easier for the company and community to determine if the lack of investment is due to a marketing problem, policies that limit or deny insurance and provide a picture to the insurer and the community about what corrective actions need to be taken to change patterns of discrimination.

### RECOMMENDATIONS:

First, Congress should provide the full appropriation authorized under the FHIP program so HUD can contract with private, non-profit fair housing enforcement organizations to investigate claims of insurance redlining.

Second, Congress would draft legislation that will require similar reporting by insurance companies about where they write insurance, the terms and conditions of the policies, rates per square foot of coverage and other items that will assist HUD, Justice, fair housing practitioners and community groups in analyzing the extension of insurance in America's neighborhoods.

Third, Congress should require every city receiving Community Development Block funds to follow its requirement to "affirmatively further fair housing" and condition grant awards on these cities addressing fair housing, lending and insurance issues.

Fourth, Congress should increase the budgets of both HUD FH&EO and Justice's Housing and Civil Enforcement Section to specifically hire and train staff to specialize in insurance cases.

It is imperative for Congress to take these preventive measures or America's cities will continue to decline. Money spent on changing the behavior of real estate agents, lenders, appraisers and insurers will guarantee healthy and viable neighborhoods where real freedom of choice exists. Until we adequately address these problems, the governments (federal, state and local) will continue to spend money on desegregation issues in public housing and schools, employment discrimination cases and voting rights cases. Let's establish desirable neighborhoods in every city so we can exercise the freedom to chose our neighborhood -- where every neighborhood will have good schools, good shopping, employment opportunities. We cannot abandon the cities -- we have the obligation to make the industries responsible for the disinvestment - real estate companies, rental managers, lenders, appraiser, insurers, secondary mortgage market buyers -- to correct the problems.

○

# INSURANCE REDLINING PRACTICES

# HEARINGS

**BEFORE THE**

## SUBCOMMITTEE ON
## COMMERCE, CONSUMER PROTECTION, AND
## COMPETITIVENESS

**OF THE**

## COMMITTEE ON
## ENERGY AND COMMERCE
## HOUSE OF REPRESENTATIVES

### ONE HUNDRED THIRD CONGRESS

**FIRST SESSION**

ON

### H.R. 1188

**A BILL TO PROVIDE FOR DISCLOSURES FOR INSURANCE IN
INTERSTATE COMMERCE**

———

**MARCH 3 AND APRIL 26, 1993**

———

## Serial No. 103–32

———

Printed for the use of the Committee on Energy and Commerce



**U.S. GOVERNMENT PRINTING OFFICE**

72-109CC     **WASHINGTON : 1993**

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-041496-2

## COMMITTEE ON ENERGY AND COMMERCE

JOHN D. DINGELL, Michigan, *Chairman*

HENRY A. WAXMAN, California
PHILIP R. SHARP, Indiana
EDWARD J. MARKEY, Massachusetts
AL SWIFT, Washington
CARDISS COLLINS, Illinois
MIKE SYNAR, Oklahoma
W.J. "BILLY" TAUZIN, Louisiana
RON WYDEN, Oregon
RALPH M. HALL, Texas
BILL RICHARDSON, New Mexico
JIM SLATTERY, Kansas
JOHN BRYANT, Texas
RICK BOUCHER, Virginia
JIM COOPER, Tennessee
J. ROY ROWLAND, Georgia
THOMAS J. MANTON, New York
EDOLPHUS TOWNS, New York
GERRY E. STUDDS, Massachusetts
RICHARD H. LEHMAN, California
FRANK PALLONE, JR., New Jersey
CRAIG A. WASHINGTON, Texas
LYNN SCHENK, California
SHERROD BROWN, Ohio
MIKE KREIDLER, Washington
MARJORIE MARGOLIES-MEZVINSKY,
   Pennsylvania
BLANCHE M. LAMBERT, Arkansas

CARLOS J. MOORHEAD, California
THOMAS J. BLILEY, JR., Virginia
JACK FIELDS, Texas
MICHAEL G. OXLEY, Ohio
MICHAEL BILIRAKIS, Florida
DAN SCHAEFER, Colorado
JOE BARTON, Texas
ALEX McMILLAN, North Carolina
J. DENNIS HASTERT, Illinois
FRED UPTON, Michigan
CLIFF STEARNS, Florida
BILL PAXON, New York
PAUL E. GILLMOR, Ohio
SCOTT KLUG, Wisconsin
GARY A. FRANKS, Connecticut
JAMES C. GREENWOOD, Pennsylvania
MICHAEL D. CRAPO, Idaho

ALAN J. ROTH, *Staff Director and Chief Counsel*
DENNIS B. FITZGIBBONS, *Deputy Staff Director*
MARGARET A. DURBIN, *Minority Chief Counsel and Staff Director*

---

### SUBCOMMITTEE ON COMMERCE, CONSUMER PROTECTION, AND COMPETITIVENESS

CARDISS COLLINS, Illinois, *Chairwoman*

EDOLPHUS TOWNS, New York
JIM SLATTERY, Kansas
J. ROY ROWLAND, Georgia
THOMAS J. MANTON, New York
RICHARD H. LEHMAN, California
FRANK PALLONE, JR., New Jersey
JOHN D. DINGELL, Michigan
   (Ex Officio)

CLIFF STEARNS, Florida
ALEX McMILLAN, North Carolina
BILL PAXON, New York
JAMES C. GREENWOOD, Pennsylvania
CARLOS J. MOORHEAD, California
   (Ex Officio)

DAVID SCHOOLER, *Staff Director/Chief Counsel*
RICHARD L. HUBERMAN, *Counsel*
MARY-MOORE HAMRICK, *Minority Counsel*
HUGH N. HALPERN, *Minority Research Assistant*

(II)

# CONTENTS

|  | Page |
|---|---|
| Hearings held on: | |
| March 3, 1993 | 1 |
| April 26, 1993 | 289 |
| Text of H.R.1188 | 6 |
| Testimony of: | |
| Bhargava, Deepak, legislative director, Association of Community Organizations for Reforms Now | 64 |
| Cameron, John, associate director, Illinois Public Action | 25, 291 |
| Creamer, Robert, executive director, Illinois Public Action | 291 |
| Duncan, Michael P., vice president and assistant general counsel, Allstate Insurance Co | 365 |
| Hubbard, Melvin, member, Professional Insurance Agents and Brokers Association of Illinois | 356 |
| McDowell, James, member, Professional Insurance Agents and Brokers Association of Illinois | 356 |
| McNary, William, legislative director, Illinois Public Action | 25 |
| Mintel, Judith, associate general counsel, State Farm Mutual Auto Insurance Co | 379 |
| Morgan, James D., president, Professional Insurance Agents and Brokers Association of Illinois | 356 |
| Murrell, Irvin, member, Professional Insurance Agents and Brokers Association of Illinois | 356 |
| Perrin, Louise, agency manager, State Farm Mutual Auto Insurance Co | 379 |
| Petty, Lilly, board member, Association of Community Organizations for Reform Now | 321 |
| Redmond, Elce, executive director, Northwest Austin Council | 355 |
| Schubert, Lynn M., assistant general counsel, American Insurance Association | 117 |
| Siegel, Carolyn, head organizer, Association of Community Organizations for Reform Now | 321 |
| Walters, Mavis A., vice president, Insurance Services Office, Inc | 135 |
| Weatherspoon, Thomas J., executive assistant-agency, State Farm Mutual Auto Insurance Co | 379 |
| Whitehead, Selwyn, president, Economic Empowerment Foundation | 42 |
| Whiting, Ernestine, board member, Association of Community Organizations for Reform Now | 64 |
| Williams, Al, member, Professional Insurance Agents and Brokers Association of Illinois | 356 |
| Willis, Robert M., superintendent of insurance, District of Columbia, on behalf of National Association of Insurance Commissioners | 101 |
| Woodward, Rhonda M., assistant vice president, Allstate Insurance Co | 365 |
| Material submitted for the record by: | |
| Allstate Insurance Company: Responses to subcommittee questions by letters and attachments dated: | |
| March 3, 1993, subcommittee letter to Wayne E. Hedien, chairman of the board and response thereto | 222 |
| May 4, 1993, from Michael P. Duncan, vice president | 421 |
| May 14, 1993, from Michael P. Duncan, vice president re comments on testimony given by Illinois Public Action | 427 |

(III)

| | Page |
|---|---|
| Material submitted for the record—Continued | |
| Association of Community Organizations for Reform Now: Responses to questions submitted by Hon. Cliff Stearns by letter dated March 3, 1992 | 146 |
| District of Columbia: Letter dated March 8, 1993 from Robert M. Willis, superintendent, insurance administration, to Hon. Cardiss Collins | 109 |
| Illinois Public Action: Letter dated May 4, 1993 responding to questions submitted by Hon. Cliff Stearns by letter dated April 27, 1993 | 418 |
| National Committee on Property Insurance: Statement of Francis A. Mancini, counsel and corporate secretary | 161 |
| State Farm Insurance Companies: Responses to subcommittee questions by letters and enclosures dated: | |
| March 30, 1993, from Cranford A. Ingham, vice president | 187 |
| April 29, 1993, from Judith Mintel, associate general counsel | 220 |
| May 5, 1993, from Judith Mintel, associate general counsel | 411 |
| May 12, 1993 responding to questions of Hon. Cliff Stearns by letter dated April 30, 1993 | 392 |
| Responses to allegations of redlining in testimony of Illinois Public Action | 400 |

# INSURANCE REDLINING PRACTICES

---

## WEDNESDAY, MARCH 3, 1993

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ENERGY AND COMMERCE,
SUBCOMMITTEE ON COMMERCE, CONSUMER PROTECTION,
AND COMPETITIVENESS,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:05 a.m., in room 2322, Rayburn House Office Building, Hon. Cardiss Collins (chairwoman) presiding.

Mrs. COLLINS. Good morning. This hearing of the Energy and Commerce Subcommittee on Commerce, Consumer Protection, and Competitiveness will come to order.

The subcommittee today will examine redlining practices of insurance companies. We will hear very disturbing reports about a variety of practices insurance companies use to deny access to insurance to some of the residents in our inner city urban areas.

Now many people may have the mistaken belief that redlining is a thing of the past, but our witnesses will testify that the practice continues and is flourishing. Selwyn Whitehead of the Economic Empowerment Foundation will testify today about her experience in trying to get liability insurance for her telecommunications consulting firm in the late 1980's. When she identified her firm as a woman-owned firm of color in Oakland, she was turned away or quoted premiums from $8,000 to $10,000 per year, but when she called on behalf of her fictitious white male boss, a Mr. Selwyn Whitehead, the first quote was for $1,200.

Just last week, there were news reports of a former sales manager for Allstate in California accusing Allstate of closing inner city offices and ordering workers to lose files from minority insurance applicants—to lose the files.

The statistics speak for themselves. Illinois Public Action will today reveal that there are 52 State Farm offices and 32 Allstate offices in a predominately white congressional district in Chicago, but in the Chicago portion of the Seventh Congressional District, which I happen to represent, there are only six State Farm offices and two Allstate offices outside the downtown area.

ACORN will testify that in Chicago only 51.1 percent of occupied, single-family units in low-income neighborhoods and only 57.6 percent in minority neighborhoods were covered by any type of insurance compared to 90 percent coverage in high-income and 87.7 percent coverage in white areas.

We will hear a somewhat different view from the American Insurance Association, of course. I appreciate the Association's will-

(1)

2

ingness to testify and to engage in a dialogue about this problem. Unfortunately, the insurance industry's general posture is to take issue with these studies and to try to nitpick them to death. But it is hard to take issue with the basic conclusions. However, the industry criticism does point out one basic problem: There is a lack of good, solid, comprehensive data about insurance coverage in urban areas.

To remedy this, therefore, I am today introducing legislation, the Anti Redlining in Insurance Disclosure Act. This act will require insurance companies to disclose information about their insurance practices and activities in urban areas such as the breakdown of policies sold by census tract, itemized by demographic characteristics. These disclosure requirements would apply to major lines of insurance such as automobile, property, and small business commercial insurance. The legislation also requires reporting of agent location by census tract.

The information generated by this legislation would help determine the true nature and extent of redlining. The public disclosure of this information would also serve as a powerful disincentive against discriminatory behavior. In addition, the legislation mandates disclosure to insurance applicants about reasons for rejection or nonrenewal and protects against the termination of agents as a result of their location or the location of their customers. The act would be administered by the Department of Commerce.

As a practical matter, access to property insurance is a necessity for mortgage loans and is often essential for access to small business loans. Without access to affordable insurance, small businesses in our urban areas cannot prosper nor generate badly needed jobs. Similarly, access to affordable automobile insurance is often essential for residents of the inner city to keep and to hold their jobs. Redlining practices just have to stop, and I am hopeful this hearing and the legislation I am introducing today will be a first step in developing effective, fair solutions to this problem.

I yield to Mr. Stearns.

Mr. STEARNS. Thank you, Madam Chairwoman, and good morning, everybody.

Today's hearing focuses on a subject which I personally find very troubling, the notion that insurance companies are limiting access to insurance based solely on race and income. Discrimination, no matter what its form, is intolerable.

The practice of redlining, where certain geographic areas are routinely denied coverage because of their racial or ethnic makeup, is not only immoral, it is illegal. There are State unfair trade practice laws and Federal civil rights statutes which outlaw such behavior. We must ensure that these laws are enforced, and in cases where denials are not based on legitimate, concrete assessment of the risk, the violators must be punished.

However, I realize that what might be considered a legitimate risk factor by one person may be interpreted as an excuse for discriminating by another. That, in large part, is why we are having the hearing this morning. We need to better understand what comprises loss costs and how we can address the problems which are driving up insurance costs and limiting accessibility in urban areas.

003805

One thing we must remember is that the problems of high prices and inaccessibility are not just limited to inner cities. In my own State of Florida, many people are experiencing great difficulty in getting affordable property insurance, particularly in the wake of Hurricane Andrew. In Florida, the accessibility problem is not limited to low-income minorities but extends to everyone, no matter what their social situation. Accessibility is indeed a problem. The question is whether a problem with accessibility necessarily equals redlining.

Madam Chairwoman, I look forward to our witnesses testimony and hearing their views on these issues.

Mrs. COLLINS. Thank you.

Mr. Greenwood.

Mr. GREENWOOD. Thank you, Madam Chairwoman.

Today's hearing covers an important topic. Discrimination of any kind should never be tolerated. So it is important for us to know if, in fact, redlining is occurring. If it is, we need to work with the State insurance commissioners and attorneys general to find out what they are doing to address the problem and to ensure that the practice is not tolerated. Before we enact legislation of any kind though, I believe we need to make sure that the data we have is good and is correct.

It is my understanding that all States have unfair trade practice statutes which prohibit insurers from committing certain practices. I am aware, for example, that my State of Pennsylvania has anti-discrimination language which applies to property and casualty insurance. Furthermore, I understand that the National Association of Insurance Commissioners is gathering data from all of the individual States. I hope that it will share its results with the subcommittee as soon as it is available.

In the interim, I believe we need to look at the core of the issue, access and availability of affordable insurance. Affordable insurance is an important component of economic growth. The availability of affordable insurance, however, is often determined by the degree of risk covered and the expenses involved in the transaction. For example, a driver with several serious driving convictions, including a DUI, would be a much higher risk than a driver with no convictions.

The Seventh Circuit Court of Appeals noted in the case of *NAACP* v. *American Family,* "Risk discrimination is not race discrimination." We must understand the difference. I hope that this hearing will provide us with that opportunity. This is an important hearing, and I look forward to hearing from our witnesses.

Thank you.

Mrs. COLLINS. Mr. McMillan.

Mr. MCMILLAN. Thank you, Madam Chairwoman.

I take seriously the charges that some of our insurers may allegedly be practicing redlining for property and automobile insurance in certain areas. Discrimination of this sort should never be tolerated, and we have laws on the books to deal with that.

I think we want to examine the claims that the availability of affordable insurance has been limited for residents of our inner cities solely as a result of discrimination. Insurance policy premiums are necessarily based on the element of risk. By identifying the charac-

teristics that are reasonably related to the likelihood of claims, insurers are able to charge the higher expected losses higher prices while charging lower prices for those with lower expected losses. Insurance policies are designed to reward risk-reducing behavior and conditions and I think they should be because that is an important part of containing costs.

Factors that indicate risk for auto insurers include age, sex, marital status, the driver's record, and where the car is located; while factors that determine risk for property values include construction, scope of coverage, protective devices, fire-fighting facilities, and the location of the home or apartment, and many other factors.

It is no wonder why higher repair costs, hospital and medical bills, labor costs, claims frequency, and death rates in our inner cities translate into higher premiums for those who live and drive in those congested areas. We can and do have a concern that the cost of insurance, for perhaps good and sound business reasons, falls on some more than others; but that is not necessarily racial discrimination.

I recognize that availability and affordability of insurance is key to the economic development of anywhere, and particularly our inner cities; but I think that the critics of our insurance industry may have the cart before the horse when they blame insurers for the poor economic state of those areas.

The way to improve the economic lot of our inner cities and provide their residents with affordable insurance would be through successful efforts, public and private, that reduce risks to property which, not surprisingly, are the same things that must be addressed anywhere and have so far defied the best intentions of public policy. This isn't to say that we shouldn't continue to strive to do that; but we can't try to make the tail wag the dog by dealing with an effect rather than a cause.

I am certainly willing to take a look at ways in which we can try to make pooling of risk work to that advantage to try to bring those costs down. I think that that is what we should be looking at. I think there are some good patterns that have been attempted to achieve that in the past and we need to reexamine those and determine whether or not they are working. If they are not working, we should see what we can do to enhance them.

I look forward to the testimony of our witnesses today in the hopes that we can find a better answer to a serious problem.

Thank you, Madam Chairwoman.

Mrs. COLLINS. Thank you very much.

[Testimony resumes on p. 25.]

[The text of H.R. 1188 and opening statements of Messrs. Moorhead and Slattery follow:]

### OPENING STATEMENT OF HON. CARLOS J. MOORHEAD

Thank you Madam Chairwoman: As we embark on efforts to revitalize this Nation's economy, particularly that of the inner-city, I am greatly disturbed by new reports of so-called insurance "redlining."

As we all know, insurance is the fuel which drives the economy. Without it people cannot buy homes, purchase automobiles, or start businesses. Any effort to limit access to insurance based on race or ethnic origin, is intolerable.

However, I am concerned about efforts to tighten restrictions on insurance companies when we can see that over-regulating banks has negatively impacted credit availability. Access to credit and access to insurance are very similar in that they

5

are both required for economic growth. We should proceed cautiously with any proposal that might constrain access to either during this fragile recovery.

I look forward to hearing from our witnesses today. I realize this issue is controversial, and I hope to learn from the different viewpoints presented by our panels.

Thank you Madam Chairwoman.

————

### OPENING STATEMENT OF HON. JIM SLATTERY

Thank you, Madam Chairwoman. I represent a rural district in Kansas, but the practice of insurance redlining in our Nation's larger cities affects even my constituents.

For example, many people in my district had trouble understanding why the Federal Government should bail out businesses destroyed in the riots which shook Los Angeles last year. If more of those businesses had access to affordable and comprehensive property and casualty insurance, the need for Federal assistance might have been much smaller.

Many of the smaller insurance companies in my district operate on very thin profit margins, but serve an important role by providing coverage to rural customers. These companies suffer because the large insurers based in urban areas are free to "cherrypick" the largest, lowest-risk customers. Insurance redlining is symptomatic of that problem.

I applaud the chairwoman's introduction of legislation today which would require annual disclosure by larger insurance companies of insurance practices and activities into major lines of property and casualty insurance. I also am pleased that she has exempted small towns from these requirements, because if there is one thing insurance agents from my district tell me every year when they convene for their annual May conference in Washington, it is relieve us of all this paperwork. Most of these companies have no more than a handful of employees, and are not a part of this problem.

I look forward to working with Chairwoman Collins on this issue, and appreciate the chance to visit with today's witnesses.

003808

I

103D CONGRESS
1ST SESSION

# H. R. 1188

To provide for disclosures for insurance in interstate commerce.

---

## IN THE HOUSE OF REPRESENTATIVES

**MARCH 3, 1993**

Mrs. COLLINS of Illinois introduced the following bill; which was referred to
the Committee on Energy and Commerce

---

# A BILL

To provide for disclosures for insurance in interstate
commerce.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    **SECTION 1. SHORT TITLE.**

4        This Act may be cited as the "Anti Redlining in

5    Insurance Disclosure Act".

6    **SEC. 2. FINDINGS AND CONSTRUCTION.**

7        (a) FINDINGS.—The Congress finds that—

8            (1) there are disparities in property and cas-

9        ualty insurance coverage provided by some insurers

10        engaged in interstate commerce between areas of

11        different incomes and racial composition,

7

2

1    (2) such disparities adversely affect insurance

2    in interstate commerce and the affordability and

3    availability of insurance for consumers, and

4    (3) disclosures of insurance activities of insur-

5    ers would benefit consumers and insurance regu-

6    lators without imposing any undue burden on

7    insurers.

8    (b) CONSTRUCTION.—Nothing in this Act is intended

9 to, nor shall it be construed to, encourage unsound under-

10 writing practices.

11 **SEC. 3. MAINTENANCE OF INFORMATION AND PUBLIC DIS-**

12    **CLOSURE.**

13    (a) GENERAL RULE.—

14    (1) DESIGNATED INSURERS.—Except as pro-

15    vided by subsection (b)(5), each insurer designated

16    by the Secretary, which sells a line of insurance des-

17    ignated by the Secretary in a Metropolitan Statis-

18    tical Area or Consolidated Metropolitan Statistical

19    Area, as designated by the Secretary (both hereafter

20    in this Act referred to as a "MSA"), shall compile

21    and make available for each calendar year to the

22    Secretary in accordance with subsection (d) and reg-

23    ulations of the Secretary and to the public for in-

24    spection and copying at the home office or at a

25    central depository established under subsection (c)

3

1    and at least one branch office (if there is one) within
2    such designated MSA—

3              (A) the number and total coverage amount
4         of insurance policies by line designated by the
5         Secretary which were issued or for which the in-
6         surer received a completed application in such
7         designated MSA, and

8              (B) the number of agents of such insurer
9         whose principal place of business is located in
10        such designated MSA and the number within
11        each census tract or county, as applicable, in
12        such designated MSA and with respect to each
13        such agent, whether such agent is an employee,
14        independent contractor working exclusively for
15        such insurer, or an independent contractor
16        appointed to represent such insurer on a non-
17        exclusive basis.

18        (2) NON-DESIGNATED INSURERS.—Except as
19   provided in subsection (b)(5), every insurer which
20   sells an insurance policy in a designated line of in-
21   surance in a designated MSA and which is not a
22   designated insurer in such MSA shall report for
23   each calendar year to the Secretary in accordance
24   with subsection (d) and regulations of the Secretary
25   the number of insurance policies in a designated line

•HR 1188 IH

4

1    sold in such MSA on an annualized basis which ad-

2    justs for varying durations of insurance policies

3    sold—

4            (A) itemized by census tract for policies

5        sold within any county with a population of

6        more than 30,000 within the designated MSA,

7        or

8            (B) by county for insurance policies sold

9        within any other county in such MSA.

10   Such information shall be made available to the pub-

11   lic on a timetable determined by the Secretary but

12   not later than December 31 of the calendar year fol-

13   lowing the calendar year for which the information

14   is required to be reported.

15       (b) REQUIREMENTS.—

16       (1) CONTENT.—The information required to be

17   maintained and made available under subsection

18   (a)(1) shall—

19            (A) be itemized in order to clearly and con-

20        spicuously disclose the number and coverage

21        amount for each line of insurance for which

22        information is required by—

23                (i) census tracts for insurance policies

24            within any county with a population of

5

1     more than 30,000 within the designated

2     MSA, or

3           (ii) county for insurance policies with-

4           in any other county within such designated

5           MSA,

6     (B) disclose for each designated line of in-

7     surance in a designated MSA and, with respect

8     to each such line, for each census tract or

9     county, as applicable, in the designated MSA—

10          (i) the total number of claims made

11          which with respect to property insurance

12          shall be disaggregated by the type and use

13          of the property insured, and

14          (ii) the total amount paid in claims

15          which with respect to property insurance

16          shall be disaggregated by the type and use

17          of the property insured.

18     (C) disclose the standards and criteria

19     used in underwriting each designated line of

20     insurance, and

21     (D) be made available to the public on a

22     timetable determined by the Secretary but not

23     later than December 31 of the calendar year

24     following the calendar year for which the infor-

25     mation is required to be made available.

6

1    (2) ITEMIZATION OF DATA.—With respect to
2  insurance for which information is required to be
3  maintained and made available under subsection
4  (a)(1), the following information shall be maintained
5  and made available for each completed application
6  and for each policy:

7        (A) The designated MSA for which such
8     insurance is issued and within such MSA the
9     census tract or county, as applicable, for which
10    such insurance is issued.

11       (B) The designated insurer who issued
12    such insurance.

13       (C) The date of the issuance of such insur-
14    ance.

15       (D) The line of the insurance which is des-
16    ignated and any subline or class of such insur-
17    ance.

18       (E) The type of insurance or policy form
19    for which applications are made and the types
20    of insurance and policy forms which are issued.

21       (F) The amount of coverage provided
22    under such insurance and any applicable
23    deductibles.

24       (G) The amount of the premiums for such
25    insurance.

7

1       (H) The durations of such insurance.

2       (I) The gender and racial characteristics of

3   the applicants for such insurance.

4       (J) A notation if such insurance was

5   issued in a voluntary or residual market.

6       (K) The reason for any declination, can-

7   cellation, or non-renewal made for such insur-

8   ance.

9       (L) With respect to property insurance,

10   the market value of the property insured and

11   the type and use of property insured.

12     (3) PERIOD OF MAINTENANCE.—Any informa-

13 tion required to be compiled and made available

14 under subsection (a) shall be maintained and made

15 available for a period of 5 years after the close of

16 the first year during which such information is

17 required to be maintained and made available.

18     (4) FORMAT FOR DISCLOSURES.—Subject to

19 subsection (c), the Secretary shall prescribe a stand-

20 ard format for making information available as re-

21 quired by subsection (a). Such format shall encour-

22 age the submission of information in a form read-

23 able by a computer.

24     (5) EXEMPTION.—

8

1        (A) SECRETARIAL ACTION.—The Secretary
2     may by regulation exempt from the require-
3     ments of subsection (a) any insurer within any
4     State if the Secretary determines that under
5     the laws of such State that such insurer is sub-
6     ject to disclosure requirements on a census
7     tract basis substantially similar to those of sub-
8     section (a) and that such law contains adequate
9     provisions for enforcement.

10       (B) UNITED STATES PROGRAM.—Report-
11    ing shall not be required under subsection (a)
12    with respect to insurance provided by a
13    program underwritten or administered by the
14    United States.

15    (6) COMPLETED APPLICATION.—For purposes
16 of subsection (a) and this subsection, the Secretary
17 shall define "completed applications" to—

18       (A) ensure that the disclosure required by
19    such subsections appropriately reflects the char-
20    acteristics of the applicants interested in pur-
21    chasing insurance in a designated MSA, and

22       (B) prevent insurers from evading the in-
23    tent of such subsections through practices de-
24    signed to discourage applicants from completing
25    applications.

9

1    (c) ACCESS SYSTEM.—The Secretary, shall imple-
2 ment a system to facilitate access to information required
3 to be maintained and made available under subsection (a).
4 Such system shall include arrangements for a central de-
5 pository of information in each designated MSA and for
6 a telephone number which can be used by the public, at
7 cost, to request such information. Statements shall be
8 made available to the public for inspection and copying
9 at such central depository of information for all designated
10 insurers within such MSA.

11    (d) SUBMISSION TO SECRETARY.—The information
12 referred to in subsection (a) shall be submitted to the Sec-
13 retary. The Secretary shall develop regulations
14 prescribing—

15        (1) the format for making such information
16        available,

17        (2) the method for submission of such informa-
18        tion, and

19        (3) the procedures for making the information
20        available to the public.

21 Any reporting insurer may submit in writing to the Sec-
22 retary such additional data or explanations as it deems
23 relevant to the decision by such insurer to sell insurance.

24 **SEC. 4. DESIGNATIONS.**

25    (a) DESIGNATIONS BY THE SECRETARY.—

HR 1188 1H——2

10

1    (1) DESIGNATIONS OF MSA'S.—The Secretary

2    shall, on an annual basis, designate the MSA's for

3    which reporting is required under section 3. At a

4    minimum, the Secretary shall designate the 150

5    MSA's having the largest population. The Secretary

6    may designate additional MSA's on the basis of such

7    criteria as the Secretary may by rule develop. Such

8    a rule shall be issued in accordance with section 553

9    of title 5, United States Code.

10   (2) DESIGNATION OF INSURERS.—For each

11   MSA designated under paragraph (1), the Secretary

12   shall take the following actions:

13        (A) The Secretary shall annually designate

14        the insurers transacting insurance business in

15        such MSA for which reporting is required under

16        section 3. At a minimum, the Secretary shall

17        annually designate the 25 insurers in such MSA

18        having the largest premium volume in the

19        designated lines of insurance.

20        (B) The Secretary shall also annually des-

21        ignate any entity providing insurance in a des-

22        ignated line of insurance as part of a residual

23        market established by State law.

24        (C) The Secretary may designate addi-

25        tional insurers on the basis of such criteria as

11

1     the Secretary may by rule develop. Such a rule

2     shall be issued in accordance with section 553

3     of title 5, United States Code. In considering

4     whether to designate additional insurers, the

5     Secretary shall ensure that—

6         (i) insurers who specialize in selling

7         insurance in urban areas, including surplus

8         lines insurers, are specifically considered

9         for designation notwithstanding their pre-

10       mium volume, and

11       (ii) that insurers representing at least

12       90 percent of the premium volume in

13       the designated lines of insurance are

14       designated in such MSA.

15     (3) DESIGNATION OF LINES OF INSURANCE.—

16     For each MSA designated under paragraph (1) the

17     Secretary shall designate the lines of property and

18     casualty insurance sold in such MSA for which re-

19     porting is required under section 3. At a minimum,

20     the Secretary shall annually designate—

21       (A) private passenger automobile insurance

22       (including appropriate sublines and classes),

23       (B) property insurance which does not

24       cover commercial property (including appro-

25       priate sublines and classes and related cov-

•HR 1188 IH

12

1       erages such as coverage of property contents

2       and property insured at cash value), and

3           (C) commercial insurance for small busi-

4       ness.

5       The Secretary may designate additional lines of in-

6       surance on the basis of such criteria as the Sec-

7       retary may by rule develop. Such a rule shall be

8       issued in accordance with section 553 of title 5,

9       United States Code. For purposes of this Act, the

10      designation of a line of insurance includes a designa-

11      tion of a subline or class of insurance.

12           (4) TIMING OF DESIGNATIONS.—The Secretary

13      shall make the annual designations required by

14      paragraphs (1), (2), and (3) no later than Septem-

15      ber 1 of the year preceding the year for which re-

16      porting is required under section 3. The Secretary

17      shall notify persons involved in the designations no

18      later than the October 1 which follows the designa-

19      tion.

20      (b) OBTAINING INFORMATION.—The Secretary may

21  obtain from insurers such information as the Secretary

22  may require to make designations under subsection (a).

•HR 1188 IH

18

13

1 **SEC. 5. DISCLOSURES TO REJECTED APPLICANTS.**

2     (a) IN GENERAL.—Except as provided in subsection

3 (e), the Secretary shall, by regulation issued under section

4 553 of title 5, United States Code—

5          (1) require insurers to provide to each applicant

6     for insurance in a designated line—

7              (A) reasons for denying an application for

8          such insurance or for canceling or not renewing

9          a policy in force, and

10             (B) actions the applicant may take to qual-

11         ify for such insurance, and

12        (2) restrict the use insurers may make of infor-

13     mation relating to—

14             (A) adverse underwriting decisions, or

15             (B) insurance coverage in a residual mar-

16         ket.

17     (b) MODEL ACTS.—In issuing regulations under sub-

18 section (a), the Secretary shall consider relevant portions

19 of model acts developed by the National Association of

20 Insurance Commissioners.

21     (c) ENFORCEMENT.—The Secretary may delegate to

22 the States the authority to enforce the requirements of

23 regulations issued under subsection (a).

24     (d) PREEMPTION.—Subsection (a) is not to be con-

25 strued to preempt any State from imposing on insurers

26 requirements of the type stated in such subsection, includ-

•HR 1188 IH

003821

14

1 ing requirements which are more stringent or more com-

2 prehensive.

3      (e) EXEMPTION.—A regulation issued under sub-

4 section (a) may not apply to insurance provided under a

5 program underwritten or administered by the United

6 States.

7      (f)  DEFINITION.—For   purposes   of   subsection

8 (a)(2)(A), an adverse underwriting decision means any of

9 the following actions with respect to insurance trans-

10 actions involving insurance coverage which is individually

11 underwritten:

12           (1) A declination of insurance coverage.

13           (2) A termination of insurance coverage.

14           (3) Failure of an agent to apply for insurance

15      coverage with a specific insurance entity which the

16      agent represents and which is requested by the

17      applicant.

18           (4) In the case of property or casualty insur-

19      ance coverage—

20                (A) place by an insurance entity or agent

21           of a risk with a residual market mechanism, an

22           unauthorized insurer, or an insurance entity

23           which specializes in substandard risks, or

15

1          (B) the charging of higher rates on the

2      basis of information which differs from that

3      which the applicant or policyholder furnished.

4 **SEC. 6. TERMINATION OF AGENTS.**

5      (a) REGULATIONS.—Except as provided in subsection

6 (d), the Secretary shall, by regulation issued under section

7 553 of title 5, United States Code, ensure that the prac-

8 tices of insurers in terminating agents who handle prop-

9 erty or casualty insurance do not result in an inappropri-

10 ate effect on the availability or affordability of insurance

11 from such insurers. Such regulations shall specifically en-

12 sure that such practices do not result in unfair discrimina-

13 tion against agents as a result of their geographic loca-

14 tions or of the geographic locations of their clients. Regu-

15 lations under subsection (a) shall be stated in terms of

16 minimum standards.

17      (b) PREEMPTION.—Subsection (a) is not to be con-

18 strued to preempt any State from imposing on insurers

19 requirements of the type stated in such subsection, includ-

20 ing requirements which are more stringent or more com-

21 prehensive.

22      (c) ENFORCEMENT.—The Secretary may delegate to

23 the States the enforcement of such regulations.

24      (d) EXEMPTION.—A regulation issued under sub-

25 section (a) may not apply to insurance provided under a

16

1 program underwritten or administered by the United

2 States.

3 **SEC. 7. IMPLEMENTATION.**

4       The Secretary shall prescribe such regulations as may

5 be necessary to carry out section 3. Such regulations may

6 contain such classifications, differentiations, or other pro-

7 visions, and may provide for such adjustments and excep-

8 tions for any class of transactions, as in the judgment of

9 the Secretary are necessary and proper to effectuate the

10 purposes of such section and to prevent circumvention or

11 evasion thereof or to facilitate compliance therewith.

12 **SEC. 8. RELATION TO STATE LAWS.**

13       This Act does not annul, alter, or affect, or exempt

14 the obligation of any insurer subject to this Act to comply

15 with the laws of any State or subdivision thereof with

16 respect to public disclosure and recordkeeping.

17 **SEC. 9. IMPROVED METHODS.**

18       The Secretary shall develop, or assist in the improve-

19 ment of, methods of matching addresses and census tracts

20 to facilitate compliance by insurers, in as economical a

21 manner as possible, with the requirements of this Act.

22 **SEC. 10. REPORT.**

23       The Secretary shall report to the Committee on En-

24 ergy and Commerce of the House of Representatives and

25 the Committee on                    of the Senate on the im-

17

1 plementation of this Act and shall make recommendations

2 to such committees on such additional legislation as the

3 Secretary deems appropriate to carry out this Act.

4 **SEC. 11. COMPILATION OF AGGREGATE DATA.**

5     (a) SCOPE OF DATA AND TABLES.—The Secretary

6 shall compile each year, for each MSA, aggregate data by

7 census tract for all insurers who are subject to section 3

8 or who are exempt from section 3 under subsection

9 (b)(5)(A) of such section. The Secretary shall also produce

10 tables indicating, for each MSA, aggregate insurance un-

11 derwriting patterns for various categories of census tracts

12 grouped according to location, age of property, income

13 level, and racial characteristics.

14     (b) AVAILABILITY TO PUBLIC.—The data compiled

15 and the tables produced pursuant to subsection (a) shall

16 be made available to the public on a timetable determined

17 by the Secretary but not later than December 31 of the

18 year following the calendar year on which the data and

19 tables are based.

20 **SEC. 12. ENFORCEMENT.**

21     (a) CIVIL PENALTIES.—An insurer who does not

22 comply with the requirements of section 3 or a regulation

23 issued under section 5 or 6 shall be subject to a civil pen-

24 alty of not to exceed $5,000 for each day during which

25 such violation continues.

18

1    (b) INJUNCTION.—The district courts of the United

2 States shall have jurisdiction over a petition of the Sec-

3 retary to enjoin an insurer from actions which are in viola-

4 tion of the requirements of section 3 or of a regulation

5 issued under section 5 or 6.

6 **SEC. 13. DEFINITIONS.**

7    For purposes of this Act:

8        (1) The term "commercial insurance" means

9    any line of property and casualty insurance, except

10   private passenger automobile and homeowner's in-

11   surance.

12       (2) The term "insurer" means any corporation,

13   association, society, order, firm, company, partner-

14   ship, individual, or aggregation of individuals which

15   is subject to examination or supervision by any State

16   insurance regulator, or which is doing or represents

17   an insurance business.

18       (3) The term "personal lines of insurance"

19   means any property and casualty insurance issued

20   for noncommercial personal, family, or household

21   purposes.

22       (4) The term "property and casualty insur-

23   ance" means insurance against loss of or damage to

24   property, insurance against loss of income or extra

25   expense incurred because of loss of, or damage to,

19

1    property, and insurance against third party liability

2    claims caused by negligence or imposed by statute or

3    contract.

4        (5) The term "residual market" means an as-

5    signed risk plan, joint underwriting association, or

6    any similar mechanism designed to make insurance

7    available to those unable to obtain it in the

8    voluntary market.

9        (6) The term "Secretary" means the Secretary

10    of Commerce.

11        (7) The term "State" means any State, the

12    District of Columbia, the Commonwealth of Puerto

13    Rico, the Northern Mariana Islands, the Virgin Is-

14    lands, American Samoa, and the Trust Territory of

15    the Pacific Islands.

16  **SEC. 14. EFFECTIVE DATE**

17    The requirements of this Act shall take effect with

18  respect to calendar year 1995.

○

•HR 1188 IH

Mrs. COLLINS. Our first panel today will be Mr. William McNary, who is the legislative director for Illinois Public Action; also, Ms. Ernestine Whiting, who is a board member of Illinois-ACORN, the Association of Community Organizations for Reform Now; and Ms. Selwyn Whitehead, who is the president of the Economic Empowerment Foundation.

Won't you come forward, please.

I understand, Mr. McNary, that you will have Mr. John Cameron, who is associate executive director of IPAC, accompanying you. Is that correct?

Mr. McNARY. He is here. Yes, Ma'am.

Mrs. COLLINS. All right. We are going to begin our testimony with you, Mr. McNary. Let me establish for you the rules of the House of Representatives. The rules of the House of Representatives are that we work on a 5-minute rule. I know you know that already because you have testified before Congress before, but perhaps some of our witnesses might not know that. You are allowed 5 minutes to give your testimony, with the full knowledge that your written testimony will become a part of the record. If there is a part of your testimony that you have not been able to give in your 5 minutes, it is likely to come out during the time of the question and answer session. So when either the light goes on or this bell goes off, that means your 5 minutes have expired.

You may begin, please, Mr. McNary.

**STATEMENTS OF WILLIAM McNARY, LEGISLATIVE DIRECTOR, ILLINOIS PUBLIC ACTION, ACCOMPANIED BY JOHN CAMERON, ASSOCIATE DIRECTOR; SELWYN WHITEHEAD, PRESIDENT, ECONOMIC EMPOWERMENT FOUNDATION; AND ERNESTINE WHITING, BOARD MEMBER, ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW (ACORN), ACCOMPANIED BY DEEPAK BHARGAVA, LEGISLATIVE DIRECTOR**

Mr. McNARY. Madam Chairwoman, I appreciate the opportunity to testify before Congress. I have not testified before Congress before. I work in the State legislature, and believe me, Madam Chairwoman, as I sit here there is a world of difference, and if the chairwoman and the members of the committee would allow me, I'm very nervous.

Mrs. COLLINS. Don't be nervous.

Mr. McNARY. All right.

On behalf of Illinois Public Action, I would like to thank you for the opportunity to express our views on the critical issue of redlining practices by insurance companies and their harmful effects on urban development. I bring to this discussion experience from several different arenas. I am the legislative director for Illinois' largest public interest organization which has advocated for stronger prohibitions against insurance redlining since the mid-seventies. I am also a former insurance salesman, and, last but not least, I am a current urban consumer of auto insurance.

Madam Chairwoman, as you are aware, the term "redlining" gained wide currency two decades ago as urban activities struggled to increase investment levels in their communities. They were first exposed to detrimental effects of widespread discriminatory prac-

26

tices by lending institutions that refused to provide mortgages or other loans in specific neighborhoods. Similar discriminatory practices by insurance companies also became a public issue at that time resulting in the enactment of State prohibitions against redlining. My organization, Illinois Public Action, was actively involved in formulating and supporting passage of those laws in our State.

Today, there is strict statutory language in the Illinois Insurance Code prohibiting geographic discrimination in the provision of homeowners' and auto insurance as well as restrictions on more subtle discriminatory practices. Auto liability rates, for example, cannot vary by neighborhood within the municipal boundaries of Chicago, nor can a policy be denied because the customer does not reside near the agent's place of business. However, I am here to testify that discrimination in the provision of auto insurance, redlining, is alive and well in Illinois.

Urban consumers particularly on the west and south sides of the city of Chicago cannot easily obtain auto insurance coverage at a reasonable price from the major carriers, the so-called "standard" companies. The impact of such redlining has been magnified by the passage of the State's mandatory automobile liability insurance law 3 years ago. Under State law, drivers must now carry adequate liability coverage. Yet the difficulties in obtaining that coverage by inner city urban residents, particularly in the African American and Latino communities with the lowest median incomes, force the city's poorest residents to pay the highest rates for substandard service, and this is particularly well illustrated by the marketing strategies of State Farm and Allstate, the two largest providers of passenger auto insurance nationally.

These two carriers, which dominate the market share in Illinois not only for auto but also for homeowners' coverage, also consistently post the lowest rates. Both carriers use captive agents who work only for their companies and conduct their businesses through neighborhood offices. We are providing the committee an analysis of where these offices are located, as listed in the 1992/1993 Chicago area telephone directories.

We analyzed the location of State Farm and Allstate offices in three adjacent Chicago Congressional Districts—the Fourth, the Fifth, and the Seventh. As you know, Madam Chairwoman, the Fourth is represented by Congressman Luis Gutierrez and is primarily Latino in population, while the Fifth is represented by Congressman Dan Rostenkowski and is primarily white in population, and the Seventh, of course, is your district and is primarily African American.

The differences between each of these neighborhoods but intertwined districts are striking, particularly in portions of these districts located in the city. You can look at the map, and in or bordering the Chicago portion of the Fifth District, there are 52 State Farm offices and 32 Allstate offices listed in the most recent telephone directory. In or bordering the Chicago portion of the Fourth District, there are just 10 State Farm offices and 5 Allstate offices listed in the directory; and in or bordering the Chicago portion of your district, Madam Chairwoman, the Seventh, there are 18 State Farm offices and 9 Allstate offices listed in the directory. However,

if we take out the downtown area, there are only 6 State Farm offices and 2 Allstate offices.

The number of State Farm and Allstate offices in the nearly equally sized city portions of these three Congressional Districts is overwhelmingly disproportionate. The 84 offices in the Fifth District were more than five times greater than the 15 in the Fourth and over three times greater than the 27 in the Seventh, only eight of which were outside of the Loop area.

We believe that the distribution of these offices clearly reveals that the auto insurance coverage by the largest carriers is not being uniformly marketed in Chicago neighborhoods. As the largest carriers with the lowest rates avoid marketing in inner city neighborhoods, many Latino and African American consumers, forced by State law to purchase liability coverage, are driven into the hands of the nonstandard, substandard insurance carriers which typically post the highest rates. Yet for the highest rates, nonstandard companies provide worse service.

Madam Chairwoman, we appreciate the opportunity to talk about the redlining practices, and we are pleased that you are proposing legislation, and we stand ready to assist you in any way we can in helping you pass the disclosure bill, which is the least we could do.

[Testimony resumes on p. 42.]

[The prepared statement and attachments of Mr. McNary follow:]

28

STATEMENT OF WILLIAM McNARY

ILLINOIS PUBLIC ACTION

Madam Chairwoman and members of the Committee, on behalf of
Illinois Public Action, I wish to thank you for the opportunity
to express our views on the critical issue of redlining
practices by insurance companies and their harmful effects on
urban development.

I bring to this discussion experience from several different
arenas: as the Legislative Director of Illinois' largest public
interest organization which has advocated for stronger
prohibitions against insurance redlining since the mid-1970s; as
a former insurance salesman; and, last but not least, as a
current urban consumer of auto insurance.

Madam Chairman, as you are aware the term "redlining" gained
wide currency two decades ago as urban activists struggled to
increase investment levels in their communities. Their work
first exposed the detrimental effects of widespread
discriminatory practices by lending institutions that refused to
provide mortgages or other loans in specific neighborhoods.

Similar discriminatory practices by insurance companies also
became a public issue at that time, resulting in the enactment
of state prohibitions against redlining. My organization,
Illinois Public Action, was actively involved in supporting
passage of those laws in our state.

Today there is strict statutory language in the Illinois
Insurance Code prohibiting geographic discrimination in the
provision of homeowners and auto insurance, as well as

003831

- 2 -

restrictions on more subtle discriminatory practices. Auto
liability rates, for example, cannot vary by neighborhood within
the municipal boundaries of Chicago. Nor can a policy be denied
because the customer does not reside near the agent's place of
business.

However I am here today to testify that discrimination in
the provision of auto insurance, i.e. redlining, is alive and
well in Illinois. Urban consumers, particularly on the west and
south sides of the City of Chicago, cannot easily obtain auto
insurance coverage at a reasonable price from major carriers --
the so-called "standard" companies.

The impact of such redlining has been magnified by the
passage of the state's mandatory auto liability insurance law
three years ago. Under state law, drivers must now carry
adequate liability insurance. Yet the difficulties in obtaining
that coverage by inner-city urban residents, particularly in
African American and Latino communities with the lowest median
incomes, force the city's poorest residents to pay the highest
rates for substandard service.

This is particularly well-illustrated by the marketing
strategies of State Farm and Allstate, the two largest providers
of private passenger auto insurance nationally. These two
carriers, which dominate market share in Illinois not only for
auto but also homeowners coverage, also consistently post the
lowest rates.

- 3 -

Both carriers utilize "captive agents" which work only for
their company and conduct their business through neighborhood
offices. We are providing the Committee with an analysis of
where those offices are located, as listed in the 1992-93
Chicago area telephone directories.

We analyzed the location of State Farm and Allstate offices
in three adjacent Chicago area Congressional districts: the 4th,
the 5th and the 7th. As you know Madam Chairwoman, the 4th is
represented by Congressman Luis Gutierrez and is primarily
Latino in population while the 5th is represented by Congressman
Dan Rostenkowski and is primarily white in population. The 7th,
of course, is your district, and is primarily African American.

The differences between each of these neighboring but
intertwined districts are striking, particularly in portions of
these districts located within the city:

* In or bordering the Chicago portion of the 5th District,
there are 52 State Farm offices and 32 Allstate offices listed
in the most recent telephone directory.

* In or bordering the Chicago portion of the 4th District,
there are just 10 State Farm offices and 5 Allstate offices
listed in the most recent telephone directory.

* In or bordering the Chicago portion of your district, the
7th, there are 18 State Farm offices and 9 Allstate offices
listed in the most recent telephone directory. However outside
of the downtown area, there are only 6 State Farm offices and 2
Allstate offices.

- 4 -

The number of State Farm and Allstate offices in the nearly
equally-sized city portions of these three Congressional
districts is overwhelmingly disproportionate. The 84 offices in
the 5th District was more than five times greater than the 15 in
the 4th District and over three times greater than 27 in the 7th
(only eight of which were outside the Loop area.)

We believe the distribution of these offices clearly reveals
that auto insurance coverage by the largest carriers is not
being uniformly marketed in Chicago neighborhoods. (See
Appendix II)

As the largest carriers with the lowest rates avoid
marketing in inner-city neighborhoods, many Latino and
African-American consumers -- forced by state law to purchase
liability coverage -- are driven into the hands of the
nonstandard insurance carriers which typically post the highest
rates.

In a survey published last year, Consumer Reports found that
the same policy costing $2812 from State Farm and $2838 from
Allstate would cost twice as much from the largest nonstandard
carriers -- $4522 from American Ambassador Casualty and $5250
from Safeway Insurance. Similarly, a different sample policy
costing $528 from State Farm and $689 from Allstate would cost
$1507 from American Ambassador Casualty and $1270 from Safeway
Insurance.

Yet for higher rates, nonstandard companies provide worse
service. Both Safeway and American Ambassador typically have

003834

32

- 5 -

among the highest rates of consumer complaints per dollar of written premiums. According to the Illinois Department of Insurance, there were 5.42 complaints per million dollars of written premiums for Safeway in 1991 and 5.13 for American Ambassador (both rates among the ten worst.) By contrast, there were just 0.40 complaints for State Farm and 0.68 for Allstate, both among the ten best.

In short, the inner-city consumer in African American and Latino neighborhoods of Chicago find themselves in a "mandatory trap" -- forced by law to purchase insurance and forced by the discriminatory marketing practices of the insurance industry to pay the highest rates for the poorest service.

I don't wish to speculate this morning on the motives behind these practices. I do want to point out, however, that risk factors cannot be blamed for making coverage difficult to obtain. While such risk factors as auto theft rates and frequency of accidents obviously vary by community, these effect costs for collision coverage, rates for which can and do vary by neighborhood.

Liability rates are based on the driving experience of the policyholder. A good driver is a good risk, no matter where he or she lives or what the color of his or her skin. And if a good driver in a higher risk neighborhood is willing to pay a higher rate for collision coverage, there is no reason she or he should find it difficult to shop for or purchase coverage from State Farm or Allstate.

- 6 -

In the past, Illinois officials from State Farm and Allstate
have denied that they engage in discriminatory marketing. They
maintain that they represent a proportionate share of the
insurance coverage provided in the west and south side
neighborhoods where they have no offices.

There is no objective way to verify such assurances as these
two companies have refused to provide data to back up their
claims. When the Illinois mandatory auto liability insurance
law took effect, the chairman of the Illinois Senate Insurance
Committee specifically requested geographic information. A
State Farm official stated that they had the data but would not
make it public.

The Illinois Department of Insurance, mandated by law to
prohibit discriminatory practices, has acknowledged that due to
the lack of agents in inner-city communities, their residents
"aren't getting a fair or equal opportunity to buy the product
of some of the major insurance carriers."

Yet state regulators have done little to alter these
practices. Although clearly possessing the statutory authority
to require disclosure of data on policies, premiums and losses
by zip code, as well as to sanction insurers for discriminatory
practices, state regulators have allowed the major carriers in
Illinois to continue the same marketing practices.

In our experience, state laws are simply not enough. Laws
on the books that prohibit discrimination are circumvented;
regulators possessing discretionary authority to force

- 7 -

compliance are too lenient with the industry to do so.

Consequently, I would conclude by recommending that Madam Chairwoman and the Committee initiate effective federal sanctions against insurance redlining. Minimally all auto insurance companies should be required to disclose of premium and loss data by neighborhood, the more precisely the better. Lacking comprehensive data on the number of policies applied for and provided, as well the claims experience by census tract or other geographic subunit, the extent and persistence of redlining cannot be fully determined.

Such federal disclosure requirements for lending institutions have been useful in limiting redlining by banks and savings and loans in urban communities.

We are pleased the Madam Chairwoman is proposing such legislation and Illinois Public Action urges the Committee to approve such a measure. We stand ready to assist in any way we can in helping win passage of an insurance disclosure bill and its enactment into law.

* * *

APPENDIX I

SAMPLE PREMIUMS, CONSUMER COMPLAINT RATIOS AND WRITTEN PREMIUMS
FOR ILLINOIS' LARGEST PRIVATE PASSENGER AUTOMOBILE INSURERS

| Company Name | Sample Prem. A | Sample Prem. B | Complaint Ratio (Rank) | $ Written Premiums |
|---|---|---|---|---|
| State Farm Mutual | $2812 | $526 | 0.40 (2) | 1,060,843,252 |
| Allstate | $2838 | $689 | 0.68 (7) | 456,926,334 |
| Country Mutual | $3266 | $720 | 0.66 (5) | 237,652,816 |
| Illinois Farmers | $2184 | $506 | 0.69 (9) | 149,082,271 |
| American Family | $3670 | $813 | 1.10 (20) | 112,131,970 |
| State Farm F & C | $3400 | $812 | 1.00 (17) | 109,249,795 |
| Economy F & C | $3976 | $920 | 1.16 (21) | 74,361,580 |
| American Ambassador | $4522 | $1507 | 5.13 (46) | 57,212,983 |
| Safeway | $5250 | $1270 | 5.30 (47) | 47,932,478 |

NOTES: Complaint ratios (complaints per $1 million in written
premiums), rankings [ratios ranked from best (1) to worst (55)],
and written premiums based on Illinois Department of Insurance
data for 1991, as published in July, 1992.

Sample premiums are from the August, 1992 edition of Consumer
Reports based on a February, 1992 survey.

Sample Premium A is for a husband and wife both age 41 and
their 17 year-old son. The husband drives a 1991 Honda
Accord nine miles to work and a total of 10,000 miles
annually. The son, an occasional driver of a 1989 Toyota
Corolla, drives 4000 miles annually and is not listed on the
policy as a principal operator. All have clean driving
records, with no recent at-fault accidents or moving
violations.

Coverage for both cars includes: bodily injury liability,
$100,000 per person, $300,000 per accident; property damage
liability, $50,000; medical payments or personal injury
protection (PIP), $5,000; collision with a $250 deductible;
comprehensive with a $50 deductible; and the state's basic
uninsured motorist coverage.

Sample B is for a retired couple, The husband is age 62; the
wife age 60. They drive a 1983 Oldsmobile Delta 88 for
pleasure only (about 4000 miles a year). They have clean
driving records.

Coverage includes: bodily injury liability, $100,000 per
person, $300,000 per accident; property damage liability,
$50,000; medical payments, $2000; collision with a $100
deductible; comprehensive with no deductible; and the
state's basic uninsured motorist coverage.

APPENDIX II


### STATE FARM AND ALLSTATE INSURANCE OFFICES IN
### THE 4TH, 5TH and 7TH CONGRESSIONAL DISTRICTS OF ILLINOIS


#### 4TH CONGRESSIONAL DISTRICT

The 4th Congressional District of Illinois is 65% Latino, 6% African American and 27% white. There were 10 State Farm offices and 5 Allstate offices in or bordering on the 4th Congressional District listed in the 1992-93 telephone directories.

CHICAGO

**State Farm Offices**

4354 S. Western
2436 S. Oakley Ave.
4222 S. Archer Ave (just outside)
2421 N. Milwaukee
4357 W. Fullerton
2956 N. Milwaukee
2015 W. Armitage
6355 W. 26th
2020 W. 35th
4019 W. 31st

**Allstate Offices**

2044 N. Cicero
3238 N. Elston
3247 W. Fullerton
3922 1/2 W. 26th
1605 N. Wood

SUBURBS

None listed.                          None listed.

## 5TH CONGRESSIONAL DISTRICT

The 5th Congressional District of Illinois is 10% Latino, 1%
African American and 79% white. There were 64 State Farm offices and
31 Allstate offices in or bordering on the 5th Congressional District
listed in the 1992-93 telephone directories.

### CHICAGO

| State Farm Offices | Allstate Offices |
|---|---|
| 1015 W. Webster | 1824 W. Addison |
| 5230 W. Irving Park | 6023 W. Addison |
| 3929 N. Ashland | 5205 W. Belmont |
| 5223 W. Belmont | 3000 N. Central |
| 5814 N. Lincoln | 4034 N. Cicero |
| 3535 W. Belmont | 3340 N. Clark |
| 2609 W. Peterson (2 agents) | 6206 W. Diversey |
| 4108 N. Cicero | 1012 W. Diversey |
| 3326 N. Ashland | 1459 W. Fullerton |
| 2472 N. Clark | 5031 N. Harlem |
| 3722 N. Cicero | 3401 N. Harlem |
| 4325 N. Western | 2431 N. Harlem |
| 2015 W. Montrose | 4938 W. Irving |
| 2358 N. Clyborn | 6052 W. Irving |
| 5110 N. Lincoln | 3110 W. Irving |
| 2233 W. Irving | 5504 W. Lawrence |
| 6048 W. Addison | 4626 W. Lawrence |
| 5110 W. Fullerton | 2311 W. Lawrence |
| 3050 N. Central | 5850 N. Lincoln |
| 5724 W. Belmont | 2250 N. Lincoln |
| 7850 W. Addison | 5040 W. Montrose |
| 7702 W. Addison | 3752 W. Montrose (2 agents) |
| 5521 N. Cumberland | 111 W. North |
| 6807 W. Irving | 4027 N. Pulaski |
| 3315 1/2 N. Harlem | 2009 W. Roscoe |
| 3406 W. Irving | 7789 W. Talcott |
| 6358 W. Gunnison | 3755 N. Western |
| 8210 W. Belmont | 639 W. Diversey |
| 5912-A W. Lawrence | 3235 Bryn Mawr |
| 5616 W. Montrose | 1900 W. Lawrence |
| 2643 N. Harlem | 2525 Peterson |
| 3637 N. Elston | 3553 W. Peterson |
| 5902 W. Fullerton (2 agents) | |
| 5733 W. Irving | |
| 7106 W. Belmont | |
| 3736 W. Foster | |
| 5217 N. Harlem (just outside) | |
| 3232 W. Foster | |
| 6048 W. Addison | |
| 4465 N. Milwaukee (2 agents) | |
| 4815 W. Diversey | |

(5TH DISTRICT/2)


(CHICAGO/continued)

## State Farm Offices

4256 W. Irving
4754 N. Milwaukee (3 agents)
7428 W. Belmont
4338 W. Lawrence
5616 W. Montrose
6700 W. Belmont
2942 Montrose
2933 W. Irving
4538 N. Western
5110 N. Lincoln
524 W. Diversey


### SUBURBS

ELMWOOD PARK
    7203 W. Fullerton
    7432 W. Grand

FRANKLIN PARK
    9521 Franklin Ave.
    9568 Grand
    2728 Mannheim

HARWOOD HEIGHTS
    6358 W. Gunnison
    4950 N. Harlem

MELROSE PARK
    501 W. North
    1306 Lake
    1807 Broadway

NORRIDGE
    8307 W. Lawrence
    7400 Irving Park
    7632 Irving Park

NORTHLAKE
    135 E. North
    404 E. North

RIVER GROVE
    8515 Grand

SCHILLER PARK
    9426 Irving Park

## Allstate Offices

FRANKLIN PARK
    10009 Grand

MELROSE PARK
    1440 W. North

NORRIDGE
    8342 Lawrence
    Harlem & Irving

## 7TH CONGRESSIONAL DISTRICT

The 7th Congressional District of Illinois is 4% Latino, 65% African American and 27% white. There were 35 State Farm offices and 17 Allstate offices in or bordering on the 7th Congressional District listed in the 1992-93 telephone directories.

### CHICAGO (Downtown)

| State Farm Offices | Allstate Offices |
|---|---|
| 435 N. Michigan | 300 W. Adams |
| 120 S. LaSalle | 800 N. Clark |
| 325 W Huron | 53 W. Jackson |
| 105 W. Madison | 333 N. Michigan |
| 307 N. Michigan | 222 W. Ontario |
| 150 S. Wacker | Sears Tower |
| 612 N. Michigan | 919 N. Michigan |
| 640 N. Lasalle | |
| 25 E. Washington | |
| 168 N. Michigan | |
| 618 S. Dearborn | |
| 208 S. LaSalle | |

### CHICAGO (Other)

| | |
|---|---|
| 6919 W. Grand | 6116 W. North |
| 725 W. 31st | 1514 W. Taylor |
| 219 W. Cermak | |
| 5310 W. North | |
| 1921 N. Harlem | |
| 5932 W. Lake | |

### SUBURBS

BELLWOOD
    4321 St. Charles Rd.
    212 Mannheim Rd.

BERKLEY
    555 St. Charles Rd.

BROADVIEW
    1718 Roosevelt
    2201 Roosevelt

FOREST PARK
    7601 W. Madison

BELLWOOD
    1129 Bellwood

BROADVIEW
    2133 Roosevelt

HILLSIDE
    4415 Harrison

OAK PARK
    10 Chicago Ave.
    128 Madison

(7TH DISTRICT/2

(SUBURBS/continued)

**State Farm Offices**

HILLSIDE
     515 Wolf Rd.

MAYWOOD
     1031 S. 17th Ave.

OAK PARK
     310 Chicago Ave.
     191 N. Marion
     505 S. Oak Park

RIVER FOREST
     7417 W. North
     975 Lake

WESTCHESTER
     10526 Cermak
     10440 Cermak
     10710 W. 31st.
     10055 Roosevelt

**Allstate Offices**

WESTCHESTER
     10526 Cremak
     10031 Roosevelt

SOURCES: All office listings from <u>Ameritech Pages Plus 1992-93</u>, for
Chicago and western suburbs, published by DonTech in August, 1992.
Data on racial make up of Congressional districts provided by the U.S.
Census Bureau in February, 1993.



42

Mrs. COLLINS. Thank you.
Ms. Whitehead.

### STATEMENT OF SELWYN WHITEHEAD

Ms. WHITEHEAD. Thank you.

Good morning, Chairwoman Collins and members of the committee. My name is Selwyn Whitehead, and I'm president and executive director of the Economic Empowerment Foundation in Oakland, Calif. We are a nonprofit corporation that seeks to find innovative strategies to partner with the financial communities to bring the financial industry back into historically underserved communities.

I want to take this opportunity to thank you for having these long overdue hearings on what I believe is one of the most destructive practices in modern American business—that is, the willful withholding of insurance products and investment vehicles from individuals and communities based solely on their race, gender, or economic class; in a word, redlining.

Redlining is destructive for our overall economy because it cavalierly isolates whole sectors of our society from risk management and financial service markets as a result of what I call intellectually dishonest race-based underwriting practices. Redlining is destructive for the shareholders of insurance companies because it arbitrarily eliminates sources of income and earned premium dollars that could be garnered from the good risks in our communities.

More importantly from our advantage, it limits our ability to own and improve residential and commercial real estate, attract equity and debt capital for community-based businesses, engage in legitimate free enterprise, and legally operate motor vehicles, all baseline requirements for succeeding in our capitalistic, mobile, small business-based economy.

I must inform you that low to moderate income and of-color residents and business owners in our urban centers and rural communities desperately need Congress to establish legislation which first establishes a mechanism for collecting information about affordability, availability, and underwriting practices of the insurance industry in historically underserved communities, then implements a series of targeted rewards and penalties to move the industry to fulfill its covenant with government to make its products and services available to all good risks in exchange for nonexclusive or noninvasive oversight. This legislation should take the form of your Insurance Industry Anti-Redlining Act.

The necessary legislation should compel the industry to seek out and serve the available pool of good risks we all know currently dwell in economically isolated communities. The necessary legislation should contain a mechanism to have the industry report to a governing body on an annual basis statistics and to show how it is servicing these communities by product type, marketing method, and investment vehicle. The legislation should be implemented, for it would be just the first step in a long and arduous 1,000-day march towards the economic parity our communities so desperately deserve and will adamantly obtain.

If I may, I would like to share my remaining minutes with a couple of stories from our community's vantage point. Much has been

said and written and debated about affordability and availability of automobile insurance for low-income and inner-city drivers. I would like to take this opportunity to move the discussion to the unavailability and unaffordability of homeowners' and small business liability coverage in those same redlined inner city communities. It is my desire to move the debate from accusation and counter-accusation to a higher level of fact-finding, analysis, and reporting, with the hope of identifying remedies.

In 1989, 1990, and again in 1991, the California Department of Insurance held hearings about redlining. Witness after witness including low- to moderate- and middle-income automobile drivers, insurance companies, minority, and female entrepreneurs, low-income and inner city home dwellers, agents, and brokers, and the Department of Insurance's own actuary provided unrefuted, sworn evidence to the Department of Insurance that the insurance industry as a whole had abandoned the inner city, that insurance companies engaged in redlining, the industry provides inferior service to low-income, minority, and inner city residents, and that the insurance industry uses territorial rating as a mask for discrimination.

The industry, through its actuaries, has countered that redlining does not exist and that insurance is readily available to all consumers but that it must cost more in the inner city. However, the industry has provided no empirical data to substantiate either the claim of availability or that it must cost higher. Furthermore, when questioned by the Department of Insurance and by our attorneys, these same industry experts have admitted that they have not conducted any studies; as such, they can prove no evidence.

I would just like to share briefly my own personal problem in obtaining insurance for my small business. In 1987, I founded Selwyn Whitehead Enterprises, a telecommunications consulting and manufacturing firm, in Oakland, Calif. Late in that year and into 1988, I pursued a contract with Pacific Bell to resell telecommunications products from manufacturers to Pacific Bell. Pacific Bell required as a condition of the contract that I have a commercial general liability policy in the amount of $1 million. In general, all utilities as well as municipal, county, State, and Federal agencies require commercial general liability insurance as a condition of contract award. Female and of-color entrepreneurs tend to focus on obtaining contracts with these agencies because most of corporate America tends to not believe that we are capable of providing good service. Thus, if we are not able to get these products, we are actually eliminated from conducting business.

Mrs. Collins, let me briefly share with you my problem of getting insurance when I identified myself, and I am proud to say I am an African American female living in an urban community, and I wanted my business there because I wanted to have the opportunity to employ young black males and Latino males, who seem to only believe that drug dealing is an appropriate way to do business. I was unable to get a policy until I, in effect, lied but did not lie by indicating that I was working for a white male; using the masculine derivative of my name, I was able to finally obtain insurance.

[Testimony resumes on p. 64.]
[The prepared statement of Ms. Whitehead follows:]

44

Written Statement of
Selwyn Whitehead
President
The Economic Empowerment Foundation

**Good morning Chairwoman Collins and Members of the Committee.**

My name is Selwyn Whitehead. I am the president and executive
director of the Economic Empowerment Foundation in Oakland, California.
We are a non-profit corporation that seeks to develop innovative strategies to
bring the resources of the financial industry back into historically underserved
communities.

I want to take this opportunity thank you for having these long overdue
hearings on what I believe is one of the most destructive practices in modern
American business: the willful withholding of insurance products and
investment vehicles from individuals and communities based solely on their
race, gender or economic class. In a word Redlining.

Redlining is destructive for the overall economy because it cavalierly
isolates whole sectors of our society from risk management and financial
services markets as the result of intellectually dishonest race-based
underwriting. Redlining is destructive for the share-holders of insurance
companies because it arbitrarily eliminates sources of income from earned
premium dollars that could be garnered from good risks our communities.
Most importantly, from our vantage, it limits our ability to own or improve
residential or commercial real estate, attract equity and debt capital for
community based businesses, engage in legitimate free enterprise and legally
operate a motor vehicle. All baseline requirements for succeeding in our
capitalistic, mobile, small-business based economy.

I must inform you that low to moderate income and of-color residents
and business owners in our urban centers and rural communities desperately
need Congress to establish legislation which first establishes a mechanism for
collecting information about the affordability, availability and underwriting
practices of the industry in historically underserved communities, then
implements a series of targeted rewards and penalties that move the industry
to fulfill its covenant with government to make its products and services
available to all good risks in exchanges for non-invasive oversight. This
legislation could take the form of an Insurance Industry Anti-Redlining Act.

The necessary legislation should compel the industry to seek out and
serve the available pool of good risks we all know dwell in these economically
isolated communities. The necessary legislation should contain a mechanisms
to have the industry report to a governoring body on an annual basis the
statics that show how it is serving these communities by product type,
marketing method and investment vehicle. This legislation should be
implemented with due haste. Fore it would be but the first step in a long and
arduous 1000 days march towards the economic parity our communities so
justly deserve and are so adamantly determined to obtain.

If I may, I would like to share with you three perspectives from the
historically underserved communities I am proud to represent. The first is that
of a nonviolent latter day militant activist demanding equal access; the second,

003847

that of a community resident and small business owner stressing the economic consequence of financial isolation; and finally that of an Economist using textbook economic theory and free market guidelines to justify the need for insurance industry investment. What is interesting is that all three arguments reach the same conclusion: The American Insurance Industry has a duty to the overall American Economy to conduct itself in a nondiscriminatory manner.

## Argument One: The Passionate Plea of a Latter Day Militant

### A. Historic Perspective: The Decline of the Urban Community

> *"Dispossessed minority communities cannot, on their own, fundamentally alter the political and economic realities for a society which, to all appearance, has sunk into terminal mean-spiritedness. They can, however, periodically unleash a reign of havoc and destruction to jolt the majority population into recognizing that poor communities of color will not simply roll over and play dead for the sake of social peace."*

> Linda Burnham, Editor, *Crossroads*, June 1992

American corporate redlining[1] in concert with governmental neglect, accompanied by the self-serving patronizing abuse of the white liberal left have succeeded in limiting the access of African American to the resources and responsibility needed to control their political and social destinies and maintain their economic viability. Now, as the twenty first century looms before us, Blacks are poised on the brink, determined more than ever to capture and control these resources so as to spur on their economic stability and financial independence. The question before American psyche is whether this long overdue goal of African American economic empowerment will be accomplished via constructive or destructive means. The answer lies as much with white Americans as it does with Blacks.

For years African Americans sought to convince the majority populace, through enumerable moral appeals and acts of nonviolence, that they as a people had as much right to economic, political and social self determination as the more affluent members of society. For years these moral pleas have fallen on deaf ears, these noble acts went unnoticed.

Now blacks have come to believe they have the responsibility, nay, the right to take the leadership role in developing the strategies for moving corporate America and government to provide the resources needed for our economic self-empowerment and self-sufficiency. Now blacks believe that

---

[1] The erection of artificial race-, gender-, or class-based barriers that inhibit persons of color and women from reaching their full economic potential.

corporate America and government have a duty to follow our lead, as they have here to fore been unwilling or unable to provide either the will or moral leadership to solve these long standing problems. Now Blacks know that the white liberal left that has profited politically and economically from our misery must get out of our way!

The resources we require, no, demand, include fair and reasonable access to capital, credit, insurance, small business development technical assistance, and profitable contracting opportunities. With these resources we could develop, on our own and for our own, the affordable and available quality housing, the affordable and available quality health care, the high quality education and the meaningful employment opportunities, including those of self-employment, that our communities need to move into the economic mainstream.

These resources have remained just beyond our grasp. We must have them for our survival. We know these resources have been intentionally withheld from us. Resources we have a right to as law abiding citizens. Resources which if not voluntarily provided to all, will be taken by force by some, with the inherent negative consequences desired by none.

The Rodney King riots of last spring signaled a rallying cry understood by all African Americans regardless of our economic status: No (Economic, Social or Political) Justice, No Peace!

### What Caused the Riots?

How did we so swiftly arrive at this point of violent confrontation? After all it was simply a court room verdict acquitting the police for acts of violence against a black man. A daily event in any city in America. After all Rodney King was a nobody. A black man with no stake in polite society, no economic or political clout. Why then would the unpunished for acts against his humanity cause such an uproar? Why, because every Black man, every Black woman and every Black child realized the instant the verdict was announce that we are all perceived to be as valueless as Rodney King to the white majority.

"... too many Americans fail to see blacks as worthy members of the political-social community. At best, the majority of Americans do not see black as suffering from discrimination or oppression and its vestiges. Thus, they feel exonerated and then neglect blacks further when neoconservative pundits and liberal white writers say the fault inheres in blacks rather than in inadequate opportunity, encouragement, or support. Moreover, such reactionary or cowardly thinking perversely transforms race-specific remedies or affirmative action for past and present race based wrongs into "reverse discrimination," as if the remedies are inflicting injuries upon whites comparable to what white discrimination inflicted upon black in the past. At worst, the majority of Americans do not see black as fully human or members

of the political and social community, stereotypical ascribing to them genetically generated moral and mental deficiencies."[2]

This stark realization bought vividly into view by the blatantly unjust verdict, transposed against a backdrop of ongoing economic abuse and political neglect, while causing all Blacks enormous pain, led some of Blacks to act out in in fits of uncontrollable rage.

## The Cost of Racism in America

"(Racism)... has cost white people, black people and the nation dearly. It is impossible to calculate the price in dollars and cents.... It has meant the loss of an enormous amount talent. The number of black lives snuffed out by violence is beyond counting. The number of black lives crippled and maimed is even greater. The psychological and social development of America's children - white as well as black - has been stunted. As a result, the nation is not prepared for an advance scientific and technological age."[3]

Ours is a dysfunctional society, a dysfunctional economy. We have become a society that places racism above justice, racism above fairness, racism above equity. As such we are doomed to failure. "When society's rewards and penalties are distributed to its members in a manner not consonant with their relative productiveness, then at least some scarce resources are bound to be overallocated to relatively unproductive member s of the "favored" race... and underallocated to more productive members of the race being discriminated against....Society's aggregate real output, therefore, will fall below its potential..."[4]

## The Solution: An Economic Empowerment Strategy

To get our country back on track, on the path of social and economic reconstruction, I believe all corporations doing business in America must do the same five things to help level the economic playing field for those who have been ignored. Each corporation with the support of government must make a commitment to achieve the following goals:

1. Board of Directors Integration Goal: Each institution should have board containing 30% People of Color, including Women of Color, by the year 2000. The Plan of Action should be that each institution should make three appointments immediately, then make the remainder over a nine years period using an immediately developed Persons of Color Advisory Board as the proving ground for potential candidate board members.

---

[2] Kenneth S. Tollett, Professor, Howard University, in the Liberals' Loss of Nerve, *The American Prospect*, Spring 1992 p. 126.

[3] James Comer, M.D., Psychiatry *Beyond Black and White*

[4] A. Leon Higginbotham, In the Matter of Color, Race and the American Legal Process: The Colonial Period, (1978), p. 380

2. **Senior Management Integration Goal:** Each institution should have senior management ranks containing 30% People of Color, including Women by the year 2000. The Plan of Action should entail for each institution to strive to make 60% of its executive appointments over next ten years people of color, including women.

3. **Persons of Color and Women Business Enterprise Purchasing Programs Goals:** Each institution should procure 30% of its goods and services from bona fide of-color and women own businesses by the year 2000.

4. **Charitable Contributions Goals:** Each institution should earmark 2% of corporate pretax income to community based grass roots organizations by the year 2000. The Plan of Action should be that each company target 1.5% of corporate earnings as the intermediate goal for 1995. Then without diminishing the amount of contributions to the arts (also without increasing it) earmark all new funding for organizations controlled and operated by people of color, including women of color that are focusing on low-income and of-color community housing, economic development and education projects.

5. **Community Development Investing, Lending and Insuring Goals:** Each California lender and each national insurer doing business in California should earmark 1% of their assets per year for the next ten years for loans, long-term investments and risk management commitments for California's historically underserved communities.

<u>What are the Benefits of these Initiatives?</u>

The community development lending and insuring commitment alone, targeting merely one percent of each financial institution's assets for revenue producing loans and premium producing insurance policies, not grant, not give a-ways, not welfare; would generate $96.5 billion in inner-city funding over the next ten years.[5] From this economic foundation each community can create with its corporate and governmental partners the kinds of collaborative efforts needed to bring about the end of redlining and bring about economic revitalization to the Black community.

We believe the financial community, including both the banking and insurance industries, have no less a responsibility to develop these kinds of programs than any other major corporation doing business in California.

In fact, we believe that because of their unique role in the business development and expansion and home ownership process, coupled with the fact that these institutions are underwritten and in effect guaranteed by all tax payers (in the banking and savings and loan instance), and are a requirement to

---

[5]California banks had a combined asset base of $352,414,000,000 as of December 31, 1991 according to the Federal Reserve Bank of San Francisco. The top 40 U.S. based insurance companies had a combined asset base of $612,715,000,000 as of December 31, 1991 according to *Business Week.*

legitimately conduct our daily lives (in the automobile, homeowners and business liability insurance instance), **financial institution have an even greater responsibility to be accessible than other corporate entities!**

### B. The Urban Community Objective:  Wealth Creation through Entrepreneurship and Homeownership

The Economic Empowerment Foundation has as its primary objectives increasing the availability of and the access to the financial resources so desperately needed by members of historically underserved communities in California.  We intend to help create for our constituency those mechanisms that can produce more reasonable access to capital, bank credit, insurance and financial and business technical assistance.

We have found in our research of successful community development models throughout the country, that in order **for a community revitalization effort to be successful it must be based on and controlled by the will of the community itself.** The role of external capital and private sector investment is to leverage the self-determined efforts of the community and its government resources.  The goal of a community undergoing a revitalization effort is to attract higher-paying industry to the community to increase employment opportunities, establish viable indigenous businesses to capture and recycle the consumer spending dollars of the residents within the community and promote and expand home ownership opportunities to stabilize the community.  These elements in essence, create community wealth.

To put the Central East and East Oakland and other like communities in a better position to create this community wealth we believe a basic economic infrastructure must first be created.  As such, the community must find ways to:

　　o  Improve the chances for community based business to survive and prosper through the provisioning of technical assistance and small business incubation programs.

　　o  Build an ownership stake or investment interest in local businesses and facilities for community residents.

　　o  Attract non-exploitive investment capital, both human and financial, from sources external to the local community.

　　o  Leverage existing local, state, and federal government funding, assistance programs, and tax incentives to attract on-going private sector investment.

　　o  Create a community based deposit taking, lending and investment institution that also provides credit capacity building training for the community.

o Provide savings instruments which encourage community
reinvestment and ownership.

o Create a mechanism to safeguard and insure commercial and
residential property against loss.

o Improve the community's public infrastructure; human
development, public safety and physical plant.

o Improve the community housing stock, reduce visual blight, and
create safe public places for congregation and recreation.


Ultimately, the community must find ways to demonstrate that effective
government, private sector, and community collaborations can ameliorate the
economic dysfunction in the inner city.


C. The Tools Needed:  An Economic Development Infrastructure

Mechanisms For Promoting Community Economic Development

The following list of economic development support systems and
programs (all of which conform to FED Regulation Y[6]), is a condensation of a
number programs in existence through out the country.  It was formulated
after interviewing numerous capital creation and resource leveraging experts
from business, government, academia and the non-profit community[7]. The
infrastructure items have been divided into six major classification:
Community Capital Formation Vehicles; Community Credit Access Systems;
Community Business Development Vehicles, Risk Management Support
Systems, Home Ownership Enhancements and Community Support Systems.
For brevity sake I will only discuss the ones that have to do with the insurance
industry.

---

[6] Regulation Y is the 1970 amendments to the Bank Holding Company Act that gave the
Federal Reserve Board the flexibility it needed to include community development in
Regulation H, which specifies the non-banking activities considered proper and permissible
(subject to individual applications) for bank holding companies. The 1971 change in Regulation
Y, now contained in section 224.24 (b)(6), defines the term community development as follows:
  Making equity and debt investments in corporations or projects designed primarily to promote
community welfare, such as the economic rehabilitation and development of low-income areas
by providing housing, businesses, services or jobs for residents.
[7]  Including Joan Shapiro, Paige Chapel and Robert Weissbourd of Chicago's South Shore
Bank, Patty Grossman of the Cascadia Revolving Fund, David Christian of the Tampa Bay
Black Business Development Corporation, Michael George of JP Morgan, Marty Leary of the
Southern Finance Project, Al Osbourn of the UCLA Anderson School of Business, Herbert
Whitehouse, inventor of the 401(k) Plan and California Insurance Commissioner John
Garamendi and members of his staff.

## Insurance Industry Risk Management and Investment Programs

### 1. Community Insurance Access Through Agency Appointments

A mechanism to increase the number of community based, of-color and women owned insurance agencies and brokerages must be negotiated with the major national carriers. This because these agencies and brokerages would be in the best position to achieve the concurrent goals of making sure the community has access to insurance products and making sure the the best possible risks are booked for the insurers.

To achieve this goal insurers should develop apprenticeship programs to help develop future agents, mentoring and technical assistance programs for new agency appointments, and develop a investment pool to help capitalized new agencies.

### 2. Community-based Property and Casualty Insurance Companies

Currently there is not a single African American owned property and casualty insurance company in the United States. As such, one of the above mentioned investment strategies should be implement in an effort to raise the minimum $6 to 10 million in capital needed to launch such a company. Such an organization will also need a stable of reinsurers to help spread its risk. The existing reinsurer network could be tapped to provide not only reinsurance but subordinated debt as well.

### 3. Community-based Primary Mortgage Insurance Company

As stated earlier in this report, in the wake of the increasing recession in California many primary mortgage insurance companies in an attempt to exit the market are increasing the premium on the product making it difficult for first time home buyers to afford the monthly payments and in some instances are putting home ownership completely out of reach. Primary mortgage insurance is required whenever a purchaser makes less than a 20% down payment. The insurance reimburses the mortgage holder the unprotected spread in case of a default. Because there are only four major players in the industry (Mortgage Guaranty Insurance Corporation (MGIC), American International Group's United Guaranty Corporation (UGC), General Electric Capital Mortgage Corporation and Allstate's PMI Mortgage Insurance Company), it is conceivable that they could shut down the market.

To make sure members of the community will have access to low down payment mortgages, a community mortgage company which can be co-owned by a community based non-profit and the pooled resources to the big four should be established.

### 4. Community-based Property Reinsurance Company

Create a community-sponsored reinsurance company as an investment and risk-taking vehicle for local capital. As a means of attracting outside businesses and investment, the community could develop an insurance fund for the sole purpose of mitigating the risk of deliberate future property damage. Because residents would have an ownership stake in the fund and thus put community capital at risk, the community could market such reinsurance not just as fund for claims recovery, but more importantly as the financial embodiment of the residents' commitment to actively promote a safer business environment. Traditional property insurance would provide conventional coverage with the community-sponsored reinsurance available only to indemnify for deliberate damage to the insured premises. Local investors -- including individuals and institutions -- would pool their money for common investment and as a reinsurance reserve. So long as deliberate property damage were avoided, returns on the capital pool would be available for reinvestment and a compounding return.

Launching the reinsurer would require actuarial assessment, portfolio management, investor solicitation, marketing, premium collection, and claims-paying services.

Capitalization could come from donations, debt and equity investment drawn from outside the community, private placement of debt within the community (churches and other community organization as well as individuals, a legislated insurance premium surcharge, and the stand-by pledge of securities from pension funds. Critical local participation could be initially boot-strapped by granting residents equity participations in the pool in return for labor contributions to community development projects. Withdrawals of capital created through such "sweat equity" would be prohibited. However dividend payments would be made after a specified holding period.

The reinsurer would not be seen as competitive to existing insurance providers because they would continue primary insurance in accordance with their own underwriting standard, pricing, and servicing constraints.

### 5. An Urban Economic Empowerment Mutual Fund

Using the successful model of private sector funds, create a traditional mutual fund specializing in enterprise zones with the charter to invest in any of the local, state or federal designated community development bank or enterprise zones nationwide. (That discretion would amplify the importance of insuring that relative market opportunities are as attractive here as elsewhere in the U.S.) Investors would receive market rates of return from a managed, highly diversified portfolio of debt, convertible, and equity securities of profit-seeking businesses willing to locate within enterprise zones. The availability of capital from this specialized source would augment federal and state tax and job training incentives. Like investment funds dedicated to environmentally

sensitive uses, the Urban Investment Mutual fund would appeal to socially motivated investors with fiduciary responsibilities including pension funds, foundations, churches, charitable organizations, individuals and insurance companies.

Launching such a fund requires the specialized management servicing capabilities of a major asset manager. In order to induce the launch, seed money investments might be pledged by prospective investors in sufficient amount to allow the fund to break even from inception. The sponsorship of such a fund might also be a low cost and highly visible way for an asset manager to contribute to a solution to the urban crisis while potentially benefitting from developing new asset sources.

Any insurer that is demonstrably and verifiably committed to working sincerely with one or more historically underserved communities to develop and implement one or more of these programs should be shown deference during your analysis of their results under the Anti-Redlining Legislation.

## Conclusion

Obtaining access to the economic resources which can lead to the economic empowerment of of-color and low-to-moderate income communities, single women and community based micro-businesses is the last frontier of the Civil Rights Movement in the United States. The Economic Empowerment Foundation is dedicated to conquering at least a small portion of this uncharted territory.

We need the support of the financial community, including insurers, in our efforts. We required the support of our elected government to compel the financial community to work with us. The activities described above are consistent with the tenants of safe and sound fiscal and fiduciary management and as such are pro-business. Additionally, they serve to enhance the human dignity of the constituents they serve by providing a foundation from which the members of the community can exercise personal responsibility and participate actively in determining the course of their own lives and the lives of their community. In America, controlling ones economic destiny is a cornerstone of human dignity. As this is our sole interest, we need the 1000 day march to begin today.

I would like to conclude this section of my remarks with a quote from a famous Black journalist, with the hope it can help shed some light on the impatience many in my community feel regarding this matter:

*"I believe race is still the fundamental issue we face in this society. I'm speaking frankly because we've tiptoed around this for too long. The reason even well-heeled black are angry is that even if you live in an ivory tower, work in a glass-enclosed office with Picassos on the wall, carry a briefcase, and dine at "21", you're still never far from that old line: "What do you call a black man with a*

*Ph.D.? A nigger." [8] That's the burden of being black in America. And every now and then some episode like the L.A. riots brings this rage simmering to the surface.*

*We can talk about benign neglect, malign neglect, government culpability, political culpability, and leadership culpability. There's an abundance of all those. But at the risk of sounding simplistic, I believe that lack of communications, misperception, and stereotyping form a triad that seems to be at the heart of the problem.*

*The media, and I say this as a media person, contribute to it. Nowhere -- in print, broadcast news, public affairs programs, or entertainment -- can you find people of color being presented as whole people. Imagine someone from Mars trying to get a picture of who lives in this country by watching television. That Martian would be as prejudice as anybody else, because he will be frightened by the images of black people he sees on television, especially if he starts with local nightly news, which is one disaster story or crime story after another.*

*What can be done? Well, when was the last time you invited black to your house, ore vice versa? If we don't have some kind of human interaction and contact, we go on living in these isolated worlds. That might not matter if black people could ensure, on their own, that their schools were adequately preparing their students, that the hospitals served them, that the political system worked for them,. But they can't Why? Because black people do not control anything in this country. The levers of power are still in white -- male for the most part -- hands. That's why all of us, regardless of our income levels, walk around with rage, barely contained."*

Charlayne Hunter-Gault, National correspondent for the MacNeil/Lehrer NewsHour, *Fortune*, November 2, 1992.

## Argument Two: Insurance Affordability and Availability, A View From the Neighborhood

Much has been said, written and debated about the affordability and availability of automobile insurance for low-income and inner city drivers. I would like to take this opportunity to move the discussion to the unavailability and unaffordability of homeowners and small business liability coverage in these same 'redlined' inner-city communities. It is my desire to move the debate from that of accusation and counter accusation to a higher level of fact

---

[8] X

finding, analysis and reporting, with the focus on identifying remedies for this situation.

In 1989, 1990, and again in hearings conducted on August 19, 1991, by the California Department of Insurance, witness after witness (including low-, moderate-, and middle-income automobile insurance consumers, minority and female entrepreneurs, low-income and inner-city home owners, agents and brokers of all stripes, and the Department of Insurance actuary, Robert Hunter) has provided unrefuted sworn evidence to the Department of Insurance that the insurance industry as a whole has abandoned the inner city, that insurance companies engage in redlining, that the industry provides inferior insurance services to low-income, minority, and inner-city residents, and that the insurance industry uses territorial rating as its mask for discrimination.

The insurance industry, through its actuaries, has countered that redlining does not exist, and that insurance is readily available to all consumers, but that it just must cost more for low-income consumers. However the industry has provided no empirical data to substantiate either their claim of availability to, or the necessity of higher cost for, inner city consumers. Furthermore, when questioned by the Department of Insurance and by our attorneys, these same insurance industry experts have admitted that they have not conducted any studies of insurance affordability or availability in any low-income, of-color or inner city community in California.

In my capacity as the President and Executive Director of the Economic Empowerment Foundation, Executive Director of the Greenlining Coalition, as President of the Coalition of Bay Area Woman-Owned Businesses, as Chair of the San Francisco Chamber of Commerce's Business Development Committee for Small, Minority and Women-Owned Businesses, as a member of the California Assembly Select Committee on Small Business, and as a member of the California Public Utilities Commission's Women and Minority Business Enterprise Advisory Board, I have over the past five years learned of numerous specific instances of insurance companies refusing to sell property and commercial casualty insurance to residents of, and businesses located in, of color, inner city, and low-income communities throughout the state.

I also have first-hand knowledge and experience as a small business owner who was refused service because of my race and gender.

In 1987 I founded Selwyn Whitehead Enterprises, a telecommunications consulting and manufacturer's representative business in Oakland. Late that year and into 1988, I pursed a contract with Pacific Bell to resell telecommunications products from manufacturers to Pacific Bell. Pacific Bell required, as a condition of that contract, that I have a commercial general liability policy in the amount of $1,000,000. In general, all utilities, as well as municipal, county, state, and federal agencies, require commercial general liability insurance as a condition for their award of contracts. Female and of-color entrepreneurs tend to focus on obtaining contracts with these agencies

Case: 1:13-cv-08564 Document #: 134-7 Filed: 08/11/17 Page 168 of 500 PageID #:5...

56

because they alone have programs and specific goals for people of color and women-owned businesses. Thus, access to commercial insurance an imperative for the further development of our businesses.

In the course of seeking a commercial general liability policy, I went first to white male friends who were manufacturer's representatives of telecommunications companies to learn the price range of these policies. They informed me that premiums for such insurance ranged from $900 to $1,500 per year. I then sought out an African-American broker to obtain a policy, in part because my contract with Pacific Bell also required that I subcontract with persons of color and women owned businesses. He could find no insurance company to provide a commercial general liability policy for my business. I next telephoned approximately 15 independent and captive agents at random from the yellow pages directory, informed them of the nature of my business (that it was of-color and woman-owned, and that it was in Oakland), and requested a quote for a commercial general liability policy.

Instead of receiving quotes from $900 to $1,500, which my white, male colleagues received, these insurers either refused to carry me at any price, informed me that they did not offer coverage for my line of business, or quoted me premiums ranging from $8,000 to $10,000 per year.

Eventually, I got wise and decided not to inform prospect insurers that mine was an of-color, woman owned business, and pretended instead to be requesting a quote for my male boss whose name was Selwyn Whitehead – a masculine Anglo name. The first insurance broker I telephoned under this mascarquade obtained a quote for me of $1,200. Eventually her firm was able to get a policy for me for a premium of $1,055 per year.

Insurers' practices such as the ones I encountered, have further depressed the economic development of already underdeveloped communities, and have contributed to the epidemic of uninsured homes and apartments and the resultant blighted neighborhoods. Swift remediation of this situation is required, because access to asset protection and small business development products is an essential first step in the economic revitalization and stability of historically underserved communities.

I'd sincerely like to know what deity gave the insurance industry the right to denied law abiding people of color and low-income individuals the opportunity to insure their homes, apartment buildings and businesses simply because they live in what are called "undesirable neighborhoods" out of choice (a community cultural or racial affinity) or economic limitation (the only place they can afford to live)?

Industry shareholders should be the first to demand that these redlining practices be eliminated immediately. Simply because this institutionalized practice has, in addition to depriving the insurers of a thorough understanding of our reasonable insurance needs, succeeded in limiting the opportunity for a greater return on investment through greater market share.

As neither the industry nor its shareholders are up to the task of doing not only the 'right thing' for our communities, but the "right thing" for their bottom lines, we have no option but to seek relief through legislation.

As such we believe Congress should immediately enact the Anti-Redlining Act which establishes a system of bonuses and penalties rewarding good non-discriminatory service and investment, and commensurately decreasing economic benefit to insurers who provide inferior or discriminatory service to our nation's inadequately served communities, especially low-to-moderate income and of-color communities.

## Argument Three: The Dispassionate Intellectual Logic of Insurance Industry Investment in the Urban Community

### Investment Diversification as a Risk Reduction Measure[9]

For many, the solution to recent insurance industry problems is to call for increased regulation of insurance company investments. This conservative line of thinking suggests that insurance investments were the cause of many of our current problems and that, therefore, regulations establishing prudent investment policies are an answer to these problems.

Those who adopt this approach have a simple philosophy: Insurance companies should not assume increased investment risks where lower risks are available. Investment should be restricted to high-grade bonds and mortgages with stable fixed rates of return.

This regulatory paradigm will be persuasive for many of this committee. It will also make you skeptical of people like myself who seem to be asking you to open up the insurance industry to increased risks. We have already described to you the damage investment red-lining does to minority neighborhoods like East Oakland and South-central Los Angeles.

Buy my purpose in speaking to this Committee is not to ask you to increased risk for the insurance industry or for policyholders. We are not here to convince you to mandate social investing to correct these social problems. Rather, we want to describe a more comprehensive view of the role of the insurance industry that does not require the neglect and therefore the destruction of whole segments of American society as the price of "risk

---

[9] This section was developed in collaboration with Herbert Whitehouse. Mr. Whitehouse, President of Whitehouse Fiduciary Advisors, a benefit consulting firm, is the former secretary of the Chase Manhattan Bank Board of Directors' Employee Benefit Review Committee. He is best known for his pioneering work in the development of the 401 (k) savings plan and for the introduction of HMO "gatekeeper" and managed care concepts to traditional health insurance plans.

reduction." In fact, we hope to show you that the redlining investment paradigm is risk creating, not risk reducing.

Regulation of insurance company investment activity is clearly appropriate. The social goals of insurance are not compatible with unrestrained risk taking in a competitive free for all. We have long ago discarded this notion for an approach that produces consumer confidence and security in exchange for limits and constraints on investment activity that all insurers must follow. But even so, the insurance industry is not insulated from competition. It is also a player in a competitive financial services industry. External competition and competition from within the industry, combined with increased consumer sophistication, has led to pressures for more competitive interest rates on products.

Thus, there has been a tension between prices, which depend largely on investment returns, and the security contemplated by the regulatory structure. This tension has, in fact, stimulated a move to a dual insurance industry. In one, sophisticated customers trade off real insurance for "pseudo- insurance" and are provided with separate account investment features not normally associated with insurance products. The other, reserved for the ordinary consumer, is tied to the general assets of the insurance company. In general, however, when consumers buy insurance in any form, even "pseudo-insurance" they are knowingly trading off investment flexibility and higher returns for security.

In addition, the consumer is very aware of the tax advantages that come with insurance products. Without these federal tax advantages many insurance products and, to some extent, the industry as a whole would be forced to provide consumers with greater intrinsic value for their premiums. But these tax advantages have been justified because of the benefits that a stable secure insurance industry which provides to society as a whole.

In short, insurance investment decisions do not exist in an unrestrained environment, or even in one where optimum risk/return asset allocations are anticipated. For example, unlike the investment approaches of non-insured employee benefit funds (which are often 60% to 70% invested in higher risk equities), state laws typically restrict insurance funds to equity holding of 5% of admitted assets, and to no more than 2% of the outstanding shares of any one corporation.

The standard MBA text in insurance is Principles of Insurance, part of the Irwin series in insurance and economic security, by Robert Mehr and Emerson Cammack. A short quotation from this text is well worth this Committee's attention:

> *When trouble besets life insurers it is usually a result of investment problems...To protect policyowner interests in insurer solvency, discourage concentration of economic power, and*

*encourage the commitment of funds for socially desirable
purposes, state laws regulate the investment of insurer assets.*

All of these objectives must be balanced in any regulation of
insurance company investment policy. In addition, the United States
Congress needs to recognize that the insurance industry, despite the
dominance of state regulation, is largely dependent of the federal tax
code. Insurance products and companies would be vastly different if not for
the tax advantages that are given to insurance products. These tax
advantages are funded by all Americans. It is only appropriate for
Congress to require that any insurance company product eligible for
these tax advantages have an investment policy that serves all
Americans. We can insist on policies that protect carrier solvency, avoid
undue concentrations of economic power, and promote the social and
economic welfare of the communities that they serve.

Every American has become aware of how difficult it is for any
individual or sector of society to be productive if cut off from the support and
resources of society. We are a society of individualistic values, but we
have come to recognize that it is only within a social and economic
organization that individuals make contributions. Americans want an
economic structure that permits everyone to contribute to the economic
development of the entire society. It is not so much the Black inner city, but
the image of its own future that every American community wants to change.
This sudden recognition of a common problem is what is behind the concern
for Los Angeles - a recognition of a shared economic isolation and an
awareness that the American economy is now structured to help only those
who are tied into the support structure of large corporations and institutional
investors.

Top Treasury administration and Federal Reserve officials, even under
the Bush Administration, have been speaking out on the need to increase
lending to the inner city. There is a recognition that certain segments of our
society have not had equal access to the capital necessary for economic
growth. Of all the messages coming out of Los Angeles, this is the message
that reached Washington. It got through because the need to end the
economic isolation of the inner city is the same need that exists for most of
America. The average American has seen: the stock market reaching new
highs while the US economy reels from a recession, top executives of major
US corporations getting rich on stock options, and at the same time, millions of
corporate workers being laid off to offset declining profits.

The election of Bill Clinton with his emphasis on providing capital to
small business and to community economic development have made it clear
that America does not want a "Wall Street" president if that means forgetting
about the rest of us. Most of us agree with the observation that the stock
market has little to do with the fortunes of the inner city. Or for that matter, our
nation's overall economic health. Wall street has always been tied to the

003862

fortunes of the largest and most powerful corporations. If this corporate sector does well, the institutional investor does well.

If this large company sector could support the entire population a policy geared to providing capital to this sector, would make economic sense. But, our economy is much broader and deeper than the large corporate sector. And this sector has been prospering because of our institutional investor bias, at the expense of the economy as a whole. Our actions are as crazy as if we were designing a species of animal without providing for a diversified genetic base. We have been sacrificing our ability to generate internal competition and our ability to fight off foreign competition.

In the past, capital has come from "Wall street" entrepreneurs who have taken the risks and reaped the financial rewards for creating much of our nation's new wealth. While this market economy prospered, a broader economy maintained itself outside these major corporations. Now this diversified economy is in danger. Today, capital for our largest corporation comes primarily from savings that used to serve the broader economy. This broad asset allocation shift is due to the growth of institutional investors; namely, insurance companies, mutual funds, and pension plans. The institutional investor was not a major factor in our financial system just three decades ago, but today dominates the allocation of economic opportunities throughout society.

Our tax structure has created a revolutionary change in our financial system. Pension and insurance capital represents "household" savings that used to be recycled through our banking system for the economic development of thousands of communities. Yet, these savings are no longer invested in our communities. Instead, this capital is almost exclusively tied to Wall Street and the capital markets. A large investor like Metropolitan Life Insurance Company will not invests in blocks of less than $50,000,000. So now we have a new concentration of wealth and a new concentration of investment management by an elite economy - the institutional investor - that is so big that the needs of small business and ordinary people are completely ignored.

We propose to connect American's largest pool of savings to real investment in Economic development. This is not social investing; but rather, a practical way to restore the historical role that original lending has played in economic development. It is also a means to ensure the ongoing strength and competitiveness that comes from a broad economy. An economy solely supporting large corporations, no matter how efficient, can not prosper in the long run if it leaves behind too large a portion of the entire economy. The idea is fairly simple.

The American economy changed when control over the allocation of its household savings was put into the hands of institutional investors instead of local bankers. These institutional investors continue to supply the largest corporations with a seemingly endless supply of capital out of the savings of

ordinary people. Yet, it is not tool late to change. Despite the damage institutional investors controlled savings has caused to our banking system, we still have a unique decentralized financial distribution network capable of harnessing this capital to stimulate economic growth. We merely need to return a portion of our capital to this network in order to stimulate economic development.

The creation of an economic development relationship with the banking sector is what we are suggesting. Institutional investors can provide banks with a reduced cost of capital. It is precisely the high cost of capital and the resulting high real interest rates on loans, not lack of loan demand, that is preventing Federal Reserve monetary policy from stimulating the economy. Real interest rates for personal, mortgage, and business loans are so high that a diversified portfolio of loans can easily match the long term return expectations of an equity dominated investment policy, even while greatly reducing risk. Modern Portfolio Theory (MPT) suggests that a market portfolio is the optimum mix for any investor. Yet, the "market" contemplated by MPT has never included the original lending needs of our economy. Only when institutional investor assets are diversified to include the entire economy can the asset allocation be considered optimum; for the investment portfolio and for society. This is where bank loan capabilities fit in; as the bridge, in a less than efficient "market" economy, between institutional capital and original lending for the building of factories and the creation of jobs.

What criteria can institutional investors use to broaden their focus from the "short-term thinking" of the large corporate market to the economy as a whole? On the basis of our research in the areas of corporate strategy and financial and economic performance, we suggest that a return on invested capital approach exists that permits a portfolio manager to distinguish among large companies, as well as to evaluate small business and community economic development investments.

Planning for future increases in productivity and profitability requires institutional investors to create real economic value; in other words to secure a "real" return on investment. The subject of return on investment is more familiar outside the institutional investor's office than in it. As an individual, if you deposit $100 in the Bailey Building and Loan Association, there will be a sign on the premises indicating your return "five percent interest per year" or "six percent compounded daily." If you buy a new home from the Bailey Building and Loan and obtain a mortgage for $100,000 with equal monthly payments of $943 over 30 years, the stated interest rate of 10 percent is understood. If you are one of the Bailey Building and Loan credit card holder's and carry an unpaid balance, you will notice that your are charged at the rate of 1-1/2 per month, or an 18 percent annual rate. These are true return on investment that even a high school student can understand.

Similarly, the economic return on investment is the profitability indicator which regulatory commissions generally use to control public utilities. To calculate the economic return on investment, or the expected return, a

institutional investor merely calculates operating income, which includes both
interest and net income divided by the average total capital. We submit that
institutional investors have access to a diversified portfolio of investments with
good returns on investment even when they go beyond the large corporate
market. Institutional investors can go directly to the broader economy, or they
can use existing intermediaries between savings and investment.
Alternatively, an insurance company or other investor can invest in the
diversified portfolio of banking institutions that are included in the soon
to be introduced Economic Empowerment Mutual Fund. The objective
of this fund will be to provide a diversified vehicle of community
development investment. Through this vehicle we will help the pension
fiduciary and insurance company portfolio manager to diversify assets
into the economy as a whole. This approach is intended to reduce the
risks of over-concentration that institutional investors are now taking.

What is a good return for an investment in a diversified portfolio? First
of all, the portfolio requires a range of risks and returns in order to be efficiently
allocated. A precise answer for any one investment depends on the cost of
debt carried by the business, and on matters of risk, timing, income
expectations, and on the relative positioning of these factors to other
investment alternatives. Further, we know that risk itself changes as the
structure of the flow of capital changes direction. In an economic structure
that directs long term financial support away form small business and from
inner cities the risks for investors are heightened. Alternatively, when the
financial system directs assets into an area the risks fall for all investors. This
phenomenon is difficult to quantify and it is not unexpected that private
investors would be afraid to fight the system. Further, our communities, unlike
the large corporate markets are by definition not efficient markets. Yet, the
world around us provides us with guidelines that indicate that small business
and the inner city are good investment. Let's look at the financial benchmarks
of the institutions who are structured specifically to deal as intermediaries
provide direct lending to the part of our economy not served directly by the
more "efficient" capital markets.

There are over 13,000 banking institutions in the united States. Many,
like First Virginia Banks, Inc., are very secure conservative institutions making a
profit by lending funds to the communities in which they do business. First
Virginia Banks produced a 17.04 percent Return on Investment for 1991, yet it
only managed to attract a 28.22 percent (although this is up from 22.08 percent
in 1990) of the institutional investor equity holdings. Yet, IBM that had only a
Return on Investment for 1991 of just 5.42 percent, was able to attract 46.1
percent of institutional investor equity holding. It is also significant to note the
First Virginia's 1991 average cost of long term debt was 10.63 percent, the same
as Chase Manhattan Bank. We suggest that long term equity return
expectations, even for the large corporate market, are not more than the
cost of long term debt for these and many other banks, and carry
substantially more risk.

The list of ten banks on Table 1 provides a good illustration of the opportunities for returns (above the riskier alternative returns) that diversification into loans to banks and through banks can provide to institutional investors. All the banks in Table 1, except for First Virginia and First Fidelity Bancorporation at 28 percent and 38 percent respectively, are more than 50 percent owned by institutional investors; it is important to note that approximately 15% of First Fidelity is owned by Banco Stantander.

## TABLE 1

| Institution - State | 1991 Return on Investment | 1991 Average Cost of Long Term Debt |
|---|---|---|
| Banc One Corp - OH | 19.14% | 9.28% |
| BankAmerica Corp. - CA | 12.00% | 8.16% |
| First Fidelity - NJ | 13.07% | 7.90% |
| First Virginia - VA | 17.04% | 10.63% |
| Great Western - CA | 13.86% | 9.10% |
| JP Morgan - NY | 13.07% | 7.40% |
| Mellon Bank Corp - PA | 12.32 | 8.08% |
| Republic NY Corp - NY | 11.42% | 8.89% |
| Wachovia Corp - NC | 15.56% | 7.35% |
| Wells Fargo - CA | 13.26% | 6.80% |

We would propose that the insurance industry has a more natural connection to banking institutions than to the large corporate manufacturing sector. As such, we also see financial institutions as a perfect vehicle for community and relationship investing. Such relationships could take many forms, including a direct partnership with our banking system as an outlet for economic development loans. The insurance industry already excels at the larger private placement market; and conceivable could extend its reach directly to small business and to the needs to the inner city. But more likely, it will make sense for the insurance industry to utilize the expertise of existing commercial banking institutions and the expanding network of Community Development Banks. No matter what the relationship or the particular approach, the objective in all cases would be consistent with the core role of all financial institutions; namely, to facilitate broad long term economic development.

Failure to diversify is risky, not only for the American economy, but for the insurance company or other institutional investor. Society will not permit the exclusion of whole segments of our economy from the advantages of institutional investor controlled savings. If the insurance industry does not include its inner city clients in its investment two things will happen. One, the inner cities will continue to deteriorate as the capital outflow continues. Two, the inner cities will be forced to take radical action to stop this outflow by organizing against insurance carriers who continue to act as agents of our destruction. This latter course of action is not efficient for either the insurance industry or the inner city.

The destruction of South-central Los Angeles has already convinced most of America of the need for increased community lending and economic investment. Yet, attempts to meet that need will fail if we don't recognize that our financial structure has radically changed in the last thirty years. Lending and investment ultimately come out of savings; and much of America's savings is directed to insurance companies by Congressional tax incentives. The policies of our President Clinton and this Democratic Congress toward insurance and other institutional investment policies will count as much as the Community Reinvestment Act in giving the American people the economic tools to turn around urban centers such as Los Angeles and East Oakland and tend to keep Old Man Potter in line.

64

Mrs. COLLINS. Thank you.
Ms. Whiting.

## STATEMENT OF ERNESTINE WHITING

Ms. WHITING. Good morning, Madam Chairwoman and members of the subcommittee.

I am Ernestine Whiting, a board member of Illinois' ACORN. I appreciate the opportunity to testify before you today on the important subject of insurance redlining. ACORN has just recently completed a study of insurance redlining in 14 cities. The study reveals severe problems in the extent, quality, and price of coverage in low-income and minority communities.

Low-income and minority areas were significantly underinsured by conventional markets by as much as 40 to 50 percent in Chicago and St. Louis. The minority areas were underinsured compared to white areas of comparable income. A wide range of obstacles were used by agents to avoid doing business in low-income minority areas. Testers from these neighborhoods were not even offered quotes on policies in 38 percent of the tests conducted. Testers were often simply told that, "We don't write policies in that neighborhood," or that, "We don't cover houses worth less than a certain value," and if that's not enough for you to listen to, then I would like to present a statement that was made by a company to its agents: "Your persistency went down the shitter—very honestly, I think you write too many blacks—you gotta sell good, solid premium paying white people—they own their homes, the white works—very honestly, black people will buy anything that looks good right now—but when it comes to pay for it next time—you're not going to get your money out of them—the only way you're going to correct your persistency is to get away from the blacks." I think this is very ridiculous, for someone to make a statement as such.

On average, in our study, callers from low-income areas were quoted rates five times higher per $1,000 of coverage when the testers from the income areas were making these calls. The policies that were offered and written in the low-income and the minority areas were often of a substandard quality. Residents of these neighborhoods were more likely to be offered FAIR plans or offered limited market value coverage.

In Detroit, all of our callers from within the city limits were offered FAIR plans, and the average rate quoted for these policies were $35.10 per $1,000 of coverage in the low-income neighborhoods versus $15.98 in the upper-income neighborhoods, and $3.47 for conventional policies in the upper-income suburban areas. Madam Chairwoman, we both know that this is definitely a form of redlining.

Right now, we would like to present to you some charts that we have mapped out in our study. [See p.88.]

If you will notice, on the first chart we are pointing out to you the minority population. The darker orange area shows that this is the population of the minorities. Next on the "Household Income," the darker orange area with the slanted lines shows you that this is the minority area of low-income people. On the "Coverage of Single Family Residences," the darker area shows where policies are being written, and the area where fewer policies are being written

is on the map that is being shown. Last but not least, the "FAIR Plan Distribution," where these policies are being written. If you will note, they are basically in the minority communities. This is definitely another form of redlining, and even Stevie Wonder could see this; this is just how clear it is.

As you can see, 25 years after the Hughes Presidential Commission identified insurance availability as essentially an obstacle to urban economic development, insurance redlining remains a widespread problem in low-income and minority communities, and I am very proud to see that Chicago's own Madam Chair Collins is taking steps to halt such practices.

Various studies by academics and governments have found patterns similar to those revealed in the ACORN study. They have demonstrated that there is a major problem of insurance availability and affordability in the minority, low-income areas. Even if you do meet all the criteria, the race factor still remains for disqualifying and paying higher rates when it comes to coverage.

Insurance redlining is both blatant and subtle. The blatant form is fairly straightforward. Despite State anti-redlining laws, an insurer can still and usually does refuse to insure someone based on the area in which they live.

Finally, an insurer can use underwriting criteria that clearly redline whole areas or classes of people. By example, if a company refuses to insure based on the age or value of a dwelling, that may have excluded all minority neighborhoods in a city, but it enlightens my heart to see and know someone sitting in high places, such as yourself, Madam Chair, who is willing to support a change that will stop unfair practices.

This concludes my testimony.

[Testimony resumes on p. 92.]

[The prepared statement of Ms. Whiting and charts referred to follow:]

66

STATEMENT OF ERNESTINE WHITING, BOARD MEMBER, ASSOCIATION OF COMMUNITY
ORGANIZATIONS FOR REFORM NOW (ACORN)

Good Morning, Madame Chairwoman, and members of the Subcommittee.
I am Ernestine Whiting, a Board Member of Illinois ACORN. I sincerely
appreciate the opportunity to present testimony before you today on the
important subject of insurance redlining. ACORN has just recently
completed a study of residential insurance availability in fourteen
cities, which underscores the urgency of the problem, particularly for
low- and moderate-income and minority families.

We appreciate your prompt response to the recent release of this
study, and commend you for holding these hearings.

## ACORN

ACORN, the Association of Community Organizations for Reform Now,
is the country's largest grassroots organization of low- and moderate-
income families. Founded in Little Rock, Arkansas in 1970, ACORN has
grown to include chapters in 26 states in the nation. ACORN members
work on a broad range of issues that affect their everyday quality of
life, including affordable housing, neighborhood safety, community
reinvestment and environmental degradation.

In 1978, Missouri ACORN released a study similar to the one which
prompted this hearing, and helped pass one of the first anti-redlining
statutes in the country. Fifteen years later, ACORN has come back to
this problem in an indirect fashion. ACORN has a long history of
working to promote bank reinvestment in historically redlined
neighborhoods, and has secured over two dozen agreements with lenders
that have resulted in commitments for billions of dollars in loans to
underserved communities.

ACORN has also initiated a very successful community-based loan
counseling program in a dozen cities, and has helped thousands of low-
and moderate- income families become homeowners. ACORN Housing
Corporation rehabilitates abandoned houses in several cities, including
Chicago, for purchase by low- and moderate-income families, who
typically earn between $12,000 and $30,000 per year.

Paradoxically, our successes in increasing community reinvestment
and housing opportunities have brought us face to face with new
obstacles. After successfully developing loan programs tailored to the
needs of low-income people, we heard from our members that the monthly
premiums for homeowners insurance were often the final impediment to an
affordable mortgage. For a family that saves enough for a down payment,
and barely meets the flexible debt-to-income guidelines used by lenders
that work with us, the high price of homeowners insurance presents a
real and tangible obstacle to becoming a homeowner.

Our members found that when they began to shop around for
homeowners insurance, they were told it was "unavailable in that area."
Participants in our loan programs are frequently unable to get premium
homeowners insurance covering the contents of their house, or are unable

to get coverage for the full replacement cost of any damage their property might incur -- hardly an encouraging sign for someone about to invest their life savings in a thirty year mortgage.

The problems associated with insurance redlining are a problem no one area of town or of the country can avoid. Insurance is vital to all sectors of the economy. Without insurance, banks will not originate loans, businesses cannot risk expansion, homes are abandoned, and services and jobs disappear. The costs of these problems will eventually have to be shared by everyone.

## Summary of Testimony & Recommendations

My testimony today has five principal points:

**1. Insurance redlining remains a pervasive problem in low-income and minority communities, twenty-five years after a Presidential Commission identified insurance availability as a central obstacle to urban economic development.**

Problems of insurance availability in low-income and minority communities have been repeatedly documented by successive studies by the government, academics and community groups, and persist despite the creation of FAIR plans in the 1970's. Studies have consistently identified several problems in low-income and minority neighborhoods: large numbers of properties and individuals altogether without coverage; lower quality and higher priced policies than in high-income and white areas; more frequent cancellations and non-renewals of policies; and large numbers of policies written by unregulated, fly-by-night "surplus line" carriers. The racial composition of a neighborhood appears to play a significant and independent role in determining insurance availability, quality, and price.

**2. Problems of insurance redlining are due to a variety of industry practices designed to avoid writing policies in low-income and minority areas.**

Companies may use a variety of techniques to avoid business in low-income and minority communities. Agents are frequently located exclusively in the suburbs, or in high-income areas. Agents frequently discourage or effectively "pre-screen" potential customers in low-income and minority areas, often by refusing to offer quotes over the phone. Policy-seekers in low-income and minority areas may be subjected to higher standards in order to receive coverage, such as required inspections of property. The underwriting criteria used by a carrier also may have a discriminatory effect. The use of minimum property values, or the age of dwellings as criteria, for example, may exclude or disadvantage policy-seekers from low-income or minority areas.

**3. Insurance redlining has a devastating cost for individuals, neighborhoods, and society, and any comprehensive, federal urban strategy must address the problem of insurance redlining.**

Insurance redlining undermines economic development in urban, low-income, and minority communities. Without affordable insurance, access to credit is made more difficult, urban businesses cannot remain competitive with their suburban counterparts, the housing stock deteriorates or is abandoned, and residents who can afford to do so leave their neighborhood. The success of any urban initiative -- including enterprise zones-- depends in large part on ending insurance redlining.

**4. The problem of insurance redlining is compounded by an ineffective state regulatory apparatus that is unwilling or unable adequately to protect consumers.**

State insurance departments are generally understaffed and underfunded, and frequently are "captured" by industry interests --leaving consumers and communities with inadequate protections against industry abuses.

**5. The federal government can and must take a proactive role to end insurance redlining.**

The Congress and the new Administration can take several affirmative steps to end insurance redlining, including: requiring enhanced disclosures of insurance companies; increasing enforcement activity by the Justice Department and HUD under the Fair Housing Act; and subjecting insurance companies to community support reviews to ensure that the industry supports --rather than obstructs-- efforts to revitalize low-income and minority neighborhoods.

**1. Insurance Redlining -- "Fact not Fiction": A Review of the Evidence**

The existence of insurance redlining has been documented by numerous studies, commissions and panels over the course of two decades. We define insurance redlining as the industry practice of refusing to write policies, charging differential rates, offering substandard coverage, discouraging applications, or imposing differential requirements as a condition of coverage based on the geographic location of a property or individual seeking coverage.

Insurance redlining in practice means that minority and low-income neighborhoods are underinsured; consumers in these neighborhoods receive lower-quality coverage at a higher price than policy-holders in high-income or predominantly white areas and are more likely to be covered by FAIR plans; policy-holders in minority and low-income areas are more likely to have their policies canceled or non-renewed by a carrier, and to have their claims contested.

In each study, the racial composition of a neighborhood appears to have been a significant factor, even after all other criteria are taken into account, such as income, the number of rental and owner-occupied units, the incidence of fire and crime, and the age and value of dwellings are accounted for.

Studies in these areas have consistently documented several factors which account for these disparities.

**(1) Applicants from predominantly minority and low-income areas are often "pre-screened" --or discouraged from seeking coverage.**

Results of phone surveys to agents from applicants posing as residents from neighborhoods of different race compositions and income levels show significant disparities. Applicants from low-income and minority neighborhoods are often simply not offered quotes over the phone, or face stiffer requirements as a condition of coverage than residents of other neighborhoods.

003871

(2) Insurers use discriminatory underwriting criteria.

Although no insurer is allowed to use race as an underwriting criteria, the use of criteria such as the value of the dwelling, the age of the dwelling or its construction type have the effect of redlining areas with high concentrations of low-income and minority households, such as the inner city. Such criteria may be established by carriers at certain thresholds precisely in order to exclude certain neighborhoods.

In some cases, agents may be instructed by companies to avoid writing policies to people in certain professions --those in which minorities are more likely to be represented.

(3) Insurers use discriminatory rate setting methods.

Basic rates for property insurance are primarily established by territory. Larger companies in particular may create territories that effectively carve up a city according to the racial and income characteristics of neighborhoods --thereby allowing for wide disparities in premiums charged.

(4) Agents are underrepresented in low-income and minority neighborhoods.

The number of agents selling policies in a zip code varies sharply based on the racial and income composition of a neighborhood, even after other factors are taken into account. And changes in the racial composition of a neighborhood may lead to dramatic shifts in the number of agents located there.

(5) Policy-holders in low-income and minority areas are treated as second class consumers by many carriers.

Policy-holders in minority and low-income neighborhoods are more likely to have their claims disputed, as well as have their policies canceled or non-renewed without reason, or for reasons which would not result in the termination of a policy-holder in a high-income or predominantly white area.

(6) State regulators are unable and often unwilling to stop these practices.

State insurance departments are often underfunded and understaffed, and the pro-industry bias of many departments leaves many anti-discrimination laws effectively unenforced, and many consumers without recourse.

(7) FAIR plans and assigned risk pools --created to be the insurer of last resort-- may in fact be used as "dumping grounds" for whole neighborhoods.

A disproportionate number of homeowners in minority and low-income areas are assigned to the residual market. The policies available in this market are often limited to fire and extended coverage, usually do not cover the insured for full replacement cost, and may cost as much as 270% more than the conventional market.

(8) Abandonment by the large insurers has created a niche for unregulated surplus lines carriers.

Surplus lines carriers --or "scavenger" companies-- are chartered offshore, and may avoid state regulation as well as insurance by state guarantee funds. These specialized carriers may aggressively market policies in low-income and minority communities, sometimes leaving consumers altogether unprotected in case of a major claim.

These problems have been documented over the past twenty five years in the following studies.

### HUGHES PANEL -- INSURANCE IN RIOT AFFECTED AREAS (1968)

The first federal investigation of the urban insurance crisis was conducted by the Hughes panel in 1968. Concerned that the outbreak of the now historic urban riots would lead to a mass flight of insurers from the inner city, the panel was appointed to study the cause and effect of the availability crisis, and make recommendations for its remedy.

What the panel concluded, however, was that "[r]iots [were] only one aspect" of the availability crisis. In the words of David Badain, "[t]he panel in fact found that the industry was one which 'exaggerated its urban loss experience' and manifested its view in underwriting manuals warning of excessive inner-city risks. As these views were accepted by underwriters and agents, insurance in these areas became less readily available, and the cycle of deterioration continued."

The results of this exodus by the insurers, as the panel predicted, has been to create additional incentives for those inner-city residents who can afford to relocate to the suburbs to do so.

For those people who can not afford to leave the result has been to further erode the incentive to maintain their property. The panel predicted this as well, and warned the country that "[i]nsurance must be available now."

### FEDERAL INSURANCE ADMINISTRATION: FULL INSURANCE AVAILABILITY (1974)

In 1974, the Federal Insurance Administration issued a report entitled "Full Insurance Availability" which was highly critical of the FAIR plans. Indeed, it found that only 4.8 percent of the 3 million FAIR policies then in effect had actually reported losses, indicating that the "the vast majority of the insureds in the plans should have been written voluntarily."

### US COMMISSION ON CIVIL RIGHTS (1979)

In Insuránce Redlining, Fact not Fiction, a report of the Illinois, Indiana, Michigan, Minnesota, Ohio and Wisconsin Advisory Committees to the US Commission on Civil Rights, in 1979, the same problems with availability, quality and affordability were documented.

The Committee also performed a zip code analysis of policies written in Chicago, similar to that performed by ACORN, and had similar findings. The study examined the level of coverage by the conventional market and FAIR plans, and compared these figures to the racial

composition of the zip codes, controlling for the age of housing, family income levels and the incidence of fires and thefts.

Of all factors considered, coverage levels were most closely correlated with the racial and income composition of neighborhoods, for both the conventional market and FAIR plans. This correlation remained significant even after controlling for the differential incidence of fire and theft by neighborhood type.

## STUDIES BY PROFESSOR GREGORY SQUIRES (1980's)

Professor Gregory Squires, of the University of Milwaukee, Wisconsin, has been the leading academic researcher on the problem of insurance redlining for two decades. He drafted much of the study submitted to the U.S. Commission on Civil Rights, and has also recently performed similar studies on the availability and cost of insurance. The methodology of these studies has included both statistical analysis of zip code data in Milwaukee, phone testing of agents, and analyses of agent locations by zip code.

The results of the statistical analysis Professor Squires recently performed for Milwaukee those the results of his study for the U.S. Commission on Civil Rights a decade earlier. Squires found that:

"Racial composition was associated with the number of policies written per owner-occupied dwelling more highly than income, poverty rate, age or condition of housing, population turnover, crime rate, incidents of fire, and other factors presumably associated with risk. More importantly, racial composition remained statistically significantly associated with the distribution of insurance policies even after these other variables were controlled."

Prof. Squires has also performed testing similar to that conducted by ACORN, and found that:

"In testing programs we have carried out in Milwaukee with the Metropolitan Milwaukee Fair Housing Council and others have done in cities throughout the United States, residents of minority communities have been discouraged while residents of predominantly white neighborhoods have been encouraged to do business with insurance agents. Despite limitations in available data and the methodologies often employed, the overwhelming conclusion of existing research is that there is a racial gap in the availability of property insurance. While some of this gap can be accounted for by financial considerations of insureds, conditions of properties, and risk related factors generally, the racial gap remains substantial even after these factors are taken into consideration."

Another example given by Prof. Squires is the correlation of agent location to the racial composition of neighborhoods, which he found to be significant in Milwaukee in 1970, 1980, and 1990, even after taking into consideration the number of owner occupied housing units, the age and condition of homes, and the income of the residents. A striking example was of the Sherman Park neighborhood on Milwaukee's west side, which changed from 1 percent non-white to 24 percent non-white between 1970 and 1980. Over this same period, the number of insurance agents declined, from 22 to 9.

Prof. Squires has also uncovered the following statements from company underwriting manuals and guides:

"Coverage may not be bound on the following classifications without prior approval... professional athletes, musicians or entertainers."

"Following occupations not to be approved for preferred policies: janitors, stewardesses, traveling salesmen, auto salesmen (particularly those associated with used cars sales), musicians, athletes, etc."

"RED FLAGS FOR AGENTS AND CLAIMS PERSONNEL...

a.    Declining property values...
b.    Population or racial changes."

Perhaps the most ludicrous example was of the one agent who was told to avoid members of the clergy for automobile insurance because they "tend to place their faith in the Lord when driving."

## ILLINOIS PUBLIC ACTION COUNCIL (IPAC)

These results have been corroborated by other studies. A report from the Illinois Public Action Council (IPAC) found that both State Farm and Allstate, in their auto insurance practices, had "redlined by not placing agents in all city neighborhoods and not providing phone quotes to callers from certain areas." In fact, neither of these companies had any agents in the west and mid south areas of Chicago. The total area redlined by these companies covers over 85 square miles of the city.

## PENNSYLVANIA PUBLIC INTEREST COALITION

The Pennsylvania Public Interest Coalition found similar results for auto insurance. Agent locations and the likelihood of being offered coverage or a quote over the phone differed significantly based on the race and income of neighborhood.

NAACP LAWSUIT (1992)

Recently, the NAACP won a major victory in a class action suit charging a Wisconsin insurer with discrimination in the sales of insurance. The NAACP case is the first time a federal appeals court has ruled that the Fair Housing Act also prohibits bias in the underwriting and sales of homeowners insurance. The suit charged that American Family, the largest underwriter in Wisconsin, was redlining parts of Milwaukee. It also alleged that the company was charging higher premiums to non-whites for properties of comparable value and risk, instructing agents to avoid selling policies to blacks and failing to locate offices in black neighborhoods.

The suit has now been sent back to a lower court to determine whether the discriminatory practices did occur as defined by the federal Fair Housing Act and state law. It must also be noted that the appeal court's ruling only applied to rates shown to be based on race, rather than actuarial classifications. The ruling did not make a judgment as to whether risk classifications having a disparate impact on members of a racial or ethnic group are illegal under the Fair Housing Act.

Prof. Squires, who has prepared evidence for the NAACP case, presented the following evidence from the case. The quote is from a sales manager for the American Family Insurance company advising several agents in 1988:

"Your persistency went down the shitter . . . very honestly, I think you write too many blacks . . . you gotta sell good, solid premium paying white people . . . they own their homes, the white works . . .Very honestly, black people will buy anything that looks good right now . . . but when it come to pay for it next time . . . you're not going to get your money out of them . . . the only way you're going to correct your persistency is get away from the blacks."

TOLEDO FAIR HOUSING CENTER

The Toledo Fair Housing Center, has also been investigating claims of insurance redlining and has conducted phone testing of Toledo insurers. Their findings are consistent with those from other studies. Confronted by a common refusal to insure properties valued at less than $30,000, the Center examined the impact such a policy and found that the policy has a disparate effect on 78% of the African-American community, 74% of the Hispanic community and 30% of the Caucasian community in the city of Toledo. The impact on the MSA would be, respectively, 71%, 40% and 12%.

The Center has also been investigating claims discrimination, and while complete results are not yet available, has found discrimination in 95% of the investigations conducted. In these studies, the Center has been using similar residences with property owners of different races, and has even given the Caucasian property owners properties in a

74

markedly inferior state. Nevertheless, the center has found a clear
pattern of discrimination.

MISCELLANEOUS EVIDENCE

·An article by Peter Kerr of the <u>New York Times</u> documented the
prevalence of offshore "scavenger" companies, who literally prey upon
the underinsured inner city. In the wake of the Los Angeles riots, Kerr
surveyed business owners and found that a large portion of policies
written to businesses in south-central Los Angeles were written by
"surplus line" carriers, or "scavenger companies". These insurers, who
offer policies at a much higher cost than mainstream carriers, licensed
offshore and avoid state regulations almost entirely. Often, when huge
payments become due, their address may turn out to be little more than a
post office box, and the policy holder is left holding a worthless piece
of paper.

·John Garamendi, the Insurance Commissioner in California,
recently reported receiving a map of San Francisco from an insurance
agent. The map had the minority and low-income portions of San
Francisco outlined in yellow highlighter. The agent claims that the
mid-sized carrier who sent him the map instructed him not to write
policies in any of the highlighted areas. The company is under
investigation.

Despite the lack of readily available data on the subject, scores
of investigations by academics, interest groups and governmental
agencies have unerringly come to the same conclusion: insurance
redlining is indeed "fact – not fiction." The insurance industry's
methodological arguments with the results of these studies over the
course of three decades only underscore the need for systematic
disclosure of data by the insurance industry.

## 2. "A Policy of Discrimination?": Findings of ACORN Research

On February 5, 1993, ACORN released a study on the availability,
quality and cost of residential insurance in fourteen major cities. The
study, the first of its kind, combined a statistical analysis of
insurance company filings by zip code in 5 cities with the results of
extensive testing in 13 cities. I would like to submit a copy for the
record, as well as assorted press clippings. In addition, I would like
to submit a written response to the AIA's recent critique of this study.

The statistical analysis was performed in four states currently
requiring such disclosure of property and casualty insurance companies –
disclosure similar in kind to the federal Home Mortgage Disclosure Act
(HMDA) filings required of banks. It compared the number of homeowners
or other personal dwelling policies written by the industry in various
urban and suburban zip codes to demographic data on race and income of

neighborhoods. The study also looked at the quality of coverage in
neighborhoods of different racial and income compositions.

The second part of the study consisted of the results of extensive
testing of various insurance agents and underwriters in thirteen cities.
Testers attempted to obtain quotes for insurance from both captive and
independent agents for properties in different neighborhoods --
including low-income, generally minority urban areas, upper-income
predominantly white urban areas, and suburban areas. Information on
disparities in the ability of callers to get quotes and to get the
premium policy, and differences in prices of policies and the frequency
of required inspections was then compiled.

Among the key findings of the study are that:

<u>(1) Minority and low-income neighborhoods where data was available were
underinsured -- by as much as 48% in low-income neighborhoods in
Chicago.</u>

This figure of "relative coverage" was arrived at by comparing the
number of single family units in a zip code with the total number of
residential policies written by all insurers in that zip code. Similar
results were found in St. Louis and Kansas City, Missouri, with these
areas underinsured by 50% and 30% respectively. For Wisconsin and
Minnesota, data was only collected for the largest companies, but the
discrepancies between low income areas and upper income areas was
significant.

Discrepancies remained significant when comparing the coverage of
neighborhoods of similar income, but different racial composition.

<u>(2) Test callers from low-income neighborhoods were refused a quote on a
policy 38% of the time, compared to 7% of the time for callers from
high-income areas.</u>

Callers from low-income areas were often plainly told by agents
that "we don't write policies in that area", or "we don't write policies
for properties of that value." In some cases, testers were told they
would have their call returned at a later time with a quote -- promises
that were rarely kept.

<u>(3) Insurance policies written in low-income and minority neighborhoods
tend to be of substandard quality.</u>

Callers from low-income neighborhoods were offered "market value"
policies -- policies which do not cover the property for the full
replacement costs in case of damage. They were also offered FAIR plan
policies more frequently than callers from high-income areas. FAIR plan
policies are often of substandard quality and usually cost substantially
more than conventional policies --270% more in Missouri, for example.

<u>(4) Test callers from low-income neighborhoods were quoted rates averaging 2.5 times higher, relative to their level of coverage, as test callers from upper-income neighborhoods.</u>

These figures were based on quotes given by agents to testers, relative to the level of coverage offered.

The results of this study seem to indicate problems as serious in its dimensions as those identified by the Hughes panel in 1968. The causes of this problem are, however, varied, and can perhaps best be introduced through some examples of the barriers ACORN members have faced in trying to obtain homeowners insurance.

### 3. Obstacles to Obtaining Homeowners Insurance: Examples

The following are examples of the obstacles facing low-income and minority consumers in obtaining coverage.

In Minnesota, an ACORN member in the Philips neighborhood of Minneapolis, who had recently bought her home through the ACORN loan counseling program, wanted to switch her homeowners insurance to the same carrier as her auto insurance carrier. She was refused insurance for the bizarre reason that "her house was too big."

In Chicago, several members in the same area of town, had their premiums doubled, or in some cases were outright canceled, without the insurer offering any reason. In some cases these members owned their homes for up to twenty years, and had no abnormal claims history.

One Chicago ACORN member, who obtained a home through ACORN Housing Corporation, got a policy from a carrier --only to be informed several weeks later that a "mistake" had been made and her premiums would in fact be much higher than she was originally told. For this ACORN member, the higher premiums meant that she would have great difficulty meeting her mortgage payments.

Many ACORN members have reported they were either unable to get insurance, were canceled or had their premiums raised because an abandoned property appeared on their block. At the same time, however, members who have considered buying and rehabilitating abandoned properties were also refused coverage.

Another member in Minnesota, who had been a policy-holder for twenty years with the same company had her policy canceled after two small claims --one for a dog bite and the other for vandalism.

In addition, many members across the country reported the identical problems we discovered in our phone surveys. They were told "Nobody will insure you there", "Only the FAIR plan will cover you there", "We don't write policies for houses that old", or "We don't write policies for houses which are only worth that much."

And the final barrier, of course, is the high price of coverage. As our survey showed, even for conventional policies the cost for residents of low income areas was as much as 250% more than for suburban areas. Another member is currently paying $92.50 a month for her insurance -- over $1,000 a year for a low-income homeowner.

Perhaps the most tragic case we have encountered was that of an ACORN member in St. Louis whose house recently burned down. The man's principal asset -- with which he might have started a business or sent a child to school -- was unprotected. He had in fact been canceled only a month earlier for an unrelated reason. This is certainly a tragic story, but one which would perhaps be seen by an underwriter as optimum risk management. The logic here is akin to the cartoon of the homeowner opening a letter in his mailbox reading "Dear policy-holder, we have canceled your policy because our records have shown that you have not had a claim for over five years, so we figure you're due for one."

### 4. Modes of Redlining: Causes of Problems of Insurance Availability, Affordability and Quality

There seem to be two problems with insurance availability. The structure of the industry is such that there is an enormous potential for discriminatory redlining -- that is, in industry terms, unfair, or "irrational", discrimination. This problem is aggravated by inadequate state level regulation and oversight, as well as the complete lack of any federal regulation, or concerted efforts to prosecute insurance redlining where it is discovered.

There is also, as we are all aware, a problem with our inner-cities. The problem is not just abandoned houses in our neighborhood, but neighborhoods that have themselves been abandoned: by the banks, the insurance companies and even its residents. The effect of this abandonment was made clear in the L.A. riots, but is made no less clear on a daily basis to anyone who lives in these neighborhoods.

The insurance industry is not exclusively to blame for these problems, but it is certainly not exempt from responsibility. Addressing this problem requires more far reaching solutions than insurance reform alone, but we may be certain that urban aid packages and enterprise zones will all be wasted if adequate and affordable insurance are not made available in distressed areas.

Currently, however, the structure of the insurance industry is such that it continues to perpetuate the problem. The industry's response is often that problems in availability are actually caused by rate regulation. According to a State Farm report, "It is axiomatic that whenever the actuary is prevented from adjusting prices to fit the book of business, the underwriter is forced to adjust the book of business to fit the price permitted." It is also axiomatic, however, that if an insurer wishes to adjust the book of business to avoid certain area, they can do so by adjusting the price.

There are in fact a variety of ways in which insurers are responsible for low levels of coverage in urban areas, and a variety of ways in which an insurer can effectually redline.

Techniques for redlining can be broken down into two categories: blatant and subtle.

The blatant forms are fairly straightforward. Despite several state attempts at "anti-redlining" statutes, an insurer can still usually flat out refuse to insure someone based on the area in which they live. An insurer can also blatantly redline by offering prohibitory rates, that is, offer an unreasonable quote that is well beyond the ability of a policy-seeker to afford. Finally, an insurer can use underwriting criteria which clearly redline whole areas or classes of people, such as the age of the dwelling, the construction of the dwelling or the value of the dwelling. As you know, the use of criteria that have the effect of discrimination is illegal in employment --and should be prohibited for insurance as well under the Fair Housing Act.

Subtle redlining is really endemic to the structure of the system. There are many ways in which the price, quality and coverage of a policy can be varied, often based on short cuts and generalizations, rather than the individual analysis of risk. Higher prices may often lead to the unwillingness to buy a home, while inferior levels of coverage take away the incentive to renovate or upgrade ones home.

Other subtle forms of discrimination include requirements for detailed inspections applied in low-income and minority areas, but not in high-income neighborhoods. This means that, on the whole, people in these neighborhoods are more likely to pay surcharges or to be refused coverage for reasons that go undetected in other neighborhoods.

Another common complaint is the disparate treatment of claims. Inspections of claims may be more common in certain neighborhoods than in others, an inspection which the insurer will avoid inflicting on its more select customers for fear of losing their business. Cancellations, based on one or two claims are also more likely to be inflicted on policy-holders on the wrong side of the tracks.

Finally there is the issue of agent location and marketing. Agents who do not live or work in the neighborhood they insure not only cannot offer equal service, they are also more prone to view intuitively the inner-city as uniformly high risk. This is no surprise when all they see of the neighborhoods they insure is the latest crime segment on the nightly news. The comparison can be drawn here to the same problem we have had with banks. Lenders that have large portfolios of loans in low-income areas often find that those loans perform better than their conventional portfolio -- while lenders without branches in minority neighborhoods continue to rely on the grossest stereotypes.

There are also, however, numerous tactics companies can use to explicitly redline neighborhoods, or cancel policy holders they already have in certain neighborhoods.

003881

For example, in Minnesota, one agent anonymously described the following scheme. The insurance company would cancel an agent, and then redistribute the policies he or she held to another agent. The original agent would have been earning a 10% commission on policies they had solicited, while the new agent would only receive 2%. The new agent would then be informed by the company that the properties must be reinspected, with the goal of dumping whole areas. However, the agent would subsequently receive a 4% commission on those policies he or she retains after reinspection, covering any loss caused by cancellations.

Another agent was flat out told to reinspect all properties over fifty years old in a certain territory, because actuarial analysis showed a higher risk level for properties over fifty years old. However, an insurance industry study from earlier years claimed that the only significant difference in loss patterns for differently aged properties was at the five year age barrier. If this difference is significant, then it is clear there would still be a difference between properties over 50 years old and under 50 years old, on average. The fifty year threshold, however, may be largely arbitrary, and may therefore be used to dump the older areas of town, which are generally predominantly minority.

The system of establishing rates based on geographic "territories" has also resulted in substantially higher prices for low-income and minority families, who account for the bulk of inhabitants in high rate areas. Larger companies --which have the capacity to create territories as small as a single zip code-- can define their territories so as to carve up a city or state by the racial and income composition of neighborhoods --and charge prohibitive rates in predominantly minority and low-income areas. The "territory" system, then, not only results in an extremely regressive system in which low-income families pay more for coverage than high-income families, but can also be used as an instrument of redlining by a large carrier determined to avoid writing policies in particular neighborhoods.

### 5. FAIR plans -- A Failed Solution

FAIR plans were established on the recommendation of the Hughes panel. For those states in which the industry voluntarily set up shared risk pools for "high risk" insureds, the option of Federal Riot Reinsurance was made available. This reinsurance, which is literally the insurance of insurance, was offered at a lower rate than was available on the open market, to companies which participated in the FAIR plans. FAIR plans were explicitly created to be the insurer of last resort.

But problems with the FAIR plans rapidly made themselves apparent. In New York, for example, they were required to operate at cost, thereby essentially nullifying their goal and begging the question of what purpose the discounted Federal reinsurance fulfilled. In most states, FAIR plans were also substantially more expensive than the conventional

market-- 300% more in New York, according to a 1979 Aetna study. Also, FAIR plans often only offer limited coverage as opposed to full homeowners coverage.

It also became apparent that the FAIR plans had become a dumping ground for whole areas, as opposed to identifiably high-risk individuals -- areas that the underwriters just don't want to spend the time evaluating independently. Thus, rather than being used for riot stricken areas, or high risk individuals, FAIR plans were used by companies to avoid any policy-seeker perceived to be high-risk, simply by virtue of his or her zip code. A 1977 study by Robert Abrams revealed that 45% of Bronx residents and businesses were covered by FAIR plans or "surplus line carriers". ACORN found this in its analysis as well, with low-income, minority areas accounting for almost 70% of the FAIR plans written in St. Louis. In Detroit, all our test callers who sought insurance *anywhere* in the city were solely offered FAIR plan policies.

Little has therefore changed since 1976, when a report by the Detroit city council President, Carl Levin, found that in many instances "Detroiters cannot obtain insurance in the private market at all and must purchase insurance in the property pool. Insurance purchased from the pool is more expensive and provides less coverage that in the private market."

The claim that many low-risk families were being burdened with the FAIR plan has been supported by statistical analysis. In New York, only 4.8% of FAIR plan policy holders reported any claims, according to testimony before the Judiciary committee in 1978. ACORN's preliminary analysis of 1991 zip code data in St. Louis and Kansas City, Missouri, found that only 6% of FAIR plan policy holders reported claims, compared to 12% of conventional policy-holders. Similarly, NY PIRG found in 1978 that only 1/3 of the FAIR plans in New York had any surcharges -- implying that, upon inspections, the majority turned out to be well maintained properties.

FAIR plan policy holders were thus being offered inferior coverage at a greater price -- and those policy holders who were unfairly grouped in these programs were alone in bearing the cost of higher risk properties, while the conventional market made even more money. It is in this sense that FAIR plans are only one of the many subtle mechanisms for redlining. People are redlined out of the conventional market, only to find themselves rated out of the residual market.

The Boards governing FAIR plans frequently have little public input. The Board of the New York Auto Insurance Plan, for example, consists of fifteen members, eight of which are insurance company representatives, and seven of whom are "public members." However, these public members must be appointed by the rest of the board, and are then elected by the board itself.

The idea of having consumer representatives on the board is thus a farce, and is made clear by the fact that not a single member of the

003883

Governing committee is a resident of the neighborhoods where most of the clients of the plan reside.

Clearly, FAIR plans did not solve the insurance availability crisis predicted by the Hughes panel, but it would be a mistake to blame this failure on the FAIR plans themselves. Rather, these problems suggest a problem with the functioning of the conventional market that has changed very little since the investigation by the Hughes panel. Indeed, it might be argued that the creation of FAIR plans served to deflect attention from gross abuses within the industry, and to defer much needed reforms.

### 6. State Regulation: Inadequate and Ineffective

A few states have passed anti-redlining statutes. However, these are usually fairly ineffective, and poorly enforced. The NAIC model laws language for anti-redlining statutes suggests that states prohibit "refusing to insure" someone based *solely* on their geographic location. Some states also make cancellations subject to that restriction. Discrimination on the basis of race is illegal in all states, sometimes specifically in reference to insurance, sometimes through more broad based civil rights laws.

The wording of these laws leaves companies excessive latitude. Broad based redlining and anti-discrimination laws, for example, do not prohibit or restrict the use of underwriting criteria which have the effect of redlining or discriminating against minorities. And the enforcement of these laws has been less than aggressive.

The most comprehensive legislation addressing redlining was enacted in Michigan. This statute requires that the owner of any building meeting property code may obtain premium coverage with the insurer of his or her choice. FAIR plans are also available, and offer full coverage at a price which reflects the average price of similar conventional policies. Michigan also has a cap on the difference in territorial rates any company may set, and limits the number of territories to three. In some respects, the Michigan law sets the standard for the nation.

Nevertheless, a member from Detroit was repeatedly refused coverage by one insurer, and referred to the FAIR plan -- yet she was never asked whether her property was up to code. When she asked to speak to the agent's supervisor, he informed her that coverage could be made available, but it would cost three times as much as the FAIR plan. Indeed, every test caller from the city of Detroit in our study was referred to the FAIR plan. Clearly, then, such laws make little difference if they are not enforced.

California has passed some of the most aggressively pro-consumer legislation in recent years. Proposition 103, enacted by the voters as the insurance reform initiative, obliged insurers to insure all good drivers, and prohibits any rate that is unfairly discriminatory.

Commissioner Garamendi has also been working on anti-redlining regulations which emphasize a "carrot and stick" approach. Under these regulations, an insurer with a bad record of providing coverage in inner city areas is financially penalized, via a decrease in the amount of profit permitted in rate approvals. Insurers who play by the rules are given a bonus. Despite the industry's claims that market incentives, and not prohibitions are the way to solve the insurance availability problems, few insurers have expressed support for these regulations.

The current system of state level regulation is insufficient and inadequate. According to a 1988 report by the Consumer Insurance Information Group (CIIG) and the Association of Professional Independent Agents (PIA National), insurance departments have inadequate resources to regulate carriers. Four states, New York, California, Florida and Texas, control more than half of all funds and staff dedicated to insurance regulation in the country.

The report also showed that the average department has less than four actuaries -- the individuals charged with assessing risk and evaluating company rate filings. This pales in comparison to the number of actuaries analyzing and filing the rates for the insurance companies. In Chicago, the rate filing manual for one company may be as long as 1500 pages! It the insurers' risk analysis is faulty or based on prejudice, it is unlikely that the insurance department would ever find out.

Years earlier, a similar criticism was made by then Detroit City Council President Carl Levin, regarding the time constraints facing the department when evaluating rate hikes. "These rigid time constraints are a substantial problem in the rate making process. The insurance bureau receives approximately 7500 filings each year, about 1500 of which request rate increases, and has five staff people available to review them. The time pressures and the sheer volume work against an adequate review of all rate increase requests."

And the departments do seem to be a little too close to the industry. Another PIA study showed that at least 38% of insurance commissioners had worked for the industry prior to serving the state, while almost half would work for the industry after serving an average of only 3.3 years. Also, less than a fourth of the states have elected officials who are directly responsible to consumers of insurance.

Recently, an article in the Washington Post made these ties explicit. The NAIC, which was planning a meeting in the Washington, D.C. area sent a letter to several of the larger local insurers requesting contributions, accommodations and even golf tee times from the industry.

Another example can be seen in the saga of the New York disclosure law. Originally, disclosure of homeowners policies was to be provided to the commissioner by zip code. However, because of complaints by the industry, this requirement was changed by regulation to require only

disclosure by *county*. This change rendered the data virtually useless in determining urban availability problems.

In fact, when ACORN tried to gain access to this data, we were informed that it had not even been examined, due to staff shortages, and that it was the custom of the department not to make it publicly available until it had examined the data itself. When we pressed the issue, we were then informed that not all the data could be provided to us anyway, because some companies requested the data not be made publicly available This denial was in spite of the fact that the statute explicitly states that the data shall be made accessible to the public. When ACORN mentioned this point, we were told they were aware of this legal obligation, but that they usually withheld the information anyway, because they like "to stay on the companies good side"!

To summarize, the current insurance system, in attempting to pool similar risk, has the effect of placing an excessive burden on urban residents -- who are usually low-income and minority. The problems, if not endemic to the system itself, are aggravated by an industry that may still "exaggerate its urban losses"; an industry that, because of the lack of federal regulation, inconsistent and inadequate legislation, poor enforcement and inadequate state regulation is given too much opportunity to underwrite based on poor or unsubstantiated conventional wisdom, intuition and shortcuts.

### 7. Insurance Redlining and Economic Development

Overpriced and substandard quality insurance contributes to abandonment and urban decline, and leaves urban businesses and residents poorly situated to compete with their suburban counterparts. This dilemma is illustrated by the response of one of the trade groups to our recent study. A spokesperson for the group argued that "[o]f course insurance is more expensive in inner cities. But so are groceries." Unfortunately she had it reversed -- it is groceries that are made more expensive <u>because</u> insurance is more costly in urban areas. Indeed, there is probably no single product --including groceries-- which is as regressive in its impact on low-income households.

President Clinton clearly understands the relationship of financial services availability to economic development. The President articulated a vision for new solutions to problems of inner-city decline, focusing on the creation of partnerships between the government, private industry and non-profit community groups as the best hope for change. In particular, he returned repeatedly to the question of the availability of credit and financial services as the central question underlying the imperative of recreating our inner cities.

Indeed, the development of thriving neighborhoods with expanding opportunities for homeownership and entrepreneurship hinges on the availability of credit and insurance. Mortgage lenders will often not make loans without property insurance -- no insurance means no home. And, high-priced insurance acts as a real deterrent to the creation of

affordable housing for low- and moderate-income families. Residents of low-income and minority neighborhoods face additional hurdles in achieving a better standard of living in the form of homeowners and auto insurance rates that may be several times that of their suburban counterparts.

In addition, any urban aid or enterprise zone legislation will be a foregone failure without affordable insurance. A small business cannot remain competitive with its suburban counterparts if its insurance costs twice as much, and without adequate insurance, a small business cannot risk expansion. And the jobs that do exist are made inaccessible by over-priced auto insurance.

The first presidential commission on insurance availability put it simply: "communities without insurance are communities without hope."

## Recommendations: A Ten-Point Plan to End Insurance Redlining

The insurance industry is currently unregulated by the federal government, and, aside from a very few states, has no affirmative obligation to serve all communities. Insurance companies, like banks, are licensed institutions, and derive a significant benefit from the state and the taxpayer. Unlike banks, insurance companies are generally not subject to disclosure or community reinvestment requirements.

Most states have state or industry organized guarantee funds, which provide payments in case a member becomes insolvent. Although these guarantee funds are not directly backed by the government, losses to the members are often subsidized in the form of tax breaks. That is, any money used to pay the claims of an insolvent insurer is deducted from state taxes. Such public benefits should result in an affirmative obligation of insurers to serve the communities in which they do business.

In light of the obligations of the industry, and the urgent need for affordable insurance to support economic development, Congress and the Administration should take several affirmative steps to end insurance redlining, including:

## 1. Requiring disclosure of homeowners policies written by carriers, on a census tract basis

Insurance companies should be required to publicly disclose policies written, denied, and canceled by census tract, as well as the race, income and gender of applicants. Companies should report the value and other characteristics of the property being insured, as well as the level and quality of coverage and premiums charged. Such disclosure is essential in order to assess the extent, quality, and price of coverage in neighborhoods of different income and racial compositions, as well as to monitor compliance with non-discrimination laws.

### 2. Requiring disclosure of underwriting criteria

Companies should be required to disclose publicly their underwriting criteria. This should include the rate manuals used by agents, rate filings and the loss cost analysis these rates are based on. This is essential in order to be able to evaluate whether or not underwriting criteria or reasons for rejection or reinspection are being selectively applied to certain neighborhoods or groups, and whether standards employed may have a discriminatory effect.

### 3. Requiring disclosure of agent and sales office location

Companies should be required to disclose the location of agents who sell their policies on a zip code basis. The absence of agent representation in low-income or minority neighborhoods not only indicates an unwillingness to do business, but also makes it impossible to underwrite risk accurately.

### 4. Requiring disclosure of investments of policy-holder premiums

Companies should be required to disclose publicly their investments of policy-holder premiums, with particular emphasis on investments that support affordable housing and job-creation in areas in which the carriers collect premiums. Since insurance companies now possess more capital than do banks and thrifts, policy makers must be able to assess their participation in the redevelopment of urban areas.

### 5. Requiring disclosure of reasons for denial of coverage, termination of policies, or increases in rates.

Policy-holders today can be left stranded by the whim of a company, despite having held a policy for many years without making significant claims. The least that consumers deserve is advance notice of termination or of increases in rates. In the case of termination or denials the consumer should also be given a specific reason for the denial, and notification of what remedies or repairs must be made for coverage to be approved or continued.

Disclosure of terminations and increases in rates should also be made by census tract and by the race and sex of the affected policy holder.

### 6. Expanding HUD's Fair Housing Initiatives Program (FHIP) for testing of insurance companies

Testers should be used to monitor compliance with anti-discrimination laws and regulations, including those governing underwriting, inspection and claims policies and practices. Given the apparent prevalence of pre-screening of applicants based on the racial characteristics of neighborhoods, testing is an essential compliance tool.

### 7.   Investigating  and prosecuting insurance redlining under the Fair Housing Act

The Department of Justice and HUD should aggressively investigate and prosecute insurance companies for discrimination under the Fair Housing Act.

### 8.   Prohibiting the use of discriminatory underwriting criteria, including geography

Minimum standards should be established which restrict the use of underwriting criteria that are largely beyond the control of the individual.  HUD should prohibit the use of underwriting criteria which have the effect of denying coverage disproportionately to members of a protected class under the Fair Housing Act. Standards should also be established to restrict the termination of agents based on where they write policies.

### 9.   Establishing minimum standards to govern the operation of FAIR plans

Minimum standards should be established to govern the price and quality of policies offered through FAIR plans.  FAIR plan rates should be based on an average of companies' rates in the conventional market, and should offer equivalent policies and levels of coverage.  FAIR plan referrals by agents should be based on objective criteria, rather than on neighborhood characteristics that are largely beyond the control of the individual policy-seeker.

### 10.  Subjecting insurance companies to community support requirements

Insurance companies should be required to undergo community support reviews to evaluate their level of service to low- and moderate-income and minority neighborhoods, compliance with anti-discrimination laws and regulations, and their record of reinvestment in communities in which they collect premiums.  Companies should be graded on their community support performance, and applications by companies for rate increases should be subject to an assessment of their performance as well as public comments.

### Conclusion

Insurance, the industry will tell us, is all about evaluating risk.  But risk is a difficult thing not only to evaluate quantitatively, but also qualitatively.  There are certain factors over which homeowners, auto owners and business entrepreneurs have no control.   Too often underwriting of insurance is based on prejudices and stereotypes about neighborhoods, rather than sober risk assessment.

For years, low-income people and minorities were told that they were higher risks in mortgage lending -- yet no study has ever supported the claim that African-Americans constitute a higher risk for loan

default. The problem was rather with an industry which only marketed its loans to and developed products for a middle class, suburban and largely white clientele.

Mortgage evaluation, as well as insurance underwriting, is more art than science, and requires a practical and hands on knowledge of the neighborhood and people being served. I have to admit, I certainly would not rely on my judgment to evaluate the solvency of a bank, insurance company, or of a company whose junk bonds I was considering buying -- but people still claim even the latter are profitable if properly managed. When it comes to mortgages, the same holds true -- the community knows best. And after years of waffling, some banks are finally realizing that serving low-income neighborhoods is not charity, but simply good business. Hopefully, insurance companies will come to the same realization.

The realities of the urban crisis that faces us is such that we can no longer ignore the link between race, poverty, and the geography of the urban landscape. Geographic redlining, as well as discriminatory practices in general, must be stopped.

And community groups have an obligation to find solutions. ACORN is working directly with insurance companies to underwrite risk fairly, and to educate consumers. The goal of the ACORN neighborhood safety program, which we hope to implement with companies, is to reduce risk in our neighborhoods. This should result in a direct reduction in premiums for low-income families that take steps to reduce risk, people who have proven they are committed to their homes and neighborhoods, and have a track record showing what can be accomplished with an organized neighborhood.

But the crisis of insurance availability is too important for the federal government to continue to ignore. Insurance is not a luxury. It is an essential need, and we cannot continue to deprive a large part of America this need. In the words of the Hughes panel a quarter century ago:

"Insurance is essential to revitalize our cities. It is the cornerstone of credit. Without insurance, banks and other financial institutions will not -- cannot -- make loans. New housing cannot be constructed, and existing housing cannot be repaired. New businesses cannot be opened, and existing businesses cannot expand, or even survive. Without insurance, buildings are left to deteriorate; services, goods and jobs diminish. Efforts to rebuild our nation's inner-cities cannot move forward. *Communities without insurance are communities without hope.*"

Thank you, Madame Chairwoman. That concludes my testimony.









003894

92

Mrs. COLLINS. Thank you.

Mr. McNary, in your testimony you indicated that the chairman of the Illinois Senate Insurance Committee requested some geographic data from State Farm and that State Farm refused to make it available. Well, maybe we will have better luck getting it at the Federal level. That is why today I am writing both to State Farm and Allstate requesting information on general policies regarding marketing of insurance in inner cities along with some very specific information on policies that are issued in Chicago.

But, Mr. McNary, you indicated that you were a former insurance salesman working primarily in urban minority areas. Can you tell us a little about your experience with the insurance companies?

Mr. McNARY. Well, the fact is, I sold life insurance, so rather than talk about my experience, we are talking basically about the property casualty area. In my experience, though, I find on the statewide level, which would probably be more helpful, we think it is totally unfair to mandate that a product be sold, mandate that minorities purchase product and do nothing to make sure that it is offered nondiscriminately and to make sure that it is offered at a reasonable price.

Mrs. COLLINS. I am very interested in your chart over here, because as you can see, from downtown Chicago all the way out to the Oak Park line, it is practically blank. I found that very impressive because it highlights the absence, if you will, of the kind of coverage that we are talking about.

Mr. McNARY. Absolutely. You would think no people were living in those particular areas when you compare it to Rostenkowski's district.

Second, you know, I wanted to share an experience with you as far as going further south.

Mrs. COLLINS. I was just looking at that little drop down south there, around 57th Street where the Seventh Congressional District also drops, where there is practically no coverage at all.

Mr. McNARY. And you will see that that continues to extend south. As a matter of fact, let me share this with you. On 79th and Stoney Island, which is also in an inner city community—it is not your district—they have one of the heavily trafficked Sears stores there; it is primarily African American. Now you can go there and get your car fixed, because I have done that, but you cannot purchase Allstate insurance, which is marketed out of Sears, out of that same store, and I don't know why, where you have such heavy traffic volume, where you have a lot of people—obviously, they understand the need to fix cars—why you can't purchase the same product that is sold in most other Sears at that particular store.

Mrs. COLLINS. Your study relates primarily to automobile insurance, and although the lack of agents in inner cities obviously affects access to all lines of insurance, ACORN recently did a study that focused on property insurance and came to some similar conclusions with respect to property insurance that you did with respect to automobile insurance. Do you have any reaction to the ACORN study, Mr. McNary?

Mr. McNARY. I think what is very important here is that, if redlining is not going on, the insurance industry, at the very least, should provide data, provide disclosure, that would prove that it is

not going on. Obviously, they have this information. They have indicated before the insurance commissions in many States that they have the information. They point blank told the chairman of the Illinois Senate Insurance Commission that they are not required and will not provide that particular piece of information.

We can't necessarily prove the fact that there is redlining going on, but if there is data that can help substantiate it, we support your bill so that we can get the information and begin to get at the truth of what is going on in these areas. So we definitely support ACORN.

Mr. CAMERON. If I might, Madam Chairwoman——

Mrs. COLLINS. Would you state your name and position for the record, please.

Mr. CAMERON. I am John Cameron. I am the associate director of Illinois Public Action and worked with Mr. McNary on this study.

The two carriers that we looked at, Allstate and State Farm, are not only the largest automobile insurers, they are also the largest homeowners' insurers, so the same sort of pattern of discriminatory marketing that you see illustrated here applies to the homeowner insurance area, and I think that probably explains why ACORN found the kinds of numbers they did when they looked at the kinds of policies that are available in the Chicago area.

Mrs. COLLINS. So you have a heavily populated areas largely of homeowners, who have automobiles, and they take their automobiles to Sears and have their automobiles repaired, but Sears will not insure their homes and will not insure their automobiles, basically—not Sears but Allstate.

Mr. CAMERON. It is interesting, because I also am a resident of the city of Chicago. I live on the North Side close to Rostenkowski's district, and in my neighborhood—I am actually in Congressman Yates's district but right on the border there. But in our neighborhoods, we find that there is a State Farm virtually on every corner of every major intersection, and an Allstate on about every other corner, and in the large Sears in my neighborhood they have a big Allstate office there, but if you drive to the West Side or the South Side you find no State Farm offices and no Allstates in the Sears, and you have to look hard and really be persistent even to get an appointment.

We found, for example, on the South Side there was one Allstate office but it was never open. It was never open on the weekend. You couldn't get an appointment to get a bid on insurance.

Mrs. COLLINS. So there was just a sign up there saying Allstate Insurance. You think basically it was not an insurance office at all?

Mr. CAMERON. Well, you could never find anyone to answer the phone anyway.

Mrs. COLLINS. Ms. Whiting, I have seen some criticisms of the ACORN study by the insurance industry. In particular, they say that your data does not necessarily reflect all the insurers doing business in an area and that therefore your conclusions about the lack of coverage may not be valid. So don't you think that that is a good argument perhaps for the legislation that I am writing so that that information can be made available? And how do you respond to their criticism of your work?

94

Ms. WHITING. Madam Chairwoman, the way that I would respond to that: as you know, ACORN is a very large organization and we have a lot of members in the low- and moderate-income communities, especially in the Chicago metropolitan area. Through our research and phone calls, when we call the insurance companies to get rates for coverage in our communities, a lot of times they said either they didn't insure the area because it wasn't worth being insured, or, if they did quote us a figure, we found out that the price range was much higher compared to the suburban areas, which are basically white.

Through our study and phone calling and dealing with the insurance agencies, there is proof enough. Sure, we may not have the data written down, but at the same time I must agree with the gentlemen over here when they made their statement. If the insurance companies feel that they are not redlining, then why are they not willing to expose their coverage and plans such as were mentioned earlier? I am saying that if you have something that you feel that you are doing right, then you won't mind exposing it.

Mrs. COLLINS. Are you saying that the insurance companies are hiding the data that they have that proves, in fact, that they are redlining?

Ms. WHITING. Yes, that is exactly what I am saying.

At one time in Chicago there were Allstate insurance agencies located in most of the Sears stores in the metropolitan area. Today, in order to get insurance, you have to go to maybe a suburban area, and, if you think about it, a lot of low-income people don't have their own personal transportation, and if you have to travel across town to try to get insurance, it is very discouraging. They don't even make agencies available in our areas to service us.

Mrs. COLLINS. Well, my time has expired.

Mr. Stearns.

Mr. STEARNS. Thank you, Madam Chairwoman.

Ms. Whiting, I just would like to take a moment before we start—but even before that, Mr. McNary, I don't want you to be nervous. I want to tell you a quick story; I hope it won't be part of my time.

Mr. MCNARY. Well, you saw me spill the water, so it was very legitimate.

Mr. STEARNS. Whenever a constituent comes into my congressional office and they are a little nervous, I say to them, "Don't be nervous; everything in here is bought and paid for by you;" and after that they all take the best chair.

Ms. Whiting, I just want to bring to your attention that all the testimony was supposed to be here by February 26, and being in the minority we have very little staff and we try hard to review all the documents, and we did not receive your testimony until recently—until, I guess, yesterday—in spite of our request to get it. So putting aside that fact, it presents us a little problem to craft all the questions, and we would like to review your testimony. So I hope in the future you will get it here on time, and I hope you understand the importance that, to get a fair shake here, we have got to have that.

Since we don't have the benefit of your written statement beforehand, we have prepared a list of questions which we would like to

95

give you and your staff to respond to within 5 legislative days; and I would ask unanimous consent, Madam Chairwoman, that these questions be made part of the hearing record.

Mrs. COLLINS. Without objection, it is so ordered.

Mr. STEARNS. Let me just briefly make a general comment. In my business when I tried to get insurance, if I was getting insurance for my home I could find it easier than to get insurance for a restaurant that I owned. So, indeed, risk is a part of getting insurance; there is no way to deny it. And I found that the more risky the real estate investment, the higher not only the interest rate from the bank—and banks would not give me mortgage rates—but I couldn't even get insurance, and I found the rates were just enormous.

You state that ACORN is working directly with insurance companies to underwrite risks fairly. Could you please share with us examples of this cooperative effort and the results of your efforts?

Ms. WHITING. Well, as of this date we have only had one meeting, and that was with Allstate. In that meeting, we presented to them a safety program that we have designed to send our members through and to educate consumers on how to make their homes and properties more safe in the communities.

You also mentioned that there is a high risk in certain communities. That may be well and true, but at the same time I don't feel that it is fair that you make individuals pay for something that they have no control over. High risk a lot of times has a lot to do with society at large, and if you look into a lot of things there is always risk involved, and it is just not fair to make individuals pay for this.

Mr. STEARNS. Are you saying it is not right for the insurance companies to make you pay for the high risk? That is what you said.

Mr. BHARGAVA. I am Deepak Bhargava, legislative director of ACORN.

I think what Ms. Whiting is saying is that there is a distinction between things that individuals can do to control risk. With homeowners' insurance, that is maintaining your property, having a fire alarm, having a smoke alarm, having a burglar alarm, having a lock——

Mr. STEARNS. Just a minute. When you go to underwrite property, don't you have to consider the age of the dwelling, the construction of the dwelling, and the overall value of the dwelling, and take that into consideration for the risk involved?

Mr. BHARGAVA. I think there are a couple of issues. Yes, you do. One of the questions is whether the standards being used by the companies to underwrite particular properties are, in fact, correct or not, and we don't know what those standards are.

For example, it may be true that older properties are at greater risk for fire than properties that are of newer construction, but it also may be true that the risk of a 10-year-old property doesn't vary much from that of a 15-year-old property. There are various thresholds of risk. The age of a dwelling can be set by a company in a manner that is consistent with the racial or income composition of neighborhoods in a particular city in a way that would exclude them. That is the question, I think, about the disclosure of

underwriting that is in Mrs. Collins' bill, that by doing that you would at least be able to determine whether that is true or not.

Mr. STEARNS. Do you support the NAIC declination model law that requires companies to tell individuals why they have been denied coverage?

Mr. BHARGAVA. Yes.

Mr. STEARNS. OK. What has ACORN done to encourage State legislators to enact this model act? Because as I understand, this has been endorsed by a bipartisan group in this. So if a person is denied, why don't we do this on a State level rather than mandate more Federal laws? If you endorse that, what has ACORN done?

Mr. BHARGAVA. On the State level, we have been involved in insurance issues since 1978 when we helped pass in Missouri one of the first anti-redlining laws on the books. With regard to the particular issue that you are speaking to, I don't know what has been going on at the State level, but I would be happy to find out.

Mrs. COLLINS. Mr. Greenwood.

Mr. GREENWOOD. Thank you.

I have a question for Mr. McNary.

I was fascinated by the argument that you made about the Sears store being perfectly willing to take the neighbor's money to repair an automobile, but not willing to take the money when it came time to sell them insurance. If I understand the argument that you have made and also, in large part, the argument that Ms. Whitehead made, it is that there is, in fact, a significant pool of good risk consumers who, if they had the opportunity or a greater opportunity to purchase insurance, would not only be able to cover their risk, but provide a profit to the insurance company. That is your premise. Isn't that correct?

Ms. WHITEHEAD. That is absolutely true.

Mr. McNARY. Correct.

Mr. GREENWOOD. OK. Now here is the thing I can't figure out. Why is it then that somebody is not exploiting—in the kindest use of the word—that market for profit?

Mr. McNARY. They are. In Illinois, there is a big group of insurers that is exploiting that area for profit, and they are what are called the substandard insurance companies.

Mr. GREENWOOD. I understand that. But the question is, if I were a young go-getter sales person for Allstate or State Farm—and you have been in that business—why wouldn't I figure that out and go find that business?

Ms. WHITEHEAD. The company will not accept that business.

If I might just digress for a second, before my ex-husband and I purchased our house in East Oakland—and you must realize, we purchased in East Oakland in one of the highest income census tracts in 1980—what had happened between 1980 and this current census is that that zip code became predominately African American and Latino American. Prior to that, it was predominately Caucasian, blue-collar, some high-level income. So it was a nice area in an urban community.

The problem is that the complexion of the neighborhood changed. But you have to remember now who was moving into that neighborhood were "huppies" and "buppies," not people on welfare. But

97

in the actuarial heaven above us, the statisticians only look at demography.

My belief is, the real problem is underwriting and actuaries back off some place removed from really getting to know who the people are. They perceive that when a community changes complexion things are going to happen—crime is going to increase, there are going to be wholesale riots periodically—and, in fact, I have found out that for every heavily urbanized community with a large concentration of of-color individuals, there is a number pasted next to that community; 25 used to be for L.A.; that was the period in between race riots; and it was that way for all communities. Now it is 10 years in Los Angeles. But that number is also up in Oakland, the same number, and I asked all the city fathers, "Has there ever been a riot in Oakland?" Nobody can ever find out that there was a riot. So that is what I mean by intellectually dishonest race-based underwriting practices.

Mr. McNARY. And if I may share there with you, there is a former top manager of Allstate who tried to be that go-getter that you just talked about. He is in California, and right now he has a lawsuit against Allstate because when he tried to do what you just suggested, he tried to make Allstate the "good hands people," they wanted him to get his hands out of the business. This lawsuit alleges that employees were instructed by management to misplace or ignore inquiries and insurance applications for undesirable motorists: "If necessary to avoid the processing, such applications should be placed in a storage area and ignored."

We can't accuse legitimately a company of redlining. However, if a company is not redlining, what is wrong with disclosing the premiums that they collect by zip code, the loss data by zip code in this area, so that we can see? and we will help insurance industry make the case that they are not redlining if we have the data, and that is what we are asking for, at minimum, the data.

Mr. GREENWOOD. The bottom line is that you allege that they are missing out on opportunities to profit because someone is making stupid decisions economically, right?

Ms. WHITEHEAD. Exactly.

You know, my organization isn't about social welfare, we are about making money, business. We want to make money for our banking partners that help us revitalize our communities, and we want to make money for our insurance partners, but we have to stop being motivated strictly by race and hiding behind that form of discrimination, because it does our economy no good.

Mr. GREENWOOD. I guess what I want to be a part of, if there is a problem as you have identified it, is trying to figure out why it is that the market itself can't solve this problem. With enough good information, I hope we don't get into imposing the heavy hand of the Federal Government in here if we can avoid it. Unfortunately, when you do that, you always have unintended, undesirable consequences. I hope we can figure out how to solve this problem without doing that.

Thank you.

Ms. WHITEHEAD. Could I respond just real quickly?

Mrs. COLLINS. Yes, you may respond.

98

Ms. WHITEHEAD. I agree with you wholeheartedly, and one of the things that I don't want us to maybe overlook is the need to have this be what the Government does on the Federal level, just have a pool for the collection of data. We could move forward with the industry, maybe with a little bit of your pushing, to look at ways to invest in these communities.

I know you all are concerned about the solvency of insurance companies.

Mrs. COLLINS. Very much.

Ms. WHITEHEAD. But in your zeal to manage the kind of investment that you are going to allow the industry, do not lock off an opportunity for that investment to help revitalize our community.

For example, if you tell the industry that they can only invest in the IBM's of the world—and we all know the trouble that the IBM's are in right now—later on in my testimony I have some ideas about some possible investment pools that the industry could get involved in to help capitalize community development banks or to help further capitalize the successful commercial banks that are using CRA as an appropriate mechanism. But we just need to look at the big picture and bring as many people to the table to help think of good moves forward as possible.

Mrs. COLLINS. Thank you.

Mr. McMillan.

Mr. McMILLAN. Thank you, Madam Chairwoman.

I think all of us are interested in what you just mentioned, and that is doing those kinds of things that attract investment, create jobs, and get at the causes of higher risks that may exist in certain parts of our country and cities.

I think all of you have indicated that you do accept the fact that insurance has to be underwritten on the basis of risk. Is that correct?

Ms. WHITEHEAD. I'll answer that. Yes, but the risk should be the same for white communities as it is for blacks, and I'm saying that it is my observation that that is not the case. Additional burdens are put on predominately black and Latino communities and that is, in effect, taking earned premium dollar out of the insurance industry.

In my community, the level of income there is about $68,000 a year, and not only are the blacks and browns that moved into that community paying too much or not able to get insurance, but my white neighbors who bought the property too.

Mr. McMILLAN. I understand that. That is what we are trying to address.

Mr. McNary, you didn't answer my question. Do you think insurance ought to be underwritten on the basis of risk?

Mr. McNARY. To answer your question, I guess it ought to be underwritten on the risks related to coverage. In other words, I think the question we are talking about here in addition to underwriting is making it available. If the product is unavailable, then obviously it is not going to be written according to risk or any other means, if it is not available to be purchased.

Mr. McMILLAN. Then the fact that Oakland is more earthquake prone or Watts may be more riot prone shouldn't be a factor in someone underwriting property insurance?

Mr. MCNARY. I'm sure those considerations are taken into consideration as risks are underwritten.

Mr. MCMILLAN. Well, they are, but you accept the fact that they must be?

Mr. MCNARY. I accept the fact that they are.

Mr. MCMILLAN. You don't accept the fact that they need to be?

Mr. MCNARY. I guess I'm not that much of a businessman. I accept that as a premise that you can underwrite——

Mr. MCMILLAN. Well, you have been in the insurance business. You have sold life insurance.

Mr. MCNARY. That is correct.

Mr. MCMILLAN. And life insurance is based on the concept that everybody pays and the risk is spread. No one can predict specifically who is going to die prematurely and who is not. But the spreading of the risk is what brings the cost down.

So I think the issue here is how much we are going to allow a focus on risk in terms of pricing insurance. I think that is what we are talking about. That may be very different than pure racial discrimination. I think that is what we are trying to determine here. If you don't believe that insurance needs to be risk based, then we are talking about a totally different set of things, and that is to say that maybe everybody in the United States should pay the same premium for automobile insurance on the same automobile.

Mr. CAMERON. Congressman, if I might respond to that.

Mr. MCMILLAN. Yes.

Mr. CAMERON. I think it is important to distinguish different kinds of risks for different kinds of coverage though. A good driver is a good risk whether they are black or Latino or white.

Mr. MCMILLAN. I would agree with you.

Mr. CAMERON. Whether you are on the north side of Chicago or the west side.

Mr. MCMILLAN. I agree with you.

Mr. CAMERON. Yet, in fact, we find that they can't obtain reasonably priced insurance in many parts of the City of Chicago.

A number of the factors that you mentioned as risk oriented to auto earlier, like congestion, like vehicle theft, are not at all particularly unique to the inner city in Chicago, and in fact the community I live in is just as congested, and probably more so, than many parts of Mrs. Collins' district, and yet we find that I can easily obtain that insurance whereas someone in Mrs. Collins' district has difficulty doing it.

Again, we are saying, you know; rates are related to risk, and we are not advocating here that rates be standardized, we are not advocating rate control by the Federal Government whatsoever, but what we are talking about is simply the ability to go and purchase high quality, low cost insurance, which simply can't be done today in the City of Chicago.

Mr. MCMILLAN. I understand that, and I think we are all trying to address that problem.

It seems to me the issue of territory is very important here. There are a lot of other risk factors, but you are saying that maybe simply carving out a territory and saying that is a relatively high risk area is part of the problem. That seems to me one of the fundamental things you are saying.

100

Ms. WHITEHEAD. Yes.

Mr. McMILLAN. And that may be coincidentally, or not coincidentally, corresponding to racial characteristics. I mean there are other territorial ways of carving things out. I could carve out the whole San Francisco Bay area as being a high risk earthquake area without being discriminatory in terms of minorities, right?

Ms. WHITEHEAD. Yes, sir.

Mr. McMILLAN. And so I think somehow or other we have got to figure out how we do that, and maybe there is some reason for doing it on a territorial basis; I don't really know; we would have to look at the numbers.

Ms. WHITEHEAD. You have hit it right on the head.

Mr. McMILLAN. But then there are certain things that maybe we need to try to spread the risk on and do so consciously, that may be a way of subsidizing certain things. But in a sense, insurance is subsidizing the weak with the strong, and I think that is something that is worth looking at.

Ms. WHITEHEAD. But don't you think we have to start with getting the numbers from the industry on what they are doing right now?

Mr. McMILLAN. Well, I would have to look at that in terms of details and how much information you are going to need to really do an adequate study.

Ms. WHITEHEAD. Just briefly, I would like to share with you the strange kind of territorial rating that is going on. After the L.A. disturbances, one of the board members of my organization is the manager of the Eastmont Mall, and he got a call from his insurance carrier that his Workmen's Comp insurance was going to be cancelled because there was a fear that there were going to be large claims as a result of race-related incidents.

That is why I go back to my original statement. Oakland is not Los Angeles. If Los Angeles has a high propensity to have race riots, perhaps one should charge a different rate than Oakland, but one just cannot say because East Oakland has the same concentration numerically of blacks as Los Angeles do you need to cancel a Workmen's Comp policy from a business that is thriving and trying to serve our community.

Mr. McMILLAN. Well, let me just conclude on this. I have been in Lloyds of London with the syndicator who underwrites earthquakes and hurricanes in the United States, and been through the process of how he determines risk. You know, they have had a rough time lately. We have had two major hurricanes and one major earthquake, which almost wrecked these people. So, they are sitting there with their money at risk. It takes somebody's money to underwrite insurance, and he is making the best judgment he can. But I think you raise some interesting points, and it is worth taking a look at.

Mr. McNARY. Mr. McMillan, I just want to say that we are surely not opposed to risk pooling and some of the suggestions you mentioned, but let us not lose sight of the fact that we think it is very important to have Federal legislation. Just in the paper today, in the Washington Post, it says, "Regulators eye cozying ties to the insurance industry."

The fact of the matter is, in State after State after statewide level, we see that the insurance regulators, the people that are supposed to be between the consumer and the industry to protect both interests have a tendency to be too cozy with one side.

A case in point is, the director of the Department of Insurance of Illinois, Zack Stamp—or the former director, I should say—admitted that there was a problem with redlining, admitted that there was a problem with lack of penetration in minority areas. He had the statutory ability to do something about it, but he chose not to do it. Right now, it probably is a coincidence that now he is working for the American Insurance Association. That happens time and time and time again.

So I think if we had some Federal direction, at least for disclosure, at minimum, we could at least use this information to better enforce our statutory regulations on the statewide level.

Thank you.

Mrs. COLLINS. We thank all of the witnesses for appearing before us this morning, and our next panel will be the Honorable Robert M. Willis, who is the superintendent of insurance for the District of Columbia, also representing the National Association of Insurance Commissioners.

Won't you come forward, please.

Welcome, Mr. Willis. You may give your testimony at this time.

### STATEMENT OF ROBERT M. WILLIS, SUPERINTENDENT OF INSURANCE, DISTRICT OF COLUMBIA, ON BEHALF OF NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS

Mr. WILLIS. Good morning, Madam Chairwoman and members of the Subcommittee on Commerce, Consumer Protection, and Competitiveness.

My name is Robert Willis. I am superintendent of insurance for the District of Columbia and, as such, a member of the National Association of Insurance Commissioners. The NAIC is an association of chief insurance regulators from the 50 States, the District of Columbia, and the four U.S. possessions. On behalf of the NAIC, I want to thank you for this opportunity to discuss with you the important topic of unfair discrimination by insurance companies based on geographic location or other inappropriate factors, sometimes referred to as "redlining."

I serve as a member of the NAIC's Urban Insurance Subgroup formed in 1992. My testimony today will describe how State insurance regulators are responding to the issue of redlining, what the NAIC has done and is doing about the issue, and review some of the efforts now underway to ease the burden of access and affordability of insurance faced by urban consumers both in commercial and personal lines of insurance.

First, I think it is critically important to put this problem in an appropriate context that ordinary citizens living in urban areas can understand and relate to, as one of access, availability, and affordability.

Access is an issue to the extent that a number of insurers distribute their products through direct advertising, through agents or brokers, who do not reside or work in urban areas needing insurance coverages. Thus, some urban consumers may have limited

102

choices, in an industry which relies upon competitiveness, to limit the cost of insurance.

Availability becomes an issue when insurers either refuse to underwrite coverages or urban areas or particular parts thereof or systematically abandon these areas, creating an environment where there is little competition.

Affordability is clearly the major concern of insurance consumers, but for purposes of this testimony I want to emphasize that the fact that urban consumers must often accept less than adequate insurance protection due to high cost is a major theme, and I think we need to spend some time with that.

In looking at redlining, it is a term that I think is overly broad, it is nontechnical, it has been used to describe a wide array of activities on the part of insurers as well as insurance agents.

However, I think the regulatory concern must focus on the unlawfully discriminatory practices affecting access, availability, and affordability of insurance in urban areas and, in addition to that, in rural areas. We shouldn't confuse these types of practices with varying definitions of redlining; I have heard several here today.

Most recently, in the context of commercial and personal lines of insurance, there appear to be discriminatory practices in which insurers and/or agents engage in and refuse to provide coverage, and to the extent that they provide coverage, the coverage is provided under unfair terms to people who happen to live in certain geographic areas. This complaint is more frequently raised by urban residents. We also, however, have to give consideration to the fact that geographic locations within the urban environment are also subject to forms of discrimination. This appears to affect on a disproportionate basis black and brown people and minority businesses that are located in the so-called inner city.

State insurance regulators are concerned that urban consumers may be unfairly discriminated against by insurers simply because of where they live. A critical question is whether the insurer's decision not to underwrite or to offer coverage to persons with property in urban neighborhoods is discrimination as to geographic location or on the basis of race or class.

In 1979, the NAIC adopted amendments to the Unfair Trade Practices Act, provisions that prohibit unfair discrimination. State regulators are not solely interested in preventing unfair discrimination based on geography, we are also concerned about problems of access and affordable insurance that cannot be traced to unfair discrimination such as the problem of adequate access, availability, and affordability of insurance in urban areas.

Clearly, the charging of higher rates to persons or businesses that pose a higher risk of loss may be a sound business practice and perfectly legal. However, this practice can stifle business opportunity and create hardships on businesses, individuals, and urban communities as a whole. State insurance regulators are exploring ways to assist inner city residents in obtaining this much needed insurance. A major concern is the ability of minority agents and brokers to underwrite insurance coverages with the so-called top tier or larger insurers. This is clearly a key component to resolving the access and availability issues. Another major concern is

the availability of surety bonding coverages for urban and small business and minority contractors.

Madam Chairwoman, let me just conclude with a few comments, if I may. The NAIC, through the Urban Issues Subgroup, is working with the Statistical Task Force to develop a base for developing the structure of a data base to obtain the kinds of information that you have outlined in your proposed legislation. This is an ongoing effort on the part of the NAIC. I think that we will very shortly have accurate information that insurers as well as regulators can agree on, and we would make that information available to this committee.

I want to thank you on behalf of the members of the NAIC for raising this very important topic. It provides impetus for State regulators to also take a part in the process, and I think you are on the right track, and I certainly support your efforts.

[The prepared statement of Mr. Willis follows:]

STATEMENT OF ROBERT M. WILLIS, SUPERINTENDENT OF INSURANCE, DISTRICT OF COLUMBIA, ON BEHALF OF NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS

Madam Chairwoman, members of the Subcommittee on Commerce, Consumer Protection and Competitiveness, my name is Robert M. Willis. I am the Superintendent of Insurance of the District of Columbia and, as such, a member of the National Association of Insurance Commissioners [NAIC]. The NAIC is an association of the chief insurance regulators from the 50 States, the District of Columbia, Guam, American Samoa, Puerto Rico, and the Virgin Islands. On behalf of the NAIC, I want to thank you for this opportunity to discuss with you the important topic of unfair discrimination by insurance companies based on geographic location or other inappropriate factors, sometimes referred to as "redlining". I serve as a member of the NAIC's Urban Insurance Issues Subgroup, formed in June 1992. My testimony today will describe how State insurance regulators are responding to the issue of "redlining", what the NAIC has done and is doing on this issue, and review some of the efforts now underway to ease the burdens of access and affordability of insurance faced by urban consumers of both commercial lines and personal lines insurance.

I think it is critically important to put this problem in an appropriate context that ordinary citizens living in urban areas can understand and relate to, as one of access, availability, and affordability. "Access" is an issue to the extent that a number of insurers distribute their products through direct advertising or through agents and brokers who do not reside or work in the urban areas needing insurance coverages. Thus, some urban consumers may have limited choices in an industry which relies upon competitiveness to limit the cost of insurance. "Availability" becomes an issue when insurers either refuse to underwrite coverage in urban areas or particular parts thereof or systematically abandon these areas, creating an environment where there is little competition. "Affordability" is clearly the major concern for insurance consumers, but for purposes of this testimony, I want to emphasize the fact that urban consumers must often accept less than adequate insurance protection due to the high costs of that protection.

The term "redlining" is a broad, non-technical term that has been used to describe a wide array of activities by not only insurers and insurance agents but also by other financial institutions. A commonly used definition is "the refusal of an insurance company, bank or other financial institution to provide its services solely because of the location of the property in question." The term "redlining" evokes the image of an executive of a financial services institution taking a red pen to a map to circumscribe a region in which that institution refuses to provide services, whether those services be housing loans or car insurance. However, I think the regulatory concern must focus on unlawfully discriminatory practices affecting the access, availability and affordability of insurance in urban or rural areas and not confuse these types of practices with varying definitions of redlining. Most State insurance laws require that rates, rules and underwriting practices shall not be excessive, inadequate or unfairly discriminatory.

Most recently, in the context of commercial lines and personal lines of property and casualty insurance, there appear to be discriminatory practices in which an insurer and/or its agents refuse to provide insurance, or provide insurance under un-

fair terms, to people who live in a certain geographic area. Although this complaint is raised most frequently by urban residents, consideration must be given to the fact that geographic locations within the urban environment are subject to discrimination which appears to affect disproportionately black and brown people and business located in the so-called "inner city."

State insurance regulators are concerned that urban consumers may be unfairly discriminated against by insurers because of where they live. The more obvious form of unacceptable discrimination is that based upon race, despite State and Federal laws prohibiting such discrimination. A critical question remains whether an insurer's decision not to underwrite or to offer reduced coverage to persons or property in urban neighborhoods is discrimination as to the geographic area or on the basis of race. This is a particularly perplexing issue when insurance rates allowing an insurer to make a reasonable profit are in place.

In 1979, the NAIC adopted as an amendment to the Unfair Trade Practices Act a provision that prohibits unfair discrimination based upon the geographic location of the risk or the age of a residential property.[1] In that definition, the members of the NAIC recognize that there may be legitimate underwriting reasons for insurers to treat risks in one geographic region differently than those of another region, and strive to prohibit only those not based upon sound actuarial findings.

Twenty-six States and the District of Columbia have laws and/or regulations that prohibit redlining.[2] In 15 of those States, the prohibition is based upon the language of the Unfair Trade Practices Act.

However, State regulators are not solely interested in preventing unfair discrimination based on geography. We are also concerned about problems of access to affordable insurance that cannot be traced to unfair discrimination, such as the problems of adequate access, availability and affordability of insurance in urban environments. Clearly, charging higher rates to persons and businesses that pose a higher risk of loss may be a sound business practice and perfectly legal. However, this practice can stifle business opportunity and create hardship on businesses, individuals, and urban communities as a whole. In addition to our efforts to prevent unfair discrimination, State insurance regulators are also exploring ways to assist inner city residents in obtaining access to needed insurance. A major concern is the ability of minority agents and brokers to underwrite insurance coverages with the larger and more successful insurers. This is clearly a key component to resolving the access and availability issues. Another major issue is the availability of surety bonding coverage for urban small businesses and minority contractors.

In June 1992, the NAIC formed the Urban Insurance Issues Subgroup of the Market Conduct and Consumer Affairs Subcommittee. The NAIC charged the group with the following activities:

1. Study and make recommendations regarding the underwriting and marketing practices of insurers, particularly in urban areas, as they relate to the availability and affordability of commercial and personal lines insurance, and to the Unfair Trade Practices Act.

2. Examine pricing practices of reinsurers in urban areas as well as the potential of reinstating the Federal Riot Reinsurance Program.

---

[1] The relevant provisions of the NAIC Unfair Trade Practices Act now read as follows:
Section 4. Unfair Trade Practices Defined: Any of the following practices, if committed in violation of Section 3, are hereby defined as unfair trade practices in the business of insurance:
G. Unfair Discrimination: (3) Making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazard by refusing to insure, refusing to renew, canceling or limiting the amount of insurance coverage on a property or casualty risk solely because of the geographic location of the risk, unless such action is the result of the application of sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience. (4) Making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazards by refusing to insure, refusing to renew, canceling or limiting the amount of insurance coverage on the residential property risk, or the personal property contained therein, solely because of the age of the residential property. (5) Refusing to insure, refusing to continue to insure, or limiting the amount of coverage available to an individual because of the sex, marital status, race, religion or national origin of the individual; however, nothing in this subsection shall prohibit an insurer from taking marital status into account for the purpose of defining persons eligible for dependent benefits. Nothing in this action shall prohibit or limit the operation of fraternal benefit societies.
[2] The following 27 jurisdictions have anti-redlining provisions: Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Illinois, Maryland, Michigan, Minnesota, Missouri, Montana, Nebraska, New Hampshire, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Texas, Virginia, Wisconsin, and West Virginia, 15 of which (identified in boldface) include language from the NAIC Unfair Trade Practices Act. See Attachment A for a complete, State-by-State listing.

The Subgroup has established three primary objectives. First, assess the extent and nature of the problems of affordability and availability of insurance for urban consumers. Second, examine the underlying causes of those problems. Finally, identify and develop effective policy and regulatory measures designed to address these problems.

The subgroup decided at the outset that what was needed in this emotionally charged debate was factual information and analysis as to where and to what extent urban consumers face problems of availability and affordability of needed insurance. Therefore, one of the first acts was to survey the State insurance departments, asking what information regarding urban insurance issues was available, and what were the departments' opinions on the subject. That survey is nearly finished, and we are currently analyzing the responses. However, while that analysis is not complete, we can draw a few conclusions:

—To the extent insurance regulators see availability and affordability as a problem, they see it as caused not only by unfair discrimination, but also by problems in underwriting, marketing, and agent location, among others.

—Although most frequently identified as a problem in automobile insurance and homeowners insurance, redlining has been identified as a problem by some regulators as a problem for small businesses in obtaining access to a wide range of commercial insurance products.

—Geographically-defined problems of access to affordable insurance are not strictly urban.

In that survey, the Urban Insurance Issues Subgroup also discovered that many States have conducted surveys of their own which help to shed light on issues related to redlining. The variety, depth, and richness of these studies will add much to the work of the Subgroup.

In addition to this survey of NAIC members, the subgroup has initiated a project to compile and analyze statistical information relating to the availability and cost of insurance in various urban areas across the country. The subgroup has requested the assistance of the NAIC Statistical Task Force in identifying the information currently available and a standardized process to collect this information.

We need to find adequate answers to the following important questions:

1. What sources of insurance are available to urban consumers?

2. How difficult is it for consumers in urban areas to obtain desired insurance coverage?

3. Do urban consumers face greater limitations in the types of coverage, policy options, and premium payment options available than non-urban consumers?

4. Do urban consumers have access to insurance agents residing or working in their communities?

5. Do urban consumers face different treatment regarding underwriting guidelines, claims handling, and cancellation and renewal practices?

6. How much do urban consumers pay for insurance relative to what non-urban consumers pay for comparable coverage?

7. Do existing residual market mechanisms provide adequate insurance coverage?

8. What factors cause differences in availability and price between urban and non-urban consumers? To what extent are such differences caused by:

(a) economic factors associated with geographic location; (b) race or ethnicity; (c) income; (d) education; (c) occupation; (f) automobile driving record; (g) the value and age of residential property; and (h) any other discriminatory factors?

It is important to recognize that we do not intend to confine our analysis to purely statistical data. We will include in our evaluation information and research from outside sources, as well as the use of diverse research methodologies, possibly including surveys, focus groups, and community outreach.

We will conduct this research project in two phases. First, we will analyze statistical data already collected by some States and statistical agencies. Second, we will determine what additional data collection activities should be undertaken, to achieve the objectives of the subgroup and the long-term interests of State' regulators. We expect to finish this preliminary analysis by June of this year. Should the NAIC decide that a special data call is necessary, we would expect to have a much more extensive analysis by the end of the year.

In 1968, in response to the concern that insurers' fears about riot-related losses would dry up the insurance market in urban areas, the Federal Government established a riot reinsurance program and authorized Fair Access to Insurance Requirements (FAIR) plans by passage of the Urban Property Protection and Reinsurance

Act.[3] The Act called for the Federal Government, through the Federal Insurance Administration (FIA), to reinsure excess property losses growing out of riots and falling on a participating insurer. Participating insurers could pass on a portion of the reinsurance costs to their policyholders, so long as the insurer wrote direct business in a specified line in a State and participated in a qualifying FAIR plan operated in that State.

Under the Act, roughly 30 States created FAIR plans. A qualifying FAIR plan in a particular State is supported by all the insurers writing in the State in the line or lines covered by the plan. In the geographic areas covered by the plans, basic property insurance could be purchased by property owners without having to pay that portion of the premium that reflects an "environmental" hazard.

The Federal riot reinsurance program was terminated in 1983, but most of the FAIR plans remain as a residual market for select geographic areas. The Urban Insurance Issues Subgroup's survey revealed that most State insurance departments believe the FAIR plans in their States are operating without major problems, and are largely effective at providing coverage. Some consumer groups disagree with this assessment, and the Subgroup will examine this issue more closely.

Both within the design of the FAIR plans and in the implementation of other programs, we have seen one of the strengths of State government in action—the ability of States to develop innovative ideas that are well suited to the needs of a particular region. For example, in New York State, the insurance department has effectively used a combination of a Territorial Credit Program, a "Take-Out Process" to increase the likelihood that urban consumers will find auto insurance in the voluntary market, and a Limited Assignment Distribution System, to reduce residual market costs and improve service. In California, a proposed regulation currently under consideration would provide a financial incentive for insurers to provide above-average service to underserved communities.

As you know, Madam Chairwoman, the NAIC has in place a program to enhance consumer participation in NAIC deliberations, under which the NAIC underwrites the expenses for consumer representatives to travel to NAIC meetings. Under this program, we have received a great deal of invaluable information and advice from consumer advocates. Furthermore, we will be meeting with representatives of the Association of Community Organizations for Reform Now (ACORN) at the NAIC meeting in a few days to explore some ideas for bringing relief to urban insurance consumers.

In conclusion, Madam Chairwoman, we appreciate the interest of this subcommittee in, and its concern for, consumers. State insurance regulators are just as concerned about redlining and other discriminatory barriers to urban insurance consumers, and we are actively pursuing solutions. As State insurance regulators, we are using our collective databases and research resources to develop innovative and flexible solutions to assure that individual consumers and businesses have fair and reasonable access to affordable insurance.

Madam Chairwoman, I am available to answer questions you or members of the subcommittee may have. Thank you for the opportunity to provide this testimony.

Mrs. COLLINS. Thank you.

Mr. Willis, the ACORN study reveals disparities in the willingness of agents to do business in different neighborhoods in the Washington, D.C., area. As superintendent of insurance for the District of Columbia, what is your reaction to this study result?

Mr. WILLIS. I have two reactions, not to nitpick the study because I think it raises very important issues about access and availability.

The study was done in the context of the Washington metropolitan area, so I just want to state for the record that that information does not apply to the District of Columbia solely.

Mrs. COLLINS. Everyone in the District of Columbia can get insurance at the same rate no matter where they live, Southeast, upper Northwest, Capitol Hill, or wherever else?

Mr. WILLIS. Partially correct.

Mrs. COLLINS. Well, what part is not correct?

---

[3] Pub. L. 90-448, title XI (1968).

Mr. WILLIS. Let me explain that in the District of Columbia insurance companies file a single rate for coverage here in the District. There is no distinction made between parts of the District of Columbia. I feel that the more central theme is the question of how guidelines are being applied to insured properties, individuals, in urban areas.

Mrs. COLLINS. No, I want you to answer my question.

Mr. WILLIS. Yes.

Mrs. COLLINS. Is the premium the same for a house, say, where the real estate value is $40,000 in Southeast as a house that is worth $40,000 in upper Northwest Washington, D.C.?

Mr. WILLIS. That is an excellent question, and let me address it in the context of what State regulation does.

Mrs. COLLINS. Yes or no?

Mr. WILLIS. The premium may be different. They may be vastly different. The reason that there are differences is not based on the insurance rate that is approved by the insurance regulator, it is based on, I believe, the guidelines that are being applied by the company, which is a matter that is not subject currently to State regulation.

Mrs. COLLINS. How would the company issue its guidelines?

Mr. WILLIS. The guidelines are not issued.

Mrs. COLLINS. Well, what would be their policy?

Mr. WILLIS. I think what happens is, the agent, in quoting business in Southeast Washington or west of the park, the northern tip of our city—the agent would receive from the insurer criteria, the underwriting guidelines, as to how to price the businesses in different parts of the city.

Mrs. COLLINS. And what would those guidelines be like? Would the guidelines say, for example, that in Southeast this house with the same real estate value should not be insured or should be insured at a higher rate?

Mr. WILLIS. I think what we have seen is that there may be a declination, meaning that there would not be insurance.

For example, if a townhouse in the District of Columbia, regardless of its location, is next to a vacant building, insurers will normally decline coverage in that instance, the fear being that there is a risk of fire when a property isn't being occupied and other risks inherent in the urban environment.

Now we may have the same value, the structures of the properties may be the same in different parts of the city, but the rates of insurance that would be offered would be different.

Mrs. COLLINS. Do you think there is any evidence of "redlining" in the District of Columbia?

Mr. WILLIS. Well, I take issue with the——

Mrs. COLLINS. With the word "redlining"?

Mr. WILLIS. More than philosophically with the term "redlining." I think it is inflammatory.

Mrs. COLLINS. So what terminology would you use in a single word?

Mr. WILLIS. Discrimination. I think that is how we tend to lose focus on dealing with this issue. We get, I believe, hung up on the issue of trying to decide what is or is not redlining using statistical, empirical data to prove or disprove the point, and the bottom line

108

is, State regulators, our concerns should be with the issue of discrimination.

All States have laws that deal with unfair discrimination in the structure of insurance rates and the application of insurance rates. Now relative to the application of insurance rates, the conduct on behalf of insurers and their agents is a matter of State regulation, and I think there is adequate authority to deal with it, but I think we really confuse ourselves getting hung up on trying to define what is or is not redlining.

Mrs. COLLINS. Let me ask you this. You say that all States have regulations of some kind or another. What is wrong with having a uniform regulation about the discrimination that we are talking about, a Federal uniform standard?

Mr. WILLIS. Well, Madam Chairwoman, in all deference, I'm not sure that a Federal definition would do more than what already exists at the State level. I think the issue of data collection is an appropriate concern. The NAIC, as I mentioned, has a subgroup that is vigorously discussing the issue.

Mrs. COLLINS. When did NAIC begin to discuss the issue?

Mr. WILLIS. The issue came to light fully—I'll put it in that context—June, 1992. At that point, the Urban Insurance Issues Group was formed, influenced by a number of commissioners that wanted to drive home the problem and make it an issue for the NAIC and the membership. There is a lot of effort going into compiling the data.

Mrs. COLLINS. When do you think the data may be compiled?

Mr. WILLIS. I think as a member of the committee, with pushing very hard, that the committee would have a report by the end of this year. I say that because although the issue of data seems to be a very simple thing to do, looking at insurance company data files, we need to be specific on exactly what data is necessary in order to prove or disprove the discrimination concern that we have.

State insurance departments, I think, are uniquely positioned to raise those questions, to look at the quality of the data, anticipate the quality of the data that we are asking the insurers to provide.

It is also important that we use a unified approach in requesting the data in order to minimize the impact and the cost to insurers, so that is one of the initial efforts of the committee.

Mrs. COLLINS. Thank you.

Mr. Stearns.

Mr. STEARNS. Thank you, Madam Chairwoman.

When she was mentioning to you about redlining, she sort of intimated, please give us a definition. I think you said the word, in your opinion, is "discrimination."

Mr. WILLIS. That is correct.

Mr. STEARNS. Is that from the NAIC standpoint, or is that from your personal standpoint?

Mr. WILLIS. That is from my personal standpoint. I philosophically choose not to engage in the debate of redlining because I think it tends to not have us focus on the real issue, and I think that ordinary citizens aren't impressed with the use of the term "redlining." From their perspective, it is whether I have access to insurance, whether it is affordable, and trying to figure out the reasons why that is a problem for them.

Mr. STEARNS. In the ACORN testimony we have, it states—and let me read this to you; I just want your comment on it; it concerns the NAIC: "The problem of insurance redlining is compounded by ineffective State regulatory apparatus that is unwilling or unable to adequately protect consumers." Do you think that is true—yes or no?

Mr. WILLIS. I disagree with that.

Mr. STEARNS. OK. How many complaints do the various insurance departments receive each year on redlining?

Mr. WILLIS. I can't speak to that question, Mr. Stearns. Let me talk about the District of Columbia. In 1992, there were 27,000 complaints or questions that were raised by citizens in the District of Columbia, and we responded to those.

Now I can't speak to what happens in others States, but I think that tells me that there is a large public concern and regulators need to be positioned to be able to respond.

Mr. STEARNS. Would you mind, perhaps after you have reflected on it, giving us this information and supplying it to us for the record?

Mr. WILLIS. I certainly will.

Mrs. COLLINS. In 5 working days, please, so we can close the record on this hearing.

Mr. WILLIS. I would be happy to.

Mrs. COLLINS. Thank you.

[The following information was received for the record:]

GOVERNMENT OF THE DISTRICT OF COLUMBIA,
DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS,
*Washington, DC, March 8, 1993.*

Hon. CARDISS COLLINS,
*Chairwoman, Subcommittee on Commerce, Consumer Protection and Competitiveness, House of Representatives,*
*Washington, DC.*

DEAR MADAM CHAIRWOMAN: On March 3, 1993, I testified before your subcommittee at a hearing on redlining by insurers.

During the hearing I was asked to submit for the record information regarding consumer complaints the District of Columbia has received during 1992.

We have reviewed our files and found that there were no complaints based upon race. The total number of complaints received by our department last year was 27,000. Of those, 11,880 complaints related to claim disputes or questions about claims; 15,120 related to policy cancellations or non-renewals.

Please call me or Patrick Kelly, (202) 727-8001 in my department, if you have any questions.

Again, thank you for the opportunity to testify.

Sincerely yours,

ROBERT M. WILLIS, *Superintendent.*

Mr. STEARNS. Let me just talk in general terms about redlining. Do you think that the company is "redlining" simply because they do not have agents in all the market areas? We saw the maps up here, and I think you saw them too. Do you agree with what is said there, just because we don't have the State Farm agents in those areas or they don't provide telephone quotes—I mean let's just keep it to the point of these charts. Do you agree with those charts, that that indicates that insurance companies are redlining? Just yes or no.

Mr. WILLIS. It is hard to answer yes or no. I think that that is some evidence of a business decision to concentrate in certain markets. Whether that is discriminatory, which is the term I would choose to use, I think requires more analysis, and I just can't respond to that.

Mr. STEARNS. Do you think the Government or State government should require to market in those areas?

Mr. WILLIS. Let me start with a point that insurance is inherently discriminatory, because an insurer is deciding which risks you are going to cover. So if we reached a point where insurance were required in rural or even urban communities, I think we are getting well beyond the issue of what we understand, the process of what we understand to be insurance. I don't think it should be required. I think the concern is whether the sale, the marketing of that insurance, is being done, again, on a discriminatory basis.

Mr. STEARNS. As the insurance commissioner, do you have laws and regulations currently on the books that prohibit unacceptable discrimination based on race?

Mr. WILLIS. The laws of the District of Columbia prohibit unfair discriminatory practices in a broad context. The law itself, as most State laws, insurance laws, does not specifically raise the issue of race. What you find is that racial discrimination is covered by other general statutes.

To use an example, if there were a claim or an allegation of racial discrimination in the District, we would try and resolve the issue between the policyholder and the insurer. If that did not work, the matter would be referred to the Office of Human Rights and Minority Business Development. They would reach a finding as to whether or not the discrimination was based on race.

Mr. STEARNS. Let me get more precisely to the heart of the question, and I appreciate your honesty here. Do you think CRA requirements should be imposed on insurance companies? Why or why not? This has been going through every year, and there is more legislative push on it, and let me ask you, should we start that process here?

Mr. WILLIS. I think it would erode a part of the process of insurance. Insurance companies collect premiums and, based on that premium collection, have an obligation to invest funds, to generate a rate of return, which lowers the cost of insurance. If we had a situation where insurers were required to invest under CRA's, we may be limiting the upward potential of those funds in terms of the investment return. That kind of scenario, if regulators were requiring that, would place regulators in the business of managing the insurance companies. Everyone has a concern for solvency. We want companies to be solvent, but I don't think that it is in the best interest of the public for regulators to decide issues of investment return. So I wouldn't support that.

Mr. STEARNS. That's all, Madam Chairwoman.

Mrs. COLLINS. Thank you.

Mr. McMillan.

Mr. McMILLAN. Thank you, Madam Chairwoman.

It used to be that securities analysts analyzing the performance of insurance companies normally expected that an insurance company that was in the fire and casualty liability business would

111

break even on underwriting, but make money on the reserves—that is, the investments—that is where their profits came from. I don't know whether that is still true or not, but I think it serves to illustrate the fact that risk spreading is a pretty balanced game, and there are a lot of ways to manage risk. Certainly, that is a part of the business of being in insurance.

I live in the District. Maybe I ought to go back and check my insurance rates on my house. I live pretty close into Northeast, about as close as you can get to the Capitol residentially. Would you say that I am paying an average risk, a high risk, or low risk, from your experience?—forgetting my individual behavioral characteristics.

Mr. WILLIS. Without knowing more about the specifics, I wouldn't want to generalize. I would say to you that the insurance rates that are approved in the District are a uniform rate, and, again, you have to particularize by looking at your individual property in terms of its age, the location of the fire department, and there are just so many other criteria that could affect the ultimate premium that you pay that I think it would be unfair to generalize.

Mr. MCMILLAN. But there are factors that, taken into account, get down to a pretty narrow territorial differentiation, I would suspect.

Mr. WILLIS. That is correct.

Mr. MCMILLAN. Would it be a matter of 5 or 6 blocks perhaps?

Mr. WILLIS. It could. It depends on the underwriting criteria being applied by the company. Again, that kind of information is not reviewed or approved by State regulators. When a citizen brings forth a complaint and there is an allegation of unfair treatment or discrimination, we then get into the criteria underlying the rate being applied by the company, but absent that, it is just not a point of concern at this juncture.

Mr. MCMILLAN. In your position, do you get an adequate flow of expressed concern or complaints that give you a good basis for determining whether or not there is, in fact, racial discrimination within the District, as opposed to legitimate discrimination based on risk variation?

Mr. WILLIS. Let me say that the flow of complaints for the most part do not allege racial discrimination. I can't think of even one in the last year where there was a claim made on that basis. Citizens will complain more frequently about the cost of insurance or that their insurance has been cancelled on a basis that they may feel is discriminatory. Having received that information, we will conduct an investigation, do fact finding, and try and resolve the matter. Citizens in this city generally have not complained about insurance on the issue of race, and I don't know that we are unique, but that has been my experience.

Mr. MCMILLAN. Well, I think all of us complain about the prices.

Mr. WILLIS. If I might, I am a native Washingtonian, I have lived in the city off and on, and prior to Mayor Kelly's appointment of me to this position I lived in Virginia, and the relocation here caused me to really understand the citizens' complaint about the cost of insurance here in the District.

Let me just share a thought with you, and it is one of the issues that I am going to be working with the subcommittee on to try and

see if we can get some credible data. If we accept the fact that there are 600,000 people that live in the city and during the course of a day there are more than 2 million people that come to work in the District of Columbia, my insurance in the District is based on where my car is garaged. So let's assume that Joe Smith works in the city and he drives every day. His insurance is based on where his car is garaged, and let's make that location Virginia. During the course of a working day, there are a lot of automobiles here in the city, the majority of which come from outside the city.

When I start looking at insurance rates in the District, I have got a huge concern about the actuarial occurrence rate statistics being applied here in the District. The rate charged is based on the fact that there is a high level of occurrences here in the District, and what I want to get at is whether those occurrences are based on the behaviors of D.C. residents or those from without, and to the extent that they are driven by activities or behaviors outside, I think we need to get at the issue of whether the rate in the District is greater than it should be relative to the risk.

Now this isn't discrimination based on race, but I think it is an issue based on those who live in the city and those who live without: Are we adequately allocating the inherent risk between the urban communities and the suburbs?

Mr. MCMILLAN. If I could just make a couple of quick comments, I have noticed that myself. I have thought about getting a used Humzee to drive on the streets. My own bias is that drivers who come in from Maryland are a lot more reckless than those that come in from Virginia. I try to avoid them.

Another risk is—my wife was involved in a taxi accident in which one taxi rammed another and she suffered some serious damage to her knee. But taxis comprise a rather significant percentage of the vehicles on the streets of Washington, and I'll bet that 99 percent of them are used fleet vehicles brought in from elsewhere that probably impose an enormous risk factor. I wonder if that is taken into account.

Mr. WILLIS. Mr. McMillan, that is one of the issues we want to look at in trying to peel the onion on this occurrence rate statistic, because in my situation I don't drive to work but I'm paying that statutory rate, the approved rate, here in the District, having grave concerns about the allocation of the risk that I am perceived to present.

Mr. MCMILLAN. Thank you very much.

Mrs. COLLINS. Let me say before I call up the next witnesses that I had this chart put back up because I realize that members were, in fact, at the Democratic Caucus and didn't get a chance to see. You can look at that chart and see what some of the concerns were in the testimony before you got here as to the location of State Farm offices and Allstate offices, which are the largest insurers in the Chicago metropolitan area, and perhaps in wider areas across the Nation as well, in insurance. So with that kind of background, you can base your questions on that.

But before I get to you, I'm going to use the license of the full committee Chair to recognize the ranking member of the full Energy and Commerce Committee, Mr. Moorhead, who has joined us.

Mr. Moorhead.

113

Mr. MOORHEAD. Thank you, Madam Chairwoman. I welcome you also, Mr. Commissioner.

Mr. WILLIS. Good morning.

Mr. MOORHEAD. Some consumers allege that insurers intentionally overprice their product to prevent sales in urban areas. As an insurance commissioner, don't you and the other commissioners review the rates charged? Have you found that insurers intentionally overprice products in urban areas and are allowed to do so by the insurance commissioner overseeing the ratemaking process?

Mr. WILLIS. Mr. Moorhead, that kind of behavior is not allowed by State regulators. Again, before you came in I believe we had a discussion about what impacts the ultimate premium. Insurance companies file a rate with the insurance regulator, and that rate is reviewed, and hopefully it is subsequently approved. The rate then is the base at which the discussion starts as to the premium that is ultimately paid by the policyholder.

You may see a graduation in the costs from that rate based on various underwriting criteria being applied by the company, and one of the concerns that showed itself in the ACORN report is that in the major metropolitan area here in Washington there was a large difference in the premium being paid as between low-income neighborhoods and the so-called upper-income neighborhoods. The rate of insurance would be the same if, for example, let's assume the base line were $1, but you may see a $2 or $3 difference between the ultimate premium being paid because of the underwriting guideline.

So to try and respond to your question, State regulators are aware of the issue, but our charter is to approve the rates. We have not gone to the extent—the State laws do not allow us to review the underwriting guidelines that I think really drive the premium costs.

Mr. MOORHEAD. You know, it is in the interests of everybody that everybody be able to buy insurance, because the protection of the general public is there, is everyone can have insurance one way or the other. But the problem that obviously comes up is that if insurance companies cannot exercise legitimate underwriting criteria, they may be caught with most of their policies under circumstances where they are broke, and that wouldn't be in the best interests of everyone either. How do we solve that problem?

Mr. WILLIS. I agree with you. As Madam Chair has indicated, there is a serious need for a review, an assessment, of data, and we may take issue as to whether that is more appropriate for the Federal Government as opposed to State regulators. I think you understand how I come out. We are involved in the process, and I think we will have a product by the end of this year.

But putting that aside, again it goes back to the question of understanding the risk criteria, those decisions that are being made by the insurer when that policy is being placed. It isn't as apparent in looking at the rate.

Mr. MOORHEAD. I know many States have a program whereby people who cannot get automobile insurance otherwise can get it through a State-created agency, usually by pooling a number of insurance companies together. But we cannot afford to have a system where there are lots of people who are un- or under-insured, be-

114

cause when you get into an accident with them you may be left without any recovery whatsoever. Some people have suggested that we go to no-fault policies or other things of that sort to get around it. What is your suggestion as the way we can work towards a system where everybody will have insurance to cover damages if they are in an accident?

Mr. WILLIS. I think the first consideration is that—and this is a concern of all State regulators, and that is making sure you have a fully competitive market in your jurisdiction. Let me use the District of Columbia as an example. Automobile coverage is mandatory here in the District. There are essentially two markets. There is the preferred, the voluntary, market, and a lot of those products are marketed on a direct basis, meaning there is no insurance agent involved, although some are. At the other end of the spectrum there is the assigned insurance program, where those who are declined coverage by the preferred insurer automatically have to explore that option. Now when you look at the cost of that insurance, you may find that the cost is 30 to 40 percent higher than it would be with a preferred or standard carrier.

I think what the State regulator needs to do, what we are in fact doing in the District, is to try and work with companies to build in a third tier. There are many people that automatically, because there is no other choice, go to the assigned insurance plan that may have had one moving violation in the past year. Those people need to fall into a middle ground of risk rather than assume that they are the worst of risk and then have an extremely high cost of insurance. Those rates that we apply to the assigned insurance plan, I think, tend to be lower than they should be because we are not discouraging the behavior on the part of poor drivers and we are penalizing everyone else who happens to be in that pool as a matter of law, having no other choice.

Mr. MOORHEAD. Thank you very much.

Mr. WILLIS. You are quite welcome.

Mrs. COLLINS. Mr. Towns.

Mr. TOWNS. Thank you very much, Madam Chair.

Mr. Willis, I listened very carefully to you in reference to your saying that you did not feel that "redlining" was an appropriate term, that it should be "discrimination." I would like to ask you, did you look at the ACORN report in terms of the 14 cities that it looked at in terms of their practices?

Mr. WILLIS. I did, yes.

Mr. TOWNS. You did?

Mr. WILLIS. Yes.

Mr. TOWNS. I think if you did, I think you would have to go beyond that. Even in the business community, they say "redlining" now. I think that when you talk about discrimination, I think some of this gets lost in the process. When you say that people are not aware of the term "redlining," I say to you in my neighborhood they are aware of the term "redlining," they are very much aware of it.

I think when you talk about discrimination sometimes some of this gets lost in the process, because we can spin that into a lot of things, but when we talk about this, I feel much more com-

115

fortable using the term "redlining," because this is really what is happening—redlining.

Now I can understand you. You represent an organization, and you have the obligation and responsibility to enforce these laws and rules and regulations that are on the books, so it makes it nice for you to come and say that, but to those people who are out there trying to get insurance, I'm telling you, they are calling it "redlining."

Mr. WILLIS. Could I respond?

Mr. TOWNS. Sure.

Mr. WILLIS. I think we are really singing out of the same hymn book in terms of our concerns. I was speaking, am speaking, from a regulatory standpoint. When I look at the laws of the District of Columbia and those of many States, the insurance regulator has a responsibility to ensure that insurance is not sold on a discriminatory basis, so that legal piece is what I am concerned about; that is my trigger in order to take an appropriate action.

If I am looking at the issue in the context of redlining, there is no statutory reference I can rely upon in order to take what I view as an appropriate action. So it isn't quibbling as to whether it is an appropriate term or not, but I'm saying from a regulatory standpoint in order to take the appropriate action I have to look at it in terms of discrimination, and it doesn't matter what someone else may call it. If we can determine that it is discrimination, then I think the regulator—I know that I have a responsibility to act.

Mr. TOWNS. Let me put it this way. What we are doing now is just not working.

Mr. WILLIS. I agree with you.

Mr. TOWNS. You agree with that?

Mr. WILLIS. Absolutely.

Mr. TOWNS. On that note, there is a bit of a call, as you know, in terms of Federal intervention at this level. I would just like to know your views on that, as a person, not as the agency.

Mr. WILLIS. OK.

Mr. TOWNS. I don't want you to jeopardize your standing on the board.

Mr. WILLIS. In deciding to testify, the NAIC membership and I were very clear that the earlier piece that I gave was on behalf of the NAIC but anything beyond that point was me, and that I would indicate when I was separating from the NAIC. So let me draw that separation at this point.

As an individual, I think that there are some huge issues here in terms of access, affordability, availability of insurance, and it would be more than intellectually dishonest to say that these problems don't exist. I hear enough from consumers, agents and brokers, minority agents and brokers, to at least provide me with a high level of concern that these are issues we need to get after.

What we first need to do is to define the nature and the extent of the problem. If, for example, in Southeast Washington, to use that as an example, we find that the insurance rates are higher than they are in Northeast Washington, that doesn't necessarily prove redlining, but it is a level of concern. I think citizens have a right to know, if there is a distinction in coverages, if there is

a distinction in the price that is being paid, how come? Tell me what underlies their pricing decision.

If top-tier companies—the so-called top tier—are not writing in parts of Washington, D.C., we need the empirical data to be able to make that assessment and raise the further question, "Why aren't you writing business in parts of the city? You file a general rate with me, so we understand the cost of insurance. Now if you, through your agents or brokers, are deciding not to write coverages in parts of the city, I need to know, one, that it has happened; and, two, why it is happening."

In this community, agents have, I won't say lobbied, but have talked to me pretty strongly about their inability to have a direct writing contract with the top-tier companies. That is a huge issue. The agent who lives in urban America is the person on the ground that can best assess the nature and extent of that risk.

Having someone in Hartford, Conn., to look at a map of Washington and over a telephone line decide whether or not coverage would be extended to me is inappropriate, it doesn't help the urban landscape, people that are in this community, and one of the things I think needs to happen is to allow minority agents the ability to have a direct writing contract with the so-called top-tier companies so that they can provide that coverage in their communities; they best understand their communities. And adjunct to that is the issue of minority contractor bonding, the same issue. Who is better able to assess the risk than people that live in this community?

Last year, the Congress sponsored a bill, H.R. 22, and H.R. 22 was looking at tax enterprise zones, and one of the first requirements was that the State insurance commissioner had to certify the availability of commercial insurance in the geographic area, saying that if the insurance rates for commercial at 17th and K are $100, what is the situation in Anacostia in terms of the same availability of those insurance rates, so I view that legislation as a wake-up call to the industry, and it certainly begs that question. I'm not in a position to answer the question as to whether there is or is not redlining. We need to really move aggressively—and NAIC is certainly doing that—aggressively towards developing the data, the information, to be able to respond to those kinds of questions.

Mr. TOWNS. Thank you very much, Mr. Willis.

Mr. WILLIS. Thank you.

Mr. TOWNS. Let me just say to you, Madam Chair, the reason I was late is, as you know, I am on the Health Committee, and health is a very high topic in the United States of America, so we were meeting prior to this, and that is why I was not here. But I would like to take this opportunity to salute ACORN for the outstanding work that they are doing around this country in terms of highlighting these kinds of issues, because they really need to be highlighted.

Thank you. I yield back.

Mrs. COLLINS. Thank you very much.

Mr. Willis, we thank you for your testimony. I believe it was Mr. Stearns who said there would probably be more questions for you, and, again, we would appreciate it if all of the questions are re-

sponded to in 5 working days and sent to this subcommittee within that time so that we can close our records.

Mr. WILLIS. You shall have it. Thank you very much.

Mrs. COLLINS. Thank you.

Mrs. COLLINS. Our third panel consists of Ms. Lynn M. Schubert, who is the assistant general counsel for the American Insurance Association; and Ms. Mavis A. Walters, executive vice president, Insurance Services Office, Inc.

Come forward, please. We are going to begin with you, Ms. Schubert.

**STATEMENTS OF LYNN M. SCHUBERT, ASSISTANT GENERAL COUNSEL, AMERICAN INSURANCE ASSOCIATION; AND MAVIS A. WALTERS, VICE PRESIDENT, INSURANCE SERVICES OFFICE, INC.**

Ms. SCHUBERT. Thank you, Madam Chairwoman.

I am Lynn Schubert. I am with the American Insurance Association, which is a trade organization representing more than 250 property casualty insurers. Most of our insurers specialize in commercial lines; we do also write personal lines—auto and home-owners.

For the record, I would like to point out that two companies that have been mentioned extensively here today, Allstate and State Farm, are not AIA members.

We greatly appreciate the opportunity to be here with you today to discuss the important topic of access to insurance for urban residents and businesses. We have one overriding goal, Chairwoman Collins; that is that these residents and businesses, as all other Americans, but be able to purchase attractive insurance products at a price reasonably based on the risk. AIA members are committed to working with legislators, regulators, consumers, and brokers to assure that this occurs.

It is a fact that certain areas in America, primarily in our inner cities, have a higher number of residents and businesses that are without insurance. These discrepancies are related to a whole host of socio-economic circumstances faced by people who work and live in our urban areas. Insurance is not the only industry affected by these factors, but neither can we ignore how important insurance is to the viability of these neighborhoods.

Outright racial or ethnic discrimination in insurance underwriting also may occur. We hope that it is infrequent. We know that it is a violation of both Federal and State law. AIA advocates the stringent prosecution of this wherever it is found. But whether the availability problems are caused by economics or by discrimination, they must be addressed. It is cold comfort to those citizens for whom insurance is unavailable to explain to them the reasons why the problem exists. We believe it is time to start attacking these problems head on.

Specifically, we would like to work with legislators and regulators to develop products and marketing ideas that would increase the access and adequately serve urban residents. We want to discuss establishment of things such as market assistance plans and other programs that would facilitate this access. We already are working on programs to bring urban-based, independent agents to-

gether with standard companies. We have been talking with regulators in Illinois, New York, Arkansas, and D.C. to start establishing these programs. If successful, we hope to expand these pilot programs to efforts nationwide in every major urban area.

In addition, we also support the inclusion of homeowners' insurance in existing FAIR plans to address the needs of homeowners unable to find insurance in the voluntary market. In California, we have publicly supported a proposal which would provide a statewide rating of basic first-party insurance in the context of a cost-effective no-fault system. We believe this system should be considered in other States where auto insurance costs are too high, especially for low-income residents. We will continue to explore other options along these same lines for other lines of insurance as well.

Allegations have been made that insurance is unavailable in urban areas due to insurance redlining. Redlining is an illegal and offensive practice that cannot be tolerated. AIA opposes redlining. The term has long referred to an attempt to discriminate on the basis of race or ethnic origin by not doing business in certain neighborhoods. This practice is illegal in every State; it is reprehensible, inexcusable, and must not be tolerated. Those that conduct it must be punished.

Defining the term has proven to be a difficult task, but regulators have discussed this extensively in recent years and have come up with a model definition at the NAIC level. Essentially, that definition states that permitting unfair discrimination between individuals or risks of similar class and refusing to insure because of the geographic location of the risk is unacceptable unless you can prove by actual or reasonably anticipated loss experience that there is a reason for that. AIA has supported that definition. We supported it at the NAIC level; we have supported it at the State level; and, in fact, as long as 2 years ago we have urged the NAIC to encourage States to adopt that model definition.

Illinois law specifically prohibits those activities that have been described here earlier today. Statutes alone, however, cannot address all of the issues on availability and affordability that we must tackle as an industry. The first step in making insurance available for all Americans is the development of products that are attractive and affordable for urban residents and businesses. We must focus our attention on the fundamental issue of the rapid development and approval of attractive and affordable insurance products that are tailored to meet the needs of urban consumers.

In California, we joined together with a broad coalition of consumer groups, including Consumers Union and the Latino Issues Forum, to create the innovative, no-frills, low-cost auto policy I mentioned a moment ago. The price for that policy in California statewide would have been $220, saving California consumers $1.8 billion in the first year alone.

If I could just wrap up to tell you we are addressing this same idea of innovative products on the property side, we have come up with some creative ideas to address homeowners' specific concerns in urban areas, and we are continuing to try and address the access issue by working with agents' groups and specifically tailoring programs to address urban consumers in our urban cities. We

119

would like to continue to work with legislators, the Congress, regulators, and consumer groups to work on these efforts together.

[Testimony resumes on p. 135.]

[The prepared statement of Ms. Schubert follows:]

STATEMENT OF
THE AMERICAN INSURANCE ASSOCIATION
BEFORE THE ENERGY AND COMMERCE SUBCOMMITTEE ON
COMMERCE, CONSUMER PROTECTION AND COMPETITIVENESS

MARCH 3, 1993

INSURANCE ACCESS AND REDLINING

## I. INTRODUCTION

The American Insurance Association is a national trade organization representing more than 250 companies writing property and casualty insurance in every state and jurisdiction of the United States. AIA members write 36% of all commercial property and casualty insurance in the United States. They also write a significant amount of personal, homeowners and automobile insurance. AIA member companies employ more than 145,000 people and pay $2.2 billion in state taxes and fees (including payroll taxes) to state governments each year.

We appreciate the opportunity to be here today to discuss the important topic of access to insurance for urban residents and businesses. We have one over-riding goal Chairwoman Collins: these residents and businesses, as all other Americans, must be able to purchase attractive insurance products at a price reasonably based on the risk. AIA members are committed to working with legislators, regulators, consumers and brokers to ensure that this occurs.

It is a fact that certain areas -- especially in our cities-- have higher numbers of residents and small businesses without insurance than other areas. These discrepancies are related to a whole host of socio-economic circumstances faced by people who work and live in the urban areas, and which also increase the cost of insurance. Outright racial or ethnic discrimination may also occur. We hope that it is infrequent. We know that it is a violation of federal and state law. We advocate stringent prosecution wherever it is found

But whether the availability problems are caused by economics or by discrimination, they must be addressed. It is cold comfort to the citizens for whom insurance is unavailable to explain to them the reasons why the problem exists. We believe it is time to start attacking these problems head-on.

We encourage and will participate in thorough and thoughtful dialogue on the subject of urban insurance coverage with the goal of developing workable solutions to the problems. Specifically, we would like to work with legislators and regulators to develop marketing ideas which adequately serve the urban residents. We

003923

want to discuss the establishment of market assistance plans and other programs to facilitate greater access to insurers. For example, we already are working on programs to bring urban-based independent agents together with companies. We now are working with regulators in Illinois and New York to begin this process. If successful, we hope to expand these efforts nationwide. In addition, we also support the inclusion of homeowners insurance in existing Fair Access to Insurance Requirement Plans (FAIR) to address the needs of homeowners who are unable to find insurance in the voluntary market.

In California we have publicly supported a proposal which would provide for statewide rating of basic first party insurance in the context of a cost effective no-fault system. We believe this system should be considered in other states where auto insurance costs are too high, especially for low-income urban citizens. We will continue to explore other options along these lines for other lines of insurance.

Allegations have been made that insurance is unavailable in urban areas due to insurance redlining. Before any discussion of positive proposals, these allegations must be addressed.

## II. DEFINITION OF REDLINING

Redlining is an illegal offensive practice that cannot be tolerated. AIA opposes redlining. The term has long referred to an attempt to discriminate on the basis of race or ethnic origin by not doing business within certain "redlined" neighborhoods. The practice is illegal, reprehensible, inexcusable and must not be tolerated. Violators should be punished.

Defining the term, however, in order to identify the specific activities that constitute the practice of redlining, has proven a difficult task. Redlining is an emotionally charged term that connotes different things to different people and, as such, has defied definition in a universally accepted manner. In recent years insurance regulators and industry representatives have spent many hours debating the issue and hammering out language describing and prohibiting certain practices that constitute redlining. This language, embodied in the National Association of Insurance Commissioners (NAIC) Model Unfair Trade Practices Act, defines and prohibits the following as unfair discrimination:

Making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazard by refusing to insure, refusing to renew, canceling or limiting the amount of insurance coverage on a property or casualty risk solely because of the geographic location of the risk, unless such action is the result of the application of sound underwriting and actuarial

2

principles related to actual or reasonably anticipated loss experience.

We strongly endorse this provision. We have supported its adoption by the NAIC and its passage in state legislatures across the country. The language clearly proscribes arbitrary underwriting decisions based upon geographic location alone. It recognizes, however, that sound underwriting and actuarial principles cannot be ignored by the industry -- insurers must make rational underwriting decisions that will preserve their solvency and protect consumers.

AIA has a clear record of opposition to the arbitrary reliance by insurers upon physical location alone when rendering underwriting decisions. Throughout our history we have consistently stated our belief that insurance should be readily available, subject to fair and sound underwriting principles. The first step to making insurance available is the development of products that are attractive and affordable for urban residents and businesses.

### III. THE FIRST STEP TOWARD A SOLUTION

We must focus our attention immediately on a fundamental issue, i.e., the rapid development and approval of attractive and affordable insurance products tailored to meet the needs of urban consumers.

In California, we have joined forces with a broad coalition of consumer and civil rights groups led by Consumers Union and the Latino Issues Forum to create an innovative, no-frills no-fault automobile insurance policy. This policy is a perfect example of a creative, practical and sound solution to a real problem of people in need.

The policy is designed to be offered statewide at one low price. It guarantees all injured accident victims at least $15,000 in medical and wage loss benefits for a uniform statewide price, and removes nuisance and minor injury litigation for non-economic losses. Independent actuaries have concluded that the basic coverage could be sold, on an actuarially sound statewide basis, for $220, saving California consumers $1.8 billion in the first year alone.

Unfortunately, this product is not yet available to California consumers. During recent sessions of the California legislature, the bill that would pave the way for provision of this product in the marketplace has been bottled up.

The National Conference of Insurance Legislators has just approved a model automobile insurance law providing $15,000 of basic personal compensation coverage and property damage

3

liability coverage, along with limits on lawsuits and health care costs. AIA estimates the standard price for the minimum mandated coverage would be $117 in Vermont, $146 in Missouri and $199 in Texas.

We are working to inform legislators and regulators about the potential benefits of this and similar new products. AIA encourages all state legislators and insurance regulators to maintain a receptive attitude toward innovative and experimental insurance products. These kinds of products will serve as the key that will guarantee an open door to insurance for all consumers.

## IV. OTHER INSURANCE ISSUES

AIA recognizes that there are a number of other issues that may have an impact on urban consumers and their ability to obtain insurance. The term redlining often is used loosely as a catch-all, short-hand term to identify a wide variety of issues affecting the urban areas of our nation.

These problems pertain to agents, marketing, property condition and valuation, consumer's rights regarding reasons for declination of coverage, the residual market, and product pricing. We would like to address concerns raised in each of these areas.

### A. Agent/Marketing Issues

#### 1. Location of Agents with Company Appointments

One of the most controversial issues is whether agents with standard company appointments can be found in urban areas. Some urban consumers contend that insurance companies selectively place agents in locations that discourage applications for policies from certain geographic areas. The majority of AIA member companies market their products through the independent agency system. These agents are truly independent entrepreneurs, usually representing more than one insurer. These agents are not company employees placed in a particular office by the insurance company. The companies they represent cannot and do not control the location of the agent's place of business.

We do believe that it is inappropriate for an insurance company to arbitrarily refuse to contract with agents solely because of their geographic location or the geographic location of their customers. We do not support this practice, and will work with legislators and insurance regulators to ensure that it does not take place.

4

### 2. Termination of Unprofitable Agents

Some urban consumers also contend that insurers terminate agents on the pretext that they are unprofitable, merely to avoid business from a certain area. If this practice is occurring we agree that it is objectionable and should be prohibited. However, an insurer should not be barred from terminating a truly unprofitable agent.

### 3. Steps to Improve Agent Representation in Urban Areas

Acknowledging the importance of making insurance readily accessible in urban areas, many AIA members already have in place programs to seek out appointments with agents located in these areas and with minority agents. These efforts include active recruitment; participation in trade fairs in order to meet urban agents and brokers; and participation in agent association programs, including INVEST, a program which assists students with financial difficulties to start a career in the insurance industry.

We believe that these efforts are but a sampling of what is being done by insurers in this area. Certainly, though, more must be done. AIA will continue to work with the Congress, state legislators, insurance regulators, agent organizations and consumers to improve existing efforts, and to establish other programs that help companies increase the number of minority and urban-based agents with company appointments. As mentioned above, AIA already is talking with the insurance departments of Illinois and New York about conducting a trade fair where agents and company representatives could meet and begin the process of appointment. AIA members also continue to participate in and build upon educational programs to help urban agents learn what is required to obtain a particular company appointment and meet those requirements. Another proposal involves developing special programs under which minority and urban-based agents could pool their books of business to meet the premium volume required by some companies for agency appointments.

### 4. Other Marketing Systems

It is important to note, however, that about 60% of personal lines insurance is not sold through the independent agency system. It is sold by captive agents, employees, or by direct marketing such as mail and telephone. Increasing the number of independent agents serving urban areas alone will not be enough to resolve access problems. Other new marketing techniques will be required to better serve urban areas. AIA members would be delighted to assist regulators in developing such techniques within the limits of state and federal antitrust laws.

5

003927

.

### 5. The Product

Residents in urban areas must have ready access to insurance products that are attractive to them as well as affordable. As discussed above, the first requirement is the product. Products can be offered which provide coverages and limits which are desirable, at a price that is affordable. AIA consistently has supported the authorization by law and the approval by regulators of such products. However, each policy must be underwritten carefully, looking at underlying risk factors. To make such products available to greater numbers of consumers, risk factors must be decreased. Specifically, I am referring to the high risk of fire, high crime rates and excessive increases in automobile repair costs and health costs.

### 6. Marketing and Service

Marketing and servicing products in communities where English often is a second language presents special difficulties. AIA companies have added Spanish speaking customer service representatives to personal lines service centers and toll free hot lines, print posters and brochures in both English and Spanish, and have programs to target small and disadvantaged contractors. These efforts make marketing and servicing products in the urban areas more effective.

## B. Property Issues

### 1. Age of the Property

Some people claim that denying insurance based solely on the age of a building is a form of redlining. We disagree. However, it is an insurance access issue, and should be addressed. AIA believes that insurers should not make the availability of property insurance contingent solely on the basis of age of the dwelling. However, age is one relevant factor to be considered in determining the price of a product and the need for a property inspection. If a request for insurance is made for a property located in a neighborhood where the homes are known to be past a certain age, a property inspection would be in order to review the condition and insurability of that property.

### 2. Market Value versus Replacement Value

Some view refusals to issue replacement cost coverage in homeowners' policies for risks that evidence a substantial disparity between replacement cost and market value as redlining. Again, we disagree. AIA acknowledges that many insurers will not provide this coverage when there is a wide disparity between the replacement cost and the market value of a structure. In most instances, in order to qualify for replacement cost coverage, an insured must buy enough coverage to represent at least 80% of the

6

cost of replacing the structure. This requirement may present a dilemma for insureds who own homes built before the 1950s. For many of these older homes the cost to replace the building with the exact type of materials used in the original construction far exceeds what the owner might spend to replace the dwelling using modern materials and simpler construction techniques. Replacement cost coverage is not well-suited for these kinds of properties, because insureds may be unwilling or unable to buy -- and insurers may be unwilling to sell -- insurance in an amount well beyond the price for which the dwelling could be sold. Insurers, however, have responded to the needs of property owners faced with this disparity. For example, a lower cost variable percentage replacement loss settlement endorsement has been developed.

This endorsement permits an insured to choose to insure at a lower percentage of insurance to replacement value (i.e., usually 50%, 60%, or 70%), rather than the 80% usually required for replacement cost coverage. Thus, if the policyholder decides to insure for 50% of the replacement cost of the property, the premium would be lower than coverage for 70% of the replacement cost. However, if the property is totally destroyed, the proceeds to the policyholder would be 50% of the replacement cost of the property.

Additionally, the industry has developed repair cost policies that delete the replacement cost provision and provide that a damaged dwelling will be repaired or replaced with commonly used building materials instead of materials of like kind and quality. It is important to recognize that when faced with a dilemma such as this, the insurance industry has responded with products suited for a particular purpose. Without the regulatory approval of these products, the industry cannot address the problems of the consumer. These are further examples of the industry responding to consumer needs with specialized products.

It has been asserted that these types of products are inferior and do not provide the same coverage as is available to properties without this large difference between market value and replacement costs. However, the cost of insurance is based in part on the expected cost to pay a claim under the policy. The price of providing replacement cost policies for these types of properties is so high that prior to the development of alternative products, consumers asserted that property insurance was unavailable because it was unaffordable. To address this concern, insurers developed new products that would provide a measure of coverage and protection, but would not cost so much as to be unavailable. The price of insurance must reflect the risk. Companies will continue to attempt to address the needs of consumers by creating legitimate products that can be purchased for a reasonable price.

7

### 3. Consumers' Right to Know Why Coverage was Declined

Another complaint voiced by some consumers is that they were denied insurance coverage, but no one would tell them why. We believe that underwriting decisions should be made from objective evaluations and that applicants and insureds are entitled to the specific reasons for adverse underwriting decisions. This requirement is set forth in the current NAIC Model Declination, Termination, and Disclosure Act, which AIA supports.

### 4. Corrective Action on Declined Property

Some consumers also argue that if they are denied coverage, and correct the deficiencies identified as the basis for the denial, they should be entitled to coverage. AIA believes that applicants and insureds who have received adverse underwriting decisions in the private market and have taken corrective actions are entitled to reconsideration for coverage.

### 5. Prior Underwriting Decisions

#### a. Prior Declination of Coverage by Another Insurer

An issue related to those discussed above is denial of coverage merely because an applicant previously was denied by another insurer. Under most state unfair trade practices acts insurers cannot decline an application for coverage solely because it previously was declined by another insurer. AIA support enactment of these laws.

#### b. Prior Insurance Through a Residual Market Plan

Similarly, AIA believes that insurers should not decline an application for coverage solely because the risk previously was insured by a residual market plan.

### C. General Issues

#### 1. Channelling of Risks Into the Residual Market

It also has been stated by some consumers that insurers force all risks from certain geographic areas into residual market pools. A residual market is a market of last resort for consumers who are unable to purchase insurance in the voluntary market. It is not in the best interests of either the insurance industry or insurance consumers to push normally insurable risks into the residual market pool. We believe residual market plans should insure as few risks as possible. To this end, we support plans that require at least two declinations for coverage from voluntary market insurers before providing residual market

8

coverage, and consumer outreach programs designed to provide
continuing opportunities for education and advice regarding
insurance coverages.

For property insurance, residual market plans are known as
Fair Access to Insurance Requirements Plans or "FAIR" Plans.
There are a number of these pools in operation today which
provide basic property insurance for risks that cannot be insured
in the voluntary market.  These pools enable potential home and
business owners to qualify for mortgages and other loans that are
not available without proper insurance coverage.

However, participation of the FAIR plan in the marketplace
is decreasing.  Commercial lines premium volume written through
the FAIR Plans declined steadily in most states from 1986 through
1991 as a percentage of total commercial premium volume.  For
example, commercial written premiums in the Illinois FAIR Plan
declined from about one quarter of one percent (0.24%) to less
than one-tenth of one percent (.088%) of total commercial premium
in the voluntary market.  In addition to Illinois, we analyzed
the District of Columbia and eight large urban states,
California, Georgia, Massachusetts, Michigan, New Jersey, New
York, Ohio, and Pennsylvania, and found that each experienced
significant drops in FAIR Plan commercial lines premium volume in
relation to the state commercial voluntary market.  The decline
in FAIR Plan premium volume in relation to the commercial
voluntary market generally indicates that businesses were having
an easier time finding insurance through the voluntary market.

Personal lines FAIR Plan premium volume also decreased in
Illinois and other states relative to the voluntary market.  For
example, FAIR Plan premium volume in Illinois dropped from just
over one-half of one percent (0.52%) to about one-third of one
percent (.036%) of total personal lines (homeowners) premiums
from 1986 to 1991.  In New York, FAIR Plan premium dropped from
nine tenths of one percent of the voluntary market to under six
tenths of one percent.  Overall, in eight out of the nine states
that we analyzed, premium volume in the FAIR plan declined in
relationship to the voluntary market between 1986 and 1991, and
in the remaining state where FAIR plan market penetration did not
decline, the increase was less than two tenths of one percent.

The number of applications received by the FAIR Plans for
commercial and personal lines combined also generally decreased
from 1986 to 1991.  Our analysis of applications and policies
issued in the ten jurisdictions examined indicates that over that
period, the number of applications received annually declined by
an average of 25.5% and the number of policies and binders issued
by each of the plans annually decreased by an average of 23.3%.
These are all signs of improving property insurance availability
in the voluntary markets of these states and the District of
Columbia.  The bottom line conclusion is that the percentage of

9

risks written by the FAIR Plan versus the voluntary market is decreasing steadily.

### 2.  Product Pricing

Some consumers allege that insurers intentionally overprice a product to prevent sales in urban areas.  In many states, pricing of insurance is determined through a regulatory approval process.  Rates are not intentionally set higher for urban risks to prevent people from purchasing the insurance.  Individual company rates should be and are based on loss experience and are subject to the review of the state insurance regulator.  In many cases, urban insurance rates are the same as or lower than those applicable to risks in suburban areas.  In other instances policies for risks in urban areas will be more expensive than similar risks in suburban areas.  This rate disparity is due to the increased costs of certain policies, such as increased incidents and severity of claims in certain areas, or increased distance from a fire station.

Automobile insurance is a good example of this cause and effect.  The cost of automobile insurance reflects the costs of goods and services that are paid by automobile insurance premiums, including litigation, health care, and auto repair. The frequency of bodily injury liability claims countrywide has increased 19.0% from 1987 through the third quarter of 1992, according to NAII/ISO Fast Track data.  The increase in the loss cost for bodily injury liability during that same period was 67.1%.  Meanwhile, the frequency of property damage liability claims and collision claims in countrywide has decreased 11.0% and 16.0%, respectively, with the loss costs increasing 13.0% and 1.4%.  This helps demonstrate that liability claims and the resulting medical costs are a major source of high and rising auto insurance costs.

Of course, these costs are not uniform between states, or within areas of certain states.  For example, in Illinois, the average loss cost for bodily injury liability is $109, compared to the countrywide average loss cost of $119. In the District of Columbia, the average loss cost for bodily injury liability is $191, compared to the countrywide average loss cost of $119. Virginia has an average loss cost for bodily injury liability of $101, and Maryland $144.  Some other average loss costs as of the third quarter of 1992 for these areas are: property damage liability: Illinois  $65, D.C.  $79, Virginia  $47, Maryland $62, countrywide  $56; collision: Illinois  $117, D.C.  $150, Virginia  $76, Maryland  $104, countrywide  $103.  These costs are reflected in rates charged in these states.

There also are significant differences in how costs are distributed within states.  For example, according to a 1990

10

003932

report, the bodily injury liability claim frequency per 100 insured cars in Chicago was 3.07 versus the Illinois statewide average of 1.81.  This means that bodily injury liability claims were filed 69.6% more often in Chicago than for the state, as a whole.  Also, there were 52 bodily injury liability claims for every 100 property damage liability claims in Chicago compared to 34 for the state, as a whole.  Thus, in Chicago, an injury claim was 55% more likely to be filed for each property damage claim, than the average for the state of Illinois.

We understand the role that insurance costs play in limiting access to insurance.  We know that rates based on loss experience may be more than some consumers are able to pay.  In fact, if insurance is not affordable, it essentially is not available.  However, we believe there are rational solutions to problems relating to the cost and the value of auto insurance.  One such solution is the development of innovative, low cost products such as our no-frills, no-fault automobile insurance policy proposed in California.  With cooperation and creativity we can meet the needs of all consumers, including those who are low-income, by offering them useful and affordable insurance products.  If these products are available, and consumers are interested in purchasing them, insurers are sure to increase their marketing efforts to be the company making those sales.

## IV.  THE BOTTOM LINE ON INSURANCE

Despite all of these discussions, the bottom line question that must be addressed is whether those urban consumers wishing to purchase insurance are currently able to do so.

The Roper Organization Inc., a nationally known public opinion survey firm, included a question on homeowners insurance as part of a representative sample of 1,976 Americans for the 1992 Public Attitude Monitor published by the Insurance Research Council.  Conducted during June 1992, the survey found that 94% of those surveyed owning homes had homeowners insurance.  Not surprisingly, the Roper survey showed some variations in the share of homeowners with insurance by region, income and community type.  For example, the survey indicated that homeowners living in central cities of metropolitan areas with populations of greater than 250,000 actually were more likely to have homeowners insurance (96%) than the population as a whole.  Central city residents owning homes, including those living in very large cities with more than a million people, were more likely to have homeowners insurance than persons living in suburbs (95%) and those living in rural areas and small towns (91%).  There were also regional and income variations.  Homeowners with insurance ranged from 98% in the Northeastern region of the U.S., to 91% in the South. In terms of household income, home insurance rates for the country as a whole were 82%

11

for homeowners with less than $15,000 income, 95% for households with incomes from $15,000 to $30,000, and 96% for household incomes greater than $30,000, according to the Roper data.

The 1992 Roper findings are nearly identical to those from another independent national survey conducted by Cambridge Reports Inc. in 1989 on home ownership and home insurance rates. The Cambridge survey found that 95% of homeowners nationally carried homeowners insurance.

Other surveys also document that small business insurance consumers are largely able to obtain desired insurance coverages and that voluntary market availability improved steadily during the 1980s. The purchase of various insurance coverages by small businesses increased during the 1980s. Urban small businesses were in some cases more likely to have some coverages than their suburban, small town or rural counterparts. Nationally representative surveys of small businesses (<u>Small Business Attitude Monitor 1991</u>, <u>Business Attitude Monitor, 1988</u>) conducted by the Insurance Research Council showed that the share of small businesses purchasing key coverages such as property and liability rose from 1988 to 1991, and had risen to very high levels by 1991. This evidence of general availability and affordability tracks well with the independent data on the use of FAIR plans in commercial lines discussed above.

Small businesses located in major cities were just as likely as their counterparts in suburbs, non-metropolitan cities and towns, and rural areas to have liability insurance, more likely to have business interruption insurance, and somewhat less likely to have property insurance. In this context, urban applies to small businesses located within the city limits of a large city. As for specifically inner city businesses, the only representative study of which we are aware on these businesses was published in 1982 by All Industry Research Advisory Council (now the Insurance Research Council). This study, <u>Availability and Use of Business Insurance by Small Urban Businesses</u>, covers inner city small businesses in Chicago, Atlanta, Boston, Brooklyn, Cleveland, Detroit, Los Angeles, and Philadelphia. The survey indicated that at that time 92% of the inner city firms had some type of property-liability coverage and 86% had the property coverages of fire, wind and vandalism.

Small businesses in Chicago were as likely as businesses in the overall sample to have at least one or more of the property-liability coverages.

Although it appears from the data that insurance is available and affordable to the vast majority of businesses in inner-city areas, we recognize that this still might leave some insurable risks without coverage for one reason or another. We must continue our efforts to make insurance available for all

12

insurable risks.

## V.   OTHER ISSUES

In recent discussions of redlining, many of the above issues have been raised.  Additionally, issues of insurance investment in urban areas, affirmative action within insurance companies and contributions to minority or urban-oriented organizations have been added to the discussion.  I would like to address what we are doing in connection with these broader social and economic issues.  We are proud of our successes, and would like to mention them.  However, we recognize that more has to be done by everyone, including insurers, to help revitalize our urban areas.

### A.   Affirmative Action Within Insurance Companies

AIA member companies fund and participate in the recruitment and advancement of minorities through a variety of programs, both external and internal.  The external organizations supported by our members include: The Urban League, Black Executive Exchange Program, and SER (Jobs for Progress, Inc.), minority summer internship and scholarship programs like INROADS, inner-city youth job training initiatives like INVEST and the STAG Program. Internal initiatives include targeted college recruitment, company-wide managerial diversity training, the creation of specific, regular opportunities for minority employees to meet and network with top management, minority career development programs, coaching and mentoring programs.  Several companies have made an explicit commitment to promote minorities to the highest professional and managerial positions.  Some advance the process by auditing the employee mix to ensure representation of the labor pool at large.

In addition to employee opportunities for minorities, many companies also target minority companies as vendors.  For example, one AIA member's targeted minority vendors program played a part in 12% of the company's 1991 purchases being made through minority or women vendors.

### B.   Jobs In Urban Areas

Probably the most important need of urban centers today is jobs for urban residents.  Many AIA member companies maintain significant facilities in urban areas across America.   Thousands of workers are employed by the insurance industry in cities such as Chicago, Atlanta, Baltimore, Boston, Cleveland, Dallas, Detroit, Los Angeles, Miami, New York City, Philadelphia and Pittsburgh.

### C.   Insurance Company Investment in Urban Areas

Related to the issue of jobs is the issue of investment.

13

Insurance industry investment in urban areas is significant. Excluding all other types of insurance investments in urban areas and only considering the purchase of municipal bonds, the insurance industry has invested billions of dollars a year into urban areas. For example, for the most recent year for which we have data, 1989, insurers held or sold a total of $1.8 billion in various Chicago municipal bonds. For Los Angeles city alone, insurers held or sold $573.4 million in these bonds. For Los Angeles county, insurers sold or held $501.2 million in bonds. The total of all bonds sold or held by insurers as of the end of 1989 for both Los Angeles city and county was approximately $1.1 billion. In addition to these investment dollars, companies also contribute financially to many regional and national organizations dedicated to the advancement of minority interests and the revitalization of American cities. A list of some of these organizations is attached as Appendix A.

These contributions assist not only residents in urban areas, but all of America, by giving urban residents a chance for housing, education, cultural activities, career training, and a host of other opportunities which would not be available without the efforts of corporate America. The insurance industry is proud of its participation in these programs, and intends to look for additional ways to assist in the revitalization of our urban areas.

**VII. CONCLUSION**

This sensitivity to the benefits of working with minorities and women as employees and managers, as a sales force, as vendors, as customers, and as citizens, is well documented in the insurance industry. We are committed to work with the Congress, state legislators, insurance regulators and consumers to address both broad social and economic and insurance specific problems.

In summary, we oppose redlining. We support the NAIC Unfair Trade Practices Model Act. Further, we look forward to working with the Congress as you address these important issues.

14

## Appendix A

### Minority and Urban Organizations
### Supported in Part by Insurance Companies

The NAACP
The National Urban League
The United Negro College Fund
Howard University
Livingstone College
Morehouse College
Johnson C. Smith University
Spelman College
Emory College
Hampton University
The Local Initiatives Support Corporation (affordable urban housing)
Martin Luther King Jr. Youth Foundation
Opportunities Industrialization Centers of America
The National Political Congress of Black Women
The National Puerto Rican Forum
The National Society of Black Engineers
The Latin American Association
Las Jovenes
The San Juan Tutorial Program (education, cultural enrichment and recreation for inner city Hispanic children)
National Puerto Rican Coalition
National Council of La Raza
El Hogar Del Futuro, Inc.
Mexican American Legal Defense & Educational Fund
National Urban Fellows
Minority Career Fairs
Neighborhood Housing Services
Center for Community Change
Community Training and Assistance Center
Council for Community Based Development
Low Income Housing Fund
National Minority Suppliers Development Council
Northwest Bronx Community and Clergy Coalition
WAVE Inc.
A Better Chance
Amistad Foundation
Coalition of African American Cultural Organizations
I Have a Dream Foundation
Habitat for Humanity (Atlanta, Newark, NJ)
The Philadelphia Martin Luther King Association for Nonviolence
United Way
Interracial Scholarship Fund
Y.M.C.A.

15

Mrs. COLLINS. Thank you.
Ms. Walters.

## STATEMENT OF MAVIS A. WALTERS

Ms. WALTERS. Thank you, Madam Chairwoman.

I'm the executive vice president of Insurance Services Office, and I am a fellow of the Casualty Actuarial Society and a member and past president of the American Academy of Actuaries. ISO is a non-profit corporation that provides a wide range of statistical, actuarial policy form and related services to property casualty insurers. But since ISO itself is not an insurer, I cannot knowledgeably address underwriting practices. But as an actuary, I can address the subject of cost-based pricing and the importance of territorial rating.

One of the basic principles of insurance pricing is that the price should reflect the cost of providing coverage plus a reasonable margin for profit. This is not unique to insurance, by the way, but is widely followed in other competitive areas in our economy.

Insurers use the process of risk classification to identify risks with similar characteristics so that those differences in costs may be recognized. This process allows insurers to charge those with higher expected losses higher prices while charging those with lower costs lower prices.

While there are many specific risk characteristics used in auto and homeowners' insurance, they do not explain all the observed differences in loss costs. Territory, with a geographical area where the risk is located, is also an extremely important factor. To measure the differences in expected costs by geographical area, insurers gather premium and loss data by statistical territory. ISO's statistical territories are usually more broadly defined than the territories used by major insurers.

For example, for homeowners, ISO generally defines large cities as a single territory, while the major personal lines writers may have as many as 10, 12, or more territories for a large city like Chicago. We should note also that the major personal lines insurers are not ISO participating companies.

Focusing on auto insurance for just a moment, several years ago ISO, along with others, examined urban auto insurance costs to see if there were some common patterns to explain why auto premiums were so high in some cities. A complete copy of that report, "Factors affecting urban auto insurance costs," I would like to submit for the record in this hearing.

Mrs. COLLINS. Without objection, it is so ordered.

Ms. WALTERS. The one finding which stood out among all the others is that high claim frequency seems to be driving up loss costs much more so than claim severity. The fact that insurance loss costs are higher in certain geographical areas than others is a reflection of overall economic factors affecting urban life. While the costs of insurance may be relatively high in certain urban areas, insurers are in the same position as other providers of good services in the city who must reflect their costs of doing business in their prices if they are going to stay in business.

Insurers do not create high-cost areas, they merely identify them, and as part of the competitive process insurers seek to refine their

territories to more accurately subdivide them on the basis of relative degrees of risk.

To the extent that insurers are successful in identifying statistically significant differences in loss costs among insureds, they will be able to price these products more accurately. As long as the price differences are based on differences in expected costs, those prices are actuarially valid and result in rates that are adequate, not excessive, and not unfairly discriminatory.

In a voluntary competitive market, an insurer cannot knowingly disregard identifiable differences in loss costs without being disadvantaged competitively. If an insurer deliberately overcharges an insured, other competitors, whose price is more in line with that insured's expected costs, will attract a significant portion of that overpriced business. At the same time, an insurer should not be expected to provide insurance at a price known to be inadequate. Such behavior would be economic suicide.

Suggestions are sometimes made that insurers should broaden their risk classes and/or their territory definitions to include a wider selection of risks. This would serve to average costs among a broader group, resulting in some risks paying more and some paying less. In effect then, lower risk insureds would be subsidizing higher risks.

While recognizing that the high cost of insurance can be a burden to lower-income consumers, imposing subsidies through the private competitive market cannot solve the underlying problem. Those lower-risk consumers who would be required to pay more to subsidize the higher-risk consumers often object to such proposals.

Unfortunately, the inevitable economic consequences of a mandated departure from cost-based pricing are no different in the insurance market than any other competitive market—subsidies, scarcity of products, and misallocation of products and services. Great care should be taken that in the quest for solutions to the insurance problems of some consumers broader and more serious difficulties are not visited not only upon that group of consumers but others as well.

Thank you, Madam Chairwoman.

[The prepared statement of Ms. Walters and summary of the report referred to follow:]

### STATEMENT OF MAVIS A. WALTERS

I am Mavis A. Walters, Executive Vice President of Insurance Services Office, Inc. (ISO). I am a fellow of the Casualty Actuarial Society and a member and former president of the American Academy of Actuaries.

Iso is a non-profit corporation that provides a wide range of statistical, actuarial, policy form and related services to, property-casualty insurance companies. ISO is licensed or registered to perform these services as a rating, rate service or advisory organization throughout the United States and in Puerto Rico and is subject to examination by insurance regulators.

No property-casualty insurer can be excluded from participating in ISO. Neither can an insurer be required to join ISO. Those insurers that are ISO participants may choose the ISO products or services they wish to purchase and do not have to adhere to the advisory prospective loss costs or standardized coverage parts developed by ISO.

ISO's corporate policy of non-adherence is central to its operation and distinguishes it from the traditional rating bureaus it replaced. ISO focuses on the essential task of developing information to assist participating insurers in making informed, intelligent and independent decisions about the insurance premiums they charge and the insurance policy forms they use.

Insurers find ISO products and services valuable because few companies have either the internal resources or large enough marketshare to generate the same level of actuarial analysis and loss cost information that is needed to accurately determine prices for all lines of insurance in all jurisdictions. Insurers supplement their own individual experience with the aggregate information provided by ISO in order to obtain a reasonable degree of confidence in the measure of risk potential.

ISO's development of standardized coverage parts facilitates comparison shopping by consumers, speeds claims settlement by providing greater certainty in the meaning of contract terms, and provides insurers with consistency for all their operations. Standardized coverage parts also enable the gathering of meaningful data on the insurance coverages that have been sold, thereby, permitting the determination of sound actuarial projections of future costs.

These advisory services foster a competitive marketplace by providing information upon which individual insurers can base their independent pricing decisions, by reducing costs to consumers through economies of scale, and by the efficient development of standardized coverage parts.

ISO provides these services for the following fifteen property/casualty lines of insurance:

Personal Lines of Insurance: Personal Automobile; Dwelling Fire and Allied Lines; Homeowners (including Mobilehomes); Personal Inland Marine; and Personal Insurance Coverages (PIC) including Personal Liability and Residence Theft.

Comercial Lines of Insurance:

Commercial Automobile; Boiler and Machinery; Commercial Crime; Farm; General Liability; Commercial Glass; Commercial Inland Marine; Commercial Multiple Line; Nuclear Energy Liability; and Professional Liability.

ISO provides no services for workers compensation or for life and health insurance. ISO provides only limited services for Professional Liability insurance and no services for such lines as ocean marine, fidelity and surety, financial guaranty, excess or umbrella insurance or surplus lines. ISO services are available only for insurance provided in the United States. And ISO has no role in the relationships—either financial or contractual—between the insurers who receive many of ISO's services and their agents or customers.

Pursuant to State law ISO also serves as a statistical agent. State laws allow insurance regulators to appoint one or more statistical agents to gather data from individual insurers and report it in aggregate form via State approved statistical plans. These reports enable regulators to ascertain whether rates meet the statutory standards: i.e. that they are adequate, not excessive and not unfairly discriminatory.

ISO captures information based on the provisions of its standardized coverage parts and in conformity with approved statistical plans that meet both regulatory and ratemaking needs. Each year ISO collects nearly a billion records of premiums and losses from reporting insurers. The aggregate statistical data derived from the reported information is submitted by ISO to regulatory authorities, thereby efficiently fulfilling the legally mandated data reporting requirements of insurers.

ISO also provides analyses of the aggregate statistical information to insurers who wish to purchase this service. These actuarial analyses include ISO determined estimates of future loss payments by line of insurance and in classification and territory detail.

Today's hearing has been called to address the "redlining" practices of insurance companies relating to property and auto insurance. In examining this issue I believe it is important to define the different aspects of the problem before attempting to seek solutions. Redlining in the insurance context has typically meant the inability of consumers to obtain insurance protection based solely on the area in which they are located. Concern has also been expressed about higher premiums for auto or homeowners coverage based upon geographical area.

Since ISO is not an insurer and does not make underwriting decisions regarding whom to insure and what coverage to offer a specific risk, I cannot make any particularly valuable contribution to this debate in those areas. However, as an actuary, and as a representative of ISO, I can address the subject of cost-based pricing and the importance of territorial rating.

One of the basic principles in pricing an insurance policy is that the price should reflect the cost of providing the coverage plus a reasonable margin for profit. This is not a principle unique to insurance pricing but is widely followed in other competitive areas in an economy based upon private enterprise. Cost-based pricing is, in fact; the economic or allocational standard of fairness typically applied to the marketplace.

The fact is that not all automobiles, not all homes, not all businesses present the same risks to insurance companies. Statistics demonstrate that cars driven by young men are much more likely to have accidents than cars driven by adult drivers

for example. And homes made of brick are less likely to burn than homes made of wood frame. Insurers use the process of risk classification to help identify risks with similar characteristics so that the differences in costs may be recognized. By identifying the characteristics that are reasonably related to the likelihood of claims, insurers are able to charge those with the higher expected losses higher prices while charging those with lower expected losses, lower prices. Prices based on costs are socially neutral. In a competitive environment there is a natural incentive for insurers to become more accurate in their pricing.

In personal auto insurance some of the important characteristics which help to distinguish different risk groups or classes are the age, sex and marital status of the drivers, the use of the automobile, the make and model of the automobile and the number of accidents and/or serious convictions of the drivers. For homeowners and personal property insurance the important characteristics are construction, amount of insurance, scope of coverage, protection class and protective devices. Each of these characteristics are part of the insurance classification system used for rating purposes by almost all insurers.

ISO statistical data and analytical information demonstrate conclusively that these factors are reliable indicators of risk. Grouping insureds on the basis of these factors results in differences in loss costs from State to State as well as countrywide. These differences in loss costs result in pricing differentials.

However, use of these specific characteristics does not explain all the observed differences in loss costs. For most lines of insurance, territory, or the geographical area where the risk is located, is also an extremely important factor in determining expected costs. It certainly should not be surprising to anyone that the costs of things for which insurance pays are relatively higher in urban areas than in rural areas. Car repair costs, hospital and medical charges, labor costs, rents, theft rates, etc. all are higher in cities than rural areas and these higher costs translate into higher insurance claim costs. In addition, other factors such as congestion, population density and vehicle density contribute to a greater number of accidents and claims for auto insurance in urban areas.

In order to measure the actual differences in claim costs and claim frequency by geographical area, insurers gather premium and loss data by statistical territory. For example, ISO's most recent homeowners' loss cost analysis for Illinois evaluates each territory's loss experience over the most recent 5 year period. All homeowners territories are analyzed on the same basis to avoid distortions that might occur due to varying risk characteristics within each territory. The resulting base loss cost amounts for three major cities in Illinois are:

| | |
|---|---|
| Chicago | $135.74 |
| Evanston | 108.17 |
| Rockford | 104.44 |
| Statewide average | 116.56 |

Note: These base loss costs represent an HO-3 $60,000 coverage limit on a frame construction property in a class 5 fire protection area.

. Originally, territories for personal property insurance were established to recognize the varying degrees to which specific natural hazards affected identifiable geographic areas. For example, to reflect the windstorm hazard certain zones were established based on an area's susceptibility to hurricanes, tornadoes or frequent gale force winds. When the hail hazard was joined with windstorm the zones or territories were modified to reflect both hazards.

Once multi-peril policies that combined the coverages of fire, wind, hail and theft in one policy came on the scene, territories were reconfigured to reflect the multi-peril exposure. These reconfigured territories were widely used until the mid-1970's.

In the early 1980's ISO territories were adopted which reflected our analysis of the following:

1. Major population centers as reported by the U.S. Census Bureau.

2. Major crime areas based on FBI crime reports, particularly burglary and robbery statistics.

3. Cities that had the best grade of fire protection as determined by on-site inspections of fire prevention engineers. A city with a class 3 or better grade was given its own territory definition.

4. City or county-wide areas that had significant fire exposure such as dry brush or heavily forested areas; windstorm exposure (frequency of hurricanes, tornadoes, hailstorms); melting snow exposure and theft exposure.

These data were analyzed by ISO staff to establish the current ISO statistical territories for homeowners. ISO's statistical territories are usually more broadly de-

139

fined than the territory definitions currently used by the major writers of auto and homeowners. For example, for homeowners and dwelling fire, ISO generally defines large cities as a single territory, while the major personal lines writers might have from 2 to 3 or a dozen or more separate territories for a large city like Chicago.

For the record, it should be recognized that the major personal lines insurers are not ISO participating companies. In fact, the companies that report data to ISO represent a relatively small portion of the total market for personal auto and homeowners. The following table indicates the market share of the top 20 companies in each State shown, as well as the market share for the ISO insurers in the top 20, and in total, based on information from the A.M. Best Co.:

### HOMEOWNERS MARKET SHARE
[In Percent]

| State | Top 20 | ISO in Top 20 | Total of all ISO Companies |
|---|---|---|---|
| Illinois | 83.6 | 20.6 | 26.4 |
| Minnesota | 79.8 | 9.7 | 23.1 |
| Missouri | 85.4 | 18.6 | 25.3 |
| Wisconsin | 75.2 | 6.9 | 22.9 |

### HOMEOWNERS MARKET SHARE
[In Percent]

| State | Top 20 | ISO in Top 20 | Total of all ISO Companies |
|---|---|---|---|
| Illinois | 79.0 | 6.6 | 14.2 |
| Minnesota | 82.6 | 8.1 | 14.8 |
| Missouri | 85.8 | 11.5 | 15.6 |
| Wisconsin | 81.4 | 3.6 | 12.5 |

The ISO Statistical Plans have not, until very recently, called for the reporting of data in zip code detail. However, effective January 1, 1993 the ISO Personal Auto Statistical Plan does call for the capturing of data in zip code detail and beginning January 1, 1994, we will be capturing homeowners data in zip code detail.

In the area of auto insurance it has long been recognized that drivers in some cities pay relatively high premiums. Consequently, several years ago a broad cross-section of insurance industry interests examined the factors that affect urban auto insurance costs to see if there were some common patterns to explain those high costs. This study, "Factors Affecting Urban Auto Insurance Costs" was prepared by ISO, The National Association of Independent Insurers (NAII), the Alliance of American Insurers (AAI), the American Insurance Association (AIA) and State Farm Insurance Companies.

There were several key findings in the analysis and a copy of the Executive Summary is attached to this testimony. A complete copy of the report is being submitted for the record in this hearing. If there is one finding which stands out among all the others, it is the one that high claim frequency seemed to be driving up the loss costs much more so than claim severity. And, furthermore, that a relatively high number of personal injury (bodily injury liability and where applicable, personal injury protection) claims were a major factor.

The fact that insurance loss costs are higher in certain geographical areas than in others is a reflection of overall economic factors affecting urban life. While the cost of insurance may be relatively high in certain urban areas, insurers are in the same position as other providers of goods and services in the city who must reflect their costs of doing business in their prices if they are going to stay in business.

Insurers do not create high cost areas, they merely identify them. And as part of the competitive process insurers seek to refine their territories to more accurately subdivide them on the basis of relative degree of risk.

To the extent that insurers are successful in identifying statistically significant differences in loss costs among insureds they will be able to price their products more accurately. As long as the price differences are based on differences in expected costs, those price differences are actuarially valid, and would result in prices that are adequate, not excessive and not unfairly discriminatory. To the extent that premium distinctions are not based on demonstrable differences in expected costs those distinctions cannot be said to be actuarially valid.

In a voluntary competitive market, an insurer cannot knowingly disregard identifiable differences in loss costs without being disadvantaged competitively. If an in-

surer knowingly over charges lower cost or lower risk insureds they are susceptible to having other competitors offer insurance to those same risks at a lower price i.e., a price more in line with their expected costs. Therefore, over the long term they will lose a significant portion of the over-priced, highly profitable business.

At the same time an insurer should not be expected to provide insurance to the higher risk insureds at a price they know to be inadequate. Such behavior would be economic suicide.

Suggestions are sometimes made that insurers should broaden their risk classes and/or their territory definitions to include a wider selection of risks. This would serve to average costs among a broader group resulting in some risks paying more and others less. In effect then, lower risk insureds would be subsidizing higher risks.

While recognizing that the high cost of insurance can be a burden to lower income consumers, imposing subsidies through the private, competitive market cannot solve the underlying problem. Those lower risk consumers who would be required to pay more to subsidize the higher risk consumers often object to such proposals.

# Factors Affecting Urban Auto Insurance Costs

## Executive Summary

The increasing cost of personal auto insurance affects nearly every household in the nation. Insurance Services Office (ISO), the National Association of Independent Insurers (NAII), the Alliance of American Insurers (AIA), the American Insurance Association (AIA), the Insurance Information Institute (III) and State Farm Insurance Companies set out to examine the question: "Why do drivers in some cities pay such high premiums for auto insurance?"

Insurance data and non-insurance data for 18 large cities in 13 states were aggregated and evaluated in an attempt to identify particular characteristics that lead to higher insurance costs. Since these cities cover a spectrum of laws, regulations, legal systems and enforcement dealing with personal autos and insurance, each city's data was related to its respective statewide average. The resulting relativities were used to make comparisons between cities.

The key findings of the analysis are:

- While costs were higher in some cities ("high cost") than their statewide averages, costs were comparable to or lower than the statewide averages in other cities ("low cost"). Cities were categorized as "high cost," "low cost" or "neutral," based on their relationship to their respective states, not based on comparison among cities.

- "High cost" cities had much higher claim frequencies than their statewide averages, but average claim severities in the cities studied were not substantially different from those for the entire state.

- Generally, cities with high accident frequency compared with their entire state, not surprisingly, had relatively high claim frequency. These cities were identified as "high cost" in this study.

- A relatively high number of personal injury (bodily injury liability and, where applicable, personal injury protection) claims was a major factor in explaining the difference between "high cost" and "low cost" cities.

- "High cost" cities were generally the most congested as measured by population and vehicle densities.

- Most "high cost" cities had high theft rates.

- Most "high cost" cities had significant insurance losses attributed to uninsured motorists.

- Each city was unique in its combination of factors contributing to auto insurance costs.

Why do drivers in many cities pay more for auto insurance than drivers elsewhere in their states? The answer is fundamental: It costs insurers more to provide personal auto insurance coverage in these cities than it does elsewhere.

There are many variables that help to explain why some cities have higher auto insurance costs than their respective statewide averages. This study suggests that no single factor is totally responsible. The relative number of auto accidents and resulting claims was the primary reason for higher insurance costs. But there is no simple or single explanation for higher claim frequencies in "high cost" cities.

A definition of insurance terms used in this study can be found in the Glossary on page 43.

003944

Mrs. COLLINS. Thank you.

Ms. Schubert, I appreciate the willingness of AIA to testify today. The AIA recently analyzed the ACORN report, and one of your criticisms of the report was that the data did not necessarily reflect all the insurers doing business in the area and that therefore the conclusions about lack of coverage may have been invalid. Don't you think that is a good argument for legislation that would require comprehensive reporting of insurance activities and practices in the urban areas?

Ms. SCHUBERT. I think the comprehensive collection of that information is very important. The NAIC currently, as Superintendent Willis described those efforts, is making efforts to do that. Also, ISO is going to be collecting, I understand, zip code data for personal lines, auto, as well as homeowners, so whether legislation is going to be required to gather that information or not I would guess remains to be seen. I do believe it is important to get that information, and our companies, of course, will be cooperating in every way to provide that information.

Mrs. COLLINS. Zip codes tend to stay the same forever. My zip code has been the same ever since we have had zip codes, but the makeup of the community has not been the same. So isn't it better to use census tract rather than zip code data to get more accurate information?

Ms. SCHUBERT. From my perspective—and certainly I am not a statistician——

Mrs. COLLINS. Nor am I a statistician, but it just seems to me if you want valuable information you will go to the most accurate source that you have available.

Ms. SCHUBERT. As long as we can report the information and the company's report where they are writing the policies, I would guess you could then correlate it to the census tract.

Mrs. COLLINS. But that is an extra step that you don't really need, isn't it?

Ms. SCHUBERT. I believe ISO probably could better accurately address that question.

Ms. WALTERS. May I address that?

Mrs. COLLINS. Would you address that?

Ms. WALTERS. Yes, please. I think, Madam Chairwoman, the very fact, as you point out, that zip codes' definitions tend to remain the same is, in fact, very important when one is doing a statistical study because it takes often more than a year, and sometimes 2 or 3 years or more of data, in order to get a credible base of information upon which to make any kinds of judgments.

So I think from a statistical standpoint it is more valuable to collect information on a zip code basis so that you can look at that premium and loss information on a consistent basis rather than something that is constantly changing from year to year.

Mrs. COLLINS. Census data is really given about every 5 or 10 years, and it is pretty stable. You know, we don't go out and count every day; we don't go out and count every other day; we usually do it about every 5 years; we kind of juggle the figures around a little bit. But every 10 years we do a whole census of the United States, and it seems to me those are pretty hard numbers. They are the numbers on which we base representation in Congress,

143

they are the numbers on which we base whether or not funds go to certain areas for education, for housing assistance, for farm subsidies, for all kinds of ways that we spend the money in our country, and they seem to be pretty good, solid figures, although I don't always agree with them by far, because I think there may be some undercounts here or there. But they are numbers that we have generally accepted ever since there was a Census Department in our country.

Ms. WALTERS. Oh, yes. I wasn't taking issue with the fact that the census data are acceptable, I was merely suggesting from an insurance standpoint I think there is more value to those who want to use the information.

Mrs. COLLINS. Can you tell me how banks have to report on mortgage loans? Can anybody—either one of you? Nobody uses census tract? They do. That is what they use, the census tract.

Anyway, back to you again, Ms. Schubert. Your testimony indicates support for requiring applicants to be told reasons for adverse underwriting decisions and restricting the use of prior underwriting decisions or prior coverage in a residual market. As you know, the bill I mentioned today is going to have similar provisions. Would you support those provisions?

Ms. SCHUBERT. Those provisions are in the NAIC model declination termination law, and we have supported those traditionally. We will continue to support those types of provisions.

Mrs. COLLINS. Mr. Stearns.

Mr. STEARNS. Thank you, Madam Chairwoman.

The ACORN study suggested that market value coverage is an inferior product when compared to replacement cost. Why do insurers not offer replacement cost coverage in some situations, and why do you not consider this discriminatory?

Ms. SCHUBERT. The policy that you mention is a type of homeowner's policy. Originally, the policies that were available for homeowners' insurance were replacement value policies. For particular homes that have a great difference between the market value of the home and the cost to replace that home in the exact condition in which it was built—say if it is a particularly older home, there is a great deal of detail in there—the disparity is very great. The premium that is required for that policy is extremely high. So what occurred was, consumers that were unable to purchase the insurance, not because it wasn't available or offered, but because it was too expensive—to address that issue, the industry tried to create products that were more tailored to each type of home or each type of property.

The two things they have done—it is not just market value, but they have come up with a policy that is a percentage of replacement value. Instead of it being 100 percent, perhaps you would have 70 percent of the replacement value; if there were total destruction of the home, you would get 70 percent of that value.

Also, there is a cost to repair which would put the property back in the same condition using today's materials rather than trying to do the stucco or whatever was required from when the house was originally built.

Additionally, there is the market value policy that would allow a homeowner to purchase another property of that same kind in

003946

that same neighborhood, the concept being that we can make those products available at a cost that is affordable to the people that own those homes. It is an instance where we have tried to come up with innovative ways to address specific consumer concerns.

Mr. STEARNS. Could you give us some examples of economic consequences if a federally or State mandated departure from cost-based pricing occurred? Has this resulted in some companies leaving certain lines of coverage? Have these mandates actually solved any problems, or have things been made worse?

Ms. WALTERS. Yes, Mr. Stearns, I would be happy to address that question. I certainly alluded to it in my statement, in my formal testimony.

When you mandate that insurers depart from cost-based pricing, someone can require that prices be made equal, certainly you can pass laws doing that, but those laws will not affect the underlying costs, and, in effect, it is very difficult to legislate against knowledge.

If insurers have successfully been able to identify statistically significant differences among insureds—that is, real risk differences—then their economic behavior is inevitably going to be guided by those real risk differences, so that mandating that the prices be made equal or that you ignore those cost differences means there is going to be fierce competition among the insurers to write as much of that overpriced business as they possibly can, because insurers will be guaranteed to make huge profits because they are being forced to overcharge people.

At the same time, insurers are going to do everything that they legally can to avoid writing the business where they are guaranteed to make a loss. This creates availability problems for many consumers, and it doesn't end up solving the problem. In some ways, it ends up making it a lot worse.

Mr. STEARNS. Some have suggested that commuters contribute to the congestion and vehicle density in urban areas and that perhaps these commuters are unfairly contributing to higher auto premium rates in urban areas. Do you agree with this, or are loss cost factors fairly allocated between commuters and inner city residents?

Ms. WALTERS. I believe that the loss costs are properly allocated since the insurance mechanism requires that those who are responsible for the losses—that is, to the extent that we have—we do have a lot of commuters coming into the District of Columbia. To the extent that they cause auto accidents, those accidents are charged back to those commuters—that is, to the place where their policies are written so they be charged back to Virginia or to Maryland, and they wouldn't be charged to the District of Columbia. So the costs are properly allocated to those who incur the costs.

Mrs. COLLINS. Thank you.

Mr. Towns.

Mr. TOWNS. Thank you.

Let me understand something you said, Ms. Schubert. You talked about California. Has that been done by statute? I was not clear on that. Could you just clear that up for me?

Ms. SCHUBERT. Certainly. It would have required a statute. The policy was developed by the consumers with input from the industry. The industry was requested by the Consumers Coalition to

price it, which we did. It would have required a statute in California to make California a no-fault State. Commissioner Garamendi did come out in favor of it, and understand—although this is not my speciality, auto insurance—that it only failed by one vote to come out of the committee last year, and certainly we will be working to have that introduced again this year.

Mr. TOWNS. Thank you very much.

Mrs. COLLINS. Thank you.

Those bells that you heard ringing mean that the House is in session and we have a vote that is going on right at this minute.

Thank you for testifying before us.

This hearing is adjourned.

[Whereupon, at 12:10 p.m., the subcommittee was adjourned, to reconvene at the call of the Chair.]

[The following material was received for the record. Exhibits numbered 3 and 4 submitted by State Farm Insurance Companies are retained in the subcommittee files.]

ONE HUNDRED THIRD CONGRESS

JOHN D. DINGELL, MICHIGAN, CHAIRMAN

HENRY A. WAXMAN, CALIFORNIA
PHILIP R. SHARP, INDIANA
EDWARD J. MARKEY, MASSACHUSETTS
AL SWIFT, WASHINGTON
CARDISS COLLINS, ILLINOIS
MIKE SYNAR, OKLAHOMA
W.J. "BILLY" TAUZIN, LOUISIANA
RON WYDEN, OREGON
RALPH M. HALL, TEXAS
BILL RICHARDSON, NEW MEXICO
JIM SLATTERY, KANSAS
JOHN BRYANT, TEXAS
RICK BOUCHER, VIRGINIA
JIM COOPER, TENNESSEE
J. ROY ROWLAND, GEORGIA
THOMAS J. MANTON, NEW YORK
EDOLPHUS TOWNS, NEW YORK
GERRY E. STUDDS, MASSACHUSETTS
RICHARD H. LEHMAN, CALIFORNIA
FRANK PALLONE, JR., NEW JERSEY
CRAIG A. WASHINGTON, TEXAS
LYNN SCHENK, CALIFORNIA
SHERROD BROWN, OHIO
MIKE KREIDLER, WASHINGTON
MARJORIE MARGOLIES-MEZVINSKY, PENNSYLVANIA
BLANCHE M. LAMBERT, ARKANSAS

CARLOS J. MOORHEAD, CALIFORNIA
THOMAS J. BLILEY, JR., VIRGINIA
JACK FIELDS, TEXAS
MICHAEL G. OXLEY, OHIO
MICHAEL BILIRAKIS, FLORIDA
DAN SCHAEFER, COLORADO
JOE BARTON, TEXAS
ALEX McMILLAN, NORTH CAROLINA
J. DENNIS HASTERT, ILLINOIS
FRED UPTON, MICHIGAN
CLIFF STEARNS, FLORIDA
BILL PAXON, NEW YORK
PAUL E. GILLMOR, OHIO
SCOTT KLUG, WISCONSIN
GARY A. FRANKS, CONNECTICUT
JAMES C. GREENWOOD, PENNSYLVANIA
MICHAEL D. CRAPO, IDAHO

ALAN J. ROTH, STAFF DIRECTOR AND CHIEF COUNSEL
DENNIS B. FITZGIBBONS, DEPUTY STAFF DIRECTOR

**U.S. House of Representatives**
**Committee on Energy and Commerce**
Room 2125, Rayburn House Office Building
Washington, DC 20515-6115

March 3, 1992

Ms. Ernestine Whiting
ACORN
739 8th Street South East
Washington, D.C. 20003

Dear Ms. Whiting:

Thank you very much for your testimony before the Subcommittee on Commerce, Consumer Protection, and Competitiveness this morning. Your testimony was enlightening and I very much appreciate your taking the time to appear before the Subcommittee.

While the ACORN report appears to illuminate some disturbing problems in the inner-cities, I have some concerns about the methodology used in this report, as it appears to deviate from accepted standards in the academic and professional community.

In order to better ascertain the implications of the ACORN study, I would appreciate your cooperation in answering several questions I have regarding the methodology of this report. These questions are technical in nature and better lend themselves to written answers than those which could be provided in the necessarily limited structure of the Subcommittee's hearing.

I would appreciate it if you or members of the ACORN staff could provide written answers to the attached questions within 5 legislative days so that we may close the hearing record in a timely manner. Please send your responses to the attention of:

Mary-Moore Hamrick
Committee on Energy and Commerce Minority Staff
564 Ford House Office Building
Washington, D.C. 20515

If you have any questions, please contact Ms. Hamrick at (202) 226-3400. Thank you very much for your cooperation and assistance.

Sincerely,

Cliff Stearns
Ranking Republican Member
Subcommittee on Commerce, Consumer
  Protection, and Competitiveness

# Questions on ACORN Study

**Part I: Zip Code Analysis**

1.  In the zip code analysis, there was a great deal of variation between the cases studied. For instance, the data for Chicago, Milwaukee, and Minneapolis-St. Paul did not include data on either HO-8 policies or the premium/median house value ratio. In fact, the only statistic uniformly available across all five cases was that of the level of coverage. This would make direct comparisons between cities almost impossible, even though the level of coverage data appears to indicate that some of the cities studied do a better job than others in providing coverage. How can these cases, especially when compared with one another, yield meaningful data without consistency in the data presented?

2.  The fact that in four of the five cases examined in the zip code analysis, data about the type of insurance purchased (FAIR, HO-8, etc.) was included, would appear to indicate that this information was important to describing the nature of the problem identified in each case. Why was the Minneapolis-St. Paul case included in your study if the only data available was on level of coverage?

3.  There is a failure to control for variables that generally factor into underwriting decisions, such as crime rates, etc. Why did you fail to control for these external variables? Do you believe that had you controlled for these variables, there would have been a significant difference in the results?

4.  While categories remained relatively consistent between the other four cities studied, the Minneapolis-St. Paul study coded the results differently, omitting the "high income neighborhood" and "minority neighborhood." Why was this particular case coded this way? Do you believe that this would have a negative impact on the degree to which it could be compared to the other cases?

5.  When presenting cross-tabular statistics such as the ones presented in the zip code analysis, it is traditional to include the results of any statistical tests performed on the data such as the Chi-Square or Pearson's R, as well as information on whether or not the figures were statistically significant. If you have computed these statistics, please forward them to the Subcommittee with an explanation as to why they were not included in the study you submitted. Also, please discuss at what level a statistic was considered statistically significant and why. If you have not computed these statistics, please explain why not.

6. In estimating coverage ratios of "occupied, single-family housing units," you include all 1-4 family housing units (page 4). It would appear that many of these homes would be occupied by renters rather than owners, since more than one family resides there. In the case of a single property with 4 units, is that counted as 1 unit or 4? How do you control for the fact that it might be the landlord who failed to insure the property and not the occupant, who is in fact a renter and not counted by your study?

7. Please supply a list of the zip codes that were used in the zip code analysis, broken down by state. Also, please list the sources of the data used, i.e. Bureau of the Census, Department of Insurance, or any other entity that provided data for the zip code analysis.

8. Did you make any attempt to adjust the insurance department data on policies in Minnesota and Wisconsin to account for the fact that only a limited number of companies writing homeowners insurance reported data?

**Part II: Test Calls**

1. Why did you compute aggregate figures for the test call cases when you did not for the zip code analysis?

2. Traditionally, survey callers or interviewers are given some training prior to conducting interviews. How much training did your callers receive? Also, please make a copy of the questionnaire and caller instructions used during the test calls available to the Subcommittee.

3. The report states under "Test Calls: Methodology" (page 41) that "In thirteen cities ACORN members were asked to conduct a total of forty-eight calls to agents." Were forty-eight calls made in each of the thirteen cities, or across all thirteen cities?

4. What percentage of the agents in each city are represented by the sample polled? Did you calculate standard error for these samples?

5. How did you arrive at your sample size? What confidence level were you assuming?

6. Why did you choose to use cross-tabulations for this study? Given the small sample size, would regression analysis have not been more appropriate?

7. On page 41 of the ACORN report, you indicated that in addition to the parameters you set out for them, callers "were asked to make adjustments based on neighborhood conditions." Exactly how much variation was allowed from the prepared standards?

8. As with the zip code analysis, you failed to include any statistical test data on the cross-tabulations performed on the test calls. If you have computed these statistics, please forward them to the Subcommittee with an explanation as to why they were not included in the study you submitted. Also please discuss at what level a statistic was considered statistically significant and why. If you have not computed these statistics, please explain why not.


**ACORN**

Honorable Cliff Stearns
Ranking Republican Member
Subcommittee on Commerce, Consumer Protection, and Competiveness
Committee on Energy & Commerce/Minority Staff
564 Ford House Office Building
Washington, D.C. 20515

ATTN: Ms. Mary-Moore Hamrick

Dear Representative Stearns:

We appreciate the opportunity to respond to questions submitted to us at the recent hearing of the Subcommittee on insurance redlining. Our response to these questions is attached.

You are correct in noting inconsistencies and limitations in the nature of data that is collected and maintained by various states. It is for this very reason that the legislation recently introduced by Congresswoman Collins, which would provide a uniform format for insurance disclosure, is so desperately needed. Such data would be essential for a comprehensive and exhaustive analysis of the insurance industry's practices, and their effect on low- and moderate-income and minority neighborhoods and families. This data will also prove essential in designing a public policy response to identified problems.

Please do not hesitate to call me at (202) 547-2500 if you have any questions about the attached responses. I look forward to working with you in coming weeks.

Sincerely,

Deepak Bhargava
Legislative Director

Attachment

cc: The Honorable Cardiss Collins

**Association of Community Organizations for Reform Now**
National Office: 739 8th Street S.E., Washington, D.C. 20003 · 202-547-9292  FAX 202-546-2483

**Part I:  Zip Code Analysis**

1.      The zip code analysis, as explained in the methodology, was indeed constrained by the paucity of the data available.  In our research, the four states examined --Minnesota, Missouri, Illinois and Wisconsin-- were the only states which made such data publicly available.

As the methodology points out, the nature of the data disclosed by the companies differed significantly from state to state.   Because all the states do not require disclosure of all companies, nor for similar data, we did not aggregate the data for all states.  Where the more detailed data was available for a particular state, we made it available in our study.

For states in which all companies did not report, the terminology used was "relative coverage".  Relative coverage reflects the market share these companies held in different neighborhoods of different characteristics.  These numbers do not, therefore, measure the absolute levels of coverage, but rather illustate a disturbing disparity between areas of different racial and income characteristics.  We believe that such disparities are by themselves of significant interest despite the lack of comparability for other aspects of the study.

We did not attempt to compare the data from various cities, precisely because the data is not uniform or consistent.  We decided to present the results of data on items which were only available for one or two cities --such as premium/median house value, and cancellation and declination rates-- without making any claims about whether the findings might be applicable elsewhere.

2.      You are correct in noting that disparities in the quality of coverage available in neighborhoods of different racial and income compositions are an important feature of urban insurance problems.  We included data for Minneapolis-St. Paul despite the lack of data on the quality of policies written because we felt that at a minimum the analysis could still speak to the level of penetration of neighborhoods of different demographic types by the largest carriers.

3.      The goal of this study was to examine the relative levels of coverage in different neighborhoods, as well as what obstacles were presented to residents of different areas seeking insurance.  The zip code study is thus meant to analyze the dimensions of the problem.  An analysis of the role of all the underwriting criteria which may enter into decisions by carriers would have been well beyond the scope of the study.

In addition, few companies make their underwriting criteria or loss cost analyses available.  In fact, we tried to obtain loss cost analyses from the ISO four months ago, and have yet to receive them.

With regard to the second part of your question, we maintain --based on the results of the test calls, and other anecdotal and statistical evidence-- that race and income of neighborhood account for a significant portion of the disparity revealed in the study.

On this point, I would refer you to the work of Professor Gregory Squires. Professor Squires, with the resources of the US Commission on Civil Rights and of the University of Wisconsin has been able to control for variables such as poverty rate, population turnover, incidences of crime and fire, and virtually every other factor that might bear on risk and found that "racial composition remained significantly associated with the distribution of insurance policies even after these other variables were controlled." This

analysis was conducted for Milwaukee. Prof. Squires' analysis was recently presented before the Subcommittee on Consumer Credit and Insurance, of the Committee on Banking, Finance, and Urban Affairs.

4.      Zip code disclosure in Minnesota is limited to a selected number of urban zip codes. The zip codes selected by the Insurance Department did not include any zip codes with an income greater than 120% of the Area Median Income ("high-income") or any zip codes in which minorities comprised more than 75% of the residents ("minority").

        Thus, the omission does not reflect a difference in how we coded the zip codes, but rather in how the data was collected by the Department. I believe that this was made clear in the study.

        It should be noted that the findings of the study in Minneapolis-St.Paul tracked those for other cities in that income and racial composition of neighborhood were correlated with the relative coverage level.

5.      We did not calculate any statistical tests on the results of our zip code analysis. For analysis of Home Mortgage Disclosure Act (HMDA) data reported by insured depsiotry institutions --the data most nearly resembling in type the data we used-- it is not in fact standard practice to perform statistical tests on the data because there are generally extremely large sample sizes of applications and originated loans.

        It should be noted that the data is not a survey, nor does it attempt to establish or quanitify causal relationships between variables. It should further be noted that in all cities, the data represents  upwards of 80% of all policies written.

6.      A single property with four units is counted as a single unit, because a single policy would generally be written for the entire structure. Our study did not examine "contents only" or renters policies.

        Excluding non-owner-occupied single-family units would have been contrary to an accurate assesment of insurance availability.  No effort was made to control for type of ownership, because this is irrelevant to measurement of overall insurance availability.

        The use of "occupied, 1-4 family units" was the most accurate indicator we found available to eliminate uninsurable dwellings from the analysis --for example, multi-family units.  Since both renter-occupied and owner-occupied single family units may have any type of coverage --fire and extended, homeowners, etc-- it was not possible to determine level of coverage solely with reference to owner-occupied single-family units.

7.      The zip codes included in the study are attached.

        Demographic data is derived from 1990 census data.  Translations from census tract to zip codes were done by CACI Marketing, Inc. which issues a Sourcebook of Zip Code Demographics.

        Information on policies written on a zip code basis was obtained from the Insurance Departments of Missouri, Illinois, Minnesota, and Wisconsin.

8.      For states in which all companies did not report, namely Minnesota and Wisconsin, the terminology used in the study was "relative coverage". That is, the market share the reporting companies held in neighborhoods of different demographic

characteristics. These numbers are not, therefore, absolute levels of coverage, but were rather meant to illustrate a disturbing disparity between areas of different racial and income characteristics.

It would have been conceptually difficult to "adjust" the figures as you suggest, because it is unclear that the patterns and disparities for the largest carriers would be at all similar to those of companies that do not report. Thus, if no information is collected on 20% of the policies written in a given market, it is unclear how one would impute a distribution to them.

I might add that that is why it is essential to collect data in some form from all carriers who write policies in Metropolitan Statitsical Areas (MSAs).

## Part II: Test Calls

1.    Aggregate figures were computed for the test calls becuase a single and consistent methodology was used in all thirteen cities.  As explained above, data for the zip code analysis was not directly comparable because of the different ways in which the data was collected.

2.    Role plays were conducted between callers and on-site project supervisors before making calls, and test call coordinators briefed callers on how to respond to questions they might be asked about the property in question.  Callers were given very precise instructions about what to ask for and how to respond to questions from agents.  Callers were not informed of the nature of the study, or told whether a particular response from an agent might represent disparate treatment --only to accurately note the response of an agent.

Calls were conducted from ACORN offices where supervision was available.

Questionnaires and caller instructions are enclosed.

3.    Forty eight calls were made in each of the thirteen cities.

4.    We did not calculate such figures. Agents were randomly selected.  [See Response to Question #5, and caller instructions on selection of agents].

5.    It is important to understand that testing --as performed by private, fair housing groups under HUD's Fair Housing Initiatives Program, for example-- is not designed to provide statistically significant evidence of discrimination, but to uncover instances of disparate treatment. Judicial precedents under the Fair Housing Act have established that 3 cases of disparate treatment constitute a "pattern or practice" of discrimination.

Standard testing methodology generally involves no more than 3-6 separate contacts with a particular agent. Our sample size of 48 contacts is within these parameters. Professor Squires' study of Milwaukee using testers included 60 contacts with agents.

6.    Again, it is not common practice in the fair housing community to use regression anaylsis because the point of the technique is to establish the existence of disparate treatment. It should be noted that our study does not claim that the incidence of disparate tretament reflected in our testing is reflected in identical proportions in the insurance market at large --only that disparate treatment exists and appears to be common.

7.    Adjustments were made from property characteristics listed on the test call questionnaire.  The nature and need for those adjustments are explained in the attached insutructions for test callers.

8.    We did not compute any statistical tests on the data. Establishing statistically significant variations is not the purpose of fair housing testing. Please see responses to #5 and # 6.

| Zip Codes used in ACORN study. | | | | |
|---|---|---|---|---|
| Kansas City | St. Louis | Chicago | Minn. St. Paul | Milw., Wisc. |
| | | | | |
| Zip Code | Zip Code | Zip Code | Zip Code | Zip Code |
| 64108 | 63106 | 60472 | 55106 | 53205 |
| 64128 | 63107 | 60608 | 55114 | 53206 |
| 64130 | 63112 | 60609 | 55408 | 53204 |
| 64106 | 63113 | 60612 | 55410 | 53208 |
| 64109 | 63115 | 60615 | 55417 | 53212 |
| 64110 | 63120 | 60616 | 55418 | 53210 |
| 64127 | 63133 | 60619 | 55430 | 53203 |
| 64132 | 63140 | 60621 | 55416 | 53202 |
| 64105 | 63108 | 60623 | 55101 | 53215 |
| 64111 | 63101 | 60624 | 55102 | 53209 |
| 64124 | 63103 | 60636 | 55103 | 53216 |
| 64126 | 63104 | 60637 | 55104 | 53218 |
| 64050 | 63147 | 60644 | 55105 | 53207 |
| 64053 | 63102 | 60647 | 55107 | 53211 |
| 64112 | 63110 | 60649 | 55108 | 53214 |
| 64120 | 63111 | 60651 | 55116 | 53110 |
| 64123 | 63116 | 60653 | 55117 | 53213 |
| 64125 | 63118 | 60607 | 55119 | 53219 |
| 64147 | 63139 | 60622 | 55401 | 53227 |
| 64131 | 63143 | 60625 | 55403 | 53172 |
| 64129 | 63136 | 60626 | 55404 | 53220 |
| 64164 | 63121 | 60627 | 55405 | 53221 |
| 64116 | 63130 | 60639 | 55406 | 53222 |
| 64114 | 63109 | 60640 | 55407 | 53223 |
| 64030 | 63074 | 60660 | 55409 | 53225 |
| 64018 | 63114 | 60406 | 55411 | 53154 |
| 64024 | 63117 | 60501 | 55412 | 53224 |
| 64029 | 63144 | 60605 | 55413 | 53226 |
| 64052 | 63134 | 60610 | 55414 | 53228 |
| 64054 | 63026 | 60613 | 55415 | 53130 |
| 64075 | 63042 | 60618 | 55419 | 53132 |
| 64081 | 63125 | 60632 | 55454 | 53217 |
| 64088 | 63135 | 60650 | 55455 | |
| 64089 | 63025 | 60026 | | |
| 64098 | 63088 | 60606 | | |
| 64117 | 63119 | 60641 | | |
| 64150 | 63123 | 60657 | | |
| 64161 | 63137 | 60153 | | |
| 64163 | 63138 | 60426 | | |
| 64439 | 63017 | 60617 | | |

Page 1

| | | | | |
|---|---|---|---|---|
| 64444 | 63031 | 60620 | | |
| 64134 | 63033 | 60628 | | |
| 64063 | 63043 | 60643 | | |
| 64068 | 63044 | 60165 | | |
| 64136 | 63122 | 60666 | | |
| 64137 | 63129 | 60130 | | |
| 64151 | 63011 | 60160 | | |
| 64153 | 63141 | 60201 | | |
| 64034 | 63005 | 60202 | | |
| 64118 | 63021 | 60302 | | |
| 64119 | 63034 | 60304 | | |
| 64138 | 63038 | 60409 | | |
| 64133 | 63040 | 60411 | | |
| 64055 | 63105 | 60469 | | |
| 64048 | 63124 | 60629 | | |
| 64056 | 63126 | 60645 | | |
| 64057 | 63127 | 60659 | | |
| 64058 | 63128 | 60164 | | |
| 64060 | 63131 | 60171 | | |
| 64070 | 63146 | 60176 | | |
| 64139 | | 60301 | | |
| 64146 | | 60402 | | |
| 64149 | | 60415 | | |
| 64156 | | 60455 | | |
| 64157 | | 60456 | | |
| 64158 | | 60458 | | |
| 64165 | | 60480 | | |
| 64166 | | 60534 | | |
| 64167 | | 60601 | | |
| 64113 | | 60602 | | |
| 64155 | | 60614 | | |
| 64064 | | 60630 | | |
| 64082 | | 60634 | | |
| 64145 | | 60635 | | |
| 64152 | | 60638 | | |
| 64154 | | 60655 | | |
| | | 60658 | | |
| | | 60104 | | |
| | | 60419 | | |
| | | 60443 | | |
| | | 60466 | | |
| | | 60471 | | |
| | | 60016 | | |
| | | 60018 | | |

Page 2

003957

| | | | | |
|---|---|---|---|---|
| | | 60056 | | |
| | | 60070 | | |
| | | 60074 | | |
| | | 60077 | | |
| | | 60090 | | |
| | | 60131 | | |
| | | 60162 | | |
| | | 60194 | | |
| | | 60438 | | |
| | | 60439 | | |
| | | 60445 | | |
| | | 60452 | | |
| | | 60453 | | |
| | | 60457 | | |
| | | 60459 | | |
| | | 60465 | | |
| | | 60476 | | |
| | | 60477 | | |
| | | 60482 | | |
| | | 60513 | | |
| | | 60525 | | |
| | | 60546 | | |
| | | 60611 | | |
| | | 60631 | | |
| | | 60633 | | |
| | | 60642 | | |
| | | 60652 | | |
| | | 60656 | | |
| | | 60478 | | |
| | | 60141 | | |
| | | 60425 | | |
| | | 60429 | | |
| | | 60461 | | |
| | | 60004 | | |
| | | 60005 | | |
| | | 60007 | | |
| | | 60008 | | |
| | | 60022 | | |
| | | 60025 | | |
| | | 60043 | | |
| | | 60053 | | |
| | | 60062 | | |
| | | 60067 | | |
| | | 60068 | | |

Page 3

| | | | | |
|---|---|---|---|---|
| | | 60076 | | |
| | | 60082 | | |
| | | 60091 | | |
| | | 60093 | | |
| | | 60107 | | |
| | | 60154 | | |
| | | 60163 | | |
| | | 60173 | | |
| | | 60193 | | |
| | | 60195 | | |
| | | 60203 | | |
| | | 60305 | | |
| | | 60422 | | |
| | | 60430 | | |
| | | 60462 | | |
| | | 60463 | | |
| | | 60464 | | |
| | | 60473 | | |
| | | 60558 | | |
| | | 60646 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Page 4

1/5/93                    **M E M O R A N D U M**

**To: Test Call Supervisors**
**Fr: Steuart**
**Re: Insurance Test Calls**

The following instructions and the attached two-page form are explain what each office must do as part of our insurance study to be released in early February. **The completed forms must be overnight mailed to D.C. for arrival by Tuesday, January 19.** We will review the substance of these instructions orally tomorrow.

Each office must do a total of 48 test calls to agents. You should pick a total of eight addresses to call about: four in low-income, predominantly minority neighborhoods, two in an upper-income, predominantly white neighborhood in the city, and two in an upper-income, predominantly white neighborhood in the suburbs. For each of the eight properties we need six test calls done. You should follow the directions below for picking addresses, picking agents to call, picking callers, and to prepare callers.

**Picking Addresses**
Addresses should be in zip codes where the demographics are right. Pick the zip codes from which you want your addresses to come and then check with me on the demographics. Low-income is defined as less than 80% of AMI; high-income as greater than 120% of AMI. A predominantly minority zip code is greater than 75% minority; a predominantly white neighborhood less than 25% minority. We'll use the following labels for neighborhood type.
    A) Low income, mostly minority zip code in the city. Pick four addresses in this category.
    B) High income, mostly white zip code in the city. Pick two addresses from this category.
    C) High income, mostly white zip code outside the city. Pick two addresses in this category.

**Picking Agents to Call**
You need not call the same agents for each address. Call the agents that someone shopping for insurance might actually call. That means calling nearby agents or agents downtown where you might work. Residents of high-income areas aren't likely to call an inner-city agent, other than downtown, but someone in a low-income area might well call an agent from a wealthy neighborhood, either because that's where the agents are or because they think they might get a better deal.

**Callers**
People doing the test calls need to be able to write down what the agents are telling them and they need to understand what a homeowners policy is. You should role play with each tester and think about the likely responses that they'll get. Testers should not be allowed to speak to one another, and should not be told about the nature of the study, or what the purpose of the call is. Callers should not be told to expect any particular response to their questions --such as discouragement or referral to a FAIR plan.

Have people call from the office for quality control. All calls must be monitored. When agents want to call back, have them call testers at home, not at the ACORN office. Test call coordinators should review the forms with the callers as soon after the calls as possible - after each call ideally - and add any information to the form that callers remember but that didn't get onto the paper.

We want our callers to be treated the way typical callers from the neighborhoods in question would be treated. This means that white testers should do the calls for property in white, high-income neighborhoods, and African-American testers should do the calls for property in minority, low-income areas.

On the form under Buyer Characteristics, we're saying that the caller is a first-time homebuyer to get away from questions about past insurance, and that auto insurance is with a separate company so that agents can't offer discount policies for having the same company cover auto and homeowners.

**Property Values**
As you'll see on the form, our callers are saying that they are buying the houses that they want insurance on. This gets them away from having to answer questions about past insurance, and it gives us a value for the property - the sale price. Sale prices vary by neighborhood and by city, but we want them to be pegged to some consistent numbers for the report.

When you check with me on your zip codes (today or tomorrow) I'll tell you the median house value for that zip code from the 1990 census. We should give sale prices that do not deviate more than 5% from the median value in either direction.

**Other Property Characteristics**
I've listed fifteen property characteristics to use for each property where feasible. Change the characteristics where necessary to make them fit the neighborhood in question. For instance, the property can't have been built in 1950 if it's in a suburb that was a cornfield until 1970. Frame, as opposed to brick, houses don't exist in some low-income neighborhoods. Some high-income neighborhoods don't have two-bedroom houses with no garage and no air conditioning. Change only what you have to and write it down on the form before the caller makes the call.

**Likely Responses to Questions on the Form**
1) If no agent is available, don't leave a message. Call later or call another agent. Once you get an agent, get his or her name down.

2) If their first question is what kind of policy you want you'll have to go to 3) and then come back to 2). More likely they'll ask for just address, zip code, value, age of house, and brick or frame. They might ask a lot more, like the kinds of property characteristics listed at the top of the form. They should not be asking a lot of stuff about the buyer, but they might. In the event that there is not a scripted response for a question that an agent might ask, please write down the answer that the tester gave.

3) The policy that we're requesting is a premium "homeowners" policy (in Texas change HO-3 to HO-C). People shouldn't feel that it is strange to be so specific about what they want. Shoppers are often told by friends, relatives, or other sales people what to request in a product, even when they don't really know what it means. Agents are used to this.

When agents won't give us a quote on this policy but push another it's likely to be one of the following policies, or a combination.
- coverage on the house for market value, rather than full replacement value,
- a higher deductible,
- a Fire and Extended Coverage policy that does not include insurance on the contents (theft), or for liability,
- a FAIR Plan policy, through the state's "high risk" pool.

4) It is possible that an agent will go ahead and give a quote even if he or she has no intention of writing a policy. They might discourage buyers by putting obstacles in their way. To this question they may answer that they need to inspect the property, or merely drive by and look at it. They may require you to come to their office rather than coming to your house or mailing an application. Whatever they say may be relevant when compared to what they say in other neighborhoods.

5) A necessarily subjective question. You might ask the tester: Was this person aggressive in trying to sell you something or were they providing as little information as possible because they had to?

**Insurance Response Form**

City_____
Date of Call_____
Caller Name_____     Caller Phone_____

Company/Agency_____     Phone_____
Sales Office Address_____

Property Address_____     Sale Price_____
Zip Code_____     Category_____

Property Characteristics (if they ask)
| | | |
|---|---|---|
| frame | built in 1950 | 1 and 1/2 stories |
| 2 bedrooms | 1 and 1/2 baths | kitchen and dining area |
| front porch | no basement | no garage |
| no fireplace | no smoke alarm | no burglar alarm |
| no recent remodelling | gas furnace | no air conditioning |

Buyer Characteristics (if they ask)
first time homebuyer     auto insurance is with another company

(Information in this box should be filled out by test call coordinator)

1) Hello, I'd like to speak to an agent about homeowners insurance.
   Agent Name_____

2) I'd like to get a quote on homeowner's insurance for a home that I'm buying.
   What do you need to know to give me a quote?

   Write down what questions they ask below, and answer from the information
   above.  Only provide the information that is requested.

   Question #1_____

   Question #2_____

   Question #3_____

   Question #4_____

   Question #5_____

   Question #6_____

   Question #7_____

   Question #8_____

003962

3) *I need an HO-3 homeowners policy that covers fire, theft, and liability with*
   - *coverage of the house for 80% of replacement value*
   - *contents for 50% of the house coverage*
   - *liability for $100,000*
   - *medical for $1,000*
   - *with a $250 deductible.*
If they give you a quote for this policy, write down the annual premium and move on to "4)."
   Annual Premium_____

If they won't offer this policy, ask them why._____
_____
_____

Get the following information for the policy that they do offer.    .
   Type of Policy_____
   Amount of coverage for the house_____
   Amount of coverage for Contents_____
   Amount of coverage for Liability_____
   Amount of coverage for Medical_____
   Deductible_____
   Annual Premium_____

4) *If I decide to buy this policy what will I need to do to get it approved?*
_____
_____
_____

5) *Thanks. I'll get back to you later.*
After you hang up, write down anything that the agent said that made you think he or she wanted to sell you a policy, or did not want to sell you a policy.
_____
_____
_____

Did you feel that the agent wanted your business?(yes,no, or not sure)_____

Other Information
_____
_____
_____
_____
_____
_____
_____

## TESTIMONY OF

### FRANCIS A. MANCINI
### COUNSEL AND CORPORATE SECRETARY
### NATIONAL COMMITTEE ON PROPERTY INSURANCE

My name is Francis A. Mancini. I serve as Counsel and Corporate Secretary of the National Committee on Property Insurance (NCPI). NCPI is a research and technical association, approved as an insurance advisory organization in all 50 states. NCPI's Property Insurance Plans Service Office (PIPSO) division assists property insurance plans (FAIR Plans) in their administration, operations and functions. We appreciate the opportunity to provide the subcommittee written testimony regarding the issue of redlining which was a subject of the March 3, 1993 subcommittee hearing.

In written statements, oral testimony and during the question and answer period of the recent hearing, many references were made concerning the nation's FAIR Plans. These references were most prominent in the testimony of the ACORN witness. These references indicate a general misconception of the origins, operations and purpose of the FAIR Plans. It is noted that this testimony is limited to FAIR Plans and no reference is made to Beach/Windstorm Plans.

There has been a great deal of testimony presented to the subcommittee questioning the methodology used in the ACORN study. While we share these concerns, our testimony will not dwell on those weaknesses. Rather, it is our intention to have our testimony provide the subcommittee with factual information regarding the creation, evolution and current operation of the FAIR Plans.

A review of the testimony reveals that criticism leveled at the FAIR Plans can be grouped into five categories:

- not functioning as designed

- limited coverage availability

- unreasonable underwriting standards

- excessive rates

- unfairly structured governing boards

Before addressing each of these items, it would be appropriate to review the history of the creation of the FAIR Plans.

The mid to late 1960's brought several major civil disorders in various urban areas of the United States including the Watts District of Los Angeles, California; Newark, New Jersey; and Detroit, Michigan.

In July 1967, the National Commission on Civil Disorders (known as the Kerner Commission) was formed by the signing of Executive Order 11365. The National Advisory Panel on Insurance in Riot-Affected Areas (known as the Hughes Panel) was also established at this time to advise the Commission.

The findings and recommendations of the Kerner Commission, published in March 1968, are well-known and received broad publicity. Included in the Commission Report were the findings and recommendations of the National Advisory Panel on Insurance in Riot-Affected Areas.[1]

– 1 –

The findings of that Panel can be summarized as follows:

- Serious availability problems in the property insurance markets exist in many urban areas and riots and the threat of riots is aggravating the situation.

- Insurance is a necessity for homeowners and businessmen and is an essential force in revitalizing our cities.

- Where property insurance is available in core urban areas, the costs are often prohibitive.

The following, among others, were recommendations of the Panel:

1. "We recommend that the Insurance Industry, in cooperation with the states, institute in all states, plans establishing fair access to insurance requirements (FAIR Plans).

   A FAIR Plan assures every property owner in a state:

   - Inspection of his property;

   - Written notice of any improvements or loss prevention measurers to make his property insurable; and

   - Insurance if the property is adequately maintained according to reasonable underwriting standards.

   FAIR Plans make these assurances applicable to all dwelling and commercial buildings and their contents for the perils of:

   - Fire and extended coverage (damage from wind, hail explosion, riot, civil commotion, aircraft, vehicles and smoke);

   - Vandalism and malicious mischief; and

   - Burglary and theft."[2]

2. "The Federal Government charter a National Insurance Development Corporation (NIDC) to:

   - Provide reinsurance against the risk of extraordinary loss from civil disorders and thereby remove the burden from a single group of persons or segment of the insurance industry;

   - Provide a source of reinsurance for state pools;

   - Assess the performance of FAIR Plans and other insurance programs designed to deal with the problems of the inner city by gathering information, analyzing data and preparing studies for the benefit of the public, the industry and government."[3]

– 2 –

The Congress responded to the findings of the Kerner Commission and the Hughes Panel. Cognizant of the need for reasonable access to insurance, while responding to industry concerns regarding solvency and stability, the Congress enacted the "Urban Property Protection Reinsurance Act of 1968" (UPPRA)[4] as part of the Housing and Urban Development Act of 1968. In their wisdom and judgment and in response to insurer solvency concerns, the "Act" did not include all of the recommendations made by the Hughes Panel. Congress also established the National Insurance Development Program to provide for Federal Riot Reinsurance.

The UPPRA authorized riot reinsurance to be made available only to insurers with continuing participation in the state plans that provided Fair Access to Insurance Requirements (hence FAIR Plans) for citizens requiring essential property insurance. The following are key elements of the Act relative to Underwriting:

Essential Property Insurance[5] was defined under the Act as:

- Insurance against direct loss to property as defined and limited in standard fire policies and extended coverage endorsement as approved by the state insurance authority.

- Insurance against the peril of vandalism and malicious mischief (added in 1970).

Eligible Property[6] was defined as:

- Any real property, personal property or mixed real and personal property potentially insurable under one or more lines of essential property insurance subject to inspection to ascertain insurability and applicable rates.

Reasonable Underwriting Standards[7] for declination must be relevant to the perils against which insurance is sough and may include:

- Physical condition of the property; however, the mere fact that a property does not satisfy all current building codes would not in itself suffice;

- The property's present use such as extended vacancy (except for rehab property) or the improper storage of flammable materials; or

- Other specific characteristics of ownership, condition, occupancy or maintenance that are violative of public policy and that result in substantially increased exposure to loss.

Declinations[8] require that:

- In the event that a risk is declined on the basis that it does not meet reasonable underwriting standards or that coverage will be written on condition that the property be improved, the insurer or placement facility shall promptly send copies of the inspection and action reports to the applicant advising him of the procedures available, including rights of appeal to the State insurance authority.

– 3 –

Cancellation and Non–renewal[9] standards include:

- Except in cases of owner or occupant incendiarism, material misrepresentation, or non–payment, each Plan shall require its participating insurers to give and each such insurer shall give property owners no less than 30 days prior written notice of any cancellation or non–renewal with respect to any eligible risk whether or not such risk is then insured under the Plan in order to allow the affected property owner sufficient time to apply for an inspection and to obtain coverage under the Plan if necessary.

The above "Guidelines," along with several other requirements, became the minimum standards for a State FAIR Plan, in order for its participating companies to be eligible for riot reinsurance.

The enabling documents for the FAIR Plans were developed on a state–by–state basis. This resulted in a number of variations regarding eligible areas, eligible risks, rates applicable and specific underwriting standards. These variations continue to be evident today.

Since 1968, thirty–two States, Puerto Rico and the District of Columbia have created FAIR Plans either by statute or voluntarily by the insurance industry. Exhibit I lists the FAIR Plans, date of inception and statutory or voluntary status. Exhibit I also indicates those Plans which are not PIPSO Subscribers and for which no information is provided.

A **Compendium of State Property Insurance Plans** compiled by PIPSO from information provided by the subscribing FAIR Plans is prepared annually and includes extensive information on Plan operations. A copy of the 1993 Compendium will be forwarded to the Subcommittee on March 19, 1993.

In 1983, the Congress eliminated funding for the National Insurance Development Fund (Federal Riot Reinsurance Program) and all federal oversight of the FAIR Plans ceased, leaving this exclusively to the local insurance regulator.

With this brief history in mind we would now like to comment on the five general criticisms of FAIR Plans presented to the subcommittee.

**The FAIR Plans are not functioning as designed.**

The FAIR Plans are functioning as designed and, in many jurisdictions, have evolved beyond the original limited intent designed by Congress. Only eight relatively small FAIR Plans remain that limit coverage to the essential property insurance defined by Congress in 1968. The remaining FAIR Plans have expanded coverage availability in their states to meet real and perceived market needs.

In addition to twelve FAIR Plans which offer homeowners coverage, other coverages offered by various FAIR Plans include crime, sprinkler leakage, earthquake, personal liability, time element, sinkhole collapse and volcanic action. Currently, one Plan is developing a Business Owners Policy. Additionally, many FAIR Plans have been expanded to include coverage for farm and manufacturing property and manufactured homes.

– 4 –

Because FAIR Plans operate on a state–by–state basis, under the oversight of the insurance regulator, regulators have been able to expand the availability of coverage in the FAIR Plans to meet specific market needs in their jurisdictions. In all FAIR Plans, either by statute or regulation, the insurance regulator has the authority to expand the FAIR Plan to address demonstrated market failures.

FAIR Plans have not remained stagnant, but have evolved over the last 25 years to continue to meet the ever changing insurance needs of the public. They have accomplished this, in addition to the above, by expanding from designated urban areas to Plans which provide coverage on a statewide basis. In the last six years, new plans have been created in Arkansas, Mississippi, Hawaii and Florida.

The Property Insurance Plans Service Office has developed numerous manuals, guidelines and other publications to assist the Plans in their operations. Attached as Exhibit II is a listing of several of the PIPSO publications which we will be happy to provide the Subcommittee, upon request.

**The FAIR Plans only offer substandard or inferior coverage (policy forms).**

Policy forms utilized by the FAIR Plans are filed with the state insurance regulators by the Insurance Services Office (ISO) or other independent bureaus and approved for use not only by the FAIR Plan but by all licensed insurers operating in the state.

Particular criticism has been aimed at the HO–8 homeowner's policy as an alleged substandard or inferior insurance policy. Of the twelve FAIR Plans that provide homeowners coverage, only four offer the HO–8, while the others offer the HO–8 and other homeowner policy forms.

The HO–8 Policy will meet the needs of most Plan property owners by providing repair cost coverage (using common construction materials and methods) for the dwelling and other covered structures, while providing actual cash value coverage for personal property. The Policy covers the basic perils, includes coverage for loss of use of the property (additional living expense) and provides comprehensive personal liability coverage. The Policy does not require that the dwelling be insured to its full replacement cost.

As noted above regarding the expansion of FAIR Plans to offer additional coverages and to write in expanded areas, the determination of the policy forms used by the FAIR Plans in each jurisdiction rests with the insurance regulators. Thus, market needs as perceived by the regulator will determine which policy forms are used. Again, however, it must be stressed that all policy forms utilized by FAIR Plans are filed with and approved by the regulator and additional forms can be made available with regulatory authority.

**The FAIR Plans utilize unfair underwriting standards**

The underwriting standards utilized by the FAIR Plans differ from state to state. A common feature of the standards is that they are either embodied in the statute creating the FAIR Plan and subject to approval by the legislature or can be found in the regulations (plan of operation) under which the FAIR Plan operates and subject to approval by the regulator.

– 5 –

The most common underwriting reasons for a FAIR Plan to deny coverage include, vacant property open to trespass, poor physical condition, including unrepaired fire damage, poor housekeeping which includes overcrowding and storage of rubbish or flammable material and violation of law or public policy.

Applicants denied coverage by a FAIR Plan for an underwriting reason must be advised in writing of the deficiency, informed of how to correct it in order to make the property insurable and be provided with information on their right of appeal.

In 1979, the Federal Standards for statewide FAIR Plans were amended to meet the growing concern of insurers and local insurance regulators as regards arson for profit schemes (owner or occupant incendiarism). Under the amended standards, the FAIR Plans (with the regulators' approval) were allowed to expand reasons for declination/cancellation/non–renewal where known arson/moral hazard "indicators" were found to exist.

FAIR Plan underwriting standards are reasonable and are embodied in public documents which are subject to the legislative process and or regulatory oversight.

**FAIR Plan premiums are excessive.**

Similar to coverage and policy form availability and underwriting standards, premium rates for FAIR Plans are established on a state–by–state basis and by a variety of methods. The one constant in all FAIR Plan rate setting is that the rate setting mechanism is embodied in either statute or regulations with the insurance regulator retaining the authority to approve all FAIR Plan premium rates.

The **Compendium of State Property Insurance Plans** provides information on the FAIR Plans' Rate Structure. FAIR Plans have incurred a statutory underwriting loss in each year of their existence with the exception of 1987 when a modest excess of income over expenses was realized. Since their inception the nation's FAIR Plans have incurred an aggregate statutory underwriting losses of over $1 billion. This loss has been incorporated into the overall property insurance rate making process. As a result, all insureds in states with FAIR Plans subsidize the deficit.

Nationally, rate making is undergoing a change. All insurers (including the FAIR Plans) are in the process of adopting "loss cost" procedures to replace the advisory rate procedure previously used. However, under the loss cost procedure, the insurance regulator will still retain final approval over all FAIR Plan premium rates.

**The FAIR Plan Governing Boards are unfairly structured.**

The structure of all FAIR Plan Governing Boards are embodied in either statute or regulation and are subject to amendment by either the legislature or the insurance regulator. Seventeen FAIR Plans have public or non–industry members who serve on their Governing Boards and fifteen FAIR Plans include insurance agent representatives.

– 6 –

003969

FAIR Plan Governing Boards conduct open meetings with a representative of the insurance regulator in attendance in many cases. Action of the FAIR Plan Governing Boards are subject to an appeal process that includes both administrative and judicial remedies. In many cases, the insurance regulator will be the final arbiter of the action of FAIR Plan Governing Boards.

* * * * * * * * * * * * * * * * * *

The nation's FAIR Plans are not only fulfilling the need for which they were established but have evolved to address subsequent insurance needs arising over the last two decades. The coverages and policy forms available through FAIR Plans have been expanded to meet market needs in individual jurisdictions as determined by the regulator. The eligible areas within states for FAIR Plan coverage have been expanded to meet market needs, particularly in rural and coastal areas. FAIR Plan underwriting standards and rate levels remain reasonable and subject to legislative or regulatory oversight.

In recent years, the PIPSO division of NCPI has reported a decline in the number of applications received by the FAIR Plans and policies issued by the FAIR Plans. This is an indication that the voluntary property insurance market is functioning properly and insuring properties that may have previously been written through FAIR Plans.

In 1991, only 1.07% of the total property insurance market (by earned premium) was written through FAIR Plans. This penetration level is dwarfed by the penetration levels for automobile and workers' compensation residual markets which in some states are equal to a third to two-thirds of the total market, respectively.

Included as Exhibit III is a copy of the 1991 PIPSO Report which provides current FAIR Plan statistics. These Reports are forwarded to Insurance Regulators in the states having FAIR Plans.

In conclusion, the nation's FAIR Plans, operated by the insurance industry and subject to legislative and regulatory oversight, have and continue to fulfill the property insurance needs for those unable to obtain coverage through the conventional markets. The flexibility of the FAIR Plans and the oversight authority of regulators have allowed the FAIR Plans to expand where needed, but also to remain as created where market need does not dictate change.

Whether individual FAIR Plans should offer additional coverages or policy forms, ease underwriting standards or inspection procedures or adopt new rate setting programs are issues to be addressed by individual legislatures or regulators in each FAIR Plan state. These public officials have not abandoned this responsibility in the past and are unlikely to do so now.

Again, we appreciate the opportunity to present testimony to the subcommittee. It is our hope that this statement has provided a better understanding of how the FAIR Plans operate and the extent to which they are subject to legislative and regulatory oversight.

Should any member of the subcommittee or its staff have any questions regarding this statement or desires additional information regarding the FAIR Plans, in general, or a particular FAIR Plan, the PIPSO division of NCPI is prepared to provide the information or data requested.

Thank you.

– 7 –

### ENDNOTES

1.  Meeting the Insurance Crisis of our Cities – A Report by the Presidents National Advisory Panel on Insurance in Riot Affected Areas, published January 1968

2.  Ibid (Page 9)

3.  Ibid (Page 13)

4.  The Urban Property Protection Reinsurance Act of 1968 12 U.S.C. 1749bbb–1749bbbb–21 – Part 1905 – Statewide "FAIR" Plans

5.  Ibid 1905.1(h)

6.  Ibid 1905.1(f)

7.  Ibid 1905.7(c)

8.  Ibid 1905.7(d)

9.  Ibid 1905.9(a)

– 8 –

EXHIBIT I

### State Property Insurance Plans (Subscribers)

| State | Inception | State | Inception |
|---|---|---|---|
| California | 1968 | Minnesota | 1969 |
| Connecticut | 1969 | Missouri | 1969 |
| Delaware | 1968 | New Jersey | 1968 |
| Dist. of Columbia | 1968 | New Mexico | 1969 |
| Georgia | 1970 | New York | 1968 |
| Illinois | 1968 | North Carolina | 1969 |
| Indiana (V) | 1968 | Ohio | 1968 |
| Iowa (V) | 1968 | Oregon | 1968 |
| Kansas (V) | 1970 | Pennsylvania | 1968 |
| Kentucky | 1968 | Rhode Island | 1968 |
| Louisiana | 1968 | Virginia | 1968 |
| Maryland | 1969 | Washington | 1968 |
| Massachusetts | 1968 | West Virginia | 1986 |
| Michigan | 1968 | | |

### State Property Insurance Plans (Non–Subscribers)

| State | Inception | State | Inception |
|---|---|---|---|
| Arkansas | 1988 | Mississippi | 1987 |
| Florida | 1992 | Puerto Rico | Unknown |
| Hawaii | 1991 | Wisconsin | 1970 |

(V) – Voluntary (all others are Statutory)

**EXHIBIT 11**
**Page 1 of 2**

### NCPI–PIPSO PUBLICATIONS

**Directories**

- Compendium of Property Insurance Plans

- Compendium of Property Insurance Plan Governing Committee Structure & Meeting Requirements

- Directory of Property Insurance Plans

**Guidelines/Manuals**

- ABC's of Negotiating

- ACV Guidelines

- Anti–Arson Action Plan

- Catastrophe Claims Procedure Manual

- Duties and Responsibilities of Members of the Governing Committee's of Property Insurance Plans Including a Governing Committee Member's Guide for Using and Interpreting Property Insurance Plan Financial Statements

- Guidelines for the Development of A State Property Insurance Plan's Articles of Agreement and Plan of Operations

- Guidelines for a Property Insurance Plan Accounting Manual

- Internal Audit Procedural Guidelines

- Internal Controls: Guidelines for a Business Travel and Expense Reporting Procedure

- Is It Wind or Is It Water?

- Juvenile Firesetters Programs: A Summary of Available Resources

- Model State Property Insurance Plan Standing Committee Guide

- Operational Audit Guidelines

- Underwriting Guidelines for Property Insurance Plans

- Voluntary Guidelines for the Coordination of Wind and Flood Losses

#### Studies/Reports

· America's Vanishing Coastlines

· Analysis of Standard Mortgage Clause and Selected Provisions of the New York Standard Fire Policy

· Arson In America: Property Insurance Plan Efforts to Combat the Problem

· Depopulation Task Force Report

· FAIR and Beach Plans Underwriting Results and Market Penetration Report

· Federal Taxation of Residual Property Insurance Mechanisms

· PIPSO Reports

· Property Insurance Plans Compilation of Expenses Per Policy

· Regionalization Task Force Report

· Study on the Alternatives Available When Considering Windstorm Catastrophe Funding

· Underwriting and Inspection Liability: A Summary and Analysis for Underwriting and Loss Control Consideration

EXHIBIT III



**September, 1992**

Enclosed are the PIPSO Reports for the twelve months ending October, November, December, 1991.

The narrative which accompanies this Report will focus on trends observed in the FAIR and Beach/Wind Plans for the five years 1987 through 1991. The narrative contains "Comparison Charts" which show percentage changes in applications, policies, premium and losses from:

- 3rd quarter, 1991 to 4th quarter, 1991,
- 4th quarter, 1990 to 4th quarter, 1991, and,
- Twelve months, 1990 to twelve months, 1991

## FAIR PLAN SUMMARY

*Exhibits A1 through A10 show results for 29 FAIR Plans. The data in these ten Exhibits (and the data shown in Figures 1 through 4 in the narrative) show experience for Basic and, where applicable, Homeowners lines of coverage. The data in Exhibits A1, A2, A3, A7 and A8 present experience for the twelve months ending October, November, December, 1991. Exhibits A4, A5 and A6 are identical in format to Exhibits A1, A2 and A3, respectively, but present experience for the five years ending October, November, December, 1991. Exhibits A9 and A10 show experience for each of the five fiscal years and Exhibit A10 provides inception to date totals.*

*The "FAIR Plan Comparative" on Page 3 shows percent changes in FAIR Plan experience from previous periods.*

For the fifth consecutive year, the number of new applications received by the FAIR Plans declined. The Plans received 234,876 new applications in 1991, 4.4% fewer than the 245,582 new applications received in 1990 and 39.7% fewer than the 389,639 new applications received in 1987, the first of the five years covered by this edition of PIPSO Reports.

The number of new policies followed a five year trend similar to the one noted for new applications. Although new policies jumped 4.0% from 148,263 in 1990 to 154,233 in 1991, this increase was not the result of any market forces. New policies issued in 1991 were 37.0% fewer than the 244,755 new policies issued in 1987.

1

| | | | | FIGURE 1 |
|---|---|---|---|---|

FAIR Plan Experience Trends
New Applications and New Policies
1987 through 1991

| Year | New Applications * | | New Policies * | |
|---|---|---|---|---|
| | Number Received | Percent of 1987 Volume | Number Issued | Percent of 1987 Volume |
| 1987 | 389,639 | 100.0 | 244,755 | 100.0 |
| 1988 | 303,961 | 78.0 | 191,647 | 78.3 |
| 1989 | 264,940 | 68.0 | 162,059 | 66.2 |
| 1990 | 245,582 | 63.0 | 148,263 | 60.6 |
| 1991 | 234,876 | 60.3 | 154,233 | 63.0 |

\* Includes Homeowners.

Figure 1 shows the change in the number of new applications and new policies from 1987 through 1991. Amounts are also shown as a percentage of 1987 volume to assist in tracking FAIR Plan experience during the period covered by this Report. For the five years ending in 1991, Figure 1 illustrates how the Plans have responded to the softening of the voluntary market which began in 1987. The drop in new applications and new policies was most pronounced in 1988 reflecting the initial shift from the Plans to the voluntary market which occurred as the market was becoming soft. Additional decreases in the number of new applications and new policies occurred in the years following 1988 as risks moved from the Plans to the voluntary market.

Figure 2 on page 4 shows the number of habitational policies issued by all the FAIR Plans increased from 678,359 in 1990 to 689,478 in 1991. This increase follows three successive decreases in habitational policies from 747,277 in 1987 to 678,359 in 1991.

The number of commercial policies plummeted 43.7% from 164,200 in 1987 to 92,463 in 1991 with all FAIR Plans reporting a decrease in the number of commercial policies during the period. Much of the decrease in the number of commercial policies occurred from 1987 to 1989, the first two years of the most recent soft voluntary market cycle. During that period, many commercial policies found placement in the voluntary market. In 1989, the FAIR Plans issued 113,749 commercial policies which was a 30.7% decrease from the 164,200 commercial policies issued in 1987. From 1989 to 1991, the number of commercial policies dropped an additional 18.7% (from 113,749 to 92,463).

(Continued on Page 4)

© 1992, National Committee on Property Insurance

No portion of this material may be copied or reproduced without the written consent of the National Committee on Property Insurance.

The data contained herein is based on information derived from other sources. Although this information is considered reliable, we do not guarantee its accuracy.

2

174

## FAIR PLAN COMPARATIVE

| Category | 4th Quarter, 1991 | 4th Quarter, 1990 | Percent Change |
|---|---|---|---|
| New Applications | 57,659 | 60,788 | –5.1 |
| Renewal Applications | 157,361 | 167,245 | –5.9 |
| Total Applications | 215,020 | 228,033 | –5.7 |
| New Policies | 39,031 | 36,389 | 7.3 |
| Renewal Policies | 152,098 | 155,650 | –2.3 |
| Total Policies | 191,129 | 192,039 | –0.5 |
| Reported Losses | 9,995 | 10,207 | –2.1 |
| Written Premium | $ 56,002 | $ 58,450 | –4.2 |
| Earned Premium | $ 58,353 | $ 63,192 | –7.7 |
| Paid Losses | $ 49,097 | $ 48,190 | 1.9 |
| Incurred Losses | $ 45,312 | $ 55,047 | –17.7 |
| Incurred Loss Adjustment Expenses | $ 7,112 | $ 6,741 | 5.5 |
| Operating Expenses | $ 17,208 | $ 17,830 | –3.5 |
| Statutory Underwriting Results | $ –11,279 | $ –16,426 | –31.3 |
| Operating Results | $ –8,648 | $ –12,139 | –28.8 |
| **Category** | **4th Quarter, 1991** | **3rd Quarter, 1991** | **Percent Change** |
| New Applications | 57,659 | 64,340 | –10.4 |
| Renewal Applications | 157,361 | 173,038 | –9.1 |
| Total Applications | 215,020 | 237,378 | –9.4 |
| New Policies | 39,031 | 39,139 | –0.3 |
| Renewal Policies | 152,098 | 159,681 | –4.7 |
| Total Policies | 191,129 | 198,820 | –3.9 |
| Reported Losses | 9,995 | 12,562 | –20.4 |
| Written Premium | $ 56,002 | $ 59,390 | –5.7 |
| Earned Premium | $ 58,353 | $ 57,879 | 0.8 |
| Paid Losses | $ 49,097 | $ 52,982 | –7.3 |
| Incurred Losses | $ 45,312 | $ 57,702 | –21.5 |
| Incurred Loss Adjustment Expenses | $ 7,112 | $ 9,669 | –26.4 |
| Operating Expenses | $ 17,208 | $ 18,684 | –7.9 |
| Statutory Underwriting Results | $ –11,279 | $ –28,176 | –60.0 |
| Operating Results | $ –8,648 | $ –24,396 | –64.6 |
| **Category** | **January 1, 1991 to December 31, 1991** | **January 1, 1990 to December 31, 1990** | **Percent Change** |
| New Applications | 234,876 | 245,582 | –4.4 |
| Renewal Applications | 646,242 | 672,376 | –3.9 |
| Total Applications | 881,118 | 917,958 | –4.0 |
| New Policies | 154,233 | 148,263 | 4.0 |
| Renewal Policies | 627,708 | 632,925 | –0.8 |
| Total Policies | 781,941 | 781,188 | 0.1 |
| Reported Losses | 43,938 | 45,853 | –4.2 |
| Written Premium | $ 232,362 | $ 246,005 | –5.5 |
| Earned Premium | $ 236,476 | $ 258,786 | –8.6 |
| Paid Losses | $ 208,832 | $ 215,574 | –3.1 |
| Incurred Losses | $ 202,434 | $ 215,736 | –6.2 |
| Incurred Loss Adjustment Expenses | $ 29,332 | $ 27,582 | 6.3 |
| Operating Expenses | $ 70,875 | $ 72,383 | –2.1 |
| Statutory Underwriting Results | $ –66,165 | $ –56,915 | 16.3 |
| Operating Results | $ –52,115 | $ –42,552 | 22.5 |

**NOTE:** All dollar figures shown above are in thousands of dollars.

3

FIGURE 2

FAIR Plan Experience Trends
Habitational and Commercial Policies
1987 through 1991

| | Number of Habitational Policies * | | Number of Commercial Policies | |
|---|---|---|---|---|
| Year | Issued | Percent of 1987 Volume | Issued | Percent of 1987 Volume |
| 1987 | 747,277 | 100.0 | 164,200 | 100.0 |
| 1988 | 723,579 | 96.8 | 160,670 | 97.9 |
| 1989 | 709,829 | 95.0 | 113,749 | 69.3 |
| 1990 | 678,359 | 90.8 | 102,829 | 62.6 |
| 1991 | 689,478 | 92.3 | 92,463 | 56.3 |

* Reported habitational class data includes Homeowners. In 1987 and 1988, not all the Plans provided accurate breakdowns between habitational and commercial policies. Consequently, for 1987 and 1988 the total of habitational and commercial policies in this table differs from the total policy counts shown in Exhibit A10 of the PIPSO Reports.

Written premium and earned premium also declined more steeply for commercial than for habitational. Figure 3 (next page) shows habitational, commercial and total written premium for each year from 1987 through 1991.

Habitational written premium increased 4.4% from $170.2 million in 1987 to $177.7 million in 1988. From 1988 to 1991, habitational written premium declined as more habitational policies found placement in the voluntary market. The $162.5 million in habitational written premium in 1991 was 95.5% of the $170.2 million written in 1987. Commercial written premium decreased each year from $156.0 million in 1987 to $69.8 million in 1991 – a 55.2% decrease from 1987. Total written premium decreased 28.8% from $326.2 million in 1987 to $232.4 million in 1991.

FAIR Plan earned premium totaled $236.5 million in 1991. This is an 8.6% decline from $258.8 million in 1990 and a 28.2% decline from $329.6 million in 1987. As with written premiums, the bulk of the decrease in earned premium was felt in the commercial class where premium dropped 55.4% from $170.5 million in 1987 to $75.9 million in 1991.

Habitational earned premium increased 10.9% from $159.1 million in 1987 to $176.4 million in 1989 before decreasing in 1990 and 1991. In 1991 habitational earned premium was $160.5 million – 0.9% higher than the $159.1 million earned in 1987.

Exhibit A10 of the PIPSO Reports shows the number of reported losses decreased 11.0% from 49,385 in 1988 to 43,938 in 1991 after increasing 1.8% in 1988 from 48,514 in 1987. While the number of reported losses for all the FAIR Plans varied little from 1987 to 1991, several Plans reported large increases in reported losses as a result of catastrophes which occurred during the period.

The **North Carolina Joint Underwriting Association (NCJUA)** reported a 285.4% increase in the number of reported losses from 1,397 in 1988 to 3,987 in 1989. In 1990, reported losses for the Plan dropped to 2,074. Exhibit A10 shows that total loss and loss adjustment expenses reported by the Plan more than doubled from $5.8 million in 1988 to $12.6 million in 1989 but decreased to $3.4 million in 1990. Much of the surge in losses from 1988 to 1989 resulted from **Hurricane "Hugo" (Cat. #18, September, 1989)** which moved inland after making landfall in South Carolina. The **NCJUA** reported that, as of June 30, 1992, it has paid $3.6 million in losses and $442 thousand in loss adjustment expenses. By contrast, the Plan paid $2,000 in loss and loss adjustment expense from **Hurricane "Bob" (Cat. #85, August 18–20, 1991)** since "Bob" did not move inland.

**Hurricane "Bob"** did cause significant losses in Massachusetts as did a massive

| | Habitational Written Premium ('000) * | | Commercial Written Premium ('000) | | Total Written Premium ('000) * | |
|---|---|---|---|---|---|---|
| Year | Reported | Percent of 1987 Volume | Reported | Percent of 1987 Volume | Reported | Percent of 1987 Volume |
| 1987 | $ 170,232 | 100.0 | $ 155,955 | 100.0 | $ 326,187 | 100.0 |
| 1988 | 177,654 | 104.4 | 120,450 | 77.2 | 298,104 | 91.4 |
| 1989 | 173,283 | 101.8 | 96,596 | 61.9 | 269,879 | 82.7 |
| 1990 | 162,810 | 95.6 | 83,195 | 53.3 | 246,005 | 75.4 |
| 1991 | 162,528 | 95.5 | 69,834 | 44.8 | 232,362 | 71.2 |

**FIGURE 3**

FAIR Plan Experience Trends
Habitational and Commercial Written Premium
1987 through 1991

* Includes Homeowners

coastal storm **(Cat. #90, October 29–November 1, 1991)** which resulted from the combination of a North Atlantic storm with the remnants of **Hurricane "Grace"**. Massachusetts received 1,786 losses as a result of Hurricane "Bob". As of June 30, 1992, the Plan has paid nearly **$3.2 million** in loss and loss adjustment expenses. The October storm caused nearly 1,000 reported losses. So far, the Plan has paid **$695.2 thousand** in loss and loss adjustment expenses.

Plans in Rhode Island and New York were also affected by the two storms. The **Rhode Island Joint Reinsurance Association (RIJRA)** received 375 losses from Hurricane "Bob" and 50 losses from the October storm. The RIJRA has paid loss and loss adjustment expenses of **$701.6 thousand** and **$55.1 thousand** from "Bob" and the October storm, respectively. The **New York Property Insurance Underwriting Association** received 405 reported losses from Hurricane "Bob" which resulted in incurred losses of approximately **$340 thousand**. Losses from the October storm were negligible.

Nearly 100 catastrophes affected the FAIR Plans in the five years 1987 through 1991. All but six of these catastrophes involved wind damage. Besides Hurricanes "Hugo" and "Bob" and the October storm, there were numerous catastrophes involving tornadoes.

Two particularly serious windstorms occurred in 1989. On July 10, 1989, tornadoes **(Cat. #14)** struck several New England States, New York and New Jersey. Hardest hit was the **Connecticut FAIR Plan** which paid approximately $1.25 million from the storms. Tornadoes struck seven states on the southeast coast between May 3 and May 6, 1989. The **North Carolina Joint Underwriting Association** sustained nearly all the FAIR Plan losses from these tornadoes although FAIR Plans in Georgia, Louisiana and Virginia were also affected. North Carolina paid **$625.2 thousand** in loss and loss adjustment expenses.

In December, 1988, the **California FAIR Plan Association** incurred nearly $1.0 million in losses from two windstorms which occurred within a period of nine days. The first windstorm **(Cat. #77)** occurred between December 7 and 9 and resulted in paid losses of **$740 thousand** with loss adjustment expenses of $67 thousand. One week later, a second windstorm **(Cat. #78)** occurred resulting in **$254 thousand** in losses and **$40 thousand** in loss adjustment expenses.

During 1991 there were two storms which produced losses of more than $1 million.

5

From March 26 through March 28, a storm system which produced wind, hail, tornadoes and flooding (Cat. #65) affected ten FAIR Plan states. FAIR Plan losses from the storm were approximately $1.9 million. Michigan estimated that it incurred more than $1.4 million of these losses. On July 7 and 8, 1991, FAIR Plan states were affected by a storm (Cat. #84) which also produced wind, hail, tornadoes and flooding. Michigan was once again hardest hit by the storm and estimated losses of nearly $1.5 million.

While wind damage was the leading cause of catastrophe–related losses, the **California FAIR Plan Association** was affected by three earthquakes during the five years ending in 1991. As of June 30, 1992, the Plan had paid **$760 thousand** in loss and loss adjustment expenses resulting from a June 28, 1991 earthquake (Cat. #83) on the

Sierra Madre fault which registered 6.0 on the Richter scale. The Plan has paid nearly $1.1 million in loss and loss adjustment expenses from the **Loma Prieta Earthquake (Cat. #20, October 17, 1989)** which registered 7.1 on the Richter Scale. On October 1, 1987, an earthquake on the Whittier fault (Cat. #40) which measured 5.9 on the Richter Scale and resulted in the California Plan sustaining more than $1.0 million in loss and loss adjustment expenses.

In 1990 and 1991, the **California FAIR Plan Association** paid over $2.2 million in losses from fires. In late June, 1990 fires (Cat. #43) resulted in loss and loss adjustment expenses of more than $1.2 million. In October, 1991, fires in Oakland (Cat. #87, **October 20–22, 1991**) cost the Plan an additional $1.0 million in loss and loss adjustment expenses.

**THE BOTTOM LINE:** The FAIR Plans reported statutory underwriting losses of **$66.2 million**. This is a 16.3% increase from the $56.9 million in statutory underwriting losses reported in 1990. Operating losses increased 22.5% from $42.6 million in 1990 to $52.1 million in 1991.

Figure 4 (right) shows that after reporting a statutory underwriting gain of $744 thousand in 1987, the FAIR Plans reported statutory underwriting losses which increased each year from 1988 through 1991. As the soft voluntary market conditions persisted, earned premiums decreased.



Figure 4

During the first eight months of 1992, there have been several significant catastrophes. These include the Los Angeles riots in early May, which resulted in losses and loss adjustment expenses of $47 million and **Hurricane "Andrew" (Cat. #27)** which recently caused the **Louisiana Joint Reinsurance Association** to incur an estimated $1.0 million (For information on losses sustained by the **Florida Windstorm Underwriting Association** and the **Louisiana Insurance Underwriting Association**, please refer to the **Beach/Wind Plan Summary**, which begins on page 11).

Although we expect statutory underwriting losses for all the FAIR Plans to continue to increase in 1992, the impact of these catastrophes on Plan experience beyond 1992 cannot be determined.

6



*Exhibits B1 through B7 show Homeowners results for the ten FAIR Plans and the one Coastal Plan offering the coverage. Exhibits B1 through B3 show experience for the twelve months ending December 31, 1991.Exhibits B4 through B6 are identical in format to Exhibits B1 through B3 but show each Plan's Homeowners experience on an "inception to date" basis. Exhibit B7 presents Homeowners experience for each of the most recent five years and relates the experience to the total habitational experience for the eleven Plans offering the coverage.*

*The Homeowners Comparative on Page 8 shows percent changes in Homeowners experience from prior periods.*

New Homeowners applications decreased 1.2% from 41,584 in 1990 to 41,093 in 1991. From 1987 to 1991, the number of new applications decreased 36.1% from 64,303 to 41,093. The number of new policies decreased 40.7% from 51,842 in 1987 to 30,765 in 1990 before increasing to 32,317 in 1991.

Figure 5 shows the number of new and renewal Homeowners applications and policies for the years 1987 through 1991. The number of applications and policies are also expressed as a percentage of 1987 experience. Figure 5 shows that while the number of new applications and policies decreased steadily from 1987 to 1991, the number of renewal applications and policies fluctuated during the period. Renewal applications ranged from 120,417 in 1987 to 129,597 in 1990 but showed no identifiable pattern of increase or decrease. The number of renewal policies decreased from 132,249 in 1988 to 118,198 in 1990 before increasing to 118,416 in 1991. The erratic pattern in renewal application and renewal policy trends may be the result of a steady increase in renewal Homeowners business reported by the Plan in Michigan offset by decreases reported by other Plans in which the soft voluntary market has begun to impact Homeowners.

**FIGURE 5**

Homeowners Experience
Applications and Policies
Five Year Trend: 1987 through 1991

| Year | New Applications | | Renewal Applications | |
|---|---|---|---|---|
| | Number Received | Percent of 1987 Volume | Number Received | Percent of 1987 Volume |
| 1987 | 64,303 | 100.0 | 120,417 | 100.0 |
| 1988 | 50,469 | 78.5 | 128,792 | * 107.0 |
| 1989 | 42,999 | 66.9 | 125,988 | 104.6 |
| 1990 | 41,584 | 64.7 | 129,597 | 107.6 |
| 1991 | 41,093 | 63.9 | 122,913 | 102.1 |

| Year | New Policies | | Renewal Policies | |
|---|---|---|---|---|
| | Number Issued | Percent of 1987 Volume | Number Issued | Percent of 1987 Volume |
| 1987 | 51,842 | 100.0 | 118,789 | 100.0 |
| 1988 | 39,840 | 76.8 | 132,249 | 111.3 |
| 1989 | 31,610 | 61.0 | 125,791 | 105.9 |
| 1990 | 30,765 | 59.3 | 118,198 | 99.5 |
| 1991 | 32,317 | 62.3 | 118,416 | 99.7 |

(Continued on Page 9)

7

## HOMEOWNERS COMPARATIVE

| Category | 4th Quarter, 1991 | 4th Quarter, 1990 | Percent Change |
|---|---|---|---|
| New Applications | 10,338 | 11,170 | −7.5 |
| Renewal Applications | 31,063 | 34,335 | −9.5 |
| Total Applications | 41,399 | 45,505 | −9.0 |
| New Policies | 8,575 | 7,826 | 9.6 |
| Renewal Policies | 29,508 | 29,362 | 0.5 |
| Total Policies | 38,083 | 37,188 | 2.4 |
| Reported Losses | 4,119 | 4,194 | −1.8 |
| Written Premium | $ 13,238 | $ 12,847 | 3.0 |
| Earned Premium | $ 13,031 | $ 12,764 | 2.1 |
| Paid Losses | $ 14,114 | $ 12,611 | 11.9 |
| Incurred Losses | $ 10,607 | $ 12,203 | −13.1 |
| Incurred Loss Adjustment Expenses | $ 2,248 | $ 1,931 | 16.4 |
| Operating Expenses | $ 3,641 | $ 3,661 | −0.5 |
| Statutory Underwriting Results | $ −3,465 | $ −5,031 | −31.1 |
| Category | 4th Quarter, 1991 | 3rd Quarter, 1991 | Percent Change |
| New Applications | 10,338 | 11,869 | −12.9 |
| Renewal Applications | 31,063 | 35,143 | −11.6 |
| Total Applications | 41,399 | 47,012 | −11.9 |
| New Policies | 8,575 | 8,612 | −0.4 |
| Renewal Policies | 29,508 | 30,524 | −3.3 |
| Total Policies | 38,083 | 39,136 | −2.7 |
| Reported Losses | 4,119 | 5,672 | −27.4 |
| Written Premium | $ 13,238 | $ 13,435 | −1.5 |
| Earned Premium | $ 13,031 | $ 12,800 | 1.8 |
| Paid Losses | $ 14,114 | $ 16,428 | −14.1 |
| Incurred Losses | $ 10,607 | $ 21,784 | −51.3 |
| Incurred Loss Adjustment Expenses | $ 2,248 | $ 4,778 | −53.0 |
| Operating Expenses | $ 3,641 | $ 4,296 | −15.2 |
| Statutory Underwriting Results | $ −3,465 | $ −18,058 | −80.8 |
| Category | January 1, 1991 to December 31, 1991 | January 1, 1990 to December 31, 1990 | Percent Change |
| New Applications | 41,093 | 41,584 | −1.2 |
| Renewal Applications | 122,913 | 129,597 | −5.2 |
| Total Applications | 164,006 | 171,181 | −4.2 |
| New Policies | 32,317 | 30,765 | 5.0 |
| Renewal Policies | 118,416 | 118,198 | 0.2 |
| Total Policies | 150,733 | 148,963 | 1.2 |
| Reported Losses | 17,745 | 18,275 | −2.9 |
| Written Premium | $ 52,228 | $ 49,470 | 5.6 |
| Earned Premium | $ 50,990 | $ 50,893 | 0.2 |
| Paid Losses | $ 59,644 | $ 53,791 | 10.9 |
| Incurred Losses | $ 62,768 | $ 54,805 | 14.5 |
| Incurred Loss Adjustment Expenses | $ 10,754 | $ 8,336 | 29.0 |
| Operating Expenses | $ 15,230 | $ 14,460 | 5.3 |
| Statutory Underwriting Results | $ −37,762 | $ −26,706 | 41.4 |

**NOTE:** All dollar figures shown above are in thousands of dollars.

8

The **Michigan Basic Property Insurance Association** reported that the number of renewal Homeowners applications increased each year from 70,955 in 1987 to 80,925 in 1991. Renewal Homeowners policies increased each year from 64,923 in 1987 to 74,023 in 1991.

The **Kentucky Property Insurance Placement Facility** issued 4,310 renewal policies in 1991. This is a **71.0% decrease** from the 14,840 renewal policies issued in 1988. In 1988, prior to the drop, the number of renewal policies had increased 71.5% from 8,654 in 1987. The decline in renewal Homeowners policies from 1988 to 1991 was largely the result of the Plan's discontinuing the HO–2 form in November, 1989 and offering only the HO–8 form.

Exhibit B7 of the **PIPSO Reports** shows habitational written and earned premiums for 1987 through 1991 in each Plan offering Homeowners coverage. Habitational written and earned premiums are separated into "Homeowners" and "All Other Habitational" to show Homeowners experience in relation to total habitational experience. This exhibit is the best measure of the effect Homeowners coverage has on total habitational experience for the eleven Plans offering the coverage.

Homeowners written premium increased from $48.8 million in 1987 to $52.8 million in 1988. After declining to $49.5 million in 1990, Homeowners written premium increased to $52.2 million in 1991. This was a 7.1% increase from the $48.8 million in 1987. Earned premium increased from $44.3 million in 1987 to $52.4 million in 1989. After decreasing to $50.9 million in 1990, Homeowners earned premium increased to $51.0 million in 1991 – 15.0% above the $44.3 million earned in 1987.

For the five years 1987 through 1991, Homeowners written premium totaled $255.5 million. This is **57.1%** of the total habitational premium written by the Plans which offer Homeowners. Exhibit B7 does not show total premium written by the eleven Plans offering Homeowners but the $255.5 million in Homeowners written premium was **42.8%** of the $597.7 million in total premiums written by the eleven Plans offering the coverage.

There was little change in the number of reported losses from 1987 to 1991. During 1991 the Plans received 17,745 reported losses which was a 2.9% decrease from the five year peak of 18,275 reported losses in 1990 and a 1.2% increase from the 17,537 reported losses in 1987. Paid losses increased steadily from $43.8 million in 1987 to $59.6 million in 1991 – a total increase of 36.2%.

Figure 6 shows incurred losses and incurred loss adjustment expense for 1987 through 1991. The exhibit shows that incurred losses and loss adjustment expense did not change significantly until 1990. From 1990 to 1991, incurred losses increased 14.5% from $54.8 million to $62.8 million while loss adjustment

**FIGURE 6**

Homeowners Experience
Incurred Loss and Loss adjustment Expenses
Five Year Trend: 1987 through 1991

| | Incurred Loss (000) | | Incurred Loss Adjustment Expense (000) | |
|---|---|---|---|---|
| Year | Amount | Percent of 1987 Volume | Amount | Percent of 1987 Volume |
| 1987 | $ 52,668 | 100.0 | $ 7,818 | 100.0 |
| 1988 | 54,960 | 104.4 | 7,226 | 92.5 |
| 1989 | 56,190 | 106.7 | 7,755 | 99.2 |
| 1990 | 54,805 | 104.1 | 8,336 | 106.6 |
| 1991 | 62,768 | 119.2 | 10,754 | 137.6 |

9

003983

expenses increased 29.0% from $8.3 million to $10.8 million. The increases were largely due to catastrophe losses in Massachusetts and Michigan during 1991.

In Massachusetts, incurred losses on Homeowners increased 17.8% from $18.1 million in 1990 to $21.3 million in 1991. Incurred loss adjustment expenses increased 33.9% from $3.3 million in 1990 to nearly $4.4 million in 1991. Much of this increase in incurred loss and loss adjustment expense resulted from Hurricane "Bob" (Cat. #85,

August 18–20) and from the coastal storm in late October (Cat. #90, October 29 through November 1).

In Michigan, incurred losses increased 28.7% from $27.7 million in 1990 to $35.6 million in 1991 while incurred loss adjustment expense increased 37.1% from $3.9 million in 1990 to $5.4 million in 1991. Much of the increase in Homeowners loss and loss adjustment expense in Michigan resulted from windstorms which occurred March 26–28, 1991 (Cat. #65) and July 7–8, 1991 (Cat. #84).

**THE BOTTOM LINE:** Statutory underwriting losses for Homeowners totaled $37.8 million in 1991. This was a 41.4% increase from the $26.7 million losses sustained in 1990 and the highest aggregate losses ever experienced on Homeowners coverage.

Figure 7 (right) shows that statutory underwriting losses increased slightly from $25.5 million in 1988 to $26.7 million in 1990 before increasing 41.4% to $37.8 million in 1991. The increase was largely due to the surge in catastrophe–related losses which the Plans experienced in 1991.

At this point, no estimate can be made of Homeowners losses for 1992. So far, three Plans offering the coverage have incurred substantial catastrophe losses. The two Plans in Louisiana have incurred an estimated $9.0 million in total losses from Hurricane "Andrew" (Cat. #27, August 24–26, 1992). In addition, the Michigan Basic Property Insurance Association has estimated that it



incurred losses of over $631.5 thousand from a storm in mid–June (Cat. #18, June 14–19, 1992), which produced wind, hail, tornadoes and flooding. No estimate of Homeowners losses from either Hurricane "Andrew" or the June windstorm is available at this time.

10



*Beach and Wind Plans operate in Alabama, Florida, Louisiana, Mississippi, North Carolina, South Carolina and Texas. Results of operations for the seven Beach and Wind Plans are displayed in Exhibits D1 through D10. Exhibits D1, D2, D3, D7 and D8 display results of operations for the twelve months ending October, November and December, 1991. Exhibits D4, D5 and D6 are identical in format to Exhibits D1, D2 and D3 except that Exhibits D4 through D6 show results for five years instead of one year. Exhibits D9 and D10 show data for 1987 through 1991 on a "by-year" basis. In addition, Exhibit D10 shows inception to date totals.*

*Plans in Florida, Mississippi, South Carolina and Texas reinsure a portion of their business. Exhibits E1 through E7 are identical in format to exhibits D2, D3, D5, D6, D8, D9 and D10, respectively. The "E" exhibits show "net of reinsurance" data for each of the four Plans participating in reinsurance agreements. Data for Alabama, Louisiana and North Carolina is aggregated to avoid repeating figures already reported in the "D" exhibits. Exhibits D1, D4 and D7 have no corresponding "E" Exhibit since none of the data shown on these three exhibits is changed by reinsurance activities.*

*The Beach/Wind Plan Comparative on Page 9 shows percent changes in Beach/Windstorm Plan experience from previous periods.*

F igure 8 shows total application and total policy trends from 1987 through 1991 with figures for each year presented as a percentage of 1987 experience. Figure 8 shows the soft voluntary market has had little effect on the Beach/Wind Plans. Since Texas does not report new and renewal applications or new and renewal policies separately, comments on applications and policies will ignore trends in new and renewal experience.

From 1990 to 1991 decreases were noted both in total applications and total policies. The number of total applications decreased 7.6% from 180,694 in 1990 to 166,911 in 1991. The number of applications received in 1991 was 6.6% fewer than the 178,707 applications received in 1987. Total policies numbered 140,712 in 1991 – dropping 6.4% from the 150,344 policies issued in 1990 and 2.5% from 144,311 in 1987.

| | | | | FIGURE 8 |
|---|---|---|---|---|
| **Beach/Wind Plan Experience Trends**<br>**Total Applications and Total Policies \***<br>**1987 through 1991** | | | | |
| | Total Applications | | Total Policies | |
| Year | Number Received | Percent of 1987 Volume | Number Issued | Percent of 1987 Volume |
| 1987 | 178,707 | 100.0 | 144,311 | 100.0 |
| 1988 | 173,404 | 97.0 | 140,486 | 97.3 |
| 1989 | 184,488 | 103.2 | 141,851 | 98.3 |
| 1990 | 180,694 | 101.1 | 150,344 | 104.2 |
| 1991 | 166,911 | 93.4 | 140,712 | 97.5 |

\* Includes Homeowners.

Plans in Florida and South Carolina have received more applications and policies in 1991 than in 1986. Louisiana and North Carolina

(Continued on Page 13)

11

## BEACH/WIND PLAN COMPARATIVE

| Category | 4th Quarter, 1991 | 4th Quarter, 1990 | Percent Change |
|---|---|---|---|
| New Applications | 18,332 | 17,926 | 2.3 |
| Renewal Applications | 16,117 | 17,448 | –7.6 |
| Total Applications | 34,449 | 35,376 | –2.6 |
| New Policies | 16,041 | 13,641 | 17.6 |
| Renewal Policies | 17,260 | 18,132 | –4.8 |
| Total Policies | 33,301 | 31,773 | 4.8 |
| Reported Losses | 462 | 718 | –35.7 |
| Written Premium | $ 12,824 | $11,857 | 8.2 |
| Earned Premium | $ 12,519 | $ 9,559 | 31.0 |
| Paid Losses | $ 910 | $ 2,545 | –64.2 |
| Incurred Losses | $ 638 | $ 4,482 | –85.8 |
| Incurred Loss Adjustment Expenses | $ 102 | $ 606 | –83.2 |
| Operating Expenses | $ 3,477 | $ 3,134 | 10.9 |
| Statutory Underwriting Results | $ 8,302 | $ 1,337 | 520.9 |
| Category | 4th Quarter, 1991 | 3rd Quarter, 1991 | Percent Change |
| New Applications | 18,332 | 27,559 | –33.5 |
| Renewal Applications | 16,117 | 23,405 | –31.1 |
| Total Applications | 34,449 | 50,964 | –32.4 |
| New Policies | 16,041 | 18,237 | –12.0 |
| Renewal Policies | 17,260 | 23,471 | –26.5 |
| Total Policies | 33,301 | 41,708 | –20.2 |
| Reported Losses | 462 | 1,728 | –73.3 |
| Written Premium | $ 12,824 | $17,989 | –28.7 |
| Earned Premium | $ 12,519 | $12,865 | –2.7 |
| Paid Losses | $ 910 | $ 1,652 | –44.9 |
| Incurred Losses | $ 638 | $ 391 | 63.2 |
| Incurred Loss Adjustment Expenses | $ 102 | $ 398 | –74.4 |
| Operating Expenses | $ 3,477 | $ 4,117 | –15.5 |
| Statutory Underwriting Results | $ 8,302 | $ 7,959 | 4.3 |
| Category | January 1, 1991 to December 31, 1991 | January 1, 1990 to December 31, 1990 | Percent Change |
| New Applications | 85,871 | 92,684 | –7.4 |
| Renewal Applications | 81,040 | 88,010 | –7.9 |
| Total Applications | 166,911 | 180,694 | –7.6 |
| New Policies | 61,467 | 64,829 | –5.2 |
| Renewal Policies | 79,245 | 85,515 | –7.3 |
| Total Policies | 140,712 | 150,344 | –6.4 |
| Reported Losses | 4,817 | 2,689 | 79.1 |
| Written Premium | $ 58,775 | $ 55,134 | 6.6 |
| Earned Premium | $ 36,573 | $ 43,490 | –15.9 |
| Paid Losses | $ 8,917 | $ 100,960 | –91.2 |
| Incurred Losses | $ 4,713 | $ –41,345 | –111.4 |
| Incurred Loss Adjustment Expenses | $ 1,595 | $ –1,177 | –235.5 |
| Operating Expenses | $ 14,912 | $ 14,408 | 3.5 |
| Statutory Underwriting Results | $ 15,353 | $ 71,604 | –78.6 |

**NOTE:** All dollar figures shown above are in thousands of dollars.

12

issued more policies in 1991 than in 1986 but received fewer applications. While reason for these increases varies from Plan to Plan, representatives of several Plans have commented that development of Beach–front property during the late 1980s has contributed to the increases in applications and policies over the period. Additionally, South Carolina has experienced an increase in the number of applications and policies since 1989, the year Hurricane "Hugo" hit.

Exhibit D9 of the **PIPSO Reports** shows habitational and commercial written premium trends from 1987 through 1991. Written premiums increased 31.1% from $31.7 million in 1987 to $41.6 million in 1991. Commercial written premiums dropped 46.8% from $32.3 million in 1987 to $17.2 million in 1991. Nearly all the Beach/Wind Plans experienced declining commercial written premiums and increasing habitational written premiums during the five years ending in 1991. From 1990 to 1991 habitational written premium increased 10.6% from $37.6 million to $41.6 million while commercial written premium decreased 2.0% from $17.5 million to $17.2 million.

Earned premiums decreased in both habitational and commercial classes from 1990 to 1991. Habitational earned premiums decreased 10.2% from $29.9 million in 1990 to $26.8 million in 1991 after increasing 30.0% in 1990 from $23.0 million in 1989. Habitational earned premium was 31.7% higher in 1991 than the $20.4 million earned in 1987. Commercial earned premium dropped 28.3% from $13.6 million in 1990 to $9.7 million in 1991. The $9.7 million earned in 1991 was 56.9% less than the $22.6 million earned in 1987. During the five years 1987 through 1991, commercial earned premium declined nearly every year. The only exception was in 1990 when earned premium increased to $13.6 million from

$12.1 million in 1988. This increase was chiefly due to lower reinsurance premium ceded by Texas during that year.

Exhibit D10 of the **PIPSO Reports** shows that from 1990 to 1991, the number of reported losses increased 79.1% from 2,689 to 4,817. Most of this increase was experienced by the Plans in Florida and Texas. In Florida, the number of reported losses jumped 374.3% from 443 in 1990 to 1,658 in 1991. In Texas reported losses increased 271.3% from 523 in 1990 to 1,419 in 1991. What was unusual about these increases is that neither Florida nor Texas was affected by a tropical storm or hurricane in 1991.

The most significant catastrophe to affect the **Florida Windstorm Underwriting Association** in 1991 occurred on April 24 and 25 when a windstorm **(Cat. #71)** accompanied by flooding, hail and tornadoes hit Florida. The Plan received nearly 500 claims from the storm and paid upwards of $2.5 million in loss and loss adjustment expenses. In addition to this storm, the Plan incurred combined loss and loss adjustment expenses of $182.4 million from four windstorms which occurred earlier in the year.

In early May, Texas received over 200 losses from a storm in the Galveston area **(Cat. #73, May 2–6)** which produced wind, hail, tornadoes and flooding. The Plan estimated dollar losses from this storm to be minimal. Exhibit D10 shows that despite the 271.3% increase in the number of reported losses from 1990 to 1991, incurred loss and loss adjustment expense increased 12.2% from nearly $1.6 million in 1990 to $1.8 million in 1991. This suggests that most of the increase in reported losses reported by the Plan from this storm and other catastrophes in 1991 turned out to be either small losses or were closed without payment.

13

The **North Carolina Insurance Underwriting Association (NCIUA)** was the only Beach/Wind Plan to experience hurricane losses in 1991. **Hurricane "Bob"** (Cat. #85, August, 1991) resulted in 437 paid losses. The NCIUA paid $427.0 thousand in loss and loss adjustment expense.

Exhibit D10 shows that loss and loss adjustment expenses for all the Plans reversed from –$42.5 million in 1990 to $6.3 million in 1991. While this is due in part to the catastrophe losses sustained by the **Florida Windstorm Underwriting Association**, the chief reason for the reversal was that the negative losses (and loss adjustment expenses) shown in 1990 resulted from an excess of prior year losses over current year losses. Incurred losses (or loss adjustment expenses) for any year are calculated as "losses paid" + "losses outstanding–current year" – "losses outstanding–prior year". In 1990, "prior outstanding losses" referred to losses incurred during accident year 1989 while "current outstanding losses" referred to losses from accident year 1990. At the end of 1989, current outstanding losses exceeded $100 million as a result of **Hurricane "Hugo"** (Cat. #18, September 17–22, 1989) and three storms which affected Texas. During 1990, the largest catastrophe to affect a Beach/Wind Plan state was **Tropical Storm "Marco"** (Cat. #51, October 11–13, 1990). "Marco" hit Florida and cost the **Florida Windstorm Underwriting Association** $184.5 thousand in loss and loss adjustment expenses. This amount was less than 1% of the $100 million in losses outstanding at the end of 1989. In addition, loss reserves from Hurricane "Hugo" were lowered during 1990. Consequently, at the end of 1990, paid losses and current outstanding losses <u>combined</u> were less than "prior outstanding losses" causing the unusual "negative" incurred

loss and loss adjustment expense for that year.

The brunt of **Hurricane "Hugo"** was borne by South Carolina but also affected North Carolina. The **South Carolina Wind and Hail Underwriting Association** has paid **$99.7** <u>million</u> in loss and loss adjustment expenses (This amount was partially defrayed by **$16.3 million** in reinsurance which the Plan received two weeks after the storm hit). The **North Carolina Insurance Underwriting Association** paid **$758.2 thousand** in loss and loss adjustment expenses as a result of the storm.

The **Texas Catastrophe Property Insurance Association** received over 1,200 reported losses from **Tropical Storm "Allison"** (Cat. #12, June 25–27, 1989). On August 1–2, 1989, Texas was hit by Hurricane "Chantal" (Cat. #15). The Plan received more than 1,700 reported losses from this storm. A mid–October hurricane, **"Jerry"** (Cat. #19, October 15–16, 1989) produced over 4,000 losses. Although no "dollar loss" data is available from the Plan, incurred loss and loss adjustment expense increased from **$2.5** million in 1988 to **$14.2 million** in 1989.

While the 1989 Atlantic hurricane season resulted in Plan losses of over $100 million, inception to date figures in Exhibit D10 show that Hurricane "Alicia", which hit Galveston, Texas in August, 1983, produced the largest hurricane losses to affect a single Plan. The Texas Plan incurred losses of more than **$150 million as a result of "Alicia"**. Exhibit D10 shows that while the Texas Plan incurred **$22.6 million** in loss and loss adjustment expense for the five years 1987 through 1991, inception to date loss and loss adjustment expenses totaled $207.6 million, $153.1 million of which was incurred during the quarter ending September 30, 1983.

14

003988

**THE BOTTOM LINE:** The seven Beach/Wind Plans incurred a statutory underwriting gain of **$15.4 million** – 78.6% less than the $71.6% million gain in 1990.



The smaller gain was chiefly due to the reversal in loss and loss adjustment expenses noted earlier. Figure 9 (right) shows statutory underwriting results for 1987 through 1991. It shows that 1989 was the only year during the last five years that the seven Beach/Wind Plans produced a statutory underwriting loss. The $148.0 million statutory underwriting loss more than offset the statutory underwriting gain in the other four years, resulting in a five year statutory underwriting loss of $17.0 million. Given the losses of $70 million and $8.0 million experienced by Plans in Florida and Louisiana respectively from Hurricane "Andrew" (Cat. #27, August 24–26, 1992), the seven Beach/Wind Plans can be expected to incur a statutory underwriting loss in 1992.

15

187

# State Farm Mutual Automobile Insurance Company

ONE STATE FARM PLAZA
BLOOMINGTON, IL 61710

CRANFORD A. INGHAM
VICE PRESIDENT AND GENERAL COUNSEL
AREA CODE 309
766-2711

March 30, 1993

Representative Cardiss Collins, Chairwoman
Subcommittee on Commerce, Consumer Protection
  and Competitiveness
U.S. House of Representatives
Washington, DC  20515-6120

Dear Representative Collins:

I am responding to your letter of March 3, 1993 to Ed Rust.
State Farm wishes to cooperate with the Subcommittee
investigation and provide you with the information you request.

As an Illinois domestic insurer with significant writings of
personal lines business in Chicago and in all areas of this
country, we take very seriously the charges made to your
Subcommittee.  Despite the fact that we currently have a
significant presence in Chicago and most other major urban areas
in this country, State Farm is always willing to reexamine our
marketing and underwriting practices with a view towards
improving service and the availability of our insurance products
to members of the public who may feel they have been underserved.
We are constantly trying to improve our Corporate performance in
this area and are open to suggestions as to how this may be
accomplished in a way that will be beneficial to all of our
customers both present and future.

State Farm strives to offer our insurance products to the general
public in a manner that does not discriminate on the basis of
race, color, religion or national origin.  As evidence of this
fact, using the homeowners line as an example, enclosed is a copy
of the "President's Letter" of September 12, 1979 in which our
underwriting philosophy was reaffirmed by State Farm's President
(Exhibit 1).  This letter was sent to every employee and agent
companywide.  Our homeowners underwriting philosophy has remained
constant; the philosophy set forth in Mr. Rust's 1979 letter
remains in effect today.  As you will note, each person who
desires homeowners insurance from State Farm is entitled to an
inspection of the property before any application is denied.

We believe our responsibilities go beyond simply deciding whether
a particular property meets our underwriting standards.  We
encourage applicants to make necessary repairs to qualify for

2

coverage if an inspection reveals deficiencies that prevent the underwriting of the property. We also actively participate in programs and activities to improve deteriorating neighborhoods. Attached is a press release announcing an award which State Farm recently received for our many years of participation in programs of the Neighborhood Housing Services (NHS) organizations (Exhibit 2). This NHS award program recognizes and encourages voluntary efforts to stimulate the flow of capital and delivery of financial services to low and middle income neighborhoods. One major reason for this award is that State Farm agents and employees volunteered their time and effort in Los Angeles to assist in the clean-up after the 1992 urban disturbances in South Central Los Angeles.

A major center for our NHS activities has been Chicago, Illinois. Attached as Exhibit 3 is the 1992 Annual Report of NHS of Chicago. As you can see, a number of the neighborhoods that have been the subject of revitalization are located in the 7th Congressional District of Illinois. In addition to our long-standing and substantial financial support for NHS organizations, State Farm employees and agents have actively engaged in volunteer projects for several years to help rebuild Chicago neighborhoods. As an example, attached is Exhibit 4 containing an excerpt from a State Farm Illinois Regional Office publication describing our participation in Neighborworks and a letter notifying State Farm agents of our 5th annual Neighborworks project in Chicago and encouraging their participation. This year's target neighborhood is Roseland.

State Farm's long-standing Corporate policy to operate our business on a basis that is free of prejudice is consistent with the current legal requirements in effect in Illinois. Please note Sections 767.22 and 1031(3) and (5) of the Illinois Insurance Code prohibit underwriting and rating of insurance on a basis that is unfairly discriminatory. We comply at all times with these and other similar legal requirements.

As will be readily apparent from an examination of the specific answers to your questions, State Farm is a leading writer of automobile and homeowners insurance providing insurance services in all areas in the City of Chicago.

**Question 1: Why are there so few State Farm agents in innercity neighborhoods and what is the company policy on agents providing price quotes over the telephone?**

Answer: This question seems to assume that there are an inadequate number of State Farm agents' offices to serve consumers in urban areas. The question may be based on some of the inaccurate information previously provided to the Subcommittee concerning State Farm's business in the 7th Congressional District of Illinois. As an illustration of our

3

operations in urban areas, then, let's look at the facts in this
part of Chicago. State Farm currently has approximately 70
agents whose offices are located in the 7th Congressional
District. More importantly, State Farm agents are not restricted
to writing business only in the area immediately surrounding
their offices. In fact, it is common for agents to have
policyholders located throughout many parts of the city and state
in which they do business. More than 500 State Farm agents
currently write insurance on houses, automobiles or businesses
located in the 7th Congressional District. It is fair to say
that all of these 500 plus State Farm agents are providing
services in your area, not just those 70 agents whose offices are
physically located there.

State Farm career agents, as self-employed businessmen and
businesswomen, are free to locate an office wherever they choose.
Among the factors affecting where a State Farm agent chooses to
locate his or her office are availability of suitable office
space at an affordable price, market potential, accessibility,
security, visibility, traffic patterns and identification.
Obviously, a significant number of our agents have chosen to
locate their offices in your part of the state.

Just because there is not an agent's office in a particular area
does not mean the service provided to consumers living in that
area is inferior. If this were the case insurance companies who
choose to market their products without agents (such as GEICO and
USAA) by definition would be providing inadequate service and
would thus face difficulties obtaining state licenses, meeting
state regulatory requirements and gaining consumer confidence and
marketshare. This is clearly not the case.

With regard to the issue of providing telephone rate quotes, many
State Farm agents (whether urban, suburban or rural) consider it
inappropriate to give price quotes over the phone to new
applicants. This is because it is often not possible to develop
enough information to determine the appropriate price, to counsel
an applicant about appropriate coverage or to determine whether
the risk meets the Company's underwriting guidelines without
seeing the vehicle or property to be insured.

State Farm requires that each agent obtain complete information
on every application to properly rate and underwrite the risk and
provide appropriate counseling concerning coverage. As a result,
it can be said that we discourage the practice of quoting prices
over the telephone, but, in our view, it is more appropriate to
characterize our efforts as encouragement to our agents to
provide proper rating, underwriting and counseling services, not
as a mandatory Corporate directive prohibiting telephone rate
quotes. It is our goal at State Farm to promote a high degree of
professionalism in our agency force and to assist our agents in
providing the best possible service to each and every insurance

4

consumer. Failure to quote a rate over the telephone is in no way an indication that State Farm would decline to insure the risk.

The company-wide philosophy outlined above is, of course, modified to comply with all applicable state laws regulating the business of insurance. For example, Section 767.28 of the Illinois Insurance Code provides that "any individual who is a potential applicant for a policy of personal automobile insurance. . . shall be provided an oral estimate of premium charges based on the information provided to an insurance producer who maintains an office within any municipality with 500,000 or more inhabitants. Such an estimate shall be given by such insurance producer but shall not be binding." In the City of Chicago State Farm agents are made aware of this legal requirement and their obligation to comply with it.

Question 2:  With respect to the city of Chicago, please provide the names and locations of State Farm agents (either direct employees or independent contractors by zip code for the last five years).

Answer:  See list attached as Exhibit 5. This list includes State Farm agents having offices in the city of Chicago sometime during the last five years. Of course, some of the agents listed have gone on to become agency managers or retired, so they are no longer active. The total number of active State Farm agents in the City of Chicago has grown by 15% during the five year period.

State Farm has a strong record in serving urban consumers and working with neighborhood groups and other consumer organizations in the city of Chicago to address their insurance needs and concerns. Though State Farm has more than 165 agents' offices and several Claim Service Offices located in Chicago, many more State Farm agents whose offices are not within the city limits service business located in the city. State Farm has more agents with offices located in the City of Chicago than any other individual company and more agents serving Chicago consumers than any other individual company. Regardless of whether or not a State Farm agent's office is located in a particular zip code, State Farm insures cars and homes on a non-discriminatory basis throughout the city. As evidence of this fact, State Farm has had significant growth in the number of homes and cars insured in the City of Chicago in the past few years at a time when the population of the City has been declining.

Question 3:  With respect to each zip code in the city of Chicago, please provide the specified data on an annual basis for the last five years itemized with respect to the specified lines of insurance.

5

Answer:  State Farm has been required by law to report extensive
zip code and other data and information to the Illinois
Department of Insurance.  The Illinois reporting requirements are
contained in two articles of the Illinois Insurance Code,
Sections 1065.900 et. seq.  (The Illinois Insurance Cost
Containment Act) which became law in 1989 and Section 755.25
(Zip Code Disclosure) which became law in 1980.  These two laws
cover most of the type of data elements you have requested.

Illinois Cost Containment Reporting:  Since 1989 State Farm has
submitted written exposures, written premium and earned premium
for zip codes located in the City of Chicago.  The lines of
insurance required to be reported are personal automobile and
personal property.  Enclosed please find as Exhibit 6 zip code
information from our Illinois Cost Containment Shipment Files.
This exhibit contains the data elements by all zip codes within
the City of Chicago for the lines of business reported to the
State of Illinois.  In addition, Exhibit 6 contains similar
information for the rental dwelling line of business.  Business
written by State Farm through the various residual market
mechanisms such as the FAIR Plan is not included.

Illinois Zip Code Disclosure:  Also, enclosed as Exhibit 7 is
information that State Farm has prepared from zip code data
reported by us to the Illinois Insurance Department relating to
the years 1988 through 1991.  The Department required the
reporting of this zip code data pursuant to Section 755.25 of the
Illinois Insurance Code, but reporting is limited to the
homeowners lines of business including residential fire business.
Neither the rental dwelling line or residual market business is
included in these reports.  The data elements contained in this
report are as follows:

        - New business
        - Renewals
        - Company Non-Renewals
        - Cancellations

The information is limited to the twenty-two zip codes designated
by the Illinois Department of Insurance all of which are located
in the City of Chicago.  The information also includes aggregate
data for the entire City of Chicago.  For the purpose of any
analysis of this data, please note that the policy count relating
to cancellations includes a count of new business applications
submitted to the company which were declined as well as company-
initiated cancellations.

In providing the above information we have primarily relied upon
data regularly reported to the State of Illinois.  Thus, for
example, we have not provided a full five years of private
passenger automobile data since the Illinois Cost Containment Act
has not been in effect for that long.  Also, we were only able to

003994

6

locate four years of homeowners data reported under the Illinois
Zip Code Disclosure law; it is likely that the report for 1987
has been destroyed.  In addition, incurred losses are not
required to be reported to the State of Illinois under either
statute so the incurred loss data that matches the premium and
exposure information contained herein has not been compiled.  We
would like to work with the Subcommittee to provide any
additional information that you feel you may need or to assist in
the analysis of the data provided.

I have also included a copy of the Computer Data Request Form
from the Public Sale Coordinator, Data Processing Section of the
Illinois Department of Insurance (Exhibit 8).  As you can see
there are extensive zip code and other data reports already
available for sale from the State of Illinois.  Perhaps your
Subcommittee may wish to undertake an analysis of some of the
data available from the Illinois Department of Insurance.  This
data includes the experience and locational focus of many
insurers, not just the one or two companies providing the
greatest amount of service in Illinois urban areas.

Great care must be taken in any analysis of either the zip code
information provided here or the more broadly-based information
available from the Illinois Department of Insurance.  Zip code
detail will often produce significant random variation due to the
small volume of data.  Also, zip code data may be affected by
state legal requirements that regulate the use of territorial
rating.   For example, Illinois Insurance Code Section 767.17
requires that certain private passenger automobile insurance
coverages have rates that do not vary by territory within the
City of Chicago.  In addition, zip code boundaries are not
constant over time and are changed to reflect mail delivery
routes.   Population, number of households and number of vehicles
also vary significantly by zip code.  For example, a zip code
assigned to an area predominated by a large office building,
hospital or university may have few households or vehicles to
insure.  In your Congressional District there are extreme
differences in the population, households and vehicles contained
in zip codes involving variations of 200% to 300%.  Because of
these and other considerations, many adjustments and informed
judgment are an essential part of any analysis of this data.

Question 4:  Please explain the underwriting guidelines used in
deciding whether to issue homeowners and automobile insurance
including any minimum risk standards.

Answer:  State Farm's automobile insurance underwriting
guidelines vary state-by-state in order to comply with state
legal requirements and various economic factors related to each
individual state.  In general, in deciding whether to issue
automobile insurance the following criteria are used:

7

1.   All drivers of the vehicle to be insured must have a valid driver's license from the state of residence.

2.   The driving record of all drivers of the vehicle to be insured are considered.  Driving record includes prior negligent accidents and motor vehicle moving violations.

3.   Use of the vehicle to be insured is considered.

4.   Type and condition of the vehicle to be insured is considered.

Homeowners insurance underwriting guidelines also vary state-by-state due to individual state legal requirements and various economic factors present in each state.  Elements common to all homeowners underwriting guidelines include the fact that State Farm desires to insure average or better than average properties. By this we mean those which present a favorable loss history and reflect proper housekeeping and maintenance.

As a matter of company policy no requests for homeowners insurance will be denied and no policy will be terminated because of any of the following:

1.   Age or type of construction (brick or frame) of a dwelling.

2.   The location of a dwelling, provided it is not adjacent to property which creates an increased chance of loss, and provided it is not situated in an area subject to increased chance of loss arising out of a natural disaster, such as hurricanes.

3.   Age, sex, race, religion or marital status of the owner or occupant of property, or because the applicant was insured previously by the FAIR Plan or other residual market mechanism.

Minimum risk standards for homeowners insurance which are in accordance with the overall philosophy described in the paragraph above are as follows:

1.   Applicants whose property presents a greater likelihood of sustaining damage from an insured peril will either be refused insurance or will be asked to place their property in an insurable condition prior to providing coverage.

2.   Applicants who conduct activities not considered characteristic of those normally carried on in a typical household environment will either be refused insurance or will be asked to discontinue those activities prior to providing coverage.  Examples of these activities are large

8

    stores, manufacturing, auto repair, activities involving
large, frequent gatherings and nursing services.

State Farm's underwriting rules for both automobile and
homeowners insurance do not vary by area within the state of
Illinois.

Also, the Illinois Insurance Code has specific requirements
regulating the cancellation and nonrenewal practices of insurers
in the homeowners and automobile insurance lines. Any consumer
who feels that an insurance policy has been unjustly or illegally
terminated has a right to request a hearing pursuant to Illinois
Insurance Code Section 755.23.

I hope the information contained in this letter is of assistance
to you in your investigation and once again, I wish to emphasize
State Farm's willingness to cooperate with you and your
Subcommittee in any way we can. We stand ready to assist you
further.

                Very truly yours,

                C. A. Ingham

CAI/kr
cc:  Director Stephen Selcke
      Illinois Department of Insurance

# State Farm Insurance Companies



March 12, 1993

*Dear State Farm Agent,*

How many times have you gone on an appointment and had to turn around because the risk was not eligible or desirable?  How many times have you had to tell an insured or prospect that their home does not or no longer qualifies for State Farm Insurance?

Have you wondered why entire neighborhoods have deteriorated to their current conditions?  Would you like to help?

State Farm Insurance has joined forces with Neighborhood Housing Services of Chicago and local residents to improve neighborhoods within the city.  June 5, 1993, is the annual Neighborworks Day where State Farm agents and employees work alongside community residents to help improve their neighborhoods.

This year we will be working in the Roseland neighborhood, helping senior citizens repair and upgrade their homes, building a playground for children, sprucing up a women's residential treatment center and doing landscaping.

We need your help.  Remember, your participation can mean the difference between success and failure.

It's a great opportunity to be a good neighbor.  Give something back. Join us for Neighborworks on Saturday, June 5, 1993!

Sincerely,

*Bill*

*Louise*

**Bill Clark**
Agency Director
2001 Spring Road, Ste. 265
Oak Brook, IL 60521
Ph. (708) 990-0882

**Louise Perrin**
Chairperson, Neighborworks '93
1100 Lake St., Ste. 35
Oak Park, IL 60301
Ph. (708) 386-2255

HOME OFFICES: BLOOMINGTON, ILLINOIS 61710-0001

# THE PRESIDENT'S LETTER

Office of the President / State Farm Insurance Companies / Bloomington, Illinois

Volume 15, No. 3                                                      September 12, 1979
Printed in USA

### HOMEOWNERS UNDERWRITING PHILOSOPHY REAFFIRMED

Over the past year or so, representatives of various urban neighborhood organizations have met with people from State Farm's regional and home offices to express their concerns about the availability of homeowners insurance. I've taken part in some of these discussions, and the subject has been explored with you at agency conventions and in recent issues of the *Reflector*.

Everyone at State Farm involved with the selling and servicing of our homeowners business should have a clear understanding of our underwriting philosophy. To achieve that is the purpose of this letter.

It's our position that the majority of American homes can meet the eligibility standards for full replacement cost homeowners insurance or where market value is a problem, our new Modified Replacement Cost Homeowner program, including some of your customers now covered in FAIR plans.

In dealing with applicants for homeowners insurance, it's important to keep the following points clearly in mind:

1. Each application for homeowners insurance should be considered on its individual merits.

2. Each person who desires State Farm homeowners insurance is entitled to an inspection of the property before any application is declined. We are hopeful that this inspection can take place within ten days of the request.

3. If after inspection you have determined that the dwelling does not meet State Farm's underwriting criteria, it would be helpful if you would point out to the customer the reasons for the declination and also point out those areas of repair necessary to permit reconsideration of the request.

4. While the agent remains our first-line underwriter in all cases, I ask that you advise those whose applications are denied by you that, if they desire, the decision may be reviewed by the regional office underwriters.

5. As a matter of company policy, State Farm fully supports these principles:

   a. No request for homeowners insurance will be denied and no policy cancelled or non-renewed solely because of age or location of a residence, type of construction—brick or frame—or because another insurer declined insurance, or because the applicant was insured by the FAIR plan.

   b. In no case will homeowners insurance be denied because of the age, sex, race, religion or marital status of the owner or residents of a dwelling.

I'm fully aware that marketing homeowners insurance in some of our metropolitan areas is difficult because of the time and expense involved in the inspection and underwriting process. But I also know that you appreciate the importance of doing all that we reasonably can to make certain that State Farm insurance protection is available on a fair and equitable basis throughout the country. I'm counting on your cooperation.

Edward B. Rust

197



**PRESS RELEASE**

**A SOCIAL COMPACT**
*Between Financial Institutions
& America's Neighborhoods*

*Contact: Lynn Reilly Whiteside
202-296-9758*

*HOLD FOR RELEASE UNTIL
WEDNESDAY, SEPTEMBER 16.*

### STATE FARM INSURANCE COMPANIES AND NEIGHBORHOOD HOUSING SERVICES OF LOS ANGELES HONORED IN WASHINGTON

State Farm Insurance Companies and Neighborhood Housing Services of Los Angeles were among 20 financial services companies and neighborhood nonprofit organizations from around the country honored today for achievements in serving and rebuilding America's lower income neighborhoods.

The awards were presented at a Washington, D.C. recognition program sponsored by The Social Compact, a consortium of 200 financial services company chief executives who have joined together to promote improvement of America's lower income neighborhoods. The awards are designed to stimulate partnerships between companies and non-profit organizations and encourage voluntary efforts to stimulate the flow of capital and delivery of financial services in low- and middle-income neighborhoods.

"Through the Outstanding Community Investment Awards program, we are promoting establishment of voluntary standards for investment and involvement by the financial services industry. We want to make a substantive difference in the quality of life in America's neighborhoods," said Preston Martin, Chairman of the Social Compact and former vice chairman of the Federal Reserve System. "With these awards, we are celebrating the examples of industry leadership that merit recognition as models."

State Farm was recognized for its long-standing support for Neighborhood Housing Services (NHS) which promotes rehabilitation of lower income neighborhoods. The insurer was particularly recognized for its work in the last year with the Los Angeles NHS chapter. In addition to its traditional financial support and work with NHS leaders, State Farm people participated in several NHS volunteer projects -- including the cleanup after the urban disturbances in south central Los Angeles.

-more-

## ABOUT THE OUTSTANDING COMMUNITY INVESTMENT AWARDS

The Outstanding Community Investment Awards are the primary vehicle of the Social Compact for recognizing and encouraging expansion of proven, effective company programs which: (1) "go the extra mile" to assure the delivery of financial services which meet the needs of their lower income communities; (2) support the creation of "homeownership-quality" housing for low and moderate income families; and (3) strengthen the quality of life in America's disadvantaged neighborhoods and rural communities.

The awards are annually presented to the chief executives of ten financial services companies whose institutions, under their leadership, have displayed unusual effectiveness and creativity in meeting the needs of lower income communities. Participation in the awards competition is open to both members and nonmembers of The Social Compact.

The entries are scored on the merits of information provided regarding their underwriting and originations, affirmative programs to serve the low to moderate income market, affordable housing and/or community development initiatives, and senior management and contribution support to local nonprofit organizations.

Initial analysis of submissions was provided by the Affordable Housing Staff of Freddie Mac. Nominations were then reviewed and rated by an external panel composed of leaders from the housing and community development nonprofit sector. Final selection, based upon this input, was made by the Recognition Committee of The Social Compact Leadership Group. Institutions represented by members of the Recognition Committee were not eligible to participate in the competition.

INDEPENDENT CONTRACTORS IN THE CITY OF CHICAGO FOR THE LAST 5 YEARS

| ZIP | NAME | ADDRS |
|---|---|---|
| 60601-5405 | MENEGHAN, PAUL J | 307 N MICHIGAN SUITE 1514 |
| 60601-7509 | PERISIN, NICHOLAS J | 168 N MICHIGAN SUITE 803 |
| 60602-1702 | NAZAR, JANICE C | 25 E WASHINGTON LOWER LEVEL |
| 60602-2705 | LINDQUIST, LLOYD | 111 W WASHINGTON SUITE 1042 |
| 60602-2706 | FOURNIER, JACQUELINE M | 111 W WASHINGTON SUITE 1260 |
| 60603-3404 | CURI, MARK J | 120 S LASALLE ROOM 651 |
| 60604-1104 | TRIPLETT, NAKANURA C | 208 S LASALLE SUITE 1873 |
| 60605-1840 | SPINELLI, RUSSELL M | 618 S DEARBORN |
| 60606-4202 | LAUDER, TED | 150 S WACKER DRIVE SUITE 3240 |
| 60609- | KRAJCI, JOANNE | 4354 S WESTERN |
| 60609-1101 | CICHON, JOSEPH C | 2020 WEST 35TH STREET |
| 60609-3245 | KLIMOWSKI, JOSEPH M | 1624 W 47TH STREET |
| 60610-3617 | DOUGLAS, WILLIAM | 325 W HURON SUITE 304 |
| 60610-3731 | NAVARRO, FRED | 640 N LASALLE SUITE 580 |
| 60611-1601 | LORES, GEORGE | 919 N MICHIGAN AVE SUITE 1902 |
| 60611-3111 | LINDQUIST, J P | 612 N MICHIGAN AVENUE ROOM 418 |
| 60611-4008 | BEHRENDS, GARREL K | 435 N MICHIGAN SUITE 1333 |
| 60613-2507 | GUARRACI, JOSEPH R | 3929 N ASHLAND AVENUE |
| 60613-4416 | COGHLAN, JOHN E | 736 W ADDISON STREET |
| 60614-1610 | DILLARD, WILLIAM L | 524 W DIVERSEY |
| 60614-2765 | RHODES, CHARLES T | 2472 N CLARK STREET |
| 60614-2932 | TOLONEO, JOSEPHINE A | 2358 N CLYBOURN AVENUE |
| 60614-3540 | KUCZKA, LINDA A<br>KUCZKA, FRANK | 1015 W WEBSTER<br>1015 W WEBSTER |
| 60615-4210 | GILMORE, CRAIG M | 1634 E 53RD STREET SUITE A |

AGENCY PLANNING
MARCH 1993
(CHICAGO/BG)

INDEPENDENT CONTRACTORS IN THE CITY OF CHICAGO FOR THE LAST 5 YEARS

| ZIP | NAME | ADDRS | |
|-----|------|-------|--|
| 60615-4530 | SPINELLI, FRANK B | HYDE PARK BANK RM527 | 1525 E 53RD STREET |
| 60616-1913 | YUN, MARK M | 219 W CERMAK | |
| 60616-3006 | MCKENZIE, KATHLEEN M | 725 W 31ST STREET | |
| 60617-2728 | SCOTT, HELEN | 1641 E 87TH STREET | |
| 60617-3638 | GRAY, IRA C | 9212 S STONY ISLAND AVENUE | |
| 60617-5021 | BERNIER, DYANNA P | 9618 S COMMERCIAL | |
| 60617-6638 | TAYLOR, JEFFREY M | 3659 E 106TH STREET | |
| | TAYLOR, PAUL L | 3657 E 106TH | |
| 60618-1413 | BEIERWALTES, ANDREW F | 2942 W MONTROSE | |
| 60618-1621 | KAPKA, STANLEY B | 4325 N WESTERN | |
| 60618-1713 | TOLENTINO JR, GERARDO A | 2015 W MONTROSE | |
| 60618-3208 | CONISKEY, BARRY F | 3406 W IRVING PARK | |
| 60618-3536 | ECIMOVICH, VICTOR A | 2933 W IRVING PARK | |
| 60618-3805 | VEITH, HERBERT M | 2233 W IRVING PARK ROAD | |
| 60618-4324 | HALAS, JAMES L | 3637 N ELSTON AVENUE | |
| 60618-5429 | METHLING, RICHARD R | 3535 W BELMONT | |
| 60619-2801 | HENDERSON, THOMAS B | 211 1/2 E 79TH STREET | |
| 60619-5104 | TOWNSEND, JOHN | 8152 S COTTAGE GROVE | |
| 60619-6525 | APPLETON, THEAUTRY P | 1524 E 87TH STREET | |
| 60619-7239 | BROWN, ARTHUR F | 72 E 95TH STREET | |
| 60620-4719 | APPLETON, TOMMIE L | 1815 W 87TH STREET | |
| 60623-4364 | ANDRADE, AUGUSTO A | 4355 W 26TH STREET | |
| 60623-4902 | BRUNDAGE, JAMES M | 4019 W 31ST STREET | |
| 60625-2117 | CORRIGAN, EDWARD M | 4538 N WESTERN AVENUE | |
| 60625-2502 | TON, JIMMY | 5110 N LINCOLN AVE | |

AGENCY PLANNING
MARCH 1993
(CHICAGO/BG)

INDEPENDENT CONTRACTORS IN THE CITY OF CHICAGO FOR THE LAST 5 YEARS

| ZIP | NAME | ADDRS |
|---|---|---|
| 60625-2502 | COSTANZA, MARINA E<br>SHELTON, WALTER J | 5110 N LINCOLN<br>5110 N LINCOLN AVENUE |
| 60625-4830 | MACKEY, MARK T | 3332 W FOSTER |
| 60625-5726 | LEE, JAE HYUN | 3736 W LAWRENCE |
| 60626-2405 | RYAN, MICHAEL F<br>SHEAHAN, THOMAS F | 7035 N CLARK STREET SUITE 2E<br>7035 N CLARK STREET  SUITE 2E |
| 60626-2406 | RYAN, FRANCIS E | 7028 N CLARK STREET |
| 60628-2942 | BOYD, RICHARD H | 412 E 103RD STREET |
| 60628-5201 | ADKINS, RAYMOND V | 11435 S HALSTED |
| 60629-3049 | SPITKOVSKY, ROBERT J | 3143 W 71ST STREET |
| 60629-4121 | SALAN, SAM | 6824 S PULASKI |
| 60629-4435 | KARR, MICHAEL J | 5724 S PULASKI |
| 60629-4606 | RUNDLE, DAVID W<br>RUNDLE, KENNETH N | 4006 W 63RD STREET<br>4006 W 63RD STREET |
| 60629-5012 | KACZANOWSKI, L B | 4316 W 63RD STREET |
| 60629-5137 | LIZZIO, ROY J | 6601 S PULASKI |
| 60630-1250 | ZIPAY JR, JOHN W<br>LEFAVE, JAMES E | 5350 N MILWAUKEE<br>5350 N MILWAUKEE |
| 60630-2460 | GRANITE, JOHN R | 5097 N ELSTON AVENUE |
| 60630-2644 | SULA, KYUNG J | 4338 WEST LAWRENCE AVENUE |
| 60630-2954 | EFFNER SR, JAMES R | 6358 W GUNNISON |
| 60630-3130 | GARRISON, VERNON L | 5912A W LAWRENCE |
| 60630-3412 | JOHNSON, HAGARD G | 5520 W LAWRENCE |
| 60630-3629 | SCAVO JR, MICHAEL A<br>SCAVO, CHRISTOPHER M<br>SCAVO, MICHAEL A | 4754 N MILWAUKEE<br>4754 N MILWAUKEE<br>4754 N MILWAUKEE |
| 60630-3738 | MAYS SR, JAMES D<br>MAYS JR, JAMES D | 4465 N MILWAUKEE<br>4465 N MILWAUKEE |

AGENCY PLANNING
MARCH 1993
(CHICAGO/BG)

INDEPENDENT CONTRACTORS IN THE CITY OF CHICAGO FOR THE LAST 5 YEARS

| ZIP | NAME | ADDRS |
|---|---|---|
| 60631-1086 | RAGO, KATHLEEN E | 7132 N HARLEM AVENUE |
| 60631-1304 | SUNDBERG, CARL N | 6689 N NORTHWEST HIGHWAY |
| 60631-1450 | COVEDARICA, BATO Z | 6420 N NORTHWEST HIGHWAY |
| 60631-1536 | MCCABE, EDWARD R | 6655 N AVONDALE |
| 60631-2126 | TAYLOR, JOHN R | 6134 N NORTHWEST HIGHWAY |
| 60632-2513 | WILSON, ROBERT A | 4222 S ARCHER |
| 60632-2620 | FALDUTO, ANTHONY J | 5456 S KEDZIE |
| 60632-2827 | FRIELLO, BERT A | 4342 S ARCHER AVENUE |
| | NOWICKI, ROBERT P | 4342 ARCHER AVENUE |
| 60632-4116 | GALLAGHER, RAYMOND C | 4848 S PULASKI |
| 60634-1829 | GERHADY, ELWOOD A | 5616 W MONTROSE AVENUE |
| | VENTURI, THOMAS P | 5616 W MONTROSE |
| 60634-2305 | SMITH, RICHARD N | 6807 W IRVING PARK |
| | CASEY, PATRICK T | 6807 W IRVING PARK |
| 60634-2608 | KENT, ROBERT C | 5733 W IRVING PARK |
| 60634-2750 | LAGRIPPE, JOSEPH A | 3452 N CENTRAL |
| 60634-2806 | GALLO, JACK | 8210 W BELMONT AVENUE |
| 60634-3018 | BURGESS, STEVEN P | 7702 W ADDISON |
| | HARTMAN, RAYMOND G | 7702 W ADDISON |
| 60634-3022 | BURGESS, MICHAEL J | 7850 W ADDISON |
| 60634-3432 | STORINO, DOMINIC | 7428 W BELMONT AVENUE |
| | NUZZO, JOHN J | 7428 W BELMONT AVENUE |
| 60634-3602 | COLEMAN, THOMAS J | 3315 1/2 N HARLEM |
| 60634-4209 | MAGINE, PETER E | 6048 W ADDISON STREET |
| | BECKER, CARL G | 6048 W ADDISON STREET |
| 60634-4536 | KINDT, THOMAS L | 7106 W BELMONT AVENUE |
| 60634-4848 | SKAJA, RICHARD T | 6700 WEST BELMONT |

AGENCY PLANNING
MARCH 1993
(CHICAGO/BG)

INDEPENDENT CONTRACTORS IN THE CITY OF CHICAGO FOR THE LAST 5 YEARS

| ZIP | NAME | ADDRS |
|---|---|---|
| 60634-5208 | BOWER, JOSEPH F | 5724 W BELMONT |
| 60634-5310 | BLOESE, RONALD R | 3050 N CENTRAL AVENUE |
| 60635-1629 | GLEASON, JUDITH A | 2643 N HARLEM |
| 60635-2117 | BONEBRAKE, C STEVE | 6919 W GRAND AVENUE |
| 60635-3792 | JEPSEN, JAMES | 1921 N HARLEM AVE SUITE S108 |
| 60636-2023 | TURK, FRED G | 6251 S WESTERN AVENUE |
| 60638-1644 | OBERC, ANDREW J | 5796 S ARCHER AVENUE |
| 60638-2320 | NIKRUT, BRUNO H | 6918 W ARCHER AVENUE |
| 60638-2439 | RIORDAN, MICHAEL J | 6538 WEST ARCHER |
| 60638-2723 | MILLER, LEO M | 6093 S ARCHER AVENUE |
| 60638-3051 | NORVILAS, MICHAEL A | 5446 S ARCHER AVENUE |
| 60638-4101 | JENICEK, ALBERT D | 6551 W 63RD STREET |
| 60638-5009 | MURPHY, THOMAS P<br>MALYSZEK, PAUL J | 6247 W 63RD STREET<br>6247 W 63RD STREET |
| 60638-5836 | SHERRY, MICHAEL R | 4943 W 63RD STREET |
| 60639-1732 | MITCHELL, RAYMOND R | 4815 W DIVERSEY AVENUE |
| 60639-2057 | BURTON, RAYMOND G | 4357 W FULLERTON |
| 60639-2058 | SCHENK JR, WILLIAM E | 4358 W FULLERTON |
| 60639-2208 | HIGGINS JR, PATRICK J<br>HIGGINS, JOHN F | 5902 W FULLERTON<br>5902 W FULLERTON |
| 60639-2404 | BENZIGER, RAYMOND W | 5110 W FULLERTON |
| 60640-1101 | GIBBS, WAYNE E | 5458 N ASHLAND |
| 60640-2032 | DABUL, MIGUEL | 5240 NORTH ASHLAND AVENUE |
| 60641-1808 | ORLAND, THEODORE A<br>ORLAND, PRIME | 4108 N CICERO AVENUE<br>4108 N CICERO AVENUE |
| 60641-2504 | GRADY, RICHARD F | 5230 W IRVING PARK |

AGENCY PLANNING
MARCH 1993
(CHICAGO/BG)

INDEPENDENT CONTRACTORS IN THE CITY OF CHICAGO FOR THE LAST 5 YEARS

| ZIP | NAME | ADDRS |
|-----|------|-------|
| 60641-2937 | O'NEILL, JEROME F | 4256 W IRVING PARK |
| 60641-3356 | GARBUTT, EARL D | 5356 W ADDISON |
| | TILLMAN, MORRIS R | 5356 W ADDISON |
| 60641-3616 | SINCLAIR, ADAM G | 3722 N CICERO AVENUE |
| 60641-3946 | ACKERLUND, RONALD J | 3540 N PULASKI ROAD |
| 60641-4210 | HICKEY, DAVID R | 5223 W BELMONT AVENUE |
| | HICKEY, ROY | 5223 W BELMONT AVENUE |
| 60643-1116 | BANKS, OLIVER | 2032 W 95TH STREET |
| 60643-1831 | MERCURY, KENNETH M | 9944 S WESTERN |
| 60643-2817 | ROMANO, JOSEPH J | 1810 W 103 ST SUITE 204 2ND FL |
| 60643-3228 | RESTKO, THADDEUS R | 10944 S WESTERN AVENUE |
| 60644-1833 | WILLIAMS, LARRY C | 5932 W LAKE STREET |
| 60645-1811 | DORTON, JAMES E | 7205 N WESTERN AVENUE |
| 60645-2155 | HOMER, WILLIAM | 2125 W HOWARD |
| 60645-4527 | YORE, PETER M | 2759 "A" WEST PRATT BOULEVARD |
| 60646-1268 | DALSANDRO, ROSE C | 6141 WEST TOUHY |
| 60646-3711 | BIELINSKI, RONALD E | 6304 N MILWAUKEE |
| 60646-4107 | MURPHY, THOMAS PATRICK | 5309 W DEVON |
| 60646-4448 | JANET, MICHAEL J | 6336 N CICERO |
| 60646-5425 | WIANS, DAVID A | 5872 N MILWAUKEE |
| 60646-6220 | LIVELY, GERALD D | 5667 N MILWAUKEE AVENUE |
| 60646-6222 | CADWALADER, ELIZABETH A | 5692 N MILWAUKEE |
| 60646-6408 | PATUR, BLAIR L | 5627 N CENTRAL AVENUE |
| 60647-2627 | MIRANDA, MILSA M | 2421 N MILWAUKEE |
| 60647-4513 | BAUER, JOSEPH P | 2015 W ARMITAGE |

AGENCY PLANNING
MARCH 1993
(CHICAGO/BG)

INDEPENDENT CONTRACTORS IN THE CITY OF CHICAGO FOR THE LAST 5 YEARS

| ZIP | NAME | ADDRS |
|---|---|---|
| 60649-4015 | TOWNSEND, JAMES E | 7639 S JEFFERY BLVD |
| 60652-1528 | KALEEL, THEODORE J | 3354 W 79TH STREET |
| 60652-1708 | O'CONNOR, JEROME W | 2613 W 79TH STREET |
| 60652-1815 | RUCIN, JEROME L | 3842 W 79TH STREET |
| 60652-1854 | NOWAKOWSKI, KENNETH L | 3782 1/2 W 79TH STREET |
| 60652-3631 | SCHUBERT, WILLIAM L | 8516 S PULASKI |
| 60655-2409 | PANJAN JR, GEORGE F | 3215 W 103RD STREET |
| 60655-2747 | STADLER, ROBERT J | 3310 W 111TH STREET |
| 60655-3827 | ADENA, HENRY | 10637 S PULASKI ROAD |
| 60656-1479 | CALI, VITO P | 5521 N CUMBERLAND SUITE 1115 |
| 60656-1803 | LYONS, THOMAS J | 5217 N HARLEM |
| 60656-1901 | NICEK, PAUL A | 7013 W HIGGINS AVENUE |
| 60657-2109 | PEDERSEN, RALPH S | 3326 N ASHLAND AVENUE |
| 60659-1207 | BILOTICH, MICKEY | 3627 W DEVON |
| 60659-1712 | BERKE, MARSHALL | 2755 W DEVON |
| 60659-1994 | PAHL, JACK D | 2400 W DEVON SUITE 203 |
| 60659-4004 | MONAGHAN, SUSAN V MONAGHAN, MICHAEL J | 2609 W PETERSON AVENUE 2609 W PETERSON AVENUE |
| 60659-4602 | LEE, JI YONG | 5814 N LINCOLN AVENUE |
| 60660-1314 | FEIEREISEL, RONALD E | 1524 W DEVON |
| 60660-2501 | JESSEN, HANS W | 6129 N BROADWAY |

TRAINEE AGENTS IN THE CITY OF CHICAGO FOR THE LAST 5 YEARS

| ZIP | NAME | ADDRS |
|---|---|---|
| 60608-4930 | UNDERHILL, SYLVIA T | 2436 SOUTH OAKLEY AVENUE |
| 60615-4210 | KING, GREGORY | 1634 E 53RD STREET SUITE A |
| 60618-1621 | STACHURSKI, MARIA | 4325 N WESTERN |
| 60631-1086 | SZWAJDA, SANDRA M | 7132 N HARLEM |
| 60634-4848 | WILLIAMS, ANTHONY | 6700 WEST BELMONT |
| 60639-4337 | ADKINS III, RAYMOND V | 5310 W NORTH AVENUE |
| 60646-2925 | FOSTER, PATRICIA C | 6430 N CENTRAL |
| 60646-5553 | PULLANO, WILLIAM E | 5725 N CENTRAL AVENUE |
| 60659-1910 | AURORA, NARAIN K | 2400 W DEVON |

**FROM: Illinois Cost Containment Shipment Files**

SR D946-4
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
CHICAGO AREA EXPOSURE & PREMIUM BY ZIPCODE
1991



| ZIP | WRITTEN PREMIUM | EARNED PREMIUM | EXPOSURE |
|---|---|---|---|
| 60601 | 627,364 | 618,999 | 634 |
| 60602 | 69,759 | 67,417 | 64 |
| 60603 | 67,413 | 68,030 | 66 |
| 60604 | 55,605 | 39,056 | 35 |
| 60605 | 758,226 | 749,805 | 819 |
| 60606 | 249,210 | 246,774 | 250 |
| 60607 | 1,135,609 | 1,116,336 | 1,076 |
| 60608 | 3,133,701 | 3,285,239 | 3,942 |
| 60609 | 3,288,799 | 3,243,064 | 3,506 |
| 60610 | 3,517,709 | 3,427,596 | 2,506 |
| 60611 | 875,693 | 865,180 | 1,016 |
| 60612 | 2,427,337 | 2,427,133 | 5,565 |
| 60613 | 5,152,513 | 5,085,259 | 5,103 |
| 60614 | 991,139 | 982,772 | 3,861 |
| 60615 | 3,014,562 | 2,982,772 | 3,303 |
| 60616 | 3,537,336 | 3,498,579 | 11,001 |
| 60617 | 8,276,177 | 8,276,137 | 4,614 |
| 60618 | 9,022,561 | 8,889,342 | 11,999 |
| 60619 | 4,264,738 | 4,207,254 | 1,026 |
| 60620 | 5,929,276 | 5,935,204 | 3,818 |
| 60621 | 3,324,594 | 3,283,651 | 3,240 |
| 60622 | 2,600,675 | 2,560,481 | 1,017 |
| 60623 | 7,620,392 | 7,520,709 | 9,203 |
| 60624 | 3,432,558 | 3,414,803 | 2,100 |
| 60625 | 1,431,158 | 1,414,803 | 5,191 |
| 60626 | 4,044,170 | 4,775,055 | 11,939 |
| 60628 | 10,280,009 | 10,637,176 | 7,175 |
| 60629 | 8,081,528 | 8,033,172 | 9,386 |
| 60630 | 5,553,268 | 5,263,885 | 2,849 |
| 60631 | 7,276,956 | 7,171,798 | 18,925 |
| 60632 | 14,305,335 | 14,078,481 | 9,021 |
| 60633 | 6,686,232 | 6,570,380 | 2,516 |
| 60634 | 1,239,426 | 1,213,946 | 14,171 |
| 60636 | 2,239,426 | 2,213,946 | 5,563 |
| 60637 | 6,412,853 | 10,083,975 | 10,398 |
| 60638 | 10,252,797 | 4,020,537 | 5,184 |
| 60639 | 8,365,320 | 8,242,983 | 7,800 |
| 60640 | 3,118,326 | 3,756,523 | 1,961 |
| 60641 | 1,815,582 | 1,788,973 | 9,417 |
| 60643 | 7,154,325 | 7,022,902 | 4,240 |
| 60644 | 4,137,129 | 4,080,550 | 2,033 |
| 60645 | 5,406,983 | 5,366,559 | 3,798 |
| 60646 | 2,780,930 | 2,664,278 | 436 |
| 60647 | 6,555,990 | 2,743,593 | 7,543 |
| 60649 | 390,890 | 387,467 | 11,430 |
| 60651 | 5,324,755 | 5,237,082 | 4,529 |
| 60652 | 6,805,241 | 6,755,240 | 5,322 |
| 60653 | 2,770,008 | 2,727,994 | 1,278 |
| 60655 | 4,637,527 | 4,566,754 | 66 |
| 60660 | 3,642,500 | 3,413,154 | 316,776 |
| 60661 | 62,385 | 62,130 | |
| | 256,565,115 | 252,837,651 | |

PAGE

/18/93

**FROM: Illinois Cost Containment Shipment Files**

STATE FARM FIRE AND CASUALTY COMPANY - ALL COMPANIES
CHICAGO AREA HOMEOWNERS EXPOSURE & PREMIUM BY ZIPCODE
1991
SB D946-3



| ZIP | WRITTEN PREMIUM | EARNED PREMIUM | EXPOSURE |
|---|---|---|---|
| 60601 | 84,204 | 80,036 | 517 |
| 60602 | 2,039 | 1,920 | 7 |
| 60603 | 1,447 | 1,456 | 11 |
| 60604 | 1,169 | 1,459 | 11 |
| 60605 | 153,958 | 148,621 | 788 |
| 60606 | 189,290 | 169,750 | 143 |
| 60607 | 119,610 | 106,007 | 707 |
| 60608 | 542,721 | 516,228 | 2,192 |
| 60609 | 591,256 | 638,936 | 2,356 |
| 60610 | 536,410 | 556,515 | 2,591 |
| 60611 | 542,410 | 439,538 | 1,248 |
| 60612 | 175,368 | 165,265 | 843 |
| 60613 | 905,657 | 1,805,662 | 3,564 |
| 60614 | 1,918,618 | 424,259 | 7,432 |
| 60615 | 456,742 | 716,551 | 1,608 |
| 60616 | 805,725 | 1,720,949 | 1,195 |
| 60617 | 1,830,360 | 921,316 | 4,408 |
| 60618 | 963,086 | 225,931 | 3,302 |
| 60620 | 1,240,491 | 740,854 | 3,062 |
| 60621 | 796,617 | 204,097 | 577 |
| 60622 | 236,130 | 1,111,794 | 2,026 |
| 60623 | 214,253 | 545,513 | 2,460 |
| 60624 | 179,703 | 195,513 | 4,247 |
| 60625 | 210,037 | 1,304,410 | 2,134 |
| 60626 | 1,459,900 | 1,272,284 | 3,757 |
| 60628 | 1,599,598 | 1,505,466 | 6,144 |
| 60629 | 972,914 | 910,401 | 3,603 |
| 60630 | 1,214,983 | 290,094 | 1,630 |
| 60631 | 316,499 | 2,302,571 | 9,577 |
| 60632 | 2,460,714 | 1,057,303 | 1,542 |
| 60633 | 1,500,020 | 382,293 | 1,102 |
| 60634 | 412,661 | 1,380,464 | 2,310 |
| 60636 | 1,475,015 | 664,714 | 2,509 |
| 60637 | 1,727,100 | 552,479 | 2,459 |
| 60638 | 451,277 | 1,300,756 | 2,555 |
| 60639 | 1,362,315 | 999,200 | 1,779 |
| 60640 | 521,526 | 1,385,975 | 4,558 |
| 60641 | 1,474,224 | 937,275 | 1,553 |
| 60643 | 690,434 | 357,011 | 1,894 |
| 60644 | 376,678 | 1,044,914 | 2,774 |
| 60645 | 1,139,204 | 49,189 | 153 |
| 60646 | 52,592 | 765,467 | 3,532 |
| 60647 | 916,779 | 1,420,684 | 5,701 |
| 60649 | 1,585,909 | 313,656 | 1,032 |
| 60651 | 731,747 | 392,427 | 2,042 |
| 60652 | 600,675 | 542,224 | 2,461 |
| 60653 | 600,556 | 310,499 | 975 |
| **** | **49,355,125** | **46,581,999** | **176,918** |

**FROM:   Illinois Cost Containment Shipment Files**



STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
SR D966-4
CHICAGO AREA EXPOSURE & PREMIUM BY ZIPCODE
1990

3/18/93

PAGE 1

**FROM: Illinois Cost Containment Shipment Files**

SR D944-3
STATE FARM FIRE AND CASUALTY COMPANY - ALL COMPANIES
CHICAGO AREA HOMEOWNERS EXPOSURE & PREMIUM BY ZIPCODE
1990



| ZIP | WRITTEN PREMIUM | EARNED PREMIUM | EXPOSURE |
|---|---|---|---|
| 60601 | 66,675 | 63,705 | 412 |
| 60602 | 1,576 | 1,648 | 7 |
| 60603 | 1,428 | 1,533 | 9 |
| 60604 | 2,259 | 2,140 | 6 |
| 60605 | 129,102 | 125,378 | 739 |
| 60606 | 29,841 | 29,122 | 189 |
| 60607 | 435,295 | 418,269 | 1,907 |
| 60608 | 747,412 | 716,203 | 2,127 |
| 60609 | 535,840 | 502,574 | 2,088 |
| 60610 | 435,840 | 144,881 | 484 |
| 60611 | 150,939 | 144,881 | 1,532 |
| 60612 | 940,508 | 1,590,804 | 1,901 |
| 60613 | 1,652,198 | 378,739 | 3,612 |
| 60614 | 596,253 | 423,685 | 7,881 |
| 60615 | 423,646 | 1,504,485 | 5,217 |
| 60616 | 1,562,697 | 1,536,433 | 6,217 |
| 60617 | 1,593,427 | 1,285,392 | 27,217 |
| 60618 | 1,842,484 | 192,323 | 3,530 |
| 60620 | 231,136 | 422,243 | 530 |
| 60621 | 202,631 | 164,314 | 1,727 |
| 60622 | 542,403 | 2,210 | 2,210 |
| 60623 | 169,890 | 1,001,279 | 4,085 |
| 60624 | 1,041,700 | 151,582 | 2,070 |
| 60625 | 231,582 | 174,777 | 1,096 |
| 60627 | 183,829 | 1,209,052 | 3,554 |
| 60628 | 1,259,050 | 1,210,161 | 5,513 |
| 60629 | 1,597,015 | 1,340,474 | 5,874 |
| 60630 | 1,594,045 | 800,875 | 3,308 |
| 60631 | 837,265 | 444,391 | 4,269 |
| 60632 | 1,202,052 | 1,272,124 | 9,234 |
| 60633 | 2,180,398 | 2,089,976 | 3,264 |
| 60634 | 987,773 | 444,410 | 1,027 |
| 60636 | 358,596 | 337,976 | 1,027 |
| 60637 | 1,296,015 | 1,264,015 | 6,542 |
| 60638 | 632,290 | 605,964 | 2,654 |
| 60639 | 1,262,617 | 1,214,618 | 5,294 |
| 60640 | 1,195,175 | 1,153,534 | 1,571 |
| 60641 | 419,860 | 406,964 | 1,053 |
| 60642 | 1,266,022 | 1,215,286 | 3,354 |
| 60643 | 1,871,881 | 1,805,524 | 3,860 |
| 60644 | 329,637 | 318,167 | 1,155 |
| 60645 | 986,689 | 948,257 | 42,560 |
| 60646 | 41,549 | 39,021 | 133 |
| 60647 | 1,723,052 | 696,200 | 3,432 |
| 60649 | 1,227,197 | 1,261,533 | 5,421 |
| 60650 | 1,310,329 | 299,377 | 5,164 |
| 60651 | 299,377 | 288,779 | 1,799 |
| 60652 | 667,568 | 500,436 | 2,596 |
| 60653 | 527,400 | | 2,525 |
| TOTAL | 42,034,548 | 41,179,062 | 168,719 |

Case: 1:13-cv-08564 Document #: 134-7 Filed: 08/11/17 Page 322 of 500 PageID #:5...

210

PAGE 1

**FROM: Illinois Cost Containment Shipment Files**

SR D946-4
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
CHICAGO AREA EXPOSURE & PREMIUM BY ZIPCODE
1989



| ZIP | WRITTEN PREMIUM | EARNED PREMIUM | EXPOSURE |
| --- | --- | --- | --- |

5/18/93

004013

**FROM:  Illinois Cost Containment Shipment Files**



STATE FARM FIRE AND CASUALTY COMPANY - ALL COMPANIES
CHICAGO AREA HOMEOWNERS EXPOSURE & PREMIUM BY ZIPCODE
1989

| ZIP | WRITTEN PREMIUM | EARNED PREMIUM | EXPOSURE |
|---|---|---|---|
| 60601 | 56,440 | 54,304 | 357 |
| 60602 | 1,768 | 2,017 | 9 |
| 60603 | 1,483 | 1,383 | 10 |
| 60604 | 579 | 568 | 2 |
| 60605 | 101,116 | 99,896 | 577 |
| 60606 | 21,623 | 21,819 | 103 |
| 60607 | 194,785 | 142,510 | 236 |
| 60608 | 671,829 | 654,523 | 1,951 |
| 60609 | 434,404 | 422,158 | 2,307 |
| 60610 | 351,265 | 342,236 | 440 |
| 60611 | 123,379 | 120,636 | 2,852 |
| 60612 | 741,177 | 723,850 | 2,730 |
| 60613 | 539,705 | 527,352 | 1,542 |
| 60614 | 379,031 | 374,103 | 1,541 |
| 60615 | 406,449 | 397,467 | 5,396 |
| 60616 | 1,449,572 | 1,419,373 | 5,008 |
| 60617 | 764,963 | 755,030 | 2,191 |
| 60618 | 192,910 | 179,598 | 3,408 |
| 60619 | 106,861 | 499,257 | 1,415 |
| 60620 | 513,864 | 421,051 | 2,025 |
| 60621 | 434,442 | 421,009 | 3,671 |
| 60622 | 917,603 | 893,639 | 2,155 |
| 60623 | 175,222 | 664,629 | 3,355 |
| 60624 | 1,454,039 | 1,116,568 | 5,958 |
| 60625 | 1,245,654 | 1,214,175 | 5,540 |
| 60626 | 770,263 | 745,743 | 3,209 |
| 60627 | 1,014,102 | 984,070 | 4,454 |
| 60628 | 1,997,943 | 1,936,636 | 4,100 |
| 60629 | 907,000 | 877,804 | 4,198 |
| 60630 | 411,085 | 407,511 | 4,140 |
| 60631 | 322,751 | 314,710 | 1,213 |
| 60632 | 1,204,381 | 1,168,994 | 1,974 |
| 60633 | 528,700 | 509,082 | 5,733 |
| 60634 | 592,705 | 577,102 | 2,702 |
| 60635 | 1,149,455 | 1,141,078 | 5,031 |
| 60636 | 1,177,366 | 466,915 | 3,454 |
| 60637 | 359,134 | 352,068 | 942 |
| 60638 | 1,143,580 | 819,553 | 3,570 |
| 60639 | 1,162,398 | 1,115,812 | 3,070 |
| 60640 | 809,746 | 757,543 | 1,075 |
| 60641 | 309,144 | 300,979 | 3,074 |
| 60642 | 922,393 | 802,243 | 2,599 |
| 60643 | 35,074 | 35,207 | 128 |
| 60644 | 648,650 | 645,290 | 3,230 |
| 60645 | 155,073 | 157,557 | 5,587 |
| 60646 | 1,139,156 | 1,113,535 | 4,487 |
| 60647 | 268,665 | 261,473 | 2,400 |
| 60648 | 599,553 | 580,589 | 2,432 |
| 60649 | 276,407 | 271,131 | 154,707 |
| **TOTAL** | **38,758,000** | **37,771,925** | **154,707** |

PAGE 1

3/17/93

STATE FARM FIRE AND CASUALTY COMPANY - ALL COMPANIES
CHICAGO AREA RENTAL DWELLING EXPOSURE & PREMIUM
SR D944-5
1991



| ZIP CODE | WRITTEN PREMIUM | EXPOSURE |
|---|---|---|
| 60601 | 459.00 | 1 |
| 60603 | 357.00 | 1 |
| 60604 | 1,597.00 | 7 |
| 60607 | 14,942.00 | 42 |
| 60608 | 61,943.00 | 242 |
| 60609 | 104,842.37 | 391 |
| 60610 | 9,171.22 | 15 |
| 60611 | 3,112.00 | |
| 60612 | 28,749.02 | 89 |
| 60613 | 42,162.34 | 109 |
| 60614 | 112,781.85 | 251 |
| 60615 | 12,041.66 | 41 |
| 60616 | 52,212.31 | 195 |
| 60617 | 180,197.82 | 481 |
| 60619 | 164,768.47 | 432 |
| 60620 | 54,626.31 | 200 |
| 60621 | 33,651.17 | 110 |
| 60622 | 41,082.31 | 196 |
| 60623 | 56,135.64 | 242 |
| 60624 | 74,104.66 | 86 |
| 60625 | 17,571.90 | 196 |
| 60626 | 24,637.22 | 55 |
| 60627 | 109,537.22 | 148 |
| 60628 | 76,329.12 | 379 |
| 60629 | 78,567.46 | 344 |
| 60630 | 17,320.46 | 278 |
| 60631 | 107,905.50 | 73 |
| 60632 | 21,021.16 | 441 |
| 60633 | 85,642.38 | 83 |
| 60634 | 29,742.15 | 63 |
| 60636 | 20,894.75 | 154 |
| 60638 | 44,380.03 | 213 |
| 60639 | 69,559.06 | 270 |
| 60640 | 37,945.19 | 237 |
| 60641 | 63,522.14 | 98 |
| 60642 | 13,528.23 | 218 |
| 60643 | 46,954.53 | 72 |
| 60644 | 49,905.52 | 200 |
| 60645 | 23,103.09 | 122 |
| 60646 | 38,494.48 | 87 |
| 60647 | 112,633.51 | 132 |
| 60649 | 21,610.98 | 346 |
| 60650 | 58,085.89 | 94 |
| 60652 | 42,340.00 | 72 |
| 60653 | 22,300.87 | 199 |
| 60655 | 27,308.19 | 14 |
| 60656 | 109,059.45 | 239 |
| 60657 | 6,855.87 | 40 |
| 60659 | 26,250.96 | 62 |
| 60660 | 21,496.40 | 59 |
| | 2,548,781.98 | 8,979 |

PREPARED BY ACCOUNTING - STATISTICAL SERVICES SPECIAL REPORTS UNIT

Case: 1:13-cv-08564 Document #: 134-7 Filed: 08/11/17 Page 325 of 500 PageID #:5...

213

3/1/93

SR D944-5
STATE FARM FIRE AND CASUALTY COMPANY - ALL COMPANIES
CHICAGO AREA RENTAL DWELLING EXPOSURE & PREMIUM
1990



| ZIP CODE | WRITTEN PREMIUM | EXPOSURE |
|---|---|---|
| 60601 | 158.00 | 1 |
| 60603 | 316.00 | 1 |
| 60604 | 1,501.99 | 7 |
| 60605 | 313.00 | 1 |
| 60607 | 9,564.71 | 34 |
| 60608 | 47,261.44 | 254 |
| 60609 | 79,208.10 | 325 |
| 60610 | 5,186.00 | 1 |
| 60611 | 100.00 | 1 |
| 60612 | 21,163.19 | 70 |
| 60613 | 38,113.56 | 104 |
| 60614 | 96,313.61 | 250 |
| 60615 | 11,209.59 | 38 |
| 60616 | 47,954.75 | 102 |
| 60617 | 104,411.52 | 403 |
| 60618 | 131,411.52 | 462 |
| 60619 | 47,149.29 | 162 |
| 60620 | 38,310.84 | 95 |
| 60621 | 27,915.25 | 95 |
| 60622 | 49,523.84 | 194 |
| 60623 | 40,441.10 | 178 |
| 60624 | 23,461.10 | 184 |
| 60625 | 60,596.91 | 54 |
| 60626 | 17,492.04 | 119 |
| 60627 | 80,556.01 | 328 |
| 60628 | 45,466.38 | 257 |
| 60629 | 22,318.59 | 258 |
| 60630 | 13,372.59 | 58 |
| 60631 | 95,102.10 | 400 |
| 60632 | 72,942.08 | 73 |
| 60633 | 25,933.07 | 324 |
| 60634 | 41,903.35 | 109 |
| 60635 | 42,407.04 | 161 |
| 60636 | 60,517.56 | 215 |
| 60638 | 51,727.91 | 220 |
| 60639 | 11,307.37 | 64 |
| 60640 | 28,975.50 | 199 |
| 60641 | 21,626.50 | 62 |
| 60642 | 30,335.23 | 95 |
| 60643 | 16,955.64 | 78 |
| 60644 | 47,915.81 | 232 |
| 60645 | 1,986.09 | 285 |
| 60646 | 22,051.24 | 147 |
| 60647 | 7,653.79 | 6 |
| 60648 | 17,926.43 | 115 |
| 60649 | 12,177.35 | 289 |
| 60651 | | 63 |
| 60652 | | 72 |
| 60653 | | 72 |
| | 2,093,110.81 | 8,032 |

3/17/93



STATE FARM FIRE AND CASUALTY COMPANY - ALL COMPANIES
SR D946-5
CHICAGO AREA RENTAL DWELLING EXPOSURE & PREMIUM
1989

| ZIP CODE | WRITTEN PREMIUM | EXPOSURE |
|---|---|---|
| 60601 | 155.00 | 1 |
| 60603 | 354.00 | 1 |
| 60604 | 721.00 | 8 |
| 60607 | 1,767.51 | 33 |
| 60608 | 39,723.50 | 180 |
| 60609 | 72,223.37 | 294 |
| 60610 | 4,511.82 | 13 |
| 60611 | 197.00 | 1 |
| 60612 | 9,036.23 | 46 |
| 60613 | 17,277.10 | 65 |
| 60614 | 31,277.18 | 227 |
| 60615 | 80,665.66 | 355 |
| 60616 | 9,915.53 | 101 |
| 60617 | 40,420.82 | 366 |
| 60618 | 64,794.13 | 400 |
| 60619 | 135,989.47 | 162 |
| 60620 | 14,957.42 | 124 |
| 60621 | 29,826.54 | 74 |
| 60622 | 39,453.48 | 141 |
| 60623 | 39,179.29 | 181 |
| 60624 | 39,931.18 | 58 |
| 60625 | 17,868.90 | 170 |
| 60626 | 15,256.74 | 48 |
| 60627 | 17,725.83 | 108 |
| 60628 | 60,797.01 | 261 |
| 60629 | 63,869.01 | 299 |
| 60630 | 11,193.96 | 220 |
| 60631 | 3,137.10 | 43 |
| 60632 | 15,429.82 | 71 |
| 60634 | 71,492.42 | 308 |
| 60635 | 33,531.45 | 111 |
| 60636 | 35,903.38 | 128 |
| 60637 | 14,051.43 | 48 |
| 60638 | 52,492.09 | 205 |
| 60640 | 23,477.56 | 83 |
| 60641 | 49,920.45 | 106 |
| 60642 | 12,305.60 | 144 |
| 60643 | 33,531.45 | 86 |
| 60644 | 24,183.28 | 78 |
| 60645 | 19,692.16 | 104 |
| 60646 | 78,239.35 | 279 |
| 60647 | 12,305.60 | 40 |
| 60649 | 45,474.71 | 185 |
| 60651 | 10,662.46 | 14 |
| 60653 | 3,462.69 | 101 |
| 60655 | 18,593.75 | 179 |
| 60656 | 11,727.69 | 193 |
| 60657 | 16,271.39 | 88 |
| 60658 | 12,898.63 | 61 |
| 60659 | 12,898.43 | 43 |
| 60660 | 1,033,270.01 | 7,221 |

004017

## State Farm Fire and Casualty Company
## State Farm General Insurance Company

## Homeowners and Residential Fire
## 12 Months 1991

| Zip | Canc | Non-Renew | New Bus | Renewal |
|---|---|---|---|---|
| 60629 | 35 | 10 | 900 | 6,380 |
| Chicago Area* | 933 | 270 | 23,620 | 144,126 |
| 60608 | 6 | 1 | 377 | 1,694 |
| 60609 | 33 | 6 | 387 | 1,866 |
| 60612 | 9 | 1 | 82 | 422 |
| 60615 | 8 | 3 | 333 | 1,201 |
| 60616 | 4 | 2 | 281 | 1,522 |
| 60617 | 64 | 23 | 696 | 5,278 |
| 60619 | 32 | 5 | 267 | 2,078 |
| 60620 | 39 | 11 | 386 | 3,157 |
| 60621 | 14 | 3 | 82 | 484 |
| 60622 | 14 | 2 | 410 | 1,446 |
| 60623 | 19 | 1 | 502 | 2,025 |
| 60624 | 12 | 0 | 97 | 375 |
| 60627 | 10 | 3 | 156 | 940 |
| 60628 | 60 | 16 | 393 | 3,279 |
| 60633 | 6 | 1 | 115 | 991 |
| 60636 | 33 | 6 | 124 | 1,151 |
| 60637 | 7 | 4 | 193 | 823 |
| 60643 | 39 | 13 | 371 | 3,240 |
| 60644 | 23 | 3 | 210 | 942 |
| 60649 | 19 | 1 | 215 | 855 |
| 60651 | 53 | 5 | 323 | 2,151 |
| 60653 | 3 | 0 | 29 | 120 |
| 22 Zip area | 507 | 110 | 6,029 | 36,040 |

Chicago Area *  Includes Zip Codes 60601-60653 and 60655-60659

216

## State Farm Fire and Casualty Company
## State Farm General Insurance Company

### Homeowners and Residential Fire
### 12 Months 1990

| Zip | Canc | Non-Renew | New Bus | Renewal |
|---|---|---|---|---|
| 60629 | 27 | 7 | 833 | 6,112 |
| Chicago Area* | 745 | 238 | 23,874 | 135,820 |
| 60608 | 15 | 2 | 331 | 1,505 |
| 60609 | 23 | 2 | 290 | 1,755 |
| 60612 | 6 | 2 | 79 | 385 |
| 60615 | 6 | 3 | 316 | 1,111 |
| 60616 | 4 | 1 | 288 | 1,376 |
| 60617 | 33 | 15 | 631 | 5,009 |
| 60619 | 31 | 9 | 248 | 2,007 |
| 60620 | 34 | 12 | 382 | 3,029 |
| 60621 | 5 | 1 | 57 | 471 |
| 60622 | 22 | 0 | 377 | 1,238 |
| 60623 | 14 | 7 | 348 | 1,828 |
| 60624 | 9 | 0 | 75 | 352 |
| 60627 | 8 | 1 | 125 | 932 |
| 60628 | 49 | 8 | 373 | 3,119 |
| 60633 | 0 | 1 | 115 | 963 |
| 60636 | 19 | 3 | 108 | 1,135 |
| 60637 | 5 | 0 | 154 | 819 |
| 60643 | 36 | 7 | 329 | 3,145 |
| 60644 | 10 | 4 | 176 | 865 |
| 60649 | 15 | 4 | 169 | 802 |
| 60651 | 37 | 14 | 356 | 1,997 |
| 60653 | 2 | 0 | 20 | 110 |
| 22 Zip area | 383 | 96 | 5,347 | 33,953 |

Chicago Area *   Includes Zip Codes 60601-60653 and 60655-60659

004019

## State Farm Fire and Casualty Company
## State Farm General Insurance Company

### Homeowners and Residential Fire
### 12 Months 1989

| Zip | Canc | Non-Renew | New Bus | Renewal |
|---|---|---|---|---|
| 60629 | 24 | 7 | 833 | 5,919 |
| Chicago Area* | 604 | 225 | 22,323 | 127,971 |
| 60608 | 9 | 0 | 283 | 1,346 |
| 60609 | 28 | 3 | 331 | 1,608 |
| 60612 | 3 | 2 | 74 | 342 |
| 60615 | 5 | 3 | 335 | 983 |
| 60616 | 3 | 2 | 248 | 1,251 |
| 60617 | 33 | 9 | 623 | 4,694 |
| 60619 | 15 | 6 | 255 | 1,922 |
| 60620 | 18 | 9 | 277 | 2,918 |
| 60621 | 10 | 2 | 49 | 457 |
| 60622 | 12 | 2 | 320 | 1,041 |
| 60623 | 14 | 5 | 260 | 1,723 |
| 60624 | 4 | 1 | 72 | 312 |
| 60627 | 4 | 0 | 127 | 937 |
| 60628 | 40 | 13 | 337 | 2,986 |
| 60633 | 1 | 0 | 108 | 911 |
| 60636 | 17 | 12 | 113 | 1,095 |
| 60637 | 3 | 2 | 189 | 751 |
| 60643 | 32 | 9 | 338 | 3,075 |
| 60644 | 8 | 4 | 168 | 781 |
| 60649 | 5 | 5 | 167 | 706 |
| 60651 | 34 | 5 | 328 | 1,873 |
| 60653 | 2 | 1 | 31 | 91 |
| 22 Zip area | 300 | 95 | 5,033 | 31,803 |

Chicago Area *   Includes Zip Codes 60601-60653  and  60655-60659

**State Farm Fire and Casualty Company**
**State Farm General Insurance Company**

**Homeowners and Residential Fire**
**12 Months 1988**

| Zip | Canc | Non-Renew | New Bus | Renewal |
|---|---|---|---|---|
| 60629 | 32 | 4 | 827 | 5,748 |
| Chicago Area * | 724 | 151 | 20,619 | 122,279 |
| 60608 | 19 | 0 | 285 | 1,206 |
| 60609 | 28 | 7 | 270 | 1,496 |
| 60612 | 0 | 0 | 49 | 331 |
| 60615 | 4 | 0 | 273 | 898 |
| 60616 | 8 | 1 | 251 | 1,131 |
| 60617 | 48 | 8 | 568 | 4,488 |
| 60619 | 23 | 3 | 220 | 1,919 |
| 60620 | 32 | 9 | 262 | 2,933 |
| 60621 | 3 | 0 | 52 | 454 |
| 60622 | 14 | 2 | 279 | 923 |
| 60623 | 20 | 3 | 261 | 1,657 |
| 60624 | 8 | 1 | 52 | 290 |
| 60627 | 5 | 2 | 125 | 946 |
| 60628 | 46 | 11 | 255 | 2,988 |
| 60633 | 1 | 0 | 93 | 871 |
| 60636 | 20 | 3 | 97 | 1,068 |
| 60637 | 10 | 2 | 151 | 711 |
| 60643 | 30 | 6 | 313 | 2,998 |
| 60644 | 9 | 3 | 154 | 739 |
| 60649 | 10 | 0 | 138 | 689 |
| 60651 | 43 | 5 | 296 | 1,741 |
| 60653 | 2 | 0 | 20 | 101 |
| 22 Zip area | 383 | 66 | 4,464 | 30,578 |

Chicago Area *    Includes Zip Codes 60601-60653  and  60655-60659

004021

| COMPUTER DATA REQUEST FORM | | Public Sale Coordinator<br>Data Processing Section<br>Illinois Department of Insurance<br>320 West Washington Street, Fourth Floor<br>Springfield, Illinois 62767 |
|---|---|---|

Pursuant to (Ill. Rev. Stat. 1989, ch. 73, par 1020.2) information available from the Illinois Department of Insurance is listed below. For assistance call the Public Sale Coordinator at (217)524–0605.

**Instructions:** • Payment must be received before requests can be processed or mailed.
    • Customer must supply IBM-compatible tapes for any tape data set requested.
      —Tapes may be 9 track 1600 or 6250 BPI.
    • The Department of Insurance will supply IBM-compatible diskettes for any diskette data set requested.
      —Customer must specify size and density of diskette desired.
      —ASCII format only
    • Return completed request form with your check made payable to Director of Insurance/ISRF to above address

| Computer Data Requested: | Amount Enclosed: |
|---|---|

Diskette size desired : ☐ 5.25"  ☐ 3.5"     Density: ☐ LOW  ☐ HIGH

| The undersigned hereby agrees that any data received as a result of this request will not be resold, reconveyed, or otherwise transferred for cash, merchandise, or any consideration or thing of value, to any individual, corporation, association or other third party. | –FOR DEPARTMENT USE ONLY– |
|---|---|
| | Filed By |
| | Date Mailed |

| Requestor's Signature: | Date Filed: | Phone: |
|---|---|---|
| Mail Request to: | | |
| Street: | City & State: | Zip: |

## PRICE SCHEDULE—Effective February 5, 1992

**Licensee Data**
Producer Registered Firms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $600/List/Diskette/Tape
Licensee Data Base (all licensees) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $300/Microfiche Set
Applicants Passing Exams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $100/List/Diskette (bi–weekly)
Applicants Failing Exam . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $50/List/Diskette  (bi–weekly)
All Producers or Producers with specific authority . . . . . . . . . . . . . . . . . . . . . . . $600/Tape/Diskette, $1000/List
Producers from Upstate (zips 60000–60699) . . . . . . . . . . . . . . . . . . . . . . . . . . . $300/Tape/Diskette, $500/List
Producers from Downstate (zips 60700–62999) . . . . . . . . . . . . . . . . . . . . . . . . $300/Tape/Diskette, $500/List
Producers from Ten Zip Codes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $180/List/Diskette
Producers subject to Continuing Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $600/List/Diskette/Tape
Premium Finance, Public Adjuster or Surplus Lines Licensees . . . . . . . . . . . . . $100/List/Labels
Third Party Administrators, Preferred Provider Administrators, and Third Party
   Prescription Program licensees/registrants . . . . . . . . . . . . . . . . . . . . . . . . . . . . $25/List

**Complaint Data**
Non–Confidential Standard Report
   (complaints by company, coverages or reasons) . . . . . . . . . . . . . . . . . . . . . . . . $200/Report

**Insurer Data**
Company Name, Address and Authority (all companies) . . . . . . . . . . . . . . . . . . . $100/List/Diskette/Tape, $200 Labels
Company Name, Address, CEO and Phone Number (all companies) . . . . . . . . . . $100/List/Diskette/Tape, $200 Labels
HMO Company Name and Address . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $25/List
Medicare Supplements and Status Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $25/List
A&H Company FEINs, Phone Numbers and Addresses . . . . . . . . . . . . . . . . . . . . $100/List/Diskette
HMO Annual Statement data (all HMO's for one year) . . . . . . . . . . . . . . . . . . . . $600/Diskette
HMO Quarterly Statement data (all HMO's for one quarter) . . . . . . . . . . . . . . . . $200/Diskette
Line of business Market Share (Life, Accident and Health including Fraternals) . . $200/Report
Line of business Market Share (Property and Casualty) . . . . . . . . . . . . . . . . . . . $200/Report
Company Name & Address for Worker's Comp . . . . . . . . . . . . . . . . . . . . . . . . . . $100/List/Diskette/Tape
Auto premium comparison – by company (includes inquiry program) . . . . . . . . . . $100/3.5" 1.4MB Diskette only (monthly)
Auto premium comparison – by driver (includes inquiry program) . . . . . . . . . . . . $100/3.5" 1.4MB Diskette only (monthly)

**Police/Firemen Pension Data**
Funds: Name and Address (all Funds) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $100/List/Diskette/Tape, $200 Labels
Participant Data for a Fund (available only to Fund) . . . . . . . . . . . . . . . . . . . . . . $100/Diskette

**Homeowner/Residential Fire Policy Counts**
Raw Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $200/Tape/Diskette (quarterly)
Zip Code Market Share Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $400/Report
Company Detail Report (new, renewal, non–renewal and
   cancellation by zip for Chicago and East St. Louis) . . . . . . . . . . . . . . . . . . . . . . $200/Tape/Diskette (quarterly)

220

# State Farm Insurance Companies

**ONE STATE FARM PLAZA**
**BLOOMINGTON, ILLINOIS 61710**

**JUDITH K. MINTEL**
**ASSOCIATE GENERAL COUNSEL**
(309) 766-3520

April 29, 1993

**CORPORATE LAW DEPARTMENT**

Richard L. Huberman
U.S. House of Representatives
Ford Building (Annex II)
Room 151
Washington, DC  20515

Re:  Representative Collins' Data Request –
     Cancellation/Nonrenewal

Dear Mr. Huberman:

Enclosed is a copy of the additional data that you requested from
State Farm.  The exhibit contains policy counts for Illinois
homeowners and residential fire business written by the State
Farm Companies in the Chicago area for year ending December 31,
1991.

The exhibit is similar to Exhibit 7 attached to C. A. Ingham's
March 30, 1993 letter to Representative Collins except that all
zip codes in the City of Chicago are shown separately (including
some zip codes which were not included in the definition of
"Chicago area" in the initial submission).  In addition, the
definition of cancellation count in the attached exhibit is
different from the cancellation count contained in the original
Exhibit 7 in that the attached exhibit does not include
declinations in the cancellation column.

If you have any questions concerning this, please feel free to
call me.

                              Very truly yours,

                              Judith Mintel

JKM/kr
Attachment

PAGE 1

4/16/93

STATE FARM FIRE SF D946
AND CASUALTY COMPANY
ALL COMPANIES
ILLINOIS HOMEOWNERS & RESIDENTIAL FIRE - CHICAGO AREA
FOR THE YEAR ENDING DECEMBER 31, 1991



| ZIP CODE | CANCELLATION COUNT | NON-RENEWAL COUNT | NEW BUSINESS COUNT | RENEWAL BUSINESS COUNT |
|---|---|---|---|---|
| 60601 | | | 119 | 323 |
| 60602 | | | | 3 |
| 60603 | | | | 4 |
| 60604 | | | | |
| 60605 | 2 | 2 | 5 | 520 |
| 60606 | 3 | 1 | 164 | 194 |
| 60607 | 3 | 1 | 74 | 495 |
| 60608 | 2 | 4 | 159 | 1,444 |
| 60609 | 1 | 9 | 337 | 1,466 |
| 60610 | 4 | 2 | 344 | 2,055 |
| 60611 | 3 | 1 | 452 | 1,495 |
| 60612 | | 4 | 743 | 1,522 |
| 60613 | 16 | 4 | 1,032 | 2,500 |
| 60614 | 2 | 2 | 283 | 4,891 |
| 60615 | 1 | 2 | 201 | 1,522 |
| 60616 | 46 | 3 | 694 | 3,276 |
| 60617 | 11 | 3 | 751 | 3,320 |
| 60618 | 25 | 1 | 267 | 2,078 |
| 60619 | 24 | 1 | 388 | 5,157 |
| 60620 | | | 362 | |
| 60621 | 8 | 2 | 410 | 1,444 |
| 60622 | 3 | 1 | 502 | 2,025 |
| 60623 | | | 507 | 3,435 |
| 60624 | 10 | 3 | 541 | 1,811 |
| 60625 | 4 | 3 | 136 | 3,940 |
| 60626 | 1 | 16 | 203 | 4,229 |
| 60627 | 47 | 10 | 908 | 4,580 |
| 60628 | 2 | 3 | 640 | 5,085 |
| 60629 | 1 | 6 | 324 | 4,627 |
| 60630 | 2 | 4 | 657 | 3,356 |
| 60631 | 11 | 1 | 115 | 991 |
| 60632 | 4 | 1 | 87 | 8,009 |
| 60633 | 7 | 5 | 441 | 3,614 |
| 60634 | 28 | 1 | 124 | 5,151 |
| 60635 | 5 | 1 | 133 | 1,021 |
| 60636 | | 1 | 605 | 5,443 |
| 60637 | 30 | 4 | 677 | 3,080 |
| 60638 | 2 | 4 | 502 | 1,401 |
| 60639 | 1 | | 190 | 1,611 |
| 60640 | 2 | 1 | 311 | 2,255 |
| 60641 | 35 | 3 | 310 | 5,642 |
| 60642 | 7 | 3 | 422 | 3,213 |
| 60643 | 6 | 3 | 519 | 3,794 |
| 60644 | 28 | 7 | 502 | 3,385 |
| 60645 | 7 | 1 | 378 | 855 |
| 60646 | | 1 | 335 | |
| 60647 | 4 | 3 | 328 | 2,151 |
| 60648 | 2 | 3 | 464 | 4,095 |
| 60649 | 1 | 6 | 351 | |
| 60650 | 1 | 2 | 408 | 2,120 |
| 60651 | 3 | 5 | 488 | 4,788 |
| 60652 | 3 | 3 | 404 | 4,035 |
| 60653 | | | 244 | 3,494 |
| 60654 | | | 260 | |
| 60655 | | | 203 | 2,161 |
| 60656 | | | 345 | 345 |
| 60657 | 4 | | 1,264 | 4,050 |
| 60658 | 1 | | | 1,950 |
| 60659 | | | | |
| 60660 | | | | |
| | 555 | 265 | 23,434 | 141,352 |

PREPARED BY: ACCOUNTING - STATISTICAL SERVICES SPECIAL REPORTS UNIT

004024

**U.S. House of Representatives**

Committee on Energy and Commerce

SUBCOMMITTEE ON COMMERCE
CONSUMER PROTECTION, AND COMPETITIVENESS

Washington, DC 20515-6120

March 3, 1993

Mr. Wayne E. Hedien
Chairman of the Board and Chief Executive Officer
Allstate Insurance Company
Allstate Plaza
Northbrook, IL 60062

Dear Mr. Hedien:

The Subcommittee is investigating the nature and extent
of redlining by insurance companies. To assist the
Subcommittee in its investigation, please provide the
Subcommittee the following information with respect to your
company by March 24, 1993.

(1) Allstate primarily markets directly through its own
agents. Analyses have shown that there are often fewer
insurance agents in inner-city neighborhoods, particularly
Black and Hispanic communities, than other urban
neighborhoods. Why are their so few agents in inner-city
neighborhoods? What is the company policy on agents
providing price quotes over the phone? Does it vary
depending on the location of the property or automobile to be
insured? Please explain. Please provide any relevant
documentation of company policy.

(2) With respect to the City of Chicago, please provide
the names and locations of company agents (either direct
employees or independant contractors) by zip code for the
last five years.

(3) With respect to each zip code in the City of
Chicago, please provide the specified data on an annual basis
for the last five years itemized with respect to the
specified lines of insurance. The specified lines of
insurance are homeowners, other similar personal property
lines such as fire and theft, and automobile (liability,

223

-2-

comprehensive, and collision). The specified data are the number of insurance policies applied for, the number of such policies issued, the number of such policies renewed, the number of such policies cancelled or not renewed, the total earned premium for each line, and the total losses incurred for each line.

(4) Please explain the underwriting guidelines used in deciding whether to issue homeowners and automobile insurance, including any minimum risk standards.

If you have any questions about your response, you may contact Richard Huberman of the Subcommittee staff at (202) 226-3160. Thank you for your cooperation.

Sincerely,

CARDISS COLLINS
Chairwoman

cc:rh

004026

224

RESPONSES TO SUBCOMMITTEE QUESTIONS BY ALLSTATE INSURANCE COMPANY, WAYNE E. HEDIEN, CHAIRMAN OF THE BOARD AND CHIEF EXECUTIVE OFFICER

1.  Allstate primarily markets directly through its own agents. Analyses have shown that there are often fewer insurance agents in inner-city neighborhoods, particularly Black and Hispanic communities, than other urban neighborhoods. Why are there so few agents in inner-city neighborhoods? What is the company policy on agents providing price quotes over the phone? Does it vary depending on the location of the property or automobile to be insured? Please explain. Please provide any relevant documentation of company policy.

Allstate feels that it is accessible in every neighborhood in the city of Chicago. While good business practices don't make it necessary to locate an agent in each and every neighborhood, we believe customers have no problem in reaching an Allstate location.

The decision to open an agent's office is based on a number of factors including (but not limited to) the following:

●  What is our current market penetration?
●  Do we already have agents in place that have established a business presence and level of profitability?
●  What competitive pressures exist?
●  Have our competitors already successfully cornered the market?
●  Can a particular office be operated on a profitable basis to the company?
●  Can a particular office be operated on a profitable basis to the agent?
●  Are there sufficient households to support additional agent deployment?
●  What are the traffic patterns of the community?
●  Does the agent have any ties to the community?

An extremely important factor in opening a sales location is the agent's willingness to incur the expense of opening an office as well as his/her desire for the location. Determining agent locations is not a decision made by Allstate management alone, rather, we attempt to partner with our agents to select locations that will profit both the company and the agent. We encourage our agents to act as entrepreneurs with their agency site selection and development of their business plans.

We are in full compliance with the Illinois statute that requires agents to provide quotes over the telephone. It is common practice, and our preference, to meet with potential customers to best tailor insurance coverage to the individual customer's needs. If that meeting is not feasible, our agents will provide rate quotations over the telephone. In other words, simply because an agent is not located on a given block or in a particular neighborhood, it should not be construed that we do not write or are seeking to avoid business in that particular location. In fact, we have a substantial book of business in every area of the city. Indeed, any Allstate agent licensed in the state of Illinois can take an application for business located in the city of Chicago.

An Allstate agent is within a telephone call to any area of the city and can provide insurance information to potential customers. To demonstrate this, attached as Exhibit A are those yellow pages ads from the Chicago area listing Allstate agents. Again, we emphasize that accessibility to an Allstate agent, either by phone or by visiting an office should not be a problem for Chicago residents.

agents.jk

2.    <u>With respect to the city of Chicago, please provide the names and locations of company agents (either direct employees or independent contractors) by zip code for the last five years.</u>

Attached, as Exhibit B is our latest listing of all agents and their locations for the city of Chicago. We do not keep an active record of historical changes made to our agency force, and are unable at this time to go back and provide the additional information you have requested.

We do have available the actual number of agent locations for the city and our Chicago Metro Region. For your information we have compared the number of agents and locations for the city of Chicago with the entire Chicago Metro Region. We've also expressed the city of Chicago numbers as a percent of the total Region. This is shown as Exhibit C.

You should be aware that the late 80s and early 90s (1990 and 1991) represented years of great growth for Allstate. This was true in the city of Chicago and our Chicago Metro Region area, as well as the rest of the country.

It was during 1991 that a company decision to achieve a more balanced and profitable growth rate was made. This decision was based on many factors including such things as overall cost of new business, greater emphasis on maintaining current customers and meeting their needs, the capital needed to support business written, and over agent saturation in many markets due to the expansion of current agencies via agency growth and solicitors. As a result we have experienced some agent attrition throughout the country over the past several months.

The number of agents in the city has decreased over the period from 1990 to 1993. The decrease is similar to what we have seen throughout the region, and our penetration of Chicago agents in the Region is about the same in 1993 as it was in 1990. However, the more important indicator of agent locations over this period of time has increased both in number (14) and as a percentage of total regional representation (2.9 percentage points).

Throughout these times Allstate has continued to be committed to the city of Chicago. As mentioned earlier the number of agent locations in the city of Chicago has not only increased over the past few years, but it has done so at a faster rate than agent locations in the surrounding suburbs of Cook, DuPage and Lake counties.

One other piece of information might be of interest. In the ten zip codes that comprise the majority of the Illinois 4th Congressional District, Allstate has 29 agents. This represents approximately 14% of our total for the city.

agents.jk

3.  With respect to each zip code in the city of Chicago, please provide the specified data on an annual basis for the last five years itemized with respect to the specified lines of insurance. The specified lines of insurance are homeowners, other similar personal property lines such as fire and theft, and automobile (liability, comprehensive and collision). The specified data are the number of insurance policies applied for, the number of such policies issued, the number of such policies renewed, the number of such policies canceled or not renewed, the total earned premium for each line, and the total losses incurred for each line.

Not all of the data which you have requested is readily available. Indeed in some cases it may not be available at all, even through special audits, as it has not been retained on any of our records. In other cases the data may not be readily available or readily accessible since the information is not required to be reported by an individual state's statistical plan and we have not deemed it important enough to track.

We have provided you with two exhibits. Exhibit D contains information that is part of a Zip Code Disclosure Report supplied to the Illinois Insurance Department. This report is filed on a quarterly basis, and for each zip code supplies the number of policies written new, the number of policies renewed, the number of policies non-renewed, and the number of canceled policies. · This is done for Homeowners and for Renters and Condominium policies. For your request we have summarized years 1988, 1989, 1990, 1991 and 1992 and include the Chicago zip codes only (60601-60660).

The second exhibit (Exhibit E) shown also contains information reported to the Illinois Insurance Department. For both Homeowners and Private Passenger Auto we are supplying Written and Earned Premium for each of the Chicago zip codes. This information is supplied for years 1989, 1990 and 1991.

Allstate has substantial numbers of customers in all zip codes in the city of Chicago. We base our conclusion, at least in part, on the use of the FAIR Plan within the city. Currently only three zip codes (60612, 60621 and 60653) within the city are classified as FAIR Plan Credit Eligible Zip Codes. A FAIR Plan Credit Eligible Zip Code is defined as one where 15% or more of the homes in the zip are insured by the Illinois Fair Plan. Even in those zips, Allstate writes a considerable number of insureds, as shown by our 1991 Written Premium according to the Fair Plan.

| Zip Code | 1991 Written Premium |
|----------|----------------------|
| 60612    | $270,000             |
| 60621    | 720,000              |
| 60653    | 159,000              |

agents.jk

4.  <u>Please explain the underwriting guidelines used in deciding whether to issue homeowners and automobile insurance, including any minimum risk standards.</u>

Our underwriting guidelines are designed to assist our agents in determining the eligibility for the various products we sell. With respect to automobile insurance, eligibility for either Allstate Insurance or Allstate Indemnity Company (which is our subsidiary company which issues specialty vehicles and risks) is based on the following primary criteria:

- Number and type of accidents
- Number and type of traffic violations
- Type of vehicle
- Years of driving experience
- Existence and proof of prior insurance

Within Allstate Insurance Company we generally are looking for people who are accident and violation free, who drive an average type of vehicle, and have had reasonable experience operating similar type vehicles. An exception might the be the 16 year old who gets his drivers license and now would be part of his parents' policy. An example of someone falling in the Allstate Indemnity Company would be someone with multiple violations or accidents or driving a high loss experience auto such as a Porsche.

With respect to Homeowners Insurance, eligibility is based on the following primary criteria:

- Fire Protection
- Prior Losses
- Prior Insurance - if needed
- Physical Condition
- Market Value to Replacement Value relationship
  - Market Value is defined as what a home would reasonably sell for in the present market
  - Replacement Cost is the cost to rebuild a home using materials of like kind and quality

Allstate has made available four different types of Homeowner Policies designed to service a broad range of protection and price needs; Select Value - Standard, Select Value - Deluxe, Deluxe and Deluxe Plus. The Select Value type policies were developed specifically for those homes where either the insured did not want to insure to full replacement cost or where the cost to rebuild far exceeds market value or purchase price of the dwelling. An example of this type of home could be an older type home. Because of changes in construction materials and methods some homes simply could not be rebuilt as they currently stand today, i.e., the home might be able to be repaired, but it could not be replaced at the value it's insurable for.

agents.jk

The Select Value - Deluxe and the Deluxe Policies protect against the identical type of losses and have the same internal limits of protection for such things as jewelry, money, etc. We also offer the same optional coverages under both forms such as Replacement Cost on Contents.

There is no minimum value for the Select Value - Standard Policy. The Allstate agent will work with the potential customer to "select" what best fits the customers individual situation.

Allstate believes the ability to underwrite business is extremely crucial in the running of an insurance company. We believe we have an obligation to try and keep our rates as low as possible. The rates we use today have proven to be adequate for the risk characteristics we have chosen to accept. An expansion of eligible risk characteristics will cause our premiums to rise. Similarly, without any requirements or guidelines prices would rise, causing the majority of our policyholders to pay more for a selected few whose costs to insure are predictably greater.

agents.jk

229

RESPONSES TO SUBCOMMITTEE QUESTIONS BY ALLSTATE INSURANCE
   COMPANY, WAYNE E. HEDIEN, CHAIRMAN OF THE BOARD AND
   CHIEF EXECUTIVE OFFICER

**1)** **Please provide the number of auto exposures by zip code for the city of Chicago.**

Attached as Exhibit A are our written car years for each of the past five years. These
are broken out separately for Liability Coverage, Collision Coverage and Comprehensive
Coverage.

**2)** **How many agents are located in the 7th Congressional District of Illinois?**

Within the city of Chicago we have 23 Allstate agents that are also within the boundaries
of the 7th Congressional District. These 23 agents represent approximately 11% of our
total agency force in the city.

If we include those agents who are within a zip code that falls at least partially within the
7th Congressional District we have 31 agents or almost 15% of our Chicago agency force
represented. In addition, we have another 21 agents that fall within the boundaries of
the 7th Congressional District, but which are not in the city of Chicago.

With a grand total of 44 agents within the boundaries of the 7th Congressional District
we feel we are well represented in this area.

## TOTAL ALLSTATE
## PRIVATE PASSENGER AUTO
## WRITTEN CAR YEARS

| ZIP CODE | LIABILITY COVERAGE | | | | |
|---|---|---|---|---|---|
| | 1988 | 1989 | 1990 | 1991 | 1992 |
| 60601 | 271 | 269 | 263 | 266 | 281 |
| 60602 | 35 | 40 | 37 | 37 | 43 |
| 60603 | 24 | 24 | 20 | 11 | 13 |
| 60604 | 31 | 24 | 24 | 14 | 10 |
| 60605 | 344 | 337 | 363 | 381 | 393 |
| 60606 | 69 | 84 | 95 | 71 | 30 |
| 60607 | 375 | 370 | 378 | 401 | 417 |
| 60608 | 2108 | 2104 | 2145 | 2206 | 2196 |
| 60609 | 2061 | 2114 | 2211 | 2229 | 2150 |
| 60610 | 1121 | 1148 | 1205 | 1258 | 1246 |
| 60611 | 818 | 782 | 829 | 856 | 890 |
| 60612 | 4 | 822 | 836 | 853 | 824 |
| 60613 | 2326 | 2311 | 2377 | 2519 | 2576 |
| 60614 | 2637 | 2649 | 2733 | 2907 | 3049 |
| 60615 | 2328 | 2363 | 2352 | 2314 | 2297 |
| 60616 | 1962 | 1955 | 2016 | 2040 | 2074 |
| 60617 | 6891 | 7136 | 7134 | 6977 | 6607 |
| 60618 | 5079 | 5108 | 5391 | 5620 | 5642 |
| 60619 | 9201 | 9407 | 9250 | 8969 | 8701 |
| 60620 | 7681 | 7872 | 7901 | 7797 | 7456 |
| 60621 | 2155 | 2173 | 2195 | 2115 | 1966 |
| 60622 | 1602 | 1556 | 1568 | 1593 | 1569 |
| 60623 | 2478 | 2501 | 2569 | 2557 | 2414 |
| 60624 | 5 | 1583 | 1609 | 1610 | 1536 |
| 60625 | 3978 | 3745 | 3645 | 3583 | 3576 |
| 60626 | 1652 | 1611 | 1578 | 1587 | 1513 |
| 60627 | 196 | 200 | 216 | 203 | 181 |
| 60628 | 6900 | 7052 | 7224 | 7342 | 7082 |
| 60629 | 6797 | 7265 | 7349 | 7080 | 6702 |
| 60630 | 4828 | 4775 | 4658 | 4587 | 4542 |
| 60631 | 2438 | 2369 | 2294 | 2228 | 2285 |
| 60632 | 4961 | 5003 | 5023 | 5030 | 4773 |
| 60633 | 388 | 455 | 498 | 583 | 626 |
| 60634 | 5377 | 5368 | 5332 | 5428 | 5421 |
| 60635 | 1368 | 1395 | 1428 | 1472 | 1430 |
| 60636 | 2352 | 2450 | 2542 | 2546 | 2411 |
| 60637 | 2546 | 2627 | 2546 | 2420 | 2321 |
| 60638 | 5043 | 5213 | 4990 | 4926 | 4824 |
| 60639 | 3594 | 3726 | 3718 | 3800 | 3699 |
| 60640 | 2392 | 2245 | 2125 | 2194 | 2153 |
| 60641 | 4047 | 4311 | 4343 | 4584 | 4622 |
| 60642 | 245 | 263 | 244 | 220 | 211 |
| 60643 | 4423 | 4522 | 4565 | 4582 | 4469 |
| 60644 | 10 | 2152 | 2138 | 2172 | 2080 |

| | | | | | |
|---|---|---|---|---|---|
| 60845 | 2466 | 2531 | 2550 | 2457 | 2341 |
| 60846 | 2673 | 2667 | 2544 | 2474 | 2406 |
| 60847 | 3010 | 3016 | 3299 | 3631 | 3756 |
| 60848 | 398 | 399 | 375 | 359 | 206 |
| 60849 | 3248 | 3301 | 3237 | 3222 | 3038 |
| 60850 | -2 | 10 | 14 | 22 | 18 |
| 60851 | 11 | 2289 | 2347 | 2376 | 2305 |
| 60852 | 3825 | 4040 | 4003 | 3884 | 3729 |
| 60853 | 878 | 920 | 956 | 984 | 976 |
| 60854 | 3 | 6 | 7 | 10 | 6 |
| 60855 | 2593 | 2600 | 2603 | 2661 | 2670 |
| 60856 | 2422 | 2395 | 2355 | 2347 | 2306 |
| 60857 | 2848 | 2786 | 2846 | 3021 | 3081 |
| 60858 | 17 | 22 | 20 | 10 | 11 |
| 60859 | 2238 | 2052 | 2015 | 2111 | 2053 |
| 60860 | 1808 | 1791 | 1735 | 1797 | 1760 |
| **TOTAL** | **143577** | **152304** | **152863** | **153554** | **149964** |

## TOTAL ALLSTATE
### PRIVATE PASSENGER AUTO
### WRITTEN CAR YEARS

| ZIP CODE | COLLISION COVERAGE | | | | |
|---|---|---|---|---|---|
| | 1988 | 1989 | 1990 | 1991 | 1992 |
| 60601 | 251 | 253 | 244 | 250 | 263 |
| 60602 | 29 | 34 | 33 | 32 | 38 |
| 60603 | 22 | 21 | 20 | 12 | 13 |
| 60604 | 27 | 23 | 19 | 11 | 10 |
| 60605 | 302 | 296 | 328 | 350 | 357 |
| 60606 | 61 | 74 | 88 | 67 | 29 |
| 60607 | 321 | 322 | 325 | 331 | 332 |
| 60608 | 1606 | 1583 | 1542 | 1565 | 1514 |
| 60609 | 1555 | 1571 | 1589 | 1591 | 1488 |
| 60610 | 1028 | 1041 | 1088 | 1140 | 1126 |
| 60611 | 763 | 716 | 773 | 794 | 820 |
| 60612 | 4 | 594 | 616 | 626 | 624 |
| 60613 | 2000 | 1942 | 1995 | 2103 | 2124 |
| 60614 | 2326 | 2311 | 2403 | 2545 | 2661 |
| 60615 | 2009 | 2019 | 1986 | 1938 | 1890 |
| 60616 | 1633 | 1621 | 1650 | 1659 | 1681 |
| 60617 | 5634 | 5836 | 5736 | 5559 | 5215 |
| 60618 | 3949 | 3929 | 4053 | 4177 | 4175 |
| 60619 | 7761 | 7907 | 7717 | 7487 | 7224 |
| 60620 | 6094 | 6249 | 6246 | 6121 | 5807 |
| 60621 | 1677 | 1700 | 1699 | 1626 | 1493 |
| 60622 | 1221 | 1145 | 1083 | 1101 | 1060 |
| 60623 | 1817 | 1788 | 1770 | 1712 | 1607 |
| 60624 | 3 | 1218 | 1193 | 1187 | 1147 |
| 60625 | 3145 | 2872 | 2718 | 2681 | 2610 |
| 60626 | 1386 | 1330 | 1277 | 1265 | 1213 |
| 60627 | 157 | 164 | 172 | 162 | 141 |
| 60628 | 5466 | 5592 | 5711 | 5814 | 5570 |
| 60629 | 5514 | 5871 | 5823 | 5504 | 5112 |
| 60630 | 4072 | 3984 | 3847 | 3788 | 3712 |
| 60631 | 2051 | 2012 | 1945 | 1886 | 1921 |
| 60632 | 4021 | 3999 | 3903 | 3803 | 3516 |
| 60633 | 298 | 344 | 365 | 426 | 452 |
| 60634 | 4404 | 4377 | 4308 | 4399 | 4371 |
| 60635 | 1169 | 1180 | 1176 | 1187 | 1140 |
| 60636 | 1813 | 1883 | 1917 | 1900 | 1802 |
| 60637 | 2059 | 2132 | 2071 | 1963 | 1828 |
| 60638 | 4161 | 4296 | 4072 | 4004 | 3888 |
| 60639 | 2839 | 2867 | 2721 | 2670 | 2532 |
| 60640 | 1988 | 1819 | 1670 | 1686 | 1631 |
| 60641 | 3269 | 3504 | 3442 | 3588 | 3590 |
| 60642 | 203 | 221 | 217 | 185 | 175 |
| 60643 | 3507 | 3612 | 3623 | 3644 | 3520 |
| 60644 | 7 | 1657 | 1623 | 1627 | 1539 |

233

| | | | | | |
|---|---|---|---|---|---|
| 60645 | 2109 | 2123 | 2088 | 1999 | 1893 |
| 60646 | 2318 | 2309 | 2192 | 2136 | 2073 |
| 60647 | 2323 | 2300 | 2419 | 2644 | 2709 |
| 60648 | 350 | 352 | 328 | 304 | 173 |
| 60649 | 2729 | 2769 | 2655 | 2621 | 2470 |
| 60650 | -1 | 6 | 8 | 14 | 8 |
| 60651 | 7 | 1690 | 1708 | 1723 | 1616 |
| 60652 | 3176 | 3320 | 3265 | 3122 | 2993 |
| 60653 | 707 | 752 | 765 | 783 | 779 |
| 60654 | 3 | 5 | 6 | 10 | 5 |
| 60655 | 2167 | 2170 | 2166 | 2228 | 2235 |
| 60656 | 2101 | 2079 | 2037 | 2057 | 2013 |
| 60657 | 2424 | 2366 | 2426 | 2586 | 2599 |
| 60658 | 14 | 18 | 16 | 8 | 9 |
| 60659 | 1813 | 1611 | 1567 | 1615 | 1534 |
| 60660 | 1564 | 1532 | 1435 | 1468 | 1416 |
| TOTAL | 117426 | 123311 | 121878 | 121484 | 117486 |

234

TOTAL ALLSTATE
PRIVATE PASSENGER AUTO
WRITTEN CAR YEARS

| ZIP CODE | COMPREHENSIVE COVERAGE | | | | |
|---|---|---|---|---|---|
| | 1988 | 1989 | 1990 | 1991 | 1992 |
| 60601 | 260 | 257 | 252 | 259 | 273 |
| 60602 | 33 | 36 | 36 | 37 | 45 |
| 60603 | 22 | 22 | 22 | 11 | 13 |
| 60604 | 28 | 22 | 19 | 11 | 10 |
| 60605 | 312 | 307 | 338 | 354 | 369 |
| 60606 | 60 | 77 | 91 | 67 | 29 |
| 60607 | 331 | 338 | 333 | 349 | 349 |
| 60608 | 1677 | 1644 | 1601 | 1619 | 1585 |
| 60609 | 1616 | 1631 | 1645 | 1646 | 1538 |
| 60610 | 1070 | 1088 | 1127 | 1183 | 1175 |
| 60611 | 823 | 782 | 814 | 839 | 868 |
| 60612 | 622 | 617 | 634 | 651 | 646 |
| 60613 | 2095 | 2044 | 2069 | 2189 | 2216 |
| 60614 | 2427 | 2438 | 2494 | 2643 | 2779 |
| 60615 | 2067 | 2087 | 2040 | 1997 | 1959 |
| 60616 | 1687 | 1665 | 1682 | 1696 | 1724 |
| 60617 | 5804 | 5994 | 5871 | 5708 | 5383 |
| 60618 | 4216 | 4185 | 4287 | 4395 | 4402 |
| 60619 | 7923 | 8080 | 7859 | 7628 | 7404 |
| 60620 | 6219 | 6369 | 6343 | 6237 | 5948 |
| 60621 | 1698 | 1723 | 1722 | 1652 | 1516 |
| 60622 | 1290 | 1212 | 1151 | 1166 | 1131 |
| 60623 | 1884 | 1837 | 1815 | 1762 | 1658 |
| 60624 | 1170 | 1253 | 1229 | 1215 | 1176 |
| 60625 | 3325 | 3030 | 2873 | 2830 | 2763 |
| 60626 | 1488 | 1410 | 1345 | 1322 | 1277 |
| 60627 | 159 | 166 | 174 | 164 | 144 |
| 60628 | 5593 | 5708 | 5808 | 5914 | 5689 |
| 60629 | 5815 | 6145 | 6086 | 5757 | 5366 |
| 60630 | 4304 | 4212 | 4048 | 3955 | 3900 |
| 60631 | 2201 | 2147 | 2067 | 2004 | 2044 |
| 60632 | 4247 | 4228 | 4120 | 4016 | 3715 |
| 60633 | 315 | 365 | 390 | 449 | 478 |
| 60634 | 4722 | 4690 | 4599 | 4643 | 4639 |
| 60635 | 1225 | 1238 | 1242 | 1249 | 1196 |
| 60636 | 1845 | 1919 | 1949 | 1929 | 1837 |
| 60637 | 2127 | 2202 | 2124 | 2018 | 1901 |
| 60638 | 4370 | 4514 | 4263 | 4169 | 4068 |
| 60639 | 2959 | 2991 | 2832 | 2783 | 2669 |
| 60640 | 2077 | 1899 | 1736 | 1755 | 1716 |
| 60641 | 3473 | 3687 | 3620 | 3767 | 3762 |
| 60642 | 214 | 232 | 218 | 193 | 182 |
| 60643 | 3613 | 3718 | 3696 | 3750 | 3640 |
| 60644 | 1685 | 1698 | 1668 | 1665 | 1581 |

235

| | | | | | |
|---|---|---|---|---|---|
| 60845 | 2207 | 2234 | 2196 | 2110 | 1998 |
| 60646 | 2444 | 2443 | 2309 | 2249 | 2190 |
| 60647 | 2452 | 2428 | 2550 | 2770 | 2846 |
| 60848 | 377 | 382 | 355 | 331 | 183 |
| 60649 | 2798 | 2835 | 2708 | 2683 | 2541 |
| 60650 | 9 | 8 | 10 | 14 | 9 |
| 60651 | 1726 | 1736 | 1753 | 1769 | 1669 |
| 60652 | 3335 | 3480 | 3425 | 3283 | 3146 |
| 60653 | 722 | 762 | 775 | 793 | 794 |
| 60654 | 3 | 5 | 6 | 10 | 5 |
| 60655 | 2278 | 2275 | 2257 | 2307 | 2308 |
| 60656 | 2211 | 2163 | 2123 | 2154 | 2107 |
| 60657 | 2548 | 2490 | 2521 | 2680 | 2705 |
| 60658 | 15 | 19 | 17 | 8 | 9 |
| 60659 | 1908 | 1700 | 1631 | 1675 | 1608 |
| 60660 | 1630 | 1605 | 1501 | 1541 | 1485 |
| TOTAL | 127754 | 128472 | 126467 | 126023 | 122366 |

Exhibit **B**

**ALLSTATE INSURANCE COMPANY**

**CHICAGO AGENT LISTING**
As Of February 28, 1993

| Zip Code | Name | Address |
|---|---|---|
| 60601 | Bayer, Wayne A | 333 N. Michigan, #330 |
| 60601 | Reid, Hugh L | 333 N. Michigan, #330 |
| 60601 | Gonzalez, Alan P | 333 N. Michigan, #330 |
| 60601 | Smith, Rex G | 333 N. Michigan, #330 |
| 60601 | Gray, George H | 333 N. Michigan, #330 |
| 60601 | Berry, Montell B | 333 N. Michigan, #330 |
| 60601 | Thompson, Hilda L | 333 N. Michigan, #330 |
| 60604 | Ihaza, William O | 53 W. Jackson, #320 |
| 60604 | Briscoe, Stephanie Elaine | 53 W. Jackson, #320 |
| 60606 | Weiler, Robert E | 233 S. Wacker |
| 60606 | McDowell, Robert L | 233 S. Wacker |
| 60606 | Adebayo, Sikiru A | 233 S. Wacker |
| 60606 | Burlinski, Anthony R | 300 W. Adams, #312 |
| 60606 | Scharneck, Norbert R | 233 S. Wacker |
| 60606 | Olds, Donald J | 233 S. Wacker |
| 60606 | Viola, Anthony M | 233 S. Wacker |
| 60606 | Whitehead, Roger | 233 S. Wacker |
| 60606 | Mitchell, Rogers J | 233 S. Wacker |
| 60606 | Preer, Andrew S | 233 S. Wacker |
| 60606 | Montgomery, Robert E | 233 S. Wacker |
| 60607 | Wheeler, Glynis J | 1514 W. Taylor Street |
| 60607 | Strickland, Donna M | 1514 W. Taylor Street |
| 60610 | King, Leslie S | 111 W. North Avenue |
| 60610 | Hall, Franklin P | 111 W. North Avenue |
| 60610 | Silverman, Myron R | 111 W. North Avenue |
| 60610 | Djordjevich, Charles | 800 N. Clark, #425 |
| 60610 | Moore, Orita J | 222 W. Ontario, #510 |
| 60611 | Jackson, Harvey A | 919 N. Michigan, #2512 |
| 60613 | Roscoe, Brian K | 1824 W. Addison |
| 60613 | Shefler, Alvin | 1824 W. Addison |
| 60613 | Patterson, Alvin | 4153 N. Broadway |
| 60613 | Lowing, William G | 4153 N. Broadway |
| 60614 | Murray, Peter J | 639 W. Diversey Parkway |
| 60614 | Fejes, Steve | 1459 W. Fullerton |
| 60614 | Fox, Marla J | 1459 W. Fullerton |
| 60614 | Heidkamp, Jerome H | 639 W. Diversey Parkway |

chgoagnt.jk

ALLSTATE INSURANCE COMPANY

CHICAGO AGENT LISTING
As Of February 28, 1993

| Zip Code | Name | Address |
|---|---|---|
| 60614 | Cheronis, Dion | 639 W. Diversey Parkway |
| 60614 | Sutz, Eileen | 1012 W. Diversey Parkway |
| 60614 | Suarez, Edmundo M | 2250 N. Lincoln Avenue |
| 60614 | Keller, Donald C | 2250 N. Lincoln Avenue |
| 60614 | Rowan, Patrick J | 2250 N. Lincoln Avenue |
| 60615 | Howell, Edith | 1507 E. 53rd Street/2 Floor |
| 60616 | Auyeung, Yoklim | 2812 S. Wentworth Avenue |
| 60616 | Auyeung, Lei | 2812 S. Wentworth Avenue |
| 60617 | Turner, Gregory H | 1726 E. 87th Street |
| 60617 | Gordon, Collis L | 8200 S. Stony Island |
| 60617 | Ransom Jr., William H | 8548 S. Stony Island |
| 60617 | Green, Cheryl Renata | 8548 S. Stony Island |
| 60618 | Sullivan, Stephanie R | 2009 W. Roscoe |
| 60618 | Fonacier Jr., Andres | 3752 W. Montrose Avenue |
| 60618 | Apolinar, Nelia B | 3110 W. Irving Park Road |
| 60618 | Archbold, Oscar Alexander | 2009 W. Roscoe |
| 60618 | Tompkins Sr., Solomon | 3755 N. Western Avenue |
| 60618 | Ham, Gloria | 3752 W. Montrose Avenue |
| 60618 | Armando Ortega Ins Ag Inc. | 3238 N. Elston Avenue |
| 60619 | Moore, Ronald E | 822 E. 87th Street, #102B |
| 60619 | Benjamin, Henry | 415 E. 87th Street |
| 60619 | Moore, Rhonda Bates | 822 E. 87th Street, #102B |
| 60620 | Duncan, Richard | 955 W. 87th Street |
| 60620 | Powell, Aubrey | 8754 S. Ashland Avenue |
| 60620 | Griffin, Cheryl D | 8754 S. Ashland Avenue |
| 60620 | Wright, Frances Iris | 8951 S. Western Avenue |
| 60620 | Shavers, John | 8951 S. Western Avenue |
| 60620 | Stevens, Charles H | 1824 W. 79th Street |
| 60620 | McEwen, Clarence L | 8754 S. Ashland Avenue |
| 60622 | Donohue, Michael H | 1605 N. Wood Street |
| 60623 | Gallardo, Abimael | 3922½ W. 26th Street |
| 60625 | Maher, Michael James | 2311 W. Lawrence Avenue |
| 60625 | Patrick, James John | 2311 W. Lawrence Avenue |

chgoagm.jk

**ALLSTATE INSURANCE COMPANY**

**CHICAGO AGENT LISTING**
As Of February 28, 1993

| Zip Code | Name | Address |
|---|---|---|
| 60626 | Hudson, Gary L | 1667 W. Pratt Avenue |
| 60628 | Ross, Robert W | 10812 S. Halsted Street |
| 60628 | Harris, Patsy M | 9600 S. Halsted Street |
| 60629 | Donners, Thomas J | 4217 W. 63rd Street |
| 60629 | Christofero, John G | 4217 W. 63rd Street |
| 60629-4486 | Larson, Raymond Lee | 5558 S. Pulaski Road |
| 60629-4486 | Reipsa, Ronald F | 5558 S. Pulaski Road |
| 60629-4486 | Knafl, Harry J | 5558 S. Pulaski Road |
| 60629-4603 | Manzke, Michael G | 3957 W. 63rd Street |
| 60629-4603 | O'Keefe, Dennis G | 3957 W. 63rd Street |
| 60629-4603 | Rhines, Daniel D | 3957 W. 63rd Street |
| 60630 | Diaz, Blas | 5504 W. Lawrence Avenue |
| 60630 | Diaz, Ana B | 5504 W. Lawrence Avenue |
| 60630 | Chung, Tina | 4626 W. Lawrence Avenue |
| 60631 | Keeton, Richard M | 7789 W. Talcott Road |
| 60631 | Javier, Desiderio C | 6774 Northwest Highway, #1 |
| 60631 | Leahy, William J | 7789 W. Talcott Road |
| 60631 | Gerhardt, Samuel R | 7789 W. Talcott Road |
| 60631 | Stiglic, Paul T | 7789 W. Talcott Road |
| 60631 | Turner, Albert | 7789 W. Talcott Road |
| 60631 | Jaffe, Jerome | 7789 W. Talcott Road |
| 60631 | Zatko, George J | 7789 W. Talcott Road |
| 60631 | Angel, Jeannette B | 6321 N. Avondale, #211 |
| 60631 | Larson, John A | 7789 W. Talcott Road |
| 60631 | Mister-White, Johnnie B | 7789 W. Talcott Road |
| 60631 | Nelson, Janet | 7789 W. Talcott Road |
| 60631 | Werba, Russell J | 7789 W. Talcott Road |
| 60631 | Urich, Claude Francis | 6321 N. Avondale, #211 |
| 60632 | Bramwell, Armando | 2823 W. 55th Street |
| 60632 | Manzke, Robert A | 5239 S. Archer Avenue |
| 60632 | Morgan, James T | 4425 S. Archer Avenue |
| 60632 | Dilelio, Ronald R | 4117 W. 47th Street, #104 |
| 60632 | Bender, Deborah E | 4425 S. Archer Avenue |
| 60632 | Doyle, Brian P | 5239 S. Archer Avenue |
| 60632 | Malham Jr., Ronne G | 4425 S. Archer Avenue |
| 60632 | McGettrick, Thomas E | 5239 S. Archer Avenue |
| 60633 | Morris-Owens, Pamela | 2206 State Street |

chgoagnt.jk

## ALLSTATE INSURANCE COMPANY

### CHICAGO AGENT LISTING
As Of February 28, 1993

| Zip Code | Name | Address |
|---|---|---|
| 60633 | Johnson, Esther Deborah | 2206 State Street |
| 60634 | Patterson, Frank M | 6023 W. Addison Street |
| 60634 | Odiamar, Rogelio R | 6052 W. Irving Park Road |
| 60634 | Van, Edward L | 3401 N. Harlem Avenue |
| 60634 | Zurad, Christopher J | 6023 W. Addison Street |
| 60634 | Prahl, Marilyn | 3000 N. Central |
| 60634 | McGuire, James P | 6023 W. Addison Street |
| 60634 | Kearney, Thomas A | 3401 N. Harlem Avenue |
| 60634 | Rozmus, Jerome L | 3401 N. Harlem Avenue |
| 60634 | Stich, Charles B | 3401 N. Harlem Avenue |
| 60634 | Viola, Joseph J | 3401 N. Harlem Avenue |
| 60634 | Monroe, Harry A | 3401 N. Harlem Avenue |
| 60634 | Chavich, Mike T | 3401 N. Harlem Avenue |
| 60634 | Doheny, Michael L | 3401 N. Harlem Avenue |
| 60635 | Allen, Ronald | 2431 N. Harlem Avenue |
| 60635 | Posley, David Wayne | 1601 N. Harlem Avenue |
| 60635 | Williams, Willie J | 2431 N. Harlem Avenue |
| 60635 | Costello, James A | 2431 N. Harlem Avenue |
| 60635 | Lowing, William G | 1601 N. Harlem Avenue |
| 60635 | Tanner, Jesse Donald | 1601 N. Harlem Avenue |
| 60635 | Miller, Timothy | 3327 W. 115th Street |
| 60635 | Radakovitz, Joseph | 3327 W. 115th Street |
| 60636 | Stevenson, Ben J | 6140 S. Western Avenue |
| 60638 | Tenn, Joseph Michael | 5518 S. Archer Avenue |
| 60638 | Skold, Ronald D | 5518 S. Archer Avenue |
| 60638 | JKL & Associates, Inc. | 6646 W. Archer Avenue |
| 60638 | Boyce & Associates, Inc. | 6646 W. Archer Avenue |
| 60639 | Summers, Kurt A | 2044 N. Cicero |
| 60639 | Catanzaro, Frank A | 6206 W. Diversey Avenue |
| 60639 | Tolson Jr., Herschel | 2044 N. Cicero |
| 60639 | Valdez, Martin | 6206 W. Diversey Avenue |
| 60639 | DeFrancesca, James V | 6206 W. Diversey Avenue |
| 60639 | Winters, Jerome Eric | 6116 W. North Avenue |
| 60640 | Tzirides, Dino | 1900 W. Lawrence Avenue |
| 60640 | Ibrahim, Ashur | 1708 W. Foster Avenue |
| 60640 | Douglas, Joyce F | 1900 W. Lawrence Avenue |
| 60640 | Payne, Janette V | 1900 W. Lawrence Avenue |
| 60640 | Atienzo, Miguel | 1900 W. Lawrence Avenue |

chgoagnt.jk

**240**

### ALLSTATE INSURANCE COMPANY

### CHICAGO AGENT LISTING
As Of February 28, 1993

| Zip Code | Name | Address |
|---|---|---|
| 60641 | Bianchini, Robert | 5040 W. Montrose |
| 60641 | Corpuz, Nestor M | 4938 W. Irving Park Road |
| 60641 | Catuira, Marcelino P | 4938 W. Irving Park Road |
| 60641 | Policape, Harry | 5040 W. Montrose |
| 60641 | Casey Jr., John T | 4027 N. Pulaski Road |
| 60641 | Januszkiewicz, Ludomir | 5205 W. Belmont Avenue |
| 60641 | Lowing, William G | 4730 W. Irving Park Road |
| 60641 | Joseph, Promod Wilfred | 5040 W. Montrose |
| 60641 | Banks, Edna Mary | 4034 N. Cicero |
| 60641 | Miller, Ronald A | 4027 N. Pulaski Road |
| 60643 | Hallberg, Katherine M | 10831 S. Western Avenue |
| 60643 | Hallberg, John D | 10831 S. Western Avenue |
| 60643 | Spencer, Gregory | 2143 W. 95th Street |
| 60643 | McNulty, Edwin R | 10046 S. Western Avenue |
| 60643 | Curry Sr., Richard J L | 2143 W. 95th Street |
| 60643 | Hallberg, Thomas M | 10831 S. Western Avenue |
| 60645 | Milkes, Mark R | 2612 W. Touhy Avenue |
| 60645 | Milkes, Michael H | 2612 W. Touhy Avenue |
| 60646 | Guerrero Jr., Jose Chavez | 6117 W. Touhy Avenue |
| 60646 | Gardi, Theresa S | 6117 W. Touhy Avenue |
| 60646 | Dabrowski, Lech | 6315 N. Milwaukee |
| 60646 | Heller, Lewis S | 6117 W. Touhy Avenue |
| 60646 | Hansen, Donald E | 5701 N. Milwaukee Avenue |
| 60646 | Doyle, Cornelius C | 5701 N. Milwaukee Avenue |
| 60646 | Pray, Willard A | 5701 N. Milwaukee Avenue |
| 60647 | Caban, Julio | 3247 W. Fullerton |
| 60647 | Carroll, Gail Elizabeth | 3247 W. Fullerton |
| 60649 | Creamer, Bernard Owens | 2222 E. 75th Street |
| 60649 | Hill, Patricia A | 2222 E. 75th Street |
| 60649 | Tanner, Jesse Donald | 2222 E. 75th Street |
| 60652 | Hurley, Daniel R | 8325 S. Pulaski Road |
| 60652 | Wright, Donald | 2525 W. 79th Street |
| 60652 | Gasper, Raymond J | 8318 S. Kedzie |
| 60652 | Taylor, William E | 8325 S. Pulaski Road |
| 60652 | Muhammad, Terris A | 7601 S. Kostner Street, #204 |
| 60652 | Hawkins Jr., Edgar | 8325 S. Pulaski Road |
| 60652 | Lopresti, Madeline M | 8325 S. Pulaski Road |

chgoagnt.jk

### ALLSTATE INSURANCE COMPANY

### CHICAGO AGENT LISTING
#### As Of February 28, 1993

| Zip Code | Name | Address |
|----------|------|---------|
| 60652 | Bovenkerk, Arthur C | 8318 S. Kedzie |
| 60652 | Hall, Gwendolyn G | 2525 W. 79th Street |
| 60652 | Weathers, Leonard B | 8325 S. Pulaski Road |
| 60652 | Neumann, John A | 8318 S. Kedzie |
| 60652 | Macey, Donald L | 8325 S. Pulaski Road |
| 60652 | Duggan, Thomas J | 8318 S. Kedzie |
| 60652 | Janks, Vincent P | 8318 S. Kedzie |
| 60652 | Myles, Safonia | 7601 S. Kostner Street, #204 |
| 60652 | Kosic Sr., William P | 8318 S. Kedzie |
| 60655 | O'Mara, William | 3055 W. 111th Street, #1-S |
| 60655 | Broderick, Daniel J | 10424 S. Kedzie |
| 60655 | Wollenberg, Edward J | 3055 W. 111th Street, #1-S |
| 60655 | Lewinski, Norbert | 10424 S. Kedzie |
| 60655 | Six, Kerry Claire | 10424 S. Kedzie |
| 60655 | Donegan, John M | 3055 W. 111th Street, #1-S |
| 60655 | Danielewicz, Ernest J | 3055 W. 111th Street, #1-S |
| 60656 | Boyce, Patricia | 5151 N. Harlem Avenue, #311 |
| 60656 | Christl, Carl James | 5151 N. Harlem Avenue, #311 |
| 60656 | Beatovic, David K | 5151 N. Harlem Avenue, #311 |
| 60656 | Ivers, Terrence M | 6546 W. Higgins, #101 |
| 60656 | Heidkamp, Robert E | 8342 W. Lawrence Avenue |
| 60657 | Takach, Linda | 3340 N. Clark Street, #200 |
| 60657 | Ziaziaris, Marina | 3340 N. Clark Street, #200 |
| 60659 | Boubin, Jerry J | 6223 N. California |
| 60659 | O'Brien, Daniel J | 2525 W. Peterson, #218 |
| 60659 | Bondi, Thomas L | 2525 W. Peterson, #218 |
| 60659 | Byun, Cheong Gi | 3235 W. Bryn Mawr |
| 60659 | Paprocki, Eugene J | 3553 Peterson, #207 |
| 60659 | Yi, Peter Pyongki | 6223 N. California |
| 60659 | Gleason, Allan J | 6140 N. Lincoln, #105 |
| 60659 | Chung, Daniel | 5850 N. Lincoln, A&B |
| 60660 | Thumawongsa, Bunjong | 5616 N. Broadway, 2 Floor |
| 60660 | Schoenback, Charlene | 1400 W. Devon Avenue |

chgoagnt.jk

Exhibit C

# ALLSTATE INSURANCE COMPANY

## AGENT LOCATIONS

| | Chicago Metro Region | City of Chicago | |
|---|---|---|---|
| | | # | % of Total |
| **January, 1990** | | | |
| Agents | 808 | 241 | 29.8 |
| Locations | 315 | 80 | 25.4 |
| **January, 1991** | | | |
| Agents | 842 | 253 | 30.0 |
| Locations | 359 | 100 | 27.9 |
| **January, 1992** | | | |
| Agents | 779 | 264 | 33.9 |
| Locations | 341 | 107 | 31.4 |
| **January, 1993** | | | |
| Agents | 742 | 215 | 29.0 |
| Locations | 332 | 94 | 28.3 |

## ALLSTATE INSURANCE COMPANY
## ALLSTATE INDEMNITY COMPANY

Policies written by Chicago Zip Code (60601-60660) for calendar years 1988-1992.

| | |
|---|---|
| HO | = Homeowners |
| REN | = Renters and Condominium |
| NEW BUS | = New Business Written |
| REN BUS | = Renewal Business Written |
| CANC | = Cancellations |
| NON-REN | = Non-Renewal |

Information from Zip Code Disclosure Report submitted to Illinois Insurance Department quarterly.

agents.jk

244

.

| ZIP CODE | NEW BUS | REN BUS | 1988–HO TOTAL | |
|---|---|---|---|---|
| | | | CANC | NON–REN |
| 60601 | 2 | 13 | 0 | 0 |
| 60602 | 0 | 12 | 0 | 0 |
| 60603 | 0 | 29 | 0 | 0 |
| 60604 | 1 | 5 | 0 | 0 |
| 60605 | 2 | 18 | 0 | 0 |
| 60606 | 1 | 9 | 0 | 0 |
| 60607 | 29 | 115 | 1 | 0 |
| 60608 | 180 | 1413 | 34 | 5 |
| 60609 | 225 | 1746 | 45 | 13 |
| 60610 | 16 | 57 | 1 | 1 |
| 60611 | 1 | 18 | 0 | 1 |
| 60612 | 39 | 405 | 9 | 3 |
| 60613 | 88 | 604 | 5 | 1 |
| 60614 | 134 | 796 | 5 | 4 |
| 60615 | 47 | 412 | 3 | 3 |
| 60616 | 50 | 530 | 4 | 0 |
| 60617 | 536 | 4650 | 36 | 23 |
| 60618 | 579 | 3220 | 44 | 20 |
| 60619 | 506 | 5803 | 45 | 28 |
| 60620 | 508 | 5036 | 41 | 32 |
| 60621 | 123 | 1467 | 30 | 14 |
| 60622 | 146 | 903 | 34 | 5 |
| 60623 | 188 | 1873 | 28 | 4 |
| 60624 | 72 | 1164 | 16 | 3 |
| 60625 | 354 | 2120 | 21 | 6 |
| 60626 | 63 | 386 | 5 | 8 |
| 60627 | 112 | 674 | 2 | 8 |
| 60628 | 594 | 5682 | 82 | 57 |
| 60629 | 830 | 4029 | 26 | 12 |
| 60630 | 333 | 2173 | 2 | 8 |
| 60631 | 164 | 1252 | 0 | 0 |
| 60632 | 396 | 2527 | 17 | 12 |
| 60633 | 70 | 346 | 2 | 1 |
| 60634 | 490 | 3327 | 6 | 8 |
| 60635 | 234 | 1700 | 2 | 8 |
| 60636 | 219 | 2664 | 51 | 32 |
| 60637 | 86 | 1202 | 14 | 4 |
| 60638 | 383 | 2757 | 3 | 15 |
| 60639 | 588 | 3074 | 41 | 16 |
| 60640 | 101 | 650 | 3 | 6 |
| 60641 | 440 | 2098 | 14 | 7 |
| 60642 | 158 | 1065 | 0 | 0 |
| 60643 | 466 | 3827 | 31 | 18 |
| 60644 | 139 | 1796 | 30 | 5 |
| 60645 | 222 | 1273 | 4 | 11 |
| 60646 | 224 | 1541 | 2 | 8 |
| 60647 | 353 | 2058 | 49 | 12 |

004047

| | | | | |
|---|---|---|---|---|
| 60648 | 249 | 1781 | 0 | 1 |
| 60649 | 150 | 1458 | 17 | 6 |
| 60650 | 419 | 2334 | 26 | 13 |
| 60651 | 334 | 3094 | 80 | 34 |
| 60652 | 376 | 2064 | 2 | 2 |
| 60653 | 27 | 263 | 9 | 0 |
| 60654 | 0 | 0 | 0 | 0 |
| 60655 | 202 | 1621 | 1 | 4 |
| 60656 | 232 | 1920 | 2 | 3 |
| 60657 | 144 | 846 | 5 | 4 |
| 60658 | 76 | 406 | 1 | 2 |
| 60659 | 165 | 1016 | 4 | 2 |
| 60660 | 55 | 411 | 4 | 2 |
| Total | 12921 | 95733 | 939 | 495 |

246

| ZIP CODE | NEW BUS | REN BUS | 1989-HO TOTAL CANC | NON-REN |
|---|---|---|---|---|
| 60601 | 0 | 13 | 1 | 0 |
| 60602 | 1 | 11 | 1 | 0 |
| 60603 | 1 | 23 | 0 | 0 |
| 60604 | 1 | 6 | 0 | 0 |
| 60605 | 6 | 17 | 0 | 0 |
| 60606 | 0 | 8 | 0 | 1 |
| 60607 | 15 | 138 | 0 | 0 |
| 60608 | 137 | 1466 | 55 | 5 |
| 60609 | 187 | 1788 | 90 | 16 |
| 60610 | 6 | 69 | 1 | 0 |
| 60611 | 5 | 15 | 2 | 1 |
| 60612 | 37 | 403 | 20 | 6 |
| 60613 | 73 | 624 | 6 | 4 |
| 60614 | 110 | 831 | 6 | 3 |
| 60615 | 50 | 419 | 11 | 4 |
| 60616 | 43 | 527 | 6 | 0 |
| 60617 | 471 | 4933 | 111 | 25 |
| 60618 | 478 | 2966 | 41 | 20 |
| 60619 | 394 | 5998 | 85 | 28 |
| 60620 | 397 | 5270 | 66 | 41 |
| 60621 | 104 | 1467 | 36 | 13 |
| 60622 | 153 | 939 | 67 | 2 |
| 60623 | 233 | 1894 | 97 | 11 |
| 60624 | 80 | 1151 | 44 | 4 |
| 60625 | 277 | 2240 | 26 | 12 |
| 60626 | 65 | 414 | 5 | 5 |
| 60627 | 108 | 737 | 3 | 4 |
| 60628 | 596 | 5861 | 223 | 64 |
| 60629 | 752 | 4545 | 58 | 22 |
| 60630 | 259 | 2280 | 5 | 2 |
| 60631 | 140 | 1301 | 1 | 3 |
| 60632 | 385 | 2761 | 30 | 12 |
| 60633 | 63 | 390 | 2 | 0 |
| 60634 | 403 | 3526 | 10 | 7 |
| 60635 | 211 | 1771 | 3 | 11 |
| 60636 | 201 | 2684 | 81 | 28 |
| 60637 | 90 | 1215 | 34 | 11 |
| 60638 | 279 | 2937 | 11 | 8 |
| 60639 | 515 | 3302 | 72 | 25 |
| 60640 | 61 | 711 | 6 | 2 |
| 60641 | 308 | 2303 | 19 | 17 |
| 60642 | 135 | 1148 | 3 | 2 |
| 60643 | 388 | 4058 | 48 | 26 |
| 60644 | 104 | 1785 | 55 | 17 |
| 60645 | 154 | 1355 | 4 | 8 |
| 60646 | 162 | 1620 | 1 | 4 |
| 60647 | 341 | 2117 | 130 | 16 |

| | | | | |
|---|---|---|---|---|
| 60648 | 193 | 1912 | 1 | 2 |
| 60649 | 133 | 1508 | 26 | 21 |
| 60650 | 436 | 2510 | 45 | 14 |
| 60651 | 289 | 3123 | 144 | 35 |
| 60652 | 360 | 2298 | 6 | 11 |
| 60653 | 24 | 274 | 5 | 3 |
| 60654 | 0 | 0 | 0 | 0 |
| 60655 | 169 | 1705 | 4 | 3 |
| 60656 | 215 | 1978 | 0 | 4 |
| 60657 | 115 | 888 | 13 | 6 |
| 60658 | 70 | 447 | 0 | 0 |
| 60659 | 136 | 1065 | 8 | 7 |
| 60660 | 55 | 434 | 2 | 3 |
| Total | 11174 | 100179 | 1830 | 599 |

248

| ZIP CODE | NEW BUS | REN BUS | 1990-HO TOTAL CANC | NON-REN |
|---|---|---|---|---|
| 60601 | 2 | 12 | 0 | 0 |
| 60602 | 0 | 10 | 0 | 0 |
| 60603 | 2 | 17 | 0 | 0 |
| 60604 | 1 | 4 | 0 | 0 |
| 60605 | 3 | 17 | 0 | 0 |
| 60606 | 0 | 4 | 0 | 0 |
| 60607 | 16 | 144 | 1 | 0 |
| 60608 | 179 | 1469 | 30 | 6 |
| 60609 | 215 | 1801 | 82 | 18 |
| 60610 | 5 | 67 | 2 | 0 |
| 60611 | 2 | 14 | 0 | 1 |
| 60612 | 50 | 409 | 15 | 3 |
| 60613 | 49 | 624 | 5 | 6 |
| 60614 | 86 | 833 | 11 | 6 |
| 60615 | 32 | 434 | 5 | 1 |
| 60616 | 54 | 519 | 4 | 4 |
| 60617 | 507 | 5086 | 130 | 44 |
| 60618 | 343 | 3594 | 48 | 23 |
| 60619 | 360 | 6102 | 70 | 24 |
| 60620 | 362 | 5352 | 83 | 47 |
| 60621 | 112 | 1479 | 23 | 9 |
| 60622 | 150 | 941 | 34 | 3 |
| 60623 | 473 | 1929 | 58 | 6 |
| 60624 | 90 | 1148 | 38 | 6 |
| 60625 | 201 | 2261 | 34 | 15 |
| 60626 | 24 | 417 | 6 | 2 |
| 60627 | 110 | 791 | 4 | 6 |
| 60628 | 422 | 5864 | 147 | 59 |
| 60629 | 638 | 4888 | 49 | 25 |
| 60630 | 209 | 2313 | 12 | 6 |
| 60631 | 88 | 1320 | 3 | 3 |
| 60632 | 370 | 2888 | 10 | 18 |
| 60633 | 51 | 413 | 3 | 2 |
| 60634 | 325 | 3638 | 6 | 15 |
| 60635 | 151 | 1828 | 15 | 6 |
| 60636 | 300 | 2673 | 96 | 44 |
| 60637 | 79 | 1239 | 36 | 6 |
| 60638 | 228 | 3002 | 7 | 19 |
| 60639 | 431 | 3443 | 92 | 25 |
| 60640 | 57 | 702 | 4 | 5 |
| 60641 | 256 | 2408 | 9 | 6 |
| 60642 | 107 | 1219 | 1 | 2 |
| 60643 | 298 | 4186 | 35 | 29 |
| 60644 | 130 | 1793 | 36 | 14 |
| 60645 | 113 | 1336 | 2 | 10 |
| 60646 | 128 | 1651 | 3 | 7 |
| 60647 | 384 | 2148 | 99 | 18 |

249

| | | | | |
|---|---|---|---|---|
| 60648 | 148 | 1950 | 1 | 11 |
| 60649 | 112 | 1548 | 49 | 7 |
| 60650 | 448 | 2641 | 50 | 23 |
| 60651 | 299 | 3109 | 108 | 43 |
| 60652 | 240 | 2484 | 5 | 8 |
| 60653 | 32 | 271 | 6 | 2 |
| 60654 | 0 | 0 | 0 | 0 |
| 60655 | 150 | 1734 | 3 | 4 |
| 60656 | 160 | 2021 | 1 | 11 |
| 60657 | 105 | 883 | 24 | 8 |
| 60658 | 59 | 466 | 0 | 0 |
| 60659 | 100 | 1069 | 1 | 12 |
| 60660 | 51 | 448 | 3 | 3 |
| Total | 10097 | 103054 | 1599 | 681 |

| ZIP CODE | NEW BUS | REN BUS | 1991 – HO TOTAL CANC | NON – REN |
|---|---|---|---|---|
| 60601 | 0 | 3 | 0 | 0 |
| 60602 | 0 | 3 | 0 | 0 |
| 60603 | 0 | 7 | 0 | 0 |
| 60604 | 1 | 2 | 0 | 0 |
| 60605 | 16 | 15 | 0 | 0 |
| 60606 | 3 | 4 | 1 | 0 |
| 60607 | 9 | 139 | 1 | 0 |
| 60608 | 177 | 1521 | 21 | 8 |
| 60609 | 151 | 1807 | 46 | 39 |
| 60610 | 4 | 66 | 0 | 0 |
| 60611 | 0 | 9 | 1 | 0 |
| 60612 | 38 | 420 | 1 | 4 |
| 60613 | 59 | 602 | 8 | 1 |
| 60614 | 90 | 795 | 7 | 3 |
| 60615 | 37 | 418 | 5 | 5 |
| 60616 | 31 | 502 | 5 | 4 |
| 60617 | 353 | 5121 | 94 | 65 |
| 60618 | 373 | 3637 | 21 | 24 |
| 60619 | 342 | 6111 | 59 | 38 |
| 60620 | 273 | 5331 | 72 | 65 |
| 60621 | 79 | 1493 | 22 | 15 |
| 60622 | 148 | 982 | 17 | 10 |
| 60623 | 230 | 2015 | 17 | 26 |
| 60624 | 73 | 1134 | 11 | 13 |
| 60625 | 188 | 2206 | 23 | 27 |
| 60626 | 37 | 365 | 2 | 3 |
| 60627 | 71 | 828 | 3 | 3 |
| 60628 | 367 | 5852 | 151 | 83 |
| 60629 | 528 | 5093 | 32 | 34 |
| 60630 | 208 | 2330 | 3 | 9 |
| 60631 | 100 | 1309 | 0 | 3 |
| 60632 | 326 | 3015 | 8 | 17 |
| 60633 | 57 | 429 | 1 | 2 |
| 60634 | 377 | 3744 | 8 | 15 |
| 60635 | 140 | 1793 | 20 | 11 |
| 60636 | 141 | 2717 | 45 | 39 |
| 60637 | 69 | 1229 | 23 | 16 |
| 60638 | 246 | 3037 | 2 | 10 |
| 60639 | 422 | 3394 | 63 | 55 |
| 60640 | 57 | 688 | 5 | 5 |
| 60641 | 254 | 2432 | 8 | 12 |
| 60642 | 103 | 1225 | 0 | 2 |
| 60643 | 292 | 4301 | 42 | 35 |
| 60644 | 97 | 1777 | 28 | 16 |
| 60645 | 130 | 1230 | 2 | 14 |
| 60646 | 136 | 1708 | 1 | 6 |
| 60647 | 400 | 2204 | 82 | 48 |

| | | | | |
|---|---|---|---|---|
| 60648 | 155 | 1930 | 0 | 6 |
| 60649 | 123 | 1525 | 43 | 15 |
| 60650 | 393 | 2773 | 48 | 35 |
| 60651 | 271 | 3147 | 45 | 74 |
| 60652 | 245 | 2527 | 5 | 13 |
| 60653 | 24 | 258 | 6 | 7 |
| 60654 | 0 | 0 | 0 | 0 |
| 60655 | 179 | 1730 | 3 | 8 |
| 60656 | 173 | 2016 | 1 | 3 |
| 60657 | 89 | 869 | 10 | 6 |
| 60658 | 66 | 445 | 0 | 1 |
| 60659 | 105 | 1081 | 7 | 5 |
| 60660 | 27 | 477 | 0 | 6 |
| | | | | |
| Total | 9083 | 103821 | 1129 | 964 |

252

|  |  |  | 1992 – HO TOTAL | |
| ZIP CODE | NEW BUS | REN BUS | CANC | NON – REN |
|---|---|---|---|---|
| 60601 | 0 | 1 | 0 | 0 |
| 60602 | 0 | 7 | 0 | 0 |
| 60603 | 0 | 2 | 1 | 0 |
| 60604 | 2 | 3 | 0 | 0 |
| 60605 | 7 | 38 | 0 | 1 |
| 60606 | 0 | 6 | 0 | 0 |
| 60607 | 11 | 132 | 1 | 1 |
| 60608 | 129 | 1518 | 28 | 12 |
| 60609 | 125 | 1656 | 65 | 63 |
| 60610 | 7 | 61 | 1 | 0 |
| 60611 | 1 | 8 | 0 | 0 |
| 60612 | 35 | 420 | 7 | 5 |
| 60613 | 41 | 570 | 8 | 2 |
| 60614 | 73 | 762 | 9 | 7 |
| 60615 | 21 | 416 | 4 | 7 |
| 60616 | 30 | 477 | 2 | 2 |
| 60617 | 239 | 6099 | 94 | 89 |
| 60618 | 382 | 3658 | 36 | 22 |
| 60619 | 271 | 6074 | 60 | 42 |
| 60620 | 257 | 5165 | 74 | 60 |
| 60621 | 62 | 1395 | 31 | 21 |
| 60622 | 158 | 995 | 20 | 5 |
| 60623 | 157 | 1903 | 17 | 12 |
| 60624 | 59 | 1095 | 15 | 17 |
| 60625 | 189 | 2196 | 25 | 24 |
| 60626 | 36 | 348 | 8 | 3 |
| 60627 | 86 | 823 | 7 | 11 |
| 60628 | 349 | 5815 | 137 | 92 |
| 60629 | 444 | 5131 | 41 | 39 |
| 60630 | 182 | 2342 | 4 | 9 |
| 60631 | 101 | 1413 | 1 | 3 |
| 60632 | 235 | 3028 | 10 | 18 |
| 60633 | 22 | 443 | 3 | 4 |
| 60634 | 346 | 3769 | 10 | 13 |
| 60635 | 114 | 1745 | 8 | 8 |
| 60636 | 131 | 2581 | 51 | 92 |
| 60637 | 53 | 1192 | 22 | 19 |
| 60638 | 227 | 3112 | 7 | 11 |
| 60639 | 319 | 3310 | 70 | 38 |
| 60640 | 47 | 625 | 6 | 2 |
| 60641 | 248 | 2445 | 9 | 14 |
| 60642 | 89 | 1249 | 0 | 4 |
| 60643 | 253 | 4317 | 42 | 35 |
| 60644 | 75 | 1677 | 35 | 55 |
| 60645 | 113 | 1218 | 3 | 18 |
| 60646 | 121 | 1687 | 1 | 8 |
| 60647 | 309 | 2179 | 71 | 33 |

253

| | | | | |
|---|---|---|---|---|
| 60648 | 63 | 946 | 0 | 4 |
| 60649 | 109 | 1511 | 29 | 29 |
| 60650 | 347 | 2856 | 50 | 22 |
| 60651 | 191 | 3023 | 53 | 97 |
| 60652 | 116 | 2519 | 4 | 10 |
| 60653 | 15 | 257 | 6 | 6 |
| 60654 | 0 | 0 | 0 | 0 |
| 60655 | 145 | 1776 | 5 | 4 |
| 60656 | 120 | 2049 | 3 | 1 |
| 60657 | 79 | 834 | 12 | 10 |
| 60658 | 40 | 454 | 1 | 0 |
| 60659 | 83 | 1069 | 3 | 6 |
| 60660 | 25 | 453 | 2 | 1 |
| Total | 7489 | 102853 | 1212 | 1111 |

72–109 0 – 93 – 9

| ZIP CODE | NEW BUS | REN BUS | 1988-REN TOTAL | |
|---|---|---|---|---|
| | | | CANC | NON-REN |
| 60601 | 52 | 211 | 0 | 0 |
| 60602 | 0 | 11 | 0 | 0 |
| 60603 | 1 | 24 | 0 | 0 |
| 60604 | 14 | 4 | 0 | 0 |
| 60605 | 60 | 301 | 0 | 1 |
| 60606 | 38 | 88 | 0 | 1 |
| 60607 | 66 | 148 | 1 | 1 |
| 60608 | 195 | 793 | 31 | 1 |
| 60609 | 174 | 799 | 35 | 1 |
| 60610 | 429 | 1137 | 1 | 6 |
| 60611 | 334 | 799 | 1 | 4 |
| 60612 | 57 | 222 | 6 | 0 |
| 60613 | 575 | 1385 | 1 | 10 |
| 60614 | 1035 | 1862 | 3 | 15 |
| 60615 | 357 | 1396 | 2 | 4 |
| 60616 | 134 | 659 | 1 | 0 |
| 60617 | 142 | 639 | 18 | 1 |
| 60618 | 265 | 1286 | 20 | 5 |
| 60619 | 295 | 2057 | 12 | 5 |
| 60620 | 218 | 803 | 7 | 0 |
| 60621 | 110 | 395 | 16 | 2 |
| 60622 | 163 | 657 | 28 | 4 |
| 60623 | 179 | 785 | 24 | 3 |
| 60624 | 99 | 470 | 14 | 2 |
| 60625 | 247 | 1051 | 4 | 4 |
| 60626 | 314 | 841 | 1 | 2 |
| 60627 | 69 | 191 | 2 | 1 |
| 60628 | 160 | 596 | 17 | 1 |
| 60629 | 210 | 741 | 6 | 3 |
| 60630 | 146 | 592 | 2 | 0 |
| 60631 | 70 | 335 | 0 | 0 |
| 60632 | 148 | 638 | 8 | 0 |
| 60633 | 13 | 59 | 1 | 0 |
| 60634 | 97 | 528 | 1 | 0 |
| 60635 | 107 | 511 | 0 | 0 |
| 60636 | 110 | 527 | 19 | 2 |
| 60637 | 202 | 1063 | 4 | 2 |
| 60638 | 78 | 273 | 1 | 0 |
| 60639 | 145 | 897 | 18 | 2 |
| 60640 | 330 | 1061 | 2 | 6 |
| 60641 | 169 | 741 | 2 | 4 |
| 60642 | 29 | 98 | 0 | 0 |
| 60643 | 105 | 322 | 1 | 2 |
| 60644 | 134 | 561 | 17 | 0 |
| 60645 | 233 | 1024 | 1 | 2 |
| 60646 | 38 | 225 | 0 | 0 |
| 60647 | 257 | 1114 | 36 | 3 |

**255**

| | | | | |
|---|---|---|---|---|
| 60648 | 74 | 265 | 0 | 0 |
| 60649 | 279 | 1097 | 4 | 7 |
| 60650 | 173 | 691 | 12 | 2 |
| 60651 | 197 | 1124 | 42 | 4 |
| 60652 | 37 | 145 | 0 | 1 |
| 60653 | 66 | 372 | 7 | 0 |
| 60654 | 0 | 0 | 0 | 0 |
| 60655 | 45 | 139 | 0 | 0 |
| 60656 | 159 | 667 | 0 | 2 |
| 60657 | 882 | 2020 | 0 | 12 |
| 60658 | 95 | 250 | 0 | 0 |
| 60659 | 131 | 571 | 0 | 3 |
| 60660 | 229 | 886 | 1 | 1 |
| Total | 10770 | 39147 | 430 | 132 |

**256**

| ZIP CODE | NEW BUS | REN BUS | 1989-REN TOTAL CANC | NON-REN |
|---|---|---|---|---|
| 60601 | 77 | 232 | 1 | 0 |
| 60602 | 0 | 7 | 1 | 0 |
| 60603 | 3 | 17 | 0 | 0 |
| 60604 | 2 | 14 | 0 | 0 |
| 60605 | 90 | 287 | 0 | 1 |
| 60606 | 42 | 282 | 0 | 0 |
| 60607 | 65 | 160 | 0 | 1 |
| 60608 | 138 | 875 | 44 | 3 |
| 60609 | 174 | 830 | 71 | 3 |
| 60610 | 479 | 1259 | 1 | 3 |
| 60611 | 356 | 886 | 1 | 1 |
| 60612 | 66 | 241 | 16 | 3 |
| 60613 | 500 | 1512 | 0 | 8 |
| 60614 | 1056 | 2159 | 2 | 14 |
| 60615 | 359 | 1455 | 9 | 6 |
| 60616 | 187 | 677 | 3 | 1 |
| 60617 | 161 | 895 | 45 | 1 |
| 60618 | 250 | 1248 | 12 | 3 |
| 60619 | 261 | 1653 | 25 | 5 |
| 60620 | 235 | 810 | 12 | 4 |
| 60621 | 118 | 582 | 22 | 4 |
| 60622 | 173 | 652 | 49 | 2 |
| 60623 | 217 | 841 | 86 | 3 |
| 60624 | 106 | 491 | 32 | 1 |
| 60625 | 218 | 1032 | 9 | 6 |
| 60626 | 348 | 853 | 2 | 4 |
| 60627 | 71 | 193 | 1 | 0 |
| 60628 | 172 | 629 | 36 | 5 |
| 60629 | 241 | 768 | 24 | 1 |
| 60630 | 128 | 615 | 0 | 4 |
| 60631 | 73 | 356 | 0 | 0 |
| 60632 | 160 | 681 | 17 | 1 |
| 60633 | 22 | 61 | 1 | 1 |
| 60634 | 89 | 523 | 1 | 0 |
| 60635 | 107 | 520 | 0 | 2 |
| 60636 | 93 | 539 | 38 | 5 |
| 60637 | 236 | 1049 | 22 | 8 |
| 60638 | 68 | 269 | 1 | 1 |
| 60639 | 126 | 841 | 31 | 2 |
| 60640 | 344 | 1122 | 3 | 5 |
| 60641 | 136 | 742 | 6 | 0 |
| 60642 | 20 | 109 | 1 | 0 |
| 60643 | 124 | 313 | 8 | 0 |
| 60644 | 138 | 577 | 32 | 2 |
| 60645 | 220 | 1032 | 1 | 6 |
| 60646 | 46 | 214 | 0 | 1 |
| 60647 | 260 | 1120 | 97 | 7 |

257

| | | | | |
|---|---|---|---|---|
| 60648 | 70 | 264 | 1 | 2 |
| 60649 | 289 | 1105 | 9 | 4 |
| 60650 | 175 | 715 | 23 | 4 |
| 60651 | 226 | 1128 | 73 | 5 |
| 60652 | 27 | 152 | 0 | 1 |
| 60653 | 82 | 391 | 4 | 1 |
| 60654 | 0 | 0 | 0 | 0 |
| 60655 | 45 | 141 | 0 | 0 |
| 60656 | 162 | 671 | 0 | 1 |
| 60657 | 907 | 2190 | 3 | 12 |
| 60658 | 67 | 260 | 0 | 0 |
| 60659 | 146 | 578 | 2 | 1 |
| 60660 | 269 | 926 | 1 | 3 |
| Total | 11020 | 40744 | 879 | 162 |

| ZIP CODE | NEW BUS | REN BUS | 1990 – REN TOTAL | |
|---|---|---|---|---|
| | | | CANC | NON – REN |
| 60601 | 69 | 235 | 1 | 0 |
| 60602 | 0 | 9 | 0 | 0 |
| 60603 | 2 | 18 | 0 | 0 |
| 60604 | 3 | 14 | 0 | 0 |
| 60605 | 97 | 314 | 0 | 0 |
| 60606 | 42 | 74 | 0 | 1 |
| 60607 | 74 | 178 | 0 | 0 |
| 60608 | 110 | 855 | 21 | 3 |
| 60609 | 102 | 842 | 41 | 8 |
| 60610 | 481 | 1397 | 1 | 5 |
| 60611 | 323 | 1011 | 2 | 8 |
| 60612 | 38 | 242 | 5 | 1 |
| 60613 | 559 | 577 | 2 | 7 |
| 60614 | 974 | 2225 | 1 | 26 |
| 60615 | 321 | 1488 | 4 | 6 |
| 60616 | 172 | 669 | 2 | 2 |
| 60617 | 101 | 686 | 15 | 5 |
| 60618 | 237 | 1217 | 10 | 3 |
| 60619 | 253 | 1638 | 7 | 4 |
| 60620 | 153 | 797 | 8 | 5 |
| 60621 | 54 | 579 | 8 | 3 |
| 60622 | 154 | 642 | 24 | 1 |
| 60623 | 131 | 884 | 35 | 2 |
| 60624 | 72 | 496 | 20 | 0 |
| 60625 | 216 | 990 | 2 | 3 |
| 60626 | 345 | 881 | 6 | 4 |
| 60627 | 69 | 179 | 3 | 0 |
| 60628 | 91 | 639 | 18 | 4 |
| 60629 | 130 | 801 | 7 | 3 |
| 60630 | 104 | 611 | 2 | 4 |
| 60631 | 57 | 374 | 0 | 0 |
| 60632 | 109 | 694 | 8 | 1 |
| 60633 | 22 | 61 | 0 | 2 |
| 60634 | 111 | 536 | 1 | 2 |
| 60635 | 89 | 513 | 0 | 2 |
| 60636 | 50 | 510 | 23 | 3 |
| 60637 | 179 | 1084 | 13 | 4 |
| 60638 | 70 | 272 | 2 | 0 |
| 60639 | 113 | 785 | 9 | 2 |
| 60640 | 324 | 1160 | 2 | 6 |
| 60641 | 133 | 711 | 1 | 2 |
| 60642 | 16 | 107 | 0 | 0 |
| 60643 | 84 | 341 | 2 | 0 |
| 60644 | 91 | 603 | 11 | 3 |
| 60645 | 192 | 1045 | 2 | 3 |
| 60646 | 30 | 218 | 0 | 1 |
| 60647 | 211 | 1087 | 37 | 6 |

259

| | | | | |
|---|---|---|---|---|
| 60648 | 50 | 267 | 0 | 0 |
| 60649 | 250 | 1159 | 7 | 0 |
| 60650 | 109 | 715 | 8 | 1 |
| 60651 | 115 | 1112 | 35 | 8 |
| 60652 | 18 | 148 | 1 | 1 |
| 60653 | 51 | 392 | 2 | 3 |
| 60654 | 0 | 0 | 0 | 0 |
| 60655 | 30 | 136 | 0 | 0 |
| 60656 | 141 | 630 | 0 | 1 |
| 60657 | 979 | 2383 | 5 | 11 |
| 60658 | 72 | 239 | 0 | 2 |
| 60659 | 103 | 545 | 0 | 2 |
| 60660 | 261 | 958 | 1 | 6 |
| Total | 9537 | 39973 | 415 | 180 |

260

| ZIP CODE | NEW BUS | REN BUS | 1991 – REN TOTAL CANC | NON – REN |
|---|---|---|---|---|
| 60601 | 81 | 271 | 0 | 1 |
| 60602 | 2 | 4 | 0 | 0 |
| 60603 | 1 | 6 | 0 | 0 |
| 60604 | 1 | 10 | 0 | 0 |
| 60605 | 83 | 318 | 1 | 1 |
| 60606 | 21 | 28 | 0 | 0 |
| 60607 | 71 | 203 | 0 | 2 |
| 60608 | 65 | 828 | 7 | 0 |
| 60609 | 50 | 786 | 22 | 8 |
| 60610 | 533 | 1434 | 0 | 8 |
| 60611 | 294 | 1122 | 2 | 7 |
| 60612 | 54 | 227 | 1 | 2 |
| 60613 | 587 | 1699 | 0 | 10 |
| 60614 | 984 | 2354 | 0 | 25 |
| 60615 | 311 | 1455 | 2 | 5 |
| 60616 | 144 | 658 | 1 | 3 |
| 60617 | 68 | 645 | 8 | 0 |
| 60618 | 223 | 1103 | 0 | 2 |
| 60619 | 192 | 1579 | 2 | 4 |
| 60620 | 113 | 765 | 3 | 3 |
| 60621 | 50 | 536 | 1 | 7 |
| 60622 | 169 | 657 | 8 | 3 |
| 60623 | 82 | 853 | 4 | 4 |
| 60624 | 58 | 483 | 2 | 2 |
| 60625 | 175 | 933 | 0 | 5 |
| 60626 | 265 | 861 | 0 | 2 |
| 60627 | 39 | 166 | 1 | 1 |
| 60628 | 63 | 608 | 8 | 5 |
| 60629 | 99 | 745 | 1 | 2 |
| 60630 | 113 | 592 | 0 | 1 |
| 60631 | 59 | 361 | 0 | 0 |
| 60632 | 81 | 658 | 1 | 2 |
| 60633 | 18 | 58 | 0 | 1 |
| 60634 | 95 | 558 | 0 | 2 |
| 60635 | 73 | 501 | 0 | 1 |
| 60636 | 37 | 464 | 5 | 4 |
| 60637 | 166 | 1046 | 4 | 3 |
| 60638 | 60 | 273 | 0 | 0 |
| 60639 | 76 | 698 | 4 | 3 |
| 60640 | 278 | 1150 | 0 | 7 |
| 60641 | 120 | 676 | 1 | 0 |
| 60642 | 12 | 92 | 0 | 0 |
| 60643 | 93 | 331 | 2 | 0 |
| 60644 | 88 | 593 | 5 | 3 |
| 60645 | 148 | 1026 | 0 | 3 |
| 60646 | 35 | 197 | 0 | 1 |
| 60647 | 212 | 992 | 17 | 9 |

004063

| | | | | |
|---|---|---|---|---|
| 60648 | 49 | 261 | 0 | 0 |
| 60649 | 238 | 1133 | 3 | 5 |
| 60650 | 58 | 632 | 1 | 2 |
| 60651 | 90 | 1049 | 10 | 8 |
| 60652 | 34 | 135 | 0 | 1 |
| 60653 | 40 | 369 | 1 | 2 |
| 60654 | 0 | 0 | 0 | 0 |
| 60655 | 36 | 130 | 0 | 0 |
| 60656 | 123 | 619 | 0 | 3 |
| 60657 | 925 | 2531 | 0 | 16 |
| 60658 | 57 | 229 | 0 | 0 |
| 60659 | 104 | 501 | 0 | 1 |
| 60660 | 207 | 976 | 0 | 4 |
| Total | 8603 | 40168 | 128 | 194 |

004064

262

|  |  |  | 1992–REN TOTAL | |
|---|---|---|---|---|
| ZIP CODE | NEW BUS | REN BUS | CANC | NON–REN |
| 60601 | 74 | 311 | 0 | 0 |
| 60602 | 0 | 4 | 0 | 1 |
| 60603 | 2 | 3 | 0 | 0 |
| 60604 | 3 | 10 | 0 | 0 |
| 60605 | 53 | 330 | 0 | 2 |
| 60606 | 20 | 25 | 0 | 1 |
| 60607 | 71 | 191 | 1 | 2 |
| 60608 | 30 | 701 | 4 | 4 |
| 60609 | 36 | 624 | 14 | 14 |
| 60610 | 456 | 1521 | 0 | 9 |
| 60611 | 289 | 1178 | 1 | 9 |
| 60612 | 39 | 212 | 2 | 2 |
| 60613 | 535 | 1731 | 0 | 10 |
| 60614 | 1004 | 2425 | 1 | 20 |
| 60615 | 314 | 1431 | 1 | 1 |
| 60616 | 124 | 652 | 0 | 2 |
| 60617 | 75 | 542 | 7 | 6 |
| 60618 | 217 | 1006 | 1 | 4 |
| 60619 | 159 | 1460 | 4 | 14 |
| 60620 | 105 | 692 | 1 | 1 |
| 60621 | 37 | 451 | 2 | 4 |
| 60622 | 172 | 591 | 6 | 3 |
| 60623 | 26 | 647 | 3 | 7 |
| 60624 | 39 | 411 | 3 | 6 |
| 60625 | 182 | 881 | 1 | 7 |
| 60626 | 223 | 820 | 0 | 2 |
| 60627 | 34 | 137 | 1 | 1 |
| 60628 | 59 | 520 | 12 | 13 |
| 60629 | 91 | 606 | 0 | 5 |
| 60630 | 82 | 582 | 0 | 1 |
| 60631 | 54 | 364 | 0 | 1 |
| 60632 | 61 | 569 | 0 | 1 |
| 60633 | 17 | 58 | 0 | 2 |
| 60634 | 91 | 536 | 0 | 2 |
| 60635 | 60 | 476 | 0 | 1 |
| 60636 | 30 | 386 | 8 | 6 |
| 60637 | 186 | 976 | 4 | 4 |
| 60638 | 28 | 266 | 0 | 0 |
| 60639 | 68 | 570 | 6 | 5 |
| 60640 | 304 | 1155 | 1 | 9 |
| 60641 | 116 | 633 | 1 | 2 |
| 60642 | 16 | 88 | 0 | 0 |
| 60643 | 61 | 310 | 3 | 1 |
| 60644 | 91 | 511 | 2 | 4 |
| 60645 | 148 | 1020 | 0 | 3 |
| 60646 | 37 | 197 | 0 | 0 |
| 60647 | 166 | 870 | 5 | 8 |

| | | | | |
|---|---|---|---|---|
| 60648 | 20 | 127 | 0 | 1 |
| 60649 | 233 | 1080 | 5 | . 8 |
| 60650 | 49 | 513 | 2 | 4 |
| 60651 | 59 | 868 | 9 | 11 |
| 60652 | 22 | 133 | 0 | 0 |
| 60653 | 35 | 347 | 1 | 2 |
| 60654 | 0 | 0 | 0 | 0 |
| 60655 | 51 | 123 | 0 | 0 |
| 60656 | 118 | 581 | 0 | 2 |
| 60657 | 990 | 2568 | 0 | 28 |
| 60658 | 35 | 217 | 0 | 0 |
| 60659 | 66 | 476 | 0 | 1 |
| 60660 | 212 | 974 | 0 | 3 |
| Total | 7975 | 37687 | 112 | 260 |

**ALLSTATE INSURANCE COMPANY**
**Voluntary Private Passenger Auto**
**Chicago Zips 60601 - 60660**
**Liability Coverages Combined**
**(Bodily Injury, Property Damage, Medical and Uninsured Motorist)**
**Policy Year 1989 Evaluated at 12/31/90**

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $138,281 | $138,281 |
| 60602 | 19,158 | 19,158 |
| 60603 | 11,178 | 11,178 |
| 60604 | 10,252 | 10,252 |
| 60605 | 159,466 | 159,466 |
| 60606 | 45,471 | 45,471 |
| 60607 | 184,629 | 184,629 |
| 60608 | 920,579 | 920,579 |
| 60609 | 913,029 | 913,029 |
| 60610 | 593,045 | 593,045 |
| 60611 | 420,852 | 420,852 |
| 60612 | 369,135 | 369,135 |
| 60613 | 1,122,264 | 1,122,264 |
| 60614 | 1,350,940 | 1,350,940 |
| 60615 | 1,080,534 | 1,080,534 |
| 60616 | 886,353 | 886,353 |
| 60617 | 3,135,060 | 3,135,060 |
| 60618 | 2,283,518 | 2,283,518 |
| 60619 | 3,962,827 | 3,962,827 |
| 60620 | 3,424,582 | 3,424,582 |
| 60621 | 913,924 | 913,924 |
| 60622 | 725,759 | 725,759 |
| 60623 | 1,083,228 | 1,083,228 |
| 60624 | 667,740 | 667,740 |
| 60625 | 1,788,243 | 1,788,243 |
| 60626 | 798,678 | 798,678 |
| 60627 | 89,765 | 89,765 |
| 60628 | 3,097,006 | 3,097,006 |
| 60629 | 3,031,199 | 3,031,199 |
| 60630 | 2,201,679 | 2,201,679 |
| 60631 | 1,104,935 | 1,104,935 |
| 60632 | 2,178,560 | 2,178,560 |
| 60633 | 208,149 | 208,149 |
| 60634 | 2,416,076 | 2,416,076 |
| 60635 | 637,276 | 637,276 |
| 60636 | 1,065,318 | 1,065,318 |
| 60637 | 1,156,867 | 1,156,867 |
| 60638 | 2,221,970 | 2,221,970 |
| 60639 | 1,630,912 | 1,630,912 |
| 60640 | 1,102,309 | 1,102,309 |
| 60641 | 1,950,239 | 1,950,239 |
| 60642 | 109,742 | 109,742 |
| 60643 | 2,015,099 | 2,015,099 |
| 60644 | 1,001,444 | 1,001,444 |
| 60645 | 1,229,750 | 1,229,750 |
| 60646 | 1,242,824 | 1,242,824 |
| 60647 | 1,315,034 | 1,315,034 |
| 60648 | 176,156 | 176,156 |
| 60649 | 1,504,505 | 1,504,505 |
| 60650 | 4,915 | 4,915 |
| 60651 | 1,060,415 | 1,060,415 |
| 60652 | 1,693,159 | 1,693,159 |
| 60653 | 388,946 | 388,946 |
| 60654 | 2,673 | 2,673 |
| 60655 | 1,101,286 | 1,101,286 |
| 60656 | 1,100,530 | 1,100,530 |
| 60657 | 1,387,120 | 1,387,120 |
| 60658 | 9,279 | 9,279 |
| 60659 | 996,255 | 996,255 |
| 60660 | 882,716 | 882,716 |
| Total | $88,340,833 | $88,340,833 |

ALLSTATE INSURANCE COMPANY
Voluntary Private Passenger Auto
Chicago Zips 60601 - 60660
Collision
Policy Year 1989 Evaluated at 12/31/90

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $77,783 | $77,783 |
| 60602 | 10,128 | 10,128 |
| 60603 | 5,620 | 5,620 |
| 60604 | 8,462 | 8,462 |
| 60605 | 60,153 | 60,153 |
| 60606 | 27,217 | 27,217 |
| 60607 | 119,078 | 119,078 |
| 60608 | 470,373 | 470,373 |
| 60609 | 480,034 | 480,034 |
| 60610 | 326,794 | 326,794 |
| 60611 | 232,031 | 232,031 |
| 60612 | 195,605 | 195,605 |
| 60613 | 542,300 | 542,300 |
| 60614 | 697,593 | 697,593 |
| 60615 | 646,657 | 646,657 |
| 60616 | 537,531 | 537,531 |
| 60617 | 1,769,701 | 1,769,701 |
| 60618 | 991,894 | 991,894 |
| 60619 | 2,275,595 | 2,275,595 |
| 60620 | 2,132,235 | 2,132,235 |
| 60621 | 541,098 | 541,098 |
| 60622 | 373,904 | 373,904 |
| 60623 | 607,726 | 607,726 |
| 60624 | 420,715 | 420,715 |
| 60625 | 834,410 | 834,410 |
| 60626 | 382,530 | 382,530 |
| 60627 | 58,757 | 58,757 |
| 60628 | 1,932,355 | 1,932,355 |
| 60629 | 1,248,005 | 1,248,005 |
| 60630 | 795,300 | 795,300 |
| 60631 | 397,138 | 397,138 |
| 60632 | 918,601 | 918,601 |
| 60633 | 88,645 | 88,645 |
| 60634 | 831,929 | 831,929 |
| 60635 | 235,353 | 235,353 |
| 60636 | 649,045 | 649,045 |
| 60637 | 603,123 | 603,123 |
| 60638 | 909,210 | 909,210 |
| 60639 | 789,465 | 789,465 |
| 60640 | 555,552 | 555,552 |
| 60641 | 695,615 | 695,615 |
| 60642 | 44,691 | 44,691 |
| 60643 | 1,176,839 | 1,176,839 |
| 60644 | 611,441 | 611,441 |
| 60645 | 561,335 | 561,335 |
| 60646 | 470,605 | 470,605 |
| 60647 | 577,923 | 577,923 |
| 60648 | 65,334 | 65,334 |
| 60649 | 969,956 | 969,956 |
| 60650 | 2,428 | 2,428 |
| 60651 | 628,720 | 628,720 |
| 60652 | 702,379 | 702,379 |
| 60653 | 224,676 | 224,676 |
| 60654 | 1,307 | 1,307 |
| 60655 | 411,434 | 411,434 |
| 60656 | 414,267 | 414,267 |
| 60657 | 668,005 | 668,005 |
| 60658 | 3,342 | 3,342 |
| 60659 | 472,301 | 472,301 |
| 60660 | 439,754 | 439,754 |
| Total | $33,942,197 | $33,942,197 |

266

ALLSTATE INSURANCE COMPANY
Voluntary Private Passenger Auto
Chicago Zips 60601 - 60660
Comprehensive
Policy Year 1989 Evaluated at 12/31/90

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $75,968 | $75,968 |
| 60602 | 10,861 | 10,861 |
| 60603 | 5,683 | 5,683 |
| 60604 | 5,948 | 5,948 |
| 60605 | 68,970 | 68,970 |
| 60606 | 27,450 | 27,450 |
| 60607 | 95,419 | 95,419 |
| 60608 | 324,142 | 324,142 |
| 60609 | 331,303 | 331,303 |
| 60610 | 321,898 | 321,898 |
| 60611 | 242,429 | 242,429 |
| 60612 | 140,328 | 140,328 |
| 60613 | 448,406 | 448,406 |
| 60614 | 617,856 | 617,856 |
| 60615 | 469,453 | 469,453 |
| 60616 | 388,564 | 388,564 |
| 60617 | 1,350,221 | 1,350,221 |
| 60618 | 782,836 | 782,836 |
| 60619 | 1,741,313 | 1,741,313 |
| 60620 | 1,940,771 | 1,940,771 |
| 60621 | 482,945 | 482,945 |
| 60622 | 274,557 | 274,557 |
| 60623 | 450,005 | 450,005 |
| 60624 | 315,753 | 315,753 |
| 60625 | 594,934 | 594,934 |
| 60626 | 205,082 | 205,082 |
| 60627 | 51,305 | 51,305 |
| 60628 | 1,751,036 | 1,751,036 |
| 60629 | 549,595 | 549,595 |
| 60630 | 527,837 | 527,837 |
| 60631 | 277,980 | 277,980 |
| 60632 | 478,771 | 478,771 |
| 60633 | 65,096 | 65,096 |
| 60634 | 561,132 | 561,132 |
| 60635 | 159,421 | 159,421 |
| 60636 | 571,551 | 571,551 |
| 60637 | 455,660 | 455,660 |
| 60638 | 411,175 | 411,175 |
| 60639 | 588,517 | 588,517 |
| 60640 | 399,148 | 399,148 |
| 60641 | 445,185 | 445,185 |
| 60642 | 20,365 | 20,365 |
| 60643 | 965,118 | 965,118 |
| 60644 | 510,436 | 510,436 |
| 60645 | 320,827 | 320,827 |
| 60646 | 340,930 | 340,930 |
| 60647 | 442,033 | 442,033 |
| 60648 | 46,627 | 46,627 |
| 60649 | 885,335 | 885,335 |
| 60650 | 1,995 | 1,995 |
| 60651 | 516,146 | 516,146 |
| 60652 | 320,702 | 320,702 |
| 60653 | 152,065 | 152,065 |
| 60654 | 1,091 | 1,091 |
| 60655 | 291,143 | 291,143 |
| 60656 | 283,481 | 283,481 |
| 60657 | 558,621 | 558,621 |
| 60658 | 2,796 | 2,796 |
| 60659 | 348,584 | 348,584 |
| 60660 | 250,410 | 250,410 |
| Total | $25,263,409 | $25,263,409 |

**ALLSTATE INSURANCE COMPANY**
Voluntary Private Passenger Auto
Chicago Zips 60601 - 60660
Liability Coverages Combined
(Bodily Injury, Property Damage, Medical and Uninsured Motorist)
Policy Year 1990 Evaluated at 12/31/92

| Zip Code | Written Premium | Earned Premium |
|----------|-----------------|----------------|
| 60601 | $139,388 | $139,388 |
| 60602 | 17,979 | 17,979 |
| 60603 | 9,372 | 9,372 |
| 60604 | 10,460 | 10,460 |
| 60605 | 170,365 | 170,365 |
| 60606 | 49,012 | 49,012 |
| 60607 | 188,362 | 188,362 |
| 60608 | 955,243 | 955,243 |
| 60609 | 963,736 | 963,736 |
| 60610 | 616,647 | 616,647 |
| 60611 | 443,097 | 443,097 |
| 60612 | 387,733 | 387,733 |
| 60613 | 1,149,872 | 1,149,872 |
| 60614 | 1,385,233 | 1,385,233 |
| 60615 | 1,098,093 | 1,098,093 |
| 60616 | 934,903 | 934,903 |
| 60617 | 3,376,224 | 3,376,224 |
| 60618 | 2,390,065 | 2,390,065 |
| 60619 | 4,218,691 | 4,218,691 |
| 60620 | 3,622,470 | 3,622,470 |
| 60621 | 975,488 | 975,488 |
| 60622 | 753,160 | 753,160 |
| 60623 | 1,127,307 | 1,127,307 |
| 60624 | 690,779 | 690,779 |
| 60625 | 1,774,378 | 1,774,378 |
| 60626 | 806,596 | 806,596 |
| 60627 | 103,796 | 103,796 |
| 60628 | 3,343,187 | 3,343,187 |
| 60629 | 3,271,940 | 3,271,940 |
| 60630 | 2,157,554 | 2,157,554 |
| 60631 | 1,075,672 | 1,075,672 |
| 60632 | 2,288,218 | 2,288,218 |
| 60633 | 238,713 | 238,713 |
| 60634 | 2,442,462 | 2,442,462 |
| 60635 | 666,677 | 666,677 |
| 60636 | 1,171,005 | 1,171,005 |
| 60637 | 1,200,001 | 1,200,001 |
| 60638 | 2,259,411 | 2,259,411 |
| 60639 | 1,665,639 | 1,665,639 |
| 60640 | 1,067,954 | 1,067,954 |
| 60641 | 1,991,355 | 1,991,355 |
| 60642 | 109,285 | 109,285 |
| 60643 | 2,115,402 | 2,115,402 |
| 60644 | 1,026,610 | 1,026,610 |
| 60645 | 1,270,338 | 1,270,338 |
| 60646 | 1,200,560 | 1,200,560 |
| 60647 | 1,434,626 | 1,434,626 |
| 60648 | 165,338 | 165,338 |
| 60649 | 1,525,122 | 1,525,122 |
| 60650 | 6,845 | 6,845 |
| 60651 | 1,126,859 | 1,126,859 |
| 60652 | 1,787,789 | 1,787,789 |
| 60653 | 407,653 | 407,653 |
| 60654 | 3,293 | 3,293 |
| 60655 | 1,125,320 | 1,125,320 |
| 60656 | 1,101,888 | 1,101,888 |
| 60657 | 1,413,065 | 1,413,065 |
| 60658 | 8,307 | 8,307 |
| 60659 | 1,001,025 | 1,001,025 |
| 60660 | 881,028 | 881,028 |
| **TOTAL** | **$70,888,582** | **$70,888,582** |

268

**ALLSTATE INSURANCE COMPANY**
Voluntary Private Passenger Auto
Chicago Zips 60601 - 60660
Collision
Policy Year 1990 Evaluated at 12/31/92

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $79,574 | $79,574 |
| 60602 | 10,669 | 10,669 |
| 60603 | 6,789 | 6,789 |
| 60604 | 5,503 | 5,503 |
| 60605 | 93,370 | 93,370 |
| 60606 | 30,621 | 30,621 |
| 60607 | 124,651 | 124,651 |
| 60608 | 495,654 | 495,654 |
| 60609 | 527,119 | 527,119 |
| 60610 | 337,036 | 337,036 |
| 60611 | 254,964 | 254,964 |
| 60612 | 218,990 | 218,990 |
| 60613 | 569,488 | 569,488 |
| 60614 | 742,237 | 742,237 |
| 60615 | 694,786 | 694,786 |
| 60616 | 601,144 | 601,144 |
| 60617 | 1,983,088 | 1,983,088 |
| 60618 | 1,054,087 | 1,054,087 |
| 60619 | 2,522,335 | 2,522,335 |
| 60620 | 2,345,847 | 2,345,847 |
| 60621 | 597,556 | 597,556 |
| 60622 | 382,246 | 382,246 |
| 60623 | 682,167 | 682,167 |
| 60624 | 463,176 | 463,176 |
| 60625 | 828,705 | 828,705 |
| 60626 | 416,096 | 416,096 |
| 60627 | 69,116 | 69,116 |
| 60628 | 2,179,449 | 2,179,449 |
| 60629 | 1,372,735 | 1,372,735 |
| 60630 | 894,597 | 894,597 |
| 60631 | 443,572 | 443,572 |
| 60632 | 1,020,039 | 1,020,039 |
| 60633 | 105,687 | 105,687 |
| 60634 | 963,131 | 963,131 |
| 60635 | 274,216 | 274,216 |
| 60636 | 730,954 | 730,954 |
| 60637 | 662,372 | 662,372 |
| 60638 | 954,910 | 954,910 |
| 60639 | 871,346 | 871,346 |
| 60640 | 535,607 | 535,607 |
| 60641 | 799,716 | 799,716 |
| 60642 | 51,816 | 51,816 |
| 60643 | 1,302,252 | 1,302,252 |
| 60644 | 637,521 | 637,521 |
| 60645 | 617,637 | 617,637 |
| 60646 | 518,115 | 518,115 |
| 60647 | 630,328 | 630,328 |
| 60648 | 68,355 | 68,355 |
| 60649 | 998,990 | 998,990 |
| 60650 | 3,426 | 3,426 |
| 60651 | 671,473 | 671,473 |
| 60652 | 760,289 | 760,289 |
| 60653 | 245,932 | 245,932 |
| 60654 | 1,831 | 1,831 |
| 60655 | 434,822 | 434,822 |
| 60656 | 469,820 | 469,820 |
| 60657 | 701,924 | 701,924 |
| 60658 | 3,173 | 3,173 |
| 60659 | 479,001 | 479,001 |
| 60660 | 458,894 | 458,894 |
| **TOTAL** | **$37,001,148** | **$37,001,148** |

269

ALLSTATE INSURANCE COMPANY
Voluntary Private Passenger Auto
Chicago Zips 60601 - 60660
Comprehensive
Policy Year 1990 Evaluated at 12/31/92

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $55,407 | $55,407 |
| 60602 | 7,548 | 7,548 |
| 60603 | 4,133 | 4,133 |
| 60604 | 3,652 | 3,652 |
| 60605 | 56,272 | 56,272 |
| 60606 | 21,682 | 21,682 |
| 60607 | 84,241 | 84,241 |
| 60608 | 294,686 | 294,686 |
| 60609 | 313,282 | 313,282 |
| 60610 | 232,602 | 232,602 |
| 60611 | 187,769 | 187,769 |
| 60612 | 136,015 | 136,015 |
| 60613 | 327,561 | 327,561 |
| 60614 | 472,931 | 472,931 |
| 60615 | 428,016 | 428,016 |
| 60616 | 371,649 | 371,649 |
| 60617 | 1,227,989 | 1,227,989 |
| 60618 | 594,012 | 594,012 |
| 60619 | 1,564,533 | 1,564,533 |
| 60620 | 1,431,506 | 1,431,506 |
| 60621 | 357,480 | 357,480 |
| 60622 | 246,533 | 246,533 |
| 60623 | 424,249 | 424,249 |
| 60624 | 292,287 | 292,287 |
| 60625 | 517,798 | 517,798 |
| 60626 | 176,811 | 176,811 |
| 60627 | 39,419 | 39,419 |
| 60628 | 1,325,305 | 1,325,305 |
| 60629 | 689,296 | 689,296 |
| 60630 | 491,022 | 491,022 |
| 60631 | 255,801 | 255,801 |
| 60632 | 457,981 | 457,981 |
| 60633 | 65,509 | 65,509 |
| 60634 | 535,312 | 535,312 |
| 60635 | 152,686 | 152,686 |
| 60636 | 434,221 | 434,221 |
| 60637 | 405,899 | 405,899 |
| 60638 | 488,202 | 488,202 |
| 60639 | 549,512 | 549,512 |
| 60640 | 332,515 | 332,515 |
| 60641 | 423,528 | 423,528 |
| 60642 | 24,596 | 24,596 |
| 60643 | 870,988 | 870,988 |
| 60644 | 451,472 | 451,472 |
| 60645 | 280,481 | 280,481 |
| 60646 | 306,533 | 306,533 |
| 60647 | 346,909 | 346,909 |
| 60648 | 40,407 | 40,407 |
| 60649 | 773,383 | 773,383 |
| 60650 | 2,460 | 2,460 |
| 60651 | 484,733 | 484,733 |
| 60652 | 394,665 | 394,665 |
| 60653 | 142,335 | 142,335 |
| 60654 | 1,362 | 1,362 |
| 60655 | 258,677 | 258,677 |
| 60656 | 269,557 | 269,557 |
| 60657 | 418,791 | 418,791 |
| 60658 | 1,885 | 1,885 |
| 60659 | 308,003 | 308,003 |
| 60660 | 210,600 | 210,600 |
| TOTAL | $22,042,691 | $22,042,691 |

ALLSTATE INSURANCE COMPANY
Voluntary Private Passenger Auto
Chicago Zips 60601 - 60660
Liability Coverages Combined
(Bodily Injury, Property Damage, Medical and Uninsured Motorist)
Policy Year 1991 Evaluated at 12/31/92

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $142,631 | $142,631 |
| 60602 | 20,876 | 20,876 |
| 60603 | 5,610 | 5,610 |
| 60604 | 6,888 | 6,888 |
| 60605 | 183,602 | 183,602 |
| 60606 | 37,280 | 37,280 |
| 60607 | 207,276 | 207,276 |
| 60608 | 985,917 | 985,917 |
| 60609 | 979,325 | 979,325 |
| 60610 | 662,095 | 662,095 |
| 60611 | 465,730 | 465,730 |
| 60612 | 406,687 | 406,687 |
| 60613 | 1,248,764 | 1,248,764 |
| 60614 | 1,539,506 | 1,539,506 |
| 60615 | 1,085,250 | 1,085,250 |
| 60616 | 949,470 | 949,470 |
| 60617 | 3,304,586 | 3,304,586 |
| 60618 | 2,551,067 | 2,551,067 |
| 60619 | 4,090,587 | 4,090,587 |
| 60620 | 3,792,934 | 3,792,934 |
| 60621 | 1,001,729 | 1,001,729 |
| 60622 | 794,614 | 794,614 |
| 60623 | 1,153,698 | 1,153,698 |
| 60624 | 709,909 | 709,909 |
| 60625 | 1,810,686 | 1,810,686 |
| 60626 | 844,286 | 844,286 |
| 60627 | 97,081 | 97,081 |
| 60628 | 3,403,445 | 3,403,445 |
| 60629 | 3,274,328 | 3,274,328 |
| 60630 | 2,180,045 | 2,180,045 |
| 60631 | 1,062,814 | 1,062,814 |
| 60632 | 2,305,845 | 2,305,845 |
| 60633 | 275,345 | 275,345 |
| 60634 | 2,536,128 | 2,536,128 |
| 60635 | 703,285 | 703,285 |
| 60636 | 1,235,657 | 1,235,657 |
| 60637 | 1,149,694 | 1,149,694 |
| 60638 | 2,239,367 | 2,239,367 |
| 60639 | 1,743,595 | 1,743,595 |
| 60640 | 1,148,720 | 1,148,720 |
| 60641 | 2,146,375 | 2,146,375 |
| 60642 | 100,674 | 100,674 |
| 60643 | 2,154,018 | 2,154,018 |
| 60644 | 1,062,276 | 1,062,276 |
| 60645 | 1,266,876 | 1,266,876 |
| 60646 | 1,192,338 | 1,192,338 |
| 60647 | 1,628,400 | 1,628,400 |
| 60648 | 162,664 | 162,664 |
| 60649 | 1,555,571 | 1,555,571 |
| 60650 | 10,234 | 10,234 |
| 60651 | 1,180,676 | 1,180,676 |
| 60652 | 1,781,220 | 1,781,220 |
| 60653 | 419,655 | 419,655 |
| 60654 | 4,585 | 4,585 |
| 60655 | 1,189,487 | 1,189,487 |
| 60656 | 1,122,807 | 1,122,807 |
| 60657 | 1,540,338 | 1,540,338 |
| 60658 | 4,278 | 4,278 |
| 60659 | 1,089,377 | 1,089,377 |
| 60660 | 949,084 | 949,084 |
| TOTAL | $72,897,261 | $72,897,261 |

271

**ALLSTATE INSURANCE COMPANY**
Voluntary Private Passenger Auto
Chicago Zips 60601 - 60660
Collision
Policy Year 1991 Evaluated at 12/31/92

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $87,488 | $87,488 |
| 60602 | 14,888 | 14,888 |
| 60603 | 6,875 | 6,875 |
| 60604 | 3,851 | 3,851 |
| 60605 | 111,407 | 111,407 |
| 60606 | 24,961 | 24,961 |
| 60607 | 134,910 | 134,910 |
| 60608 | 515,916 | 515,916 |
| 60609 | 539,719 | 539,719 |
| 60610 | 375,653 | 375,653 |
| 60611 | 278,621 | 278,621 |
| 60612 | 237,615 | 237,615 |
| 60613 | 646,374 | 646,374 |
| 60614 | 853,731 | 853,731 |
| 60615 | 674,592 | 674,592 |
| 60616 | 606,948 | 606,948 |
| 60617 | 2,022,831 | 2,022,831 |
| 60618 | 1,165,091 | 1,165,091 |
| 60619 | 2,554,558 | 2,554,558 |
| 60620 | 2,515,063 | 2,515,063 |
| 60621 | 627,182 | 627,182 |
| 60622 | 418,445 | 418,445 |
| 60623 | 715,809 | 715,809 |
| 60624 | 495,552 | 495,552 |
| 60625 | 862,892 | 862,892 |
| 60626 | 437,492 | 437,492 |
| 60627 | 65,948 | 65,948 |
| 60628 | 2,287,951 | 2,287,951 |
| 60629 | 1,498,679 | 1,498,679 |
| 60630 | 912,489 | 912,489 |
| 60631 | 433,268 | 433,268 |
| 60632 | 1,079,767 | 1,079,767 |
| 60633 | 128,439 | 128,439 |
| 60634 | 1,011,017 | 1,011,017 |
| 60635 | 290,912 | 290,912 |
| 60636 | 792,120 | 792,120 |
| 60637 | 670,671 | 670,671 |
| 60638 | 994,660 | 994,660 |
| 60639 | 939,757 | 939,757 |
| 60640 | 572,761 | 572,761 |
| 60641 | 863,429 | 863,429 |
| 60642 | 45,183 | 45,183 |
| 60643 | 1,387,997 | 1,387,997 |
| 60644 | 709,195 | 709,195 |
| 60645 | 628,765 | 628,765 |
| 60646 | 514,188 | 514,188 |
| 60647 | 747,577 | 747,577 |
| 60648 | 68,166 | 68,166 |
| 60649 | 1,070,755 | 1,070,755 |
| 60650 | 4,333 | 4,333 |
| 60651 | 762,012 | 762,012 |
| 60652 | 833,796 | 833,796 |
| 60653 | 253,982 | 253,982 |
| 60654 | 3,340 | 3,340 |
| 60655 | 466,762 | 466,762 |
| 60656 | 491,105 | 491,105 |
| 60657 | 806,789 | 806,789 |
| 60658 | 2,005 | 2,005 |
| 60659 | 523,393 | 523,393 |
| 60660 | 497,848 | 497,848 |
| **TOTAL** | **$39,287,543** | **$39,287,543** |

ALLSTATE INSURANCE COMPANY
Voluntary Private Passenger Auto
Chicago Zips 60601 - 60660
Comprehensive
Policy Year 1991 Evaluated at 12/31/92

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $56,187 | $56,187 |
| 60602 | 9,826 | 9,826 |
| 60603 | 2,477 | 2,477 |
| 60604 | 2,813 | 2,813 |
| 60605 | 62,481 | 62,481 |
| 60606 | 15,818 | 15,818 |
| 60607 | 79,169 | 79,169 |
| 60608 | 276,201 | 276,201 |
| 60609 | 293,337 | 293,337 |
| 60610 | 247,931 | 247,931 |
| 60611 | 196,929 | 196,929 |
| 60612 | 130,826 | 130,826 |
| 60613 | 356,278 | 356,278 |
| 60614 | 522,580 | 522,580 |
| 60615 | 389,557 | 389,557 |
| 60616 | 342,143 | 342,143 |
| 60617 | 1,165,091 | 1,165,091 |
| 60618 | 618,131 | 618,131 |
| 60619 | 1,467,641 | 1,467,641 |
| 60620 | 1,302,223 | 1,302,223 |
| 60621 | 315,658 | 315,658 |
| 60622 | 232,434 | 232,434 |
| 60623 | 368,875 | 368,875 |
| 60624 | 258,489 | 258,489 |
| 60625 | 435,197 | 435,197 |
| 60626 | 164,860 | 164,860 |
| 60627 | 35,544 | 35,544 |
| 60628 | 1,279,162 | 1,279,162 |
| 60629 | 766,639 | 766,639 |
| 60630 | 468,995 | 468,995 |
| 60631 | 237,159 | 237,159 |
| 60632 | 542,268 | 542,268 |
| 60633 | 69,952 | 69,952 |
| 60634 | 525,034 | 525,034 |
| 60635 | 152,303 | 152,303 |
| 60636 | 396,262 | 396,262 |
| 60637 | 384,138 | 384,138 |
| 60638 | 459,524 | 459,524 |
| 60639 | 518,614 | 518,614 |
| 60640 | 288,844 | 288,844 |
| 60641 | 429,924 | 429,924 |
| 60642 | 24,107 | 24,107 |
| 60643 | 841,897 | 841,897 |
| 60644 | 390,317 | 390,317 |
| 60645 | 250,565 | 250,565 |
| 60646 | 290,472 | 290,472 |
| 60647 | 388,090 | 388,090 |
| 60648 | 38,162 | 38,162 |
| 60649 | 678,590 | 678,590 |
| 60650 | 2,018 | 2,018 |
| 60651 | 405,064 | 405,064 |
| 60652 | 444,025 | 444,025 |
| 60653 | 135,548 | 135,548 |
| 60654 | 2,090 | 2,090 |
| 60655 | 238,181 | 238,181 |
| 60656 | 265,270 | 265,270 |
| 60657 | 452,666 | 452,666 |
| 60658 | 1,003 | 1,003 |
| 60659 | 268,622 | 268,622 |
| 60660 | 203,028 | 203,028 |
| TOTAL | $21,177,229 | $21,177,229 |

273

**ALLSTATE INDEMNITY COMPANY**
Voluntary Private Passenger Auto
Chicago, Zips 60601-60660
Liability Coverages Combined
Policy Year 1989 evaluated @ 12/90

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $8,632 | $8,632 |
| 60602 | 1,182 | 1,182 |
| 60604 | 771 | 771 |
| 60605 | 9,645 | 9,645 |
| 60606 | 2,666 | 2,666 |
| 60607 | 7,321 | 7,321 |
| 60608 | 30,552 | 30,552 |
| 60609 | 21,618 | 21,618 |
| 60610 | 25,109 | 25,109 |
| 60611 | 18,215 | 18,215 |
| 60612 | 5,660 | 5,660 |
| 60613 | 33,855 | 33,855 |
| 60614 | 39,534 | 39,534 |
| 60615 | 37,582 | 37,582 |
| 60616 | 13,052 | 13,052 |
| 60617 | 59,690 | 59,690 |
| 60618 | 55,769 | 55,769 |
| 60619 | 82,651 | 82,651 |
| 60620 | 57,872 | 57,872 |
| 60621 | 20,672 | 20,672 |
| 60622 | 28,065 | 28,065 |
| 60623 | 30,692 | 30,692 |
| 60624 | 20,817 | 20,817 |
| 60625 | 49,980 | 49,980 |
| 60626 | 33,003 | 33,003 |
| 60627 | 1,078 | 1,078 |
| 60628 | 42,344 | 42,344 |
| 60629 | 65,026 | 65,026 |
| 60630 | 22,359 | 22,359 |
| 60631 | 7,454 | 7,454 |
| 60632 | 55,329 | 55,329 |
| 60633 | 8,756 | 8,756 |
| 60634 | 36,757 | 36,757 |
| 60635 | 10,241 | 10,241 |
| 60636 | 25,599 | 25,599 |
| 60637 | 35,290 | 35,290 |
| 60638 | 21,692 | 21,692 |
| 60639 | 41,086 | 41,086 |
| 60640 | 43,906 | 43,906 |
| 60641 | 43,428 | 43,428 |
| 60642 | 2,003 | 2,003 |
| 60643 | 45,909 | 45,909 |
| 60644 | 16,872 | 16,872 |
| 60645 | 26,201 | 26,201 |
| 60646 | 12,293 | 12,293 |
| 60647 | 38,879 | 38,879 |
| 60648 | 2,633 | 2,633 |
| 60649 | 35,828 | 35,828 |
| 60650 | 1,053 | 1,053 |
| 60651 | 15,083 | 15,083 |
| 60652 | 20,679 | 20,679 |
| 60653 | 11,552 | 11,552 |
| 60654 | 676 | 676 |
| 60655 | 8,620 | 8,620 |
| 60656 | 14,031 | 14,031 |
| 60657 | 29,103 | 29,103 |
| 60659 | 26,621 | 26,621 |
| 60660 | 26,547 | 26,547 |
| **TOTAL** | **$1,489,533** | **$1,489,533** |

004076

ALLSTATE INDEMNITY COMPANY
Voluntary Private Passenger Auto
Chicago, Zips 60601-60660
Collision
Policy Year 1989 evaluated @ 12/90

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $4,512 | $4,512 |
| 60602 | 613 | 613 |
| 60604 | 180 | 180 |
| 60605 | 6,664 | 6,664 |
| 60606 | 1,137 | 1,137 |
| 60607 | 3,862 | 3,862 |
| 60608 | 12,268 | 12,268 |
| 60609 | 8,488 | 8,488 |
| 60610 | 10,908 | 10,908 |
| 60611 | 9,715 | 9,715 |
| 60612 | 2,267 | 2,267 |
| 60613 | 10,496 | 10,496 |
| 60614 | 15,641 | 15,641 |
| 60615 | 18,038 | 18,038 |
| 60616 | 6,440 | 6,440 |
| 60617 | 31,325 | 31,325 |
| 60618 | 21,089 | 21,089 |
| 60619 | 47,911 | 47,911 |
| 60620 | 27,792 | 27,792 |
| 60621 | 12,049 | 12,049 |
| 60622 | 12,954 | 12,954 |
| 60623 | 12,332 | 12,332 |
| 60624 | 11,172 | 11,172 |
| 60625 | 21,631 | 21,631 |
| 60626 | 10,710 | 10,710 |
| 60627 | 193 | 193 |
| 60628 | 26,428 | 26,428 |
| 60629 | 25,612 | 25,612 |
| 60630 | 8,295 | 8,295 |
| 60631 | 3,145 | 3,145 |
| 60632 | 25,148 | 25,148 |
| 60633 | 1,552 | 1,552 |
| 60634 | 13,374 | 13,374 |
| 60635 | 2,897 | 2,897 |
| 60636 | 13,227 | 13,227 |
| 60637 | 15,153 | 15,153 |
| 60638 | 8,213 | 8,213 |
| 60639 | 15,719 | 15,719 |
| 60640 | 14,363 | 14,363 |
| 60641 | 17,604 | 17,604 |
| 60642 | 1,033 | 1,033 |
| 60643 | 24,060 | 24,060 |
| 60644 | 5,220 | 5,220 |
| 60645 | 11,211 | 11,211 |
| 60646 | 5,337 | 5,337 |
| 60647 | 19,397 | 19,397 |
| 60648 | 1,135 | 1,135 |
| 60649 | 22,443 | 22,443 |
| 60650 | 41 | 41 |
| 60651 | 6,690 | 6,690 |
| 60652 | 8,302 | 8,302 |
| 60653 | 7,538 | 7,538 |
| 60654 | 224 | 224 |
| 60655 | 4,178 | 4,178 |
| 60656 | 5,427 | 5,427 |
| 60657 | 13,048 | 13,048 |
| 60659 | 10,423 | 10,423 |
| 60660 | 10,269 | 10,269 |
| TOTAL | $667,093 | $667,093 |

**ALLSTATE INDEMNITY COMPANY**
Voluntary Private Passenger Auto
Chicago, Zips 60601-60660
Comprehensive
Policy Year 1989 evaluated @ 12/90

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $3,636 | $3,636 |
| 60602 | 453 | 453 |
| 60604 | 100 | 100 |
| 60605 | 5,157 | 5,157 |
| 60606 | 1,270 | 1,270 |
| 60607 | 3,104 | 3,104 |
| 60608 | 8,450 | 8,450 |
| 60609 | 6,139 | 6,139 |
| 60610 | 8,435 | 8,435 |
| 60611 | 8,060 | 8,060 |
| 60612 | 2,243 | 2,243 |
| 60613 | 6,712 | 6,712 |
| 60614 | 11,997 | 11,997 |
| 60615 | 12,904 | 12,904 |
| 60616 | 5,394 | 5,394 |
| 60617 | 26,748 | 26,748 |
| 60618 | 13,207 | 13,207 |
| 60619 | 38,087 | 38,087 |
| 60620 | 22,676 | 22,676 |
| 60621 | 9,453 | 9,453 |
| 60622 | 9,790 | 9,790 |
| 60623 | 8,732 | 8,732 |
| 60624 | 8,079 | 8,079 |
| 60625 | 14,020 | 14,020 |
| 60626 | 6,578 | 6,578 |
| 60627 | 90 | 90 |
| 60628 | 20,543 | 20,543 |
| 60629 | 13,024 | 13,024 |
| 60630 | 4,967 | 4,967 |
| 60631 | 1,621 | 1,621 |
| 60632 | 14,179 | 14,179 |
| 60633 | 1,239 | 1,239 |
| 60634 | 9,077 | 9,077 |
| 60635 | 1,824 | 1,824 |
| 60636 | 11,764 | 11,764 |
| 60637 | 12,074 | 12,074 |
| 60638 | 3,933 | 3,933 |
| 60639 | 11,073 | 11,073 |
| 60640 | 8,570 | 8,570 |
| 60641 | 8,932 | 8,932 |
| 60642 | 552 | 552 |
| 60643 | 20,231 | 20,231 |
| 60644 | 4,061 | 4,061 |
| 60645 | 7,034 | 7,034 |
| 60646 | 2,684 | 2,684 |
| 60647 | 12,606 | 12,606 |
| 60648 | 332 | 332 |
| 60649 | 16,906 | 16,906 |
| 60650 | 18 | 18 |
| 60651 | 5,409 | 5,409 |
| 60652 | 4,105 | 4,105 |
| 60653 | 4,796 | 4,796 |
| 60654 | 120 | 120 |
| 60655 | 2,391 | 2,391 |
| 60656 | 3,168 | 3,168 |
| 60657 | 8,486 | 8,486 |
| 60659 | 6,135 | 6,135 |
| 60660 | 5,435 | 5,435 |
| **TOTAL** | **$468,803** | **$468,803** |

276

ALLSTATE INDEMNITY COMPANY
Voluntary Private Passenger Auto
Chicago, Zips 60601-60660
Liability Coverages Combined
Policy Year 1990 evaluated @ 12/92

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $4,562 | $4,562 |
| 60602 | 887 | 887 |
| 60604 | 2,358 | 2,358 |
| 60605 | 15,329 | 15,329 |
| 60606 | 4,510 | 4,510 |
| 60607 | 8,332 | 8,332 |
| 60608 | 25,411 | 25,411 |
| 60609 | 27,653 | 27,653 |
| 60610 | 24,732 | 24,732 |
| 60611 | 34,040 | 34,040 |
| 60612 | 9,885 | 9,885 |
| 60613 | 34,961 | 34,961 |
| 60614 | 49,748 | 49,748 |
| 60615 | 47,155 | 47,155 |
| 60616 | 13,630 | 13,630 |
| 60617 | 68,683 | 68,683 |
| 60618 | 46,514 | 46,514 |
| 60619 | 98,310 | 98,310 |
| 60620 | 70,114 | 70,114 |
| 60621 | 26,133 | 26,133 |
| 60622 | 29,076 | 29,076 |
| 60623 | 37,078 | 37,078 |
| 60624 | 28,471 | 28,471 |
| 60625 | 44,314 | 44,314 |
| 60626 | 26,067 | 26,067 |
| 60627 | 308 | 308 |
| 60628 | 49,156 | 49,156 |
| 60629 | 58,807 | 58,807 |
| 60630 | 22,402 | 22,402 |
| 60631 | 21,939 | 21,939 |
| 60632 | 49,806 | 49,806 |
| 60633 | 8,229 | 8,229 |
| 60634 | 26,015 | 26,015 |
| 60635 | 8,178 | 8,178 |
| 60636 | 25,885 | 25,885 |
| 60637 | 49,009 | 49,009 |
| 60638 | 28,575 | 28,575 |
| 60639 | 32,109 | 32,109 |
| 60640 | 40,310 | 40,310 |
| 60641 | 46,651 | 46,651 |
| 60642 | 2,019 | 2,019 |
| 60643 | 48,168 | 48,168 |
| 60644 | 22,008 | 22,008 |
| 60645 | 30,238 | 30,238 |
| 60646 | 15,986 | 15,986 |
| 60647 | 52,413 | 52,413 |
| 60648 | 3,300 | 3,300 |
| 60649 | 41,038 | 41,038 |
| 60650 | 1,673 | 1,673 |
| 60651 | 20,555 | 20,555 |
| 60652 | 29,714 | 29,714 |
| 60653 | 14,182 | 14,182 |
| 60655 | 8,837 | 8,837 |
| 60656 | 19,697 | 19,697 |
| 60657 | 36,847 | 36,847 |
| 60658 | 0 | 0 |
| 60659 | 30,288 | 30,288 |
| 60660 | 24,994 | 24,994 |
| TOTAL | $1,647,289 | $1,647,289 |

ALLSTATE INDEMNITY COMPANY
Voluntary Private Passenger Auto
Chicago, Zips 60601-60660
Collision
Policy Year 1990 evaluated @ 12/92

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $3,644 | $3,644 |
| 60602 | 358 | 358 |
| 60604 | 58 | 58 |
| 60605 | 9,458 | 9,458 |
| 60606 | 1,884 | 1,884 |
| 60607 | 3,919 | 3,919 |
| 60608 | 14,851 | 14,851 |
| 60609 | 15,147 | 15,147 |
| 60610 | 10,661 | 10,661 |
| 60611 | 15,526 | 15,526 |
| 60612 | 6,243 | 6,243 |
| 60613 | 12,482 | 12,482 |
| 60614 | 16,611 | 16,611 |
| 60615 | 23,187 | 23,187 |
| 60616 | 6,545 | 6,545 |
| 60617 | 40,446 | 40,446 |
| 60618 | 16,586 | 16,586 |
| 60619 | 57,849 | 57,849 |
| 60620 | 38,544 | 38,544 |
| 60621 | 13,711 | 13,711 |
| 60622 | 10,224 | 10,224 |
| 60623 | 14,791 | 14,791 |
| 60624 | 13,719 | 13,719 |
| 60625 | 18,299 | 18,299 |
| 60626 | 7,701 | 7,701 |
| 60627 | 39 | 39 |
| 60628 | 39,125 | 39,125 |
| 60629 | 26,465 | 26,465 |
| 60630 | 8,049 | 8,049 |
| 60631 | 8,731 | 8,731 |
| 60632 | 22,630 | 22,630 |
| 60633 | 2,940 | 2,940 |
| 60634 | 10,647 | 10,647 |
| 60635 | 1,231 | 1,231 |
| 60636 | 14,657 | 14,657 |
| 60637 | 25,695 | 25,695 |
| 60638 | 8,418 | 8,418 |
| 60639 | 12,740 | 12,740 |
| 60640 | 11,956 | 11,956 |
| 60641 | 16,714 | 16,714 |
| 60642 | 836 | 836 |
| 60643 | 25,473 | 25,473 |
| 60644 | 7,539 | 7,539 |
| 60645 | 11,462 | 11,462 |
| 60646 | 6,320 | 6,320 |
| 60647 | 17,207 | 17,207 |
| 60648 | 1,106 | 1,106 |
| 60649 | 24,498 | 24,498 |
| 60650 | 209 | 209 |
| 60651 | 8,905 | 8,905 |
| 60652 | 16,568 | 16,568 |
| 60653 | 7,716 | 7,716 |
| 60655 | 3,650 | 3,650 |
| 60656 | 4,273 | 4,273 |
| 60657 | 14,446 | 14,446 |
| 60658 | 139 | 139 |
| 60659 | 12,654 | 12,654 |
| 60660 | 9,500 | 9,500 |
| TOTAL | $754,982 | $754,982 |

278

**ALLSTATE INDEMNITY COMPANY**
Voluntary Private Passenger Auto
Chicago, Zips 60601-60660
Comprehensive
Policy Year 1990 evaluated @ 12/92

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $3,050 | $3,050 |
| 60602 | 202 | 202 |
| 60604 | 36 | 36 |
| 60605 | 7,305 | 7,305 |
| 60606 | 1,322 | 1,322 |
| 60607 | 2,738 | 2,738 |
| 60608 | 10,354 | 10,354 |
| 60609 | 9,663 | 9,663 |
| 60610 | 7,190 | 7,190 |
| 60611 | 11,761 | 11,761 |
| 60612 | 3,807 | 3,807 |
| 60613 | 7,470 | 7,470 |
| 60614 | 11,696 | 11,696 |
| 60615 | 15,194 | 15,194 |
| 60616 | 4,711 | 4,711 |
| 60617 | 27,989 | 27,989 |
| 60618 | 9,956 | 9,956 |
| 60619 | 37,681 | 37,681 |
| 60620 | 28,388 | 28,388 |
| 60621 | 9,198 | 9,198 |
| 60622 | 6,791 | 6,791 |
| 60623 | 9,655 | 9,655 |
| 60624 | 10,000 | 10,000 |
| 60625 | 11,680 | 11,680 |
| 60626 | 4,232 | 4,232 |
| 60627 | 30 | 30 |
| 60628 | 28,733 | 28,733 |
| 60629 | 14,705 | 14,705 |
| 60630 | 4,126 | 4,126 |
| 60631 | 4,537 | 4,537 |
| 60632 | 11,250 | 11,250 |
| 60633 | 1,972 | 1,972 |
| 60634 | 6,572 | 6,572 |
| 60635 | 855 | 855 |
| 60636 | 10,589 | 10,589 |
| 60637 | 17,176 | 17,176 |
| 60638 | 4,506 | 4,506 |
| 60639 | 7,999 | 7,999 |
| 60640 | 6,835 | 6,835 |
| 60641 | 8,484 | 8,484 |
| 60642 | 431 | 431 |
| 60643 | 19,357 | 19,357 |
| 60644 | 5,640 | 5,640 |
| 60645 | 6,275 | 6,275 |
| 60646 | 3,091 | 3,091 |
| 60647 | 10,676 | 10,676 |
| 60648 | 339 | 339 |
| 60649 | 18,296 | 18,296 |
| 60650 | 149 | 149 |
| 60651 | 6,668 | 6,668 |
| 60652 | 7,829 | 7,829 |
| 60653 | 4,500 | 4,500 |
| 60655 | 1,814 | 1,814 |
| 60656 | 2,674 | 2,674 |
| 60657 | 9,033 | 9,033 |
| 60658 | 52 | 52 |
| 60659 | 6,954 | 6,954 |
| 60660 | 4,738 | 4,738 |
| **TOTAL** | **$488,954** | **$488,954** |

ALLSTATE INDEMNITY COMPANY
Voluntary Private Passenger Auto
Chicago, Zips 60601-60660
Collision
Policy Year 1991 evaluated @12/92

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $5,401 | $5,401 |
| 60604 | 0 | 0 |
| 60605 | 8,049 | 8,049 |
| 60606 | 959 | 959 |
| 60607 | 2,449 | 2,449 |
| 60608 | 12,543 | 12,543 |
| 60609 | 6,997 | 6,997 |
| 60610 | 11,332 | 11,332 |
| 60611 | 9,181 | 9,181 |
| 60612 | 2,180 | 2,180 |
| 60613 | 6,617 | 6,617 |
| 60614 | 10,742 | 10,742 |
| 60615 | 25,539 | 25,539 |
| 60616 | 7,649 | 7,649 |
| 60617 | 30,733 | 30,733 |
| 60618 | 16,309 | 16,309 |
| 60619 | 54,156 | 54,156 |
| 60620 | 44,723 | 44,723 |
| 60621 | 12,388 | 12,388 |
| 60622 | 6,611 | 6,611 |
| 60623 | 15,108 | 15,108 |
| 60624 | 9,848 | 9,848 |
| 60625 | 11,024 | 11,024 |
| 60626 | 5,486 | 5,486 |
| 60627 | 528 | 528 |
| 60628 | 31,019 | 31,019 |
| 60629 | 20,743 | 20,743 |
| 60630 | 6,403 | 6,403 |
| 60631 | 3,335 | 3,335 |
| 60632 | 20,087 | 20,087 |
| 60633 | 2,575 | 2,575 |
| 60634 | 9,457 | 9,457 |
| 60635 | 1,033 | 1,033 |
| 60636 | 14,250 | 14,250 |
| 60637 | 17,875 | 17,875 |
| 60638 | 11,475 | 11,475 |
| 60639 | 14,738 | 14,738 |
| 60640 | 6,691 | 6,691 |
| 60641 | 12,836 | 12,836 |
| 60642 | 251 | 251 |
| 60643 | 24,720 | 24,720 |
| 60644 | 7,119 | 7,119 |
| 60645 | 10,723 | 10,723 |
| 60646 | 5,950 | 5,950 |
| 60647 | 14,342 | 14,342 |
| 60648 | 506 | 506 |
| 60649 | 19,623 | 19,623 |
| 60650 | 804 | 804 |
| 60651 | 4,476 | 4,476 |
| 60652 | 12,597 | 12,597 |
| 60653 | 5,779 | 5,779 |
| 60655 | 3,706 | 3,706 |
| 60656 | 3,641 | 3,641 |
| 60657 | 13,890 | 13,890 |
| 60659 | 7,195 | 7,195 |
| 60660 | 9,859 | 9,859 |
| TOTAL | $634,250 | $634,250 |

280

**ALLSTATE INDEMNITY COMPANY**
Voluntary Private Passenger Auto
Chicago, Zips 60601-60660
Comprehensive
Policy Year 1991 evaluated @12/92

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $4,859 | $4,859 |
| 60604 | 0 | 0 |
| 60605 | 7,057 | 7,057 |
| 60606 | 951 | 951 |
| 60607 | 1,954 | 1,954 |
| 60608 | 8,771 | 8,771 |
| 60609 | 4,680 | 4,680 |
| 60610 | 9,129 | 9,129 |
| 60611 | 8,794 | 8,794 |
| 60612 | 1,445 | 1,445 |
| 60613 | 4,698 | 4,698 |
| 60614 | 8,500 | 8,500 |
| 60615 | 18,371 | 18,371 |
| 60616 | 6,185 | 6,185 |
| 60617 | 23,397 | 23,397 |
| 60618 | 9,608 | 9,608 |
| 60619 | 38,794 | 38,794 |
| 60620 | 34,849 | 34,849 |
| 60621 | 9,020 | 9,020 |
| 60622 | 4,315 | 4,315 |
| 60623 | 10,767 | 10,767 |
| 60624 | 7,219 | 7,219 |
| 60625 | 7,168 | 7,168 |
| 60626 | 2,657 | 2,657 |
| 60627 | 492 | 492 |
| 60628 | 23,177 | 23,177 |
| 60629 | 12,997 | 12,997 |
| 60630 | 4,123 | 4,123 |
| 60631 | 1,739 | 1,739 |
| 60632 | 12,090 | 12,090 |
| 60633 | 1,719 | 1,719 |
| 60634 | 6,367 | 6,367 |
| 60635 | 480 | 480 |
| 60636 | 10,630 | 10,630 |
| 60637 | 12,995 | 12,995 |
| 60638 | 6,269 | 6,269 |
| 60639 | 10,400 | 10,400 |
| 60640 | 3,905 | 3,905 |
| 60641 | 6,877 | 6,877 |
| 60642 | 136 | 136 |
| 60643 | 19,719 | 19,719 |
| 60644 | 5,855 | 5,855 |
| 60645 | 5,423 | 5,423 |
| 60646 | 3,324 | 3,324 |
| 60647 | 10,262 | 10,262 |
| 60648 | 92 | 92 |
| 60649 | 17,476 | 17,476 |
| 60650 | 640 | 640 |
| 60651 | 3,652 | 3,652 |
| 60652 | 7,516 | 7,516 |
| 60653 | 3,752 | 3,752 |
| 60655 | 1,858 | 1,858 |
| 60656 | 2,077 | 2,077 |
| 60657 | 9,253 | 9,253 |
| 60659 | 4,786 | 4,786 |
| 60660 | 4,610 | 4,610 |
| **TOTAL** | **$447,879** | **$447,879** |

281

**ALLSTATE INDEMNITY COMPANY**
Voluntary Private Passenger Auto
Chicago, Zips 60601-60660
Liability Coverages Combined
Policy Year 1991 evaluated @12/92

| Zip Code | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $5,296 | $5,296 |
| 60604 | 1,706 | 1,706 |
| 60605 | 13,443 | 13,443 |
| 60606 | 2,926 | 2,926 |
| 60607 | 4,610 | 4,610 |
| 60608 | 14,820 | 14,820 |
| 60609 | 10,458 | 10,458 |
| 60610 | 25,313 | 25,313 |
| 60611 | 20,715 | 20,715 |
| 60612 | 6,268 | 6,268 |
| 60613 | 21,228 | 21,228 |
| 60614 | 33,305 | 33,305 |
| 60615 | 49,101 | 49,101 |
| 60616 | 13,286 | 13,286 |
| 60617 | 44,300 | 44,300 |
| 60618 | 35,821 | 35,821 |
| 60619 | 75,990 | 75,990 |
| 60620 | 52,647 | 52,647 |
| 60621 | 19,070 | 19,070 |
| 60622 | 13,535 | 13,535 |
| 60623 | 21,425 | 21,425 |
| 60624 | 17,723 | 17,723 |
| 60625 | 27,037 | 27,037 |
| 60626 | 15,302 | 15,302 |
| 60627 | 3,269 | 3,269 |
| 60628 | 37,664 | 37,664 |
| 60629 | 36,723 | 36,723 |
| 60630 | 17,531 | 17,531 |
| 60631 | 9,281 | 9,281 |
| 60632 | 36,144 | 36,144 |
| 60633 | 6,848 | 6,848 |
| 60634 | 23,019 | 23,019 |
| 60635 | 6,809 | 6,809 |
| 60636 | 17,424 | 17,424 |
| 60637 | 28,035 | 28,035 |
| 60638 | 30,709 | 30,709 |
| 60639 | 31,625 | 31,625 |
| 60640 | 27,321 | 27,321 |
| 60641 | 33,500 | 33,500 |
| 60642 | 2,602 | 2,602 |
| 60643 | 28,697 | 28,697 |
| 60644 | 15,466 | 15,466 |
| 60645 | 24,252 | 24,252 |
| 60646 | 15,042 | 15,042 |
| 60647 | 34,890 | 34,890 |
| 60648 | 3,502 | 3,502 |
| 60649 | 31,243 | 31,243 |
| 60650 | 2,990 | 2,990 |
| 60651 | 13,393 | 13,393 |
| 60652 | 21,284 | 21,284 |
| 60653 | 8,032 | 8,032 |
| 60655 | 9,238 | 9,238 |
| 60656 | 14,060 | 14,060 |
| 60657 | 30,741 | 30,741 |
| 60659 | 24,176 | 24,176 |
| 60660 | 26,939 | 26,939 |
| TOTAL | $1,197,774 | $1,197,774 |

**Allstate Insurance & Indemnity Company**
**Chicago, Zips 60601 - 60660**
**Homeowners**
**1989**

| Zip | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $1,565 | $1,493 |
| 60602 | 3,561 | 3,356 |
| 60603 | 7,392 | 7,003 |
| 60604 | 1,664 | 1,580 |
| 60605 | 9,116 | 8,610 |
| 60606 | 1,323 | 1,265 |
| 60607 | 70,707 | 66,729 |
| 60608 | 552,310 | 525,070 |
| 60609 | 882,691 | 838,498 |
| 60610 | 57,960 | 54,733 |
| 60611 | 15,275 | 14,393 |
| 60612 | 219,538 | 208,228 |
| 60613 | 344,853 | 325,350 |
| 60614 | 587,362 | 554,118 |
| 60615 | 226,549 | 213,965 |
| 60616 | 218,468 | 206,544 |
| 60617 | 2,074,886 | 1,959,585 |
| 60618 | 1,271,916 | 1,201,207 |
| 60619 | 2,238,296 | 2,112,565 |
| 60620 | 2,627,928 | 2,479,952 |
| 60621 | 733,381 | 694,525 |
| 60622 | 591,118 | 561,208 |
| 60623 | 1,002,842 | 952,565 |
| 60624 | 615,132 | 583,095 |
| 60625 | 852,744 | 804,808 |
| 60626 | 209,291 | 197,440 |
| 60627 | 31,137 | 29,409 |
| 60628 | 2,816,249 | 2,658,345 |
| 60629 | 1,241,302 | 1,172,183 |
| 60630 | 750,855 | 708,070 |
| 60631 | 391,590 | 369,240 |
| 60632 | 762,579 | 720,713 |
| 60633 | 86,950 | 82,034 |
| 60634 | 994,110 | 937,393 |
| 60635 | 255,525 | 240,972 |
| 60636 | 1,277,773 | 1,206,464 |
| 60637 | 500,110 | 473,243 |
| 60638 | 684,701 | 645,673 |
| 60639 | 1,113,403 | 1,052,652 |
| 60640 | 363,496 | 343,175 |
| 60641 | 804,057 | 758,328 |
| 60642 | 48,212 | 45,468 |
| 60643 | 1,432,255 | 1,351,070 |
| 60644 | 987,332 | 933,965 |
| 60645 | 383,366 | 361,486 |
| 60646 | 460,956 | 434,632 |
| 60647 | 1,173,060 | 1,112,554 |
| 60648 | 77,365 | 72,960 |
| 60649 | 746,115 | 704,380 |
| 60650 | 10,968 | 10,379 |
| 60651 | 1,468,826 | 1,392,705 |
| 60652 | 590,823 | 557,114 |
| 60653 | 106,000 | 100,452 |
| 60655 | 385,666 | 363,650 |
| 60656 | 338,585 | 319,258 |
| 60657 | 513,725 | 485,112 |
| 60658 | 1,614 | 1,522 |
| 60659 | 413,294 | 389,779 |
| 60660 | 214,455 | 202,337 |
| Total | $36,844,542 | $34,816,622 |

Allstate Insurance & Indemnity Company
Chicago, Zips 60601 - 60660
Homeowners
1990

| Zip | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $3,957 | $3,932 |
| 60602 | 2,654 | 2,755 |
| 60603 | 5,825 | 5,724 |
| 60604 | 1,086 | 1,112 |
| 60605 | 13,614 | 13,250 |
| 60606 | 1,489 | 1,468 |
| 60607 | 81,990 | 79,538 |
| 60608 | 595,958 | 598,801 |
| 60609 | 930,820 | 928,778 |
| 60610 | 61,785 | 59,945 |
| 60611 | 18,331 | 17,693 |
| 60612 | 240,390 | 238,012 |
| 60613 | 367,864 | 355,745 |
| 60614 | 647,629 | 626,385 |
| 60615 | 242,292 | 235,626 |
| 60616 | 230,613 | 225,323 |
| 60617 | 2,151,478 | 2,091,320 |
| 60618 | 1,373,011 | 1,334,063 |
| 60619 | 2,380,982 | 2,306,506 |
| 60620 | 2,728,656 | 2,643,380 |
| 60621 | 771,198 | 759,020 |
| 60622 | 623,565 | 618,718 |
| 60623 | 1,131,235 | 1,126,510 |
| 60624 | 641,184 | 634,227 |
| 60625 | 895,987 | 868,210 |
| 60626 | 213,402 | 206,362 |
| 60627 | 30,234 | 29,399 |
| 60628 | 2,867,621 | 2,780,935 |
| 60629 | 1,359,495 | 1,320,838 |
| 60630 | 791,018 | 763,883 |
| 60631 | 409,453 | 395,230 |
| 60632 | 836,314 | 815,810 |
| 60633 | 94,982 | 91,921 |
| 60634 | 1,052,609 | 1,016,269 |
| 60635 | 270,471 | 261,194 |
| 60636 | 1,293,943 | 1,265,247 |
| 60637 | 514,317 | 504,432 |
| 60638 | 725,970 | 700,968 |
| 60639 | 1,242,485 | 1,213,477 |
| 60640 | 384,381 | 372,649 |
| 60641 | 866,581 | 836,968 |
| 60642 | 46,445 | 44,839 |
| 60643 | 1,503,010 | 1,453,613 |
| 60644 | 1,046,742 | 1,026,850 |
| 60645 | 401,931 | 388,053 |
| 60646 | 480,454 | 463,793 |
| 60647 | 1,321,186 | 1,304,792 |
| 60648 | 76,111 | 73,531 |
| 60649 | 784,515 | 781,440 |
| 60650 | 11,926 | 11,816 |
| 60651 | 1,556,114 | 1,539,251 |
| 60652 | 632,288 | 610,352 |
| 60653 | 111,781 | 110,303 |
| 60655 | 412,768 | 398,456 |
| 60656 | 348,904 | 336,741 |
| 60657 | 583,222 | 566,269 |
| 60658 | 1,377 | 1,329 |
| 60659 | 438,251 | 421,381 |
| 60660 | 236,506 | 228,744 |
| Total | $39,088,780 | $38,095,416 |

284

Allstate Insurance & Indemnity Company
Chicago, Zips 60601 - 60660
Homeowners
1991

| Zip | Written Premium | Earned Premium |
|---|---|---|
| 60601 | $752 | $728 |
| 60602 | 731 | 707 |
| 60603 | 1,080 | 1,045 |
| 60604 | 2,791 | 2,701 |
| 60605 | 22,407 | 21,704 |
| 60606 | 6,192 | 6,011 |
| 60607 | 82,580 | 80,146 |
| 60608 | 648,986 | 641,196 |
| 60609 | 1,031,805 | 1,018,708 |
| 60610 | 69,317 | 67,228 |
| 60611 | 15,214 | 14,747 |
| 60612 | 236,093 | 232,008 |
| 60613 | 429,287 | 415,926 |
| 60614 | 685,834 | 664,443 |
| 60615 | 275,167 | 267,337 |
| 60616 | 227,167 | 221,286 |
| 60617 | 2,283,864 | 2,218,845 |
| 60618 | 1,458,518 | 1,415,782 |
| 60619 | 2,583,584 | 2,508,416 |
| 60620 | 2,948,411 | 2,859,387 |
| 60621 | 844,369 | 826,373 |
| 60622 | 684,807 | 672,678 |
| 60623 | 1,214,256 | 1,198,098 |
| 60624 | 686,904 | 673,965 |
| 60625 | 909,081 | 881,314 |
| 60626 | 219,893 | 212,757 |
| 60627 | 32,839 | 31,681 |
| 60628 | 2,957,588 | 2,870,166 |
| 60629 | 1,509,162 | 1,465,628 |
| 60630 | 828,702 | 802,194 |
| 60631 | 418,943 | 405,453 |
| 60632 | 926,644 | 901,694 |
| 60633 | 99,246 | 96,179 |
| 60634 | 1,133,085 | 1,096,604 |
| 60635 | 298,281 | 288,739 |
| 60636 | 1,448,245 | 1,412,582 |
| 60637 | 561,720 | 546,628 |
| 60638 | 769,068 | 744,445 |
| 60639 | 1,388,202 | 1,351,393 |
| 60640 | 428,872 | 416,076 |
| 60641 | 895,786 | 867,164 |
| 60642 | 49,963 | 48,345 |
| 60643 | 1,605,893 | 1,555,910 |
| 60644 | 1,124,466 | 1,097,962 |
| 60645 | 394,518 | 381,859 |
| 60646 | 502,813 | 486,622 |
| 60647 | 1,509,771 | 1,477,649 |
| 60648 | 78,033 | 75,520 |
| 60649 | 834,476 | 810,032 |
| 60650 | 7,011 | 6,840 |
| 60651 | 1,768,466 | 1,736,950 |
| 60652 | 706,280 | 683,589 |
| 60653 | 115,742 | 113,446 |
| 60655 | 430,352 | 416,528 |
| 60656 | 360,597 | 348,966 |
| 60657 | 636,188 | 617,103 |
| 60658 | 165 | 160 |
| 60659 | 456,168 | 440,718 |
| 60660 | 264,680 | 268,496 |
| Total | $42,109,846 | $40,974,016 |

## A COMPARISON OF THE ALLSTATE 1992 HOMEOWNERS INSURANCE PRODUCTS

**Coverages**

| | REPLACEMENT COST POLICIES | | | | SELECT VALUE POLICIES | |
| | STANDARD | DELUXE | DELUXE COUNTRY | DELUXE PLUS | STANDARD | DELUXE |
|---|---|---|---|---|---|---|
| Home Replacement Cost Guarantee | Optional | Optional | Optional | Included | Not Available | Not Available |
| Personal Property Replacement Cost | Optional | Optional | Optional | Included | Optional | Optional |
| Contents (% of Dwelling Coverage) | 50 % | 50 % | 50 % | 75 % | 50 % | 50 % |
| Business Property Off Premises | No | $200 | $200 | $200 | No | $200 |
| Business Property On Premises | No | $1,000 | $1,000 | $2,000 | No | $1,000 |
| Computers | $3,000 | $5,000 | $5,000 | $5,000 | $3,000 | $5,000 |
| Money, Etc. | $100 | $200 | $200 | $200 | $100 | $200 |
| Securities, Accts., Bills | $500 | $1,000 | $1,000 | $1,000 | $500 | $1,000 |
| Manuscripts | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| Watercraft | $500 | $1,000 | $1,000 | $2,000 | $500 | $1,000 |
| Trailers | $500 | $1,000 | $1,000 | $1,000 | $500 | $1,000 |
| Theft of Jewelry, Watches, Furs | $500 | $1,000 | $1,000 | $2,500 ($1,000/item) | $500 | $1,000 |
| Trading Cards ($250/card) | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| Theft of Firearms | $1,000 | $2,000 | $2,000 | $3,000 | $1,000 | $2,000 |
| Theft of Silverware and Goldware | $1,000 | $2,500 | $2,500 | $2,500 | $1,000 | $2,500 |
| Oriental Rugs ($2,500/item) | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Auto/Boat Parts | $500 | $1,000 | $1,000 | $2,000 | $500 | $1,000 |
| Building Codes | No | No | No | Additional 10% | No | No |
| Additional Living Expense | 12 months | 12 months | 12 months | 12 months | 12 months | 12 months |
| Fire Dept. Charges | $250 | $500 | $500 | $500 | $250 | $500 |

004088

## Coverages

| | REPLACEMENT COST POLICIES | | | | SELECT VALUE POLICIES | |
| | STANDARD | DELUXE | DELUXE COUNTRY | DELUXE PLUS | STANDARD | DELUXE |
|---|---|---|---|---|---|---|
| Debris Removal of Trees, etc. | 5% / $250 | 5% / $500 | 5% / $500 | 5% / $500 | 5% / $250 | 5% / $500 |
| Arson Reward | $5,000 | $5,000 | $5,000 | $5,000 | $5.000 | $5.000 |
| Power Interruption Off Premises - Freezer Contents | No | Yes | Yes | Yes | No | Yes |
| Damage to Property of Others (Sec. II) | $250 | $500 | $500 | $1,000 | $250 | $500 |
| Building Structures Not Attached | Cov. B (10%) | Cov. B (10%) | Cov. B (10%) | Cov. B (10%) | Cov. B (10%) | Cov. B (10%) |

## Optional Coverages

| | | | | | | |
|---|---|---|---|---|---|---|
| Cov. BC - Building Codes | Yes | Yes | Yes | Incl. | No | No |
| Cov. BP - Business Personal Property | No | Yes | Yes | Yes | No | Yes |
| Cov. DP - Electronic Data Processing Equipment | Yes | Yes | Yes | Yes | Yes | Yes |
| Cov. F - Fire Dept. Charges | Yes | Yes | Yes | Yes | Yes | Yes |
| Cov. G - Loss Assmts. | Yes | Yes | Yes | Yes | Yes | Yes |
| Cov. J - Jewelry, Watches & Furs* | Yes | Yes | Yes | Yes | Yes | Yes |
| Cov. K - Incidental Office, Private School | Yes | Yes | Yes | Yes | Yes | Yes |
| Cov. LR - Lock Replacement | Yes | Yes | Yes | Incl. | Yes | Yes |
| Cov. M - Money | Yes | Yes | Yes | Yes | Yes | Yes |
| Cov. P - Business Pursuits | Yes | Yes | Yes | Yes | Yes | Yes |
| Cov. S - Increased Coverage on Securities | Yes | Yes | Yes | Yes | Yes | Yes |

## Optional Coverages

| | REPLACEMENT COST POLICIES | | | | SELECT VALUE POLICIES | |
| --- | --- | --- | --- | --- | --- | --- |
| | STANDARD | DELUXE | DELUXE COUNTRY | DELUXE PLUS | STANDARD | DELUXE |
| Cov. SD - Satellite Dish Antennas | Yes | Yes | Yes | Yes | Yes | Yes |
| Cov. SE - Cellular Commun. Equip. | Yes | Yes | Yes | Yes | Yes | Yes |
| Cov. ST - Increased Coverage on Silverware | Yes | Yes | Yes | Yes | Yes | Yes |

## Optional Endorsements

| | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| HRCG I ** | Yes | Yes | Yes | Incl. | No | No |
| HRCG II *** | Yes | Yes | Yes | Incl. | No | No |
| Earthquake Coverage | Yes | Yes | Yes | Yes | Yes | Yes |
| Home Day Care Coverage | Yes | Yes | Yes | Yes | Yes | Yes |
| Cov. CA - Cameras* | Yes | Yes | Yes | Yes | Yes | Yes |
| Cov. MI - Musical Instruments* | Yes | Yes | Yes | Yes | Yes | Yes |
| Cov. SP - Sports Equipment* | Yes | Yes | Yes | Yes | Yes | Yes |
| Dwelling In Course of Construction | No | Yes | No | No | No | No |
| Windstorm & Hail Deduct. | Yes | Yes | Yes | Yes | Yes | Yes |

The shaded coverages represent a new expanded coverage feature.

\* Coverage available up to $25,000
\*\* HRCG I applies to the Dwelling and Attached Garages
\*\*\* HRCG II applies to the Dwelling, Attached Garages and Detached Garages

R2831B

# INSURANCE REDLINING PRACTICES

---

### MONDAY, APRIL 26, 1993

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ENERGY AND COMMERCE,
SUBCOMMITTEE ON COMMERCE, CONSUMER PROTECTION,
AND COMPETITIVENESS,
*Chicago, Ill.*

The subcommittee met, pursuant to notice, at 10:05 a.m., in the Ceremonial Courtroom, room 2525, Dirksen Federal Office Building, Chicago, Ill., Hon. Cardiss Collins (chairwoman) presiding.

Mrs. COLLINS. Good morning. This hearing of the Energy and Commerce Subcommittee on Commerce, Consumer Protection and Competitiveness will come to order.

This morning our hearing is on redlining. The subcommittee will today continue the examination of redlining practices in insurance companies, with specific attention to the Chicago area. We will hear very disturbing reports about a variety of practices insurance companies use to deny access to insurance for the residents of our urban areas. Indeed, we see in front of us graphic and concrete evidence of the apparent redlining practiced by some major insurers in the Chicago area. Insurance companies cannot get away with avoiding the large segments of Chicago merely because their residents are black or brown or poor.

Studies of redlining have shown that Chicago exhibits some of the worst forms of redlining. You cannot begin to understand the problems unless you have been the victim of redlining which is a disease—a blight on our community, that has defied effort after effort of eradication.

As a practical matter, access to property insurance is a necessity for mortgage loans, and is often essential for access to small business loans. Without access to affordable insurance, small businesses in our community can neither prosper nor generate badly needed jobs. Similarly, access to affordable automobile insurance is often essential for residents of the inner cities to keep and hold job.

At a previous subcommittee hearing on March 3rd, Illinois Public Action testified that there were 52 State Farm offices and 32 Allstate offices in the 5th Congressional District of Illinois, represented by Congressman Dan Rostenkowski, which is a predominantly white Congressional District in Chicago. But, according to the Public Action testimony, in the Chicago portion of my 7th Congressional District, there were only 6 State Farm Offices and 2 Allstate offices outside of the downtown area. Public Action's testimony today is more detailed, and is based on data submitted to the

(289)

290

subcommittee for the record of the March 3rd hearing by State Farm and Allstate.

In particular, Illinois Public Action's testimony today will reveal that State Farm and Allstate agents are disproportionately concentrated in northwest and southwest side neighborhoods. According to the testimony, not surprisingly, State Farm and Allstate policies are also similarly disproportionately concentrated in northwest and southwest side neighborhoods. Furthermore, the testimony reveals that these distribution patterns largely reflect the race and income patterns of Chicago communities.

According to Public Action, all of the areas with the greatest concentration of State Farm policies are in majority white communities, while all but one of the areas with the least concentration are in majority African American or Hispanic communities. The testimony reveals that Allstate had a similar concentration in the majority white community, on the northwest and southwest side, although a significantly larger proportion of Allstate's policies are in the higher income majority African American communities. However, according to the testimony, most of the areas with the least concentration of Allstate policies outside downtown are in majority African American or Hispanic, low-income communities. In sum, the testimony reveals that State Farm apparently avoids minority communities, while Allstate seems to avoid poor communities.

In our previous hearing ACORN testified that in Chicago only 51.1 percent of occupied single family units in low-income neighborhoods, and only 57.6 percent in minority neighborhoods were covered by any type of insurance, compared to 90 percent coverage in high-income and 87.7 percent coverage in white areas. ACORN's testimony today will reinforce this point and provide evidence of the difficulty our urban residents have in buying insurance.

We will hear from the Northwest Austin Council, a community group that has been fighting the efforts of Allstate to close a claims and sales office in the inner city. Allstate will also testify today, and they will say that they are an urban insurer/writer that serves the inner city. Allstate can show their commitment to the city by putting their money where their mouth is by keeping the agents in the community.

We will hear from an organization of African American insurance agents. The organization will discuss the difficulty independent agents have in getting appointments from major insurance companies to serve the inner city.

We will also hear from Allstate and State Farm. Let me emphasize that these maps that we are going to see are based on the companies' own data. Unfortunately, the insurance industry's general posture, when accused of redlining, is to take issue with the data and studies alleging redlining, and try to nitpick them to death. They cannot easily take issue with their very own data. These maps say it all. However, the industry criticism does point out one basic problem. There is a lack of good, solid, comprehensive data about insurance coverage in the urban areas.

To remedy this, I have introduced legislation, H.R. 1188, the Anti-Redlining in Insurance Disclosure Act. This act will require insurance companies to disclose information about their insurance

practices and activities in urban areas, such as the breakdown of policies sold by census tract, itemized by demographic characteristics. These disclosure requirements would apply to major lines of insurance such as automobile, property and small business/commercial insurance. The legislation, further, requires reporting of agent location by census tract.

The information generated by this legislation would help determine the true nature and extent of redlining. The public disclosure of this information would also serve as a powerful disincentive against discriminatory practices and behavior. In addition, the legislation mandates disclosure to insurance applicants about reasons for rejection or non-renewal, and protects against the termination of agents as a result of their location or the location of their customers. The act would be administered by the Department of Commerce.

I am hopeful the subcommittee will be able to act on this legislation in the next few weeks. Redlining practices just have to stop. I am hopeful this hearing and the subcommittee's efforts will be an important step in developing effective solutions to this problem.

Let me say that our ranking member, on the Subcommittee on Commerce, Consumer Protection and Competitiveness, Mr. Cliff Stearns of Florida, had planned to be with us this morning, however, an unavoidable circumstance prevented his being here. He has to be in his district this morning. He is represented, however, by his staff member, Mr. Halpern, who is here to my left.

Our first panel of witnesses will be Mr. Robert Creamer, who is the executive director of the Illinois Public Action, who is accompanied by Mr. John Cameron, the associate director of Public Action, and Ms. Lilly Petty, who is a board member of the Illinois Chapter of ACORN.

May we begin with you, please, Mr. Creamer. Before you begin, let me say that the House of Representatives' rules are that each Member of Congress and each witness are allowed 5 minutes to give a summary of their testimony, with the full knowledge that all written testimony will be made a part of the record. We have the time clock here with us today. We will be using it.

Thank you, Mr. Creamer.

**STATEMENTS OF ROBERT CREAMER, EXECUTIVE DIRECTOR, ILLINOIS PUBLIC ACTION, ACCOMPANIED BY JOHN CAMERON, ASSOCIATE DIRECTOR; LILLY PETTY, BOARD MEMBER, ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW (ACORN), ACCOMPANIED BY: CAROLYN SIEGEL, HEAD ORGANIZER**

Mr. CREAMER. Madam Chairwoman, and Mr. Minority Representative, on behalf of Illinois Public Action, I wish to thank you for the opportunity and once again express our views on this critical issue of redlining practices in insurance in Chicago.

As you know, in the March 3rd hearing of the committee on this issue, Public Action presented testimony on the uneven distribution of State Farm and Allstate offices in Chicago, which we believe indicated a clear pattern of discriminatory marketing by these two companies, the largest and generally least-expensive insurers of automobiles and homes in Illinois.

The net effect of these practices, usually referred to as redlining is to force the city's poorest consumers to purchase coverage from substandard carriers that are both more expensive and least responsive to consumer needs. Both Allstate and State Farm denied that they redlined, and they maintained office location is not meaningful.

In response to our testimony at the last hearing, your committee requested specific information from the two companies on agents, policies, premiums and losses broken down by zip codes in Chicago. Based on the data provided, which did not include critical loss information, we have analyzed the distribution of agents and policies in Chicago for the most recent years, for both Allstate and State Farm. That analysis, which we are providing to the committee this morning, substantially contradicts the claim of both companies, finding that the marketing of policies is closely correlated with the geographic distribution of agents and offices; that policies are correspondingly concentrated in the communities with the most agents and lacking in those communities with the fewest or no agents, and that this uneven distribution of agents and policies largely reflects racial and, in some cases, income makeup of those communities.

Specifically, we found, first, State Farm and Allstate agents are indeed disproportionately concentrated in the northwest and southwest side zip codes. Nine northwest and three southwest side zip codes had five or more State Farm agents, while seven west side and seven south side zip codes had one or no agents. At the same time, nine northwest side and four southwest, and two far southwest side zip codes had five or more Allstate agents, while seven west side and seven south side zip codes had one or no agents.

Second, State Farm and Allstate policies are disproportionately concentrated in these same communities. Nine northwest and five southwest side zip codes had the heaviest concentration in State Farm policies, while seven west side, and eight south side zip codes had the least. And you can see on this chart, the red represents the areas with the least, the blue with the most.

For Allstate, six northwest and four southwest side, and four far south side zip codes had the heaviest concentration of policies; while four west side and three near south side zip codes had the least.

Next, policy distributions largely reflect race and income patterns. All of the 17 zip codes with the greatest concentration of State Farm policies are in majority white communities, while all but one of the 16 zip codes, with the least concentration outside the downtown area, are in majority black and Hispanic communities.

Allstate had a similar concentration of the majority white communities on the north and southwest side, although a significant portion of its policies are in the higher income, majority black communities, which is different from the State Farm activities. However, most zip codes, with the least concentration of policies outside the downtown area are in low income communities, that are majority black or Hispanic.

Now, I would note, parenthetically, that the one exception to these patterns is somewhat higher distribution of Allstate policies in the two Austin zip codes, areas bordering the Allstate office on North Avenue, not surprisingly. It is my understanding that the company intends to shut that office and move it out of the city.

Finally, State Farm and Allstate agents and policies are disproportionately distributed by Congressional District. The seven zip codes, excluding the Loop, in the predominantly black 7th District, had six State Farm agents, and an average of 3,568 policies, while the six zip codes in the neighboring, but predominantly white 5th District had 56 agents, with an average of 18,250 policies. Allstate had eight agents in this Congressional District, with an average of 3,124 policies; but 42 agents and an average of 7,583 policies in the 5th District zip codes.

In sum, whatever their motivations and intentions may be, the policy and agent data provided by State Farm and Allstate clearly demonstrates that many Chicago communities, particularly those that are predominantly black or Hispanic and low income are substantially under-served by these two companies. As a consequence, we would once again add our voice in strong support of your legislation, H.R. 1188, the Anti-redlining and Insurance Disclosure Act. We believe this approach, modeled on the disclosure requirements of the Community Reinvestment Act imposed on the lending industry would be a powerful incentive to end discriminatory marketing by all insurance carriers.

I would also note that the provisions of H.R. 1188 require disclosure of data by census tract and that is extremely important. In analyzing the data provided to the committee, it is clear that the zip code breakdowns are not precise enough to present a full picture of insurance company marketing practices since the tract data would allow for accurate per capita correlations, as well as detailed analysis of policy distributions by race, income and other key factors.

I would close by commending Madam Chairwoman on her leadership on this issue, both in holding these hearings and in sponsoring such significant legislation. Your actions stand in sharp contrast to the failure of the Illinois Department of Insurance to seriously address redlining practices in this city. You have our firm commitment in assisting your efforts in any way possible.

Thank you very much.

[Testimony resumes on p. 321.]

[The attachments to the prepared statement of Mr. Creamer follow:]

AN ANALYSIS OF ZIP CODE DISTRIBUTION OF
STATE FARM AND ALLSTATE AGENTS AND POLICIES IN CHICAGO

## Summary of Findings

**STATE FARM AND ALLSTATE AGENTS DISPROPORTIONATELY CONCENTRATED
IN NORTHWEST AND SOUTHWEST SIDE ZIP CODES**

State Farm and Allstate, the nation's two largest providers
of automobile and homeowners insurance, claim not to discrimi-
nate in marketing or to redline Chicago neighborhoods.  However
their agents are disproportionately located on the city's
northwest and southwest sides:

* **Nine northwest and three southwest side zip codes had five
  or more State Farm agents while seven west side and seven
  south side zips had one or no agents.**

* **Nine northwest, four southwest, and two far-south side zip
  codes had five or more Allstate agents while seven west
  side and seven south side zips had one or no agents.**

**STATE FARM AND ALLSTATE POLICIES ARE DISPROPORTIONATELY CON-
CENTRATED IN NORTHWEST AND SOUTHWEST SIDE ZIP CODES**

Both State Farm and Allstate contend that the lack of agents
does not mean a community is underserved.  However the data on
auto and home policies provided by the two companies documents a
similar pattern of disproportionate distribution:

* **Ten northwest and five southwest side zip codes had the
  heaviest concentrations of State Farm policies while seven
  west side and eight south side zips had the least.**

* **Six northwest, four southwest side, and four far-south
  side zip codes had the heaviest concentrations of Allstate
  policies while four west side and three near-south side
  zips had the least.**

**POLICY DISTRIBUTIONS LARGELY REFLECT RACE AND INCOME PATTERNS OF
CHICAGO COMMUNITIES**

The disproportionate distribution of both agents and
policies generally corresponds to the race and income make-up of
Chicago community areas:

* **All of the seventeen zip codes with the greatest concen-
  trations of State Farm policies are in majority white
  communities, while all but one of the sixteen zip codes
  with the least concentration, outside the downtown area,
  are in majority black or hispanic communities.**

Summary/two

* Allstate had a similar concentration in the majority white
  communities on the northwest and southwest side although a
  significant proportion of its policies are in the higher
  income majority black communities. However most zip codes
  with the least concentration of policies, outside the
  downtown area, are in low income communities that are
  majority black or hispanic.

**STATE FARM AND ALLSTATE AGENTS AND POLICIES ARE DISPROPORTION-
ATELY DISTRIBUTED BY CONGRESSIONAL DISTRICT**

   Congressional districts, which in Chicago largely adhere to
racial boundaries, show the same pattern of disproportionate
distribution of auto and home policies:

* The seven zip codes, excluding the Loop, in the
  predominantly black Seventh District had 6 State Farm
  agents and an average of 3,568 policies while the six zip
  codes in the neighboring but predominantly white Fifth
  District had 56 agents and average of 18,250 policies.

  Allstate had 8 agents and an average of 4,124 policies in
  the Seventh District zips but 42 agents and an average of
  7,583 policies in the Fifth District zip codes.

* The four zip codes in the predominantly black Second
  District had 4 State Farm agents and an average of 6,233
  policies while the four zip codes in the neighboring but
  predominantly white Third District had 25 agents and
  average of 17,777 policies.

  Allstate had 10 agents and an average of 8,574 policies in
  the Second District zips but 34 agents and an average of
  9,154 policies in the Third District zip codes.

                    *        *

## AN ANALYSIS OF ZIP CODE DISTRIBUTION OF
## STATE FARM AND ALLSTATE AGENTS AND POLICIES IN CHICAGO

### Introduction: AGENT DISTRIBUTION AND REDLINING

In testimony presented to the U.S. House Subcommittee on Commerce, Consumer Protection and Competitiveness last month, and in previous studies, Illinois Public Action has documented the unequal distribution of State Farm and Allstate offices in Chicago neighborhoods.

These analyses have consistently found a disproportionate concentration of such offices in northwest and southwest side communities that are predominantly white and middle income, and a corresponding lack of those offices in communities on the west and south side that are predominantly black and hispanic.

We have contended that this pattern of office location is a result of discriminatory marketing, often referred as "redlining", that makes it difficult for inter-city consumers to shop for and purchase insurance coverage from State Farm and Allstate. These two firms, who dominate market share both in Illinois and nationwide for automobile and homeowners insurance, generally charge the lowest rates.

As a consequence, many low-income minority Chicagoans are forced into the hands of the "non-standard" carriers which typically have the highest rates and the poorest records of consumer service. With auto liability coverage mandated by law and lenders requiring coverage for home mortgages, the poorest consumers are forced to pay the most for their insurance.

Both State Farm and Allstate have challenged these analyses and they insist that they do not engage in discriminatory marketing or other redlining practices. As they have recently stated to the Subcommittee:
**"State Farm strives to offer our insurance products to the general public in a manner that does not discriminate on the basis of race, color, religion or national origin."** (1)

**"Allstate feels that it is accessible in every neighborhood in the city of Chicago."** (2)

Further, both firms claim that because agents are not restricted to selling policies in their immediate vicinity and are willing to provide pricing information over the phone, office locations are not meaningful:

- 2 -

"Just because there is not an agent's office in a particular
area does not mean the service provided to consumers living
in that area is inferior...Regardless of whether or not a
State Farm agent's office is located in a particular zip
code, State Farm insurer cars and homes on a non-discrimi-
natory basis throughout the city." (3)

"Simply because an agent is not located on a given block or
in a particular neighborhood, it should not be construed
that we (Allstate) do not write or are seeking to avoid
business in that particular location." (4)

However the following analysis substantially contradicts the
claims of both companies. Based on the zip code data on
policies and agent locations provided by State Farm and
Allstate, it is clear that:

* the marketing of policies is closely correlated with the
  geographic distribution of agents and offices;

* that policies are correspondingly concentrated in the
  communities with the most agents and lacking in those
  communities with few or no agents; and

* this uneven distribution of agents and policies largely
  reflects the racial and income make-up of those
  communities.


## AGENT DISTRIBUTION BY ZIP CODE

As indicated by previous analyses of advertised office
locations, both State Farm and Allstate have widely uneven
distributions of agents in Chicago communities.

State Farm lists 186 agents ("independent contractors" and
trainee agents) as having had offices in 58 Chicago zip codes
during the last five years. Although this was an average of
slightly more than three per zip, the distribution ranges from
no agents in a dozen west side and south side zip codes to as
many as twenty in one northwest side zip code. Overall most
State Farm agents are concentrated in ten north and northwest,
three southwest and one far southeast side zip codes. (Map I)

Allstate lists 215 agents as of February 28, 1993 located in
57 Chicago zip codes (or an average of slightly less than four
per zip code.) However a similar pattern of uneven distribution
is evident -- ranging from several zip codes on the northwest
and southwest sides with more than a dozen agents to ten zip
codes on the south and west sides with no agents.

- 3 -

As with State Farm, most Allstate agents are located on the
northwest side followed by the southwest side zip codes;
although Allstate has a substantially larger number of agents on
the far south side side.  (Map II)

Agent distribution is closely correlated with policy
distribution for both companies.  Although zip codes are not a
precise designation of the immediate service area (not
infrequently an office located on the border of one zip code
markets to policyholders across the street in the neighboring
zip), the zip codes with the most agents generally have the most
policies, and those with the fewest agents have fewer policies.

### TABLE I -- AGENTS AND POLICIES PER ZIP CODE

**State Farm (auto/1991)**

|  | (#) | Total Policies | Average per Zip Code |
|---|---|---|---|
| Zip Codes with 0 to 1 agents | 19 | 60,200 | 3,168 |
| Zip Codes with 2 to 4 agents | 19 | 107,139 | 5,639 |
| Zip Codes with 5 or more agents | 14 | 147,503 | 10,536 |

**Allstate (auto liability/1992)**

|  | (#) | Total Policies | Average per Zip Code |
|---|---|---|---|
| Zip Codes with 0 to 1 agents | 18 | 28,048 | 1,558 |
| Zip Codes with 2 to 4 agents | 18 | 57,159 | 3,572 |
| Zip Codes with 5 or more agents | 16 | 63,958 | 3,762 |

NOTE -- data for both firms excludes the downtown
zip codes 60601-60606 and O'Hare (60666)

SOURCES: State Farm, Allstate -- see Appendix A



MAP I

STATE FARM AGENTS
BY ZIP CODE

0-1 Agents

2-4 Agents

5+ Agents

DOWNTOWN DELIVERY ZIP CODES
— Not to Scale —



- 6 -

While it should come as no surprise that agents and offices are located in neighborhoods with the most policyholders, both State Farm and Allstate have maintained that agent location does not indicate discriminatory marketing. **However the zip code data provided by these companies clearly demonstrate that the number of policies is closely correlated with the geographic distribution of agents and offices.**

## POLICY DISTRIBUTION BY ZIP CODE

### State Farm Policies by Zip Code

Based on the exposure data provided to the Subcommittee, State Farm Mutual had 316,710 policies in the City of Chicago during 1991. Map III illustrates the distribution of those policies by zip code.

As is immediately apparent, State Farm policyholders are concentrated in the same communities as their agents. Fourteen north side, five southwest side, one far-south side and one southeast side zip codes had 125% or more of the average number of policies. At the same time, ten south side and eight west side zip codes had less than 75% of the average.

State Farm Fire & Casualty lists 176,843 homeowners policy exposures in 1991 for Chicago. These were distributed similarly as seen on Map IV. Twelve north side, four southwest side and one southeast side zip codes had more than 125% of the average number of policies. At the same time, nine south side and six west side zip codes had less than 75% of the average.

Racial and income breakdowns by zip code are not readily available, but there are data for corresponding community areas. (See Appendix B) Zip codes do not precisely correspond with the community areas, and several include diverse communities, eg. 60608 includes both the white and average income community of Bridgeport and the hispanic and lower-income Lower West Side community (Pilsen). However the community area data allow for some comparisons of policy distribution by race and income.

The zip codes with the highest concentration of State Farm policyholders are all majority white community areas, while almost all of zip codes with the fewest average policies (outside the downtown Loop and Near North areas) are either majority black or hispanic.

. Most of the zip codes with the fewest State Farm policies are low-income. However there is no necessary correspondence





- 9 -

with income: eight of the northwest side zip codes with the
highest concentrations of policies are average income, while
only one of the five far-south side zip codes representing
average income areas had a high concentration of policies.

Although there is a larger number of State Farm policies in
average income majority black communities than low-income areas,
the numbers are not at all comparable to those in similar income
majority white communities.

## Allstate Policies by Zip Code

Allstate auto and home policies also closely track agent
locations. Allstate had 149,930 automobile liability policies,
as measured in written car years, in Chicago during 1992,
distributed over 57 zip codes as illustrated by Map V.

Again there was a heavy concentration in the same northwest
side, the southwest side and southeast side zip codes as with
State Farm. However Allstate also had a larger proportion on
its policies in the five far-south side zip codes and a smaller
percentage on the far north side.

The distribution of residential property insurance,
including both homeowners and renters insurance, was virtually
the same based on the data provided to the Subcommittee.
Allstate had some 151,493 such new or renewed policies in
Chicago in 1992 -- see Map VI.

In general, Allstate's policy distribution corresponds more
closely with income distribution than race. While almost all of
the zip codes (outside of downtown) with the lowest percentage
of Allstate policyholders were either majority black or
hispanic, these were also communities with the lowest incomes.

There was a higher concentration of both auto and home
policies in the majority black zip codes representing average
income communities. (As indicated above, Allstate has a higher
number of agents in those areas while having only a handful in
the lower-income zip codes.)

## POLICY DISTRIBUTION BY CONGRESSIONAL DISTRICT

Another revealing approach to analyzing the zip code policy
data provided by State Farm and Allstate is by congressional
district. Following last year's redistricting, congressional
districts closely follow racial boundaries, particularly in
Chicago.



MAP V

ALLSTATE AUTO
LIABILITY POLICIES

BY ZIP CODE
(1992)

Average per zip
code was 2,630

75% or less
of average

75%-125% of
average

125% or more
of average

DOWNTOWN DELIVERY ZIP CODES
— Not to Scale —



MAP VI

ALLSTATE HOME
& RENTERS POLICIES

BY ZIP CODE
(1992)

Average per zip
code was 2,690

75% or less
of average

75%-125% of
average

125% or more
of average

DOWNTOWN DELIVERY ZIP CODES
— Not to Scale —

004109

- 12 -

Zip code alignments, of course, do not necessarily correspond to the boundaries of the new congressional districts, and often a zip code may be part of two or more such districts. As a consequence, we examined the number of policies in only the 47 zip codes which are wholly or predominantly in a congressional district; the information was not available to accurately apportion the multi-district zip codes.

Tables II and III summarize the policy information by congressional district (see Appendix C for full data.) While the seven Chicago congressional districts represent varying proportions of the cities (and thus differing number of zip codes), several interesting comparisons are possible.

In the four south side zip codes of the predominantly black Second District, there were just four State Farm agents, and an average of 3,767 auto policies and 2,466 home policies. By contrast, the four southwest side zip codes in the overwhelmingly white Third District had 25 agents and averaged 11,766 auto and 6,011 home policies -- nearly three times that of the Second District.

Similarly, in the predominantly black Seventh District, excluding the Loop six zip codes but even including the Near North communities, there were just 6 State Farm agents in seven zip codes. These zips averaged 2,041 auto policies and 1,527 home policies.

The five zip codes in the adjacent and predominantly hispanic Fourth District had just eight agents; they averaged 3,965 auto and 2,560 home policies. However the neighboring six zip codes in the overwhelmingly white Fifth District had 56 agents; and an average of 11,835 auto and 6,415 home policies -- more than five times the average per zip code in the Seventh District and two-and-a-half times the average in the Fourth.

The pattern is similar, if not as extreme, for Allstate. While the number of agents was greater in the Third District zip codes that the Second, and the average number of policies, both home in auto, was much closer.

However the non-Loop zip codes in the Seventh District had only Allstate eight agents, averaging just 1,325 auto and 1,799 home policies. In the Fourth District, there were six agents and an average of 2,417 auto and 2,677 home policies.

By contrast, in the Fifth District there were 42 agents and an average of 3,924 auto policies and 3,659 home policies -- more than twice the average in the Seventh and more than 50% greater than in the Fourth.

- 13 -

**TABLE II -- STATE FARM POLICIES BY CONGRESSIONAL DISTRICT IN CHICAGO**

**AUTO/1991**

| Cong. District | Zip Codes in District* | Total Policies | Average Pol./Zip | Listed Agents |
|---|---|---|---|---|
| 1 | 7 | 25,629 | 3,661 | 10 |
| 2 | 4 | 15,067 | 3,767 | 4 |
| 3 | 4 | 47,065 | 11,766 | 25 |
| 4 | 5 | 19,825 | 3,965 | 8 |
| 5 | 6 | 71,008 | 11,835 | 56 |
| 7 | 6 downtown | 1,868 | 311 | 9 |
|  | 7 other | 14,290 | 2,041 | 6 |
| 9 | 8 | 51,730 | 6,466 | 28 |

**HOME/1991**

| Cong. District | Zip Codes in District* | Total Policies | Average Pol./Zip | Listed Agents |
|---|---|---|---|---|
| 1 | 7 | 12,487 | 1,784 | 10 |
| 2 | 4 | 9,863 | 2,466 | 4 |
| 3 | 4 | 24,044 | 6,011 | 25 |
| 4 | 5 | 12,801 | 2,560 | 8 |
| 5 | 6 | 38,491 | 6,415 | 56 |
| 7 | 6 downtown | 1,470 | 245 | 9 |
|  | 7 other | 10,688 | 1,527 | 6 |
| 9 | 8 | 27,212 | 3,402 | 28 |

* Includes zip codes only wholly or predominantly in a congressional district; does not include partial zip codes.

- 14 -

TABLE III -- ALLSTATE POLICIES BY CONGRESSIONAL DISTRICT IN CHICAGO

AUTO (Liability)/1992

| Cong. District | Zip Codes in District* | Total Policies | Average Pol./Zip | Listed Agents |
|---|---|---|---|---|
| 1 | 7 | 20,221 | 2,889 | 14 |
| 2 | 4 | 17,130 | 4,282 | 10 |
| 3 | 4 | 20,028 | 5,007 | 36 |
| 4 | 5 | 12,085 | 2,417 | 6 |
| 5 | 6 | 23,546 | 3,924 | 42 |
| 7 | 6 downtown | 770 | 128 | 20 |
|   | 7 other | 9,278 | 1,325 | 8 |
| 9 | 8 | 15,240 | 1,905 | 35 |

HOME (Homeowners & Renters)/1992

| Cong. District | Zip Codes in District* | Total Policies | Average Pol./Zip | Listed Agents |
|---|---|---|---|---|
| 1 | 7 | 21,405 | 3,058 | 14 |
| 2 | 4 | 17,170 | 4,292 | 10 |
| 3 | 4 | 16,588 | 4,147 | 36 |
| 4 | 5 | 13,387 | 2,677 | 6 |
| 5 | 6 | 21,952 | 3,659 | 42 |
| 7 | 6 downtown | 853 | 142 | 20 |
|   | 7 other | 12,595 | 1,799 | 8 |
| 9 | 8 | 16,482 | 2,060 | 35 |

* Includes zip codes only wholly or predominantly in a congressional district; does not include partial zip codes.

- 15 -

As with the community area data, the congressional district analyses demonstrate the same pattern of uneven distribution of agents and policies, which largely reflect the racial and income make-up of those districts.

**A Concluding Note**

Only with policy information by census tract could a more precise correlation between agents, policies, race and income be possible. However the zip code data presented to the Subcommittee does provide a clear picture of the disproportionate concentration of policies in predominantly white and middle-income northwest and southwest side communities and a corresponding lack of those policies in communities on the west and south side that are predominantly black or hispanic. And that disproportionate distribution closely reflects the office locations of State Farm and Allstate agents.

**NOTES**

(1) Quoted from correspondence to Representative Cardiss Collins, Chair of the Subcommittee on Commerce, Consumer Protection and Competitiveness, U.S. House of Representatives from Cranford A. Ingham, Vice-President and General Counsel, State Farm Mutual Automobile Insurance Company, dated March 30, 1993.

(2) Quoted from correspondence to Representative Cardiss Collins, Chair of the Subcommittee on Commerce, Consumer Protection and Competitiveness, U.S. House of Representatives from Allstate Insurance Company, March, 1993.

(3) State Farm, op cit.

(4) Allstate, op cit.

All data subsequently cited on agent locations, automobile and home insurance policies by zip codes from information provided to the Subcommittee in these correspondences. Data in Appendix B on community areas from the Census Bureau, U.S. Department of Commerce.

* * *

APPENDIX A -- Agents and Policies by Zip Code

STATE FARM (auto/1991)

| Zip Codes with 0 to 1 Agents | | Zip Codes with 2 to 4 Agents | | Zip Codes with 5 or More Agents | |
|---|---|---|---|---|---|
| Zip | Policies | Zip | Policies | Zip | Policies |
| 60607 | 1105 | 60609 | 3942 | 60614 | 9013 |
| 60608 | 4076 | 60610 | 3506 | 60617 | 10303 |
| 60612 | 1016 | 60611 | 2587 | 60618 | 11001 |
| 60620 | 5899 | 60613 | 5565 | 60625 | 9203 |
| 60621 | 1026 | 60615 | 3303 | 60629 | 13739 |
| 60622 | 3818 | 60616 | 3861 | 60630 | 11809 |
| 60624 | 1017 | 60619 | 4614 | 60631 | 7175 |
| 60627 | 2148 | 60623 | 3240 | 60634 | 18925 |
| 60633 | 2669 | 60626 | 4000 | 60638 | 14171 |
| 60636 | 1829 | 60628 | 5191 | 60639 | 7258 |
| 60637 | 2516 | 60632 | 9386 | 60641 | 10398 |
| 60642 | 5184 | 60635 | 9021 | 60646 | 9417 |
| 60644 | 1961 | 60640 | 5563 | 60652 | 9769 |
| 60648 | 8410 | 60643 | 7808 | 60659 | 5322 |
| 60649 | 2033 | 60645 | 7322 | | |
| 6065: | 3098 | 60647 | 4749 | (14) | 147,503 |
| 60653 | 436 | 60655 | 7543 | | |
| 60657 | 7430 | 60656 | 11660 | Average: 10,536 | |
| 60658 | 4529 | 60660 | 4278 | | |
| (19) | 60,200 | (19) | 107,139 | | |
| Average: 3,168 | | Average: 5,639 | | | |

APPENDIX A/2

**ALLSTATE (auto liability/1992)**

| Zip Codes with 0 to 1 Agents | | Zip Codes with 2 to 4 Agents | | Zip Codes with 5 or More Agents | |
|---|---|---|---|---|---|
| Zip | Policies | Zip | Policies | Zip | Policies |
| 60608 | 2196 | 60607 | 417 | 60610 | 1246 |
| 60609 | 2150 | 60613 | 2576 | 60614 | 3049 |
| 60611 | 890 | 60616 | 2074 | 60618 | 5642 |
| 60612 | 824 | 60617 | 6607 | 60620 | 7456 |
| 60615 | 2297 | 60619 | 8701 | 60629 | 6702 |
| 60621 | 1988 | 60625 | 3576 | 60631 | 2285 |
| 60622 | 1569 | 60628 | 7082 | 60632 | 4773 |
| 60623 | 2414 | 60630 | 4542 | 60634 | 5421 |
| 60624 | 1536 | 60633 | 626 | 60635 | 1430 |
| 60626 | 1513 | 60638 | 4828 | 60639 | 3699 |
| 60627 | 181 | 60640 | 2154 | 60641 | 4622 |
| 60636 | 2411 | 60645 | 2341 | 60643 | 4469 |
| 60637 | 2321 | 60647 | 3756 | 60646 | 2406 |
| 60642 | 211 | 60649 | 3038 | 60652 | 3729 |
| 60644 | 2060 | 60657 | 3081 | 60655 | 2670 |
| 60648 | 206 | 60660 | 1706 | 60656 | 2306 |
| 60651 | 2305 | | | 60659 | 2053 |
| 60653 | 976 | (16) | 57,159 | | |
| (18) | 28,048 | | | (17) | 63,958 |
| | | Average: 3,572 | | | |
| Average: 1,558 | | | | Average: 3,762 | |

004115





APPENDIX C -- Chicago Agents and Policies by Congressional District

### State Farm (1991)

FIRST DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60615 | 2 | 3303 | 1608 |
| 60619 | 4 | 4614 | 2382 |
| 60637 | 0 | 2516 | 1102 |
| 60642 | 0 | 5184 | 2554 |
| 60649 | 1 | 2033 | 1094 |
| 60653 | 0 | 436 | 153 |
| 60655 | 3 | 7543 | 3594 |
| TOTAL | 1.1 | 25629 | 12487 |
| Av./Zip | | 3661 | 1784 |

SECOND DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60620 | 1 | 5899 | 3662 |
| 60627 | 0 | 2148 | 1134 |
| 60628 | 2 | 5191 | 3757 |
| 60636 | 1 | 1829 | 1310 |
| TOTAL | 4 | 15067 | 9863 |
| Av./Zip | 1 | 3767 | 2466 |

THIRD DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60629 | 7 | 13739 | 7639 |
| 60632 | 4 | 9386 | 5230 |
| 60638 | 5 | 14171 | 6399 |
| 60652 | 9 | 9769 | 4776 |
| TOTAL | 25 | 47065 | 24044 |
| Av./Zip | 6.2 | 11766 | 6011 |

APPENDIX C/2

FOURTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60608 | 1 | 4076 | 2192 |
| 60609 | 3 | 3942 | 2356 |
| 60622 | 0 | 3818 | 2026 |
| 60623 | 2 | 3240 | 2640 |
| 60647 | 2 | 4749 | 3587 |
| TOTAL | 8 | 19825 | 12801 |
| Av./Zip | 1.6 | 3965 | 2560 |

FIFTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60614 | 5 | 9013 | 7432 |
| 60625 | 6 | 9203 | 4247 |
| 60630 | 12 | 11809 | 6144 |
| 60634 | 20 | 18925 | 9577 |
| 60641 | 10 | 10398 | 5459 |
| 60656 | 3 | 11660 | 5632 |
| TOTAL | 56 | 71008 | 38491 |
| Av./Zip | 9.3 | 11835 | 6415 |

SEVENTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60601-06 | 9 | 1868 | 1470 |
| 60607 | 0 | 1105 | 705 |
| 60610 | 2 | 3506 | 951 |
| 60611 | 3 | 2587 | 1266 |
| 60612 | 0 | 1016 | 563 |
| 60624 | 0 | 1017 | 478 |
| 60644 | 1 | 1961 | 904 |
| 60651 | 0 | 3098 | 2521 |
| TOTAL (non-Loop) | 6 | 14290 | 10688 |
| Av./Zip (non-Loop) | 0.9 | 2041 | 1527 |

004119

APPENDIX C/3

NINTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60613 | 2 | 5565 | 3596 |
| 60626 | 3 | 4000 | 2407 |
| 60631 | 6 | 7175 | 3603 |
| 60640 | 2 | 5563 | 2589 |
| 60645 | 3 | 7322 | 3945 |
| 60646 | 10 | 9417 | 4558 |
| 60648 | 0 | 8410 | 4033 |
| 60660 | 2 | 4278 | 2481 |
| TOTAL | 28 | 51730 | 27212 |
| Av./Zip | 3.5 | 6466 | 3402 |

APPENDIX C/4

<u>Allstate (1992)</u>

FIRST DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60615 | 1 | 2297 | 3929 |
| 60619 | 3 | 8701 | 8064 |
| 60637 | 0 | 2391 | 2297 |
| 60642 | 0 | 211 | 1432 |
| 60649 | 3 | 3038 | 2933 |
| 60653 | 0 | 976 | 655 |
| 60655 | 7 | 2607 | 2095 |
| TOTAL | 14 | 20221 | 21405 |
| Av./Zip | 2 | 2889 | 3058 |

SECOND DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60620 | 7 | 7456 | 6219 |
| 60627 | 0 | 181 | 1080 |
| 60628 | 2 | 7082 | 6743 |
| 60636 | 1 | 2411 | 3128 |
| TOTAL | 10 | 17130 | 17170 |
| Av./Zip | 2.5 | 4282 | 4292 |

THIRD DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60629 | 8 | 6702 | 6272 |
| 60632 | 8 | 4773 | 3893 |
| 60638 | 4 | 4824 | 3633 |
| 60652 | 16 | 3729 | 2790 |
| TOTAL | 36 | 20028 | 16588 |
| Av./Zip | 9 | 5007 | 4147 |

APPENDIX C/5

FOURTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60608 | 2 | 2196 | 2773 |
| 60609 | 0 | 2150 | 2441 |
| 60622 | 1 | 1569 | 1916 |
| 60623 | 0 | 2414 | 2733 |
| 60647 | 3 | 3756 | 3524 |
| TOTAL | 6 | 12085 | 13387 |
| Av./Zip | 1.2 | 2417 | 2677 |

FIFTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60614 | 9 | 3049 | 4264 |
| 60625 | 2 | 3576 | 3448 |
| 60630 | 3 | 4542 | 3188 |
| 60634 | 13 | 5451 | 4742 |
| 60641 | 10 | 4622 | 3442 |
| 60656 | 5 | 2306 | 2868 |
| TOTAL | 42 | 23546 | 21952 |
| Av./Zip | 7 | 3924 | 3659 |

SEVENTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60601-06 | 20 | 770 | 853 |
| 60607 | 2 | 417 | 395 |
| 60610 | 5 | 1246 | 2047 |
| 60611 | 1 | 890 | 1476 |
| 60612 | 0 | 824 | 480 |
| 60624 | 0 | 1536 | 1604 |
| 60644 | 0 | 2060 | 2454 |
| 60651 | 0 | 2305 | 4141 |
| TOTAL (non-Loop) | 8 | 9278 | 12595 |
| Av./Zip (non-Loop) | 1.1 | 1325 | 1799 |

APPENDIX C/6

NINTH DISTRICT

| Zip Code | Agents | Auto Policies | Home Policies |
|----------|--------|---------------|---------------|
| 60613 | 4 | 2576 | 2877 |
| 60626 | 1 | 1513 | 1427 |
| 60631 | 14 | 2285 | 2432 |
| 60640 | 5 | 2153 | 2131 |
| 60645 | 2 | 2341 | 2499 |
| 60646 | 7 | 2406 | 2402 |
| 60648 | 0 | 206 | 1056 |
| 60660 | 2 | 1760 | 1658 |
| TOTAL | 35 | 15240 | 16482 |
| Av./Zip | 4.4 | 1905 | 2060 |

321

Mrs. COLLINS. Thank you.
Ms. Petty.

## STATEMENT OF LILLY PETTY

Ms. PETTY. Good morning. My name is Lilly Petty. I am an ACORN member—ACORN, Association of Community Organizations for Reform Now.

First, I would just like to say I want to thank Congresswoman Collins and the subcommittee for allowing me this opportunity to testify before you today. I am a little nervous, so just excuse me.

Mrs. COLLINS. That is all right.

Ms. PETTY. My story is, the way I had started into this campaign, I just recently had purchased a home through ACORN's lending program. I had such a hard fight to get this started. So, when I did get my home, then I had a hard time, because, you know, you cannot get a house without home mortgage insurance. So, after I got my house, I had to search around to get insurance which I could afford. Where I found my insurance was through Allstate. I found that Allstate, to me, it is like a bait and switch situation. They bait you in, and then, once they get you in, they switch you for something else.

I called a whole lot of agencies to try to get the right price, and they were all so high. So, then I finally got one Allstate agency and they quoted me a good price, so I got that policy and I was happy; but, a month later after I had the insurance policy, then they tell me that it was a mistake, I could not get the policy for that amount. I would have to send them like $276 more in order to maintain my insurance. They only give you like a week or so to come up with that money. Well, me, I had already scraped all of the money that I could get just to put down on my house in order to get the closing, and it is hard for me to come up with $200 and some just like that.

Originally, I think that what Allstate should do is they should quote you up front how much your policy is before, so you will know where you stand and where to go. I could have looked somewhere else for a cheaper policy, but I settled for that.

So, after that, I contacted our ACORN office and they told me that we would do a study on insurance to see if they were redlining, because they said that most of the people that they knew, they did not pay that much for homeowner's insurance anyway. So, we got into a study, and we did test calls. We had come to find out that a lot of our members—other people had increases in their insurance. Some were canceled because of abandoned buildings, and some had canceled once they filed their first claim, and some did not even get policies at all. Over 50 percent of our people in our communities do not even have insurance policies.

We did some test calls. In the test calls, we showed that they would not give insurance in the neighborhoods. Some refused to give us quotes. When we did get prices, they varied so much, from agent to agent, there is no way of telling that the individual agent is racist, or that the company as a whole is racist. The company will not release their rate manuals or underwriting standards.

That is why this legislation is so important, because companies will have to release their underwriting standards, so we can really

004124

tell what is going on. We need the disclosure by census tract, race and sex, which is also needed, just like with the banks. Not until Homley required similar disclosure, could we really show what was going on with the banks. Only then did the Federal Government start enforcing CRA.

ACORN released a study in February—the first comprehensive national study on insurance redlining. Here in Chicago, over 49 percent of single family units were without insurance. On the average, callers from low-income neighborhoods were quoted 3.7 times higher than those quoted to callers from upper income neighborhoods. Low-income callers were refused replacement value of policies 62 percent of the time. People from low-income neighborhoods are paying more insurance and getting less.

Days after releasing the study we went to Washington to lobby on the issue. By the time that we got there, Congresswoman Cardiss Collins had already met with our legislative staff and drafted the legislation.

On June 19th, we will be holding our first ever National Insurance Summit. We asked them—because we know the legislation was just part of the solution—just like we had to take the bankers around the neighborhoods to show them what they did, we will do the same with the insurance companies.

Insurance redlining really hurts our neighborhoods. For years they have taken out of our neighborhoods, and now they have to give something back. It was not too much of a risk to lend in our neighborhood, and our lending program not only got people's homes, but profits for the bank.

We will introduce our Neighborhood and Home Safety Program, which reduces crime, theft, fire and vandalism—a way for us to bring them business, so people have taken precaution and organize to reduce risk in their home and their community. So, what we will be doing—we will be holding this insurance summit, and we will have insurance companies from all around the country to come in and we will introduce to them this Home Safety Program that ACORN has put together. This is to lower the risk of the insurance companies, so that they will be able to make money. Because they say that we have taken money out—that we are high risk. But, if you just look around at our communities, and you look at all of the abandoned buildings, and the vacant lots in our buildings, they cannot say that we are high-risk, because most of those people, if they had had insurance in the first place, we would not have all of these abandoned buildings in our neighborhoods. So, we are not the high-risk.

All we are asking is that we want the insurance company—we want to just be able to live. We want for the future. We do not want to see this happen for our children—the abandoned buildings and all around and for our kids—when they come up they cannot even get insurance. At the rate they are going, it is skyrocketing. After a while, no one will be able to afford a home like myself. I thank you so much.

[Testimony resumes on p. 347.]

[The prepared statement and attachments of Ms. Petty follow:]

**STATEMENT OF LILLY PETTY, BOARD MEMBER, ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW (ACORN)**

Good Morning, Madame Chairwoman, and members of the Subcommittee. I am Lilly Petty, a Board Member of Illinois ACORN. I appreciate the opportunity to testify before you today on the important subject of insurance redlining.

ACORN began our campaign to end insurance redlining here in Chicago. Last year ACORN Housing Corporation found that rehabilitating houses for low-income families was made difficult by the sky-high cost of insurance. And then, in the space of two months, dozens of ACORN members reported having their policies canceled, or their premiums doubled or tripled.

I obtained a home through the ACORN Housing Corporation. They helped me with my application, and figured out exactly how much I could afford to pay for my house. I then shopped around for the best homeowners insurance, and finally wound up signing a policy with Allstate, which had the best price. One month after getting the policy, I was not only informed that my premiums were dramatically increased, but that I had to pay back payments for the previous month! I found this outrageous, and was even more shocked when I found out I was not the only one Allstate did this to. When I heard that ACORN was examining claims of redlining across the country, I was determined to be active in the study.

In early February, ACORN released a study of insurance redlining in fourteen cities. The study revealed severe problems in the extent, quality, and price of coverage in low-income and minority communities.

**"A Policy of Discrimination"**

The results of our study were alarming. The four principal findings of our study were that:

*Low-income and minority areas were significantly under insured by the conventional and residual markets -- by as much as 48% in Chicago, for example. And, minority areas were underinsured compared to white areas of comparable income.

*A wide range of obstacles were used by agents to avoid doing business in low-income and minority areas. Testers from these neighborhoods were not even offered quotes on policies in 38% of the tests conducted. Testers were often simply told that: "we don't write policies in that neighborhood", or that "we don't cover houses worth less than a certain value."

*On average, in Chicago, callers from low-income areas were quoted rates 3.7 times higher, per thousand dollars of coverage, than were testers from upper income areas.

*The policies that were offered and written in low-income and minority areas were often of a substandard quality. Residents of

324

these neighborhoods were more likely to be offered FAIR plans, or offered limited market-value coverage. In Chicago, callers were refused quotes on premium policies in 62% of the cases.

I have attached a copy of the executive summary of this study for the record, along with the statistical and phone survey results for Chicago.

Various studies by academics and the government have found patterns similar to those revealed in the ACORN study. They have demonstrated that there is a major problem of insurance availability and affordability in minority and low-income areas. For example, the Missouri Department of Insurance recently reexamined some of the data ACORN looked at in St. Louis, and found that low-income minority areas were not only paying more for insurance than low-income white neighborhoods, but that they actually experienced less losses.

The California Department of Insurance also undertook similar analyses, and found very similar results. As Commissioner Garamendi himself testified, "There is almost a direct relationship between the affluent areas and the areas with a higher percentage of policies... redlining exists in California -- particularly in Los Angeles."

**FAIR plans - the Last Federal Involvement in Insurance**

As you can see, twenty five years since the Hughes Presidential Commission identified insurance availability as a central obstacle to urban economic development, insurance redlining remains a widespread problem in low-income and minority communities.

After studies and hearings by the Hughes panel in the 1960's, FAIR (Fair Access to Insurance Requirement) plans were created to solve some of the problems. These were basically shared risk pools for high risk policy-holders. They were supported by the industry, in exchange for federal riot reinsurance benefits.

FAIR plans still exist in most states, although they are usually more expensive and offer substandard levels of coverage. And when confronted with claims of redlining, insurers often simply point to the existence of the FAIR plans as the remedy.

Unfortunately, FAIR plans did not solve the problem. Numerous studies have argued that FAIR plans have in fact become "dumping" grounds for whole neighborhoods. A study conducted in New York showed that individuals were more likely to be placed on the FAIR plan if they were African-American than if they had a building code violation. Illinois has recognized this problem and instituted a FAIR plan depopulation program, which has been moderately successful, though FAIR plan dumping still seems to be

occurring.  According to ACORN's study 88.1% of the FAIR plans written in Chicago were written in minority areas.

The heart of the problem, however, lies in the conventional market and with the practices of insurance companies, which have resisted change for over 25 years.

**Modes of Redlining**

Insurance Redlining is both blatant and subtle.  Despite state "anti-redlining" statutes, an insurer can still usually refuse to insure someone based on the area in which they live.

In evidence from a lawsuit against a Milwaukee insurer on behalf of the NAACP, an agent was instructed by an insurer to "get away from the blacks" and sell good solid premium paying white people."

In California, which recently passed laws requiring insurers to cover any applicant with a good driving records, agents for one insurer were instructed to discourage these applicants if they were from the wrong side of town, and even to lose their applications if they persisted.

An insurer can also redline by offering outrageous rates, that is, offer an unreasonable quote that is well beyond the ability of a policy-seeker to afford.  Even the state approved rates, however, are not always legitimate, as the Missouri study showed.

Finally, an insurer can use underwriting criteria that clearly redline whole areas or classes of people.  For example, if a company refuses to insure based on the age or value of a dwelling, that may have the effect of excluding all the minority neighborhoods  in a city.  A study by the Toledo Fair Housing Alliance found that refusing to cover houses with a market value under $30,000 had an adverse effect on 78% of the African-American community, 74% of the Hispanic community and 30% of the Caucasian community in the city of Toledo.

While some people who are redlined out of the conventional or residual market may remain without insurance, others turn to "scavenger" companies, or surplus line carriers.  When the time comes for a big claim, these companies may turn out to be nothing more than a P.O. box --and leave the policy holder high and dry.

**Redlining - The Cost to Communities**

Insurance redlining has a devastating cost for individuals, neighborhoods, and society.

The development of thriving neighborhoods with expanding opportunities for homeownership and new jobs hinges on the availability of credit and insurance.  Mortgage lenders will not

326

make loans without insurance -- no insurance means no home. And to a low-income person who works hard to buy a home, high insurance rates can be the final obstacle to a mortgage.

And an inner-city small business cannot hope to compete with its suburban counterparts if its insurance costs twice as much. Without adequate and competitive insurance, enterprise zones alone will not lead to increased job opportunities in our communities.

The recent riots in Los Angeles demonstrate the fragility of a community without insurance. It is estimated that up to 50% of minority owned business in L.A. were uninsured, and that 40% of small business in L.A. will not be reopening because of lack of insurance. And while insurers claim losses exceeding $700 million in L.A., actual estimates of damage could exceed $2 billion. In contrast, catastrophes in Santa Barbara and Oakland incurred between $1.4 billion and $2 billion in *claim*, although they affected much smaller territories.

**ACORN Neighborhood Safety Program**

Community groups have an obligation to contribute to the solution of these problems. ACORN is trying to work directly with insurance companies to underwrite risk fairly, and to educate consumers. ACORN hopes to develop a Neighborhood Safety Program, to reduce risk in our neighborhoods, and thereby to improve the affordability of insurance in our communities.

However, preliminary negotiations have already shown the industry to be reluctant to offer discounts for these types of programs. These negotiations have also been hampered by a lack of consensus on the exact nature and extent of the problems of availability and affordability in obtaining homeowners coverage. I have enclosed a copy of an article from the leading trade press, <u>The National Underwriter</u>, about our negotiations with Allstate here in Chicago, as well as a description of the ACORN Neighborhood Safety Program.

**The Disclosure in Insurance Redlining Act - H.R. 1188**

Despite the numerous studies and testimony, insurers still deny the allegations of redlining, and claim that any discrepancies in price, coverage and quality of insurance is due to legitimate risk analysis.

Unfortunately, most state regulators do not have the necessary facilities or staff to investigate these claims. State regulators primary role is to insure the companies' solvency, and few have enough staff able to evaluate the fairness of their rates. A recent study by the Professional Insurance Agents and the Consumers Insurance Interest Group (PIA/CIIG) revealed that on average, states have less than 3.5 full time actuaries on their staff -- the individuals charged with assessing risk and

evaluating company rate filings -- while New York alone had 50 of these. Many states have one or no full time actuaries on their staff.

This means that many states are unable to deal with the incredible flow of rate filings submitted by the industry. These requests for rate increases and changes may be over 1000 pages long, and a department receives thousands of these a year. If the insurers risk analysis is faulty or based on prejudice, it is unlikely that the insurance department would ever find out.

Federally disclosed information would therefore allow community groups, the federal government and even industry groups to independently analyze essential data which states do not collect or are unable to evaluate. Such data would not only allow us the first glimpse at conclusive numbers on how severe the insurance crisis in our cities is, but would also allow us to look at how race and income levels affect these problems. And it is probable that this data would simply embarrass many insurers into making improvements in insuring low-income areas.

Your legislation is both modest and reasonable -- in fact, most of the data required is already collected by the companies for their own use. I would, however, like to go over some of the provisions in your act which we view as essential if this data is to remain useful.

As the conceptually similar Home Mortgage Disclosure Act (HMDA) has shown, for such data to be useful, it must be collected both on a census tract basis, and, where possible, for the race of the policy holder. Currently, the few states requiring disclosure do so only on a zip code basis, which is just too big an area to allow for accurate analysis.

It is also important that companies data be disaggregated, so their individual practices can be examined.

It is also important that insurers make their underwriting criteria public, as required in your bill. When an applicant is refused coverage, they have no way of knowing if this was done for legitimate reasons, or if it was simply done out of prejudice. This is why it is also important to require written notification to refused applicants, listing not only the specific reasons for rejection, but what repairs of other actions may be taken for insurance to be provided.

It is also important that information on the race of the policy holder be disclosed, where appropriate. This information has also proven priceless in HMDA.

We strongly support the legislation that you have introduced, Madame Chairwoman. I can assure you that ACORN members around the country will continue to work to see it become the law of the land.

## A POLICY OF DISCRIMINATION?:
## HOMEOWNERS INSURANCE REDLINING IN 14 CITIES

### NATIONAL FINDINGS

#### Overview & Purpose

After the 1968 riots, the President's National Advisory Commission on Civil Disorders put the importance of insurance availability and affordability in context:

> "Insurance is essential to revitalize our cities. It is the cornerstone of credit. Without insurance, banks and other financial instiutions will not --cannot-- make loans. New housing cannot be constructed, and existing housing cannot be repaired. New businesses cannot be opened, and existing businesses cannot expand, or even survive. Without insurance, buildings are left to deteriorate; services, goods and jobs diminish. Efforts to rebuild our nation's inner-cities cannot move forward. <u>Communities without insurance are communities without hope.</u>"

At the prompting of the federal government, Fair Access to Insurance Requirement (FAIR) plans were established in most states in the 1970's to provide coverage for "high risk" individuals --in practice for whole neighborhoodsin which private companies would not write policies. Since that time, little research has been conducted to assess either the extent of insurance coverage, or the differential quality and pricing of policies, in neighborhoods of different racial and income compositions.

This study is the result of a three month project designed to assess whether there are disparities in the level, quality, and price of homeowners' insurance coverage based on the income and racial composition of neighborhoods. The study also examines disparate treatment of individuals by insurance agents seeking policies on homes in neighborhoods of different racial and income compositions.

The data is based on a detailed statistical analysis of policies written on a zip code basis in five cities where such data is publicly available for 1991: Chicago, IL; Kansas City, MO; Milwaukee, WI; Minneapolis-St. Paul, MN; and St. Louis, MO, as well as the results of extensive testing of independent and captive agents. Test calling was done in all those cities except Milwaukee, as well as: Bridgeport, CT; Dallas, TX; Washington, D.C.; Des Moines, IA; Detroit, MI; Little Rock, AR; New Orleans, LA; New York, NY; and Seattle, WA. [See Methodology]

#### Background

"Homeowners insurance" is a generic term used to refer to several different types of policies, the best of which cover full replacement cost, and other "HO-8" policies which cover only the market value of property and contents. Fire and extended policies offer coverage only for damage to the house itself by fire or other disasters.

The principal distinction in this study is between standard homeowners policies and inferior policies, which may include FAIR plans, fire and extended coverage, or market value coverage plans. The study does not include or discuss renters, condominium, or "contents only" policies.

**Findings**

**(1)** The level of coverage of occupied, single-family units in low-income and minority neighborhoods remains substantially below that of high-income and white neighborhoods, and units in minority neighborhoods are less likely to be covered than units in white neighborhoods of comparable income. For example:

*In Chicago, only 51.1% of occupied, single-family units in low-income neighborhoods, and only 57.6% in minority neighborhoods, were covered by any type of insurance, compared to 90.0% coverage in high-income and 87.7% coverage in white areas.

*In St. Louis, only 67.3% of occupied, single family units in low-income minority areas were covered, compared to 85.5% coverage in low-income white areas.

*In Kansas City, 79.0% of occupied, single-family units in low-income and 77.0% of minority areas, were insured compared to 96.0% in high-income and 96.2% in white areas. Only 77% of units in low-income minority neighborhoods were covered, compared to 90% in low-income white neighborhoods.

*In Milwaukee and Minneapolis-St. Paul, the total level of coverage in low-income and minority neighborhoods by the top 26 underwriters, respectively, was lower than that for high-income and white neighborhoods.

**(2)** A principal explanation of the lower level of coverage in low-income and minority neighborhoods is the array of obstacles presented by insurance agents to residents seeking policies in those neighborhoods. For the 13 cities in which testing was undertaken:

*In high-income urban and suburban neighborhoods, callers were refused a quote over the phone only 8% and 6% of the time, respectively, compared to 38% for callers from low-income neighborhoods. When callers from low-income areas were persistent, they were usually unsuccessful in getting quotes, even on the second try. Agents who offered explanations usually mentioned negative characteristics of the neighborhood or excessively low property values, and some specified minimum property values below which they would not write insurance.

*Agents conditioned approval of the policies on inspections of the property 65% of the time in low-income neighborhoods, 27% of the time in high-income urban neighborhoods, and 9% of the time in high-income suburban areas.

*Callers from low-income neighborhoods felt that their agent was eager to sell them a policy of any kind only 14% of the time, compared to 55% of the time in upper-income urban areas, and 76% of the time in upper-income suburban areas.

**(3)** The quality of policies offered in low-income and minority areas is substantially lower than in high-income and white areas. For example,

*In Milwaukee, 91.4% of all FAIR plans were written in low-income neighborhoods, though such neighborhoods have only 27.5% of the area's single-family housing stock. By contrast, only 0.1% of FAIR plans were written in high-income areas, which contain 6.4% of the single-family housing stock. FAIR policies in Wisconsin offer only market value homeowners coverage or fire and extended coverage.

*In St. Louis, 71.7% of HO-8 policies were written in low-income areas, though such areas accounted for only 27.7% of the occupied, single-family housing stock. 32.9% of HO-8 policies were written in minority areas, though such areas contain only 10.0% of the occupied,

330

single-family housing stock.

*Nationally, substandard policies were offered instead of standard homeowners insurance to test callers from low-income neighborhoods 38% of the time, 14% of the time in high-income urban areas, and not at all in suburban areas. The substandard policies in most cases covered only market value, rather than replacement cost. These policies also tended to have lower contents coverage and higher rates. It appears that agents offered these policies automatically to homes in low-income neighborhoods, or neighborhoods with low property values.

*In Detroit, <u>every</u> caller seeking a quote on property in the city limits --from both high-income and low-income areas-- was refused a standard plan and referred to the FAIR plan, while no callers from suburban areas were refused a standard plan.

(4) The price of policies offered and written was significantly higher in low-income and minority areas than in high-income and white areas. For example:

*Nationally, in every city the premiums quoted to test callers were at a higher rate per thousand dollars of building coverage in the lower-income neighborhoods than high-income areas. The national averages were $10.41 per thousand in low-income areas, $5.25 per thousand in upper income, urban areas, and $3.79 per thousand in upper-income suburbs.

*In St. Louis and Kansas City, the only cities where data was available on price, policy holders in low-income and minority areas paid roughly twice the amount in premiums as did policy holders in high-income and white areas, relative to the median value of the houses in the areas. A significant price disparity remained when comparing neighborhoods of the same income, but different racial composition.

(5) Cancellations, Non-renewals and Rejections

*In Chicago and Milwaukee, policy holders in low-income neighborhoods were cancelled 13% and 38% more frequently than policy holders in high-income areas. In Minneapolis-St. Paul, policy holders in low-income areas were cancelled 78% more frequently than policy holders in middle-income neighborhoods.

*In Chicago and Milwaukee, policy holders in minority neighborhoods were cancelled 18%, and 58% more frequently than policy holders in white neighborhoods.

*In Chicago and Milwaukee, the non-renewal rate for policy holders in low-income neighborhoods was 95% and 67% higher, respectively than for policy holders in high-income neighborhoods.

*In Chicago and Milwaukee, the non-renewal rate for policy holders in minority areas was in both cases 157% higher than for policy holders in white areas.

*In Minneapolis-St. Paul, applicants for insurance on properties in low-income areas were rejected three times as often and applicants in predominantly minority areas were rejected more than three times as often as applicants from high-income and white areas.

# CHICAGO ZIP CODE ANALYSIS: FINDINGS

**Summary**

The analysis of 1991 data reported by all underwriters in Cook County, IL revealed that:

1. Residences in low-income and minority areas are underinsured, and that minority areas are underinsured relative to white areas of comparable income.

2. Policy holders in low-income and minority areas are more likely to have inferior forms of coverage than policy holders in high-income and white areas, and that policy holders in minority areas are more likely to have inferior plans than are policy holders in white neighborhoods of comparable income.

3. Policy holders in low-income and minority areas are more likely to be cancelled than policy holders in high-income or white neighborhoods, and that policy holders in minority areas are more likely to be cancelled than policy holders in white neighborhoods of comparable income. The disparities in cancellation rates are small but significant.

## (1) Level of Coverage, by Neighborhood Type

The FAIR plans created in the 1970's were supposed to ensure that homeowners insurance is available for all residences, albeit at a higher price or with lesser coverage. The industry has argued that since all individuals have access to some form of residential insurance, "redlining" does not exist. This study --while suggesting that redlining may also take the form of differential pricing and quality by race and income of neighborhood-- provides evidence that that low-income and minority areas continue to be underinsured, and that neither conventional nor FAIR policies are meeting existing insurance needs.

In order to arrive at an estimate of the level of coverage in neighborhoods of different demographic characteristics, the total number of homeowners, FAIR plan, and fire and extended policies written was divided by the number of occupied, single family residences. All occupied, single family residences --whether owner- or renter-occupied-- would have one of the three forms of coverage listed above. Policies written on multi-family properties are not separable, and therefore tend to inflate the overall level of coverage in all neighborhoods, but the overestimation of coverage is probably greater in low-income and minority areas.

The complete lack of any kind of coverage for thousands of properties in many neighborhoods suggests that "old fashioned" redlining is still a major problem.

### a. By Median Income of Neighborhood

In general, occupied, single-family units in high-income areas were 77% more likely to be covered by some form of residential insurance --homeowners, fire and extended, or FAIR plan-- than units in low-income residential neighborhoods.

Fully 49% of occupied, single-family units in low-income neighborhoods were altogether without coverage.

332

| INCOME | % SINGLE-FAMILY UNITS INSURED |
|---|---|
| Low-Income | 51.1% |
| Moderate-Income | 78.7% |
| Middle-Income | 92.6% |
| High Income | 90.5% |
| All Zip Codes | 74.6% |

### b. By Racial Composition of Neighborhood

In general, occupied, single-family units in white areas were 52% more likely to be covered by some form of residential insurance than units in minority areas. Fully 42% of units in minority areas were totally without any form of coverage.

| RACE | % SINGLE-FAMILY UNITS INSURED |
|---|---|
| Minority | 57.6% |
| Predominantly Min | 50.8% |
| Integrated | 74.0% |
| White | 87.7% |
| All Zip Codes | 74.6% |

### c. By Racial Composition & Median Income of Neighborhood

The racial disparity remains significant when comparing neighborhoods of comparable income, but different racial characteristics. For nearly every income category, residences in minority areas were less likely to be insured than were residences in white areas. And occupied, single family units in the one upper-income, predominantly minority zip code were less likely to be insured than residences in the low-income white areas. This suggests that racial composition of an area may independently affect the availability of insurance.

Single-family units in low-income, minority areas were 21% less likely to be covered by some form of residential insurance than units in comparable white neighborhoods.

| RACE (Low-Income) | % SINGLE-FAMILY UNITS INSURED |
|---|---|
| Minority | 46.7% |
| Predominantly Min | 50.4% |
| Integrated | 60.7% |
| White | 56.6% |
| All Low-Inc Zip Codes | 51.1% |

### (2) Quality of Coverage

The quality of coverage available for residences differed significantly based on the income and racial composition of the neighborhoods studied. One aspect of insurance redlining, then, is the lower quality of insurance available in low-income and minority areas.

The most desirable form of residential insurance is homeowners insurance, which generally covers the policy holder for fire, other external and most interior damage or theft. Homeowners policies generally cover the replacement cost of damaged or stolen items, rather than their market value. Less desirable are fire and extended policies, which only cover damage, by fire or other cause, but not contents or liability

Least desirable are FAIR plans, which offer less coverage than do conventional policies, and cost significantly more.

In order to measure the quality of coverage available to residents of different neighborhoods, the percent of FAIR plans written in an area of certain demographic charateristics is compared to the number of occupied, single-family units in that same area. If percent of all FAIR plans written is disproportionately higher in minority or low-income areas, this would tend to suggest that residents of those area receive lower-quality, higher-priced coverage than residents of high-income or white areas.

### a. By Median Income of Neighborhood

For FAIR plans, the contrast in marked. Fully 78.1% of FAIR plan policies were written in low-income neighborhoods, though such areas accounted for only 32.4% of the occupied, single-family housing stock in Cook county.

| INCOME | % All FAIR Plans Written | % 1-4 Family Units |
|---|---|---|
| Low | 78.1% | 32.4% |
| Moderate | 21.4% | 29.7% |
| Middle | 0.5% | 19.6% |
| High | 0.1% | 18.3% |

### b. By Racial Composition of Neighborhood

Fully 88.1% of all FAIR policies written were in minority neighborhoods, though minority neighborhoods account for only 26.8% of the occupied, single-family units. Only 1.9% of all FAIR plans written were in white neighborhoods, though 48.1% of the total occupied, single-family units are in such neighborhoods.

| RACE | % All FAIR Plans Written | % 1-4 Family Units |
|---|---|---|
| Minority | 88.1% | 26.8% |
| Predom Min | 6.4% | 6.6% |
| Integrated | 3.6% | 18.5% |
| White | 1.9% | 48.1% |

### c. By Racial Composition and Median Income of Neighborhood

Discrepancies in the quality of coverage by racial composition remained significant when comparing neighborhoods of similar income composition.

Disproportionate numbers of FAIR plans were written in low- and moderate-income minority neighborhoods, relative to the percent of occupied, single family housing in those neighborhoods. Fully 69.2% of all FAIR policies written were in low-income, minority areas, though such neighborhoods contain only 17.0% of the occupied, single-family units. By contrast, only 0.6% of the total FAIR policies were written in low-income, white neighborhoods, though

such neighborhoods contain fully 2.4% of the occupied units in Cook county.

| RACE (Mod-Inc) | % All FAIR Plans Written | % 1-4 Family Units |
|---|---|---|
| Minority | 18.8% | 9.4% |
| Predom Min | 0.0% | 0.1% |
| Integrated | 1.6% | 10.9% |
| White | 0.9% | 11.3% |

### (3) Cancellations and Non-Renewals of Policies, By Neighborhood Type

Few companies reported large numbers of cancellations for any neighborhood, and many reported none, suggesting that there may be problems with the data set.

However, there were small but consistent differences in the rate at which policy holders in low-income and minority neighborhoods were terminated, compared to policy holders high-income and white areas. Policy holders in minority areas were generally cancelled and non-renewed more frequently than policy holders in white neighborhoods of comparable income.

*Policy holders in low-income neighborhoods were 13% more likely to be cancelled than policy holders in high-income neighborhoods.

*Policy holders in minority neighborhoods were 18% more likely to be cancelled than policy holders in white neighborhoods.

*Policy holders in low-income, minority areas were 13% more likely to be cancelled than policy holders in low-income, white neighborhoods. Policy holders in moderate-income minority areas were 25% more likely to be cancelled than policy holders in moderate-income, white neighborhoods.

*The non-renewal rate for policy holders in low-income neighborhoods was 95% higher than for policy holders in high-income neighborhoods.

*The non-renewal rate for policy holders in minority neighborhoods was 157% higher than for policy holders in high-income neighborhoods.

## Chicago, Il

| Income as % of AMI | Race % Minority | Total Coverage /1-4 Family units | Of all FAR, % written In area | % of All 1-4 Family units In area | % Cancel. | % non-renew. |
|---|---|---|---|---|---|---|
| Total | | 74.64% | 100.00% | 100.00% | 2.06% | 0.63% |
| <80% | >75% | 46.68% | 69.23% | 16.95% | 2.22% | 1.10% |
| <80% | 50-75% | 50.39% | 6.43% | 6.14% | 2.21% | 0.80% |
| <80% | 25-50% | 60.74% | 1.86% | 6.95% | 2.09% | 0.62% |
| <80% | <25% | 56.62% | 0.56% | 2.39% | 1.97% | 0.61% |
| 80-100% | >75% | 75.40% | 18.81% | 9.42% | 2.46% | 1.31% |
| 80-100% | 50-75% | 75.10% | 0.00% | 0.08% | 1.68% | 0.39% |
| 80-100% | 25-50% | 80.15% | 1.64% | 8.93% | 2.08% | 0.58% |
| 80-100% | <25% | 80.34% | 0.90% | 11.27% | 1.97% | 0.49% |
| 100-120% | >75% | 96.92% | 0.04% | 0.44% | 2.47% | 0.81% |
| 100-120% | 25-50% | 85.17% | 0.07% | 1.91% | 2.03% | 0.55% |
| 100-120% | <25% | 93.26% | 0.38% | 17.25% | 2.02% | 0.43% |
| >120% | 50-75% | 51.81% | 0.00% | 0.37% | 1.63% | 0.41% |
| >120% | 25-50% | 96.05% | 0.00% | 0.69% | 1.83% | 0.62% |
| >120% | <25% | 91.15% | 0.06% | 17.21% | 1.90% | 0.42% |
| <80% | Income | 51.12% | 78.08% | 32.43% | 2.15% | 0.64% |
| 80-100% | Income | 78.70% | 21.36% | 29.70% | 2.13% | 0.72% |
| 100-120% | Only | 92.55% | 0.50% | 19.60% | 2.03% | 0.47% |
| >120% | | 90.54% | 0.06% | 18.27% | 1.90% | 0.43% |
| | >75% | 57.59% | 88.08% | 26.81% | 2.33% | 1.19% |
| Race | 50-75% | 50.77% | 6.43% | 6.59% | 2.16% | 0.78% |
| Only | 25-50% | 73.96% | 3.58% | 18.46% | 2.07% | 0.59% |
| | <25% | 87.66% | 1.91% | 48.12% | 1.97% | 0.46% |

ACORN

004138

336

## TEST CALL FINDINGS: Chicago

**Property Values**

The market values for homes selected in the Chicago metropolitan area averaged $45,000 in the low income urban neighborhoods, $150,000 in the upper income urban neighborhoods, and $155,000 in the upper income suburban neighborhoods.

**Willingness of Agents to Quote**

Chicago was the only city in the study in which callers were able to get every agent to quote a premium, regardless of neighborhood. In lower income urban neighborhoods, however, almost all of the agents made it clear that the policy could only be approved if an inspection showed minimal deterioration and modern electrical and plumbing systems. Many agents expressed doubt that properties in question would pass such inspections, and one agent mentioned that there would be a fee for the inspection.

**Type of Policy Offered**

In lower income urban neighborhoods agents refused to quote a premium for a standard or deluxe homeowners policy 62% of the time. Instead agents would offer policies that cover only the market value of the home. When pressed agents provided various reasons for refusing standard coverage. The most common reason was simply the neighborhood. But some agents mentioned property values below which these policies were not available - $75,000 and $55,000 were both mentioned most often. One agent said that the problem was that the house was frame construction.

In upper income neighborhoods both inside and outside the city limits every agent offered the standard or deluxe policy.

**Cost Per Thousand Dollars of Coverage**

The average rate for premiums quoted in low income urban areas was $9.51 per $1,000 of coverage on the property.

In upper income urban areas the rate was only $2.59, and in upper income suburban areas it was $2.60.

**Property Inspections**

Agents said that property inspections would be required 88% of the time in low income urban neighborhoods, 14% of the time in upper income urban neighborhoods, and 17% of the time in upper income suburban neighborhoods.

**Eagerness to Sell**

Callers were asked to judge whether the agent was eager to sell them a policy. In low income urban neighborhoods callers felt that the agent was eager to do business only 19% of the time. This figure rose to 79% in higher income urban neighborhoods and 100% in higher income suburbs.

# CHICAGO

| | N'hood* | Calls Refused Quote | Quotes Refused Stndrd Policy | Calls Refused Stndrd Policy | Rate Dollars per thsnd | Inspctn Rqurd | Agent Eager to Sell |
|---|---|---|---|---|---|---|---|
| Chicago | A | 0% | 62% | 62% | 9.51 | 88% | 19% |
| Chicago | B | 0% | 0% | 0% | 2.59 | 14% | 79% |
| Chicago | C | 0% | 0% | 0% | 2.6 | 17% | 100% |

* Neighborhood A is low income urban
Neighborhood B is higher income urban
Neighborhood C is higher income suburban



### OBSTACLES TO OBTAINING HOMEOWNERS INSURANCE

**CHICAGO**

- Property Inspection Required
- Substandard Policy Only Offered
- Refusal to Quote Premium

88%

62%

14%    17%

low income minority urban areas | upper income white urban areas | upper income white suburban areas



### Average Rates Quoted
(per $1000 coverage)

**CHICAGO**

$9.51     $2.59     $2.60

$10.00
$8.00
$6.00
$4.00
$2.00
$0.00

low income minority urban areas47 | upper income white urban areas | upper income white suburban areas



# ACORN
## NEIGHBORHOOD AND HOME
## SAFETY PROGRAM

*The Community-based Solution to Insurance Redlining, Crime, and Fire
In Low and Moderate Income Neighborhoods*

- *NEIGHBORHOOD ORGANIZATION*

- *COMMUNITY POLICING*

- *SAFETY SEMINARS*

- *HOME SAFETY AUDITS*

- *PROPERTY MARKING*

- *SAFETY DEVICES*

This document is a draft overview of ACORN's plan to make homeowners insurance affordable and accessible in low and moderate income neighborhoods through community-based crime and fire prevention.

This program will succeed only with the active support and involvement of elected state and local officials, insurance regulators, police departments, fire departments, manufacturers of home safety products, and, most importantly, leaders of the insurance industry.

**For More Information Contact
Association of Community Organizations for Reform Now**

The ACORN Neighborhood and Home Safety Program will be the first national program to be implemented in communities throughout the country bringing organized residents of low and moderate income neighborhoods together with the powerful insurance industry to attack crime and fire in a comprehensive way. Residents will participate in a six-part program to prevent crime and fire in their neighborhoods and in their homes. Insurance companies will provide residents with discounts on homeowners and renters insurance in recognition of the reduced losses that the program will bring about. The "risk management" expertise of the insurance industry, and the "crime prevention" expertise of neighborhood organizations will finally be shared in a national program driven by financial incentive for both sides.

Roger A. Litton, author of the British book "Crime and Crime Prevention for Insurance Practice" recognized the potential of a program such as this in 1982.

"The influence of an insurance company is potentially critical as it is probably the only agency in a position to offer a property owner financial incentives for crime prevention measures. There is substantial evidence that, when they do choose to act, insurers can functin to prevent crime or to change the type of crime which occurs (as witness the apparent displacement of burglaries from commercial to private properties in the 1960s). In fact, insurers are probably uniquely positioned to intervene effectively to influence crime prevention - given that the ability can be recognized and that the incentive can be appreciated and mobilized."

## WHAT IS RISK MANAGEMENT?

"Risk management" is a central component of the kinds of commercial insurance policies bought by large corporations. These policies are underwritten on a case-by-case basis and in order for the company to obtain a low premium they must have in place an effective risk management program to reduce the likelihood that claims will be filed. When insurance companies write personal lines of property/casualty insurance such as homeowners or auto insurance they cannot negotiate price individually with each customer based on that customer's risk management strategy. Instead, the insurance agents follow a set rate structure and abide by company underwriting guidelines, for the most part. Within that rate structure, however, discounts are provided for participation in certain pre-approved risk management programs. In this country that means smoke alarms, burglar alarms, and in some cases dead-bolt locks. Auto insurance discounts are provided to drivers who have completed approved defensive driving courses. Naturally, the discounts provided by insurance companies for participation in these programs, or utilization of these safety devices, provides a strong incentive for consumers to participate. The net effect is fewer accidents, burglaries, and fires. Insurance companies, therefore, hold one of the keys to safe neighborhoods: financial incentive.

## THE PROGRAM COMPONENTS

ACORN members developed the Neighborhood and Home Safety Program by reviewing the work that the organization has done in neighborhoods over the past twenty-three years and holding it up against the current literature on crime and fire prevention. What resulted was a program that strengthens both the ACORN organizing and the more conventional prevention work by integrating them into a single program. We believe that the whole is more effective than the sum of its parts, and that the program has the potential to bring insurance rates for urban households that participate in line with those of their counterparts in the suburbs.

## Part 1: Neighborhood Organization and Block Meetings

ACORN neighborhood organizations meet on a regular basis, elect officers and representatives to a city-wide ACORN board, and work on a variety of neighborhood problems identified by the membership. The neighborhood organizations generally comprise residents of an area that includes 1,500 - 2,500 households.

Block meetings are hosted by ACORN members within the neighborhood organization on a less frequent basis. At these meetings residents have an opportunity to meet each other and to discuss problems on their own blocks, such as abandoned houses, vacant lots, and crime problems. They also hear reports on what the larger neighborhood organization is doing.

**Each participant in the program will be part of an ACORN neighborhood organization and will host or attend at least one "block meeting" per year.** Block meetings will be led by local residents, but will have ACORN staff in attendance. The agenda for each meeting will include the following.
1. Update on neighborhood organization activities
2. Discussion of crime and other problems on the block
3. Agreement on plan to reduce crime and solve other problems on the block
4. Distribution of home safety literature

The plans agreed to at these block meeting will go beyond the conventional *neighborhood watch* strategy. Besides agreeing to report unusual activity, neighbors will develop strategies to ensure that vacant properties are secured, that tall weeds in vacant lots are mowed, and that street and alley lighting exists and is maintained. The role of ACORN staff at these meetings will be to provide information about proven methods of solving these problems elsewhere in the city. The activities carried out by these block groups will be reported back by the host to the full neighborhood organization.

*Justification for Discount* - As far as we know, no American insurance company has ever offered a discount for participation in any kind of neighborhood organization. In England, however, several companies offer discounts for participation in approved neighborhood watch programs.

In this country numerous studies have shown that neighborhood watch programs have reduced burglaries and other crime between 20% and 60%. There is additional academic research arguing that the most effective neighborhood watch programs are those that are part of multi-issue community organizations, such as ACORN. Since the ACORN neighborhood organizations offer all of the benefits of neighborhood watch plus more, their crime prevention value should not be in question.

## Part 2 - Community Policing

While neighborhood watch programs were the crime prevention breakthrough of the 70s and 80s, it has been *community policing* in the 90s. These words are implemented in a different way in every city in the country, but they are taken very seriously by members of ACORN. To us community policing means finally getting more of what the organization has demanded through two decades of organizing: more visible police presence in the neighborhoods, more respect and less harassment, an open door at the chief's office, and respect for the crime prevention role played by community organizations.

Every ACORN neighborhood organization has some relationship with its local police department, but the programs and practices vary widely from increased foot patrols, to establishment of neighborhood police stations, to crime reports at neighborhood meetings. As a component of the Neighborhood and Home Safety Program **every ACORN neighborhood organization that has members in the program will develop an annual community policing plan and report.** This requirement guarantees that some level of community policing is happening even in cases where police departments are less proactive about it. It also provides a system to track the effectiveness of the various community policing models when compared to insurance loss data by neighborhood and police crime reports.

*Justification for Discount* - A great deal of research has shown that community policing prevents crime, but common sense shows that "the squeaky wheel gets the most grease." The neighborhood groups that are in constant communication with police get the most attention paid to their areas. And more police attention generally means that crime moves to less heavily patrolled areas.

## Part 3 - Safety Seminars

Some insurance companies have recognized the usefulness of bringing people together for meetings to hear from experts and discuss ways of reducing risk. One large company recently invited all of its policyholders in a Chicago neighborhood to a meeting on fire prevention after experiencing significant fire losses in that neighborhood. Unfortunately, very few of those policy-holders attended, despite the door-prize of free smoke alarms. Insurance companies on their own can clearly not mobilize communities to act. Working with ACORN, however, seminars such as these will be packed.

As a component of the Neighborhood and Home Safety Program **all participants will attend at least two safety seminars per year.** The seminars will be conducted by community leaders, but will include guest experts on various home safety issues from police departments, fire departments, utility companies, and insurance companies. These seminars will be attended not only by program participants, but also community residents at-large.

*Justification for Discount* - No statistics are available that we know of showing reduced losses as a result of meetings such as these, but many of the practices that will be taught at these seminars result in significant savings against property losses and liability claims.

## Part 4 - Home Safety Audits

In some cities police officers will inspect homes to suggest ways to deter burglars and vandals. Some fire departments will do similar inspections to identify fire hazards and suggest fire prevention measures. Very few homeowners ever benefit from such inspections, however, and even if they do have their homes inspected and implement the safety recommendations, their insurance companies are unaware of the significant risk reductions that have taken place.

Numerous insurance companies acknowledge the value of home safety audits by publishing guides for homeowners to inspect their own homes. Many books and articles have been published that explain how we can make our homes safer as well, and most neighborhood watch programs include suggestions for how participants can deter crime

ACORN is uniquely situated to conduct home safety audits in the neighborhoods where it is organized. ACORN staff and leaders spend countless hours in the homes of members and prospective members as part of the ongoing process of neighborhood organizing. Adding home safety audits to these visits will be seen not as an intrusion by an outside party, but as a service provided by caring neighbors.

To implement a home safety audit program, ACORN will review existing fire and crime prevention audit materials and develop a checklist. ACORN staff and a corps of ACORN members will be trained to conduct the audits, and a system will be established to monitor implementation of the audit recommendations. **Each participant in the Neighborhood and Home Safety Program will have a home safety audit conducted by a trained ACORN member or staff when they apply for the discount insurance program.**

*Justification for Discount* - The home safety audits will reduce risk in two ways. First, they will simply make homeowners aware of what they can do to reduce risk, which to some degree will result in implementation of safety measures. But more significantly, they will make it possible to establish and enforce standards that when met and certified, can be rewarded by additional insurance discounts. Establishment of standards will take place in negotiation with insurers and be subject to amendment over time.

## Part 5 - Property Marking

Some police departments will mark property with an engraving instrument to deter theft and to facilitate identification. While there is universal consensus that marking property is an effective deterrent, very few people do it. The low participation rate in these programs is due to limited funding for outreach, and to the fact that most police programs require that property be brought to a police station.

ACORN neighborhood organizations are ideally situated to provide a marking service. Marking will take place during home safety audits, at community meetings, and at the ACORN office. **Every participant in the Neighborhood and Home Safety Program will have valuable property marked at the initial home safety audit.**

*Justification for Discount* - Marking deters theft and increases the chance of retrievl of stolen property.

## Part 6 - Safety Devices

Insurance companies provide discounts already to policyholders with smoke alarms and burglar alarms, but there are a host of other affordable devices that are also effective deterrents. Dead bolt locks, inexpensive motion detectors, strengthened window locks, and strategically located fire extinguishers are just a few.

Because manufacturers of these devices have an economic incentive to have them approved by insurance companies for discounts, and because the Neighborhood and Home Safety Program offers excellent marketing and public relations opportunities, we believe that a potential exists to obtain certain devices at discount prices or free for program participants. **ACORN will meet with representatives of the major companies that manufacture these products to negotiate a program the will make them**

available and integrate their use into the Neighborhood and Home Safety Program.

*Justification for Discount* - Discounts will be based on statistics from manufacturers and independent researchers on the effectiveness of the various products.

## APPLICATION and CERTIFICATION

In order to receive the discount for participation in the ACORN Neighborhood and Home Safety Program individuals will apply at ACORN offices or at community meetings. Depending on the arrangements agreed to by the participating insurers the application process for the discount may or may not include the application for the actual insurance policy.

ACORN staff will be hired specifically to collect and process applications and certifications of ongoing participation. Each participating household will have a file that includes the following.

1. The initial application form
2. Report on the initial home safety audit
3. Actions taken on home safety audit recommendations
4. Dates and locations of annual block meetings
5. Dates of safety seminars attended
6. Safety devices installed
7. Descriptions of any claims filed on the policy

## ELIGIBILITY AND OUTREACH

The program will initially be available only in neighborhoods where ACORN neighborhood organizations already exist. Within these neighborhoods flyers will be distributed and block captains will make phone calls inviting residents to informational meetings about the program.

Once the program is well underway, applicants will be accepted from neighborhoods where no ACORN groups currently exist in cases where residents first establish a neighborhood organizing committee and hold a neighborhood meeting. ACORN staff will assist in the development of these new neighborhood organizations, and at the point where the group meets minimum thresholds of activity and elects officers, its members will be eligible to participate in the Neighborhood and Home Safety Program.

## APPROVAL OF DISCOUNTS

Discounts for participants in the Neighborhood and Home Safety Program will be integrated into the rate structures of participating insurance companies. In most states the discounts must be approved by state insurance commissioners. ACORN members have met with commissioners or their staffs in fourteen states to get initial feedback on the idea and have found almost universal support. ACORN also presented an outline of the program to the Urban Issues Working Group of the National Association of Insurance Commissioners (NAIC) at its last meeting. The NAIC has agreed to review and comment on subsequent drafts of the program description and will consider endorsing it at an upcoming meeting.

## PARTICIPATION BY COMPANIES

ACORN is in discussions with major property/casualty insurers to further develop the Neighborhood and Home Safety Program and to secure commitments to implement it with substantial discounts. ACORN will host an Urban Insurance Summit in Chicago on June 19 at which the program will be reviewed in detail before a gathering of major insurance companies.

A major factor motivating the industry to participate in the program is the attention paid to the issue of insurance redlining by the media and Congress since ACORN released its study of inner-city homeowners insurance on February 8. Not only has there been a steady stream of news stories on the issue, but two subcommittee chairs in the U.S. House of Representatives have introduced bills to address the issue and held a series of informational and legislative hearings, all of which have included testimony from ACORN. For the first time since passage of the McCarran-Ferguson Act in 1945 there is a likelihood that the federal government will step in to regulate an aspect of the insurance business.

In this climate it makes good sense for the industry to pursue non-legislative remedies to the problems of insurance cost and availability in inner-cities in cooperation with community organizations. We believe that the Neighborhood and Home Safety Program will be one such remedy.

# NATIONAL UNDERWRITER

PROPERTY & CASUALTY /
RISK & BENEFITS
MANAGEMENT EDITION

APRIL 12, 1993          $2.50          NO. 15 97TH YEAR

# ACORN, Allstate Clash On HO Plan

**By L.H. Otis**

It seemed like an ambitious, even quixotic, undertaking—the joining of forces of one of the largest urban property and casualty insurers and one of the largest grassroots community organizations in the fight to provide affordable urban homeowners coverage.

But the uneasy alliance between Allstate and the consumer advocacy group ACORN rapidly disintegrated following a Feb. 27 meeting in Chicago and has escalated into a war of words and actions.

ACORN had sought early in the year to work with Allstate towards underwriting a neighborhood and home safety program in which urban homeowners would get a discount on their homeowners coverage in exchange for implementing home and community "risk management" measures.

Despite its praise for ACORN's ideas, Allstate opted not to commit to them as proposed, citing a number of constraints. ACORN has subsequently embarked on a nationwide campaign to bring its proposals before citizens, insurance regulators and other officials.

"We believe that Allstate was

## Consumer Group Battles For Discount For City Homeowners

interested in a program that would reduce risks and make it easier for them to serve inner city markets," said Stuart Pittman, national campaign director in ACORN's Washington office.

The "ACORN Neighborhood and Home Safety Program" seeks reductions in the incidences of fire, theft and vandalism among urban homeowners through the implementation of community policing programs, fire and crime prevention seminars, ACORN-overseen "home safety audits" and the use of home safety devices.

In return for participating in the program, homeowners would receive a discount on their insur-

*Cont'd from Page 1*

ACORN—which stands for Association Community Organizations for Reform Now—targeted Allstate for its program because Allstate said it is the largest writer of urban coverage, and because, ACORN members have had many problems with the insurer, Mr. Pittman said.

The ACORN approach "has some very solid aspects to it" because it focuses on loss control, said Kevin Sullivan, vice president of corporate relations at Allstate's Northbrook, Ill., headquarters.

Of the Feb. 27 meeting, which he attended, Mr. Sullivan said that "at that point ACORN was really looking for somebody to engage and get started with that program, but we were not at that point yet."

In late 1992, Allstate appointed an officer to explore how to better serve urban areas, Mr. Sullivan said. That officer, Rhonda Woodard, assistant vice president for urban affairs, attended the meeting.

"I mentioned that formal communication with ACORN, the insurer expressed willingness to work with the community group, Mr. Sullivan said.

"Having said that, we have been the target of a whole host of ACORN protests," because ACORN demands that Allstate begin working on its

*Cont'd on Page 6*

proposal were not accepted to, he said. "We question their willingness to continue to cooperate," he said.

Mr. Pittman described an evolving situation where at each juncture Allstate did not respond to ACORN requests for meetings until a public protest was organized. After the lone tentious but, in ACORN's opinion, constructive meeting on Feb. 27, Allstate brushed off ACORN's national leadership with suggestions that the issue was better dealt with on a local level, he said.

Mr. Sullivan denied that Allstate ever refused to meet with ACORN at any level or that protests convinced the company to do so.

"We have been attempting to encourage them all along, at least in our efforts. We asked Allstate to say, 'do what they want in their time frame,' Mr. Sullivan said.

Rather than compel Allstate to meet with them, ACORN's public process served instead to "tax our resolve to work with them," he said.

ACORN members are now demonstrating against Allstate, including pickets and sit-ins at Allstate offices across the country, with demands that it immediately change its rate and underwriting guidelines for urban areas which proposed federal legislation would compel it to make public if passed.

At its own expense, ACORN flew its national president, Maude Hurd, eight senior ACORN representatives



346

from around the country, Jason Adkins of the Boston-based Center for Insurance Research, and Mr. Pittman to Chicago for the Allstate meeting, Mr. Pittman said.

Mr. Sullivan, Ms. Woodard, Richard Wisnkewski, director of product administration, and Marshall Antonio, assistant vice president, corporate relations were present from Allstate. (Ms. Hurd, in a later letter she sent Mr. Sullivan, expressed displeasure that Allstate had not felt the need for senior management to attend the meeting. Mr. Sullivan said that it would have been premature to engage senior management in such initial talks.)

Despite differences, Mr. Pittman said that ACORN felt the dialogue was viewed as sufficiently constructive on both sides, and that details of a follow-up meeting where Allstate would present counterproposals were discussed.

But, in two letters, Allstate effectively disassociated itself from the national dialogue process, and Mr. Pittman, who added that he suspects this chilling effect came down from senior management.

Mr. Sullivan denied this but noted that "there is an awareness at a senior officers' level and an agreement with the recommended approach [Allstate is taking]."

In a March 9 letter to Ms. Hurd, Mr. Sullivan stated that Allstate looked forward to continuing a "good-faith dialogue" with ACORN, and was "encouraged by many of the elements of your proposal."

He then went on to say that developing "group products" for urban homeowners "would require significant expense, time and resources, as well as changes in the insurance laws of many of the states in this country."

While admitting that ACORN's risk management measures would "lead to reduced costs for insurance," he concluded that, "if rates are not actuarially justified when they are filed by our company, it is not likely that they will be approved by regulators."

Mr. Sullivan said that ACORN officials "were talking about" a 40 percent rate discount for their program. Mr. Pittman said "we were very clear that that was negotiable."

Ms. Hurd responded to Mr. Sullivan's letter with a March 12 letter of her own, in which she reiterated Allstate for leaving "no room for negotiation."

While continuing to await Allstate counterproposals, ACORN was "left

with no options other than to pursue a public campaign drawing attention to what we consider to be irresponsible and discriminatory practices by Allstate," she wrote.

In a March 29 letter to Ms. Hurd, Mr. Antonio of Allstate stated that "while we don't see the [ACORN] proposal as the first step, we do see possibilities that may exist by talking with the local chapters of ACORN."

Mr. Pittman said that in downgrading the discussions from national to local, "their response was very negative in our view."

Mr. Sullivan said that Allstate intended for a national dialogue to continue, to be supplanted only with more concrete local talks.

But Mr. Antonio's letter stated: "Since we are in our research phase and have already had the opportunity to review your proposal, and can put your local chapters in touch with our regional offices, we don't see the value in continuing national meetings."

In recent weeks ACORN has held community meetings on its proposal, and Mr. Pittman. Insurance regulatory and other state officials have attended these meetings and their response has been positive, he said.

Robert M. Willis, the District of Columbia superintendent of insurance, said that "obviously I would support anything that improves public safety," but added that any rate discounting would be a matter only insurers could address.

At a meeting he had with ACORN officials, he told them: "I understand what you are doing and think it's a good idea, but that [proposal] is not within the regulatory framework."

Mr. Willis said that ACORN should direct its energies towards working with insurers, consumers and elected legislators towards implementing the program and passing pertinent statutes, rather than urging regulators to action, who only enforce the laws.

Mr. Willis said "I don't agree that regulators would have a discomfort approving such a discount," noting that it was "totally inappropriate" of Allstate to cite this as a hurdle to the program. Offering new insurance products with limited loss experience "is part and parcel of the insurance business," he said.

"I was really happy to see consumer groups taking an active interest in what they could do to ensure availability and affordability of coverage," said Robert Schneider, the Texas insurance department's associate commissioner for consumer services. Mr. Schneider, who attended one of the ACORN community meetings in Dallas, said he
Cont'd on Page 25

Cont'd from Page 6
doesn't have a lot of detail about the program but "whatever we can do as regulators, we will do" to encourage it.

Legislating group p-e coverage, or approving rate discounts without firm actuarial backing are possibilities if that is what is required, Mr. Schneider said.

Rather than put up roadblocks, "it is my hope that Allstate and other insurers can do what they can to make ACORN's and other programs work," he said.

Ron Sheffield, Arkansas' deputy insurance commissioner, who has also attended ACORN meetings, said that ACORN has "got the ball rolling," but questioned the validity of certain aspects of their proposal.

Mr. Sheffield said that although instituting loss prevention measures should enable homeowners to obtain discounts on their coverage, he did not believe that setting one single discount figure was appropriate.

Both Mr. Sheffield and Mr. Schneider said ACORN proposed a 25 percent discount rate for its program at meetings they attended.

Mr. Sheffield said that ACORN had legitimate concerns but noted that they should be more willing to work towards their goals with other interested parties rather than simply dictating what they want. ACORN's approach is to say "we have been treated unfairly and here is our way of making it right," Mr. Sheffield said. "They don't ask, they don't say how can we work with you to get these things, they demand," he said.

Mr. Sheffield suggested that ACORN might find "more friends than they realize" at the National Association of Insurance Commissioners, and suggested that they formally approach that body with their proposals, which could be addressed in a model law.

Mr. Pittman said that because of the importance which will be attached to the loss history of such a program, ACORN wants "to make darn sure it's implemented right and we want to do it to ensure that it is."

Currently, ACORN's strategy "has been refocused away from Allstate to get [the program] implemented through other companies," he said.

"As a practical matter we can't sanction a particular group or company's discount program as the way to produce a discount program," Texas' Mr. Schneider said.

347

Mrs. COLLINS. Thank you.

Ms. Petty, ACORN has done a lot of work in the mortgage disclosure area. Some time ago, the Banking Committee of Congress passed legislation that said that mortgage disclosure, based on census tract, was essential, because any mortgage disclosure that had been based on zip codes was not sufficient. My question to you is do you think that mortgage disclosure has helped to combat mortgage redlining?

Ms. PETTY. Yes. Yes, it has.

Mrs. COLLINS. Do you think that similar insurance disclosure, using census tract, such as in my legislation, would be helpful?

Ms. PETTY. Yes, I certainly do.

Mrs. COLLINS. Also, Ms. Petty, there has been some criticism of ACORN's study by the insurance industry. In particular, they say that your data does not necessarily reflect all of the insurers doing business in an area and that, therefore, your conclusions about lack of coverage may not be valid.

What do you think about that?

Ms. PETTY. I did not understand what you said.

Mrs. COLLINS. Do you think that the studies that ACORN has done are valid studies—that they are good——

Ms. PETTY. Yes, they are.

Mrs. COLLINS [continuing]. Hard, clear, provable——

Ms. PETTY. Yes, they are.

Mrs. COLLINS [continuing]. Statistics?

Ms. PETTY. We did a lot of study on this. We did a lot of work. We put a lot of work into this, and yes, it is.

Mrs. COLLINS. Since you think that it is a good study, and your study is based on what? You say your study was based on telephoning?

Ms. PETTY. We did test calls, we compare—we did test calls comparing upper-class neighborhoods to low-income neighborhoods. As we did these calls, every time we called an upper class it was quoted like—for—like $1,000 for our property is like $9.59 per thousand; where, in the upper-class neighborhoods, it was like $2.59 per thousand. So, we are actually paying double the price than they are paying, and we are getting less coverage, because we can't even get replacement value. All they will give us is at market value, and we are paying more money; where a person in the upper-class neighborhood on $150,000 home is paying like $2.59. This is replacement value for them, it is not replacement value for us.

Mrs. COLLINS. You said that Allstate, when they quoted you a figure, you thought they were practicing in a kind of bait and switch. Now, that is pretty serious.

Ms. PETTY. Well, it is serious to me, because I had to come up with the extra money, so that is really serious. I would like to have known up front how much money I had to pay before I got stuck in to this, you know. Because it is not easy for me to come up with $300—almost $300 just like that. I am a low and moderate income person. If it was that much money, I think they should have just left it until time for my renewal. I had a valid policy which I had gave to the bank. Once they know you have given this to the bank, nobody is hardly going to go to the bank and tell them, say, well,

348

cancel my policy because it didn't go through. So, they know this. So, this way, once they tell you this, they have got you. You have got to send that extra money if you want to be insured. If you are not insured, then the mortgagor comes and they are going to cancel your loan. So, they have you stuck.

To me, it is really just something crooked. I feel like they are doing a whole lot of people like this, and it is wrong.

Mrs. COLLINS. Did you do any studies to show, in your telephoning, that other people had had the same kind of experience—that they were quoted one rate for their insurance and only to find out a little bit later that their insurance coverage was going to be more?

Ms. PETTY. I found out a lot of people were having this. Also, I found out that, in the middle of their insurance, they would just cancel it, like some owing them $500 at one time. I do not understand how the insurance can raise the rate of $500 on anybody at one time. The insurance company, they say it is because of the crime in our area. I know, myself, I do not commit any crime. I do believe that there are crimes also in the upper-class neighborhoods too, they just publicize what happens in our neighborhoods more. There is crime all over the world. I do not feel like I should have to pay for crime that other people commit.

Mrs. COLLINS. Mr. Creamer, can one conclude from your study that it appears Allstate definitely stays away from poor people, while State Farm apparently stays away from African American and Hispanic people, regardless of income?

Mr. CREAMER. That appears to be the case. Whereas, Allstate does indeed have a substantial market penetration in higher income, moderate income African American communities, State Farm does not. The distribution of State Farm policies seems to virtually directly tract race. The distribution of Allstate policies seems to tract primarily income; although, in many respects, of course, that results in the same outcome, at least in lower income African American and Hispanic communities.

Mrs. COLLINS. Your past studies, Mr. Creamer, related primarily to automobile insurance; although the lack of agents in inner cities obviously affects access to all lines of insurance. Your current study also looks at property insurance. In addition ACORN recently did a study that focused on property insurance and came to similar conclusions with respect to property insurance that you did with respect to automobile insurance. So, do you think the same conclusions apply to the property insurance?

Mr. CREAMER. That appears to be the case. Yes. The numbers are virtually the same in terms of the distribution of policies between auto and property. Let me just point out, by the way, that most of the data at least—in the Allstate case it is quite clear that the data on insurance is related to liability insurance for auto. Now, there is no necessary relationship between neighborhood and liability likelihood in the auto area. I mean, you might argue that one community has more likelihood for collisions or for theft, a car theft or whatever. The liability has to do with how somebody drives. As you know, in this State, everyone is required to obtain liability insurance when they drive a car. The distribution of policies for liability insurance, that should have no relationship to

where someone lives, is virtually the same as it is for property insurance, leading us to the conclusion, without any question, that there is a racially and/or income, depending on the company-based motivation in the marketing patterns, rather than something that is based on some kind of statistical or actuarial fact.

Let me just add, by the way, the insurance industry has systematically refused our requests and the requests of virtually every other consumer organization that deals with this issue, to produce data that correlations losses and premiums from various communities. Let me tell you, in the legislature, they will go down to State legislatures, or suburban legislatures and say you do not want this bill to pass because they are going to try to use it to raise rates of people who are outside of Chicago—the implication being clearly, that if they were to distribute that information, it would show graphically that they charge a disproportionately greater amount in premiums than they can show any difference in losses.

Mrs. COLLINS. Well, I believe one of you testified that Allstate is likely to close an office in Austin. I forgot which one of you it was right now. Who was it?

Mr. CREAMER. I mentioned it.

Mrs. COLLINS. Was it you, Bob? Mr. Creamer? I wrote it down, but it is hard for me to read my writing with this hand. Anyway, that would mean, of course, that the agent would not be there. The insurance company argues, however, that they do not control the location of agents. How would you respond?

Mr. CREAMER. I would respond that, if the company had a marketing system that places it in the hands of their agents as to where they sell policies entirely, they should change their marketing system. I mean, it is their responsibility to assure that their product is equally accessible to people of all income and racial types in this city.

By the way, the graphic thing here is that, in that one area where there happens to be an office—in an area that would expect otherwise likely to see a low concentration of policies, we actually see a higher concentration of policies than in other comparably situated situations. There is no doubt that the presence of the agent or the agency has a substantial impact on the number of policies in the area; directly contrary I might add to the company's allegations. Now, if that agent moves out, we will probably—certainly see the same result in that community that pertains in other communities—and that is a substantial decline over time in the number of policies written in the area.

Mrs. COLLINS. Mr. Creamer, at our last hearing, Mr. Bill McNary, in Washington, represented the Illinois Public Action, and I think he made a statement that, often there are Allstate offices and agents in Sears stores. However, sometimes in communities that service African American communities, that insurance is not there. Sometimes he says there is just a sign in the window, and that really there is no Allstate agency there. Are you aware of that?

Mr. CREAMER. On occasion, our understanding is that is correct in a number of cases. I should point out that the office on the west side of Chicago that they apparently intend to close, is not in a Sears store at all. It is a free-standing office in a bustling commu-

nity by the way, where apparently the agents have decided they will do better by moving elsewhere.

Mrs. COLLINS. Well, another thing that he testified to when he was in Washington was the fact that there is a store in the south side of Chicago, just outside of a predominantly African American Community where residents of that community can go to the All-state Automobile Service Center to get their automobile repaired, and yet they cannot—I think they said it was at 79th Street the store is—and yet, they cannot get Allstate insurance to cover their homes or their cars. That seems rather strange to me.

Mr. CREAMER. That is the case. As it happens, there is another—one of the few offices—Allstate offices, 4 or 5 blocks away from that location. In the normal course of events, you would expect there to be an Allstate office at the Sears store—it is a large Sears facility—and there is not there. That is correct.

Mrs. COLLINS. I want to get back to you, Ms. Petty, on this—on the data that you did. Now, most of your data that you had you received from the Illinois Department of Insurance. Is that accurate?

Ms. PETTY. Most of the data that I have?

Mrs. COLLINS. Yes. Most of ACORN's study was based on data that was prepared by the Illinois Department of Insurance. Is that accurate?

Ms. PETTY. No.

Mrs. COLLINS. That is not accurate?

Ms. PETTY. No.

Mrs. COLLINS. It is my understanding that ACORN got data from the Chicago——

Ms. PETTY. Oh, I am sorry. It was brought to my attention. Yes, you are correct. I am sorry.

Mrs. COLLINS. OK. Now, let me say this. That insurance informa-tion that you got from the Department of Insurance shows there the activity based on zip codes. Is that accurate?

Ms. PETTY. Yes, that is accurate.

Mrs. COLLINS. That is accurate?

Ms. PETTY. Yes.

Mrs. COLLINS. OK. And from that study is how you were able to determine where the location was of service and non-service?

Ms. PETTY. Yes. That is correct.

Mrs. COLLINS. OK. Thank you.

Now, you mention in your statement, Ms. Petty, that you also found that even when people in low-income areas got insurance, they found it difficult to keep it—that they were canceled or non-renewed—very often you found that to be the case in Chicago?

Ms. PETTY. Yes.

Mrs. COLLINS. Did you look at any—did the study which was based on the Illinois Department of Insurance—did that indicate that outside of Chicago, say in Maywood and surrounding areas, that that was the same case?

Ms. PETTY. Well, we did this—it was all over; but ours was just mostly our members. Mostly the members.

Mrs. COLLINS. The members of ACORN?

Ms. PETTY. Yes.

Mrs. COLLINS. OK. Do members of ACORN live in the suburban areas, or just in Chicago?

Ms. PETTY. Mainly in Chicago. We have some——

Mrs. COLLINS. Do you have someone accompanying you, Ms. Petty?

Ms. PETTY. Yes.

Mrs. COLLINS. Give us your name, please, so that we will have it for the record.

Ms. SIEGEL. My name is Carolyn Siegel, and I am the head organizer for Chicago ACORN.

Mrs. COLLINS. OK. Would you like to testify to that question?

Ms. SIEGEL. Sure. I think that our members all over the country have been finding that they get canceled when there is an abandoned building on their block. Sometimes they get canceled, and they cannot figure out the reason. Our information on that came both from looking at the fact that there is some reason why those 51 percent of people in low-income neighborhoods are not insured. It does not mean they were not always insured. Many of them have been canceled. Through talking to our members, they gave us a lot of reasons why they were told they were canceled.

Mrs. COLLINS. What were some of those reasons?

Ms. SIEGEL. Some of them were there was an abandoned building on the block, some people who could not get insurance. Actually some of our test calls over the phone, we got people saying we do not give insurance in that neighborhood, we cannot do it, or the value of your house is not enough in that neighborhood. So, there was a variety of reasons; but we have 100,000 members around the country, and it is true here in our Chicago chapter, as well as around the country.

Mrs. COLLINS. Ms. Petty, the Insurance Information Institute has criticized ACORN's analysis of test calls to agents by saying that some—and I am quoting now: "Some agents refused to quote unless they meet the prospective client in their office."

How would you answer that?

Ms. PETTY. Well, some of them refused to quote according to where you live. If you tell them your address—I do not know about the part about in the house; but I know if you tell them your address, some will refuse to give you a quote on the phone once they find out your address.

Mrs. COLLINS. So, do you think that when they say unless they meet the prospective client in their office, how would they know where the prospective client came from if they met in the insurance office?

Ms. SIEGEL. I think a couple of things that we saw—one is on the calls, it certainly did not require— people calling for addresses of homes in upper-income communities were given a quote over the phone much more frequently than someone calling from a low-income neighborhood. Also, we also, in some of our cities on the test calls, also controlled for the race of the caller, and found that there were differences in quotes. This was done in Boston. There were differences in quotes between a white caller and an African American caller calling for addresses of homes on the same block in a low-income community.

352

Mrs. COLLINS. When you called in Chicago did they ask for zip codes or the address?

Ms. PETTY. Yes, they did.

Ms. SIEGEL. Address, first question.

Ms. PETTY. Address, that is the first question.

Mrs. COLLINS. That was an indicator of whether or not they were going to probably give insurance?

Ms. SIEGEL. Yes.

Ms. PETTY. Yes. I found out also in my calling, when I was trying to get my own insurance was I would call the same agents—Allstate agents, and I would get a different quote each time. No one ever gave me the same quote.

Mrs. COLLINS. Well, when that happened, did you ask why you were getting all of these different quotations?

Ms. PETTY. Well, they would tell me something about it is based on where you live. It is based according to—they would say like the geographic area or something like that. Naturally, I presumed they know when you get too difficult, that it is a predominantly black neighborhood. So, this is to my opinion why it is so high, because——

Mrs. COLLINS. Mr. Creamer, do you agree that this response of the Insurance Information Agency seems a flimsy excuse that does not explain the large disparities and refusals to quote among different types of neighborhoods?

Mr. CREAMER. I have not heard any answer that is substantial. As I understand from the documents of the insurance industry, they presented a map that showed that virtually every zip code in the State—I think it was State Farm, had 1,500 or more policies in the metropolitan area. That simply does not answer the disparities. You see huge disparities in penetration in these communities. They are directly related to the presence of agents. As a consequence, they have to be directly related to their marketing strategy.

By the way, let me add, we did a study similar to ACORN's on the calling several years back, and found virtually identical results with respect to the number of people told that they would be—have to come to the office. When you combine the lack of presence of offices with the vast over-proportion of frequency of requests that you come to the office, you see why policies are not sold.

If you were from a predominantly African American community, when we did this similar study that they did several years ago, our people were told we have got to come to the office, we do not quote over the phone. If you are from the northwest side, or from Evanston, or from the north suburbs, you are always given a quote on the phone. So, there is an overtly discriminatory marketing practice involved in that activity.

Perhaps Mr. Cameron can comment further, if you do not mind.

Mr. CAMERON. Just a point on that issue though. Subsequent to our study, there was State legislation passed that said it was illegal to do that for auto insurance, not for homeowners insurance, but for auto insurance. Then, in the response that was presented to the committee from both State Farm and Allstate, they note that and say they do not do that uniformly. It is my understanding actually, when Allstate, or when ACORN did your homeowner's

study, that you were able to get quotes in Chicago areas, as opposed to other cities. That is my recollection of that. Correct me if I am wrong.

Subsequent to the State law being passed here, the problem of not getting quotes over the phone has seemed to have been cleared up at least for auto insurance that we are aware of. Let me point out that that also is a particular barrier. It is not only a discriminatory practice. If there are no agents in your neighborhood, it is very difficult to go and take—and we were told initially, you know, you would have to bring your family so we know all of the drivers, et cetera, et cetera. I mean, this becomes an unreasonable hurdle to providing that insurance. If you are from a community—in your Congressional District, Madam Chairwoman, there is no office down the street, as there are in many other parts of the City of Chicago or its suburban areas. So, I do not think this problem has been at all dealt with seriously nationally. Certainly we hope that we would have a change of marketing strategy elsewhere.

Mrs. COLLINS. Just a couple of more quick questions. One is that—let me make a statement—that one of my concerns is that insurers often use unjustified stereotypes in underwriting, as opposed to objective individualized risk analysis. I am going to quote from a recent critique of the ACORN study from the Insurance Information Institute. It says: "Census data on family income is not reliable. In blue collar neighborhoods income may be under-reported, as a significant number of workers, particularly independent contractors, like plumbers and contractors may receive a lot of cash income which may not be reported. As a result, two neighborhoods, which report the same income, may have substantially different levels of actual income."

Do you have any reason to believe that blue collar workers are in fact more likely to under-represent their income than say doctors or lawyers or insurance executives, Mr. Creamer, or Ms. Petty?

Mr. CREAMER. There is absolutely no evidence that that is the case—that they are—what a specious argument. There is no evidence at all that blue collar people underestimate their income—understate their income to the Census Bureau more than white collar people. The data here are so indisputably clear that I suspect it is necessary, if I were the insurance industry's representatives, to resort to such specious arguments.

Mrs. COLLINS. Did you want to add something? All right, Ms. Petty?

Ms. PETTY. No.

Mrs. COLLINS. Is there anything further you want to say for the record, either of you?

Mr. CAMERON. I just want to make one point. I really want to underscore, having looked at the information that was provided to the committee by zip code, the necessity to have a more fine grain analysis. Your bill clearly, by requesting that information by census tract and by race and gender, is extremely important in terms of finding out why there are some disparities in certain communities, and what the patterns actually are.

Again, if the industry maintains that they are not involved in discriminatory practices, this should certainly aid their case in making that start, because the zip code data does not tell that

354

story. It shows there is, apparently, a discriminatory marketing strategy out there. If we had more accurate data, and they are not redlining, they are not discriminating, that clearly would advance that. So, I would hope that they would join us in supporting your legislation.

Mrs. COLLINS. Let me just—you just threw a question in my mind when you mentioned about the zip code. What about the zip code plus four? There has been some talk about the zip code plus four providing even more detailed information, and perhaps not—that we will not need the census. What do you think about that?

Mr. CAMERON. It is not a question of how small the area it is from, it is whether it is easily correlatable with the information on the population—what the age is, what the income levels are, what the race, what the—other character—occupational characteristics are. That information comes from the census by census tract. Unless we can get the Census Bureau to provide the Commerce Department zip code plus four breakdowns—they are commercially available, I would suppose it is possible—but, I would say that that does not seem to be a wise strategy.

Mr. CREAMER. Let me just add, by the way, that, if the industry argues that it would somehow be an onerous burden to provide this data by census tract—I mean, if we had their customer list, we, for a very little cost, could use a readily available computer program to convert addresses into census tracts. I mean, this is not a technologically difficult problem. If the insurance industry is required to do it, with precious little cost they can do it.

I do want to add one other quick thing, Madam Chair. The necessity for the data on losses in these areas is a critical factor, because the next cut they are going to make here is—they are going to say, well, we are going to market every place and then we are going to charge onerous rates in areas which, to a great extent, we argue they do today. There is a State law in Illinois that you cannot discriminate with respect to auto liability insurance among these various areas inside the City of Chicago.

Certainly there is discrimination with respect to the question of collision and with respect to homeowners and property insurance. Is that based on anything other than stereotypes? Is it based on real losses? Should it be? Those are policy questions that are not addressable without the real data. They can stand here until they are blue in the face and tell us that they are more heavily exposed in these areas; but as long as they refuse to provide the empirical data, correlated by the number of policies and by the number of—by the amount of premiums paid, there is no evidence to sustain that, and we have every reason to believe it would not sustain that conclusion.

Mrs. COLLINS. Thank you very much.

Mr. CREAMER. Thank you.

Mrs. COLLINS. I thank this panel for appearing before us.

Now we will go to our next panel, which will be Mr. Elce Redmond, who is the Executive Director of the Northwest Austin Council; Mr. James Morgan, President, Professional Insurance Agents and Brokers Association of Illinois. Mr. Morgan is accompanied by Mr. James McDowell, Mr. Irvin Murrell, and Mr. Al Williams. Would you come forward, please?

355

While we are getting our name tags on our next panel, let me say—I am asking unanimous consent that we keep the hearing record open, because we may in fact have questions that we will want to have answered in the future. What we will do is to have written questions perhaps by the ranking minority member and others. When we receive those requests for information in writing, we like to have them come back to our subcommittee within 5 working days, so that we can then close our record on this hearing.

Why don't we begin with you, Mr. Redmond?

**STATEMENTS OF ELCE REDMOND, EXECUTIVE DIRECTOR, NORTHWEST AUSTIN COUNCIL; JAMES D. MORGAN, PRESIDENT, PROFESSIONAL INSURANCE AGENTS AND BROKERS ASSOCIATION OF ILLINOIS, ACCOMPANIED BY JAMES McDOWELL, IRVIN MURRELL, AL WILLIAMS, AND MELVIN HUBBARD, MEMBERS**

Mr. REDMOND. Yes. Thank you very much.

Good morning ladies and gentlemen. My name is Elce Redmond, and I am the Executive Director of the Northwest Austin Council. My testimony today is on behalf of several west side community organizations who have been in the forefront of the battle against insurance redlining in our community. Those groups are the South Austin Community Coalition Council, the Gailwood Montclair Community Organization, the Northwest Neighborhood Federation, and the Cragen Business Association.

I would first like to thank all of the residents from the west side of Chicago who have come here today to let their voices be heard. Second, I would like to thank Congressperson Cardiss Collins, whose dedication and commitment to social justice moved her to hold this hearing.

I would like to begin my opening statement by saying that insurance redlining is alive and well in the City of Chicago. Almost every·day I hear horror stories about residents who cannot get insurance for either their home or car simply because of the neighborhood in which they live. If a person is lucky enough to get insurance, they pay inflated premium costs.

Insurance redlining is simply another racist tool that seeks to undermine and destroy inner-city neighborhoods. A classic example of this is currently the neighborhood organizations mentioned above have been in a heated battle with the Allstate Insurance Company because of their plans to move its only full-service claims facility from the Chicago area to the suburbs. This facility located at 2341 North Harlem, services the greater west side in the Chicago area. Allstate has stated that they will close the facility and force policyholders to travel in excess of 30 to 40 miles to file a claim.

Allstate and other insurance companies boast about the people they serve, but in zip codes of 60612, 60624, 60644 and 60651, which is the predominantly black west side, the service-based insurance company is under-represented.

We recommend that legislation be passed similar to the Community Reinvestment Act that forces banks to lend money in urban neighborhoods to be used to force insurance companies like Allstate to reinvest in our neighborhoods. We feel that this legislation could

356

end institutional racist activities of many of this cities' insurance companies.

Again, I thank you for this opportunity to express my views on this issue. I will gladly answer any questions you may have.

Mrs. COLLINS. Mr. Morgan

## STATEMENT OF JAMES D. MORGAN

Mr. MORGAN. Representative Collins, and other members of the subcommittee, thank you for allowing us to have this forum. I really appreciate it. My name is James Morgan. I have been an insurance agent and/or broker for the past 20 years. In my experiences of those past 20 years, I have seen many of my peers come and go. I feel that the insurance industry is the only industry that profits from the lack of subordinates, whether they are agents or brokers, and they tend to keep this industry in the transient manner in which it is now.

The insurance industry profits from the mystique that they generate with their lackadaisical policy and empirical data that they present to us, the consumers, and producers and brokers. They give us a feeling of alienation. They have other terms that they use for it, such as twisting and turning policies, which are the reasons that a lot of them make policyholders come to the office, so they can sell them other types of insurance than what they came for.

We feel the inner city is causing a domino effect, where redlining is really disinvesting in the community because, as it has been stated by the member of—many of the witnesses so far, you must have insurance before you can get a loan, before you can do numerous things, close on houses. Therefore, that causes a disinvestment and a loss of jobs, loss of businesses in our community.

We feel this bill is a step in the right direction, by making the industry somewhat responsible and accountable. However, we feel that is just a step—that there should be other provisions in the bill—there should be other independent agent business—insurance companies that should be presented too, because Allstate and State Farm are not the only companies in this State. We have 500 in this State that admitted to write business, and Allstate and State Farm are just the tip of the iceberg.

We feel that it is possible that we may need some Federal regulation to help end the redlining. We may need to make the insurance industries exempt from the antitrust legislation that they have enjoyed for numerous years. We feel that the insurance industry must adhere to the affirmative action legislation, such as the banks, and such as the CRA. However, more importantly, the insurance industry should be forced to stop all of the discriminatory practices, overt and covert, that right now dictates the industry.

We, in the inner city, see most of our insurance to be in place in the residual markets, such as the fair plans, such as the Illinois Automobile Insurance plans, et cetera. We feel that the voluntary market should be more readily available for our clients and our customers. Therefore, we would like to offer, as a suggestion, something that would probably be unpopular with them, like statewide rates, because that is what insurance is all about. It is supposed to take a risk and divided it equally amongst the population. It is not doing that with the zip code rating that they are using now—

004159

and more importantly, to end the mystique, and make the insurance industry disclose pertinent information.

Thank you for having this forum. I will be open for any questions that you may have.

[The prepared statement and attachment of Mr. Morgan follow:]

STATEMENT OF JAMES D. MORGAN, PROFESSIONAL INSURANCE AGENTS AND BROKERS ASSOCIATION

P.I.A.B.A. [Professional Insurance Agents and Brokers Association] was originally formed in 1974 by a group of Insurance Producers for the sole purpose of achieving common goals and solving problems they were experiencing. Today, P.I.A.B.A., has a membership of over 100 minority owned, independent, professional producers dedicated to the growth, progress and financial independence of the organization.

Our organization feels directly responsible for welfare of it's members as well as the interest of the consumer. As servants to the community, we feel that it is our duty to address these unjust and unfair practices. We have tried other measures to address these problems such as:

Having an urban trade fair to unite producers with some of the insurance companies, with hopes of getting contracts.

We have hired experts in this field to research some of the causes of the problems and recommend what our organization can do differently to correct them.

Of course this only scratches the surface, and comparatively speaking it is not hardly enough considering the insurmountable problems facing us as small businessmen/women. Due to our hands-on knowledge of the situation, we do however feel that at this point we are aware of some adjustments that could be beneficial to independent producers and consumers.

———

REDLINING REPORT

I. Nature and Extent of Redlining Practices by Companies in the Sale of Property and Casualty Insurance.

Major insurance companies that deal with property and casualty coverage, deliberately purge minority producers from the business. The few contracts that major carriers do issue to minority producers, are cancelled in a very short time. These carriers tend to use unrealistic statistics of production as a reason for using these unfair tactics. We feel that if this trend continues it will put Minority Independent Agencies out of business, which were originally used as a tool to implement the presence of these companies in the urban areas.

II. How Such Redlining Practices Affect the Availability, Affordability and Quality of Insurance Coverage.

Redlining and discrimination causes the quality to go down, and often limits affordable insurance. As a result of this, Chicago insurance agents, brokers and consumers do not have fair access to quality insurance at reasonable prices. More often, inner-city consumers must turn to larger suburban agencies who charge exorbitant rates. In most cases, consumers cannot afford to pay these rates, and in many cases they refuse to write the policies at all.

III. The Role of Residual Markets in Redlining Practices, and the Effect Such Practices Have on Urban Development and the Availability of Jobs in the Urban Areas.

Residual Markets were originally set up because there were no insurance markets available. As it stands now, the majority of the business is going into residual markets. Why, because there are no "voluntary markets". In all of those residual markets, the Fair Plan, etc., the cost of the insurance is prohibitively expensive, and the commissions paid to the brokers are considerably low. The service is terrible, and we feel that if more voluntary markets were available, there would not be a need for residual markets.

IV. What Public Interest Groups, the Insurance Industry, and Regulators are Doing to Address Redlining.

In June of 1990, P.I.A.B.A. hosted an urban Insurance Trade Fair with the cooperation of the Illinois Department of Insurance, Alliance of American Insurers, American Insurance Association, Illinois Association of Professional Insurance Agents, Illinois Insurance Conference, Illinois Surplus Lines Association, IIAI, National Association of Independent Insurers, and the Insurance School of Chicago for the sole purpose of increasing the availability of a broader range of personal and commercial line of coverages in the State, with the initial emphasis on the Chicago area. Hundreds of agents attended and several major companies were in attendance,

we are sorry to say this event was a failure. To our knowledge, no agents were contracted to represent the standard marketplace.

V. Address Particularly the Impact of These Issues on the Chicago Area.

As it stands right now, the Chicago insurance market is not fully open and accessible to many Chicago agents, brokers and consumers, especially those who do business in the inner-city and minority neighborhoods. Many major carriers with price competitive and comprehensive policies, in property and casualty, are reluctant to fully commit to doing business in the city of Chicago, and some of its neighborhoods. As a result of this, many Chicagoans have been forced to go without insurance or do business with smaller companies who offer less comprehensive policies at higher prices, without strong customer service support from the company. In the last 5 years the market situation has not improved for Chicago agents, brokers or consumers, matter of fact it has gotten increasingly worse. Our organization is very concerned that If this trend continues It will close the doors of many Minority Independent Producers and the ultimate result is loss of thousands of jobs city-wide.

VI. H.R. 1188 The Anti-Redlining in Insurance Disclosure Act.

P.I.A.B.A. is in favor of this bill, because we feel it will fair representation of contracts with standard companies. The breakdown of information by census tract would give us a better view of the company statistics and demographic information. The regulations and restrictions placed on the insurers regarding cancellations denials, and nonrenewals will help producers to better serve the consumer. The Secretary of Commerce will develop additional regulations to ensure practices of companies terminating agents unfairly or unjustly is a regulation that has been long awaited.

P.I.A.B.A. POSITION

We the members of P.I.A.B.A. are against the practice of Redlining by the insurance companies in the sale, underwriting, and marketing of insurance (property & casualty).

We are against discriminatory guidelines practiced by companies that deny minority agents and brokers equal compensation and contracts.

We are against the racially motivated collusion between Insurance Companies and the larger White Agencies who are allowing them to write business in our neighborhoods. These same companies do not allow us to write this business.

We are against the lack of company sponsored programs for minority agencies in the field of Commercial Casualty.

We are against the lack of investment dollars into the minority community from the very companies who make "Billions" of dollars every year from our community. Proposed Action:

(1) We propose that information concerning data in rating, claims, underwriting, pricing, and contracting, be submitted to the Commerce Department and all information be assessable to the public.

(2) All companies should stop the practice of redlining in minority areas.

(3) There should be new guidelines developed by the insurance companies that would make it "mandatory" for all licensed insurance companies to accept a "percentage" of licensed minority producers, based on the demographics of that particular area.

(4) There should be no city, State, county, or Federal agency enter into any contract or conduct any business with companies that participate in any type of discriminatory act.

(5) We recommend that an advisory board be developed to monitor some of the actions of these companies, comprised of minority agents.

(6) There should be a comprehensive effort to organize the common economic interest of consumers, agents, and brokers to make sure that the city of Chicago, is treated fairly by the insurance industry.

(7) The media, political leaders, regulatory agencies, business organizations, civic and community groups, and general public must be alerted to the danger of limited access to qualify insurance at fair prices in the Chicago area and neighborhoods.

P.I.A.B.A. continues to fight for our fair share. We recognize that over $5 billion in insurance premiums are written in Illinois each year. Nearly 60 percent of those premiums are written in the Chicago area alone. After nearly 7 years of unrelenting battles, minority agents are still trying hard to make some headway with major companies. Because of contract entrenchment, Minority Producers are not getting their fair share, thus unable to recycle the moneys into the community or create new jobs. The probability of companies closing community based offices, firing their minority agents and cancelling contracts minority-owned independent contractors is a devastating and harrowing reality. We will continue to work towards trying to prevent this catastrophe from going any further.

359

Mrs. COLLINS. Thank you.

I was looking at your written statement here. You mention, as a part of your written statement, under the heading, "How Much Redlining Practices Affect the Availability, Affordability and Quality of Insurance Coverage." You say that "Redlining and discrimination causes the quality to go down and often limits affordable insurance." In which ways?

Mr. MURRELL. Could I answer that?

Mrs. COLLINS. Mr. Murrell.

Mr. MURRELL. I would like to answer that, because I have been in the insurance business 18 years, working in various companies. First of all, insurance companies have got a lot of things which they never prove, and because they speak in "insurancese." In other words, insurance does have its own particular language.

For example, if I came and said bonjour, comment allez vous, most of the people in here would not understand that because they do not speak French. What the insurance companies do is bog you down with paper; but let's keep it very simple. The bottomline is that they discriminate. They violate the 14th Amendment of the Constitution.

If you take, in the City of Chicago, the premium dollars that people pay, you find out and line them up with the amount of premium dollars that they pay, according to income, you will find that the top income communities in the City of Chicago, in the suburbs, pay the less premiums. You could take a demographic area like Chatham and Manook, which do not have a large—let's look at homes—they have not had a loss in those areas. You have got the Killhill area of incomes that pay three times as much, in terms of homeowners insurance, then you go across the line. What aggravates me is you can go down to Western Avenue, on one side of Western Avenue is 33 percent more than on the other side; so if you walk across the street, which is predominantly white, you pay less claims. That is ludicrous.

You can take the whole State of Illinois and line the premium dollars up. It is not only in Chicago; but take the State of Illinois and line the premium dollars up, and you will find there is no black community in the whole State of Illinois that gets a break. You can line the premium dollars up in the State of Illinois and you will find that there is not one white community that has a higher rate. How do you justify that? I, as a broker, cannot even insure this building nor the homes or my house on my block—on the house that I live in for 20 years. I cannot insure a house. I can drive from my office on Western Avenue to Halsted, and I cannot insure any of the buildings.

Mrs. COLLINS. Why is that? Then I am going to get back to this question. Why can't you insure it?

Mr. MURRELL. The basic argument is that there is a collusion—first of all, there is something that affects the consumer. What affects the—we pay money. If you read this thing that they passed out that I just looked over briefly, there are 3,000 policyholders they claim that they insured. The issue is not insuring, because you can put 15 agents on one block, and if they give a $1 premium because they can't get it—my point is simply this——

004162

Mrs. COLLINS. I want to know why you cannot insure your house?

Mr. MURRELL. I cannot insure my house because I cannot get a contract with a direct company.

Mrs. COLLINS. OK.

Mr. MURRELL. All right. I can go to a white broker and get paid less commission, and put the business through him. Same thing with the premium dollars. This is my aggravation. We are still—you know, the bottomline is, if it is $2,000 in premium to insure my car and my house per year, and the person in the suburbs is paying only $300 or $1,500, that is a drastic disparity. There is no justification for that, and there is no accountability for that.

Mrs. COLLINS. Thank you. Same question. Redlining and discrimination causes the quality to go down. We are talking about the affordability and quality of the insurance coverage. Redlining and discrimination causes the quality to go down and often limits affordable insurance. Your response to that.

Mr. MCDOWELL. Thank you, Madam Chairwoman.

Let me go back a little bit.

Mrs. COLLINS. No. Just answer my question.

Mr. MCDOWELL. I will. I want you to understand who we are.

Mrs. COLLINS. I do understand, that is why you are here. If I did not understand who you were, you would not be on this witness table.

Mr. MCDOWELL. OK. Well, why I wanted to make sure is that so far the witnesses have been talking about Allstate and State Farm. We do not represent Allstate and State Farm. We would not like to. We would like to represent independent insurance companies. As our president stated, there are over 500 independent insurance companies that do business in the State of Illinois.

I have been in business for over 20 years, and have been fighting ever since to get a contract to do business in my neighborhood. So have a lot of our other members who have had more years than I have, such as this gentleman next to me here—over 30 some years of doing business in the insurance business, and cannot get a contract to represent his constituents in his community. The reason why I raise this so high is that people like to do business in their neighborhood. When they seek insurance, whether it is the automobile or homeowners insurance, they are going to find someone in their neighborhood to do business. If this person in this neighborhood does not have a contract that is competitive through the marketplace, that consumer tends to pay a higher rate, because whoever that agent or broker is, that agent or broker is going to give him what he has to sell.

There could be those residual markets, the Fair Plan, the automobile insurance plan. There could be the specialty insurance companies who, of course, charge higher rates, with less comprehensive policies—such as, if you buy a home or building insurance policy, you may not get rental reimbursement because they do not offer rental reimbursement. You may not get towing because they do not offer towing. You may want a lower deductible, but you cannot get a lower deductible.

You may even have a homeowner who wants a comprehensive insurance policy. You can only acquire that through the major insur-

ance carriers. If you do not have agents in that area, that particular agent is going to give him what he has and, most of the time, it is going to be the specialty insurance carrier or the Fair Plan, who do not offer comprehensive insurance coverage. Those are the problems we are having. What we need are companies to do those type of things.

I was reading the Sunday Sun Times, and it just so happens that in this newspaper, there was one insurance company, and this is an independent insurance company, and they listed all of their agents. I started to analyze this, and I wish Mr. Creamer and his group would do a study similar to what they did with State Farm and Allstate, because I think State Farm and Allstate are doing a better job than these independent insurance companies. We need more of these independent companies doing business in our neighborhood.

In this study, if you drew a line from north to south on that map, there would not be an independent insurance agent east of Cassie Avenue. There would not be one. This is just one company, which is a major company that writes a lot of business. If you did each company like that, you would find similar circumstances the same way. That is right there in the Chicago Sun Times, just listing the agent.

Mrs. COLLINS. Thank you. Mr. Al Williams. also, in Mr. Redmond's testimony, he says that—he talked about addressing the impact of these issues in the Chicago area. He says: "As it stands right now, the Chicago insurance market is not fully open and accessible to many Chicago agents, brokers and consumers, especially those who do business in the inner city and in minority neighborhoods." We have already heard that.

"Many major carriers with price competition and comprehensive policies and property and casualty are reluctant to fully commit to doing business in the City of Chicago and some of its neighborhoods."

Do you agree with that?

Mr. WILLIAMS. Yes, I do, Madam Chairwoman.

Mrs. COLLINS. It says: "As a result of this, many Chicagoans have been forced to go without insurance or do business with smaller companies which offer less comprehensive policies at higher prices, without strong customer service support from the company."

Do you agree with that?

Mr. WILLIAMS. Yes, I do, Madam Chairwoman.

Mrs. COLLINS. It says: "In the last 5 years the market situation has not improved for Chicago agents, brokers, or consumers. As a matter of fact, it has gotten increasingly worse."

Your comment?

Mr. WILLIAMS. I do agree with the last comment as well. I think it has gotten progressively worse.

Mrs. COLLINS. Thank you.

Mr. Redmond, do you have any reaction to the conclusions of the Illinois Public Action and ACORN studies?

Mr. REDMOND. Yes. One of the things is that we support both particular studies, because in our particular neighborhood it is incredibly hard for a person to get any sort of insurance, whether it

362

is car or home insurance. If a person does have home insurance, a classic example is, one of our members moved out into Naperville, Ill. She was paying $1,300 a year on her insurance for her home. When she moved to Naperville, it reduced to $800 a year. That is by moving from one place to another. For that time she was in on the 1300 block of Monitor she was paying $1,300 a year. She moves to Naperville, and she is only paying $800.

If people do have home insurance, it is at an incredibly inflated price in our particular neighborhoods. The service that people get is almost non-existent for the kind of money that they are paying. We have been battling with Allstate to try to keep them from closing their only full-service office in our neighborhood. They treat us like we are non-existent. They say that we are going to do it anyway, regardless of how far the people in the community have to travel into the suburbs to file a claim.

Mrs. COLLINS. Well, to what extent are any other insurance companies or agents located in your neighborhood in Austin?

Mr. REDMOND. A lot of people either utilize either Allstate or State Farm. There are some independent insurance companies in the community; but, as the gentlemen here have testified, they have an incredibly inflated price as well. It is hard for a young person in our neighborhood to get car insurance because of the particular community they live in. It is hard for a young family to get home insurance because of the particular community they live in.

That is with State Farm and Allstate, and independent insurance companies. We find that this is a total redline. It is something that is undermining and destroying our particular neighborhood.

Mrs. COLLINS. Well, Mr. Morgan, you have mentioned the use of insurance trade fairs to get agents together with insurance companies, in the hope of getting more agency appointments. Have these fairs been productive?

Mr. MORGAN. No. As of yet, we have not had any results from them. We had the Association of Independent Insurers to come and bring a lot of their national companies—the frontline companies, other than Allstate and State Farm. No appointments were made as of yet. It has been over 3 years ago—well, close to 3 years ago, so I do not know if they are going to make any now. They adhere to pressure. You know, if they feel political pressure coming on, they will put on a facade and they will pretend like they are going to do something, but nothing ever——

Mrs. COLLINS. Finally, Allstate and State Farm are direct writers. That is, they use exclusive agents, rather than independent agents. In your view, how well do they serve the urban market, either or you, or any of you?

Mr. MORGAN. Well, I would like to address it first. Allstate and State Farm are—they have a lot of representation, and maybe not on the west side; but on the south side, we have quite a few. The way they operate is a little different from the independent broker. See, none of us would like to be what they call—these are captive agents. They are captive. Some even call them corralled or exclusive agents. We are all brokers. We like to work with different companies. With Allstate and State Farm, they own the book of business. So, if an agent leaves, Allstate and State Farm will renew it without having to pay commissions, or they pay a commission to

whomever they appoint. With the independent brokers, they do not have that kind of commitment. We would own the book of business, and it would be to our discretion to put them with let's say an Aetna or a Travelers. Aetnas and Travelers does not have the incentive that maybe Allstate and State Farm would have. That might be one of the reasons why we do not have any independent insurance companies represent—I do not think any of us here have any independent frontline national companies. We have the substandard local companies, or specialty companies, as they like to call themselves. That is just one point. Somebody else may have another point.

Mrs. COLLINS. Mr. Murrell.

Mr. MURRELL. Basically, to understand, you have the Allstate and the State Farm type agents or captive agents that do marketing in the City of Chicago, then you have what I call the life/casualty captive, that is the Prudentials and the Metropolitans, then you have the fire funds, the CN agents that deal with independent brokers. Universally, they all discriminate in terms of their rates.

The reason why your appearance here is very good, Congresswoman, is because, number one, State Farm, no matter what they are, has set the policy terms and rates. The other companies usually fall behind them. The second point is, as far as independent brokers, and we are concerned, we are the front line in terms of the community. We give the information out.

Part of the things in your bill, you wanted us to address the economical impact of an insurance agency in a community. The independent broker supplies jobs, puts money in banks, depends upon the latitude of that participation—that's middle-class jobs in our community. In the last 10 years, not only have you had a reduction in that, but you have an overt conspiracy to keep the number of agents down. The bottomline is somebody insures your car, somebody insures your home.

Just like in State Farm, just so people can relate, they are getting their premium dollars out of the City of Chicago. They have a bottomline profit. Now, in order for me to get those records, I have to go and file suit against them. Number one, I have to prove standard. They can fight me off for 2 years until I get into discovery. Now, the reason why they are here is because they do not want you to get into discovery.

If your bill were to pass, ACORN and the rest of the people could get that information. They would stop. Because this is the only industry in which they control those kind of things. Because they can sit up here and say well, the claims ratio is not like that, because we did not take the data. I can take the independent brokers and say that we do not have a loss. I can target a place like Manook and Chatham, I can take a place—and where I live in Washington Park, and take a 20-year period of time and demonstrate the racial make-up of it. I can even take Harvey, Marham and show that there is a direct correlation—that they have an increase, and a direct link to race. I can show that. There is no argument about that. The facts are there.

I can take and show that another area over on Western, where you have a decrease in income because the economy here is bad, all right, and the dollars are not there, but there is no rate in-

crease. So, there is a racial factor in there that is against the law. They are not exempt from—the insurance companies, no matter what they say, are not exempt from discrimination law. They have to comply, because they are a public trust. When they say all of a sudden because I live and I underwrite, and all of the corporate executives live downtown, and for some reason over a cocktail party I decide over the next 10 years that I am not going to insure in the City of Chicago, or I am going to take an unjust premium out of there, because the bottomline is why should I pay $2,600 for car insurance? That is almost half the cost of the car sometimes.

Now, 30 years ago, when the diversification in the City of Chicago was more diversified, that policy of taking money from urban dollars was not there. Now, by ignoring hispanic and minorities, you can see all over the State, Rockville, all the way to the other side, Independence, the same place. It is racially motivated and that is wrong.

Mrs. COLLINS. Yes, sir? Give your name for the record, please.

Mr. HUBBARD. My name is Melvin Hubbard.

Mrs. COLLINS. Yes, Mr. Hubbard?

Mr. HUBBARD. I am pleased to be here to address you, Madam Chairwoman. I want to give a specific. We have been speaking of some generalities. I think that we have got pretty much occupied with the generalities. Let me speak to a specific—something that someone in the room can very well understand, in terms of how the quality and discrimination is affected.

Let's take, for example, a family such as the lady, Mrs. Petty, who wants to buy a home, and would qualify for a home with a mean income of—a family income of $35,000 a year. That person could qualify to buy an $80,000 home, when we use the qualifications. The principal and interest for that $80,000 home for 30 years would be about $700 a month. That is principal and interest. Now, you have to pay the taxes on that home. The taxes could very well be, depending on the community, about $50 per month, or $600 a year.

Second to that, the next thing that comes up, to make sure that that person qualifies for that home is the insurance. Now, of course, if that person, such as Ms. Petty, could have gotten, or the rate that she was quoted was a rate which permitted her to qualify for the loan to satisfy the mortgage company. However, if she had been quoted the rate that she ultimately had to pay, she would not have qualified by her standard lending institution to buy that home. Now, we may have done something differently to get it through, but, under the qualifications of the lending institution, she would have not been able to qualify, had she been given the initial rate.

For example, the insurance on that home should come out about $20 a month, or somewhere around $300 a year for the insurance to insure that home. With the companies that we represent, I would have to write her an insurance policy that would cost her at least $50 a month. So, with the $50 a month for the insurance and the $50 a month for the taxes, that would make her principal interest payment—a housing payment of $800 a month. On that income, she would not qualify. She would then have to purchase a house of lesser quality, which directly relates to redlining and discrimina-

tion—causing the lower of a quality in any given community. So, that is one specific item that is very important, in that one may or may not be able to qualify to purchase a home, if he or she cannot get insurance at a standard rate.

Mrs. COLLINS. Thank you very much.

Did you want to add something further, Mr. Williams?

Mr. WILLIAMS. No.

Mrs. COLLINS. OK. Thank you.

Mr. MORGAN. I would like to add one other thought.

Mrs. COLLINS. OK.

Mr. MORGAN. In speaking of generality that Mr. Hubbard alluded to, last year, about a year ago, Niles, Ill., a suburb of Chicago, changed their zip code. They used to share a zip code with Chicago. They got their own zip code. It was in the paper—in the Sun Times. It showed just how much the homeowners would save in homeowner insurance, how much the auto savings would be. They had a little matrix chart that showed health insurance, they would save $X$ amount of dollars a year; they would save $X$ amount of dollars in homeowners insurance, and $X$ amount of dollars in auto insurance. It never said one thing about there would be any less claims. So, if you want to find—you know, if you have got all of those—that information I know readily available—and that is a classic example there to show you the effects of redlining—how one suburb can change—just by changing their zip code, are going to save that kind of money and nothing about claims. It did not say one time that they were going to have less claims.

Mrs. COLLINS. We thank this panel for appearing before us. Your testimony has certainly been very helpful as we continue to explore this issue. Thank you for coming.

Our next panel will be Mr. Michael P. Duncan, who is the vice president and assistant general counsel for Allstate Insurance Company, who will be accompanied by a Ms. Rhonda M. Woodard, who is the assistant vice president for Allstate. Would you come forward, please.

## STATEMENT OF MICHAEL P. DUNCAN, VICE PRESIDENT AND ASSISTANT GENERAL COUNSEL, ALLSTATE INSURANCE CO., ACCOMPANIED BY RHONDA M. WOODWARD, ASSISTANT VICE PRESIDENT

Mr. DUNCAN. Good morning. My name is Michael P. Duncan. I am vice president and assistant general counsel of Allstate Insurance Company. Ms. Woodard is assistant vice president. Ms. Woodard has worked as an underwriting manager in three States, and more recently in our home office for 4 years as underwriting and product development director, with responsibility for 28 States. We have submitted a written record and a written statement, and hope that it will be put into the written record.

Mrs. COLLINS. It most certainly will be.

Mr. DUNCAN. We are both very pleased to be able to tell you that Allstate Insurance Company shares the serious concern the Chair of this committee has for adequate service by the insurance industry to the urban market. We are aware, Madam Chairwoman of your concern about the availability and affordability of insurance

in urban areas. We applaud you for conducting this hearing in Chicago. We thank you for the invitation to testify.

Our concern about the urban market is indicated by our willingness to serve the urban marketplace, and our share of that market. In our written statement, we itemize various data that will not be a surprise to you, as we have been working with you and your staff, and have provided this data and more.

We serve urban markets around the country in a number of ways. For example, we have 215 agents in the City of Chicago, with 94 sales locations. The number of agents we have in Chicago is greater than the number of agents we have in the whole of Illinois, outside of the urban area of Cook, Blake and DuPage Counties.

Office location is not the only indicator of availability. We advertise extensively on television and radio and in the Yellow Pages. As is demonstrated by our distribution of business, as is shown on these two maps, one of which is for auto insurance and the other for homeowners' insurance, we are accessible to all within the Chicago community. Additionally, our agency force solicits by telephone and by letter.

In some cases, we have more insureds in zip codes where we do not have agents, than in zip codes where we have agents. An example of that would be in the Garfield Park zip code of 60624, where we have a higher share of the market for both home and auto than we have in 60614, the Lincoln Park area, where there are two agent locations.

We insure 186,000 automobiles in the City of Chicago. That is 17½ percent of all of the automobiles in the city. We insure 123,000 home and condominium owners. That is 24 percent of that market. The number of renters policies we have in the city is about 30,000. The number of separate fire policies for residents that we issue in the city is about 10,000.

You asked us to address redlining. As you can see, it is not a practice in which we engage. We are available to all residents of Illinois, with underwriting criteria that do not vary by location or by race. Allstate is also a strong supporter of neighborhood revitalization, through our partnerships with neighborhood housing services of America, the low and moderate income task force, of which our chairman, Wayne Hedein, is a Co-Chair, the National Urban League Board of Directors, the National Center for Neighborhood Enterprise, the Chicago Urban League Board, and the National Capital Corporation Board.

We have received recognition for our urban contributions. In fact, our chairman, Mr. Hedein, will accept an award this very day in Washington, D.C., from the National Alliance to end homelessness.

Another indication of our commitment to urban America is that our employees have provided volunteer services, through our Helping Hands Program, in tutoring, senior citizen care, community service work, hospital volunteering and recreation.

We have also spent countless hours meeting with community groups. On occasion, these meetings have begun in confrontations, but we have always been able to work with people who pursue valid interests and good faith. There are times when these meetings are not productive, and there are times when the sincerity and

purpose of the community and group appears to be other than intending to reach a successful result.

Because we are a large presence in the urban area, and we have a very recognizable public image, we frequently become a target for people seeking publicity instead of progress. The record we set forth here and the data on these maps shows the reality.

From our perspective, occasional breakdowns and attacks do not deter us from our commitment to urban America. We will continue to market our products. We will continue to provide financial and human resource and in-kind support to urban organizations and programs. We have worked extensively with your staff in providing information about our position in the market and about the provisions in your bill. We look forward to working with your staff as that bill is further considered by this subcommittee. As things now stand, and as we see it, the goal that you intend to achieve through Federal legislation could be adequately received through actions taking place at the National Association of Insurance Commissioners. I believe Commissioner Willis told you about those activities when he appeared before you in Washington.

Thank you very much for the opportunity to address this subcommittee. Ms. Woodard and I would be happy to elaborate or answer questions, if we can.

[The prepared statement and attachment of Mr. Duncan follow:]

STATEMENT OF MICHAEL P. DUNCAN, VICE PRESIDENT AND ASSISTANT GENERAL
COUNSEL, ALLSTATE INSURANCE COMPANY

My name is Michael P. Duncan. I am Vice President and Assistant General Counsel of Allstate Insurance Company and with me is Rhonda Woodard, an Assistant Vice President. Ms. Woodard has worked as Underwriting Manager in three States, and most recently in our home office for 4 years as Underwriting and Product Development Director with responsibility for 28 States. We have submitted a written statement and request it be made part of the record.

We are both very pleased to be able to tell you that Allstate Insurance Company shares the serious concern the Chair of this subcommittee has for adequate service by the insurance industry to the urban market. We are aware, Madam Chairwoman, of your concern about the availability and affordability of insurance in urban areas and we applaud your conducting a hearing in Chicago on this matter. We appreciate your extending an invitation to us to testify. Our concern about urban markets is indicated by our willingness to serve the urban marketplace and by our share of that market. In our written statement we itemize various data that will not surprise you, as we have been working with you and your staff, and have provided this data and more.

We serve urban markets around the country in a number of ways. For example, we have 215 agents in the City of Chicago with 94 sales locations. The number of agents we have in Chicago is greater than the number we have in the whole of Illinois outside of the urban areas of Cook, Lake and DuPage counties.

But office location is not the only indicator of availability. We advertise extensively on television and radio and in the yellow pages and as is demonstrated by our distribution of business, we are accessible to all within the Chicago community. Additionally, our agency force solicits by telephone and by letter. In some cases we have more insureds in zip codes where we do not have agents than in zips where we do have agents.

We insure 186,097 automobiles in the City of Chicago. That represents 17½ percent of all the automobiles in the city. We insure 123,185 home and condominium owners in the city. That is 23.8 of that market. The number of renters policies we have in the city is 29,748. The number of separate fire policies for residences that we issue in the city is 9,887.

You asked us to address redlining. As you can see we do not engage in redlining. In fact, we have one set of underwriting standards applicable across the State.

You asked about the residual market. Residual markets are provided for those who cannot secure insurance through the voluntary market. Losses generated by

368

those in the residual markets are shared by the whole industry. In a State with healthy regulation and healthy competition like Illinois, you commonly find a small residual market. In Illinois less than 3⁄10 of 1 percent of the automobile and less than 1⁄2 of 1 percent of the property market are in the residual market.

Allstate's commitment to urban areas has also been demonstrated in many other ways. We have given financial support to many causes and organizations in our cities across the country. Additionally we have provided service on boards of directors of many of these organizations. And finally, we have a corporately sponsored volunteer program called Helping Hands, by which Allstate employees are encouraged to volunteer and donate their time and talents to the betterment of the lives of others including those affected by many urban oriented programs.

Allstate is also a strong supporter of neighborhood revitalization through our partnerships with Neighborhood Housing Services of America, the Low and Moderate Income Task Force of which our chairman Wayne Hedien is a co-chair, the National Urban League Board of Directors, the National Center for Neighborhood Enterprise Board, the Chicago Urban League Board, and the National Capital Corporation Board.

Another indication of our commitment to urban America is that our employees provide volunteer services through our Helping Hands Program in tutoring, senior citizen care, community service work, hospital volunteer and recreation. An employee named Mike Burnside co-founded an organization called New Cities Development Corporation to halt housing deterioration in neighborhoods in which he serves as an ordained pastor during off-hours. They purchase vacant, run down houses, refurbish them, and help make them affordable. Allstate has provided funds for this effort. We have received recognition for our urban contributions and, in fact, our chairman Wayne Hedien will accept an award this very day in Washington, D.C. from the National Alliance to End Homelessness.

Countrywide we have provided monetary, human resource and in kind contributions to hundreds of organizations and we will just name some of those that are Chicago based. The Austin Career Education Center, BUILD, Chicago Association of Neighborhood Development Organizations, Chicago Alliance for Neighborhood Safety, Chicago Urban League, Chicago Rehab Network, Clarence Darrow Center for Community Economic and Development, Community and Management Assistant Program, Family Rescue, Gateway Foundation, Health Advocacy Project of Little Village, Inner City Impact, Latino Institute, Leadership Counsel for Metropolitan open Communities, Little City Foundation, National Training and Information Center, National Housing Services of Chicago, Inc., Project Education, Project Serve, Rainbow House, Residents for Emergency Shelter, the Housing Resource Center, Chicago Coalition for the Homeless, and West Side Business Improvement Association, Inc.

We have also spent countless hours meeting with community groups. On occasion, these meetings have begun in confrontations but we have always been able to work with groups who pursue valid interests in good faith. We have a long history of cooperation with grassroots community organizations. The groups we have worked with have impressed us with their sincere commitment to addressing urban issues, and their work has yielded results. Our partnerships have included organizations such as Neighborhood Enterprise and the National Training and Information Center. Our successes with these groups is a direct result of our mutual agreement on goals that benefit the community.

There are times when these meetings are not productive and there are times when the sincerity and purpose of the community group appears to be other than reaching a successful result.

Because we are a large presence in the urban area, and we have a very recognizable public image, we frequently become a target for people seeking publicity instead of progress.

From our prospective, those occasional breakdowns do not deter us from our commitment to urban America. We will continue to market our products. We will continue to provide financial and human resource and in kind support to urban organizations and programs.

We have worked with your staff extensively in providing information about our position in the market and about the provisions in your bill. We look forward to working with your staff as that bill is further considered by the subcommittee. As things now stand, our view is that the goal that you intend to achieve through Federal legislation could be adequately achieved through actions taking place at the National Association of Insurance Commissioners. We understand that Commissioner Willis of the District of Columbia, and others, have related those actions to you in a prior hearing.

Thank you for the opportunity to address the subcommittee on these important issues. Ms. Woodard and I are willing to elaborate and answer any questions we can.





Mrs. COLLINS. Thank you. I think the first thing I would like to have you do is tell us about your maps.

Mr. DUNCAN. Yes. The maps indicate, by zip code, the market share that Allstate has. The market share for, take automobile, is at a minimum of 8 percent. The first category shown on the map is a dark color, represented, I think in 60626 and 60622, where we have 8 to 11 percent. The other categories are the yellow which is 11 to 13 percent. The medium blue there would be 13 to 18 percent. The green is 18 to 21 percent of the market. The dark purple would be anything over 21 percent.

In homeowners, those categories are yellow is 10 to 15 percent of the market, green is 15 to 20, the middle blue or the darker blue there is 20 to 30 percent, the greenish-brown color is 30 to 40 percent, and the darkest color on there is where we have over 40 percent of the share of the market.

Mrs. COLLINS. Mr. Duncan, in your testimony and just now you suggested, in lieu of proceeding with the redlining bill, you might want to wait for NAIC. Well, somebody ought to write a novel entitled "Waiting for NAIC". You know, one could wait forever. In too many cases, the NAIC alone—you know, it only starts to act when Congress gets involved. That is only to deflect pressure from congressional action to protect the NAIC's turf.

Now, the NAIC has been talking about doing something for a long time, and I do not see anything happening. I might consider giving the NAIC a role in the legislation, under the direction and oversight of the Commerce Department, but I cannot wait to see what NAIC is going to do anymore. Everybody in this room will be long gone by the time that they do anything. So, my question is why should I wait for NAIC to do anything? They have not done it thus far.

Mr. DUNCAN. We respect your position on that, Congresswoman, and we very much respect your intentions. We believe that the NAIC is active and acting. As I understand it, you have been told about their actions. They have on their agenda, for their meeting in June to deal with this issue, and I am sure they will.

Mrs. COLLINS. Well, I sure hope they will. It will be a new experience for me, since I have been chairing this subcommittee, to see they are moving at anything other than a snail's pace on any matter that we have looked at since I have been chairing this committee.

Anyway, let me say this. At IPAC, Mr. Creamer's testimony was that Allstate discriminates by income level. True or false?

Mr. DUNCAN. False.

Mrs. COLLINS. Absolutely?

Mr. DUNCAN. Absolutely.

Mrs. COLLINS. Unequivocally?

Mr. DUNCAN. Yes.

Mrs. COLLINS. That is a hard word to say; but, yes, anyway, right?

Mr. DUNCAN. Yes, indeed.

Mrs. COLLINS. OK. Why do you think these claims are?

Mr. DUNCAN. Well, I do not know. I will have to confess, I heard his testimony, and I saw the exhibits that were presented, and I do not understand them. So, if you will give us time to try and ex-

amine their testimony and their maps, we will see if we can get back to you and respond.

Mrs. COLLINS. What about 5 working days? Will that give you sufficient time?

Mr. DUNCAN. I do not know. As I say, I was—I found it confounding. We will do our best to get back to you very soon. We will try for 5 days.

Mrs. COLLINS. Are you aware that similar statements were made at our hearing earlier on this very subject, at which very much the same statements were made in Washington?

Mr. DUNCAN. Yes. Ms. Woodard would like to address that.

Mrs. COLLINS. Ms. Woodward.

Ms. WOODARD. A couple of things, Congresswoman, as it relates to income and race, and some of the correlations that are being drawn. The penetration in the marketplace, and the information that we put together, because we do not collect income as a part of the application or the insurance record with our customers is not one that we are familiar with working with.

I think what has happened is that the information that we have collected about where we write our policies, where we support them and where we are renewing them has been correlated over to the census information for what the income of the people who live in those communities are.

Mrs. COLLINS. So, you do use census information when you want to?

Ms. WOODARD. No, no. I am saying that I think Mr. Creamer is such——

Mrs. COLLINS. You have used census information; is that right?

Ms. WOODARD. No, ma'am. That is not what I said.

Mrs. COLLINS. You never use census information at all for any reason—not to find out about incomes or anything else?

Ms. WOODARD. Not as a part of underwriting criteria. Not as a part of our operations.

Mrs. COLLINS. Not as a part of a database, or any kind of informational basis? Marketing?

Ms. WOODARD. Not as part of—no ma'am.

Mrs. COLLINS. Why did you use that word "census?"

Ms. WOODARD. What I said was I think that Mr. Creamer may have drawn the correlation between the information in our records and information that may be in the census.

Mrs. COLLINS. Oh, I misunderstood.

Ms. WOODARD. Yes. I was saying that our records, because it is strictly——

Mrs. COLLINS. You said that you did not gather any information based on income?

Ms. WOODARD. On income, correct.

Mrs. COLLINS. However, you did look at census information to determine it? Did I correctly hear?

Ms. WOODARD. No, ma'am. What I was saying is that the information that we have on our policyholders has no income or census information.

Mrs. COLLINS. So, I was doing some selective listening, in other words?

Ms. WOODARD. Yes.

374

Mrs. COLLINS. OK.

Ms. WOODARD. What I am saying is that because that is the arena that they work in, they may have taken the information collected and drew a correlation between two separate databases.

Mrs. COLLINS. OK. My mistake.

Well, you heard a lot of things about Allstate. They said that—what was that terminology that was used, if I can read my writing—bait and switch? What about that bait and switch—when a person calls up and is given a quotation for coverage for homeowners coverage, and then a very short period of time later are told that they have to pay more money to get that same coverage? It was termed bait and switch. What were your thoughts when that was said?

Ms. WOODARD. I think for a customer who has been quoted without an agent maybe having benefit of seeing a property, for getting all of the physical information, for going out and properly rating it and classifying it, that can happen. I think it is unfortunate. One of the big things that we have worked on in the company is agent misquotes—that the agent gathers the information, does not do a good job, does not do a complete job. Then, when the policy gets into the office, we go through the process, and start to look at brick and frame and fire protection, and a number of things, or we verify what the replacement cost on the policy is going to be. There are a number of things that might change what the price is. That is a problem of agent quoting, and one that we have built a lot of things in to try to address, but it still remains a problem.

Mrs. COLLINS. It does not do much to make you win friends and influence people, does it?

Ms. WOODARD. No, it does not.

Mrs. COLLINS. I wonder why Allstate would not stand behind its agents in that case, rather than have the ill will that is out in the community as a result of that kind of practice?

Ms. WOODARD. One of the things that we are required to do is to charge the correct premium that is filed for the risk that is presented. It would be a nice service feature if somehow the company could absorb the cost of the agent's error.

Mrs. COLLINS. Well, can the company continue to keep an agent in its employ who does that repeatedly? You mentioned that it has been a recurring problem, maybe not with the same agent, but there is evidently a problem there.

Mr. DUNCAN. Correct. If we had an agent do that continuously, yes, we would take disciplinary action against him.

Let me add one other thing, if I may. That kind of thing does happen. It is a complex business. We are doing tens of thousands of transactions a day, and there are errors. If you look—if I may cite, I think it was Mr. McNarry's testimony for Illinois Public Action before you in Washington. He indicated that one of the reasons they like to have Allstate serving the community and want us to write more insurance is that we have such a low ratio of complaints. These are the kinds of things that would be reported in those complaints.

So, while we are sorry that Ms. Petty had a problem, this is not indicative of Allstate's practice or the experience of the Illinois Insurance Department, which puts out the numbers about the com-

004177

375

plaints about Insurance Companies. We were cited by Illinois Public Action as one of the best in complaint ratios.

Mrs. COLLINS. Well, you have heard testimony this morning about that Austin Office. What do you have to say about that—about the moving of the Austin Office.

Mr. DUNCAN. Well, we have not left. We are still there. There are agents there and there are claims people there. There are some functions that will be serviced from another location. Quite frankly, this is a common thing. We have, as we take advantage of technology, there are some things you can do better and do them differently. That is all that is going on there.

We know you are concerned about affordability of insurance. If we did not do things to take advantage of technological advances, to lower the price of insurance, we would be remiss in our duty, and we would probably not be accomplishing what you would like us to accomplish.

Let me say too that this is not just happening there. We did the same thing for the same reasons at an office in Mundelein, Ill. So, this is just part of a program to streamline and lower our costs and control it. We are going to provide and have promised to the people of Monclair, that we will provide excellent service in the future as we have in the past.

Mrs. COLLINS. Are you making that same promise to the people in the Northwest Austin Area?

Mr. DUNCAN. Yes.

Ms. WOODARD. We made the commitment to—we are currently working with the Planning Commission in the City of Chicago to find another drive-in location. The agents who are there, and the people who are there to write for us will be there through the end of the year. Hopefully, by the end of the year, our work with the Chicago Planning Commission will find us another location where people can bring their cars in and have estimates written. The majority of the loss reports and the claims that are reported are done by phone.

Mrs. COLLINS. At the Austin Office, you have agents who take claims and agents who write policies, I assume; is that right?

Ms. WOODARD. The agents have little involvement in the claim report taking; but, yes, they do write insurance business there.

Mrs. COLLINS. Where would the agents go if they left the Austin area? Would they be downsized? Where would the people in the Austin area get the service? I am afraid I did not really understand.

Ms. WOODARD. We think that, with this move, we will have more locations in—there are I think eight agents there who are all in one location. They have the option now of opening single individual locations of their own. We could very well end up with more locations, as a result of moving out of that facility into smaller neighborhood offices.

Mrs. COLLINS. I see. Is there any way to get a commitment from you at this time that the area will be served?

Mr. DUNCAN. You have that.

Ms. WOODARD. You have that.

Mrs. COLLINS. I have it?

Mr. DUNCAN. You bet.

376

Mrs. COLLINS. Thank you.

One of the industry criticisms of the recent ACORN report was that the data did not necessarily reflect all of the insurers doing business in the area and that, therefore, the conclusions about lack of coverage may not be valid. Mr. Duncan, don't you think that's a good argument for legislation that would require comprehensive reporting of insurance activities and practices in urban areas, like my bill?

Mr. DUNCAN. I apologize. I did not catch the start of your statement.

Mrs. COLLINS. I said one of the industry criticisms of the recent ACORN report was that the data did not necessarily reflect all of the insurers doing business in the area and that, therefore, the conclusions about lack of coverage may not have been valid. My question is don't you think that that is a good argument for legislation that would require comprehensive reporting of insurance activities and practices in urban areas? I also added, such as my bill.

Mr. DUNCAN. Yes. The answer is obviously we do not think so. As you know, we have met with your staff, and we have met for some time with you on the bill too, and gone through some of the concerns we have about it. Ultimately, as I say, I think we can do this in another manner, and do it in a manner we hope would be consistent with the records that we now keep, rather than engaging in new——

Mrs. COLLINS. Would you tell me what your objection would be to doing it based on census tract?

Mr. DUNCAN. Well, we do not keep data by census tract.

Mrs. COLLINS. Well, you have just heard Mr. Creamer say it would be just a very simple procedure to do it by census tract. Why would you not find it to be the same?

Mr. DUNCAN. I understand Mr. Creamer is an expert on many things, but we do not think he is correct about that.

Mrs. COLLINS. Ms. Woodard, you would agree that census tract would be difficult to get the information—it would be more difficult to get the information based on census tract than on zip code?

Ms. WOODARD. Yes, ma'am—that it would be very difficult to take the policyholder, database, and convert that—that it would not be either easy or inexpensive to do so, particularly when the end result of having done so would be reporting. I think if we could report the information—we could find a way to do that in our existing base, I think that it would serve our interest in keeping costs down. and serve your interests in knowing precisely what companies are doing.

Mrs. COLLINS. Well, it seems to me that, in order to determine the true extent of redlining, we would have to do more than what has been done. Allstate has been working by census tract and, thus far, it has not—we have not been able to see exactly what it is.

Now, Mr. Creamer, from Illinois Public Action, simply thinks that one reason why we do not have the information is because you have not given it to us, whereas, on the other hand, if we had the census tract information, it would be lying out there for everybody to see. You do not agree with that, Mr. Duncan?

Mr. DUNCAN. Well, I would suggest to you that, if you look at these maps, and you look at the share of business that we have,

it will not be hard for you to conclude that we are writing a heck of a lot of business all over the City of Chicago. If you have a desire to find out about other insurers, you know, I do not know how you are going to do that. From our perspective, first, we think that doing it by zip code is compatible with the way we do business today. We would like not to engage in another costly, expensive reporting relationship that does not relate to the way we do business.

Second, as you know, we are concerned about if this can be done by the States, which now regulate the insurance business, that is the way we think it should be done.

Mrs. COLLINS. The industry argues that denying insurance, based solely on the age of the property is not redlining. Now, it seems to me that the age of the property by itself, tells you very little about the risk. So, I want to know what the rationale is for such a policy. Mr. Duncan, or Ms. Woodward.

Ms. WOODARD. We do not use age alone as an underwriting criteria. Age is one factor that is evaluated. As we indicated in our written statement and in our oral statement, the underwriting guidelines that we use, we use across the State. They have to do with the number of losses. The things that age may be indicators of have to do with the condition of roofs or wiring or other elements that correlate to the possibility of losses occurring, more so than just the age, in and of itself.

Mrs. COLLINS. I would like to get back to another question about the number of agents in Austin.

Mr. DUNCAN. Yes. I believe we made an error on that. It is three.

Mrs. COLLINS. Exactly. That is what I am looking at. There is quite a difference there. OK. Well, I believe—did you want to add something more?

Ms. WOODARD. No, no. I think that was my mistake, when I was talking about the number of agents that were there in the Montclair, Claymont.

Mrs. COLLINS. OK. Mr. Duncan, I believe you said that I had your word that there was going to be a continuation of service in the Austin area. Is that correct?

Mr. DUNCAN. That is correct.

Mrs. COLLINS. OK. So, I do not need to pursue that any further. Your word is your bond, and I am satisfied with that.

Finally, in a recent—well, not finally—in a recent decision, the Seventh Circuit Court of Appeals upheld regulations of the Department of Housing and Urban Development that provided that the Fair Housing Act prohibits discrimination in the provision of property insurance. Does Allstate support this ruling?

Mr. DUNCAN. I have not read the case, so I really do not feel competent to comment on it. It may be——

Mrs. COLLINS. Well, that is one of the questions we will put in writing to you and would like to have answered in the next 5 working days.

Mr. DUNCAN. That is fine.

Mrs. COLLINS. Also, the question—another question would be does Allstate support vigorous enforcement of the Fair Housing Act, with respect to insurers? I will certainly want a clear-cut, decisive answer on that too.

Mr. DUNCAN. Thank you. I suspect that the two are related.

Mrs. COLLINS. I suspect too.

Mr. DUNCAN. We may believe that it does not apply—if it does not apply to us, obviously it could not be enforced——

Mrs. COLLINS. OK.

Mr. DUNCAN [continuing]. As to insurers.

Mrs. COLLINS. One of the concerns I have heard is that many insurers refuse to insure properties below a minimum value. What is the possible rationale for these policies, other than to redline poorer areas? Either of you?

Ms. WOODARD. There are a number of different policies and coverages, some of which we sell with the minimum value, some of which we do not. Our decision not to have a minimum value on a number of different policies, for that reason, to have as much market reach as we can. Typically, when there is a minimum, it is because, in our company, over a period of time, we have found that we can't break even because the numbers that we have at that value are not large enough to generate enough premium and market share for us to make a profit on it. So, over a period of time, we may have changed the minimum amount of insurance that someone can qualify for in order to get a particular policy.

Mrs. COLLINS. As I understand it, the Insurance Services Office, or ISO, generally uses a complete city as a territory, with the exception of New York City, which is subdivided into boroughs. How does this compare with your practice?

Ms. WOODARD. Our practice is to group a number of zip codes that are contiguous together—to look at the losses that have occurred by theft, burglary, fire, wind and hale—to look at all of that with a group of zip codes together. The difference in rates that are charged would then reflect the difference on the loss experience that has occurred within those zip codes that have been grouped together.

Mrs. COLLINS. I just have one final question. That is Illinois Public Action, when we looked at their analysis, we saw large disparities in insurance coverage by neighborhoods. When we compared the level of activity by State Farm and Allstate in white areas, versus black areas, say the Seventh Congressional District, versus the Fifth Congressional District, we see ratios of around 5 to 1 and 2 to 1 by Allstate, with respect to number of agents and policies. So, how do you respond to that?

Mr. DUNCAN. I think the response is indicated on these exhibits here. We have a higher share of the market for insurance in Chicago than we have as to our share for the whole State. We have a higher share in zip codes in Chicago—for example, I mentioned 60624 Garfield Park, in your district—than we have in the State of Illinois.

So, they make extraordinary claims, and they pull together that is hard to follow. They compare apples to orange. That is quite simple and quite honest, and I think the only exhibit that answers all of these questions.

Mrs. COLLINS. If you would be kind enough to prepare the data from which you did those two maps to the subcommittee, we would be very appreciative.

Mr. DUNCAN. You will have it.

Mrs. COLLINS. Thank you very much. Thank you for testifying before us this morning.

Mr. DUNCAN. Thank you.

Mrs. COLLINS. Our next panel will Mr. Thomas J. Weatherspoon, executive assistant-agency, State Farm Mutual Automobile Insurance Company, who will be accompanied by Ms. Judith Mintel, who is the associate general counsel, and Ms. Louise Perrin, who is the agency manager. Will you come forward, please?

Mr. Weatherspoon, you may begin.

## STATEMENT OF THOMAS J. WEATHERSPOON, EXECUTIVE ASSISTANT-AGENCY, STATE FARM MUTUAL AUTO INSURANCE CO., ACCOMPANIED BY JUDITH MINTEL, ASSOCIATE GENERAL COUNSEL, AND LOUISE PERRIN, AGENCY MANAGER

Mr. WEATHERSPOON. Madam Chairwoman, and members of the subcommittee and staff, I appreciate the opportunity to appear before you and share our State Farm story. I have provided you with a copy of my written statement, and I ask that you please enter it as a permanent part of these hearings.

Mrs. COLLINS. Your statement in its entirety will be made a part of the record.

Mr. WEATHERSPOON. Thank you.

My name is Tom Weatherspoon. I am an Executive Assistant representing the State Farm Insurance Companies. I have with me Judith Mintel and also Louise Perrin. As you know, State Farm is our home—or rather has our home in Illinois. I was an agency director in the Chicago area, with responsibility for managing several Chicago agents before being promoted to my current position. I have also been an agent and manager and have personal knowledge of State Farm marketing activities in Chicago.

During the past 20 years I have worked tirelessly along with State Farm agents and all levels of management, many of whom are African American and Hispanic, all in a partnership to build a diverse company, whose goals include representing a diverse market. I must confess to you, we are all frustrated and feel a sense of betrayal with the unsubstantiated charges of redlining that have been directed toward our company.

It is State Farm's corporate policy and philosophy to treat all people fairly and to avoid any and all unfair and illegal discriminatory practices. This is communicated regularly to State Farm agents and employees involved in the selling and servicing of insurance policies. We offer all of our insurance products to the general public in a manner that does not discriminate on the basis of race, color, religion or national origin. Therefore, we feel that the charges of redlining concerning State Farm, based on misleading and inaccurate data are not only untrue, but also tend to impede further progress in dealing with urban issues.

Specifically, with respect to the City of Chicago, State Farm is involved in extensive and ongoing efforts to include all residents of Chicago's diverse population in our business activities. We have more than 165 agent offices located throughout the city. In the past 5 years, the number of State Farm agents locating their offices in the City of Chicago has grown by 15 percent. Regardless of whether or not the State Farm agent's office is located in a particular zip

code, our agents have no territorial restrictions, and they insure cars and homes on a nondiscriminatory basis throughout the city. As evidence of this, we have had significant growth in the number of homes and cars insured in the City of Chicago in the past few years at a time, I might add, when the population of the city has been declining.

Currently, State Farm insures more than 300,000 cars, more than 175,000 homes and apartments and more than 9,000 rental dwellings in virtually all Chicago zip codes. The extent of State Farm's business activities throughout the City of Chicago is clearly indicated by the maps in attachment 2 and as you can see here on the easel.

The green symbol on the first map represents the location of 165 State Farm agent offices. The dark blue symbol shows the location of our 14 claims service centers, including one under construction in Hyde Park. The red symbol shows the 18 neighborhood banks in which we have significant deposits set aside to provide support for minority-owned businesses. The light blue symbol shows the area where we are involved in projects to help clean up and beautify various Chicago neighborhoods. Also, this map shows the number of agents who service 25 or more policies on risk located in selected zip codes where an agent had not yet chosen to locate. As you can see, in zip code 60622, for example, we have 65 agents who service 25 or more policies.

The second map in attachment two shows the result of our marketing efforts in Chicago. The green indicates the zip codes where we have 1,500 or more State Farm policies in force. In fact, there is virtually no resident in the Chicago area who is more than 5 miles from a State Farm agent.

Madam Chairwoman, I am near the end of my time. I might remind you to review carefully my written statement, as the balance of it deals with the extent of State Farm's business activities throughout the City of Chicago.

In conclusion, I appreciate the fact that you are concerned about this issue. I assure you that we are concerned as well. I encourage you to be our partner as we continue to address the insurance needs of this and every community in the future. Thank you.

[The prepared statement of Mr. Weatherspoon follows. Attachments to the prepared statement are retained in the subcommittee files.]

STATEMENT OF THOMAS J. WEATHERSPOON, EXECUTIVE ASSISTANT-AGENCY, STATE FARM INSURANCE COMPANY

Representative Collins and members of the subcommittee and staff, I am Tom Weatherspoon representing State Farm. Illinois is our home State. I was a State Farm agency director in Illinois with responsibility for managing several Chicago agents before being promoted to my current position; I have also been a State Farm agent and I have personal knowledge of State Farm marketing activities in Chicago. State Farm insures a significant number of autos, homes and small businesses in Chicago as well as in all areas of this country.

We take very seriously the recent charges of discrimination made by others before you and other Members of Congress. While State Farm continuously reviews and reexamines our business practices with a view towards improving service and the availability of our insurance products, it is State Farm's Corporate Policy and Philosophy to treat all people fairly and to avoid any and all unfair and illegal discriminatory practices. This is communicated regularly to State Farm agents and employees involved in the selling and servicing of our insurance policies. Attachment I to

this testimony provides a description of our underwriting philosophy and contains a letter from State Farm's president to all employees and agents reminding them of our strong commitment to avoid any unfair or illegal discriminatory practices in the homeowners insurance line.

State Farm offers all our insurance products to the general public in a manner that does not discriminate on the basis of race, color, religion or national origin. Unsubstantiated charges of "redlining" or illegal discriminatory practices concerning State Farm based on misleading and inaccurate data are not only untrue, but also impede further progress in dealing with urban problems.

Specifically, with respect to the City of Chicago, State Farm is involved in extensive and ongoing efforts to include all residents of Chicago's diverse population in State Farm business activities. The Company has more than 165 agent offices located throughout the city. In the last 5 years the number of State Farm agents locating their offices in the City of Chicago has grown by 15 percent. In addition to the 165 agents whose offices are located in Chicago, many more State Farm agents whose offices are not within the city limits service policyholders located in the city.

Regardless of whether or not a State Farm agent's office is located in a particular zip code, State Farm's agents have no territorial restrictions and they insure cars and homes on a nondiscriminatory basis throughout the city. As evidence of this fact, State Farm has had significant growth in the number of homes and cars insured in the City of Chicago in the past few years at a time when the population of the city has been declining.

Most importantly, large numbers of Chicago consumers irrespective of their race, color, religion, national origin or income are State Farm policyholders and receive important financial and other services from State Farm. Currently, State Farm insures more than 300,000 cars, more than 175,000 homes and apartments and more than 9,000 rental dwellings in the City of Chicago. This volume of business and the fact that it is located in virtually all Chicago zip codes demonstrate that charges of "redlining" concerning State Farm are untrue.

The extent of State Farm's business activities throughout the City of Chicago is clearly indicated by the maps in Attachment II. The first map indicates by zip code location State Farm agent offices, our claim service centers including one under construction in Hyde Park, the neighborhoods in which State Farm volunteers have participated in revitalization efforts. As a quick glance will reveal, there is extensive State Farm involvement throughout the City. However, office location is not a true measure of State Farm marketing activity. Also shown on the first map is the number of agents who service 25 or more policies on risks located in selected zip codes. these zip codes were selected because no State Farm agent had chosen to locate an office there. This portion of the map illustrates significant State Farm activity even in those zip codes that have no State Farm agents physically located there. It is important to note that no one in the City of Chicago is more than 5 miles away from a State Farm Agent.

The second map in Attachment II shows the ultimate result of all of State Farm's marketing efforts. When each zip code in which 1,500 State Farm policies are in force are colored green, it becomes clear that State Farm insures a large number of cars, homes and small businesses in virtually all areas of the City.

State Farm has also made significant investments in corporate property in Chicago to serve our growing policyholder population. In the last 2 years alone State Farm has:

—Purchased land and built a claims service office in Hyde Park. Our investment: $1.9 million.

—Updated an existing claims service office in Riverview. Our investment: $865,000.

—Purchase land and built a claims service office on South Halstead Street. Our investment: $2.2 million.

—Updated an existing claims service office on South Archer Street. Cost: $839,000.

Last month the African-American Contractors Association awarded State Farm the 1993 Outstanding Majority Corporation of the Year Award. This award was presented as a result of State Farm's activity in constructing these additional claim facilities in the City of Chicago and insisting on a high level of minority contractor and subcontractor representation.

We also actively participate in programs and activities to improve deteriorating neighborhoods. In 1992 State Farm received an award from the Social Compact for our many years of participation in programs of the Neighborhood Housing Services (NHS) organizations. This NHS award program recognizes and encourages voluntary efforts to stimulate the flow of capital and delivery of financial services to low and middle income neighborhood. A major center for our NHS activities has

been Chicago, Illinois. State Farm has provided direct cash support as well as significant contributions to the NHS secondary mortgage program. In addition to a long-term financial commitment, State Farm volunteers regularly participate in NHS-sponsored neighborhood beautification campaigns. Projects involve general clean-up, yard work, landscaping, painting and carpentry. Some of the Chicago neighborhoods recently receiving State Farm volunteer assistance are Central Austin, and Roseland. Attachment III contains information on our activities with NHS.

State Farm has extensive investments in Chicago including many innercity neighborhoods. For example, State Farm provides $1 million in interest-free deposits to four neighborhood banks in the Chicago area in cooperation with the Austin District Development Corporation. The funds are available for lending by the banks to small businesses in the Austin neighborhood. In addition, State Farm currently has a roster of over 94 financial institutions nationwide participating in the State Farm minority bank program. This program (operated in conjunction with the Federal Government program established in 1969 to provide support for minority-owned businesses) currently includes several Chicago banks. Importantly, State Farm also has significant investments in bonds that fund government projects in urban areas. The par value of all Chicago and Cook County bonds held by State Farm Companies as of December 31, 1992 was close to $74 million.

There are several other important areas of State Farm's business practices in the City of Chicago, such as advertising, employment and educational opportunities, participation in community organizations and our constructive role in public policy deliberations and decisionmaking which merit comment. Attachments IV, V and VI explain in more detail the positive and constructive role State Farm has played in these areas. In your invitation to State Farm you also requested comments on your proposed legislation. Attachment VII contains our comments on H.R. 1188.

As can clearly be seen State Farm is committed to serving the insurance marketplace in all areas of Chicago and any allegations of "redlining" concerning us are simply untrue. Thank you for this opportunity to express State Farm's views.

Mrs. COLLINS. Well, the first question is the same. As we look at the analysis that the Illinois Public Action had on its map—and I had to bring it up here so I could see it a little bit better—we see large disparities in the insurance coverage by neighborhood. If we compare the level of activities with State Farm and Allstate and white versus black areas, say the 5th Congressional District, as opposed to the 7th Congressional District, we see ratios of around 5 to 1 and 2 to 1 by Allstate, with respect to numbers of agents and policies, but ratios of around 9 to 1 and 5 to 1, respectively, by State Farm.

I want you to comment on these statistics. They would seem to indicate that State Farm avoids black areas proportionately more than Allstate. Your comment, please.

Mr. WEATHERSPOON. First of all, I think those facts and numbers are not fair or true in fact. I would simply point you to the number of agents who are represented here today, and I think you would realize that we have a large number of African American agents and Spanish agents who represent these areas very well. I would say to you that that is just not a true statement.

Mrs. COLLINS. Well, I am not as worried about—concerned about the number of agents you have here, as about the number of people who live in these neighborhoods who have insurance coverage by State Farm. Can you give us proof that you serve a substantial number of people in the 7th Congressional District.

Mr. WEATHERSPOON. Sure. I would ask you to look at the map that we prepared here for you. Again, that map means that all of those areas in green, which include the 7th Congressional District, we have over 1,500 policies in every one of those zip codes.

Mrs. COLLINS. How do you compare the 1,500 to the study that IPAC has done?

Mr. WEATHERSPOON. I would simply have to say to you that the information that they provided in their testimony and the statements that were made here today, I do not have a clue how they have come to those figures or what they mean. I can simply tell you what I know we do at State Farm. Having been a marketing officer in this area, I know that we continue to market our business in all areas of Chicago.

Mrs. COLLINS. It is my information—I have just been told in fact, that IPAC used State Farm data and that this seems to be a discrepancy between what you have said and what IPAC has said based on State Farm data. Are you aware of that?

Mr. WEATHERSPOON. Let me ask Judy Mintel to respond to that.

Mrs. COLLINS. Sure.

Ms. MINTEL. Representative Collins, we were not provided a copy of the study that IPAC did using our data, so it is very difficult for us to comment at this time. We will get an opportunity to review it now that we have it in our hand, and we will be glad to provide you an analysis.

I would have to say though that just right off the bat, in Mr. Ingram's letter to you, we have provided several caveats, in terms of the use of that data, none of which it seems that IPAC had read or at least digested. For example, on 60612, which is one of the zip codes here on the near west side, some of the information released by the Federal Government indicates that there are approximately 1,300 households or housing units in that zip code. Some of the other zip codes, for example, Lincoln Park, which is 60614, has close to 40,000 households. So, just based on some of the newspaper coverage and a quick look at what IPAC has done, it seems to me that they have done no adjusting for the number of households. For example, they are saying we write many more households in Lincoln Park, and that indicates racial discrimination, but they have not even looked at how many households are in that zip code available for insurance.

Mrs. COLLINS. Well, we take data from various places. It seems to me one way of clarifying all of this and making sure it is on the same basis, and that we are not comparing apples to oranges or grapes or something else, is to use census data. If you use census data, you have the demographics that are already there, the numbers of people, the households and all of that information, which is what my bill would in fact do. Then we would not have these wide disparities in these analyses of Allstate or any other insurance company or any other group in the newspaper or anybody else. It would all be the same. So, that is one of the reasons why I have introduced this legislation, because I think we need to know exactly. I am concerned about redlining. It is a problem.

Now, as you have heard also, Illinois Public Action testified that it appears that State Farm just does not get it—that, you know, State Farm is reluctant to insure people who are Hispanics or who are African Americans. I mean, this is an awful harsh statement to make, but it seems that that is the case. Now, how do you justify that, Ms. Mintel?

Mr. WEATHERSPOON. This is Ms. Perrin.

Mrs. COLLINS. Ms. Perrin, I am sorry.

384

Ms. PERRIN. Yes, Madam Chairwoman. Being an agent—I was an agent in the Chicago area, now I am an agency manager. I can state, as an agent, I did not discriminate and I know my fellow agents do not discriminate based upon race, religion, economics or creed. We do not discriminate. Agents are independent contractors and as independent contractors, they want to write business wherever it may be. We do have over 500 agents who do service the 7th Congressional District. We have 70 agents who are located in zip codes in your district. Nowhere within your district is a resident more than 5 miles within an agent's office.

Also, as an African American and also someone who happens to live in the west side, speaking from experience, I live in an area on the southwest side. When I moved to the west side, my insurance rates dropped. A lot of statements have been made here that I can speak from first hand experience, just are not true.

Mrs. COLLINS. Well, you are about the only person I have ever heard that said when they moved that their insurance rate drops. I mean, the insurance companies are not known to drop rates. I do not doubt the veracity of your statement, because it probably happened in your individual case.

Ms. PERRIN. The rates are standard for the territories, and my rates did go down, my homeowner's rate.

Mrs. COLLINS. I do not doubt that. I do not doubt that one bit.

Let me say this now, Mr. Weatherspoon. You object to the use of census tracts; is that right?

Mr. WEATHERSPOON. Yes. For us to tell the story, we do not keep our records based on census tracts.

Mrs. COLLINS. Well, the banks have been required to use census tracts for a number of years now in order to give mortgages. There are inexpensive computer programs that translate addresses into census tracts, so what is the problem?

Mr. WEATHERSPOON. I am going to ask Judy to answer that question for you. Again, I can simply say that our data is not kept that way. I think she can give you a further explanation.

Ms. MINTEL. Representative Collins, I think our basic problem with census tract data is that we have not done it in the past. If we convert to census tract data, which, as you indicate, it is possible to do, although very expensive and not within the timeframes allowed by your bill, we could convert; but your bill also does not preempt State regulations, so we are required to report zip code information to approximately 25 or 30 States. That means that we would have to keep both the zip code indicator, which is going up to nine digits now, along with the census tract indicator which is, based on our estimates, going to be 13 or 14 indicators on a computer record. This is a very large storage area. I cannot give you all of the technical details, as far as the data processing. State Farm insures millions and millions of cars and homes and the volume of data that you are talking about is so large that you are going to have a computer at the Department of Commerce that rivals the Department of Defense to manage all that data.

We hope that we can work with you and your staff to get a manageable database that will provide the information that you think you need.

385

Mrs. COLLINS. All of the information that I know I need—not that I think I need—is information that we need to prove that redlining is in fact alive, because we do not seem to get the same answers when we talk to the insurance companies, and we talk to the people who want to be insured, and we look at the lack of insurance, and we talk to banks about mortgages and the possibility of people getting insurance and what have you. We know that redlining is alive and we know that we need this information. So, I will just correct you on that. Not that I think we need, but what we must have.

Ms. MINTEL. All I can tell you is that State Farm practices are not as you describe.

Mrs. COLLINS. Well, I do not doubt that either; but we are trying to get to the core of the matter here. I am sure that census information would help us get to the core of the matter.

We need, if you will please, submit for the record the list of the 70 agents that you say are in the 7th Congressional District. That data we do not happen to have right now, and we would appreciate if you would submit it for our record within the usual 5 working days. That would be very helpful for us to close this out.

Now, question. Of those 70 agents, what percentage is that 70 of the total number of agents you have in the 7th Congressional District? Are those 70 black agents or 70 agents, period in the 7th?

Ms. MINTEL. 70 agents, in total that are in the zip code.

Mrs. COLLINS. How many of those are African American or Hispanic?

[No response.]

Mrs. COLLINS. Nobody knows? Lord only knows. Could you get that information for me too, please? How many are in the city or the suburbs, such as Maywood, just outside of the Chicago area.

Ms. MINTEL. Let me make sure I have your question. You would like to know——

Mrs. COLLINS. How many are Hispanic or African American? How many are within the City of Chicago or outside the City of Chicago, yet within the 7th Congressional District? That would be very helpful to us.

Ms. MINTEL. OK.

Mrs. COLLINS. OK. If you have it statewide, that would be helpful too, but particularly in the 7th Congressional District or citywide. Let's make it citywide.

Ms. MINTEL. Citywide. All right.

Mrs. COLLINS. OK.

Ms. MINTEL. We will provide it to you, assuming we have it. I just have a question——

Mrs. COLLINS. You do not have any information over at State Farm? Everything I am asking for, you do not seem to have.

Ms. MINTEL. Well, that is not true. We have provided you extensive information.

Mrs. COLLINS. Provide me with the 70 agents that you have who are in the 7th Congressional District. Break it down as to who is Hispanic and who are African Americans and by city. If, in fact, some of those 70 are within the 7th Congressional District, but outside the boundaries of the city, in Westchester, Hillside, Maywood,

004188

River Forest, Berkeley, let me know that too, because that is all a part of the 7th Congressional District.

Ms. MINTEL. We will do the best we can.

Mrs. COLLINS. Downtown of course—you know we go to the lake out here—beyond the lake we do not worry about.

Well, this is kind of a little nitty question, but anyway, according to Illinois Public Action, Allstate serves higher-income African American communities. What is your reaction? How do you compare State Farm's performance to Allstate's on the income issue?

Mr. WEATHERSPOON. I would have to tell you that, from being a marketer and a marketing officer in this area, I do not keep records by income. Our agents, who are independent contractors, do not keep their records or insure by income. They simply insure individuals who meet the underwriting standards and criteria that we have. Income has not been an issue or a question that they would ask.

Mrs. COLLINS. Do you have a minimum level for the property? Do you have a minimum level that you will cover or will not cover?

Mr. WEATHERSPOON. We have no minimum level.

Mrs. COLLINS. OK.

One of the industry criticisms of the recent ACORN report was that the data did not necessarily reflect all the insurers doing business in the area and, therefore the conclusions about lack of coverage might not have been valid. Don't you think that this is a reason for using census tract as opposed to zip code information?

Mr. WEATHERSPOON. Once again, what you say may be of importance. We think that the way we do it right now has served very well. As Judy said earlier, to change our census to reflect census data would be very very costly and very cumbersome.

Mrs. COLLINS. The same question I asked to Allstate. The industry argues that denying insurance based solely on the age of the property is not redlining. It seems to me that the age of the property by itself tells one very little about the risk. What I want to know is what is the rationale for such a practice? Ms. Perrin?

Ms. PERRIN. Yes. We do not redline based upon the age of the property. We have policies that we insure homes built before 1950 and built after 1950. We do not redline based upon the age of the home. If it meets our underwriting guidelines, regardless of the age, we can write it.

Mrs. COLLINS. Do you redline at all?

Ms. PERRIN. To the best of my knowledge and understanding, no.

Mrs. COLLINS. Mr. Weatherspoon?

Mr. WEATHERSPOON. Jus let me follow-up a little bit.

Mrs. COLLINS. Do you redline at all?

Mr. WEATHERSPOON. No, we do not redline. We do not redline at State Farm. There is no question about that. When we write our policies that are prior to 1950 that Louise was making reference to, it is the construction of the home that is important. That decision is also the kinds of wiring that is used and the kinds of materials that were used in the building of those homes that has changed with what we do today. In answer to your question, we do not redline at all.

Mrs. COLLINS. Well, talk to me about the construction of the home that was made prior to 1950, of a house of a certain kind was

387

built prior to 1950 in say Lawndale, and a very similar house, using the same construction methods and materials were used in say Park Ridge, would there be a difference in the cost of the coverage for the house?

Ms. MINTEL. I think Mr. Weatherspoon has given me the microphone. The answer is no. Our underwriting guidelines do not differ by geographic area in the State. I think he gave it to me because my house in Bloomington has an HO3 with a market value endorsement. That house was built in 1922. I do not really view the coverage that I have in my house as inferior coverage. My house would be very expensive to replace. I could not afford the policy if it were on a replacement cost basis. State Farm is not anxious to try to find plasterers and people with slate and leaded glass and that kind of thing that is in my house. So, I do not think it is really legitimate or fair to categorize the type of coverage that I have as inferior. It was what I selected.

Mrs. COLLINS. Would your rates be different if the house were in Park Ridge, as opposed to Lawndale—same house, same conditions, same construction? Mr. Weatherspoon, would your rates for the coverage be different?

Mr. WEATHERSPOON. Well, the rates would be the same. I think there are other factors that might influence that.

Mrs. COLLINS. What would they be?

Mr. WEATHERSPOON. Those factors would be our particular loss experience in any given area.

Mrs. COLLINS. So, that would bump it up a little bit in Lawndale?

Mr. WEATHERSPOON. Well, I cannot say that for sure. I do not know what those experiences are right in front of me now. I would say to you——

Mrs. COLLINS. Do you have any idea?

Mr. WEATHERSPOON. Let me finish this statement. I would say to you that, if the experience of losses from storm history, from crime or whatever were higher in that area, then indeed it would be higher. It would just depend on that particular area. I would say to you that around the City of Chicago we have our highest and lowest rates within that very area.

Mrs. COLLINS. As I understand it, ISO generally uses a complete city as a territory, with the exception of New York City—the same question I asked Allstate—which is subdivided into boroughs. How does this compare to your practices at State Farm?

Ms. MINTEL. We have to distinguish between auto insurance and homeowners' insurance. In auto insurance, the State of Illinois has required a uniform rate within the City of Chicago, and that, for the mandatory coverages, and that is what we use.

In the homeowners' area, we have five different rate levels, based on the claims experience, both claims severity and claim frequency that Mr. Weatherspoon referenced. So, the answer is both. We have a single rate and then also, in the homeowners' area, we have multiple rates. I would say, in general, for most cities across this country, that is typical.

Mrs. COLLINS. Is there anything further you would like to add for the record, either of you? Ms. Perrin?

Ms. PERRIN. Having been with State Farm for 8 years, and also living in the City of Chicago, State Farm has been very active in activities, helping to spur business development on the west side. We have deposited like a million dollars in three of the banks on the west side of Chicago to help spur business development. You have State Farm and employees who are active in the Best Program, which is a mentoring, tutoring, classroom instructional program with the Emmett School on the west side. We are also very active in neighborhood housing. Our agents and employees are doing things within the City of Chicago, and do have a vested interest within the city.

Mrs. COLLINS. Thank you. Thank you very much for your testimony.

I asked Mr. Creamer if he would stay around, because I probably would want to recall him. He has agreed to do so. At this point, I am going to ask Mr. Creamer to return to the witness stand. You are excused. Mr. Creamer.

Mr. Creamer, you have seen and heard the testimony here. What are your thoughts about some of the testimony, as it relates to the study that was done at IPAC, and perhaps to the one that was done with ACORN? I know you know much more about the IPAC one, so that is the one I want you to respond to.

Mr. CREAMER. There are several points we should make. First, there was an interesting criticism made by the State Farm agents, or pardon me, State Farm representatives, with respect to the issue of their per capita or per household number of policies. They used as an example in their testimony, the comparison of the number of policies, home policies in 60614, which is the Lincoln Park area, noting there are 40,000 units there, and there are 7,432 policies, in 60612, where they pointed out there were only 1,300 households. Unfortunately, there are only 563 policies there. If one adjusted the number of policies for the number of households, you would still find a discrepancy of 5 to 1 holding the number of households constant, as between the 60612 zip code and the 60614 zip code. In other words, there are five times more policies sold in 60614 by State Farm than there are in 60612, after adjusting for household numbers. At least according to the numbers they presented.

This is exactly why the kind of data that you are requesting, based upon census tracts, that allows us to adjust specifically for households, that allows us to adjust specifically for the number of people per capita or the number of automobiles and income and racial makeup of these communities is so critical.

Now, let me point out, in addition, we would be more than happy to discuss a very large consulting contract to show State Farm and Allstate how they can, for precious little money, convert their—and solve this massive data problem we just heard about. Madam Chair, we have multi-hundreds of thousands of members on which we keep zip code data and four-digit zip code data on a very small computer. I am sure the people from State Farm know very well that data storage is a minuscule problem when it comes to this issue, and the real question is very simple. They do not want this data made public.

Now, let me add an addition on the question of loss. The issue of loss experience has been raised by the two companies. I would